**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| MARK WARREN PEARY, individually and in his capacity as executor of the Estate of Joseph Shuster,<br><br>    Plaintiff,<br><br> vs.<br><br>DC COMICS, INC., a New York corporation; DC COMICS, a New York general partnership; DC ENTERTAINMENT, INC., a Delaware Corporation; WARNER BROS. DISCOVERY, INC., a Delaware Corporation; and DOES 1-10,<br><br>    Defendants. | Civil Action No. 1:25-cv-00910<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

---

Plaintiff Mark Warren Peary ("Plaintiff" or "Peary"), for his complaint against Defendants DC Comics, Inc., DC Comics, DC Entertainment, Inc., and Warner Bros. Discovery, Inc. alleges as follows:

## NATURE OF THE ACTION

1.  This action seeks to vindicate the foreign copyright interests of Joseph Shuster ("Shuster"), the co-creator of Superman, in the wake of their automatic statutory reversion to his estate ("Shuster Estate") under the parallel copyright laws of certain foreign countries.

2.  At issue are foreign copyrights to the original Superman character and story, co-authored "on spec" by Jerome Siegel ("Siegel") and Shuster. Though Siegel and Shuster assigned worldwide Superman rights to DC's predecessor in 1938 for a mere $130 ($65 each), the copyright laws of countries with the British legal tradition—including Canada, the United Kingdom, Ireland, and Australia—contain provisions automatically terminating such assignments 25 years after an author's death, vesting in the Shuster Estate the co-author's

1

undivided copyright interest in such countries.

3.    Shuster died in 1992 and Siegel in 1996. By operation of law, Shuster's foreign copyrights automatically reverted to his estate in 2017 in most of these territories (and in 2021 in Canada). Yet Defendants continue to exploit Superman across these jurisdictions without the Shuster Estate's authorization—including in motion pictures, television series, and merchandise—in direct contravention of these countries' copyright laws, which require the consent of all joint copyright owners to do so.

4.    Prior Superman litigation regarding the U.S. Copyright Act's termination right, 17 U.S.C. § 304(c), rightly or wrongly determined that Shuster's heirs could not exercise that U.S. statutory right based on a 1992 agreement with Shuster's siblings, years prior to the probating of his estate. Plaintiff accepts and in no way here challenges that outcome. But that litigation, crafted by Defendants, conspicuously left the foreign rights at issue here entirely unaddressed. Indeed, in a closely related case regarding Siegel, Defendants insisted (and prevailed on their argument) that the U.S. termination claim at issue had no extraterritorial effect whatsoever on their foreign rights. This action therefore presents a clean slate for vindicating valuable rights that have now vested in the Shuster Estate by the automatic operation of foreign copyright law.

5.    Plaintiff, as executor of the Shuster Estate, seeks damages and injunctive relief for Defendants' ongoing infringement in Canada, the United Kingdom, Ireland and Australia, as well as declaratory relief establishing the Shuster Estate's ownership rights across relevant jurisdictions. The matter is ripe for adjudication, as Defendants are actively planning a major new Superman motion picture and other derivative works for imminent worldwide release.

## PARTIES

6.    Defendant DC Comics, Inc. is a corporation organized under the laws of the State of New York, which has its principal place of business at 4000 Warner Blvd., Burbank, California 91522.

7.    Defendant DC Comics is a general partnership organized under the laws of the State of New York, which has its principal place of business at 1700 Broadway, Lbby 1, New York, New York 10019.

8.    Defendant DC Entertainment, Inc. ("DC Entertainment") is a corporation organized under the laws of the State of Delaware, which has its principal place of business at 4000 Warner Blvd., Burbank, California 91522. Defendants DC Comics, Inc., DC Comics, and DC Entertainment, individually and/or collectively, are hereinafter referred to as "DC."

9.    Defendant Warner Bros. Discovery, Inc. ("Warner Bros.") is a corporation organized under the laws of the State of Delaware, which has its principal place of business at 230 Park Avenue South, New York, New York 10003. (Warner Bros., DC Comics, Inc., DC Comics, and DC Entertainment are sometimes collectively referred to herein as the "Defendants"; each reference to Defendants shall also refer to each Defendant.)

10.    Plaintiff Mark Warren Peary is an individual that is currently residing in, and is a citizen of, the State of New Mexico.

11.    Plaintiff is the nephew of Joseph Shuster and is the executor of the Shuster Estate, *In re: Shuster, Joseph*, BP080635, Los Angeles County Superior Court.

## JURISDICTION AND VENUE

12.    The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), as the claims are between citizens of different states, and the amount in controversy,

exclusive of interest and costs, exceeds $75,000.

13.     By way of example, the last feature film to focus primarily on Superman, *Man of Steel* (2013), had a theatrical box office gross of $46,198,857 in the United Kingdom and Ireland, $291,045,518 in the United States and Canada, and $21,880,008 in Australia. The value of the copyright thus vastly exceeds $75,000.

14.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, as Plaintiff's claims arise under the Berne Convention for the Protection of Literary and Artistic Works, a treaty to which the United States is a party and that Congress has implemented. Pub. L. 100-568, 102 Stat. 2853 (Oct. 31, 1988).

15.     This Court has subject matter jurisdiction over the declaratory claim pursuant to 28 U.S.C. § 2201.

16.     This Court has personal jurisdiction over Warner Bros., DC Comics, Inc. and DC Comics because they are either domiciled in or have their principal place of business in the State of New York.

17.     This Court has personal jurisdiction over DC Entertainment because it regularly does business in the State of New York and has such substantial contacts with it as to warrant general jurisdiction. Specific jurisdiction is also proper because the claims in this Complaint arise out of transactions and occurrences within the State of New York.

