**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MARK WARREN PEARY, individually and in his capacity as executor of the Estate of Joseph Shuster,

          Plaintiff,

   vs.

DC COMICS, INC., et al.,

          Defendants.

---

Civil Action No. 1:25-cv-00910-JMF

**ORAL ARGUMENT REQUESTED**

 

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Plaintiff Mark Warren Peary,*
*individually and as executor of the Estate of*
*Joseph Shuster*

February 28, 2025

## **TABLE OF CONTENTS**

INTRODUCTION……………………………………………………………………...1

BACKGROUND………………………………………………………………………1

ARGUMENT…………………………………………………………………………...6

I.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OR, AT MINIMUM, HAS
      SHOWN SUFFICIENTLY SERIOUS QUESTIONS ON THE MERITS……………..7

      A.    Choice-of-Law Principles Require Application of Each Territory's
            Copyright Law……………………………………………………………7

      B.    The Copyright Laws of All Four Jurisdictions Provide for Automatic
            Reversion of the Rights Assigned in the 1938 Grant………...………………...8

            1.    Reversion is mandatory and occurs automatically. ……………………...8

            2.    Shuster could not pre-assign the reversionary interest.…………………11

            3.    Only Plaintiff, Shuster's duly appointed executor, could deal in this
                  reversionary interest……………………………………………………...11

      C.    The Copyright Laws of All Four Jurisdictions Require Plaintiff's Consent
            for Exploitation. ………………………………………………………………13

II.   PLAINTIFF WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION...14

      A.    Loss of Statutory Rights of Control…………………………………………...14

      B.    Loss of Expressive Control…………………………………………………....16

      C.    Impossibility of Calculating Damages………………………………………...17

III.  THE BALANCE OF HARDSHIPS TIPS SHARPLY IN PLAINTIFF'S FAVOR……..20

IV.   THE PUBLIC INTEREST STRONGLY FAVORS AN INJUNCTION………...……...22

      A.    Comity and the Protection of International Copyright Cooperation……………..22

      B.    Vindication of Author Protection Policies……………………………………23

CONCLUSION……………………………………………………………….………24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Cayuga Nation v. Tanner*,
 6 F.4th 361 (2d Cir. 2021) ........................................................................ 12

*Cescinsky v. Routledge and Sons Ltd.* (1916) 2 K.B. 325 ........................................... 13

*Chadha v. Chadha*,
 No. 16-CV-3739, 2020 WL 1031385 (E.D.N.Y. Mar. 2, 2020),
 *adopted*, 2020 WL 5228812 (E.D.N.Y. Sept. 2, 2020)........................................ 15

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
 598 F.3d 30 (2d Cir. 2010)............................................................................ 7

*DC Comics v. Pac. Pictures Corp.*,
 545 Fed. App'x 678 (9th Cir. 2013) ........................................................ 4, 5, 12

*DISH Network L.L.C. v. 786 Wireless World, Inc.*,
 No. 21-CV-5730, 2024 WL 708229 (E.D.N.Y. Jan. 3, 2024),
 *adopted*, 2024 WL 1092498 (E.D.N.Y. Mar. 13, 2024)........................................ 14

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
 869 F.3d 848 (9th Cir. 2017) ........................................................................ 15

*eBay v. MercExchange, L.L.C.*,
 547 U.S. 388 (2006)...................................................................................... 14

*EMI Apr. Music Inc. v. 4MM Games, LLC*,
 No. 12-CV-2080, 2014 WL 325933, at *9 (S.D.N.Y. Jan. 13, 2014),
 *adopted*, 2014 WL 1383468 (S.D.N.Y. Apr. 7, 2014)........................................ 17

*Fox Television Stations, Inc. v. FilmOn X LLC*,
 966 F. Supp. 2d 30 (D.D.C. 2013) ................................................................ 15

*Fuchberg & Fuchberg v. Galizia*,
 300 F.3d 105 (2d Cir. 2002)...................................................................... 5, 12

*Golan v. Holder*,
 565 U.S. 302 (2012).............................................................................. 22, 23

*Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg.*,
 545 U.S. 308 (2005)...................................................................................... 7

*HarperCollins Publishers L.L.C. v. Gawker Media LLC*,
 721 F. Supp. 2d 303 (S.D.N.Y. 2010) ............................................................ 14

*Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.*,
   826 F. Supp. 2d 619 (S.D.N.Y. 2011) ................................................................. 15

*Howarth v. FORM BIB, LLC*,
   No. 18-CV-7047, 2019 WL 1986594 (S.D.N.Y. May 6, 2019) ............................... 15

*Ideavillage Prod. Corp. v. Bling Boutique Store*,
   No. 16-CV-9039, 2018 WL 3559085 (S.D.N.Y. July 24, 2018)............................... 16

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
   153 F.3d 82 (2d Cir. 1998)................................................................................. 7, 8

*John Wiley & Sons, Inc. v. Book Dog Books, LLC*,
   327 F. Supp. 3d 606 (S.D.N.Y. 2018) ................................................................. 21

*Korzeniewski v. Sapa Pho Vietnamese Rest. Inc.*,
   No. 17-CV-5721, 2019 WL 312149 (E.D.N.Y. Jan. 3, 2019),
   *adopted*, 2019 WL 291145 (E.D.N.Y. Jan. 23, 2019) ........................................ 15

*Lee v. Marvel Enterprises, Inc.*,
   386 F. Supp. 2d 235, 240 (S.D.N.Y. 2005) ........................................................ 17

*McGraw-Hill Glob. Educ. Holdings, LLC v. Khan*,
   323 F. Supp. 3d 488 (S.D.N.Y. 2018) ................................................................. 15

*Mills Music, Inc. v. Snyder*,
   469 U.S. 153 (1985)............................................................................................ 3

*Novello & Co. Ltd. v. Keith Prowse Music Publishing Co. Ltd.*
   [2005] E.M.L.R. 477 ......................................................................................... 11

*Pearson Educ., Inc. v. Vergara*,
   No. 09-CIV-6832, 2010 WL 3744033 (S.D.N.Y. Sept. 27, 2010) .................... 15, 17

*Periwinkle Ent., Inc., F/S/O Scarlett Johansson v. The Walt Disney Co.*,
   No. 21STCV27831 (L.A. Super. Ct. July 29, 2021)............................................. 19

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010)....................................................................... 15, 16, 17

*Seven Network (Operations) Ltd v. TCN Channel Nine Pty Ltd*,
   [2005] FCAFC 144 ........................................................................................... 13

*Siegel v. Nat'l Periodical Publ'ns, Inc.*,
   508 F.2d 909 (2d Cir. 1974)............................................................................. 2, 10

iv

*Siegel v. Warner Bros. Ent. Inc.*,
  542 F. Supp. 2d 1098 (C.D. Cal. 2008),
  *judgment entered*, No. CV 04-8400 ODW (RZX),
    2011 WL 13127546 (C.D. Cal. Mar. 15, 2011),
  *rev'd on other grounds sub nom. Larson v. Warner Bros. Ent.*,
  504 F. App'x 586 (9th Cir. 2013) ................................................................... 2, 5

*Supplement Mfg. Partner, Inc. v. Healthy Again, LLC*,
  No. 22-CV-5106, 2023 WL 5278110 (E.D.N.Y. Aug. 16, 2023) ............................. 16

