# EXHIBIT 5

# FEDERAL COURT OF AUSTRALIA

## Seven Network (Operations) Ltd v TCN Channel Nine Pty Ltd
## [2005] FCAFC 144

**COPYRIGHT** – cinematograph film – oral agreement between organiser of charitable undertaking and television station under which television station's camera operator and sound recordist accompanied organiser and troubled youths on trek along Kokoda Track – under agreement, television station to televise short film of trek, on station's news and current affairs program, and organiser to have raw footage subsequently for use to promote the charity – after program went to air, organiser handed tapes of raw footage as arranged – organiser taking tapes to film producer who makes a one-hour documentary, which is proposed to be televised by competitor television station – original television station seeks injunction on basis of threatened infringement of copyright – whether copyright in original raw footage co-owned by organiser and original television station – whether original television station had contracted to assign to organiser its interest in copyright or to grant him a licence – whether licence assignable – construction of oral contract – admissibility of extraneous circumstances – admissibility of party's statements of its intention on an earlier occasion.

*Copyright Act 1968* (Cth) ss 22(4), 30, 86, 98

*Lauri v Renad* [1892] 3 Ch 402 cited
*Cescinsky v George Routledge & Sons* Ltd [1916] 2 KB 325 cited
*Prior v Lansdowne Press Pty Ltd* [1977] VR 65 cited
*Prior v Sheldon* (2000) 48 IPR 301 cited
*Bradley Egg Farm Ltd v Clifford* [1943] 2 All ER 378 distinguished
*W Marshall & Co Ltd v AH Bull Ltd* (1901) 85 LT 77 cited
*Coopers v Stephens* [1895] 1 Ch 567 cited
*Messager v British Broadcasting Co* [1927] 2 KB 543 cited
*Dorling v Honnor Marine Ltd* [1964] Ch 560 cited
*Jones v South-Eastern and Chatham Railway Company's Managing Committee* (1918) 87 LJKB 775
*R v Connolly* [1991] 2 Qd R 171
*Adelaide Chemical & Fertilizer Co Ltd v Carlyle* (1940) 64 CLR 514
*Teper v The Queen* [1952] AC 480
*Ratten v The Queen* [1972] AC 378
*James Miller & Partners Ltd v Whitworth Street Estates (Manchester) Ltd* [1970] AC 583
*L Schuler AG v Wickman Machine Tool Sales Ltd* [1974] AC 235
*Secured Income Real Estate (Australia) Limited v St Martins Investments Proprietary Limited* (1979) 144 CLR 597
*FAI Traders Insurance Company Ltd v Savoy Plaza Pty Ltd* [1993] 2 VR 343
*White v Australian and New Zealand Theatres Limited* (1943) 67 CLR 266
*Australian Estates Ltd v Palmer* (unreported, New South Wales Court of Appeal, Kirby P, Samuels and Meagher JJA, 22 December 1989)
*Holroyd v Marshall* (1862) 10 HL Cas 191

- 2 -

*Dick Bentley Productions Ltd v Harold Smith (Motors) Ltd* [1965] 1 WLR 623
*Esso Petroleum Co Ltd v Mardon* [1976] QB 801
*Antaios Compania Naviera S.A. v Salen Rederierna A.B.* [1985] AC 191
*Summit Investment Inc v British Steel Corporation (The "Sounion")* [1987] 1 Lloyd's Reps 230
*Ray v Classic FM plc* (1998) 41 IPR 235
*British Actors Film Company, Limited v Glover* [1918] 1 KB 299
*Hospital Products Limited v United States Surgical* Corporation (1984) 156 CLR 41
*Kilpin v Ratley* [1892] 1 QB 582
*Pacific Film Laboratories Pty Ltd v Commissioner of Taxation (Cth)* (1970) 121 CLR 154
*United Dominion Corporation Ltd v Brian Pty Ltd* [1983] 157 CLR 1
*Norman v FC of T* (1963) 109 CLR 9

**SEVEN NETWORK (OPERATIONS) LIMITED & ANOR v
TCN CHANNEL NINE PTY LIMITED & OTHERS**

**NSD 667 OF 2005**

**LINDGREN, FINKELSTEIN AND EDMONDS JJ
8 AUGUST 2005
SYDNEY**

Signed by AustLII

GENERAL DISTRIBUTION

**IN THE FEDERAL COURT OF AUSTRALIA**                     **NSD 667 OF 2005**
**NEW SOUTH WALES DISTRICT REGISTRY**

### ON APPEAL FROM A JUDGE OF THE FEDERAL COURT OF AUSTRALIA

BETWEEN:    **SEVEN NETWORK (OPERATIONS) LIMITED**
            **(ACN 052 845 262)**
            **FIRST APPELLANT**

            **CHANNEL SEVEN SYDNEY PTY LIMITED**
            **(ACN 000 145 246)**
            **SECOND APPELLANT**

AND:        **TCN CHANNEL NINE PTY LIMITED (ACN 001 549 560)**
            **FIRST RESPONDENT**

            **NBN LIMITED (ACN 000 232 486)**
            **SECOND RESPONDENT**

            **BRETT MURRAY**
            **THIRD RESPONDENT**

            **D.A.R.E OPERATIONS PTY LIMITED (ACN 108 345 446)**
            **FOURTH RESPONDENT**

            **LOOK TELEVISION PRODUCTIONS PTY LIMITED**
            **(ACN 008 685 497)**
            **FIFTH RESPONDENT**

            **LOOK FILM PRODUCTIONS PTY LIMITED**
            **(ACN 002 486 384)**
            **SIXTH RESPONDENT**

JUDGES:         **LINDGREN, FINKELSTEIN AND EDMONDS JJ**
DATE OF ORDER:  **8 AUGUST 2005**
WHERE MADE:     **SYDNEY**

**THE COURT ORDERS THAT:**

1.    The appeal be stood over to Tuesday, 9 August 2005 at 1.00 pm for the making of
      orders, including orders as to costs.

Retrieved from AustLII on 13 February 2020 at 19:23:38

Verify version

- 2 -

2.      The parties attempt to agree on the orders to be made consistent with the reasons for
        judgment published today, and in the event that they have not reached agreement by
        9.00 am on Tuesday, 9 August 2005, they submit, by email to each Judge's Associate,
        the forms of order for which they will respectively contend and short submissions in
        support.

Note:   Settlement and entry of orders is dealt with in Order 36 of the Federal Court Rules.

Signed by AustLII

GENERAL DISTRIBUTION

IN THE FEDERAL COURT OF AUSTRALIA                    NSD 667 OF 2005
NEW SOUTH WALES DISTRICT REGISTRY


ON APPEAL FROM A JUDGE OF THE FEDERAL COURT OF AUSTRALIA

| | |
|---|---|
| BETWEEN: | SEVEN NETWORK (OPERATIONS) LIMITED (ACN 052 845 262) FIRST APPELLANT |
| | CHANNEL SEVEN SYDNEY PTY LIMITED (ACN 000 145 246) SECOND APPELLANT |
| AND: | TCN CHANNEL NINE PTY LIMITED (ACN 001 549 560) FIRST RESPONDENT |
| | NBN LIMITED (ACN 000 232 486) SECOND RESPONDENT |
| | BRETT MURRAY THIRD RESPONDENT |
| | D.A.R.E OPERATIONS PTY LIMITED (ACN 108 345 446) FOURTH RESPONDENT |
| | LOOK TELEVISION PRODUCTIONS PTY LIMITED (ACN 008 685 497) FIFTH RESPONDENT |
| | LOOK FILM PRODUCTIONS PTY LIMITED (ACN 002 486 384) SIXTH RESPONDENT |
| JUDGES: | LINDGREN, FINKELSTEIN AND EDMONDS JJ |
| DATE: | 8 AUGUST 2005 |
| PLACE: | SYDNEY |

REASONS FOR JUDGMENT

## LINDGREN J

### INTRODUCTION

1    The primary Judge was required to hear and decide the appellants' application for injunctive relief in circumstances of urgency. The hearing concluded on 19 April 2005 and his Honour delivered judgment with reasons on 21 April 2005. With respect, it was a *tour de force*.

Retrieved from AustLII on 13 February 2020 at 19:23:38

Verify version

2    Although the appeal was given an expedited hearing and we were required to give an early
decision (that decision was announced on 25 July 2005 with orders to be made and reasons
published later), we have been favoured with more time and more expansive submissions
than was the primary Judge.  Notwithstanding this, I adopt his Honour's statement (at [5])
that '[t]here is much that can be (and has been) said for both sides and my views have
fluctuated'.

3    I have had the benefit of reading in draft the Reasons for Judgment of Finkelstein J and
Edmonds J.  This relieves me of the necessity of summarising the background facts.

**GENERAL**

4    The amended application and the pleadings referred to 'the Single Tape Films', 'the All
Tapes Film' and 'the Selected Film Footage'.  In substance, the first two expressions refer to
the same thing, namely, the aggregate of the visual images, including the aggregate of the
sounds embodied in the associated soundtrack, filmed and recorded during the Kokoda trip.
The original format of the film made on the trip was 'Sony Mini DV'.  Following the trip,
back in Sydney, the film was transferred to 'DV Pro tapes' (which, together with certain pre-
departure and post-return footage, was referred to at trial as the 'Camera Tapes').

5    Mr Shannon said that by the end of the trip he had filmed approximately 20–25 Sony Mini
DV tapes.  Mr Simond's estimate was 25–30.  Each tape contained approximately 60 minutes
of footage.  Both the Sony Mini DV tapes and the DV Pro tapes had come from Seven's
stock of blank tapes.  After the dubbing onto the DV Pro format, the Sony Mini DV tapes
were recycled by Seven.   In the ordinary course, the Camera Tapes would have been
similarly recycled, but a special arrangement concerning them was made at the meeting on
11 February 2004, referred to below.

6    Apparently, it was because Seven's legal representatives thought that the cinematograph film
embodied in the Camera Tapes might constitute a single film or a separate film per tape, that
they adopted the expressions 'All Tapes Film' to refer to the former, and 'Single Tape Films'
to refer to the latter.  The distinction is unimportant for present purposes.  I will use the
expressions 'the Camera Tapes' and 'the Camera Tapes film' to distinguish between the

Signed by AustLII

- 3 -

physical things, the Camera Tapes, and the cinematograph film, including associated sound track, embodied in them.

7     *Today Tonight* is a half hour program. After deduction of some six or seven minutes for advertisements, the remaining 23–24 minutes is usually divided into four segments. Two segments or 'breaks', totalling some 11½ to 12½ minutes, were allocated to the *Dare Kokoda* (or *Daring Kokoda*) story. Mr Simond, the *Today Tonight* reporter concerned, spent some five working days playing the Camera Tapes and selecting footage, which, together with archival material, made up the 11½ to 12½ minutes. After allowing for the archival material, the selected footage occupied something a little less than that. The selected footage was transferred to a Master tape. It was designated at trial, 'the Selected Film Footage'.

8     It was not disputed that Seven owned the copyright in the Selected Film Footage. His Honour accepted the evidence of Llewellyn Willis Davies of the fifth and sixth respondents (collectively, 'Look'), that in compiling the one-hour Look Documentary he had not used the Selected Film Footage in any way. Moreover, his Honour thought the Selected Film Footage and the Look Documentary so different in nature and structure as to render the Selected Film Footage of little value to an experienced maker of a one hour special documentary, and, for the same reason, he thought 'subconscious copying' unlikely.

9     On the appeal, there is no challenge to these conclusions. Therefore, I agree with his Honour that an injunction in relation to the Selected Film Footage is not called for.

