# EXHIBIT 7

QUEEN
Z
565
.T67
1981

Consumer and
Corporate Affairs
Canada

Consommation
et Corporations
Canada

# Ownership of Copyright in Canada

## Barry Torno



Copyright
Revision
Studies

En français:       La propriété du droit d'auteur au Canada

Disponible au:     Service des communications
                   Consommation et Corporations Canada
                   Ottawa (Ontario)
                   K1A 0C9



Industry Canada
Library    Queen

SEP 16 1998

Industrie Canada
Bibliothèque    Queen



(OWNERSHIP OF COPYRIGHT IN CANADA)

(Barry Torno)



COMMUNICATIONS CANADA

Nov 5 1981

LIBRARY BIBLIOTHÈQUE

Copyright Revision Studies
Research and International Affairs Branch
Bureau of Corporate Affairs
Consumer and Corporate Affairs Canada

The analysis and conclusions of this study do not
necessarily reflect the views of the Department.

Copyright Revision Studies
Research and International Affairs Branch
Bureau of Corporate Affairs

## Published

Copyright Payment Obligations for Cable Television: Pros and Cons by S.J. Liebowitz, 1980.

The Mechanical Reproduction of Musical Works in Canada by Mike Berthiaume and Jim Keon, 1980.

A Performing Right for Sound Recordings: An Analysis by Jim Keon, 1981.

Term of Copyright Protection in Canada: Present and Proposed by Barry Torno, 1981.

An Economic Analysis of a Performers' Right by Steven Globerman and Mitchell P. Rothman, 1981.

Crown Copyright in Canada: A Legacy of Confusion by Barry Torno, 1981.

Copyright, Competition and Canadian Culture: The Impact of Alternative Copyright Act Import Provisions on the Book Publishing and Sound Recording Industries by Ake G. Blomqvist and Chin Lim, 1981.

The Impact of Reprography on the Copyright System by S.J. Liebowitz, 1981.

Ownership of Copyright in Canada by Barry Torno, 1981.

Available in both official languages from:

> Communications Branch
> Consumer and Corporate Affairs Canada
> Ottawa, Ontario
> K1A 0C9

## Forthcoming

Canadian International Copyright Relations Under the Berne and Universal Copyright Conventions by Barry Torno.

Fair Dealing:  The Need for Conceptual Clarity on the Road to Copyright Revision by Barry Torno.

Audio and Video Home Taping:  Impact on Copyright Payments by Jim Keon.

Exemptions Under the Canadian Copyright Act by D. Magnusson and V. Nabhan.

Copyright and Computer Software by J. Palmer and R. Resendes and Copyright and Computer Data Bases by J. Palmer.

Remedies and Enforcement by A.M. Butler.

©Minister of Supply and Services Canada 1981

Cat. No. RG44-1/9E
ISBN 0-662-11397-7

FOREWORD

This series of studies concerning aspects of copyright law was initiated to provide a better understanding of some important problems and issues involved in the revision of the Canadian Copyright Act. The present Act is now more than fifty years old. The wide breadth of legal, economic and technological developments since the Act was proclaimed underlie the significance of the revision process. The creation and dissemination of information is becoming an increasingly important resource of our society. In addition, the copyright community, including authors, publishers, the film and video industries, broadcasters, the recording industry, educators, librarians and users, contributes hundreds of millions of dollars to the economy. For this reason the Research and International Affairs Branch of the Bureau of Corporate Affairs felt it necessary to undertake in-depth economic and legal research into the cultural, economic and legal implications of the most important of the copyright issues.

With respect to the appropriateness of the economic studies of this series the following passage from the 1971 study of the Economic Council of Canada entitled Report on Intellectual and Industrial Property is perhaps the most perceptive and eloquent:

> It is sometimes implied that where cultural goals are important, economic analysis, with its base associations of the market place, should take a back seat. But this involves a serious misconception of the proper and useful role of economic analysis. It may well be true that in the final analysis, economics is much more concerned with means than with ends, and that the really fundamental "achievement goals" of a society are largely, if not wholly, non-economic in nature. It is also true, however, that, in practice, means can have an enormous influence on ends, whether for good or ill, and that as a result, the systematic analysis of economic means is indispensable both in the specification of social goals and the planning of how to achieve them. In the case of cultural goals, among others, economic analysis can be of great help in bringing about a clearer identification of the goals in the first place, and then in planning for their attainment by the shortest, least costly and most perseverance-inducing route.

> It is particularly important that the relevance of cultural goals in a policy-planning situation should not be used as a smoke screen behind which material interests are allowed to shelter unexamined. In an increasingly service-oriented and knowledge-based society, cultural matters in the broadest sense are to a growing extent what economic life is all about. They must not fail to be studied in their economic as well as their other aspects. (pp. 139-140)

It is within this spirit that the economic studies completed for the Branch have been commissioned and carried out.

In addition to internal studies, the Branch has contracted with research academics from the Canadian university community who have a special interest in copyright. The external funding of research provides the Branch with new insights and perceptions from some of the most highly skilled academics in Canada with respect to the many complex issues inherent in the revision of the Copyright Act. Additionally, it serves to foster an interest and involvement in these important policy issues amongst others within the academic community. Such involvement and input can only lead to a better understanding and a consequent improvement in the copyright policy formation process.

This study, by Barry Torno of the Department of Justice, constitutes the most thorough exploration to date of the many facets of the subject of copyright ownership in Canada. The study provides the reader with a complete overview of the manner in which a variety of factors have coalesced to influence the recommendations offered with respect to questions of initial ownership, voluntary dispositions (e.g., assignments and licences) and non-voluntary dispositions (e.g., compulsory licences). These factors include longstanding principles of Anglo-American copyright law, obligations arising under the two principal international copyright conventions to which Canada adheres, the impact of new reproductive technologies and questions of practicality and fairness.

The results and recommendations contained in this study are those of the author and do not necessarily imply acceptance by Consumer and Corporate Affairs Canada or the Department of Justice.    We believe that this approach is optimal for the purpose of encouraging the researchers to employ the widest scope in both the creation and presentation of their views.

Dr. Fenton Hay
Director
Research and International
Affairs Branch

## SUMMARY

The study is divided into four principal sections and concludes with a recapitulation of the recommendations offered.

### International Obligations

Legislative constraints arising by virtue of Canada's adherence to the Berne and the Universal Copyright Conventions are explored in the first chapter.

It is observed that the 1928 Rome Text of the Berne Convention to which Canada adheres requires that initial ownership of the copyright protecting a work must vest first in the author of the work. Further, each Convention country is free to define "author" as it deems appropriate.

While the Universal Copyright Convention is not as clear on the point, the study suggests that it similarly mandates that the author, however defined, be the first owner of copyright.

### Initial Ownership

The second chapter of the study commences with a discussion of the principle of "author as first owner" within the development of Anglo-American copyright law and within the international conventions.

Thereafter the focus shifts to ownership questions arising in relation to certain types of works whose existence is inextricably linked with specific technologies, such as photographs, sound recordings and films. It is proposed that the author of a photograph no longer be deemed to be the party who owned the negative at the time it was created but, rather, that the author should be defined as the person who composed the photograph.

Problems with the treatment of sound recordings under the present Act are considered next. It is recommended that the present protection of sound recordings on the basis of assimilation to musical, literary or dramatic works be abolished and that sound recordings be protected as a separate class of original works. It is further recommended that sound recordings no longer have "makers" but rather "authors," who should no longer be determined by reference to ownership of the plate from which the contrivance embodying the sound recording was derived. The study invites further comment from the recording industry on its

recommendation that the author of a sound recording be defined as the person principally responsible for the arrangements undertaken for the creation of a sound recording.

A range of special problems with respect to the Copyright Act's provisions regarding cinematographic works is explored, including the ambiguity of whether productions captured on videotape are presently protected. It is proposed that the terms "cinematography" or "process analogous to cinematography" be defined to include: (a) any means whereby the effect of motion pictures is produced, irrespective of the technological process used (e.g., videotape, videodisc), and (b) any sounds accompanying "motion pictures."

The study recommends the abolition of the present split treatment of films, whereby some films are protected by assimilation to a series of photographs while others are protected by assimilation to dramatic works.

Finally, the study invites further comment from the film industry regarding its proposal that the author of a cinematographic work should be defined as the party responsible for the arrangements undertaken for the making of the work.

The study looks next at two present exceptions to the principle of author as first owner: works by employees and commissioned works. Generally, the copyright in works created by employees vests first in their employers. The study reviews the strengths and weaknesses of this situation and advocates that a revised Act should not derogate from the general principle of first ownership by the author. The Act should merely provide that all authors (including employees) may transfer part or all of their copyright or prospective entitlement to copyright to a third party (including employers) by contract (including employment agreements).

The study also proposes that the present provisions which vest initial copyright in certain commissioned artistic works in the commissioning party, rather than the creator of the works, should be repealed.

With respect to works of joint authorship, the study proposes a significant departure from the present definition of "a work produced by the collaboration of two or more authors in which the contribution of one author is not distinct from the contribution of the other author or authors." In order to address several anomalies which arise from this definition, particularly with respect to musical works, it

is proposed that joint works encompass both inseparable and interdependent contributions. With respect to the rights and responsibilities of each joint owner to the other joint author(s) and to third parties, one of the study's more important proposals is that any co-owner should be able to assign, exercise or license his interest in the whole of a copyright without requiring the consent of the other co-owner(s).

The study argues that the present treatment of collective works under the Act is unsatisfactory in many respects. Protection is available only for written works and not, for example, for collections of sound recordings or films; only works or parts of works by different authors can give rise to a collective work. Therefore, one of the recommendations is that the definition of a collective work should provide for copyright for such works regardless of the underlying class(es) of works which comprise the collective work. It is further proposed that the definition of collective work be amended to delete the requirement that the works or parts of works included in a collective work must be by different authors.

The last topic addressed in this section is that of moral rights (i.e., the rights of an author to claim authorship of his work and to restrain any distortion, mutilation or other modification of the work prejudicial to his honour or reputation). At present, the Act is silent regarding whether moral rights arise where the author is not a natural person, as is often the case with motion pictures. Also the Act fails to provide for the assignment or licensing of moral rights. Positive recommendations with respect to both matters are offered.

## Voluntary Dispositions

Two important attributes of copyright are highlighted at the commencement of this section. Subject to any express or implied terms of a contract, transfer of the copyright in a work does not include transfer of the ownership of any object(s) in which the work is embodied. The opposite is equally true. The sale of a painting does not necessarily constitute a conveyance of the copyright.

The study recommends that the Act should abolish the present scheme of assignments plus the tripartite configuration of licences (licences coupled with a grant of an interest, contractual licences and bare licences) and replace it with the concept of a "transfer of copyright ownership" (that is, an assignment, mortgage, exclusive licence or any other conveyance, alienation, or hypothecation of a

copyright, whether or not it is limited in time or place of effect, but not including a non-exclusive licence).

The study further proposes that the general principle now contained in the Act that a copyright owner may transfer any of the exclusive rights comprised in the copyright, as to time, place and rights (including any subdivision of rights such as paperback and trade edition versions of the publication right) be continued.

The study also examines the issue of transfers of possession of originals of works (e.g., paintings and manuscripts). It is recommended that where a person is bequeathed the original of a work not published prior to the death of the testator, the bequest should be construed as including such of the copyright as the testator owned prior to his death, unless a contrary intention is indicated in the will.

Also proposed is a provision which would allow a valid legal assignment of a future copyright.

## Non-Voluntary Dispositions

Under the present Act there are three principal classes of provisions which, in different ways and in varying degrees, qualify the exclusive rights of copyright owners. Sections 7 and 13 of the Act provide for compulsory licences with respect to the reproduction and public performance of certain classes of works, subject to the conditions specified in these sections. In essence, the Act provides that upon compliance with the provisions of these sections a person may either reproduce or perform a work without first obtaining the permission of the copyright owner.

The study explores the public policy objectives served by these provisions as well as many substantive deficiencies inherent in the present provisions. It offers recommendations which would replace the two separate licences with a single, more equitable, more workable compulsory licence.

Section 19 of the Act provides that when the copyright owner of a musical, literary or dramatic work grants permission to have such a work recorded, any subsequent party may record the work pursuant to the terms and conditions of the compulsory licence established by this section. This licence was the subject of another of the research studies in the Copyright Revision Series, The Mechanical Reproduction of Musical Works in Canada, and the

recommendations offered in that in-depth study were adopted in their entirety.

The Copyright Act contains certain provisions in several sections of the Act which are collectively referred to colloquially as "the printing clauses" or "printing licences." These clauses make full copyright protection for some works conditional, to some extent, upon printing of the works in Canada. These provisions were enacted principally in response to the "manufacturing" provisions of the American Copyright Act of 1909 which have now been abrogated vis-à-vis Canada by virtue of U.S. adherence to the Universal Copyright Convention and the passage of the American Copyright Act of 1976. Furthermore, the above changes mean that the existence of these provisions in the Canadian Act results in the Act being in conflict with Canada's international obligations under the Berne Copyright Convention. It is therefore recommended that the printing clauses should be repealed.

The final section of the study examines the reversionary interest proviso of the Act which provides that, in certain prescribed circumstances, a party who has acquired one or more of the rights comprising the copyright protecting a work ceases to own such rights beyond the twenty-fifth year after the death of the author of the work, notwithstanding that the party was granted such rights for the full term of protection. The study points out the reversionary provision is subject to many qualifications and even where applicable is of limited value. More importantly, it is argued that the provision is an inequitable intrusion into the ability of parties to agree to expiration terms of their own choosing, unrestricted by artificial limitations. It is therefore recommended that the reversionary interest provisions should be repealed.

TABLE OF CONTENTS

Page

CHAPTER I   - INTRODUCTION

        Ownership . . . . . . . . . . . . . . . .   1
        International Obligations . . . . . . . .   1
            The Berne Convention . . . . . . . .    1
            The Universal Copyright Convention . . 4

CHAPTER II  - INITIAL OWNERSHIP

        The Principle of "Author as First Owner". . 7
        The Copyright/Technology Interface. . . . . 9
            Photographs. . . . . . . . . . . . . .  9
            Sound recordings . . . . . . . . . . . 15
            Cinematographic works. . . . . . . . . 24
        Exceptions to the Author/First Owner
            Principle . . . . . . . . . . . . . . 39
            Works by employees . . . . . . . . . . 39
            Commissioned works . . . . . . . . . . 50
        Works of Joint Authorship . . . . . . . . . 57
        Collective Works. . . . . . . . . . . . . . 67
        Moral Rights. . . . . . . . . . . . . . . . 70
            Moral rights and juridical persons . . 71
            Moral rights and alienability. . . . . 72

CHAPTER III - VOLUNTARY DISPOSITIONS

        The Subject Matter of Copyright Agreements. 77
        Assignments and Licences. . . . . . . . . . 80
        The Divisibility of Copyright:  . . . . . . 84
            By rights. . . . . . . . . . . . . . . 84
            By time. . . . . . . . . . . . . . . . 85
            By territory . . . . . . . . . . . . . 85
        The Requirement of Writing. . . . . . . . . 89
        Transfers of Possession of Originals of
            Works . . . . . . . . . . . . . . . . 90
        Future Copyright. . . . . . . . . . . . . . 91

CHAPTER IV  - NON-VOLUNTARY DISPOSITIONS
        Compulsory Licences . . . . . . . . . . . . 93
            Reproduction and public
                performance licences . . . . . . . 94
            Printing licences. . . . . . . . . . . 103
            The mechanical reproduction licence  .106
        The Reversionary Interest Proviso . . . . .107

CHAPTER V   - SUMMARY OF RECOMMENDATIONS           113

BIBLIOGRAPHY                                       119

Chapter I

INTRODUCTION

## Ownership

Section 3(1) of the Canadian Copyright Act defines the term "copyright" in such a manner as to render it a bundle of exclusive statutory rights which protect original literary, dramatic, musical and artistic works.[1]  Inextricably linked with any issue concerning the exploitation of these rights is the fundamental question of establishing the criteria for determining the appropriate party to exercise them, i.e., the question of ownership.  This paper examines the ownership provisions of the Act and the issues they raise and offers recommendations for amending the Act.  Consideration will first be given to the obligations that Canada has accepted in agreeing to adhere to two major international copyright conventions:  the Berne Convention and the Universal Copyright Convention.  Subsequently, issues of initial ownership of copyright will be examined. This will be followed by an analysis of the many questions attendant upon the disposition of rights, both voluntary and non-voluntary.  Finally, there is a summary recapitulation of the recommendations resulting from the analysis contained in previous portions of the paper.

## International Obligations and Copyright Ownership

Insofar as Canada adheres to certain international conventions, domestic law must reflect the obligations thereby imposed and should seek to be compatible with not only the letter but, equally, the spirit of these conventions.

The Berne Convention  Canada adheres to the 1928 Rome Text of the Berne Convention, not having acceded to its later revisions concluded at Brussels in 1948, at Stockholm in 1967 and at Paris in 1971.  Thus, constraints and obligations im-

---

1.    Section 45 of the Copyright Act provides that there is no entitlement to copyright or any similar right in any literary, dramatic, musical or artistic work other than under the Copyright Act.  See also Canadian Admiral Corporation Ltd. v. Redifussion Inc. et al. (1954) Ex. C.R. 382, at 390; 20 C.P.R. 75; 14 Fox Pat. C. 114, at 122.

posed upon Canada by the Berne Convention may be determined by examining the Rome Text, although the preceding and succeeding texts may be useful both in understanding the Rome Text and in exhibiting trends in the development of international copyright law.

No single article of the Rome Text explicitly stipulates what party shall be the first owner of the copyright in a work. There is, however, a consistency of language throughout the Convention from which it may be inferred that, subject to any dealing with the copyright by the author, the author is always to be the first owner of copyright.[2] Support for this proposition may be gleaned from the following observations. Throughout the Rome Text, there are no provisions whereby initial ownership of copyright

_____

2.    The following examples will serve to illustrate this premise:

article 1:   "...rights of authors over their literary and artistic works."
article 2(2):  "...the rights of the author of the original work."
article 2(bis) (2):   "...the author shall have the sole right..."
article 4(1):  "Authors...shall enjoy...the rights..."
article 4(2):  "...the author...his rights..."
article 5:  "Authors...shall enjoy...the same rights..."
article 6(1):  "Authors...shall...the same rights..."
article 6(3):   "...the rights which an author may have acquired..."
article 6(bis) (1):   "...the author's copyright and even after transfer of the said copyright..."
article 7(bis):   "...copyright protection belonging in common to joint authors..."
article 8:  "The authors...shall enjoy...the exclusive right ..."
article 11(bis) (1):  "Authors...shall enjoy the exclusive right..."
article 11(bis) (2):   "...the right which belongs to the authors..."
article 13:  "The authors...shall have the exclusive right..."
article 14(1):  "Authors...shall have the exclusive right..."
article 14(3):  "...the rights of the author..."
article 15:  "...the rights belonging to the author..."
article 22:  "...the rights of authors..."

- 3 -

attaches to anyone other than the author.  This point is en-
hanced by the reference in article 6(bis) (1) to the
author's copyright and its transferability.  The Convention
does not, however, define the term "author."  An under-
standing of the term as used in the Convention may be ob-
tained from the Guide to the Berne Convention which, while
not intended to serve as an official interpretation of the
Convention, does provide valuable explanations as to its
nature, aims and scope (World Intellectual Property Or-
ganization, 1978, p. 4).  While the Guide specifically
treats the 1971 Paris Text of the Convention, where this
text does not differ from the 1928 Rome Text the Guide
effectively elucidates both.  With respect to the lack of a
Convention definition of "author," common to both the 1928
Rome Text and the 1971 Paris Text, the Guide states:

> ...on this too, national laws diverge wide-
> ly, some recognizing only natural persons as
> author, while others treat certain legal en-
> tities as copyright owners, some imposing
> conditions for the recognition of authorship
> which others do not accept.  (World Intel-
> lectual Property Organization, 1978, p.
> 11)[3]

By not defining author, it was intended to leave the
Convention countries free to define the term in accordance
with their respective social, cultural and economic policies

---

3.         Note that the passage quoted refers to authors and
to copyright owners in the same phrase, seemingly intimating
that these terms are equivalent or synonymous.  But clearly
they are not necessarily synonymous.  Copyright may be
transferred.  Therefore, the expression "copyright owners"
must be broader than "authors" as the former includes not
only those who are owners because they are authors, but also
those who are owners of copyright by reason of subsequent
acquisition.    The phrase would probably have been more
accurate if it had read:

> ...some recognizing only natural persons as
> authors and thereby as first owners of copy-
> right, while other countries treat certain
> legal entities (such as corporations and
> other juridical persons) as either (a)
> authors and thereby first owners of copy-
> right, or (b) as the first owners of copy-
> right, without addressing the issue of
> authorship.

- 4 -

and legal doctrines (including the concept of authorship). In the words of the Guide, "to define it ('author') in a manner binding on all member countries would be difficult if not impossible" (World Intellectual Property Organization, 1978, p. 11).

In conclusion, insofar as the 1928 Rome Text invariably speaks of copyright and its constituent elements only in relation to, and as attaching to, the author, initial ownership of copyright protecting a work must necessarily always be vested in the author of the work in question, however the term "author" may be defined. Since the Convention leaves it undefined, each Convention country is at liberty to adopt such definition(s) of the term as may be appropriate to its needs.

The Universal Copyright Convention   Canada also adheres to the 1952 text of the Universal Copyright Convention (UCC), not having acceded to the 1971 revised text concluded at Paris.

Like the Berne Convention, the UCC does not expressly provide which party shall be the first owner of the copyright protecting a work.  However, unlike the Berne Convention, the UCC does not establish numerous Convention minima with respect to works, and therefore it does not contain the considerable number of references relating to ownership of copyright which are found in the Berne Convention.[4]   The only three passages in the UCC similar to those referred to earlier in the discussion of the Berne Convention are the following:

article I:          "Each Contracting State undertakes to provide for the adequate and effective protection of the rights of authors and other copyright proprietors."

article III 1.:     "all the copies of the work published with the authority of the author or other copyright proprietor"

article V 1.:       "Copyright shall include the exclusive right of the author to make, publish, and authorize the making and publication of translations of works protected under this Convention."

———————————

4.      See p. 2, footnote 2.

From these excerpts, it would seem that the UCC provides copyright protection equally to "the author and other copyright proprietors," save for the translation right which attaches exclusively to "the author." The UCC is also similar to the Berne Convention in that it does not define either the term "author" or the expression "authors and other copyright proprietors." Therefore, it would seem that each of the member states of the UCC is at liberty to define these terms as it pleases. It is significant, however, that the UCC employs the expression "authors and other copyright proprietors," rather than merely "authors."

Arpad Bogsch, Director General of the World Intellectual Property Organization, offers two reasons why the term "authors and other copyright proprietors" was adopted in the UCC. In so doing, he sheds some light on the manner in which it may be understood.

> The first reason is that "author" has a different meaning in the various copyright laws of the world. Some countries recognize as authors only physical persons, others recognize also legal entities.[5] In the case of works made by an employee in the course of his employment, some countries recognize the employer, others the employee as author. The question of who is the author or are the authors of a photograph or a motion picture belongs among the most controversial problems of copyright law and the replies may considerably vary from one country to the other. These differences, however, do not matter as far as Article I is concerned. What this Article prescribes is the protection of the rights of the copyright proprietor: he may be the "author" (whatever this means in the different countries), or he may be a person other than the person who, in the terminology of the copyright laws of a least some countries, is, or would be called, the author, if this person is "copyright proprietor."
>
> The other reason for which the Conference appended "and other copyright proprietors"

---

5.    Not surprisingly, this same reason was advanced for the absence of a definition of "author" in the Berne Convention, noted earlier.

- 6 -

> to "authors" is probably that it wanted to
> make clear that those who acquire the rights
> of the author are in the same position as
> the author himself.  Thus Convention protec-
> tion will extend not only to the author but
> also to his successors, whether inter vivos,
> such as assignees, or mortis causa, such as
> heirs or legatees.  (Bogsch, 1972, p. 7)[6]

The discussion by Bogsch regrettably leaves the
specific question of first ownership of copyright
unanswered.  While it is less clear than the Berne Conven-
tion, Bogsch's commentary seems to imply that, under the
UCC, the author, however defined, is the first owner of
copyright and that "other copyright proprietors" derive
their ownership only from or through the author.

---

6.    See also p. 19 et seq. of Bogsch's treatise where he
illustrates the difficulties in cases of works by employees,
corporate authors, motion pictures, photographs, etc.  As
Bogsch points out, these problems are not solved by the
Convention and any contracting country may decide according
to its domestic copyright law who the author of a given work
is.

Chapter II


INITIAL OWNERSHIP


Section 12 of the Act is entitled "Ownership of Copyright" and, save for section 12(6) which pertains to ownership in cases of assignments, it is concerned primarily with initial ownership of copyright in a work upon its creation. Examples of other sections of the Act which have an effect upon initial ownership are section 9, concerning photographs, section 10, records and perforated rolls, and section 11, Crown copyright.[1]


## The Principle of Author as First Owner

Section 12(1) states succinctly that the author of a work is the first owner of the copyright in that work, subject to the provisions of the Act. While the substance of this provision may seem self-evident to some, one must bear in mind that it was not until the Statute of Anne (8 Anne, Ch. 19, 1709) that this principle was codified in law. Previously, the right to generate copies of a book which, in effect, constituted the core of copyright as it was then understood, belonged generally in the first instance to the printer who produced the book and then to the bookseller who subsequently owned the book for resale. The Statute of Anne, regarded as the predecessor of modern day Anglo-American copyright statutes, including Canada's Copyright Act, significantly altered this situation by statutorily vesting the right to reproduce in the first instance in the author. According to the Statute's preamble this right was provided to authors in order to encourage "...learned Men to compose and write useful books." Copyright legislation descending from the Statute of Anne has generally maintained this principle of the author's initial ownership of the copyright in his work upon its creation. However, certain exceptions have developed which will also be considered in this paper.

---

1.     The topic of Crown copyright was recently the subject of a detailed study. See Torno, <u>Crown Copyright in Canada</u>, 1981.

- 8 -

Insofar as section 12(1) of the Act provides that the author of a work is the first owner of the copyright in his work, it also faithfully reflects the construction of the 1928 Rome Text of the Berne Convention and the 1952 Geneva Text of the UCC offered earlier. Thus, section 12(1) mirrors the Statute of Anne and also fully reflects Canada's international obligations with respect to first ownership of copyright.

This statement must be qualified, however, by the observation that section 12(1) opens with the words "subject to this Act..." These words establish that the principle enunciated in this section -- that the author is the first owner of copyright -- may be subjugated to or displaced or qualified by other provisions in the Act. There are two areas where this principle of section 12(1) is so modified.

The first consists of the two provisions in the Act where contract considerations have been included:

1. Section 12(2), where the first owner of copyright in an engraving, photograph or portrait ordered by a third party and made for valuable consideration is deemed to be that third party, unless there is an agreement to the contrary.

2. Section 12(3), where the first owner of the copyright in a work produced by an author in the course of employment under a contract of service or apprenticeship is deemed to be the employer, unless there is an agreement to the contrary.

