# EXHIBIT 9

## [1 International Copyright Law and Practice AUS § 4](#)

*International Copyright Law and Practice*     >     AUSTRALIA

## Author

Brad Sherman[*]

James Lahore[*]

## AUS § 4 Ownership and Transfer

### [1] Initial Ownership

The general rule for vesting rights[1] is that the author of a literary, dramatic, musical, or artistic work is the initial owner of any copyright subsisting in it.[2] This rule is subject to any contract, assignment, or rights of the Crown,[3] and to the special provisions discussed below relating to works made on the job or commission.[4]

The term "author" is not defined in the Act except in the case of photographs. Under the case law, as Mr. Justice Isaacs pointed out, the two expressions "author" and "original work" are correlative:[5] the author is the person who originates the particular form of literary, dramatic, musical, or artistic expression.[6] In relation to photographs, Section 10(1) defines the "author" as the person who took the photograph.[7]

Part IV copyright in recordings, films, broadcasts, and published editions is subject to different rules of initial vesting. As explained above, such copyright is separate from, and additional to, any copyright subsisting in works recorded, filmed, or broadcast, or published in the form of an edition.[8] The protection is rather given here to the investment

---

[*] Professor, Law School, University of Queensland, Australia. Professor Sherman has contributed this chapter since 1999.

[*] Professor Emeritus, Intellectual Property Law, University of London; Professorial Fellow, University of Melbourne; Special Counsel, Mallesons Stephen Jaques, Melbourne. Professor Lahore contributed this chapter through 1998.

[1] For presumptions affecting proof of ownership and other issues, see § 8[3] *in fine infra*.

[2] CA, Sec. 35(2).

[3] *See* § 2[4][e] *supra*.

[4] *See* § 4[1][b] *infra*.

[5] Sands & McDougall Pty. Ltd. v. Robinson (1917) 23 C.L.R. 49, 55.

[6] *Cf.* Bulun Bulun v. R. & T. Textiles Pty. Ltd. (1998) 41 I.P.R. 513, 525 (Federal Court) (holding that this principle precludes recognizing legal concepts of group ownership or communal title to works of authorship under Aboriginal customary law) (discussed in further detail in § 7[1][d] *infra*).

[7] CA, Sec. 208. If the photograph was taken before the commencement of the 1968 Act, its "author" remains the person who was the owner of the material on which the photograph was taken at the time it was taken.

of the record manufacturer, film producer, broadcaster, or publisher. The vesting of Part IV copyright in such media productions will be treated below.[9]

### [a] Joint Works

A "work of joint authorship" is defined in Section 10 of the 1968 Act as a work which has been produced by the collaboration of two or more authors and in which the contribution of each author is not separate from the contribution of the other author or the contribution of the other authors.[10] It is not necessary for a court to identify all of the joint authors of a work nor what the precise contributions of the parties were for a court to conclude that a work is one of joint authorship.[11] All that matters is that it can be shown that two or more people contributed to the work. It is important to note the limitations of this definition.

To start, each party must contribute to the joint work as an "author." If A corrects or edits a work written by B, A may be a joint author with B depending upon the amount of intellectual input provided by A. Further, the contribution of one coauthor must not be separable from that of any other coauthor. Thus the person who contributes written material to a collective work, such as an encyclopedia, is not a joint author with the compiler if the various contributions are separable and distinguishable.[12] Similarly, if one person writes the lyrics of a musical work and another person writes the music, as in the operas of Gilbert and Sullivan, each author is an author in respect of his work; they are not joint authors.[13]

A reference to the "author" of a work in the Copyright Act is to be read as a reference to all the authors of a joint work.[14] The author is *prima facie* the copyright owner,[15] and an act is deemed to be done with the license of the copyright owner if it was authorized by a license binding the "owner."[16] It seems, therefore, that all joint authors, as the copyright "owner," must give their consent to a license.

### [b] Works Made for Hire

Australian copyright law has no generic category of "works made for hire" but treats such works under more specific categories.[17]

---

[8] *See* § 2[2] *supra*.

[9] *See* § 4[1][b][ii] *infra*.

[10] *See, generally*, Milwell Pty. Ltd. v. Olympic Amusements Pty. Ltd. (1999) 43 I.P.R. 32, 41 (Federal Court, Full Court) (discussing joint authorship).

[11] University of Sydney v. Objectivision Pty. Ltd. [2019] FCA 1625, para. 564. The position is different, however, in other situations, for example in the transfer of ownership of the copyright work.

[12] For the definition of a "collective" work, see § 4[3][c][i] *infra*.

[13] *See* Redwood Music Ltd. v. B. Feldman & Co. Ltd. [1979] R.P.C. 1, 385, [1980] 2 All E.R. 817.

