# EXHIBIT 10

## *1 International Copyright Law and Practice CAN § 4*

*International Copyright Law and Practice*    >    CANADA

## Author

**Jeremy de Beer**[*]

**Ysolde Gendreau**[*]

**David Vaver**[*]

## CAN § 4 Ownership and Transfer

### [1] Initial Ownership

In principle, an author is any human being who creates the work at issue. The author of a work is the first owner of copyright in it,[1] subject to exceptions for works made in the course of employment[2] and both for older photographs and engravings, as well as for older portraits, and for industrial designs.[3] Presumptions may apply to proving authorship and ownership.[4]

### [a] Joint Works

#### [i] Collaborative Works

Copyright may be jointly owned by the coauthors of a joint work, that is, "a work produced by the collaboration of two or more authors in which the contribution of one author is not distinct from the contribution of the other author or authors."[5] General principles of joint property or of partnership or agency apply to the coauthors' disposition of their interests in a joint work.

---

[*] Professor, Faculty of Law, University of Ottawa. Professor de Beer has contributed this chapter since 2014.

[*] Professor, Faculty of Law, University of Montreal. Professor Gendreau contributed this chapter between 1999 and 2013.

[*] Professor Emeritus of Intellectual Property and Information Technology Law, University of Oxford; Professor of Intellectual Property Law, Osgoode Hall Law School, Toronto. Professor Vaver contributed this chapter through 1998.

[1] CA, Sec. 13(1).

[2] *See* § 4[1][b][i] *infra*.

[3] *See* § 4[1][b][iii] *infra*.

[4] *See* §§ 5[3][a] and 8[3][c] *infra*.

[5] CA, Sec. 2 (definition of "work of joint authorship").

According to the Federal Court, the test here comprises a pair of criteria: collaboration between the parties, and contributions that are not distinct.[6] The court specifically rejected any criterion of intention as foreign to the British-Canadian copyright tradition, but rather as a transplant from U.S. law, noting that no appellate court had endorsed any such intention requirement for joint works.[7]

There is abundant case law in which the courts have determined that the statutory criteria for joint works have not been satisfied. Merely suggesting ideas for a work, without collaborating in actual expression, does not make a person a joint author with the person who translates the ideas into tangible form.[8] Similarly, merely contributing work or effort to the production of a work does not satisfy the statutory requirements of joint authorship. The contribution must meet the threshold of originality if a person is to be considered a joint author.[9] Illustrating the criterion of distinctiveness, one decision held that a musician who composed background music for a stage production was not a joint author of the entire production. The court emphasized that the music was "autonomous and distinct" from the rest of the production, notably because different music could be easily substituted for it and the body movements of the characters, choreographed before the music had been chosen, were not related to it.[10]

**[ii] Cinematographic Works**

The authors of a cinematographic work include any person who gives the work its "original character." Such originality may arise in the dramatic unfolding of the work or, more simply, in how it looks or sounds overall. Such an author could be, for example,

---

[6] Neugebauer v. Labieniec (2009) 75 C.P.R. (4th) 364 (Fed. Ct.), *affirmed*, Neugebauer v. Labieniec (2010) 87 C.P.R. (4th) 1 (F.C.A.) (finding a joint work in Holocaust memoirs written with the help of a professional writer and publicly presented as such).

[7] This decision throws doubt on prior case law stressing any intention to merge contributions or to work as joint authors. *See, e.g.,* Neudorf v. Nettwerk Productions Ltd. (1999) 3 C.P.R. (4th) 129 (B.C.S.C.) (finding that claimant failed on the latter criterion of intention with regard to a song).

[8] *See, e.g.,* Delrina Corp. v. Triolet Systems Inc. (1993) 47 C.P.R. (3d) 1, 47 (Ont. Gen. Div.) (holding that a lawyer is the sole author and copyright owner of an agreement drafted on the instructions of his client, even where the client supplies the forms and ideas upon which the agreement is based); Dolmage v. Erskine (2003) 23 C.P.R. (4th) 495 (Ont. S.C.) (holding that a student who writes a business case in a workshop class is the sole author of his work, even though he may have benefited from discussions with his professors and classmates).

[9] Atlantic Canada Regional Council of Carpenters, Millwrights, and Allied Workers v. Maritime Environmental Training Institute Ltd., 2014 NSSC 64, paras. 21–24 (finding that the claimant had failed to establish that it had made any such contribution to the authorship by a U.K.-based company of a scaffolding training manual). *See also* Whitehall Entertainment Incorporated v. Kafka Pictures Inc., 2022 BCPC 184.

[10] Drapeau v. Carbone 14 [2003] J.Q. no. 13044 (Que. C.A.). *See also* Re Editors' Association of Canada, New Certification Order (2003) 22 C.P.R. (4th) 21 (C.A.P.P.R.T.) (holding that, even if editors and authors work together toward a common goal, they are not joint authors because the natures of their respective contributions are different).

the writer of a film scenario.[11] This apparently simple rule is, however, subject to a number of caveats.

To start, most cinematographic works originate from the efforts of a creative team and, to the extent the original contributions of team members are indistinguishable, may be characterized as joint works.[12] Further, all too often in practice, the film production company ensures that everyone working for it either does so under a contract of service or assigns any copyright interest he or she may have to the company.[13] Finally, there was a shift starting in 1994 in the classification of films as dramatic works, and accordingly in the definition of authorship on point. However, present rules apply to any pre-1994 film that does display originality in its arrangement, acting form, or combination of incidents.[14]

That said, the statutory definition of the "maker" of a cinematographic work, to wit, its producer, is without relevance for authorship or the ownership of rights.[15] The producer of a cinematographic work having an "original character" cannot claim to be its author merely because he arranged the financing and made the production possible. For example, a Quebec court rejected a producer's claim to that effect, holding instead that the person who was both scriptwriter and director authored the film and first owned copyright in it.[16]

### [b] Works Made for Hire

There are exceptions to the general rule vesting copyrights in the natural persons respectively authoring works.[17] The major exception concerns works of any type made in the course of employment; others are quite specific to certain types of works, often older works.[18]

---

[11] *See, e.g.,* Cossette-Trudel v. Carle [2004] R.J.Q. 2713 (Que. S.C.) (holding that the author of a scenario, who had not fully completed his task, but whose work had enabled the production company to accept the project, was entitled to 25% of royalties due to the authors of the scenario).

[12] For rules governing joint works, see § 4[1][a] *supra*.

