# EXHIBIT 11

## *2 International Copyright Law and Practice UK § 4*

***International Copyright Law and Practice   >   UNITED KINGDOM***

## Author

**Jonathan Griffiths**[*]

**Lionel Bently**[*]

**William R. Cornish**[*]

## UK § 4 Ownership and Transfer

### [1] Initial Ownership

Section 11(1) of the 1988 Act states the principle that initial ownership belongs to the author. However, Section 9 defines "author" differently according to the subject matter in question.

The term "author" here refers to any flesh-and-blood creator of any work in the traditional categories of literary, dramatic, musical, and artistic works.[1] If a work is computer-generated, however, and is therefore without any such ascertainable human author, it obtains as its author "the person by whom the arrangements necessary for the creation of the work are undertaken."[2]

While film authorship is treated as a special type of joint authorship between directors and producers,[3] other provisions initially vest copyrights for sound recordings, broadcasts, and published editions in the "authors," that is, in the entities making or disseminating these media productions, as explained below.[4] As already seen, the Act,

---

[*] Professor of Intellectual Property Law, Queen Mary, University of London. Jonathan Griffiths has contributed this chapter since 2014.

[*] Herchel Smith Professor of Intellectual Property Law, University of Cambridge. Professor Bently contributed this chapter between 1998 and 2013.

[*] Professor Emeritus of Intellectual Property Law, University of Cambridge. Professor Cornish, who contributed this chapter through 1997, passed away in 2022.

[1] For consideration of the question of whether an amanuensis is an author, see § 2[1][a] *supra*. But a spiritual medium who transcribed messages from the spiritual world was author of the work: Cummins v. Bond (1927) 1 Ch. 167 (Eve J.) (holding that the medium "had exercised sufficient skill, labour and effort to justify being treated as author").

[2] C.D.P.A., Secs. 9(4), 178. *See, e.g.,* Nova Productions Ltd. v. Mazooma Games [2006] EWHC 24 (Ch), paras. 104–106, [2006] R.P.C. (14) 379 (finding images in a computer game to be "computer-generated" and treating as the "author" the person who created the appearance of the elements, the rules and logic for the generation of each frame, and the computer program itself, but not players). On the resulting term of rights, see § 3[1][a] *supra*.

[3] *See* § 4[1][a][ii] *infra*.

pursuant to special provisions, also allocates the ownership of Crown and Parliamentary copyright.[5]

In certain circumstances where no author can be identified, the 1988 Act allocates authorship through the use of statutory presumptions, as explained below.[6]

## [a] Joint Works

Copyright in a "work of joint authorship" is held by all of its coauthors.[7] This concept also now applies to "films" pursuant to special rules, explained below.[8]

### [i] In General

The term "work of joint authorship" normally applies to literary, dramatic, musical, and artistic works. It is specially extended to a broadcast "where more than one person is taken as making the broadcast."[9] No special provisions apply to sound recordings, or published editions, as they do to films.[10] A work is one "of joint authorship" if it meets four conditions. These conditions are a) "collaboration," b) authorship, c) contribution and d) non-distinctness of contribution.[11]

The first condition of collaboration requires the work to have been made "in prosecution of a preconcerted joint design" or at least on the basis of cooperation between the authors.[12] Long-distance collaborative efforts or cooperation would seem to qualify,[13] but friendly suggestions for amendment do not.[14] The separate adaptation or elaboration of a pre-existing work after that work has been generated does not. Rather, in such circumstances, a separate copyright may subsist in the subsequent

---

[4] *See* § 4[1][b][iii] *infra.*

[5] *See* § 2[4][e] *supra.*

[6] *See* § 4[2][c] *infra.*

[7] To implement the Term-Amendment Directive (2011/77/EC, discussed in *"E.U.," herein, at § 5[2][e]*), the concept of a "work of co-authorship," that is, "a work produced by collaboration of the author of a musical work and the author of a literary work where the two works are created in order to be used together," has been introduced effective November 1, 2013. *See* § 3[1][b] *infra.*

[8] *See* § 4[1][a][ii] *infra.*

[9] C.D.P.A., Sec. 10(2), cross-referenced to Sec. 6(3), which identified these persons as those "providing," or taking "responsibility" for the contents of the program and those making the "arrangements necessary for its transmission."

[10] On films as joint works, see § 4[1][a][ii] *infra.*

[11] C.D.P.A., Sec. 10(1). *See* Kogan v. Martin [2019] EWCA Civ 1645, para. 31. There is no additional requirement that the parties must have intended to create a work of joint authorship: Beckingham v. Hodgens [2003] F.S.R. 238, 249. On the term of copyright in such works, see § 3[1][b] *supra.*

[12] Levy v. Rutley (1871) L.R. 6 C.B. 583; Cala Homes (South) Ltd. v. Alfred McAlpine Homes East Ltd. [1995] F.S.R. 818.

[13] Cala Homes (South) Ltd. v. Alfred McAlpine Homes East Ltd. [1995] F.S.R. 818, 835.

[14] Kogan v. Martin [2019] EWCA Civ 1645, paras. 33–35.

adaptation or elaboration.[15] For example, where a musician arranges a prior musical work, there may be separate copyrights.[16]

The second condition of authorship can arise in different forms. Thus, for example, the person who devises the plot of a literary or dramatic work may be an author, as well as the person who expresses the plot in the form of a finished work.[17] Under the third condition, the contribution of a putative joint author must be "authorial." That is, it must be of the sort of activity protected by copyright; expression rather than mere ideas, specification-setting or proof-reading.[18] In order to qualify as a joint author, it will be sufficient for an author to contribute elements that express his or her own intellectual creativity, even if that contribution is not equivalent in terms of quantity or quality to that of the other contributors. The threshold applicable to contributions to works of joint authorship is the same as that applicable to works of individual authorship.[19] The final requirement, that the contributions are not "distinct," excludes from joint authorship the situation where one person writes certain parts and another the others, for example, where one writes the words and the other the music of an opera or a song.[20]

One joint owner may not exploit a joint work without the license of the other or others.[21] Assignments of joint copyright have to be made by each of its joint owners; equally a license requires the assent of each.[22] Joint authorship will usually be

---

[15] On derivative works, see § 2[3][a] *supra*.

