# EXHIBIT 12

# HEINONLINE



DATE DOWNLOADED: Fri Jan 26 17:07:51 2024
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

Bluebook 21st ed.
Ken Cavalier, Potential Problems with Commonwealth Copyright for Posthumous Poets and Other Dead Authors, 52 J. COPYRIGHT SOC'y U.S.A. 225 (2005).

ALWD 7th ed.
Ken Cavalier, Potential Problems with Commonwealth Copyright for Posthumous Poets and Other Dead Authors, 52 J. Copyright Soc'y U.S.A. 225 (2005).

APA 7th ed.
Cavalier, Ken. (2005). Potential problems with commonwealth copyright for posthumous poets and other dead authors. Journal of the Copyright Society of the U.S.A., 52(2), 225-238.

Chicago 17th ed.
Ken Cavalier, "Potential Problems with Commonwealth Copyright for Posthumous Poets and Other Dead Authors," Journal of the Copyright Society of the U.S.A. 52, no. 2 (Winter 2005): 225-238

McGill Guide 9th ed.
Ken Cavalier, "Potential Problems with Commonwealth Copyright for Posthumous Poets and Other Dead Authors" (2005) 52:2 J Copyright Soc'y USA 225.

AGLC 4th ed.
Ken Cavalier, 'Potential Problems with Commonwealth Copyright for Posthumous Poets and Other Dead Authors' (2005) 52(2) Journal of the Copyright Society of the U.S.A. 225

MLA 9th ed.
Cavalier, Ken. "Potential Problems with Commonwealth Copyright for Posthumous Poets and Other Dead Authors." Journal of the Copyright Society of the U.S.A., vol. 52, no. 2, Winter 2005, pp. 225-238. HeinOnline.

OSCOLA 4th ed.
Ken Cavalier, 'Potential Problems with Commonwealth Copyright for Posthumous Poets and Other Dead Authors' (2005) 52 J Copyright Soc'y USA 225          Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

Provided by:
William M. Rains Library

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

# POTENTIAL PROBLEMS WITH COMMONWEALTH COPYRIGHT FOR POSTHUMOUS POETS AND OTHER DEAD AUTHORS

*by* KEN CAVALIER*

## INTRODUCTION

In this post-TRIPs Agreement[1] world, where WIPO[2] can enforce intellectual property rights to a minimum standard enforced by recourse to WTO panels, there is a growing misconception that the differences between national intellectual property right protection regimes are fast diminishing. For example, the recent Sonny Bono amendment to the U.S. Copyright Act[3] has retroactively extended copyright protection to the "life of the author plus 70 years" from the former "life of the author plus 50 years." This legislation brings the U.S. term of protection into line with the term in civil code countries and Great Britain. There was a recent constitutional challenge to this amendment, but in *Eldred v. Ashcroft*[4] the United States Supreme Court upheld the right of Congress to change the term of protection. However, in Canada and many other Commonwealth countries, the term of copyright protection has remained at the "life of the author plus 50 years" standard first established in the 1911 U.K. Imperial Copyright Act[5] and the Berne Convention.[6] While there may well be increasing pressure to lengthen the term of protection, at the present time the standard established in 1911 continues to fulfill the minimum copyright

---

*Ph.D (art history), Northwestern University; LL.B, University of British Columbia; LL.M Candidate, University of British Columbia. Adjunct Professor (Law of Cyberspace), Faculty of Law, University of British Columbia. The author is also involved in legal consulting and part-time private practice for his firm, Ken Cavalier Barrister & Solicitor. He can be reached at kcavalier@telus.net, tel: (604) 581 0261, or fax: (604) 677 6109. The photo of Solomon Linda and the Evening Birds is published with the permission of Dr. Owen Dean, attorney for the executor of the Solomon Linda estate.

[1] Agreement on Trade Related Aspects of Intellectual Property Rights, Including Trade in Counterfeit Goods, Protection Agreement (1994), 25 I.I.C. 209 (TRIPs) as appended to the World Trade Organization Agreement of 1994 (WTO).
[2] World Intellectual Property Organization.
[3] Sonny Bono Copyright Term Extension Act, Pub. L. No. 105-298, § 102(b), 112 Stat. 2827, 2827 (1998) (amending 17 U.S.C. § 302 (1994)).
[4] 537 U.S. 186 (2003).
[5] 1 & 2 Geo. 5, c. 46, § 3 (Eng.).
[6] Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886, as last revised July 24, 1971, 25 U.S.T. 1341, 828 U.N.T.S. 221.

protection term called for in the TRIPs Agreement that resulted from the 1994 Uruguay Round. It is clear then, that the term of copyright protection is not uniform around the globe. This is not the only significant difference among national copyright acts. However, since copyright is linked to the nation of origin of the author and can be enforced internationally,[7] these differences can be critical when determining the risk of legal liability for potential infringement.

