# EXHIBIT 13



**HEINONLINE**

DATE DOWNLOADED: Thu Jan 25 18:40:01 2024
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
Alan J. Hartnick, Stanly Rothenberg: Final Thoughts on the Dickens Provision, 54 J.
COPYRIGHT SOC'y U.S.A. 565 (2007).

ALWD 7th ed.
Alan J. Hartnick, Stanly Rothenberg: Final Thoughts on the Dickens Provision, 54 J.
Copyright Soc'y U.S.A. 565 (2007).

APA 7th ed.
Hartnick, A. J. (2007). Stanly rothenberg: final thoughts on the dickens provision.
Journal of the Copyright Society of the U.S.A., 54(Issues 2-3), 565-570.

Chicago 17th ed.
Alan J. Hartnick, "Stanly Rothenberg: Final Thoughts on the Dickens Provision,"
Journal of the Copyright Society of the U.S.A. 54, no. Issues 2-3 (Winter-Spring
2007): 565-570

McGill Guide 9th ed.
Alan J. Hartnick, "Stanly Rothenberg: Final Thoughts on the Dickens Provision" (2007)
54:Issues 2-3 J Copyright Soc'y USA 565.

AGLC 4th ed.
Alan J. Hartnick, 'Stanly Rothenberg: Final Thoughts on the Dickens Provision' (2007)
54(Issues 2-3) Journal of the Copyright Society of the U.S.A. 565

MLA 9th ed.
Hartnick, Alan J. "Stanly Rothenberg: Final Thoughts on the Dickens Provision."
Journal of the Copyright Society of the U.S.A., vol. 54, no. Issues 2-3,
Winter-Spring 2007, pp. 565-570. HeinOnline.

OSCOLA 4th ed.
Alan J. Hartnick, 'Stanly Rothenberg: Final Thoughts on the Dickens Provision' (2007)
54 J Copyright Soc'y USA 565            Please note: citations are provided as
a general guideline. Users should consult their preferred citation format's style
manual for proper citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.
-- To obtain permission to use this article beyond the scope of your license, please use:
   *Copyright Information*

# ©OPYRIGHT _____ 565

## O R N E R

### STANLEY ROTHENBERG: FINAL THOUGHTS ON THE DICKENS PROVISION

*by* ALAN J. HARTNICK*

Stanley Rothenberg, my friend and colleague for more years than I can remember, was a senior partner in intellectual property at Moses & Singer. He wrote books and articles in the field that both of us share: copyright law. He was the past President of the Copyright Society of the U.S.A., and an adjunct professor at Fordham Law School. He died on November 3, 2006 before he could publish an article on the copyright trap, the so-called "Dickens Provision," in British Commonwealth nations.[1]

Copyrighted materials created before 1957 are subject to the British Commonwealth reversion of rights back to the estate of the author. This occurs at the twenty-fifth anniversary of the date of death, regardless of whether the author was British, American or from any other county having the copyright treaty status with countries of the British Commonwealth.

This special problem in the case of copyrights created before 1957 in the United Kingdom, Canada, Australia, South Africa and other nations or territories that were in the British Commonwealth at that time is something that attorneys may not remember. Any prospective buyer of authors' copyrights must reckon with this right of reversion of copyrights. Under applicable law, the copyright will revert to the estate twenty-five years after the writer's death automatically, for the balance of the period of copyright protection.[2]

Stanley Rothenberg was interested in such reversionary rights. He had delivered on April 21, 2006 a paper for the 14th Annual Conference

---

*Alan J. Hartnick is a partner in the New York City law firm of Abelman, Frayne & Schwab, Past President of the Copyright Society, former Editor-in-Chief of this Journal, columnist on intellectual property for the *New York Law Journal*, and Adjunct Professor at Fordham Law School, teaching copyright.

[1] The Dickens Provision was inserted into the Copyright Act of Great Britain — and its former colonies — in the early twentieth century after outrage that the works of Charles Dickens were generating huge profits for publishing companies while his family was destitute.

