# EXHIBIT 14

## Duquesne Law Review

Volume 61 | Number 2                                              Article 5

2023

# Whose Ledger Is Really Red? Confidential Arbitration Killed the Black Widow

Daniel Charles Smolsky

Follow this and additional works at: https://dsc.duq.edu/dlr

Part of the Entertainment, Arts, and Sports Law Commons, Labor and Employment Law Commons, and the Litigation Commons

Recommended Citation
Daniel C. Smolsky, *Whose Ledger Is Really Red? Confidential Arbitration Killed the Black Widow*, 61 Duq. L. Rev. 229 (2023).
Available at: https://dsc.duq.edu/dlr/vol61/iss2/5

This Student Article is brought to you for free and open access by the School of Law at Duquesne Scholarship Collection. It has been accepted for inclusion in Duquesne Law Review by an authorized editor of Duquesne Scholarship Collection. For more information, please contact beharyr@duq.edu.

# Whose Ledger is Really Red?
# Confidential Arbitration Killed the Black Widow

*Daniel Charles Smolsky*[*]

*"I've got red in my ledger.  I'd like to wipe it out."*
— Natasha Romanoff[1]

### ABSTRACT

*After filing a complaint against the Walt Disney Company in July 2021, Scarlett Johansson ensured that she would follow through with litigation to protect other Hollywood talent.  Despite that assurance, Johansson settled her suit with Disney only sixty-three days after filing her complaint.  This Article explores what Johansson's shockingly swift settlement reveals about not only the entertainment industry, but the majority of modern employment disputes.  Did Disney abuse its power and intentionally sacrifice box-office profits at Johansson's expense, or did Johansson leverage her public influence to compel an unwarranted settlement?  Whose ledger is really red—and perhaps more importantly—why is that ledger red?*

*This Article concludes that one of the largest problems with modern employment contracts is binding predispute arbitration, a practice that has become so ubiquitous that such clauses are practically non-negotiable.  The strength of binding arbitration has only been reinforced by the U.S. Supreme Court, which has consistently refused to allow states to pass laws which interfere with the fundamental attributes of arbitration under the Federal Arbitration Act (FAA).  Because the Court has recognized that arbitration agreements may absolutely preclude judicial remedies, this Article proposes two solutions that aim to address arbitration's biggest problems without violating federal law.*

*First, Congress should enact the Forced Arbitration Injustice Repeal Act to ban predispute arbitration.  This change would not only protect Hollywood talent, but also provide additional safeguards to the vast majority of American employees that are subject to such agreements.  Second, the California General Assembly—and other state legislatures—could minimize the disadvantages of predispute arbitration by requiring arbiters to publish their findings unless mutually agreed upon by both parties after a dispute arises.  This change would serve to quell some of arbitration's largest problems without infringing on its "fundamental attributes" as recognized by the U.S. Supreme Court.*

---

[*]  J.D. Candidate, Duquesne University Thomas R. Kline School of Law, 2023; B.S. Business Administration, Duquesne University Palumbo-Donahue School of Business, *summa cum laude*, 2020.  In addition to his family and friends for their constant love and support, Daniel would like to thank Professor Jan M. Levine for his invaluable guidance and encouragement throughout law school.
    1.  THE AVENGERS, at 01:05:19 (Marvel Studios 2012).

229

TABLE OF CONTENTS

I.    INTRODUCTION .............................................................230
II.   BACKGROUND ...............................................................233
      A.    Hollywood History Lesson.................................233
            1.    The Golden Age......................................233
            2.    The Collapse of the Studio System .......236
            3.    Modern Major Film Franchises...........237
      B.    Money Talks: Taking Points Off the Back End ...238
            1.    What is Profit Participation?................238
            2.    Hollywood Accounting and
                  Vertical Integration ..............................240
      C.    Hollywood is Changing,
            History is Repeating Itself................................241
III.  ANALYSIS ....................................................................243
      A.    Whose Ledger is Really Red? ...........................244
            1.    Black Widow's Day-and-Date Release.....244
            2.    Purported Party Arguments..................246
            3.    What if . . . ?.........................................247
      B.    Hollywood's Red Room: Forced Arbitration ........249
IV.   SOLUTION.....................................................................253
      A.    Banning Mandatory Arbitration ......................254
            1.    The Supreme Court & FAA...................254
            2.    The Forced Arbitration
                  Injustice Repeal Act...............................256
      B.    Limiting Confidentialiy ...................................258
V.    CONCLUSION.................................................................259

I.    INTRODUCTION

Scarlett Johansson is one of the most recognized actresses in Hollywood. A bonafide movie star for nearly twenty years, Johansson has largely maintained her immense celebrity status by portraying Natasha Romanoff, better known under the alias Black Widow, in the Marvel Cinematic Universe (MCU).[2] The MCU is the largest film franchise of all time; it has grossed more than $25 billion dollars since its inaugural film: *Iron Man*.[3] Following the commercial

---

2.  *See Scarlett Johansson*, BIOGRAPHY.COM, https://www.biography.com/actor/scarlett-johansson (last visited Sept. 12, 2021) [hereinafter *Johansson Biography*].

3.  IRON MAN (Marvel Studios 2008). The film grossed $585.8 million dollars. *See* Travis Clark, *All 26 Marvel Cinematic Universe Movies, Ranked by How Much Money They Made at the Global Box Office*, INSIDER, https://www.businessinsider.com/marvel-movies-ranked-how-much-money-at-global-box-office-2021-11 (last updated May 16, 2022, 10:40 AM).

success of *Iron Man*, the Walt Disney Company (Disney) acquired Marvel Entertainment (Marvel) in 2009 to broaden Marvel's brand and expand the MCU.[4] One of Disney's first orders of business after acquiring Marvel was casting Johansson in *Iron Man 2*.[5]

The success of *Iron Man 2* solidified Johansson's role within the MCU as she subsequently appeared in eight blockbuster films for the franchise over the following decade.[6] Her MCU tenure was slated to end in April 2020 following the release of *Black Widow*,[7] the first and only Marvel film in which Johansson would portray the film's titular character.[8] The film was highly anticipated to serve as Johansson's well-deserved send-off from the MCU,[9] but last minute alterations to the film's release soured her departure and resulted in one of the "most high-profile example[s] of a debate [that had] been boiling under the surface in the entertainment industry."[10]

On July 29, 2021, Johansson filed a lawsuit against Disney, alleging that the multimedia conglomerate had violated the terms of her contract and cheated her out of pay by shifting *Black Widow*'s release to their subscription video on-demand streaming service, Disney+, amidst the COVID-19 pandemic.[11] Several early commenters speculated that her lawsuit could have an "immortal legacy" in the entertainment industry by helping establish precedent for future disputes between Hollywood talent and studios.[12] When

---

4. Daniel Indiviglio, *Disney Buys Marvel*, ATLANTIC (Aug. 31, 2009), https://www.theatlantic.com/business/archive/2009/08/disney-buys-marvel/24119/.

5. *See* Nikki Finke, *Another 'Iron Man 2' Deal: Scarlett Johannson [sic] to Replace Emily Blunt as Black Widow For Lousy Lowball Money*, DEADLINE HOLLYWOOD (Mar. 11, 2009, 3:31 PM), https://deadline.com/2009/03/another-iron-man-2-exclusive-scarlett-johannson-will-replace-emily-blunt-in-iron-man-2-8763/. *Iron Man 2* was slightly more successful than its predecessor, grossing $623.9 million dollars. *See* Clark, *supra* note 3.

6. *Johansson Biography*, *supra* note 2. The other films she appeared in, along with their global box office sales, were: *The Avengers* (2012) ($1.5 billion), *Captain America: The Winter Soldier* (2014) ($714.4 million), *Avengers: Age of Ultron* (2015) ($1.4 billion), *Captain America: Civil War* (2016) ($1.15 billion), *Avengers: Infinity War* (2018) ($2.05 billion), *Captain Marvel* (2019) ($ 1.128 billion), *Avengers: Endgame* (2019) ($2.8 billion), and *Black Widow* (2021) ($379.6 million). Clark, *supra* note 3.

7. *Johansson Biography*, *supra* note 2.

8. *See Movies*, MARVEL, https://www.marvel.com/movies (last visited Sept. 12, 2021) (providing a list of the 23 MCU films released prior to *Black Widow*).

9. *See* Michael Canva, *Black Widow Finally Gets Her Own Movie, One That Poses the Question: Who is She, Really?*, WASH. POST (July 1, 2021, 6:00 AM), https://www.washingtonpost.com/arts-entertainment/2021/07/01/who-is-black-widow/.

10. *See* Ryan Faughnder & Anousha Sakoui, *Forget ScarJo vs. Disney. Hollywood's Streaming Fight is Just Beginning*, L.A. TIMES (Aug. 16, 2021, 5:00 AM), https://www.latimes.com/entertainment-arts/business/story/2021-08-16/forget-scarjo-vs-disney-streaming-pay-is-a-much-larger-hollywood-issue.

11. *Id.*

12. *Id.* In fact, this Article began as a speculative article aiming to predict how the California courts would analyze Johansson's claim and Disney's defenses.

Disney sought private arbitration via court order, Johansson's representatives criticized Disney for trying to "hide" its misconduct and asked, "[w]hy is Disney so afraid of litigating this case in public?"[13]  As Johansson garnered mass support in Hollywood, she became "an emblem of a major battle between talent and studios in a transformative moment for the entertainment industry."[14]  Her lawsuit had the potential to change Hollywood "forever."[15]

Unfortunately, forever only lasted sixty-three days.  On September 30, 2021, the Black Widow settled her suit behind closed doors.[16]  This Article explores what Johansson's shockingly swift settlement reveals about not only the entertainment industry but also employment disputes across the country.  Did Disney abuse its power and intentionally sacrifice *Black Widow*'s box-office profits at Johansson's expense, or did Johansson simply leverage her public influence to compel an unwarranted settlement?  Whose ledger is really red—and perhaps more importantly—why is that ledger red?[17]

Part II.A of this Article serves as a Hollywood History lesson.[18]  It traces the origins of the entertainment industry and natural power imbalance between Hollywood studios and "talent."[19]  Part II.B defines profit-participation—the compensation scheme that gave rise to Johansson's suit—and explores the vertically-integrated nature of Hollywood.[20]  Part II.C explains that, despite the rise in celebrity status, history is repeating itself as the now vertically-integrated Hollywood studios shift to simultaneous streaming releases.[21]  Part III criticizes the death of litigation in Hollywood and the cause of Hollywood's red ledger: mandatory predispute arbitration.[22]  Part IV proposes legislative solutions that aim to mitigate that power

---

13.  Sarah Whitten, *Disney Wants to Move Scarlett Johansson's Lawsuit Behind Closed Doors. Her Lawyers Want an Open Court*, CNBC, https://www.cnbc.com/2021/08/23/disney-wants-to-move-scarlett-johansson-lawsuit-to-private-arbitration.html (last updated Aug. 23, 2021, 3:56 PM) [hereinafter *Disney's Closed Doors*].

