# EXHIBIT 15

# BIG SCREEN OR BUST?: HOW CONTRACTUAL NEGOTIATIONS IN HOLLYWOOD MUST ADAPT IN THE STREAMING ERA

*Alexis Narotzky\**

## I.  Introduction

Scarlett Johansson made her first appearance as her superhero alter-ego, the Black Widow, on May 7, 2010, in the movie *Iron Man 2*.[1]  Over the next intervening eleven years, Johansson appeared in several of Disney's Marvel ("Disney" or "Marvel") movies in supporting roles.[2]  On July 9, 2021, Marvel released the *Black Widow* with Scarlett Johansson as the lead character.[3]  Johansson's agreement for her character's eponymous film was built upon the expectation of large bonuses based on profit from outsized box-office receipts, understood as a profit-participation or contingent compensation contract.[4]  Johansson's lawyers negotiated for a "wide theatrical release" to protect her financial interests by surmising the success of a Marvel blockbuster would result in a higher bonus.[5]  Upon learning of the development of Disney's own streaming platform, Disney+, Johansson's lawyers fought for the *Black Widow* to still have a wide theatrical release due to fear that streaming of the film would bastardize Johansson's profits.[6]  Although Disney reassured Johansson that the *Black Widow* would

\* Notes Editor, *Cardozo Journal of Conflict Resolution* Vol. 24; J.D. Candidate 2023, Benjamin N. Cardozo School of Law.

1 Complaint, Periwinkle Entertainment, Inc., F/S/O Scarlett Johansson v. The Walt Disney Co., No. 21STCV27831 (C.A. Super. Ct. July 29, 2021) [hereinafter Johansson Complaint]; *Iron Man 2*, IMDʙ, https://www.imdb.com/title/tt1228705/ [https://perma.cc/5YAQ-ZYN8] (last visited Nov. 8, 2021).

2 Johansson Complaint, *supra* note 1.

3 Joe Flint & Erich Schwartzel, *Scarlett Johansson Sues Disney Over 'Black Widow' Streaming Release*, Wᴀʟʟ Sᴛ. J. (last updated July 29, 2021, 5:57 PM), https://www.wsj.com/articles/scarlett-johansson-sues-disney-over-black-widow-streaming-release-11627579278 [https://perma.cc/V8KJ-AZG8].

4 Box office receipts are defined as revenue from ticket sales in movie theaters. *Id.*

5 A wide theatrical release is commonly understood in the movie industry to mean appearing in 600 or more movie theaters for a period of 90–120 days. *See* Johansson Complaint, *supra* note 1, at 3.

6 *Id.* at 4.

first be released in theaters similar to other Marvel movies, the film was released simultaneously in theaters as well as Disney+.[7]

Johansson filed suit, claiming that Disney breached their contract by releasing *Black Widow* in this fashion.[8]  Allegedly, this simultaneous release in two formats diminished Johansson's box office profits.[9]  Instead of requiring each individual to pay for their own ticket at the theater, groups could watch the film together for the mere thirty-dollar streaming fee charged by Disney+.[10]  Thus, Johansson alleged to have missed out on millions of dollars generated by box-office receipts, in turn minimizing the profit the movie earned and, therefore, her contingent compensation.[11]  Johansson and Disney settled their dispute, though the details of the settlement are still unknown.[12]

As studios continue to prioritize direct-to-consumer streaming, conflicts over profit-participation have become more numerous.[13]  On February 7, 2022, *The Matrix Resurrections* co-producer Village Roadshow Entertainment Group ("Village Roadshow") filed a complaint against WarnerMedia, alleging breach of contract over their decision to release the film in theaters and on HBO Max simultaneously.[14]  *The Matrix Resurrections* earned $37 million in box-office receipts.[15]  Village Roadshow alleges that WarnerMedia

---

7  Flint & Schwartzel, *supra* note 3.

8  Catie Keck, *Scarlett Johansson's Black Widow Lawsuit Has Unearthed a Huge Problem with Streaming*, VERGE (Aug. 5, 2021, 2:10 PM), https://www.theverge.com/22611516/scarlett-johansson-disney-lawsuit-streaming-services-transparency [https://perma.cc/6FSC-FCQ2].

9  *Id.*

10  Abbie Beckley, *Scarlett Johansson Deserves Everything She Got From Disney*, BATTALION (Oct. 8, 2021), https://www.thebatt.com/opinion/scarlett-johansson-deserves-everything-she-got-from-disney/article_a60dc172-2848-11ec-b51d-d714fa5b3418.html [https://perma.cc/R2GG-X53A].

11  Johansson Complaint, *supra* note 1.

12  Kim Masters and Tatiana Siegel, *Scarlett Johansson, Disney Settle Explosive 'Black Widow' Lawsuit*, HOLLYWOOD REPORTER (Sept. 30, 2021, 4:48 PM), https://www.hollywoodreporter.com/business/business-news/scarlett-johansson-disney-settle-black-widow-lawsuit-1235022598/ [https://perma.cc/2YPV-N32H].

13  Kim Masters, *Disney v. Scarlett Johansson: Why "a Ton of Lawsuits" May Be Next*, HOLLYWOOD REP. (Aug. 4, 2021, 6:45 PM), https://www.hollywoodreporter.com/business/business-news/disney-vs-scarlett-johansson-lawsuits-next-1234992368/ [https://perma.cc/T5HP-ULKU].

14  HBO Max is owned by WarnerMedia. Joe Flint, *'Matrix' Co-Producer Sues Warner Bros. Over HBO Max Streaming Release*, WALL ST. J. (Feb. 7, 2022, 2:02 PM), https://www.wsj.com/articles/matrix-co-producer-sues-warner-bros-over-hbo-max-streaming-release-11644254583 [https://perma.cc/N6UE-7CGD].

15  Nicole Sperling, *Producer of 'The Matrix Resurrections' sues Warner Bros. Over How the Film Was Released*, N.Y. TIMES (Feb. 7, 2022), https://www.nytimes.com/2022/02/07/business/matrix-resurrections-lawsuit.html [https://perma.cc/723C-UJAQ].

"materially reduce[d] box office and correlated ancillary revenue . . . that Village Roadshow and others would be entitled to receive in exchange for driving subscription revenue for the new HBO Max service, for which only WarnerMedia would be the sole beneficiary."[16] Essentially, WarnerMedia is accused of furthering its subscription base at the expense of talent's profit participation bonus, similar to Johansson's suit.[17]

Johansson and Village Roadshow's allegations raise important considerations for the future of contractual negotiations between lawyers on behalf of their clients and movie studios. Contracting for compensation based on box-office receipts has been common practice in Hollywood for decades. However, the proliferation of streaming services as a means of watching films has fundamentally changed the release of movies paradigm, resulting in a need to change how talent negotiates with studios.

This Note seeks to address the nascent issue surrounding contracting in Hollywood post the availability of streaming services, called subscription video-on-demand ("SVOD"). To provide necessary context, Part II of this Note will discuss a history of contracts in Hollywood between the actor and the studio. This background will describe the evolution of the relationship between the studio and their stars which in turn resulted in a change in the type of contracts negotiated. Next, this Note will introduce streaming services, its effect on the motion picture industry and their preferred contract model. Part III considers the future of Hollywood as it relates to how films will be released. Part IV highlights important considerations when entering into negotiations for contracts in Hollywood. Part V will provide three suggested provisions that entertainment attorneys should consider negotiating for when contracting in Hollywood: (1) demanding wide-theatrical releases; (2) demanding more money up front; and (3) a pay-per-view streaming fee.

---

[16] Complaint at 3, Village Roadshow Films (BVI) Ltd. et al. v. Warner Brothers Entertainment, Inc. et al., No. 22STCV04606 (C.A. Super. Ct. Feb. 7, 2022) [hereinafter Matrix Complaint].

[17] *Id.* at 3–4.

## II. Background

### A. *The History of Contracting in Hollywood*

#### i. 1920s–1950s: The Studio Era

The Motion Picture Industry in the 1920s was known as "The Studio Era."[18] At this time, there were five fully integrated movie studios.[19] A fully integrated studio handled all the necessary steps to make a movie in-house: (1) Production, (2) Distribution, and (3) Exhibition.[20] These dominant studios, commonly referred to as the Big Five, were Loew's-MGM, Paramount, RKO, Twentieth Century-Fox and Warner Brothers.[21] These studios maintained virtual monopolies over the motion picture industry.[22] "Each studio had exclusive contracts with actors and directors; owned the theaters where their movies played; worked with each other to control how movies were shown in independent theaters; and, in some cases, owned the companies that processed the film."[23] Each studio was producing approximately fifty films per year.[24]

During the Studio Era, actors predominantly signed contracts in which the "studios would retain the talent's services for a term (often for many years) for a fixed weekly salary."[25] Typically, contracts were for seven-year terms that could be renegotiated and/or terminated every six to twelve months.[26] The actors had little to no control over their roles[27] and the profits remained in the hands of the studios.[28]

---

[18] *The Studio Era*, Libr. of Cong., https://guides.loc.gov/american-women-moving-image/motion-pictures/studio-era [https://perma.cc/DF39-8W5B] (last visited Feb. 7, 2022).

