# EXHIBIT 16

2019 ENTERTAINMENT LAW ISSUE

by Brandon Milostan

# BYE BYE BACK END, HELLO STREAMING

**While talent can hedge bets in an upfront buyout, this type of compensation may become a huge net loss when a production is a big hit**

The meteoric rise of Netflix has completely re-shaped content production, distribution, and consumption in Hollywood. For better or for worse, these changes are altering talent compensation structures and, as a result, affecting the practices of entertainment lawyers. Because Netflix utilizes a subscription-based business model, it cannot monetarily calculate the performance of any individual title. Unable to precisely determine a title's performance, Netflix is unwilling and arguably unable to offer its talent an interest in the hypothetical profits that an individual title would realize, a marked departure from the standard practice in the entertainment industry. To the extent talent would like a return to the pre-Netflix contingent compensation model, the onus will be on entertainment lawyers to craft back-end-like compensation structures for the streaming era.

The Golden Age of Hollywood lasted from the end of the silent era to the emergence of television in the 1960s. For individual talent, this era has been glistening since 1950, when famed agent Lew Wasserman negotiated a deal for Jimmy Stewart to star in Universal's *Winchester '73*. While the film itself has a deserved place in American cinema history in its own right, its historical significance is merely the "B film" to the blockbuster that is the deal itself. With a then financially struggling Universal unable to pay Stewart's usual $250,000 salary, Wasserman advised Stewart to forego his flat fee in exchange for a cut of the "net profits" from the film, a move netting Stewart millions.

With the major studios intrigued by the prospect of reducing their risk and immediate production costs, this "back-end model" quickly spread. By the mid-1950s, A-level talent were getting a percentage of a

**Brandon Milostan is a member of Los Angeles law firm Greenberg Glusker LLP's entertainment group where he negotiates entertainment deals for emerging and established actors, writers, producers, directors, musicians, social media influencers, financiers, and distribution and production companies.**

AMANE KANEKO



film's profits in addition to a fixed salary. While this "contingent compensation" structure has undergone countless sequels, prequels, and reboots since *Winchester '73*, the opportunity for talent to cash in has remained constant since its premiere.[1] Effectively, a single western set the precedent for talent to take a bite out of the major Hollywood content producers' profits. Since that day in 1950, these content producers have been looking for an opportunity to take those profits back.

Enter Netflix. Since 2007, the streamer has seen exponential growth, challenging, passing, and arguably lapping the major studios. More than making Netflix an industry juggernaut, Netflix's revolutionary business model is affecting a paradigm shift in the way the entire industry operates. Netflix first entered consumers' vernacular in 1999 as a nonthreatening DVD-by-mail service. Hollywood studios welcomed the emergence of a



new distribution window, especially one that could only survive by buying their DVDs at the full retail price. Even when Netflix shifted toward streaming, the Hollywood studios recognized the opportunity that a new distribution channel, especially one not capped by theater seats or broadcast hours, presented. To the major studios, Netflix was, at worst, a fleeting fad that helped produce healthier bottom lines and, at best, a testing ground for a potential content-creator-to-consumer subscription service down the road.

Then came *Lilyhammer*, the first "Netflix Original." Netflix had the studios' attention, turning nearly 100 years of Hollywood status quo into Norma Desmond overnight. Distribution platforms were not supposed to produce content. Theater chains did not produce films. DVD pressers did not develop original series. The studios had to acknowledge Netflix for what it was: a disrupter. Even so, it was still a bit player and a credible threat only to the smaller production companies that licensed content to the major studios.

Then, all 13 episodes of *House of Cards* were released on the same day. Netflix changed the game again. TV series were supposed to follow a tried-and-true release model: air on a specific network and, perhaps, be off-network syndicated or exploited via home entertainment down the line. Also, releasing an entire season of a series in the same day would cripple bottom lines for various reasons, including that time is needed to promote each episode to maximize ad space prices, prime time linear broadcasting only spans three hours, and popular shows are valuable lead-ins to less popular shows. Netflix was taking advantage of consumers' preferred viewing habits in a way that could boost their revenues while undermining the studios' revenues. In so doing, Netflix became a true threat.

The major studios were slow to react. By the time Netflix released *Orange Is the New Black*, *Master of None,* and *Stranger Things* and Hulu and Amazon rose to power by following in Netflix's footsteps, it was too late for the studios. Netflix's business model, or the "Netflix model," had taken hold across Hollywood. The Hollywood powers were forced to recognize the streamer for what it had always been: a risk-taking innovator, the gold standard in entertainment, and most important, the future of the industry.

