# EXHIBIT 18

2023 WL 5302083 (Cal.Super.) (Trial Pleading)
Superior Court of California,
Central District.
Los Angeles County

TSG ENTERTAINMENT FINANCE LLC, a Delaware limited liability corporation, Plaintiff,

v.

TWENTIETH CENTURY FOX FILM CORPORATION, a Delaware corporation, and The Walt Disney Company, a Delaware corporation, Defendant.

No. 23STCV19433.
August 15, 2023.

**Complaint and Request for Judicial Reference Pursuant to Cal. Code Civ. Proc. § 638**

John V. Berlinski - State Bar No. 208537, jberlinski@birdmarella.corm, Fanxi Wang - State Bar No. 287584, fwang@birdmarella.com, Ashley D. Bowman - State Bar No. 286099, abowman@birdmarella.com, Kimberly A. Meyer - State Bar No. 307655, kmeyer@birdmarella.com, Brandon R. Teachout - State Bar No. 321672, bteachout@birdmarella.com, Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.c., 1875 Century Park East, 23rd Floor, Los Angeles, California 90067-2561, Telephone: (310) 201-2100, Facsimile: (310) 201-2110, for plaintiff Tsg Entertainment Finance LLC.

Plaintiff TSG Entertainment Finance LLC ("TSG" or "Plaintiff") alleges against Twentieth Century Fox Film Corporation ("Fox") and The Walt Disney Company ("Disney," and together with Fox, "Defendants") as follows:

**I. INTRODUCTION**

1. The pejorative term "Hollywood Accounting" refers to the opaque and creative methods frequently employed by major television and film studios to cheat those who share in the profits of a television series or film out of their full contracted-for shares. The practice has unfortunately become ubiquitous among the major Hollywood studios, with a recent report from CNN Business describing the tactics of Hollywood Accounting as among "the most fantastical fictions ever devised in Tinseltown." Even by those standards, however, this case stands out. At its root, it is a chilling example of how two Hollywood behemoths with a long and shameful history of Hollywood Accounting, Defendants Fox and Disney, have tried to use nearly every trick in the Hollywood Accounting playbook to deprive Plaintiff TSG-the financier who, in good faith, invested more than $3.3 billion with them-out of hundreds of millions of dollars.

2. TSG has financed some of Fox's most successful, beloved, and award-winning films of the past decade, including *Avatar: The Way of Water, Bohemian Rhapsody, Deadpool, Deadpool 2, X-Men: Days of Future Past, Logan, Dawn of the Planet of the Apes, The Martian, The Grand Budapest Hotel, JoJo Rabbit, The Banshees of nisherin, Hidden Figures, The Shape of Water,* and *Empire of Light.* In total, TSG has helped finance more than 140 Fox films since the parties began their relationship.

3. TSG financed these films pursuant to a Revenue Participation Agreement with Fox, dated as of December 31, 2012 (the "RPA"), and later amended nine times. The RPA provides in relevant part that TSG would co-finance with Fox the production

Case 1:25-cv-00910-JMF    Document 26-19    Filed 02/28/25    Page 3 of 18

TSG ENTERTAINMENT FINANCE LLC, a Delaware limited..., 2023 WL 5302083...

and marketing costs for certain Fox films (the "Qualifying Pictures"). As consideration for its financing commitments, Fox promised TSG a share of the "Defined Gross Receipts" for these Qualifying Pictures, *i.e.,* Fox's revenues from distributing the Qualifying Pictures less certain contractually agreed upon distribution fees and expenses. The amount of TSG's funding requirement and its share of Defined Gross Receipts vary based on the type of film financed.

4. The nature of this arrangement places TSG at the mercy of Fox to appropriately distribute and account for the Defined Gross Receipts of Qualifying Pictures consistent with the terms of the RPA. For years, TSG relied on Fox to do so to the best of Fox's abilities, which was--in theory at least--in the best interests of both TSG and Fox.

5. As the years went by, TSG's return on its investments in Fox films decreased dramatically. TSG therefore hired an independent auditing firm to conduct an audit of Fox's books and records to determine whether Fox was calculating Defined Gross Receipts in compliance with the terms of the RPA.

6. What the auditors found in sampling just three of the 140+ films at issue[1] was clear evidence of Hollywood Accounting. For example, the auditors discovered that Fox failed to credit TSG with revenue that Fox's own business records showed should have been included in Defined Gross Receipts, Fox charged TSG tens of millions of dollars of distribution fees that the RPA does not permit, and Fox deducted from TSG's Defined Gross Receipts additional tens of millions of dollars of purported "distribution expenses" that, in fact, had nothing to do with the distribution of the Qualifying Pictures and were therefore not properly deductible.

---

[1] Defendants' transactions and Defined Gross Receipts accountings relating to each of these 140+ Qualifying Pictures are at issue in this proceeding.

---

7. The auditors also uncovered rampant "self-dealing," the practice by which a studio enters into "sweetheart" deals with its licensee affiliates to artificially minimize the profit payments to stakeholders like TSG, who generally share only in the revenues received by the studio, excluding the revenues received directly by these licensee exhibitors.

8. The RPA includes several contractual provisions specifically written to protect TSG from such self-dealing. For example, while the RPA grants Fox the right to control the distribution and marketing of Qualifying Pictures, that right is conditional and Fox must exercise it "on a fair, reasonable, good faith and non-discriminatory basis." The RPA also provides that if Fox licenses Qualifying Pictures to an affiliate, it must do so "upon monetary terms comparable to the terms on which [Fox] enters into similar transactions with unrelated third Parties" (the "No Self-Dealing Promise").

9. Fox brazenly ignored those obligations in many different affiliate transactions. For example, the auditors found blatant self-dealing in connection with Fox's licensing of films to its affiliated domestic cable network FX Networks LLC ("FX"). Fox and FX had a standing agreement giving FX the right to license exhibition rights to Fox films, including Qualifying Pictures, in exchange for pre-determined license fees tied to the domestic box office performance of each film. But when it came to the Academy Award-winning film *The Shape of Water,* Fox and FX ignored the terms of their own agreement and did a secret side deal for a fraction of what the parties had previously agreed was fair value. On information and belief, Fox entered into numerous other "sweetheart" side deals like this in connection with licensing its other Qualifying Pictures to FX and other affiliated entities.[2]

---

[2] Fox provided the auditors with insufficient information about "similar transactions" negotiated with third parties at

Case 1:25-cv-00910-JMF    Document 26-19    Filed 02/28/25    Page 4 of 18

TSG ENTERTAINMENT FINANCE LLC, a Delaware limited..., 2023 WL 5302083...

arms' length to ascertain its compliance with the No Self-Dealing Promise in connection with this FX license. Based on the prevalence of Hollywood Accounting and self-dealing uncovered elsewhere, however, TSG pleads on information and belief that Fox also breached this No Self-Dealing Promise in connection with the initial terms of the FX license.

