# EXHIBIT 23

# THE PARAMOUNT DECREES AND BLOCK BOOKING: WHY BLOCK BOOKING WOULD STILL BE A THREAT TO COMPETITION IN THE MODERN FILM INDUSTRY

**Mark Marciszewski**[*]

INTRODUCTION ................................................................................228
I.    BACKGROUND ..........................................................................231
      A.    Film Industry..................................................................231
      B.    Paramount Consent Decrees ..........................................234
      C.    Department of Justice's Motion to Terminate Decrees............237
            1.    Changes in the Marketplace and Technology......................238
            2.    Industry Still Subject to Antitrust Laws ...............242
            3.    Third-Party Comments ........................................243
II.   ANALYSIS..................................................................................244
      A.    History of Block Booking ..............................................245
      B.    Block Booking as an Illegal Tying Arrangement ....................247
            1.    Two Distinct Products ..........................................249
            2.    Economic Power in the Tying Product................................251
            3.    Arrangement Affects a "Not Insubstantial" Volume of
            Commerce in Tied Market ................................................252
      C.    Potential Problems with Judicial Review of Block Booking ....257
            1.    Market definition ..................................................258
                  i.    Debunking the Theatrical Plus Digital Market Definition.....259
                  ii.   Broad Definition—Collective Theatrical Market ................266
                  iii.  Narrow Definition—Individual Film Market Power............272
            2.    Public Interest ......................................................277
                  i.    Likelihood of Repeat Violation ...........................278
                  ii.   Block Booking's Impact on Consumers ................................281
CONCLUSION....................................................................................284

---

    * J.D., University of Virginia School of Law, 2020; B.S. Psychology, *magna cum laude*, University of Central Florida, 2017. Mark would like to thank the editorial board of the *Vermont Law Review* for all their work in bringing this Article to publication.

INTRODUCTION

Movies are one of the most common and popular forms of entertainment in the United States today.[1] Over three-quarters (76%) of the U.S. and Canadian population went to movie theaters in 2019, or roughly 268 million people.[2] This number was highest among the younger demographics, particularly among the 12–17 and 18–24 age brackets.[3] The U.S. box office has made over $11 billion every year since 2015, with a record $11.9 billion in 2018.[4] The highly lucrative nature of the industry has resulted in a handful of major film distributors fighting for supremacy. However, varying aspects of the film industry surrounding licensing to movie theaters have been regulated by a series of Supreme Court decisions and Southern District of New York consent judgments known colloquially as the *Paramount* Decrees, which are named after Paramount Pictures, the defendant in the majority of the pivotal cases.[5]

These Decrees "successfully dismantled and ended the motion picture horizontal distributor cartel of the 1930s and 40s and have regulated aspects of the motion picture industry for the last seventy years."[6] The *Paramount* Decrees regulate the film industry to varying degrees, from prohibiting some distributors from acquiring movie theaters without court approval to barring certain film-licensing practices.[7]

In late 2019, the Department of Justice (DOJ) moved to terminate these *Paramount* Consent Decrees, which have governed the movie industry since

---

1.  *See* Jackie Cohen, *America's Culture of Entertainment*, CBS MARKETWATCH (Jan. 11, 2005), https://www.marketwatch.com/story/americans-value-entertainment-studies-show (noting that 48.9% of 14,000 survey respondents considered movies to be a "favorite pastime"); Anne Stych, *Americans' Favorite Forms of Entertainment Are Digital*, BIZWOMEN (Mar. 28, 2019), https://www.bizjournals.com/bizwomen/news/latest-news/2019/03/americans-favorite-forms-of-entertainment-are.html?page=all (stating that 27% "of all entertainment hours in 2018 were spent watching TV and movies").

2.  THEME REPORT 2019, MOTION PICTURE ASS'N 5 (2020) [hereinafter MPA, THEME REPORT 2019] https://www.motionpictures.org/wp-content/uploads/2020/03/MPA-THEME-2019.pdf.

3.  *Id.*

4.  *Id.* at 9.

5.  United States v. Paramount Pictures Inc., 334 U.S. 131 (1948).

6.  Memorandum in Support of Motion of the United States for an Order Terminating Antitrust Judgments at 2, United States v. Paramount Pictures, No. 1:19-mc-0054 (S.D.N.Y. 2019) [hereinafter Motion for Terminating Judgments].

7.  *See The Paramount Decrees*, U.S. DEP'T. JUST. https://www.justice.gov/atr/paramount-decree-review (last updated Aug. 7, 2020) (discussing *United States v. Paramount Pictures* and the effects of the *Paramount* Decrees).

the late 1940s.[8] Although the government received over 80 comments—many arguing that some or all of the prohibitions on licensing practices contained in the Decrees should be maintained—the government determined that "not one comment identifies any ground to conclude that–absent the Decrees–[film distributors] would collude to re-impose uniform distribution and licensing schemes on movie theatres."[9]

The comments were from various movie theater trade groups, regional movie-theater chains, single theaters, and other smaller players in the industry.[10] The focus of the comments was that terminating the Decrees would allow major film distributors to use these anticompetitive licensing practices to foreclose opportunities for independent distributors, to financially disadvantage small town or limited screen theaters, and to enhance their leverage in licensing negotiations with theaters—all resulting in increased market power.[11]

The government, however, discredits these comments since they do not cite legal principles or present concrete evidence that the anticompetitive behavior declared illegal in the *Paramount* Decrees over 70 years ago would repeat itself absent the Decrees' restrictions.[12] The DOJ moved forward despite the public concern and filed an order to terminate the Decrees on August 7, 2020.[13] This Article presents the legal arguments against terminating the Decrees, as well as argues the danger and high likelihood that the antitrust violations underlying the Decrees, if overturned, are bound to repeat themselves.

This Article does not cover all aspects of the *Paramount* Decrees. Instead, it focuses on the restriction that the majority of commenters agree should not be overturned: the ban on the film licensing practice known as "block booking." Block booking is the practice of licensing films in groups by specifically conditioning the licensing of one film on the acceptance to show one or more other films.[14] Phrasing it in the context of antitrust law, the

---

8. Karen Lent & Kenneth Schwartz, *The DOJ Moves to Terminate the Paramount Consent Decrees: Is This the End of the Movie Industry as We Know It?*, N.Y. L.J. (Dec. 9, 2019), https://www.law.com/newyorklawjournal/2019/12/09/the-doj-moves-to-terminate-the-paramount-consent-decrees-is-this-the-end-of-the-movie-industry-as-we-know-it/?slreturn=20200819131901.

9. Motion for Terminating Judgments, *supra* note 6, at 5.

10. *See id.* at 29 (including the groups National Association of Theatre Owners (NATO), Bow Tie Cinemas, 30 drive-in theaters, and other single theaters).

11. *Id.* at 29–30.

12. *See id.* at 5 (arguing that "not one comment identifies any grounds to conclude that[]absent the Decrees" major film distributors would collude to engage in anticompetitive behavior).

13. Order Terminating Antitrust Judgments at 1, United States v. Paramount Pictures, Inc., No. 1:19-mc-00544-AT (S.D.N.Y. 2020) [hereinafter Order Terminating Judgments].

14. *Block Booking*, BLACK'S LAW DICTIONARY (11th ed. 2019).

practice involves "'tying' multiple films together in one theatrical license, instead of licensing films on a film-by-film basis."[15]

Part I focuses on the current legal landscape surrounding the decision to overturn the *per se* ban on block booking. First, Part I.A provides background on the theatrical film-licensing market by highlighting the overall structure of the market and what makes films a unique product. Secondly, Part I.B outlines the relevant parts of the Supreme Court's holdings in *United States v. Paramount* that involve block booking. Finally, Part I.C outlines the reasons the DOJ has used to argue that the *Paramount* Decrees are unnecessary in the modern film industry.

Part II of this Article outlines the reasons why the *per se* ban on block booking for film distributors should not be terminated. First, Part II.A gives a brief history of block booking in the theatrical-licensing market, focusing on how it impacted the theatrical-licensing market before the *Paramount* Decrees. Second, Part II.B outlines how block booking would still constitute an illegal tying arrangement if practiced today.

Finally, Part II.C explains how judicial review of block booking would be difficult under modern antitrust laws and could lead to incorrect rulings. Namely, the biggest issue for courts is properly defining the market in order to measure the economic power of the tying product. This Article first rebuts the market definition proposed by the DOJ that the theatrical market is included in a larger "film" market that includes physical and digital at-home markets. Then, it advocates for two market definitions, which better define the theatrical market: (1) a broader definition of the collective theatrical market over an extended period of time, with consideration that this definition would be hard to consistently define and apply to future block-booking arrangements; and (2) a narrower definition of individual films in a shorter temporal period that mimics a theatrical run length that would most accurately reflect how the theatrical-licensing market actually works. Finally, this Subpart of the Article will address why terminating the *per se* ban on block booking is against the public interest, primarily for two reasons: (1) there is a high likelihood that block booking would be used in an anticompetitive manner as a repeat violation of antitrust laws; and (2) block booking would have a negative impact on the consumers of theatrical films.

15. Order Terminating Judgments, *supra* note 13, at 15.

## I.    Background

### A.    Film Industry

The film industry is vast and profitable, generating tens of billions in revenue every year.[16] However, the process of making and marketing a movie is long and complicated. It takes many steps to even create a finished film including: writing the script, casting, set design, filming, producing, and editing—to name a few.[17]

As difficult as it is to make a movie, those in the industry have "said that making a movie is not nearly as difficult as getting it distributed."[18] There are enormous costs—in both time and money—involved with distributing a movie, but having a well-known director or actor can help secure a good distribution deal.[19] Most of the major studios are subsidiaries of large media conglomerates who distribute their own movies.[20] The obvious advantage of having its own distributor in-house is that the large media conglomerates, like Disney or Universal, do not have to share the profits of their films with other third parties.[21] On the other hand, it is more expensive when their movie is a flop, since there is no third party to share the costs.[22] Either way, these conglomerates do not have to rely upon impressing a third-party distributor to get their film to the public. Independent filmmakers are not as fortunate, and as a result, they "often use film festivals as an opportunity to get the attention of distributors."[23]

A film distributor has several responsibilities and duties to ensure the success of a film. The distributor determines how many copies, or prints, of the film to make, and then shows the movie in a screening to prospective buyers that represent the movie theaters.[24] Traditionally, a distributor

---

16.  David Robb, *U.S. Film Industry Topped $43 Billion in Revenue Last Year, Study Finds, But It's Not All Good News*, Deadline (July 13, 2018), https://deadline.com/2018/07/film-industry-revenue-2017-ibisworld-report-gloomy-box-office-1202425692/ ("The American film industry generated $43.4 billion in revenue [in 2017] . . . .").

17.  Jeff Tyson, *How Movie Distribution Works*, HowStuffWorks 1, 2 (Sept. 18, 2000), https://entertainment.howstuffworks.com/movie-distribution.htm (describing the path a movie undergoes, from having an idea for a film to its eventual distribution).

18.  *Id.*

19.  *Id.*

20.  *See generally* Edward Jay Epstein, The Big Picture: Money And Power In Hollywood 14–19, 82, 109, 133 (2006) (describing the power that the big six studios have over their subsidiaries and the content they produce).

21.  Tyson, *supra* note 17, at 2.

22.  *Id.*

23.  *Id.* at 1.

24.  This specified time period is also known as the "engagement." *Id.*

determined how many screens it should book for a particular film based upon a calculation that included the high cost of producing and shipping a film print. A standard 35-millimeter film print could "cost[] $1,500 to $2,500 to print and ship . . . a figure that easily runs into the millions for a wide release."[25] Modern technological breakthroughs led to a push for a transition from film projection of traditional 35-millimeter prints to digital projection in the early 2000s.[26] The move to digital projection led to the exponential decrease in cost for studios to distribute their movies to theaters.[27] The exponential decrease in cost, "combined with the end of the prohibition on block booking, could unwind the core system of operations in the American movie industry . . . [and] could radically alter the quality and variety of films shown in our nation's theaters and later in homes."[28]

Since these films are copyrighted,[29] it is important to note that the movie-theater buyers do not purchase the films themselves or their copyrighted exclusive rights, but instead only purchase nonexclusive licenses to show the films in their theaters.[30] The film is only licensed for a limited period of time, usually a specified number of weeks.[31] Once an agreement is completed, the distributor will send the prints to the theaters before the opening day of the engagement.[32] At the end of the movie's theatrical run, "the theater sends the

---

25. Duane Marsteller, *Theater Owners Weigh Film Perfection, Conversion Costs*, USA TODAY (Feb. 22, 2013), https://www.usatoday.com/story/life/movies/2013/02/22/digital-theater-movies/1940067/.

26. "Digital formats began to displace film in earnest more than a decade ago and the charge was led by George Lucas. In 2002, *Star Wars: Episode II-Attack of the Clones* became the first major movie to be shot entirely on digital video, even though, back then, it had to be transferred on to 35mm film for most cinemas to show it. The producers of *Attack of the Clones* estimate that they spent $16,000 on 220 hours of digital tape. If they had used the same amount of film, it would have cost them $1.8 million." Helen Alexander & Rhys Blakely, *The Triumph of Digital Will Be the Death of Many Movies*, THE NEW REPUBLIC (Sept. 12, 2014), https://newsrepublic.com/article/119431/how-digital-cinema-took-over-35mm-film.

27. *Id.*

28. NAT'L ASS'N OF THEATRE OWNERS (NATO), COMMENTS OF THE NATIONAL ASSOCIATION OF THEATER OWNERS U.S. DEPARTMENT OF JUSTICE, ANTITRUST DIVISION REVIEW OF PARAMOUNT CONSENT DECREES 9 (2018) [hereinafter NATO, COMMENTS ON DOJ'S REVIEW OF PARAMOUNT DECREES] https://www.justice.gov/atr/page/file/1102536/download.

29. *See* 17 U.S.C. § 102(a)(6) ("Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression . . . from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include . . . motion pictures and other audiovisual works . . . .").

30. *See* Tyson, *supra* note 17, at 1 (identifying that a studio or independent investor purchases the rights to a film).

31. *See id.* at 1, 3 (specifying that the length of engagement is normally four weeks).

32. *Id.* at 1.

print back to the distribut[or] . . . and makes [the] payment on the lease agreement."[33]

The buyers negotiate with the distribution company on which movies the theater wishes to lease and the specific terms of the agreement.[34] There are two ways a theater can lease a film: (1) bidding; and (2) percentage.[35] Bidding is where a "theater agree[s] to pay a fixed amount for the right to show the movie."[36] It is a one-time payment to show the film for a set amount of time, with the benefit of gain and the risk of loss due to box-office returns resting all on the individual movie theaters. This practice is not used by many film distributors anymore.[37] Instead, "[m]ost agreements are for a percentage of the box office (ticket sales)."[38] The representatives of the theaters negotiate with the distributors regarding the percentages of the net and gross box offices, as well as length of the lease.[39] The length of these leases can vary depending on the popularity of the movie.[40] Traditionally, theaters receive a progressively larger "cut of [the] movie revenues the more weeks they run a film . . . ."[41] However, "some movie deals have moved towards flat rates . . . [s]o as revenues wane after the first week, theaters have less incentive to keep the movie."[42] Distributors, on the other hand, have every incentive to keep their movies in theaters as long as possible.[43] The average run for most movies is "about four weeks in at least 2,000 theaters, and some films will run in at least 1,000 theaters for another week after that."[44] At a "bare minimum," most agreements last for at least two weeks.[45]

All of these licensing agreements are "separate contract[s] for each movie shown, and . . . will cover the movie's entire run at a given movie theater."[46] In some circumstances where a movie is extremely popular and

---

33.  *Id.*

34.  *Id.*

35.  *Id.* at 3.

36.  *Id.*

37.  *Id.*

38.  *Id.*

39.  *Id.*

40.  Mark Fahey, *Why Movies Are Sometimes Here and Gone in Theaters*, CNBC (Nov. 17, 2015), https://www.cnbc.com/2015/11/17/why-movies-are-sometimes-here-and-gone-in-theaters.html.

41.  *Id.*

42.  *Id.*

43.  *Id.*

44.  *Id.*

45.  *Id.*

46.  Krzysztof Wozniak, *Vertical Restraints in the Movie Exhibition Industry*, (Jan. 1, 2014) (Ph.D dissertation, N.Y.U. Graduate School of Business Administration) (on file with author).

continuing to draw in steady crowds, a movie theater may negotiate an extension of the licensing agreement.[47]

Distributors do not only deal with movie theaters. They also obtain the ancillary right to distribute the movie through other outlets like physical DVDs, cable and network television, and streaming rights.[48] Beyond licensing the film itself, the distributors also deal with other ancillary rights related to the film, "includ[ing] soundtrack CDs, posters, games, toys and other merchandising."[49] This Article is only concerned with the distribution of films to movie theaters.

## B.  Paramount Consent Decrees

During the 1930s and 1940s, the motion-picture industry was dominated by eight major motion-picture distributors who had conspired and colluded in an attempt to monopolize the first-run[50] film distribution and movie-exhibition markets.[51] As a result of block-booking licensing and their horizontal conspiracy, the major motion-picture distributors "controlled 70 percent of national box office receipts."[52] They also "accounted for most of the first-run motion pictures distributed in the United States at that time, including over 95 percent of class A feature films–the higher-grade, highly-publicized films shown in the 'leading' motion picture theatres."[53] The market structure led to consolidation of market power among the major film distributors, allowing the major film distributors to "cooperat[e] and collud[e], establishing a cartel . . . for the purpose of (1) limiting the first run of their pictures, as much as possible, to the theatres that the major [distributors] owned and controlled; and (2) closing off first-run theatres to their competitors, independent motion picture distributors."[54]

---

47.  Tyson, *supra* note 17, at 3.

48.  *Id.* at 2.

49.  *Id.*

50.  During the 1930s and 1940s, the theatrical practice was to have "first-run" and "second-run" theatrical releases. As the names suggest, the "first-run" was a films first appearance in the theaters, and when the first-run ended it would start its "second-run," normally at a different theater. As one may assume, a movie's first-run was the more lucrative run. Motion for Terminating Judgments *supra* note 6, at 2–3, 8–9.

51.  *See* United States v. Paramount Pictures, Inc. 66. F. Supp. 323 (S.D.N.Y. 1946); *modified on recharging,* 70 F. Supp. 53 (S.D.N.Y. 1946); *aff'd in part and rev'd in part,* 334 U.S. 131 (1948), *on remand,* 85 F. Supp. 881 (S.D.N.Y. 1949), *aff'd,* 339 U.S. 974 (1950) (outlining the domination of the motion picture industry by the *Paramount* Defendants).

