# EXHIBIT 25

Journal of Business & Technology Law

Volume 18 | Issue 1                                                                                                                    Article 5

# Rear Window: The Future of Hollywood Contracting in the Streaming Age

Miller Friedman

Follow this and additional works at: https://digitalcommons.law.umaryland.edu/jbtl

 Part of the Entertainment, Arts, and Sports Law Commons, and the Internet Law Commons

## Recommended Citation

Miller Friedman, *Rear Window: The Future of Hollywood Contracting in the Streaming Age*, 18 J. Bus. & Tech. L. 97 (2022)
Available at: https://digitalcommons.law.umaryland.edu/jbtl/vol18/iss1/5

This Notes & Comments is brought to you for free and open access by the Academic Journals at DigitalCommons@UM Carey Law. It has been accepted for inclusion in Journal of Business & Technology Law by an authorized editor of DigitalCommons@UM Carey Law. For more information, please contact smccarty@law.umaryland.edu.

# Rear Window: The Future of Hollywood Contracting in the Streaming Age

MILLER FRIEDMAN*

**INTRODUCTION**

In late July 2021, actor Scarlett Johansson filed a complaint against media conglomerate Disney, alleging, among other things, breach of contract and tortious interference.[1] Johansson's complaint stated Disney did not honor a 2017 contract which guaranteed that the Johansson-led film *Black Widow* would enjoy a "wide theatrical release."[2] Johansson's understanding of that term led her to believe the film would be released exclusively in theaters.[3] Instead, Disney announced in March 2021 that the film would be released on its new streaming service Disney+ the same day the film was released in theaters.[4]

It may appear as though this "day-and-date" release strategy, as it is called,[5] would have no effect on Johansson and the rest of the *Black Widow* participants given the unrelenting popularity of films released

---

* © Miller Friedman, J.D. Candidate, 2022, University of Maryland Francis King Carey School of Law. The author would like to thank everyone at the Journal of Business and Technology Law for their contributions to this paper. Additionally, the author would like to thank his family and friends who served as valuable resources throughout the writing process.

1. Complaint for (1) Intentional Interference with Contractual Rels.; and (2) Inducing Breach of Cont., Periwinkle Entertainment, Inc. v. Walt Disney Co., (Cal. Super. Ct. Jul. 29, 2021) (No. 21STCV27831).
2. *Id.* at 8.
3. *Id.*
4. Pamela McClintock, *"There's Not Much Theaters Can Do": Disney's 'Black Widow' Tries Day-and-Date as Studios Experiment*, THE HOLLYWOOD REPORTER (Mar. 25, 2021, 6:35 AM).
5. Chris Lindahl, *Scarlett Johansson's Disney Lawsuit Could Shape the Future of Talent Compensation*, INDIEWIRE (Jul. 29, 2021, 8:00 PM), https://www.indiewire.com/2021/07/scarlett-johansson-disney-lawsuit-black-widow-future-of-talent-compensation-1234654421.

*Rear Window: The Future of Hollywood Contracting in the Streaming Age*

by Marvel Studios, the subsidiary of Disney that produced the film.[6] However, Johansson's contract was structured in such a way that her compensation for the film was largely based on receiving a cut from the box-office sales.[7] In the film industry, this is called a gross points structure, and it is the vehicle by which the world's most popular actors make considerable sums of money off blockbuster films like *Black Widow*.[8] The gross points model is discussed in further detail in this Article, but at its simplest, the model dictates that more tickets sold at the box office will result in more money made for actors.[9] The essence of Johansson's complaint was that Disney's decision to release *Black Widow* day-and-date cannibalized the film's box office numbers, thus cutting into her profits.[10] Further, Johansson contended the day-and-date decision was made specifically to attract more people to Disney+, thereby bolstering Disney's stock price to Johansson's detriment.[11]

Johansson's complaint is the most high-profile example of the type of dispute that has presented existential questions for the film industry[12]—how will physical theaters interact with streaming services, and how will actors navigate contract negotiations if the typical box office fee structure is no longer as viable as it once was? This Article will attempt to answer these questions.[13] Part One focuses further on Johansson and Disney's back and forth.[14] Part Two discusses the larger implications of Johansson's suit on the film industry and other problems presented by the push-and-pull between theaters and streaming services.[15] Part Three discusses potential solutions such as an up-front model, a royalty structure that those in the industry have offered to structuring future contracts, and the likelihood that those solutions will help provide more clarity to actors and executives down the line.[16]

---

6. *See Top Lifetime Grosses*, BOX OFFICE MOJO, https://www.boxofficemojo.com/chart/ww_top_lifetime_gross/?area=XWW (last visited Oct. 21, 2021).
7. *Periwinkle,* No. 21STCV27831 at 10.
8. *See generally* Victor P. Goldberg, The Net Profits Puzzle, 97 COLUM. L. REV. 524 (1997).
9. *See infra* Section II.
10. *Periwinkle*, No. 21STCV27831 at 15.
11. *Id.* at 16.
12. *See infra* Section III.
13. *See infra* Sections III-IV.
14. *See infra* Section II.
15. *See infra* Section III.
16. *See infra* Section IV.

