# EXHIBIT 1

Case No: HC11C04518

Neutral Citation Number: [2012] EWHC 268 (Ch)
**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Rolls Building, Fetter Lane, London EC4A 1NL

Date: 20 February 2012

Before :

**THE HON MR JUSTICE ARNOLD**
- - - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **(1) DRAMATICO ENTERTAINMENT LIMITED** | **Claimants** |
| **(2) EMI RECORDS LIMITED** | |
| **(3) MERCURY RECORDS LIMITED** | |
| **(4) POLYDOR LIMITED** | |
| **(5) ROUGH TRADE RECORDS LIMITED** | |
| **(6) SONY MUSIC ENTERTAINMENT UK LIMITED** | |
| **(7) VIRGIN RECORDS LIMITED** | |
| **(8) WARNER MUSIC UK LIMITED** | |
| **(9) 679 RECORDINGS LIMITED** | |
| - and - | |
| **(1) BRITISH SKY BROADCASTING LIMITED** | **Defendants** |
| **(2) BRITISH TELECOMMUNICATIONS PLC** | |
| **(3) EVERYTHING EVERYWHERE LIMITED** | |
| **(4) TALKTALK TELECOM GROUP PLC** | |
| **(5) TELEFÓNICA UK LIMITED** | |
| **(6) VIRGIN MEDIA LIMITED** | |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Ian Mill QC, Edmund Cullen** and **Tom Richards** (instructed by **Forbes Anderson Free**) for
the **Claimants**
**The Defendants** did not appear and were not represented

Hearing date: 9 February 2012
- - - - - - - - - - - - - - - - - - - - -

# Judgment

**MR JUSTICE ARNOLD :**

## Contents

| Topic | Paras |
|---|---|
| Introduction | 1-8 |
| The absence of the operators and users of TPB | 9-15 |
| The Claimants' rights | 16-18 |
| Bittorrent | 19-20 |
| TPB | 21-29 |
| Legal Framework | 30-38 |
| International treaties | 30-33 |
| Berne Convention | 30 |
| WIPO Copyright Treaty | 31-32 |
| WIPO Performances and Phonograms Treaty | 33 |
| Information Society Directive | 34-36 |
| Domestic Implementation of the Information Society Directive | 37 |
| The 1988 Act | 38 |
| Infringement by users of TPB | 39-71 |
| Copying | 40-43 |
| Communication to the public | 44-71 |
| Infringement by the operators of TPB | 72-83 |
| Authorisation | 73-81 |
| The nature of the relationship | 75-76 |
| The means used to infringe | 77 |
| Inevitability of infringement | 78 |
| Degree of control | 79 |
| Steps to prevent infringement | 80 |
| Conclusion | 81 |
| Joint tortfeasance | 82-83 |
| Conclusion | 84 |

## Introduction

1.  The Claimants are record companies claiming on their own behalf and in a representative capacity on behalf of the other members of BPI (British Recorded Music Industry) Ltd ("BPI") and Phonographic Performance Ltd ("PPL"). The Defendants are the six main retail internet service providers ("ISPs"). Between them they have a fixed line market share of some 94% of UK internet users. By this claim the Claimants seek an injunction against the Defendants pursuant to section 97A of the Copyright, Designs and Patents Act 1988 ("the 1988 Act"), which implements Article 8(3) of European Parliament and Council Directive 2001/29/EC of 22 May 2001 on the harmonisation of certain aspects of copyright and related rights in the information society ("the Information Society Directive"), requiring the Defendants to take measures to block or at least impede access by their customers to a peer-to-peer ("P2P") file-sharing website called The Pirate Bay ("TPB").

2.  In *Twentieth Century Fox Film Corp v British Telecommunications plc* [2011] EWHC 1981 (Ch), [2011] RPC 28 ("*20C Fox v BT*") I held that the Court had jurisdiction, and that it was appropriate to exercise my discretion, to make a blocking order against the Second Defendant ("BT") with respect to a website called Newzbin2. In *Twentieth Century Fox Film Corp v British Telecommunications plc (No 2)* [2011] EWHC 2714 (Ch) I determined the terms of that order.

3.    On 12 December 2011 Vos J made a similar order against the First Defendant ("Sky") in respect of Newzbin2. The making of the order was not opposed by Sky, and its wording was agreed. Paragraph 1 of that order provides:

> "In respect of its residential fixed line Sky Broadband customers to whose service the system known as Mohawk is applied, the Respondent shall within 7 working days adopt the following technical means to block or attempt to block access by its customers to the website currently known as Newzbin2 and currently accessible at www.newzbin.com, its domains and sub-domains and including payments.newzbin.com and any other IP address or URL whose sole or predominant purpose is to enable or facilitate access to the Newzbin2 website. The technology to be adopted is:
>
> (i)    IP blocking in respect of each and every IP address from which the said website operates and which is:
>
>     (a)    notified in writing to the Respondent by the Applicants or their agents; and
>
>     (b)    in respect of which the Applicants or their agents notify the Respondent that the server with the notified IP address blocking does not also host a site that is not part of the Newzbin2 website.
>
> (ii)    IP address re-routing in respect of all IP addresses that provides access to each and every URL available URL available from the said website and its domains and sub-domains and which URL is notified in writing to the Respondent by the Applicants or their agents; and
>
> (iii)    URL blocking in respect of each and every URL available from the said website and its domains and sub-domains and which is notified in writing to the Respondent by the Applicants or their agents."

4.    On 9 February 2012 I made a similar order against the Fourth Defendant ("TalkTalk") in respect of Newzbin2. Again, the making of the order was not opposed by TalkTalk, and its wording was agreed. Paragraphs 1-4 of that order provide:

> "1.    In respect of its customers to whose internet access service the system known as SIG (Service Inspection Gateway) is applied whether optionally or otherwise, the Respondent shall within 10 working days adopt the following technical means to block or attempt to block access to the website currently known as Newzbin2 and currently accessible at www.newzbin.com and/or www.newzbin2.es, its domains and sub-domains and including payments.newzbin.com and any other URL the sole or predominant purpose of which is to enable or facilitate

access to the Newzbin2 website.  The technical means to be adopted is:

URL blocking in respect of each and every URL from which the said website (and its domains and sub-domains which are notified in writing to the Respondent by the Applicants or their agents) operates.

2.  For the avoidance of any doubt, paragraph 1 is complied with if the Respondent uses the system known as SIG.

3.  In respect of its customers to whose internet access service the system known as blackholing is applied, the Respondent shall within 10 working days adopt the following technical means to block or attempt to block access to any IP address the sole or predominant purpose of which is to enable or facilitate access to the Newzbin2 website.  The technical means to be adopted is:

IP blocking in respect of each and every IP address from which the said website operates and which is:

(a)  notified in writing to the Respondent by the Applicants or their agents; and

(b)  in respect of which the Applicants or their agents notify the Respondent that the server with the notified IP address does not also host a site that is not part of the Newzbin2 website.

4.  For the avoidance of any doubt, paragraph 3 is complied with if the Respondent uses the system known as blackholing."

5.  As I explained in *20C Fox v BT* at [2], that application was a sequel to a successful claim for copyright infringement brought by the applicants in that case against Newzbin Ltd, which had operated an almost identical website to Newzbin2 ("Newzbin1"). Newzbin Ltd was found by Kitchin J to have infringed the claimants' copyrights on a large scale: *Twentieth Century Fox Film Corp v Newzbin Ltd* [2010] EWHC 608 (Ch), [2010] FSR 21 ("*20C Fox v Newzbin*"). He granted an injunction against Newzbin Ltd to restrain further infringements of the claimants' copyrights. Subsequently the Newzbin1 website ceased operation. Shortly afterwards, however, the Newzbin2 website commenced operation at the same location. As was explained in more detail in *20C Fox v BT* at [48]-55], Newzbin2 operated in essentially the same manner as Newzbin1. It followed that Kitchin J's findings of infringement of copyright in respect of Newzbin1 were equally applicable to Newzbin2: see *20C Fox v BT* at [113].

6.  In the present case, however, the Claimants have not brought proceedings for copyright infringement against the operators of TPB in this jurisdiction, although both civil and criminal proceedings have been brought in a number of other jurisdictions. Accordingly, the Claimants and the Defendants agreed to a consent order made by

Henderson J on 20 January 2012 directing the trial of two preliminary issues, namely whether on the evidence before the Court, (i) users and (ii) the operators of TPB infringe the Claimants' copyrights in the UK. The remaining issues raised by the claim were left to be dealt with at a second hearing if the Claimants prevailed on either or both of the preliminary issues. In the particular circumstances of the present case, I accept that this was a sensible way in which to proceed, but I wish to make it clear that I do not regard it as essential for claims of this nature to be dealt with in two stages.

7.   Understandably, the Defendants did not choose to appear or be represented at the trial of the preliminary issues. I was informed by counsel for the Claimants that the Defendants' position is that it is not for the Defendants to decide whether or not users or the operators of TPB infringe the Claimants' rights, but for the Court to do so. Be that as it may, I have considered the Claimants' contentions with care to see if they are made out on the evidence and the law.

