# EXHIBIT 2

**Canadian Association of Internet Providers, Canadian Cable Television Association, Bell ExpressVu, Telus Communications Inc., Bell Canada, Aliant Inc. and MTS Communications Inc.** *Appellants/Respondents on cross-appeal*

*v.*

**Society of Composers, Authors and Music Publishers of Canada** *Respondent/Appellant on cross-appeal*

and

**Internet Commerce Coalition, European Telecommunications Network Operators' Association, European Internet Service Providers' Association, Australian Internet Industry Association, Telecom Services Association, U.S. Internet Industry Association, Canadian Recording Industry Association and International Federation of Phonogram Industry** *Interveners*

INDEXED AS: SOCIETY OF COMPOSERS, AUTHORS AND MUSIC PUBLISHERS OF CANADA *v.* CANADIAN ASSN. OF INTERNET PROVIDERS

Neutral citation: 2004 SCC 45.

File No.: 29286.

2003: December 3; 2004: June 30.

Present: McLachlin C.J. and Iacobucci, Major, Bastarache, Binnie, Arbour, LeBel, Deschamps and Fish JJ.

ON APPEAL FROM THE FEDERAL COURT OF APPEAL

*Constitutional law — Extraterritorial application of laws — Parliament's legislative competence to enact laws having extraterritorial effect — Presumption that Parliament did not intend to do so in absence of clear words or necessary implication to contrary.*

**Association canadienne des fournisseurs Internet, Association canadienne de télévision par câble, Bell ExpressVu, Telus Communications Inc., Bell Canada, Aliant Inc. et MTS Communications Inc.** *Appelantes/Intimées au pourvoi incident*

*c.*

**Société canadienne des auteurs, compositeurs et éditeurs de musique** *Intimée/Appelante au pourvoi incident*

et

**Internet Commerce Coalition, European Telecommunications Network Operators' Association, European Internet Service Providers' Association, Australian Internet Industry Association, Telecom Services Association, U.S. Internet Industry Association, Association de l'industrie canadienne de l'enregistrement et International Federation of Phonogram Industry** *Intervenantes*

RÉPERTORIÉ : SOCIÉTÉ CANADIENNE DES AUTEURS, COMPOSITEURS ET ÉDITEURS DE MUSIQUE *c.* ASSOC. CANADIENNE DES FOURNISSEURS INTERNET

Référence neutre : 2004 CSC 45.

Nº du greffe : 29286.

2003 : 3 décembre; 2004 : 30 juin.

Présents : La juge en chef McLachlin et les juges Iacobucci, Major, Bastarache, Binnie, Arbour, LeBel, Deschamps et Fish.

EN APPEL DE LA COUR D'APPEL FÉDÉRALE

*Droit constitutionnel — Extraterritorialité des lois — Pouvoir du Parlement d'adopter des lois ayant une portée extraterritoriale — En l'absence d'un libellé clair ou d'une déduction necéssaire à l'effet contraire, le législateur est présumé ne pas avoir voulu conférer une portée extraterritoriale à une loi.*

*Copyright — Applicability of copyright legislation — Communication of music on Internet — SOCAN seeking to impose liability for royalties on Internet Service Providers — Whether real and substantial connection to Canada sufficient to support application of Copyright Act.*

*Copyright — Infringement — Communication to public by telecommunication — Communication of music on Internet — SOCAN seeking to impose liability for royalties on Internet Service Providers — Copyright Act deeming participants in telecommunication that provide only means of telecommunication not to be communicators — Whether Internet Service Providers providing solely a conduit for information communicated by others can claim benefit of s. 2.4(1)(b) of Copyright Act — Whether Internet Service Providers impart or transmit copyrighted music and thereby infringe copyright — Whether creation of "cache" of Internet material, even for a purely technical reason, infringes copyright — Copyright Act, R.S.C. 1985, c. C-42, s. 2.4(1)(b).*

This appeal raises the question of who should compensate musical composers and artists for their Canadian copyright in music downloaded in Canada from a foreign country via the Internet.

The respondent is a collective society which administers in Canada the copyright in music of Canadian members and foreign members of counterpart societies. The respondent wants to collect royalties from Internet Service Providers located in Canada because, it argues, they infringe the copyright owner's exclusive statutory right to communicate the work to the public by telecommunication and to authorize such communication. The appellants represent a broad coalition of Canadian Internet Service Providers. They argue that they neither "communicate" nor "authorize" anyone to communicate musical works because they are merely a conduit and do not regulate the content of the Internet communications which they transmit.

In 1988 Parliament added what is now known as s. 2.4(1)(b) to the *Copyright Act* which provides that persons who only supply "the means of telecommunication necessary for another person to so communicate" are not themselves to be considered parties to an infringing communication.

*Droit d'auteur — Applicabilité de la législation sur le droit d'auteur — Communication d'œuvres musicales au moyen de l'Internet — Demande de la SOCAN afin que les fournisseurs de services Internet soient contraints au versement de redevances — L'existence d'un lien réel et important avec le Canada suffit-elle pour que s'applique la Loi sur le droit d'auteur?*

*Droit d'auteur — Violation — Communication au public par télécommunication — Communication d'œuvres musicales au moyen de l'Internet — Demande de la SOCAN afin que les fournisseurs de services Internet soient contraints au versement de redevances — Suivant la Loi sur le droit d'auteur, le participant à une télécommunication qui ne fait que fournir les moyens de télécommunication n'est pas réputé en être l'auteur — Le fournisseur de services Internet qui se contente d'être un agent permettant à autrui de communiquer bénéficie-t-il de l'art. 2.4(1)b) de la Loi sur le droit d'auteur? — Le fournisseur de services Internet fait-il connaître ou transmet-il une œuvre musicale protégée et viole-t-il de ce fait le droit d'auteur? — La création d'une antémémoire, même pour des raisons purement techniques, viole-t-elle le droit d'auteur? — Loi sur le droit d'auteur, L.R.C. 1985, ch. C-42, art. 2.4(1)b).*

Le présent pourvoi soulève la question de savoir qui doit verser des redevances aux artistes et aux compositeurs titulaires du droit d'auteur canadien sur les œuvres musicales téléchargées au Canada à partir d'un autre pays au moyen de l'Internet.

L'intimée est une société de gestion qui gère au Canada les droits d'auteur sur les œuvres musicales de ses membres canadiens et des membres étrangers de sociétés homologues. Elle veut percevoir des redevances auprès des fournisseurs de services Internet situés au Canada parce que, selon elle, ils violeraient le droit exclusif conféré par la loi au titulaire du droit d'auteur de communiquer l'œuvre au public par télécommunication et d'autoriser une telle communication. Les appelantes représentent une vaste coalition de fournisseurs canadiens de services Internet. Elles font valoir qu'elles ne « communiquent » pas d'œuvres musicales ni n'« autorisent » leur communication puisqu'elles ne sont que des agents et ne réglementent pas le contenu des communications Internet qu'elles transmettent.

En 1988, le Parlement a ajouté à la *Loi sur le droit d'auteur* la disposition antérieure à l'actuel al. 2.4(1)b) prévoyant que la personne qui ne fait que fournir « à un tiers les moyens de télécommunication nécessaires pour que celui-ci [e]ffectue [une communication] » n'est pas elle-même partie à une communication illicite.

In 1995, the respondent applied to the Copyright Board for approval of Tariff 22 which proposed the amount and allocation of the royalty. The Board convened a hearing to determine which activities on the Internet attract liability under the tariff. The Board held that copyright liability attaches to content providers but that the normal activities of Internet Service Providers other than the content providers did not constitute "a communication" for the purpose of the *Copyright Act* and thus fall within the protection of s. 2.4(1)(*b*). Even where the intermediary does more than act as a conduit, the Board held that no copyright liability is incurred in Canada unless the communication originates from a server located in Canada (except perhaps if the content provider has "the intention to communicate it specifically to recipients in Canada").

The Federal Court of Appeal found that copyright may be imposed in respect of any telecommunication that has a real and substantial connection with Canada, and is not restricted only to an Internet communication from a host server located in Canada. The Board's exclusion of the appellants from copyright liability where they perform a pure intermediary function was upheld. However, the majority held that where an Internet Service Provider in Canada creates a "cache" of Internet material, even for purely technical reasons, they no longer act as a mere intermediary and thus become a participant in the copyright infringement and are liable to that extent under Tariff 22. The dissenting judge agreed with the Board that to cache for the purpose of enhancing Internet economy and efficiency did not constitute infringement.

*Held*: The appeal should be allowed in part; the cross-appeal should be dismissed.

*Per* McLachlin C.J. and Iacobucci, Major, Bastarache, Binnie, Arbour, Deschamps and Fish JJ.: The capacity of the Internet to disseminate works of the arts and intellect is one of the great innovations of the information age. Its use should be facilitated rather than discouraged, but this should not be done unfairly at the expense of the creator of the works. The Internet presents a particular challenge to national copyright laws, which are typically territorial in nature.

By enacting s. 2.4(1)(*b*) of the *Copyright Act*, Parliament made a policy distinction between those who use the Internet to supply or obtain content such as "cheap music" and those who are part of the infrastructure of the Internet itself. Parliament decided that there is

En 1995, l'intimée a demandé à la Commission du droit d'auteur d'homologuer le tarif 22 proposant le paiement d'une redevance d'un certain montant. La Commission a tenu des audiences pour déterminer quelles activités Internet emportaient l'obligation de payer la redevance prévue par le tarif. La Commission a statué que le fournisseur de contenu pouvait être contraint au versement d'une redevance, mais que les activités habituelles d'un fournisseur de services Internet autre qu'un fournisseur de contenu ne constituaient pas une « communication » au sens de la *Loi sur le droit d'auteur* et, par conséquent, jouissaient de la protection de l'al. 2.4(1)*b*). Même lorsque l'intermédiaire est davantage qu'un simple agent, la Commission a conclu à l'absence de violation du droit d'auteur au Canada à moins que la communication ne provienne d'un serveur situé au Canada (sauf peut-être si le fournisseur du contenu a « l'intention de le communiquer précisément à des destinataires au Canada »).

La Cour d'appel fédérale a estimé qu'une redevance peut être exigée chaque fois qu'une télécommunication a un lien réel et important avec le Canada et non seulement lorsqu'une communication Internet provient d'un serveur hôte se trouvant au Canada. Elle a confirmé la décision de la Commission selon laquelle les appelantes ne violaient pas le droit d'auteur lorsqu'elles agissaient uniquement à titre d'intermédiaires. Les juges majoritaires ont cependant statué que le fournisseur de services Internet au Canada qui crée une « antémémoire », même pour des raisons purement techniques, n'est plus un simple intermédiaire, mais participe à la violation du droit d'auteur et est assujetti à cet égard au tarif 22. La juge dissidente a convenu avec la Commission que la mise en antémémoire dans le but d'améliorer l'efficacité des communications Internet et d'en réduire le coût ne constitue pas une violation du droit d'auteur.

*Arrêt* : Le pourvoi est accueilli en partie; le pourvoi incident est rejeté.

*La* juge en chef McLachlin et les juges Iacobucci, Major, Bastarache, Binnie, Arbour, Deschamps et Fish : La possibilité de diffuser des œuvres artistiques et intellectuelles grâce à l'Internet est l'une des grandes innovations de l'ère de l'information. Le recours à l'Internet doit être facilité, et non découragé, mais pas de manière injuste, au détriment des créateurs. L'Internet représente un véritable défi pour les lois nationales sur le droit d'auteur qui, de par leur nature même, s'appliquent habituellement dans des territoires donnés.

En adoptant l'al. 2.4(1)*b*) de la *Loi sur le droit d'auteur*, le législateur a fait une distinction de principe entre ceux qui utilisent l'Internet pour fournir ou se procurer du contenu, notamment de la musique à peu de frais, et ceux qui font partie de l'infrastructure Internet

Case 1:25-cv-00910-JMF    Document 39-3    Filed 03/21/25    Page 5 of 63

430                SOCAN v. CANADIAN ASSN. OF INTERNET PROVIDERS          [2004] 2 S.C.R.

a public interest in encouraging intermediaries that make telecommunications possible to expand and improve their operations without the threat of copyright infringement. Section 2.4(1)(*b*) indicates that in Parliament's view, Internet intermediaries are not "users" at all, at least for purposes of the *Copyright Act*.

A telecommunication occurs when music is transmitted from the host server to the end user. An Internet communication that crosses one or more national boundaries "occurs" in more than one country, at a minimum, the country of transmission and the country of reception. To occur in Canada, a communication need not originate from a server located in Canada. To the extent that the Board concluded that a communication that does not originate in Canada cannot be said to occur in Canada, it erred. To hold otherwise would not only fly in the face of the ordinary use of language, but would have serious consequences in other areas of law relevant to the Internet.

The applicability of the *Copyright Act* to communications that have international participants will depend on whether there is a sufficient connection between this country and the communication in question for Canada to apply its laws consistently with the principles of order and fairness. A real and substantial connection to Canada is sufficient to support the application of our *Copyright Act* to international Internet transmissions in a way that will accord with international comity.

In terms of the Internet, relevant connecting factors would include the *situs* of the content provider, the host server, the intermediaries and the end user. The weight to be given to any particular factor will vary with the circumstances and the nature of the dispute. The conclusion that Canada could exercise copyright jurisdiction in respect both of transmissions originating here, and transmissions originating abroad but received here, is not only consistent with our general law but with both national and international copyright practice.

It is a different issue, however, whether Canada intended to exercise its copyright jurisdiction to impose copyright liability on every participant in an Internet communication with "a real and substantial connection" to Canada. This latter issue raises questions of statutory interpretation of the *Copyright Act*.

Section 2.4(1)(*b*) of the *Copyright Act* provides that participants in a telecommunication who only provide "the means of telecommunication necessary" are deemed

comme telle. Le législateur a décidé qu'il est dans l'intérêt du public d'encourager les intermédiaires, qui rendent les télécommunications possibles, à étendre et à développer leurs activités sans s'exposer au risque de violer le droit d'auteur. L'alinéa 2.4(1)*b*) indique que, de l'avis du législateur, les intermédiaires Internet ne sont pas du tout des « utilisateurs », à tout le moins pour l'application de la *Loi sur le droit d'auteur*.

Il y a télécommunication lors de la transmission de l'œuvre musicale du serveur hôte à l'utilisateur final. La communication Internet qui franchit une ou plusieurs frontières nationales « se produit » dans plus d'un pays, soit à tout le moins dans le pays de transmission et dans le pays de réception. Point n'est besoin qu'une communication provienne d'un serveur situé au Canada pour qu'elle se produise au Canada. La Commission a eu tort de conclure qu'une communication qui ne provient pas du Canada ne se produit pas au Canada. Conclure en sens contraire irait non seulement à l'encontre du sens ordinaire des mots, mais aurait de graves conséquences dans d'autres domaines de l'application de la loi à l'Internet.

L'applicabilité de la *Loi sur le droit d'auteur* à une communication à laquelle participent des ressortissants d'autres pays dépend de l'existence entre le Canada et la communication d'un lien suffisant pour que le Canada applique ses dispositions conformément aux principes d'ordre et d'équité. L'existence d'un lien réel et important avec le Canada suffit pour que notre *Loi sur le droit d'auteur* s'applique aux transmissions Internet internationales conformément au principe de la courtoisie internationale.

En ce qui concerne l'Internet, le facteur de rattachement pertinent est le *situs* du fournisseur de contenu, du serveur hôte, des intermédiaires et de l'utilisateur final. L'importance à accorder à l'un d'eux en particulier varie selon les circonstances de l'affaire et la nature du litige. La conclusion selon laquelle le Canada pourrait exercer sa compétence en matière de droits d'auteur à l'égard tant des transmissions effectuées au pays que de celles provenant de l'étranger est conforme non seulement à notre droit général, mais aussi aux pratiques nationales et internationales en la matière.

C'est une autre question, toutefois, que celle de savoir si l'intention du législateur canadien était d'exercer sa compétence en matière de droits d'auteur de façon à contraindre au versement de redevances tout participant à une communication Internet ayant « un lien réel et important » avec le Canada. Le règlement de cette deuxième question exige l'interprétation des dispositions de la *Loi sur le droit d'auteur*.

L'alinéa 2.4(1)*b*) de la *Loi sur le droit d'auteur* dispose que le participant à une télécommunication qui ne fait que fournir « les moyens de télécommunication

not to be communicators. The provision is not a loophole but is an important element of the balance struck by the statutory copyright scheme. The words of s. 2.4(1)(*b*) must be read in their ordinary and grammatical sense in the proper context. In this context, the word "necessary" is satisfied if the means are reasonably useful and proper to achieve the benefits of enhanced economy and efficiency. The "means" include all software connection equipment, connectivity services, hosting and other facilities and services without which such communication would not occur. So long as an Internet intermediary does not itself engage in acts that relate to the content of the communication, but confines itself to providing "a conduit" for information communicated by others, then it will fall within s. 2.4(1)(*b*). The attributes of such a "conduit" include a lack of actual knowledge of the infringing contents, and the impracticality (both technical and economic) of monitoring the vast amount of material moving through the Internet. However, the protection provided by s. 2.4(1)(*b*) relates to protected functions, not to all of the potential activities of an Internet Service Provider.

A content provider is not immune from copyright liability by virtue only of the fact that it employs a host server outside the country. Conversely, a host server does not attract liability just because it is located in Canada. The liability of a host server should be determined by whether or not the host server limits itself to "a conduit" (or content-neutral) function and thereby qualifies for protection under s. 2.4(1)(*b*).

The creation of a "cache" copy is a serendipitous consequence of improvements in Internet technology, is content neutral, and in light of s. 2.4(1)(*b*) of the Act ought not to have any legal bearing on the communication between the content provider and the end user. "Caching" is dictated by the need to deliver faster and more economic service, and should not, when undertaken only for such technical reasons, attract copyright liability and therefore comes within the shelter of s. 2.4(1)(*b*). The Board's view is correct and its decision in that regard should be restored.

An Internet Service Provider's knowledge that someone might be using content-neutral technology to violate copyright is not necessarily sufficient to constitute authorization, which requires a demonstration that the defendant did give approval to, sanction, permit, favour, or encourage the infringing conduct. Notice of infringing content, and a failure to respond by "taking it down", may in some circumstances lead to a finding of "authorization". Therefore, authorization could be inferred in a proper case, but all would depend on the facts.

nécessaires » n'est pas réputé en être l'auteur. Cette disposition n'est pas une échappatoire, mais un élément important de l'équilibre établi par le régime législatif en cause. Il faut interpréter les termes qu'elle emploie dans leur sens ordinaire et grammatical, selon le contexte. Dans le contexte considéré, un moyen est « nécessaire » s'il est raisonnablement utile et approprié pour l'obtention des avantages que sont une économie et une efficacité accrues. Les « moyens » englobent tous les logiciels de connexion, les services assurant la connectivité, les installations et services offrant l'hébergement sans lesquels la communication n'aurait pas lieu. L'intermédiaire Internet qui ne se livre pas à une activité touchant au contenu de la communication, mais qui se contente d'être « un agent » permettant à autrui de communiquer, bénéficie de l'application de l'al. 2.4(1)(*b*). Ce qui caractérise entre autres un tel « agent », c'est l'ignorance du contenu attentatoire et l'impossibilité (tant sur le plan technique que financier) de surveiller la quantité énorme de fichiers circulant sur l'Internet. Toutefois, la protection prévue à l'al. 2.4(1)(*b*) s'applique à une fonction protégée, et non à toute activité possible d'un fournisseur de services Internet.

Le fournisseur de contenu n'échappe pas à l'application des dispositions sur le droit d'auteur du seul fait qu'il utilise un serveur hôte situé à l'étranger. À l'inverse, un serveur hôte n'est pas assujetti à ces dispositions seulement parce qu'il est situé au Canada. La responsabilité du serveur hôte doit être déterminée par le fait qu'il se limite ou non au rôle d'« agent » (ou n'a aucune incidence sur le contenu); dans l'affirmative, il bénéficie de la protection prévue à l'al. 2.4(1)(*b*).

L'antémémoire est une belle invention issue du progrès de la technologie Internet, elle n'a aucune incidence sur le contenu et, au vu de l'al. 2.4(1)(*b*) de la Loi, elle ne devrait avoir aucun effet juridique sur la communication intervenant entre le fournisseur de contenu et l'utilisateur final. La « mise en antémémoire » est dictée par la nécessité d'offrir un service plus rapide et plus économique. Elle ne devrait pas emporter la violation du droit d'auteur lorsqu'elle a lieu uniquement pour de telles raisons techniques et bénéficie donc de la protection prévue à l'al. 2.4(1)(*b*). La Commission avait raison sur ce point, et sa décision doit être rétablie à cet égard.

Le fait qu'un fournisseur de services Internet sache que quelqu'un pourrait violer le droit d'auteur grâce à une technologie sans incidence sur le contenu n'équivaut pas nécessairement à autoriser cette violation, car il faut démontrer que l'intéressé a approuvé, sanctionné, permis, favorisé ou encouragé le comportement illicite. L'omission de « retirer » un contenu illicite après avoir été avisé de sa présence peut, dans certains cas, être considérée comme une « autorisation ». Celle-ci peut parfois être inférée, mais tout dépend des faits.

The *Copyright Act* is often presented as "a balance" between the rights of those who create works of the arts and the intellect and those who wish to use such works. However, the balance is only tangentially at issue here because Parliament has expressed the view in s. 2.4(1)(*b*) that those who provide internet infrastructure are not properly to be considered "users" of such works for purposes of the Act.

*Per* LeBel J.: Except for the analysis of the appropriate test for determining the location of an Internet communication under the *Copyright Act*, the judgment of the majority and the disposition of the appeal is agreed to. Parliament's power to legislate with extraterritorial effect is well-settled as a matter of Canadian law. However, it is a common law presumption that Parliament does not intend legislation to apply extraterritorially. The presumption is rebuttable where the contrary intention is expressly stated or implied by the legislation. Nothing in the *Copyright Act* impliedly gives s. 3(1)(*f*) extraterritorial effect, particularly given the principle of territoriality of copyright law. Therefore, given that Parliament did not intend the Act to have effect outside Canada, an Internet communication only occurs within Canada where it originates from a host server located in Canada. In this way, the copyright works physically exist within Canadian territory and thus attract the protection of s. 3(1)(*f*). This test for determining the *situs* of a communication, which is the location of the host server, has the virtue of simplicity; it best accords with the principle of territoriality and harmonizes our copyright law with international treaty principles, and it diminishes privacy concerns. It is also sound from an operational perspective and it provides the requisite predictability and best accords with the meaning and purpose of the Act.

By contrast, importing the real and substantial connection test that was developed in a very different context is inappropriate to determine whether a communication occurred within Canada. The real and substantial connection test was developed to deal with the exigencies of the Canadian federation and should not be lightly transposed as a rule of statutory construction. The real and substantial connection test is not a principle of legislative jurisdiction; it applies only to courts. Furthermore, it is inconsistent with the territoriality principle and its use should not be understood as a limit on Parliament's power to legislate with extraterritorial effect. There is also a danger that this approach could also result in a layering of royalty obligations between states.

On dit souvent de la *Loi sur le droit d'auteur* qu'elle établit « un équilibre » entre les droits de ceux qui créent des œuvres artistiques et intellectuelles et ceux des personnes désireuses d'utiliser ces œuvres. Le présent pourvoi ne touche qu'accessoirement à cet équilibre, le législateur ayant indiqué à l'al. 2.4(1)*b*) que ceux qui fournissent l'infrastructure Internet ne doivent pas être considérés comme des « utilisateurs » pour l'application de la Loi.

*Le* juge LeBel : Sauf l'analyse relative au critère qu'il convient d'appliquer pour localiser d'une communication Internet au regard de la *Loi sur le droit d'auteur*, le jugement des juges majoritaires et le règlement du pourvoi qu'ils proposent sont acceptés. Le pouvoir du Parlement d'adopter des lois ayant une portée extraterritoriale est bien établi en droit canadien. En common law, le Parlement est présumé ne pas avoir eu l'intention de conférer à une loi une portée extraterritoriale. Cette présomption peut être réfutée par l'intention contraire exprimée expressément ou implicitement dans la loi. Aucune disposition de la *Loi sur le droit d'auteur* ne confère implicitement une portée extraterritoriale à l'al. 3(1)*f*), compte tenu, tout particulièrement, du principe de territorialité du droit d'auteur. Puisque le Parlement n'a pas voulu que la Loi s'applique à l'extérieur du Canada, une communication Internet a donc lieu au Canada uniquement lorsqu'elle provient d'un serveur hôte situé au Canada. De la sorte, les œuvres protégées par le droit d'auteur existent physiquement sur le territoire canadien et bénéficient donc de la protection de l'al. 3(1)*f*). Ce critère de localisation de la communication, fondé sur l'emplacement du serveur hôte, a le mérite d'être simple; il respecte le mieux le principe de la territorialité et il harmonise notre droit d'auteur avec les principes formulés dans les traités internationaux. En plus de réduire le risque d'atteinte à la vie privée, il est valable sur le plan pratique, il offre la prévisibilité voulue et il est le plus compatible avec la portée et l'objet de la Loi.

En revanche, il est inopportun d'appliquer le critère du lien réel et important, qui a vu le jour dans un contexte très différent, pour déterminer si une communication a eu lieu au Canada. Ce critère a été formulé en fonction des exigences de la fédération canadienne et ne saurait être transformé à la légère en règle d'interprétation législative. Ce n'est pas un principe de compétence législative; il s'applique uniquement aux tribunaux. De plus, il cadre mal avec le principe de la territorialité et ne devrait pas être interprété comme limitant le pouvoir du Parlement d'adopter des lois ayant une portée extraterritoriale. Le recours à ce critère comporte également le risque d'une superposition des redevances exigibles dans les différents États.

This Court should adopt an interpretation of s. 3(1)(*f*) that respects end users' privacy interests, and should eschew an interpretation that would encourage the monitoring or collection of personal data gleaned from Internet-related activity within the home. Locating the communication at the place of the host server addresses privacy concerns, as such concerns are diminished because it is the content provider who has made the information public by posting it on the server. By contrast, the real and substantial connection test, insofar as it looks at the retrieval practice of end users, encourages the monitoring of an individual's surfing and downloading activities. Privacy interests of individuals will be directly implicated where owners of copyrighted works or their collective societies attempt to retrieve data from Internet Service Providers about an end user's downloading of copyrighted works.

**Cases Cited**

By Binnie J.

**Referred to:** *Théberge v. Galerie d'Art du Petit Champlain inc.*, [2002] 2 S.C.R. 336, 2002 SCC 34; *CCH Canadian Ltd. v. Law Society of Upper Canada*, [2004] 1 S.C.R. 339, 2004 SCC 13; *Citron v. Zundel* (2002), 41 C.H.R.R. D/274; *Reference re Earth Future Lottery*, [2003] 1 S.C.R. 123, 2003 SCC 10; *Braintech, Inc. v. Kostiuk* (1999), 171 D.L.R. (4th) 46; *Dow Jones & Co. v. Gutnick* (2002), 194 A.L.R. 433, [2002] HCA 56; *Goldman v. The Queen*, [1980] 1 S.C.R. 976; *Dr. Q v. College of Physicians and Surgeons of British Columbia*, [2003] 1 S.C.R. 226, 2003 SCC 19; *Tolofson v. Jensen*, [1994] 3 S.C.R. 1022; *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077; *Unifund Assurance Co. v. Insurance Corp. of British Columbia*, [2003] 2 S.C.R. 63, 2003 SCC 40; *Libman v. The Queen*, [1985] 2 S.C.R. 178; *Canada (Human Rights Commission) v. Canadian Liberty Net*, [1998] 1 S.C.R. 626; *Kitakufe v. Oloya*, [1998] O.J. No. 2537 (QL); *Hunt v. T&N plc*, [1993] 4 S.C.R. 289; *Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustees of)*, [2001] 3 S.C.R. 907, 2001 SCC 90; *Spar Aerospace Ltd. v. American Mobile Satellite Corp.*, [2002] 4 S.C.R. 205, 2002 SCC 78; *Beals v. Saldanha*, [2003] 3 S.C.R. 416, 2003 SCC 72; *Bell ExpressVu Limited Partnership v. Rex*, [2002] 2 S.C.R. 559, 2002 SCC 42; *WIC Premium Television Ltd. v. General Instrument Corp.* (2000), 8 C.P.R. (4th) 1; *Re World Stock Exchange* (2000), 9 A.S.C.S. 658; Commission of the European Communities, *Commission Decision of 8 October 2002 relating to a proceeding under Article 81 of the EC Treaty and Article 53 of the EEA Agreement* (Case No. COMP/C2/38.014 — IFPI "Simulcasting"); *National Football League v. PrimeTime*

Notre Cour doit opter pour l'interprétation de l'al. 3(1)*f*) qui respecte le droit à la vie privée de l'utilisateur final et écarter toute interprétation qui favoriserait le contrôle ou la collecte de données personnelles lors d'une utilisation de l'Internet à domicile. Localiser la communication en fonction du serveur hôte permet d'assurer la protection des renseignements personnels : le risque d'atteinte à la vie privée est réduit parce que c'est le fournisseur de contenu qui a rendu l'information publique en la rendant disponible sur le serveur. Par contre, dans la mesure où il touche aux pratiques d'extraction des utilisateurs finaux, le critère du lien réel et important favorise le contrôle des activités individuelles de téléchargement et de navigation. Le droit au respect de la vie privée sera directement touché lorsqu'un titulaire du droit d'auteur ou une société de gestion tentera d'obtenir d'un fournisseur de services Internet des données sur les œuvres protégées que télécharge un utilisateur final.

