# EXHIBIT 3

## TELSTRA CORPORATION LTD v AUSTRALASIAN PERFORMING RIGHT ASSOCIATION LTD

5   HIGH COURT OF AUSTRALIA

DAWSON, TOOHEY, GAUDRON, MCHUGH and KIRBY JJ

14 August 1997

10  Intellectual property — Copyright — Infringement — Provision of music to telephone callers placed on held — Callers using conventional telephones — Callers using mobile telephones — Whether works broadcast within meaning of Copyright Act 1968 s 31(1)(a)(iv) and (v) — (CTH) Copyright Act 1968 ss 10(1), 26, 31(1)(a)(iv), 31(1)(a)(v), 199(4).

15  Words and phrases — "to the public" — "broadcast or other matter".

This was a test case arising from the participation by the appellant (Telstra) in the provision, in various ways, of music to telephone users who were placed on hold (music on hold). The respondent (APRA) contended that, by its participation in the provision of music on hold, Telstra infringed certain exclusive rights in the works which the respondent enjoyed as copyright owner pursuant to s 31 of the Copyright Act 1968 (Cth) (the Act).

20  Section 31 of the Act provided:

"(1) For the purposes of this Act, unless the contrary intention appears, copyright, in relation to a work, is the exclusive right:

(a) in the case of a literary, dramatic or musical work, to do all or any of the following acts:

25      . . .

(iii) to perform the work in public;

(iv) to broadcast the work;

(v) to cause the work to be transmitted to subscribers to a diffusion service."

The trial judge rejected APRA's submissions that Telstra had engaged in activities
30  which fell within each of the three subparagraphs of s 31(1)(a) of the Act. The Full Court allowed the respondent's appeal and held unanimously that the appellant had broadcast the works within the meaning of subpara (iv) and held by majority that the appellant had caused the works to be transmitted to subscribers to a diffusion service within the meaning of subpara (v).

35      Telstra participated in the provision of music on hold in three different ways: (a) where a person made a telephone call to a Telstra service centre and heard music played by a machine at the centre when he was placed on hold; (b) where a person heard music on hold after calling various business and governmental organisations to which Telstra provided a transmission facility for that purpose; and (c) where a person heard music on hold after making a telephone call to a subscriber to a service known as CustomNet, which is
40  provided by Telstra.

Each of the three situations could occur in one of two ways: where the caller used a conventional telephone, and where the caller used a mobile telephone. APRA contended that, in the case of music on hold heard by a caller using a mobile telephone, Telstra had broadcast the works within the meaning of s 31(1)(a)(iv). In respect of music on hold
45  heard by callers using conventional telephones, APRA contended that Telstra caused the transmission of the works to subscribers within the meaning of s 31(1)(a)(v) of the Act.

Held:

*Section 31(1)(a)(iv)*

*Per curiam:* (i) In each of the situations in which Telstra participated in the provision
50  of music on hold to callers using mobile telephones, it was the operator of a diffusion service and the works were broadcast within the meaning of s 31(1)(a)(iv) of the Act

Per Dawson and Gaudron JJ (Toohey and McHugh JJ concurring):

(ii) The use of the words "to the public" in s 10 of the Act (as amended) conveys a broader concept than the use of the words "in public" in s 31(1)(a)(iii) of the Act; it is irrelevant where the relevant communication occurs as there can be a communication to individual members of the public in a private or domestic setting which is a communication to the public.

(iii) In determining what is meant by transmission "to the public", the nature of the audience constituted by those who receive music on hold is important. Behind the concept of the copyright owner's public is recognition of the fact that where a work is performed in a commercial setting, the occasion is unlikely to be private or domestic and the audience is more appropriately seen as a section of the public.

(iv) Callers on hold constitute the copyright owner's public, not because they themselves would be prepared to pay to hear the music, but because others are prepared to bear the cost of them having that facility. For the performance of the music to that audience the copyright owner would expect to receive payment, even if not from the members of the audience.

### Section 31(1)(a)(v)

Per Dawson, Gaudron and Kirby JJ (Toohey and McHugh JJ contra):

(v) In each of the situations in which Telstra participated in the provision of music on hold to callers using conventional telephones, it was the operator of a diffusion service and the works were transmitted to subscribers to a diffusion service within the meaning of s 31(1)(a)(v) of the Act.

Per Dawson and Gaudron JJ:

(vi) Section 199(4) of the Act, while limited to transmission to subscribers to a diffusion service, reflects a policy that royalties paid for an unauthorised broadcast ought to be regarded as covering an extension of the broadcast to the subscribers to a diffusion service.

(vii) The transmission of the works occurred in the course of "a service distributing broadcast or other matter" namely, the systematic provision of music on hold, and constituted the diffusion service referred to in s 31(1)(a)(v).

(viii) The intent of s 26(5) is to create subscribers to a diffusion service conducted as part of or incidentally to a telephone service where otherwise they would not exist.

(ix) The agreement to provide the telephone service must be deemed to extend to the provision of the diffusion service, for it is not possible to be a subscriber to a service in the absence of an agreement with a provider to provide it. Telstra is deemed under s 26(5) to have agreed with subscribers to its telephone service to provide them with the diffusion service so that, under s 26(4), Telstra was the operator of the diffusion service by which the works were transmitted. Under s 26(2) Telstra was not only the operator of that service but the only operator of that service.

### Note

As to copyright in musical works, see vol 15 INTELLECTUAL PROPERTY [240-1605]. As to infringement of copyright by broadcast or transmission by a diffusion service, see [240-2525]-[240-2530].

### Appeal

This was an appeal from a decision of the Full Court of the Federal Court of Australia.

*J McL Emmerson* and *B N Caine* for the appellant.

*D K Catterns QC* and *R Cobden* for the respondent.

**Dawson and Gaudron JJ.** The respondent, the Australasian Performing Right Association Ltd (APRA), owns the copyright in a number of musical and literary

works (the works) which are the music and lyrics of various songs. The appellant, Telstra Corporation Ltd (Telstra), which previously traded under the name of Telecom, holds a general telecommunications licence under the Telecommunications Act 1991 (Cth) and supplies, maintains and owns a
5  telecommunications network in Australia. This test case arises from the participation by Telstra in the provision, in various ways, of music to telephone users who are placed on hold (music on hold). It is common ground that the works were used in providing music on hold.

APRA contends that, by its participation in the provision of music on hold,
10  Telstra has infringed certain exclusive rights in the works which APRA enjoys as copyright owner pursuant to s 31 of the Copyright Act 1968 (Cth) (the Act). That section relevantly provides:

(1) For the purposes of this Act, unless the contrary intention appears, copyright, in relation to a work, is the exclusive right:
15

(a) in the case of a literary, dramatic or musical work, to do all or any of the following acts:

. . .

(iii) to perform the work in public;

(iv) to broadcast the work;

20    (v) to cause the work to be transmitted to subscribers to a diffusion service.

APRA contended before Gummow J at first instance in the Federal Court that Telstra had engaged in activities which fell within each of the three subparagraphs of s 31(1)(a) set out above. Gummow J rejected APRA's
25  contentions in relation to each subparagraph.[1] APRA appealed to the Full Court of the Federal Court, but no reliance was placed upon subpara (iii) and it may be disregarded for present purposes. The Full Court allowed APRA's appeal.[2] It held unanimously that Telstra had broadcast the works within the meaning of subpara (iv) and held by majority (Black CJ and Burchett J; Sheppard J
30  dissenting) that Telstra had caused the works to be transmitted to subscribers to a diffusion service within the meaning of subpara (v). Telstra now appeals to this court against the decision of the Full Court.

The evidence revealed that Telstra participated in the provision of music on hold in three different ways. The first was where a person made a telephone call
35  to a Telstra service centre and heard music played by a machine at the centre when he was placed on hold. The second situation involved a person who heard music on hold after calling various business and governmental organisations to which Telstra provided a transmission facility for that purpose. The third situation involved a person hearing music on hold after making a telephone call to a
40  subscriber to a service known as CustomNet, which is provided by Telstra. Where the telephone line of a subscriber to CustomNet is busy, the electromagnetic current carrying the call is diverted to a music on hold facility situated at Telstra's nearest telephone exchange. In any of these three situations the music on hold may be pre-recorded and played from a compact disc or tape
45  recording or may consist of music broadcast from a radio station which transmits to the general public.

Each of the three situations outlined above may occur in one of two ways. The first is where the caller uses what might be described as a conventional telephone;

50  1  See *APRA v Telstra Corp Ltd* (1993) 46 FCR 131; 118 ALR 684

2  See *APRA v Telstra Corporation* (1995) 60 FCR 221, 131 ALR 141

the second is where the caller uses a mobile telephone. APRA contends that, in respect of music on hold heard by callers using a conventional telephone, Telstra has caused the transmission of the works to subscribers to a diffusion service within the meaning of s 31(1)(a)(v). In the case of music on hold heard by a caller using a mobile telephone, APRA contends that Telstra has broadcast the works within the meaning of s 31(1)(a)(iv).

### Conventional telephones: s 31(1)(a)(v)

It is convenient to turn first to the question whether, by its participation in the provision of music on hold to callers using conventional telephones, Telstra has infringed APRA's exclusive right to cause the works to be transmitted to subscribers to a diffusion service within the meaning of s 31(1)(a)(v). The right conferred by s 31(1)(a)(v) had its origin in the right of public communication guaranteed by the 1886 Berne Convention for the Protection of Literary and Artistic Works, in the manner described by Kirby J in his judgment. The provision itself contains three requirements which must be considered in this case. First, there must be a diffusion service. Secondly, the work must be transmitted to subscribers to that service. Thirdly, the alleged infringer must have caused that transmission.

Section 31(1)(a)(v) is amplified by s 26 of the Act. It is necessary to set out s 26 in full as it stood at the relevant time:

(1) A reference in this Act to the transmission of a work or other subject-matter to subscribers to a diffusion service shall be read as a reference to the transmission of the work or other subject matter in the course of a service of distributing broadcast or other matter (whether provided by the person operating the service or by other persons) over wires, or over other paths provided by a material substance, to the premises of subscribers to the service.

(2) For the purposes of this Act, where a work or other subject matter is so transmitted:

(a) the person operating the service shall be deemed to be the person causing the work or other subject matter to be so transmitted; and

(b) no person other than the person operating the service shall be deemed to be causing the work or other subject-matter to be so transmitted, whether or not he provides any facilities for the transmission.

(3) For the purposes of the application of this section, a service of distributing broadcast or other matter shall be disregarded where the service is only incidental to a business of keeping or letting premises at which persons reside or sleep, and is operated as part of the amenities provided exclusively for residents or inmates of the premises or for those residents or inmates and their guests.

(4) A reference in this section to the person operating a service of distributing broadcast or other matter shall be read as a reference to the person who, in the agreements with subscribers to the service, undertakes to provide them with the service, whether he is the person who transmits the broadcast or other matter or not.

(5) Where a service of distributing matter over wires or over other paths provided by a material substance is only incidental to, or part of, a service of transmitting telegraphic or telephonic communications, a subscriber to the last mentioned service shall be taken, for the purposes of this section, to be a subscriber to the first mentioned service.

Although there is no dispute about it, reference should be made to s 199(4) at this point. That subsection provided:

A person who, by the reception of an authorised television broadcast or sound broadcast, causes a literary, dramatic or musical work or an adaptation of such a work,

an artistic work or a cinematograph film to be transmitted to subscribers to a diffusion service shall be treated, in any proceedings for infringement of the copyright, if any, in the work or film, as if he had been the holder of a licence granted by the owner of that copyright to cause the work, adaptation or film to be transmitted by him to subscribers
5   to that service by the reception of the broadcast.

The subsection is limited to transmission to subscribers to a diffusion service but appears to reflect a policy that royalties paid for an authorised broadcast ought to be regarded as covering the extension of the broadcast to the subscribers to a diffusion service.

10   Returning to s 26 and to the first requirement of s 31(1)(a)(v), it is not contested that the transmission of music on hold to users of a conventional telephone occurs "over wires, or over other paths provided by a material substance", within the meaning of s 26(1). However, the question remains whether there can be said to be a "service of distributing broadcast or other

15   matter". In the light of s 199(4), it is "other matter" which is the more significant category for present purposes, but under s 26(1), both in the case of broadcast matter and other matter, the matter need not be provided by the operator of the diffusion service. That is important because music on hold comes from both sound recordings and radio broadcasts. In either case it is irrelevant that Telstra

20   has not itself provided or selected the music. But there still must, under s 26(1), be a service of distributing such matter. It is this aspect of the concept of a diffusion service which is contested.

Turning for a moment to the second requirement of s 31(1)(a)(v), while that provision refers to transmission to "subscribers to a diffusion service", s 26(1)

25   requires that reference to be read as a reference to transmission to "the premises of subscribers to the service". The shift in meaning required by s 26(1) would seem to have a practical explanation: it could not be expected that a transmission by means of a diffusion service would always be to a subscriber personally whereas it would necessarily be to his or her premises. But the point made by

30   Telstra is that the premises to which music on hold is transmitted are not those of subscribers. On the contrary, Telstra says, where a business or organisation has arranged for a music on hold transmission facility to be provided to it by Telstra or subscribes to CustomNet, it is that business or organisation which constitutes the subscriber to the facility of providing music on hold. It is said that the

35   operation of such a facility could not involve transmission to those subscribers because the music on hold is transmitted straight to the caller to those premises; it is never transmitted to the premises which the caller is calling. In the case of a call to a Telstra service centre, it is said that there are no subscribers at all.

Allied to this submission is the contention by Telstra that music on hold cannot

40   be a service to callers who receive it because they may not want to receive it but are compelled to do so while waiting to be connected to the person they have called. This brings us back to the first requirement of s 31(1)(a)(v), namely, that there must be a diffusion service. In our view, a service may nevertheless be a service even if it is unwanted by, and offers no choice to, those whom it is meant

45   to serve. No doubt those who arrange for Telstra to provide music on hold to their callers are provided with a service, but that is not to say that music on hold is not also a service to those to whom it is played. Obviously, those who arrange for the music on hold to be played to callers who cannot get through regard it as a service to those callers or they would not make the arrangement. In the same way, music

50   played in commercial premises may not be appreciated by persons frequenting the premises, but if it is provided it must be because it is perceived to be a benefit

and good for business. This is recognised by s 26(3) which requires a diffusion service to be disregarded where it is only incidental to a business of keeping or letting premises at which persons reside or sleep and is operated as part of the amenities provided exclusively for residents or inmates of the premises or for those residents or inmates and their guests. It is not to be supposed that all the guests in a hotel, for example, will want to hear the music transmitted by the hotel as a service to them, but from the terms of s 26(3) it is apparent that that characteristic does not preclude an amenity from being regarded as a service for the purposes of the Act.

No doubt a service requires some system or organisation whereby those intended to be served receive the service. If there is any doubt about this, it is, we think, removed by the reference in s 26(1) to the transmission of the work or other subject matter "in the course of" a service of distributing broadcast or other matter. This is significant for present purposes because it means that the mere transmission of a work in which there is copyright from one telephone user to another — by whistling a tune, for example — would not constitute a service. The system or organisation required must, under s 26(1), be for the purpose of distributing matter. Distribution involves the spreading abroad or dispersal of the thing being distributed. That is what happens with music on hold. From a common source the music is conveyed over wires to the various destinations at which it is received. A telephone service is ordinarily a means of communication between two persons, but this does not mean that it cannot also be used to provide a service of distributing matter. Indeed, while music on hold is played to a caller, the communication ceases to be two way and may for that reason be more easily seen as a distribution. Moreover, the dispersal of matter need not be simultaneous for there to be a distribution of that matter. There may, of course, be more than one caller at a time who receives music on hold, but that does not mean that a single holder does not also receive it in the course of its distribution, notwithstanding that others receive it at different times. We are therefore satisfied that the transmission of the works occurred in the course of "a service of distributing broadcast or other matter", namely, the systematic provision of music on hold. It is this which constitutes the diffusion service referred to in s 31(1)(a)(v).

