# EXHIBIT 5

```
 1              UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3                HONORABLE OTIS D. WRIGHT

 4            UNITED STATES DISTRICT JUDGE PRESIDING

 5                       - - -

 6
     DC Comics,                      )
 7                    PLAINTIFF,     )
                                     )
 8   VS.                             )   NO. CV 10-3633 ODW
                                     )
 9   Pacific Pictures Corporation, et )
     al.,                            )
10                    DEFENDANT,     )
     _____)
11

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15               LOS ANGELES, CALIFORNIA

16             WEDNESDAY, SEPTEMBER 5, 2012

17

18

19   _____

20           KATIE E. THIBODEAUX, CSR 9858
              U.S. Official Court Reporter
21           312 North Spring Street, #436
             Los Angeles, California 90012
22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR PLAINTIFF:

 4        O'MELVENY AND MYERS LLP
          BY:  DANIEL M. PETROCELLI
 5        -and- DIMITRI D. PORTNOI
          -and- MATTHEW T. KLINE
 6        -and- JASON TOKOROFF
          400 South Hope Street
 7        Eighteenth Floor
          Los Angeles, CA  90067
 8

 9

10   FOR DEFENDANT:

11        TOBEROFF AND ASSOCIATES PC
          BY:  MARC TOBEROFF
12        -and- KEITH ADAMS
          -and- PABLO ARREDONDO
13        22337 Pacific Coast Highway
          Suite 348
14        Malibu, CA  90265

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1      LOS ANGELES, CALIFORNIA; WEDNESDAY, SEPTEMBER 5, 2012

 2                            1:30 P.M.

 3                            - - - - -

 4

 5

 6           THE CLERK:  Calling Item 2, CV 10-3633, DC Comics

 7    versus Pacific Pictures Corporation, et al.

 8              Counsel, may I have your appearances please.

 9           MR. PETROCELLI:  Thank you.  Good afternoon, your

10    Honor.  Daniel Petrocelli with Matthew Kline, Dmitri

11    Portnoi and Jason Tokoro for plaintiff DC Comics.

12           MR. TOBEROFF:  Good afternoon, your Honor.  Mark

13    Toberoff for the defendants.  I am here with my

14    associates Keith Adams and Pablo Arredondo.

15           THE COURT:  Gentlemen, good afternoon.

16              All right.  We are here on plaintiff's motion

17    for partial summary judgment on the first and third

18    claims, and I believe everyone has gotten our tentative;

19    correct?

20           MR. PETROCELLI:  Yes, your Honor.

21           THE COURT:  All right.

22           MR. TOBEROFF:  Yes, your Honor.

23           THE COURT:  Beginning with the moving party.

24           MR. PETROCELLI:  Yes.  Do you prefer that we --

25           THE COURT:  Make yourself comfortable.
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

1       MR. PETROCELLI:  I am actually more comfortable

2   standing if that is okay with you.

3           Your Honor, the central dispositive issue with

4   respect to our first claim the termination notice of the

5   Schuster heirs is ineffective is that the 1992 agreement

6   replaced all prior agreements and grants and regranted

7   new grants in 1992, and that would govern the parties

8   fully and finally going forward.

9           The copyright termination statute in all the

10  cases, all of them, including Milne and Mewborn and

11  Steinbeck all agree, and I believe even the defendants

12  agree that if we are dealing with grants that were made

13  after January 1, 1978, then there is no right of

14  termination.

15          If we are dealing with grants that still are

16  in existence as of the time this notice of termination

17  was filed in 2003, that were made prior to January 1,

18  1978, then there may be a right of termination.  We have

19  to then go to our other arguments that we presented in

20  our brief.

21          I am going to focus mainly on what I think is

22  the lynchpin argument which is the 1992 agreement, and

23  the first case to really address the issue of what would

24  happen if the parties entered into a new agreement after

25  January 1, 1978 superseding and replacing the old

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    agreements, whether that would extinguish any right to

2    terminate was addressed in the Milne case by the first

3    the District Court, the late Florence Marie-Cooper and

4    then the Ninth Circuit.

5              In that case, the Milne case, I submit,

6    directly deals with the issue at hand, namely that if the

7    parties do enter into a new post 1978 agreement replacing

8    the old agreement, there is no right to terminate.  The

9    copyright statute itself says that because it only

10   applies, it only provides the right to terminate to the

11   pre 1978 agreements and grants.

12             So Milne went on to address another argument

13   made by Ms. Milne in that claim, Clair Milne, contesting

14   the termination -- or advancing the termination right.

15   Forgive me.  And Clair Milne argued in that case, well,

16   wait a second, there is another part of the copyright

17   statute in the termination sections that says you can't

18   have an agreement to the contrary.

19             So even though the parties enter into this new

20   agreement replacing the old with a new set of grants,

21   that is still an agreement to the contrary and that is

22   still forbidden and you can't wipe out a termination

23   right in that manner.

24             That issue was discussed at length in Milne,

25   and the Milne court concluded that if the parties in fact

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    have superseded their old agreement with a new agreement

2    and it is after 1978, that is the beginning and the end

3    of the analysis.  It is straightforward because the

4    copyright statute on its face only allows termination for

5    pre 1978 grants.  And all of the discussion on that case

6    is really focused on this threshold issue which was the

7    case of first impression there, of whether the other

8    section dealing with a forbidden agreement to the

9    contrary encompassed this type of agreement.

10           And the court, after a lengthy analysis of the

11    legislative history and the cases, concluded that you can

12    supersede, revoke and replace, and that wipes out any

13    right of termination.  And there is nothing wrong with

14    that.  In fact, the court goes on to cite very important

15    language in the congressional history whereby Congress

16    made clear that nothing in this section or legislation is

17    intended to change the existing state of the law of

18    contracts concerning the circumstances in which an author

19    may terminate a license, transfer or assignment.

20           Indeed, Congress explicitly endorsed the

21    continued right of parties to a transfer or license, to

22    voluntarily agree at any time to terminate an existing

23    grant and negotiate a new one.  And that is at Pages 1045

24    and 1046 of the opinion which is 430 F.3d.  And then the

25    court winds through additional points and concludes that

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   superseding agreements are not subject to termination.

 2        THE COURT:  Is this a long way of saying you agree

 3   with the tentative?

 4        MR. PETROCELLI:  Yes.  And I didn't want to be

 5   presumptuous, but that would pretty much sum it up,

 6   Judge.

 7        THE COURT:  Thank you, Mr. Petrocelli.

 8        MR. PETROCELLI:  So, unless the court has any

 9   questions, I would be prepared to defer.  And, by the

10   way, I am going to submit on the tentative even with

11   respect to the majority interest issue which the court

12   tentatively ruled against us unless you have questions or

13   if I need to respond.

14        THE COURT:  No.  We will deal with that later.

15        MR. PETROCELLI:  Thank you.

16        THE COURT:  All right.  Mr. Toberoff.

17        MR. TOBEROFF:  Your Honor, since -- your Honor,

18   since this is all about a half page agreement called the

19   1992 agreement, and a lot of fancy arguments are being

20   made about that page, I would like to set up that

21   document for you.

22        THE COURT:  I am not certain that there are any

23   fancy arguments.  We have an agreement supported by quite

24   a bit of consideration, and isn't that kind of the end of

25   it?  Promises made that we will never again pursue any
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    future interests in Superman, promises repeated over and

2    over again.  Where is the fancy part?

3         MR. TOBEROFF:  I intend to explain all of that to

4    you.  First, I would just like permission to set that up.

5         THE COURT:  Go ahead.

6         (Pause in proceedings.)

7         THE COURT:  We spent a good deal of tax payer

8    money to upgrade this courtroom, and we are still using

9    those things?

10        MR. TOBEROFF:  Well, I am using it so that we can

11   really focus on this 1992 agreement.

12            That is the agreement in question, your Honor.

13   First of all, I would like to tell you how much I

14   appreciate the fact that the order you sent out was

15   labeled a tentative order, and I am here to attempt to

16   change your opinion about this matter by focusing on both

17   the facts and the law.

18        THE COURT:  Okay.

19        MR. TOBEROFF:  The termination provisions were

20   entered into, were enacted by Congress.  They are very;

21   unusual provisions because they cut through everything we

22   are taught in law school that a deal is a deal, that you

23   make a contract, if there is consideration for a

24   contract, it is enforceable whether it is for $10 or

25   $10 million.  You stick by those contracts.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          And Congress said with respect to authors and

2    the Copyright Act, no.  There is a tremendous imbalance

3    of power between publishers and authors, and that means

4    that when authors want to have their works published,

5    they are going to have no leverage and those works may go

6    on to become very, very valuable.  And they will not have

7    had the opportunity to have bargained for profits or for

8    sufficient remuneration because they had no bargaining

9    leverage.

