**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MARK WARREN PEARY,

               Plaintiff,

     v.

DC COMICS, INC.; DC COMICS; DC
ENTERTAINMENT, INC.; WARNER
BROS. DISCOVERY, INC.; and DOES 1-10,

               Defendants.

---

Case No. 1:25-cv-00910-JMF

 

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................... 1

II.    FACTUAL BACKGROUND ........................................................................... 2

    A.    The Long-Running Superman Cases And The Courts' Prior Rulings .................. 3

    B.    Peary's Years-Long Delay In Filing This Motion ................................................ 6

    C.    The Harm An Injunction Against The New Superman Movie Would Cause ....... 7

    D.    The Lack of Harm To Peary ................................................................................. 8

III.    ARGUMENT ................................................................................................... 8

    A.    The Court Lacks Jurisdiction To Resolve Peary's Motion. ................................. 8

    B.    Peary's Motion For A Preliminary Injunction Is Meritless. ............................... 9

        1.    There Is No Risk Of Irreparable Harm. ......................................................... 9

        2.    A Preliminary Injunction Would Severely Harm DC And The Public Interest ........................................................................................................ 10

        3.    Peary Cannot Establish Likelihood Of Success On The Merits. ................... 11

            a.    Peary's Claims Are Barred By Collateral Estoppel ............................ 11

            b.    The Foreign Reversion Provisions Do Not Apply ............................. 18

            c.    Peary Has No Reversion Rights Because Any Such Reversionary Interests Were Assigned To DC In The 1992 Agreement ................... 21

    C.    A Bond Of At Least $75 Million Is Required Under Rule 65(c) ........................ 25

IV.    CONCLUSION ............................................................................................... 26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AXA Inv. Managers UK Ltd. v. Endeavor Cap. Mgmt. LLC*,
   890 F. Supp. 2d 373 (S.D.N.Y. 2012) ...................................................................... 25

*Booker v. BWIA W. Indies Ariways Ltd.*,
   2007 WL 1351927 (E.D.N.Y. May 8, 2007), *aff'd*, 307 F. App'x 491 (2d Cir. 2009) ........... 16

*Cayuga Nation v. Tanner*,
   6 F.4th 361 (2d Cir. 2021) ................................................................................. 17

*Chappell & Co. Ltd. v. Redwood Music Ltd.*,
   [1981] RPC 337 ............................................................................................... 24

*Clark v. Bear Stearns & Co.*,
   966 F.2d 1318 (9th Cir. 1992) ............................................................................ 17

*DC Comics v. Pac. Pictures Corp.*,
   2012 WL 4936588 (C.D. Cal. Oct. 17, 2012), *aff'd*, 545 F. App'x 678 (9th Cir. 2013)... passim

*DC Comics v. Pac. Pictures Corp.*,
   545 F. App'x 678 (9th Cir. 2013) ..................................................................... passim

*Estate of Molino*,
   165 Cal. App. 4th 913 (2008) ........................................................................ 16, 23

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
   559 F.3d 110 (2d Cir. 2009) ................................................................................ 9

*Frazer Exton Dev., L.P. v. Kemper Env't, Ltd.*,
   2007 WL 756494 (S.D.N.Y. Mar. 13, 2007) ........................................................... 16

*Fuchsberg & Fuchsberg v. Galizia*,
   300 F.3d 105 (2d Cir. 2002) .............................................................................. 17

*Hanson Tr. PLC v. SCM Corp.*,
   774 F.2d 47 (2d Cir. 1985) ................................................................................. 9

*In re Kalt's Estate*,
   16 Cal. 2d 807 (1940) ...................................................................................... 16

*In re Pac. Pictures Corp.*,
   679 F.3d 1121 (9th Cir. 2012) .............................................................................. 3

*Ingber v. N.Y. City Dep't of Educ.*,
   2014 WL 2575780 (S.D.N.Y. June 9, 2014) ............................................................ 9

*Jonas v. Est. of Leven*,
   116 F. Supp. 3d 314 (S.D.N.Y. 2015) ................................................................. 18

*Larson v. Warner Bros. Ent., Inc.*,
   504 F. App'x 586 (9th Cir. 2013) ......................................................................... 3

## TABLE OF AUTHORITIES
(conintued)

**Page(s)**

*Larson v. Warner Bros. Ent., Inc.*,
    640 F. App'x 630 (9th Cir. 2016) ............................................................. 3

*Meyappa Chetty v. Supramanian Chetty*,
    [1916] 1 AC 603 ......................................................................................... 23

*Monowise Ltd. Corp. v. Ozy Media, Inc.*,
    2018 WL 2089342 (S.D.N.Y. May 3, 2018) ........................................... 10

*Murphy v. Gallagher*,
    761 F.2d 878 (2d Cir. 1985) ..................................................................... 11

*New Era Publ'ns Int'l, ApS v. Henry Holt & Co., Inc.*,
    873 F.2d 576 (2d. Cir. 1989) .................................................................... 11

*Postlewaite v. McGraw-Hill*,
    333 F.3d 42 (2d Cir. 2003) ................................................................. 11, 17

*Redwood Music Ltd. v. B. Feldman & Co. Ltd.*,
    [1979] RPC 1 .......................................................................................22, 23

*Sibanda v. Elison*,
    2023 WL 7165046 (S.D.N.Y. Oct. 31, 2023) ...................................... 9, 15

*Siegel v. Warner Bros. Ent. Inc.*,
    542 F. Supp. 2d 1098 (C.D. Cal. 2008) ................................................... 15

*State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*,
    120 F.4th 59 (2d Cir. 2024) ....................................................................... 9

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
    60 F.3d 27 (2d Cir. 1995) ......................................................................... 10

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................................ 9

*Yamaha Corp. of Am. v. United States*,
    961 F.2d 245 (D.C. Cir. 1992) ................................................................. 17

**Statutes**

17 U.S.C. § 304 ................................................................................... 5, 15

Australian Copyright Act 1968, § 239(4) ............................................ 20, 22

Canadian Copyright Act, RSC 1985, c. C-42, § 14 ............................. 20, 22

Canadian Copyright Act, RSC 1985, c. C-42, § 2 ..................................... 22

Irish Copyright & Related Rights Act 2000, Sch. I, Pt. I, § 16 ........... 20, 22

U.K. Copyright Act 1911, § 5(2) ......................................................... 19, 22

U.K. Copyright, Designs & Patents Act 1988, c. 48, Sch. I, ¶ 27 ........ 19, 22

## TABLE OF AUTHORITIES
(conintued)

**Page(s)**

**Rules**

Fed. R. Civ. P. 44.1 ................................................................................................ 18

**Other Authorities**

18 Moore's Federal Practice - Civil § 132.03[3][e] (2025) ........................................ 17

5 Am. Jur. 2d Appellate Review § 833 ...................................................................... 16

*Copinger and Skone James on Copyright* (19th ed.), § 4-140(e)(ii) ........................... 24

*Copyright and the First Amendment,*
   70 COLUM. L. REV. 983 (1970) ............................................................................ 11

Defendants DC Comics, Inc., DC Comics, DC Entertainment, and Warner Bros. Discovery, Inc. (collectively "DC") respectfully submit this memorandum of law in opposition to Plaintiff Mark Warren Peary's Motion for a Preliminary Injunction.

