# EXHIBIT C

DANIEL M. PETROCELLI (S.B. #097802)
  dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
  mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
  cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

Attorneys for Plaintiff DC Comics

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DC COMICS,<br><br>            Plaintiff,<br><br>       v.<br><br>PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, LAURA SIEGEL LARSON, an individual and as personal representative of the ESTATE OF JOANNE SIEGEL, and DOES 1-10, inclusive,<br><br>            Defendants. | Case No. CV 10-3633 ODW (RZx)<br><br>**PLAINTIFF DC COMICS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS FIRST AND THIRD CLAIMS FOR RELIEF**<br><br>DECLARATIONS OF DANIEL M. PETROCELLI AND PAUL LEVITZ; STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW; AND [PROPOSED] ORDER FILED CONCURRENTLY HEREWITH<br><br>Hon. Otis D. Wright II<br><br>**Hearing Date**:  Aug. 20, 2012<br>**Hearing Time**:  1:30 p.m.<br>**Courtroom**:      11 |

1     TO DEFENDANTS AND THEIR COUNSEL OF RECORD:

2          PLEASE TAKE NOTICE that on August 20, 2012, at 1:30 p.m., or as soon

3 thereafter as counsel may be heard by the above-entitled court, located in

4 Courtroom 11 at 312 North Spring Street, Los Angeles, California 90012, plaintiff

5 DC Comics ("DC") will and hereby does move pursuant to Federal Rule of Civil

6 Procedure 56 for summary judgment on its First and Third Claims for Relief.

7          DC's First Claim alleges five independent grounds for deeming invalid the

8 copyright termination notice filed on November 10, 2003, by the heirs of Superman

9 co-creator Joseph Shuster.  First Amended Compl. ("FAC"), Docket No. 49 ¶¶ 105-

10 34.  There are no issues of material fact as to three of these grounds, warranting

11 summary judgment in DC's favor:

12          (1)  In exchange for more than $600,000 and other benefits, Jean

13         Peavy—the sole beneficiary of Shuster's estate—entered into a 1992

14         agreement with DC that rescinded all of Shuster's prior copyright grants and

15         re-granted to DC any copyright interests that Shuster or his heirs may have

16         held.  This agreement eliminated any pre-1978 copyright grant that might

17         otherwise be subject to termination under the Copyright Act.  *See* 17 U.S.C.

18         §§ 304(c)-(d), 203(a); *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1042-

19         45 (9th Cir. 2005); *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200-

20         02 (2d Cir. 2008).

21          (2)  In 2001 and 2003, Jean Peavy, her son Mark Peary, and the Estate

22         of Joseph Shuster "assign[ed]" their putative "copyright termination interest

23         in 'SUPERMAN'" and any "termination" rights they possessed to a joint

24         venture with Pacific Pictures Corporation, defendant Marc Toberoff's film

25         production company.  When the Shuster Estate served its copyright

26         termination notice weeks later in November 2003, none of Jean, Mark Peary,

27         or the Shuster Estate possessed the majority (or greater than 50%) share of

28         Joe Shuster's putative termination interest required to terminate under the

DC'S MOT. FOR PARTIAL SUMM. J.

Copyright Act and Copyright Office regulations. *See* 17 U.S.C. §§ 304(d), 304(c)(1); 37 C.F.R. §§ 201.10(b)(1)(vii), (c)(2); *Steinbeck*, 537 F.3d at 202. Defendants' undisputed failure to disclose the transfer of their purported termination interest to Pacific Pictures was not "harmless error"—both the notice and the sworn declarations filed with it concealed material facts about defendants' illicit agreements in violation of federal law.

(3) The Shuster heirs' copyright termination notice is premised on § 304(d) of the Copyright Act, which allows termination only by certain individuals whose rights "expired" under § 304(c) of the Act. 17 U.S.C. §§ 304(c)-(d). Because Joe Shuster passed away in 1992 without exercising any purported termination right or leaving a statutory heir to inherit it, his termination right did not "expire"—it simply ceased to exist. As a result, there is no statutory basis for the Shuster heirs to terminate under § 304(d).

Summary judgment is also warranted in DC's favor on its Third Claim, which arises under § 304(c)(6)(D) of the Copyright Act. FAC ¶¶ 165-73. Section 304(c)(6)(D) establishes that during the 10-year notice period before the Shuster heirs' copyright termination notice purports to take effect (2003 to 2013), the Shusters were and are barred from entering into any agreement regarding the putative rights they hope to recapture with any party other than DC, the original "grantee" to those rights. 17 U.S.C. § 304(c)(6)(D). It is *undisputed* that defendants have entered into various rights-tying agreements that improperly restrict the Shuster heirs' freedom to enter into agreements with DC during that 10-year notice period, including the Pacific Pictures agreements, as well as a 2008 "consent agreement" with the heirs of Superman co-creator Jerry Siegel, which remains in effect today. Defendants admit the Pacific Pictures agreements are "not lawful" under § 304(c)(6)(D)—effectively conceding liability for part of DC's Third Claim. Defendants dispute whether their 2008 consent agreement is unlawful, but their admissions in deposition establish its illegality.

DC'S MOT. FOR PARTIAL SUMM. J.

This motion is made pursuant to Federal Rule of Civil Procedure 56, Central District Local Rule 56, and this Court's Standing Order Regarding Newly Assigned Cases (Docket No. 18). This motion is made following several conferences of counsel on June 27, 2012, and days subsequent, pursuant to Central District Local Rule 7-3. Marc Toberoff, counsel for defendants Mark Warren Peary and Laura Siegel Larson, has said he is unavailable for a hearing on August 20, 2012, due to vacation plans he told us about last week. Decl. of Daniel M. Petrocelli ¶ 51 & Ex. 50. As we have told Mr. Toberoff, if he is truly unavailable on August 20, DC is amenable to setting a hearing date (on DC's motion for summary judgment and any cross-motion defendants might file) for a later hearing date in September 2012 that is convenient for the Court, and assuming a hearing is required. *Id.* However, as DC explained to Mr. Toberoff, DC is unwilling to permit him to use his unavailability on August 20 to alter his briefing obligations—and the normal briefing deadlines—under the rules. *Id.* DC offered Mr. Toberoff a briefing schedule and hearing date that would have avoided impacting his vacation in any way; he declined it. *Id.*

This motion is based on this Notice of Motion and Motion and accompanying Memorandum of Points and Authorities; the concurrently filed Declarations of Daniel M. Petrocelli and Paul Levitz; the concurrently filed Statement of Uncontroverted Facts and Conclusions of Law; the concurrently filed Proposed Order; and all exhibits, files, and records on file in this action, matters of which judicial notice may be taken, and such additional submissions and argument as may be presented at or before the hearing on this motion.

Dated: July 16, 2012        Respectfully submitted,

By: /s/ Daniel M. Petrocelli
Daniel M. Petrocelli
Attorneys for Plaintiff DC Comics

1

# **TABLE OF CONTENTS**

2

I.   INTRODUCTION .................................................................................. 1

3

II.  STATEMENT OF FACTS .................................................................... 3

4

    A.   Joe Shuster's Agreements And Relationship With DC ........................ 3

5

    B.   Jean Peavy's 1992 Agreement With DC .............................. 5

6

    C.   Mark Peary Looks To Recapture The Superman Copyrights ............... 7

    D.   This Lawsuit ........................................................................ 9

7

III. SUMMARY JUDGMENT IS WARRANTED ON DC'S FIRST CLAIM ............................................................................................... 10

8

    A.   The 1992 Agreement Bars The Shusters From Terminating ............... 10

9

    B.   The Estate Lacked The Majority Interest Necessary To Terminate ......................................................................... 18

10

    C.   The Shuster Heirs Have No Statutory Right To Terminate ................ 21

11

IV.  SUMMARY JUDGMENT IS WARRANTED ON DC'S THIRD CLAIM ............................................................................................... 23

12

V.   CONCLUSION ................................................................................... 25

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DC'S MOT. FOR PARTIAL SUMM. J.

