**EXHIBIT M**

1   Marc Toberoff (State Bar No. 188547)
      mtoberoff@ipwla.com
2   Keith G. Adams (State Bar No. 240497)
      kgadams@ipwla.com
3   Pablo D. Arredondo (State Bar No. 241142)
      parredondo@ipwla.com
4   TOBEROFF & ASSOCIATES, P.C.
    22337 Pacific Coast Highway #348
5   Malibu, California 90265
    Telephone:  (310) 246-3333
6   Fax:         (310) 246-3101

7   Attorneys for Defendants Mark Warren
    Peary, as personal representative of the
8   Estate of Joseph Shuster, Jean Adele Peavy,
    and Laura Siegel Larson, individually and
9   as personal representative of the Estate of
    Joanne Siegel

10              **UNITED STATES DISTRICT COURT**

11   **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| DC COMICS, | Case No: CV 10-03633 ODW (RZx) |
|---|---|
| Plaintiff, | Hon. Otis D. Wright II, U.S.D.J. |
| vs. | Hon. Ralph Zarefsky, U.S.M.J. |
| PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF, an individual; MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER; JEAN ADELE PEAVY, an individual; LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, and DOES 1-10, inclusive, | **DEFENDANTS' OPPOSITION TO DC COMICS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS FIRST AND THIRD CLAIMS FOR RELIEF** |
| | *Declaration of Keith G. Adams; Statement of Genuine Issues; Evidentiary Objections; and [Proposed] Order filed concurrently herewith* |
| Defendants. | Complaint filed:  May 14, 2010 Discovery Cutoff:  None Set Trial Date:  None Set |
| | Date:   August 20, 2012* Time:   1:30 p.m. Place:  Courtroom 11 |

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ..........................................2

    The Termination Right Under The U.S. Copyright Act................................2

    The Relationship Between Superman's Co-Creators And DC ......................4

    The 1992 Agreement To A Modest Pension Increase...................................5

    The Executor Of Shuster's Estate Exercises His Termination Right.............6

    The 2001 And 2003 PPC Agreements, Cancelled In 2004 ...........................6

    Enforcement Of The Siegel Termination, Triggering This Action................7

LEGAL STANDARD............................................................................................7

ARGUMENT .......................................................................................................8

I.      DC'S FIRST CLAIM IS MERITLESS.................................................8

    A.      The 1992 Agreement Cannot Bar The Shuster Termination ...............8

          1.      The Termination Right Is Inalienable........................................8

          2.      The 1992 Agreement Is Not A "Revocation and Re-Grant".................................................................................9

                a.      There Is No Express Revocation Or Re-Grant...............11

                b.      There Is No Rescission Or Novation Under New York Law ...............................................................12

                c.      DC's Extrinsic Evidence Does Not Show Otherwise ...............................................................15

                d.      The 1992 Agreement Did Not Achieve Congress' Purpose ...............................................................16

    B.      The Shuster Executor Possessed The Majority Interest Needed To Terminate And Properly Signed The Termination Notices..........17

    C.      The Shuster Executor Has A Statutory Right To Terminate .............19

II.      DC'S THIRD CLAIM FAILS AS A MATTER OF LAW .........................21

    A.      Section 304(c)(6)(D) Does Not Provide DC With Any Rights .........21

    B.      DC Lacks Standing To Bring Its Third Claim .................................23

    C.      The Third Claim Is Barred By The Statute Of Limitations ...............24

III.   DC'S MOTION IS PROCEDURALLY DEFECTIVE ................................24

CONCLUSION.....................................................................................................25

TABLES OF CONTENTS AND AUTHORITIES

# **TABLE OF AUTHORITIES**

**Federal Cases**

*Abuelhiia v. Chappelle,*
  2009 U.S. Dist. LEXIS 55861, 2009 WL 1883787 (S.D.N.Y. June 29, 2009) ...... 13

*Alexander v. Sandoval,*
  532 U.S. 275 (2001) ..................................................................................... 24

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) .................................................................................. 7, 15

*Associated Food Stores, Inc. v. Siegel,*
  205 N.Y.S.2d 208 (1960) .............................................................................. 13

*Blaire & Co. v. Otto,*
  5 A.D.2d 276, (N.Y. App. Div. 1958) ........................................................ 14, 15

*Bourne Co. v. MPL Commc'ns, Inc.,*
  675 F. Supp. 859 (S.D.N.Y. 1987) .................................................................. 22

*Brown Bros. Elec. Contractors, Inc. v. Beam Const. Corp.,*
  41 N.Y.2d 397 (1977).................................................................................... 12

*CBOCS West, Inc. v. Humphries,*
  553 U.S. 442 (2008) ..................................................................................... 23

*Citibank, N.A. v. Benedict,*
  2000 WL 322785 (S.D.N.Y. Mar. 27, 2000) ..................................................... 13

*Classic Media, Inc. v. Mewborn* ("*Mewborn*"),
  532 F.3d 978 (9th Cir. 2008)................................................................... *passim*

*Croman v. Wacholder,*
  769 N.Y.S.2d 219 (2003) ............................................................................... 12

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.,*
  411 F.3d 384 (2d Cir. 2005) ........................................................................... 15

*Endicott Trust Co. v. Milasi,*
  572 N.Y.S.2d 524 (1991) ............................................................................... 13

*Faulkner v. Nat'l Geographic Soc.,*
  452 F. Supp. 2d 369 (S.D.N.Y. 2006) .............................................................. 12

*Goldome Corp. v. Wittig,*
  221 A.D.2d 931 (N.Y. App. Div. 1995)............................................................. 14

*Greenberg v. Nat'l Geographic Soc'y,*
  533 F.3d 1244 (11th Cir. 2008)......................................................................... 3

*Groucho Marx Prods. V. Day & Night Co.,*
  689 F.2d 317 (2d Cir. 1982) ........................................................................... 20

*In re WorldCom, Inc.*,
   2007 WL 2049723 (S.D.N.Y. July 13, 2007) ............................................ 14

*Indep. Energy Corp. v. Trigen Energy Corp.*,
   944 F. Supp. 1184 (S.D.N.Y. 1996) ........................................................ 14

*International Klafter Co., Inc. v. Continental Cas. Co.*,
   869 F.2d 96, 100 (2d Cir. 1989) ............................................................ 15

*Marvel Characters, Inc. v. Simon*,
   310 F.3d 280 (2d Cir. 2002) .............................................................. 4, 8

*Meridian Project Sys., Inc. v. Hardin Constr. Co.*,
   426 F. Supp. 2d 1101 (E.D. Cal. 2006) .................................................... 25

*Milne v. Slesinger, Inc.*,
   430 F.3d 1036 (9th Cir. 2005) ........................................................ *passim*

*Milton H. Greene Archives v. CMG Worldwide*,
   568 F. Supp. 2d 1152 (C.D. Cal. 2008) .................................................... 20

*N.Y. Times v. Tasini*,
   533 U.S. 483 (2001) ........................................................................ 4

*Penguin Group (USA) Inc. v. Steinbeck*,
   537 F.3d 193 (2d Cir. 2008) ........................................................ *passim*

*Portsmouth Square Inc. v. Shareholders Protective Committee*,
   770 F.2d 866 (9th Cir. 1985) ........................................................... 7, 8

*Siegel v. Nat'l Periodical Publications, Inc.*,
   508 F.2d 909 (2d Cir. 1974) ............................................................... 5

*Siegel v. Warner Bros. Ent. Inc.*,
   542 F. Supp. 2d 1098 (C.D. Cal. 2008) ........................................ 4, 6, 7, 16, 19

*Siegel v. Warner Bros. Entertainment Inc.*,
   Case No. 04-CV-08400 ODW (RZx) ...................................................... 1, 16

*Stewart v. Abend*,
   495 U.S. 207 (1990) .................................................................. 2, 4, 8

*United States v. Bellecci*,
   2008 WL 802367 (E.D. Cal. Mar. 26, 2008) ................................................ 25

