UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK WARREN PEARY,<br><br>            Plaintiff,<br><br>v.<br><br>DC COMICS, INC.; DC COMICS; DC ENTERTAINMENT, INC.; WARNER BROS. DISCOVERY, INC.; and DOES 1-10,<br><br>            Defendants. | Case No. 1:25-cv-00910-JMF<br><br>**DECLARATION OF IAN MILL KC, INSTRUCTED BY THE DEFENDANTS, IN RELATION TO THE PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

I, Ian Mill KC, declare and state as follows:

1.    I am a self-employed barrister practising before the Courts of England and Wales. I joined the Chambers now known as Blackstone Chambers in 1982 and have continued in practice from there ever since then. In 1999, I was appointed Queen's Counsel (QC), a title which automatically changed to King's Counsel (KC) upon the death of Her Majesty Queen Elizabeth II.

2.    Throughout the past 40 years, I have specialised in advising on, and representing parties to, legal disputes in the fields of the creative arts including, in particular, music and film. Those disputes have for the most part raised issues of English contract and/or UK copyright law. In consequence, I believe that I have become and am fully conversant with the provisions of the UK copyright legislation enacted since the commencement of the 20th Century, insofar as such provisions appear that they may be relevant to these proceedings, and with the judicial authorities which have interpreted and applied them. Such authorities include the case of *Novello & Co Ltd v Keith Prowse Music Publishing Co Ltd* [2004] EWCA Civ 1776, a decision of the English Court of Appeal, which resolved an academically controversial issue about the impact of the introduction of the UK Copyright Act 1956 ("the 1956 Act") and, subsequently, the UK Copyright, Designs &

Patents Act 1988 ("the 1988 Act") on the effect of the proviso to Section 5(2) of the UK Copyright Act 1911 ("the 1911 Act") - the provision upon which the Plaintiff relies in these proceedings in asserting infringement of UK copyright by the Defendants. I represented the successful party in *Novello*.

3. A copy of my curriculum vitae is attached to this Declaration as **Exhibit A**.

4. The content of this Declaration, including my responses to the questions set out below, is based on my knowledge and experience as set out above. If called as a witness, I could and would competently testify as to such matters.

5. In preparing this Declaration, I have reviewed and considered the following documents:

- The Plaintiff's Complaint dated 31 January 2025;

- The Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction dated 28 February 2025;

- The Central District of California's decision in *DC Comics v. Pacific Pictures Corp.*, 2012 WL 4936588 (C.D. Cal. 2012) ("*Superman I*")

- The Ninth Circuit Court of Appeals' decision in *DC Comics v. Pacific Pictures Corp.*, 545 F. App'x 678 (9th Cir. 2013) ("*Superman II*").

6. I have been asked to provide my expert opinion on certain aspects of UK law that the Defendants consider to arise in the context of the Plaintiff's preliminary injunction motion. Specifically, I have been asked to address the following questions, as a matter of UK law:

- Is the 1938 Grant[1] by Joseph Shuster to DC Comics subject to reversion under the 1911 Act and/or the 1988 Act? (**Question 1**)

- If so, did the reversionary interest devolve to Jean Peavy—who was named sole heir and executor in Mr Shuster's will—when Mr Shuster died in 1992? (**Question 2**)

- If so, did Ms Peavy effectively assign that reversionary interest to DC Comics in the 1992 Agreement? (**Question 3**).

7. I have been asked to assume, for purposes of my responses to those questions in this Declaration, that:

- Joseph Shuster and Jerome Siegel "were the joint authors and the original joint owners" of an early Superman work (per paragraph 51 of the Complaint);

- This work was protected throughout by copyright in the UK;

- Mr Shuster and Mr Siegel conveyed all copyrights in this work (including any UK copyrights) to DC Comics in the 1938 Grant (as defined in the Complaint);

- Mr Shuster died on 30 July 1992;

- Mr Shuster's will named Jean Peavy as sole beneficiary and executrix of his estate, and Ms Peavy held herself out as such following Mr Shuster's death;

- Following Mr Shuster's death, Ms Peavy entered into the 1992 Agreement with DC Comics (as defined in the Complaint and annexed as Exhibit 2 thereto);

- Mr Shuster's estate had not been probated at the time of the 1992 Agreement;

- The Plaintiff was subsequently appointed as substitute executor of Mr Shuster's estate;

- The court in *Superman I* found and relied on several facts about Ms Peavy's status in rendering its decision, including that "Shuster had no wife or child, and his will

---

[1] For purposes of this Declaration, I adopt the terms "1938 Grant" and "1992 Agreement" as they are defined in the Plaintiff's Complaint.

