# EXHIBIT B

[No. 1]             **4th January 1979**             [1979] R.P.C.

IN THE HIGH COURT OF JUSTICE—QUEEN'S BENCH DIVISION

*Before*: MR. JUSTICE ROBERT GOFF

REDWOOD MUSIC LTD. *v*. B. FELDMAN & CO. LTD.

24th February, 1978

5    *Copyright — Pre-1957 works — Copyright Act 1911 — Reversionary interests — American authors now deceased — Assignment of copyright to plaintiffs prior to obtaining probate in U.K. — Whether assignment effective to pass title — Second assignment and second writ issued after letters of administration obtained—Actions consolidated — Title passed on first assignment.*

10    *Songs — Both words and music joint works — Works of joint authorship — Whether works of joint authorship collective works — Whether joint works fall within proviso to section 5(2) of the 1911 Act.*

*Copyright Act, 1911, sections 5(2), 16(1), (3), 35(1).*
*Copyright Act 1956, sections 2(2), 11(2), (3), 46(5), 50(1), (2), schedule 3, para.*
15 *2, schedule 7, paras. 9, 10(1), 28, schedule 8, paras. 4, 6, schedule 9.*

This was a further test action brought by the plaintiffs to determine their right to the copyright in certain songs. The full facts are set out in Redwood Music Ltd. *v*. Francis, Day & Hunter Ltd.*

Under the Copyright Act 1911, by the proviso to section 5(2), the copyright in
20 a work reverted to the author's legal personal representatives 25 years after his death notwithstanding any agreement to the contrary. This reversionary right did not extend to collective works. The Copyright Act 1956, schedule 7, para. 28 preserved the reversionary interests in pre-1957 works.

By an assignment, the plaintiffs claimed to hold the reversionary interest in a
25 song in which it was conceded that both the words and the music were the joint works of two authors. Both authors were American citizens and had died in the U.S.A. The beneficiaries of one of the authors assigned his undivided share in the copyright to the plaintiffs before probate had been granted in the U.K. The defendants claimed that the assignment was ineffective to pass title. Letters of
30 administration were granted to an attorney administrator and a second assignment

---

*Reported [1978] R.P.C. 429.

2

**Robert Goff, J.**     Redwood Music Ltd. *v.* B. Feldman & Co. Ltd.    [1979] R.P.C.

*executed. A second writ was issued in case the first assignment was ineffective. The two actions were consolidated.*

*The defendants contended with regard to the songs, (1) that all works of joint authorship were collective works within the meaning of section 35(1) of the 1911 Act and (2) that in any case the proviso to section 5(2) did not apply to works of joint authorship as under section 16(1) of that Act it could not be said in some cases with certainty until after the death of the second author when, or indeed whether, the copyright would revert to the personal representatives of the author who died first.*

*Held, (1) that the plaintiffs were the owners of the copyright in the song; the proviso to section 5(2) as preserved by the Act of 1956, applied to the assignment of the copyright in works of joint authorship.*

*(2) that the title to the individed share in the copyright devolved upon the personal representatives by virtue of the will of the author and not by virtue of a grant of probate in the U.K.; the letters of administration granted to the attorney administrator merely proved the document from which title was derived. Accordingly, the personal representatives and later, the beneficiaries had acquired good title to the undivided share on the death of the author and the first assignment was effective to pass title to the plaintiffs.*

Johnson *v.* Warwick (1856) 17 C.B. 516, Chetty *v.* Chetty [1916] A.C. 603, Ingall *v.* Moran [1944] K.B. 160, R. *v.* Inhabitants of Netherseal 4 T.R. 258, Haas *v.* Atlas Assurance Co. Ltd. [1913] 2 K.B. 209, *considered*. Attorney-General *v.* New York Breweries Co. [1899] A.C. 62, *distinguished*.

*(3) that the first part of paragraph (c) of section 35(1) of the 1911 Act refers to collaborative works (other than works of joint authorship) whereas the second part refers to works in which contributions by others are incorporated by a third party. Consequently, where the words and music of a song are written jointly by two authors whose contributions are not distinct, section 35(1) did not apply nor could it be said that a song in which the words and music are written in distinct parts by the same, as opposed to different, authors was a collective work.*

*(4) that although practical problems arose in the application of section 16(1) (which governs the duration of the copyright in joint works) so that in some circumstances it may be impossible to know at the time of the death of the author who dies first when the reversionary interest expectant will revert to his legal personal representatives or indeed revert at all, this merely affected the value of the expectancy and not its existence. There was no reason, therefore, why the complications inherent in the application of section 16(1) to the proviso should inexorably lead to the conclusion that the proviso did not apply to works of joint authorship.*

No further authorities were referred to in the judgment.

*F. M. Drake, Q.C.* and *J. Camp* instructed by *Denton, Hall & Burgin* appeared on behalf of the plaintiffs. *Owen Stable, Q.C.* and *J. F. Mummery* instructed by *Joynson-Hicks* appeared on behalf of the defendants.

**Robert Goff, J.**—On 21st February 1977 I gave judgment in *Redwood Music Ltd.* v. *Francis, Day and Hunter* and other actions: [1978] R.P.C. 429. Those

Case 1:25-cv-00910-JMF   Document 51-2   Filed 04/07/25   Page 4 of 19

consolidated actions were designed to test a number of issues relating to reversionary interests in the copyrights in a large number of songs, the reversionary interest in question being that which arises under the proviso to section 5(2) of the Copyright Act 1911. This action is yet another test action in the same series, designed
5  to obtain a decision on one further point on the reversionary interest.

