# EXHIBIT C

Case No: HC0003960

<u>**Neutral Citation Number: [2006] EWHC 2883 (Ch)**</u>
<u>**IN THE HIGH COURT OF JUSTICE**</u>
<u>**CHANCERY DIVISION**</u>

<u>Royal Courts of Justice</u>
<u>Strand, London, WC2A 2LL</u>

<u>16th November 2006</u>

**Before** :

**MR JUSTICE LINDSAY**

- - - - - - - - - - - - - - - - - - - -

**Between :**

| | | |
|---|---|---|
| **(1)** | **Peer International Corporation** (a company incorporated pursuant to the laws of the State of New Jersey, United States of America) | |
| **(2)** | **Southern Music Publishing Co Inc** (a company incorporated pursuant) to the laws of the State of New York, United States of America | |
| **(3)** | **Peermusic (UK) Limited** | <u>**Claimants**</u> |
| | - and - | |
| **(1)** | **Termidor Music Publishers Limited** | |
| **(2)** | **Termidor Musikverlag Gmbh & Co KG** (a company incorporated pursuant to the laws of Germany) | <u>**Defendants/Part 20 Claimants**</u> |
| | - and - | |
| | **Editora Musical de Cuba** | <u>**Part 20 Defendant**</u> |

- - - - - - - - - - - - - - - - - - - -

Pushpinder Saini and (as to succession) Simon Taube QC (instructed by Sheridans) for the Claimants
Peter Prescott QC, James Mellor and (as to succession) Michael O'Sullivan (instructed by Teacher Stern Selby) for the Part 20 Defendant

Hearing dates:  2005 May: 10, 11, 12, 13, 16, 17, 18, 25
2005 September: 26, 27 and 28 (in Cuba)
2005 October: 14
2006 January: 26
2006 March: 6, 7, 8, 9, 10, 13, 16, 17, 20, 21, 24
2006 May: 2, 22, 23, 24, 25
2006 October: 30

- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

Schedule

| Song No. | Title of Work | Composer | Date of Composer's death | 1911 Act reversion begins | Date of alleged Original Agreement | Law applicable to the original agreement * = express | Date of the EGREM intervention | Date of the EMC intervention | Date of alleged Further Dealings |
|---|---|---|---|---|---|---|---|---|---|
| (1) | Aurora | Manuel Corona | 9.1.50 | 1975 | 27.2.30 | * Mex | | 14.6.2000 | No claim |
| (2) | Cuidadito Compay Gallo | Antonio Fernandez Ortiz (Nico Saquito) | 4.8.82 | 2007 | 10.12.36 | * Cub | 3.5.60 | 14.6.2000 | 25.8.98 and addendum dated 1.7.02 |
| (3) | Compay Gato (aka Adios Compay Gato) | Antonio Fernandez Ortiz (Nico Saquito) and M. Sanchez | 4.8.82 / 5.6.91 | 2007 | 16.10.45 | Cub | 3.5.60 | 14.6.2000 | 25.8.98 and addendum dated 1.9.02 and deed of 1.6.04 for Sanchez |
| (4) | Al Vaiven De Mi Carreta | Anthonio Fernandez Ortiz (Nico Saquito) | 4.8.82 | 2007 | 20.6.40 | Cub | | 14.6.2000 | 25.8.98 and addendum dated 1.7.02 |
| (5) | Diablo Tun Tun, El | Bienvenido Gutierrez | 5.12.66 | 1991 | 11.2.33 and 25.7.58 (in respect of the reversion) | Cub | 15.2.62 | | |
| (6) | Damelo | Ignacio Pineiro | 12.3.69 | 1994 | 10.10.30 | Cub | | 22.9.2000 | 20.8.99 and 12.4.01 and addendum of 15.4.02 |
| (7) | Buey Viejo | Ignacio Pineiro | 12.3.69 | 1994 | 12.8.33 | * N.Y | 13.1.64 | 22.9.2000 | 20.8.99 and 12.4.01 and addendum of 15.4.02 |
| (8) | Echale Salsita (aka Echales Salsito) | Ignacio Pineiro | 12.3.69 | 1994 | 12.8.33 | * N.Y | 13.1.64 | 22.9.2000 | 20.8.99 and 12.4.01 and addendum of 15.4.02 |
| (9) | Esas So Non Cubanas | Ignacio Pineiro | 12.3.69 | 1994 | 28.2.45 | Cub | 13.1.64 | 22.9.2000 | 20.8.99 and 12.4.01 and addendum of 15.4.02 |
| (10) | Guanajo Relleno, El | Ignacio Pineiro | 12.3.69 | 1994 | 12.8.33 | * N.Y | 13.1.64 | 22.9.2000 | 20.8.99 and 12.4.01 and addendum of 15.4.02 |
| (11) | Mentira Salome (aka Mentiras Salome) | Ignacio Pineiro | 12.3.69 | 1994 | 12.8.33 | * N.Y | 13.1.64 | 22.9.2000 | 20.8.99 and 12.4.01 and addendum of 15.4.02 |
| (12) | Rumberos De La Habana, Los | Ignacio Pineiro | 12.3.69 | 1994 | 12.8.33 | * N.Y | | 22.9.2000 | 20.8.99 and 12.4.01 and addendum of 15.4.02 |
| (13) | Borinquen | Ignacio Pineiro | 12.3.69 | 1994 | 12.8.33 | * N.Y | 13.1.64 | 22.9.2000 | 20.8.99 and 12.4.01 and addendum of 15.4.02 |
| (14) | Romance Guajiro | Celia Romero | 12.10.67 | 1992 | 28.2.42 | Cub | 26.4.64 | | 23.7.99; 19.8.02 and addendum of 19.8.02 |

**Mr Justice Lindsay :**

## A. Introduction

1.    This action concerns the English copyright in thirteen musical compositions (for brevity I shall call them "songs") written in a Cuban style. The songs were written by Cuban nationals, the first in time in 1930, the last in 1945. The titles of the songs and the names of their respective seven composers (one work having joint composers) are set out in the Schedule annexed to this judgment. I will usually refer to a song by the number I have given it in the Schedule's left hand margin.

2.    The Mechanical Copyright Protection Society Ltd ("MCPS"), which collects and distributes royalties in respect of works protected by English copyright, finding that there were disputes as to entitlement to that copyright, registered the songs as subject to dual claims; Peermusic (UK) Ltd, a wholly owned U.K. subsidiary of Peer International Corporation (a company incorporated under the laws of New Jersey, USA) claimed to own the copyright but so also did either or both of Termidor Music Publishers Ltd (incorporated in England) and Termidor Musikverlag Gmbh & Co KG (incorporated in Germany). For most purposes it is convenient to lump those companies together as either the Peer companies ("Peer") or the Termidor ones ("Termidor").

3.    On 25th August 2000 Peer began proceedings against Termidor in respect of the thirteen songs and three others; it sought a declaration that it was the copyright owner of the songs. It soon became apparent from Termidor's defence that such title as Termidor claimed had been acquired from Editora Musical de Cuba ("EMC"), an emanation – I deliberately use a loose word - of the Cuban state operating, as its name suggests, in connection with Cuban music. On 5th March 2001 Termidor applied for EMC to be joined as a Part 20 Defendant and on 15th March 2001, by consent, permission for that was granted and directions (later slightly varied) were given which included that the Part 20 proceedings should be heard at the same time as the action. The directions included reference to there being expert evidence as to Cuban law.

4.    Once Cuban law had come into play it was thought fit to have some issues raised as preliminary issues of law and on 28th October 2002 Park J's Order identified three main questions and gave directions for their resolution. The hearing of those issues came before Neuberger J. on 12th December 2002. His Order included three rulings; firstly, that the documents relied on by Peer as assignments to it, or confirmations of assignments to it, of copyright were "initially valid under the relevant applicable law (without pre-judging what such law is)"; secondly, that a Cuban law called Law 860, which I shall need to return to, was ineffective to deprive Peer of any English copyright otherwise vested in it and, thirdly, that some documents called "Composer Confirmation of Rights", which Peer said it had obtained in Cuba from heirs of the composers of the songs, were ineffective on their own but, when joined with further documents called Addenda, were effective in point of their language to assign to Peer the reversionary copyrights arising under the proviso to section 5 (2) of the Copyright Act 1911.

5.    That provision, whilst in force, as it was until 1st June 1957, had the effect that although a composer could in his lifetime assign copyright for up to 25 years after his

death, the period beyond that until the expiry of the copyright, a period I shall call "the 1911 Act reversion", could be disposed of by the composer only by his Will. Disposition by such Will apart, the 1911 Act reversion was to devolve automatically (so the Act provides) "on his legal personal representatives as part of his estate".

6.    Neuberger J. granted permission to appeal and there was an appeal and cross-appeal which were determined on 4th August 2003 when Neuberger J's order was affirmed by the Court of Appeal.  Permission to appeal to the House of Lords was refused.  EMC's case had then, of course, to be considered or reconsidered in the light of the Court of Appeal's ruling and on 7th March 2004 EMC produced its Part 20 Defendant's Statement of Case which raised wide-ranging attacks on Peer's claims to the English copyrights.  It has since been amended.  There is no counterclaim by EMC.  Termidor has taken no further part in the proceedings; the hard fought contest has been solely between Peer and EMC as the trial has been that of issues as between Peer and EMC as directed by Master Bragge on 5th July 2004.

7.    Neither side can be congratulated on the way it anticipated and provided for important legal issues and there have been many additional statements of case and amendments.  The last amendment to EMC's pleadings, for example, was even after all of what I had taken to be the final speeches had finished on 25th May 2006.  The last written evidence was not received until months later.  Oral evidence was heard not only here but, over three days, in Cuba.  It has been an unfortunate feature that expert evidence on Cuban law was heard only relatively late on in the action; crucial issues might have been seen for what they were much earlier if it had been brought forward.  The hearing before me began on 10th May 2005 and the last hearing day was well over a year later, on 30th October 2006.

8.    To turn from a legal or procedural introduction to an historical one, Cuba has enjoyed several indigenous styles of popular music and there have been recordings made of its music going back to the late twenties and early thirties of the last century when recordings available at prices which the general public could afford first appeared on the market.  Sales of sheet music were an alternative and cheaper way in which the public could encounter the Cuban sound.  The lively and expressive music had, of course, a warm welcome in Cuba but also a following in other Hispanic countries and in the United States.  A pioneer of North American interest in the music was the late Mr Ralph Peer, a United States music publisher who visited Cuba, who met composers, who took assignments of copyright and who built up an extensive list of popular Cuban works, including the thirteen songs in issue, to the copyrights in respect of which, by way of what I will call "original agreements", made directly between the composer and a Peer company, Peer became ostensibly entitled.  The copyrights thus assigned included the English copyrights, although it could hardly have been expected (and, I would think, never transpired) that the English copyright was to be of monetary significance in comparison with others, such as the United States and Spanish copyrights.  I say that Peer became "ostensibly" entitled as EMC's arguments include that the original agreements were and are void or voidable.

9.    Peer, represented overall by Mr Saini, paints Ralph Peer as a connoisseur of Cuban music throughout the 30s, 40s and 50s.  EMC, represented overall by Mr Prescott QC and Mr Mellor, by contrast seeks to draw him as a quasi-monopolist who drove impecunious composers to accept the terms, sometimes misleading but always, says EMC, unconscionably ferocious in Peer's favour, which were presented to them on a

take-it-or-leave-it basis.  The thirteen songs of relevance in this action are by no means more than a very small number of the 600 or so works which Peer is believed to have acquired throughout the period to which I have referred.  One of the columns in the Schedule gives the date of the original agreement that refers to each respective work identified.

10.   In 1959 came a radical change.  In that year Senor Fidel Castro came to power in the Cuban revolution and he subsequently became, as he remains, the country's president.  Peer's office in Cuba closed down; it no longer employed Cubans in Cuba.  The U.S. government prescribed that U.S. citizens were no longer free to visit Cuba.  Money payments to Cubans in Cuba from corporations or citizens of the United States could no longer be paid; U.S. law forbade it.  There was a long period during which Peer had no contact, direct or indirect, with the composers to whom (but for the new U.S. laws) money would have been payable as royalties due.  But, come the late nineties, Peer, perhaps encouraged by the success of the film "The Buena Vista Social Club", wishing to make its title to copyrights and to 1911 Act reversions more assured at a time at which, by then, all the relevant composers were dead, began, especially by way of a Cuban lawyer then living in Cuba, Senora Isabel Cordova, to put feelers out for fresh documents to be made by persons understood to be the respective composers' heirs.  In that way Peer collected apparent confirmations of rights to which addenda were sometimes added.  Consistently with the later ruling of the Court of Appeal, it was only where there had been both a confirmation *and* an addendum that there was <u>ostensible</u> assignment to Peer of the 1911 Act reversion but, in all cases where the 1911 reversion was claimed by Peer save as to song (1), there has been both a confirmation and an addendum.  Song (1) drops out of Peer's claim reducing the songs claimed to thirteen.  Again I have used the word "ostensible" as EMC seeks to raise many issues as to the confirmations and addenda (which, in the Schedule and in this judgment, I have lumped together under the title "Further Dealings").

<u>The plan to be followed in this judgment</u>

11.   As will later be seen, there are technical but very different suggested legal difficulties in the path of each of Peer and EMC, in the latter case as to its locus standi, arguably restricting the kind of attack it is in a position to make, in the former as to its title, arguably restricting the type of relief it can claim.  I shall first, under the heading of "Observations on EMC's attacks on Peer's contracts", deal with those suggested difficulties, often arising under Cuban law (as derived from Spanish law) and then, under the heading "Peer's difficulties", I shall deal with those, mainly deriving from English law as to succession on death and, in particular, from the Copyright Act 1911.  Those suggested difficulties on each side do not require any descent into contested fact (as opposed to contested expert evidence as to foreign law) and I shall conclude what I have to say under those headings without needing greatly to add to the facts I have already mentioned.  But a resolution of each side's preliminary legal difficulties falls short of resolving all the issues that properly fall for decision and, accordingly, after dealing with those legal difficulties, I shall need to say something about the oral and other "ordinary" evidence I have received and deal with a number of discrete issues before coming to a final conclusion.

**B.  Observations on EMC's attacks on Peer's contracts**

12.    Peer's principal claim is that it is entitled to declarations that it is the owner of copyright (the English copyright, that is) in the thirteen songs.  In part it claims by way of the "original agreements" made, now many years ago, with the composers and in part by way of documents believed to have been signed ("the Further Dealings") by heirs of those composers.  EMC attacks both the validity of the original agreements and of the Further Dealings, but, unsurprisingly, the attacks give rise to different legal issues depending on what it is that is being attacked.

13.    The proper law of both the original agreements and of the Further Dealings is not English; as to the former it is often Spanish law because at the time of the original agreements the Cuban civil law was still that of the Spanish Civil Code of 1888.  However, as is indicated in the Schedule, in some cases the original agreement contained an express incorporation of either Mexican law ("Mex") or that of New York ("NY").

14.    At the time of the Further Dealings, 1998-2002, whilst there were by then some indigenous Cuban provisions embodied in Cuban civil law, respect continued to be paid to its Spanish origins and so it is that I have been able to receive relevant and admissible expert evidence as to the applicable laws not only from a Cuban national practising in Cuba (for EMC) but also from a Spanish national living in Spain (for Peer).  It has not been said of Peer's expert, Dr Agustin Gonzalez of the firm of Uria & Menendez of Madrid, where he is in charge of their Intellectual Property Team, that his evidence is in any way to be diminished because he does not practice in Cuba and hence does not have that immediate relationship with Cuban law that practice there would bring.  Equally, it has not been said of EMC's expert, Lic. René de Jesus Burguet Rodriguez of the Faculty of Law at the University of Havana, that his evidence is at all to be discounted because his office, like that of all lawyers in Cuba is, to use his terms, "supervised methodically by the Ministry of Justice" and because EMC is an emanation of the Cuban State.  He is free in Cuba to act, and does act, in litigation against Cuban State companies and Cuban Ministries.  No other potential questions as to the competence or impartiality of either expert were raised and I have thus been fortunate in being able to evaluate their respective evidence entirely by reference to what has seemed to me to be the respective merits of their arguments on the relatively few issues on which they differ.  As will later be seen, I have not wholly adopted the preferences of either of them but have sometimes taken from one, sometimes from the other.  I am grateful to each for the assistance he has given me.

15.    I now turn to a number of sub-headings relating to what may or may not be legal difficulties in EMC's path.

Has EMC locus standi to seek to attack the original agreements for "dolus" or fraud?

16.    This subject is, with only three exceptions, regulated by the Spanish Civil Code (the "SCC") of 1888.  For the moment there is no need further to define "dolus" (often translated as "fraud") than to identify Article 1269 of that Code which provides:-

>    "[Dolus] exists when, with insidious machinations, one of the contracting parties induces the other to formalise a contract which he would not have formalised without them."

Nor is it necessary at this stage to consider the effect of dolus on contracts beyond saying that it can include their voidability. What is important, under this heading, is that under the SCC it is only the victim of the dolus – in contractual terms, the innocent party to the contract – and his heirs and guarantors that may complain *by action* with the intent of achieving the voidability of a contract made under the SCC. EMC, being neither a party to nor heir or guarantor of an innocent party to the contract, is thus not in a position to proceed *by action* to obtain some recognition of the voidability of any of the relevant original agreements.

17. But, of course, EMC is not here proceeding by action; it is a Part 20 Defendant and, in point of form, has no counterclaim. It does, though, assert the voidability of all the original agreements on the ground of fraudulent misrepresentation – see paragraph 9 of the Part 20 Defendants' Statement of Case. That form of fraudulent misrepresentation would fall within the SCC's concept of dolus. Moreover, such assertion, as it seems to me, would be regarded by the SCC as an attempt to invoke dolus as a defence by way of the "exceptio doli". In cases concerning contract, said Senor Burguet, the exceptio doli is open, inter alios, to a third party defendant, someone who is neither the innocent party to, nor heir or guarantor of, that innocent party. That is permitted, exceptionally, he said, where the defendant asserts the annulability of the contract because he has no other ground of defending his own title to property and no other way in which he can escape an obligation upon him deriving from the impugned contract.

18. It can readily be seen that if a wide range were to be given to the invocation of the exceptio doli by such third parties it could lead to the curiosity that the effect of a contract that had not previously been put in issue by any party to it and might not even be wished to be put in issue by the innocent party to it could nonetheless, in the absence of such party and without his even knowing, be denied effect, albeit at least in part between different parties. But the exceptio doli is, it seems, not given wide range; despite some possible cases in lower Courts, the only examples from the Supreme Court of Spain which Senor Burguet had been able to find where it had been successfully deployed by a third party to a contract fell into the category described as "terceria de dominio". By contrast, Senor Gonzalez, impressed by the lack of other examples, was of the view that in contract cases it was *only* within the "terceria" category that the exceptio doli could be deployed by a contractual third party, at any rate, I apprehend, in the absence, as in the case before me, of the innocent party to it being party to the proceedings or consenting to the relief sought. I accept that latter view. Examples were given of "terceria" cases involving banks and secured lenders and dealings between husbands and wives but no authoritative legal definition of the category was put in evidence by either expert although reference was later made to a Spanish legal encyclopaedia which defined it as "a procedural mechanism that enables a third party to oppose the seizure of goods [or, perhaps, "of land" or "of assets"] that actually belong to him or her and not to the debtor". No one suggested that EMC's pleadings put it within the "terceria" class. No one suggests that EMC is being required to perform any of the original agreements.

19. I conclude, on the expert evidence I have received as to the SCC, that EMC is not in a position in these proceedings to assert the avoidability of any of the original agreements made under the provisions of the SCC on the grounds of dolus or fraud.

20.     I mentioned that there were three exceptions to the applicability of the SCC.  One contract – that of the 27th February 1930 as to song (1) - Aurora - made with a man called, it seems, "Manuel Corona M", was made in Mexico and is subject to Mexican law.  However, such were the confusions about that man, that contract and the song in question that I do not understand the original agreement related to it to be now relied upon Peer.  There is no counterclaim as to it by EMC and I need not further consider it in any detail save to add that I was not told that any English royalties for song (1) going back to before the beginning of the 1911 Act reversion in 1975 were in issue.

21.     Another contract, one made as to song (2) by Antonio Fernandez (whose nom-de-plume was Nico Saquito) with Southern Music International Inc on the 10th December 1936, had an express adoption of Cuban law.  However, as, at that date, Cuban contract law was that of the SCC there is no need to regard that contract as a true exception and I therefore, in relation to this contract, conclude as I have as to the rest that were subject to the SCC.

22.     Last of the possible exceptions is a contract of the 12th August 1933 as to songs (7), (8), (10), (11) and (12) made with Ignacio Piniero.  That had an express adoption of New York law, as to which no expert evidence was adduced.  As to that contract, in relation to dolus or fraud, I therefore have to apply English law (as I would have done also as to song (1) had it been necessary).  I was not addressed on English law as to the locus needed to raise fraud relating to the formation of a contract, but I conclude that, in the absence both of the putative innocent party to a contract and of his personal representatives as parties and of any evidence of the intention of that innocent party or his representatives with respect to the proceedings, English law would not permit a stranger to the contract by action or defence to assert its voidability on the grounds of fraud.  Thus, as to every relevant original agreement, I hold that EMC is not in a position in these proceedings to assert the voidability of the contract on the grounds of dolus or fraud.

