# EXHIBIT G

However, for the reasons I have already given, and for those which
have been given more fully by Buckley and Goff L.JJ., I agree that the
right course for this court to take is to delete the condition and to make
the amendments necessary to make quite plain what the defendant is
restrained from doing.

A

> *Appeal allowed.*
> *Order of Blackett-Ord V.-C. discharged.*
> *Injunction in terms of notice of appeal*
>     *with amendments as indicated in judg-*
>     *ment of Buckley L.J. substituted.*
> *Plaintiff's costs of motion before Blackett-*
>     *Ord V.-C. and of appeal, to be taxed in*
>     *favour of defendant.*

B

C

Solicitors: *Halliwell Landau & Co., Manchester; Willey, Hargrave
& Co., Leeds.*

L. G. S.

D

————————

[COURT OF APPEAL]

E

MIDLAND BANK TRUST CO. LTD. AND ANOTHER *v.* GREEN
AND ANOTHER

[1970 G. No. 334]

1977  Oct. 17, 18, 19, 20, 21                                Oliver J.

1979  March 12, 13, 14;        Lord Denning M.R., Eveleigh L.J.     F
      April 11                            and Sir Stanley Rees

*Land Charge—Charges registrable—Estate contract—Unregistered
option to purchase farm—Farm conveyed to grantor's wife at
gross undervalue—Whether court can inquire into adequacy of
consideration—Whether wife " purchaser . . . for money or
money's worth "—Whether option void against wife—Whether
fraud—Land Charges Act 1925 (15 & 16 Geo. 5, c. 22), s. 13 (2)*

G

In 1961 a father granted to his son a 10-year option to
purchase the farm which the son farmed as a tenant. The
option was not registered under the Land Charges Act 1925,
and in 1967 the father, wishing to deprive the son of his option,
conveyed the farm, then worth about £40,000, to the mother
for £500. When the son found out about the conveyance
he sought to register the option and give notice exercising it.
In proceedings commenced, after the mother's death, by the
son (and carried on after his death by his executors, the present
plaintiffs), against, inter alia, the mother's estate for, inter alia;

H

a declaration that the option was binding on the estate, the judge held that the mother was " a purchaser of a legal estate for money or money's worth " against whom the unregistered option was void under section 13 (2) of the Land Charges Act 1925.[1]

On appeal by the plaintiffs : —

*Held,* allowing the appeal (Sir Stanley Rees dissenting), that, in determining whether a legal estate had been purchased " for money or money's worth " within the meaning of section 13 (2) of the Land Charges Act 1925, the court could inquire into the adequacy of the consideration and the genuineness of the transaction, at least where the land had not been dealt with further (post, pp, 624D–E, 627H—628A, 629D–E); and that the conveyance of the farm to the mother at a gross undervalue was not a purchase " for money or money's worth " and, accordingly, the option was not void for non-registration as against the mother's estate.

*Per* Lord Denning M.R. The provisions for protecting a purchaser are of no avail when the sale to him is done in fraud of the holder of the estate contract (post, p. 624F). Fraud in this context covers any dishonest dealing done so as to deprive unwary innocents of their rightful dues (post, p. 625B).

*Per* Sir Stanley Rees. Unless fraud is proved or the conveyance is a sham or the consideration nominal or illusory then an unregistered estate contract is void against the purchaser (post, p. 635E–G).

Decision of Oliver J. post, p. 598A; [1978] 3 W.L.R. 149; [1978] 3 All E.R. 555 reversed.

The following cases are referred to in the judgments in the Court of Appeal:

*Crofter Hand Woven Harris Tweed Co. Ltd.* v. *Veitch* [1942] A.C. 435; [1942] 1 All E.R. 142, H.L.(Sc.).

*Hollington Brothers Ltd.* v. *Rhodes (Note)* [1951] 2 All E.R. 578.

*Hornal* v. *Neuberger Products Ltd.* [1957] 1 Q.B. 247; [1956] 3 W.L.R. 1034; [1956] 3 All E.R. 970, C.A.

*Lazarus Estates Ltd.* v. *Beasley* [1956] 1 Q.B. 702; [1956] 2 W.L.R. 502; [1956] 1 All E.R. 341, C.A.

*Madell* v. *Thomas & Co.* [1891] 1 Q.B. 230, C.A.

*Miles* v. *Bull* [1969] 1 Q.B. 258; [1968] 3 W.L.R. 1090; [1968] 3 All E.R. 632.

*Mogul Steamship Co. Ltd.* v. *McGregor, Gow & Co.* (1889) 23 Q.B.D. 598, C.A.

*Monolithic Building Co., In re* [1915] 1 Ch. 643, C.A.

*Polsky* v. *S. and A. Services* [1951] 1 All E.R. 185.

*Snook* v. *London and West Riding Investments Ltd.* [1967] 2 Q.B. 786; [1967] 2 W.L.R. 1020; [1967] 1 All E.R. 518, C.A.

*Stock* v. *Frank Jones (Tipton) Ltd.* [1978] 1 W.L.R. 231; [1978] I.C.R. 347; [1978] 1 All E.R 948, H.L.(E.).

*Twyne's Case* (1601) 3 Co.Rep. 80b.

*Watson, In re, Ex parte Official Receiver in Bankruptcy* (1890) 25 Q.B.D. 27, C.A.

The following additional cases were cited in argument in the Court of Appeal:

*Amos, In re* [1891] 3 Ch. 159.

---

[1] Land Charges Act 1925, s. 13 (2): see post, p. 627D.

592

Midland Bank Trust Co. v. Green (C.A.)                    [1980]

*Beesly* v. *Hallwood Estates Ltd.* [1960] 1 W.L.R. 549; [1960] 2 All E.R. 314.                                                                                          A

*Bolton (H.L.) (Engineering) Co. Ltd.* v. *T. J. Graham & Sons Ltd.* [1957] 1 Q.B. 159; [1956] 3 W.L.R. 804; [1956] 3 All E.R. 624, C.A.

*Fry* v. *Lane* (1888) 40 Ch.D. 312.

*Greene* v. *Church Commissioners for England* [1974] Ch. 467; [1974] 3 W.L.R. 349; [1974] 3 All E.R. 609, C.A.

*Vane* v. *Vane* (1873) L.R. 8 Ch.App. 383.

*Vartoukian* v. *Daejan Properties Ltd.* (1969) 20 P. & C.R. 983.            B


The following cases are referred to in the judgment of Oliver J.:

*Beddoe, In re* [1893] 1 Ch. 547, C.A.

*Bolton (H. L.) (Engineering) Co. Ltd.* v. *T. J. Graham & Sons Ltd.* [1957] 1 Q.B. 159; [1956] 3 W.L.R. 804; [1956] 3 All E.R. 624, C.A.

*Carl Zeiss Stiftung* v. *Rayner & Keeler Ltd. (No. 2)* [1967] 1 A.C. 853; [1966] 3 W.L.R. 125; [1966] 2 All E.R. 536, H.L.(E.).            C

*Eton College* v. *Minister of Agriculture, Fisheries and Food* [1964] Ch. 274; [1962] 3 W.L.R. 726; [1962] 3 All E.R. 290.

*Green* v. *Green* (unreported), February 19, 1976, Templeman J.

*Hollington Brothers Ltd.* v. *Rhodes (Note)* [1951] 2 All E.R. 578.

*Inland Revenue Commissioners* v. *Gribble* [1913] 3 K.B. 212, C.A.

*Jones* v. *Trinder, Capron & Co.* [1918] 2 Ch. 7, C.A.

*Monolithic Building Co., In re* [1915] 1 Ch. 643, C.A.            D

*Moritz, decd., In re* [1960] Ch. 251; [1959] 3 W.L.R. 939; [1959] 3 All E.R. 767.

*Vane* v. *Vane* (1873) L.R. 8 Ch.App. 383.


The following additional cases were cited in argument before Oliver J.:

*Addiscombe Garden Estates Ltd.* v. *Crabbe* [1958] 1 Q.B. 513; [1957] 3 W.L.R. 980; [1957] 3 All E.R. 563, C.A.            E

*Fidelitas Shipping Co. Ltd.* v. *V/O Exportchleb* [1966] 1 Q.B. 630; [1965] 2 W.L.R. 1059; [1965] 2 All E.R. 4, C.A.

*Fry* v. *Lane* (1888) 40 Ch.D. 312.

*Holder* v. *Holder* [1968] Ch. 353; [1968] 2 W.L.R. 237; [1968] 1 All E.R. 665, C.A.

*Hollingsworth* v. *Lee* [1949] V.L.R. 140.            F

*Lindsay Petroleum Co.* v. *Hurd* (1874) L.R. 5 P.C. 221, P.C.

*Mountford* v. *Scott* [1975] Ch. 258; [1975] 2 W.L.R. 114; [1975] 1 All E.R. 198, C.A.

*Smith* v. *Morrison* [1974] 1 W.L.R. 659; [1974] 1 All E.R. 957.


ACTION

By writ dated January 27, 1970, as amended, the original plaintiff,    G
Thomas Geoffrey Green, commenced proceedings against the defendants, Walter Stanley Green and Robert Derek Green, as personal representatives of Evelyne Green, for, inter alia, (1) a declaration that an option granted to the plaintiff for the purchase at £75 per acre of Gravel Hill Farm, Thornton-le-Moor, Lincolnshire, was binding on the estate of Evelyne Green; (2) specific performance of the contract arising by reason of the option and    H
the exercise thereof by the plaintiff; (3) all necessary accounts and inquiries; (4) damages in lieu of or in addition to specific performance; (5) damages for conspiracy; and against Walter Stanley Green personally

**1 Ch.**                    **Midland Bank Trust Co. v. Green (C.A.)**

A  for damages for conspiracy.  By order dated January 19, 1973, Beryl
Rosalie Kemp became a defendant as the executrix of Walter Stanley
Green, and, by order dated November 16, 1973, the proceedings were
ordered to be carried on by the Midland Bank Trust Co. Ltd. and
Margaret Ann Green, as executors of the plaintiff, as plaintiffs.

B  The facts are stated in the judgments of Oliver J. and Lord Denning
M.R.

C  *Jeremiah Harman Q.C.* and *Jonathan Parker* for the plaintiffs.  Where
a transaction which can be described as a sham or a conspiracy, where
the expressed consideration is grossly inadequate, the undervalue may
be so great that it can be said to be the badge of fraud.  Walter's
conveyance to his wife, Evelyne, may have been effective to convey the
land to her, but it was a sham, being in truth a voluntary conveyance,
dressed up as a sale.  A " purchaser " is defined in section 205 (1) (xxi) of
the Law of Property Act 1925, as meaning a " purchaser in good faith for
valuable consideration " and as including " a lessee, mortgagee or other
person who for valuable consideration acquires an interest in property . . ."
But while " valuable consideration " includes marriage, it does not include
D  a " nominal consideration in money; . . ."

By section 13 (2) of the Land Charges Act 1925, a land charge class D,
which includes an option or estate contract, is void against a purchaser
of the land charged therewith unless the charge is registered before
completion of the purchase, but there is an important proviso to the effect
that the subsection only applies in favour of a purchaser of a legal estate
" for money or money's worth."  By section 20 (8) of the Act, a
E  " purchaser " means any person who " for valuable consideration, takes
any interest in land or in a charge on land; . . ."

The word " purchaser " has diverse meanings, but it has come to mean,
not just one who acquires otherwise than by escheat or descent, but one
who acquires under a contract of sale on payment of the purchase price.
The words of James L.J. in *Vane* v. *Vane* (1873) L.R. 8 Ch.App. 383,
F  398, show that a person may be described as a purchaser when in truth
he should not properly be so described.  The word is used by Buckley L.J.
in *Inland Revenue Commissioners* v. *Gribble* [1913] 3 K.B. 212, 217 et
seq., in its ordinary commercial sense.  As Buckley L.J. states, the word
may mean one of four things, viz., (1) its ordinary commercial meaning,
i.e., a buyer for money; (2) a person who becomes a purchaser for money
or money's worth; (3) a purchaser for valuable consideration which need
G  not be money or money's worth, but may be the consideration of marriage;
and (4) its technical meaning, a person who does not take by descent.

The plaintiffs contend that in the Land Charges Act 1925, " purchaser "
is used to refer to any person who comes into a transaction as a commer-
cial matter, which carries with it overtones of the normal way in which
a sale is carried through, namely with solicitors on both sides, a contract
H  in writing, requisitions on title and, above all, negotiation of the price.
Section 13 of the Land Charges Act 1925 was designed to protect one
who comes into a transaction as a commercial contract.  The transaction
here bears none of the badges of a purchase.  The gross undervalue is a

594

**Midland Bank Trust Co. v. Green (C.A.)** **[1980]**

relevant factor to be considered. Whilst the court will not normally consider the adequacy of the price, there must come a point at which the disparity between price and value renders the transaction no true sale. An analogy can be drawn with the former jurisdiction to set aside sales of reversions. The position as to this was altered by statute, 31 Vict. c. 4, so that thereafter the sale of a reversion could not be set aside merely on the grounds of inadequacy of price. But in *Fry* v. *Lane* (1888) 40 Ch. D. 312, Kay J., having considered that Act, said at p. 321, that it was obvious that the undervalue must not be " . . . so gross as to amount of itself to evidence of fraud . . ."

Here the parties to the conveyance were husband and wife; there was no conceivable commercial purpose for a sale, and the price paid was but a minute fraction of the true value of the farm conveyed. The price, in other words, was the badge of a sham or fraud. The value of the farm in 1967 was £81,000, yet the price paid by Evelyne was only £500.

Others factors which go to prove that the sale was a sham, apart from the relationship between the parties, were the hurriedness with which the transaction was carried through, the purpose of the parties to defeat the rights of a third party which was known to both parties to the contract, and the total lack of the normal stages of a conveyance on sale. The transaction was in reality a gift, and not a sale. If any person who takes a legal estate for money is to be treated as a " purchaser ", then the court must face the difficult problem which arises when the " money " is only £1 or a penny. To use such a test would be to make the statute an instrument of fraud. Here there was undoubtedly a conspiracy between Walter and Evelyne to injure their son Geoffrey in his legal rights. [Reference was made to *H. L. Bolton (Engineering) Co. Ltd.* v. *T. J. Graham & Sons Ltd.* [1957] 1 Q.B. 159 and *Hollingsworth* v. *Lee* [1949] V.L.R. 140.]

*Harman Q.C.* sought to introduce into the evidence, under the Civil Evidence Act 1968, an affidavit sworn in the *Beddoe* application by Walter.

*Leonard Hoffmann Q.C.* with *Gavin Lightman* and *F. P. Hinks* for the defendants. It would be a breach of confidentiality for the affidavit to be used as evidence at the trial or anywhere else. The point has been the subject matter of a ruling by Templeman J. in interlocutory proceedings [*Green* v. *Green* (unreported), February 19, 1976]. A paragraph of the plaintiffs' reply, which pleaded an estoppel based on the attitude adopted by the defendants on the *Beddoe* application, was struck out by Templeman J. as being scandalous. It is inadmissible to reopen a matter which has already been decided interlocutorily between the parties: see *Fidelitas Shipping Co. Ltd.* v. *V/O Exportchleb* [1966] 1 Q.B. 630. This therefore raises an issue estoppel per rem judicatam. In the case of a " without prejudice " statement, no one is entitled to use it, because a person must as a matter of policy be free to make admissions.

*Harman Q.C.* No question of res judicata arises. The issue which Templeman J. decided was whether or not the paragraph in the plaintiffs' reply should be struck out. The averment was that there had been an election by the defendants in the *Beddoe* application which gave rise to an estoppel. The paragraph was struck out and the decision to that extent is binding as res judicata. But Templeman J. did not decide anything

A  about the use of Walter's affidavit as evidence of fact at the trial. *Carl Zeiss Stiftung* v. *Rayner & Keeler Ltd.* (*No.* 2) [1967] 1 A.C. 853 shows that in order to create an issue estoppel the issue must be one which it was *necessary* for the judge to decide. It could not be a res judicata if it was not an issue of fact. In his judgment, Templeman J. did not refer to *In re Moritz, decd.* [1960] Ch. 251.

The normal practice of a *Beddoe* application, where there is an opposing
B  party, is for him to be excluded at certain points while certain evidence is being given, and that procedure was adopted in this case. The affidavit was voluntarily supplied by the defendant Walter to the plaintiffs, and it was referred to in the defendants' list of documents. Templeman J. treated the matter as if the affidavit had been delivered in the course of the *Beddoe* application, but in fact it was done privately by Walter. There
C  is no " without prejudice " aspect which applies to a statement of fact by a witness. The essence of Geoffrey's affidavit was that Walter would have been a prime witness were he alive, and that he could not have been stopped from giving evidence in the witness box. *In re Moritz, decd.* demonstrates that a *Beddoe* application is not to be treated as if it were a " without prejudice " proceeding. Any claim to privilege as to the contents of the affidavit must have been waived by its having been included
D  in the defendants' list of documents in the action.

Proceedings in chambers are protected by the rule that publication of anything done or said there is a contempt of court. But section 12 of the Administration of Justice Act 1960 provided that the publication of information relating to proceedings before any court sitting in private was not of itself to be a contempt of court, except in certain specified
E  instances, and those instances do not cover the present case. Affidavits are always filed. In the old days it was the right of any person to inspect the file, but the rules have now been changed so that one cannot now do so until they reach the Public Record Office. There can be no question of confidentiality as to documents which are going to become public in this way. Where the interests of justice require that one party should be able to open his heart to the judge, preservation from publication
F  of the confidential document is achieved by the procedure adopted in *In re Moritz, decd.* [1960] Ch. 251. If it was part of the ratio decidendi of Templeman J.'s judgment, then such decision was inconsistent with *In re Moritz,* to which no reference was made. Furthermore such a decision could not be res judicata since it formed no part of the formal proceedings, which consist of the pleadings and the order. To give rise
G  to an issue estoppel, it must be an issue necessarily arising.