18.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1), because DC Comics, Inc., DC Comics, and Warner Bros. reside in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

### Siegel and Shuster Create the First Superhero

19.     Working together in New York City in 1933, graphic artist Joseph Shuster and writer Jerome Siegel conceived on their own volition a cartoon strip featuring the first "superhero": a unique man of superhuman strength and powers who would perform feats of great importance for the public good—an original concept that embodied our nation's ideals at the world's darkest hour. They named their character "Superman."

20.     In or about 1934, also in New York City, Siegel and Shuster co-authored on their own volition fifteen daily Superman comic strips, consisting of one week (six days) of completely inked daily Superman comic strips and three additional six-day weeks of "Superman" comic strips in penciled form (the "1934 Superman Comic Strip"). "Superman" was submitted by Siegel and Shuster to numerous publishers over the next few years.

21.     In or about January or February 1938, the New York City-based comic book publisher Detective Comics, the predecessor to Defendants DC and Warner Bros., expressed interest to Siegel and Shuster in publishing their 1934 Superman Comic Strip in a magazine. In response, Siegel and Shuster cut and pasted their 1934 Superman Comic Strip into more than ninety separate panels, to render their newspaper strip more suitable for a magazine layout (the "Revised 1934 Superman Comic Strip").

22.     By an instrument dated March 1, 1938 (hereinafter, the "1938 Grant"), which had been prepared by Detective Comics, Siegel and Shuster agreed to the publication of their Revised 1934 Superman Comic Strip by Detective Comics. A true and correct copy of the 1938 Grant is annexed hereto as Exhibit 1. Siegel and Shuster were not represented by counsel in the transaction, concluded in New York City. As consideration for the 1938 Grant, Siegel and

Shuster received $10 per page of the subject publication, equal to a total of $130, or $65 each.

23.    Thereafter, Detective Comics published Siegel and Shuster's Revised 1934 Superman Comic Strip in the June 1938 issue of *Action Comics No. 1*,  which was issued for sale from New York on April 18, 1938.

24.    *Action Comics No. 1* and the predecessor materials created solely by Siegel and Shuster contained all the essential elements of Superman which continue to this day, including without limitation, Superman's origin from the distant planet, his backstory (sent to Earth as an infant in a spaceship by his scientist father), his core physical and mental traits, his mission as a champion of the oppressed to use his great powers to benefit humankind, his secret identity as newspaper reporter Clark Kent, his relationship with other key characters such as the newspaper editor from whom he takes his assignments, and his romantic interest in Lois Lane, who rebuffs Clark as a coward, while romantically inclined toward Superman. Taken together, these constitute the Superman works (collectively, the "Work").

25.    Subsequent litigation confirmed that Shuster and Siegel owned the original copyright(s) to the Work but determined, at the urging of Defendants' predecessor, that the 1938 Grant had validly assigned all rights to Superman throughout the world. *Siegel v. Nat'l Periodical Publications, Inc.*, 508 F.2d 909, 914 (2d Cir. 1974); *Siegel v. Warner Bros. Ent. Inc.*, 542 F. Supp. 2d 1098, 1145 (C.D. Cal. 2008), *judgment entered*, No. CV 04-8400 ODW (RZX), 2011 WL 13127546 (C.D. Cal. Mar. 15, 2011), *rev'd on other grounds sub nom. Larson v. Warner Bros. Ent.*, 504 F. App'x 586 (9th Cir. 2013).

**Prior Litigation *Re*: Termination Rights Under the U.S. Copyright Act**

26.    In November 2003, Plaintiff, as the executor of the Shuster Estate served DC Comics and Warner Bros. Entertainment, Inc. with a notice of termination under Section 304(c)

of the United States Copyright Act, 17 U.S.C. § 304(c) (the "U.S. Termination"). As the court

held in the sister Superman case *Siegel*, 542 F. Supp. 2d at 1140-42, the Copyright Act and its

termination provisions have no extraterritorial application. Therefore, the Shuster Estate's U.S.

Termination applied solely to the Work's U.S. copyright and had no effect on Defendants' or

their predecessors' rights to the Work in countries outside the United States, governed by their

respective copyright laws.

27.    In response, DC filed an action for declaratory relief in 2010, asserting that the

U.S. Termination was invalid under the Copyright Act, 17 U.S.C. §§ 101 *et seq.* and New York

state law. *DC Comics v. Pacific Pictures Corp. et al*, Case No. CV 10-3633 ODW (RZx) (C.D.

Cal. 2010).

28.    DC's claims principally relied on a perfunctory one-page agreement prepared by

DC's counsel in New York City, within weeks of Shuster's death, and signed by Shuster's

brother Frank Shuster ("Frank") and sister, June Peavy ("Peavy"), in 1992 ("1992 Agreement"),

without the advice of counsel. A true and correct copy of the 1992 Agreement is annexed hereto

as Exhibit 2.

29.    DC took the position that the 1992 Agreement extinguished Shuster's

termination rights under the U.S. Copyright Act, even though authors' siblings, like Frank and

Peavy, hold no statutory termination rights and, in any event, the Copyright Act expressly

provides that "Termination . . . may be effected notwithstanding any agreement to the contrary."

17 U.S.C. § 304(c)(5). *See Stewart v. Abend*, 495 U.S. 207, 230 (1990) (reviewing the legislative

history of the Act's "inalienable" termination right). But it did follow DC Comics' long tradition

of leaving its authors impoverished, even Superman's creators.