*TSG Entm't Finance LLC v. Twentieth Century Fox Films Corp. and The Walt Disney Co.*,
  No. 23STCV19433  (L.A. Super. Ct.) (filed Aug. 15, 2023) (settled Jan. 1, 2024) ................ 19

*Village Roadshow Films (BVI) Ltd. et al. v. Warner Bros. Ent., Inc. et al.*,
  No. 22STCV04606 (L.A. Super. Ct. Feb. 7, 2022) ................................................. 18

*Warner Bros. Ent. Inc. v. RDR Books*,
  575 F. Supp. 2d 513 (S.D.N.Y. 2008) ........................................................... 16, 21

*Warner Bros. Ent. Inc. v. WTV Sys., Inc.*,
  824 F. Supp. 2d 1003 (C.D. Cal. 2011) ........................................................... 15

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ....................................................................................... 6

*WPIX, Inc. v. ivi, Inc.*,
  691 F.3d 275 (2d Cir. 2012) ........................................................................ 21

*WPIX, Inc. v. ivi, Inc.*,
  765 F. Supp. 2d 594 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 275 (2d Cir. 2012) ............................. 17

**Statutes**

17 U.S.C. § 101 ................................................................................................................ 8

17 U.S.C. § 304 ................................................................................................................ 5

28 U.S.C. § 1331 .............................................................................................................. 8

Australian Copyright Act 1968 (Cth) ...................................................... 9, 10, 11, 14

Berne Convention Implementation Act of 1988, Pub. L. 100–568, 102 Stat. 2853 (1988)
    (codified as amended in scattered sections of 17 U.S.C.) ................................. 7, 8, 22

California Probate Code § 7000 ..................................................................................... 5

California Probate Code § 7001 ..................................................................................... 5

California Probate Code § 13100 (1992) ................................................................. 5, 24

Canadian Copyright Act (R.S.C., 1985, c. C-42) ........................................... 9, 11, 13

Irish Copyright and Related Rights Act, 2000 ................................................... *passim*

United Kingdom Copyright Act of 1911 ............................................................ *passim*

United Kingdom Copyright, Designs and Patents Act 1988, c. 48 ..................... *passim*

**Treatises**

14 Witkin, Summary of Cal. Law, Wills § 405 (10th ed. 2005) ................................... 5

Bently, Ong, Gellar & Nimmer, *International Copyright Law and Practice*, ch. 4
    (Matthew Bender ed., Lexis 2025) .......................................................................... 8

**Other Authorities**

Alan J. Hartnick, *Stanley Rothenberg: Final Thoughts on the Dickens Provision*,
    54 J. Copyright Soc'y 565 (2007) ............................................................................ 8

Alexis Narotzky, *Big Screen or Bust?: How Contractual Negotiations in Hollywood
Must Adapt in the Streaming Era*, 24 Cardozo J. Conflict Resol. 661 (2023) .......... 18

Barry Torno, Copyright Revision Studies, Research and International Affairs Branch,
    Bureau of Corporate Affairs, Consumer and Corporate Affairs Canada,
    *Ownership of Copyright in Canada* (Minister of Supply & Services Canada 1981) ............... 13

Brandon Milostan, *Bye Bye Back End, Hello Streaming*,
    L.A. Lawyer 44 (May 2019) ................................................................................................. 18

Daniel Charles Smolsky, *Whose Ledger Is Really Red? Confidential Arbitration
    Killed the Black Widow*, 61 Duq. L. Rev. 229 (2023) ............................................................. 20

Irish Revenue Legislative Services, Guide to Interpreting Legislation,
    Part 01-00-06 (2024) ............................................................................................................... 11

Ken Cavalier, *Potential Problems with Commonwealth Copyright for Posthumous
    Poets and Other Dead Authors*, 52 J. Copyright Soc'y 225 (2005) .......................................... 8

Mark Marciszewski, *The Paramount Decrees and Block Booking: Why Block Booking
    Would Still Be a Threat to Competition in the Modern Film Industry*,
    45 Vermont L. Rev. 227 (2020) ............................................................................................. 18

Miller Friedman, *Rear Window: The Future of Hollywood Contracting in the
    Streaming Age*, 18 J. Bus. & Tech. L. 97 (2022) .................................................................... 18

Sergio Sparviero, *Hollywood Creative Accounting: The Success Rate of Major
    Motion Pictures*, Media Indus. J. (2015) ............................................................................... 17

Zack Sharf, *Christopher Nolan Exits Warner Bros. After Nearly Two Decades,
    New Film Set Up at Universal*, IndieWire (Sept. 14, 2021) ..................................................... 19

## INTRODUCTION

This case presents a straightforward question of international copyright law: whether Defendants can continue exploiting Superman in Canada, the United Kingdom, Ireland, and Australia without the consent of Joseph Shuster's estate, which now owns an undivided one-half interest in the Superman copyrights in these jurisdictions by operation of law.[1] The answer is no. Under the copyright laws of these jurisdictions—each derived from Section 5(2) of the U.K. Copyright Act of 1911, c. 46—the rights Shuster assigned to Defendants' predecessor in 1938 automatically reverted to the executor of his estate in 2017 (U.K., Ireland, and Australia) and 2021 (Canada). Defendants' exploitations of Superman across these territories without Plaintiff's authorization are causing and threaten to cause further irreparable harm that only an injunction can prevent.

## BACKGROUND

In 1933, working together in New York City, Joseph Shuster and Jerome Siegel created "on spec" something unprecedented: the world's first superhero, "Superman." Dkt. 1 ¶ 19. Superman embodied America's highest ideals during humanity's darkest hour. *Id.* By 1934, they had drawn fifteen Superman daily comic strips—six of these strips (a full week's worth) were completely finished with ink, while the remaining strips (three weeks' worth) were in penciled form. *Id.* ¶ 20.

In early 1938, Detective Comics (DC Comics' predecessor), a New York-based publisher, expressed interest in publishing their work. *Id.* ¶ 21. To accommodate Detective

---

[1] DC Comics, Inc., DC Comics GP, DC Entertainment, Warner Bros. Discovery, Inc., and Does 1-10 are collectively referred to as "Defendants." Mark Warren Peary, individually and in his capacity as executor of the Estate of Joseph Shuster (the "Shuster Estate"), is referred to as "Plaintiff."

Comics' magazine format, Siegel and Shuster reorganized their original comic strips into over

ninety separate panels. *Id.* On March 1, 1938, without the benefit of legal counsel, they signed

away their rights to Superman for a mere $130 ($65 each) in a grant prepared by Detective

Comics in New York (the "1938 Grant"). *Id.* ¶ 22. The 1938 Grant provided in its entirety:

> I, the undersigned, am an artist or author and have performed work for a strip entitled "SUPERMAN"
>
> In consideration of $130.00 agreed to be paid me by you, I hereby sell and transfer such work and strip, all good will attached thereto and exclusive right to the use of the characters and story, continuity and title of strip contained therein, to you and your assigns to have and to hold forever and to be your exclusive property and I agree not to employ said characters or said story containing the same characters by their names contained therein or under any other names at any time hereafter to any other person, firm or corporation, or permit the use thereof by said other parties without obtaining your written consent therefor. The intent hereof is to give you exclusive right to use and acknowledge that you own said characters or story and the use thereof, exclusively. I have received the above sum of money.
>
> /s/ Joe Shuster & Jerome Siegel
> Accepted: Detective Comics, Inc.

*Id.* Ex. 1.