**WHO OWNED THE COPYRIGHT IN THE CAMERA TAPES FILM?**

10     I also agree with the primary Judge that Seven and Mr Murray were co-owners of the copyright in the Camera Tapes film.

11     Subsections 98(2) and (3) of the *Copyright Act 1968* (Cth) ('the Act') provide:

> '(2)     Subject to the next succeeding subsection the maker of a cinematograph film is the owner of any copyright subsisting in the film by virtue of this Part.
>
> (3)     Where:

Signed by AustLII

- 4 -

> (a)    a person makes, for valuable consideration, an agreement with another person for the making of a cinematograph film by the other person; and
>
> (b)    the film is made in pursuance f the agreement;
>
> the first-mentioned person is, in the absence of any agreement to the contrary, the owner of any copyright subsisting in the film by virtue of this Part.'

Subsection 22(4) of the Act provides:

> 'For the purposes of this Act:
>
> (a)    a reference to the making of a cinematograph film shall be read as a reference to the doing of the things necessary for the production of the first copy of the film; and
>
> (b)    the maker of the cinematograph film is the person by whom the arrangements necessary for the making of the film were undertaken.'

12    Professor Lahore (*Copyright and Designs*, at [20,145]) states in relation to s 22(4):

> 'The owner is therefore the producer who arranges the production of the first negative or tape of the film.  The directors, actors and others involved in the making of the film have no copyright interests in the film unless they are "makers" of the film.'

Also in relation to s 22(4), Professor Ricketson states (*The Law of Intellectual Property: Copyright, Designs and Confidential Information* at [5.45]) that the subsection's reference to the doing of things that are necessary for the production of a film:

> '... could include the business and financial "things" that are necessary for the production of the first copy as much as the actual physical acts involved in its making, such as the direction, shooting and editing.'

Professor Ricketson suggests that s 22(4) has the effect that ordinarily the owner of the copyright in a cinematograph film is the producer, rather than the camera operator or the director.

13    His Honour, the primary Judge, referred to both learned authors but did not find either's exposition of great assistance in the unusual circumstances of the present case.

14    Seven submits that while Mr Murray made the arrangements for the trip, Seven alone made the arrangements for the production of the Camera Tapes film.

Signed by AustLII

- 5 -

15    I disagree.  In my opinion, both Seven and Mr Murray made the arrangements necessary for the production of the first copy of the Camera Tapes.  I respectfully adopt his Honour's description of the arrangement as a 'joint venture'.  The idea for the trek **and for the filming of it** was Mr Murray's.  He arranged for the selection of the school boys to go on it and for the consent of their parents.  Accordingly, he arranged for the subject matter of the film: ten troubled and troublesome schoolboys walking the Kokoda Track.  He arranged for the funding of the return airfares, two nights' hotel accommodation in Port Moresby, insurance, and the supply of shoes, socks, sporting undergarments, backpacks, one-man tents, sleeping bags and food and drink, not only for them and the Camp Dare personnel, but also for Messrs Shannon and Lynch.

16    Seven's contribution was:

    (a)    remunerating the freelance camera operator, Mr Shannon, who was already providing his services to Seven (Seven paid Mr Shannon's tax invoices for his services totalling $6435);

    (b)    remunerating the freelance sound recordist, Mr Lynch, who was also already providing his services to Seven (Seven paid Mr Lynch's tax invoice of $3,850);

    (c)    supplying, through Mr Simond, a 'script', in the sense of a list of the kinds of matters to be filmed, prepared by Mr Simond and given by him to Mr Shannon for use by him and Mr Lynch on the trip;

    (d)    providing one Sony camera;

    (e)    paying for the hire from Mr Shannon of a second Sony camera (Seven paid his invoice for $550);

    (f)    supplying the blank Sony Mini DV tapes which were, in due course, recycled;

    (g)    hiring the sound recording equipment for use by Mr Lynch from the Audio Sound Centre at Artarmon;

    (h)    supplying the batteries for the cameras and for the sound recording equipment;

    (i)    supplying the blank DV Pro tapes;

    (j)    through Mr Shannon and Mr Lynch, deciding upon scenes and sequences to be filmed but with suggestions from Mr Murray and others.

17    The evidence was that the cost of Seven's contribution was of the order of $10,000.  The 'cost' of Mr Murray's contribution is difficult to identify.  In one sense, he contributed

Retrieved from AustLII on 13 February 2020 at 19:23:38

Verify version

Signed by AustLII

- 6 -

nothing more than his own time. However, he obtained substantial cash and kind from others. Mr Murray estimated the total value at $150,000. The value of the cash, goods and services which Mr Murray obtained far exceeded the cost of Seven's contribution.

18    No doubt a person's contribution may be too distant from the production of the first copy of a cinematograph film, for that person to be regarded as a 'maker' of it, but that is not so in the present case. Mr Murray arranged for the trip and came to an arrangement with Seven for the filming of it. Without Mr Murray, there would have been no expedition, and, without his invitation to Seven, there would have been no filming of it by Messrs Shannon and Lynch, and therefore no Camera Tapes film. It is not as though Mr Murray was proposing only the trip, and Seven suggested the filming of it. The filming of it was Mr Murray's idea from the outset. Indeed, he had made or set in train arrangements for another camera operator (once, Honie Rowley and later Paul Croll) which, in the event, were not implemented.

19    As was no doubt to be expected, in the course of the trek, various individuals made suggestions as to what should be filmed. For example, Mr Murray suggested a shot which included boys in the background, praying, with a view to showing that their Islamic faith was respected and that Camp Dare's work was applicable to those of all faiths, nationalities and races. Of course, Mr Shannon, as the camera operator, had the ultimate say as to precisely what filming took place, but this does not signify that Seven alone was the maker of the film.

20    Although the circumstances may indicate otherwise, ordinarily co-owners of copyright hold as tenants in common, not as joint tenants: *Lauri v Renad* [1892] 3 Ch 402 at 412-413; *Cescinsky v George Routledge & Sons* Ltd [1916] 2 KB 325 ('*Cescinsky*'); *Prior v Lansdowne Press Pty Ltd* [1977] VR 65 at 68; *Prior v Sheldon* (2000) 48 IPR 301 at [79]. In the absence of the consent of the other co-owner, one co-owner is neither entitled to do an act comprised in the copyright, nor to grant a licence to a third party to do such an act, and the non-consenting co-owner is entitled to an injunction against the infringing co-owner or putative licensee: *Lauri v Renad*, above, at 413-3; *Cescinsky*, at 329-320.

21    In my opinion, Mr Murray and Seven owned the copyright in the Camera Tapes film as tenants in common. We are not required to determine in what shares. The primary Judge said (at [59]) that '[c]opyright in the Camera Tapes was jointly held between DARE and Seven'. I have little doubt that his Honour was not intending to distinguish between 'joint'

Signed by AustLII

- 7 -

and 'in common' co-ownership.  The word 'joint' is often used, even by the most highly respected of writers, in a broad sense to refer simply to co-ownership; cf *Copinger and Skone James on Copyright* (13th ed), ch 7; *Prior v Sheldon*, above, at [79].

22    Unless Seven assigned its interest in the copyright to Mr Murray, or the respondents enjoy the benefit of a licence, binding on Seven, to do what they propose, they threaten to infringe the copyright in the Camera Tapes film, and Seven is entitled to an injunction.

**THE UNINCORPORATED ASSOCIATION ISSUE**

23    At the time of the critical meeting in Mr McPherson's office at Seven's studios at Epping on 11 February 2004, D.A.R.E Operations Pty Limited and D.A.R.E International Pty Limited had not been incorporated.  They were not registered until 12 and 15 March 2004 respectively.

24    Prior to and as at 11 February 2004, Mr Murray undertook his activities of assisting troubled youth and young people from disadvantaged backgrounds, with the support and assistance of others.  Those others contributed cash or goods or services.  Some of them worked with Mr Murray and the young people, and some did not.  Kevin Watt (who described himself as a 'corporate coach'), Ross Townhill (a certified practising accountant), Iain Cook (a personal trainer), and Thomas Aguilar (who described himself as a 'youth worker ... youth motivational speaker'), all attended the meeting on 11 February 2004 in support of Mr Murray, and had previously aided him in his activities in various ways (Mr Cook and Mr Aguilar accompanied Mr Murray on the Kokoda trip).

25    In my opinion, at the meeting on 11 February 2004, Seven, through Mr McPherson, the Executive Producer of *Today Tonight*, made a contract with Mr Murray.  Seven relies on references in the evidence to 'Camp Dare' as the supposed party with which Seven dealt.  It is true that there were numerous references in the course of the 1–1½ hour meeting to 'Camp Dare' as if it was an organisational entity.  Perhaps the high point of that evidence is an acknowledgment by Mr Murray that his contention was that Mr McPherson had agreed that 'Camp Dare', as distinct from Mr Murray 'personally', was to make use of the footage. Seven also points to the use of 'we' as distinct from 'I' by Mr Murray, and to references by Mr Watt, for example, to 'Camp Dare'.

- 8 -

26    In my view, however, the position is tolerably plain:  Mr McPherson, Mr Murray and all others present at the meeting should reasonably have understood 'Camp Dare' to mean 'Mr Murray supported and assisted by others', and should reasonably have conceived of Mr Murray as the only person on the Camp Dare side who was taking the benefit and incurring the burden of the commitments made at the meeting.

27    Mr Murray's acknowledgment, referred to at [25] above, is properly to be seen as no more than an acknowledgment that he was acting in charitable rather than private interests.

28    *Bradley Egg Farm Ltd v Clifford* [1943] 2 All ER 378, relied on by Seven, is distinguishable. The 'Lancashire Utility Poultry Society', an unincorporated body with a large number of members, purported to contract to test the plaintiffs' fowls for a particular disease.  On the Society's side, the contract was made on its notepaper and signed by its Technical Manager. The issue was who were the principals of a person who was clearly an employee, who carried out the testing, and who were therefore liable for the employee's negligence.  The Court of Appeal held, by majority, that they were the members of the Society's Executive Council, not the Society's members.

29    The present case is not one in which Mr Murray was employed and the question is by whom. Rather, the question is with which person or persons Seven was dealing.

30    The parties intended to conclude an agreement and the law strives to fulfil, rather than to frustrate, their expectations.  A choice must to be made between Mr Murray on the one hand and no one on the other hand.  I have no doubt that the common intention of the parties was that Mr Murray be the contracting party.  He was clearly the leader of those on his side who attended the meeting on 11 February 2004.  He began the discussion with a 10–15 minute exposition of 'Camp Dare'.  It was Mr Murray with whom Mr McPherson conversed over the question of the subsequent use to be made of the Camera Tapes.  Seven had previously dealt with Mr Murray in relation to a *Today Tonight* story on a Camp Dare boot-camp at Ulladulla.

31    Mr Murray did not purport to contract on behalf of a company to be formed (cf *Corporations Act* s 131) and there was no purported assignment by him to either D.A.R.E. company, both of which can henceforth be ignored.

- 9 -

32    At the meeting on 11 February 2004, Seven contracted with Mr Murray.

**WAS THERE A CONTRACT FOR A FUTURE ASSIGNMENT OR FOR THE GRANT OF A LICENCE?**

**General**

33    As at 11 February 2004, Seven owned the blank Camera Tapes, while it and Mr Murray were to own, as tenants-in-common, the copyright in the cinematograph film yet to be embodied in them. Because Seven had physical possession of the Camera Tapes, Mr Murray would be able to exploit the copyright only by getting access to them. Because of co-ownership of the copyright, each of Mr Murray and Seven would need the other's consent in order to do any of the acts, the exclusive right to do which constituted that copyright.