It should be noted at this juncture that both of the above subsections are stated in terms of matters of contract, i.e., valuable consideration, the existence of a contract of service or apprenticeship, or the presence or absence of an "agreement to the contrary." Section 12(2) does not mention the author of a photograph or portrait, and thus vitually ignores the question of authorship. However, section 12(3) adverts to the existence of an author but specifically provides that someone other than the author is to be the first owner of the copyright in the work which the author created. The apparent conflict between the Berne principle of the author as first owner and the above provisions will be addressed later.

The second area in which the principle of the author as the first copyright owner has been addressed in a special manner consists of the special definitions of the term "author" with respect to certain works which have in common

their reliance on specific and specialized forms of technology for their respective realization, i.e., photographs, sound recordings and motion pictures. These do not create exceptions to the principle of author as first owner of copyright. Rather, the law establishes definitions which depart from the common precept of the immediate creator as author in order to overcome difficulties in attempting to ascertain who is to be considered the author of such works. Since the person deemed to be the author under the basic principle of first ownership will be the first owner of copyright, such special definitions will be crucial in addressing any questions of first ownership. The use of such definitions to establish the first owner of copyright in a work is consistent with the latitude provided in this respect by both the Berne Convention and the UCC.

In summary, the principle of the author as first owner of copyright in his work has been an implicit facet of copyright in Anglo-American law since the Statute of Anne, and an implicit facet of the Berne Convention since its inception. This concept should, therefore, similarly prevail in Canadian copyright legislation.

## The Copyright/Technology Interface

Photographs  Ever since the category of photographic works was added to the spectrum of works protected under copyright, there have been problems in establishing which party or parties should be considered: (a) the author of a photograph and (b) the owner of the copyright protecting that photograph. Such difficulties are essentially attributable to attempts to adapt existing copyright terminology, which arose principally in a literary context, to advances in technology which made possible new modes and forms of protectible expression. This adaptation process, which continues today, requires an evolving, flexible definition of the term "author."

As discussed earlier, the basic principle has long been that the author of a work is the first owner of copyright in his work. Thus, the question of determining authorship continues to be crucial in determining ownership of copyright in photographs. The Fine Arts Copyright Act of 1862 (25 & 26 Victoria, c. 68, s. 1) was the first statute to include photographic works under the copyright umbrella; however, it failed to establish who, specifically, was to be considered the author of such works. A series of cases addressing the issue followed, beginning with Nottage v. Jackson in 1883 [(1883) 11 Q.B.D. 627].

- 10 -

In the Nottage case, the court recognized that "author" was not defined under the Fine Arts Copyright Act of 1862, but nevertheless decided that the author of a photograph was the person who supervised the arrangement of the picture and the pose or grouping of the object or objects, and who was most nearly the effective cause of the photograph when completed. In most cases, the photographer would, according to this test, be considered to be the author.

In 1888, the case of Pollard v. The Photographic Co. [(1888) 40 Ch. D. 345] held that, notwithstanding who the author of the photograph was, the person who posed for the photograph and paid valuable consideration for the photograph was the owner of the copyright in the photograph. This finding was based upon the supposition of an implied agreement between the photographer and the person paying valuable consideration for the transfer to the latter of the rights in the photograph.[2]

Two relevant cases were decided in 1895. In Ellis v. Marshall & Son [(1895) 64 L.J.Q.B. 757], a photographer requested a person to pose for a photograph. The person agreed and granted the photographer permission to sell copies of the photograph. The court held that in such a case the photographer is the author and owner of the copyright in the photograph, taking the view that the granting of permission is not sufficiently valuable consideration to imply a contract to the contrary. In Melville v. The Mirror of Life Company [(1895) 2 Ch. 531], it was held that the photographer was author and therefore owner of the copyright in the photograph. The court was of the opinion that the manual operator of the camera is not the photographer where he acts under the instructions of someone else. In deciding the ownership of the copyright in the photograph, the court specified two facts which had influenced its decision to ascribe authorship of the photograph to the photographer: first, the parties involved had expressed the intention that the negative of the photograph be kept by the photographer as his property and, second, the subject of the photograph had consented to have the photographer sell copies of the photograph. The first point was later to become crucial in the evolution of determining copyright ownership in photographic works in English copyright law.

---

2.    Issues arising from this implied contract concept, i.e., works made in the course of employment and commissioned works, are examined later in this chapter.

- 11 -

In 1903, the decision in Boucas v. Cooke [(1903) 2 K.B. 227] complicated matters somewhat in that the court expressed disapproval of the decision in the Melville case, stating that it had established an improper test for the ownership of the copyright in a photograph. The central criticism of the criterion used in the Melville case was that it considered the intention of the parties with respect to the property in the negative of the photograph. It was thus decided in the Boucas case that, notwithstanding that the photographer retains the property in the negative, where a photograph is taken in the ordinary way by a photographer for a sitter at the sitter's request and upon a promise either express or implied to pay for the photograph, the copyright belongs to the sitter.

The situation with respect to authorship of a photograph was further aggravated by the case of Stackemann v. Paton [(1906) 1 Ch. 774]. In this case, the Boucas decision was discussed but was distinguished on the facts existing in the Stackemann situation. In addition, the court in the Stackemann case stated that the author of the photographs in question was the one who actually took the photographs, even if he was in fact guided or directed by another person.

It was against this backdrop of differing judicial opinion that, in 1911, the United Kingdom enacted its revised Copyright Act. Section 21 of the Act, upon which section 9 of the Canadian Copyright Act was modeled, sought to end the problems with respect to ownership of copyright in photographs. In effect, it adopted the approach in the Melville case and deemed the author of the photograph to be the person who was the owner of the negative at the time it was made.

By establishing ownership of the photographic negative as the criterion to identify the author of a photograph and thereby the first owner of copyright, there is no doubt that the legislators were attempting to come to grips with a complex and perplexing problem. They recognized that the courts had, until then, had great difficulty in establishing with certainty and generality who was to be considered the author of a photograph. Until the advent of the photograph and its inclusion under copyright law, authorship of a work had always been a matter of fact, generally uncomplicated by any overriding legal doctrines.

The cases subsequent to Nottage v. Jackson illustrated that the courts had had great difficulty in establishing one consistent test for the determination of authorship of a photograph. Apparently for this reason, Parliament defined

- 12 -

the author as the owner of the photographic negative in the
Copyright Act of 1911.    Doubtless in doing so, the legis-
lators sought to end uncertainty as to the question of
authorship by making it a matter of law.  However, as a re-
sult they over-simplified the test of authorship and dis-
carded a number of important considerations.    Furthermore,
in their attempt to provide the relatively simple and
certain solution which was enacted in section 21, they
either misapprehended or overlooked the inherent principle
underlying copyright expressed in the <u>Nottage</u> case.    That
is, that the author of a photograph is the person who super-
intended the arrangement of the picture and who is most
nearly the effective cause of the photograph when completed.
The legislators failed to recognize that, while very often
the owner of the negative of a photograph could in fact have
been the person who, according to the <u>Nottage</u> test, was the
effective cause of the photograph, there were also many
times when this was not so.  Ownership of the negative would
therefore be in no way indicative of who, in fact, created
or originated the photograph.  Had Parliament suggested, for
example, that the ownership of the materials upon which any
other artistic work was fixed, such as the canvas of a
painting or drawing, was to be the index of its authorship,
this would have been decried as a travesty of the concept of
the author as the creator or originator of the work.    The
only factor in favour of the legislators in this case was
that they had sought to resolve the uncertainty as to
authorship of a photograph.  However, it is submitted that
although section 21 was well intended, it is a measure which
was inimical to the concept of the author as first owner.

Despite these criticisms of the U.K. provision in
section 21, it was dutifully adopted in section 9 of the
Canadian Copyright Act.  The first reported Canadian case
involving section 9 was <u>Dobran</u> v. <u>Bier</u> in 1958 [(1958) 15
D.L.R. (2d) 595; 29 C.P.R. 150].  There it was held that the
person who both took the photograph and then owned the nega-
tive was to be considered the author of the photograph.  The
judge's reference to the person who took the photograph was
reminiscent of the <u>Nottage</u> case and indicates that the court
tended to qualify the statutory language of section 9 with
the added consideration of the party who was the actual cap-
tor of the image in the photograph.

More recently the same tendency noted above was dis-
played in the case of <u>Global Upholstery Co. Ltd.</u> v. <u>Galaxy
Office Furniture</u> [(1977) 29 C.P.R. (2d) 145].  There the
court stated:

> The author of the photograph is the photo-
> grapher who did the photographic work.
> Subject to the Act, the photographer is the
> first owner of copyright therein.[3] (p. 157)

It is not clear from this quote or from the remainder of the
decision whether the court even considered section 9 in de-
ciding that the photographer was the author. What seems to
be evident, however, is that as in the Dobran case the court
considered determination of the party which actually did the
photographic work as the decisive factor in establishing who
should be considered the author.

The foregoing condensed history of the issue of
authorship in photographic works should serve to illustrate
that the present criterion in section 9 for determining
authorship of a photograph is at best insufficient, at worst
inappropriate and inaccurate. Moreover, the adoption of
section 21 of the 1911 U.K. Copyright Act in the Canadian
Copyright Act perpetuated the errant notions of the drafts-
men of the former Act vis-à-vis previous case law. If
effect is to be given to the fundamental principle that the
author of a work sould be the first owner of copyright, then
ownership of the physical embodiment of a photographic work
is, by itself, an insufficient and unrealistic consideration
to establish its authorship. Surely the more germane consi-
deration is establishing who, in fact, produced a work or at
least who was responsible for the decisions made as to the
composition, focus, etc. of the photograph. Witness the
opinion of Judge Learned Hand in an American copyright case:

> ...no photograph, however simple, can be un-
> affected by the personal influence of the
> author....(Jewelers' Circular Publishing Co.
> v. Keystone Publishing Co., 274 Fed. 932,934
> (S.D.N.Y., 1921) affirmed 281 Fed. 83 (2d
> Cir. 1922))

---

3.      Note that there was an earlier photography-related
case prior to the enactment of the first Canadian Act (i.e.,
under protection of the U.K. legislation): Tremblay v. La
Compagnie d'Imprimerie de Québec (1900) 6 Rev. de Dur.
312. In that case, it was held that the photographer who
was responsible for the photograph was its author. Even if
he was acting as an agent for a principal, this was
insufficient to make the principal the author of the photo.
Thus first ownership of the copyright was retained by the
photographer/author.

- 14 -

Melville Nimmer, in his excellent treatise on copyright, commented that the view expressed above by Judge Hand has become the prevailing view in the United States so that any photograph

...may claim the necessary originality to support copyright merely by virtue of the photographer's personal choice of subject matter, angle of photograph, lighting, and determination of the precise time when the photograph is to be taken. (Nimmer, 1979, p. 2-111)

Therefore, insofar as copyright protection for a photograph depends upon originality and originality in turn depends upon the decisions of the photographer, then who more appropriately deserves to be considered the author of a photograph than the photographer? Certainly not the mere owner of the negative, for he may be an entirely different person, having no substantive participation in or relationship to the creation of the photograph.

The Keyes-Brunet study considered the question of ownership of copyright in photographs (Keyes and Brunet, 1977). While the study recognized that "he who takes the picture may or may not be the owner of the copyright" (Keyes and Brunet, 1977, p. 69), this matter was examined no further. The study went on to recommend that ownership of the copyright in a photograph should vest in the person who owned the material on which it is taken at the time it is taken, so as to overcome situations, such as occur with polaroid photographs, where no negative is produced in the photographic process (Keyes and Brunet, 1977, pp. 48 and 70). In light of the previous commentary and the history of copyright protection for photographs, the Keyes-Brunet proposal is obviously unsatisfactory.

Eight briefs received in response to the Keyes-Brunet study expressed dissatisfaction with this particular recommendation. Representative of these comments were those of the Writers' Union of Canada which contended that the person responsible for the composition of the photograph (i.e., the photographer) is its creator and should legally be recognized as its author. Cited in support was the Whitford Report (1977) which specifically considered the dual questions of authorship and ownership in still photographs. The report recommended that the author of a photograph be defined as "the person responsible for the composition of the photograph" (p. 154) and earlier noted that:

> Photographers today are apparently faced with the position that, in many cases, they have to work with material which is not their property, for some clients insist upon their work being done with materials supplied by the clients. There is no reason, in principle, why the author of a photograph should not be defined as the person responsible for the composition of the photograph. Such a definition lacks the degree of certainty at present attaching to ownership of copyright in photographs, but it commends itself to professional photographers and we recommend its adoption. (Whitford Report, 1977, p. 148)

In view of the foregoing, it is submitted that to be consistent with the general copyright concept of the author as the originator, or effective cause, of a work and to rectify the error now present in section 9, authorship of a photograph should not be determined by ownership of the photographic material. Rather, the author should be considered to be the person who composed the photograph. This will settle the mantle of authorship upon the person who is, in fact, the effective and, most often, the immediate cause of or creator of a photograph, irrespective of the subsidiary and often irrelevant consideration of the ownership of the photographic material. In this way, and in accordance with the fundamental principle of copyright law expressed in section 12(1) of the Copyright Act, the creator of the photograph will, as its author, automatically be the first owner of the copyright therein.

Sound recordings   If the advent of photography caused some growing pains in the adaptation and evolution of copyright law, the same may be said with greater force vis-à-vis sound recordings. Sound recordings today can be embodied in many types of contrivances, such as records, tapes, cassettes, music boxes, etc. However, the invention of the flat record disc, coming as it did only a few years after the establishment of the Berne Convention in 1886, added a new dimension to the problem of adapting the term "author" and other copyright terminology to new sound reproduction technology. Of course, at that time, various mechanisms existed to reproduce musical tunes. However, music boxes, piano rolls and the like in essence merely provided means whereby musical contrivances could be operated to produce programmed sounds; the flat disc (as well as the cylinder) represented a revolutionary development whereby sounds could actually be captured and reproduced. It should be noted here that the term

"sound recording" is used to denote the aggregate of all sounds embodied within any one of the various contrivances capable of recording and reproducing sounds, with the exception of motion picture sound tracks. The purpose of this exception will be clarified later. Also, it may be noted that insofar as records, tapes, cassettes and similar sound-reproducing mechanisms constitute the necessary embodiment of "a sound recording," this term has, with growing acceptance, been used to refer to or to connote such contrivances themselves (subject again to the exception of motion picture sound tracks). Here, however, sound recordings will be used to refer only to the sounds captured and not to their support mechanisms. At the time when copyright protection for sound recordings was introduced under the Copyright Act, the terminology had not yet developed sufficiently to distinguish between the sound recording which the Act sought to protect and the support mechanism on which the sound recording was embodied. Section 4(3) thus employed the term "contrivance" not, as a literal interpretation would suggest, to indicate the mechanism embodying the sounds, but rather to mean the aggregate of the sounds captured within the support mechanism.

As noted, under the Act the determination of the author of a work constitutes the most basic and crucial factor in determining the first owner of the copyright in that work. This determination of authorship is equally as relevant to sound recordings as it is to other works subject to copyright protection.

The question of authorship of a sound recording is, however, somewhat different from that issue with respect to literary, dramatic, musical and artistic works. This is as much a consequence of the manner in which sound recordings are protected under the Copyright Act as it is a consequence of the manner in which sound recordings come into existence. While sound recordings are protected in Canada under the regime of the Copyright Act, they are not described or protected as a separate category of works. Rather, according to section 4(3), copyright protection subsists in them "in like manner as if such contrivances were musical, literary or dramatic works."

Not only does this assimilation of sound recordings with musical, literary or dramatic works make the manner of copyright protection of sound recordings a matter of conjec-

ture,[4] it also gives rise to the question, Why are sound recordings not protected as a fully fledged category of works equal to but separate from other categories of copyright protected works such as literary, artistic, musical and dramatic works? The answer may lie in the fact that, in the early stages of the development of recording technology, the general view was that sound recordings should not be considered to constitute original works equal to, for example, a novel or a painting. This reticence to accord sound recordings the full status of works in their own right may have resulted from the perception that, while the creation of sound recordings required a measure of creativity, it was creativity of a different order than that necessary to produce a novel or a painting. The observations of the Ilsley Commission are of value in this regard:

> As the Gregory Committee points out, while a record "has called forth in its production a measure of artistic skill, there is always a great measure of what is only technical and industrial in its manufacture." While our (i.e., Canada's) Copyright Act provides that copyright shall subsist in records as if they were musical, literary or dramatic works, they are nowhere described as original works in the Act, and we think it desirable not to describe them as works in any new legislation. We think, however, that they should be the subject of copyright protection. (Ilsley Commission, 1957, p. 76)

This perception seems to have lingered, albeit in modified form, in the Commonwealth countries. For example, while the copyright legislation of both the United Kingdom and Australia previously accorded protection to sound recordings on a comparable basis to that which prevails in Canada (i.e., on the basis of assimilation to musical works) such assimilation-based protection has been removed in both countries in recent revisions of their copyright statutes which protect sound recordings in their own right. The conceptual leap has not, however, been complete and, for instance sound recordings are protected in Australia not as "original works" but rather as "subject matter other than works."

---

4.    That is, is the sound recording to be protected merely as a musical work, literary work, dramatic work, or as some combination or permutation of these three categories?

- 18 -

When the United States decided to establish copyright protection for sound recordings for the first time in 1976, it made no relevant distinction between sound recordings and all other forms of works, not being conceptually constrained by its own history of treatment in this area. In examining the question of providing such protection, the 1971 Report of the American House of Representatives on sound recordings stated that the extension of statutory protection to sound recordings as another of the classes of copyrightable subject matter was overdue (p. 6).[5]    No reasons were found which argued against protecting sound recordings as a separate class of original works. Thus, sound recordings became an enumerated class of works protected under the American Copyright Act separate from but equal to other categories of works such as literary works, musical works, dramatic works, etc.  (The Copyright Act 1976, section 102(a)).  Just as there has been no suggestion that sound recordings should not be protected within the scope of the Canadian Copyright Act, there have been no compelling reasons offered to deny equal treatment as a separate category of works to sound recordings.  It is time for Canada to shed its now dated and inappropriate legacy in this area of copyright law and accord sound recordings protection in their own right as another protected class of works.

The difficulties in deciding the question of authorship of a sound recording are also partly the result of the manner in which they came to exist, as illustrated by Nimmer in his treatise on copyright:

> Only those who have made original contributions to a work may claim as authors and only authors, or those who claim through them may be regarded as copyright owners. The determination of who in fact has made original contributions to a given work is a much more complex question in the case of motion pictures and sound recordings than it is in the case of a literary work. Even if the work is one of collaboration, the contributions of the several joint authors do not vary in kind, even if there may be great variation in quantity and quality.  Hence with such works it is necessary to merely state that the author or his assignee shall be the copyright owner.  The problem with respect to motion pictures and sound recor-

5.    See also Nimmer, 1979, Appendix 18, p. 6.

> dings is that it is not always easy to
> determine who should be regarded as the
> authors since such works virtually always
> represent the combined contributions of a
> number of different people, performing
> various functions. (Nimmer, 1979, 2-149)

If, however, all who made original contributions to
a sound recording were to be deemed co-authors, in the ab-
sence of numerous and complex contracts or assignments the
difficulties imposed by the potentially conflicting
interests and desires of the probably numerous co-authors
could be so enormous as to render dealing with the sound re-
cording impractical if not impossible.

In an attempt to meet the peculiarities of sound re-
cordings, section 10 of the present Copyright Act provides,
in part, that the owner of the original plate from which a
sound reproduction may be derived, at the time when the
plate was made, is deemed to be the author.  Because the
owner of the plate is thereby considered to be the author of
the reproduction, he is automatically the first owner of the
copyright in the sound recording under section 12(1) of the
Act.  As in the case of photographic works, the Act relies
on ownership of the original physical embodiment from which
copies may be reproduced as the simplifying criterion for
determining the author of a sound recording.  This measure
attempts, in essence, to make dealing with the copyrighted
work more certain and practical by gathering up all the
threads of the multifarious contributions to the work into a
single manageable bundle, and by placing this bundle in the
hands of a single entity deemed to be the author.  Signifi-
cantly, the criterion for this deemed authorship:  (a)
avoids any direct consideration of whether the deemed author
actually contributed artistically to the creation of the
work; (b) changes the determination of the author from a
question of fact to one of law; and (c) focuses attention
not on the parties who contributed the elements of the sound
recording, but on the owner of the plate of the sound re-
cording.

The case of Nottage v. Jackson appears to have been
the earliest case to address the question of authorship of a
technology-based work.  That case, dealing with photographs,
established what may be the appropriate test for authorship
of other technology-based works (i.e., works requiring a
special form of technology for their realization).  In the
Nottage case, the author was held to be the party which was
most nearly the effective cause of the completed work.
Efficient cause is synonymous with effective cause and has

been legally defined to mean:  "the cause which originates
and sets in motion the dominating agency that necessarily
proceeds through other causes, as mere instruments or
vehicles, in a natural line of causation to the expected or
intended result" (Bole v. Pittsburgh Athletic Club, CCA, 205
F. 468, 471).

Turning to sound recordings, the question which must
be posed is whether the present criterion for authorship,
while arguably adequate for purposes of certainty, is appro-
priate in the context of providing some recognizable link
with the concept of creativity.  It would be useful in
answering this question to review findings of some earlier
studies on authorship of sound recordings and ownership of
copyright therein.

The Ilsley Commission considered questions surroun-
ding copyright in sound recordings (Ilsely Commission, 1957,
p. 76).  The commission noted that neither the Rome Text of
the Berne Convention nor the Universal Copyright Convention
imposed any obligations to give copyright protection to re-
cords.[6]  In contrast, however, it was noted that the U.K.
Imperial Copyright Act of 1911 provided for copyright in
sound recordings as if they were musical works but not as
original works.  It was also noted that the method of copy-
right protection for records in the U.K. had been adopted in
the Canadian Copyright Act under section 4(3).  To ensure
that sound recordings continued to be able to receive copy-
right protection while not being considered "works,"[7] the
commission recommended that (subject to certain qualifica-
tions not directly relevant here) the maker of a sound re-
cording should be the first owner of the copyright in the
sound recording except where the sound recording was commis-
sioned.[8]  The commission neither discussed author nor de-

---

6.    Note, however, that the question of whether the con-
ventions require copyright protection for records is not
totally determinative of a member country's convention obli-
gations vis-à-vis sound recordings. If a country chooses to
provide copyright protection for sound recordings, it will
be obliged, under the convention principle of national
treatment, to provide the same copyright treatment to
foreign nationals as it provides to its own nationals.

7.    Refer to the discussion at p. 17.

8.    Commissioned works are examined later in this
chapter.

fined maker in its study of sound recordings, possibly because the former term did not appear suitable with respect to a sound recording, and possibly because it was presumed that the latter term was sufficiently descriptive in itself. However, the commission's definition of the term "maker" as later used in relation to cinematographic works (i.e., the person by whom the arrangements necessary for making the film were undertaken) would be the most appropriate construction to import to the same term in relation to sound recordings. Thus, "maker" would denote the person by whom the arrangements necessary for the making of the sound recording were undertaken.

The recent Keyes-Brunet study also examined sound recordings and noted that the assimilation of sound recordings to literary, dramatic and musical works presented "the same difficulties of application as arose with respect to motion picture films" (Keyes and Brunet, 1977, p. 84). On this basis it was recommended, in contrast to the Ilsley Commission's viewpoint, that sound recordings should be protected as a separate class of subject matter in order to eliminate such difficulties. The study also proposed that copyright in a sound recording should be owned by its maker.[9] "Maker" was defined as "the person or entity by whom the arrangements necessary to make the recording were undertaken."

The Whitford Report in the United Kingdom, which preceded the Keyes-Brunet study by a month, also recommended that the maker of a sound recording should own the copyright therein (1977, p. 147). However, the Whitford Report defined "maker" differently than did Keyes-Brunet, in a manner reminiscent of the present definition of the author of a sound recording in the Canadan Act as the person who owns the record at the time when it is made.

The term "maker" has been used repeatedly in relation to sound recordings in the report of the Ilsley Commission, the Keyes-Brunet study and the Whitford Report either in preference to or in avoidance of the term "author," without any express reason or justification. It would appear to have been left to conjecture why a sound recording should have a maker while other works protected under the Copyright Act possess an author. The fact is, however, that the present Act has been using the term "author" in relation to sound recordings since its enactment in 1924.

9.    Save for commissioned sound recordings where, in the absence of any agreement to the contrary, the copyright would belong to the commissioning party.

- 22 -

Perhaps there was an implicit belief that the term "author" had reached the limits of its adaptability or that there would be great difficulty in identifying and isolating those parties who contributed, in the previously cited words of the Gregory Committee, "a measure of artistic skill," as distinct from "technical and industrial" elements. Perhaps it was felt that because sound recordings were not protected in their own right as works, it was inappropriate to refer to their creators by the same term used to denote the creators of recognized works, e.g., literary or artistic works. As well, the possible incongruity in applying author-related concepts, such as moral rights, to the juridical persons (corporations) often involved in the production of sound recordings might have favoured use of the term "maker." For each of the foregoing arguments, however, there are superior countervailing arguments.

Sound recordings have found a long-standing niche in Canada within the Copyright Act. The term "author" has consistently been adapted and used in the Act in relation to all forms of expression entitled to copyright protection, including sound recordings, to denote the person perceived as the effective cause or originator of same and thus the person considered to merit the benefits of copyright protection. The term "author" has always been used in this liberal sense to denote, for example, the painter, the sculptor, the composer and the photographer -- not just the writer. The mere fact that a sound recording relies on a specific form of technology for its creation and often, but not always, originates from within a corporate context, is not sufficient reason to halt the continued dynamic adaptation of the term "author" in the Copyright Act. Moreover, notwithstanding that juridical persons, such as corporations, may not be perceived by some to possess the attributes believed necessary for entitlement to such author-related concepts as moral rights, the fact is that in many areas of social organization, the law ascribes human-like powers to them. For instance, they are assumed to be able to own property, to conclude contracts and to accept legal responsibility for their corporate acts. Indeed corporations and other juridical persons presently possess the status of an author and the concomitant pecuniary and, ostensibly, moral rights with respect to sound recordings

- 23 -

and other works.10   It therefore seems appropriate to con-
tinue to use the term "author" with respect to sound re-
cordings whether or not the author is a natural or juridical
person.

The present statutory definition of author with re-
spect to sound recordings is, however, inappropriate.
Authorship of a sound recording is currently determined on
the basis of ownership of the original plate from which the
contrivance embodying the sound recording was derived.   As
noted, the case of Nottage v. Jackson established a test for
authorship of photographs which was admirably suited to
other technology-based works such as sound recordings.   This
test focused on an investigation ascertaining the party who
was the effective cause of the creation of the work.   Owner-
ship of the original plate of a sound recording may indicate
who is the effective cause of the sound recording, but it is
too narrow a test to identify such effective cause accurate-
ly in every case.

Instructive insight may be gleaned from the 1976
U.S. Copyright Act with regard to authorship.   In that
statute, copyright protection is provided to all original
works of authorship, with specific reference to sound re-
cordings as one of the enumerated categories.   Section
102(a) of the U.S. Act states that copyright in a protected
work vests initially in its author or authors.   It does not,
however, specifically define or delineate who is to be con-
sidered the author of a sound recording.   Nimmer advises
that authorship of sound recordings is determined on the
basis of which person(s) provided the originality in the
sound recording necessary to support the claim to copyright
protection (1979, p. 2-144).   He suggests that there are
two potential sources of such originality:   the performing
artists who perform the sounds recorded, and the record pro-
ducer whose employees participate in the recording session.
He then observes:

Absent an employment relationship, or an ex-
press assignment of copyright from the perfor-

---

10.    Under the Interpretation Act, R.S.C., "person" is
defined to include, inter alia, corporations.   Under section
10 of the Copyright Act, the possibility arises that a cor-
poration may be the owner of the original plate of a sound
recording when made and may thus be deemed to be the
author.   The same applies for photography under section 10
vis-à-vis ownership of original negatives and for cinemato-
graphs protected as photographs under section 3(1)(e).