[14] CA, Sec. 78.

[15] CA, Sec. 35(2).

[16] CA, Sec. 15.

### [i] Part III Works

As explained above, these are original literary, dramatic, musical, and artistic works.[18]

### [A] Employment Generally

Where a literary, dramatic, musical, or artistic work is made by the author in pursuance of the terms of his employment under a contract of service or apprenticeship,[19] the employer is the first owner of copyright in the work.[20] The question of whether a work was made in pursuance of the terms of employment is "not the bare question of whether the author is employed under a contract of service at the time a work is made." Rather, it is necessary to ask: "[D]id the employee make the work because the contract of employment expressly, or impliedly, required or at least authorised the work to be made?"[21]

This provision is subject to the special provisions relating to the works of journalists and certain commissioned works referred to immediately below, and its operation may also be excluded or modified by agreement. This exception applies to all works, and it is in accordance with the common law regarding employment contracts.[22]

### [B] Employed Journalists

Section 35 applies special provisions to literary, dramatic, or artistic works[23] which are made pursuant to terms of employment under a contract of service or apprenticeship for the purpose of being published in a newspaper, magazine, or similar periodical.[24] These provisions may be excluded or modified by agreement.[25] The result, absent any contract to the contrary, is that the copyright is divided, but differently so depending on whether the work is created before or after July 30, 1998.

---

[17] On the vesting of Crown copyright generally, see § 2[4][e] *supra*.

[18] On such works, see § 2[2][a] *supra*.

[19] *But cf.* Centrestage Management Pty. Ltd. v. Riedle [2007] FMCA 147, paras. 20–21 (rejecting the argument that, had the author realized that terms of employment would have deprived him of copyright, he would not have agreed to such terms).

[20] CA, Sec. 35(6). A performance by an employee is taken to be made by the employer unless modified or excluded by agreement: CA, Sec. 22(3B), (3C) (introduced by the U.S. Free Trade Agreement Implementation Act 2004, Item 2).

[21] EdSonic v. Cassidy [2010] FCA 1008, para. 41.

[22] CA, Sec. 35(4).

[23] *N.b.*, musical works are not included.

[24] These provisions do not apply to works made before the commencement of the Act on May 1, 1969. In the case of such works, the employer owns the copyright for all purposes, but the employee is entitled to restrain the publication of the work otherwise than in a newspaper, magazine, or similar periodical. CA, Sec. 213(1), (3), (6), (7).

[25] CA, Sec. 35(3).

In relation to works created after July 30, 1998, an employed journalist is owner of the copyright for (1) the reproduction of the work for the purpose of inclusion in a book and (2) the reproduction of the work in the form of a hard copy facsimile. In all other cases, the proprietor of the employing newspaper, magazine, or similar periodical is the owner of the copyright.

In relation to works created prior to July 30, 1998, the proprietor only owns the copyright in so far as it relates (1) to the publication of the work in the newspaper, magazine, or similar periodical, (2) to the broadcasting of the work, or (3) to the reproduction of the work for such publication or broadcasting. In all other cases, the employee is the owner of copyright.

### [C] Commissioned Works

The author generally owns copyright in a literary, dramatic, musical, or artistic work which has been commissioned by another person. The person giving the commission may become the first owner only pursuant to contract, except for cases subject to a special rule for commissioned photographs, portraits,[26] and engravings.[27]

In relation to works made after July 30, 1998, the person commissioning a photograph is treated as owner of the copyright only in cases where the photograph was taken "for a private and domestic purpose."[28] This includes a portrait of family members, of a wedding party, or of children. Thus, with the exception of photographs taken for private and domestic purposes and subject to agreements to the contrary, the photographer will be copyright owner.

In relation to works made prior to July 30, 1998, the copyright in a commissioned photograph, portrait, or engraving is owned by the person who commissioned the photograph and not the photographer. That is, where A makes an agreement with B for the taking of a photograph, the painting or drawing of a portrait, or the making of an engraving by B, A is the owner of any copyright subsisting in the work if the agreement is made for valuable consideration and the work is made in pursuance of the agreement. But if, at the time the agreement was made, A made known to B, expressly or by implication, the purpose for which the work was required, B is entitled to restrain the doing of any act comprised in the copyright in the work otherwise than for that purpose. These provisions of the 1968 Act may be excluded or modified by agreement. They are also subject to the special rules relating to the works of journalists referred to above.[29]

---

[26] The image on the Australian Hells Angels membership card of a profile (or sideview) of a human skull wearing a feathered headdress was held not to be a portrait because "no particular person was represented by it": Hells Angels v. Redbubble [2019] FCA 355, paras. 131–135.