[13] For rules on point, see §§ 4[1][b] and 4[2][b] *infra*.

[14] If a pre-1994 film lacked "original character" in its arrangement, acting forms, or combinations of incidents, it could qualify for protection as a photograph or a series of photographs. In such a case, authorship would have been attributed with regard to the film as it would have been with regard to a photograph at that time. On such cases, see § 4[1][b][iii] *infra*.

[15] CA, Sec. 2. This provision is tied to Sec. 5(1)(b), implementing Art. 4(a) of the Paris Act 1971 of the Berne Convention, to ensure that a film whose maker is resident or headquartered in a Berne Union country qualifies for copyright protection in Canada, whether or not the author is a Berne national. *See* § 6[1] *infra*.

[16] Films Rachel Inc. (Syndic), J.E. 95-2103 (Que. S.C.) (also declining to treat the work as a compilation but noting that, even on this basis, the director had final responsibility over such elements as shooting, soundtrack, mixing, editing, etc., that went to make up the final product).

[17] *See* § 4[1] *supra*.

[18] *See* § 4[1][b][iii] *infra*.

### [i] Works Made on the Job

Where an author is employed under a contract of service or apprenticeship and the work is made in the course of his employment, the author's employer is, subject to any contrary agreement, the first owner of the copyright, subject to a proviso for contributions to a newspaper, magazine, or similar periodical.[19]

There is no magic formula for determining whether a work is one in which an employer enjoys copyright. However, several elements may be considered as indicia: tax declarations concerning the nature of income earned on the job,[20] the employer's ownership of tools, actual or possible control over the author, assumption of risk in the exploitation of the work, etc.[21] If a work done by an employee does not fall under the terms of his employment[22] or is treated by both parties as the employee's according to an agreement implied by the parties' course of dealing,[23] copyright vests in the employee. Context and custom may play roles in construing the employment relation or agreement, as, for example, in allocating the rights in works created by academics.[24] Irrespective of the terms and conditions of employment, the author continues to enjoy moral rights in the work.[25] Finally, the Quebec Court of Appeal has held that neither the work's final destination nor the author's creativity exhibited during the project are pertinent considerations when determining whether copyright vests in the author or employer.[26]

---

[19] CA, Sec. 13(3).

[20] Kennedy v. Ruminski, 2014 FC 526, para. 24 (in dispute over ownership of copyright in data management program, finding computer programmer to be employee because he declared himself to be such for tax purposes, but finding ownership of the disputed program had in fact been dealt with in an agreement).

[21] *See* Saxon v. Communications Mont-Royal Inc. [2000] J.Q. no. 5634 (Que. S.C.).

[22] *See, e.g.,* Fénollar v. PRB Média [2006] J.Q. no. 3348 (Que. S.C.) (in a case where the conception of a format for a television series was not part of the duties of an editor employed by a television production company, the copyright in that format remained with the employee); Mejia v. LaSalle College International Vancouver Inc., 2014 BCSC 1559 (taking photographs for an employer's website fell outside the employee's contract as a design instructor; thus, copyright in the photograph belonged to the employee).

[23] *See, e.g.,* Boudreau v. Lin (1997) 75 C.P.R. (3d) 1 (Ont. Gen. Div.) (holding that a purported assignment of copyright by the employer to the employee after the creation of the work did not in itself imply that the employer owned the right *ab initio*); Ritchie v. Sawmill Creek Golf & Country Club Ltd. (2004) 35 C.P.R. (4th) 163 (Ont. S.C., Div. Ct.) (holding the sole employee of a self-owned company, which he alone directed, to benefit from an agreement to the contrary leaving copyright in him).

[24] *See, e.g.,* Dolmage v. Erskine (2003) 23 C.P.R. (4th) 495 (Ont. S.C.) (finding that students, and presumably academic staff, enjoy an "academic exception … thoroughly understood and accepted for a very long time" that allows them to remain the copyright owners of their writings); Wiebe v. Saskatchewan Institute of Applied Science and Technology, 2007 SKQB 60 (finding no need to consider ownership by Institute given the fact that course materials were not prepared at the request and under the supervision of Institute). *But see* Hanis v. Teevan (1998) 81 C.P.R. (3d) 496 (Ont. C.A.) (holding that a public university owned the copyright in computer programs developed by programmers employed in its computer-services department under contracts of service).

[25] For moral rights, see § 7 *infra.*

[26] Lachance v. Productions Marie Eykel inc., 2014 QCCA 158, para. 14 (holding that televisual works created in part by employee as part of an educational series belonged to its employer, with the consequence that the employee was not entitled to claim any remuneration from the employer's licensee for sale of DVDs).

There is a proviso for any article or other contribution to a newspaper, magazine, or similar periodical: in the absence of any agreement to the contrary, the author is deemed to have reserved the right to restrain the publication of the work, otherwise than as part of a newspaper, magazine or similar periodical.[27] However, the Supreme Court ruled that staff writers for newspapers would have had to have asserted their right to restrain the release of their articles before suing as a class for putting the articles in an online database.[28]

### [ii] Works Made on Commission

In the case of a work made on commission,[29] the author as an independent contractor, engaged under a contract for services rather than a contract of service, remains the copyright owner, absent contractual terms to the contrary.[30]

For example, when a lawyer drafts an agreement for a client or a computer software consultant creates a program to a client's order, the lawyer or consultant retains copyright in the work and may recreate and use it for other clients, unless copyright was transferred or later use would violate any duty such as confidentiality toward the original client.[31]

In the case of a commissioned work, it is possible to govern the allocation of rights by express agreement or, failing that, for the commissioning party to claim rights under the doctrines of implied license or of estoppel.[32] The court may consider that the circumstances warrant the existence of a license to use the work for the purpose for which it was ordered in favor of the contracting party, and the amount paid for the work may have an impact on that finding.[33]

### [iii] Photographs, Engravings, Portraits; Designs

Copyright vests in the actual author of any artistic work, subject to the following exceptions and transitional rules:[34]

---

[27] CA, Sec. 13(3), last clause.

[28] Robertson v. Thomson Corp., 2006 SCC 43, (2006) 52 C.P.R. (4th) 417, paras. 59–63 (also discussed in § 2[3][b] *supra* and § 8[1][a] *infra*).

[29] *But cf.* § 4[1][b][iii] (exceptions for older commissioned engravings, photographs, and portraits).