[16] Chappell & Co. Ltd. v. Redwood Music Ltd. [1981] R.P.C. 337; Beckingham v. Hodgens [2003] F.S.R. 238.

[17] Kogan v. Martin [2019] EWCA Civ 1645, paras. 36–41 (noting that too much focus on who pushed the pen is likely to detract attention from what it is that is protected).

[18] *Compare* Cala Homes (South) Ltd. v. Alfred McAlpine Homes East Ltd. [1995] F.S.R. 818 (finding joint authorship in explaining a house design in detail, both verbally and through sketches, to a technical draftsman who then produced drawings of elevations and floor plans), *with, e.g.,* Celebrity Pictures Ltd. v. B. Hannah Ltd. [2012] EWPCC 32, para. 8 (providing a "general" brief to a photographer as to the types of poses the party commissioning the photographs wanted did not make that party a joint author); Fylde Microsystems Ltd. v. Key Radio Systems Ltd. [1998] F.S.R. 449, (1998) 39 I.P.R. 481 (Laddie J.) (finding that suggestions, comparable to proofreader's help, made by a customer of the producer of software were insufficient to constitute customer as coauthor); Brighton v. Jones [2004] E.M.L.R. (26) 507 (holding that suggestions made by a director to a playwright, prompted by problems with the script encountered during rehearsals, did not support the director's claim to co-authorship, because her contributions were not shown to contribute "to the creation of the dramatic work rather than" to "interpretation and theatrical presentation of the dramatic work"). *See also* Kogan v. Martin [2019] EWCA Civ 1645, paras. 42, [2021] EWHC 24 (Ch), paras. 319–320 (finding sufficient expressive contribution to film script about opera singer in creation, selection and gathering together of detailed concepts and emotions, as well as suggestions of language and repertoire to be sung).

[19] Kogan v. Martin [2019] EWCA Civ 1645, paras. 43–46 (contributions to film script).

[20] Chappell & Co. Ltd. v. Redwood Music Ltd. [1981] R.P.C. 337. But it has been held that, where one person added an introduction to the music of a song, this introduction was not "distinct" because it was "heavily dependent" on the rest of the tune and because, by itself, it would "sound odd and lose meaning": Beckingham v. Hodgens [2003] F.S.R. 238, 248.

[21] C.D.P.A., Sec. 173(2). *See* Cescinsky v. Routledge [1916] 2 K.B. 325; Robin Ray v. Classic FM Ltd. [1998] F.S.R. 622 (Lightman J.).

[22] Powell v. Head (1879) 12 Ch. D. 686.

presumed to lead to equal shares, but this allocation may be varied by the court where it feels comfortable evaluating the contributions.[23]

### [ii] Films

Films made on or after July 1, 1994, are treated as works of joint authorship and are subject to the general rules applicable to joint copyright.[24] Under Sections 9(2)(ab) and 10(1A) of the Act, the principal director and producer are treated as joint authors of such films, save where they are the same person.

There is no further explanation of what is meant by "principal director," but the term "producer" is defined as "the person by whom the arrangements necessary for the making of the film are undertaken."[25] The identification of this person is treated as a question of fact,[26] but the courts have emphasized aspects such as initiation of the project, organization, arrangement of location, over and above the doing of the filming, assisting with such organization, or merely providing finance.[27]

Where a film is made by an employee in the course of employment, Section 11(2) of the 1988 Act applies: in the absence of agreement to the contrary, copyright vests initially in the employer.[28] No such exception to the basic principle that the author is the first owner is made in relation to commissioned films: in such cases it is likely that the commissioner will be treated as the producer, and coauthor, with the principal director.[29]

---

[23] *See* Bamgboye v. Reed [2004] E.M.L.R. 61; Fisher v. Brooker [2006] EWHC 3239; Minder Music Ltd. v. Sharples [2015] EWHC 1454 (I.P.E.C.), paras. 84–90; Martin v. Kogan [2021] EWHC 24 (Ch), paras. 324–357 (contributions to characterization, feel and musicality of screenplay leading to 20% share for coauthor).

[24] Prior to July 1, 1994, for the purposes of determining authorship, films were treated in a similar fashion to sound recordings: the author was statutorily defined as "the person by whom the arrangements necessary for the making of the film are undertaken." For further explanation, see § 4[1][b][iii] *infra*. However, films begun before July 1, 1994, but completed thereafter are treated as made when completed: Related Rights Reg. 25(2). Furthermore, it is not an infringement of any right which the principal director has by virtue of these Regulations to do anything after commencement in pursuance of arrangements for the exploitation of a film made before November 19, 1992: Related Rights Reg. 36(2).

[25] C.D.P.A., Sec. 178. *See, e.g.,* Slater v. Wimmer [2012] EWPCC 7, para. 13 (adopting the definition of director as "the person who had creative control of the making of the film," and holding cameraman to be the director of small-scale film about sky-diving on Everest, while finding ownership by both director and producer). On presumptions regarding who is the director, producer, or author of underlying material in a film, see § 4[2][c] *in fine infra*. However, it is unclear whether the term "principal director" will be treated as narrower than the term "director" when used in relation to moral rights. *See* § 7[1] *infra*.

[26] Beggars Banquet Records v. Carlton TV [1993] E.M.L.R. 349, 361; A & M Records v. Video Collection [1995] E.M.L.R. 25, 29.

[27] Adventure Films v. Tully [1993] E.M.L.R. 376. *See also* Century Communications v. Mayfair Entertainment [1993] E.M.L.R. 335 (film made under restrictive conditions in China was produced by organizer outside of China); Beggars Banquet Records v. Carlton TV [1993] E.M.L.R. 349 (arguable claim that person who provided finance and arranged access to venue where event was filmed was a person who made arrangements).

[28] On works by employees generally, see § 4[1][b][i] *infra*.

[29] On commissioned works generally, see § 4[1][b][ii] *infra*.

The producer is rebuttably presumed to have been assigned the rental rights in works and performances included in a film.[30] Authors and performers, however, retain unwaivable rights to remuneration for rentals made after April 1, 1997.[31] No such transfer is presumed to be made by the principal director. However, if it has been voluntarily made, that director also benefits from the same unwaivable right to remuneration.