Let us explore a cautionary tale about how these differences have recently (July 2004) caused a major legal problem for Disney Enterprises, Inc. in South Africa. Under joint and several liability, Disney found itself, along with Nu Metro and David Gresham Records, named in a $1.6 million law suit for copyright infringement concerning the song *Mbube* (better known as *The Lion Sleeps Tonight*) filed on behalf of the Ntsele family[8] of South Africa.[9] In an interlocutory measure, effective until the copyright infringement case is decided, some 240 or more of the trademarks owned by Disney Enterprises in South Africa (Mickey Mouse, Donald Duck, etc.) have been attached by court order on behalf of the family. Disney Enterprises brought an application before Justice Hekkie Daniels of the High Court of South Africa (Transvaal Provincial Division) to have the order lifted, but the application failed.[10] Should Disney lose the infringement case, the family could compel the company to sell the trademarks to satisfy the judgment against it unless Disney settles with the family.

Here are the facts of the case so far. In 1939 an itinerant South African Zulu composer and musician named Solomon Linda wrote, and with his band the Evening Birds, recorded a tune called *Mbube* (Lion) on Gallotone Records in Johannesburg. The song reputedly sold over 100,000 copies over the next decade and founded a genre of music bearing its

---

[7] Under the TRIPs agreement, authors of signatory countries are entitled to what is called "National Treatment" or legal rights equivalent to those of the citizens in the host country allowing authors to sue wherever the infringement takes place. But because of the express recognition of local intellectual property laws within the author's home country, a suit brought in the home country of the author against a foreign infringer under national laws could well be enforceable if the infringer has any assets within the home country. *See infra.*

[8] Ntsele is the family name attached to the estate of Solomon Linda, whose daughters live in Soweto. 3rd Ear Music, MBUBE – Mickey Mouse, Donald Duck & Goofy Under House Arrest in SAfrica?, *at* http://www.3rdearmusic.com/forum/forumaug04/mbube_mmouse.html (last visited Jan. 18, 2005).

[9] *Disney Can Be Sued Over Song Royalties*, THE STAR, Sept. 8, 2004, *at* http://www.thestar.co.za/index.php?fSetId=505&fSectionId=129&fArticleId=2216662.

[10] Disney Enters., Inc. v. Griesel, Case No. 12003/04 (High Ct., Transvaal Prov. Div.) (unreported).

name even today. Ten years later, the recording would come to the attention of Pete Seeger, who would write a song called *Wimoweh* performed by the Weavers, which rose to a number six hit in 1951–52. *Mbube* would later become ubiquitous as the song *The Lion Sleeps Tonight*.[11]



Solomon Linda and the Evening Birds, 1941.

Linda reportedly assigned the copyright in the song for "a few Guinness"[12] or "about ten shillings in his pocket";[13] the precise amount seems unclear, but it was some paltry sum when compared with the reported $15

---

[11] For a chronology of the song and its hit status see, Owen Dean, Spoor & Fisher, Pretoria, The 'Lion' Song Fact Sheet, July 2004, *at* http://www.spoor.com/article.php?no=489; for a discussion of the copyright claim, see Owen Dean, Spoor & Fisher, Pretoria, Copyright Infringement Claim with Respect to 'The Lion Sleeps Tonight', July 2004, *at* http://www.spoor.com/article.php?no=491; for a discussion of reversionary copyright and Dr. Dean's participation in the case, see Owen Dean, Spoor & Fisher, Pretoria, Mickey Mouse, Donald Duck and Others, 'Kidnapped and Held Hostage' in Extraordinary Legal Proceeding, July 2004, *at* http://www.spoor.com/article.php?no=488.

[12] 3rd Ear Music, Where Does the Lion Sleep Tonight?, *at* http://www.3rdearmusic.com/forum/mbube2.html (last visited Jan. 18, 2005).