[2] M. WILLIAM KRASILOVSKY & SIDNEY SHEMEL, THIS BUSINESS OF MUSIC 257, 299 (8th ed. 2000).

on International Intellectual Property Law at Fordham Law School. This article utilizes Stanley's paper to form what has to be his last published article. The practical consequence of his paper will be discussed by a respected music lawyer, Thomas R. Levy of The Levy Firm.

## I.  STANLEY ROTHENBERG'S PAPER

"Under the Imperial (United Kingdom) Copyright Act of 1911 (the "Act") the term of copyright was life of the author plus fifty years, however, pursuant to the proviso to Section 5(2) of the Act, where the author was the first owner of the copyright and the copyright was assigned or licensed to another party, other than by will, the assignment or license did not vest in the assignee or licensee rights in excess of twenty-five years after the death of the author. The assignee received only the first twenty-five years beyond the author's death, in addition to the balance of the author's life. The remaining twenty-five years of the "life plus fifty years" U.K. term of copyright reverted to the author's estate, notwithstanding any agreement to the contrary. Although pursuant to the U.K. Copyright Act of 1956 the provision (Section 5(2)) was repealed effective June 1, 1957, it was "grandfathered" (i.e., remained in effect) for grants made prior to June 1, 1957. (Likewise, Sched. 1, par. 27, the U.K. Copyright, Designs and Patents Act 1988.) On the other hand, the 1988 Act also provided that commencing August 1, 1989 the author, while alive, may assign the reversionary interest at any time.[3]

"Many former British colonies, dominions, territories and protectorates inherited, or included in their copyright acts, the reversionary rights provision, although the effective dates vary. In Australia, for example, the Copyright Act of 1968 eliminated the reversionary rights provision, however, works made before May 1, 1969 and copyrights in such works, transferred or licensed before said date, May 1, 1969, remain subject to reversion. Similarly, the reversionary provision of the Imperial Copyright Act of 1911, which applied to Hong Kong until 1972,

---

[3] In 2004, *Novello and Co., Ltd. v. Keith Prowse Music Publishing Co., Ltd.*, Ct. App., EWCA Civ. 1776, held that the U.K. Copyright Act of 1956 accomplished the same end, and that reversionary interest assignments made by the author prior to June 1, 1957, which were not effective, could be assigned (or rather reassigned) effectively by the author while alive commencing June 1, 1957. The business model represented by such an assignment is used for illustrative purposes only. In practice, it is used more typically in music publishing than in book publishing.

remains effective in Hong Kong as regards assignments made before December 12, 1972.

"The countries involved include Canada, the Republic of South Africa, Australia, New Zealand, Hong Kong, and others, from the former British Commonwealth. The various countries must be checked out on a country-by-country basis.

"The British Commonwealth reversionary right is distinguishable from the right of termination of transfer under the United States Copyright Act in that the Commonwealth reversionary right is automatic and does not require, among other conditions, a timely notice to the grantee and a timely filing of a copy of the notice as is required under the U.S. Copyright Act, 17 U.S.C. §§ 203 and 304(c) and (d).

"The reversionary right does not apply to the equivalent of the U.S. work made for hire, such as a work made under employment pursuant to a U.K. or Canadian contract of service or apprenticeship.

"The grant of the twenty-five year reversion in the case of a "life plus fifty year" copyright term may be made by the author's estate at any time after the author's death, but not while the author is alive, subject to the aforementioned U.K. exception. In the U.K., the extension of the term of copyright from "life plus fifty years" to "life plus seventy years" following the European Union Copyright Directive 93/98 of 1993 makes its reversionary interest potentially more valuable.

"In *Boosey & Hawkes v. The Walt Disney Co.*,[4] involving Igor Stravinsky's musical composition *The Rites of Spring* in the video of Walt Disney's motion picture *Fantasia*, the U.S. Second Circuit Court of Appeals held that the doctrine of forum non conveniens did not apply and the U.S. district court should try the case consisting of copyright infringement claims under the laws of eighteen different foreign countries. Thus, by analogy, under similar circumstances, a British Commonwealth reversionary rights owner may be able to sue *here* for copyright infringement that occurred or may occur in many of the former British Commonwealth countries."