14.  Maureen Lee Lenker, *Before Scarlett Johansson, Olivia de Havilland Took on an All-powerful Studio — and Won*, YAHOO! NEWS (Aug. 27, 2021), https://ca.news.yahoo.com/news/scarlett-johansson-olivia-havilland-took-205414771.html.

15.  Clémence Michallon, *Scarlett Johansson's Lawsuit Against Disney Could Change Hollywood Forever*, THE INDEP. (July 30, 2021, 7:23 AM), https://www.independent.co.uk/voices/scarlett-johansson-disney-lawsuit-black-widow-b1893366.html.

16.  Sarah Whitten, *Scarlett Johansson and Disney Settle 'Black Widow' Lawsuit*, CNBC, https://www.cnbc.com/2021/09/30/scarlett-johansson-and-disney-settle-black-widow-lawsuit.html (last updated Oct. 1, 2021, 2:24 PM).

17.  *See* THE AVENGERS, *supra* note 1, at 01:05:19.

18.  *See infra* pp. 233–38.

19.  Hereinafter, "talent" will be used to represent Hollywood employees on the creative side of film and television production, such as actors, producers, and writers.

20.  *See infra* pp. 238–41.

21.  *See infra* pp. 241–43.

22.  *See infra* pp. 243–53.

discrepancy by either banning predispute arbitration agreements or making arbitration proceedings more transparent.[23] Part V provides concluding remarks.[24]

## II.    BACKGROUND

### A.    *Hollywood History Lesson*

#### 1.    *The Golden Age*

The entertainment industry and Hollywood have been synonymous for more than a century.[25] These terms will be used interchangeably for purposes of this Article, but the industry's story begins in the original locations of United States film production: New York, New Jersey, and other cities along the Eastern Seaboard.[26] As the art of producing motion pictures grew in popularity between 1900 and 1906, the industry's exploitative business practices developed in turn.[27] Thomas Edison, who owned a vast majority of the patents on motion picture cameras, established the Motion Picture Patents Company with other patent holders in 1908 to monopolize the equipment necessary for film production.[28] The group used law enforcement, or sometimes "hired thugs," to enforce their patents on independent filmmakers, which in turn stifled creativity and the growth of the entertainment industry.[29] In response, independent filmmakers fled west to a small neighborhood in Los Angeles where Edison's patents were harder to enforce: Hollywood.[30]

In Hollywood, actors were rarely credited for their work as the industry developed during the "silent era."[31] Studio heads worried that crediting actors for their performances would result in actors "gain[ing] a level of notoriety that would allow the performers to demand higher wages."[32]    Carl Laemmle revolutionized the

---

23.   *See infra* pp. 253–59.
24.   *See infra* pp. 259–60.
25.   *See* Chad Upton, *How Hollywood Became the Center of the Film Industry*, INSIDER (Nov. 18, 2011, 10:41 AM), https://www.businessinsider.com/how-hollywood-became-the-center-of-the-film-industry-2011-11.
26.   *See id.*
27.   *See id.; see also The Silent Era — History of Silent Black and White Movies*, HIST. OF FILM, http://www.historyoffilm.net/movie-eras/silent-black-and-white-movies/ (last visited Oct. 24, 2021).
28.   *See* Upton, *supra* note 25.
29.   *Id.*
30.   *Id.*
31.   Andrew Tavin, *How Have Movie Stars' Salaries Changed Over Time?*, OPPU, https://www.opploans.com/oppu/articles/how-have-movie-stars-salaries-changed-over-time/ (last updated July 8, 2022).
32.   *Id.*

industry in 1909 when he founded the Independent Moving Pictures Company and ditched the practice of forcing entertainers to work anonymously.[33]   In 1910, Laemmle concocted an elaborate marketing scheme to garner media attention for his film, *The Broken Oath*, and its leading lady, Florence Lawrence.[34]   Lawrence would inevitably become the "original Hollywood star" and first actor to receive an American film credit for her starring role.[35] Laemmle had effectively created the Hollywood "star system," which allowed the industry to flourish as "the cult of film celebrity [took] root in the global psyche."[36]  When the industry continued to develop and silent films were replaced by "talking pictures," talent notoriety developed in turn and "Hollywood increased its reputation as the land of affluence and fame."[37]

Although the United States and world economies collapsed during the Great Depression, the decade of the 1930s was the "height of Hollywood's Golden Age" as an estimated eighty million Americans went to the movies every week to distract themselves from the hardships of the Great Depression.[38]  During that time, the entertainment industry operated under the "studio system"[39] as five major studios—Warner Bros., RKO, Fox, MGM, and Paramount— dominated the means of production and distribution for major motion pictures.[40]   The following characteristics, which will be explored in further depth,[41] have been cited as some of the most significant aspects of Hollywood's studio system: (1) studios owned their own movie theaters (which played their own movies), (2) studios offered independent theaters a block set of films which mixed

---

33.  *See* Julia Hitz, *Carl Laemmle, The German Who Invented Hollywood*, DW.COM (Jan. 17, 2017), https://www.dw.com/en/carl-laemmle-the-german-who-invented-hollywood/ a-36 733079.  Laemmle's first film production company was one of several independent companies that challenged the Motion Picture Patents Company's monopoly over the entertainment industry. *Id.*  In 1912, the company merged with several other production companies to become the media conglomerate now known as Universal Studios. *Id.*  Laemmle moved the studio to California two years later and set up the Universal City Studios near Los Angeles, thus laying the groundwork for the motion picture industry in Hollywood. *Id.*

34.  Tavin, *supra* note 31.

35.  *See id.*; *see also* Margaret Heidenry, *Introducing Florence Lawrence, Hollywood's Forgotten First Movie Star*, VANITY FAIR (May 25, 2018), https://www.vanityfair.com/hollywood/ 2018/05/florence-lawrence-first-movie-star-old-hollywood.

36.  Heidenry, *supra* note 35.

37.  *See Hollywood*, HISTORY.COM, https://www.history.com/topics/roaring-twenties/hollywood (last updated Aug. 21, 2018) [hereinafter *Hollywood History*].

38.  *Id.*

39.  *The Studio System*, CLASSIC HOLLYWOOD CENT., https://www.classichollywoodcentral.com/background/the-studio-system/ (last updated Dec. 3, 2019).  The "Star System" was an "infamous" product of the "studio system." *Id.*

40.  *Id.*

41.  *See infra* text accompany notes 58–64.

their own desirable films with other unwanted films, and (3) studios paid talent a set salary and bound them to long-term employment contracts.[42]

Hollywood's Golden Age brought tremendous growth and recognition to the entertainment industry, but the studio system also cultivated incredibly exploitative business practices and employment structures.[43] At the time, major film studios considered this "justified" exploitation because their fiscal success was largely driven by their ability to capitalize on the fame of their biggest stars, or "commodit[ies]."[44] Despite the California legislature's attempt to minimize such exploitation,[45] Hollywood executives maintained those practices for nearly three decades until Olivia de Havilland[46] challenged the studio system through the California courts.[47]

In 1943, de Havilland filed suit against Warner Bros. in an attempt to declare her lengthy employment contract unenforceable.[48] Despite the societal pressure to settle, de Havilland maintained her suit and was eventually freed from her contract by the California Court of Appeals.[49] Her victory effectively ended "Hollywood's version of indentured servitude" and marked the beginning of the end to both the star system and the studio system that enabled it.[50]

---

42. *See* Rafael Abreu, *What is the Studio System — Hollywood's Studio Era Explained*, STUDIOBINDER (May 2, 2021), https://www.studiobinder.com/blog/what-is-the-studio-system-in-hollywood/.

43. *See The Star System*, CLASSIC HOLLYWOOD CENT., https://www.classichollywoodcentral.com/background/the-star-system/ (last updated Dec. 3, 2019).

44. *Id.* Howard Suber, professor emeritus of film history at the University of California, Los Angeles, additionally wrote that that Hollywood employment "was essentially a form of indentured servitude . . . . These contracts gave all of the advantages to the studio and made it nearly impossible for stars to have a say in their careers." Brett Lang, *How Olivia de Havilland Took on the Studio System and Won*, YAHOO! (July 27, 2020), https://www.yahoo.com/video/olivia-havilland-took-studio-system-195944941.html.

45. *See* CAL. LAB. CODE § 2855 (1937). Enacted in 1937, this statute limited personal service employees' contracts to seven-year terms. *Id.*

46. Olivia de Havilland was Warner Bros. ingénue—one of the studio's brightest stars that appeared in several romantic action films. *See* Thomas Stipanowich, Opinion, *Olivia de Havilland: The Actress Who Took on the Studio System and Won*, L.A. TIMES (July 1, 2016, 5:00 AM), https://www.latimes.com/opinion/op-ed/la-oe-stipanowich-de-havilland--20160701-snap-story.html.

47. Suzelle M. Smith & Don Howarth, *Hollywood Grande Dame's Legal Legacy*, 44 L.A. LAW., May 2021, at 23, 24.

48. *Id.*

49. De Haviland v. Warner Bros. Pictures, 153 P.2d 983, 989 (Cal. Ct. App. 1944) (finding that film studios could not compel actors to waive certain employment protections in private agreements). The author has not been able to determine why Olivia de Havilland's last name was misspelled in the official reporter.

50. Stipanowich, *supra* note 46.

Duquesne Law Review

## 2.    *The Collapse of the Studio System*

While de Havilland's lawsuit was instrumental in prompting change within the entertainment industry, the studio system was not entirely dismantled until a few years after her lawsuit when the Supreme Court separately declared that the vertically-integrated studios[51] had violated anti-trust laws.[52]  Although several major film studios were found to have been violating federal antitrust laws as early as 1930,[53] President Herbert Hoover permitted studios to maintain monopoly practices under the guise of the National Industrial Recovery Act.[54]  The government quickly reversed that stance following the Great Depression, but once again compromised with the film studios in an eleventh-hour consent decree in 1940.[55]  That consent decree provided that the major studios would limit their monopolistic business practices in good-faith, but that any violations would be shielded from the public via private arbitration.[56]  The consent decree was neither strictly enforced nor challenged in the courts until several prominent independent producers, ironically including Walt Disney, formed the Society of Independent Motion Picture Producers and entered the industry's antitrust battle.[57]

In *United States v. Paramount Pictures*,[58] the United States sought to prevent and restrain Hollywood studio violations of the first two sections of the Sherman Act.[59]  The suit specifically alleged that the major studios had monopolized the film industry by vertically combining and controlling film production, distribution, and exhibition.[60]  The Supreme Court analyzed various trade practices

---

51.    *See infra* text accompanying notes 96–101.

52.    *See* United States v. Paramount Pictures, 334 U.S. 131, 174 (1948).

53.    *See* Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 44 (1930).

54.    The National Industrial Recovery Act of June 16, 1933, ch. 90, 48 Stat. 195, "declared a national emergency and laid down policy objectives for the industrial recovery." 15 U.S.C. § 701. The Act was held unconstitutional in A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 542 (1935).