[19] F. Andrew Hanssen, *Vertical Integration During the Hollywood Studio Era*, 53 J. L. & Econ. 519, 523 (2010).

[20] *Id.*

[21] *Id.*

[22] Scott Bomboy, *The Day the Supreme Court Killed Hollywood's Studio System*, Nat'l Const. Ctr. (May 4, 2021), https://constitutioncenter.org/blog/the-day-the-supreme-court-killed-hollywoods-studio-system [https://perma.cc/6QNC-769Y].

[23] *Id.*

[24] *The Studio Era, supra* note 18.

[25] Joe Sisto, *Profit Participation in the Motion Picture Industry*, 21 Ent. & Sports L. 1, 21 (2003).

[26] S. Abraham Ravid, A Concise Handbook of Movie Industry Economics 45 (Charles C. Moul ed., 2005).

[27] *Id.*

[28] Sisto, *supra* note 25, at 22.

### ii.  1950s–Today: Profit Participation Contracts

The Studio Era ended in 1948 after the Supreme Court's decision in *Paramount v. United States*.[29]  The Court ruled that movie studios could not own their own theaters, ending their monopoly on the motion picture industry and the Big Five's fully integrated model.[30]  With the downfall of the Studio Era, fewer movies were produced each year.  For example, Metro-Goldwyn Mayer released 51 films in 1937, which was reduced to 24 by 1948.[31]  The existing model of paying actors a yearly salary was no longer viable as the number of films decreased.  Hollywood needed to pivot.

By the 1950s–60s, talent would no longer sign long-term contracts with studios for fixed salaries but instead began negotiations for compensation that entitled the actor to a portion of the film's profits.[32]  The first profit participation contract was negotiated by Jimmy Stewart's agent, Lew Wasserman for Universal's *Winchester '73*.[33]  At the time, Stewart's typical payment was $250,000 per movie.[34]  However, Universal did not have the money to pay him up front.[35]  Instead of Stewart receiving his typical fee, Wasserman negotiated a contract in which Stewart would receive part of the net profits.[36]  Wasserman's decision proved prescient, as Stewart was awarded millions for his performance.[37]  Wasserman's acuity encouraged other Hollywood representatives to begin demanding that their clients be remitted a portion of the net profits *in addition* to their typical flat fee.[38]

### 1.  Buchwald v. Paramount Pictures Corporation

*Buchwald v. Paramount Pictures Corp.* was a critical case for Hollywood profit participation contracts.[39]  Pulitzer Prize-winning author and humorist, Art Buchwald, wrote an eight-page screen

---

[29]  U.S. v. Paramount, 334 U.S. 131 (1948).

[30]  *Id.*

[31]  Mark Weinstein, *Profit-Sharing Contracts in Hollywood: Evolution and Analysis*, 27 J. Legal Stud. 67, 72 (Jan. 1998).

[32]  *Id.* at 88–89.

[33]  Brandon Milostan, *Bye Bye Back End, Hello Streaming*, 42 L.A. Law. 44 (May 2019).

[34]  *Id.; see also* Victor P. Goldberg, *The Net Profits Puzzle*, 97 Colum. L. Rev. 524, 527 (1997).

[35]  Milostan, *supra* note 33.

[36]  Goldberg, *supra* note 34, at 527.

[37]  Milostan, *supra* note 33.

[38]  Weinstein, *supra* note 31, at 85.

[39]  Buchwald v. Paramount Pictures Corp., No. C 706083, 1990 WL 357611 (1990).

treatment which he titled "It's a Crude, Crude World."[40] Buchwald sent his plot idea to his agent Alain Bernheim, who pitched the idea to Paramount as a potential starring vehicle for Eddie Murphy in 1982.[41] In March 1983, Buchwald entered into an agreement with Paramount in which Paramount had "purchased the rights to Buchwald's story and concept," subsequently titled "King for a Day."[42] Bernheim was notified two years later that Paramount would no longer be making "King for a Day."[43] Thus, Buchwald in turn, optioned his treatment to a competing studio.[44] However, in the summer of 1987, it became apparent that Paramount was working on a project for Eddie Murphy titled "The Quest."[45] This movie is now known as the wildly successful blockbuster Coming to America.[46] In the credits of Coming to America, no acknowledgement was made of Art Buchwald.[47] The agreement between Buchwald and Paramount entitled Buchwald to receive profits "[i]f, but only if, a feature length theatrical motion picture shall be produced *based upon* Author's Work."[48] Ultimately, the Los Angeles County Superior Court found that Coming to America *was* based upon Buchwald's treatment.[49]

Once Buchwald succeeded on his claim of authorship, the next phase of litigation—and most important to our understanding of Hollywood net-profit contracts—addressed the compensation owed to Bernheim and Buchwald.[50] Paramount had argued that even though Coming to America made $288 million at the box office, the studio made no profit because of marketing and development offsets.[51] Therefore, although Buchwald was entitled to net

---

[40] *Id.*; David Folkenflik, *Columnist Art Buchwald Leaves Us Laughing*, NPR (Jan. 18, 2007, 9:44 AM), https://www.npr.org/templates/story/story.php?storyId=5249437 [https://perma.cc/ND25-JKRT].

[41] Buchwald v. Paramount Pictures Corp., No. C 706083, 1990 WL 357611 (1990).

[42] *Id.*

[43] *Id.* at 5.

[44] *Id.* at 6.

[45] *Id.*

[46] Buchwald v. Paramount Pictures Corp., No. C 706083, 1990 WL 357611, at 6 (1990).

[47] PJ Grisar, *Did Art Buchwald Come Up with 'Coming to America?'*, FORWARD (Mar. 4, 2021), https://forward.com/culture/465247/art-buchwald-coming-2-america-eddie-murphy-john-landis-lawsuit-king-for-a/ [https://perma.cc/EAA9-4ES4].

[48] Buchwald v. Paramount Pictures Corp., No. C 706083, 1990 WL 357611, at 7 (Cal. Super. Ct. 1990).

[49] *Id.* at 15.

[50] Buchwald v. Paramount Pictures Corp., No. 706083, 1992 WL 1462910 (Cal. Super. Ct. 1992).

[51] Grisar, *supra* note 46.

profits, there were none.[52]  This led Judge Thomas Schneider to rule the contract to be unconscionable, throwing out the net profit formula within the contract and opting to calculate fair market value as the compensation for Bernheim and Buchwald.[53]

## 2.   Hollywood's "Creative Accounting"

*Buchwald v. Paramount Pictures Corp.* shed light on what has colloquially become known as Hollywood's "creative accounting."[54]  In Hollywood, the term "profit" has been defined differently in each contract.[55]  Specifically, in response to the *Buchwald* case, there have been additional terms that have been incorporated into contracts.  For example, contracts now mention production costs, distribution fees, and use phrases such as "ordinary course of business."[56]  The struggle for talent is that these ambiguous terms are later defined by corporations in ways that will meet their needs, providing "ample leeway to make interpretation in its favor."[57]

The Financial Accounting Standards Board ("FASB") has published Generally Accepted Accounting Principles ("GAAP").  GAAP governs calculations of revenue and expenses, and has created guidelines specific to different industries.[58]  In 1981, FASB released the Financial Accounting Standards Bulletin 53 which explained how "income from the exploitation of a motion picture is to be recognized as earned and when the cost of producing and distributing a motion picture is recognized as incurred."[59]  In 2000, Bulletin 53 was revoked and replaced by the American Institute of Certified Public Accountants' Statement of Position 00-2.[60]  The motion picture industry is encouraged to follow these revised accounting standards.  Nevertheless, studios do not follow these

---

[52] *Id.*

[53] Buchwald v. Paramount Pictures Corp., No. 706083, 1992 WL 1462910 (Cal. Super. Ct. 1992).

[54] *See generally* Sergio Sparvierio, *Hollywood Creative Accounting: The Success Rate of Major Motion Pictures*, 2 MEDIA INDUS. J. 19, 20 (2015).

[55] Harold L. Vogel, *Movie Industry Accounting*, *in* A CONCISE HANDBOOK OF MOVIE INDUSTRY ECONOMICS 74 (Charles C. Moul ed., 2005).

[56] *Id.*

[57] *Id.* at 74–75.

[58] Joseph F. Hart & Philip J. Hacker, *Less Than Zero*, 19 L.A. LAW. 34, 36 (1996).

[59] *Id.*; Status of Statement No. 53, FIN. ACCT. STANDARDS BD. https://www.fasb.org/page/PageContent?pageId=/Reference-library/superseded-standards/status-of-statement-no-53.html&bcpath=TFf.