Most industry analysis has focused solely on the dynamic shift from the traditional, window-based[2] model to a new-age, binge-watching Netflix model. Rightfully so. Not since home video's advent has the entertainment industry been so disrupted. Amid these content consumption changes, however, another fundamental change to the entertainment industry has emerged affecting more than content creators, a change to the financial infrastructure of production across Hollywood and one that threatens Wasserman's legacy.

As Netflix was revolutionizing the industry by creating its own exclusive content and releasing it in a manner that circumvented the standard distribution windows, it was also fundamentally changing the way producers pay talent. Netflix was paying its talent huge up-front fees as a calculation of the anticipated contingent compensation that the talent would have otherwise received from the project under the back-end model,[3] thus buying out talent's back end at fair market value.[4]

Netflix argues that this "buyout model" gives talent the best of both worlds: providing the contingent compensation that Lew Wasserman fought for nearly 70 years ago but also guaranteeing it by paying it all up front. Even if Netflix wanted to follow the back-end model, it would argue that it is impossible. As a flat-fee, subscriber-based service, Netflix could argue that it has no means of tracking its proceeds from any individual title. There are no box office receipts, no linear broadcast ad sales, no licensing fees, and no home entertainment sales. Indeed, Netflix publicly presents the buyout model as a means of luring top talent away from the major studios, doubling down on it as a necessary aspect of operating an access-based platform.

It is indisputable that the buyout model can be beneficial to talent. First, the buyout payment accounts for, and pays out, the projected contingent compensation that the talent would have received under the back-end model, paradoxically guaranteeing contingent compensation. Most films lose money[5] and rarely does talent actually receive any contingent compensation under the traditional back-end model. Second, by disbursing this large fee up front, the buyout model provides the talent with financial security, something to be valued in an industry in which tentpoles with a built-in fan base ebb and low-budget indie films flow. Talent also will have fewer expenses under the buyout model, able to save on legal and accounting fees associated with studio

audits on their contingent compensation. Perhaps most important, with the fair market value of their back end paid up front, talent will receive the time value of money by not having to wait for a film to hit "net profits."

So, is Netflix's buyout model a coup for talent? Not necessarily. It may have been the case that Netflix needed to adopt a pro-talent approach to compensation in order to poach top talent from the studios, even if such a position was not in the best interests of Netflix. Nevertheless, as Netflix arguably surpasses the major studios, why would it continue to do so?

The buyout model may not be beneficial for talent after all. It may merely be better for Netflix than the back-end model. While the buyout model may provide these blessings, it also brings burdens for talent. Most important, the buyout model takes away talent's upside. It may be true that most films lose money, but when they do make money, they tend to make a lot. While not every film is *Winchester '73* or *Gravity*, the back end on a successful film routinely nets A-level talent eight-digit sums. Since Netflix will not pay eight-figure sums to the stars of all of its content, Netflix is essentially buying out its stars' upside.

Effectively, Netflix is altering the risk allocation of an entertainment project. Under the back-end model, studios hedge their bets on each project, paying limited guaranteed dollars across many projects but losing a portion of the profits of those that prove successful. Here, talent bears all the risk. Under the buyout model, it is talent who hedge bets on an individual film, taking larger fees for each project in case none of those projects achieves "net profits." Netflix takes on all the risk and keeps all the reward, losing a fortune in up-front payments on unsuccessful films but reaping all the profits of their hits.

Why would Netflix, but none of its major studio predecessors, elect to take on so much risk? It is the result of Netflix's business model, a model that does not operate strictly on a money-in-money-out basis, a model that values attracting new customers, maintaining current customers, and their customers' data, a model that thrives on an expansive library and, for this reason, is better situated to survive the misses and capitalize on the hits.

Does it work out in the end? Since Netflix is paying the estimated back end from each of its projects, A-level talent who miss out on the contingent compensation upside of their hits can ultimately make it up by making more on their misses, right? No. First, the very premise of this proposition is flawed. Netflix is independently calculating the anticipated contingent compensation based on information for which only it has access.[6] Talent has no practicable means of verifying this calculation. While talent with clout can surely negotiate higher buyout payments, they are ultimately adjusting from an anchor that Netflix gets to set. Also, there are tax consequences associated with not being able to spread income across multiple years.