10. But the audit findings barely scratch the surface of the myriad ways Fox breached its agreement with TSG and lined its own pockets at TSG's expense. One such example relates to the distribution of Qualifying Pictures in what is known as the "Pay 1 window." Up until recently, nearly all films debuted in the movie theatres and remained there exclusively for a period of time, typically between approximately 90 to 120 days. This period of time is known as the theatrical "window." Films would generally then be released in secondary distribution channels in sequential "windows," starting with pay per view (*i.e.,* digital film rentals), then home video (*i.e.,* DVD and Blu-Ray sales), then pay television (*i.e.,* exhibition on pay television networks such as HBO and Showtime, traditionally known as the "Pay 1" window) and then subscription video-on-demand or "SVOD" (*i.e.,* availability on a subscription-based digital streaming service such as Netflix or Hulu).

11. This windowing of film distribution is designed to maximize profits for the studios (and for stakeholders like TSG) by preventing one distribution revenue stream from cannibalizing another. Exclusive windows generally prevent this behavior, because a viewer interested in watching the next *Avatar* when it debuts needs to buy a ticket and watch it in the theatre. If that same viewer wants to watch a hit film a second or third time, as is common, she must wait and then pay an incremental fee for that access to the re-run. Thus, the film studio-and any investors and profit participants in the film-typically reap the financial benefits of multiple "windows" of revenue from the same film. When windows are collapsed on one another, however, the studio (and its investors) miss out on significant potential sources of revenue.

12. For decades, Fox licensed films to the pay television service HBO exclusively in the "Pay 1 window" pursuant to an "output deal" that required HBO to license Fox films after they had debuted in the theatres. Relevant to this dispute, public sources have reported that Fox agreed in 2012 to license HBO its films released through 2022, for an estimated $200 million per year.[3]

---

[3]    https://www.latimes.com/entertainment/envelope/la-xpm-2012-aug-15-la-et-ct-hbo20th-20120815-story.html.

13. In 2019, however, Fox was acquired by Disney. Shortly thereafter, Disney's then-CEO Bob Chapek announced that Disney would restructure to focus strategically on building value in its wholly- and majority-owned SVOD platforms, such as Disney+ and Hulu. This meant that Disney wanted to make its most attractive content available for streaming on those platforms as soon as possible. Standing in the way of this strategy, however, was that the Fox films, including the Qualifying Pictures, were contractually exclusive to HBO in the Pay 1 window, and therefore could not be offered on Disney+ and Hulu without violating the terms of the HBO license. Undeterred, on information and belief, Disney ordered Fox to renegotiate its agreement with HBO and give up a significant portion of its guaranteed HBO license fees, in return for HBO agreeing that Fox could license these Qualifying Pictures to Disney+ and Hulu.

14. Specifically, according to public reports, in November 2021, after decades of lucrative Pay 1 licensing deals, Fox-on information and belief at the direction of its parent company Disney-convinced HBO to waive its exclusivity and thus enable Disney+ and Hulu to exhibit films concurrently with HBO's Pay 1 window. While this move was beneficial to Disney, its shareholders and, relatedly, its senior executives, it came at a great cost to TSG because such valuable waivers in the entertainment business do not come for free. On information and belief, the renegotiation of the Fox/HBO Pay 1 output deal cost Fox many millions of dollars that otherwise would have been reported to TSG as Defined Gross Receipts.

Case 1:25-cv-00910-JMF    Document 26-19    Filed 02/28/25    Page 5 of 18

TSG ENTERTAINMENT FINANCE LLC, a Delaware limited..., 2023 WL 5302083...

15. Moreover, on information and belief, once the rights reverted to Fox, it entered into "sweetheart" deals with affiliates Disney+ and Hulu. On information and belief, these deals did not even begin to approach the tremendous value that Disney derived from exhibiting the Qualifying Pictures on its wholly-owned streaming platforms, including the benefit of increases in these platforms' subscriber bases. In other words, Fox, acting at the direction of Disney, violated the No Self-Dealing Promise.

16. Furthermore, as part of the HBO renegotiation, Fox shortened its traditional home video (*e.g.,* DVD) window in order to more quickly make certain Qualifying Pictures available on Disney+ and Hulu. In doing so, Fox once again cannibalized a key revenue stream to boost the value of its affiliated streaming platforms at the expense of TSG.

17. On information and belief, these deviations from the traditional windowing of Fox's films-in spite of Fox's express and implied obligations to TSG-were a direct result of Disney's interference with the RPA in pursuit of its ultimate goal: to prop up its wholly- or majority-owned streaming platforms and the share price of its stock using content from other divisions of the company. Moreover, as Disney's own CEO, Bob Iger, has admitted, his company pursued this strategy recklessly and with little forethought. For example, during Disney's August 9, 2023 earnings call-in which Mr. Iger announced Disney+'s second subscription price increase in a year-Mr. Iger admitted with respect to Disney+, "We grew this business really fast, really before we even understood what our pricing strategy should be or could be."

18. By 2022, this admittedly thoughtless Disney strategy, and Fox's pattern of systematic self-dealing and Hollywood Accounting, had deprived TSG of the cash it needed to fund future Qualifying Pictures. But for this lack of liquidity, TSG would have fully invested in additional Fox films and reaped the full financial benefits associated with maximizing its investments in these Qualified Pictures. However, TSG had one last tool available to obtain the necessary financing to fully invest in these films-a feature of the RPA called the "Qualifying Picture Slate Repurchase Procedure." This procedure provides that TSG is entitled to request a repurchase offer on groupings of five consecutively-released Qualifying Pictures (referred to herein as "tranches"). Under the RPA, if Fox and TSG are unable to come to terms on the repurchase price for a given tranche, TSG is then entitled to market, and ultimately sell, its interest in the tranche of Qualifying Pictures to third-party buyers. The purpose of this procedure is to allow TSG to generate liquidity, including for purposes of funding future Qualifying Pictures.