52.  Motion for Terminating Judgments, *supra* note 6, at 9.

53.  *Id.* at 7

54.  *Id.*

In 1938, the United States filed an antitrust suit against these eight major movie distributors, collectively known as the "*Paramount* Defendants," alleging violations of § 1 and § 2 of the Sherman Antitrust Act.[55] The complaint charged the *Paramount* Defendants "with combining and conspiring unreasonably to restrain trade and commerce in the production, distribution and exhibition of motion pictures and to monopolize such trade and commerce in violation of the Sherman Act."[56]

After a trial in the Southern District of New York, the "[District] Court found that [*Paramount*] Defendants through illegal horizontal collusion and a cartel had (1) monopoly power in the distribution market for first-run motion pictures; and (2) engaged in a conspiracy to fix licensing practices . . . for substantially all theatres located in the United States."[57] The decision was then appealed, until finally the case reached the United States Supreme Court.[58]

The Supreme Court began its analysis of block-booking licensing by emphasizing the unique nature of films as a product due to their copyright protection. First, the Court noted that "[n]o film is sold to an exhibitor in the distribution of motion pictures," instead "[t]he right to exhibit under copyright is licensed."[59] This is different than other products, for example a piece of machinery, that is sold and passes through the stream of commerce in one direction. When licensing copyrighted films, the product is only available for use to the buyer for a limited time before all rights return to the seller.[60]

The Supreme Court then defined block booking as "the practice of licensing, or offering for license, one feature or [a] group of features on condition that the exhibitor will also license another feature or group of features released by the distributors during a given period."[61] Since block-booking licensing forces theaters to license films in bulk, it "prevents competitors from bidding for single features on their individual merits."[62] The Supreme Court agreed with the District Court that a reason block

---

55. *The Paramount Decrees*, *supra* note 7. These eight were Paramount, Fox, Universal, Columbia, Warner Bros., Metro-Goldwyn Mayer, Inc. (MGM), United Artists, and Loew's Inc. (now defunct and a part of MGM). *Paramount Pictures,* 66 F. Supp. at 328–29. There were also five movie-theater defendants that no longer exist, and as a result are not mentioned further in the context of this Article.

56. *Paramount Pictures*, 66 F. Supp. at 330.

57. Motion for Terminating Judgments, *supra* note 6, at 10.

58. United States v. Paramount Pictures, 334 U.S. 131, 140 (1948).

59. *Id.* at 141.

60. Tyson, *supra* note 17, at 3.

61. *Paramount*, 334 U.S. at 156.

62. *Id.* at 156–57.

booking is illegal is that "it adds to the monopoly of a single copyrighted picture that of another copyrighted picture which must be taken and exhibited in order to secure the first."[63] The focus on the "enlargement of the monopoly of the copyright" was a result of a "reliance on the principle which forbid[] the owner of a patent to condition its use on the purchase or use of patented or unpatented materials."[64] The Supreme Court in *Paramount* approved of this principle since "copyright law, like the patent statutes, makes reward to the owner a secondary consideration."[65]

Continuing to focus on the unique nature of a copyrighted product, the Court cited a previous decision that held that "'[t]he sole interest of the United States and the primary object in conferring [a copyright] monopoly lie in the general benefits derived by the public from the labors of authors.'"[66] This "reward to the author or artist serves to induce release to the public of the products of his [or her] creative genius. . . . [However] the reward does not serve its public purpose if it is not related to the quality of the copyright."[67] The focus of the Court is on the proper reward for each individual copyrighted film.[68] The Court held that when "a high quality film greatly desired is licensed only if an inferior one is taken, the latter borrows quality from the former and strengthens its monopoly by drawing on the other."[69]

The practice of block booking one high-quality film with one or more lower quality films "tends to equalize rather than differentiate the reward for the individual copyrights."[70] Even if there was a way to quantify objectively the "quality" of each film such that every film in a bundle were of equal quality, "the requirement[s] that all [the films] be taken if one is desired [still] increases the market for some."[71] In this scenario, each film "stands not on its own footing but in whole or in part on the appeal which another film may have . . . [with] the result [being] to add to the monopoly of the copyright in violation of the principle of the patent cases involving tying clauses."[72]

Although the Supreme Court used the previous patent antitrust cases to assume the Defendants had market power from their possession of a

---

63.  *Id.* at 157 (quoting United States v. Paramount Pictures, Inc. 66. F. Supp. 323, 349 (S.D.N.Y. 1946)) (internal quotations omitted).

64.  *Id.*

65.  *Id.* at 158.

66.  *Id.* (quoting Fox Film Corp. v. Doyal, 286 U.S. 123, 127 (1932)).

67.  *Id.*

68.  *Id.*

69.  *Id.*

70.  *Id.*

71.  *Id.*

72.  *Id.*

monopoly on an individual copyright for a film; the Court later recognized that, as a result of the conspiracy, the five major Defendants did control 70% of national box-office receipts.[73] This high share of the market made the Court unsympathetic to the film distributors' business-rationale defenses. The Court was not persuaded by the Defendants' argument that the absence of the practice of block booking would "be very disadvantageous to [film distributors] and [would] greatly impair [their] ability to operate profitably."[74] Instead, the Court emphasized that "the policy of the anti-trust laws is not qualified or conditioned by the convenience of those whose conduct is regulated."[75] An interest in a profitable "practice which contravenes the policy" of antitrust law cannot receive sanction from the courts.[76]

The Court iterated their holding as "a refusal to license one or more copyrights unless another copyright is accepted" to be a *per se* violation of antitrust law.[77] The *Paramount* decision and following decrees "successfully dismantled and ended the motion picture horizontal distributor cartel of the 1930s and 40s and have regulated aspects of the motion picture industry for the last seventy years."[78]

## C.   Department of Justice's Motion to Terminate Decrees

In the spring of 2018, the antitrust division of the United States DOJ announced it would review old perpetual antitrust judgments as a form of legal housekeeping, "review[ing] nearly 1,300 judgments going back over 100 years to evaluate whether they're still in the public interest."[79] In August 2018, the DOJ announced it would be reviewing the *Paramount* Decrees.[80]

---

73.  "In the 92 cities of the country with populations over 100,000 at least 70 per cent [sic] of all the first-run theatres are affiliated with one or more of the five majors." *Id.* at 167. This finding would suffice in meeting the threshold of the Defendant having market power in the tying product to find a *per se* ruling of an antitrust violation required in modern tying cases.

74.  *Id.* at 159.

75.  *Id.*

76.  *Id.*

77.  *Id.*

78.  Motion for Terminating Judgments, *supra* note 6, at 2.

79.  Alexi Horowitz-Ghazi, *Why the DOJ is Concerning Itself with the Old Anti-Trust Paramount Consent Decrees*, NAT'L PUB. RADIO (Dec. 6, 2019), https://www.npr.org/2019/12/06/785671243/why-the-doj-is-concerning-itself-with-the-old-anti-trust-paramount-consent-decre. Other decrees "included antiquated sounding settlements aimed at curbing monopoly power over music roles for piano players and hoof pads for horseshoes." *Id.*

80.  Alex Weprin, *Justice Department Moves to Terminate Paramount Consent Decrees*, HOLLYWOOD REP. (Nov. 18, 2019), https://www.hollywoodreporter.com/thr-esq/justice-department-moves-terminate-paramount-consent-decrees-1255858.

On November 22, 2019, the DOJ filed a motion to terminate the *Paramount* Consent Decrees, effective "immediately except for a two-year sunset period on the Decrees' provisions banning block booking and circuit dealing."[81] The sunset period's purpose would be to allow film distributors "and their movie theatre licensees a transition period to adjust to any film licensing proposals that would replace the Decrees' required theatre-by-theatre, film-by-film licensing structure."[82] "The Antitrust Division . . . concluded that terminating the *Paramount* Decrees would be in the public['s] interest[,]" since "the Decrees long ago . . . 'uprooted' and ended the Defendants' illegal conspiracy and, along with the passage of time, 'rid' the industry of 'all taint of the conspiracy,' undoing 'what the conspiracy achieved.'"[83]

The primary question and concern for the DOJ in their motion is "whether the antitrust violations that the Decrees remedied would reoccur if the Decrees are terminated."[84] If the violations would not likely reoccur if the Decrees were terminated, then there is no reason for the Decrees to continue and should be terminated. For the DOJ "[t]here is no reason to believe the Defendants would or could re-establish the industry-wide horizontal conspiracy or cartel that was the basis for the original enforcement action by the United States and the resulting Decrees."[85]

The DOJ offered two reasons for this belief: (1) that a conspiracy or cartel like the one formed in the 1930s and 1940s would be "improbable today because of the technological and marketplace changes that have transformed the movie industry over the last seventy years;"[86] and (2) "since the motion picture industry has always remained fully subject to the antitrust laws, any recurrence of the anticompetitive collusion that the Decrees enjoined would be prohibited under existing law."[87]

### 1.    Changes in the Marketplace and Technology

The DOJ stated in its motion that "significant changes in the motion picture industry over the last seventy years have made it unlikely that the

---

81.  Motion for Terminating Judgments, *supra* note 6, at 1–2. The DOJ officially filed its order to terminate the *Paramount* Decrees on August 7, 2020. Order Terminating Judgments, *supra* note 13, at 1.

82.  Motion for Terminating Judgments, *supra* note 6, at 2.

83.  *Id.* at 16. (quoting United States v. Paramount, 334 U.S. 131, 148, 171 (1948)).

84.  *Id.* at 3.

85.  *Id.*

86.  *Id.*

87.  *Id.* at 3–4.

remaining Defendants could or would reinstate their cartel to monopolize the motion picture distribution and theatre markets."[88]

Before the *Paramount* Decrees, film distributors formed and maintained an illegal cartel during the 1930s and 1940s due to two factors: "(1) Defendants collectively had monopoly power in the distribution market for first-run films; and (2) the major Defendants also owned the best 'first-run' theatres in the most important geographic locations."[89] These facts contributed to a "market structure [that] led to collusion [which] foreclosed independent distributors from sufficient access to the first-run theatre market."[90]

However, the DOJ believes that "[b]oth the market structure and distribution system that facilitated that collusion no longer exist."[91] Specifically, it highlighted that "seventy-years of technological innovations, new competitors and business models, and shifting consumer demand have fundamentally changed the industry."[92] First, the DOJ argues that new competitors, like Disney and Lionsgate, are not subject to the *Paramount* Decrees since they were not around in the 1930s and 1940s and were not named defendants in the Decrees.[93] However, the ban on block booking differs from the other restrictions addressed by the Southern District of New York Consent Decrees with specific defendant distributors. Instead, the ban on block booking is specifically addressed by a Supreme Court decision that affects all film distributors.[94] Further, "major studios such as Disney and Lionsgate . . . operate within the bounds of the Decrees [since] the Decrees act as a set of customs that are largely respected . . . [and] continue to serve the procompetitive interests mandated by both statutory and judicial precedence."[95] The existence of the *per se* ban on block booking stemming from the Supreme Court deters the major distributors from attempting the practice of block booking, while "abandoning the Decrees could result in an

---

88.  *Id.* at 16.
89.  *Id.* at 17 (footnote omitted).
90.  *Id.*
91.  *Id.* at 18.
92.  *Id.*
93.  *See* Order Terminating Judgments, *supra* note 13, at 10 (noting several successful distributors that have emerged since the Decrees were established).
94.  *See generally* United States v. Paramount Pictures, Inc., 334 U.S. 131, 156–59 (1948) (holding that it is illegal to "refus[e] to license one or more copyrights unless another copyright is accepted," without tailoring the holding to those within the Consent Decrees).
95.  NATO, COMMENTS ON DOJ'S REVIEW OF PARAMOUNT DECREES, *supra* note 28, at 12.

era of 'experimentation' that could lead to decreased product and potentially the end of many smaller exhibitors and distributors."[96]

The technological innovations, in the government's view, have changed the distribution of motion pictures "dramatically."[97] During the *Paramount* Defendant's cartel "[i]n the 1930s and 40s, the only way that the public could view a motion picture was in a single-screen movie theatre–multiplexes, broadcast and cable television, the Internet, and DVDs did not exist."[98] This "single-screen, theatre-only distribution market" provided the major film distributors of the time "the incentive and ability to limit the first-run distribution of their films to a select group of owned or controlled theatres in order to maximize their profits, and to relegate independent theatres to subsequent less profitable runs."[99]

In contrast, it is not the standard practice for modern film distributors to "use sequential theatrical runs and clearances to separate first-run and subsequent-run theatres primarily because subsequent theatrical runs, as well as subsequent-run theatres, no longer exist in any meaningful way."[100] Instead, the trend is for films to be "released broadly to thousands of multi-screen theatres at the same time in [one longer] single theatrical run."[101] "Once their single theatrical run ends, films are distributed to various non-theatrical aftermarkets that did not exist in the 1940s–Internet streaming, Internet downloads, pay and broadcast television, and DVDs."[102]

"The *Paramount* Decrees do not apply to any of these aftermarkets[, where] [m]ovie distributors can and do earn significant revenues from these post-theatrical markets . . . ."[103] However, "[d]espite the plethora of options associated with in-home entertainment, the theatrical box office is the most vital and dependable source of revenue for studio content, and thus ripe for abuse if not carefully regulated."[104] The government admits that "[s]uccess in the theatrical market can and do[es] translate into higher post-theatrical

---

96. *Id.* at 13. "[T]he combination of [the exponential decrease in cost of distributing prints] with a repeal in the prohibition on block booking alone could lead to fundamental changes to America's movie production, distribution, and exhibition system with consequences that could prove disastrous." *Id.*

97. Motion for Terminating Judgments, *supra* note 6, at 18.

98. *Id.*

99. *Id.* at 18–19.

100. *Id.* at 19.

101. *Id.*

102. *Id.*

103. *Id.*

104. NATO, C<small>OMMENTS ON</small> DOJ'<small>S</small> R<small>EVIEW OF</small> P<small>ARAMOUNT</small> D<small>ECREES</small>, *supra* note 28, at 6.

revenues . . . ."[105] For example, the top box-office titles in 2017 were also almost exclusively the top home-video rentals.[106]

However, still defiant, the government claims that theatrical revenues are not as relevant since "some independent distributors, relying on subscription, instead of box office revenues, currently release movies to theaters with either limited theatrical runs or on the same day as internet movie streaming services."[107] The DOJ uses Netflix as an example, "which plans to release over fifty movies this year, [and] 'mostly bypasses theaters.'"[108] Again, the DOJ misses the issue. First, studios that distribute theatrically still have "an edge" over exclusively streaming platforms in purchasing the rights to quality, midrange titles.[109] Even small studios that choose a traditional distribution model benefit from the legitimacy and box-office receipts granted by a theatrical run.[110] Second, secondary streaming services like Netflix are increasingly becoming owned and controlled by the major film distributors themselves.[111] The result is that streaming services like Amazon have begun to choose a traditional distribution model, which has "paid off" for Amazon whose films released in its initial year of releases, "including Kenneth Lonergan's Oscar-winning drama *Manchester by the Sea*[,] [c]ollectively[] have grossed more than $90 million at the US box office . . . ."[112] Furthermore, the Southern District of New York has already held that the Decrees remained important despite numerous "changes of significance in the motion picture industry," including

---

105.  Motion for Terminating Judgments, *supra* note 6, at 19.

106. *Compare Top-Selling Video Titles in the United States 2017*, THE NUMBERS, https://www.the-numbers.com/home-market/packaged-media-sales/2017 (last visited Dec. 13, 2020) (showing top movies in the home market for 2017), with *Top 2017 Movies at the Domestic Box Office*, THE NUMBERS, https://www.the-numbers.com/box-office-records/domestic/all-movies/cumulative/released-in-2017 (last visited Dec. 13, 2020) (stating the top domestic box-office titles for 2017).

107.  Order Terminating Judgments, *supra* note 13, at 9–10.

108. *Id.* at 10 (quoting Brooks Barnes, *Netflix's Movie Blitz Takes Aim at Hollywood's Heart*, N.Y. TIMES (Dec. 16, 2018), https://www.nytimes.com/2018/12/16/business/media/netflix-movies-hollywood.html).

109.  Ashley Rodriguez, *Netflix and Amazon are Pushing Out the Last major Studios Still Seeking Smart Movies For Adults*, QUARTZ (Aug. 1, 2017), https://qz.com/1043327/netflix-and-amazon-are-pushing-out-the-last-major-studios-still-seeking-smart-movies-like-detroit/.

110.  Ashley Rodriguez, *US Cinema Chains Want Nothing to do With Netflix, but They Love Amazon*, QUARTZ (Apr. 3, 2017) [hereinafter Rodriguez, *US Cinema Chains Want Nothing to do With Netflix*], https://qz.com/947237/unlike-netflix-cinema-chains-really-want-to-work-with-amazon/ (suggesting that because Netflix refuses to attend CinemaCon they are less likely to be influenced by the cinema industry and instead produce their own content).

111. *See* discussion *infra* Part II.C.1.i (highlighting Disney, Universal, and Warner's entry into the streaming market).

112.  Rodriguez, *US Cinema Chains Want Nothing to do With Netflix*, *supra* note 110.

the advent of VCRs and the "proliferation of cable television networks . . . ."[113]

## 2.    Industry Still Subject to Antitrust Laws

The other main rationale the DOJ gives in support of its motion to overturn the *Paramount* Decrees is that the film industry would still be subject to normal antitrust laws that would prevent further illegal anticompetitive practices.[114] The DOJ highlights that "absent an illegal horizontal agreement among [d]efendants to do so, the licensing restraints that the *Paramount* Decrees currently prohibit are not, by themselves, *per se* illegal under current antitrust law."[115] Further, the government asserts, contrary to the opinions expressed in several of the public comments, the prohibited licensing practices in the *Paramount* Decrees "may be efficient, and thus, if allowed, beneficial to competition and consumers."[116]

Over the years since the Supreme Court issued its opinion in *Paramount*, the DOJ highlights that the "antitrust case law has evolved to undermine the Decrees' ongoing regulatory provisions."[117] This evolution of the antitrust case law mainly distinguishes how the Decrees currently "bar vertical licensing practices as *per se* illegal," while "under current Supreme Court precedent, a court today would judge that same conduct pursuant to the fact-specific rule of reason. . . . [by] evaluating the specific market facts to determine whether an antitrust foreclosure claim lies, and whether the agreement's anticompetitive harm outweighs its procompetitive benefits."[118] Absent the Decrees, the government notes that "it would be a factual question specific to a geographic market whether . . . licensing terms illegally foreclosed competition in that geographic market."[119] The federal courts have continuously disagreed with the position the government takes, continuing to

---

113.  United States v. Loew's Inc., 705 F. Supp. 878, 881 (S.D.N.Y. 1988); *see also* Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., No. 97 Civ. 5499, 2004 U.S. Dist. LEXIS 5411, at *15 (S.D.N.Y. Mar. 30, 2004) (holding that the type of block booking described by the *Paramount* court, is *per se* illegal).

114.  *See* Motion for Terminating Judgments, *supra* note 6, at 3–4 (arguing that all film studios in the motion picture industry are still subject to antitrust laws which will prohibit them from anti-competitive collusion).

115.  *Id*. at 5.

116.  *Id.*

117.  *Id.* at 16.

118.  *Id.* at 16, 23–24 (citing Jefferson Par. Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 21 (1984) ("holding that tying arrangements [like block booking] are presumed to be *per se* illegal only in certain factual circumstances, including where the defendant had market power and where the tie foreclosed competitors from the tied market")).