Friedman Page Proof 2 (Do Not Delete) 1/26/2023 5:12 PM

MILLER FRIEDMAN

## II. A Brief Overview of Hollywood Contracting

Before considering Johansson's particular legal gripe with Disney, it is important to consider the ways by which studios pay actors and filmmakers. Film players are almost always paid flat fees at the outset of production, but many of them also structure their contracts to include "back-end" deals, from which they receive a percentage of money based on how well the film does at the box office.[17] Historically, these back-end deals fall under two categories: the net points structure and the gross points structure.[18]

Under a net points structure, the actor is paid a percentage of the pool of funds that is accrued from primarily box office receipts, but also from Blu-Ray/DVD sales and pay-per-view sales.[19] However, before an actor can receive their percentage of the pool money under the structure, the studio must subtract their expenses, which are often significant.[20] These expenses include costly things like distribution fees and advertising.[21] As a result, actors rarely see substantial profits from the net points pool, even if a film pulls in a great deal of money at the box office.[22] Many industry players have taken umbrage with this disparity, and some have filed suit in an attempt to alter studios' accounting practices.[23] The basis of many of the suits is that the accounting practices are designed specifically to deny actors profit while enriching the studio itself.[24] In *Buchwald v. Paramount Pictures Corp.*,[25] Paramount claimed that the 1988 film *Coming to America*, which earned more than $160 million in gross receipts, actually accrued a net loss of $18 million.[26] The plaintiff

---

17. Mark Weinstein, *Profit-Sharing Contracts in Hollywood: Evolution and Analysis*, 27 J. LEGAL STUD. 67, 68 (1998).
18. *Id.*
19. *Id.* at 75.
20. Adam J. Marcus, Buchwald v. Paramount Pictures Corp. *and the Future of Net Profit*, 9 CARDOZO ARTS & ENT. L.J. 545, 560 (1991).
21. *Id.* (quoting Memorandum of Points & Auths. of Defendant Paramount Pictures Corporation Re Phase II Hearing on Legal & Cont. Interpretation Issues at 2-3, Buchwald v. Paramount Pictures Corp., L.A. Daily J. App. Rep. 14482 (L.A. Super. Ct. 1990) (No. C-706083)).
22. *Id.* at 546-7.
23. *See generally* Batfilm Productions v. Warner Bros., Inc., No. BC051653 (L.A. Super. Ct. 1994); Estate of Jim Garrison v. Warner Bros., Inc., (U.S. Dist. Ct. 1995); and Buchwald v. Paramount Pictures Corp., No. C 706083, 1990 WL 357611 (Cal. Super. Ct. 1990).
24. *Id.*
25. 1990 WL 357611.
26. Marcus, *supra* note 20, at 559.

*Rear Window: The Future of Hollywood Contracting in the Streaming Age*

challenged this notion, and the California court found certain elements of the plaintiff's contract with Paramount were indeed unconscionable.[27] Although Paramount settled with the plaintiff in this instance, and specific elements in the contract at issue were deemed unconscionable, Hollywood has continued to use the net points structure in its contracts.[28] Shortly after *Buchwald,* the case of *Batfilm Productions v. Warner Bros.*[29] came before the California Court of Appeals. Benjamin Melniker and Michael Uslan sued Warner Bros. for providing them with paltry back-end compensation.[30] Melniker and Uslan obtained an option on the motion picture rights to the characters and stories associated with the Batman comic book franchise in 1979.[31] Nine years later, Melniker and Uslan entered into an agreement with Warner Bros. which stated, among other things, that the two men were entitled to 13 percent of the net profits of the upcoming Batman film.[32] Unsurprisingly, Melniker and Uslan did not receive any money at all from the 13 percent deal they made with Warner Bros., and claimed the contract was unconscionable.[33] Unlike in *Buchwald*, the California Court of Appeals ruled that, while the contract may have been unfair to Melniker and Uslan, it was not unconscionable, and the court denied the two men relief.[34] Today, it is common knowledge that there is very little money to go around in any given net points pool, and as a result of *Buchwald* and *Batfilm*, film participants are used to shrugging off seemingly counterintuitive definitions of the word "profit" when it comes to a Hollywood production. In 2019, Universal Pictures declared its film *Yesterday* lost $87.7 million, even though the film only cost $26 million to make and grossed $153.7 million.[35] When so-called Hollywood accounting

---

27. *Buchwald,* 1990 WL 357611 at 1. *See also* Marcus, *supra* note 20, at 568 (explaining that the Buchwald Court decided the contract between Buchwald and Paramount was unconscionable partly because it was a contract of adhesion and the contract was presented to Buchwald on a take-it-or-leave-it basis, and partly because Paramount drafted the whole contract based on standard form provisions).
28. *See infra* Section III.
29. 1996 WL 34427763.
30. *Id.* at 1.
31. *Id.*
32. *Id.* at 6.
33. *Id.* at 1.
34. *Id*. at 37.
35. Anthony D'Alessandro, *'Yesterday' Net Profit Statement Shows It's The Same Old Song On Hollywood Accounting*, Deadline (May 5, 2020, 9:04 AM) https://deadline.com/2020/05/yesterday-net-profit-statement-loss-universal-beatles-danny-boyle-1202925277/.

practices are employed in conjunction with a film, it makes it nearly impossible for actors to receive substantial compensation off their net points deals.[36]