8.   The Claimants have filed a considerable volume of evidence in support of the claim. Some of this evidence relates to issues other than the preliminary issues. I do not consider that it is necessary to summarise all the evidence relevant to the preliminary issues in this judgment, although I have taken it all into account.

The absence of the operators and users of TPB

9.   The operators of TPB have not been joined as defendants to this claim, nor has it been served upon them. They did not appear at the hearing, nor have they been represented. Nor has any user been joined, served, appeared or been represented. It might be asked why it would be appropriate for this Court to determine the preliminary issues in their absence. Counsel for the Claimants gave four answers to that question, the first three of which I agree with.

10.  First, there is no jurisdictional requirement to join or serve the operators or users of TPB. Article 8(3) of the Information Society Directive and section 97A of the 1988 Act (set out below) confer jurisdiction on the Court to grant injunctions against intermediaries whose services are used by a third party to infringe copyright. Neither Article 8(3) nor section 97A requires joinder or service of the third party.

11.  Secondly, the courts both in this jurisdiction and in other Member States have proceeded on the basis that it is not necessary to join or serve the third party. In *20C Fox v BT* the operators of Newzbin2 claimed to be different to the operators of Newzbin1. I granted the order sought even though the operators of Newzbin2 had not been joined or served and no user was joined or served (although one user did apply to be joined prior to the second hearing). The same approach has been adopted by courts in Belgium, Denmark and the Netherlands. Thus in *Stichting Bescherming Rechten Entertainment Industrie Neederland BREIN v Ziggo BV* (case 374634/HA ZA 10-3184, judgment dated 11 January 2012) the District Court of the Hague (Judges Blok, Kalden and Loos) held at [4.42]:

> "The District Court considers on that as follows. The imposing of the claimed order meets the conditions of due process. After all, the measure is imposed after a prior, fair and impartial procedure, i.e. the present proceedings. Contrary to what Ziggo

> and XS4ALL argue, it is not required that all its subscribers are
> parties to the proceedings or are heard. It provides that 'the
> person or persons concerned' must be heard. In a case like the
> present one, in which an order is claimed against
> intermediaries, such intermediaries can be considered to be the
> persons concerned in the sense of this provision. Said
> intermediaries have been heard. Any different interpretation
> would render the regulation for orders against intermediaries
> which the European legislator has implemented with the
> Enforcement Directive meaningless. It is inherent in such
> regulation that an order can be imposed upon inter alia internet
> providers to cease their services in proceedings to which the
> alleged infringer is not, at least not necessarily a party and so is
> not heard in it. One of the reasons for implementing such an
> option is precisely, after all, the situation that the alleged
> infringer cannot be sued, for instance because his identity is not
> known (see Memorandum, following the report, Parliamentary
> Documents II 2005-2006, 30 392, no. 6, p. 10 and 11)."

12. Thirdly, it would be impracticable, or at least disproportionate, to require joinder or service of the operators or users of TPB.  TPB was set up and originally operated by four Swedish individuals (Fredrik Neij, Gottfrid Svartholm Warg, Peter Sunde Kolmisoppi and Carl Lundström) who were convicted of criminal offences of aiding and abetting copyright infringement by the Swedish courts. It appears that, while their (unsuccessful) appeals against conviction were pending, they left the jurisdiction of the Swedish courts. While Warg is said to be in Cambodia, it is unclear where the others are. Furthermore, they have claimed that TPB is now operated by a Seychelles company called Reservella Ltd, although this is disputed. In subsequent civil proceedings brought by a number of record companies in Sweden against Warg, Neij and Sunde, the court has thus far been unable to serve the proceedings on the defendants. There is no reason to believe that any attempt to serve English proceedings on them would be any more successful.

13. Even if proceedings could be served upon the operators of TPB, there is no reason to believe that they would seek to defend them or to make representations to this court. The BPI wrote to the operators complaining of infringement on 12 July 2011 and subsequently sent a copy of the letter by email on 10 August 2011, but received no reply. The operators' attitude is clear from the following passage on the "about" page of TPB:

> "Only torrent files are saved at the server. That means no
> copyrighted and/or illegal material are stored by us. It is
> therefore not possible to hold the people behind The Pirate Bay
> responsible for the material that is being spread using the
> tracker. Any complaints from copyright and/or lobby
> organisations will be ridiculed and published at the site."

True to their word, the "legal threats" page of the website contains links to copies of a series of cease and desist letters sent by right owners together with the operators' responses, which tend to the profane. The page ends:

"No action (except ridiculing the senders) has been taken by us because of these. :-)

Nice graphs for the law firms who don't get the hint above:

(we used to have a nice graph here, but it's simpler to just say: 0 torrents has been removed, and 0 torrents will ever be removed.)"

There is more evidence of this kind.

14.    Turning to the users of TPB, the evidence is that there is a considerable number of these in the UK. While in theory it would be possible to identify those users, or most of them, who were using TPB during a particular period by means of *Norwich Pharmacal* orders directed to ISPs, that would be a costly exercise in itself. It would be wholly disproportionate to attempt to join or serve all such users, and there would be no basis for singling out particular users for joinder or service. Nor, I suspect, would most users wish to defend the proceedings or even make representations.

15.    The fourth answer given by counsel was that any findings of infringement made in these proceedings would not be binding upon the operators or users of TPB. While technically correct, I do not regard this point as particularly persuasive, since if the order sought by the Claimants is granted the operators and users of TPB will be adversely affected.

The Claimants' rights

16.    Each of the Claimants is in the business of making and exploiting sound recordings of musical works. To that end they own or exclusively license the copyrights in such sound recordings. As noted above, they represent the members of BPI and PPL. BPI is an industry body which represents the interests of independent and major record companies in the UK. Currently BPI has some 361 members. It is a member of the International Federation of the Phonographic Industry ("IFPI"), which represents the interests of the recording industry worldwide. IFPI has 1,400 members in 66 countries, and affiliated industry associations in 45 countries. PPL is a UK collective licensing body which administers certain of the rights conferred by copyright on behalf of its members. The members of BPI and PPL between them hold the UK rights for approximately 99.8% of all sound recordings sold legally in the UK. The Claimants' evidence is that, with one exception, none of the members of BPI or PPL has granted a licence to TPB.

17.    For the purposes of these proceedings, the Claimants rely in particular upon the copyrights which the relevant Claimant owns in each of the recordings in the following sample albums:

| Recording | Claimant |
|---|---|
| "The House" by Katie Melua | Dramatic Entertainment Ltd |
| "It's Not Me, It's You" by Lily | EMI Records Ltd |

| Allen | |
|---|---|
| "Last Night On Earth" by Noah & The Whale | Mercury Records Ltd |
| "Lights" by Ellie Goulding | Polydor Ltd |
| "Valhalla Dancehall" by British Sea Power | Rough Trade Records Ltd |
| "Everybody Wants To Be On TV" by Scouting For Girls | Sony Music Entertainment UK Ltd |
| "What Did You Expect From The Vaccines?" by The Vaccines | Sony Music Entertainment UK Ltd |
| "Hold Me Down" by You Me At Six | Virgin Records Ltd |
| "Seasons Of My Soul" by Rumer | Warner Music UK Ltd |
| "The Defamation of Strickland Banks" by Plan B | 679 Recordings Ltd |

18.    Each Claimant has confirmed that it has not granted TPB a licence in respect of the respective sample recording(s).

<u>Bittorrent</u>

19.    The Bittorrent P2P protocol is described in an expert report by Michael Walsh of Kerna Communications Ltd, a specialist computer networking and security consultancy based in Dublin. It is convenient to quote the key passages of his report:

"65.    Peer to peer technologies are in continuing development. Since the successful prosecution of a previous service, Limewire, in 2010 Bittorrent has emerged as the dominant P2P protocol. P2P services each differ from one another in many technical details, but they all share certain basic elements:

(a)    The user downloads and installs on his or her computer a piece of software, for example μTorrent (also known as uTorrent). This software is easily found using an internet search engine and is downloaded for free without any personal identification required.

(b)    Once the software is installed on a computer, whenever that computer connects to the Internet it becomes part of a P2P network or system consisting of many other computers using the same software. P2P software often

installs itself so that it runs in the background whenever the computer is started.

(c)     A user locates files for download in different places depending on the P2P technology in use. Bittorrent users may use The Pirate Bay because it is simple to search and find music, video, games and software.

(d)     Once a user is a participant in a P2P network, he or she can download files hosted and being made available by other users of the P2P network. At the same time the user's computer acts as an uploader, making the files that it has locally available to others.  The files are not stored or hosted on a central server. Instead, each computer that is part of the network can act as a mini-server from which other P2P users on the network can download files.