**Jurisprudence**

Citée par le juge Binnie

**Arrêts mentionnés :** *Théberge c. Galerie d'Art du Petit Champlain inc.*, [2002] 2 R.C.S. 336, 2002 CSC 34; *CCH Canadienne Ltée c. Barreau du Haut-Canada*, [2004] 1 R.C.S. 339, 2004 CSC 13; *Citron c. Zundel* (2002), 41 C.H.R.R. D/274; *Renvoi relatif à la Earth Future Lottery*, [2003] 1 R.C.S. 123, 2003 CSC 10; *Braintech, Inc. c. Kostiuk* (1999), 171 D.L.R. (4th) 46; *Dow Jones & Co. c. Gutnick* (2002), 194 A.L.R. 433, [2002] HCA 56; *Goldman c. La Reine*, [1980] 1 R.C.S. 976; *Dr Q c. College of Physicians and Surgeons of British Columbia*, [2003] 1 R.C.S. 226, 2003 CSC 19; *Tolofson c. Jensen*, [1994] 3 R.C.S. 1022; *Unifund Assurance Co. c. Insurance Corp. of British Columbia*, [2003] 2 R.C.S. 63, 2003 CSC 40; *Libman c. La Reine*, [1985] 2 R.C.S. 178; *Canada (Commission des droits de la personne) c. Canadian Liberty Net*, [1998] 1 R.C.S. 626; *Kitakufe c. Oloya*, [1998] O.J. No. 2537 (QL); *Hunt c. T&N plc*, [1993] 4 R.C.S. 289; *Holt Cargo Systems Inc. c. ABC Containerline N.V. (Syndics de)*, [2001] 3 R.C.S. 907, 2001 CSC 90; *Spar Aerospace Ltée c. American Mobile Satellite Ltée*, [2002] 4 R.C.S. 205, 2002 CSC 78; *Beals c. Saldanha*, [2003] 3 R.C.S. 416, 2003 CSC 72; *Bell ExpressVu Limited Partnership c. Rex*, [2002] 2 R.C.S. 559, 2002 CSC 42; *WIC Premium Television Ltd. c. General Instrument Corp.* (2000), 8 C.P.R. (4th) 1; *Re World Stock Exchange* (2000), 9 A.S.C.S. 658; Commission des affaires européennes, *Décision de la Commission du 8 octobre 2002 relative à une procédure d'application de l'article 81 du traité CE et de l'article 53 de l'accord EEE* (Affaire COMP/C2/38.014 — IFPI « Simulcast »); *National Football League c. PrimeTime*

*24 Joint Venture*, 211 F.3d 10 (2000); *Los Angeles News Service v. Conus Communications Co.*, 969 F.Supp. 579 (1997); *National Football League v. TVRadioNow Corp.*, 53 USPQ2d 1831 (2000); Trib. gr. inst. Paris, May 22, 2000 (*UEJF v. Yahoo! Inc.*); *Yahoo! Inc. v. Ligue contre le racisme et l'antisémitisme*, 145 F.Supp.2d 1168 (2001); *Bishop v. Stevens*, [1990] 2 S.C.R. 467; *Compo Co. v. Blue Crest Music Inc.*, [1980] 1 S.C.R. 357; *Menear v. Miguna* (1996), 30 O.R. (3d) 602, rev'd (1997), 33 O.R. (3d) 223; *Newton v. City of Vancouver* (1932), 46 B.C.R. 67; *Sun Life Assurance Co. of Canada v. W. H. Smith & Son, Ltd.*, [1933] All E.R. Rep. 432; *Electric Despatch Co. of Toronto v. Bell Telephone Co. of Canada* (1891), 20 S.C.R. 83; *Canadian Assn. of Broadcasters v. Society of Composers, Authors and Music Publishers of Canada* (1994), 58 C.P.R. (3d) 190; *Religious Technology Center v. Netcom On-line Communication Services, Inc.*, 907 F.Supp. 1361 (1995); *Vigneux v. Canadian Performing Right Society, Ltd.*, [1945] A.C. 108; *Muzak Corp. v. Composers, Authors and Publishers Association of Canada, Ltd.*, [1953] 2 S.C.R. 182; *Apple Computer Inc. v. Mackintosh Computers Ltd.*, [1987] 1 F.C. 173, aff'd [1990] 2 S.C.R. 209; *C.B.S. Inc. v. Ames Records & Tapes Ltd.*, [1982] 1 Ch. 91; *Godfrey v. Demon Internet Ltd.*, [1999] 4 All E.R. 342; *A & M Records, Inc. v. Napster, Inc.*, 114 F.Supp.2d 896 (2000), aff'd in part, 239 F.3d 1004 (2001).

By LeBel J.

**Referred to:** *Croft v. Dunphy*, [1933] A.C. 156; *Reference re Offshore Mineral Rights of British Columbia*, [1967] S.C.R. 792; *Reference re Newfoundland Continental Shelf*, [1984] 1 S.C.R. 86; *Bolduc v. Attorney General of Quebec*, [1982] 1 S.C.R. 573; *Arcadi v. The King*, [1932] S.C.R. 158; *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077; *Beals v. Saldanha*, [2003] 3 S.C.R. 416, 2003 SCC 72; *Hunt v. T&N plc*, [1993] 4 S.C.R. 289; *R. v. Sharpe*, [2001] 1 S.C.R. 45, 2001 SCC 2; *Daniels v. White*, [1968] S.C.R. 517.

**Statutes and Regulations Cited**

*Agreement on Trade-Related Aspects of Intellectual Property Rights*, 1869 U.N.T.S. 299 (being Annex 1C of the *Marrakesh Agreement Establishing the World Trade Organization*, 1867 U.N.T.S. 3).

*Berne Convention for the Protection of Literary and Artistic Works*, September 9, 1886, art. 5.

*Constitution Act, 1982*, s. 52(2)(*b*), (*c*), Sch., item 17.

*Copyright Act*, R.S.C. 1985, c. C-42, ss. 2 "telecommunication" [ad. 1988, c. 65, s. 61], 2.4(1)(*b*) [ad. 1997, c. 24, s. 2], 3(1) [repl. *idem*, s. 3(1)], (*f*) [rep. & sub. 1988, c. 65, s. 62], 27(1).

*24 Joint Venture*, 211 F.3d 10 (2000); *Los Angeles News Service c. Conus Communications Co.*, 969 F.Supp. 579 (1997); *National Football League c. TVRadioNow Corp.*, 53 USPQ2d 1831 (2000); Trib. gr. inst. Paris, 22 mai 2000 (*UEJF c. Yahoo! Inc.*); *Yahoo! Inc. c. Ligue contre le racisme et l'antisémitisme*, 145 F.Supp.2d 1168 (2001); *Bishop c. Stevens*, [1990] 2 S.C.R. 467; *Compo Co. c. Blue Crest Music Inc.*, [1980] 1 R.C.S. 357; *Menear c. Miguna* (1996), 30 O.R. (3d) 602, inf. par (1997), 33 O.R. (3d) 223; *Newton c. City of Vancouver* (1932), 46 B.C.R. 67; *Sun Life Assurance Co. of Canada c. W. H. Smith & Son, Ltd.*, [1933] All E.R. Rep. 432; *Electric Despatch Co. of Toronto c. Bell Telephone Co. of Canada* (1891), 20 R.C.S. 83; *Assoc. canadienne des radiodiffuseurs c. Société canadienne des auteurs, compositeurs et éditeurs de musique*, [1994] A.C.F. No. 1540 (QL); *Religious Technology Center c. Netcom On-line Communication Services, Inc.*, 907 F.Supp. 361 (1995); *Vigneux c. Canadian Performing Right Society, Ltd.*, [1945] A.C. 108; *Muzak Corp. c. Composers, Authors and Publishers Association of Canada, Ltd.*, [1953] 2 R.C.S. 182; *Apple Computer Inc. c. Mackintosh Computers Ltd.*, [1987] 1 C.F. 173, conf. par [1990] 2 R.C.S. 209; *C.B.S. Inc. c. Ames Records & Tapes Ltd.*, [1982] 1 Ch. 91; *Godfrey c. Demon Internet Ltd.*, [1999] 4 All E.R. 342; *A & M Records, Inc. c. Napster, Inc.*, 114 F.Supp.2d 896 (2000), conf. en partie par 239 F.3d 1004 (2001).

Citée par le juge LeBel

**Arrêts mentionnés :** *Croft c. Dunphy*, [1933] A.C. 156; *Reference re Offshore Mineral Rights of British Columbia*, [1967] R.C.S. 792; *Renvoi relatif au plateau continental de Terre-Neuve*, [1984] 1 R.C.S. 86; *Bolduc c. Procureur général du Québec*, [1982] 1 R.C.S. 573; *Arcadi c. The King*, [1932] R.C.S. 158; *Morguard Investments Ltd. c. De Savoye*, [1990] 3 R.C.S. 1077; *Beals c. Saldanha*, [2003] 3 R.C.S. 416, 2003 CSC 72; *Hunt c. T&N plc*, [1993] 4 R.C.S. 289; *R. c. Sharpe*, [2001] 1 R.C.S. 45, 2001 CSC 2; *Daniels c. White*, [1968] R.C.S. 517.

**Lois et règlements cités**

*Accord sur les aspects des droits de propriété intellectuelle qui touchent au commerce*, 1869 R.T.N.U. 332 (annexe 1C de l'*Accord de Marrakech instituant l'Organisation mondiale du commerce*, 1867 R.T.N.U. 3).

*Convention de Berne pour la protection des œuvres littéraires et artistiques*, 9 septembre 1886, art. 5.

*Copyright Act 1968* (Australia), n° 63 de 1968, art. 10(1) « communicate », « to the public ».

*Copyright Amendment (Digital Agenda) Act 2000* (Australie), n° 110 de 2000, ann. 1, art. 6, 16.

*Copyright Act 1968* (Australia), No. 63 of 1968, s. 10(1) "communicate", "to the public".

*Copyright Amendment (Digital Agenda) Act 2000* (Australia), No. 110 of 2000, Sch. 1, ss. 6, 16.

*Digital Millennium Copyright Act*, 17 U.S.C. § 512 (1998).

*Directive 2000/31/EC of the European Parliament and of the Council of 8 June 2000 on certain legal aspects of information society services, in particular electronic commerce, in the Internal Market ("Directive on electronic commerce")*, [2000] O.J. L. 178/1, Preamble, clauses 17, 19, 22, 42, arts. 3(1), 13(1).

*Statute of Westminster, 1931* (U.K.), 22 Geo. 5, c. 4 [reprinted in R.S.C. 1985, App. II, No. 27], s. 3.

*WIPO Copyright Treaty*, CRNR/DC/94, December 23, 1996, art. 8, Agreed Statements, art. 8.

*WIPO Performances and Phonograms Treaty*, CRNR/DC/95, December 23, 1996.

*Digital Millennium Copyright Act*, 17 U.S.C. § 512 (1998).

*Directive 2000/31/CE du Parlement européen et du Conseil du 8 juin 2000 relative à certains aspects juridiques des services de la société de l'information, et notamment du commerce électronique, dans le marché intérieur (« Directive sur le commerce électronique »)*, [2000] J.O. L. 178/1, préambule, par. 17, 19, 22, 42, art. 3(1), 13(1).

*Loi constitutionnelle de 1982*, art. 52(2)b), c), ann., point 17.

*Loi sur le droit d'auteur*, L.R.C. 1985, ch. C-42, art. 2 « télécommunication » [aj. 1988, ch. 65, art. 61], 2.4(1)b) [aj. 1997, ch. 24, art. 2], 3(1) [rempl. *idem*, art. 3(1)], f) [abr. & sub. 1988, ch. 65, art. 62] 27(1).

*Statut de Westminster de 1931* (R.-U.), 22 Geo. 5, ch. 4 [reproduit dans L.R.C. 1985, app. II, n° 27], art. 3.

*Traité de l'OMPI sur le droit d'auteur*, CRNR/DC/94, 23 décembre 1996, art. 8, déclarations communes, art. 8.

*Traité de l'OMPI sur les interprétations et exécutions et les phonogrammes*, CRNR/DC/95, 23 décembre 1996.

## Authors Cited

Anonymous. "The music industry: In a spin", *The Economist* (March 2003), p. 58.

*Black's Law Dictionary*, 6th ed. St. Paul, Minn.: West Publishing Co., 1990, "necessary".

Brown, Raymond E. *The Law of Defamation in Canada*, vol. 1, 2nd ed. Scarborough, Ont.: Carswell, 1999 (loose-leaf).

Canada. House of Commons. Sub-Committee on the Revision of Copyright of the Standing Committee on Communications and Culture. *A Charter of Rights for Creators*. Ottawa: House of Commons, 1985.

Gervais, Daniel J. "Transmissions of Music on the Internet: An Analysis of the Copyright Laws of Canada, France, Germany, Japan, the United Kingdom, and the United States" (2001), 34 *Vand. J. Transnat'l. L.* 1363.

Gratton, Eloïse. *Internet and Wireless Privacy: A Legal Guide to Global Business Practices*. Toronto: CCH Canadian, 2003.

McKeown, John S. *Fox on Canadian Law of Copyright and Industrial Designs*, 4th ed. Toronto: Thomson/Carswell, 2003 (loose-leaf).

Nimmer, Melville B. *Nimmer on Copyright*, vol. 3. New York: Matthew Bender (loose-leaf updated December 2002, release 59).

Pietsch, Matthew V. "International Copyright Infringement and the Internet: An Analysis of the Existing Means of Enforcement" (2001-2002), 24 *Hastings Comm. & Ent. L.J.* 273.

## Doctrine citée

Anonymous. « The music industry : In a spin », *The Economist* (March 2003), p. 58.

*Black's Law Dictionary*, 6th ed. St. Paul, Minn. : West Publishing Co., 1990, « *necessary* ».

Brown, Raymond E. *The Law of Defamation in Canada*, vol. 1, 2nd ed. Scarborough, Ont. : Carswell, 1999 (loose-leaf).

Canada. Chambre des communes. Sous-comité du Comité permanent des communications et de la culture sur la révision du droit d'auteur. *Une charte des droits des créateurs et créatrices*. Ottawa : Chambre des communes, 1985.

Gervais, Daniel J. « Transmissions of Music on the Internet : An Analysis of the Copyright Laws of Canada, France, Germany, Japan, the United Kingdom, and the United States » (2001), 34 *Vand. J. Transnat'l. L.* 1363.

Gratton, Eloïse. *Internet and Wireless Privacy : A Legal Guide to Global Business Practices*. Toronto : CCH Canadian, 2003.

McKeown, John S. *Fox on Canadian Law of Copyright and Industrial Designs*, 4th ed. Toronto : Thomson/Carswell, 2003 (loose-leaf).

Nimmer, Melville B. *Nimmer on Copyright*, vol. 3. New York : Matthew Bender (loose-leaf updated December 2002, release 59).

*Nouveau Petit Robert : Dictionnaire alphabétique et analogique de la langue française*. Paris : Dictionnaires Le Robert, 2003, « communiquer ».

Case 1:25-cv-00910-JMF    Document 39-3    Filed 03/21/25    Page 10 of 63

Reindl, Andreas P. "Choosing Law in Cyberspace: Copyright Conflicts on Global Networks" (1997-1998), 19 *Mich. J. Int'l L.* 799.

*Shorter Oxford English Dictionary on Historical Principles*, vol. 1, 5th ed. Oxford: Oxford University Press, 2002, "communicate".

Smith, Graham J. H. *Internet Law and Regulation*, 3rd ed. London: Sweet & Maxwell, 2002.

Sullivan, Ruth. *Sullivan and Driedger on the Construction of Statutes*, 4th ed. Markham, Ont.: Butterworths, 2002.

Takach, George S. *Computer Law*, 2nd ed. Toronto: Irwin Law, 2003.

Vaver, David. *Copyright Law*. Toronto: Irwin Law, 2000.

APPEAL and CROSS-APPEAL from a judgment of the Federal Court of Appeal, [2002] 4 F.C. 3, 215 D.L.R. (4th) 118, 290 N.R. 131, 19 C.P.R. (4th) 289, [2002] F.C.J. No. 691 (QL), 2002 FCA 166, affirming in part a judgment of the Copyright Board (1999), 1 C.P.R. (4th) 417. Appeal allowed in part; cross-appeal dismissed.

*Thomas G. Heintzman, Q.C.*, and *Barry B. Sookman*, for the appellants/respondents on cross-appeal.

*Y. A. George Hynna, Brian A. Crane, Q.C., Gilles M. Daigle* and *C. Paul Spurgeon*, for the respondent/appellant on cross-appeal.

*Andrea Rush* and *Stephen Zolf*, for the interveners the Internet Commerce Coalition, the European Telecommunications Network Operators' Association, the European Internet Service Providers' Association, the Australian Internet Industry Association, the Telecom Services Association and the U.S. Internet Industry Association.

*Glen A. Bloom*, for the interveners the Canadian Recording Industry Association and the International Federation of Phonogram Industry.

The judgment of McLachlin C.J. and Iacobucci, Major, Bastarache, Binnie, Arbour, Deschamps and Fish JJ. was delivered by

1    BINNIE J. — This appeal raises the difficult issue of who should compensate musical composers and

Pietsch, Matthew V. « International Copyright Infringement and the Internet : An Analysis of the Existing Means of Enforcement » (2001-2002), 24 *Hastings Comm. & Ent. L.J.* 273.

Reindl, Andreas P. « Choosing Law in Cyberspace : Copyright Conflicts on Global Networks » (1997-1998), 19 *Mich. J. Int'l L.* 799.

Smith, Graham J. H. *Internet Law and Regulation*, 3rd ed. London : Sweet & Maxwell, 2002.

Sullivan, Ruth. *Sullivan and Driedger on the Construction of Statutes*, 4th ed. Markham, Ont. : Butterworths, 2002.

Takach, George S. *Computer Law*, 2nd ed. Toronto : Irwin Law, 2003.

Vaver, David. *Copyright Law*. Toronto : Irwin Law, 2000.

POURVOI et POURVOI INCIDENT contre un arrêt de la Cour d'appel fédérale, [2002] 4 C.F. 3, 215 D.L.R. (4th) 118, 290 N.R. 131, 19 C.P.R. (4th) 289, [2002] A.C.F. n° 691 (QL), 2002 CAF 166, qui a confirmé en partie un jugement de la Commission du droit d'auteur (1999), 1 C.P.R. (4th) 417. Pourvoi accueilli en partie; pourvoi incident rejeté.

*Thomas G. Heintzman, c.r.*, et *Barry B. Sookman*, pour les appellantes/intimées au pourvoi incident.

*Y. A. George Hynna, Brian A. Crane, c.r., Gilles M. Daigle* et *C. Paul Spurgeon*, pour l'intimée/appelante au pourvoi incident.

*Andrea Rush* et *Stephen Zolf*, pour les intervenantes Internet Commerce Coalition, European Telecommunications Network Operators' Association, European Internet Service Providers' Association, Australian Internet Industry Association, Telecom Services Association et U.S. Internet Industry Association.

*Glen A. Bloom*, pour les intervenantes l'Association de l'industrie canadienne de l'enregistrement et International Federation of Phonogram Industry.

Version française du jugement de la juge en chef McLachlin et des juges Iacobucci, Major, Bastarache, Binnie, Arbour, Deschamps et Fish rendu par

LE JUGE BINNIE — Le présent pourvoi soulève l'épineuse question de savoir qui doit verser des

artists for their Canadian copyright in music down-loaded in Canada from a foreign country via the Internet. In an era when it is as easy to access a web-site hosted by a server in Bangalore as it is to access a website with a server in Mississauga, where is the protection for the financial rights of the people who created the music in the first place? Who, if anyone, is to pay the piper?

The Internet "exists", notionally, in cyberspace. It has been described as a "fascinating exercise in symbiotic anarchy"; see G. S. Takach, *Computer Law* (2nd ed. 2003), at p. 30. It is not contained by national boundaries. The Internet thus presents a particular challenge to national copyright laws, which are typically territorial in nature.

The answer to this challenge proposed by the respondent, the Society of Composers, Authors and Music Publishers of Canada ("SOCAN"), is to seek to impose liability for royalties on the various Internet Service Providers located in Canada irre-spective of where the transmission originates. There is no doubt that such an imposition, from SOCAN's perspective, would provide an efficient engine of collection.

The appellants, on the other hand, represent-ing a broad coalition of Canadian Internet Service Providers, resist. Their basic argument is that none of them, as found by the Copyright Board, regulate or are even in the usual case *aware* of the content of the Internet communications which they trans-mit. Like a telephone company, they provide the medium, but they do not control the message.

Parliament has spoken on this issue. In a 1988 amendment to the *Copyright Act*, R.S.C. 1985, c. C-42, it made it clear that Internet intermediaries, as such, are not to be considered parties to the infring-ing communication. They are service providers, not participants in the *content* of the communication. In light of Parliament's legislative policy, when applied

redevances aux artistes et aux compositeurs titulai-res du droit d'auteur canadien sur les œuvres musi-cales téléchargées au Canada à partir d'un autre pays au moyen de l'Internet. À une époque où il est aussi facile d'avoir accès à un site Web hébergé par un serveur situé à Bangalore qu'à un site Web dont le serveur se trouve à Mississauga, de quelle manière les droits financiers des créateurs d'œuvres musicales sont-ils protégés? Qui doit, s'il y a lieu, payer la note?

2    Théoriquement, l'Internet « existe » dans le cy-berespace. À la p. 30 de son ouvrage intitulé *Computer Law* (2e éd. 2003), G. S. Takach dit qu'il s'agit d'une [TRADUCTION] « entreprise fascinante d'anarchie symbiotique ». L'Internet n'a pas de frontières nationales. Il représente donc un vérita-ble défi pour les lois nationales sur le droit d'auteur qui, de par leur nature même, s'appliquent habituel-lement dans des territoires donnés.

3    La solution proposée par l'intimée, la Société canadienne des auteurs, compositeurs et éditeurs de musique (« SOCAN »), est de contraindre au versement de redevances les divers fournisseurs de services Internet situés au Canada, peu importe le lieu d'origine de la transmission. Il est indubitable, du point de vue de la SOCAN, que l'établissement d'une telle contrainte offrirait un mécanisme effi-cace de perception.

4    En revanche, les appelantes, qui représentent une vaste coalition de fournisseurs canadiens de servi-ces Internet, s'y opposent. Elles font principalement valoir, comme l'a conclu la Commission du droit d'auteur, qu'elles ne réglementent pas ni même, la plupart du temps, ne *connaissent* le contenu des communications Internet qu'elles effectuent. Tout comme une compagnie de téléphone, elles fournis-sent le moyen de communication, mais n'exercent aucun contrôle sur le message.

5    Le législateur a agi en 1988 en modifiant la *Loi sur le droit d'auteur*, L.R.C. 1985, ch. C-42. Il a clairement indiqué que les intermédiaires Internet ne sont pas, comme tels, parties à la communica-tion qui viole le droit d'auteur. Ce sont des four-nisseurs de services, et non des participants quant au *contenu* de la communication. Au vu de la

to the findings of fact by the Copyright Board, I agree with the Board's conclusion that as a matter of law the appellants did not, in general, "communicate" or "authorize" the communication of musical works in Canada in violation of the respondent's copyright within the meaning of the *Copyright Act*.

6    SOCAN sought a judicial review of the Board's decision by the Federal Court of Appeal, which essentially upheld the Board's exclusion of the appellants from copyright liability where they perform a pure intermediary function: [2002] 4 F.C. 3. However, the court, in a 2-1 majority decision, also held that where an Internet Service Provider in Canada creates a "cache" of Internet material, even for purely technical reasons, they are no longer a mere intermediary but a communicator and thus become a participant in the copyright infringement. A contrary conclusion was reached by Sharlow J.A., dissenting in part, who agreed with the Copyright Board that to cache for the purpose of enhancing Internet economy and efficiency does not constitute infringement. I agree with the dissent on this point. To that extent, the appeal should be allowed.

7    The respondent's cross-appeal seeking to hold Internet intermediaries liable for copyright royalties even where serving only as a conduit should be dismissed.

### I.   Facts

8    The Internet is a huge communications facility which consists of a worldwide network of computer networks deployed to communicate information. A "content provider" uploads his or her data, usually in the form of a website, to a host server. The content is then forwarded to a destination computer (the end user). End users and content providers can connect to the Internet with a modem under contract with an Internet Service Provider.

politique législative du Parlement, appliquée aux conclusions de fait de la Commission du droit d'auteur, je conviens avec cette dernière que, de façon générale, les appelantes n'ont pas « communiqué » ni « autorisé » la communication d'œuvres musicales au Canada en violation du droit d'auteur de l'intimée au sens de la *Loi sur le droit d'auteur*.

La SOCAN a présenté à la Cour d'appel fédérale une demande de contrôle judiciaire visant la décision de la Commission; or, la cour a essentiellement confirmé que les appelantes ne violent pas le droit d'auteur lorsqu'elles agissent uniquement à titre d'intermédiaires : [2002] 4 C.F. 3. Toutefois, à raison de deux juges contre un, elle a aussi statué que lorsqu'il crée une « antémémoire », même pour des raisons purement techniques, le fournisseur de services Internet au Canada n'est plus un simple intermédiaire, mais communique des données et participe donc à la violation du droit d'auteur. Partiellement dissidente, la juge Sharlow a tiré une conclusion contraire; elle a convenu avec la Commission du droit d'auteur que la mise en antémémoire dans le but d'améliorer l'efficacité des communications Internet et d'en réduire les coûts ne constitue pas une violation du droit d'auteur. Je suis d'accord avec elle sur ce point et je crois qu'il y a lieu d'accueillir le pourvoi à cet égard.

Le pourvoi incident dans lequel l'intimée demande à notre Cour de statuer qu'un intermédiaire Internet, même lorsqu'il n'est qu'un simple agent, est tenu de verser des redevances au titre du droit d'auteur, doit être rejeté.

### I.   Les faits

L'Internet est un vaste système de communication constitué d'un ensemble de réseaux informatiques à l'échelle planétaire. Le « fournisseur de contenu » télécharge ses données, qui revêtent habituellement la forme d'un site Web, sur un serveur hôte. Le contenu est ensuite transmis à un ordinateur de destination (l'utilisateur final). Utilisateurs finaux et fournisseurs de contenu peuvent se connecter à l'Internet à l'aide d'un modem moyennant la conclusion d'un contrat avec un fournisseur de services Internet.

An Internet transmission is generally made in response to a request sent over the Internet from the end user (referred to as a "pull"). The host server provider transmits content (usually in accordance with its contractual obligation to the content provider). The content at issue here is the copyrighted musical works in SOCAN's repertoire.

La transmission Internet s'effectue généralement en réponse à une demande transmise sur l'Internet par l'utilisateur final (l'« extraction personnalisée »). Le fournisseur du serveur hôte transmet le contenu (habituellement en application de l'entente contractuelle qui le lie au fournisseur de contenu). Le contenu visé en l'espèce correspond à des œuvres musicales protégées par le droit d'auteur inscrites au répertoire de la SOCAN.

9

In its decision dated October 27, 1999 ((1999), 1 C.P.R. (4th) 417, at p. 441), the Copyright Board provided a succinct description of an Internet transmission:

Dans sa décision datée du 27 octobre 1999, la Commission du droit d'auteur a brièvement décrit la transmission Internet :

10

First, the file is incorporated to an Internet-accessible server. Second, upon request and at a time chosen by the recipient, the file is broken down into packets and transmitted from the host server to the recipient's server, via one or more routers. Third, the recipient, usually using a computer, can reconstitute and open the file upon reception or save it to open it later; either action involves a reproduction of the file, again as that term is commonly understood.

Premièrement, le fichier est enregistré sur un serveur accessible sur l'Internet. Deuxièmement, à la demande du destinataire et au moment fixé par celui-ci, le fichier est divisé en paquets et transmis du serveur hôte au serveur du destinataire, à travers un ou plusieurs routeurs. Troisièmement, le destinataire, habituellement à l'aide d'un ordinateur, peut reconstituer et ouvrir le fichier dès réception ou l'enregistrer en vue de son ouverture ultérieure; dans l'un et l'autre cas, il y a reproduction du fichier, encore une fois au sens courant de ce terme.

*(Tarif des droits à percevoir par la SOCAN pour l'exécution publique d'œuvres musicales 1996, 1997, 1998 (Tarif 22, Internet) (Re),* p. 25)

The respondent, SOCAN, is a collective society recognized under s. 2 of the *Copyright Act,* to administer "performing rights" in Canada including those of (1) its Canadian member composers, authors and music publishers, and (2) foreign composers, authors and music publishers whose interest is protected by a system of reciprocal agreements with counterpart societies here and in other countries. Essentially, SOCAN administers in Canada "the world repertoire of copyright protected music".

L'intimée, la SOCAN, est une société de gestion au sens de l'art. 2 de la *Loi sur le droit d'auteur* autorisée à gérer les [TRADUCTION] « droits d'exécution » au Canada, notamment ceux (1) des compositeurs, auteurs et éditeurs de musique canadiens qui en sont membres et (2) des compositeurs, auteurs et éditeurs de musique étrangers dont les droits sont protégés par des ententes réciproques conclues avec des sociétés homologues au pays et à l'étranger. Pour l'essentiel, la SOCAN gère au Canada [TRADUCTION] « le répertoire mondial des œuvres musicales protégées par le droit d'auteur ».