Identifying the relevant diffusion service in this way has certain consequences when one turns to the second requirement of s 31(1)(a)(v) and attempts to identify subscribers to the diffusion service. Realising this, APRA did contend that the telephone service provided by Telstra was itself a diffusion service, but that contention cannot be sustained. A diffusion service within the meaning of s 31(1)(a)(v) and s 26(1) is a service of distributing broadcast or other matter and that is an inapt description of a telephone service. The primary function of a telephone service is to facilitate communication between persons — usually two persons — and not the distribution of matter. Moreover s 26(5), in using the words "a service of distributing matter over wires or over other paths provided by a material substance" is describing a diffusion service within the meaning of s 26(1) (although without the requirement of subscribers), which it envisages as being distinct from a telephone service, although capable of being incidental to or part of that service. One may therefore accept that the systematic provision of music on hold is a diffusion service without accepting that the telephone service itself is a diffusion service, even though the former is only incidental to or part of the latter. But without more, the mere existence of a diffusion service does not identify any subscribers other than, perhaps, the subscribers for which Telstra

contends, namely, those who arrange for the diffusion service to be provided. In this case, of course, the music on hold is not transmitted to those persons. It was for that reason that APRA sought to rely upon the telephone service (to which those who receive music on hold are subscribers) as a diffusion service. That
5    argument having been rejected, APRA is forced to rely upon s 26(5).

However, in our view, s 26(5) is sufficient to serve the purpose of APRA in identifying subscribers to the diffusion service which otherwise clearly exists in this case. The systematic transmission of music on hold is, as we have said, a diffusion service, being a service of distributing broadcast or other matter to
10   callers who receive the music. If it is not part of the telephone service which is used for the transmission because it is merely a one way communication, then it is clearly incidental to the telephone service. The result of this is that, under s 26(5), a subscriber to the telephone service is deemed, for the purposes of s 26, to be a subscriber to the diffusion service. The evident intent of s 26(5) is to create
15   subscribers to a diffusion service conducted as part of or incidentally to a telephone service where otherwise they would not exist. It is to be noted that the opening words of s 26(5) do not use the term "diffusion service", for to do so might suggest the requirement under s 31(1)(a)(v) and s 26(1) that there be subscribers to it. Instead, s 26(5) commences with that part of the definition of a
20   diffusion service contained in s 26(1) which does not contain the requirement of subscribers and then deems the subscribers to the telephone service to be the subscribers to the diffusion service. The works were undoubtedly transmitted to the premises of the subscribers so deemed.

The result is to give an expanded operation to s 26(1) and, consequently, to
25   give s 31(1)(a)(v) an extended application. But s 31(1)(a)(v) cannot be construed without reference to s 26 and unless subs (5) of that section is given the meaning which we have given it, it is difficult to see what meaning it could be given. Simply as a matter of construction that result is required, for it is not possible to read s 31(1)(a)(v) in isolation from s 26.

30   The third and final requirement which APRA must establish is that it was Telstra which caused the works to be transmitted to the premises of the deemed subscribers. Under s 26(2), the person operating the service is deemed to be the person causing the work or other subject matter to be transmitted to the exclusion of any other person. Telstra would fall within the description of the person
35   causing the work to be transmitted but under s 26(4) that term is to be read as a reference to the person who, in the agreements with subscribers to the service, undertakes to provide them with the service, whether he is the person who transmits the broadcast or other matter or not. Of course, Telstra has no agreements with callers who receive music on hold to provide them with that
40   service. But they are deemed to be subscribers to that service under s 26(5) by reason of their being subscribers to the telephone service. The agreement to provide the telephone service must, in those circumstances, be deemed to extend to the provision of the diffusion service, for it is not possible to be a subscriber to a service in the absence of an agreement with a provider to provide it. It will
45   be seen that by this means Telstra is deemed under s 26(5) to have agreed with subscribers to its telephone service to provide them with the diffusion service so that, under s 26(4), Telstra was the operator of the diffusion service by which the works were transmitted. Under s 26(2) Telstra was not only the operator of that service but the only operator of that service.

50   It follows that in each of the situations in which Telstra participated in the provision of music on hold to callers using conventional telephones, it was the

operator of a diffusion service and the works were transmitted to subscribers to a diffusion service within the meaning of s 31(1)(a)(v) of the Act.

## Mobile telephones: s 31(1)(a)(iv)

The remaining question is whether, by participating in the provision of music on hold to callers using mobile telephones, Telstra broadcast the works within the meaning of s 31(1)(a)(iv) of the Act. The term "broadcast" is defined by s 10(1) of the Act and means "transmit by wireless telegraphy to the public". "Wireless telegraphy" is also defined to mean "the emitting or receiving, otherwise than over a path that is provided by a material substance, of electromagnetic energy". Mobile telephones have a radio transmitter and a radio receiver by which communication is made to a nearby base station. Through the base station, radio transmissions to and from the mobile telephone are connected to the rest of the telephone network. When a caller from a mobile telephone hears music on hold, he has received a transmission, otherwise than over a path provided by a material substance, of electromagnetic energy, that is to say, by wireless telegraphy. The only issue is whether the transmission in question can be said to be "to the public".

Music on hold may be transmitted to mobile telephones from different base stations or, if the callers are in the same area, from the one base station using different frequencies. But at any one time only one caller may be receiving music on hold. At other times there may be considerably more callers hearing music on hold. The music is transmitted to each caller individually by means of his or her mobile telephone and the caller may receive it in private or domestic circumstances. The privacy of mobile telephone calls is protected by legislation.[3] Different callers may call the number in question for different purposes. It is against this background that Telstra contends there is no transmission of music on hold "to the public" where the caller is using a mobile telephone.

Until 1986, "broadcast" was defined in s 10 of the Act to mean "broadcast by wireless telegraphy" and "broadcasting" had a corresponding meaning. The Copyright Amendment Act 1986 (Cth) added the words "other than from point to point" before the words "by wireless telegraphy". Section 10(1A) was also added and it provided that a broadcast was to be taken to be from point to point if it was intended by the broadcaster to be received only by particular equipment at a particular location.

There was a further amendment by the Statute Law (Miscellaneous Provisions) Act (No 2) 1986 (Cth). In introducing the bill for that Act, the Attorney-General said in his second reading speech:[4]

> The amendment will clarify the definition of "broadcast", which was modified by the Copyright Amendment Act 1986, passed last sittings. Interested groups have submitted that the wording inserted by that Act is ambiguous, and does not express the government's intention that "broadcast", in this context, should cover transmissions to the copyright owner's public, whether the "general" public or part of the public. Following consultations there is agreement with the policy and wording of the proposed new definition.

The Statute Law (Miscellaneous Provisions) Act (No 2) omitted s 10(1A) and replaced the definition of "broadcast" with the words which now appear in the

---

3. See Telecommunications (Interception) Act 1979 (Cth) s 7
4. See House of Representatives, *Commonwealth Parliamentary Debates (Hansard)* 15 October 1986 at 2067

Act, namely, "transmit by wireless telegraphy to the public". That definition removes from the definition of "broadcast" the word "broadcast" itself and replaces it with the concept of transmission to the public. That means that it is not helpful to resort to the ordinary meaning of the word "broadcast" in construing

5    the definition. The addition of the words "to the public" was, if the Attorney-General's second reading speech is any guide, intended to incorporate the notion of the copyright owner's public.

The concept of the copyright owner's public was developed in a series of cases which, however, were concerned with the distinction between a

10   performance in public and a private or domestic performance. Section 31(1)(a)(iii) speaks of the right to perform a work "in public", but the definition of "broadcast", with which we are concerned, speaks of transmission "to the public". If anything, the use of the words "to the public" conveys a broader concept than the use of the words "in public" since it makes clear that the place

15   where the relevant communication occurs is irrelevant. That is to say, there can be a communication to individual members of the public in a private or domestic setting which is nevertheless a communication to the public. A broadcast by a radio station is just such a communication.

A performance or broadcast to the world at large is obviously a performance

20   or broadcast to the public. But the situation becomes a little more difficult in the case of a performance or broadcast to a limited class of persons. In that context, in considering what constitutes a performance in public, the cases recognise that the relationship of the audience to the owner of the copyright is significant in reaching a conclusion. It is from this that the notion of the copyright owner's

25   public developed. In *Duck v Bates*[5] Brett MR said:

the representation must be other than domestic and private. There must be present a sufficient part of the public who would go also to a performance licensed by the author as a commercial transaction; otherwise the place where the drama is represented will not

30   be a "place of dramatic entertainment" within the meaning of the statute.

In *Harms (Inc) and Chappell & Co v Martans Club*[6] Lord Hanworth MR said:

In dealing with the tests which have been applied in the cases, it appears to me that one must apply one's mind to see whether there has been any injury to the author. Did

35   what took place interfere with his proprietary rights? As to that, profit is a very important element.

The idea of the copyright owner's public first explicitly emerged in *Jennings v Stephens*[7] where Greene LJ said:

40   The question may therefore be usefully approached by inquiring whether or not the act complained of as an infringement would, if done by the owner of the copyright himself, have been an exercise by him of the statutory right conferred upon him. In other words, the expression "in public" must be considered in relation to the owner of the copyright. If the audience considered in relation to the owner of the copyright may

45   properly be described as the owner's "public" or part of his "public", then in performing the work before that audience he would in my opinion be exercising the statutory right conferred upon him; and any one who without his consent performed the work before that audience would be infringing his copyright.

50   5. (1884) 13 QBD 843 at 847
6   [1927] 1 Ch 526 at 532
7   [1936] Ch 469 at 485

The view expressed by Greene LJ in *Jennings v Stephens* was repeated by him in *Ernest Turner Electrical Instruments Ltd v Performing Right Society Ltd*[8] and was adopted by Luxmoore and Goddard LJJ, the latter adding that the relevant question is: "Is the audience one which the owner of the copyright could fairly consider a part of his public?"[9] In *Performing Right Society Ltd v Harlequin Record Shops Ltd*[10] Browne-Wilkinson J also adopted the view of Greene LJ, saying that it is important to see whether the performance is given to an audience for performances to which the composer would expect to receive a fee, this being what he understood Greene LJ to have meant by the copyright owner's public.

In this country, the concept of the copyright owner's public was adopted in *APRA v Canterbury-Bankstown League Club Ltd*[11] and *Rank Film Production Ltd v Colin S Dodds*.[12] In the latter case the playing of films transmitted by a video cassette recorder to television sets in motel rooms was held to be "in public". Rath J observed:[13]

> In the present case the motel guest in his room may easily be envisaged as part of the copyright owner's public. It is not the restricted size of the audience, or the privacy of the surroundings, that is decisive on the issue; the critical matter is the presentation of the movie by the occupier of the motel to his guest in that capacity.

The distinction between what is "in public" and what is "in private" is of little assistance in determining what is meant by transmission "to the public". The transmission may be to individuals in private circumstances but nevertheless be to the public. Moreover, the fact that at any one time the number of persons to whom the transmission is made may be small does not mean that the transmission is not to the public. Nor does it matter that those persons in a position to receive the transmission form only a part of the public, though it is no doubt necessary that the facility be available to those members of the public who choose to avail themselves of it. In *Rank Film Production Ltd v Colin S Dodds* the number of guests playing films in their rooms may not have been large, but the motel was open to the paying public. Similarly, those members of the public who choose to call a relevant number on their mobile telephone may be relatively small, but the facility is available to members of the public generally.

What is important is the nature of the audience constituted by those who receive music on hold. Lying behind the concept of the copyright owner's public is recognition of the fact that where a work is performed in a commercial setting, the occasion is unlikely to be private or domestic and the audience is more appropriately to be seen as a section of the public. It is in a commercial setting that an unauthorised performance will ordinarily be to the financial disadvantage of the owner's copyright in a work because it is in such a setting that the owner is entitled to expect payment for the work's authorised performance. In this case it is not so much the preparedness of the audience of music on hold to pay to hear the works were it not for their unauthorised performance that is significant. That simple analysis belongs to an age where communications were less technologically advanced and business and marketing techniques were less

8. [1943] Ch 167 at 171, 172-3
9. [1943] Ch 167 at 175-6
10. [1979] 1 WLR 851 at 857; [1979] 2 All ER 828 at 833
11. (1964) 81 WN (Pt 1) (NSW) 300 at 305-6
12. [1983] 2 NSWLR 553 at 559. See also the discussion in *APRA v Commonwealth Bank of Australia* (1992) 40 FCR 59 at 67-75; 111 ALR 671 at 678-86
13. [1983] 2 NSWLR 553 at 559

developed. Rather, it is the preparedness of those who wish the music on hold to be played to bear the cost of the arrangement which provides the key, for it reveals the commercial character of the broadcast and the commercial deprivation suffered by the copyright owner. Callers on hold constitute the copyright owner's public, not because they themselves would be prepared to pay to hear the music, but because others are prepared to bear the cost of them having that facility. For the performance of the music to that audience the copyright owner would expect to receive payment, even if not from the members of the audience. For these reasons, we conclude that when the works were transmitted to persons using mobile telephones when placed on hold, in each of the three situations revealed by the evidence, they were broadcast within the meaning of s 31(1)(a)(iv).

We would dismiss the appeal.

**Toohey J.** The circumstances giving rise to this appeal and the relevant provisions of the Copyright Act 1968 (Cth) (the Act) appear in the judgment of Dawson and Gaudron JJ.

In this court Telstra Corporation Ltd (Telstra) challenged the judgment of the Full Court of the Federal Court that it had broadcast works in which the copyright was owned by Australasian Performing Right Association Ltd (APRA) and that it had caused the works to be transmitted to subscribers to a diffusion service. In the first case there was held to be a breach of s 31(1)(a)(iv) of the Act; in the second case there was held to be a breach of s 31(1)(a)(v).[14]

I agree with Dawson and Gaudron JJ that, by participating in the provision of music on hold to callers using mobile telephones, Telstra broadcast the works within the meaning of s 31(1)(a)(iv). I have nothing to add to what their Honours have written in this regard. Accordingly, the appeal in relation to this part of the judgment of the Full Court must be dismissed.

As to the appeal in relation to s 31(1)(a)(v), I agree with much of what Dawson and Gaudron JJ have written. In particular, I agree that Telstra was the operator of a diffusion service. But I cannot take the further step of concluding that the works, that is the music in question played on hold to callers using conventional telephones, were thereby transmitted to subscribers to a diffusion service. On this aspect I find the reasons of Sheppard J in the Full Court persuasive. I shall explain why this is so.

Section 26(1) of the Act provides that a reference to the transmission of a work to subscribers to a diffusion service:

shall be read as a reference to the transmission of the work . . . in the course of a service of distributing broadcast or other matter (whether provided by the person operating the service or by other persons) over wires, or over other paths provided by a material substance, to the premises of subscribers to the service.

Neither "diffusion" nor "diffusion service" is defined in the Act but s 26 is critical in determining whether there has been a breach of s 31(1)(a)(v).

There are three situations in which Telstra participates in the provision of music on hold which is played to callers using conventional telephones:

(1) Where the service is provided by Telstra itself when its customers are placed on hold when they telephone one of its offices or service centres.

---

14  *APRA v Telstra Corp* (1995) 60 FCR 221, 131 ALR 141

(2) Where the call is made to an organisation which has available itself of the transmission facility provided by Telstra.

(3) Where an organisation causes music on hold to be played to customers from the service known as CustomNet, provided by Telstra. This involves the diversion of a call, where the line is busy, to a music on hold facility at Telstra's nearest telephone exchange.

Clearly enough, in each of these cases there is a transmission of recorded music which may be the subject of copyright. And there is a transmission of that music in the course of a service of distributing matter over wires or other paths. The real problem, and the source of difference between Black CJ and Burchett J on the one hand and Sheppard J on the other, is whether that transmission is "to the premises of subscribers to the service".

It is apparent that the persons who listen to the music are not themselves subscribers to the service of transmitting the music. Indeed, in the words of Sheppard J:[15]

They are strangers to it. They do not solicit it and they do not subscribe to it. Their purpose in telephoning the number is to deal with the organisation, [Telstra] or otherwise, with which they have business.

It must be remembered that it is the service of distributing the matter to which s 26(1) refers. That is the service of distributing the music. It is not the telecommunications service to which a caller may subscribe. The two are separate. That much is apparent from s 26(5) which reads:

Where a service of distributing matter over wires or over other paths provided by a material substance is only incidental to, or part of, a service of transmitting telegraphic or telephonic communications, a subscriber to the last mentioned service shall be taken, for the purposes of this section, to be a subscriber to the first mentioned service.

Subsection (5) contemplates two services which are related but are nevertheless distinct. The subsection may well apply where there is a subscription to a combined diffusion service and telecommunications service. It may also apply where there are separate subscriptions to two such services. But, in the present case, it is the services received by the caller which are relevant. And from the caller's perspective there is but one service. The service of receiving telephonic communication and the service of hearing music during that communication are the same thing. For the caller, it is of no moment whether there is music on hold or an answering machine or indeed silence. An argument that receiving a transmission of music on hold is incidental to receiving a telephonic transmission cannot be accepted. Subsection (5) cannot fairly be construed so as to confer rights which are not otherwise to be found in the relevant provisions of the Act. As Gummow J, the primary judge, observed:[16]

Subsection (5), in deeming a person to be a subscriber to the service, cannot be taken to also deem an agreement with the subscriber and an undertaking to provide them with the service, for the section provides no guidance as to who would be deemed to have made such an undertaking. The very process of identification of the person who is to be taken to be operating this service set down in subs (4) requires an analysis of the agreement to ascertain who is undertaking to provide the service, an analysis which cannot be performed upon a deemed agreement.