10          So what we are going to do is give you authors

11   the ability after a very long waiting period, in the case

12   of the terminations, 56 years, in the case of the

13   Schusters under 304(d), 75 years, we are going to give

14   them an attempt to realize some of the increased market

15   value of their works because when they first made the

16   deal with the publisher, not only didn't they have any

17   leverage but no one really knew what the value of these

18   creations were.

19          And, understand, large companies use

20   copyrights for exclusivity and to profit, but the reason

21   for copyright law to begin with is to provide financial

22   incentives for people to create because by providing

23   authors financial incentives, it is thought to be good

24   for commerce and good for a culture.

25          Siegel and Schuster who created Superman

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   before there were any superheros and signed a document

 2   with a small publisher, a release to have that publisher

 3   publish Superman and got paid $130 were later held in

 4   1947 and again in '74 to have sold all their rights for

 5   $130, the poster boys for the termination provisions.

 6            When people talk about the legislative intent

 7   to correct the imbalance of power between authors and

 8   publishers, they often refer to Siegel and Schuster

 9   selling Superman for $130.

10       THE COURT:  Is that your position is that they

11   sold Superman, and all they were compensated was $130?

12   Is that your argument?

13       MR. TOBEROFF:  That is what they were originally

14   compensated.

15       THE COURT:  No.  No. is that what you are trying

16   to tell me?

17       MR. TOBEROFF:  No.  That is the beginning of the

18   story.  That is the beginning of the story.

19       THE COURT:  Okay.  Pretend that we don't have a

20   jury here and be factually accurate.  All right.

21       MR. TOBEROFF:  All right.  Your Honor, the -- so

22   the purpose of the termination, so concerted was the

23   legislative intent to give you authors and their families

24   a termination right, that they put into the termination

25   provisions, a provision that said termination can be
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   affected notwithstanding any agreement to the contrary.

 2            This is a statutory prohibition because they

 3   realized that as soon as they give this termination right

 4   to authors that publishers would use their bargaining

 5   leverage when they make deals with authors to assent away

 6   their termination rights, to circumvent termination

 7   rights, to encumber termination rights.

 8            And so in the first case that dealt with this

 9   language which is Marvel versus Simon which dealt with

10   Captain America, another superhero.  Simon had signed a

11   settlement agreement in a case where they were arguing

12   over who had the rights to Captain America, and they

13   resolved that case with a settlement agreement.  And that

14   settlement agreement said everything you did for us, we

15   own all rights to Captain America.  And everything you

16   did for us was work for hire.

17            Later on, Simon sought to exercise his

18   termination rights under the Copyright Act and the

19   District Court in New York, Southern District, said you

20   can't, you don't have any termination rights because you

21   signed something saying it is work for hire.  And if it

22   is work for hire, you don't have any termination rights.

23   And Simon argued that this is an agreement to the

24   contrary, reading it this way is an agreement to the

25   contrary, and the District Court said I don't think so.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    You are bound by your settlement agreement.  You are

 2    done.

 3              They went to the Second Circuit, and the

 4    second circuit reversed saying to the extent you can't

 5    after the fact nullify the termination right by calling

 6    works works for hire.  That is an agreement to the

 7    contrary because the way Marvel was reading the agreement

 8    has the effect of extinguishing the termination right.

 9    And that is prohibited by the Copyright Act.  It is void

10    to the extent it nullifies the termination right.  That

11    was the first major case dealing with this provision

12    notwithstanding any agreement to the contrary.

13              Now, we get to the Milne decision in the Ninth

14    Circuit which is a different situation.  In Milne, the

15    son, Christopher Milne, was in the termination window.

16    He had a termination right.  He was going to terminate,

17    and he went to the original grantee which was

18    Schlesinger, Inc., SSI, and said I am going to terminate

19    that 1930 grant and then I will get the rights back and I

20    might renegotiate a new deal with you or I might sell

21    them to somebody else.  And like Superman, the

22    Winnie-the-Pooh rights, it was a billion dollar

23    enterprise.

24              And SSI said, wait a minute, don't do that,

25    why don't we negotiate a new deal now.  So wielding the
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  threat of termination, they said rather than statutorily

2  terminate the 1930 grant and then enter into a new

3  agreement, let's do it contractually.

4       And so they entered into an agreement, a

5  multi-page agreement that did a number of things.  One,

6  it expressly revoked the old 1930 grant.  Two, it

7  expressly said that we are doing this because of your

8  termination right and we are doing it in lieu of

9  termination.  Three, it expressly regranted the exact

10  same copyrights granted in the 1930 grant because the

11  whole purpose was to replace that grant.  All of it was

12  express.  And, as a result, Christopher Milne ended up

13  with an additional $300 million.

14       Now, the court said since the purpose of

15  termination is to allow authors and their families to

16  realize the increased market value of their works years

17  later, and that is exactly what Christopher Milne was

18  doing.  He was using the leverage of termination to do

19  that.

20       The court reasoned that, although they didn't

21  follow the statutory formalities of termination, we

22  achieved a congressional objective.  He used the

23  termination as leverage to bargain a new deal, and that

24  new deal corresponded to the value of the Winnie-the-Pooh

25  franchise in question.  And, then, thereby created a

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   narrow exception to what, to the prohibition of you can

2   terminate notwithstanding any agreement to the contrary.

3           So you could be sure after the Milne case that

4   every time you exercise, an author or family exercised a

5   termination right with respect to something of value,

6   what is the publisher going to say?  Revocation and

7   regrant.  They are going to find a post '78 agreement and

8   call it a revocation and regrant.

9           And that is exactly what happened in the

10  Mewborn case that I litigated.  They found a '78

11  agreement that assigned the exact same thing as a '76

12  agreement, motion picture television and allied rights,

13  they both had the exact same, very similar language, and

14  they said the '78 agreement, by dealing with the same

15  subject matter, effectively supersedes the '76 agreement,

16  and therefore you have no agreement that you can

17  terminate.

18          And they read into the agreement a revocation

19  and a regrant, and the district court bought that

20  argument and said you have no termination right.  All you

21  have is this 1980 agreement because the 1975 agreement by

22  dealing with the same subject effectively superseded even

23  though, and we argue, there is no language of revocation

24  and regrant.  In Milne, it was express.  Here, there is

25  no language.  You can't reform an agreement for the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    parties.

2              It went up to the Ninth Circuit and in

3    Mewborn, and the Ninth Circuit agreed.  The Ninth Circuit

4    said we are going to limit our ruling in Milne to the

5    factual circumstances of Milne which is someone with a

6    current termination right uses that termination right as

7    leverage to bargain for a new deal for value relative to

8    the market value of the copyrights they are dealing with.

9              And the important point is the use of the

10   termination right by leverage because the court concluded

11   in Milne that is how you realize the congressional

12   objective, and as long as that is being realized in a

13   real way, we are okay with that.  But that is not what

14   happened in Mewborn.

15             The court said there is no express revocation.

16   Mewborn, she had termination rights, but they wouldn't

17   come up for another 16 years.  So it wasn't relevant to

18   the negotiation.  The amount of money involved was a few

19   thousand dollars, didn't reflect the value of Lassie.

20   And it said, therefore, because the factors in Milne were

21   not present here, we are not going to read a revocation

22   into that.  We are not going to take this termination

23   right away from this person given this concerted

24   legislative objective behind the right.

25             Steinbeck which is relied on heavily in the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    tentative is not binding, but Steinbeck is not against

2    our position.  Steinbeck supports Milne.  In Steinbeck,

3    the court noted that Elaine Steinbeck wielded the

4    termination right to bargain for a substantially enhanced

5    deal.  And that substantially enhanced deal was major

6    advances, major royalties.

7            So Steinbeck does not contradict.  But I would

8    submit, your Honor, that the two Ninth Circuit cases in

9    Mewborn and Milne are what is most relevant and binding

10   here although Steinbeck can also be instructive.

11           So, now, let's go to, if I may, your Honor, to

12   the 1992 agreement, and I would like to talk about what

13   it is and it isn't.  And a bit of history about Siegel

14   and Schuster.  In 1938, there was -- the core grant of

15   Siegel and Schuster's Superman copyright which is really

16   their, the Superman character and the initial Superman

17   story from which everything else is derived, that was

18   granted in the 1938 grant.  That was -- it was then

19   litigated in 1947 where Siegel and Schuster litigated

20   whether they had rights to Superman from the 1938 grant,

21   and the court said they do, they have all rights under

22   the 1938 grant and they entered into a stipulated

23   judgment.