## I.    INTRODUCTION

Peary's preliminary injunction motion is baseless on multiple grounds and should be denied:  the Court lacks jurisdiction to hear the case; Peary's claims are foreclosed by the California federal court's findings and a final judgment against him; Peary has no reversion rights under the foreign laws he cites; and Peary is guilty of interminable delay.

DC has briefed separately the threshold jurisdictional issue in its pending motion to dismiss.  And Peary's motion fails every prong of the preliminary-injunctive-relief test:

<u>Delay and Harm.</u>  Peary delayed *for years*—not months—in bringing this motion.  The only debate is how many years he waited.  It has been 15 years since Peary began contesting the enforceability of the governing 1992 Agreement that assigned to DC "any" and "all" rights his family held in Superman—arguments Peary lost in federal court litigation in the 2010s.  The day that case ended in 2016, Peary and his longtime business partner (counsel of record here) knew that DC was extensively exploiting Superman abroad, and they neither filed suit for declaratory relief nor brought an injunction motion.  Peary might assert that he could not bring such suit until his alleged reversion rights vested.  But by his own assertion, those rights vested *eight years ago*, in July 2017—four months prior to the worldwide release of DC's *Justice League* movie, featuring Superman.  As for the latest Superman movie that Peary challenges, the world has known since *January 2023* that DC was producing it and would release it in July 2025.  For Peary to try to enjoin the movie now—when DC has spent hundreds of millions of dollars to produce and promote it, while Peary remained silent—would drastically prejudice DC and scores of theater owners, among others.  It would also deprive millions of viewers access to this work.

The Merits. Peary has no chance to succeed on his claims. Peary's claims arise under foreign reversion statutes, which his motion inaccurately describes. As the plain language of those statutes makes clear, and as actual legal experts in those countries attest (Peary offers no such proof), reversion rights only exist in narrow circumstances where, unlike here, (a) an author's original copyright grant remains in existence and (b) the copyrights subject to reversion have not already been assigned by the author's heirs. To prevail on his claims, therefore, Peary needs the Court to disregard the collateral estoppel effect of numerous rulings that California federal courts made in rejecting Peary's previous claims to Superman rights. Those rulings conclusively establish that the 1992 Agreement that Jean Peavy (Peary's mother, and Shuster's executor and sole heir) made with DC (a) revoked Shuster's original 1938 copyright grant to DC and (b) assigned to DC "any" and "all" rights that Shuster's family held in Superman, in 1992 and going forward, based on any source—thereby, "fully settl[ing]" "any and all" claims among the parties. In previous litigation, Peary argued the 1992 Agreement was unfair, that DC's contractual interpretation defied New York law, and that DC sidestepped California probate law—all arguments he recycles here. But the district court and Ninth Circuit rightly rejected each argument, and the Ninth Circuit found that Peary waived on appeal his probate arguments that had not succeeded below.

Peary cannot relitigate these issues, which are fatal to his foreign-law claims. And even if he could, those claims would fail as a threshold matter based on the plain language of the 1992 Agreement, which extinguishes any copyright grant that may have been subject to reversion and assigns to DC any reversionary interests that may have existed.

## II.   FACTUAL BACKGROUND

The salient facts were conclusively decided in prior federal litigation. The key facts and rulings (many omitted from Peary's papers) are detailed in DC's pending motion to dismiss, Dkt.

29 at 3-7.  DC highlights them briefly here.

###### A.    The Long-Running Superman Cases And The Courts' Prior Rulings

Marc Toberoff, a movie producer and also Peary's litigation counsel, entered into business and legal relationships with the heirs of Jerry Siegel and Joseph Shuster.  *See DC Comics v. Pac. Pictures Corp.*, 545 F. App'x 678, 682 (9th Cir. 2013) (noting agreement "between the heirs and a corporation headed by their attorney, Marc Toberoff, in which they formed a joint venture to exploit any recovered Superman works").  During years of litigation, Toberoff and the heirs (including Peary) sought to unwind binding contracts between DC and the families, which had assigned any and all Superman copyright interests to DC.  The Ninth Circuit was openly critical of the "ethical and professional concerns raised by Toberoff's actions."  *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1124 (9th Cir. 2012).  In part, this was because his deals with the heirs—which the courts struck down—barred them "from making any deal with DC without Toberoff's" consent.  *DC Comics v. Pac. Pictures Corp.*, 2012 WL 4936588, at *11-12 (C.D. Cal. Oct. 17, 2012) ("*Superman I*"), *aff'd*, 545 F. App'x 678 (9th Cir. 2013) ("*Superman II*").

In the Siegel-family litigation, the Ninth Circuit enforced an agreement that Siegel's heirs made with DC in 2001 assigning any and all copyright interests to DC—before Toberoff interfered.  *Larson v. Warner Bros. Ent., Inc.*, 504 F. App'x 586 (9th Cir. 2013); *Larson v. Warner Bros. Ent., Inc.*, 640 F. App'x 630 (9th Cir. 2016).  At argument, the presiding Ninth Circuit judge noted that the Siegels' prior lawyer (experienced entertainment counsel) advised them they made a binding deal with DC; counsel said it was the "right thing to do" to honor it.[1]

---

[1] *See* Matt Kline Decl. ("KD") Ex. A at 10:14-13:1; Ex. B.  The Ninth Circuit ruled the heirs waived privilege over many such communications.  *In re Pac. Pictures Corp.*, 679 F.3d at 1130.

Peary's arguments that he was entitled to Superman copyrights were likewise rejected. In 2010, DC filed suit in the Central District of California, seeking a declaration that Peary's 2003 copyright termination notice was rendered invalid by the 1992 Agreement his mother had made with DC. *Superman I*, 2012 WL 4936588, at *1. In ruling for DC, the district court found the following facts to be uncontested:

- On March 1, 1938, Shuster and Siegel, the co-creators of Superman, assigned to DC the "exclusive right to the use of the [Superman] characters and story." *Id.* at *1. On April 18, 1938, DC published "Action Comics #1," which featured an adapted version of Siegel and Shuster's Superman story. *Id.*

- On July 30, 1992, Shuster died in California. *Id.* at *2. He had no wife or child, and his will named his sister, Jean Peavy, as sole beneficiary and executrix of his estate. *Id.* On August 17, 1992, Jean executed an affidavit identifying herself as Shuster's "successor" and sole heir and requesting that his property "be paid, delivered or transferred to her." *Id.* Four days later, Jean wrote to DC, identifying herself as "heir to [Shuster's] Will" and asking DC to pay his "final debts and expenses." *Id.*

- On October 2, 1992, the parties executed the 1992 Agreement under which DC would cover Shuster's debts and pay Jean $25,000 a year for the rest of her life. *Id.* In exchange, Jean and her brother Frank re-granted all of Shuster's rights to DC and vowed never to assert a claim to such rights. *Id.* DC's Paul Levitz told the siblings that the 1992 Agreement "would represent the author/heir's last and final deal with DC, and would fully resolve any past, present, or future claims against DC." *Id.* Jean and Frank confirmed they understood and agreed. *Id.*

- Over the next decade, DC maintained good relations with Jean. *Id*. at *3. Upon learning that Siegel's heirs had served a copyright termination notice on DC, Jean Peavy reiterated her commitment "to honor" the 1992 Agreement. *Id*.