# TABLE OF AUTHORITIES

## CASES

*Blair & Co. v. Otto*,
   5 A.D.2d 276 (N.Y. App. Div. 1958) .......................................................... 13, 14

*Burroughs v. Metro-Goldwyn-Mayer, Inc.*,
   683 F.2d 610 (2d Cir. 1982) ..................................................................... 19, 20

*C3 Media & Mktg. Group v. Firstgate Internet, Inc.*,
   419 F. Supp. 2d 419 (S.D.N.Y. 2005) ............................................................. 14

*CBOCS West, Inc. v. Humphries*,
   553 U.S. 442 (2008) ....................................................................................... 24

*Classic Media, Inc. v. Mewborn*,
   532 F.3d 978 (9th Cir. 2008) ........................................................ 15 , 16, 17

*Estate of Molino*,
   165 Cal. App. 4th 913 (2008) ......................................................................... 15

*Flowers v. Carville*,
   310 F.3d 1118 (9th Cir. 2002) ........................................................................ 25

*Goldbard v. Empire State Mut. Ins. Co.*,
   5 A.D.2d 230 (N.Y. App. Div. 1958) .............................................................. 13

*Goldome Corp. v. Wittig*,
   221 A.D.2d 931 (N.Y. App. Div. 1995) ........................................................... 14

*Groves v. Prickett*,
   420 F.2d 1119 (9th Cir. 1970) ........................................................................ 24

*Hartzheim v. Valley Land & Cattle Co.*,
   153 Cal. App. 4th 383 (2007) ......................................................................... 24

*In re Kalt's Estate*,
   16 Cal.2d 807, 811 (1940) .............................................................................. 15

*In re Pacific Pictures Corp.*,
   679 F.3d 1121 (9th Cir. 2012) ...................................................................... 2, 7

*In re WorldCom, Inc.*,
   2007 WL 2049723 (S.D.N.Y. July 13, 2007) ................................................. 14

*Indep. Energy Corp. v. Trigen Energy Corp.*,
   944 F. Supp. 1184 (S.D.N.Y. 1996) ............................................................... 14

*Int'l Bank of Comm. v. Int'l Energy Dev. Corp.*,
   981 S.W.2d 38 (1998) .................................................................................... 20

*Milne v. Stephen Slesinger, Inc.*,
   430 F.3d 1036 (9th Cir. 2005) .................................................................*passim*

*Nat'l Res. Def. Council v. E.P.A.*,
   437 F. Supp. 2d 1137 (C.D. Cal. 2006) .......................................................... 10

DC'S MOT. FOR PARTIAL SUMM. J.

*Norgart v. Upjohn Co.*,
  21 Cal. 4th 383 (1999) ....................................................................... 25

*Pearson v. Super. Ct.*,
  202 Cal. App. 4th 1333 (2012) ........................................................... 20

*Penguin Grp. (USA) Inc. v. Steinbeck*,
  537 F.3d 193 (2d Cir. 2008) .......................................................*passim*

*Polar Bear Prods., Inc. v. Timex Corp.*,
  384 F.3d 700 (9th Cir. 2004) ............................................................. 25

*Sarkisian v. Sayre*,
  2007 WL 4427309 (Cal. Ct. App. 2007) ............................................ 24

*Siegel v. Nat'l Periodical Publ'ns*,
  364 F.Supp. 1032 (S.D.N.Y. 1973), *aff'd*, 508 F.2d 909 (2d Cir.
  1974) ..................................................................................................... 4

*Suh v. Yang*,
  987 F. Supp. 783 (N.D. Cal. 1997) ..................................................... 25

*Sullivan v. Little Hunting Park, Inc.*,
  396 U.S. 229 (1969) ........................................................................... 24

*Sylve v. Riley*,
  15 Cal. App. 4th 23 (1993) ................................................................. 25

*Touche Ross & Co. v. Redington*,
  442 U.S. 560 (1979) ........................................................................... 25

*TransOrient Marine Corp. v. Star Trading & Marine, Inc.*,
  736 F. Supp. 1281 (S.D.N.Y. 1990) ................................................... 13

*U.S. v. Hardesty*,
  977 F.2d 1347 (9th Cir. 1992) (en banc) ............................................ 16

*Wagner v. CT Cimarron, LLC*,
  320 Fed. Appx. 539 (9th Cir. 2009) .................................................... 24

*Wyatt v. Union Mort. Co.*,
  24 Cal. 3d 773 (1979) ......................................................................... 25

**STATUTES AND REGULATIONS**

17 U.S.C. § 304 ............................................................................... *passim*

37 C.F.R. § 201.10(b)(1)(vii) ................................................................ 18

37 C.F.R. § 201.10(e) ............................................................................ 19

Fed. R. Civ. P. 56(a) .............................................................................. 10

**OTHER AUTHORITIES**

H.R. REP. NO. 941476 (1976) ..................................................................... 11, 23, 24

RESTATEMENT (SECOND) OF CONTRACTS § 279 (1988) ........................................ 13

S. REP. NO. 104-315 (1996) ..................................................................... 22

SUPP. REG.'S REP. ON GEN. REV'N OF U.S. COPYRIGHT LAW, 89TH CONG. 72 (1965) ........................................................................ 10, 21

SECOND SUPP. REF.'S REP. ON GEN. REV'N OF U.S. COPYRIGHT LAW, 94TH CONG. 307 (1975) ........................................................................ 24

## I.  INTRODUCTION

DC filed this case in May 2010 to protect its rights in the Superman property it has owned and nurtured for 70 years.  Heirs of Joe Shuster, the first illustrator of Superman, served a copyright termination notice purporting to recapture certain early Superman works as of October 2013.  DC's First Claim contests the validity of that notice, and its Third Claim challenges the web of illicit agreements that Marc Toberoff and his entertainment companies and business partners engineered in violation of DC's rights under the Copyright Act.  Summary judgment is warranted in DC's favor on both claims.  There is a pressing need to resolve these claims now, given the imminence of the 2013 termination date.

<u>DC's First Claim.</u>  DC alleges five independent grounds for deeming the Shusters' termination notice invalid, three of which are ripe for summary judgment:

*a.  The Shusters' 1992 Agreement with DC.*  The 1976 Copyright Act created a right to terminate certain pre-1978 copyright grants.  Leading copyright termination cases make clear that a post-1978 agreement that supersedes all prior copyright grants before 1978 eliminates any claimed termination right.  *See Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1042-45 (9th Cir. 2005); *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200-04 (2d Cir. 2008).

Those cases apply with full force here.  In 1992, Shuster's heirs solicited and executed such an agreement, in exchange for valuable consideration from DC.  After Shuster died, his sister and sole heir, Jean Peavy, approached DC asking for financial security for the rest of her life, as well as survivor benefits for her brother Frank, and payment of Shuster's "large unpaid debts," which she and Frank could not pay.  DC agreed, on the condition that this additional compensation would buy complete peace with the Shusters.  DC, Jean, and Frank entered into a 1992 agreement that provided for these benefits and that rescinded all of Shuster's prior copyright grants, re-granted to DC all copyright interests "in any and all work created in whole or in part by … Shuster," and released DC from "all claims[,]

DC'S MOT. FOR PARTIAL SUMM. J.

whether now or hereafter existing" regarding his copyrights.  DC has provided Jean and Frank, to date, more than $600,000 under the contract, and Jean continues to accept payments under it today.  For years, Jean repeatedly affirmed her satisfaction with the 1992 agreement and her intent to "honor" it by not serving a copyright termination notice.  This all changed in 2001, after Jean's adult and jobless son, Mark Peary, began looking for ways to claim an interest in Superman and Toberoff intervened to disrupt the family's longtime contract with DC.  Peary rewrote Jean's will to name himself her sole heir, appointed himself executor of Shuster's Estate in place of Jean, and, in 2003, filed a termination notice for the Estate.

This notice was legally invalid.  The copyright provision Peary invoked only allows termination of copyright grants executed *before* 1978.  17 U.S.C. § 304(d); *Steinbeck*, 537 F.3d at 200-04.  Because the 1992 agreement had the legal effect of extinguishing all pre-1978 copyright grants and replacing them with a new, all-encompassing 1992 grant, there was nothing left for Peary to terminate in 2003.  *Id.* A deal is a deal, and like the Shuster family's claims to the Superman copyrights rejected by the courts in the 1940s and 1970s, this new claim must, too, be rejected.