*United States v. Granderson*,
   511 U.S. 39 (1994) ........................................................................ 23

*Wang v. Chen*,
   1992 WL 7840 (S.D.N.Y. Jan.10, 1992) .................................................... 13

*Yahava v. Hua*, 87 Civ. 7309,
   1989 WL 214481 (S.D.N.Y. Nov.28, 1989) .................................................. 13

## Statutes and Regulations

17 U.S.C. § 101 *et seq.* (1978)............................................................................. *passim*

17 U.S.C. § 203(a) ...................................................................................... 3

17 U.S.C. § 304(c) ............................................................................... *passim*

17 U.S.C. § 304(c)(2) ........................................................................... *passim*

17 U.S.C. § 304(c)(6)(D) ...................................................................... *passim*

17 U.S.C. § 304(d) ............................................................................... *passim*

17 U.S.C. § 507(b) ..................................................................................... 24

Fed. R. Civ. P. 56(c) .................................................................................. 7

67 Fed. Reg. 69134 .................................................................................. 20

67 Fed. Reg. 69135 .................................................................................. 20

## Legislative History

H.R. Rep. No. 94-1476 .......................................................................... 3
  94th Congress, 2d. Sess.  (1976)

H.R. Rep. No. 105-452,
  105th Congress, 2d Sess. (1998) ............................................................ 21

## Secondary Sources

3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 9 ...................................... *passim*

3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 11 .................................... *passim*

3 W. Patry, *Patry on Copyright* § 7:47 ...................................................... 22

6 W. Patry, *Patry on Copyright* § 21:18 ...................................................... 23

## **INTRODUCTION**

Plaintiff DC Comics' ("DC") motion for summary judgment (Docket No. 458; "MSJ") presents little more than erroneous, half-hearted arguments that are willfully blind to the purpose, plain language and effect of the Copyright Act and contracts.

The Copyright Act's "termination" provisions, which expressly preempt contracts and empower authors and their estates to terminate old copyright grants without cause, were enacted by Congress to remedy the "unequal bargaining position of authors" and to enable them to secure "the monetary rewards of a work that may have been initially undervalued, but which later becomes a commercial success." *Classic Media, Inc. v. Mewborn* ("*Mewborn*"), 532 F.3d 978, 983-84 (9th Cir. 2008). Both here and in *Siegel v. Warner Bros. Entertainment Inc.*, Case No. 04-CV-08400 ODW (RZx) ("*Siegel*"), DC has repeatedly tried to evade the termination rights of the estates of Superman's creators, Jerry Siegel ("Siegel") and Joe Shuster ("Shuster").

DC's First Claim attempts to invalidate the notice of termination (the "Shuster Termination") served by Mark Warren Peary (the "Shuster Executor"), executor of the Estate of Joseph Shuster (the "Shuster Estate"), on three dubious grounds. *First*, DC erroneously argues that a 1992 agreement ("1992 Agreement") between DC and Shuster's siblings, Frank Shuster and Jean Peavy, waived the Shuster Executor's termination right, even though: (i) siblings have never held termination rights, 17 U.S.C. § 304(c)(2); (ii) the 1992 Agreement nowhere mentions termination; (iii) the Shuster Executor was not a party to the 1992 Agreement; (iv) *no one* held termination rights in 1992, as Shuster left no widow, child or grandchild; (v) there was no possibility of termination until the 1998 Copyright Term Extension Act ("CTEA") extended the right to an author's estate, *id.* at §§ 304(c)(2)(D), 304(d); and (vi) even if the Shuster Executor had been a party to the 1992 Agreement, the termination interest cannot be assigned or waived, and remains exercisable "notwithstanding any agreement to the contrary," *id.* at §§ 304(c)(5), 304(c)(6)(D).

To circumvent this, DC falsely asserts that the 1992 Agreement "revoked and

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

re-granted" Siegel and Shuster's Superman copyright grants (on which DC has always relied), even though the plain language of the 1992 Agreement says no such thing. Whereas revocation of prior contracts must be express and unequivocal, the short 1992 Agreement does not mention Shuster's prior Superman grants, or even Superman, and has no language revoking such grants; rather, it simply raised Frank and Jean's pension and included a standard quitclaim of their rights, if any.

*Second*, DC erroneously argues that the Shuster Executor improperly signed his termination notice, because Pacific Pictures Corporation ("PPC") held the right to terminate. This is a legal impossibility – PPC cannot possess any termination rights under the statute and, as DC admits (MSJ 8:14-15), the terminated copyrights cannot be transferred to third parties before 2013. 17 U.S.C. §§ 304(c)(2), (c)(6)(D).

*Third*, DC relies on wordplay to falsely argue that, because Shuster died prior to the 1998 CTEA, Shuster's termination rights disappeared, but did not "expire." This ignores the clear language and intent of the CTEA, the common-sense meaning of "expire," and well-established law that rights "expire" upon death.

DC's Third Claim accrued in 2006 and is barred by the three-year statute of limitations. This claim also fails because it is based on a non-existent right, found nowhere in the Copyright Act, and rejected by both case law and copyright treatises.

Lastly, DC's motion is defective as it fails to address most of defendants' affirmative defenses to DC's claims, preventing summary judgment in DC's favor, while permitting summary judgment against DC on its erroneous legal theories.

## FACTUAL AND PROCEDURAL BACKGROUND
## The Termination Right Under The U.S. Copyright Act

For over two centuries, the United States Copyright Act has consistently provided authors and their families with the right to recover previously transferred copyrights to enable their participation in the increased value of such copyrights. *See Stewart v. Abend*, 495 U.S. 207, 219 (1990), 3 M. Nimmer & D. Nimmer, *Nimmer On Copyright* ("*Nimmer*"), § 9.02. These protections culminated in the current

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1    Copyright Act's termination provisions.  17 U.S.C. §§ 203(a), 304(c)-(d).

2        "The 1976 Copyright Act was supposed to reverse two hundred years of

3    publishers' exploitation of authors under the [] Copyright Act."  *Greenberg v. Nat'l*

4    *Geographic Soc'y*, 533 F.3d 1244, 1259 n.1 (11th Cir. 2008).  On January 1, 1978, it

5    went into effect, and with it major changes to U.S. copyright law that significantly

6    enhanced the rights of authors and their families.  17 U.S.C. § 101 *et seq.* (1978).

7        When Congress extended the copyright term in the 1976 Act, it intended to

8    benefit authors rather than grantees, for whom the automatic grant of the extended

9    term would be an unjustified windfall.  *See* H.R. Rep. No. 94-1476 (1976) at 140.

10   Congress therefore coupled the term extension with a new right of authors and their

11   *statutory* heirs (*i.e.*, spouse, children and grandchildren) to terminate transfers of

12   copyright executed before January 1, 1978.  17 U.S.C. § 304(c).

13       When Congress further extended the copyright term in the 1998 CTEA, it

14   again coupled this extension with another termination right in § 304(d), for situations

15   where § 304(c)'s termination right had not been exercised by 1998.  *Id*., § 304(b), (d).

16   The 1998 CTEA also created a new class of persons eligible to terminate an author's

17   prior copyright grants, if the author is not survived by a spouse, child or grandchild:

18   the executor of the author's estate.  17 U.S.C. § 304(c)(2)(D).

19       These statutory termination rights lie in stark contrast to ordinary contract

20   principles, as they empower authors, their statutory heirs and estates to terminate

21   prior copyright grants *without cause*, and regardless of the contracting parties'

22   promises, intent or expectations.  *Id*., § 304(c)(5).  Indeed, in enacting the termination

23   provisions, Congress abrogated standard "freedom of contract" principles and

24   ensured that the termination right cannot be contractually waived or circumvented:

25   "[t]ermination of the grant may be effected notwithstanding any agreement to the

26   contrary;" and "[a] further grant…of any right covered by a terminated grant is valid

27   only if it is made after the effective date of termination … [or as to] the original

28   grantee or such grantee's successor in title, after the notice of termination has been

1 | served….”  17 U.S.C. § 304(c)(5)-(6)(B).