- named his sister, Jean Peavy, as sole beneficiary and executrix of his estate," and that Ms Peavy held herself out as such in the wake of Mr Shuster's death, *Superman I*, 2012 WL 4936588, at *2;

- The courts in *Superman I* and *II* held that the 1992 Agreement "as a matter of New York law, superseded the 1938 assignment of copyrights to DC, and therefore operated to revoke that assignment and re-grant the Superman copyrights to DC," *Superman II*, 545 F. App'x at 680; *see also Superman I*, 2012 WL 4936588, at *4–7.

- The courts in *Superman I* and *II* held that the 1992 Agreement granted DC Comics "any" and "all" rights Ms. Peavy "may have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights . . . in any and all work created in whole or in part by [Mr Shuster]," *Superman I*, 2012 WL 4936588, at *4–7; *Superman II*, 545 F. App'x at 680–81;

- The U.S. Supreme Court thereafter denied a petition for writ of certiorari in the case, *Peary v. DC Comics*, 574 U.S. 923 (2014).

I confirm that the analysis and the responses that follow are predicated on these assumptions.

**(1)    SUMMARY OF RESPONSES**

8.    For the convenience of the Court, I summarise my responses to these questions as follows:

9.    **Question 1:** Under the UK reversion provisions (which I address in more detail below), an assignment of a copyright, or the grant of any interest in the copyright, in a work by its author, as the first owner of such copyright, made between 16 December 1911 and 1 June 1957, is subject to the reversionary interest specified in the proviso to Section 5(2) of the 1911 Act, whatever the purported term of such assignment or grant. The Plaintiff contends, in reliance upon such provision, that the copyright conveyed in the 1938 Grant by Mr Shuster to DC Comics reverted to Mr Shuster's legal personal representative in 2017 (25 years after his death). However, as I read them, the *Superman I* and *Superman II* decisions held, in the context of an issue between

the same parties and in relation to the same work over analogous termination rights under the US Copyright Act of 1976, that the 1992 Agreement had revoked the 1938 Grant and re-granted "all rights" that Mr Shuster's siblings "may have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights . . . in any and all work created in whole or in part by [Mr Shuster]" to DC Comics. In those circumstances, and as explained below, I would expect an English court, if faced with the issues raised by Question 1, to follow the logical consequences of those decisions and answer that question in the negative. If, as a matter of its construction, the 1992 Agreement re-granted all copyright interests to DC Comics, that must logically apply as much to any UK copyright as to the US copyright. That being the construction placed upon the 1992 Agreement, as it seems to me, by the two US decisions, an English court would accept as correct that construction and decide the case before it accordingly, whether on the basis of an issue estoppel or out of deference to the decisions of US courts in relation to an agreement, whose proper interpretation and effect would appear to be a matter of New York law (see *Superman II* at paragraph 1).

10.    **Question 2:** Under the UK reversion provisions, the reversionary interest devolves on the death of an author upon "his legal personal representative." The provisions do not define the expression "legal personal representative," but decided English court cases (identified below) confirm that, where an author has a will identifying an executor, that identified individual is the "legal personal representative" upon whom the reversionary interest devolves at the time of death (and notwithstanding the absence of any formal probate proceedings). Mr Shuster's will, as I understand it, named his sister, Jean Peavy, as his sole executor and heir. As a result, when Mr Shuster died in 1992, any reversionary interest in the work that may have existed at that time devolved upon Ms Peavy. That would have occurred in advance of the execution of the 1992 Agreement.

11.  **Question 3:** The UK reversion provisions expressly permit an author's legal personal representative to assign the reversionary interest at any time after the author's death—including before the expiration of the 25-year vesting period. No particular form of language is required to effect such an assignment. Ordinary principles of English contract law would apply as to the proper construction of the written instrument (subject to the express or implied incorporation of a foreign proper law). If there was a reversionary interest to assign at the time of the execution of the 1992 Agreement, I would expect an English court to conclude that it was validly assigned in that Agreement.

12.  I would like to make it clear that my current view is that the Plaintiff's UK infringement claim should fail for additional reasons under UK law which I am not asked to address in this Declaration.