I have been told that an appeal is pending in the Court of Appeal against my decision in the consolidated actions. The intention is that my decision in the present case should be taken to the Court of Appeal and that the appeal should be argued at the same time as the appeal in the consolidated actions. This case is
10 really no more than an appendix to those actions. I do not propose, therefore, to repeat in this judgment the background to the Copyright Act 1911. It is enough for me to record that the Act of 1911 was an amending and consolidating Act which made far-reaching changes in the law of copyright, and in particular extended the term of copyright to the period of the life of the author plus fifty years.
15 Section 5(2) of the Act of 1911 is concerned with assignment, and provides that the owner of the copyright in any work may assign the right and may grant any interest in the right by licence, subject to the various provisions contained in the subsection. The proviso to the subsection is, in the present action as in the consolidated actions, the most relevant provision of the Act. It reads as follows:

20     "Provided that, where the author of a work is the first owner of the copyright therein, no assignment of the copyright, and no grant of any interest therein, made by him (otherwise than by will) after the passing of this Act, shall be operative to vest in the assignee or grantee any rights with respect to the copyright in the work beyond the expiration of twenty-five years from the
25     death of the author, and the reversionary interest in the copyright expectant on the termination of that period shall, on the death of the author, notwithstanding any agreement to the contrary, devolve on his legal personal representatives as part of his estate, and any agreement entered into by him as to the disposition of such reversionary interest shall be null and void, but nothing
30     in this proviso shall be construed as applying to the assignment of the copyright in a collective work or a licence to publish a work or part of a work as part of a collective work".

It will be observed that the concluding words of the proviso exclude from its application "the assignment of the copyright in a collective work or a licence to
35 publish a work or part of a work as part of a collective work". In the consolidated actions I had to decide whether a song, of which the words were written by one author and the music composed by another, was a collective work and so excluded from the application of the proviso. In this case I have to decide whether a song of which both the words and the music are works of joint authorship as defined
40 by section 16(3) of the Act of 1911 is likewise excluded. This question had been touched upon in the course of the argument in the consolidated actions; and in my judgment I expressed an opinion on the status of works of joint authorship in one sentence, which was clearly no more than an obiter dictum. Since the question is now raised for decision for the first time, I have of course treated the question as
45 res integra, unaffected by my recently expressed opinion on the subject.

In order to raise this question for the decision of the court, the plaintiffs (whom I shall refer to as "Redwood") selected one song, "Just like a Gypsy", written and composed in about 1919, of which the words were jointly written by Nora Bayes

4

**Robert Goff, J.      Redwood Music Ltd. *v.* B. Feldman & Co. Ltd.      [1979] R.P.C.**

and Seymour Simons, and the music was also jointly composed by the same two persons, who were both citizens of the United States, and who were as authors the first owners of the copyright under the Act of 1911 in both words and music. It is not in dispute that, under the Act of 1911, there were two separate copyrights— one in the literary work constituted by the words, and the other in the musical work constituted by the music. It is also not in dispute that both the words and the music were produced by the collaboration of Nora Bayes and Seymour Simons, and that the contributions of the two to the words are not distinct from each other, and that likewise their contributions to the music are not distinct from each other. It follows, as is also undisputed, that the words and music each constitute a work of joint authorship as defined by section 16(3) of the Act of 1911; and that on the creation of the song Nora Bayes and Seymour Simons each owned (as tenants in common) an equal undivided share in the copyright in the words, and in the copyright in the music. In the action now before me Redwood claim a number of declarations, including a declaration that they are the owners in the United Kingdom of the entire and exclusive copyright and of all other rights of a like nature in the song "Just like a Gypsy", and in the words and music thereof. The substance of their claim is that the proviso to section 5(2) is applicable to the assignment of a work of joint authorship; that, although there had been an earlier assignment by the joint authors of the copyrights in the words and music of the song to publishers (the defendants or their predecessors in title), nevertheless by virtue of the proviso to section 5(2) the reversionary interests in the equal shares in the copyrights in both words and music had devolved upon the legal personal representatives of each author (Nora Bayes having died on 19th March 1928 and Seymour Simons on 12th February 1949) and, by virtue of the assent of such personal representatives, the beneficiaries under their respective wills; that by virtue of certain provisions of the Copyright Act 1956 (to which I shall refer in due course) there had been substituted for such copyrights, copyrights subsisting under the Act of 1956, and that such substitution (although it affected the length of the period of the copyrights) did not affect the title of the beneficiaries to their shares therein; and that by virtue of certain assignments made in 1974, 1976 and 1977, title passed from such beneficiaries to Redwood. It transpired however that, although they had selected a song which indisputably consisted of works of joint authorship, nevertheless in the case of neither the will of Nora Bayes nor the will of Seymour Simons had a grant of probate or letters of administration been obtained in this country before the assignments to Redwood were executed, or indeed before the present action was commenced (on 23rd September 1977). It was contended by the defendants (whom I shall refer to as "the Publishers") that Redwood were for this reason unable to prove any title to the copyright in the words or music of the song. Redwood sought to overcome this difficulty by obtaining a grant of probate of both wills in this country. However they did not in fact succeed in doing so. In the case of the will of Nora Bayes, they gave up the attempt because the varied matrimonial career of the testator rendered the necessary American proceedings inordinately expensive. In the case of the estate of Seymour Simons, it was believed that they had (despite delays caused by the recent blizzards in the United States) succeeded in their attempt three days before the commencement of the hearing, on Friday 10th February; but it transpired that what they had in fact obtained was a grant of letters of administration with the will annexed, such grant being made to a Mr. Catherall who had been appointed as attorney for this purpose by Ruthven Simons, the son of Seymour Simons, who had on 6th February 1978 obtained an order in the Probate Court of the State of Michigan appointing him Administrator de bonis non with will annexed, for this very purpose.

Against this background, there developed a substantial argument between the parties on the question whether Redwood had established any title, at the date of the commencement of the action to the late Seymour Simons' share in the copyrights in the words and music of the song. Redwood recognised that, since they had not in any event proved the will of Nora Bayes, they could not establish any title to her shares in the copyrights; and they also recognised that, if they failed to establish their title to Seymour Simons' shares in the copyrights, then anything that I might say on the subject of the application of the proviso to section 5(2) of the Act of 1911 to an assignment of the copyrights in a work of joint authorship would be obiter. To meet that difficulty, they issued a second writ after the date of the grant of letters of administration to Mr. Catherall and after an assignment by Mr. Catherall to Redwood purporting to assign to Redwood the late Seymour Simons' shares in the copyrights; and I made the necessary order to enable the two actions to be dealt with at the same time. It is accepted by the Publishers that, if they are right on their submission as to title in the first action, then Redwood are able to establish a good title in the second action. The result is that, in these proceedings, the question of title only goes to costs; though the Publishers have expressed an interest in a decision on the question of title, as affecting other songs. It has been agreed that, if I should decide the question of title against Redwood in the first action, I should dismiss that action, but indicate that, had I decided the question of title in Redwood's favour in the first action, I would have decided the point on works of joint authorship as I have decided it in the second action; and that I should then give my decision on that point in the second action. On the other hand, should I decide the question of title in Redwood's favour in the first action, I should then proceed to decide the point on works of joint authorship in that action; and I should dismiss the second action, while indicating that, had I decided the point on title in the first action differently, my decision on the point on works of joint authorship in the second action would have been the same as my decision on that point in the first action.