<u>Has EMC locus standi to attack the original agreement for undue influence, unconscionability or breach?</u>

23.     The same broad considerations that limit actions and defences asserting the voidability of contracts on the grounds of dolus to proceedings in which the innocent party, if not himself voluntarily party to the proceedings, is at least joined as a party or is represented therein by his heirs or personal representatives (or, possibly, under the SCC, where his guarantors are party) seem to me to apply equally to cases where the grounds for voidability are undue influence, unconscionability or breach.  It may be, under the SCC, that such assertions could be made by way of the exceptio doli in "terceria" cases but, as I have already mentioned, this is not said to be a "terceria" case.  In my judgment EMC is accordingly not able in this action to assert the voidability of any of the original agreements on the grounds of undue influence, unconscionability or breach.

<u>Was any original agreement void ab initio on some other ground?</u>

24.     It is a familiar feature of many systems of law that certain types of contract are prohibited.  Where such a provision applies the contract is of no effect.  EMC asserts that under Cuban law it was, at the respective times of the original agreements, impermissible to make contracts assigning rights in future works and that accordingly

several of the original agreements (five in number) are said to have been void ab initio. It is not said that Mexican, New York or English law had any similar provision and no expert evidence was led to suggest that Cuban law or the SCC contained the alleged provision as to impermissibility. There is no ground on which I could conclude that any of the original agreements was void ab initio by reason only of its purporting to assign rights in future works.

<u>In any event, is EMC's attack on the Cuban original agreements barred by limitation?</u>

25.    It was not, I think, disputed but that the appropriate limitation period regulating by when attack against the original agreements had to be begun would be the period or periods of limitation prescribed at the respective dates when the original agreements were entered into. Unfortunately, though, no Spanish or Cuban authority could be found by either expert that dealt with limitation in the particular context of copyright, unusual in that a contract of such a kind could, in practical terms, sometimes last for and be effective for some 100 years or so. In the copyright context, what, then, would be the starting date under a Cuban-law original agreement which would set time running against a composer, his heirs or guarantors who might wish to argue for the voidability on some grounds such as dolus, undue influence, unconscionability or breach of a contract which the composer had made?

26.    Senor Burguet's view was that time should start to run under the SCC from the "consumacion" of the contract and that 4 years would be permitted after "consumacion" of the contract before a person having locus standi to bring the complaint would be barred by limitation. "Consumacion" occurs when no provision of the contract that on the face of things is still required to be performed remains unperformed. But both the negative provisions inherent in copyright and the positive ones such as to the payment of royalties can subsist for very many years. On that view of limitation it would be easy to suppose an action for voidability on such grounds as I have mentioned still being open to a party having locus standi over a 100 years after the contract had been entered into. Senor Burguet acknowledged that doctrine was divided; there had been some cases, but not as to copyright, in which the Spanish Supreme Court had regarded time as starting to run against a party when that party first knew of the defect – here it would be fraud, unconscionability, undue influence or breach – which the innocent party alleged to have occurred. The Court, had, he said, been inconsistent. Nonetheless he preferred that, so far as concerned an *action,* time ran from consumacion and in his view a defence – a plea or exceptio – was never barred by limitation. A defence was a form of protection given to a victim of the voidable act and justice required that it should always be available.

27.    Senor Gonzalez's preferred view was that limitation barred an action for dolus 4 years after the person seeking to make the allegation first knew of the dolus. Article 1969 of the SCC, he pointed out, provides:-

> "The time limitation on all kinds of action when no special provision determines otherwise, will be counted as from the day when they could have been exercised."

But that article, with its express reference to "when no special provision determines otherwise" has to be read consistently with Article 1301 which could be regarded, as Senor Burguet had averred, as a "special provision" which "determined otherwise".

Article 1301 expressly applied, Senor Gonzalez accepted, to claims of, inter alia, fraudulent misrepresentation and it prescribed a period of 4 years which ran from consumacion. Senor Gonzalez thus acknowledged that a strong argument could be made that Article 1969 was cut down by Article 1301 in relation to actions for dolus. There was a passage of his cross-examination, specially by reference to a Spanish case dealing with an annuity, which illustrated a possibility of confusion, not in Senor Gonzalez's mind but commented on in the Spanish authority, between when it was that a case could first be brought, on the one hand, and, on the other, the date by which, if limitation was to be avoided, it had to be brought. Senor Gonzalez was troubled, I think, by what he tacitly took to be the somewhat absurd conclusion that under Article 1301 one could otherwise have an action, unbarred by limitation, validly started a 100 years or so after the contract was made and (if the claimant had not affirmed the contract after obtaining such knowledge) any number of years since the claimant had first known of the facts which he was asserting in the action. To avoid that he had formed a view, aided by Article 1969, that time expired 4 years after knowledge but he accepted that his view was not supported by any reported authority that he could produce. His view was more his rationale of what would be good sense where there was, as could be the case in copyright, a contract which contemplated the passage of very many years before its consumacion. His view, was, I think, more what he thought the law ought to be than what it was; he accepted that it might be wrong.

28.    If I limit myself, as I believe I have to do, to what the Spanish law on the point is rather than what it might one day become, I must, in my view, prefer Senor Burguet's view, based on Article 1301 and its express provision as to dolus and also on high Spanish extra-judicial doctrine in support of Senor Burguet's view, notwithstanding the eminent sense of Senor Gonzalez's proposed development. I conclude that under the SCC an action, otherwise properly constituted, asserting that the original contract in question should be set aside for dolus would be unbarred by limitation until 4 years after its consumacion. So far as concerns a Cuban law original agreement, attack upon it by <u>action</u> by EMC, had EMC had locus, would, in other words, still be unbarred by limitation.

29.    Senor Gonzalez relied on high Spanish extra-judicial authority for the view that, where a properly constituted defence asserted the voidability of a contract, that defence was to be affected by the same period of limitation as would have been an action seeking the voidability of the contract. It was the same high extra-judicial authority which had identified consumacion as the starting point for limitation purposes. I prefer that view to Senor Burguet's one that the defence is *never* barred. Thus, for practical purposes, just as, even now, limitation would be no bar to a properly constituted action for dolus in relation to such of the original agreements that are subject to the SCC, so also it would be no bar to a plea of dolus as a defence raised by a party having the standing to do so.

<u>Limitation as to EMC's attack on the other original agreements</u>

30.    Here, in the absence of expert evidence as to New York or Mexican law, I must apply English law. No case falling within any relevant trust or concealed fraud or other exception has been made out and I conclude that even were EMC to have had locus it would now be barred by limitation.

Has EMC locus standi to complain of restraint of trade as to the original agreements?

31.     Amongst EMC's attacks on the validity of the original agreements is an averment that they are unenforceable as being in unreasonable restraint of trade. No evidence of the provisions of some foreign law on this subject in any foreign jurisdiction has been brought to my attention so I shall address the question of standing by reference to English law. Whilst English law's respect for privity of contract normally confines standing in contractual matters to the parties to the relevant contract, it could be argued that, so far as relates to restraint of trade, a broader view should be permitted. As Lord Macnaghten said in *Nordenfelt v Maxim Nordenfelt Guns & Ammunition Co.* [1894] AC 535 at 565:-

> "The public have an interest in every person's carrying on his trade freely: so has the individual. All interference with individual liberty of action in trading, and all restraints of trade of themselves, if there is nothing more, are contrary to public policy and therefore void. That is the general rule."

But that public interest provides no wholly compelling reason for taking a different approach to standing in relation to restraint of trade to that taken in relation to contracts generally. There is, after all, a public interest in the honouring of contracts; pacta servanda sunt. Nor have I been referred to any authority where the doctrine of restraint of trade has been successfully relied upon in relation to a contract by someone other than an "innocent" party thereto and in the absence of that party. But let it be assumed, for the moment, that the ordinary view of standing may be relaxed in relation to restraint of trade where a relaxation is justified by appropriate and exceptional circumstances. Could it be said that any such circumstances could be found here? The youngest of the original agreements is now over 60 years old and the oldest over 75. Yet no challenge by a party thereto or his representatives has so far been mounted in Cuba or in England. That failure is not explained; there is not even convincing evidence that any original party has wanted to challenge his or her original contract. No composer who made an original agreement is still alive. No direct and first-hand evidence of the circumstances surrounding the making of any of the original agreements has been given. The extent to which dealings between a United States music publisher and a Cuban composer of Cuban music contracting many years ago in Cuba could be said to have an impact upon the proper interests of the English public and hence upon English public policy could hardly be regarded as so considerable as to require unusual provision so as to allow a challenge now to be made by some person who otherwise would not be able to do so. In the circumstances I cannot hold EMC to have standing in these proceedings to assert in England the unenforceability of any original contract on the grounds of its being, under English law, in unreasonable restraint of trade.

The Cuban original agreements: the interim until dolosity is put in issue

32.     Senor Burguet's opinion was that, in the interval between the making of a contract and the launching of proceedings for its annulment by the innocent party on the ground of dolus, the contract remains effective. In Mr Saini's cross-examination of Senor Burguet one finds, after reference to a passage in Senor Burguet's report, the following:-

> "Q.    What you meant there was that unless the innocent party to the contract claimed annulment the contract was effective until that time?
>
> A.    Yes, exactly.
>
> Q.    I am pleased to hear that:  by "efficacy" you mean "effectiveness"?
>
> A.    Yes.
>
> Q.    That is the position, to make it clear, both under the Spanish Civil Code and also under the Cuban Civil Code, is that correct?
>
> A.    Yes."

After that Senor Burguet continued his answer by moving to a different point but I do not take him to have resiled from the answer which he gave which, as I have understood Senor Gonzalez, coincides with Senor Gonzalez's view.  I accept that to be the case.  Accordingly, as no person having due standing has as yet even begun proceedings for annulment of any original agreement on the ground of dolus, the potential dolosity (if such there is) of any original agreement does nothing to undermine or negate the effectiveness of the contract in the meantime.

<u>The Cuban and other original agreements: the possibility of, and the interim until, termination for breach</u>

33.    The SCC, needless to say, makes provision for the termination of a contract by reason of its breach.  If the parties to it agree that it is ended then no problem arises but let it be supposed that is not agreed but that one party wishes to terminate the contract on the ground of the other's breach.  Both Senor Burguet and Senor Gonzalez agree that in such a case notice must be given to the party asserted to be in breach of the other's desire to terminate.  That is essential.  No particular form of notice is prescribed but the desire to terminate must be clearly communicated, be it by words or by conduct, to the other party (or parties).  If the giving of some such notice is not possible (for example, where the other contracting party cannot be found) then proceedings for termination would have to be begun in lieu of such notice.  If such notice is given but its recipient does not accept that there has been a termination then it is for the Court to decide whether or not there has been a valid termination.

34.    But what is the status of a contract where notice of termination has been given or has been found to be impossible to be given, where termination has not been accepted and where the Court has not yet ruled on whether the contract was duly terminated or not?  Is the party desiring termination obliged to perform the contract in that interval?  May he, for example, safely contract afresh with some other person to provide to him something akin to that which he would have received under the contract which he avers has come to an end?   May he sell afresh that which he was contracted to sell under the contract he wishes to terminate?   Senor Burguet and Senor Gonzalez disagreed on this point.  It was the latter's view that, unless and until the Court ruled in such a situation, the contract continues in force.  Senor Gonzalez was of that view

as otherwise, he said, one party was given the ability unilaterally to bring the contract to an end notwithstanding the other's disagreement. In Mr Prescott's cross-examination of Senor Gonzalez the following passage occurred:-

> "Q.  Why do you think Senor Burguet is wrong?
>
> A.   Well, mainly because, following Professor Burguet's opinions, the validity and effectiveness of a contract would be subject to the will of only a party, and that is not acceptable under the Spanish Civil Code. In particular there is an Article 1957 that forbids that possibility."

Senor Gonzalez added that if, ultimately, the Court did decide that the contract had been validly terminated then its decision would be retro-active to the moment when notice to terminate had been given. After the subject had been explored for a while I put to Senor Gonzalez what I had understood his evidence to be. I said:-

> "As I have understood it, later on you can realise that if only you had known how the Court ultimately would decide, you would have seen that there had been a termination, but you do not necessarily know that at the time.
>
> A.   Correct my Lord."

35.  There was no right, in Senor Gonzalez' view, until the Court had decided the matter, which enabled the party desiring termination to contract afresh with another party. It would be imprudent to do so. If, ultimately, the Court ruled against the termination of the first contract the unsuccessful party would be likely to find himself in breach both of the old contract and the new. The proper course would be to go to Court and seek appropriate interim interlocutory measures. I accept Senor Gonzalez's views on this subject; I agree that otherwise, contrary to the SCC, termination would be at the will of just one party. It follows, as I see it, that unless it can be predicated (as it cannot be) that Peer would accept that it had been in breach of any original agreement, then, as no notice of termination has ever been served on Peer by or on behalf of any original contracting party nor any interim provisions ordered by any Court, such original contracting parties (and, where appropriate, their representatives, successors and assigns) continue to be bound by and are required to perform those contracts. Belief in a party that he has sufficient grounds to entitle him to treat the contract as at an end does not of itself bring the contract to an end or entitle that party to it to treat it as if ended.

36.  Whilst there are, no doubt, shades of difference between the SCC which I have been looking on this issue and the English law which, in the absence of evidence of Mexican or New York law I must apply to the songs identified in the Schedule as subject to those laws, my conclusion as to the original agreements regulated other than by the SCC is the same.

Composers' state of mind as to repudiation by Peer

37.     Amongst the difficulties both in relation to limitation and to a composer's putative freedom to contract with another as to copyrights earlier assigned to Peer is the ascertainment, as may be relevant, of when and why it was that each respective composer with whom I am concerned became aware of such matters as (so EMC alleges) gave rise to an ability to treat as annulled or to seek the annulment of his original agreement with Peer.  Until a note from EMC of the 26th May 2006 and its late proposed amendment (as was accepted) of para 18 of its Statement of Case, the language of its pleading had suggested knowledge of, for example, the unconscionability of the bargains made or of misrepresentation by Peer in connection with them as existing in the composers from the outset of each separate original agreement.  That, it transpired, had never been intended by EMC and would, indeed, have been inconsistent with some of its other arguments.  The amendment of the 26th May 2006 made it plain that no consciousness in any relevant composer of misrepresentation to him, undue influence on him or as to the inherent unconscionability of his contract with Peer had played any part in the composer's alleged belief that each was respectively entitled to consider his or her contracts with Peer as discharged by repudiation by Peer.  That alleged state of mind on the composers' part was now stated to arise only because Peer had ceased paying royalties in 1960 and had closed its Havana office.  I have no direct or reliable evidence of whether any relevant composer had in fact considered himself discharged from all obligations to Peer or that, if any had so considered, he had done so for the reasons asserted.  A composer, for example, could well have considered, as the non-payment of royalties was likely to have been by reason of the U.S. embargo and without any deliberate intent to breach on Peer's part, that it may not have entitled him to regard the contract as at an end, at any rate without some judicial decision to that effect.  Equally, so far as closure of the Havana office was concerned, the composer might have reflected that there was no contractual obligation on Peer's part that there should be an Havana office and, moreover, that the circumstances of the 1959 revolution made it difficult or would have made it difficult for Peer to maintain one.  Indeed, if the office was not in fact sacked in the early months or years of the Revolution, it was at least subjected to a fairly wholesale destruction or dispersal of its papers.  It does not seem to me to follow from the fact that a composer made a fresh contract with another (a government body such as EGREM) in relation to copyright previously assigned Peer that he did so because he considered himself free to do so by reason of a repudiation by Peer, especially if he had been told that Law 860 had made void all contracts with Peer.

The original agreements: restitution

38.     Proceedings under the SCC for annulment of a contract are not unusually associated with some form of restitution also being sought.  Restitution can be sought only by action or counterclaim; it is not open to a party by way of mere defence.  Thus if, for example, a vendor has by contract and in fact assigned property to another by way of a contract which he comes to believe is annullable, he has first to bring an action for restitution against that other party before he is able, free of the risk of acting unlawfully, to sell the property to someone else.  No composer or his heirs has sought restitution from Peer.

Voluntad rebelde

39.    In his first report Senor Gonzalez wrote that in relation to a right to terminate a contract for breach, the party claiming that had to show that "The breaching party must have a clear and unjustified intention to breach".  That was put to Senor Burguet in cross-examination and he agreed with it but in a later report he revisited the subject of the element of intentionality behind the breach.  The breach, he said, must not have been justified nor one provoked by the person asserting that there had been a breach and it had both to be of such significance that it frustrated the legitimate expectations of the party not in breach and to give rise to serious hindrance in achieving the object of the contract.  But, beyond that, it sufficed, he said, that the party said to be in breach had committed what, *objectively regarded*, was a breach.

40.    Senor Gonzalez responded in writing to this new position.  He accepted that the traditional requirement of "voluntad rebelde" or intention to default in fulfilment of the contract had weakened over recent years but in his view there still had to be an examination of the intention of the party said to be in breach and he referred to decisions of 1992, 1998 and 2002 which, he said, showed that it was still required that "intentional conduct which is an obstruction to the fulfilment of the contract" had to be shown if a right to terminate for breach was to arise.

41.    But what is "intentional conduct" in this context?    It may be that "intentional conduct" is a phrase meant to exclude only that which was accidental, undeliberate or plainly unintended.  A man cleaning a gun which he believes is unloaded may quite deliberately pull the trigger.  It is his intended conduct to pull the trigger but not his intended conduct to cause a bullet to leave the gun.  In all jurisdictions persons are in many contexts presumed to intend the ordinary and natural consequences of  their actions and where, for example, one party to a contract persists over a long period in failing to perform it yet without adequately taking steps to explain to the other why that was so and without adequately taking steps to undo the consequences of his breach and stop its recurrence, I would expect any Court to adopt Senor Burguet's view that, having regard to presumed intention, what would there be taken to have been shown was something that *objectively regarded* was a breach which could be relied upon so as to lead to a termination, notwithstanding that the facts might fall short of demonstrating conduct subjectively intended to obstruct the fulfilment of the contract,   Otherwise the innocent party could be locked into a situation  in which he still had to perform his part of the bargain and could not safely remedy his position by contracting afresh with someone else.

42.    What the point comes to at this stage of the argument is this: supposing, against my view, that EMC did have locus standi to assert that Peer had been in material breach of any original contract, it would not necessarily have assisted Peer to assert that it had never meant to be in breach.

Conclusions as to the original agreements in the light of EMC's attacks upon them

43.    (i)      In paragraph 7 of its Part 20 Defendant's Statement of Case EMC asserts that five of the original agreements are void ab initio under Cuban law simply by reason of their having purported to assign all compositions composed by the contracting composer during the term of the contract and hence that the contracts included purported assignments of rights in future works, a thing there said to be not

permissible. This plea fails. The subject, as to three of the contracts, was regulated not by any indigenous Cuban law but by the SCC, adopted at the time by Cuba as the applicable law. I have not been satisfied that the SCC included any provision as to such impermissibility. As for the two remaining of the five original agreements referred to, one was regulated by Mexican and the other by New York law. I have not been satisfied that either of those systems of law had at the time any such provision as to impermissibility. Nor, were I to apply English law to those two contracts in the absence of expert evidence as to Mexican or New York law, would I conclude that merely by reason of the inclusion therein of a purported assignment of rights to future works would a contract be held invalid, either ab initio or at all.

(ii)    In paragraph 9 of its Statement of Case EMC asserts that all of the original agreements are voidable under their respective applicable laws for misrepresentation, undue influence and unconscionability. So far as concerns contracts regulated by the SCC, I have held, for the reasons I have given above, that EMC has no standing entitling it to assert the voidability on such grounds of any of such of the original agreements. The assertion thus far fails. So far as concerns voidability for breach, then, as it has not been said, let alone proved, that any composer, a party to the original contract, has, by himself or his heirs or personal representatives ever given any form of notice to Peer (in whatever form, even by his conduct) of his intention to terminate his contract on the ground of breach, there is as yet no ability in such persons, let alone in a stranger to the contract such as EMC, to assert that the contract is already at an end by reason of the breach by Peer of any of its terms.

(iii)    In paragraph 23 of its Statement of Case EMC asserts that the original agreements are unenforceable as being in unreasonable restraint of trade. For the reasons I have given, in my view EMC has no standing enabling it to make any such assertion, which accordingly fails.

(iv)    I have already touched on paragraph 18 of the Amended Statement of Case of EMC. In the form to which it was re-amended after the conclusion of what I had taken to be final speeches (which form of re-amendment, as I have mentioned, I allowed in the absence of objection from Mr Saini) it reads as follows:-

> "18.    By virtue of
>
> ………
>
> 18.2    The fact that the claimants ceased paying any royalties to the Cuban composers in 1960 ….. and
>
> 18.3    The fact that the claimants closed their Havana office in 1960 ....
>
> The composers were entitled to and did treat the contracts as repudiated and considered themselves discharged from all obligations and liabilities thereunder."