*Hoffmann Q.C.* There is a general rule of policy which prevents the use of material contained in affidavits sworn on a *Beddoe* application on behalf of a party without that party's consent. It cannot be contended that the unilateral act by Walter in disclosing the contents of his affidavit to Geoffrey amounted to a waiver of confidentiality. The paragraph in the plaintiffs' reply was struck out by Templeman J. because the material could
H  not be used. There is thus an estoppel per rem judicatam.

[OLIVER J. ruled that Walter's affidavit, sworn in the *Beddoe* application, was admissible in evidence.]

**Midland Bank Trust Co. v. Green (C.A.)**     **[1980]**

Evelyne was not a party to any contract with her son Geoffrey. Consequently an alternative action in damages pleaded against her estate is an action in tort based on the tort of conspiracy. The old rule of actio personalis moritur cum persona was altered by section 1 of the Law Reform (Miscellaneous Provisions) Act 1934. That Act was repealed by the Proceedings Against Estates Act 1970, but section 3 (3) of that Act does not enable proceedings to be revived where they would have become statute barred under the earlier Act. Therefore no claim based on conspiracy is maintainable as against Evelyne's estate, since any action for damages should have been commenced within six months of the crucial date, the grant of probate of Evelyne's will on November 29, 1968.

As to the effect of the Land Charges Act 1925, three facts are established: (1) that the option was not registered; (2) that Walter executed a conveyance of the legal estate to Evelyne; and (3) that the consideration which she paid was the sum of £500. Was she a purchaser as defined in the Act? If the answer is yes, then was the consideration " money or money's worth " and was she a purchaser of the legal estate?.

Various meanings can no doubt be given to the word " purchaser ", but precision is important in dealing with a conveyancing statute. The draftsman provided a precise definition in section 20 (8) of the Land Charges Act viz., " ' Purchaser ' means any person (including a mortgagee or lessee) who, for valuable consideration, takes any interest in land or in a charge on land; and ' purchase ' has a corresponding meaning; . . ." Here Evelyne plainly took an interest in the land and the transaction was plainly treated as effective. Equally she plainly paid money as a consideration for the conveyance. The amount of course is very little compared with the value of the property, but under the Land Charges Act 1925 it seems that even a nominal consideration would suffice: *Mountford* v. *Scott* [1975] Ch. 258. There is thus a marked divergence between the meaning of purchaser in the Land Charges Act 1925 and the Land Registration Act 1925, section 3 (xxi), as compared with that in section 205 (i) (xxi) of the Law of Property Act 1925. [Reference was made to *Smith* v. *Morrison* [1974] 1 W.L.R. 659, 676; *Hollington Brothers Ltd.* v. *Rhodes (Note)* [1951] 2 All E.R. 578; *In re Monolithic Building Co.* [1915] 1 Ch. 643, 662 and to *Megarry & Wade, The Law of Real Property,* 4th ed. (1975), pp. 1048 et seq.] All that needs to be done here is to apply the plain words of the Land Charges Act 1925.

The general principle as to the operation of the doctrine of election is that if a party to a contract declares that he is not going to fulfil his obligations, then, while that situation continues, the other party may treat the contract as repudiated and may claim damages. If repudiation is accepted, the obligation of the party in default becomes one to pay damages: see *Fry on Specific Performance*, 6th ed. (1921), p. 477.

Geoffrey concurred with the other executors of Evelyne in swearing an estate duty affidavit which described the land as her unincumbered property, valuing it at £40,000, without making any adverse claim. Also he signed a cheque for payment of stamp duty at £400. He continued to pay rent to his mother, and he entered into a new agreement with his other co-executors. All these acts constituted an election to treat the

A    contract as discharged.  This was done with full knowledge of all the facts
and with advice.  If the advice was wrong, that is unfortunate for him.

Even if these facts do not operate as a discharge of contractual
obligations, they do operate as an acquiescence in the position, which
disentitles the plaintiffs to specific performance.

On the evidence the court can take the view that there is a high
probability that Walter thought that there was a binding option, and,
B    since the option was discussed in their presence on several occasions, may
conclude that both Walter and his wife, Evelyne, knew of the existence
of the option.

Walter's motive, after a quarrel with Geoffrey, seems to have been to
put it out of his power to comply with the option.  There is no evidence
as to Evelyne's motive, but there is evidence that Geoffrey and his mother
C    were not on good terms.  Provided that the property was conveyed for
valuable consideration, the option would not bind Evelyne.  Her motive
would be immaterial.  No question of fraud or deceit arises.  Evelyne
was merely taking advantage of the legal rights conferred on her by the
statute.

As to acquiescence, see *Snell's Principles of Equity,* 27th ed. (1973),
p. 632; *Lindsay Petroleum Co.* v. *Hurd* (1874) L.R. 5 P.C. 221 and
D    *Holder* v. *Holder* [1968] Ch. 353.

*Harman Q.C. in reply.*  Section 20 of the Land Charges Act 1925
provides that the definition of " purchaser " is only to apply " unless the
context otherwise requires," and here the context does " otherwise
require," because if one attempts to read the words of the definition into
section 13 (2) of the Act, in place of the word " purchaser," the result
E    is nonsense and is contradictory, viz., " Provided that . . . this subsection
only applies in favour of *any person . . . who, for valuable consideration,
takes any interest in* [*that*] *land* of a legal estate for money or money's
worth."  That is just gibberish.  The right conclusion is that " purchaser "
in the proviso bears some other meaning than the technical one in section
20 (8).  The word plainly bears the meaning ascribed to it in ordinary
parlance, namely a " purchaser " in the commercial sense.  [Reference was
F    made to sections 199 and 205 (1) (xxi) of the Law of Property Act 1925.]
" Purchaser " here means one who is in good faith.  Section 199 means
that a purchaser in bad faith *is* affected.  The proviso to section 13 (2)
of the Land Charges Act 1925 is limited to purchasers whose purchase
is a genuine transaction of bargain and sale, and if they are not of that
nature they are not protected by the proviso.  The language of the
G    conveyance, which described Evelyne as " the purchaser," is not con-
clusive; nowhere does the conveyance describe the transaction as a
" conveyance on sale " : *Addiscombe Garden Estates Ltd.* v. *Crabbe* [1958]
1 Q.B. 513.

The consideration was totally inadequate; it appears to have been
paid as a cloak to conceal the true value.  The statute should not
H    be allowed to be used as an instrument of fraud.

There is no authority on election which suggests that where a man
has a remedy against A, which is partial and inadequate, he is electing
to abandon his more complete and better remedy against B.  It is a choice

**Midland Bank Trust Co. v. Green (C.A.)**  [1980]

between two inconsistent lines of conduct as regards the same party.  A
Acquiescence in the present case does not afford a defence.

OLIVER J.  This is in many ways a tragic and very unhappy family
dispute.  Walter Stanley Green was a Lincolnshire farmer.  He was mar-
ried and his wife was Evelyne Green.  They had two sons, Geoffrey and
Derek, and three daughters.  I hope it will not be considered disrespectful
if, for convenience, I refer to all the members of the family by their  B
Christian names.

Now Walter appears to have been a man of some substance.  He was
the freehold owner of more than one farm, and one farm which he owned
was known as "Thoresway," which was a farm of 600–700 acres and
which appears to have been farmed originally by him and his younger
son, Derek, together, either in partnership or under some other arrange-
ment.  Another farm was Gravel Hill Farm at Thornton-le-Moor in  C
Lincolnshire.  That was a smaller farm amounting to some 300 acres, and
it was farmed by Walter's elder son, Geoffrey.  Geoffrey had a tenancy
of the land at £3 an acre, or thereabouts, which was granted to him in
1954.

Walter retired from active farming in 1960, and at that time, or
thereabouts, he sold Thoresway—or his interest in Thoresway—to Derek  D
at a price of £75 an acre, which was well below the market value at
the time.  Geoffrey wanted to buy Gravel Hill Farm at a similar price, but
it seems that Walter had some knowledge, or that he had been advised,
of the death duty advantages attendant upon the possession of agricultural
property, and he was desirous, at that time at any rate, of retaining
agricultural investment.  So he and Geoffrey went to a firm of solicitors in  E
Brigg, Messrs. Hett, Davy & Stubbs—now Messrs. Hett, Stubbs & Kemp
—and those solicitors drew up, and Walter signed, an option agreement
which was dated March 24, 1961.  That agreement was in these terms.
It was addressed to

> "Thomas Geoffrey Green Gravel Hill Farm Thornton-le-Moor.  In
> consideration of the sum of £1 paid by you to me I hereby give you
> the option of purchasing the Gravel Hill Farm now in your occupation  F
> at the sum of £75 . . . per acre.  This option to remain effective for
> ten years.  Dated this March 24, 1961."

It bore a sixpenny stamp and was signed by Walter.

The evidence of Geoffrey's widow—she was not cross-examined on this
and I accept her evidence—is that thereafter the existence of the option
and the possibility of Geoffrey's exercising it were discussed on frequent  G
occasions between Walter and Geoffrey in the presence of Walter's wife,
Evelyn.  It appears that Geoffrey and his wife were in the habit of
visiting Walter and Evelyne at weekends; and Mrs. Geoffrey Green's
evidence was, and again I accept it, that Evelyne must have known all
about the option, or about its existence at any rate.  Whenever it was
discussed, Mrs. Green told me, Walter said that he still wanted to retain  H
an agricultural investment and, in the result, up to August 1967 the
option had not been exercised.  It had not only not been exercised but
it had not been registered under the Land Charges Act 1925; so that

A  as a matter of law Walter could still sell the land elsewhere free from the option although, of course, that would be a clear breach of his contract with Geoffrey.

On August 14, 1967, a Mr. Harrod, a partner in a well-known firm of solicitors in Spalding, Messrs. Roythorne & Co., received a telephone call from Walter's younger son, Derek. It appears that Mr. Harrod had previously acted for Derek in various matters. He was the litigation

B  partner in Roythorne. Derek asked him to come over to his—that is Derek's—farm and Mr. Harrod did so and he was introduced to Walter, whom, he told me, he had not previously met. Walter then gave Mr. Harrod certain instructions. Now, although these are in fact privileged they were introduced in evidence, and Mr. Hoffmann took no objection to Mr. Harrod telling me about them. Walter told Mr. Harrod that he had signed what he " thought " was an option in favour of his son. That,

C  on Mrs. Green's evidence, which as I have said I accept, was, I think, somewhat disingenuous because Walter knew perfectly well that he had signed a document which was an option. There is no question of his " thinking " that it was an option; he knew quite well that it was an option. He instructed Mr. Harrod there and then to prepare a conveyance of Gravel Hill Farm in favour of his, Walter's, wife Evelyne, who was

D  not present on this occasion and whom Mr. Harrod had not at this stage ever met. for a consideration of £500, and there is no dispute between the parties in this action—and indeed it is a matter of plain common sense—that £500 was a totally inadequate consideration for a farm of 300 acres whether tenanted or not. Walter, at the same time, gave an authority to Mr. Harrod addressed to the National Provincial Bank Ltd.

E  at Brigg, where, apparently, he had his account, to collect the title deeds: and he also gave him an authority addressed to Hett, Stubbs & Kemp, who had been, up to that time, his solicitors, to hand over all the documents which they had relating to his affairs. The latter authority certainly, and probably the former, were prepared by Mr. Harrod and signed by Walter. In fact the documents with Hett, Stubbs & Kemp turned out, in the end, to consist of very little. They were, I think,

F  Walter's will and the title deeds to his and Evelyne's house, The Old Rectory, Croxby.

On that same evening, Mr. Harrod sent off a search requisition to the land registry with a request to notify the result by telephone. He was notified by telephone, or his firm was notified by telephone, that the search was negative and that was confirmed on August 15. Mr. Harrod

G  told me that he was unable to deal with the matter personally on August 16 because he was then involved in some planning inquiry at Brigg, which kept him rather late, but on the morning of August 17 he gave instructions to his conveyancing partner, Mr. Jenkinson, to go to Brigg, to go to the bank, pick up the title deeds, to arrange for the use with a friendly firm of solicitors in Brigg of a secretary and a typewriter and office space and,

H  there and then, to prepare a conveyance for £500 and to take it to a nursing home at Cleethorpes for execution by Walter and his wife. Walter had apparently, at that time, been going to Cambridgeshire to stay with a daughter, but Mr. Harrod had learned that Walter had been taken

ill and was going to a nursing home in Cleethorpes. Mr. Jenkinson, as one would expect, did as he was instructed. He collected the deeds, he prepared a conveyance, and he took it to Cleethorpes for execution by Walter and his wife. That conveyance is a conveyance in the ordinary form of a conveyance on sale. It is made on August 17, expressed to be between Walter Stanley Green who is described as "the vendor" and Evelyne Green his wife, who is described as "the purchaser." It recites Walter's seisin in fee simple and an agreement to sell to the purchaser for a like estate at the price of £500. Then there is the operative part. The document is in some respects curious because Mr. Jenkinson had inserted in it a certificate of value which certified that the transaction was one in respect of which the amount or value, or the aggregate amount or value, of the consideration did not exceed £5,500. This was palpably wrong in a conveyance of a valuable estate of this sort at what was, quite obviously, a grotesque under-value, and I do not think that Mr. Jenkinson could really have thought about it very seriously. No doubt he was in a hurry at the time. I think in the witness box he was disposed to admit himself that if he had been served with a document of this sort in the course of investigating title he would, on the face of the document, have felt that it was a matter about which he would at least be justified in raising a requisition. But I accept from him that there was nothing sinister in this. I think he made an error of judgment.

As I say, he took the conveyance, when prepared, to Cleethorpes. He told me that he read it and explained it to Walter and his wife and they executed it and Evelyne gave Mr. Jenkinson a cheque for £500, drawn on her bank account, and he took it, together with the conveyance and the title deeds, back to his office. The very next day, August 18, that cheque was negotiated and paid into Roythorne & Co.'s client account to the credit entry of "W. S. Green re your affairs" and the conveyance was dated August 17.

In September 1967, Geoffrey, having made up his mind to exercise the option, visited his parents and it appears from his widow, Mrs. Green's, evidence that he learned that the land had been conveyed to his mother at a sum of £500. Mrs. Green told me that her understanding was that they were not prepared to discuss with him the exercise of the option and, indeed, he was very upset and immediately went and took legal and other advice. No doubt it was as a result of that that on September 5, 1967, an estate contract was registered, but that was a case of bolting the stable door after the horse had gone.

On October 6 Geoffrey, through his solicitors, gave a formal notice of exercise of the option. Nothing turns on that and I do not think that it is in dispute that, if and so far as the option was still capable of being exercised, that notice was an effective exercise which brought into being —subject to one point which has not been very strenuously argued by Mr. Hoffmann—a contract between Walter and Geoffrey for the sale of the farm—a contract which, of course, Walter at this stage had disabled himself from performing.

There followed correspondence between the respective solicitors in which Messrs. Roythorne pointed out that the option was, at the material time—that is the date of the conveyance to Evelyne—unregistered.

601

A    Perhaps, not surprisingly, neither Walter nor his wife Evelyne complied with the option notice and Geoffrey continued as tenant of the farm; the rent due in March was tendered on a " without prejudice " basis and then on March 28, 1968, the picture changed suddenly because Evelyne died quite unexpectedly.  By her will, which was dated December 20, 1967, she had appointed Walter, Geoffrey and Derek to be her executors and she gave a life interest to her husband Walter and the residue on trust for

B    sale, and for equal division of the proceeds of sale between her five children.

After her death, not altogether surprisingly, the Inland Revenue declined to accept a 10 shilling deed stamp and assessed stamp duty on a value of £40,000, which was the value which had been agreed between Roythorne and the district valuer.

C    Between March and November correspondence between the solicitors concerning the question of whether Geoffrey would join in proving the will took place.  He ultimately determined to prove and he signed an Inland Revenue affidavit on October 14, 1968, which showed the farm as an asset of the estate valued at £40,000 but without any notation of any adverse claim against the estate either by him or anybody else.  At the same time, however, Geoffrey's solicitors were threatening proceedings

D    against Walter for damages.  On September 30, 1968, Walter executed a deed of gift of his property at Croxby to Derek and his sisters and I have been told, although I do not think there is any specific evidence of this, that at the same time he gave away substantially the whole of such other property as he had.  I do not think that this is in issue and the inference seems to me, so far as it is material in these proceedings, to be irresistible that he was taking steps to put assets out of his control—

E    to put them out of his control and also out of the reach of Geoffrey against whose claim for breach of contract there really could be no defence.  Such proceedings as had been threatened were, in fact, commenced on November 25, 1968, and a statement of claim was endorsed on the writ pleading the grant of the option, its exercise, Walter's failure to comply and that the property was, as indeed is clearly the

F    case, very much more valuable than the price contained in the option; and then there was a claim for damages.  That was a claim based entirely, at that stage of course, on breach of contract.  These are events which have assumed some importance in the case because they have been relied on by the defendants as establishing that Geoffrey had elected in some way to affirm the purchase by his mother, and to proceed for damages.  It should, however, be mentioned that all this was being done against the

G    background of negotiations which were then in train between Geoffrey, through his solicitors, and the other executors and the family generally, to try to settle the dispute on the basis of Geoffrey's purchasing the farm.  The price proposed was, no doubt, in excess of the option price but nevertheless the basis was that he should become the purchaser of the farm.  That applies equally to another act relied on by the defendants, which

H    is the concurrence by Geoffrey, as executor, in paying the stamp duty assessed on the conveyance, an act which he did in response to an express request to the then executors' solicitors, Messrs. Roythorne, in March 1969.  On November 29, 1968, probate was granted, and on April 14,

1969, Walter and Derek, on the one hand, as executors of Evelyne, and    A
Geoffrey for himself, agreed a new rent of £2,250 for Gravel Hill Farm
with his co-executors.  That is yet another act relied on as an election to
affirm the transaction with his mother Evelyne.