30.    On August 21, 1992, just three weeks after Shuster's death, Peavy had written to

Time Warner (DC's then-parent company) in New York City, explaining that she had "spent a very stressful two weeks arranging for [Shuster's] funeral, disposing of the belongings in his apartment and trying to get the financial affairs in order." She expressed feeling "shocked" at inheriting Shuster's "financial plight," as it was "bad enough to lose a family member with whom you are close."

31.    In her state of grief and desperation, Peavy asked for "[a]ny help that Time Warner could give to the family of Joe Shuster to pay his final debts and expenses." She explained it was "embarrassing for me to have to write to you this way" and "unbelievable to me that Joe could have so little," but she had no choice but to ask for assistance from the company that had profited so extensively from Siegel and Shuster's iconic creation.

32.    On September 8, 1992, Paul Levitz of DC Comics sent a letter from its New York headquarters to Frank, stating that Time Warner would pay him $25,000 per year instead of the $5,000 per year called for in a 1975 agreement between Shuster and Warner Communications.

33.    In response to Paul Levitz's letter, Frank informed DC in a letter dated September 10, 1992, that he wished to assign his $25,000 payments to his sister Peavy and "that if payments were made in her name, she would not pursue the termination of the Superman copyright as provided for to [sic] creators' heirs in the 1976 U.S. Copyright Act."

34.    Shortly thereafter, Peavy, Frank, and DC Comics entered into the 1992 Agreement on October 2, 1992. The 1992 Agreement, which did not include an integration clause or any of the customary language to work a novation under New York law, was "to confirm our agreement to pay you, collectively, a total of $25,000 a year, payable to Jean Shuster Peavy[.]"

35.    Peavy and Frank executed DC Comic's 1992 Agreement solely in their personal

capacities, shortly after Shuster's death and well prior to the actual probating of the Shuster

Estate, which did not occur until July 23, 2003, wherein Plaintiff was appointed executor on

October 7, 2003.

36.    DC argued that the perfunctory 1992 Agreement, which contained no integration

clause, somehow worked a novation of the 1938 Grant under New York law and that whereas,

under 17 U.S.C. § 304(c), pre-1978 U.S. copyright grants by authors *or* heir(s) are terminable, 17

U.S.C. § 203(a), governing post-1977 U.S. copyright grants, permits only termination of grants

by authors, not heir(s). DC took this position even though it had always relied on the 1938 Grant,

upheld in *Siegel*, 508 F.2d at 914, as granting DC's predecessor all rights to Superman

worldwide, and DC continued to rely on the 1938 Grant (not the ephemeral 1992 Agreement) for

DC's chain-of-title to Superman long after the 1992 Agreement, including in the sister Superman

action, *Siegel*, 542 F. Supp. 2d at 1132.

### The U.S. Termination Rights Are Decided, Leaving the Foreign Reversionary Rights Intact

37.    In a two-to-one memorandum disposition, the Ninth Circuit surprisingly adopted

DC's position holding that the 1992 Agreement worked an express or implied novation of the

1938 Grant under New York law such that Shuster's termination rights under the U.S. Copyright

Act were eviscerated. *DC Comics v. Pac. Pictures Corp.*, 545 F. App'x 678 (9th Cir. 2013)

("*Shuster I*"). The irony that Shuster's impecunious plight is thought to have motivated the

enactment of the Copyright Act's vital termination right went unmentioned.

38.    As wrong as *Shuster I* was about novations under New York law and the

unwaivable termination right under U.S. copyright law, and as unconscionable as the 1992

Agreement was as so construed, Plaintiff accepts that the Shuster Estate's termination right under

U.S. copyright law was conclusively decided in *Shuster I*.

39.     But DC and *Shuster I* left two key issues open. *First*, the decision says nothing about foreign copyright laws or the Foreign Reversionary Rights at issue here. Not only are the district court and appellate opinions silent as to the issue, but DC elected to bring its complaint solely under U.S. law. This makes sense given that DC had taken the position (and prevailed on it) in the related *Siegel* litigation that notices of termination under the U.S. Copyright Act have no effect whatsoever on their long-held Superman foreign rights.

40.     DC also undoubtedly chose to litigate *Shuster I* in this way because both the 1992 Agreement and the parties' related correspondence were silent as to Foreign Reversionary Rights. This is unsurprising because Foreign Reversionary Rights now at issue did not vest until nearly twenty-five years after execution of the 1992 Agreement and nearly four years after the conclusion of *Shuster I*.

41.     *Second*, the Foreign Reversionary Rights vest only in the personal representative of an author's estate. *Shuster I* left open whether Peavy had the authority, prior to the probating of the Shuster Estate and the appointment of an executor, to bind the estate to the 1992 Agreement. The court stated: "The factual and legal dispute regarding whether [Peavy] acted as [Shuster's] executor when she signed the 1992 Agreement is a potentially complex one; we do not address this question of state law, because the heirs failed to raise it in their opening brief." *Shuster I*, 545 F. App'x at 681 n.3. This finding of waiver means the authority of Peavy to bind the Shuster Estate to the 1992 Agreement was not actually adjudicated in *Shuster I*.

42.    Peavy did not have authority to bind the Shuster Estate to the 1992 Agreement, which she signed in her personal capacity and long before the estate was probated. Under California law, where Shuster last resided and died, "A person has no power to administer the estate until the person is appointed personal representative and the appointment becomes effective. Appointment of a personal representative becomes effective when the person appointed is issued letters." Cal. Prob. Code § 8400(a).

43.    This limitation applies "whether or not the person is named executor in the decedent's will[.]" Cal. Prob. Code § 8400(b).