Siegel and Shuster's original Superman story was published from New York in *Action

Comics #1* on April 18, 1938 (the "Work"). Dkt. 1 ¶ 23. The Work contained the essential

elements that define the character to this day, including without limitation, Superman's origin

story from a distant planet, his arrival on Earth as an infant in a spaceship, his core physical and

mental traits, his mission to champion the oppressed, his dual identity as reporter Clark Kent and

Superman, which he kept secret, and his complex relationship with Lois Lane. *Id.* ¶ 24. While

prior litigation confirmed Shuster and Siegel's original ownership of Superman's copyright, it

also upheld the 1938 Grant as an assignment of worldwide rights to Defendants' predecessors.

*Siegel v. Nat'l Periodical Publications, Inc.*, 508 F.2d 909, 914 (2d Cir. 1974); *Siegel v. Warner

Bros. Ent. Inc*., 542 F. Supp. 2d 1098, 1145 (C.D. Cal. 2008), *judgment entered*, No. CV 04-

2

8400 ODW (RZX), 2011 WL 13127546 (C.D. Cal. Mar. 15, 2011), *rev'd on other grounds sub nom. Larson v. Warner Bros. Ent*., 504 F. App'x 586 (9th Cir. 2013).

In 2003, the Shuster Estate was probated, and Plaintiff was appointed executor. The Shuster Estate thereafter exercised its right under the U.S. Copyright Act, 17 U.S.C. § 304(c), to terminate Shuster's 1938 Grant.[2] Dkt. 1 ¶ 26. Defendants and their predecessors responded with a declaratory relief action that sought to void the U.S. termination. *Id.* ¶ 27. Their argument relied on a short 1992 agreement, signed by Shuster's brother, Frank Shuster ("Frank"), and sister, Jean Peavy ("Peavy"), in their individual capacities, barely two months after Shuster's death and more than a decade before probate of the Shuster Estate (the "1992 Agreement"). *Id.* ¶ 28. The 1992 Agreement provided in relevant part:

> This is to confirm our agreement to pay you, collectively, a total of $25,000 a year, payable to Jean Shuster Peavy, commencing as of August 1, 1992, for as long as either one of you is alive….
>
> We ask you to confirm by your signatures below that this agreement fully settles all claims to any payments or other rights or remedies which you may have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon. In any event, you now grant to us any such rights and release us, our licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever….

*Id.* Ex. 2.

In a 2-1 memorandum disposition, the Ninth Circuit held the 1992 Agreement by Frank and Peavy worked a novation of Shuster's 1938 Grant under New York law so as to deprive the Shuster Estate of its statutory termination right under the Copyright Act. Dkt. 1 ¶ 37; *DC Comics*

---

[2] Congress intended to provide creators and their estates with this inalienable termination right to level the playing field and allow authors or their estates to finally participate in the market value of their works when it was no longer conjectural. *See Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-73 (1985).

*v. Pac. Pictures Corp.*, 545 F. App'x 678 (9th Cir. 2013) ("*Shuster I*"). This decision was plainly wrong under federal copyright, New York, and California law, but Plaintiff accepts that it conclusively determined the Shuster Estate's rights under the U.S. Copyright Act's termination provisions. Dkt. 1 ¶ 38.

The story of Superman's liberation, however, did not end there. The copyright laws of countries following British legal tradition contain mandatory provisions that automatically terminate copyright assignments 25 years after an author's death, returning the rights to the author's estate. Dkt. 1 ¶¶ 47-49. The U.K. Parliament enacted this "Dickens Provision"—so named because Charles Dickens' estate was left penniless despite the enormous commercial success of his works—in the U.K. Copyright Act of 1911. *Id.* ¶ 47. The Dickens Provision exists in jurisdictions that were part of the British Empire as of 1911, including Canada, the United Kingdom, Ireland, and Australia.[3] *Id.* ¶¶ 48-49.

Joseph Shuster died on July 30, 1992, and Jerome Siegel died on January 28, 1996. *Id.* ¶ 52. Under the copyright laws of all relevant territories except Canada, Shuster's share of the copyright automatically reverted to the personal representative of the Shuster Estate on July 30, 2017 (25 years after his death). *Id.* In Canada, the reversion occurred on January 28, 2021 (25 years after Siegel's death). *Id.*

The *Shuster I* litigation, drafted by Defendants and their predecessors as masters of their own complaint, did not address the Foreign Reversionary Rights, which were years away from vesting. *Id.* ¶¶ 39-40. And in related Superman litigation regarding Siegel's U.S. termination rights, Defendants successfully insisted that U.S. termination claims had no effect whatsoever on

---

[3] Plaintiff refers to the Dickens Provision as it appears in the respective laws of these countries as the "Foreign Reversionary Rights."

Defendants' foreign rights because the U.S. Copyright Act has no extraterritorial application. *Siegel*, 542 F. Supp. 2d at 1140-42.

Importantly, the Foreign Reversionary Rights at issue here vest only in the personal representative of a creator's estate. *Id.* ¶ 41. In *Shuster I*, the majority of the Ninth Circuit panel expressly declined to rule whether Frank and/or Peavy, who executed the 1992 Agreement, had the authority to bind the Shuster Estate before its probate. 545 F. App'x at 681 n.3. It ruled instead that the Shuster Estate had waived this defense as to that litigation and the U.S termination rights at issue therein. *Id.* It is well settled that "[i]f a court does not address an issue because it deems the argument on the issue to have been waived, then, for collateral estoppel purposes, the issue has not been decided." *Fuchberg & Fuchberg v. Galizia*, 300 F.3d 105, 109 (2d Cir. 2002).

As explained by Judge Thomas in his *Shuster I* dissent, the 1992 Agreement could not bind the Shuster Estate even as to the U.S. termination rights at issue[4]:

> Further, this record is not sufficient to establish that Joe Shuster's siblings had the authority in 1992 to revoke and supersede his 1938 copyright grant. At that time, Frank was a third-party beneficiary of Joe's agreement with DC, under which DC agreed to pay Frank certain survivor benefits; Jean was a stranger to that agreement. Jean had identified herself as Joe's executrix and sole heir in state probate court and in her communications with DC, but Joe's estate hadn't been probated, nor had Jean been appointed his executrix. Although title to property transfers to heirs upon death, Cal. Probate Code § 7000, that transfer of title is subject to probate administration, Cal. Probate Code § 7001. In 1992, California law required probate of any estate in which the value of the personal property exceeded $60,000. Cal. Probate Code § 13100 (1992). Under California law, Jean could not dispose of Joe's copyright interests before probate. *See* 14 Witkin, Summary of Cal. Law, Wills § 405 (10th ed. 2005 Probate law). Thus, neither Frank nor Jean had the authority to enter into a novation of the original contract.

---

[4] U.S. termination rights vest in a variety of statutorily defined heirs, 17 U.S.C. § 304(c)(2), unlike Foreign Reversionary Rights that vest solely in the author's personal representative. *See infra* pp. 11-13.

*Shuster I*, 545 F. App'x at 683 (Thomas, J., dissenting).

Despite the automatic operation of the Foreign Reversionary Rights, Defendants continue to exploit Superman in the relevant foreign territories without authorization from the Shuster Estate. Dkt. 1 ¶¶ 68-70, 78-80, 88-90, 98-100. Their unauthorized exploitations include major motion pictures, television series, video games, and merchandising. *Id.* Most pressingly, Defendants are planning to release their latest film, *Superman*, worldwide, including in the subject foreign territories, on July 11, 2025. *Id.* ¶¶ 70, 80, 90, 100.