34    What were those exclusive rights? Section 86 of the Act provides:

> 'For the purposes of this Act, unless the contrary intention appears, copyright, in relation to a cinematograph film, is the exclusive right to do all or any of the following acts:
> (a)    to make a copy of the film;
> (b)    to cause the film, in so far as it consists of visual images, to be seen in public, or, in so far as it consists of sounds, to be heard in public;
> (c)    to communicate the film to the public.'

At the meeting, the parties did not speak in terms of any of these classes of act or refer to 'copyright' at all.

35    For whatever agreement Seven made at the meeting, Mr Murray furnished consideration: he agreed to permit Seven's Mr Shannon and Mr Lynch to go on the trip and to record the moving images and accompanying sounds, to bear the cost of their fares, accommodation and other expenses, and to allow Seven first use of the raw footage for the purpose of the making of a story and the broadcasting of it on *Today Tonight*.

36    Was the consideration furnished by Mr Murray furnished for a promise by Seven to him to assign to him Seven's interest in the copyright in the cinematograph film to be made, or was it furnished for the grant of a licence by Seven? The answer to this question is not obvious. As McCardie J observed in *Messager v British Broadcasting Co* [1927] 2 KB 543 at 550, whether an assignment or licence is created often gives rise to difficulty, and (at 551):

Verify version

Signed by AustLII

- 10 -

*'Intention must be the ultimate test for deciding whether an agreement be an assignment or a licence, and intention is to be gathered from the document itself and the surrounding circumstances.'*

37    The primary Judge was persuaded to find a promise to assign.  In support he referred to the facts that Seven and Mr Murray were to be co-owners of the copyright;  that Seven had no continuing use for the Camera Tapes after the broadcasting of the story on *Today Tonight*;  and that through Mr Simond, Seven handed over to Mr Murray the Camera Tapes, which were the only embodiment of the subject matter of the copyright.

38    To my mind, the handing over of the Camera Tapes carries little weight:  since they were the only embodiment of the Camera Tapes film and Seven had no further use for them, it was inevitable that they would be delivered to Mr Murray in order that he be able to do any act at all comprised in the copyright, no matter how minor.  For example, if Seven had consented to Mr Murray's copying a substantial part of the Camera Tapes film for the purpose of screening it for his family, the Camera Tapes would have had to be handed over (cf the delivery of the electro blocks of illustrative drawings in *Cooper v Stephens* [1895] 1 Ch 567 and *W Marshall & Co Ltd v AH Bull Ltd* (1901) 85 LT 77).  In any event, Mr Murray agreed in cross-examination that the basis on which he was handed the Camera Tapes at Soldiers Beach was the basis, whatever it was, that had been agreed at the meeting on 11 February 2004.  The property in them passed from Seven to Mr Murray upon delivery; but in implementation of the contract of 11 February 2004.

**What was said at the meeting on 11 February 2004?**

39    It is necessary to consider closely what was said at the meeting relevant to what was to happen to the Camera Tapes after Seven's story had gone to air, against the background facts known to both parties.  Although affidavits by all who attended the meeting were read, the material relating to the actual conversation at the meeting was not read, the evidence in that respect being given orally.

40    It seems to me that the possible analyses with respect to which the conversation at the meeting is to be considered are:

(1)    that Seven contracted to assign its interest in the copyright to Mr Murray, and

Retrieved from AustLII on 13 February 2020 at 19:23:38

- 11 -

    (a)      Mr Murray promised that the acts comprised in the copyright would not be done except for promotional purposes; or

    (b)      Mr Murray made no such contractual promise.

(2)    that Seven granted Mr Murray a non-assignable licence to do the acts comprised in the copyright:

    (a)      for promotional purposes only; or

    (b)      for any purpose; and

(3)    that Seven granted Mr Murray an assignable licence to do the acts comprised in the copyright:

    (a)      for promotional purposes only; or

    (b)      for any purpose.

His Honour's conclusion was (1)(b). Of course, at the time of the conversation, the subject matter of the copyright had not come into existence. We are concerned with 'an agreement made in relation to a future copyright'; cf s 197 of the Act.

41    A careful reading of the transcript bears out his Honour's observation that the recollections of those who were present at the meeting have been affected by the conflict which subsequently arose and by their allegiances. His Honour was not satisfied either that Mr McPherson expressly imposed a limitation as to the use of the Camera Tapes by Camp Dare or, on the other hand, that the request included such words as 'as we see fit' or 'at our discretion'. There is no challenge to his Honour's findings in either respect.

42    Nor is there a challenge to his Honour's finding that Mr Murray gave as the reason for the request, that he wanted the Camera Tapes for Camp Dare promotional purposes. It was inevitable that his reason for the request be given, although it might have been given with different degrees of detail and elaboration. Mr Murray said that both he and Mr Watt said that the tapes were required in order to promote Camp Dare. Mr Murray said that he added 'you know, DVDs ...'. Mr Watt denied referring to promotional purposes.

43    His Honour found that Mr Watt 'referred to rights as well as the physical tapes'. No doubt his Honour had in mind Mr Watt's testimony that he said 'Camp Dare would like the rights to the tape and the footage after [you] have used it on *Today Tonight*'. Mr Simond denied that anything was said on the topic of 'ownership of rights in the footage' and Mr McPherson's

- 12 -

testimony was to the same effect. His Honour may be taken to have preferred the evidence of Mr Watt on this question.

**Conclusions as to the effect of the conversation at the meeting**

44      The finding that Mr McPherson's response to the request was unequivocal does not necessarily mean that a 'promotional purpose' limitation was not part of the bargain reached. If it was, however, it was because of a limitation in the terms of the request to which Mr McPherson was responding.

45      It seems to me that the critical question is how Mr Murray's initial request is properly to be understood, in the light of all relevant surrounding circumstances. Mr Murray said 'I want their [Mr Shannon's and Mr Lynch's] footage because, you know, we want to be able to [do] promotional stuff for Camp Dare and, you know, DVDs ...', to which Mr McPherson replied 'Well, I can't see a problem with that'. It is possible to regard Mr Murray's statement of his reason as a gratuitous truthful statement of his intention at the time, but it is also possible to regard it as an integral part of the request.

46      After considerable fluctuation in my view, I have concluded, for the reasons which appear below, that the latter view is the correct one. The sense of the exchange is captured, in my opinion, if we imagine Mr McPherson emphasising the word 'that' – 'well I can't see a problem with **that**'. Mr McPherson's positive response incorporated the notion 'promotional stuff for Camp Dare, you know, DVDs'.

47      There is a separate, but related, question as to the scope of the notion of 'promotional purposes'. Mr Murray lacked the skill and equipment required to make anything out of the Camera Tapes, which were in DV Pro format. Clearly, it was envisaged that he be at liberty at least to authorise others to make a copy of parts of the Camera Tapes film in order to produce a film fit to be, at least in some circumstances, seen and heard in public or communicated to the public. It is not necessary, and it is undesirable, for the Court to attempt, to delineate the precise extent, if any, beyond 'DVDs', of the meaning of the expression 'promotional purposes'. It suffices to say that, for the reasons which appear below, I do not think the proposed broadcasting on the competing Nine network was within the terms of Mr Murray's request – 'promotional stuff for Camp Dare and you know, DVDs'.

- 13 -

48    The significance of the exchange between Mr Murray and Mr McPherson on 11 February 2004 must be assessed against the following background facts.

49    (1)    At least one story on Camp Dare's 'boot camp' for school boys at Ulladulla had previously gone to air on *Today Tonight* (there was also an unclear reference in the evidence to a 'follow up' story).  On 16 September 2003, Mr Murray sent an email to Sonia Lear of Seven.  In it Mr Murray stated that the *Today Tonight* reporter involved, Mr Simond, 'left Ben Fordam [sic] in the dark ...'.  Ben Fordham worked for Nine.  This was one of several instances of Mr Murray aligning himself with Seven and showing that he regarded Nine as Seven's, and his own, 'opposition'.

50    More importantly, however, the email concluded:

> *'Let me know if there is anything I can do for you and let me know when the story goes to air.  Oh just wanted to ask, is it possible to get a copy of the footage shot at Camp DARE, I just want to put together a promo video to send out to high schools.  Adam the camera man said he had 7 hours of footage.  It would be a great help, **I won't tell anyone**!'* (my emphasis)

This passage is of some significance in showing a kind of promotional use for which Mr Murray might wish to have raw footage.  More important, however, is the statement 'I won't tell anyone'.  This shows that Mr Murray appreciated that Seven would not readily agree to hand over raw footage as distinct from adhering to its ordinary practice of recycling the film after a story had been composed from it and gone to air.  (The evidence was that Seven retained only (on a master tape) the film that had gone to air.)

51    In cross-examination in relation to this sentence, Mr Murray agreed that he said 'I won't tell anyone' because he knew that it was unusual to get access to raw footage, and that even in the context of using the raw footage only for a 'promo to go to high schools', it was something unusual as he understood it. [**T226**].

52    There might be several reasons for a general policy against parting with raw footage:

- a desire not to encourage the making of such requests with resulting administrative inconvenience to Seven;
- a desire not to allow depletion of its stock of blank tapes;

- 14 -

- a desire not to allow some possibly poor quality filming and sound recording to be seen and heard;

- a desire to avoid the possibility of embarrassment to persons filmed; and, generally,

- a desire that the film be seen only as 'packaged' by Seven via its own broadcast, and with accompanying advertisements, rather than in its raw form and free of any control by Seven.

53    It should be inferred that Mr Murray understood, or if he had thought about it would have understood, that there were reasons for Seven's expected reluctance to hand over raw footage, and for the sensitivity of a request for raw footage.

54    Mr Murray hoped, nonetheless, that Seven would regard the making of 'a promo video to send out to high schools' as a special case. He was suggesting that the limited and charitable nature of his request should induce Seven to make an exception in his case.

55    In the event, Seven did not give Mr Murray the Ulladulla footage: it gave him VHS copies of the program that had gone to air, which he used for promotional purposes. The fact that he did not get the raw footage could only have reinforced his understanding of the response which a request for raw footage was likely to elicit from Seven.

56    There may well have been some differences between the Ulladulla and the Kokoda circumstances:  Mr Murray was a co-owner of the copyright in the Camera Tapes, his contribution to the cost of the Kokoda venture was much greater than Seven's, and the question of his having access to the Kokoda raw footage was raised prior to the filming. On the other hand, his request for the Kokoda footage was a request for far more footage than was his request for the Ulladulla footage. In fact, the evidence reveals little, if anything, about the background to the filming of the Ulladulla boot-camp. What is important, however, is that Mr Murray's email shows that he must have understood, later on 11 February 2004, that the similar request he then made was again a sensitive one, and that Seven would again be reluctant to part with raw footage unless he could make out a special case of a 'charitable' nature.

- 15 -

57    (2)  Apparently there was a rapport between Mr Murray and Mr Simond, and Mr Murray raised with Mr Simond his idea of taking ten boys from Punchbowl High School on the Kokoda Track and for a film of the venture to be screened as a 'special' on Anzac Day (25 April 2004).  On 9 October 2003, he sent an email to Mr Simond stating:

> '*I think with the Kokoda special we can beat the effort ACA* [*A Current Affair*, Nine's half-hour news and current affairs program in competition with Seven's *This Day Tonight*] *did back in '96 with Angry Anderson, and the Kokoda trail they did.*'

58    (3)  On 17 October 2003, Mr Murray emailed Mr Simond stating:

> '*The 10-15 minutes sounds great as you said, a good starting point, but we really are looking for a 1 hour special, this will have so many spin off effects, especially with the 60th anniversary next year, we could do this one and announce a special for next year and be Johnny on the spot for it **and get the jump on the other networks**, even take up the same team to visit the track twelve months on.*'  (my emphasis)

59    (4)  In cross-examination, Mr Murray was asked whether he was conscious back in late 2003 of the 'rivalry' between Seven and Nine, to which he replied 'Now, I was, yes, yes, It is quite evident'.