- 24 -

mers to the record producer, the resulting ownership of the sound recording copyright will either be exclusively in the performing artists, or (assuming an original contribution by the sound engineers, editors, etc., as employees of the record producer), a joint ownership between the record producer and the performing artists. (Nimmer, 1979, p. 2-150)

Thus, the U.S. law has developed a test which identifies the author or authors as the party or parties responsible for providing the sound recordings with the originality necessary to support a claim to copyright protection. In this case, the U.S. Act contemplates the possibility of ownership of the copyright vesting in either the proximate cause of creation of the recording (the artists) and/or the effective cause (the record company/producer). However, given the structure of the recording industry, in the vast majority of cases the copyright will devolve upon the record companies pursuant to contractual relationships with artists. Where the artist has created a recording without the involvement of a record company, then the artist will be not only the proximate cause but also, as a result of his entrepreneurial contribution, the effective cause of the recording. In either case, the focus on establishing some nexus with the act of creativity, whether proximate or effective, lies conceptually and closer to the <u>Nottage</u> principle, than does the concept of connecting <u>authorship</u> to ownership of chattels.

In conclusion, it is recommended that, insofar as the person principally responsible for the arrangements undertaken for the making of the sound recording is the effective cause of the creation of the sound recording, that person should be defined as the author. There will always be sufficient evidence upon which to determine who arranged for the creation of the sound recording. In accordance with the fundamental principle of copyright law in section 12(1) as to ownership, first ownership of the copyright in a sound recording will devolve upon this author. Thus, if the performing artists arranged for the creation of the sound recording, they will be its authors and thus the first owners of copyright therein. If the record company or producer was responsible, the latter will be entitled to the status of author and first owner of the copyright in the sound recording.

<u>Cinematographic works</u>  Several problems exist in the present treatment of cinematography in the Canadian Copyright Act, not the least of which relates to ascertaining who is the

- 25 -

first owner of the copyright in a work produced by the cinematographic process. Many of these problems stem from what
may be characterized as the dual treatment of cinematography, i.e., the possibility that under the Copyright Act a
work of cinematography may be protected as either a dramatic
work or an artistic work. This dual treatment has resulted
in cinematography being a most confusing corner of copyright
law in Canada.

Some provisions of the Copyright Act relevant to
cinematographs are:

section 3(1)(e):       "...'copyright'...includes the sole right
in the case of any literary, dramatic,
musical or artistic work, to reproduce,
adapt and publicly present such work by
cinematograph, if the author has given
such work an original character; but if
such original character is absent, the
cinematographic production shall be
protected as a photograph";

section 2:            "'cinematograph' includes any work produced by any process analogous to cinematography";

section 2:            "'dramatic work' includes...any cinematograph production where the arrangement
or acting form or the combination of incidents represented give the work an original character";

section 2:            "'artistic work' includes...photographs."

While cinematograph is defined as including "any
work produced by any process analogous to cinematography,"
this definition is not without some ambiguity, partly because cinematography is not defined. It is possible that
the legislators thought that cinematography had a commonly
understood meaning. One author in the field of copyright
refers to a definition of cinematography which, in essence,
was cited as being "the art and process of making motion
pictures by taking photographs with a motion picture camera"
(Perry, 1972, p. 256). The definition of photograph in the
Copyright Act includes "any work produced by any process
analogous to photography." With slight variations, various
dictionaries essentially define photography as the art and
process of obtaining accurate representations of visible
matter by means of the chemical action of light or other

- 26 -

kinds of radiant energy upon specially treated surfaces. Thus, predicated on the earlier definition postulated for cinematography, one could argue that the latter art form necessarily involves, or is accomplished by, a form of photography, with the added feature that cinematography achieves or imports an impression of motion. While a photograph freezes action by capturing an image at one instant in time, cinematography utilizes a sequential exposition of images captured so as to illustrate progressive changes in the image from one instant to the next, and thereby portray motion (Ladas, 1938, p. 441).

Part of the ambiguity referred to earlier pertains to the question of whether technological processes other than photographs, such as videotape and videodisc, which also produce the impression of motion, are presently included under the definition of cinematograph in the Copyright Act and are thus entitled to the same copyright protection. One view is that this question should probably be answered in the negative because the technological process which produces videotapes and videodiscs differs from that which produces a cinematograph. The former involves electronic techniques akin to television, the latter involves the photo-chemical techniques of photography (Perry, 1972, pp. 266-267).[11] This is clearly based on a strict literal interpretation of the definition of cinematograph which establishes that, to be a cinematograph, the process used to produce a work must be analogous to cinematography.

Those who would answer the question in the affirmative must rely on other considerations in support of their view. The definition of cinematograph was couched in terminology which probably sought to reflect the language used in article 14(4) of both the 1908 Berlin and the 1928 Rome

---

11.    The view expressed by Ms. Perry was based on a construction of a portion of the decision rendered by Cameron J. in the case of Canadian Admiral Corp. Ltd. v. Rediffusion Inc. et al.    (1954) Ex. C.R. 382, 397.    An encapsulation of Ms. Perry's argument is as follows:

- 27 -

Texts of the Berne Convention: "The above provisions[12] apply to reproduction or production effected by any other process analogous to cinematography."

Dr. Stephen Ladas, commenting on section 14(4) of the Rome Text expressed the view that:

> The last paragraph (of Article 14) casts a glance toward the future. Scientific progress might develop a new principle, analogous to that of the cinematograph, for the reproduction of literary or artistic works, or for the original creation of new works. The Convention provides that in such cases the above provisions would be applicable. (Ladas, 1938, p. 445)[13]

The language of the Rome Text differs slightly from that of the Canadian Act but the extent to which this difference in language is significant vis-à-vis the issue at hand remains undetermined. The discrepancy does serve, how-

---

1) videotapes do not give rise to negatives;
2) cinematography involves the making of a series of photographs and the creation of negatives;
3) Cameron J. held that in order to be protected as a photograph an image must be permanent, visible, capable of being handled and involve the production of a negative; and
4) therefore, "Videotapes are probably not protected as cinematograph films because they do not involve photographs."

It will be observed that the strength of this argument rests primarily on the importance ascribed to the second premise. While it may be true that cinematography involves the making of a series of photographs and the creation of negatives, this observation begs the key question of whether "processes which are analogous to cinematography" must similarly involve the making of a series of photographs and negatives.

12.    i.e., those related to cinematography.

13.    Note that this comment was made with respect to the identical predecessor of article 14(4) of the Rome Text in the 1908 Berlin Text.

- 28 -

ever, to explain further the fact that the status of video-
tapes continues to be unclarified. An attempt to resolve
this state of affairs resulted in a revision of the language
of the 1967 Stockholm Text of the Berne Convention. Cinema-
tographic works were defined to include "works expressed by
a process analogous to cinematography" (Berne Convention,
Stockholm Text, 1967, article 2(1)) in an attempt to clarify
that the process involved was of less importance than the
expression achieved. The Stockholm Text thus clearly pro-
vided for the protection of videotapes, videodiscs and other
as yet undiscovered means of producing audiovisual images
under the guise of cinematographic works, irrespective of
the technological processes used to produce them (Keyes and
Brunet, 1977, p. 82). This view is confirmed in the Guide
to the Berne Convention:

> ...the appearance of new technical means of
> communicating to the public has given birth to
> categories of works which are in some ways akin
> to cinematograph films though in the television
> and audiovisual domain.
>
> It is not so much the process employed which is
> analogous as the effects, sound and visual, of
> such process. (World Intellectual Property
> Organization, 1978, p. 15)

Finally, notice must be taken of the following pas-
sage from Nimmer with respect to the parallel question of
protection of videotapes as motion pictures under the 1909
U.S. Copyright Act:

> The Material Objects Embodying Motion Pictures
> and Other Audiovisual Works -- Film, Tape,
> Disc, Etc.
>
> (1) The Current Copyright Act. Motion pic-
> tures and other audiovisual works are most
> often embodied in film. It is now clear, how-
> ever, that this need not be the case. A work
> is no less a motion picture (or other audio-
> visual work) because the images are embodied in
> a videotape, videodisc, or any other tangible
> form.
>
> (2) The 1909 Act. The conclusion stated above
> is entirely clear with respect to works first
> created after January 1, 1978, the effective
> date of the present Copyright Act. But what of
> works first created prior thereto? If such a

- 29 -

work were embodied in videotape or videodisc form, was it eligible for statutory copyright protection under the 1909 Act? The question remains relevant under the present Act, because if such a work were ineligible for statutory copyright under the 1909 Act, it would, upon publication, have entered the public domain, and hence be non-protectible under the present Act. It is also presently relevant in construing the meaning of a grant of "motion picture rights" under instruments executed prior to the current Act.

The one court to rule upon this issue with respect to the 1909 Act (Trophy Products Inc. v. Telebrity Inc. 185 U.S. P.Q. 830, N.Y. Sup. Ct. 1975) employed essentially the same definition for motion pictures as that set forth above under the present Act. Specifically, the court held: "...there can be little doubt that what...(Congress) intended (in protecting motion pictures under the 1909 Act, as amended in 1912) was any instrumentality which reproduced the moving images and not merely a transparent tape made of celluloid or some similar product...." It was therefore held that videotape is eligible for statutory copyright as a motion picture. This was also the view adopted by Copyright Office Regulations under the 1909 Act, and was adopted by the Senate and House Committee Reports in connection with the Sound Recording Amendment of 1971, which squarely expressed the opinion that videotape is a form of "motion picture" under the 1909 Act, and is copyrightable as such. This it is submitted, represents the correct view of the status of videotape and discs under the 1909 Act. (Nimmer, 1979, pp. 2-129 to 2-131)

It is recommended that either the term "process analogous to cinematography" or "cinematography" itself should be statutorily defined to include any means by which the effect of motion pictures is produced, irrespective of the technological process utilized. This will ensure that videotapes, videodiscs and any other technology which may develop to render the effective portrayal of motion pictures will be included within the meaning of cinematographs and will thereby clearly be protected under copyright.

- 30 -

A collateral problem associated with the definition of cinematograph is the absence of any reference to the fact that all films of theatrical quality and a considerable number of other films contain a sound track as an integral part of the work. As the present definition of cinematograph was framed when the technology for combining sound with motion pictures was in its infancy, it is understandable how such a definition could find its way into the legislation. As the technology evolved, the broad language of section 4(3) of the Act with respect to sound recordings (i.e., contrivances by means of which sounds may be mechanically reproduced) automatically encompassed the sound track; however, protection then was afforded to the sound track as a separate entity and it has been suggested that this is still the case (Perry, 1972, pp. 265-266). As in the case of whether videotapes can be protected as cinematographs, the present status of sound tracks is not without a measure of uncertainty. Lahore, in commenting on the British Copyright Act of 1911, which contained comparable language to the present Canadian Act, states simply, in support of the view expressed by Perry: "The sound track in a film under S. 19(1) of the British Copyright Act, 1911, was a contrivance by means of which sounds may be mechanically reproduced" (Lahore, 1978, p. 63). However, in decisions in both English[14] and Australian[15] cases with respect to the meaning to be ascribed to the terms "cinematograph films" and "cinematograph rights" as they appeared in contracts in respect of licensing of same, the courts ruled that these terms must have been understood by the parties to include sound films. Finally, the American law on this point, while not determinative, certainly provides some valuable insights. It had been argued that, as the U.S. Act of 1909 (enacted 15 years prior to the Canadian Act -- i.e., at a time when there was no sound film technology) did not provide copyright protection to sound recordings and, as the limited copyright extended to sound recordings by the Amendment of 1971 did not apply to "sounds accompanying a motion picture," it followed that sound tracks were unprotected matter under the 1909 Act. However, as Nimmer points out:

> This view was rejected by the Copyright Office, which promulgated regulations under the 1909 Act which recognized the motion pic-

---

14.    Pathé Pictures Ltd. v. Bancroft (1933), Macg. Cop. Cas (1928-35) 403

15.    Williamson Ltd. v. M.G.M. Theatres, Ltd. (1937) 56 C.L.R. 567

- 31 -

ture sound track as "an integral part of a motion picture." The limited judicial authority on the issue also held a sound track to be eligible for statutory copyright as a "motion picture." This view is surely the more acceptable one. It recognizes that "talkies are but a species of the genus motion pictures. (Nimmer, 1979, p. 2-136)

Insofar as a cinematograph's sound track both physically and commercially constitutes as vital and integral a facet of the cinematograph as the visual element, the Copyright Act should legally treat it as an integral part of cinematograph. To that end, cinematograph should be statutorily defined as including any sounds accompanying motion pictures. Accordingly, the sound track of a cinematograph would be protected solely under the copyright regime applying to the cinematograph as a whole and, as a corollary, the meaning of the term "sound recording" should be restricted to denoting the aggregate of sounds captured on support mechanisms capable of fixing aural forms of expression only.

Certainly the most fundamental issue with respect to the treatment of cinematographic works under the present Act is the regime of dual classification. A cinematographic production is protected under the Act either as a dramatic work, if it "possesses original character," or as an artistic work consisting of a series of photographs if it lacks "original character." In the former case, the author is not specified in the Act, while in the latter case the author is statutorily deemed to be the party who owned the negative at the time it was made. The result is that there are two different kinds of authors of cinematographic productions.[16] In both cases, however, the principle in section 12(1) is applicable and those parties who are the authors (however that status arises) of cinematographic productions which fall into either of the two classes will be the first owners of the copyright protecting their works.

---

16.    Differentiation between films protected as dramatic works and those protected as artistic (photographic) works is not restricted to the question of authorship. Other differences are:

(1)    Dramatic works are protected for the life of the author plus 50 years; photographs are protected for 50 years from the making of the original negative (see Torno, Term of Copyright Protection in Canada, 1981).

- 32 -

The presence or absence of original character thus appears to be central to the present scheme of protection for cinematographic works under the Act. What, then, is original character and how does it differ, if at all, from originality, the underlying prerequisite for copyright protection for all classes of works? The concept of originality has been described by a Canadian court in the following manner:

> The meaning of the word was discussed in a judgement of Peterson J. in the case of University of London Press Ltd. v. University Tutorial Press Ltd. (1916) 2 Ch. 601 and has been frequently cited with approval in many cases. "The word 'original' does not mean that the work must be the expression of original or inventive thought. Copyright Acts are not concerned with the originality of ideas, but with the expression of thought....The originality which is required relates to the expression of the thought. But the Act does not require that the expression must be in an original or novel form, but that the work must not be copied from another work -- that it should originate from the author." For a work to be "original" it must originate from the author; it must be the product of his labour and skill and it must be the expression of his thoughts. (Canadian Admiral Corp. Ltd. v. Rediffusion, Inc. (1954) 20 C.P.R. 75, 90)

---

(2)    As there is no public exhibition right for artistic works under the Act and as exhibition does not constitute performance, as defined in section 2 of the Act, the owner of artistic copyright would appear to have no redress against the performance of his work in public if this was accomplished without reproduction of the film.

(3)    The compulsory licence provisions of section 13 of the Act apply to, inter alia, dramatic works which have been published or performed in public; these provisions do not apply to artistic works.

The meaning of the term "original character" does not lend itself quite so readily to resolution. Its origins are found in article 14 of the 1908 Berlin Text of the Berne Convention and it subsequently appears in an amended article 14(2) of the 1928 Rome Text. That part of the definition of dramatic work in section 2 of the Act which encompasses "any cinematograph production where the arrangement or acting form or the combination of incidents represented to give the work an original character" together with section 3(1) which provides for the protection of a "cinematograph production ...as a photograph...if original character is absent" collectively reflect Canada's Convention obligations under the cited article 14(2) of the Rome Text. However, the reference in section 2 of the Act, to the arrangement or acting form or the combination of incidents which bestows upon a work an original character and which provides some inkling of what is to be understood by this latter term does not appear in the Rome Text. This language is an adaptation of the language of the Berlin Text by which Canada was bound earlier. Article 14 of the Berlin Text provided:

> Cinematographic productions are protected as literary or artistic works[17] when by the arrangement of the stage effects or by the combination of incidents represented, the author shall have given to the work a personal and original character.

The comments of Dr. Stephen Ladas with respect to the above passage provide the most lucid explanation of the meaning of the term "personal and original character."

> Thus cinematographic works were deemed to be literary or artistic works if they were original intellectual productions by virtue of either of two elements: arrangement of stage effects or combination of incidents represented. The first element involves not only a subject (which might belong to the public do-

---

17.    Note that the meaning of the term "literary or artistic works" in the Convention is not synonymous with the terms "literary works" and "artistic works" as they are defined in the Act. The former term is a far more encompassing concept in the Convention meaning any production in the literary, scientific or artistic domain, whatever the mode or form of its production, and including the four classes of works in the Canadian Act, i.e., literary, musical, dramatic and artistic.

- 34 -

>main -- for instance, the life of Henry the
>VIII), but also its development by an indivi-
>dual choice of means. The second element re-
>fers to the action, the episodes, the disposi-
>tion of characters and the actors, etc. It is
>the dramatic or artistic work in the produc-
>tion, and not the ideas or subjects treated,
>which give it a personal and original charac-
>ter. (Ladas, 1938, p. 236)

Ladas also discussed the treatment of the concept of per-
sonal and original character in the intervening years
between the Berlin and Rome Texts and, in so doing, directly
addressed the relationship between personal and original
character and originality. He considered the Berlin Text
definition of cinematographic productions unsatisfactory to
film producers because:

>a) it did not include films reproducing natural
>scenes and scenes taken from life, and

>b) it contained the requirement that the work have a
>"personal character," which was not required by
>the Convention in respect of other works.

Ladas indicated that at the Rome Conference of 1928,
the Secretariat of the predecessor body to the World Intel-
lectual Property Organization (WIPO)

>suggested that it would be going too far to
>protect a cinematographic production which did
>not present an original character, and that a
>film that merely reproduced the scenes of a
>street without any scenic arrangement should be
>protected as nothing more than a photograph.
>In order, however, to make clear that no other
>requirement was made for cinematographic works,
>except that for originality (as for all other
>works), the Bureau proposed that the word
>"personal" be struck out, and the following
>words be added: "if this character is lacking,
>the cinematographic production enjoys the pro-
>tection of photographic works." This proposal
>was approved by the Conference except that the
>words "by the arrangement of the stage effects
>or by the combination of incidents represented"
>were also struck out. (Ladas, 1938, p. 237)

The resulting provision was the present article 14(2) of the
Rome Text cited previously.

- 35 -

Thus, while the concept of personal and original character may have constituted a further prerequisite in addition to originality for the protection of certain cinematographic works, such a prerequisite was a function of the personal component. The altered original character concept served only to highlight where, with respect to cinematographic works, one was to look for the basic prerequisite of originality common to all works. The additional proviso regarding the possibility of protection as a photograph must be understood to reflect a recognition that the nature of the product and labour necessary for a work to be original may vary between certain cinematographic and photographic works.

The foregoing analysis is borne out both by Skone James, commenting on the parallel language of the 1911 U.K. Act, where it is stated that "the effect of the definition (...of, inter alia, original character) is no doubt to point out where the originality in a cinematograph production must subsist" (Skone James, 1971, p. 221) and by the Exchequer Court of Canada in its citation, with approval, of the above passage in Canadian Admiral Corp. v. Rediffusion Inc. ((1954) 20 C.P.R. 75, at 94). Further, when the 1928 Rome Text of the Berne Convention was revised in 1948 at Brussels, both the protection of films by assimilation and the bifurcated protection scheme (i.e., literary or artistic works or photographs) were dispensed with and cinematographic works were protected as a single class of original works (Brussels Text 1948, Berne Convention, article 14(2)). This treatment of films has continued in both the 1967 Stockholm Text and the 1971 Paris Text.

The 1952 Text of the Universal Copyright Convention similarly provides for the protection of cinematographic works as a single class of original works (1952 Geneva Text, UCC, article 1).[18] It appears that: (a) the presence of the term "original character" in the Rome Text does not necessitate the present dual treatment of films under the Act; and (b) such treatment results in disparate protection[19] for what is now universally regarded as a single species of original works which merits uniform treatment

_____

18.    See also the discussion of the term "cinematographic works" by Bogsch, 1972, p. 9.

19.    See footnote 16 on pp. 31-32.

whether "silent" or "talkies," whatever their
type (films on location, films made in studios,
cartoons, etc.) or the technical process used
(films on celluloid, videotape, etc.), whatever
they are intended for (showing in cinemas or
television transmission) and finally whoever is
their maker (commercial production companies,
television organizations or mere amateurs).
(World Intellectual Property Organization,
1978, p. 15)

Therefore, it is recommended that all cinematographic works
be protected as a single class of original works, similarly
situated in terms of prerequisites for protection, to all
other classes of works.

Having addressed the issue of the protection of
films carried by support mechanisms other than celluloid,
the status of sound tracks, and the relationship of the dual
treatment of cinematographic works in the Act to the provi-
sions of the Rome Text in terms of original character, one
must finally turn to the question of first ownership of
copyright. As there is no specific provision in the Act
with respect to the first ownership of copyright in cine-
matographic works, the principle of author as first owner
prevails.

However, as noted, due to the dual treatment of
films under the present Act, authorship is equally dichoto-
mous. The Act specifically provides that the author of a
photograph (and thus the first owner of the copyright) is
owner of the negative at the time it was made. Therefore,
the owner of the negative of a cinematographic work pro-
tected as a series of photographs will be the first owner of
copyright in that work.

The author of a cinematographic work protected as a
dramatic work is not, however, similarly established by the
Act. Hence the perplexing problem of identifying the author
(and first owner of copyright) in the greatest percentage of
films. Fox advises that "in the case of a dramatic work,
questions will naturally arise as between the author or
writer of the scenario and the director or producer of the
film. It would seem that the producer is the author of
cinematograph film as dramatic work" (Fox, 1967, p. 176).
While Fox may be correct in his submission, the cases which
he cites in support of it are of somewhat dubious authori-
ty. The first, the Canadian Admiral case, does not appear
to address the question specifically at all, and the
second relies on an analogy to ownership of the negative in

- 37 -

the case of films qua photographs (Nordisk Films v. Onda (1922) Macq. Cop. Cas. 337).

It would appear that the line of reasoning advanced by Skone James is more apt:

> Some difficulty may arise as to the ownership of copyright in a cinematograph production considered as a dramatic work. Frequently the writer of the scenario or plot and the producer who arranges the scenes to be filmed, are different persons. It would seem that the latter is the owner of the copyright in the cinematograph production since it is he who makes the arrangements. (Skone James, 1971, p. 22)

In Copyright Law in the European Community Dietz advises that the question of authorship and copyright in motion pictures is one of the most difficult questions in copyright, and one on which the solutions of the nine member countries of the EEC diverge considerably (1978, p. 50). The principal reason cited by Dietz is the same as that raised earlier: the extent and diversity of the persons whose work is included in the completed film.

Dietz further advises that the solutions adopted can be divided into two major categories. The first comprises those countries which grant the copyright to the producer (i.e., the U.K., Ireland, Luxembourg and Holland).[20] The second category comprises those countries which consider as joint or co-authors (and hence, first owners of copyright) those natural persons who collaborate in the creation of a film (i.e., Belgium, Denmark, the Federal Republic of Germany, France and Italy). However:

> most of these countries...ensure that a result is achieved which is also financially acceptable to the film producer, i.e. either via the concept of cessio legis or by a far reaching presumption of the assignment of rights in favour of the producer. (Dietz, 1978, p. 51)

Thus, in both situations -- one resulting directly, the other indirectly (where the technology/copyright inter-

---

20.    Dietz states that in Holland this results from case law, supported by the regulations on compilations, even though this is rejected by legal theory (1978, p. 51).

face arises once again) -- there is a bias toward having
ownership of the copyright devolve upon the party constitu-
ting the effective cause of the creation of a work. There
are, however, several compelling reasons why this result
should be obtained directly (i.e., the recognition of the
effective causality theory as a determinant of the party who
is the author rather than indirectly (i.e., through a statu-
torily presumed transfer or licence from the circle of con-
tributors).

> First, the definition of the "intellectual cre-
> ators" of a film is quite difficult, since the
> laws in the various countries do not agree as
> to whether a certain activity in the creation
> of the film is such as to entitle a person to
> be deemed a collaborator in the film. The pro-
> ducer of the film may be prevented from taking
> steps against an infringer, if he can only do
> so as an assignee of the joint authors, and has
> not secured an assignment from all of them.
> Secondly, an important creative element in the
> film is the impersonating of the actors and the
> work of the performing musicians. The above
> theory leaves their contributions out of con-
> sideration. Lastly, practical difficulties
> arise when the original copyright belongs to
> the "intellectual collaborators." There is
> doubt regarding the duration of the copyright;
> the difference of nationality of the authors,
> the question whether any of these could legally
> consent to the assignment of the copyright to
> the producer, etc., may create many uncer-
> tainties.

> For these reasons, the theory, which recognizes
> as the author of a cinematographic work, the
> producer, on the analogy of collective works,
> such as dictionaries, seems sounder. The pro-
> ducer hires the persons who collaborate in the
> creation of the work; he coordinates their
> efforts; he controls and supervises the comple-
> tion of the film, which is the final result of
> the common effort. It is the producer's task
> to crystallize and amalgamate the different
> activities. Under this theory, the various
> contributors, the same as the contributors to a
> collective work, have copyright in their indi-
> vidual contributions insofar as the same are
> subject matter of copyright, and provided they
> have not assigned such copyright to the pro-

ducer, and they maintain their moral rights as authors in such contributions. But the film is not merely the sum total of the several individual activities. It is rather the result of the joint efforts of all, as organized, controlled and amalgamated by the producer, and it is the latter who is to be deemed the author of the resulting film. (Ladas, 1938, p. 461)

It is therefore recommended that the Act specify that the author of a cinematographic work should be, in essence, the producer of that work and should be defined as the person principally responsible for the arrangements undertaken for the making of the cinematographic work.[21]

## Exceptions to the Author/First Owner Principle

Works by employees    One of the two areas enumerated earlier which affects the application of the principle that the author of a work is the first owner of copyright therein consists of those exceptions based, in part, upon contractual considerations. The first such exception is "works made in the course of employment." This specific exception is embodied in section 12(3) of the present Copyright Act which reads as follows:

> Where the author was in the employment of some other person under a contract of service or apprenticeship and the work was made in the course of his employment by that person, the person by whom the author was employed shall, in the absence of any agreement to the contrary, be the first owner of the copyright; but where the work is an article or other contribution to a newspaper, magazine, or similar periodical, there shall, in the absence of an agreement to the contrary, be deemed to be re-

21.    In view of the many diverse and complex forms of production and distribution agreements which prevail in the film industry, the proposed definition of author may prove to be fraught with certain problems. The author would welcome submissions by members of Canada's film industry regarding a definition of "author qua producer."

Insofar as the same concern may arise vis-à-vis the proposed definition of the author of a sound recording, submissions by members of the Canadian recording industry would similarly be welcomed.