[27] CA, Sec. 35(5). This section does not apply to a work made at any time in pursuance of an agreement made before May 1, 1969: CA, Sec. 213(2).

[28] Copyright Amendment Act (No. 1) 1998, Schedule 1, Items 2 and 3.

[29] See § 4[1][b][i][B] supra.

### [D] Architects

An architect who is paid a reasonable fee for his work impliedly licenses the client to use his drawings for the purpose for which they were prepared, which is often the construction of a building. In this situation, an implied license is also granted by the architect to subsequent owners of the land.[30] The terms of an implied license may be changed, however, by the express terms of the contract between the client and the architect.[31] An implied license may also be negated by the express terms in the contract.[32]

### [ii] Part IV Copyright

Vesting of copyright must be separately considered in cases of sound recordings, cinematograph films, both sound and television broadcasts, and published editions of works.[33]

### [A] Sound Recordings

Subject to the special rules set out in the next paragraph, the maker of a sound recording owns copyright in that recording.[34] The maker of a sound recording is the person who owned the record at the time when the first record embodying the recording was produced.[35] The "record" is defined as the disk, tape, paper, or other device in which the sounds are embodied, and the "sound recording" is defined as the aggregate of the sounds embodied in a "record."[36] The owner is therefore the person who owns the material of the matrix or master tape at the time it is made. This is usually the recording company in commercial manufacture.

Special rules exist in relation to the ownership of the copyright in sound recordings of live performances.[37] The owner of any copyright in a sound recording of a live

---

[30] *But cf.* Parramatta Design and Developments Pty. Ltd. v. Concrete Pty. Ltd. [2005] FCAFC 138 (holding that no such implied license applied as the architect had not been paid a reasonable fee for the drawings).

[31] Milankov Designs and Project Management v. Di Latte [2018] WASC 14 (the implied license given by the plaintiff to the defendant was to use the plans initially prepared for development approval; it was not, however, an implied license to build a house, because this would have been inconsistent with the terms of the contract, which provided that the plaintiff was to prepare working drawings and specification documentation in a separate stage).

[32] Building Corporation WA v. Marshall (No. 2) [2022] WASC 140, para. 71 (holding that a finding of implied license of transfer of copyright from architect/designer to client was negated by a term of the contract which said that "copyright of designs will remain the property of [the designer's] fee to be credited against building contract").

[33] For the definitions of these categories, see § 2[2][b] *supra*.

[34] CA, Sec. 97(1), (2) (amended by the U.S. Free Trade Agreement Implementation Act 2004, Items 1–5) (subject to any assignment or Crown copyright).

[35] CA, Sec. 22(3).

[36] CA, Sec. 10.

[37] CA, Sec. 84 (introduced by the U.S. Free Trade Agreement Implementation Act 2004, Item 4) (defining "live performance"). A sound recording of a "live performance" is defined as a sound recording made at the time of the live performance. A "live performance" is defined as a performance of a dramatic work, a musical work, the reading or delivery of a literary work, a

performance is the maker of the sound recording. The maker of a sound recording in this context is not only the person who owned the record at the time when the first record embodying the recording was produced, as defined in the foregoing paragraph, but also the performer whose performance was recorded.[38] Both the owner of the material and the performer own copyright in the recording as tenants in common, and this rule applies in principle to all sound recordings protected by copyright as of January 1, 2005. Special provisions ensure that parties who owned copyright in sound recordings prior to January 1, 2005, are either able to continue to exercise their rights as they had done previously[39] or that they receive appropriate compensation for their losses.[40]

### [B] Cinematograph Films

The maker of a cinematograph film owns copyright in it.[41] The "maker" of a cinematograph film is effectively the producer, that is, the person by whom the arrangements necessary for the making of the film were undertaken.[42] Technically, the film is deemed made upon the production of the first copy of the film, in which the visual images or sounds comprising the film are embodied.

Starting in 2006, the director of a film is considered, along with the producer, another maker of the film.[43] However, directors share with producers only limited and transferable rights that, as described below, entitle them to draw remuneration from the retransmission of films that have been broadcast, while producers hold all other rights.[44] Where a film is commissioned or made in the course of employment, even this limited right to remuneration will be owned by the commissioner or the employer, respectively, in the absence of an agreement to the contrary.[45] All others involved in the making of a film, but who are not makers, for example, actors and screen writers, have no copyright interests in the film.[46]

### [C] Commissions for Sound Recordings and Films

Where a person commissions another person to make a sound recording or film for valuable consideration and the sound recording or film is made in pursuance of

---

performance of dance, circus, variety act, or an expression of folklore. CA, Sec. 22 (inserted by the U.S. Free Trade Agreement Implementation Act 2004, Item 3).