[30] *See, generally,* Lee Ting Sang v. Chung Chi-Keung [1990] 2 A.C. 374, 2 W.L.R. 1173 (P.C.) (restating and applying the factors distinguishing a contract for services from a contract of service).

[31] *See* Delrina Corp. v. Triolet Systems Inc. (1993) 47 C.P.R. (3d) 1, 47 (Ont. Gen. Div.). On breach of confidence, see § 9[1][b][i] *infra*.

[32] On implied consent generally, see § 4[2][b][ii] *infra. See, e.g.,* Robertson v. Thomson Corp., 2006 SCC 43, (2006) 52 C.P.R. (4th) 417, paras. 54–58 (remanding for a determination of whether freelance journalists had impliedly licensed online use of their articles in databases) (also discussed in §§ 2[3][b] and 4[1][b][i] *supra* and § 8[1][a] *infra*). For commentary, see G. D'Agostino, "Canada's Robertson Ruling: Any Practical Significance for Copyright Treatment of Freelance Authors?" [2007] E.I.P.R. 66.

[33] *See* Céjibé Communication Inc. v. Construction Cleary (1992) Inc., J.E. 98-2071 (Que. S.C.). *See, e.g.,* Cselko Associates Inc. v. Zellers Inc. (1992) 44 C.P.R. (3d) 56 (Ont. Gen. Div.) (finding a license when $ C 16,000 was paid for the drawing of a teddy-bear to be used in promotional activities).

- *Photographs made before November 7, 2012:* The owner of the initial negative or other plate of such a photograph when it was made, or of the initial photograph when taken without any negative or plate, is deemed to be the author of the photograph and thus, subject to the following rule, the owner of copyright in it.[35]

- *Engravings, photographs, or portraits commissioned before November 7, 2012:* Copyright vested in any engraving, photograph, or portrait commissioned before November 7, 2012, in the person ordering such a work, when it was made for valuable consideration,[36] subject to any contrary agreement which can be express or implied.[37]

- *Design rights:* The author of a design initially owns rights accorded by the Industrial Design Act in the design unless it is made for another person for good and valuable consideration: then that person initially owns such rights in the design.[38] Thus the employer of a designer, or the person who commissions an independent designer, owns such rights in any design made on the job or on order, subject to contrary agreement.[39]

## [2] Transfers: General Rules; Conflicts of Laws

Canadian copyright law determines who is the initial owner of such Canadian rights as may subsequently be transferred.[40] Furthermore, contractual issues raised by a contract that a court characterizes as Canadian may also be governed by Canadian law. If the Canadian Copyright Act has any provision concerning the specific contractual issue

---

[34] *See also* § 4[1][b][i] *supra* (rule concerning works made in the course of employment).

[35] Pre-2012-Revision CA, Sec. 10(2); NAFTA Implementation Act, S.C. 1993, ch. 44, Sec. 76(2), retaining pre-1994 CA, Sec. 10; Copyright Modernization Act, S.C. 2012, ch. 20, Sec. 59(3).

[36] Pre-2012-Revision CA, Sec. 13(2); Copyright Modernization Act, S.C. 2012, ch. 20, Sec. 60. Since July 1, 1998, the valuable consideration had to be actually paid in full before the hirer became the first owner of copyright. *See* Devon Studios Ltd. v. Scarponi (2000) 8 C.P.R. (4th) 154 (Ont. S.C.).

[37] *Compare* Planet Earth Productions v. Rowlands (1990) 30 C.P.R. (3d) 129 (Ont. S.C.) (holding record company commissioning a freelance photographer to own copyright in promotional photographs he took of its singers), *with* Allen v. Toronto Star Newspapers Ltd. (1995) 63 C.P.R. (3d) 517, 129 D.L.R. (4th) 171 (Ont. Gen. Div.), *reversed on other grounds,* (1997) 78 C.P.R. (3d) 115 (Ont. D.C.) (a freelancer, commissioned to take a photograph for the front cover of a magazine, held to remain the copyright owner of the photograph under trade practice where magazine had returned the original negatives to him).

[38] Industrial Design Act, R.S.C. 1985, ch. I-9, Sec. 12(1). *N.b.,* only the owner of such rights is entitled to apply for a registration, and assignees since 1993 may register. Industrial Design Act, R.S.C. 1985, ch. I-9, Sec. 13(1). For further analysis, see § 2[4][c] *supra*.

[39] *Cf.* Labrie v. Les Uniformes Town & Country Inc. (1992) 44 C.P.R. (3d) 514 (F.C.A.) (designer likely to remain the owner if all she is paid is a sum intended to cover her expenses).

[40] *See, e.g.,* Frank Brunckhorst Co. v. Gainers Inc. (1993) 47 C.P.R. (3d) 222 (Fed. Ct.) (striking a pleading that unsuccessfully sought to rely on U.S. work-for-hire doctrine with regard to a work of U.S. origin).

raised in such a case, it will apply to that issue. Otherwise, the common law of an English-speaking province or the Civil Code of Quebec may be applicable to the issue.[41]

Case law is not abundant enough to predict how a Canadian court would deal with a foreign copyright contract, for example, one with a clause stipulating that foreign contract law will govern it.[42] There are Canadian provisions for facilitating the execution of written instruments of transfer abroad, but they are intended to facilitate putting such instruments into evidence and do not preclude arguing for the application of foreign contract rules to a foreign contract for purposes of determining its validity and effects.[43]

Some Canadian provisions are designed, at least partly, to accord authors or their heirs some protection against improvident bargains, for example, by requiring assignments to be in writing and in other cases preventing assignments from being fully effective.[44] Under choice-of-law principles, there seems little reason to apply at least the Canadian provisions requiring written assignments beyond such Canadian parties and transactions. While Canadian provisions terminating transfers might apply to non-Canadian transactions, they clearly affect ownership of only Canadian copyright.[45]

### [a] Interests Subject to Transfer

A copyright owner may assign or grant a license of copyright in a work either wholly or partially.[46] A transfer may be subject to limitations that may concern, for example, term, territories, media, or market sectors.[47] Unlike copyright, moral rights may not be transferred.[48]

The assignee is, to the extent of the assignment, a copyright owner.[49] By contrast, a copyright license that non-exclusively allows a party to do something does not give an

---

[41] *See also* § 4[3][e] *infra* (indicating that execution on contractual or other liens against copyright interests may depend on the law in the province where process is undertaken).