## [b] Works Made for Hire

In the United Kingdom, there is no specific category of "works made for hire" but rather diverse rules applicable to diverse materials that, in some systems, might fall into such a category. The initial ownership of copyright continues generally to be determined by the law in effect on the date when the materials in question were made.[32]

### [i] Employees' Works and Films

Copyright in a literary, dramatic, musical, or artistic work, or film, under the 1988 Act, initially belongs to the author or coauthors unless the work is made in the course of employment.[33] Section 11(2) of the Act restates the rule that, in the absence of agreement to the contrary, copyright in such a work or film made in the course of employment vests initially in the employer.[34]

In determining whether there is an employment relationship, courts consider whether "mutuality of obligation" and "control" exist between the parties.[35] There is sufficient "mutuality" only where the employer is bound to provide work and pay, and the employee to provide his labor. Moreover, for the employment relationship to exist, one party (the employer) must be able to exercise control over the other (the employee). In

---

[30] C.D.P.A., Secs. 93A and 191F. These apply in relation to the authors of literary, dramatic, musical, or artistic works but, except in relation to agreements concluded before December 1, 1996, not to any rental right in relation to the inclusion in the film of the screenplay, the dialog, or music specifically created for and used in the film.

[31] For further analysis, see §§ 4[3][b] and 5[3][b][ii] *infra*.

[32] C.D.P.A., Sched. 1, para. 11. Most notably, the 1988 Act no longer includes certain presumptions found in the 1956 Act. First, under the previous law, copyright in a work made by an author in the course of employment by the daily or periodical press presumptively vested in the employer for purposes of its publication in the newspaper or periodical: C.A. 1956, Sec. 4(2); for pre-1957 works see Sched. 8, para. 1(b). Second, under the 1956 Act, a party commissioning a photograph, portrait, or engraving for value presumptively acquired copyright in that work: C.A. 1956, Sec. 4(3), Sched. 8, para. 1(a). Third, there is no longer any special provision attributing the authorship of a photograph to the person owning the material on which it was taken: C.A. 1956, Sec. 48(1). Rather, a photographic work is now treated like any other artistic work, so that the photographer is the author: C.D.P.A., Sec. 4(2).

[33] C.D.P.A., Sec. 11. For further details on films, see § 4[1][a][ii] *supra*.

[34] If the employee is a director of a company, fiduciary duties which require him not to enter into transactions which conflict with the interests of the company may render such a person a trustee of any copyright acquired by him individually, for example, through assignment. *See* Vitof Ltd. v. Altoft [2006] EWHC 1678 (Ch), para. 146 (trust arising when retention of copyright in software by director would place director's own interests in conflict with those of the company).

[35] *See* Carmichael v. National Power Plc. [1999] 4 All E.R. 897 (House of Lords); Ultraframe (UK) Ltd. v. Fielding [2004] R.P.C. (24) 479 (Court of Appeal).

those professions where a worker has a considerable amount of freedom, the control requirement is met if there is a "sufficient framework of control." If the two factors of mutuality and control are present, the relationship might be one of employment; if they are not present, it is not. However, these factors are not of themselves conclusive. The court will examine all other relevant aspects and provisions to establish whether they are consistent with a contract of service.[36] The courts pay considerable attention to whether typical attributes of employment are present: whether regular sums are paid as wages or salary; whether income tax deductions are made on the "pay-as-you-earn" basis used for employees; whether there is a joint contribution to a pension scheme; and whether national insurance contributions are paid by both parties as for an employee.[37]

Even if an employment relationship exists, it is not every work created during its subsistence that belongs presumptively to the employer, but only those made in "the course of the employment." This requires an examination of the employee's duties, to determine whether the making of the work fell within the scope of those duties.[38] The starting point of this analysis should be the written contract, if one exists. Whether the work was created during office hours, or using materials provided by the employer, may also be useful evidential pointers, but they are not in themselves determinative. Equally, the fact that the work was created outside of office hours may point toward it being made outside the course of employment, but that fact will not be determinative.[39]

Finally, copyright in works made by employees in the course of employment will not be treated as belonging to the employer where there is an agreement to the contrary. Such an agreement must be one concerning title to copyright and must be legally enforceable, so that a mere recital in a contract between the parties will not necessarily suffice.[40] Such an agreement has been implied from custom: where an

---

[36] The designation of the nature of the relationship between the parties in a written agreement is not conclusive of the arrangement's legal nature. In particular, courts will take into account the fact that a written agreement may not reveal the true legal position in circumstances in which the parties are not in equal bargaining positions. *See* Autoclenz Ltd. v. Belcher [2011] UKSC 41.

[37] *See, e.g.,* Robin Ray v. Classic FM Ltd. [1998] F.S.R. 622 (Lightman J.) (holding consultant not to be employee where agreement described him as independent contractor and contemplated that he would have other business commitments, and he worked on the commission for a short period); Chadwick v. Lypiatt Studio Ltd. [2018] EWHC 1986 (Ch), paras. 78–84 (reviewing factors relevant to distinction between an employee and an independent contractor).

[38] *See* Stevenson Jordan & Harrison v. MacDonald & Evans [1952] 69 R.P.C. 10.

[39] *See* Intercase UK Ltd. v. Time Computers Ltd. [2004] E.C.D.R. (8) 78, para. 11. *Compare* Beloff v. Pressdram [1973] 1 All E.R. 241 (a journalist who wrote a confidential memorandum to colleagues about a possible article was acting in the course of her employment), *with* Noah v. Shuba [1991] F.S.R. 15 (a consultant epidemiologist who drafted a guide to skin piercing at home in the evenings and on weekends was held to own copyright in the guide, despite the fact that he had researched the contents at his employer's library and the manuscript had been typed by his secretary). *See also* Mei Fields Designs Ltd. v. Saffron Cards & Gifts Ltd. [2018] EWHC 1332 (I.P.E.C.) (on a multi-factorial assessment, design director not employed to design greetings cards herself).