[13] Rian Malan, *In the Jungle* (2003) whose article originally appeared in *Rolling Stone* magazine, is available for download *at* http://www.coldtype.net/Assets/pdfs/Jungle.pdf .

million U.S. dollars of royalties generated by the song and its derivations over the next sixty-five years.[14] Linda would die in 1962,[15] the year following the rise to a number one hit of the Tokens version of *The Lion Sleeps Tonight*.[16] It is estimated that over 150 different artists have done cover versions of this song over the years and it has been featured in fifteen movies;[17] and it is reported that the tune has logged the estimated equivalent of three decades of air-play in the U.S. alone since 1939.[18]

It has been argued by Dr. Owen Dean, a South African copyright attorney,[19] that because the work was created and fixed by a South African in 1939 and the copyright assigned at that time, that Linda's death in 1962 triggered the start of the twenty-five year clock resulting in the reversion of the copyright to his estate in 1987. This reversion is the result of the operation of Section 5(2) of the Imperial Copyright Act of 1911, passed by the Parliament of the U.K., which Dr. Dean correctly argues could obtain in countries that were formerly part of the British Empire. It is this widespread applicability of reversionary rights that has Disney, and so many other assignees and licensees of copyrighted material of posthumous authors, so concerned.

Many countries that were former colonies and even dominions of the British Empire in 1911 inherited the Imperial Copyright Act of 1911 as their first, and sometimes only Copyright Act. Although, even in 1911 the Act provided that it could be replaced by domestic copyright legislation (as Canada did in 1921), many countries were content to use the Imperial Copyright Act of 1911 for years. If we look to the Solomon Islands, or the Palestinian Authority or the State of Israel, Newfoundland before it became part of Canada, New Zealand, Australia, South Africa and elsewhere, we can find examples of much copyright legislation based upon the Imperial Copyright Act of 1911.

Although these members of the British Empire became members of the British Commonwealth after 1931 or independent states later in the century, this changing status did not necessarily affect their copyright legislation, nor strip it of its British heritage.

The U.S. never had a "Dickens provision" in its copyright legislation, nor have the so-called "artist rights" civil code countries.[20] Even in Brit-

---

[14] Reuters, *A Flap Over 'The Lion Sleeps Tonight'*, *at* http://www.reuters.com, July 2, 2004; *see also* Dean, Fact Sheet, *supra* note 11.
[15] Dean, Copyright Infringement, *supra* note 11.
[16] Dean, Fact Sheet, *supra* note 11.
[17] *Id.*
[18] *See* note 13 *supra*.
[19] For a profile of Owen Dean, see Spoor & Fisher, Owen Dean, *at* http://www.spoor.co.za/showteam.php?TeamID=11 (last visited Jan. 18, 2005).
[20] In the U.S., Rep. Dallinger presented a bill proposing a very similar provision in 1924 (H.R. 8177 and H.R. 9137, 68th Cong.), but this bill never passed.

ain where the provision originated, its repeal in 1956 has taken the concept of reversionary rights from the consciousness of many barristers and solicitors. Assignees who thought they had purchased "all the copyrights" from the authors are dismayed to learn that they have not when the estates come asking for renegotiated assignments twenty-five years after the death of the original author. As we know from the estates of Elvis Presley and other artists and authors, the revenues generated after death may well exceed the revenues that were ever available to the author or artist while he or she was alive.

Additionally, since the authority to license or authorize use is legally possessed only by the owner of the copyright, the concept of reversion can potentially leave users legally liable for copyright infringement to the estates under the principle of *Nemo Dat* (no-one can grant ownership rights unless they possess those rights themselves). This is the situation in which Disney Enterprises has found itself. Having purchased authorization to use *The Lion Sleeps Tonight* in its productions of *The Lion King* from Abilene Publishing Company (the U.S. administrators of the copyright to the song), you can imagine their surprise and dismay when they learned they are jointly liable for copyright infringement in this instance or any other where rights have been transferred in jurisdictions wherein the reversionary rights exist in copyrighted material. As a consequence, Disney has been fighting a legal battle to deny the existence of such reversionary rights with the estate of Solomon Linda that has thus far been unsuccessful.[21]

Let us quote Dr. Dean as he explains the effect of the recent court proceedings in Pretoria against Disney Enterprises:

---

Several civil code countries have developed their own version of reversionary copyright after the death of the author, but none are sufficiently close to the 1911 Act s. 5(2) provisions to be called a "Dickens provision." These countries include Spain, Cuba and Panama, which each granted reversionary rights of fifty-five years after the initial twenty-five years after the death of the author to the heirs of the author (the same in Columbia for "compulsory heirs" according to Barbara Ringer in *Study 31*, *infra* note 26, at 604). In Bulgaria, Haiti and Yugoslavia the term after the death of the author is determined by the life of the surviving spouses and a term to children for twenty years for Haiti, age of majority for Bulgaria and twenty-five years for Yugoslavia. James J. Guinan, Jr., *Study No. 30*, *Duration of Copyright* (Jan. 1957), *in* 1 STUDIES ON COPYRIGHT 473, 478 (Arthur Fisher Mem. Ed. 1963).