## II. TOM LEVY'S COMMENTARY

"The practical effects of British reversionary rights require careful thought on the part of the practitioner in any number of

---

[4] 145 F.3d 481 (2d Cir. 1998).

situations in addition to the asset acquisition mentioned by Mr. Hartnick. Today, entertainment properties are rarely exploited on a merely local basis but typically may be utilized all over the world. Producers who intend to spend large sums of money on creating an entertainment property such as a motion picture or a Broadway show will want assurances that such a property can be exploited over a broad range of media and in every territory.

"Suppose that Novelist wrote a novel called "Fantasy" in 1950 and, at the time of its publication, assigned all of his rights in the novel to his publisher.[5] Your client, Producer, comes to you for help in acquiring the right to make a motion picture based on "Fantasy." Your research discloses that Novelist died in 1990. As described in the Rothenberg paper, the publisher's rights in the British Reversionary Territories will come to an end in 2015, twenty-five years after Novelist's death. You will have to advise Producer to acquire the rights for the life of the copyright in "Fantasy" outside the British reversionary territories and the United States from the Publisher. The rights in the British reversionary territories after 2015 will have to be acquired from Novelist's estate or his heirs. The rights in the United States present their own somewhat analogous problems which are outside the scope of this commentary.

"Had "Fantasy" been written in 1965 rather than in 1950, there is no problem with reversionary rights in Great Britain. The law does not apply to works created after June 1, 1957. But one cannot stop the analysis there. Reversionary rights would still apply in Australia for example and each of the reversionary territories would have to be examined to be sure that the rights are acquired from the correct parties.

"The above scenario represents a typical case relatively free of complications. However, consider the case of the "jukebox musical," often an assemblage of thirty or more musical compositions associated with a single recording artist but not necessarily by the same composers and lyricists. If such a musical is intended for Broadway, the investment in the production is likely to exceed $5 million and the producer for himself and for his investors will want to acquire worldwide rights in the included songs for at least seven to ten years after the projected Broadway opening. The reversionary rights problem requires the careful practitioner to examine each song to be included separately for each writer and in each reversionary rights country.

---

[5] *See* 17 U.S.C. § 304(c), (d) (2000).

The problem is no different than the problem with "Fantasy" except that now it is multiplied many times over.

"What we learn from this is that the licensing or acquisition of rights in copyrighted works is an arena well stocked with land mines. The practitioner must be aware that with respect to each separate work there must be a separate analysis done for the United States, for each of the reversionary territories and for the rest of the world. The analysis must include a study of the period of time for which rights are needed and, if there are multiple owners in a territory over the applicable period, each must be contacted and the appropriate rights acquired."

## CONCLUSION

And everything is on the Internet, including material on the Dickens Provision.[6]

Solomon Linda of South Africa died in 1962 in absolute poverty. The "Dickens Provision" in South Africa remained in force until 1965. When the Estate retained a lawyer, Owen Dean, he realized that Linda's song recorded in 1939 belonged to his family in 1987. The song was utilized in its famous progeny, *Wimoweh* and *The Lion Sleeps Tonight*. The publisher had licensed Disney for use in the movie and musical. Notwithstanding, Dean obtained a license from the Estate to Walt Disney Enterprises.

And so, the reversionary interest under the 1911 Imperial Copyright Act gave the Linda Estate rights in the counties of the former British Empire and Commonwealth and those rights commenced from 1987.

It is with great pleasure that Stanley Rothenberg's Fordham paper is published and with comments by Tom Levy. This article is an effort to remind lawyers of an international copyright trap for older works in British Commonwealth nations.

---

6 *See* SAMUSICDOTCOZA, http://www.samusic.co.za/index.