55.    *See U.S. Supreme Court Decides Paramount Antitrust Case*, HISTORY.COM, https://www.history.com/this-day-in-history/u-s-supreme-court-decides-paramount-anti-trust-case (last updated Apr. 30, 2020) [hereinafter *Hollywood Antitrust Cases*]; *see also* Vassiliki Malouchou, *A Century in Exhibition – The 1940s: Conflict and Consent Decrees*, BOXOFFICE PRO (Mar. 24, 2020), https://www.boxofficepro.com/century-in-exhibition-1940s-boxoffice-paramount-consent-decrees/.

56.    Malouchou, *supra* note 55.

57.    *See Hollywood Antitrust Cases*, *supra* note 55.

58.    United States v. Paramount Pictures, 334 U.S. 131, 140 (1948).

59.    *See* 15 U.S.C. §§ 1–2.  Congress passed the first antitrust law, the Sherman Act, which "was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade.  It rests on premise that unrestrained interaction of competitive forces will yield the best allocation of economic resources." N. Pac. Ry. Co. v. United States, 356 U.S. 1, 4 (1958).

60.    *See Paramount Pictures*, 334 U.S. at 140.

addressed by the consent decree: (1) clearance and runs, (2) pooling agreements, (3) formula deals, (4) block-booking, and (5) discrimination.[61]  The Court supported the decree's strict restriction on "block-booking,"[62] writing that it was illegal to refuse to license "one or more copyrights unless another copyright is accepted" and rejected the studio's argument that the manipulative practice was necessary to secure profits.[63]  The Supreme Court's decision effectively required studios to divest themselves of their own theater chains, and thus limited vertical integration and triggered Hollywood's transition to its modern practices.[64]

Because studio moguls could neither exploit talent for pennies nor maintain persistent profits after losing their "iron grip" on film distribution,[65] major studios produced fewer films during the 1950s.[66]  The rapid development of television also saw post World War II audiences dwindle as Hollywood's movie-stars gravitated towards television for more lucrative opportunities.[67]  These developments further led to the narrowing of the power discrepancy between the once "unstoppable" Hollywood studios and talent today.[68]

### 3.  Modern Major Film Franchises

In 1975, an up-and-coming director named Steven Spielberg brought a story about a small beach town and a terrifying great white shark to the big screen.[69]  *Jaws* immediately became a cult phenomenon and "paved the way for the massive tentpole features that now dominate the summer season [in Hollywood]."[70]  *Jaws* reinvented Hollywood's marketing scheme by using several prime-time network commercials to tease the film's release using thirty-second advertising blocks,[71] which enabled Universal Pictures to capitalize on its popularity "with an explosion of marketing tie-ins,

---

61.  *Id.* at 144–61.
62.  *Id.* at 156.  The Court defined block-booking as the "licensing . . . [of] one feature or group of features on condition that the exhibitor will also license another feature or group of features released by the distributors."  *Id.*
63.  *Id.* at 158–59.
64.  *See id.* at 152, 159; *see also Hollywood Antitrust Cases, supra* note 55.
65.  *See* Erin Blakemore, *How TV Killed Hollywood's Golden Age*, HISTORY.COM, https://www.history.com/news/how-tv-killed-hollywoods-golden-age (last updated Sept. 1, 2018).
66.  *See Hollywood History, supra* note 37.
67.  *See* Blakemore, *supra* note 65.
68.  *See id.*
69.  JAWS (Zanuck/Brown Company & Universal Pictures 1975).
70.  Kate Erbland, *How 'Jaws' Forever Changed the Modern Day Blockbuster—And What Today's Examples Could Learn From It*, INDIEWIRE (June 20, 2017, 3:53 PM), https://www.indiewire.com/2017/06/jaws-modern-blockbuster-steven-spielberg-1201844390/.
71.  *See id.*

[by] selling everything from the soundtrack to action figures and clothing."[72] The *Jaws* distribution model was an easily repeatable formula for success, and studios quickly adapted film releases to include similar "massive marketing blitzes" to enhance film popularity. In 1977, George Lucas and 20th Century Fox showed just how powerful that distribution model could be when they took the *Jaws* "marketing and merchandise campaign to the nth degree"[73] in a galaxy far, far away.[74]

The release of *Star Wars* further pushed studio heads to build expanded fictional universes and promote ancillary revenue streams.[75] The film "reorient[ed] the entire industry around visual spectacle and event films with mass cultural—and mass commercial—appeal."[76] Because massive film franchises[77] tend to have cult followings that continuously draw loyal fans back to theaters, celebrity culture and influence has also grown exponentially since the 1980s.[78] Modern celebrity status has provided Hollywood talent—like Scarlett Johansson—with significantly more leverage during contract negotiations, which in turn has shifted Hollywood compensation structures towards profit participation.[79]

## B.  *Money Talks: Taking Points Off the Back End*

### 1.  *What is Profit Participation?*

Profit participation, sometimes referred to as "back-end compensation," is the right of an actor to tie some of their compensation to

---

72.  Michelle Coffey, *How 'Jaws' Went Viral in the 1970s*, MARKETWATCH (June 11, 2015, 11:15 AM), https://www.marketwatch.com/story/how-jaws-went-viral-in-the-1970s-2015-06-11.

73.  Chris Heckmann, *What is New Hollywood? The Revolution of 1960s and '70s Hollywood*, STUDIOBINDER (May 17, 2020), https://www.studiobinder.com/blog/what-is-new-hollywood/.

74.  STAR WARS, at 00:21 (Lucasfilm Ltd. 1977).  The film was retroactively titled, *Star Wars: Episode IV—A New Hope.*

75.  Peter Suderman, *How Star Wars Redefined the Notion of What a Movie Could Be*, VOX (Dec. 15, 2015, 9:20 AM), https://www.vox.com/2015/12/15/10119474/how-star-wars-changed-hollywood.  Other major film franchises (and their global revenues) that followed *Star Wars* were: the Marvel Cinematic Universe ($22.59 Billion) and The Wizarding World of Harry Potter ($9.18 Billion). *See* Sarah Whitten, *The 13 Highest-grossing Film Franchises at the Box Office*, CNBC, https://www.cnbc.com/2021/01/31/the-13-highest-grossing-film-franchises-at-the-box-office.html (last updated Jan. 31, 2021, 9:54 AM).

76.  Suderman, *supra* note 75.

77.  A film franchise is generally defined "as a film series, or a collection of films, that share the same fictional universe or have been marketed as a series."  Whitten, *supra* note 82.

78.  Eric Strum, Note, *Hollywood Accounting: Profit Participation and the Use of Mediation as a Mode of Resolving These Disputes*, 18 CARDOZO J. CONFLICT RESOL. 457, 463 (2017).

79.  *Id.*

the profits of a film or television show.[80]  The right to back-end prof-
its typically manifests in one of two different ways: (1) the right to
receive a portion of the net or gross receipts of the film; or, (2) the
right to a lump sum payable when the film's receipts reach a prede-
termined level, or "deferment."[81]   In theory, profit participation
agreements benefit both contracting parties; production companies
and film studios can lessen their upfront financial burden while ac-
tors can bet on themselves to maximize their potential earnings.

While some variations of profit participation can be traced back
to Hollywood's Golden Age,[82] the development of major blockbusters
and film franchises saw major talent tie more of their compensation
to box-office performance because "moviegoers [flocked] to theaters
and made . . . [movie talent] larger-than-life."[83]  In 1989, Jack Ni-
cholson's representatives negotiated one of the most noteworthy
back-end deals when they sacrificed forty percent of his standard
fee in exchange for a cut of the box-office profits and merchandise
sales for Tim Burton's *Batman*.[84]   Nicholson went on to earn
roughly six times his standard fee for his portrayal of the Joker,[85]
and paved the way for decades of successful back-end deals, alt-
hough some celebrities have notably been unable to recoup pur-
ported losses on the back-end.[86]

Today, profit participation is not the flashy gamble that it once
was, but an unavoidable industry standard given the massive po-
tential for long-term financial gains.[87]  Prominent Hollywood talent
understand that stable, significant profits stem from nearly all film
franchises or syndicated television shows, and thus ensure that
their contracts guarantee compensation on the back-end.[88]   Of
course, major studios foresaw that inevitable shift in compensation

---

80.   Joe Sisto, *Profit Participation in the Motion Picture Industry*, 21 ENT. & SPORTS LAW.
1, 21 (2003).

81.   *Id.* at 22.

82.   *See* Strum, *supra* note 78, at 462.

83.   *Hollywood History*, *supra* note 37.

84.   Tavin, *supra* note 31.

85.   *Id.*

86.   *See* Robert Yaniz Jr., *How John Travolta Lost $10 Million Betting on 'Battlefield
Earth,'* SHOWBIZ CHEAT SHEET (Aug. 18, 2021), https://www.cheatsheet.com/entertain-
ment/how-john-travolta-lost-million-battlefield-earth.html/. Travolta took a $10 million dol-
lar pay cut to star in *Battlefield Earth.  Id.*  He was slated to earn $15 million on the back-
end if the film met a modest contingency, but the film fell well-short and was labeled one of
the "worst sci-fi movies ever." *Id.* (citing Morgan Korn, *The Top Hollywood Deals Negotiated
by Actors*, YAHOO! FIN. (Apr. 22, 2014), https://www.yahoo.com/lifestyle/tagged/travel/blogs/
daily-ticker/the-10-best-deals-ever-struck-by-hollywood-actors-141916181.html).

87.   Strum, *supra* note 78, at 463.

88.   *See Star Salaries: The Back-End Deal*, HOLLYWOOD.COM (June 3, 2014), https://
www.hollywood.com/general/star-salariesthe-backend-deal-57162216.

structure and mitigated their potential losses on the back-end through "Hollywood accounting."[89]

### 2. *Hollywood Accounting and Vertical Integration*

Although Hollywood's opaque accounting methods "would be considered ruinous in any other industry," they have successfully enabled several studios to make elaborate deductions from successful projects to ensure that profit participants make little to nothing on the back-end.[90] While some major celebrities have successfully reached settlements after challenging such "improbable accountings," challenging them through litigation is often costly and difficult[91]:

> Hollywood contracts generally are as incoherent as the tax code . . . . As a result, contracts typically are a mélange of vague terms, conflicting references, and provisions that have been copied from other contracts, resulting in documents that are needlessly long, disjointed, and unintelligible, and that require years of costly litigation to interpret.[92]

While most major talent guarantee compensation on the back-end, employment contracts have been left intentionally broad to minimize back-end payments, dissuade potential lawsuits, and protect studio interests.[93] The inability to judicially oppose Hollywood accounting also stems from the studios' modern ability to vertically integrate, despite aforementioned attempts to dissuade Hollywood monopolies.[94]

In 1970, the Federal Communications Commission (FCC) adopted the financial syndication rules (fin-syn rules) to "enhance competition by prohibiting television networks from engaging in the

---

89. Roman M. Silberfeld & Bernice Conn, *The Red and the Black: Studios Have Suffered Recent Court Setbacks in Their Efforts to Defend Hollywood Accounting*, 34 L.A. LAW., May 2011, at 36, 37.