[60] FIN. ACCT. STANDARDS BD., STATEMENT OF FINANCIAL ACCOUNTING STANDARDS NO. 139, RECISSION OF FASB STATEMENT NO. 53 AND AMEND. TO FASB STATEMENTS NO. 63, 89, AND 121 (2008).

guidelines.[61]  Instead, profits are defined by a Standard Profit Definition (SPD) which is included in the talent's employment contract.[62]

Studio net profits is essentially "a contractually defined formula which can vary from studio to studio and agreement to agreement."[63]  The formula is continuously "subject to recalculation in each accounting period."[64]  Profit-participation contracts have been subject to litigation, such as *Buchwald v. Paramount*. However, there has been no federal appellate level decision that has ruled "on the intricacies of studio accounting practices."[65]

An overall understanding of Hollywood's "creative accounting" begins with an understanding of how the industry defines certain terms.  First is revenue, which predominantly comes from box office receipts.[66]  It is important to note that box office revenue does not immediately go directly to the studio.  Instead, a substantial piece of box office revenue is kept by theater owners who exhibit the movies.[67]  Thus, revenue received by the studio is the percentage of box office receipts that the studio receives after the theater owners take their allocation.[68]  For example, if a film earned $100 million in box office receipts, the studio could have received only half of that.[69]

### 3.  Types of Profit Contracts

Today, contingent compensation agreements fall within a spectrum of three general types: (1) first-dollar gross, (2) adjusted gross, and (3) net profits.[70]  Gross receipts are defined as the film's total revenue.[71]  A studio will rarely grant a true first-dollar gross contract, in which talent would receive a percentage of revenue

---

[61]  Neal Robin, Note, *Hit Losers: The Good (Faith) Fight for Net-Profits Payments from Blockbuster Hollywood Productions*, 4 J. L. Tech. & Internet 445, 456 (2013).

[62]  Hart & Hacker, *supra* note 57.

[63]  Dina Appleton & Daniel Yankelevits, Hollywood Dealmaking: Negotiating Talent Agreements for Film, TV, and Digital Media 232 (3d ed. 2018).

[64]  *Id.*

[65]  *Id.* at 236.

[66]  *Id.* at 237.

[67]  *Id.*

[68]  *Id.*

[69]  Appleton & Yankelevits, *supra* note 63, at 237.

[70]  Angus Finney, *Streamers Help Reignite Big Battles Over Film and TV Profit Participation*, Variety (Jan. 15, 2022, 6:02 AM), https://variety.com/2022/film/spotlight/streamers-help-reignite-big-battles-over-film-and-tv-profit-participation-1235154957/ [https://perma.cc/AG3H-N6AR].

[71]  Sisto, *supra* note 25, at 22.

without any deductions taken first.[72]  Thus, first-dollar gross is actually understood in the industry as providing talent a share of the profit after only a few limited expenses have been taken out, such as taxes and trade dues.[73]  Considered the most valuable form of profit-participation, the actor needs sufficient bargaining power to receive this type of contract.[74]  This was the type of contract that Scarlett Johansson was able to receive for the Black Widow.

Another variation is called the first-dollar gross at break-even, in which the upfront payment to the actor is considered an advance against his back-end payment.[75]  For example, if a contract promises $20 million against 10 percent of the gross, the actor is guaranteed a salary of at least $20 million regardless of the box office success of the movie.[76]  However, if 10% of the gross exceeds $20 million, the actor would receive the additional payment.  The adjusted gross contract allows the talent "a share of the gross receipts after the studio has recouped its negative and print and ad costs."[77]  Negative costs are the actual costs of producing the movie.[78]  Adjusted gross receipts involve "customary off-the-top deductions as well as certain other contractually stipulated distribution costs."[79]  These are typical costs, such as advertising expenses.[80]

Lastly, the term "net profits" has no particularized meaning as a matter of law but rather is subject to Hollywood's changing definitions.[81]  "Net profit" has come to be defined by each studio on a contract-to-contract basis.  Although "net profits" is defined on a contract-to-contract basis, it is understood to mean that once the break-even point has been reached—when receipts are equal to the amount of money spent by the studio comprehensively—then the talent receives a percentage of the profits.[82]  Two of the largest line-item deductions are distribution fees and negative costs.  Distribution fees are "means of compensating the studio for its costs for maintaining distribution offices and facilities."[83]  Negative costs

---

[72] Appleton & Yankelevits, *supra* note 63, at 177.

[73] Vogel, *supra* note 55, at 73.

[74] Sisto, *supra* note 25, at 22, 24.

[75] Appleton & Yankelevits, *supra* note 63, at 177.

[76] *Id.*

[77] *Id*. at 242.

[78] Vogel, *supra* note 55, at 73.

[79] Appleton & Yankelevits, *supra* note 63, at 252.

[80] *Id.*

[81] Robin, *supra* note 61, at 451.

[82] Sisto, *supra* note 25, at 24.

[83] Appleton & Yankelevits, *supra* note 63, at 240.

typically include gross profit participants because those are paid before net profits are reached.[84]  Thus, under net profit participation, the profit participant receives profits *only after* the full distribution of fees and costs has been recovered.[85]

## B.  *Profit-Participation Contract Motivations*

### i.   The Actor's Perspective

An actor would prefer a contract that enables them to participate in the upside of the film rather than a straight salary.  Profit-sharing contracts provide talent an opportunity to make more money than a contract that only provides for a salary.[86]  If the movie is wildly successful, more revenue will come in.  For gross participants, this provides even greater income; for net participants, they still must overcome Hollywood's "creative accounting" and hope that the movie turns a profit.  However, if the movie is unsuccessful, revenue may fall short of expectations, and thus contingent compensation could be disappointing or not at all.  Additionally, contingent compensation allows talent to continue to earn money based on residuals.

### ii.   The Studio's Perspective

A studio might prefer a profit-participation contract as well.  Profit participation contracts provide for lower up-front payments, freeing up funds for the studio to invest in the production.  Using "creative accounting," studios can allocate numerous expenses to offset the revenue, thus reporting lower income numbers, allowing them to minimize the amount they must pay the talent.[87]

Additionally, profit-participation encourages creative investment.  "Each party's reward needs to be tied to what it contributes to the combined value created by the project to induce it to exert the best efforts for the overall project."[88]  Essentially, if people have more skin in the game, they are more motivated to bring their best.[89]  Incentivizing talent to create will produce not only a better

---

[84] *Id.* at 242.

[85] Vogel, *supra* note 55, at 73.

[86] *See* Goldberg, *supra* note 33, at 526.

[87] Sisto, *supra* note 25, at 27.

[88] Peter Labuza, *Putting Penn to Paper: Warner Bros.' Contract Governance and the Transition to New Hollywood*, 80 VELVET LIGHT TRAP 4, 11 (2017).

[89] *Id.*

payoff for the talent themselves but also for the studio backing them, as they might get a blockbuster film.[90]

## C.   *Enter: Streaming Services*

### i.   Timeline of Streaming Platforms

Netflix was founded by Reed Hastings and Marc Randolph in 1997.[91]  Netflix provided video rentals similar to Blockbuster but delivered the DVD straight to the consumer's home.[92]  The process was simple; consumers would select a movie or television show on Netflix's website, and within a few days, the DVD was delivered to their home "in the now iconic red envelopes" along with a prepaid return envelope.[93]  In 2000, Hastings proposed a merger with Blockbuster, with the hopes of becoming Blockbuster's streaming service, although the technology was not yet there to allow that dream to come to fruition.[94]  He offered "that Blockbuster buy a 49% stake in Netflix and absorb the Blockbuster name."[95]  Blockbuster declined, unconvinced that "digital media posed a serious threat to their business [ ]."[96]

Netflix's goal of offering a streaming platform materialized in 2007 and completely "challeng[ed] the Hollywood status quo."[97]  Streaming allowed Netflix's subscribers to watch movies directly online, and the need for a physical DVD was eliminated.  By 2013, Netflix began developing its own shows, the first being *House of Cards*.[98]  Shortly thereafter, Netflix became the first streaming ser-

---

[90] *Id.*

[91] WILLIAM L. HOSCH, BRITANNICA ENCYCLOPEDIA (last updated Jan. 14, 2022), https://www.britannica.com/topic/Netflix-Inc [https://perma.cc/8NAQ-AL5G].

[92] *See* Amy Lamare, *How Streaming Started: YouTube, Netflix, and Hulu's Quick Ascent*, BUS. OF BUS. (July 31, 2018, 9:29 AM), https://www.businessofbusiness.com/articles/a-brief-history-of-video-streaming-by-the-numbers/ [https://perma.cc/5NXU-C2A2].

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] Brooks Barnes, *The Streaming Era Has Finally Arrived. Everything is About to Change*, N.Y. TIMES (Nov. 18, 2019), https://www.nytimes.com/2019/11/18/business/media/streaming-hollywood-revolution.html [https://perma.cc/MW9A-NJBE].