Finally, even if it were the case that it all works out in the end for A-level talent, contingent compensation is often available to unknown, lower-level talent[7] who are unlikely to garner high buyout payments on their first big projects. While that project's success often leads to career boosts or subsequent work opportunities for such talent, Hollywood history is replete with examples of overnight sensations whose limelight quickly flickers and fades after their first big success. The buyout model is a death knell to such talent. Under the traditional back-end model, while these stars may never get their star on Hollywood Boulevard, they can at least use their back-end receipts to buy a Beverly Hills home on Sunset Boulevard.

Maybe the buyout model is better for some talent but worse for others. Surely the fact that the buyout model exists, and thus provides talent with the choice, is a good thing. It is the continued existence of this choice that invites skepticism, however, as the back-end model may soon reach its end crawl. With the Netflix model poised to replace the traditional window model, the buyout model will likely completely swallow the back-end model. Indeed, Hulu and Amazon have adopted the buyout model,[8] and it appears that Apple is following suit for its exclusive content.[9] Notably, Disney recently announced[10] that it would follow the buyout model for the content created for its streaming service, Disney+, marking the first time that a traditional studio will adopt the model. It is expected that NBCUniversal, Viacom, and WarnerMedia, who will launch their respective streaming services in the coming year, will jump on the buyout model bandwagon. As streaming continues to become the most prominent means by which viewers consume content, and the buyout model continues to become the most prominent means by which talent is compensated, it becomes increasingly likely that the back-end model will soon be retired.

Despite this likelihood, it is far from a certainty that Lew Wasserman's brain child will soon be extinct. It may be the case that the back-end model will continue to coexist alongside the buyout model, used strictly for the content released via traditional windows. After all, there will always be movie theaters and linear television broadcasting. To what extent, then, will risk-taking talent have a meaningful way of obtaining contingent compensation in lieu of large up-front payouts?

It is no secret that streaming renders linear broadcasting antiquated and obsolete.[11] Indeed, advertising revenue has steadily declined as linear broadcasting has hemorrhaged viewers in the wake of streaming and cord-cutting's rise to prominence.[12] As linear broadcasting revenues dwindle, so too does silver screen talent's ability to obtain back end. What about motion picture talent? Despite the damage streaming has done to the home entertainment market in the United States, the home entertainment window continues to thrive overseas, accounting for roughly 25 percent of the studios' gross receipts on each film.[13] Also, films released via traditional windows are routinely licensed to streaming platforms in exchange for hefty license fees. While such fees may primarily be imputed going forward, as content distributors are likely to exclusively license such content to its wholly owned streaming platform, they will continue to represent a substantial piece of a film's gross receipts. However, home entertainment revenue and streaming license fees are not enough, on their own, to reach "net profits" and the anticipated loss of the linear broadcasting window certainly will not help.

The driving force for talent to get any back end has always been the theatrical release. Much of the industry analysis has focused on how streaming is exacerbating the general decline in box office receipts over the last decade.[14] However, has the recent rise of theatrical subscription services like MoviePass and AMC Stubs A-List offset the harm done by the advent of streaming? On the one hand, both box office receipts and ticket sales were up in 2018.[15] This lends itself to an argument that, especially as the theatrical sub-industry adapts, the continued profitability of the majority of the traditional windows, notwithstanding the rise of streaming, will keep the major studios from going all-in on streaming and preserve talent's opportunity to seek back end. On the other hand, these fledgling[16] theatrical subscription services may merely be a flash in the pan. Even worse for the back-end model, subscription-based services may be testing the waters for studios to launch their own theatrical subscription-services. Specifically, the U.S. Department of Justice has stated that it may stop enforcing[17] the 1948 Supreme Court Paramount Consent Decree,[18] which forced the major Hollywood studios to sell their ownership stakes in movie theaters. With Netflix

and Disney rumored to be interested in acquiring theater chains,[19] there is a belief that the new, streaming-era powerhouses may include theatrical admissions as part of their subscription packages.[20] While still unlikely, the possibility exists that the all-important theatrical window itself may soon abandon the traditional window model in favor of the streaming transition.

Overall, the industry shift toward streaming is ushering in a new model of talent compensation, replacing the back-end model with a buyout model. How will the emergence of the buyout model impact talent, financiers, and entertainment lawyers who represent them?

As for talent, the effect is obvious. Directors, producers, writers, and actors alike will no longer be able to obtain a slice of the financial success of a project. While spec scripts writers may still be able to obtain a cut of the license rights obtained under development and shopping deals, this type of back end has a natural ceiling and does not provide the same upside as traditional contingent compensation.