19. Between June 7, 2022 and June 30, 2023, TSG attempted to exercise its right to request that Fox make an offer for repurchase of TSG's interests in thirteen different tranches of five Qualifying Pictures. Fox, however, declined to engage with TSG with respect to many of them. Initially, Fox took the position that TSG's requests were untimely as to the older tranches of films, which include such box office smashes as *X-Men: Days of Future Past, Dawn of the Planet of the Apes,* and *The Martian.* This was entirely disingenuous, however, as Disney Executive Vice President and CFO Paul Shurgot-speaking on behalf of Fox-unwittingly revealed when he e-mailed TSG, stating:

> "While we don't agree with your characterization of the agreement, we are open to finding a path forward to resolve this which makes economic sense. However, as discussed, *we are not open to providing an offer* **on** *selected non-consecutive tranches that are among the most profitable tranches released to date,* as doing so is counter to the agreement and would undercut our ability to recoup the TSG Additional Contributions."

(Emphasis added).

20. Mr. Shurgot's e-mail was illuminating in several ways. First, it revealed that Fox's timeliness excuse for refusing to make offers on certain tranches of Qualifying Pictures (which is also controverted by the RPA's plain terms, the parties' negotiating history, and the purpose and intent of the Qualifying Picture Slate Repurchase Procedure) was purely pretextual. Rather, Fox simply did not like that TSG had selected some of "the most profitable tranches released to date" as candidates for sale--something TSG was entirely within its right to do under the RPA.

21. Second, the fact that this e-mail came from Mr. Shurgot--an employee of Disney, not Fox--revealed that Disney was now calling the shots and that Fox's refusal to comply with the RPA's terms was being driven by the tortious interference of Disney in the RPA. On information and belief, once Disney learned of the RPA and its Qualifying Picture Slate Repurchase Procedure, it became increasingly dissatisfied with the bargain struck by Fox and TSG, and directed its subsidiary Fox not to comply with the plain language of the RPA because Fox's breaches of contract would put more dollars in Disney's pockets.

22. Regardless of motive, Fox's refusal to timely come to the table and make offers to repurchase certain tranches of Qualifying Pictures left TSG unable to generate sufficient liquidity to fully fund certain new Qualifying Pictures, including *Avatar: The Way of Water,* the much-anticipated sequel to James Cameron's *Avatar.* As a result, TSG was forced to avail itself of an advance from Fox--the "Fox Picture Advance"-to meet its funding obligations for such films. The consequence was that TSG's share of Defined Gross Receipts was dramatically reduced, further eroding TSG's ability to generate liquidity for future productions, and frustrating TSG's ability to realize the benefit of its agreement with Fox. Most egregiously, this scheme triggered a provision in the RPA that entitles Fox to a 50% share of TSG's profits after the winding-up of TSG's investment vehicle.

23. Adding insult to injury, after TSG notified Fox of its intent to assert its rights in this legal action, Fox and Disney attempted to capitalize on *Fox's own prior breaches and misconduct* to further line their pockets at TSG's expense. Specifically, Fox and Disney informed TSG that they planned to invoke a provision of the RPA that they claimed would force TSG to resell *all* Qualifying Pictures to Fox at less than their true value *and* require TSG to waive *all of its existing claims* against Fox. Fox boldly admitted that the pretext for triggering this provision was the issuance of the Fox Picture Advance-which, again, was only necessary because of Fox's prior breaches of contract. In short, Fox and Disney took the appalling step of doubling down on Fox's own breaches of contract in an effort to bully TSG into submission and prevent the filing of this lawsuit. But TSG will not be bullied and Fox's misconduct cannot be swept under the carpet.

24. The aforementioned examples are just the tip of the iceberg, based on publicly available information and a limited audit of less than 3% of the Qualifying Pictures at issue in this case. What they demonstrate, however, is that Fox and Disney's conduct is part of a pattern of Hollywood Accounting, self-dealing, and interference with contract calculated to minimize TSG's returns on the RPA and enrich Fox and its affiliates, including its parent company Disney. TSG is therefore left with no choice but to file this Complaint to enforce its rights under the RPA.

## II. JURISDICTION AND VENUE

25. Section 23(a) of the RPA provides that "Any claims, disputes, disagreements or other matters in question arising out of or relating to this Agreement (each, a 'Claim') shall be submitted to a general, non-jury reference (the 'Referee') to hear and decide all matters relating to the Claim pursuant to California Code of Civil Procedure Sec. 638 ('638 Reference')." Section 23(b) further provides that "If any lawsuit is filed asserting a Claim, the parties intend and agree that the state or federal court where that action is filed shall be authorized to enforce this Section 23[.]" Accordingly, by agreement of the parties, this Court has jurisdiction to submit this claim to a Referee pursuant to California Code of Civil Procedure Sec. 638.

26. Section 23(c) of the RPA provides:

> The Referee shall be selected by mutual agreement between the parties, but if the parties cannot agree upon a Referee within five (5) business days of a written request therefore, then within ten (10) business days of the written request, each side shall exchange its own list of four retired judges of the California state or federal courts whom it wishes to nominate as potential Referees and shall rank the potential Referees by number in order of preference (in descending order, assigning "1" to the lowest choice). If any name appears on both lists, that judge shall act as Referee. If there is more than one match, the judge with the highest combined ranking shall serve as Referee. If there are no matches, then each side has the option to veto one name from the other side's list, and shall rank the remaining potential Referees by number in order of that side's preference (in descending order, assigning "1" to the lowest choice). The lists shall be exchanged and the single judge with the highest combined rating shall serve as Referee. In the event of a tie, the names of the tied judges shall be placed in a hat and one name will be drawn to serve as Referee. If the highest-rated or agreed-upon judge declines to serve or becomes unable to serve after selection, then the procedures set forth above shall be repeated to select a new Referee.

27. The Court has personal jurisdiction over Defendants pursuant to California Code of Civil Procedure § 410.10 because Defendants are domiciled in and doing business in the State of California. The amount in controversy exceeds the jurisdictional minimum of this Court.

28. Venue is proper in this County pursuant to California Code of Civil Procedure §§ 395(a) and 395.5 because Fox and Disney have their principal place of business in the County of Los Angeles.