119.  Motion for Terminating Judgments, *supra* note 6, at 24.

stress the importance of the *per se* ban on block booking under modern antitrust law and the innovations in technology.[120]

The DOJ continues to group block booking with other licensing practices, like resale-price maintenance and circuit dealing, when discussing how restraints to "intrabrand" competition may be beneficial such that they should be analyzed under the rule of reason.[121] However, the government gives examples of how each licensing practice, except for block booking, may be beneficial to inter-brand competition and new market entrants.[122]

### 3. Third-Party Comments

Although the antitrust "[d]ivision received over eighty comments. . . . argu[ing] that some or all of the licensing restraints contained in the Decrees should be maintained," the government believed that "not one comment identifies any ground to conclude that–absent the Decrees–Defendants would collude to re-impose uniform distribution and licensing schemes on movie theatres."[123]

The comments opposing terminating some or all of the Decrees' provisions "came from individuals, movie theatre trade groups–NATO, and the ICA, regional movie theatre chains . . . single theatres . . . and other trade groups."[124] The National Association of Theatre Owners (NATO) is the largest movie theater trade association in the United States, representing more than 33,000 movie screens from large theater chains to hundreds of independent movie-theater owners.[125] On the other hand, the Independent Cinema Alliance (ICA) "represents theatres that serve small town and rural markets."[126] Both support preserving the prohibition on block booking.[127]

---

120.  *See, e.g.*, United States v. Loew's Inc., 705 F. Supp. 878, 890 (S.D.N.Y. 1988) (noting court decisions that have contradicted government-developed antitrust laws and policies); Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., No. 97 Civ. 5499, 2004 U.S. Dist. LEXIS 5411, at *15 (S.D.N.Y Mar. 30, 2004) (describing block booking as a tying arrangement that is *per se* illegal).

121.  "For example, a film distributor might set minimum movie ticket prices in its theatrical license agreements to eliminate intrabrand price competition between theatres showing the same film at the same time. Eliminating that competition would encourage those theatres to invest in better and more innovative consumer services—better seating, sound and projection systems, more amenities, and lower popcorn and soda prices—and more promotional efforts." Motion for Terminating Judgments, *supra* note 6, at 24–25.

122.  *See id.* at 25–26.

123.  *Id.* at 5.

124.  *Id.* at 29 (footnote omitted).

125.  *Id.* at 29 n.23.

126.  *Id.*

127.  *Id.* NATO, however, did "not seek to preserve the vertical integration or other vertical licensing restrictions contained in the Decrees." *Id.*

A large number of the organizations submitting comments on the government's motion "argue[d] that removing the Decrees' *per se* ban on block booking . . . would end the theatre-by-theatre, film-by-film licensing structure that the Decrees mandate, and enhance each individual Defendant's bargaining power in its separate negotiations with theatres and theatre circuits."[128] The DOJ did recognize the "potential disruption" to the film-licensing market by potentially allowing block-booking licensing, so the DOJ "propose[d] . . . a two-year sunset to [the ban on block booking] to provide for a transition period which would allow [film distributors] and movie theatres to adjust their business plans accordingly."[129] However, the government still believes that the Decrees should be terminated since none of the comments could find conclusive evidence that current film distributors would repeat their predecessors' anticompetitive behavior of the 1930s and 40s,[130] nor that any comment could "establish that the current antitrust laws are inadequate to police any such collusion."[131]

## II.  ANALYSIS

The Antitrust Division included a 60-day notice and public comment period, in which the Division received over 80 comments.[132] Many of the comments argue that some or all of the licensing restraints continued in the Decrees should be maintained, but the clearest consensus was that the ban on the licensing practice known as "block booking" should not be overturned.[133]

Under Second Circuit law, the key question for motions to terminate prior decrees is whether the antitrust violations underlying the decrees are

---

128.  *Id.* at 5.

129.  *Id.* at 34.

130.  *Id.* at 5 (citing United States v. International Business Machines Corp., 163 F.3d 737, 741–42 (2d Cir. 1998) (affirming order to terminate consent decree because the antitrust violations underlying the decree were unlikely to reoccur)).

131.  Motion for Terminating Judgments, *supra* note 6, at 30.

132.  *Paramount Consent Decree Review Public Comments 2018*, U.S DEP'T OF JUST., https://www.justice.gov/atr/paramount-consent-decree-review-public-comments-2018#comments (last updated Dec. 20, 2018).

133.  *See, e.g.*, A TRIP TO THE MOVIES, COMMENTS REGARDING THE POSSIBLE NULLIFICATION OF THE PARAMOUNT DECREES 3 (2018), https://www.justice.gov/atr/page/file/1102366/download (opining that consumers and regional chains will pay a hefty price if the Decrees are overturned); *see also* E-mail from New Vision Theatres to Dep't of Just. (Oct. 1, 2018), https://www.justice.gov/atr/page/file/1102511/download (commenting that "[a]llowing studios to own and operate movie theaters will stress our financial model even beyond the increasing share of the box office revenues the studios demand today . . . .")

likely or unlikely to reoccur absent the existence consent decrees.[134] This Part outlines what the practice of block booking is, why it constitutes an illegal tying arrangement that violates the Sherman Antitrust Act, and why the anticompetitive practice is likely to reoccur to the detriment of the public's interest. While the *Paramount* Decrees include numerous other provisions like a *per se* ban on resale-price maintenance and a prohibition on circuit dealing[135] that commenters also argue should be continued, this Article will only focus on the ban on block booking.

## A.    History of Block Booking

The Supreme Court defined block booking as "the practice of licensing, or offering for license, one feature or group of features on condition that the exhibitor will also license another feature or group of features released by the distributors during a given period."[136] In layman's terms, block booking allowed a studio to "sell its films in packages on an all-or-nothing basis— usually requiring theaters to buy several mediocre pictures for every desirable one."[137] In legal terms, block booking operated as a type of tying arrangement.[138] A tying arrangement is defined by the Supreme Court "as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different, (or tied) product . . . ."[139]

In 1942, the Society of Independent Motion Picture Producers wrote an open letter that described the practice of block booking as "the root of all evil in the motion picture industry."[140] Block booking has been credited to "Adolph Zukor, the studio pioneer who transformed Paramount into Hollywood's first vertically-integrated movie company . . . ."[141] By selling the films in packages, Zukor realized that "a movie theater that wanted one of his A-pictures could be forced to buy several inferior B-pictures."[142] "Most

---

134.   *See* United States v. Int'l Bus. Mach. Corp., 163 F.3d 737, 742 (2d Cir. 1998) (affirming the district court's finding that the salient issue was whether the defendant would use market power to create a tying agreement).

135.   The circuit dealing provisions required that "films be licensed on a theatre-by-theatre basis, and prohibit licensing on a circuit-wide basis." Motion for Terminating Judgments, *supra* note 6, at 34.

136.   United States v. Paramount Pictures Inc., 334 U.S. 131, 156 (1948).

137.   J.A. Aberdeen, *Block Booking: "The Root of All Evil in the Motion Picture Industry"*, COBBLESTONE ENTERTAINMENT (2005), https://www.cobbles.com/simpp_archive/blockbook_intro.htm.

138.   Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., No. 97 CIV.5499, 2000 WL 264295, at *14 (S.D.N.Y. Mar. 9, 2000); *see also* Fields Productions, Inc. v. United Artists Corp., 318 F. Supp. 87, 88 (S.D.N.Y. 1969) (describing block booking as a type of tying agreement).

139.   N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5 (1958).

140.   Aberdeen, *supra* note 137.

141.   *Id.*

142.   *Id.*

*Vermont Law Review*                    [Vol. 45:227

film blocks contained about 20 or more features, but some theaters complained that in the most extreme cases one block had predetermined the playbill for an entire year . . . ."[143] For some "theater owners it was all or nothing—and those that couldn't afford 20 or more movies at one time had to opt for nothing," while others were "compelled to show three or four pictures" which theater owners could not "truthfully recommend for the sake of one good feature which [the owners would] present with no sense of apology."[144] This practice helped guarantee a market for a studio's B-pictures.[145]

The practice of block booking was especially problematic for independent movie producers for a variety of reasons. First, it "made it difficult for the independents to get their own movies into theaters when exhibitors had already purchased a block of films that would provide the theater with plenty of movies."[146] Critics "believed that block booking encouraged slack filmmaking by forcing inferior films on the theaters and the moviegoers."[147] Even independent producers were disgruntled with the practice, since their practice was to "distinguish[] their films by quality rather than volume . . . ."[148] However, the producers were in no position of bargaining power, since vertically integrated companies dominated the industry, so they had to accept that their films would be "fettered by the pre-packaged studio deadweight."[149]

Absent block booking, film distributors must license their films individually on their own merits. However, "[n]umerous commenters [to the DOJ's motion] argue that removing the Decrees' *per se* ban on block booking and circuit dealing would end the theatre-by-theatre, film-by-film licensing structure that the Decrees mandate, and enhance each individual Defendant's bargaining power in its separate negotiations with theatres and theatre circuits."[150]

---

143. *Id.*

144. Erin Blakemore, *The Hollywood Extortion Racket that Gave Us Today's Summer Blockbusters*, HISTORY (Sept. 1, 2018), https://www.history.com/news/the-hollywood-extortion-racket-that-gave-us-todays-summer-blockbusters.

145. Aberdeen, *supra* note 137.

146. *Id.* "[E]ven worse, since the independent released their films through the studio-owned exchanges, the independents found that their films were being used by the Hollywood distributors to pawn off low-budget studio B-pictures." *Id.*

147. *Id.*

148. *Id.*

149. *Id.*

150. Motion for Terminating Judgments, *supra* note 6, at 5.

### B.    Block Booking as an Illegal Tying Arrangement

The Supreme Court defines a tying arrangement as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier."[151] It is "a device used by a seller with market power in one product market to extend its market power to a distinct product market."[152] Tying arrangements are found to be anticompetitive on the theory that "if the seller has market power over the tying product, the seller can leverage this market power through tying arrangements to exclude other sellers of the tied product."[153] In other words, tying is "prohibited where a seller 'exploits,' 'controls,' 'forces,' or 'coerces' a buyer of a tying product into purchasing a tied product."[154] The injury that results from tying arrangements "is reduced competition in the market for the tied product."[155]

The antitrust doctrines governing tying arrangements have evolved over time. The general trend is that enforcement was strict early on but has relaxed over the years. Earlier antitrust decisions by the Supreme Court regarding tying arrangements held that the arrangements "serve hardly any purpose beyond the suppression of competition."[156] This assumption was later rejected in cases involving unpatented tying products.[157] Over time, the Supreme Court's "strong disapproval of tying arrangements has substantially diminished" and the Supreme Court now requires "a showing of market

---

151.  Eastman Kodak Co. v. Image Tech. Servs., 504 U.S. 451, 461–62 (1992) (quoting N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5–6 (1958)).

152.  Rick-Mik Enters., Inc. v. Equilon Enters., LLC, 532 F.3d 966, 971 (9th Cir. 2008) (quoting Cascade Health Sols. v. PeaceHealth, 515 F.3d 883, 912 (9th Cir. 2008)).

153.  *Id.*

154.  *Id.*; *see, e.g.*, Jefferson Par. Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12 (1984) ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."), *abrogated on other grounds by* Illinois Tool Works Inc. v. Indep. Ink, Inc. 547 U.S. 28 (2006).

155.  *Rick-Mik Enters.*, 532 F.3d at 971; *see also Jefferson Par. Hosp. Dist. No. 2*, 446 U.S. at 12 ("When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.").

156.  Standard Oil Co. of Cal. and Standard Stations v. United States, 337 U.S. 293, 305–06 (1949).

157.  *See Jefferson Par. Hosp. Dist. No. 2*, 466 U.S. at 11–12 (discussing the attractiveness of bundling for consumers); United States Steel Corp. v. Fortner Enters., Inc., 429 U.S. 610, 610 (1977) (holding "[w]here the record merely shows that the credit forms [of the tying product] are unique because the seller was willing to accept a lesser profit—or to incur greater risks—than its competitors, such uniqueness does not give rise to any inference of economic power in the credit market.").

power in the tying product" as opposed to "relying on assumptions . . . ."[158] The Court's change in perspective has resulted in the jurisprudence moving away from treating tying arrangements as a *per se* antitrust violation[159] towards adding a market-power threshold to prove that a tying arrangement is anticompetitive and violates antitrust laws.[160]

In order for a tying arrangement to be a *per se* antitrust violation, the plaintiff must prove:

> (1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a "not insubstantial volume of commerce" in the tied product market.[161]

The three elements are clear. First, there must be two distinct products. Second, the defendant must possess enough economic power in the tying product to force their customers into purchasing the tied product; in other words, the defendant must have market power in the tying product. Finally, the result of the tying arrangement must have some effect that is "not insubstantial" in the tied product market.

The Supreme Court recently reiterated, "the justification for the challenge [against tying arrangements] rested on either an assumption or a showing that the defendant's position of power in the market for the tying product was being used to restrain competition in the market for the tied

---

158.  *Illinois Tool Works Inc.*, 547 U.S. at 35.

159.  *See* N. Pac. Ry. Co. v. United States, 356 U.S. 1, 6 (1958) (holding that evidence of a tying arrangement is evidence of market power); United States v. Paramount Pictures, Inc., 334 U.S. 131, 143 (1948) (holding that block booking is a *per se* violation); Int'l Salt Co. v. United States, 332 U.S. 392, 396, 398 (1947) (holding that tying arrangements are a clear restraint and thus a *per se* violation while rejecting plaintiff's quality control rationale).

160.  See for example Eastman Kodak Co. v. Image Tech. Servs., 504 U.S. 451, 486–504 (1992) (Scalia, J. dissenting), where Justice Scalia's critique of the majority for treating tying arrangement as a *per se* violation and not taking into account a participant's market power foreshadows the Court's later shift away from treating all tying arrangements as *per se* illegal; *Jefferson Par. Hosp. Dist. No. 2,* 466 U.S. at 18 where the *Jefferson* Court's analysis of whether there is an illegal tying arrangement turns on whether "[the] petitioners are selling two separate products that may be tied together, and, if so, whether they have used their market power to force their patients to accept the tying arrangement." *See also* Illinois Tool Works Inc. v. Indep. Ink, Inc. 547 U.S. 28, 28 (2006) (holding that a patent does not create a presumption of market power in the tying product); United States v. Microsoft Corp., 253 F.3d 34, 81 (D.C. Cir. 2001) (holding that tying arrangements should be analyzed under the Rule of Reason and not *per se* violations).

161.  Rick-Mik Enters., Inc. v. Equilon Enters., LLC, 532 F.3d 966, 971 (9th Cir. 2008) (quoting Cascade Health Sols. v. PeaceHealth, 515 F.3d 883, 913 (9th Cir. 2008)).

product."[162] Thus, one of the most important elements "in all cases involving a tying arrangement, [is that] the plaintiff must prove that the defendant has market power in the tying product."[163] This requirement overturned the Supreme Court's precedent of an automatic presumption of market power in intellectual property products, like patents or copyrights.[164]

After analyzing block booking as a potential tying arrangement under the modern trend of tying-arrangement case law,[165] it becomes clear that the practice meets all three elements to constitute an illegal tying arrangement under current antitrust law.

### 1.    Two Distinct Products

The first element a plaintiff has to prove is "that the defendant tied together the sale of two distinct products or services . . . ."[166] A seller must condition "the sale of one product (the tying product) . . . on the purchase of a separate product (the tied product)."[167] The distinct product element "requires that the alleged tying product and tied product be separate, *i.e.*, they must exist in separate and distinct product markets."[168] The basic rationale is that "if there is no separate market for the allegedly tied product, there can be no fear of leveraging a monopoly in one market to harm competition in a second market."[169] In that scenario, no second market would exist. The test becomes that "no tying arrangement can exist unless there is a sufficient

---

162.  *Illinois Tool Works Inc.*, 547 U.S. at 34.

163.  *Id.* at 46.

164.  *See, e.g.*, *id.* at 35 ("[T]ying arrangements serve hardly any purpose beyond the suppression of competition.") (quoting Standard Oil Co. of Cal. and Standard Stations v. United States, 337 U.S. 293, 305 (1949)).

165.  Although this part analyzes block booking outside of a *per se* violation, federal courts have emphasized the importance of other *per se* violations in terms of preventing anticompetitive behavior. *See, e.g.*, United States v. Loew's Inc., 705 F. Supp. 878, 890 (S.D.N.Y. 1988) (highlighting the importance of the *per se* ban in context of new technologies like VCR and cable television networks); *see also* Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., No. 97 Civ. 5499, 2004 U.S. Dist. LEXIS 5411, at *15 (S.D.N.Y Mar. 30, 2004) (holding block booking of the type described by the *Paramount* court is *per se* illegal).

166.  *Rick-Mik Enters.*, 532 F.3d at 971 (quoting *Cascade Health Sols.*, 515 F.3d at 913).

167.  Kaufman v. Time Warner, 836 F.3d 137, 141 (2d Cir. 2016) (citing E & L Consulting, Ltd. v. Doman Indus. Ltd., 472 F.3d 23, 31 (2d Cir. 2006)).

168.  *Id.*; *see also* Jefferson Par. Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 19–24 (1984) (finding separate product markets in part because the evidence showed that anesthesiologists were more akin to office-based physicians than radiologists and other hospital-based physicians); Eastman Kodak Co. v. Image Tech. Servs., 504 U.S. 451, 462–63 (1992) (finding separate and distinct product markets existed because two products had "been sold separately in the past and still [were] sold separately to self-service equipment owners.").

169.  *Kaufman*, 836 F.3d at 142.

demand for the purchase of [the tied product] separate from [the tying product] to identify a distinct product market in which it is efficient to offer [the former] separately from [the latter]."[170] Courts have found relevant evidence of separate and distinct consumer demand for the tying product and the tied product to include "the history of the products being, or not being sold separately"[171] and "the sale of the products separately in similar markets."[172]

In the case of block-booking licensing, the distinct products are the different films that are bundled together. The practice of "[b]lock-booking prevents competitors from bidding for single features on their individual merits."[173] Each film is a distinct product with its own individual copyright protection. The tying product in the context of block booking would be an A-list film or an upcoming blockbuster, while the tied product would be a B-list film or less anticipated feature.[174] In most cases, the A-list film would be bundled, or tied, with a group of B-list films. The Supreme Court in *Paramount* found the different films to be separate products, emphasizing that when "a high quality film greatly desired is licensed only if an inferior one is taken, the latter borrows quality from the former and strengthens its monopoly by drawing on the other."[175]

The first piece of evidence that the different films are distinct products is that films have a "history" of being sold separately. There is clear evidence that since the 1940s, the theatrical film market has been licensing movies on a film-by-film, theater-by-theater basis.[176] The fact of a nearly 80-year history of the products being sold separately, not including the years before the block-booking practices of the 1930s and 40s, is strong evidence that each film is a distinct product.[177]

The second piece of evidence that courts may consider is if the products are sold separately in similar markets. Determining whether the markets are similar would require investigating how films are licensed and distributed to the public after their theatrical release. In every situation, outside of a franchise box set, movies are sold on a film-by-film basis, including how

---

170. *Jefferson Par. Hosp. Dist. No. 2.*, 466 U.S. at 21–22.

171. *Kaufman*, 836 F.3d at 142 (citing *Eastman Kodak Co.*, 504 U.S. at 462).

172. *Id.* (citing United States v. Microsoft Corp., 253 F.3d 34, 87–88 (D.C. Cir. 2001).

173. United States v. Paramount Pictures, Inc., 334 U.S. 131, 156–57 (1948).

174. *See id.* at 156 (defining the practice of block booking).