Actors of Johansson's stature[37] eschew the net points model altogether and instead negotiate for a gross points structure.[38] Johansson, and those like her, attract viewers to the theaters. In return studios are willing to give them gross points as an incentive to do business with them.[39] When an actor or filmmaker secures gross points on a film, they are paid a percentage not of the profits after expenses are accounted for, but of the gross revenue.[40] This payment structure can take the form of first-dollar gross, where the participant takes a percentage of the money starting from the first ticket sold, or, more commonly, the contract can give an actor bonuses that are triggered by the gross reaching certain dollar amounts.[41] Some participants receive their regular up-front salary as well as gross points on the back end, but some participants are willing to forego an up-front salary if it means they will be able to receive more points on the back end.[42] Leonardo DiCaprio, who is regularly paid over $20 million up-front to work on films, agreed to take a minimal salary for the film *Inception*, and counted on his gross points to earn him money.[43] His gamble paid off, and his earnings from *Inception* were $50 million, the largest of his career to date.[44] Therefore, gross points are enormously important to actors, which in turn makes ticket sales enormously important to actors, as well. This fact makes Johansson's

---

36. Victor P. Goldberg, The Net Profits Puzzle, 97 Colum. L. Rev. 524 (1997).
37. It is worth noting that films starring Johansson have grossed over $14 billion total, making her one of the highest-grossing box office actors in the history of cinema. *Top Stars at the Worldwide Box Office,* The Numbers, https://www.the-numbers.com/box-office-star-records/worldwide/lifetime-acting/top-grossing-stars (last visited Oct. 21, 2021).
38. Weinstein, *supra* note 17, at 68. (explaining that plaintiff Buchwald had little bargaining power with the film studio, while "big stars" like Tom Hanks are able to negotiate for gross points).
39. *See id.*
40. *Id.* at 75.
41. *Id.*
42. Francesca Bacardi, *Jonah Hill Was Paid $60,000 for 'Wolf of Wall Street,'* Variety (Jan. 22, 2014, 2:40 PM) https://variety.com/2014/film/news/jonah-hill-was-paid-60000-for-wolf-of-wall-street-1201066745 ("Instead of earning his usual high-seven-figures, Hill opted to agree to SAG's 'minimum wage' for the seven-month shoot, which is around $60,000 before commissions and taxes").
43. *Id.*
44. *Id.*

*Rear Window: The Future of Hollywood Contracting in the Streaming Age*

complaint, and the future of Hollywood at-large, even more difficult to navigate.

### III. Johansson and Disney

Johansson and Disney settled out of court,[45] but Johansson's complaint along with Disney's response are nonetheless instructive and provide a starting point in analyzing how actors and studios view streaming platforms going forward.

Johansson's complaint alleged that she signed a contract with Disney that claimed, "if Producer in its sole discretion determines to release the Picture, then such release shall be a wide theatrical release of the Picture (i.e., no less than 1,500 screens)."[46] Johansson's side said it was "well understood" by both Johansson and Disney that "wide theatrical release" meant an exclusive theater release that would last anywhere from 90 to 120 days.[47] According to Johansson, "it has long been custom and practice in the film industry for feature films to have at least a 90-day exclusive theatrical release before they are released on home video."[48] Shortly after the launch of Disney+, Johansson reached out to Marvel's Chief Counsel Dave Galluzzi to confirm that the existence of Disney+ would not affect the release of *Black Widow*.[49] According to Johansson, Galluzzi replied that "it is 100 percent our plan to do a typical wide release of *Black Widow*."[50] Additionally, Galluzzi allegedly emphasized that "[w]e totally understand that Scarlett's willingness to do the film and her whole deal is based on the premise that the film would be widely theatrically released like our other pictures. We understand that should the plan change, we would need to discuss this with you and come to an understanding as the deal is based on a series of (very large) box office

---

45. *See* Gene Maddaus, *Scarlett Johansson and Disney Settle 'Black Widow' Pay Lawsuit*, Variety (Sep. 30, 2021, 8:02 PM) https://variety.com/2021/film/news/scarlett-johansson-disney-lawsuit-settled-1235078355/.
46. Complaint for (1) Intentional Interference with Contractual Rels.; and (2) Inducing Breach of Cont., Periwinkle Entertainment, Inc. v. Walt Disney Co., (Cal. Super. Ct. Jul. 29, 2021) (No. 21STCV27831).
47. *Id.*
48. *Id.*
49. *Id.* at 10.
50. *Id.*

bonuses."[51] Ultimately, the plan did change, and Disney announced *Black Widow* would be released day-and-date.[52]

In response to the announcement, Johansson asked Disney to pay her $80 million up front in compensation.[53] After Disney did not respond with a counteroffer to that proposal,[54] Johansson filed her complaint.[55]

*Black Widow* has earned roughly $380 million at the box office worldwide so far,[56] and while that seems like a large number, it is quite small by the Marvel Cinematic Universe's lofty standards.[57] *Black Widow* has the third smallest worldwide box office earnings of any of Marvel's films, and it is Marvel's worst-performing film at the box office in 10 years.[58] It would be difficult to argue that Disney's choice to release the film day-and-date has nothing to do with the box office numbers, as Disney reported they earned $60 million from sales of the film through Disney+ on its first weekend alone.[59] Given Johansson's agreement that she would receive gross points on *Black Widow*,[60] the loss of at least $60 million at the box office cost her a lot of money.