(e)     P2P technology distributes large data files by breaking them up into small pieces (chunks) and sends them over the Internet to the requesting user. The P2P software may request chunks of the file from different members of the P2P network. When all the data is received by the user's computer, the file is reassembled as a whole.

(f)       Because of their organisation, where users in a P2P network will generally act both as a client and a server (i.e. uploader as well as downloader), each participant provides resources to the network such as bandwidth, storage space and computing power, thereby increasing capacity as the network grows.  P2P networks scale well as they grow in size and are resilient where there is no central component.

66.    When an uploader using an ISP's Internet service chooses to share a copyright work stored on his or her computer such as a sound recording or film in the form of a digital file and connects to a P2P service using an ISP's Internet service, he or she makes that file publicly available to substantial numbers of other P2P users who are able to search for the file and, on a request made automatically by one PC to another, transfer and share further copies of that file over the Internet.

…

Sharing a file for the first time

68.    In the Bittorrent system, when a user has a new file to share with other peers (i.e. no other copies already exist in P2P

networks) they first need to make available details relating to that file so that others can find it.

69.    They first select two related entities that will facilitate P2P distribution of the new file – the 'tracker' that will co-ordinate the distribution of the file among the peers and the torrent site itself where the user will publish the information necessary to share the file.

70.    The tracker is commonly needed because, during the sharing process, the identity of the computers which can provide pieces that make up the file contents change regularly as other users acquire the content and make it available (and others may become unavailable).

71.    The tracker monitors the computers that have all or some of the pieces available for download and makes that information available to any user's Bittorrent client when it commences the download process.

72.    The user then creates, typically with a piece of software, a torrent file that provides all the information necessary for others to download the shared file using P2P software.  The torrent file is a small text file.  It provides a set of instructions to the Bittorrent client installed on a user's computer.  The torrent file does not itself contain any of the content to which it relates. The Torrent file contains the file list, file sizes and hash values that the Bittorrent software assigns to the files to, in effect, uniquely identify the content. The hash value is a reference code comprising a string of letters and numbers, which is used to identify each piece of the content to be shared. This enables the tracker to recognise pieces of the content file as they are shared and is intended to ensure that the content files are correctly downloaded and unmodified.

73.    The user uploads that torrent file to the torrent site. The user then runs their P2P client software on the machine containing the complete file to be shared – a process known as providing the seed, or seeding.

74.    The P2P client software then interacts with the torrent site and associated tracker to allow others to find and share that new file.

Downloading and sharing a file that is already available

75.    A computer user would typically download and share a file using Bittorrent P2P in the following manner:

    (a)    Identify the file they wish to download – either by using a web browser and search engine to find a site

       hosting torrent files, or alternatively going directly to a known dedicated torrent website and browsing its contents.

(b)    Retrieve and open the torrent file associated with that file using the Bittorrent client software running on their computer.

(c)    The Bittorrent client software uses the information in that torrent file to communicate with the tracker server that identifies all users ('peers') who are able to share the file.

(d)    Computers that are online, running P2P software and are able to share the file, report back regularly to the tracker to let it know they can provide (pieces of) the file to other peers.

(e)    The tracker server links peers together and each peer then sends pieces of the file to the user's computer where the P2P client software receives them and reassembles them into the complete file.

76.    Often, through the course of downloading a single file, one peer will connect to hundreds of others. Therefore, unlike other systems (where high demand for a particular content file may slow the download process), where demand for a specific file via Bittorrent is high, the more efficient the download performance for all users.

77.    A Bittorrent user that has a complete file available for upload is called a 'Seeder' and their file copy is called a 'Seed'. A user that is downloading, but does not yet have the complete file, is called a Leecher.

78.    The community of Bittorrent computers sharing a file at any time is called a Swarm. The size and membership of a swarm will change over time as computers come and go."

20.    As is clear from this account, the key part of the Bittorrent protocol is the creation and distribution of torrent files associated with particular content files. The torrent files do not themselves contain any material from the associated content files. Rather, they enable the identification, and hence the uploading and downloading, of the relevant content files. Thus they serve a somewhat similar function to the NZB files described in *20C Fox v Newzbin* at paragraphs [29] to [31] (summarised in *20C Fox v BT* at [32]).

TPB

21.    TPB describes itself on the "about" page as follows:

> "The Pirate Bay is the worlds largest bittorrent tracker. Bittorrent is a filesharing protocol that in reliable way enables big and fast file transfers.
>
> This is an open tracker, where anyone can download torrent files. To be able to upload torrent files, write comments and personal messages one must register at the site. This is of course free."

22.    TPB provides an organised directory of content which users can browse and from which they can select the content of their choice. Among the search options available are "music" and "audio". By use of the various search options it is easy to find, among other things, recordings by particular artists. It is also possible to select files that are popular with other users. Furthermore, users can select file types including "music" and "FLAC" (i.e. Free Lossless Audio Codec, an audio format similar to MP3).

23.    Having selected the content, the user downloads the relevant torrent file for that content from TPB. The Bittorrent software on the user's computer will then use the information in the torrent file to download the "pieces" of the content file from the "swarm" in the manner described by Mr Walsh.

24.    As Mr Walsh explains in a second report TPB used to offer so-called Magnet links as an alternative to downloading a torrent file directly from its website. Recently TPB has made provision of a Magnet link the default option (while retaining the facility for direct download if the user wishes it). A Magnet link simply provides a different means whereby TPB enables users to download torrent files. The Magnet link connects the user either to a Bittorrent tracker or to the "swarm" in order to obtain the torrent file rather than obtaining it directly from The Pirate Bay. It is not necessary to go into the technical details of this.  Once the torrent file has been acquired, the user can download the content to which it relates.

25.    TPB also provides a simple facility for registered users to upload torrent files. Registration is straightforward and free.

26.    TPB is a very widely-used website.  As at 19 December 2011, over 30 million users worldwide were using its service. As of 21 December 2011, it was the 43rd most popular website in the UK according to the authoritative Alexa rankings. According to Comscore measurements, in October 2011 it received 3,669,050 unique visitors from the UK (8.61% of the worldwide total).

27.    As for the content that is available on TPB, it is vast in scale. As at 19 December 2011, its index listed 4,021,772 torrent files. In order to provide evidence of the extent to which BPI's members' works are included in that content, Dr David Price, who is Head of Piracy Intelligence at Envisional Ltd, a consultancy based in Cambridge, has undertaken an analysis of its distribution between different categories of content using a sample of 62,380 files. He concludes that 25.59% of the content is comprised of music (including music videos).

28.    Dr Price has also analysed the proportion of this content which is commercially available, and therefore highly likely to be protected by copyright. In the music

category, 75.1% of the files chosen for verification were confirmed as being commercially available. An additional 3% were considered to be likely to be protected by copyright. Applying these figures to the total number of torrents available as at 19 December 2011, it implies that over 1 million "music" torrents were listed on TPB, of which over 750,000 were commercially available. As at that date, torrents for 72 of the top 75 albums in the UK chart were available on TPB.

29.    It should be noted that the operators of TPB do not operate the website for altruistic reasons. On the contrary, the website carries click-through advertising. Dr Price estimates the revenue generated by such advertising, based on some fairly conservative assumptions, at somewhere in the range US$1.7 to 3 million in the month of October 2011. In addition the operators sell merchandise, the revenue from which is more difficult to estimate.

Legal framework

*International treaties*

30.    *Berne Convention*. The International Convention for the Protection of Literary and Artistic works signed at Berne on 9 September 1886 (Paris Act of 1971 as amended in 1979) ("the Berne Convention"), to which all Member States of the European Union are parties, includes the following provisions:

"*Article 2*

(1)    The expression 'literary and artistic works' shall include every production in the literary, scientific and artistic domain, whatever may be the mode or form of its expression, such as books, pamphlets and other writings; lectures, addresses, sermons and other works of the same nature; dramatic or dramatico-musical works; choreographic works and entertainments in dumb show; musical compositions with or without words; cinematographic works to which are assimilated works expressed by a process analogous to cinematography; works of drawing, painting, architecture, sculpture, engraving and lithography; photographic works to which are assimilated works expressed by a process analogous to photography; works of applied art; illustrations, maps, plans, sketches and three-dimensional works relative to geography, topography, architecture or science.