11

In 1995, SOCAN applied to the Copyright Board for approval of Tariff 22 applicable to Internet telecommunications of copyrighted music. Tariff 22 would require a licence and a royalty fee

En 1995, la SOCAN a demandé à la Commission du droit d'auteur d'homologuer le tarif 22 applicable à la communication sur l'Internet d'œuvres musicales protégées par le droit d'auteur. Le tarif 22 exigerait une licence et le paiement d'une redevance pour

12

Case 1:25-cv-00910-JMF    Document 39-3    Filed 03/21/25    Page 15 of 63

440    SOCAN *v.* CANADIAN ASSN. OF INTERNET PROVIDERS    *Binnie J.*    [2004] 2 S.C.R.

to communicate to the public by telecommunication, in Canada, musical works forming part of SOCAN's repertoire, by a telecommunications service to subscribers by means of one or more computer(s) or other device that is connected to a telecommunications network where the transmission of those works can be accessed by each subscriber independently of any other person having access to the service . . . .

13    Recognizing that there might be many participants in any Internet communication, the Board convened a Phase I hearing to "determine which activities on the Internet, if any, constitute a protected use targeted in the tariff" (p. 424).

14    SOCAN initially argued that "virtually everyone involved in the Internet transmission chain is liable [to pay royalties] for the communication, including those who provide transmission services, operate equipment or software used for transmissions, provide connectivity, provide hosting services or post content" (p. 426).

15    SOCAN now disclaims any intent to target the Backbone Service Providers, which are the entities that do not retail Internet services to individual subscribers but provide the facilities and long distance connections including fibre optics and telephone lines that support the Internet.

16    The appellants, on the other hand, stand at the portals of the Internet. They operate the infrastructure provided by the Backbone Service Providers. They retail access to the Internet both to content providers and to end user subscribers. Familiar examples include Bell Globemedia's "Sympatico" service and the Rogers "Hi-Speed Internet" service. As such, according to SOCAN, they are not passive conduits like the Backbone Service Providers but active participants in the alleged acts of copyright infringement.

17    The Internet operates by means of a series of protocols that enable higher level applications such

la communication au public par télécommunication, au Canada, des œuvres faisant partie du répertoire de la SOCAN, à des abonnés par le biais d'un service de télécommunications à l'aide d'un ordinateur ou d'un autre appareil raccordé à un réseau de télécommunications, lorsque chaque abonné peut avoir accès à la transmission de ces œuvres de manière indépendante par rapport à toute autre personne ayant accès au service . . .

Reconnaissant que les participants à une communication Internet peuvent être nombreux, la Commission a tenu des audiences dont la première phase devait permettre de « détermin[er] quelles activités sur l'Internet, le cas échéant, constituent une utilisation protégée visée par le tarif » (p. 2).

La SOCAN a tout d'abord soutenu que « pratiquement tous ceux qui font partie de la chaîne de transmission de l'Internet sont responsables [du paiement des redevances pour] la communication, notamment ceux qui fournissent les services de transmission, ceux qui utilisent le matériel ou le logiciel employés pour les transmissions, ceux qui assurent la connectivité, ceux qui offrent des services d'hébergement ou ceux qui rendent disponible du contenu » (p. 5).

La SOCAN nie maintenant vouloir cibler les fournisseurs de services de réseau de base, qui ne vendent pas des services Internet à des abonnés individuels, mais fournissent les installations et les connexions interurbaines, y compris les fibres optiques et les lignes téléphoniques qui tiennent lieu d'infrastructure à l'Internet.

Pour leur part, les appelantes gardent les portails de l'Internet. Elles exploitent l'infrastructure des fournisseurs de services de réseau de base. Elles vendent l'accès à l'Internet à leurs abonnés, tant les fournisseurs de contenu que les utilisateurs finaux. Les services « Sympatico » de Bell Globemedia et « Internet haute vitesse » de Rogers, par exemple, sont bien connus. Selon la SOCAN, il ne s'agit pas d'agents passifs comme les fournisseurs de services de réseau de base, mais bien de participants actifs aux violations alléguées du droit d'auteur.

L'Internet a recours à une série de protocoles permettant des applications plus évoluées comme

as the World Wide Web to operate. Transmission control protocol ("TCP") is the most common protocol and it controls most of the applications used on the Internet. The TCP resides in both host server and end user computers and it controls the sending and receipt of packets transmitted over the Internet. However, routers and other intermediate points on the Internet have no involvement in TCP operation.

A content provider may store files on its own computer, but it may also purchase space on a "host server" operated by an Internet Service Provider under commercial arrangements that include storing, making available and transmitting Web site content to end users. Once a musical work or other content has been posted on a host server, it is possible for any person with a computer and an arrangement with an Internet Service Provider to access the work on demand from anywhere in the world via the Internet.

The Copyright Board found that Internet Service Providers who "host" Web sites for others are generally neither aware of nor control the content of the files stored in memory; however, in some cases they do warn content providers not to post illegal content (e.g., criminal pornography, defamatory material, copyright infringing materials, viruses, etc.), and will usually retain a master "root" password that allows them to access all the files on the server. The contract generally reserves to the host server provider the authority to periodically review for content posted in breach of their agreement and to remove such files. The existence of such means of control, and the host server provider's discretion in whether or not to exercise them, justifies the imposition of liability for a copyright licence on host servers, according to SOCAN.

The host server breaks the content down into units of data called "packets" consisting of a series of bytes (typically no more than 1500). Each packet has a destination address attached to it in

le World Wide Web. Le plus courant, le protocole de contrôle de transmission (« TCP »), contrôle la plupart des applications utilisées sur l'Internet. Implanté dans le serveur hôte et dans l'ordinateur de l'utilisateur final, il contrôle l'envoi et la réception des paquets de données transmis sur l'Internet. Les routeurs et les autres points intermédiaires n'ont cependant rien à voir avec son fonctionnement.

18   Un fournisseur de contenu peut stocker des fichiers dans son propre ordinateur. Il peut aussi acheter de l'espace dans un « serveur hôte » exploité par un fournisseur de services Internet. Il conclut alors une entente commerciale prévoyant le stockage du contenu d'un site Web, son accessibilité et sa transmission aux utilisateurs finaux. Une fois l'œuvre musicale ou l'autre contenu rendu disponible sur un serveur hôte, quiconque possède un ordinateur et a conclu une entente avec un fournisseur de services Internet peut, où qu'il se trouve dans le monde, y accéder sur demande.

19   La Commission du droit d'auteur a conclu que, en règle générale, les fournisseurs de services Internet qui « hébergent » des sites Web pour des tiers ne connaissent pas le contenu des fichiers stockés en mémoire, ni ne le contrôlent. Dans certains cas, toutefois, ils mettent en garde le fournisseur de contenu contre l'illégalité d'un contenu et lui recommandant de ne pas le rendre disponible (pornographie criminelle, diffamation, violation du droit d'auteur, virus, etc.); ils conservent habituellement un mot de passe « de base » leur permettant d'avoir accès à tous les fichiers du serveur. Le contrat confère généralement au fournisseur du serveur hôte le pouvoir d'examiner périodiquement le contenu rendu disponible pour déterminer s'il contrevient à l'entente et de supprimer les fichiers en cause le cas échéant. Selon la SOCAN, l'existence d'un tel pouvoir de contrôle, que le fournisseur du serveur hôte peut exercer ou non, justifie l'obligation d'un serveur hôte d'obtenir une licence du titulaire du droit d'auteur.

20   Le serveur hôte divise le contenu en unités de données appelées « paquets », lesquels se composent d'une série d'octets (au plus 1 500 en général). Chaque paquet comporte une adresse de

the form of a "header". The host server transmits the packets to a router which reads the address in the packet's header and performs computations to determine the most appropriate transmission route over which to send the packet to its destination. The router does not access the data portion of the packet. The various packets are forwarded from router to router and may follow different transmission routes along the way until they reach the Internet Service Provider at the receiving end which, under contract to the end user, transmits the packets to a computer operated by the end user. The result is the reconstitution on the end user's computer of all that is required to view or, in the case of music, "to play" the work, either at that time or later if the work is saved on the end user's computer.

21     It is evident that a single corporate entity like Rogers, Bell or AT&T Canada can play a variety of roles in Internet transmission. The Board's analysis therefore focussed on what *functions* attract copyright liability. To the extent a particular entity performs a specified function, it may be liable for copyright infringement in respect of the *function* unless licensed.

22     The appellants initially argued against copyright liability on the theory that intermediaries only handle "packets" of incomplete music in computer coded compressed form, which may be sent or received out of order. In their view they were not communicating the musical works as such, and thus could not be guilty of copyright infringement. This was rejected by the Copyright Board on the basis that the fragmentation into packets was dictated by "the technical exigencies of the Internet" (at p. 447):

While some intermediaries may not be transmitting the entire work or a substantial part of a work, all of the packets required to communicate the work are transmitted from the server on which the work is located to the end user. Consequently, the work is communicated.

The correctness of this finding is no longer contested.

destination sous forme d'« en-tête ». Le serveur hôte transmet les paquets à un routeur qui lit l'adresse dans l'en-tête et détermine à l'issue de calculs le meilleur itinéraire d'acheminement. Le routeur n'a pas accès aux données. Les divers paquets sont transmis d'un routeur à l'autre et peuvent suivre des itinéraires différents pour atteindre, à l'extrémité réception, le fournisseur de services, qui transmet les paquets à l'ordinateur de l'utilisateur final en application du contrat le liant à ce dernier. Le résultat est la reconstitution sur l'ordinateur de l'utilisateur final de tout ce qui est nécessaire au visionnement ou, dans le cas d'une œuvre musicale, à l'« écoute », soit immédiatement, soit à un moment ultérieur si l'œuvre est sauvegardée dans l'ordinateur du client.

Il est évident qu'une même entreprise, telle Rogers, Bell ou AT&T Canada, peut jouer divers rôles dans la transmission Internet. La Commission s'est donc essentiellement demandé quelles *fonctions* faisaient naître une obligation sur le plan du droit d'auteur. Lorsqu'elle exécute une fonction donnée, l'entreprise peut violer le droit d'auteur relativement à cette *fonction*, sauf si elle a obtenu une licence.

Initialement, les appelantes ont nié toute obligation en matière de droits d'auteur, arguant que les intermédiaires ne traitent que des « paquets » d'œuvres musicales incomplètes sous forme de données informatiques codées comprimées, qui peuvent être transmises ou reçues dans le désordre. Elles estimaient ne pas communiquer d'œuvres musicales comme telles et, de ce fait, ne pas violer le droit d'auteur. La Commission du droit d'auteur a rejeté cet argument : la fragmentation en paquets était dictée par les « exigences techniques de l'Internet » (p. 32) :

Bien que certains intermédiaires puissent ne pas transmettre l'intégralité de l'œuvre ou une partie importante de celle-ci, tous les paquets indispensables à la communication de l'œuvre sont transmis du serveur sur lequel elle se trouve à l'utilisateur final. En conséquence, l'œuvre est communiquée.

La justesse de cette conclusion n'est plus contestée.

A particular issue arose in respect of the appellants' use of "caching". When an end user visits a Web site, the packets of data needed to transmit the requested information will come initially from the host server where the files for this site are stored. As they pass through the hands of an Internet Service Provider, a temporary copy may be made and stored on its server. This is a cache copy. If another user wants to visit this page shortly thereafter, using the same Internet Service Provider, the information may be transmitted to the subsequent user either directly from the Web site or from what is kept in the cache copy. The practice of creating "caches" of data speeds up the transmission and lowers the cost. The subsequent end user may have no idea that it is not getting the information directly from the original Web site. Cache copies are not retained for long periods of time since, if the original files change, users will get out-of-date information. The Internet Service Provider controls the existence and duration of caches on its own facility, although in some circumstances it is open to a content provider to specify no caching, or an end user to program its browser to insist on content from the original Web site.

SOCAN argued that where a cache copy is made on a computer located in Canada and then retransmitted, there is a distinct violation in Canada of copyright protection. This, as stated, is the issue that divided the Federal Court of Appeal.

The Board was also required to consider the potential copyright infringement of "hyperlinks", particularly when the link is automatic. Automatic links employ an embedded code in the Web page that automatically instructs the browser, upon obtaining access to the first site, to download a file from a second site. The user does not need to do anything but visit the initial site before information from the second site is "pulled". A different legal issue may arise where the user must take action, such as to click the mouse button over the hyperlink, in order to obtain access to the information from the second site.

While much of the Internet discussion focussed on music available on the World Wide Web, Tariff

23   Une question particulière s'est posée au sujet du recours des appelantes à la « mise en antémémoire ». Lorsqu'un utilisateur final visite un site Web, les paquets de données nécessaires pour transmettre l'information demandée proviennent au départ du serveur hôte où sont stockés les fichiers de ce site. Lorsque les fichiers passent par un fournisseur de services Internet, ce dernier peut en faire une copie provisoire et la conserver dans son serveur. Il s'agit d'une antémémoire. Si un autre utilisateur souhaite consulter cette page peu après par l'entremise du même fournisseur de services Internet, l'information peut lui être transmise à partir du site Web directement ou de l'antémémoire. La création d'une « antémémoire » accélère la transmission et réduit les coûts. L'utilisateur final subséquent peut ignorer totalement que l'information ne lui parvient pas directement du site Web initial. L'antémémoire n'est pas conservée longtemps, car si le fichier initial est modifié, l'utilisateur obtiendra une information périmée. Le fournisseur de services Internet décide de l'existence d'une antémémoire et de sa durée; toutefois, dans certaines circonstances, un fournisseur de contenu peut préciser qu'il ne doit pas y avoir d'antémémoire, ou un utilisateur final peut programmer son navigateur de manière à exiger l'accès au contenu du site Web initial.

24   La SOCAN a prétendu que le fait de créer une antémémoire sur un ordinateur situé au Canada, puis de la retransmettre, constitue une violation distincte du droit d'auteur au Canada. C'est cette question qui a divisé la Cour d'appel fédérale.

25   La Commission devait également se pencher sur la violation éventuelle du droit d'auteur par un « hyperlien », spécialement lorsqu'il est automatique, un code intégré à la page Web ordonnant automatiquement au navigateur, lorsque l'accès au premier site est obtenu, de télécharger un fichier à partir d'un second site. L'utilisateur n'a rien d'autre à faire que de visiter le site initial pour que l'information soit « extraite » du second site. Une question de droit différente pourrait se poser si l'utilisateur devait faire quelque chose, comme cliquer sur l'hyperlien, pour avoir accès à l'information du second site.

26   Même si une bonne partie de l'examen relatif à l'Internet a surtout porté sur les œuvres musicales

22 may also apply to copyrighted music sent by e-mail or displayed on business bulletin boards or other Internet applications.

## II. Relevant Statutory Provisions

27

*Copyright Act*, R.S.C. 1985, c. C-42

**2.** . . .

"telecommunication" means any transmission of signs, signals, writing, images or sounds or intelligence of any nature by wire, radio, visual, optical or other electromagnetic system;

**2.4** (1) For the purposes of communication to the public by telecommunication,

.   .   .

(*b*) a person whose only act in respect of the communication of a work or other subject-matter to the public consists of providing the means of telecommunication necessary for another person to so communicate the work or other subject-matter does not communicate that work or other subject-matter to the public; and

.   .   .

**3.** (1) For the purposes of this Act, "copyright", in relation to a work, means the sole right to produce or reproduce the work or any substantial part thereof in any material form whatever, to perform the work or any substantial part thereof in public or, if the work is unpublished, to publish the work or any substantial part thereof, and includes the sole right

.   .   .

(*f*) in the case of any literary, dramatic, musical or artistic work, to communicate the work to the public by telecommunication,

and to authorize any such acts.

## III. Judicial History

A. *Decision of the Copyright Board*

28

Tariff 22 proposed the amount and allocation of a royalty payable to copyright owners for the

disponibles sur le World Wide Web, le tarif 22 peut aussi s'appliquer aux œuvres musicales protégées par le droit d'auteur qui sont transmises par courriel ou présentées sur des babillards électroniques commerciaux ou d'autres applications Internet.

## II. Dispositions législatives pertinentes

*Loi sur le droit d'auteur*, L.R.C. 1985, ch. C-42

**2.** . . .

« télécommunication » vise toute transmission de signes, signaux, écrits, images, sons ou renseignements de toute nature par fil, radio, procédé visuel ou optique, ou autre système électromagnétique;

**2.4** (1) Les règles qui suivent s'appliquent dans les cas de communication au public par télécommunication :

.   .   .

*b*) n'effectue pas une communication au public la personne qui ne fait que fournir à un tiers les moyens de télécommunication nécessaires pour que celui-ci l'effectue;

.   .   .

**3.** (1) Le droit d'auteur sur l'œuvre comporte le droit exclusif de produire ou reproduire la totalité ou une partie importante de l'œuvre, sous une forme matérielle quelconque, d'en exécuter ou d'en représenter la totalité ou une partie importante en public et, si l'œuvre n'est pas publiée, d'en publier la totalité ou une partie importante; ce droit comporte, en outre, le droit exclusif :

.   .   .

*f*) de communiquer au public, par télécommunication, une œuvre littéraire, dramatique, musicale ou artistique;

Est inclus dans la présente définition le droit exclusif d'autoriser ces actes.

## III. Historique des procédures judiciaires

A. *La décision de la Commission du droit d'auteur*

Le tarif 22 proposait le paiement d'une redevance d'un certain montant au titulaire du droit

communication of music on the Internet. At the end of the first phase of its proceeding, geared to determining who might be liable to pay royalties, the Copyright Board held that a royalty can be imposed on content providers who post music on a server located in Canada that can be accessed by other Internet users. However, the Board also held that the normal activities of Internet intermediaries not acting as content providers do not constitute "a communication" for the purpose of the *Copyright Act* and thus do not infringe the exclusive communication rights of copyright owners. The parties did not frame an issue in relation to infringement of the right of reproduction, and its role, if any, did not play a significant part in the Board's decision.

d'auteur pour la communication d'une œuvre musicale sur l'Internet. Au terme de la première phase de ses audiences visant à déterminer qui pouvait être tenu de verser des redevances, la Commission du droit d'auteur a statué que les fournisseurs de contenu qui rendent des œuvres musicales disponibles sur un serveur situé au Canada auquel ont accès d'autres utilisateurs de l'Internet pouvaient être contraints au versement d'une redevance. Cependant, elle a aussi conclu que les activités habituelles d'un intermédiaire Internet n'agissant pas à titre de fournisseur de contenu ne constituent pas une « communication » au sens de la *Loi sur le droit d'auteur* et, par conséquent, ne violent pas les droits de communication exclusifs des titulaires de droits d'auteur. Les parties n'ont pas formulé de question concernant la violation du droit de reproduction, et celui-ci n'a pas une grande incidence sur la décision de la Commission, si toutefois il en a une.

In reaching its conclusions the Copyright Board considered a number of questions, including the following (at p. 443):

Pour arriver à ses conclusions, la Commission du droit d'auteur a examiné un certain nombre de questions, dont les suivantes (p. 27) :    29

1.  *When* does a communication *to the public* occur on the Internet?

1.  *À quel moment* une communication *au public* a-t-elle lieu sur l'Internet?

2.  *Who "communicates"* (in the copyright sense) on the Internet? In particular, who can benefit from paragraph 2.4(1)(*b*) of the Act?

2.  *Qui « communique »* (au sens de la *Loi sur le droit d'auteur*) sur l'Internet? En particulier, qui peut invoquer l'al. 2.4(1)*b*) de la Loi?

3.  When does the act of "*authorizing*" a communication on the Internet occur?

3.  Quand y a-t-il *« autorisation »* d'une communication sur l'Internet?

4.  When does a communication on the Internet occur *in Canada*?

4.  Quand une communication sur l'Internet se produit-elle *au Canada*?

After hearing 11 days of evidence and submissions and a subsequent period of reflection, the Board concluded that an Internet communication occurs at the time the work is transmitted from the host server to the computer of the end user, regardless of whether it is played or viewed at that time, or later, or never. It is made "to the public" because the music files are "made available on the Internet openly and without concealment, with the knowledge and intent that they be conveyed to all who

Après onze jours d'audiences suivis d'une période de réflexion, la Commission a conclu qu'une communication Internet a lieu au moment où l'œuvre est transmise du serveur hôte à l'ordinateur de l'utilisateur final, que l'écoute ou le visionnement soit immédiat ou ultérieur, ou n'ait jamais lieu. Il y a communication « au public » parce que les fichiers musicaux sont « rendu[s] disponibles sur l'Internet de manière ouverte, sans dissimulation, l'intéressé, en connaissance de cause, ayant    30

might access the Internet" (p. 445). Accordingly, "a communication may be to the public when it is made to individual members of the public at different times, whether chosen by them (as is the case on the Internet) or by the person responsible for sending the work (as is the case with facsimile transmissions)" (p. 445). This is no longer contested.

31    In order to determine the level of intermediate participation in Internet transmission of musical works that could trigger liability for infringement under s. 3(1)(*f*) of the *Copyright Act*, the Board was required to interpret the scope of the limitation in s. 2.4(1)(*b*), which says that an Internet Service Provider does not "communicate" a copyrighted work if its "<u>only</u> act" is to provide "the <u>means</u> of telecommunication <u>necessary</u> for another person to so communicate the work" (emphasis added).

32    The Board rejected SOCAN's argument that s. 2.4(1)(*b*) should be narrowly construed as an exemption to copyright liability. The Board held that where an intermediary merely acts as a "<u>conduit</u> for communications by other persons" (p. 453 (emphasis added)), it can claim the benefit of s. 2.4(1)(*b*). If an intermediary does more than merely act as a conduit (for example if it creates a cache for reasons other than improving system performance or modifies the content of cached material), it may lose the protection. Insofar as the Internet Service Provider furnishes "ancillary" services to a content provider or end user, it could still rely on s. 2.4(1)(*b*) as a defence to copyright infringement, provided any such "ancillary services" do not amount in themselves to communication or authorization to communicate the work. Creation of an automatic "hyperlink" by a Canadian Internet Service Provider will also attract copyright liability.

l'intention qu'[ils] soient transmi[s] à tous ceux qui peuvent avoir accès à l'Internet » (p. 30). En conséquence, « il peut y avoir communication au public quand celle-ci est faite à des personnes du public à des moments différents, que le moment soit choisi par ces dernières (ce qui est le cas sur l'Internet) ou par la personne responsable de l'envoi de l'œuvre (ce qui est le cas pour les transmissions par télécopieur) » (p. 30). Cela n'est plus contesté.

Pour déterminer quel degré de participation d'un intermédiaire à la transmission d'une œuvre musicale par l'Internet est susceptible d'entraîner la violation du droit d'auteur conféré à l'al. 3(1)*f*) de la *Loi sur le droit d'auteur*, la Commission a dû interpréter l'al. 2.4(1)*b*) et délimiter la portée de la restriction qu'il établit. Suivant cette disposition, un fournisseur de services Internet n'effectue pas la « communication » d'une œuvre protégée par le droit d'auteur s'il « <u>ne fait que</u> » fournir « à un tiers les <u>moyens</u> de télécommunication <u>nécessaires</u> pour que celui-ci l'effectue » (je souligne).

La Commission a rejeté l'argument de la SOCAN selon lequel le libellé de l'al. 2.4(1)*b*) doit être interprété restrictivement, comme s'il établissait une exception à la violation du droit d'auteur. Elle a statué que l'intermédiaire qui est un simple « <u>agent</u> permettant à autrui de communiquer » (p. 40 (je souligne)) peut se prévaloir de l'al. 2.4(1)*b*). S'il n'est pas un simple agent (par exemple, s'il crée une antémémoire pour d'autres raisons que l'amélioration du rendement du système ou s'il modifie les données mises en antémémoire), il peut perdre cette protection. Dans la mesure où il fournit des services « accessoires » à un fournisseur de contenu ou à un utilisateur final, le fournisseur de services Internet peut toujours invoquer l'al. 2.4(1)*b*) en défense à une accusation de violation du droit d'auteur à condition que les « services accessoires » ne constituent pas eux-mêmes une communication de l'œuvre ou une autorisation de la communiquer. La création d'un « hyperlien » automatique par un fournisseur canadien de services Internet est également susceptible de violer le droit d'auteur.

As to "authorization", the Board found that knowledge by an Internet Service Provider that its facilities *might* be used for infringing purposes was not enough to incur liability. The Internet Service Provider needed to grant "the person committing the infringement a license or permission to infringe" (p. 458).

In the result, the Board stated that an Internet communication occurs in Canada only if it originates from a server in Canada. Thus, a content provider is subject to a royalty approved by the Board if, but only if, the content is posted on a server located in Canada.

### B. *The Federal Court of Appeal*

#### 1. Evans J.A. (Linden J.A. Concurring) for the Majority

SOCAN's application for judicial review was allowed in part. Evans J.A. concluded that the standard of review of the Copyright Board's interpretation of the s. 2.4(1)(*b*) defence was correctness, but as to other issues involving the application of the *Copyright Act* to the facts, the proper standard of review was unreasonableness.

The Federal Court of Appeal did not agree with the Board's insistence that an Internet communication only occurred in the country where the host server is located. In its view, a communication (and therefore a royalty) may arise in respect of any telecommunication that has a real and substantial connection with Canada. The real and substantial connection test would also be applied to a content provider who authorized posting copyright material on a host server. In the court's view, the Board's decision undercompensated SOCAN's members for a potential loss of music sales in the Canadian market as a result of the receipt in Canada of copyright music on the Internet.

33 En ce qui concerne l'« autorisation », le fait qu'un fournisseur de services Internet sache que ses installations *pourraient* servir à des fins illicites ne suffit pas, selon la Commission, à engager sa responsabilité. Le fournisseur de services Internet doit avoir accordé « à l'auteur de l'atteinte une licence ou une permission d'agir illégalement » (p. 47).

34 Enfin, la Commission a dit qu'une communication Internet ne se produit au Canada que lorsqu'elle provient d'un serveur situé au Canada. En conséquence, un fournisseur de contenu ne doit verser la redevance fixée par le tarif homologué que s'il rend du contenu disponible sur un serveur situé au Canada.

### B. *La Cour d'appel fédérale*

#### 1. Le juge Evans (avec l'appui du juge Linden), pour les juges majoritaires

35 La demande de contrôle judiciaire de la SOCAN a été accueillie en partie. Le juge Evans a conclu que la norme de contrôle applicable à l'interprétation, par la Commission du droit d'auteur, du moyen de défense prévu à l'al. 2.4(1)*b*) était celle de la décision correcte, mais que pour toutes les autres questions comportant l'application de la *Loi sur le droit d'auteur* aux faits de l'espèce, la norme était celle du caractère déraisonnable.

36 La Cour d'appel fédérale n'a pas convenu avec la Commission qu'une communication Internet ne se produit que dans le pays où est situé le serveur hôte. Elle a estimé qu'il peut y avoir communication (et, de ce fait, qu'une redevance peut être exigible) chaque fois qu'une télécommunication a un lien réel et important avec le Canada. Le critère du lien réel et important s'appliquerait aussi au fournisseur de contenu ayant autorisé un serveur hôte à rendre disponibles des éléments protégés par le droit d'auteur. La cour a estimé que la décision de la Commission indemnisait insuffisamment les membres de la SOCAN pour la diminution éventuelle des ventes d'œuvres musicales sur le marché canadien par suite de la réception au Canada, sur l'Internet, d'œuvres musicales protégées par le droit d'auteur.

37    According to Evans J.A., the Copyright Board erred in law when it ignored all connecting factors other than the location of the host server for the purpose of identifying communications that occur in Canada, and which therefore attract liability to pay a royalty to SOCAN. The most important connecting factors will normally be the location of the content provider, the end user and the intermediaries, in particular the host server. The location of the end user is a particularly important factor in determining if an Internet communication has a real and substantial connection with Canada. The location of a cache or a linked site in Canada from which material is transmitted would provide additional potential connecting factors.

38    As to the limited protection of s. 2.4(1)(*b*), the majority opinion ruled that the Board erred in law when it held that an Internet Service Provider who caches material is thereby providing a means *necessary* for another to communicate it. The fact that the cache enhances the speed of transmission and reduces the cost to the Internet access provider does not render the cache a practical *necessity* for communication. To decide otherwise would further erode copyright holders' right to be compensated for the use of their works by others.

### 2.  Sharlow J.A. (Dissenting in Part)

39    Sharlow J.A. disagreed with the majority on the interpretation of "necessary" in s. 2.4(1)(*b*), and found that in the context of that paragraph, something should be considered "necessary" for communication if it makes communication practicable or more practicable. Sharlow J.A. therefore agreed with the Board's conclusion that intermediaries who carry out caching activities are entitled to rely on s. 2.4(1)(*b*) of the Act.

### IV.  Analysis

40    This Court has recently described the *Copyright Act* as providing "a balance between promoting the

Selon le juge Evans, la Commission du droit d'auteur a commis une erreur de droit en omettant de tenir compte de tous les facteurs de rattachement autres que celui de l'emplacement du serveur hôte pour déterminer quelles communications ont lieu au Canada et emportent, par conséquent, l'obligation de verser une redevance à la SOCAN. Les facteurs de rattachement les plus importants sont normalement l'emplacement du fournisseur de contenu, celui de l'utilisateur final, celui des intermédiaires et, en particulier, celui du serveur hôte. Le lieu où se trouve l'utilisateur final revêt une importance particulière lorsqu'il s'agit de décider si une communication Internet a un lien réel et important avec le Canada. L'existence au Canada d'une antémémoire ou d'un site chaîné à partir duquel sont transmis des fichiers est susceptible de constituer un facteur de rattachement supplémentaire.