15. (1995) 60 FCR 221 at 233; 131 ALR 141 at 152

16  *APRA v Telstra Corp Ltd* (1993) 46 FCR 131 at 137  118 ALR 684 at 690-1

That the music on hold facility would have to be treated as separate from the facility of making telephone calls for s 26 to operate is made abundantly clear from s 26(4) which reads:

5    A reference in this section to the person operating a service of distributing broadcast or other matter shall be read as a reference to the person who, in the agreements with subscribers to the service, undertakes to provide them with the service, whether he is the person who transmits the broadcast or other matter or not.

The subsection places emphasis on the existence of agreements with subscribers
10   to the service, that is the service of providing subscribers with material which is copyright.

Section 26 relevantly is concerned with the distribution of recorded music to the premises of subscribers to a diffusion service. The obvious illustration of such a service is the transmission of music (or film), whether for a fee or not, to those
15   who wish to listen (or watch), by providing them with a facility for listening to (or watching) the material over wires, or other paths provided by a material substance, to the premises of the subscribers. The use of the term "premises" shows, as Sheppard J noted,[17] "that what was intended to be covered was the physical transmission of copyright material from some central source to the
20   premises of the various subscribers to the service".

It follows that the majority in the Full Court erred in allowing the appeal in respect of s 31(1)(a)(v). I would allow the present appeal in that regard and, to that extent, restore the judgment of Gummow J.

25   **McHugh J.** Telstra Corporation Ltd (Telstra)[18] appeals against an order of the Full Court of the Federal Court of Australia which held that Telstra was liable for infringing the copyright in material that was transmitted through its telephonic and telecommunications services.[19] The respondent, Australasian Performing Right Association Ltd (APRA) was, for relevant purposes, the assignee of the
30   copyright in the material. At first instance Gummow J had held that Telstra was not liable.[20]

The principal question in the case concerns the correct interpretation of s 31(1)(a)(iv) and (v) as informed by s 26 of the Copyright Act 1968 (Cth) (the Act). Section 31(1)(a)(iv) and (v) provide:

35   For the purposes of this Act, unless the contrary intention appears, copyright, in relation to a work, is the exclusive right:
     (a) in the case of a literary, dramatic or musical work, to do all or any of the following acts:

40           . . .
          (iv) to broadcast the work;
          (v) to cause the work to be transmitted to subscribers to a diffusion service.

The right recognised by s 31(1)(a)(iv) is commonly referred to as the "broadcast right", and that recognised by s 31(1)(a)(v) as the "diffusion right".

45
_____

17. (1995) 60 FCR 221 at 234; 131 ALR 141 at 153
18. At the commencement of these proceedings, Telstra Corporation Ltd traded under the name "Telecom"
19. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221; 131 ALR 141 (Black CJ and Burchett J, Sheppard J dissenting in part)
50   20  *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1993) 46 FCR 131  118 ALR 684

Section 26 provides:

(1) A reference in this Act to the transmission of a work or other subject-matter to subscribers to a diffusion service shall be read as a reference to the transmission of the work or other subject-matter in the course of a service of distributing broadcast or other matter (whether provided by the person operating the service or by other persons) over wires, or over other paths provided by a material substance, to the premises of subscribers to the service.

(2) For the purposes of this Act, where a work or other subject-matter is so transmitted:

(a) the person operating the service shall be deemed to be the person causing the work or other subject-matter to be so transmitted; and

(b) no person other than the person operating the service shall be deemed to be causing the work or other subject-matter to be so transmitted, whether or not he provides any facilities for the transmission.

(3) For the purposes of the application of this section, a service of distributing broadcast or other matter shall be disregarded where the service is only incidental to a business of keeping or letting premises at which persons reside or sleep, and is operated as part of the amenities provided exclusively for residents or inmates of the premises or for those residents or inmates and their guests.

(4) A reference in this section to the person operating a service of distributing broadcast or other matter shall be read as a reference to the person who, in the agreements with subscribers to the service, undertakes to provide them with the service, whether he is the person who transmits the broadcast or other matter or not.

(5) Where a service of distributing matter over wires or over other paths provided by a material substance is only incidental to, or part of, a service of transmitting telegraphic or telephonic communications, a subscriber to the last-mentioned service shall be taken, for the purposes of this section, to be a subscriber to the first-mentioned service.[21]

By s 10(1) of the Act, "broadcast" is defined to mean "transmit by wireless telegraphy to the public".

### The factual background

APRA is, for relevant purposes, the owner of the copyright in certain works which include the lyrics and music of the songs "Tell Me a Story", "Change" and "Let It Be". For the purpose of testing the operation of s 31(1)(a)(iv) and (v), APRA and Telstra cooperated in presenting evidence relating to certain factual situations. The learned trial judge said:[22]

Those factual situations include (a) the provision of music on hold by some third party to a caller (eg one of the witnesses, Mr Bowden, telephoned Premier Cabs and heard "Tell Me a Story" and "Change"), (b) the provision of music on hold by a Telecom service centre to a caller (eg Mr Bowden called the Epping-Ryde Telecom office and listened to "Let It Be"), (c) the provision of music on hold by Telecom to a caller in the course of a special music on hold service provided by Telecom to certain customers, and known as "CustomNet", and (d) the transmission of music on hold through the mobile telephone network (eg a witness, Mr O'Neill, used a mobile phone to call the Australian Musical Copyright Owner's Society and heard three songs). In each case, the music is provided either by a device which plays recorded music, or by a radio.

---

21. After the commencement of the present proceedings, s 26(2)(b) was amended by Sch 2 of the Law and Justice Legislation Amendment Act (No 2) 1994 (Cth) by substituting the words "he or she" for "he"

22. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1993) 46 FCR 131 at 132; 118 ALR 684 at 685

Telstra holds a general telecommunications licence issued under the Telecommunications Act 1991 (Cth). When the Act was passed, Telstra owned most of the telephone lines and equipment used for the carriage of telecommunications in Australia. However, Telstra is no longer responsible for
5 every line and piece of equipment. The Telecommunications Act declares that Telstra's responsibility for the lines and equipment of domestic customers ends at the first telephone socket and for those of commercial customers at the main distribution frame[23] in the building of those customers. If the customer is a domestic customer, the customer is the owner or lessee of and is responsible for
10 all equipment beyond the first socket. If the customer is a commercial customer, the customer is responsible for all equipment beyond the main distribution frame. The operation of the system was described by the learned trial judge as follows:[24]

15 In the case of a telephone call from an ordinary domestic telephone, when a person (the caller) picks up a telephone in order to make a call, the caller draws electromagnetic current which is provided by the nearest telephone exchange. When the caller dials a number the dialling signal is sent back to the nearest exchange and is routed by that exchange through the network to the exchange nearest to the person being-dialled (the recipient). If the recipient is engaged, then the signal does not pass beyond the exchange nearest to the recipient. An engaged signal is sent back to the
20 caller. Where the caller is connected and begins to speak, the electromagnetic current sent from the exchange to his telephone is modulated in response to his voice by a device located in the base of the handset. This modulated current returns to the nearest exchange where it is amplified and sent through the network to the recipient. The earpiece in the handset of the recipient contains a device which converts the electromagnetic current into sound.
25 Where the communication emanates from a commercial telephone system, such as a PABX, the position is complicated by the fact that such systems use their own power source rather than power provided by the exchange. Thus, if a person uses a PABX, an electromagnetic current is drawn from the electricity grid, is modulated by the person speaking, and is sent to the nearest exchange. There it is amplified and sent through the
30 network to the recipient. Therefore, the recipient receives, at least in part, an electromagnetic current which originates from the caller's PABX. In other cases, the recipient receives a current which originates from the caller's exchange and is modulated by the caller. It should be noted that where the caller and the recipient are reasonably close to one another, the modulated current may not necessarily be amplified. From a technical point of view, the playing of music on hold has the same
35 effect as someone speaking. The electromagnetic current originating in the PABX, for example, is modulated by the music source and this modulated current then moves through the network to the person listening to the music.
Many commercial telephone systems have the capacity to play music on hold. A music source, such as a compact disc player or radio, may be connected to such
40 equipment. Some of the equipment to which music sources can be attached is supplied by Telecom. The remainder is supplied by other companies unrelated to Telecom. In its advertising for products with a music on hold facility, Telecom refers to the advantages of such a facility.
Music on hold is also played by Telecom at a number of its "service centres" to
45 callers who telephone the centres. The music at these centres is provided by means of a machine playing recorded music. Telecom also provides a music on hold facility to certain subscribers of a service called "CustomNet". Subscribers to CustomNet are

---

23. The main distribution frame connects external telephone lines owned by Telstra to the customer's internal telephone lines
50 24 *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1993) 46 FCR 131 at 133 4; 118 ALR 684 at 686 7

provided with call handling capabilities equivalent to those available from a PABX system. Telephone handsets at the business premises of the subscribers are connected directly to a Telecom exchange. The subscribers pay a fee to receive the facilities of CustomNet. One optional feature available to subscribers is a music on hold facility which is provided by means of a compact disc player. When a person calls a subscriber to CustomNet and the subscriber is engaged, the caller's electromagnetic current does not pass beyond the subscriber's nearest exchange, but is instead diverted to the music on hold facility until the subscriber's telephone line becomes available. What is important for present purposes is that the electromagnetic current carrying music never passes to the premises of the subscriber, and a person operating a telephone at the subscriber's premises will never hear the music on hold. Instead, the current carrying the music moves directly from the Telecom exchange to the caller.

## Section 26 of the Act

Section 26 defines, for the purpose of s 31(1)(a)(v), what constitutes a diffusion service, what is involved in transmitting a work or other subject matter to a diffusion service, the person who causes that work or subject matter to be transmitted by a diffusion service, and the subscribers to that service.

By necessary implication, if not express words, s 26(1) identifies a diffusion service as "a service of distributing broadcast or other matter . . . over wires, or over other paths provided by a material substance, to the premises of subscribers to the service".[25] Central to the concept of a diffusion service is the distribution of "broadcast or other matter". In s 26 "broadcast" is used as an adjective while in s 10(1) it is defined as a verb. But there can be no doubt that the definition in s 10(1) applies and that the phrase "broadcast . . . matter" in s 26(1) refers to matter that has been, is being, or will be transmitted by wireless telegraphy to the public.[26] Section 10(1) defines "wireless telegraphy" as "the emitting or receiving, *otherwise than over a path that is provided by a material substance,* of electromagnetic energy" (emphasis added). As Professor Ricketson points out in his work on the Berne Convention:[27]

> Essentially, [the term "broadcasting"] refers to the transmission of sounds or images, or both, by electromagnetic waves without any artificial means of guidance or support (such as a wire or cable), for the purpose of enabling reception of the sounds or images which are transmitted by members of the general public. However, there are now many ways, apart from broadcasting in its pure sense, in which sounds and images can be transmitted to the final listener or viewer. For example, it has long been possible to do this with the aid of an artificial conductor, such as a wire or cable, and the range of conductors has now expanded enormously, even including such intangible means as laser beams. These methods can also be used in combination with broadcasts, for example, as a means of further diffusion once a broadcast has been received [footnotes omitted].

25. See also the second reading speech on the Copyright Bill 1968 (Cth), in which the Attorney-General, Mr Nigel Bowen, said: "A diffusion service is one in which transmission is effected by landline and not by broadcasting": Commonwealth of Australia, House of Representatives, *Parliamentary Debates (Hansard)*, 16 May 1968 at 1529

26. In s 10(1) broadcast is defined to mean "transmit by wireless telegraphy *to the public*" (emphasis added). The italicised words were not in the Act when it became law in 1968 although they may have been implied. They reinforce the conclusion that, for the purpose of s 26, the phrase "broadcast . . . matter" refers to matter that has been, is being, or will be transmitted to the public independently of its transmission to subscribers to a diffusion service

27 *The Berne Convention for the Protection of Literary and Artistic Works: 1886–1986* (1987) at 435 6

The reference to wireless telegraphy in the definition of "broadcast" in s 10(1), however, makes it clear that "broadcasting" in s 26(1) is used "in its pure sense" and that it does not refer to matter that is sent by wire or cable or over a path that is provided by a material substance. As the Copyright Convergence Group
5  reported to the relevant minister:[28]

Section 10 of the Copyright Act defines "broadcast" as to "transmit by wireless telegraphy to the public". This excludes transmissions over wires or other material paths. This approach is in accordance with the provisions of the international copyright conventions to which Australia is party, and in particular the Berne Convention. These
10  conventions distinguish between wired and wireless transmissions and only recognise wireless transmissions as broadcasts. However, the CCG considers that the separation of what may be the same activities by a service provider into two separate categories of protection based on the means of delivery of the service is no longer equitable in today's communications environment, and that this anomalous distinction should be
15  removed from the Act.

In s 26(1), therefore, the phrase "broadcast . . . matter" means matter which is transmitted by wireless telegraphy to the public other than by a service "over wires, or over other paths provided by a material substance".

It necessarily follows that, when s 26(1) refers to "a service of distributing
20  broadcast . . . matter . . . over wires" etc, it is referring to the relaying of matter to subscribers which has been, is being, or will be transmitted to the public by electromagnetic waves without any artificial means of support such as wire or cable. When s 26 was enacted, it is likely that the relaying of broadcast material in this sense was perceived as the type of service in respect of which the section
25  would have its largest application. It also seems likely that the relaying of material already broadcast, being, or to be broadcast was the principal activity which the drafters of Art $11^{bis}(1)$ of the Berne Convention,[29] the primary source of s 26, had in mind when Art $11^{bis}(1)$ was drafted and revised. Installations which received broadcasts, amplified them, and sent them by cable to individual
30  subscribers seem to have been common in Europe at the relevant times in the evolution of the Berne Convention.[30] Mr Catterns QC, who appears for APRA, contends that retransmission of broadcasts is also "a very important aspect" of s 26. He referred to "community antennas" in areas of Sydney, which relay television broadcasts by means of "wire" to houses with poor television
35  reception, as constituting a diffusion service to which people could subscribe.
   The music that was sent over the telephone wires in this case was not broadcast matter within the definition in s 26(1) of the Act. Even if the music was transmitted to the telephone system by means that would answer the description "wireless telegraphy" within s 10(1), it was not broadcast "to the public". The
40  music is not heard until it is transmitted to the caller and that occurs only because of the transmission of electromagnetic signals over the path provided by a material substance, viz, the telephone line.

45  28. Copyright Convergence Group, *Highways to Change: Copyright in the New Communications Environment*, August 1994 at 16
   29. See the 1948 Brussels Revision (the Brussels Act 1948); the 1967 Stockholm Revision (the Stockholm Act 1967); the 1971 Paris Revision (the Paris Act 1971). The history of the relevant provisions of the Berne Convention is conveniently set out in the judgment of Kirby J. See also Ricketson, *The Berne Convention for the Protection of Literary and Artistic Works: 1886-1986* (1987)
50  30. See, for example, the factual background to *Performing Right Society Ltd v Marlin Communal Aerials Ltd* [1977] FSR 51

### The meaning of "other matter" in s 26(1)

Section 26(1) also refers to "a service of distributing . . . other matter . . . over wires" etc. Are the words "other matter" wide enough to cover a case where music is transmitted to a telephone caller, as occurred in the present case? Certainly, they are wide enough to include every combination of words, signs, symbols, sounds or pictures, whatever their source. But the expression "other matter" cannot be at large. Unless the expression is given a restricted meaning, the term "broadcast . . . matter" in s 26(1) is effectively redundant.

Courts often avoid reading down general words in an instrument when they follow the enumeration of a class or classes of persons or things unless "in the particular case the true construction of the instrument requires you to conclude that they are intended to be used in a sense limited to things ejusdem generis with those which have been specifically mentioned before".[31] Nevertheless, there are numerous reported cases where the courts have read the word "other" to mean "other like"[32] even when, as here, the specified genus itself comprises only one category.[33] In *Stag Line Ltd v Foscolo, Mango & Co Ltd*,[34] the House of Lords was called on to interpret a charterparty which gave liberty to the vessel "to call at any ports in any order, for bunkering or other purposes". Lord Buckmaster said:[35]

> The word "bunkering" must have some demonstrative and limiting effect, and the phrase "or other purposes" following it cannot be so construed as to disregard the effect of the first example and assume that any purpose is thereby permitted. If that were so, the word "bunkering" might be left out.