24           Then, in 1974, Siegel and Schuster were in

25   court again, and the court focused again on the 1938

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  grant, your Honor, and they said based on the 1947 case,

2  DC owns all rights to Superman based on the 1938 grant.

3  So you have two court decisions upholding this 1938

4  grant, and then, after that, there are various other

5  assignments from Siegel and Schuster that DC has relied

6  on for years for its chain of title to Superman.

7          In 1975, due to negative publicity regarding

8  DC's and Warner Brothers' treatment of Siegel and

9  Schuster, the cartoonist's guild and various other

10 parties objected.  Warner Brothers were coming out with a

11 big Christopher Reeve movie, they engineered the 1975

12 agreement.

13         The 1975 agreement restored their credit which

14 had been taken away for years because they had sued DC,

15 and it provided them a pension of $20,000 each which

16 they, after that, they raised that pension.  And it said

17 when Joe Schuster dies, we are going to give his brother

18 Frank Schuster a $5,000 survivor pension.  And it also

19 acknowledged that, as of 1975, Siegel and Schuster had

20 just lost the 1974 case, acknowledged that DC owns all

21 right, title and interest to Superman.

22         So, in 1992, when this document was entered

23 into, Jean Peavy and Frank Schuster didn't own any rights

24 to the Superman to grant.  Like Mewborn, in the Lassie

25 case, the court said a 1978 agreement assigning motion

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    picture and television rights to Lassie is a nullity

2    because you already signed it in 1976.

3           So, here, just to set the stage, Jean -- the

4    siblings of Joe Schuster, Frank Schuster and Jean Peavy

5    who signed this 1992 document, their rights -- they

6    didn't have any rights to Superman.  What they had was

7    the right to a $5,000 pension.

8           And that is what this document is about, your

9    Honor, and I can show you based on other evidence that

10   that is what this document is about.  So if you turn to

11   the first paragraph of this document, it is basically a

12   three paragraph agreement, it provides them with a

13   $25,000 pension.

14          There is another document that was signed on

15   the same date by Frank Schuster which I can put on on

16   this machine for you, but that document, I can read it to

17   you, it is Exhibit 9 to the Petrocelli declaration.  It

18   says, in consideration of the agreement dated as of

19   August 1, 1992, with DC Comics between DC Comics and

20   myself, I hereby waive any rights and remedies they may

21   have under the agreement dated December 23, 1975.  That

22   is the 1975 agreement that gave them a $5,000 pension.

23          In giving them a pension, they threw in a

24   quitclaim.  Now, and that is the language that the court

25   in its tentative focused on and found to be broad or

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    construed as superseding, but what is noteworthy and why
 2    I call it a tentative is the transfer language says and
 3    this is the key, this is the yellow highlighted portion
 4    on the board that I put in front of you.  It says,
 5    that -- excuse me, your Honor.  Just need a sip of water.
 6              It says we ask you to confirm by your
 7    signature below that this agreement fully settles all
 8    claims to any payment or other rights or remedies which
 9    you may have, meaning Frank Schuster and Jean Peavy.
10    They didn't have any rights at that time, but it said any
11    rights you have under any agreement.  And then it says
12    down below, whether now or hereafter existing, and then
13    it says down below, and they grant those rights which you
14    may have.  And it says it assigns such rights.
15              Do you see that, your Honor?  The focus is on
16    the rights that Frank Schuster and Jean Peavy had, not on
17    the original Superman copyrights of Siegel and Schuster
18    that were granted in 1938 and acknowledged in 1975.
19              And there is no basis, I respectfully submit,
20    your Honor, for -- to read into this document as a
21    revocation or regrant.
22              And I put to the court, why would DC who has a
23    1938 grant upheld in two court judgments to give them all
24    rights to Superman and in an acknowledgment by 1975 by
25    Siegel and Schuster that they already own all rights to
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Superman, why would DC feel the need to revoke all of

2    that chain of title that it has relied on for years and

3    replace it with an ambiguous document like this?  If they

4    were really revoking these pre '78 copyright grants.

5            They have a multibillion dollar Superman

6    franchise.  It just, it defies credibility to suggest

7    that Warner Brothers and DC are going to be launching

8    movies that cost, those Superman movies cost about $250

9    million a pop with another 150 million in print and

10   advertising and marketing cost.  That is $400 million a

11   motion picture.  They have investment partners.  They

12   have insurance.

13           It defies credibility to suggest that they are

14   going to throw away the chain of title that they have

15   relied on for years that has been upheld by two court

16   judgments and replace it with this half-page ambiguous

17   scenario here.

18           And if DC which is an intellectual property

19   company with inside counsel and outside counsel and

20   Warner, in particular, if they intended to revoke those

21   prior agreements, it would have been easy enough to say

22   it in plain English, or as my father says in plain

23   Brooklyn English.  If that was their intention, they

24   would have put it in the contract.

25           They know how to say we hereby cancel the 1938

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    grant or refer generally we hereby cancel all pre '78
2    grants.  They didn't do so.  Not only does it suggest
3    that wasn't DC's intent or the parties' intent, but if
4    they wanted a revocation, it was incumbent upon them to
5    say so because courts whether it is New York or
6    California, all courts say you are bound by the objective
7    manifestation of your intent.  I am not interested in
8    after the fact rationalizations and self-serving
9    declarations years later.  I am going to look at the
10   document that you signed.  So none of this is in there.
11           There is no language of rescission, there is
12   no language of revocation, and the -- the sweeping
13   language, your Honor, is language about their rights.
14   Jean Peavy, it says rights that, quote, you may have, and
15   the only rights that Jean, that Frank Schuster had was
16   rights to a $5,000 pension.  That is why the first
17   paragraph talks about the pension, and that is why a
18   letter he signed on the same date talks about he is
19   waiving his rights to that pension under the 1975
20   agreement.
21           Now, the court mentioned in its tentative that
22   we didn't come up with any evidence.  Well, first and
23   foremost, the evidence of no revocation, your Honor, is
24   the 1992 agreement itself.  Secondly, and that is why
25   this should end, but if we go outside that and start
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1 looking at extrinsic evidence, the evidence is abundant.

2 And it all points to the fact that this agreement had

3 nothing do with termination and nothing to do with the

4 revocation and regrant.  And I would like to briefly take

5 you through that, your Honor.

6    Number one, Paul Levitz was the president,

7 long time president of DC.  Paul Levitz's name is on the

8 document, and Paul Levitz managed the relationship with

9 the Schuster heirs, the Schuster siblings, Jean Peavy and

10 Frank Schuster.  He submits a four or five page

11 declaration.  He talks about the generosity of DC.  He

12 talks about how they met in New York prior to signing

13 this agreement.  He talks about how the -- it was

14 expressed at their meeting that they were going to

15 increase the $5,000 pension and make it $25,000.

16    The silence is deafening.  He doesn't say a

17 word about revocation and regrant.  Now, he is the

18 president of DC.  He is not going to lie in a sworn

19 declaration.  That is why he says nothing about

20 revocation or regrant even though he is submitting the

21 declaration in support of their motion and not a word

22 about revocation or regrant.

23    When the Schusters served the termination in

24 2003, did DC or Warner Brothers hop up and say you can't

25 do that, you have no termination rights.  You have a

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    revocation and regrant, this 1992 agreement.  Not a word

 2    about the 1992 agreement, your Honor.

 3              In 2005, they send a multi-page letter to the

 4    Schusters trying to get them to settle.  And in that

 5    agreement, they take on the Schuster termination.  They

 6    don't mention the 1992 agreement in 2005 either.

 7              It bears mentioning, your Honor, when we are

 8    talking about settlement and we are talking about

 9    leverage and the termination right in that agreement

10    which they have made, in that letter which they have they

11    have made public, just for starters, they offered the

12    Schusters $2 million, a percentage of the profits which

13    starts to reflect the leverage of termination because

14    then they really exercised their termination and it was

15    exercised by the party with the termination rights which

16    was the Schuster executive.

17         THE COURT:  Couple of things.  I need you to slow

18    down a little bit.

19         MR. TOBEROFF:  I am sorry.

20         THE COURT:  And are you talking about negotiations

21    that were taking place between the parties in connection

22    with settlement?

23         MR. TOBEROFF:  Yes, your Honor.  But it is in a

24    letter that they put into evidence in this case.