DC moved for summary judgment and argued that the 1992 Agreement, which all agreed was governed by New York law, revoked Shuster's original 1938 copyright grant (the "1938 Grant"). Because the U.S. Copyright Act permits termination of *only* those assignments "executed before January 1, 1978," 17 U.S.C. § 304(c)-(d), DC argued that the 1992 Agreement left no pre-1978 assignment to terminate and thus Peary's 2003 notice was invalid. *Id*. at *5. DC argued that the 1992 Agreement was a wall-to-wall assignment, granting to DC any and all rights in Superman. *E.g.*, KD Ex. C, § III.

The district court ("California Court") agreed with DC. "In sum, the Court finds that the 1992 Agreement ... superseded and replaced all prior grants of the Superman copyrights. The 1992 Agreement thus represents the parties' operative agreement and, as a post-1978 grant, it is not subject to termination under 17 U.S.C. § 304(d)." *Superman I*, 2012 WL 4936588, at *9. The 1992 Agreement "expressly and unambiguously" was a re-grant of "all rights." *Id*. at *5.

On appeal, the Ninth Circuit affirmed:

> The district judge correctly held that the 1992 Agreement, as a matter of New York law, superseded the 1938 assignment of copyrights to DC, and therefore operated to revoke that assignment and re-grant the Superman copyrights to DC.... We agree with the district judge that, under the plain text of the 1992 Agreement, which "fully settles all claims" regarding "any copyrights, trademarks, or other property right in any and all work created in whole or in part by [Shuster]," and further "now grants to DC any such rights," it superseded the 1938 assignment as a matter of New York law. We therefore hold that the agreement created a new, 1992 assignment of works to DC—an assignment unaffected by the 2003 notice of termination.

*Superman II*, 545 F. App'x at 680-81.

In so holding, the Ninth Circuit rejected Peary's arguments that the 1992 Agreement ran afoul of New York contract law, California probate law, and copyright law. *Id.* & n.3. The California Court's detailed summary judgment ruling recounted the many undisputed facts refuting these claims. *Superman I*, 2012 WL 4936588, at *1-3. This included the parties' course of negotiations and how Jean Peavy represented herself—before making the 1992 Agreement— as Shuster's executor and sole heir. *Id.* at *2. The only agreements the courts held to be invalid were Toberoff's agreements with the heirs, which violated the Copyright Act and raised ethical questions, given his dual role as business partner. *Supra* at 3; *Superman II*, 545 F. App'x at 682.

### B. Peary's Years-Long Delay In Filing This Motion

As is plain from the broad language of the 1992 Agreement ("any copyrights," "any and all work created [by Shuster]," "any such rights"), and the California court orders and judgment, there was no carveout for foreign rights or the foreign reversionary copyright interests that Peary now claims. Yet some 12 years after the Ninth Circuit ruled in *Superman II*, Peary asserts that the 1992 Agreement left room for him to lay claim to reversionary rights under the laws of 10 foreign countries. This is not a position Peary took with DC before filing this lawsuit in January 2025—despite the fact that DC has openly and extensively exploited Superman throughout the world during the nearly eight years since Peary claims the reversions took place.

Peary was plainly on notice—both during the prior Superman litigation and in the decade that has followed—that DC was exploiting Superman in each of the countries about which he now complains. Various media stories from the 2010s and 2020s have reported on where and how DC has exploited Superman abroad, including in countries like the U.K., Canada, Ireland, and Australia, *e.g.*, KD Ex. D (*Man of Steel* "pulled in £11M from 574 situations [in the U.K.], dominating the market"); *id.*, Ex. E (similar; Ireland); *id.*, Ex. F (*Batman v. Superman: Dawn of Justice* had "No. 5 best opener ever at the overseas box office," including "$20.7M [in the U.K.]

for the biggest March opening of all time" and "$9.9M" in Australia.); *id.*, Ex. G (similar); *id.*, Ex. H (*Justice League*, released in Nov. 2017—*after* alleged reversions—"dominated the international box office" including "$9.8 million" in U.K.).

Indeed, in Peary's own telling, *since 2017 alone*, DC has distributed and exploited no fewer than 19 film, TV, and videogame works derivative of Superman—and "ubiquitous Superman merchandising"—in the countries covered by the injunction he seeks. Compl. ¶¶ 69, 79, 89, 99. Such exploitations are hard to miss; Superman receives significant attention in the press, on social media, and among fans. Jeff Goldstein Decl. ("JGD") ¶¶ 3-5 & Exs. 1-3.

Yet, despite contending that Peary's reversion rights "automatically reverted," "accrued," and "vested" in the U.K., Ireland, and Australia on July 30, 2017, and in Canada on January 28, 2021, Compl. ¶¶ 3, 52, 66, 76, 86, 96, Peary remained silent. He did not make a claim, sue, or seek an injunction, and instead waited some *eight* years to file this case.

Nor did he do anything when the new Superman movie at the center of their motion was first announced. On January 31, 2023 (*over two years ago*), Peter Safran and James Gunn—the newly appointed heads of DC Studios—told the world that a new Superman movie was slated for release on July 11, 2025, as a centerpiece of a multi-year reboot of DC film and TV projects. Peter Safran Decl. ("PSD") ¶ 3. Since then, news of the movie, its cast, its production, its promotion, and its worldwide 2025 release have received constant, widespread attention. *See* JGD ¶¶ 3-5 & Exs. 1-2 (collecting 460+ media articles from 2023-2024); *id.*, Ex. 3 (collecting social media posts). Yet Peary waited 24 months after that announcement and well after the movie had already been filmed to file suit—then a month after that, to move for this injunction.

### C.     The Harm An Injunction Against The New Superman Movie Would Cause

DC has spent over ▮▮▮▮▮▮ producing and marketing the new Superman movie. PSD ¶ 7. DC anticipates the film will generate over ▮▮▮▮▮ in box-office revenues in the

four territories at issue in this motion. *Id*. ¶ 8.  Barring DC from realizing its share of these revenues (roughly ████ would not only significantly damage DC ████████), but greatly harm theater operators that rely on tentpole movies like *Superman* to stay in business.  *Id*.; JGD ¶¶ 9, 12.  An injunction would also harm the actors and creative professionals whose work would not be exposed to these large, important territories.  *See* PSD ¶ 9.  The injunction would damage DC and its affiliates' reputation among businesses and the general public.  *See* JGD ¶¶ 10-12.

In terms of the harm to DC and the public, barring theatrical release is just the start.  Such movies are extremely popular in these foreign territories in downstream channels of distribution: *e.g.*, on streaming services, as permanent digital downloads, on pay and non-pay TV, in hotels, etc.  *See* PSD ¶ 8.  Foreclosing DC from pursuing these opportunities would cost in excess of an additional ████████ not to mention the damage to relationships with licensees, advertisers, merchandisers, and scores of other counterparts.  *See id*.; JGD ¶¶ 10, 12.

### D.    The Lack of Harm To Peary

Peary has never had direct involvement with the creation or exploitation of Superman.  While his counsel now claims that Peary needs to shape the creative future of Superman, and to deprive him of that honor would be an irreparable harm, Peary is not the creator of the property or a successful artist, and were he to prevail on any claim in this case (and he should not), he could be remedied by money damages.  Money damages would be all the more appropriate since Peary concedes he has no U.S. copyright interest in Superman and thus never could have prevented DC from making the new Superman movie (or any other work).  Compl. ¶¶ 37-38.