*b. Lack of Majority Interest.*  By defendants' own admissions, the Estate did not own the required "more than one-half" share, 17 U.S.C. § 304(d)(1), of Shuster's termination interest when it filed its termination notice in 2003.  In 2001, "Toberoff created a joint venture between the [Shusters] and" his company, Pacific Pictures.  *In re Pacific Pictures Corp.*, 679 F.3d 1121, 1124 (9th Cir. 2012).  Jean and Peary "assign[ed] to the Venture" all of their putative termination interests, promised not to enter into any agreement concerning those rights "without [Pacific Pictures'] express written consent," and agreed that if the venture were terminated "for any reason," Pacific Pictures would get 50% of the rights.  The Estate ratified in 2003 that the joint venture owned the Shusters' "copyright termination interest."

Two weeks after executing the 2003 Pacific Pictures agreement, Peary and the Estate served the copyright termination notice at issue here, in which Peary and

DC'S MOT. FOR PARTIAL SUMM. J.

1 Toberoff falsely attested that the Estate owned the right to terminate. The notice
2 made *no mention* of the Pacific Pictures Joint Venture, which at the time, by
3 contract, held 100% of the Shusters' putative termination rights. Worse still,
4 Toberoff swore under oath that he investigated "the current ownership of the rights
5 being terminated" and did not disclose his company's plain interest in the rights.
6 These material falsehoods to DC and the Copyright Office are alternative grounds
7 judicially to invalidate the Shusters' termination notice.

8      *c. Section 304(d) Does Not Apply to the Shusters.* The Estate is ineligible to
9 terminate under § 304(d), in any event. This section applies *only* when termination
10 rights under § 304(c) "expired." Under § 304(c), Shuster's window to terminate
11 opened in April 1984 and was set to "expire" in April 1997. Shuster's right to
12 terminate never "expired" because he died in 1992 choosing never to exercise it,
13 and leaving no wife, child, or grandchild to inherit it, as the statute requires.

14      <u>DC's Third Claim.</u> The Court need only reach this claim if it does not grant
15 DC judgment on its First Claim. During the 10-year notice period (2003 to 2013)
16 before the Estate's termination notice purports to take effect, the Shusters are barred
17 by the Copyright Act from entering into agreements regarding their putative
18 Superman copyrights with any party other than DC. *See* 17 U.S.C. § 304(c)(6)(D).
19 Defendants *admit* the Pacific Pictures contracts that Toberoff engineered are "not
20 lawful" under § 304(c)(6)(D)—thus conceding part of DC's Third Claim—and also
21 admit they entered into another rights-tying agreement in 2008 that continues to
22 exist to this day. The Copyright Act bars such "trafficking in future [copyright]
23 interests," *Milne*, 430 F.3d at 1047, and the Court should declare defendants'
24 consent agreements invalid and restore DC's exclusive 10-year bargaining right.

25 **II.**    **STATEMENT OF FACTS**

26     **A.**    **Joe Shuster's Agreements And Relationship With DC**

27     Jerry Siegel and Joe Shuster created the character "Superman" in the 1930s;
28 but for years, the pair was unable to find a publisher for their story. Statement of

    DC'S MOT. FOR PARTIAL SUMM. J.

Uncontroverted Facts ("SUF") 1.  In 1938, DC—which had employed Siegel and Shuster to do other work—elected to include Superman in a new comic book titled *Action Comics*.  SUF 2.  On March 1, 1938, Siegel and Shuster granted to DC the "exclusive right to the use of the [Superman] characters and story."  SUF 3.  *Action Comics #1* ("*AC#1*"), published on April 18, 1938, featured an adapted version of Siegel and Shuster's Superman story along with several other stories.  SUF 4.

After *AC#1* was published, Siegel and Shuster continued to supply DC with draft Superman material pursuant to work-for-hire agreements.  SUF 5.  They were compensated for their work in royalties and bonuses, both of which increased with Superman's success.  *Id.*  By 1941, the *Saturday Evening Post* reported that the pair stood to make over $2 million (in today's terms) in the next year alone.  SUF 6.

The pair's relationship with DC became contentious.  In 1947, Siegel and Shuster sued DC in New York seeking to invalidate the 1938 assignment.  The court concluded that the 1938 assignment granted "all" Superman rights to DC.  In 1948, the parties entered into a stipulated judgment under which Siegel and Shuster acknowledged the 1938 assignment granted to DC all rights in Superman.  SUF 7.

In 1969, Siegel and Shuster filed another action against DC in New York seeking to recapture the renewal copyright in *AC#1*.  The courts again recognized that Siegel and Shuster assigned all of their Superman rights to DC in 1938—including renewal rights.  *See Siegel v. Nat'l Periodical Publ'ns*, 364 F.Supp. 1032 1038 (S.D.N.Y. 1973), *aff'd*, 508 F.2d 909, 913-14 (2d Cir. 1974).

Siegel and Shuster faced financial difficulties and, after their legal claims were rejected, turned to DC for help.  In a 1975 agreement, DC provided Siegel and Shuster with, in today's dollars, lump sums of $75,000 each, lifetime annual payments of $80,000 each per year, survivor payments to their heirs, and insurance coverage, as well as "credits" as creators of Superman.  SUF 8.  Siegel and Shuster again acknowledged that DC owned all Superman-related copyrights.  *Id.*  Since 1975, DC has voluntarily increased the annual payments, made periodic cost-of-

DC'S MOT. FOR PARTIAL SUMM. J.

living adjustments, given special bonuses, and paid to have Siegel, Shuster, and their families travel to Superman-related events. SUF 9. All told, the Siegels and Shusters have been paid well over $4 million under the 1975 Agreement, not including medical benefits or bonuses. SUF 10.

In 1976, Congress amended the Copyright Act to allow authors and certain statutory heirs to terminate prior copyright grants and recapture the underlying copyrights in certain limited circumstances. 17 U.S.C. § 304. Neither Siegel nor Shuster ever attempted to exercise any purported termination right, although the windows for both to do so opened in 1984, while both were still alive. SUF 11.

Shuster passed away on July 30, 1992. SUF 12. Shuster had no wife, child, or grandchild, and his will named his sister, Jean Peavy, as sole beneficiary and executrix of his estate. SUF 13. On August 17, 1992, Jean filed a sworn affidavit in California state court identifying herself as Shuster's "successor" and sole heir and requesting that his property "be paid, delivered or transferred to her." SUF 14.

## B. Jean Peavy's 1992 Agreement With DC

Four days after filing her affidavit in the California probate court, Jean wrote to DC, identifying herself as "heir to [Joe Shuster's] Will" and asking DC to pay Shuster's "final debts and expenses." SUF 15. DC offered to cover Joe's debts and increase survivor payments to his brother Frank from $5,000 to $25,000 per year. SUF 16. On September 10, 1992, Frank sent a letter to DC's then-Executive Vice President, Paul Levitz, stating he was "extremely pleased" with the increased payments, and asking, after "discuss[ing] this good news with [Jean]," that payments be made directly to Jean, who would "send [Frank] whatever money [he] wanted as a gift which would not be taxable to [him]." SUF 17. Frank asked if he and Jean could meet with Levitz in New York to discuss the issue. *Id.*

Levitz dealt with scores of authors and heirs during his decades running DC. SUF 18. When DC agreed to grant an author or heir's request for additional money, Levitz would give them the same admonition: this agreement would

DC'S MOT. FOR PARTIAL SUMM. J.

represent the author/heir's last and final deal with DC, and would fully resolve any past, present, or future claims against DC.  *Id.*  Levitz reiterated this condition to Frank and Jean in 1992, who confirmed they understood and agreed.  *Id.*

Following this discussion, the parties executed an agreement on October 2, 1992.  It confirmed that DC would cover Shuster's debts and pay Jean $25,000 a year for the rest of her life.  SUF 19.  In exchange, Jean and Frank re-granted all of Joe Shuster's rights (including any Superman copyrights) to DC and vowed never to assert a claim to such rights.  The 1992 Agreement stated, in pertinent part:

> We [DC] ask you to confirm by your signatures below that this agreement fully settles all claims to any payments or *other rights or remedies which you may have under any other agreement or otherwise*, whether now or hereafter existing regarding any copyrights, trademarks, or other property right *in any and all work* created in whole or in part by your brother, Joseph Shuster, or any works based thereon.  In any event, *you now grant to us any such rights and release us, our licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever*.  SUF 19 (emphasis added).