2 |    In recognizing the intent of the 1976 Act to “enhance the author's position,” by

3 | adjusting “the author/publisher balance,” the Supreme Court has emphasized the

4 | “inalienable” right of authors and their estates “to revoke a copyright transfer.”  *N.Y.*

5 | *Times v. Tasini*, 533 U.S. 483, 496 (2001); *see also Stewart,* 495 U.S. at 230 (“[the

6 | 1976 Act] provides an inalienable termination right”); *Marvel Characters, Inc. v.*

7 | *Simon* (“*Simon*”), 310 F.3d 280 (2d Cir. 2002) (publisher cannot bar termination by

8 | re-characterizing works as “works for hire” in a settlement agreement).

9 |    **The Relationship Between Superman's Co-Creators And DC**

10 |    In 1933-34, writer Siegel and illustrator Shuster, two high school students, co-

11 | created Superman as the champion of the oppressed in the midst of the Great

12 | Depression.  *See* Statement of Genuine Issues (“SGI”) ¶ 46; *Siegel v. Warner Bros.*

13 | *Ent. Inc.* (“*Siegel I*”), 542 F. Supp. 2d 1098, 1114 n.3 (C.D. Cal. 2008).  Siegel and

14 | Shuster's original character would become a cultural icon, spawn a multi-billion

15 | dollar franchise and bring fortune to many – but not to them.  SGI ¶47.  On March 1,

16 | 1938, Siegel and Shuster signed an agreement (the “1938 Grant”), without the aid of

17 | counsel, that granted Superman to DC.  SGI ¶48.  In exchange, DC paid them $130,

18 | and assured them they would be looked after.  *Id.*  But despite Superman's

19 | phenomenal success, DC refused to pay them a royalty.  SGI ¶50.

20 |    Thus, in 1947, Siegel and Shuster filed suit against DC in Westchester, N.Y.

21 | SGI ¶51.  The court held that DC owned Superman pursuant to the 1938 Grant, but

22 | that DC had stolen Superboy from Siegel while he was overseas fighting for his

23 | country in WWII.  SGI ¶52.  Although the case was settled, DC retaliated by cutting

24 | Siegel and Shuster off, and from 1949-1975, systematically erased their credit byline

25 | and any references to them from its publications and corporate histories.  SGI ¶53.

26 | While Superman appeared *everywhere*, from comics to radio, TV, films, and

27 | merchandise, his creators slipped into obscurity and poverty:  Siegel's last job was as

28 | a mail clerk, and Shuster worked intermittently as a messenger boy.  SGI ¶54.

In 1969, Siegel and Shuster brought a federal action as to ownership of the Superman renewal copyright, resulting in *Siegel v. Nat'l Periodical Publications, Inc.,* 508 F.2d 909, 912-913 (2d Cir. 1974), which held that DC owned the Superman renewal copyright pursuant to the 1938 Grant.  SGI ¶¶55-56.

In 1975, the National Cartoonists Society and the Cartoonists Guild launched a public-relations campaign to protest DC's shabby treatment of Superman's then elderly creators.  SGI ¶57.  Worried negative publicity would affect the box office of its planned Superman film, DC's parent, Warner, finally agreed to pay Siegel and Shuster a pension of $20,000 a year, and restored their credit after 26 years (the "1975 Agreement").  SGI ¶58.  The 1975 Agreement also provided that, after Shuster's death, Warner would pay his brother Frank a $5,000 pension.  SGI ¶59.

### The 1992 Agreement To A Modest Pension Increase

Shuster died on July 30, 1992 without widow or child, and was survived only by his siblings, Frank Shuster (died in 1996) and Jean Peavy.  SGI ¶60.  Upon his death, no one had any termination rights to Shuster's copyrights, and Shuster's assets were limited to a few shares of stock.  SGI ¶¶61-62; 17 U.S.C. § 304(c)(2).  As such, Shuster's estate was not probated.  SGI ¶61.  Instead, per Cal. Prob. Code § 13101, Jean requested by affidavit that his stock be transferred to her.  *Id.*

On October 2, 1992, DC entered into a short agreement with Frank and Jean ("1992 Agreement") to raise their pension to $25,000, which stated:

> [T]his agreement fully settles all claims to any payments or other rights or remedies which ***you*** [Frank and Jean] may have … regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon.  In any event, ***you*** now grant to us any such rights and release us… and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.

SGI ¶66 (emphasis added).  The 1992 Agreement made no mention of termination rights, Shuster's prior Superman grants to DC, or Superman.  SGI ¶68.

The same day, October 2, 1992, Frank signed a letter to Paul Levitz, DC's then-President, stating that, in consideration for the 1992 Agreement, Frank was

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

waiving his $5,000 pension under the 1975 Agreement. SGI ¶70. Levitz characterized the 1992 Agreement as a small act of charity in the spirit of the 1975 Agreement. SGI ¶72. Levitz also made clear that Frank and Jean never held any rights under the Copyright Act and that DC was under no legal obligation to raise the Shusters' pension. SGI ¶73. In the years following the 1992 Agreement, Frank and Jean struggled to get by. SGI ¶77. Requests for increases in their pension were denied, but periodic bonuses were granted. *Id*.

### The Executor Of Shuster's Estate Exercises His Termination Right

Years later, in 1998, Congress passed the CTEA which, for the first time, extended termination rights to the executor of an author's estate. Pub. L. 105-298. Accordingly, on July 15, 2003, Joseph Shuster's nephew, Mark Warren Peary, petitioned the Superior Court of the State of California to probate Shuster's estate. SGI ¶64. Shuster's will nominated Jean as executrix of his estate and stated that, in the event Jean declined to serve, Mr. Peary should be appointed as executor. SGI ¶63. As Jean was 86, she declined to serve. SGI ¶64. On October 7, 2003, the Court duly appointed Peary as executor and granted him the "special power … to terminate prior transfers of the decedent's copyright(s) pursuant to Section §304(c) of the United States Copyright Act, 17 U.S.C. § 304(d), incorporating without limitation 17 U.S.C. § 304(c)(2)(D), and to maintain and defend on behalf of the decedent and the estate all proceedings … in connection with this action." SGI ¶65. In November 2003, the Shuster Executor filed in the U.S. Copyright Office and served on DC a notice of termination under 17 U.S.C. § 304(d), terminating Shuster's 1938 Grant and subsequent Superman grants. SGI ¶84; *Siegel I*, 542 F. Supp. 2d at 1114, n.3.

### The 2001 And 2003 PPC Agreements, Cancelled In 2004

In 2001, spurred by the well-publicized Siegel termination, Mr. Peary, a writer and investor, had sought the advice of an attorney, and contacted Mr. Toberoff. SGI ¶78. In November 2001, they entered into an agreement (the "2001 PPC Agreement") to enforce Shuster's termination rights. SGI ¶79. In 2003, after the

6

Shuster Estate was probated, a new agreement was made between PPC and the

Shuster Executor (the "2003 PPC Agreement").  SGI ¶83.  In 2004, both PPC

Agreements were cancelled and revoked, and replaced with a legal retainer

agreement, retroactive to 2001.  SGI ¶85.  On August 2, 2011, the parties confirmed

their intent that PPC have no continuing interest whatsoever when they revoked the

PPC Agreements in 2004.  SGI ¶88.

### Enforcement Of The Siegel Termination, Triggering This Action

In 1997, Jerry Siegel's widow and daughter served notices of termination,

entitling them to a share of Superman profits from 1999.  *Siegel I*, 542 F. Supp. 2d at

1114-16; SGI ¶97.  DC refused to pay, and four years of grinding negotiations did not

result in a settlement.  *Id.*  In 2004, the Siegels filed suit to vindicate their copyrights.

SGI ¶98.  On April 28, 2005, DC sent a letter to the Shuster Executor that offered to

settle with the Shusters at the expense of the Siegels, which the Executor declined.