13.  I now turn to expand, as necessary, upon the reasoning underpinning my responses as summarised above.

**(2)   COPYRIGHT REVERSION UNDER UK LAW**

14.  Copyright reversionary interest rights were introduced in the UK by the 1911 Act.[2] The relevant provision—Section 5(2) of the 1911 Act—states in relevant part ("the proviso"):

> "Provided that, where the author of a work is the first owner of the copyright therein, no assignment of the copyright, and no grant of any interest therein, made by him (otherwise than by will) after the passing of this Act, shall be operative to vest in the assignee or grantee any rights with respect to the copyright in the work beyond the expiration of twenty-five years from the death of the author, and the reversionary interest in the copyright expectant on the termination of that period shall, on the death of the author, notwithstanding any agreement to the contrary, devolve on his legal personal representatives as part of his estate, and any

---

[2] I understand that the Plaintiff's counsel has provided the Court with copies of the relevant UK Statutes, and therefore I do not separately attach them to this Declaration.

agreement entered into by him as to the disposition of such reversionary interest shall be null and void, but nothing in this proviso shall be construed as applying to the assignment of the copyright in a collective work or a licence to publish a work or part of a work as part of a collective work".

15. UK copyright law as set out in the 1911 Act has since been amended, in the first instance by the 1956 Act, and subsequently by the 1988 Act, which remains in full force and effect today. Both these latter Acts contain transitional provisions, which stipulate the extent to which the provisions of the previous legislation remain relevant.

16. In relation to the proviso, the Court of Appeal in *Novello* (see paragraph 2 above) decided that the effect of the transitional provisions of the 1956 Act was to render valid any assignment or grant of a reversionary interest made by an author as first owner of copyright after 1 June 1957 in respect of a pre-1956 Act work (i.e. a work to which the proviso had previously applied).

17. The 1988 Act retained the effect of the proviso in relation to grants and assignments that were made during the currency of the 1911 Act. It was silent as to the effect in that regard of the coming into effect of the 1956 act (thus, the need for *Novello*). The proviso had no effect in relation to assignments or grants after the coming into effect of the 1988 Act.

18. The relevant provision - paragraph 27 of Schedule 1 to the 1988 Act - states, in relevant part:

"(1) Where the author of a literary, dramatic, musical or artistic work was the first owner of the copyright in it, no assignment of the copyright and no grant of any interest in it, made by him (otherwise than by will) after the passing of the 1911 Act and before 1st June 1957, shall be operative to vest in the assignee or grantee any rights with respect to the copyright in the work beyond the expiration of 25 years from the death of the author.

(2) The reversionary interest in the copyright expectant on the termination of that period may after commencement be assigned by the author during his life but in the absence of any assignment shall, on his death, devolve on his legal personal representatives as part of his estate.

(3) Nothing in this paragraph affects—

(a) an assignment of the reversionary interest by a person to whom it has been assigned,

(b) an assignment of the reversionary interest after the death of the author by his personal representatives or any person becoming entitled to it, or

(c) any assignment of the copyright after the reversionary interest has fallen in."

19. Thus, the proviso continues to have its effect in relation to a grant or assignment by the author of a work, who was the first owner of its copyright, made between 16 December 1911 and 1 June 1957. The reversionary interest rights therefore continue to come into effect automatically, in relation to such a grant or assignment, 25 years following the death of the author.

20. The reversionary interest devolves upon the "legal personal representative" of the deceased author upon the author's death. The executor of a deceased author's estate is an example of a qualifying "legal personal representative." The prevailing view under UK law is that, if the deceased author has left a will, the reversionary interest passes automatically to the named executor upon the author' death. The named executor's rights derive from the deceased's will itself, rather than from a subsequent grant of probate; in other words, the grant of probate merely confirms that which has already been conferred: see *Redwood Music Ltd. v. B. Feldman & Co. Ltd.* [1979] RPC 1 at 5 (grant of probate offers *proof* of title, but the testator's will is *the source* of title), attached as **Exhibit B** to this Declaration; *Peer International Corp. v. Termidor Music Publishers Ltd*. [2006] EWHC 2883 (Ch) at 69 ("Probate merely proves the executors' title rather than conferring it."), attached as **Exhibit C** to this Declaration. The overarching principle that "an executor derives his title and authority from the will of his testator and not from any grant of probate," and

accordingly that "the personal property of the testator . . . vests in him upon the testator's death," has been clear for at least a century, following the decision of the House of Lords in *Meyappa Chetty v. Supramanian Chetty* [1916] 1 AC 603 at 608, which is attached as **Exhibit D** to this Declaration. (By contrast, had the deceased author died intestate, the reversionary interest would not vest in the administrator until letters of administration had been obtained: see *Peer International* (supra)).[3] For a further discussion of these principles, see *Redwood Music* (supra).