I turn therefore to consider the question of title in the first action. The dispute between the parties was as follows. It was accepted by both parties that, where an English domiciled testator dies leaving personal property situated in this country, then on the testator's death such personal property will vest in his executors who derive their title from the will. Of course, if it becomes necessary for the executors to prove title to the property, a grant of probate must be produced, because only by virtue of such a grant can the will (and therefore the executors' title) be proved in a court of law. Only by such means, to use the vivid words of Jervis, C.J. in *Johnson* v. *Warwick* (1856) 17 C.B. 516 at 522, has the court "the legal optics through which to look at [the will]". If a grant of probate is not obtained until after the date of commencement of the proceedings, this does not mean that the executors cannot prove their title as at that date; their title has derived from the will, not from the grant of probate, and provided that the death of the testator occurred before the date of the commencement of the proceedings, it makes no difference that the proof of their title, i.e. the grant of probate, came into existence at a later date. It was also accepted by both parties that the position would be different in the case of an administrator. An administrator derives his title from the grant. The property of the deceased vests in him only from the date of the grant, though for some purposes, for example the pursuit of remedies in respect of wrongs committed against the property between the date of the deceased's death and the date of the grant, the letters of administration relate back to the date of the deceased's death. Accordingly, if before the date of the grant he should commence

6

**Robert Goff, J.**     *Redwood Music Ltd. v. B. Feldman & Co. Ltd.*     **[1979] R.P.C.**

proceedings in respect of any of the deceased's assets, he will be unable to prove any title to those assets as at the date of the commencement of the proceedings. See *Chetty* v. *Chetty* [1916] A.C. 603 at 608 per Lord Parker; and *Ingall* v. *Moran* [1944] K.B. 160.

It is against the background of this distinction that the argument developed in the present case. Mr. Stable advanced the following submissions on behalf of the Publishers. Under the proviso to section 5(2) of the Act of 1911, the reversionary interest in copyright devolves, on the death of the author, upon his legal personal representatives as part of his estate. Copyright subsisting under the copyright legislation in this country is property situate in this country; and the only person whom the English courts will recognise as the legal personal representative of a deceased person in respect of assets situate in this country is a person to whom an English grant of probate or letters of administration has been made. No such person, he submitted, existed in the present case until the grant of letters of administration to Mr. Catherall a few days before the commencement of the hearing. Only an assignment executed by him, or by persons deriving title from him, would be effective to pass title in Seymour Simons' shares in the copyrights to Redwood.

To this Mr. Drake, for Redwood, submitted that the words "legal personal representatives" in the proviso to section 5(2) were wide enough to include the executors appointed in Mr. Simons' will. The beneficiaries derived their title from Mr. Simons, through his executors and by virtue of their assent, and the beneficiaries (or those deriving title from them) were able subsequently to give a good title to the shares in the copyrights in the song to Redwood. The only purpose of the grant to Mr. Catherall of letters of administration with will annexed was to prove the will; for this purpose, it did not matter that the grant of letters of administration was not obtained until after the commencement of the action, because Redwood derived their title not from Mr. Catherall, but from the beneficiaries under the will.

The point therefore raises the question: where a person domiciled in a foreign country, for example the United States of America, dies leaving a will, does English law only recognise the title to his personal property situated in this country to vest in his legal personal representatives upon either a grant of probate or a grant of letters of administration in this country? I must confess that I expected to find some clear authority cited to me on this question; but there was a surprising lack of clear guidance to be gained from the text-books, and the decided cases cited to me do not appear, at first sight at least, to speak with a united voice.

I start with the position that, had Mr. Simons died domiciled in this country, his shares in the copyrights subsisting under the Act of 1911 would have vested on his death in his executors. He in fact died domiciled abroad, apparently in the State of Michigan. He died testate, appointing three executors in his will. There is no evidence before me that the law of the State of Michigan is different in any material respect from the law of this country. In these circumstances I can see no good reason why, in principle, the title to Mr. Simons' shares in the copyrights should not have vested on his death in his executors appointed in his will. Indeed, if they did not do so, it would appear that the title vested in nobody until the grant of letters of administration to Mr. Catherall a few days ago, this not being a case where, as in the case of an intestacy, the title vests in the President of the Family Division. Such a conclusion would be surprising, since generally the law knows no interval between the testator's death and the vesting of title in his executors.

[No. 1]                    **Queen's Bench Division**                    Robert Goff, J.

In *Tristram and Coote's Probate Practice,* 25th Edition at page 415, there is a passage founded primarily upon Rule 29 of the Non-contentious Probate Rules, in which it is stated that :

> "where the will of a testator, whatever his domicile, is admissible to proof in England and Wales and is in the English or Welsh language, any executor named therein is accepted as having the full rights of executorship. He may obtain probate of the will, or if he resides out of England and Wales he may appoint an attorney or attorneys to obtain administration (with will) for his use and benefit...".

This statement I accept. It follows that an executor appointed in a will made in the English language by a foreign domiciled testator may obtain probate of the will in this country. The grant of probate proves the will; it does not confer title on the executor, but proves the document from which he derives his title. In the case of an attorney administrator, the will is proved by the letters of administration with will annexed, this being another method by which in English law a will may be proved (see *R.* v. *Inhabitants of Netherseal* 4 T.R. 258 at 260, per Lord Kenyon).