No notice in any form whatsoever of any intent on the part of any composer, party to one of the original agreements, that he had decided to treat any original agreement as at an end or that he regarded himself as discharged therefrom has been given to Peer.

No such person has asserted that on the grounds either of cesser of the payment of royalties or on the grounds of Peer having closed its Havana office as paragraph 18 suggests. Even if any such notice could be spelled out of any surrounding circumstances, there is nothing that could fairly be taken to have indicated to the composer Peer's acceptance of any such repudiation or discharge. No proceedings for discharge for breach or any associated restitution have been begun by any person entitled to bring them. In consequence, whether it is the SCC or English law that has to be applied, so far as this action is concerned, the original agreements continued to have force during their span and in the cases (songs (2), (3) and (4)) where their span has not yet expired, they continue to have force. In relation to song (5), where the original agreement was after the repeal of section 5(2) of the 1911 Act, the original agreement continues to have force. If, in its amended form, paragraph 18 intends to assert that there has in fact been a discharge from further performance of his contract on the part of any composer on the grounds which it sets out then the paragraph fails.

(v)      Paragraph 19 of EMC's case asserts that from 1960 onwards the composers, believing the original agreements with the claimant to be at an end, made new assignments. It then goes on to identify to whom the new assignments were made. In the circumstances I have described, which include that no notice was given by any composer of his intention to treat his agreement as terminated and in the absence, also, of he or she having begun proceedings to that end, no composer had in his lifetime any entitlement to make new assignments of the property or rights which had already been the subject of the original agreements. Nor was any evidence given by any composer that by 1960 or at any other date he personally believed that the original agreements with Peer were at an end. There is, in my judgment, no entitlement yet proven in any composer entitling him or her from 1960 onwards, to make new assignments of anything that had been previously assigned to Peer under an original agreement. It has to be remembered, though, that (save as to song (5)) what had previously been assigned to Peer did not include any rights after the commencement of the relevant 1911 Act reversion

(vi)      Paragraph 21 of EMC's case asserts that the new assignments to it or to its forebear, EGREM, were clear and unequivocal acts on the part of the composers such as were inconsistent with the continued existence of the original agreements. The paragraph asserts that the making of the new assignments "…. constituted a manifestation of intent that the composers considered the original agreements as terminated". But there is no plea that that manifestation was brought to Peer's notice either at the time or at any other time until the service of the case. By that time it was quite clear that Peer was asserting the continued existence of the original agreements. Accordingly and in the absence of any interim measures being ordered by any court and, indeed, in the absence of proceedings brought by any person entitled to do so, the original agreements still required to be performed by the composers. I thus do not see paragraph 21 as assisting EMC so far as concerns the original agreements.

(vii)      Paragraph 22 of the case asserts that "In the premises by the end of 1964 all of the original contracts had been terminated". For the reasons I have given I cannot accept that as being the case. I would add this: On the 11th January 1990 the New York firm of attorneys, Rabinowitz, Boudin, Standard, Krinsky & Lieberman PC, wrote to Peer describing themselves as representing not only EMC but "a large number of Cuban composers and their heirs residing in Cuba". The letter did not

identify either the composers or the heirs but so far from indicating a belief in EMC or in those Cubans that the original agreements had by then long been terminated by breach, the letter was at least consistent with their wishing to assert and rely upon the original agreements so far as concerned the past. Nor was the letter consistent with all composers' and heirs' rights having already been passed to EMC as the letter asked for information to establish which <u>individuals</u> would be entitled to payment. As for the then-present and the then-future, the letter did mention that termination notices had begun to be served (which suggests that they had not been served much earlier) but, in fact, none had by then been served nor later was. Since the composers and heirs represented by Rabinowitz were never identified it is hard to know what to make of this letter in relation to the issues now before the Court but it does make it difficult for EMC credibly to assert a widespread belief in the Cuban composers or their heirs that the original agreements had long been regarded by them as no longer subsisting and taking effect.

<u>A summary as to the original agreements at this stage</u>

44.     Of the many attacks on the validity and enforceability of the original agreements made in EMC's pleadings, only the simple ones in paragraph 4 of its Statement of Case, to which I have not yet referred, survive as attacks open to be raised <u>by EMC</u>. I say nothing at all at this stage as to whether the many attacks could be raised with any prospect of success by anyone else; I have looked thus far only at them as being raised in this action by EMC.

45.     I shall not deal with the allegations raised in that paragraph 4 (which chiefly go to the identity of the parties to the original agreements) at this stage and so I will proceed on the basis that, paragraph 4 issues apart, as between EMC and Peer the original agreements must be taken to subsist according to their respective tenor and as contracts which Peer is entitled to seek to enforce with regard to the periods to which they relate. But the original agreements are, of course, not the only Peer contracts in issue in this case as, save as to song (5), for periods after the beginning of the 1911 Act reversion, Peer has to and does assert contracts made with heirs. The ones asserted were made in and after 1998. I must now therefore turn to what EMC calls "composer confirmation of rights" and the other documents which I lump together as part of the "Further Dealings".

## C.  Further Dealings

46.     The exact wording of the Further Dealings varied from the case of one composer to another but, broadly speaking, each consisted of three types of document: a Composer Confirmation of Rights (a "CCR"), a confirmation of heirship and an addendum. I shall take those relating to Nico Saquito as typical. The relevant parts of the CCR in his case provided as follows:-

> "I … do hereby confirm the authority of Peer International Corporation and its affiliated companies and assigns on a worldwide basis, to administer and control all rights in and to the musical compositions included heretofore on the attached Schedule "A" authored by my late father, Antonio Fernandez Ortiz (aka Nico Saquito).

I further confirm that each of the Schedule "A" compositions are subject to a publishing agreement entered into by my father, and binding on me, my sister, Caridad Fausta Fernandez Arbelo, and Peer International Corporation, conveying to Peer International Corporation (and its affiliates and assigns worldwide), a one hundred per cent (100%) interest inclusive of the worldwide copyright interest in and to the subject works (including all renewals, extensions and reversions of copyright wherever arising) under all applicable laws and treaties throughout the world with the exception of Cuba where my rights are represented by the Cuban Musical Author Agency (ACDAM).

The within confirmation and authorisation shall be deemed my instruction to and shall be binding upon all licensees, and all persons, firms and corporations recording, performing or otherwise using any of the Schedule "A" works in whatever manner or by whatever means".

There then followed a very full list of compositions by Nico Saquito. The affidavit of heirship, the full title of which was "Affidavit of Heirship, Confirmation of Rights, and Authorisation and Direction of Payment", provided as follows:-

"2: Peer International Corporation, its affiliated companies and assigns.

The undersigned, being duly sworn, deposes and states as follows:

I hereby represent and warrant that I am one of the children of the composer Antonio Fernandez a/k/a Nico Saquito (hereinafter referred to as "Nico Saquito"). I and my sister, Caridad … Arbelo, are the sole heirs of Nico Saquito, who died on August 4th, 1982. As one of the children and two heirs of Nico Saquito, I am legally entitled to receive a one-half (½) allocation of any and all musical royalties accrued after 1988 or hereafter accruing in respect of any works authored in whole or in part by Nico Saquito, and owned or controlled by Peer International Corporation, its affiliates or assigns, limited to those listed on the attached Schedule "A". I hereby acknowledge that the within direction of payment applies to all composer royalties to be remitted by Peer International Corporation, its affiliates or assigns.

I hereby specifically confirm the authority of Peer International Corporation in respect of any and all works listed on the Schedule "A", authored in whole or in part by Nico Saquito and owned or controlled by Peer International Corporation, its affiliates or assigns, in so far as my interests therein and thereto are concerned (including, without limitation, my interest in or to the United States Renewal terms of copyright in such

works).  I further confirm the authority of Peer International Corporation to register copyrights and renewal copyrights in all such works in the name of the composer, the composer's heirs, or in the name of Peer International Corporation as employer for hire so as to secure maximum copyright duration and protection throughout the world, and to render statements of account and to make payments directly to me in respect of my one-half (½) allocation of any such post-1988 royalties and future royalties referred to above".

Both the English and the Spanish versions of the documents were signed by the Cuban individual making the document and each on its back bears a notarial notation.

47.    The addendum to CCRs, to the significance of which the Court of Appeal drew attention, was not notarially executed but was signed by the Cuban makers of the document and it provided as follows:

"You have referred us to the 'Composer Confirmation of Rights' dated …  Pursuant to proceedings you have brought in the United Kingdom to protect the musical rights acquired by Peer International Corporation, its affiliates, and assigns, we granted to you pursuant to the "Composer Confirmation of Rights" dated …. You have asked us to provide you with this statement.

We Antonio Fernandez Arbelo and Caridad Fausta Fernandez Arbelo, confirm that we were, when entering into the "Composer Confirmation of Rights" dated August 25th 1998 and remain the sole and rightful heirs of Antonio Fernandez Ortiz (Nico Saquito), pursuant to law or testamentary disposition.

Further we confirm that the "Composer Confirmation of Rights" dated August 25th 1998 was intended to confer upon Peer International Corporation, its affiliates and assigns, amongst other matters, and without limitation the exclusive licence and assignment of any and all rights vested in me with respect to the United States copyright renewal and the United Kingdom reversionary rights in the compositions referred to in the Schedule "A" to the "Composer Confirmation of Rights" dated August 25th 1998."

With relatively minor and necessary consequential changes from one to the other, all Further Dealings that are set out in the Schedule to this judgment follow the form of those that I have just cited.

Further Dealings: the 1911 Act Reversions

48.    Given that I am concerned only with English copyright, I now need to refer in more detail to section 5 (2) of the Copyright Act 1911 which, so far as here material, provides as follows:-

> "(2)      The owner of the copyright in any work may assign the right, either wholly or partially, and either generally or subject to limitations ….. and either for the whole term of the copyright or for any part thereof, and may grant any interest in the right by licence, but no such assignment or grant shall be valid unless it is in writing signed by the owner of the right in respect of which the assignment or grant is made, or by his duly authorised agent:  Provided that, where the author of the work is first owner of the copyright therein, no assignment of the copyright, and no grant of any interest therein, made by him (otherwise than by will) after the passing of this Act, shall be operative to vest in the assignee or grantee any rights with respect to the copyright in the work beyond the expiration of 25 years from the death of the author, and the reversionary interest in the copyright expectant on the termination of that period shall, on the death of the author, notwithstanding any agreement to the contrary, devolve on his legal personal representatives as part of his estate, and any agreement entered into by him as to the disposition of such reversionary interest shall be null and void, ….."

49.    Since the 1st June 1957 it has been possible for authors to assign copyright in the works beyond that period of 25 years after their death but paragraph 27 of Schedule 1 of the Copyright Design and Patents Act 1988 preserves the effect of the proviso in section 5 (2) in relation to assignments made before the 1st June 1957.  I shall need to return to the proviso to section 5 (2) when I turn later to legal difficulties in Peer's path.  However, even on the basis that, in this action and as between Peer and EMC, I should proceed on the footing that the original agreements are effective according to their letter, that would not suffice to carry present rights to Peer after the expiry of 25 years from the composer's death unless Peer has taken under the will of a composer (which is never the case) or takes by assignment from "his legal personal representatives" upon whom the composer's estate or the relevant part of it had devolved.

50.    Antonio Fernandez Ortiz (Nico Saquito, as I have mentioned, was his nom-de-plume) died on the 4th August 1982.  Whatever the terms of his original agreement, so far as concerns English copyright, present rights thereunder will therefore cease in 2007 unless some fresh and valid arrangement has been made with his estate.  His co-author of song (3), Senor Sanchez, died in 1991.

51.    Bienvenido Julian Gutierrez died on the 5th December 1966.  Fresh dealings with his "legal personal representatives" would thus have been required if Peer were to have rights running beyond 1991 but, fortunately for Peer, he made an original agreement with Peer after 1st June 1957 and so Peer has no need of a Further Dealing in his case.  Prima facie Peer still has the copyright to song (5) directly from him.

52.    Ignacio Pineiro died on the 12th March 1969; the original agreement thus carried no English rights beyond 1994.  Celia Romero died on the 12th October 1967; her original agreement thus expired, so far as concerns English copyright, in 1992.

53.  Accordingly, save in the case of Nico Saquito, Senor Sanchez and Bienvenido Gutierrez, as to the last of whom the original agreement is, for the purposes of this action, to be taken as still enforceable by Peer, in the case of every other composer some further dealing with the composer's "legal personal representatives" is required to be shown if Peer is to have present rights as to English copyright.  Peer does plead that there have been adequate dealings such as confer upon it, it claims, those present rights.  EMC attacks the validity of those dealings.  What I shall look at next is EMC's ability to raise some of the attacks on the Further Dealings in the manner which it does.

54.  One attack would have depended on the law referred to throughout the action as Cuban Law 860 of 11th August 1960.  However, I do not need to look further into Law 860 for immediate purposes because, whilst it may have provided a reason for Cuban composers to *believe* that Peer no longer had rights under the original contracts, Law 860 has been held by the Court of Appeal, as I have said, to have been expropriatory without compensation and on that account such as not to have taken effect so far as concerned English copyright.

55.  Could it be, though, that dealings alleged to have been made between a living composer and EMC's forebear, EGREM, in the interval after the 1st June 1957 (repeal of Section 5(2) of the 1911 Act) but before any Further Dealing between Peer and the composer's personal representatives could take effect in EGREM's favour for the rest of the available period of copyright running from the commencement of the 1911 Act reversion and thus deny any content to such of Peer's later Further Dealings by which it had hoped to utilise the 1911 Act reversions?  Here the tables are turned and it is Peer rather than EMC that relies upon Law 860.  This subject, which I will call "the EGREM intervention", was dealt with in very late expert evidence as to Cuban law and even later argument, in October 2006.  I shall for the moment leave it over until later so to say that EMC alleged that there are 4 such contracts with EGREM.  They are shown in the Schedule and are of 3rd May 1960, with Nico Saquito (songs (2), (3) and (4)); of 15th February 1962, with Bienvenido Gutierrez (song (5)); of 13th February 1964, with Ignacio Pineiro (songs (6) to (13) inclusive) and 26th April 1964, with Celia Romero (song (14)).  As I say, I shall leave the EGREM intervention and the related subject of EMC intervention till later and I will first deal with other challenges by EMC to Peer's Further Dealings.

56.  Another class of attack raised by EMC, one which can be dealt with at this stage, is its contention that all the Further Dealings, dealings subsequent to the original agreements, are voidable for misrepresentation, duress, undue influence and unconscionability and are unenforceable or should be set aside under the equitable jurisdiction of the Court.  But, much as was the case in relation to the original agreements, it is an extraordinary feature of this attack that no party on the composer side to any relevant Further Dealing has been joined as a party to this action.  It is not said that EMC represents any such party and none, himself or herself, has raised a case (here or, so far as is known, in Cuba or the USA) claiming breach, misrepresentation, duress, undue influence or unconscionability in relation to whatever particular Further Dealing was his or her concern.  I would not be able to accept that initiating proceedings in Cuba was hopelessly beyond the financial or practical reach of the composers' heirs; one Cuban witness gave evidence that anyone could go to a law firm there and get advice at a reasonable price.  It is not suggested

that any such person is under some disability such that he or she could not have raised such a claim had it been intended to do so nor, in any case, is it shown that in any other way EMC is entitled to raise such a case on his or her behalf. In my judgment, whether the appropriate law is English law or Cuban or Spanish law, nothing has been shown to me to suggest, in the absence as parties to these proceedings of all such parties to the Further Dealings, that EMC has locus standi to raise any such complaints.

57. That is all I propose to say at this stage, before any detailed look at the contested evidence, by way of observations on EMC's attack on Peer's Further Dealings. It will become necessary later to look, as part of Peer's difficulties, at whether not EMC but persons duly having locus could raise any of the kinds of claims EMC has been trying to raise. It is to Peer's difficulties that I therefore now turn.

### D. Some of Peer's Difficulties

<u>No grant to it and no legal owner</u>

58. At an early stage, after reference had been made to section 5 (2) of the 1911 Act supra, it came to be seen that the proviso put a difficulty in Peer's way where it relied other than on an original agreement. In particular there was a difficulty as to its assertions that there had been assignments to it of the 1911 Act reversions, namely as to the English copyright in respect of a period beyond the expiry of 25 years after the composer's death. The 1911 Act provides, as I have referred to, that the 1911 Act reversion "shall … devolve on [the composer's] legal personal representatives as part of his estate".

59. Who are such "legal personal representatives"? The English copyright is movable property situate in England. In the ordinary course an English court does not, with respect to such property, look into whether some one or more persons, either by way of the order of some foreign court or otherwise, have become describable as "legal personal representatives" but rather expects an English grant to be made that includes the property in question. Thus one finds in *Dicey & Morris, Conflict of Laws, 13th Edition 2000*, under the general editorship of Mr Lawrence Collins, as he then was, the following at Rule 127 and thereafter:-

> "Rule 127 – A grant of representation or other authority to represent a deceased person under the law of a foreign country has no operation in England.
> ……….
> ……….
>
> Comment
>
> 26-037 The general rule is that a foreign representative of the deceased who wishes to represent him in England must obtain a grant of representation here and cannot sue in his character as a foreign personal representative. The rule, is, in short, an application of the general principle that no person will be recognised by the English courts as personal representative of the deceased unless and until he has obtained an English grant of probate or letters of administration."

The 13th Edition was the one current when this part of the argument was dealt with; in the now current 14th rule (now Rule 135) and the comment remains the same – see para 26-037. It is not said that any of the relevant composers died testate. No English grant of probate to the estate of any has been made nor have any relevant letters of administration been granted. Until such a grant to a deceased's estate is made it vests, nowadays, in the Public Trustee – Administration of Estates Act 1925 section 9 as amended. If, by way of that vesting, the 1911 Act reversions are vested in the Public Trustee, how could Peer, especially in the absence of that legal owner from these proceedings, press for the relief which it initially sought, namely that it is entitled to a declaration that it is the owner (and, presumably, as the pleading gives no reason to separate legal and beneficial ownership, the <u>legal</u> owner) or exclusive (legal) licensee of the identified compositions?

60.    Peer met this new possibility by amending to add an alternative form of relief to the Particulars of Claim asking that it be granted a declaration that Peer had a better title than EMC to ownership of the copyrights in the various compositions or alternatively that there should be an order appointing Peer as administrator of the relevant estates but limited to the parts of the unadministered estates constituted by the 1911 Act reversions.

61.    This newly emergent point gave rise to extended argument and the instruction of new Counsel, Counsel directing themselves exclusively to the probate and succession issues that had thus emerged. Firstly, by Mr Taube QC, Peer argues that the term "legal personal representatives" in the proviso to section 5 (2) of the 1911 Act is wide enough to include persons in whom the personal property of the composer has vested on his death, whether or not they are personal representatives by way of a grant from an English court. The term is wide enough, he has to say, to include the persons, be it in the capacity of heirs or next-of-kin or otherwise, to whom, under the appropriate foreign law, the English 1911 Act reversion belongs on the composer's death.

<u>Legal personal representatives</u>

62.    I shall first consider that argument without the benefit of authority. A number of related counters to it arise. Firstly, when the legislature uses an English legal term of art – "personal representatives" – but intends that it should have other than its usual English meaning, it is reasonable to expect that that some other meaning is intended is made clear. The added word "legal" hardly does that and there is nothing else that points to a departure from the usual technical meaning. Secondly, had Mr Taube's construction been intended, the words "on his legal personal representatives" in the longer phrase "shall ….. devolve on his legal personal representatives as part of his estate" would, in my view, have been unnecessary and possibly confusing. Such redundancy in a statute is in general to be resisted and it can be if the added reference to legal personal representatives (I am far from sure what the word "legal" adds) is taken to have been intended to identify those who become personal representatives, if not, consistently with the general practice illustrated in *Dicey & Morris* supra, by way of an English grant, then at least by way of there having been some conferment on them by the Will or by some foreign court of rights and duties closely analogous to those falling upon personal representatives under English law. Indeed it may be that some such role to be played by some foreign law was what prompted the additional word "legal". Without some such limitation there are practical difficulties so foreseeable that one would expect some provision to be made for them. As EMC

points out, if a composer leaves five children who take jointly, would all dealing with the copyright be sterilised unless and until all five could be found and would agree to it? The Act, moreover, seems to contemplate that there will be "legal personal representatives" of the whole estate upon whom the 1911 Act reversions devolve "as part" of that whole.

63. Next, in 1911, only a few years after the Land Transfer Act 1897 which simplified devolution by making real property, like personal property, devolve upon personal representatives, there was likely to have been a far greater awareness than might be found today of the different descriptions of devolution as to real and personal property and in respect of heirs, next-of-kin, devisees, legatees, creditors and personal representatives. Heirs, next-of-kin and others are, under English law, persons upon whom fall very different rights and duties than those falling upon personal representatives as that term is generally understood in English usage. I recognise, of course, that the class from which personal representatives in England are drawn very commonly consists of or includes those describable loosely as the deceased's heirs but what is required of them respectively in the two capacities is very different. So different that if, in 1911, heirs of persons deceased who had been domiciled abroad and who, without any Will or order of the foreign court, acquired rights to movable assets situate here had been intended to be included within the class upon whom 1911 Act reversions devolved without need of any English order, that would, in my view, have been seen by the legislature to be something which would have required express provision. None such is found.