A defence was served in Geoffrey's action for damages against his
father and a list of documents was served, but otherwise that action seems
to have remained more or less inactive for the next nine months and part
of the explanation for that may well have been due to the fact that, as    B
appears from the correspondence, Walter, at some stage in 1969, decided
to consult some other solicitors, he apparently having—temporarily at any
rate—repented of what he had done.  Geoffrey also changed his solicitors
and on January 27, 1970, he started this action against his father Walter
and Derek, as executors of his mother, seeking a declaration that the
option was binding on her estate and specific performance.  That was
amended in October 1970 to include a claim for damages for conspiracy    C
against her estate and against Walter personally.  There was also a claim
that the land was held by the estate as trustee for Walter, but that has
not, I think, been seriously pursued before me.

On February 8, 1972, Walter died and on January 19, 1973, his sole
personal representative, Mrs. Kemp, was added as a defendant.  She served
a defence formally adopting the defence already served by the other    D
defendants.  On October 7, 1975, that defence was struck out for failure
to comply with an order for discovery.  So far, therefore, as Walter's
estate is concerned, the action is undefended.  On May 11, 1973, Geoffrey,
the plaintiff in the action, died and his will was subsequently proved by
the present plaintiffs, Midland Bank Trustee Co. Ltd. and his widow,
Margaret Ann Green, on October 2, 1973.  On November 16, 1973, it
was ordered that the action be carried on by them as plaintiffs.    E

So as the matter now comes before the court, it is a claim by Geoffrey's
executors against Derek as the sole surviving personal representative of
Evelyne, for specific performance of the option and for damages for con-
spiracy, and against Walter's executrix for damages, the latter claim being
undefended.

I have stated facts which are not substantially in dispute.  What is    F
in issue on the pleadings is the question of whether the conveyance con-
stituted a bona fide sale by a vendor to a purchaser or whether it was, in
truth, a fraudulent and colourable transaction or a sham.  There are
certain facts, here, which it has been necessary to investigate and I must,
I think, state my conclusions.  In the first place, no evidence has been
adduced to suggest that the conveyance did not do, and was not intended    G
to do, what, on the face of it, it did, namely to vest the legal estate in the
land in Evelyne and to vest it in her beneficially.  Secondly, there was
nothing illusory, I am quite satisfied, about the £500.  It was paid to
Walter and there is no reason to suggest or believe that it was not retained
by him for his own use and benefit.  Thirdly, there is no reason to suppose
that it did not genuinely come from Evelyne's own pocket.  This is a case
where I am bound to say—and I made some remarks during the course    H
of the hearing about it—discovery has left something to be desired.  That
may be something of an understatement.  But very late in the day there

603

A    was produced a copy of Evelyne's bank account which shows that this sum of £500 was raised on overdraft from the bank on her current account. Mr. Harrod, the partner in Roythorne who was responsible for the litigation, very frankly admitted before me that the failure to produce this before was entirely his responsibility and was due to an oversight on his part, and I entirely accept that. In the event I do not think that any harm has been done by the late production.

B        There remains the question of the state of mind of the parties at the date of the execution of the conveyance. The instructions given to Mr. Harrod must, I think, lead to the conclusion that Walter had obtained from somewhere advice that an option could be defeated by a sale to a third party. Mr. Harrod recollects giving no such advice but I find on the evidence before me that the conclusion is really irresistible that, prior to C    the conveyance, Walter and Evelyne thought, and intended, that the effect of it would be to defeat the option. In support of this I have, first of all, Mrs. Green's unchallenged evidence that the option and her husband's desire to exercise it were subjects of discussion in the presence of Walter and Evelyne. Secondly, I have the admission which is contained in a letter written by Mr. Harrod in December 1969. Mr. Harrod thinks he must have written it with hindsight but even if that is so, he can, I think, D    only have got the information in it from Walter who, after all, knew his own state of mind better than anybody else. I need not read the letter in full. It was a letter written by Messrs. Roythorne to Walter's then solicitors. As I have said, he changed solicitors, temporarily at any rate, in 1969 and consulted a firm called Beckett and Co. They communicated with Messrs. Roythorne and Messrs. Roythorne sent a reply on December E    15, 1969, in which they said:

"... At the time when we were first consulted by Mr. W. S. Green he was very anxious to find some way of avoiding the option in favour of his son Mr. Geoffrey Green. Whether he should have done so or not was a matter upon which we were not asked to advise."

F    Thirdly, there is the conduct of both Walter and Evelyne after the conveyance, when it would have been so easy to put things right if it had not been intended to defeat Geoffrey's option. Fourthly, there is the almost unseemly haste with which the transaction was effected. And finally, and perhaps conclusively, there is an affidavit by Walter himself. This has given rise to a curious and unusual point on which I was required to rule, G    although it may, perhaps, be said that there were already strong enough circumstances in the undisputed facts in the correspondence to enable the court to draw any necessary inferences. Paragraphs 7 and 9 of the statement of claim contain pleas of conspiracy and that the conveyance was a fraudulent and colourable transaction. Paragraph 7 states:

"... if, contrary to the plaintiff's contention, the purchase price of H    £500 was paid ..."—that was then in issue—"... then (i) the said expressed purchase price ... was a very small fraction of the real value of Gravel Hill Farm at the date of the ... conveyance "—and that, I think, is indubitable—" and (ii) the said conveyance did not

604

Oliver J.          **Midland Bank Trust Co. v. Green (C.A.)**          **[1980]**

constitute a bona fide sale by a vendor to a purchaser but was on the contrary a fraudulent or colourable transaction or sham."                A

And in paragraph 9 it is pleaded alternatively:

". . . the conveyance was executed pursuant to an agreement or arrangement made between . . ." Walter and Evelyne ". . . whereby they conspired together to defraud and injure the plaintiff by completing a sale or what purported to be a sale of Gravel Hill Farm     B
by . . ." Walter to Evelyne ". . . and to deprive the plaintiff of the benefit of the said option."

I need hardly mention the difficulty of direct proof of allegations of this sort in view of the deaths of Walter, Evelyne and Geoffrey. Apart from Derek, who was not called to give evidence before me, these were the only people who could have had any personal knowledge of the trans-     C
action, apart perhaps from Mr. Harrod who, of course, was in a position where any advice that he gave or anything that he was told for the purpose of giving advice, was privileged. This has brought to light the question of evidence upon which I had to rule.

After the commencement of the action, Evelyne's executors made a *Beddoe* application [see [1893] 1 Ch. 547] for directions which came before Brightman J. It was an application in the usual way by originating     D
summons, and in that application both Walter and Geoffrey swore affidavits. Geoffrey of course as an executor and also a beneficiary, was a party, and a necessary party, to that application.

Shortly before the trial but in good time—although not the time required by the rules—the plaintiffs' solicitors gave notice under the Civil Evidence Act 1968 to put in those affidavits as evidence of the facts     E
therein stated. That of Walter in particular contains an important admission. Walter's affidavit had already been relied on, without objection being taken, in some particulars which were served in 1971. The introduction of the affidavit as evidence at the trial under the Civil Evidence Act 1968 was, however, objected to by Mr. Hoffmann on the ground that the use of the affidavit in evidence at the trial—initially I think he was prepared to go further and say " or anywhere else " although he sub-     F
sequently modified that—would be a breach of confidentiality and I have been referred to an interlocutory judgment of Templeman J. in this action on February 19, 1976, which, it is submitted by Mr. Hoffmann, concludes the matter against the plaintiffs. I have heard a considerable argument about this and I must therefore state the facts about the application because although I do not think that in the result the introduction of this     G
evidence seriously affects the legal result of the case, on the view of the law which I take, I ought, I apprehend, to make and state my findings of fact and findings of law on this, in case the matter goes further or the question arises again in other proceedings.

On December 18, 1972, the plaintiff delivered a reply which contained this paragraph:
                                                                            H
" Further or alternatively:—in proceedings the short title and reference to the record whereof are . . ." and there then follows the reference to the record of the *Beddoe* application—" the second

A  defendant "—that is Derek—" (jointly with the above named Walter Stanley Green) sought for and obtained relief on the basis of an election to treat the transaction effected by the said conveyance as a sham, and not or alternatively not a bona fide transaction. Such election was made by reason of the evidence adduced by the second defendant and the said Walter Stanley Green in the said proceedings. The plaintiff was a party to the said proceedings and appeared

B  therein, and further was represented and made submissions by counsel in the said proceedings on the footing that the second defendant and the said Walter Stanley Green accepted that the said transaction was a sham and not a bona fide transaction. In the premises the second defendant is now estopped from contending that the said transaction was a bona fide sale."

C  So the plea there was one of estoppel based upon the attitude which had been taken up by Walter and Derek in the *Beddoe* application.

On November 5, 1975, application was made to strike this out as scandalous and that came before Templeman J. as a procedure summons. Before referring to the transcript of his judgment which is before me on this matter, I must state some of the background facts. The *Beddoe*

D  application was made by Walter and Derek, and Geoffrey was made a party. I have been told by Mr. Harman, on instructions, that the plaintiffs on the summons, i.e. the defendants in this action, availed themselves of what they conceived to be the privilege which was conferred on them by the practice, sanctioned by *In re Moritz, decd.* [1960] Ch. 251, of withholding the evidence from Geoffrey and excluding Geoffrey and his counsel from part of the hearing of the summons. As I shall subsequently

E  point out, I am not sure that the privilege conferred on them by the decision in *In re Moritz, decd.* in fact enables them to withhold an affidavit. However, they did not, apparently, serve the affidavit upon Geoffrey. It appears from Geoffrey's affidavit that Walter, who, I think it is obvious from correspondence before me now, was then acutely unhappy about what had happened, had personally shown him the draft of

F  the affidavit and he was thus able to comment on it in an affidavit which he filed in those proceedings. On those affidavits and after hearing arguments, Brightman J. gave directions to Walter and Derek, Geoffrey and his counsel being excluded from part of that hearing while the argument was in process. Thereafter, Derek, in his list of documents on behalf of the defendants on the present proceedings, disclosed the *Beddoe* summons and the affidavits in schedule 1, part 1, of the list of documents.

G  They claimed no privilege and raised no objection to production. I mention this because on the assumption that that is correct, it seems that Templeman J. may possibly have given his judgment under some misapprehension about how Walter's affidavit had in fact come into the hands of Geoffrey and his advisers.

H  I do not propose to read the whole of the judgment which Templeman J. then gave. What he said for material purposes was this. He referred to the *Beddoe* application and the nature of such an application, and he said:

> "... of course, it is necessary for defendants to open their hearts to
> the judge and tell him exactly what the action looks like. The judge  A
> is acting in some respects as though he were the adviser and trustee
> giving guidance. The application is invariably heard in chambers,
> and nothing is published because of the jurisdiction of the judge to
> look after the estate, and because any information made public
> would be available to the plaintiff in the action, and might well be
> prejudicial to the defence and the estate which the judge is there to  B
> protect. Over the whole of such an application there is an aura of
> confidentiality, which is preserved by hearing everything in chambers.
> It so happened that the plaintiff [Geoffrey], apart from being the
> plaintiff in these proceedings, was the son of the deceased, and inter-
> ested in her estate, and, therefore, he was interested in the application
> and therefore, rightly or wrongly, the affidavit evidence sworn in  C
> support of that application was served upon him, and he turned up
> in chambers."

Then he mentions that Brightman J. gave certain directions and continued:

> "The plaintiff, having, as I have said (because he was interested in
> the estate) received a copy of the affidavit sworn in this highly con-
> fidential application, thought himself justified in making use of the  D
> affidavit for the purposes of this action."

Templeman J. refers to the paragraph in the reply which I have read and
he says that it was

> "... a bold claim that somehow in that application some kind of
> election was made by the defendants, and that election estops them
> from putting forward part of the defence they have put forward and  E
> wish to persist in. Well, that struck me at first blush as a scandalous
> assertion in the reply, and if it is scandalous I must strike it out. If
> the plaintiff thinks that the order made in chambers by Brightman J.
> was wrong, or anything ought to be disclosed, he can always go back
> to the judge. It is a matter entirely for him. But that does not justify
> the plaintiff pleading at the moment confidential matters without the
> slightest attempt to refer back to Brightman J., who decided these  F
> confidential matters. It is said: ' Oh, well, we have the affidavit, and
> the affidavit is not now in chambers, so we can go along and tell
> everybody about it. We won't tell anyone what was said before the
> judge in chambers but we will produce this affidavit.' In my judg-
> ment, the same aura of confidentiality hangs over that affidavit as
> hangs over the whole of the proceedings in chambers and I am  G
> surprised that any attempt should be made to exploit it."

It is this last sentence that Mr. Hoffmann relies upon as creating an
estoppel per rem judicatam, but I think it is important to place it in its
proper context. The question before the court on that occasion was
whether, when a party to a *Beddoe* application has taken up a particular
attitude either through his counsel or in his affidavit, that can be seized  H
on by the other party in his pleading as the foundation for a plea of
estoppel or election. Templeman J. was clearly of the view that, as a
matter of practice and policy, that was wrong because it is important that

A  parties in a fiduciary position should be able to take the directions of the court without feeling that they are going thereby to be restricted in some way in the prosecution of their case. And, if I may say so with respect, I would in no way dissent from that. But he was not in any way concerned, nor, so far as I know, was it argued before him at all, with the very much broader question of whether, when a party has put on affidavit evidence of facts and that affidavit has been filed by or on behalf of the party to a *Beddoe* application, after the deponent's death that affidavit can be tendered as evidence of the same facts either by or against the party or his representatives and whether in the same or some other proceedings. That point, which is the point that I am concerned with, was not so far as I am aware argued before him, and I do not for one moment think that he intended to decide it or even considered it.

C  Assuming therefore that the broad statement that " the same aura of confidentiality hangs over the affidavit as hangs over the whole of the proceedings in chambers," were wide enough to cover the point now in issue—of which, taken in its context, I am by no means convinced—I find myself unable to accept Mr. Hoffmann's primary submission on this matter which is that the point is, so far as this trial is concerned, res judicata. If there is any estoppel per rem judicatam it is what is called an issue estoppel and without referring in detail to the speeches in the House of Lords in *Carl Zeiss Stiftung* v. *Rayner & Keeler Ltd.* *(No. 2)* [1967] 1 A.C. 853, I can, I think, take the principles from *Spencer Bower and Turner, Res Judicata,* 2nd ed. (1969), p. 18 where he sets out what is involved in the burden of showing res judicata. He lists there six matters: (i) that the alleged judicial decision was what in law is deemed such; there is no doubt about that in this case; (ii) that the particular judicial decision relied upon was in fact pronounced, as alleged; which of course is the case; (iii) that the judicial tribunal pronouncing the decision had competent jurisdiction in that behalf; there is no dispute about that; (iv) that the judicial decision was final; and in the sense in which that word is used here I think that this decision was a final decision, though made on an interlocutory application; (v) that the judicial decision was, or involved, a determination of the same question as that sought to be controverted in the litigation in which the estoppel is raised; and (vi) that the parties to the judicial decision, or their privies, were the same persons as the parties to the proceedings in which the estoppel is raised, or their privies, or that the decision was conclusive in rem.

In elaboration of that, at p. 179, he points out that the determination must be fundamental and not collateral and he states that what one has to look at is the record—the formal judgment or order. Where an express declaration as to any particular question or issue appears on the face of the record of a formal judgment or where from the judgment itself the actual grounds of the decision can be clearly ascertained, there is no necessity for further search. But it is not in general permissible where there is no such express declaration in the formal record to examine what was said by judges in delivering their judgment for the purpose of discovering what were the real grounds of their decision. He adds that that was considered inconvenient and points out that it is legitimate to look

608

at the report of the judgment as delivered to ascertain, not what the
fundamental grounds of the decision actually *were*, but for what they
*were not*, for the purpose of negativing any contention that some one
particular ground was the only possible and necessary basis of the decision.   A

The wide statement, on the assumption still that it bears the meaning
which Mr. Hoffmann seeks to attribute to it, was not one which, in my
judgment, *necessarily* arose for decision. The only issue on the procedure
summons was whether, where proceedings have taken place in chambers   B
in this way, it can be subsequently relied upon as an estoppel in some
way prejudicial *to him that* a party took up a particular attitude or made
a particular submission. It is true, of course, that, in arriving at his
conclusion, Templeman J. based himself upon what was said in the
affidavits; but he was not concerned there at all with the question of
whether *the affidavit could be used as proof of the facts* which were set
out in it. That is the only purpose for which the documents are sought   C
to be used on this occasion.

On the point which it falls to me to decide, therefore, I can see no
issue estoppel here. Indeed, I think it would be most surprising if there
were, for the order which was made on the record is one which was made
" upon reading the pleadings " which included at that date particulars
referring in terms to the facts contained in Walter's affidavit but as facts   D
to be relied on under paragraph 7 of the statement of claim and not in
support of some pleaded estoppel or election. Those particulars were not
struck out or sought to be struck out.