44.    Because rights to the Work had a value vastly in excess of California's then-applicable $60,000 Small Estate Limit, probate was required. Probate did not occur until 2003 wherein Plaintiff was appointed the executor of the Shuster Estate.

45.    The dissent in *Shuster I*, which discussed the unadjudicated issue of Peavy's authority to act for the Shuster Estate, found these statutes unmistakably clear:

> Further, this record is not sufficient to establish that Joe Shuster's siblings had the authority in 1992 to revoke and supersede his 1938 copyright grant. At that time, Frank was a third-party beneficiary of Joe's agreement with DC, under which DC agreed to pay Frank certain survivor benefits; Jean was a stranger to that agreement. Jean had identified herself as Joe's executrix and sole heir in state probate court and in her communications with DC, but Joe's estate hadn't been probated, nor had Jean been appointed his executrix. Although title to property transfers to heirs upon death, Cal. Probate Code § 7000, that transfer of title is subject to probate administration, Cal. Probate Code § 7001. In 1992, California law required probate of any estate in which the value of the personal property exceeded $60,000. Cal. Probate Code § 13100 (1992). Under California law, Jean could not dispose of Joe's copyright interests before probate. *See* 14 Witkin, Summary of Cal. Law, Wills § 405 (10th ed. 2005 Probate law). Thus, neither Frank nor Jean had the authority to enter into a novation of the original contract.

*Shuster I*, 545 F. App'x at 683 (Thomas, J., dissenting).

## FOREIGN REVERSIONARY RIGHTS

46.     The foreign reversionary rights now at issue ("FRRs") originated with the United Kingdom Copyright Act of 1911.

47.     Section 5(2) of that Act, in force at the time of Shuster and Siegel's 1938 Grant, provided:

> [W]here the author of a work is the first owner of the copyright therein, no assignment of the copyright, and no grant of any interest therein, made by him (otherwise than by will) after the passing of this Act, shall be operative to vest in the assignee or grantee any rights with respect to the copyright in the work beyond the expiration of twenty-five years from the death of the author, and the reversionary interest in the copyright expectant on the termination of that period shall, on the death of the author, notwithstanding any agreement to the contrary, devolve on his legal personal representatives as part of his estate, and any agreement entered into by him as to the disposition of such reversionary interest shall be null and void[.]

48.     These reversionary rights are mandatory and supersede any contrary agreement. Sometimes called "the Dickens provision," Parliament enacted Section 5(2), which was received into the law of all then-British Commonwealth territories, to address unjust assignments that left heirs like those of Charles Dickens penniless.

49.     Other foreign jurisdictions have identical or nearly identical provisions to Section 5(2) of the U.K. Copyright Act of 1911 that also apply to Shuster and Siegel's 1938 Grant. The foreign jurisdictions that provide the FRRs include, among others, Australia, Canada, Hong Kong, India, Republic of Ireland, Israel, New Zealand, Republic of South Africa, Singapore, and the United Kingdom (collectively, the "Foreign Reversionary Territories").

50.     Under the copyright regimes of the Foreign Reversionary Territories, a copyright that has been granted to a third-party automatically reverts to the personal representative of the author's estate 25 years after the death of the author if: (i) the author (or joint author) is the first

copyright owner (or joint owner) of the work; and (ii) the grant being terminated was made by the author (or joint author). In all Foreign Reversionary Territories except Canada, when the work is a joint work, the copyright reversion occurs on the later of 25 years after the death of the first co-author to die or on the date of the death of the last co-author to die. In Canada, reversion occurs 25 years after the death of the last co-author to die.

51. Shuster and Siegel were the joint authors and the original joint owners of the Work, and the 1938 Grant was made by them as joint authors and owners.

52. In this case, because Shuster died on July 30, 1992, and Siegel died on January 28, 1996, the FRRs accrued (in all Foreign Reversionary Territories except Canada) and vested in Plaintiff on July 30, 2017, or 25 years after Shuster's death. In Canada, the FRRs accrued and so vested on January 28, 2021.

## THE BERNE CONVENTION

53. The United States acceded to the Berne Convention for the Protection of Literary and Artistic Works ("Berne Convention") on November 16, 1988, and it entered into force after congressional action on March 1, 1989. Pub. L. 100-568, 102 Stat. 2853 (Oct. 31, 1988). Today, the Berne Convention has over 180 member countries and city-states.

54. Article 5, Section 1 of the Berne Convention provides: "Authors shall enjoy, in respect of works for which they are protected under this Convention, in countries of the Union other than the country of origin, the rights which their respective laws do now or may hereafter grant to their nationals, as well as the rights specially granted by this Convention."

55. Article 5, Section 2 of the Berne Convention provides: "The enjoyment and the exercise of these rights shall not be subject to any formality; such enjoyment and such exercise shall be independent of the existence of protection in the country of origin of the work.

Consequently, apart from the provisions of this Convention, the extent of protection, as well as the means of redress afforded to the author to protect his rights, shall be governed exclusively by the laws of the country where protection is claimed."

56.     The country of origin of the Work is the United States. The countries where protection of the Work is claimed herein are the Foreign Reversionary Territories, including Canada, the United Kingdom, Australia, New Zealand, and Ireland. As such, the Court is treaty bound to apply the laws of these countries without "any formality" so as to protect Plaintiff's enjoyment and exercise of the Shuster Estate's Superman copyright interests, which reverted to Plaintiff as the executor of Shuster's estate under the laws of such countries.