The stakes are enormous. For example, in 2013, *Man of Steel*, Defendants' last major release dedicated to Superman, grossed in theaters alone over $46 million in the U.K. and Ireland, and $22 million in Australia, followed by lucrative pay television, free television, home video releases, and ubiquitous merchandising. *Id.* ¶ 13. Now, as Defendants prepare to release their first major Superman film in over a decade, this matter requires urgent intervention to prevent Defendants' infringement of the Shuster Estate's valuable rights in Canada, the United Kingdom, Ireland, and Australia (collectively, "Major Commonwealth Markets").

## ARGUMENT

To obtain a preliminary injunction, a plaintiff may establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Or, under the Second Circuit's "serious questions" standard, a plaintiff may show: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief," in addition to the injunction being in the public interest.

6

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

## I. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OR, AT MINIMUM, HAS SHOWN SUFFICIENTLY SERIOUS QUESTIONS ON THE MERITS

The undisputed facts and law establish Plaintiff's likelihood of success. The analysis turns on three straightforward propositions that apply across all relevant territories: (1) under choice-of-law principles influenced by Article 5(2) of the Berne Convention, the copyright law of each jurisdiction governs Plaintiff's rights in that territory; (2) under the copyright law of the U.K., Ireland, and Australia, Shuster's 1938 Grant automatically terminated in 2017, and in Canada in 2021; and (3) Defendants cannot exploit Superman in any of these jurisdictions without Plaintiff's consent.

### A. Choice-of-Law Principles Require Application of Each Territory's Copyright Law.

Article 5(2) of the Berne Convention, to which the United States and all relevant nations are signatories, provides that "the extent of protection, as well as the means of redress afforded to the author to protect his rights, shall be governed exclusively by the laws of the country where protection is claimed." Because Plaintiff seeks to vindicate copyrights and redress infringement in Canada, the U.K., Ireland, and Australia, the respective copyright law of each such country controls the exploitation of such rights therein. *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 89 (2d Cir. 1998) (holding that, under the Berne Convention, "if the law of the country of infringement applies to the scope of substantive copyright protection, that law will be applied uniformly to foreign and domestic authors.").[5]

---

[5] There is federal question jurisdiction over Plaintiff's claims under *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 314 (2005). While the laws of the

**B.** **The Copyright Laws of All Four Jurisdictions Provide for Automatic Reversion of the Rights Assigned in the 1938 Grant.**

1.    *Reversion is mandatory and occurs automatically.*

The copyright laws of the Major Commonwealth Markets each contain an automatic and mandatory reversionary right. This right originated in Section 5(2) of the U.K. Copyright Act of 1911, which Parliament enacted specifically to protect authors' heirs from unremunerative transfers like the 1938 Grant at issue here. Alan J. Hartnick, *Stanley Rothenberg: Final Thoughts on the Dickens Provision*, 54 J. Copyright Soc'y 565, 565 n.1 (2007) (Ex. 13 at 3).[6] This progenitor statute provided:

> [W]here the author of a work is the first owner of the copyright therein, no assignment of the copyright, and no grant of any interest therein, made by him (otherwise than by will) after the passing of this Act, shall be operative to vest in the assignee or grantee any rights with respect to the copyright in the work beyond the expiration of twenty-five years from the death of the author, and the reversionary interest in the copyright expectant on the termination of that period shall, on the death of the author, notwithstanding any agreement to the contrary, devolve on his legal personal representatives as part of his estate, and any agreement entered into by him as to the disposition of such reversionary interest shall be null and void[.]

Ex. 1 at 8.

---

Major Commonwealth Markets create Plaintiff's causes of action, they require interpretation of substantial issues under the Berne Convention, *Itar-Tass*, 153 F.3d at 89, which is a treaty of the United States, Pub. L. 100-568, 102 Stat. 2853, 17 U.S.C. § 101, 28 U.S.C. § 1331.

[6] For additional background, the Court may wish to consult Geller, Nimmer, and Bently's authoritative treatise *International Copyright Law and Practice*, chapters CAN § 4[3][b] (Ex. 10), UK § 4[3][d] (Ex. 11), AUS § 4[3][c] (Ex. 9). *See also* Ken Cavalier, *Potential Problems with Commonwealth Copyright for Posthumous Poets and Other Dead Authors*, 52 J. Copyright Soc'y 225 (2005) (Ex. 12). All references to "Ex." are to the exhibits appended to the Declaration of Marc Toberoff submitted herewith, unless otherwise stated, and page pincites for exhibits are to the PDF page number, rather than to the page number of the document contained within.

The reversionary right operates similarly across all four jurisdictions, with only minor variations. In each territory, the reversion is automatic and mandatory, superseding any contrary contractual provisions. The current Canadian statute provides:

> Where the author of a work is the first owner of the copyright therein, no assignment of the copyright and no grant of any interest therein, made by him, otherwise than by will, after June 4, 1921, is operative to vest in the assignee or grantee any rights with respect to the copyright in the work beyond the expiration of twenty-five years from the death of the author, and the reversionary interest in the copyright expectant on the termination of that period shall, on the death of the author, notwithstanding any agreement to the contrary, devolve on his legal representatives as part of the estate of the author, and any agreement entered into by the author as to the disposition of such reversionary interest is void.[7]

Canadian Copyright Act (R.S.C., 1985, c. C-42), § 14(1) (Ex. 6 at 19).

The current U.K. statute provides:

> Where the author of a literary, dramatic, musical or artistic work was the first owner of the copyright in it, no assignment of the copyright and no grant of any interest in it, made by him (otherwise than by will) after the passing of the 1911 Act and before 1st June 1957, shall be operative to vest in the assignee or grantee any rights with respect to the copyright in the work beyond the expiration of 25 years from the death of the author.

U.K. Copyright, Designs and Patents Act 1988, c. 48, Schedule I, § 27(1) (Ex. 2 at 174).

The current Irish statute provides:

> Where the author of a literary, dramatic, musical or artistic work was the first owner of the copyright in the work, an assignment of the copyright and a grant of any interest in it, made by him or her (otherwise than by will) after the passing of the Act of 1927 and before the first day of October, 1964, shall not operate to vest in

---

[7] The only major difference among Canada, the U.K., Ireland, and Australia is that Canada defines the 25-year vesting period for *all* joint authors as counting from the date of death of the *last* joint author to die. Canadian Copyright Act (R.S.C., 1985, c. C-42), § 9 (Ex. 6 at 17) ("[R]eferences in this Act to the period after the expiration of any specified number of years from the end of the calendar year of the death of the author shall be construed as references to the period after the expiration of the like number of years from the end of the calendar year of the death of the author who dies last."). The U.K., Irish, and Australian copyright acts count the 25-year period from the date of the *subject* joint author's death. U.K. Copyright, Designs and Patents Act 1988, c. 48, § 10(3) (Ex. 2 at 23); Irish Copyright and Related Rights Act, 2000, § 22(4) (Ex. 8 at 36); Australian Copyright Act 1968 (Cth), § 78 (Ex. 4 at 152).

the assignee or grantee any rights with respect to the copyright in the work beyond the expiration of 25 years after the death of the author.

Irish Copyright and Related Rights Act, 2000, First Schedule, Part I, § 16(1) (Ex. 8 at 197-98).