60    (5)  His Honour said (at [56]) that Mr McPherson was influenced to agree to Mr Murray's request by:

> '(1)  *The unusual nature of the arrangement whereby Seven was only contributing the equivalent of wages and the use of equipment in obtaining film of an unusual, indeed exotic, and expensive overseas event with obvious television appeal with all other expenses to be met by DARE.*
>
> (2)  *The fact that as the Camera Tapes would be erased and recycled after any program had gone to air, there was no possibility of any further commercial exploitation by Seven of any copyright in the Camera Tapes thereafter.*
>
> (3)  *A desire to assist a good cause championed by Simond.*
>
> (4)  *As the reference by Murray to the use for promotional purposes did not ring any warning bells with him.  I am satisfied that if the possibility of any part of the Camera Tapes being broadcast on Nine had been raised, it is likely that McPherson would not have agreed to that possibility.*'

61    (6) The following exchange occurred in the cross-examination of Mr Murray:

> '*Do you seriously tell his Honour that your understanding of what happened on 11 February, is that Mr McPherson authorised you to take that footage to be broadcast on Channel Nine? – They gave it to me, it is mine. I can do with it what I like. He said, "You can have it".*'

It is not clear that Mr Murray was stating what his understanding was of Mr McPherson's intention, but in my opinion it should be inferred in the light of (1) to (5) above that he would have expected Mr McPherson not to agree if the possibility of any part of the Camera Tapes film being broadcast by Nine had been raised.

62    What would have happened if it had been raised is a matter of speculation. Mr Murray had a strong desire to achieve the broadcast of a one-hour special. He may have tried to persuade Mr McPherson that he was being unreasonable in view of the extent of the Camp Dare investment in the project. He may have sought a discussion with the Programming people at Seven. He may have immediately abandoned Seven and taken his project to another network, such as Nine. It may be, therefore, that the Camera Tapes would never have come into existence. All that we can be sure of, and Mr Murray must be taken to have been sure of it, is that the Camera Tapes would not have come into existence in circumstances in which Seven would have agreed to the making of a documentary out of them for broadcast by Nine.

63    Mr Murray's request of Mr McPherson should be understood in the sense that **he**, Mr Murray, wanted the Camera Tapes for Camp Dare promotional purposes only. There is no good reason to regard Seven as having agreed to anything more than what Mr Murray requested, and to have granted to Mr Murray anything more than a non-assignable licence for those purposes.

64    An assignment of Seven's share in the copyright would result in Mr Murray being able to assign the copyright to any third party who would be at liberty to do the acts in the copyright for any purpose, for example, the copying of parts and using them to make a television advertisement for communication to the public.

65    Nor is there reason to regard the agreement as one for the grant of an assignable licence. It was probably inevitable that Mr Murray personally be the licensee, once it is accepted that

Retrieved from AustLII on 13 February 2020 at 19:23:38

- 17 -

the licence was one only for the promotion of Camp Dare. Moreover, '[a] licence is, prima facie, personal to the licensee': *Dorling v Honnor Marine Ltd* [1964] Ch 560 at 568.

66      This does not mean that Mr Murray could not exercise the licence through the engagement of others. Clearly, the parties contemplated that at least he would be entitled to have others produce 'DVDs' out of the Camera Tapes film. Perhaps too, if Mr Murray had engaged Look to produce a one-hour film to promote the work of Camp Dare for screening by him or on his behalf, in schools or public venues or before service organisations or prospective sponsors, this would have fallen within the notion of 'promotional purposes'.

67      We are not required to attempt to define the outer boundaries of Mr Murray's licence. It was not a licence for 'unrestricted use' as was pleaded in para 96(b) of the respondents' further amended defence. the concept of a use by Mr Murray for promotional purposes. According to the Licence Agreement between Look and Nine of late December 2004, Look produced a film described as:

> 'one commercial hour formatted with 5 breaks (6 segments) including all opening and closing titles and all play-ons and play-offs.'

Look warranted to Nine that it owned the 'complete entire unfettered and exclusive rights in [the 'DAREing the Kokoda' film]'. Mr Murray was not a party.

68      In my opinion, this was not Mr Murray exercising his non-assignable licence to use the Camera Tapes for 'promotional purposes, you know, DVDs', notwithstanding some references in the Look Documentary to Camp Dare.

**CONCLUSION**

69      Seven agreed, for valuable consideration, that Mr Murray was to have a non-assignable licence to do the acts comprised in the copyright for the promotion of Camp Dare.

70      The proposed communication by Nine to the public of the documentary 'DAREing the Kokoda', lies outside that licence, and would, for lack of a licence binding on Seven, infringe the copyright in the Camera Tapes film.

- 18 -

71    The appeal should be allowed with costs, and there should be an injunction.  The parties
should be given the opportunity of agreeing on the terms of the injunction.


I certify that the preceding seventy-one (71)
numbered paragraphs are a true copy of the
Reasons for Judgment herein of the
Honourable Justice Lindgren.


Associate:

Dated:              8 August 2005

Signed by AustLII

GENERAL  DISTRIBUTION

**IN THE FEDERAL COURT OF AUSTRALIA**                    **NSD 667 OF 2005**
**NEW SOUTH WALES  DISTRICT REGISTRY**


**ON APPEAL  FROM A JUDGE OF THE FEDERAL COURT OF AUSTRALIA**

| | |
|---|---|
| BETWEEN: | **SEVEN NETWORK (OPERATIONS)  LIMITED** |
| | **(ACN 052 845 262)** |
| | **FIRST APPELLANT** |
| | |
| | **CHANNEL SEVEN SYDNEY PTY LIMITED** |
| | **(ACN 000 145 246)** |
| | **SECOND APPELLANT** |
| | |
| AND: | **TCN CHANNEL NINE PTY LIMITED (ACN 001 549 560)** |
| | **FIRST RESPONDENT** |
| | |
| | **NBN LIMITED (ACN 000 232 486)** |
| | **SECOND RESPONDENT** |
| | |
| | **BRETT MURRAY** |
| | **THIRD RESPONDENT** |
| | |
| | **D.A.R.E OPERATIONS  PTY LIMITED (ACN 108 345 446)** |
| | **FOURTH RESPONDENT** |
| | |
| | **LOOK TELEVISION  PRODUCTIONS PTY LIMITED** |
| | **(ACN 008 685 497)** |
| | **FIFTH  RESPONDENT** |
| | |
| | **LOOK FILM PRODUCTIONS PTY LIMITED** |
| | **(ACN 002 486 384)** |
| | **SIXTH RESPONDENT** |
| | |
| JUDGES: | **LINDGREN, FINKELSTEIN  AND EDMONDS JJ** |
| DATE: | **8 AUGUST  2005** |
| PLACE: | **SYDNEY** |

**REASONS FOR JUDGMENT**

## FINKELSTEIN J

72      The point we have to decide on this appeal lies in a narrow compass, but the matter is of
        some consequence to the parties.  The issue is this.  Who is the owner of the copyright in a
        cinematograph film, being footage taken on a trip to the Kokoda Trail?  The judge decided
        (and his finding is not challenged) that the footage was made by the appellants (collectively
        "Seven") and Mr Murray, and therefore they were joint owners.  In *Prior v Lansdowne Press*

- 2 -

*Pty Ltd* [1977] VR 65, 68, Gowans J held that co-authors hold copyright as tenants in common rather than as joint tenants and, in the absence of agreement to the contrary, in equal shares. Mr Murray contends that at a meeting held on 11 February 2004 Seven agreed to assign to him absolutely its then future interest (the film was taken the following month) in the copyright. Thus he says he was entitled to authorise the fifth and sixth respondents, production companies, to make from the footage a documentary to be shown in a broadcast by the first respondent, TCN Channel Nine Pty Ltd ('Nine'). The judge accepted these contentions. They are challenged on appeal.

73      The dispute arises in the following way. Mr Murray established an organisation called DARE (Discipline And Responsibility Encounter) (sometimes called 'Camp Dare') to assist young people from disadvantaged backgrounds to pursue their goals and dreams. One of the things he does is to arrange residential camps with motivational programs of one kind or another. He is keen to promote DARE as much as possible. He relies heavily on sponsorship and volunteer assistance.

74      Mr Simond is a reporter with 'Today Tonight', a current affairs program produced and broadcast by Seven. In 2003, Mr Simond was approached by Mr Murray and asked to do a segment on DARE. Mr Simond agreed and arranged for a film to be shot of a DARE camp. A segment was later shown on 'Today Tonight'. Before the program went to air Mr Murray sent an email to Seven expressing his gratitude. The email went on: 'Oh just wanted to ask, is it possible to get a copy of the footage shot at Camp DARE, I just want to put together a promo video to send out to high schools, Adam the camera man said he had 7 hours of footage, it would be a great help, I won't tell anyone!' Following the broadcast Seven sent Mr Murray a tape of the program in the form it had been broadcast. Mr Murray used the tape to promote DARE.

75      At the beginning of October 2003 Mr Murray hit upon the idea of taking a group of students from Punchbowl Boys' High School, an underprivileged school whose students are largely drawn from the Muslim Lebanese community, on a trip to the Kokoda Trail. He contacted Mr Simond and told him of the idea. He wanted to know whether Seven would film the trip for a special documentary that might be broadcast on Anzac Day. Mr Simond expressed interest, at least for a short segment to be shown.

- 3 -

76    A meeting to discuss the proposal was arranged for 11 February, attended by Mr Murray and his two advisers, Mr Townhill (an accountant) and Mr Watt (a corporate consultant), and representatives of Seven, including Mr Simond and Mr McPherson, the executive producer of 'Today Tonight'. Before the meeting, Mr Murray discussed the proposal with Mr Townhill and Mr Watt. Mr Townhill suggested that Mr Murray obtain written confirmation from Seven that DARE was to retain ownership of any footage shot on the trip because of its importance 'as a fund raising asset for Camp DARE'. Mr Townhill made a note of this conversation on his personal computer. The note reads: 'C7 written commitment confirmation of DARE ownership of rights. Today Tonight. BM'.

77    Strictly speaking the evidence of this conversation and the note was inadmissible. The common law rule (which has not been changed by the *Evidence Act 1995* (Cth)) is that self-serving statements are inadmissible to support the credibility of a witness: *Jones v South-Eastern and Chatham Railway Company's Managing Committee* (1918) 87 LJKB 775, 779; *R v Connolly* [1991] 2 Qd R 171, 173-174. The rationale for the prohibition is that it presents a person with the opportunity of creating false evidence. In any event, self-serving evidence usually has little probative value. There are exceptions to the rule. One exception is where the evidence forms part of the *res gestae*. It will be part of the *res gestae* if the statement is made contemporaneously with and directly concerning an event in issue: *Adelaide Chemical & Fertilizer Co Ltd v Carlyle* (1940) 64 CLR 514, 524-526, 530; *Teper v The Queen* [1952] AC 480, 487; *Ratten v The Queen* [1972] AC 378, 389. This is not the situation here. The judge relied on Mr Townhill's note but was in error in doing so. In any event, even if the note were admissible it is not clear (because his evidence is ambiguous) whether Mr Townhill told Mr Murray that he should ask for rights over the footage for 'fund raising' purposes. If he had, that would support Seven's case.