> served to the author a right to restrain the
> publication of the work, otherwise than as part
> of a newspaper, magazine or similar periodical.

Essentially, the first portion of section 12(3) establishes
that the employer, and not the author, is the first owner of
the copyright in a work created by an author pursuant to a
contract of service or of apprenticeship.  The second part
establishes a privileged class of employee authors, accor-
ding to authors of contributions to newspapers, magazines or
similar periodicals a right to restrain publication in for-
mats other than those for which the works have been created.

The model for section 12(3) of the Act was section
5(1)(b) of the U.K. Imperial Copyright Act of 1911, which
used identical language.  Sections 4(2) and 4(4) of the
U.K. Copyright Act of 1956 maintain the provisions of the
predecessor Imperial Act of 1911.  The Australian Copyright
Act 1968-1976, incorporates the same principles in sections
35(4) and 35(6).

Under the new American Copyright Act of 1976, both
works prepared by employees in the course of their employ-
ment and certain works specially ordered or commissioned are
grouped together under the definition of "works made for
hire" (17 U.S.C. section 101).  The U.S. legislation does
not specifically refer to works made pursuant to a "service
of contract" vis-à-vis works made by employees, as do the
Canadian, British and Australian Acts.  However, the absence
of statutory definitions of the terms "employee" and "scope
of employment" in the U.S. Act result in the equally nett-
ling task of examining each case of the facts and measuring
it against the rather uncertain common law tests which
attempt to determine whether an employee is working "under a
contract of service" (in the Commonwealth countries) or
whether a person is an employee working within the "scope of
his employment" (in the United States).

The common law tests which have evolved in both
cases are essentially the same (and share the same strengths
and weaknesses).  Lahore states that the provisions of the
Australian Act:

> preserve the distinction at common law between
> contracts of service and contracts for ser-
> vices, between a relationship of master and
> servant, on the one hand, and that of principal
> and independent contractor, on the other.  The
> traditional test for distinguishing between the
> two is to determine, as a matter of fact,

> whether the person employed is under the direc-
> tion and control of the employer as to the man-
> ner in which he shall carry out his work, or
> whether he was employed to exercise his skill
> and achieve an indicated result in such manner
> as he should, in his own judgement, determine.
> In the former case the person employed would be
> regarded as a servant and in the latter an in-
> dependent contractor. The question has been
> regarded as one of the degree of control.
> (Lahore, 1977, p. 136)[22]

The traditional test of control, whether actual or prospective, has proven to be fraught with difficulties in application, not only for laymen but for the courts them-selves. It has resulted in attempts to make further quali-fications and refinements of the doctrine which, regret-tably, have served instead to muddy the waters still further. Lahore quite rightly points out that:

> In most situations where the construction of an
> employment contract arises in order to deter-
> mine ownership of copyright the traditional
> control test cannot be applied. The more
> skillful or creative is the work of the author,
> the more difficult it becomes to conceive of
> the employer as being in a position to direct
> the manner in which the work shall be done.
> The problem is not, of course, unique to the
> copyright area, but the nature of the work of
> the writer, artist, musician and craftsman
> raises the issue very clearly. (Lahore, 1977,
> p. 819)

Indeed, Lord Justice Denning has stated that "it is almost impossible to give a precise definition of the distinction. It is often easy to recognize a contract of service when you see it, but difficult to say wherein the difference lies" (Stevenson Jordan & Harrison Ltd. v. MacDonald & Evans (1952) 1 T.L.R. 101 at 111).

---

22. See also Simmons v. Health Laundry Co. (1910) 1 K.B. 543; University of London Press Ltd. v. University Tutorial Press Ltd. (1916) 2 Ch. 601; Massie & Renwick v. Underwriters Survey Bureau Ltd. et al. (1940) 1 D.L.R. 625. Nimmer, 1979, pp. 5-12 says of the position in the United States: "The crucial question in determining an employment relationship is whether the alleged employer has the right to direct and supervise the manner in which the writer performs his work."

- 42 -

In view of these difficulties with the concept of control, the courts have moved towards a series of tests which intermingle questions of control with enquiries regarding organization. The result, vis-à-vis the provision of an ascertainable yardstick against which employment relationships can be measured, is equally unsatisfactory. In the 1973 case of Beloff v. Pressdram Ltd. Mr. Justice Ungoed-Thomas suggested that:

> it thus appears, and rightfully in my respectful view, that, the greater the skill required for an employee's work, the less significant is control in determining whether the employee is under a contract of service. Control is just one of the many factors whose influence varies according to the circumstances. The test which emerges from the authorities seems to me, as Denning L. J. said, whether on the one hand the employee is employed as part of the business and his work is an integral part of the business, or whether his work is not integrated into the business but is only accessory to it, or...the work is done by him in business on his own account. (Beloff v. Pressdram Ltd. (1973) 1 All E.R. 241 at 250)

Recognition of the problems just touched on led to the authors of the Whitford Report to recommend that:

> it would be desirable, in any fresh legislation, to avoid expressions such as "contract of service" which, if they are intelligible at all, are intelligible only to lawyers, whereas we believe that the question of who owns copyright should be clear and certain from the beginning. Rights in employees works should be defined solely by reference to works made by employees in the course of employment, and that the references to "contracts of service" and "apprenticeship" should be deleted (1977, pp. 143-145).

It will be appreciated from the preceding comparison of the Commonwealth and American experiences that the Whitford Report proposal, while well-intentioned is seriously flawed. The U.S. legislation presently refers only to "works made by employees in the course of employment" and the courts have had to struggle with addressing the questions, When is an author an employee? and When has a work been made in the course of employment? As noted, in addres-

sing these questions, the American courts have developed the same troublesome criteria which occurred in Commonwealth countries with regard to contracts of service and contracts for services, and which, ironically, led the Whitford Committee to make the subject recommendation in the first place. Adoption of the Whitford Committee recommendation will not ameliorate the problems raised above in any meaningful way.

In 1957, the Ilsley Commission reviewed the exceptional provision of section 12(3) applicable to works made in the course of employment and summarily approved the notion that the copyright in such a work should vest first in the employer unless there is an agreement to the contrary.

> We think that the general principle that copyright in a work made in the course of the author's employment by another person should vest in that person unless there is an agreement to the contrary is the correct one. (p. 46)

Collaterally, the commission did not favour retention of the existing qualification, reserved to employee authors who contribute to magazines, periodicals, etc., in the form of the aforementioned right to restrain publication in different formats. The reasons offered were that the provision of such a privileged status to some employees in one kind of business (periodicals) and not to employees in other kinds of businesses was unjustifiably discriminatory. Further, to carve out a privileged class of employees was seen as impossible in practice, while to extend the right of restraint to all employees was considered an intolerable burden on employers.

The commission considered only the initial vesting of the entire copyright in the employer. It failed to examine the underlying issues and arguments favouring protection for both employees and employers and thus did not consider alternative schemes which: first and foremost, would be compatible with Convention obligations; second, would be capable of achieving the desired measure of certainty of ownership of copyright in works by employees; and third, would achieve an equitable balancing of the interests of employee authors and employers.

A recent study by Dr. Jeremy Phillips admirably fills the analytical chasm left by the Ilsley report and, in

turn, left unfilled by the Keyes-Brunet report.[23]
Dr. Phillips advises that this is an area in which national
laws have been founded upon fundamentally different assump-
tions. For this reason, neither the Berne nor the Universal
Copyright Conventions contain provisions which specifically
govern it. He further suggests that the question of copy-
right ownership of works by employees is especially compli-
cated by the fact that it reflects the crossroads of three
different sets of legal rules: (a) the law of copyright,
which seeks to protect the interests of authors; (b) the law
of industrial relations, which seeks to harmonize the
dealings of employers with their employees; and (c) the law
of contract, whereby legal recognition is given to the pri-
vate will of contracting parties.

Dr. Phillips then provides a succinct encapsulation
of the issues and internal tensions generated by the conflu-
ence of these three disparate areas of the law.

> Let us remind ourselves of the nature of the
> legal problem before us: it is that where one
> person pays another person to produce a parti-
> cular result, in this instance a copyright
> work, and that result is vested with the attri-
> butes of a legal property, both the author and
> the employer may expect to enjoy proprietary
> rights in it. The employer's claim to enjoy-
> ment derives from the fact that he has paid his
> money in order that the result should be cre-
> ated; the author's claim is derived from the
> fact that it is his act of creation which
> brings the property into being, its proprietary
> attributes being in effect a reward for the
> fact of creation. Where an employee by his en-
> deavours brings about the existence of a tangi-
> ble res -- a loaf of bread, for example, or a
> piece of pottery -- it is generally accepted in
> civilised legal systems that the resulting
> res will belong to the employer, who has
> financed the transaction and who alone will

---

23.    The Keyes-Brunet report advocated retention of the
principle of employer as first owner of copyright solely on
the basis that "the absence of a statutory 'presumption'
...(an inexplicable characterization of Section 12(3) of the
present Statute which does not contain any 'presumptions')
...in favour of...employers would result in a spate of
contracts and collective agreements, incorporating clauses
to the opposite effect" (1977, p. 71).

then exploit its physical property by disposing
of it or by using it as he pleases; and such is
the nature of the tangible res; that is, physi-
cal property can only be exploited in full by
one or the other party. If the employer sells
the piece of pottery, the employee cannot also
do so; if the employer eats the loaf of bread,
then once again the employee may not. But
where the employee creates a copyright work, he
brings into being two types of property: (i)
the tangible res, the actual words or pictures
on a particular piece of paper, and (ii) the
copyright in the words or pictures, for exam-
ple, the right to exploit their form irrespec-
tive of the destiny of their tangible content.
Unlike the physical property of the piece of
paper, the words upon it may be used or enjoyed
by more than one person at a time; and a copy-
right cannot be consumed like a loaf of bread,
nor broken like a piece of pottery, though it
will, unlike the china, cease to be "property"
in the fullness of time. Finally the use by
the employee of the words which he was employed
to write may devalue completely his services to
his employer, or it may have some slighter
effect, or it may have no effect at all, upon
the employer's enterprise. This, then, is the
scope of the problem. (Phillips, 1979, pp.
273-274)

Dr. Phillips utilizes the arguments advanced by Dr.
Adolf Dietz as the focus for examination of the employer/
employee issue. Dr. Dietz suggests that:

As concerns authors who create protected works
within the framework of a service or employment
relationship, it must be ensured in one way or
another that the employer or master is not un-
necessarily restricted in the exploitation or
use of the work created by his orders or under
his instructions. The solution can consist
either in that, under the general principle,
copyright arises in the creator of the work,
even if he is an employee, and is then contrac-
tually,...conveyed to the employer, or the
solution may be that the employer is considered
in such cases, by a legal fiction, as the owner
of the copyright. In these cases a special
legal rule is unavoidable, whereas in the first
case reference to the general rules concerning

> the assignment of copyright is in principle
> sufficient....the United Kingdom, Ireland and
> the Netherlands have decided...on the second
> solution.  As a general rule, the other coun-
> tries have no acquisition of original copyright
> by the employer.... (Dietz, 1978, pp. 62-63)

Notwithstanding these differences, Dietz is quick to point
out that in all the member countries of the EEC, the neces-
sary exploitation rights rest in practice with the employer,
whether under contractual agreement or on the strength of
the position under law of the employee author.  However, as
Dr. Phillips notes, Dr. Dietz still criticizes the laws of
the United Kingdom, Ireland and the Netherlands on the
ground that they are "wrong in principle."

> This is because Dr. Dietz adopts as his guide-
> line the fundamental copyright principal con-
> tained in the Berne Convention that the author
> should be recognized in all cases as the author
> of his work, and therefore in him alone should
> copyright initially vest.  (Phillips, 1979,
> p. 273)

> The nature of Dietz's criticism leads Dr. Phillips
to pose three important questions:  (a) Is the principle by
which the three jurisdictions are tried and found wanting a
fair one?  (b) Does the domestic law of the three jurisdic-
tions in fact fall short of the principle? and (c) Does it
matter if domestic law does fall short of that principle if,
in general, the countries with "wrong" principles apply them
with the same results as the countries with the "right"
ones?

> In brief, Dr. Phillips answers all three questions
in the affirmative.

> He acknowledges the argument that the activity of
employers in commissioning and paying for copyrightable
works is a valuable, commendable act, worthy of legal recog-
nition and encouragement and therefore that employee authors
should have no better claim to have copyright vested in
them.  Nonetheless, Phillips argues that this view may not
be allowed to stand when one distinguishes between the
nature of the contribution of employers and that of employee
authors.

> The author is the "causa sine qua non" of the
> work's creation (the cause without which a
> thing could not exist), while the employer is

never more than a "causa causans" (the immediate cause)[24] at the very most, and may be less. (Phillips, 1979, p. 273)

With respect to the second question, Dr. Phillips concurs with the views of Dietz that, insofar as both the U.K. and the Irish Copyright Acts provide for initial ownership of copyright in employees' works by employers, such legislation is not in accord with the basic tenet of, and corresponding obligation arising under, the Berne Convention. The same significant criticism is thus equally as applicable to the present Canadian Copyright Act as it is to the U.K. and Irish Acts.

The comments of the Whitford Committee with respect to this question are tinged with no small degree of irony in view of the subsequent and forceful arguments made by Dr. Dietz and Dr. Phillips.

Some members of the Committee feel that it is not altogether easy to reconcile a provision vesting copyright initially in persons other than the authors (as for example in the case of commissioned works or employees' works) with our Convention commitments. In some Convention countries there is no provision of this character. In other Convention countries, however, there are provisions similar to those found in the 1911 and 1956 Acts and it has never been suggested that in enacting such provisions there has been a failure to observe Convention obligations. (Whitford Report, 1977, p. 138)[25]

The last word on the subject of U.K. (and thus Canadian) legislation vis-à-vis Convention obligations belongs to Dr. Phillips:

---

24.    It is suggested that the role of the employer would have been more appropriately characterized as that of the "causa proxima" (the cause that necessarily sets the other causes in operation) rather than the "causa causans."

25.    However, no more than six pages later the Whitford Report itself states:  "We are of the opinion that...the repeal of particular provisions touching first ownership of employees' works and commissioned works is...undoubtedly consistent with Convention obligations" (p. 144).

It is only two-and-a-half years since the Whitford Committee reported that (inter alia) there had never been made any suggestion that the British law concerning the initial failure of copyright with employers was a failure to observe its Convention obligations. That suggestion has now been made by Dr. Dietz, in a context of transnational legal harmonization in which the British and Irish governments may find it hard to resist bringing themselves into line. (Phillips, 1979, p. 277)

The third issue, while not as critical as the first two, in Dr. Phillip's opinion also gives rise to a solution which weighs in favour of investing copyright ownership in employees. This opinion is predicated on two separate notions. Firstly, and most importantly, the fact that a law is usually satisfactory in its application to individual cases ought not to detract from those cases in which it is deficient or anomolous, especially where the deficiency is the result of the adoption of incorrect aims or principles. In this regard, referring to the present provisions of the U.K. and Canadian Acts, Dr. Phillips points out that:

> every type of employer has his particular in-
> terest to protect, and some require greater
> protection than others, but the protection
> given is always the same. Those employers
> whose business is to publish copyright materi-
> als created by their employees (e.g., newspaper
> proprietors), those who do not necessarily pub-
> lish copyright materials but who prepare it for
> publication by others (e.g., advertising agen-
> cies), those who prepare materials which happen
> to be protected by copyright but which are not
> intended in many cases for any sort of commer-
> cial or even public airing (e.g., accountants,
> solicitors) and those who, like universities,
> employ staff to perform a variety of research,
> teaching and administrative functions and who
> do not fall conveniently within any of the pre-
> ceding descriptions, all have their particular
> problems and requirements; some may demand the
> maximum amount of property protection that the
> law can give, while others may find it a posi-
> tive embarrassment. Yet only newspaper propri-
> etors in respect of materials intended for pub-
> lication are treated as an individual case.
> While it is true that the current law produces
> some element of certainty, and it would be im-

- 49 -

> practicable to legislate for every conceivable
> employment situation, one may wonder precisely
> what degree of certainty is more desirable than
> the attainment of the fairest result in the
> largest number of cases. (Phillips, 1979,
> p. 276)

The second notion is that a law which designates principles
or aims fundamental to it is easier to appreciate and inter-
pret than one which does not.

All of the preceding arguments lend support to the
proposition that there should be no derogation from the
general principle that the author should be the first owner
of the copyright protecting his work, even in the case of
works by authors who are employees. First, there was the
very real problem of establishing meaningful criteria by
which to establish with certainty that an author was an em-
ployee or was working pursuant to a contract of service.
Second, there was the irreducible element of obligations
arising under the Berne and, possibly, the Universal Copy-
right Conventions. Third, there was the need to attempt to
establish the most equitable balancing of the interests and
claims of both employees and employers which, on balance,
resulted in the scales tipping in favour of employees.
Fourth, there was the desirability of establishing the
rights of both employees and employers with the greatest de-
gree of certainty possible. This desire for certainty mili-
tated against solutions such as that raised for discussion
and ultimately rejected by the Whitford Commission, i.e.,
giving an employer ownership in only that part of the copy-
right in a work produced by an employee which was required
by the employer for his business.[26]

Certainty would also be assured when the parties
themselves were required to address the question of copy-
right if one or more wished to provide for ownership upon
terms different from those established by the Act. It is
submitted that, here, both certainty and a further element
of equity again favour employees:

---

26.    There would always exist a potentially large grey
area resulting from possible differences of opinion between
employers and employees as to what part of the copyright was
"required by the employer for his business." Such differ-
ences of opinion could give rise to considerable delay and
expense in deciding, for example, who should bring proceed-
ings for infringement. This is a matter which is best dealt
with by the parties by contract.

> As long as copyright ownership as between em-
> ployer and employee can be provided for by con-
> tract, it may make little practical difference
> in most situations whether one or the other is
> considered to be the initial copyright owner in
> the absence of a contract. It could be argued,
> however, that the burden of contracting, i.e.,
> deviating by contract from the statutory rule,
> should be placed on the shoulders of the party
> who is ordinarily in a better position to carry
> this burden.  This party would seem to be the
> employer, by reason of his stronger bargaining
> position and more convenient recourse to expert
> legal advice.  (Varmer, 1963, p. 732)

Based on all of these factors, both separately and
in the aggregate, it is recommended that a revised Copyright
Act should not contain any special provisions with respect
to works by employees, other than one which recognizes that
an author (including an employee) may transfer part or all
of his prospective entitlement to copyright to a third party
(including an employer) by way of contract (including an em-
ployment agreement).

Commissioned works  The second major exception to the funda-
mental copyright principle of author as first copyright
owner pertains to works which are often referred to general-
ly as "commissioned works," although in fact, this classifi-
cation is applicable only to three specific types of artis-
tic works (engravings, photographs or portraits) which have
been commissioned (i.e., produced on order for valuable
consideration).[27]  This specific exception is established
in section 12(2) of the Copyright Act in the following
terms:

> Where, in the case of an engraving, photograph
> or portrait, the plate or other original was
> ordered by some other person and was made for
> valuable consideration in pursuance of that or-
> der, then in the absence of any agreement to
> the contrary, the person by whom such plate or
> other original was ordered shall be the first
> owner of the copyright.

---

27.    Wherever  the  term  "commissioned"  appears in this
paper, it refers to situations where a work was produced to
order for valuable consideration.

Upon analysis of this provision, several noteworthy elements become evident. First, as indicated above, the provision is limited in its application to "engravings, photographs, or portraits." Thus, subject to any other statutory exceptions (e.g., sound recordings), or any contractual agreements to the contrary, the owner of copyright in all other commissioned works is the author. While engraving and photograph are defined in section 2 of the Act, portrait is not. Webster's dictionary defines portrait as "a pictorial representation or delineation of a person, especially of the face painted, drawn, engraved photographed or the like." It may thus be appreciated that section 12(2) is applicable not only to all commissioned engravings and photographs. Any other artistic work will, if it constitutes a portrait, also bring section 12(2) into play. It will be shown that portraits played a considerable role in generating the antecedents of section 12(2). A second noteworthy element of section 12(2) is its importation into the Copyright Act of several concepts associated with contracts for services. In this regard, the section uses the terms "ordered," "valuable consideration," and "agreement to the contrary." This element will also be shown to have had an important part to play in the genesis of the section. The third, and perhaps most important element of note, is the fact that the section overrules the principle established in section 12(1) of the author as the first owner of the copyright. Instead, it stipulates that the commissioner of the engraving, photograph or portrait (i.e., "the person by whom the plate or other original was ordered") is the first owner of the copyright therein.

A study of the historical roots of section 12(2) is valuable in understanding the rationale for its existence and in evaluating the merits and demerits of maintaining the provision. As noted earlier, the Statute of Anne reflected the principle that the copyright in a literary work was to be owned by the author. The Statute did not specifically provide this but, as no other person could be the owner of the copyright unless by a transfer from the author, it was understood that the author was always to be considered the first owner of the copyright in his work. This view was confirmed in the case of Storace v. Longman in 1978 in which the opinion of the court was that only a legislative measure could alter who would first own the copyright in a work.

The Statute of Anne of 1709 was concerned exclusively with literary copyright -- that is, copyright in literary works and other writings. Artistic works did not receive any legislative copyright protection in the United Kingdom

until 1734, when the Engraving Copyright Act (8 Geo. 2, c. 13) was passed. However, the Engraving Copyright Act only provided protection for engravings. Over succeeding years, various kinds of artistic works became subject to statutory copyright protection as new legislation was enacted. Paintings, drawings and photographs were the last species of artistic works to obtain legislative copyright protection and were not considered worthy of such protection until the enactment in 1862 of the Fine Arts Copyright Act. The first section of that Act constitutes the origins of the present-day provisions of section 12(2) of the Canadian Copyright Act. It provided, inter alia, that if a painting, drawing or photograph was "made or executed for or on behalf of any person for a good or valuable consideration," even though its author was the original owner of the copyright, he would not retain the copyright unless there was an express agreement reserving it to him signed by the person for whom or on whose behalf the work was executed. In the absence of such a written agreement, the ownership of the copyright would pass from the author to the person for whom or on whose behalf the work was executed.

Two points are noteworthy. First, and more important, this provision established a special rule as to ownership of copyright in commissioned paintings, drawings and photographs[28] not by precluding the author from being the first owner of the copyright but, rather, by providing for an automatic transmission of the copyright to the commissioning party, in the absence of an agreement reserving it for the author. This subtle difference between section 12(2) of the present Canadian Copyright Act and section 1 of the Fine Arts Copyright Act is not without importance vis-à-vis Canada's obligations under the Berne Convention. Second, a Royal Commission appointed just 13 years after the passage of the Fine Arts Copyright Act to examine the workings of the numerous and various Copyright Acts then existing in the United Kingdom, among these the Fine Arts Copyright Act, experienced a great deal of difficulty and conflict of opinion vis-à-vis the commissioning of works and how this should affect ownership of copyright:

> (The Royal Commissioners) referred to the expediency of making a distinction between pictures painted on commisson and others. They experienced a difficulty in defining what a

---

28.    Note that section 1 of the Fine Arts Copyright Act did not refer to portraits and engravings in contrast to section 12(2) of the present Copyright Act.

- 53 -

commission was, and...arrived at the conclusion
that no distinction could practically be made.
(Copinger, 1881, p. 390)

The commissioners also questioned whether photo-
graphs should be treated on the same footing as paintings:

When photographs are taken with a view to
copies being sold in large numbers, it is prac-
tically impossible that the copyright...should
pass to each purchaser...and it must remain
with the photographer, or cease to exist. On
the other hand, the same reasons exist for
vesting the copyright of portraits in the
purchaser or person for whom they are taken, as
in the case of a painting.
    Indeed, considering the facility of mul-
tiplying copies and the tendency among photo-
graphers to exhibit the portraits of distin-
guished persons in shop windows, it may be
thought that there is even greater reason for
giving the persons whose portraits are taken
the control over the multiplication of copies
than there is in the case of a painting. It
therefore becomes a question of whether it is
not necessary to make that distinction between
photographs that are portraits and those that
are not, and between photographs taken on com-
mission and those taken otherwise, which we
have depreciated in the case of paintings.
(Copinger, 1881, p. 408)

They suggested that the copyright in a non-commissioned
photograph belongs to the photographer but recommended that,
in the case of a photograph taken on commission, no copies
should be able to be sold or exhibited without the sanction
of the commissioning party, due to the concerns for the pri-
vacy of "distinguished persons" whose likeness might be ex-
ploited. The commissioners also felt that the same ques-
tions arose with respect to engravings, lithographs, prints
and similar works. Thus, with regard to the transfer of
copyright in cases of commissioning, it was recommended that
these should be treated on the same basis as photographs.

It was not until 1911 that action was taken upon the
recommendations of the commissioners to enact a copyright
statute consolidating the then 20 or so existing copyright
statutes. In that year the Imperial Copyright Act (1 & 2
Geo. 5, c. 46) became effective, containing section 5(1)(a)
which provided for copyright ownership in certain kinds of

- 54 -

commissioned works.    In accordance with the Royal Commis-
sion's recommendations, this section brought engravings and
photographs together for equal treatment, but also added
portraits to reflect the commissioners' concerns in this
area.    While under the Fine Arts Copyright Act, the
commissioning party in most circumstances became the eventu-
al owner of copyright by a statutory transmission from the
author, this transfer was eliminated by section 5(1)(a) of
the Imperial Act as the commissioner was specified to be the
first owner of the copyright, ab initio.    This seems not
only to have been contrary to the established principles of
copyright law at that time (i.e., that the author should be
the first owner of the copyright in his work), but also to
have been a misinterpretation of the Royal Commission's
recommendations.    Nevertheless, the essential parts of sec-
tion 5(1)(a) of the 1911 Imperial Copyright Act were adopted
in section 12(2) of the Canadian Copyright Act, effective in
1924.

        In 1957, the Ilsley Commission reviewed the provi-
sion of section 12(2) with respect to commissioned photo-
graphs, engravings and portraits and expressed the view that
the main reason for the exception in favour of a commission-
ing party was personal interest in privacy (p. 47).[29]    It
should be remembered, however, that copyright legislation is
not essentially intended to constitute privacy legislation.
Consideration of the privacy of a commissioning party seems
to have taken on a measure of unwarranted importance within
the Copyright Act.    The Commission saw a second reason for
this exception as being the desire to avoid any sharp
difference in effect resulting from a contract for services
(i.e., a commission) and a contract of service (i.e., em-
ployment) (p. 48).    While it is not an overriding concern to
have uniformity of treatment with respect to employment
situations and commissioning situations, it is a relevant
consideration.

        The Keyes-Brunet study reviewed section 12(2) and
acknowledged that certain views had been expressed by in-
terested parties that ownership should in all cases vest
first in the creator of a work and that it should be the
responsibility of the parties commissioning the works to en-
sure that all the rights which they wish to obtain are ac-
quired by contract.    The proposal which would follow from
such views, i.e., the elimination of the exception vis-à-vis

29.    Also see Studies on Copyright, Arthur Fisher
Memorial Edition, 1963, p. 734 where essentially the same
view was expressed.

first ownership of copyright in favour of commissioners of works, was characterized by Keyes and Brunet as containing a "simplistic logical appeal." In their view, the only counter argument was that elimination of the exemption would result in a spate of contracts and collective agreements to the opposite effect.[30] However, to the extent that such contracts would deal with copyright ownership with certainty and would have the added feature of representing the contractual wishes of both commissioning parties and commissioned parties, it is submitted that they should be encouraged rather than avoided.