[38] CA, Sec. 22(3A) (introduced by the U.S. Free Trade Agreement Implementation Act 2004, Item 2).

[39] CA, Sec. 100AF (introduced by the U.S. Free Trade Agreement Implementation Act 2004, Item 8).

[40] CA, Sec. 116AAA (introduced by the U.S. Free Trade Agreement Implementation Act 2004, Item 10).

[41] CA, Sec. 98(1), (2) (subject to any assignment or Crown copyright).

[42] CA, Sec. 22(4).

[43] CA, Sec. 98(4) (introduced by the Copyright Amendment (Film Directors' Rights) Act 2005, Sec. 1, Schedule 1, effective May 8, 2006).

[44] See § 8[1][b][iv] infra.

[45] CA, Sec. 98(5) (introduced by the Copyright Amendment (Film Directors' Rights) Act 2005, Sec. 1, Schedule 1).

[46] For the moral rights of certain film creators, see § 7 infra.

the agreement, the person giving the commission, not the maker, is the owner of the copyright.[47]

### [D] Crown Copyright in Sound Recordings and Films

Subsistence of copyright in an original, literary, dramatic, musical, or artistic work made by or under the direction or control of the Commonwealth or State has been discussed previously.[48] The same principle applies where a sound recording or a cinematograph film is made by, or under the direction or control of, the Commonwealth or a State. Copyright subsists in such a film or recording if copyright would not otherwise subsist in the film or recording under the 1968 Act, and the owner of the copyright is the Commonwealth or the State, as the case may be.[49] These provisions have effect subject to any agreement made by, or on behalf of, the Commonwealth or a State with the maker of the recording or film by which it is agreed that the copyright in the recording or film is to vest in the author or maker, or in another person specified in the agreement.[50]

### [E] Broadcasts

The owner of any copyright in a radio or television broadcast is the maker of the broadcast, namely the Australian Broadcasting Corporation, the Special Broadcasting Service, or a person who has a television or radio license or a radio-communications license.[51] A "broadcast" is defined as a communication to the public delivered by a broadcasting service within the meaning of the Broadcasting Services Act 1992,[52] with exclusions set out above.[53]

### [F] Published Editions

The owner of any copyright subsisting under the 1968 Act in an edition of a work is the publisher of the edition.[54]

### [2] Transfers: General Rules; Conflicts of Laws

No authoritative case law resolves conflicts of laws concerning foreign copyright transfers.[55]

---

[47] CA, Secs. 97(3), 98(3). This also applies to film directors' copyright: CA, Sec. 98(4) (introduced by the Copyrights Amendment (Film Directors' Rights) Act 2005, Sec. 1, Schedule 1). See § 4[1][b][iv] *supra*.

[48] *See* § 2[4][e] *supra*.

[49] CA, Sec. 178.

[50] CA, Sec. 179.

[51] CA, Sec. 99 (subject to any assignment or Crown copyright).

[52] CA, Sec. 10(1) (amended by Copyright Amendment (Digital Agenda) Act 2000).

[53] *See* § 2[2][b][iii] *supra*.

[54] CA, Sec. 100 (subject to any assignment or Crown copyright).

### [a] Interests Subject to Transfer

Copyright is personal property and, subject to the requirements of the Copyright Act, is transmissible by assignment, by will, and by operation of law.[56] Exclusive and non-exclusive licenses may be granted for copyright.[57]

Copyright is also divisible as to time, place, and the exclusive rights comprising copyright. To start, an assignment or license may be limited to apply to one or more of the acts that the copyright owner has the exclusive right to do, for example, publication rights, performing rights, translation rights, broadcasting rights, serial rights, paperback-reprint rights, etc.[58] Further, an assignment or license may be limited to apply to a place in or part of Australia or other countries.[59] Finally, an assignment or license may be limited to apply to part of the copyright term.[60]

An assignment limited in any of these ways is referred to in the Copyright Act as a partial assignment.[61] If, as a result of any partial assignment, different persons are the owners of a copyright in respect of its application, for example, to the film rights and the serial rights in a novel, or to acts in different countries or at different times, the copyright owner for the purposes of the Copyright Act is the person who is entitled to the particular limited rights at issue.[62]

Copyright is distinct from property in the material object in which a work, for example, a letter or art work, is embodied. While the author usually owns copyright in the work, the recipient of such an object, or his successor in title, may own the embodiment.[63] To deal with the problem of divided ownership, the Copyright Act provides a presumption that copyright passes under a will together with the manuscript of an unpublished work or with an unpublished artistic work.[64]

### [b] Formal Requisites for Transfers

---

[55] For an example of the distinction between copyright and transfer issues, see § 3[3][c][ii] *supra*. For a general discussion of the choice of laws applicable to chain of title worldwide and to foreign copyright contracts, see *"Introduction," herein, at § 5[3]*.