[42] For analysis of the choice of laws applicable to chain of title worldwide and to foreign copyright contracts, see Graeme B. Dinwoodie, *"International Copyright: The Introduction," herein, at § 5[3]* (hereinafter "Introduction").

[43] CA, Sec. 58. Assignments or grants made in a treaty country may be made before a notary public, judge, commissioner, or other official authorized to administer oaths or perform notarial acts. If signed and sealed by such an official, the document will be admissible as evidence without further proof. This consequence follows for documents made in a non-treaty country only if the official's authority is certified by the local Canadian diplomatic or consular officer. However, other means of proving the due execution of such a document, for example, by oral testimony, are not thereby excluded.

[44] *See* §§ 4[2][b], 4[2][c], 4[3][a], 4[3][b], and 4[3][c] *infra.*

[45] For further analysis, see *"Introduction," herein, at § 5[3]*; Ulmer, *Intellectual Property Rights and the Conflicts of Laws*, 39 (1978).

[46] As of September 1, 1997, the pertinent rules apply equally to assignments or grants involving copyright in performances, sound recordings, and broadcasts. CA, Sec. 25. *See also* Sec. 81(2) (blank-audiotape levies).

[47] CA, Sec. 13(4). *See, e.g.,* Jung v. Suh (1991) 37 C.P.R. (3d) 111, 112 (B.C.S.C.) (assignment for part of Canada was thought valid).

[48] On possible waiver of such rights, see § 7[4] *infra.*

[49] CA, Secs. 13(5), 36(1).

ownership interest in the copyright and therefore is not subject to the rules on transfers.[50] An exclusive licensee may sue third parties for infringement.[51]

Under Canadian law, copyrights may devolve on heirs by virtue of any bequest of the testator's "personal property."[52]

### [b] Formal Requisites for Transfers

#### [i] Writing Requirement

No assignment or grant of an exclusive license of copyright is valid unless it is made in a writing signed by the owner of the right assigned or licensed or by his duly authorized agent.[53] Special rules apply to exclusive distributors of books[54] and to transfers made abroad.[55]

The writing requirement is substantive, not evidentiary.[56] The writing need not be in any particular form, and it may satisfy the formal requirement even when it is executed well after the purported transfer, which it later confirms.[57] Any symbol that is intended to operate as a person's authentication of the document should suffice to constitute his signature for an assignment or a grant of a license of copyright.[58] An intention to

---

[50] See Ritchie v. Sawmill Creek Golf & Country Club Ltd. (2004) 35 C.P.R. (4th) 163, para. 21 (Ont. S.C., Div. Ct.) (holding that gift to defendant of photograph album containing photographs of defendant's golf club taken by claimant, in the hope of obtaining work from defendant, accompanied by statement that defendant could do with them "as he wished," created a license, but did not transfer an interest in the copyrights).

[51] That said, the Supreme Court did not allow such a licensee to sue the owner-licensor for the parallel importation of products bearing a copyright-protected logo subject to the license, holding that the owner could not have infringed its own copyright: Euro-Excellence Inc. v. Kraft Canada Inc. (2007) 59 C.P.R. (4th) 353 (S.C.C.) (with a minority supporting the view that the exclusive licensee may sue the licensor on rights exclusively licensed) (also discussed under § 8[1][c][ii] *infra*).

[52] See Underwriters' Survey Bureau Ltd. v. Massie & Renwick Ltd. [1938] Ex. C.R. 103, 114–116, *affirmed,* Massie & Renwick Ltd. v. Underwriters' Survey Bureau Ltd. [1940] S.C.R. 218, [1940] 1 D.L.R. 625.

[53] CA, Sec. 13(4). For what constitutes a license, see § 4[2][a] *supra*. The same requirement now applies to assignments or licenses of copyright in performer's performances, sound recordings, and broadcasts. *See* § 9[1][a] *infra.*

[54] CA, Sec. 2 (definition of "exclusive distributor"). Exclusive distributors of books must be appointed in writing by the copyright owner or exclusive licensee of copyright in the book in Canada in order to obtain standing to sue unauthorized distributors or importers for infringement. The provision does not, however, explicitly require the signature or licensee's signature to the appointment, although one would normally expect such an appointment to be so signed. On the pertinent right, see § 8[1][b][iii][C] *infra*.

[55] CA, Sec. 58 (discussed in § 4[2] *supra*).

[56] The writing need not be produced in court if there is sufficient evidence to prove its existence and terms: Dolmage v. Erskine (2003) 23 C.P.R. (4th) 495 (Ont. S.C.) (also discussed in § 4[1][a][i] and § 4[1][b][i] *supra*).

[57] See, e.g., Mensys Business Solution Centre Ltd. v. Drummond (Municipalité régionale de comté) [2002] J.Q. no. 169 (Que. S.C.) (holding that the minutes of company directors' meetings, both on seller's and buyer's sides, meet writing requirement); Constructeurs I & S Inc. v. Camiré [2001] J.Q. no. 2697 (Que. S.C.) (accepting a writing executed several years after the agreement was concluded).

[58] One court has, however, refused to accept a stamp, used by the copyright owner apparently as her signature, on an invoice that purported to assign reproduction rights in a design, without further evidence to prove that the owner customarily

assign copyright must normally be manifest, but it need not be explicit, and courts look at the whole agreement and its context to decide whether an assignment is intended.[59] If a written assignment document is unsigned, courts may at least imply a license.[60]

In cases of shrink-wrap contracts, as well as click-wrap and browse-wrap contracts online, acceptance of their terms should be clearly ascertainable to be binding.[61] Moreover, an express or implied waiver of the writing requirement may be possible, depending on the case.[62]

The case law is mixed regarding the need to specify the nature of the rights and the grant expressly. Thus, contracts that purport to transfer "the property" in, or "any rights to," architectural drawings have been construed to pass only tangible property, not copyright.[63] Language purporting to grant "the sole and exclusive *right*" to do acts included within copyright may be variously construed as effectuating an assignment or a license.[64]

### [ii] Implied Consent

Courts may at times hold that copyright owners have "impliedly consented" to specific acts. The bases for such holdings can often be unclear, sometimes appearing to be equitable in nature and sometimes contractual, and some of these holdings may thus be limited to the facts of the case.[65] In any event, consent is a defense to infringement

---

authenticated documents this way: Milliken & Co. v. Interface Flooring Systems (Can.) Inc. [1998] 3 F.C. 103 (Fed. Ct.). This holding seems closer to the civil law than to the modern common law position, which would put the onus of proof on the person who would seek to disprove that what looks like an authentication is in fact not intended to operate as such.