[40] *See, e.g.,* Robin Ray v. Classic FM Ltd. [1998] F.S.R. 622 (Lightman J.) (holding that statement in agreement to the effect that relationship is one of employment does not amount to "an agreement to the contrary" if real relationship is not one of employment).

epidemiologist wrote a skin-piercing guide, the court held that even if the guide had been written in the course of the epidemiologist's employment, past practice of the employer in allowing its employees to assign copyright to journals, indicated the existence of an understanding that copyright was to be retained by its employees.[41]

Where a work is created in a fiduciary relation, whether of employment as just discussed or of rendering services discussed immediately below, copyright may be held on a constructive trust for the person to whom a fiduciary duty was owed.[42]

### [ii] Commissioned Works and Films

A party commissioning a work[43] will obtain copyright in that future work if, while complying with the formal requirements of Section 91,[44] the author assigns rights to him, even in advance of creation.[45] Even where there is no express assignment, the courts may infer that the author, effectively acting as an independent contractor, is subject to an implied obligation to assign the copyright to the commissioner. This inference may give rise to a trust of the copyright and render the commissioner its equitable owner.[46] Such implied agreements to assign have been found in diverse circumstances.[47] However, an agreement to assign will only be implied where an implied license is insufficient to reflect the contracting parties' intention.[48]

---

[41] Noah v. Shuba [1991] F.S.R. 15.

[42] *Cf.* Ultraframe (UK) Ltd. v. Fielding [2004] R.P.C. (24) 479 (Court of Appeal) (holding that, where the managing director and 100% shareholder created works for the company, to wit, designs subject to the unregistered design right, he held them on trust for the company).

[43] *See, generally,* Gabrin v. Universal Music Operators Ltd. [2004] E.C.D.R. 18; Ultraframe (UK) Ltd. v. Fielding [2004] R.P.C. (24) 479 (Court of Appeal) and, in a different context, Trimingham v. Associated Newspapers [2012] EWHC 1296 (QB), paras. 320–337 (on what amounts to commissioning).

[44] On formal requirements, see § 4[2][b] *infra.*

[45] Under the 1956 Act, a party commissioning a photograph, portrait, or engraving for value presumptively acquired copyright in that work: C.A. 1956, Sec. 4(3), Sched. 8, para. 1(a). Once this provision was superseded, subjects portrayed in photographs or films obtained rights to protect their privacy interests. *See* § 7[1][e] *infra.* Commissioners are treated as first owners of unregistered design rights and registered designs. On these rights, see § 2[4][c] *supra.*

[46] *See, e.g.,* Robin Ray v. Classic FM Ltd. [1998] F.S.R. 622 (Lightman J.) (terms to be implied only where and insofar as they are necessary), *approved*, R. Griggs Group Ltd. v. Raben Footwear [2005] F.S.R. (31) 706 (Court of Appeal); Grisbrook v. MGN Ltd. [2010] EWCA Civ 1399 (restricting a freelance photographer's oral license to contemplated publication of photographs in a newspaper, but not extending it to globally delivering them to the public within back-issues via any website); Celebrity Pictures Ltd. v. B. Hannah Ltd. [2012] EWPCC 32 (implied license to use photographs in magazine).

[47] *See, e.g.,* John Richardson Computers v. Flanders & Chemtech Ltd. [1993] F.S.R. 497 (computer program upgraded); A & M Records v. Video Collection [1995] E.M.L.R. 25 (sound recording made); Pasterfield v. Denham [1999] F.S.R. 168 (preparation of advertising leaflet); R. Griggs Group Ltd. v. Raben Footwear [2005] F.S.R. (31) 706 (Court of Appeal) (logo belonged to commissioner, even though author was freelance artist for company which was commissioned); Lucasfilm v. Ainsworth [2008] EWHC 1878 (Ch), *affirmed on point*, [2009] EWCA Civ 1328, paras. 206–8 (copyright in helmets which had been created on the basis of drawings supplied to the creator and which were intended for use in Star Wars films belonging to film producer).

[48] *See* Clearsprings Management Ltd. v. Businesslinx Ltd. [2006] F.S.R. (3) 21 (holding the commissioner of a web-based database only entitled to perpetual and irrevocable, royalty-free, non-exclusive personal license, as opposed to the copyright

### [iii] Recordings, Broadcasts, Editions

Copyrights in sound recordings, broadcasts, and certain editions, generally speaking, vest initially in the entrepreneurs who undertake the making of the relevant media productions—as follows:[49]

- *Sound recordings:* Subject to prior assignment, copyright in a sound recording vests in the producer, that is, the person by whom the arrangements necessary for making it are undertaken.[50]

- *Broadcasts:* Copyright in a sound or television broadcast belongs to the person making the broadcast. If a person relays another's broadcast by reception and immediate retransmission, the author is the maker of the original broadcast rather than the person who relays it.[51]

  - *Published editions:* Copyright in the typographical format of the published edition of a work belongs to the publisher.[52] The ownership of the "publication right," which arises where a person publishes a previously unpublished work in which copyright has expired, vests in the publisher.[53]

The ownership of rights in films receives the special treatment discussed above.[54]

### [2] Transfers: General Rules; Conflicts of Laws

Courts in the United Kingdom, in dealing with a copyright contract, have distinguished between the foreign law governing the assignability of a foreign right purportedly subject to the contract and the proper law of the contract itself.[55]

---

ownership or exclusive license contended for); Slater v. Wimmer [2012] EWPCC 7 (declining to imply a term assigning copyright to, or licensing, producer where film director was only paid expenses).

[49] On these copyrights, see § 2[2][c] *supra* and § 9[1][b] *infra*.

[50] A & M Records v. Video Collection [1995] E.M.L.R. 25 (distinguishing person who created arrangements from person who made the recording); Bamgboye v. Reed [2004] E.M.L.R. 61. On performances, see § 9[1][a] *infra*.

[51] C.D.P.A., Sec. 9(2)(b). Under the 1956 Act, the author of a broadcast was either the British Broadcasting Corporation, the Independent Broadcasting Authority, or the broadcasting organizations of countries to which the Act has been applied, each in respect of its own broadcasts.

[52] C.D.P.A., Sec. 9(2)(e).

[53] Related Rights Reg. 16.