[21] Pretoria High Court Judge Hekkie Daniels dismissed an application by Disney to lift the order attaching the trademarks on September 7, 2004. *Disney Can Be Sued Over Song Royalties*, THE STAR, Sept. 8, 2004, *at* http://www.thestar.co.za/index.php?fSetId=505&fSectionId=129&fArticleId=2216662.

> The summons and particulars of claim in the landmark Solomon Linda case were served on Disney Enterprises Inc in the United States of America on 13 July 2004, on Nu Metro Home Entertainment (Pty) Limited on 16 July 2004 and on David Gresham Entertainment Group (Pty) Limited and David Gresham Records (Pty) Limited, on 14 July 2004 in terms of an edictal citation order granted by the Court. . . .
>
> [I]t was recorded in the South African Register of Trade Marks that the registered trade marks of Disney Enterprises Inc in South Africa are now attached in favour of the executor of the Linda estate as per the order granted late last month.
>
> This attachment order in effect grants the executor a right over the registered trade marks which can, however, in the meantime be freely used by Disney Enterprises Inc or its licensees.
>
> Should judgment be granted against Disney Enterprises Inc and any damages and cost awards that are granted are not paid, the executor will be entitled to sell the registered trade marks to realise the monies due to the estate.[22]

Further, Dr. Dean explains how he sees the reversionary rights in South Africa and elsewhere in the former Empire working in this case:

> Solomon Linda died in 1962, at which time the British Imperial Copyright Act of 1911 was still in force in South Africa. Subsequent South African Copyright Acts dating from 1965 and 1978 preserved the subsistence, ownership and duration of copyright arising out of the 1911 British Imperial Copyright Act. The proviso to Section 5(2) of the Imperial Copyright Act stated that where the author of a work was the first owner of the copyright therein and that copyright was assigned, no assignment made during the currency of the Act would be operative to vest in the assignee any rights under the copyright in the work beyond a period of 25 years after the death of the author, and that, at the expiration of the 25 year period, the copyright in the work for the remaining period of its term (i.e., a further 25 years) would revert to the author's legal personal representative or executor as part of his estate; any agreement entered into by the author as to the disposition of such reversionary interest would be null and void.
>
> It is contended by the executor of the estate of Solomon Linda that in terms of the aforegoing provision the copyright in *Mbube* devolved on him in 1987, (i.e., twenty-five years after the death

---

[22] Owen Dean, Spoor & Fisher, Pretoria, Disney Has 3 Weeks to "Free" Mickey Mouse, July 2004, *at* http://www.spoor.com/article.php?no=494.

of Linda) and that such reversionary interest fell to be administered by him as an asset in the estate of Solomon Linda. When Solomon Linda died in 1962 he was intestate and his only known asset was a bank account in the amount of R148.00 (GBP74) and this asset was distributed amongst his heirs. The existence of the reversionary interest was not known at the time and was therefore not distributed to the heirs. Its existence only came to light in 2003, whereupon the estate was reopened and an executor was freshly appointed to deal with the reverted copyright in *Mbube*. It is contended that the copyright in question extends to all countries of the British Empire and the Commonwealth in which the British Imperial Copyright Act had currency in the late 1930s.[23]

## I. THE "DICKENS PROVISION"

The "Dickens Provision"[24] was inserted into the 1911 Imperial Copyright Act when the term of copyright protection was first lengthened from "42 years from publication or life of the author plus 7 years whichever was the longer" to "life of the author plus 50 years." As any assignee, or original author for that matter, previously had no exclusive copyright extending past the twenty-five years after death period, there could be no claim of expropriation of any rights that the assignee had already purchased in works assigned before 1911.[25] Since prior to the 1911 Imperial Copyright Act all copyrights were extinguished long before twenty-five years after the death of the author, there were no rights to which an agree-