90. *Id.* at 36–37.

91. Strum, *supra* note 78, at 473. In 1999, David Duchovny alleged that Fox Broadcasting Company "cheated him out of millions of dollars from [*The X-Files*] . . . [by] [selling] various rights to the [series] to its own or affiliated companies at below-market prices and engag[ing] in other actions that reduced the apparent profits generated by the series." Janet Shprintz, *Duchovny Sues Fox over TV Rights Sales,* VARIETY (Aug. 13, 1999, 12:00 AM), https://variety.com/1999/biz/news/duchovny-sues-fox-over-tv-rights-sales-1117750376/.

92. Silberfeld & Conn, *supra* note 89, at 37–38.

93. *Id.* at 38.

94. *See supra* text accompanying notes 58–64 (discussing the Supreme Court's limiting of vertical integration in *Paramount Pictures*).

syndication business."[95] The FCC promulgated the fin-syn rules to lessen the dominance of three television networks, ABC, NBC, and CBS. The rules were enacted to prevent production studios from consolidating their power and monopolizing television production but were repealed in 1995 when the FTC stated that a more competitive industry had emerged.[96]

The repeal of the fin-syn rules effectively gave entertainment studios the green light to reintroduce vertical integration and expand into all aspects production, such as broadcasting, distribution, production, program development, and developing new methods of off-network distribution.[97] Major studios grew to become "media empires [that] virtually eliminated . . . small, independent production compan[ies],"[98] and their vertically-integrated nature enabled them to engage in profit-participation manipulation by lowering licensing fees for their major projects—and thus the project's residual profits—and "hiding" those profits in affiliate distributors.[99] By making successful projects "look" less profitable on the balance sheet, the studio can retain more profits and pay talent less on the back-end. While there is plenty of legal scholarship that evaluates both vertical integration and profit participation in Hollywood,[100] the recent rise in digital streaming—accelerated by the COVID-19 pandemic—has seen swift changes within the industry that has rendered these issues more difficult to challenge, evaluate, and litigate given the lack of transparency, precedent, and an overwhelming fear of a Hollywood public relations disaster.

## C.   Hollywood is Changing, History is Repeating Itself

Five major media conglomerates—Disney, Sony Pictures, NBC Universal, Viacom CBS, and Warner Media—"still hold dominance

---

95.  Marc H. Simon, *Vertical Integration and Self-Dealing in the Television Industry: Should Profit Participants Be Owed a Fiduciary Duty?*, 19 CARDOZO ARTS & ENT. L.J. 433, 437 (2001).

96.  *Id.* at 439. The FTC was also persuaded because ABC, NBC, and CBS had promised they would refrain from "affiliate favoritism." *Id.* That promise was unsurprisingly short lived. *Id.* ("While there was no persuasive evidence indicating network 'affiliate favoritism' when the fin-syn rules were repealed, it is clearly corporate practice now. This is not surprising since the [entertainment] industry studios are no longer prohibited from owning and syndicating their own television programs.") (internal citations omitted).

97.  Barbara M. Rubin, *Combating Vertical Integration in Television Deal Making*, 28 L.A. LAW., May 2005, at 24, 24.

98.  *Id.* at 25.

99.  *See* Strum, *supra* note 78, at 465.

100.  *See, e.g.*, Silberfeld & Conn, *supra* note 89; Simon, *supra* note 95; Hillary Bibicoff, Comment, *Net Profit Participations in the Motion Picture Industry*, 11 LOY. L.A. ENT. L. REV. 23 (1991).

through their worldwide presence."[101] While these five conglomerates often simultaneously play the "role" of creator, producer, retailer, and distributor; the development of Netflix—and the ever-increasing number of streaming services over the last several years—has complicated entertainment disputes even further.[102]

Traditional revenue within the industry primarily stemmed from commercial advertising (for television shows) and box-office ticket sales (for films).[103] Although major studios often maintain in-house research teams to analyze both viewership and distribution trends, third party research firms also independently assess those primary sources of revenue. Independent theater chains[104] can verify box office reports, and independent ratings firms, such as Nielsen,[105] can provide oversight and protection to potential advertisers by analyzing viewership trends.[106] Those independent audits have drastically decreased over the last decade—following in Netflix's footsteps have been Disney (which operates both Hulu and Disney+), WarnerMedia (which operates HBO Max), NBCUniversal (which operates Peacock), and several other companies[107]—because the studios are not as frequently audited by independent organizations; thus, their viewership numbers often remain isolated from the public-eye and unverifiable to profit-participants.[108] Netflix and Disney+ have have occasionally offered "rare glimpse[s]" into the

---

101. James Murphy, *The "Big Five" Film Studios and Their Worldwide Presence*, MOVIEVIRAL (June 10, 2021) https://www.movieviral.com/2021/06/10/the-big-five-film-studios-and-their-worldwide-presence/. In fact, the "[o]dds are that the latest movie you've watched was filmed, produced, or in some way backed by one of these studios and their subsidiaries." *Id.*

102. *See* Faughnder & Sakoui, *supra* note 10.

103. *See* Frank Pallotta, *The Problem with Netflix's Viewership Numbers*, CNN BUS., https://www.cnn.com/2019/01/18/media/netflix-viewership-numbers/index.html (last updated Jan. 18, 2019, 2:36 PM).

104. *See supra* text accompanying notes 58–64.

105. "Nielsen ratings tell media participants who was exposed to content and advertising. [Nielsen] use[s] multiple metrics such as reach, frequency, averages and the well-known [sic] ratings—the percentage of a specific population that was exposed to content and ads—to determine exposure. TV ratings provide insight into who's watching which programs—valuable information for networks, content distributors, brands, . . . [and advertisers.]" *Nielsen TV Ratings*, NIELSEN, https://www.nielsen.com/us/en/solutions/measurement/television/ (last visited Jan. 12, 2022).

106. Pallotta, *supra* note 104.

107. *See* Alex Sherman & Samantha Subin, *Disney Makes the Trend Clear: Growth is Slowing for Streaming Services*, CNBC, https://www.cnbc.com/2021/11/10/disney-netflix-and-other-streaming-services-subs-arpu-q3-2021.html (last updated Nov. 10, 2021, 8:55 PM).

108. *See* Julia Alexander, *Disney Won't Share Ratings for Original Disney+ Titles Despite Industry Push to do So*, VERGE (Nov. 12, 2019, 3:01 AM), https://www.theverge.com/2019/11/12/20956700/disney-plus-ratings-original-shows-streaming-mandalorian-efficiency-metric-cancelation (writing that streaming services do not run advertisements and thus have "no pressure to partner with a . . . ratings agency[] to show advertisers how well a show or movie is performing").

success of specific projects,[109] but those claims are often unsubstantiated and have been criticized as "silly" given the lack of transparency in the industry.[110] The recent shift to streaming has offended both actor and non-actor talent over the last several years,[111] and Hollywood's rather turbulent history is poised to repeat itself unless effective precedence emerges through new caselaw or statutory changes that address these problems.

## III.    ANALYSIS

When Johansson publicly announced her lawsuit against Disney, commentators were quick to acknowledge that she was the "latest in a long line of major talent who [had] chosen legal fights with studios . . . over money."[112] Despite that "long line" of dissatisfied talent, almost all Hollywood claims settle out of court for undisclosed amounts.[113] While Hollywood talent have seemingly been satisfied with settling, those often-confidential settlements have neither protected other talent nor prevented further manipulation in the industry.

Johansson was supposed to establish precedent; she was not going to settle and allow Disney to take advantage of her—or any other Hollywood talent—in the future.[114] Her resilience drew comparisons to Olivia de Havilland, as one commentator wrote: "Olivia de Havilland may be best remembered for portraying Melanie Hamilton in *Gone With the Wind*, but her landmark legal victory could permanently link her to another Scarlett."[115] That link was ultimately short-lived, but it might not have been entirely Johansson's fault.

---

109.   Pallotta, *supra* note 103.

110.   Brian Tallerico (@Brian_Tallerico), TWITTER (Jan. 17, 2019, 4:24 PM), https://twitter.com/Brian_Tallerico/status/1086011328182059014. Tallerico is the president of the Chicago Films Critics Association. *See* Pallotta, *supra* note 104.

111.   In late 2020, Warner Bros. announced that its 2021 film slate would be released in a hybrid fashion with films simultaneously debuting in theaters and on their HBO Max streaming service. Christopher Nolan, the famous director that had been with the studio for nearly twenty years, stated that he was in "disbelief" over the decision because of the lack of transparency from Warner Bros., who was using film projects as "a loss-leader for . . . the fledgling streaming service . . . without any consultation." *See generally* Zack Sharf, Christopher Nolan Exits Warner Bros. After Nearly Two Decades, New Film Set Up at Universal, VERGE (Sept. 14, 2021, 11:19 AM), https://www.indiewire.com/2021/09/christopher-nolan-exits-warner-bros-new-film-universal-1234664679/.

112.   *See* Kali Hays, *Scarlett Johansson Isn't the First Actor to Sue a Studio—and She Won't Be the Last*, L.A. MAG. (July 30, 2021), https://www.lamag.com/culturefiles/scarlett-johansson-lawsuit-disney/.

113.   Some influential Hollywood talent that settled out-of-court include Elizabeth Taylor, Kevin Costner, and Sylvester Stallone. *See id.*

114.   *See Disney's Closed Doors, supra* note 13.

115.   *See* Lenker, *supra* note 14.

A.  *Whose Ledger is Really Red?*

1.  *Black Widow's Day-and-Date Release*

The COVID-19 pandemic upended the entertainment industry, and Disney had already postponed *Black Widow's* release for more than a year when it announced that the film would be simultaneously released in theaters and on Disney+.[116] *Black Widow's* release was expected to pave the way for Marvel's "massive slate of other MCU [projects] waiting in the wings,"[117] but Disney's last-minute alterations prompted Johansson's public filing against the corporation in the California courts.[118] It is important to recognize that Disney was "keenly aware of how . . . devastating [film] piracy can be to potential earnings" when they announced the partial streaming release, a method that is inherently easier to pirate.[119]

To partially offset those potential losses, *Black Widow* was sold as Disney's third "premier access" film on Disney+, meaning subscribers paid an additional $30 fee to stream the film on its release.[120] In her complaint, Johansson stipulated that her compensation for starring in the film was largely based on its back-end box-office receipts.[121] Therefore, Johansson alleged that she had extracted a promise from Marvel to ensure that *Black Widow* would receive a "theatrical release" to maximize her box-office receipts and "protect her financial interests."[122] Even though "Disney, Marvel, and most everyone else in Hollywood [knew that] a 'theatrical release' is . . . *exclusive* to movie [theaters]," Johansson alleged that Disney forced Marvel to violate its promise to attract millions of Marvel fans to Disney+.[123]

---

116.  Sarah Whitten, *Movie Theater Group Blasts Disney for Releasing 'Black Widow' in Theaters and Streaming at Same Time*, CNBC, https://www.cnbc.com/2021/07/19/movie-theaters-blast-disney-for-releasing-black-widow-in-theaters-and-streaming-.html (last updated July 19, 2021, 6:05 PM) [hereinafter *Black Widow's Simultaneous Release*].