[98] Cynthia Littleton & Janko Roettgers, *Ted Sarandos on How Netflix Predicted the Future of TV*, VARIETY (Aug. 21, 2018, 6:30 AM), https://variety.com/2018/digital/news/netflix-streaming-dvds-original-programming-1202910483/ [https://perma.cc/UF6E-VEBY].

vice to win an Emmy Award.[99]  The rise of Netflix ultimately drove Blockbuster out of business, with one sole store currently remaining in Bend, Oregon.

Netflix was the original streaming platform, but soon other companies jumped on board.  Hulu was launched in 2008 as "a joint venture between AOL, Comcast, Facebook, MSN, Myspace, and Yahoo."[100]  Hollywood saw the potential in streaming as not only being more convenient for the customer but providing a way to make money from older television shows.[101]  Since then, multiple platforms have been introduced, including but not limited to Amazon Video, Apple Studios, Disney+, HBO Max, and Paramount+.

Streaming services have been the impetus for what is colloquially called "cutting the cord."[102]  In essence, individuals are no longer interested in paying for cable television to reduce the number of superfluous channels they pay for while prioritizing the content they desire.  Streaming services provide the opportunity to watch your show or movie quickly—"binge-watching"—rather than wait weekly.[103]  A Pew Research Center survey found that 71% of individuals who no longer use cable say they do not need it because everything they want to watch is online.[104]  From 2015 to 2021, the number of cable users fell among all demographics.[105]  Unsurprisingly, individuals ages 18-24 are the lowest percentage (34%) of people who still subscribe to cable television.[106]

Streaming services disrupted the television industry first but then set their sights on the film industry.  Netflix released its first original movie in late 2015, titled *Crouching Tiger, Hidden Dragon: The Green Legend*.[107]  Netflix continued releasing new original content at an accelerated pace, and by 2019, "Netflix averaged just

---

[99] Clare Y. Cho, Cong. Rsch. Serv., R46545, Competition Among Video Streaming Services 4 (2020).

[100] Lamare, *supra* note 92.

[101] *Id.*

[102] Hazal Senkoyuncu, *The Age of Streaming Services: Then, Now, and Beyond*, Artifice (Jan. 24, 2020), https://the-artifice.com/history-of-streaming/ [https://perma.cc/Y6SB-34XT].

[103] Elizabeth Barber, *Netflix to Release First Original Movie*, Time (Sept. 30, 2014, 1:02 AM), https://time.com/3447312/netflix-to-release-first-original-movie/ [https://perma.cc/W4DE-4YDW].

[104] Lee Rainie, *Cable and Satellite TV Use Has Dropped Dramatically in the U.S. Since 2015*, Pew Rsch. Ctr. (Mar. 17, 2021), https://www.pewresearch.org/fact-tank/2021/03/17/cable-and-satellite-tv-use-has-dropped-dramatically-in-the-u-s-since-2015/ [https://perma.cc/LGU5-2UB5].

[105] *Id.*

[106] *Id.*

[107] Barber, *supra* note 103.

over one new original TV program or movie for every day of 2019."[108]  To date, Netflix has received 89 Oscar nominations and has won 15 academy awards.[109]  At the 93rd Annual Oscars held in 2021, Netflix and Amazon Prime Video won seven and two awards, respectively, which set a new record for streaming service film wins.[110]  Streaming services have proven that they will be a continuous thorn to traditional studios.

### ii.   The Streaming Service Contract Model

Streaming platforms have opted for a more traditional Studio Era contracting model: a payment upfront.  In these contracts, talent is typically offered large compensation upfront.[111]  However, especially for contracts for television shows, the talent does not stand to gain profit participation for subsequent re-runs or views.[112]  For example, Dan Fogelman, the creator of the hit television show "This Is Us," signed a contract with Netflix in which he received a lump sum payment of around $150 million but will not receive any profits from re-runs of new shows he develops for Netflix in the future.[113]  Similarly, Steven Spielberg signed a multiyear deal to make films for Netflix, as did Shonda Rhimes and Ryan Murphy.[114]

Netflix, for example, believes that its contracting model provides "the best of both worlds: providing the contingent compensation that Lew Wasserman fought for nearly 70 years ago but also guaranteeing it by paying it all up front."[115]  Streaming services believe that by offering a larger payment upfront, they are factoring in what the actor possibly could receive in profits had there been profit-participation clause in the contract.  Additionally, Netflix would argue that it is impossible to provide the back-end model

---

[108] Gavin Bridge, *Netflix Released More Originals in 2019 Than the Entire TV Industry Did in 2005*, VARIETY (Dec. 17, 2019, 1:50 PM), https://variety.com/2019/tv/news/netflix-more-2019-originals-than-entire-tv-industry-in-2005-1203441709/ [https://perma.cc/L2X9-JTMK].

[109] Kasey Moore, *How Many Oscars Has Netflix Won in Its History?*, WHAT'S ON NETFLIX (Apr. 24, 2021, 4:21 PM), https://www.whats-on-netflix.com/news/how-many-oscars-has-netflix-won-in-its-history/ [https://perma.cc/6XAF-TB9V].

[110] Dade Hayes, *Streaming Films Notch Nine Overall Oscar Wins, Setting New Record – Update*, DEADLINE (Apr. 25, 2021, 8:29 PM), https://deadline.com/2021/04/2021-oscars-most-streaming-film-wins-ever-1234743184/ [https://perma.cc/4E83-GAKF].

[111] Joe Flint, *The War for Talent in the Age of Netflix*, WALL ST. J. (Sept. 21, 2019), https://www.wsj.com/articles/the-war-for-talent-in-the-age-of-netflix-11569038435.

[112] *Id.*

[113] *See generally id.*

[114] *Id.* Joe Flint, *Netflix Strikes Deal with Filmmaker Steven Spielberg*, WALL ST. J. (last updated June 21, 2021, 3:55 PM), https://www.wsj.com/articles/netflix-strikes-deal-with-filmmaker-steven-spielberg-11624293296?mod=Article_inline [https://perma.cc/R8KE-F3J3].

[115] Milostan, *supra* note 33.

because "[t]here are no box office receipts, no linear broadcast ad sales, no licensing fees, and no home entertainment sales."[116] Furthermore, streaming services would argue that most films lose money—due to Hollywood's "creative accounting"—thus, the talent benefits from a lump sum upfront.[117]

Streaming platforms typically include provisions that they remain the sole distributor of the film.[118] For television shows, these provisions allow them to maintain control over the choice of distribution of the content without having to renegotiate with the producers who created it.[119] SVOD services have the sole power to decide whether they retain the show on their platform or sell it to a rival network or service willing to pay.[120] Instead of facing potential liability to the talent for not choosing the platform that offers the highest bid for the content, the SVOD services can make their own strategic decisions.[121]

Overall, in the contracting model used by streaming services, the talent "hedge bets on an individual film, taking larger fees for each project in case none of those projects achieve 'net profits.'"[122] On the other hand, streaming platforms "take on all the risk and keep all the reward, losing a fortune in up-front payments on unsuccessful films but reaping all the profits of their hits."[123]

One possible reason that streaming platforms have opted for paying talent more money upfront is due to their immense revenue streams. As of 2020, Netflix garnered $25 billion in revenue, making $4.6 billion in profit.[124] With this immense cash flow, Netflix has the ability to procure more talent and content than traditional studios. Additionally, streaming services seem to be more willing to pay money upfront so that they do not have to worry about

---

[116] *Id.*

[117] *Id.*

[118] Matthew Kassorla, *Movie Contracts in the Age of Streaming*, Cornell Sun (Aug. 20, 2021), https://cornellsun.com/2021/08/20/movie-contracts-in-the-age-of-streaming/ [https://perma.cc/5SLA-GAPE]. *See also Netflix Film and Scripted TV Series Streaming Contracts*, Sebastian Gibson, https://www.sebastiangibsonlaw.com/netflix-film-and-scripted-tv-series-streaming-contracts/ [https://perma.cc/YAH5-Z89L] (last visited Nov. 14, 2021).

[119] Flint, *supra* note 111.

[120] *Id.*

[121] *Id.*

[122] Milostan, *supra* note 33.

[123] Milostan, *supra* note 33.

[124] Georg Szalai, *Studio Profit Report: Netflix Reigns, Paramount and Sony Gain*, Hollywood Rep. (Mar. 5, 2021, 6:45 AM), https://www.hollywoodreporter.com/business/business-news/studio-profit-report-netflix-reigns-paramount-and-sony-gain-4143889/ [https://perma.cc/VN5G-U5AZ].

back-end deals.[125]  Instead, they are able to reap all the benefits if the film is successful without having to be concerned with contingent compensation calculations.