With regard to financiers, several time-tested financing models will be disrupted by a regime that does not allow for profit sharing. Outside of the projects funded by the new Hollywood powers, most financing models involve third-party financiers funding the production budget of a project in return for first-dollar recoupment of the investment, plus interest and premiums (if any), and a share of any profits from the project. With their profit share eradicated by a shift toward the buyout model,[21] financiers lose their upside, giving them little motivation to invest in such projects. Passive financiers simply interested in recouping their investment plus interest should look to other industries. With no real upside, financiers will need to demand exorbitant, bridge-financing-level interest rates, which will all but curtail the number of projects made without direct funding from the major studios or streamers.

How will the rise of the buyout model affect the practices of entertainment lawyers? A shift toward streaming is both a bane and a boon for entertainment lawyers, disturbing longstanding cottage industries but also presenting novel issues to resolve and new opportunities to advocate for their clients. As a bane, the decline of the back-end model will make legal and accounting firms specializing in profit participation audits obsolete. In addition, entertainment attorneys' exposure to malpractice liability is likely to increase. Specifically, as the major studios launch their streaming services, projects originally set to be exploited under the traditional window model may be pushed to that studio's streaming platform and strictly or predominantly exploited via streaming, costing talent the contingent compensation that their agents and lawyers negotiated in addition to the benefits of a large upfront payment. To prevent such a scenario, at least during the transition period, entertainment lawyers should negotiate a guaranteed theatrical release on a guaranteed number of screens, as well as a general commitment to adhere to traditional windows. As another example, entertainment lawyers negotiating buyout-model contracts will need to find a way to verify a streaming entity's calculation of anticipated contingent compensation or risk malpractice liability if the buyout payment poorly reflects the success of a project.

As for the boon, the rise of the buyout model presents novel issues for entertainment lawyers. In the short term, entertainment attorneys will need to grapple with standard talent provisions that give talent the right to participate in any derivative works based on a project with terms no worse than those in the agreement for that first project. Such provisions present an issue if the talent was entitled to back end under the first, traditional-window project, but the derivative work is intended to be exploited on a streaming platform. Indeed, Amazon's *Hanna*, Netflix's *Pee-wee's Big Holiday*, the upcoming *Chronicles of Narnia*, *Resident Evil*, and *Matilda* projects all potentially fit the bill. With the sequels to *Avatar* and *Zombieland* being released over 10 years after the premiere of their respective prequel, entertainment lawyers may need to contend with this issue for the next decade. While an amendment or side letter to the original agreement may be required, the negotiations for such derivative works should otherwise mirror the negotiations for other buyout-model contracts wherein the streamer would calculate the anticipated back end for the derivative work and paying it up-front.

What differentiates these agreements is that more information is available to the talent and their entertainment lawyers in this situation. If the first film in the series was incredibly profitable for the talent participant—as would often be the case if a derivative work is greenlit—the entertainment lawyer has a strong argument that the total compensation payable to the talent for the first project (i.e., fixed compensation and the contingent compensation) would make up the "floor" of the original agreement for the first project. Should the streamer refuse to pay that total amount as the buyout for the derivative work, the entertainment lawyer can argue that the streamer is in breach of that first agreement. While the streamers will never agree to such a high upfront payment, this threat of breach certainly strengthens an entertainment lawyer's bargaining position on the agreement for the derivative work.

Most important, entertainment lawyers will be tasked with imagining compensation schemes that will provide talent with project-performance-based disbursements similar to contingent compensation. That is, as risk-seeking talent grow tired of not being able to capitalize on the success of their projects, the onus will be on the agents and lawyers to develop back-end-like compensation structures for talent. Indeed, the existence and terms of such structures may be the battlegrounds of entertainment lawyers in the streaming era—the "net profits" of this generation.

What would such back-end structures look like? After all, a subscription-based access model makes it impossible to precisely calculate the revenue from an individual title, as viewers are not paying to view or own an individual title. However, theoretical options are available for talent seeking such back-end structures. One possible structure would be a type of royalty scheme that compensates talent based on the number of views a title receives. Such a compensation model is practical and feasible since subscription-based music streaming platforms have been compensating individual artists and songwriters under such a scheme for years. It may take time for entertainment lawyers and the major streamers to settle on a fair per-view royalty because there is no third party[22] setting royalties. Once the general parameters are established, however, negotiations may be much more streamlined, much as they are under the back-end model.