### III. PARTIES

29. Plaintiff TSG Entertainment Finance LLC is a limited liability corporation organized under the laws of the State of Delaware, with its principal place of business located in Clark County, Nevada.

30. Defendant Twentieth Century Fox Film Corporation, on information and belief, is, and at all relevant times was, a corporation organized under the laws of the State of Delaware doing business throughout the United States, including at its offices in the State of California, County of Los Angeles.

31. Defendant The Walt Disney Company, on information and belief, is, and at all relevant times was, a corporation organized under the laws of the State of Delaware doing business throughout the United States, including at its offices in the State of California, County of Los Angeles.

### IV. FACTUAL BACKGROUND

#### A. TSG and Fox Enter into the RPA.

32. TSG and Fox are parties to the RPA, originally dated as of December 31, 2012. A true and correct copy of the RPA will be filed as Exhibit 1 to this Complaint upon entry of an appropriate protective order concerning the confidentiality of documents.

Case 1:25-cv-00910-JMF    Document 26-19    Filed 02/28/25    Page 8 of 18

TSG ENTERTAINMENT FINANCE LLC, a Delaware limited..., 2023 WL 5302083...

33. Under the RPA, TSG agreed to co-finance a percentage of the production and marketing costs for Qualifying Pictures produced by Fox. TSG's financing commitment varies from film to film depending on a number of factors.

34. As consideration for its financing commitments, TSG is entitled to a share of the Defined Gross Receipts for each of the Qualifying Pictures, *i.e.,* the revenue Fox, its affiliates, and their subdistributors generate from the distribution of each film. Like TSG's financing commitment, TSG's share of Defined Gross Receipts for each Qualifying Picture varies depending on a number of factors. Exhibit B to the RPA sets forth the formula by which Fox is to calculate Defined Gross Receipts and account for and pay TSG's share of thereof.

35. As between TSG and Fox, the RPA grants Fox a qualified right to control the distribution, marketing, advertising, publicizing, and other exploitation of the Qualifying Pictures. However, that qualification is significant and Fox's discretion is subject to certain express limitations. In particular, Section VI.BB. 1 of Exhibit B states: "The exercise by Fox of its sole business judgment hereunder shall be on a fair, reasonable, good faith and non-discriminatory basis." Section VI.BB.4 further provides that "If [Fox] licenses the exhibition of a Qualifying Picture to any theatre, television station or other exhibitor which is an affiliated entity, [Fox] shall do so upon monetary terms comparable to the terms on which [Fox] enters into similar transactions with unrelated third Parties." In short, Fox's discretion over the distribution of Qualified Pictures is constrained by its duty to be fair, to act in good faith, to refrain from discriminating against TSG, and to deal with its affiliated companies in a manner consistent with how it deals with third parties in similar arms' length transactions.

36. If TSG is unable to meet its funding obligations for a given Qualifying Picture, Section 2(g) of the RPA provides that, barring certain other contingencies, Fox shall advance on behalf of TSG the amount of any shortfall of TSG's funding (known as a "Fox Picture Advance"). Fox is entitled to recoup, in the first position, the Fox Picture Advance from any payments due to TSG for its share of Defined Gross Receipts on Qualifying Pictures. The RPA further provides that upon the occurrence of a Fox Picture Advance, Fox shall become entitled to 50% of TSG's equity in its investment after the expiration of the term of the RPA. In other words, TSG faces a stiff financial penalty if it cannot meet its funding obligations.

37. To ensure that TSG has sufficient cash flow to avoid this outcome, the RPA also contains certain provisions concerning TSG's right to sell its interests in Qualifying Pictures, referred to in the RPA as the "Qualifying Picture Slate Repurchase Procedure." As is relevant to TSG's claims in this proceeding, the original version of Section 15(c)(i) of the RPA provided:

> On the date that is five (5) years after the initial domestic theatrical release of the fifth (5th) Qualifying Picture not previously repurchased pursuant to clause (a) or (b) above[4], Fox shall provide TSG with a reasonable good faith written offer determined consistent with Fox's general practices to purchase TSG's interest in the first five released Qualifying Pictures (the "First Qualifying Picture Slate") ...

---

[4]    This date, as it applies to any given tranche of five films, is referred to herein as the "Fifth Anniversary Date."

38. Section 15(c)(i) goes on to provide that if TSG does not initially accept Fox's First Qualifying Picture Slate Offer, then the parties shall negotiate for 30 days, after which TSG may elect to cease negotiations and instead pursue negotiations with third parties for the sale of TSG's interest in the First Qualifying Picture Slate. Section 15(c)(i)-(iv) sets forth further procedures for TSG's sale of the First Qualifying Picture Slate. Section 15(c)(v) also provides that these procedures apply to each subsequent set of five Qualifying Pictures.

39. The RPA has been amended nine times. As is relevant to TSG's claims in this proceeding, Amendment No. 9 to the RPA, dated as of April 26, 2018, modified the Qualifying Picture Slate Repurchase Procedure such that Fox would no longer have the affirmative obligation to make the First Qualifying Picture Slate Offer (and subsequent offers for subsequent picture

Case 1:25-cv-00910-JMF     Document 26-19     Filed 02/28/25     Page 9 of 18

TSG ENTERTAINMENT FINANCE LLC, a Delaware limited..., 2023 WL 5302083...

slates) on the five-year anniversary of the initial domestic theatrical release of the fifth (5th) Qualifying Picture in the given slate; instead, that obligation would be triggered at TSG's request. A true and correct copy of Amendment No. 9 will be filed as Exhibit 2 to this Complaint upon entry of an appropriate protective order concerning the confidentiality of documents.

40. Since the inception of the RPA, TSG has financed more than 140 Fox films in accordance with the RPA's terms.

### B. Fox Engages in Rampant Hollywood Accounting to Deprive TSG of the Benefit of its Bargain Under the RPA.

41. In theory, it is in the best interests of both Fox and TSG for Fox to maximize the Defined Gross Receipts from distribution of the Qualifying Pictures. The greater the Defined Gross Receipts from a given picture, the greater both Fox's and TSG's returns on investment, and the greater liquidity TSG has to fully finance future releases. Therefore, for years, TSG trusted that Fox was distributing the Qualifying Pictures "on a fair, reasonable, good faith and non-discriminatory basis," as Fox promised to do in the RPA.