175. *Id.* at 158.

176. Motion for Terminating Judgments, *supra* note 6, at 28.

177. *See id.* ("For over seventy years, the *Paramount* Decrees have required Defendants to license their films on a film-by-film, theatre-by-theatre basis.").

they are licensed to streaming services,[178] available for digital purchase or download,[179] or sold as DVDs.[180] Furthermore, even movies that are sold in box sets, usually being successful franchises, are also available as individual films.[181] Since films are licensed and sold individually in other markets similar to the theatrical market, all evidence supports a finding that each film is a distinct product.

## 2.    Economic Power in the Tying Product

Whether a defendant has economic power in the tying product is usually the most contentiously litigated aspect of tying arrangements in modern cases. Most of the debate involves defining what the relevant market is for the tying and tied product. Since different market definitions would be advanced by different parties to suit their individual interests,[182] this analysis requires further inquiry than the other two factors. For this Part, only the legal standards are discussed, but Part II.C.1 discusses the application of these standards in depth by analyzing the different possible market definitions and their ramifications. However, it is clear "that certain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable

---

178.  *See* Kasey Moore, *What's Coming to Netflix in August 2020*, WHAT'S ON NETFLIX (Aug. 21, 2020), https://www.whats-on-netflix.com/coming-soon/whats-coming-to-netflix-in-august-2020-08-02/ (listing the various shows and films from different production companies that will begin streaming on Netflix in August 2020).

179.  *See, e.g.*, *The Greatest Showman*, AMAZON, https://www.amazon.com/Greatest-Showman-Hugh-Jackman/dp/B078HF8KHB/ref=sr_1_2?dchild=1&keywords=digital+download+movies&qid=1589231 171&sr=8-2 (last visited Dec. 13, 2020) (providing the option to digitally purchase or download *The Greatest Showman*).

180.  *See, e.g.*, *Harry Potter and the Sorcerer's Stone (2-Disc Special Edition) (Blu-ray)*, TARGET [hereinafter *Harry Potter 2-Disc Special*], https://www.target.com/p/harry-potter-and-the-sorcerer-s-stone-2-disc-special-edition-blu-ray/-/A-51333666 (last visited Dec. 13, 2020) (selling individual movies in the Harry Potter series).

181.  *Compare Harry Potter: Complete 8-Film Collection (8 Discs) (DVD)*, TARGET, https://www.target.com/p/harry-potter-complete-8-film-collection-8-discs-dvd/-/A-13810603#lnk=sametab (last visited Dec. 13, 2020) (selling the entire Harry Potter series as a set), *with Harry Potter and the Sorcerer's Stone/Chamber of Secrets DBF (DVD)*, TARGET, https://www.target.com/p/harry-potter-and-the-sorcerer-s-stone-chamber-of-secrets-dbf-dvd/-/A-53580698 (last visited Dec. 13, 2020) (selling the first and second movie in the Harry Potter series as a bundle); *Harry Potter 2-Disc Special, supra* note 180 (selling an individual movie in the Harry Potter series).

182.  For example, a defendant may want to define the market as broadly as possible so their share of the market would appear minimum in comparison to a large potential market and thus not meet the market threshold to constitute an antitrust violation. *See* United States v. E. I. Du Pont De Nemours & Co., 353 U.S. 586, 593 (1957) (stating that determining the bounds of the market is the first step in identifying an antitrust violation).

'*per se*.'"[183] The risk is that there is "substantial potential for impact on competition that occurs when a seller's dominant position in a tying product market is used as leverage to force the sale of tied products."[184] Although the major studios "are making fewer films, these movies still represent the vast majority of the annual domestic box office, granting major studios significant leverage over exhibitors."[185]

In the context of antitrust claims, "sufficient economic power in the tying product market" enables a seller "to coerce buyer acceptance of the tied product . . . ."[186] This economic, or market power, over the tying product can be determined to be "sufficient" even when "the seller does not dominate the market or the seller only exercises the power with respect to some of the buyers in the market."[187] Further, "[e]conomic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes."[188] Relevant determinants of market power include: "its absolute and relative market shares, and those of competing firms; the strength and capacity of current competitors; the potential for entry; the historic intensity of competition; and the impact of the legal or natural environment."[189] Among these factors, "[m]arket share remains the primary factor for measuring actual or potential market power."[190]

3.    Arrangement Affects a "Not Insubstantial" Volume of Commerce in Tied Market

The third element of an illegal tying arrangement is "that the tying arrangement affects a 'not insubstantial volume of commerce' in the tied

---

183.  Jefferson Par. Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 9 (1984).

184.  Cablevision Sys. Corp. v. Viacom Int'l Inc., No. 13 Civ. 1278, 2014 U.S. Dist. LEXIS 84498, *4 (S.D.N.Y. June 20, 2014) (internal citation omitted).

185.  NATO, COMMENTS ON DOJ'S REVIEW OF PARAMOUNT DECREES, *supra* note 28, at 5. "Despite a 23% decrease in films produced by major studios and their subsidiaries from 2008 to 2017, produced by major studios and their subsidiaries from 2008 to 2017, the studios' films represented over 80% of the domestic box office. Indeed, the top 25 films in 2017 accounted for 54% of the domestic box office, with the top five alone accounting for 19%." *Id.* n.21.

186.  Tic-X-Press, Inc. v. Omni Promotions Co. of Ga., 815 F.2d 1407, 1414 (11th Cir. 1987).

187.  *Id.* at 1420.

188.  *Id.*

189.  U.S. Anchor Mfg., Inc. v. Rule Indus., 7 F.3d 986, 994 (11th Cir. 1993) (quoting International Tel. & Tel. Corp., 104 F.T.C. 208, 412 (1984)).

190.  RxStrategies, Inc. v. CVS Pharmacy, Inc., No. 8:18-cv-1087-T-30TGW, 2019 WL 7584729 at *2–3 (M.D. Fla. Dec. 4, 2019) (holding that "30% or greater market share in many local geographic markets" along with other market definitions sufficient to allege market power in the defined geographic market to withstand motion to dismiss).

product market."[191] The plaintiff must prove that the tying arrangement "impairs competition in the tied market and forecloses a substantial volume of commerce in that market."[192] Even if the plaintiff proves market power in the tying market, the plaintiff would still have to prove that the tying arrangement had a substantial impact on the competitors in the tied market.[193]

This factor is harder to apply in the context of block booking in this Article because there are no past facts of the tying arrangement to rely upon. Since this is a predictive look at what could happen, inferences must be made to reach a conclusion on this element. Analyzing what happened to the theatrical film industry before the *per se* ban on block booking is the first step. In the 1930s and 40s, as a result of block-booking licensing and their horizontal conspiracy, the major motion-picture distributors "controlled 70 percent of national box office receipts."[194] Movie theaters were forced to buy large blocks of movies due to the major distributors' market power, which "made it difficult for the independent[] [film distributors] to get their own movies into theaters when exhibitors had already purchased a block of films that would provide the theater with plenty of movies."[195] Forcing theaters to accept licensing agreements they would not otherwise agree to if given the opportunity to license each film individually, in addition to blocking out competition from independent and smaller distributors, constitutes a not insubstantial amount of effected commerce. In addition, the practice allowed the major distributors to use their market power to raise the barrier to entry to an impossible level, by using up all of a movie theater's screens with their secondary films.[196]

Using the past results of block booking, it becomes possible to predict what potential effects block booking would have if used in the modern theatrical film market. First, compare the state of the market in the 1930s and 40s to the modern market. Before the *Paramount* decrees, eight major film distributors controlled 70% of the domestic box office.[197] In comparison in 2019, it took only four distributors—Walt Disney, Warner Bros., Sony

---

191.  Rick-Mik Enters., Inc. v. Equilon Enters., LLC, 532 F.3d 966, 971 (9th Cir. 2008) (quoting Cascade Health Sols. v. PeaceHealth, 515 F.3d 883, 913 (9th Cir. 2008)).

192.  Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp., 880 F.2d 1514, 1517 (2d Cir. 1989).

193.  *See* 305 E. 24th Owners Corp. v. Parman Co., 714 F. Supp. 1296, 1308 (S.D.N.Y. 1989) (outlining the test used by the Second Circuit when determining an illegal tying arrangement).

194.  Motion for Terminating Judgments, *supra* note 6, at 9.

195.  Aberdeen, *supra* note 137.

196.  *Id.*

197.  *See* Motion for Terminating Judgments *supra* note 6, at 9

Pictures, and Universal—to control 70.70% of the domestic box office.[198] Likewise, in 2018 the same four distributors controlled 68.39% of the market[199] and 63.65% of the market in 2017.[200] These market shares are eerily similar to the market shares that *eight* film distributors used to leverage their block-booking licensing to stifle competition. With the inclusion of 20th Century Fox—a distributor recently acquired by Disney—those market shares would increase to 75.15%, 77.52%, and 75.71% in 2019, 2018, and 2017 respectively.[201] Including the next tier of distributors, Lionsgate and Paramount Pictures, the market shares increase to 87.25%, 86.91%, and 88.50% respectively the past three years[202] with only seven distributors (six if you consider 20th Century Fox and Walt Disney the same entity) compared to the eight distributors that controlled 70% of the market in the late 1930s

---

198. *Market Share for Each Distributor in 2019*, THE NUMBERS [hereinafter *Market Share for Each Distributor in 2019*], https://www.the-numbers.com/market/2019/distributors (last visited Dec. 13, 2020) (reporting that Walt Disney controlled 33.25%, Warner Bros. 13.95%, Sony Pictures 11.92%, and Universal 11.58% of that years total box office). In 2019, 20th Century Fox, subsidiary of Disney, held 4.37% of the market. *Id.* If included, the total market share increases to 75.15%, or three-quarters of the market. *Id.*

199. *Market Share for Each Distributor in 2018*, THE NUMBERS [hereinafter *Market Share for Each Distributor in 2018*], https://www.the-numbers.com/market/2018/distributors (last visited Dec. 13, 2020) (reporting that Walt Disney controlled 26.24%, Warner Bros. 16.18%, Sony Pictures 14.80%, and Universal 11.17% of that year's box office). 20th Century Fox controlled 9.13%, if included the total market share would increase from 68.39% to 77.52%.

200. *Market Share for Each Distributor in 2017*, THE NUMBERS [hereinafter *Market Share for Each Distributor in 2017*], https://www.the-numbers.com/market/2017/distributors (last visited Dec. 13, 2020) (noting that Walt Disney controlled 21.74%, Warner Bros. 18.51%, Sony Pictures 9.63%%, and Universal 13.77% of that year's box office). 20th Century Fox controlled 12.06%, if included the total market share would increase from 63.65% to 75.71%. *See also Our Businesses*, THE WALT DISNEY STUDIOS [hereinafter WALT DISNEY STUDIOS, *Our Businesses*], https://www.waltdisneystudios.com/our-businesses/ (last visited Dec. 13, 2020) (describing the composition of Walt Disney Studios to include 20th Century Studios). Upon Disney's acquisition of 20th Century Fox, the company changed the studio's name to 20th Century Studios. Adam B. Vary, *Disney Drops Fox Name, Will Rebrand as 20th Century Studios, Searchlight Pictures*, VARIETY (Jan. 17, 2020), https://variety.com/2020/film/news/disney-dropping-fox-20th-century-studios-1203470349/.

201. *See supra* notes 198–200 (adding the market share of 20th Century Fox to prior totals).

202. In 2019, Lionsgate held 7.09% and Paramount Pictures held 5.01% of the market, when added to the shares of the five other major distributors, the total market share would increase to 87.25%. *Market Share for Each Distributor in 2019*, *supra* note 198. In 2018, Lionsgate held 2.95% and Paramount Pictures held 6.44% of the market, bringing the total market share to 86.91%. *Market Share for Each Distributor in 2018*, *supra* note 199. In 2017, Lionsgate held 8.01% and Paramount Pictures 4.78%, which would make the total market share 88.50%. *Market Share for Each Distributor in 2017*, *supra* note 200.

and early 40s. In fact, these seven distributors have over roughly 81.56% of the domestic box office since 1995.[203]

It is the first step to have the influence in the theatrical film market, the next question is whether these major four to seven distributors would use block booking in an anticompetitive manner that would affect a "not insubstantial amount" of the commerce in the market. For this inquiry, it is insightful to analyze the distributors' current licensing practices, and the extent to which block booking could enhance their bargaining power to compel movie theaters to accept unreasonable demands and raise the barrier to entry in the market.

A quick analysis of some of the licensing terms Disney attached to its film *Star Wars: The Last Jedi* provides a starting point. First, Disney would receive 65% of the box-office revenue for *every week* the film played, and an additional 5% in the first four weeks if the theater did not show the film in the theater's largest auditorium or if the theater dropped showtimes from its schedule during that time period.[204] This 5% penalty was to ensure that *The Last Jedi* prevents another blockbuster from taking the largest auditorium and to ensure that as many screens as possible were dedicated to the film, even if the film will "burn[] through [its] release . . . in three weeks."[205] Disney is able to push the percentage far past the industry norm of 50–60%, because almost every one of their films is considered a must-license blockbuster.[206] As a result, theaters would not try to negotiate terms for the next movie below the 50–60% norm out of fear of losing the chance to license the film.[207] One thing Disney could do with block booking, however, is raise its asking price for all movies equal to its highest blockbuster, and license all the movies under the same terms under one agreement. This would mean that Disney

---

203. From 1995–2020, the top seven distributors have controlled respectively— Disney (16.93%), Warner Bros. (15.20%), Sony Pictures (12.27%), Universal (11.72%), 20th Century Fox (11.03%), Paramount Pictures (10.34%), Lionsgate (4.07%), of the total market, which result in a combined market share of 81.56%. *Market Share for Each Distributor 1995–2020*, THE NUMBERS [hereinafter *Market Share for Each Distributor 1995–2020*], https://www.the-numbers.com/market/distributors (last visited Dec. 13, 2020)

204. J. Sperling Reich, *Why Disney Can Demand 65% of Box Office for "Star Wars: Last Jedi,"* CELLULOID JUNKIE (Nov. 4, 2017), https://celluloidjunkie.com/2017/11/04/disney-can-demand-65-box-office-star-wars-last-jedi/.

205. *Id.*

206. To illustrate, in 2017, seven out of twelve Disney films were in the top 21 grossing films. *Domestic Box Office for 2017*, BOX OFFICE MOJO [hereinafter, *Domestic Box Office for 2017 Yearly*], https://www.boxofficemojo.com/year/2017/?grossesOption=calendarGrosses (last visited Dec. 13, 2020). And in 2018, another six out of thirteen Disney films were in the top 18 grossing films. *Domestic Box Office for 2018*, BOX OFFICE MOJO [hereinafter *Domestic Box Office for 2018 Yearly*], https://www.boxofficemojo.com/year/2018/?grossesOption=calendarGrosses (last visited Dec. 13, 2020).

207. *Id.*

could use its most favorable terms from its *Star Wars* film and apply it to its not-as-sought-after films like *Cars 3*.[208]

If other film distributors push for terms like a 65% share, "theatre owners would push for 45% film rental levels on [later films]."[209] Since block booking is currently illegal, distributors need to be careful how they negotiate, since theaters will remember for the next time they return to the negotiating table.[210] Theaters may even be able to reject showing a B-list movie from Universal, if Universal pushed too hard for favorable terms on their last blockbuster, and the theater believes it can fill its screens with a combination of other blockbusters, B-list movies, and independent films. Block booking would allow distributors like Universal or Warner Bros. to negotiate for these high-level deals using their premier movie of the year and force theaters to accept those terms for the rest of the distributors' films that year. In this scenario, the movie theater could not practically turn down the offer, or else it would forfeit large amounts of profits from a distributor that averages yearly between 10–20% of the domestic box office.[211]

In addition to higher percentages and adding to the number of screens where less-popular films will be shown on upon their release, another tactic the distributors could use is to demand longer showing periods for the tied films. For example, Disney's *Avengers: Endgame*, released in April of 2019, was on over 4,000 screens during its first four weeks and over 3,000 screens in its fifth and sixth weeks,[212] while Disney's *Dumbo*, released one month prior in March of 2019, was on just over 4,000 screens for its first two weeks, over 3,000 screens in its third and fourth weeks, over 2,000 screens in its fifth week, and only over 1,000 screens in its sixth week.[213] If Disney tied *Dumbo* to *Avengers: Endgame*, they could demand that *Dumbo* be shown for at least four, five, or even six weeks for every theater that wants to license *Avengers: Endgame*, increasing the number of screens *Dumbo* will occupy to match the much higher number of screens that *Avengers: Endgame* could demand. In

---

208.  Compare *Star Wars* which earned over $1.3 billion in worldwide box office sales, *Star Wars Ep. VIII: The Last Jedi (2017)*, THE NUMBERS, https://www.the-numbers.com/movie/Star-Wars-Ep-VIII-The-Last-Jedi#tab=summary (last visited Dec. 13, 2020), with *Cars 3* which did not have nearly as an outstanding figure, earning just over $383 million worldwide. *Cars 3 (2017)*, THE NUMBERS, https://www.the-numbers.com/movie/Cars-3#tab=summary (last visited Dec. 13, 2020).

209.  Reich, *supra* note 204.

210.  *Id.*

211.  With Warner Bros. holding 15.20% and Universal holding 11.72% of all domestic box office earning between 1995 and 2020. *Market Share 1995–2020*, *supra* note 203.

212.  *Avengers: Endgame*, BOX OFFICE MOJO, https://www.boxofficemojo.com/release/rl3059975681/weekly/?ref_=bo_rl_tab#tabs (last visited Dec. 13, 2020).

213.  *Dumbo*, BOX OFFICE MOJO, https://www.boxofficemojo.com/release/rl2675869185/weekly/?ref_=bo_rl_tab#tabs (last visited Dec. 13, 2020).

this hypothetical, Disney could easily police these terms since *Dumbo* was released before *Avengers: Endgame*, and Disney could refuse to distribute *Avengers: Endgame* to any theater that violates the contractual terms. This type of agreement would keep less meritorious films in theaters longer than a competitive market would dictate, and would place the theaters in a position where they are showing a film that is no longer profitable in order to be able to show an upcoming profitable blockbuster. The extra thousands of screens that *Dumbo* would have to be shown upon would each be an opportunity taken away from another major distributor or independent film producer that would have shown their film on that screen currently in a competitive market free of block booking.

In this all-or-nothing scenario, theaters are interested in the top blockbuster movies and could be forced to fill their screens with less desirable films or extend a film's showing for longer than it is profitable for the theater. This activity not only hurts the theaters, but it creates impossibly high barriers to entry for smaller distributors and independent films when all of a theater's screens are being filled to accommodate a larger distributor's anticompetitive demands. As a result, block booking would affect a not insubstantial volume of commerce in the tied product market.