Disney's response to Johansson's complaint focused primarily on the confounding nature of the Covid-19 pandemic and the havoc it

---

51. *Id.*
52. *Id.*
53. Eric Schwartzel and Joe Flint, *How Disney and Scarlett Johansson Reached the Point of No Return*, WALL STREET JOURNAL (Sep. 3, 2021, 1:06 PM) https://www.wsj.com/articles/how-disney-and-scarlett-johansson-reached-the-point-of-no-return-11630688765.
54. *Id.*
55. *Id.*
56. *Black Widow*, BOX OFFICE MOJO (Oct. 1, 2021) https://www.boxofficemojo.com/releasegroup/gr321081861/.
57. *See* Travis Bean, *All 24 Marvel Cinematic Universe Films Ranked At The Box Office—Including 'Black Widow,'* FORBES (Apr. 24, 2020, 11:54 AM), https://www.forbes.com/sites/travisbean/2020/04/24/all-23-marvel-cinematic-universe-films-ranked-at-the-box-office-including-black-widow/?sh=2e522747494e (noting that 8 Marvel films have earned over $1 billion at the worldwide box office).
58. *Brand: Marvel Comics*, BOX OFFICE MOJO, https://www.boxofficemojo.com/brand/bn3732077058/?ref_=bo_bns_table_1
59. *See* Jason Gurwin, *Marvel's "Black Widow" Surpasses $60M in Disney+ Premier Access Sales During Opening Weekend*, THE STREAMABLE (Jul. 11, 2021, 11:16 AM), https://thestreamable.com/news/black-widow-sees-60m-in-disney-plus-premier-access-sales-during-opening-weekend.
60. *See supra* note 7 and accompanying text.

*Rear Window: The Future of Hollywood Contracting in the Streaming Age*

has wreaked on the film industry.[61] Disney claimed there was "no merit" to Johansson's complaint,[62] and that "[t]he lawsuit is especially sad and distressing in its callous disregard for the horrific and prolonged global effects of the Covid-19 pandemic."[63] Disney claimed they fully complied with Johansson's contract and that Johansson could use *Black Widow* to continue to earn upon the $20 million she already received from her front end deal with Disney.[64] Disney's main argument, then, was that *Black Widow* was given a day-and-date release primarily to reduce the amount of people who were congregating in person in an effort to minimize the spread of COVID-19.

Johansson's complaint shows she doubted that Disney decided on a day-and-date release strategy solely because of the pandemic.[65] Johansson stated in her complaint that "Disney knew that a 'day-and-date' release on Disney+ would drive up the total number of Disney+ subscribers—a key metric impacting Disney's stock price."[66] Regardless of whether Johansson is correct that Disney opted for a day-and-date release for reasons other than Covid-19, there is reason to think studios and streaming platforms alike are considering expanding on the strategy once COVID-19 is no longer as great a concern as it is currently.[67] In 2020, Warner Bros. struck a deal with HBO to release all their 2021 films day-and-date on HBO's streaming

---

61. *See* Brad Adgate, *The Impact Covid-19 Had on the Entertainment Industry In 2020*, FORBES (Apr. 13, 2021, 11:45 AM), https://www.forbes.com/sites/bradadgate/2021/04/13/the-impact-covid-19-had-on-the-entertainment-industry-in-2020/?sh=3b4e129b250f ("The $2.2 billion in box office receipts in 2020 marked a 40-year low in domestic box office").
62. Brent Lang, *Disney Fires Back at Scarlett Johansson, Calls 'Black Widow' Lawsuit 'Sad and Distressing,'* VARIETY (Jul. 29, 2021, 5:16 PM), https://variety.com/2021/film/news/disney-scarlett-johansson-black-widow-lawsuit-response-pandemic-1235030837/.
63. *Id.*
64. *Id.*
65. Complaint, Periwinkle Entertainment, Inc. v. The Walt Disney Company, No. 21STCV27831 (Cal. Sup. Ct. Jul. 29, 2021).
66. *Id.* at 5.
67. 2020 was not the first time that executives at Disney had put thought into the merits of simultaneously releasing films in theaters and on home release. *See* Peter Pollack, *Theater Chain Head Discusses DVD Release Windows*, ARS TECHNICA (Mar. 30, 2006, 7:31 PM) https://arstechnica.com/uncategorized/2006/03/6497-2/ ("To combat illegal downloads, Disney head Robert Iger instead went so far last summer as to suggest simultaneous release dates for both theater and home…").

MILLER FRIEDMAN

platform HBO Max.[68] This too was billed as a covid-related measure,[69] but in July of 2021 WarnerMedia CEO Jason Kilar announced Warner Bros. would produce at least 10 movies that will stream on HBO Max on the same day as the films' theatrical release in 2022.[70] Warner Bros. avoided a situation like the one Disney had with Johansson by compensating actors and filmmakers very shortly after they decided to employ their day-and-date strategy throughout the entirety of 2021.[71] Warner Bros. sees day-and-date as a successful strategy,[72] and while they have remarked that theatrical releases are still important to their business model,[73] it is clear they are going to continue to experiment with something different even when even absent Covid concerns.[74]

## IV. DAY-AND-DATE RELEASES AND THE FUTURE OF BACK-END CONTRACT STRUCTURING

Disney settling with Johansson is unsurprising given studios' previous eagerness to settle such disputes out of court.[75] Studios have stated

---

68. *See* Julia Alexander, *Warner Bros. Will Release All of its New 2021 Movies Simultaneously on HBO Max*, THE VERGE (Dec. 3, 2020, 1:30 PM), https://www.theverge.com/2020/12/3/22150605/hbo-max-warner-bros-movies-2021-simultaneous-release-matrix-godzilla-suicide-squad-space-jam.