…

*Article 11*bis

(1)    Authors of literary and artistic works shall enjoy the exclusive right of authorizing:

(i)    the broadcasting of their works or the communication thereof to the public by any other means of wireless diffusion of signs, sounds or images;

> > (ii)    any communication to the public by wire or by rebroadcasting of the broadcast of the work, when this communication is made by an organization other than the original one;
> >
> > (iii)   the public communication by loudspeaker or any other analogous instrument transmitting, by signs, sounds or images, the broadcast of the work.
>
> …"

31.    *WIPO Copyright Treaty*. The World Intellectual Property Organisation Copyright Treaty agreed in Geneva on 20 December 1996 ("the WIPO Copyright Treaty"), to which the European Union and all its Member States are parties, includes the following provisions:

> "*Article 1*
>
> **Relation to the Berne Convention**
>
> (1)    This Treaty is a special agreement within the meaning of Article 20 of the Berne Convention for the Protection of Literary and Artistic Works, as regards Contracting Parties that are countries of the Union established by that Convention. This Treaty shall not have any connection with treaties other than the Berne Convention, nor shall it prejudice any rights and obligations under any other treaties.
>
> (2)    Nothing in this Treaty shall derogate from existing obligations that Contracting Parties have to each other under the Berne Convention for the Protection of Literary and Artistic Works.
>
> (3)    Hereinafter, 'Berne Convention' shall refer to the Paris Act of July 24, 1971 of the Berne Convention for the Protection of Literary and Artistic Works.
>
> (4)    Contracting Parties shall comply with Articles 1 to 21 and the Appendix of the Berne Convention.
>
> …
>
> *Article 8*
>
> **Rights of communication to the public**
>
> Without prejudice to the provisions of Articles 11(1)(ii), 11*bis*(1)(i) and (ii), 11*ter*(1)(ii), 14(1)(ii) and 14bis(1) of the Berne Convention, authors of literary and artistic works shall enjoy the exclusive right of authorizing any communication to the public of their works, by wire or wireless means, including the making available to the public of their works in such a way that members of the public may access these works from a place and at a time individually chosen by them."

32.    At the Diplomatic Conference at which the WIPO Copyright Treaty was adopted, a number of statements concerning its interpretation were agreed. These include the following statement in relation to Article 8:

> "It is understood that the mere provision of physical facilities for enabling or making a communication does not in itself amount to communication within the meaning of this Treaty or the Berne Convention. …"

33.    *WIPO Performances and Phonograms Treaty*. The World Intellectual Property Organisation Performances and Phonograms Treaty ("the WIPO Performances and Phonograms Treaty"), which was agreed at the same time as the WIPO Copyright Treaty, and to which the European Union and all its Member States are also parties, includes the following provisions:

> "*Article 10*
>
> **Right of Making Available of Fixed Performances**
> Performers shall enjoy the exclusive right of authorizing the making available to the public of their performances fixed in phonograms, by wire or wireless means, in such a way that members of the public may access them from a place and at a time individually chosen by them.
>
> …
>
> *Article 14*
>
> **Right of Making Available of Phonograms**
>
> Producers of phonograms shall enjoy the exclusive right of authorizing the making available to the public of their phonograms, by wire or wireless means, in such a way that members of the public may access them from a place and at a time individually chosen by them."

*Information Society Directive*

34.    The Information Society Directive contains 61 recitals. For present purposes, it is sufficient to refer to the following:

> "(23)   This Directive should harmonise further the author's right of communication to the public. This right should be understood in a broad sense covering all communication to the public not present at the place where the communication originates. This right should cover any such transmission or retransmission of a work to the public by wire or wireless means, including broadcasting. This right should not cover any other acts.
>
> (24)   The right to make available to the public subject-matter referred to in Article 3(2) should be understood as covering all acts of making

available such subject-matter to members of the public not present at the place where the act of making available originates, and as not covering any other acts.

(25)    The legal uncertainty regarding the nature and the level of protection of acts of on-demand transmission of copyright works and subject-matter protected by related rights over networks should be overcome by providing for harmonised protection at Community level. It should be made clear that all rightholders recognised by this Directive should have an exclusive right to make available to the public copyright works or any other subject-matter by way of interactive on-demand transmissions. Such interactive on-demand transmissions are characterised by the fact that members of the public may access them from a place and at a time individually chosen by them.

(26)    With regard to the making available in on-demand services by broadcasters of their radio or television productions incorporating music from commercial phonograms as an integral part thereof, collective licensing arrangements are to be encouraged in order to facilitate the clearance of the rights concerned.

(27)    The mere provision of physical facilities for enabling or making a communication does not in itself amount to communication within the meaning of this Directive.

…

(58)    Member States should provide for effective sanctions and remedies for infringements of rights and obligations as set out in this Directive. They should take all the measures necessary to ensure that those sanctions and remedies are applied. The sanctions thus provided for should be effective, proportionate and dissuasive and should include the possibility of seeking damages and/or injunctive relief and, where appropriate, of applying for seizure of infringing material.

(59)    In the digital environment, in particular, the services of intermediaries may increasingly be used by third parties for infringing activities. In many cases such intermediaries are best placed to bring such infringing activities to an end. Therefore, without prejudice to any other sanctions and remedies available, rightholders should have the possibility of applying for an injunction against an intermediary who carries a third party's infringement of a protected work or other subject-matter in a network. This possibility should be available even where the acts carried out by the intermediary are exempted under Article 5. The conditions and modalities relating to such injunctions should be left to the national law of the Member States."

35.    Article 3 provides as follows:

"**Right of communication to the public of works and right of making available to the public other subject-matter**

1.    Member States shall provide authors with the exclusive right to authorise or prohibit any communication to the public of their works, by wire or wireless means, including the making available to the public of their works in such a way that members of the public may access them from a place and at a time individually chosen by them.

2.    Member States shall provide for the exclusive right to authorise or prohibit the making available to the public, by wire or wireless means, in such a way that members of the public may access them from a place and at a time individually chosen by them:

   (a)    for performers, of fixations of their performances;

   (b)    for phonogram producers, of their phonograms;

   (c)    for the producers of the first fixations of films, of the original and copies of their films;

   (d)    for broadcasting organisations, of fixations of their broadcasts, whether these broadcasts are transmitted by wire or over the air, including by cable or satellite.

3.    The rights referred to in paragraphs 1 and 2 shall not be exhausted by any act of communication to the public or making available to the public as set out in this Article."

36.    Article 8 provides as follows:

"**Sanctions and remedies**

1.    Member States shall provide appropriate sanctions and remedies in respect of infringements of the rights and obligations set out in this Directive and shall take all the measures necessary to ensure that those sanctions and remedies are applied. The sanctions thus provided for shall be effective, proportionate and dissuasive.

2.    Each Member State shall take the measures necessary to ensure that rightholders whose interests are affected by an infringing activity carried out on its territory can bring an action for damages and/or apply for an injunction and, where appropriate, for the seizure of infringing material as well as of devices, products or components referred to in Article 6(2).

3.    Member States shall ensure that rightholders are in a position to apply for an injunction against intermediaries whose services are used by a third party to infringe a copyright or related right."

*Domestic implementation of the Information Society Directive*

37.    The Information Society Directive was transposed into domestic law by the Copyright and Related Rights Regulations 2003, SI 2003/2498 ("the 2003 Regulations"). Article 3 was implemented by Regulations 6 and 7, which amended section 20 in Part I of the 1988 Act and inserted new section 182CA into Part II of the 1988 Act, although as discussed below the amendment to section 20 went further than Article 3 required. Article 8(3) was implemented by Regulation 27, which inserted new sections 97A and 191JA into Parts I and II respectively of the 1988 Act.

*The 1988 Act*

38.    As amended by the 2003 Regulations, the 1988 Act includes the following provisions:

"**The acts restricted by copyright in a work**

16.(1)  The owner of the copyright in a work has, in accordance with the following provisions of this Chapter, the exclusive right to do the following acts in the United Kingdom –

(a)      to copy the work (see section 17);

…

(d)      to communicate the work to the public (see section 20);

…

and those acts are referred to in this Part as the 'acts restricted by the copyright'.

(2)     Copyright in a work is infringed by a person who without the licence of the copyright owner does, or authorises another to do, any of the acts restricted by the copyright.

(3)     References in this Part to the doing of an act restricted by the copyright in a work are to the doing of it –

(a)     in relation to the work as a whole or any substantial part of it

(b)     either directly or indirectly;

and it is immaterial whether any intervening acts themselves infringe copyright.

…

### Infringement of copyright by copying

17.(1)   The copying of the work is an act restricted by the copyright in every description of copyright work; and references in this Part to copying and copies shall be construed as follows.

(2)   Copying in relation to a literary, dramatic, musical or artistic work means reproducing the work in any material form. This includes storing the work in any medium by electronic means.

…

(6)   Copying in relation to any description of work includes the making of copies which are transient or are incidental to some other use of the work.

…

### Infringement by communication to the public

20.(1)   The communication to the public of the work is an act restricted by the copyright in—

    (a)   a literary, dramatic, musical or artistic work,

    (b)   a sound recording or film, or

    (c)   a broadcast.

(2)   References in this Part to communication to the public are to communication to the public by electronic transmission, and in relation to a work include—

    (a)   the broadcasting of the work;

    (b)   the making available to the public of the work by electronic transmission in such a way that members of the public may access it from a place and at a time individually chosen by them.

…

### 97A   Injunctions against service providers

(1)   The High Court (in Scotland, the Court of Session) shall have power to grant an injunction against a service provider, where that service provider has actual knowledge of another person using their service to infringe copyright.