Pour ce qui est de la protection limitée prévue à l'al. 2.4(1)*b*), les juges majoritaires ont statué que la Commission avait commis une erreur de droit en concluant qu'un fournisseur de services Internet qui met des données en antémémoire fournit ainsi les moyens *nécessaires* pour qu'un tiers puisse les communiquer. Le fait que l'antémémoire accélère la transmission et réduit les coûts du fournisseur d'accès Internet ne rend pas *nécessaire* le recours à une antémémoire pour qu'il y ait communication. Statuer en sens contraire affaiblirait davantage les droits des titulaires de droits d'auteur à une rémunération pour l'utilisation de leurs œuvres par autrui.

### 2.  La juge Sharlow (dissidente en partie)

La juge Sharlow n'était pas d'accord avec l'interprétation, par les juges majoritaires, du mot « nécessaires » employé à l'al. 2.4(1)*b*) et elle a conclu que, dans le contexte de cet alinéa, il faut tenir pour « nécessaire » à la communication ce qui la rend réalisable ou plus pratique. Elle a donc convenu avec la Commission que les intermédiaires qui recourent à la mise en antémémoire ont droit à la protection de l'al. 2.4(1)*b*) de la Loi.

### IV.  Analyse

Notre Cour a récemment dit de la *Loi sur le droit d'auteur* qu'elle établit « un équilibre entre, d'une

public interest in the encouragement and dissemination of works of the arts and intellect and obtaining a just reward for the creator (or, more accurately, to prevent someone other than the creator from appropriating whatever benefits may be generated)" (*Théberge v. Galerie d'Art du Petit Champlain inc.*, [2002] 2 S.C.R. 336, 2002 SCC 34, at para. 30; *CCH Canadian Ltd. v. Law Society of Upper Canada*, [2004] 1 S.C.R. 339, 2004 SCC 13, at para. 10). The capacity of the Internet to disseminate "works of the arts and intellect" is one of the great innovations of the information age. Its use should be facilitated rather than discouraged, but this should not be done unfairly at the expense of those who created the works of arts and intellect in the first place.

The issue of the proper balance in matters of copyright plays out against the much larger conundrum of trying to apply national laws to a fast-evolving technology that in essence respects no national boundaries. Thus in *Citron v. Zundel* (2002), 41 C.H.R.R. D/274, the Canadian Human Rights Tribunal wrestled with jurisdiction over an alleged hate Web site supplied with content from Toronto but posted from a host server in California. In *Reference re Earth Future Lottery*, [2003] 1 S.C.R. 123, 2003 SCC 10, the issue was whether sales of tickets from an Internet lottery in Prince Edward Island constituted gambling "in the province" when almost all of the targeted on-line purchasers resided elsewhere. The "cyber libel" cases multiply. In *Braintech, Inc. v. Kostiuk* (1999), 171 D.L.R. (4th) 46, the British Columbia Court of Appeal refused to enforce a Texas judgment for Internet defamation against a B.C. resident where the B.C. resident's only connection with Texas was "passive posting on an electronic bulletin board" (para. 66). There was no proof that anyone in Texas had actually looked at it. On the other hand, in *Dow Jones & Co. v. Gutnick* (2002), 194 A.L.R. 433, [2002] HCA 56, the High Court of Australia accepted jurisdiction over a defamation action in respect of material uploaded onto the defendant's server in New Jersey and downloaded by end users in the State of Victoria. The issue of global forum shopping for actions for Internet torts has scarcely been addressed. The availability of child

part, la promotion, dans l'intérêt du public, de la création et de la diffusion des œuvres artistiques et intellectuelles et, d'autre part, l'obtention d'une juste récompense pour le créateur (ou, plus précisément, l'assurance que personne d'autre que le créateur ne pourra s'approprier les bénéfices qui pourraient être générés) » (*Théberge c. Galerie d'Art du Petit Champlain inc.*, [2002] 2 R.C.S. 336, 2002 CSC 34, par. 30; *CCH Canadienne Ltée c. Barreau du Haut-Canada*, [2004] 1 R.C.S. 339, 2004 CSC 13, par. 10). La possibilité de diffuser des « œuvres artistiques et intellectuelles » grâce à l'Internet est l'une des grandes innovations de l'ère de l'information. Le recours à l'Internet doit être facilité, et non découragé, mais pas de manière injuste, au détriment des auteurs d'œuvres artistiques et intellectuelles.

La réalisation d'un juste équilibre dans le domaine du droit d'auteur se heurte au problème beaucoup plus complexe de l'application de lois nationales à une technologie qui évolue rapidement et qui, par essence, ne respecte aucune frontière nationale. Par exemple, dans l'affaire *Citron c. Zundel* (2002), 41 C.H.R.R. D/274, le Tribunal canadien des droits de la personne était aux prises avec la compétence à l'égard d'un site Web dont on alléguait le caractère haineux; le contenu provenant de Toronto mais était rendu disponible à partir d'un serveur hôte situé en Californie. Dans le *Renvoi relatif à la Earth Future Lottery*, [2003] 1 R.C.S. 123, 2003 CSC 10, notre Cour était appelée à décider si la vente de billets de loterie sur l'Internet à l'Île-du-Prince-Édouard constituait un jeu [TRADUCTION] « dans la province », la quasi-totalité des acheteurs en ligne visés résidant à l'extérieur de la province. Les affaires de diffamation sur l'Internet se multiplient. Dans *Braintech, Inc. c. Kostiuk* (1999), 171 D.L.R. (4th) 46, la Cour d'appel de la Colombie-Britannique a refusé d'exécuter un jugement rendu au Texas contre un citoyen de la province dont le seul lien avec le Texas était [TRADUCTION] « l'affichage passif sur un babillard électronique » (par. 66). Aucune preuve n'établissait que qui que ce soit au Texas avait effectivement pris connaissance des données. En revanche, dans *Dow Jones & Co. c. Gutnick* (2002), 194 A.L.R. 433, [2002] HCA 56, la Haute Cour d'Australie s'est déclarée compétente à l'égard d'une action en

41

pornography on the Internet is a matter of serious concern. E-commerce is growing. Internet liability is thus a vast field where the legal harvest is only beginning to ripen. It is with an eye to this broader context that the relatively precise questions raised by the Copyright Board must be considered.

diffamation relative à des données téléchargées en amont sur le serveur du défendeur au New Jersey, puis téléchargées en aval par des utilisateurs finaux se trouvant dans l'État de Victoria. La question de la recherche d'un tribunal favorable pour entendre une action intentée relativement à un délit lié à l'Internet a à peine été abordée. L'accessibilité de matériel pornographique juvénile sur l'Internet est une question très préoccupante. Le commerce électronique prend de l'ampleur. La responsabilité liée à l'Internet est donc un vaste domaine dans lequel les tribunaux commencent tout juste à se prononcer. C'est en ne perdant pas de vue ce contexte plus général qu'il faut examiner les questions relativement précises soulevées par la Commission du droit d'auteur.

A. *Communication Under the Copyright Act*

A. *Communication au sens de la Loi sur le droit d'auteur*

42    It is an infringement for anyone to do, without the consent of the copyright owner, "anything that, by this Act, only the owner of the copyright has the right to do" (s. 27(1)), including, since the 1988 amendments, the right "to communicate the work to the public by telecommunication . . . and to authorize any such acts" (s. 3(1)(f) (emphasis added)). In the same series of amendments, "telecommunication" was defined as "any transmission of signs, signals, writings, images or sounds or intelligence of any nature by wire, radio, visual, optical or other electromagnetic system" (s. 2). The Board ruled that a telecommunication occurs when the music is transmitted from the host server to the end user. I agree with this. The respondent says that the appellants as intermediaries participate in any such transmission of their copyrighted works, and authorize others to do so, and should therefore be required to pay compensation fixed under Tariff 22.

Constitue une violation du droit d'auteur l'accomplissement, sans le consentement du titulaire de ce droit, d'« un acte qu'en vertu de la présente loi seul ce titulaire a la faculté d'exécuter » (par. 27(1)), y compris, depuis les modifications de 1988, « communiquer au public, par télécommunication, une œuvre [. . .] [et] [. . .] autoriser ces actes » (al. 3(1)f) (je souligne)). Suivant ces mêmes modifications, « télécommunication » s'entend de « toute transmission de signes, signaux, écrits, images, sons ou renseignements de toute nature par fil, radio, procédé visuel ou optique, ou autre système électromagnétique » (art. 2). La Commission a statué qu'il y avait télécommunication lors de la transmission de l'œuvre musicale du serveur hôte à l'utilisateur final. Je suis d'accord. L'intimée prétend qu'en qualité d'intermédiaires, les appelantes participent à pareille transmission de leurs œuvres protégées par le droit d'auteur et autorisent des tiers à faire de même, de sorte qu'elles devraient être tenues de verser la rémunération que prévoit le tarif 22.

43    In the United States, unlike Canada, detailed legislation has now been enacted to deal specifically with the liability of Internet intermediaries; see the *Digital Millennium Copyright Act*, 17 U.S.C. § 512 (1998). Australia has enacted its *Copyright Amendment (Digital Agenda) Act 2000*, No. 110 of 2000. The European Commission has

Contrairement au Canada, les États-Unis ont adopté des dispositions législatives détaillées sur les obligations des intermédiaires Internet; voir la *Digital Millennium Copyright Act*, 17 U.S.C. § 512 (1998). L'Australie a adopté la *Copyright Amendment (Digital Agenda) Act 2000*, n° 110 de 2000. La Commission européenne a adopté un

issued a number of directives, as will be discussed. Parliament's response to the World Intellectual Property Organization's ("WIPO") *Copyright Treaty* (1996), CRNR/DC/94, and the *Performances and Phonograms Treaty* (1996), CRNR/DC/95, remains to be seen. In the meantime, the courts must struggle to transpose a *Copyright Act* designed to implement the *Berne Convention for the Protection of Literary and Artistic Works* of 1886, as revised in Berlin in 1908, and subsequent piecemeal amendments, to the information age, and to technologies undreamt of by those early legislators.

The Board took the view that "[t]o occur in Canada, a communication must originate from a server located in Canada on which content has been posted" (p. 459), except perhaps if the content provider has "the intention to communicate it specifically to recipients in Canada" (p. 460). In my view, with respect, this is too rigid and mechanical a test. An Internet communication that crosses one or more national boundaries "occurs" in more than one country, at a minimum the country of transmission and the country of reception. In *Dow Jones*, *supra*, the defendant argued that the appropriate law should be that of the jurisdiction where the host server is located, but this was rejected in favour of the law of the State of reception by the High Court of Australia. To the extent the Board held that a communication that does not *originate* in Canada does not *occur* in Canada, I disagree with its decision.

At the end of the transmission, the end user has a musical work in his or her possession that was not there before. The work has necessarily been communicated, irrespective of its point of origin. If the communication is by virtue of the Internet, there has been a "telecommunication". To hold otherwise would not only fly in the face of the ordinary use of language but would have serious consequences in other areas of law relevant to the Internet, including Canada's ability to deal with criminal and civil liability for objection-

certain nombre de directives. J'y reviendrai. Le Parlement n'a pas encore donné suite au *Traité sur le droit d'auteur* (1996), CRNR/DC/94, et au *Traité sur les interprétations et exécutions et les phonogrammes* (1996), CRNR/DC/95, de l'Organisation mondiale de la propriété intellectuelle (« OMPI »). Dans l'intervalle, les tribunaux doivent s'efforcer d'appliquer, en cette ère de l'information et à l'égard de technologies que ne pouvaient même pas concevoir les législateurs de l'époque, une loi sur le droit d'auteur visant la mise en œuvre de la *Convention de Berne pour la protection des œuvres littéraires et artistiques* de 1886, révisée à Berlin en 1908, ainsi que des modifications subséquentes apportées ponctuellement à cette loi.

La Commission a considéré que « [p]our que la communication se produise au Canada, il faut qu'elle provienne d'un serveur situé au Canada sur lequel le fichier se trouve » (p. 48), sauf peut-être si le fournisseur du contenu a « l'intention de le communiquer précisément à des destinataires au Canada » (p. 49). Avec égards, j'estime qu'il s'agit d'un critère trop mécanique et trop rigide. La communication Internet qui franchit une ou plusieurs frontières nationales « se produit » dans plus d'un pays, soit à tout le moins dans le pays de transmission et dans le pays de réception. Dans *Dow Jones*, précité, le défendeur soutenait que le droit applicable devait être celui du pays où se trouve le serveur hôte, mais la Haute Cour d'Australie a rejeté sa thèse, privilégiant l'application du droit de l'État de réception. Je suis en désaccord avec la Commission dans la mesure où elle conclut qu'une communication qui ne *provient* pas du Canada ne se *produit* pas au Canada.

À l'issue de la transmission, l'utilisateur final a en sa possession une œuvre musicale qu'il n'avait pas auparavant. L'œuvre a nécessairement été communiquée, peu importe sa provenance. Si la communication est effectuée sur l'Internet, il y a « télécommunication ». Conclure en sens contraire irait non seulement à l'encontre du sens ordinaire des mots, mais aurait de graves conséquences dans d'autres domaines de l'application de la loi à l'Internet, notamment en ce qui concerne la possibilité, pour le Canada, d'appliquer le droit pénal et le droit civil

44

45

able communications entering the country from abroad.

46    The word "communicate" is an ordinary English word that means to "impart" or "transmit" (*Shorter Oxford English Dictionary on Historical Principles* (5th ed. 2002), vol. 1, at p. 463). Communication presupposes a sender and a receiver of what is transmitted; see *Goldman v. The Queen*, [1980] 1 S.C.R. 976, at p. 995. The "communicator" is the sender, not the recipient. Thus, says SOCAN, all those entities located in Canada (other than Backbone Service Providers) who participate in the act of imparting or transmitting a copyrighted work across the Internet are guilty of infringement of the Canadian copyright. Any lesser protection, SOCAN says, would not strike an appropriate balance between the rights of copyright owners and the public interest in the encouragement and dissemination of their musical works (*Théberge*, *supra*, at para. 30).

47    As the Board ruled against SOCAN on this question, we must decide what standard of judicial review is applicable.

B. *Standard of Review*

48    It is not necessary in this case to address at length the "pragmatic and functional" test to determine the appropriate standard of judicial review. I agree with Evans J.A. that a standard of correctness is indicated by the customary four factors: (i) presence or absence of a privative clause, or statutory right of appeal; (ii) the expertise of the tribunal relative to that of the reviewing court on the issue in question; (iii) the purpose of the legislation and any particular provision in issue; and (iv) the nature of the question (*Dr. Q v. College of Physicians and Surgeons of British Columbia*, [2003] 1 S.C.R. 226, 2003 SCC 19, at para. 26).

49    There is neither a preclusive clause nor a statutory right of appeal from decisions of the Copyright Board. While the Chair of the Board must be a current or retired judge, the Board may hold a hearing without any legally trained member present. The *Copyright Act* is an act of general application which usually is dealt with before courts rather than

aux communications indésirables qui nous arrivent de l'étranger.

Dans son sens ordinaire, le mot « communiquer » signifie « faire connaître » ou « transmettre » (*Le Nouveau Petit Robert* (2003), p. 485). La communication présuppose un expéditeur et un destinataire de ce qui est transmis; voir *Goldman c. La Reine*, [1980] 1 R.C.S. 976, p. 995. C'est l'expéditeur qui « communique », et non le destinataire. Ainsi, selon la SOCAN, toute entité située au Canada (à l'exclusion d'un fournisseur de services de réseau de base) qui contribue à faire connaître et à transmettre sur l'Internet une œuvre protégée par le droit d'auteur viole le droit d'auteur au Canada. La SOCAN affirme qu'une interprétation plus laxiste ne permettrait pas d'établir un juste équilibre entre les droits des titulaires de droits d'auteur et la promotion, dans l'intérêt du public, de la création et de la diffusion de leurs œuvres musicales (*Théberge*, précité, par. 30).

La Commission ayant donné tort à la SOCAN sur ce point, nous devons déterminer quelle est la norme de contrôle judiciaire applicable.

B. *La norme de contrôle*

Il n'est pas nécessaire, en l'espèce, d'appliquer en détail la méthode « pragmatique et fonctionnelle » pour déterminer la norme de contrôle judiciaire applicable. Je conviens avec le juge Evans que la norme de la décision correcte s'impose au regard des quatre facteurs habituels : (i) la présence ou l'absence dans la loi d'une clause privative ou d'un droit d'appel; (ii) l'expertise du tribunal relativement à celle de la cour de révision sur la question en litige; (iii) l'objet de la loi et de la disposition particulière; (iv) la nature de la question (*Dr Q c. College of Physicians and Surgeons of British Columbia*, [2003] 1 R.C.S. 226, 2003 CSC 19, par. 26).

Il n'existe dans la loi ni clause privative ni droit d'appel des décisions de la Commission du droit d'auteur. Même si son président doit être juge ou juge à la retraite, la Commission peut tenir une audience en l'absence de tout membre ayant une formation juridique. La *Loi sur le droit d'auteur* est une loi de portée générale dont l'application relève

tribunals. The questions at issue in this appeal are legal questions. For example, the Board's ruling that an infringement of copyright does not occur in Canada when the place of transmission from which the communication originates is outside Canada addresses a point of general legal significance far beyond the working out of the details of an appropriate royalty tariff, which lies within the core of the Board's mandate.

None of the parties is challenging the Board's view of the facts themselves. It is the legal significance of the facts that is in issue. In my view, accordingly, the decision of the Board on the legal questions at issue in this appeal should be reviewed on a correctness standard.

### C. *Application and Scope of the Copyright Act*

The Federal Court of Appeal was unanimous in its conclusion that copyright infringement occurs in Canada where there is a real and substantial connection between this country and the communication at issue. Evans J.A. stated, at para. 191:

> In my opinion, therefore, the Copyright Board erred in law when it ignored all connecting factors other than the location of the host server for the purpose of identifying communications that occur in Canada and can therefore attract liability to pay a royalty to SOCAN.

I agree with the general proposition that the Board erred in holding that the only relevant connection between Canada and the communication is the location of the host server. As a matter of international law and practice, as well as the legislative reach of our Parliament, Canada's jurisdiction is not so limited.

It is a different issue, however, whether Canada intended to *exercise* its copyright jurisdiction to impose copyright liability on every participant in an Internet communication with "a real and substantial connection" to Canada. This second issue

habituellement des cours de justice, et non des tribunaux administratifs. Les questions en litige dans le présent pourvoi sont des questions de droit. Par exemple, en concluant à l'absence de violation du droit d'auteur au Canada lorsque la communication est transmise à partir de l'étranger, la Commission a tranché une question de droit d'une importance générale allant bien au-delà de la mise au point d'un tarif de redevances approprié, laquelle est au cœur du mandat de la Commission.

Aucune des parties ne conteste l'appréciation des faits par la Commission. C'est leur portée juridique qui est en cause. C'est pourquoi, à mon avis, le contrôle de la décision de la Commission quant aux questions de droit que soulève le présent pourvoi doit se faire en fonction de la norme de la décision correcte.

### C. *Application et portée de la Loi sur le droit d'auteur*

La Cour d'appel fédérale a conclu à l'unanimité à la violation du droit d'auteur au Canada lorsqu'il existe un lien réel et important entre notre pays et la communication en cause. Le juge Evans a dit (par. 191) :

> J'estime donc que la Commission du droit d'auteur a commis une erreur de droit en ignorant tous les facteurs de rattachement autres que celui de l'emplacement du serveur hôte pour déterminer quelles communications ont lieu au Canada et sont par conséquent susceptibles d'engendrer l'obligation de verser des redevances à la SOCAN.

Je suis d'accord avec l'affirmation générale selon laquelle la Commission a conclu à tort que le seul facteur de rattachement pertinent entre le Canada et la communication est l'emplacement du serveur hôte. Au regard du droit international et de la pratique y afférente, ainsi que de la portée des lois du Parlement, la compétence du Canada n'est pas aussi restreinte.

C'est une autre question, toutefois, que celle de savoir si l'intention du législateur canadien était d'*exercer* sa compétence en matière de droits d'auteur de façon à contraindre au versement de redevances tout participant à une communication

50

51

52

53

raises questions of statutory interpretation of the *Copyright Act*.

### 1.   Canada's Legislative Reach

54    While the Parliament of Canada, unlike the legislatures of the Provinces, has the legislative competence to enact laws having extraterritorial effect, it is presumed not to intend to do so, in the absence of clear words or necessary implication to the contrary. This is because "[i]n our modern world of easy travel and with the emergence of a global economic order, chaotic situations would often result if the principle of territorial jurisdiction were not, at least generally, respected"; see *Tolofson v. Jensen*, [1994] 3 S.C.R. 1022, at p. 1051, *per* La Forest J.

55    While the notion of comity among independent nation States lacks the constitutional status it enjoys among the provinces of the Canadian federation (*Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077, at p. 1098), and does not operate as a limitation on Parliament's legislative competence, the courts nevertheless presume, in the absence of clear words to the contrary, that Parliament did not intend its legislation to receive extraterritorial application.

56    Copyright law respects the territorial principle, reflecting the implementation of a "web of interlinking international treaties" based on the principle of national treatment (see D. Vaver, *Copyright Law* (2000), at p. 14).

57    The applicability of our *Copyright Act* to communications that have international participants will depend on whether there is a sufficient connection between this country and the communication in question for Canada to apply its law consistent with the "principles of order and fairness ... that ensure security of [cross-border] transactions with justice"; see *Morguard Investments*, *supra*, at p. 1097; see also *Unifund Assurance Co. v. Insurance Corp. of British Columbia*, [2003] 2 S.C.R. 63, 2003 SCC 40, at para. 56; *Sullivan and Driedger*

Internet ayant « un lien réel et important » avec le Canada. Le règlement de cette deuxième question exige l'interprétation des dispositions de la *Loi sur le droit d'auteur.*

### 1.   La portée des lois canadiennes

Même si, contrairement aux législatures provinciales, le Parlement du Canada a le pouvoir d'adopter une loi ayant une portée extraterritoriale, en l'absence d'un libellé clair ou d'une déduction nécessaire à l'effet contraire, il est présumé ne pas avoir voulu le faire. Il en est ainsi parce qu'« [é]tant donné la facilité de voyager dans le monde moderne et l'émergence d'un ordre économique mondial, la situation deviendrait souvent chaotique si le principe de la compétence territoriale n'était pas respecté, du moins de façon générale »; voir *Tolofson c. Jensen*, [1994] 3 R.C.S. 1022, p. 1051, le juge La Forest.

Bien que la notion de courtoisie ne soit pas reconnue constitutionnellement entre les États indépendants comme elle l'est entre les provinces de la fédération canadienne (*Morguard Investments Ltd. c. De Savoye*, [1990] 3 R.C.S. 1077, p. 1098) et qu'elle n'ait pas pour effet de restreindre la compétence législative du Parlement, les tribunaux tiennent néanmoins pour acquis, à défaut d'un libellé manifestement contraire, que le législateur n'a pas voulu conférer à une loi une portée extraterritoriale.

Les dispositions législatives sur le droit d'auteur respectent le principe de la territorialité, reflétant la mise en œuvre d'un [TRADUCTION] « réseau de traités internationaux interreliés » compte tenu du principe du traitement national (voir D. Vaver, *Copyright Law* (2000), p. 14).

L'applicabilité de la *Loi sur le droit d'auteur* à une communication à laquelle participent des ressortissants d'autres pays dépend de l'existence entre le Canada et la communication d'un lien suffisant pour que le Canada applique ses dispositions conformément aux « principes d'ordre et d'équité [...] qui assurent à la fois la justice et la sûreté des opérations [transfrontalières] »; voir *Morguard Investments*, précité, p. 1097; *Unifund Assurance Co. c. Insurance Corp. of British Columbia*, [2003] 2 R.C.S. 63, 2003 CSC 40, par. 56; *Sullivan and*

*on the Construction of Statutes* (4th ed. 2002), at pp. 601-2.

Helpful guidance on the jurisdictional point is offered by La Forest J. in *Libman v. The Queen*, [1985] 2 S.C.R. 178. That case involved a fraudulent stock scheme. U.S. purchasers were solicited by telephone from Toronto, and their investment monies (which the Toronto accused caused to be routed through Central America) wound up in Canada. The accused contended that the crime, if any, had occurred in the United States, but La Forest J. took the view that "[t]his kind of thinking has, perhaps not altogether fairly, given rise to the reproach that a lawyer is a person who can look at a thing connected with another as not being so connected. For <u>everyone knows that the transaction in the present case is both here and there</u>" (p. 208 (emphasis added)). Speaking for the Court, he stated the relevant territorial principle as follows (at pp. 212-13):

I might summarize my approach to the limits of territoriality in this way. As I see it, all that is necessary to make an offence subject to the jurisdiction of our courts is that a <u>significant portion of the activities constituting that offence</u> took place in Canada. As it is put by modern academics, it is sufficient that there be a "real and substantial link" between an offence and this country . . . . [Emphasis added.]

So also, in my view, a telecommunication from a foreign state to Canada, or a telecommunication from Canada to a foreign state, "is both here and there". Receipt may be no less "significant" a connecting factor than the point of origin (not to mention the physical location of the host server, which may be in a third country). To the same effect, see *Canada (Human Rights Commission) v. Canadian Liberty Net*, [1998] 1 S.C.R. 626, at para. 52; *Kitakufe v. Oloya*, [1998] O.J. No. 2537 (QL) (Gen. Div.). In the factual situation at issue in *Citron v. Zundel, supra*, for example, the fact that the host server was located in California was scarcely conclusive in a situation where both the content provider (Zundel) and a major part of his target audience were located in Canada. The *Zundel* case was

*Driedger on the Construction of Statutes* (4e éd. 2002), p. 601-602.

**58** Dans l'arrêt *Libman c. La Reine*, [1985] 2 R.C.S. 178, le juge La Forest a clarifié la question de la compétence. Il s'agissait d'une affaire de combine frauduleuse pour vendre des actions. Des vendeurs se trouvant à Toronto sollicitaient au téléphone des acheteurs aux États-Unis, et l'argent investi par ces derniers (que l'accusé à Toronto faisait passer par l'Amérique centrale) se retrouvait finalement au Canada. L'accusé soutenait que le crime, à supposer qu'il y en ait eu un, avait été perpétré aux États-Unis. Or, le juge La Forest a estimé que « [c]e genre de raisonnement a provoqué, peut-être pas tout à fait à juste titre, le reproche selon lequel un avocat est une personne qui peut considérer des choses connexes comme non reliées entre elles. En effet, <u>tout le monde sait que l'opération en l'espèce se situe à la fois ici et à l'autre endroit</u> » (p. 208 (je souligne)). S'exprimant au nom de notre Cour, il a formulé comme suit le principe de la territorialité applicable (p. 212-213) :

Je pourrais résumer ainsi ma façon d'aborder les limites du principe de la territorialité. Selon moi, il suffit, pour soumettre une infraction à la compétence de nos tribunaux, qu'une <u>partie importante des activités qui la constituent</u> se soit déroulée au Canada. Comme l'affirment les auteurs modernes, il suffit qu'il y ait un « lien réel et important » entre l'infraction et notre pays . . . [Je souligne.]

**59** Aussi, à mon avis, une télécommunication effectuée à partir d'un pays étranger vers le Canada ou à partir du Canada vers un pays étranger « se situe à la fois ici et à l'autre endroit ». Le lieu de réception peut constituer un facteur de rattachement tout aussi « important » que le lieu d'origine (sans compter l'emplacement physique du serveur hôte, qui peut se trouver dans un pays tiers). Voir, dans le même sens, *Canada (Commission des droits de la personne) c. Canadian Liberty Net*, [1998] 1 R.C.S. 626, par. 52; et *Kitakufe c. Oloya*, [1998] O.J. No. 2537 (QL) (Div. gén.). Dans l'affaire *Citron c. Zundel*, précitée, par exemple, le fait que le serveur hôte était situé en Californie était peu concluant dans la mesure où tant le fournisseur de contenu (Zundel) que la majeure partie de son public cible se trouvaient au Canada.

decided on grounds related to the provisions of the *Canadian Human Rights Act*, but for present purposes the object lesson of those facts is nevertheless instructive.

60    The "real and substantial connection" test was adopted and developed by this Court in *Morguard Investments, supra*, at pp. 1108-9; *Hunt v. T&N plc*, [1993] 4 S.C.R. 289, at pp. 325-26 and 328; and *Tolofson, supra*, at p. 1049. The test has been reaffirmed and applied more recently in cases such as *Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustees of)*, [2001] 3 S.C.R. 907, 2001 SCC 90, at para. 71; *Spar Aerospace Ltd. v. American Mobile Satellite Corp.*, [2002] 4 S.C.R. 205, 2002 SCC 78; *Unifund, supra*, at para. 54; and *Beals v. Saldanha*, [2003] 3 S.C.R. 416, 2003 SCC 72. From the outset, the real and substantial connection test has been viewed as an appropriate way to "prevent overreaching . . . and [to restrict] the exercise of jurisdiction over extraterritorial and transnational transactions" (La Forest J. in *Tolofson, supra*, at p. 1049). The test reflects the underlying reality of "the territorial limits of law under the international legal order" and respect for the legitimate actions of other states inherent in the principle of international comity (*Tolofson*, at p. 1047). A real and substantial connection to Canada is sufficient to support the application of our *Copyright Act* to international Internet transmissions in a way that will accord with international comity and be consistent with the objectives of order and fairness.