In my view, the preferred construction of s 26(1) is that "other matter" must be read ejusdem generis with "broadcast . . . matter". Unless that is done, the latter expression is effectively redundant, notwithstanding that the term "broadcast" is a key term in Pt III of the Act. In s 26(1) the term "broadcast" must have a limiting effect. It would be surprising if the legislature, having used this key term to limit matters that came within the section, then intended to make it superfluous by using the expression "other matter".

A much better construction of the expression "broadcast or other matter" in s 26(1) is that it refers to matter that is transmitted *to the public* by wireless telegraphy or some like means involving the transmission of signals, sounds or images by electromagnetic energy but without any means of guidance by wires or other paths provided by a material substance.[36] On that hypothesis, s 26(1) deals with the *further* transmission of *such* matter by means of wires or other

31. *Anderson v Anderson* [1895] 1 QB 749 at 753

32. *Thames and Mersey Marine Insurance Co Ltd v Hamilton, Fraser & Co* (1887) 12 App Cas 484 at 491, 494-5, 501-2; *Re Richardsons and M Samuel & Co* [1898] 1 QB 261 at 266-7; *Bond v Foran* (1934) 52 CLR 364 at 376-7; *Nelson Hospital Board v Cook* [1946] NZLR 287; *Gregory v Fearn* [1953] 1 WLR 974 at 976; [1953] 2 All ER 559 at 560; *Corn v Weir's (Glass) Ltd* [1960] 1 WLR 577 at 582-3; [1960] 2 All ER 300 at 304-5; *Canwan Coals Pty Ltd v DCT* [1974] 1 NSWLR 728 at 733-4

33. *Stag Line Ltd v Foscolo, Mango & Co Ltd* [1932] AC 328; *Parkes v Secretary of State for the Environment* [1978] 1 WLR 1308; [1979] 1 All ER 211; *Re Collins; Ex parte Official Trustee in Bankruptcy v Bracher* (1986) 10 FCR 209; 65 ALR 338; *Director of Public Prosecutions v Vivier* [1991] 4 All ER 18 at 19-20

34. [1932] AC 328

35. [1932] AC 328 at 334

36. See the definition of "wireless telegraphy" in s 10(1) of the Act and cf the definition of the expression ' telegraph' or telegraph line   in s 3 of the Post and Telegraph Act 1901 (Cth)

paths provided by material substance to the premises of subscribers to a service. The words in parenthesis in s 26(1) "distributing broadcast or other matter (whether provided by the person operating the service or by other persons)" support this construction.

5      The terms of Art 11$^{bis}$(1) of the Berne Convention also support this construction. Article 11$^{bis}$(1) provides:[37]

> (1) Authors of literary and artistic works shall enjoy the exclusive right of authorizing:
>
> 10      (i) the broadcasting of their works or the communication thereof to the public by any other means of wireless diffusion of signs, sounds or images;
>
> (ii) any communication to the public by wire or by rebroadcasting of the broadcast of the work, when this communication is made by an organization other than the original one;
>
> (iii) the public communication by loudspeaker or any other analogous instrument 15      transmitting, by signs, sounds or images, the broadcast of the work.

Article 11$^{bis}$(1)(ii) is the primary source of s 31(1)(a)(v) and s 26 of the Act. In his useful commentary on Art 11$^{bis}$(1)(ii), Professor Ricketson states:[38]

> Article 11$^{bis}$(1)(ii) deals only with the distribution of broadcast programs, and does 20      this under the same condition that applies to rebroadcasting: a separate authorisation *for this secondary utilisation of a broadcast* is only required where the "communication by wire" is done by an organisation other than the original one. In the same way, no question as to whether this communication is made to a "new public" arises, so long as this is a communication to the public. In the case of the original organisation, therefore, it is free to distribute its broadcast programs by cable without having to seek further 25      permission. This "licence" can be viewed in several ways. On the one hand, it enables a broadcasting organisation to carry out its broadcasting effectively, particularly in areas where direct reception of programs is difficult and would involve the broadcasting organisation in additional expense if it had to rely on broadcasting alone. In this sense, cable distribution can be assimilated to rebroadcasting. On the other hand, the character 30      of the act, involving as it does distribution through some form of artificial conductor, is qualitatively different from broadcasting, and the question arises as to whether it should be treated as a distinct act of dissemination requiring the authorisation of the copyright owner. It is for this reason, that some national laws treat the acts of broadcasting and cable distribution as distinct acts, even where the cable distribution is of programs which have been broadcast by the same organisation [footnotes omitted, emphasis 35      added].

In a footnote to this passage, the learned author refers to s 31(1)(a)(v) of the Act as an example of a national law that has treated broadcasting and cable distribution as distinct acts.

40

which means "a wire or cable used for telegraphic or telephonic communication . . . or any apparatus for transmitting messages or other communications by means of electricity"

37. The Paris Act 1971, reproducing the language used in the Stockholm Act 1967. The Copyright Bill 1967 (Cth) was revised following the changes to the Berne Convention, including 45      Art 11$^{bis}$(1), introduced by the Stockholm Act 1967. In the second reading speech on the Copyright Bill 1968 (Cth), the Attorney-General, Mr Nigel Bowen, stated: "Since the 1967 bill was introduced, the Berne Convention has been again revised at a conference in Stockholm at which Australia was represented. Those further changes in our copyright law which would be required to give effect to the Stockholm Revision have been incorporated in this bill": Commonwealth of Australia, House of Representatives, *Parliamentary Debates (Hansard)*, 16 May 1968 at 1528

50 38 *The Berne Convention for the Protection of Literary and Artistic works· 1886–1986* (1987) at 450 1

Mr Catterns QC contends that the phrase "broadcast or other matter" "really could not be broader". He submits:

It is broader than the notion of the UK Act "programmes" . . . on the one hand, and it is also broader than the early Wireless Telegraphy Act . . . We submit that the phrase is a broad phrase certainly apt to cover the sort of communications that we are involved in here.[39]

But, for the reasons that I have given, the expression "other matter" in s 26(1) is not at large. No doubt it includes every conceivable signal, sound or image, whether or not it is contained in a program. But not every signal, sound or image is "broadcast matter". For the purposes of s 26, such signals, sounds or images are "broadcast . . . matter" only when they have been, are being, or will be conveyed to the public by electromagnetic waves without any support from wires, cables or other paths provided by a material substance.

There can be no doubt that music which is transmitted can be "broadcast or other matter". But if the construction that I have placed on that composite expression is correct, the transmission of music by itself is not enough to fall within the expression. Once the view is accepted that "other matter" is describing matter that is analogous to broadcast matter, it seems to follow that the matter — whether it be music, news, stock exchange prices or the like — must possess a special quality when it is distributed "over wires, or over other paths provided by a material substance". In the case of broadcast matter, that quality is that it is matter that has been, is being, or will be transmitted "by wireless telegraphy to the public". In the case of "other matter", that quality is that it is matter which has been, is being, or will be transmitted to the public by similar means. That is to say, the matter must be transmitted to the public by electromagnetic energy but without guidance or support from wires, cables, or other paths provided by a material substance.

It follows that, with great respect, I differ from the view expressed by Burchett J in the Full Court when his Honour said:[40]

The source of the music, whether a radio set, or record, tape or compact disc, is not of significance for the application of s 26.

Section 26(1) also makes it clear that central to the idea of a diffusion service is the distribution of a common pool of "broadcast or other matter" which will be shared by a number of subscribers. The use of the term "distributing" implies that what the subscriber receives is the same "broadcast or other matter" that other subscribers receive. A diffusion service therefore is a service in which matter is distributed to a number of persons. The section is concerned with a service of distributing matter from a common source to a number of premises controlled or occupied by subscribers to the service. Of course, in some cases only one subscriber may in fact receive the service. In that case, the service will not be within the definition in s 26(1) unless other persons have the opportunity to share in the distribution of the matter. The right of subscribers to have access to the broadcast or other material is therefore central to the operation of s 26. An agreement that a subscriber should receive matter that was not accessible by any other person would not in my view be a diffusion service within the meaning of

39. Section 48(3) of the Copyright Act 1956 (UK) referred to "a service of distributing broadcast programmes, or other programmes"

40  Australasian Performing Right Association Ltd v Telstra Corp Ltd (1995) 60 FCR 221 at 252· 131 ALR 141 at 169

s 26(1). The subscribers may receive the material at different times. But each subscriber must have a right of access to the common material. Further support for this construction of the term "distributing" arises from the construction that I have placed on the expression "broadcast or other matter". That construction

5  requires that the matter which is distributed be matter that has been, is being, or will be transmitted to the public.

Relying on the French translation of the Berne Convention, Mr Catterns QC submits that the term "distributing" in s 26 means transmission even though the English version of the Convention uses the term "distributing". Professor

10  Ricketson also suggests that the English translation should be given the same meaning as the French translation of the Convention.[41] This argument has considerable force. If the Act had given the relevant parts of the Convention the force of law, I would be inclined to uphold it. But the Act has not done that. Instead, it has relied on the English translation in creating the domestic law.

15  Because the legislature has used the English version, those words should be given their ordinary English meaning.

Plainly, s 26(1) distinguishes between the transmission of copyright works or other subject matter and the service of distributing broadcast or other matter. It may often be the case, however, particularly in the case of cable television, that

20  the service of distributing broadcast or other matter will consist almost entirely of distributing works or other subject matter that are the subject of copyright. Nevertheless, for the purposes of the subsection, a distinction exists between the service of distributing "broadcast or other matter" and the transmission of the

25  "work or other subject-matter". The former is the collective name for all the material which is distributed as part of the service whether or not it is the subject of copyright.

Subsections (2), (3), (4) and (5) of s 26 expand and restrict the definition of diffusion service in s 26(1). Importantly, they define the person who, for the

30  purposes of s 31(1)(a)(v) of the Act, causes a work to be transmitted to subscribers to a diffusion service. Sections 26(2) and (4) combine to define the person who is responsible for the transmission of the material. Section 26(2) provides that, for the purposes of the Act, the person operating the service which transmits a work or other subject matter "shall be deemed to be the person

35  causing the work or other subject-matter to be so transmitted". That subsection goes on to provide that no other person shall be deemed to cause the work or other subject matter to be transmitted. To determine who is the person operating the service for the purpose of subs (2), it is necessary to refer to subs (4). Subsection (4) provides that a person operates a service when that person under

40  an agreement with subscribers to the service undertakes to provide them with the service whether or not he or she is the person who transmits the broadcast or other matter.

### The meaning of s 26(5)

45  The provisions of s 26(5) are curious and somewhat obscure. The words "a service of distributing matter" in s 26(5) refer back to the service referred to in s 26(1). That is to say, they refer back to the service of distributing broadcast or other matter. Mr Catterns QC, accepts this is so. If circumstances exist so as to

---

50  41  *The Berne Convention for the Protection of Literary and Artistic Works 1886–1986* (1987) at 431

attract the operation of subs (5), that subsection defines the subscriber to the diffusion service. So much is common ground between the parties. However, they disagree as to what else it does.

Where the service of distributing broadcast or other matter is only incidental to or part of a service of transmitting telegraphic or telephonic communications, the subscriber to the telegraphic or telephonic communication service is also deemed to be a subscriber to the service of distributing broadcast or other matter. But nothing in subs (5) makes the person providing the telegraphic or telephonic communication service the person operating the service for the purpose of s 26(2). By s 26(4) the person who operates the service is the person who, by agreement with the subscribers to the service, undertakes to provide them with the service of distributing broadcast or other matter. That makes it very difficult to give subs (5) an operation independent of s 26(1).

The preferred construction of s 26(5), therefore, is that the "service of distributing matter over wires" etc in the opening words of that subsection is a reference to the "service of distributing broadcast or other matter" referred to in s 26(1). However, s 26(1) does not define the provider of the service. Nor does s 26(1) define, for the purpose of s 31(1)(a)(v), who is the person who "cause[s] the work to be transmitted to subscribers to a diffusion service" — which is after all the main reason for enacting s 26. That function is fulfilled by s 26(2) and (4).

## The person operating the diffusion service

Sections 26(2), (4) and 199(4) give content to s 31(1)(a)(v) of the Act which defines copyright in relation to a work as including the exclusive right to cause a work to be transmitted to the subscribers to a diffusion service. Section 26(2) declares that the person operating the diffusion service referred to in s 26(1) "shall be deemed to be the person causing the work or other subject-matter to be so transmitted" and that no other person "shall be deemed to be causing the work or other subject-matter to be so transmitted, *whether or not he provides any facilities for the transmission*" (emphasis added). Section 26(2) therefore has the effect of exempting the person who provides the facilities for further transmission of the "broadcast or other matter" from liability for the wire or cable distribution of "broadcast or other matter" unless that person is the person who operates the diffusion service. And by s 26(4), the person who operates the diffusion service is the person "who, in the agreements with subscribers to the service, undertakes to provide them with the service, *whether he is the person who transmits the broadcast or other matter or not*" (emphasis added). Section 199(4) reinforces this protection of the person who merely provides the means for further transmitting broadcast or other matter by declaring that a person who, by the reception of an authorised television or sound broadcast, causes a copyright work to be transmitted to subscribers to a diffusion service is to be treated for the purpose of infringement proceedings as having a licence from the copyright owner to cause the work to be so transmitted. Sections 26(2), (4) and 199(4) ensure therefore that the only persons who will be liable for breach of s 31(1)(a)(v) are those persons who undertake to subscribers to further transmit material which has been, is being, or will be transmitted to the public by wireless telegraphy or similar means.

## Telstra did not breach s 31(1)(a)(v)

Because the music on hold played to callers had not been transmitted to the public by wireless telegraphy or similar means before being transmitted to any

subscribers to a diffusion service, it was not "broadcast or other matter" for the purpose of s 26(1). On this ground alone, the present appeal could succeed. But Telstra did not rely on this point. Moreover, both Gummow J and the Full Court acted on the assumption that music on hold was at least "other matter" for the

5 purpose of s 26(1). It is true that Mr Catterns QC, for APRA, submitted that the expression "broadcast or other matter" was wider than the equivalent provision in the Copyright Act 1956 (UK) and was certainly wide enough to cover the music played in this case. But this was a passing reference. If there had been an appeal on this point, he would certainly have submitted a more detailed

10 argument. As a result of the way the case has been conducted, therefore, it would be inappropriate to allow the appeal on this point.

In my view, however, the appeal on the diffusion right issue must be allowed on the ground that, within the meaning of s 26(1) and (4), Telstra was not a person who by agreement undertook to provide subscribers with "a service of

15 distributing broadcast or other matter", whatever meaning is given to the expression "broadcast or other matter". There is no doubt that a person who provides a telegraphic or telephonic service may at the same time provide a distribution service for the purpose of s 26(1). But as s 26(2) and (4) make clear,

20 the only person who causes "the work or other subject-matter to be so transmitted" for the purpose of ss 26 and 31(1)(a)(v) is the person who has entered into agreements with subscribers and undertaken to provide them with a service of "distributing broadcast or other matter". Where the circumstances of a case attract the operation of s 26(5), the subscriber to the telegraphic or

25 telephonic service is taken to be the person who receives the copyright work that is distributed as part of the broadcast or other matter. But s 26(5) does not deem the provider of the telegraphic or telephonic service to be the person causing the work to be transmitted. Depending on the facts of the case, that subsection may create a statutory fiction.[42] But it does no more than make the subscriber to the

30 telegraphic or telephonic service the subscriber to the diffusion service. I can see no ground for concluding that, where s 26(5) operates, it not merely deems the subscriber to the telegraphic or telephonic service to be a subscriber to the diffusion service but also deems the provider of the telegraphic or telephonic service to be the person who by agreement undertakes to provide the subscriber

35 with a service of "distributing broadcast or other matter". A deeming provision must be read strictly. It is "improper ... to extend by implication the express application of such a statutory fiction".[43]

Accordingly, in my opinion, the appeal should be allowed on the diffusion right issue.

40

### The broadcast right — s 31(1)(a)(iv)

I agree for the reasons given by Dawson and Gaudron JJ that the appeal on the broadcast right issue must fail.

### Order

45 I would allow Telstra's appeal on the diffusion right issue but reject its appeal on the broadcast right issue.

42. cf *Hunter Douglas Australia Pty Ltd v Perma Blinds* (1970) 122 CLR 49 at 65-67

50  43  *FCT v Comber* (1986) 10 FCR 88 at 96· 64 ALR 451. See also *Commonwealth v Genex Corp Pty Ltd* (1992) 176 CLR 277 at 291 2, 110 ALR 154

**Kirby J.** This appeal from a decision of the Full Court of the Federal Court of Australia,[44] concerns music provided to telephone users who are placed on hold (music on hold). The question is whether, under the Copyright Act 1968 (Cth) (the Act), provision of such music may constitute a breach of copyright in the musical works used for that purpose.