25    Otherwise, I wouldn't be talking about it.  It is a
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    document that they have relied on, your Honor.  That is

2    why I am talking about it.

3                So in 19 -- 2008, in the Siegel case where the

4    Siegel termination was upheld, it was argued that even

5    though the Siegel termination was upheld, Warner can

6    continue as they could to exploit Superman because they

7    were successors to Joe Schuster's half of the copyright.

8    And they were successors to Joe Schuster's half of the

9    copyright that was granted in the 1938 grant which is the

10   key grant upheld in two court judgments.

11               So in 2008, after the termination was served

12   in 2003, they didn't say to the court that our chain of

13   title to Joe Schuster has been replaced by a 1992

14   agreement.  Again, they made no mention of the 1992

15   agreement.  You know what the first time is that they

16   mentioned the 1992 agreement?  After they replaced their

17   lawyers and they hired new counsel, and new counsel came

18   up with this theory.

19               But, that is what I meant, your Honor, when I

20   was talking about fancy.  I wasn't referring to your

21   tentative.  I was referring to a new argument that is

22   being contrived by lawyers that bears no relation to the

23   actual document that was signed by the parties.  That is

24   what I meant by that comment.

25               There is other evidence, your Honor, even the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   evidence that they point to, that actually runs in our

 2   favor, and I have to dial it back just a little bit, and

 3   I will try and slow down.  I'm sorry.

 4           The key factor in the Milne case was that the

 5   holder of a current termination right within the

 6   termination window is going to use the termination to

 7   bargain for a much better deal that bears some

 8   resemblance to the market, increased market value of what

 9   they are bargaining for.

10           Here, this never took place.  Frank Schuster

11   didn't have a termination right.  He is the brother of

12   Joe.  Jean Peavy didn't have a termination right despite

13   their mentioning things in letters about termination.

14   They are not lawyers.  They don't know what they are

15   talking about.  They don't have a termination right.

16         THE COURT:  Why not?  Jean?

17         MR. TOBEROFF:  Because siblings don't have

18   termination rights.

19         THE COURT:  What about as the executor?

20         MR. TOBEROFF:  She wasn't the executor.  The

21   estate was never probated.

22         THE COURT:  She was named as executrix in the

23   will; right?

24         MR. TOBEROFF:  That's right, but the estate was

25   never probated.  What happened was she was a beneficiary.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    The estate was in probate because they didn't have any

2    money.  She sent -- when you have a pauper's estate, you

3    don't have a probate estate.  He had a few shares of

4    stock, and she sent in -- there is a regulatory

5    declaration you can send in saying these are his assets.

6    His assets are some shares, ironically, of Time Warner

7    stock and can you send me the stock.  And they did that.

8    It was never probated.

9         Then what happened was in 1992, nobody had --

10   even if she was an executrix in 1992, she didn't have a

11   termination right because executors of estates didn't get

12   termination rights until 1998 under the Copyright Term

13   Extension Act.  So in 1992 -- first of all, so Jean

14   Schuster, Jean and Frank had never had any termination

15   rights, ever.  In 1992, no one had termination rights

16   despite mentions in letters to termination rights.

17        So, interestingly, they point, they say, well,

18   termination was mentioned in letters from Jean Peavy,

19   and, therefore, she used it as leverage to bargain for a

20   new deal.  And what I submit, your Honor, is let's say

21   Jean thought she had termination rights, DC knows she

22   doesn't have termination rights.  Their lawyers know who

23   had termination rights and who don't.  And even if Jean

24   and Frank thought they were using termination rights,

25   they didn't have termination rights.  And if they don't

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    have them, how can it be used as leverage to negotiate a

 2    better deal thereby fulfilling the congressional intent

 3    of the termination provision?  It couldn't.  It never

 4    happened.

 5            And I submit that DC is reinventing history.

 6    It is not in the agreement, and it is not in their

 7    letters.  And I will give you another example.  Exhibit

 8    43 is a letter dated July 10, 1993 from Jean Peavy to

 9    Paul Levitz.  Because it is in 1993, it took place after

10    1992.  They claim that the intent of the parties in 1992

11    was to relinquish their termination rights.  The intent

12    of both DC and Jean Peavy was to relinquish their

13    termination rights.

14            So if she relinquishes the termination rights,

15    how come in 1993 she refers to termination rights in

16    trying to ask them for even another increase in their

17    pension?  She says, during the past year, Frank and I

18    have been able to review our rights as Joe's only

19    surviving next of kin.  We are aware of the fact that in

20    1994 after 56 years, Superman could revert to us.

21            She is talking about that in 1993 after she

22    signed that.  The 56 years is the window for the first

23    termination right.  She is talking about termination.

24    She doesn't know what she is talking about because Frank

25    and her don't have any termination rights, but it
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   certainly suggests that she didn't relinquish them in

 2   1992 if she is talking about it in 1993.

 3            Then, in response, and I can put this on the

 4   elmo.  I don't know.  Would you like to look at it, your

 5   Honor?

 6        THE COURT:  Do you want me to look at it?

 7        MR. TOBEROFF:  Well, I will show you another

 8   document.  I'm sorry.  It is exhibit -- it is Exhibit 20

 9   to Petrocelli's declaration, a letter dated July 10,

10   1993.  So then, in response, Paul Levitz, the same Paul

11   Levitz who sent in a declaration never mentioning

12   revocation or regrant, he writes a letter back.

13            And he says, as I hope you recall from our

14   meetings in New York, we have done extensive research

15   into the Copyright Act and any potential rights that you

16   and Frank may have as Joe's siblings and survivors.  It

17   is our firm conviction based on that research and expert

18   counsel that you don't have any legal rights or claims

19   whatsoever.

20            Now, he is telling them what we know, that

21   they didn't have any rights.  All they have for rights

22   was a $5,000 pension.  So he says -- but he starts out

23   the paragraph, I hope you recall from our meetings in New

24   York that we have done extensive research and that you

25   don't have any rights.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1            Well, in his declaration, the meetings in New

 2   York he is talking about are meetings that took place he

 3   says in late September before they signed this in

 4   October.  So what he is saying is before we signed this

 5   thing, the reason we are only giving you $25,000 a year

 6   split two ways and we are going to deduct taxes from that

 7   as well is because you don't have any rights.  This is an

 8   act of charity.  And that is why they did it.

 9            Now, a key point -- so the things they point

10   to as being evidence -- and in the tentative, it says we

11   don't present any evidence -- all of this, the 1992

12   agreement, these letters are all evidence that it wasn't

13   the intent of the parties.

14        THE COURT:  That is not a complete sentence.

15        MR. TOBEROFF:  Sorry.  Did I miss something

16   grammatically?

17        THE COURT:  No I just missed something.  You said

18   it wasn't the intent of the parties.

19        MR. TOBEROFF:  Oh.  Excuse me.  That it wasn't the

20   intent of the parties to relinquish termination rights

21   which they didn't have, that it wasn't -- there was no

22   use of the termination right to achieve a congressional

23   purpose of being able to bargain a new deal that is

24   relative to the increased market value of the copyrights

25   in question.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          THE COURT:  Now, we understand that each party has

 2   different interests here with respect to termination

 3   rights.

 4              DC is not anxious for any of the heirs or

 5   putative heirs to terminate anything and reclaim any of

 6   their rights, is it?

 7          MR. TOBEROFF:  Correct.

 8          THE COURT:  All right.  They are sitting on the

 9   golden goose.  Now, with respect to the Schusters, they

10   kept saying over and over again that they would not seek

11   to reclaim any rights in the future.  They said that over

12   and over again.  They made their intent clear; right?

13   And I guess in exchange for that, DC continued to give

14   them checks.

15          MR. TOBEROFF:  Correct, your Honor.

16          THE COURT:  Okay.  Now, granted, DC acknowledges

17   and I think we all acknowledge DC was not under any legal

18   obligation to do so, was it?

19          MR. TOBEROFF:  Not at all.  It was charitable.

20          THE COURT:  It was, and it also was designed to

21   keep them happy and not make them start looking for

22   perhaps other rights, get them a nice deal, a sweet deal,

23   that goes on into perpetuity, and I don't know the extent

24   to which it took care of their needs.  But it seemingly

25   made them happy year in and year out, all through the
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    '90's.  They kept getting checks, and I guess they were

 2    happy with that.  And I guess that means they didn't go

 3    out and find a lawyer to research their rights under the

 4    Copyright Act; right?

 5         MR. TOBEROFF:  No, your Honor.  They were very

 6    unhappy with that, and the letters that are all attached

 7    to the declaration, every year, essentially when it comes

 8    Christmas time, they are begging for money.

 9         THE COURT:  They may have been begging for money,

10    but then they would get money and then they would express

11    their gratitude.