### III.  ARGUMENT

### A.    The Court Lacks Jurisdiction To Resolve Peary's Motion.

Before the Court can address the almost unprecedented request for an eleventh-hour injunction of a major movie that has been public news for over two years, it must first evaluate

whether it even has jurisdiction to hear the case.  DC's motion raising that threshold issue is

currently before the Court and should be granted.

### B.    Peary's Motion For A Preliminary Injunction Is Meritless.

Peary, of course, has no right to the drastic remedy of an injunction:

> "A preliminary injunction is an *extraordinary remedy* never awarded as
> of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008);
> *see also Hanson Tr. PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985)
> (describing a preliminary injunction as "*one of the most drastic tools in
> the arsenal* of judicial remedies").

*Sibanda v. Elison*, 2023 WL 7165046, at *1 (S.D.N.Y. Oct. 31, 2023) (Furman, J.).[2]

> A party seeking a preliminary injunction must ordinarily establish (1)
> irreparable harm; (2) either (a) a likelihood of success on the merits, or
> (b) sufficiently serious questions going to the merits of its claims to
> make them fair ground for litigation, plus a balance of the hardships
> tipping decidedly in favor of the moving party; and (3) that a
> preliminary injunction is in the public interest....

*Id.  Peary's motion fails on every single count.*

#### 1.  There Is No Risk Of Irreparable Harm.

"A showing of irreparable harm is the single most important prerequisite for the issuance

of a preliminary injunction."  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118

(2d Cir. 2009).  "Thus, if a party fails to show irreparable harm, a court need not even address

the remaining elements."  *Sibanda*, 2023 WL 7165046, at *1; *accord State Farm Mut. Auto. Ins.

Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 80 (2d Cir. 2024).

This Court "must consider [Peary's] delay in seeking relief when analyzing whether [he]

will suffer irreparable harm in the absence of relief."  *Ingber v. N.Y. City Dep't of Educ.*, 2014

WL 2575780, at *2 (S.D.N.Y. June 9, 2014) (Furman, J.).  That is because:

---

[2] All emphases are added and internal citations/quotation marks omitted unless noted.

> Preliminary injunctions are generally granted under the theory that there
> is an urgent need for speedy action to protect the plaintiffs' rights.
> Delay in seeking enforcement of those rights, however, tends to
> indicate[] at least a reduced need for such drastic, speedy action.

*Monowise Ltd. Corp. v. Ozy Media, Inc.*, 2018 WL 2089342, at *2 (S.D.N.Y. May 3, 2018)

(Furman, J.). Indeed, "*delay 'standing alone' may 'preclude the granting of preliminary*

*injunctive relief*' because it 'suggests that there is, in fact, no irreparable injury.'" *Id.*.

Peary's lengthy delay demonstrates no irreparable injury exists here. Peary waited some

*eight* years after his alleged foreign reversionary rights "reverted," "accrued," and "vested" in

2017, Compl. ¶¶ 3, 52, to bring this suit—and then waited yet another month to file this motion.

Peary's longtime counsel has litigated Commonwealth countries' reversionary rights since at

least 2017—this is not some new theory that Peary or his agent just discovered. *See* Compl.

¶¶ 82-93, *Anson v. Weinstein*, No. 2:17-cv-08360-CBM-KS (C.D. Cal. Nov. 15, 2017).

"[C]ourts in [the Second] Circuit 'typically decline to grant preliminary injunctions in the

face of unexplained delays of *more than two months*.'" *Monowise*, 2018 WL 2089342, at *2

(collecting cases). Peary waited *91 months* before seeking injunctive relief. Declining to enjoin

DC is particularly appropriate where, as here, "it appeared indisputable that [Peary was] well

aware of [his alleged] rights" and chose not to act on them, and DC "had taken costly steps

during the period of delay" that would be adversely impacted by injunctive relief. *Tom Doherty*

*Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 39 (2d Cir. 1995).

### 2. A Preliminary Injunction Would Severely Harm DC And The Public Interest.

For the reasons shown in Section II.C., an injunction would cause extreme financial and

reputational harm to DC, measuring well over ▓▓▓▓▓▓ Such an injunction would also harm

the public interest. "From a first amendment viewpoint, the effect of an injunction is to restrain

the infringing expression altogether—an effect which goes beyond what is necessary to secure

the copyright property." *New Era Publ'ns Int'l, ApS v. Henry Holt & Co., Inc.*, 873 F.2d 576, 597 (2d. Cir. 1989) (Oakes, C.J., concurring) (quoting Paul Goldstein, *Copyright and the First Amendment*, 70 COLUM. L. REV. 983, 1030 (1970)).  Mr. Gunn, the director of the new *Superman* film, has been upfront about the vital, timely message he hopes to convey with the movie:

> When I watch the trailer and the movie, we do have a sort of battered vision of Superman at the beginning.  I think that is our country[.]  I believe in the goodness of human beings.  And I believe that most people in this country, despite their ideological beliefs [or] their politics, are doing their best to get by and trying to be good people, despite what it may seem like to the other side and what that other side might be.  I think this movie is about that.

KD, Ex. I.  Particularly where, as here, interest in the film is high, *supra* at 7, audiences should not be deprived of the film.

### 3. Peary Cannot Establish Likelihood Of Success On The Merits.

#### a. Peary's Claims Are Barred By Collateral Estoppel.

As Toberoff himself acknowledged in prior Superman litigation, "[i]t is well established that the findings in a prior litigation are binding on the parties or their successors in a subsequent litigation involving the same facts."  KD Ex. J at 11.  The doctrine of collateral estoppel bars re-litigation of an issue where: (1) an identical issue was involved in a prior action, (2) the issue was actually litigated, and (3) determination of the issue was necessary to the prior court's judgment.  *See* Restatement (Second) of Judgments § 27 (1982); *Postlewaite v. McGraw-Hill*, 333 F.3d 42, 48 (2d Cir. 2003).  The doctrine is necessary, Toberoff has argued, "to increase judicial efficiency, to reduce the number of inconsistent rulings and to promote the finality of judgments."  KD Ex. J at 12 (citing *Murphy v. Gallagher*, 761 F.2d 878, 882 (2d Cir. 1985)).  This case is a prime example of why the doctrine exists.

The prior Peary case—which alone spanned six years, over 600 docket entries, and many separate appellate proceedings—centered around the scope and effect of the 1992 Agreement.

Although the claims in that case concerned the U.S. Copyright Act's termination provisions, rather than the foreign reversion provisions, the issues underlying the two cases are the same:

i) Whether the 1992 Agreement revoked or extinguished Shuster's original 1938 Grant of Superman rights to DC?

ii) Whether the 1992 Agreement effected a new, all-encompassing grant of Superman rights to DC by Jean Peavy, Shuster's heir and executor?

iii) Whether the 1992 Agreement is binding on Peary, who installed himself as "substitute executor" of Shuster's estate? *Superman I*, 2012 WL 4936588, at *3.

Each of these three issues was extensively litigated and conclusively decided in DC's favor by the California Court in a final judgment on the merits. Peary is bound by those rulings, which are fatal to his claims here.

i. Issue 1 (Revocation) Was Actually Litigated And Necessarily Decided.