Over the next decade, DC maintained good relations with the Shusters, and Jean and Levitz corresponded regularly.  SUF 20.  In the close to 60 letters back and forth between Paul and Jean, Jean thanked DC for its generosity, reaffirmed the 1992 Agreement, and requested bonus payments in excess of those required.  *Id.*  In a 1993 letter, Jean confirmed she would "stick to our bargain" and not attempt "to reclaim the SUPERMAN copyright," but asked for an increase in payments "plus a yearly increment to account for inflation."  SUF 21.  In 1999—after Congress amended the copyright statute to grant additional statutory heirs termination rights, and after learning that Jerry Siegel's heirs had served Superman copyright termination notices on DC—Jean reiterated her commitment "to honor" the 1992 Agreement, and again asked for a bonus:

> I have learned from the Internet that Joanne Siegel has filed a copyright claim for SUPERMAN.  *I want you to know that I intend to continue to honor our pension agreement.*  I would, however, appreciate a generous bonus for this year as you had done many times in the past.  SUF 22.

In 1993, 1994, 1995, 1996, 1998, 1999, 2000, and 2001, DC provided additional bonuses to Jean, ranging from $10,000 to $25,000. SUF 23. In one instance when Jean asked for more, DC made clear that Jean had no legal rights to make such requests, but would pay her a bonus anyway, which she thanked DC for doing. SUF 24. DC paid the Shusters over $600,000 under the 1992 Agreement and as special bonuses, and DC continues to make payments to Jean to this day, SUF 25—providing her the very security she and Frank requested in 1992.

Jean's 50-year-old son, Mark Peary (born Peavy), who lives with his mother, testified that Jean was of sound mind when she sent these letters to DC. SUF 26. However, he, Jean's doctor, and Jean's daughter have all testified that, after "suffer[ing] a debilitating stroke in May of 2009," Jean has aphasia, and has difficulty communicating and "understand[ing] what people are saying." SUF 27.

DC enjoyed good relations with Peary as well for a time. In 1996, Peary sent Levitz a screenplay about "the life story of Joe Shuster and Jerry Siegel" called "Dreamers," and asked Levitz to share it with Warner Bros. SUF 28. It detailed how Shuster became estranged from DC, but toward the end of his life, he and DC made amends. *Id.* Warner Bros. declined to develop "Dreamers," and in 1999, Peary submitted a revised script and asked Levitz if the Siegel family's copyright termination effort would "interfere with [him] selling [his] screenplay." SUF 29.

Before he met Toberoff, Peary never told DC the Shusters had a right to terminate or challenged the 1992 Agreement. SUF 30. Instead, from 1992 to 2001, he and Jean affirmed the Agreement and accepted payments under it. *Id.*

### C. Mark Peary Looks To Recapture The Superman Copyrights

Without Jean's knowledge, Peary began looking in 2001 for ways to claim an interest in Superman. He spoke with Toberoff, who also wished "to capture Superman for himself." *Pacific Pictures*, 679 F.3d at 1124-25. Toberoff proposed "creat[ing] a joint venture between the [Shuster] Heirs and" Toberoff's company Pacific Pictures. *Id.* In a November 2001 "Joint Venture Agreement," Peary and

Jean "transfer[ed] and assign[ed]" the following "Rights" to the Joint Venture:

> The Rights shall include without limitation, all current and future rights, claims, title, copyrights and interests in and to each character, story element, and indicia associated with, and all rights to proceeds from "SUPERMAN," or the "SUPERMAN" stories and comic books….

SUF 31.  The agreement provided that "in the event of termination of the Venture for any reason, all Rights, property or assets of the Venture will be held fifty percent (50%) by [the Shusters] and fifty percent (50%) by [Pacific Pictures]." *Id.*

Toberoff, Jean, Peary, and the Shuster Estate reaffirmed the terms of the joint venture in a 2003 amendment "confirm[ing]" that the *joint venture* held the Estate's "copyright termination interest in 'SUPERMAN.'" SUF 32.  Peary admits that, in 2003, he understood "that all of the Joe Shuster rights, *termination rights, to the extent they existed*, were being transferred and assigned to the venture just as [the contract] says." SUF 33 (emphasis added).  He also concedes, as did Toberoff, that these Pacific Pictures agreements are "not lawful," because, *inter alia*, the Shusters could only make such a rights deal with DC.  SUF 34; Docket No. 191 at 8.

Peary negotiated the Pacific Pictures agreements directly with Toberoff, and without receiving any outside advice from counsel.  SUF 35.  He only told his mother about the agreements "just before [they] were ready to sign."  SUF 36. When asked years ago about the Pacific Pictures agreements, Jean testified her "son handles everything legal" and she did not "know what's going on."  SUF 37.

In 2003, Peary initiated proceedings to probate Joe Shuster's estate—even though, in 1992, his mother had already filed an affidavit in California probate court to obtain all of Shuster's assets.  SUF 38.  Peary asked the court to appoint him executor in place of his mother.  *Id.*  Peary has kept this probate matter open for *nine* years—despite his sworn responsibility as executor to "complet[e] the estate administration as promptly as possible."  SUF 39; Docket No. 186 at 12-13.

Several weeks after initiating the probate matter and signing the 2003 Pacific Pictures Joint Venture contract, Peary, on behalf of the newly formed Shuster

Estate, served a copyright termination notice on DC purporting to take effect on October 26, 2013 (the "Notice"). SUF 40. The Notice *nowhere* mentions the Joint Venture with Pacific Pictures or the fact that the Shusters had transferred all their putative termination interests to the Venture. *Id.* Attached to the Notice were sworn certifications by Toberoff and Peary that all information contained in the Notice was "true and correct" and "signed by all persons whose signature is necessary to terminate" Shuster's copyright grants. Toberoff also certified "that before serving the foregoing document …, I caused a reasonable investigation to be made as to the current ownership of the rights being terminated." SUF 41.

In 2008, Peary and Jean signed a "consent agreement" with the Siegels that bars the families from entering into an agreement with DC without the other's consent. Defendants admit the 2008 agreement remains in force today. SUF 42-43.

### D. This Lawsuit

DC filed this action in May 2010. DC's First Claim seeks a declaration that the "Shuster Termination Notice [is] invalid," on five independent grounds. Docket No. 49 ¶¶ 106-34. DC is entitled to summary judgment on three of these grounds:

- "The 1992 Agreement Bars the Shusters from Pursuing Termination";
- "The Shusters Lack the Majority Interest Necessary to Terminate," because they assigned 50% of their putative rights to Pacific Pictures; and
- "There Is No Statutory Basis for the Shusters to Terminate," given that Joe Shuster had no statutory heir under the Copyright Act when he died. *Id.*

DC's Third Claim, which is brought in the alternative to its First Claim, alleges that the Pacific Pictures Agreements and 2008 consent agreement improperly restrict the Shuster heirs' ability to enter into agreements with DC, in violation of § 304(c)(6)(D) of the Copyright Act.

Defendants moved to dismiss DC's First and Third Claims, but abandoned their motion after this Court denied their SLAPP motion. Docket Nos. 333-34, 342-43. As the Court observed in denying that SLAPP motion, "the Pacific

1  Pictures Agreements essentially gut the 1992 Agreement, purporting to assign to

2  Toberoff those rights which were already assigned to DC."  Docket No. 337 at 3.

3       Discovery confirms there are no issues of material fact as to three of the

4  grounds entitling DC to judgment on its First Claim and as to DC's Third Claim.

5  These claims can and should be resolved now—and the cloud of uncertainty

6  surrounding the future of the Superman property after 2013 should be lifted.

7  **III.  SUMMARY JUDGMENT IS WARRANTED ON DC'S FIRST CLAIM.**

8       Summary judgment is appropriate where there is "no genuine issue as to any

9  material fact."  FED. R. CIV. P. 56(a).  Where, as here, the issue raised is a question

10  of law, such as "a question of statutory interpretation, it is appropriate to decide the

11  issue on summary judgment."  *Nat'l Res. Def. Council v. E.P.A.*, 437 F. Supp. 2d

12  1137, 1157 (C.D. Cal. 2006); *see Steinbeck*, 537 F.3d at 196-97, 200-04.