SGI ¶86.  In 2008-09, Warner/DC suffered serious setbacks, as the Court held that

the Siegels, represented by Mr. Toberoff, had successfully recovered their original

Superman copyrights by valid statutory termination.  SGI ¶98; *Siegel I*, 542 F. Supp.

2d 1098; 658 F. Supp. 2d 1036 (C.D. Cal. 2009).  In 2010, DC replaced its general

and outside counsel, and retaliated by suing herein the Siegels, the Shusters and their

long-time counsel, Mr. Toberoff.  SGI ¶99.

### LEGAL STANDARD

A motion for summary judgment may only be granted if the evidence "show[s]

that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 247-50 (1986).  The moving party bears the burden of

identifying credible "admissible evidence" that demonstrates the absence of a

genuine issue of material fact for trial.  *Id.* at 256.  The court must resolve all

ambiguities and draw all reasonable inferences *against* the moving party.  *Id.* at 255.

Courts can, and routinely do, order summary judgment *against* the moving party, as

1    it had "a full and fair opportunity to develop and present facts and legal arguments in

2    support of its position" and knew the "sufficiency of his or her claim will be in

3    issue." *Portsmouth Square Inc. v. Shareholders Protective Committee*, 770 F.2d 866,

4    869 (9th Cir. 1985).

## ARGUMENT

### I.    DC'S FIRST CLAIM IS MERITLESS

#### A.    <u>The 1992 Agreement Cannot Bar The Shuster Termination</u>

##### 1.    **The Termination Right Is Inalienable**

As a matter of law, the 1992 Agreement by Frank and Jean cannot bar the

Shuster Executor's exercise of his termination rights.  The termination provisions

specifically abrogated standard freedom of contract principles to make the

termination right "inalienable." *Stewart*, 495 U.S. at 230.  An author or his estate

may exercise termination rights "***notwithstanding any agreement to the contrary***,

including an agreement to make a will or to make a future grant." 17 U.S.C. §

304(c)(5) (emphasis added).  Thus, any agreement that purports to waive, settle or

limit the termination right is unenforceable.  DC's refrain that a "deal is a deal" (MSJ

2, 17-18) is inapplicable to the Copyright Act's termination provisions.

The 1992 Agreement contains only three obligations of Frank and Jean:  they

settled any claim to payment, quitclaimed to DC, and covenanted not to assert any

rights that *they* held relating to Joe Shuster's works.  SGI ¶¶66-67.  Of course, the

1992 Agreement makes no mention of termination rights.  SGI ¶68.  Nor does it

purport to limit or waive those rights, let alone the rights of the Shuster Executor,

who was not a party to the Agreement.  *Id*.  This is unsurprising, because an author's

siblings, like Frank and Jean, have never held termination rights, and an estate did not

have termination rights until passage in 1998 of the CTEA.  17 U.S.C. § 304(c)(2).

Even if the Shuster Executor had been a party to the 1992 Agreement and had

*expressly* agreed to settle the termination right, the 1992 Agreement would be an

unenforceable "agreement to the contrary." *Simon*, 370 F.3d at 290.  Nor could

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

anyone have anticipatorily assigned the estate's future Superman copyrights to DC in 1992. "[A]n agreement to grant right covered by a terminated grant is not valid if entered before notice of termination," 17 U.S.C. § 304(c)(6)(D), and notice of termination was not served here until November 2003. SGI ¶84.

### 2. The 1992 Agreement Is Not A "Revocation and Re-Grant"

DC attempts to circumvent termination by trying to jam the 1992 Agreement into a narrow and inapplicable "revocation and re-grant" exception recognized in *Milne v. Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005). DC glosses over *Milne's* different facts and holding, while ignoring the plain language of the 1992 Agreement.

*Milne* concerned the "Winnie the Pooh" copyrights. In 1930, Pooh's author assigned his copyrights to the predecessor of SSI. *Id.* at 1039-40. In 1983, SSI was "faced with the possibility that [the author's son] Christopher might seek to terminate the rights," which were within the statutory termination window. *Id.* In lieu of statutory termination, Christopher agreed to the contractual "revocation of the [1930] agreement[] in favor of the new agreement, followed by the re-granting (on the same page) of the rights in the Pooh works to SSI." As a result of his termination leverage, the Pooh heir received a "net gain of hundreds of millions of dollars." *Id.* at 1040-41.

In 2002, Christopher's daughter, Claire Milne, sought to recapture the Pooh copyrights by terminating the 1930 grant. *Id.* at 1041. *Milne* held there was no longer a 1930 grant to terminate, because the 1983 contract had expressly *revoked* it and expressly *re-granted* the copyrights to SSI. *Id.* at 1043. The court emphasized that Christopher held the termination right, was within the termination window, and "could have served a termination notice," but instead used the "bargaining power" of the immediate threat of termination as "leverage to obtain a better deal" and "considerably more money." *Id.* at 1045. This was not "an agreement to the contrary," because the contractual termination and negotiation of a new grant on greatly enhanced terms achieved "the very result envisioned by Congress [in] the termination provisions." *Id.* at 1047.

9

*Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 196 (2d Cir. 2008),
although not binding here, followed *Milne*'s reasoning.  In 1938, John Steinbeck
granted many of his copyrights to his publisher.  In 1994, his widow, Elaine, entered
into a new contract that, like Christopher Milne's, <u>expressly</u> revoked the 1938 grant
and re-granted the copyrights.  *Id.* at 197.  In exchange, the publisher made major
financial concessions.  *Id.* 196.  Steinbeck's sons thereafter attempted to terminate
the 1938 grant.  The court held that Elaine's 1994 contract revoked the 1938 grant,
because it expressly "stated that 'when signed by Author and Publisher, [it] will
cancel and supersede the previous agreements'" (*id.* at 196) and thus "terminated and
superseded the 1938 Agreement. … leaving in effect no pre-1978 grants to which the
termination rights … applied." *Id.* at 200.  *Steinbeck*, like *Milne*, stressed that Elaine
"wield[ed] the threat of termination," during an open window for major works (*e.g.*,
"Of Mice and Men" (1938) and "The Grapes of Wrath" (1939)), to secure market
value.  *Id.* at 202, 204.  The court reasoned that "this kind of renegotiation appears to
be exactly what was intended by Congress." *Id.* at 202.

In *Classic Media, Inc. v. Mewborn*, 532 F.3d 978 (9th Cir. 2008), the Ninth
Circuit revisited these issues, upheld a termination notice regarding the novel "Lassie
Come Home," and firmly rejected the publisher's attempt, like DC's here, to extend
*Milne*'s narrow holding.  In 1976, the author's daughter, Mewborn, assigned her
share of Lassie film, television and allied rights to the publisher.  *Id.* at 980.  In 1978,
she signed a second contract, which purported to assign the already-assigned rights to
the publisher for an additional $3,000.  *Id.* at 981.  In 1996, Mewborn served a
termination notice as to her operative 1976 grant.  The publisher sued Mewborn,
claiming that the non-terminable 1978 grant "superseded" and implicitly "revoked
and re-granted" her Lassie rights.  *Id.* at 981-82.  The Ninth Circuit upheld the
termination and rejected the publisher's attempt to re-characterize the 1978 grant as a
"revocation and re-grant."  In so doing, it refused to extend *Milne* beyond its "distinct
factual scenario," and distinguished *Mewborn* on two principal grounds.  *Id.* at 987.

1    **First**, the Ninth Circuit emphasized that Mewborn's 1978 agreement, unlike in

2    *Milne*, did not "*expressly* revoke the earlier … assignments." *Id.* at 989 (emphasis

3    added).  The 1978 grant was therefore a "nullity" as it purported to grant copyrights

4    previously assigned to the publisher and already in its possession.  *Id.* at 986.

5    **Second**, the Ninth Circuit noted that, whereas Christopher's agreement

6    "expressly stated that it was made in exchange for non-exercise of the immediately

7    investive termination right," Mewborn's 1978 agreement "was silent on the issue."