21.     Although the reversionary interest does not fall in until 25 years after the author's death, an author's legal personal representative may assign that interest at any time after the death of the author. There is, unsurprisingly, no requirement that the representative wait until the reversion actually takes effect: see *Chappell & Co. Ltd. v. Redwood Music Ltd*. [1981] R.P.C. 337, attached as **Exhibit E** to this Declaration, which at page 347 included the following passage about the proviso: the 1911 Act "made [it] impossible for the author either to assign or license, or to contract to assign or license, in manner extending into the reversionary 25 year period, *though his legal personal representatives (or a beneficiary after assent) can do so at any time after the author's death*" (emphasis added). See also *Copinger and Skone James on Copyright* (19th ed.)[4], the relevant excerpt from which (paragraphs 4-137 to 4-149) is attached as **Exhibit F** to this Declaration.

22.     There is no specific language that a legal personal representative must use in order to assign a reversionary interest. Ordinary principles of English contract law would govern the meaning of such a grant or assignment (subject to an express or implied choice of a foreign law by the parties).

---

[3] *Peer International* distinguishes *Redwood Music* in the context of intestacy. Its discussion of intestacy does not apply here because Mr Shuster left a will. Its brief observations on the position where there is a will are *obiter dicta*.

[4] A leading practitioners' textbook on UK copyright law.

**(3)**    **THE PLAINTIFF'S CLAIM BASED ON THE PROVISO**

23.    The Plaintiff contends that the copyright conveyed in the 1938 Grant by Mr Shuster to DC Comics reverted to him in 2017 (25 years after Mr Shuster's death). In assessing the merits of this contention from a UK law perspective, one threshold question is whether the Plaintiff has established the existence, as at the date of alleged reversion, of a qualifying grant or assignment by Mr Shuster as first owner of the copyright.

24.    It is my opinion that an English court, in addressing that question, would have particular regard to the Ninth Circuit's decision in *Superman II* "that the 1992 Agreement, as a matter of New York law, superseded the 1938 assignment of copyrights to DC, and therefore operated to revoke that assignment and re-grant the Superman copyrights to DC": 545 F. App'x at 680. If, based on the *Superman I* and *Superman II* decisions, an English court concluded that the 1938 Grant was extinguished in 1992, it would necessarily conclude that there was no eligible grant or assignment that would qualify for reversion under UK law at the relevant time, i.e., at the time of the Plaintiff's claimed reversion in 2017.[5] This would lead inevitably to the dismissal of the Plaintiff's UK infringement claim.

25.    In my opinion, an English court would be likely to follow those two US decisions as giving rise to an issue estoppel adverse to the Plaintiff, precluding him from re-litigating that issue and therefore from succeeding on his UK infringement claim.

26.    My reasoning takes into account the elements necessary for an issue estoppel to arise under English law. Those elements are as follows, see *Midland Bank Trust Co Ltd v Green* [1980] Ch 570 at 607 (CA) (**Exhibit G**):

---

[5] For the avoidance of doubt, the 1992 Agreement itself would not be subject to reversion, as it was both (i) made after 1957, and (ii) not made by the author.

    a.      The earlier decision, whether domestic or foreign, was judicial.

    b.      The earlier decision was pronounced.

    c.      The court pronouncing the earlier decision had jurisdiction over the parties and the subject-matter of the earlier case.

    d.      The earlier decision was final and on the merits.

    e.      The two cases had the same parties or their privies.

    f.      The later case raised an issue which (i) had been determined in the earlier case and (ii) had been fundamental (as opposed to incidental) to the outcome in the earlier case.

27.     By reference to those elements:

    a.      The earlier (US) decisions were clearly judicial and pronounced.

    b.      The fact that those were foreign court decisions was irrelevant: see *Carl Zeiss Stiftung v Rayner & Keeler Ltd & Ors* [1967] AC 853 at pages 917-918 and 966-967 (**Exhibit H**); *The Sennar* [1985] 1 WLR 490 at page 493 (**Exhibit I**). A foreign court's decision can give rise to an issue estoppel.

    c.      The decision-making tribunals clearly had jurisdiction over the parties and over the subject-matter of the case before them.

    d.      The decisions were final decisions on the merits.

    e.      The decisions determined a question raised in the later litigation, between the same parties or their privies, which was fundamental to the outcome of the earlier case.