That this is the law, appears to have been accepted by Scrutton, J. (as he then was) in *Haas* v. *Atlas Assurance Co. Ltd.* [1913] 2 K.B. 209. Section 19 of the Revenue Act 1889 provided that "where a policy of life assurance has been effected with any insurance company by a person who shall die domiciled elsewhere than in the United Kingdom, the production of a grant of representation from a court in the United Kingdom shall not be necessary to establish the right to receive the money payable in respect of such policy". The plaintiff, the testamentary executor by Swiss law of a Mr. Haerle who was the assured under certain life policies effected with an English insurance company and who died domiciled in Switzerland, brought an action in this country against the insurance company to recover the sums due under the policy, without obtaining a grant of probate in this country. Scrutton, J. held that he was entitled to succeed in the action. The policies made the policy sums payable to the "executors administrators or assigns" of the assured; the plaintiff was within the description "executors or administrators", and as such had established his right to receive the money. In his judgment, Scrutton, J. considered that, under the law as it existed before the passing of section 19 of the Revenue Act 1889, the plaintiff would have had to produce a grant of representation from a court in the United Kingdom by virtue of section 11 of the Revenue Act 1884, the purpose of that section being to ensure that the duty payable in this country on the policy moneys was recovered by the Revenue. But although that was the purpose of that enactment, the effect of the grant was "to establish the right" to recover or receive the personal estate of the deceased person situate in the United Kingdom. These words appear to have been understood by Scrutton, J. to mean, not "to confer the right" upon the claimant, but to "prove the existence of the right". He said (at pages 217-18 of the report) :

> "On behalf of the plaintiff it is said that he has established the right to receive this money, and that the former law which would have prevented him from establishing such a right unless he produced a grant of representation from a court in the United Kingdom has been expressly repealed by section 19 of the Revenue Act of 1889. In other words, the legal optics of the court (to quote the phrase of Jervis, C.J.) had been supplemented by statutory spectacles which enabled the court to see that which it could not see previously without

1—B

8

**Robert Goff, J.**    Redwood Music Ltd. *v.* B. Feldman & Co. Ltd.    **[1979] R.P.C.**

the assistance of a grant of representation from a court of the United Kingdom".

That submission the learned judge accepted. Furthermore, section 19 of the Revenue Act 1889, which dispensed with the need to produce a grant of representation from a court of the United Kingdom, appears itself to have presupposed that the executor of a foreign domiciled testator could establish his title without such a grant, which must mean that he could derive his title from the testator himself. If this is right in the case of an English court in action such as a right to claim money under an English policy of assurance, I do not see why it should not also be right in the case of English personal property in the nature of copyright.

Of course, the proviso to section 5(2) of the Copyright Act 1911 provides that the reversionary interest referred to in the proviso shall devolve on the "legal personal representatives" of the author as part of his estate. If, as I think, English copyright which forms part of the estate of a testator who dies domiciled abroad can vest in the executors appointed in his will, without any grant of probate or letters of administration in this country, then I can find nothing in the Act of 1911 which compels me to conclude that the words "legal personal representatives" in the proviso should not be wide enough to include persons in whom the personal property of the author vests on his decease, whether they are legal personal representatives under English law or not. Indeed, to read those words as restricted to legal personal representatives under English law may have the effect in some cases of defeating the proviso, which provides that the reversionary interest shall devolve on the legal personal representatives on the death of the author, whereas on Mr. Stable's argument the interest may only devolve, in a case such as the present, on a grant of probate or letters of administration in this country.

Mr. Stable, in support of his submission relied upon certain passages in *Williams and Mortimer on Executors, Administrators and Probate*. At page 45 of that work, it is stated (citing *Attorney-General* v. *New York Breweries Co.* [1899] A.C. 62) that:

"A foreign grant of probate or administration or other foreign authority does not authorise dealings with English property: a foreign personal representative who intermeddles with English assets without obtaining an English grant is therefore liable as executor de son tort".

Again at page 106 it is stated (citing the same authority) that:

"Although the English courts, in general, recognise foreign grants as impelling them to make a grant of the same or similar nature here, a foreign grant has no direct effect in this country. Consequently a person entrusted with a grant abroad must obtain one here before he may take any proceedings in the courts in England as the personal representatives of the deceased".

Mr. Stable, in support of his submission also relied strongly on the *New York Breweries* case cited in Williams and Mortimer. In that case, a testator died domiciled in the State of New York. He owned certain shares and debentures in an English company. His executors, without obtaining a grant of probate or letters of administration in this country, and intending never to do so, instructed the com-

**[No. 1]**                  **Queen's Bench Division**                  **Robert Goff, J.**

pany to transfer the shares and debentures to them. The purpose was obviously to avoid the payment of the duty which became payable upon the grant of probate. The company, in order to ascertain what its obligations were, transferred a single share and a single debenture to the executors. This, as was intended, resulted in a test action, in which the question to be decided was whether there had been revealed a legitimate method of avoiding duty. In the Queen's Bench Division, the Crown tested the position by claiming penalties from the company under an Act of George III, on the ground that the company had taken possession of or administered part of the personal estate of a deceased person without obtaining probate or letters of administration within six months of his death as required by the Act. In the Court of Appeal and the House of Lords, however, the Crown did not ask for penalties but claimed duty on the ground that the company had intermeddled with the testator's property in this country and, having thus constituted themselves executors do son tort, had rendered themselves liable to pay duty to the extent of the assets administered by them in this country. The Crown failed in the Queen's Bench Division, but succeeded in both the Court of Appeal and the House of Lords. There are passages in the judgment of A. L. Smith, L.J. in the Court of Appeal and in the speech of the Earl of Halsbury in the House of Lords which were relied upon by Mr. Stable. For example, A. L. Smith, L.J. stated (see [1898] 1 Q.B. 205 at 217):

> "But in the present case the American will as regards these English assets had no validity whatever in this country, nor had the American executor any right under it to receive the testator's assets here. Until they had taken out representation to their testator in this country, they were pure strangers to the English assets".