<u>Redwood Music</u>

64. Mr Taube relies on a passage (which he accepts is obiter) in the judgment of Robert Goff J. in *Redwood Music v B. Feldman & Co. Ltd.* [1979] RPC 1 at 8.

65. The case dealt with the copyright in a song which had two joint authors as to its words and the same two joint authors as composers of its music. One of those two was a Mr Simons, a citizen of United States. He died testate in 1949 and his Will had named executors but no grant either of probate or of letters of administration had been made in respect of any part of his estate by the court in England. The claimant in the action, Redwood, depended, as to its title to that particular copyright, in part upon the 1911 Act reversion having passed, one way or another, to beneficiaries under Mr Simons' will and upon there having been persons falling within the description of Mr Simons' "legal personal representatives" for the purposes of the proviso to section 5 (2) who could have and had passed title to those beneficiaries. There had been assignments from such beneficiaries to Redwood – see *page 4 lines 21-32*.

66. Redwood had been met by an assertion that, in order for anyone to be recognised as "legal personal representatives" in England, a grant to him had to have been made in England. In response to that, before the actual hearing but after the commencement of the action, Redwood had procured steps to be taken in the USA and, ultimately, a new grant, a grant of letters of administration with the will annexed, was made in England in respect of Mr Simons' estate following a grant of administration de bonis non by the Probate Court in Michigan – *page 4 lines 47-52*. The English administrator thus constituted made a fresh assignment to Redwood and Redwood began a second action. The issue as to title as at the commencement of the first action thus became

relevant only to costs – *page 5 line 17*.  At *page 8* of the judgment one finds the passage relied upon by Mr Taube; it says:-

> "Of course, the proviso to section 5 (2) of the Copyright Act 1911 provides that the reversionary interest referred to in the proviso shall devolve on the "legal personal representatives" of the author as part of his estate.  If, as I think, English copyright which forms part of the estate of a testator who dies domiciled abroad can vest in the executors appointed in his will, without any Grant of Probate or Letters of Administration in this country, then I can find nothing in the Act of 1911 which compels me to  conclude that the words "legal personal representatives" in the proviso should not be wide enough to include persons in whom the personal property of the author vests on his decease, whether they are legal personal representatives under English law or not.  Indeed, to read those words as restricted to legal personal representatives under English law may have the effect in some cases of defeating the proviso, which provides that the reversionary interests shall devolve on the legal personal representatives on the death of the author, whereas on Mr Stables' argument the interest may only devolve, in a case such as the present, on the Grant of Probate or Letters of Administration in this country."

At *page 10* the learned Judge concluded that the executors named in Mr Simons' will had acquired on his death a good title to the reversionary interest, if any, in his share in the copyright in the song.  It had devolved, he held, upon them as his "legal personal representatives" by virtue of the proviso to section 5 (2) of the 1911 Act.  He held also that those executors had thereafter made implied assents to the beneficiaries through whom Redwood claimed – *page 10 line 21*.  Redwood accordingly won the issue of title in the first action.

67.     There had, in *Redwood*, been three executors named in Mr Simons' will.  A grant to them in the United States is not expressly referred to in the judgment but there are some references to suggest that there may or must have been one.  Thus at *page 6 line 21* Counsel spoke of executors having made an assent and on *page 10* between *lines 9 and 21* the learned Judge spoke, as I have mentioned, of the executors having made an assent, if not an express one then one implied.  Moreover, at *page 5 lines 4-6* he mentions that *Redwood* had recognised that since they could not prove the will of Nora Bayes, the co-author and co-composer with Mr Simons, "They could not establish any title to her share in the copyrights".  That perhaps suggests that in Mr Simons' case, by contrast, the executors had obtained a United States grant of probate.   I have no reason to think that the later Michigan grant of an administratorship de bonis non precludes there having been an earlier grant of probate to the named executors.

68.     The learned Judge's reasoning in *Redwood* on this issue is not above doubt, as is its applicability here, although I embark on the following passages with some diffidence.

69.     Firstly, a good deal of the reasoning in *Redwood* had grown from the observation that executors derive title from the will, not from the grant of probate that may follow it.

Probate merely proves the executors' title rather than conferring it – *page 7 line 12-13*; *page 5 lines 41-42*.  But administrators are in a quite different position; their title is derived from their grant and the deceased's property vests in them only if a grant has been made – *page 5 lines 45-47*.  It can be, therefore, that an argument that relates to executors and testate succession does not carry the day as to administrators and intestate succession, the only kind I am concerned with.

70.    Secondly, part of the reasoning depended on the provisions of section 19 of the Revenue Act 1889 which, in respect of English policies of life assurance, provided (no doubt for obvious commercial reasons, if foreigners were ever to be tempted to acquire such policies) that where such had "been effected with any insurance company by a person who shall die domiciled elsewhere than within the United Kingdom, the production of a grant of representation from a Court in the United Kingdom shall not be necessary to establish the rights to receive the money payable in respect of such policy" – see *page 7 lines 17-23*.  Robert Goff J. continued, at *page 8,* to read that provision as appearing to have pre-supposed that the executor of a foreign-domiciled testator could establish his title without an English grant in his favour, which, he said, must mean that he could derive title from the testator himself.  In the sense that title in any event was *conferred* by the will that is entirely unexceptional but the learned Judge continued:-

> "If this is right in the case of an English [chose] in action such
> as a right to claim money under an English policy of assurance,
> I do not see why it should not also be right in the case of
> English personal property in the nature of copyright."

But that, as it seems to me, fails to recognise that section 19 of the Revenue Act 1889 was the exception rather than the rule.  Had its provision been the ordinary rule then there would have been no need of it in the particular case of life policies.  The very fact that there had been need for a statute on the point indicates that it was exceptional.  It is thus not, in my view, possible to extrapolate from that exceptional provision as to English policies of assurance in order to find what is correct with respect to copyright.  It may be, too, that the last sentence of that fuller citation above, on which Mr Taube relies ("Indeed etc….") confuses devolution, that is, in this context, entitlement on death, with a *vesting* on death, which is what the learned Judge had been discussing – see e.g. *page 8 line 15*.  Whilst the proviso requires that there should be a devolution upon legal personal representatives on the death that does not necessarily require an immediate *vesting* in them on death or preclude a vesting under section 9 of the Administration of Estates Act.

71.    However, I am glad to find I have no need to hold *Redwood* to be wrong.  In that case there had been persons whom, it seems, could fairly be described as having the characteristics of "legal personal representatives" within a loose but ordinary usage, namely Mr Simons' three United States executors.  Given (applying English law by analogy) that their title as executors was *conferred* upon them by Mr Simons' will irrespective of whether there had been a United States or English grant to them, they could, as it seems to me, be described, without abuse of language, as personal representatives and the fact that the judgment speaks of their having made an assent suggests that that was so.  But it is, in my view, too big a jump to move from regarding persons who, despite the absence of any English grant could, for the reasons I have given, be fairly describable as "legal personal representatives" to concluding

that *anyone* becoming entitled to the English personal property in any capacity on the death of someone domiciled abroad can be, without more, regarded as a "legal personal representative" within the proviso. Robert Goff J. had no need to go that far and I have no reason to think that he meant to or did.

72.     I confess my preferred construction of the proviso would be to limit "legal personal representatives", consistently with the observations in *Dicey*, to those obtaining an English grant but if that is wrong I would limit them so as to exclude the very different categories composed of heirs, next-of-kin, devisees, legatees or creditors in respect of whom no grant or order of any Court, English or foreign, has been made as to title to or as to the vesting of the deceased's personal property. I do not expect, in the absence from the 1911 Act of any express provision in that behalf, that persons in such categories were intended to be included by the legislature; I find no authority that requires them to be included and the fact that it may, in the case of some foreign jurisdictions, be more difficult to separate the categories I have described than it is in this one merely strengthens the reasons for my preferred construction.

73.     Where does all this lead? Firstly, if, as I have held, there has not yet been any devolution of any 1911 Act reversion under the proviso to section 5 (2) of the 1911 Act, then there is no reason to take anyone but the Public Trustee to be the present legal owner of such reversions. That gives rise to this question:  as to the compositions in respect of which Peer has to rely on the 1911 Act, is Peer in a position to obtain relief of the kind it asks for, given that it is neither legal owner of any 1911 Act reversion and has not even procured the joinder of the legal owner, the Public Trustee, notwithstanding the long interval since the point that the legal estate was vested in the Public Trustee was first raised?  Neither has it added the "heirs" through whom it claims. Secondly, in many respects Peer's claims depend upon its having acquired the 1911 Act reversion from Cuban beneficiaries. If no Cuban beneficiary or even combination of Cuban beneficiaries is properly to be regarded as having acquired the legal title to the 1911 Act reversion in the capacity of "legal personal representatives" of a composer, how can Peer, in respect of those reversions, frame its claim?

74.     Although no Cuban law on this point has been explored in evidence, it does not seem to me to follow that simply because someone, by reference to his being, say, a child or one of the children or a surviving spouse of a composer, can be spoken of as that composer's "heir" that he or she, without the intervention of the Cuban Court (and none is mentioned) becomes entitled to raise a claim to the English copyright in respect of royalties due on the late composer's songs in England. There may, for example, be unpaid creditors, possibly unpaid government creditors, of the estate. It may be that the Cuban government, hungry for hard currency, requires that it should be it alone that recovers the foreign currency, replacing it, to the heirs, with Cuban currency. It may be that when the genealogy is uncertain or where heirs dispute between themselves as to their respective proportions that there is no vesting in any heir unless and until there is a Cuban Court order. I am thus left uncertain whether Peer's description of someone or that person's own description of himself as an "heir" suffices to establish in him or her any form of estate or interest in or claim to any English copyright.

Rights to a due administration

75.   I shall, though, assume that each Cuban heir of a relevant intestate deceased composer had an equitable interest, as Peer asserts, in the due administration of such part of the deceased's estate as is situate in England.  That equitable interest is assignable.  So far as concerns the 1911 Act reversions relating to works of the composers Antonio Fernandez Ortiz, Maximiliano Sanchez and Celia Romero then, says Peer, it has collected effective assignments from <u>all</u> of the relevant heirs.  In such cases it has thus acquired the totality of the equitable rights to require a due administration.  In the case of Ignacio Pineiro it has collected, it says, from five out of the ten heirs and so in his case it is entitled to half (EMC having collected the other half) of such equitable rights.

76.   The CCRs and their respective addenda, which, as I say, I lump together under the term "Further Dealings" and which I have set out above, are what Peer relies upon as an indication of its having collected the several equitable rights of the kind I have described.  Peer claims, I think rightly, that the Court of Appeal's decision shows that such rights could be and were assigned to it.  The action, says Peer, is not about title in some absolute terms but simply as to whether Peer or EMC has the better title so that the MCPS can properly be safe in distributing to Peer rather than to anyone else.  It would be disproportionate, says Peer, where it already has the equitable rights to a due administration, to require formal grants of representation in England in order to satisfy the MCPS where, quite often, not just in this the case of these songs but in many others, royalties are so modest as to make the cost of obtaining a grant disproportionate.  MCPS, says Peer, does not insist on seeing a legal title; a good beneficial title suffices.    Even where there is no English "legal personal representative" of a composer for the purposes of section 5 (2) of the 1911 Act, where all of his heirs have assigned to Peer then Peer, it asserts, would be able to compel such a personal representative, were there to be one, to transfer the legal interest in the reversions to it subject only to discharge of debts and administration expenses.  In such a case there is no need for going through the formalities of obtaining a grant; it would, says Peer, be a waste of time and money.

An English grant

77.   I can only deal with the facts of this case and, on such facts, I am unimpressed by any argument about an insistence on a grant being such a waste.  It is a familiar enough argument that the legal owner should be before the Court as a party – consider *Performing Right Society Ltd v London Theatre of Varieties Ltd* [1924] AC 1 at 13, 14, 18 and 19 HL.  In the context of an action with well over 20 days of hearing spread over well more than a year, the time expended upon and the costs merely of the obtaining of grants, supposing that proper parties would come forward to ask for one, would be invisibly minimal.  I have not been told of any insuperable difficulties that have come to light in the course of application for grants or for the joinder of the Public Trustee nor of any reason (beyond the suggested waste of time and money) why no grant has been sought, nor why the Public Trustee was not joined.  As for joinder, it might be thought technical enough to assert that the legal owner should be joined when there is a legal owner likely to take and to have a real interest in the contest but, the accusation would run, it would be quite unnecessarily to be concerned with form rather than function to insist on such a joinder when the legal owner was as nominal as the Public Trustee.  But I suspect that what has deterred Peer from joining

the Public Trustee has not been the simple step of joinder but has been the risk of its needing to implement suggestions which the Public Trustee might make as to enquiries to be made and as to yet further persons to be joined if the Public Trustee were, after joinder, to be and remain no more than a passive party. If that is right then it cannot be said that insistence on the legal owner's joinder is merely "technical".

78.    EMC, by Mr O'Sullivan, raises a number of other points in answer to Mr Taube. As to the relief claimed by Peer, he argues, rightly in my view, that a declaration that Peer is the owner of a copyright requires Peer to show something other than that it has rights in equity indirectly including rights relating to the copyright. As to the alternative declaration sought by amendment, namely that Peer has a better title than Termidor or EMC, he questions whether that can be a proper form of declaration. He argues that the relief claimed concerns matters other than merely MCPS's practice and in any event points out that there is no evidence as to what MCPS's practice is, where, as here, a thorough-going dispute has broken out.

79.    Where there is no dispute to a title then I can quite see that MCPS may not require a grant to have been made. There may be many cases where a letter or letters from members of the late composer's family or from the family's advisers enable it to act without anything more formal. But when a dispute is brought to its notice, even by someone not having standing to pursue that dispute in court and where the dispute concerns the circumstances in which assignments to the purported assignee came to be made, I have no evidence that MCPS, even there, does not require a grant to be produced to it. Nor could I be critical of it if in such circumstances it did require to see a grant.

80.    I have already dealt with argument as to the 1911 Act reversions, section 5 (2) of the 1911 Act and *Redwood* supra. As to other parts of Peer's claims, Mr O'Sullivan draws attention to *Ingall v Moran* [1944] KB 160 and *Hilton v Sutton Steam Laundry* [1946] KB 65. Both underline the need for a claimant who claims title by way of the estate of a deceased to have acquired a good title by the time the claim form is issued; otherwise his claim will be a nullity. Mr O'Sullivan picks up Mr Taube's very proper reference to section 11 of the Revenue Act 1884 (which I am assured is still in force) and refers to its requirement that, where there is an intestacy, letters of administration from a court in the United Kingdom "….shall be necessary to establish *the right to recover or receive* any part of the personal estate … situated in the United Kingdom" (my emphasis). That is consistent, he argues, with a requirement that Peer has to acquire a grant in its favour if it is to be able to ask a court to declare in its favour with a view to its then recovering past and future royalties from MCPS. It would, as it seems to me, drive a coach and four through legislation which, by requiring an English grant of representation, provides a convenient mechanism for the collection of taxes and duties if, rather than obtaining such a grant, those claiming through a foreign domiciled deceased could obtain a declaration as to their having a better title than some competitor by arguing, as Peer does, that, even if they have failed to acquire a *legal* title, they are enabled to recover and receive by reason of their being better placed than anyone else in equity. The fact, as is likely, that in the case now before me there are no English creditors, Crown creditors or otherwise, does not undo the requirements of section 11.

A disposition against declaratory relief

81.   I regard the arguments I have so far dealt with under this main heading as very
powerful arguments against there being any declaration either such as was originally
asked for by Peer or as is asked for Peer by amendment.  I am far from sure whether
any facts could overcome the conclusions of law thus far pressing against declaratory
relief but, assuming that could be the case, I shall proceed on the basis that, unless
contrary factors of at least equal weight emerge when I later look at the facts in more
detail as part of a review of the propriety, in the relevant circumstances, of the grant
of a declaration *as discretionary relief,* I will be disposed to refuse any declaration as
sought in paragraphs 12 or 13 (1) of the Re-amended Particulars of Claim.

Peer or another as administrator

82.   But that leaves Peer's claim that it itself should be appointed as administrator as to the
1911 Act reversions on the footing that they represent unadministered estate.  Peer
seeks that relief by way of section 116 of the Supreme Court Act 1981 which, so far
as relevant, provides as follows:-

> "If by reason of any special circumstances it appears to the
> High Court to be necessary or expedient to appoint as
> administrator some person other than the person who, but for
> this section, would in accordance with probate rules have been
> entitled to the grant, the Court may in its discretion appoint as
> administrator such person as it thinks expedient."

The persons who would, in accordance with probate rules, have been entitled to the
grant are described in rule 22 of the Non-contentious Probate Rules (NCPR) 1987
which, prescribe, after giving priority to a surviving husband or wife, that the children
of the deceased and the issue of any deceased child who died before the deceased are
second in line to a grant of administration.  Thus in order to obtain a grant under
section 116 Peer would ordinarily need to show that it was necessary or expedient for
itself to be appointed rather than, for example, a child or children of the deceased, as
administrator.  Had it been shown to me that such child or children could not be found
or, if found, refused or declined to apply for a grant then the necessity or expediency
of appointing Peer might perhaps have been shown but no such evidence has been
given.  That basic pre-condition of a grant under section 116 has not been made good.

83.   Peer, though, is entitled to argue that in some cases NCPR 24 (1) gives it priority.
That rule provides:-

> "24 (1) Where all the persons entitled to the estate of the
> deceased (whether under a will or on intestacy) have assigned
> their whole interest in the estate to one or more persons, the
> assignee or assignees shall replace, in the order of priority for a
> grant of administration, the assignor or, if there are two or more
> assignors, the assignor with the highest priority."

84.   But I do not understand any heir to have assigned his or her "whole interest in the
estate" to Peer but only the whole interest in the identified copyrights.  One might
think that where a grant is only to relate to a part of an estate that it would suffice to

give priority to an assignee that the whole interest in only that part had been assigned to him but NCPR 24 (1) does not seem to permit that. So, on the face of things, Peer does not, so far, replace others in the order of priority. NCPR 30 (2), which, as a matter of discretion, enables a grant "to the person beneficially entitled to the estate by the law of the place where the deceased died domiciled" again looks to entitlement to the whole estate but, even if it did not, I cannot see a grant being likely to be made in the exercise of a discretion without the district judge or registrar, learning of the disputed circumstances surrounding the assignments by heirs, first requiring notices to be sent affording opportunity to family members possibly prior to Peer to oppose. I cannot assume what the reactions to such notices might be. Even those who signed Further Dealings in favour of Peer may claim, perhaps influenced by EMC's arguments and the evidence it has adduced, that they were tricked into signing as they did.

85.    I cannot think that even if the basic requirement of section 116 had been made good or if the NCPR conferred a discretion upon me that I would be in a position in this action and without more now to make grants thereunder. I shall need, when I come to consider the facts in greater detail, to look at the circumstances in which the CCRs were obtained from children of deceased composers but at this stage it suffices to say that such heirs could claim (I do not have to say could <u>successfully</u> claim) that doubt surrounds the circumstances in which those confirmations were obtained. Even if I had a present discretion to make a grant I would thus need to recognise that it would be far better for the administrator to be some quite independent and impartial person rather than a person, Peer, conduct of whose representative in the obtaining of the CCRs upon which it relies has been thoroughly sought to be impugned. I cannot possibly see that I would be appointing Peer as administrator. The head of relief sought in paragraph 13 (2) of the Re-amended Particulars of Claim thus seems to me quite beyond any possibility of here and now being granted.

86.    Peer, in the course of argument, floated the idea that if it could not be appointed then surely some independent figure such as a respectable accountant could be. There are a number of objections to that as matters stand. Firstly, I have no idea what the reaction of the heirs of the various composers would be to such an idea. Any wishing to undo their Further Dealings with Peer (and their existence cannot be discounted) may wish to resist the costs that such appointment would introduce, especially if, as Peer has argued, the royalties are, in amount, in some cases at least, insignificant. In such cases royalties could be consumed by such fees as would be inevitable if a professional administrator were appointed. The heirs would need to be consulted before any grants were made. Secondly, EMC could fairly say that Peer, having had ample opportunity to do so, has never yet further amended the relief which it claims in the action to ask other than that *it* should be appointed and that Peer should thus be restricted to the relief it has asked for. Even if that second point had no weight, which is not the case, the first one would preclude any immediate grant.

87.    There are four songs, as I have mentioned, as to which Peer's claims do not rest upon section 5 (2) of 1911 Act namely songs (2), (3) and (4) (as to which 25 years from the composer's death has not yet expired) and song (5) (by Bienvenido Gutierrez) in respect of which the assignment to Peer was made on the 25th July 1958, after the repeal of, and hence unaffected by, section 5 (2). Those four songs apart, and subject only, so far as concerns declaratory relief, to further consideration after I have gone

into the facts in more detail, in my judgment upon such of the arguments as I have so far dealt with, none of the relief as claimed by Peer is proper to be granted.