Mr. Hoffmann, however, has submitted that even if there is no issue
estoppel here, nevertheless there is some general principle that protects
evidence of facts given on a *Beddoe* application from being used or
referred to. He was, I think, inclined at first to put it as generally as that   E
—that no affidavit filed on a *Beddoe* summons could be used or referred
to in any other proceedings than that summons. Such a proposition
clearly does not in my judgment bear examination. In the absence of a
direction by the judge that there should be no publication—and there was
no such direction here—the publication of matters in chambers is not
per se a contempt of court any longer. The affidavits are filed and   F
formerly could be inspected by anybody on payment of the appropriate
fee, which was why, as I understand it, the practice grew up of giving
confidential evidence by way of an exhibited statement which was not
filed. Although the affidavits are not now open to immediate public
inspection, they are open to inspection once they get into the Public
Record Office. That, no doubt, is a fairly lengthy process, but at the   G
time when the practice in relation to *Beddoe* applications grew up, they
could be inspected by anybody on payment of the appropriate fee and it
is difficult to see how any general confidentiality could be claimed for
documents which then were—and still are, ultimately—open to public
inspection.

Quite apart from this, suppose that affidavits are filed containing false
statements which lead the court to give directions for an action to be   H
prosecuted or defended by trustees. Beneficiaries subsequently challenge
the payment by the trustees of the costs of the unsuccessful proceedings

A   on the ground that the court's directions were procured by fraud. Is it to be said that they cannot refer to the affidavits by which the fraud was perpetrated? That cannot, in my judgment, be right and I think that Mr. Hoffmann was disposed to concede it.

Mr. Hoffmann confined himself to the much more modest proposition that an affidavit sworn in a *Beddoe* summons cannot be referred to in the proceedings which are the subject matter of the summons without

B   the consent of the party on whose behalf the affidavit was sworn. I am bound to say that I know of no authority for such a proposition. Indeed it seems to me to contradict what is implicit in *In re Moritz, decd.* [1960] Ch. 251 namely that if the exhibits to the affidavit *are* furnished to or get into the hands of the opposite party to the litigation, they can be used by him to the detriment of his opponent. *In re Moritz, decd.*

C   enshrines the practice of the Chancery Division which entitles an applicant for directions as to litigation to withhold from the other party the exhibits to his affidavits and the argument conducted before the judge. The reasoning behind that is, of course, that the party would otherwise be entitled to use it as a weapon to the prejudice of the applicant. At the time of *In re Moritz, decd.* the former R.S.C., Ord. 61, rr. 17 and 18 were in force which enabled inspections to take place of all filed documents

D   on payment of the prescribed fee and although the right has since been restricted, that restriction cannot, I think, have altered the basis of the Chancery practice. If, as Mr. Hoffmann suggests, there is some general principle of confidentiality which protects the use of all material delivered to anyone in the course of a *Beddoe* application, it would, it seems to me, be unnecessary to withhold it, at any rate so far as its use in evidence

E   is concerned, although it might well be, I suppose, that there were other reasons for withholding exhibited material, such as counsel's opinions. In exercising its jurisdiction to give directions, the court, as Wilberforce J. pointed out in *Eton College* v. *Minister of Agriculture, Fisheries and Food* [1964] Ch. 274, is exercising an essentially administrative function, and will adapt its practice so far as is practicable in order to do justice in the particular circumstances of the case.

F   I am bound to say that I know of no general principle which would prevent any party to the litigation from inspecting and making use of a filed document. Indeed, the rules of court make express provision for him to be given notice of filing and R.S.C., Ord. 63, r. 4, whilst now restricting the right of public examination, makes an express exception so far as the parties are concerned. Rule 4 (3) provides:

G   " Nothing in the foregoing provisions shall be taken as preventing any party to a cause or matter searching for, inspecting and taking or bespeaking a copy of any affidavit or other document filed in the central office in that cause or matter or filed therein before the commencement of that cause or matter but made with a view to its commencement."

H   Indeed, it is clear from *Jones* v. *Trinder, Capron & Co.* [1918] 2 Ch. 7 that a filed document may be used even after an order removing it from the file has been made.

That, as it seems to me, is the whole point of the practice generally
adopted of dealing with confidential matter by exhibited statements or   A
documents which are not filed. I doubt, in fact, whether the direction
given in *In re Moritz, decd.* [1960] Ch. 251 could have been given in
the case of the affidavit itself although the point did not arise there
because the only question with which the court was concerned was
inspection of the exhibits. It seems to me, however, that the Rules of the
Supreme Court give an express right to a party to see and take copies of   B
filed material.

In any event, I do not think I have to decide any such general question
in this case and I must be cautious of expressing wide general propositions
which go beyond the immediate case before me. I am concerned with a
particular limited question here and on these facts it seems to me that
even if there was any such confidentiality as to the admissions or state-
ments which are contained in Walter's affidavit as Mr. Hoffmann claims,   C
that was waived by their publication, first by Walter himself to Geoffrey
and secondly by their inclusion without any claim of privilege in the list
of documents served by Derek.

Mr. Hoffmann argues that such affidavits are akin to " without
prejudice " correspondence and therefore cannot be used even in cross-
examination and even if the deponent is called at the trial and gives   D
evidence which flatly contradicts what he has said in his affidavit. I do
not think that this analogy really runs; the privilege conferred by " without
prejudice " negotiations is based, as I understand it, upon some express or
implied agreement that it should not be referred to in evidence except in
the event of a final and concluded agreement of compromise. I can see
no such implication where a party, who may be under the Chancery
practice entitled to withhold any exhibited controversial evidence from his   E
opponent on a *Beddoe* application, deliberately discloses it to him. What
Mr. Hoffmann seeks to suggest, in effect, is that the fact that an affidavit
is sworn on a *Beddoe* application confers some sort of proprietary interest
not, I think, in the deponent but in the party on whose behalf the affidavit
is sworn. I do not think that there can be any proprietary interest in
evidence and it would seem to me lamentable if, when a deponent is dead   F
and his affidavit on a *Beddoe* application prior to the proceedings may
be the only available direct evidence of relevant or even critical facts, it
cannot be referred to except by permission of one or other party to the
litigation who may have a direct interest in suppressing it. If there is
any such principle of confidentiality in respect of filed evidence it must,
I think, be one which it is open to the trial judge to over-ride in an appro-
priate case. But in any event, as I say, I am clearly of the view that in   G
this case the privilege of confidentiality, if there be such, was waived and
I have admitted the affidavits in evidence.

Having said that, they contain, I think, very little that adds to what
was already pretty clear from the correspondence and the surrounding
circumstances. Walter gives some evidence about the value of the farm
which he puts at £150 an acre at the time of the grant of the option and   H
about £185 an acre at the time when he swore his affidavit in 1970. The
material passage upon which Mr. Harman relies is in paragraph 4. Speak-
ing of the date of the conveyance to Evelyne, Walter said:

611

**1 Ch.**          **Midland Bank Trust Co. v. Green (C.A.)**          **Oliver J.**

A

" At this date and for a few months prior thereto, there was and had been a serious quarrel between Geoffrey and the testatrix and myself. Neither the option nor any estate contract constituted by the option and the notice of intention to exercise it had been registered at the land charges registry, and the testatrix and I were advised by our solicitors that in these circumstances if I transferred the farm to a purchaser, the purchaser would take free of Geoffrey's rights there-under. Thereupon in order to defeat Geoffrey's option over the farm,

B

on August 17, 1967, I sold and conveyed the farm (subject to the tenancy) to the testatrix in consideration of the payment by her to me of £500."

That is, of course, a clear admission of his motives as against Walter himself and against his estate. The only material passage which I find in

C

the other affidavit which was filed on behalf of Geoffrey is the statement, which I see no reason to doubt, that in March 1970 Geoffrey saw his father Walter who showed him a copy of the draft of his affidavit.

On that evidence and in the light of the other matters I have referred to, I am unable to resist the conclusion that both Walter and Evelyne knew of the option, that they conceived and became parties to the con-

D

veyance in the belief that it would frustrate the effective exercise of the option and that the defeat of the option was their primary purpose and intent in entering into and completing the transaction. What then are the consequences? First, there cannot, I think, be any answer so far as Walter's estate is concerned to a claim for damages. There will therefore be judgment against the defendant, Beryl Rosalie Kemp, in her capacity as executrix of Walter, for an inquiry as to damages, with liberty to apply.

E

So far as Evelyne's estate is concerned, there is however what appears to me to be a complete answer to any such claim. The claim, being one in tort, is one which under the old law would not have survived the death of Evelyne; under the Law Reform (Miscellaneous Provisions) Act 1934, it would have survived but only if the action was commenced within six months of the grant of representation to her estate, i.e. November 29,

F

1968. Since this action was not commenced until January 1970, it is, as I say, clearly out of time. Although the relevant provisions of the Act of 1934 relating to the time limitation were repealed by the Proceedings Against Estates Act 1970, section 3 (3) of that Act prevents the revival of any cause of action which was already barred, as this one was, when the Act came into force. Mr. Harman, although not making any concession, felt unable to argue against those propositions.

G

The only live question, therefore, so far as Evelyne's estate is con-cerned, is specific performance and, as one would expect, Mr. Hoffmann relies upon section 13 of the Land Charges Act 1925, which was the relevant legislation in force at the material time. That section provides in subsection (2) that " A land charge of class B, class C or class D,"—and of course an option or estate contract is a class C (iv):

H

" created or arising after the commencement of this Act, shall (except as hereinafter provided) be void as against a purchaser of the land charged therewith, or of any interest in such land, unless the land charge is registered in the appropriate register before the completion

of the purchase:"—and then there is this important proviso— A
" Provided that, as regards a land charge of class D and an estate
contract created or entered into after the commencement of this Act,
this subsection only applies in favour of a purchaser of a legal estate
for money or money's worth."

If Evelyne was a purchaser of the legal estate for money or money's worth
within that proviso that must be the end of the case. Mr. Harman argues B
thus. First of all, he says, in the proviso which I have just read, the word
" purchaser " is used to refer and to refer only to a person who comes
into a matter as a commercial matter—one who acquires the legal estate
under a contract of sale. He has referred me to a number of cases, for
instance, *Vane* v. *Vane* (1873) L.R. 8 Ch.App. 383; *Inland Revenue Com-
missioners* v. *Gribble* [1913] 3 K.B. 212 and *H. L. Bolton (Engineering)
Co. Ltd.* v. *T. J. Graham & Sons Ltd.* [1957] 1 Q.B. 159 for the various C
meanings of the term and for the ordinary meaning of the term. The
present transaction, he says, bears none of the badges of a purchase.
There was no negotiation of the price. There were no normal con-
veyancing stages and there was no conceivable commercial purpose in
the transaction; it was merely a gift dressed up to look like a sale. The
difficulty, I feel, about that submission is that the statute with which D
I am concerned contains its own artificial definition of a purchaser and
the question is not, as it seems to me, whether Evelyne was a purchaser
in the ordinary sense of the term as outlined in, for instance, *H. L. Bolton
(Engineering) Co. Ltd.* v. *T. J. Graham & Sons Ltd.*, but whether she was
a purchaser within the statutory definition which is contained in the Act.
That statutory definition is in section 20 (8) which is in these terms:

> "'Purchaser' means any person (including a mortgagee or lessee) E
> who, for valuable consideration, takes any interest in land or in a
> charge of land; and ' purchase ' has a corresponding meaning; . . ."

Mr. Harman seeks to escape from this by pointing out that section 20
expressly provides that the definitions only apply " unless the context
otherwise requires." The context does here, he says, " otherwise require "
because if you write out the statutory definition in full in the proviso to F
section 13 (2) in place of the word " purchaser " it makes no sense at
all; in fact it makes nonsense and is contradictory. Therefore, he says,
" purchaser " in the proviso has some other meaning. The meaning he
ascribes to it is the ordinary meaning which in common parlance one
would have, i.e. a purchaser under a contract.

I am bound to say, with respect and with regret, that I find that too G
facile a test. The main subsection applies only to a purchaser as defined.
It is then provided that that which, ex hypothesi, applies only to a
statutory purchaser shall apply only in particular circumstances, that is
to say, in the case of the " purchaser of a legal estate for money or
money's worth " in the case of particular land charges. I can see no
reason for giving a restricted meaning to the word " purchaser " beyond H
that which the section requires, the only requirements being, as I see it,
*the substitution of the legal estate for " any interest in the land " and of
" money or money's worth " for " valuable consideration."* Mr. Harman

A
also relies on the definition of purchaser which is contained in section 205 (1) (xxi) of the Law of Property Act 1925 which is in these terms:

> "'Purchaser' means a purchaser in good faith for valuable consideration and includes a lessee, mortgagee or other person who for valuable consideration acquires an interest in property . . ."

Then there is an exception for Part I of the Act which I do not think I
B need trouble with—and it continues:

> "'purchase' has a meaning corresponding with that of 'purchaser'; and 'valuable consideration' includes marriage but does not include a nominal consideration in money; . . ."

He also refers to section 199 of the Act which provides:

> "A purchaser shall not be prejudicially affected by notice of—(i) any
C instrument or matter capable of registration under the provisions of the Land Charges Act 1925, or any enactment which it replaces, which is void or not enforceable as against him under that Act or enactment, by reason of the non-registration thereof; . . ."

He translates section 199 into a positive provision by implication that a purchaser in bad faith *is* affected, using "bad faith" in the sense of a
D deliberate design to take advantage of the statutory provisions of the Land Charges Act 1925 or of a fraudulent intention. This, he says, was not a real purchase at all; it was a sham; it was a disguised gift with a consideration put in merely to enable the statutory provisions of the Land Charges Act 1925 to be invoked.

Again, regretfully, I do not feel that I can accept that submission. The transaction was not in my judgment a sham in the accepted sense
E of the word at all. There was a genuine passing of the legal estate by Walter to his wife without any reservation of any interest to Walter. It was, and was intended to be, a beneficial transfer of the legal estate. There was a genuine payment of the expressed consideration of £500 and there was an acceptance of that payment. That there may have been some ulterior motive for the transaction does not as it seems to me make
F the transaction other than what it was. Obviously a substantial and indeed an almost overwhelming element of gift existed here but in my judgment that cannot matter.

Mr. Hoffmann argues that really I have only to look at two main questions. I think in fact, in his argument, he sub-divided them into sub-questions but basically they come to this—(1) was Evelyne a purchaser as defined? and (2) was the consideration for the purchase
G "money or money's worth" and did she acquire a legal estate?

First of all, did she take any interest in the land? She plainly did; the legal estate was conveyed to her. Secondly, did she take it for valuable consideration? The conveyance recites that the money was paid as consideration for the conveyance, the evidence establishes that she did pay the money and one can see no reason why she should have paid
H that money except for the conveyance of that land to her. I do not think that it can matter what her motive was in entering into this transaction. She was acquiring a legal estate and paying no doubt a wholly inadequate sum for it; but that she was paying money for it seems to

me to be beyond doubt.  The fact that she knew and indeed intended
that the transaction should have a particular effect as regards Geoffrey's
option does not seem to me to make her any less a purchaser within the
statutory definition or a purchaser for money or money's worth.

A

Mr. Hoffmann has referred me to some well known cases on this
branch of the law, *Hollington Brothers Ltd.* v. *Rhodes (Note)* [1951] 2
All E.R. 578 and *In re Monolithic Building Co.* [1915] 1 Ch. 643 which
established that actual knowledge in this context is really immaterial.  I
therefore find myself compelled to accept Mr. Hoffmann's argument and to
hold that Evelyne was a purchaser for money or money's worth of the legal
estate against whom Geoffrey's option was, under the statutory provisions,
void.

B

I said in the course of the hearing that the merits appeared to me to
be all one way.  Mr. Hoffmann cautioned me against jumping to any
such conclusion without any full knowledge of the family quarrels which
have gone on or of the circumstances.  I accept that and will qualify it
to this extent, that, so far as the evidence before me goes, it seems to
me that the merits are all one way.  The conclusion I have reached there-
fore is one which I reach with regret, because as it seems to me Geoffrey
had a clear legal right which was deliberately frustrated by his parents
in breach of the contract created by the option.  Nevertheless I cannot,
with the best will in the world, allow my subjective moral judgment to
stand in the way of what I apprehend to be the clear meaning of the
statutory provisions.  That, therefore, it seems to me, concludes the case.
It is unnecessary for me to deal with the other defences which have been
raised by the defendants, defences of laches, acquiescence, election and
estoppel.  I need only say this, that having considered the circumstances
I am not satisfied that, if I were in Mr. Harman's favour on the main
point, any of those defences could avail the defendants.  But they do
not in the circumstances arise and regretfully I feel therefore that as
against the estate of Evelyne, i.e., against the defendant, Derek Green, in
his capacity as surviving executor, I must dismiss the claim.

C

D

E

> *Judgment against first defendant for damages
> and costs, up to date that her defence was
> struck out, together with costs of first two
> days of the hearing.*
> *Claims against remaining defendants dismissed
> with costs, save that plaintiff have costs of
> half a day's hearing to be set off against
> such costs.*

F

G

Solicitors: *Sidney Torrance & Co. for J. Levi & Co., Leeds; Simmons
& Simmons for Roythorne & Co., Spalding.*

T. C. C. B.

H

APPEAL from Oliver J.

By notice dated March 23, 1978, the plaintiffs appealed on the grounds
that (1) the judge, having found (a) that the primary purpose and object of

A the conveyance to Evelyne Green was to defeat Thomas Geoffrey Green's option and (b) that the £500 paid by Evelyne Green was a "grotesque undervalue," was wrong in holding that Evelyne Green was nevertheless a purchaser for the purposes and within the meaning of the proviso to section 13 (2) of the Land Charges Act 1925 and that she accordingly took the property free from the option; (2) the judge was wrong in holding that the expression "a purchaser of a legal estate for money or money's worth" B in the proviso to section 13 (2) included a purchaser otherwise than in good faith; and (3) the judge was wrong in holding that a purchaser having actual knowledge of an estate contract which had not been registered took free therefrom.