**DEFENDANTS' ONGOING INFRINGEMENT**

57.     Upon information and belief, the copyrights to the Work have been duly renewed.

58.     The Work is a joint work, created by Siegel and Shuster.

59.     As the original co-author of the Work, Shuster owned an undivided fifty percent (50%) of the copyright in and to the Work.

60.     Despite the automatic cancellation of Shuster's 1938 Grant under the unequivocal copyright laws of the Foreign Reversionary Territories, Defendants continue to exploit both the original Work and derivatives thereof with impunity in those Foreign Reversionary Territories. For instance, a new major motion picture, entitled *Superman* and produced by DC, is presently scheduled for distribution by Warner Bros. on July 11, 2025. On information and belief, the film will be released worldwide, including in the Foreign Reversionary Territories.

61.     Upon information and belief, DC never, or rarely, exploits the Work independently of its controlling parent company Warner Bros.; even relatively simple functions such as Superman licensing are not handled directly by DC, but are exploited exclusively

through Warner Bros. Furthermore, the agreements and other arrangements between Warner Bros. and DC regarding the Work are not arm's-length agreements; they primarily serve Warner Bros.' interests, and thus, do not reflect the appropriate market values of the copyrights to the Work and derivatives thereof at issue herein.

62.     Upon information and belief, Warner Bros. and DC are, and at all times material hereto, were the alter-egos of each other and there exists, and has existed at all times material hereto, a unity of interest and ownership among such Defendants such that any separateness has ceased to exist. The Defendants, and/or each of them, used assets of the other Defendants, and/or each of them, for its and/or their separate, individual purposes, and caused valuable assets, property, rights and/or interests to be transferred to each other without adequate consideration.

63.     Upon information and belief, the fictitiously named Defendants captioned hereinabove as Does 1 through 10, inclusive, and each of them, were in some manner responsible or legally liable for the actions, damages, events, transactions and circumstances alleged herein. The true names and capacities of such fictitiously named Defendants, whether individual, corporate, associate, or otherwise are presently unknown to Plaintiff, and Plaintiff will amend this Complaint to assert the true names and capacities of such fictitiously named Defendants when the same have been ascertained. For convenience, each reference herein to a named Defendant shall also refer to the Doe Defendants and each of them.

64.     Upon information and belief, each of the Defendants was the agent, partner, servant, employee, or employer of each of the other Defendants herein, and that at all times herein mentioned, each Defendant acted within the course and scope of such employment, partnership and/or agency and that each Defendant is jointly and severally responsible for the damages hereinafter alleged.

## FIRST CLAIM FOR RELIEF

### (Infringement Under Canadian Copyright Law)

65.     Plaintiff incorporates by reference paragraphs 1 through and including 65 set forth hereinabove, as if the same were fully set forth herein.

66.     Since January 28, 2021, under the United Kingdom Copyright Act of 1911 (c. 46), § 5(2) and the Canadian Copyright Act (R.S.C., 1985, c. C-42), § 14(1), the Shuster Estate and its beneficiaries have been joint owners of all copyright interests in the Work, including joint owners of the rights to reproduce, publicly display, and distribute the Work in Canada, as well as to create derivative works thereof and to reproduce, publicly display, and/or distribute such post-reversion derivative works in Canada.[1]

67.     As the Work is a joint work, Defendants must obtain the consent of all co-authors as to all exploitations of the Work in Canada, including the exploitation or distribution of any pre- or post-reversion derivative works thereof. *Cescinsky v. George Routledge & Sons, Ltd.*, [1916] 2 K. B. 325 (1915). Defendants have not obtained Plaintiff's consent.

68.     Since January 28, 2021, Defendants have, within Canada, made, caused to be made, and purported to authorize the making of copies of the Work; publicly displayed and purported to authorize the public display of copies of the Work and of derivative works thereof; distributed and purported to authorize the distribution of the Work and of such derivative works; and otherwise have exploited the Work and such derivative works in Canada—all without Plaintiff's required authorization or consent.

---

[1] The Foreign Reversionary Territories do not have the so-called "derivative works exception" to terminated grants that exists under U.S. copyright law. 17 U.S.C. § 203(b)(1); 17 U.S.C. § 304(c)(6)(A).

69.    In particular, since January 28, 2021, the Superman character and other elements of the Work, have appeared in numerous derivative works (created both before and after the reversion of the Canadian copyright), distributed and exploited in Canada, without Plaintiff's authorization, including but not limited to Defendants' numerous feature motion pictures, such as *Zack Snyder's Justice League* (2021), *DC League of Super-Pets* (2022), *Black Adam* (2022) and *The Flash* (2023); numerous animated films, such as *Batman and Superman: Battle of the Super Sons* (2022), *Legion of Superheroes* (2023), *Justice League: Warworld* (2023), and *Justice League: Crisis on Infinite Earths* (2024); live-action television series, such as *Supergirl* (2015-2021) and *Superman & Lois* (2021-2024); animated television series, such as *My Adventures with Superman* (2023-present); and videogames, such as *Justice League: Cosmic Chaos* (2023), *Suicide Squad: Kill the Justice League* (2024), and *MultiVersus* (2024), plus ubiquitous Superman merchandising.

70.    On information and belief, Defendants intend to release a new feature film, titled *Superman*, on or about July 11, 2025, including in Canada.

71.    Defendants' conduct in connection with the distribution and exploitation in Canada of the Work and these and other numerous derivative works featuring Superman constitutes direct copyright infringement under the Canadian Copyright Act (R.S.C., 1985, c. C-42), § 27.

72.    Defendants' acts of direct infringement have been willful, intentional, and purposeful, in wholesale disregard of and indifference to the rights of Plaintiff.