The current Australian statute provides:

Without prejudice to the generality of subsection (1), where the author of a work that was made before the commencement of this Act was the first owner of the copyright in the work:

(a) any assignment of the copyright, or any grant of an interest in the copyright, made by the author (otherwise than by will) after the commencement of the Copyright Act, 1911 and before the commencement of this Act, being an assignment or grant that has effect in relation to copyright in the work under this Act by virtue of subsection (1), does not operate to vest in the assignee or grantee any rights with respect to the copyright in the work after the expiration of 25 years after the date of the death of the author;

(b) on the death of the author, the reversionary interest in the copyright expectant on the termination of that period devolves, notwithstanding any agreement to the contrary, on his or her legal personal representative as part of his or her estate; and

(c) any agreement entered into by the author as to the disposition of that reversionary interest is of no force or effect[.]

Australian Copyright Act 1968 (Cth), § 239(4) (Ex. 4 at 572-73).

Prior litigation confirmed that Shuster was an original joint author and owner of the Work. *Siegel v. Nat'l Periodical Publications, Inc.*, 508 F.2d at 914. Each country's contemporary copyright act provides for automatic reversion to the Shuster Estate, vesting in its executor.[8] Plaintiff therefore holds an undivided one-half interest in the Work's copyright in the Major Commonwealth Markets.

---

[8] Even if the contemporary copyright acts did not carry the reversionary right forward as they do, such right vested under Section 5(2) of the U.K. Copyright Act of 1911, in force at the time of the 1938 Grant, and remains enforceable today.

10

> 2. *Shuster could not pre-assign the reversionary interest.*

The U.K. Copyright Act of 1911, in force at the time of the 1938 Grant, contained no provision authorizing *inter vivos* transfers of the reversionary interest by the author and none exists in the copyright acts of Canada or Australia today. While the current versions of the U.K. and Irish copyright acts do contain such a provision,[9] they have been authoritatively interpreted to apply only to *inter vivos* assignments by authors on or after June 1, 1957, in the U.K., and by analogy, October 1, 1964, in Ireland.[10] *Novello & Co. Ltd. v. Keith Prowse Music Publishing Co. Ltd.* [2005] E.M.L.R. 477, ¶ 11 (holding that it is "clear beyond doubt that assignments executed before 1st June 1957 remain ineffective to pass the reversionary interest to the assignee.") (Ex. 3 at 7). Shuster's 1938 Grant obviously occurred long before June 1, 1957.

> 3. *Only Plaintiff, Shuster's duly appointed executor, could deal in this reversionary interest.*

In all four jurisdictions, the reversionary interest devolves on the personal representative of the author's estate to manage and determine who is entitled to it. Canadian Copyright Act (R.S.C., 1985, c. C-42), § 14(1) (Ex. 6 at 19) ("[T]he reversionary interest in the copyright expectant…shall, on the death of the author, notwithstanding any agreement to the contrary, devolve on his legal representatives as part of the estate of the author[.]"); Australian Copyright Act 1968 (Cth), § 239(4)(b) (Ex. 4 at 573) ("[T]he reversionary interest in the copyright expectant on the termination of that period devolves…, notwithstanding any agreement to the

---

[9] U.K. Copyright, Designs and Patents Act 1988, c. 48, Schedule I, § 27(2) (Ex. 2 at 174); Irish Copyright and Related Rights Act, 2000, First Schedule, Part I, § 16(2) (Ex. 8 at 198).

[10] "Decisions of other common law countries are frequently cited and adopted by the Irish courts, particularly where there is no Irish authority governing the issue in question. Given the origin of the Irish legal system and the judicial links between the two systems, it is not surprising that English decisions are the most commonly cited foreign decisions." Irish Revenue Legislative Services, Guide to Interpreting Legislation, Part 01-00-06, § 10 (Ex. 27 at 16).

contrary, on his or her legal personal representative as part of his or her estate."); U.K.

Copyright, Designs and Patents Act 1988, c. 48, Schedule I, § 27(2) (Ex. 2 at 174) ("The

reversionary interest in the copyright expectant on the termination of that [25-year]

period…devolve[s] on his legal personal representatives as part of his estate."); Irish Copyright

and Related Rights Act, 2000, First Schedule, Part I, § 16(2) (Ex. 8 at 198) (similar).

Thus, in the Major Commonwealth Markets, only a deceased author's "personal

representative," here Plaintiff, may deal in the reversionary interest. This result flows from the

current copyright acts, as well as the reversionary right in Section 5(2) of the U.K. Copyright Act

of 1911, Ex. 1 at 8, in force at the time of the 1938 Grant.

The 1992 Agreement with Shuster's siblings in their individual capacities has no bearing

on the Foreign Reversionary Rights. As Judge Thomas's dissent explained in *Shuster I*, at the

time of the 1992 Agreement, the Shuster Estate had not been probated and had no "personal

representative" with the authority to dispose of something as valuable as the Work; Frank and

Peavy had no legal authority to act on behalf of it. *Shuster I*, 545 F. App'x at 683 (Thomas, J.,

dissenting). Thus, notwithstanding the panel majority's misapplication of New York's novation

law, the 1992 Agreement still failed to assign the Foreign Reversionary Rights.

Plaintiff can add little to Judge Thomas' considered analysis on this topic, expressly left

undecided by the panel majority in *Shuster I*, 545 F. App'x at 681 n.3, except to note that the

1992 Agreement is *also* completely silent as to foreign rights and unvested future rights.

Further, by treating the issue of Frank and Peavy's lack of probate authority as waived,

the *Shuster I* panel majority left the issue undecided. *Cayuga Nation v. Tanner*, 6 F.4th 361, 374

(2d Cir. 2021) (for issue preclusion, requiring that "the issue was actually litigated and decided

in the previous proceeding"); *Fuchberg & Fuchberg*, 300 F.3d at 109 ("If a court does not

address an issue because it deems the argument on the issue to have been waived, then, for collateral estoppel purposes, the issue has not been decided."). The previously unaddressed and undecided Foreign Reversionary Rights issue is now ripe for decision.

**C.    The Copyright Laws of All Four Jurisdictions Require Plaintiff's Consent for Exploitation.**

Unlike in the United States, in the Major Commonwealth Markets, joint copyright owners must act unanimously to authorize any exploitation of their work. *Cescinsky v. George Routledge & Sons, Ltd.* [1916] 2 K.B. 325 (applying across all former British territories); *see Seven Network (Operations) Ltd v. TCN Channel Nine Pty Ltd*, [2005] FCAFC 144 ¶ 20 (Ex. 5 at 10) (citing *Cescinsky*: "In the absence of the consent of the other co-owner, one co-owner is neither entitled to do an act comprised in the copyright, nor to grant a licence to a third party to do such an act, and the non-consenting co-owner is entitled to an injunction against the infringing co-owner or putative licensee."); *see also* Barry Torno, Copyright Revision Studies, Research and International Affairs Branch, Bureau of Corporate Affairs, Consumer and Corporate Affairs Canada, *Ownership of Copyright in Canada* (Minister of Supply & Services Canada 1981) (Ex. 7 at 78) ("In the United Kingdom, and in Canada, the case of *Cescinsky v. Routledge and Sons Ltd.* ((1916) 2 K.B. 325) is the authority for the proposition that a joint author or other co-owner may not unilaterally exercise the rights he owns in a copyright without the agreement of the other co-owners."). This result also flows from the common statutory language defining any reference to an author, in the case of a joint work, to refer to *all* authors, discussed *supra* n.7.