78    Returning to the narrative, we now come to the all-important meeting of 11 February. It lasted just over one hour. Things were agreed. There was some argument that it was not possible to identify the contracting parties. This is fanciful. Whatever was agreed was between Seven and Mr Murray. On this finding, it is common ground that Mr McPherson agreed that Seven would send two men (a cameraman and a sound recordist) to film the expedition on the basis that the fares, accommodation and expenses of the men were covered by Mr Murray. It is also common ground (at any rate, it was so found by the judge) that

- 4 -

Mr McPherson committed Seven to broadcasting a piece on the expedition on 'Today Tonight'. He did not, however, commit Seven to broadcasting the documentary that Mr Murray was looking for.

79    There was a short discussion about the 'rights' to the footage. The discussion took place toward the end of the meeting. There is no doubt something was agreed. It is necessary to decide precisely what was agreed. To undertake that task I will consider the respondents' case in its most favourable light. That is, I will determine what was agreed solely by reference to the respondents' account of the negotiations, save to the extent that this account was rejected by the judge.

80    On the respondents' side there are only two witnesses who gave relevant evidence, Mr Murray and Mr Watt. This is what Mr Murray said:

> '*Q:     Now could you continue on with the – after discussion of the logistics and what you've said about you pressing for a longer program what else was said in the course of the meeting?  A:  I asked – Craig McPherson said well look, once it goes to air I want their footage because, you know, we want to be able to promotional stuff for Camp Dare and, you know, DVDs and, you know, sort of as we see fit and he sort of looked at Chris Simond and said well I can't see a problem with that.*
>
> *Q:     Do you recall anything particularly about Mr McPherson looked at Mr Simond at the time?  A:  Yes, he was a very cool character and he sort of put his hand on his head like this and sort of swung his chair around at Chris Simond and said, 'I can't see a problem with that' and then sort of swung back to us.*
>
> *Q:     Now did anyone else then on behalf of Camp Dare raise the issue of the footage?  A:  Certainly.  Again as the meeting went on more logistics was discussed and I panned out the scenarios that will happen but –*
> *…*
>
> *HIS HONOUR:  The logistics, for example, you should tell us about that?  A: Right.  Well, I went on to explain that we'd got boots, socks, sporting undergarments to stop them chafing, line-breaks, you know, pants, shirts, the whole kit.  Black Wolf had donated $14,500 worth of backpacks and sleeping bags and tents, single man tents for everyone.  So I told them look we'd supply that and then Kevin Watt chimed in at that point and said, "So once it goes to air Camp Dare will have the rights to use the footage for promotional purposes and, you know, as we see fit" and Craig McPherson said, "Yes, no problem, once it goes to air, no problem".'*

Signed by AustLII

- 5 -

The judge accepted most of this evidence. He did reject one important aspect. He did not accept the assertion that Mr Watt said that DARE should be able to use the footage 'as we see fit'.

81     Then there is the evidence of Mr Watt. What follows is from his evidence in chief:

> 'Q:     And can you give us the effect of what he [Mr McPherson] said on that topic, Mr Watt? A: He said that Channel Seven will send the cameraman and the sound man on the Kokoda but there was no mention of any other funds coming forward from him. He just said that we will do that.
>
> Q:     You indicated that after that you said something to Mr McPherson. Just go back to that and tell us what you said to Mr McPherson once he said what you have just mentioned? A: I said to him that Camp Dare would like the rights to the tape and the footage after they have used it on Today Tonight.
>
> Q:     And did he say something in response to that? A: It was a simple "Yeah, okay, no problem".
>
> Q:     Now, was there – could you just continue on with the meeting? What else do you recall being said in the course of that meeting after that had been said? A: One of the things that – I stood up and said to him – I don't know whether I stood up – but I said to him that "The amount of tape footage you're going to get from us is going to be much more than you can use in a Today Tonight show." I said, "You're going to get perhaps a mountain of fodder for various TV programs."
>
> Q:     Yes. Continuing on, after that was there any further reference to the film or the footage? A: No.'

Mr Watt was cross-examined. It was put to him that all he had requested of Seven was the right to use the footage for promotional purposes. He rejected this suggestion. He said that he had made no reference to use for promotional purposes. When asked by the judge: 'You are sure?', Mr Watt responded: 'I am sure that I didn't refer to it, it was unconditional, there were no conditions from either party.' In the light of the judge's findings (which I will come to shortly), it is clear that he did not accept this part of Mr Watt's evidence.

82     The Kokoda trip took place between 1 and 9 March 2004. The Seven crew (cameraman and sound recordist) went on the trip and recorded about thirty hours of footage with accompanying sound. 'Today Tonight' screened a segment of the expedition on 23 April

Retrieved from AustLII on 13 February 2020 at 19:23:38

Verify version

- 6 -

2004 with a follow-up segment on 26 April 2004, showing World War II veterans meeting the schoolboys who attended the trip.  Seven did not produce a documentary.

83    There are matters that occurred after the trip that may help explain what agreement was reached during the February conversation.  As things presently stand Anglo-Australian law does not allow reference to what the parties to a contract said and did before or after the contract as an aid to construction:  *James Miller & Partners Ltd v Whitworth Street Estates (Manchester) Ltd* [1970] AC 583; *L Schuler AG v Wickman Machine Tool Sales Ltd* [1974] AC 235; *Secured Income Real Estate (Australia) Limited v St Martins Investments Proprietary Limited* (1979) 144 CLR 597; *FAI Traders Insurance Company Ltd v Savoy Plaza Pty Ltd* [1993] 2 VR 343.  The fear is that this approach could result in a contract having different meanings on different days.  The rule does not, however, prevent the reception of pre-contract conduct (*White v Australian and New Zealand Theatres Limited* (1943) 67 CLR 266) or post-contract conduct (*Australian Estates Ltd v Palmer* (unreported, New South Wales Court of Appeal, Kirby P, Samuels and Meagher JJA, 22 December 1989)) to identify the things with which the contract does deal.  The matters to which I will now refer provide this kind of assistance.

84    In early May 2004, Mr Murray telephoned Mr Simond and told him that he was planning to conduct a camp at Soldiers Beach on the Central Coast.  He invited Seven to film the event. Mr Simond agreed.  During the course of the conversation Mr Murray said:  '[O]h, by the way, this stuff [the Kokoda expedition] has gone to air now, can we have the tapes?' Mr Simond responded:  'Yes, I will talk to Craig [McPherson] about it.'  In due course Mr Simond went to Soldiers Beach for the filming.  During a break he called Mr Murray to his [Mr Simond's] car and said: 'My friend … I come bearing gifts.'  He then opened the car door, took out the tapes containing the footage and handed them to Mr Murray.  Mr Murray's response was:  '[M]an, I can't believe you have given me these, well done, good luck.'  In cross-examination he acknowledged that he also said to Mr Simond: 'I want the tapes for a DVD to send out to potential sponsors.'

85    On the basis of this evidence the judge made the following findings:

> '(1)    That provision of the Camera Tapes by Seven to DARE was raised separately by Murray and by Watt.

- 7 -

(2)     *That the reason advanced by Murray for the request was use by DARE of the Camera Tapes for promotional purposes and there was no mention of any other particular proposed use. I am not satisfied that there was an express reference to any general discretion to use the Camera Tapes as DARE saw fit or that, if mentioned, it was heard, understood or accepted by McPherson.*

(3)     *That Watt raised the topic after Murray and that he referred in that context to DARE financing the expedition and paying all the expenses for Shannon and Lynch.*

(4)     *That Watt referred to rights as well as the physical tapes. He had planned to do so in advance.*

(5)     *That McPherson unequivocally committed Seven to providing the only copy of the Camera Tapes to DARE once whatever program or programs that Seven chose to broadcast had gone to air without any express limitation as to the use of the Camera Tapes by DARE.'*

The result, according to the judge, was that Seven promised it would assign to Mr Murray the copyright in the footage when it came into existence. The doctrine of *Holroyd v Marshall* (1862) 10 HL Cas 191 would take care of the rest.

86     The judge did not ignore the statement made from time to time by Mr Murray about the use of the footage for promotional purposes. As to this, the judge said that: 'The statement on the part of DARE about the purpose for use being promotional was representational (and had an influence as such) rather than promissory. It was not a term or condition of the agreement to transfer title.' The judge is saying that the statement induced the agreement but did not achieve the status of a warranty. This is an unlikely but possible result: *Dick Bentley Productions Ltd v Harold Smith (Motors) Ltd* [1965] 1 WLR 623, 627; *Esso Petroleum Co Ltd v Mardon* [1976] QB 801.

87     The general approach taken by the judge adopts 'top-down' reasoning. He inquired whether copyright had been assigned (and found that it had) and then investigated whether there was any exception to an absolute assignment. I would prefer a 'bottom-up' approach and determine precisely what has been given over.

88     In deciding exactly what has been agreed, we are confined to an examination of what the parties said and did. This examination is to be approached from the perspective of the

Signed by AustLII

- 8 -

reasonable person, who previously only had work in torts cases.  What would the reasonable person think the parties meant?

89    The discussion between the parties must be understood in the following context.  I have already mentioned that the judge found that the footage was jointly owned by Seven and Mr Murray.  He reached this conclusion in the following way.  Copyright in a cinematograph film lies with the maker of the film:  *Copyright Act 1968* (Cth), s 98(1).  The maker is 'the person by whom the arrangements necessary for the making of the film were undertaken': s 22(4).  Mr Murray made the arrangements for the Kokoda expedition.  The trip was filmed by Seven personnel.  So, according to the judge, each was a maker of the film.  This finding is probably incorrect, but was not challenged on appeal.  Notwithstanding the finding of joint ownership, it is clear that at the meeting the discussion proceeded upon the assumption that the footage of the trip would, in the absence of some agreement to the contrary, belong to Seven.  If anyone had turned their mind to the ownership of copyright (it is possible that Mr Townhill had copyright in mind but he made no mention of it), it seems also to have been assumed that copyright would belong to Seven.

90    Turning then to what the parties said, the first thing the reasonable person would think having observed the discussion is that the parties implicitly agreed (that is the observer would be required to presume the existence of the agreement, for the topic was not discussed) that Seven could use the film for a program to be broadcast to the public through its network.  Mr Murray wanted this broadcast to be a one-hour special program but even if it were not, the reasonable observer would implicitly understand that Seven could broadcast whatever section of the film it saw fit.  In legal terms, the joint owners of the copyright, Seven and Mr Murray, conferred a licence on Seven to do an act that would otherwise be in breach of their jointly owned copyright.

91    It is equally clear that Mr Murray was given some 'right'.  What was the nature of that right?  The proper approach is to examine what right Mr Murray requested.  He asked for nothing more than to be given the footage so that he could use it for promotional purposes.  He had made a similar request in the past.  He confirmed in May 2004 that this is what he was seeking.  Mr McPherson agreed to give Mr Murray what he wanted.  Nothing that has been attributed to Mr McPherson can be taken by our reasonable observer as a promise to give

Mr Murray any more than he had requested. Another way of looking at it is this. In negotiating a contract the language used by the parties is often imprecise. Then it is the duty of the court to give a common sense meaning to the words used: *Antaios Compania Naviera S.A. v Salen Rederierna A.B.* [1985] AC 191. The court's duty is to separate the 'purposive sheep from the literalist goats': *Summit Investment Inc v British Steel Corporation (The 'Sounion')* [1987] 1 Lloyd's Reps 230, 235. The sheep must win the day.