The Whitford Committee in the United Kingdom also examined the issues involved in commissioned works and noted that:

> superficially, the repeal of particular provisions touching first ownership of employees' works and commissioned works is attractive and undoubtedly consistent with Convention obligations...it would not establish the rights of interested persons with the degree of certainty and justice which is undoubtedly desirable. (Whitford Report, 1977, p. 144)[31]

—————————————

30.    Predicated on this rationale alone, and without examining the question of obligations arising under the Berne Convention, the Keyes-Brunet report recommended that the ownership of the copyright in all commissioned works be vested in the person commissioning the work, in the absence of an agreement to the contrary (1977, p. 71).

31.    For a more complete discussion of the merits of the Committee's rationalization of the conflict between the Berne Convention obligations of the United Kingdom and its recommendations vis-à-vis works by employees and "commissioned works," refer to p. 72. The Committee was of the view that such certainty and justice would not prevail because, in many instances, authors and commissioning parties would not enter into express agreements regarding ownership of copyright and the courts might be predisposed to sustain claims on the part of either or both parties to implied licences or to beneficial interests in the copyright. It is suggested that this argument is far from persuasive. Where the legislation states unequivocally that, in the absence of a written agreement to the contrary, the owner of copyright is the author, there would be little, if any, scope for judicial construction of a provision which, in essence, defeated its very object.

- 56 -

Having adopted this view, Committee members could not then agree on which measures would be most appropriate to satisfy their desire for certainty and justice. Five members believed that:

> the copyright in all commissioned work should belong to the author (or employer)[32] subject to two important qualifications: (1) the persons commissioning the work should have an exclusive licence for all purposes which could <u>reasonably</u> be said to have been <u>within the contemplation of the parties at the moment of commissioning</u>; and (2) the commissioner should have the power to restrain any exploitation for other purposes against which he could <u>reasonably take objection</u>.

By contrast, four members of the Committee felt that the best solution was to provide that, where the only purpose of a commission is the creation of a copyright work, subject to any agreement to the contrary the copyright in the work should vest in the commissioner. The person commissioned should, however, have the right to an award from the commissioner in the event that the latter exploited the work in a way which could not have been reasonably anticipated at the time the work was made. Alternatively, where the creation of a work is not the only purpose of the commission (where it is incidental to the carrying on of a business and for the giving of a service, as in the case of an accountant, lawyer or architect), the copyright should vest in the person commissioned, subject to an agreement to the contrary.

It will be appreciated that this bifurcated scheme would probably create more problems than it would solve.

Neither of the two recommendations would be practical or satisfactory. The first, while it may be compatible with obligations under the Berne Convention, entails a restricted licence mechanism fraught with significant difficulties recognized by the Committee itself, such as a subjective test of the intentions of the parties at the time of commissioning and uncertainty as to the extent and scope of

---

32. The report seems to intimate that either: (a) even amongst this group of commissioners there was a measure of disagreement; or (b) in view of the two qualifications which constitute part of the recommendation, it was viewed as a matter of indifference which party owns the copyright, both alternatives being equally disconcerting.

the restraining power of the commissioner. The second recommendation probably would conflict with obligations under the Berne Convention. Moreover, it could prove to have equally substantial problems arising from uncertainty related to: (a) the modes of exploiting the work reasonably anticipated by both parties; (b) the right of award suggested for the author; and (c) the purpose for which the work was commissioned.

Finally, it should be noted that, in response to the Keyes-Brunet proposal that in the absence of an agreement to the contrary ownership of the copyright in all commissioned works should be vested in the commissioner, more than twice as many submissions disagreed as agreed. The contra submissions generally asserted that the author should always be the initial owner of the copyright in a work, notwithstanding that the work was commissioned subject to an agreement to the contrary.

In conclusion it is recommended that section 12(2) of the Copyright Act should be repealed and that the Act clarify that, <u>subject to a written agreement to the contrary</u>, the author of any work is the initial owner of the copyright therein, notwithstanding the fact that the work was commissioned.

## Works of Joint Authorship

The principle that the author of a work is the first owner of the copyright therein gives rise to a number of questions with respect to the ownership of copyright in works created by more than one author, such as works of joint authorship and collective works. The first of these categories will be discussed here and the second will be considered in the following section.

Section 2 of the Copyright Act defines "work of joint authorship" as: "a work produced by the collaboration of two or more authors in which the contribution of one author is not distinct from the contribution of the other author or authors."

It is useful briefly to compare this definition with that for collective works, which are defined in section 2 of the Act as:

(a) an encyclopaedia, dictionary, year book or similar work,

(b) a newspaper, review, magazine, or similar periodical, and

- 58 -

        (c)    any  work  written  in  distinct  parts  by
               different  authors  or  in  works  or  parts  of
               works  of  different  authors  are  incorpor-
               ated.

This  definition  was  borrowed,  as  was  the  definition  of  works
of  joint  authorship  from  the  1911  Imperial  Copyright  Act
(sections  35(1)  and  16(3),  1  &  2  Geo.  5,  c.  46).

        It  may  be  appreciated  from  comparing  these  defini-
tions  that,  apart  from  the  specific  inclusion  of  the  works
enumerated  in  paragraphs  (a)  and  (b)  above,  the  essential
difference  between  a  work  of  joint  authorship  and  a
collective  work  is  that  the  former  is  comprised  of  contribu-
tions  which  are  not  distinct  from  one  another,  while  the
latter  is  a  work  written  in  distinct  parts  (Nimmer,  1979,
p.  17-61).[33]    An  additional  attribute  of  a  work  of  joint
authorship  is  that  it  must  have  been  produced  by  the  col-
laboration  of  two  or  more  authors.    However,  there  are  two
reasons  why  this  factor  may  not  be  entirely  determinative  of
whether  a  work  is  one  of  joint  authorship.    Firstly,  even
where  a  work  was  produced  by  the  collaboration  of  two  or
more  authors,  it  would  not  be  a  work  of  joint  authorship  if
it  was  written  in  distinct  parts.    Rather,  it  would  be  a
collective  work  (Skone  James,  1948,  p.  203).    Secondly,  the
meaning  and  scope  of  the  term  "collaboration"  is  not  without
some  uncertainty  as  it  has  not  been  fully  explored  or
developed  in  case  law,  or  legislation  in  the  United  Kingdom
or  in  Canada.

        The  concept  of  joint  authorship  as  it  is  known  today
was  first  established  as  a  common  law  principle  in  the  case
of  Levy  v.  Rutley  ((1871)  L.R.  6  C.P.  523).    Section  1  of
the  1833  Dramatic  Copyright  Act  contained  a  reference  to  the
authors  of  a  work.    In  interpreting  this  section,  the  court
in  Levy  v.  Rutley  recognized  that  there  may  be  instances
where  the  facts  of  a  case  reveal  that  two  or  more  authors
participated  in  creating  a  single  work.    The  facts  of  the
Levy  case  illustrated  this  and  the  court  was  of  the  view
that  each  co-author  should  share  in  the  copyright  attaching
to  the  work.    The  court  held  that  "though  it  may  not  be
necessary  that  each  (author)  should  contribute  the  same
amount  of  labour,  there  must  be  a  joint  labouring  in  fur-
therance  of  a  common  design."    Thus,  collaboration  linked
with  common  design  formed  the  basis  for  recognizing  a  work
of  joint  authorship.

_____

33.        See  also  Skone  James,  1971,  para.  663.

- 59 -

However, only in the United States has there been a substantial development of the concept of common design. In the United States, the requirement of common design has been perceived not in terms of collaboration in physical or chronological propinquity (Nimmer, 1979, p. 6-6), but rather as a function of the intentions of the authors. The collaboration and common design elements of joint authorship have been cast in the recent American Copyright Act in terms of works which have been "prepared by two or more authors with the intention that their contributions be merged into separable or interdependent parts of a unitary whole." The first element of this definition (i.e., the intention of parties) reflects several important U.S. cases and will briefly be discussed here; the second element (the interdependent or inseparable parts) will be addressed subsequently.

The first of the aforementioned cases was Edward B. Marks Music Corp. v. Jerry Vogel Music Co. (140 F. 2d. 226 (2d Cir. 1944)), which held that joint authorship would arise even where joint authors did not actually work together in their common design, did not contribute to the work at the same time, and even where one contributor did not know the other(s). The reasoning of the court was that the only requirement for joint authorship should be that each author had the intention at the time he created his contribution that his contribution should be part of a greater work to which some other person would make or had made a contribution.

This reasoning was extended slightly in the subsequent case of Shapiro, Bernstein & Co. v. Jerry Vogel Music Co. (161 F. 2d. 406 (2d Cir. 1946)), known as the Melancholy Baby case in reference to the song which was at issue. There it was held that, even though one author intended his contribution to be complemented by that of another particular known person, if a different person, unknown to the author, made a complementary contribution, the resulting work would be one of joint authorship. The unknown contributor would be a joint author in spite of not having been the particular intended contributor. The logic seems to have been that the intention that one's contribution be complemented by a further work for the purposes of creating a greater work would be sufficient to create joint authorship, and the status of such greater work should not be altered by the fact that the contributors did not know each other personally, or that the contributions were produced at different times.

Thus, in developing an understanding of the expressions "collaboration" and "common design," the American

- 60 -

courts placed the greatest emphasis upon the intentions of the authors at the time of the creation of their respective contributions.    This reflected a broad interpretation of these two expressions.    Such an approach provides the most pragmatic and valuable interpretation and should be adopted in a reconstituted definition of works of joint authorship -- i.e., that part of the definition of the term "joint work" in the U.S. Act which speaks of "the intention of the parties" should be incorporated into a revised Act.    This proposal may give rise to uncertainty which may only be resolved by a court of law, but the concept of the author's intentions is inextricably linked to the concept of common design and statutory recognition of this is an appropriate step.

It is also suggested that the line of demarcation adopted in the U.S. Act vis-à-vis author's intentions is sound in its rejection of the principle adopted in the 12th Street Rag case.    In that case it was held that the intention necessary to create a joint work need not be that of the author but could be that of his assignee.    In addition, it was held that even if the intention of contributing to a joint work did not exist at the moment of creation of a contribution, if such an intention was subsequently formed by the author or his assignee, this would be sufficient to create a joint work upon merger of the contributions.    It appears that these two facets of the 12th Street Rag case were rejected in the American Copyright Act because they would have broadened the concept of joint authorship beyond its reasonable limits,[34] and would in effect do away with the requirements of a common design and active collaboration (Cary, 1963, p. 712).

The second element of joint works is the "nondistinctiveness" of the contributions of each joint author. The source of this requirement that the contribution of one author not be distinct from that of another author(s) was section 16(3) of the 1911 Imperial Copyright Act.    Melville Nimmer suggests that the principle of joint authorship is justified on two alternative bases, both reflected in the definition of joint work in the new U.S. Act.    The present definitions of joint works in the U.K. and Canadian Acts encompass only one of these bases, the inseparability or indistinguishability of the contributions of the authors. Nimmer advises that

---

34.    "The touchstone here is the intention, at the time the writing is done, that the parts be absorbed or combined into an integrated limit" (House Report, 1971, p. 120).

- 61 -

> where the respective contributions of each
> author are inseparable in the sense that they
> are not separately identifiable the only work-
> able solution is to regard each author as the
> joint owner of an undivided interest in the en-
> tire work. An example of such a situation is
> the collaboration of two playwrights whose re-
> spective contributions to the final play are
> inextricably combined. (Nimmer, 1979, p. 6-5)

He continues:

> A second basis for the principle of joint
> authorship occurs where the respective contri-
> butions are interdependent. Here, although the
> contributions are separately identifiable, each
> may be said to be written pursuant to an im-
> plied (if not express) agreement that the pro-
> duct of the several contributions will be
> jointly regarded as an indivisible whole. For
> example, although the words and music of a song
> are separately identifiable, the lyricist and
> composer in jointly undertaking the task of
> creating a song, in the absence of express
> agreement to the contrary, may be presumed to
> have intended that each shall own an undivided
> interest in the combined product of their re-
> spective efforts. (p. 6-5)

Thus, because in Canada the definition of musical work in the Copyright Act encompasses only arrangements of melody and harmony and not lyrics, a song comprised of lyrics by one author and music by a second author would con- stitute a collective work. The same song in the United States would constitute a joint work. In Canada, the lyri- cist would own the copyright in the lyrics, the composer would own the copyright in the music and whoever was respon- sible for bringing together the two separately protectable works to form the collective work (i.e., the song) would hold the copyright in the collective work. If there was no third-party catalyst responsible for bringing the two under- lying works together -- i.e., the lyricist and composer alone were responsible for the "second-tier" collective work -- each, in addition to his separate copyright, would hold the second-tier copyright jointly with the other. In essence, the collective work would, in addition, be a joint work.

Some further explanation seems appropriate. Hereto- fore the terms "work of joint authorship" and "joint work" have been used interchangeably and synonymously. The

Canadian Act uses only "work of joint authorship."  This
term has become known colloquially as a joint work and it
has been used in such manner here.[35]   However, as Nimmer
quite rightly points out:

> A joint work is a broader concept than that of
> joint authorship in that while the product of
> joint authorship is, indeed, a joint work, it
> is also possible for a joint work to result al-
> though there has been no joint authorship.  A
> joint work may be more properly defined as one
> in which the copyright is owned in undivided
> shares by two or more persons. (Nimmer, 1979,
> p. 6-2)

It is in this sense that it is suggested that in certain
circumstances a collective work in Canada may also be a
joint work (i.e., but not a work of joint authorship) in
that the copyright in the collective work is owned in un-
divided shares by the parties whose separate works comprise
the collective work.[36]

    Proceeding from the sublime to the ridiculous, under
slightly different circumstances other songs may not consti-
tute collective works at all, let alone collective works-
cum-joint works.  It is clear that in Canada under the pre-
sent Act a song can never be a work of joint authorship be-
cause the parts are not indistinguishable.  However, in
order for a song to constitute a collective work, the Act
requires that the parts which make up the collective work be
authored by different persons.  Thus, where the same person
writes both the music and lyrics, he owns the separate copy-
right in each and neither a second-tier work nor copyright
protecting same, even arises.  This labyrinthine state of
affairs alone, as it impacts on the world of music and re-
cording, is sufficiently unsatisfactory to merit considera-
tion of amendments to the definitions of works of joint

---

35.    The difference between the U.S. and Canadian defini-
tions of "joint works" and works of joint authorship is not
relevant vis-à-vis this issue.

36.    See Redwood Music Ltd. v. Francis Day & Hunter et
al. (1978) R.P.C. (Nov. 13) June 15, 1978, p. 429 at
pp. 452-455.  Note:  In a decision which postdated the pre-
paration of this paper, the House of Lords reversed the
finding of the Court of Appeal (which supported the discus-
sion herein of "songs" as collective works) and held that
the separate copyrights in each of the words and music of a
song do not merge to form a separate copyright in the song;
i.e., songs themselves do not constitute collective works
(Chappel & Co. Ltd. et al. v. Redwood Music Ltd.; Redwood
Music Ltd. v. Francis Day & Hunter Ltd. et al. [1980] 2 All
ER 817).

authorship and collective works. When this is added to the persuasive argument for treating interdependent parts, intended to be viewed as a unitary whole as constituting a work of joint authorship, the case for amendment is made even more cogent.

Accordingly it is recommended that the second part of the definition of joint works in the U.S. Act, which speaks of merger into "inseparable or interdependent parts of a unitary whole," also be adopted in a revised Canadian Act.

Having looked at the criteria for works of joint authorship, it is now appropriate to turn to the incidents of ownership of works of joint authorship. That is, what are the rights and responsibilities of each joint owner to the other(s) and to third parties vis-à-vis the joint work and the respective interests of the joint owner therein?

The primary principle of copyright ownership in the Act (i.e., the author of a work is the first owner of the copyright therein) remains applicable to works of joint authorship modified slightly to reflect the special nature of the latter. The case of Lauri v. Renad ((1892) 3 Ch. D. 402) is generally regarded as the leading authority for the proposition that joint authors of a work hold the copyright therein in equal shares (in the absence of an agreement to the contrary) as tenants-in-common, rather than as joint tenants. This decision was based upon the court's belief that the matter had been decided by an earlier case, that of Powell v. Head ((1879) 12 Ch. D. 686), where it was held that co-owners of a copyright hold it as tenants-in-common. However, two points must be made. Firstly, in the Powell case, the two co-owners had acquired common ownership of a copyright by assignment to each of a one-half interest of the copyright from the author, rather than as a result of joint authorship (Skone James, 1971, p. 288, note 5). Thus, it could be said that the Powell case did not decide the matter of co-ownership arising by virtue of joint authorship. In spite of this, the holding of Lauri v. Renad with respect to equal co-ownership due to joint authorship has been viewed as correct.[37] Secondly, it should be noted that insofar as the copyright legislation of the day, as well as the succeeding copyright legislation in the United Kingdom, Canada and the United States was silent on common ownership of copyright in works of joint authorship, it devolved upon the common law to clarify questions of this nature.

---

37.    Skone James, 1971, p. 288, note 5; Nimmer, 1979, p. 6-21; as well as section 201(a) of the 1976 U.S. Copyright Act.

- 64 -

In determining the rights and duties of joint owners of copyright, the courts analogized to applicable rules relating to joint ownership of real property. The concept of joint owners of copyright holding their interests as tenants-in-common, expressed in Lauri v. Renad, is borrowed from the law of real property. Unless expressly agreed, the relationship of joint owners is that of tenancy-in-common and not joint tenancy[38] (wherein the last surviving joint owner becomes the sole owner of the entire work, i.e., the right of survivorship). The prevailing rule upon the concept of tenancy-in-common is that, upon the death of each joint owner, his heirs or legatees acquire his respective share of the joint work.

It is recommended that, to clarify and ensure the rights and duties of joint authors as co-owners, the principle of Lauri v. Renad should be codified so that joint authors will be the first and equal co-owners of the copyright in a work of joint authorship as tenants-in-common without any right of survivorship.

Another of the incidents of tenancy-in-common is that each party holds an undivided share in the whole and may exercise his rights in the commonly owned property without requiring the concurrence of the other tenants in common (Cary, 1963, p. 108). However, this particular facet of tenancy-in-common has not been adopted in the area of copyright. In the United Kingdom, and in Canada, the case of Cescinsky v. Routledge and Sons Ltd. ((1916) 2 K.B. 325) is the authority for the proposition that a joint author or other co-owner may not unilaterally exercise the rights he owns in a copyright without the agreement of the other co-owners. The Cescinsky case held that the old common law rule as to the right of a co-owner to use common property did not apply to copyright and, further, that although the sole right to reproduce a work is divisible in title, it is indivisible as to exercise. On this basis the court held that a reproduction of a work with the consent of one co-owner by a third party was nevertheless an infringement of copyright because the consent of all the other co-owners was absent. Thus, one co-owner alone cannot grant a licence in a copyright valid as against the other co-owners (Skone James, 1971, p. 288).

In contrast, American case law has, subject to certain qualifications, generally adopted the doctrine that any

---

38. The distinction between the terms "joint owners" and "joint tenants" must always be borne in mind.

one co-owner may exercise or license his interest in the whole of a copyright without requiring the consent of all the other co-owners (Cary, 1963, p. 108; Nimmer, 1979, p. 6-22).[39]

Both doctrines accomplish the same desirable net result: the provision of proportionate benefits to each co-author/co-owner. However, in the United Kingdom and Canada emphasis is placed on security of ownership of each co-author wherein all the co-owners must determine among themselves the mode of exploitation of the work as a whole and the manner of sharing the resulting benefits. In the United States, emphasis is placed on ease of commercial exploitation with the added feature of sharing of benefits according to the rule of accountability (Cary, 1963, p. 173). It is true that, under the American approach, one co-owner may enter into an agreement for the exploitation of a work without the concurrence of his co-owner(s) which may prove to be inimical to the best interests of all the co-owners. It is equally true, however, that under the present Canadian approach, any one co-owner may prevent the exploitation of a work where all the others wish to proceed with a particular transaction. In both cases, the solution lies in the co-owners setting forth their respective rights and responsibilities to each other vis-à-vis the exploitation of the work in an appropriately drafted agreement.

The Cescinsky doctrine is an inappropriate intrusion into the affairs of co-owners of copyright. They should be situated similarly to other tenants-in-common and, thus left to provide for the terms under which a work may be exploited via private contractual arrangement (subject as in the United States to the equitable rule of accountability). As in the United States, a licence granted by any one co-owner should be valid vis-à-vis the licensee.

Certain additional provisions following from the foregoing should be adopted to clarify further the positions of co-authors and other co-owners of copyright. Each co-owner should similarly be capable of selling or assigning

---

39. Probably the most important qualification is the "rule of accountability," which is applicable when one joint owner uses or licenses a work without the consent of his co-owners. In such cases, the rule demands that a joint owner is under "a duty to account to the other joint owners of the work for a rateable share of the profits realized from his use of the work...or...from licensing the work."

his particular ownership interest, without requiring the consent of the other co-owners. Moreover, the principle should be continued that the assignee or new owner of the copyright owned in common will "step into the shoes" of former co-owners.

Another provision seems appropriate. According to the decision in Lauri v. Renad, any joint author or co-owner may maintain an action against a third party for infringement of the copyright owned in common independently of the other co-owners. One problem which may arise is that, theoretically, an alleged infringer may find himself inundated by numerous separate infringement actions each brought by one of the many co-owners, for the same single act of infringement. The possibility that a multiplicity of suits could be used to harass an alleged infringer should be avoided. Therefore, the launching of an infringement action by one co-owner should preclude the others from bringing a separate suit in respect of the same cause of action. Rather, they should be compelled to join as parties in the first infringement action if they wish to pursue the alleged infringer in their own name for that particular act of infringement.

Section 4(1) restricts copyright protection in Canada to only those works whose author(s) meet(s) the criteria set out therein. The Ilsley Commission proposed that copyright should subsist in works of joint authorship only if at least one of the authors is an "eligible" author. The commission added that only the eligible authors of a work should be entitled to the copyright in the work.

The following passage from Skone James provides a most lucid exploration of questions pertaining to "qualified" authors and works of joint authorship. It is recommended that those sections of the U.K. Act of 1956 which establish the law in this regard as described in the passage, should be adopted in Canada.

> If, however, the subsistence of copyright in a work depends upon the author being a qualified person, that is to say, if it is an unpublished work, or a work first published otherwise than in the United Kingdom or a country to which the Act of 1956 extends, then, if one or more of the authors is, or are, not qualified persons, the work is to be treated as a work in which copyright subsists, but the author or authors who is, or are, qualified persons are to be treated as the sole owner, or sole owners, of

the copyright for the purposes of the Act of 1956.

Suppose that A and B jointly produce a work, A being a British subject, and B a foreigner not resident in the United Kingdom, at the time when the work was made, nor entitled to protection under the international provisions of the Act of 1956. In such a case B would not, while the work is unpublished, be entitled to any protection if he were the sole author, and consequently A is to be treated, for the purposes of the Act, as if he were the sole author.

Although A is to be treated as the sole author for ascertaining legal ownership of copyright under the Act of 1956, it does not, of course, follow that B, in the circumstances we are now supposing, has no rights as against A. A is no doubt considered to be the legal owner of the entire copyright, and he -- and he alone -- could bring an action for infringement, but he may have contractual obligations towards B, and, in the absence of agreement to the contrary, he would probably be regarded as trustee of the copyright for himself and B in equal shares.

But A, apparently, could, while the work remained unpublished, alone grant licences in respect of the work.

If, however, the work is first published in the United Kingdom, all the authors become legally entitled to the copyright. What, then, is the position, supposing the author who, prior to publication, was considered as the sole author, granted a licence to publish contrary to the wishes of his co-author? It is thought that the publisher is not exposed to an action for infringement at the instance of the latter, but that he can rely upon the licence obtained from the author who, at the time when the licence was given, had the legal right to grant it. (Skone James, 1971, p. 288)

## Collective Works

It will be recalled from the introduction to the discussion of works of joint authorship that section 2 of the Copyright Act defines a collective work as:

    (a)    an encyclopaedia, dictionary, year book or similar work,

    (b)    a newspaper, review, magazine, or similar periodical, and

    (c)    any work written in distinct parts by different authors or in which works or parts of works of different authors are incorporated.

Thus, any work which falls into one of the categories of works enumerated in subsections (a) and (b) will automatically constitute a collective work, regardless of whether or not it shares any of the attributes established as criteria for protection as a collective work set out in subsection (c). While it is true that in the majority of cases, works of the type listed in subsections (a) and (b) would fall within the ambit of the general criteria, this may not always be so. Therefore, it is recommended that the definition of collective works should be amended to provide a general set of criteria, followed by an illustrative list of examples such as those set out in (a) and (b) of the present Act. As indicated, the list would be illustrative only, the general criteria remaining at all times pre-eminent.

Turning now to the general criteria set out in subsection (c), it is manifest that:

(1) in order to constitute a collective work, the component parts must be by different authors. Where the separate parts which comprise a work are by the same author, that author would, as indicated earlier, own the separate copyrights in each of the parts which can be separately copyrighted but there would be no second-tier collective work nor, obviously, any second-tier copyright.

(2) in addition to the specific types of works mentioned in subsections (a) and (b) of the definition, collective works would appear to occur only in the assembling of "written works." Literary, dramatic and musical works (as presently defined) are all examples of literary works. However, sound recordings and films, while protected on the basis of assimilation to these works, are not written works and therefore would not appear to be able to be assembled themselves so as to constitute collective works. This would be equally true in the case of artistic works.

A further distinction must be borne in mind, that between collective works and "compilations":

> Whereas a collective work consists of a number of contributions which are themselves separate and independent works, for example, an anthology or encyclopaedia, a compilation is a work formed by the collection and arranging of pre-existing materials (...regardless of whether such materials would or would not be separately copyrightable)[40] or of data that are selected, co-ordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. Examples are directories and railway guides: Kelly v. Morris [1866] LR 1 Eq. 697; H. Blacklock & Co. Ltd. v. Arthur Pearson Ltd. [1915] 2 Ch. 376. The term "compilation" may include a collective work. In the case of a compilation, not a collective work, the only subsisting copyright will be that of the compiler: A and C Black Ltd. v. Claude Slacey Ltd. [1929] 1 Ch. 177. (Lahore, 1977, p. 45)

The copyright in a collective work merely protects the owner against a third party copying or otherwise infringing the particular compilation or arrangement of a collective work; it does not afford protection against the unauthorized copying of any one or more of the individual underlying works.

The preceding is a general statement of the rights of the owner of the copyright in a collective work against third parties other than the other owners of copyright in the works which constitute the collective work. A separate but corollary issue is the scope of the rights of the owner of the copyright in a collective work versus this latter category, i.e., those underlying works contained within the collective work. There appears to have been little jurisprudence on this point in Commonwealth countries and a revised Act could benefit from an explicit provision in this regard, such as that contained in section 201(c) of the U.S. Copyright Act:

---

40.    See the definition of compilation in the U.S. Copyright Act, 17 U.S.C. section 102.

In the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series.