[56] CA, Sec. 196(1). There is a presumption, which may be rebutted by evidence of contrary intention, that copyright passes under a will with the manuscript of an unpublished work or with an unpublished artistic work: CA, Sec. 198. *See* § 4[2][c] *infra*.

[57] For a discussion on implied licenses of copyright, see Realestate.com.au Pty. Ltd. v. James Kelland Hardingham and Others [2022] HCA 39.

[58] CA, Sec. 196(2)(a).

[59] CA, Sec. 196(2)(b).

[60] CA, Sec. 196(2)(c).

[61] CA, Sec. 16.

[62] CA, Sec. 30. *See* Albert & Sons Pty. Ltd. v. Fletcher Construction Co. Ltd. [1974] 2 N.Z.L.R. 107.

[63] Re Dickens [1935] Ch. 267.

[64] CA, Sec. 198. *See* § 4[2][c] *infra*.

The Copyright Act provides that an assignment of copyright, whether total or partial, does not have effect unless it is in writing signed by or on behalf of the assignor.[65] An exclusive license must be signed by or on behalf of the owner or prospective owner of copyright, authorizing the licensee, to the exclusion of all other persons, to do an act that, by virtue of the Act, the owner of the copyright would, but for the license, have the exclusive right to do.[66] Special provisions concern the assignment of future copyright, as explained below.[67]

No particular form of writing is required by the Act, and the legal effect of a document dealing with the disposition of a work or the copyright subsisting in it is a question of construction. Difficulty may arise in deciding whether the writing is sufficient to give effect to an assignment or exclusive license.[68] Also, it may not be clear whether the contract, although in writing, is to take effect as an assignment or a license.[69]

Although there has not been a transfer of copyright in writing as required by the Copyright Act, an enforceable oral agreement to assign copyright will give rights in equity to the grantee, who will be entitled to interlocutory relief in infringement proceedings.[70] Standing to sue is further discussed below.[71]

### [c] Contractual and Related Presumptions

Section 198 of the Copyright Act provides that, if a person is entitled by bequest to the manuscript of a literary, dramatic, or musical work, or to an artistic work, and the work was not published before the death of the testator, the bequest is presumed to include the copyright in the work in so far as the testator was the copyright owner immediately before his death, unless a contrary intention appears in the will. A manuscript is defined as an original document embodying the work whether written by hand or not.[72]

---

[65] CA, Sec. 196(3). *See* Robin Jig & Tool Co. Ltd. v. Taylor [1979] F.S.R. 130.

[66] CA, Sec. 10(1).

[67] *See* § 4[3][b] *infra*.

[68] *See, e.g.*, London Printing & Publishing Alliance Ltd. v. Cox [1891] 3 Ch. 291 (terms of a letter held to constitute a valid assignment of the copyright); E.W. Savory Ltd. v. The World of Golf Ltd. [1914] 2 Ch. 566 (receipt held sufficient writing for a valid assignment).

[69] *See* Jonathan Cape Ltd. v. Consolidated Press Ltd. [1954] 1 W.L.R. 1313; Frisby v. British Broadcasting Corporation [1967] Ch. 932.

[70] *See, e.g.*, Gold Peg International v. Kovan Engineering [2005] FCA 1521, paras. 71–113 (ruling in this sense, but declining to grant final relief unless the legal owner is joined or legal title acquired); Intelmail Explorenet Pty. Ltd. v. Vardanian [2009] FCA 1018 (implying equitable ownership of copyright from an oral contract to ensure the "reasonable and effective operation of the contract"). *But cf.* Windridge Farm Pty. Ltd. v. Grassi [2011] NSWSC 196, paras. 125–135 (rejecting a claim for equitable ownership of a film made illegally on claimant's premises that were not a residential property, *inter alia*, given no impairment of claimant's goodwill).

[71] *See* § 8[3] *infra*.

[72] CA, Sec. 240. This provision only applies to a bequest contained in the will of a testator who died after the commencement of the 1968 Act on May 1, 1969. Another approach is taken where an author died before that date and a person has acquired ownership of a manuscript of a work by an author under that author's will. Then, if the work (a) has not been published, or (b) in the case of a dramatic or musical work, has not been performed in public, or (c) in the case of a lecture, has not been delivered

Under the Copyright Amendment (Digital Agenda) Act 2000, the transitional rules provide that, where copyright owners have previously assigned or licensed the broadcasting or diffusion rights, that is, before March 4, 2001, they will not be taken to have assigned or licensed the broader components of the new communication right, notably making available online. Importantly, an assignment of all rights may be taken as evidence of a contrary intention, and such an intention may also be found outside the express terms of the agreement. A contrary intention to assign more than wireless-broadcasting rights could be found from the conduct of the parties, the agreement negotiations, or from accepted industry practice.