[59] *See, e.g.,* Michaud v. Turgeon [2003] J.Q. no. 5834 (Que. C.A.) (written contract from which it was reasonable to infer that the author had assigned his exclusive right to publish the work was found sufficient).

[60] Doris Tremblay v. Orio Canada Inc., 2013 FCA 225 (focusing on substance over form, because the copyright owner was the party that wrote the unsigned assignment agreement, and clearly intended to transfer copyright).

[61] *Compare* North American Systemshops Ltd. v. King (1989) 27 C.P.R. (3d) 367, 26 C.I.P.R. 165 (Alta. Q.B.) (holding that the sale of a physical copy of a computer program in a shrink-wrap license did not suffice to impose the conditions of that license, since the buyer was not put on notice of them at the time of sale), *and* Century 21 Canada Limited Partnership v. Rogers Communications Inc. (2011) 96 C.P.R. (4th) 1 (B.C.S.C.) (holding that browsing effectuates consent online when terms are provided with sufficient notice, are available for review prior to acceptance, and clearly state that further proceeding into the site constitutes acceptance).

[62] *See, e.g.,* Centre de Location Ravary (Laval) Ltée. v. Télé-Direct (Publications) Inc. [1995] R.J.Q. 1245, 1249–50 (Que. S.C.) (not requiring a written assignment where a privately held corporation sued, without objection from its sole shareholder and director, for infringement of a work produced by the shareholder for the corporation's benefit). *See also* § 4[1][b] *supra* and § 4[2][b][ii] *infra* (discussing implied licenses in some cases).

[63] *See* Lifestyle Homes Ltd. v. Randall Homes Ltd. (1990) 30 C.P.R. (3d) 76, 92 (Man. Q.B.), *affirmed,* (1991) 34 C.P.R. (3d) 505 (Man. C.A.).

[64] *See, e.g.,* Marquis v. DKL Technologies Inc. (1989) 24 C.I.P.R. 289, 293 (Que.) (holding the grant of "the exclusive rights to publish, distribute and market" a computer program in return for royalties to be an exclusive license, rather than an assignment).

[65] *See, e.g.,* Dessins Drummond Inc. v. Publicités Brigil Inc. [2001] R.J.Q. 425 (Que. S.C.) (sale of architectural plans by branch of copyright owner, which modified the plans to suit the buyer's needs, involved permission to build houses accordingly); Candow v. Savory (2000) 8 C.P.R. (4th) 219 (Nfld. S.C.) (holding that a music composer who consented to the making of 500

Case 1:25-cv-00910-JMF   Document 26-11   Filed 02/28/25   Page 11 of 17

1 International Copyright Law and Practice CAN § 4

and, as such, must be proven by the defendant.[66] A finding of implied consent has the same effect as a finding of a non-exclusive license.[67] An act undertaken outside the scope of this implied consent will constitute infringement.[68] The existence as well as the scope of an implied license may be inferred from the conduct of the parties.[69]

The defense may fail if the person supposed to have given implied consent lacks the authority to give express consent.[70] The implied license may, of course, be avoided by including a clause in an agreement between the parties to specify uses that may or may not be made of the work.[71] In addition, it is doubtful that one can justify infringements by invoking so-called "industry practices."[72] A freelance contract to develop, for example, music, may be interpreted to create an implied license to use the works developed.[73]

### [c] Contractual and Related Presumptions

A transfer will generally take effect according to the terms of its constitutive instrument.[74] Exceptionally, courts may imply licenses to use works in ways not expressly covered by contractual terms.[75] One provision in the Copyright Act, as explained below, precludes the transfer of certain future rights.[76]

The Copyright Act allows the parties to contractual transfers to limit them with regard to rights, territories, media, etc.[77] The common law of contracts supplements federal law in

---

analog records in 1987 impliedly consented to the making of the CD version in 1996 because it was produced from the same master tape).

[66] *See, e.g.,* Aga Khan v. Tajdin (2011) 329 D.L.R. (4th) 521 (Fed. Ct.), *affirmed*, Tajdin v. Aga Khan, 2012 FCA 12 (finding no consent where no expert evidence was provided as to the meaning of ceremonial gestures that were claimed to have given permission to copy).

[67] Ritchie v. Sawmill Creek Golf & Country Club Ltd. (2004) 35 C.P.R. (4th) 163 (Ont. S.C., Div. Ct.).

[68] *See, e.g.,* Nicholas v. Environmental Systems (International) Ltd. (2010) 87 C.P.R. (4th) 83 (Fed. Ct.) (finding that publication of a report on a website was outside the scope of the expected use of a report prepared for a corporation and, accordingly, outside any implied consent); Ankenman Associates Architects Inc. v. 0981478 BC Ltd., 2017 BCSC 333, paras. 51–53, 61 (finding no implied license for a Creditor to use architectural plans when the Debtor had not paid the architect in full).

[69] Doris Tremblay v. Orio Canada Inc., 2013 FCA 225.

[70] *See, e.g.,* Télé-Métropole Inc. v. Bishop (1990) 72 D.L.R. (4th) 97, 110–112, 31 C.P.R. (3d) 394 (S.C.C.), *affirming* (1987) 18 C.P.R. (3d) 257, 263, 16 C.I.P.R. 243 (F.C.A.) (holding that a collecting society, dealing only in musical performing rights, may not impliedly consent to grant of mechanical rights).

[71] For further details, see § 4[2][b][i] *supra.*

[72] Hager v. ECW Press Ltd. (1999) 85 C.P.R. (3d) 289 (Fed. Ct.).

[73] Pinto v. Bronfman Jewish Education Centre et al., 2013 FC 945.

[74] *See, e.g.,* Films Rachel Inc. (Syndic), J.E. 95-2103 (Que. S.C.) (terminating a transfer of copyright in a cinematographic work to the producer pursuant to a provision that copyright revert to the author if the producer defaulted in payment).