[54] On such ownership, see § 4[1][a][ii] *supra*.

[55] Campbell Connelly & Co. Ltd. v. Noble [1963] 1 W.L.R. 252, 254; Gloucester Place Music Ltd. v. Le Bon [2016] EWHC 3091 (Ch), paras. 14–17, discussed in *"Introduction," herein, at § 5[3]*. *See, e.g.,* Crosstown Music Co. v. Rive Droite Music Ltd. [2010] EWCA Civ 1222, para. 58 (in the case of "a contract which deals with copyright throughout the universe," looking to apply its "express English [choice-of-] law clause"). *Cf.* R. Griggs Group Ltd. v. Evans (No. 2) [2004] F.S.R. (48) 939 (noted in § 4[2][d] *infra*), *affirmed*, R. Griggs Group Ltd. v. Raben Footwear [2005] F.S.R. (31) 706 (Court of Appeal). For a point on which the Copyright Act 1911 may residually affect the assignability of U.K. rights, see § 4[3][d] *infra.* For analysis of chain of title worldwide and of foreign copyright contracts, see *"Introduction," herein, at § 5[3]*.

## [a] Interests Subject to Transfer

Section 90(1) of the 1988 Act declares: "Copyright is transmissible by assignment, by testamentary disposition or by operation of law, as personal or moveable property." Thus copyright may be assigned, either in whole or in part; interests may be licensed exclusively or non-exclusively; rights may be mortgaged or made the subject of a charge by means of a conditional assignment; and they may pass to the trustee in bankruptcy.[56]

Copyright in a work must be distinguished from ownership of the physical embodiment of the work, for example, the manuscript of a text.[57] On death, copyright will pass under any will covering it generally or specifically; otherwise it will pass under the general principles of intestacy.

## [b] Formal Requisites for Transfers

Assignments of legal interests in copyright have to be in writing and signed by or on behalf of the assignor.[58] The same rule applies to assignments of future copyright[59] and to licenses if the licensee wishes to take advantage of his entitlement to sue for infringement.[60] In other circumstances, licenses do not have to be in any particular form and may indeed be implied from surrounding circumstances.[61]

## [c] Contractual and Related Presumptions

---

[56] C.D.P.A., Sec. 90(4). *See, e.g.,* Crosstown Music Co. v. Rive Droite Music Ltd. [2010] EWCA Civ 1222 (confirming the validity of assignments that were to end, with reversion of the assigned rights to the author, in the event of material breach). For the rules applicable to the priority of transfers, see § 4[2][d] *infra.* On attachment, see § 4[3][c] *in fine infra*.

[57] *See, e.g.,* Philip v. Pennell [1907] 2 Ch. 577 (when a letter is sent, the implication is that ownership of the paper is being transferred to the recipient; not so the copyright). *See also* Duchess of Sussex v. Associated Newspapers Ltd. [2021] EWHC 273 (Ch), [2021] EWCA Civ 1810.

[58] C.D.P.A., Sec. 90(3). Secondary evidence may be allowed to prove the existence and content of such an assignment unless the party relying on the document has the document in his possession or could produce it in court without difficulty. *See, e.g.,* Springsteen v. Flute International Ltd. [1999] E.M.L.R. 180, *affirmed on appeal, sub nom.* Masquerade Music Ltd. v. Springsteen [2001] E.M.L.R. 654 (rejecting so-called "best evidence" rule and stating that court has discretion as to what weight to afford secondary evidence and will require party seeking to adduce such evidence to account for absence of documentary evidence).

[59] C.D.P.A., Sec. 91(1). The presumptive transfer of rental rights need not satisfy this provision: C.D.P.A., Sec. 93A(4). An assignment of future copyright in a work, signed by or on behalf of the prospective owner of copyright, is effective to vest the copyright in the assignee on the work's coming into existence. Prior to that point, the assignment agreement takes effect as an equitable assignment of copyright. Where there is more than one such agreement in existence in relation to a single putative work, the first assignee in time will become the legal owner on the work's coming into existence. *See* Performing Right Society v. B4U Network (Europe) Ltd. [2013] EWCA Civ 1236.

[60] C.D.P.A., Secs. 92, 101 (exclusive license must be in writing and automatically confers right to sue). A license, even if non-exclusive, may (if the parties so choose) grant the licensee a right of action against infringers: C.D.P.A., Sec. 101A (added by Information Society Reg. 28).

[61] Robin Ray v. Classic FM Ltd. [1998] F.S.R. 622 (Lightman J.); Godfrey v. Lees [1995] E.M.L.R. 307. *See, e.g.,* Nelson v. Rye and Cocteau Records Ltd. [1996] F.S.R. 313, 339–40 (Laddie J.) (acknowledging that issuing was a right separate and distinct from the reproduction right, but holding that a license to manufacture for the purposes of sale carried with it "by necessary implication" a license to release the copies to the public).

Presumptions concerning the initial ownership of copyright have already been indicated.[62] The presumption that the author of a work included in a film transfers the rental right to the film producer has already been discussed.[63] A further presumption exists that where a work is unpublished, and a bequest is made of a document or other material thing containing the work, then the bequest is to be construed as including the copyright in the work, in so far as the testator was the owner of the copyright immediately before his death.[64]

In actions for infringement of copyright, the Act creates a number of evidentiary presumptions which may assist the plaintiff.

- The *person named as author* on a publication of a literary, dramatic, or musical work, or upon an artistic work when it is made, is rebuttably presumed to be the author; and it is also thus presumed that he is not in an employment or any other situation which would deprive him of the copyright initially.[65]

- Absent which, if the *publisher* of such a work is identified and the work is first published in the United Kingdom or a convention country, copyright is rebuttably presumed to subsist and be owned by the person named as the publisher at first publication.[66]

- Where *the author is dead*, it is rebuttably presumed that the work is original and first published where and when the plaintiff alleges.[67]

- As regards *sound recordings*, *films*, and *computer programs*, statements naming the copyright owner, or giving the date or place of first publication, are rebuttably presumed to be true.[68]

- As regards a *film* issued, or communicated to the public, persons are presumed to be the producer or director if they are named as such, and the named director to be the principal director.[69]

## [d] Recordation; Priority of Transfers

Copyright legislation does not require transactions to be publicly recorded. However, a mortgage by a company of its copyright or a copyright license must be registered within

---

[62] *See* § 4[1] *supra.*

[63] *See* § 4[1][a][ii] *supra.*

[64] C.D.P.A., Sec. 93.