---

[23] Dean, Copyright Infringement, *supra* note 11.
[24] The colloquial description of the provision as the "Dickens provision" is mentioned by Madam Justice Janet Wilson in paragraph 83 of the judgment of *Anne of Green Gables Licensing Authority, Inc. v. Avonlea Traditions, Inc.*, [2000] O.J. No. 740, 2000 CPR LEXIS 3 (Ont. Super. Ct. Mar. 10, 2000). This would appear to be one of the most recent Canadian cases on the existence and continued viability of reversionary copyright in Canada.
[25] "One reason, no doubt, for fixing the period of twenty-five years from the death of an author as the limit of assignability of copyright was because at that date the work ceased to have exclusive copyright, and any person—including, of course, the assignee of copyright, who then ceased to have the benefit of assignment—could have published the work on a royalty basis." F.E. SKONE JAMES & E.P. SKONE JAMES, COPINGER AND SKONE JAMES ON THE LAW OF COPYRIGHT 133 (9th ed. 1958). The authors then cite the s. 3 proviso for compulsory licensing from the 1911 Imperial Act which allowed for assignees to apply for licenses to continue using the copyrighted material at set royalty levels provided certain notification procedures were carried out. He goes on to say, "In the case, however, of works existing prior to the Act of 1911 this right did not arise until thirty years after the death of the author (Copyright Act, 1911, s. 3). There was thus left a hiatus of five years." *Id.* n.(c).

ment of assignment of copyright following that period could apply. The extension, then, of the term of protection was a benefit intended for the family of the deceased author. The Public Domain would forego its claim to the copyrighted work for an additional twenty-five years for the benefit of the family. This would avoid the desperate economic situation faced by the family of Charles Dickens following his death, while his book royalties had continued to flow into the publishing companies to whom he had assigned his copyrights earlier in his career. This new bargain, at the expense of the Public Domain, would enable the posthumous term of copyright protection to be extended in accordance with the term of protection in the Berne Convention (after the Berlin 1908 meetings) while accomplishing a "social good."

As time passed, the provision nullifying any agreement to assign the copyright in the work, except by bequest by the first owner of copyright, came to be regarded as a restriction on the right of authors to freely contract with their publishers for the entire period of copyright protection. The provision was identified as "paternalistic" and not consistent with the freedom to contract.[26] As a result, it was repealed in the U.K. in 1956 (effective in 1957), but because of the operation of the Statute of Westminster of 1931 it remained in effect in other former British Empire countries until it was formally repealed or replaced by subsequent copyright legislation. In some countries, the provision has never been repealed.[27] In others, like the U.K., there exist a number of years between the 1911 Im-

---

[26] Concerning the reception of the 1952 Gregory Report in Britain whose recommendations led to the removal of the provisions in the 1956 U.K. Copyright Act, the author says, "it is interesting that little or no consideration was given to the proviso allowing copyrights to revert to the author's estate during their last 25 years; the Committee appeared to assume that if the 25-year compulsory license were dropped [s. 3 Imperial Copyright Act 1911], the 25-year reversion necessarily went with it." In his 1948 edition of *Copinger on the Law of Copyright*, F.E. Skone Jones argued that the intended benefits of the reversionary proviso were "quite illusory" for two reasons: "(1) since the copyright reverts to the author's estate it is likely to be sold for debts, and (2) since the rights during the last twenty-five years are necessarily non-exclusive because of the compulsory license, they are not calculated to bring very much in any case." Barbara Ringer, *Study No. 31, Renewal of Copyright* (Julius Culp ed., June 1960), *in* STUDIES ON COPYRIGHT, *supra* note 20, at 613.

[27] *Id.* Ringer points out that the Lord Chancellor in 1955 emphasized that the Brussels Convention demands the compulsory license provision had to go. She also reports that the 1957 Isley Report on Copyright in Canada did not mention reversion but that the New Zealand Daglish Report [at 24-25] viewed the removal of reversion as "a retrograde step from the point of view of reward to authors." *Id.* at 614. Neither New Zealand nor Canada, nor Australia, Ceylon, Ireland, Israel, Pakistan, the Union of Burma, the Union of South Africa, nor the Federation of Rhodesia and Nyasaland re-

perial Statute and the date of repeal, within which reversionary rights can still be triggered twenty-five years after the death of the author if the rights were assigned or transferred.