117.  *Id.*

118.  *See* Complaint at 2, Periwinkle Ent., Inc., F/S/O Scarlett Johansson v. Walt Disney Co., No. 21STCV27831 (Cal. App. Dep't Super. Ct. July 29, 2021).

119.  *Black Widow's Simultaneous Release*, *supra* note 116. Disney had previously ensured that its most profitable MCU film of all time, *Avengers: Endgame*, was simultaneously released in both North America and China—Disney's largest markets—to minimize the risk of piracy and thus maximize box-office profits. *Id.*

120.  Steven Cohen, *Disney Plus Premier Access Lets Subscribers Buy New Movies While They're Still in Theaters*, INSIDER, https://www.businessinsider.com/guides/streaming/ disney-plus-premiere-access (last updated Sept. 22, 2021, 4:56 PM). *Black Widow* was a "premier access" film for three months before subscribers could watch the film without paying an additional fee. *Id.*

121.  Complaint, *supra* note 118, at 2.

122.  *Id.*

123.  *Id.* (emphasis added).

According to Johansson's complaint, *Black Widow's* day-and-date release "cannibalized" the film's box-office receipts while simultaneously strengthening Disney's financial interests.[124] Johansson therefore accused Disney of intentionally inducing Marvel's breach to prevent her "from realizing the full benefit of her bargain[.]"[125] In response, Disney criticized Johansson's public filing, stating that it was both meritless and "especially sad and distressing in its callous disregard for the horrific and prolonged global effects of the COVID-19 pandemic."[126] The studio also asserted that it had technically complied with its contractual obligations, and that *Black Widow's* release enhanced Johansson's ability "to earn additional compensation on top of the $20 [million]" she had already received.[127]

Bryan Lourd, managing director and co-chairman of the Creative Artists Agency that represents Johansson, criticized Disney for revealing Johansson's salary—which had not been shared with the public—as a potential tactic to make her appear less sympathetic.[128] Lourd also condemned Disney's direct attack regarding the COVID-19 pandemic, writing that it was clearly "an attempt to make [Johansson] appear to be someone they . . . know she isn't."[129] The public nature of the dispute led to several people publicly stating both support for Johansson's lawsuit and concern over Disney's actions.[130] As the dispute garnered recognition in the court of public

---

124. *Id.* at 5. Three days after the release of *Black Widow*, Disney shared that the film grossed over $60 million through Disney+ Premier Access, which accounted for just under 28% of the film's $215 million global revenue. *See Marvel Studios' 'Black Widow' Surpasses $215 Million Between Box Office and Disney+ Premier Access*, WALT DISNEY CO. (July 12, 2021), https://thewaltdisneycompany.com/marvel-studios-black-widow-surpasses-215-million-between-box-office-and-disney-premier-access/. Disney's stock also rose by more than 4% in response to film's successful concurrent release. *See* Adelia Cellini Linecker, *Disney Rallies on Big Premiere, Streaming Sales But 'Black Widow' May Be Unique Case*, INVESTORS.COM (July 12, 2021, 4:20 PM), https://www.investors.com/news/disney-stock-black-widow-eyes-biggest-movie-premiere-since-pandemic-began/.

125. Complaint, *supra* note 118, at 6.

126. Sarah Whitten, *Disney Blasts Scarlett Johansson over Black Widow Streaming Lawsuit*, CNBC, https://www.cnbc.com/2021/07/29/disney-blasts-scarlett-johansson-over-black-widow-streaming-lawsuit.html (last updated July 29, 2021, 8:18 PM).

127. *Id.*

128. *See* Sarah Whitten, *Scarlett Johansson's Agent Slams Disney for Accusing 'Black Widow' Star of Disregarding Public Covid Risks*, CNBC, https://www.cnbc.com/2021/07/30/scarlett-johanssons-agent-slams-disney-for-lawsuit-response.html (last updated July 30, 2021, 4:32 PM).

129. *Id.*

130. *See, e.g.*, Matt Grobar, *'WandaVision's Elizabeth Olsen Sides With Scarlett Johansson In Lawsuit Against Disney*, DEADLINE (Aug. 23, 2021, 2:28 PM), https://deadline.com/2021/08/elizabeth-olsen-declares-support-scarlett-johansson-disney-suit-12348204 29/ (noting that both Elizabeth Olsen and Jason Sudeikis supported Johansson's decision to challenge Disney); Katie Kilkenny, *SAG-AFTRA President: Disney Using "Gender-Shaming and Bullying" Tactics Over Scarlett Johansson Lawsuit*, HOLLYWOOD REP. (Aug. 5, 2021,

opinion, both parties submitted documents to the Los Angeles County Superior Court in anticipation of the lawsuit that "could change Hollywood forever."[131]

### 2.    *Purported Party Arguments*

In relevant part, Johansson's agreement with Marvel provided that:

> [Periwinkle Entertainment, Inc.] shall furnish [Marvel] the services of [Johansson] to perform the role of 'Black Widow' / 'Natasha Romanova' in the theatrical motion picture currently entitled 'Black Widow' ('Picture'). For the avoidance of doubt, if [Marvel] in its sole discretion determines to release the Picture, then such release shall be a ***wide*** ***<u>theatrical</u>*** ***release*** of the Picture (i.e., no less than 1,500 screens).[132]

Johansson alleged that every prior Marvel film in which she had appeared employed similar contractual language and received an exclusive theatrical window of at least ninety-six days.[133] After Marvel's Chief Counsel, Dave Galuzzi, promised Johansson that Disney+ would not impact her agreement,[134] Kevin Feige, Marvel's President, allegedly revealed that Disney was "calling the shots" and planned *Black Widow*'s simultaneous release to procure additional Disney+ subscriptions.[135] Although Johansson had agreed to settle all claims arising out of her contract with Marvel through arbitration—a non-negotiable industry standard—she argued that her suit was not subject to that agreement because it was only brought against Disney.[136]

In Disney's response, the company stated Johansson's lawsuit was a "futile effort to evade . . . unavoidable [arbitration] (and

---

4:37 PM), https://www.hollywoodreporter.com/business/business-news/sag-aftra-president-slams-disney-tactics-scarlett-johansson-lawsuit-1234994218/ (sharing that "Disney should be ashamed of themselves for resorting to tired tactics of gender-shaming and bullying"); Jamie Lee Curtis, *The 100 Most Influential People of 2021: Scarlett Johansson*, Time (Sept. 15, 2021, 7:15 AM), https://time.com/collection/100-most-influential-people-2021/6095932/scarlett-johansson/ (supporting Johansson's "brilliant response to a real-life manipulation . . . [by filing] a breach-of-contract lawsuit").

131.    Michallon, *supra* note 15.

132.    Complaint, *supra* note 118, at 8 (emphasis in original). The author reached out to Johansson's attorneys for information regarding the complete employment contract but received no response. *Id.*

133.    *Id.*

134.    *Id.* at 10.

135.    *See id.* at 11.

136.    *Id.* at 12, 13.

generate publicity through a public filing)."[137]   Disney also contested that Johansson's contract with Marvel promised neither theatrical nor exclusive distribution of *Black Widow* and that—because the film debuted on roughly 9,600 domestic screens—Johansson's claim was "as indefensible as it sounds" under the plain language of the contract,[138] which guaranteed only 1,500 screens.[139]   According to Disney, *Black Widow*'s simultaneous release was nothing more than an "attempt to capture the broadest possible audience," and Johansson's lawsuit was an ill-intended attempt to garner support and solicit additional compensation that Disney had already provided in good-faith.[140]

### 3.    *What if . . . ?*[141]

It is difficult to adequately address potential court interpretations of Johansson's claim because party submissions—which are inherently crafted to fit specific narratives—naturally skew third-party perception and analysis.[142]   Nevertheless, a California court would have utilized "traditional rules of contract interpretation" to address the merits of Johansson's claim.[143] Although the court's initial inquiry would have been "confined to the writing alone,"[144] the contractual language would have been interpreted in its "ordinary and popular sense, rather than . . . [its] strict legal meaning; unless used by the parties in a technical sense[] or . . . [other] special meaning is given to them by usage."[145]   California law also enables parties to permit a "contract [to] be explained by reference to the

---

137.   *See* Notice of Motion and Motion to Compel Arbitration and Stay Court Proceedings at 6, Periwinkle Ent., Inc., F/S/O Scarlett Johansson v. Walt Disney Co., No. 21STCV27831 (Cal. App. Dep't Super. Ct. Aug. 20, 2021) [hereinafter Motion to Compel Arbitration]. Disney alleged that the California Court of Appeal had clearly provided that compelled arbitration was proper. *Id.* (citing Boucher v. Alliance Title Co., Inc., 127 Cal. App. 4th 262, 269 (Cal. Ct. App. 2005)).

138.   *See* Motion to Compel Arbitration, *supra* note 137, at 6–7.

139.   Complaint, *supra* note 118, at 8.

140.   *See* Motion to Compel Arbitration, *supra* note 137, at 10.

141.   *See What if . . . ?: What If . . . Captain Carter Were the First Avenger?* (Marvel Studios Aug. 11, 2021).   As one of the MCU television series that followed in the footsteps of *Black Widow*, *What if . . . ?* introduced Marvel audiences to Uatu the Watcher, a being who exists outside the planes of space and sees time as "a prism of endless possibility, where a single choice can branch out into infinite realities." *Id.* at 01:02.  In the opening credits, Uatu invites audiences to "follow [him] and ponder the question . . . What if?" *Id.* at 01:31. Perhaps his question is better suited to predict the outcome of Johansson's claim in an alternate universe that did not bind actresses to confidential arbitration.