### D.  *Streaming and the Covid-19 Pandemic*

The Covid-19 Pandemic was an additional boost for streaming services.  With movie theaters closed, production companies began releasing their movies straight to streaming platforms. WarnerMedia made the decision to release the rest of "its 2021 slate of films concurrently in theaters and on" their platform, HBO Max, as a reaction to the poor box office receipts of their much-ballyhooed film *Tenet*.[126]  Releasing *Tenet* exclusively at the box office allowed WarnerMedia to garner how willing people were to return to the movies.  *Tenet*'s meager opening box office receipts of $9.4 million[127] left the industry unsure whether that was an upsetting figure or considered a success given the pandemic.[128]  There are multiple factors that could have had an effect on WarnerMedia and *Tenet*'s their success at the box office.  The pandemic was still in full force, leaving many patrons wary of venturing to the theaters.  Additionally, major cities, like New York, still had their movie theaters closed, leaving streaming as moviegoers' only option.[129]  "*Tenet* was the cinema industry's guinea pig—a way for studios to gauge audience willingness to return to theaters."[130]  On December 3, 2020, WarnerMedia announced that all seventeen films planned for 2021 would be released in theaters and HBO

---

[125] Anne Thompson, *Netflix Versus Hollywood: From Oscar Frontrunners to A-List TV Creators, Ted Sarandos Reveals His Master Plan*, Indie Wire (Aug. 24, 2017, 1:58 PM), https://www.indiewire.com/2017/08/netflix-ted-sarandos-will-smith-adam-sandler-1201866954/ [https://perma.cc/98KG-2EEU].

[126] Alison Herman, *Sifting Through the Fallout of Warner Bros. Paradigm-Shifting Announcement*, The Ringer (Dec. 4, 2020, 6:15 AM), https://www.theringer.com/movies/2020/12/4/22151472/warner-bros-2021-movies-hbo-max-streaming-takeaways [https://perma.cc/29C8-J9KZ].

[127] *Tenet,* Box Office Mojo by IMDB Pro, https://www.boxofficemojo.com/release/rl1442940417/ [https://perma.cc/QF92-5MUU] (last visited Feb. 13, 2022).

[128] Rebecca Rubin, *Christopher Nolan Defends 'Tenet' Box Office Results*, Variety (Nov. 3, 2020, 3:59 PM), https://variety.com/2020/film/news/christopher-nolan-tenet-release-1234822593/ [https://perma.cc/F6NL-RRVK].

[129] *Id.*

[130] David Sims, *Hollywood's Tenet Experiment Failed*, Atlantic (Sept. 14, 2020), https://www.theatlantic.com/culture/archive/2020/09/hollywoods-tenet-experiment-didnt-work/616345/ [https://perma.cc/K6YT-8R72].

Max on the same day.[131] *Tenet*'s director Christopher Nolan vehemently criticized this plan in favor of watching movies on the big screen.[132]

Other studios followed this simultaneous release strategy with their own variations. Disney announced that two of their films, *Cruella* and *Black Widow*, would be available on Disney+ Premier Access in addition to theatrical release.[133] Disney+ Premier Access charges subscribers a $30 one-time fee which allows them "to gain early streaming access to a movie that's still playing in theaters."[134] The one-time fee allows you to stream the movie as many times as you would like so long as you remain a Disney+ member.[135] A new release remains on Disney+ Premier Access for approximately three months before its available to all Disney+ members.[136] That three-month window mimics the traditional "wide theatrical release" timeline that is common practice in Hollywood.[137]

On September 10, 2021, Disney announced that their remaining 2021 films would be exclusively released in theaters.[138] Though films were typically in theaters exclusively for 90—120 days,[139] most 2021 films would maintain exclusive theatrical release for only 45 days.[140] Additionally, WarnerMedia negotiated an agreement with Regal Cinemas, a large movie theater chain in the

131 WarnerMedia, *Some Big 2021 News for Fans*, MEDIUM (Dec. 3, 2020), https://medium.com/warnermedia/some-big-2021-news-for-fans-62bb4abc883 [https://perma.cc/G4KE-UUR5].

132 Kim Lyons, *Tenet Coming to HBO Max–Which Director Nolan Called the 'Worst Streaming Service'–May 1st*, VERGE (Mar. 21, 2021, 9:22 AM), https://www.theverge.com/2021/3/21/2234 2955/tenet-coming-hbo-max-nolan-streaming-movie-theaters [https://perma.cc/2BQE-KAC7].

133 Pamela McClintock & Aaron Couch, *'Black Widow' to Hit Disney+ Premier Access and Theaters Simultaneously*, HOLLYWOOD REP. (Mar. 23, 2021, 11:30 AM), https://www.hollywoodreporter.com/movies/movie-news/black-widow-to-hit-disney-premier-access-and-theaters-simultaneously-4129190/ [https://perma.cc/8US3-LDMK].

134 Steven Cohen, *Disney Plus Premier Access Lets Subscribers Buy New Movies While They're Still in Theaters*, BUS. INSIDER (Sept. 22, 2021, 4:56 PM), https://www.businessinsider.com/disney-plus-premiere-access [https://perma.cc/MBY6-45Y3].

135 *Id.*

136 *Id.*

137 *Id.*

138 Jill Goldsmith & Erik Pedersen, *Disney's 'Eternals,' 'West Side Story,' 'Encanto,' 'Last Duel' and More to Hit Theaters Ahead of Streaming Bow*, DEADLINE (Sept. 10, 2021), https://deadline.com/2021/09/disney-release-dates-eternals-encanto-last-duel-west-side-story-kingsmanj-last-duel-1234830827/ [https://perma.cc/U59J-59C2].

139 Johansson Complaint, *supra* note 1, at 3.

140 Ramishah Maruf, *Disney Announces the Rest of Its 2021 Movies Will Debut Exclusively in Theaters*, CNN (Sept. 12, 2021, 4:58 PM), https://www.cnn.com/2021/09/12/business/disney-movies-theater-2021/index.html [https://perma.cc/575V-GZPM].

United States, in which Warner's 2022 films would have a 45-day exclusive theatrical release.[141]

### i.   The Future of Hollywood

Barry Diller, the former chairman and CEO of Paramount Pictures and 20th Century Fox, told NPR that "the industry is dead."[142]  Diller is certain that "[t]he movie business as before is finished and will never come back."[143]  Are you?

The pandemic has certainly accelerated the shift to streaming services.  Many traditional movie theaters were closed, and studios needed to be creative in how to release movies to the public.  When WarnerMedia announced that it would release all 2021 films in hybrid format, the plan was for only one year.[144]  However, people have come to enjoy being able to watch in the comfort of their own homes.  Instead of taking a family to the movies and paying for each individual ticket, families can come together and watch a movie on an oversized, high-definition flat-screen experience without the hassle of finding the right movie time or seat selection.

Performance Research, in partnership with Full Circle Research, conducted a survey of over 1,000 individuals in the United States.  These individuals were asked whether they "would wait and watch a must-see movie at home for $20."[145]  When told that there would be 90 days between theatrical and home release, 44% said they would either probably or definitely wait to watch it at home.[146]  Comparatively, only 27% said they would either probably or definitely see it in theaters first.[147]  The data showed that as participants were told that the length between theatrical and home

---

[141] *Id.*; Jared Bruett, *Warner Bros. Will End Simultaneous HBO Max Releases for Movies in 2022*, Game Rant (Mar. 25, 2021), https://gamerant.com/hbo-max-warner-bros-theaters-2022-movies/ [https://perma.cc/39VZ-VMXG].

[142] David Gura, *Barry Diller Headed 2 Hollywood Studios. He Now Says the Movie Business is Dead*, NPR (July 8, 2021 1:55 PM), https://www.npr.org/2021/07/08/1014095135/barry-diller-headed-2-hollywood-studios-he-now-says-the-movie-business-is-dead [https://perma.cc/2APD-UJXL].

[143] *Id.*

[144] Nina Gregory & Andrew Limbong, *Warner Bros. to Stream All Its Films in 2021*, NPR (Dec. 3, 2020, 4:08 PM), https://www.npr.org/sections/coronavirus-live-updates/2020/12/03/942360011/warner-brothers-to-stream-all-its-films-in-2021 [https://perma.cc/W6FQ-96P3].

[145] Adam B. Vary, *Audiences Still Prefer to See 'Tenet', 'Wonder Woman 1984' in Movie Theaters, but Most Would be Fine Watching at Home (EXCLUSIVE)*, Yahoo! (Aug. 18, 2020), https://www.yahoo.com/now/audiences-still-prefer-see-tenet-155722069.html [https://perma.cc/CLX3-GG7K].