More than establishing the framework for a per-view royalty, entertainment lawyers have the flexibility to craft various perks, escalations, and bonuses under such a compensation structure. Some of these schemes mirror those available under the buyout model, while others may be available for the first time due to increased consumer data available to streamers. As for viewing existing schemes under a streaming lens, both box office bonuses, which provide talent with a set-value bonus as theatrical receipts reach negotiated milestones, and escalations—i.e., increases in a participant's contingent compensation as certain net profits thresholds are reached—may be replaced by a similar scheme that provides talent with set-value bonuses and/or per-view royalty escalations as a title reaches certain negotiated view counts.

As for novel compensation schemes, entertainment attorneys may attempt to negotiate elevated royalties for target demographic views, e.g., since the personal data of the 18 to 39 demographic is nearly universally valued higher than others, entertainment lawyers may demand a per-view royalty bump for these viewers, assuming the streamer can accurately measure these demographics.

As an unlikely alternative to per-view royalties, entertainment lawyers can demand a small portion of the respective streamers' profits—likely via stock or stock options in a streamer at the time of the title's release. Indeed, there is precedent in the entertainment industry for paying an individual performer in stock.[23] Ironically, the most promising such structure arguably would be the result of Netflix's own actions. Specifically, Netflix recently released a revolutionary title, *Black Mirror: Bandersnatch*, a first-of-its-kind interactive film in which viewers are asked to make choices that influence the direction of the plot. The film undoubtedly brings to mind the popular "Choose Your Own Adventure" books published in the 1970s by Bantam Books. Indeed, the Netflix title, about the development of a video game with a similar interactive format, even contains dialogue that directly references the "Choose Your Own Adventure" style of storytelling.

Unlike this self-aware metafilm, Netflix was less sentient, as Chooseco, LLC, the publisher that owns the "Choose Your Own Adventure" trademark, brought trademark infringement and dilution claims against Netflix in January claiming that the dark and graphic nature of *Black Mirror: Bandersnatch* negatively impacted book sales and Chooseco's ability to license the format in the future.[24] Whether Netflix's reference to the "Choose Your Own Adventure" trademark in the film can support such claims remains to be seen, but Chooseco stands a reasonable chance of prevailing in the suit.[25]

What does this have to do with back-end-like compensation structures in a buy-out-model-dominated industry? In its suit, Chooseco demands $25 million in damages or Netflix's profits from the title, whichever is greater. Many in the entertainment industry believe that Netflix has an algorithm to translate viewership data into monetary terms but elects to keep such an algorithm under wraps. A decision in favor of Chooseco may force Netflix to disclose that algorithm in order to properly determine whether the streamer should be forced to disgorge its *Bandersnatch* profits. Should Netflix have to publicly disclose such an algorithm, or even admit its existence, the floodgates would be open for talent to demand back end based on that algorithm.

Finally, entertainment lawyers need to confront novel issues associated with such back-end compensation structures. For example, if a per-view royalty comes to fruition, the legal and accounting firms built around profit participant audits may adapt to handle the viewership accounting issues that are likely to arise, especially since Netflix keeps such viewership information to itself.[26] More generally, entertainment lawyers may adjust their practices to account for other changes precipitated by a subscription-based model. Specifically, under a per-view royalty structure, no longer will entertainment lawyers need to quibble over issues like whether certain expenses can be deducted before reaching "net profits." Instead, the battlefield between distributors and talent will shift to issues like the placement of a title on the streaming platform and the minimum amount of spending the streamer will have to commit to advertising the title (both on the platform through featured/autoplay trailer placement and via traditional advertising outlets). Entertainment lawyers may even be able to negotiate ways to increase the likelihood that a streamer's recommendation algorithm will suggest the title. Finally, because it is possible that the streamer will negotiate for reduced per-view royalties as the minimum ad spend increases, entertainment lawyers and accountants will need to disentangle the streamers' general overhead from such an ad spend.

Overall, while the industry shift from the traditional window model to the modern streaming model may bring changes arguably detrimental to talent interests, it also brings new opportunities for agents and entertainment lawyers to put on their Lew Wasserman caps to invent and implement the talent payment structures of this new era. ■

---

[1] *See, e.g.,* Stephen Galloway, *Sandra Bullock to Make $70 Million (At Least) for "Gravity,"* Hollywood Reporter, Feb. 26, 2014, *available at* https://www.hollywoodreporter.com/news/gravity-sandra-bullock-make-70-683561; Eriq Gardner, *Fox Rocked by $179M "Bones" Ruling: Lying, Cheating and "Reprehensible" Studio Fraud,* Hollywood Reporter, Feb. 27, 2019, *available at* https://www.hollywoodreporter.com/thr-esq/fox-rocked-by-179-million-bones-ruling-lying-cheating-reprehensible-studio-fraud-1190346.