42. As a precaution, however, TSG exercised its right to hire a third-party accounting firm to audit Fox's books and records. In the interests of efficiency and economy, the auditors inspected only a small sampling of the Qualifying Pictures-less than 3%-while preserving TSG's right to bring future claims as to all Qualifying Pictures. A true and correct copy of the resulting audit report will be filed as Exhibit 3 to this Complaint upon entry of an appropriate protective order concerning the confidentiality of documents.

43. The audit revealed that Fox had employed a number of underhanded Hollywood Accounting tricks in order to underpay TSG by at least *$40 million.* As TSG would come to learn, however, this was just the beginning in a pattern of behavior by Fox calculated to deprive TSG of its bargained-for rights under the RPA.

#### 1. Self-Dealing With Affiliate FX

44. FX is a domestic basic cable network that, on information and belief, has been affiliated with Fox at all times relevant to the allegations in this Complaint. In or around 2016, Fox entered into an "output" agreement with FX, which promised that FX would have the right to exhibit reruns of subsequently-released Fox films in exchange for pre-established license fees based on the domestic box office performance of each film.

45. Through the audit, however, TSG learned that Fox had ignored the terms of its own output agreement and licensed at least one film--The *Shape of Water,* which won Best Picture at the 90th Academy Awards--to FX in a backroom side deal that appallingly shaved nearly $4 million off of the parties' previously agreed-upon price.[5]

---

[5]  Fox refused to provide the auditors with information sufficient to determine whether and to what extent the Fox/FX output agreement itself violated the No Self-Dealing Promise. On information and belief, it did and TSG suffered additional damages in connection with Fox entering into this sweetheart arrangement with affiliate FX.

46. Thus, Fox simply ignored its existing output agreement and renegotiated a sweetheart deal for an Oscar-winning Qualifying Picture to enrich its affiliate FX and deprive TSG of its fair share of Defined Gross Receipts. On information and belief, Fox and FX repeated this blatant self-dealing in connection with numerous Qualifying Pictures.

### 2. Self-Dealing in Connection With the Pay 1 Window

47. In March 2019, Disney acquired 21st Century Fox and its assets, including Fox, in a transaction worth $71.3 billion. In the words of the New York Times, the acquisition turned Disney into "an entertainment colossus the size of which the world has never seen."[6] However, it also put immense pressure on Disney to make the costly acquisition worthwhile for Disney's shareholders.

[6] https://www.nytimes.com/2019/03/20/business/media/walt-disney-21 st-century-fox-deal.html.

48. Prior to being acquired by Disney, Fox had licensed its films exclusively to HBO in the Pay 1 window for more than 30 years. In 2012, Fox and HBO had entered into a 10-year output agreement, meaning that Fox had agreed to license to HBO all of its films released from 2012 through 2022. The license fees payable under this agreement were, on information and belief, guaranteed for the entirety of this time period.

49. However, according to public reports, in and around November 2021-after it was acquired by Disney-Fox upended decades of precedent with HBO in the Pay 1 window and renegotiated its deal with HBO to allow its new affiliates Disney+ and Hulu to share co-exclusive streaming rights with HBO and HBO Max for certain films. Of course, HBO did not simply give up its valuable exclusivity to share this content with a competitor for nothing. On information and belief, the renegotiation of the HBO output deal cost Fox tens of millions of dollars that otherwise would have been included in the Defined Gross Receipts reported to TSG.

50. On top of this, for certain Qualifying Pictures, Fox agreed to accelerate the start of the Pay 1 window, such that those Qualifying Pictures would be made available on Disney+ and HBO Max the same day they were released on home video, *e.g.,* on Blu-ray and for digital purchase on Apple TV and Amazon Prime Video, and well before the traditional start of the Pay 1 window (which would ordinarily occur after the Home Video window). The result was that the Pay 1 window was effectively collapsed into the Home Video window, such that consumers with access to these streaming platforms would have no incentive to buy the Qualifying Pictures on Blu-ray or via digital stores. Instead, they could just access the films whenever, wherever, and however many times they wanted to, via their Disney+ and Hulu subscriptions.

51. Accordingly, on information and belief, this artificially accelerated Pay 1 window cannibalized Home Video revenues and further reduced the total amount of Defined Gross Receipts reported to TSG. The impact was material. According to public reports, Disney saw a nearly 20% decrease in home video revenue in 2022 as compared to 2021.

52. On information and belief, the ability to offer films for streaming so soon after release was tremendously valuable to Disney+ and Hulu (and, by extension, to their owner Disney) and massively boosted the subscribership of these streaming platforms while reducing canceled subscriptions, known as "churn." However, Fox allowed its sister-company Disney to take all of this upside without sharing any of it with Fox, and therefore TSG received none of the upside either.[7] This is the very definition of the "discriminatory" conduct that Fox promised not to engage in when it expressly agreed in the RPA to exercise its business judgment "on a fair, reasonable, good faith and non-discriminatory basis."

[7] On information and belief, to the extent Fox licensed Qualifying Pictures to Disney+ and Hulu in exchange for any consideration, such licenses also violated the RPA's No Self-Dealing Promise.

53. But why would Fox throw away the guaranteed Pay 1 and home entertainment revenues that it had negotiated so hard to obtain and that it knew would maximize the value of its films? On information and belief, these breaches of the RPA were a

Case 1:25-cv-00910-JMF     Document 26-19     Filed 02/28/25     Page 11 of 18

TSG ENTERTAINMENT FINANCE LLC, a Delaware limited..., 2023 WL 5302083...

direct result of the interference of Disney, which induced Fox to disregard its obligations to TSG in order to promote Disney's wholly-owned or majority-owned streaming platforms. Moreover, Disney's top executives stood to gain millions of dollars in compensation from the promotion and growth of these streaming services.

54. For example, in fiscal year 2020 as the pandemic raged on, Mr. Chapek was awarded equity grants totaling 3.8 times his $2.5 million base salary. According to Disney's compensation committee (as detailed in the company's 2021 Annual Report), these bonuses were Mr. Chapek's reward for "work[ing] to quickly program new offerings on our DTC [direct-to-consumer] and linear channels" and "launch[ing its] direct-to-consumer services in several key markets." For fiscal year 2021, that proportion increased further, as Mr. Chapek received equity grants of 5.6 times his salary for, in the words of the 2022 Annual Report, "[s]uccessfully increas[ing] subscribers to Disney+ [and] Hulu[.]"