### C.   *Potential Problems with Judicial Review of Block Booking*

The Department of Justice believes that "[a]bsent the Decrees, the Sherman Act would continue to provide effective deterrence against any industry-wide attempts to reestablish a cartel to monopolize the film distribution and exhibition markets."[214] Since the film industry would remain subject to liability under the current antitrust laws, the government believes that the courts will be able to discern the difference between the "vertical restrictions [that] can be benign or even beneficial to competition" and the vertical restrictions that will be anticompetitive and restrain trade.[215] Assistant Attorney General Makan Delrahim has stated that "the [antitrust] Division will review the vertical practices initially prohibited by the Paramount decrees using the rule of reason . . . . If credible evidence shows a practice harms consumer welfare, antitrust enforcers remain ready to act."[216]

---

214.   Motion for Terminating Judgments, *supra* note 6, at 17.

215.   *See id.* at 16–17 ("Under current Supreme Court precedent, a court today would judge that same conduct pursuant to the fact-specific rule of reason.").

216.   Weprin, *supra* note 80.

The issue with the DOJ relying upon the courts to implement a rule-of-reason review for block booking is the fact intensive rule-of-reason analysis in the case of block booking presents a realistic probability for problematic rulings. As discussed briefly above in Part II.B.3 and further in this Part, if block-booking licensing were to become a common practice, the anticompetitive effects and higher barriers of entry would be harmful to the theatrical film industry and downstream movie-theater patrons. However, clever legal arguments, including manipulating the market definition to lessen their appearance of economic power in the tying product, from highly influential and resourceful film distributors could smokescreen the true anticompetitive effects of block bookings, resulting in a rule-of-reason analysis upholding an actual anticompetitive behavior that is harmful to the industry. Distributors could "develop booking obligations that diverge only superficially from those in the *Paramount* case and its progeny."[217] If challenged, major film distributors would instigate "widespread litigation and forum shopping, as parties [would] attempt to redefine the laws and practices that have governed the industry for seventy years."[218] Even if the courts would "be able to prohibit all forms of block booking eventually, many small studios, exhibitors, and consumers would suffer from the uncertainties and expenses of the anti-competitive landscape created by such ambiguities."[219] The ambiguities of the rule of reason would have two detrimental outcomes if applied to block booking: (1) a court may misapply the rule of reason by improperly defining the proper market definition; or (2) drawn out litigation over several years will permanently and detrimentally effect many small or independent studios, exhibitors, and consumers.

### 1.    Market definition

The first problem with judicial review of block booking is defining the relevant market. In order to find an antitrust violation for "a vertical antitrust claim based on a single film," a court would have "to determine whether that film or any film (for that matter) has or could have market power."[220] Even the DOJ recognizes that determining the relevant market "would entail consideration of several factors uncommon to most consumer products."[221] It is not as simple to assert that each individual film is a unique product due

217.  NATO, Comments on DOJ's Review of Paramount Decrees, *supra* note 28, at 18.
218.  *Id.*
219.  *Id.*
220.  Motion for Terminating Judgments, *supra* note 6, at 24 n.21.
221.  *Id.*

to its copyright protection and thus a market in and of itself, because the Southern District of New York, with whom the motion to terminate the Decrees was filed, has repeatedly "rejected the proposition that allegedly unique products, by virtue of customer preference for that product, are 'markets unto themselves.'"[222] The unique product as a "market unto themselves" is the smallest market definition, with the complete market being just the one movie owning 100% of its own market. With this definition rejected by the courts, film distributors would try to advocate the widest market possible, so that they could not possess the requisite economic power to make block booking an illegal tying arrangement.[223] With each individual film being a part of a larger economic market, the question becomes how large is the proper definition for the market that encompasses the film being licensed to movie theaters?

### i.    Debunking the Theatrical Plus Digital Market Definition

The market definition most prominently supported by the DOJ in their motion to terminate the *Paramount* Decrees, and one most likely to be used by the major film distributors, includes all types of "movie distribution platforms, like television, the Internet and DVDs . . . ."[224] The DOJ cited the "technological and marketplace changes that have transformed the movie industry over the last seventy years"[225] as one of the reasons the Decrees are no longer necessary. The theory is that internet-streaming services like Netflix, or even physical DVDs, did not exist in the 1930s and 40s when the *Paramount* Decrees were decided.[226] In the DOJ's view, the major film distributors were only able to amass market power during the 1930s and 40s because single-run movie theaters were the only way for the public to watch

---

222.  *See, e.g.*, Carell v. Shubert Org., Inc., 104 F. Supp.2d 236, 265 (S.D.N.Y. 2000) (finding that the relevant market should be construed broadly as the market for Broadway shows, not limited to market for specific show *Cats*); *see also* Global Discount Travel Services, LLC v. Trans World Airlines, Inc., 960 F. Supp. 701, 704–05 (S.D.N.Y. 1997) (defining the market as being comprised of more than a single product stating, "[A] consumer [might prefer] . . . Pepsi because she prefers the taste, or NBC because she prefers 'Friends,' 'Seinfeld,' and 'E.R.' . . . but at base, Pepsi is one of many sodas, and NBC is just another television network. Likewise, tickets on TWA are like tickets on any other airline."); Theatre Party Associates, Inc. v. Shubert Organization, Inc., 695 F. Supp. 150, 156 (S.D.N.Y. 1988) (holding that the plaintiff "failed to define a relevant market" and did not show it possessed a "significant market share.").

223.  For example, if the market was defined so ridiculously wide as to include "all forms of entertainment worldwide," a single film distributor could completely monopolize the entire domestic box office without having a major economic impact on the defined market.

224.  Motion for Terminating Judgments, *supra* note 6, at 33.

225.  *Id.* at 3.

226.  *Id.* at 33.

movies.[227] Extending this argument to the modern film industry, the DOJ believes the modern major film distributors could not cause the same types of anticompetitive effects through block booking theatrical film releases that their 1930s and 40s predecessors accomplished in their monopolization efforts.

The DOJ's view of how the markets for the film industry operates is completely misguided. There are different distinct markets for movies that include first-run theatrical markets as well as secondary at-home markets. The two major distinct markets that the industry defines are the Theatrical market and the Home/Mobile Entertainment market.[228] The Motion Picture Association (MPA) defines the Theatrical market as, quite simply, the total box office revenue.[229] The MPA defines the Home/Mobile Entertainment market separately, and even breaks that market into two categories: Physical and Digital.[230] The MPA defines the Physical market to include "sell-through packaged goods, brick and mortar, subscription (physical only), and kiosk," while defining the Digital market to include "electronic sell-through [EST], video on demand [VOD], and subscription streaming [SVOD] . . . ."[231]

In 2019, the Theatrical film market accounted for $11.4 billion, down slightly from a record high $11.9 billion in 2018.[232] Still, the Theatrical market constituted 31% of the total U.S. film market, with the Digital market constituting 56% and the Physical market constituting 13%.[233] The Theatrical market has been steady between $11.1 billion and $11.9 billion since 2015, where consistent increases and decreases have been present in the Home/Mobile Entertainment markets.[234] The Digital markets have increased every year, with increases between $2.5 billion and $3.3 billion, while the Physical market has decreased every year between $1 billion and $1.2 billion.[235] The inverse relationship between the Physical and Digital markets suggests that *these two markets* work as one market, while the Theatrical market acts independently. This intuition is reflected by how the MPA categorizes the Digital and Physical markets together as the defined "Home/Mobile Entertainment" market while keeping the Theatrical market

---

227.  *Id.* at 18.
228.  *See* MPA, THEME REPORT 2019, *supra* note 2, at 1, 9.
229.  *Id.*
230.  *Id.* at 8.
231.  *Id.* at 9 n.4. The MPA borrows the definition for Physical and Digital from the Digital Entertainment Group (DEG) who compiles the entertainment market data. *Id.* (referencing the DEG's definition for the physical and digital market).
232.  *Id.* at 18.
233.  *Id.* at 9.
234.  *Id.*
235.  *Id.*

separate.[236] Treating the Theatrical market separate from the Digital/Physical at home markets also reflects how films are licensed and distributed.

The industry norm is not to license the same movies to movie theaters that distributors license to digital streaming services or offer directly as digital downloads or DVDs. The current business model gives movie theaters "an exclusive 90-day window to show films before they are made available to other distribution channels such as streaming services."[237] Even during the spring of 2020, when the coronavirus caused movie theaters nationwide to shut down, film distributors did not immediately shift theatrical releases of their most anticipated features to streaming services or internet-distribution methods. Highly anticipated films of 2020, like Disney's newest live-action remake, *Mulan*, and the next Marvel installment, *Black Widow*, have had their release dates pushed back to later times.[238] In an interview with CNBC, when asked about skipping theatrical releases in favor of direct to streaming service releases, Disney CEO Bob Chapek stated that Disney still "believe[s] in the theatrical experience, particularly to launch big blockbuster franchise films, [] it fuels the entire Disney company, from consumer products to theme parks all the way to Disney+, and so we really think that's the smart way to launch our big tent-pole films."[239]

When distributors have chosen to push a select number of their films onto streaming services early, it has usually only been to shorten the time of their physical releases (like DVDs). For example, although Disney pushed

236. *Supra* text accompanying notes 228–31.

237. Jonathon Berr, *Movie Theaters Start Losing Exclusive 'Window' from Studios*, FORBES (Mar. 17. 2020), https://www.forbes.com/sites/jonathanberr/2020/03/17/movie-theaters-start-losing-exclusive-window-from-studios/#30a4bc38398c.

238. John Ballard, *Disney Announces New Release Dates for Upcoming Movies*, THE MOTLEY FOOL (Apr. 6, 2020), https://www.fool.com/investing/2020/04/06/disney-announces-new-release-dates-for-upcoming-mo.aspx; *but see* Pamela McClinock, *'Mulan' Heads for Disney+ in the U.S. and Other Select Countries at Premium Price*, THE HOLLYWOOD REPORTER (Aug. 4, 2020), https://www.hollywoodreporter.com/heat-vision/mulan-heads-disney-us-select-countries-at-premium-price-1298688 (noting *Mulan* will be offered in select countries to Disney+ subscribers at an additional premium rental price of $29.99 after moving the theatrical release back multiple times but will still offer the film in theaters in the remaining countries; however, "[i]n a call with investors, Walt Disney Co. CEO Bob Chapek stressed that *Mulan* is a 'one-off . . . as opposed to saying there is some new business windowing model that we are looking at.'").

239. CNBC Television, *Watch CNBC's Full Interview with Disney CEO Bob Chapek*, YOUTUBE, at 7:40–7:59 (May, 11, 2020), https://www.youtube.com/watch?v=t5kFCUqLwQQ.

262                    *Vermont Law Review*                    [Vol. 45:227

their features *Frozen II*[240] and *Onward*[241] onto streaming services early, they did not forgo their theatrical release; they only skipped their earlier physical and digital marketing strategies to move straight to Disney's owned streaming service.[242] Other examples are movies like *The Invisible Man*, *The Hunt*, *Harley Quinn: Bird of Prey*, and *Bloodshot*, which went straight from theaters to digital distribution after the movie theaters shut down.[243]

In fact, a very small minority of movies have skipped their theatrical release in favor of a different mode of distribution. Disney's *Artemis Fowl* is going to forgo its theatrical run in favor of a straight-to-streaming service release.[244] However, the decision to release *Artemis Fowl* on Disney+ is more a result of Disney's anticipation that the movie would not be well received and profitable at the box office.[245] *Artemis Fowl* is regarded as a B-list movie

---

240.  *See* Bruce Haring, *'Frozen 2' Gets an Earlier-Than-Expected Release on Disney+ to Keep the Kids Amused*, DEADLINE (Mar. 13, 2020), https://deadline.com/2020/03/frozen-2-gets-an-earlier-than-expected-release-on-disney-to-keep-the-kids-amused-1202883148/ (noting the release of *Frozen II* on Disney+ was "three months ahead of schedule" on March 15; *see also Frozen II*, BOX OFFICE MOJO (2020), https://www.boxofficemojo.com/release/rl2424210945/ (showing that by the March 15, 2020 release date of Disney+, *Frozen II* was only being shown in 165 theaters, far less than the 4,440 theaters it was being shown in when it was released *four months* earlier).

241.  *See* Matt Patches, *Onward is Now on Disney Plus, Which is Wild When You Think About It*, POLYGON (Apr. 3, 2020), https://www.polygon.com/disney-plus/2020/4/3/21206725/onward-watch-disney-plus-streaming (noting *Onward*'s digital release to VOD platforms like Amazon, VUDU, and Apple on March 20, 2020 and release on Disney+ on April 3, 2020); *Onward*, BOX OFFICE MOJO, https://www.boxofficemojo.com/release/rl3433267713/?ref_=bo_rl_tab#tabs (last visited Dec. 13, 2020) (showing that *Onward*'s last day in theaters was March 19, 2020, the last day before movie theaters shut down due to the coronavirus outbreak).

242.  *See* Patches, *supra* note 240 (comparing Disney's earlier film strategies to those employed with *Onward*, where the company moved the film quickly from theatrical release to Disney+).

243.  Anthony D'Alessandro, *Will 'Trolls World Tour' Profit Off Universal's Experimental VOD (& Drive-In Theater) Model?*, DEADLINE (Apr. 10, 2020), https://deadline.com/2020/04/trolls-world-tour-vod-box-office-movie-profits-universal-coronavirus-1202903913/.

244.  Andrew Liptak, *Disney is Releasing Artemis Fowl Directly to Disney+*, TOR.COM (Apr. 3, 2020), https://www.tor.com/2020/04/03/disney-plus-artemis-fowl-delayed-skipping-theaters-release-streaming-coronavirus-covid-19/?fbclid=IwAR3l_f6m515zc_EOZH9INFOUfzWmyISbtWLA5kFUS2RbIFZZJFgx0SysDAE.

245.  *See, e.g.*, Ben Child, *Evil or Genius – What Has Disney Done to Artemis Fowl?*, THE GUARDIAN (Mar. 5, 2020), https://www.theguardian.com/film/2020/mar/05/evil-or-genius-what-has-disney-done-to-artemis-fowl-eoin-colfer ("Fans of the original books by Eoin Colfer are incensed by the latest film trailer, which seems confused on the hero's morality"); *see also* Craig Elvy, *Disney's Artemis Fowl Movie is Facing Fan Backlash: Here's Why*, SCREENRANT (Mar. 3, 2020), https://screenrant.com/artemis-fowl-disney-movie-story-book-changes-backlash/ ("While it's never wise to write off a film based on its trailer, it's understandable that fans wouldn't be overjoyed by what they've seen of *Artemis Fowl* so far, given that it fundamentally changes both the story and its lead character."); Hoai-Tran Bui, *'Artemis Fowl' Trailer: Book Fans, Prepare to Be Enraged*, SLASHFILM (Mar. 2, 2020), https://www.slashfilm.com/artemis-fowl-trailer-official/ ("Now *Artemis Fowl*, rather than being the antihero arc all us book readers know and love it to be, is . . . a lame superhero movie? . . . It looks cheesy and bad . . .").

in an already crowded upcoming Disney catalog.[246] It is a prime example of a B-list movie that would potentially be tied to other A-list movies in a block-booking deal, because it is the only film in Disney's catalog (which includes Walt Disney Studios, Pixar, Marvel, Twentieth Century Fox, and other studios films) that has skipped its release to theaters while Disney has pushed back the release of their A-list movies like *Jungle Cruise*, *Black Widow*, and *The Eternals*.[247]

Other examples of films forgoing theatrical release are Paramount's *The Lovebirds* and STX's *My Spy*. Both were originally scheduled to release in theaters April 3 and April 17, respectively, and both moved to digital distribution methods when the movie theaters closed.[248] This strategy is the small minority approach, and it is only preferable for the lower-regarded films that are described as "non-events on paper" and anticipated to experience "potential marketing costs and losses."[249]

The only film that could reasonably be described as a potential blockbuster that has explored a digital-release alternative, rather than delaying its traditional theatrical release, is Universal's *Trolls World Tour*.[250] Universal has decided, in the wake of the movie theaters being shut down, that it will distribute *Trolls World Tour* concurrently in theaters and on demand rentals (48 hours for $19.99).[251] This decision has not been without backlash. Large movie-theater chain AMC Theatres has announced that "it will no longer play any of the [Universal] films in the wake of NBCUniversal CEO Jeff Shell's promise to open titles on [digital] and in theatres at the same time."[252] AMC's CEO cited the breaking of the 90-day window between the theatrical release and the at-home distribution release as "unacceptable" and has pledged to not show any Universal film in its theaters in the United States, Europe, or the Middle East until Universal abandons the practice.[253] It is hard

---

246.  *See* Angie Barry, *The B-List*, THE TIMES (Jan. 16, 2019), https://www.mywebtimes.com/2018/12/29/the-b-list-coming-soon-to-theaters-9-more-films-to-get-excited-about-in-2019/aiu9tkf/.

247.  Ballard, *supra* note 238.

248.  D'Alessandro, *supra* note 243.

249.  *Id.*; *see also* Ryan Lattanzio, *Netflix Scoops up Paramount's 'The Lovebirds' After Canceled Theatrical Release*, INDIEWIRE (Mar. 20, 2020), https://www.indiewire.com/2020/03/lovebirds-netflix-paramount-issa-rae-kumail-nanjiani-1202219456/ (detailing Paramount's and Netflix's preexisting agreement for Netflix to pick up Paramount films that have high potential for "theatrical misfire").

250.  D'Alessandro, *supra* note 243.

251.  *Id.*

252.  Dave McNary, *AMC Theatres Won't Play Universal Movies in Wake of 'Trolls World Tour' Dispute*, VARIETY (Apr. 28, 2020), https://variety.com/2020/film/news/amc-theatres-trolls-world-tour-dispute-1234592445/.

253.  *Id.*

to predict who will "blink first" in the standoff between Universal (who is due to miss out on box-office revenue from not showing its films in AMC's theaters as well as lost revenue by providing a digital rental option instead of a more profitable theatrical release)[254] and AMC (who will lose out on the revenue of upcoming Universal blockbusters like the newest *Fast and the Furious* and *Jurassic World* franchises if they cannot find enough replacements from other distributors and who is also on the verge of reorganization bankruptcy).[255] Either way, any success that *Trolls World Tour* has via digital rental will most likely be a product of the unusual circumstances where all movie theaters have shut down and families across the Unites States and the world are quarantined in their home with an increased at-home demand for new entertainment.[256] In fact, the "sales and rentals of individual titles to the home were $24.9 billion in 2004 and shrank 62 percent to $9.3 billion in 2019."[257] Comparing the decrease in revenue of home rentals with the Theatrical markets slow and steady increase in revenue, it is clear film distributors would not prudently switch their business model away from licensing their blockbuster films to movie theaters to licensing their blockbuster films to a declining at-home rental market.

The other implication the DOJ makes in comparing the Theatrical market with the Digital at-home market is that the Theatrical market is somehow a dying market, and people are no longer willing to pay for the theatrical experience but instead wait for the films to be distributed for at-home consumption.[258] The suggestion that movie theaters are outdated modes of entertainment is simply a blatant misrepresentation of the state of the Theatrical market. The U.S.—Canada box office has consistently been between $10.2 and $11.9 billion the last decade (2010-2019), with record high of $11.9 billion as recent as 2018.[259] More than three-quarters (76%) of the U.S. and Canadian population—or roughly 268 million people—went to

---

254. *See* D'Alessandro, *supra* note 243 (discussing Universal's dispute with AMC over the studio's decision to release a movie directly to PVOD). For example, if Universal receives roughly 50% of the box office revenue of a $10 per person movie ticket (revenue of around $5 a person), but offers the same film for rental for two days for roughly $20 (receiving usually 80% of that, or $16), Universal will find more profit for at home digital release for parties of less than four people. Once a group reaches at least four, or a demographic that would see a particular favorite movie more than once in the theater, Universal would be generating less revenue with the $16 from home rental than they would if they sold four tickets to the movie where they grossed $5 per ticket.