69. *Id.* ("'We're living in unprecedented times which call for creative solutions, including this new initiative for the Warner Bros. Pictures Group,' said Warner Bros").

70. *See* Etan Vlessing and Georg Szalai, *Warner Bros. to Produce 10 Movies Exclusively for HBO Max in 2022*, THE HOLLYWOOD REPORTER (Jul. 22, 2021, 8:02 AM), https://www.hollywoodreporter.com/business/business-news/warner-bros-to-produce-10-movies-exclusively-for-hbo-max-in-2022-1234986624/.

71. *See* Malathi Nayak, Christopher Palmeri, *Scarlett Johansson Sues Disney for Streaming 'Black Widow' (2)*, BLOOMBERG LAW (Jul. 29, 2021, 5:15 PM), ("But some companies, like Warner Brothers Entertainment Inc., settled out of court with its stars after films like 'Wonder Woman' were released on its HBO Max streaming service last year, Johansson said in the complaint").

72. *See* Dade Hayes, *Day-and-Date Streaming is "Winning Strategy", But Consumer Bond With Movies Is "Greater Now Than It's Ever Been", WarnerMedia & Universal Execs Say*, DEADLINE (Aug. 10, 2021, 4:21 PM), (explaining that WarnerMedia executive Jim Wuthrich thinks the day-and-date strategy is increasing viewership numbers because the films are more accessible with respect to both location and time).

73. *Id.* ("The studio has pursued a middle path, setting deals with exhibitors for reduced windows but preserving the exclusive theatrical windows…").

74. *Id.*

75. *See* Tim Connors, *Beleaguered Accounting: Should The Film Industry Abandon Its Net Profits Formula?*, 70 S. CAL. LAW. REV. 841 at 908 ("The negative public opinion

*Rear Window: The Future of Hollywood Contracting in the Streaming Age*

that in order to avoid negative publicity, they attempt to resolve payment disputes with actors as amicably as possible.[76] This is helpful for actors like Johansson who file complaints, but for actors at-large, the constant settlements create potential challenges.[77] The lack of case law surrounding net and gross profits is unhelpful in guiding currently.[78] In the absence of this case law, studios can attempt to move in several different directions when it comes to compensating their artists.[79] So what options do actors and filmmakers have if the current trend toward streaming continues?

*A. The Buyout Model*

One option that has been offered up as a solution is the so-called "buyout model."[80] Under the buyout model, studios would attempt to calculate what an actor or filmmaker would stand to earn under the traditional back-end model, and then pay that amount up front to the actor or filmmaker before the film is actually released.[81] Some have argued that this structure provides actors and filmmakers with the potential for additional compensation that they have come to expect over the last number of years while eliminating the risk associated with a film that does much worse than expected when it is released.[82] Others have noted that the opposite is also true—if a film does much better than expected upon its release, actors will have received a lump sum in advance that is smaller than what they would have received under the traditional back-end structure.[83]

It is also important to consider the stature[84] of each actor and filmmaker when considering how willing they will be to participate in a buyout structure. Under the buyout structure, the actors are the ones taking on the risk that the studios normally took on under the

---

that the popular conceptions of the net profit formula inspires leads to very tangible economic losses for the studios").

76. Connors, *supra* note 75.
77. Connors, *supra* note 75 at 909.
78. Connors, *supra* note 75 at 909.
79. *See infra* Section IV.a-d.
80. *See* Brandon Milostan, *Bye Bye Back End, Hello Streaming*, L.A. Law. 44, May 2019, at 46.
81. *Id.*
82. *Id.*
83. *Id.* at 47.
84. Stature here refers not to popularity or fame, but specifically to how much money the actor has previously demanded on other projects.

back-end structure.[85] Under the buyout model, "it is talent who hedge bets on an individual film, taking larger fees for each project in case none of those projects achieves 'net profits.'"[86] By contrast, the studios and streaming services stand to lose a great deal of money by paying actors and filmmakers up front but will enjoy enormous profits if films become extremely popular.[87] Whether actors and filmmakers are comfortable with this risk re-allocation will likely depend on how lucrative their old deals could have been.[88] Take Johansson and stars of her ilk[89] as an example. Recall that under the old model, these stars could make as much as $50 million on a hit film if they decided to structure their contract largely based on back-end accruals.[90] $50 million is a significant sum of money, and it is possible that the largest stars will be reluctant to participate in a buyout model if they cannot earn such lofty sums when a film does much better than expected.[91] Actors and filmmakers who are not of Johansson's stature, however, never stood to collect those sums, even if they worked on a hit film, due to the Hollywood accounting practices discussed in Section II.[92] For these participants, it may make more sense to simply receive a lump sum in advance of a film's release, instead of having to worry about whether a film will become profitable by Hollywood's arcane standards.[93]