(2)    In determining whether a service provider has actual knowledge for the purpose of this section, a Court shall take into account all matters which appear to it in the particular circumstances to be relevant and, amongst other things, shall have regard to –

(a)    whether a service provider has received a notice through a means of contact made available in accordance with regulation 6(1)(c) of the Electronic Commerce (EC Directive) Regulations 2002 (SI 2002/2013); and

(b)    the extent to which any notice includes –

(i)    the full name and address of the sender of the notice;

(ii)    details of the infringement in question.

(3)    In this section 'service provider' has the meaning given to it by regulation 2 of the Electronic Commerce (EC Directive) Regulations 2002."

Infringement by users of TPB

39.    The Claimants contend that UK users of TPB infringe their copyrights in two ways. First, by copying sound recordings within section 17 of the 1988 Act. Secondly, by communicating sound recordings to the public within section 20 of the 1988 Act. I will consider these in turn.

*Copying*

40.    It is clear that a user of TPB who selects a torrent file in order to obtain a copy of particular content, and then downloads the associated content files, copies the content contained in those files on his or her computer. It follows that, if the content files comprise a copyright work, and if the user does not have licence of the copyright owner, he or she will be infringing copyright.

41.    The Claimants have adduced evidence from Thomas Sehested of MarkMonitor Inc, a company that specialises in evidence gathering on the internet. MarkMonitor has conducted an investigation into the exploitation of the sample recordings by the operators and users of TPB. Mr Sehested's evidence demonstrates that between 11 and 29 November 2011 (i) torrent files for all of the sample recordings were available for download on TPB, (ii) by means of those torrent files, at least 15% of each album comprised in the sample recordings was being shared by a user via an account held at each of the Defendants and (iii) at least 1% of each album had been downloaded by MarkMonitor from each user account. Thus users of TPB who have accounts with each of the Defendants (and who are therefore in the UK) have been engaged in sharing (and thereby making unlicensed copies of) the sample recordings.

42.    More generally, Mr Sehested explains that since 2007 MarkMonitor has monitored the activities of P2P users in the UK for the IFPI. For this purpose the IFPI have

supplied MarkMonitor with sample lists of copyright-protected record label repertoire, selected on the basis of the UK Singles and Album charts. As at 20 December 2011, the list comprised 15,000 titles. MarkMonitor monitors P2P networks to ascertain the number of instances where titles on the list are made available to, and downloaded by, P2P users via the Defendants. This information has been utilised for the purpose of providing notifications to the Defendants of instances where their services have been used for the illegal downloading of works of the BPI's members. By 21 November 2011, some 3,299,337 such instances had been identified. The vast majority of these involved the Bittorrent protocol. Since TPB is the most popular torrent site, it may be inferred that a substantial proportion involved use of TPB.

43.    I therefore conclude that UK users of the TPB who have accounts with the Defendants have infringed, and are continuing to infringe, the Claimants' copyrights by copying the Claimants' sound recordings on a large scale.

*Communication to the public*

44.    At this point a difference between the claims advanced by the claimants in *20C Fox v Newzbin* and the claims advanced by the Claimants in the present case should be noted. In *20C Fox v Newzbin* the claimants contended that the users had infringed their copyrights by copying (see [85] and [97]) and that Newzbin Ltd had (in addition to authorising and being jointly liable for infringements by the users) infringed their copyrights by communicating the copyright works (namely films) to the public. The claimants did not contend that the users had communicated the works to the public. By contrast, in the present case the Claimants do contend that the users of TPB are communicating the copyright works to the public, but for present purposes do not contend that the operators of TPB are doing so. The reason why the Claimants do not presently assert communication to the public by the operators of TPB is the pending reference to Court of Justice of the European Union made by the Court of Appeal in *Football Dataco Ltd v Sportradar Gmbh* [2011] EWCA Civ 330, [2011] 1 WLR 3044. I shall return to this point below.

45.    Article 3(1) of the Information Society Directive and section 20 of the 1988 Act have been considered in a number of recent cases which I shall consider in chronological order.

46.    In Case C-306/05 *Sociedad General de Autores v Editores de España (SGAE) v Rafael Hoteles SA* [2006] ECR I-11519 SGAE, a collective licensing body in Spain, complained that the installation and use of television sets in Rafael's hotel involved the communication to the public of works falling within the repertoire which it managed. The Audienca Provincial (Provincial Court) of Barcelona referred to the CJEU three questions, the first and third of which the Court interpreted as asking, essentially, whether the distribution of a signal through television sets to customers in hotel rooms constituted communication to the public within the meaning of Article 3(1), and whether the installation of television of sets in hotel rooms constituted in itself an act of that nature.

47.    In considering this question, the Court of Justice said at [36] that "'communication to the public' must be interpreted broadly". The Court went on:

"40.    It should also be pointed out that a communication made in circumstances such as those in the main proceedings constitutes, according to Article 11*bis*(1)(ii) of the Berne Convention, a communication made by a broadcasting organisation other than the original one. Thus, such a transmission is made to a public different from the public at which the original act of communication of the work is directed, that is, to a new public.

41.    As is explained in the Guide to the Berne Convention, an interpretative document drawn up by the WIPO which, without being legally binding, nevertheless assists in interpreting that Convention, when the author authorises the broadcast of his work, he considers only direct users, that is, the owners of reception equipment who, either personally or within their own private or family circles, receive the programme. According to the Guide, if reception is for a larger audience, possibly for profit, a new section of the receiving public hears or sees the work and the communication of the programme via a loudspeaker or analogous instrument no longer constitutes simple reception of the programme itself but is an independent act through which the broadcast work is communicated to a new public. As the Guide makes clear, such public reception falls within the scope of the author's exclusive authorisation right.

42.    The clientele of a hotel forms such a new public. The transmission of the broadcast work to that clientele using television sets is not just a technical means to ensure or improve reception of the original broadcast in the catchment area. On the contrary, the hotel is the organisation which intervenes, in full knowledge of the consequences of its action, to give access to the protected work to its customers. In the absence of that intervention, its customers, although physically within that area, would not, in principle, be able to enjoy the broadcast work.

43.    It follows from Art.3(1) of Directive 2001/29 and Art.8 of the WIPO Copyright Treaty that for there to be communication to the public it is sufficient that the work is made available to the public in such a way that the persons forming that public may access it. Therefore, it is not decisive, contrary to the submissions of Rafael and Ireland, that customers who have not switched on the television have not actually had access to the works.

44.    Moreover, it is apparent from the documents submitted to the court that the action by the hotel by which it gives access to the broadcast work to its customers must be considered an additional service performed with the aim of obtaining some benefit. It cannot be seriously disputed that the provision of

> that service has an influence on the hotel's standing and, therefore, on the price of rooms. Therefore, even taking the view, as does the Commission of the European Communities, that the pursuit of profit is not a necessary condition for the existence of a communication to the public, it is in any event established that the communication is of a profit-making nature in circumstances such as those in the main proceedings.
>
> …
>
> 46.    While the mere provision of physical facilities, usually involving, besides the hotel, companies specialising in the sale or hire of television sets, does not constitute, as such, a communication within the meaning of Directive 2001/29, the installation of such facilities may nevertheless make public access to broadcast works technically possible. Therefore, if, by means of television sets thus installed, the hotel distributes the signal to customers staying in its rooms, then communication to the public takes place, irrespective of the technique used to transmit the signal."

48.    Accordingly the Court ruled as follows:

> "While the mere provision of physical facilities does not as such amount to communication within the meaning of Directive 2001/29/EC of the European Parliament and of the Council of 22 May 2001 on the harmonisation of copyright and related rights in the information society, the distribution of a signal by means of television sets by a hotel to customers staying in its rooms, whatever technique is used to transmit the signal, constitutes communication to the public within the meaning of Article 3(1) of that directive."

49.    In Case C-136/09 *Organismos Sillogikis Diacheirisis Dimiourgon Theatrikon kai Optikoakoustikon Ergon v Divani Akropolis Anonimi Xenodocheiaki kai Touristiki Etaireia* [2010] ECR I-37 the Court of Justice ruled by way of reasoned order that a hotelier who installed television sets in the rooms of its hotel and connected them to a central antenna thereby committed an act of communication to the public within Article 3(1).

50.    In *20C Fox v Newzbin* Kitchin J held at [113]-[125] that Newzbin Ltd had communicated the claimants' films to the public applying the guidance of the Court of Justice in *SGAE v Rafael*. In particular, he found that Newzbin Ltd had made the films available to the public by electronic transmission in such a way that members of the public might access them from a place and at a time chosen by them within section 20(2)(b) of the 1988 Act.

51.    In Case C-393/09 *Bezpečnostní softwarová asociace – Svaz softwarové ochrany v Ministerstvo kultury* [2010] ECR I-0000 the Court of Justice ruled that television broadcasting of a graphic user interface did not constitute communication to the

public within Article 3(1) for reasons connected with the particular character of a graphic user interface.