61    In terms of the Internet, relevant connecting factors would include the *situs* of the content provider, the host server, the intermediaries and the end user. The weight to be given to any particular factor will vary with the circumstances and the nature of the dispute.

62    Canada clearly has a significant interest in the flow of information in and out of the country. Canada regulates the reception of broadcasting signals in Canada wherever originated; see *Bell ExpressVu Limited Partnership v. Rex*, [2002] 2 S.C.R. 559, 2002 SCC 42. Our courts and tribunals regularly take jurisdiction in matters of civil liability arising out of foreign transmissions which are received and

La décision rendue s'appuyait sur des motifs liés à la *Loi canadienne sur les droits de la personne*, mais pour les besoins du présent pourvoi, l'illustration demeure néanmoins instructive.

Notre Cour a adopté puis développé le critère du « lien réel et important » dans *Morguard Investments Ltd.*, précité, p. 1108-1109; *Hunt c. T&N plc*, [1993] 4 R.C.S. 289, p. 325, 326 et 328; et *Tolofson*, précité, p. 1049. Ce critère a été confirmé et appliqué plus récemment dans *Holt Cargo Systems Inc. c. ABC Containerline N.V. (Syndics de)*, [2001] 3 R.C.S. 907, 2001 CSC 90, par. 71; *Spar Aerospace Ltée c. American Mobile Satellite Corp.*, [2002] 4 R.C.S. 205, 2002 CSC 78; *Unifund*, précité, par. 54; et *Beals c. Saldanha*, [2003] 3 R.C.S. 416, 2003 CSC 72. Dès le départ, le critère du lien réel et important a été considéré comme un moyen approprié d'« éviter que l'on aille trop loin [. . .] et [de] restrei[ndre] l'exercice de compétence sur les opérations extraterritoriales et transnationales » (le juge La Forest dans *Tolofson*, précité, p. 1049). Il reflète la réalité sous-jacente de « la territorialité des lois selon l'ordre juridique international » et du respect des mesures légitimes prises par un autre État qui est inhérent au principe de la courtoisie internationale (*Tolofson*, p. 1047). L'existence d'un lien réel et important avec le Canada suffit pour que notre *Loi sur le droit d'auteur* s'applique aux transmissions Internet internationales conformément au principe de la courtoisie internationale et aux objectifs d'ordre et d'équité.

En ce qui concerne l'Internet, le facteur de rattachement pertinent est le *situs* du fournisseur de contenu, du serveur hôte, des intermédiaires et de l'utilisateur final. L'importance à accorder au *situs* de l'un d'eux en particulier varie selon les circonstances de l'affaire et la nature du litige.

Il est clair que l'information qui entre au Canada et qui en sort présente un intérêt considérable pour notre pays. Le Canada réglemente la réception des signaux de radiodiffusion sur son territoire indépendamment de leur origine; voir *Bell ExpressVu Limited Partnership c. Rex*, [2002] 2 R.C.S. 559, 2002 CSC 42. Nos tribunaux judiciaires et administratifs se penchent régulièrement sur la

have their impact here; see *WIC Premium Television Ltd. v. General Instrument Corp.* (2000), 8 C.P.R. (4th) 1 (Alta. C.A.); *Re World Stock Exchange* (2000), 9 A.S.C.S. 658.

Generally speaking, this Court has recognized, as a sufficient "connection" for taking jurisdiction, situations where Canada is the country of transmission (*Libman*, *supra*) *or* the country of reception (*Liberty Net*, *supra*). This jurisdictional posture is consistent with international copyright practice.

In a recent decision of the European Commission involving "simulcasting", a model reciprocal agreement approved by the Commission was based on the country-of-destination principle. The decision commented that according to the principle "which appears to reflect the current legal situation in copyright law, the act of communication to the public of a copyright protected work takes place not only in the country of origin (emission-State) but also in all the States where the signals can be received (reception-States)": *Commission Decision of 8 October 2002 relating to a proceeding under Article 81 of the EC Treaty and Article 53 of the EEA Agreement* (Case No. COMP/C2/38.014 — IFPI "Simulcasting"), para. 21 (emphasis added).

Canada is a signatory but not yet a party to the WIPO *Copyright Treaty*. This treaty responded to the development of the Internet and other on-demand telecommunications technology. Article 8 provides that:

. . . authors of literary and artistic works shall enjoy the exclusive right of authorizing any communication to the public of their works, by wire or wireless means, including the making available to the public of their works in such a way that members of the public may access these works from a place and at a time individually chosen by them.

The "making available" right is generally exercised at the point of transmission. This does not deny the interest of the country of reception but avoids, as a

responsabilité délictuelle découlant de transmissions en provenance de l'étranger qui sont reçues et ont des répercussions au pays; voir *WIC Premium Television Ltd. c. General Instrument Corp.* (2000), 8 C.P.R. (4th) 1 (C.A. Alb.); *Re World Stock Exchange* (2000), 9 A.S.C.S. 658.

Notre Cour a généralement reconnu l'existence **63** d'un « lien » justifiant l'exercice de la compétence lorsque le Canada était le pays de transmission (*Libman*, précité) *ou* de réception (*Liberty Net*, précité). Sa position est dans le droit fil des pratiques internationales en matière de droits d'auteur.

Dans une affaire récente portant sur la diffu- **64** sion en « simulcast », un accord réciproque type approuvé par la Commission européenne reposait sur le principe du pays de destination. La Commission a signalé que suivant le principe « qui reflète, semble-t-il, la situation juridique actuelle en matière de droits d'auteur, l'acte consistant à communiquer au public une œuvre protégée par le droit d'auteur a lieu non seulement dans le pays d'origine (pays d'émission), mais aussi dans les pays où les signaux peuvent être reçus (pays de réception) » : *Décision de la Commission du 8 octobre 2002 relative à une procédure d'application de l'article 81 du traité CE et de l'article 53 de l'accord EEE* (Affaire COMP/C2/38.014 — IFPI « Simulcast »), par. 21 (je souligne).

Le Canada est signataire du *Traité sur le droit* **65** *d'auteur* de l'OMPI, mais n'y est pas encore partie. Ce traité fait suite à l'essor de l'Internet et des autres technologies de télécommunication sur demande. L'article 8 prévoit :

. . . les auteurs d'œuvres littéraires et artistiques jouissent du droit exclusif d'autoriser toute communication au public de leurs œuvres par fil ou sans fil, y compris la mise à la disposition du public de leurs œuvres de manière que chacun puisse y avoir accès de l'endroit et au moment qu'il choisit de manière individualisée.

Le droit de « mise à la disposition » est généralement exercé au lieu de la transmission. Le but n'est pas de nier le droit du pays de réception, mais

Case 1:25-cv-00910-JMF    Document 39-3    Filed 03/21/25    Page 33 of 63

458          SOCAN v. CANADIAN ASSN. OF INTERNET PROVIDERS    Binnie J.          [2004] 2 S.C.R.

matter of policy, a "layering" of royalty obligations in different countries that are parties to the WIPO *Copyright Treaty.*

66      In 2000, the European Commission issued what is known as its *E-Commerce Directive*; see *Directive 2000/31/EC of the European Parliament and of the Council of 8 June 2000 on certain legal aspects of information society services, in particular electronic commerce, in the Internal Market ("Directive on electronic commerce")*, [2000] O.J. L. 178/1. Its purpose was to ensure the free movement among Member States of "information society services", defined as "any service normally provided for remuneration, at a distance, by means of electronic equipment . . . and at the individual request of a recipient of a service" (Preamble, clause 17). The *E-Commerce Directive* preferred as a matter of policy the law of the Member State on whose territory the service provider is established (art. 3(1)). It was thought that "[i]nformation society services should be supervised at the source of the activity . . . to that end, it is necessary to ensure that the competent authority provides such protection not only for the citizens of its own country but for all Community citizens" (Preamble, clause 22 (emphasis added)). The Directive notes that the place where a service provider is established should be determined by the case law of the European Court of Justice, which holds that the proper *situs* is not the place where the technology is, or the place where the person accessing the service is, but rather where the service provider's centre of activities is (Preamble, clause 19); see G. J. H. Smith, *Internet Law and Regulation* (3rd ed. 2002), at p. 269.

67      Supranational organizations such as the European Commission may thus allocate responsibility among their member States — whether the state of transmission or the state of reception — as a matter of policy. In the absence of such regional or international arrangements, the territorial nature of copyright law must be respected.

d'éviter la superposition des redevances dans les différents pays qui sont parties au traité.

En 2000, la Commission européenne a publié sa *Directive sur le commerce électronique*; voir *Directive 2000/31/CE du Parlement européen et du Conseil du 8 juin 2000 relative à certains aspects juridiques des services de la société de l'information, et notamment du commerce électronique, dans le marché intérieur (« Directive sur le commerce électronique »)*, [2000] J.O. L. 178/1. L'objectif était d'assurer la libre circulation entre les États membres des « services de la société de l'information », c'est-à-dire « tout service fourni, normalement contre rémunération, à distance au moyen d'équipement électronique [. . .] à la demande individuelle d'un destinataire de services » (préambule, par. 17). La *Directive sur le commerce électronique* donne préséance aux dispositions de l'État membre où est établi le fournisseur de services (art. 3, par. 1). On a estimé que « [l]e contrôle des services de la société de l'information doit se faire à la source de l'activité [. . .] Pour cela, il est nécessaire de garantir que l'autorité compétente assure cette protection non seulement pour les citoyens de son propre pays, mais aussi pour l'ensemble des citoyens de la Communauté » (préambule, par. 22 (je souligne)). La directive prévoit que le lieu d'établissement du prestataire est déterminé conformément à la jurisprudence de la Cour européenne de justice selon laquelle il ne s'agit pas du lieu où se trouve la technologie ni de celui où se trouve la personne ayant accès au service, mais bien du lieu dans lequel le prestataire a le centre de ses activités (préambule, par. 19). Voir G. J. H. Smith, *Internet Law and Regulation* (3e éd. 2002), p. 269.

Un organisme supranational comme la Commission européenne peut donc avoir pour politique générale de répartir l'obligation de verser des redevances entre ses États membres, qu'il s'agisse du pays de transmission ou du pays de réception. En l'absence d'un accord régional ou international en ce sens, la nature territoriale du droit d'auteur doit être respectée.

National practice confirms that *either* the country of transmission *or* the country of reception may take jurisdiction over a "communication" linked to its territory, although whether it chooses to do so is a matter of legislative or judicial policy; see generally M. V. Pietsch, "International Copyright Infringement and the Internet: An Analysis of the Existing Means of Enforcement" (2001-2002), 24 *Hastings Comm. & Ent. L.J.* 273.

(a) *The United States*

At present there is authority in the United States for taking copyright jurisdiction over both the sender of the transmission out of the United States and the receiver in the United States of material from outside that country.

In *National Football League v. PrimeTime 24 Joint Venture*, 211 F.3d 10 (2d Cir. 2000), the U.S. defendant caused satellite transmission of NFL football games from the U.S. to Canada. The court found this to violate the NFL's U.S. copyright even though the broadcasts were being sent to the satellite and thence to Canada for Canadian viewers. The United States was the <u>country of transmission</u>. It was held sufficient to constitute U.S. copyright infringement that a significant step in the telecommunication had taken place in the United States (at p. 13):

... it is clear that PrimeTime's uplink transmission of signals captured in the United Sates is a step in the process by which NFL's protected work wends its way to a public audience. In short, PrimeTime publicly displayed or performed material in which the NFL owns the copyright. Because PrimeTime did not have authorization to make such a public performance, PrimeTime infringed the NFL's copyright.

At the same time, some U.S. courts take the view that U.S. copyright is also breached when the U.S. is the <u>country of reception</u>. Thus in *Los Angeles News Service v. Conus Communications Co.*, 969 F.Supp. 579 (C.D. Cal. 1997), the plaintiff had videotaped riots that occurred in Los Angeles in connection with the Rodney King assault case. The CBC broadcast some of the footage in Canada. Inevitably, some homes in border States saw the CBC broadcast. The

La pratique nationale confirme que *soit* le pays de transmission, *soit* le pays de réception peut s'attribuer compétence à l'égard d'une « communication » ayant un lien avec son territoire, mais sa décision relève de la politique législative ou judiciaire; voir généralement M. V. Pietsch, « International Copyright Infringement and the Internet : An Analysis of the Existing Means of Enforcement » (2001-2002), 24 *Hastings Comm. & Ent. L.J.* 273.

a) *États-Unis*

Suivant certaines décisions judiciaires rendues aux États-Unis, la compétence en matière de droits d'auteur peut être exercée tant à l'égard de l'expéditeur des fichiers qui se trouve à l'étranger que de la personne qui les reçoit aux États-Unis.

Dans *National Football League c. PrimeTime 24 Joint Venture*, 211 F.3d 10 (2d Cir. 2000), la partie défenderesse, qui était américaine, était à l'origine de la transmission par satellite de matchs de football de la NFL des États-Unis vers le Canada. La cour a conclu que cela violait le droit d'auteur de la NFL aux États-Unis, même si les signaux étaient transmis à un satellite et, de là, au Canada, à l'intention des téléspectateurs canadiens. Les États-Unis étaient le <u>pays de transmission</u>. Selon la cour, le fait qu'une étape importante de la télécommunication avait eu lieu aux États-Unis suffisait pour qu'il y ait violation du droit d'auteur dans ce pays (p. 13) :

[TRADUCTION] . . . il est évident que la transmission sans terre-satellite, par PrimeTime, de signaux captés aux États-Unis constitue une étape dans le processus grâce auquel œuvre protégée de la NFL atteint un auditoire. En somme, PrimeTime a présenté au public ou diffusé à son intention du matériel sur lequel la NFL avait un droit d'auteur. Comme elle n'avait pas l'autorisation de le faire, elle a violé le droit d'auteur de la NFL.

Il appert cependant d'autres décisions états-uniennes que les dispositions américaines sur le droit d'auteur sont également violées lorsque les États-Unis sont le <u>pays de réception</u>. Ainsi, dans *Los Angeles News Service c. Conus Communications Co.*, 969 F.Supp. 579 (C.D. Cal. 1997), la partie demanderesse avait enregistré sur bande vidéo les émeutes qui s'étaient produites à Los Angeles relativement à l'affaire Rodney King (policiers accusés de

68

69

70

71

plaintiff alleged breach of U.S. copyright. The CBC moved to dismiss the U.S. proceeding for lack of jurisdiction, but was unsuccessful. The court held, at pp. 583-84:

Under the plain language of the Act, the subject footage was "displayed" on television sets within the United States within the meaning of the Copyright Act. To find otherwise would leave a substantial loophole in the copyright laws. Broadcasters could deliberately transmit potentially infringing material from locations across the U.S. borders for display in the United States without regard to the rights of copyright owners set forth in the U.S. Copyright Act.

72    Equally, in *National Football League v. TVRadioNow Corp.*, 53 USPQ2d 1831 (W.D. Pa. 2000), the court found that a Web site in Canada that "streamed" U.S. cable television through the Internet with worldwide availability infringed the U.S. transmission rights of the copyright owners despite the fact that the defendant was located in Canada and arguably was not in violation of Canadian copyright laws.

(b) *Australia*

73    Australia has recently adopted the *Copyright Amendment (Digital Agenda) Act 2000* to implement its obligations under the WIPO treaties. The definition of "communication to the public" appears to apply Australian copyright law to communications entirely within Australia, those originating within Australia and received by an end user outside Australia, and those originating outside Australia but received by an end user in Australia:

**10.  Interpretation**

(1)  In this Act, unless the contrary intention appears:

. . .

voies de fait à son endroit). La SRC en avait diffusé des extraits au Canada. Inévitablement, ces images avaient été captées dans certains États frontaliers. La partie demanderesse a allégué la violation du droit d'auteur aux États-Unis. La SRC a demandé le rejet de l'action pour défaut de compétence, mais elle a été déboutée. La cour a statué aux p. 583-584 :

[TRADUCTION] Suivant le sens ordinaire des mots employés dans la loi, les images en cause ont été « présentées » à la télévision sur des appareils se trouvant aux États-Unis, au sens de la Copyright Act. Conclure en sens contraire affaiblirait sensiblement les dispositions sur le droit d'auteur. Un radiodiffuseur pourrait transmettre délibérément des images susceptibles de violer le droit d'auteur à partir d'endroits situés à l'extérieur du territoire américain pour qu'elles soient ensuite diffusées aux États-Unis au mépris des droits conférés aux titulaires de droits d'auteur par la Copyright Act des États-Unis.

De même, dans l'affaire *National Football League c. TVRadioNow Corp.*, 53 USPQ2d 1831 (W.D. Pa. 2000), la cour a conclu qu'un site Web canadien qui permettait d'avoir accès dans le monde entier à la télédistribution américaine grâce à l'Internet violait les droits de transmission aux États-Unis des titulaires de droits d'auteur même si la défenderesse était située au Canada et que l'on pouvait soutenir qu'elle ne violait pas les dispositions canadiennes sur le droit d'auteur.

b) *Australie*

Récemment, l'Australie a adopté la *Copyright Amendment (Digital Agenda) Act 2000* pour s'acquitter de ses obligations découlant des traités de l'OMPI. La définition de « communication au public » paraît faire en sorte que les dispositions australiennes sur le droit d'auteur s'appliquent aux communications effectuées en totalité en Australie, à celles qui proviennent de l'Australie et qui sont reçues par un utilisateur final à l'étranger, ainsi qu'à celles qui proviennent de l'étranger et qui sont reçues par un utilisateur final en Australie :

[TRADUCTION]

**10.  Interprétation**

(1)  Sauf indication contraire, les définitions qui suivent s'appliquent à la présente loi.

. . .

**communicate** means make available online or electronically transmit (whether over a path, or a combination of paths, provided by a material substance or otherwise) a work or other subject-matter.

· · ·

**to the public** means to the public within or outside Australia. [Emphasis added.]

(*Copyright Act 1968* (Australia), No. 63 of 1968, s. 10(1), as amended by the *Copyright Amendment (Digital Agenda) Act 2000*, Sch.1, ss. 6 and 16)

The definition of "to the public" seems to permit Australian copyright holders to exact royalties on both communication from Australia of material directed to overseas audiences as well as overseas communications received in Australia.

(c) *France*

An analysis of liability in France suggests that "[c]ourts will likely assert jurisdiction not only over transmissions from France, but also transmissions into France that are alleged to cause damage" (emphasis added); see D. J. Gervais, "Transmissions of Music on the Internet: An Analysis of the Copyright Laws of Canada, France, Germany, Japan, the United Kingdom, and the United States" (2001), 34 *Vand. J. Transnatl. L.* 1363, at p. 1376. In *UEJF v. Yahoo! Inc.*, Trib. gr. inst. Paris, May 22, 2000, the court ordered Yahoo! Inc., a U.S. based Internet company, to block access by French users to an Internet auction offering Nazi paraphernalia because [TRANSLATION] "the harm is suffered in France". (The U.S. courts refused to give effect in the United States to the French court order, not on jurisdictional grounds as such, but based on First Amendment rights; see *Yahoo! Inc. v. Ligue contre le racisme et l'antisémitisme*, 145 F.Supp.2d 1168 (N.D. Cal. 2001).)

**au public** Au public en Australie ou à l'étranger.

· · ·

**communiquer** Rendre disponible en ligne ou transmettre par voie électronique (au moyen d'un chemin, ou d'une combinaison de chemins, assuré par un support matériel ou autrement) une œuvre ou un autre objet du droit d'auteur. [Je souligne.]

(*Copyright Act 1968* (Australie), nº 63 de 1968, par. 10(1), modifiée par la *Copyright Amendment (Digital Agenda) Act 2000*, ann. 1, art. 6 et 16)

74

La définition d'« au public » semble permettre au titulaire du droit d'auteur australien d'exiger des redevances tant à l'égard de la communication, à partir de l'Australie, de matériel destiné à un auditoire étranger que de la communication, à partir de l'étranger, de matériel destiné aux Australiens.

c) *France*

75

L'analyse de la situation en France donne à penser que [TRADUCTION] « [l]es tribunaux s'attribuent compétence non seulement à l'égard des transmissions effectuées à partir de la France, mais aussi à l'égard des transmissions vers la France dont on allègue qu'elles sont préjudiciables » (je souligne); voir D. J. Gervais, « Transmissions of Music on the Internet : An Analysis of the Copyright Laws of Canada, France, Germany, Japan, the United Kingdom, and the United States » (2001), 34 *Vand. J. Transnatl. L.* 1363, p. 1376. Dans *UEJF c. Yahoo! Inc.* (22 mai 2000), le Tribunal de grande instance de Paris a ordonné à Yahoo! Inc., une société Internet établie aux États-Unis, d'empêcher les utilisateurs français d'avoir accès à la vente aux enchères, sur l'Internet, d'une panoplie d'objets nazis parce que le « dommage [était] subi en France ». (Les tribunaux américains ont refusé de donner effet à la décision française non pas pour des motifs liés à la compétence, mais sur le fondement des droits garantis par le Premier Amendement : *Yahoo! Inc. c. Ligue contre le racisme et l'antisémitisme*, 145 F.Supp.2d 1168 (N.D. Cal. 2001).)

76    Accordingly, the conclusion that Canada *could* exercise copyright jurisdiction in respect both of transmissions originating here and transmissions originating abroad but received here is not only consistent with our general law (*Libman, supra,* and *Liberty Net, supra*), but with both national and international copyright practice.

77    This conclusion does not, of course, imply imposition of automatic copyright liability on foreign content providers whose music is telecommunicated to a Canadian end user. Whether or not a real and substantial connection exists will turn on the facts of a particular transmission (*Braintech, supra*). It is unnecessary to say more on this point because the Canadian copyright liability of foreign content providers is not an issue that arises for determination in this appeal, although, as stated, the Board itself intimated that where a foreign transmission is aimed at Canada, copyright liability might attach.

78    This conclusion also raises the spectre of imposition of copyright duties on a single telecommunication in both the State of transmission and the State of reception, but as with other fields of overlapping liability (taxation for example), the answer lies in the making of international or bilateral agreements, not in national courts straining to find some jurisdictional infirmity in either State.

2.    The Interpretation of the *Copyright Act*

79    I therefore turn to the question of the extent to which Canada has exercised its copyright jurisdiction in relation to the Internet Service Providers at issue in this appeal.

80    SOCAN asserts Canadian copyright in the material transmitted from outside Canada to an end user in Canada. It is true that end users in Canada wind up with copyrighted material in their possession, and a communication to the Canadian user has therefore

Par conséquent, la conclusion selon laquelle le Canada *pourrait* exercer sa compétence en matière de droits d'auteur à l'égard tant des transmissions effectuées au pays que de celles provenant de l'étranger est conforme non seulement à notre droit général (*Libman*, précité, et *Liberty Net*, précité), mais aussi aux pratiques nationales et internationales en la matière.

Évidemment, il ne s'ensuit pas automatiquement que les fournisseurs de contenu étrangers dont les fichiers musicaux sont communiqués à un utilisateur final au Canada ont l'obligation de verser des redevances. L'existence d'un lien réel et important dépend des circonstances de la transmission (*Braintech*, précité). Inutile de s'attarder sur ce point puisque notre Cour n'est pas appelée en l'espèce à se prononcer sur la responsabilité des fournisseurs de contenu étrangers au regard des dispositions canadiennes sur le droit d'auteur, même si la Commission a laissé entendre que des redevances pouvaient être exigibles à l'égard d'une transmission étrangère destinée au Canada.

Cette conclusion soulève également la crainte que l'on doive verser des redevances pour une même communication tant dans le pays de transmission que dans le pays de réception. Or, comme c'est le cas pour d'autres domaines où il y a chevauchement d'obligations (en matière fiscale, par exemple), la solution réside dans la conclusion d'accords internationaux ou bilatéraux, et non dans la recherche, par les tribunaux nationaux, d'une faille au chapitre de la compétence dans l'un ou l'autre des pays.

2.    L'interprétation de la *Loi sur le droit d'auteur*

J'examinerai maintenant dans quelle mesure le Canada a exercé sa compétence en matière de droits d'auteur à l'égard des fournisseurs de services Internet visés en l'espèce.

La SOCAN prétend que les dispositions canadiennes sur le droit d'auteur s'appliquent au matériel transmis de l'étranger à un utilisateur final au Canada. Il est vrai que ce dernier se retrouve en possession d'une œuvre protégée par le droit d'auteur,

occurred. The question is whether Tariff 22 imposes a licensing requirement on the appellants and others performing an intermediary function in telecommunications.

At this point the prospect of seeking to collect royalties from foreign infringers is not an attractive prospect for SOCAN. The question therefore is whether any or all of the appellants, in the ordinary course of their business, impart or transmit copyrighted music, and thereby do themselves infringe the copyrights represented by the respondent, within the meaning of the Act.

In Canada, copyright is a creature of statute, and the rights and remedies provided by the *Copyright Act* are exhaustive; see *CCH*, *supra*, at para. 9; *Théberge*, *supra*, at para. 5; *Bishop v. Stevens*, [1990] 2 S.C.R. 467, at p. 477; *Compo Co. v. Blue Crest Music Inc.*, [1980] 1 S.C.R. 357, at p. 373.

The respondent must show that the appellants infringed its "sole right", in relation to the musical works at issue, to "communicate to the public by telecommunication".

This will require consideration of two related legal issues:

(i)  Can the appellants claim the protection of the limitation in s. 2.4(1)(*b*)?

(ii) What is the meaning of "authorization" of copyright infringement, in the context of Internet communications?

  (a)  *The Section 2.4(1)(b) Protection*

A telecommunication starts, as the Board found, at p. 450, with the content provider.

The fact that [the communication] is achieved at the request of the recipient or through an agent neither adds to, nor detracts from the fact that the content provider effects the communication.

The 1988 amendments to the *Copyright Act* specify that participants in a telecommunication who only provide "the means of telecommunication

de sorte qu'il y a eu communication à un utilisateur canadien. La question est de savoir si le tarif 22 oblige les appelantes et tout autre intermédiaire du domaine des télécommunications à obtenir une licence.

Pour l'heure, tenter de percevoir des redevances auprès de contrevenants étrangers n'intéresse guère la SOCAN. Il s'agit donc de déterminer si les appelantes, ou l'une d'elles, dans le cadre habituel de leurs activités, font connaître ou transmettent une œuvre musicale protégée par le droit d'auteur et, de ce fait, violent elles-mêmes les droits d'auteur que gère l'intimée, au sens de la Loi. [81]

Au Canada, le droit d'auteur tire son origine de la loi, et les droits et recours que prévoit la *Loi sur le droit d'auteur* sont exhaustifs : voir *CCH*, précité, par. 9; *Théberge*, précité, par. 5; *Bishop c. Stevens*, [1990] 2 R.C.S. 467, p. 477; *Compo Co. c. Blue Crest Music Inc.*, [1980] 1 R.C.S. 357, p. 373. [82]

L'intimée doit démontrer que les appelantes ont violé son « droit exclusif » de « communiquer au public, par télécommunication » les œuvres musicales en cause. [83]

L'examen de deux questions de droit connexes s'impose : [84]

(i)  Les appelantes bénéficient-elles de l'exception prévue à l'al. 2.4(1)*b*)?

(ii) Que faut-il entendre par « autoriser » la violation du droit d'auteur dans le contexte d'une communication Internet?

  a)  *La protection prévue par l'al. 2.4(1)b)*

Comme l'a conclu la Commission (à la p. 37), le fournisseur de contenu est à l'origine de la télécommunication. [85]

Le fait que [la communication] se réalise à la demande du destinataire ou par l'intermédiaire d'un tiers ne change rien au fait que le fournisseur de contenu est l'auteur de la communication.

Suivant les modifications apportées en 1988 à la *Loi sur le droit d'auteur*, le participant à une télécommunication qui ne fait que fournir « les moyens [86]

necessary" are deemed <u>not</u> to be communicators. The section as presently worded provides as follows:

**2.4** (1) For the purposes of communication to the public by telecommunication,

.   .   .

(*b*) a person whose <u>only act</u> in respect of the communication of a work or other subject-matter to the public consists of <u>providing the means of telecommunication necessary</u> for another person to so communicate the work or other subject-matter <u>does not communicate</u> that work or other subject-matter to the public; [Emphasis added.]

87    Parliament did not say that the intermediaries are engaged in communication of copyright content *but* enjoy an immunity. Instead, s. 2.4(1)(*b*) says that such intermediaries are deemed, for purposes of the *Copyright Act*, not to <u>communicate</u> the work to the public at all. Whether or not intermediaries are parties to the communication for legal purposes other than copyright is an issue that will have to be decided when it arises.

88    The respondent contends that s. 2.4(1)(*b*) is an exemption from liability and should be read narrowly; but this is incorrect. Under the *Copyright Act*, the rights of the copyright owner and the limitations on those rights should be read together to give "the fair and balanced reading that befits remedial legislation" (*CCH, supra,* at para. 48).

89    Section 2.4(1)(*b*) is not a loophole but an important element of the balance struck by the statutory copyright scheme. It finds its roots, perhaps, in the defence of innocent dissemination sometimes available to bookstores, libraries, news vendors, and the like who, generally speaking, have no actual knowledge of an alleged libel, are aware of no circumstances to put them on notice to suspect a libel, and committed no negligence in failing to find out about the libel; see *Menear v. Miguna* (1996), 30 O.R. (3d) 602 (Gen. Div.), rev'd on other grounds (1997), 33 O.R. (3d) 223 (C.A.); *Newton v. City of Vancouver*

de télécommunication nécessaires » <u>n'est pas</u> réputé en être l'auteur. Voici le libellé actuel de l'al. 2.4(1)*b*) :

**2.4** (1) Les règles qui suivent s'appliquent dans les cas de communication au public par télécommunication :

.   .   .