In April 1993, the Australasian Performing Right Association Ltd (APRA) commenced proceedings in the Federal Court against Telstra Corporation Ltd (Telstra) which, at the time, traded under the name "Telecom".[45] APRA was the owner of copyright in certain literary and musical works which are the subject of this litigation (the works). Telstra was the holder of a general telecommunications licence under the Telecommunications Act 1991 (Cth). APRA sought declaratory and injunctive relief to restrain Telstra from performing, or authorising the performance of, the works in public; broadcasting them; or transmitting them to subscribers to a Telstra telecommunications service. APRA also sought to restrain Telstra from authorising, or permitting, any person to connect the works to the Telstra telecommunications network through equipment capable of transmitting the works to Telstra's subscribers.

At first instance in the Federal Court, Gummow J held that none of the activities challenged by APRA amounted to an infringement of APRA's copyright. His Honour dismissed the application.[46] The appeal to the Full Court of the Federal Court was allowed.[47] In this court, Telstra challenges the construction of the Act adopted by the Full Court.

### Different sources and kinds of music on hold

The detailed technical information describing the operation of the telephone system, as used to play music on hold, is contained in the reasons of Gummow J.[48] Only a few of these technical details are important for the resolution of the issues before this court. At the relevant times Telstra participated in the provision of music on hold in three ways:

1. When calls made to Telstra service centres were placed on hold. The music at such centres was supplied by a machine at the service centre playing recorded music to the waiting caller.

2. Telstra also facilitated the transmission of music on hold through telephone systems with the capacity to play such music to callers who could not be attended to immediately. A music source, such as a radio broadcast transmitter or a compact disc player, could be connected to such systems. In such a case, it was the transmission facility, and not the music, which was provided by Telstra. Until shortly before the hearing at first instance, Telstra was the only general carrier of

---

44. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221; 131 ALR 141 per Black CJ, Sheppard and Burchett JJ

45. For convenience, the appellant is referred to throughout as "Telstra"

46. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1993) 46 FCR 131 at 144; 118 ALR 684

47. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221; 131 ALR 141

48. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1993) 46 FCR 131 at 132-4; 118 ALR 684

telecommunications in Australia. As such, it was then the sole owner and, operator of the telecommunications network through which music on hold was provided.[49]

5   3. Finally, such music was provided by a service known as CustomNet. When a person telephoned another who was a subscriber to CustomNet and the subscriber's telephone was engaged, the electromagnetic current carrying the call was diverted to the music on hold facility at the Telstra exchange nearest to the subscriber, until the subscriber's telephone line became available. Under the
10  CustomNet system, the electromagnetic current carrying music on hold did not pass to the premises of the subscriber and thence to the caller. It moved directly from the Telstra exchange to the caller.

In each of the foregoing forms of music on hold, the music might either be pre-recorded music, derived from a compact disc player or tape recorder, or
15  music and words broadcast from a radio station transmitting to the general public.

The technical evidence accepted by Gummow J establishes that telephone calls are transmitted in two ways. Most are transmitted by way of the telephone lines, or as expressed in s 26(1) of the Act, "over wires, or over other paths
20  provided by a material substance". However, this is not so with calls to and from mobile telephones. They are transmitted by radio signals. Each mobile telephone has a radio transmitter and receiver which allow it to communicate with the nearest base station connecting its radio transmissions to the rest of the telephone network. In receiving signals from a base station, a mobile telephone operates in
25  a way similar to an FM radio receiver. The telephone does not have its own set frequency dedicated to it. When a user makes a call from a mobile telephone, it communicates with the nearest base station seeking a frequency allocation. This request is then sent to the nearest telephone exchange. It allocates frequencies for transmission and reception. The telephone switches to those frequencies and
30  commences the connection.

The present proceedings therefore concern several forms of music on hold, based upon combinations of the elements of the systems described above:[50]

(1) music on hold played to callers who telephone Telstra's own service
35      centres;
(2) music on hold played to callers who telephone subscribers to CustomNet;
(3) pre-recorded music on hold played to callers who telephone organisations which provide music themselves or who have acquired the
40      facilities to provide a music source from a supplier other than Telstra. In this case, Telstra transmits the music on hold, but does not provide it;
(4) broadcast music on hold played under the circumstances described in para (3); and
(5) recorded or broadcast music played to callers using mobile telephones
45      in the circumstances described in paras (1)-(4).

49. See *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1993) 46 FCR 131 at 132-3; 118 ALR 684, describing the role of Telstra in providing the telecommunications system under the Telecommunications Act 1991 (Cth)
50  50 See *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 230, 131 ALR 141 per Sheppard J

### Relevant provisions of the Act

APRA brought its proceedings on the basis of a claim that the activities described above, and all of them, constituted an infringement of its copyright in the works in question. Such copyright is conferred by s 31 of the Act. That section provides, relevantly:

(1) For the purposes of this Act, unless the contrary intention appears, copyright, in relation to a work, is the exclusive right:

  (a) in the case of a literary, dramatic or musical work, to do all or any of the following acts:

    . . .
    (iii) to perform the work in public;
    (iv) to broadcast the work;
    (v) to cause the work to be transmitted to subscribers to a diffusion service; . . .

Section 10(1) of the Act defines the word "broadcast" to mean "transmit by wireless telegraphy to the public". The same section defines "wireless telegraphy" as "the emitting or receiving, otherwise than over a path that is provided by a material substance, of electromagnetic energy".

Further indications of the meaning of "broadcast" are to be found in other provisions of the Act. Section 25(1) states:

A reference in this Act to broadcasting shall, unless the contrary intention appears, be read as a reference to broadcasting whether by way of sound broadcasting or of television.

Section 22(5) provides, relevantly:

For the purposes of this Act, a . . . sound broadcast shall . . . be deemed to have been made by the person by whom, at the time when, and from the place from which, the . . . sounds constituting the broadcast . . . were broadcast.

The meaning of "sound broadcast" is, by s 10(1) of the Act, "sounds broadcast otherwise than as part of a television broadcast".

Section 26 is critical. It contains detailed provisions concerning the meaning of "diffusion service", as contemplated by s 31(1)(a)(v). The section and s 199(4), which is also important, are set out in the reasons of Dawson and Gaudron JJ. I will not repeat them.

### Common grounds for a test case

In order to isolate the issues relevant to the appeal, it is useful to identify several matters which are not the subject of dispute:

1. The proceedings were brought by APRA as a test case. Indeed, APRA and Telstra have cooperated in the litigation, which nonetheless presents a real legal controversy for decision.[51] The factual context for the litigation was, for this reason, uncontentious. The subject of the music on hold in dispute comprised six literary and six musical works, set out in the statement of claim. Nothing turns on the identification of the particular works. It was agreed that evidence that such works were used as music on hold was sufficient to support the test case on the legal issues applicable to all music on hold.

---

51 *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1993) 46 FCR 131 at 132; 118 ALR 684

2. There was no issue about the legality of the transmission of music on hold by way of the telecommunications network, other than the question whether such transmission constituted a breach of APRA's copyright. Telecom was at all material times, as Telstra still is, the holder of a general telecommunications
5 licence, issued on 25 November 1991 under the Telecommunications Act. Most of Australia's telecommunications network is supplied, maintained and owned by Telstra.[52]

3. In the Federal Court, the parties pressed submissions concerning the effect of s 199(4) of the Act, in cases where the source of the music on hold was a radio
10 broadcast transmitted through a diffusion service to waiting callers who had been placed on hold. Those submissions were not repeated in this court. Consideration of the effect of s 199(4) is therefore limited.

4. At first instance, APRA contended that the activities described above fell
15 within the scope of the right "to perform the work in public" contained in s 31(1)(a)(iii) of the Act.[53] However, this contention was not pressed in the Full Court of the Federal Court[54] or in this court. The point need not be considered.

The remaining issues in the appeal can be simply stated. APRA contends that Telstra has infringed its copyright by the provision of music on hold in the
20 following ways:

1. By playing its own music on hold to callers who telephone Telstra service centres by transmitting music on hold played by third parties, or by playing music on hold to callers who telephone subscribers to CustomNet, Telstra has "cause[d] the work to be transmitted to subscribers to a diffusion service" under
25 s 31(1)(a)(v) of the Act (the diffusion right issue); and

2. By playing or transmitting recorded or broadcast music on hold to callers using mobile telephones either directly or via the CustomNet service, Telstra has "broadcast the work" within the meaning of s 31(1)(a)(iv) of the Act (the
30 broadcast right issue).

### Proceedings in the Federal Court of Australia

#### (1) The diffusion right issue:

35 At first instance, Gummow J held that none of Telstra's actions in playing or transmitting music on hold could be considered to have "cause[d] the work to be transmitted to subscribers to a diffusion service", within the meaning of s 31(1)(a)(v).[55] His Honour concluded that the transmission of music on hold was the transmission of the work "over wires, or over other paths provided by a
40 material substance", as required by s 26(1) of the Act.[56] However, he did not consider that such transmission was undertaken "in the course of a service of distributing broadcast or other matter . . . to the premises of subscribers to the

45 52. Telecommunications Act s 123
   53. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1993) 46 FCR 131 at 138-9; 118 ALR 684
   54. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 232; 131 ALR 141
   55. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1993) 46 FCR 131 at 138; 118 ALR 684
50 56 *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1993) 46 FCR 131 at 135· 118 ALR 684

service".[57] He pointed to the fact that music on hold was not provided for the benefit of the listener, but was a service benefiting, if anyone, the transmitter of the music:[58]

> Although this might conceivably be viewed as a service to the latter class of persons, subs (1) requires transmission to the premises of subscribers to the service.

Noting that the ordinary meaning of the word "distribute" was to "spread or disburse", and that "[a] central feature of any distribution is a uni-directional flow of something from one to more than one", Gummow J also concluded that a service with the primary function of facilitating communication between two people could not properly be described as "distributing" a service.[59]

Even if the provision of music on hold was properly to be regarded as satisfying the requirements of s 26(1), Gummow J emphasised the lack of any "agreements with subscribers to the service" under which Telstra "undertakes to provide them with the service".[60] His Honour's conclusions on the diffusion right issue applied equally to the transmission of recorded or radio broadcast music.[61]

By majority,[62] the Full Court of the Federal Court allowed the appeal by APRA on the diffusion right issue. Black CJ and Burchett J rejected Gummow J's finding that the transmission of music on hold had not been undertaken "in the course of a service of distributing" the work to subscribers to the service. While the service of music on hold was undoubtedly for the benefit of persons calling the subscriber, "[w]hat is provided is still a service even if it is not sought or appreciated by members of a class to which it is intended to appeal".[63]

Black CJ and Burchett J also considered that the provision of music on hold was a service of "distributing" the work. It was distributed to "everyone within the class of people who are intended to hear it".[64] There may be many people calling the same number at the same time, all hearing the same work from the same source. The disbursement from a common source was crucial. The fact that a separate electromagnetic current flowed to each caller did not deprive the service of its distributive character. Their Honours found support in s 26(5) of the Act, which recognises that a service of "distributing" matter can be "part of" a service to which there are subscribers.[65] This appeared to be an express negation of the argument that the person to person nature of telephone communication, and the inherent limitations placed on the capacity to distribute music on hold, prevented such communication of music on hold from constituting "a service of distributing" matter for the purposes of s 26(1) of the Act.

57. The Act s 26(1)
58. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1993) 46 FCR 131 at 137; 118 ALR 684 at 690
59. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1993) 46 FCR 131 at 137; 118 ALR 684 at 690
60. s 26(4) of the Act
61. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1993) 46 FCR 131 at 138; 118 ALR 684
62. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221; 131 ALR 141 per Black CJ and Burchett JJ; Sheppard J dissenting on this point
63. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 131 ALR 141 at 145, 170; 60 FCR 221 at 226 per Black CJ; similarly, see Burchett J at 252-3
64. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 131 ALR 141; 60 FCR 221 at 226 per Black CJ, see also Burchett J at 253
65. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 131 ALR 141; 60 FCR 221 at 226 7 per Black CJ 251 2 per Burchett J

For Black CJ, the critical point was whether the provision of music on hold could be said to be distributed "to the premises of subscribers to the service", as required by s 26(1). The answer to this question depended upon the construction of s 26(5) of the Act, which his Honour saw as operating to define the requisite "subscribers".[66] He concluded that the provision of music on hold was a service "incidental to" the telephone service, within the terms of s 26(5):[67]

> But incidental to the telephone service, and only incidental to it, there will be the service, appreciated no doubt by some and perhaps the source of annoyance to others, of music being played for the caller if the call cannot be attended to immediately.

In such a case, s 26(5) provided that a subscriber to the telephone service is to be taken, for the purposes of s 26(1), to be a subscriber to the distribution service. No actual subscription to the incidental service was required. When s 26(5) was viewed in this way, there was no need for any "agreements" between Telstra and subscribers to provide the service of music on hold, under s 26(4). The "agreements" needed only to provide for the telephone service. The same analysis was adopted by Burchett J:[68]

> If a subscriber to one service is required, by the statute, to be "taken, for the purposes of this section, to be" a subscriber to the other, it must also be taken that the agreement to provide him with the one service covers the other.

Both Black CJ and Burchett J distinguished between the situation where the source of the music on hold was a radio broadcast as opposed to the provision of recorded music. Where the music on hold was a radio broadcast, s 199(4) of the Act operated to treat the person who caused the work to be transmitted to subscribers as if he or she had been the holder of a licence granted by the owner of a copyright.[69]

In dissent on the diffusion right issue, Sheppard J recognised the possible injustice to APRA of the result which flowed from his interpretation of the Act.[70] However, his Honour preferred the construction of s 26 favoured by Gummow J. In his view, the language of that section was not apt to deal with cases presented by the development of the new technology of music on hold.[71] This was a defect which the judges could not repair. Sheppard J was particularly critical of the reliance placed by the majority on the effect of s 26(5):[72]

> Much was made of s 26(5) but . . . it cannot control the whole meaning of the section nor be read so as to confer rights which are not to be found even incidentally in the provisions of s 31, which, after all, is the provision which confers the right, or in the remaining provisions of s 26.

66. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 227; 131 ALR 141

67. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 227; 131 ALR 141

68. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 254; 131 ALR 141 at 171

69. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 131 ALR 141; 60 FCR 221 at 229 per Black CJ, 254-255 per Burchett

70. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 232; 131 ALR 141

71. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 234; 131 ALR 141

72. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 234 5; 131 ALR 141 at 153

Sheppard J, like Gummow J, also rested his opinion on this issue upon the legislative history of ss 31 and 26.[73] Taking into account the purpose of the provisions in the equivalent English legislation,[74] and the way in which they had come to be mirrored in the Act, Sheppard J considered that it was:

very difficult to impute to those responsible for the drafting of s 26 an intention to provide for a situation such as that contended for by APRA here.[75]

Any injustice required a legislative rather than a judicial response.[76]

### (2) The broadcast right issue:

On the second issue, Gummow J found that transmissions to mobile telephones by the base stations, involving as they did the emission of electromagnetic energy, clearly constituted a transmission "by wireless telegraphy" within the definition of "broadcast" in s 10(1) of the Act.[77] However, whether the transmission of music on hold to an individual mobile telephone caller could be said to be transmission "to the public", was more problematical. His Honour reviewed the legislative history of the definition of "broadcast" in the Act. He considered the available authorities on the proper construction of "public" as that word appears in various provisions of the Act and similar legislation in other jurisdictions.[78] He emphasised that the words "to the public" depended for their meaning not upon the number of recipients of the transmission but upon its essential character.[79] The operation of the mobile telephone system was designed to ensure privacy and confidentiality of each transmission. There were also statutory prohibitions on the interception of communications passing through the telecommunications system.[80] These considerations led Gummow J to conclude that it would be:

distorting the language of the broadcasting provisions to hold that if during the course of this private communication one party was to communicate a work to the other party, this amounts to a broadcast by [Telstra] to the public.[81]

73. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 235-6; 131 ALR 141
74. Copyright Act 1956 (UK)
75. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 236; 131 ALR 141 at 155
76. See, for example, the Copyright Act 1956 (UK)
77. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1993) 46 FCR 131 at 141; 118 ALR 684
78. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1993) 46 FCR 131 at 141-3; 118 ALR 684 discussing the Copyright Amendment Act 1986 (Cth) s 10(1A); Statute Law (Miscellaneous Provisions) Act (No 2) 1986 (Cth); *Australasian Performing Right Association Ltd v Commonwealth Bank of Australia* (1992) 40 FCR 59; 111 ALR 671; *Rank Film Production Ltd v Dodds* [1983] 2 NSWLR 553; *Chappell & Co Ltd v Associated Radio Co of Australia Ltd* [1925] VLR 350; *Mellor v Australian Broadcasting Commission* [1940] AC 491; Copyright Act 1976 (US)
79. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1993) 46 FCR 131 at 144; 118 ALR 684
80. See s 7 of the Telecommunications (Interception) Act 1979 (Cth)
81. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1993) 46 FCR 131 at 144; 118 ALR 684 at 697

This conclusion would hold equally if Telstra itself were playing the music, as, well as merely transmitting it, to mobile telephones.[82] The provision of s 22(5) focused on the point in space and time at which the electromagnetic energy was transmitted. The playing of music on hold by Telstra would not alter the
5  circumstance that the transmission itself was not "to the public", and was not, therefore, a "broadcast".