12         MR. TOBEROFF:  That's correct, your Honor.  But I

13    am glad you are bringing that up because I think that

14    goes to the core of this.  This is a very unusual right.

15    It goes against everything that we are taught in law

16    school, like I said, at the beginning of this, that a

17    deal is a deal, that you have a contract.

18           Let's just say for hypothetical purposes that

19    Jean Schuster was the executrix and there was an estate

20    and she did have the power of termination and she signed

21    a document that said I hereby state that I will never,

22    ever in consideration for $25,000 a year exercise my

23    termination right.  That wouldn't -- that would be void.

24    That would be totally void.

25           Why?  Because of the provision in the
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    termination that says the termination right is

 2    inalienable.  You can't waive it, you can't encumber it,

 3    you can't circumvent it.  Why did the Congress make the

 4    termination inalienable?  And, by the way, your Honor, it

 5    was held in two supreme court cases to be inalienable.

 6             In Stewart v. Abend which is the famous

 7    copyright case dealing with Rear Window and a case called

 8    New York Times versus Tasini, they held the termination

 9    right to be inalienable.  Now, the question is why would

10    they take these rash measures which hamper freedom of

11    contract principles that we all learn in law school

12    govern parties' transactions.  Why would they do that?

13             The reason is because they knew that the first

14    thing publishers would do is go to authors or the heirs

15    that don't have any money -- to many people $25,000 a

16    year is a tremendous amount of money -- and they would go

17    to them and say we are going to give you $25,000 not to

18    exercise your termination rights and you have to promise

19    never to exercise your termination rights and you have to

20    waive your termination rights.  You have to agree never

21    to exercise those rights, or if you do exercise those

22    rights, we are going to penalize you and you have to pay

23    back all that money.

24             They knew that publishers would do that.  They

25    didn't want publishers to do that because that would
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   defeat the purposes of the termination, and that is why

 2   they had the provision notwithstanding any agreement to

 3   the contrary.  That is why they had the provision.

 4          So there is a -- forgive me, your Honor, there

 5   is a disconnect here, and that disconnect is totally

 6   understandable.  And that is the same disconnect that we

 7   experienced in the district court in the Lassie case and

 8   that was experienced at the district court level in the

 9   Captain America case.

10          And that is people look at this through the

11   glass of contract law not through the glass and

12   objectives of the Copyright Act.  This is a new area of

13   law because these cases are now coming into existence

14   because of the long waiting period, 56 years and 75

15   years.

16          And you have these leading cases, but, believe

17   me, the Ninth Circuit as it expressed in Mewborn and the

18   Supreme Court takes this termination right very

19   seriously, and the prohibition of notwithstanding any

20   agreement to the contrary is very serious.  They don't

21   want people waiving their termination rights.  And they

22   said, Milne said under these specific factors, since the

23   purpose of the termination right was really realized

24   here -- really realized, excuse me -- the objective was

25   realized, because the purpose was realized to the tune of
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   a $300 million increase, even though they didn't follow

2   the formalities, they contractually terminated instead of

3   statutorily terminated, we are going to let this go.  But

4   then in Mewborn, they are going to say we don't want

5   publishers to go crazy with this revocation or regrant

6   exception.  If you don't have a factual scenario that is

7   similar to Mewborn, it doesn't work and they struck it

8   down.

9           And in Steinbeck which is relied on in the

10  tentative, your Honor, the Steinbeck court says that

11  Elaine Steinbeck wielded the termination right to bargain

12  for a better deal.  Here, Jane Peavy and Frank Schuster

13  didn't wield anything.  What they wielded was a $5,000

14  pension, and DC wielded a little money.

15          And there was -- DC has never acted as if this

16  1992 agreement is the basis of its chain of title, and

17  the reason, your Honor, why I wanted to put that

18  agreement in front of you is because it really is not

19  credible that Warner Brothers and DC is relying for

20  $400 million movies in a billion dollar business on this

21  half page resolution in an agreement with Jean Peavy and

22  Frank Schuster.

23          And there is discussion about understanding

24  law in reviewing these contracts in the tentative, and I

25  just want to point out that these cases of Milne and

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Mewborn which are Ninth Circuit cases are construing the

 2   prohibition of notwithstanding any agreement to the

 3   contrary in the Copyright Act.  And in construing

 4   notwithstanding any agreement to the contrary, they are

 5   saying that a revocation and regrant must be express, and

 6   you must use the termination right which you must have as

 7   leverage to bargain a better deal.

 8           And you must be within the termination window

 9   or near the termination window.  In Steinbeck, they argue

10   that they are not in the termination window.  That is

11   incorrect.  We checked it out.  Grapes of Wrath and other

12   leading Steinbeck works were in the termination window,

13   and there were a few Steinbeck works that were outside

14   but close to the termination window.  Therefore, they use

15   the termination in Steinbeck as leverage to achieve a

16   better deal thereby fulfilling the congressional

17   directive of the termination right.

18           Nothing even remotely like that happened here,

19   your Honor, because, number one, Jean Peavy and Frank

20   Schuster had no termination rights and never had any

21   termination rights.  Number two, your Honor, nobody had a

22   termination right in 1992.  So they couldn't have used it

23   as leverage.

24           And DC knew no one had any rights and they

25   said in their letter referring to 1992 meetings before
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   they signed this document that we analyzed this, and you

2   don't have any rights.  So no one could have used the

3   termination right as leverage to bargain for a better

4   deal, termination had nothing to do with this agreement.

5   It was about a 1992 pension increase of the only right

6   that Frank Schuster had which was a right to $5,000 on a

7   1975 agreement.

8           And the 1975 agreement acknowledged that DC

9   already owned all rights to Superman, and this came

10  through in a quitclaim.  And it therefore says you hereby

11  grant to us, you settle any claims or rights and you

12  grant to us all rights that you, meaning Frank Schuster

13  and Jean Peavy had, not you grant us, regrant to us Joe

14  Schuster's copyright grants and we revoke his prior

15  grants.

16          THE COURT:  Wait a minute.

17          There is really no dispute here then; right?

18          MR. TOBEROFF:  Excuse me, your Honor?

19          THE COURT:  What is the dispute?  DC says it owns

20  the rights.  You agree.  Why are we here?

21          MR. TOBEROFF:  The dispute, your Honor, is that DC

22  owns the rights by virtue of a 1938 grant and some other

23  grants.

24          THE COURT:  Okay.

25          MR. TOBEROFF:  The Copyright Act is, on an

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    author's estate, the executor of an author's estate, the

2    right to recover their copyrights after a very long

3    waiting period by terminating all grants.  They have to

4    follow certain formalities.

5         THE COURT:  Don't go through all that again.

6    There are no heirs, there is no spouse, there is no

7    issue.  There is no executrix.  You just said that the

8    Schusters had no rights.  Why are we here?

9         MR. TOBEROFF:  Your Honor, the Schusters --

10        THE COURT:  They have no rights to reclaim.

11        MR. TOBEROFF:  We are here because the chain of

12   title to the Schuster copyrights is based on pre '78

13   grants.

14        THE COURT:  The chain of title.  What chain of

15   title?  There was a works for hire back in 1938.  Nothing

16   has changed.

17        MR. TOBEROFF:  The original Superman story was not

18   a work for hire, and it was held in the Siegel case which

19   this court granted a judgment on which said that it is

20   not work for hire.

21        THE COURT:  Okay.  How did title to Superman,

22   then, change from DC?  And when?

23        MR. TOBEROFF:  It changed -- it hasn't changed

24   yet.

25        THE COURT:  Okay.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          MR. TOBEROFF:  This is declaratory relief, to

2     declare that a termination notice that was filed in 2003

3     that becomes effective in 2013 is void, is ineffective.

4     So DC has Superman.  They continue to exploit Superman,

5     but in 2013, they will have certain Superman copyrights

6     but will not have the original Superman story that was

7     created by Siegel and Schuster independently and was not

8     work for hire.

9          THE COURT:  Who will have that?

10          MR. TOBEROFF:  That will be owned by the estate of

11     Joe Schuster, and by the Siegels and most probably they

12     will enter into a new agreement with the natural buyer

13     for those rights since the rights are split.  Other

14     people may be reluctant to buy those rights, but they can

15     sell them to somebody else.  But, probably, they will

16     enter into a negotiation with Warner Brothers to make a

17     new deal with Warner Brothers.  But it won't be a deal

18     for $25,000 annual pension split two ways with taxes

19     deducted first.  It will be a real deal that is relative

20     to the market value of Superman which is exactly what

21     Congress wanted.

22               And, your Honor, the Siegel termination has

23     been upheld.  There is no reason why the Schuster

24     termination shouldn't be upheld.  It is the mirror image.