In 2003, Peary served copyright termination notices pursuant to 17 U.S.C. § 304(d) seeking to terminate Shuster's original 1938 grant of Superman rights to DC and recapture those rights. *Superman II*, 545 F. App'x at 680. In *Superman I*, DC sought to invalidate those notices on the ground that the 1992 Agreement revoked the 1938 Grant and regranted all Superman rights to DC, thus extinguishing the only copyright grant that might otherwise be subject to termination. *Id.* Whether the 1992 Agreement extinguished the 1938 Grant was actually and exhaustively litigated in cross-motions for summary judgment. *E.g.*, KD Exs. C, K.

The California Court's 2012 summary judgment ruling expressly decided the issue in DC's favor, holding that "the 1992 Agreement, which represented the Shuster heirs' opportunity to renegotiate the prior grants of Joe Shuster's copyrights, superseded and replaced all prior

grants of the Superman copyrights"—including the 1938 Grant.  2012 WL 4936588, at *9; *id.* at *7 ("the 1992 Agreement unmistakably operates to supersede all prior grants").

On appeal, the Ninth Circuit affirmed, holding that "the 1992 Agreement, as a matter of New York law, superseded the 1938 assignment of copyrights to DC, and therefore operated to revoke that assignment and re-grant the Superman copyrights to DC."  545 F. App'x at 680. Peary's subsequent efforts to challenge the California Court's ruling, including in a petition for rehearing and rehearing *en banc* to the Ninth Circuit and a petition for certiorari to the U.S. Supreme Court, were denied.  KD ¶ 13 & Ex. L.

Peary's current lawsuit seeks to relitigate the exact same issue, this time in the guise of claims for copyright infringement under various foreign reversion statutes.  Peary concedes, as he must, that *all* of these statutes hinge on the existence of a copyright grant made by the author as the first owner of the copyright before his death.  Compl. ¶¶ 47, 49.  As a result, the threshold issue underlying all of Peary's claims is whether the 1938 Grant—the only copyright grant that could be eligible for reversion—was extinguished by the 1992 Agreement.  *See id.*  That issue was conclusively decided in *Superman I* and *II*, and cannot be relitigated here.

ii.  Issue 2 (Regrant Of All Rights) Was Actually Litigated And Necessarily Decided.

Another central issue in *Superman I* and *II* was whether the 1992 Agreement regranted all of Shuster's Superman rights to DC, resulting in a new, all-encompassing 1992 grant not subject to termination under the U.S. Copyright Act.  545 F. App'x at 681.  Again, this question was hotly litigated in cross-motions for summary judgment.  *E.g.*, KD Exs. C, K.

And again, the California Court's 2012 summary judgment ruling expressly decided the issue in DC's favor, holding that "[t]he broad and *all-encompassing* language of the 1992 Agreement" effectively granted "*all* copyright agreements and interest" in the Superman works

to DC. 2012 WL 4936588, at *4-5, *7. The Court rejected Peary's argument that the scope of

the 1992 Agreement was unclear, holding, *id.* at *5:

> [T]he Court finds no ambiguity in the parties' agreement.... [T]he Court
> finds that the 1992 Agreement does in fact settle all prior agreements....
> The 1992 Agreement extends ... to "all claims to any payments or other
> rights or remedies which [the Shusters] may have under any other
> agreement or otherwise, whether now or hereafter existing regarding
> any copyrights...." Accordingly, *the 1992 Agreement not only settled
> and released all "claims[,]... rights [and] remedies" concerning the
> Shuster copyrights under <u>all</u> prior agreements, but it also extended the
> release to such rights and remedies as might exist "otherwise."*
>
> Immediately after so settling all rights, the 1992 Agreement expressly
> and unambiguously provides: "In any event, you [Shuster's heir] now
> grant to us any such rights and release us, our licensees and all others
> acting with our permission, and covenant not to assert any claim of right,
> by suit or otherwise, with respect to the above, now and forever." ... In
> other words, *the 1992 Agreement first settled all claims, and then
> granted DC "such rights" as were just settled, essentially revoking and
> regranting <u>all</u> copyright agreements and interest.*

On appeal, the Ninth Circuit affirmed, holding "[w]e agree with the district judge that,

under the plain text of the 1992 Agreement, which 'fully settles *all* claims' regarding '*any*

copyrights, trademarks, or other property right in *any and all* work created in whole or in part by

... Joseph Shuster,' and further 'now grant[s] to [DC] any such rights,' it superseded the 1938

assignment as a matter of New York law" and "created a new, 1992 assignment of works to

DC—an assignment unaffected by the 2003 notice of termination." 545 F. App'x at 680-81.

Peary's subsequent petitions for review were denied. KD ¶ 13, Ex. L.

Peary's current lawsuit seeks to relitigate the exact same question. Under the foreign

reversion statutes, an author's "legal personal representative" can assign a reversionary interest

at any time after the author's death. *See* Compl. ¶¶ 46-47; *see also infra* Section III.B.3.c. As a

result, a key question underlying all of Peary's claims is whether the 1992 Agreement granted

"all" of Jean Peavy's rights or only a limited subset. The California Court conclusively held that

the 1992 Agreement is "all-encompassing," and included any rights that Jean may have had in Shuster's copyrights. 2012 WL 4936588, at *4-5, *7. Peary cannot relitigate that ruling here.[3]

    <u>iii. Issue 3 (Whether Peary Is Bound) Was Actually Litigated And Necessarily Decided.</u>

    Peary tries to evade the plain language of the 1992 Agreement and the preclusive effect of *Superman I* and *II* by misrepresenting that "the authority of [Jean] Peavy to bind the Shuster Estate to the 1992 Agreement was not actually adjudicated." Compl. ¶ 41.

    Peary selectively quotes from a footnote in the Ninth Circuit's opinion, which says the exact opposite of what Peary claims. The Ninth Circuit recognized that the question whether Jean Peavy had the authority to bind Shuster's estate to the 1992 Agreement was *both* actually litigated and necessarily decided in the district court proceedings, and declined to disturb or discuss that ruling for the simple reason that Peary failed to preserve it on appeal:

> *The heirs argued explicitly below*, as a ground for rejecting DC's claim for summary judgment, that the 1992 Agreement could not now bind the estate because "the Shuster Executor was not a party to the 1992 Agreement"—an issue of state law that they appeared to have tried to revive at oral argument. *The district judge's ruling implicitly rejected this argument*, holding that the estate was bound by the 1992 Agreement.... *[W]e do not address this question of state law, because the heirs failed to raise it in their opening brief.*

545 F. App'x at 681 n.3. That the Ninth Circuit declined to review the California Court's ruling

---

[3] In the separate *Siegel* litigation, Toberoff took the position that the U.S. Copyright Act's termination provisions allow an author's heir to recapture rights under "foreign laws" and obtain "foreign profits." *Siegel v. Warner Bros. Ent. Inc.*, 542 F. Supp. 2d 1098, 1140-42 (C.D. Cal. 2008). DC disagreed, since, as the Ninth Circuit held, the U.S. Act's termination provisions are clear that they "in no way affect[] rights arising under any ... foreign laws." *Id.* (citing 17 U.S.C. § 304(c)(6)(E)). Peary's suggestion that this somehow forecloses DC from arguing that prior litigation over U.S. rights has preclusive effect in this litigation over foreign rights, Mot. at 4-5, is misplaced. Even though the nominal claims in this case and the 2010s lawsuit are different, the underlying issues concerning the scope and effect of the 1992 Agreement are the same (*e.g.*, does "all" mean "all"?). The California Court's rulings on these issues are dispositive of both sets of claims (U.S.-based and foreign-based)—as the word "all" plainly encompasses both categories.