13       **A.  The 1992 Agreement Bars The Shusters From Terminating.**

14       The 1976 Copyright Act created a right to terminate pre-1978 copyright

15  grants in certain limited circumstances.  Congress crafted the termination provisions

16  as a "compromise" between the interests of copyright authors and their heirs, and

17  grantees like DC, who spent decades developing properties like Superman.  *E.g.*,

18  SUPP. REG.'S REP. ON GEN. REV'N OF U.S. COPYRIGHT LAW, 89TH CONG. 72 (1965)

19  ("SUPP. REP.") (termination provisions a "compromise" designed to provide a

20  "benefit to authors … without being unfair to publishers, film producers, and other

21  users").  In 1998, Congress passed the Copyright Term Extension Act ("CTEA"),

22  which extended the term of copyright protection and allowed termination of pre-

23  1978 copyright grants during the extended period.

24       1. The 1992 Agreement bars the Shusters from pursuing termination because

25  it rescinded all pre-1978 copyright grants that might otherwise be terminable and

26  replaced them with a new, all-encompassing grant.  It is well-established that a

27  post-1978 agreement that supersedes all prior copyright grants—like the 1992

28  Agreement—extinguishes any termination right that may otherwise have existed.

*Steinbeck*, 537 F.3d at 200-04; *Milne*, 430 F.3d at 1045.  In writing the copyright termination rules, Congress contemplated that such agreements could serve as an alternative to termination, making clear:  "'Nothing in the Copyright Act has altered the power of private powers to contract,'" *Milne*, 430 F.3d at 1045 (quoting legislative history), or "prevent[s] the parties to a transfer or license from voluntarily agreeing ***at any time*** to terminate an existing grant and negotiating a new one," H.R. REP. NO. 94-1476, at 127 (1976) (emphases added).

Defendants say the 1992 Agreement is unenforceable under § 304(c)(5) of the Act, which allows termination "notwithstanding any agreement to the contrary," Docket No. 333 at 19, but Congress' words above, *Milne*, and *Steinbeck*, refute this:

a.  *Milne* involved the rights to Winnie the Pooh.  In 1930, Pooh's author, A.A. Milne, granted copyright interests to SSI in exchange for a share of future royalties.  430 F.3d at 1040.  In 1983, A.A.'s son Christopher re-granted the same rights to SSI and agreed not to pursue termination in exchange for increased royalties.  *Id.*  Year later, Christopher's daughter Clare later attempted to terminate A.A.'s 1930 grant to SSI, but the Ninth Circuit held that her father's 1983 contract revoked all pre-1978 grants that might otherwise be terminable.  *Id.* at 1043.

Clare argued the 1983 agreement was an unenforceable "agreement to the contrary."  *Id.*  The Ninth Circuit disagreed, emphasizing that Christopher "freely and intelligently" entered into the 1983 agreement, securing "a better deal" for A.A.'s heirs.  *Id.*at 1045.  Clare's "current dissatisfaction provide[d] no reason to discredit the validity of the 1983 agreement and the rights conferred thereby."  *Id*.

b.  In *Steinbeck*, the Second Circuit relied upon *Milne* and reached a similar conclusion.  In 1938, John Steinbeck granted copyrights in his most popular works to his publisher.  After John's death, his termination interest passed by statute to his widow Elaine *and* his children.  537 F.3d at 196, 203.  Though Elaine did not hold the majority share of John's termination interest in 1994 necessary to terminate, as successor by will to John's copyrights (and prior to any attempt to terminate by his

DC'S MOT. FOR PARTIAL SUMM. J.

children), she entered into an agreement with the publisher superseding the 1938 agreement in exchange for increased royalties and other benefits. *Id.*

John's children later served a notice purporting to terminate the 1938 grant. *Id.* at 197. They argued that Elaine's 1994 agreement was an "agreement to the contrary" because it had the effect of depriving them of their termination rights. As in *Milne*, the claim was rejected. *Id.* at 202-04. The Second Circuit held that it was not proper to read the prohibition of "'agreement[s] to the contrary' so broadly that it would include any agreement that has the effect of eliminating a termination right." *Id.* at 202. Authors and heirs can "threaten (or … make good on a threat) to exercise termination rights and extract more favorable terms from early grants of an author's copyright," but they do *not* have "more than one opportunity, between them, to use termination rights to enhance their bargaining power or to exercise them." *Id.* at 204. Because Elaine entered into the post-1978 agreement replacing the original grant, no termination right remained.

c. The 1992 Agreement operates the same way as the contracts in *Steinbeck* and *Milne*. It says the Shusters "*now grant to* [DC] any … copyrights, trademarks, or other property right in any and all work created in whole or in part by [Joe Shuster]…." SUF 19 (italics added). Jean and Frank further agreed—going farther than Christopher Milne or Elaine Steinbeck—that their agreement "fully settles all claims to any payments or other rights or remedies … *whether now or hereafter existing* regarding the copyrights, trademarks, or other property right in any and all work [he] created…." *Id.* (emphases added). As did the contracts in *Steinbeck* and *Milne*, the 1992 Agreement operated to revoke and re-grant all prior grants of Shuster's rights, thereby eliminating any possible termination right. Indeed, Jean acknowledged as much, affirming in letters to DC, as late as 1999, that the effect of the 1992 Agreement was to prevent her from terminating. *Supra* at 6-7.

2. Defendants make three arguments why the 1992 Agreement should not bar the Shusters from pursuing termination—each is mistaken:

DC'S MOT. FOR PARTIAL SUMM. J.

a. They first claim the 1992 Agreement did not eliminate any prior copyright grants because it does not contain the words "rescind" or "revoke." But neither *Steinbeck* nor *Milne* impose a "magic words" requirement, particularly with respect to a contract that was made 13 years before either case was decided. Nor does New York law, which defendants concede applies, Docket No. 333 at 21, and which for decades has recognized that, if parties enter into a contract covering the same subject matter as a prior contract, the first contract is rescinded *even if* it does not expressly say so. *E.g.*, *Blair & Co. v. Otto*, 5 A.D.2d 276, 279-82 (N.Y. App. Div. 1958); RESTATEMENT (SECOND) OF CONTRACTS § 279 (1988). "The question always is whether the subsequent agreement, … *in whatever form it may be*, is a matter of intention, *expressed or implied*, a superseder of, or substitution for, the old agreement." *Goldbard v. Empire State Mut. Ins. Co.*, 5 A.D.2d 230, 233 (N.Y. App. Div. 1958) (emphasis added); *accord Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 736 F. Supp. 1281, 1283 (S.D.N.Y. 1990).

Intent to supersede or "novate" a prior contract is established where, as here, a new contract encompasses all of the parties' obligations and remedies concerning a given subject matter. The 1992 Agreement plainly covers the same subject matter as Joe Shuster's prior copyright grants—*i.e.*, assignment of "copyrights … *in any and all work* created in whole or in part by … Joseph Shuster." It is also clear that the 1992 Agreement represents the Shuster heirs' sole and final agreement with DC, replacing all remedies they may otherwise claim. It states: "[This] *fully settles **all claims** to any payments or other rights or remedies* which you may have under *any other agreement or otherwise*, *whether now or hereafter existing* regarding" any and all copyrights in Joe Shuster's works. SUF 19 (emphases added); *supra* at 6.

Similar language has repeatedly been held, *as a matter of law*, to constitute a novation—even in the absence of express language of "revocation." For example:

- In *Blair*, 5 A.D.2d at 278-79, 282, the court held at the pleading stage that a contract providing that payments thereunder would "'constitute complete

DC'S MOT. FOR PARTIAL SUMM. J.

satisfaction' for services rendered, past and future," evinced the parties'
"clear and unmistakable intent" to supersede the prior contracts.