8    *Id.* at 986-89.  Moreover, while Christopher "had the present right to serve an

9    advance notice of termination" and "could [have] exercise[d] [his termination] right

10   at any moment," Mewborn could not, because the termination window was not open,

11   and thus, "unlike Milne, … [she] had nothing in hand with which to bargain."  *Id.*

12   Taken together, *Milne, Steinbeck*, and *Mewborn*, stand for the narrow

13   proposition that (1) an author's statutory heir who holds a termination right, and (2) is

14   within or close to the termination window, (3) may leverage the imminent threat of

15   termination to realize market value for a copyright(s) by (4) *expressly* revoking a

16   terminable pre-1978 copyright grant, (5) expressly re-granting such copyright(s) in a

17   non-terminable post-1978 grant, and (6) thereby intentionally trade-in their

18   termination right.  It is only in such narrow circumstances that the Congressional

19   objective in enacting the termination right is fulfilled, albeit by express contractual,

20   instead of statutory, termination.  *See Mewborn*, 532 F.3d at 987 (noting *Milne*'s

21   express agreement "was tantamount to following the statutory formalities," and

22   "achieved the exact policy objectives for which 304(c) was enacted").

23   Despite DC's efforts, the facts here are similar only to *Mewborn*, and none of

24   *Milne's* requirements are met.

25                    a.    There Is No Express Revocation Or Re-Grant

26   The 1992 Agreement does not contain *any* language of revocation (SGI ¶68),

27   let alone the express revocation of prior copyright grants required by *Milne*,

28   *Mewborn*, and *Steinbeck*.  It does not include the term revoke, rescind, supersede,

replace, or any other synonyms.  SGI ¶68.  Indeed, the agreement does not even mention Superman or Joseph Shuster's key 1938 Grant and subsequent Superman grants.  *Id.*; *compare Milne*, 542 F.3d at 1041 (new agreement *expressly* "provided for the revocation of the [prior] agreements"); *Steinbeck*, 537 F.3d at 197 (contract *expressly* provided it would "cancel and supersede the previous agreements").

Nor does the 1992 Agreement contain any re-grant of Shuster's Superman copyrights.  The 1992 Agreement merely "settles all claims to any payments or other rights or remedies which you [*Frank and Jean*] may have under any other agreement or otherwise … in any and all work created in whole or in part by your brother [Joe Shuster]" and "grant[s] to [DC] any such rights."  SGI ¶66.  This is a boilerplate quitclaim that did not and could not transfer Shuster's Superman copyrights, long-owned by DC under Siegel and Shuster's 1938 Grant and subsequent grants.  SGI ¶¶74-75.  Just like in *Mewborn*, any Superman grant in the 1992 Agreement was a "nullity" because Frank and Jean "had nothing [] to transfer."  532 F.3d at 986.

In sum, the 1992 Agreement fails the Ninth Circuit's requirement that a "revocation and re-grant" be *expressly* stated by the holder of the termination right. *Milne*, 430 F.3d at 1040-41; *Mewborn*, 532 F.3d at 989.

b.  There Is No Rescission Or Novation Under New York Law

In fashioning this narrow exception to the termination right, the Ninth Circuit in *Milne* and *Mewborn* held that "revocation and re-grants" must be **express** as a matter of federal copyright law, and did not look to state contract law.  Nevertheless, the 1992 Agreement fares no better under New York law, which looks not to "subjective intent" but, "rather, to the objective manifestations of the intent of the parties" in their agreement.  *Brown Bros. Elec. Contractors, Inc. v. Beam Const. Corp.*, 41 N.Y.2d 397, 399 (1977).  *See Faulkner v. Nat'l Geographic Soc.*, 452 F. Supp. 2d 369, 381 (S.D.N.Y. 2006) ("post hoc conclusions of contracting parties" are irrelevant); *Croman v. Wacholder*, 769 N.Y.S.2d 219, 223 (2003) ("[N]o basis to accept plaintiff's after-the-fact contention that the written agreement means

1   something other than what it says.").

2      The 1992 Agreement does not cancel or rescind the 1938 Grant or any

3   subsequent Superman grants.  New York law requires that "cancellation or rescission

4   of a contract must be clearly expressed … unqualified and positive, express and

5   absolute."  *Associated Food Stores, Inc. v. Siegel*, 205 N.Y.S.2d 208, 210 (1960)

6   (internal quotations omitted); *Endicott Trust Co. v. Milasi*, 572 N.Y.S.2d 524, 525

7   (1991) (same).  The 1992 Agreement does not contain any mention of Joseph

8   Shuster's key 1938 Grant or subsequent Superman grants, or even of Superman, and

9   does not even hint that those agreements were being rescinded.  SGI ¶68.

10      Nor is the 1992 Agreement a "novation," as DC erroneously argues.  MSJ 13.

11  A novation occurs when the parties "extinguish[] … the old contract" and replace it

12  with "a new contract."  *Wang v. Chen*, 1992 WL 7840 at *6 (S.D.N.Y. Jan. 10,

13  1992).  Like the Ninth Circuit's requirement that a "revocation and re-grant" be

14  express, "New York courts have set a stringent standard for novation."  *Abuelhija v.*

15  *Chappelle*, 2009 WL 1883787, at *6 (S.D.N.Y. June 29, 2009).

16      "[A] novation must never be presumed."  *Wang*, 1992 WL 7840 at *6.  Rather,

17  there must be a "clear and definite intention on the part of all concerned that such is

18  the purpose of the agreement."  *Yahaya v. Hua*, 1989 WL 214481 at *4 (S.D.N.Y.

19  Nov.28, 1989); *see Citibank, N.A. v. Benedict*, 2000 WL 322785, at *8 (S.D.N.Y.

20  Mar. 27, 2000) ("[A]ll parties must have 'clearly expressed their intention that a

21  subsequent agreement … [be] substituted for an old agreement'").

22      The 1992 Agreement falls far short of this "stringent standard" – it includes no

23  mention that Shuster's prior Superman grants are being extinguished, and its

24  boilerplate quitclaim is wholly insufficient to establish any mutual intent to novate.

25  SGI ¶¶66-68; *Abuelhija*, 2009 WL 1883787, at *6 (S.D.N.Y. June 29, 2009)

26  (standard merger clause that a new agreement "supersedes all understandings of the

27  parties hereto" insufficient to prove an intent to extinguish the old agreement).

28      The issue here is not that the 1992 Agreement fails to include "magic words"

1  (MSJ 13); rather, it fails to provide *any* indication that the parties intended either a

2  rescission or novation.  DC tries to evade the strict standards of New York law by

3  systematically misrepresenting case law:

4  •  *Blaire & Co. v. Otto*, 5 A.D.2d 276, 279-82 (N.Y. App. Div. 1958) did not

5  hold, as DC falsely claims, that a provision that payments would "constitute complete

6  satisfaction for services rendered" showed "clear and unmistakable intent" to

7  supersede prior agreements.  MSJ 13-14.  The court actually stated that, if the quoted

8  language was the only evidence, it might find no novation.  *Id.* at 282.  A "[c]lear and

9  unmistakable" novation was based on a different document that *expressly* stated that

10  the parties "'no longer have any interest in [the prior Agreement].'"  *Id.* at 272.

11  •  In *Goldome Corp. v. Wittig*, 221 A.D.2d 931 (N.Y. App. Div. 1995), the

12  superseding contract did not merely contain a broad release "discharging defendant

13  from 'all cause and causes of action,'" as DC falsely implies.  MSJ 14.  The contract

14  identified the first agreement, and evidenced a clear intent to replace it.  *Id.* at 931.

15  •  *Indep. Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184, 1196

16  (S.D.N.Y. 1996) did not even address these issues; rather, it addressed whether a

17  prior oral agreement had merged into a later written contract and whether the parol

18  evidence rule barred evidence of the oral agreement.