28.     The last of these points requires some amplification. For an issue estoppel to arise, the issue in the second proceedings must be the same as in the first proceedings. In *Blair v Curran* (1939) 62 CLR 464 (**Exhibit J**), the High Court of Australia held (by a majority) that an estoppel arose in circumstances where the issue was the proper construction of a provision in a will and the earlier decision had construed the same provision, but in the context of a dispute as to different

property of the same estate.[6] By parity of reasoning, it seems to me that an English court would be likely to conclude that those decisions determined the same issue as arises in the present case – the same contractual provision was being construed in relation to essentially the same subject-matter (copyright in the work). The fact that the US decisions concerned US copyrights and US termination interests rather than UK copyrights and UK reversionary interests strikes me as immaterial. The central argument being advanced by the Defendants in the present case is the same as the central argument which prevailed in the earlier case in which the US decisions were pronounced. A decision on the proper construction of a contractual provision which refers to *"all rights"* in relation to copyright in a work logically is apposite whichever territorial subset of such rights is in play.

29. It is also necessary that the previous decision was determined by the outcome on that same issue - i.e. that the resolution of that issue was necessary for the earlier decision and fundamental to it. This requirement, having regard to the facts summarised in the previous paragraph, is likely to be found to be satisfied. If the issue is found by an English court to be the same, the outcome on that issue was centrally responsible for determining the earlier proceedings; the text of the US decisions makes this clear.

30. In my opinion, therefore, I would expect an English court to conclude that all the necessary elements for an issue estoppel were satisfied.

31. Even were that to prove not to be the case, so that an English court was not strictly bound by them, I would nonetheless expect an English court to regard those US decisions as highly persuasive authorities on the issue of construction of the 1992 Agreement, in particular as that Agreement is, it appears, governed by New York law, and I would expect an English court to defer to them. In so concluding, I have given independent consideration to the meaning of the provision

---

[6] See also *Badar Bee v Habib Merican Noordin & Ors* [1909] AC 615 (**Exhibit K**).

in question (from an English contract lawyer's perspective) and reached the same conclusion on the issue of construction as is to be found in the US decisions.

32. I would therefore expect an English court to answer **Question 1** (see paragraphs 6 and 9 above) in the negative – i.e., to conclude that the 1938 Grant is not subject to reversion under the 1911 Act and/or the 1988 Act.

33. In relation to my response to **Question 2** (see paragraphs 6 and 10 above), I consider that an English court would be likely to regard Ms Peavy as someone qualified to enter into the 1992 Agreement as assignor of the UK copyright in the work. The relevant legal elements are as set out in paragraphs 20 and 21 above. As to the facts, I am asked to assume that Ms Peavy was named in Mr Shuster's will as the executrix of his estate and his sole heir, that she held herself out as such, and that the *Superman I* decision found and relied on those facts.

34. On that basis, under U.K. law, it seems that any reversionary rights in relation to the work would have passed automatically and immediately to Ms Peavy upon Mr Shuster's death, as probate is not a prerequisite to devolution on an executor who is named in a will. Accordingly, I would expect an English court to answer **Question 2** (see paragraphs 6 and 10 above) in the affirmative – i.e., to conclude that any reversionary interest that did exist devolved to Ms Peavy upon Mr Shuster's death.

35. Accordingly it seems that an English court should find that Ms Peavy had the authority to assign away any such UK copyright reversion rights (to the extent any existed) at any time after Mr Shuster's death, as such assignments are permitted before the 25-year vesting period expires.

36.     Finally, as the US decisions determined that Ms Peavy in the 1992 Agreement assigned "any" and "all" rights in Superman to DC, the logical consequence of the US decisions is that Ms Peavy in the 1992 Agreement assigned any UK reversionary interest in Superman that she may have had (see the discussion and analysis in paragraph 28 above). The UK reversionary interest would form part of "any" and "all" copyright interests held by Ms Peavy. As explained in paragraph 22 above, no particular form of language is required to effect an assignment of a UK reversionary interest. Therefore, I would expect an English court to answer **Question 3** (see paragraphs 6 and 11 above) in the affirmative – i.e. to conclude that, if there was a reversionary interest to assign at the time of the execution of the 1992 Agreement, it was validly assigned by that Agreement.

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. Executed on __7__ April 2025.

BY: _____/s/ Ian Mill_____

Ian Mill KC