In the House of Lords, Lord Halsbury referred (see [1899] A.C. 62 at 71) to the fact that the company "knew that by the entry in their register which they made they enabled property to be diverted from one person who, in this country, was by law entitled to it, to another person who had no such title at all". Even so, I do not consider that the question whether the New York executors had in law title to the personal property in question (the shares and debentures) arose for decision in that case; because in any event since the executors (on the facts found or assumed) had no intention of ever obtaining a grant of probate in this country, their title (if any) could never be established by the English company. It is striking that in the Court of Appeal, both Rigby and Collins, L.JJ. decided in favour of the Crown on the basis, not that the New York executors had no title, but that their title (if any) could not be proved. Thus Rigby, L.J. (at page 221) said of the will that it "cannot be looked at or given in evidence until representation is taken out here", and said of the executors that they "cannot be recognised by our law as representatives of the deceased, and on the hypothesis never intend to be representatives here". Similarly, at page 224, Collins, L.J. said "it is immaterial in this view whether they are named in the will or not, as the court cannot be informed upon this fact except through the medium of probate". I read the speech of Lord Shand in the House of Lords (at pages 74-5) to be to the same effect; and I consider that, read as a whole, the judgment of A. L. Smith, L.J. in the Court of Appeal, in which he stresses the intention of the executors not to apply for probate in this country, should also be understood to the same effect, which is consistent with the submission of the Attorney-General for the Crown before the Court of Appeal (see page 210). I regard these passages as illustrative of the fact that the question whether the New York executors had title to the shares and debentures

10

**Robert Goff, J.**     Redwood Music Ltd. *v.* B. Feldman & Co. Ltd.     [1979] R.P.C.

did not arise for decision, it being sufficient for the decision that the company knew that such title (if it existed) would not be established.

I therefore conclude that the *New York Breweries* case does not assist the Publishers in the present case; and that for the reasons I have already given, the executors named in Mr. Seymour Simons' will acquired on his death a good title to the reversionary interest (if any) in his shares in the copyrights in the song which devolved upon his legal personal representatives by virtue of the proviso to section 5(2) of the Act of 1911.

Mr. Stable took one further point on title. He submitted that, even if he was wrong in his primary contention, Redwood had failed to establish any assignment from the executors named in Mr. Seymour Simons' will to the beneficiaries from whom Redwood claimed to derive their title. I must confess to a little surprise at this point being taken, having regard to the correspondence which had passed between the solicitors to the parties. But in any event there is, in my judgment, no substance in the point. Under English law, what is required to pass title in personal property to beneficiaries is not an assignment by the executors but an assent by them; and such an assent may be implied from the executors' conduct. There is no suggestion that the law of Michigan is in any way different from the law of this country in this respect. There is ample material before the court in the present case from which such an assent may be implied; and, if there was no express assent, I am certainly prepared to hold that there was an implied assent.

I therefore decide the issue of title in Redwood's favour in the first action; and I turn now to consider, in the first action, the main issue in the case, which is whether an assignment of the copyright in a work of joint authorship is caught by the proviso to section 5(2) of the Act of 1911, as preserved in the Copyright Act 1956, or is excluded from the proviso, either because the proviso on its true construction does not apply to such an assignment, or because such an assignment is an assignment of the copyright in a collective work and so is excluded from the operation of the proviso by its concluding words.

It is to be observed that the proviso as now applicable is strictly speaking the proviso as preserved in the Act of 1956. Section 46(5) of the Act of 1956 provides that, subject to the preceding provisions of the section (which are immaterial for present purposes), "no copyright, or right in the nature of copyright, shall subsist otherwise than by virtue of this Act or of some other enactment in that behalf." By section 50(2), subject to the transitional provisions referred to in section 50(1), the enactments specified in the Ninth Schedule to the Act were repealed to the extent there specified; the Acts so repealed included the whole of the Act of 1911, except for three sections which are immaterial for present purposes. For the extent to which the proviso to section 5(2) of the Act of 1911 has been preserved, we have to turn to the transitional provisions, which are contained in the Seventh Schedule to the Act of 1956. The relevant paragraph of that Schedule is paragraph 28, which provides as follows:

"(1) Where by virtue of any provision of this Act copyright subsists in a work, any document or event which—

(a) was made or occurred before the commencement of that provision, and

  (b) had any operation affecting the title to copyright in the work under the Act of 1911, or would have had such an operation if the Act of 1911 had continued in force

shall have the corresponding operation in relation to the copyright in the work under this Act...."

. . . . . . .

(3) Without prejudice to the generality of sub-paragraph (1) of this paragraph, the proviso set out in paragraph 6 of the Eighth Schedule to this Act (being the proviso to subsection (2) of section 5 of the Act of 1911) shall apply to assignments and licences having effect in relation to copyright under this Act in accordance with that sub-paragraph, as if that proviso had been re-enacted in this Act...."

. . . . . . .

It is not disputed that, after the commencement of the Act of 1956, copyright subsisted in the words and music of the song "Just like a Gypsy" by virtue of the Act of 1956. It is also not in dispute that the original assignment to the Publishers, or their predecessors in title, was a document which was made before the commencement of the relevant provisions of the Act of 1956, and had an operation affecting the title to copyright in the words and music of the song under the Act of 1911. It follows that the assignment had, by virtue of paragraph 28(1), the "corresponding operation" in relation to the copyrights in the song under the Act of 1956. It further follows that, without prejudice to the generality of paragraph 28(1), the proviso set out in paragraph 6 of the Eighth Schedule (which is the proviso to section 5(2) of the Act of 1911) applied to the assignment as if that proviso had been re-enacted in the Act of 1956. That is how the proviso continues to have effect in relation to a pre-1956 assignment of copyrights which now only subsist by virtue of the Act of 1956.

Before I turn to consider the main question in the case, which is essentially a question of construction of the proviso, I must say a few words about works of joint authorship. As I have already indicated, works of joint authorship are the subject of section 16 of the Act of 1911, and it is not in dispute that both the words and music of "Just like a Gypsy" are works of joint authorship as defined by section 16(3) of that Act. Accordingly, copyright in the words and music originally subsisted by virtue of the Act of 1911. There was one copyright in the words, and one in the music. Each copyright was owned by Nora Bayes and Seymour Simons as tenants in common, with the effect that, until the original assignment to the Publishers or their predecessors in title, each had an equal but undivided share in the single copyright in the words and likewise in the single copyright in the music. Upon the assignment, the whole copyright vested in the Publishers, or their predecessors in title, subject to the effect of the proviso to section 5(2), if applicable. The copyright, under the Act of 1911, was (by virtue of section 16(1)) for "the life of the author who first dies and for a term of fifty years after his death, or during the life of the author who dies last, whichever period is the longer." This is a period which could only finally be determined on the death of the longer-lived author; though since it must be very rare for one joint author to survive the other by more than fifty years, the period of copyright in a work of joint authorship under the