A summary thus far and first reflections on declaratory relief

88.   My reasons thus far have led to a very substantial cull of the claims and defences on both sides. What is there that survives? As for song (5), Peer can, as between it and EMC, claim to the full extent of the copyright life remaining; it is not vulnerable to either the EGREM or EMC interventions which I shall later describe. In the case of songs (2), (3) and (4), Peer is still able directly to rely on its original agreements as to those songs but only for a short while; until August 2007 so far as its title derives from Nico Saquito but until 2016 so far as its claim derives from Senor Sanchez. In the light of findings thus far, the only defences which EMC is able to deploy as to songs (2), (3) and (4) in respect of periods after the 1911 Act reversion beginning in 2007 and 2016 respectively are the EGREM intervention and EMC interventions, which I have yet to deal with, and its defences in paragraph 4 of its Amended Defence, which again I have yet to deal with. But paragraph 4 of the Amended Defence does purport to affect songs (2) and (3) so I shall have to deal with it in that connection. In any event I have to look at the paragraph 4 defence as to its effect on songs (9) and (14). As to song (4), it is unaffected by the paragraph 4 defence and as to that, in relation to the period until August 2007, I repeat that there is thus far no defence which EMC is able to deploy.

89.   Looking at the other side of the cull, as to songs in respect of which Peer has to rely on the 1911 Act reversion, I am, for the reason I have given, already disposed against granting declaratory or other relief in Peer's favour but, as declaratory relief is discretionary, I shall look into the facts in more detail, as I have foreshadowed, but I shall begin that regard with something of a real disposition, as I have explained, against the grant of such relief.

90.   Why I need to look at the facts in more detail on this subject is this. Even though, in my judgment, EMC, for want of its having standing and for want of the joinder of certain parties, has no present ability to pursue its case, under several headings, that the original agreements were voidable and should be avoided, it has, without objection from Peer, argued that the terms of the original agreements, properly construed, are such as would at least leave them very vulnerable to attack from persons who *did* have standing to attack them. As to the Further Dealings, EMC has not only argued but has led evidence which, again, might suggest that they are vulnerable to be set aside should a person of proper standing attempt to achieve that. Must I, when I come to the point of granting or withholding the discretionary relief of declarations in Peer's favour, totally ignore the arguments and evidence for and against the vulnerability of the original agreements or of Further Dealings on the basis that no person having proper locus standi has yet appeared to seek their annulment or may or should I look into those arguments and that evidence as being relevant to the granting or withholding of what is admittedly a discretionary relief?

Declaratory relief (1)

91.   That question requires me, in my judgment, first to look at what is the effect of declaratory relief in general and to look also at how declarations would be likely to or might be used were they to be granted in this case. Declarations, although very often

framed in apparently absolute terms, can, in strict analysis, bind only the parties to the proceedings in which they come to be made and the privies of those parties. The fact that, despite the absolute nature of the language used in the declaration, only such persons are bound is very often immaterial. In proceedings between the owners of Blackacre and Whiteacre as to where the boundary between them lies, a declaration cast in absolute terms, may, in practice, achieve the apparently absolute effect which its language suggests simply because the issue will be resolved by the unchanging past conveyancing and usage history down to the commencement of the proceedings, as to which, generally, all properly collectable evidence will have been adduced. The issue, moreover, is unlikely to affect any one but those owners and those deriving title under them. In cases such as that the apparently absolute nature of the language used in the declaration should mislead nobody. But it cannot be assumed that all who read declarations will realise that only the parties to the proceedings in which they were made and their successors are affected by its terms. Still less can that be safely assumed where the declaration may be deployed outside this jurisdiction, a jurisdiction in which the limited force of declaratory relief is, if not widely understood by the public at large, at least comprehensible to the lawyers within the jurisdiction. Accordingly any Court asked to make directions in terms which may be used to affect others than the parties to the case and where there is no assurance that no other evidence could be material to resolution of the issues to which the declaration relates has to be cautious. If the declaration affects not only past but also future enjoyment of rights then even more reserve is needed. In such cases it can only be prudent to look into the uses to which the declaration is likely to be put.

92.    To what use would the declarations sought by Peer be likely to be put? Peer could say that it simply wished to obtain them in order to be able to produce them to MCPS and hence to do no more than recover the fruits of the English copyright in the particular 13 songs. But that would not be credible and it has not been said. One might reasonably expect, if that were to be said, that Peer would first have considered whether the game was worth the candle; whether the likely costs of the proceedings it was embarking upon were justified by the likely recovery from the MCPS. That, of course, would have required some assessment by Peer of what the recovery from the MCPS would be likely to be in the case of the 13 songs. But it became quite apparent during the hearing that Peer had really very little idea of what the recovery in respect of the 13 songs would be. At first it thought it was just a few hundred pounds that was already at stake; further investigation disclosed that it could be a few thousand pounds at stake. In either case I cannot believe that Peer would have embarked on the proceedings, ones of exceptional complication, had they been intended to do no more than to lead to the recovery of such relatively minor sums as accrued royalties or prospective royalties. Whilst the case has never been marked out as a test case by Peer, I cannot believe other than that it has been hoped by Peer that the relief obtained in it would be capable of being used as if the case had been a test case despite the absence of a prior consideration by the parties together or by the Court of what would be the appropriate subject matter (in particular which would be the appropriate songs of Peer's 600 or so) if the case were to be a test case. Peer has been free to choose its best examples and I am unconvinced that its selection of these 13 songs has been solely by reference to careful selection from its 600 or more songs of various different classes of the many contracts under which copyrights or reversions were acquired in such a way that each of the 13 represents a discrete class separate from the others.

93.   In such circumstances I think it prudent to assume that whatever declaration, if any, as might emerge in Peer's favour is intended to be used by Peer possibly as to other songs than these thirteen and possibly in jurisdictions other than this one. Indeed, when this part of the case was discussed, at the very end of argument, Mr Saini made it plain that, were I so to hold, Peer would wish to use the declaration granted to demonstrate to others than EMC, for example, that EMC's claims in fraud had failed. It also appeared consistently with his note for a hearing in October 2006 that Peer may have the intention of using the declaration (England having been selected as a jurisdiction neutral between the USA and Cuba in such matters) in jurisdictions which did not have their own copyright laws.

94.   I am, in other words, in a situation in which the language of any declaration granted, unless extremely circumscribed, *could* mislead others. But Peer has never suggested any form of declaration which, for example, on its face limits its effect to only this jurisdiction and English copyright or only for a certain period or which makes apparent that it only affects the parties to the action and their successors or which makes clear that one cannot safely extrapolate from a declaration as to any of the thirteen songs to the case as it would be in relation to different songs from the same composers or to the works of different composers altogether. If, for example, a case were to emerge, despite EMC, for want of locus, being unable usefully to assert the annulability of an original agreement or of a Further Dealing, that such relief might very well be open to a composer's heirs, an unqualified declaration in Peer's favour, in the absence of some prior indication by the heirs that no such relief was to be sought (and there is no such indication), would, as it seems to me, be almost irresponsible in its potential to mislead.

95.   In the circumstances, it seems to me that I therefore need to look into EMC's arguments and evidence as to the vulnerability of original agreements and Further Dealings not with a view to striking down those agreements and dealings in these proceedings but with a view to seeing whether they are so vulnerable to attack from others than EMC that only a very circumscribed declaration, if any, could fairly be made in respect of them. For that purpose I do not need to look into the attacks raised by EMC in the same detail as I would have done had EMC had locus but even so I must look into them to some extent. But I shall first look at EMC's paragraph 4 defences.

The paragraph 4 defence as to song (2)

96.   The allegation is that the agreement of the 10th December 1936 (song (2)) was not made with a claimant, Peer, but with "Southern Music International Inc.". The response from Peer is that Southern Music International Inc. was merely a trading name used in Cuba by the second claimant, Southern Music Publishing Co. Inc. The composer Senor A.F. Ortiz (Nico Saquito) signed the version of the agreement in Spanish in which the other contracting party is named as "Southern Music International Inc. ("en espanol Compania de Musica Del Sur, Internacional, S.A.) Consituida de acuerdo con las leyes de Cuba, y con Domicilio en esta Ciudad, en la manzana de Gomez …."). The agreement is headed, in heavy print "Southern Music International Inc." which is there given an address in the district of Gomez, Havana.

97.   The agreement is signed at its foot on behalf of the publishers' side by a Mr B. Gilmore under rubber stamp lettering that reads "Southern Music Publishing Co. Inc."

the proper name of the second claimant. The rubber stamp lettering is no part of the agreement; it might not even have been on the sheet when Senor A.F. Ortiz signed it. I must prefer that the publisher party is "Southern Music International Inc.". I have no evidence that no such body existed or that some such did exist, but that is the party so named in the agreement. The detailed further description of that body in Spanish as cited above suggests that it was a separate free-standing corporation incorporated or established under the laws of Cuba. What evidence is there, then, as opposed to mere assertion, that it was no more than a trading name of a claimant? EMC says there is none. The parties contrived to have a transcript taken of the argument and oral evidence but it is a transcript of which, as to some of the days, no index was made available despite steps taken to that end. Checking minor points of detail is thus far from easy and I have not been able to find any evidence on the point. So, unless and until any is drawn to my attention, I shall hold that no claimant has any title by way of original agreement to song (2). I would add that I cannot regard Mr Jaegerman's evidence on 7th March 2006 (p. 119, line 23 et seq) as proof that "Southern Music International Inc" was <u>not</u> a separate corporation under the laws of Cuba or was no more than a trading name of a claimant. There were Further Dealings (those of the 25th August 1998 and 1st July 2002) by which a member of the late composer's family purported to confirm that the song was the subject of a publishing agreement made by the late composer with Peer International Corporation (the 1st claimant) but those Further Dealings could not serve to divest the other company, the Cuban one, of its still-subsisting title under the agreement with it of 1936, a title good until 2007, and so I cannot as yet see any claimant having any present title (ahead of the 1911 Act reversion) to the English copyright to song (2).

The paragraph 4 defence to song (3)

98.     Here part of the paragraph 4 defence is that song (3) is a joint work composed by both A.F. Ortiz and Senor Sanchez and, in effect, that only an original agreement by, or Further Dealings relating to, A.F. Ortiz are produced.

99.     Both Senor Ortiz and Senor Sanchez signed the agreement of October 1945 under the printed description of "El Compositor" and both have their names typed in within the part of the printed form left blank and intended to be completed with the names of "El Compositor".

100.    A second part of the paragraph 4 defence to song (3) is that the copyright was assigned by the joint composers by the original agreement of 16th October 1945 not to any claimant but to "Peer International Corporation, …..Con Dominicilio en Esta Capital, en San Rafael no. 314……". Peer asserts that that was a trading name in Cuba of the first claimant at the time. In this case the description of the party does not suggest that it is a free-standing corporation other than the first claimant (which does not include an "Inc." in its name) and I am prepared to assume that the publisher in the contract of the 16th October 1945 was indeed the first claimant. The paragraph 4 defence fails.

The paragraph 4 defence to song (9)

101.    The defence relates to an original agreement of 28th February 1945. It is that the publisher party was not one of the claimants but a Cuban company. The party is described as "Peer Internacional Corporation, que en lo adelante se llamara el Editor".

It is signed on the publisher's part by Ernesto Roca, an individual whom the evidence identifies as having worked for Peer. There is no hint that the publisher was a corporation other than the First Claimant. The paragraph 4 defence fails.

The paragraph 4 defence to song (14)

102. Here the relevant original agreement is that of 28th January 1942. The publisher's description is exactly as it was in the original agreement of 28th February 1945 which I have dealt with in relation to Song 9. The outcome is the same; the paragraph 4 defence fails.

Are the original agreements vulnerable to attack from others than EMC?

103. I shall first consider vulnerability in England on the ground of restraint of trade. I do not understand the expert evidence to establish with any assurance a Cuban doctrine on the subject independent of dolus, unconscionability, duress and breach. Perhaps it is because of that that EMC asserts the relevance of the English doctrine on the point.

104. As for that, as I have mentioned, every one of the composers who were party to the original agreements is now dead. I shall assume, though, that it would be open to anyone with appropriate locus to lay claim to the UK copyright in one or more of the songs by challenging the validity of the related original agreement with a view to the challenger then enjoying the copyright either (as appropriate) in the rest of the period until the expiry of 50 years from the composer's death, a period which has not yet expired in any case (save for the now immaterial song (1)) or until the beginning of the 1911 Act reversion. If such a person began proceedings here to set aside an original agreement on the ground that its terms were in unreasonable restraint of trade, those proceedings, so urges EMC, would fall to be judged by reference to the English doctrine of restraint of trade and an English view of what was unreasonable. Despite their being Cuban (or Mexican or New York) contracts, it would be the UK copyright that would be in issue, a bundle of proprietary rights exercisable only here. The trade unreasonably restrained, if any, would be dealings with and relating to that UK copyright. Whether Cuban law has or had a corresponding doctrine and how it would be exercised, would, says EMC, be immaterial; rather the Court would look at the English law in point, beginning with *Macaulay –v- Schroeder Publishing* [1974] 1 WLR 1308 HL. I do not have to decide the point but I see force in EMC's argument thus far and I shall assume that it is correct.

105. On that basis EMC points to different ways in which different original agreements (which vary greatly from one to another) are, it says, vulnerable to attack from persons having locus. I shall not deal with every case but I note EMC's argument that in no case was there any clear obligation on the publisher to print sheet music for distribution to the public or to promote and exploit the work concerned. In some cases Peer could, without requiring the composer's consent, assign the benefit of the contract to a third party upon whom no obligations, payment of royalties apart, would devolve. Peer or its assignee could thus stultify the work leaving the composer (restraint of trade aside) with no redress. Some of the original agreements are in "blanket" form in which the composer assigns all his prior unregistered works and sometimes also such future and accepted works as might come to be written by him or her within a specified contract period. Years of work could thus be stultified. It has been said that Peer had very many composers signed up with it. It certainly had very

many more than the few with whom this action is concerned. Peer would in many cases have thus been able, had it wished, say, to promote one composer at the expense of others, simply to put a composer's works in a drawer and leave them there – compare *Schroeder supra per Lord Reid* at 1313. I accept that a factor against the publisher doing so would be that a reputation for such oppressive behaviour could lose the publisher business but, as Lord Reid observed – p. 1313 – it could not be assumed that its assignee would always act reasonably.

106. The English Court would also be able to reflect upon Peer's apparent use of standard (and often printed) forms for its contracts, forms leaving only the occasional blank to be filled in. That might suggest, as it did to Lord Reid in *Schroeder*, that the contracts were more arranged on take-it-or-leave-it terms than such as were "moulded by any pressure of negotiation" – see *Schroeder* at p. 1314.

107. Much of EMC's criticism was exaggerated or unfounded. In particular, it became apparent that there were rival publishers operating at the time in Cuba; Peer was no quasi-monopolist and presumably dissatisfied composers could have taken their work to others rather than signing up with Peer. But, the next consideration apart, I would be far from sure, were there to emerge claimants with locus, that they would necessarily fail in English proceedings to have the respective original agreements undone for the remaining years in respect of the UK copyright on the ground of unreasonable restraint of trade.

108. But if, as EMC insists, questions as to restraint of trade are for English law, proceedings of that kind here will be affected by English limitation. The Cuban limitation period may well not have expired, for reasons I have explained, but EMC can hardly claim to have restraint of trade judged in England by English law yet with a Cuban limitation period. If, then, proceedings, were they to be brought, were under English law, I cannot see how they could survive a plea of English limitation. It is not as if the terms of any original agreement have only just come to light, or were concealed by fraud or that the claimant (whoever it might be) has been under some material disability that has delayed the running of time. EMC argue that the limitation period has not yet expired as there is, as yet, no "consumacion". It attempts, therefore, to do exactly what I have indicated could hardly be achieved, to mix Cuban and English provisions so as to have the benefit of both of the English doctrine and the Cuban limitation. That cannot be and I thus see no vulnerability of the original agreements in English proceedings on the ground of restraint of trade.

109. As for the vulnerability of the original agreements on a number of other grounds – dolus, fraud, misrepresentation, undue influence, unconscionability – all, for success, would require clear evidence as to the circumstances in which the deceased composer came to make his or her contract. The onus would be on the claimant. I have no reason to think any such evidence could now be found. I would expect that if it could be it would have been already produced in this action. Moreover, any such relief would be discretionary and I would expect any claimant to encounter difficulty when seeking to explain the gap in time between the making of the contract or, at best, the claimant's later acquisition of knowledge as to the circumstances surrounding that, on the one hand, and the launching of proceedings on the other. Another difficulty would be the gap, never less (save as to the immaterial song (1)) than 25 years, between the original agreement and its composer's death, a period during which the composer presumably could have, but failed to, bring proceedings either in Cuba or in

England of whatever kind I have to consider a claimant might now bring. I cannot regard the original agreements as vulnerable on any such grounds.

110. But that leaves proceedings based on breach. This is a subject of some difficulty as it involves both hypothesis and unusual circumstances. Soon after the Cuban Revolution of 1959 banking relations between Cuban and American banks ceased and later the U.S. government imposed an economic embargo against Cuba which, as later understood by Mr Petersen William (Your Ref: TP/19829), Peer's Senior Vice-President of Legal and Business Affairs, prohibited any payments by U.S. companies or citizens to Cuban nationals residing in Cuba. The existence of an embargo of that broad kind is not disputed though its content varied from time to time. By 1963, replacing earlier provisions, there was a U.S. provision in place as part of the Cuban Assets Control Regulations ("CACR"). Regulation 515.201, was headed "Transactions involving designated foreign countries or their nationals …." Cuba was the designated foreign country. Regulation 515.201 continued:-

> "All of the following transactions are prohibited ….
>
> (9) (1)  All transfer of credit and all payments between, by, through, or to any banking institution …. by any person …. subject to the jurisdiction of the United States;
>
> …………
>
> (b) (1)  All dealings in, including, without limitation, transfers, withdrawals, or exportations of, any property or evidences of indebtedness or evidence of ownership of property by any person subject to the jurisdiction of the United States."

111. The prohibitions affected not only U.S. corporations but:-

> "515.329
>
> ……….
>
> (4)      Any ……… corporation …… which is owned or controlled by …….."
>
> any person, citizen or resident of the United States, or corporation organized under the laws of the United States."

Accordingly the first claimant would breach the embargo if a payment were made to Cubans in Cuba by the English company, the third claimants. Thus it was that without there necessarily being any voluntad rebelde – see paragraph 39 supra - there was a long period in which royalties collected by Peer which, in ordinary course, would have been payable to Cuban composers under the original agreements, were not paid. But, to add to that, neither royalty statements nor even some explanation of the impasse Peer had by then encountered were sent to the composers, all of whom (save as to song (1)) lived many years into the period of the embargo. Before me Peer argued that the prohibitions on the sending of "evidences of indebtedness" precluded the sending of royalty statements. I see the force of that but, had there been a will on

Peer's part to do all it could to perform its obligations but staying short of actual breach of its own government's regulations, I have little doubt but that at least some form of royalty statements and very possibly royalties could have been procured to reach composers. Things done later (though whilst the embargo still endured) showed that, when Peer wished so to arrange it, post could reach Cuba other than by the Official U.S. postal service and dollars could be paid by way of a Canadian bank, without, it seems, Peer having been held in breach of the CACR. There was evidence of telephone calls getting through and, when Peer chose to do so, the services of Senora Isabel Cordova were used to communicate with heirs of composers. Nor could there be any excuse for *some* letters or messages of explanation not being sent, indirectly if need be, to explain to composers the wide range of the embargo and, without mentioning any details such as would amount to "evidences of indebtedness", such as might allay their worry by some reference to royalties, accrued and accruing, being still collected. I am not satisfied, at least until Mr Jaegerman, who joined Peer in 1991, later turned his mind to the subject, that Peer felt any need to go the least bit out of its way to ensure that it was doing its best either to perform its obligations under its Cuban contracts or to explain the difficulties. There was, as Mr Jaegerman candidly said, 38 years of nothing. He said:-

> "Now, in 1998 we were looking at 38 years of nothing. Not
> one composer's statement had gone to Cuba; not one cheque
> had been cashed."

112.   Had a person with locus earlier moved to obtain a termination of an original agreement on the grounds of breach or, perhaps, frustration, he would, in my view, had have a fair prospect of obtaining such relief but were he to begin proceedings now to such an end he would plainly encounter difficulties. Songs (7), (8), (10), (11), (12) and (13) ("the New York law songs") are subject to contracts regulated by New York law. I have had no evidence to lead me to think that New York limitation would not bar such a claim. Were I to apply English limitation in the circumstances I cannot see how any claimant would escape the bar. But as to songs (2), (3), (4), (5), (6), (9) and (14) ("the Cuban law songs") then, if I am right in accepting that for limitation purposes time runs from consumacion - see paragraphs 25 et seq: then limitation would not bar proceedings in Cuba as to those songs but the hypothetical claimant in such proceedings may, of course, have sufficiently affirmed the contract post-breach (for example by receiving royalties for periods after alleged breach) to have lost the ability any longer to ask for it to be set aside on the ground of breach or upon whatever other ground its termination was sought. Here one is required to heap hypothesis upon possibility; the question becomes too speculative to be capable of an informed answer and I cannot be sure what the outcome would be likely to be if an original agreement as to the Cuban law songs was sought now to be set aside under Cuban law on the grounds of breach by Peer, despite Peer having plainly sought in recent years as well as could reasonably be expected of it to make contractual amends for the "38 years of nothing".