*Jeremiah Harman Q.C.* and *Jonathan Parker* for the plaintiffs. The plaintiffs' case depends on the construction of "purchaser" in the Land C Charges Act 1925 and on whether the principle that fraud unravels all things applies.

A document might be a genuine conveyance but it does not follow that it represents a genuine sale and purchase, and a transaction which is merely a device has the badge of a transaction which is not a proper sale and purchase. Where the motive for a transaction is an intent to injure D it makes the purchase in bad faith. The difference lies in the primary purpose and intent of the transaction. A genuine purchaser buying with knowledge of an option has as his primary purpose and intent the obtaining of the land. In the present case the primary purpose and intent was not the obtaining of the land but the defeating of the option. Thus, there is a difference between a bona fide purchase where the defeating of the option is an incidental result of the primary purpose and the E present case where the whole object was to defeat the option holder's rights.

Where one has a transaction conceived purely for the purpose of injuring another party the court can say that Parliament could never have deliberately created an instrument to facilitate such a purpose.

In section 199 of the Law of Property Act 1925 the words "shall not F be prejudicially affected by notice" do not mean that a purchaser "may not be affected by notice." The section could not have been inserted unless it was possible for a purchaser to be affected by notice. It is to be noted that a "purchaser" within the meaning of the Law of Property Act 1925 is a purchaser in good faith: see section 205 (1) (xxi). It would not have been the intention of the legislature to protect a mala fide purchaser with notice. A purchaser in good faith can only mean some- G one who is not purchasing in the course of illegal or fraudulent dealings.

As to sections 13 (2) and 20 (8) of the Land Charges Act 1925, in order to find out whether a definition is intended to be excluded by the context one has to read in the definition in full, and if the two do not fit together one can say that the definition cannot have been intended to apply in the particular context. The definition of "purchaser" in H section 20 (8) is expressed to be "unless the context otherwise requires," and when one reads that definition into section 13 (2) it makes complete nonsense, but if one gives "purchaser" its ordinary meaning, i.e., a person who acquires property under a contract for sale, it fits in with

the intention of the legislature. " Purchaser " should be given a meaning    A
different from the statutory definition because otherwise the statute
becomes an engine of fraud. This does not result in giving different
definitions to " purchaser " in the substantive part of section 13 (2) and in
the proviso because " purchaser " cannot be read in its statutory sense
wherever it occurs in the section.

Remembering that the Land Charges Act 1925 has to be construed
with the Law of Property Act 1925, which refers directly to matters    B
registrable under the Land Charges Act, and that the definition of
" purchaser " in the Law of Property Act contains the reference to good
faith, clearly both were intended to be run together.

Cases in which the courts have interpreted " purchaser " in other
statutes include *Vane* v. *Vane*, L.R. 8 Ch.App. 383, 398–399; *In re Amos*
[1891] 3 Ch. 159, 165, and *H. L. Bolton (Engineering) Co. Ltd.* v. *T. J.
Graham & Sons Ltd.* [1957] 1 Q.B. 159, 168, 169, 170. They show that    C
the word " purchaser " in a statute is susceptible of different meanings
according to the context, that there is no rigid adherence to one meaning
and that if a certain meaning will not effect the purpose for which
Parliament was legislating it should not be given that meaning.

In the present instance " purchase " should be given its ordinary every-
day meaning of bought in a regular way, and it is very odd to have    D
only a conveyance and no contract. The transaction between the father
and mother is attacked on the ground that it was in no true sense a
purchase. The element of purchase was a sham or a cover for what
was in truth a voluntary conveyance or gift, given the disproportion
between the value of the property and the price which was so small as to
be nugatory. Add to that that the purpose was to defeat the option and
that the conveyance was executed with almost indecent haste and the    E
transaction bears no resemblance to a purchase by the mother. Ade-
quacy of consideration is not always irrelevant: see *Fry* v. *Lane*,
40 Ch.D. 312, 320–321, 322. The undervalue if gross is a factor which
will be taken into account in determining whether there has been a pur-
chase. The transaction was in effect a transfer between two persons for
bogus consideration.    F

The plaintiffs' case is also put on the basis that the conveyance
amounted to the carrying out of a fraudulent transaction and that
fraud unravels everything: see *Lazarus Estates Ltd.* v. *Beasley* [1956]
1 Q.B. 702, 712, 719, 721–722. The principle that no court will allow
a person to keep an advantage obtained by fraud applies to the mother,
and the judge's findings can only amount to a finding of a conspiracy
to defraud between her and the father. Purpose and intent is the    G
vital factor in determining whether there is a conspiracy to defraud.
The mother's conscience is bad and equity can allow the option to be
enforceable against her. [Reference was made to *Hollington Brothers Ltd.*
v. *Rhodes (Note)* [1951] 2 All E.R. 578; *In re Monolithic Building
Co.* [1951] Ch. 643; *Beesly* v. *Hallwood Estates Ltd.* [1960] 1 W.L.R.
549 and *Crofter Hand Woven Harris Tweed Co. Ltd.* v. *Veitch* [1942]    H
A.C. 435.]

" Purchaser " in the Land Charges Act 1925 cannot be read as
including a person who is not buying the property because he wants it

617

A but who is a conspirator taking the property in order to injure another. Though it is not fraud to take advantage of one's legal rights, i.e., to seek to achieve a legitimate benefit for oneself, it is fraud to seek to use one's legal rights to inflict deliberate damage on some other person. It would be wrong to allow machinery provided for the protection of genuine purchasers to be used to further such a purpose. Undoubtedly the conveyance constituted a breach of contract

B by the father, and the mother aided and abetted that breach.

The *Monolithic, Hollington* and *Beesly* cases are wholly distinguishable and show that a conspiracy to injure can be regarded as an exact parallel to a purchase by someone with actual notice of an unregistered option whose purpose is not to advance his own interests but to injure another, and that is not a transaction which can be described as a " purchase."

C *Leonard Hoffmann Q.C.* and *Gavin Lightman* for the defendant Robert Derek Green. This is not a case of fraud. Fraud involves deception and dishonesty: all one has here is a deliberate breach of contract. That is something which happens all the time in a commercial context and it is never suggested that it is fraud. There is no finding of fraud in the judgment because the question never arose.

D It is not a sufficient answer to the defendant's case to say that there was fraud in the old sense of effecting the transaction with knowledge of the option because the whole purpose of the Land Charges Act 1925 is that a person in such a position should not be bound by the option: see section 13 (2). " Purchaser " is a term of art defined in section 20 (8), and " valuable consideration " means anything of value; so, just as the £1 paid for the option was " valuable considera-

E tion " the £500 paid on the conveyance was also " valuable consideration " even though neither could be described as adequate. See also section 205 (1) (xxi) of the Law of Property Act 1925, which provides that valuable consideration does not include a nominal consideration. By no stretch of the imagination can £500 be described as nominal but, in any event the Land Charges Act 1925 does not exclude even

F nominal consideration from being valuable consideration.

As to nominal consideration, see *Davidson's Precedents in Conveyancing,* 5th ed. (1885), p. 63. If one had always to consider whether consideration was adequate it would make the system of conveyancing unworkable. Of course, if one had a conveyance whereby money was expressed to be paid but it was never intended that it should be paid, that would not be a purchase for valuable consideration, but the

G conveyance in the present case precisely reflects what the parties intended. In *Vartoukian* v. *Daejan Properties Ltd.* (1969) 20 P. & C.R. 983, 988, Stamp J. said that he was not concerned with investigating the adequacy of the consideration.

Under the proviso to section 13 (2) the valuable consideration has to be " money or money's worth." It would be a misuse of

H language to say that £500 was not " money or money's worth." Even if one reads in the words " in good faith," the most that can be said is that the father and the mother knew perfectly well that what they were doing was defeating the option, but the purpose of section 13 (2) of

the Land Charges Act 1925 was to make knowledge immaterial. Other
sections are more restrictive, including references to " in good faith "
and " with notice," which confirms that the omission of such pro-
visos in section 13 (2) was quite deliberate.

There is no necessary relationship between adequacy of considera-
and the question of whether a transaction is in good faith. To be
in good faith a transaction must not be intended to be something other
than that which it appears to be. [Reference was made to *Hollington
Brothers Ltd.* v. *Rhodes* (*Note*) [1951] 2 All E.R. 578, 580 and
*Megarry & Wade, The Law of Real Property*, 4th ed., p. 1048.] The
policy and wording of the Land Charges Act 1925, section 13 (2),
are clear, and the principle of construction which should be applied
is that found in *Stock* v. *Frank Jones* (*Tipton*) *Ltd.* [1978] 1 W.L.R.
231, 235, 238.

As for the plaintiffs' argument based on section 199 of the Law of
Property Act 1925, simply as a matter of ordinary language, if under
the Land Charges Act 1925 an interest is void as against a purchaser
it is impossible to see how any amount of notice can resurrect it. It
is clear from the context of section 199 (1) (i) that " purchaser " must
mean " purchaser for the purposes of the Land Charges Act 1925 "; and
see *Wolstenholme and Cherry's Conveyancing Statutes*, 13th ed. (1972),
p. 328. Thus, the two statutes are harmonised.

To say that the right of the option holder bound the conscience
of the mother is simply another way of saying that he had an equitable
interest. What Lord Cozens-Hardy M.R. was saying in *In re Mono-
lithic Building Co.* [1915] 1 Ch. 643 was that if you induce someone not
to register their charge in order to secure some advantage then your
security will be postponed to his. That is actual fraud. The argu-
ment on fraud is really a circular one, because in order to establish
fraud the plaintiffs have to assume that the mother was not entitled
to take free of the option, but, if as a matter of construction she was
so entitled, for her to do so cannot be described as fraud. Simply
to say that the purpose of the transaction was to defeat the option
gets one nowhere because that must be the purpose of anyone who
knows what the effect of the transaction would be. [Reference was
made to *Greene* v. *Church Commissioners for England* [1974] Ch.
467.]

The plaintiffs are seeking a declaration that the option is binding
on the mother and her estate and the answer is that it is not because of
section 13 (2). To establish that one has to ask four questions. Did
the mother take an interest in land? Was that interest a legal interest?
Was it for valuable consideration? Was that valuable consideration
money or money's worth? The answers to all 'four are " yes," and in
the end that is how the judge approached the matter.

*Lightman* following. The purpose of the transaction was not to
defraud but to defeat the option. The Land Charges Act 1925 super-
seded the new Act which had been passed in 1922. In section 3 (1)
of that Act one finds substantially the same scheme as in section 13 (2)
and one also finds the same definition of " purchaser." Similarly, where
notice or bona fides was relevant it was expressly provided for.

A For a definition of a " sham " transaction, see *Snook* v. *London and West Riding Investments Ltd.* [1967] 2 Q.B. 786, 802, which was considered in *Miles* v. *Bull* [1969] 1 Q.B. 258, 262, 263–264, 265. A transaction can be perfectly genuine although the purpose for which it was entered into was to defeat the rights of some other party.

*Harman Q.C.* in reply. The statute cannot have been intended and should not be allowed to effectuate a conspiracy to defraud or to injure, B and the correct view of the judgment is a finding of a conspiracy between the father and mother, the matter having been investigated on the facts and at law in argument in the face of express averments in the pleadings that the whole transaction was one only designed to injure the son.

As for the citation from *Vartoukian* v. *Daejan Properties Ltd.*, 20 P. & C.R. 983, 990, nothing could be further from the present case. The citations from *Stock* v. *Frank Jones (Tipton) Ltd.* [1978] 1 W.L.R. C 231 are accepted, but the question is not one of construction but of whether the courts will allow an Act of Parliament to be the very instrument by which a conspiracy to do a wrongful act is carried out.

It was said that this was not a case of fraud but simply of deliberate breach of contract, and reference was made to *In re Monolithic Building Co.* [1915] 1 Ch. 643, 670, but that is of little assistance, while *Greene* D v. *Church Commissioners for England* [1974] Ch. 467 concerned a purchaser taking advantage of his own legal rights owing no obligation himself to the option holder.

The defendant conceded that a transaction, apparently protected by the statute could be investigated if it could be shown to be a sham in the sense that nothing was intended to be paid. That must mean that one is entitled to look at the reality of the transaction, and once that is con-E ceded why should one be estopped from alleging that the transaction constituted a wrongful act and that Parliament did not create the Act to further such a transaction.

*Cur. adv. vult.*

April 11. The following judgments were read.
F

LORD DENNING M.R. The Greens are a Lincolnshire farming family. This story might be called the Green Saga. The father and mother were Walter and Evelyne Green. They had two sons, Geoffrey and Derek, and three daughters. The father Walter had the freehold of two farms. They were a few miles apart in the northern part of Lincolnshire called Lindsey. One was a farm of 700 acres called Thoresway, near Market G Rasen, which he farmed himself with his younger son Derek, the other, of 300 acres called Gravel Hill Farm, he let to his elder son Geoffrey as a tenant ever since he came of age.

When father Walter was about 62 years of age, he decided to retire. He let each son have a farm as his own. Geoffrey was aged about 28 and Derek a year or two younger. Both married with children. He sold the 700 H acre farm to his younger son Derek at £75 an acre. That was well below the market price. But he did not treat Geoffrey, the elder son, so favourably. He only gave him an option to buy his farm, Gravel Hill Farm, the 300 acre farm. It was to be at the same price as Derek's, £75 an acre,

but it was only an option.  The father did this so as to enable him to get    A
out of death duties.  The option was to be effective for ten years.  Mean-
while, the elder son Geoffrey was only to be a tenant of his farm.

The option was drawn up by the family solicitor, Mr. Stubbs, of Brigg,
about seven miles away.  Father and son went to see him at Brigg.  The
solicitor wrote it out.  Father Walter signed it.  It figures so largely in this
case that I will set it out in full:

> " To Thomas Geoffrey Green, Gravel Hill Farm, Thornton-le-Moor.    B
> In consideration of the sum of one pound paid by you to me I here-
> by give you the option of purchasing the Gravel Hill Farm now in
> your occupation at the sum of £75 (seventy-five pounds) per acre.
> This option to remain effective for ten years.

> Dated March 24, 1961.

> W. S. Green."    C

The option was signed over a sixpenny stamp and kept by Mr. Stubbs in
his office at Brigg.  Now Mr. Stubbs was a very careful and meticulous
solicitor, but strangely enough he made a serious mistake.  He ought to have
registered the option as an estate contract under the Land Charges Act
1925.  It was the simplest thing in the world to do.  But he did not do it.
Why he did not, no one knows.  It is a mystery.  Neither father Walter nor    D
elder son Geoffrey knew of this mistake.  They thought everything was in
order: and continued for years to think so.  The mistake was afterwards
to cost everyone dear.

For six years the family lived happily as families do.  The father
Walter and mother Evelyne retired to the Old Rectory at Croxby, near
Caistor, three or four miles away.  The sons and their wives went over at    E
weekends to see them, taking the grandchildren with them.  Geoffrey
wanted to exercise the option.  He and his wife Margaret often discussed it
with his father and mother.  But father said no.  He wanted to keep Gravel
Hill Farm as an agricultural investment so as to save death duties.  Mother
Evelyne was there at all these discussions and knew all about them.  She
knew that Geoffrey wanted to exercise the option.

Then something transpired which was to shake the family to its roots.    F
Father Walter decided to deprive the elder son Geoffrey of the option.  He
met a lawyer somewhere or other and told him of the option.  We do not
know who this lawyer was.  But he seems to have suggested to the father
a way of getting out of the option.  This lawyer said to father Walter:
" See if the option has been registered.  If it has not been registered as a
land charge, you can sell Gravel Hill Farm over the head of Geoffrey and
get rid of the option."  That unknown lawyer went further.  He seems to    G
have made inquiries at the registry and found that the option was not
registered.  He told father Walter.  Father Walter told his wife, mother
Evelyne.  They both told the younger son, Derek.  Together the three of
them hatched a plot.  I call it a plot because it certainly was.  It was that
father Walter should sell Gravel Hill Farm to mother Evelyne for £500
and convey it to her.  It was to be done quickly—without the elder son    H
Geoffrey knowing anything about it.  The conveyance was to take place
before Geoffrey could exercise the option.  Once the conveyance was
executed, his option would be defeated.

**1 Ch.**          **Midland Bank Trust Co. v. Green**          **Lord Denning M.R.**

A    We would much like to know the reason for this plot: but the court has been left completely in the dark. Father and mother are dead. Geoffrey is dead. Derek, the younger son, probably knows. But he did not give evidence. (His lawyers advised him that the reason was not relevant.) At any rate Derek took the initiative in carrying out the plot. He telephoned his own separate solicitor, Mr. Harrod, of Spalding. That was in Holland in the south of the county, 60 miles away from Brigg. He did

B    not telephone the family solicitor, Mr. Stubbs, at Brigg because Mr. Stubbs knew all about the option and would not of course allow any such plot to go through: so Derek the younger son got his own solicitor Mr. Harrod to come over the 50 or 60 miles to his (Derek's) farm: and Derek got his father Walter to meet him there. Father Walter had never met Mr. Harrod before, but he there and then instructed Derek's solicitor. He told him to prepare a conveyance of Gravel Hill Farm from his (Walter's)

C    name into his wife (Evelyne's) name for the sum of £500. That was a grotesquely small sum. It was worth £40,000 or £50,000. Father Walter gave authority to Mr. Harrod to collect the title deeds from the bank at Brigg so as to draw up the conveyance. He made it clear that it had to be done as quickly as possible. It had to be done before Geoffrey got to hear of it and before the option was registered.