73.    As a direct and proximate result of Defendants' infringement of the Work's copyrights and exclusive rights, Plaintiff has been injured in an amount to be determined at trial, inclusive of Plaintiff's actual damages and Defendants' profits.

74.    Defendants' conduct is causing, and unless enjoined by this Court, will continue to cause Plaintiff great and irreparable injury that cannot be fully compensated or measured in money. Plaintiff has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF
### (Infringement Under U.K. Copyright Law)

75.    Plaintiff incorporates by reference paragraphs 1 through and including 74 set forth hereinabove, as if the same were fully set forth herein.

76.    Since July 30, 2017, under the U.K. Copyright Act of 1911 (c. 46), § 5(2), and under the U.K. Copyright, Designs and Patents Act 1988, c. 48, Schedule I, § 27(1), the Shuster Estate and its beneficiaries have been joint owners of all copyright interests in the Work, including joint owners of the rights to reproduce, publicly display, and distribute the Work in the United Kingdom, as well as to create derivative works thereof and to reproduce, publicly display, and distribute derivative works in the United Kingdom.

77.    As the Work is a joint work, Defendants must obtain the consent of all co-authors as to all exploitations of the Work in the United Kingdom, including the exploitation or distribution of any pre- or post-reversion derivative works thereof. U.K. Copyright, Designs and Patents Act 1988, c. 48, § 173(2). Defendants have not obtained Plaintiff's consent.

78.    Since July 30, 2017, Defendants have, within the United Kingdom, made, caused to be made, and purported to authorize the making of copies of the Work; publicly displayed and purported to authorize the public display of copies of the Work and of derivative works thereof; distributed and purported to authorize the distribution of the Work and of derivative works thereof; and otherwise have exploited the Work and such derivative works in the United Kingdom—all without Plaintiff's required authorization or consent.

79.     In particular, since July 30, 2017, the Superman character and other elements of

the Work, have appeared in numerous derivative works (created both before and after the

reversion of the United Kingdom copyright to Plaintiff) which have been distributed and

exploited in the United Kingdom by Defendants, without Plaintiff's authorization, including but

not limited to Defendants' numerous feature motion pictures, such as *Justice League* (Nov.,

2017), *Shazam!* (2019), *The Lego Movie 2: The Second Part* (2019), *Zack Snyder's Justice

League* (2021), *DC League of Super-Pets* (2022), *Black Adam* (2022) and *The Flash* (2023);

numerous animated films, such as *Batman and Superman: Battle of the Super Sons* (2022),

*Legion of Superheroes* (2023), *Justice League: Warworld* (2023), and *Justice League: Crisis on

Infinite Earths* (2024); live-action television series, such as *Krypton* (2018-2019), *Supergirl*

(2015-2021), and *Superman & Lois* (2021-2024); animated television series, such as *My

Adventures with Superman* (2023-present); and videogames, such as *Lego-DC Supervillains*

(2018), *Justice League: Cosmic Chaos* (2023), *Suicide Squad: Kill the Justice League* (2024),

and *MultiVersus* (2024), plus ubiquitous Superman merchandising.

80.     On information and belief, Defendants intend to release a new feature film, titled

*Superman*, on or about July 11, 2025, including in the United Kingdom.

81.     Defendants' conduct in connection with the distribution and exploitation in the

United Kingdom of the Work and these and other numerous derivative works featuring

Superman constitutes direct copyright infringement under the U.K. Copyright, Designs and

Patents Act 1988 (c. 48), §§ 16-21.

82.     Defendants' acts of direct infringement have been willful, intentional, and

purposeful, in wholesale disregard of and indifference to the rights of Plaintiff.

83.     As a direct and proximate result of Defendants' infringement of the Work's copyrights and exclusive rights, Plaintiff has been injured in an amount to be determined at trial, inclusive of Plaintiff's actual damages and Defendants' profits.

84.     Defendants' conduct is causing, and unless enjoined by this Court, will continue to cause Plaintiff great and irreparable injury that cannot be fully compensated or measured in money. Plaintiff has no adequate remedy at law.

### THIRD CLAIM FOR RELIEF
**(Infringement Under Irish Copyright Law)**

85.     Plaintiff incorporates by reference paragraphs 1 through and including 84 set forth hereinabove, as if the same were fully set forth herein.

86.     Since July 30, 2017, under the U.K. Copyright Act of 1911 (c. 46), § 5(2), as well as the Irish Copyright and Related Rights Act, 2000, First Schedule, Part I, § 16(1), the Shuster Estate and its beneficiaries have been joint owners of all copyright interests in the Work, including joint owners of the rights to reproduce, publicly display, and distribute the Work in Ireland, as well as to create derivative works thereof and to reproduce, publicly display, and distribute such derivative works in Ireland.

87.     As the Work is a joint work, Defendants must obtain the consent of all co-authors as to all exploitations of the Work in Ireland, including the exploitation or distribution of any pre- or post-reversion derivative works thereof. Irish Copyright and Related Rights Act, 2000, Part II, ch. 2, § 22(4). Defendants have not obtained Plaintiff's consent.

88.     Since July 30, 2017, Defendants have, within Ireland, made, caused to be made, and purported to authorize the making of copies of the Work; publicly displayed and purported to authorize the public display of copies of the Work and of derivative works thereof; distributed

20

and purported to authorize the distribution of the Work and of such derivative works; and otherwise have exploited the Work and such derivative works in Ireland—all without Plaintiff's required authorization or consent.