There can be no serious dispute that Defendants are exploiting and plan to continue exploiting the Work in the Major Commonwealth Markets, constituting direct copyright infringement. Canadian Copyright Act (R.S.C., 1985, c. C-42), § 27 (Ex. 6 at 38); U.K. Copyright, Designs and Patents Act 1988, c. 48, §§ 16-21 (Ex. 2 at 25-27); Irish Copyright and

Related Rights Act, 2000, Part II, ch. 2, §§ 37, 39-43 (Ex. 8 at 39-46); Australian Copyright Act 1968 (Cth), § 36 (Ex. 4 at 86). Plaintiff has thus, at minimum, raised serious questions going to the merits of his claims, if not shown his outright likelihood to prevail.

## II.    PLAINTIFF WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

Without immediate injunctive relief, Plaintiff will suffer irreparable harm that cannot be adequately compensated by monetary damages. While the Second Circuit no longer applies an *automatic* presumption of irreparable harm in copyright cases post-*eBay v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), courts consistently find such harm where, as here, unauthorized exploitation threatens a copyright owner's ability to control their intellectual property across multiple territories and media. *DISH Network L.L.C. v. 786 Wireless World, Inc.*, No. 21-CV-5730, 2024 WL 708229 (E.D.N.Y. Jan. 3, 2024), *adopted*, 2024 WL 1092498 (E.D.N.Y. Mar. 13, 2024) ("[I]rreparable harm has been readily found in copyright infringement cases." (collecting cases)). There are several distinct forms of irreparable injury on the facts of this case.

### A.    Loss of Statutory Rights of Control.

Defendants' ongoing infringement impairs Plaintiff's fundamental statutory right to determine (or have any say in) the exploitation of his copyright interest. As the Court has noted: "On a broader front, the purpose of the copyright law is to *prevent* the kind of [infringement] that has taken place here. In the present case, the only realistic remedy that would fulfill the statute's purpose is for the court in fact to *prevent*." *HarperCollins Publishers L.L.C. v. Gawker Media LLC*, 721 F. Supp. 2d 303, 307 (S.D.N.Y. 2010) (emphases in original). Failing to grant an injunction would amount to imposing a compulsory license on Plaintiff, forcing him to accept some amount of profit, determined (if, contrary to the below, it is reasonably determinable at all) after lengthy and arduous legal proceedings, in place of what copyright is supposed to provide—

the right to exclude exploitation without consent. *See Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (discussing "the difficulty of protecting a right to *exclude* through monetary remedies" (emphasis in original)).

An effective compulsory license also undermines Plaintiff's "negotiating leverage," including to set "non-monetary terms" not compensable with damages, while at the same time depriving him of control over his "business reputation" and "goodwill." *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017); *see also Fox Television Stations, Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30, 50 (D.D.C. 2013). These losses of control over the core interests protected by copyright are, by definition, irreparable. *Warner Bros. Ent. Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1012-13 (C.D. Cal. 2011) (granting an injunction because the inability to control the use of one's intellectual property constitutes irreparable harm as it is "neither easily calculable, nor easily compensable").

It is for this reason that "[a] plaintiff has no adequate remedy at law where, absent an injunction, the defendant is likely to continue infringing its copyright(s)." *Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.*, 826 F. Supp. 2d 619, 633 (S.D.N.Y. 2011) (quoting *Pearson Educ., Inc. v. Vergara*, No. 09-CIV-6832, 2010 WL 3744033, at *4 (S.D.N.Y. Sept. 27, 2010)); *Chadha v. Chadha*, No. 16-CV-3739, 2020 WL 1031385, at *15 (E.D.N.Y. Mar. 2, 2020), *adopted*, 2020 WL 5228812 (E.D.N.Y. Sept. 2, 2020) (finding irreparable harm where "'[i]n the absence of a permanent injunction, defendants may continue to distribute unauthorized copies of plaintiffs' [products], thus preventing plaintiffs from controlling the distribution of their products and recovering associated profits'" (quoting *McGraw-Hill Glob. Educ. Holdings, LLC v. Khan*, 323 F. Supp. 3d 488, 499-500 (S.D.N.Y. 2018))); *Howarth v. FORM BIB, LLC*, No. 18-CV-7047, 2019 WL 1986594, at *2 (S.D.N.Y. May 6, 2019) (same); *Korzeniewski v. Sapa Pho*

15

*Vietnamese Rest. Inc.*, No. 17-CV-5721, 2019 WL 312149, at *9 (E.D.N.Y. Jan. 3, 2019),

*adopted*, 2019 WL 291145 (E.D.N.Y. Jan. 23, 2019) ("[T]he 'threat of continuing violations'

establishes the necessary irreparable harm." (citing *Ideavillage Prod. Corp. v. Bling Boutique*

*Store*, No. 16-CV-9039, 2018 WL 3559085, at *5 (S.D.N.Y. July 24, 2018))); *Supplement Mfg.*

*Partner, Inc. v. Healthy Again*, *LLC*, No. 22-CV-5106, 2023 WL 5278110, at *5 (E.D.N.Y. Aug.

16, 2023) ("[A] plaintiff has no adequate remedy at law where, absent an injunction, the

defendant is likely to continue infringing its copyright[ ]." (internal quotation marks omitted)).

### B.    Loss of Expressive Control.

As the Second Circuit explained, the loss of any say in the exploitation of a copyright

represents "[t]he loss of First Amendment freedoms" that "for even minimal periods of time[]

unquestionably constitutes irreparable injury." *Salinger*, 607 F.3d at 81. This interest is

particularly acute in a case like this, where the Work is the proud family legacy of Plaintiff's

uncle, Joe Shuster. Declaration of Mark Warren Peary ("Peary Decl.") ¶¶ 4-6, 8-10 & Ex. A. The

decision whether and how to exploit this work of creative genius is thus not merely a matter of

money, it is a fundamentally expressive matter concerning the integrity of the family legacy.

The Court has found irreparable harm when copyright infringement does more than

financial harm, but exacts an emotional toll. *Warner Bros. Ent. Inc. v. RDR Books*, 575 F. Supp.

2d 513, 552 (S.D.N.Y. 2008). Plaintiff faces a similar harm; he must sit by while his uncle's

Superman creation is exploited like a corporate asset without his authorization, destroying his

ability to curate and cultivate his family's legacy. Peary Decl. ¶¶ 9-10. This kind of personal

injury cannot be fixed with money, *Warner Bros. Ent. Inc.*, 575 F. Supp. 2d at 552, and "is a loss

that one should not be expected to suffer[,]" *Salinger*, 607 F.3d at 81.

16

C. **Impossibility of Calculating Damages.**

Here, damages are measured by Defendants' profits from their numerous infringements, but the international scope and complexity of their ubiquitous Superman exploitations makes monetary damages virtually impossible to calculate with reasonable certainty. *First,* even setting aside notorious "Hollywood accounting," *Lee v. Marvel Enterprises, Inc.*, 386 F. Supp. 2d 235, 240 (S.D.N.Y. 2005), copyright infringement damages are routinely held to be irreparable as a matter of fact due to the difficulty of reasonably quantifying them. *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 618 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 275 (2d Cir. 2012) ("These losses are 'notoriously difficult' to prove and nearly impossible to quantify, and accordingly are considered irreparable." (citing *Salinger*, 607 F.3d at 82 and *Pearson Educ.*, 2010 WL 3744033)); *EMI Apr. Music Inc. v. 4MM Games, LLC*, No. 12-CV-2080, 2014 WL 325933, at *9 (S.D.N.Y. Jan. 13, 2014), *adopted*, 2014 WL 1383468 (S.D.N.Y. Apr. 7, 2014) (finding irreparable harm where "actual damages are extremely difficult to measure").