92      It will be necessary to further define the legal character of the 'right' obtained by Mr Murray. But first I should say something about the content of the 'right' to use the film. It had several aspects. First, the right was conferred on Mr Murray and him alone. Second, it was not a right that was capable of being passed on; it was personal to Mr Murray. Third, the right to use the film was for a limited purpose, namely to use the film for promotional purposes. That is, the film could not be used for commercial purposes. The distinction between the two types of use is important. It is, I think, clear that the parties intended that Mr Murray could use the footage to promote DARE's activities and thereby raise funds. Indeed that was the reason he sought the right in the first place. But the right to use the film for promotional purposes did not carry with it the right to lease, hire or assign the right to use the film to a third party for use by that third party, even if that use would promote the activities of DARE.

93      Turning now to the legal character of the rights given to Mr Murray. On the view that I take, Seven did not assign copyright to Mr Murray. If copyright were assigned he would have the full power to deal with the footage in any way he chose. No such thing was intended by the parties to the agreement. It is perfectly clear that what was intended was the grant of permission (or to use the statutory term – a licence) to Mr Murray for him to use the footage for a limited purpose. Being for consideration, the licence was granted in perpetuity. In the absence of that licence Mr Murray could not make any use of the film although he is a co-owner: *Ray v Classic FM plc* (1998) 41 IPR 235. The licence granted protected Mr Murray from an action for infringement. Whether the permission is capable of protection by action by Mr Murray (as to which see *British Actors Film Company, Limited v Glover* [1918] 1 KB 299, 309) need not be decided.

94      The next point is this. Nine's ability to broadcast the film to the public is dependent upon it having permission to do so from the copyright owner or owners: Copyright Act, ss 86, 101. It has Mr Murray's permission, but he is not the sole owner of the copyright. So Nine also

- 10 -

requires the permission of Seven.  It does not have that permission directly from Seven.  It could only obtain that permission if the licence given to Mr Murray contained an implied term that it could be assigned.  Here we look to the presumed intention of the parties and ask whether the putative implied term is necessary for the reasonable or effective operation of the licence:  *Hospital Products Limited v United States Surgical* Corporation (1984) 156 CLR 41.  The judge made a finding that is inconsistent with the implication of the supposed term.  The finding is that 'if the possibility of any part of the [film] being broadcast on Nine had been raised, it is likely that McPherson would not have agreed to that possibility'.

95      The final thing to deal with is the effect of the delivery of the footage to Mr Murray.  The footage that was handed over was the only copy in Seven's possession.  Prima facie that footage, which was originally shot on tapes owned by Seven and then transferred to other tapes owned by Seven, belonged to Seven.  I do not think anything said at the February meeting had the effect of passing (future) property to Mr Murray.  On the other hand, it can safely be inferred that when Mr Simond gave the footage to Mr Murray he intended to pass property (a verbal gift) which took effect on delivery: *Kilpin v Ratley* [1892] 1 QB 582.  This did not assign copyright: *Pacific Film Laboratories Pty Ltd v Commissioner of Taxation (Cth)* (1970) 121 CLR 154.

96      I am of the view that the appeal should be allowed, the orders of the judge be set aside and in lieu thereof there be an order restraining Mr Murray and DARE Operations Pty Limited from using the footage otherwise than for promotional purposes and restraining the remaining defendants from causing any part of the footage being shown or communicated to the public.  I agree with Lindgren J that the parties should attempt to agree on the terms of the injunction.  In addition, Seven should have its costs of the appeal and the trial below.

I certify that the preceding twenty-five (25) numbered paragraphs are a true copy of the Reasons for Judgment herein of Honourable Justice Finkelstein.

Associate:

Dated:         8 August 2005

Signed by AustLII

GENERAL DISTRIBUTION

**IN THE FEDERAL COURT OF AUSTRALIA**    **NSD 667 OF 2005**
**NEW SOUTH WALES DISTRICT REGISTRY**

**ON APPEAL FROM A JUDGE OF THE FEDERAL COURT OF AUSTRALIA**

| | |
|---|---|
| **BETWEEN:** | **SEVEN NETWORK (OPERATIONS) LIMITED (ACN 052 845 262) FIRST APPELLANT** |
| | **CHANNEL SEVEN SYDNEY PTY LIMITED (ACN 000 145 246) SECOND APPELLANT** |
| **AND:** | **TCN CHANNEL NINE PTY LIMITED (ACN 001 549 560) FIRST RESPONDENT** |
| | **NBN LIMITED (ACN 000 232 486) SECOND RESPONDENT** |
| | **BRETT MURRAY THIRD RESPONDENT** |
| | **D.A.R.E OPERATIONS PTY LIMITED (ACN 108 345 446) FOURTH RESPONDENT** |
| | **LOOK TELEVISION PRODUCTIONS PTY LIMITED (ACN 008 685 497) FIFTH RESPONDENT** |
| | **LOOK FILM PRODUCTIONS PTY LIMITED (ACN 002 486 384) SIXTH RESPONDENT** |

| | |
|---|---|
| **JUDGES:** | **LINDGREN, FINKELSTEIN AND EDMONDS JJ** |
| **DATE:** | **8 AUGUST 2005** |
| **PLACE:** | **SYDNEY** |

**REASONS FOR JUDGMENT**

## EDMONDS J

### ISSUE

97    The issue on this appeal is whether the third respondent ('Mr Murray') was entitled to authorise the fifth and sixth respondents ('Look Productions') to make a documentary from cinematograph film footage ('footage') taken on a trip to the Kokoda Trail in Papua New

Signed by AustLII

- 2 -

Guinea ('the Kokoda expedition') to be shown in a television broadcast by the first and second respondents ('Nine').

## BACKGROUND

98    The background to this issue, in particular the events and the participants in those events, is set out in [3] to [50] of the reasons for judgment of the learned primary judge.  In summary:

(i)    In 2003, the first appellant's (Seven's) 'Today Tonight' program had broadcast a story about a youth camp conducted by Mr Murray, under the banner 'Camp Dare', at Ulladulla on the New South Wales South Coast.  Chris Simond ('Mr Simond'), an employee of Seven, had been the reporter on that story.  In late 2003, Mr Murray approached Mr Simond seeking to interest Seven in broadcasting a story about an expedition to the Kokoda Trail which Mr Murray, again under the Camp Dare banner, was proposing to arrange for a group of boys from Punchbowl Boys High School.

(ii)   After some correspondence, a meeting was held at Seven's premises on 11 February 2004 between representatives of Seven on the one hand and Mr Murray and his Camp Dare supporters on the other.  In attendance on the Seven side, were Mr Simond, Craig McPherson (Today Tonight's executive producer) ('Mr McPherson'), Stuart Shannon (a cameraman) ('Mr Shannon') and Matthew Lynch (sound recorder) ('Mr Lynch') who were both under contract to Seven.  On the other side were Mr Murray, Ross Townhill (an accountant) ('Mr Townhill'), Kevin Watt (a corporate consultant) ('Mr Watt') and Thomas Aguiler and Iain Cook (both involved in conducting youth camps).

(iii)  It is not in dispute that at that meeting Mr McPherson, on behalf of Seven, and Mr Murray reached an agreement in relation to their respective contributions, both financial and otherwise, to the Kokoda expedition and the filming of that expedition.  The primary judge found that on any view, Mr McPherson committed Seven at that meeting to screening a piece on the Kokoda expedition on Today Tonight, although the length of the piece was undetermined.  He also committed to sending Messrs Shannon and Lynch on the basis that all fares, accommodation and expenses including outfitting would be met by Mr Murray.  Mr Murray raised the question of a one hour special documentary but Mr McPherson made it clear

- 3 -

that that would be a decision for others to make and that it would be made in the light of the footage which came back [31].

(iv)   It is also not in dispute that at that meeting Mr McPherson, on behalf of Seven, and Mr Murray reached an agreement dealing with their respective rights as to use of the footage.  What is disputed are the legal implications of that agreement, in particular and relevantly, ownership of copyright in the footage and the nature and extent, if it be relevant, of any derivative rights of user.

(v)   The expedition took place between 1 March and 9 March 2005.  Mr Shannon recorded about 30 hours of film.  Whilst Mr Murray, and no doubt others, contributed to decisions as to what would and would not be filmed, the primary judge was satisfied that Mr Shannon made and executed the decisions.  The primary judge was also satisfied that Mr Shannon endeavoured to comply with the brief he had received from Mr Simond [34].

(vi)   Shortly after return from Kokoda, the 'Sony' Mini DV tapes', which contained the film shot on the expedition, were copied onto 'DV Pro tapes' (which, together with certain pre-departure and post-return footage, was referred to below as the 'Camera Tapes') and delivered to Mr Simond.  Both the Sony Mini DV tapes and the DV Pro tapes had come from Seven's stock of tapes.  The Sony Mini DV tapes were then erased and recycled in accordance with Seven's practice.  Messrs Shannon and Lynch billed Seven for their time and, in Mr Shannon's case, for the use of a camera.  The remaining camera equipment was supplied by Seven.

(vii)   Mr Simond received the DV Pro tapes on or about 12 March 2004 and then spent approximately five working days playing all of those tapes in order to watch all of the footage.  He also watched tapes of footage shot before and after the expedition.  He eventually selected approximately 12½ minutes of the footage for the 'Today Tonight' story (referred to below as 'the Selected Footage Film'), and wrote a script for the story, for which he provided the voice over.  The program was broadcast on 23 April 2004.  Mr Simond was the reporter.  On 26 April 2004 a follow up story was broadcast on 'Today Tonight' which showed World War II veterans meeting with the school boys who had gone on the Kokoda expedition.

(viii)   In early May, Mr Murray contacted Mr Simond and there was a discussion about the provision of the tapes.  Mr Murray's version of the discussion was slightly at variance with Mr Simond's version, however, in substance they were the same.

- 4 -

(ix)    On or about 21 May 2004 Mr Simond was at Soldiers Point on the Central Coast during filming of a DARE Camp which Mr Murray had invited Mr Simond to come and film.  On that occasion, Mr Simond handed to Mr Murray all the existing DV Pro tapes and a number of VHS copies of the 'Today Tonight' story that went to air.

(x)     At some time shortly after 17 May 2004 Mr Murray and Look Productions' Mr Davies discussed the making of a documentary about the Kokoda expedition from the footage on the DV Pro tapes.  Mr Davies suggested an approach to the ABC which failed, and later approaches to Seven and SBS also failed.

(xi)    In early September 2004 Nine exhibited an interest in the proposed Kokoda documentary.  This led to a licence agreement between Look Productions and Nine in late December 2004.  The consideration for the licence was $30,000.  Mr Davies estimated the cost of production was at least $25,000 and Mr Murray was given a fee of about $2000.

(xii)   Work on developing the documentary had progressed during late 2004.  It was not until February 2005 that Mr Davies converted the DV Pro tapes into a suitable format to be utilised and incorporated into the documentary.  It was proposed to broadcast the documentary over the ANZAC weekend of 2005.

(xiii)  Shortly after Mr Simond and Mr McPherson became aware that Nine was promoting the Look Productions documentary, Seven commenced these proceedings against Nine by application filed on 24 March 2005.  On that day Bennett J granted Seven an interlocutory injunction effectively restraining Nine from broadcasting the Look Productions documentary.  Mr Murray, D.A.R.E. Operations Pty Limited and Look Productions were joined as respondents and the proceedings continued on the pleadings.

**THE PLEADINGS AND ARGUMENT**

99    The pleadings referred to 'the Single Tape Films' and 'the All Tapes Film' apparently because Seven's legal representatives thought that the cinematograph film embodied in the footage might constitute a separate film per tape or a single film.  I agree with Lindgren J that the distinction is unimportant for present purposes.