It is further suggested that the present restriction in the Act limiting copyright protection to collective works resulting only from the collection and arrangement of written works is discriminatory and without basis in any discernible public policy context. The same skills and effort must be brought to bear when choosing and arranging any works to form a greater work, whether they be artistic, cinematographic, etc. Therefore, a revised definition of collective works should specifically provide for copyright protection in collective works, regardless of the class of underlying works which comprise the collective work.

Finally, the present requirement that the works assembled into a collective work must be by separate authors operates inequitably and to the detriment of the single author who gathers earlier works together to form an anthology of his works. It is true that if anyone copies a substantial part of any one of an author's individual works, he may sue for infringement of such work. However, where someone takes less than a substantial amount of each of the individual works for the purpose of creating an abridged version of the collective work, yet the taking of the parts of the works in its totality constitutes infringement of a substantial part of the collective work, the author would apparently be without redress as there is no copyright presently in a collective work comprised of works or parts of works by the same author.

The definition of a collective work should therefore be amended to delete the requirement that the works or component parts of works must be by different authors.

Moral Rights

Section 12(7) of the Copyright Act provides that

independently of the author's copyright, and even after the assignment, either wholly or partially, of the said copyright, the author has the right to claim authorship of the work, as well as the right to restrain any distor-

> tion, mutilation or other modification of the
> work that would be prejudicial to his honour or
> reputation.

This section establishes in Canadian copyright law those
rights known generally as the artists' moral rights, speci-
fically the right of paternity (i.e., the right to claim
authorship) and the right of integrity (i.e., the right to
restrain acts prejudicial to honour or reputation).

As noted in an earlier study (Torno, Term of Copy-
right Protection in Canada, 1981), the provisions with
respect to moral rights are unstintingly silent on a great
many questions, two of which are relevant to the issue of
ownership:[41]

(i)      Do moral rights arise where the author is other
         than a natural person (i.e., the definitions of
         author in the case of both sound recordings and
         photographs[42] encompass the possibility that
         such status may fall upon a corporation or
         other juridical person)?

(ii)     Are moral rights alienable (i.e., can the
         rights of paternity and integrity be assigned
         or licensed by the author during his lifetime
         and/or, where the contemplated term of protec-
         tion extends beyond the author's death, upon
         his death by testamentary disposition or other-
         wise)?

Moral rights and juridical persons  Neither the internation-
al conventions nor domestic Canadian copyright law specifi-
cally prohibits or recognizes moral rights attaching to
authors other than natural persons.  The moral rights now
recognized in Canada are the right to claim authorship and
the right to restrain acts prejudicial to honour or reputa-
tion.  The question was not raised in the reports by the
Gregory Commission, the Ilsley Commission, Keyes and Brunet
or the Whitford Commission.  However, one need only consider
the hundreds of millions of dollars spent annually by
corporations to establish and enhance the goodwill asso-
ciated with their products, services and company names, and

---

41.    In addition, the Act fails to indicate: one, the
duration of the term of protection for moral rights, and
two, what remedies are available to an aggrieved party whose
moral rights have been infringed.

42.    See footnote 10 on p. 23.

- 72 -

the multitude of lawsuits brought by corporations each year to defend their "good name" from libel and slander, to recognize that honour and reputation are as important to a company as they are to an individual.

Where a company is an author, as in the case of films or sound recordings, it is recommended that the same moral rights be accorded to the corporate author as would be accorded to a natural author.

<u>Moral rights and alienability</u>  The moral rights found in section 12(7) of the Act were established in response to Canada's adherence to the 1928 Rome Text of the Berne Convention and, in particular, article 6(bis), which provides:

> (1) Independently of the author's copyright, and even after transfer of the said copyright, the author shall have the right to claim authorship of the work, as well as the right to object to any distortion, mutilation or other modification of the said work which would be prejudicial to his honour or reputation.

> (2) The determination of the conditions under which these rights shall be exercised is reserved for the national legislation of the countries of the Union.  The means of redress for safeguarding these rights shall be regulated by the legislation of the country where protection is claimed.

Article 6(bis)(1) remains little changed in the 1971 Paris Text, the only change relevant to the issues discussed here being the substitution of the expression "economic rights" for the term "copyright."  The Guide to the Berne Convention, in commenting on the opening phrase of article 6(bis)(1), "Independently of the author's (copyright), and even after transfer of the said (copyright)" states,

> This protects the author against himself and stops entrepreneurs from turning the moral right into an immoral one.  Indeed, some laws expressly lay down that the moral right cannot be assigned and that the author may not waive it.  However, on this point, too, the courts have some freedom of action.  (World Intellectual Property Organization, 1978, p. 42)

Thus, inalienability of moral rights is not an obligation under the Rome Text; rather, it is optional.

- 73 -

This is reinforced by the second paragraph of article 6(bis) which specifically leaves questions of enforcement of moral rights and their exercise to the domestic law of member countries.

Nimmer advises that:

It is sometimes said that moral rights as applied in Berne Convention countries are inalienable by their very nature since they constitute an element of the author's personality rather than a property right. However, not all countries which adhere to the doctrine regard it as inalienable and the Berne Convention does not require such inalienability. (Nimmer, 1979, p. 8-247)[43]

Therefore, it would appear that Canada may decide for itself whether or not to make the moral rights established by section 12(7) alienable.

Moral rights are treated in many European countries as non-transferable and inalienable, based on the view that they are inextricably linked with the personality of the author. The copyright statute of France, for example, establishes that moral rights are attached to the author's person and are inalienable (article 6, Law No. 57-298 on Literary and Artistic Property of March 11, 1957). However, even in France, a leading proponent of moral rights, it has been held that an express contractual waiver of a moral right is valid although the courts usually refuse to presume an implied waiver (Strauss, 1963, p. 974).[44] Thus, although moral rights are viewed as inalienable in the sense that they may not actually be transferred to another, they are alienable in the sense that the author may bind himself contractually not to pursue his moral rights against the other parties to a contract. Moreover, the purported inalienability of moral rights in France is rendered even more doubtful as French jurisprudence has established a legal presumption of waiver of the paternity and integrity rights in some cases of collective works (such as newspapers and encyclopaedias) and adaptations of a work to a different medium (Strauss, 1963, pp. 141 and 974). Thus, although

43. For a more detailed analysis of this issue see Nimmer, 1967 and S. Ladas, 1938, p. 600.

44. See also Bernstein v. Matador and Pathé Cinéma, D.H. 1933-533 D.A. 1933, 104.

- 74 -

superficially the French law appears to dictate the inalienability of moral rights, in practice there is a recognition that such rights may be waived contractually and, in effect, alienated.

Indeed, in some countries, such as the United Kingdom and Australia, there are essentially no statutory provisions establishing moral rights, notwithstanding the fact that both adhere to the more onerous texts of the Berne Convention, subsequent to the Rome Text. Lahore states, with respect to Australian copyright law:

> The only provisions of the Copyright Act 1968-1976 which give to an author rights in the nature of moral rights are ss. 189-195 relating to false attribution of authorship, but these provisions only recognize very limited rights of paternity and integrity and do not fully comply with the obligations imposed by Article 6 bis of the Convention. There is no other legislation which does so. (Lahore, 1977, p. 379)

With regard to the United Kingdom, Skone James advises:

> So far as this country is concerned, the only statute law at all concerned with (moral rights) is S. 43 of the Copyright Act, 1956. But even this section, whilst going some way to grant an integrity right, only does so in respect of artistic works. Further, not only does such section not grant a paternity right to authors but, instead, makes it an offence to ascribe paternity to a non-author. Other than this, and actions for passing off, defamation, and slander of goods, it would not seem that English law affords protection for the rights provided for in Article 6 bis. (Skone James, 1971, p. 455)

The Ilsley report in 1957 did not advert to the issue of alienability (pp. 118-120) whereas the Keyes-Brunet report merely adopted the French principle of inalienability based on the perception that this was undoubtedly the cor-

- 75 -

rect principle (Keyes and Brunet, 1977, p. 58).[45] However "correct" the principle may seem superficially, adoption of the doctrine of inalienability could give rise to some rather thorny conflicts where the author's moral rights are utilized to preclude or to frustrate the exploitation of economic rights which the author has ceded. The nature and importance of this potential conflict was explored recently in a case comment on Gilliam v. American Broadcasting Companies (the Monty Python case)(538 F. 2d 14 (2d Cir. 1976)):

> ...commercial flexibility would be significantly impaired if the artist and the publisher were prevented from contractually arranging for the manner in which the artist's work is to be presented. This might be the consequence of creating, as some have suggested, inalienable

45.    It should be noted that, while French law purports to prohibit alienability of moral rights during the author's lifetime, this is permitted upon the author's death. The author may transmit his moral rights by testamentary disposition to his heirs or to unrelated third persons. Keyes and Brunet characterize this state of affairs as reflecting "undoubtedly,...the correct principles:...moral rights finding their roots in the author's honour and reputation should only be exercised by the author himself, or by those who legally claim to represent the continuation of the person of the author." It may be queried how an unrelated third party represents the continuation of the author after his death in any significantly different way than does an unrelated third party to whom an assignment of moral rights has been made during an author's lifetime? In essence, in both situations the third party has acquired his rights by a form of assignment and may be equally distant from the personality of the author.

It is of further interest that the Keyes-Brunet report finds only a portion of the French law on moral rights to reflect the "undoubtedly correct principles." French law also provides that moral rights should prevail in perpetuity. Keyes and Brunet, with the same degree of equanimity with which they find the French law on moral rights to be in tune with some underlying eternal verity, simply advise that in allowing perpetual moral rights the French apparently lost sight of the "correct principles" and "that this is where the new Canadian Act should not follow the French example." They recommended instead that the term of protection for moral rights should be the same as that for pecuniary rights.

rights in the artist to prevent unacceptable modifications of his creations. Since such a right could be exercised despite any agreements reached in contract or any subsequent plans or expenditures made in reliance on contractual terms allowing alterations, this would create unacceptable opportunity for strike suits and harassment on the part of the artist. Faced with this prospect, producers and publishers might be unwilling to invest in and distribute artistic works unless they could profitably be displayed in their original form. This would not only have the result of restricting the market for artistic works in general, but would especially harm those authors who are more than willing to allow changes to be made in their works to render them marketable. The conse-quence to the public at large would be a re-duced access to intellectual and artistic works.

It appears, therefore, that the most reasonable compromise between the interests in achieving protection for the artist's personal and pecu-niary rights, and in preserving commercial flexibility is to recognize that authority to alter artistic works may be contractually granted and will be binding on the creator, but to construe such authority strictly in favor of the artist, and to create a presumption that he retains any rights not expressly surrendered. (Harvard Law Review, 1976, p. 479)

Thus, if the moral rights established in section 12(7) of the Act are made strictly inalienable as suggested by the Keyes-Brunet report, the potential for the conflict dis-cussed in the Harvard case commentary would remain an omni-present debilitating spectre.

It is recommended that a revised Copyright Act should provide that the authority to alter protected works may be contractually granted (i.e., moral rights, like pecu-niary rights, may be fully assigned, licensed, etc.) during an author's lifetime. The Act should complement this with a provision that the author is presumed to retain all such moral rights as are not specifically assigned.

Chapter III

VOLUNTARY DISPOSITIONS

## The Subject Matter of Copyright Agreements

As one commentator has wisely suggested, before considering assignments and licences in detail, it is first necessary to understand the nature of the interests with which such agreements purport to deal.

> Copyright must be distinguished from the right of possession of the physical object (...in which the work protected by copyright is embodied). Copyright is distinct from the material object related to the copyright; it is an intangible incorporeal right in the nature of a privilege or franchise quite independent of any material substance such as a manuscript or plate used for printing; the copyright owner has the right to dispose of (...the copyright) on such terms as he may see fit, or he may decline to dispose of it on any terms. (Fox, 1967, p. 286)

Two important attributes of copyright may be discerned from this statement. First, as the works protected by copyright (e.g., the literary work, artistic work and sound recording) are distinct from the paper on which the words are written or the tape or disc or film in which the images or sounds are embodied, the latter are not included in a transfer of the copyright unless the contract expressly or implicitly provides otherwise.[1] The opposite is equally true. The artist who sells a painting sells only the physical object; he does not necessarily also sell the copyright (Massie & Renwick Ltd. v. Underwriters' Survey Bureau Ltd. et al. (1940) S.C.R. 218 at p. 229). The foregoing general statement is subject to any express or implied terms of the contract and to any of the provisions of the Copyright Act relating to commissioned works, works by employees in the course of their employment and works subject to the Crown copyright provisions.

---

1.    The transfer of the originals of unpublished works by testamentary instrument raises special considerations which are addressed in detail in the next section of this chapter.

- 78 -

> Courts may tend to interpret a contract so that (...in certain circumstances) the copyright passes with the material object in which the author's expression is embodied, but the general principle is clear that copyright refers to the rights to exclude others from certain unauthorized uses of the author's work as communicated in various modes of expression, and not to any rights of exclusion with regard to the material medium of communication. (Lahore, 1977, p. 146)[2]

Second, copyright possesses all of the quintessential attributes of personal property[3] and, indeed, it has been characterized as a species of personal property.[4] However, without a full appreciation of the significance to be attached to: (a) the term property, and (b) the character- ization of copyright as a species of property, the simple label "personal property" can prove to be clearly less than the self-explanatory proposition which many believe it to be and can all too easily be misunderstood and misused.

The following two passages shed light on the meaning of the term "property," which is of value in understanding both the terms "personal property" and "intellectual pro- perty":

> In everyday conversation we usually speak of "property" rather than "property rights," but

---

2.      See also _Pacific Film Laboratories Pty. Ltd._ v. _Commissioner of Taxation of the Commonwealth_ (1970) 121 C.L.R. 154.

3.      (a) Copyright may be sold, licensed and bequeathed.

(b) Upon the death of the owner of copyright, the copyright vests in the personal representatives of the owner (_Novello & Co._ v. _Hinrichson Edition Ltd._ (1951) chapter 595).

(c) Upon the bankruptcy of the copyright owner of either a published or an unpublished work, the copyright vests in the trustee without any assignment in writing (The Bankruptcy Act R.S.C. 1952, c. 14, sections 41(5), 52).

4.      _Jeffreys_ v. _Boosey_ (1855) 24 L.J. Ex. 81 at p. 85; Fox, 1967.

the contraction is misleading if it tends to make us think of property as _things_ rather than as _rights_, or of ownership as outright rather than circumscribed. The concepts of property and ownership are created by, defined by, and therefore limited by, a society's system of law. When you own a car, you own a set of legally defined rights to use the vehicle in certain ways and not in others; you may not use it as a personal weapon, for example, nor may you leave it unattended beside a fire hydrant. Among the most important rights you do have are the right to prevent others from using the vehicle, except with your permission and on your terms, and the right to divest yourself of your ownership rights in the vehicle by selling them to someone else. We may say, then, that ownership always consists of (1) a set of rights to use property in certain ways (and a set of negative rights or prohibitions, that prevent its use in other ways); (2) a right to prevent others from exercising those rights, or to set the terms on which others may exercise them; and (3) a right to sell your property rights. (Dales, 1968, pp. 58-59)

Few writings on the subject of intellectual property expose the circular and issue-begging use constantly made of the word "property." "Property," of course, means little more than legal protection for a claim made by a person. It usually refers to the guarantee of an entitlement to exclude. The reasons for finding such an entitlement necessitate, in intellectual property law as in all other areas of law, an enquiry as to whether the conditions of protection are met. But whatever the precise definition of "property," the point here is that it is not _reason_ to say that something deserves protection because it is "property"; "property" is a shorthand description for a _conclusion_ of law. It is meaningless, for example, to claim protection on the ground that one has "natural property rights" in something. Land and moveable goods are commonly called "property" because they are typical subjects over which exclusive rights are recognized by law, but whenever the existence or extent of a right to exclude is challenged no assistance is gained by stating that one's

interest is "property." Particularly must all
fog be lifted for the next few years when some
copyright law reform in Canada may reasonably
be expected. Wringing hands or raising voices
over "expropriation of property" or "piracy" or
quoting the eighth commandment, will not con-
tribute to the settlement of issues beyond pro-
viding an inarticulate point of view, without
reasons, on policy questions concerning both
the fact and form of incentive to be provided
to creators. (McDonald, 1969, p. 145)

## Assignments and Licences

Section 12(4) of the Copyright Act provides that:

The owner of the copyright in a work may assign
the right, either wholly or partially, and
either generally or subject to territorial
limitations, and either for the whole term of
copyright or for any part thereof, and may
grant any interest in the right by license, but
no such assignment is valid unless it is in
writing signed by the owner of the right in re-
spect of which the assignment or grant is made,
or by his duly authorized agent.

This provision, taken from section 5(2) of the 1911 U.K.
Imperial Act, reflects three principal elements. First, the
bundle of rights provided to the copyright owner which con-
stitutes the owner's copyright may be disposed of either by
assignment or by licence. Second, the bundle of rights is
divisible temporally and geographically and in terms of re-
production (i.e., by rights). Third, both assignments and
licences must be in writing.[5] The first of these elements
will be discussed here and the second and third will be con-
sidered in the following two sections of this chapter.

Pursuant to an assignment of less than the entire
bundle of rights which constitute the copyright (whether it
be all the means of reproduction but limited as to locality,
or one specific right but unrestricted as to locality, and
so on) section 12(6) of the Act provides that the assignee
is to be regarded as the owner of the part assigned, and the
assignor as the owner of the part not assigned. The effect

_____

5.      The question of whether all forms of licences are
required to be in writing is discussed later in this
chapter.

of the legislation is to render it possible that there may be within the meaning of the Act two or more owners of the copyright in any one work at any one time.

As an owner of a part of the copyright, an assignee may "individually for himself, in his name as a party of a suit, action or proceeding, protect and enforce such rights as he may hold, and to the extent of his right, title and interest is entitled to the remedies provided by the Copyright Act" (section 20(5)).

In addition to providing for the granting of an assignment of a part or the totality of the copyright, section 12(4) also contemplates that a copyright owner may grant "any interest in the right by licence." However, the licence referred to in this section constitutes one of only three different types of voluntary licences and the legal consequences attendant upon each vary considerably. In addition to the licence referred to in section 12(5) (i.e., a licence coupled with the grant of an interest in the right), there are contractual licences and bare licences. James Lahore advises that "some confusion has arisen from the terminology used in successive Copyright Acts, and the rights of the parties to a licence agreement and the effect of a licence on third parties have not been clear" (Lahore, 1977, p. 160). The Australian Copyright Act of 1905, the U.K. Copyright Act of 1911 and the Canadian Act each refer to the grant of an interest in a copyright. The revised U.K. Act of 1956 and the revised Australian Act, 1968-1976, have both done away with this terminology and provide instead for exclusive and non-exclusive licences. The U.S. Copyright Act of 1976 similarly provides for exclusive and non-exclusive licences.

The confusion which has arisen from the use of the concept "licence coupled with a grant of an interest," and the degree to which such confusion has resulted in the courts' de facto treatment of this as tantamount to either an exclusive licence or even an assignment is explored below. This supports the argument to supplant this troublesome concept with a scheme predicated in part on an exclusive/non-exclusive dichotomy.

The bare licence is a permission only to do an act comprised in the copyright which would be an infringing act without that permission. There is no contract in the copyright. The contractual licence is a licence coupled with a contract, such as an agreement between A & B that B can perform A's copyright work in public

> for one month in consideration of a cash pay-
> ment to A for the exercise by B of the act com-
> prised in A's copyright.  The (...contractual)
> licence becomes a licence coupled with a grant
> if the grantee of the licence is also the
> grantee of a proprietary interest in the copy-
> right.  (Lahore, 1977, p. 160)

Although for the purposes of the preceding tripar-
tite scheme Lahore advises that the expression "grant of an
interest by licence" used in section 12(4) of the Canadian
Act means the grant of a proprietary interest, in addressing
the question specifically he counsels that the significance
of the reference to a grant of an interest in copyright is
not clear.  In his view, it means a licence coupled with the
grant of a proprietary interest in the copyright in the
sense in which Buckley L.J. applied that concept in Hurst
v. Picture Theatres Ltd. ((1915) 1 K.B. 1), as the first
ground of his decision that when the plaintiff bought a
ticket to see a film, the contractual licence so constituted
was not revocable (the essence of a proprietary interest)
and therefore created a proprietary interest.  However, as
Lahore himself points out, the above ruling was strongly
criticized by the High Court in Cowell v. Rosehill Race-
course Co. Ltd. ((1937) C.L.R. 605).  In British Actors Film
Company Ltd. v. Glower ((1918) 1 K.B. 299) Mr. Justice Lush
stated that the "grant of an interest in copyright" must be
understood to mean the grant of proprietary interest in the
particular right which was the subject matter of the agree-
ment and that an exclusive interest in limited performing
rights could constitute such an interest.  His statements
were, however, mere obiter (i.e., judicial asides, not con-
stituting the binding part of his judicial pronouncement).

To further complicate the all too muddied waters
which spring from the draftsmanship of section 12(5) and its
sister provision in the U.K. Act of 1911, not only have the
courts been unable to address satisfactorily the question of
what constitutes the grant of an interest in copyright[6]
but, in addition, due to the all but impossible task of dis-
tinguishing between an exclusive licence and a partial
assignment of one or more of the bundle of rights, the
courts have in general construed an agreement expressed in
the form of a sole and exclusive licence as a partial

---

6.      "...there has never been an authoritative definition
of what is a sufficient interest where the interest is not
an interest in land or in chattels on the land" (Lahore,
1977, p. 166).

assignment.[7]  Thus it still remains undecided whether an exclusive licensee may sue in his own name or must join the licenser as a party.[8]

As indicated, while the most recent British and Australian Acts have done away with the concept of licences which grant an interest, both have established alternative regimes predicated on a structure of assignments and exclusive and non-exclusive licences. However, as both Lahore and Skone James advise, this state of affairs is less than fully satisfactory.

> As it is possible to assign copyright partially, as to place, time and the class of acts which may be performed, it is difficult in many cases to distinguish between such a partial assignment and similarly limited exclusive licence which authorizes the licensee to do an act comprised in the grantor's copyright to the exclusion of all other persons. It is important to make the distinction as the rights of the parties to a licence agreement differ substantially from those of the parties to an assignment particularly in the case of publishing contracts. The question must depend upon the construction of the contract in each case, as a matter of fact, and it is difficult, and possibly not very helpful to lay down general rules of construction based upon the decided cases. (Lahore, 1977, p. 175)

It is suggested that the approach adopted in the United States in its recently revised Copyright Act, with respect to assignments and licences, overcomes many of the problems raised in the preceding pages and should be adopted in Canada.

Section 101 of the new U.S. Act establishes and defines a "transfer of copyright ownership" as "an assignment, mortgage, exclusive licence, or any other conveyance, alienation, or hypothecation of a copyright, whether or not it is limited in time or place of effect, but not including a non-exclusive licence" (17 U.S.C. section 101).

---

7.    See, for example, Jonathan Cape Ltd. v. Consolidated Press Ltd. (1954) 1 W.L.R. 1313.

8.    See Fox, 1967, p. 441 and Skone James, 1971, p. 166.

While this definition still distinguishes between an assignment and a licence there are, in essence, no consequences attendant upon whether a given conveyance is an assignment or an exclusive licence. Moreover, with regard to non-exclusive licences the consequences are specifically delineated and readily ascertainable.[9]

## The Divisibility of Copyright

By rights  Section 12(5) of the Canadian Copyright Act permits an assignment of copyright either wholly or partially. This provision clearly permits the separation of the rights to reproduce, perform, dramatize, etc.  It has, however, been argued that a separate assignment of one of the exclusive rights of the copyright owner conferred by the Act, limited to a particular purpose (for example, an assignment of serial rights), would be an invalid assignment and would only take effect as a licence (Skone James, 1971, p. 159). James Lahore takes issue with this opinion and points to the case of Jonathan Cape Ltd. v. Consolidated Press Ltd. ((1954) 1 W.L.R. 1313) in support (Lahore, 1977, p. 151).

Suffice to say that the position on this question is unclear under the present Act and a revised Act should provide, as do the Australian and American Acts, that the owner of copyright may transfer any of the exclusive rights comprised in a copyright, including any subdivision of the rights specifically enumerated in the Act.  As the Report of the U.S. House Committee indicated:

It is thus clear, for example, that a local broadcasting station holding an exclusive licence to transmit in a particular geographic area and for a particular period of time, could sue in its own name as copyright owner, someone

---

9.       (a) The non-exclusive licensee has no standing to sue in his own name as do the exclusive licensee and the assignee.

(b) The non-exclusive licensee does not have the right to resell or sublicense his rights, in the absence of a contractual provision to that effect, whereas both the assignee and the exclusive licensee may do so unless specifically precluded by contract.

(c) A non-exclusive licence may be oral or implied whereas both an assignment and an exclusive licence must be in writing.

who infringed that particular exclusive right.
(1971, p. 123)

By time   As in the case of dispositions limited as to mode
of reproduction or locality, section 12(4) provides for the
division of any of the rights which comprise copyright, re-
stricted as to any period of the duration of the applicable
term of copyright protection.  There have been no proposals
to alter this state of affairs and none are offered.

Notice should be taken of the decision in Howitt v.
Hall ((1862) 6 L.T. 348) which is still applicable law in
England.  It held that, in the absence of a special contract
to the contrary, the assignor of a copyright was entitled,
after an assignment, to continue selling copies of a work
printed by him before the assignment and remaining in his
possession.

By territory   Section 12(4) of the Act provides that
copyright is divisible not only with regard to mode of
reproduction and to time, but, equally, "subject to terri-
torial limitations."   Thus, ostensibly a copyright owner
could appoint a particular publisher to publish his work in
western Canada and could assign to a second publisher the
right to publish the same work in a separate edition for the
rest of Canada.   Professor Nimmer suggests that under the
American Act, pursuant to the "transfer of copyright owner-
ship" concept proposed earlier in this study for adoption in
Canada,

an exclusive license to a newsstand dealer to
distribute a given edition of a given newspaper
at a designated corner on a particular after-
noon would convey to such dealer the "owner-
ship" of such right, so that if another dealer
were to attempt to distribute the same paper at
the same time and place, the first dealer could
sue the second for infringement of his distri-
bution right. (Nimmer, 1979, p. 10-21)

By virtue of Canada's adherence to the two international
copyright conventions, a Canadian author may own the copy-
right protecting his work in each of the member countries of
the conventions and thus may deal with his rights in a com-
parable manner on a jurisdiction by jurisdiction basis.

It must be clearly understood, however, that the
territorial grant of rights, whether international or intra-
national, does not carry with it as a necessary corollary
the right to control the flow of authorized editions from

other jurisdictions or territories into the subject territory. In order to establish this latter state of affairs, where deemed appropriate, specific import restrictions must be added to the subject copyright legislation. Where such provisions have been added to the copyright legislations of various countries, it has been only with respect to importation from foreign countries -- seldom if ever between territories established by grants of rights with regard to locality within a country.

The manner in which the present provisions of the Act work together to give rise to this state of affairs and the rationale for its existence are as follows.

Section 3(2) of the Act defines publication as "the issue of copies of the work to the public." Section 106(3) of the American Copyright Act accords to copyright owners the exclusive right "to distribute copies or phonorecords[10] of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease or lending." Professor Nimmer states that this right, under the American Act, is "in essence...a right to control publication of the work" and that the term "distribution" was used merely "for the sake of clarity" (Nimmer, 1979, p. 8-115).