### [d] Registration; Priority of Transfers

There are no provisions in the Copyright Act relating to the registration of transfers or other dispositions of copyright interests.[73] Subject to the general rules of law and equity, the first assignee in time pursuant to a valid legal assignment will take priority over subsequent assignees.[74]

## [3] Limitations of Transfer; Specific Cases

### [a] Statutory and Other Limitations

There are no special provisions in the Copyright Act governing different types of copyright contracts, such as publishing or broadcasting contracts. However, as explained below, it is not allowed to contract out of exemptions that allow the reproduction of computer programs in specified cases.[75]

Limitations are imposed on transfers by the general law of contract, for example, the law relating to undue influence and restraint of trade,[76] and also by antitrust law.[77] As explained below, the Copyright Act, by means of the Australian Copyright Tribunal, has established a system whereby license schemes operated by associations on behalf of authors, and licenses granted by individual authors, can be reviewed.[78]

### [b] Assignments of Future Copyright

---

in public, the fact that a person has ownership of the manuscript is evidence only that that person is the owner of the copyright in the work.

[73] *See* § 5[3] *infra.*

[74] With respect to agreements to assign, see § 4[2][b][i] *supra.*

[75] With respect to these exemptions, see § 8[2][d][ii] *infra.*

[76] *See, e.g.*, Schroeder Music Publishing Co. Ltd. v. Macauley [1974] 1 W.L.R. 1308; Clifford Davis Management Mtd. v. WEA Records Ltd. [1975] 1 All E.R. 237; O'Sullivan v. Management Agency & Music Ltd. (1984) 2 I.P.R. 499.

[77] Competition and Consumer Act 2010.

[78] *See* § 5[2] *infra.*

Section 197 of the Copyright Act recognizes one method of assigning copyright before it comes into existence and converts what would otherwise be an equitable right into a legal right.[79]

The term "future copyright" is defined as copyright which is to come into existence at a future time or upon the happening of a future event.[80] Section 197(1) provides that where, by an agreement made in relation to such a future copyright and signed by or on behalf of the person who, apart from the provisions of Section 197(1), would be the owner of the copyright when it comes into existence, that person purports to assign the future copyright wholly or partially to an assignee, then the copyright vests in that assignee or his successor in title when it comes into existence by force of that subsection.

This vesting will only take place if, on the coming into existence of the copyright, the assignee or a person claiming under him would, apart from Section 197(1), be entitled as against all other persons to have the copyright vested in him, wholly or partially, as the case may be. This subsection does not apply to agreements made before the commencement of the 1968 Act.[81] The assignee of future copyright now becomes the legal owner of the copyright when it comes into existence and vests in him as a result of the operation of the Act. If the person who would be entitled to the copyright when it comes into existence is dead, the copyright devolves as if it had subsisted immediately before his death and he had then been the owner of the copyright.[82] No further action by the assignee or his successor in title is necessary, and either can take proceedings without joining the author as plaintiff or defendant.

However, it is important to note that the copyright does not vest in the assignee or a person claiming under him unless he would, apart from the operation of Section 197(1), be entitled as against all other persons to have the copyright vested in him when it comes into existence. The question is whether the assignee would, apart from the Act, be entitled as against all other persons to have the copyright vested in him, wholly or partially, by means of an action for specific performance when the copyright comes into existence. He would not be so entitled if, for example, the agreement had not been made for valuable consideration.

### [c] Reversionary Interests

There are two situations in the Copyright Act where copyright will revert to an author or to the author's estate after assignment or other such transfer. It is important to note, however, that these reversions only apply to "old" copyrights subsisting at the time the Copyright Act 1968 came into operation on May 1, 1969. It is necessary to distinguish two periods: the first between July 1, 1912, and May 1, 1969, when the Copyright Act

---

[79] Before the commencement of the Copyright Act of 1968 on May 1, 1969, an agreement purporting to assign a future copyright could also take effect in equity, although not at law. *See* Performing Right Society Ltd. v. London Theatre of Varieties Ltd. [1924] A.C. 1.

[80] CA, Sec. 10(1).

[81] CA, Sec. 239(3)(b).

[82] CA, Sec. 197(2).

of 1911 was in force; and the second before the 1911 Act came into force on July 1, 1912.