[75] *See* § 4[1][b] *supra.*

[76] *See* § 4[3][c] *infra.*

[77] CA, Sec. 13(4).

guiding the interpretation of agreements to which the laws of the English-speaking provinces apply. In Quebec, the Civil Code provides such supplementary guidance, coupled with statutory provisions that allow for construing agreements in favor of authors.[78] The case law suggests a trend in the courts to presume that copyright contracts transfer only such rights as the contracts specifically mention.[79] The courts, however, have not yet fully explored the consequences of this trend relative to changing media.[80]

### [d] Recordation; Priority of Transfers

Assignments or grants of licenses may be registered at the Copyright Office upon production of the original document, or a certified copy thereof, and payment of the prescribed fee.[81] A registration certificate may serve as presumptive evidence, not only of the assignment or grant in question, but also that the registrant is the assignee or licensee.[82] Failure to register a grant makes it void against a later assignee for consideration without actual notice, unless the first assignment is registered before the second.[83] It is, however, not settled law that the priorities the Act establishes necessarily preclude relief under provincial law to different effect.[84]

The Copyright Act also allows for registering assignments of copyright in the Copyright Office as collateral. However, until the relationship between the Act and provincial laws is clarified, it is sound practice also to comply with the laws of the province where the copyright owner is located. Public recording of the documents creating the security is generally required for protection against third-party claims or in bankruptcy. Five common law provinces—Ontario, British Columbia, Manitoba, Saskatchewan, and Alberta—have legislation modeled on Article 9 of the U.S. Uniform Commercial Code.[85] In Quebec,

---

[78] *See* § 4[3][a] *infra.*

[79] *See, e.g.*, Bishop v. Stevens (1987) 18 C.P.R. (3d) 257, 260–261, 16 C.I.P.R. 243 (F.C.A.), *affirmed,* (1990) 72 D.L.R. (4th) 97, 31 C.P.R. (3d) 394 (S.C.C.) (transfer of right to broadcast does not include transfer of right to make ephemeral recording of work, even if the recording is practically necessary for efficient broadcasting); Prism Hospital Software Inc. v. Hospital Medical Records Institute (1994) 57 C.P.R. (3d) 129, 154–156, 255–267 (B.C.) (favoring owner, although authorities cited by the court suggest that copyright licenses be construed according to ordinary principles of contract interpretation); Re Royalties for Retransmission Rights of Distant Radio and Television Signals (1993) 47 C.P.R. (3d) 327, 381–383 (Cop. Bd.) (holding that the copyright owner of a film does not, in typical film distribution contract, assign right to receive statutory royalties for cable retransmission).

[80] For commentary, see G. D'Agostino, *Copyright, Contracts, Creators: New Media, New Rules* (Edward Elgar, 2010).

[81] CA, Sec. 57(1).

[82] CA, Secs. 53(2.1) and 53(2.2). For further analysis, see § 5[3] *infra.*

[83] CA, Sec. 57(3).

[84] *See, e.g.,* Poolman v. Eiffel Productions S.A. (1991) 42 F.T.R. 201, 35 C.P.R. (3d) 384 (Fed. Ct.) (allowing a later assignee for value without notice of the first assignment at the time of the later assignment to assert provincial law against the first assignee's priority).

[85] Their definition of "personal property" includes choses in action, hence copyrights. *See* El Sissi, "Security Interests in Copyright" (1995) 10 I.P.J. 35.

copyrights may be pledged or may, where the owner is a corporation, limited partnership, or cooperative, be included in a general guarantee taken to secure a loan.[86]

### [3] Limitations of Transfer; Specific Cases

#### [a] Rules Outside the Copyright Act Affecting Contracts

Normally, publishing, broadcasting, or other such contracts are governed by the common law[87] or, in Quebec, by the civil law.

There is case law in which a contract providing that copyright in the manuscript of a commissioned history book would belong to the commissioning party was held to apply only if the final form of the manuscript had been accepted for publication.[88] Otherwise the author retained copyright in the manuscript, as well as in research materials, and could freely exploit the work. There is no statutory inhibition on the free alienability of contract, save as mentioned below.[89] Provisions in the Copyright Act recognizing moral rights declare them to be waivable in whole or in part.[90]

Provincial law may apply to creators' contracts.[91] For example, there are provisions to such effect in Saskatchewan.[92] In Quebec, special mandatory provisions regulate contracts made between promoters or entrepreneurs, on the one hand, and the creators of literary and artistic works, on the other, to exploit or publish the works. Such contracts, *inter alia*, must be made in duplicate in writing and be signed by the parties, must clearly set out specified provisions and allow for termination under specified conditions, and, unless otherwise agreed, are subject to arbitration.[93] The relationship between such provincial provisions and the federal Copyright Act, in case of conflict, is unclear.

---

[86] Article 2684 of the Civil Code of Quebec refers specifically to patents and trademarks as intellectual property rights that can be hypothecated, but the rest of the provision makes it clear that it applies to copyright too. *See* Zimmerman, Bertrand, and Dunlop, "Intellectual Property in Secured Transactions" (1991) 8 C.I.P. Rev. 74.

[87] *See, e.g.,* Prism Hospital Software Inc. v. Hospital Medical Records Institute (1994) 57 C.P.R. (3d) 129, 154–156, 255–267 (B.C.) (computer software license). On the relation between common law and federal law in Canada, see § 1[1][c] *supra*.

[88] Tedesco v. Bosa (1992) 45 C.P.R. (3d) 83 (Ont.).

[89] On formal requirements, see § 4[2][b] *supra*. On compulsory licenses, see § 8[2][e] *infra*; on antitrust considerations, § 8[2] *infra*.

[90] CA, Sec. 14.1(2). *But see* § 7[4] *infra* (waiver of moral rights).

[91] Provincial law may also apply to security interests in copyright. *See* § 4[3][e] *infra*.

[92] The Arts Professions Act, S.S. 2009, ch. A-28.002, Sec. 9.

[93] Chapter III of Act respecting the professional status of artists in the visual arts, arts and crafts and literature, and their contracts with promoters, Statutes of Quebec 1988, ch. 69. For commentary, see Y. Gendreau, "Copyright Contracts in Canada: the Quebec Perspective," *in* U. Loewenheim (ed.), *Urheberrecht im Informationszeitalter—Festschrift für Wilhelm Nordemann*, 579 (Munich: C.H. Beck, 2004).

Federal legislation providing collective bargaining rights to protect the status of artists has been held by the Supreme Court of Canada to be consistent with the Copyright Act.[94] This allows not just collective societies but also labor unions representing artists to negotiate minimum fees for the use of copyright-protected works.