[65] C.D.P.A., Sec. 104(2) and, for joint authors, Sec. 104(3).

[66] C.D.P.A., Sec. 104(4). *See* Waterlow Publishers Ltd. v. Rose [1995] F.S.R. 207, 218. These presumptions do not operate for the purposes of the "publication right": Related Rights Reg. 17(2)(b). On this right, see § 9[1][b] *infra.*

[67] C.D.P.A., Sec. 104(5).

[68] C.D.P.A., Sec. 105(1), (2), (3). *See, e.g.,* Microsoft Corporation v. Electro-wide Ltd. [1997] F.S.R. 580, 594 (presuming Microsoft to be owner of copyright in computer program for purposes of summary judgment).

[69] C.D.P.A., Sec. 105(2)(a), (5), and (6) (as amended by Information Society Regs., Sched. 1, para. 8(1)(c)).

21 days of its creation with the Registrar of Companies if it is not to be void against the liquidator or a creditor of the company.[70] Otherwise, the first transfer in time of specific rights has priority over claims deriving from subsequent purported transfers of the same rights with one exception: a prior license will not bind a subsequent *bona fide* purchaser of the copyright who, without actual or constructive notice of the prior license, gives valuable consideration for the copyright.[71] One court applied, to transfers of copyrights worldwide, the English equity rule that a purported transferee with notice of a prior transfer does not acquire the rights subject to the prior transfer.[72]

## [3] Limitations of Transfer; Specific Cases

### [a] Equity and Public Policy

The terms of assignments, licenses, and other dealings are normally a matter for free negotiation. The courts, however, have subjected some copyright contracts to scrutiny.

### [i] Equity Between Parties

Courts may occasionally set aside or reform copyright contracts on the ground either that the contract is an unreasonable restraint of trade or that it was made in circumstances of "undue influence."

The courts will set aside contracts which are in restraint of trade where they are unreasonable, having regard to the interests of the parties and the public interest. For example, a contract between a composer and music publisher was found to display an excessive disparity of obligation. The composer was bound to submit all the songs he wrote, but the publisher was under no obligation to publish the songs, nor to pay royalties absent publication. Further, the author was bound for a period of ten years, while the publisher was bound for a period terminable upon a month's notice.[73]

Subsequent cases have applied the doctrine of restraint of trade to performers as regards recording agreements.[74] However, where an established artist renegotiated an earlier agreement on the grounds that it was unduly burdensome, the fact that the

---

[70] Companies Act 2006, Secs. 859A, 859D (defining "intellectual property"), 859H (effect of non-registration).

[71] C.D.P.A., Sec. 90(4). Although good faith and absence of notice are treated as separate requirements, it is difficult to imagine a situation where the good faith requirement adds anything to the notice requirement.

[72] R. Griggs Group Ltd. v. Evans (No. 2) [2004] F.S.R. (48) 939 (where an implied agreement by author E to assign copyright throughout the world to G gave G an equitable interest in the copyright which bound D, a purchaser with notice; the court ordered D to assign worldwide copyrights to G), *affirmed*, R. Griggs Group Ltd. v. Raben Footwear [2005] F.S.R. (31) 706 (Court of Appeal).

[73] Schroeder v. Macaulay [1974] 3 All E.R. 616. In Lord Diplock's view the terms demonstrated an inequality of bargaining power, but subsequent decisions have been reluctant to develop any general principles of this sort. *See* Clifford Davis v. WEA Records [1975] 1 All E.R. 237.

[74] *See, e.g.,* Zang Tumb Tuum v. Johnson [1993] E.M.L.R. 61 (recording agreement binding young group individually and collectively to the record company for up to nine years, while the record company could terminate its obligations at any time, was invalid).

renegotiated contract might have lasted for twelve years did not justify setting it aside as a restraint of trade, given the generous remuneration which was promised to the artist.[75]

A contract may also be invalidated on grounds of undue influence. For example, undue influence may be presumed to have been exerted by a manager over an unknown protégé.[76] On such a finding, the contract may be voidable, not only for the future, but *ab initio*.[77] Remedies may include assigning copyright to the author in works produced during the relationship and an accounting for profits, but subject to deduction for contributions to the author's success.[78]

## [ii] Public Policy; Competition

Copyright transactions may also be subject to considerations of public policy arising from principles that favor free competition or commerce. While the U.K. was a Member of the European Union, two distinct regimes of competition law were applicable: one deriving directly from E.U. Law; the other, domestic. However, since the end of the transitional period under the Withdrawal Agreement, the United Kingdom is no longer subject to the E.U. system of competition law.[79]

Anti-competitive practices are regulated in a variety of ways that could, in principle, apply to certain copyright dealings.[80] The Competition Act 1998 introduced into the domestic environment, provisions equivalent to Articles 81 and 82 of the then-applicable E.C. Treaty:[81] a so-called "Chapter I" prohibition of anti-competitive agreements or practices, and a "Chapter II" prohibition of abuses by an undertaking of a dominant position in the marketplace. The impact of these provisions is more telling than the equivalent Treaty articles, because in domestic law there is no requirement that the agreement, conduct, or abuse affect trade between Member States of the European Union. Consequently, the two prohibitions might catch a variety of individual copyright licenses, refusals to license, and collective licensing arrangements.

In addition, under Chapter IV of the Enterprise Act 2002, the Competition and Markets Authority ("C.M.A.") may instigate an investigation of market situations which it considers may prevent, restrict or distort competition.[82] The C.M.A. must investigate

---

[75] Panayiotou v. Sony Music Entertainment [1994] E.M.L.R. 229. The main ground for rejecting the artist's claim was that it was contrary to public policy to seek to re-open a previously compromised action.

[76] O'Sullivan v. Management Agency and Music [1985] Q.B. 428.