## II. REVERSIONARY RIGHTS IN CANADA

Section 14(1) of the current Canadian Copyright Act[28] still contains reversionary rights based upon the "Dickens provision"[29] from Section 5(2) of the 1911 Imperial Copyright Statute:

> 14. (1) Where the author of a work is the first owner of the copyright therein, no assignment of the copyright and no grant of any interest therein, made by him, otherwise than by will, after June 4, 1921, is operative to vest in the assignee or grantee any rights with respect to the copyright in the work beyond the expiration of twenty-five years from the death of the author, and the reversionary interest in the copyright expectant on the termination of that period shall, on the death of the author, notwithstanding any agreement to the contrary, devolve on his legal representatives as part of the estate of the author, and any agreement entered into by the author as to the disposition of such reversionary interest is void.

The reference to June 4, 1921 is to the adoption by Canada of our first Copyright Act following the period from 1911 until that date (even though it did not come into force until January 1924). Presumably then, reversionary rights would apply to any Canadian copyright material assigned between 1911 and the present day.

A further complicating wrinkle in Canada is the Sections 12 and 13 provisions of our Copyright Act concerning ownership of copyright. In Section 12 we are told that:

---

    pealed the Dickens provision from their Copyright Acts before 1960 when the *Renewal of Copyright* article was written.

[28] Copyright Act, R.S.C. 1985, c. C-42, § 14(1) (1985) [hereinafter Canadian Copyright Act].

[29] Madam Justice Wilson refers to the "Dickens" provision in paragraph 83 of *Anne of Green Gables Licensing Authority, Inc.* In a discussion of the history of Canadian copyright legislation, it is noted that, "[Canada's] 1906 Copyright Act was succeeded by Canada's 1921 Copyright Act, which, while assented to on June 4, 1921, was not proclaimed into force until January 1, 1924. This new act consolidated earlier Canadian and United Kingdom copyright statutes and other statutes applicable in Canada, including the 1842 Imperial Act and the 1906 Copyright Act, both in force when the copyright for *Anne of Green Gables* was registered in London." *Id.* at para. 77.

> Without prejudice to any rights or privileges of the Crown, where any work is, or has been, prepared or published by or under the direction or control of Her Majesty or any government department, the copyright in the work shall, subject to any agreement with the author, belong to Her Majesty and in that case shall continue for the remainder of the calendar year of the first publication of the work and for a period of fifty years following the end of that calendar year.

Note that the term of Crown copyright protection runs for a straight fifty years following the end of the calendar year of publication and has no reference to the life of the author plus any number of years.

Section 13(1) states the general supposition that "Subject to this Act, the author of a work shall be the first owner of the copyright therein." The section goes on to describe two other exceptions to this general supposition.

In 13(2) we are informed that:

> [w]here, in the case of an engraving, photograph or portrait, the plate or other original was ordered by some other person and was made for valuable consideration, and the consideration was paid, in pursuance of that order, in the absence of any agreement to the contrary, the person by whom the plate or other original was ordered shall be the first owner of the copyright.

However, this exception is only for an engraving, photograph or portrait made under commission.

In 13(3) we are told that:

> Where the author of a work was in the employment of some other person under a contract of service or apprenticeship and the work was made in the course of his employment by that person, the person by whom the author was employed shall, in the absence of any agreement to the contrary, be the first owner of the copyright, but where the work is an article or other contribution to a newspaper, magazine or similar periodical, there shall, in the absence of any agreement to the contrary, be deemed to be reserved to the author a right to restrain the publication of the work, otherwise than as part of a newspaper, magazine or similar periodical.

It is this critical description of work made in the course of employment that has concerned me as an entertainment lawyer here in Canada whenever American clients demand the inclusion of a boilerplate "work-for-hire" clause on the basis of U.S. law. The U.S. Copyright Act definition of a "work made for hire" includes both:

> (1) a work prepared by an employee within the scope of his or her employment; or (2) a work specifically ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. . . .[30]

Section 201(b) of the U.S. Copyright Act allows that:

> In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purpose of this title, and unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