142.   The author was unable to obtain additional information from either party prior to the settlement agreement.

143.   Mountain Air Enter., LLC v. Sundowner Towers, LLC, 398 P.3d 556, 561 (Cal. 2017).

144.   *Id.*

145.   Cal. Civ. Code § 1644 (1872).

Duquesne Law Review    Vol. 61

circumstances under which it was made, and the matter to which it relates."[146]

The plain language of the alleged agreement, "no less than 1,500 screens,"[147] seems to support Disney's defense that it had technically satisfied its obligations. Johansson, however, provides compelling evidence that such a restrictive definition of "wide theatrical release" had never been utilized in previous Marvel films.[148] A California court would have likely attempted to "give effect to the mutual intention of the parties as it existed *at the time* of contracting,"[149] and thus interpreted "wide theatrical release" in its broad "popular sense" within the entertainment industry because it was not used in an overtly "technical sense."[150]

The California Court of Appeal has also recognized that sophisticated parties "may . . . elect to have [an] arbitrator, rather than the court, decide which grievances are arbitrable."[151] Because Johansson's mandatory arbitration clause required that all disputes be submitted to a JAMS[152] arbitrator,[153] a court would have deferred to that arbitrator "to determine issues of arbitrability."[154] Had the court attempted to determine the issue of arbitrability, it would have still "liberally construed"[155] the arbitration clause and found that "the Federal Arbitration Act . . . favor[s the] enforcement of valid arbitration agreements."[156]

---

146. CAL. CIV. CODE § 1647 (1872).

147. Complaint, *supra* note 118, at 8.

148. *Id.* at 10. Johansson's complaint also included an email from Marvel's Chief Counsel, which acknowledged that it was "100% [Marvel's] plan to do a typical wide release" and acknowledging that Johansson's "whole deal [was] based on the premise that the film would be widely theatrically released like our other pictures." *Id.* (emphasis omitted).

149. CAL. CIV. CODE § 1636 (1872) (emphasis added).

150. CAL. CIV. CODE § 1644.

151. Rodriguez v. Am. Techs., Inc., 136 Cal. App. 4th 1110, 1123 (Cal. Ct. App. 2006).

152. "Founded in 1979, JAMS is the world's largest private alternative dispute resolution (ADR) provider." *About Us*, JAMS, https://www.jamsadr.com/about/ (last visited Sept. 12, 2021). JAMS settles the vast majority of Hollywood disputes. *See* Ronald J. Nessim & Scott Goldman, *Mandatory Arbitration Provisions Involving Talent and Studios and Proposed Areas for Improvement,* 22 UCLA ENT. L. REV. 233, 233 (2015).

153. *See* Motion to Compel Arbitration, *supra* note 137, at 12.

154. *Rodriguez*, 136 Cal. App. 4th at 1123.

155. EFund Cap. Partners v. Pless, 150 Cal. App. 4th 1311, 1329 (Cal. Ct. App. 2007).

156. Alvarez v. Altamed Health Servs. Corp., 60 Cal. App. 5th 572, 580 (Cal. Ct. App. 2021). This prediction is further supported by previous Hollywood disputes, as Charlie Sheen similarly believed that suing a non-signatory to a contract would enable him to circumvent binding arbitration. *See* Matthew Belloni, *Charlie Sheen Denied in Effort to Stop Arbitration*, HOLLYWOOD REP. (Mar. 23, 2011, 10:04 AM), https://www.hollywoodreporter.com/business/business-news/charlie-sheen-denied-effort-stop-170459/. The Court rejected that argument, *see id.*, and Sheen unsurprisingly settled before JAMS arbitrated his case. *See* Matthew Belloni, *Official: Charlie Sheen Settles Lawsuit with Warner Bros., Chuck Lorre*, HOLLYWOOD REP. (Sept. 26, 2011, 3:18 PM), https://www.hollywoodreporter.com/business/business-news/official-charlie-sheen-settles-lawsuit-240214/.

The alleged facts in Johansson's complaint and Disney's response do not indicate that a clear winner would have emerged had Johansson's lawsuit proceeded; California's traditional rules of contract interpretation partially support both arguments. Comprehensive legal analysis by the California judiciary would have been incredibly informative because it would have both established precedent and enabled Hollywood talent—and their attorneys—to adequately evaluate, negotiate, and sign future contracts that incorporate potential day-and-date releases. While Johansson's settlement technically prevented that insightful analysis, it would have nevertheless been shielded from the public—regardless of whether the suit was settled—because of her contract's mandatory arbitration agreement, which would have almost certainly been enforced given previous precedent.

## B.    Hollywood's Red Room: Forced Arbitration[157]

Marvel is not the only studio that requires talent to arbitrate; nearly all Hollywood studios require binding arbitration.[158] In fact, arbitration has become so ubiquitous in the entertainment industry that contractual terms are practically non-negotiable; Hollywood "talent's real world choice is limited to agreeing to [arbitration] provisions or not working for a major studio."[159]

Arbitration has long been recognized as a valid form of alternative dispute resolution, tracing back to 1925 and the enactment the Federal Arbitration Act (FAA),[160] which ensured the validity and enforcement of arbitration agreements "in any maritime transaction or . . . contract evidencing a transaction involving commerce."[161] The Supreme Court has recognized that the FAA is a Congressional "policy favoring arbitration [that] withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration."[162] While some states have attempted to place restrictions on

---

157.  In the MCU, the Red Room is a secret government facility where Black Widow assassins, like Natasha Romanoff, are trained. *See* Caitlin Tasker, *All About the Red Room in Marvel's "Black Widow,"* INSIDE THE MAGIC (June 8, 2021), https://insidethemagic.net/2021/06/black-widow-red-room-marvel-ct1mmb/. Like mandatory arbitration in the entertainment industry, the Red Room was entirely confidential in nature—not even its visitors were certain of its exact location.

158.  Nessim & Goldman, *supra* note 152, at 233.

159.  *Id.*

160.  Federal Arbitration Act, 9 U.S.C. §§ 1–14.

161.  9 U.S.C. § 2.

162.  Southland Corp. v. Keating, 465 U.S. 1, 10 (1984).

Duquesne Law Review    Vol. 61

the enforcement of mandatory arbitration proceedings,[163] the Supreme Court has routinely recognized that the FAA supersedes state requirements that try to limit the enforceability of binding arbitration.[164]  The broad protections conferred by the Court under the FAA have therefore prompted near exponential growth in the use of binding arbitration agreements by powerful corporations in all employment settings.[165]

For these reasons, "[a] lot of sophisticated lawyers on the talent side believe that arbitration is the devil."[166]  In fact, Hollywood arbitration seems to result in undisclosed settlements so frequently that it appears the entertainment industry is uniquely geared towards forcing settlement all the time.[167]  Rather than airing out Hollywood's vast problems in the court of public opinion, disputes can be arbitrated in privacy.[168]  While an ultra-wealthy Hollywood celebrity does not fit the traditional mold of a disenfranchised employee, there is a panoply of scholarship discussing the various problems affiliated with binding arbitration in all employment contexts, such as the repeat player/provider bias, the inability to appeal decisions, and the general lack of transparency throughout the arbitration process.[169]

The repeat player/provider bias suggests that disputant companies choosing an arbitrator, such as film studios, can readily switch arbitration providers should they constantly lose their cases.[170]  Arbitrators could have biases—both subconscious and conscious—that slant their decisions in favor of their most lucrative clients.[171]  In

---

163. *See* Brian Farkas, *The Continuing Voice of Dissent: Justice Thomas and the Federal Arbitration Act*, 22 HARV. NEGOT. L. REV. 33, 41–43 (2016).

164. *See, e.g.*, Kindred Nursing Ctrs. Ltd. P'ship v. Clark, 137 S. Ct. 1421, 1428–29 (2017); AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 357 (2011); Preston v. Ferrer, 552 U.S. 346, 359 (2008).

165. Ashley M. Sergeant, *The Corporation's New Lethal Weapon: Mandatory Binding Arbitration Clauses*, 57 S.D. L. REV. 149, 157 (2012).

166. Dale Kinsella & Nick Soltman, *When Stars Sue Studios: The Truth About Profit Participation Cases*, HOLLYWOOD REP. (Sept. 18, 2021, 6:30 AM), https://www.hollywoodreporter.com/business/business-news/hollywood-profit-participation-misconceptions-1235015051/.

167. Hays, *supra* note 112.

168. *See generally* Nicole Sperling, *Hollywood Loses $10 Billion a Year Due to Lack of Diversity, Study Finds*, N.Y. TIMES (Mar. 11, 2021), https://www.nytimes.com/2021/03/11/movies/hollywood-black-representation.html; Amanda Hess, *Hollywood Uses the Very Women It Exploited to Change the Subject*, N.Y. TIMES (Jan. 24, 2018), https://www.nytimes.com/2018/01/24/arts/can-hollywood-fix-its-harassment-problem-while-celebrating-itself.html.

169. *See, e.g.*, Martin H. Malin, *The Arbitration Fairness Act: It Need Not and Should Not Be an All or Nothing Proposition*, 87 IND. L.J. 289, 312–13 (2012); Jean R. Sternlight, *Creeping Mandatory Arbitration: Is It Just?*, 57 STAN. L. REV. 1631, 1650–51 (2005).

170. *See* Sternlight, *supra* note 169, at 1650.

171. *Id.*

addition, companies often have greater experience and exposure to the process as repeat players, which provides them with an inherent advantage against first-time opponents.[172]  Put simply, "powerful corporations have more resources and . . . money than the average [opponent].  Therefore, corporations often have the ability to buy time and delay the process . . . [and cause] the employee or consumer to forego pursuing their claims."[173]

Mandatory arbitration has also been criticized because of the "few legal protections [that] exist to guarantee that an arbitrator is neutral and competent."[174]  While arbitration is often heralded as a judicially comparable form of dispute resolution, its inherent biases are often "exacerbated because it is difficult for employees to know the track record of arbitrators and to ascertain their reasoning . . . [because] arbitrators are not required to explain their decisions in writing."[175]  Further, the Supreme Court has noted that only arbitration decisions in "manifest disregard" of the law would be subject to secondary judicial review.[176]  Because the Supreme Court has not clearly defined that standard,[177] the majority of circuit courts have applied a limited reading of "manifest disregard of the law" that does not encompass mere legal errors such as misunderstanding or misapplication of the law.[178]  Therefore, binding predispute arbitration allows for potentially unfair—and unappealable—decisions, and the confidential nature of most arbitration agreements only aggravates these issues.[179]

In *Cole v. Burns International Security Services*, a federal court recognized that the "lack of public disclosure may [also]

---

172.  *Id.* at 1651.

173.  Sergeant, *supra* note 165, at 167.  Although this might not be as relevant in the entertainment industry, it is indicative of the widespread problem that any predispute arbitration agreement poses for employees.

174.  Elizabeth A. Roma, *Mandatory Arbitration Clauses in Employment Contracts and the Need for Meaningful Judicial Review*, 12 AM. U. J. GENDER SOC. POL'Y & L. 519, 530 (2004).

175.  *Id.* (citing Paul H. Haagen, *New Wineskins for New Wine: The Need to Encourage Fairness in Mandatory Arbitration*, 40 ARIZ. L. REV. 1039, 1068 (1998)).

176.  *See* Wilko v. Swan, 346 U.S. 427, 436–37 (1953).  That statement was not overruled, but the Court's holding in *Wilko* was overruled by *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, which held that predispute agreements to arbitrate—like Johansson's agreement—are enforceable. *See* 490 U.S. 477, 485–86 (1989).

177.  Williams v. Cigna Fin. Advisors Inc., 197 F.3d 752, 761 (5th Cir. 1999) (noting that "[t]he concept of "manifest disregard of the law" has not been defined by the Supreme Court).