[146] *Id.*

[147] *Id.*

release was shorter, the number that were willing to wait until home release went up.[148] Notably, participants were then asked about their preferences based on specific movies. When asked about their preferences for viewing *Black Widow*, only 13% said that they "only want[ed] to see this in the movie theater."[149] This number was consistent amongst the rest of the movies surveyed, including *Tenet* and *Wonder Woman 1984*; the range that only wanted to see the movie in the theater was from 12%—19%.[150]

These statistics are not just based on the Covid-19 pandemic instilling fear of being in a movie theater. Pew Research Center conducted a survey back in 2006 in which 75% of survey participants stated that they would prefer watching a movie at home.[151] This survey was conducted prior to Netflix's first Streaming Video On-Demand model, which highlights that this number could only increase.[152] Additionally, the quality of streaming platforms' original movies has skyrocketed in recent years. As previously mentioned, streaming services have been producing content that "is gaining critical recognition at the highest level."[153]

## III. Considerations When Negotiating for Streaming Platform Releases

### A. *Power Dynamics Between the Streaming Service and the Actor*

When a film premieres in theaters, there is immense data on how well the film performed, typically calculated by its "box-office

---

[148] *Id.*

[149] *Id.*

[150] *Id.*

[151] *About 6 in 10 Young Adults in U.S. Primarily Use Online Streaming to Watch TV*, Pew Rsch. Ctr. (Sept. 13, 2017), https://www.pewresearch.org/fact-tank/2017/09/13/about-6-in-10-young-adults-in-u-s-primarily-use-online-streaming-to-watch-tv/ [https://perma.cc/UY3J-FW5J]; *Increasingly, Americans Prefer Going to the Movies at Home,* Pew Rsch. Ctr. (May 16, 2006), https://www.pewresearch.org/social-trends/2006/05/16/increasingly-americans-prefer-going-to-the-movies-at-home/ [https://perma.cc/UK3W-CUMD].

[152] Netflix began streaming in 2007. Tara Bitran, *Skip Intro: Netflix Turns 25 Today*, Netflix (Aug. 29, 2022), https://www.netflix.com/tudum/articles/netflix-trivia-25th-anniversary [https://perma.cc/N2ZM-2MJ3].

[153] Tom Ward, *How Has the Unstoppable Rise of Streaming Platforms Impacted Film? We Asked the Experts*, Esquire (June 9, 2021), https://www.esquire.com/uk/culture/tv/a36842312/streaming-platforms/ [https://perma.cc/M93X-43QP].

numbers."[154] There are countless websites that track how many tickets were purchased opening weekend and keep tallies on how much a movie has "profited" thus far.[155] It is easy to gauge how many have seen a movie based on box office numbers, as each individual is required to have their own ticket. This knowledge provides sufficient bargaining power for the talent, as they can go to the next production company and show them how successful they were in the past, which enables them to contract for a greater percentage of the profits in the future. However, streaming services provide a wrinkle in that analysis. First, it is difficult to ascertain how many individuals have actually watched a movie. Instead of purchasing a ticket for each individual, the family pays one flat monthly fee. However, there are films that are only available for rent, requiring a purchase each time someone wants to stream the film. Secondly, multiple people could be watching together on one screen, but it would appear that only one person has viewed it. One person only needs to pay the monthly subscription or the rental fee; therefore, it is difficult to determine how many people have actually seen the film on streaming services. All that is known is that the monthly or rental fee has been paid, not how many have seen it.

Only the streaming service themselves have access to the number of streams, and they are reluctant to give out that information. For example, the first episode of Ted Lasso season 2 premiered on July 23, 2021.[156] Apple TV+ boasted how fantastic the premiere was without providing any concrete data to support their assertions.[157] Apple TV+ stated that it had "expanded its number of new viewers by a record-breaking 50% week-over-week."[158] However, this statistic is meaningless when there is no base value to compare it to.[159] Similarly, Marvel's premiere of Loki on Disney+ was said to be "the most-watched first episode in Disney+ his-

---

[154] Box office numbers refers to the number of ticket sales in theaters.

[155] *See generally Box Office Mojo*, IMDB Pro, https://www.boxofficemojo.com [https://perma.cc/44FC-NA2N] (last visited Nov. 4, 2021); *The Numbers*, Nash Info. Serv., https://www.the-numbers.com/box-office [https://perma.cc/Q38L-TA3Y] (last visited Nov. 4, 2021).

[156] Brandon Katz, *How Many Viewers are Actually Watching 'Ted Lasso' Season 2?*, Observer (July 27, 2021, 3:23 PM), https://observer.com/2021/07/apple-tv-plus-ted-lasso-season-2-viewership-ratings-audience/ [https://perma.cc/X4AV-GGRQ].

[157] *Id.*

[158] *Id.*

[159] Brandon Katz, *Why Big Streaming Companies are Determined to Keep Their Ratings Hidden at All Costs*, Observer (July 28, 2021, 3:25 PM), https://observer.com/2021/07/netflix-apple-amazon-disney-streaming-viewership-ratings-mystery/ [https://perma.cc/6TXA-RYMD].

tory."[160]  Again, this assertion is meaningless when there is no data provided on what the previous most-watched first episode viewership was to properly gauge how successful Loki was comparatively. This inane puffery amongst all streaming services, providing "unverifiable numbers or vague platitudes meant to sound monumental."[161]  The lack of transparency makes it difficult to compare a Netflix release to a Hulu release to an HBO release, and especially to a theatrical release.[162]

Streaming platforms have been reluctant to provide this data to the public because they believe it makes them more competitive against other streaming platforms.[163]  As an example, if a streaming platform has a smaller number of subscribers, their numbers would look worse compared to streaming giants like Netflix simply because more people are subscribed to the latter.[164]  Additionally, people question Netflix's decision to count at least two minutes of streaming as a view of the content, claiming that the threshold is low to inflate their numbers.[165]  The secrecy of the true data allows these streaming services to self-report without the fear of criticism that the numbers are not as strong as one would expect.

This secrecy behind the true numbers provides difficulty for talent and their representatives.  Box-office scorecards provided information on daily totals of tickets and viewers in theaters.  Agents can use these statistics as bargaining chips for their clients to achieve a larger percentage of the profits.[166]  However, the lack of access to reliable viewership data on streaming services makes it difficult to know how well the movie truly did and thereby understand what the actors are entitled to for that film and leverage that success on their client's next endeavor.  Additionally, streaming services typically reserve the right to be the sole distributor of the film.[167]  This provides even more of an upper hand to the streaming platform as they have complete control over the future of the film.

---

[160] *Id.*

[161] *Id.*

[162] Stephen M. Colbert, *Why Netflix Counts Two Minute Views in its Movie Watch Numbers*, Screen Rant (Aug. 9, 2021), https://screenrant.com/netflix-2-minutes-veiwership-numbers-why/ [https://perma.cc/W3QX-MLWD].

[163] Katz, *supra* note 159.

[164] *Id.*

[165] Colbert, *supra* note 162.

[166] Brooks Barnes & Nicole Sperling, *How's Hollywood to Plan When it Doesn't Know Who's Watching What?*, N.Y. Times (Sept. 5, 2021), https://www.nytimes.com/2021/09/05/business/box-office-movie-ratings.html [https://perma.cc/TKZ4-SHWE].

[167] Kassorla, *supra* note 118.

i. The True Benefactors of Streaming: The Streaming Services Itself

The market was not always convinced that SVOD platforms would be successful. In March of 2020, the shares of ViacomCBS fell to $11 when it announced that its own platform would enter the market.[168] The market was clearly unconvinced that consumers were willing to pay for additional streaming services. However, a year later, ViacomCBS' stock increased sevenfold, trading at over $82 a share.[169] Similarly, HBO Max's global subscriber base increased by 18% to 73.8 million in 2021.[170] A streaming service becomes a more valuable property as the number of subscribers increases.[171] As Village Roadshow's complaint alleges, "by using Village Roadshow films to drive the HBO Max subscriber base to nearly 74 million, [Warner Brothers] has enabled its HBO Max service to have a valuation of $60 billion on a standalone basis."[172] Companies such as Disney and WarnerMedia have every incentive to release films on their platforms, leading to an increase in their subscriber base and, thus, their revenue.

Chief Executive Officers (CEOs) greatly benefit because stock prices skyrocket when new content on their streaming services are announced, and CEOs tend to have large stock options in their corporation. For example, the co-CEOs of Netflix, Reed Hastings and Ted Sarandos, are expected to earn $34.6 million each in 2021.[173] Hasting's compensation comprised $34 million in stock options. Sarandos' compensation comprised over $14 million in stock options. The remainder comprised their base salary.

Village Roadshow's complaint against WarnerMedia illustrates how studios and their CEOs stand to benefit at the expense of talent. In their complaint, Village Roadshow alleges that WarnerMedia's primary purpose was to increase subscription revenue for HBO Max rather than consider what was best for the film and its stars.[174] By releasing the movie on their SVOD platform,

---

[168] Meg James, *Why Media Stocks are Booming One Year After Coronavirus Shutdown*, L.A. TIMES (Mar. 10, 2021, 5:16 PM), https://www.latimes.com/entertainment-arts/business/story/2021-03-10/media-stocks-growth-boom-streaming [https://perma.cc/G7NC-WVKP].

[169] *Id.*

[170] Matrix Complaint, *supra* note 16, at 7.

[171] *Id.* at 4.