[2] The predictable distribution schedule by which films are exploited under the traditional distribution model used by the major studios (e.g., theatrical, home video, pay cable, etc.).

[3] Anne Thompson, *Netflix Versus Hollywood: From Oscar Frontrunners to A-List TV Creators, Ted Sarandos Reveals His Master Plan,* Indiewire (Aug. 24, 2017), https://www.indiewire.com.

[4] Ashley Rodriguez, *Why Amazon and Netflix are paying so much to lock down the world's best talent,* Quartz (Nov. 17, 2016), https://qz.com/840106/why-amazon-and-netflix-are-paying-so-much-to-lock-down-the-worlds-best-talent [hereinafter Rodriguez].

[5] Schuyler M. Moore, The Biz: The Basic Business, Legal, and Financial Aspects of the Film Industry 11 (5th ed. 2018).

[6] Michael Schneider, *"Bird Box" Ratings: Nielsen Backs Up Netflix's Claims That It's a Big Hit,* Variety, Jan. 8, 2019, *available at* https://variety.com [hereinafter Schneider].

[7] For example, the first-time writer of a hit who wrote the screenplay on spec.

[8] Rodriguez, *supra* note 4.

[9] Juli Clover, *Apple Paying Reese Witherspoon and Jennifer Aniston $1.25M Per Episode for Upcoming Morning Show Drama,* MacRumors (Jan. 17, 2018), https://www.macrumors.com.

[10] Cynthia Littleton, *Inside Disney's Daring Dive into the Streaming World,* Variety, Jan. 29, 2019, *available at* https://variety.com.

[11] Dave Morgan, *Who Wins And Loses When 9 Trillion Linear TV Ads Disappear?,* MediaPost (Aug. 9, 2018), https://www.mediapost.com.

[12] *Id.*

[13] Diane Bartz, *U.S. movie theater chains fear Justice Dept. review may hit profits,* Reuters (Nov. 12, 2018), https://www.reuters.com.

[14] Note that limited releases for Oscar purposes, such as Netflix's *Roma,* will not generate enough revenue to reach "net profits."

[15] Alissa Wilkinson, *Hollywood's record-busting 2018, explained,* Vox (Jan. 3, 2019), https://www.vox.com.

[16] Jason Guerrasio, *MoviePass lays off its entire business-development team as the company continues to tailspin,* Business Insider (Feb. 22, 2019), https://www.businessinsider.com.

[17] Ted Johnson, *DOJ Will Review 70-Year-Old Consent Decrees That Regulate How Studios, Exhibitors Do Business,* Variety, Aug. 2, 2018, *available at* https://variety.com.

[18] United States v. Paramount Pictures, 334 U.S. 131 (1948).

[19] James Shapiro, *Disney, Warner, Universal, Et Al To Own Theaters Again?,* Birth.Movies.Death., (Aug. 3, 2018), https://birthmoviesdeath.com/2018/08/03/disney-warner-universal-et-al-to-own-theaters-again; Bob Verini, *Indie Producers Embrace Streaming Services, Despite Some Downsides,* Variety, Feb. 14, 2019, *available at* https://variety.com [hereinafter Verini].

[20] Verini, *supra* note 19.

[21] As with spec script writers, the only upside available to these financiers will be a cut of a license fee.

[22] *E.g.*, the Copyright Royalty Board.

[23] *See, e.g.,* Joel Brown, *50 Cent Scored Half a Billion Dollars – How 50 Made a Killing Off Water,* Addicted 2 Success (Nov. 14, 2018), https://addicted2success.com/motivation/how-50-cent-scored-half-a-billion-dollars.

[24] Kalhan Rosenblatt, *Netflix sued by "Choose Your Own Adventure" book publisher over "Black Mirror: Bandersnatch,"* NBC News (Jan. 12, 2019), https://www.nbcnews.com.

[25] While Netflix avoided using the mark in advertising the title and likely has a strong descriptive fair use defense, Chooseco alleges that it has "received an unprecedented amount of outreach from people who believed we were associated with the creation of this film," 20th Century Fox currently holds an options contract to develop an interactive series based on the "Choose Your Own Adventure" series and Chooseco has actively policed the use of its mark over the years. *Id.*; Mary Connelly, *Jeep ad prompts lawsuit from children's book publisher,* Automotive News, Mar. 29, 2007, https://www.autonews.com.

[26] Schneider, *supra* note 6.