55. Similarly, Bob Iger (Mr. Chapek's predecessor *and* successor) received the overwhelming majority of his fiscal year 2020 compensation-just over $16.5 million-in the form of stock grants. The reason for his mammoth award (according to the 2021 Annual Report) was that he "[s]uccessfully launched Disney+ and drove unprecedented subscriber growth in the first year." When Mr. Iger was reinstated as CEO in November 2022, he received a compensation package including potential performance-based stock grants valued at $15 million, with a base salary of $1 million, *i.e.* only 1/15 of his stock incentives.[8] In short, Disney (and the executives running it) had and continue to have every incentive to do anything and everything they can, including manipulating distribution of the Qualifying Pictures and preventing TSG from liquidating its interests in certain tranches of Qualifying Pictures, to attempt to boost Disney's share price at the expense of TSG and other profit participants.

[8]     https://www.hollywoodreporter.com/business/business-news/bob-iger-disney-new-contract-details-chapek-severence-1235266921/.

### 3. Additional Claims

56. The audit commissioned by TSG further revealed that Fox had also employed a number of tried-and-true accounting tricks to unjustly reduce the amount of Defined Gross Receipts reported to TSG.

57. For example, Fox charged exorbitant fees on the revenue from distribution of films via Electronic Sell-Through ("EST")-- that is, digital sales of Qualifying Pictures through Apple, Amazon Prime Video, and similar services. Apple and Amazon-- *not Fox*--perform all distribution functions with respect to EST distribution, including delivering the units to the end user viewers. Accordingly, under the RPA, Fox was entitled to charge a lesser distribution fee on the revenues from EST distribution. But Fox instead applied a fee that is only allowed where Fox itself is the sole distributor, which is nearly double the fee that Fox was entitled to charge. The auditors estimated that this unethical accounting trick alone reduced TSG's Defined Gross Receipts by at least *$54.5 million* across the full Qualifying Picture slate.

58. Fox also improperly charged TSG millions of dollars in purported "distribution expenses" associated with the operation of a service called "Movies Anywhere." Movies Anywhere is a cloud-based digital locker and streaming platform that allows users to stream and download purchased films from five different studios (Disney, Fox, Sony, Universal and Warner Brothers). The business model of Movies Anywhere is to give consumers one digital storage system that allows them to access all of their movies from the five participating studios, each of which provides funding to Movies Anywhere. Fox reports *no receipts* to TSG in connection with this Movies Anywhere service, yet Fox has allocated to each Qualifying Picture a portion of its costs associated with operating this entity. In short, Fox is forcing TSG to invest in an enterprise that is

Case 1:25-cv-00910-JMF     Document 26-19     Filed 02/28/25     Page 12 of 18

TSG ENTERTAINMENT FINANCE LLC, a Delaware limited..., 2023 WL 5302083...

guaranteed to generate no return for TSG. This undisclosed investment is clearly not a properly chargeable distribution cost and constitutes Hollywood Accounting at its worst. The independent auditors estimated that for the complete Qualifying Picture slate, the distribution expenses Fox improperly charged in connection with Movies Anywhere exceeded *$35 million.*

59. These are just some examples of the many ways Fox manipulated its accountings to cheat TSG out of its fair share of Defined Gross Receipts, and TSG expects to uncover many more during discovery into all of the Qualifying Pictures.

### 4. Underperformance of the Qualifying Pictures

60. Within a few months of the acquisition, Disney management had fired virtually all the Fox staff that had previously managed the production and distribution of the Qualifying Pictures TSG had financed under the RPA. On information and belief, the Qualifying Pictures were effectively abandoned in bad faith in the wake of the acquisition, leading to a significant decline in audience awareness and market positioning for Fox's films. The result was that TSG's share of Defined Gross Receipts-which had already been artificially deflated as a result of Fox's schemes--was reduced even further.

61. The mismanagement of the Qualifying Pictures that followed Disney's overhaul of Fox's film division has been significant and demonstrable, with a marked difference in the profitability of Qualifying Pictures pre- and post-merger, even after adjusting for the downturn at theatres during the Covid-19 pandemic. Fox's failure to adequately market and distribute the Qualifying Pictures post-Disney acquisition was in breach of its contractual obligations to exercise its business judgment "on a fair, reasonable, good faith and non-discriminatory basis" and the implied covenant of good faith and fair dealing. On information and belief, these breaches were the direct result of the interference of Disney.

### C. Fox Refused to Honor TSG's Right to Trigger the Qualifying Picture Slate Repurchase Procedure.

62. If not for Fox's Hollywood Accounting, TSG would have had significantly more liquidity with which to fund future Qualifying Picture releases. But instead, TSG was forced to avail itself of the Qualifying Picture Slate Repurchase Procedure to generate this liquidity.

63. Accordingly, between June 7, 2022 and June 30, 2023, TSG requested that Fox make offers to repurchase thirteen slates of five films each, as follows:

| Tranche No. | Qualifying Picture Nos. | Date of release of 5th film in slate | Fifth Anniversary Date | Date of Repurchase Request |
|---|---|---|---|---|
| 1 | 1-5 | 6/28/2013 | 6/28/2018 | 6/30/2023 |
| 2 | 6-10 | 9/27/2013 | 9/27/2018 | 6/30/2023 |
| 4 | 16-20 | 5/2/2014 | 5/2/2019 | 6/30/2023 |
| 5 | 21-25 | 9/12/2014 | 9/12/2019 | 8/29/2022 |
| 7 | 31-35 | 4/10/2015 | 4/10/2020 | 6/30/2023 |
| 9 | 41-45 | 10/16/2015 | 10/16/2020 | 8/29/2022 |

| 13 | 61-65  | 3/24/2017  | 3/24/2022  | 6/30/2023 |
| 15 | 71-75  | 10/6/2017  | 10/6/2022  | 6/7/2022  |
| 16 | 76-80  | 12/20/2017 | 12/20/2022 | 6/7/2022  |
| 17 | 81-85  | 5/18/2018  | 5/18/2023  | 6/7/2022  |
| 18 | 86-90  | 10/12/2018 | 10/12/2023 | 2/22/2023 |
| 19 | 91-95  | 1/25/2019  | 1/25/2024  | 2/22/2023 |
| 20 | 95-100 | 6/7/2019   | 6/7/2024   | 2/22/2023 |

64. As demonstrated above, the Fifth Anniversary Date for seven of those thirteen slates had passed as of the date of the request; the Fifth Anniversary Date for the remaining six slates had not yet occurred at the time of the request.