255. McNary, *supra* note 252.

256. *Id.*

257. *Id.*

258. Order Terminating Judgments, *supra* note 13, at 9–10.

259. MPA, THEME REPORT 2019, *supra* note 2, at 18.

see films at the theater at least once in 2019, a slight increase from 2018.[260] Eleven percent of the total population were frequent moviegoers who visited movie theaters once a month or more, while 54% of the total population were occasional moviegoers (less than once a month but multiple times a year).[261] In 2019, a total of 1.24 billion admission tickets were sold, or an average of 4.6 tickets per moviegoer.[262] The number of tickets sold has consistently been between 1.24 and 1.36 billion per year over the last decade.[263] For context, that is roughly three movie tickets purchased per person of the entire United States and Canadian population (roughly 365 million people). In the context of other forms of live entertainment, the U.S. Cinema attendance still vastly outpaces other choices, with 1.242 billion in attendance in 2019, almost three times as many as theme parks (422 million), and over nine times more than all major sports combined (129 million between the NFL (16.7 million), NHL (22.2 million), NBA (21.9 million) and MLB (68.5 million)).[264] Part of the popularity can be traced to the affordability of movie theaters with an average ticket price of around $36.64 for a family of four, whereas the average ticket price for a family of four for a sporting event or theme park ranges between $131.96 and $409.40.[265] However, the total revenue of movie-theater ticket sales still substantially outpaces the revenue from live sports ticket sales and is in the same ballpark as theme-park revenue.[266]

Although the Sherman Antitrust Act is focused on conduct in or effecting the American markets,[267] an analysis of the global film market can be insightful by giving a contextual understanding to the American market. The global data further supports that the Theatrical market is its own market. In 2019, the overall global film market share was 42% Theatrical, 48% Digital, and 10% Physical.[268] Since 2015, the Global Theatrical market increased every year, albeit at a slower rate than the Global Digital market.[269]

---

260. *Id.* at 27.

261. *Id.*

262. *Id.*

263. *Id.* at 18.

264. *Id.* at 19.

265. *Id.*

266. *See id.* (comparing the attendance rates with the price per ticket of each activity).

267. *See* United States v. Nippon Indus. Co., 109 F.3d 1, 4 (1st Cir. 1997) (indicating the interpretive evolution of the Sherman Antitrust Act to include wholly foreign conduct effecting U.S. markets, not just domestic conduct); 15 U.S.C. § 6a ("[This Act] . . . shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations . . . .").

268. MPA, THEME REPORT 2019, *supra* note 2, at 8 (reflecting "the combined market for entertainment content at movie theaters and content released digitally and on disc. This excludes pay television subscription revenue (due to the role of sports and other live content) and licensing, and the advertising-based market.").

269. *See id.*

*Vermont Law Review*                 [Vol. 45:227

In contrast, the Global Physical market has decreased each year since 2015.[270] Again, the Digital and Physical markets work in an inverse relationship, being as both markets overlap as "Home/Mobile Entertainment" market, and the rise of Digital market share is to the detriment of the Physical market.[271] The Theatrical market is still a significant portion of the entire film industry, being the highest grossing market until 2019, when it was outpaced by the Digital market by roughly 6%.[272]

Another aspect to consider when analyzing the Digital market's rise within the Global and Domestic combined market shares is that the Digital market is also engulfing the pay television subscription revenue and licensing market in addition to the Physical market.[273] The pay-television subscription revenue and licensing market is not considered by the MPA, mainly since the data is hard to incorporate due to the difficulty separating film revenue from sports and other live content.[274] This missing data would contribute to why the Digital market appears to be growing at a much faster rate than the Physical market is decreasing.[275]

### ii.  Broad Definition—Collective Theatrical Market

A more accurate possible market definition to measure film distributors' economic power in their tying product is limiting the market to the Theatrical market, with the tying product being the A-list blockbuster movies and the tied product being the B-list movies.

The film-distribution market is similarly concentrated as it was during the 1930s and 40s when the *Paramount* cases were decided. Between 1995 and 2020, over 77% of the film-distribution market was controlled by the top

---

270.  *See id.*

271.  *See id.* (charting the visual representation of these market relationships).

272.  *Id.*

273.  *See Cord Cutting Statistics for 2020*, No CABLE, https://nocable.org/learn/cable-tv-cord-cutting-statistics/ (last visited Dec. 13, 2020) (noting the decrease in "Pay TV Households" as well as the increase in streaming subscriptions and "Non-Pay TV Households.").

274.  MPA, THEME REPORT 2019, *supra* note 2, at 8.

275.  Although the Digital market is most likely taking the revenue from the Physical and television markets, the Digital market's growth is also part of the normal growth of the Home/Mobile Entertainment market, absent any change in consumer preference in a similar manner where the Theatrical market is slowly increasing over time without impacting the Digital or Physical markets due to its organic growth.

six distributors (or around 84% by the top eight).[276] For context, the *Paramount* defendants were eight studios that controlled 70% of the market.[277] As for the *Paramount* defendants specifically (Paramount, MGM, Warner, 20th Century Fox, RKO pictures, Universal, Columbia, and United Artists), they controlled about 50% of the market between 1995 and 2020, with the big change being the entry of Disney and Sony who combine for 29.20% of the market.[278]

In 2019, it took only four distributors, Walt Disney (33.25%), Warner Bros. (13.95%), Sony Pictures (11.92%), and Universal (11.58%), to control 70.70% of the domestic box office.[279] This market-share percentage is eerily similar to the equivalent market shares that *eight* film distributors used to leverage their block-booking practice licensing to stifle competition.[280] With the inclusion of 20th Century Fox (4.36%), a distributor recently acquired by Disney, those market shares increase to 75.07%.[281] Including the next tier of distributors, Lionsgate (7.09%) and Paramount Pictures (5.01%), the market share would increase to 87.17% for 2019 with only seven distributors (six if you consider 20th Century Fox and Walt Disney the same entity)[282] compared to the eight distributors that controlled 70% of the market in the late 1930s and early 1940s.[283]

While having market power in the overall theatrical market helps identify the major distributors, over 900 films are shown in theaters each

---

276. With the top six distributors being: Disney (16.94%), Warner Bros. (15.20%), Sony Pictures (12.28%), Universal (11.72%), 20th Century Fox (11.03%), Paramount pictures (10.34%), for combined market share of 77.51%. *Market Share for Each Distributor 1995-2020*, *supra* note 203. The top eight distributors includes all of the aforementioned film distributors plus Liongate (4.07%) and New Line (2.64%), bringing the total market share to 84.22%. *Id.*

277. Motion for Terminating Judgments, *supra* note 6, at 3, 9.

278. Between 1995 and 2020, the eight *Paramount* Defendants held a total market share of 50.01 %, with Paramount holding 10.34%, MGM (1.58%), Warner Bros. (15.20%), 20th Century Fox (11.03%), Universal (11.72%), United Artists (0.14%),  Columbia holding less than 0.01%, and RKO pictures holding no market share during this time period because it went out-of-business. *Market Share for Each Distributor 1995–2020*, *supra* note 203. In this same period, Disney held 16.93% and Sony (12.27%) for total market share of 29.20%. *Id.*

279. *Market Share for Each Distributor in 2019*, *supra* note 198. If 20th Century Fox (4.37%), a subsidiary of Disney, were included then the combined market share would be 75.07%, or three-quarters of the market.

280. *Compare* Motion for Terminating Judgments, *supra* note 6, at 9 (noting that the *Paramount* Defendants controlled about 70% of the market), *with supra* note 279 and accompanying text (showing that the top four distributors in 2019 controlled 70.70% of the market).

281. *Supra* note 279.

282. *Market Share for Each Distributor in 2019*, *supra* note 198.

283. *See supra* note 197 and accompanying text.

*Vermont Law Review* [Vol. 45:227

year.[284] However, each of the 900 plus films are not all in direct competition nationally with each other. A better definition of the competitive market considers how these distributors compete with each other; namely, what is the market for the A-list blockbuster films that command the most negotiating power in deals with the movie theaters. There are three potential approaches for defining the share of the A-list or blockbuster market: (1) percentage of the top-25 box-office grossing films in the calendar year; (2) percentage of the top-10 box-office grossing films in the calendar year; and (3) percentage of weeks with the top-grossing film in the calendar year.

Of the top-25 box-office grossing films in 2019, all 25 were distributed by just five distributors: Disney–nine (36%); Warner Bros.–six (24%); Universal–five (20%); Sony–three (12%); and Lionsgate–two (8%).[285] The top four distributors, Disney, Warner Bros., Universal and Sony, were responsible for an overwhelming 23 of the 25 top grossing films (92%).[286] Lionsgate, considered within the second tier of distributors with Paramount, rounds out the last two films, meaning all 25 films were among the top six or seven film distributors.[287] The disparity becomes more evident when looking at the top-10 box-office grossing films in 2019: Seven were distributed by Disney (70%), two by Warner (20%), and one by Sony (10%).[288] Defining the market as the top-10 instead of 25, Universal is no longer represented, and Sony and Warner's market share is reduced while Disney's market share is greatly increased.

In 2018, the distributors of the top 25 grossing films were as follows: Warner distributed seven (28%); Disney–six (24%); Universal–four (16%); Twentieth Century Fox–three (12%); Sony–three (12%); and Paramount–two (8%).[289] Much like 2019, the top-five distributors accounted for 23 of the

---

284. *See Domestic Box Office for 2019*, BOX OFFICE MOJO [hereinafter *Domestic Box Office for 2019 Yearly*], https://www.boxofficemojo.com/year/2019/ (last visited Dec. 13, 2020) (showing over 900 movie titles for fiscal year 2019).

285. Disney released nine: *Avengers: Endgame, Lion King, Toy Story 4, Frozen II, Captain Marvel, Star Wars: The Rise of Sky Walker, Aladdin, Dumbo, Maleficent: Mistress of Evil*; Warner Bros. released six: *Joker, It Chapter Two, Pokémon Detective Pikachu, Shazam, Aquaman*; Universal released five: *Us, Fast & Furious: Hobbs & Shaw, How to Train Your Dragon: The Hidden World, The Secret Life of Pets 2, Glass*; Sony released three: *Spider-Man: Far from Home, Jumanji: The Next Level, Once Upon a Time... In Hollywood*; Lionsgate released two: *John Wick: Chapter 3– Parabellum, Knives Out*. *Id.*

286. *Id.*

287. Ambiguity between six and seven is dependent on if treating 20th Century Fox and Walt Disney as one entity even though they are separate distributors under the same parent Disney company. *Supra* note 200.

288. *Domestic Box Office for 2019 Yearly, supra* note 284.

289. *See Domestic Box Office for 2018 Yearly*, *supra* note 206 (listing which production companies and their respective films were the top grossers of 2018).

25 highest grossing movies with the remaining two films being distributed by Paramount instead of Lionsgate. When the analysis is limited to the top-ten box-office grossing films, there is a greater diversity of distributors in 2018 than in 2019. In 2018, five different distributors had a top ten grossing film[290] compared to only three in 2019.[291] Still, defining the market as the top-10 eliminates some major distributors like Warner, and reduces the market shares of 20th Century Fox and Sony while increasing the market share of Disney, Paramount, and Universal. Again, these differences in market shares—depending on the market definition—create incentives for potential defendant distributors to argue for one market definition over another.

One issue, however, with focusing only on the top-grossing films in cumulative terms for the year is that it gives disproportionate advantages to blockbuster films that are released during the higher grossing times of the year. For example, summertime blockbusters, and holiday releases gross more than early spring or early fall releases.[292] An alternative solution is to look at the highest grossing films in each individual week. In 2019, the distributors who had the top-grossing film at the box office for at least four weeks were: (1) Disney (18 weeks, roughly 35% of the year); (2) Universal (11 weeks, roughly 21% of the year); (3) Warner (10 weeks, roughly 19% of the year); (4) Sony (4 weeks, roughly 8% of the year); and (5) Lionsgate (4 weeks, roughly 8% of the year).[293] In 2018, the distributors who had the top-grossing film at the box office for at least four weeks were: (1) Disney (15 weeks, roughly 29% of the year); (2) Warner (11 weeks, roughly 21% of the year); (3) Universal (10 weeks, roughly 19% of the year); (4) Sony (8 weeks, roughly 15% of the year); (5) Twentieth Century Fox (4 weeks, roughly 8% of the year); and (6) Paramount (4 weeks, roughly 8% of the year).[294] The top five to seven distributors are the same no matter how the market is defined, either by box-office totals, top-grossing films, or most weeks with the top-

---

290.  In 2018, five films were distributed by Disney (50%), two by Universal (20%), and one each by 20th Century Fox, Sony, and Paramount (10%) respectively. *Id.*

291.  *Compare Domestic Box Office for 2018 Yearly*, *supra* note 206, *with Domestic Box Office for 2019 Yearly*, *supra* note 284.

292.  *See generally*, *Domestic Box Office Weeklies for 2019*, BOX OFFICE MOJO [hereinafter *Domestic Box Office Weeklies for* 2019], https://www.boxofficemojo.com/weekly/by-year/2019/ (last visited Dec. 13, 2020) (looking at the weekly gross profit patterns throughout the year of 2019).

293.  *See id.* (aggregating data on theatrical run period for 2019 films and their respective distributors to form annual percentages).

294.  *See generally Domestic Box Office Weeklies for 2018*, BOX OFFICE MOJO [hereinafter *Domestic Box Office Weeklies for* 2018], https://www.boxofficemojo.com/weekly/by-year/2018/ (last visited Dec. 13, 2020) (aggregating data on theatrical run period for 2018 films and their respective distributors to form annual percentages).

grossing film.[295] The difference between the distributors is the exact amount of the market share; and therefore a particular distributor is incentivized to choose the market definition that would support the conclusion that it does not have enough economic power for its block-booking arrangement to be considered an illegal tying arrangement.

There are two potential issues with all three of these possible market definitions. First, the temporal cutoffs for calculating market power are more arbitrary than reflective of the actual Theatrical market. Choosing to calculate market shares per calendar year skews the data for movies released during the Christmas and end of December release period. For example, *Star Wars: The Rise of Skywalker* was the sixth highest grossing film in 2019,[296] but it was not released until December 20, 2019.[297] The difference is *Star Wars: The Rise of Skywalker* was only the sixth highest grossing film during the 2019 calendar year, grossing over $390 million, but it was the third highest grossing film *released* in 2019, grossing over $515 million in total revenue over its entire theatrical run between 2019 and 2020.[298] Similarly, *Jumanji: The Next Level*, a December 13, 2019 release, was the eleventh highest grossing film during 2019 exclusively at over $192 million, but the tenth highest grossing film *released* in 2019 at over $316 million.[299] Even the weekly breakdown is subject to the arbitrary calendar cutoff. For example, *Aquaman* was a highest weekly grossing movie in both 2018 *and* 2019.[300]

The second issue involves the difficulty defining the difference between an "A-list" and "B-list" movie, and by extension, what the overall market is for blockbuster features. The above analysis attempted to define "A-list" movies from multiple angles. Each seem plausible, but each would result in different answers to whether a distributor has economic power in the licensing market. In 2019, for example, Universal accounted for 20% of the top-25 box-office grossing films of the year, but distributed none of the top-10 box-office grossing films of the year.[301] Similarly, in 2018, Warner

---

295.  *See id.* (showing the top grossing films each week of 2018); *see Domestic Box Office Weeklies for 2019, supra* note 292 (noting how much each film grossed per week in 2019).

296.  *Domestic Box Office for 2019 Yearly, supra* note 284.

297.  *Star Wars: Episode IX – The Rise of Skywalker*, Box Office Mojo, https://www.boxofficemojo.com/release/rl3305145857/?ref_=bo_yld_table_6 (last visited Dec. 13, 2020).

298.  *Domestic Box Office for 2019 Yearly, supra* note 284.

299.  *Id.*

300.  *See Domestic Box Office Weeklies for 2018, supra* note 293 (showing that *Aquaman* was the number-one release during the first week of 2019); *see also id.* (showing that *Aquaman* was the number-one release during the last two weeks of 2018).

301.  In 2019, Universal released five films in the top-25 but none of them made the top-10. *Domestic Box Office for 2019 Yearly, supra* note 284.

Bros. distributed 28% of the top-25 grossing films, the most of any distributor; however, Warner Bros. did not distribute a single top-10 grossing film during the year.[302] The distinction between the top-10 and the top-25 definitions could mean the difference between Universal and Warner Bros. prevailing on a motion to dismiss (since they have absolutely no economic power) or losing an argument that they do not have economic power in the tying market. However, the distinction is not without merit. The top-10 films in 2019 grossed roughly $4.38 billion, twice as much as compared to films 11–25 which grossed roughly $2.16 billion.[303] By extension of this principle, a distributor could argue that courts should consider the market of "A-list" films to only be the top 15, 20, 30, or 50. Distributors could even argue for an arbitrary revenue amount that the film must make during its runtime. For example, an "A-list" film must make over $400 million (only about 4–6 films per year), $300 million (around 6–10 films per year), $200 million (around 11–14 films per year), or $100 million (around 29–34 films per year).[304] Again, each distributor would have their market shares increase or decrease depending on which cutoff a court would accept, potentially being the difference between a distributor having or not having economic power in the tying market. This could result in different courts finding identical block-booking arrangements to be antitrust violations or completely legal, depending on which market definition each court accepts.

Although this market definition is better than the one proposed by the Department of Justice, since it properly recognizes the distinction between the Theatrical market and At-home Digital and Physical markets, a broad Theatrical market definition is still flawed. There is too much variation in defining the temporal bounds and what constitutes an "A-list" movie, allowing distributors the potential to avoid liability for using block booking as an anticompetitive tying arrangement by creatively defining the parameters of the tying film's market through savvy legal arguments.

---

302.  In 2018, Warner Bros. released seven films in the top-25 but none of them made the top-10. *Domestic Box Office for 2018 Yearly*, *supra* note 206.

303.  Top-10 grossing $ 4,375,186,846 and film 11–25 grossing $2,157,777,820. *Domestic Box Office for 2019 Yearly, supra* note 284.

304.  In 2019, 6 films grossed over $400 million, 10 films grossed over $300 million, 11 films grossed over $200 million, and 31 films grossed over $100 million. *Id*. In 2018, 4 films grossed over $400 million, 6 films grossed over $300 million, 14 films grossed over $200 million, and 34 films grossed over $100 million. *Domestic Box Office for 2018 Yearly*, *supra* note 206. In 2017, 4 films grossed over $400 million, 8 films grossed over $300 million, 13 films grossed over $200 million, and 33 films grossed over $100 million.  *Domestic Box Office for 2017 Yearly*, *supra* note 206.