Another potential issue with the buyout model for studios is one of incentive.[94] Under the traditional back-end structure, actors and filmmakers have a large incentive to market and promote their film; the more people see the film, the more they can gain off a share of the gross receipts.[95] With the buyout model, actors and filmmakers

---

85. Milostan, *supra* note 80 at 47.
86. *Id.*
87. *Id.*
88. *See* Blaine Roth, *Tuning into The On-Demand Streaming Culture—Hollywood Guilds' Evolution Imperative in Today's Media Landscape*, 27 UCLA ENT. LAW. REV. 141, 167 (2020) ("[the buyout model] may also help talent who work on less successful films or televisions shows, that are subject to less reuse and thus lower residual payments.").
89. *See supra* note 35 and accompanying text.
90. *See supra* note 35 and accompanying text.
91. *See supra* note 70 and accompanying text.
92. *See supra* note 22 and accompanying text.
93. Roth, *supra* note 88 at 167.
94. Milostan, *supra* note 80 at 47 ("The driving force for talent to get any back end has always been the theatrical release.").
95. *See supra* notes 33-35 and accompanying text.

are paid in advance of the film's release.[96] Seemingly, the incentive they would have to market and promote the film would all be in service to the studio or the streaming platform—they are the ones who now have the heightened incentive to attract as many eyeballs as possible.[97] This may present legal questions, whereby studios and actors would have to conduct additional negotiations concerning marketing and promotion before signing a contract.

*B. The Per-View Royalty*

Another potential option would be to structure deals whereby actors and filmmakers receive a percentage of each view of their film.[98] This structure would be similar to music streaming platforms on a surface level.[99] This method may be attractive to studios and participants, as it is essentially a direct replacement of the gross points structure for the streaming milieu.[100] The structure could even maintain the bonus structure, whereby actors are paid a predetermined sum when a film reaches a certain amount of views on the streamer's platform.[101] However, the particularities of film streaming as opposed to music streaming present challenges to this method. First, studios and actors would have to determine how much money participants would make per stream.[102] This argument has already proven controversial in the music world,[103] and undoubtedly the film world would be prone to

---

96. Milostan, *supra* note 80 at 48.
97. *See supra* note 70 and accompanying text.
98. Milostan, *supra* note 80 at 49.
99. *Id.* (Music streaming services like Spotify and Apple Music pay artists a very small amount of money for every stream of one of their songs, and the artists will often have to share the total amount of money received per song with a record label, a manager, and anyone else who has contracted to receive a share of total streaming profits. The amount paid per stream varies based on the service and the country where a song is being streamed, but Spotify pays roughly $.0004 per play). *See* Dylan Smith, *How Much Does Spotify Pay Per Stream? Here's the Latest Data*, DIGITAL MUSIC NEWS (Aug. 17, 2020), https://www.digitalmusicnews.com/2020/08/17/how-much-does-spotify-pay-per-stream-latest.
100. *Id.*
101. *Id.*
102. *See generally* Ben Sisario, *Musicians Say Streaming Doesn't Pay. Can the Industry Change?*, THE NEW YORK TIMES (May 7, 2021), https://www.nytimes.com/2021/05/07/arts/music/streaming-music-payments.html.
103. *Id.*

MILLER FRIEDMAN

similar controversies.[104] Second, and perhaps more importantly, streaming services are loath to publicly announce how many people watch each of their films or television shows.[105] Creators of television shows have remarked that they cannot even get access to how many people are watching shows they created.[106] While some streaming platforms, like Netflix, have become more willing to present viewership numbers to the public in recent years,[107] many streaming services still keep that data private,[108] and a per-view royalty system would require the studios and streaming platforms to share this data with lawyers of participants for virtually every film they produce.[109] The third problem that would likely arise from a per-view payment structure is the meaning of the word "view."[110] Netflix says someone has "viewed" a film on its platform if the film stayed on their screen for at least two minutes.[111] This is a broad definition of the word "view," and it is similar to the definition of "listen" that Spotify uses in its music data.[112] If actors and filmmakers were being paid by the

---

104. *See* Milostan, *supra* note 80 at 48 (explaining that one confounding detail of a potential per-view royalty system is that music streaming is regulated through the Copyright Royalty Board, whereas film streaming is not yet subject to that regulation).
105. *See* Gerry Smith, *Netflix Won't Share Crucial Data, so TV Producers are Piecing it Together Themselves,* CONCORD MONITOR (May 10, 2020, 6:36 PM) https://www.concordmonitor.com/Netflix-won-t-share-crucial-data-so-TV-producers-are-piecing-it-together-themselves-34268375.
106. *Id.* (Explaining that comedian Ali Wong and showrunner Lauren Iungerich do not know how many people have watched their comedy specials and shows that have been released through Netflix).
107. Netflix notes that 142 million of their accounts have watched at least some portion of Squid Game. What portion of the show those accounts have watched is another story. *See* Milostan, *supra* note 104.
108. *See* Olivia Pakula, *The Streaming Wars+: An Analysis of Anticompetitive Business Practices in Streaming Business*, 28 UCLA ENT. LAW. REV. 147 at 168 ("…platforms have access to significant data that is unavailable to outside parties").
109. *Id.* at 167 (noting that data collected by streaming services allow the companies to make choices like which participants to hire for a project and how much money to allocate for a project).
110. *See* Joan E. Solsman, *Netflix: 'Mind-boggling' 142 million accounts have tuned in to Squid Game*, CNET (Oct. 20, 2021, 9:46 AM) https://www.cnet.com/tech/services-and-software/netflix-mind-boggling-142-million-accounts-tuned-in-to-squid-game/.
111. *Id.*
112. Spotify counts something as a stream if the user listens to a song for over 30 seconds. *See How We Count Streams*, Spotify https://artists.spotify.com/help/article/how-we-count-streams (last visited Oct. 27, 2021).