52.     As noted above and as I shall discuss in more detail below, the amendment to section 20 of the 1988 Act by Regulation 6 of the 2003 Regulations went further than was required by Article 3 of the Information Society Directive. In *ITV Broadcasting Ltd v TVCatchup Ltd (No 2)* [2011] EWHC 1874 (Pat), [2011] FSR 40 at [49]-[79] Floyd J rejected an argument that the amendment was *ultra vires* the power to make those Regulations conferred by section 2(2) of the European Communities Act 1972 in so far as it introduced section 20(1)(c). In my judgment his reasoning must apply equally to section 20(1)(b).

53.     In that case the claimant television broadcasters contended that the defendant, which operated an internet-based service for the live streaming of television programmes, had infringed the claimants' copyrights in their broadcasts and in films included therein.  Having considered *SGAE v Rafael* at [80]-[104], Floyd J's provisional conclusion was that the defendant had communicated the claimants' broadcasts and the films included therein to the public, but that the law was not clear and so a question should be referred to the CJEU.

54.     Shortly afterwards the CJEU handed down two judgments in quick succession. The first was Joined Cases C-403/08 and C-429/08 *Football Association Premier League Ltd v QC Leisure* [2011] ECR I-0000. One of the questions which Kitchin J had referred to the Court of Justice in *Football Association Premier League Ltd v QC Leisure (No 2)* [2008] EWHC 1411 (Ch), [2008] FSR 32 was interpreted by the Court as asking, in essence, whether "communication to the public" within the meaning of Article 3(1) of the Information Society Directive was to be interpreted as covering transmission of broadcast works, via a television screen and speakers, to the customers present in a public house. The Court held that this question was to be answered in the affirmative. Its reasoning, so far as presently relevant, was as follows:

"191.   As regards, first, the concept of communication, it is apparent from Article 8(3) of the Related Rights Directive and Articles 2(g) and 15 of the Performance and Phonograms Treaty that such a concept includes 'making the sounds or representations of sounds fixed in a phonogram audible to the public' and that it encompasses broadcasting or 'any communication to the public'.

192.    More specifically, as Article 11*bis*(1)(iii) of the Berne Convention expressly indicates, that concept encompasses communication by loudspeaker or any other instrument transmitting, by signs, sounds or images, covering – in accordance with the explanatory memorandum accompanying the proposal for a copyright directive (COM(97) 628 final) – a means of communication such as display of the works on a screen.

193.    That being so, and since the European Union legislature has not expressed a different intention as regards the interpretation of that concept in the Copyright Directive, in particular in

Article 3 thereof (see paragraph 188 of the present judgment), the concept of communication must be construed broadly, as referring to any transmission of the protected works, irrespective of the technical means or process used.

194.    In Case C-403/08, the proprietor of a public house intentionally gives the customers present in that establishment access to a broadcast containing protected works via a television screen and speakers. Without his intervention the customers cannot enjoy the works broadcast, even though they are physically within the broadcast's catchment area. Thus, the circumstances of such an act prove comparable to those in *SGAE*.

…

196.    Accordingly, it must be held that the proprietor of a public house effects a communication when he intentionally transmits broadcast works, via a television screen and speakers, to the customers present in that establishment.

197.    That said, in order for there to be a 'communication to the public' within the meaning of Article 3(1) of the Copyright Directive in circumstances such as those of the main proceedings, it is also necessary for the work broadcast to be transmitted to a new public, that is to say, to a public which was not taken into account by the authors of the protected works when they authorised their use by the communication to the original public (see, to this effect, *SGAE*, paragraphs 40 and 42, and the order of 18 March 2010 in Case C-136/09 *Organismos Sillogikis Diacheirisis Dimiourgon Theatrikon kai Optikoakoustikon Ergon*, paragraph 38).

198.    When those authors authorise a broadcast of their works, they consider, in principle, only the owners of television sets who, either personally or within their own private or family circles, receive the signal and follow the broadcasts. Where a broadcast work is transmitted, in a place accessible to the public, for an additional public which is permitted by the owner of the television set to hear or see the work, an intentional intervention of that kind must be regarded as an act by which the work in question is communicated to a new public (see, to this effect, *SGAE*, paragraph 41, and *Organismos Sillogikis Diacheirisis Dimiourgon Theatrikon kai Optikoakoustikon Ergon*, paragraph 37).

199.    That is so when the works broadcast are transmitted by the proprietor of a public house to the customers present in that establishment, because those customers constitute an additional public which was not considered by the authors when they authorised the broadcasting of their works."

55.    The second judgment was Joined Cases C-431/09 and C-432/09 *Airfield NV v Belgische Vereniging van Auteurs, Compositien en Uitgevers CVBA (SABAM)* [2011] ECR I-0000. In that case the CJEU had to consider the meaning of "communication to the public" in Council Directive 93/83/EEC of 27 September on the coordination of certain rules concerning copyright and rights related to copyright applicable to satellite broadcasting and cable retransmission ("the Satellite Broadcasting Directive"). Airfield was a Belgian satellite television provider which offered to the public a package of channels that could be viewed by means of a satellite decoder. The package included encrypted channels. Customers entered into a subscription agreement with Airfield which provided them with a decoder card enabling them to view the encrypted channels. Airfield concluded a series of agreements with broadcasting organisations, to obtain broadcast television programs for broadcast. Through its technical services provider, Canal, Airfield leased capacity on the Astra Satellite for onward transmission of the signals via the satellite to its customers.

56.    The Court of Justice had to consider what it described as "indirect" as well as "direct" transmission of TV programmes. Under indirect transmission, the broadcasting organisations sent the programmes via a fixed link to Canal, who compressed and scrambled them, sent them to their station in the Netherlands from whence they were beamed, in encrypted form, to the Astra satellite. Under a variation of this indirect method, the broadcasting organisations sent the programmes via satellite to Canal, who again beamed them up in encrypted form. Airfield was authorised by the broadcasting organisations to do all this, and paid the broadcasting organisation a fee dependent on the numbers of subscribers. The direct method of transmission avoided the first link (either the fixed link or the satellite link) between the broadcasting organisation and Canal. The broadcasting organisation transmitted the encrypted programmes directly to the satellite. Airfield and Canal merely provided the key to the broadcasting organisations and to their subscribers so that the programmes were encrypted in a way which their subscribers could decode.

57.    Various collecting societies brought actions in Belgium complaining that Airfield's activities amounted to a re-broadcast of television programmes already broadcast by the broadcasting organisations, and therefore Airfield could not benefit from the authorisation already granted by the collecting societies to the broadcasting organisations. The Court of Justice interpreted the questions asked by the Belgian court as asking, in essence, whether the Satellite Broadcasting Directive was to be interpreted as requiring a satellite package provider to obtain authorisation from the right holders concerned for a communication to the public of works that was effected in the course of the direct or indirect transmission of television programmes, such as the transmissions at issue in the main proceedings. In answering this question the Court applied its jurisprudence regarding Article 3(1) of the Information Society Directive for reasons which it explained as follows:

"44.    First of all, it should be borne in mind that Directive 93/83 is not the only European Union instrument in the field of intellectual property and that, in view of the requirements deriving from the unity and coherence of the legal order of the European Union, the terms used by that directive must be interpreted in the light of the rules and principles established by other directives relating to intellectual property, such as, in

particular, Directive 2001/29 (see, by analogy, Case C-271/10 *VEWA* [2011] ECR I-0000, paragraph 27).

…

71.    … it is clear from Article 2 of Directive 93/83 that copyright holders must authorise any communication of the protected works to the public by satellite.

72.    Next, it follows from the Court's case-law that such authorisation must be obtained in particular by a person who triggers such a communication or who intervenes when it is carried out, so that, by means of that communication, he makes the protected works accessible to a new public, that is to say, a public which was not taken into account by the authors of the protected works within the framework of an authorisation given to another person (see, by analogy, with regard to communication to the public within the meaning of Article 3 of Directive 2001/29, Case C-306/05 *SGAE* [2006] ECR I-11519, paragraphs 40 and 42, and the order of 18 March 2010 in Case C-136/09 *Organismos Sillogikis Diacheirisis Dimiourgon Theatrikon kai Optikoakoustikon Ergon*, paragraph 38)."

58.    The Court of Justice went on at [77]-[82] to conclude that the satellite package provider expanded the circle of persons having access to the relevant programmes and thereby enabled a new public to have access to the works and other protected subject-matter. The Court also held at [83] that it followed that the satellite package provider was required to obtain authorisation from the right holders concerned. Accordingly it ruled as follows:

"Article 2 of Council Directive 93/83/EEC of 27 September 1993 on the coordination of certain rules concerning copyright and rights related to copyright applicable to satellite broadcasting and cable retransmission must be interpreted as requiring a satellite package provider to obtain authorisation from the right holders concerned for its intervention in the direct or indirect transmission of television programmes, such as the transmission at issue in the main proceedings, unless the right holders have agreed with the broadcasting organisation concerned that the protected works will also be communicated to the public through that provider, on condition, in the latter situation, that the provider's intervention does not make those works accessible to a new public."