*b*) <u>n'effectue pas une communication</u> au public la personne <u>qui ne fait que fournir</u> à un tiers <u>les moyens de télécommunication nécessaires</u> pour que celui-ci l'effectue; [Je souligne.]

La Loi ne dit pas de l'intermédiaire qu'il est partie à la communication d'un contenu protégé par le droit d'auteur, *mais* qu'il jouit d'une immunité. L'alinéa 2.4(1)*b*) prévoit plutôt que, pour l'application de la *Loi sur le droit d'auteur*, il est réputé ne pas <u>communiquer</u> l'œuvre au public. La question de savoir si l'intermédiaire participe à la communication pour l'application d'autres dispositions que celles de la *Loi sur le droit d'auteur* n'a pas à être tranchée dans le présent pourvoi.

L'intimée prétend à tort que l'al. 2.4(1)*b*) constitue une exception à la violation du droit d'auteur et doit être interprété restrictivement. Dans la *Loi sur le droit d'auteur*, les droits du titulaire du droit d'auteur et les restrictions y afférentes doivent être considérés de pair et recevoir « l'interprétation juste et équilibrée que commande une mesure législative visant à remédier à un état de fait » (*CCH*, précité, par. 48).

L'alinéa 2.4(1)*b*) n'est pas une échappatoire, mais un élément important de l'équilibre établi par le régime législatif en cause. Il tire peut-être son origine du moyen de défense fondé sur la diffusion de bonne foi dont peuvent parfois se prévaloir librairies, bibliothèques, marchands de journaux et commerçants apparentés qui, de façon générale, n'ont aucune connaissance de la diffamation alléguée, n'ont aucune raison de supposer son existence et n'ont pas fait preuve de négligence en ne la découvrant pas; voir *Menear c. Miguna* (1996), 30 O.R. (3d) 602 (Div. gén.), inf. pour d'autres motifs par

(1932), 46 B.C.R. 67 (S.C.); *Sun Life Assurance Co. of Canada v. W. H. Smith & Son, Ltd.*, [1933] All E.R. Rep. 432 (C.A.). See generally R. E. Brown, *The Law of Defamation in Canada* (2nd ed. (loose-leaf)), vol. 1, at § 7.12(6).

The 1988 amendments, including the predecessor to s. 2.4(1)(*b*), followed on the recommendation of an all party Sub-Committee on the Revision of Copyright of the House of Commons Standing Committee on Communications and Culture. Its report, entitled *A Charter of Rights for Creators* (1985), identified the need for a broader definition of telecommunication, one that was not dependent on the form of technology, which would provide copyright protection for retransmissions. This led to the adoption of the broad definition of communication in s. 3(1)(*f*). In conjunction with this, the Committee recommended, at p. 80, that those who participate in the retransmission "solely to serve as an intermediary between the signal source and a retransmitter whose services are offered to the general public" should not be unfairly caught by the expanded definition. The ostensible objective, according to the Committee, was to avoid the unnecessary layering of copyright liability that would result from targeting the "wholesale stage" (p. 80).

The words of s. 2.4(1)(*b*) must be read in their ordinary and grammatical sense in the proper context. "Necessary" is a word whose meaning varies somewhat with the context. The word, according to *Black's Law Dictionary*,

may mean something which in the accomplishment of a given object cannot be dispensed with, or it may mean something reasonably useful and proper, and of greater or lesser benefit or convenience, and its force and meaning must be determined with relation to the particular object sought. [Emphasis added.]

(*Black's Law Dictionary* (6th ed. 1990), at p. 1029)

In context, the word "necessary" in s. 2.4(1)(*b*) is satisfied if the means are reasonably useful and

(1997), 33 O.R. (3d) 223 (C.A.); *Newton c. City of Vancouver* (1932), 46 B.C.R. 67 (C.S.); *Sun Life Assurance Co. of Canada c. W. H. Smith & Son, Ltd.*, [1933] All E.R. Rep. 432 (C.A.). Voir, de façon générale, R. E. Brown, *The Law of Defamation in Canada* (2ᵉ éd. (feuilles mobiles)), vol. 1, par. 7.12(6).

90  La réforme de 1988, y compris l'adoption de la disposition antérieure à l'al. 2.4(1)(*b*), faisait suite à la recommandation d'un sous-comité multipartite sur la révision du droit d'auteur du Comité permanent des communications et de la culture de la Chambre des communes. Dans son rapport intitulé *Une charte des droits des créateurs et créatrices* (1985), le sous-comité invoque la nécessité d'une définition plus large du mot télécommunication, une définition qui ne serait pas liée au type de technologie en cause et qui assujettirait les retransmissions aux dispositions sur le droit d'auteur. D'où l'adoption d'une définition large de la communication à l'al. 3(1)(*f*). Parallèlement, le sous-comité a recommandé (à la p. 88) que celui qui participe à une retransmission « qui n'est destinée qu'à relayer le signal entre la source d'émission et un retransmetteur dont les services sont offerts au grand public » ne soit pas injustement visé par la définition élargie. L'objectif manifeste, selon le sous-comité, était d'éviter la superposition inutile d'obligations relatives au droit d'auteur qui se produirait si l'on ciblait la retransmission « en gros » (p. 88).

91  Il faut interpréter les termes employés à l'al. 2.4(1)*b*) dans leur sens ordinaire et grammatical, selon le contexte. La signification du mot « nécessaire » (« *necessary* », en anglais) varie en quelque sorte en fonction du contexte. Voici la définition qu'en donne le *Black's Law Dictionary* :

[TRADUCTION] [S]e dit de ce dont on ne peut faire l'économie pour accomplir quelque chose, ou de ce qui est raisonnablement utile et approprié et présente un avantage plus ou moins grand, la force et le sens de ce mot devant être déterminés eu égard à la fin recherchée. [Je souligne.]

(*Black's Law Dictionary* (6ᵉ éd. 1990), p. 1029)

Dans le contexte considéré, un moyen est « nécessaire » au sens de l'al. 2.4(1)*b*) s'il est raisonna-

proper to achieve the benefits of enhanced economy and efficiency.

92    Section 2.4(1)(*b*) shields from liability the activities associated with providing the means for another to communicate by telecommunication. "The 'means'", as the Board found, ". . . are not limited to routers and other hardware. They include all software connection equipment, connectivity services, hosting and other facilities and services without which such communications would not occur" (p. 452). I agree. So long as an Internet intermediary does not itself engage in acts that relate to the content of the communication, i.e., whose participation is content neutral, but confines itself to providing "a conduit" for information communicated by others, then it will fall within s. 2.4(1)(*b*). The appellants support this result on a general theory of "Don't shoot the messenger!"

93    In rejecting SOCAN's argument on this point, the Board concluded (at p. 453):

In the end, each transmission must be looked at individually to determine whether in that case, an intermediary merely acts as a conduit for communications by other persons, or whether it is acting as something more. Generally speaking, however, it is safe to conclude that with respect to most transmissions, only the person who posts a musical work communicates it. [Emphasis added.]

94    The Board also found, after its analysis of the activities of the various participants in an Internet transmission, that the person who "make[s] the work available for communication" is not the host server provider but the content provider (at p. 450):

Any communication of a work occurs because a person has taken all the required steps to make the work available for communication. The fact that this is achieved at the request of the recipient or through an agent neither adds to, nor detracts from the fact that the content provider effects the communication. [Emphasis added.]

95    This conclusion, as I understand it, is based on the findings of fact by the Board of what an Internet

blement utile et approprié pour l'obtention des avantages que sont une économie et une efficacité accrues.

L'alinéa 2.4(1)*b*) soustrait à l'application des dispositions sur le droit d'auteur les activités liées à la fourniture à un tiers de moyens de télécommunication lui permettant d'effectuer une communication. Comme l'a conclu la Commission, « [l]es "moyens" [. . .] ne se limitent pas aux routeurs et autre matériel. Ils englobent tous les logiciels de connexion, les services assurant la connectivité, les installations et services offrant l'hébergement sans lesquels la communication n'aurait pas lieu » (p. 39). Je suis d'accord. L'intermédiaire Internet qui ne se livre pas à une activité touchant au contenu de la communication, dont la participation n'a aucune incidence sur celui-ci et qui se contente d'être « un agent » permettant à autrui de communiquer bénéficie de l'application de l'al. 2.4(1)*b*). C'est pourquoi les appelantes exhortent notre Cour à ne pas tirer sur de simples messagers.

En rejetant l'argument de la SOCAN sur ce point, la Commission a conclu (p. 40) :

Au bout du compte, il faut prendre chaque transmission isolément afin de décider si, en l'occurrence, un intermédiaire donné est un simple agent permettant à autrui de communiquer ou s'il agit à un autre titre. D'une façon générale, cependant, on peut dire à coup sûr, en ce qui a trait à la plupart des transmissions, que seule la personne qui rend disponible une œuvre musicale communique celle-ci. [Je souligne.]

Après avoir analysé les activités des différents participants à une transmission Internet, la Commission a conclu que la personne qui « [rend l'œuvre] disponible pour communication » n'est pas le fournisseur du serveur hôte, mais le fournisseur de contenu (p. 37) :

Toute communication d'une œuvre a lieu parce qu'une personne a accompli toutes les démarches nécessaires pour la rendre disponible pour communication. Le fait que cela se réalise à la demande du destinataire ou par l'intermédiaire d'un tiers ne change rien au fait que le fournisseur de contenu est l'auteur de la communication. [Je souligne.]

Selon moi, la Commission s'est appuyée à cet égard sur ses conclusions de fait concernant

intermediary, including a host server provider, actually does. To the extent they act as innocent disseminators, they are protected by s. 2.4(1)(*b*) of the Act. As the Board put it, at p. 452:

As long as its role in respect of any given transmission is limited to providing the means necessary to allow data initiated by other persons to be transmitted over the Internet, and as long as the ancillary services it provides fall short of involving the act of communicating the work or authorizing its communication, it should be allowed to claim the exemption.

I agree with this approach. Having properly instructed itself on the law, the Board found as a fact that the "conduit" begins with the host server. No reason has been shown in this application for judicial review to set aside that conclusion.

A comparable approach to technology infrastructure was taken by this Court in a contract dispute involving telephone companies back in 1891:

The owners of the telephone wires, who are utterly ignorant of the nature of the message intended to be sent, cannot be said within the meaning of the covenant to transmit a message of the purport of which they are ignorant.

(*Electric Despatch Co. of Toronto v. Bell Telephone Co. of Canada* (1891), 20 S.C.R. 83, at p. 91, *per* Gwynne J.)

Interpretation of s. 2.4(1)(*b*) in this way is consistent with art. 8 of the WIPO *Copyright Treaty*. In the accompanying Agreed Statements, the treaty authority states:

It is understood that the mere provision of physical facilities for enabling or making a communication does not in itself amount to communication within the meaning of this Treaty or the Berne Convention.

Similarly, the European *E-Commerce Directive* provides, in clause 42 of its Preamble, that Internet intermediaries are not liable where their actions are confined to

the technical process of operating and giving access to a communication network over which information made

l'activité réelle d'un intermédiaire Internet, y compris le fournisseur du serveur hôte. S'il y a diffusion de bonne foi, l'al. 2.4(1)(*b*) s'applique. Comme l'a dit la Commission (p. 39) :

Tant que son rôle relativement à une transmission donnée est limité à la fourniture des moyens nécessaires à la transmission de données provenant d'autrui et destinées à être transmises sur l'Internet, et tant que les services accessoires qu'il fournit ne vont pas jusqu'à la participation à la communication de l'œuvre ou à l'autorisation de sa communication, il convient de lui accorder le bénéfice de l'exemption.

Je partage ce point de vue. Après avoir dûment tenu compte du droit applicable, la Commission a tiré la conclusion de fait que la fonction d'« agent » commence au serveur hôte. Aucune raison invoquée à l'appui de la demande de contrôle judiciaire ne justifie le rejet de cette conclusion.

En 1891, appelée à statuer sur un litige contractuel opposant des compagnies de téléphone, notre Cour a adopté un point de vue comparable relativement à une infrastructure technologique : **96**

[TRADUCTION] On ne peut dire des propriétaires des fils téléphoniques, qui ignorent tout de la nature du message devant être transmis, qu'ils transmettent, au sens de la convention, un message dont ils ignorent la teneur.

(*Electric Despatch Co. of Toronto c. Bell Telephone Co. of Canada* (1891), 20 R.C.S. 83, p. 91, le juge Gwynne)

Pareille interprétation de l'al. 2.4(1)*b*) respecte l'art. 8 du *Traité sur le droit d'auteur* de l'OMPI. Les déclarations communes adoptées relativement à cet article précisent : **97**

Il est entendu que la simple fourniture d'installations destinées à permettre ou à réaliser une communication ne constitue pas une communication au public au sens du présent traité ou de la Convention de Berne.

De même, la *Directive sur le commerce électronique* européenne prévoit (au par. 42 de son préambule) que l'intermédiaire Internet ne peut être tenu responsable lorsque son activité est limitée **98**

au processus technique d'exploitation et de fourniture d'un accès à un réseau de communication sur lequel les

available by third parties is transmitted or temporarily stored, for the sole purpose of making the transmission more efficient; this activity is of a mere technical, automatic and passive nature, which implies that the [Internet intermediary] has neither knowledge of nor control over the information which is transmitted or stored.

99    While lack of knowledge of the infringing nature of a work is not a defence to copyright actions generally (J. S. McKeown, *Fox on Canadian Law of Copyright and Industrial Designs* (4th ed. (looseleaf)), at pp. 21-4 and 21-5), nevertheless the presence of such knowledge would be a factor in the evaluation of the "conduit" status of an Internet Service Provider, as discussed below.

100    The Internet Service Provider, acting as an intermediary, does not charge a particular fee to its clients for music downloading (although clearly the availability of "free music" is a significant business incentive).

101    I conclude that the *Copyright Act*, as a matter of legislative policy established by Parliament, does not impose liability for infringement on intermediaries who supply software and hardware to facilitate use of the Internet. The attributes of such a "conduit", as found by the Board, include a lack of actual knowledge of the infringing contents, and the impracticality (both technical and economic) of monitoring the vast amount of material moving through the Internet, which is prodigious. We are told that a large on-line service provider like America Online delivers in the order of 11 million transmissions a day.

102    Of course an Internet Service Provider in Canada can play a number of roles. In addition to its function as an intermediary, it may as well act as a content provider, or create embedded links which automatically precipitate a telecommunication of copyrighted music from another source. In such cases, copyright liability may attach to the added functions. The protection provided by s. 2.4(1)(*b*) relates to a protected function, not to *all* of the activities of a particular Internet Service Provider.

informations fournies par des tiers sont transmises ou stockées temporairement, dans le seul but d'améliorer l'efficacité de la transmission. Cette activité revêt un caractère purement technique, automatique et passif, qui implique que [l'intermédiaire Internet] n'a pas la connaissance ni le contrôle des informations transmises ou stockées.

L'ignorance du caractère attentatoire d'une activité ne peut être opposée en défense à une action pour violation du droit d'auteur (J. S. McKeown, *Fox on Canadian Law of Copyright and Industrial Designs* (4e éd. (feuilles mobiles)), p. 21-4 et 21-5), mais le fait d'être conscient de ce caractère attentatoire peut jouer dans la détermination de la qualité d'« agent » de l'intermédiaire Internet, comme je l'indique ci-après.

Le fournisseur de services Internet, à titre d'intermédiaire, n'exige pas de frais de ses clients pour le téléchargement d'œuvres musicales (même s'il est clair que l'accès à des « fichiers musicaux gratuits » les incite grandement à faire affaire avec lui).

À mon avis, suivant la *Loi sur le droit d'auteur*, qui consacre la politique législative du Parlement, l'intermédiaire qui fournit des logiciels et du matériel pour faciliter le recours à l'Internet ne viole pas le droit d'auteur. Comme l'a conclu la Commission, ce qui caractérise entre autres un tel « agent » c'est l'ignorance du contenu attentatoire et l'impossibilité (tant sur le plan technique que financier) de surveiller la quantité énorme, voire prodigieuse, de fichiers circulant sur l'Internet. Un important fournisseur de services en ligne comme America Online effectue, nous dit-on, quelque onze millions de transmissions par jour.

Certes, un fournisseur de services Internet au Canada peut jouer de nombreux rôles. En plus d'agir comme intermédiaire, il peut aussi être fournisseur de contenu ou créer des liens intégrés qui communiquent automatiquement des œuvres musicales protégées par le droit d'auteur provenant d'autres sources. Dans de tels cas, les fonctions supplémentaires peuvent engager la responsabilité au regard du droit d'auteur. La protection prévue à l'al. 2.4(1)*b*) s'applique à une fonction protégée, et non à *toute* activité d'un fournisseur de services Internet.

On the other hand, as Evans J.A. pointed out, at para. 141, Internet Service Providers who operate a host server would not lose the protection of paragraph 2.4(1)(*b*) by providing their normal facilities and services, such as housing and maintaining the servers, and monitoring "hits" on particular Web pages, because these added services are merely ancillary to the provision of disk space and do not involve any act of communication.

#### (b) *The Liability of the Host Server*

Having held quite specifically that "the content provider effects the communication" (p. 450) and that "only the person who posts a musical work communicates it" (p. 453 (emphasis added)), the Board added the further limitation that to attract copyright liability, "a communication must originate from a server located in Canada" (p. 459).

This added limitation arose from a misreading by the Board of the earlier decision of the Federal Court of Appeal in *Canadian Assn. of Broadcasters v. Society of Composers, Authors and Music Publishers of Canada* (1994), 58 C.P.R. (3d) 190 ("*CAB 1994*"). The Board described what it conceived to be the effect of *CAB 1994* as follows at p. 459:

*CAB 1994* makes it clear that communications occur where the transmission originates. The place of origin of the request, the location of the person posting the content and the location of the original Web site are irrelevant. As a result, the right to authorize must be obtained from the person administering the right in Canada only when the information is posted on a Canadian server, and the right to communicate must be obtained from that same person only when the transmission originates from a server located in Canada. [Emphasis added.]

I agree with Evans J.A. that *CAB 1994* which dealt with the *timing* of a transmission, not its *location*, "does not support the Board's conclusion" (para. 172). The correct view is that a content provider is not immunized from copyright liability by virtue only of the fact it employs a host server outside the country.

Par contre, comme l'a souligné le juge Evans au par. 141 de ses motifs, le fournisseur de services Internet qui exploite un serveur hôte n'est pas privé de la protection de l'al. 2.4(1)*b*) lorsqu'il fournit ses installations et services habituels, tels que l'hébergement et la maintenance des serveurs, et qu'il compte les « visites » d'un site Web, ces services supplémentaires étant simplement accessoires à la fourniture d'espace disque et ne constituant pas une communication.

#### b) *La responsabilité du serveur hôte*

Après avoir expressément conclu que « le fournisseur de contenu est l'auteur de la communication » (p. 37) et que « seule la personne qui rend disponible une œuvre musicale communique celle-ci » (p. 40 (je souligne)), la Commission a ajouté qu'« il faut [que la communication] provienne d'un serveur situé au Canada » pour que s'appliquent les dispositions canadiennes sur le droit d'auteur (p. 48).

Cette restriction supplémentaire découle de l'interprétation erronée d'un arrêt antérieur de la Cour d'appel fédérale : *Assoc. canadienne des radiodiffuseurs c. Société canadienne des auteurs, compositeurs et éditeurs de musique*, [1994] A.C.F. nº 1540 (QL) (« *ACR 1994* »). Voici quel était l'effet, selon la Commission, de cet arrêt (p. 48) :

Il ressort clairement de l'arrêt *ACR 1994* que les communications se produisent au lieu d'où provient la transmission. Le lieu d'origine de la demande, la situation de la personne qui rend disponible le contenu et la situation du site Web initial n'ont aucun rapport. Par conséquent, le droit d'autoriser ne doit être obtenu de la personne qui administre le droit au Canada que lorsque l'information se trouve sur un serveur canadien, et le droit de communiquer ne doit être obtenu de cette même personne que lorsque la transmission provient d'un serveur situé au Canada. [Je souligne.]

Je conviens avec le juge Evans que l'arrêt *ACR 1994*, qui portait non pas sur le *lieu* de la communication, mais sur le *moment* où elle se produit, « n'appuie pas la conclusion de la Commission » (par. 172). Force est de conclure que le fournisseur de contenu n'échappe pas à l'application des dispositions sur le droit d'auteur du seul fait qu'il utilise un serveur hôte situé à l'étranger.

103

104

105

106     Conversely, a host server does not attract liability just because it *is* located in Canada. A simple "host server" test would catch communications that have no connection to Canada other than the location of a piece of physical equipment, serving a neutral role as a technological conduit. Indeed it may be "impossible for the user to predict the location of the [host] server"; see A. P. Reindl, "Choosing Law in Cyberspace: Copyright Conflicts on Global Networks" (1997-1998), 19 *Mich. J. Int'l L.* 799, at p. 820.

107     It is on this aspect of the test that I respectfully disagree with my colleague LeBel J., who accepts the Board's geographic limitation, i.e., that for copyright purposes there is no communication in Canada unless a communication "originates from a host server located in Canada. . . . [This] provides a straightforward and logical rule" (para. 146). My colleague agrees that in the first instance the liability of a host server provider, as with any other Internet Service Provider, should be determined by whether or not the host server provider limits itself to "a conduit" function, as discussed above, and thereby qualifies for protection under s. 2.4(1)(*b*). However, in my colleague's view, even those participants in an Internet telecommunication who step outside the "conduit" role, and who would otherwise be liable for copyright infringement, will be exempt from liability for Canadian copyright unless the host server itself happens to be located here. In my view, with respect, such an added requirement would be unduly formalistic and would tilt the balance unfairly against the copyright owners. If there are to be formalistic rules they should be imposed by Parliament.

108     My colleague LeBel J., at para. 149, also relies on art. 8 of the WIPO *Copyright Treaty*, which gives the copyright owner the exclusive right of "making available to the public . . . their works", but as previously noted, the Board found that in copyright terms it is the content provider, not the host server provider, that makes the work available. Accordingly, as I see it, the issue of the relevance of art. 8 to

À l'inverse, un serveur hôte n'est pas assujetti à ces dispositions seulement parce qu'il *est* situé au Canada. Ne tenir compte que de l'emplacement du « serveur hôte » assujettirait des communications n'ayant aucun lien avec le Canada si ce n'est l'emplacement d'une composante de l'équipement physique servant uniquement de support à la fonction d'agent. Il peut en effet être [TRADUCTION] « impossible, pour l'utilisateur, de prévoir l'emplacement du serveur hôte »; voir A. P. Reindl, « Choosing Law in Cyberspace : Copyright Conflicts on Global Networks » (1997-1998), 19 *Mich. J. Int'l L.* 799, p. 820.

C'est sur ce point que je suis en désaccord avec mon collègue le juge LeBel, qui fait droit à la restriction géographique établie par la Commission, savoir que pour l'application du droit d'auteur, une communication n'a lieu au Canada que lorsqu'elle « provient d'un serveur hôte situé au Canada. [. . .] [Cela] offre [. . .] une règle simple et logique » (par. 146). Mon collègue convient que, de prime abord, la responsabilité du fournisseur du serveur hôte, comme celle de tout autre fournisseur de services Internet, doit être déterminée par le fait qu'il se limite ou non au rôle d'« agent », tel qu'il est mentionné précédemment; dans l'affirmative, il bénéficie de la protection prévue à l'al. 2.4(1)*b*). Or, selon mon collègue, même le participant à une communication Internet qui ne se contente pas de jouer le rôle d'« agent » et qui, autrement, violerait le droit d'auteur au Canada, bénéficiera de l'exception prévue à moins que le serveur hôte ne soit lui-même situé au pays. Avec égards, j'estime qu'il s'agit d'une condition supplémentaire indûment formaliste qui défavoriserait injustement les titulaires de droits d'auteur. Si des règles formalistes doivent s'appliquer, il appartient au Parlement de les établir.

Mon collègue le juge LeBel invoque également au par. 149 de ses motifs l'art. 8 du *Traité sur le droit d'auteur* de l'OMPI, qui reconnaît aux titulaires de droits d'auteur le droit exclusif de « [mettre leurs œuvres] à la disposition du public ». Or, comme je l'ai déjà signalé, la Commission a conclu que, pour les besoins du droit d'auteur, c'est le fournisseur de contenu, et non le fournisseur du serveur hôte, qui

the interpretation of the *Copyright Act* does not arise.

The Board found that a host server provider like AT&T Canada "merely gives the customer [i.e., the content provider] the right to place information on the servers" (p. 441). Typically the host server provider will not monitor what is posted to determine if it complies with copyright laws and other legal restrictions. Given the vast amount of information posted, it is impractical in the present state of the technology to require the host server provider to do so. In any event, it is unrealistic to attribute to a provider an expertise in copyright law sufficient to "lawyer" all of the changing contents of its servers on an ongoing basis in the absence of alleged infringements being brought to their attention.

However, to the extent the host server provider has notice of copyrighted material posted on its server, it may, as the Board found, "respond to the complaint in accordance with the [Canadian Association of Internet Providers] Code of Conduct [which] may include requiring the customer to remove the offending material through a 'take down' notice" (p. 441). If the host server provider does not comply with the notice, it may be held to have *authorized* communication of the copyright material, as hereinafter discussed.

Shorn of its misreading of the *CAB 1994* case, the Board was correct in its general conclusion on this point, which for ease of reference I set out again (at p. 453):

> In the end, each transmission must be looked at individually to determine whether in that case, an intermediary merely acts as a conduit for communications by other persons, or whether it is acting as something more. Generally speaking, however, it is safe to conclude that with respect to most transmissions, <u>only the person who posts a musical work communicates it</u>. [Emphasis added.]

met l'œuvre à la disposition du public. Par conséquent, j'estime que la question de la pertinence de l'art. 8 pour l'interprétation de la *Loi sur le droit d'auteur* ne se pose pas.

La Commission est également arrivée à la conclusion qu'un fournisseur de serveur hôte comme AT&T Canada « donne simplement au client [le fournisseur de contenu] le droit de mettre de l'information sur les serveurs » (p. 24). En général, le fournisseur du serveur hôte ne contrôle pas la légalité du matériel rendu disponible, notamment au regard des dispositions sur le droit d'auteur. Étant donné l'énorme quantité de fichiers accessibles, il est impossible, en l'état actuel de la technologie, d'exiger du fournisseur du serveur hôte qu'il le fasse. De toute manière, on ne saurait prêter à ce fournisseur une connaissance du droit d'auteur suffisante pour assurer en tout temps la légalité du contenu variable de ses serveurs, et ce, en l'absence de toute allégation de violation. [109]

Toutefois, si le fournisseur du serveur hôte est informé de la présence de fichiers protégés par le droit d'auteur, il pourrait, comme l'a conclu la Commission, « donner suite à la plainte, conformément au Code d'éthique de [l'Association canadienne des fournisseurs Internet] [et pourrait notamment] exiger du client, au moyen d'un avis de retrait, qu'il retire les fichiers faisant l'objet de la plainte » (p. 25). S'il ne se conforme pas à l'avis, on pourrait conclure qu'il a *autorisé* la communication des fichiers protégés par le droit d'auteur, ce sur quoi je reviendrai. [110]

Malgré son interprétation erronée de l'arrêt *ACR 1994*, la Commission a tiré une juste conclusion générale sur ce point (à la p. 40), que je reproduis de nouveau pour des raisons de commodité : [111]

> Au bout du compte, il faut prendre chaque transmission isolément afin de décider si, en l'occurrence, un intermédiaire donné est un simple agent permettant à autrui de communiquer ou s'il agit à un autre titre. D'une façon générale, cependant, on peut dire à coup sûr, en ce qui a trait à la plupart des transmissions, que <u>seule la personne qui rend disponible une œuvre musicale communique celle-ci</u>. [Je souligne.]

112    In my view, the Federal Court of Appeal was right to uphold this aspect of the Board's ruling.

### (c)  *The Use of Caches*

113    The majority in the Federal Court of Appeal concluded that the use of *caching* amounts to a function falling outside s. 2.4(1)(*b*). Evans J.A. took the view, at para. 132, that protection is only available "when, without that person's activity, communication in that medium of telecommunication would not be practicable or, in all probability, would not have occurred". This is a high eligibility test which could inhibit development of more efficient means of telecommunication. SOCAN and others representing copyright owners would always be able to argue that whatever the advances in the future, a telecommunication could still be made practicable using the old technology, and that one way or the other the telecommunication would "in all probability" have occurred. In my view, with respect, Evans J.A. has placed the bar too high.

114    Parliament has decided that there is a public interest in encouraging intermediaries who make telecommunications possible to expand and improve their operations without the threat of copyright infringement. To impose copyright liability on intermediaries would obviously chill that expansion and development, as the history of caching demonstrates. In the early years of the Internet, as the Board found, its usefulness for the transmission of musical works was limited by "the relatively high bandwidth required to transmit audio files" (p. 426). This technical limitation was addressed in part by using "caches". As the Board noted, at p. 433: "Caching reduces the cost for the delivery of data by allowing the use of lower bandwidth than would otherwise be necessary." The velocity of new technical developments in the computer industry, and the rapidly declining cost to the consumer, is legendary. Professor Takach has unearthed the startling statistic that if the automobile industry was able to achieve the same performance-price improvements as has the computer chip industry, a car today would cost

À mon avis, la Cour d'appel fédérale a eu raison de confirmer ce volet de la décision de la Commission.