All members of the Full Court disagreed with Gummow J's conclusions on this point. They found that, by playing or transmitting recorded or broadcast
10  music on hold to callers using mobile telephones, Telstra had "broadcast the work" within the meaning of s 31(1)(a)(iv) of the Act. The reasoning of all three judges rested upon a construction of the words "to the public". Their Honours rejected the contention that the fact that the transmission of music on hold was private, and directed to individuals, as such, prevented it from being made "to the
15  public".

Sheppard J agreed with the primary judge's characterisation of telephone communications as "private affairs".[83] However, in his view this did not prevent them from being "to the public" any more than the fact that most listeners to radio
20  will do so in the privacy of their own homes or cars. The determining factor was not the privacy of telephone communication (which was a given), but the nature of the use of the copyright material.[84] His Honour saw no significant distinction between the words "to the public" in the definition of "broadcast" in s 10 and the term "in public" in s 31(1)(a)(iii) of the Act and similar provisions, as interpreted
25  by court decisions.[85] The cases cited identified the relevant "public" as being "the copyright owner's public", particularly where the performance of the work in question occurred as an adjunct to a commercial activity. The size of the particular "public" was irrelevant.

30  Burchett J agreed that it was the relationship of the audience to the owner of the copyright in question which was of prime importance,[86] and not the size of the audience. Black CJ agreed in the reasons and conclusions of the other members of the Full Court on this point.[87] Accordingly, the court unanimously allowed the appeal on the broadcast right issue.

35

82. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1993) 46 FCR 131 at 144; 118 ALR 684
83. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 239; 131 ALR 141
40  84. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 248; 131 ALR 141
85. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 242-8; 131 ALR 141 discussing *Duck v Bates* (1884) 13 QBD 843; *Hurms (Inc) Ltd v Martans Club Ltd* [1927] 1 Ch 526; *Performing Right Society Ltd v Hawthorns Hotel (Bournemouth) Ltd* [1933] Ch 855; *Jennings v Stephens* [1936] Ch 469; *Ernest Turner Electrical Instruments Ltd v Performing Right Society Ltd* [1943] Ch 167; *Australasian Performing Right Association Ltd v*
45  *Canterbury-Bankstown League Club Ltd* (1964) 81 WN (Pt 1) (NSW) 300; *Performing Right Society Ltd v Rangers FC Supporters Club* [1975] RPC 626; *Rank Film Production Ltd v Dodds* [1983] 2 NSWLR 553; *Australasian Performing Right Association Ltd v Commonwealth Bank of Australia* (1992) 40 FCR 59; 111 ALR 671. See also at FCR 259-60 per Burchett J
86. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 259, 261; 131 ALR 141
50  87. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 229, 131 ALR 141

## Matters of approach

In this court, Telstra propounded two arguments critical to the general approach of the Federal Court.

First, Telstra argued that the Full Court had erred in concluding that Telstra was liable for copyright infringement, in transmitting music on hold in its capacity as a general carrier of telecommunications. The fact that Telstra did not initiate or control the contents of those communications was said to be crucial. Even in the case of CustomNet, Telstra would often have no control of the content of the transmission. The Act could never have intended to impose upon an operator of a telecommunications network, in effect, strict liability for any copyright infringement, with the result that customers could transmit copyright information to each other and thereby render Telstra liable for the breach, although it had no way of knowing that such a breach had occurred and no chance of preventing it from happening.

Secondly, Telstra argued that the Full Court was incorrect in disregarding the fact that persons listening to music on hold had no necessary desire or intention to do so. In making a telephone call, a caller would rarely, if ever, seek to hear either the particular music played, or even music generally. A call would invariably be made for a different purpose, namely communicating with a person for a business or personal reason. So far as callers were concerned, there would be no possible cause for complaint if they made a telephone call and did not hear any music on hold. Telstra emphasised that this factual distinction between the case of music on hold, and the cases relied upon by the Full Court, involving an element of consensus between the audience and the music provider, was a significant one.

On the other hand, APRA formulated its case on the basis that the diffusion and broadcast rights in the Act had their genesis in, and were elements of, the right of "public communication" guaranteed by the Berne Convention for the Protection of Literary and Artistic Works 1886 (the Convention).[88] APRA submitted that the Convention was the primary guide to the ascertainment of the meaning of the phrase "transmitted to subscribers to a diffusion service".[89] The legislative history of the Act demonstrated that it intended that a copyright owner should, consistently with revisions of the Convention, enjoy the broad right to communicate its work to the public. Subject to limited exceptions (such as s 199(4)), the relevant rights in s 31(1)(a) of the Act were intended to be coextensive. In particular, no significant distinction was contemplated by the Convention between the right to broadcast (s 31(1)(a)(iv)) and the right to transmit to subscribers to a diffusion service: s 31(1)(a)(v). Thus, in APRA's submission, the words of those provisions should not be given the narrow

---

88. Article 17 of the Berne Convention 1896 provided for periodic revisions of the Convention. These have occurred in 1896, 1908, 1928, 1948, 1967, and 1971. "Berne Convention" is a generic term. A particular revision of the Convention is identified by reference to the conference at which the revision was made by member States. The main revisions have been as follows: the 1896 Paris Revision; the 1908 Berlin Revision; the 1948 Brussels Revision (the Brussels Act 1948); the 1967 Stockholm Revision (the Stockholm Act 1967); the 1971 Paris Revision (the Paris Act 1971). See Ricketson, *The Berne Convention for the Protection of Literary and Artistic Works: 1886-1986* (1987) Ch 3

89 Relying on *Minister for Immigration and Ethnic Affairs v Teoh* (1995) 183 CLR 273 at 287-8; 128 ALR 353

construction which Telstra attached to them. The overriding intention of the Act, as of the Convention, was that the copyright owner should receive broad protection.

The meaning of the legislation under scrutiny in this appeal is not absolutely

5   clear. The primary duty of a court in such a case is to give effect to the imputed will of the parliament as expressed in the legislation. But where that will is ambiguous it is relevant to elucidate pertinent considerations of legal principle or legal policy. The importance of the competing policy considerations was recognised by the Full Court.[90] The law of copyright is concerned with balancing

10  the public interest in economic and cultural development against the interests of individuals in securing a fair and equitable return for their intellectual efforts.[91] The potential liability of a telecommunications carrier for infringement of copyright, promoted through its network, is a matter of considerable public importance. The potential financial consequences of the decision in this case for

15  telecommunications carriers (and therefore for the customers who may ultimately bear the costs of such potential liability) are considerable. The impact of a decision imposing liability on a telecommunications carrier may, in time, be heavier still, given the increasing integration of transmission technologies and the resulting technological blurring of the boundaries between the roles of carriers

20  and content-providers.[92] Such considerations led Sheppard J to the conclusion that a legislative rather than a judicial response to the suggested injustice of denying copyright protection to the owner for the use of its work in a diffusion service was what was called for.[93] I agree that in this area, where the interests are large, and the rights are ultimately derived from the language of an international

25  treaty of national as well as global importance, judicial restraint is called for where an Act is obscure or arguably inapplicable.

However, the determination of whether the playing or transmission of music on hold by Telstra through its telecommunications network constitutes an infringement of the exclusive rights described by s 31(1)(a) of the Act ultimately

30  involves the construction of an Act of the Australian Parliament. A court must seek to ascertain the purposes of the parliament as expressed in the language which it has used in the legislation.[94] It may consider the purposes of the Act to determine whether more than one construction is available. So far as possible, it should adopt the construction which best promotes those purposes. The comment

35  of Dawson J in *Mills v Meeking* is in point:[95]

> [I]f the literal meaning of a provision is to be modified by reference to the purposes of the Act, the modification must be precisely identifiable as that which is necessary to effectuate those purposes and it must be consistent with the wording otherwise adopted by the draftsman.

40

90. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 237; 131 ALR 141 per Sheppard J
91. Cornish, *Intellectual Property: Patents, Copyright, Trade Marks and Allied Rights*, 3rd ed (1996) at 11
92. See Loughlan, "Music on Hold: The Case of Copyright and the Telephone. *Telstra Corp Ltd v Australasian Performing Rights Association Ltd*" (1996) 18 *Sydney Law Review* 342 at 342; Report of the Copyright Convergence Group, "Highways to Change. Copyright in the New Communications Environment" (1994)
93. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 237; 131 ALR 141 per Sheppard J
94. Acts Interpretation Act 1901 (Cth) s 15AA; *Re Bolton; Ex parte Beane* (1987) 162 CLR 514 at 517-18; 70 ALR 225
95. (1990) 91 ALR 16 at 30 1

45

50

A court must give effect to the clear meaning of a statute even where the result seems anomalous or unfair.[96] The potential consequences of assigning a particular interpretation to a provision may be taken into account in seeking the purpose of the parliament. However, this will only be one factor among many to be considered:[97]

> If the choice is between two strongly competing interpretations ... the advantage may lie with that which produces the fairer and more convenient operation so long as it conforms to the legislative intention. If, however, one interpretation has a powerful advantage in ordinary meaning and grammatical sense, it will only be displaced if its operation is perceived to be unintended.

With these familiar rules of statutory construction in mind I approach the task presented by the appeal.

### The diffusion right issue

Whether the provision of music on hold involves an infringement by Telstra of the exclusive right of APRA to "cause the work to be transmitted to subscribers to a diffusion service" necessitates, ultimately, an elucidation of s 26 of the Act. That section identifies the three relevant elements of that exclusive right: the "diffusion service"; the "subscribers" to the service; and the persons who "cause the work to be transmitted". Let me deal with each of these elements in turn:

(1) *Music on hold is a "diffusion service":* Section 26(1) requires that, for there to be a "diffusion service", there must be a "service of distributing broadcast or other matter". To succeed, APRA was therefore obliged to demonstrate that the transmission of music on hold by Telstra (1) constituted a "service" and (2) amounted to the act of "distributing" the works.

Telstra submitted that as defined in s 26(1), a "diffusion service" was a service to the recipients of the matter, not to the senders. Subscribers to such a service are persons who subscribe to receive the matter, not to send it. According to s 26(4), there must also exist agreements with the subscribers that they will receive the service. These conditions were not satisfied in the present case.

It is true that callers obliged to listen to music on hold do not explicitly seek, or necessarily want, to hear the music. The real purpose of their call is, at least initially, unrelated. Music on hold may even frustrate or annoy them. They have no means of preventing the provision of the particular music or of altering its content. Some might prefer silence so that, while waiting, they can get on with work, reading, or doing other things. They might, if they could choose, select ancient music by long deceased performers to which no copyright attaches, rather than the kind of modern music described in the evidence, for which copyright was fresh and protected by APRA.

However, the word "service", in its ordinary use, involves no notion of the desirability or congeniality of the thing provided. Otherwise, the occasional reception of nuisance calls or unwanted calls from unloved relatives or persistent creditors over the telephone might render the provision of the telephone facility no longer a "service". From the fact that the market has led in recent years to the proliferation of music on hold services, it may be inferred that many, perhaps most, callers are thought to prefer music to the frustrations of silence. It seems reasonable to infer from the growth of such facilities, in Australia as elsewhere, that market research or business estimates have convinced those who pay for

---

96  See *R v L* (1994) 122 ALR 464 at 468-9

97  *Cooper Brookes (Wollongong) Pty Ltd v FCT* (1981) 35 ALR 151 at 170, 55 ALJR 434 at 443 4

them that providing them is in their economic, social or other interests. I agree
with the comments of Black CJ on this point:[98]

> [T]he service, whether provided directly by the trader itself or by a third party, is
> provided for the benefit of the trader's customers. It is the perceived benefit to the
> customers that makes the provision of the service of benefit to the trader.

To constitute a "service" there would be no need for the music to be provided
as an independent and distinct commercial operation. Section 26(3) and 26(5) of
the Act both assume that an activity "only incidental to" certain commercial
operations may constitute a "service". This suggests that the word was intended
to be given a broad interpretation encompassing activities incidental to more
general services, such as "a business of keeping or letting premises" (s 26(3)) or
"a service of transmitting telegraphic or telephonic communications": s 26(5).

It is also clear that, by transmitting music on hold, Telstra was "distributing"
the works, despite the fact that they were played to individuals through individual
telephone connections and, depending upon the number of simultaneous callers,
only one person would ordinarily hear the same work at the same time from the
same subscriber's handpiece. The *Macquarie Dictionary* defines "distribute" as
"to divide and bestow in shares; deal out; allot . . . to disperse through a space or
over an area; spread; scatter". As Gummow J pointed out, "[a] central feature of
any distribution is a uni-directional flow of something from one to more than
one".[99] While it is indeed difficult to see how a service facilitating
communication between two people could fulfil such a requirement, this is not
the "service" to which s 26(1) of the Act refers. The relevant "service" is the
entire "service of distributing broadcast or other matter . . . to the premises of
subscribers to the service". It is not, as such, the facilitation of the individual
transmissions from one telephone to another. The terms of s 26(1) are wide
enough to include a process consisting of the dissemination of various musical
works to different people at multiple premises via the Telstra network. Over time,
works emanating from a particular source are carried to everyone within the class
of persons intended to hear them, that is, the callers to a particular number. No
element of simultaneity is necessary, any more than in the distribution of a
publication or of presents at the festive season. When properly characterised in
this way, the "service" is undoubtedly one of "distributing" matter.

In support of the foregoing conclusion, it is worth noticing s 26(5) of the Act.
This subsection clearly contemplates that the inherent individual to individual
nature of telephone communication will not disqualify it from constituting a
"service" of the relevant kind. It does this by including "a service of distributing
matter" which is only "part of" the broader telephonic service, within the scope
of s 26(1).

Nothing turns on the fact that s 26(1) equates transmission "to subscribers"
with distribution to "the premises of subscribers".[100] This requirement merely
makes s 26(1) workable by recognising that, inherent in the operation of the
telephone network, is the provision of the service to a person's premises rather

---

98. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 226;
    131 ALR 141

99. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1993) 46 FCR 131 at 137;
    118 ALR 684

100 *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 253;
    131 ALR 141

than to an actual person. Otherwise, liability would depend upon the identity of the person using the service within the premises.

The transmission of music on hold by Telstra therefore constitutes a "diffusion service" within the meaning of s $31(1)(a)(v)$ of the Act. The Full Court was correct in so deciding.

(2) *The "subscribers" to the service:* To fall within the definition of the diffusion rights contained in s 26(1), music on hold must be distributed "over wires, or over other paths provided by a material substance, to the premises of subscribers to the service". It is common ground that the first half of this provision, describing the mode of carriage of the transmissions, is satisfied. However, unless APRA can demonstrate that the music on hold is distributed "to the premises of subscribers to the service", the appeal must be upheld on the diffusion right issue. The difficulty here is obvious. It is the caller, and not the subscriber to the music on hold service, who receives the music. For technical reasons, the music never reaches the premises of the person who is providing the music on hold. By definition that person is busy, occasioning the need to "hold".

APRA did not dispute this difficulty. It argued that the "subscribers to the service" were subscribers to the telephonic communications service, which did include the callers receiving the music on hold. It relied on a particular construction of the effect of s 26(5) of the Act. That subsection is concerned with the situation where a service referred to in subs (1) is "only incidental to, or part of, a service of transmitting ... telephonic communications ...". In such cases, subs (5) deems that "a subscriber to the last-mentioned service shall be taken, for the purposes of this section, to be a subscriber to the first-mentioned service".

APRA also submitted that the effect of s 26(5), as found by Black CJ and Burchett J in the Full Court, was correct. Telstra had contracted to provide its subscribers with a service of transmitting telephonic communications. Either as "part of", or "incidental to", that service Telstra transmitted music on hold from the premises of the subscribers to the premises of other subscribers. The service in question was therefore neither unsought nor unwanted, or wanted only by the transmitter. By virtue of s 26(5) of the Act, subscribers contracted, inter alia, to receive music on hold as a service incidental to the service to which they have agreed to subscribe. It was not necessary to identify a distinct service of distributing matter. It was argued that it would accord with a natural use of language to say that Telstra provided a service of transmitting data, facsimiles and music on hold as *part of* its telephone service.