25     You are dealing with works that were co-created by Siegel

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   and Schuster, and there is no reason why the Schuster

2   termination shouldn't be upheld as the Siegel termination

3   was upheld.

4           And you can't take away this important right

5   that Congress has given these people based on, you know,

6   after the fact rationalizations when DC is bound by their

7   own document.  They drafted that document.  If they

8   wanted to revoke pre '78 grants, the 1938 grant upheld in

9   two court judgments, why didn't they we hereby revoke

10  those grants?  Or why didn't they say we hereby revoke

11  all prior grants and replace it with this grant?

12          THE COURT:  That is not a grant of anything, is

13  it?

14          MR. TOBEROFF:  What?

15          THE COURT:  This August 1, 1992 letter isn't a

16  grant of anything.

17          MR. TOBEROFF:  I agree.  I agree, your Honor.

18  That is what we are saying.  They are saying that this

19  August, 1992 letter did the following:  Revoked Siegel

20  and Schuster's prior copyright grants which DC has always

21  relied and regranted Siegel and Schuster's copyrights to

22  DC.  And because it took place in 1992 and was signed by

23  Schuster heirs, it can't be terminated and now we are

24  bulletproof.  And they never came up with that argument

25  ever before.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1              They came up with that argument when they

 2     hired Mr. Petrocelli in 2010.  That is when they first

 3     presented that argument even though the termination

 4     notices were served in 2003.

 5          THE COURT:  Okay.

 6          MR. TOBEROFF:  And looking -- the reason why I

 7     wanted to, you know, I know it is a little antiquated,

 8     your Honor, to do a big blowup like that on an easel.

 9     But the reason why I wanted to do that is because I

10     wanted to put in front of you that half page agreement

11     which all the fuss is about because it did not say any of

12     the things that DC says it says.  And with due respect, I

13     think the court was to some extent led astray by some of

14     these arguments which I call fancy arguments.

15              And the reason I call them fancy arguments is

16     there is no indication in that document of revocation or

17     regrant.  They say impliedly revoked by talking about the

18     same subject matter, your Honor, but it doesn't talk

19     about the same subject matter.  It doesn't talk about Joe

20     Schuster's original Superman copyrights.  It says

21     whatever rights you, Frank and Jean, have, and they

22     didn't have any rights.  And DC says in its letters you

23     didn't have any right and the 1975 agreement says we

24     already own all rights.

25          THE COURT:  All right.  Tell me specifically what

       UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    you mean when you say they don't have any rights,

 2    specifically, what are you saying?  They also don't have

 3    any future rights?

 4         MR. TOBEROFF:  Jean Peavy and Frank Schuster had

 5    no rights to Joe Schuster's copyrights because they were

 6    long ago -- in 1992 because they were long ago assigned

 7    to DC by Siegel and Schuster.  So in 1992, they didn't

 8    have any rights to give to DC.  They also didn't have

 9    termination rights.  That's what I mean.

10         THE COURT:  Are you saying they also had never

11    acquired termination rights?

12         MR. TOBEROFF:  No.  Siblings aren't entitled to

13    termination rights.  So what happened is the Siegels had

14    termination rights because before 1998 --

15         THE COURT:  No.  Stay with the Schusters.

16         MR. TOBEROFF:  Okay.

17         THE COURT:  All right.  And the Schuster estate

18    will never acquire any termination rights, or will the

19    executor be able to exercise those termination rights?

20         MR. TOBEROFF:  The executor has termination

21    rights.  In 1998, the law changed.  And, previously, only

22    authors and statutory heirs were charged.  By statutory,

23    I mean spouse, children or grandchildren.  That is it.

24    Not siblings.  Then in 1998, they said that is not really

25    fair.  What if you were never married or didn't have any
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   children.  We are going to give termination rights to the

 2   executor administrator of estates if there is no spouse

 3   or children.

 4          And after 1998, that is the first time there

 5   was any possibility of a Schuster termination.  Unlike

 6   the Siegels who terminated long before that because they

 7   had a spouse and a child that could terminate.  So what

 8   do you do, then, when you terminate?  You go to a court

 9   which they did, and you said he died, we didn't have

10   enough money to bury him when he died therefore we didn't

11   probate the will.

12          But, now, there is this new right.  So we want

13   to probate the estate for purposes of exercising this new

14   right in the Superior Court of California.  This was duly

15   processed, petition for probate.  They probated, and the

16   will said I nominate, if the estate is probated, I

17   nominate Jean Peavy as the executrix, but if she declines

18   to act, I nominate Warren Peary, my nephew, as executor.

19   And she declined to act because she was 82 at the time,

20   and Warren Peary was nominated the executor.  That is the

21   first time anybody has the rights.  And who has the

22   rights?  Warren Peary, the executor.  He then files

23   termination notices in 2003.

24       THE COURT:  Wait a minute.  Back up.  You see that

25   is the first time when Warren Peary was named the
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   alternative executor, that is the first time anyone had

2   any rights.

3        MR. TOBEROFF:  Termination rights.  Yes.  Or any

4   rights outside of a $5,000 pension of Frank Schuster.

5        THE COURT:  Well, didn't Jean have those rights

6   before when she was the primary executrix?

7        MR. TOBEROFF:  No, because you become -- you don't

8   become executor or executrix unless there is an estate

9   that is probated.  And I am not a trust and estates

10  lawyer, but my understanding is that when someone says in

11  a will that you will be the executrix, it means if the

12  estate is probated that you will be the executrix.  I

13  don't think she has legal power to sign things as the

14  executrix if there is no estate over which to be an

15  executrix.  It is hard to pronounce that word.

16       THE COURT:  Okay.  I understand.

17       MR. TOBEROFF:  So she didn't -- I don't believe in

18  1998, that is why before termination notice could be

19  served for the Schusters, they would have to probate the

20  will.  And they went to court and said we didn't probate

21  the will before because there were no assets to be really

22  concerned about that don't rise to the level of probating

23  and under a special section for pauper's will, you can

24  just distribute the few assets by sending in a piece of

25  paper in the probate court or Superior Court.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1           So once they had this right, they then

2  probated the estate.  We served termination notices in

3  2003.  And from all this time from 2003 to 2010, no

4  one said peep about you can't do this, the 1992

5  agreement.  If DC really believed that this was a bar to

6  termination, wouldn't that be the first thing out of

7  their mouths on getting this termination notice?

8           And when they send a letter to the Schusters

9  trying to settle and telling them if we settle with the

10  Siegels before you, we are not going to settle with you.

11  And we don't agree that this termination is valid.

12  Wouldn't they say remember the 1992 agreement you signed,

13  that bars termination.  They don't say anything about it.

14           This is cooked up now, and I'm sorry to say it

15  is a side show.  Because if you really look at that

16  agreement, your Honor, if a jury looked at that agreement

17  or, I mean, let me put it this way, we are all lawyers

18  here.

19           If you were a lawyer for DC and your intention

20  was to revoke all prior grants from Siegel and Schuster

21  or from Schuster to DC of an important billing or a

22  copyright like Superman, wouldn't you put in the

23  agreement I hereby revoke all prior grants from Joe

24  Schuster to Superman?  Wouldn't you say I cancel those

25  agreements?  Wouldn't you say I rescind those agreements?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1                You would make it abundantly clear.  You would
 2       say we hereby revoke and rescind all prior grants by Joe
 3       Schuster of Superman copyrights and including without
 4       limitation, the 1938 grants.  And we are hereby
 5       regranting those rights.  And you would do it -- that is
 6       why they do it.  Not only didn't they do it which casts a
 7       great inference that that wasn't the intention of DC, but
 8       it was incumbent upon them to do that.
 9                And they are bound by the objective
10       manifestations that are intent in this flimsy one page
11       letter.  And I don't believe this is a sound basis to
12       deprive the second half of the copyright of their rights
13       under the copyright act.  And, your Honor, this is a --
14       many think about this case as the seminal case dealing in
15       this area.  First of all, it is dealing with Superman so
16       there is a tremendous amount of interest in the case.
17                And, secondly, it is dealing with a lot of the
18       nuances of a fairly complicated area of law.  There have
19       been law review articles about the Superman case.