does not mean that it lacks preclusive effect. On the contrary, it means that ruling remains final, binding, and preclusive. *See Frazer Exton Dev., L.P. v. Kemper Env't, Ltd.*, 2007 WL 756494, at *1 (S.D.N.Y. Mar. 13, 2007) ("It is hornbook law that an affirmance by an appellate court 'ratifies, confirms, and declares that the trial court judgment was correct, as if there had been no appeal.'") (quoting 5 Am. Jur. 2d Appellate Review § 833).[4]

As the Ninth Circuit recognized, the question whether Jean had authority to bind Shuster's estate to the 1992 Agreement was expressly raised and litigated in the district court proceedings. In summary judgment briefing, Peary argued—as he does here—that Jean Peavy lacked authority to enter into the 1992 Agreement on behalf of Shuster's estate because she had not been formally appointed Shuster's executor by a probate court. *E.g.*, KD Ex. M at 1, 8. The California Court rejected that argument in concluding that, "by entering into the 1992 Agreement," Jean "struck a deal *that binds all other heirs*." 2012 WL 4936588, at *8. Based on this conclusion, the Court further held that "the 1992 Agreement, *which represented the Shuster heirs' opportunity to renegotiate the prior grants of Joe Shuster's copyrights*, superseded and replaced all prior grants of the Superman copyrights" and extinguished any termination right that Peary may otherwise have had. *Id.* at *9.

---

[4] Conversely, the Ninth Circuit dissent on which Peary relies has *no* preclusive effect. *See Booker v. BWIA W. Indies Ariways Ltd.*, 2007 WL 1351927, at *3 n.4 (E.D.N.Y. May 8, 2007), *aff'd*, 307 F. App'x 491 (2d Cir. 2009) ("A dissent, however, is not binding and has absolutely no precedential value.").

That dissent is also incorrect, and contrary to California probate law, which holds that title to property passing by will vests in the beneficiary immediately upon the testator's death, *In re Kalt's Estate*, 16 Cal. 2d 807, 811 (1940)—here, in 1992, when Shuster died—and that a transfer of property prior to probate is as effective as if made after probate, *id.*; *Estate of Molino*, 165 Cal. App. 4th 913, 921 (2008). In any event, while the dissent questioned whether Jean could bind Shuster's heir (*i.e.*, herself), it noted "[t]he record is not developed fully enough for me to determine what consequences actually flow from that conclusion" and that "it may well be, under California probate law, that the ultimate outcome is unchanged." *Superman II*, 545 F. App'x at 683-84 (Thomas, J., dissenting).

It is irrelevant that the California Court did not expressly address all the nuances of

Peary's argument and California probate law—all of which DC had rebutted in its briefing.  *E.g.*,

KD Ex. N at 7-8.  For collateral estoppel purposes, it is the court's "*judgment* that matters," not

the specific language used to discuss the court's rulings.  *Yamaha Corp. of Am. v. United States*,

961 F.2d 245, 254 (D.C. Cir. 1992).  "An issue that was necessarily implicit in a larger

determination is given issue preclusive effect," even if "it may not be expressly mentioned in the

decision."  18 Moore's Federal Practice - Civil § 132.03[3][e] (2025); *see Postlewaite*, 333 F.3d

at 48 ("The prior decision of the issue need not have been explicit ... '[i]f by necessary

implication it is contained in that which has been explicitly decided.'"); *Clark v. Bear Stearns &

Co.*, 966 F.2d 1318, 1321 (9th Cir. 1992) (same).[5]

*       *       *

Peary is bound by the California Court's rulings that the 1992 Agreement (1) revoked

Shuster's original 1938 copyright grant, (2) effected a new, all-encompassing grant of Superman

rights to DC, and (3) is binding on Peary as substitute executor of Shuster's estate.  These

findings are fatal to his foreign law claims—which, as set forth below, fail as a matter of law.

---

[5] Peary's own authorities recognize this, in language he omits. Mot. at 12. *Cayuga* recognized that, "[o]f course, issue preclusion extends not only to issues that are expressly decided but also to those issues that are 'by necessary implication adjudicated in the prior litigation.'" *Cayuga Nation v. Tanner*, 6 F.4th 361, 375 (2d Cir. 2021). *Fuchsberg* stands for the unremarkable proposition that an issue that was "waived" in prior litigation, such that it was never litigated or decided, has no preclusive effect. *Fuchsberg & Fuchsberg v. Galizia*, 300 F.3d 105, 109 (2d Cir. 2002). That is not the case here, where the probate issues were litigated extensively in district court, necessarily decided by that court, and then tactically waived by Peary in his opening brief on appeal. The Ninth Circuit confirmed each of these steps occurred. 545 F. App'x at 681 n.3.

b.  The Foreign Reversion Provisions Do Not Apply.[6]

i.  Peary Has Not Proved The Applicable Foreign Law.

Peary asserts that foreign law applies, Mot. at 7, but falls far short of proving the governing structure or principles of foreign law applicable to this case.  It is well-established that "the party claiming foreign law applies carries both the burden of raising the issue that foreign law may apply in an action and *the burden of proving foreign law to enable the district court to apply it in a particular case*."  *Jonas v. Est. of Leven*, 116 F. Supp. 3d 314, 330 (S.D.N.Y. 2015).  "Written and oral testimony from experts … remains the basic mode of proving foreign law." *Id.*; *see* Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party….").  Peary has not submitted any such expert testimony, and provides hardly any analysis of foreign law beyond selective and misleading quotations from the applicable statutes.  Most significantly, Peary proffers no authorities on foreign law apart from the statutes themselves for the key argument in his motion that "[o]nly Plaintiff, Shuster's duly appointed executor, could deal in this reversionary interest."  Mot. at 11-13.  Peary's suggestion that the Court refer to a treatise and a law review article for "background," *id.* at 8 n.6, is hardly helpful.

Although it is not DC's burden, DC proffers four foreign-law experts on the laws of the U.K., Canada, Ireland, and Australia, respectively.  Notably, the U.K. expert successfully tried one of the few U.K. authorities that Peary cites, *Novello & Co. Ltd. v. Keith Prowse Music*

---

[6] Because Peary seeks a preliminary injunction only as to the U.K., Canada, Ireland, and Australia—not any of the six additional territories referenced in his Complaint—DC addresses the law only of those four jurisdictions in this brief.  However, the end result is the same in all countries: Peary has no rights to any Superman copyright anywhere in the world.

*Publishing Co. Ltd.* [2004] EWCA Civ 1776, and his expert opinions confirm Peary is wrong.

Ian Mill Decl. ("IMD") ¶¶ 2, 9-36.

> ii. Peary Has No Reversion Rights Because There Was Not An
> Operative Grant By The Author To Revert.

In each of the U.K., Canada, Ireland, and Australia, copyright reversion rights apply only

to a grant or assignment *made by the author as the first owner of the copyright* in the subject

work.  IMD ¶¶ 14-19; Daniel Glover Decl. ("DGD") ¶¶ 13-14; Giancarlo Salizzo Decl. ("GSD")

¶¶ 6, 18-22; Anita Cade Decl. ("ACD") ¶¶ 11, 14.  For purposes of this motion only, DC does

not dispute that Shuster can be considered an "author" of the first-published Superman story and

the "first owner of [its] copyright" within the meaning of the statutes.  Peary, however, cannot

point to an existing grant or assignment by Shuster eligible for reversion—which bars his claims.