- *Goldome Corp. v. Wittig*, 221 A.D.2d 931 (N.Y. App. Div. 1995) (summary judgment), considered whether the parties' settlement agreement superseded their employment agreement. The settlement contained a release discharging defendant from "all cause and causes of action ... from the beginning of the world to" today. *Id.* at 932-33. This broad release "establishe[d] that [the settlement] superseded and extinguished the employment agreement." *Id.*

- *Indep. Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184 (S.D.N.Y. 1996) (summary judgment), considered whether a written contract conveying a power plant superseded an earlier oral agreement. The written contract began: "In consideration for the assignment by … (IEC) of all its interests in and to the electrical generating plant .…" *Id.* at 1196. These words alone "indicate[d] an intention to treat comprehensively the issue of reimbursement and to be bound only by the terms of the written agreement." *Id.*

- And *In re WorldCom, Inc.*, 2007 WL 2049723, at *2 (S.D.N.Y. July 13, 2007) (summary judgment), held that a settlement agreement superseded a marketing agreement between SkyTel and Beepwear. The settlement stated it represented a "full and final compromise," "release[d] and discharge[d] SkyTel … from any and all actual or potential claims [under] the Joint Marketing Agreement," and Beepwear promised "not hereafter [to] institute any suit" against SkyTel. "[A] new contract's release of parties' claims under an old contract proves that the parties intended to novate the old contract." *Id.* at *3; *accord C3 Media & Mktg. Group v. Firstgate Internet, Inc.*, 419 F. Supp. 2d 419, 435 (S.D.N.Y. 2005) (motion to dismiss).

The 1992 Agreement is also plainly a revocation and full re-grant of "any and all" of Shuster's Superman rights, and it includes a release that is the same or broader than the language in the contracts in the cases above. Jean Peavy made her

DC'S MOT. FOR PARTIAL SUMM. J.

full and final deal with DC in 1992, and that deal can and should be enforced.

      b.  Defendants next say the 1992 Agreement did not dispose of the Shusters' putative termination right, because Peary—who appointed himself executor of Shuster's Estate in 2003—was not a party to the 1992 contract.  Docket No. 333 at 19.  This is baseless, because Jean—Shuster's sole heir—clearly *was* a party to the contract and bound all other heirs.  In both *Steinbeck*, 537 F.3d at 204, and *Milne*, 403 F.3d at 1040, one heir executed an agreement that superseded all pre-1978 copyright grants and thus prevented later heirs from terminating.  Such agreements bind *all future heirs*, including the Estate and Peary.  *See id.*

      Defendants cannot and do not dispute that Jean had authority to enter into the 1992 Agreement.  Shuster's will named her the sole beneficiary and "executrix" of his estate.  SUF 13.  As Shuster's sole heir, Jean had complete authority to assign any copyright interests in his works to DC in the 1992 Agreement.  Title to property passing by will vests in the beneficiary at the time of the testator's death, *In re Kalt's Estate*, 16 Cal.2d 807, 811 (1940)—or in July 1992, when Shuster died—and a transfer of such property prior to probate is as effective as if made after probate, *id.*; *Estate of Molino*, 165 Cal. App. 4th 913, 921 (2008).  Peary cannot circumvent the 1992 Agreement by having himself appointed, *post hoc*, executor of a newly opened Shuster Estate, in place of his mother, who probated his estate years ago.  As the sole beneficiary and executor of Shuster's estate, Jean successfully filed affidavits in California state court in 1992 requesting that all of Joe's property be transferred to her.  She then entered into the 1992 Agreement a few months later, after telling DC she was his sole heir.  SUF 14, 15, 19; *supra* at 5-6.

      c.  Defendants last claim that *Classic Media, Inc. v. Mewborn*, 532 F.3d 978 (9th Cir. 2008), "limited *Milne*" and establishes they should prevail on DC's claim.  Docket No. 333 at 20.  First of all, *Mewborn* does not purport to limit or undermine *Milne*—nor could it.  There is no tension between the decisions and, if there were, the Ninth Circuit rule is clear: *Milne*, the court's earlier-decided opinion,

"controls." *U.S. v. Hardesty*, 977 F.2d 1347, 1347 (9th Cir. 1992) (en banc).

*Mewborn* also addressed an unusual set of facts not presented here—or in *Milne* or *Steinbeck*. In *Mewborn*, Winifred Mewborn, daughter of Lassie creator Eric Knight, granted Knight's copyrights to Classic in 1976. In 1978—after Classic became aware of the new copyright termination regime, but before Winifred learned of it—Classic convinced her to sign a new agreement in exchange for a pittance: $3,000. 532 F.3d at 980-81. The contract did not "substitute[] or revoke[]" any pre-1978 copyright grants; instead, it "affirm[ed]" the 1976 grant and granted Classic "addition[al]," new rights. *Id.* at 982, 989. The fact that there had been an insufficient revocation and regrant in *Mewborn* was highlighted, the court reasoned, by the fact that Winifred could have invoked the termination regime to get more leverage and demand more money, but because she was unaware of the termination regime, she did not do so. *Id.* at 989.

Thus, the facts here mirror *Steinbeck* and *Milne*, not *Mewborn*. First, unlike *Mewborn*, where the post-1978 agreement transferred rights "in addition to" those transferred in pre-1978 grants, the 1992 Agreement leaves no previous agreement in place. It settles "all claims … under any agreement" related to "any and all" works "created in whole or in part by … Joseph Shuster." *Supra* at 6, 12-15.

Second, Jean and Frank Shuster—unlike Winifred, who was apparently duped by Classic—were aware of the Copyright Act's termination regime when they bargained for and entered into the 1992 Agreement. Like Christopher Milne and Elaine Steinbeck, Jean and Frank expressly adverted to the regime in their 1992 dealings with DC. *See* SUF 17, 21, 22.

Third, *Mewborn* relied on the fact that Winifred owned a statutory termination right in reasoning that her failure to rely on her right prejudiced her in negotiations with Classic. 532 F.3d at 989. Here, while Jean and Frank invoked the termination regime in 1992 and said they might otherwise bring a claim if a deal could not be reached, DC had strong arguments in 1992 (and now) that neither Jean

DC'S MOT. FOR PARTIAL SUMM. J.

nor anyone in her family was a statutory heir and that any termination right was lost when Joe died. *Infra* at 21-22; *see* Docket No. 333 at 18. Moreover, the fact that Jean and Frank were able to obtain hundreds of thousands of dollars in benefits—especially for Jean, whom Joe had not provided for in prior contracts with DC, SUF 45—shows that *Mewborn*'s concerns about Winifred's ignorance are inapt here.

Finally, *Steinbeck* expressly noted that when Elaine Steinbeck made her 1994 agreement that stripped herself and her stepchildren of any termination rights that might exist then or in the future, Elaine, like Jean, was "unable to terminate," because Elaine lacked the necessary majority interest to terminate in 1994. 537 F.3d at 203 n.5. *Steinbeck* nonetheless held that contracts that have the effect of eliminating termination rights that might come into existence in the future—either by the creation of new legal rights or otherwise—can and must be enforced. *Steinbeck* explained: "We cannot see how [Elaine's] 1994 Agreement could be [unenforceable] solely because it had the effect of eliminating termination rights [that her stepchildren would assert under § 304(d) of CTEA, which was enacted in 1998] that did not yet exist" when Elaine signed her contract in 1994. *Id.* at 203.

3. In sum, the 1992 Agreement satisfies all of the requirements needed to be a post-1978 agreement under the Copyright Act. On its face, it settles all claims between DC and the Shusters, and DC paid Frank and Jean every year for the last 20 years significant compensation as consideration for the final and complete peace DC told the Shusters the 1992 contract required. *Supra* at 6-7. Before Toberoff and Peary intervened, Jean conceded time and again, and as late as 1999, that she could *not* pursue a termination claim, given the 1992 Agreement. *Id.*; SUF 21, 22. Under clear New York contract law, and clear copyright law set forth in *Steinbeck*, *Milne*, and *Mewborn*, the 1992 Agreement superseded all prior copyright grants the Shusters had made prior to 1978, and left only the non-terminable 1992 agreement. As with the New York courts in the 1940s and 1970s that bound Joe Shuster to deals he made with DC, this Court should bind Jean and her heirs as well—and

reject Peary and the Estate's claims for rights Jean bargained away 20 years ago.