19  •  *In re WorldCom, Inc.*, 2007 WL 2049723 at *3 (S.D.N.Y. July 13, 2007)

20  applied *Delaware*, not New York, law.  The court did not hold that novation required

21  a mere generalized statement waiving the parties' claims, as DC falsely suggests.

22  MSJ 14.  The superseding agreement very specifically identified the prior agreement,

23  and then expressly stated that it was "'the entire agreement … [and] supersedes any

24  and all prior communications, negotiations and agreements between or among the

25  parties pertaining to the subject matter hereof.'"  *Id.* at *2.

26      These cases actually undermine DC's claims.  The 1992 Agreement did not

27  identify Shuster's prior grants nor state it superseded them (*In re WorldCom, Inc.*,

28  2007 WL 204973 at *2), nor attempt to replace such grants (*Goldome*, 221 A.D.2d at

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

931), nor was it accompanied by documents expressly stating that the parties were no longer bound by Shuster's prior agreements (*Blaire*, 5 A.D.2d at 282).

c.    <u>DC's Extrinsic Evidence Does Not Show Otherwise</u>

The language of the 1992 Agreement clearly demonstrates that it was not a revocation or re-grant of Joe Shuster's prior Superman copyright grants and ends the analysis. Under New York law, whether a contract is ambiguous is a threshold question of law … [for] the court." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 390 (2d Cir. 2005). Where, as here, a contract's terms are unambiguous, the "intent of the parties must be determined from their final writing and no parol evidence or extrinsic evidence is admissible." *International Klafter Co., Inc. v. Continental Cas. Co.*, 869 F.2d 96, 100 (2d Cir. 1989).

However, even if one looked beyond the 1992 Agreement's language, DC has provided no extrinsic evidence that would let it survive, much less win, summary judgment. *Anderson,* 477 U.S. at 256-57. Tellingly, neither the declaration of Paul Levitz (DC's then-President) nor DC's correspondence describe the 1992 Agreement as a revocation or re-grant, or remotely suggest that this was the parties' intent. SGI ¶¶71-73. Rather, this material, like the agreement itself, points to one thing – a simple raise of Frank and Jean's pension by a few thousand dollars. SGI ¶66.

To the extent that the 1992 Agreement could be read to even relate to any prior agreements, it would implicate only the 1975 Agreement that originally gave Frank his annual pension. SGI ¶59. Indeed, on the day the 1992 Agreement was signed, Frank sent a letter to DC waiving his pension under the 1975 Agreement. SGI ¶70. The 1975 Agreement, however, did not transfer Superman copyrights and expressly acknowledged that all such rights were already owned by DC. SGI ¶58.

DC's conduct over 18 years demonstrates that it ***never*** viewed the 1992 Agreement as the basis for its chain-of-title to Superman. SGI ¶74. The perfunctory 1992 Agreement bears no resemblance to the elaborate rights agreements (including short form assignments for filing with the Copyright Office) customarily used by

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1  Warner/DC.  SGI ¶76.  DC has offered **no** evidence that it ever registered the 1992

2  Agreement with the Copyright Office as it would have done for key assignments.

3  Moreover, in *Siegel*, DC admitted, and the Court agreed, that it co-owns the original

4  Superman copyrights based on Shuster's 1938 Grant (not the 1992 Agreement).

5  *Siegel I*, 542 F. Supp. 2d at 1142; SGI ¶75.  Levtiz's 2005 letter to the Shusters says

6  this also.  SGI ¶86.  Even after DC was served with the Shuster Termination in 2003,

7  DC never claimed anything about the 1992 Agreement until 2010, in this lawsuit.

8      DC's newfound claim that 1992 Agreement revoked Siegel and Shuster's 1938

9  Grant – meaning its chain-of-title to its multi-billion dollar franchise is based on a

10  short document that never even mentions Superman – is not credible.  Nor is it

11  credible that DC would have exchanged its core 1938 Grant, twice adjudicated to

12  have given it *all rights* to Superman, for the 1992 Agreement, raising a pension.

13          d.    The 1992 Agreement Did Not Achieve Congress' Purpose

14      Unlike in *Milne*, the 1992 Agreement was not negotiated within an open or

15  imminent termination window, when the termination right could be meaningfully

16  leveraged.  *Milne*, 430 F.3d at 1045 ("Although Christopher presumably could have

17  served a termination notice, he elected instead to use his leverage to obtain a better

18  deal…").  Indeed, neither the parties to the 1992 Agreement, nor anybody else, held

19  a termination right in 1992, as siblings like Frank and Jean have never had any

20  termination rights and the 1998 CTEA had not yet extended those rights to an estate's

21  executor.  17 U.S.C. § 304(c)(2).  The facts here are therefore even weaker than in

22  *Mewborn*, where the author's daughter was at least eligible for termination rights, but

23  could not exercise those rights for many years.  532 F.3d at 987.

24      DC attempts to obfuscate this fatal fact by stating that "[l]ike Christopher

25  Milne and Elaine Steinbeck, Jean and Frank expressly adverted to the [termination]

26  regime in their 1992 dealings with DC."  MSJ 16.  DC omits, however, that it always

27  knew they had no termination rights.  As Levitz wrote, "[i]t is our firm conviction …

28  that you [Jean and Frank] don't have any legal rights or claims whatsoever."  SGI

¶73.  Frank and Jean's stray uninformed references to termination were therefore meaningless.  Without the actual threat of termination, they, unlike Christopher Milne, "had nothing in hand with which to bargain."  *Mewborn*, 532 F.3d at 989.

Frank and Jean's total lack of bargaining power is evident from the terms of the 1992 Agreement, which merely increased their pension from $5,000 to $25,000, split two ways.  SGI ¶66.  This small sum bears no relation to the value of Superman, and lies in stark contrast to the $2,000,000 offered the Shuster Executor once the termination was served.  SGI ¶86.  Frank and Jean were not represented by counsel; nor was there any back and forth over the 1992 Agreement's terms.  *See Mewborn*, 532 F.3d at 989 (noting that Mewborn "signed the contract 'as is' without the advice of counsel and without negotiating any of its terms" and received just $3,000).  By contrast, the leverage of termination secured Milne "a net gain of hundreds of millions of dollars" (*Milne*, 430 F.3d at 1040-41) and Steinbeck "a far larger annual guaranteed advance, and royalties."  *Steinbeck*, 537 F.3d at 196.

Ultimately this case bears no resemblance to *Milne* and *Steinbeck*; and is comparable to *Mewborn.*  Frank and Jean had no rights to assign, and no termination leverage.  The 1992 Agreement, which raised their modest pension, reflects this, just like the small transaction in *Mewborn*, and did not achieve the "result envisioned by Congress when it enacted the termination provisions."  *Milne*, 430 F.3d at 1047.

## B.  The Shuster Executor Possessed The Majority Interest Needed To Terminate And Properly Signed The Termination Notices

The Shuster Termination was served on November 10, 2003, with an effective date of October 26, 2013 and was duly signed by Mark Warren Peary, as Executor of the Shuster Estate.  SGI ¶84.  Pursuant to 17 U.S.C. § 304(c)(4), termination notices must be signed "by the number and proportion of the owners of [the author's] termination interest required" to terminate.  Pursuant to 17 U.S.C. § 304(c)(2)(D), if an "author's widow or widower, children, and grandchildren are not living, the author's executor … shall own the author's entire termination interest."  Because Joe

Shuster had no widow or children (SGI ¶60), Mr. Peary, the Executor, held the entire termination interest when the Shuster Termination was executed and served in 2003. The notice properly stated that it "ha[d] been signed by all persons whose signature is necessary to terminate said grants under Section 304(d) of Title 17, United States Code." SGI ¶84. DC contends that the termination is invalid because "the Estate did not own the requisite majority interest," erroneously arguing that 50% of the termination right was owned by PPC, under the PPC Agreements. MSJ 18. This argument is meritless and contradicts DC's own argument in both its complaint (Dkt. No. 49, ¶¶ 167-68) and its motion (MSJ 8:14-15) that the termination interest is not transferable before the effective termination date, per 17 U.S.C. §304(c)(6)(D).