**Robert Goff, J.**     Redwood Music Ltd. *v.* B. Feldman & Co. Ltd.     [1979] R.P.C.

Act of 1911 must almost invariably be the life of the author who died first plus fifty years after his death. In the present case, the first author to die was Nora Bayes (who died on 19th March 1928). It follows that the copyrights had not expired when the Act of 1956 came into force, and continued to subsist, as copyrights under the Act of 1956 by virtue of section 2(2) of that Act. In the Act of 1956, a work of joint authorship is defined in section 11(3); there are minor differences between the definitions in the two Acts, but they are not material. By section 11(2) of the Act of 1956, the provisions of the Third Schedule shall have effect with respect to works of joint authorship. The effect of paragraph 2 of the Third Schedule is that, in the case of works of joint authorship, the period of copyright is now prolonged to the end of the period of fifty years from the end of the calendar year in which the death of the author who dies last occurs, though if the copyright had already expired before the commencement of the relevant provisions of the 1956 Act, it was not revived to obtain the benefit of that longer period (see paragraph 10(1) of the Seventh Schedule).

I now turn to consider the proviso to section 5(2) and the question whether an assignment of the copyright in a work of joint authorship is caught by the proviso. I shall first consider this question in relation to the proviso as enacted in the Act of 1911; and I shall then consider whether any different conclusion is to be reached in relation to the proviso as preserved in the Act of 1956.

The first submission of Mr. Stable on behalf of the Publishers was that all works of joint authorship are collective works, and that since assignments of copyright in collective works are expressly excluded from the proviso, it can have no application to an assignment of copyright in a work of joint authorship. Now there is a definition of "collective work" in section 35(1) of the Act of 1911, which provides that in that Act, unless the context otherwise requires, collective work means:

"(*a*) an encyclopaedia, dictionary, year book, or similar work;

(*b*) a newspaper, review, magazine, or similar periodical; and

(*c*) any work written in distinct parts by different authors, or in which works or parts of works of different authors are incorporated".

A work of joint authorship is defined in section 16(3) of the Act of 1911 as "a work produced by the collaboration of two or more authors in which the contribution of one author is not distinct from the contribution of the other author or authors". In my judgment, it would be straining the words of the definition of "collective work" far beyond their natural and ordinary meaning to hold that the definition embraces all works of joint authorship. Obviously, the Publishers can derive no assistance from paragraph (*a*) or paragraph (*b*) of the definition, and they did not seek to do so. They have to rely upon the more general words in paragraph (*c*). This paragraph falls into two parts. The first part refers to "any work written in distinct parts by different authors"; such a work surely differs from a work of joint authorship, in which the contributions of the authors must be "not distinct" from each other. Nor can the second part of the paragraph, which refers to "any work . . . in which works or parts of works of different authors are incorporated", assist the Publishers. It cannot be said, to take the example of "Just like a Gypsy", that works by Nora Bayes and Seymour Simons were incorporated into the words or music of the song, nor that parts of works by Nora Bayes and Seymour Simons were incor-

porated into the words or music of the song. Mr. Stable submitted that, since the word "work" means a creation of human endeavour in which copyright does not necessarily subsist, I should hold that taking for example the music of the song, a work or part of a work of both authors was incorporated in that music. I do not
5 consider that the words of the second part of the paragraph can be so construed. In my judgment, these words contemplate the existence of two or more distinct works by separate authors, and the incorporation of the whole or part of each of those works into a larger work. I still incline to the opinion, which I expressed in my judgment in the consolidated actions, that the first paragraph (c) of the definition
10 of collective work refers to collaborative works (other than works of joint authorship), whereas the second part refers to works in which contributions by others are incorporated by a third party. Furthermore, Mr. Stable's submission does not give effect to both parts of the paragraph: indeed, he was constrained to admit that, if his construction of the second part of the paragraph was correct, the first part
15 was surplusage. This may be a convenient result for his clients, since it disposes of that part of the paragraph which most obviously excludes works of joint authorship; but in construing a section in an Act of Parliament, the court should, so far as possible, give effect to all parts of the section. Furthermore, had it been the intention of Parliament to exclude assignments of the copyright in works of joint
20 authorship from the operation of the proviso of section 5(2), I cannot help thinking that the proviso would have been drafted differently. Since the Act contains a definition of works of joint authorship, the most obvious course would have been to exclude assignments of the copyright in such works expressly, in the same way as assignments of the copyright in collective works have been excluded. But if it was
25 the intention to exclude them by defining a collective work in such a way as to include all works of joint authorship, I am quite sure that the definition of collective works would have taken a very different form from the definition in section 35(1) of the Act.

There was one last point which Mr. Stable, for the Publishers, advanced under
30 this head. He submitted that, even if neither the words nor the music of "Just like a Gypsy" was a collective work, nevertheless the song itself was. In this connection, he relied upon the first part of paragraph (c) of the definition, submitting that the song was a work written in distinct parts by different authors, the distinct parts being the words and music. The short answer to this argument is, in my judgment,
35 that the words and music were both written not by different authors but by the same authors, i.e. by Nora Bayes and Seymour Simons.

In his submission Mr. Stable urged upon me the unpractical results that might flow from holding that a song, in which the words were written by one author and the music by another, was a collective work with the effect that assignments in the
40 copyrights in such words and music were excluded from the operation of the proviso, whereas a song, such as "Just like a Gypsy", in which the words and music were both works of joint authorship, was not. Both, he said, are works of multiple authorship; assignments of both should, therefore, be excluded from the operation of the proviso to section 5(2). The answer to this submission may, to some extent,
45 lie in the effect of section 16(1) of the Act upon the proviso to section 5(2), a matter to which I shall refer later in this judgment. Again, Mr. Stable submitted, suppose you have a song in which the words are the joint work of three authors, and the music is the joint work of only two of these three. In these circumstances the work would be a collective work (within the first part of paragraph (c) of the definition);
50 whereas if the third co-author had taken no part in writing the words, this would

14

**Robert Goff, J.     Redwood Music Ltd.** *v.* **B. Feldman & Co. Ltd.    [1979] R.P.C.**

not be so. This may very well be right. But I do not consider that an oddity of this kind should compel me to reach a different conclusion in the present case. Quite apart from the fact that such oddities do occur on the borderland between two defined concepts, I do not consider that the existence of this one requires me to depart from the clear words of the statute.