113.   The outcome of this is that where Peer is still entitled to rely directly upon an original agreement (as opposed to the 1911 Act reversion) - that is to say as to songs (2), (3) and (4) - or upon an assignment of reversion made after the repeal of the 1911 Act - song (5) - there is no factor to be added to those I mentioned earlier which militates against a declaration in Peer's favour save, as to song (2), the para 4 defence raised by

EMC.  But nor is there anything as yet to weaken the case against declaratory relief. As for the rest of the songs, the validity of an original agreement is not, of itself, enough to confer any title on Peer, which has to rely upon Further Dealings.  It is to the Further Dealings that I now turn.  They were the subject of a good deal of oral evidence which I shall need to examine.

### E.  Evidence from "heirs" and others

114.  Strictly speaking, the oral evidence given in Cuba was before me not as a judge of the High Court of England and Wales but as a special examiner. However, neither side has taken any point such as to deny to me the assessment of that evidence or a reception of the transcripts thereof as would have been appropriate had the evidence been before me as a High Court judge.

115.  Before I turn to look at the oral evidence, witness by witness, I need to say something generally about the evidence of fact (as opposed to expert evidence) from the witnesses from Cuba on both sides.  It may be that the witnesses resident in Cuba felt constrained, particularly in proceedings involving both an emanation of the Cuban State and music regarded as part of their national heritage, by a wish either to ingratiate themselves with or not to offend the Cuban government.  As for the witnesses of fact formerly resident in Cuba, on the claimants' side, a marked distaste on their part for the Castro regime (which had imprisoned one of them) may have coloured their evidence.  To the difficulties in evaluation which such "political" possibilities add there are to be added ones inevitably to some extent to be introduced when questions and answers require translations; nuances can be lost and there is delay.  To hearsay there was all too often added a failure to answer the particular question put, argumentativeness, exaggeration, prejudice and sometimes startling inconsistency.  But I need to have in mind that the Cuban witnesses on both sides may very well have been quite unfamiliar and ill at ease with cross-examination as a process in our adversarial litigation.  Even so, and after making allowances to reflect that, if I had to describe this oral evidence generally I would have to describe the quality as disappointing.  I shall leave remarks as to the evidence of Senora Cordova till later but my concern at this point is to examine the evidence given by other non-expert Spanish-speaking witnesses of fact on both sides with the aim of finding what, if anything, is said that points either way on the questions of whether any of the original agreements or any of the Further Dealings might, with some more-than-fanciful prospects of success, be impugned even now were someone with locus to attempt that.

116.  In a few cases witnesses' names are given differently from one document to another or between documents and the transcript of oral evidence.  I have thus had to pick one name or the other for the same individual; I have meant no discourtesy but it may be that I have sometimes picked the wrong one.

117.  Of the very much greater number of heirs of the composers with whom I am concerned, only seven gave evidence, three of whom were related to the far less important composer, Manuel Corona, the composer of song (1).

118.  A recurring EMC theme was that the composers' heirs as a class were poor and ignorant persons and hence members of a class which, in respect of its dealings, equity would strive to protect.  To some event poverty is a comparative matter and

there was little or no enquiry into the respective means of the various heirs either in absolute terms or in comparison with their fellow Cubans. I am not prepared to assume that they were so poor that they would clutch at any straw, however unjust it might be against them, in order to be relieved, however briefly and meanly, from poverty. As for ignorance, there was evidence that Cuban composers discussed topics of mutual interest relative to their work and its exploitation, organised themselves and were well aware of standard terms and familiar shortcomings, from the point of view of composers, in dealings with publishers. They discussed such matters with their families and I think it right to expect their families to have had far greater awareness of copyright issues than would have been found in the Cuban population at large. I do not pretend that heirs would know in any detail or perhaps at all of relatively complicated matters such as the existence and assignment of the 1911 Act reversions or equivalents in other jurisdictions but they would be well enough placed to be able to know what was, in broad terms, fair and what was unfair.

119.    Where, in relation to his or her cross-examination, I have found a witness inconsistent, unreliable or speaking from other than personal knowledge I have felt it unsafe simply to accept unsubstantiated assertions in his or her witness statement. Nor have I felt it safe to rely on the small number of witness statements from witnesses who, still available to have been called for cross-examination in Cuba, were not so tendered.

120.    Jose Carbo Menendez, formerly resident in Cuba but who now lives in New Jersey, was called by the claimants. His cross-examination did nothing to weaken the claimants' case that the original agreements were fair dealings. He said nothing as to the Further Dealings but the vehemence and repetition with which he described Ruiz Quenedo's written evidence (which is undoubtedly flawed in part) as "all lies" indicated a tendency to exaggeration or prejudice and his assertion that (as at 2005) "for the last 46 years all the composers have been getting paid royalties" and that if they had not it was simply because Peer did not have the correct address for them was literally incredible given Peer's own evidence of "38 years of nothing" and of the CACR. I cannot rely upon his evidence.

121.    Marta Beatiz Matamoros Audinot (who, in common with all the rest of the witnesses whose evidence I shall now describe, was called by EMC) gave no evidence as to any original agreement or Further Dealing but her evidence, as an heir to a quite different composer, Miguel Matamo-Ros Matamoros, might have been thought to throw some light in a general way on how Senora Cordova conducted her dealings with heirs and thus upon Further Dealings. I can quite see that there could be evidence of dealings with heirs A, B, C and D which disclosed such a pattern that one could take it that dealings with heirs E, F and G would probably have followed the same course. Short of its utility in building up such a pattern, evidence as to other composers and other heirs would be of little or no value. This witness gave evidence that Senora Cordova did not give her advice (and to that extent did not mislead her) and did not ask for payment. She said that Senora Cordova had told her that Peer wanted to organise things so that the heirs in her family could receive payments and had said that all of the heirs, all of the sisters and brothers, had to sign a document in order for payments to be made. Given that there were in this particular family a large number of heirs – ultimately thirteen of whom eleven were in Cuba and two in the USA – and given the propensity, which became clear from other evidence, of families in Cuba to squabble

over entitlement to United States Dollars, I cannot regard an insistence that <u>all</u> heirs should sign, so that Peer should thus acquire a written and reliable indication of the family's entitlement inter se, as unreasonable. At points her evidence was hearsay upon hearsay (what her uncles had told her that her grandfather had told them) and wrong. I do not have to say that she was untruthful but she was occasionally mistaken and she added little or nothing on the questions I am looking at.

122. Victoria Modesta Dominguez Rodriguez, a great niece of Ignacio Piniero, gave evidence in Cuba. As she was born in 1966 and he died (intestate) in 1969, she was, unsurprisingly, not able to speak as to his original agreements. As for the particular Further Dealings made with Ignacio Piniero's family, there had been some malpractice and (a recurring feature) a split in the family. Her aunt Berta, in order to obtain money, had falsely claimed to be Ignacio Piniero's sole heir. That was nothing to do with Peer. More generally, Senora Cordova had not said to her, Victoria, that she was working for EMC and had not pressurised her to sign anything. Rather she had said that until the members of the family proved themselves to be the heirs they were not entitled to sign anything. Peer had, in my view, no right to demand a CCR, which involved the future, as the price of a distribution of already-accrued royalties but I do not understand Senora Dominguez's evidence as saying that that had been required of her or her family. Rather it was, as would not have been unreasonable, especially in the light of the falsity of Berta's claim, that if no proof of heirship was given to Peer then members of the family would not be entitled to sign a CCR and, so far as unable to prove their heirship, would not for the time being receive anything. It may be of interest, though, that this was the witness who gave evidence that anyone in Cuba (she was speaking of time after the Revolution) could go to a law firm and get advice at a reasonable price.

123. Bienvenida Lea Corona Dominguez, a niece of Manuel Corona, was born in March 1924. He died in January 1950 so she had been 25 at his death. She gave oral evidence in chief of her being approached by Senora Cordova who told her that she had money for her, royalties from previous years. Senora Cordova gave her $500 and papers which, she said, she signed without reading. She said that she later learned that the papers she had signed had described her as Manuel Corona's widow whereas he had never married and she was only his niece. When, in cross-examination, the document was put to her she said in successive answers that it bore her signature but that she had not signed it. She then said that somehow her signature had been inserted into the document. Then she accepted that the signature "may be mine" but argued that it could not be because it described her as the wife of Manuel Corona, which left open the obvious possibility that she had been willing to misdescribe her relationship to the composer in order to maximise her receipts. She had, as it transpired, kept the dollars which she had received for herself rather than distributing them amongst the family. Later still she suggested that Senora Cordova had photocopied her signature. She was an inconsistent witness whose evidence added little of relevance although I do accept her evidence that what she did sign was not signed before a notary. She did not give evidence from which I could infer some general pattern of dealings between Senora Cordova and heirs.

124. Evelio Landa Martinez gave evidence both by video link and, later, in Cuba. He is a composer but is unrelated to any that concerns me. He was old enough to speak from personal knowledge of Peer disappearing, as he put it, from Cuba after the revolution

of 1959.  He spoke also of "Musicabana" being set up as a publishing collective in Cuba to protect composers' rights.  He gave no evidence as to any original agreement but he did speak of a number of publishing houses other than Peer operating in Cuba before the revolution, denying force to the erstwhile claim of EMC that Peer had had virtually monopolistic powers over composers at that time.  Indeed, so far from his being forced by one compelling circumstance or another to sign up with Peer, he had chosen Peer for such songs as he had assigned to them on the basis that Peer had the existing catalogue into which his work would best fit.  He gave no evidence of any Further Dealing.  He had himself signed with Peer in 1955 but had believed that Law 860 had later cancelled their contract.  He had thus signed two of his songs to EGREM, (a forebear of EMC) or to EMC, for the whole life of the copyright.  He had had dealings with Senora Cordova.  He knew that she was representative of Peer and that by then she and had left EMC.  He had not asked her for advice.  He had in 1999 signed a contract with Peer without asking himself how he could do so if he had already signed one involving the same subject matter with EMC.  He accepted (on being shown what was apparently his receipt) that it was *possible* that he had received US$1,443 in cash in August 1999, on the very same day as he had signed his contract with Peer.  He had earlier firmly denied his receipt of that sum.  In re-examination he then said that Senora Cordova had paid him in Cuban Pesos but then reverted once more to it being possible that he had been paid in dollars.  He accepted that he had arranged with Peer that he should be paid dollars by way of Duales Bank, a Canadian bank, and that he had in fact been paid through that bank.  That contrasted with his written evidence that he had never received any money from Peer after signing his contract with it.

125.  He was a comprehensively inconsistent witness but (as notarial execution or notation of contracts will later became of some relevance) I add that although the notary who had apparently put his, the notary's, name to Evelio's contract with Peer (a Senor Azugaray) was not one whose work was later investigated in the evidence, I think it probable that, as he said, Evelio had not signed the contract in front of *any* notary.

126.  Esther Catalina Corona Rousselot gave oral evidence in Cuba.  She is a niece of Manuel Corona.  She gave no evidence as to any original agreement or Further Dealing.  Her oral evidence made it plain that she had failed to understand some passages of her own witness statement.  She had had no dealings herself with Senora Cordova and she contradicted herself in the space of 2 or 3 answers as to whether her cousin, Bienvenida Lea Corona Dominguez, had told her that Senora Cordova had persuaded her, Bienvenida, to sign some documents.   Later she asserted that Beinvenida had told her nothing.  It became clear that a paragraph in her witness statement was incorrect and that she was not infrequently speaking not from any personal knowledge and was also in part repeating what ACDAM (another forerunner or relation of EMC) had told her.  She said nothing of relevance upon which I could rely.

127.  Clara Corona, a sister of Esther, gave oral evidence in Cuba.  She did not speak to any original agreement or any Further Dealing.  In her written evidence she had verified her sister's statement but plainly had done so without understanding it.  She had never met anyone from or representing Peer (although she gave confusing evidence about a man whom she had supposed to have represented Peer).  She both said that she had

had no dealings with Senora Cordova and that she did not know whether she had had any. Her evidence added nothing to the case.

128. Felipe Ernesto Rodriguez Dias gave evidence in Cuba. He is the only child of a nephew of Ignacio Pineiro. Felipe was born in 1965 and Ignacio Pineiro died in March 1969 so, as one would expect, this witness was not able to give any evidence as to any original agreement or as to Ignacio Pineiro's dealings with Peer. After Ignacio Pineiro's death his (Felipe's) aunt, Berta Maria Rodriguez O'Farrill, had falsely claimed to be Ignacio's sole heir and had even obtained a declaration from the court in Havana (later set aside) to that effect. Ignacio Pineiro had some ten heirs. Felipe's witness statement was framed not exclusively from personal knowledge but, several members of his family having met and having decided what was to be "our statement", that collective version was then asserted by him. In part Felipe also relied upon "stories told by my uncle Moises". The heirs of Ignacio Pineiro had become divided; some had signed for Peer and some to EMC. I have no reason to think that this witness told lies but neither did he tell anything of any materiality to the questions I am now looking at.

129. Moises Prudencio Rodriguez O'Farrill was born in September 1916. He is a nephew of Ignacio Pineiro. Whilst he knew that his uncle had made contracts with Peer he had no personal knowledge of them. His uncle had complained to him that, whilst Peer had given him the gift of a beautiful music book, they – "the Americans"- had kept "the money". When it was put to him that there existed in the papers what appeared to be cheques in Ignacio Pineiro's favour from Peer companies which had been cashed he said he did not know whether it was possible Ignacio Pineiro had received money from Peer; he did not know much about Ignacio Pineiro's musical life, contracts or business. His written evidence that Ignacio Pineiro was never paid money or royalties by Peer cannot be relied on. His written evidence included that five of the ten heirs of Ignacio Pineiro had signed contracts with EMC and that there had been a split in the family occasioned by his sister Berta's false claim to be the sole heir. The only thing he said in oral evidence of relevance to the original agreements was that Ignacio Pineiro was not the type of person who would sign a contract if he did not want to. He said nothing of relevance to the Further Dealings.

130. Juliana Aida Rodriguez Puig, born in 1941, is a child of a nephew, now deceased, of Ignacio Pineiro. She said that he did not discuss his contracts with the young members of his family. She, too, spoke of the divided family, with five of the ten heirs having signed with EMC and five with Peer. The two sides did not speak to one another. She said nothing of relevance to the original agreements or to Further Dealings.

131. Ricardo Fresneda Diaz, himself a composer, was born on 9th June 1926. He is no relation to any composer with whose works I am concerned but he spoke of working with Ignacio Pineiro on a sugar plantation in 1957 (i.e. between 12 and 27 years after the composer's original agreements). He said in his written evidence that Ignacio Pineiro was resentful of Peer, had believed that he had been exploited by it and that Peer had not paid what they should have paid. All the composers named in the proceedings, he said, had had complaints that Peer had not honoured its promises. He himself had not signed for Peer (despite the offer of substantial sums, US$500 and US$1,000) but some had done so, he wrote, out of complete financial desperation. Ignacio Pineiro had advised him against signing with Peer. "By signing with Peer

they would usually receive a payment, although this could be as little as 5 pesos (equivalent to US$5 at the time) which was at least some small financial help to these people. Invariably, however, these musicians would not receive any further monies from Peer." When complaint was made to Peer, he wrote, Peer would respond that further monies were being retained in order to repay the "advance" that Peer had made upon the signing of the contract. He, too, gave evidence of other companies than Peer operating in Cuba in the late 1950s. He wrote of Peer leaving Cuba; he put it as late as 1963 and said that so far as he was aware Peer ceased paying any money to any composers after that time. In cross-examination it became plain that he had no specific knowledge of Ignacio Pineiro's contracts with Peer but he said that Ignacio Pineiro was an intelligent person, famous during his career. If, as he said, Ignacio Pineiro was both famous and intelligent, it seems improbable that he would have made three contracts, as he did, with Peer, spread over 15 years, if Peer, not the only publisher available, had been exploitative or had consistently failed to honour its side of its agreements. Sr. Ricardo spoke of a technique whereby Ernesto Roca, both Peer's representative then in Cuba and, at the same time, director of the official (pre-Revolution) music registration body in Cuba, would, upon a song being registered, covertly procure its transfer to Peer. But no specific example was given and he, Senor Ricardo, had had no personal dealings with Peer and was in general relying simply upon what he had been told by other people. He was not aware of any of the relevant composers having made any legal claims against Peer. He said that when Ignacio Pineiro had had no contracts signed for playing music "then we would go to work in the countryside, in the sugar plantations or to collect the harvest". That was because there was "economic chaos" at the time, 1957 or thereabouts. I feel able to accept Ricardo Fresneda Dias' evidence where he is clearly speaking from his own personal knowledge but it says nothing as to Further Dealings and, whilst it emerges that composers had griped against Peer, I do not see his evidence as describing from his own personal knowledge any complaints as to any material original agreement which is a complaint still available to any heirs of the composers with whom I am concerned and which would be so strong and so provable even now so as to be likely to succeed against Peer were proceedings now to be launched by someone having locus.

132.    Nicholas Valentino Gutierrez gave oral evidence in Cuba. He is the nephew and heir of a well known composer, Julio Cueras (sometimes Cuevas) Diaz, (but not, I apprehend, related to any of the composers with whom I am concerned). His uncle, who died in 1975, had made contracts with Peer in 1942 and 1946. He said that his uncle never received royalties from Peer, but the reason he gave for that – that relations with the USA and Cuba were broken and that nothing could get into Cuba – did not apply until the revolution of 1959, long after the contracts had been made with Peer. Nor was I convinced that he would necessarily know if a royalty addressed to his uncle had indeed been received by his uncle. I cannot conclude that his uncle never received any royalty from Peer.

133.    This witness spoke of Isabel Cordova's dealings with him, but he gave no evidence as to any original arrangements nor as to any Further Dealings with any of the relevant composers' heirs. As for her dealings with him, in 2001 Senora Cordova, who told him she was acting for Peer, gave him the telephone number of Mr Jacome, a Peer executive in the USA, and he was able to telephone Mr Jacome (who spoke Spanish). Senora Cordova had told Senor Nicholas that there were past royalties collected by Peer but that, to get them, he had first to sign a document. She gave him a cheque for

US$1,500 as past royalties. He signed what he seems to have understood to be a receipt for a cheque. No notary was present. He said, though, that he had read the whole batch of documents presented to him for his signature. They went well beyond a mere receipt for a cheque. His evidence was far from clear, but left me with the impression that Senora Cordova, whilst not deceiving the witness by telling him that all he was signing was a receipt, <u>may</u> (and I put it no higher than that) have improperly required a signed CCR from him as a pre-requisite of the payment even of past royalties. For her to require confirmation of heirship for the purpose would not have been wrong, but to require a CCR *even as to past royalties* would, as I have already touched upon, in my view have been improper on her behalf.

134. Orlando Gutierrez Giraldes, grandson of the composer of song (5), gave oral evidence in Cuba. His grandfather died in 1966, at which time the witness was 13 or 14 years of age. The witness threw no light on his grandfather's original agreement with Peer save to aver that, as far as he knew, the composer had never received a penny from Peer. Given that the composer's first contract with Peer was made in 1933, long before the witness was born, it is impossible, without further explanation (and none was given) to accept that the witness was there speaking from personal knowledge. His grandfather complained, he said, that "publishing houses" had robbed him but that, of itself, would not necessarily point to Peer, still less requiring a conclusion that the composer had never received a penny from Peer.

135. As for Further Dealings, he had received royalties from Peer and he did not say that Peer had in any way misled him. His complaint seemed to be that not enough was being received but that, of course, could have been because the relevant work was not being sufficiently played to generate more. He did not say that not enough was being received because anything that should have been paid was not being paid or that Peer had deliberately delayed payment. His family had signed a CCR and an affidavit of heirship, all with apparent notarial endorsement, and had received more than $1,000 from Peer but not more, he thought, than $2,000. He also spoke of royalties received in the 1980s. What had been signed was, he said, signed in the street, with the documents resting upon a car. But, despite their apparent notarial endorsements, he said that what was signed was not signed in front of a notary but outside in the street. He was quite clear about that and I believe he was telling the truth. He did not suggest that he was forced into signing anything; nobody, he said, could force him into signing any document. He understood there would be a circumvention of the US embargo on payments to Cubans in Cuba; Senora Cordova had told him that he could receive money through her despite the embargo and he was, either instead or in addition, paid through Banco Metropolitano.

136. Leaving aside his reference to no notary being present (which I shall need to return to and which was not taken further in re-examination), his evidence does nothing to support EMC's claims that his family's dealings should be set aside. Interesting, though, was his description of Senora Cordova, effectively Peer's representative in Cuba at the time, 1999, being of the view that the embargo on payment to Cubans in Cuba from the United States could be and was circumvented.