D    That meeting at Derek's farm was on August 14, 1967. Mr. Harrod did as he was instructed. Never in the history of conveyancing has anything been done so rapidly. It was all done and completed in three days. A search was requested of the registry. The reply was got by telephone that no option was registered. Mr. Harrod's partner, Mr. Jenkinson, went over from Spalding to Brigg (60 miles). He collected the title deeds of Gravel Hill Farm from the bank at Brigg. He did not go back to his

E    own office at Spalding to draw up the conveyance. He went to a friendly firm of solicitors at Brigg, borrowed the use of a secretary and office space and prepared the conveyance. He took it over from Brigg to Cleethorpes (about 15 miles) where father Walter was in a nursing home. There it was executed by father Walter and mother Evelyne. Father Walter transferred Gravel Hill Farm to his wife for £500. Mother Evelyne gave the solicitors

F    a cheque (in their favour) for £500 drawn on her bank account—overdrawn for the purpose. The solicitor, Mr. Jenkinson—by an error of judgment—certified that the value of the land did not exceed £5,500. Whereas it was worth at least £40,000: and was being transferred for £500. Dated August 17, 1967. All in three days.

    The deed was done. This is how Walter himself described it in an affidavit made on June 24, 1970, after his wife's death:

G

    "Neither the option nor any estate contract constituted by the option and the notice of intention to exercise it had been registered at the Land Charges Registry, and the testatrix and I were advised by our solicitors that in these circumstances if I transferred the farm to a purchaser, the purchaser would take free of Geoffrey's rights there-

H    under. Thereupon in order to defeat Geoffrey's option over the farm, on August 17, 1967, I sold and conveyed the farm (subject to the tenancy) to the testatrix in consideration of the payment by her to me of £500."

622

Lord Denning M.R.        Midland Bank Trust Co. v. Green        **[1980]**

As happens in families, one of them could not keep a secret. A rumour  A
reached the elder son Geoffrey: " Father has sold your farm to Mother for
£500." At once he went over to his father and said: " I want to exercise
the option." Father said: " I am not going to discuss it with you."
Geoffrey went off to his solicitors. Then those solicitors did what they ought
to have done six years before. On September 5, 1967, they registered the
option. But it was too late. Three weeks too late. The conveyance had
been executed on August 17, 1967. It was, as the judge said, " a case of  B
bolting the stable door after the horse had gone." On October 6, 1967,
Geoffrey's solicitors gave notice exercising the option. But was it any
good then? Was it not also too late?

Six months later on March 28, 1968, the mother Evelyne died quite
unexpectedly. She left her property to her husband Walter for life and
afterwards for her five children equally. So if the conveyance of Gravel  C
Hill Farm is valid, it goes to all five children.

Walter and Geoffrey both died in the next year or two. Walter died
on February 8, 1972. Geoffrey died on May 11, 1973. His wife and
children have remained on at Gravel Hill Farm, farming it and paying an
agreed rent for it. If the conveyance to the mother was good—and free
of the option—they will have to leave. The farm will have to be sold and
the proceeds divided among the five children of Walter and Evelyne. Only  D
one-fifth for Geoffrey's widow and children. That does seem most unfair
to Geoffrey, his widow and children, who have farmed it all their lives and
ought in justice to be able to remain there.

*The litigation*

Now for the story of the litigation. It bids fair to rival in time and  E
money the story of *Jarndyce* v. *Jarndyce*.

First, Geoffrey, while alive, sued Walter for damages for breach of the
option contract. This took Walter by complete surprise. The unknown
lawyer never warned him that this might happen. He at once got rid of
all his assets so as to avoid paying any damages to Geoffrey. He gave his
property at Croxby to the younger son Derek and his sisters. The judge  F
suggested that he repented of what he had done.

Second, Geoffrey also, while alive, started an action against his mother's
estate represented by her executors (who were his father Walter and his
brother Derek). He claimed that the option was binding on her estate. He
also claimed damages for conspiracy. Then Walter died and his
daughter Beryl was added as defendant as his sole personal representative;
Geoffrey died and his widow and the bank became his executors.  G

Third, Geoffrey, while alive, started an action against the family solici-
tors for negligence in failing to register the option. After his death it was
continued by his executors. This resulted in the reported case of *Midland
Bank Trust Co. Ltd.* v. *Hett Stubbs & Kemp* [1979] Ch. 384, covering
47 pages.

All sorts of points have arisen in the course of interlocutory proceedings.  H
At one stage Beryl failed to plead plene administravit and may find her-
self personally liable. At another stage there was a prolonged argument
whether there could be a conspiracy between husband and wife. This

A  resulted in a judgment covering 25 pages: see *Midland Bank Trust Co. Ltd.* v. *Green (No. 3)* [1979] Ch. 496.

It looks to me as if there may be claims made against some solicitors or others for negligence in some stages of this litigation.

*The one point in the case*

Having thus told the story, I come to the one point in this case: is the
B  option binding on the mother's estate? If it is, Geoffrey's widow is entitled to call for a conveyance to her of Gravel Hill Farm on payment of £75 an acre, that is £22,500: and all the outstanding litigation will come to an end—save for endless arguments about the costs involved. If the option is not binding on the mother's estate, then Gravel Hill Farm will belong to her estate: and all the outstanding litigation will continue to vex
C  the courts for years to come. The value of farming land has gone up so much that it may have reached £1,500 an acre: at which Gravel Hill Farm would be worth about £454,500. A prize worth a fight.

We have been shown an opinion given by counsel to father Walter on March 10, 1970, while father and Geoffrey were still alive. It said:

D  "I have no doubt that T. G. Green had a good cause of action against his mother and could have enforced his option against her as soon as he learnt of the sale. The sale was clearly a sham, and in purpose and effect a gift. Accordingly, notwithstanding non-registration of the option, the option ran with the land and bound the mother, for she was not a bona fide purchaser for money or money's worth."

But Oliver J. in his considered judgment held the contrary: see ante, p. 614B:

E  "I . . . find myself compelled . . . to hold that Evelyne was a purchaser for money or money's worth of the legal estate against whom Geoffrey's option was, under the statutory provisions, void."

*The statutory provisions*

The option was an "estate contract" within Class C (iv) of section
F  10 (1) of the Land Charges Act 1925 as to which section 13 (2) of the Act says:

"A land charge of . . . Class C . . . shall (except as hereinafter provided) *be void as against a purchaser* of the land charged therewith, or of any interest in such land, unless the land charge is registered in the appropriate register before the completion of the purchase: Pro-
G  vided that, as respects . . . an estate contract created or entered into after the commencement of this Act, this subsection only applies *in favour of a purchaser of a legal estate for money or money's worth.*"

And "purchaser" is defined in section 20 (8) as meaning:

"any person (including a mortgagee or lessee) who, for valuable consideration, takes any interest in land or in a charge on land; . . ."

H  But that is "unless the context otherwise requires."

To these must be added section 199 (1) of the Law of Property Act 1925:

" A purchaser shall not be prejudicially affected by notice of—(i) any instrument or matter capable of registration under the provisions of the Land Charges Act 1925 . . . which is void or not enforceable as against him under that Act . . . by reason of the non-registration thereof; . . ."

A

And " purchaser " there means by section 205 (xxi):

" a purchaser in good faith for valuable consideration . . . ' purchase ' has a meaning corresponding with that of ' purchaser '; and ' valuable consideration ' includes marriage but does not include a nominal consideration in money; . . ."

B

Upon reading those various provisions, it is significant that section 13 makes an estate contract void for non-registration except as against " a purchaser of a legal estate for money or money's worth." It is significant that this does not include " in good faith " or " valuable consideration." And there is an express provision that such a purchaser in good faith for valuable consideration is not to be prejudicially affected by " notice " of non-registration. Somehow or other we must reconcile these.

C

*The construction of those sections*

D

To my mind the key words are " for money or money's worth." They mean for an adequate sum in money or money's worth. I cannot believe that the legislature intended to protect a purchaser who paid far less than the land was worth—in collusion with the vendor. If that were the case, it would open the door to fraud of the worst description. All that a man —who had contracted to sell his land—would have to do to get out of his bargain would be to convey it to his wife for a very small sum. I know that, in the ordinary law of contract, we never inquire into the adequacy of the consideration. But this is different. " Money or money's worth " means a fair and reasonable value in money or money's worth: not an undervalue: particularly a gross undervalue as here.

E

*Fraud*

F

Apart from that, I am clearly of opinion that these provisions for protecting a purchaser are of no avail when the sale to him is done in fraud of the holder of the estate contract. This is shown by *In re Monolithic Building Co.* [1915] 1 Ch. 643 where it was held that a purchaser, who paid full value, was protected notwithstanding that he had full notice. But Lord Cozens-Hardy M.R. expressly said, at p. 663:

G

" I put aside altogether any question of fraud. The doctrine of the court in a case of fraud, of course, proceeds upon a different footing, and any security may be postponed if you can find fraud in its inception."

and Phillimore L.J. said, at p. 670:

H

" Let us not import considerations which may be applicable, or which it might be desirable to make applicable, where there is dolus malus . . ."

A  With that encouragement, I am prepared to say as I did in *Lazarus Estates Ltd.* v. *Beasley* [1956] 1 Q.B. 702, 712:

> "No court in this land will allow a person to keep an advantage which he has obtained by fraud. No judgment of a court, no order of a Minister, can be allowed to stand if it has been obtained by fraud. Fraud unravels everything."

B  By fraud here, I do not mean only the sort of fraud which is actionable in deceit. I mean the sort of fraud as was spoken of by Lord Coke when he condemned conveyances made in fraud of creditors: see *Twyne's Case* (1601) 3 Co.Rep. 80b. Fraud in this context covers any dishonest dealing done so as to deprive unwary innocents of their rightful dues. The marks of it are transactions done stealthily and speedily in secret for no sufficient consideration. All these appear in this conveyance made by Walter to
C  his wife Evelyne.

If the judge had viewed the case in this light he would certainly have decided in favour of Geoffrey's widow. He said, ante, p. 614c:

> "The conclusion I have reached therefore is one which I reach with regret, because as it seems to me Geoffrey had a clear legal right which was deliberately frustrated by his parents in breach of the
D  contract created by the option."

If it were necessary, I should have thought that the agreement between Walter and Evelyne might amount to a conspiracy. The predominant purpose was to damage Geoffrey: see *Crofter Hand Woven Harris Tweed Co. Ltd.* v. *Veitch* [1942] A.C. 435, 445; and I see no reason why, in modern times, husband and wife should not be liable to an action for conspiracy.
E  But it is unnecessary to go so far. Suffice it that in my opinion the agreement was made—and the conveyance executed—deliberately to deprive Geoffrey of the benefit of his option. That was a fraud upon Geoffrey. The mother was a party to the fraud. She cannot be allowed to take advantage of it to the prejudice of Geoffrey. Nor can her executors take advantage of it as against his widow and children. The mother's estate
F  took Gravel Hill Farm subject to the option, even though it had not been registered at the Land Registry. The option was duly exercised on October 6, 1967. The mother's estate should honour it by transferring Gravel Hill Farm to Geoffrey's estate. I would allow the appeal accordingly.

G  EVELEIGH L.J. I am left with a very uncomfortable feeling that the court is being kept in the dark. Counsel for the defendants has urged the court not to speculate. That is a temptation which is difficult to resist but on the other hand I think it would be wrong to allow speculation to influence one's decision in this case. On the one hand, one might conjure up reasons for criticising Walter's conduct to a greater degree than the facts found by the judge warrant. On the other hand, it is not difficult to
H  think of excuses for him. It may be that we are dealing with a family arrangement which has gone wrong. It may be we are dealing with the case of a man mindful of the interests of his family who is seeking so to arrange his affairs as to avoid greater death duties.

Eveleigh L.J.          **Midland Bank Trust Co. v. Green**          **[1980]**

Geoffrey had an option to buy the farm for £75 an acre. The option A
was not registered. Walter conveyed the farm to his wife and the
consideration expressed in the conveyance was £500. The farm was
worth at least £40,000. It could be foreseen that it would become even
more valuable. It is today worth about £400,000. Both Walter and his
wife knew of the option and they knew that it was not registered. Walter
conveyed to his wife in order to defeat Geoffrey's option.

Section 199 of the Law of Property Act 1925 and section 13 of the B
Land Charges Act 1925 relate to this transaction. By reference to the
respective definition sections and to the wording of the sections themselves
one finds that the provisions of section 199 apply to a bona fide purchaser
for valuable consideration which includes marriage. The provisions of
section 13 of the Land Charges Act 1925 so far as they are relevant apply
to a purchaser for valuable consideration in the form of "money or C
money's worth." *There is no reference to bona fides.*

It is difficult to reconcile the two sections and the view has been put
forward that section 199 was really unnecessary in view of the provisions
of section 13. It has been said that section 199 might have been an over-
sight.

In such a carefully prepared scheme of legislation as we see in the six
Acts of Parliament of 1925, I feel that section 199 was designed to fulfil a D
void in the picture which would or might have existed if section 13 had
stood alone. Seeing that section 199 makes specific reference to the pro-
visions of section 13 I cannot but conclude that section 199 was inserted to
be complementary to section 13 for the express purpose of putting the
effect of section 13 into perspective. The scheme of the Land Charges Act
1925 was to allow the relevant interests in land to be dealt with unencum-
bered by other interests which were not registered. Thus it is provided E
that the unregistered estate contract shall be void as against a purchaser for
valuable consideration in the form of money or money's worth. It does
not make the contract void for all purposes. The intention is that the land
or the relevant interest in it shall pass unencumbered. The provisions are
designed to preserve priorities and not to rob various transactions referred
to in section 13 of all effect. Thus, for example, whilst an unregistered F
prior mortgage may be postponed to a subsequent registered mortgage it
would seem that the prior mortgagee could exercise the mortgagor's equity
of redemption.

Section 13 does not in as many words deal with the effect upon a pur-
chaser of notice of the charge. As the contract is void it might be said
that notice could not possibly make any difference. On the other hand, it G
might be said that whilst the purchaser's title was unaffected some residual
personal liability lay with him. To induce a vendor to sell when there is
knowledge of a binding option given to someone else would on the face of
it appear to be the tort of inducing a breach of contract. It might also be
said that the transaction could involve a conspiracy. Since the decision of
*Crofter Hand Woven Harris Tweed Co. Ltd.* v. *Veitch* [1942] A.C. 435 it H
might be difficult to argue conspiracy where full consideration was given
for the property because the predominant object would not be to harm
someone else. Other considerations might well arise, as they have done in

**1 Ch.**          **Midland Bank Trust Co. v. Green**          **Eveleigh L.J.**

A    the present case, when it is claimed that the consideration is wholly inadequate.

It seems to me that the provisions of section 199 might well be invoked as a defence when an essential ingredient in a claim against a purchaser included knowledge of the land charge. But it would only come to the assistance of a bona fide purchaser of the land. I would hesitate long before coming to a firm conclusion as to the purpose of section 199 of the

B    Law of Property Act 1925 and it is not necessary for this case that I should do so. I am of the opinion, however, that its careful provisions are quite deliberate and emphasise that the provisions of the Land Charges Act 1925 are designed to protect title to the land itself but not to protect the personal liability of those dealing with it in bad faith in whose hands the land still is. As no one else has yet acquired an interest in the land, I see no

C    obstacle to the court inquiring into the bona fides of the purchaser and consequently the genuineness of the transaction with a view to deciding whether the purchaser should be allowed to deal with the land as unencumbered land.

Section 13 (2) of the Land Charges Act 1925 provides:

D    "A land charge of Class B, Class C, or Class D, created or arising after the commencement of this Act, shall (except as hereinafter provided) be void as against a purchaser of the land charged therewith, or of any interest in such land, unless the land charge is registered in the appropriate register before the completion of the purchase: Provided that, as respects a land charge of Class D and an estate contract created or entered into after the commencement of this Act, this subsection only applies in favour of a purchaser of a legal estate

E    for money or money's worth."

The section is providing that the charge in question shall be void for the purpose of charging the land. It is made void, however, only where there is a purchaser as defined in section 20 (8), that is:

"any person (including a mortgagee or lessee) who, for valuable consideration, takes any interest in land or in a charge on land; . . ."

F    and where he takes that interest "for money or money's worth." As I read section 13, it applies to a transaction where the money or money's worth provides the reason for the vendor parting with his interest and for the purchaser acquiring his. £500 is money. However, when the estate that is conveyed is worth some £40,000, it seems to me wholly unrealistic to conclude that the transfer was for £500. There are many cases in the law of

G    contract where inadequate valuable consideration has been held to suffice but there the importance of consideration is to provide a test whereby legal relations can be said to have been concluded. It is the hallmark by which we recognise a binding contract. Something more than that, in my opinion, is envisaged by section 13 of the Land Charges Act 1925. In very many cases there will be a deed that of itself will produce a binding legal transaction.

H    I do not think that money or money's worth is to be treated in the same way as valuable consideration is treated in the law of contract. There the adequacy of the consideration is irrelevant. Under section 13 I do not

think that this is so. The requirement of a return in money or money's
worth goes to the quality of the transaction. It envisages a transaction    A
where the failure to register should not be allowed to prejudice the pur-
chaser. In other words, a transaction where it is right that the land should
be free of the charge.

Counsel has argued that it is not permissible to go behind the trans-
action. This would include the contention that it is not permissible to
inquire into the true value of the land. It is said that we are dealing with a    B
genuine conveyance which transfers the legal estate and as that is achieved
it is wrong to say that the conveyance is a sham. I do not say that the
conveyance is a sham. In my opinion, however, the consideration of £500
expressed in the conveyance is a sham. It is not for £500 that the property
was conveyed. The true transaction, in my opinion, was a gift coupled with
a token of £500 sought to be included to meet the requirements of section
13 of the Land Charges Act 1925. It is not dissimilar from the giving of    C
a halfpenny when one makes a friend a present of a knife.