89.     In particular, since July 30, 2017, the Superman character and other elements of the Work, have appeared in numerous derivative works (created both before and after the reversion of the Irish copyright) which have been distributed and exploited in Ireland by Defendants, without Plaintiff's authorization, including but not limited to Defendants' numerous feature motion pictures, such as *Justice League* (Nov., 2017), *Shazam!* (2019), *The Lego Movie 2: The Second Part* (2019), *Zack Snyder's Justice League* (2021), *DC League of Super-Pets* (2022), *Black Adam* (2022) and *The Flash* (2023); numerous animated films, such as *Batman and Superman: Battle of the Super Sons* (2022), *Legion of Superheroes* (2023), *Justice League: Warworld* (2023), and *Justice League: Crisis on Infinite Earths* (2024); live-action television series, such as *Krypton* (2018-2019), *Supergirl* (2015-2021), and *Superman & Lois* (2021-2024); animated television series, such as *My Adventures with Superman* (2023-present); and videogames, such as *Lego-DC Supervillains* (2018), *Justice League: Cosmic Chaos* (2023), *Suicide Squad: Kill the Justice League* (2024), and *MultiVersus* (2024), plus ubiquitous Superman merchandising.

90.     On information and belief, Defendants intend to release a new feature film, titled *Superman*, on or about July 11, 2025, including in Ireland.

91.     Defendants' conduct in connection with the distribution and exploitation in Ireland of the Work and these and other numerous derivative works featuring Superman constitutes direct copyright infringement under the Irish Copyright and Related Rights Act, 2000, Part II, ch. 4, §§ 37, 39-43.

92.     Defendants' acts of direct infringement have been willful, intentional, and purposeful, in wholesale disregard of and indifference to the rights of Plaintiff.

93.     As a direct and proximate result of Defendants' infringement of the Work's copyrights and exclusive rights, Plaintiff has been injured in an amount to be determined at trial, inclusive of Plaintiff's actual damages and Defendants' profits.

94.     Defendants' conduct is causing, and unless enjoined by this Court, will continue to cause Plaintiff great and irreparable injury that cannot be fully compensated or measured in money. Plaintiff has no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF
### (Infringement Under Australian Copyright Law)

95.     Plaintiff incorporates by reference paragraphs 1 through and including 94 set forth hereinabove, as if the same were fully set forth herein.

96.     Since July 30, 2017, under the U.K. Copyright Act of 1911 (c. 46), § 5(2), and under the Australian Copyright Act 1968 (Cth), § 239(4), the Shuster Estate and its beneficiaries have been joint owners of all copyright interests in the Work, including joint owners of the rights to reproduce, publicly display, and distribute the Work in Australia, as well as to create derivative works thereof and to reproduce, publicly display, and distribute such derivative works in Australia.

97.     As the Work is a joint work, Defendants must obtain the consent of all co-authors as to all exploitations of the Work in Australia, including the exploitation or distribution of any pre- or post-reversion derivative works thereof. Australian Copyright Act 1968 (Cth), § 78. Defendants have not obtained Plaintiff's consent.

98.     Since July 30, 2017, Defendants have, within Australia, made, caused to be made, and purported to authorize the making of copies of the Work; publicly displayed and purported to authorize the public display of copies of the Work and of derivative works thereof; distributed and purported to authorize the distribution of the Work and of such derivative works; and otherwise have exploited the Work and such derivative works in Australia—all without Plaintiff's required authorization or consent.

99.     In particular, since July 30, 2017, the Superman character and other elements of the Work, have appeared in numerous derivative works (created both before and after the reversion of the Australian copyright to Plaintiff) which have been distributed and exploited by Defendants in Australia, without Plaintiff's authorization, including but not limited to Defendants' numerous feature motion pictures, such as *Justice League* (Nov., 2017), *Shazam!* (2019), *The Lego Movie 2: The Second Part* (2019), *Zack Snyder's Justice League* (2021), *DC League of Super-Pets* (2022), *Black Adam* (2022) and *The Flash* (2023); numerous animated films, such as *Batman and Superman: Battle of the Super Sons* (2022), *Legion of Superheroes* (2023), *Justice League: Warworld* (2023), and *Justice League: Crisis on Infinite Earths* (2024); live-action television series, such as *Krypton* (2018-2019), *Supergirl* (2015-2021), and *Superman & Lois* (2021-2024); animated television series, such as *My Adventures with Superman* (2023-present); and videogames, such as *Lego-DC Supervillains* (2018), *Justice League: Cosmic Chaos* (2023), *Suicide Squad: Kill the Justice League* (2024), and *MultiVersus* (2024), plus ubiquitous Superman merchandising.

100.    On information and belief, Defendants intend to release a new feature film, titled *Superman*, on or about July 11, 2025, including in Australia.

101.    Defendants' conduct in connection with the distribution and exploitation in Australia of the Work and these and other numerous derivative works featuring Superman constitutes direct copyright infringement under the Australian Copyright Act 1968 (Cth), § 36.

102.    Defendants' acts of direct infringement have been willful, intentional, and purposeful, in wholesale disregard of and indifference to the rights of Plaintiff.

103.    As a direct and proximate result of Defendants' infringement of the Work's copyright, Plaintiff has been injured in an amount to be determined at trial, inclusive of Plaintiff's actual damages and Defendants' profits.

104.    Defendants' conduct is causing, and unless enjoined by this Court, will continue to cause Plaintiff great and irreparable injury that cannot be fully compensated or measured in money. Plaintiff has no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF
### (Declaratory Relief)

105.    Plaintiff incorporates by reference paragraphs 1 through and including 104 set forth hereinabove, as if the same were fully set forth herein.