Defendants' exploitations of the Work span multiple media, distribution channels, and revenue streams. The exploitation in feature films, as just one example, may encompass theatrical box office receipts, pay and free television exploitation, streaming, digital downloads, and related merchandise licensing—each with its own complex accounting systems and challenges. Sergio Sparviero, *Hollywood Creative Accounting: The Success Rate of Major Motion Pictures*, Media Industries Journal 2.1 19-20, 31 (2015) (Ex. 24 at 2-3, 14). The interaction between distribution windows, their revenue streams, and associated distribution and marketing costs reasonably attributable to each creates tremendous additional complexity. *See id.* This is then exacerbated by a studio's licensing or "block booking" multiple films together, where a blockbuster, like *Superman*, is the main attraction but is inadequately accounted for.

17

Mark Marciszewski, *The Paramount Decrees and Block Booking: Why Block Booking Would Still Be a Threat to Competition in the Modern Film Industry*, 45 Vermont L. Rev. 227, 229-30 (2020) (Ex. 23 at 4-5).

Further, streaming services have become enormously important to studio bottom lines, though studios routinely insist that, unlike a theatrically released film, there is no way to quantify the economic success of streamed content. Ex. 21 at 25 (Warner Bros. Discovery 2023 Form 10-K: "Although audience measurement systems have evolved and improved…they still do not fully capture all viewership across streaming and other digital platforms…"); Brandon Milostan, *Bye Bye Back End, Hello Streaming*, L.A. Lawyer 44, 46 (May 2019) ("There are no box office receipts, no linear broadcast ad sales, no licensing fees, and no home entertainment sales.") (Ex. 16 at 4). *See generally* Miller Friedman, *Rear Window: The Future of Hollywood Contracting in the Streaming Age*, 18 J. Bus. & Tech. L. 97, 108-10 (2022) (Ex. 25 at 14-16). Even if the number of times a film was streamed were obtainable in discovery, the *profits* attributable to that film would be impossible to determine, given that streaming services make money from subscriptions to their entire library of film and television shows of varying caliber, age, and notoriety.

Indeed, even if such profits were determinable, Warner Bros. has repeatedly been accused of using major films like *Superman* as loss leaders, which are deliberately sold at below-market value to attract subscribers to its streaming service, rendering any "profit" calculation meaningless. Alexis Narotzky, *Big Screen or Bust?: How Contractual Negotiations in Hollywood Must Adapt in the Streaming Era*, 24 Cardozo J. Conflict Resol. 661, 662-63 (2023) (Ex. 15 at 3-4) (discussing *Village Roadshow Films (BVI) Ltd. et al. v. Warner Bros. Entm't, Inc.*

*et al.*, No. 22STCV04606 (C.A. Super. Ct. Feb. 7, 2022) (Ex. 17),[11] and *Periwinkle Entm't, Inc.,*
*F/S/O Scarlett Johansson v. The Walt Disney Co.*, No. 21STCV27831 (L.A. Super. Ct. July 29,
2021)); Zack Sharf, *Christopher Nolan Exits Warner Bros. After Nearly Two Decades, New Film*
*Set Up at Universal*, IndieWire (Sept. 14, 2021) (Director Christopher Nolan, with Warner Bros.
for nearly twenty years, "said he was in 'disbelief' over Warners' handling of new releases,
adding…'they've got some of the top filmmakers…who worked for years in some cases on these
projects…meant to be big-screen experiences…And now they're being used as a loss-leader for
the streaming service—for the fledgling streaming service—without any consultation.'") (Ex. 26
at 1-2).

　　*Second*, the parent-subsidiary relationship between Warner Bros. Discovery and the DC
subsidiaries, in addition to the vertical integrations within each Defendant, further obscures the
true value of Defendants' exploitation of Superman in each territory. As alleged in the
Complaint, agreements between Warner Bros. and DC regarding Superman are not arm's-length
transactions and thus do not reflect appropriate fair market values, Dkt. 1 ¶¶ 61-62; neither are
those between Warner Bros. and other vertically integrated entities within it, *id.*[12] Defendants'
vertically integrated corporate structure makes it virtually impossible to obtain legitimate
revenue figures and deductible costs and thus impossible to calculate true "profits" from their

---

[11] The allegations in this verified complaint against subsidiaries of Defendant Warner Bros.
reveal the extent of "Hollywood accounting" that victimizes even billion-dollar corporate
partners, a practice to which an individual family member will be far more vulnerable. Ex. 17
¶¶ 9-19, pp. 5-10.

[12] The industry is rife with this kind of self-dealing, which forces business partners to undertake
expensive and difficult independent audits. *TSG Entm't Finance LLC v. Twentieth Century Fox*
*Films Corp. and The Walt Disney Co.*, No. 23STCV19433 (L.A. Super. Ct.) (filed Aug. 15,
2023) (settled Jan. 1, 2024) (reporting how audit of just 3% of films involved in dispute found
widespread evidence of self-dealing) (Ex. 18 ¶¶ 1-24, 42-43, pp. 2-6, 9).

extensive infringing content. Daniel Charles Smolsky, *Whose Ledger Is Really Red? Confidential Arbitration Killed the Black Widow*, 61 Duq. L. Rev. 229, 241-43 (2023) (describing how major media conglomerates, including Warner Media, have worldwide dominance and "simultaneously play the 'role' of creator, producer, retailer, and distributor," making independent evaluation of their reported numbers effectively impossible) (Ex. 14 at 16).

 *Third*, Defendants will likely argue for reductions or "apportionment" by claiming that only a portion of their (largely indeterminable) profits comes from using elements of the original Superman Work, rather than from new elements they added in later derivative versions. Defendants will also likely argue for reductions by claiming Superman appears with other characters they own (e.g., in *Justice League* films), and debating the percentage of profits attributable to Superman versus other characters like Batman. The scope, complexity, and uncertainty of assessing is simply too much, particularly as Plaintiff is not a sophisticated corporate party, but a family member trying to safeguard his uncle's legacy.

## III. THE BALANCE OF HARDSHIPS TIPS SHARPLY IN PLAINTIFF'S FAVOR

 The balance of hardships weighs decisively in favor of injunctive relief. Without it, Plaintiff will face hardship as a result of the three categories of irreparable harm identified above. Any hardship to Defendants would be both self-inflicted and manageable. Warner Bros. Discovery is a global media conglomerate with extensive legal resources and teams of intellectual property lawyers, including in the Major Commonwealth Markets, apprising Defendants of their rights. Defendants and their predecessors have long been on notice of the Foreign Reversionary Rights—indeed, since the U.K. Copyright Act of 1911. They must also have known that when Canada, Australia, and Ireland achieved independence, each preserved this protection in their own copyright statutes. As such, Defendants should have anticipated *for*

*decades* that their rights would automatically terminate in 2017 (U.K., Ireland, Australia) and 2021 (Canada).

Despite this knowledge, Defendants proceeded to develop a major new Superman film scheduled for July 2025 release, making no effort to negotiate appropriate licenses with Plaintiff. Courts consistently hold that such self-inflicted wounds carry little weight in the balance of hardships analysis. *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012) ("[A]n infringer of copyright cannot complain about the loss of ability to offer its infringing product." (citation omitted)); *Warner Bros.*, 575 F. Supp. 2d at 553 ("The only possible harm to Defendant[s] is the loss of the chance to sell an infringing [movie], but the law does not protect this type of hardship."); *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 637 (S.D.N.Y. 2018).