Signed by AustLII

- 5 -

**Before the Primary Judge**

100    Before the primary judge the case was pleaded and argued on the following bases:

*For Seven:*

(i)    That it was the owner of the copyright in each 'Single Tape Film', in the 'All Tapes Film' and in the selective film transferred to 'DV Pro tapes' (which, together with certain pre-departure and post-return footage, I hereinafter refer to as the 'Camera Tapes'), either pursuant to sub-s 98(2) of the *Copyright Act* 1968 (Cth) ([26] of the Statement of Claim) or pursuant to sub-s 98(3) of that Act ([27] of the Statement of Claim).

(ii)    That it loaned the Camera Tapes to Mr Murray on condition that the Camera Tapes should be used:

(a)    for the purpose of promoting the work of the organisation known as Camp Dare to potential sponsors, and the internal purposes of Camp Dare, and for no other purpose;

(b)    in the alternative to (a) above, otherwise than for commercial use ([38] of the Statement of Claim).

This arrangement was a gratuitous bailment for restricted use ([39] of the Statement of Claim).

(iii)    That Mr Murray has, without the licence of Seven, authorised the copying in Australia of a substantial part of the Camera Tapes ([43] of the Statement of Claim).

*For Mr Murray*

(iv)    That Seven and Mr Murray were, upon the making of the Camera Tapes, the joint owners of copyright in the Camera Tapes ([26(a)] of the Further Amended Defence);

(v)    Alternatively, that Mr Murray is the owner of the copyright in the Camera Tapes pursuant to sub-s 98(3) of the *Copyright Act* ([26(b)] of the Further Amended Defence);

(vi)    Further, and alternatively, that Seven was the first owner of the copyright in the Camera Tapes but entered into an agreement to assign that copyright for valuable consideration to D.A.R.E. Operations Pty Ltd on or about 11 February 2004 by

Signed by AustLII

- 6 -

way of a future assignment of copyright pursuant to s197 of the *Copyright Act* ([26(c)] of the Further Amended Defence).

(vii)     Further, and alternatively, that Seven was the first owner of the copyright in the Camera Tapes but entered into a verbal agreement to assign that copyright for valuable consideration to D.A.R.E. Operations Pty Ltd on or about 11 February 2004 by way of future assignment, thereby creating an equitable interest in the copyright. In consequence, D.A.R.E. Operations Pty Ltd is the equitable owner ([26(d)] of the Further Amended Defence).

(viii)    Further, and in answer to the whole claim, that Seven and Mr Murray reached an oral agreement on 11 February 2004 that Mr Murray was entitled to (a) the ownership; or (b) unrestricted use, of the Camera Tapes after Seven had broadcast a segment of the footage of the Camera Tapes on their Today Tonight Show ([96] of the Further Amended Defence).

**On Appeal**

101     Seven's notice of appeal relied on a number of grounds, some of which assailed the primary judge's anterior, or failure to make, findings on matters underlying his ultimate findings (grounds 1, 2, 3, 6, 7, 8, 9, 10 and 11) while others assailed his ultimate findings or conclusions (grounds 4 and 5).

102     Ground 5 of Seven's notice of appeal asserted that the primary judge erred in holding that copyright in the Camera Tapes was jointly owned by Mr Murray and Seven. In its written submissions, Seven wrote:

> *'The appellants propose to rely on all grounds taken in the Notice of Appeal other than ground 5.'*

103     When questioned about this abandonment, senior counsel for Seven said that he no longer wanted to abandon it 'because of the inconsistency of the abandonment'. However, no explanation was forthcoming as to the alleged inconsistency and, more importantly, no submissions were made in support of the previously abandoned ground which put in issue the trial judge's finding that when the copyright came into existence, it was jointly owned by Mr Murray and Seven.

Retrieved from AustLII on 13 February 2020 at 19:23:38

Verify version

- 7 -

104    The thrust of Seven's argument on appeal was that the primary judge '… should have held that there was no evidence justifying a conclusion that any of the respondents acquired any proprietary interest in the copyright in the cinematograph films contained on the Camera tapes':  [86] of Seven's written submissions.  To which, for completeness, I would merely add, by way of parenthetical interpolation after the word 'acquired' and before the words 'any proprietary interest', '(whether by way of assignment or otherwise)'.

105    For Mr Murray, it was argued that the parties had agreed upon the use that was to be made of the copyright that resided in the Camera Tapes and, it followed, that there was no need for an assignment:  [65] of the respondents' written submissions.  Alternatively, there was an assignment of any copyright interest Seven owned in the Camera Tapes which took effect, pursuant to an anterior agreement for value made on 11 February 2004, that is prior to the copyright coming into existence, but only after the copyright came into existence and after the Camera Tapes had been used by Seven to produce the Selected Footage Film to be shown on its 'Today Tonight' program:  [67]-[70] of the respondents' written submissions.

106    Importantly, neither Seven nor Mr Murray pleaded or argued, either below or on appeal, that Mr Murray's entitlement to authorise Look Productions to make a documentary from the Camera Tapes to be shown in a television broadcast by Nine was sourced in a licence from Seven to Mr Murray and in Seven's case, that because the licence was personal to Mr Murray he had no entitlement to authorise Look Productions to make the documentary and Look Productions, in turn, had no entitlement to authorise Nine to broadcast the documentary. Indeed, the pleadings and argument below proceeded on the basis that Mr Murray had no licence at all ([43] of the Statement of Claim; [7]-[11] of Seven's written submissions below). On appeal, the only ground that referred to the grant of a licence by Seven to Mr Murray to make use of the Camera Tapes was ground 10 and the only confinement or restriction referred to therein was that his Honour should have found that it was only for 'promotional purposes'.  While his Honour did refer to such use at [64] of his reasons for judgment, it was in the context of whether or not it was a term or condition of an agreement to transfer title; not a licence.  It is quite clear that the confinement or restriction both in the primary judge's reasons for judgment and in ground 10 of the notice of appeal was not articulated in terms that the licence was personal.  I shall return to this aspect of the case later.

Signed by AustLII

- 8 -

**THE FINDINGS BELOW**

107    One of the difficulties with this case is that at the crucial meeting which took place at Seven on 11 February 2004, none of the conversations in evidence touched on matters of copyright in the Camera Tapes or ownership thereof, none referred to rights of user, either in terms of assignment, partial or otherwise, or in terms of licence, personal or assignable, and none did anything to clarify the rights of Seven and Mr Murray, as future copyright owners, inter se.  It seems to be common ground that Seven could use the Camera Tapes to make the Selected Footage Film for its 'Today Tonight' program to be broadcast to the public on its network. Mr Murray had wanted this broadcast to be a one hour special program, however, clearly, there was no issue that Seven could use the Camera Tapes for this purpose and broadcast the Selected Footage Film whatever its duration.   But it is difficult to draw from these conversations at the 11 February 2004 meeting whether this could be done by Seven as copyright owner, under licence from the copyright owner, or with the consent of the co-owner of the copyright.  It is also common ground that after Seven used the Camera Tapes to make the Selected Footage Film for its 'Today Tonight' program to be broadcast to the public on its network, Mr Murray could use the Camera Tapes (Seven having no further use for them) - on Mr Murray's case for any purpose, on Seven's case only for 'promotional purposes'.  But again, it is not possible from the conversations which occurred at the 11 February 2004 meeting to be certain as to whether Mr Murray could do this as copyright owner, under licence from the copyright owner, or with the consent of the co-owner of the copyright.

108    The commercial utility of the proceedings before the learned primary judge substantially depended upon it being decided within two or three days after a hearing lasting some seven days.  The primary judge observed [1]:

> *'These reasons will necessarily be more economical than would be the case if the demands of time were not so insistent and there has not been the usual opportunity for editing and revision.'*

109    Nevertheless, the primary judge observed [55] (reading 'DARE' as Mr Murray):

> *'The commercial context, what occurred before and after the meeting, my assessment of the witnesses and consideration of the detail of the evidence given as to the meeting satisfies me of certain matters relating to the Camera Tapes:*

- 9 -

(1)    That provision of the Camera Tapes by Seven to DARE was raised separately by Murray and by Watt.

(2)    That the reason advanced by Murray for the request was use by DARE of the Camera Tapes for promotional purposes and there was no mention of any other particular proposed use.  I am not satisfied that there was an express reference to any general discretion to use the Camera Tapes as DARE saw fit or that, if mentioned, it was heard, understood or accepted by McPherson.

(3)    That Watt raised the topic after Murray and that he referred in that context to DARE financing the expedition and paying all the expenses for Shannon and Lynch.

(4)    That Watt referred to rights as well as the physical tapes.  He had planned to do so in advance.

(5)    That McPherson unequivocally committed Seven to providing the only copy of the Camera Tapes to DARE once whatever program or programs that Seven chose to broadcast had gone to air without any express limitation as to the use of the Camera Tapes by DARE.'

110    None of these findings were critically assailed by Seven or, not surprisingly, Mr Murray. Seven expressly embraced (1) and (2), made no reference to (3) and (4) and submitted that (5) had to be read in the context that Mr Murray had already expressed the relevant words of limitation in making his request:  'For McPherson to have repeated such a limitation would have been supererogatory'.

111    So far as finding (5) is concerned, the primary judge observed [56]:

'In my view, McPherson was influenced to do as he did by:

(1)    The unusual nature of the arrangement whereby Seven was only contributing the equivalent of wages and the use of equipment in obtaining film of an unusual, indeed exotic, and expensive overseas event with obvious television appeal with all other expenses to be met by DARE.

(2)    The fact that as the Camera Tapes would be erased and recycled after any program had gone to air, there was no possibility of any further commercial exploitation by Seven of any copyright in the Camera Tapes thereafter.

(3)    A desire to assist a good cause championed by Simond.

Retrieved from AustLII on 13 February 2020 at 19:23:38

Verify version

Signed by AustLII

- 10 -

> (4)    As the reference by Murray to the use for promotional purposes did
> not ring any warning bells with him, I am satisfied that if the
> possibility of any part of the Camera Tapes being broadcast on Nine
> had been raised, it is likely that McPherson would not have agreed to
> that possibility.'

112    None of these findings were put in issue by the parties.  Finding (4) is totally speculative
because the prospect of a documentary produced from the Camera Tapes being broadcast on
Nine was never raised at any relevant time, and certainly not at the meeting of 11 February
2004.  Moreover, counsel for Seven never put to Mr Murray or Mr Watt that either knew that
Mr McPherson would not have agreed to the possibility of a documentary produced from the
Camera Tapes being broadcast on Nine.  In my opinion, inferring any condition of limitation
or restriction on the grant by a party of a right to another by reference to what the party might
have said or done in response to something that was not said or done by the other is fraught
with danger.

## WHO OWNED THE COPYRIGHT IN THE CAMERA TAPES?

113    The primary judge found [59] that the arrangements necessary for the making of the film
were undertaken primarily by Mr Murray, that Seven also played a part and that it was, in
effect, a joint venture.  He therefore concluded that copyright in the Camera Tapes was
jointly held between Mr Murray and Seven.  As indicated in [102] and [103] above, in its
written submissions Seven abandoned reliance on ground 5 of its notice of appeal which put
the primary judge's conclusion in issue, but subsequently resiled from that abandonment
during the course of the hearing.  However, no submissions were made in support of the
previously abandoned ground.

114    I have had the advantage of reading in draft the reasons for judgment of Lindgren J.  On this
issue, his Honour agrees with the primary judge's conclusion that copyright in the Camera
Tapes is jointly held between Mr Murray and Seven for the reasons Lindgren J elaborates at
[15]-[21] of his reasons.  If the relationship between Seven and Mr Murray was that of
partnership and the copyright in the Camera Tapes was partnership property, as it
undoubtedly would be on the hypothesis, then I would be disposed to agree with the primary
judge and Lindgren J that Seven and Mr Murray owned the copyright in the Camera Tapes as
co-owners, without any relevant distinction between the terminology of the primary judge,

Signed by AustLII

- 11 -

viz., 'joint', and 'in common' co-ownership. In other words, it may be accepted that ordinarily co-owners of copyright hold as tenants in common, not as joint tenants: *Prior v Landsdowne Press Pty Ltd* [1977] VR 65; *Prior v Sheldon* (2000) 48 IPR 301 at [79].