Professor Nimmer's views reflect those of the Register of Copyrights: "The language of this clause is virtually identical with that in the definition of 'publication' in section 101, but for the sake of clarity we have restated the concept here" (1965, p. 19).[11]

Thus, under both Canadian law and American law the right of publication is synonymous with, and indeed constitutes one and the same thing as, the right of distribu-

---

10. For a discussion of the relationship between "copies" and "phonorecords" under Canadian law, see B. Torno, Fair Dealing, forthcoming.

11. "Publication" is defined as "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental lease or lending."

- 87 -

tion.[12]   In Canada, this right of distribution is statuto-
rily qualified by section 3(1) of the Act which provides
that the right to publish a work or any substantial part of
a work is applicable only where "the work is unpublished."
Thus, once a work is published (i.e., the initial distribu-
tion of copies of the work takes place with the consent of
the copyright owner), there is no continuing right to con-
trol any subsequent distribution of the copies; the distri-
bution right is "exhausted."[13]   This concept of exhaustion
is known under American copyright law as the "first sale
doctrine" and is codified in the Copyright Act of 1976 in
section 109(a):

> Notwithstanding the provisions of Section
> 106(3), the owner of a particular copy or
> phonorecord lawfully made under this title, or
> any person authorized by such owner, is en-
> titled, without the authority of the copyright
> owner, to sell or otherwise dispose of the pos-
> session of that copy or phonorecord.

Dietz advises that in Europe:

> The countries that give the right of distribu-
> tion in addition to the right of reproduction
> have ensured that the distribution right cannot
> serve as a means of permanent control of the
> sale of copies once marketed legitimately.  For
> this purpose, the theory of the so-called "ex-
> haustion of the distribution right" was con-
> trived and sanctioned by the relevant laws.
> (Dietz, 1978, p. 91)

In those Common Market countries where there is no separate
distribution right, exhaustion is established via other
mechanisms in the appropriate legislation or through the
development of case law.

------

12.    This statement must be qualified only to the extent
that under the present U.S. Act which, unlike the Canadian
Act, does have separate definitions of "publish" and "dis-
tribute," an offer to distribute copies or phonorecords to
the public may constitute a "publication" and yet not con-
stitute an infringement of the right to distribute.

13.    For a more detailed discussion of the concept of ex-
haustion and its relationship to and the policy implications
of the establishment of import restrictions into Canada of
copies emanating from abroad, see A.G. Blomqvist and C. Lim,
1981.

- 88 -

Professor Nimmer lucidly sets out the underlying
rationales for both a right of distribution (in addition to
a right of reproduction) and the limitation of this right
via the doctrine of exhaustion:

> ...it would be anomalous indeed if the copy-
> right owner could prohibit distribution of his
> work when this occurred through unauthorized
> reproduction but were powerless to prevent the
> same result if the owner's own copies (or
> copies authorized by him) were stolen or other-
> wise wrongfully obtained and thereafter pub-
> licly distributed. The fact that such conduct
> might violate criminal and tort laws relating
> to wrongful possession and dominion over tan-
> gible personal property does not alter the fact
> that a wide gap would be left in the remedies
> to be accorded to a copyright owner. There-
> fore, granting the distribution right is a
> necessary supplement to the reproduction right
> in order to fully protect the copyright owner.
>
> This rationale becomes inapplicable in the
> situation where the copyright owner first con-
> sents to the sale or other distribution of
> copies or phonorecords of his work. In such
> circumstances the copyright owner wishes still
> to prevent unauthorized reproduction, but it is
> no longer for the purpose of preventing distri-
> bution of the copies or phonorecords which he
> has released into the public channels since by
> hypothesis he has already consented to such
> disposition of his work. Therefore the right
> to prevent unauthorized distribution at that
> point (although still no doubt desired by the
> copyright owner) is no longer a necessary
> supplement for the purpose above described.
>
> In such circumstances continued control over
> the distribution of copies is not so much a
> supplement to the intangible copyright, but is
> rather primarily a device for controlling the
> disposition of the tangible personal property
> which embodies the copyrighted work. There-
> fore, at this point the policy favoring a copy-
> right monopoly for authors gives way to the
> policy opposing restraints of trade and re-
> straints of alienation.

The above discussion has assumed a situation where distribution occurs as to copies or phonorecords which have not been unlawfully reproduced. The distribution right is equally, and perhaps more important when invoked with respect to infringing copies or phonorecords. Its importance in this context arises not because the copyright owner would otherwise be without a cause of action against the infringing reproducer. Its importance lies rather in the practical consideration that the reproducer may be unavailable or financially irresponsible so that the distributor of the infringing copies or phonorecords may be the only party against whom the copyright owner may obtain meaningful relief for the infringement of his work. (Nimmer, 1979, p. 8-117)

Having set out the concomitants associated with the establishment of the right of a copyright owner to assign his right "generally or subject to territorial limitations," it is recommended, in keeping with the proposals previously offered, that the owner of copyright have the right to grant a transfer of copyright ownership limited as to territory.

The Requirement of Writing

Under the present Act, the requirement that a conveyance of part or all of the copyright must be in writing signed by the owner or his agent is restricted to assignments and to those problematic licences which "grant an interest." Thus, both non-exclusive and exclusive licences which do not carry with them "a proprietary interest," may be granted orally.

There is no specific language required for a written assignment and thus it has been held that an assignment may be contained in letters[14] or in a receipt.[15] Under the proposed scheme whereby both assignments and exclusive licences would be treated as "transfers of copyright ownership," it is recommended that the requirement of writing should be applicable to such transfers but not to non-exclusive licences.

---

14.    London Printing & Publishing Alliance Ltd. v. Cox (1891) 3 Ch. 291.

15.    Ornamin. (U.K.) Ltd. v. Basca Ltd. & Viking Industrial Plastics Ltd. (1964) R.P.C. 293.

- 90 -

## Transfers of Possession of Originals of Works

The Ilsley Commission (1957) recommended that the substance of section 38 of the 1956 United Kingdom Act should be enacted in Canadian copyright legislation:

> 38. Where under a bequest (whether specific or general) a person is entitled, beneficially or otherwise, to the manuscript of a literary, dramatic or musical work, or to an artistic work, and the work was not published before the death of the testator, the bequest shall, unless a contrary intention is indicated in the testator's will or a codicil thereto, be construed as including the copyright in the work in so far as the testator was the owner of the copyright immediately before his death.

The Keyes-Brunet study expressed the opinion that there appeared to be no reason that the rebuttable presumption in the above-quoted section should arise only upon the bequest of originals of such manuscripts. Rather, it should also arise upon the bequest of originals of any unpublished material protected by copyright, such as original negatives and plates of motion picture films and sound recordings. Indeed, there does not appear to be any reason to so limit the provision and it is recommended that the provision be expanded in the manner described above. Where material protected by copyright has not been published, there is little likelihood that the ownership of the copyright has been separated from the ownership of the physical object embodying the work protected by copyright. To deny to the person who is entitled to the original (of an unpublished work) under a bequest, the collateral entitlement to whatever copyright the testator held would be to separate the ownership of copyright from the ownership of the physical object embodying the original copyright of the work and thereby to make it unlikely that anyone could legitimately publish or otherwise bring the unpublished material to light. This would seem to be contrary to the Copyright Act's objective of fostering the creation and dissemination of knowledge.

It is submitted that the presumption established by section 38 should not be applicable in the case of published works as once publication has been effected, the ownership of the copyright will probably have been at least partly transferred and thus separated from ownership of the original of the published work.

## Future Copyright

A valid legal assignment of a future copyright cannot be made under the Copyright Act.

> The only effect of such assignment is that the assignee will be regarded in equity as the equitable owner of the copyright when it comes into existence, although the copyright will vest in the author; the "assignee" will have a right in equity to have the copyright assigned to him. Holyroyd v. Marshall (1862) 10 H L.C. 191; Ward Lock & Co. Ltd. v. Lang (1906) 2 Ch. 550. (Lahore, 1977, p. 152)

The Ilsley Commission recommended the enactment of a provision similar to section 37 of the 1956 United Kingdom Copyright Act which would expressly enable a person to assign the legal title to a prospective copyright to which he might otherwise become entitled as the author of a work to be created. The section reads as follows:

> 37(1) Where by an agreement made in relation to any future copyright, and signed by or on behalf of the prospective owner of the copyright, the prospective owner purports to assign the future copyright (wholly or partially) to another person (in this subsection referred to as "the assignee"), then if, on the coming into existence of the copyright, the assignee or a person claiming under him would, apart from this subsection, be entitled as against all other persons to require the copyright to be vested in him (wholly or partially, as the case may be), the copyright shall, on its coming into existence, vest in the assignee or his successor in title accordingly by virtue of this subsection and without further assurance.

> (2) Where, at the time when any copyright comes into existence, the person who, if he were then living, would be entitled to the copyright is dead, the copyright shall devolve as if it had subsisted immediately before his death and he had then been the owner of the copyright.

> (3) Subsection (4) of (...Section 36) shall apply in relation to a licence granted by a prospective owner of any copyright as it

- 92 -

applies in relation to a licence granted by the owner of a subsisting copyright, as if any reference in that subsection to the owner's interest in the copyright included a reference to his prospective interest therein.

(4) The provisions of the Fifth Schedule to this Act shall have effect with respect to assignments and licences in respect of copyright (including future copyright) in television broadcasts.

(5) In this Act "future copyright" means copyright which will or may come into existence in respect of any future work or class of works or other subject matter, or on the coming into operation of any provisions of this Act, or in any other future event, and "prospective owner" should be construed accordingly and, in relation to any such copyright, includes a person prospectively entitled thereto by virtue of such an agreement as is mentioned in subsection (1) of this section.

The enactment of section 37 had been recommended by the Gregory Committee (1952, p. 152, para. 270) in the United Kingdom with a view to facilitating the exploitation of works protected by copyright. Both the Ilsley Commission and the Keyes-Brunet report recommended enactment of a similar provision for similar reasons. Accordingly, it is recommended that a provision comparable to section 37 of the U.K. Copyright Act be enacted, modified where necessary to reflect the earlier recommendations with respect to the equating of assignments and exclusive licences as distinct from non-exclusive licences.

Chapter IV

NON-VOLUNTARY DISPOSITIONS

Voluntary dispositions of copyright have been discussed earlier (i.e., forms of exploitation of the exclusive rights of copyright holders initiated by copyright holders). This section will consider non-voluntary dispositions; that is, provisions of the Act, which in different ways and in varying degrees statutorily qualify the exclusive rights of copyright holders.

Compulsory Licences

The Copyright Act establishes various forms of what may be termed compulsory licences. These are statutorily created licences of one or more of the copyright owner's bundle of rights and such licences are generally provided to any party wishing to exercise them, subject to satisfaction of the prerequisites and terms and conditions of the licences (e.g., occurrence of triggering event, payment of prescribed royalties). In general, such compulsory licences are regarded as a means of giving effect to those public policy considerations related to ensuring both just compensation to copyright owners and access by the public to certain works subject to the statutory monopoly granted to owners of copyright by the Act.

James Lahore advises that "the use of this form of control over the exercise of copyright...has a long history in copyright law" (Lahore, 1977, p. 325) and points to the Literary Property Act of 1842 (5 & 6 Vict. c. 45) which included a provision for a general compulsory licence "to provide against the suppression of books of importance to the public." This permitted re-publication of a book after the author's death on application to the Privy Council, if the copyright owner would not allow re-publication. This provision was carried forward (augmented to incorporate provisions vis-à-vis both reproduction and public performance) as section 4 of the Imperial Act of 1911 which, in turn, was the basis for section 13 of the Canadian Act. Indeed, it appears that as far back as 1783, four of the original American states each enacted copyright legislation containing compulsory licence provisions which were applicable when copies of a copyrighted book were not supplied in a reasonable quantity and at a reasonable price.[1]

---

1.    The four states were Connecticut, Georgia, New York and South Carolina. See Fenning, 1935.

<u>Reproduction and public performance licences</u>    Section 7(1)
of the Act provides that:

> After the expiration of 25 years, or in the
> case of a work in which copyright subsisted on
> the fourth day of June 1921, 30 years from the
> death of the author of a published work,
> copyright in the work shall not be deemed to be
> infringed by the reproduction of the work for
> sale if the person reproducing the work proves
> that he has given the prescribed notice in
> writing of his intention to reproduce the work,
> and that he has paid in the prescribed manner
> to, or for the benefit of, the owner of the
> copyright, royalties in respect of all copies
> of the works sold by him, calculated at the
> rate of 10% on the price at which he publishes
> the work.

Section 13 of the Act reads as follows:

> Where at any time after the death of the author
> of a literary, dramatic or musical work that
> has been published or performed in public, a
> complaint is made to the Governor in Council
> that the owner of the copyright in the work has
> refused to republish or to allow the perfor-
> mance in public of such work, and that by
> reason of such refusal, the work is withheld
> from the public, the owner of copyright may be
> ordered to grant a license to reproduce the
> work or perform the work in public, as the case
> may be, upon such terms and subject to such
> conditions as the Governor in Council may think
> fit.

Upon comparing the two provisions, the following
similarities and differences, beyond the commonality of pur-
pose discussed earlier, may be observed:

a)      Both sections pertain only to works which have
        been published (or, alternatively, vis-à-vis
        section 13 alone, performed in public).

b)      Section 7(1) is only operative 25 years after
        the death of the author, whereas section 13 is
        operative at any time after publication of the
        subject works.  However, the only criteria to
        be satisfied in order for section 7(1) to be
        operative is the passage of the said 25 years

after the author's death, while in order for section 13 to be operative the following criteria must be satisfied:

1)      the applicant for the licence must satisfy the governor in council that:
i) the owner of the copyright in the work has refused to republish or to allow the performance in public of a work, and
ii) by reason of such refusal the work is being withheld from the public; and

2)      the governor in council must exercise his discretion to grant a licence in the applicant's favour.

c)      Section 7(1) is applicable with respect to all classes of published works (including, presumably, mechanical contrivances protected by section 4(3) "as if such contrivances were musical, literary or dramatic works" and cinematographic works protected by sections 3(e) and 2 on the basis of assimilation to either dramatic works or photographs).[2]  By contrast, section 13 is not applicable to artistic works but only to literary, dramatic and musical works (including, presumably, mechanical contrivances and those films protected as dramatic works, but not those protected on the basis of assimilation to artistic works).

d)      The royalty rate in section 7(1) is fixed at 10 per cent of the published price whereas, in section 13, the rate is to be established by the governor in council.

In 1952, the Gregory Committee in the United Kingdom considered the proviso to sections 3 and 4 of the 1911 Imperial Act (the counterparts, respectively, of sections 7(1) and 13 of the Canadian Act) and recommended their repeal (Report of the [Gregory] Copyright Committee, 1952, paras. 15 and 22). The report concluded that the proviso to sections 3 and 4 were not decisive enough to secure the publication of books in cheap editions which would not other-

---

2.      The applicability of the licences to films and sound recordings is rendered unclear in view of the reference in both licences to the death of the author as a condition precedent to the operation of the licences and the frequent corporate authorship of these works.

- 96 -

wise be available to the public, at or about the same
prices.   The specific argument offered for repealing the
section 3 proviso was that, as a matter of general practice,
publishers did not wait for 25 years from the date of publi-
cation, let alone for 25 years from the death of the author
before they issued cheap editions of works in popular de-
mand.   The discussion of the merits and demerits of section
4 was reduced to the simple observation that no applications
had ever been made to the Privy Council under that section.
More important, however, in the decision-making process was
the view that both of the foregoing provisions were in con-
flict with, and therefore prevented the United Kingdom's ad-
herence to, the Brussels Text of the Berne Union.   Whereas
the Rome Text (to which Canada adheres) permits a measure of
discretion to member countries vis-à-vis their respective
domestic terms of copyright, the Brussels Text required all
member countries to provide a minimum term equal to the life
of the author plus 50 years.   The report advised that the
section 3 proviso and section 4

> were attacked by other members of the Berne
> Union as contrary to the principles of the Con-
> vention, and the amendments incorporated in
> article 7 of the Brussels Convention were
> avowedly aimed at making it clear that limita-
> tions of this kind in the absolute rights of
> authors, etc., for the full term of copyright
> were not consonnant with the Convention. (Re-
> port of the [Gregory] Copyright Committee,
> 1952, p. 7)

This interpretation apparently was accepted as valid
by the Gregory Committee, the U.K. delegation to the
Brussels Convention[3] and, finally, by the English Parlia-
ment which repealed the subject provisions of the 1911 Act
in the 1956 U.K. Copyright Act.   However, the question of
its validity is rendered moot insofar as the parameters of
this present discourse are Canada's present international
obligations.   As Canada presently adheres to the Rome Text,
it is not necessary to weigh the possible disadvantages of
repeal against the prospective advantages of adherence to
the required latest text of the Berne Union, the 1971 Paris
Text.   The question of retaining some form of compulsory
licence may be examined solely on its own merits.

--------

3.      See U.K. Board of Trade, Comparison of the Rome and
Brussels Copyright Conventions With Explanatory Notes by the
United Kingdom Delegates, Her Majesty's Stationery Office,
1949.   Cf. Documents de la Conference de Bruxelles, 5-26
Juin 1948, p. 201, para. 3, where it is suggested that the
licences do not necessarily conflict with article 7.

A review of the reasons cited by the Keyes-Brunet report for the repeal of sections 7(1) and 13 provides a suitable framework for such examination. Some of their reasons were:

the proven uselessness of the provisions in that:

> a) no licence has been issued under either section (p. 75);
> b) section 7 would not extend to many sound recordings since it would be impossible to ascertain the death of the author of a sound recording where the author was a corporation (p. 74); and
> c) the purpose of section 13 might be defeated by an owner willing to publish at a high price or to perform in a specific place or in only one of the media (p. 75).

With regard to a), the importance of compulsory licence provisions may well reside not so much in their actual use but, rather, in the possibility of their use. The mechanical reproduction licence of section 19 is an example of this precept. The recording industry rarely resorts to the actual use of the licence provisions of section 19, utilizing them instead as the framework within which (or the backdrop against which) private contractual arrangements are entered into, which most often reflect many of the features of the "unused" licence provisions. The degree of indirect usage of section 19 (i.e., through the spectre of resolution to it if necessary) remains unquantifiable and, in the same manner, the degree of comparable usage of the provisions of sections 7(1) and 13 remains unquantifiable.

As to Keyes' and Brunet's second point, the time frame for the operation of a compulsory licence need not be measured from the death of an author; it could be measured from the date of first publication or first performance in public (cf. section 19 where the triggering event is the making of a mechanical contrivance with the authorization of the owner of the copyright in the recorded musical work).

The final concern raised by Keyes and Brunet is a technical difficulty which arises from the present construction of the compulsory licence provisions. A restructured licence could avoid such problems. This is therefore not a telling argument against the basic value or purpose which can be served by a compulsory licence.

Keyes and Brunet go on to contend that it is inequitable and discriminatory that only certain works under certain conditions should be the subject of compulsory licences. One could, however, make the same allegations with respect to discrimination and unfairness vis-à-vis the Keyes-Brunet proposals to protect certain works by Canadians only. More importantly, however, this criticism can be addressed by recalling the fundamental character and purpose of copyright; that is, it is a statutory right which may be framed (subject to international obligations) in whatever way best serves its purpose of serving as "a class of policy tools used to improve society's 'total information system' in sectors in which the production and distribution of knowledge might otherwise be inadequate" (Economic Council of Canada, 1971, p. 3).

They also make the point that "compulsory provisions are derogations of exclusive rights and as such should be strictly construed....[and]...given the strict construction that might be placed upon them, the present sections do not provide access" (pp. 74-75). This statement represents the normative views of its authors. As stated previously all provisions included in the Copyright Act are equally statutory enactments and are valuable in their own right. Informed discussion is not aided by labelling certain provisions as derogations of other provisions (with the often attendant perception that certain provisions reflect fundamental rights which existed prior to, and are simply validated and protected by, the Act). Nor is it useful to suggest that such provisions must therefore be treated as circumspect. In the recent words of Mr. Justice Estey of the Supreme Court of Canada:

> (copyright law)...neither cuts across existing rights in property or conduct nor falls in between rights and obligations heretofore existing in common law. Copyright legislation simply creates rights and obligations upon the terms and in the circumstances set out in the statute. This creature of statute has been known to the law of England at least since the days of Queen Anne when the first copyright statute was passed. (Compo Company Limited v. Blue Crest Music Inc. et al. S.C.C., 45 C.P.R. 2d, March, 1980, p. 1)

The further suggestion that the possibility of a strict construction of the compulsory licence provisions (which possibility is predicated upon the unacceptable characterization of the licences as "derogations") results in the failure of the present provisions to provide access, is, accordingly, most tenuous.

Fourthly, Keyes and Brunet state that "not surprisingly, the complete abolition of compulsory licensing was urged by a great many authors and owners who saw the present sections as anachronistic and unjustifiable" (p. 75). Indeed, it should not surprise anyone that authors and publishers may not look favourably on certain compulsory licences. If, after due consideration of the interests of the parties affected by compulsory licences, it is believed that the licences can be utilized to serve a valuable social end, then the suggestion that they are "anachronistic and unjustifiable" can carry little weight.

They also claim that compulsory licences are limitations upon the terms of protection of authors. But compulsory licences are not limitations upon the term of protection. The period of protection remains constant; it is the exclusivity of the author's right to control exploitation of his work during the term which is affected. This, in essence, is the same argument raised and addressed with regard to their third point.

Keyes and Brunet consider compulsory licences to be inconsistent with their recommendation to provide a general term of protection of life plus 50 years and, in the case of section 13, to be an obvious contradiction of it. This is but another variation on the same themes as those raised in the second, third and fifth points above. Further, it is not at all clear why section 13 (and not, apparently, section 7, or for that matter section 19(1)) is perceived as being "in obvious contradiction" of a general term of "life plus 50."

Finally, they argue that the possibility of international retaliation by the application of the "rule of the shorter term" cannot be ignored. The rule of the shorter term is the colloquial expression for the comparison of terms provisions which appear in slightly different language in both the Berne and Universal Copyright Conventions. In essence, the rule provides for a comparison of the terms of protection offered by member countries and provides that no foreign work is to receive longer protection than it receives in its country of origin. The suggestion that this rule may be invoked in retaliation by other countries by virtue of the existence of compulsory licences such as those in sections 7(1) and 13 appears to be without foundation.

The following passage is drawn from a study prepared jointly by Barbara Ringer, the Register of Copyright in the United States, and by Lewis Flacks, Special Legal Assistant to the Register, at the request of the Secretariat of the

Intergovernmental Copyright Committee, the co-ordinating
body of the UCC:

> In the case where work of country B belongs to
> a class that is protected in both country A and
> country B, and the copyright term for that
> class has not expired in either country A or
> country B, country A must offer the work the
> same rights as those applicable to its own
> works...even if those rights are much more
> limited, or are denied outright, in country B.
> As the passage from the 1971 Rapporteur's Re-
> port...makes clear, material reciprocity of
> this sort is not possible under UCC. (Ringer
> and Flacks, 1979, p. 26)

The same argument is applicable with respect to the compari-
son of terms provisions of the Berne Convention.

It is submitted that the case offered against com-
pulsory licences (both generally and specifically those of
the type established by sections 7(1) and 13) is lacking in
substance and merit. The value of the latter category of
licences may be enhanced and made more meaningful by re-
dressing certain deficiencies in the manner in which they
have been presently cast. The proposal which follows seeks
to replace the two licences with one which would overcome
the respective weaknesses of the two provisions and synthe-
size their respective strong points.

In view of the value of and the social objectives
served by compulsory licences of this type, as earlier dis-
cussed, it would be inappropriate not to provide that the
proposed compulsory licence should be applicable to all
classes of works, as in section 7(1). Therefore, it is pro-
posed that the revised licence should be applicable to all
classes of protected works. Both sections 7(1) and 13 pre-
clude the operation of their respective licences with re-
spect to works which have not previously been made available
to the public with the authorization of their copyright
owners. This policy is sound and should be adopted.
Further, the provisions of section 13 which contemplate that
the concept of prior public availability should not be arti-
ficially restricted to publication (i.e., the distribution
of copies of a work) but should encompass further modes of

making a work available to the public (performance in public) are also sound and should be adopted.[4]

As noted, section 7(1) is only operative 25 years after the death of the author, whereas section 13 is operative at any time after the death of the author. However, the only criterion to be satisfied in order for section 7(1) to be operative is the passage of the said 25 years, while in order for section 13 to be operative, the applicant for the licence must satisfy the governor in council that: (i) the owner of the copyright in the work has refused to republish or to allow the performance in public of a work; and (ii) by reason of such refusal the work is being withheld from the public.

In keeping with the objective of these compulsory licences, the unavailability of a work to the public rather than the mere passage of a prescribed period of time subsequent to the author's death should serve as the primary condition precedent to the operation of the compulsory licence. Therefore, it is proposed that the revised licence should provide in a manner similar to that of section 13 that, in order to obtain a licence, a prospective licensee must demonstrate to the satisfaction of a designated body that:[5]

(1) the owner or exclusive licensee of the copyright in a work has refused to republish or to allow the performance in public of such work in response to a request to do so by the prospective licensee; or

(2) the owner or exclusive licensee of the copyright cannot be located after reasonable efforts to do so have been undertaken by the prospective licensee; and

(3) by reason of this refusal or inability to locate the owner or exclusive licensee, the work is not available to satisfy the reasonable demands of the Canadian market.

---

4.    In keeping with the thrust of the doctrine of prior public availability, the definition of performance should subsume not only live performance of protected works but also their broadcasting or diffusion.

5.    A copyright royalty tribunal would be a more appropriate body than the governor in council.

If both the preceding conditions are met, the copyright
royalty tribunal should have a broad measure of discretion
with respect to the granting of a licence and the terms and
conditions (including amount of royalties payable) upon
which the licence is to be granted.

The one remaining matter to be addressed (which
would constitute a further condition precedent to the opera-
tion of the licence) is the period of time which must elapse
prior to the licence being prospectively available and the
corollary determination of an appropriate starting point
from which to measure the period of time. Presently, under
both sections 7(1) and 13, the starting point is the death
of the author. The rationale generally offered for the
adoption of the death of the author as the starting point
was that the compulsory licence should not interfere with
the exploitation of an author's work by the author during
his lifetime. This merits examination.

First, in the vast majority of situations the author
is not the party who exploits (i.e., disseminates) his own
work either during his lifetime or, quite obviously, during
the balance of the term of protection subsequent to his
death. The author generally assigns or licenses all or part
of the copyright to one or more publishers, producers or
other entrepreneurs for a part or, in many cases, for the
whole of the term of protection. While authors may not find
it a particularly comforting thought, whether they are alive
or dead has little bearing on the exploitation of their
works by such entrepreneurs. Second, it is necessary to in-
quire whether, in view of the issue raised above, and given
the object of these compulsory licences (i.e., to provide
access to certain copyright works not otherwise available),
pre-eminence should attach to whether the author is alive or
not, a factor which may postpone the operation of the li-
cence anywhere from one day to possibly 80 years.