### [i] *Post Mortem* Termination of Pre-1969 Transfers

An author did not have the complete power of assignment under the Copyright Act of 1911 which he now has under the 1968 Act, and the operation of the 1911 Act in this respect is preserved for works made before May 1, 1969.[83] The 1968 Act provides that, where the author of a work made before May 1, 1969, was the first owner of copyright in it, no assignment of, or grant of interest in, the copyright under the 1911 Act made by the author (otherwise than by will) after July 1, 1912, and before May 1, 1969, can vest in the assignee or grantee any rights with respect to the copyright in the work after the expiration of 25 years from the death of the author.[84] The assignment or grant made before May 1, 1969, if it conveys copyright interests in a work under the 1911 Act, has the same operation in relation to the copyright in the work under the 1968 Act, assuming that copyright subsists in it pursuant to the provisions of the 1968 Act.[85]

On the death of the author, the reversionary interest in copyright going into effect on the termination of that 25-year *post mortem* period devolves, notwithstanding any agreement to the contrary, on his legal personal representatives as part of his estate, and any agreement entered into by the author as to the disposition of that reversionary interest is of no force or effect.[86]

The following restrictions applying to the operation of these provisions should be noted:

- The author must have been the first owner of copyright in the work. This means that the limitation on assignment or grant of an interest does not apply if the author is not the first owner of copyright because of the operation of the Act in relation to commissions for certain artistic works, the work of journalists, and contracts of service.[87]

- Dispositions made by the author by will are not affected, nor are dispositions made by a person other than the author.

  - The "assignment" of the copyright in a collective work or a "license" to publish a work or a part of a work as part of a collective work is excluded.[88] A "collective work" has the following meaning given to it by Section 204(2): (a) an encyclopedia, dictionary, yearbook, or similar work; (b) a newspaper, review, magazine, or similar periodical; or (c) a work written in distinct parts by different

---

[83] For the transitional rules governing terms of copyright in works predating the 1968 Act, see § 3[2][d][ii] *supra*.

[84] CA, Sec. 239(4)(a).

[85] CA, Sec. 239(1).

[86] CA, Sec. 239(4)(b), (c).

[87] CA, Sec. 213 (ownership of copyright in works made before May 1, 1969).

[88] CA, Sec. 239(4).

- authors, or in which works or parts of works of different authors are incorporated.[89]

- The limitation on the power to assign does not apply to an assignment made before July 1, 1912, or after May 1, 1969. If an assignment is made after July 1, 1912, the fact that it relates to a work made before that date does not exclude the operation of the reversion.

This limitation on the power to assign is extended to apply to copyright under the 1968 Act in sound recordings or cinematograph films in the same way that it applies to copyright in works.[90]

**[ii] Transfers Not Applicable to "Substituted" Terms**

The Copyright Act contains special provisions dealing with assignments and licenses of copyright made before the commencement of the British Copyright Act of 1911, on July 1, 1912, where copyright in the particular work subsists under the 1968 Act.[91] There are a number of these old copyrights in existence and the position with regard to assignments and licenses of them is still relevant at the present time. The general outline of the legislation is as follows:

- Copyright subsisted in books and in artistic works, performing right subsisted in dramatic and musical works, and a lecturing right subsisted in lectures, all under the Copyright Act of 1905. Imperial copyright and performing rights also subsisted under certain United Kingdom Acts.

- The British Copyright Act of 1911, in Section 24(1), substituted new rights, set out in the First Schedule to that Act, for rights existing immediately before the commencement of the Act in Australia on July 1, 1912.

- Those substituted rights under the British Copyright Act of 1911 are now referred to in Division 5 of Part XI of the 1968 Act, and the 1968 Act now applies to those rights if they subsisted immediately before the commencement of the 1968 Act on May 1, 1969.

- As the effect of Section 24(1) of the British Copyright Act of 1911 in giving substituted rights was in general to extend the term of copyright in pre-1912 works, the proviso to Section 24(1) of that Act contained provisions for the revesting of copyright in the extended term in the author where there had been an assignment or license of the whole of the old term.

- The operation of this proviso is preserved in Section 248 of the 1968 Act.

The rights that were substituted for existing rights (and any Imperial rights) by Section 24(1) of the British Copyright Act of 1911 were in general for a term of the author's life and 50 years. In order that the author should have the benefit of this extended term,

---

[89] A song with lyrics and music is not a collective work: Chappell & Co. Ltd. v. Redwood Music Ltd. [1981] R.P.C. 337.

[90] CA, Sec. 239(6). There was no copyright in a cinematograph film as such before May 1, 1969. Copyright subsisted in the constituent elements: the scenario as a "dramatic work," the stills as "photographs," etc. CA, Sec. 222.