### [b] Termination of Transfers and Reversion of Rights

Assignments or grants of interest are ineffective to vest copyright beyond 25 years after an author's death where the author was the first owner of the copyright: after this period the copyright reverts to the author's estate.[95] This provision is designed to protect an author's heirs from prior improvident dealings, and it cannot be contractually waived.[96] The only stated exceptions are assignments of copyright in a collective work or licenses to publish a work as part of a collective work.[97] It does not apply where a corporation is the first owner of copyright, for example, in older cases of photographs and sound recordings,[98] and works produced by employees in the course of their employment. The provision does not apply to performers' performances and broadcasts, nor to post-September 1, 1997 sound recordings, which are not "works" having "authors."[99]

### [c] Transfer of Future Rights and Causes of Action

The Act does not refer to granting copyright interests in future works. In the common law provinces, an agreement with respect to future works may be effective in equity and as such specifically enforced once the work comes into existence. In Quebec, the assignment of a right in a work to be created is valid in light of Article 1374 of the Civil Code of Quebec, which allows a *prestation* to be related to future property that "is determinate as to kind and determinable as to quantity."[100] Care must be exercised when

---

[94] *See* Canadian Artists Representation v. National Gallery of Canada, 2014 SCC 42, addressing the Status of the Artist Act, S.C. 1992, ch. 33, discussed further in § 9[2] *infra*.

[95] CA, Sec. 14(1). *See also* § 4[3][e] *infra* (on the conditional reversion of transferred rights from a bankruptcy estate). Only Canadian copyrights would seem to be subject to such reversion. Foreign copyright, even if conveyed by a Canadian contract, would be treated by a Canadian court as subject to the foreign law establishing the copyright. *See* Redwood Music Ltd. v. Bourne (1995) 63 C.P.R. (3d) 380 (Ont.).

[96] At any time after the author's death, however, the legal representatives may make deals with respect to the reversionary interest. *See* Kelley Estate v. Roy (2002) 21 C.P.R. (4th) 539 (Fed. Ct.).

[97] CA, Sec. 14(2). "Collective work" is defined in Section 2: "(a) an encyclopedia, dictionary, yearbook, or similar work; (b) a newspaper review, magazine, or similar periodical; and (c) any work written in distinct parts by different authors, or in which works or parts or works of different authors are incorporated." The collective work must have a copyright of its own, *e.g.*, as a compilation: Chappell & Co. Ltd. v. Redwood Music Ltd. [1980] 2 All E.R. 817, 827 (H.L.). On compilations, see § 2[3][b] *supra*.

[98] As of September 1, 1997, sound recordings fall into the category of subject matter for which there is no "author," but assignments or grants of copyright made before that date by the flesh-and-blood maker of a sound recording—until then to be considered an "author" of a "work"—continue to be subject to reversion. Copyright Amendment Act, S.C. 1997, ch. C-24, Sec. 55. On who qualifies as an author of a pre-1994 sound recording, see § 9[1][a][ii] *infra*.

[99] *See* § 9[1][a] *infra*.

[100] *See* Diffusion YFB Inc. v. Disques Gamma (Québec) Ltée. [1999] R.J.Q. 1455 (Que. S.C.). For special provisions in Quebec governing certain classes of contract to exploit future works, see § 4[3][a] *supra*.

purporting to assign existing causes of action for copyright infringement: such causes may be assigned in association with an assignment or grant of an interest by license of the copyright, provided that suitable language is used.[101]

Effective March 12, 1998, an assignment or license of copyright concluded before April 25, 1996, may not be construed as transferring rights to remuneration for private copying, unless the agreement "specifically" so provides.[102] The policy here is to ensure that authors, performers, and producers intended to benefit from such rights do in fact benefit from them and that those persons are not immediately stripped of them by general language in existing agreements.

**[d] Government Expropriation and Immunity**

The Copyright Act does not entitle the Crown to take copyright without compensation. Only during emergencies such as war has the government taken over copyright owned by aliens, pursuant to special powers.

However, the provision that the copyright in works prepared or published by or under the direction of the Crown shall, subject to any agreement with the author, belong to the Crown puts the onus of reaching a contrary agreement on the author. An author may find that a work in which she thought she had the copyright has, through her inadvertence, become subject to Crown copyright.[103] Crown ownership may not necessarily result from the Copyright Act alone, but from other legislation.[104] For example, the Crown acquires copyright ownership of land surveys not when they are created but when they are registered and deposited into Ontario's land registry system.[105] In another regulatory context, it was held that although copyright ownership is not transferred, the term of protection can in effect be cut short by legislation other than the Copyright Act. For example, seismic data used for offshore oil and gas exploration is copyright protected, but the relevant regulatory scheme indicates that any documentation submitted to gain approvals must be kept confidential only for a period of 5–15 years. After the confidentiality period expires, no claim for copyright infringement was permitted in respect of copying or distribution of the protected works.[106]

The Crown, as provincial, territorial, or Federal governments, has been held liable for the payment of copyright royalties. There was some doubt on this point because, in principle, the Crown is not bound or affected by legislation "except only as therein mentioned or referred to."[107] The Copyright Act refers to Crown exceptions to liability, and the Federal

---

[101] *See, e.g.,* Prise de Parole Inc. v. Guérin, éditeur, Ltée. (1995) 66 C.P.R. (3d) 257, 260–262 (Fed. Ct.), *affirmed,* (1996) 206 N.R. 311 (F.C.A.) (allowing *bona fide* assignments of such causes in association with an assignment of copyright).

[102] Copyright Amendment Act, S.C. 1997, ch. C-24, Sec. 58.1. On such remuneration, see § 8[2][e][i] *infra*.

[103] *See* Ironside v. A.G. [1988] R.P.C. 197, 202–203 (Ch.). *Cf.* Hawley v. Canada (1990) 71 D.L.R. (4th) 632, 30 C.P.R. (3d) 534 (Fed. Ct.) (holding that the Crown holds the copyright in works produced by prisoners serving their sentence).

[104] For Crown copyright, see § 2[4][e] *supra*.

[105] Keatley Surveying Ltd. v. Teranet Inc., 2019 SCC 43.

[106] Geophysical Service Incorporated v. Encana Corporation, 2017 ABCA 125 (CanLII).