[77] The contract will not be voidable if, aware of its voidability, the relevant party has continued to act as if the contract was valid: Ryder v. Nicholls [2000] E.M.L.R. 632.

[78] Elton John v. James [1991] F.S.R. 397. Since the contract is only voidable, contractual dealings with *bona fide* purchasers will remain binding. *See* Llewelyn & Aplin, *Intellectual Property*, paras. 13–25 to 13–28; and, more generally, *The Modern Law of Copyright*, paras. 12.61 to 12.62, pp. 687–8.

[79] *See* Competition (Amendment etc.) (EU Exit) Regulations 2019, S.I. 2019/93.

[80] For an overview, see R. Whish and D. Bailey, *Competition Law*, Chap. 19 (10th ed., 2021).

[81] *I.e.,* corresponding to Articles 101 and 102 of the F.E.U. Treaty.

and assess whether there is an adverse effect on competition. If the C.M.A. finds such an effect, it may require that action be taken to remedy the effect and make orders or require undertakings to bring about appropriate changes.[83] In a previous investigation, under powers similar to those now granted by the Enterprise Act, the predecessor Monopoly and Mergers Commission held that certain practices of the Performing Right Society were unsatisfactory and the Society agreed to amend its rules.[84]

### [b] Unwaivable Rental-Remuneration Rights

A significant exception to the freedom of copyright contracts applies to transfers of rental rights.[85] Where a person transfers the rental right "concerning" a film or sound recording to the producer of the film or sound recording, Section 93B states that "he retains the right to equitable remuneration for rental." The potential beneficiaries of the retained right are the authors of literary, dramatic, musical, or artistic works, as well as the principal directors of films, of which copies are subject to rentals.[86]

The right applies if the transfer is presumed under Section 93A or if it is voluntary.[87] The right is contractually unwaivable and unassignable, other than to a collecting society or by testamentary disposition or operation of law, for example, in bankruptcy.[88] The remuneration is to be claimed from the person "for the time being entitled to the rental right," and the relevant time is presumably the time of rental rather than of claim. The amount deemed equitable is to be determined by agreement; otherwise, by the Copyright Tribunal, based on the importance of the contribution of the author or performer to the film or sound recording.[89] Remuneration is not to be considered inequitable merely

---

[82] Enterprise Act 2002, s. 131. When making a reference, the Competition and Markets Authority must have reasonable grounds for suspecting that a feature, or combination of features, of a market in the United Kingdom for goods and services prevents, restricts or distorts competition in connection with the supply or acquisition of any goods or services in the United Kingdom or a part of the United Kingdom.

[83] Enterprise Act 2002, s. 138. These powers may include making licenses available as of right or modifying the terms on which licenses are made available. *See* C.D.P.A., Sec. 144. Recourse may be had to the Copyright Tribunal to settle appropriate license terms. On the Tribunal, see § 5[2] *infra*. A finding of anticompetitive conduct may be raised as a defense when seeking mitigation in an infringement suit. *See* § 8[4][a][iv] *infra*.

[84] *Report on the Supply in the UK of the Services of Administering Performing Rights and Film Synchronization Rights* (Cmnd. 3147, 1996).

[85] Related Rights Reg. 33, giving effect to Rental Rights Directive, Art. 4. On this directive, see *"E.U.," herein, at § 4[2][c]*, with text in Appendix 3. For commentary, see *The Modern Law of Copyright, Chap. 30*.

[86] Section 191G of the 1988 Act has the same effect as regards performers. It seems that Section 93B applies not just to circumstances where the work is incorporated in a film or sound recording, for example, the music used in a film, but also where the work is to be rented with the sound recording or film, such as might occur with art work on a record sleeve. This conclusion is consistent with the expansive definition of author in Section 93B(1)(a) as covering authors of artistic works and the use in Section 93B(1) of "concerning."

[87] On these presumptions, see § 4[1][a][ii] *supra* and § 9[1][a][ii] *infra*. For further analysis, see *The Modern Law of Copyright*, paras. 30.14 to 30.32, pp. 2169–2178.

[88] C.D.P.A., Sec. 93B(5).

[89] C.D.P.A., Secs. 93C and 191H. *See* § 5[2] *infra*.

because it was paid by way of a single payment or at the time of transfer of the rental right.

## [c] Scope of Transfers; Attachment

The Act takes a liberal view of what may be transferred, permitting partial assignments or licenses by reference to one or more of the acts within the exclusive rights. Transfers may be made for a period less than the full duration of the right: for example, there may be an assignment of the serial rights of a novel for a term of five years. Nor is there any requirement, in the absence of agreed terms, that licenses be exercised within any given period or at all. Furthermore, there is no general prohibition on the assignment of rights in respect of modes of exploitation not developed at the time of the agreement, and whether a transfer covers such modes is a matter of construction.[90] If formally sufficient, assignments may be made of rights in works to be created in the future.[91] Finally, the Act imposes no limits on general principles of involuntary assignment of assets upon bankruptcy or liquidation, nor does it affect the garnishing of copyright, otherwise subject to the provisions of British bankruptcy law.[92]

## [d] Reversionary Rights

The current legislation contains no provision under which rights in works created after June 1, 1957, may revert to the author or his estate.[93] But it preserves the right given by the Copyright Act 1911, Section 5(2), in respect of works created before June 1, 1957, which were assigned between the passing of that Act and June 1, 1957.[94] This provision renders the assignment void as against the author's personal representatives insofar as it extends to the period of copyright that commences 25 years from the author's death. The reversionary right does not arise either (i) where the author was not the initial owner of the copyright[95] or (ii) in the case of a collective work.

## [e] Resale Right: *Droit de Suite*

---

[90] *See The Modern Law of Copyright*, paras. 12.17 to 12.24, pp. 659–668.

[91] *See* § 4[2][b] *supra.*

[92] *See* § 4[2][d] *supra.*

[93] Such reversionary rights, however, may well be created by contract. *See, e.g.,* Crosstown Music Co. v. Rive Droite Music Ltd. [2010] EWCA Civ 1222 (confirming clause that triggered the reversion of rights upon material breach).