Consequently, the people for whom the work was prepared are deemed to be the author, something like the commissioner of a portrait or engraving in Canada under s. 13(2) of our Act. Canadian copyright law has no such broad definition of "work made for hire." For the author to be someone other than the actual author, the author must be in the employment of some other person under a contract *of service* or apprenticeship "creating an engraving, photo, or portrait on commission," or working under the auspices of the Crown. Otherwise the first owner of the copyright is the author. It could well be argued that the "work-for-hire clause" is internal evidence that the author was not "employed" under a contract *of* service but rather working in a contract *for* service as an independent contractor. Indeed, creative people often prefer this designation as it allows them to deduct business expenses against their enterprise that would be denied to an employee as an employment expense. The problem that arises then is that if the copyrighted work produced is not produced under a contract of service in the course of employment in an employer/employee relationship, the first owner of the copyright is likely to be the author. While it is standard practice to have the author assign all copyrights to work so produced to the contracting party, this is an assignment from the first owner and thus could well trigger reversionary rights twenty-five years after the death of the author under Section 14(1). To exercise due diligence, it would seem prudent to warn clients of this possible problem with the "work-for-hire" clauses when drafting and advising on contracts between production companies and creative personnel. Liability insurance for all lawyers in the jurisdiction could be kept less expensive by avoiding a "re-

---

[30] 17 U.S.C. § 101 (2000).

versionary rights surprise" such as that experienced by Disney Enterprises in South Africa.

## III. THE MORAL OF THE CAUTIONARY TALE

Should Disney lose its case in South Africa, it could be forced to pay some damages to the estate of Solomon Linda, perhaps the $1.6 million claimed.[31] This amount will certainly not be beyond Disney's ability to pay, and will certainly aid a poor Zulu family in Soweto. However, the ramifications of the applicability of reversionary rights for other copyrighted material owned or licensed by Disney (and others in instances where the author has passed on) can be assumed to be disturbing to the very company that has demonstrated an appreciation of the value of its own intellectual property. On the other hand, if Disney did purchase the rights in good faith, how can it be fair that they are liable for the copyright infringement?

The answer to that lies in the ability to sue other parties. Certainly if one is forced to pay damages for lost royalties, one ought to be able to seek indemnification from the licensor for purporting to have the right to authorize the license when it did not.

A party may also be entitled to sue legal advisors who draft licensing agreements if it can be demonstrated that they failed to exercise due diligence by failing to warn that copyright laws outside the U.S. differ in significant ways from those within, and that those differences may give rise to significant legal liability for copyright infringement. For example, an attorney or legal advisor may be liable for not warning of the potential or reversionary rights liability. After all, if one is acquiring rights to a work from a Commonwealth country, one would assume that the legal advisors would inform themselves and their client about the copyright regime in that nation.

The moral, then, is that if you are a lawyer advising your clients concerning the copyright law in a Commonwealth country, be sure to inform them about the nuances of the differing copyright law regimes and poten-

---

[31] If Disney prevails, it will not be because the reversionary rights did not exist in South Africa, but rather because the U.S. company, Folkways, was able to secure a second assignment agreement in 1983 (four years before the reversionary rights actually devolved on the estate) from the widow of Solomon Linda, Regina, assigning her copyright and copyright interests in the song to them. Whether she actually had the authority to enter such an agreement at that time is the crux of the controversy over whether the executor of the estate had actually distributed that portion of the estate known as the reversionary rights to her at that time. The current case is argued on the basis that the reversionary rights were an unknown asset of the estate at the time the first executor distributed the assets of the estate to the beneficiaries and thus must be dealt with now.

tial liability. If you lack the expertise to do so, consult someone who specializes in copyright in that jurisdiction to advise you. If you are an assignee of copyright from a deceased author, be aware that if they were the first owner of copyright, the assignment deal you signed may be null and void twenty-five years after that author died unless they have been assigned by bequest in a valid last will and testament.[32] Make yourself aware of any notice provisions that could allow your client to retain license to use that may exist within the local copyright law.[33] Be aware that the rights you have authority to administer may revert, leaving you without authority to license or assign anything to do with the work. You too, would be well advised to consult a copyright specialist for the jurisdiction involved. And if you are the representative of the estate of a deceased Commonwealth author, be sure to review any agreements of assignation of copyright that the author made before the twenty-five-year period following his or her death has elapsed. If reversionary rights are triggered, you may find that the estate owns rather more valuable copyrights than anyone imagined.

---

[32] While it is true that the only assignment agreement not voided after twenty-five years is a bequest, it should be remembered that wills are by their very nature revocable right up to the death of the testator.

[33] *E.g.*, Canadian Copyright Act, R.S.C. 1985, c. C-42 (as amended, §§ 60(2), 57) (concerning Substituted Right and Registration of Assignment).