178.  *See, e.g.*, Sheldon v. Vermonty, 269 F.3d 1202, 1206 (10th Cir. 2001) (holding that misinterpreting the law and errors in fact finding are not enough to overturn arbitration decision); Hoffman v. Cargill, Inc., 236 F.3d 458, 462 (8th Cir. 2001) (writing that a court cannot set aside an arbitration decision just because an arbitrator errs in either legal interpretation or factual determination).

179.  Alexia Fernández Campbell, *Google Employees Fought for their Right to Sue the Company—and Won*, VOX (Feb. 22, 2019, 4:10 PM), https://www.vox.com/technology/2019/2/22/18236172/mandatory-forced-arbitration-google-employees.

systematically favor companies over individuals" in compelled arbitration.[180] The court reasoned that:

> Judicial decisions create binding precedent that prevents a recurrence of . . . violations; it is not clear that arbitral decisions have any such preventive effect. The unavailability of arbitral decisions also may prevent potential plaintiffs from locating the information necessary to build a case of intentional misconduct or to establish a pattern or practice of discrimination by particular companies.[181]

This is important to recognize because, assuming Johansson had arbitrated her suit, there would have been no public inquiry into the release of *Black Widow* given the confidential nature of Hollywood arbitration. As it stands, the arbitration process would prevent talent from ascertaining how Disney calculates and distributes revenue from Disney+ to profit-participants, which is particularly damning given the general lack of transparency in the industry.[182] In fact, the only reason some information regarding Disney+ "accounting" was provided at all was because of Johansson's public filing.[183] Had Johansson not forced Disney's hand, critical information could have been shielded behind private arbitration altogether.

To play devil's advocate, it is also important to acknowledge that Johansson might not have planned to actually continue her suit, but instead use her celebrity status to compel settlement in a case that she had no business winning. The resulting settlement, however, prevented any semblance of progression in the entertainment industry for other Hollywood talent. While Johansson had the star-power necessary to compel settlement, other up-and-coming, less influential talent do not have that luxury. Often times, "[t]he short-lived nature of entertainment careers makes it imperative for the artist to maximize available public exposure" and deal with unfavorable contractual agreements or terms to avoid potential costly, and often unsuccessful, arbitration proceedings.[184]

This Article is not advocating for mandatory litigation in all Hollywood disputes, but it is certainly criticizing industry complacency

---

180.  Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465, 1477 (D.C. Cir. 1997).
181.  *Id.* (citing Jean R. Sternlight, *Panacea or Corporate Tool?: Debunking the Supreme Court's Preference for Binding Arbitration,* 74 WASH. U. L. Q. 637, 686 (1996)).
182.  *See generally* Alexander, *supra* note 108.
183.  *See* Motion to Compel Arbitration, *supra* note 137, at 10.
184.  Jonathan Blaufarb, *The Seven-Year Itch: California Labor Code Section 2855,* 6 HASTINGS COMM. & ENT. L.J. 653, 655 (1984).

and insistence on binding, confidential arbitration that fails to establish precedence to protect all Hollywood talent—not just the industry's brightest stars—from contract manipulation or coercion. As it stands, major studios can settle out-of-court with major Hollywood talent,[185] even those adamant about maintaining their claim,[186] because the industry's major players *should* be better off in the long-run. Manipulation and misconduct are effectively swept under the rug so long as industry elite can maintain profits. Importantly, this problem is not unique to Hollywood, as predispute arbitration agreements have increasingly become nonnegotiable terms of employment across America.[187]

## IV.  SOLUTION

Johansson's dispute with Disney highlights a problem that has plagued Hollywood for more than a century: the inherent power imbalance between studios and talent renders the vast majority of talent unprotected in the instance of wrongdoing. What is even more concerning is the notion that studios—to a certain degree—understand that their actions have been coercive. When Warner Bros. announced a day-and-date release for *Wonder Woman 1984*,[188] the studio renegotiated the back-end deals for the film's lead actress, Gail Gadot, and director, Patty Jenkins.[189] Perhaps the studio's voluntary renegotiations were instigated in good-faith, or maybe Warner Bros. was cautious in the wake of Johansson's public suit after having previously lost one of Hollywood's few litigated cases.[190]

---

185.    *See* Joe Flint, *Scarlett Johansson Lawsuit Stirs Debate Over Streaming-Era Movie Compensation*, WALL ST. J., (last updated Aug. 12, 2021, 6:20 AM) (recognizing that lawsuits are not a realistic option for settling modern entertainment disputes).

186.    *See generally Disney's Closed Doors, supra* note 13.

187.    *See generally,* Katherine V.W. Stone and Alexander J.S. Colvin, *The Arbitration Epidemic*, ECON. POL'Y INST. (Dec. 7, 2015), https://www.epi.org/publication/the-arbitration-epidemic/. And in 2020, plaintiffs only won recovery in a shocking 1.6% of cases that were subject to mandatory arbitration agreements. *See* Abha Bhattarai, *As closed-door arbitration soared last year, workers won cases against employers just 1.6 percent of the time*, WASH. POST (Oct. 27, 2021, 7:00 AM), https://www.washingtonpost.com/business/2021/10/27/mandatory-arbitration-family-dollar/27/mandatory-arbitration-family-dollar/.

188.    WONDER WOMAN 1984 (Warner Bros. Pictures 2020).

189.    Brooks Barns & Nicole Sperling, *Trading Box Office for Streaming, but Stars Still Want Their Money*, N.Y. TIMES, https://www.nytimes.com/2020/12/07/business/media/warner-bros-hbo-max-movies-pay.html (last updated Sept. 5, 2021).

190.    *See supra* text accompanying notes 47–50 (outlining Olivia de Havilland's legal victory over Warner Bros.).

When Scarlett Johansson, one of Hollywood's highest paid ac-
tresses,[191] has neither the ability nor desire to push back against
manipulative studios or mandatory arbitration, the question be-
comes whether *any* individual has the ability to prompt the same
kind of systemic change that Olivia de Havilland procured roughly
seventy-five years ago?[192] Hollywood history reveals that the court
of public opinion prompts change in the entertainment industry,
but that "court" has largely been silenced in the wake of mandatory
arbitration. There are tactics that both Congress and the California
State Legislature could take, however, to resolve modern disputes
that would ensure that history does not repeat itself as Hollywood
shifts to streaming.

### A. *Banning Mandatory Arbitration*

#### 1. *The Supreme Court & FAA*

"California has a long history of animosity towards the arbitra-
tion, rather than litigation, of disputes arising in . . . the employ-
ment . . . context."[193] In 2015, the California State Legislature at-
tempted to prohibit mandatory arbitration claims in employment
agreements arising under the California Labor Code.[194] The bill
was vetoed by then California Governor, Jerry Brown, who recog-
nized that a "blanket ban on mandatory arbitration . . . has been
struck down in other states as violating the Federal Arbitration
Act."[195] A similar attempt was vetoed two years later, with Gover-
nor Brown recognizing that "states must follow the Federal Arbi-
tration Act . . . and the Supreme Court's interpretation of the
Act."[196]

Undeterred, the California State Legislature passed A.B. 51 in
2020 to require "voluntary agreement," as opposed to unilateral

---

191. *See* Madeline Berg, *The Highest-Paid Actresses 2019: Scarlett Johansson Leads With $56 Million*, FORBES (Aug. 23, 2019, 3:04 PM), https://www.forbes.com/sites/mad-dieberg/2019/08/23/highest-paid-actresses-scarlett-johansson/?sh=6c5084344b4d.

192. *See supra* text accompanying notes 47–50.

193. William Hayden, *California Again Attempts to Outlaw the Mandatory Arbitration of Employment Disputes*, SNELL & WILMER (Sept. 23, 2021), https://www.swlaw.com/publications/legal-alerts/3008.

194. Edward Lozowicki, *Governor Brown Vetoes California Bill Prohibiting Arbitration of Employment Claims*, A.B.A. (Jan. 15, 2016), https://www.americanbar.org/groups/litiga-tion/committees/alternative-dispute-resolution/practice/2016/gvr-brown-vetoes-ca-bill-pro-hibiting-arbitration-employment-claims/; *see also* A.B. 465, 2015 Assemb. (Cal. 2015).

195. Governor's Veto Message of A.B. 465, 2015 Assemb. (Cal. 2015).

196. Governor's Veto Message of A.B. 3080, 2018 Assemb. (Cal. 2018) (citing DIRECTV, Inc. v. Imburgia, 136 S. Ct. 463, 468 (2015) (overruling a California court's refusal to enforce an arbitration provision in a consumer contract because it disregarded the Court's prior de-cision in *Concepcion*)).

implementation via industry-wide contracts.[197] After a federal district court granted an injunction and stated that the bill was preempted by the FAA, a split Ninth Circuit reversed the injunction and found that requiring arbitration to be agreeable was not an "obstacle to the purposes and objectives of the FAA," and thus not preempted by federal law.[198] Following that decision, the plaintiffs-appellees filed a petition for rehearing *en banc*,[199] arguing that A.B. 51 discouraged arbitration and thus served as an obstacle to the FAA's pro-arbitration objectives.[200] In February 2022, the Ninth Circuit ordered hearings on the matter to be deferred until the Supreme Court ruled in *Viking River Cruises, Inc. v. Moriana.*[201] On June 15, 2022, the Supreme Court ruled, in *Viking River Cruises,* that a separate California law[202] was preempted by the FAA because it did not allow individuals to arbitrate certain kinds of "representative" claims.[203]

On February 15, 2023, the Ninth Circuit formally struck down A.B. 51 as preempted by the FAA and held that the California law "burden[ed] the defining feature of arbitration agreements" by categorically deterring employers from including non-negotiable arbitration agreements in employment contracts.[204] After considering whether the statute served as an "unacceptable obstacle" to the FAA,[205] the court found that the statute was "antithetical to the FAA's 'liberal federal policy favoring arbitration agreements.'"[206] The court's holding demonstrates the judicial tendency to favor of arbitration in light of the FAA, and highlights several Supreme Court cases in which the Court has further explored those principles.