[172] *Id.* at 7–8.

[173] Natalie Jarvey, *Netflix Co-CEOs Set to Earn More Than $34M in 2021*, HOLLYWOOD REP. (Dec. 28, 2020, 1:29 PM), https://www.hollywoodreporter.com/business/digital/netflix-co-ceos-set-to-earn-more-than-34-million-in-2021-4105742/ [https://perma.cc/BG99-G24Y].

[174] Matrix Complaint, *supra* note 16, at 3–4.

they allegedly rerouted the audience to their own platform, reaping all the benefits and causing Village Roadshow to lose out on ancillary revenue that they would have received from a wide-theatrical release.[175]  When WarnerMedia decided it was going to release films simultaneously, CEO Jason Kilar acknowledged that HBO Max[176] would greatly benefit from this arrangement.[177]  Furthermore, Andy Forrsell, the Head of HBO Max, stated that films released on HBO Max "have been very helpful in the acquisition and more helpful in retention than we ever could have seen or hoped."[178]  Overall, releasing movies direct-to-consumer not only helps raise the value of the streamer but also has an accretive impact on CEO's compensation.

## B.  *Big Stars v. Small Stars?*

If studios continue to simultaneously release films at the box office and on an SVOD platform, it is important to consider how smaller stars will be impacted compared to blockbuster stars.  The big A-list actors have greater negotiating leverage; thus, even though a movie may be profiting less through streaming, they can bargain for a bigger piece of the pie.  Smaller stars, on the other hand, typically do not have that kind of bargaining power.  In the case of profit-participation contracts, this would leave smaller stars with even less money because of Hollywood's creative accounting.

Those with less leverage end up signing net-profit agreements, like Art Buchwald, whereas the film's bigger stars tend to enter gross-profit agreements for traditional theatrical release movies.[179]  However, if the movie is released on a streaming service and there is a profit-participation contract in place, the profits will most likely be lower than if there had been a wide theatrical release.  The big-

---

175  *Id.* at 3.

176  *Id.* at 1 (stating that HBO is owned by WarnerMedia).

177  Adam Epstein, *How Many Studios Will Follow Warner's Direct-to-Streaming Strategy in 2021?*, Quartz (Dec. 4, 2020), https://qz.com/1941829/will-other-studios-follow-warnermedias-hbo-max-release-strategy/ [https://perma.cc/E3YZ-WJPC]; Peter Kafka, *WarnerMedia's CEO Explains Why He's Blowing Up the Movie Business*, Vox (Dec. 3, 2020, 4:18 PM), https://www.vox.com/recode/22151073/warner-bros-hbo-max-movies-jason-kilar-warnermedia-interview [https://perma.cc/G4J3-YS7V].

178  Ryan Faughnder, *Theaters or HBO Max? Warner Bros. Movie Plans Take Shape as Discovery Merger Looms*, L.A. Times (June 8, 2021, 5:00 AM), https://www.latimes.com/entertainment-arts/business/story/2021-06-08/can-warner-bros-keep-movie-dreams-alive [https://perma.cc/6VG4-6KLN].

179  Weinstein, *supra* note 31, at 68.

ger star that signed the gross profit contract will receive a pay-out first, and "[t]he fact that some major stars get a percentage of the gross is considered one of the reasons 'net-profits' are reduced."[180] Thus, when the bigger stars' profit participation is treated as a cost, the payoff to the net participant will be reduced.[181] If box office numbers are already lower because of streaming, the smaller star is going to get even less than they would before.

On the other hand, the streaming services' contracting model could end up being better for smaller stars because it guarantees money upfront; thus, one does not need to worry about profits. This would prove the up-front payment model common amongst streaming services better for smaller stars. However, if the upfront payment is based on what one would expect to make through profits as well, then smaller stars may still end up with less.

Brandon Milostan notes that Hollywood's history is filled with "overnight sensations whose limelight quickly flickers and fades after their first big success."[182] For these one-hit wonders, their only compensation would be upfront rather than a potential continuous stream of income far into the future.[183]

## IV.  PROPOSALS FOR NEW HOLLYWOOD CONTRACTING

### A.  *Traditional Negotiations for Wide Theatrical Releases*

Instead of moving towards the contracting methods of streaming services, attorneys and their talent can instead advocate that the film maintain its wide theatrical release. For the actor, this would be beneficial because they stand to gain greater profit numbers from a wide theatrical release. For the studio, they can continue the gamble that they pay the actor less up front and the rest through profit determined by box-office numbers.

Actors may also want to continue having a wide-theatrical release of their films due to the access to information regarding the success of the movie. Negotiating for wide-theatrical releases is something that would bridge the information asymmetry gap that streaming services pose because SVOD platforms are reluctant to

---

[180] *Id.*
[181] *Id.* at 95.
[182] Milostan, *supra* note 33, at 47.
[183] *Id.* at 46–47.

provide verifiable numbers of viewership.[184] Information regarding the success of the movie is also necessary to increase their bargaining power for future negotiations.

However, the future is streaming. Given the Covid-19 pandemic, people are enjoying the ability to watch movies in the comfort of their own homes. Not only do people enjoy watching movies at home, but the studios have every incentive to continue streaming. A studio like Warner Brothers is able to retain all the profits without having to compensate an intermediary such as the movie theater owner. Instead, releasing a film on their streaming platform brings all the revenue directly to them. One could view it as almost having a monopoly on the process. Thus, studios have little incentive to want movies to be released in theaters.

Negotiating for a clause requiring a wide-theatrical release in the wave of streaming is something that only A-list talent would be able to demand. Studios want to retain talent, and if the talent decides this is the route they want to continue, they would have the leverage to ask for this. However, continuing to negotiate for wide-theatrical releases would be maintaining the status quo in Hollywood negotiations.

One consideration is the fact that after Scarlett Johansson's lawsuit, Disney announced that the rest of its movies for 2021 would be released solely in theaters to start. However, the contracts for these movies being released were most likely signed pre-pandemic. Thus, it is reasonable to believe that Disney's decision was in response to Johansson's complaint and was fearful that other actors would file similar suits. Companies like Disney and WarnerMedia did not produce films for their streaming services primarily, compared to Netflix and Amazon Prime. Therefore, companies that did not engage in streaming releases prior to the Covid-19 pandemic will want to include release on streaming services clauses in their contracts going forward.

### B. *Negotiate for More Money Up Front*

Another consideration for lawyers negotiating for their talent is to ask for a larger up-front payment. This is a common practice that streaming services are already engaging in, and it seems to be working for them in retaining talent. However, studios like Disney

---

[184] *See generally* Katz, *supra* note 156.

may be wary of doing this because it requires access to a significant amount of up-front capital. This brings the issue full circle, as this lack of capital to pay large up-front compensation brought about the change from the Studio Era to modern-day profit-participation contracts.

Nevertheless, this could be a good option for talent. Asking for more money upfront is hopefully providing "the projected contingent compensation that the talent would have received under the back-end model, paradoxically guaranteeing contingent compensation."[185] In essence, streaming services believe and proclaim to the talent that they are providing the same amount they would have received had there been contingent compensation, but in accelerated form.[186] However, because knowledge is king, with streaming services reluctant to provide true viewership data and only estimations as to the success of the film, it seems that talent is at a disadvantage. Actors are taking a calculated risk by accepting guaranteed dollars today versus contingent compensation based on the performance of their films. Given Hollywood's "creative accounting," the large initial payment would provide some financial security.[187] Instead, "talent will receive the time value of money by not having to wait for a film to hit 'net profits.'"[188]

Despite receiving a potentially larger initial payment upon signing the contract, the actor could still come out worse off should the movie be wildly successful. Typically, A-list talent can receive up to eight-figures in profits.[189] However, streaming platforms will likely not pay these large sums to all stars across their content. Additionally, these up-front payments will be subject to taxation when received, whereas contingent payments made in the future provide the talent the ability to pay taxes over time.[190]

## C. *Negotiations for Pay-Per-View Streaming*

Streaming took over the music industry long before it did the film industry. Applications like Spotify provide a similar concept to Netflix; for a monthly fee, subscribers have access to unlimited

---

[185] Milostan, *supra* note 33, at 46.

[186] *Id.*

[187] *Id.*

[188] *Id.* at 47.

[189] *Id.* at 47.