65. However, Fox has failed as of the time of filing to make offers for ten of these thirteen tranches. Fox has also taken the position that TSG missed its chance to sell seven of the film tranches (Tranche Nos. 1, 2, 4, 5, 7, 9, and 13) because TSG had failed to request offers precisely on the Fifth Anniversary Date applicable to those tranches.[9]

[9] The Fifth Anniversary Dates for each of Tranches 15, 16, and 17 passed after the date of TSG's repurchase requests for those tranches. Fox made repurchase offers on each of those tranches dated October 6, 2022, February 13, 2023, and June 30, 2023, respectively. Only the offer relating to Tranche 15 was made "on" the Fifth Anniversary Date as set forth in Section 15(c)(i) of the RPA. The offers relating to Tranches 16 and 17 were both made several months after the Fifth Anniversary Dates pertaining to those tranches had passed.

66. In an e-mail to TSG dated November 18, 2022, Disney Executive Vice President and CFO Paul Shurgot--speaking on behalf of Fox--stated:
"While we don't agree with your characterization of the agreement, we are open to finding a path forward to resolve this which makes economic sense. However, as discussed, we are not open to providing an offer on selected non-consecutive tranches that are among the most profitable tranches released to date, as doing so is counter to the agreement and would undercut our ability to recoup the TSG Additional Contributions."

67. However, nothing in the RPA prevents TSG from selecting tranches for repurchase based on their profitability, nor does it require TSG to request repurchase offers on "consecutive" tranches. Crucially, the RPA also contains no requirement that TSG make repurchase requests on or before the Fifth Anniversary Date.

68. Fox's position that it gets to maintain the status quo for the "most profitable tranches" is also contrary to the intent of Section 15(c)(i) and Amendment No. 9 to the RPA. The *purpose* of the Qualifying Picture Slate Repurchase Procedure was to provide TSG with a mechanism to liquify its interests in the films it co-financed and to generate funds for future productions. Amendment No. 9 to the RPA was intended to serve that purpose by allowing TSG to decide *if and when* the Qualifying Picture Slate Repurchase Procedure would be triggered.

Case 1:25-cv-00910-JMF   Document 26-19   Filed 02/28/25   Page 14 of 18

TSG ENTERTAINMENT FINANCE LLC, a Delaware limited..., 2023 WL 5302083...

69. As a result of Fox's refusal to make timely offers on these film tranches (and due further to Fox's Hollywood Accounting and self-dealing), TSG had limited liquidity to fund certain Qualifying Pictures--including, most significantly, *Avatar: The Way of Water*-and was forced to seek a Fox Picture Advance to fund those films. And because Fox is entitled to recoup the Fox Picture Advance from TSG's share of Defined Gross Receipts, Fox has further frustrated TSG's ability to realize the benefit of its bargain with Fox, as well as TSG's ability to fund Qualifying Pictures on a go-forward basis. In short, by refusing to engage in the Qualifying Picture Slate Repurchase Procedure in breach of the RPA, Fox has enriched itself at TSG's expense, to the tune of hundreds of millions of dollars.

70. Perhaps most egregiously, after TSG informed Fox of its intent to file this action, Fox and Disney capitalized on Fox's own breaches of the RPA in a bad-faith attempt to whitewash their misconduct. On August 11, 2023, Fox sent TSG an e-mail taking the position that, because it had previously issued the Fox Picture Advance, it was entitled to invoke a provision of the RPA that would purportedly allow it to repurchase *all* released Qualifying Pictures and extinguish TSG's hundreds of millions of dollars of legal claims. Fox's stated basis for invoking this purported right was its payment of the Fox Picture Advance. In other words, Fox doubled down on its ***own prior breaches of contract*** that had deprived TSG of sufficient liquidity and forced it to avail itself of the Fox Picture Advances, in an attempt to deprive TSG of any recourse for Fox's decade-plus of unbridled Hollywood Accounting.

71. On information and belief, Fox's refusal to comply with the Qualifying Picture Slate Repurchase Procedure--and subsequent attempts to capitalize on its misconduct--were intentional and bad-faith attempts to frustrate TSG's ability to realize the benefit of its bargain. Thus, even to the extent that Fox's acts were not in direct breach of the express terms of the RPA, it breached the covenant of good faith and fair dealing that is an implied term of every contract.

72. On information and belief, Fox's refusal to make offers on certain film tranches in breach of the RPA, and subsequent attempts to wrongly benefit from those breaches, were the direct result of the interference of Disney. Specifically, Disney was dissatisfied with the bargain Fox had struck with TSG prior to Disney's acquisition of Fox, and therefore sought to prevent TSG from availing itself of its rights under the RPA.

73. On information and belief, these acts are part of a deliberate pattern of behavior designed to systematically deprive TSG of its rights under the RPA and unfairly enrich Fox, Fox's affiliates, and Fox's parent company Disney. Accordingly, TSG brings this Complaint to enforce its rights.

**FIRST CAUSE OF ACTION**

**<u>Breach of Contract</u>**

**(Against Fox)**

74. Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1 through 73 of this Complaint, inclusive, as though fully set forth herein.

75. Plaintiff has performed all conditions, covenants, and promises required to be performed by Plaintiff in accordance with the terms of the RPA, or such performance has been excused.

76. All conditions required for Fox's performance of the conditions, covenants, and promises required to be performed by it in accordance with the terms of the RPA have occurred.

77. Fox has breached the Agreements by, among other things, failing to distribute, market, advertise, publicize, and otherwise exploit all Qualifying Pictures on a fair, reasonable, good faith and non-discriminatory basis; failing to license all Qualifying Pictures to its affiliates on monetary terms comparable to the terms on which Fox enters into similar transactions with unrelated third parties; failing to correctly account to and pay TSG in connection with its obligations as to all Qualifying Pictures; and failing to abide by the Qualifying Picture Slate Repurchase Procedure.

78. As a direct and proximate result of Fox's breaches of the RPA, Plaintiff has suffered, and will continue to suffer, monetary damages in an amount to be proved at trial.

## SECOND CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

### (Against Fox)

79. Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1 through 73 of this Complaint, inclusive, as though fully set forth herein.