*Vermont Law Review* [Vol. 45:227

### iii. Narrow Definition—Individual Film Market Power

A better approach to defining the relevant market to measure film distributors' economic power in their tying product is by narrowly defining the market temporally and focusing on individual films. By focusing on each individual film instead of the overall theatrical market, it focuses specifically on the actual tying product instead of using non-exact substitutes. By focusing on the short temporal run of an individual film, it eliminates the arbitrary calendar cutoffs of films released in December, as well as considering the discrepancies of box office revenues for blockbusters released at different times of the year with naturally different theater attendance trends.

When movie theaters agree to exhibit a film, the individual film's theatrical run is rather limited. A film is typically most profitable in its first two or three weeks, but most major film distributors have negotiated for more or less standard runs for their blockbuster films of at least four weeks.[305] By analyzing the small temporal time of four weeks, the market-power analysis becomes whether the specific potential blockbuster film in question would have substantial market power during its initial four-week release. This analysis can be accomplished by looking at the share of the movie's box-office revenue over that four-week time. The four-week timeframe eliminates the arbitrary cutoffs of the previous broad Theatrical market definition, since it reflects the industry's standards and focuses on the exact temporal range where the individual film is being licensed.

The analysis of whether an individual film has economic power within the market becomes better defined by focusing on individual films during the time the film will be released. This focus removes variations that potential defendant distributors could use to avoid liability for their anticompetitive block-booking tactics. This market definition does have one potential limitation: when films are licensed to the theaters, the amount of market power of the individual film is speculative. If the film has not been released or shown yet, there are no box-office numbers to rely on as there were for the previously discussed broad definition of the Theatrical market.

However, the market for an anticipated blockbuster film is not as speculative as it may first appear. Even if it is speculative to the exact numbers, most distributors and movie theaters in the industry are able to accurately predict the range of the expected share of the box-office

---

305. *See* Fahey, *supra* note 40 (noting that an average run time of about four weeks is standard).

earnings,[306] and as a result, what kind of market power it has during licensing negotiations. For example, when negotiating with Disney for one of their upcoming blockbusters, a movie theater is able to fairly predict the market share of that film in comparison to licensing other films, like a Warner or Universal blockbuster set to debut during the same week. These types of calculations are a common practice of the negotiating process.[307]

A few examples in recent years will help illustrate this point, given the context that having around "30% or greater market share" can constitute a film having sufficient economic market power.[308] The most illustrative example would be Marvel's *Avengers: Endgame* distributed by Walt Disney Studios Motion Pictures. *Endgame* was the highly anticipated 22nd film in Marvel's 11-year narrative known as the "Infinity Saga."[309] It was shown in a total of 4,662 theaters in its first three weeks, before dropping to 4,220 in its fourth week and below 4,000 screens every subsequent week in theaters.[310] In its opening week, *Endgame* grossed $473,894,638, or about 88.3% of the U.S. box office total of $536,535,969.[311] It topped the box office in its second and third week as well, accounting for 72.4% and 36.9% respectively.[312] Over its initial four-week theatrical run, *Endgame* grossed

---

306.  *See, e.g.,* Scott Schlesinger, *Using Analytics to Predict Hollywood Blockbusters*, HARV. BUS. REV., Oct. 11, 2012, https://hbr.org/2012/10/using-analytics-to-predict-hollywood-blockbusters (discussing the various metrics used in analytical computations to predict whether a film will rise to blockbuster status).

307.  *See, e.g.,* Jeff Tyson, *The Art of the Deal—How Movie Distribution Works*, HOWSTUFFWORKS, https://entertainment.howstuffworks.com/movie-distribution1.htm (last visited Dec. 13, 2020) (illustrating the ways and variables that go into negotiations between theaters and distributors).

308.  RxStrategies, Inc. v. CVS Pharmacy, Inc., No. 8:18-cv-1087-T-30TGW, 2019 WL 7584729 at *2 (M.D. Fla. Dec. 4, 2019) (holding that "30% or greater market share in many local geographic markets" along with other market definitions sufficient to allege market power in the defined geographic market to withstand motion to dismiss).

309.  Alex Abad-Santos, *Avengers: Endgame's $1.2 Billion Opening Weekend is the Biggest in Movie History*, VOX (Apr. 29, 2019), https://www.vox.com/2019/4/29/18521581/avengers-endgame-box-office-1-2-billion.

310.  *Avengers: Endgame*, BOX OFFICE MOJO [hereinafter *Avengers: Endgame Weekly Earnings*], https://www.boxofficemojo.com/release/rl3059975681/weekly/?ref_=bo_rl_tab#tabs (last visited Dec. 13, 2020).

311.  *Endgame* opening week was April 26–May 2 2019, where the film grossed $473,894,638. *Id.* For the same period, the gross box-office earnings in the U.S. totaled $536,411,226. *Domestic Box Office Weeklies for 2019*, *supra* note 292. Based on these figures, *Endgame* grossed about 88.35% of gross box-office earnings in the U.S. for the same period.

312.  *Endgame* grossed $186,551,101 the second week and $80,949,131 the third week. *Avengers: Endgame Weekly Earnings*, *supra* note 309. During these weeks U.S. box-office earnings grossed $257,703,964 and $219,497,995 respectively. *Domestic Box Office Weeklies for 2019*, *supra* note 292. Based on these figures, *Endgame* grossed about 72.39% and 36.88% of gross box-office earnings in the U.S. for weeks two and three respectively.

$781,331,736 of the total $1,217,134,085 U.S. box office.[313] *Endgame* dominated the box office in its first four weeks, accounting for around 64.2% of the box office over that period of time.[314]

Although all these box-office numbers were calculated in hindsight after the transaction between the movie theater and movie distributor, the success of the film was reasonably predicted. *Avengers: Endgame* broke the record for the highest grossing opening weekend ($640 million worldwide) and for fastest to reach the $1 billion mark after just five days.[315] These may seem like unpredictably high box-office numbers until one realizes that the previous record holder was *Endgame*'s predecessor, *Avengers: Infinity War*, which made $250 million opening weekend and reached the $1 billion mark after just 11 days.[316]

Another box-office dominator was Disney's *The Lion King*, a live-action remake of the 1994 animated film with the same name.[317] Much like *Endgame*, *The Lion King* opened showing on well over 4,000 screens (4,725), but was reduced to under 4,000 screens after its fourth week.[318] In its opening week, the film grossed $275,251,534 in the U.S. box office;[319] or roughly 70.4% of the total $391,079,975.[320] Over its first four weeks, *The Lion King* dominated to the tune of roughly 45.1% of the total domestic box office, or $484,207,985[321] of the $1,073,400,994 total.[322]

Disney distributed many of the box office A-list films in 2019.[323] In addition to *Endgame* and *The Lion King*, *Frozen II*, the sequel to the 2013 box-office success *Frozen*, dominated the Thanksgiving holiday much like its predecessor, bringing in roughly 59.3% of the U.S. box office its first

---

313. *Avengers: Endgame Weekly Earnings*, *supra* note 309; *Domestic Box Office Weeklies for 2019*, *supra* note 292. When the earnings from the first four weeks of *Endgame* are compared to the overall gross box-office earnings for the same period, *Endgame* grossed approximately 64.19% of overall domestic earnings for that period.

314. *Supra* note 313.

315. Abad-Santos, *supra* note 309.

316. *Id. Infinity War* was also one of only four movies to make $2 billion at the box office before the release of *Endgame*. *Id.*

317. Yohana Desta, *The Lion King is Now Disney's Highest Grossing Animated Movie Ever,* VANITY FAIR HWD, https://www.vanityfair.com/hollywood/2019/08/the-lion-king-box-office-animation-record (last visited Dec. 13, 2020).

318. *The Lion King*, BOX OFFICE MOJO [hereinafter *The Lion King Weekly Earnings*], https://www.boxofficemojo.com/release/rl3321923073/weekly/?ref_=bo_rl_tab#tabs (last visited Dec. 13, 2020).

319. *Id.*

320. *Domestic Box Office Weeklies for 2019*, *supra* note 292.

321. *The Lion King Weekly Earnings*, *supra* note 318.

322. *See Domestic Box Office Weeklies for 2019*, *supra* note 292 (totaling the overall box-office gross for the four-week period of July 19–August 15 2019).

323. Of the 25 top-grossing films in 2019, Disney distributed nine. *Id.*

week[324] and roughly 43.8% of the U.S. box office gross over its first four weeks.[325] *Star Wars: Episode IX— The Rise of Skywalker*, another Disney film and last installment in the newest *Star Wars* trilogy, grossed roughly 59.68% of the U.S. box office when it opened the week of Christmas,[326] as well as grossing around 39% of the U.S. box office over its first four weeks that included the first two weeks of 2020.[327] Not by coincidence, both *Frozen II* and *The Rise of Skywalker* were in over 4,000 theaters in its first four weeks, and dipped below the 4,000 mark afterwards.[328]

Although Disney has had successful blockbuster films, they are not the only distributor to recently have a film dominate the box office over its initial release. Warner Brother's *Joker* and *It Chapter Two* also had dominant theatrical runs. *Joker* made $137,728,787 of the total $216,651,241 box office in its opening week,[329] or roughly 63.6% of the box office from

---

324. *Frozen II* earned $202,867,358 during the week of November 22–28, 2019. *Frozen II*, BOX OFFICE MOJO [hereinafter *Frozen II Weekly Earnings*], https://www.boxofficemojo.com/release/rl2424210945/weekly/?ref_=bo_rl_tab#tabs (last visited Dec. 10, 2020). The overall gross box-office earning in the U.S. for the same week was $342,358,466. *Domestic Box Office Weeklies for 2019*, *supra* note 292. This means *Frozen II* grossed about 59.26% of all U.S. box-office earnings for this week.

325. Within its first four weeks (November 22–December 19, 2019), *Frozen II* grossed $374,233,961 in the U.S. box office. *Frozen II Weekly Earnings*, *supra* note 324. The overall gross box-office earnings in the U.S. for those same weeks totaled: $854,689,337. *Domestic Box Office Weeklies for 2019*, *supra* note 292. This means *Frozen II* grossed about 43.79% of all U.S. box-office earnings for these weeks.

326. *Star Wars: Episode IX – The Rise of Skywalker* grossed $289,796,816 during its opening week, December 20–26 2019. *Star Wars: Episode IX – The Rise of Skywalker*, BOX OFFICE MOJO [hereinafter *Star Wars (IX) Weekly Earnings*], https://www.boxofficemojo.com/release/rl3305145857/weekly/?ref_=bo_rl_tab#tabs (last visited Dec. 10, 2020). The overall gross box-office earnings in the U.S. for this same week totaled $485,547,943. *Domestic Box Office Weeklies for 2019*, *supra* note 292. This means that *Star Wars* grossed about 59.68% of all U.S. box-office earnings for this week.

327. During its first four weeks, December 20, 2019–January 16, 2020, *Star Wars: Episode IX* grossed a total of $483,645,801. *Star Wars (IX) Weekly Earnings*, *supra* note 325. The overall gross box-office earnings in the U.S. for those same weeks totaled: $1,238,594,775. *Domestic Box Office Weeklies for 2019*, *supra* note 292 (earnings for U.S. box office equaling $485,547,943 and $377,804,849 in last two weeks of 2019); *Domestic Box Office Weeklies for 2020*, BOX OFFICE MOJO [hereinafter *Domestic Box Office Weeklies for 2020*], https://www.boxofficemojo.com/weekly/by-year/2020/ (last visited Dec. 10, 2020) (earnings for U.S. box office equaling: $191,738,131 and $183,503,852 for the first two weeks of 2020). This means that *Star Wars: Episode IX* grossed about 39.05% of all U.S. box-office earnings for these four weeks.

328. *Frozen II Weekly Earnings*, *supra* note 324; *Star Wars (IX) Weekly Earnings*, *supra* note 326.

329. *Joker*, BOX OFFICE MOJO [hereinafter *Joker Weekly Box Office Earnings*], https://www.boxofficemojo.com/release/rl252151297/weekly/?ref_=bo_rl_tab#tabs (last visited Dec. 13, 2020) (reporting *Joker*'s weekly U.S. box-office earnings for October 4–10, 2019 as $137,728,787); *Domestic Box Office Weeklies for 2019*, *supra* note 292 (reporting that the overall box-office earnings in the U.S. for the week of October 4–10, 2019 as $216,651,241).

276          *Vermont Law Review*          [Vol. 45:227

October 4 to 10.[330] Over its first four weeks of release, *Joker* grossed $285,686,992 of the total $753,308,195 box office,[331] roughly 37.9%. *It Chapter Two* experienced similar success, opening its first week grossing $113,068,524 of the total $178,412,448 box office,[332] or roughly 63.4%. Over its initial four-week release, *It Chapter Two* grossed $196,850,157 of the total $627,972,172 box office,[333] which equates to roughly 31.4%.

    Much like the films previously discussed, *Joker* and *It Chapter Two* were films that were a part of the distributor's already existing intellectual property. *It Chapter Two* was the sequel to the successful 2017 film *It*; both were an adaptation of the Stephen King book of the same name.[334] *Joker* told the story of the infamous Batman villain of the same name, whose character has made numerous popular appearances in films and television.[335]

    Even though a film's exact numerical value of its market share is not known when the film is being licensed, the film's economic power is such that a distributor can "coerce [the theaters'] acceptance of the tied product."[336] Rarely do films with existing intellectual property, backed by a major distributor, fail to meet expectations. Eighteen of the top 20 grossing

---

330.  When *Joker*'s earnings are compared to the overall box-office earning in the U.S. for October 4–10, 2019, *Joker* grossed approximately 63.57%.

331.  *Joker Weekly Box Office Earnings*, *supra* note 329 (earning $285,686,992 in first four weeks October 4–31, 2019); *Domestic Box Office Weeklies for 2019*, *supra* note 292 (reporting that the overall U.S. box-office earning totaled $753,308,195 for the weeks of October 4–31, 2019). *Joker* grossed about 37.92% of all U.S. box office earnings for the same period.

332.  *It Chapter Two*, BOX OFFICE MOJO [hereinafter *It Chapter II Weekly Earnings*], https://www.boxofficemojo.com/release/rl1107461633/weekly/?ref_=bo_rl_tab#tabs (last visited Dec. 13, 2020) (reporting *It Chapter Two*'s weekly U.S. box-office earning for September 6–12 as $113,068,524); *Domestic Box Office Weeklies for 2019*, *supra* note 292 (reporting that the overall box-office earnings in the U.S. for the week of  September 6–12, 2019 as $178,412,448). Based on the above-mentioned figures, *It Chapter II* grossed about 63.37% of U.S. box-office earnings for the week of September 6–12, 2019.

333.  From September 6–October 3, 2019, *It Chapter II* grossed a total of $196,850,157. *It Chapter II Weekly Earnings*, *supra* note 332. During this same period the overall gross box-office earnings in the U.S. totaled $627,972,172. *Domestic Box Office Weeklies for 2019*, *supra* note 292. Based on these figures, *It Chapter II* grossed about 31.35% of U.S. box-office earnings for this period.

334.  The book had already been adapted into a television miniseries in 1990 before hitting the silver screen in 2017. Laura Hurley, *What the IT Miniseries Did Better Than IT Chapter Two*, CINEMABLEND (Sept. 11, 2019), https://www.cinemablend.com/television/2479488/what-the-it-miniseries-did-better-than-it-chapter-two.

335.  The Joker has appeared in at least nine films and nine television shows, and is commonly known as Batman's arch nemesis. *See, e.g.*, Cliff Wheatley, *Ranking the Batman Movie Villains*, IGN, https://www.ign.com/articles/2019/10/19/ranking-batman-movie-villains-best-worst-joker-joaquin-phoenix-heath-ledger (ranking a Joker portrayal as five of the top eight Batman movie villains) (last updated Jul. 17, 2020).

336.  Christopher R. Leslie, *Unilaterally Imposed Tying Arrangements and Antitrust's Concerted Action Requirement*, 60 OHIO STATE L. J. 1773, 1796 (1999).

movies of 2019 were either sequels, remakes, or based around already established popular characters.[337] The only two outside of this category were *Us*, written and directed by Jordan Peele, and *Once Upon a Time in Hollywood*, written and directed by Quentin Tarantino.[338] Both of these movies were highly anticipated given the attached names of Peele, who directed previously popular horror film *Get Out*,[339] and Tarantino, who directed previously popular films like *Pulp Fiction* and *Django Unchained*.[340]

Although the films have not sold one admission ticket at the time of licensing, the films' "[e]conomic power may be inferred from the [film's] desirability to consumers or from uniqueness in its attributes."[341] Even if not quantifiable, the examples discussed above illustrate how a film's desirability and unique attributes can be anticipated before its opening night.

### 2.    Public Interest

In addition to the difficulty of correctly defining the relevant market, courts may have difficulty weighing facts regarding the "public interest" of block booking: namely, (1) the likelihood the major distributors will use block booking anticompetitively to violate of antitrust laws again, and (2) what impacts block booking will have on the downstream consumers, *i.e.* movie-theater patrons.

---

337.  Of the top-20 films released in 2019, 11 were sequels (*Avengers: Endgame*, *Toy Story 4*, *Frozen II*, *Star Wars: Episode IX –The Rise of Skywalker*, *Jumanji: The Next Level*, *It Chapter Two*, *Spider-Man: Far from Home*, *Fast & Furious Presents: Hobbs & Shaw*, *John Wick 3*, *How to Train Your Dragon: The Hidden World*, *The Secret Life of Pets 2*); 3 were remakes (*The Lion King*, *Aladdin*); and 4 were based on already established popular characters (*Captain Marvel*, *Shazam!*, *Joker*, *Aquaman*, *Pokémon Detective Pikachu*).  *Domestic Box Office for 2019 Yearly*, *supra* note 284.

338.  *Id.*

339.  *See* Steve Rose, *Jordan Peele on Us: 'This Is a Very Different Movie from Get Out,'* THE GUARDIAN (Mar. 9, 2019), https://www.theguardian.com/film/2019/mar/09/jordan-peele-on-us-this-is-a-very-different-movie-from-get-out (talking about *Get Out* and the anticipation for the movie *Us*); *see also* Nicole Sperling, *Jordan Peele Breaks Down His Get Out Follow-Up: "Maybe the Evil is Us,"* VANITY FAIR (Mar. 10, 2019), https://www.vanityfair.com/hollywood/2019/03/jordan-peele-us-movie-lupita-nyongo-winston-duke-interview-meaning (noting the box-office success of *Get Out* and the film-festival success of *Us*).

340.  *Quentin Tarantino*, IMDB, https://www.imdb.com/name/nm0000233/ (last visited Dec. 13, 2020; *see also Once Upon a Time... in Hollywood Full Cast & Crew*, IMDB, https://www.imdb.com/title/tt7131622/?ref_=nm_flmg_wr_3 (last visited Dec. 13, 2020) (including *Once Upon a Time in Hollywood* which involved a star-studded cast of Brad Pitt, Leonardo DiCaprio, and Margot Robbie.).