*Rear Window: The Future of Hollywood Contracting in the Streaming Age*

view, however, presumably studios and streaming platforms would want to extend the amount of time a film must be on a screen in order to count as a view.

*C. The Disney+ Premier Access Royalty Model*

The model built around a streaming structure like Disney+ Premier Access is also worth considering, as the Premier Access structure is one of the newest experiments employed by streaming services.[113] When *Black Widow* was released day-and-date, it was not *automatically* available to every person who had a Disney+ subscription.[114] It was available to every person with a Disney+ subscription if that person paid an additional $30 flat fee.[115] *Black Widow* was the fourth Disney film to receive this treatment, and only one more film was released under the Disney+ Premier Access umbrella.[116] Disney announced they were shutting down Premier Access for now, since movie theaters are open in most parts of the country.[117]

Even though Disney cancelled its Premier Access model, it is easy to see why the model may be attractive for participants who want to make their fair share of proceeds from a film they helped create. Another potential issue with the per-view royalty is that streaming services are not really making their money directly from the films they put on their platforms.[118] They are making money from subscriptions that allow people to watch anything on their platform.[119] Disney's Premier Access model solves this issue for purposes of talent payment. The Premier Access royalty model would allow participants to receive a portion of the money gained from every account that pays the flat fee to access the film from home.[120] This structure would

---

113. *See* Steven Cohen, *Disney Plus Premier Access Lets Subscribers Buy New Movies While They're Still in Theaters*, Business Insider (Sep. 22, 2021, 4:56 PM), https://www.businessinsider.com/disney-plus-premiere-access.
114. *Id.*
115. *Id.*
116. *Id.*
117. *Id.*
118. Pakula *supra* note 108 at 165.
119. *Id.*
120. One issue with this potential solution is that *Black Widow* was available to purchase for $30. A family of more than four people is most likely receiving a discount by paying that $30 at home rather than each paying for a ticket at the movie theater. *See* José Gabriel Navarro, *Ticket Price at U.S. Movie Theaters 2009-2021*, Statista (Jul. 27, 2022), https://www.statista.com/statistics/187091/average-

be much easier for participants to quantify without having access to a streaming service's proprietary data.[121]

Disney made it clear that Premier Access was strictly a Covid measure.[122] However, the model could have long-term success for family films. Even before the pandemic, children under the age of 12 were fastest declining age group of regular moviegoers.[123] The pandemic accelerated this decline.[124] Children (and their parents) may be reluctant to go to the movie theater, but might be willing to pay $30 to access the film at home.[125] If actors and filmmakers want to continue to profit off family films, they might be wise to push the Premier Access model to ensure their royalties are defined.

### D. The Case-By-Case Model and Creative Lawyering

The three models discussed above[126] are three of many that could be suggested by studios or participants in the coming years. Ultimately, it will be up to lawyers and agents to construct the best payment structures for their clients.[127] It is clear the theatrical window is closing, and gross points are no longer going to be as reliable and lucrative as they once were.[128] However, film executives have made it clear theatrical releases are not simply going to disappear overnight.[129] This complexity will require some flexibility on the part of both sides to come to workable agreements based on the type of

---

ticket-price-at-north-american-movie-theaters-since-2001/. Theoretically, Johansson would still claim she is losing money with the Premier Access royalty model if she could show that the number of people watching *Black Widow* was disproportionate to the amount of Premier Access subscriptions purchased.
121. *See* Smith, *supra* note 105.
122. Cohen, *supra* note 113.
123. Steven Zeitchik, *The Delta Variant May Be Slowly Killing the Family Movie*, THE WASHINGTON POST (Sep. 5, 2021, 6:00 AM), https://www.washingtonpost.com/business/2021/0s9/05/delta-variant-may-be-slowly-killing-family-movie/.
124. *Id.*
125. This is supported by the fact that the films Disney released through its Premier Access structure were all family movies. *See* Milosta, *supra* note 104.
126. *See supra* Section III.
127. Brandon Milostan, *Bye Bye Back End, Hello Streaming*, L.A. Law. 44, May 2019, at 49.
128. *See* Complaint, *supra* note 65 at 5.
129. *Id.*

film being made.[130] A simple combination of methods may have satisfied both parties in Johansson and Disney's back and forth. Had the parties known in advance that a day-and-date release was imminent, they could have structured Johansson's deal so that she received gross points on the theatrical release, and then received a portion of the proceeds gained from those who paid the $30 for Disney+ Premier Access.[131] This would have avoided completely shifting the risk to Disney[132] and also avoided the scenario where Johansson felt she was not profiting from a large chunk of people who saw her film.