59.    Floyd J considered *Airfield v SABAM* in *ITV Broadcasting Ltd v TVCatchup Ltd (No 3)* [2011] EWHC 2977 (Pat) at [5]-[24] and concluded as follows:

"23.    Whilst the decision in *Airfield* is consistent with the provisional view which I expressed [in *ITV v TVCatchup (No 2)*], I am not persuaded that the principle of law engaged in the present case is rendered *acte claire* by *Airfield*. The Court's multi-factorial

approach does not make it easy to distil a clear principle as to what amounts to a communication to the public in this context. The extent to which the creation of a new link from the broadcasting organisation to the subscriber is to be equated, without more, with the creation of a 'new public' is not clear. It is also not clear whether the subscribers in the present case can be described as 'unable to enjoy the broadcasts although physically within the catchment area', given that they are entitled to receive the original broadcast in their own homes and on their laptops without intervention from TVC. Equally it is not clear whether the audience reached by these broadcasts is an audience which is additional to the public targeted by the broadcasting organisation concerned.

24.   I therefore intend to refer a question, notwithstanding *Airfield*. The question I propose to send is as follows:

'Does the right to authorise or prohibit a "communication to the public of their works by wire or wireless means" in Article 3.1 of the Directive extend to a case where:

(i)     Authors authorise the inclusion of their works in a terrestrial free-to-air television broadcast which is intended for reception either throughout the territory of a Member State or within a geographical area within a Member State;

(ii)    A third party (i.e. an organisation other than the original broadcaster), provides a service whereby individual subscribers within the intended area of reception of the broadcast who could lawfully receive the broadcast on a television receiver in their own homes may log on to the third party's server and receive the content of the broadcast by means of an internet stream?

Does it make any difference to the answer to the above question if:

(a)     The third party's server allows only a "one-to-one" connection for each subscriber whereby each individual subscriber establishes his or her own internet connection to the server and every data packet sent by the server onto the internet is addressed to only one individual subscriber?

(b)     The third party's service is funded by advertising which is presented "pre-roll" (i.e. during the period of time after a subscriber logs on but before he or she begins to receive the broadcast content) or "in-skin" (i.e. within the frame of the viewing software which displays the received programme on the subscriber's viewing device

but outside the programme picture) but the original advertisements contained within the broadcast are presented to the subscriber at the point where they are inserted in the programme by the broadcaster?

(c)    the intervening organisation is:

(i)    providing an alternative service to that of the original broadcaster, thereby acting in competition with the original broadcaster for viewers; or

(ii)    acting in competition with the original broadcaster for advertising revenues?'"

60.    In *Football Association Premier League Ltd v QC Leisure (No 4)* [2012] EWHC 108 (Ch) Kitchin LJ had to consider the application of the Court of Justice's rulings on the questions he had referred, and in particular the issue of whether the defendants had communicated any of the claimant's copyright works (in particular the Anthem and the artistic works and films contained in the broadcasts) to the public within section 20 of the 1988. He considered that issue at [4]-[59], and concluded that the defendants had communicated the claimant's copyright works to the public.

61.    Against this background I can now turn to the present case, which concerns copyright in sound recordings. The first point to note is the difference between Article 3(1) of the Information Society Directive and Article 3(2). Article 3(1) requires Member States to provide "authors" with an exclusive right to authorise or prohibit any "communication to the public" of their "works" by wire or wireless means "including the making available to the public" etc. By contrast Article 3(2) requires Member States to provide four other categories of right holder with an exclusive right only to authorise or prohibit the "making available to the public" of the relevant subject-matter etc.

62.    It is clear from the jurisprudence of the Court of Justice (see in particular Case C-5/08 *Infopaq International A/S v Danske Dagblades Forening* [2009] ECR I-6569 at [32]-[37]) that references to "authors' works" in the Information Society Directive are to be interpreted as meaning literary and artistic works within the meaning of Article 2 of the Berne Convention, consistently with European Parliament and Council Directive 2006/116/EC of 12 December 2006 on the term of protection of copyright and certain related rights, Article 1(1) of which is explicit in this respect. It is generally accepted that phonograms (i.e. sound recordings) and broadcasts are not literary or artistic works within the meaning of Article 2 of the Berne Convention: see e.g. Ricketson and Ginsburg, *International Copyright and Neighbouring Rights: The Berne Convention and Beyond* (2nd ed, Oxford University Press, 2007), pp. 505-508, 1205-1208; Goldstein and Hugenholtz, *International Copyright: Principles, Law and Practice* (2nd ed, Oxford University Press, 2010), pp. 104, 156, 186-189; Ficsor, *Guide to the Copyright and Related Rights Treaties Administered by WIPO* (WIPO, 2003), p. 27. Instead, phonograms (and performances) are protected under the International Convention for the Protection of Performers, Producers of Phonograms and Broadcasting Organisations of 1961 ("the Rome Convention") and the WIPO Performances and Phonograms Treaty and broadcasts are protected under the Rome

Convention. This explains the different treatment of authors' works on the one hand and the other types of subject matter on the other hand in Article 3 of the Information Society Directive.

63.    Care needs to be taken with films. "Cinematographic works" are literary or artistic works within Article 2 of the Berne Convention. What the Information Society Directive and other EU copyright Directives call "first fixations of films" are not. It is frequently overlooked that what the 1988 Act calls a "film" is what the Directives call a "first fixation of a film". The right conferred by the 1988 Act on "films" is a right in the signal, not a right in the content: see *Norowzian v Arks Ltd (No 1)* [1999] EMLR 57. Under current UK law, the content of a film (i.e. the cinematographic work or what some other laws call the audiovisual work) is protected as a dramatic work: see *Norowzian v Arks Ltd (No 2)* [2000] EMLR 67. Both under the Directives and under the 1988 Act, the rights in the cinematographic work (dramatic work) and in the first fixation ("film") are distinct, although they may be owned by the same person (as to which, see generally the recent judgment of the CJEU in Case C-277/10 *Luksan v van der Let* [2012] ECR I-0000).

64.    It follows that the Information Society Directive required the UK to grant the Article 3(1) right of communication to the public to dramatic works embodied in "films" and to grant the Article 3(2) right of making available to "films" within the meaning of the 1988 Act. In fact the 2003 Regulations went further and extended the Article 3(1) right to "films". Similarly, the Information Society Directive only required the UK to grant the Article 3(2) right of making available to sound recordings and broadcasts, but the 2003 Regulations went further and extended the Article 3(1) right of communication to the public. As noted above, Floyd J has held that this was permissible in the case of broadcasts and his reasoning is equally applicable to sound recordings and films.

65.    The result, as both Floyd J in *ITV v TVCatchup* and Kitchin LJ in *FA v QC Leisure* recognised, is that the CJEU's jurisprudence with regard with Article 3(1) of the Information Society Directive is applicable to section 20(1)(b) and (c) as well as section 20(1)(a) of the 1988 Act.

66.    Although Floyd J held in *ITV v TVCatchup* that it was not clear how the test laid down by the CJEU to determine whether a work has been communicated to the public within Article 3(1) was to be applied in the circumstances of that case, I consider that there is no difficulty in applying it to the facts of this case.

67.    Before doing so, however, I must revert to *Football Dataco v Sportradar*. In that case the Court of Appeal referred questions to the Court of Justice concerning the interpretation of Article 7(2)(b) of European Parliament and Council Directive of 11 March 1996 on the legal protection of databases, and in particular the words "any form of making available to the public … by online or other forms of transmission". In essence, the questions referred ask whether the transmission occurs in the location from where the data is transmitted (the "emission theory") or in the location where it is received (the "transmission theory"). Although the questions referred do not concern Article 3(1) of the Information Society Directive, the Claimants accept that it is not entirely clear from the CJEU's existing jurisprudence under Article 3(1) whether communication to public in Article 3(1) occurs where the communication originates or where it is received (or perhaps both). This matters so far as any claim

against the operators of TPB under section 20 is concerned, because TPB's servers are located outside the United Kingdom.

68.    Counsel for the Claimants submitted that this issue does not matter for present purposes. For the purpose of their claim that users of TPB infringe under section 20, the Claimants focus upon users who allow copies of the sound recordings on their computers to be uploaded to the "swarm". Since it is clear from the evidence that UK users are involved as both uploaders and downloaders, it is immaterial whether the act of communication to the public is committed at the place of origination or the place of reception. I accept this submission.

69.    I turn, therefore, to consider whether such users thereby communicate such recordings available to the public. This involves two questions. First, do they communicate the recordings by electronic transmission? In my judgment they do. I consider that they make the recordings available by electronic transmission in such a way that members of the public may access the recordings from a place and at a time individually chosen by them within section 20(2)(b). In any event, however, it is clear from the CJEU's judgment in *FA v QC Leisure* at [193] that the concept of communication must be construed broadly.