### c)  *La mise en antémémoire*

La Cour d'appel fédérale a conclu à la majorité que l'al. 2.4(1)*b*) ne s'applique pas à la *mise en antémémoire*. Le juge Evans a estimé (au par. 132) qu'il n'est possible de se prévaloir de la protection que « lorsque, sans [l']intervention [de la personne], la communication par ce moyen de télécommunication ne serait pas réalisable ou, selon toute vraisemblance, n'aurait pas eu lieu ». Il s'agit d'un critère d'applicabilité très strict qui pourrait freiner le développement de moyens de télécommunication plus efficaces. La SOCAN et d'autres représentants des titulaires de droits d'auteur pourraient toujours soutenir, peu importe les avancées techniques ultérieures, qu'une télécommunication aurait quand même pu être réalisée à l'aide de l'ancienne technologie et que, d'une façon ou d'une autre, la télécommunication aurait « selon toute vraisemblance » eu lieu. Avec égards, je crois que le juge Evans a placé la barre trop haute.

Le législateur a décidé qu'il est dans l'intérêt du public d'encourager les intermédiaires, qui rendent les télécommunications possibles, à étendre et à développer leurs activités sans s'exposer au risque de violer le droit d'auteur. Imputer aux intermédiaires une responsabilité en la matière freinerait manifestement cette croissance et ce développement, lesquels ont permis la création de l'antémémoire. La Commission a signalé que, au début, le recours à l'Internet pour la transmission d'œuvres musicales était limité par « la nécessité d'avoir une largeur de bande relativement grande pour transmettre des fichiers audio » (p. 4). Cet obstacle technique a pu être contourné grâce notamment aux « antémémoires ». La Commission a dit (à la p. 14) que « [l]a mise en antémémoire réduit le coût de livraison des données en permettant l'emploi d'une largeur de bande plus petite. » Les progrès techniques fulgurants dans le domaine de l'informatique et la chute rapide du coût supporté par le consommateur tiennent de la légende. Le professeur Takach a révélé une donnée renversante : si l'industrie automobile avait pu

under five dollars and would get 250,000 miles to the gallon of gasoline: see Takach, *supra*, at p. 21. Section 2.4(1)(*b*) reflects Parliament's priority that this entrepreneurial push is to continue despite any incidental effects on copyright owners.

In the Board's view, the means "necessary" under s. 2.4(1)(*b*) were means that were content neutral and were necessary to maximize the economy and cost-effectiveness of the Internet "conduit". That interpretation, it seems to me, best promotes "the public interest in the encouragement and dissemination of works of the arts and intellect" (*Théberge, supra*, at para. 30) without depriving copyright owners of their legitimate entitlement. The creation of a "cache" copy, after all, is a serendipitous consequence of improvements in Internet technology, is content neutral, and in light of s. 2.4(1)(*b*) of the Act ought not to have any *legal* bearing on the communication between the content provider and the end user.

As noted earlier, SOCAN successfully relied on the "exigencies of the Internet" to defeat the appellants' argument that they did not communicate a "musical work" but simply packets of data that may or may not arrive in the correct sequence. It is somewhat inconsistent, it seems to me, for SOCAN then to deny the appellants the benefit of a similar "exigencies" argument. "Caching" is dictated by the need to deliver faster and more economic service, and should not, when undertaken only for such technical reasons, attract copyright liability.

A comparable result has been reached under the U.S. *Digital Millennium Copyright Act*, which in part codified the result in *Religious Technology Center v. Netcom On-line Communication Services, Inc.*, 907 F.Supp. 1361 (N.D. Cal. 1995), where it was observed, at pp. 1369-70:

obtenir le même rapport rendement-prix que le secteur des microprocesseurs, une automobile coûterait aujourd'hui moins de cinq dollars et pourrait parcourir 250 000 milles avec un seul gallon d'essence; voir Takach, *op. cit.*, p. 21. L'alinéa 2.4(1)*b*) traduit la volonté du législateur que se poursuive cet essor animé par l'esprit d'entreprise malgré ses effets accessoires sur les titulaires de droits d'auteur.

De l'avis de la Commission, les moyens « nécessaires » au sens de l'al. 2.4(1)*b*) sont ceux qui n'ont aucune incidence sur le contenu et qui s'imposent pour maximiser les économies et la rentabilité de l'« agent » Internet. Cette interprétation me paraît assurer le mieux « la promotion, dans l'intérêt du public, de la création et de la diffusion des œuvres artistiques et intellectuelles » (*Théberge*, précité, par. 30) sans dépouiller le titulaire du droit d'auteur de ses droits légitimes. L'« antémémoire » est en somme une belle invention issue du progrès de la technologie Internet, elle n'a aucune incidence sur le contenu et, au vu de l'al. 2.4(1)*b*) de la Loi, elle ne devrait avoir aucun effet *juridique* sur la communication intervenant entre le fournisseur de contenu et l'utilisateur final.

Comme je l'ai déjà mentionné, les « exigences de l'Internet » ont permis à la SOCAN de repousser l'argument des appelantes selon lequel elles ne communiquaient pas une « œuvre musicale », mais simplement des paquets de données qui peuvent arriver ou non dans le bon ordre. Il me semble contradictoire que la SOCAN nie maintenant aux appelantes le droit d'invoquer elles aussi ces « exigences ». La « mise en antémémoire » est dictée par la nécessité d'offrir un service plus rapide et plus économique et ne devrait pas emporter la violation du droit d'auteur lorsqu'elle a lieu uniquement pour de telles raisons techniques.

Aux États-Unis, une décision a été rendue en ce sens sur le fondement de la *Digital Millennium Copyright Act*, qui a codifié en partie la décision *Religious Technology Center c. Netcom On-line Communication Services, Inc.*, 907 F.Supp. 1361 (N.D. Cal. 1995), où la cour a dit aux p. 1369-1370 :

115

116

117

These parties, who are liable under plaintiffs' theory, do no more than operate or implement a system that is essential if Usenet messages are to be widely distributed. There is no need to construe the Act to make all of these parties infringers. Although copyright is a strict liability statute, there should still be some element of volition or causation which is lacking where a defendant's system is merely used to create a copy by a third party.

See also M. B. Nimmer, *Nimmer on Copyright* (loose-leaf ed.), vol. 3, at p. 12B-13.

118    The European *E-Commerce Directive* mandates member States to exempt Internet Service Providers from copyright liability for caching (art. 13(1)).

119    In my opinion, the Copyright Board's view that caching comes within the shelter of s. 2.4(1) is correct, and I would restore the Board's conclusion in that regard.

(d) *"Authorizing" Infringement*

120    Authorizing a communication by telecommunication is a discrete infringement of s. 3(1); see *Compo, supra*, at pp. 373 and 376.

121    The respondent argues that even if the appellants did not themselves infringe the copyright, they were guilty of "authorizing" content providers to do so because Internet intermediaries *know* that material (including copyright material) placed on their facilities by content providers will be accessed by end users. Indeed as Evans J.A. pointed out, at para. 120: "Knowledge of the content available on the Internet, including 'free' music, and of end users' interest in accessing it, are powerful inducements for end users to sign up with access providers, and content providers with operators of host servers."

122    Of course there is a good deal of material on the Internet that is not subject to copyright, just as there was a good deal of law-related material in the Great

[TRADUCTION] Les personnes qui, selon la partie demanderesse, violeraient le droit d'auteur ne font rien d'autre qu'exploiter ou faire fonctionner un système essentiel à la large diffusion des messages Usenet. Point n'est besoin d'interpréter la Loi de manière à faire de toutes ces personnes des contrefacteurs. Même si la loi sur le droit d'auteur établit un régime de responsabilité stricte, il doit néanmoins y avoir un acte volontaire ou un lien de causalité, ce qui n'est pas le cas lorsque le système en cause permet uniquement à un tiers de faire une copie.

Voir aussi M. B. Nimmer, *Nimmer on Copyright* (feuilles mobiles), vol. 3, p. 12B-13.

La *Directive sur le commerce électronique* européenne dispose que les États membres veillent à ce que les fournisseurs de services Internet n'engagent pas leur responsabilité pour la mise en antémémoire (art. 13, par. 1).

À mon avis, la Commission du droit d'auteur a eu raison de conclure que la mise en antémémoire bénéficie de la protection prévue au par. 2.4(1), et je suis d'avis de rétablir sa décision à cet égard.

d) « *Autoriser* » la violation du droit d'auteur

Autoriser une communication par télécommunication constitue une violation distincte du par. 3(1); voir *Compo*, précité, p. 373 et 376.

L'intimée prétend que, même si les appelantes n'ont pas violé elles-mêmes le droit d'auteur, elles ont « autorisé » les fournisseurs de contenu à le faire parce que les intermédiaires Internet *savent* que les utilisateurs finaux consulteront les fichiers (y compris ceux protégés par le droit d'auteur) des fournisseurs de contenu. Le juge Evans a effectivement souligné (au par. 120) que « [l]e fait de connaître le contenu de l'information diffusée sur Internet, et notamment des œuvres musicales "gratuites" et d'être au courant de l'intérêt des utilisateurs finaux à y accéder constituent des éléments qui sont susceptibles d'inciter fortement les utilisateurs finaux à s'abonner auprès des fournisseurs d'accès et d'encourager les fournisseurs de contenus à s'abonner auprès des exploitants de serveurs hôtes. »

Évidemment, de nombreux fichiers Internet ne sont pas protégés par le droit d'auteur tout comme, dans l'affaire récente *CCH*, de nombreux docu-

Library at Osgoode Hall that was not copyrighted in the recent *CCH* appeal. In that case, as here, the copyright owners asserted that making available a photocopier and photocopying service by the Law Society of Upper Canada implicitly "authorized" copyright infringement. This Court, however, held that authorizing infringement under the *Copyright Act* is not so easily demonstrated, at para. 38, *per* McLachlin C.J.:

. . . a person does not authorize infringement by authorizing the mere use of equipment that could be used to infringe copyright. Courts should presume that a person who authorizes an activity does so only so far as it is in accordance with the law. . . . This presumption may be rebutted if it is shown that a certain relationship or degree of control existed between the alleged authorizer and the persons who committed the copyright infringement. . . . [Emphasis added.]

See also *Vigneux v. Canadian Performing Right Society, Ltd.*, [1945] A.C. 108 (P.C.); *Muzak Corp. v. Composers, Authors and Publishers Association of Canada, Ltd.*, [1953] 2 S.C.R. 182. SOCAN contends that the host server in essence acts as a commercial partner with the content provider when material is made available on the Internet, but there was no such finding of fact by the Board, and I do not think the rights and obligations of partnership can be so casually imposed.

The operation of the Internet is obviously a good deal more complicated than the operation of a photocopier, but it is true here, as it was in the *CCH* case, that when massive amounts of non-copyrighted material are accessible to the end user, it is not possible to impute to the Internet Service Provider, based solely on the provision of Internet facilities, an authority to download copyrighted material as opposed to non-copyrighted material.

On this point the Board concluded as follows (at p. 458):

Even knowledge by an ISP that its facilities may be employed for infringing purposes does not make the ISP liable for authorizing the infringement if it does not purport to grant to the person committing the infringement a

ments juridiques ne l'étaient pas non plus à la Grande bibliothèque d'Osgoode Hall. Dans cette affaire, les titulaires de droits d'auteur soutenaient que, en mettant un photocopieur à la disposition des usagers et en leur offrant un service de photocopie, le Barreau du Haut-Canada « autorisait » tacitement la violation du droit d'auteur. Notre Cour a toutefois statué qu'il n'est pas facile d'établir l'acte d'« autoriser » au sens de la *Loi sur le droit d'auteur* (la Juge en chef, par. 38) :

. . . ce n'est pas autoriser la violation du droit d'auteur que de permettre la simple utilisation d'un appareil susceptible d'être utilisé à cette fin. Les tribunaux doivent présumer que celui qui autorise une activité ne l'autorise que dans les limites de la légalité [. . .] Cette présomption peut être réfutée par la preuve qu'il existait une certaine relation ou un certain degré de contrôle entre l'auteur allégué de l'autorisation et les personnes qui ont violé le droit d'auteur . . . [Je souligne.]

Voir également : *Vigneux c. Canadian Performing Rights Society, Ltd.*, [1945] A.C. 108 (C.P.); *Muzak Corp. c. Composers, Authors and Publishers Association of Canada, Ltd.*, [1953] 2 R.C.S. 182. La SOCAN prétend que le serveur hôte est essentiellement un associé commercial du fournisseur de contenu lorsque les fichiers sont rendus disponibles sur l'Internet, mais la Commission n'a tiré aucune conclusion de fait en ce sens, et je ne crois pas que l'existence de droits et d'obligations découlant d'une association puisse être établie ainsi sans plus.

Le fonctionnement de l'Internet est évidemment beaucoup plus compliqué que celui d'un photocopieur, mais il est vrai en l'espèce, comme dans l'affaire *CCH*, que lorsque l'utilisateur final a accès à une quantité phénoménale de données non protégées par le droit d'auteur, on ne peut dire du fournisseur de services Internet, du simple fait qu'il fournit l'accès à l'Internet, qu'il autorise le téléchargement de fichiers protégés par le droit d'auteur par opposition à des fichiers non protégés.

123

La Commission a conclu à ce sujet (p. 47) :

124

Même le fait qu'un ISP sache que ses installations peuvent servir à des fins illicites ne peut rendre ce fournisseur responsable d'avoir autorisé la violation s'il ne prétend pas accorder à l'auteur de l'atteinte une licence ou une

license or permission to infringe. An intermediary would have to sanction, approve or countenance more than the mere use of equipment that may be used for infringement. Moreover, an ISP is entitled to presume that its facilities will be used in accordance with law.

This conclusion is generally consistent with the decision of this Court in the *CCH* case, although I would point out that copyright liability may well attach if the activities of the Internet Service Provider cease to be content neutral, e.g. if it has notice that a content provider has posted infringing material on its system and fails to take remedial action.

125    Under the European *E-Commerce Directive*, access to cached information must be expeditiously curtailed when the Internet Service Provider becomes aware of infringing content. At that time, the information must be removed or access disabled at the original site (art. 13(1)(e)). Under the U.S. *Digital Millennium Copyright Act*, those who cache information are not liable where they act expeditiously to remove or disable access to material once notice is received that it infringes copyright (s. 512(b)(2)(E)). If the content provider disputes that the work is covered by copyright, the U.S. Act lays out a procedure for the resolution of that issue.

126    In the present appeal, the Federal Court of Appeal stated that, in the case of host servers, "an implicit authorization to communicate infringing material might be inferred from their failure to remove it after they have been advised of its presence on the server and had a reasonable opportunity to take it down" (para. 160). Reference was made to *Apple Computer Inc. v. Mackintosh Computers Ltd.*, [1987] 1 F.C. 173, aff'd [1990] 2 S.C.R. 209, at pp. 211 and 208, citing *C.B.S. Inc. v. Ames Records & Tapes Ltd.*, [1982] 1 Ch. 91, at p. 110, i.e., an Internet Service Provider may attract liability for authorization because ". . . indifference, exhibited by acts of commission or omission, may reach a degree from which authorisation or permission may be inferred. It is a question of

permission d'agir illégalement. Il faudrait qu'un intermédiaire sanctionne, appuie et soutienne plus que la seule utilisation de matériel qui peut servir à porter atteinte au droit d'auteur. De plus, l'ISP a le droit de présumer que ses installations seront utilisées conformément à la loi.

Cette conclusion est généralement compatible avec l'arrêt *CCH* de notre Cour. Je ferais cependant remarquer que le fournisseur de services Internet pourrait violer le droit d'auteur si ses activités avaient une incidence sur le contenu, c'est-à-dire s'il savait qu'un fournisseur de contenu rend du matériel illicite disponible grâce à son système et ne prenait pas de mesures pour y remédier.

Suivant la *Directive sur le commerce électronique* européenne, le fournisseur de services Internet doit promptement bloquer l'accès à l'information mise en antémémoire lorsqu'il est informé de son caractère illicite. Il doit alors retirer l'information ou en rendre l'accès impossible sur le site initial (art. 13, par. 1, point e)). Aux États-Unis, la *Digital Millennium Copyright Act* prévoit que celui qui met de l'information en antémémoire ne peut être tenu responsable lorsqu'il agit promptement pour retirer cette information ou en rendre l'accès impossible après avoir été avisé de son caractère illicite (div. 512(b)(2)(E)). La loi américaine établit la procédure à suivre lorsque le fournisseur de contenu nie que l'œuvre soit protégée par le droit d'auteur.

Dans la présente affaire, la Cour d'appel fédérale a statué que, en ce qui concerne les serveurs hôtes, « on pourrait conclure qu'ils accordent l'autorisation implicite de communiquer des données [illicites] s'ils omettent de les supprimer après avoir été avisés de leur présence sur le serveur et après avoir eu une possibilité suffisante de les retirer » (par. 160). Elle a invoqué *Apple Computer Inc. c. Mackintosh Computers Ltd.*, [1987] 1 C.F. 173, conf. par [1990] 2 R.C.S. 209, p. 211 et 208, citant *C.B.S. Inc. c. Ames Records & Tapes Ltd.*, [1982] 1 Ch. 91, p. 110 : un fournisseur de services Internet pourrait être considéré comme ayant autorisé la violation du droit d'auteur parce que [TRADUCTION] « . . . l'indifférence démontrée par des actes, de la nature d'une exécution ou d'une omission, peut être telle qu'on

fact in each case . . . ." See also *Godfrey v. Demon Internet Ltd.*, [1999] 4 All E.R. 342 (Q.B.).

The knowledge that someone *might* be using neutral technology to violate copyright (as with the photocopier in the *CCH* case) is not necessarily sufficient to constitute authorization, which requires a demonstration that the defendant did "(g)ive approval to; sanction, permit; favour, encourage" (*CCH*, at para. 38) the infringing conduct. I agree that notice of infringing content, and a failure to respond by "taking it down" may in some circumstances lead to a finding of "authorization". However, that is not the issue before us. Much would depend on the specific circumstances. An overly quick inference of "authorization" would put the Internet Service Provider in the difficult position of judging whether the copyright objection is well founded, and to choose between contesting a copyright action or potentially breaching its contract with the content provider. A more effective remedy to address this potential issue would be the enactment by Parliament of a statutory "notice and take down" procedure as has been done in the European Community and the United States.

In sum, I agree with the Court of Appeal that "authorization" could be inferred in a proper case but all would depend on the facts.

D.  *Achieving a Balance Fair to Copyright Owners*

There is no doubt that the exponential growth of the Internet has created serious obstacles to the collection of copyright royalties. As Pietsch, *supra*, writes, at p. 278:

The Internet makes it possible for large numbers of people to rapidly copy protected materials worldwide. With software like Gnutella, they can do so without any centralized clearinghouse that intellectual property owners could target in an effort to enforce copyright protection, such as Napster. Such developments have led some to hypothesize that copyright law is dead because

peut l'interpréter comme une autorisation ou une permission. La véritable conclusion à tirer de la conduite d'une personne constitue une question de fait dans chaque cas . . . ». Voir également *Godfrey c. Demon Internet Ltd.*, [1999] 4 All E.R. 342 (Q.B.).

**127** Le fait de savoir que quelqu'un *pourrait* violer le droit d'auteur grâce à une technologie sans incidence sur le contenu (par ex. un photocopieur, comme dans *CCH*) n'équivaut pas nécessairement à autoriser cette violation, car il faut démontrer que l'intéressé a « approuv[é], sanctionn[é], perm[is], favoris[é], encourag[é] » (*CCH*, par. 38) le comportement illicite. Je conviens que l'omission de « retirer » un contenu illicite après avoir été avisé de sa présence peut, dans certains cas, être considérée comme une « autorisation ». Toutefois, ce n'est pas le cas en l'espèce. Tout dépend en grande partie des circonstances. Conclure hâtivement à une « autorisation » placerait le fournisseur de services Internet dans une situation difficile. Il devrait alors déterminer si l'allégation de violation du droit d'auteur est fondée et décider soit de contester l'action pour violation du droit d'auteur, soit de manquer éventuellement à ses obligations contractuelles envers le fournisseur de contenu. La meilleure solution serait que le législateur adopte une procédure « d'avis et de retrait » à l'instar de la Communauté européenne et des États-Unis.

**128** En résumé, je conviens avec la Cour d'appel que l'« autorisation » peut être inférée dans certains cas, mais que tout dépend des faits.

D.  *L'établissement d'un juste équilibre pour les titulaires de droits d'auteur*

**129** Il ne fait aucun doute que la croissance exponentielle de l'Internet a créé de sérieux obstacles à la perception des redevances exigibles au titre du droit d'auteur. Comme l'écrit Pietsch, *loc. cit.*, p. 278 :

[TRADUCTION] Grâce à l'Internet, il est désormais possible à un grand nombre de personnes à travers le monde de copier rapidement des fichiers protégés par le droit d'auteur. Un logiciel comme Gnutella leur permet de le faire sans avoir à passer par un service centralisé que les titulaires de droits d'auteur pourraient cibler pour tenter de faire respecter leurs droits, comme dans le cas de

technology is so far ahead of the law that enforcement is impossible, and should not even be attempted.

See, e.g., *A & M Records, Inc. v. Napster, Inc.*, 114 F.Supp.2d 896 (N.D. Cal. 2000), aff'd in part, 239 F.3d 1004 (9th Cir. 2001).

130      It has been estimated that in 2002 sales of recorded music fell by almost 10 percent due to Internet-based file sharing (see Anonymous, "The music industry: In a spin", *The Economist* (March 2003), at p. 58), but this "estimate" is a matter of ongoing controversy. Some say Napster was a boon to the music recording industry.

131      Nevertheless, by enacting s. 2.4(1)(*b*) of the *Copyright Act*, Parliament made a policy distinction between those who abuse the Internet to obtain "cheap music" and those who are part of the infrastructure of the Internet itself. It is clear that Parliament did not want copyright disputes between creators and users to be visited on the heads of the Internet intermediaries, whose continued expansion and development is considered vital to national economic growth.

132      This appeal is only tangentially related to holding "the balance" between creators and users. Section 2.4(1)(*b*) indicates that in Parliament's view, Internet intermediaries are not "users" at all, at least for purposes of the *Copyright Act*.

## V.  Disposition

133      For the foregoing reasons, I would allow the appeal with costs with respect to copyright liability for caches of data created in a manner that is content neutral for the purpose of economy and efficiency and dismiss the cross-appeal with costs, but otherwise return this case to the Copyright Board to proceed with Phase II of its hearings in accordance with these reasons.

Napster. Les progrès réalisés ont fait dire à certains que c'en est fini du droit d'auteur parce que la technologie est si avancée qu'il est impossible de faire appliquer la loi et qu'on ne devrait même pas tenter de le faire.

Voir par exemple *A & M Records, Inc. c. Napster, Inc.*, 114 F.Supp.2d 896 (N.D. Cal. 2000), conf. en partie par 239 F.3d 1004 (9th Cir. 2001).

On a estimé que, en 2002, les ventes de musique enregistrée avaient chuté de presque 10 pour 100 en raison de l'échange de fichiers sur l'Internet; voir Anonyme, « The music industry : In a spin », *The Economist* (mars 2003), p. 58. Or, cette « évaluation » n'a cessé de susciter la controverse. Certains affirment en effet que Napster a donné un solide coup de pouce à l'industrie de l'enregistrement sonore.

Quoi qu'il en soit, en adoptant l'al. 2.4(1)*b*) de la *Loi sur le droit d'auteur*, le législateur a fait une distinction de principe entre ceux qui abusent de l'Internet pour se procurer de la musique à peu de frais et ceux qui font partie de l'infrastructure Internet comme telle. Il est évident que le législateur n'a pas voulu que les intermédiaires Internet, dont l'expansion et le développement constants sont tenus pour essentiels à la croissance économique nationale, fassent les frais des différends qui opposent les créateurs et les utilisateurs relativement à l'application du droit d'auteur.

Le présent pourvoi ne touche qu'accessoirement à « l'équilibre » entre créateurs et utilisateurs. L'alinéa 2.4(1)*b*) indique que, de l'avis du législateur, les intermédiaires Internet ne sont pas du tout des « utilisateurs », du moins pour l'application de la *Loi sur le droit d'auteur*.

## V.  Dispositif

Pour les motifs qui précèdent, je suis d'avis d'accueillir le pourvoi avec dépens en ce qui concerne la violation du droit d'auteur par la mise en anté-mémoire effectuée par souci d'économie et d'efficacité et n'ayant aucune incidence sur le contenu, de rejeter le pourvoi incident avec dépens, et de renvoyer par ailleurs l'affaire à la Commission du droit d'auteur pour qu'elle procède à la phase II de ses audiences conformément aux présents motifs.

The following are the reasons delivered by

LeBel J. —

## I.    Introduction

Among the difficult issues raised by this appeal is how to determine, under the *Copyright Act*, R.S.C. 1985, c. C-42, whether an Internet communication occurs in Canada. I have read my colleague Binnie J.'s reasons and, although I agree with his judgment in all other respects and with his disposition of the appeal, I respectfully disagree with his analysis of the localization issue. My disagreement is confined to the appropriate test for determining the location of an Internet communication under the *Copyright Act* and does not touch on determining liability. For the reasons that follow, I would affirm the Board's determination that an Internet communication occurs within Canada when it originates from a server located in Canada.

Determining whether an Internet communication occurs within Canada is critical to phase two of the Tariff 22 hearings and to future infringement enforcement proceedings because it will determine who will be liable in Canada to pay musical composers and artists for their copyright in works under the *Copyright Act*. A vast amount of information is distributed by the Internet every day. This includes a high volume of music and other potentially copyrighted works. Internet stakeholders need to know with a degree of certainty whether they will be liable in Canada for a communication of copyrighted works. In my opinion, the test provided by the Board — the location of the host server — is sound from an operational perspective; it provides the requisite predictability and best accords with the meaning and purpose of the Act. By contrast, importing the real and substantial connection test that was developed in a very different context is, in my view, inappropriate to determine whether a communication occurred within Canada.

Version française des motifs rendus par

Le juge LeBel —

## I.    Introduction

L'une des questions épineuses que soulève le **134** présent pourvoi est de savoir comment il convient de déterminer, en application de la *Loi sur le droit d'auteur*, L.R.C. 1985, ch. C-42, si une communication Internet a lieu au Canada. J'ai lu les motifs de mon collègue le juge Binnie. Bien que je souscrive à ses motifs à tous autres égards, ainsi qu'au dispositif qu'il propose, en toute déférence, je ne suis pas d'accord avec son analyse relative à la localisation d'une communication Internet au regard de la Loi. Mon désaccord porte sur le critère qu'il convient d'appliquer à cet égard, et non sur la question de déterminer qui a l'obligation de verser des redevances. Pour les motifs qui suivent, je suis d'avis de confirmer la décision de la Commission selon laquelle une communication Internet a lieu au Canada lorsqu'elle provient d'un serveur situé au pays.

La réponse à la question de savoir si une com- **135** munication Internet a lieu ou non au Canada est d'importance critique pour la deuxième phase des audiences relatives au tarif 22 et pour les procédures ultérieures d'application de la Loi. En effet, elle permettra d'identifier qui, au Canada, sera le débiteur des redevances payables aux artistes et aux compositeurs de musique par la communication de leurs œuvres. Une vaste quantité d'information circule quotidiennement sur l'Internet, dont un grand nombre d'œuvres musicales et autres susceptibles d'être protégées par le droit d'auteur. Les intéressés doivent savoir avec un certain degré de certitude s'ils se verront reprocher ou non au Canada la communication d'œuvres protégées par le droit d'auteur. J'estime que le critère énoncé par la Commission, fondé sur l'emplacement du serveur hôte, est valable sur le plan pratique, tout en offrant la prévisibilité voulue, et il demeure le plus compatible avec la portée et l'objet de la Loi. En revanche, il est inopportun, selon moi, d'appliquer le critère du lien réel et important, qui a été formulé dans un contexte très différent, pour déterminer si une communication a eu lieu au Canada.

II. Relevant Statutory Provisions

II. Dispositions législatives pertinentes

136    *Copyright Act*, R.S.C. 1985, c. C-42

*Loi sur le droit d'auteur*, L.R.C. 1985, ch. C-42

> **3.** (1) For the purposes of this Act, "copyright", in relation to a work, means the sole right to produce or reproduce the work or any substantial part thereof in any material form whatever, to perform the work or any substantial part thereof in public or, if the work is unpublished, to publish the work or any substantial part thereof, and includes the sole right

> .  .  .

> (*f*) in the case of any literary, dramatic, musical or artistic work, to communicate the work to the public by telecommunication,

> and to authorize any such acts.

> **3.** (1) Le droit d'auteur sur l'œuvre comporte le droit exclusif de produire ou reproduire la totalité ou une partie importante de l'œuvre, sous une forme matérielle quelconque, d'en exécuter ou d'en représenter la totalité ou une partie importante en public et, si l'œuvre n'est pas publiée, d'en publier la totalité ou une partie importante; ce droit comporte, en outre, le droit exclusif :

> .  .  .

> *f*) de communiquer au public, par télécommunication, une œuvre littéraire, dramatique, musicale ou artistique;

> .  .  .

> Est inclus dans la présente définition le droit exclusif d'autoriser ces actes.