APRA finally submitted that under s 26(2)(a) of the Act, Telstra was deemed to be causing the work to be transmitted. This was because it was an "operating service" within the terms of s 26(4).

Telstra contested these arguments. It submitted that s 26(5) of the Act could not operate so as to import into the word "subscriber" the meaning of subscribers to the telecommunications service. The Full Court had erred in finding that it had such effect. Rather, s 26(5) was inserted to deal with a case in which there was a general telecommunications network to which one could subscribe, but also a secondary service of providing music if the subscriber chose also to receive it. In the case of such a combined service, s 26(5) made it clear that two separate agreements were not required for s 26(4) to be satisfied. A single agreement was sufficient. In Telstra's submission, s 26(5) was not intended to control the entire operation of s 26

Black CJ was clearly right to say that "the outcome of the appeal in respect of the diffusion right turns on s 26(5)".[101] It was so in the Full Court. So it has emerged in this court.

5 If one attempts to construe the provisions of s 26(5) in isolation, the analysis of the provision favoured by Gummow J and by Sheppard J has a measure of plausibility. Their analysis was that subs (5) "cannot . . . be read so as to confer rights which are not to be found even incidentally in the provisions of s 31".[102] However, with respect to their Honours, this approach involves construing s 26, the purpose of which is to elaborate s 31 with some detail, by reference to a
10 preconceived notion of the intended scope of s 31 itself. The duty of ascertaining the meaning of the legislation requires that s 26(5) be considered in the context of s 26 as a whole, and against the broader purposes of the Act.[103] Undertaking such an exercise, the construction of s 26(5) which the majority in the Full Court favoured appears to me to be the preferable one. My reasons are as follows:

15 1. On their face, the words of s 26(5) appear unambiguously to intend the subsection to control the operation of the term "subscribers" as it is repeated in the rest of the section. Thus, subs (5) is expressed to apply "for the purposes of this section". It is not expressed to be limited in its operation to particular subsections.

20 2. If the contrary construction of s 26(5) were adopted, the provision would not have a practical effect or operation. So much was virtually acknowledged by Telstra. The requirement that a court should endeavour to give effect to every provision of an Act[104] demands that, where one interpretation would render a section ineffectual, while another would offer it a sphere of operation, the latter
25 is to be preferred.

3. The Act was enacted in terms which permitted Australia to subscribe to the Convention. Australia became bound by the Brussels Act 1948 on 1 June 1969. It is well established doctrine in this country that, in cases of ambiguity, courts will favour a construction of an Australian statute which accords with the
30 international obligations of Australia under a treaty which it has ratified, over an interpretation which is inconsistent with the obligation.[105]

The Convention intended to provide copyright owners with a broad right to communicate their works to the public, and to afford them protection against

35 
---
101. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 225; 131 ALR 141 per Black CJ
102. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 234; 131 ALR 141 per Sheppard J; similarly see *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1993) 46 FCR 131 at 137; 118 ALR 684
103. *Metropolitan Gas Co v Federated Gas Employees' Industrial Union* (1925) 35 CLR 449 at 455; *Commissioner for Railways (NSW) v Agalianos* (1955) 92 CLR 390 at 397; *K & S Lake City Freighters Pty Ltd v Gordon & Gotch Ltd* (1985) 60 ALR 509 at 514; 59 ALJR 658 at 660-1
104. *Commonwealth v Baume* (1905) 2 CLR 405 at 414; *Beckwith v R* (1976) 12 ALR 333 at 337; 51 ALJR 247 at 249; *Chu Kheng Lim v Minister for Immigration, Local Government and Ethnic Affairs* (1992) 110 ALR 97 at 102; 67 ALJR 125 at 128; *Trade Practices Commission v Gillette Co (No 2)* (1993) 118 ALR 280 at 290
105. *Minister for Immigration and Ethnic Affairs v Teoh* (1995) 183 CLR 273 at 287; 128 ALR 353; see also *Chu Kheng Lim v Minister for Immigration, Local Government and Ethnic Affairs* (1992) 110 ALR 97 at 123; 67 ALJR 125 at 143; *Minister for Immigration and Ethnic Affairs v Guo Wei Rong* (1997) 144 ALR 567; *Minister for Foreign Affairs and Trade v Magno* (1992) 112 ALR 529 at 534; *Young v Registrar, Court of Appeal (No 3)* (1993) 32 NSWLR 262 at 274-6; *Camilleri's Stock Feeds Pty Ltd v Environment Protection Authority* (1993) 32 NSWLR 683 at 692; *Chen v Minister for Immigration and Ethnic Affairs* (1994) 123 ALR 126 at 129; *Rocklea Spinning Mills Pty Ltd v Anti Dumping Authority* (1995) 129 ALR 401 at 411

others who usurped or invaded that right. Article 11(1) of the Brussels Act 1948 provided, inter alia, that the authors of musical or dramatic works should enjoy the exclusive right to authorise:

    (i) the public presentation and public performance of their works; and

    (ii) the public distribution by any means of the presentation and performance of their works.

Article 11[bis] provided, relevantly, that authors of literary and artistic works were to have the exclusive right of authorising:

    (i) the radio-diffusion of their works or the communication thereof to the public by any other means of wireless diffusion of signs, sounds or images;

    (ii) any communication to the public, whether over wires or not, of the radio-diffusion of the work, when this communication is made by a body other than the original one;

    (iii) the communication to the public by loudspeaker or any other similar instrument transmitting, by signs, sounds or images, the radio-diffusion of the work.

Professor Ricketson[106] notes that the origins of the diffusion right in the above provisions may be traced to the particular concern of those preparing the Convention for breach of copyright through the technology of the "theatrephone". This was a device for transmission, by adaptation of the ordinary telephone, of everything audible upon the stage of a theatre.[107]

In the United Kingdom, the Copyright Act 1956 (UK) was enacted following recommendations of the Gregory Committee[108] as to changes to copyright law necessary to take into account technical developments and the Brussels Act 1948. In Australia, the Spicer Committee[109] was appointed to advise the Federal Government on which of the 1956 amendments to the United Kingdom Act should be incorporated into Australian law. The Committee recommended that provisions similar to ss 2(5) and 48(1) of the Copyright Act 1956 (UK), be adopted.[110] It is not necessary to set out those provisions. It is sufficient to note that the former subsection was adopted as s 31(1)(a)(v) of the Act, while the latter, with a few minor drafting alterations, formed the basis of s 26 of the Australian Act.

The purpose of implementing the provisions of the Convention was acknowledged by the Attorney-General (Mr N H Bowen) in his second reading speech on the Copyright Bill 1967 (Cth):[111]

    The changes proposed by the bill will enable Australia to become a party to two international agreements on copyright. These are, first, the Brussels revision in 1948 of the Berne Convention for the Protection of Literary and Artistic Works . . .

106. Ricketson, *The Berne Convention for the Protection of Literary and Artistic Works 1886-1896* at 432

107. *Oxford English Dictionary*, 2nd ed, (1989) vol 17 at 883

108. United Kingdom, *Report of the Copyright Committee* (1952) at paras 115-20

109. *Report of the Committee Appointed by the Attorney-General of the Commonwealth to Consider what Alterations are Desirable in the Copyright Law of the Commonwealth* (1959) (Chairman, Sir John Spicer)

110. *Report of the Committee Appointed by the Attorney-General of the Commonwealth to Consider what Alterations are Desirable in the Copyright Law of the Commonwealth* (1959) at paras 62, 438, 440

111. House of Representatives *Parliamentary Debates (Hansard)* 18 May 1967 at 2328

Clause 30, the predecessor to s 31, is described in terms which make plain the intention of a broad level of protection:[112]

> In respect of literary, dramatic and musical works, the copyright owner is given exclusive rights of reproduction, publication, public performance, broadcasting and communication of the works to subscribers to a diffusion service . . .

Following changes made to the Convention by the Stockholm Act 1967, the Copyright Bill 1967 (Cth) was further revised. In the second reading speech on the Copyright Bill 1968 (Cth), the intention that the Act should reflect the broad protection offered by the Convention was reinforced:[113]

> Those further changes in our copyright law which would be required to give effect to the Stockholm Revision have been incorporated in this bill.

Articles 11 and 11[bis] of the Brussels Act 1948 were reformulated by the Stockholm Act 1967, the substantive provisions of which Australia never ratified. However, Art 11(1) of the Stockholm Act was reproduced in the same terms as Art 11(1) of the Paris Act 1971. Australia became bound by this on 1 March 1978. Article 11(1) of the Paris Act provides that authors of dramatic and musical works shall enjoy the exclusive right of authorising:

> (i) the public performance of their works, including such public performance by any means or process;
> (ii) any communication to the public of the performance of their works.

The legislative history of ss 31(1)(a)(v) and 26 of the Act therefore suggests a purpose of providing the very broad protection envisaged by the successive forms of Art 11 of the Convention. It is unnecessary to comment on APRA's submission that the rights contained in s 31(1) are intended, consistent with the Convention, to be coextensive. It is sufficient to say that it would be inconsistent with the wide terms of the Convention and its successive amendments, to adopt an unduly narrow construction of s 26(5) of the Act, particularly where the clear language of that subsection by no means requires that course.

4. It is true that s 26 of the Act originated at a time when the specific technology of music on hold did not exist and may not even have been contemplated. This does not mean that the terms of the legislative provision, properly construed, may not extend to new technological forms of a "diffusion service" as they are developed. In certain circumstances, general language, originally designed to apply to an earlier technology, may apply to supervening technology.[114] I agree with what was said in *Jerome H Remick & Co v American Automobile Accessories Co*:[115]

> While statutes should not be stretched to apply to new situations not fairly within their scope, they should not be so narrowly construed as to permit their evasion because of changing habits due to new inventions and discoveries.

It has already been noted that the original concept of diffusion rights in the Brussels Act of the Convention may have derived, historically, from concern

112. House of Representatives, *Parliamentary Debates (Hansard)*, 18 May 1967 at 2329
113. House of Representatives, *Parliamentary Debates (Hansard)*, 16 May 1968 at 1528
114. This has certainly occurred in the constitutional context of s 51(v) of the Constitution: see *R v Brislan; Ex parte Williams* (1935) 54 CLR 262; *Jones v Commonwealth (No 2)* (1965) 112 CLR 206. In the statutory context see *Lake Macquarie Shire Council v Aberdare County Council* (1970) 123 CLR 327 at 331; *FCT v ICI Australia Ltd* (1972) 127 CLR 529 at 548; *Wilson v Commissioner of Stamp Duties* (1988) 13 NSWLR 77 at 78
115. 5 F (2d) 411 at 411 (1925)

about the long forgotten theatrephone.[116] It was argued that the diffusion right, as
it appeared in the Act in 1968, was intended principally to deal with the
technology of diffusion of television broadcasts and the re-transmission of free to
air broadcast material along a cable from an area receiving antennae to remote
areas where the broadcasts themselves could not otherwise be received.[117]
However, if the diffusion right had been intended to be *limited* to such
technology, the Act would have reflected that purpose by a far more specific and
limited definition of "diffusion service" than appears in s 26. As the diffusion
rights provisions go beyond such a purpose, their application to music on hold
can be said to be fairly within the scope of the statute.[118] The technological
innovation giving rise to music on hold was hardly a dramatic one. Further, the
legislature obviously contemplated the then impending development of cable
technology which would initiate the distribution of programs as well as merely
redistributing earlier broadcast material.[119] There is thus nothing in the legislative
history of the diffusion right to suggest that its operation was intended to be
limited to the particular technological circumstances prevailing at the time the
Act was enacted. The language used does not support that conclusion. It should
be rejected.

The effect of s 26(5) of the Act is to deem that subscribers to Telstra's
telecommunications service are to be taken, for the purposes of s 26(1), to be
subscribers to the service of music on hold which is "incidental to, or part of" the
telecommunications service. In this way, Telstra transmits music on hold "to the
premises of subscribers to the service" within the terms of s 26(1). The Full Court
was correct to so decide.

(3) *Telstra "cause[s] the work to be transmitted":* Section 26(2)(a) of the Act
deems "the person causing the work . . . to be so transmitted" to be "the person
operating the service". Section 26(4) then requires that the "person operating a
service" shall be read as a reference to "the person who, in the agreements with
subscribers to the service, undertakes to provide them with the service". The
suggested difficulty for APRA was the same as that faced in relation to s 26(1).
If the "subscribers to the service" referred to in s 26(4) of the Act were
subscribers to the service of music on hold, then no "agreements" with such
subscribers to provide such a service to them are identifiable. Music on hold
would fall outside the terms of the Act.

The answer to this suggested problem lies in the analysis of s 26(5) offered
above. That subsection removes the need for an agreement containing
undertakings by Telstra to provide music on hold. It is enough that music on hold
should be "incidental to, or part of" the telecommunications service provided by
Telstra. All that is required is an agreement containing an undertaking to provide
the latter service to a subscriber for there to be deemed an agreement under which

---

116. Ricketson, *The Berne Convention for the Protection of Literary and Artistic Works 1886-1986*
    at 432

117. See van Caenegem, "Copyright, Communication and New Technologies" (1995) 23 *Federal
    Law Review* 322 at 337

118. *Jerome H Remick & Co v American Automobile Accessories Co* 5 F (2d) 411 at 411 (1925)

119. See Loughlan, "Music on Hold: The Case of Copyright and the Telephone, *Telstra Corp Ltd v
    Australasian Performing Rights Association Ltd*" (1996) 18 *Sydney Law Review* 342 at 346

it is undertaken that the former service shall·be provided. This conclusion was expressed concisely by Burchett J in the Full Court, in terms which I would accept:[120]

5    If a subscriber to one service is required, by the statute, to be "taken, for the purposes of this section, to be" a subscriber to the other, it must also be taken that the agreement to provide him with the one service covers the other.

It follows that Telstra, in transmitting music on hold, infringed APRA's exclusive right "to cause the work to be transmitted to subscribers to a diffusion service", within the terms of s 31(1)(a)(v) of the Act. The majority of the Full 10   Court correctly so decided. The appeal against their decision should be rejected.

## The broadcast right issue

(1) *The submissions of the parties:* The final issue concerns the playing of music on hold to callers using mobile telephones. APRA argued that this involved 15   a breach of its exclusive right "to broadcast the work" within s 31(1)(a)(iv). To make out its case, APRA had to demonstrate that the activity in question constituted a transmission of the work by Telstra "by wireless telegraphy to the public".[121] There is no contention that the mobile phone network does not involve transmission "by wireless telegraphy". The sole issue in contest was 20   whether such transmission, in the context of mobile phones, could be said to be "to the public".

The Act contains no definition of "the public". The meaning of this and similar terms (such as "in public") has been considered by the courts in a line of authority dealing primarily with the right to authorise a work to be performed in public. 25   Neither party disputed the authority of those cases. The central point of contention was the applicability of that authority, dealing with public performance rights, to s 31(1)(a)(iv) of the Act as elaborated by s 10(1).

Telstra submitted that the definition of "broadcast" in s 10(1) of the Act, as constituting the transmission by wireless telegraphy "to the public" required that 30   the work in question be capable of reception by a large public. It argued that this is not the case with music on hold:

1. The words "to the public" and "in public" could not be treated ·as synonymous, as was found in the Full Court. The cases elucidating the phrase "in public" were not available to support APRA's argument that the playing of music 35   on hold to a user of a mobile phone constituted transmission "to the public". Those cases were concerned with different verbal formulae. They were also concerned with factual contexts not analogous to the present. Most of the cases relied upon in the Federal Court involved dramatic or musical performances in which the entire audience assembled in a particular place, united in their desire 40   to see or hear a particular dramatic or musical work. There was no such group of people, identifiable by a common enterprise and wish, in the present case.

2. The phrase "to the public" was not satisfied by a small section of the public. It referred to a transmission either to people generally, or at least to a substantial or large audience. Nor was the phrase satisfied by a group of people selected for 45   reasons unrelated to any desire to hear the work in question, for example, those people telephoning a subscriber's number to order a taxi. If there were transmission only to a narrow class of people, that class consisted of those people

50   120. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 254;
     131 ALR 141 at 171 per Burchett J
     121 Definition of "broadcast" in s 10(1)

who desired to hear the works in question, or works of the type in question. It did not include involuntary recipients subjected to the work when their actual desire would ordinarily be that it should terminate as quickly as possible so that the real purpose of their telephone call could be achieved.