20            THE COURT:  Hang on a second.
21                That doesn't matter.  None of that matters.
22       Let's stick with the issues of this tiny little case.
23       That is all I care about.  I don't care what it will do
24       to history.
25                All right.  Have you made your arguments?  You
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    have been talking for an hour.

 2         MR. TOBEROFF:  And I greatly appreciate you

 3    letting me heard, your Honor.  One last argument is that

 4    there is talk about New York law, and like I said before,

 5    the -- the Ninth Circuit cases that are binding, the

 6    Milne case and the Mewborn case, are dealing with

 7    copyright act and provision in the copyright act

 8    notwithstanding any agreement to the contrary.

 9              They don't make, in construing that language,

10    and in construing the narrow exception to that language

11    in the copyright act, they don't make reference to state

12    law.  But even if you do look at New York law, New York

13    law is not different than California law.  In fact, New

14    York law puts more emphasis on the objective

15    manifestation of the parties' intent and doesn't look at

16    extrinsic evidence and after-the-fact rationalizations.

17    They look at the document.  They say if it is not in the

18    document, it is not there.

19              Number two, to find any kind of rescission,

20    revocation or novation under New York law, the parties'

21    intent to cancel and replace a prior agreement has to be

22    unequivocal.  Has to be crystal clear.  Novation will

23    never be presumed, the cases say.

24              Now, there is one case, I believe, cited by DC

25    where they say novation can be express or implied, but in

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   those cases where they are implied, it is crystal clear

 2   from all of the circumstances surrounding the agreement,

 3   that the intention was to revoke and replace an old

 4   agreement from all of the circumstances.

 5           Here, it is the opposite.  It is not

 6   unequivocal in this flimsy 1992 agreement, and all of the

 7   surrounding circumstances don't show any intent to

 8   revoke.  And Levitz's declaration on the subject never

 9   mentions that the intent was to revoke, and he signed the

10   agreement.  And the letters show that there was no intent

11   to relinquish termination rights so it is the opposite.

12           One can't find under New York law, an

13   unequivalent intent of both parties to revoke these

14   copyright grants on which DC has long relied.  I submit,

15   your Honor, it is impossible for this document to be the

16   basis of Warner Brothers and DC's chain of title to a

17   billion dollar franchise.  Nobody would let that happen.

18           I know Warner Brother agreements and DC

19   agreements.  When they have somebody assign them

20   copyrights, they have an agreement this thick.  And they

21   attach to it a short form assignment, and that short form

22   assignment is filed with the copyright office to give the

23   word constructive notice of their copyrights.

24           If this revoked all prior Superman grants and

25   replaced it with this, that means this is the basis of
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    their Superman franchise.  And I submit that that is

2    impossible that companies of this magnitude would have

3    their lawyers draft something like this that their

4    intention was to revoke all prior grants and regrant them

5    the Superman copyrights.  It is an impossibility.

6         THE COURT:  What you suggest is lunacy.  So, okay,

7    I am sure that is not their intent.

8         MR. TOBEROFF:  Then if it is not their intention,

9    they still have the termination right.  I agree with you,

10   your Honor.  It is not their intention.

11        Thank you.

12        THE COURT:  Wrap up?

13        MR. PETROCELLI:  Because of time constraints, your

14   Honor, I am not going to try to respond to a lot of what

15   Mr. Toberoff said.  What I would like to do is just

16   recenter the issue.  When the Schusters served the notice

17   of termination in 2003 for the very first time as

18   Mr. Toberoff described, the Schusters relied solely on

19   Section 304(d) of the copyright statute claiming that

20   that section gave them the right to terminate

21   notwithstanding all the prior history.

22        That section, your Honor, 304(d) specifically

23   states that the right to terminate a copyright interest

24   is only available for copyright grants or agreements

25   before January 1, 1978.  There is no right to terminate

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   any grants after January 1, 1978.  Nobody disagrees with

 2   that.  Not certainly in the statute, and all the cases

 3   uniformly agree with it.

 4          So, the issue in this case and that is the

 5   subject of the briefing in the court's tentative is

 6   whether in 2003, when the notice of termination was

 7   served, there existed any agreements or grants prior to

 8   January, 1978, or whether the only thing that existed was

 9   after January 1, 1978.

10          So that takes us to 1992.  Because what

11   happened in 1992 is that the parties entered into an

12   agreement, the one you have in front of you which is

13   indisputably governed by New York law where it was made.

14   The defendants acknowledge that New York law applies in

15   prior briefing, and the cases apply state law to

16   interpreting a contract.

17          The issue in this case is not whether that

18   1992 agreement waives a termination right.  The issue is

19   whether that 1992 agreement was intended to and did

20   supersede and replace all prior agreements by the parties

21   and insert in place of those prior agreements a new

22   agreement going forward which we contend it plainly does.

23       THE COURT:  Wait a minute.  Do you say that this

24   1992 letter is in effect a grant of a intellectual

25   property interest?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1           MR. PETROCELLI:  Correct.  Correct.  And I will

 2   walk you through that.  Okay.  And that has been the

 3   position that we briefed, that this document does

 4   two things.  Okay.  It, number one, replaces and

 5   supersedes and gets rid of all the other prior agreements

 6   so there can be no further claims whatsoever brought

 7   under any prior agreements at all.  And, number two, it

 8   establishes new grants going forward.

 9           The sole subject matter of the operative

10   paragraph which is the second paragraph is the copyrights

11   of Joe Schuster.  That is the sole subject matter.  The

12   first -- and, again, this is subject to New York law, and

13   New York law says when you enter into an agreement -- and

14   your Honor cites it in the tentative, I won't repeat

15   it -- which supersedes prior agreements, those agreements

16   are gone.  And the second part of this is that there is a

17   new grant going forward which is specific in the second

18   sentence of that first paragraph.

19           That grant of these rights is not subject to

20   termination because it is after January 1, 1978.  And

21   this isn't the first case where this has come up, your

22   Honor.  Take the Steinbeck case.  Elaine Steinbeck

23   entered into a new agreement just like the Schusters in

24   1994 instead of 1992.  She, just like the Schusters, at

25   the time had no termination right.  She did not have any.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              The reason she did not have any even though

 2    she was the surviving spouse is because there were adult

 3    children, and the law says you have to have more than

 4    50 percent.  And her children did not want to join with

 5    her.  She only had exactly 50 percent.  And the case

 6    makes clear that she had no right to terminate.

 7         THE COURT:  Well, what rights did Jean Schuster

 8    have to convey to DC?

 9         MR. PETROCELLI:  That is precisely the correct

10    question, your Honor.  And the rights that Jean Schuster

11    had was she stood as the executrix and the sole heir

12    under the will which, prior to this agreement, she had

13    filed papers with the California court.  And we have

14    attached them to -- it is Exhibit 33 to my declaration, a

15    will made out in 1988, June 28, six years, four years

16    earlier where she was named the sole beneficiary and she

17    was also the executrix.

18              And we also cited the law, and defendants

19    don't challenge it, that on the death of the decedent, in

20    this case, Joseph Schuster who died July 30, 1992, even

21    without probate, the rights vest immediately to the sole

22    beneficiary, in this case, Jean.

23         THE COURT:  What rights in Superman does Joe

24    Schuster have in his name?

25         MR. PETROCELLI:  Joe Schuster was a party to
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   numerous contracts.  Joe Schuster, whatever Joe Schuster

 2   had the power to do the day before he died, let's say,

 3   now Jean Schuster had the power to do it.

 4           The reason why we have an agreement with Jean

 5   Schuster is because she, as she had previously told DC in

 6   correspondence that is before the court, she said she is

 7   the heir.  That is why they are dealing with her.  The

 8   only reason they are dealing with her is because she is

 9   now Joe's representative.  She is not a party to any

10   pension agreements or any personal agreements.  There was

11   no financial obligation to her whatsoever.

12        THE COURT:  When Joe Schuster died, what rights

13   did he have to Superman?

14        MR. PETROCELLI:  Joe Schuster had copyrights that

15   he had granted, and he had the right to receive money

16   over the years.  And he received that money.  By the time

17   he died, his last contract he made said he wanted his

18   brother, Frank, to get money.

19           Okay.  That is this last agreement that he

20   signed that was in 1975, and that provided for $5,000 a

21   year to brother Frank and zero to anybody else.

22        THE COURT:  But you know my question was, what

23   rights did he have in Superman?

24        MR. PETROCELLI:  He had the right to enter into a

25   new agreement.  He could have entered into a new

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    agreement.  And so what this document is is his

2    representative standing in his shoes, made a new

3    agreement.  So if Joe had made this agreement the day

4    before, it would be -- we would be making the identical

5    argument that we are making now which is that his

6    representatives made this agreement.