The plain language of each reversion provision makes clear that copyright reversion

requires several elements: (1) an operative assignment or grant of a copyright interest, (2) made

by the author, (3) where the author was the first owner of that copyright.[7]

- Per the U.K. provision, reversion rights apply to an "assignment of the copyright" or
  a "grant of any interest in it" that was "made by" "the author of a literary, dramatic,
  musical or artistic work [who] was the first owner of the copyright in it."  U.K.
  Copyright, Designs & Patents Act 1988, c. 48, Sch. I, ¶ 27(1); *see also* U.K.
  Copyright Act 1911, § 5(2) (reversion rights apply to an "assignment of the
  copyright" or a "grant of any interest therein" that was "made by" "the author of a
  work [who] is the first owner of the copyright therein").

---

[7] Each provision also applies only to assignments or grants made during a statutorily-
specified time period.  1938 is within each provision's temporal scope, so that condition is not
discussed here.

- Per the Canadian provision, reversion rights apply to an "assignment of the copyright" or a "grant of any interest therein" that was "made by" "the author of a work [who] is the first owner of the copyright therein."  Canadian Copyright Act, RSC 1985, c. C-42, § 14(1).

- Per the Irish provision, reversion rights apply to an "assignment of the copyright" or a "grant of any interest in it" that was "made by" "the author of a literary, dramatic, musical or artistic work [who] was the first owner of the copyright in the work."  Irish Copyright & Related Rights Act 2000, Sch. I, Pt. I, § 16(1).

- And per the Australian provision, reversion rights apply to "any assignment of the copyright, or any grant of an interest in the copyright" that was "made by" "the author of a work ... [who] was the first owner of the copyright in the work."  Australian Copyright Act 1968, § 239(4).

Peary claims he is entitled to reversionary rights because "[p]rior litigation confirmed that Shuster was an original joint author and owner of the Work," and "[e]ach country's contemporary copyright act provides for automatic reversion" vesting in him as executor of Shuster's estate.  Mot. at 10.  But even if Shuster were considered an "author" and first owner of the first published Superman story, that alone would not entitle Peary to reversionary rights.

Peary ignores that the reversionary statutes require an *extant copyright grant by the author*—and here, by the time of the ostensible reversions in 2017 and 2021, there was none.  *See* IMD ¶¶ 6, 9, 23-32; DGD ¶¶ 6-7, 26-29; GSD ¶¶ 7, 9, 28–37; ACD ¶¶ 6, 16-19.  As the California Court conclusively held, and the Ninth Circuit affirmed, the 1992 Agreement "superseded and replaced all prior grants of the Superman copyrights."  *Superman I*, 2012 WL 4936588, at *9; *see id.* at *5 (concluding that the 1992 Agreement "expressly and

unambiguously" was a re-grant of "all rights"); *Superman II*, 545 F. App'x at 680-81 ("under the plain text of the 1992 Agreement, which 'fully settles all claims' regarding 'any copyrights, trademarks, or other property right in any and all work created in whole or in part by [Shuster],' and further 'now grants to DC any such rights,' *it superseded the 1938 assignment as a matter of New York law*" and "created a new, 1992 assignment of works to DC").  Put simply, the 1938 Grant by Shuster upon which Peary premises his claims was extinguished in 1992.  *See id.*  Peary cannot at once rely on part of the "[p]rior litigation" to show his reversionary entitlement, Mot. at 10, while disclaiming the part that expressly and unequivocally eliminates that very right.

Peary is estopped from relitigating whether the 1992 Agreement extinguished the 1938 Grant.  Although the preclusive effect of the prior U.S. adjudications should be evaluated under domestic collateral-estoppel principles, the same outcome would follow under U.K., Canadian, Irish, or Australian law.  Each jurisdiction recognizes principles of estoppel and/or comity, and would give effect to the decisions in *Superman I* and *II*.  IMD ¶¶ 9, 23-31; DGD ¶¶ 7, 25-29; GSD ¶¶ 9, 32-36; ACD ¶¶ 6, 17-19.

Absent the 1938 Grant by Shuster, Peary cannot point to any grant eligible for reversion. The only existing Superman grant is the 1992 Agreement, which Peary does not and cannot argue is eligible.  (The 1992 Agreement was not made by Shuster, and it also postdates the expiration of the reversionary scheme in the U.K., Ireland, and Australia.)  This threshold defect dooms Peary's claims—ending the analysis.

> c.  <u>Peary Has No Reversion Rights Because Any Such Reversionary Interests Were Assigned To DC In The 1992 Agreement.</u>

Peary's claims fail for another, independent reason, should the Court choose to reach it: Any reversionary interests stemming from the 1938 Grant were validly assigned in the 1992 Agreement.  The U.K., Irish, and Australian reversion statutes provide that reversionary interests

devolve on the "legal personal representative" of the author upon the author's death and may be assigned at any time after the author's death, including (as here) before the reversion takes place. U.K. Copyright, Designs & Patents Act 1988, c. 48, Sch. I, ¶ 27(2); Irish Copyright & Related Rights Act 2000, Sch. I, Pt. I, § 16(2); Australian Copyright Act 1968, § 239(4)(b); *see* U.K. Copyright Act 1911, § 5(2); IMD ¶¶ 10-11, 14-21; GSD ¶¶ 10-11, 39-40, 50-51; ACD ¶¶ 8, 38-40. As the parties agree, an executor of a deceased author's estate is the prototypical "legal personal representative." Mot. at 10-11. The Canadian reversion statute similarly provides that reversionary interests devolve on the "legal representative" of the author upon the author's death, with that term expressly defined to include heirs and executors, and with that interest likewise assignable at any time after the author's death. Canadian Copyright Act, RSC 1985, c. C-42, §§ 2, 14(1); DGD ¶¶ 13-16, 20-23.

Under each jurisdiction's laws, if the deceased author has left a will, the reversionary interests pass automatically to the named executor upon the author's death without regard to probate—meaning that Jean Peavy, as the named executor (and sole heir) in Shuster's will, held the subject interests at the time she entered into the 1992 Agreement. IMD ¶¶ 10, 20, 33-34; DGD ¶¶ 8, 18-19, 31-35; GSD ¶¶ 10, 39-49; ACD ¶¶ 7, 21-37; *see Redwood Music Ltd. v. B. Feldman & Co. Ltd.* [1979] RPC 1 at 6 (IMD Ex. B).[8] That is because "[t]he named executor's rights derive from the deceased's will itself, rather than from a subsequent grant of probate; in other words, the grant of probate merely confirms that which has already been conferred." IMD ¶ 20 (citing *Redwood Music*, RPC 1 at 5); *accord* DGD ¶¶ 18-19; GSD ¶¶ 43-45; ACD ¶¶ 24, 34;

---

[8] DC focuses on U.K. legal authorities in this section, as each of the other countries' reversionary schemes is based on the U.K.'s. *See* Mot. at 8 (each country's reversionary right "originated in Section 5(2) of the U.K. Copyright Act of 1911"); *id.* at 9 ("The reversionary right operates similarly across all four jurisdictions, with only minor variations."). The operation of each country's reversionary scheme is discussed in greater depth in the four expert declarations.

*see also Meyappa Chetty v. Supramanian Chetty* [1916] 1 AC 603 at 608 (IMD Ex. D) ("an executor derives his title and authority from the will of his testator and not from any grant of probate," and accordingly "[t]he personal property of the testator ... vests in him upon the testator's death").

This interpretation is also the only one that aligns with the express statutory mandate that the reversionary interest devolves upon the death of the author; under a contrary reading, "it would appear that the title vested in nobody" upon the author's death, yet "the law knows no interval between the testator's death and the vesting of title in his executors." *Redwood Music*, RPC 1 at 6. As noted above, *supra* n.4, this rule is consistent with the California Court's ruling and accords with California law—where Shuster was domiciled at the time of his death—where title to property passing by will vests in the beneficiary at the time of the testator's death, *Kalt's Estate*, 16 Cal. 2d at 811, and a transfer of property prior to probate is as effective as if made after probate, *id.*; *Estate of Molino*, 165 Cal. App. 4th at 921. The probate process, thus, is not a prerequisite to the devolution of the copyright reversion interest on the named executor in a will. Peary completely ignores this crucial line of authority—and indeed cites no foreign authority at all—to baldly assert the opposite.

Because Jean Peavy was named in Shuster's will as the executor of his estate, any reversionary interests passed automatically and immediately to her upon Shuster's death.[9] And because she entered into the 1992 Agreement after Shuster's death, any reversionary interests had already devolved on her at that time. There is simply no basis in the law of any of the subject jurisdictions for Peary's suggestion that Jean was unable to assign any reversionary

---

[9] The same is true as to Jean's status as Shuster's sole named heir—yet another reason she was an appropriate "legal representative" under Canadian law—which Peary does not question. DGD ¶¶ 15-17, 31-32.

interests before the estate was formally probated.  *Cf.* Mot. at 12.  Moreover, Peary is estopped

from so arguing; Jean's status as executor and her ability to bind the estate at the time of the

1992 Agreement were litigated and necessarily decided by the California Court, which held that

Jean bound all Shuster heirs.  *Supra* Section III.B.3.a.

      This ruling cannot be undone and, in any event, it is in accord with foreign law.  The laws

of each jurisdiction permit an author's legal personal representative to assign the reversionary

interest at any time after the author's death, including before the close of the 25-year vesting

period.  IMD ¶¶ 21, 35; DGD ¶¶ 20-23, 37; GSD ¶¶ 11, 50-51; ACD ¶¶ 8, 38-40; *Chappell &*

*Co. Ltd. v. Redwood Music Ltd*. [1981] RPC 337 at 347 (IMD Ex. E) (progenitor reversion

provision in U.K. Copyright Act of 1911 "made [it] impossible for the author either to assign or

license, or to contract to assign or license, in manner extending into the reversionary 25 year

period, *though his legal personal representatives (or a beneficiary after assent) can do so at any*

*time after the author's death*"); *Copinger and Skone James on Copyright* (19th ed.),

§ 4-140(e)(ii) (IMD Ex. F) (reversion provision does not hinder "[a]n assignment of the

reversionary interest after the death of the author by the author's personal representatives," and

"[a]ny such assignment by the personal representatives is therefore valid," with "no requirement

that the personal representatives must wait until the reversion falls in").  Peary does not appear to

question this well-settled proposition.  Jean therefore could validly assign her reversionary

interests (if any) in the 1992 Agreement, even though the 25-year vesting period was running.

      Not only was Jean authorized to assign any foreign reversionary interests in the 1992

Agreement, but she in fact did so.  The 1992 Agreement, by its express terms, grants "all" rights

that Jean "may have under any other agreement or otherwise, whether now or hereafter existing

regarding any copyrights ... in any and all work created in whole or in part by [her] brother,

Joseph Shuster." *Superman I*, 2012 WL 4936588, at \*4.  "All" copyright interests necessarily includes any copyright reversionary interests.  Indeed, the contractual language specifically encompasses those rights Jean had "other[]" than by an agreement—so, including rights conferred by statute such as the foreign copyright reversion provisions—and also encompasses rights "hereafter existing," to any extent the reversionary interests might have been considered future interests at that time.  The 1992 Agreement must be interpreted according to this plain language, and no magic words are required to assign foreign reversionary interests.  IMD ¶¶ 11, 22, 36; DGD ¶¶ 9, 24, 38-39; GSD ¶¶ 53, 58-62; ACD ¶¶ 8, 43; *see also AXA Inv. Managers UK Ltd. v. Endeavor Cap. Mgmt. LLC*, 890 F. Supp. 2d 373, 387 (S.D.N.Y. 2012) (plain language governs contract interpretation under New York law).  Peary's assertion that the 1992 Agreement somehow excluded foreign reversionary interests because it did not expressly name them, Mot. at 12, departs from the plain language of the contract and the appropriate legal framework for evaluating it.  Jean's assignment of "all" rights in Superman means what it says: "all" rights. With the 1992 Agreement, Jean Peavy conveyed any foreign reversionary interests to which the Shuster estate may have been entitled.

### C.    A Bond Of At Least $75 Million Is Required Under Rule 65(c).

In the unlikely event an injunction is granted, DC asks that the Court impose a bond of no less than $75 million.  Under FRCP 65(c), "[t]he court may issue a preliminary injunction or [TRO] only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  A bond in the amount of $75 million is necessary based on the harms identified and detailed in Section II.C.  Any argument Peary may make on reply that his financial status excuses him from posting a bond should not be credited.  Peary is hardly the only one with a

stake in this action; Toberoff, who controls litigations like these on a joint venture and/or

contingency basis, has one as well. *Supra* at 3.

## IV.  CONCLUSION

Peary's motion should be denied.

Dated:  April 7, 2025                   Respectfully submitted,

                                        O'MELVENY & MYERS LLP

                                      By:   */s/ Daniel M. Petrocelli*

                                      Daniel M. Petrocelli (admitted *pro hac vice*)
                                      Matt Kline (admitted pro hac vice)
                                      Cassandra L. Seto (admitted *pro hac vice*)
                                      1999 Avenue of the Stars, 8th Floor
                                      Los Angeles, CA 90067
                                      Office: (310) 553-6700
                                      Fax: (310) 246-6779
                                      dpetrocelli@omm.com
                                      mkline@omm.com
                                      cseto@omm.com

                                      Natasha W. Teleanu
                                      Danielle Feuer
                                      1301 Avenue of the Americas, Suite 1700
                                      New York, NY 10019-6022
                                      Office: (212) 326-2000
                                      Fax: (212) 326-2061
                                      nteleanu@omm.com
                                      dfeuer@omm.com

                                      *Counsel for Defendants*

## CERTIFICATE OF WORD COUNT (L.R. 7.1(C))

Pursuant to Local Rule 7.1(c), I hereby certify that, excluding the caption, table of contents, table of authorities, signature block, and this certificate, the foregoing Memorandum of Law contains 8,695 words, counted using the Microsoft Word program used to prepare it. It therefore complies with the word-count limitation of Local Rule 7.1(c).

Dated:   April 7, 2025                          */s/ Daniel M. Petrocelli*

                                                    Daniel M. Petrocelli