**B.    The Estate Lacked The Majority Interest Necessary To Terminate.**

Even if the Estate was not barred from terminating, the Notice is invalid because—by the Shuster heirs' own admissions—the Estate did not own the requisite majority interest when the Notice was served.  Section 304(d) of the Copyright Act provides that a termination notice must be served "by the person or persons who … *own* <u>and</u> *are entitled to exercise* a total of more than one-half of [an] author's termination interest" and "*shall* be signed by the [requisite] number and proportion of the owners."  17 U.S.C. §§ 304(d)(1), (c)(1)-(4) (emphasis added); *see Steinbeck*, 537 F.3d at 202 (recognizing that author's heirs "could not have exercised their termination rights" if "they lacked more than one-half of the author's termination interest" at the time their notice was served).  Copyright Office regulations further provide that a notice "*must* include a clear identification of … the person or persons executing the notice who constitute more than one-half of that author's termination interest."  37 C.F.R. 201.10(b)(1)(vii) (emphasis added).

According to the Shuster heirs' written contracts and deposition admissions, the Estate owned *0%* of Shuster's putative termination interest when the Estate served the Notice.  In 2001, the Shusters "transfer[red] and assign[ed] … all current and future rights, claims, title, copyrights and interests" in "Joe Shuster's creations" to the Pacific Pictures Joint Venture.  SUF 31.  In 2003, the Estate "confirm[ed]" these rights included any "copyright termination interest in 'SUPERMAN' pursuant to Section 304(d) of the U.S. Copyright Law."  SUF 32.  And Peary admitted under oath that he understood when he signed the Pacific Pictures agreement, "that all of the Joe Shuster rights, *termination rights, to the extent they existed*, were being transferred and assigned to the venture just as it says."  SUF 33 (emphasis added).

Despite these admissions, the Notice that Peary and Toberoff served is *not* signed by Pacific Pictures.  Indeed, it makes *no* mention whatsoever of the Pacific Pictures Venture or its ownership interests—even though just two weeks before

DC'S MOT. FOR PARTIAL SUMM. J.

they filed the Notice, Peary and Toberoff affirmed in the 2003 Pacific Pictures
contract that the Venture owned the Estate's "termination interest."  SUF 32.

These material omissions invalidate the Notice.  The majority-interest
requirement set forth in the Copyright Act and Copyright Office regulations is
mandatory, 17 U.S.C §§ 304(c)(4)(B), 304(d)(1), 304(c)(1)-(4), and failure to
comply with these rules render a termination notice invalid, *see Burroughs v.
Metro-Goldwyn-Mayer, Inc.*, 683 F.2d 610, 622 (2d Cir. 1982) ("[t]o be effective, a
notice of termination" must comply with Copyright Office regulations); *Steinbeck*,
537 F.3d at 196 ("notice of termination is ineffective" for failure to satisfy 17
U.S.C. § 304(d)); *Milne*, 430 F.3d at 1048 (same); 37 C.F.R. 201.10(e)(1)
(narrowly defining errors that will *not* "render the notice invalid").  Defendants
know this rule well.  After this Court held in *Siegel* that "promotional
announcements" featuring the first appearance of Superman fell outside the
termination window of § 304(c), both the Siegel and Shuster heirs served new
termination notices in 2012 purporting to terminate the announcements.  SUF 44.

To salvage the Notice, defendants now assert "harmless error," claiming the
Pacific Pictures agreements were "not lawful" and "void *ab initio*" under
§ 304(c)(6)(D)—so, no harm, no foul.  Docket No. 191 at 8.  This is nonsense.
Defendants did *not* take this position when they formed their joint venture in 2001.
Nor did they take the position in 2003 when they reaffirmed the Joint Venture and
its ownership of the termination rights *just days* before filing the Notice.  While
defendants' concessions about the illegality of their Pacific Pictures contracts
concedes liability on DC's *Third* Claim, *infra* at 23-24, these admissions do not
save their Notice from invalidation.  Nor do their recent admissions alter the fact
that they submitted fraudulent termination filings that said the Estate owned the
termination rights, when days earlier they signed a contract saying the Joint Venture
owned them.  Citing the need to protect "public policy," courts reject defendants'
claims that the "illegal[ity] and unenforceab[ility]" of agreements they made are "a

defense to liability for the injuries suffered by" plaintiffs. *Int'l Bank of Comm. v. Int'l Energy Dev. Corp.*, 981 S.W.2d 38, 51-52 (1998); *Pearson v. Super. Ct.*, 202 Cal. App. 4th 1333, 1338 (2012) (defendant who entered into agreement with minor may not claim agreement unenforceable to avoid liability). This Court should likewise reject defendants' self-serving arguments.

"Harmless error," moreover, cannot be claimed under copyright law because here the supposed "error" was a purposeful omission of material facts intended to "deceive, mislead, or conceal relevant information" from DC. 37 C.F.R. 201.10(e). Peary testified he was unaware that the Pacific Pictures agreements were unlawful when he signed them and filed the Notice. SUF 34. This leaves two possible factual scenarios, both of which negate any claim of "harmless error": (1) at the time the Notice was served, Toberoff and Peary did *not* know the Agreements violated § 304(c)(6)(D)—in which case they intentionally deceived DC and the Copyright Office as to the ownership of the Estate's rights; or (2) Toberoff knew the Agreements were invalid, but hid that fact from Peary, in which case Toberoff defrauded DC and the Shusters by inducing the Shusters to execute illegal agreements, while Peary wrongly signed the Notice falsely asserting the Estate owned rights he knew he had transferred to the Joint Venture just days earlier.

The Court should deem the Notice invalid, *Burroughs*, 683 F.2d at 622-23, and given defendants' deceptions, it should hold that the Shusters are barred from terminating. At a minimum, the Estate must serve a new termination notice that complies with Copyright Act and Copyright Office regulations, and that accurately discloses the ownership of all putative rights. As with any termination notice, the Estate would have to serve this new notice *at least* two years before the purported termination would take effect, and must be prohibited from making any deal with a party other than DC concerning its putative rights before the termination date.

DC'S MOT. FOR PARTIAL SUMM. J.

**C.     The Shuster Heirs Have No Statutory Right To Terminate.**

Section 304(c) of the 1976 Copyright Act limited the class of persons who could terminate to an author or, "[w]here an author is dead, … his widow or her widower and his or her children or grandchildren."  Legislative history confirms the termination right was lost if an author died without exercising it or leaving a widow, child, or grandchild to inherit it.  SUPP. REP. at 73 (rejecting proposal to pass "rights of a dead author to his 'legal representatives, legatees, or heirs'" given Congress' "desire to keep the right … out of the author's estate").  This means that to the extent Joe Shuster had a termination right, it could have been exercised *only* by him during his lifetime, or by a widow, child, or grandchild after his death.

Shuster could have exercised his putative termination right beginning in April 1984.  Under § 304(c), a copyright grant could be terminated 56 to 61 years after the date copyright was first secured, provided that a termination notice was served 2 to 10 years before the effective termination date.  17 U.S.C. § 304(c)(3)-(4).  In other words, the window for terminating opened 46 years after the date copyright was first secured (*i.e.*, 56 years minus the 10-year maximum notice period) and expired after 59 years (*i.e.*, 61 years minus the 2-year minimum notice period).  *Id.*  The window for terminating Shuster's grant to DC of rights in *AC#1*, which obtained copyright protection in April 1938, opened in April 1984 (46 years later) and was set to expire in April 1997 (59 years later).

Shuster *never* attempted to terminate during his lifetime, which is unsurprising since, with the 1975 Agreement, he made peace with DC and assured lifetime payments for himself and his family.  *Supra* at 4-5.  Shuster died in 1992 without a widow, child, or grandchild—five years before his termination right was set to expire in 1997.  Any termination right Shuster had was lost when he died.  And in 1992, Jean obtained all of Shuster's property through a quickly resolved California probate case, claiming to be his sole heir.  *Id*.

DC'S MOT. FOR PARTIAL SUMM. J.

The 1998 CTEA allows an "author's executor" to terminate when the "[t]ermination rights provided for in subsection (c) *have expired* on or before the effective date of the [CTEA]"—*i.e.*, October 27, 1998—and the author "has not previously exercised such termination right." 17 U.S.C. § 304(d) (emphasis added). The Shuster Estate—formed by Peary, as its executor, in 2003—relies on this provision to terminate, but § 304(d) has no application here. By its plain language, § 304(d) applies *only* where the window for exercising a termination right under the 1976 Copyright Act opened and closed—*i.e.*, "expired"—and an author or statutory heir failed to terminate during that window. It does not apply where an author died while the window was open without terminating, without leaving a statutory heir, and when his sole heir, Jean, fully resolved his estate in 1992. CTEA's legislative history confirms that its aim was to create "a *revived* power of termination for individuals who did not previously exercise their *now-expired termination right* under section 304(c)," S. REP. NO. 104-315, at 18 (1996) (emphasis added)—not to open the door to an entirely new class of persons—like Peary—who never before had the right to terminate, and only created the sham of a new probate proceeding so he could be named executor. *Supra* at 8; Docket No. 186 at 12-13.

Moreover, "expired" should be read consistent with Congress's use of the term in the copyright renewal provisions, §§ 304(a)(2)(A), (2)(B) and (3)(A)(i). There, "expiration" clearly means that the initial copyright term has opened and closed after running its full 28-year course. *E.g.*, 17 U.S.C. § 304(a)(2)(A) ("At the expiration of the original term of copyright"), (a)(3)(A)(i) (renewal application may be made "within 1 year before the expiration of the original term of copyright"). "Expired" has the same meaning in the context of § 304(d)—an author or statutory heir has a second chance to terminate if the window for terminating under the 1976 Copyright Act opened, ran its full 59-year course, and closed. Had Congress' intent been otherwise, § 304(d) would have provided for termination where "rights provided for in subsection (c) *have not been exercised*," rather than limiting

DC'S MOT. FOR PARTIAL SUMM. J.

1   termination to instances where termination rights "have expired."

2   **IV.  SUMMARY JUDGMENT IS WARRANTED ON DC'S THIRD**

3   **CLAIM.**

4       DC is also entitled to summary judgment on its Third Claim, which is pled in

5   the alternative.  The Copyright Act establishes an exclusive period of time between

6   the date a copyright termination notice is served and its effective date in which *only*

7   an original copyright grantee can make an agreement with the terminating party:

8       A further grant, or agreement to make a further grant, of any right
        covered by a terminated grant *is valid only if* it is made *after the effective*
9       *date of the termination*.  As an exception, however, an agreement for
        such a further grant *may be made* between the author or [his heirs] and
10      *the original grantee* or [its successor], after the notice of termination has
        been served…. 17 U.S.C. § 304(c)(6)(D) (emphasis added).
11

12      In other words, between November 10, 2003 (when the Notice was served)

13  and October 26, 2013 (its effective date), DC was and is the *only* party that may

14  enter into an agreement with the Shuster heirs regarding the Superman rights sought

15  to be recaptured.  Section 304(c)(6)(D) not only bars third parties like Toberoff

16  from "trafficking in future [copyright] interests," *Milne*, 430 F.3d at 1047, it

17  protects original grantees who, like DC, spent decades developing and promoting

18  the copyrighted property.  Congress described this right in the original grantee's

19  favor as "in the nature of a right of 'first refusal,'" H.R. REP. NO. 94-1476 at 127,

20  and made clear this right "was one of the compromises on which the delicate

21  balance of [the termination provisions] rests."  SECOND SUPP. REF.'S REP. ON GEN.

22  REV'N OF U.S. COPYRIGHT LAW, 94TH CONG. 307 (1975).  In *Milne*, 430 F.3d at

23  1047, the Ninth Circuit cited the statutory text and legislative history above, and

24  confirmed that § 304(c)(6)(D) "give[s] the original grantee a competitive advantage

25  over third parties" akin to a "right of 'first refusal.'"

26      Defendants' Pacific Pictures agreements and 2008 consent agreement all run

27  afoul of these prohibitions and deprived DC of its statutory rights.  Indeed,

28  defendants have conceded in briefing and in depositions that the Pacific Pictures

DC'S MOT. FOR PARTIAL SUMM. J.

agreements are unlawful. *Supra* at 19. While defendants refuse to produce a copy of the consent agreement, they admit it "requires … the consent of the Siegels and Shuster Estate … to a settlement of their termination rights with DC." Docket No. 160 at 63; *see* Docket No. 231 at 6 (agreement "'prohibit[s] either family from entering into agreements conveying rights … without the express approval of *all stakeholders* in the heirs' rights") (italics added). And Peary conceded the "consent agreement" was signed by himself, "Laura [Larson], Joanne Siegel," and "Toberoff" in 2008; that it provides that "any agreement with DC or settlement with DC requires the consent of the Siegels"; and that it is "still in effect." SUF 43.

The Court can and should grant summary judgment for DC on its Third Claim, declare all of defendants' agreements invalid, and restore to DC the 10-year exclusive negotiation period it was, by right, entitled to enjoy with the Shusters, absent Toberoff's entanglements. It is well settled that the appropriate remedy for violation of exclusive negotiation rights, is specific performance and to restore the exclusive negotiation right. *E.g.*, *Groves v. Prickett*, 420 F.2d 1119, 1122 (9th Cir. 1970); *Wagner v. CT Cimarron, LLC*, 320 Fed. Appx. 539, 541 (9th Cir. 2009); *Sarkisian v. Sayre*, 2007 WL 4427309, at *3 (Cal. Ct. App. 2007).

Defendants raise two challenges to DC's Third Claim—neither has merit:

a. They argue DC lacks standing to sue under § 304(c)(6)(D), Docket No. 333 at 10, but this ignores that parties whose negotiation rights are aggrieved have standing to vindicate those rights "against third persons" like Toberoff. *Hartzheim v. Valley Land & Cattle Co.*, 153 Cal. App. 4th 383, 389 (2007); *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 239 (1969) ("The existence of a statutory right implies the existence of all necessary and appropriate remedies."). Where, as here, Congress has demonstrated its intent to create such a right, *Milne*, 430 F.3d at 1047; H.R. REP. NO. 94-1476 at 127; 2D SUPP. REP 307, the beneficiary has standing to enforce it. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008). Congress' intent to confer such a right can be inferred from "the language and focus of the

DC'S MOT. FOR PARTIAL SUMM. J.

statute, its legislative history, and its purpose," *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575-76 (1979)—*all* of which supports DC's Third Claim.

b. Defendants assert DC's Third Claim is time-barred because DC learned about the Pacific Pictures Agreements in November 2006, but filed suit six months after the three-year limitations period ended in November 2009. Docket No. 333 at 7-8. To begin, Toberoff's overall pattern of misconduct did not come to light until 2008, when Toberoff finally produced the Toberoff Timeline under court order. *E.g.*, Docket No. 185 at 11-12. DC timely filed its complaint less than two years later—well within the limitations period. *E.g.*, *Sylve v. Riley*, 15 Cal. App. 4th 23, 26 (1993). The discovery rule postpones accrual of a cause of action until the plaintiff discovers the facts underlying its claims. *E.g.*, *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 707 (9th Cir. 2004); *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397-98 (1999). Moreover, DC's Third Claim is premised on defendants' *continuing* course of conduct, including the "consent agreement," which continues to violate DC's rights under the Copyright Act to this day. FAC ¶¶ 3, 101, 169-70; *supra* at 3, 9. The statute of limitation only commences when such a "continuing wrong" ceases. *Suh v. Yang*, 987 F. Supp. 783, 795 (N.D. Cal. 1997); *Flowers v. Carville*, 310 F.3d 1118, 1126 (9th Cir. 2002); *Wyatt v. Union Mort. Co.*, 24 Cal. 3d 773, 788 (1979). DC seeks a declaration bringing defendants' continuing course of misconduct, including its newly formed offending agreements, to a halt. The Court should declare that defendants' illicit consent agreements are unlawful and void.

## V.   CONCLUSION

DC's motion should be granted, and judgment should be entered in its favor on its First and Third Claims.

Dated:  July 16, 2012

Respectfully submitted,

By:    /s/  Daniel M. Petrocelli
          Daniel M. Petrocelli
Attorneys for Plaintiff DC Comics

OMM_US:70773889