The termination right is held only by statutorily-defined classes, and PPC was not and has never been a member of any such class. 17 U.S.C. § 304(c)(2)(A)-(D). Thus, the inalienable right to serve the Shuster Termination could not have been transferred to PPC. No contract with PPC could create a new statutory class eligible or required to sign a termination notice. Only the signature of Mr. Peary, the Shuster Executor, was required and allowed by statute. 17 U.S.C. § 304(c)(4).

Moreover, the copyrights recaptured pursuant to a termination notice cannot be anticipatorily transferred to **anyone** prior to the service of a termination notice, and can be transferred only to the grantee or its successor before "the effective date of the termination" – here, October 26, 2013. 17 U.S.C. §304(c)(6)(D); 3 *Nimmer* § 11.08[A] at 11-49. Thus, as a pure matter of law, the 2001/2003 PPC Agreements – pre-dating both the effective date *and* the service of the Shuster Executor's termination notice – could not and did not transfer the prospective copyrights to be recovered by the Shuster Termination.

Furthermore, the Shuster Executor was a party only to the 2003 PPC Agreement, which did not purport to transfer the termination interest to PPC, but provided PPC with a contingent share of proceeds, if any, from any recaptured copyright interests. SGI ¶¶ 79, 83. Indeed, the Shuster Estate was not probated and

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1    the Shuster Executor not even appointed until October 7, 2003, well after the 2001

2    PPC Agreement.  SGI ¶65.  As such, the 2001 PPC Agreement is legally

3    inapplicable.  SGI ¶79.  Finally, both PPC Agreements were revoked in 2004 and

4    replaced by a legal retainer agreement.  SGI ¶85.

5         DC mischaracterizes defendants' argument and attacks a straw man argument

6    of "harmless error" that defendants never made.  MSJ 19, *citing* Docket No. 191 at 8

7    (nowhere mentioning "harmless error").  The Shuster Termination had **no** error as

8    shown above, and a parties' contracts are not information that the Copyright Act, or

9    the regulations promulgated thereunder, require in a termination notice, or otherwise.

10        Based on the totally erroneous premise that PPC had to sign the Shuster

11   Executor's termination notice, DC constructs a false dilemma to argue that someone

12   "defrauded" the Copyright Office.  MSJ 20.  This makes no sense, as neither the PPC

13   Agreements, nor any other, could transform PPC into a required signatory.

14        DC blithely suggests – without any citation or basis – that the Court should

15   "hold that the Shusters are barred from terminating."  MSJ 20.  This is unsupported

16   by any provision of the Copyright Act and is entirely inequitable.  The Shuster

17   Termination provided DC with all of the information it was entitled to, and was

18   entirely accurate as solely the Shuster Executor held the termination right.

19        **C.    The Shuster Executor Has A Statutory Right To Terminate**

20        As set forth above, under 17 U.S.C. § 304(c)(2), if an author dies without a

21   widow, child or grandchild, termination rights vest in the executor of the his estate.

22   As Joe Shuster was unmarried and had no children, the Shuster Executor holds the

23   termination right.  SGI ¶60.  This Court has already acknowledged that "[a]s executor

24   of the Shuster estate, [Mark Warren Peary] is entitled [by the CTEA] … to make the

25   same termination claims for the Superman copyright that Shuster or his heirs would

26   have been entitled to bring."  *Siegel I*, 542 F. Supp. 2d at 1114 n.3.

27        The CTEA allows an executor to terminate when the "[t]ermination rights

28   provided for in subsection [304](c) have expired on or before the effective date

[October 27, 1998] of the [CTEA]" and the author "has not previously exercised such termination right." 17 U.S.C. § 304(d). DC even admits that, due to the time windows applicable to § 304(c)'s termination right, it could not have been exercised after 1997, and, in any event, expired when Shuster died in 1992. MSJ 21; 17 U.S.C. §§ 304(c)(3)-(4). Since the §304(c) termination right expired before the CTEA's effective date, the Shuster Executor has the clear right to terminate under § 304(d).

To circumvent § 304(d), DC uses wordplay to argue that, on Shuster's death the termination right was "lost," as opposed to having "expired" – the word used in § 304(d). MSJ 21. Without any legal support, DC argues that to have "expired," the termination window must have "opened and closed" while an author or his heirs were alive. *Id.* at 22. This is nonsense. There is nothing in the CTEA, its legislative history or case law requiring an author to live until the end of the § 304(c) termination window for the author's executor to hold the termination right. *Nimmer* agrees, stating that § 304(d) was designed to "correct the imbalance arising from the fact that the author (or his heirs) failed to terminate previously, whether through neglect or inability." 3 *Nimmer* § 11.05[B][2] at 11-40.12. As *Nimmer* points out, such "inability" could arise "because no one was alive to effectuate termination" and that CTEA "solves that latter situation" through § 304(c)(2)(D). *Id.* at n.25.2.

The Copyright Office itself states, without qualification, that "the termination right will have 'expired,' see 17 U.S.C. § 304(d), 59 years after copyright was secured." 67 Fed. Reg. 69134, 69135.

Courts also routinely use "expired" to describe rights lost upon death. Indeed, in *Steinbeck,* 537 F.3d at 197, a § 304(d) case repeatedly cited by DC, the Second Circuit plainly states that "statutory termination rights expire upon [] death." *See Groucho Marx Prods. V. Day & Night Co.*, 689 F.2d 317, 320 (2d Cir. 1982) ("[T]he right is not descendible and expires upon the death of the person so protected.") (citations omitted); *Milton H. Greene Archives v. CMG Worldwide*, 568 F. Supp. 2d 1152, 1156 (C.D. Cal. 2008) ("[T]hat right expired on an individual's death.").

DC argues that CTEA was not intended "to open the door to an entirely new class of persons … who never before had the right to terminate."  MSJ. at 22.  The CTEA was intended to do and expressly did exactly that.  *See* H.R. Rep. No. 105-452, 105th Congress, 2d Sess. at 8 (1998) (the amendments "allow[] an author's executor to receive his entire termination interest in the event that the author's widow, widower, children or grandchildren are not living").  Prior to CTEA's passage, only an author's widow or widower, children or grandchildren were given termination rights.  The CTEA explicitly expanded these categories to include the "executor … of the author's estate" (17 U.S.C. § 304(c)(2)) to remedy Congress' prior refusal under the 1976 Act – misleadingly referenced by DC (MSJ. at 21:6) – to grant termination rights to estates.  As explained by *Nimmer*:

> What … if, upon the death of an author … there is no surviving spouse, and no surviving children or grandchildren?  Under the 1976 Act at its passage, the result was that no one could exercise the right of termination.  That harsh result persisted for the current Act's first two decades.  Then in the [1998] Copyright Term Extension Act, Congress ameliorated that result.  Effective from October 27, 1998 onward, ***the termination right, instead of lapsing in these circumstances, belongs to "the author's executor, administrator, personal representative, or trustee***." [quoting 17 U.S.C. § 304(c)(2)(D)].

*Nimmer* § 11.03[A][2][a] at 11-40.1-11.40.2 (emphasis added).  DC's tortured interpretation violates the clear legislative intent of CTEA and leads to the exact "harsh result" that § 304(c)(2)(D) was meant to and did avoid.  *Id*.

## II.  DC'S THIRD CLAIM FAILS AS A MATTER OF LAW

### A.  <u>Section 304(c)(6)(D) Does Not Provide DC With Any Rights</u>

DC's Third Claim is premised on the erroneous legal position that DC has a "statutory right" under 17 U.S.C. § 304(c)(6)(D) to negotiate the purchase of the recaptured Superman copyrights, and that the (1) cancelled and ineffective PPC Agreements and (2) 2008 Consent Agreement interfere with DC's "right."  MSJ 23.

The unambiguous statute provides no such "right," and case law recognizes that none exists.  Section 304(c)(6)(D) simply provides that:

> "[A] further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective

date of the termination," but that an "agreement for such a further grant may be made between the author or [his heirs] and the original grantee or such grantee's successor in title, after the notice of termination has been served."

The section merely limits the terminating party's ability to make a grant; it creates no affirmative "right(s)" for the terminated party, DC.

DC misrepresents and expands § 304(c)(6)(D) to argue that it applies to any type of agreement and gives DC an exclusive "right" to negotiate to buy terminated copyrights. MSJ 23. *See* 3 *Nimmer* § 11.08[A], n.6 (2010) ("It is inaccurate to refer to this [§ 304(c)(6)(D)] advantage as 'an exclusive period of negotiation.'").

DC's theory was expressly addressed and rejected in *Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 865 (S.D.N.Y. 1987), where an author's widow was induced by a third party to serve a termination notice, and later granted her rights to another third party before the termination date. The terminated party sued both third parties, claiming rights to "an exclusive period of negotiation" and "first refusal" under section 304(c)(6)(D), which were rejected as contrary to the statute:

> ***Nor does the statute [§ 304(c)(6)(D)] provide for an exclusive period of negotiation. The statute neither compels the terminating party to negotiate with the terminated grantee, nor forbids him from negotiating with anyone else.*** All it requires is that prior to the effective date of termination, the terminated grantee is the only person with whom the author or his successor can make an enforceable and effective agreement to transfer those rights. The provision does give the terminated grantee a preferred competitive position but "[i]f the author can afford to wait for competitive offers until after the effective date of termination, he can overcome any advantage the grantee or successor may seek to gain from the preferential position."

*Id.* (citations omitted) (emphasis added). Contrary to DC's claim that the statute gives it a 10-year "exclusive negotiation period" (MSJ 24), *Bourne* also found that the statute does ***not*** state that "a [third party] grant is valid only if *negotiated* after the termination date." 675 F. Supp. at 861 (emphasis in original).

*Bourne* also rejected the plaintiff's legislative history argument, parroted by DC (MSJ 23), that § 304(c)(6)(D) is "'in the nature of a right of first refusal;'" for if Congress intended such a right, "it would have done so in clear language." 675 F. Supp. at 865; *see* 3 *Patry* § 7:47 (2010) ("[§304(c)(6)(D) is] sometimes erroneously

described as a 'right of first refusal'); *Milne,* 430 F.3d at 1048 ( "if Congress intended [a requirement] it would have clearly said so"). "[W]here the language of a statute is clear, that language, rather than 'isolated excerpts from the legislative history,' should be followed." *United States v. Granderson*, 511 U.S. 39, 74 n. 7 (1994).

Even if DC was correct that it somehow had a right of exclusive negotiation or first refusal, the 2008 Consent Agreement does not violate it because, as DC admits, the agreement does not grant copyrights but only "'requires … the consent of the Siegels and the Shuster Estate … to a settlement of their termination rights with DC.'"  MSJ 24; SGI ¶91.  The Shuster Estate is also unable to grant recovered copyrights to anyone but DC until after the effective 2013 termination date.

Moreover, the 2008 Consent Agreement has already been addressed here. After extensive briefing, Magistrate Judge Zarefsky rejected DC's arguments that the Consent Agreement is "an independent wrong [that] violates the Copyright Act" and found that it is a legitimate "Drysdale-Koufax collective approach to negotiation," and this Court duly upheld that ruling.  SGI ¶93.

Indeed, the decision to negotiate collectively with DC was in *direct* response to DC's hard-ball tactic of trying to get the Siegels and Shuster Estate to turn against and underbid one another.  SGI ¶89 ("[I]f we are able to resolve matters with the Siegel heirs … *before* we reach an agreement with you. . . there will not be any pressing need to reach an agreement with you.").  The heirs didn't fall for it, and understood that *united*, they were in a stronger bargaining position.  Nothing in § 304(c)(6)(D) prevents them from joining forces.

## B.    DC Lacks Standing To Bring Its Third Claim

DC's entire argument that it has standing is erroneously premised on the fiction that it has a statutory "right" (MSJ 24-25); but, because a terminated grantee, like DC, has "no rights under [§ 304(c)(6)(D)], [it] cannot sue for failure to comply, and the provision therefore does not provide a basis for standing."  6 *Patry on Copyright* § 21:18.  DC can point to nothing in the statute that creates a right, much

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1  less a remedy.  And unless Congress plainly showed "an intent to create not just a

2  private right but also a private remedy," then "a cause of action does not exist and

3  courts may not create one."  *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).

4  DC's citations (MSJ at 24) do not contradict this.  *See CBOCS West, Inc. v.*

5  *Humphries,* 553 U.S. 442, 450 (2008) (right to retaliation claims where Congress

6  specifically added statutory subsection to create right); H.R. Rep. 94-1476 at 127

7  (noting only that 17 U.S.C. §203 "*permit[s]* the original grantee … to negotiate a

8  new agreement with the persons effecting the termination") (emphasis added).

9  ### C. <u>The Third Claim Is Barred By The Statute Of Limitations</u>

10  DC's Third Claim for declaratory relief under the Copyright Act is subject to

11  17 U.S.C. § 507(b)'s three-year statute of limitations.  DC's Third Claim as to the

12  2001/2003 PPC Agreements is expressly based on *their text*.  *See* Dkt. No. 49 ¶169;

13  MSJ 23-25. DC is not saved by the "discovery rule" because the PPC Agreements

14  were voluntarily produced to DC in **November 2006**, and DC took depositions on

15  these agreements in 2006.  SGI ¶¶94-95.  DC's Third Claim thus expired in

16  **November 2009**, six months before this suit was filed.  DC's excuse that it was

17  unaware until it read the anonymous "Timeline" in 2008 does not hold up because

18  DC's claim is based on the PPC Agreements themselves and, in any event, DC's in-

19  house counsel admitted to reading the "Timeline" in 2006, as well.  SGI ¶96.

20  DC effectively concedes that its Third Claim is time-barred, unless saved by

21  the "continuing harm" doctrine.  MSJ 25.  DC has no continuing harm because the

22  PPC Agreements were expressly revoked in 2004 and have no continuing effect (SGI

23  ¶85) and, as shown above, the 2008 Consent Agreement does not violate anything.

24  ## III.  DC'S MOTION IS PROCEDURALLY DEFECTIVE

25  Defendants have asserted numerous affirmative defenses, including the statute

26  of limitations, estoppel, laches, preclusion, duress, and others, as to DC's First and

27  Third Claims. With the exception of a few affirmative defenses to the First Claim,

28  and the statute of limitations and lack of standing defenses to the Third Claim, DC

1   has neglected to move for summary adjudication on many affirmative defenses,

2   which are left for trial.  Therefore, DC's motion for summary judgment is

3   procedurally defective.  *See United States v. Bellecci*, 2008 WL 802367, at *4 (E.D.

4   Cal. Mar. 26, 2008) ("Since plaintiff has addressed none of [defendants'] affirmative

5   defenses, the merit of these claims remains for determination at trial."); *Meridian*

6   *Project Sys., Inc. v. Hardin Constr. Co.*, 426 F. Supp. 2d 1101, 1110 (E.D. Cal. 2006)

7   ("Because defendant's affirmative defenses were not raised in plaintiff's initial

8   summary judgment motion, the court will not address the issues raised by the

9   affirmative defenses; those defenses remain viable…").

10  ## CONCLUSION

11       For the foregoing reasons, DC's motion for summary judgment should be

12  denied, and summary adjudication granted in defendants' favor as to sub-parts (1),

13  (2) and (3) of DC's First Claim, at issue in its motion, and as to DC's Third Claim.

14   Dated:  July 30, 2012            RESPECTFULLY SUBMITTED,

15                                   /s/ Marc Toberoff

16                                   TOBEROFF & ASSOCIATES, P.C.
                                     Attorneys for Defendants Mark Warren Peary *et al.*

DEFENDANTS' OPPOSITION TO DC'S MOTION FOR PARTIAL SUMMARY JUDGMENT