Finally, on this point, I should add that my conclusion is exactly the same on the construction of the expression "collective work" as used in the proviso as preserved by the Act of 1956, which contains (in paragraph 9 of the Eighth Schedule) a definition of "collective work" which does not differ significantly from that in section 35(1) of the Act of 1911.

I turn then to Mr. Stable's alternative argument on the proviso which was that, even if an assignment of copyright in a work of joint authorship was not excluded from the operation of the proviso by virtue of the exclusion of assignments of copyright in collective works, nevertheless on its true construction the proviso had no application to assignments of copyright in works of joint authorship. His main submission on this point was that, even taking full advantage of the Interpretation Act 1889, and substituting the plural for the singular where appropriate, the wording of the proviso simply did not work in the case of an assignment by one joint author of his share in the copyright in a work of joint authorship. In particular, he referred to the words "reversionary interest in the copyright" in lines 6 and 7 of the proviso; he submitted that it went beyond what was permissible as a matter of construction, even with the aid of the Interpretation Act, to construe these words as meaning "reversionary interest in his share in the copyright". The trouble with this submission is that exactly the same argument can be advanced concerning the main body of section 5(2); and, if the opening words of the subsection "The owner of the copyright in any works may assign the right" cannot be read as meaning "The owner of the copyright in any work or any share in such copyright may assign the right or his share therein", then neither author of a work of joint authorship would have the power under the subsection to assign his share in the copyright. I do not believe that the legislature had any intention to exclude such a power in the case of joint authors. It must surely have been intended that one joint author should be entitled, if he so wished, to transfer his share to, for example, his wife or his son; and even where two joint authors assign (as they frequently must do) the entire copyright in their work to a publisher, on a true analysis what happens is that each joint author transfers his share to the publisher, and that on receipt by the publisher of both shares they merge and form together the entire copyright in his hands. Furthermore, it must also have been the intention of the legislature that the proviso in section 5(2) requiring assignments of copyright to be in writing should be applicable to an assignment of a share in copyright, as they are to an assignment of copyright in whole or in part. Clearly, in my judgment, a broad construction of the main body of section 5(2) is necessary to give effect to this intention; and since, for consistency, a similar broad construction should be given to the proviso, I can see no reason why the proviso should not be applicable to an assignment of a share in the copyright in a work of joint authorship.

In this connection there was much debate on the question whether the central part of section 16(1) applied to the proviso of section 5(2). The relevant part of section 16(1) reads as follows:

**[No. 1]**     Queen's Bench Division     Robert Goff, J.

"and references in this Act to the period after the expiration of any specified number of years from the death of the author shall be construed as references to the period after the expiration of the like number of years from the death of the author who dies first or after the death of the author who dies last, whichever period may be the shorter . . ."

It was the submission of Mr. Stable that this part of the subsection applied only to the proviso to section 3 of the Act which, "at any time after the expiration of twenty-five years, or in the case of a work in which copyright exists at the passing of this Act thirty years, from the death of the author of a published work", permits reproduction of the work for sale if a notice has been given in the prescribed form and a royalty of ten per cent. has been paid. True, said Mr. Stable, section 16(1) uses the words "references in this Act to the period"; but, he submitted, there are two such references in the proviso to section 3, the first being a reference to a period of twenty-five years, and the second to a period of thirty years. No such reference was to be found, he submitted, in the proviso to section 5(2); because the only period there referred to is the period (mentioned at the end of line 7) on the termination of which the reversionary interest was expectant, viz. the period ending twenty-five years after the death of the author, which was not a period after the expiration of a specified number of years from the death of the author. I do not however find this argument persuasive. First, if the legislature had intended in section 16(1) to refer only to the proviso to section 3, it could easily have said so in terms, instead of using an expression "references in this Act" which, on its ordinary meaning, would more likely be intended to apply to references in different provisions in the Act. Second, I can see no good reason why, on its true construction, the proviso to section 5(2) should not be read as containing a reference to a period after the expiration of a specified number of years from the death of the author. I read the proviso as referring not only to the period which expires twenty-five years after the death of the author (on the termination of which the reversionary interest is expectant) but also to the period beyond the expiration of twenty-five years from the death of the author (i.e., beyond the expiration of the first period), during which assignments within the proviso are inoperative to vest in the assignee or grantee any rights with respect to the copyright of the work. True, the latter period is not expressly described as a "period" in the proviso; but neither are the periods referred to in the proviso to section 3, to which Mr. Stable says section 16(1) is applicable. I therefore hold that the relevant part of section 16(1) does apply to the proviso to section 5 (2).

In so holding, I recognise that there are practical problems which arise in the application of section 16(1) to the proviso to section 5(2). But these, in my judgment, arise from the facts that one joint author will die before the other, and that the period of copyright is not necessarily related to the date of the death of the joint author who dies first. Section 16(1) provides that, in the case of a work of joint authorship, copyright shall subsist during the life of the author who first dies and for a term of fifty years after his death, or during the life of the author who dies last, whichever is the longer, from which it follows that, until the death of the longer-lived author, it is not possible to know how long the copyright will last. Consistently with that provision, I read the second part of section 16(1) as meaning that one substitutes, for the period after the expiration of twenty-five years from the death of the author referred to in the proviso to section 5(2), either the period after the expiration of twenty-five years from the death of the author who dies first (whom I shall call A) or the period after the death of the author who dies last (whom I shall

**Robert Goff, J.**     **Redwood Music Ltd.** *v.* **B. Feldman & Co. Ltd.**    **[1979] R.P.C.**

call B), whichever period may be the shorter. As Mr. Drake pointed out, there are three situations which may arise. First, where B dies within twenty-five years after A's death; second, where B dies more than twenty-five years, but less than fifty years, after A's death; and third, where B dies more than fifty years after A's death. In the first of these three cases, the period (i.e. the remaining period of copyright) after the expiration of twenty-five years from the death of A will be shorter than the period after B's death; in the latter two cases, the period after B's death will be shorter—and indeed in the third case, not merely will the period after B's death be shorter, but it will be nil. Once the subsection is understood, there should be no mathematical difficulty in applying it to the proviso to section 5(2). Let me take two simple examples. First, suppose that B dies five years after the death of A; the period after twenty-five years after the death of A is, of course twenty-five years, whereas the period after the death of B is forty-five years, so that it is the first of the two periods which is the shorter. Second, suppose that B dies thirty years after the death of A. The period after twenty-five years after the death of A is again, of course, twenty-five years; whereas the period after the death of B is twenty years. The latter period is therefore the shorter. But it does follow that, under this part of section 16(1) as applied to the proviso to section 5(2), it is impossible to know, at the time of the death of the author who dies first (A), when the reversionary interest expectant will revert to the legal personal representatives of that author or indeed whether it will ever revert at all. This can never be known until the death of the author who dies last (B), or (if it happens) until his survival for fifty years after A's death, in which latter event it will be known that no interest will revert to the legal representatives of A. It must however be remembered that, even though uncertainty as to the value of the expectancy results from the application of section 16(1) to the proviso to section 5(2), the uncertainty is inherent in the fact that the subject matter of the copyright is dependent on the uncertain fact of the length of the life of the surviving joint author. Furthermore, the effect of the application of section 16(1) to the proviso is that, where the reversion takes place, it takes place in respect of the shares of both joint authors at the same time. The result is that the difficulties which can arise in the case of multiple copyrights are to some extent overcome. Because of the uncertainty, at the time of A's death, as to the point of time when (if at all) the reversionary interest will ultimately revert to his estate, and therefore as to its value, it is unlikely that the reversionary interest can then be sold (except possibly to the original publishers); and if an assignment were to take place after the reversion of each share in the copyright to the respective legal personal representatives of both authors, the situation would then be much the same as it was when the work was created, and very probably the personal representatives would assign the whole copyright to one publisher, though (if they were dissatisfied with him) this might not be the original publisher. To some extent, therefore, the vice of multiple authorship is avoided, which may explain why assignments of the copyright in works of joint authorship, unlike assignments of copyright in collective works, were not expressly excluded from the operation of the proviso. At all events, I can see no reason why the complications inherent in the application of this part of section 16(1) to the proviso should compel me to conclude that, on a true construction of the proviso, it does not apply to assignments of the copyright in works of joint authorship.

There remains the question whether my conclusion on the construction of the proviso is any different when I have regard to the proviso as preserved by the Act of 1956. I have come to the conclusion that the construction remains precisely the same. The proviso, as set out in paragraph 6 of the Eighth Schedule to the Act of

1956, is of course in identical terms to the proviso to section 5(2) of the Act of 1911, and should in my judgment be given precisely the same construction. That this was the intention of the legislature is, in my judgment, clear from paragraph 28(1) of the Seventh Schedule which provides that certain documents made before the com-
5  mencement of the Act of 1956, including for example an assignment of a share in the copyright in a work of joint authorship, which had any operation affecting the title to copyright in the work under the Act of 1911, should have the "corresponding operation" in relation to the copyright in the work under the Act of 1956. It is clear from this provision that the intention was that an assignment within the proviso
10 should operate, in relation to the new copyright subsisting under the Act of 1956, as it would have done in relation to the copyright subsisting under the Act of 1911. It is not to be forgotten that, in the case of an assignment caught by the proviso to section 5(2) of the Act of 1911, the reversionary interest may have already devolved upon the legal personal representatives of the deceased author before the commence-
15 ment of the Act of 1956. It cannot have been the intention that the proviso should have had, in relation to a pre-1956 Act assignment, any different effect after the commencement of the Act. It is true that, by paragraph 9 of the Seventh Schedule, section 16(1) of the Act of 1911 (set out in paragraph 4 of the Eighth Schedule) is expressly preserved by the Act of 1956 for one particular purpose relating to pub-
20 lication permitted under the proviso to section 3 of the Act of 1911, whereas there is no express provision preserving section 16(1) for the purposes of the proviso to section 5(2) of that Act. Even so, in my judgment, the proviso to section 5(2) as preserved in the Act of 1956 must, in order to give effect to paragraph 28(1) of the Seventh Schedule, be given the same meaning as it was given in the Act of 1911,
25 including the application to it of section 16(1) of that Act. I therefore conclude that the proviso, as preserved in the Act of 1956, is to be given the same construction as in the Act of 1911.

It follows that I decide the point on works of joint authorship in favour of Redwood. Since I have also decided the point on title in Redwood's favour, it follows
30 that the second action must be dismissed; but had Redwood failed on the point on title in the first action, I would have decided the point on works of joint authorship in the second action as I have decided it in the first.

I would be grateful for the assistance of counsel on the form of the declarations to be made in the first action.

35 The following Order was made:

UPON this action being heard contemporaneously with action 1978-R-476.

AND UPON HEARING Mr. F. M. Drake one of Her Majesty's Counsel with Mr. J. Camp of Counsel on behalf of the Plaintiffs and Mr. O. Stable one of Her Majesty's Counsel with Mr. J. Mummery of Counsel on behalf of the Defendants.

40 The Judge gave the Plaintiffs leave to amend the prayer to the Statement of Claim. The said amended prayer signed by Counsel was handed in and attached to the stamped copy pleadings.

And It Appearing that all such interests in copyright and in all rights of a like nature in the words and in the music of a song entitled "Just Like A Gypsy" written
45 and composed by Nora Bayes deceased and Seymour Simons deceased as were

18

**Robert Goff, J.**     **Redwood Music Ltd.** *v.* **B. Feldman & Co. Ltd.**     **[1979] R.P.C.**

formerly owned by the said Seymour Simons reverted to his legal personal representatives on 19th March 1953.

IT IS ORDERED AND DECLARED that the Plaintiffs are the owners in the United Kingdom of all such interests in copyright and in all rights of a like nature in the words and in the music of the said song as were formerly owned by the said Seymour Simons. 5

AND IT IS ORDERED that the Defendants do pay to the Plaintiffs their costs of this action such costs to be taxed by a Taxing Master.

Printed in Scotland by Her Majesty's Stationery Office at HMSO Press, Edinburgh
Dd 561405 K15 12/78 (15823)