137. Senor Rosendo Ruiz Quenedo was almost 87 years of age when he gave evidence in Cuba. He acknowledged that he did not now have a very good memory. He threw no direct light on the circumstances immediately surrounding the entry by the composers with whom I am concerned into the original agreements which they made in the '30s

and '40s. He had himself not witnessed (as had been one allegation) that in those days Ralph Peer would buy a musician a few drinks and would then offer a few dollars in order to procure a signature on an assignment of copyright. Moreover, the way in which his own contract with Peer was made does not suggest that there was any pattern of misleading behaviour on behalf of the Peer representatives who were present at the time; he said that the Peer representative said absolutely nothing to him about the terms of his contract.

138.    As for Further Dealings, he gave no evidence from personal knowledge as to anything having been procured by misrepresentation or pressure or (at first) otherwise such as might suggest that any Further Dealing could be impugned by anyone. Whilst he did give evidence of Senora Cordova's dealings with him, it was not such as to build up a general pattern on her part such as could and should be applied generally to the Further Dealings. In any event, his oral evidence, during which he was at one point so agitated that I thought it better to break off for the day, was severely flawed.

139.    His oral evidence included that the only payment which he received from Peer was by way of advance (and, therefore, presumably, at or about the time of his making an original agreement with Peer). His complaint was therefore about a subsequent failure to pay royalties. At one stage he said that he had never received any economic benefit from either his or his father's works (as to which he was his father's heir), presumably meaning or including no benefit from Peer. "I have repeated on many occasions", he said, "that I have received nothing". But when a cheque in his favour for royalties was shown to him he had to accept that he might have made a mistake and he then changed to asserting instead that the payment meant nothing (it was for $150 in 1949) because it was so tiny. Further, the drift of his second witness statement was that Peer had abandoned the attempt to obtain his signature to anything, in effect because he was a well-known longstanding opponent of Peer's position and that it was too problematic for Peer to persist in the hope of getting his signature to a CCR or a declaration of heirship. But it then transpired that he had put his signature as many as some ten times or so to documents which, in either English or Spanish, were or were connected with a CCR by him or a declaration of heirship in his family, he being his father's sole heir. He did not dispute his signatures but, rather than giving any likely explanation of how that came to be, he vilified Senora Cordova. Having earlier said that he had not been willing to sign anything, on seeing the documents he switched to saying that she may have "surprised" him (in the sense, I understood it, of deceiving or tricking him), adding that she was a liar who had evaded justice by fleeing from Cuba and that everyone knew that and that she had been accused of being a liar (said the transcript) by thousands of people ("por muchas personas"). No likely mechanism by which (had he been unwilling to sign the documents in question) his signature on the many documents apparently signed by him had been obtained was given. Senora Cordova may, he then suggested, have read one thing to him (his sight was not good even in 2000) but have then produced something else for him to sign. But in some cases his signature was applied to pages that did no more than set out in relatively large print the names of compositions that he or his father had written. I was quite unconvinced, judging also from what he had seemed able to read as he gave oral evidence, that he would, back in 2000, have been unable to read some at least of the pages to which his signature was applied. It was thus not only improbable that Senora Cordova could have arranged a trick under which she read one thing but required him to sign another but all this alleged trickery

to obtain his signature had been completely unexplained in his two witness statements and had not been put to her. The notion bore all the hallmarks of a false invention on the spur of the moment in an attempt to meet a difficulty he had not foreseen but to which the untruthfulness of his evidence had led him.

140. There was, too, I fear, an element of hypocrisy about his evidence. Having been, in public, over many years a resolute standard-bearer in Cuba against Peer (a company which he regarded as a bandit company that robbed the rights of "many and many authors") it seemed that behind the scenes he had signed with Peer and had received money, albeit indirectly, from Peer or from its associate, Southern. He finally accepted that Peer may have sent money to him through another organisation. If they sent money using another name, "that's up to them". The evidence which Peer could never produce, he said, was that he had accepted money paid *in the name of* Southern or Peer, rather than that, as had earlier been his case, that he had received no economic benefit at all from either his own or his father's songs from Peer. I was left with the impression that he was content to receive from Peer so long as that was not apparent on the face of whatever documents were used.

141. I am sorry so to conclude, in relation to so old and gallant a gentlemen, one who had been a famous composer in his day and who remained a man of some charm and wit, but his evidence cannot be relied on.

<u>Omar Batista</u>

142. However, at the very end of his evidence, in re-examination, Senor Rosendo said that he had not visited a notary as far as he could remember and that Senora Cordova had not brought one with her when he had signed what he had signed, which had been signed at his house. As will have been seen, he had not been the first to mention the absence of a notary, but it was, it would seem, his evidence or the cumulative effect of that evidence and the earlier evidence that triggered further enquiries being made by EMC and its advisers.

143. Accordingly at a very late stage in the proceedings a document entitled "Considerations on the Consultation made by Consultoria Juridica Internacionale" was thus put before me. It was written by Licentiate Maria Esta Reus Gonzales, Vice Minister and Director of Notaries and Civil Registries at the Ministry of Justice of the Republic of Cuba. Licentiate Reus Gonzales did not give evidence, but the document of which I am speaking was said to be true by Dr Reyes Hernandez, who did give evidence. It includes a statement that the Further Dealings, photocopies of which had been supplied to the licentiate, were not accompanied by "the due legalisation procedures before an official of the Ministry of Foreign Relations of the Republic of Cuba, which were absolutely necessary for the validity of any public document <u>intended to have effect outside the national territory</u>" (my emphasis). However, argument possibly to be derived from that observation was not explored in supplementary oral evidence-in-chief by Dr Reyes Hernandez nor was it cross-examined, nor did I understand it to have been asserted by EMC that all the Further Dealings lacked essential validity to the extent that they were intended to have effect outside the national territory. The argument, were it be relied upon, would have needed fully and clearly to have been developed, but it was not and, accordingly, I shall look into the notarisation issue on the footing that, strictly speaking, notarial execution was not required. Indeed, as I have understood the papers, it was not

<u>invariably</u> necessary, if there was to be some form of a notarial endorsement of a document, that the actual application of the signatory's signature to the document should have been made in the presence of the notary.

144.  After returning to England, I heard oral evidence and received written evidence from a Cuban official, Dr Hernandez, on the subject of the notarisation of the documents which Senor Ruiz Quenedo had signed.  Whilst, in my view, the official was at times illogical and too ready to proceed per saltum, nonetheless the evidence satisfied me that the putative notary who had apparently notarised such documents, one Omar Batista, did not exist as a notary at the time.  Whether any individual of that name existed at all or, if one had, had held himself out as a notary was not gone into.  In her earlier witness statement Senora Cordova had not mentioned the notarial endorsement of either Senor Ruiz Quenedo's documents or such endorsement of other documents.  Nor, indeed, had there been any need for her to do so.  No one had at any stage suggested that any of the Further Dealings or similar documents had required notarial execution for their validity.  Nor had notarial execution been greatly explored when Senora Cordova was cross examined by video link to her in the United States, where she now lives, on May 12th 2005, long before evidence given in Cuba in September 2005.  Speaking of Further Dealings generally and of her presence or absence as each was signed, she said that sometimes she was there physically as the document was signed but "Most of the times I was never with them", the "them" being the signatories.  She added a little later that the majority of the relevant further dealings were signed in front of a notary.  With respect to a document signed by Victoria Modesta Dominguez, her evidence suggested that it was only after the document had been signed and after the signatories had been to a notary's office that the document was given to her.  Her evidence included that, in relation to song (1), a member of the Corona family had stated before a notary that she was the heir to Manuel Corona, but Senora Cordova's evidence was not that she had been present at the time but that it was only later that the document had been given to her.  When the particular case of Rosendo Ruiz Quenedo was put to her in May 2005 it was not suggested to her that she had been present when he signed any CCR or affidavit of heirship nor that the apparent notarisation of the same had been false.  It may have been suggested to Senora Cordova (the transcript is unclear) that the notary used was a friend of hers, but she denied that and, when the question of the notary's address came up, she suggested, not unreasonably, as she was in the United States and the notary would presumably still be in Cuba, that EMC or its advisers should ask the notary as to his or her address.  Certainly nothing was put to Senora Cordova at that stage that even hinted that the notary might not exist.  Speaking of another document, one signed by Orlando Gutierrez, she said that it had been signed in the notary's presence and that it was only later on that "They would hand the documents over to me*".*

145.  However, if it were credible, as in my view it later had to be seen to be, that Senor Rosendo Ruiz Quenedo had not seen a notary in connection with the documents which he had signed and yet in a case where the documents appeared to bear an apparent notarial endorsement by a person who was not a notary (or, possibly, did not even exist at all) obviously questions would arise.  By October 2005 EMC was anxious to argue that Senora Cordova had had a hand in a deceit, an accusation which, on the evidence at that stage, could not be ruled out but which had never been put to her.  I ruled that she was to be given an opportunity to be recalled and she was

accordingly recalled and gave further written evidence in April 2006 and was further cross-examined on 2nd May 2006.

146.    New written evidence from her by then included that she was not present at the time of notarisation of Further Dealings (including notarisation of documents of the kind spoken of as Further Dealings but which were concerned with composers or heirs other than those who concern me) and was not present at the notarisation of Senor Ruiz's documents: in new evidence she said "But I never personally took part in any notarisation by being present".  It was a colleague, she said - "A lawyer called Sandra Hernandez" - whom she called in to assist heirs and composers in the notarisation process.  It was Sandra, she said, who arranged appointments and occasionally used her personal car to transport composers to the notary's office.  The notary would be someone that Sandra knew personally: "But I only knew this from what she told me".  Sandra was paid for her own and for the notary's services.  Once the documents were signed she, Senora Cordova, would pick up the documents at the homes of the composers or the heirs.  So far as concerned the document signed by Senor Ruiz, "I did no more than deliver these documents to Senor Ruiz and then, about a week later, I returned and retrieved the documents after they had been signed and notarised".  Her recollection was that Sandra had provided assistance in that notarisation.  She added "I did not forge any notarisation in the name of 'Omar Batista' on the Ruiz documents.  That notarisation appeared on the documents I collected from Senor Ruiz".  She said she had no direct knowledge of the person claiming to be Omar Batista.  She did not know any such man personally.  Sandra, she said, "informed me at the time that she dealt with a Mr Batista, but I cannot state whether they were friends or business acquaintances".  She recalled that she paid Sandra approximately $120 both for her services and for the notarisation of the Ruiz documents after she had collected the documents from Senor Ruiz.  She had not taken a receipt from Sandra for the payment.  She added "At the time, Sandra told me that a notary named Batista was the head of one of the notary offices in Havana, where other Peer documents had been notarised but I do not know this of my own knowledge".  Sandra had not communicated with her any further once proceedings had been started against her, Senora Cordova, by the Cuban government.

147.    Senora Cordova's answers on the notarisation position give rise to questions that put her credibility in issue.  In May 2005 in cross-examination, asked whether there was anyone else in Cuba who had assisted her in the project (of collecting CCRs and affidavit of heirship etc) she replied "I don't know.  I know that there were older people who were in a position to help Peermusic and the composers".  But, given that Senora Cordova paid Senora Hernandez for her help (and Senora Hernandez was a good deal younger than Senora Cordova), that answer must have been a lie.  In May 2006 Senora Cordova sought to explain by saying that she had not wished to put Senora Hernandez into trouble with the authorities, but that hardly provides an explanation.  Had she mentioned that wish either to Peer's solicitors when her evidence was being prepared or to the court when she was cross-examined in May 2005, it would have been simple enough to limit names to solicitors and counsel in a way that would not have jeopardised the person involved.  She had, after all, mentioned underlined older people without jeopardising anyone.  And if she was motivated by a wish to protect Senora Hernandez, why did she specifically mention her eventually in her witness statement of April 2006?  Did the mention no longer threaten Senora Hernandez's position (and, if not, why would it have done so earlier)?  If it did still

threaten that outcome, why should she not have sought to explain her assistance but anonymously or with the information limited to counsel, solicitors and the court? If, as Senora Cordova's April 2006 evidence averred, Senora Hernandez had played quite a part in the gathering in of notarised Further Dealings (and corresponding CCRs and affidavits of heirship, etc from persons other than those with whom I am concerned) it would have been reasonable to expect that part to have been mentioned in Senora Cordova's evidence (whether or not naming names) and Senora Cordova had no satisfactory explanation why such mention had not earlier been made. Moreover, her late evidence disclosed an improbable way in which Further Dealings were made and collected. Senora Cordova would take the unsigned documents to the prospective signatories. At some stage the signatories would sign. Senora Hernandez would arrange for notarisation but would not herself then return the notarised documents to Senora Cordova. Instead (this was Senora Cordova's evidence), Senora Cordova would need to make a subsequent visit to the signatories' residences to collect the papers, by then both signed and notarised. But why on earth should Senora Hernandez not herself pass the documents back to Senora Cordova once they were notarised? Senora Cordova's answer, only superficially plausible, was that Senora Hernandez was fearful of visiting Senora Cordova's house, which was by then being watched by authorities hostile to Senora Cordova. I say the answer was only superficially plausible as no particular reason was given why the handover should have been at Senora Cordova's house. The two had been together at signatories' houses; they had been in contact so as to inform Senora Hernandez which signatories were to be visited and where and when and Senora Cordova had been able to pay dollars to Senora Hernandez on more than one occasion. Even if a meeting at Senora Cordova's *house* would have been risky, it was hard to accept that a convenient and relatively safe handover of documents could not have been arranged elsewhere so as to avoid the need for yet another visit by Senora Cordova to wherever the signatories lived.

148. In a sense, these Omar Batista issues, if I may call them that, are of no great importance. No heir has complained of being deceived in relation to notarisation of any Further Dealing and notarisation did not affect their validity. The only case involving Omar Batista to have been examined in any detail (and one can hardly establish a pattern of dealings from only one case) was that of Senor Rosendo Ruiz Quenedo who is not a composer or heir with whom I am concerned. Nor were these issues chased to their ends; was Senora Cordova inventing the whole story? Was she being deceived by Senora Hernandez (who was paid for her efforts and expenses)? Were both or either of them deceived by a purported notary or was Senora Cordova engaged in bumping up the expenses claimable from Peer? I have no need to find which of these or other possibilities is the correct one but I am, in my judgment, entitled, when assessing Senora Cordova's evidence on other issues, to regard her evidence on the Omar Batista issue as establishing that she was willing to lie to the court. It is to an assessment of her evidence on other issues that I now turn.

## F. Deception or unfair practice as to Further Dealings by Senora Cordova or Peer?

149. Senora Cordova had a powerful distaste for the Castro regime, which had imprisoned her. Cross-examination by Mr Prescott QC began with an inquiry into her receipt from Peer, as Mr Jaegerman had spoken of in his oral evidence, of $45,000 in all over a period. She claimed she had done what she had done gratuitously and that the

payment (she was not able to give details as to whether or not it had been $45,000) had been merely for expenses. The expenses she spoke of had not included travel or expenses related to notaries. I cannot think that the expenses that she did describe could have amounted to $45,000 and, although this goes only to her credibility, I conclude that Peer had, indeed, paid her not merely for her expenses but by way of remuneration for her services and that she must have known that that was so.

150.   On the more relevant issue of whether the Further Dealings (and corresponding dealings with other heirs of other composers) were completed voluntarily and without false inducement to or deception of the heirs with whom I am concerned, she was adamant that that was so. She said she had deceived no one as to the content, meaning or consequences of the Further Dealings. In most cases she merely, she said, put prospective signatories to be able to be in touch with Peer in the United States and either Peer itself or she informed signatories that they had to sign if they were to receive money. But, given the propensity of the heirs to be ill informed or worse as to who were the heirs of any particular composer, I see nothing wrong, as I have mentioned, in Peer or Senora Cordova indicating that a signature <u>on an affidavit of heirship</u> would be needed in order for Peer to be sure who were the heirs before payments were made to persons in the character of heirs. To that extent, a statement to heirs that only if you sign a document will you be paid was not necessarily unreasonable, either as to accrued or prospective royalties. Only if it emerged that the CCR would have to be signed if *accrued* royalties were to be paid over would there have been an unfair dealing by Senora Cordova or by Peer. At the very end of his cross-examination of Senora Cordova in May 2005, Mr Prescott put questions and received answers as follows:-

> "Q.    You gave these heirs to understand that in order to receive the royalties that were owed it was necessary to sign a document saying the original composer contract was binding on them, yes or no?
>
> A.    No.
>
> Q.    Believing you, the heirs signed, yes or no? Believing what you were saying the heirs signed, yes or no?
>
> A.    No.
>
> Q.    In fact their belief deliberately induced by you was mistaken, yes or no?
>
> A.    No.
>
> Q.    These transactions are typical of a large number you participated in Cuba during about that time, 1998 to 2001, yes or no?
>
> A.    Yes.
>
> Q.    And in so doing you were helping to cheat poor but noble people out of their [inaudible, says the transcript,

but likely to have been the word "inheritances"], yes or not?

A.    No.

Q.    I have no further questions."

That was how the subject was left.  When the charge against an individual is as serious as it there was, even (or especially) a liar can expect the question to be put clearly and specifically but, in context, the reference to "these heirs", and still more so, "the heirs" was hopelessly vague given that the individuals who had been mentioned earlier (and often quite a good deal earlier) included persons who were not "heirs" at all but an original composer and persons who, whilst no doubt heirs of other composers, were not heirs of any composer with whom I was concerned.  Nor would the victims being "poor but noble" greatly help to identify them.  Nor either was it explained to the witness how a signature on a CCR would cheat a person out of his or her inheritance.  One cannot necessarily measure the respective largesse of competing music publishers by looking only at their percentage royalty rates; it may be better for a composer to get 2% from an active and ubiquitous promoter than 5% from, say, a less successful one.  But I received no argument or evidence that would have satisfied me that a Cuban heir signing a CCR for Peer would necessarily receive less overall than one signing with EGREM or EMC.  To that extent I would have been unable to hold that even such of the "poor but noble" who signed up with Peer were thereby "cheated".

151.    It is to be borne in mind, too, that the transfer of the 1911 Act reversion, in point of construction, as those instruments have been construed by the Court of Appeal, was never effected until the corresponding addendum was made.  But there was, save in the case of Celia Romero, invariably a gap of a year or so between the CCR and affidavit of heirship on the one hand and the later addendum on the other.  So far as past royalties are concerned, it was not unreasonable, as I have held, for Peer to require signed writings clearly establishing who were the heirs in order to be sure that it would be paying the right people in the right proportions and, moreover, that the recipients would acknowledge that to be the case.  To require an affidavit of heirship or a number of them involved no "cheating".  Nor, on the true construction of the CCRs (had any heir thought about it), would a signature to one bar an heir from seeking to do some better deal with his proportion of the 1911 Act reversion if he was discontent with such arrangements as he had made with Peer.  Having not, until the addendum, <u>assigned</u> the reversion, he could, so to speak, shop around in order to attempt to get a better deal.  In that context it is again difficult to see how a requirement of a CCR to be signed could be regarded as cheating heirs out of anything.

152.    I have to bear in mind, too, the absence of any evidence suggesting deception in the inducement of their signatures to Further Dealings <u>by those who made them</u>.  No one, I would add, gave evidence, speaking of the very many telephone calls made by composers' families to or from Cuba from or to Peer in the USA, that any member of one of the composers' families with whom I am concerned was either told by Peer that there would be no release of accrued royalties unless a CCR was signed or was otherwise deceived by what was then said into signing a CCR.

153.    Mr Prescott sought, on a different approach, to get an answer supporting EMC's case by asking Senora Cordova whether she knew of a single case in which an heir who had not signed a CCR had received payment from Peer. The question led nowhere. She (as I accept) could not possibly answer as she often did not know who had been paid nor when they had been paid by Peer but, in any case, the question was insufficient as, in order to be sufficiently pointed, it would have had to have been put in relation to an heir who had signed an affidavit of heirship and a CCR but who had nonetheless not received accrued royalties. There were countless royalty records which Peer had disclosed and which could perhaps have been analysed by EMC to prove or help to prove the negative that they were asserting but, if any such analysis was attempted, it never found its way into evidence. I add that Mr Jaegerman, challenged in the same way, gave an example (see the transcript of 7th March 2006, pages 88 and 89) of when Peer had paid out but when nothing at all had been signed by the relevant Cuban heir. EMC did not attempt to disprove the example. It was of particular value to Peer to obtain written confirmation by way of CCRs in cases where the original agreement had been of the "term" kind, covering such songs as the composer had written or would come to write within the described term. When events of up to half a century earlier were relevant, as they sometimes were, there could plainly be doubts, which Peer would naturally wish to have resolved, as to just when a particular song had been written. I accept Mr Jaegerman's explanation that Peer generally liked to have written confirmation as to 100% of heirship entitlement before money was sent to heirs but I could not hold that to be unreasonable, still less that it represented some deception of the heirs.

154.    All in all, despite my poor view of her credibility and reliability, I am unable, on Senora Cordova's evidence or at all, to hold that she, or, through her, Peer or Peer itself deceived any relevant signatory to a Further Dealing as to the meaning or effect of any CCR, affidavit of heirship or addendum or to hold that any Further Dealing had been falsely procured by some false inducement for which she or Peer was responsible.

155.    It follows, I believe, had any party having locus to do so complained of any Further Dealing on grounds as to deception on Peer's behalf similar to those raised by EMC, but had failed to produce evidence other than as EMC had, that it would have failed to deny to the Further Dealings the effect to which their true construction points. Given that EMC's experienced solicitors had assiduously visited Cuba to collect evidence, I am, I think, entitled to expect that no party having locus would now be likely to be able to produce evidence more conducive to that party's success on such grounds than had EMC to its.

## G.  Mr Jaegerman

156.    On the approach I have taken to the case so far there has been little need to examine Mr Jaegerman's evidence in any great detail but I should not leave it unmentioned. I have already described his job title and his joining Peer in May 1991. He was able to speak from personal knowledge of the music industry generally from 1986 or so when he first was engaged in it and to speak from Peer's activities before he joined Peer from what had obviously been a careful review by him of Peer's corporate papers. Thereafter he would generally speak of Peer's affairs from personal knowledge. I found his evidence to be careful and with limited exceptions, which I shall mention, to be such that I can accept it as reliable. His evidence that Peer had never monopolised

the position in Cuba as a publisher of Cuban music, an issue which, as the case began, had seemed to be one that EMC was seeking to make much of, was plainly correct. EMC's initial assertions came to be seen to be so unfounded that, whilst not formally abandoned by EMC, they could have been. Without my meaning, by mentioning that I accept Mr Jaegerman's evidence in some specific area, that I mean to qualify my general view of the reliability and acceptability of his evidence in other areas, I accept, too, his evidence that Peer's contracts with composers were on terms standard for their time. I accept also his broad history of U.S. legislation, judicial decisions and of OFAC (the Office of Foreign Assets Control) and its requirements and practices, of how Senora Cordova came to operate with Peer and how Peer began to receive hundreds of "collect" calls from Cuba from composers and heirs and those claiming to be heirs of composers. He it was who chiefly or alone was responsible for the form which the CCRs, affidavits of heirship and addenda took. Peer paid out more than US$2.5 million as gross royalties to Cuban composers or their heirs. I accept that since the relaxation of the US embargo upon payments to Cuba had become known to Peer it has remitted to the full extent permitted by the U.S. law as it understood that law to be. Mr Jaegerman's witness statement goes into great detail as to dealings, composer by composer and song by song, none of which was subjected to cross-examination. There had been a very extensive discovery on Peer's part. It was he who asserted, as I accept, and, as I think, Senora Cordova finally accepted, that she had been paid around US$45,000 over the four years in which she had assisted Peer, a sum which he accepted (as I do) was a huge sum by Cuban standards. Peer paid no one direct other than Senora Cordova. In cross-examination by Mr Mellor (11th May 2005, page 39, lines 6 and 7 and page 51, lines 1, 6 and 7) he gave answers that might suggest that Peer had required (or had required Senora Cordova to require) from heirs a CCR even before past accrued royalties would be paid but, in the context before and after those answers, he was plainly dealing with cases where heirship was unclear and I do not consider that, taken as a whole, his evidence was that, even where heirship had been resolved and an affidavit of heirship had been obtained, it had nonetheless been told to heirs that, even as to already accrued royalties, they would be denied payment unless they signed a CCR. The fact that either generally or even in all cases a CCR was signed as well as an affidavit of heirship does not, of itself, suggest that heirs had been told that even as to accrued royalties both were necessary if payment was to be made.

157.    I mentioned earlier there were a number of areas in which I formed the view that Mr Jaegerman's evidence had been weak in the sense of unconvincing or incomplete. Peer's dealings with OFAC were said to have been guided by advice from "outside" U.S. lawyers and such advice was said, in general, to have been not merely only oral but such also, as it seems, that no attendance notes thereof survived either as kept by Peer or as kept by the advisers. That may have been so, although I would have thought it to be inherently unlikely but the failure accurately to give a full account of advice received and as to when it was received may, consciously or unconsciously on Mr Jaegerman's behalf, have masked that there were real delays and insufficient effort expended on Peer's behalf in finding out what was or was not possible, without breaching U.S. law, by way of remitting royalties indirectly to Cuba or at least of informing composers there of what was being done with their royalties in the meantime. Mr Jaegerman agreed that everybody just got into the routine of not sending royalty statements and there was, in my judgment, insufficient examination by Peer of whether that had to be the case, what were its obligations in point of

contract in relation to royalties and royalty statements, whether and how far the position could be explained to the Cubans and to what extent the consequences, plainly disadvantageous to the Cubans, could be mitigated. Peer, it transpired (see Mr Jaegerman's cross-examination on 7th March 2006, page 28, although this had not been mentioned earlier), had, even in the 1960s and 1970s, been able to send persons to Cuba unofficially to meet the Cuban composers. So for Peer to hide behind advice as to the embargo could well have been inadequate even had the advice been made plain from contemporary sources, as it was not. For much of the time this topic would have related to periods before Mr Jaegerman had joined Peer, but I find these issues to be unconvincing exceptions to what, as I have said, was generally a reliable body of evidence from Mr Jaegerman.

## H.  Composers' failure to understand their contracts

158.  EMC argues that the composers did not understand the original agreements they respectively made. In particular, Mr Prescott urges that they failed in appropriate cases to understand the difference between the term of the contract (1, 2 or 5 years) on the one hand, which regulated the period compositions written within which had their copyright assigned to Peer and, on the other, the duration – the whole of the then-assignable life of the copyright – of the effect of the contract on such of the composer's songs as fell within it. I have received no direct evidence of any such failure to understand and, given the evidence of discussions between composers, their organisation, and their broad suspicion of Peer and other publishers, I cannot assume that such a difference would not be common knowledge amongst composers. EMC points to a letter from Ignacio Pineiro as consistent with a belief that, the five years of his Peer contract having elapsed, he was free to assign song (8) to a publisher other than Peer. But the letter is equally consistent with Ignacio Pineiro having forgotten the terms of his contract with Peer or with his simply "trying it on" to see if he could get away with an assignment to another publisher. EMC, in support of this argument as to misunderstandings of contracts, relies very generally on composers' poverty, but poverty, even if proven (as it was not in respect of a relevant composer at any relevant time) does not of itself breed misunderstanding.

159.  A similar argument is raised by EMC as to the Further Dealings; they were not understood by the heirs or the heirs were misled as to their effect by Senora Cordova. I do not believe she herself had taken the trouble to understand the meaning and effect of the Further Dealings either as a whole or as to their respective parts; I hold that her oral evidence which disclosed that was genuine. She was therefore in a position to mislead even without an intention to do so, misleading by ignorance rather than by intent. But I have no acceptable evidence that she gave advice as to the effect of the Further Dealings and some that she did not. I would expect advice as to the effect of CCRs, if any advice was given at all on the subject, to have been more likely to have emerged in the course of the very many telephone conversations between heirs in Cuba and Peer's Spanish-speaking representatives in the United States, but what was said on either side in those many conversations was not explored in any detail. Moreover, some of the assertions as to a failure to understand were entirely unconvincing. Bienvenida Corona, for example (although, as related only to the less relevant composer of song (1), not a person likely to be able to give significant evidence), asserted, in effect, that she must have been misled as to the document she signed or to have failed to understand it because, she added, how else could she have

described herself, as the documents did, as the composer's widow, which she was not. But false assertions by heirs are unfortunately quite familiar in this case and her signature on the document on that subject, hardly a difficult technical point she might not have understood, was at least as consistent with a willingness in her to deceive or an absence in her of care in order to get dollars from Peer. She decapitated rather than gilded the lily by her addition that for her to have been Corona's widow would have made her, when she signed in 2002 or 2003, 120 years of age; he had died in 1950. *On the evidence I have heard in these proceedings* I do not hold Senora Cordova or Peer to have deceived heirs as to the meaning or effect of the Further Dealings.

160.   Having now reviewed the evidence, I conclude that even had EMC had locus in these proceedings to complain, as it does, in the absence as parties of the composers or their personal representative or heirs, that the respective original agreements were void or voidable on grounds other than their true construction, EMC would have failed and would have failed, moreover, even if limitation under Cuban or Spanish law had been no bar to its success. On the ground derived from the true construction of the original agreements – restraint of trade in England under English law – EMC, even had it had locus, would have failed, if only because the English rules as to limitation.

## I.  Restraint of trade or dolus in Cuba, were there to be some opposition to Peer that did have locus

161.   I have already indicated that in these proceedings, on the evidence I have heard and on the assumption that it is the English doctrine of restraint of trade that is in play, that that doctrine does nothing to weaken Peer's claims but what would be the position if, not relying on better evidence (on the practical assumption that EMC's experienced solicitors had collected evidence as well as anyone could) but *relying simply on the terms of an original agreement*, a party having locus began proceedings as claimant in Cuba for the avoidance of the relevant agreement made by his or her forebear, one of the composers with whom I am concerned. I have not been greatly assisted in relation to that possibility by expert evidence on Spanish or Cuban law from either side but, on the other hand, I have understood "dolus" to be a flexible doctrine that may be broad enough to include what in England would be categorised as unreasonable restraint of trade. The relevance of this question is that it would be an added factor against the grant of an unqualified declaration in Peer's favour if an appropriate party as claimant rather than defendant could, by beginning proceedings in Cuba, possibly unseat Peer from whatever title the unqualified declaration would seem to have recognised. EMC's closing submissions included many pages dealing with this subject. I remain unconvinced that the arguments there raised in relation to songs (2) and (3) would have any real prospect of success; in my judgment, they represent either a misconstruction of the relevant original agreement or could be seen to be de minimis complaints on the part of the composer's successors. But as to songs (4), (8), (9), (10), (11), (12), (13) and (14), there may well be substance in the complaint that Peer, upon whom no contractual obligation to publish or exploit was created, could, for the lifetime of the composer and a period thereafter, stultify a whole period's work on the composer's part by, to use Lord Reid's phrase, simply putting the compositions composed in that period in a drawer and leaving them there. There would, of course, be commercial reasons why the publisher should not do so but it could do so should it so choose. As to song (5), there may be substance in the complaint that Peer could assign a copyright for a capital sum leaving nothing for the

composer to receive. I am not convinced that a court in Cuba, hearing the complaint of the heirs of an appropriate composer, could not, without impropriety, extend the familiar (to that court) doctrine of dolus to enable relief to be granted. The relief might include the nullification of the relevant original agreement, if not as to the past then at least as to the future. It could be argued that no such enlargement of "dolus" was necessary as Law 860 had done all the work that was necessary to undo the unattractive activities (as they would be said to be) of foreign publishers but the response to that would presumably be that where Law 860 had failed to have expropriatory effect (as is the case in England) then pro tanto an enlargement of "dolus" was required, consistently with law 860, to achieve the policy ends to which that law was directed. It is difficult to assess the weight to be ascribed to the possibility of annulment of any original agreement in such a way but I do see the possibility as amongst the factors which tend against the making of an unqualified declaration of the kind which Peer asked for in its amended prayer.

## J.  The EGREM interventions

162.    Further impediments to a clear view of Peer's ownership of the English copyrights emerge from what I have called the EGREM interventions. These are dealings between the then-living composer of one or more of the relevant songs on the one hand and EGREM, on the other, being a dealing made after the repeal of section 5(2) of the 1911 Act (so that the composer was free to deal with the English copyright in a manner that would have previously, before the repeal of the Act, have been forbidden to him inter vivos) but before any relevant Further Dealing. The respective dates of the EGREM interventions are shown in the schedule against the songs to which they relate.

163.    Peer's answer to these interventions is that, they being either assignments of copyright of unlimited duration or, at any rate, of over 10 years' duration, they were made void by Law 860. This argument was only developed at a very late stage when it became apparent that Peer wished to argue that Law 860 was, so to speak, a two-edged sword which, despite having been found by the Court of Appeal to be blunt to the extent that it did not operate to undo or restrict the effect of prior assignments of English copyright to Peer, nonetheless, with its other edge, operated under Cuban law to deny effect to or to limit the duration of the effect of assignments from Cuban composers to EGREM.

164.    Were this argument to succeed EMC would never have acquired title by way of the EGREM interventions or might stand to lose that title after a limited period.

165.    To meet the argument based on Law 860 EMC adduced evidence from a very senior Cuban lawyer, Dr Francisco Martinez Hinojosa. I hope I do not over-simplify his evidence but, in essence, it was that Law 860 was passed in order to protect Cuban composers from unfairness and depredations, that there was no question of their needing protection against the Cuban state, that EGREM was a part of that state against which no protection was needed and hence that Law 860 was to be given a purposive rather than a literal construction and on that basis did not have the effect for which Peer contended.

166.    Mr Saini makes very telling points based on the language of Law 860 but I have no expert evidence to counter that of Dr Hinojosa, who was not cross-examined and who concludes that:-

> "I can say that the correct interpretation, according to our laws, with regard to the approval and registration of music publishing contracts as required by Article 2(k) in relation to Article 32 of the said law for the Instituto Cubano de Derechos Musicales when it was operating as a publisher, and Article 31 in regard to contracts entered into with third parties, is that the said contracts entered into by the above-named composers [and he refers to Nico Saquito, Ignacio Pineiro, Bienvenido Julian Gutierrez and Celia Romero] with [EGREM] did not fall within the scope of law 860 of 1960 for reasons that are explained below."

A little later he says:

> "A claim that law 860/60 would or could have limited the terms of the EGREM contracts that I have listed in annex 1 would, in my opinion, be rejected in our courts under Cuban law".

167.    The extent to which a purposive construction can reasonably be arrived at, notwithstanding literal arguments to the contrary, may vary greatly from one jurisdiction to another and I cannot say that the purposive construction of Law 860 of the kind spoken to by Dr Hinojosa is simply outside a legitimate range of conclusions to which Cuban court could come.  In the absence of expert Cuban (or Spanish) law to the contrary, I cannot hold that this argument of Peer would have any real prospect of success.

168.    On that basis, the EGREM interventions must, at any rate if the title of EGREM can be seen to have been passed to EMC, give rise to substantial difficulties in the way of Peer being seen, in respect of periods after the beginning of the 1911 Act reversion, clearly to be the owner of such of the English copyrights as had been swept up within the EGREM interventions.

169.    As for such a passing of title from EGREM to EMC, Senor Miguel Comas Delgado made a witness statement on 16th May 2002.  He died before 1st March 2005 and, of course, his evidence was therefore not subjected to any cross-examination.  But he does speak of the organisation of EGREM and EMC and shows that they became two separate bodies.  EMC had been merely a publishing arm of EGREM but in 1993 it separated from EGREM and became an independent company.  He says : "Under the terms of separation, EMC took over control of all EGREM's publishing rights".  But control is not ownership and I have not seen any instrument that shows how EMC has come to own, if it has, the benefit of contracts made with EGREM.  However, as the absence of such an assignment might prove to be only a temporary weakness in EMC's position (on the assumption that EGREM would make a suitable assignment to EMC if called upon to do so) I do regard the EGREM interventions as real impediments, in relation to periods after the beginning of the 1911 Act reversions and to the songs to which they relate, to any unqualified declaration in favour of Peer of the kind which Peer has sought.

**K.  The EMC interventions**

170.    It will be remembered that there was no effective assignment by way of Further Dealings to Peer unless and until the relevant <u>addendum</u> was made.  But in a number of cases there were dealings between some at least of a composer's heirs and EMC, dealings before the relevant addendum, by which the heirs purported to assign to EMC their respective shares in the relevant copyrights.

171.    I have referred in the schedule only to the EMC interventions that were pleaded. They were not subject of the same detailed scrutiny as some other documents and in some cases they appeared to be incomplete, at any rate as to the versions exhibited in English, in the sense that schedules were sometimes missing, dates unclear, and there was argument as to whether they amounted merely to licences rather than assignments of copyright.  Whether such possible defects would, on more a close study, have emerged to weaken these interventions I cannot be sure but I comment in parenthesis that there was no argument, as a further potential weakening, suggesting that an EMC intervention made, as each one was, after the corresponding CCR with Peer, could not take effect according to its letter on the ground that the CCR barred such an act.  But, notwithstanding possible doubts as to the efficacy of the EMC interventions, they can only be, if anything, the cause of yet further doubts that make unqualified declarations in Peer's favour inappropriate as to periods after the 1911 Act reversions began in those cases where an EMC intervention had been made.

**L.  A return to the subject of declaratory relief**

172.    It would be possible, despite the difficulties in Peer's path which I have described, to construct possible declarations in favour of Peer in some particular cases.  Song (2) runs into the difficulty – the Para 4 defence – to which I have referred in para 96 above but as for songs (3) and (4), Peer has, until a date in 2007, no need to rely upon any Further Dealing, nor has it any need at all in respect of song (5).  Even so, there are reasons not to do so, which apply also to song (2).  Firstly, despite ample opportunity to amend the relief which it claims, an opportunity which it did exercise, Peer has never amended to claim for a declaration tailored as to all or any of those four songs.  In turn, secondly, that means that EMC has not been called upon to answer a claim for any such particularised declarations to the extent it would have been had such relief been included in some prayer on Peer's part.  Thirdly, the terms appropriate to any particularised declaration have accordingly not been the subject of argument.  Peer says that tailoring the declaration is best left until the judgment has been delivered but, as it seems to me, that is back-to-front; by the Court tailoring should be informed by the argument that has led to the judgment.

173.    To reduce the propensity to mislead, a tailored declaration, as it seems to me, would need to make it clear that it related (in some cases) only to 2007 or 2016, that it bound only as between EMC and Peer, that it was granted in proceedings in which the only opposing party was held in material ways to be bereft of locus standi and that there <u>may</u> be parties who would have locus who might wish to oppose Peer's claims to ownership and whose potential opposition to Peer, though not adjudged in these proceedings to be bound to be successful, has neither in fact been here ruled upon as hopeless.  It would also need to be made clear that Peer's claims as to a wider declaration had failed.  Without some such addition, assertions to others by Peer that, in long and heavily contested proceedings against EMC on extensive evidence in the

neutral jurisdiction of England, it had been granted an unqualified declaration that it was owner of the English copyright in, for example, song (5) El Diablo Tun Tun, whilst (if I had granted such relief) being entirely true, would hardly paint an accurate picture of the outcome even as to that song. It would be likely to suggest to many a certified invulnerability of Peer's title which these proceedings would not have been able to confirm – see also the observations of Stanley Burnton J. in *Lloyd v Svenby*, unreported [2006] EWHC 315 QB at paras 80 to 85. Whether Peer would want, as a fallback, a declaration as qualified as I have mentioned I do not know but I do know that it has never framed what it would want short of its subsisting pleading and that EMC has thus not countered a claim which has never been put into due form.

174. Fourthly, if Peer is right in asserting that the MCPS commonly acts upon what is an apparent better title at the time than that of a present known competitor and does so without some more definitive court ruling, then for the limited period until the date 2007 or 2016 as to songs (3) and (4) and for the longer period appropriate to song (5) or, indeed, more generally, it may be that if Peer's true purpose is no other than the ostensible one of its being able to receive past accrued and future royalties from the MCPS as to these particular songs then not only the highly qualified declaration that I have described but no declaration at all may be necessary. The MCPS might find this judgment sufficient for such their immediate purposes (although I am far from saying that they have to).

175. Fifthly, had Peer made it clear in its prayer that it would be content as a fallback and alternative, with such qualified declarations in respect of only the three songs I have described, EMC might (I only say *might*) have not resisted that as an alternative head of claim and, had Peer persisted but had only that relief been granted, EMC would have had a clear route to a judgment in costs in its favour. By never so framing its claim Peer denied EMC that possibility.

176. Whilst it is sometimes appropriate for a court to carve out of an excessive prayer some lesser relief as may be appropriate (and, of course, that is frequently the case in monetary claims) a difference is that there the party will have claimed the relief which it is awarded (e.g. damages consequent upon the events complained of) and it is merely the <u>quantification</u> thereof that differs. But in the case at hand there has never been a claim for qualified and alternative declarations of the kind of which I am speaking. Because of its incompleteness and propensity to mislead and the fact that it would be strenuously opposed I do not see it as the Court's task here to carve out some possible lesser relief that could be granted out of the unacceptably wide relief claimed. For these reasons I do not make any declaration even in respect of songs (3), (4) and (5). Peer has argued, as it has spent such time and, in particular, money in an attempt to obtain particular relief, that the Court should strive, if at all possible, to grant it. There is, though, fortunately, no principle that the more that a party spends in its attempt to obtain relief, the stronger is its entitlement to be granted it.

## M. Conclusion

177. Finding myself, for the reasons I have given, unable to grant any head of relief claimed by Peer, I am disposed at least to dismiss "the Trial" as it was described in Master Bragge's Order but I would welcome counsels' assistance on the formal Order appropriate where, as here, there are proceedings not merely between claimant and defendants (the defendants playing no real part) but which also involved a Part 20

defendant who has, indeed, played a part.  As for costs, I expect the parties to have a great deal they would wish to say.  The better course may be for costs to be dealt with on a separate occasion, after the parties have had opportunity to digest this judgement. There are, moreover, several interlocutory judgments as to costs, the effect of which may need to be taken into account.  Unless counsel press me otherwise, I will adjourn the questions as to the exact form of Order I should make and as to costs to a convenient date to be fixed through the usual channels.  And unless counsel now before me are agreed that this will be unnecessary, I suggest that these remaining issues should be the subject of sequential Skeleton Arguments.  Absent such agreement, I will fix a timetable for that to be done.