I think that the court is always entitled to look behind the form adopted
and ascertain the true nature of the transaction. The cases where a bill of
sale masquerades as a hire purchase agreement are good examples of this:
see *In re Watson* (1890) 25 Q.B.D. 27. In those cases the whole of the docu-
ment is treated as being a deceptive form to cover the real nature of the    D
transaction. In the present case I do not say that the conveyance was a
deceptive form but I do think that the statement of the consideration was
deceptive. Money would never have passed had it not been thought
necessary in order to satisfy section 13. Its role in this transaction was
simply a token. I do not regard the transaction as a conveyance following
a contract of sale of the land. I regard it as a conveyance giving effect to a
gift coupled with the reference to a payment of £500 in an attempt to secure    E
the advantage of section 13. In my opinion, the court is entitled to ask
the true value of the land in order to discover the true character of the
£500.

In *Polsky* v. *S. and A. Services* [1951] 1 All E.R. 185, 188, Lord
Goddard C.J. said:

> " The court has to determine whether the transaction in question is a    F
> genuine sale by the original owner of the chattel to the person who is
> finding the money and a genuine re-letting by the latter to the original
> owner on hire purchase terms, or whether the transaction, though
> taking that form, is nothing more than a loan of money on the
> security of the goods."

He went on to say, at p. 188: " The court is not to look merely at the    G
documents. It must discover what the real transaction was." As Lord
Esher M.R. said in *Madell* v. *Thomas & Co.* [1891] 1 Q.B. 230, 234:

> ". . . the court is to look through or behind the documents, and to
> get at the reality; and, if in reality the documents are only given as
> a security for money, then they are bills of sale."

I test the matter in this way. Let us assume that the law forbids the    H
gift of property between husband and wife. Could it be said that the
payment of £500 robbed the transaction of its character as a gift and made
it a sale? In my opinion it could not.

A When we refer to section 205 of the Law of Property Act 1925, we find that "purchaser" means "a purchaser in good faith for valuable consideration" and that "valuable consideration" includes marriage but does not include a nominal consideration in money. I do not say that it is permissible to import the definition section from the one Act into the other, but to refuse to acknowledge that the £500 is money for which the property was conveyed gives consistency to the scheme to be found in
B the two Acts.

If I am wrong in saying that £500 was not valuable consideration in money for which the estate was transferred within the meaning of the words in section 13, I think that the case could be approached in another way. I can assume, contrary to my opinion, that section 13 has made Geoffrey's charge void as against his mother in so far as it can be said that she holds unencumbered land which another purchaser can safely
C take. Nonetheless the mother will have induced a breach of contract and could be sued for this by Geoffrey. She could not invoke section 199 because she was not a bona fide purchaser and because (I would be prepared to say) the £500 was only a nominal consideration: see section 205 (1) (xxi) of the Law of Property Act 1925. If she can be sued for damages for breach of contract in that she has caused Geoffrey to lose
D the land, it seems to me that the court should be in a position to order her to convey the land to Geoffrey upon payment by him of the option price provided that no one else has an adverse claim to the land. There is nothing, as I see it, in such a situation which should prevent the court from restoring the status quo before the breach of contract.

However, I prefer to approach this case upon the basis I have first
E indicated above. At least as long as the land has not been dealt with further, I think that the court can look at the reality of the transaction. I do not regard the sum of £500 as being valuable consideration for which the legal estate was transferred to the mother.

I would therefore allow this appeal.

F Sir Stanley Rees. The background of this most unfortunate case and all the relevant facts have been so fully canvassed in the judgment at first instance of Oliver J. and in the judgment of Lord Denning M.R. that I can proceed at once to consider what I regard as the two major issues which confront us. They are, first, whether fraud in relation to the conveyance of Gravel Hill Farm to Evelyne has been established by the evidence against Walter and Evelyne. If it were established then counsel
G on behalf of the plaintiffs finally claimed a declaration that Evelyne took the farm subject to Geoffrey's option and that accordingly her estate is bound thereby. Alternatively, if fraud were established, the plaintiffs might be entitled to have the conveyance set aside on the principle succinctly encapsulated by Denning L.J. in the sentence "Fraud unravels everything": *Lazarus Estates Ltd.* v. *Beasley* [1956] 1 Q.B. 702. Which-
H ever approach is adopted the plaintiffs would be entitled to acquire the freehold subject to payment of the price specified in the option of £75 per acre for 303 acres, namely, £22,725.

The second major issue is as to whether upon the evidence the unregis-

A

tered option is void (as against the conveyance to Evelyne) pursuant to section 13 (2) of the Land Charges Act 1925.

I turn to deal with the fraud issue. The issue of fraud was pleaded thus in the amended statement of claim:

" . . . the said conveyance was executed pursuant to an agreement or arrangement made between [Walter and Evelyne] whereby they conspired together to defraud and injure [Geoffrey] by completing a sale or what purported to be a sale of Gravel Hill Farm by [Walter to Evelyne] and to deprive [Geoffrey] of the benefit of the said option." B

The statement of claim was originally dated January 27, 1970, and when the action came on before Oliver J. seven years later in October 1977 the issues before the judge were thus stated by him, ante, p. 602E:

" . . . it is a claim by Geoffrey's executors against Derek as the sole surviving personal representative of Evelyne, for specific performance of the option and for damages for conspiracy, and against Walter's executrix "—who is his daughter Beryl—" for damages, the latter claim being undefended." C

I add that the claim against Walter's estate was undefended because the defence was struck out for failure to comply with an order for discovery. Oliver J. continued, at p. 602F: D

" What is in issue on the pleadings is the question of whether the conveyance constituted a bona fide sale by a vendor to a purchaser or whether it was, in truth, a fraudulent and colourable transaction or a sham."

The case strongly presented to us by Mr. Harman was that Walter and Evelyne were guilty of a fraudulent conspiracy in order to deprive Geoffrey of his option and he argued that certain passages in Oliver J.'s judgment disclose that the judge had found fraud proved against Walter and Evelyne. Accordingly, it is necessary to consider at the outset what are the essential ingredients of a fraudulent conspiracy in civil law and what is the onus of proof in relation to it. E

As to the essential ingredients of the tort of conspiracy, I go first to Crofter Hand Woven Harris Tweed Co. Ltd. v. Veitch [1942] A.C. 435. The case is so familiar that I need not recite the facts. As to the tort of conspiracy in civil law Viscount Simon L.C. said, at p. 440: F

" The appellants, therefore, in order to make out their case have to establish (a) agreement between the two respondents (b) to effect an unlawful purpose (c) resulting in damage to the appellants."

G

So the object of the conspiracy must be to effect an unlawful purpose. Viscount Simon L.C., at p. 442, emphasises the importance of the wrongfulness of the intention by citing and approving a statement of Bowen L.J. in Mogul Steamship Co. Ltd. v. McGregor, Gow & Co. (1889) 23 Q.B.D. 598 in which he said, at p. 612: " An intent to ' injure ' in strictness means more than an intent to harm. It connotes an intent to do wrongful harm." H
Upon that passage Viscount Simon L.C. comments [1942] A.C. 435, 442: " A bad motive does not per se turn an individual's otherwise lawful act into an unlawful one."

A    Viscount Simon L.C. further points out that even where there is an inducement by one party to procure another to break a contract there may be a justification. As an example he says, at pp. 442–443:

"In some cases, however, B may be able to justify his procuring of the breach of contract, e.g., a father may persuade his daughter to break her engagement to marry a scoundrel. (This is not, of course, to say that the scoundrel would not have an action against the daughter

B    for breach.) The father's justification arises from a moral duty to urge [his daughter] that the contract should be repudiated."

Finally, Viscount Simon L.C. deals with the object or purpose of the persons combining together in this passage, at p. 445:

"It is enough to say that if there is more than one purpose actuating a combination, liability must depend on ascertaining the predominant purpose. If that predominant purpose is to damage another person and

C    damage results, that is tortious conspiracy. If the predominant purpose is the lawful protection or promotion of any lawful interest of the combiners (no illegal means being employed), it is not a tortious conspiracy, even though it causes damage to another person."

D    We were reminded of Lord Cozens-Hardy M.R.'s dictum in *In re Monolithic Building Co.* [1915] 1 Ch. 643, in which he said, at p. 663:

"The doctrine of the court in a case of fraud, of course, proceeds upon a different footing, and any security may be postponed if you can find fraud in its inception. But it is not fraud to take advantage of legal rights, the existence of which may be taken to be known to both parties."

E    I have already referred to Denning L.J.'s sentence as to the effect upon a transaction when fraud is proved.

The burden of proof of the allegation of fraud made against Walter and Evelyne, of course, rests upon the plaintiffs who allege it. Although fraud is alleged, the standard of proof in civil proceedings is no higher than to establish the allegation upon a balance of probabilities. But as Denning

F    L.J. said in *Hornal* v. *Neuberger Products Ltd.* [1957] 1 Q.B. 247, 258:

". . . the standard of proof depends on the nature of the issue. The more serious the allegation the higher the degree of probability that is required: but it need not, in a civil case, reach the very high standard required by the criminal law."

G    In the instant case the plaintiffs are handicapped in that Walter and Evelyne and Geoffrey are dead and therefore were unable to give evidence. Derek was available to give evidence. We were told at the Bar that Derek was not called as a witness as the result of counsel's advice. I am not myself prepared to draw any inference hostile to the case of any party to these proceedings as a result of the failure of Derek to give evidence. In particular I think it would be wrong and dangerous to do so in a case

H    involving a charge of fraud alleged against two elderly folk who are dead and have not been able to defend themselves against the serious attack which has been made against their integrity and sense of duty as parents.

It is with the foregoing principles in mind that I turn to consider the evidence in relation to the allegation of fraud made against Walter and Evelyne. [His Lordship reviewed the evidence stating that in view of the powerful comments made as to the inadequacy of the £500 paid by Evelyne for the farm it was to be observed that for the wholly nominal (and perhaps, upon the evidence, even illusory) sum of £1 Geoffrey gained his option to buy the farm for one half its true value then about £40,000 and now said to be worth 10 times more; that Walter had been generous to Geoffrey for in 1954 he had let Gravel Hill Farm to him at 30s. per acre and between 1954 and 1967 he made gifts in kind and in money which Walter said amounted to a total of £23,000 but which Geoffrey assessed at about £12,000; that by Evelyne's will dated December 20, 1967 (only 4 months after the conveyance of the farm to her), she left Gravel Hill Farm subject to Walter's life interest to the five children in equal shares so that Geoffrey became entitled to 20 per cent. of the value of the farm instead of 100 per cent. less the £22,725 he would have had to pay if he had exercised his option. His Lordship then continued:—] Mr. Harman submitted that Oliver J. had made a finding of fraud against Walter and Evelyne. I have been unable to discover any such finding in the judge's most careful judgment. If he had found fraud, he would undoubtedly have stated such a finding explicitly; furthermore, it is inconceivable that he would have failed to set aside the conveyance and made such an order as to ensure that Gravel Hill Farm was held subject to the option. What he did was to give judgment against Walter's estate for damages for conspiracy and he held that any claim there might be against Evelyne's estate was statute barred by the provisions of the Law Reform (Miscellaneous Provisions) Act 1934. As we are informed, the judge has recently decided that the tort of conspiracy may be committed by a husband and wife conspiring together. He considered the provisions of section 13 (2) of the Land Charges Act 1925 to which I shall refer in a moment and found that the conveyance fell within the ambit of the section and the option was void in relation to the transfer of the farm.

Accordingly, in my judgment, the judge did not find fraud proved, though it is plain that he considered that the merits of the case were all in favour of Geoffrey.

The plaintiffs have clearly established that Walter and Evelyne set out deliberately to defeat Geoffrey's option and carried out the transactions swiftly and secretly so as to prevent Geoffrey from taking steps to protect his option. They have shown that to have been their primary intention. The family background to the case as well as what was done with the farm, in my judgment, plainly gives rise to an inference that the motive of Walter and Evelyne was to redistribute their assets among the family in a manner which they considered justified in the family interest. Similarly, the evidence does support an inference that Walter and Evelyne were acting spitefully and deceitfully and without any just cause at all to deprive their eldest son Geoffrey of his contractual right in the farm which he had worked since 1954. If the latter inference were established and the former disproved by the plaintiffs, that would clearly justify a finding of fraud. In my judgment, the evidence on a balance of probabilities is

633

A   in favour of the inference that Walter and Evelyne acting as they believed fairly in the family's interest had just cause to act as they did. What they did would harm Geoffrey by depriving him of his option and was a breach of contract committed by Walter and procured by Evelyne. But as Viscount Simon L.C. pointed out in the *Crofter* case [1942] A.C. 435, in a family situation there may well be a justification for such action so that it would not amount to fraud. It is not, however, necessary in order to decide

B   the issue of fraud to hold that the inference from the facts against fraud is stronger than the inference in favour of fraud. It is sufficient to say that the plaintiffs have not established their allegation of fraud to the standard required.

Accordingly, in my judgment, Oliver J. was correct in not finding fraud proved against Walter and Evelyne. But if, contrary to my view, he did find fraud proved, I should hold that he was not justified in so finding.

C   I now come to consider the second main issue, namely, whether pursuant to section 13 (2) of the Land Charges Act 1925 Geoffrey's option is void as against the conveyance executed by Walter and Evelyne. If it is void, then Evelyne's estate is entitled to the unencumbered benefit of the farm but if it is not then her estate is subject to the option and Geoffrey's estate is entitled to recover the farm of 303 acres upon payment of £22,725.

D   I approach this aspect of the case upon the basis that fraud has not been established against Walter and Evelyne for the reasons I have already stated.

Lord Denning M.R. has most helpfully set out the relevant statutory provisions so that I need not re-state them. The central question which remains is whether Evelyne was within the meaning of the proviso to

E   section 13 (2) " a purchaser of a legal estate for money or money's worth."

It has been argued by Mr. Harman that the conveyance was a sham in the sense that it was not the purchase of a legal estate but merely a gift transaction dressed up as a sale with the intention of destroying the option. In *Snook* v. *London and West Riding Investments Ltd.* [1967] 2 Q.B. 786 Diplock L.J. considered the concept of a sham transaction, at p. 802:

F   " As regards the contention of the plaintiff that the transactions between himself, Auto Finance and the defendants were a ' sham,' it is, I think, necessary to consider what, if any, legal concept is involved in the use of this popular and pejorative word. I apprehend that, if it has any meaning in law, it means acts done or documents executed by the parties to the ' sham ' which are intended by them to give to third parties or to the court the appearance of creating between

G   the parties legal rights and obligations different from the actual legal rights and obligations (if any) which the parties intend to create. But one thing, I think, is clear in legal principle, morality and the authorities (see *Yorkshire Railway Wagon Co.* v. *Maclure* (1882) 21 Ch.D. 309 and *Stoneleigh Finance Ltd.* v. *Phillips* [1965] 2 Q.B. 537), that for acts or documents to be a ' sham,' with whatever legal consequences follow

H   from this, all the parties thereto must have a common intention that the acts or documents are not to create the legal rights and obligations which they give the appearance of creating. No unexpressed intentions of a ' shammer ' affect the rights of a party whom he deceived."

In *Miles* v. *Bull* [1969] 1 Q.B. 258 Megarry J. adds these comments about a sham, at p. 264:

    " On the other hand, a transaction is no sham merely because it is carried out with a particular purpose or object. If what is done is genuinely done, it does not remain undone merely because there was an ulterior purpose in doing it."

and he adds this experienced comment in relation to the level of prices in family dealings: " After all, some genuine transactions within the family are carried out at low prices; . . ."

The deed of conveyance dated August 17, 1967, recited that the vendor had agreed to sell the fee simple of the farm to the purchaser for £500. The deed thereupon conveyed the beneficial interest in the estate to Evelyne.

The £500 was paid by Evelyne to Walter. The parties certainly intended that the farm should be conveyed from Walter to Evelyne. That the ulterior motive for the transaction was to defeat Geoffrey's option, that the price was exceedingly low—perhaps only 1/80th of the true value of the farm in 1967—and that the normal step of a written contract preceding the conveyance did not take place—all these factors undoubtedly existed. Nevertheless, I respectfully agree with Oliver J.'s view that the conveyance did and was intended to convey the estate from Walter to Evelyne. It was not a " sham " and cannot in my view be converted into a sham because of the motive or reason for the transaction, namely, because the parties wished to take advantage of the provisions of section 13 (2). So no fraud has been proved and the transaction was not a sham. But it remains to consider whether Evelyne was a " purchaser . . . for money or money's worth " within the ambit of the proviso to section 13 (2).

There is a powerful argument in support of the view that the phrase " money or money's worth " does not, or at least cannot be permitted to, bear the ordinary meaning of the words. It is suggested that the phrase should be so construed that " money or money's worth " means a fair and reasonable value.

The circumstances in which a gloss may properly be placed upon the words of a statute has recently been considered by the House of Lords in *Stock* v. *Frank Jones (Tipton) Ltd.* [1978] 1 W.L.R. 231, and Lord Simon of Glaisdale said, at p. 237:

    " All this is not to advocate judicial supineness; it is merely respectfully to commend a self-knowledge of judicial limitations, both personal and constitutional. To apply it to the argument on behalf of the appellant based on anomaly, a court would only be justified in departing from the plain words of the statute were it satisfied that: (1) there is clear and gross balance of anomaly; (2) Parliament, the legislative promoters and the draftsman could not have envisaged such anomaly, could not have been prepared to accept it in the interest of a supervening legislative objective; (3) the anomaly can be obviated without detriment to such legislative objective; (4) the language of the statute is susceptible of the modification required to obviate the anomaly."

In my respectful opinion, the intention of Parliament in this proviso is

A   clear. It was, to adopt the words of Harman J. in *Hollington Brothers Ltd. v. Rhodes (Note)* [1951] 2 All E.R. 578, 580, ". . . the policy of the framers of the legislation of 1925 to get rid of equitable rights of this kind unless registered." The equitable rights to which Harman J. was referring were created by an unregistered estate contract.

B   Further, one may assume that the presence in section 3 (1) and (3) of the Land Charges Act 1925 itself of the express words " in good faith " preceding the same phrase for " money or money's worth " indicates that the omission of any qualifying words in the proviso to section 13 (2) was deliberate.

C   I respectfully agree with the reasoning and the opinion of Oliver J. in relation to the arguments advanced by Mr. Harman on two points. I think that despite the definitions of " purchaser " in section 20 (8) in the Land Charges Act 1925 as a person who takes " for valuable consideration " and by section 205 (1) (xxi) of the Law of Property Act 1925 as a person who acquires " in good faith for valuable consideration " one must look to the specific and clear definition which is contained in the proviso to section 13 (2) and not elsewhere. Nor do I think that one can read section 199 (1) of the Law of Property Act 1925 as giving rise to a valid argument that a purchaser who enters into a transaction with the deliberate intention of

D   taking advantage of the provisions of the Land Charges Act 1925 is to be prejudicially affected by an unregistered estate contract.

E   I recognise that difficulties may arise in cases in which the consideration for a contract for the sale of an estate may be what has been called nominal or illusory in deciding whether in a given case the price is " nominal " or " illusory." Equally there could be difficulty in some cases in deciding what is a valuable consideration agreed in good faith. But I am driven to the conclusion that unless fraud is proved or unless the conveyance is a sham or unless the consideration is nominal or illusory then an unregistered estate contract is void against it. Were this not the case one would be departing from the sound ordinary rule in contract law that the court will not look into the adequacy of consideration and from what seemed to Harman J. and seems to me the policy of the Land Charges Act 1925,

F   namely, to get rid of the equitable rights arising from unregistered estate contracts. Nevertheless, the protection remains that " fraud unravels all."

Accordingly, I would dismiss the appeal.

*Appeal allowed with costs.*
*Leave to appeal.*

G   Solicitors: *Sidney Torrance & Co. for J. Levi & Co., Leeds; Simmons & Simmons for Roythorne & Co., Spalding.*

C. N.

H

END OF VOLUME AND CHANCERY SERIES FOR 1980.

## SUBJECT MATTER

**ADMINISTRATION OF ESTATES**
**Matrimonial home**
*Appropriation*
Intestacy—Value of widow's interest in estate less than value of house—Notice electing to exercise her rights and requiring appropriation of house " in or towards satisfaction " of her interests in estate—Whether notice valid—Intestates' Estates Act 1952, s. 5, Sch. 2, paras. 1, 5                   *In re* **Phelps, decd.,** C.A. **275**

**BANKRUPTCY**
**Annulment**
*Discretion of court*
Annulment without public examination—Exercise of discretion—Failure to allow cross-examination of debtor—Opposition to annulment from one creditor only—Bankruptcy Act 1914, ss. 15 (1), 29
*In re* **A Debtor (No. 37 of 1976),** *Ex parte* **Taylor v. The Debtor,** D.C. **565**

**Discharge**
*Power of court*
Automatic discharge after five years—Court's discretion to order discharge—Facts and circumstances to be considered—Appellate court's duty—Insolvency Act 1976, s. 7—Bankruptcy Act 1914, s. 26 (3)
*In re* **Reed (A Debtor),** *Ex parte* **The Debtor v. The Official Receiver,** D.C. **212**

**CHARITY**
**Education**
*School site*
Land conveyed for school for poor of parish—Closure of school—Reverter of land under statute—Whether property reverting to original grantor—Whether legal estate vesting in grantee's successors in title—Schools Sites Act 1841, s. 2
*In re* **Clayton's Deed Poll,** Whitford J. **99**

**COMMON RIGHTS**
**Common land**
" *Waste land of a manor* "
Waste land severed from manor in 1878—Whether land registrable as " common land "—Commons Registration Act 1965, ss. 1 (1) (*a*), 22 (1) (*b*)
*In re* **Box Hill Common,** C.A. **109**

**COMPANY**
**Officer**
" *Manager* " *or* " *officer* "
Allegation of false accounting by departmental manager—Whether officer committing " offence in connection with . . . company's affairs "—Jurisdiction to order production and inspection of books—Companies Act 1948, ss. 441 (1) (3), 455 (1)
*In re* **A Company,** C.A. **138**

**Winding up**
*Execution*
Arrest of vessel—Issue of writ in rem by creditor—Writ not served and ship not arrested—Caveat entered in Admiralty Register—Subsequent liquidation of company—Application by creditor for leave to proceed with action in rem—Whether secured creditor—Whether leave to be granted to proceed with action—Companies Act 1948, s. 231                   *In re* **Aro Co. Ltd.,** C.A. **196**

*Fraud*
Agreement between company and second company to pay sum for cancellation of agency agreement between them—Agreement between company and third company to sell company's factory premises at alleged undervalue—Liquidator's proceedings by summons to avoid both agreements—Whether summonses properly brought in Companies Court—Companies (Winding-up) Rules 1949, r. 68—R.S.C., Ord. 5, r. 2 —Law of Property Act 1925, s. 172 (1)
*In re* **Shilena Hosiery Co. Ltd.,** Brightman J. **219**

637

**COMPANY**—*continued*
 **Winding up**—*continued*
  *Petition*
   Creditor—Debt disputed on substantial grounds—Whether prospective creditor to be
   restrained from presenting petition—Form of injunction—Jurisdiction of Com-
   panies Court—Companies Act 1948, ss. 223, 224 (1) (c)
                    **Stonegate Securities Ltd. v. Gregory, C.A. 576**

  *Voluntary liquidation*
   Potential claims to dividends and repayment of capital by holders or former holders
   of shares, share warrants to bearer and bonds—Whether such holders to be treated
   as members or contingent creditors of company—Whether assets held in trust for
   members—Companies Act 1948, ss. 212 (1) (g), 302, 343 (1)—Companies (Winding-
   up) Rules 1949, r. 106 (1) (2)
        *In re* **Compania de Electricidad de la Provincia de Buenos Aires Ltd.,**
                                                      Slade J. **146**


**CONFLICT OF LAWS**
 **Jurisdiction**
  *Movables*
   Assignment—Sale in Italy of goods stolen in England—Buyer bringing goods into
   England—Ownership—Law applicable
                **Winkworth v. Christie Manson and Woods Ltd.,** Slade J. **496**


**COPYRIGHT**
 **Infringement**
  *Artistic work*
   Design—Fabric design selected in Hong Kong—Shirts bearing design made in
   Hong Kong and imported into U.K.—Sale to public—No inquiry as to copyright—
   No prior knowledge—Whether " publication "—Whether infringement of copy-
   right—Damages—Copyright Act 1956, ss. 1 (1), 3 (5) (b), 18 (1), 49 (2) (c)
                            **Infabrics Ltd. v. Jaytex Ltd.,** C.A. **282**


**COURT OF APPEAL**
 **Jurisdiction**
  *Judge's decision " not . . . appealable "*
   Error of law in construction of statute—Whether jurisdiction to hear appeal—
   Companies Act 1948, s. 441 (3)                *In re* **A Company,** C.A. **138**


**DAMAGES**
 **Sale of land**
  *Damages in lieu of specific performance*
   Option to purchase house on dissolution of medical partnership—House belonging
   to junior partner and wife—Senior partner exercising option—Junior partner's
   failure to obtain wife's consent to sale—No evidence of attempt to persuade wife
   to sell property—Measure of damages—Date for assessing damages—Chancery
   Amendment Act 1858 (Lord Cairns' Act), s. 2      **Malhotra v. Choudhury,** C.A. **52**


**EASEMENT**
 **Prescription**
  *Right to light*
   Greenhouse—Claim for sufficient light to cultivate plants—Whether specially high
   amount of light—Whether right to extraordinary amount of light capable of being
   acquired by prescription—Whether right is to light for illumination only or capable
   of including sun's warmth—Prescription Act 1832, s. 3
                            **Allen v. Greenwood,** C.A. **119**

 **Right of way**
  *Way of necessity*
   Landlocked building plot—No right of way over proposed new roads until built—
   Whether way of necessity to be implied from grant—Public policy against land
   being made unusable—Right of way to plot—Whether means of access to plot
   beyond—Express or implied intention of parties
                    **Nickerson v. Barraclough,** Sir Robert Megarry V.-C. **325**

**FAMILY PROVISION**
  **Dependant**
    *Maintained by deceased*
      Couple living as man and wife—Home owned by woman—Man paying for accommo-
      dation and contributing to household budget—Whether assumption of responsibility
      by woman for man's maintenance—Arrangements " immediately " before death—
      Whether " substantial contribution " towards maintenance " otherwise than for full
      valuable consideration "—Inheritance (Provision for Family and Dependants) Act
      1975, ss. 1 (1) (*e*) (3), 3 (4)      *In re* **Beaumont, decd.,** Sir Robert Megarry V.-C. **444**

  **Son**
    " *Reasonable financial provision* "
      Son sharing accommodation with father—Father dying intestate—Son in good health
      and earning—Deceased's wife, estranged from husband and son, living on pension
      and supplementary benefit—Whether disposition of estate failed to make reasonable
      financial provision for son—Inheritance (Provision for Family and Dependants)
      Act 1975, ss. 1 (1) (2) (*b*), 2 (1), 3      *In re* **Coventry, decd.,** Oliver J. and C.A. **461**


**INSURANCE**
  **Contract**
    *Definition*
      Membership of medical defence union—Whether contract of insurance—Whether
      union carrying on insurance business—Insurance Companies Act 1974, ss. 12 (1),
      85 (1)                      **Medical Defence Union Ltd. v. Department of Trade,**
                                              Sir Robert Megarry V.-C. **82**


**LAND CHARGE**
  **Charges registrable**
    *Estate contract*
      Unregistered option to purchase farm—Farm conveyed to grantor's wife at gross
      undervalue—Whether court can inquire into adequacy of consideration—Whether
      wife " purchaser . . . for money or money's worth "—Whether option void against
      wife—Whether fraud—Land Charges Act 1925, s. 13 (2)
                                  **Midland Bank Trust Co. Ltd. v. Green,** Oliver J. and C.A. **590**

    *Right of pre-emption*
      Conveyance of land with right of first refusal to purchase retained lands during
      lives of parties to conveyance—Right of pre-emption registered—Subsequent
      lease of retained lands with option to purchase after grantors' deaths—Option
      registered—Conveyance in purported exercise of right of pre-emption—Subsequent
      purported exercise of option—Whether right of pre-emption creating interest in
      land—Whether right of pre-emption taking precedence over option to purchase
                                                              **Pritchard v. Briggs,** C.A. **338**


**LIMITATION OF ACTION**
  **Period of limitation**
    *Debt*
      Company in voluntary liquidation—Potential claims by holders or former holders
      of shares and bonds—Whether action upon speciality or simple contract—Whether
      company's balance sheets acknowledgment of debt—Limitation Act 1939, ss. 2 (1)
      (*a*) (3), 18 (1) (5), 24 (2)
                        *In re* **Compania de Electricidad de la Provincia de Buenos Aires Ltd.,**
                                                                      Slade J. **146**


**PRACTICE**
  **Chancery Division**
    *Summonses*
      Adjournment to judge—Whether summonses to be heard first—Considerations where
      difficult point of law raised—R.S.C., Ord. 32, r. 14 (1)
                                  *In re* **Beaumont, decd.,** Sir Robert Megarry V.-C. **444**


**PUBLIC POLICY**
  **Easement**
    *Right of way of necessity* see EASEMENT

**REVENUE**
  **Capital transfer tax**
    *Settlement*
      Trust for settlor's children subject to overriding power of appointment—Trustees'
      power to accumulate and apply income for duties, taxes, outgoings—Appointment
      of cash to beneficiary—Whether beneficiary's interest " interest in possession "
      before appointment—Whether chargeable to capital transfer tax—Finance Act
      1894, s. 2 (1) (*b*) (as substituted by Finance Act 1969, s. 36 (2))—Finance Act
      1969, s. 37 (1)—Finance Act 1975, s. 21, Sch. 5, paras. 3, 6 (2)
                          **Pearson v. Inland Revenue Comrs.**, Fox J. and C.A. **1**


    *Tax avoidance*
      Settled property—Trustees appointing part of settled property to be held on different
      trusts to main trust fund—Beneficiaries assigning equitable interests in main fund
      to overseas company—United Kingdom trustees of main trust replaced by non-
      resident trustees—Deemed disposal of main trust fund by non-resident trustees
      —Whether exercise of power of appointment creating separate settlement—Whether
      United Kingdom trustees liable to capital gains tax arising on deemed disposal—
      Finance Act 1965, s. 25 (1) (3) (11), Sch. 10, para. 12 (1)
                          **Roome v. Edwards**, C.A. **425**


**SALE OF GOODS**
  **Implied term**
    *Obligation to account*
      Conditions of sale reserving beneficial ownership until payment made for goods—
      Goods mixed with other materials in manufacturing process—No obligation to
      keep separate goods not paid for—Buyers in liquidation—Whether charge created
      over goods not paid for—Whether charge extending to products manufactured
      from such goods—Whether registrable charge—Companies Act 1948, s. 95 (1) (2) (*f*)
                          *In re* **Bond Worth Ltd.**, Slade J. **228**


**SOLICITOR**
  **Negligence**
    *Beneficiary under will*
      Solicitors' negligence in preparation of will—Resulting financial loss to beneficiary—
      Whether solicitors owing duty of care to beneficiary
                          **Ross v. Caunters**, Sir Robert Megarry V.-C. **297**


**TRUSTS**
  **Trustee**
    *Compensation*
      Settlement—Beneficiaries' shareholdings in private company vesting absolutely—Sub-
      sequent sale of company as whole—Date when compensation to be calculated—
      Whether assumed liability for taxation in absence of breach of trust to be deducted
      from compensation—Rate of interest payable on compensation—Whether payable
      on disbursements—Whether costs taxable on party and party or common fund basis
                          **Bartlett v. Barclays Bank Trust Co. Ltd. (No. 2)**, Brightman L.J. **515**


    *Compromise of litigation*
      Testator settling his chattels on successive life interests—Testatrix bequeathing her
      chattels to beneficiaries—Allegation that chattels given to beneficiaries were pro-
      perty of testator—Summons for directions—Court's direction that executors take
      proceedings to recover chattels—Beneficiaries offering compromise—Whether
      trustees empowered to accept compromise—Trustee Act 1925, s. 15
                          *In re* **Earl of Strafford, decd.**, Sir Robert Megarry V.-C. and C.A. **28**


    *Duty of trustee*
      Trustee corporation specialising in trust management—Trust property comprising
      majority shareholding in private company—Whether duty of trustee with regard
      to management of company higher than ordinary trustee
                          **Bartlett v. Barclays Bank Trust Co. Ltd. (No. 1)**, Brightman J. **515**

**VENDOR AND PURCHASER**
  **Contract**
    *Formation*
      Exchange of contract arranged by telephone conversation between solicitors—Whether
      concluded contract—Professional practice between solicitors
                                                          **Domb v. Isoz,** C.A. **548**


**WORDS AND PHRASES**
  " *Common land* "—Commons Registration Act 1965, s. 22 (1)
                                          *In re* **Box Hill Common,** C.A. **109**
  " *Immediately* "—Inheritance (Provision for Family and Dependants) Act 1975, s. 1 (1) (*e*)
                                          *In re* **Beaumont, decd.,** Sir Robert Megarry V.-C. **444**
  " *In or towards satisfaction* "—Intestates' Estates Act 1952, Sch. 2, para. 1
                                                          *In re* **Phelps, decd.,** C.A. **275**
  " *Interest in possession* "—Finance Act 1975, Sch. 5, para. 6 (2)
                                          **Pearson v. Inland Revenue Comrs.,** Fox J. and C.A. **1**
  " *Manager* "—Companies Act 1948, s. 455 (1)          *In re* **A Company,** C.A. **138**
  " *Not . . . appealable* "—Companies Act 1948, s. 441 (3)      *In re* **A Company,** C.A. **138**
  " *Offence in connection with . . . company's affairs* "—Companies Act 1948, s. 441 (1)
                                                          *In re* **A Company,** C.A. **138**
  " *Officer* "—Companies Act 1948, s. 455 (1)          *In re* **A Company,** C.A. **138**
  " *Otherwise than for full valuable consideration* "—Inheritance (Provision for Family
      and Dependants) Act 1975, s. 1 (3)
                                          *In re* **Beaumont, decd.,** Sir Robert Megarry V.-C. **444**
  " *Publication* "—Copyright Act 1956, s. 3 (5) (*b*)
                                          **Infabrics Ltd. v. Jaytex Ltd.,** C.A. **282**
  " *Purchaser . . . for money or money's worth* "—Land Charges Act 1925, s. 13 (2)
                                          **Midland Bank Trust Co. Ltd. v. Green,** Oliver J. and C.A. **590**
  " *Reasonable financial provision* "—Inheritance (Provision for Family and Dependants)
      Act 1975, s. 1 (2) (*b*)                          *In re* **Coventry, decd.,** Oliver J. and C.A. **461**
  " *Substantial contribution* "—Inheritance (Provision for Family and Dependants) Act 1975,
      s. 1 (3)                          *In re* **Beaumont, decd.,** Sir Robert Megarry V.-C. **444**
  " *Waste land of a manor* "—Commons Registration Act 1965, s. 22 (1) (*b*)
                                          *In re* **Box Hill Common,** C.A. **109**