106.    As the co-author of the Work and an original co-owner of the Work in the United States, Shuster was also an original co-owner of an undivided fifty percent (50%) of the Work under the copyright laws of the Foreign Reversionary Territories and Article 5 of the Berne Convention.

107.    Under the respective copyright laws of the Foreign Reversionary Territories, copyright grants are limited in duration to twenty-five (25) years after an author's death, and therefore copyright grants made by an author or co-author are deemed to be automatically terminated and the copyright, or rights under copyright, granted are deemed to revert to such

24

author's estate 25 years after their death.

108.    In all of the Foreign Reversionary Territories, except Canada, when the work is a joint work, the copyright reversion occurs on the later of 25 years after the death of the first co-author to die or on the date of the death of the last co-author to die. In Canada, reversion of a joint work simply occurs 25 years after the death of the last co-author to die.

109.    Shuster died in California on July 30, 1992. Siegel died on January 28, 1996.

110.    Plaintiff is the executor of the Shuster Estate, which was probated in California.

111.    According to the statutory language in the U.K. Copyright Act of 1911 Ch. 46 § 5(2), Australia Copyright Act of 1968 § 239(a), Hong Kong Copyright Ordinance of 1997 Schedule 2, § 26(1), India Copyright Act of 1957 § 79(5), Republic of Ireland Copyright and Related Rights Act of 2000 Schedule 1, § 16(a), Israel Copyright Act of 2007 § 78(e) and (f), New Zealand Copyright Act of 1994 Schedule 1, § 38(1), Singapore Copyright Act of 2006 § 237(4), Republic of South Africa's Copyright Act of 1978 §§ 43 and 41, and U.K. Copyright, Designs and Patents Act 1988, c. 48, Schedule I, § 27(1), the Shuster Estate automatically regained an undivided, one-half copyright interest in the Work on July 30, 2017, 25 years after Shuster's death.

112.    According to the Canadian Copyright Act of 1985 § 14(1), the Shuster Estate automatically regained a one-half copyright interest in the Work on January 28, 2021, 25 years after Siegel's death.

113.    Accordingly, an undivided fifty percent (50%) interest in the Work's copyright in each of the Foreign Reversionary Territories except Canada vested in the Shuster Estate on July 30, 2017, and in Canada, this copyright interest vested in the Shuster Estate on January 28, 2021.

114.    Furthermore, under the respective laws of the Foreign Reversionary Territories, co-owners of the copyright in a joint work, such as the Work, may not unilaterally exploit or license the exploitation of the joint work, and pre- and post-reversion derivative works thereof, in such Foreign Reversionary Territories without the prior consent of the other co-owner(s).

115.    Upon information and belief, Defendants have distributed, licensed and/or exploited in each of the Foreign Reversionary Territories the Work and/or numerous derivative works thereof, created both before and after the reversion to the Shuster Estate of his copyright interest in the Work, under the copyright law of the respective jurisdiction.

116.    Upon information and belief, Defendants are certain to continue infringing Plaintiff's rights because Defendants have expressed sole ownership in the Work, including as to the Foreign Reversionary Territories, and have made long term contracts predicated, in part, on the continued use and exploitation of the Work in many of the Foreign Reversionary Territories. Indeed, Defendants are actively planning to commit such infringement with the pending release of their film *Superman* in the Foreign Reversionary Territories on or about July 11, 2025. As such, a dispute as to the ownership of the Work's copyright is substantially likely if not certain to arise between Plaintiff and Defendants.

117.    By reason of the foregoing facts, an actual and justiciable controversy has arisen and now exists between Plaintiff and Defendants concerning their respective rights and interests in the Work throughout the Foreign Reversionary Territories, for which Plaintiff desires a declaration of rights.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court enter judgment in favor of Plaintiff and against Defendants:

1.      For an Order enjoining Defendants, their officers, agents, employees, and those acting in concert with them, preliminarily during the pendency of this action and permanently thereafter from: (a) infringing, or contributing to or participating in the infringement by others the copyright in the Work or acting in concert with, aiding, or abetting others to infringe said copyright in any way; (b) copying, duplicating, selling, licensing, displaying, distributing, preparing derivative works of the Work, or otherwise using or exploiting the Work, which Plaintiff jointly owns, without Plaintiff's prior written consent or license to do so;

2.      For an Order that Defendants be required to account for the actual damages suffered by Plaintiff as a result of the infringement of the Work and any profits of the Defendants attributable to the infringement of Plaintiff's copyright and/or rights under copyright in the Work;

3.      For an Order declaring that, under the laws of the Foreign Reversionary Territories, Plaintiff holds a valid reversionary interest in the Work's copyright, which reversion occurred automatically on July 28, 2017 (except in Canada, where it occurred on January 28, 2021), returning an undivided one-half interest in these jurisdictions' copyrights in the Work to Plaintiff and the Shuster Estate.

4.      For an Order declaring that Defendants cannot exploit and/or license the exploitation of the Work or derivative works thereof in any Foreign Revisionary Territory without a copyright license from Plaintiff and/or Plaintiff's prior written consent;

5.      For compensatory and exemplary damages in an amount to be determined at trial;

6.      For an award of costs;

7.      For an award of pre- and post-judgment interest in the maximum amount

permitted by law;

8.      For an award of attorneys' fees;

9.      For such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted:

Dated: January 31, 2025          **TOBEROFF & ASSOCIATES, P.C.**

*/s/ Marc Toberoff*
Marc Toberoff

mtoberoff@toberoffandassociates.com
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

Attorneys for Plaintiff, Mark Warren Peary,
individually and as executor of the Estate of
Joseph Shuster