Moreover, Defendants are well-equipped to implement territorial restrictions, which is already a standard part of their business operations. Warner Bros., like every other major studio and streaming service, routinely includes geographic limitations in its distribution contracts, and current digital platforms offer precise geo-blocking or geo-fencing capabilities. Ex. 21 at 27 (Warner Bros. Discovery 2023 Form 10-K: "[L]icensing and distribution agreements…provide for the scope of licensed rights, including geographic territory…Our agreements generally have a limited term which varies by territory…"). Territory-specific marketing and content distribution are common industry practices, and similar regional restrictions already exist for other properties. For a global media company, adjusting content distribution by territory is routine and imposes no hardship.

IV.    **THE PUBLIC INTEREST STRONGLY FAVORS AN INJUNCTION**

The public interest analysis must consider both domestic and international factors, as this case implicates not only U.S. treaty obligations but also the copyright policies of our international partners.

A.    **Comity and the Protection of International Copyright Cooperation.**

First and foremost, the public interest requires respecting international copyright commitments. The United States' adherence to the Berne Convention represents a sovereign promise to protect authors' rights under foreign copyright laws in service of the same goals copyright protects in the U.S. *Golan v. Holder*, 565 U.S. 302, 326 (2012) ("Congress rationally could have concluded that adherence to Berne 'promotes the diffusion of knowledge.' A well-functioning international copyright system would likely encourage the dissemination of existing and future works.") (internal citation omitted); *id.* at 335 ("Congress determined that U.S. interests were best served by our full participation in the dominant system of international copyright protection. Those interests include ensuring exemplary compliance with our international obligations…").

Protecting the Foreign Reversionary Rights serves this international framework. It demonstrates that U.S. courts take seriously their role in international copyright cooperation; respect the legislative choices of sovereign nations regarding author protections; support uniform interpretation of shared copyright principles; and provide the predictability that creative industries need to function across borders. U.S. courts have consistently recognized these principles in extending comity to the copyright laws of other jurisdictions. This respect for international intellectual property rights must be reciprocal. The United States cannot expect other nations to respect American intellectual property rights if our courts do not respect theirs.

22

*Golan*, 565 U.S. at 312 n.8 ("Unimpeachable adherence to Berne, Congress was told, would help ensure enhanced foreign protection, and hence profitable dissemination, for existing and future U.S. works.").

Undermining the Foreign Reversionary Rights would signal that U.S. courts are willing to disregard clear statutory protections for authors' copyrights in other countries. This could invite similar treatment of U.S. intellectual property rights abroad, destabilizing the carefully balanced international copyright system that has developed over decades of multilateral cooperation. The public has a strong interest in maintaining this system's integrity through consistent enforcement of copyright protections across borders. The copyright industries represent a substantial portion of the U.S. economy, generating trillions in revenue and supporting millions of jobs. *See* Ex. 19 at 2 (In 2023, "core copyright industries added $2.09 trillion [] of value to U.S. GDP, accounting for 7.66% of the entire U.S. economy…[and employed] 11.6 million American workers,…6.1% of total private employment in the United States."); Ex. 20 at 6, 13 (same). This concern is particularly acute given the threat that piracy poses to U.S. copyright industries, especially in rapidly evolving fields like software and artificial intelligence where protection of intellectual property is crucial. If U.S. courts fail to honor clear foreign statutory rights like those at issue here, it would significantly undermine America's ability to demand enforcement of U.S. copyrights abroad.

## B.    Vindication of Author Protection Policies.

The Foreign Reversionary Rights embody specific legislative judgments to protect authors and their estates from unremunerative transfers. When updating their copyright laws, each country made a conscious choice to preserve or strengthen these protections: the U.K. reaffirmed them in its Copyright, Designs and Patents Act 1988; Canada strengthened them

through amendments to its Copyright Act in 1985; and both Australia and Ireland deliberately maintained them in their modern copyright systems. The public interest demands that U.S. courts respect these considered policy choices by sovereign nations to shield creators from unfair exploitation. Failing to enforce these rights would effectively override the democratic will of multiple legislatures that have consistently chosen to protect authors and their families.

## **CONCLUSION**

The evidence overwhelmingly supports preliminary injunctive relief. Plaintiff is likely to succeed on the merits because the copyright laws of the Major Commonwealth Markets all provide for the automatic reversion to Plaintiff of Shuster's Superman copyright interest. These reversionary rights vest exclusively in the duly appointed executor of an author's estate. The Shuster Estate was not probated until 2003, wherein Plaintiff was appointed executor. Thus, the 1992 Agreement could not have disposed of or defeated the valuable reversionary rights here at issue. Not only did the signatories to the 1992 Agreement, without probate of the Shuster Estate, lack legal authority to bind the Estate and its executor (Plaintiff) under California probate law, Cal. Prob. Code § 13100 (1992), they lacked authority to transact in any assets worth over $60,000, such as the Work.

The threat of irreparable harm to Plaintiff is clear and present. Defendants' ongoing exploitation across these four territories impairs Plaintiff's statutory rights of control and expression, fundamental to copyright ownership, and inflicts damage that cannot be reasonably calculated with certainty.

The balance of hardships tips sharply in Plaintiff's favor. Any hardship to Defendants would be entirely self-inflicted, as they have long known of these reversionary rights, yet chose to proceed with the unauthorized exploitation of Plaintiff's copyright interests. Whereas

Defendants can readily implement territorial restrictions through their existing distribution systems, the denial of injunctive relief would force Plaintiff to endure irreparable injuries during the pendency of this litigation.

Finally, the public interest strongly favors an injunction. Enforcement of the Foreign Reversionary Rights not only honors the United States' treaty obligations but respects the considered policy choices of four sovereign nations to protect authors and their estates.

For all these reasons, Plaintiff respectfully requests that the Court enter a preliminary injunction barring Defendants from exploiting the Work and any derivative works in Canada, the United Kingdom, Ireland, and Australia pending final resolution of this action.

Dated:  February 28, 2025                    TOBEROFF & ASSOCIATES, P.C.

                                             */s/ Marc Toberoff*
                                             Marc Toberoff
                                             23823 Malibu Road, Suite 50-363
                                             Malibu, CA 90265
                                             Telephone: (310) 246-3333
                                             Facsimile: (310) 246-3101

                                             *Attorneys for Plaintiff Mark Warren Peary,*
                                             *individually and as executor of the Estate of*
                                             *Joseph Shuster*

## <u>CERTIFICATION</u>

I certify that, excluding the caption, table of contents, table of authorities, signature

block, and this certification, the foregoing Memorandum of Law contains 7,984 words,

calculated using Microsoft Word, which complies with Rule 7.1(c) of the Local Rules of the

United States District Courts for the Southern and Eastern Districts of New York.


Dated:   February 28, 2025                              <u>*/s/ Marc Toberoff*</u>
                                                        Marc Toberoff
                                                        23823 Malibu Road, Suite 50-363
                                                        Malibu, CA 90265
                                                        Telephone: (310) 246-3333
                                                        Facsimile: (310) 246-3101

                                                        *Attorneys for Plaintiff Mark Warren Peary,*
                                                        *individually and as executor of the Estate of*
                                                        *Joseph Shuster*