115    But the primary judge found that it was a 'joint venture', an arrangement which Lindgren J respectfully adopted. I also adopt that characterisation – it was a joint venture to participate in the Kokoda expedition and record it on film. It was certainly not a partnership – from Mr Murray's point of view, if not Seven's, he was not carrying on business in common with Seven with a view of profit. As the High Court recognised in *United Dominion Corporation Ltd v Brian Pty Ltd* [1983] 157 CLR 1 at 10 per Mason, Brennan and Deane JJ:

> *'The term "joint venture" is not a technical one with a settled common law meaning. As a matter of ordinary language it denotes an association of persons for the purposes of a particular trading, commercial, mining or other financial undertaking or endeavour, with a view to mutual profit, with each participant usually (but not necessarily) contributing property, property or skill. Such a joint venture (or, under Scots' law 'adventure') will often be a partnership. The term is, however, apposite to refer to a joint undertaking or activity carried out through a medium other than a partnership: such as a company, a trust, an agency, or joint ownership. The borderline between what can properly be described as a 'joint venture' and what should be more properly be seen as no more than a simply contractual arrangement may on occasion be blurred. Thus, where one party contributes only money or other property, it may sometimes be difficult to determine whether a relationship is a joint venture in which both parties are entitled to a share of profits or a simple contract of loan or a lease under which the interest or rent payable to the party providing the money or property is determined by reference to the profits made by the other.'*

116    It has long been recognised that one of the basic features of a joint venture is that the participants receive the fruits of the venture separately and in kind. As was said in *United Dominion Corporation,* supra, at [15]-[16] by Dawson J:

> *'... the feature which is most likely to distinguish [joint ventures] from partnerships is the sharing of product rather than profit.'*

117    In my view, the product of the joint venture between Seven and Mr Murray was the copyright in the Camera Tapes but that was acquired by each of them separately and not as co-owners of the copyright; rather they were multiple owners of copyright in the Camera Tapes. What Seven acquired was copyright in the Camera Tapes limited to the doing of a specified act or acts, namely, the use of the Camera Tapes to make the Selected Footage Film and the broadcast of that Selected Footage Film on its 'Today Tonight' program. That copyright,

Signed by AustLII

- 12 -

and, indeed, future copyright, can be so limited, otherwise than as a result of partial assignment, is recognised by s 30 of the *Copyright Act*. What Mr Murray acquired was copyright in the Camera Tapes to do all other acts permitted by s 86 of the *Copyright Act*.

118    My view in this regard derives from the following considerations, none of which were challenged on appeal:

(i)    The very limited extent to which Mr McPherson committed Seven to the joint venture of participating in the Kokoda expedition and recording it on film. In financial terms, Seven's contribution was less than ten percent of Mr Murray's contribution, even accepting that Mr Murray's contribution did not come out of his own pocket, but out of the pockets of supporters of the Camp DARE concept.

(ii)    The limitations accompanying Mr McPherson's commitment to broadcast the Selected Footage Film on Seven's 'Today Tonight' program. If Seven had refused to broadcast, the lack of any agreement on duration would have made the prospect of a mandatory injunction a remedy of no practical utility to Mr Murray. His object in undertaking the Kokoda expedition and filming it would have been totally frustrated.

(iii)    Seven had committed to Mr Murray that it would give him the Camera Tapes after it had used them for its limited purpose, and it did so because that purpose had been fulfilled. At that point in time, property in the Camera Tapes as a chattel, the only Camera Tapes in existence, passed from Seven to Mr Murray. That is totally consistent with the fact that Seven's limited copyright in the Camera Tapes had, by that time, ceased.

119    I do not think that the provisions of sub-s 98(2) or sub-s 22(4) of the *Copyright Act* provide any impediment to this conclusion. On the contrary, it is consistent with these provisions. Subsection 98(2) provides:

'(2)    Subject to the next succeeding subsection, the maker of a cinematograph film is the owner of any copyright subsisting in the film by virtue of this Part.'

Subsection 22(4) provides:

'(4)    For the purposes of this Act:

- 13 -

(a)    a reference to the making of a cinematograph film shall be read as
       a reference to the doing of the things necessary for the production
       of the first copy of the film; and

(b)    the maker of the cinematograph film is the person by whom the
       arrangements necessary for the making of the film were
       undertaken.'

Both Mr Murray and Seven undertook the arrangements necessary for the production of the first copy of the Camera Tapes, but Mr Murray's contribution to the joint venture, both financially and logistically, was far greater than Seven's. It is only appropriate, in my view, that their respective copyrights in the Camera Tapes should reflect their respective contributions to the joint venture. That is the way joint ventures are invariably structured and operate.

120    Moreover, the foregoing is consistent with the way in which the matter was pleaded by Mr Murray below (see [100(viii)] supra), and argued on appeal (see [105] supra), even if the argument on appeal was not directly in point.

121    My view that Seven and Mr Murray acquired separate copyrights in the Camera Tapes and not co-ownership of copyright in the Camera Tapes, leads me to the conclusion that the appeal should be dismissed. Mr Murray had, by virtue of s 86 of the *Copyright Act*, the right to licence Look Productions to make the documentary from the Camera Tapes and Look Productions had the right to licence Nine to broadcast the documentary; just as Seven had the right to make the Selected Footage and broadcast it on its own network.

**ASSIGNMENT OR LICENCE**

122    If my view that Mr Murray and Seven had separate copyrights in the Camera Tapes is wrong and they were, as the primary judge found, co-owners of the copyright in the Camera Tapes, it seems clear that Mr Murray's entitlement to authorise Look Productions to make the documentary and Look Productions' entitlement to authorise Nine to broadcast it on its network, depends on it being found that Seven assigned its interest as co-owner of the copyright to Mr Murray or that it licensed Mr Murray in terms which permitted the making of the documentary and its broadcast to the public on Nine.

123    While the primary judge does not expressly say so, it seems that he saw the agreement arising out of the meeting of 11 February 2004 as operating, inter alia, as an agreement for value to

Signed by AustLII

- 14 -

assign Seven's interest as co-owner of the copyright [not then in existence] in the Camera Tapes after Seven had utilised them to produce the Selected Footage for broadcast on the Seven network [63], [64]. Whatever the nature and scope of that agreement, I do not think it operates as an assignment of, or an agreement to assign, Seven's interest as co-owner of the copyright. It cannot operate as an assignment, because the property was not then in existence. It will only operate as an agreement to assign the interest when it comes into existence if it is for value, which I think it is, and if it manifests a clear expression of intention to assign: *Norman v FC of T* (1963) 109 CLR 9 at 30, which I do not think it does.

124    It follows, in my view, that if Mr Murray and Seven are co-owners of the copyright in the Camera Tapes, Mr Murray's entitlement to authorise Look Productions to make the documentary and Look Productions' entitlement to authorise Nine to broadcast it on its network, must be sourced in licence from Seven. As I indicated at [106] above, the only ground of appeal that referred to the grant of a licence by Seven to Mr Murray to make use of the Camera Tapes was ground 10 and the only confinement or restriction referred to therein was that his Honour should have found that any licence was only for 'promotional purposes'. The notice of appeal does not raise as a ground that the licence was personal to Mr Murray. Moreover, that latter limitation was not pleaded or argued below. Had it been pleaded, it may well have led to evidence being adduced going to that issue. For these reasons, I do not think that Seven should be allowed to now assert that the licence it granted to Mr Murray was personal to him.

125    Even if Seven is entitled to assert that the licence it granted Mr Murray was personal to him, I am far from convinced that is so. Seven knew the use which Mr Murray wanted to make of the Camera Tapes, namely to produce a one hour documentary to be broadcast to the public for promotional purposes. Seven also knew that Mr Murray did not have the skill or equipment to produce this documentary himself and that he would have to authorise others to do so. To suggest that the licence granted to him prevented him from doing this because it was personal to him, would make the grant of the licence futile. That cannot have been the intention of the parties. Similarly, in my view, it cannot be the case that Mr Murray had to personally broadcast the documentary and that he could not authorise others to do so, eg., a cinema chain or a movie house. The real issue here is whether there was a 'carve out' in the form of an implied condition that he could not authorise a network competitor of Seven to

Signed by AustLII

- 15 -

broadcast the documentary on the competing network. The answer to that issue depends on the meaning to be attributed to 'promotional purposes'. But even if that carve out existed it did not, in my view, make the licence personal to Mr Murray so that he could not authorise others to produce the documentary and broadcast the documentary to the public.

126     What then is to be made of Mr Murray's statement that he required the Camera Tapes for 'promotional purposes'? Did this 'carve out' any implied condition by way of limitation or restriction that he could not rely on any licence granted to him by Seven to authorise a competitor network of Seven to broadcast the Look Productions documentary on the competing network?

127     The primary judge found at [64] that Mr Murray's statement about the purpose for use being promotional was representational (and had an influence as such) rather than promissory. As indicated at [109] supra, the primary judge had found that Mr McPherson unequivocally committed Seven to providing the only copy of the Camera Tapes to Mr Murray once whatever program or programs Seven chose to broadcast had gone to air without any express limitation as to the use of the Camera Tapes by Mr Murray. It is not clear what influence his Honour thought Mr Murray's statement about the purpose for use being promotional had on Seven, however, it is significant, in my view, that his Honour did not at [56] list it as one of the factors that influenced Mr McPherson to do as he did including, inter alia, unequivocally committing Seven in the terms described above. In the circumstances, it is easy to understand why his Honour thought that Mr Murray's statement about the purpose for use being promotional was representational and not promissory. In my opinion, the learned primary judge was correct and he was also correct in listing the matters in (1), (2) and (3) in [56] as the matters which influenced Mr McPherson to do as he did. To those matters I would merely add Mr McPherson's awareness that the pursuits and aspirations of Mr Murray and his supporters under the DARE name were totally non-commercial; indeed such objects and pursuits were charitable.

128     The primary judge further found at [64] that even if Mr Murray's statement about the purpose for use being promissory, or a limitation, it was by no means clear to him that the broadcast of the documentary would not have borne that characterisation from the point of view of DARE. I agree. In my opinion, there is no necessary dichotomy between

- 16 -

Mr Murray's use of the Camera Tapes for promotional purposes and their use in a fashion which raises money for the objects and pursuits of Mr Murray under the DARE banner, including the right to use the Camera Tapes to produce documentaries, etc, which raise money by leasing, hiring or otherwise exploiting that produce.

129    Whether that be right or wrong, on the view I take, it does not matter.  As the copyright owner, Mr Murray was entitled to authorise Look Productions to produce the documentary and Look Productions was entitled to authorise Nine to broadcast the documentary on its network.  The appeal should be dismissed with costs.

I certify that the preceding thirty-three (33) numbered paragraphs are a true copy of the Reasons for Judgment herein of the Honourable Justice Edmonds.

Associate:

Dated:            8 August 2005

Counsel for the Appellants:        Mr T E F Hughes AO QC
                                   Mr R G McHugh

Solicitor for the Appellants:      Mallesons Stephen Jaques

Counsel for the Respondents:       Mr B R McClintock SC
                                   Mr J M Hennessy

Solicitor for the Respondents:     Gilbert + Tobin

Date of Hearing:                   23 & 24 June 2005

Date of Judgment:                  8 August 2005