It is suggested that the answer to the rationale
question posed above should be in the negative. It is far
sounder from a public policy point of view to provide to the
holders of copyright a prescribed period of exclusivity of
exploitation subsequent to the time their works are first
available to the public and then to provide for the poten-
tial availability of the subject licence from the end of
this period. Such a term will, as in the case of all
attempts to deal with questions of duration of copyright
protection, be somewhat arbitrary; however, this cannot be
avoided. Further, it must be remembered that the licence
will be only potentially available at the end of the period
of exclusivity. Where the work is available to satisfy the
reasonable demands of the Canadian market, a licence would

not be granted.   It is therefore recommended that the li-
cence be potentially available at any time after the passage
of 15 years from the date that a work is first made avail-
able to the public, as defined earlier.[6]

Printing licences   In 1957, the Ilsley Commission report set
forth the history of the printing clauses in the Canadian
Copyright Act.  The report also detailed the manner in which
these provisions had been rendered obsolete, unjustifiable
and inequitable as a result of developments in international
copyright law and concluded by recommending their elimina-
tion.  Subject to two developments which have occurred sub-
sequent to the report's publication,[7] both of which serve
only to support further its position adopted, it stands
today as the most complete discussion of and cogent argument
for: (a) the repeal of the printing clauses of sections 14,
15 and 16 and the ancillary provisions of section 28(1) and
(2); and (b) the amendment of section 28(3).  Therefore, it
is adopted here and set forth in full below:

> The principle of making full copyright protec-
> tion to some extent conditional upon printing
> in Canada receives some recognition in Sections
> 14, 15, 16 and 28(1), (2) and (3) of our Act.
>
> Section 14 provides that any person may apply
> to the Minister for a licence to print and pub-
> lish in Canada any book wherein copyright sub-
> sists, if at any time after publication and

---

6.   It should  be  recognized by those who believe that
use of the author's death as the starting date better serves
the author or owner of copyright that, in many cases, the
proposal will extend the period of copyright owner exclusi-
vity over that which would prevail were the licence to be
predicated instead on the formula now established in section
13 (i.e., "any time after the author's death"), where the
author dies during the 15 year period after his work is
first made publicly available.  Further, as the proposed li-
cence is to be extended to all classes of works, it would be
impossible to use the date of the author's death with re-
spect to those works where the author is often a juridical
person, as in the case of sound recordings and films.

7.   a) Canadian  adherence  to the UCC as of August 10,
1962; and

b) Canada's exemption from the application of the
"manufacturing clause" of the new U.S. Copyright Act vis-à-
vis works by American authors (section 601).

within the duration of the copyright the owner
of the copyright fails to print the said book
or cause the same to be printed in Canada or to
supply by means of copies so printed the rea-
sonable demands of the Canadian market for such
book. Section 15 extends a similar principle
to certain books begun as serials in certain
other countries. Section 16 contains supple-
mentary provisions and also provides that Sec-
tions 14, 15 and 16 do not apply to any work of
which the author is a British subject, other
than a Canadian citizen, or the subject or
citizen of a country that has adhered to the
Berlin Revision (1908) of the Berne Convention
and a certain protocol thereto. The most rele-
vant part of this protocol is as follows:

> Whereas any country outside the
> Union fails to protect in an ade-
> quate manner the works of authors
> who are subject to the jurisdiction
> of one of the contracting countries,
> nothing in the Convention of the
> 13th November, 1908, shall affect
> the right of such contracting coun-
> try to restrict the protection given
> to the works of authors who are at
> the date of the first publication
> thereof subjects or citizens of the
> said non-Union country, and are not
> effectively domiciled in one of the
> countries of the Union.

Canada tried at times between 1911 and 1921 to
frame legislation which would be in accord with
the Berlin Revision of the Berne Convention
(1908) and at the same time would either re-
quire authors to print their works in Canada as
a condition of copyright or at least subject
them to compulsory licensing if they did not do
so. One of the reasons for the desire to have
manufacturing or printing clauses in our Act
was that the United States had had them in
theirs since 1891. From 1909 the United States
copyright law provided that the owner of the
copyright in a book or periodical first pub-
lished outside the United States in the English
language could obtain copyright protection in
the United States (called ad interim protec-
tion) for five years from first publication but
that if he imported into the United States more

than 1,500 copies of the work during that period or failed to print the work in the United States during that period, his United States copyright ceased. This had the effect in many cases of compelling owners of copyright in works in English to print them in the United States as a condition of enjoying appropriate copyright protection in the United States.

Canada could not, once it adhered to the Berlin Revision of the Rome Convention, enact a manufacturing clause applicable to a United States citizen who first published his work in a Berne Union country unless Canada did so by virtue of the protocol mentioned above. On July 27, 1923, the Canadian Government passed an Order in Council which set out certain provisions of the protocol and restricted the grant of copyright in accordance with the protocol in regard to the United States and stated that the restrictions to which rights of authors who are subject to the jurisdiction of the United States are subjected are set forth in sections of our Copyright Act of 1921 (which had been enacted but not proclaimed), these sections being the same as Sections 14, 15, 16 and 28 of our present Act. It is clear that the manufacturing or printing clauses in these sections were regarded as consistent with the Berne Convention as revised (at least so far as United States citizens are concerned) only because of the printing clauses in the United States Copyright Act.

These clauses in the United States Copyright Act have now been made inoperative in regard to all authors who are citizens or subjects of, or whose works were first published in, a country which is a party to the Universal Copyright Convention except those who are citizens of or domiciled in the United States and except as to works first published in the United States; and the United States, in order to comply with the Universal Copyright Convention, must leave them inoperative as long as the United States remains party to that Convention. If, as we recommended, Canada becomes a party to the Universal Copyright Convention, it would appear that Canada should repeal its printing clauses, at least so far as they apply to United States citizens. Moreover, as parties to the Rome

Convention it would appear that we would no
longer be justified in applying printing
clauses to United States citizens as it can
hardly be said that the United States now fails
to protect in an adequate manner the works of
Canadian authors first published outside the
United States.

It would manifestly be undesirable to retain
the printing provisions in so far as Canadian
authors alone are concerned as we would be sub-
jecting them to restrictions not applicable in
Canada to citizens of the United States or of
any other country which is a party to the Uni-
versal Copyright Convention or to any author
who first published in any country other than
Canada which is a member of the Berne Union.
Indeed we suspect that the main reason they
were made applicable to Canadians was that to
get the United States to continue its copyright
protection to works of Canadian authors Canada
was obliged not to extend to Canadian citizens
more protection than it gave United States
citizens, which meant that Canada had to sub-
ject its own citizens to the same restrictions
as those to which it subjected United States
citizens.

The mechanical reproduction licence  Section 19 of the Copy-
right Act establishes a compulsory licensing system with re-
spect to the mechanical reproduction of literary, dramatic
and musical works.  The compulsory licensing system of sec-
tion 19 was recently the subject of a lengthy and detailed
separate study by members of Consumer and Corporate Affairs
Canada (Berthiaume and Keon, 1980).  In the course of the
study, it was established that the compulsory licensing
provision of section 19 conforms to the respective texts of
the Berne and Universal Copyright Conventions (p. 8).  The
study noted that the original concern which had given rise
to the introduction of the compulsory licensing system of
section 19 was the desire to prevent the possible develop-
ment of monopolies in the music recording industry.  Exami-
nation of the present-day situation indicated that section
19 had been successful in ensuring competitive access to
musical works once they had been recorded and that serious
disadvantages would flow from its abolition (pp. 16 and
18).  Beyond proposals for modifications to the compulsory
licensing system to enhance its operation, it was recommend-
ed that the system be retained as its continued existence

had proven to be demonstrably in the public interest.8  It is therefore unnecessary to re-examine this form of compulsory licensing system.  It is sufficient to indicate that the recommendations of this most recent study are adopted here.

## The Reversionary Interest Proviso

Section 12(5) of the Act provides that, in certain prescribed circumstances, a party who has acquired one or more of the rights comprising the copyright protecting a work ceases to own such rights beyond the twenty-fifth year

---

8.    In view of the comments in the Keyes-Brunet report vis-à-vis the compulsory licences of sections 7 and 13, it is of interest to note that Keyes and Brunet recommended retention of the compulsory licence under section 19 (albeit in amended form).  However, the rationale offered was predicated upon a most perplexing and anomalous basis.  Their report stated that: "As no case has been made for the abolition of the compulsory licensing provisions, abolition will not be considered" (p. 90).  Yet, as earlier noted, the same authors had provided, in the course of their discussion of the compulsory licence provisions of sections 7 and 13, at least four different arguments against compulsory licensing in general (i.e., inequitable, discriminatory, a limitation upon the term of protection, inconsistency with their own recommendations to provide a general term of life plus 50).  Further, the report itself stated vis-à-vis section 19 in particular:  "Those interests which have recommended the deletion of s. 19 have done so strictly on the basis of the broad principle that a copyright owner should have freedom to negotiate voluntarily, and that this right should not be interferred with" (p. 90; the very same principle which the authors themselves adopted in support of the deletion of sections 7 and 13).  Finally, and perhaps most irreconcilable with the position adopted by Keyes and Brunet was their acknowledgement of the fact that France does not have a compulsory licensing system and therefore that if the rationale for compulsory licences for recordation of musical works was sound, the recording industry in France should now be controlled by a few major companies.  However, in their words, "this apparently has not materialized."  Therefore, they conclude that "the rationale for the establishment of a compulsory licensing system now bears re-examination" (p. 90, emphasis added).  Rather than the suggested examination, however, the authors offer instead the earlier cited startling proposition that "as no case has been made for the abolition of the compulsory licensing provisions, abolition will not be considered" (p. 90).

after the death of the author of the work, notwithstanding the fact that the party was granted such rights for the full term of protection, i.e., the life of the author plus 50 years.

The section provides that the beneficiaries of the final 25 years of the term of protection become the legal representatives of the estate of the author. It is applicable, however, only where:

(a) the author is the first owner of copyright. Thus it will not usually affect a party who has acquired the copyright protecting any of the following works:

    (i) a work made by an employee in the course of his employment;

    (ii) a commissioned engraving, photograph or portrait; and

    (iii) a Crown work.

In all of the above cases, in the absence of an agreement to the contrary, the author is not the first owner of copyright. Where, however, the author has under contract retained the copyright protecting a commissioned photograph, for example, the reversionary interest provisions will be applicable. Further, considerable doubt has been expressed as to whether the reversionary interest would arise in the case of an assignment of copyright protecting sound recordings and photographs. As indicated earlier, the view has been expressed that insofar as the term of copyright for such works (50 years) bears no relation to the life of the author, section 12(5) does not apply. It is possible, however, that notwithstanding that the term of protection for sound recordings and photographs is a straight 50 years, the reversionary interest provisions could apply where the author of such works dies prior to the expiration of the 50 years. The Act simply states that any rights with respect to the copyright beyond the expiration of 25 years from the death of an author devolve on his personal representative. On balance, it would appear, however, that the better view is that which holds that there is no reversionary provision applicable with respect to the assignment of the rights protecting sound recordings and photographs.

(b) the assignment of copyright is not with respect to a collective work, nor is the licence to publish a work or part of a work as part of a collective work.

In this situation, the reversionary interest provisions are not applicable. One commentator has suggested that the above proviso is to be understood in the following terms:

> The author who is the first owner of the copyright may therefore make, for the full period of protection, an assignment of the copyright of a complete collective work or a licence to publish the collective work or part of a work as a collective work, but not an assignment of a part of a work, as for example his own contribution. Such assignment is limited to his own life plus twenty-five years thereafter. (Fox, 1967, p. 293)

The passage with respect to granting of a licence refers to the "granting of a licence to publish a <u>work</u> or <u>part of a work</u> as part of a collective work." Dr. Fox has suggested that the word "work," underlined above, is to be understood as collective work. If this is an appropriate construction, then the following "part of work" should equally be interpreted to refer to a part of a collective work. The difference between the language of the section and the construction suggested by Dr. Fox is not without importance.

In the view of Dr. Fox, as qualified above, apparently only the assignment of a complete collective work or a part of a collective work for inclusion in a further collective work will escape the application of the reversionary provision. The language of section 12(5) could also be understood to mean that a licence to publish: (a) either a collective work, or (b) a single work as long as it is for inclusion in a separate collective work, will escape the application of the reversionary provision.

The former view places a greater emphasis on the nature of the work to be included in a collective work, while the latter view emphasizes only the importance of licensing for inclusion within a collective work.

(c)  the assignment or grant of an interest in copyright is otherwise than by will;

Thus, in order for an assignment or grant of interest by an author/first owner to be subject to the reversionary provision, it must take place during his lifetime. If, in his will, an author/first owner bequeaths the copyright term, ownership of the copyright by the beneficiary will not be truncated 25 years after the death of the author.

(d)  the original (i.e., first) grant of rights is made by the author/first owner himself.

If an author/first owner dies intestate (i.e., without leaving a will) and the ownership of copyright passes to his heirs under the intestacy laws applicable to the author, an assignment of the copyright by the heirs to a third party will not be subject to reversion.

The language of section 12(5) is taken directly from a proviso to section 5(2) of the U.K. Imperial Act of 1911. The latter provision was deleted in its entirety from the revised 1956 United Kingdom Copyright Act, subject to a grandfather clause which provided for the continued applicability of the provisions of section 5(2) to pre-1957 works (unless a further assignment of the copyright is made subsequent to the commencement of the 1956 Act).

In the course of a discussion of the proviso to section 5(2), Skone James described the "illusory nature of the benefits enforced by the proviso":

> The proviso to Section 5(2) of the Act of 1911 was, of course, inserted in the interest of an author's family, to prevent, if possible, a successful author from making improvident contracts to the detriment of his dependents. In practice the benefits to the author's family or dependents have been found to be somewhat illusory. The proviso rendered null and void any attempt by a living author to dispose of the reversionary interest in his copyright, and declared that this reversionary interest should "on the death of the author," devolve on his legal personal representatives "as part of his estate." This reversionary interest, unassignable during the author's lifetime, therefore became an asset of the author's estate and assignable immediately upon his death. It was consequently liable to be sold by his executors for the payment of his debts, and, even if not required for that purpose, it was frequently the duty of the executors to realize the interest for the purpose of winding up the author's estate. Supposing the author made a specific bequest of his reversionary interest in his copyright, the specific legatee would probably be ready to sell that interest forthwith, rather than wait for a chance of income twenty-five years later. The only possible purchaser,

> at any rate in the case of a literary work,
> would, save in exceptional cases, be the
> author's publisher, and the amount which he
> would be prepared to give for a reversionary
> interest in a copyright falling into possession
> twenty-five years later would not be likely to
> be very large, particularly having regard to
> the fact that he would, even if he declined to
> purchase the reversion, be entitled to continue
> to publish the work, if he thought it worth
> while to do so, upon payment of a royalty to
> the owner of the copyright, and that, if he
> did purchase he could not acquire an exclusive
> copyright. (Skone James, 1971, p. 163)

Thus, not only is the reversionary interest provision sub-
ject to a multitude of qualifications which limit its appli-
cation, when applicable it appears to be of limited value.

Finally, and perhaps more importantly, section 15(2)
reflects an unacceptably paternalistic approach to the
treatment of authors by a benevolently disposed legisla-
ture. Such provisions perpetuate the stereotypical image of
the author as the gifted but "congenitally irresponsible"
artiste who cannot be expected to assume full responsibility
for the consequences of his actions and must be guarded
against himself.[9] Such a perception: (a) is insulting and
does a disservice to authors; (b) is not in keeping with the
societal value placed on treating each citizen as respon-
sible for his own acts; and (c) constitutes an inequitable
intrusion into the ability of the parties to agree to expi-
ration terms of their own choosing, unrestricted by artifi-
cial limitations which may not, in fact, be in an author's
best interests insofar as they may reduce the consideration
paid for the copyright.

It is therefore recommended that the reversionary
interests provisions of section 12(5) be repealed.

---

9.    See *Fisher Music Co.* v. *Witmark* 318 US 643, 656
(1943).

Chapter V

## SUMMARY OF RECOMMENDATIONS

### Photographs

The author of a photograph should be defined as the person responsible for the composition of the photograph, i.e., most often, the photographer (p. 15).

### Sound Recordings

Sound recordings should be protected in their own right as a separate class of original works (p. 18).

The author of a sound recording should be defined as the person principally responsible for the arrangements undertaken for the creation of the sound recording (p. 24). However, since this definition might prove problematic, submissions by members of the Canadian recording industry on this issue would be welcomed.

### Cinematographic Works

The terms "cinematography" or "process analogous to cinematography" should be defined to include any means whereby the effect of motion pictures is produced, irrespective of the technological process utilized, such as videotape or videodisc (p. 29).

The term "cinematograph" should be defined as including any sounds accompanying motion pictures (p. 31).

All cinematographic works should be protected as a unitary class of original works, similarly situated in terms of prerequisites for protection to all other classes of works (p. 36).

The author of a cinematographic work should be, in essence, its producer, defined as the person responsible for the arrangements undertaken for the making of the cinematographic work (p. 39). However, since this definition too may prove problematic, submissions by members of the Canadian film industry on this issue would be welcomed.

### Works by Employees

A revised Copyright Act should not contain any special provisions with respect to works by employees, other

than one which recognizes that an author, including an employee, may transfer part or all of his copyright or his prospective entitlement to copyright to a third party, including an employer, by way of contract, including an employment agreement (p. 50).

## Commissioned Works

Section 12(2) of the Copyright Act should be repealed and the Act should clarify that, subject to a written agreement to the contrary, the author of a work is the initial owner of the copyright therein, notwithstanding the fact that the work was commissioned (p. 57).

## Works of Joint Authorship

The term "work of joint authorship" should be defined as a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary work (pp. 60 and 63).

The Copyright Act should specify that joint authors are the first and equal co-owners of the copyright in a work of joint authorship as tenants-in-common without any right of survivorship (p. 64).

Any one co-owner should be able to assign, exercise or license his interest in the whole of a copyright, without requiring the consent of all of the other co-owners (pp. 65-66).

The launching of an infringement action by one co-owner should preclude the other co-owners from commencing a separate suit for the same cause of action. They should instead be obliged to join as parties in the first infringement action if they wish to pursue the alleged infringer in their own names (p. 66).

Where a work of joint authorship is an unpublished work, or a work first published elsewhere than in Canada or a country to which the Copyright Act extends, then, if one or more of the authors of the work is not a "qualified person" the work should be treated as a work in which copyright subsists. However, the author(s) who is/are qualified persons should be treated as the sole owner(s) of the copyright for the purposes of the Act (pp. 66-67).

## Collective Works

The definition of a collective work should be amended to provide a general set of criteria followed by an illustrative list of examples (p. 68).

The Copyright Act should provide that, in the absence of an express transfer of the copyright or of any of the rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work and any later collective work in the same series (p. 70).

The definition of a collective work should specifically provide for copyright for a collective work regardless of the class(es) of underlying works which comprise the collective work (p. 70).

The definition of a collective work should be amended to delete the requirement that the works or parts of works included therein must be by different authors (p. 70).

## Moral Rights

Where a juridical person (e.g., a corporation or a partnership) may be an author, as in the case of films or sound recordings, the same moral rights should be accorded to the juridical author as would be accorded to an natural author (p. 72).

Moral rights, like pecuniary rights, should be fully assignable and capable of being licensed during an author's lifetime, subject to a presumption that the author has retained all such moral rights as are not specifically assigned (p. 76).

## Assignments and Licences

The Act should abolish the present scheme of assignments plus the tripartite configuration of licences (i.e., licences coupled with a grant of an interest, contractual licences and bare licences) and replace this with the concept of a "transfer of copyright ownership" (viz. an assignment, mortgage, exclusive licence) or any other conveyance, alienation, or hypothecation of a copyright, whether or not it is limited in time or place of effect but not including a non-exclusive licence (p. 83).

## Divisibility of Copyright

The Copyright Act should provide that the owner of copyright may transfer any of the exclusive rights comprised in a copyright, including any subdivision of the rights specifically enumerated in the Act (p. 84).

The Copyright Act should provide that, in order for a transfer of copyright ownership to be valid, it must be in writing (p. 89).

## Transfers of Possession of Originals of Works

The Copyright Act should provide that where a person is entitled under a bequest, beneficially or otherwise, to the original of any work not published prior to the death of the testator, the bequest shall, unless a contrary intention is indicated in the testator's will or a codicil thereto, be construed as including the copyright in the work insofar as the testator was the owner of the copyright immediately before his death (p. 90).

## Future Copyright

The Copyright Act should contain provisions permitting the valid legal assignment or granting of an exclusive licence of a future copyright (p. 92).

## Compulsory Licences

The two compulsory licences contained in sections 7(1) and 13 should be abolished and replaced with a single compulsory licence containing the following features (p. 100):

    (a)    the licence should be applicable in respect of all classes of works (p. 100).

    (b)    the licence should be applicable only with respect to works which have been made available to the public (i.e., through distribution of copies of the work or its performance in public, either live or via broadcasting or diffusion (p. 100).

    (c)    In order to obtain a licence, a prospective licensee must demonstrate to the satisfaction of a designated body (e.g., a copyright royalty tribual) that:

- 117 -

(i)     the owner or exclusive licensee of the copyright or any part thereof has re- fused to republish or to allow the per- formance in public of such work in res- ponse to a request to do so by the pro- spective licensee; or

(ii)    the owner or exclusive licensee of the copyright or any part thereof cannot be located after reasonable efforts to do so have been undertaken by the prospec- tive licensee; and

(iii)   by reason of this refusal or inability to locate the said owner or exclusive licensee, the work is not available to satisfy the reasonable demands of the Canadian market for same (p. 101).

(c)     The licence should be "potentially available" at any time after the passage of 15 years from the date that a work is first made available to the public (p. 103).

(d)     If these conditions are met the copyright royalty tribunal should have a broad measure of discretion with respect to the granting of a licence and the terms and conditions (in- cluding the amount of royalties payable) upon which it is to be granted (p. 102).

## Printing Licences

Sections 14, 15, 16 and 28(1) and (2) should be re- pealed and any provision which replaces section 28(3) should delete any reference to printing or making in Canada (p. 103).

## Mechanical Reproduction Licences

The recommendations of the study by Berthiaume and Keon, The Mechanical Reproduction of Musical Works in Canada, should be adopted (p. 107).

## The Reversionary Interest Proviso

The reversionary interest provisions of section 12(5) of the Act should be repealed (p. 111).

BIBLIOGRAPHY

Berthiaume, Mike, and Keon, Jim. The Mechanical Reproduction of Musical Works in Canada. Ottawa: Consumer and Corporate Affairs Canada, 1980.

Blomqvist, A.G., and Lim, C. Copyright, Competition and Canadian Culture: The Impact of Alternative Copyright Act Import Provisions on the Publishing and Sound Recording Industries. Ottawa: Consumer and Corporate Affairs Canada, 1981.

Bogsch, A. The Law of Copyright Under the Universal Convention. 3rd ed. New York: R.R. Bowker Co., 1972.

Cary, George D. "Joint Ownership of Copyrights." Studies on Copyright, Arthur Fisher Memorial Edition. New Jersey: Rothman Co. & Bobbs-Merrill Co., 1963.

Copinger, W.A. The Law of Copyright. 2nd ed. London: Stevens and Haynes, 1881.

Copyright Society of the United States of America. Studies on Copyright, Arthur Fisher Memorial Editon. New Jersey: Rothman Co. & Bobbs-Merrill Co., 1963.

Dales, J.H. Pollution, Property & Prices. University of Toronto Press, 1968.

Dietz, A. Copyright Law in the European Community. Netherlands: Sifthoff & Noordhoff, 1978.

Economic Council of Canada. Report on Intellectual and Industrial Property. Ottawa, 1971.

Fenning. "Copyright Before the Constitution." Journal of the Patent Office Society, 1935.

Fox. H.G. The Canadian Law of Copyright and Industrial Design. 2nd ed. Toronto: Carswell, 1967.

(Gregory) Copyright Committee. Report of the Copyright Committee, 1952. London: Her Majesty's Stationery Office, Cmnd. 8662, 1952.

Harvard Law Review. "Protection of Artistic Integrity: Gilliam v. American Broadcasting Companies," vol. 90, 1976.

- 120 -

Keyes, A.A., and Brunet, C.  Copyright in Canada:  Proposals for a Revision of the Law.  Ottawa:  Consumer and Corporate Affairs Canada, 1977.

Ladas, S.P.  The International Protection of Literary and Artistic Property.  vol. I.  Macmillan Co., 1938.

Lahore, James.  Intellectual Property in Australia:  Copyright.  Sidney:  Butterworths, 1977.

McDonald, Bruce C.  "Review of Fox, H.G.  The Canadian Law of Copyright and Industrial Design."  Canadian Bar Review, vol. XLVII, 1969.

Nimmer, M.B.  "Implications of the Prospective Revisions of the Berne Convention and the United States Copyright."  19 Stanford Law Review, 1967.

Nimmer, M.B.  Nimmer on Copyright.  New York:  Matthew Bender & Co., 1979.

Perry, R.M.  "Copyright in Motion Pictures and Other Contrivances."  Canadian Patent Reporter, 2nd series, vol. V, Canada Law Book, 1972.

Phillips, J.  "The Employer as Author and Owner of Literary Copyright  --  Some Theoretical Reflections."  European Intellectual Property Review, October 1979.

Register of Copyrights.  Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law:  1965 Revision Bill.  89th Congress, 1st session.  Copyright Law Revision, part 6, 1965.

Report of the American House of Representatives on Copyright.  92 Congress, 1st session.  cat. no. 92-487, 1971.

Report of the Committee to Consider the Law on Copyright and Designs (Whitford Report).  London:  Her Majesty's Stationery Office, Cmnd. 6732, 1977.

Ringer, B., and Flacks, L.  Applicability of the Universal Copyright Convention to Certain Works in the Public Domain and their Country of Origin.  Paper prepared for the Intergovernmental Copyright Committee of the Universal Copyright Convention, 1979.

Royal Commission on Patents, Copyright, Trademarks and Industrial Design (Ilsley Commission).  Report on Copyright.  Ottawa:  Queen's Printer, 1957.

Skone James, E.P.  Copinger and Skone James on the Law of Copyright.  8th ed.  London:  Sweet & Maxwell, 1948.

Skone James, E.P.  Copinger and Skone James on the Law of Copyright.  11th ed.  London:  Sweet & Maxwell, 1971.

Strauss, William.  "The Moral Right of the Author."  Studies on Copyright, Arthur Fisher Memorial Edition.  New Jersey:  Rothman Co. & Bobbs-Merrill Co., 1963.

Torno, B.D.  Term of Copyright Protection in Canada: Present and Proposed.  Ottawa:  Consumer and Corporate Affairs Canada, 1981.

Torno, B.D.  Crown Copyright in Canada:  A Legacy of Confusion.  Ottawa:  Consumer and Corporate Affairs Canada, 1981.

Torno, B.D.  Fair Dealing:  The Need for Conceptual Clarity on the Road to Copyright Revision.  Ottawa: Consumer and Corporate Affairs Canada, forthcoming.

Varmer, Borge.  "Works Made for Hire and on Commission." Studies on Copyright, Arthur Fisher Memorial Edition.  New Jersey:  Rothman Co. & Bobbs-Merrill Co., 1963.

World Intellectual Property Organization.  Guide to the Berne Convention for the Protection of Literary and Artistic Works (Paris Act, 1971).  Geneva, 1978.

77584

QUEEN Z 565 .T67 1981
Torno, Barry
Ownership of copyright in Ca

565
T67
c.2

DATE DUE
DATE DE RETOUR

| 24 APR AVR 1987 | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

LOWE-MARTIN No. 1137

Canada