[91] CA, Sec. 248. For the transitional rules governing terms of copyright in works predating the 1911 Act, see § 3[2][d][i] *supra*.

proviso (a) to Section 24(1) of the 1911 Act provided that, if an author had, before July 1, 1912, assigned or granted any interest in a right which became a substituted right under the 1911 Act, this for the whole term of the right, then, at the date when the right would have expired but for Section 24(1), the extended term vested in the author, in the absence of any express agreement. Any interest created in the right before July 1, 1912 was determined if still subsisting. However, the person who was the owner of the right or interest immediately before it would have expired but for Section 24(1) had the following option:

- Either he was entitled, on giving the prescribed notice, to an assignment of the right or grant of a similar interest in the right for the remainder of the term of the right for such consideration as, failing agreement, might be determined by arbitration.

- Or else he was entitled, without any such assignment or grant, to continue to reproduce or perform the work in the same manner as previously, subject to the payment, if demanded by the author within three years after the date at which the right would have expired, of such royalties to the author as were determined by arbitration in default of agreement or without payment at all if the work was incorporated in a collective work and the owner of the right or interest was the proprietor of that collective work.[92]

The following limitations on the application of the proviso should be noted:

- The original assignment or grant must have been made by the author. Section 24(2) provided that, for the purposes of the section, the "author" included the legal personal representatives of a deceased author.

- The assignment or grant must have been for the whole of the original term of the copyright.

## [d] Security Interests; Foreclosure and Execution

Copyright is personal property and is transmissible, not only voluntarily by assignment or by will, but also involuntarily by operation of law,[93] for example, upon realizing on collateral or in bankruptcy or liquidation. There is no provision in the Copyright Act prohibiting or limiting the foreclosure or execution on copyright.

## [e] Resale Rights: *Droit de Suite*

In Australia, the Resale Royalty Right for Visual Artists Act 2009 grants artists resale-royalty rights (*droit de suite*).[94] This is a right to share in the proceeds from commercial resales of an embodiment of an original work of visual art.

---

[92] For the definition of a "collective work," see § 4[3][c][i] *supra*.

[93] CA, Sec. 196(1).

[94] The Resale Royalty Right for Visual Artists Act 2009, effective June 9, 2010. A comprehensive review of the resale right was conducted by the Commonwealth Department of Communication and the Arts: *Post-Implementation Review: Resale Royalty*

This right is inalienable *inter vivos* and may not be waived.[95] It subsists for 70 years after the year of death of the artist and devolves, upon that death by way of inheritance, to a successor or successors in title.[96] The resale royalty right only applies where the holder of the right, either the artist or successor in title, is an Australian citizen, a permanent resident of Australia, or a national or citizen of a reciprocating country.[97]

Royalties are gained only from "resales of original works of visual art sold through the secondary art market where the seller has acquired the work after the legislation takes effect" and the work is resold for a minimum of A$1,000.[98] The royalties may be collected from the sales of embodiments only of works of visual art, a category defined very broadly for this purpose,[99] if these works were created after the commencement of the Act.[100] The royalty rate payable will be a flat rate of 5% of the sale price of the commercial resale of the artwork.[101]

The task of administering the resale royalty scheme was granted to the Copyright Agency Limited (CAL), the collecting society established to deal with the reproduction of literary works.[102] "As soon as it is reasonably practicable," CAL has to post notice on its website of any commercial resales of which it is aware.[103] If, within 21 days after such posting, the holder of a resale royalty right does not notify the collecting society that it does not want the collecting society to collect royalties or enforce relevant rights on its behalf, the collecting society will be obligated to collect and distribute royalties and otherwise to enforce the relevant rights.[104]

International Copyright Law and Practice
Copyright 2025, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

**End of Document**

---

*Right for Visual Artists Act 2009 and the Resale Royalty Scheme* (2019). The review found that the resale royalty right had not had the negative impact that critics had feared on Australian art auction houses.

[95] *Id.*, Secs. 33–34.

[96] *Id.*, Sec. 12.

[97] *Id.*, Sec. 14. Section 53 provides for the making of regulations prescribing matters for the purposes of the proposed Act.

[98] *Id.*, Sec. 10(a).

[99] *Id.*, Sec. 7(2). Buildings, plans or models for buildings, circuit layouts, and manuscripts are expressly excluded from the definition. *Id.*, Sec. 9.

[100] *Id.*, Sec. 11.

[101] *Id.*, Sec. 18.

[102] *Id.*, Secs. 22–31.

[103] *Id.*, Sec. 22.

[104] *Id.*, Sec. 21(1)–(3).