Court of Appeal has upheld the Copyright Board's interpretation of these and other provisions to determine Crown liability by "necessary implication" for other uses.[108] The Crown's unique rights and privileges in the nature of copyright do not lend themselves to being raised as a defense by a third party in that only the Crown can assert the Crown's prerogative.[109]

### [e] Foreclosure; Judicial Execution

The Copyright Act does not prohibit or limit the seizure of copyright in satisfaction of a judgment debt. The copyright in an unfinished or unpublished work, however, if still owned by the author, may possibly be immune on the basis that, while unassigned, this copyright is personal to the author.[110] Moral rights are outside execution, for example, in bankruptcy, since they are unassignable.[111]

Whether execution may otherwise be levied against copyrights depends upon the terms of the legislation in the province where process is undertaken. Debts owed or accruing, for example, royalties under a publishing contract, may in all provinces be garnished or subjected to the control of a receiver.[112] The execution statutes of many provinces allow all movable or intangible property to be seized, justifying execution on copyright in some cases, but not necessarily in all cases.[113] In other provinces, the sheriff is authorized to seize only tangible property and those items of intangible property specifically listed in the execution legislation.[114]

---

[107] Interpretation Act, R.S.C. 1985, ch. I-21, Sec. 17, which applies to both federal and provincial governments. Nonetheless, provisions in the Patent Act and in the Integrated Circuit Topography Act bind Canadian governments and agents to pay compensation for use. Patent Act, R.S.C. 1985, ch. P-4, Secs. 19 and 2.1. *See* Formea Chemicals Ltd. v. Polymer Corp. Ltd. [1968] S.C.R. 754, 69 D.L.R. (2d) 114. For commentary, see Hogg, Monahan, and Wright, *Liability of the Crown*, ch. 11 (4th ed., 2011). On government use of designs of integrated circuits, see § 9[1][b][iii] *infra*.

[108] Manitoba v. Canadian Copyright Licensing Agency (Access Copyright), 2013 FCA 91.

[109] PS Knight Co. Ltd. v. Canadian Standards Association, 2018 FCA 222.

[110] *See* Vaver, "Can Intellectual Property Be Taken to Satisfy a Judgment Debt?" (1991) 6 Banking & Finance Law Rev. 225; Tamaro, "La dissociation de la propriété du Code civil des droits d'auteur: l'exemple de la saisie," in Service de la formation permanente, Barreau du Québec, *Développements récents en droit de la propriété intellectuelle*, 153 (1991).

[111] *See* § 7[4] *infra*.

[112] *See, generally,* Dunlop, *Creditor-Debtor Law in Canada* (1981). In Quebec, a contract to exploit literary or artistic works terminates on the entrepreneur's bankruptcy or receivership, and no security over the works or the contract may be granted without the creator's consent. *See* § 4[1] *supra*.

[113] *Compare* Planet Earth Productions v. Rowlands (1990) 30 C.P.R. (3d) 129 (Ont. S.C.) (allowing that a sheriff may seize and auction off copyright in a debtor's work summarily, in this case a professional photographer's complete inventory of negatives, some unpublished and therefore arguably immune to seizure), *with* Wira v. Jubilee Enterprises Ltd. (2010) 323 D.L.R. (4th) 594 (Sask. Q.B.) (holding that copyrights may not be seized because they are not choses in action).

[114] *See, e.g.*, Mortil v. Int'l Phasor Telecom Ltd. (1988) 20 C.P.R. (3d) 277 (B.C. Co. Ct.) (holding that computer software may be seized and sold in British Columbia, but the execution buyer must respect the judgment debtor's intellectual property rights, including copyright).

Copyrights form part of the bankrupt's estate and may be sold by the trustee in bankruptcy.[115] A music publisher which, under its agreement with a collecting society, is limited to a 50% share of performing-right royalties in respect of a composer's works, is thus entitled, despite the agreement, to the full 100% share if it purchases by assignment the composer's copyrights from the latter's trustee in bankruptcy.[116] Commercial or professional assets subject to a duty of confidentiality owed by the debtor—such as those of a doctor who may own the copyright in them—may also pass in bankruptcy or be subject to security, but the duty of confidentiality presumably binds purchasers and sub-purchasers from the trustee or secured party.[117]

Special provisions protect an author's copyright in his work when a person to whom he has assigned copyright goes bankrupt.[118] If the work is unpublished and no expenses have been incurred, the interest must be reassigned to the author; if expenses have been incurred, reassignment may occur if the author pays the expenses. If the work has been published, the trustee in bankruptcy must continue paying royalties to the author and can only assign the copyright upon ensuring that royalties at the same rate will continue.[119] Bankruptcy of a licensee also terminates a license agreement, eliminating all of licensee's rights to the copyrighted work.[120]

### [f] Resale Right: *Droit de Suite*

Canada does not have a *droit de suite*.

International Copyright Law and Practice
Copyright 2025,  Matthew Bender & Company, Inc., a member of the LexisNexis Group.

**End of Document**

---

[115] Bankruptcy Act, R.S.C. 1985, ch. B-3, Sec. 2 (definition of "property"). The copyright in a bankrupt's unpublished or unfinished works may possibly not pass to the trustee if the rights are considered personal to the bankrupt. *See* Vaver, "Can Intellectual Property Be Taken to Satisfy a Judgment Debt?" (1991) 6 Banking & Finance Law Rev. 225; Tamaro, "La dissociation de la propriété du Code civil des droits d'auteur: l'exemple de la saisie," in Service de la formation permanente, Barreau du Québec, *Développements récents en droit de la propriété intellectuelle* (1991) (dealing with Quebec). *But see* Ankenman Associates Architects Inc. v. 0981478 BC Ltd., 2017 BCSC 333, paras. 51–53, 61 (finding no implied license for a Creditor to use architectural plans when the Debtor had not paid the architect in full).

[116] Les Editions MCS Ltée. v. CAPAC Ltée. [1987] R.J.Q. 403, (1987) 11 C.I.P.R. 322 (Que. S.C.).

[117] Re Axelrod (1994) 119 D.L.R. (4th) 37 (C.A.). On the duty of confidence, see § 9[1][b][i] *infra. Cf.* Auckland Medical Aid Trust v. Com'r of Police [1976] 1 N.Z.L.R. 485, 488 (S.C.C.) (dealing with doctor's copyright in medical records).

[118] Re Song Corp. [2002] C.B.R. (4th) 97 (Ont. S.C.).

[119] Bankruptcy Act, R.S.C. 1985, ch. B-3, Sec. 83.

[120] Société de développement des entreprises culturelles (SODEC) v. Société Radio-Canada (SRC), 2014 QCCS 951 (holding that, once licensee of television format went bankrupt, the sub-licensee had no rights to make or show the program).