[94] C.D.P.A., Sched. 1, para. 27. The 1988 Act also preserves the reversionary interests under the 1911 Act which substituted, for subsisting terms in pre-1912 works, longer terms of copyright and declared that prior transfers conveyed neither the "windfall" of copyrights for the additional duration of the new terms, nor that of newly instituted "mechanical" rights: C.D.P.A., Sched. 1, para. 28. *See, e.g.,* Novello & Co. Ltd. v. Keith Prowse Music Publishing Co. Ltd. [2005] E.M.L.R. 477 (Court of Appeal) (applying reversion provisions in the 1911 Act, as subject to the transitional provisions in the 1988 Act, to hold valid a 1973 assignment of a reversionary interest in a 1911 Act work, where the initial assignment had occurred in the 1940s). For further analysis, see *Copinger and Skone James on Copyright*, paras. 5-137 to 5-149; *The Modern Law of Copyright*, paras. 12.36 to 12.55, pp. 672–684; *"Australia," herein, at § 4[3][c]* (but note the different time frame for parallel reversion provisions in Australia).

[95] On transitional provisions preserving initial ownership status as of the date of making of a work, see § 4[1][b] *supra.*

Artists are given a right to participate in the net sale price, after tax, of embodiments of their works resold in the United Kingdom.[96] The right is given to the author of "any work of graphic or plastic art," including "limited editions," in which copyright subsists.[97]

The right operates only in relation to "resales" of such works, that is, sales by persons to whom the tangible property in the embodiment of a work has already been transferred,[98] and only when such resale is effected by an art-market professional.[99] The royalty is payable by the seller, and the seller's agent, or if there is no such agent, either by the agent of the buyer, if there is one, or by the buyer.[100] The royalty rate is set on a sliding scale: no royalty is payable on sales under £1,000,[101] and the maximum collectable is £12,500.[102]

The right is not assignable.[103] Royalties can only be collected through a "collecting society," and provision is made for the administration of rights by a collecting society even without the holder's action.[104] The right applies to sales of existing works in which copyright subsists.[105] However, it may only be exercised in respect of the sale of a work

---

[96] The Artist's Resale Right Regulations 2006, S.I. 2006/346, effective February 13, 2006, as amended by the Artist's Resale Right (Amendment) Regulations, S.I. 2011/2873. On the Directive thus implemented, see *"E.U.," herein, at § 4[2][h]*, with text in Appendix 8. For commentary, see S. Stokes, *Artist's Resale Right (Droit de Suite): Law and Practice* (3rd ed., 2017); *Copinger and Skone James on Copyright,* Chap. 20; *The Modern Law of Copyright, Chap. 39.* Following Brexit, with effect from April 1, 2024, all references to "euros" in the Regulations have been replaced by references to "pounds." See The Design Right, Artist's Resale Right and Copyright (Amendment) Regulations 2023, S.I. 2023/1285. However, this amendment does not apply to any transactions taking place before that date.

[97] The Artist's Resale Right Regulations 2006, Reg. 4. The term "joint authors" is here defined in a different manner than for copyright: *Id.*, Reg. 5 (different from C.D.P.A., Sec. 10). The name appearing on the work is presumed to be the author: *Id.*, Reg. 6.

[98] *Id.*, Reg. 3. "Transfer of ownership by the author" is further defined as including transfer by testamentary disposition in accordance with the rules on intestacy, disposal by the author's personal representative, or disposal by an official receiver or trustee in bankruptcy: *Id.*, Reg. 3(5).

[99] More specifically, the royalty is only applicable to resales where the buyer or seller, or the agent of the buyer or of the seller where the sale takes place through an agent, "is acting in the course of a business of dealing in works of art": *Id.*, Reg. 12(3)(a).

[100] *Id.*, Reg. 13.

[101] *Id.*, Reg. 12(3)(b). No royalty is payable on a sale for less than £10,000 where the seller acquired the work directly from the author less than three years before the sale: *Id.*, Reg. 12(4).

[102] *Id.*, Sched. 1. The rates are cumulatively: 4% on the first £50,000; 3% on the next £150,000; 1% on the next £150,000; and 0.5% on the next £150,000. The right-holder is entitled to 0.25% on any part of the sale price above £500,000.

[103] *Id.*, Reg. 7. Nor is it chargeable nor waivable: *Id.*, Regs. 7(2), 8. The right does, however, pass on death as personal property by testamentary disposition or in accordance with rules of intestacy, either to a natural person or to a charity: *Id.*, Regs. 9, 7(4).

[104] *Id.*, Reg. 14. Collecting society is defined broadly as "a society or other organisation which has as its main object, or one of its main objects, the administration of rights on behalf of more than one artist." Management of the right is defined as the "collection of resale royalty … in return for a fixed fee or a percentage of the royalty." The Design and Artistic Copyright Society has undertaken to administer the resale right. Information on this society is available at *http://www.dacs.org.uk*. At least one competitor has now emerged: the Artists Collecting Society CIC. Information on this society is available at *http://www.artistscollectingsociety.org.uk*.

[105] The Artist's Resale Right Regulations 2006, Regs. 3(1), 3(2). The right applies notwithstanding the fact that the work sold was made prior to the coming into force of the legislation, as long as copyright continues to subsist. Reg. 16(1)(b).

2 International Copyright Law and Practice UK § 4

where the author of the work is a national of either i) the U.K. or ii) a state the legislation of which provides resale right protection for authors from the U.K. and their successors in title.[106] Where the author is deceased at the date of the sale, the right can be exercised by his or her personal representatives where, at the date of death, one of the conditions above is satisfied.[107]

The right does not apply to sales of works in accordance with a contract made preceding the commencement of the Regulations.[108]

International Copyright Law and Practice
Copyright 2025,  Matthew Bender & Company, Inc., a member of the LexisNexis Group.

---

**End of Document**

---

[106] The Artist's Resale Right Regulations 2006, Reg. 10, as amended by the Intellectual Property (Copyright and Related Rights) (Amendment) (EU Exit) Regulations 2019, S.I. 2019/605, Reg. 29(3). The United States is not such a country.

[107] The Artist's Resale Right Regulations 2006, Reg. 9, 10, 16(2).

[108] The Artist's Resale Right Regulations 2006, Reg. 16(1).