In *Lamps Plus, Inc. v. Varela,* the Supreme Court reaffirmed another one of those "foundational arbitration principle[s]"[207] when it

---

197.  *See* Hayden, *supra* note 193.
198.  Chamber of Com. of U.S. v. Bonta, 13 F.4th 766, 780 (9th Cir. 2021).
199.  Scott Jang, *Challengers to California's Ban on Mandatory Arbitration Contracts Hint Rehearing Petition Coming,* JD SUPRA (Sept. 24, 2021), https://www.jdsupra.com/legal-news/challengers-to-california-s-ban-on-5505146/.
200.  *See, e.g.,* Saturn Distrib. Corp. v. Williams, 905 F.2d 719, 724 (4th Cir. 1990); Sec. Indus. Ass'n v. Connolly, 883 F.2d 1114, 1123–24 (1st Cir. 1989).
201.  Viking River Cruises, Inc. v. Moriana, 142 S. Ct. 1906 (2022).
202.  Labor Code Private Attorneys General Act, CAL. LAB. CODE § 2698 (2004).
203.  *Viking River Cruises,* 142 S. Ct. at 1924.
204.  Chamber of Com. of U.S., No. 20-15291, 2023 WL 2013326 at *9 (9th Cir. Feb. 15, 2023).
205.  *Id.* (citing Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).
206.  *Id.* (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)).
207.  Lamps Plus, Inc. v. Varela, 139 S. Ct. 1407, 1415 (2019) (quoting Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 684 (2010)).

held that arbitration "is strictly a matter of consent."[208] Although subjecting talent to arbitration agreements as a condition of employment[209] would seemingly violate that foundational principle, the Supreme Court's interpretation of "consent" does not factor in the potential negotiability of arbitration agreements and instead turns on whether arbitration agreements are unambiguously communicated in contractual agreements.[210] Therefore, the late Justice Ginsburg criticized the Court's analysis of consent as "ironic" because it justifies the "imposi[tion] [of] individual arbitration on employees who surely would not choose to proceed solo."[211] Nevertheless, California would likely be unable to justify A.B. 51 as prevention of "nonconsensual" arbitration because the Supreme Court has decreed that "[a]rbitration clauses . . . may preclude judicial remedies even when submission to arbitration is made a take-it-or-leave-it condition of employment."[212] Because the Supreme Court's interpretation of the FAA is rather clear and A.B. 51 has been reversed,[213] the most effective way to combat the problems of binding arbitration is for Congress to enact the Forced Arbitration Injustice Repeal (FAIR) Act.[214]

## 2.    *The Forced Arbitration Injustice Repeal Act*

On November 3, 2021, Congressman Hank Johnson announced that the bipartisan FAIR Act had passed the House Judiciary Committee.[215] The Act's stated purpose is to "restore fairness to the American justice system by reasserting individuals' right to access the court system" by "ensur[ing] that men and women contracting with more powerful entities aren't forced into private arbitration, where the bigger party often has the advantage of choosing the arbitrator in an unappealable decision."[216] While previous iterations

---

208.  *Id.* at 1415 (quoting Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 299 (2010)) (alteration in original).

209.  Nessim & Goldman, *supra* note 152, at 233 (writing that "talent's real world choice is limited to agreeing to [arbitration] provisions or not working").

210.  *See Lamps Plus, Inc.*, 139 S. Ct. at 1416–17.

211.  *Id.* at 1421 (Ginsburg J., dissenting).

212.  *Id.* at 1420.

213.  Chamber of Com. of U.S., No. 20-15291, 2023 WL 2013326 at *9 (9th Cir. Feb. 15, 2023).

214.  Forced Arbitration Injustice Repeal Act, H.R. 963, 117th Cong. (2021).

215.  Press Release, Hank Johnson, Rep. Johnson's Bipartisan FAIR Act That Ends Forced Arbitration & Restores Accountability, Passes Judiciary Committee (Nov. 3, 2021) (on file with author).

216.  *Id.*

of the FAIR Act have failed during the proposal process,[217] Congress's consistent attempt to quell mandatory arbitration's inherent disadvantages shows that the problem plaguing Hollywood disputes is not unique to the entertainment industry.[218]

The most effective solution to prevent other Hollywood talent from the clutches of the all-powerful production studios would be for Congress to enact the FAIR Act.[219] In doing so, Congress would protect employees from the detriments of compelled arbitration by recognizing that the Supreme Court's interpretations[220] of the FAA have perverted the original meaning of the Act, which was "intended to apply to disputes between commercial entities of generally similar sophistication and bargaining power."[221] In February 2022—after a lengthy five year process—both the House and the Senate overwhelmingly approved a bill[222] to amend the FAA and ban mandatory arbitration in sexual harassment and assault cases brought by employees.[223] The amendment, which was introduced after the #MeToo movement rose to prominence, constitutes a limited but important furtherance of protections for employees against powerful corporations.[224] While Representative Kirsten Gillibrand hopes that the bill is "step one in a much longer journey" that expands protections to all employment contracts,[225] opposing representatives and corporate lobbyists have expressed concerns over the nullification of existing agreements, regardless of the intention

---

217. *See, e.g.*, FAIR Act, H.R. 1423, 116th Cong. (2019); Arbitration Fairness Act, S. 2591, 115th Cong. (2018); Mandatory Arbitration Transparency Act, H.R. 4130, 115th Cong. (2017); Arbitration Fairness Act, H.R. 3010, 110th Cong. (2007).

218. *See, e.g.*, Paige Smith, *House Approves #MeToo Bill Aimed at Workplace Sexual Harassment*, BLOOMBERG LAW (Feb. 7, 2022, 7:31 PM), https://news.bloomberglaw.com/daily-labor-report/house-approves-metoo-bill-aimed-at-workplace-sexual-harassment (enacting legislation to prevent binding arbitration for employees alleging sexual harassment or assault); Alexia Fernández Campbell, *Google Employees Fought for their Right to Sue the Company—and Won*, VOX (Feb. 22, 2019, 4:10 PM), https://www.vox.com/technology/2019/2/22/18236172/mandatory-forced-arbitration-google-employees (noting that Google removed arbitration requirements from all employment contracts in light of rising public pressure). Unfortunately, there are no signs of a similar departure from mandatory arbitration in the entertainment industry.

219. H.R. 963. On March 17, 2022, the bill was passed in the House along party lines in a 222-209 vote (only one Republican voted for the Act, while no Democrat voted against it). The Act was most recently referred to the United States Senate Committee on the Judiciary on March 21, 2022.

220. *See supra* text accompanying notes 193–214.

221. H.R. 3010.

222. Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, H.R. 4445, 117th Cong. (2021). President Biden signed the bill into law on March 3, 2022.

223. Annie Karni, *House Passes Bill to Nullify Forced Arbitration in Sex Abuse Cases*, N.Y. TIMES (Feb. 7, 2022), https://www.nytimes.com/2022/02/07/us/politics/house-bill-forced-arbitration.html.

224. *Id.*

225. *Id.*

behind mandatory arbitration.[226] Until Congress enacts more comprehensive legislation that protects all employees—including nontraditional "victims" like Hollywood talent—powerful companies will continue to bind employees to their favorite "lethal weapon," binding arbitration.[227] In the interim, however, the California State Legislature, and other legislatures alike, may enact limited legislation that resolves the problems in Hollywood (and other industries) without violating the "fundamental attributes" of arbitration currently recognized by the Supreme Court.[228]

### B.    Limiting Confidentiality

In *AT&T Mobility v. Concepcion*, the Supreme Court recognized the fundamental elements of arbitration: informality, lower costs, greater efficiency and speed, and increased expertise.[229] One element is notably absent from that list: confidentiality. Therefore, the California State Legislature should be able to avoid preemption challenges by only limiting predispute arbitration's confidentiality requirements.[230] While consenting parties could agree to confidentiality prior to a hearing's commencement, the legislature should not be preempted from preventing the underlying arbitration process—the arbitrator's factual analysis, decision-making process, and ultimate finding and award—from *automatically* being shielded from the public as a condition of employment. While JAMS rules require that arbitrators "maintain the confidential nature of [an] Arbitration proceeding and the Award[,]" they do not inherently require opposing parties to maintain confidentiality as a fundamental attribute of the process.[231]

Banning the confidential nature of mandatory arbitration would enable the California State Legislature to protect Hollywood talent and other employees while surviving preemption challenges. While the Court has recognized that informality, costs, efficiency, and expertise are fundamental to the process, it has not conclusively stated that prohibiting confidentiality necessarily interferes with

---

226.    *Id.*

227.    *See* Sergeant, *supra* note 165, at 149.

228.    *See* AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 348 (2011).

229.    *See id.* at 348; *see also* Arpan A. Sura & Robert A. DeRise, *Conceptualizing Concepcion: The Continuing Viability of Arbitration Regulations*, 62 U. KAN. L. REV. 403, 404 (2013).

230.    The National Labor Relations Board (NLRB) recently solicited comments and requested parties to address whether forced confidentiality is permissible in predispute arbitration. *See* Press Release, National Labor Relations Board, NLRB Invites Briefs on Mandatory Arbitration Clauses (Jan. 18, 2022) (on file with author).

231.    *See JAMS Comprehensive Arbitration Rules & Procedures*, JAMS (June 1, 2021), https://www.jamsadr.com/rules-comprehensive-arbitration/#Rule-26.

arbitration's fundamental attributes.[232]  In fact, barring confidentiality would arguably put arbitration on par with other judicial proceedings without diminishing its fundamental attributes; it would liken the process to other judicial matters of public record and better protect Hollywood talent from their vertically-integrated employers.

Although California could enact temporary solutions, Congress should still enact the FAIR Act because the "red" in Hollywood's ledger is indicative of a widespread problem that does not stop at Hollywood's city limits.

## V.    Conclusion

Since the entertainment industry's inception, Hollywood studios have maintained immense power over talent.  While Hollywood's brightest stars have balanced that power and guaranteed themselves higher profits on the back-end of major projects, Hollywood studios have continued to engage in business practices which minimize talent returns.  Those business practices have not been fully analyzed—let alone prevented—despite the rise in Hollywood disputes over the last decade because of the industry's strict requirement of confidential, mandatory arbitration.  That confidentiality has enabled the vertically-integrated studios to maintain significant control over the vast majority of Hollywood talent as the industry undergoes a rapid shift to streaming.[233]

As arbitration continues to expand as a staple in not only the entertainment industry, but also all employment contracts, it has become more important for potential plaintiffs to understand the decisions governing their employment contracts.  Arbitration is most analogous to the judicial system when *both* parties voluntarily consent to the process.  Therefore, Congress should enact the FAIR Act to prevent predispute arbitration and restore the original purpose of the FAA[234] to protect not only Hollywood talent, but all employees subject to the nonnegotiable judicial waiver of effective precedent.[235]  At the very least, the California General Assembly—and other state legislatures—should seek to minimize the disadvantages of mandatory arbitration by requiring studios to report

232.  *See Concepcion*, 563 U.S. at 348; *see* also Ting v. AT&T, 319 F.3d 1126, 1152 (9th Cir. 2003) (writing that bilateral confidentiality provisions may unconscionably favor large companies in arbitration disputes).

233.  *See* Faughnder & Sakoui, *supra* note 10.

234.  *See* Arbitration Fairness Act, H.R. 3010, 110th Cong. (2007).

235.  Lamps Plus, Inc. v. Varela, 139 S. Ct. 1407, 1420 (2019) (Ginsburg J., dissenting).

any critical findings underlying arbitration disputes unless mutually agreed upon by both parties *after* a dispute arises.

Like any other alternative dispute resolution process, arbitration should not stand apart from the law, but the confidential nature of arbitration seeks to hide violations from the public eye. As long as confidential predispute arbitration continues to plague the entertainment industry (and most employment contracts), the ledger will forever remain red for many potential plaintiffs moving forward.