[190] *Id.*

titles.[191] Thus, attorneys could consider advocating for a similar model that talent has through streaming music. Under this type of model, lawyers would negotiate for compensation based on the number of views a title has received.[192]

#### i. How it Works

As of April 2021, Apple Music paid one penny per stream.[193] Notably, Spotify pays roughly one-third to one-half penny per stream.[194] The question that remains is how does this process work. Journalist Anne Steele succinctly explained the process. "Streaming services pay royalties to rights holders—a group that includes labels, publishers and other distributors—which in turn pay artists based on their recording, publishing and distribution agreements. Both Apple and Spotify pay rights holders based on the share of total streams their artists garner on each service."[195]

Essentially, the royalty received by the artist is calculated by the number of streams of the artist's music divided by the total number of streams on the service.[196]

Spotify's website outlines how their royalties work. They have two kinds of royalties: recording and publishing. Recording royalties is the "money owed to rightsholders for recordings streamed . . . which is paid to artists through the licensor that delivered the music, typically their record label or distributor."[197] Publishing royalties are the money that is owed to songwriters or the owners of the composition, which is issued to publishers, collecting societies and mechanical agencies based on the territory of usage.[198] Interestingly, Spotify says that they do not pay on a per-stream rate. Instead, they calculate net revenue, which is revenue minus taxes,

---

[191] Unique to Spotify, you can have the application for free. However, your use of the app is limited, and you must listen to advertisements in between songs. Madi Alexander and Ben Sisario, *Apple Music, Spotify and a Guide to Music Streaming Services*, N.Y. TIMES (Apr. 5, 2016), https://www.nytimes.com/interactive/2015/06/30/business/media/music-streaming-guide.html [https://perma.cc/EB2N-M3PW].

[192] Milostan, *supra* note 33, at 48.

[193] Anne Steele, *Apple Music Reveals How Much It Pays When You Stream a Song*, WALL ST. J. (Apr. 16, 2021, 5:38 PM), https://www.wsj.com/articles/apple-music-reveals-how-much-it-pays-when-you-stream-a-song-11618579800 [https://perma.cc/BP2G-Z99Q].

[194] *Id.*

[195] *Id.*

[196] Joseph Dimont, *Royalty Inequity: Why Music Streaming Services Should Switch to a Per-Subscriber Model*, 69 HASTINGS L. J. 675, 685 (2018).

[197] *Royalties*, SPOTIFY FOR ARTISTS, https://artists.spotify.com/en/help/article/royalties [https://perma.cc/7AX6-H4X8] (last visited Feb. 5, 2022).

[198] *Id.*

processing fees and other outstanding payments, and then the rightsholders are paid by streamshare.[199]

Video streaming platforms could provide the same. First, it could be negotiated that the talent is paid a price per stream. Second, it could be negotiated that they receive payment similar to Spotify, in which talent receives a royalty based on their percentage of streaming on the platform. Talent, especially smaller stars, would be in favor of this method because it is a different take on the back-end model; it would allow stars to continue receiving payments. Talent across the board might be in favor of this model because they would still be receiving additional payments based on streams. Platforms like Netflix may be against such a model because it would require them to be more transparent about their streams, which as mentioned earlier, is something they are opaque about. On the other hand, this would allow them to not have to pay talent as much up front; it would provide a way to continue the back-end model.

### ii.  DVDs and Television

Pay-per view was also used through the sale of DVDs.[200]  Royalties were "paid by the studio's home-entertainment arm to its distribution arm."[201]  A standard DVD royalty was approximately twenty percent of the wholesale price. However, some of the top stars were able to negotiate for a royalty of nearly forty percent of wholesale price.

To this day, this method is used for television. For example, Warner Brothers earns an estimated $1 billion a year from *Friends* re-runs.[202]  Each star receives approximately 2%—or $20 million—every year in royalties from re-runs.[203]  Streaming services are even adopting this model when entering contracts for their original television shows. Diana Appleton's book *Hollywood Dealmaking* explains how Amazon Studios has adopted this strategy, which they have called Amazon Service MAGR (Modified Adjusted Gross)

---

[199] *Id.*

[200] Edward Jay Epstein, *Gross Hysteria*, SLATE (Jan. 23, 2006, 6:40 AM), https://slate.com/culture/2006/01/how-the-studios-compensate-the-most-powerful-movie-stars.html [https://perma.cc/2GZ5-H6FH].

[201] *Id.*

[202] Rachel Farrow, *Here's How Much Jennifer Aniston and Other Actors Get Paid for Their Reruns*, YAHOO! (Dec. 22, 2020), https://www.yahoo.com/now/much-jennifer-aniston-other-actors-203800883.html [https://perma.cc/7M4K-CWXJ].

[203] *Id.*

Payment.[204]  The formula was structured to account for factors including "participant's level of stature" and the length of the feature, assigning "a profit value on a per-point basis for every season that the show is picked up, commencing in the third season of the show."[205]  This allows talent to receive meaningful back-end payments.  A version of this could be adopted for films, in which streaming services like Apple Studios can take into account the participant's stature and assign a profit value for every stream of the film.

### iii.   Considerations

As discussed previously, streaming services have a lack of transparency.  This will pose difficulty in calculating how many views have been obtained if the streaming platform fails to provide it.  For example, Netflix counts a view as someone who has watched the content for at least two minutes.[206]  This could be a good threshold for talent, as it could be considered a lower threshold that needs to be met to retain their right to profit from viewership.  Some may argue a simple click on the content is insufficient because that is not true viewership.  Additionally, individuals tend to listen to their favorite music repeatedly while television shows and movies are not viewed as frequently.

Another potential issue is the small price paid for a royalty.  Receiving one cent per stream for a two-hour movie seems disproportionate to a two-minute song.  Therefore, the price per stream is something that would need to be negotiated in more detail.  Additionally, this would require a complete overhaul of the system, requiring a new way to monitor streaming, lawyers, and accountants ensuring there is a methodology to prove these calculations are proper.[207]

The inclusion of royalties raises the concern that if the movie is not successful, talent will receive very little.  However, this is a similar gamble that talent take when negotiating for contingent compensation; if the film is not successful, profit-participation will be less.  Additionally, musicians have debated heavily with music platforms about their payment.  Most notably was singer-songwriter Taylor Swift.  Swift published an opinion piece in the Wall Street Journal in 2014, vocalizing her opinion over the shift to

---

204  APPLETON & YANKELEVITS, *supra* note 63, at 26.

205  *Id.*

206  Colbert, *supra* note 162.

207  Milostan, *supra* note 33.

streaming as a platform to listen to music.[208] Swift noted that "[v]aluable things should be paid for. It's my opinion that music should not be free, and my prediction is that individual artists and their labels will someday decide what an album's price point is."[209] The same can be said for actors; they will have to enter into negotiations to find the proper price in order to avoid a situation in which actors avoid streaming services due to lack of payment, like Swift avoided Spotify for years.

A situation like Spotify paying minimal in royalties may be mitigated by the fact that there are less music platforms out there compared to streaming film. According to recent Midia Research Report, Spotify retains the highest market share of 31%, and Apple Music comes in second with 15% market share.[210] Together, they make up almost half of the music streaming service usage and typically have similar music provided. Comparatively, streaming platforms like Netflix and Hulu all have proprietary content, requiring the viewer to purchase subscriptions to several different streamers to access as much content as they desire. This may provide more competition amongst the platforms and encourage companies like Hulu to pay more money in royalties to stay competitive in the field.

## V. Conclusion

Between viewership changes due to the Covid-19 Pandemic, the "Cutting the Cord" phenomenon, and the increase in quality of original content by streaming services, SVOD has not only changed the playing field but is poised to dominate for decades to come. Just as the Studio Era became extinct, so too should traditional profit-participation contracts between talent and the studios. Representatives of talent must reevaluate what is in their clients' best interests, taking into account: new delivery methods to the viewer,

---

[208] Taylor Swift, *For Taylor Swift, the Future of Music is a Love Story*, Wall St. J. (July 7, 2014, 6:39 PM), https://www.wsj.com/articles/for-taylor-swift-the-future-of-music-is-a-love-story-1404763219 [https://perma.cc/3TAX-5REH].

[209] *Id.*; *see also* Jack Linshi, *Here's Why Taylor Swift Pulled Her Music From Spotify*, Time (Nov. 3, 2014, 1:24 PM), https://time.com/3554468/why-taylor-swift-spotify/ [https://perma.cc/VQ7J-EL2G].

[210] Mark Mulligan, *Music Subscriber Market Shares Q2 2021*, MIDiA Rsch. (Jan. 18, 2022), https://www.midiaresearch.com/blog/music-subscriber-market-shares-q2-2021 [https://perma.cc/FBT3-XBQU].

the dates of exclusivity to theater owners, and what is deemed a successful theatrical release among other factors.

This Note considers different contract clauses that representatives can consider negotiating for on behalf of their clients to the studio. First, one could try negotiating for the inclusion of provisions requiring their client's film to wide exclusive theatrical release to facilitate the films profitability. Next, this Note considered negotiating for more up-front money to alleviate the whims of the creative accountants. Finally, this Note proposed a new way of viewing contractual negotiations with studios, in which the actor would receive a pay-per stream rate. Initially, streaming services and their CEOs were the sole beneficiaries of streaming. This new model would allow for their clients to also be a beneficiary. This last recommendation most closely mimics the profit-participation contract, while modifying it for streaming platforms. Given the change in Hollywood, attorneys must pivot and negotiate for new provisions which would best protect their client's interests.