80. Plaintiff has performed all conditions, covenants, and promises required to be performed by Plaintiff in accordance with the terms of the RPA, or such performance has been excused.

81. All conditions required for Fox's performance of the conditions, covenants, and promises required to be performed by it in accordance with the terms of the RPA have occurred.

82. On information and belief, Fox unfairly prevented Plaintiff from receiving the benefits of the RPA by, among other things, changing its distribution patterns in order to benefit its affiliated streaming platforms, Disney+ and Hulu, to the detriment of Plaintiff's interests in the Qualifying Pictures; refusing to negotiate in good faith in connection with the repurchase of film tranches on the basis that Plaintiff selected "non-consecutive tranches that are among the most profitable tranches released to date"; attempting to leverage Fox's own prior breaches of contract to force TSG to sell all Qualifying Pictures to Fox and release all of TSG's claims relating thereto; misallocating license fees where Qualifying Pictures were "packaged" in agreement with other less valuable titles; and effectively abandoning the Qualifying Pictures after the Disney merger with respect to marketing and promotion. To the extent such acts were not in direct breach of the express terms of the RPA, they breached the covenant of good faith and fair dealing that is an implied term of every contract.

83. As a direct and proximate result of Fox's breaches of the implied covenant of good faith and fair dealing, Plaintiff has suffered, and will continue to suffer, monetary damages in an amount to be proved at trial.

## THIRD CAUSE OF ACTION

Case 1:25-cv-00910-JMF     Document 26-19     Filed 02/28/25     Page 16 of 18

TSG ENTERTAINMENT FINANCE LLC, a Delaware limited..., 2023 WL 5302083...

**Intentional Interference with Contractual Relations**

**(Against Disney)**

84. Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1 through 73 of this Complaint, inclusive, as though fully set forth herein.

85. Plaintiff and Fox were parties to the RPA, which is a valid and binding contract.

86. At all relevant times, Disney was aware of the RPA and its terms.

87. On information and belief, Disney intentionally and improperly interfered with Fox's performance of the RPA by causing or influencing Fox to, among other things, renegotiate the terms of Fox's HBO output deal and shorten the Home Video window in order to benefit Disney's streaming platforms, Hulu and Disney+; improperly market the Qualifying Pictures; refuse to comply with the Qualifying Picture Slate Repurchase Procedure; and attempt to leverage Fox's prior breaches of contract to force TSG to sell all Qualifying Pictures to Fox and release all of TSG's claims relating thereto. But for Disney's actions, Fox would not have breached the RPA in these respects.

88. Through the conduct described above, Disney intended to disrupt or prevent Fox's performance under the RPA, and did disrupt or prevent that performance.

89. Through its conduct, Disney caused damage to TSG by, among other things, reducing the Defined Gross Receipts in which TSG was entitled to share and impeding TSG's ability to sell its interests in certain Qualifying Pictures, in an amount to be proven at trial.

90. Disney's conduct was a substantial factor in causing Plaintiff's harm.

91. In engaging in the misconduct alleged herein, Disney acted with malice, oppression, or fraud, and in willful disregard of Plaintiff's rights and interests, thus entitling Plaintiff to an award of punitive damages in an amount appropriate to punish or make an example of Disney pursuant to Civil Code § 3294.

**FOURTH CAUSE OF ACTION**

**Inducing Breach of Contract**

**(Against Disney)**

92. Plaintiff incorporates by reference and realleges each and every allegation in paragraphs 1 through 73 of this Complaint, inclusive, as though fully set forth herein.

93. Plaintiff and Fox were parties to the RPA, which is a valid and binding contract.

94. At all relevant times, Disney was aware of the RPA and its terms.

Case 1:25-cv-00910-JMF   Document 26-19   Filed 02/28/25   Page 17 of 18

TSG ENTERTAINMENT FINANCE LLC, a Delaware limited..., 2023 WL 5302083...

95. As set forth above, Fox breached the RPA, including its implied covenants of good faith and fair dealing, by among other things, failing to distribute, market, advertise, publicize, and otherwise exploit the Qualifying Pictures on a fair, reasonable, good faith and non-discriminatory basis; failing to license Qualifying Pictures to its affiliates on monetary terms comparable to the terms on which Fox enters into similar transactions with unrelated third parties; failing to abide by the Qualifying Picture Slate Repurchase Procedure; and attempting to leverage Fox's prior breaches of contract to force TSG to sell all Qualifying Pictures to Fox and release all of TSG's claims relating thereto.

96. Disney intended to influence, direct, induce, or cause Fox to commit the above-described breaches because Disney knew it would benefit from such breaches. Among other benefits, Disney benefited by boosting the value of its wholly- or majority-owned streaming platforms Disney+ and Hulu, reducing the Defined Gross Receipts in which TSG is entitled to share, and impeding TSG's ability to fund future films (and thereby share in the Defined Gross Receipts for those future releases).

97. Through its conduct, Disney caused Fox to breach the RPA as set forth above. But for the influence or direction of Disney, Fox would have had no incentive, basis, and/or ability to collude with Disney; rather, absent such collusion, Fox's intent and desire would have been to maximize Defined Gross Receipts.

98. Through its conduct, Disney caused damage to Plaintiff by, among other things, inducing acts that reduced the Defined Gross Receipts in which TSG was entitled to share and impeded TSG's ability to sell its interests in certain Qualifying Pictures, in an amount to be proven at trial.

99. Disney's conduct was a substantial factor in causing Plaintiff's harm.

100. In engaging in the misconduct alleged herein, Disney acted with malice, oppression, or fraud, and in willful disregard of Plaintiff's rights and interests, thus entitling Plaintiff to an award of punitive damages in an amount appropriate to punish or make an example of Disney pursuant to Civil Code § 3294.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against the Defendants as follows:

1. For monetary damages in an amount to be proven at trial;

2. For punitive damages in an amount to be proven at trial;

3. That Plaintiff be awarded all pre-judgment interest allowable by law;

4. That Plaintiff be awarded its attorneys' fees and costs; and

5. For such further relief as the Referee may deem just and proper.

DATED: August 15, 2023

John V. Berlinski

Fanxi Wang

Ashley D. Bowman

Kimberly A. Meyer

Brandon R. Teachout

Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C.

By: <<signature>>

John V. Berlinski

*Attorneys for Plaintiff TSG Entertainment Finance LLC*

**End of Document**                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.