341.  Tic-X-Press, Inc. v. Omni Promotions Co. of Georgia, 815 F.2d 1407, 1420 (11th Cir. 1991).

For over 70 years, the *Paramount* Decrees have required Defendants to license their films on a film-by-film, theatre-by-theatre basis.[342] The United States received 82 comments to its motion, and only one comment supported terminating the Decrees.[343] *Eighty-one* comments opposed terminating some or all of the Decrees' provisions.[344] These comments came from individuals, movie-theater trade groups, regional movie-theater chains, single theaters, and other trade groups, with no comments from motion-picture producers or distributors.[345] As a response to these comments, the DOJ proposed merely "to add a two-year sunset period to the Decrees' block booking . . . provisions, which would provide a transition period to minimize market disruption and allow all parties to adjust their business plans accordingly."[346] The DOJ believes that "including a two-year sunset period for the Decrees' block booking . . . provision[] would provide movie theatres a transitional time period to adjust their business models and strategies to any proposals to change the film-by-film, theatre-by-theatre licensing regime."[347] The DOJ recognized the potential negative impacts and disruption block-booking licensing could have on movie theaters and downstream consumers, but believes that *only* a sunset period would be an adequate remedy to the concerns theaters have and would adequately prepare the theaters for the change block booking would have on the industry.[348]

### i. Likelihood of Repeat Violation

The primary concern for the Department of Justice in their motion is "whether the antitrust violations that the Decrees remedied would reoccur if the Decrees are terminated."[349] The DOJ believes that "[g]iven this changed and changing market place, . . . it is unlikely that the [film distributors] would collude to once again limit their film distribution to a select group of theatres. Indeed, it would make no economic sense."[350]

Believing that the major film distributors are not capable of anticompetitive behavior or would not push the boundaries of antitrust laws

---

342. Motion for Terminating Judgments, *supra* note 6, at 2.
343. *Id.* at 29.
344. *Id.*
345. *Id.*
346. *Id.* at 6.
347. *Id.* at 28.
348. *See id.* (claiming that a sunset provision would provide time to transition and most equitably respond to the concerns raised by the theaters).
349. *Id.* at 3.
350. *Id.* at 20.

to gain economic power is an extremely naïve perspective. It is inevitable that major film distributors will exhaust every opportunity to leverage their brands for higher profits and greater market shares.

Once film distributors recognized the potential of streaming services, many decided to create their own and pull their films from the existing third-party streaming services. Walt Disney Studios is a prime example, who is slowly ending its distribution deal with streaming giant Netflix after launching its own streaming service, Disney+, in November of 2019.[351] Although Netflix is still "king" in the streaming world with over 167 million subscribers, Disney+ surpassed 50 million subscribers in only its first five months.[352] In addition to Disney+, the Walt Disney Company bought the streaming service Hulu in 2019, which reports having 30 million subscribers even though it is only available in the United States.[353] With already half of the number of subscribers as Netflix, it is not out of the realm of possibility that the Disney-owned streaming services will overtake Netflix given the company's plan for an international rollout for Hulu in 2021 and Disney+'s continued rise in popularity and expansion throughout Western Europe, Japan, and the rest of Latin America later in 2020.[354]

Another example is WarnerMedia's streaming service of HBO. Not counting its subscribers who purchase HBO through their cable provider,[355] WarnerMedia's streaming exclusive platform HBO Now has over 8 million subscribers[356] and boasts a catalog of Emmy award-winning series like Silicon Valley, True Detective, and Game of Thrones.[357] Not content with only one streaming service, WarnerMedia launched HBO Max in May 2020, marketed as a premier streaming service with a monthly subscription of $15,

---

351.  *See* Jacob Kastrenakes, *Disney to End Netflix Deal and Launch its Own Streaming Service*, THE VERGE (Aug. 8, 2017), https://www.theverge.com/2017/8/8/16115254/disney-launching-streaming-service-ending-netflix-deal (discussing the creation of Disney+ and its impact on Netflix's new streaming catalog).

352.  Julia Alexander, *Disney Plus Surpasses 50 Million Subscribers*, THE VERGE (Apr. 8, 2020), https://www.theverge.com/2020/4/8/21214236/disney-plus-50-million-subscribers-international-europe-india-netflix.

353.  *Id.*

354.  *Id.*

355.  *See* Craig Smith, *20 Interesting HBO Statistics and Facts (2020)| By the Numbers*, DMR (July 29, 2020), https://expandedramblings.com/index.php/hbo-statistics-facts/ (showing that the total number of HBO subscribers exceeds 140 million).

356.  Julia Alexander, *Can HBO Now Survive HBO Max*, THE VERGE (Sept. 27, 2019), https://www.theverge.com/2019/9/27/20881734/hbo-now-max-streaming-wars-friends-big-bang-theory-warnermedia-netflix-disney-apple.

357.  *Stream & Watch HBO Series Online*, HBO, https://www.hbo.com/series/all-series (last visited Dec. 13, 2020).

*Vermont Law Review* [Vol. 45:227

the highest among streaming services.[358] WarnerMedia will also launch a different tiered option of HBO Max with advertisements in 2021.[359] HBO Max will include original series, licensed series and films, as well as WarnerMedia's own series and films.[360]

Not to be outdone, Universal (under parent company NBCUniversal) began its own streaming service in July 2020.[361] Universal has named their new streaming service "Peacock," and "will be available in three tiers: a free option (Peacock Free) that comes with limited programming; an ad-supported complete version that is free to existing Comcast customers and $5-a-month for everyone else; and a $10-a-month ad-free subscription option that is open to anyone" being labeled as "Peacock Premium."[362] This streaming service will include variety of movies and television series in NBCUniversal's portfolio, as well as live sports.[363]

Before entering streaming, the major film distributors, as well as their parent companies, have already aggressively expanded their influence through horizontal and vertical mergers to increase their power and influence in the market. Most recently, Walt Disney acquired entertainment giant 20th Century Fox.[364] This is far from an outlier, as Disney has in the recent years acquired many other film-related properties, such as Pixar,[365] Lucasfilm,[366] and Marvel Studios[367] to name a few.

---

358. Joan E. Solsman, *HBO Max: Everything to Know about HBO's Bigger, New Streaming App*, CNET (Sept. 11, 2020), https://www.cnet.com/news/hbo-max-roku-amazon-streaming-app-movies-app-wolves/.

359. *Id.*

360. *Id.*

361. Julia Alexander, *NBC's Peacock Streaming Service Will Launch on July 15 with Three Different Price Tiers*, THE VERGE (Jan. 16, 2020) [hereinafter Alexander, *NBC's Peacock July 15 Launch*], https://www.theverge.com/2020/1/16/21068607/nbc-peacock-streaming-service-price-launch-date-ads-universal-comcast-office-harry-potter.

362. *Id.; see also* Todd Spangler, *Inside Peacock's Ambitious Plan to Crash a Crowded Streaming Field,* VARIETY (July 7, 2020), https://variety.com/2020/tv/features/peacock-launch-streaming-comcast-nbcuniversal-1234697590/ (noting Comcast acquired NBCUniversal, the parent company of Universal Pictures, which led to a free option for current Comcast customers).

363. *See* Alexander, *NBC's Peacock July 15 Launch*, *supra* note 361 (listing several series licensed by NBCUniversal that Peacock will be licensed to stream, along with live sports programming starting in August 2020).

364. *See generally* Daniel Rice, *Disney, Fox Agreement Calls for Antitrust Cooperation, $2.5 Billion Termination Fee*, 25 No. 10 WESTLAW J. ANTITRUST 8 (2018) (explaining the cost of the merger and its implications on antitrust agreement obligations).

365. *Disney to Acquire Pixar*, THE WALT DISNEY CO. (Jan. 24, 2006), https://thewaltdisneycompany.com/disney-to-acquire-pixar/.

366. *Disney to Acquire Lucasfilm Ltd.*, THE WALT DISNEY CO. (Oct. 30, 2012), https://thewaltdisneycompany.com/disney-to-acquire-lucasfilm-ltd/.

367. *Disney to Acquire Marvel Entertainment*, THE WALT DISNEY CO. (Aug. 31, 2009), https://thewaltdisneycompany.com/disney-to-acquire-marvel-entertainment/.

Again, Disney is not the only player in this race to acquire properties. In 2004, Universal merged with NBC to create NBCUniversal,[368] and in 2016 the company acquired DreamWorks Animation.[369] Over the years, Warner Bros. has acquired numerous subsidiaries like New Line Cinema[370] and Turner Entertainment Co.,[371] not to mention it was acquired by parent company AT&T over an antitrust challenge by the Department of Justice.[372]

The repeated efforts to expand their influence in the film industry, even if it means fighting antitrust lawsuits in courts, provides evidence that the major film distributors would use block-booking agreements in an anticompetitive manner. To increase their market power in the Theatrical market, film distributors could either (1) leverage their blockbuster films to bolster the profits of their secondary films, (2) force theaters to accept more films and for longer theatrical runs than they would in a competitive market to create an increased barrier to entry from competitors, or (3) some combination of the two.

### ii.    Block Booking's Impact on Consumers

Another factor to consider in order to determine whether it is in the public's interest to terminate the *Paramount* Decrees is whether block-booking licensing would be beneficial or harmful to consumers of the film industry. The most prominent argument that public policy favors reversing the *per se* ban on block booking is that film distributors could use block-booking to achieve efficiency gains for the distributors and theaters, passing on procompetitive benefits to the downstream consumers.[373]

---

368. *NBC Closes Merger with Universal*, ASSOCIATED PRESS, http://www.nbcnews.com/id/4960838/ns/business-us_business/t/nbc-closes-merger-universal/#.Xy-qqS3Mx-U (last updated May 12, 2004).

369. Brett Lang & Cynthia Littleton, *NBCUniversal to Acquire Dream Works Animations for $3.8 Billion*, VARIETY (Apr. 28, 2016), https://variety.com/2016/biz/news/dreamworks-animation-3-8-billion-nbcuniversal-comcast-1201762634/.

370. Kenneth Li, *Time Warner Puts New Line Cinema Under Warner Bros.*, REUTERS (Feb. 28, 2008), https://www.reuters.com/article/us-timewarner-newline/time-warner-puts-new-line-cinema-under-warner-bros-idUSN2862363520080229.

371. Mark Landler, *Turner to Merge into Time Warner; a $7.5 Billion Deal*, N.Y. TIMES (Sept. 23, 1995), https://www.nytimes.com/1995/09/23/us/turner-to-merge-into-time-warner-a-7.5-billion-deal.html.

372. Edmund Lee & Cecilia Kang, *U.S. Loses Appeal Seeking to Block AT&T-Time Warner Merger*, N.Y. TIMES (Feb. 26, 2019), https://www.nytimes.com/2019/02/26/business/media/att-time-warner-appeal.html.

373. *See* Motion for Terminating Judgments, *supra* note 6, at 37–38 (claiming an end to the Decrees would alter relationships between studios and theaters, increasing efficiency and benefits to movie-goers).

However, keeping a *per se* ban on block-booking licensing would not foreclose the opportunity for film distributors to market their films in a legal bundled discount. The Supreme Court in *Paramount* held that films may "be sold in blocks or groups, when there is no requirement, express or implied, for the purchase of more than one film."[374] The holding is that it is illegal to refuse "to license one or more copyrights unless another copyright is accepted."[375] The result of the *Paramount* decision is that film distributors could still license films in groups; however, none have chosen to because distributors do not benefit from giving theaters a discount by bundling the films together.[376] If grouped together, the distributors would want to push for even better terms, which would be the result of leveraging the demand, or market power, of one film to better the terms for another film that are not dictated by the competitive market. This is exactly the type of anticompetitive tying arrangement the Supreme Court set out to prohibit in the *Paramount* decision. Any "efficiency gain" argument of bundling the licensing of films to theaters should be a moot argument, since efficient bundling is already legal according to the *Paramount* decision, and no film distributor has shown the willingness or interest to participate in that form of efficient bundled discounting of their theatrical-film licensing.[377] The distributors would only license block-booked films with anticompetitive terms in the form of an illegal tying arrangement.

These anticompetitive terms would harm the film industry by creating impossible barriers to entry for smaller and independent film distributors and limiting the variety at the box office for downstream consumers. "The strength of the American movie industry depends on the availability of a wide assortment of films catering to the varied tastes of moviegoers."[378] After the ban on block booking, the major studios dramatically decreased the number of movies they produced,[379] which made room for smaller studios that were

---

374. United States v. Paramount Pictures, Inc., 334 U.S. 131, 159 (1948).

375. *Id.*

376. *See* Reich, *supra* note 204 (noting that the high cut of box office profits distributors receives, which varies based on the film and its buzz, disincentivizes distributors from negotiating multiple films at once).

377. *Id.*

378. NATO, COMMENTS ON DOJ'S REVIEW OF PARAMOUNT DECREES, *supra* note 28, at 1 ("Indeed, both global blockbusters and low-budget independent fare are necessary to the financial vitality and reputation of the American film industry.").

379. Alexandra Gil, *Breaking the Studios: Antitrust and the Motion Picture Industry*, 3 N.Y.U. J. L. & LIBERTY 83, 119 (2008) ("Where once each studio was producing upwards of 60 films a year, with Hollywood averaging about 750 films a year in the 1930s, that number was closer to 300 in the 1950s and has continued to decline.").

finally able to compete for screen time in movie theaters.[380] The Decrees "quelled many of the earlier abuses and created a much freer market that enabled competition by independent producers, availability of more diversified product, competitive opportunities for independent exhibitors, and competitive marketing to consumers."[381] If major studios are able to "book out the vast majority" of movie-theater screens for most of the year, it "would leave little to no room for important films from smaller studios."[382] Raising the barrier to entry for smaller independent studios would rob the public of important breakout films such as *Won't You Be My Neighbor?* ($22.6 million), *RBG* ($14 million), and *Three Identical Strangers* ($12 million), all of which experienced success in the summer of 2018 despite competing against big-budget blockbusters.[383]

Furthermore, if studios decide to extend theatrical runs of their movies through block-booking licensing deals, the theaters would have less turnover in the film selection. The result would be that end consumers would have to (1) wait longer for a film's theatrical run to end to enjoy it at home through digital or physical means; and (2) give frequent movie-theater goers less variety to choose from at the box office if the same group of movies are showing for months instead of weeks. The first would impact consumers of the Digital and Physical at-home markets, or roughly 50% of the overall film market.[384] In fact, "the success of both the modern multiplex system and the home entertainment market is directly tied to the consumer-targeted programming that has thrived following the prohibition on block booking."[385]

The second involves both the at-home consumers and the frequent moviegoers. Without the possibility of a theatrical run, "many films will no longer be made, limiting the availability of choices through home entertainment platforms."[386] This result hurts even consumers of films that never visit the theater. Limiting the diversity of film selection at movie theaters would also limit the amount of return visits by the frequent

---

380.  Michael Conant, *The Paramount Decrees Reconsidered*, 44 LAW & CONTEMP. PROBS.79, 92 (1981) ("[I]n a freer market, the minor distributors, who had never been part of the illegal exhibition cartel that dictated first-run theater priorities, became equal competitors with the four surviving majors.").

381.  NATO, COMMENTS ON DOJ'S REVIEW OF PARAMOUNT DECREES, *supra* note 28, at 12.

382.  *Id.* at 5.

383.  *Id.*

384.  *See* MPA, THEME REPORT 2019, *supra* note 2, at 8–9 (displaying the profit share breakdown in the Global and U.S. Theatrical and Home/Mobile Entertainment Market between sectors).

385.  NATO, COMMENTS ON DOJ'S REVIEW OF PARAMOUNT DECREES, *supra* note 28, at 3 ("That is, *these modern innovations are able to flourish only because of the prohibition on block booking*. To abruptly remove the prohibition on block booking could dismantle the most vital moviegoing culture in the world." (emphasis in original)).

386.  *Id.* at 1.

moviegoers.[387] Frequent moviegoers, as defined by the Motion Picture Association, are individuals "who attend the cinema once a month or more."[388] Frequent moviegoers "consist of 11 percent of the population (40 million people), but account for 47 percent of the tickets sold."[389] Each of the areas standing alone are sufficiently significant that anticompetitive block booking would have a meaningfully negative impact on the general consumer of the film industry. When all considered together, there is no reasonable argument that a reversal of the *per se* ban on block-booking licensing would benefit the end consumers of films.

<div align="center">CONCLUSION</div>

Movie theaters are still a popular lucrative form of entertainment in modern America. Although they are not the only way a consumer can watch a movie anymore, theaters still provide a unique experience to their patrons and attract more customers than other forms of live entertainment. The theatrical film industry has been protected by the *Paramount* Decrees since the 1940s, as a response of anticompetitive behaviors by the eight dominant film distributors of the time.[390] The modern film industry presents the same potential for this repeated behavior if the Decrees are overturned, especially the *per se* ban on block-booking.

The Department of Justice believes the decrees should be overturned because the changes in technology present a different marketplace for films than was the case when the *Paramount* decision was decided in 1948.[391] The problem is that the DOJ grossly misconstrues what constitutes the market for theatrical films. The Digital streaming and Physical distribution markets cannot be considered the same market as the Theatrical film market, and they cannot be combined or treated as substitutes. Films that are in movie theaters are making their first run to the audience, and this run is a distinct market from when that same film is licensed and distributed digitally and physically in the later months and years. While Digital film markets act inversely to the

---

387.  *See id.* (suggesting fewer movie choices may lead to fewer return visits by consumers).

388.  MPA, THEME REPORT 2019, *supra* note 2, at 5.

389.  *Id.*

390.  *See generally* United States v. Paramount Pictures Inc., 334 U.S. 131, 176 (1948) (holding these protections as "auxiliary enforcement procedure[s], barring no one from the use of other remedies the law affords for violations either of the Sherman Act or of the decree of the court.").

391.  *See* Motion for Terminating Judgments, *supra* note 6, at 18 (arguing the *Paramount* Decrees are no longer necessary because of fundamental changes to the industry through technological innovations and new business models).

Physical film markets, the Theatrical film market's growth rate is independent from the other at-home markets.

This misinterpretation of the proper market is also why courts applying modern antitrust law would not be suited to properly determine when block booking would be an illegal tying arrangement. If a court accepts the DOJ's interpretation of the relevant market to include all movies on all platforms and modes of distribution, no film distributor would have enough market power in the tying product to affect a substantial volume of commerce in the market. This would give film distributors a free pass to completely monopolize the Theatrical market to the detriment of movie theaters, other smaller film distributors, and end consumers of movies. Given the correct market definition which focus strictly on the Theatrical market, block-booking would constitute an illegal tying arrangement when it is inevitably used to stifle competition in the theatrical market. However, even focusing on the theatrical market with A-list and B-list films, the major distributors could still manipulate the definition to create confusion over whether they possess the requisite economic power.

Finally, there is a high likelihood that the current major film distributors would repeat the same type of anticompetitive antitrust violations that their 1930s and 40s predecessors committed. Modern film distributors already push the boundary of legally acceptable behaviors wherever possible to increase their profits and market share. Either buying smaller distributors and their intellectual property, launching their own streaming services, or current licensing practices that punish movie theaters if certain demands are not met, film distributors have shown a pattern of behavior that suggests they would use block booking in order to anticompetitively increase their market share, stifle competition, and create impossibly high barriers of entry. If this is allowed to occur, movie theaters will be at the mercy of large film distributors, and the general film consumer will be robbed of opportunities to view a variety of distributors' films, including independent films, in a movie-theater experience.

In order to preserve what competition is left in the Theatrical film market, the *per se* ban on block booking needs to continue and not be overturned by the Department of Justice due to the highly anticompetitive effects of block-booking and the potential that courts will not properly apply the rule of reason to block-booking as a tying arrangement.