Another foreseeable outcome that has been posited is entertainment lawyers begin to secure deals for their clients that take net profits and gross points out of the equation altogether.[133] In place of those arguments, new ones could arise such as whether algorithms are pushing the film in the correct way,[134] or whether the streaming platform has targeted the correct audience using its data model.[135]

These types of issues have already presented themselves in the context of music streaming. In 2020, Spotify rolled out a function called discovery mode, which gave artists an option to receive a smaller royalty rate.[136] In exchange, Spotify would push their song to more listeners using its algorithm.[137] Many artists complained about the tool, claiming it was reminiscent of the Payola radio scandals from the 1950s and 1960s, when radio DJs were being paid to play songs on their programs.[138] This may not be directly analogous to the film industry, but it is likely that streaming services like Disney+ would run into similar problems as Spotify if they began compensating film participants on a per-stream basis.

Again, issues like the ones described above would be difficult to parse out publicly given film streamers' propensity to keep their data

---

130. *See* Roth, *supra* note 88, at 167 s("With the evolving types of production and distribution, it is becoming harder to neatly place a project into a definitive bucket, allow for freedom of interpretation…").
131. *See* Navarro, *supra* note 120 and accompanying text.
132. *See* Connors, *supra* note 75, at 909 and accompanying text.
133. Milostan, *supra* note 80, at 49.
134. *Id.*
135. *Id.*
136. *See* Noah Yoo, *Could Spotify's New Discovery Mode Be Considered Payola?*, Pitchfork (Nov. 9, 2020) https://pitchfork.com/thepitch/could-spotifys-new-discovery-mode-be-considered-payola/.
137. *Id.*
138. *Id.*

models very close to the vest.[139] But there may be incentive for streaming services to work with high profile actors on issues of their algorithm.[140] It has been said that "data-rich accumulation is self-reinforcing."[141] That is, the more data a streaming service can collect on viewers, the better they can cater to their preferences, which will cause the viewers to use the service more.[142] Once they use the service more, the services can collect even more data.[143] In fact, Spotify has actually taken their data tracking habits and turned them into a package that consumers actually enjoy.[144] Spotify Wrapped is a function that shows listeners their musical year in review; the tool has become hugely popular on social media, with Spotify subscribers sharing their year-end lists *en masse*.[145] Whether this is practical for or appealing to subscribers of film and television streaming services remains to be seen, but it is not unimaginable that actors and their lawyers would be open to a royalty model if it were tied to data tracking that would have the wide consumer appeal of something like Spotify Wrapped.

## CONCLUSION

Talent compensation in the streaming era is not a brand-new concern.[146] The issue had been steadily becoming more relevant as streaming services exerted more influence in the film industry.[147] As with most things, however, Covid-19 accelerated the issue tenfold.[148] Scarlett Johansson's complaint then brought the issue into the public consciousness,[149] and now it is more important than ever for studios,

---

139. *See* Milostan, *supra* note 94, at 49 and accompanying text.
140. Pakula, *supra* note 108 at 167.
141. *Id*. (quoting Staff of Subcomm. On Antitrust, Com. & Admin. Law. Of The H. Comm. On the Judiciary, 116th Cong., Investigation of Competition In Digital Markets). .
142. Pakula at 167.
143. *Id.*
144. *See* Kelly Pau, *Spotify Wrapped, Unwrapped*, Vox (Dec. 2, 2021, 5:20 PM) https://www.vox.com/culture/22814121/spotify-wrapped-2021-algorithm-data-privacy.
145. *Id.*
146. *See* Nellie Andreeva, *Disney TV Studios Eyes New Profit Participation Model As Industry Continues To Pull Away From Traditional Backend Deals*, DEADLINE (Jul. 8, 2019, 2:23 PM) https://deadline.com/2019/07/hollywood-profit-participation-tv-deals-changes-disney-streaming-services-1202641423/.
147. *Id.*
148. *See* Bean, *supra* note 57 and accompanying text.
149. *See* Lindahl, *supra* note 5.

*Rear Window: The Future of Hollywood Contracting in the Streaming Age*

streaming services, and actors to figure out how they are going to operate under the new rules of the game. While the issue has been billed to the public as megastar vs. media conglomerate,[150] the future of back-end payment is relevant to participants on every level of the cinema totem pole.[151] Hollywood contract structuring remained relatively untouched for decades,[152] but the realities of the current film industry make it imperative that the structuring is altered. Streaming and the non-traditional moviegoing experience appear to be only increasing in popularity,[153] so it would behoove the film industry to come to a working solution before the problem becomes worse.

---

150. *Id.*
151. *See* Milostan, *supra* note 80, at 47 and accompanying text.
152. The profit participation model has been the dominant one since Lew Wasserman suggested Jimmy Stewart receive points on his 1950 film *Winchester '73*. *See* Tim Gray, *Lew Wasserman: Still Remembered as Hollywood's Ultimate Mover and Shaker*, Variety (Mar. 22, 2016, 2:44 PM) https://variety.com/2016/biz/news/lew-wasserman-birthday-mover-shaker-1201721984/.
153. Samuel Spencer, *How Many Subscribers Do Netflix, Disney+ and the Rest of the Streaming Services Have?*, Newsweek (May 11, 2021, 10:39 AM) https://www.newsweek.com/netflix-amazon-hulu-disney-most-subscribers-streaming-service-1590463.