70.    Secondly, do they communicate the recordings to a new public, that is to say a public which was not taken into account by the right holders when authorising the distribution of the recordings, applying the test laid down by the CJEU in *SGAE v Rafael*, *FA v QC Leisure* and *Airfield v SABAM*? In my judgment they do, since copies of the sound recordings are made available to users who have not purchased them from an authorised source.

71.    Accordingly, I conclude that UK users of TPB infringe the Claimants' copyrights in this way also. This conclusion is consistent with that of the Full Court of the Federal Court of Australia, albeit under a slightly different statutory provision, in *Roadshow Films Pty Ltd v iiNet Ltd* [2011] FCAFC 23, (2011) 89 IPR 1: see Emmett J at [151]-[158], Jagot J at [322]-[330] and Nicholas J at [664]-[672].

Infringement by the operators of TPB

72.    The Claimants contend that the operators of TPB are liable for infringement of their copyrights on two bases. First, on the basis that the operators have committed the tort of authorising infringements by UK users. Secondly, on the basis that the operators are jointly liable for infringements by UK users (i.e. liable as accessories).

*Authorisation*

73.    The law with regard to authorisation was considered by Kitchin J in *20C Fox v Newzbin* at [85]-[95]. At [89] he cited a passage from the speech of Lord Templeman in *CBS Songs Ltd v Amstrad Consumer Electronics plc* [1988] 1 AC 1013 at 1053-1055 in which Lord Templeman approved the definition of "to authorise" given by Atkin LJ in *Monckton v Pathe Freres Pathephone Ltd* [1914] 1 KB 395 at 499, namely "to grant or purport to grant to a third person the right to do the act complained of". Kitchin J continued at [90]:

> "In my judgment it is clear from this passage that 'authorise' means the grant or purported grant of the right to do the act complained of. It does not extend to mere enablement, assistance or even encouragement. The grant or purported grant to do the relevant act may be express or implied from all the relevant circumstances. In a case which involves an allegation of authorisation by supply, these circumstances may include the nature of the relationship between the alleged authoriser and the primary infringer, whether the equipment or other material supplied constitutes the means used to infringe, whether it is inevitable it will be used to infringe, the degree of control which the supplier retains and whether he has taken any steps to prevent infringement. These are matters to be taken into account and may or may not be determinative depending upon all the other circumstances."

He went on at [98]-[102] to conclude on the fact of that case that Newzbin Ltd had indeed authorised infringements of the claimants' copyrights by its premium members.

74.    I shall consider each of the factors identified by Kitchin J in turn.

75.    *The nature of the relationship*. TPB provides a sophisticated and user-friendly environment in which its users are able to search for and locate content. John Hodge, BPI's Head of Internet Investigations, describes in his witness statement how the website is organised and the functions that are available to users. As he explains:

i)    TPB indexes and arranges torrent files so that users can choose between various different search facilities to assist them in browsing for content to download or in locating specific content or categories of content.

ii)    When uploading a torrent file, users are required to provide detailed information about it. This information provides TPB with the ability to index it and make it available for searching. It also assists users in deciding whether or not to download it.

iii)    TPB does not merely receive the upload of the torrent file, it processes it. For example, TPB deletes any tracker server that may have been nominated by the uploader in the torrent file and replaces it with tracker servers of TPB's choosing.

iv)    Users are provided with assistance and advice as to how to download from the site and as to the trustworthiness of particular torrents. Status badges are awarded to uploaders to provide an indication of number and popularity of their uploads.

v)    Users are also provided with assistance and advice as to how to circumvent blocking measures taken as a result of court orders.

vi)    Users are offered links to "cyberlocker" storage facilities for downloaded material.

vii)     Registered users are able to set preferences which allow them to choose what material can be downloaded and how information is displayed on the website.

viii)    TPB provides a forum for users to share information about content and even to ask other users to upload particular content which might not currently be available.

ix)      Users are offered a choice of 35 different languages to facilitate and encourage the widest possible participation in the use of its services by those engaged in P2P file-sharing.

76.    These features are plainly designed to afford to users of TPB the easiest and most comprehensive service possible. TPB is in no sense a passive repository of torrent files. It goes to great lengths to facilitate and promote the download of torrent files by its users.

77.    *The means used to infringe.* The torrent files which are so conveniently indexed, arranged and presented by TPB constitute precisely the means necessary for users to infringe. It is the torrent files which provide the means by which users are able to download the "pieces" of the content files and/or to make them available to others.

78.    *Inevitability of infringement.* Infringement is not merely an inevitable consequence of the provision of torrent files by TPB. It is the operators of TPB's objective and intention. That is clear from the following:

i)       Its name – The Pirate Bay – and associated pirate ship logo are clearly a reference to the popular terminology applied to online copyright infringement: online piracy.

ii)      According to a statement published on its site, it was founded by a "Swedish anti copyright organisation".

iii)     The matters described in paragraph 13 above.

iv)      In the first instance judgment in the Swedish criminal proceedings, Lundström was recorded as stating that "the purpose of the site was pirate copying".

v)       It is also evident from the numerous proceedings in other European jurisdictions that the operators of TPB are well aware that it is engaged in copyright infringement. Injunctions and other orders against the operators of TPB have been ignored. Orders against TPB's hosting service providers have been circumvented by moving TPB to new providers.

79.    *Degree of control.* TPB would be able to prevent infringement of copyright, should its operators so wish. As the website makes clear, torrents can be removed. They will be removed if "the name isn't in accordance with the content" or if they are "child porn, fakes, malware, spam and miscategorised torrents". As a matter of policy, however, the rights of copyright owners are excluded from the criteria by which the operators of TPB choose to exercise this power.

80.    *Steps to prevent infringement,* Despite their ability to do so and despite the judicial findings that have been made against them, the operators of TPB take no steps to

prevent infringement. On the contrary, as already explained, they actively encourage it and treat any attempts to prevent it (judicial or otherwise) with contempt. Indeed, according to a statement on the website, the reason for its recent adoption of Magnet links as the default option is that "it's not as easy to block as .torrent files". This confirms the operators' determination to do whatever they can to provide users with unrestricted access to torrent files and thereby enable the users to continue to infringe. As noted above, BPI has asked TPB to cease infringing its members' and PPL's members' copyrights, but this request has been ignored.

81.  *Conclusion*. In my judgment, the operators of TPB do authorise its users' infringing acts of copying and communication to the public. They go far beyond merely enabling or assisting. On any view, they "sanction, approve and countenance" the infringements of copyright committed by its users. But in my view they also purport to grant users the right to do the acts complained of. It is no defence that they openly defy the rights of the copyright owners. I would add that I consider the present case to be indistinguishable from *20C Fox v Newzbin* in this respect. If anything, it is a stronger case.

*Joint tortfeasance*

82.  Kitchin J considered the law with regard to joint tortfeasance in *20C Fox v Newzbin* at [103]-[111]. He concluded as follows:

> "108.  I derive from these passages that mere (or even knowing) assistance or facilitation of the primary infringement is not enough. The joint tortfeasor must have so involved himself in the tort as to make it his own. This will be the case if he has induced, incited or persuaded the primary infringer to engage in the infringing act or if there is a common design or concerted action or agreement on a common action to secure the doing of the infringing act.
>
> 109.  All of these cases were referred to in the recent decision of Arnold J in *L'Oréal v eBay* [2009] EWHC 1094, [2009] RPC 21. In this action L'Oréal advanced a number of claims arising from the sale through the eBay online marketplace of goods bearing L'Oréal's trade marks. One of the issues which arose was whether eBay was liable for trade mark infringement as a joint tortfeasor with the sellers of such goods. Arnold J rejected this claim on the facts, essentially because eBay was under no legal duty to prevent infringement and facilitation of infringement with knowledge and an intention to profit was not enough to render it liable.
>
> 110.  I must now apply these principles to the facts of this case. In doing so I recognise at the outset that the claimants are not able to point to specific acts of infringement by particular infringers which the defendant may be said to have procured. However, I do not understand Lord Templeman's speech in *Amstrad* to preclude a finding of liability in such a case. Clearly it is one of the matters to be taken into account and absent the

> identification of such specific acts a finding of procurement would not in general be appropriate. Nevertheless, the question to be answered remains the same, namely whether the defendant has engaged in a common design by so involving himself in the infringement as to make it his own; or whether the defendant has procured an infringement by inducement, incitement or persuasion."

Again he concluded on the facts of the case that Newzbin Ltd had procured and engaged in common design with its premium members to infringe the claimants' copyrights.

83.   In the present case, the matters I have considered in relation to authorisation lead to the conclusion that the operators of TPB induce, incite or persuade its users to commit infringements of copyright, and that they and the users act pursuant to a common design to infringe. It is also relevant in this regard that the operators profit from their activities. Thus they are jointly liable for the infringements committed by users.

Conclusion

84.   For the reasons set out above, I conclude that both users and the operators of TPB infringe the copyrights of the Claimants (and those they represent) in the UK.