III. Decision of the Copyright Board ((1999), 1 C.P.R. (4th) 417)

III. Décision de la Commission du droit d'auteur (*Tarif des droits à percevoir par la SOCAN pour l'exécution publique d'œuvres musicales 1996, 1997, 1998 (Tarif 22, Internet) (Re)*, 27 octobre 1999)

137    The Board's decision is more nuanced than Binnie J. avers to. The Board held that a communication occurs in Canada, under s. 3(1)(*f*) of the Act, where it originates from a host server located in Canada. The location of the content provider — the person who uploads content onto a host server — is irrelevant. The location of the end user — the person making the request — is also irrelevant. The Board held it is only when the copyrighted work is posted on a Canadian host server that the rights to authorize or communicate must be obtained from the person administering those rights in Canada. Foreign content providers who post content on a Canadian host server must, therefore, obtain a licence from the Canadian rights holder.

La Commission a rendu une décision plus nuancée que ne l'affirme le juge Binnie. Selon elle, il y a communication au Canada, au sens de l'al. 3(1)*f*) de la Loi, lorsqu'elle provient d'un serveur hôte situé au Canada. Le lieu où se trouve le fournisseur de contenu — la personne qui télécharge les données dans le serveur hôte — importe peu. L'emplacement de l'utilisateur final, celui qui demande la communication, n'est pas non plus important. La Commission a statué que le droit d'autoriser ou d'effectuer une communication ne doit être obtenu du gestionnaire de ce droit au Canada que lorsque l'œuvre protégée par le droit d'auteur est rendue disponible sur un serveur hôte canadien. Le fournisseur de contenu étranger qui rend un fichier disponible sur un serveur hôte canadien doit donc obtenir une licence du titulaire des droits au Canada.

138    If a communication originates from a mirror site located in Canada, that constitutes a communication in Canada regardless of the location of the original

Lorsque la communication provient d'un site miroir situé au pays, la communication a lieu au Canada peu importe l'emplacement du site initial.

site. A mirror site is an Internet site on which content from another site is copied. Further, communications triggered by an embedded hyperlink occur at the location of the site to which the hyperlink leads. If the hyperlink leads to a site on a host server situated in Canada, then the communication occurs in Canada.

However, where the host server is located outside of Canada but the content provider specifically targets Canadian recipients, the Board held that it remains an open question whether this constitutes a communication within Canada. In other words, specifically targeting a Canadian audience may well constitute a communication within Canada under the Act. Such a determination will depend on the facts of a given case, and is not foreclosed by the decision of the Board.

I would endorse the Board's approach on this issue for the reasons that follow.

IV. Analysis

A. *Extraterritorial Effect of Federal Law*

As a matter of domestic law, Parliament is fully competent to enact statutes that have extraterritorial effect. This principle is not in doubt; nor is it directly implicated in this case. The question was considered by the Privy Council in *Croft v. Dunphy*, [1933] A.C. 156, in which a party challenged a Canadian anti-smuggling provision that authorized the seizure of vessels within twelve miles of Canada's coast, which was nine miles beyond Canada's then territorial waters. The Privy Council held that Parliament was fully competent to pass legislation with extraterritorial effect (at p. 163):

Once it is found that a particular topic of legislation is among those upon which the Dominion Parliament may competently legislate . . . their Lordships see no reason to restrict the permitted scope of such legislation by any other consideration than is applicable to the legislation of a fully Sovereign State.

The Privy Council held that the *British North America Act, 1867* (now the *Constitution Act, 1867*)

Un site miroir recopie l'information contenue sur un autre site. En outre, la communication déclenchée par un hyperlien intégré se produit à l'emplacement du site auquel renvoie l'hyperlien. Lorsque ce dernier mène à un site hébergé par un serveur hôte situé au Canada, la communication se produit au Canada.

139

La Commission a toutefois conclu que lorsque le serveur hôte se trouve à l'étranger et que le fournisseur de contenu vise précisément des destinataires au Canada, la question de savoir s'il s'agit d'une communication au Canada demeure entière. En d'autres mots, le fait de viser précisément un auditoire canadien pourrait bien faire en sorte qu'il y ait communication au Canada au sens de la Loi. Une conclusion en ce sens dépend des faits de l'espèce et n'est pas exclue par la décision de la Commission.

140

Je partage l'opinion de la Commission sur ce point, et ce, pour les motifs qui suivent.

IV. Analyse

A. *Portée extraterritoriale des dispositions fédérales*

141

En droit interne, le Parlement a pleine compétence pour adopter une loi ayant une portée extraterritoriale. Ce principe n'est pas contesté, et son application n'est pas directement en cause dans le présent pourvoi. Le Conseil privé a examiné la question dans *Croft c. Dunphy*, [1933] A.C. 156, où était contestée une disposition canadienne anticontrebande autorisant la saisie de navires à douze milles et moins des côtes canadiennes, soit neuf milles au-delà de la limite des eaux territoriales canadiennes de l'époque. Le Conseil privé a statué que le Parlement avait pleine compétence pour adopter une loi ayant une portée extraterritoriale (p. 163) :

[TRADUCTION] Une fois établi que l'objet d'une loi relève de la compétence du Parlement du Dominion [. . .] leurs Seigneuries ne voient aucune raison de restreindre la portée d'une telle loi en fonction d'autres facteurs que ceux applicables aux lois d'un État pleinement souverain.

Le Conseil privé a alors décidé que l'*Acte de l'Amérique du Nord britannique, 1867* (maintenant la *Loi*

imposed no restriction on the scope of Parliament's plenary legislative power (p. 167).

142    Any doubts in this regard had been put to rest shortly before *Croft v. Dunphy*, was heard by the Privy Council, when the Imperial Parliament passed the *Statute of Westminster, 1931* (U.K.), 22 Geo. 5, c. 4. Section 3 provides: "It is hereby declared and enacted that the Parliament of a Dominion has full power to make laws having extra-territorial operation." The Privy Council, however, did not need to consider whether s. 3 had retroactive effect because it decided that Parliament had the requisite power under the *British North America Act, 1867* standing alone. Of course, the *Statute of Westminster, 1931* has now been incorporated into our Constitution: see *Constitution Act, 1982*, s. 52(2)(*b*) and (*c*), and the Schedule, item 17.

143    Parliament's power to legislate with extraterritorial effect is well settled as a matter of Canadian law: see, e.g., *Reference re Offshore Mineral Rights of British Columbia*, [1967] S.C.R. 792, at p. 816; *Reference re Newfoundland Continental Shelf*, [1984] 1 S.C.R. 86, at p. 103. I would not want Binnie J.'s use of a real and substantial connection test to be understood as a limit on Parliament's power to legislate with extraterritorial effect. The real question is whether Parliament did in fact intend that s. 3(1)(*f*) of the *Copyright Act* apply extraterritorially. If not, what then constitutes a communication within Canada?

144    It is a common law presumption that Parliament does not intend legislation to apply extraterritorially. But this presumption is rebuttable where the contrary intention is expressly stated or implied by the legislation: see *Bolduc v. Attorney General of Quebec*, [1982] 1 S.C.R. 573, at p. 578; *Arcadi v. The King*, [1932] S.C.R. 158, at p. 159. This presumption flows from the principle of territoriality, a tenet of international law. Because each State is sovereign in its own territory, it is presumed that States hesitate to exercise jurisdiction over matters that may take place in the territory of other States: see *Morguard Investments Ltd. v. De Savoye*, [1990] 3

*constitutionnelle de 1867*) n'avait apporté aucune restriction à la portée de la pleine compétence législative du Parlement (p. 167).

Peu avant que l'affaire *Croft c. Dunphy*, ne soit entendue par le Conseil privé, tout doute subsistant à cet égard avait été dissipé lorsque le Parlement impérial avait adopté le *Statut de Westminster de 1931* (R.-U.), 22 Geo. 5, ch. 4, dont l'art. 3 prévoit : « Il est déclaré et statué par les présentes que le Parlement d'un Dominion a le plein pouvoir d'adopter des lois d'une portée extra-territoriale. » Le Conseil privé n'a toutefois pas eu à déterminer si cet article avait un effet rétroactif, car selon lui l'*Acte de l'Amérique du Nord britannique, 1867* conférait déjà au Parlement le pouvoir requis. Évidemment, le *Statut de Westminster de 1931* fait désormais partie de notre Constitution; voir la *Loi constitutionnelle de 1982*, al. 52(2)*b*) et *c*), et l'annexe, point 17.

Le pouvoir du Parlement d'adopter des lois ayant une portée extraterritoriale est bien établi en droit canadien; voir, par exemple, *Reference re Offshore Mineral Rights of British Columbia*, [1967] R.C.S. 792, p. 816; *Renvoi relatif au plateau continental de Terre-Neuve*, [1984] 1 R.C.S. 86, p. 103. Je ne voudrais pas que l'on interprète le recours du juge Binnie au critère du lien réel et important comme limitant le pouvoir du Parlement d'adopter des lois ayant une portée extraterritoriale. La véritable question est de savoir si le Parlement a effectivement voulu que l'al. 3(1)*f*) de la *Loi sur le droit d'auteur* ait une telle portée. Si telle n'était pas son intention, qu'est-ce alors qu'une communication au Canada?

En common law, une présomption veut que le Parlement n'ait pas l'intention de conférer à une loi une portée extraterritoriale. Cette présomption peut cependant être réfutée par l'intention contraire exprimée expressément ou implicitement dans la loi; voir *Bolduc c. Procureur général du Québec*, [1982] 1 R.C.S. 573, p. 578; *Arcadi c. The King*, [1932] R.C.S. 158, p. 159. Cette présomption découle du principe de la territorialité, un précepte du droit international. Comme un État souverain a compétence sur son propre territoire, on présume qu'il hésitera à exercer sa compétence à l'égard d'événements qui se sont produits sur le territoire d'un autre

S.C.R. 1077. Neither s. 3(1)(*f*), nor any other related provision of the Act expressly states that it applies beyond Canada's territorial limits. Moreover, nothing in the Act impliedly gives s. 3(1)(*f*) extraterritorial effect, particularly given the principle of territoriality of copyright law.

### B. *Communication Within Canada*

Given that Parliament did not intend the Act to have effect outside Canada, when does a communication occur <u>within</u> Canada for the purpose of s. 3(1)(*f*)? Any choice between the location of the end user, host server or content provider, or all three, will be somewhat arbitrary and will import its own set of problems. Each choice has its own supporters and critics; for an overview of positions, see A. P. Reindl, "Choosing Law in Cyberspace: Copyright Conflicts on Global Networks" (1997-1998), 19 *Mich. J. Int'l L.* 799.

I share the Board's view that a communication occurs within Canada where it originates from a host server located in Canada. In this way, the copyrighted works physically exist within Canadian territory and thus attract the protection of s. 3(1)(*f*). This does not mean that the host server provider is liable; it is the content provider who is liable for an infringing communication. The Board's approach, as I have observed, provides a straightforward and logical rule for locating communications occurring within Canada that will be readily applicable by the Board in setting tariffs, by the courts in infringement proceedings, and by solicitors in providing advice to their clients.

With respect, I disagree with the approach taken by Binnie J. Turning first to the real and substantial connection test, it is my view that a test that was developed by this Court to deal with the exigencies of the Canadian federation should not be lightly transposed as a rule of statutory construction. The real and substantial connection test grew out of the recognition and enforcement of judgments

État : voir *Morguard Investments Ltd. c. De Savoye*, [1990] 3 R.C.S. 1077. Ni l'alinéa 3(1)*f*) ni aucune autre disposition connexe n'indiquent expressément que la Loi s'applique au-delà des limites territoriales du Canada. De plus, aucune disposition de la Loi ne confère implicitement une portée extraterritoriale à l'al. 3(1)*f*), compte tenu, tout particulièrement, du principe de territorialité du droit d'auteur.

### B. *Communication au Canada*

**145**  Puisque le Parlement n'a pas voulu que la Loi s'applique à l'extérieur du Canada, à quelles conditions une communication a-t-elle lieu <u>au</u> Canada aux fins de l'al. 3(1)*f*)? Que l'on retienne l'emplacement de l'utilisateur final, celui du serveur hôte ou celui du fournisseur de contenu, ou les trois, le choix sera quelque peu arbitraire et comportera son lot de problèmes. Chacune de ces options a ses tenants et ses détracteurs; pour un aperçu des divers points de vue, voir A. P. Reindl, « Choosing Law in Cyberspace : Copyright Conflicts on Global Networks » (1997-1998), 19 *Mich. J. Int'l L.* 799.

**146**  Je conviens avec la Commission qu'une communication a lieu au Canada lorsqu'elle provient d'un serveur hôte situé au Canada. De la sorte, les œuvres protégées par le droit d'auteur existent physiquement sur le territoire canadien et bénéficient donc de la protection de l'al. 3(1)*f*). Il ne s'ensuit pas que le fournisseur du serveur hôte viole le droit d'auteur. La communication illicite doit plutôt être imputée au fournisseur de contenu. Comme je l'ai fait remarquer, l'approche de la Commission offre, pour déterminer si une communication a lieu au Canada, une règle simple et logique, facile à appliquer lorsque la Commission établit un tarif, qu'un tribunal instruit une action pour violation du droit d'auteur ou qu'un avocat conseille son client.

**147**  Avec égards, je ne suis pas d'accord avec l'approche du juge Binnie. Premièrement, en ce qui concerne le critère du lien réel et important, j'estime qu'un critère formulé par notre Cour en fonction des exigences de la fédération canadienne ne saurait être transformé à la légère en règle d'interprétation législative. Le critère du lien réel et important provient de la reconnaissance et

between sister provinces as well as the appropriate assumption of jurisdiction by a court in one province over matters affecting another province, and was more recently applied to the recognition and enforcement of foreign judgments from outside Canada: see *Morguard, supra; Beals v. Saldanha*, [2003] 3 S.C.R. 416, 2003 SCC 72. There is no constitutional imperative raised in this appeal, unlike interprovincial cases (*Hunt v. T&N plc*, [1993] 4 S.C.R. 289), though international comity is implicated. The real and substantial connection test is not a principle of legislative jurisdiction; it applies only to courts.

148      The only question is whether Parliament intended the Act to have effect beyond Canada. The principle of territoriality operates at the level of a rebuttable presumption that Parliament does not intend the Act to operate beyond Canada's borders. Moreover, copyright law is territorial in nature and thus limited to its enacting State. The territoriality principle has been incorporated into a number of international treaties, to which Canada is a signatory: see, e.g., *Berne Convention for the Protection of Literary and Artistic Works* (1886); *Agreement on Trade-Related Aspects of Intellectual Property Rights* (1994), 1869 U.N.T.S. 299; World Intellectual Property Organization *Copyright Treaty* (1996), CRNR/DC/94 ("*WCT*"); and World Intellectual Property Organization *Performances and Phonograms Treaty* (1996), CRNR/DC/95.

149      Article 5 of the *Berne Convention* calls for the territorial treatment of copyright; however, the *Berne Convention* does not specifically address the communication of works over the Internet. Canada is a signatory to the *WCT*, but it is not yet party to the treaty; it has yet to ratify it. The Board refused to interpret the Act in light of the *WCT* because the *WCT* is "not binding in Canada since it has been signed but not ratified by the Canadian Government" (p. 448). I disagree. Although Canada has not ratified the treaty, this does not mean that it

de l'exécution réciproques de jugements par les provinces, de même que de l'exercice opportun de la compétence d'un tribunal d'une province à l'égard de questions touchant une autre province. Il a aussi été appliqué plus récemment à la reconnaissance et à l'exécution de jugements étrangers : voir *Morguard*, précité; *Beals c. Saldanha*, [2003] 3 R.C.S. 416, 2003 CSC 72. Contrairement aux affaires interprovinciales, le présent pourvoi ne soulève aucun impératif constitutionnel (*Hunt c. T&N plc*, [1993] 4 R.C.S. 289), bien qu'il mette en cause la courtoisie internationale. Le critère du lien réel et important n'est pas un principe de compétence législative, mais s'applique uniquement aux tribunaux.

La seule question est de savoir si le législateur a voulu que la Loi s'applique au-delà des frontières. Le principe de la territorialité établit une présomption réfutable selon laquelle le Parlement n'a pas voulu que la Loi ait une portée extraterritoriale. De plus, en raison de son caractère intrinsèquement territorial, une loi sur le droit d'auteur ne s'applique que dans le pays qui l'a adoptée. En effet, le principe de la territorialité a été intégré dans divers traités internationaux dont le Canada est signataire : voir, par exemple, la *Convention de Berne pour la protection des œuvres littéraires et artistiques* (1886), l'*Accord sur les aspects des droits de propriété intellectuelle qui touchent au commerce* (1994), 1869 R.T.N.U. 332, le *Traité sur le droit d'auteur* (1996) de l'Organisation mondiale de la propriété intellectuelle, CRNR/DC/94 (« *Traité sur le droit d'auteur* »), et le *Traité sur les interprétations et exécutions et les phonogrammes* (1996) de l'Organisation mondiale de la propriété intellectuelle, CRNR/DC/95.

La *Convention de Berne* prévoit à l'art. 5 l'application du traitement national au chapitre du droit d'auteur; elle ne traite toutefois pas expressément de la communication d'une œuvre sur l'Internet. Le Canada est signataire du *Traité sur le droit d'auteur*, mais il n'en est pas encore partie — il ne l'a pas encore ratifié. La Commission a refusé d'interpréter la Loi à la lumière de ce traité au motif qu'il « ne lie pas le Canada car le gouvernement canadien l'a signé mais ne l'a pas ratifié » (p. 34). Je ne suis pas d'accord. Le Canada n'a pas ratifié le traité, mais il

should not be considered as an aid in interpreting the Act. Article 8 of the *WCT* provides:

Right of Communication to the Public

Without prejudice to the provisions of Articles 11(1)(ii), 11*bis*(1)(i) and (ii), 11*ter*(1)(ii), 14(1)(ii) and 14*bis*(1) of the Berne Convention, authors of literary and artistic works shall enjoy the exclusive right of authorizing any communication to the public of their works, by wire or wireless means, <u>including the making available to the public of their works in such a way that members of the public may access these works from a place and at a time individually chosen by them</u>. [Emphasis added.]

The purpose of art. 8 of the *WCT* is to harmonize domestic copyright laws in the party States with respect to the right of communication of copyrighted works. We should not ignore that fact.

As L'Heureux-Dubé, Gonthier and Bastarache JJ. recently held, even though international norms are generally not binding without domestic implementation, they are relevant in interpreting domestic legislation: see *R. v. Sharpe*, [2001] 1 S.C.R. 45, 2001 SCC 2, at para. 175. Parliament is presumed not to legislate in breach of a treaty, the comity of nations and the principles of international law. This rule of construction is well established: see *Daniels v. White*, [1968] S.C.R. 517, at p. 541. Although the *Copyright Act* has not yet been amended to reflect the signing of the *WCT*, I believe this cannon of interpretation is equally applicable to the case at bar.

How to interpret the meaning of "communicate" in s. 3(1)(*f*) in the context of the Internet so as to best respect the principle of territoriality in the *Berne Convention*? In my opinion, the host server test adopted by the Board has the benefit of clearly complying with the territoriality requirement of international copyright law. It also accords with the *WCT* communication right (art. 8), which includes "the making available to the public of their works in such a way that members of the public may access these works from a place and at a time individually chosen by them"; copyrighted works are made available on the Internet when they are posted on a host server.

peut néanmoins en tenir compte pour interpréter la Loi. L'article 8 du *Traité sur le droit d'auteur* dispose :

Droit de communication au public

Sans préjudice des dispositions des articles 11.1)2°), 11*bis*.1)1°) et 2°), 11*ter*.1)2°), 14.1)2°) et 14*bis*.1) de la Convention de Berne, les auteurs d'œuvres littéraires et artistiques jouissent du droit exclusif d'autoriser toute communication au public de leurs œuvres par fil ou sans fil, <u>y compris la mise à la disposition du public de leurs œuvres de manière que chacun puisse y avoir accès de l'endroit et au moment qu'il choisit de manière individualisée</u>. [Je souligne.]

Cet article vise l'harmonisation des dispositions internes sur le droit d'auteur des pays membres en ce qui concerne le droit de communiquer une œuvre protégée par le droit d'auteur. Nous ne devons pas en faire abstraction.

Comme l'ont écrit récemment les juges L'Heureux-Dubé, Gonthier et Bastarache, même si elles ne lient pas les tribunaux en l'absence d'une mise en œuvre législative, les normes internationales sont utiles pour l'interprétation des droits sur le plan national : voir *R. c. Sharpe*, [2001] 1 R.C.S. 45, 2001 CSC 2, par. 175. Le Parlement est présumé légiférer sans porter atteinte à un traité, à la courtoisie entre les États ou aux principes du droit international. Il s'agit d'une règle d'interprétation bien établie : *Daniels c. White*, [1968] R.C.S. 517, p. 541. Même si la *Loi sur le droit d'auteur* n'a pas encore été modifiée pour tenir compte de la signature du *Traité sur le droit d'auteur*, je crois que cette règle d'interprétation s'applique également en l'espèce.

150

Comment, dans le contexte de l'Internet, devons-nous interpréter le mot « communiquer » employé à l'al. 3(1)*f*) de manière à respecter au mieux le principe de la territorialité établi dans la *Convention de Berne*? À mon avis, le critère du serveur hôte retenu par la Commission a l'avantage d'être parfaitement conforme au principe de territorialité du droit d'auteur international. Il respecte également le droit de communication au public prévu par le *Traité sur le droit d'auteur*, y compris « la mise à la disposition du public [des] œuvres de manière que chacun puisse y avoir accès de l'endroit et au moment qu'il choisit de manière

151

Before they are posted on a host server, they are not available to the public.

152    The real and substantial connection test proposed by Binnie J. is inconsistent with the territoriality principle in that it may reach out and grasp content providers located in Bangalore who post content on a server in Hong Kong based only on the fact that the copyrighted work is retrieved by end users in Canada. Unlike a broadcaster, a content provider does not know in advance which territories will receive its transmissions. Placing an emphasis on the end user is also inconsistent with the "making available" right in the *WCT*. A danger with Binnie J.'s approach is that it could result in a layering of royalty obligations between States. This danger is particularly acute with the Internet: content posted on a server is usually accessible from anywhere on the globe. With respect, to say that asserting jurisdiction over communications originating elsewhere but received in Canada accords with national and international copyright practice overstates the case. A review of various national laws demonstrates precious little harmonization in law or practice.

153    My second concern relates to privacy issues. Insofar as possible, this Court should adopt an interpretation of s. 3(1)(*f*) that respects end users' privacy interests, and should eschew an interpretation that would encourage the monitoring or collection of personal data gleaned from Internet-related activity within the home.

154    Locating the communication at the place of the host server addresses privacy concerns. In general, once the content provider has posted content on a host server, it is available to the public. Owners of copyrighted works and their collective societies can easily monitor such public content by trawling the

individualisée » (art. 8); les œuvres protégées par le droit d'auteur sont mises à la disposition du public sur l'Internet lorsqu'elles sont rendues disponibles sur un serveur hôte. Avant d'être rendues disponibles sur un serveur hôte, elles ne sont pas mises à la disposition du public.

Le critère du lien réel et important proposé par le juge Binnie cadre mal avec le principe de territorialité parce qu'il peut assujettir à la Loi un fournisseur de contenu se trouvant à Bangalore qui rend disponible un contenu sur un serveur situé à Hong Kong, pour le seul motif que l'œuvre protégée par le droit d'auteur est extraite par un utilisateur final au Canada. Contrairement à un radiodiffuseur, un fournisseur de contenu ne sait pas d'avance dans quels territoires ses transmissions seront reçues. Mettre l'accent sur l'utilisateur final est également incompatible avec le droit de « mise à la disposition » prévu dans le *Traité sur le droit d'auteur*. L'un des risques que comporte l'approche du juge Binnie est la superposition des redevances exigibles dans les différents États. Ce risque est particulièrement préoccupant dans le cas de l'Internet, puisqu'il est habituellement possible d'avoir accès au contenu d'un serveur de n'importe quel endroit dans le monde. Avec égards, je crois qu'il est exagéré d'affirmer que le fait de s'attribuer compétence à l'égard des communications provenant de l'étranger mais reçues au Canada s'inscrit dans la pratique nationale et internationale en matière de droits d'auteur. L'examen des différentes lois nationales ne révèle guère d'harmonisation sur le plan législatif ou pratique.

Ma seconde inquiétude touche au respect de la vie privée. Dans la mesure du possible, notre Cour doit opter pour une interprétation de l'al. 3(1)*f*) qui respecte le droit à la vie privée de l'utilisateur final et écarter toute interprétation qui favoriserait le contrôle ou la collecte de données personnelles lors d'une utilisation de l'Internet à domicile.

Localiser la communication en fonction du serveur hôte permet d'assurer la protection des renseignements personnels. En règle générale, une fois que le fournisseur de contenu rend des données disponibles sur un serveur hôte, celles-ci sont accessibles au public. Titulaires de droits d'auteur

publicly accessible servers with specially designed software. Privacy concerns are diminished because it is the content provider who has made the information public by posting it on the sever. Although privacy concerns are attenuated, they are not eliminated with the host server test. It is now common for Internet site operators to collect personal data from end users when users visit their Web site: see E. Gratton, *Internet and Wireless Privacy: A Legal Guide to Global Business Practices* (2003), at p. 6. But that is a question for another day.

By contrast, the real and substantial connection test, insofar as it looks at the retrieval practices of end users, encourages the monitoring of an individual's surfing and downloading activities. Such habits tend to reveal core biographical information about a person. Privacy interests of individuals will be directly implicated where owners of copyrighted works or their collective societies attempt to retrieve data from Internet Service Providers about an end user's downloading of copyrighted works. We should therefore be chary of adopting a test that may encourage such monitoring.

## V.  Conclusion

On the whole, I would adopt the Board's test for determining the *situs* of a communication because it has the virtue of simplicity; it best accords with the principle of territoriality and harmonizes our copyright law with international treaty principles; and it diminishes privacy concerns. In all other respects I agree with Binnie J. I would allow the appeal in part but otherwise remit the case to the Copyright Board to proceed with the second phase of its Tariff 22 hearings in accordance with these reasons.

*Appeal allowed in part with costs; cross-appeal dismissed with costs.*

et sociétés de gestion peuvent aisément surveiller le contenu ainsi rendu public en balayant les serveurs accessibles au public à l'aide de logiciels spéciaux. Le risque d'atteinte à la vie privée est réduit parce que c'est le fournisseur de contenu qui a rendu l'information publique en la rendant disponible sur le serveur. Bien que le critère du serveur hôte réduise ce risque, il ne le fait pas disparaître complètement. Il est désormais courant que l'exploitant d'un site Internet recueille des données personnelles sur l'utilisateur final qui consulte son site Web : voir E. Gratton, *Internet and Wireless Privacy : A Legal Guide to Global Business Practices* (2003), p. 6. Mais il s'agit d'une tout autre question.

155

Par contre, dans la mesure où il touche aux pratiques d'extraction des utilisateurs finaux, le critère du lien réel et important favorise le contrôle des activités individuelles de téléchargement et de navigation sur le Net. Les habitudes observées à ce chapitre tendent à dévoiler des renseignements personnels. Le droit au respect de la vie privée sera directement touché lorsqu'un titulaire du droit d'auteur ou une société de gestion tentera d'obtenir d'un fournisseur de services Internet des renseignements sur les œuvres téléchargées illicitement par un utilisateur final. Nous devons donc hésiter à adopter un critère susceptible d'encourager un tel contrôle.

## V.  Conclusion

156

Dans l'ensemble, je retiendrais le critère formulé par la Commission pour déterminer le *situs* d'une communication parce qu'il a le mérite d'être simple; il respecte le mieux le principe de la territorialité et il harmonise notre droit d'auteur avec les principes formulés dans les traités internationaux. De plus, il réduit le risque d'atteinte à la vie privée. Sur tous les autres points, je suis d'accord avec le juge Binnie. Je suis donc d'avis d'accueillir le pourvoi en partie et de renvoyer par ailleurs l'affaire à la Commission du droit d'auteur pour qu'elle procède à la deuxième phase de ses audiences sur le tarif 22 en conformité avec les présents motifs.

*Pourvoi accueilli en partie avec dépens; pourvoi incident rejeté avec dépens.*

*Solicitors for the appellants/respondents on cross-appeal: McCarthy Tétrault, Toronto.*

*Solicitors for the respondent/appellant on cross-appeal: Gowling Lafleur Henderson, Ottawa.*

*Solicitors for the interveners the Internet Commerce Coalition, the European Telecommunications Network Operators' Association, the European Internet Service Providers' Association, the Australian Internet Industry Association, the Telecom Services Association and the U.S. Internet Industry Association: Heenan Blaikie, Toronto.*

*Solicitors for the interveners the Canadian Recording Industry Association and the International Federation of Phonogram Industry: Osler, Hoskin & Harcourt, Ottawa.*

*Procureurs des appellantes/intimées au pourvoi incident : McCarthy Tétrault, Toronto.*

*Procureurs de l'intimée/appelante au pourvoi incident : Gowling Lafleur Henderson, Ottawa.*

*Procureurs des intervenantes Internet Commerce Coalition, European Telecommunications Network Operators' Association, European Internet Service Providers' Association, Australian Internet Industry Association, Telecom Services Association et U.S. Internet Industry Association : Heenan Blaikie, Toronto.*

*Procureurs des intervenantes l'Association de l'industrie canadienne de l'enregistrement et International Federation of Phonogram Industry : Osler, Hoskin & Harcourt, Ottawa.*