3. Where music on hold was not provided by Telstra but by a third party to a caller, Telstra had absolutely no control over the content of the transmission. It followed that Telstra did not "transmit" the work within the definition in s 10(1) of the Act. If the contrary argument were correct, it could not be confined to music on hold. Logically, it would extend to the repetition (for example by singing or whistling) by any customer of Telstra of any copyright works in the course of a conversation by mobile telephone. It was submitted by Telstra that it could not have been the intention of the parliament that such a communication would constitute an infringement of the copyright in the works, rendering Telstra, as mere carrier, liable for that breach.

APRA met these submissions as follows:

1. The term "broadcast" was exhaustively defined in s 10(1) of the Act. The legislative history made it clear that the ordinary meaning of the word was not to govern its construction to the exclusion of the special statutory definition. The purpose of employing the words "the public" in the definition was rather to invoke the well-established line of authority concerning the construction of substantially similar terminology, viz "in public".

2. The authority of these "public performance cases" had not been challenged. Instead it was contested that the cases were limited to those in which the relevant audience comprised persons willing to pay for the privilege of seeing or hearing the performance.[122] However, the size of an audience had never been an important factor in the public performance cases. The cases uniformly emphasised that it is the nature of the relationship between the audience and the copyright holder which was decisive. Accordingly, the Full Court of the Federal Court was correct in holding that Telstra's transmissions were "to the public", because they were an adjunct to a commercial activity thereby made available to a broad public comprising countless subscribers using Telstra's services.

(2) *Three relevant principles:* Three broad principles relevant to the characterisation of the activities in question may be discerned from the authorities on public performance rights. First, a number of cases emphasise the distinction between "public" performances and cases which are "domestic and private".[123] In many of these cases, decided before the broadcast right was enacted, the source of difficulty was the adaptation of the public performance right to the new potential for copyright infringement arising from broadcast technology. In the early days of radio broadcasting, the Supreme Court of Victoria held in *Chappell & Co Ltd v Associated Radio Co of Australia Ltd*[124] that a broadcast constituted a performance in public, despite the fact that each listener's receiver might be in the privacy of his or her own home:[125]

> The fact that in America, at all events, broadcasting is used largely for purposes of advertising, shows the advantages it has in bringing about publicity. In fact, publicity

122. Citing *Australasian Performing Right Association Ltd v Commonwealth Bank of Australia* (1992) 40 FCR 59 at 74–5; 111 ALR 671

123. *Chappell & Co Ltd v Associated Radio Co of Australia Ltd* [1925] VLR 350

124. [1925] VLR 350

125 [1925] VLR 350 at 360

is inherent in the word itself, and it is satisfactory to find that by the application of ordinary legal principle a conclusion in accordance with common understanding is arrived at.

5    The same conclusion was reached elsewhere by different reasoning. The applicable principles were set out by the Privy Council in *Mellor v Australian Broadcasting Commission*:[126]

10    Here it is necessary to remember that the sole right of the owner of the musical work is to perform it *in public*, and that anyone may perform the work in private. The original performance in the studio may be, and generally will be, a performance in private. In such a case the broadcast performance at the receiving end, if in public and unlicensed, will be an infringement of copyright at that place.[127] If there is merely a broadcast from the studio where the piece is performed in private, there is obviously no performance in public at all ... If the broadcast is picked up only by listeners in private it might be
15    difficult to establish that there is a public performance; for each performance would be separate, and each would be private ... Whether the studio performance is public or private, if the persons who are responsible for that performance are also responsible for the broadcasting of the piece, there is no doubt that they have facilitated the performance of the work in public by any listener who is in a position to use a loud
20    speaker and thus to perform the piece in public.

The line of cases defining the performance of a work "in public" in opposition to private performance, was reviewed by Gummow J in *Australasian Performing Right Association Ltd v Commonwealth Bank of Australia*.[128] His Honour there
25    concluded:[129]

Running through the authorities I have discussed is the notion that for the purposes of this performing right a performance will be "in public" if it is not "in private", and the perception of an antithesis between performances which are in public and those which are "domestic" or "private" in character. In determining whether a performance
30    answers the latter description, the nature of the audience is important. In coming together to form the audience for the performance were the persons concerned bound together by a domestic or private tie or by an aspect of their public life?

The second principle arises from the necessity of answering the question posed by Gummow J in the last sentence. What is the nature of the audience in
35    question? In this respect it appears that where the performance occurs "as an adjunct to a commercial activity the performance is likely to be regarded as public".[130] The authority for this proposition reaches back at least to the decision

---

40    126. [1940] AC 491 at 500-1
127. *Performing Right Society Ltd v Hammond's Bradford Brewery Co Ltd* [1934] Ch 121
128. (1992) 40 FCR 59 at 74; 111 ALR 671 after referring to *Mellor v Australian Broadcasting Commission* [1940] AC 491; *Performing Right Society Ltd v Harlequin Record Shops Ltd* [1979] 1 WLR 851; [1979] 2 All ER 828; *Southern African Music Rights Organisation Ltd v Svenmill Fabrics Pty Ltd* (SC(South Africa), 4 November 1982, unreported); *Jennings v Stephens* [1936] Ch 469; *Ernest Turner Electrical Instruments Ltd v Performing Right Society*
45    *Ltd* [1943] Ch 167; *Australasian Performing Right Association Ltd v Tolbush Pty Ltd* [1986] 2 Qd R 146
129. (1992) 40 FCR 59 at 74; 111 ALR 671; see also *Australian Performing Right Association Ltd v Canterbury-Bankstown League Club Ltd* (1964) 81 WN (Pt 1) NSW 300 at 306; *Performing Right Society Ltd v Rangers PC Supporters Club* [1975] RPC 626 at 634; cf *Rank Film Production Ltd v Dodds* [1983] 2 NSWLR 553 at 560
50    130. *Australasian Performing Right Association Ltd v Commonwealth Bank of Australia* (1992) 40 FCR 59 at 74 111 ALR 671 citing Wei *The Law of Copyright in Singapore* (1989) at 120

of the English Court of Appeal in *Duck v Bates*,[131] in which Brett MR held that, for a free performance to be "public", it would have to be attended by a sufficient portion of the public who would also choose to go to the same performance if they had to pay.[132] In *Harms (Inc) Ltd v Martans Club Ltd*,[133] it was suggested that the rationale for the requirement was that attention should be focused upon the harm caused to the creator of the works:[134]

> In dealing with the tests which have been applied in the cases, it appears to me that one must apply one's mind to see whether there has been any injury to the author. Did what took place interfere with his proprietary rights? As to that, profit is a very important element.

The commercial context in which the performance takes place has been repeatedly identified as an important element in defining a performance, "public" in character, both in Australia[135] and other jurisdictions.[136] However, it is important to recognise that this is relevant chiefly as an indication that the proprietary rights of the copyright owner may be being infringed. A significant consideration of the law of copyright is, after all, the protection of the proprietary rights of the copyright holder which have an economic value.

It is the recognition of this rationale upon which the third, and for the purposes of the present case, most important, principle is based. That is, that the relevant "public" is the group which the copyright owner would otherwise contemplate as its public for the performance of its work. This was made clear in *Jennings v Stephens*:[137]

> The question may therefore be usefully approached by inquiring whether or not the act complained of as an infringement would, if done by the owner of the copyright himself, have been an exercise by him of the statutory right conferred upon him. In other words, the expression "in public" must be considered in relation to the owner of the copyright. If the audience considered in relation to the owner of the copyright may properly be described as the owner's "public" or part of his "public", then in performing the work before that audience he would in my opinion be exercising the statutory right conferred upon him; and any one who without his consent performed the work before that audience would be infringing his copyright.

The same approach was affirmed by the English Court of Appeal in *Ernest Turner Electrical Instruments Ltd v Performing Right Society Ltd*,[138] where it was stressed that the primary consideration was the relationship of the audience to the owner of the copyright rather than that of the audience to the performers.[139]

The concept of the copyright owner's "public" has also been accepted by Australian courts as the preferable test for deciding whether a particular performance was "public" or not. Referring to the English decisions above,

131. (1884) 13 QBD 843
132. (1884) 13 QBD 843 at 847
133. [1927] 1 Ch 526
134. [1927] 1 Ch 526 at 532 per Lord Hanworth MR
135. See, for example, *Rank Film Production Ltd v Dodds* [1983] 2 NSWLR 553 at 558
136. *Jerome H Remick & Co v American Automobile Accessories Co* 5 F (2d) 411 at 412 (1925); *Messager v British Broadcasting Co Ltd* [1927] 2 KB 543 at 547; *Performing Right Society Ltd v Hawthorns Hotel (Bournemouth)* [1933] 1 Ch 855 at 857
137. [1936] Ch 469 at 485 per Greene LJ
138. [1943] Ch 167
139. [1943] Ch 167 at 172

Rath J, in *Rank Film Production Ltd v Dodds*,[140] noted that it was not the size of the audience or the privacy of the surroundings which were decisive in determining whether a performance was "in public", but rather the ascertainment of the relationship between the audience and the copyright owner.[141] His Honour continued:[142]

> The words "in public" ... must be construed in the context of the history of the copyright legislation and the case law ... Performance "in public" means performance to the public of the owner of the copyright, and "public" includes a portion of the public, however small.

(3) *Particular legislative history:* No authority exists which conclusively decides the meaning of the words "to the public" as they appear in the definition of "broadcast" in s 10 of the Act. In relation to the use, by analogy, of the authorities set out above a court should be cautious in invoking earlier judicial dicta or holdings in relation to different phrases appearing in different statutory contexts, enacted for different purposes.[143] Earlier judicial reasoning may, of course, be of assistance. However, the obligation of anyone construing legislation is that of ascertaining the meaning of the phrase in question in the context under scrutiny. Nevertheless, in the present case, the authorities do, I think, assist in giving content to the words "to the public". The legislative history of the broadcast right in the context of the general nature of copyright law argues against the contrary conclusion.

Before the enactment, in 1968, of the broadcast right in s 31(1)(a)(iv) of the Act, copyright owners were obliged to rely upon the public performance right for protection of copyright in their work when it was broadcast. As noted above, the case law prior to 1968 reflects the attempts by the courts to adapt the public performance right to broadcasting activities.[144]

As originally enacted, the Act provided in s 10(1) that "broadcast" meant "broadcast by wireless telegraphy". Although the definition was exhaustive, because it included the word "broadcast" itself, that word was to be construed according to the ordinary principles of construction.[145] Before the amendment of the Act in 1986[146] there was no requirement for the broadcast to be "to the public". Most broadcasts are received in private.[147] Therefore, no protection was needed for the copyright owner in respect of such activity.

The Act was amended twice in 1986. The Copyright Amendment Act 1986 (Cth) amended the definition in s 10(1) of the Act to read " 'broadcast' means broadcast, other than from point to point, by wireless telegraphy". A new s 10(1A) deemed a broadcast to be taken to be "point to point" "if it is intended

140. [1983] 2 NSWLR 553

141. [1983] 2 NSWLR 553 at 559; see also *Australian Performing Right Association Ltd v Canterbury-Bankstown League Club Ltd* (1964) 81 WN (Pt 1) (NSW) 300 at 306

142. [1983] 2 NSWLR 553 at 560

143. See, for example, *Ogden Industries Pty Ltd v Lucas* [1970] AC 113 at 127; *Carter v Bradbeer* [1975] 1 WLR 1204 at 1206; [1975] 3 All ER 158 at 161; see also *Damjanovic & Sons Pty Ltd v Commonwealth* (1968) 117 CLR 390 at 408–9

144. See, for example, *Chappell & Co Ltd v Associated Radio Co of Australia Ltd* [1925] VLR 350; *Mellor v Australian Broadcasting Commission* [1940] AC 491

145. See discussion in *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 239; 131 ALR 141 per Sheppard J

146. Copyright Amendment Act 1986 (Cth)

147. *Australasian Performing Right Association Ltd v Telstra Corp Ltd* (1995) 60 FCR 221 at 239, 131 ALR 141 per Sheppard J

by the broadcaster to be received only by particular equipment at a particular location". The second reading speech[148] on the Copyright Amendment Bill 1986 and the explanatory memorandum[149] identified the reasons for the amendment. It was to ensure that broadcasts via satellite (AUSSAT) fell within the provision and to make clear that only transmissions intended to be received by the public were to be within the broadcasting right, and not those intended for particular recipients (point to point transmissions). .

Before the amended provisions came into force they were, in turn, replaced by the Statute Law (Miscellaneous Provisions) Act (No 2) 1986 (Cth). This deleted s 10(1A). It introduced the definition of "broadcast" as it now stands. The explanatory memorandum which accompanied that measure explained the purpose of the amendment as follows:[150]

Accordingly programme-carrying signals not intended to be received by the *copyright-owner's public* will not be "broadcasts" even if a few members of the public possessing specialised equipment are able to pick them up [emphasis added].

The Attorney-General's second reading speech also confirmed the meaning intended to be attributed, in this context, to the words "to the public":[151]

The amendment will clarify the definition of "broadcast", which was modified by the Copyright Amendment Act 1986, passed last sittings. Interested groups have submitted that the wording inserted by that Act is ambiguous, and does not express the government's intention that "broadcast", in this context, should cover transmissions to the *copyright owner's public*, whether the "general" public or part of the public. Following consultations there is agreement with the policy and wording of the proposed new definition [emphasis added].

The definition of "broadcast" in s 10(1) of the Act is now exhaustive. The legislative history set out above makes it tolerably clear that the words "to the public" in the definition were intended to refer to the "copyright owner's public". That phrase would not have been chosen accidentally. It is a phrase with a long history in cases dealing with public performance rights. The only inference to be drawn from the use of that phrase is that the words "to the public" were intended to import the copyright owner's public.

This conclusion, suggested by the legislative history, is strengthened by a consideration of the general objectives and nature of copyright law. That consideration has been recognised in the past as an important aid to interpretation of copyright legislation.[152]

(4) *Conclusion: copyright owner's public:* Can the transmission of music on hold by Telstra be said to be a transmission to the copyright owner's public? On the criteria expressed in the case law it can. Music on hold is played largely by businesses and other organisations to entertain, placate or distract customers or clientele, in a way hoped to be congenial to them, while the telephone lines are engaged. Telstra plays or transmits it as part of its overall telephonic communications enterprise. It is undoubtedly provided as "an adjunct to a

148. House of Representatives, *Parliamentary Debates (Hansard)*, 21 May 1986 at 3667-72

149. Copyright Amendment Bill 1986, explanatory memorandum at 7-9

150. Statute Law (Miscellaneous Provisions) Bill (No 2) 1986, explanatory memorandum at 21

151. House of Representatives, *Parliamentary Debates (Hansard)*, 15 October 1986 at 2067

152. *Australasian Performing Right Association Ltd v Commonwealth Bank of Australia* (1992) 40 FCR 59 at 74, 111 ALR 671

commercial activity".[153] It cannot be described as "private" or "domestic" in character.[154] A telephone conversation may be private. However, when callers are placed on hold, they do not hear music simply because the person on the other end of the line is busy and selects that particular individual as the recipient of the

5 music. They hear the music because it is intended that any member of the public who calls the engaged number will hear the music. A caller hearing music on hold, must therefore be part of that "public" which the owner of the copyright in the music contemplates to be part of its audience.

For the foregoing reasons, the provision or transmission of music on hold by

10 Telstra constitutes a "broadcast" of the work within the terms of s 31(1)(a)(iv) of the Act. The Full Court was correct in so deciding.

## Implications of this decision

It has been suggested that the foregoing conclusions could have significant

15 consequences for other information technologies — including facsimile services, video conferencing and data transmission.[155] In particular, it has been argued that telecommunications carriers and perhaps even internet service providers could potentially become liable as a result of internet users' downloading works which are protected by copyright. Clearly, such issues go beyond the scope of this

20 appeal. They were not developed in the arguments of the parties. However, the parliament may need to consider these questions — and others arising — and to formulate a legislative response to them. They cannot be solved, but have not been overlooked, by me.

## Order

25 The appeal should be dismissed with costs.

## Order

30 Appeal dismissed with costs.

Solicitors for the appellant: *Holding Redlich.*

Solicitors for the respondent: *Faulkner & Associates.*

35
R C TITTERTON
BARRISTER

40

45

153. *Australasian Performing Right Association Ltd v Commonwealth Bank of Australia* (1992) 40 FCR 59 at 74; 111 ALR 671

154. *Australasian Performing Right Association Ltd v Commonwealth Bank of Australia* (1992) 40 FCR 59 at 74; 111 ALR 671

50 155. See Loughlan, "Music on Hold: The Case of Copyright and the Telephone *Telstra Corp Ltd v Australasian Performing Rights Association Ltd*" (1996) 18 *Sydney Law Review* 342 at 347 8