7              This is not a personal agreement about

8    personal pension claims of Jean Schuster.  She had no

9    personal pension claims.  She had nothing.  This is an

10   agreement that purports to get rid of all prior

11   agreements that Joe Schuster had with DC from the very

12   beginning through the very end and say all that is being

13   superseded now by this.

14             Secondly, it said you now grant to us any such

15   rights.

16        THE COURT:  Okay.  As we have discussed, those

17   rights were the right to receive a few bucks in the

18   pension payment.

19        MR. PETROCELLI:  No.  Here, the rights that are

20   referred to are the rights -- because it says any such

21   rights.  So you have to look to the prior sentence to see

22   what any such rights means.  And the prior sentence, I

23   believe, I don't know exactly what he put in front of

24   you, but I presume it is the copy of this agreement.

25             And the rights are, your Honor, claims to any

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    payments or other rights or remedies which you may have

 2    under any agreement or otherwise whether now or hereafter

 3    existing regarding any copyrights, trademarks or other

 4    property right in any or all work created in whole or in

 5    part by your brother, Joseph Schuster, or any works based

 6    thereon.  So, in any event, you now grant to us any such

 7    rights.  In other words --

 8         THE COURT:  Okay.  That is why I asked you.  When

 9    he died, what rights did Joseph Schuster have in

10    Superman?

11         MR. PETROCELLI:  He had the right, as I

12    indicated -- at the moment of his death?  Or prior to his

13    death?

14         THE COURT:  I want to know what rights passed to

15    Jean as a result of Joe Schuster's death.

16         MR. PETROCELLI:  All of Joe Schuster's powers and

17    rights and ability including to make a new agreement on

18    his behalf.

19         THE COURT:  Okay.

20         MR. PETROCELLI:  And that is what this document

21    is.  In other words, it is not our position, your Honor,

22    that this is a document whereby we were asking Jean to

23    convey her personal rights because she had no personal

24    rights.

25              This is a document that was entered into with
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    her to convey the rights of Joe Schuster in the

2    copyrights including the right to make a new grant of

3    those copyrights especially given, especially given, that

4    there had been the specific issue raised before this by

5    her and her brother that they might have the ability to

6    reclaim copyrights and terminate interest in the future.

7        THE COURT:  Okay.  Well, I can see why DC would

8    basically want to tear up a clear, unequivocal grant of

9    intellectual property in Superman from 1938.  I can

10   understand why they would tear that up for this ephemeral

11   thing.  That makes a lot of sense to me.

12       MR. PETROCELLI:  By the way, the 1938 agreement

13   itself that this replaces is a 1-page agreement.  It is a

14   simple 1-page grant.  I mean I think that is in the

15   record also.

16       THE COURT:  That is when lawyers could get to the

17   point.  Those were the days.

18       MR. PETROCELLI:  And, remember, they are not

19   dealing with lawyers here, your Honor.

20       THE COURT:  I know.

21       MR. PETROCELLI:  They are dealing with

22   individuals, and they are trying to obviously keep this

23   simplistic.  And the Steinbeck case, the Milne case, they

24   all say when you enter into an agreement -- let me ask

25   the same thing, your Honor, that you just asked me

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   applied to in the John Steinbeck case.  Elaine Steinbeck

2   was his representative under his will, and she canceled

3   prior grants and made new grants.  In that case, the

4   language was more specific than it is in this case.

5            And that takes us now to the New York cases on

6   whether or not when the parties make a contract to

7   replace and supersede all prior agreements and replace

8   them with something new, how specific must that be in

9   order for that to be upheld.

10           And we set out those various cases from New

11  York which described that the ultimate test is not

12  whether it is specific or explicit but what the intention

13  of the parties is.  The language, of course, is the most

14  helpful guide to that, but the intention can be implied.

15           The intent we were talking about is the intent

16  to supersede prior agreements and replace them with a new

17  grant.  We are not talking about an intent to waive or

18  relinquish termination.  That is not the operative intent

19  here.  The operative intent which would make this

20  contract a new 1992 agreement going forward is when this

21  contract is over, what do the parties think they have?

22           What the parties think they have is no more

23  prior agreements that Joe entered into, Jean never

24  entered into any agreements with DC.  This wasn't

25  canceling any of Jean's agreements.  Frank never entered

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   into any agreements with DC.  All of this was about, and

 2   if you look at the wording, in simple terms, without a

 3   lot of legal verbosity, it is extremely all-encompassing

 4   and broad.  Any and all rights.  Any and all claims.

 5   Whether now or hereafter existing regarding any

 6   copyrights, trademarks or other property right in any and

 7   all work.  You now grant that to us.  You being the only

 8   person who has the legal power to grant that to us.

 9            So now we have an explicit grant that is after

10   1978, and when Congress came along in 1998 and passed

11   this amendment to the termination law, they did not

12   change this part.  They kept the part intact that says

13   your right to terminate only applies to grants and

14   agreements prior to January 1, 1978.

15            So Milne and Steinbeck, both specifically deal

16   with the question, and Steinbeck is most applicable here

17   because Elaine Steinbeck like the Schusters in 1994 had

18   no termination right.  But she nonetheless entered into a

19   new grant of rights on behalf of her deceased husband.

20            Milne, we have a new grant of rights in 1983.

21   And so those two are the lead cases, one from the Second

22   Circuit, one from the Ninth Circuit.  And they both dealt

23   with specifically the argument that Mr. Toberoff has been

24   advancing whether or not you can make new grants that get

25   rid of old agreements after 1978 and whether that

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    extinguishes any new termination rights that might come

2    along.  And the court said, yes, it does because Congress

3    could have said something different in the statute if

4    they wanted.  They could have said the right of

5    termination applies to post-1978 grants in these

6    circumstances.  They did not.

7            And, bear in mind here, your Honor, that this

8    says, fully settles all claims and agreements in the past

9    which would include all of his copyright grants that he

10   made in the past.  So it is very clear that the intention

11   here, it is straightforward in the sense that, look, you

12   are coming back to us.  We are going to take care of this

13   once and for all, and, essentially, that is what Paul

14   Levitz testified in that affidavit which is not refuted.

15   Here is the deal, nothing more in the past, and here is

16   where it is going forward.

17           And I want to explain something, your Honor,

18   because it may not have been clear from our papers.

19   Mr. Toberoff says that this is only about the 1975

20   pension agreement.  That was the last document that Joe

21   Schuster signed.  That document said Joe is supposed to

22   get $20,000 a year for the rest of his life.  It turns

23   out they gave him a lot more than that, but on his death

24   it is supposed to go to his brother Frank for Frank's

25   life.  $5,000.  That is addressed in the first paragraph

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    here where they decided to increase Frank's lifetime

2    pension to give him more financial security from 5 to 25.

3            And they entered into a separate agreement

4    with Frank on the same day making clear, and that is

5    Exhibit 9 to my -- to Mr. Levitz's declaration making

6    clear that this waives any rights or remedies that he has

7    under the agreement dated December 23, '75 between

8    Warners and Mr. Schuster, Joseph Schuster.

9            So the purpose of Exhibit 9 was to directly

10    get rid of the '75 agreement because that was in an

11    agreement where Frank was named specifically as a third

12    party beneficiary and he could enforce.  So that is the

13    Frank Schuster agreement, Exhibit 9.

14            When you go to the 1992 agreement which is

15    Exhibit 8, this is not about a pension agreement for

16    Frank's benefit.  This is not about any other agreement

17    for Jean's benefit.  This is about Joe Schuster's

18    copyrights.  That is the sole subject matter of the

19    operative paragraph here.  And the reason --

20        THE COURT:  Okay.  Mr. Petrocelli.  All right.  I

21    understand.

22        MR. PETROCELLI:  You got it.

23        THE COURT:  You have made that.

24            All right.  The matter stands submitted.

25    Thank you, counsel.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          MR. PETROCELLI:   Thank you.

2          MR. TOBEROFF:   Thank you.

3          (Proceedings concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1                            CERTIFICATE

 2

 3

 4    I hereby certify that pursuant to Section 753, Title 28,

 5    United States Code, the foregoing is a true and correct

 6    transcript of the stenographically reported proceedings held

 7    in the above-entitled matter and that the transcript page

 8    format is in conformance with the regulations of the

 9    Judicial Conference of the United States.

10    Date:  September 10, 2012

11

12     /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA