# EXHIBIT H

**A.C.**                    AND PRIVY COUNCIL                    853

A

[HOUSE OF LORDS]

| | | |
|---|---|---|
| CARL ZEISS STIFTUNG | . . . . | APPELLANTS |

H. L. (E.)*

1965
Dec. 1, 2, 6,
7, 8, 9, 13,
14, 15, 16;
1966
Jan. 24, 25,
27, 31;
Feb. 1, 2, 3,
7, 8, 9, 13,
14, 15, 16;
May 18.

AND

B  RAYNER & KEELER LTD. AND OTHERS    .    RESPONDENTS

(Original Appeal)

RAYNER & KEELER LTD. AND OTHERS    .    APPELLANTS

AND

C  COURTS AND OTHERS    .    .    .    .    .    RESPONDENTS

(Cross-Appeal)

*International Law—Recognition—Effect—Action begun by English
    solicitors on behalf of East German organisation—Solicitors
D    instructed by governing body of organisation—Governing body
    authorised by government not recognised by H.M. Government—
    Unrecognised government set up by de jure government—Whether
    governing body of organisation competent to institute proceedings.*
*Conflict of Laws—Foreign judgment—Issue estoppel—Judgment by
    court of country with unrecognised government.*

E    In 1891 there was established at Jena, in the Grand Duchy of
Saxe-Weimar, the Carl-Zeiss-Stiftung ("the foundation"), an
organisation with industrial, scientific and charitable objects.
Under the articles of its constitution (or "statute") the legal
domicile of the foundation was to be Jena, and for representing
it as an incorporate body, for the administration of its estate and
effects, and for the supreme direction of its affairs, a "special
board" was to be formed, the rights and duties of which were
F    to pertain to that department of the state service of the Grand
Duchy under which the affairs of the University of Jena were for
the time being placed. In the case of the cessation of the special
board in consequence of political changes in the state, the
representation of the foundation, and its statutory administration,
were to be made over to the department of state which, with regard
to the University, occupied the place of the State Department
of the Grand Duchy, provided that its seat was in Thuringia,
G    otherwise to "the highest administrative authorities in Thuringia."
In 1918 the Grand Duchy was abolished and Jena became part of
the "Land" of Thuringia. In 1949 there was set up in the Russian-
administered zone of Germany, the German Democratic Republic,

---

\* *Present*: LORD REID, LORD HODSON, LORD GUEST, LORD UPJOHN
and LORD WILBERFORCE.

854                          HOUSE OF LORDS                        [1967]

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A

and the court in the present case proceeded on the basis that the Land of Thuringia continued to exist until 1952, when under a decree of the German Democratic Republic, it was divided into smaller areas, Jena being in the area of Gera, governed by the Rat (or Council) of Gera, which was itself set up by that decree.

In 1955 English solicitors, on the instruction of an individual authorised by the Council of Gera as the special board of the foundation, issued a writ against the defendants, two English limited companies and an organisation with its headquarters in the Federal German Republic (West Germany) also calling itself Carl-Zeiss-Stiftung, to restrain them (inter alia) from passing off optical and glass instruments with reference to the name " Carl-Zeiss-Stiftung " or " Carl Zeiss " or " Zeiss." Meanwhile proceedings had also been brought in West Germany to restrain this organisation and the persons appointed to administer it from administrative and representative activities on behalf of the foundation; in 1960 the Federal Supreme Court dismissed the action. In 1956 the defendants in the English proceedings took out a summons to stay all proceedings in the action and to have it dismissed on the ground that it had been begun, and was being maintained, without the authority of the foundation. On March 6, 1964, Cross J. dismissed the summons, holding that under the articles of the foundation the proper body to authorise on its behalf an action such as the present was its " special board," which was at the material time the Council of Gera. No point was taken before Cross J. as to whether Her Majesty's Government had recognised de jure or de facto the German Democratic Republic or its Government, or as to the application in the English courts of East German legislation or decrees. The defendants appealed and moved the Court of Appeal, asking that a letter be written to the Foreign Secretary requesting him to certify whether (inter alia) Her Majesty's Government had granted recognition de jure or de facto to the German Democratic Republic or to its Government and, if yes, when. The court,[1] holding that recognition was a matter which the court of its own motion was bound to consider, acceded to that request, and the Foreign Secretary subsequently certified that:

> " Her Majesty's Government have not granted any recognition de jure or de facto to (a) the ' German Democratic Republic ' or (b) its ' Government.' "

In answer to a further letter from the court,[2] the Secretary of State certified (inter alia) that since June, 1945, and up to the present date

> " Her Majesty's Government have recognised the State and Government of the Union of Soviet Socialist Republics as de jure entitled to exercise governing authority in respect of [East Germany]."

B

C

D

E

F

G

[1] Carl Zeiss Stiftung v. Rayner & Keeler Ltd. [1965] Ch. 525; [1964] 3 W.L.R. 905; [1964] 3 All E.R. 326, C.A.

[2] The Times, October 30, 1964.

A

On the defendants' contention that the council of Gera, having been set up by a decree of the unrecognised government of the German Democratic Republic, could not be recognised by the English courts as being the special board of the foundation with authority to institute proceedings therein on its behalf: —

*Held*, (1) that, although the German Democratic Republic is not recognised by Her Majesty's Government, its acts should be

B

recognised by the English courts as lawful, not as the acts of a sovereign state, but as acts done by a subordinate body which the U.S.S.R. set up to act on its behalf, since a de jure governing body cannot disclaim responsibility for the acts of subordinate bodies set up by it.

*City of Berne* v. *Bank of England* (1804) 9 Ves. 347; *Taylor* v. *Barclay* (1828) 2 Sim. 213; and *Aksionairnoye Obschestvo A. M.*

C

*Luther* v. *James Sagor & Co.* [1921] 1 K.B. 456; [1921] 3 K.B. 532; 37 T.L.R. 777, C.A. considered.

(2) That the decision of the West German courts does not fulfil the requirements for the application of the doctrine of issue estoppel and accordingly has not made the subject-matter of the present issue res judicata, so that the defendant solicitors are not estopped from contending that they have authority to bring the action in the name of the foundation.

D

(3) That questions relating to the constitution of a foreign corporation should be decided according to the law of the place where it is incorporated and since, on the evidence, every court in the Eastern Zone of Germany would hold that the Council of Gera was the special board of the foundation, the courts of another jurisdiction are debarred from deciding the question in any other way.

E

*Per* Lord Reid, Lord Hodson, Lord Upjohn and Lord Wilberforce. Issue estoppel can be based on a foreign judgment, although in such a case the doctrine should be applied with caution because of the uncertainties arising from the differences of procedure in foreign countries (post, pp. 918B, 927G, 948G, 966C–D, 967F).

*Simpson* v. *Fogo* (1862) 1 H. & M. 195 distinguished.

F

*Per* Lord Reid, Lord Hodson, Lord Guest and Lord Upjohn. There was no complete identity between the parties in the proceedings in West Germany and in the present case, since the solicitors in the present case had no connection with or interest in the German litigation and could not be estopped from now defending themselves and showing that they had authority to act (post, pp. 911A, E, 929A, 937A, C, 946A).

G

*Per* Lord Wilberforce. There is identity of parties in the two sets of proceedings. The reality behind the action is that the Council of Gera is seeking in these proceedings to set up the foundation as plaintiff. To treat the solicitors as parties is lacking in reality and is unduly technical (post, pp. 968D, 969A–B).

*Per* Lord Reid. There was no identity of issues in the two sets of proceedings. The question before the West German courts was whether the Council of Gera were the legal representatives of

H. L. (E.)

1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

H. L. (E.)

1966

——

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

——

the foundation at one date. The question here is whether at a    A
different date the solicitors had the authority of the foundation to
bring the action. An answer, yes or no, to the first question does
not necessarily imply an answer to the second (post, p. 913c).

*Per* Lord Upjohn and Lord Wilberforce. The issue whether
the Council of Gera had authority to give instructions to start
proceedings in England in the name of the foundation or
whether the foundation had become paralysed and could not act    B
depends on precisely the same facts, circumstances and argu-
ments as were relied on in the West German courts and rejected
by them (post, pp. 943G—944A, 967G—968A, 972D).

*Per* Lord Guest, Lord Upjohn and Lord Wilberforce. It was
not established that the judgment of the West German courts was
final and conclusive in West Germany as regards other pro-
ceedings between the same parties (post, pp. 936B, 949c, 971B).    C

*Per* Lord Hodson and Lord Wilberforce. There is no ground
for concluding from a communiqué issued on September 19, 1950,
by the Foreign Ministers of France, Great Britain and the United
States of America that the views of the courts of the Federal
German Republic are conclusive as to the law of Germany as a
whole (including the German Democratic Republic), the com-
muniqué being only concerned with political representation (post,    D
pp. 929G—930A, 974D).

Decision of the Court of Appeal [1965] Ch. 596; [1965] 2
W.L.R. 277; [1965] 1 All E.R. 300, C.A. reversed.

APPEAL from the Court of Appeal (Harman, Danckwerts and
Diplock L.JJ.).    E

This was an appeal by leave of the Court of Appeal by the
present appellants, the plaintiffs in the action, Carl-Zeiss-Stiftung
of Jena, from an order of that court dated December 17, 1964,
whereby it allowed the appeal of the respondents, the defendants
in the action, Rayner & Keeler Ltd., Degenhardt & Co. Ltd.
and Carl-Zeiss-Stiftung of Heidenheim, Brenz, from the order    F
of Cross J. dated March 6, 1964.

On March 17, 1965, the respondents presented a petition of
appeal naming as sole respondents thereto Louis Courts, Philip
Max Skelskey, Martin Roy Kagan, Montague Cohen, David
Michael Blackburn and William Hollis, the present individual
partners of the firm of Courts & Co., which firm, but not all the    G
individual partners, had throughout acted in this litigation as
solicitors for the appellants.

On April 12, 1965, the Appellate Committee of the House of
Lords ordered that the respondents should be permitted to present
that appeal by way of cross-appeal in the original appeal by the

A.C.                  AND PRIVY COUNCIL                              857

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A  appellants, the individual partners being respondents to that cross-appeal, with liberty to lodge a case in answer to the cross-appeal and without prejudice to any other contentions, to object therein to the competency of the cross-appeal.  The respondents were to have liberty to proceed with the cross-appeal in the event of the original appeal not being proceeded with.  The individual partners

B  lodged a case in the cross-appeal.

Carl-Zeiss-Stiftung (Jena) and Carl-Zeiss-Stiftung (Heidenheim, Brenz) are so referred to in order to distinguish by their respective seats the rival organisations claiming to be entitled to the name of the original foundation.

C  This action for passing off was commenced by writ dated October 20, 1955, in the Chancery Division of the High Court of Justice by the appellants on the footing that they were a German foundation, founded in 1891, and had their registered office and seat (" Sitz ") at Jena which was in that part of Germany now constituting the territory of the German Democratic Republic.

D  Originally the third defendants (the third respondents) were sued in the name of Carl-Zeiss, but on service on them of notice of a concurrent writ, issued by leave under R.S.C., Ord. 11, r. 1 (f), they entered an appearance as " Carl-Zeiss-Stiftung trading as Carl-Zeiss."  Subsequently the writ was amended by changing their name to Carl-Zeiss-Stiftung and extending the relief claimed.

E  As amended, the writ claimed:

" (1) An injunction to restrain the defendants and each of them from advertising offering for sale or selling any optical. instruments or any articles containing or consisting of glass under or by reference to the name ' Carl Zeiss ' or any name containing ' Zeiss ' unless such goods be those of the plaintiffs or an organisation associated with the plaintiffs and generally

F  from passing off any business or goods as and for those of the plaintiffs or an organisation associated with the plaintiffs. (2) An injunction to restrain the third defendants from using the name ' Carl-Zeiss-Stiftung ' or ' Carl Zeiss ' or any name containing ' Zeiss ' in relation to their business or goods. (3) Delivery up or destruction upon oath of all articles calculated to lead to passing off.  (4) An inquiry as to damages

G  or an account of profits.  (5) Further and other relief. (6) Costs."

The facts are stated in the opinions of Lord Reid and Lord Guest and are also fully set out in the report of the case in the Court of Appeal.[1]

[1] [1965] Ch. 596, 598–606, 637; [1965] 2 W.L.R. 277, 279–286, 289–290, C.A.

H. L. (E.)

1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

The relevant transactions in relation to the foundation at and    A
after the end of the war may be summarised as follows: Jena
was first occupied by the Americans but it subsequently became
part of the Russian Zone of occupation on July 1, 1945. When
the Americans left they took with them all the members of the
existing boards of management of the foundation. The members    B
of the board of management of the optical business had selected
three employees of the foundation, Dr. Hugo Schrade and two
others, who stayed in Jena, as suitable persons to carry on in their
absence.

On October 30, 1945, Marshal Zhukov, head of the Russian
Military Administration in Germany, made an order (SMAD 124),    C
providing for the sequestration of certain types of property in
the Russian Zone. On June 1, 1948, documents were signed
recording the confiscation of the Zeiss optical works at Jena, and
this was confirmed by the Soviet Military Administration. The
confiscated businesses became known as Volks Eigene Betriebe
(VEBs), "People's Owned Enterprises." The confiscation did not    D
involve change in the persons who ran the businesses.

On July 30, 1948, a request was made to the Minister of
Education of Wurtemburg to declare Heidenheim to be the legal
domicile of the foundation in the West and appoint five named
persons the management of the foundation, with jurisdiction out-
side the Russian Zone. On February 23, 1949, the Minister of    E
State of Wurtemburg ordered that article 3 of the Statute of the
foundation should be amended to read: "The legal seat of the
foundation is at Jena and Heidenheim." Three named persons
were appointed to administer and represent the foundation in
accordance with article 114 until a special board in accordance
with article 113 should have been reconstituted. This order was    F
confirmed by the Minister of Education on May 3, 1949, and on
January 15, 1951, the District Court of Heidenheim registered the
firm of Carl-Zeiss in the commercial register as a firm owned by the
Carl-Zeiss-Stiftung domiciled at Heidenheim, with a statement to
the effect that it had transferred its seat from Jena. By a document
signed by the Minister of Education "by proxy" on June 25,    G
1951, the management of Carl-Zeiss-Stiftung at Jena conferred on
Dr. Schrade a "power of attorney" on behalf of the Stiftung
to undertake all legal proceedings and represent it in law suits.

Meanwhile in 1949 there had been set up in the Russian Zone
of Germany the German Democratic Republic. On September 16,
1964 the Foreign Secretary certified:

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A    " Her Majesty's Government have not granted any recognition de jure or de facto to (a) the ' German Democratic Republic ' or (b) its ' Government.' "

On November 6, 1964, the Foreign Secretary further certified:

" From the area allocated to the Union of Soviet Socialist Republics, Allied forces under the Supreme Allied Commander, General Eisenhower, withdrew at or about the end
B    of June, 1945.    Since that time and up to the present date Her Majesty's Government have recognised the State and Government of the Union of Soviet Socialist Republics as de jure entitled to exercise governing authority in respect of that zone . . .    In the area comprised in the zones allocated to the Governments of the French Republic, the United Kingdom of
C    Great Britain and Northern Ireland and the United States of America in pursuance of the protocol of September 12, 1944, and the agreement of July 26, 1945, . . . the Government of the Federal Republic of Germany was established on September 21, 1949.    In a communiqué issued by the Foreign Ministers of the French Republic, the United Kingdom of Great Britain and Northern Ireland and the United States of America on
D    September 19, 1950, it was stated that ' Pending the unification of Germany, the three Governments consider the Government of the Federal Republic as the only German Government freely and legitimately constituted and, therefore, entitled to speak for Germany as the representative of the German people in international affairs.'    This statement does not constitute recognition of the Government of the Federal Republic as
E    the de jure Government of all Germany."

There was litigation in West Germany relating to the foundation. The Carl-Zeiss-Stiftung of Jena was represented therein by the Council of Gera, in the area of which Jena was situated.    The council had been set up by a decree of the German Democratic Republic in 1952 and had appointed Dr. Schrade as deputy (or
F    mandatory) of the foundation under article 4 of its statute.    In an action in the courts of the Federal Republic of Germany in West Germany against the firm Carl-Zeiss of Heidenheim, Brenz, and the three persons who had been appointed to administer it, the relief claimed was that the defendants should desist from administrative and representative activities on behalf of the
G    foundation and from the use of the name Zeiss and the style Carl-Zeiss.    On November 15, 1960, the Federal Supreme Court held that the action should be dismissed.

Meanwhile there had been litigation in the Russian Zone and on March 23, 1961, the Supreme Court of the German Democratic Republic determined an action brought by Carl-Zeiss-Stiftung of Jena, represented by the Council of Gera in its capacity as special

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

board and Dr. Schrade as mandatory, against the firm of Carl-Zeiss    A
in West Germany.  It held that the defendants should refrain from
using the firm name of Carl-Zeiss.

In the present proceedings in England the defendants in the
action applied by summons dated February 7, 1956, for

> " an order that all further proceedings in the action be stayed
> and that this action be dismissed on the ground that the same    B
> was commenced and is being maintained without the plaintiffs'
> authority and that Messrs. Courts & Co. the solicitors purport-
> ing to act for the plaintiffs herein do pay to the defendants
> the costs of this action."

Cross J. dismissed the summons.  The Court of Appeal having
reversed this decision, the plaintiffs appealed to the House of Lords.    C

*Guy Aldous Q.C., D. Falconer* and *E. Lauterpacht* for the
appellants.  It does not matter whether the U.S.S.R. or the German
Democratic Republic is the sovereign of the East German
territory.  In neither event can the laws enacted there be treated
as a nullity in this country, for, if the German Democratic    D
Republic is not independent, then the U.S.S.R. is the sovereign
there.  Thus there is no possible point at issue on which the
certificate of the Foreign Secretary can have any effect.  The law
as to the effect of such a certificate is stated in *Duff Development
Co. Ltd.* v. *Government of Kelantan.*[2]

Finding out what is the law of a foreign country means finding    E
out what is the law which the courts of that country in fact enforce.
There might conceivably be a country in which there was no
sovereign at all recognised by Her Majesty's Government de jure
or de facto and the law of that country would be the law in fact
enforced there.  On this aspect of the case the judgment of Cross J.
was right in every respect.    F

As to the Foreign Secretary's certificate of November 6, 1964,
it is only paragraph (*a*) which is of any materiality.  The U.S.S.R.
are in de jure control of the East German Zone as the occupying
power and, so far as the British Government are concerned, only
the U.S.S.R. exercises control there.  The German Democratic
Republic is a mere creature of the U.S.S.R., subservient to it.    G
The House of Lords must interpret the certificate and it should
not be interpreted so as to produce an unreasonable result.  One
must presume that everything is rightly and properly done, unless
the contrary is proved, and that the laws of East Germany are

[2] [1924] A.C. 797, 813, 823–4, 830; 40 T.L.R. 866, H.L.(E.).

A.C.                           AND PRIVY COUNCIL                           861

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A   validly enacted.  The U.S.S.R. is responsible for whatever has
happened there; whatever the German Democratic Republic did,
it did as a dependent entity.  If an occupying power allows an
existing government to pass laws, that is done under the aegis of
the occupying power, and the only government operative in East
Germany is the occupying power.  The appellants argue this case

B   on the footing that what the Foreign Secretary says is the case is
indeed the case.

In the case of the construction of a document the local law is
found by considering how the local courts would interpret it.  In
construing a foreign contract one must give it the sense which the
parties would have understood it to have, and to do that one must

C   go to the foreign law.  That has nothing to do with the question
whether or not the foreign country has been recognised by our
government.  Nor has it anything to do with the question in the
present case what article 113 of the statute of the Stiftung means
to a German.  So long as courts are operating in a country, the
law of it can be ascertained, even if no government at all is

D   recognised by Her Majesty's Government, and it is to that law
that one goes to understand what the parties meant.

It is first submitted that the onus of proof is on the defendants
in every respect: *Russian Commercial and Industrial Bank* v.
*Comptoir d'Escompte de Mulhouse*.[3]  A person who brings an
action is assumed in English law to have authority to do so.  The

E   appellants say that the power of attorney under which this action
was brought was a good power.  The onus is on the respondents
to prove the contrary.

The second submission is that what foreign law is must be
proved by proper evidence: *Lazard Brothers & Co.* v. *Midland
Bank Ltd.*[4]  The present case must depend on the interpretation

F   of the statute of the Stiftung in the light of German law at the
material time.  See *Banco de Bilbao* v. *Sancha*.[5]

Here there is a recognised government in de facto control of
East Germany, the U.S.S.R.  The statute of the Stiftung and its
operation must be interpreted so as to have regard to the law
prevailing from time to time at Jena.  That is the law which the

G   U.S.S.R. has applied.  If an occupying power does not suspend
the law operating in the territory which it occupies, the courts
validly administer the law under the authority of that sovereign,

³ [1925] A.C. 112, 119, 129, 140;    ⁵ [1938] 2 K.B. 176, 194–5; 54
40 T.L.R. 837, H.L.(E.).              T.L.R. 603; [1938] 2 All E.R. 253,
⁴ [1933] A.C. 289, 297–8; 49         C.A.
T.L.R. 94, H.L.(E.).

H. L. (E.)
1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

who permits it to continue. In East Germany there are courts of    A
law, whose authority stems from the fact that the U.S.S.R. permits
them to operate. Whatever the U.S.S.R. might say to the contrary,
that is the factual position. The source of the law which the
courts administer is irrelevant. That law may be judge-made or
customary and need not be enacted. There is evidence that under
East German law the Council of Gera was the appropriate party    B
to give the relevant authority. There was evidence that any East
German court would hold that the relevant acts were properly
authorised under the statute of the Stiftung. That law can be
proved as a fact and the English courts will accept the proof. The
law of Formosa could be proved in order to interpret a contract,
even though since 1952 Her Majesty's Government has recognised    C
no government there.

Properly understood, *Aksionairnoye Obschestro A. M. Luther
v. James Sagor & Co.*[6] is not contrary to the appellants' submis-
sions: see " Judiciary and Executive in Foreign Affairs " by F. A.
Mann in the Transactions of the Grotius Society, 1943, Vol. XXIX,
pp. 143, 156–9. That case was rightly decided on the facts, but    D
if there had been courts of law in Russia at the time and place
in question and it could have been proved what their ruling would
have been, the decision might have been the other way: see also
*U.S.* v. *Insurance Companies,*[7] and *Sokoloff* v. *National City Bank
of New York.*[8] The American approach could mitigate the
consequences of the extreme application of non-recognition. The    E
courts of a country give validity to those acts which are necessary
to preserve peace and good government and what is lawful is
ascertained by the decisions of the local courts at the particular
time in question.

As to de facto and de jure recognition: see " Recognition " by
Sir John Fischer Williams K.C., Transactions of the Grotius    F
Society, 1929, Vol. XV, pp. 53, 66–70; Oppenheim's International
Law, 8th ed. (1955) Vol. I, pp. 134–6, para. 74 and *Upright* v.
*Business Machines Co. Inc.*[9]

If the House of Lords rejected the appellants' submissions on
this part of the case, it would mean that every judgment in the
courts in East Germany for the last ten years had been a nullity,    G
including decisions on divorces and contracts, and that all officials
appointed had been unlawfully appointed and that, for example, all

---

[6] [1921] 1 K.B. 456, 469–72; 37        [8] (1924) 145 N.E. 917.
T.L.R. 282; [1921] 3 K.B. 532,           [9] (1961) 13 App.Div. 2nd 36; 213
546–7; 37 T.L.R. 777, C.A.               N.Y. 2nd 417.
    [7] (1874) 89 U.S. 99.

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A marriages before those officials were invalid. This is avoided by accepting that the laws are valid because they derive their authority from the only valid government in East Germany, the U.S.S.R.

The recognition point, which was not taken in the court of first instance, should be jealously scrutinised: see *Tasmania* B *(Owners)* v. *City of Corinth (Owners).*[10] There was no evidence before the court that the German Democratic Republic was independent. The evidence was all one way that it was dependent on the U.S.S.R. which remained the occupying power. The respondents have not proved that the laws in question did not validly stem from the U.S.S.R. In their case they make no C distinction between governments which are subservient and those which are not.

Alternatively to the recognition point there is the question whether the Council of Gera was the special board of the Stiftung at the relevant date. That involves a question of the law in force at Jena. There is no doubt that it is, according to the law in force D in East Germany. But if one is to go outside what the courts there would say, the matter is one of construction of the statute of the Stiftung, especially article 113, and in construing it no question of the recognition of the German Democratic Republic arises. The views of Her Majesty's Government on that point have nothing to do with identifying the special board. Once it is identified, it can E sue in this country as the appropriate body to do so: see *Luigi Monta of Genoa* v. *Cechofracht Co. Ltd.*[11] In East Germany the occupying power is still there and the government there is not independent but is subservient. The situation is different from that which prevailed in *Salimoff & Co.* v. *Standard Oil Co. of New York,*[12] but that case is relied on.

F The case for the appellants is summarised in their reasons in their printed case. (1) This action was properly authorised by the Council of Gera as the special board of the Stiftung and the respondents have not proved the contrary. (2) This action was properly authorised by Dr. Schrade under his power of attorney dated June 29, 1951, from the Ministry of Education, Thuringia, G as the special board of the Stiftung at that time, and the respondents have not proved the contrary. (3) This action was properly authorised by the board of management of the optical works of the Stiftung under article 114 of the statute, acting by Dr. Schrade

---

[10] (1890) 15 App.Cas. 223, 225, H.L.(E.).

[11] [1956] 2 Q.B. 552; [1956] 3 W.L.R. 480; [1956] 2 All E.R. 769.

[12] (1933) 186 N.E. 179.

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

as the sole member of that board, and the respondents have not    A
proved the contrary.  (4) This action was properly authorised by
Dr. Schrade as the mandatory or proxy mandatory of that board
under the provisions of article 9 of the statute, and the respondents
have not proved the contrary.  (5) The respondents ought not to
have been allowed to argue in the Court of Appeal a case
inconsistent with, and contrary to, the case which they put forward    B
in the High Court.  (6) The respondents ought not to have been
allowed to take any point in the Court of Appeal which they had
not taken in the High Court and on which all the material facts
were not before the court as completely as would have been the
case if the controversy had arisen in the High Court.  (7) The
respondents had expressly disclaimed the non-recognition point in    C
the hearings before the High Court, and the Court of Appeal ought
not to have allowed them to take that point in the appeal.  (8) It
is implicit in, or, alternatively, not inconsistent with, the Foreign
Office certificate that, so far as laws are recognised by the East
German courts as valid and have not been, or purported to have
been, made by the German Democratic Republic over the last    D
fifteen years, those laws are to be regarded as having been made by,
or with the authority of, the U.S.S.R. and accordingly those laws
are to be regarded as valid.  (9) It is not disputed that the U.S.S.R.,
which is regarded by Her Majesty's Government as de jure
sovereign authority of East Germany, would regard the laws in
question as valid.  (10) Only the U.S.S.R. as the de jure sovereign    E
in East Germany can say that the laws in question are not valid,
and the U.S.S.R. has not done so.  (11) If the validity of the laws
in question had been put in issue by the respondents in the High
Court, the appellants might have been able to adduce evidence to
establish that such laws did in fact derive their authority from
the U.S.S.R. as the de jure sovereign power in East Germany, and    F
the House of Lords should assume that those laws did in fact so
derive their authority.  (12) There was no issue in the High Court
as to the validity of the laws in East Germany and it is unnecessary
for the House of Lords to take notice of the non-recognition point,
since recognition of the laws of East Germany as valid does not
involve taking any view contrary to that of Her Majesty's Govern-    G
ment.  (13) The laws of East Germany can and should be proved
as matters of fact without it being necessary to inquire as to who is
the sovereign power.  (14) Diplock L.J. was in error in holding
that the hearing before Cross J. was conducted on the erroneous
assumption that the German Democratic Republic was recognised

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A    by the Crown as a sovereign state and its government as a sovereign government. (15) In the circumstances and having regard to the evidence filed by them in this application the respondents cannot discharge the onus upon them. (16) The statute of the Stiftung is a private document of a commercial nature and the attitude of Her Majesty's Government as to the recognition or non-recognition of

B    any particular authority is irrelevant to its construction or the intention of the founder. (17) The "highest administrative authorities in Thuringia" for the purposes of article 113 of the statute of the Stiftung are to be ascertained according to the laws of East Germany, and, as a matter of fact, the Council of Gera is the highest administrative authority in that part of Thüringia in

C    which Jena is situate.

*Mark Littman Q.C., Michael Kerr Q.C.* and *T. M. Shelford* for the respondents. The constitutional background of Germany since the war appears from *Rex* v. *Bottrill, Ex parte Kuechenmeister.*[13] Since 1871 Her Majesty's Government has recognised only one German state. Germany is still one, and there are no West German

D    nationals or East German nationals; all are Germans. So the domicile of the foundation, which was incorporated before 1945, is Germany as a whole and the determination of its status and the right to represent it are matters which affect Germany as a whole and which, if arising outside Germany, are within the scope of the Foreign Office communiqué set out in the certificate of November 6,

E    1964. In the determination of such matters the decisions of the courts of the Federal Republic are paramount. The West German decrees to the effect that Heidenheim is the domicile of the foundation are not relied on for the purposes of this summons: see also *Preston (orse Putynski)* v. *Preston (orse Putynska) (orse Basinska)*[14] and Selected Documents on Germany and the Question

F    of Berlin 1944–61 (Cmnd. 1961 No. 1552), p. 43, document No. 9.

*Luther* v. *Sagor*[15] was right in holding that the laws of a state not recognised by His Majesty's Government have no legal effect in an English court which cannot give any effect to them. The law of a subservient state not so recognised does not become the law of the dominant state because it is made under pressure and control

G    of the dominant state. If the new laws of the unrecognised German Democratic Republic are not given any legal effect, hardship, inconvenience or injustice may result in some cases, but there is not a vacuum. The old laws would remain in force, whether

[13] [1947] K.B. 41; 62 T.L.R. 570; [1946] 2 All E.R. 434, C.A.

[14] [1963] P. 141, 151–2; [1963] 2 W.L.R. 1401; [1962] 3 All E.R. 1057.

[15] [1921] 1 K.B. 456, 473–474.

866                        HOUSE OF LORDS                    **[1967]**

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

customary, statutory or judge-made. Appointments of judges **A** under the old laws would be valid, though appointments under the new laws would be invalid.

The question to be decided now is not whether those in West Germany represent the Stiftung, but whether those in East Germany represent it. It might conceivably be held that neither do.

The following propositions are submitted: (1) It is an **B** established rule of constitutional law that it is the sovereign's prerogative to act as the representative of the nation in international affairs. This comes within the province of the sovereign acting through the executive. The matters covered include the question which states and which governments are to be recognised as having sovereign authority in foreign lands.                                **C**

(2) On such matters the views of the sovereign, given through the executive, are decisive. The courts will take judicial notice of the attitude of the executive and, when any doubt exists, will seek information from the executive, and that information is conclusive.

(3) In matters thus within the province of the executive there **D** is a principle established over the last hundred and fifty years that the courts will not speak with a different voice from that of the executive. This principle has been applied to a wide variety of different situations, which include the following: (i) laws purporting to emanate from states or governments unrecognised by Her Majesty have no legal effect in an English court; (ii) an **E** unrecognised government cannot initiate proceedings in an English court; (iii) a party cannot found his case on any contention which involves recognition by an English court of the existence of such a body as having sovereign powers; (iv) these are matters of public policy of which the court will take notice of its own motion, **F** and the court will not decide such matters except on the basis of what it knows or believes to be the true facts.

(4) These principles are probably founded, as a matter of constitutional law, on the fact that in law the courts are the Queen's courts and that she will not speak with one voice through the executive and another through the judges.                        **G**

(5) Whatever its constitutional origins, this is founded on practical policy. Her Majesty's Government must consider many matters besides legal questions, such as injustice to individuals, treaty obligations and political consequences, as also the boundaries and functions of states, for example, whether or not to recognise a division of Germany. This is recognised by the authorities.

A    (6) Non-recognition may create a practical vacuum so far as enforcement in an English court is concerned. But all the law already established in the area goes on in the country itself. The law in the Eastern Zone is the law at the end of the Hitler regime, save so far as it has been changed by the United States or the Soviet military administrations; for example, the German Civil Code continues in force.

B    (7) As to retroactivity: (a) When a non-recognised state becomes recognised, the English courts are bound to treat the acts of the government as valid, with retroactive effect. (b) The judiciary is dependent on the Crown and in effect the act of recognition compels the courts to apply a different set of laws from that which

C    they would otherwise apply. (c) The recognition brings in acts emanating from a state which was formerly unrecognised. It is wrong to say that if there is a sovereign recognised de jure, the courts regard everything done in that territory as having been done by that sovereign. In the present case three possible positions can be put forward: (i) that everything in East Germany is done by

D    the U.S.S.R.; (ii) that what exists there is a usurping government purporting to be making laws but in fact acting without the consent of the de jure government; or (iii) that the de facto power is acting with the consent of the de jure government.

     (8) The court cannot let this action continue for these reasons: (i) The appellants cannot rely on the Council of Gera as giving

E    authority for this action as the special board of the Stiftung without showing that it is indeed the special board. They have to show that the Council of Gera exists and exercises governmental functions. It is essential for them to set up the decree of 1952, but that decree purports to be a decree of the German Democratic Republic and the appellants do not rely on it because it emanates

F    from a state not recognised by Her Majesty's government either de jure or de facto. (ii) This case goes further than *Luther* v. *Sagor* [16] and is a fortiori because the recognition of the Council of Gera as a governmental body would involve the recognition of an organ of an unrecognised state. (iii) To allow that the Council of Gera was a proper body to institute proceedings for the Stiftung

G    would be to recognise the authority of an unrecognised state to institute proceedings in English courts. (iv) Such proceedings as the present would not only be brought by an unrecognised state or government but would be for its benefit, because the effect of the action succeeding would be that the organs of the unrecognised

[16] [1921] 1 K.B. 456; [1921] 3 K.B. 532.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

H. L. (E.)
1966
───
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
───

state could run the Stiftung's affairs.  (v) There is no justification   A
for holding that the decree of 1952 is to be treated as a law of the
U.S.S.R. or otherwise as deriving legislative authority from the
U.S.S.R.  That would be contrary to the terms of the Foreign
Secretary's certificate and the decree itself.  In substance and effect
this would put the German Democratic Republic on a par with a
recognised state.                                                         B

The authorities on the general law are Dicey's Conflict of
Laws, 7th ed. (1958), pp. 662–4; Oppenheim's International law,
8th ed. (1955), Vol. I, pp. 765–6; Lauterpacht's Recognition in
International Law (1947), pp. 44, 70–1, 72–3, 145–50, 154, 156–7.
*City of Berne* v. *Bank of England* [17]; *Jones* v. *Garcia del Rio* [18];
*Thompson* v. *Powles* [19]; *Taylor* v. *Barclay* [20]; *Republic of Peru* v.   C
*Dreyfus Brothers & Co.* [21]; *Mighill* v. *Sultan of Johore* [22]; *Foster*
v. *Globe Venture Syndicate Ltd.*[23]; *The Gagara* [24]; *The Annette* [25];
*The Lomonsoff* [26]; *Luther* v. *Sagor* [27]; *White, Child & Beney Ltd.*
v. *Simmons* [28]; *Banque Internationale de Commerce de Petrograd*
v. *Goukassow* [29]; *Duff Development Co. Ltd.* v. *Government of
Kelantan* [30]; *Russian Commercial and Industrial Bank* v. *Comptoir*   D
*d'Escompte de Mulhouse* [31]; *Lazard Brothers & Co.* v. *Midland
Bank Ltd.*[32]; *Banco de Bilbao* v. *Sancha* [33]; *The Arantzazu
Mendi* [34]; *Gdynia Ameryka Linie Zeglugowe Spolka Akcyjna* v.
*Boguslawski.*[35]

There is nothing in English law which raises the possibility of
an exception to the rule stated by the respondents.                       E

As to the American position: see Professor D. P. O'Connell
on International Law (1965), Vol. I, pp. 189–99.  American law on
this point is not wholly settled or clear, but it is not established
that it is different from English law in this respect: see *The
Maret* [36]; *Russian Socialist Federated Soviet Republics* v.            F

[17] (1804) 9 Ves. 347.
[18] (1825) Turn. & R. 297.
[19] (1828) 2 Sim. 194.
[20] (1828) 2 Sim. 213, 220–1.
[21] (1888) 38 Ch.D. 348, 358–9; 4 T.L.R. 333.
[22] [1894] 1 Q.B. 149; 10 T.L.R. 115, C.A.
[23] [1900] 1 Ch. 811, 814–5.
[24] [1919] P. 95; 35 T.L.R. 259, C.A.
[25] [1919] P. 105.
[26] [1921] P. 97, 105; 37 T.L.R. 151.
[27] [1921] 1 K.B. 456; [1921] 3 K.B. 532, 540, 545, 546–7, 547–8, 549, 551, 559.

[28] (1922) 127 L.T. 571, 583; 38 T.L.R. 616, C.A.
[29] [1923] 2 K.B. 682; 691–2, C.A.
[30] [1924] A.C. 797, 827–8.
[31] [1923] 2 K.B. 630, 636, 663; 39 T.L.R. 574, C.A.; [1925] A.C. 112, 123–4.
[32] [1933] A.C. 289, 297–8.
[33] [1938] 2 K.B. 176, 195–6.
[34] [1939] A.C. 256, 264; 55 T.L.R. 455; [1939] 1 All E.R. 719, H.L.(E.).
[35] [1953] A.C. 11, 30, 44–5; [1952] 2 T.L.R. 317; [1952] 2 All E.R. 470, H.L.(E.).
[36] (1944) 145 Fed. 2nd 431.

G

A  *Cibrario* [37]; *Banco Nacional de Cuba* v. *Sabbatino* [38]; *Petrogradsky Mejdunarodny Kom. Merchesky Bank* v. *National City Bank of New York* [39]; and *In the Estate of Luks*.[40]  In cases in which the courts have refused recognition of a foreign law, it was not because of the objectionable character of the law but because the body which made it had no power to do so.  This applied equally to a

B  marriage law and a confiscatory law.

By refusing recognition to a foreign government for a prolonged period one is sending the government to Coventry and putting it to inconvenience which may produce hardship for individual persons, including British subjects, but this may be in accordance with the policy of Her Majesty's Government and

C  follows from the doctrine of non-recognition.

As to the American cases cited for the appellants, see how *U.S.* v. *Insurance Companies* [41] was dealt with in O'Connell on International Law (1865) Vol. I, pp. 189–90.  Lauterpacht on Recognition, p. 146, shows that this case is not an authority for the exception contended for by the appellants.  *Sokoloff's* case,[42]

D  also relied on by the appellants, indicates no more than the possibility of an exception.  Too much must not be extracted from *Salimoff's* case [43]: see Lauterpacht on Recognition, pp. 147–8.  It is very far away from the present case, which stands on its own in view of the form of the certificate.  *Uprights* case [44] was not concerned with the validity or invalidity of foreign legislation: see

E  also *Baldy* v. *Hunter* [45]; *MacLeod* v. *United States* [46]; *Fred S. James & Co.* v. *Second Russian Insurance Co.* [47]; *Banque de France* v. *Equitable Trust Co. of New York*.[48]

Once there is recognition, the American courts will not inquire into the validity of a foreign act of state, unless the United States

F  Government intimates that it has no objection to their doing so.

Foreign laws will only be enforced on the ground of comity and, in the absence of recognition of the foreign state, there is no comity.  The inconveniences of non-recognition are always urged in favour of recognition.  During the last 150 years the principle has been worked out that not recognising a state necessarily

G  involves not recognising any laws which it has purported to make.

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

[37] (1923) 139 N.E. 259.
[38] (1964) 376 U.S. 398, 410–411.
[39] (1930) 170 N.E. 479, 481 et seq.
[40] (1965) 45 Misc. 2nd 72; 256 N.Y. 2nd 194.
[41] 89 U.S. 99.
[42] 145 N.E. 917.
[43] 186 N.E. 179.
[44] 13 App.Div. 2nd 36; 213 N.Y. 2nd 417.
[45] (1898) 171 U.S. 388.
[46] (1913) 229 U.S. 416.
[47] (1925) 146 N.E. 369.
[48] (1929) 33 Fed. 2nd 202.

H. L. (E.)
1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

An unrecognised government is not always evil nor a recognised    A
government always good.

As to the respondents' submission (8), in order to bring the
action the appellants must show that they have the characteristics
specified in the statute of the Stiftung and that they have been
appointed in accordance with it. *In order to do this, they must*
rely on the decree of 1952. But that decree was part of the    B
setting up of the new order in East Germany and indicates the
highly political character of the special board so appointed.
The members of the Council of Gera are bound as communists to
obey the directions of the East German government. The courts
of East Germany are also influenced by political considerations.
As to this aspect of the case: see what Cardozo C.J. said in the    C
*Petrogradsky* case.[49]  Even if the respondents are wrong in sub-
mitting that *Luther* v. *Sagor*[50] is subject to no exception, a law
of this character cannot come within that case. Here there is an
unrecognised decree by an unrecognised government, relating to
that government. There is no authority in English or United
States law for treating it as an exception to the principle that such    D
laws have no effect in an English court. This action is in effect an
attempt by an unrecognised government to extend the original
confiscations of 1945. English courts will not help to enforce
foreign confiscatory laws and therefore will not give the appellants
the relief they seek.

As to the *Luigi Menta* case,[51] that was correctly dealt with in    E
the Court of Appeal in the present case.[52]

No inference is to be drawn from the evidence that Her
Majesty's Government regards any body purporting to act as a
law-making body in Eastern Germany as the alter ego of the
U.S.S.R. It does not regard the U.S.S.R. as governing through
the German Democratic Republic. Accordingly, the English courts    F
should not treat whatever is done by that body as being done on
behalf of the U.S.S.R. That government is nothing at all if it
does not draw its authority from the U.S.S.R. But there is no
evidence of any delegation to it from the U.S.S.R. On the contrary,
both claim that it is absolutely independent. There is no principle
which would allow the English courts to say that, although the law    G
in question is not a law of the U.S.S.R., it is to be treated as such.
In the eyes of the U.S.S.R. this is not a law of the Soviet
Government nor of the Soviet occupying authority.

[49] 170 N.E. 479, 481.
[50] [1921] 3 K.B. 532
[51] [1956] 2 Q.B. 552.
[52] [1965] Ch. 596, 652, 663; [1965]
2 W.L.R. 227; [1965] 1 All E.R.
300, C.A.

H. L. (E.)

1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

A     The appellants have contended that, even if the Council of Gera could not be relied on as providing authority to bring the action, Dr. Schrade had sufficient authority under his power of attorney. But, in the absence of special rules of construction, that foreign document must be construed according to English principles, since prima facie foreign law is presumed to be the same
B     as English law. On that approach, the relevant organ of the Stiftung could not make a wholesale delegation of its powers to an individual any more than an English board of directors could so delegate its powers unless there was in the articles of association power to do so: see Dicey's Conflict of Laws, 7th ed., p. 1107; *In*
C     *re Parana Plantations Ltd.*[53] and *Rouyer Guillet et Cie* v. *Rouyer Guillet & Co. Ltd.*[54] In the statute of the Stiftung there is no contemplation of a board consisting of one person and Dr. Schrade could not constitute a quorum capable of making a resolution on behalf of the board.

     *Michael Kerr Q.C.* following: The argument that the German
D     Democratic Republic acted as agent for the U.S.S.R. is unacceptable. (1) It rests on no basis of legal principle known to the law and is not a necessary consequence of the Foreign Office certificate. (2) Its acceptance would involve the drawing of inferences, unsupported by any evidence, which are of a political nature and an indeterminate character. (3) Its acceptance would have far
E     reaching and unintended consequences. (4) There is no ground of law or public policy which should incline the courts to give effect to it.

     As to (1), the act of A cannot be attributed to B or deemed to be the act of B unless there exists one of two factual situations, either (a) that B expressly or impliedly authorised A to act on his
F     behalf, in which case the court must be satisfied that the authority has been proved and also that the intention of the parties to stand in a principal and agent relationship is proved, or (b) that when A performed the act on behalf of B he had no authority to do so but that B subsequently ratified his act. It is not sufficient that A intends to act on B's behalf if he does not say so and if there is
G     no ratification. A power of control and domination, however great, does not in English law result in a legal attribution of A's acts to B. In international law there is no principle which entitles a court to attribute to a de jure sovereign acts done within his territory. His attitude is quite irrelevant. That follows

[53] [1946] 2 All E.R. 214, 217, C.A.          [54] [1949] 1 All E.R. 244, C.A.

872                    HOUSE OF LORDS                    **[1967]**

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

from the principle in *Luther* v. *Sagor*.[55] The argument that an    A
ostensible situation is a sham has never been used to validate an
act; it has only been used to invalidate what the parties have done.

As to (2), if the House of Lords were to hold that the substance
was different from the appearance in relation to the grant of
independence to the German Democratic Republic, that would be
a political inference in a manner not dealt within the evidence of    B
either party to this case. The House of Lords could ask the
Foreign Secretary whether the indirect rule in East Germany which
is suggested is factual.

(3) As to the consequences of accepting the submission, in this
situation the English courts would be obliged to accord to the
laws of the unrecognised East German Republic the same    C
recognition as is accorded to those of a recognised state. Laws
made by the U.S.S.R. in this indirect way would be quite different
from laws which they were entitled to make under the Berlin
Declaration, and the English courts would have to recognise as valid
any laws so made, whether or not they fall within the province of
the rights of the U.S.S.R. Under that declaration the U.S.S.R. had    D
no power to set up the German Democratic Republic. The
phenomenon of powerful states dominating small states is world
wide, for example, Hungary or Panama. The only question is:
does the law in question purport to be that of the duly recognised
de jure government? If it purports to be, then it is recognised as
the law of that government. But, if that government says that it    E
did not make that law and the subordinate government says that it
made the law, then there is no principle by which it can be treated
as a law made by the de jure government merely because the latter
would be entitled to legislate. There is no presumption that any
act which takes place in the territory of a de jure sovereign is his
act. On the basis of the appellants' argument the English courts    F
might have to recognise the legislation of any unrecognised govern-
ment. The present position is analogous to that which arises when
rebels have gained control of part of a sovereign's territory. The
government they set up can derive no authority from the de jure
sovereign and its acts and those of its officers must be treated as
nullities until Her Majesty's Government have given it de facto    G
recognition.

(4) The only safe legal basis is to ask: has this been proved to
be the act of the U.S.S.R.? If the answer is "No," there is no way
in which this law can be attributed to the U.S.S.R.

[55] [1921] 3 K.B. 532.

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A   *Guy Aldous Q.C.* in reply.   One must see exactly what the Foreign Office certificate proves: see J. L. Brierley's Law of Nations, 6th ed. (1963), pp. 146-8.   The practice of the British Government in recognising Governments de jure or de facto is stated.   Recognition does not depend on whether or not Her Majesty's Government likes the particular foreign government.

B   The certificate of September 16, 1964, shows that the German Democratic Republic is not so recognised, and that as a fact there has been no abdication by the U.S.S.R.   The factual position shown by the Foreign Office certificate must be accepted.   The U.S.S.R. cannot, by setting up what in the eyes of Her Majesty's Government is a sham régime, force other countries to accept that

C   the laws made in the name of that régime were not the act of the U.S.S.R., which is responsible for all that goes on in Eastern Germany.   When a hired servant gives orders to under-servants, his orders are valid because they stem from the master.

The Stiftung is entitled to institute proceedings to protect its name and goodwill.   Under article 4 of its statute the special board has a general power in this connection, which is not restricted by

D   anything in article 8.   The boards of management of the optical works and glass works continue to exist at Jena and have approved the institution of these proceedings.   The meaning of the statute is not controlled by the attitude of Her Majesty's Government on the question of recognition and should be construed without

E   regard to it.

The relevant law is the German law in force at Jena.

*Mark Littman Q.C.* submitted that the following questions should be put to the Foreign Office: " (1) (a) Does Her Majesty's Government recognise the U.S.S.R. as being not only de jure entitled to exercise governing authority in the said zone but also

F   as in fact doing so?   (b) Does Her Majesty's Government recognise the U.S.S.R. as exercising such authority in the said zone, if at all, (inter alia) through the instrumentality of the so-called ' German Democratic Republic '?   (2) Does Her Majesty's Government recognise the purported legislation of the ' German Democratic Republic ' as lawful acts done by or on behalf of the U.S.S.R.

G   as de jure entitled to exercise governing authority in the said zone?"

*Guy Aldous Q.C.*   Questions of law which arise from recognition are for the court and not for the Foreign Office to determine.   The answers already given by the Foreign Office go as far as they can go.   The situation is clearly defined in Selected Documents on Germany and the Question of Berlin 1944–1961 (Cmnd. 1961 No.

874                         HOUSE OF LORDS                    **[1967]**

H. L. (E.)    1552) at p. 188 (Document No. 67 Joint Declaration of the Allied    A
1966          High Commission on the Status of East Germany, April 8, 1954).
───────       This indicates that the U.S.S.R. is the only sovereign in East
Carl Zeiss    Germany.  The further questions should not be put to the Foreign
Stiftung      Office.
*v.*
Rayner &          [LORD REID intimated that in the opinion of their lordships the
Keeler Ltd.   further questions should not be put.]                               B
(No. 2)
───────           [The hearing of arguments arising on the cross-notice were
              adjourned to the next sittings.]

              January 21, 1966.  *Guy Aldous Q.C.*  It is submitted that the
              appellants have the right to open this point.

              *Mark Littman Q.C.*  The respondents appealed against the
              cross-notice by the other side.  The Court of Appeal considered    C
              only the recognition point and delivered no decision on the other
              points, which were not argued.  This is the respondents' first
              opportunity to appeal on this point.

              [LORD REID.  In the special circumstances, it is better that the
              respondents should open this point and reply.]
                                                                                  D
              *Mark Littman Q.C.*  For the purposes of this part of the
              argument, it must be assumed that the Council of Gera exists and
              is the highest legal authority in Thuringia and is capable of acting
              as the special board.

              There have been conflicting decisions of the courts in West and
              East Germany, the former in effect deciding in favour of the
              respondents' contentions and the latter deciding in favour of those   E
              of the appellants.  This is a question of foreign law and the relative
              priority of the two decisions must be considered.  The judgment
              of the West German court should be given priority as res judicata
              or by estoppel.

              As to estoppel, it is submitted, first, that the West German       F
              court had jurisdiction, since all the parties submitted to it.  The
              eventual decision was framed in the sense required by the law of
              estoppel and it cannot be challenged on the ground that it was
              wrong or applied the wrong law.  No estoppel arises from the
              decision in East Germany because the respondents were not parties
              to the proceedings there and the judgment was a default judgment.    G
              The courts there had no jurisdiction and the respondents never
              purported to submit to their jurisdiction.

              Secondly, the judicial system of a country is an aspect of its
              sovereignty, as much so as its legislature.  One must contrast the
              recognition afforded to the U.S.S.R. in relation to East Germany
              and that accorded to the Federal Republic of West Germany.

A    The U.S.S.R. is recognised as the occupying power and it exercises governing power within its zone in zonal matters, but it is not recognised as having power to act or speak in any matter affecting Germany as a whole. But the Federal Republic is recognised as a fully sovereign state, the state of Germany, which has been uninterruptedly recognised by the Foreign Office since 1871. It is

B    entitled to speak for Germany as a whole in international affairs: see the communiqué of September 19, 1950, referred to in the Foreign Office certificate of November 6, 1964. The present dispute is not a purely zonal matter, but affects Germany as a whole and is, moreover, an international matter. The basic issue concerns the interpretation of German law, as distinct from zonal law. It

C    concerns the right to represent a foundation which was established, not during the occupation under a new U.S.S.R. law, but many years ago under the laws of Germany. This foundation has operated, not only in the Soviet Zone, but throughout Germany and the world. This dispute concerns the right to represent the foundation outside the Soviet Zone and outside Germany alto-

D    gether. It concerns assets in England and not in the Soviet Zone. It concerns the relative authority of the Supreme Court of the Soviet Zone and the Supreme Court of the Federal Republic when dealing with such matters. The views of the Supreme Court of the Federal Republic should be treated in England as authoritative. The courts in East Germany are influenced by

E    political considerations.

    In English law the question who is entitled to represent a corporation depends on the law of the country where it is domiciled, that is, to which it owes its existence. The law of the domicile of this foundation is German law.

    The issues in this application are res judicata as between the

F    parties thereto by reason of the judgment of the Supreme Court of the Federal Republic, because this issue is the same as the issue which was decided by the court. As to res judicata, see Halsbury's Laws of England, 3rd ed., Vol 15 (1956), p. 168, para. 334; p. 181, para. 355; p. 210, para. 393; Dicey's Conflict of Laws, 7th ed., p. 196 et seq. and Spencer Bower on Res Judicata, p. 91, para. 141.

G    The issue on the summons of February 7, 1956, now in question is between the defendants and some other person. But who is that person? Not the nominal plaintiff, the Stiftung, because if the issue were decided in favour of the defendants, it would establish that the nominal plaintiff was never before the court at all. The Council of Gera was a party to the German proceedings

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

H. L. (E.)
1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

and can be regarded as parties to the present proceedings. This      A
is not a narrow technical point; it bears on the policy of the courts
to see that there is an end of litigation. Suppose the Council of
Gera was not a party and the solicitors were, estoppel affects, not
only the parties to proceedings, but also their privies, and in the
present case the solicitors were privies to the Council of Gera.
They claim the rights they are asserting because they derive them      B
from the Council of Gera: see Halsbury's Laws of England, 3rd
ed., Vol. 15, p. 196, para. 372; *Hancock* v. *Welsh* [56]; *Kinnersley*
v. *Orpe* [57] and Spencer Bower on Res Judicata, pp. 130–1, paras.
205, 206.

There is privity of interest between the solicitors and the
Council of Gera, since they are representing its interests. The      C
object of estoppel is to prevent substantially the same people
litigating the same matter twice. Here the very same issue has
already been decided by the courts in both East and West
Germany. That issue was whether the events of 1948 paralysed
the organs of the foundation in East Germany. The solicitors
have no authority to conduct these proceedings on behalf of the      D
appellants, because they are estopped by the judgment of the
Supreme Court of the Federal Republic in an action brought in
the name of the present appellants against the present respondents.

As to res judicata, see *Connelly* v. *Director of Public Prosecu-
tions* [58] and *Fidelitas Shipping Co. Ltd.* v. *V.O. Exportchleb*. [59]

If it is necessary to look behind the judgment of the West      E
German court to the underlying issue. That can be done, since issue
estoppel is part of the law of England. It is submitted (1) that
res judicata applies not only to the cause of action but also to the
issues; (2) that one is not restricted to looking at the formal order
and (3) that the other material to be looked at includes the plead-
ings and the reasons of the judge. The matter often arises in the      F
Divorce Division: see Spencer Bower on Res Judicata, p. 3, para.
6; pp. 8–9, para. 13; p. 102, para. 158; p. 112, para. 170; pp. 113–5,
paras. 173–5. It is not suggested that there are special facts
applicable in England which were not applicable in West Germany,
so that one can look to see whether the decision there rested on
any such special facts.      G

The principle of res judicata is correctly set out in Phipson on
Evidence, 10th ed. (1963), p. 518, para. 1363. The relevant

[56] (1816) 1 Stark. 347.
[57] (1780) 2 Dougl. 517.
[58] [1964] A.C. 1254; 1353 et seq;
[1964] 2 W.L.R. 1145; [1964] 2 All
E.R. 401, H.L.(E.).

[59] [1966] 1 Q.B. 630, 641–2; [1965]
2 W.L.R. 1059; [1965] 2 All E.R. 4,
C.A.

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A authorities are *Reg.* v. *Inhabitants of the Township Hartington Middle Quarter* [60]; *Flitters* v. *Allfrey* [61]; *Hunter* v. *Stewart* [62]; *Hoystead* v. *Commissioner of Taxation* [63]; *Marginson* v. *Blackburn Borough Council* [64]; *Bright* v. *Bright* [65]; *Thompson* v. *Thompson* [66]; *Warren* v. *Warren* [67]; *Thoday* v. *Thoday* [68]; *Fidelitas Shipping Co. Ltd.* v. *V.O. Exportchleb* [69]; *Randolph* v. *Tuck* [70]; *Penn-Texas*

B *Corporation* v. *Murat Anstaldt (No. 2)* [71]; *Henderson* v. *Henderson* [72]; *Ellis* v. *M. Henry* [73]; *Castrique* v. *Imrie* [74]; *New Brunswick Railway Co.* v. *British & French Trust Corporation Ltd.* [75]; *In re Dulles' Settlement (No. 2)* [76] and *Ricardo* v. *Garcias.* [77]

As to the question who are parties or privies, see Spencer Bower on Res Judicata, pp. 126–7, paras. 197–8, and the sum-

C mary of the American authorities in the American Restatement of the Law (Judgments) (1943), ss. 79, 83, 84 and 85. " Privy " covers a person who is in control of the proceedings. If the Council of Gera would have been estopped from putting forward this claim, the solicitors whom they have instructed are also estopped. It is enough that they have been professionally employed; they are

D representing the same interest. The term " party " includes servants. *Laidlaw* v. *Blackwood* [78] is distinguishable on the facts.

As to foreign judgments, see *Henderson* v. *Henderson* [79]; *Kok Hoong* v. *Leong Cheong Kwang Mines Ltd.* [80] and *Bank of Australasia* v. *Nias.* [81] The English courts will not treat a foreign judgment as ineffective for the purposes of estoppel just because,

E in the opinion of the English court, it is wrong, or a wrong system of law was applied according to foreign rules on conflict of laws, or the foreign court adopted an incorrect view on some point of

---

[60] (1855) 4 E. & B. 780.
[61] (1874) L.R. 10 C.P. 29, 40.
[62] (1861) 4 De G. F. & J. 168, 178.
[63] [1926] A.C. 155, 163–8; 42 T.L.R. 207, P.C.
[64] [1939] 2 K.B. 426, 435–6; 55 T.L.R. 389; [1939] 1 All E.R. 273, C.A.
[65] [1954] P. 270, 272–4, 280–1; [1953] 3 W.L.R. 659; [1953] 2 All E.R. 939.
[66] [1957] P. 19, 28–9, 36–7, 38, 44; [1957] 2 W.L.R. 138; [1957] 1 All E.R. 161, C.A.
[67] [1962] 1 W.L.R. 1310, 1312, 1313; [1962] 3 All E.R. 1031.
[68] [1964] P. 181; [1964] 2 W.L.R. 371; [1964] 1 All E.R. 341, C.A.
[69] [1966] 1 Q.B. 630, 640, 641–2.
[70] [1962] 1 Q.B. 175, 182–3, 184; [1961] 2 W.L.R. 855; [1961] 1 All E.R. 814.

[71] [1964] 2 Q.B. 647; [1964] 3 W.L.R. 131; [1964] 2 All E.R. 594, C.A.
[72] (1843) 3 Hare 100.
[73] (1871) L.R. 6 C.P. 228.
[74] (1869) L.R. 4 H.L. 414, H.L.(E.).
[75] [1939] A.C. 1, 19–20, 20–21, 23, 35; T.L.R. 360; [1938] 4 All E.R. 747, H.L.(E.).
[76] [1951] Ch. 842, 851; [1951] 2 T.L.R. 145; [1951] 2 All E.R. 9.
[77] (1845) 12 Cl. & F. 368, 387, H.L.(E.) 69, C.A,
[78] (1843) 15 Sc.Jur. 484.
[79] 3 Hare 100, 113–15; (1844) 6 Q.B. 288, 296 et seq.
[80] [1964] A.C. 993, 1010–11; [1964] 2 W.L.R. 150; [1964] 1 All E.R. 300, P.C.
[81] (1851) 16 Q.B. 717, 734–5.

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A    English law. But if the proceedings of the foreign court were contrary to natural justice, that would justify an English court in refusing to have regard to its judgment. Or, if the English court were satisfied that the foreign court was not trying to apply the law, it would take that into account. But none of these considerations are relevant to the present case: see Spencer Bower on Res Judicata, p. 162, para. 272; *Luther* v. *Sagor* [82] and *Godard* v. *Gray*.[83]

B    As to the position of the first and second defendants, Cross J. said in his judgment [84] that they could not invoke the doctrine of res judicata. But the defendants and each of them have been acting in concert and jointly and they are within the category of privity. The principle is broad enough to cover this case. The action is brought against the three defendants as joint tortfeasors in respect of a matter in which they have acted in concert and they have identical interests so as to come within the rule, the object of which is to prevent a plaintiff from relitigating a matter with the person with whom he has already litigated it and also to prevent him getting in by the back door by suing persons who are jointly liable with the person he has already sued: see Spencer Bower on Res Judicata, p. 126, para. 197; pp. 127–8, para. 198; pp. 130–1, para. 206; and *Flitters* v. *Allfrey*.[85]

So far as the opinion delivered by the East German Court is concerned, the respondents were not parties to it and it was delivered without jurisdiction. Dicey on Conflict of Laws, 7th ed., pp. 1016–7, rule 189, sets out the five cases in which a foreign court has jurisdiction to give a judgment in personam which is capable of enforcement or recognition in England. That judgment comes within none of them: see also pp. 1018–9, 1027–8. The relevant cases are *Emanuel* v. *Symon* [86]; *In re Dulles' Settlement* (*No. 2*) [87] and *In re Trepca Mines Ltd.*[88]

The judgment of the Federal Supreme Court was delivered on November 15, 1960. That of the Supreme Court of the German Democratic Republic was delivered on March 23, 1961. Therefore, it was too late for the latter judgment to create an estoppel since there cannot be two estoppels per rem judicatam: see Spencer Bower on Res Judicata, pp. 160–1, paras. 266, 267.

The West German judgment should be preferred to the East German judgment (1) on the ground of estoppel; (2) on the ground

[82] [1921] 3 K.B. 532, 558–9.
[83] (1870) L.R. 6 Q.B. 139, 148–9.
[84] [1964] R.P.C. 299, 333.
[85] L.R. 10 C.P. 29, 41.

[86] [1908] 1 K.B. 302, 309–10; 24 T.L.R. 85, C.A.
[87] [1951] Ch. 842.
[88] [1960] 1 W.L.R. 1273, 1280–1; [1960] 3 All E.R. 304, C.A.

A.C.                AND PRIVY COUNCIL                        879

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A  of the Foreign Office certificate and (3) on the ground of the intrinsic merit of the judgment.

The following questions should be put to the Foreign Office: (1) Does Her Majesty's Government recognise that the determination of the status of and the right to represent a body under the law of the State of Germany prior to 1945 and now having its Sitz
B  in the territory of the zone allocated to the U.S.S.R. are matters (a) which affect Germany as a whole and (b) which, if arising outside Germany, are within the scope of the communiqué dated September 19, 1950, as referred to in the answer to question 2 in the certificate dated November 6, 1964? (2) What states, governments or authorities now functioning in Germany or any parts of
C  it does Her Majesty's Government recognise as entitled to determine any such matter as is referred to in question 1?

[LORD REID intimated that in the opinion of their Lordships these questions should not be put.]

As to the effect which English courts should give to decisions of foreign courts on a matter of foreign law, see *Guaranty Trust*
D  *Co. of New York* v. *Hannay & Co.*[89]; *Bankers and Shippers Insurance Co. of New York* v. *Liverpool Marine & General Insurance Co. Ltd.*[90] and *Evera S.A. Commercial* v. *Bank Line Ltd.*[91]

Her Majesty's Government recognises the Soviet Government as de jure entitled to govern in East Germany. The government
E  of West Germany is recognised as a sovereign body. The situation is that the courts in East Germany are saying one thing and those in West Germany another. There are no special statutes in the Eastern Zone applying to this matter and so the law which should be applied there is the German Civil Code and the articles of association of the Stiftung. The English courts are here concerned
F  with the law of Germany as to the right to represent a German corporation. This depends on the law of the domicile of the corporation as understood in English private international law: see Dicey's Conflict of Laws, 7th ed., p. 477, rule 76. If a French corporation was required to have its central office in Burgundy, it would be regarded as incorporated under the law of France, not of Burgundy. Since the incorporation of the Stiftung the
G  original principalities have become part of the single state of Germany and, when the German Civil Code came into existence,

[89] [1918] 2 K.B. 623, 637–8; 34 T.L.R. 427, C.A.
[90] (1926) 24 Ll.L.R. 85, 87, 92, 93, H.L.(E.).
[91] [1961] 1 Lloyd's Rep. 231, H.L.(E.).

HOUSE OF LORDS    **[1967]**

H. L. (E.)
1966
———
Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)
———

A

it applied to existing foundations and still applies. This foundation was not domiciled in one part of Germany, as distinct from Germany as a whole. Even if the *Stiftung* had its centre of gravity at Jena, that did not so locate it there that its capacity to act through its organs depended on the law of that particular part of Germany. The law which governs the whole of Germany must be distinguished from the local laws passed in the different zones, for example, the Soviet Zone.

B

The English courts recognise the U.S.S.R. as the occupying power in their Zone but their authority is restricted to matters not affecting Germany as a whole. But they recognise the Federal Republic of Germany as a fully sovereign state, the only German government entitled to speak as representative of the German people in international affairs and the successor of the Weimar Republic. The present matter is not purely zonal, but concerns Germany as a whole and comes within the category of an international affair within the declaration of September 19, 1950. There is no question of the meaning and effect of zonal law and it concerns an old foundation, not established under the authority of the U.S.S.R., which operated throughout Germany and the world and not just in the Soviet Zone. The question is not as to the right to represent that body in the Soviet Zone but as to the right to represent it in the international sphere outside Germany. It concerns its assets in the international sphere and not just in the Soviet Zone. It raises the problem of the relative authority of the courts in East Germany and of those of the Federal Republic of Germany. The latter have the higher claim to authority in these matters: see the Reciprocal Enforcement of Judgments (Germany) Order, 1961 (S.O. 1961 No. 1199) Schedule, articles I (3), III, IV and V (1). There is no comparable arrangement for the recognition of the courts and judgments of East Germany. This is another indication of the high degree of recognition granted by Her Majesty's Government to the Federal Republic of Germany. If there is any doubt or ambiguity in the Foreign Office certificate already given, it can be resolved by inviting a further answer from the Foreign Office.

C

D

E

F

In the case before the Federal Supreme Court the right questions were put and the contentions were fairly stated and understood. The reasoning of the judgment was cogent and its conclusions were correct. But, whether they were correct or not, the court was entitled to treat the law of East Germany, not as foreign law but as something of which it could take judicial notice.

G

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A    As to the confiscation point, a decree made in East Germany has purported to extend the confiscation of all the property of the Stiftung to its assets in England. The English courts will not give effect to such legislation: see *Leconturier* v. *Rey*.[92] They will look behind the formal relationships of the parties to the action. So that if a decision of a foreign court giving effect to confiscatory legislation is on the face of it delivered in relation to a contract

B    or a liquidation, the English courts will look behind these to the reality of the situation: see *Banco de Vizcaya* v. *Don Alfonso de Bourbon y Austria*[93]; *Government of India, Ministry of Finance (Revenue Division)* v. *Taylor*[94] and an article on "Prerogative Rights of Foreign States and the Conflict of Laws" by Dr. F. A.

C    Mann (1954), Transactions of the Grotius Society, Vol. 40, pp. 25, 34 et seq., 46–47. In the present case the claim is for the enforcement of confiscatory legislation, either directly or indirectly.

[Their Lordships indicated that the latter contentions raised a substantive defence which should not be argued on the summons,

D    but remained open to the respondents in the action.]

*Michael Kerr Q.C.* following. There are two aspects of the jurisdiction point on which there are several authorities: (1) the application of issue estoppel, the question whether one looks at the formal order or the record and (2) the meaning and scope of the expressions "parties" and "privies" in connection with

E    res judicata.

Starting with issue estoppel regarded from the point of view of the common law in civil matters, once an issue of fact or law or mixed fact and law has been litigated and determined by a court of competent jurisdiction the parties and their privies are estopped from relitigating it. The questions arise: (a) What material

F    may be looked at to determine the existence of the estoppel? (b) Are foreign judgments treated differently from English judgments? It is a question of evidence whether an issue has been litigated and determined. When the judgment shows what issues have been determined, the court will look at that. "It is the res judicata, not the record of it, which creates the estoppel": Spencer

G    Bower on Res Judicata, p. 5 and see *Reimers* v. *Druce*[95] and *In re Truford*.[96] A judgment can only be impeached if the court

---

[92] [1910] A.C. 262; 26 T.L.R. 368, H.L.(E.).
[93] [1935] 1 K.B. 140; 50 T.L.R. 282.
[94] [1955] A.C. 491, 509–10; [1955] 2 W.L.R. 303; [1955] 1 All E.R. 292, H.L.(E.).
[95] (1857) 26 L.J.Ch. 196.
[96] (1887) 36 Ch.D. 600, 613–17; 3 T.L.R. 798.

H. L. (E.)
1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

which pronounced it had no jurisdiction or if it offends against    A
natural justice. In *Kali Krishna Tagore* v. *Secretary of State for
India*[97] the court looked at the actual judgment and not merely
at the order. Spencer Bower on Res Judicata, pp. 175 et seq.,
distinguishes between res judicata in the ordinary sense and res
judicata as a bar to subsequent recovery: see also *Sri Raja Rao
Lakshmi Kontaiyammi* v. *Sri Raja Inuganti Rajagopa Rao*.[98]    B
These cases were followed in a line of Australian authorities:
*Gray* v. *Dalgetty & Co. Ltd.*[99]; *Rex* v. *Wilkes*[100]; *Mraz* v. *The
Queen (No. 2)*[101] and *Brown* v. *Robinson*,[102] and see *Sealfon* v.
*United States*[103]; Spencer Bower on Res Judicata, p. 47, para. 64,
and *Connelly* v. *Director of Public Prosecutions*.[104]

No distinction can be drawn between foreign judgments and    C
English judgments.

As to the next point, the meaning and scope of the expressions
" parties " and " privies," there are few decisions in England. It
is not possible to get any definition of the terms which is both
concise and exhaustive; there are too many permutations. A
" privy " is a person so situated in relation to a party in the earlier    D
proceedings and the new proceedings that further proceedings by
him as agent would amount in substance to the relitigation of one
or more of the issues already decided in the earlier proceedings, a
relitigation between the real parties and interests. A party or
privy includes any person who is a real party in interest to the
claim or defence in question, that is, any person who participates    E
in the conduct of the proceedings, whether alone or with other
persons, or as a representative on the record, who is acting in the
interest of a party, whether or not that representative has a
personal interest in the proceedings. The Council of Gera is
covered by this definition, being in opposition to the respondents'
claim, and they cannot shelter behind the solicitors on the record.    F
Conversely, there is included any person on the record who
represents anyone who is a real party or has a real interest, and
who acts on that person's behalf so as to be in privity with that
person, whether or not he himself has any personal interest in the
proceedings. A principal and agent are in privity.

One may illustrate the position with three cases. In the first    G
case take Action 1 (*Company* v. *C and D*): A and B instruct

[97] (1888) L.R. 15 Ind.App. 186,
P.C.
[98] (1898) L.R. 25 Ind. App. 102,
107–8, P.C.
[99] (1916) 21 C.L.R. 509, 543.
[100] (1948) 77 C.L.R. 511, 518–19.

[101] (1956) 96 C.L.R. 62, 69–70.
[102] (1960) S.R.(N.S.W.) 297, 301–2.
[103] (1948) 332 U.S. 575, 578, 579.
[104] [1964] A.C. 1254, 1321, 1333–4,
1343 et seq., 1366.

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A    solicitors to issue a writ in the name of the company against C and D for a declaration that C and D are not directors of the company, and other ancillary relief.  C and D issue a summons to stay the action on the ground that it is brought without the company's authority.  (C and D may also add a claim that their costs are to be paid by the solicitors personally, but whether or not they do

B    so is irrelevant.)  A and B file evidence in answer to the summons to the effect that A and B authorised the action and that they are entitled to do so as directors of the company.  (The solicitors may also file evidence that they received their instructions from A and B and believe A and B to be entitled to act as directors of the company, but it is submitted that whether or not they do so is

C    irrelevant).  C and D file evidence denying that A and B are directors and asserting that C and D are the directors.  On the hearing of the summons the judge decides that A and B are not directors and that C and D are directors.  The summons therefore succeeds and he stays the action.  (He may or may not also order the solicitors to pay C and D's costs, but it is submitted that

D    whether or not he does so is irrelevant.)  Action 2 (i) (*C and D v. the Company*), C and D sue the company for directors' fees. On the instructions of A and B, a solicitor enters an appearance for the company and pleads that C and D are not directors.  C and D plead estoppel per rem judicatam on the basis of the issue raised and determined in their favour in the summons in Action

E    1.   This plea must succeed, for the simple reason that the issues in, and the formal parties to, Actions 1 and 2 (i) are identical. Alternatively, Action 2 (ii) (*C and D v. A and B*).  Since A and B continue to assert that they are directors, C and D bring an action to restrain them from claiming to be entitled to act as directors of the company.  A and B plead that they are directors and C and D

F    are not.  C and D plead that A and B are estopped per rem judicatam from raising this issue on the ground that it has already been determined in the summons in Action 1.  Their estoppel could be upheld on the grounds that: (i) this issue was raised and litigated in that summons, (ii) C and D were parties to this issue, (iii) A and B were parties to this issue.  They were not parties to Action 1, but upon the trial of the summons they

G    became the opposing party to the issue raised and litigated by that summons, the "real party in interest" to the summons.  (iv) The conclusion that they were the real party in interest to that summons can also be stated by saying that the solicitors (who may be regarded as the formal parties to the summons) represented A and

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

B in the issue litigated in that summons and that accordingly there    **A**
was privity between A and B and the solicitors. (It should be
noted in this connection that in all these illustrations A and B
are clients of the solicitors on that side: compare the definition of
" clients " in section 86 (1) of the Solicitors Act, 1957, formerly
section 81 of the Solicitors Act, 1932.) (v) The same conclusion
can also be stated by saying that in the summons in Action 1    **B**
the issue which was litigated was between the company and C
and D, namely, that the company cannot be represented by A and
B, and that A and B are the real parties in interest or privy to
that issue.   These are semantic differences, not real distinctions.
(vi) It would be contrary to common sense that there should be an
estoppel in Action 2 (i) but not in this action, when the issue and    **C**
the real parties to that issue were precisely the same in Actions
1, 2 (i) and 2 (ii), and a relitigation of that issue would in substance
be a relitigation between precisely the same parties.

In the second case take Action 1 (*Company* v. *C and D*): As
in the first case, but C and D's summons fails. On the summons
the judge decides that C and D are not the directors and that A    **D**
and B are.   The action proceeds and an injunction is given against
C and D to restrain them from acting as directors of the company.
Action 2: C and D are not put off and sue A and B for a
declaration that A and B are not directors of the company.   A and
B plead estoppel on the basis of the summons in Action 1.   C
and D plead that there is no estoppel because (a) A and B were    **E**
not parties to Action 1; (b) the decision in Action 1 was merely
that C and D were not directors, not that A and B were.   The
plea of estoppel would succeed because (a) A and B were parties
or privies to the issue tried in the summons in Action 1 for the
same reasons as those submitted in relation to Action 2 (ii) in the
first case; (b) the evidence shows that the issue raised and decided    **F**
in the summons in Action 1 was not only that C and D were not
directors, but also that A and B were.

The third case may be considered in two parts: I. Action 1
(*Company* v. *C and D* in Jurisdiction X): As in Action 1 in the
second case, C and D's summons to stay fails and it is held that
A and B are entitled to represent the company.   Action 2    **G**
(*Company* v. *C and D* in Jurisdiction Y): Upon C and D issuing
the summons to stay, A and B plead that C and D are estopped
by the issue raised and decided in the summons in Action 1.   It
is submitted that (as in Action 2 (i) in the first case) the plea of
estoppel must succeed because the issue and the formal parties are

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A  identical. II. (the present case) Action 1 (*Company* v. *C and D* in Jurisdiction X): Proceedings as in Action 1 in the first case. The summons to stay the action succeeds and it is held that A and B are not entitled to represent the company, the converse result of Action 1 in I. above. Action 2 (*Company* v. *C and D* in Jurisdiction Y): Upon C and D issuing a summons to stay on the

B  ground that A and B have no right to represent the company and that this issue has been decided in the summons in Action 1, C and D would be entitled to rely upon the estoppel in the same way as A and B are entitled to rely on it in I. above. The only difference is that in I. the summons to stay fails in Jurisdiction X, thus raising an estoppel in favour of A and B in Jurisdiction Y;

C  whereas in this case the summons to stay succeeds in Jurisdiction X, thus raising an estoppel in favour of C and D in Jurisdiction Y. Further, it makes no difference in either I. or II. above whether the solicitors on either side in Jurisdictions X and Y are identical or not; in either event the estoppel will operate in favour of, or against (as the case may be) the real parties to the issue raised and

D  determined in the summons, for the reasons submitted in relation to Action 2 (ii) in the first case.

As to estoppel: see *In re Defries*.[105] As to the position of the solicitors, see *Myers* v. *Rothfield*,[106] reversed in the House of Lords sub nom. *Myers* v. *Elman*.[107] In this litigation if the Stiftung is not a party against the respondents, it must be the Council of

E  Gera. But the council cannot be heard to argue the same point that has already been decided in West Germany, nor can the solicitors of whom the council are the clients: see the definition of "client" in section 86 (1) of the Solicitors Act, 1957.

It is enough to show that the persons instituting these proceedings have already instituted previous proceedings in which they

F  have failed. Privity is a wide concept, wide enough to embrace such a case as this. The solicitors are parties to these proceedings and privies of the Council of Gera. It does not matter whether or not they are protagonists: see Spencer Bower on Res Judicata, p. 126, para. 197. An estoppel would have been created if the West German case had been decided the other way.

G  The American authorities on this point are the Corpus Juris, Vol. 50 (Judgments), pp. 275–7, para. 756; p. 281, para. 757; p. 297, para. 768; *Bruszewski* v. *United States* [108]; *Gibson* v. *United*

---

[105] (1883) 48 L.T. 703.
[106] [1939] 1 K.B. 109, 124–5; [1938] 3 All E.R. 498, C.A.
[107] [1940] A.C. 282, 336; 56 T.L.R. 177; [1939] 4 All E.R. 484, H.L.(E.).
[108] (1950) 181 Fed. 2nd 419.

886                              HOUSE OF LORDS                              **[1967]**

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

*States* [109]; *Chicago Rock Island and Pacific Railway Co. v.    A
Schendel* [110]; *Warren Featherbone Co. v. De Camp* [111]; *Cuneo
Importing Co. v. American Transportation Co.* [112]; *Cutler v.
Jennings* [113] *and Don Chemical Co. v. Benton.* [114]    The conclusions
to be deduced from those cases are: (1) Where there is a judgment
against A upon an issue with B, B can rely on the judgment as
creating an estoppel when the same issue arises in proceedings    B
instituted by C where C is in a significant relationship with A.
(2) There is a significant relationship where C is a person who
institutes the proceedings upon the instructions of A or conducts
the proceedings under the control of A or derives his alleged
authority to bring the proceedings from A.    For " significant
relationship " one can say " privity."    None of these principles    C
would have applied to *Laidlaw's* case. [115]

*Guy Aldous Q.C.*    Counsel on the appeal are instructed to
appear on behalf of the Carl-Zeiss-Stiftung, neither for the Council
of Gera nor for the solicitors.    On the cross-appeal they are
instructed on behalf of the six individual partners of the firm of
solicitors.                                                                              D

Two points arise on the cross-appeal: (1) Whether under
German law the effect of the confiscation of the assets of the two
businesses of the foundation under the Soviet military decree of
1948 was to deprive the organs of the foundation of their capacity
to act, so that the Council of Gera was not capable of acting as the
special board of the foundation, and (2) whether because of the
Federal Supreme Court's decision in November, 1960, it was res    E
judicata, at least against the third defendants in the present action
(the third respondents), that the Council of Gera could not represent
the foundation and therefore the Council of Gera were estopped
from bringing this action as against at least the third defendants.
The cause of action is misappropriation by passing off the name
and marks of the Carl-Zeiss-Stiftung and the question is whether
the plaintiffs in the action are the persons to take proceedings to
protect the name and trade marks.

The appellants put their case thus: (1) The Carl-Zeiss-Stiftung
is an existing corporation domiciled at Jena.    (2) Therefore the
law governing the question whether it has validly authorised these    F
proceedings in the law in force at Jena at the date of the authorisa-
tion.    (3) According to that law these proceedings are validly

[109] (1954) 211 Fed. 2nd 425.          [113] (1925) 130 A. 583.
[110] (1926) 270 U.S. 611, 617.          [114] (1962)  357 S.W. 2nd 565.
[111] (1907) 154 Fed. 198.               [115] 15 Sc.Jur. 484.
[112] (1917) 241 Fed. 421; 247 Fed.
413.

**A.C.**                    AND PRIVY COUNCIL                    887

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A  authorised and on this point every court in East Germany would follow the decision of the East German Supreme Court. To establish these matters proves the appellants' case.

The vital question is: what is the local law? That must be decided as a fact on the evidence before the court. The local law is proved by the evidence of persons who know how that law is

B  interpreted in the local courts. It is common ground that every court in East Germany would hold these proceedings properly brought. The relevant law is the law which would be applied there, not the law which the courts in England or West Germany think ought to be applied: see *Lazard Brothers*.[116]

It is conceded that Carl-Zeiss-Stiftung is an existing corporation.

C  The key to the case is its place of domicile. It is contrary to the evidence to say that its domicile is in Germany as a whole and not at Jena. Every Stiftung had to be established according to the laws of a particular " land " and on those laws the control of it depended. The legal domicile of this Stiftung has always been at Jena and the relevant law in this case is the law governing there

D  at the date of the authorisation of the legal proceedings. This is recognised in English law. In its judgment the West German court was purporting to administer the law in force in East Germany. A similar question as to which board of directors of a Spanish bank had the legal right to represent it during the Spanish Civil war arose in *Banco de Bilbao* v. *Sancha*.[117] The only way of

E  proving the law of East Germany is to call expert witnesses to prove how the courts there would interpret the code. It is irrelevant to call experts from West Germany to say how they think the East German courts would decide. Even if the judges in East Germany decide according to the wishes of the state, that is equivalent to a state decree and is accordingly the law.

F  As to the ascertainment of the law of a foreign country on a point which has already been the subject of a decision by a court of that country: see the *Bankers and Shippers* case [118]; the *Guaranty Trust* case [119]; the *Evera* case [120]; *Baron de Bode's* case [121]; *The Sussex Peerage* case [122] and *Buerger* v. *New York Life Assurance Co.*[123] The court would revolt against a conclusion

G  which would put the foundation into a state of perpetual

---

[116] [1933] A.C. 289, 296 et seq., 302.
[117] [1938] 2 K.B. 176, 194–5.
[118] 24 Ll.L.Rep. 85, 87–8, 90–1, 92, 94.
[119] [1918] 2 K.B. 623, 637–41, 644.

[120] [1961] 1 Lloyd's Rep. 231.
[121] (1845) 8 Q.B. 208, 250–1.
[122] (1844) 11 Cl. & F. 85.
[123] (1927) 96 L.J.K.B. 930; 43 T.L.R. 60, C.A.

H. L. (E.)
1966
───────
Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)
───

immobility: *A.G. Der Manufacturen D.A. Woronin Leutchig* v. *Frederick Huth & Co.*[124] The findings of Cross J. are correct. They involve the conclusion that the board of management in East Germany was properly appointed.

As to the question of res judicata, counsel on this side are appearing for the Carl-Zeiss-Stiftung and they are not affected by the pleadings of other persons for whom they do not appear; they are not putting forward arguments on behalf of anyone else. Success on the main part of the case would involve success in proving that the Carl-Zeiss-Stiftung are the right parties. There can be no estoppel against the Carl-Zeiss-Stiftung by reason of the proceedings in West Germany to which they were not parties: see *Buerger's* case.[125] *Nana Ofori Atta II* v. *Nana Abu Bonsra II*[126] does not help in this case.

On this part of the case it is submitted: (1) Since there is no estoppel against the Stiftung, counsel can put forward contentions on their behalf, because they were parties to the summons of February 7, 1956. This summons was sent both to the plaintiffs and to the solicitors: compare the form in the Encyclopedia of Forms and Precedents, Vol. V, p. 241.

(2) The submission by the defendants that the Council of Gera are the parties to these proceedings is wrong. On the footing that the solicitors are parties to these proceedings and that counsel on this side represent them (although they deny it), the solicitors are not privies of the Council of Gera. Not being privies to the Council of Gera, they are not bound by the West German judgment.

(3) Issue estoppel has no application in foreign judgments. It is quite different from res judicata in the case of English judgments.

(4) The judgments of the West German courts are perverse in that they purported to apply as the law of East Germany, that which they knew perfectly well was not the law there.

(5) The appellants do not put forward any counter estoppel.

Estoppel is a rule of law or evidence which prevents a party from proving facts which would be in his favour. Here no estoppel is alleged against the Stiftung and it cannot be estopped from proving such facts as it may wish.

The Council of Gera are not parties to these proceedings, and it is contrary to all accepted ideas or jurisprudence that a person

───────────

[124] (1941) 70 Ll.L.Rep. 262, 269.      [126] [1958] A.C. 95; [1957] 3 W.L.R.
[125] 96 L.J.K.B. 930.                         830; [1957] 3 All E.R. 559, P.C.

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

should be held to be a party who has never received any documents and is not named as a party and has had no opportunity to address the court: see *Daimler Co. Ltd.* v. *Continental Tyre & Rubber Co. (Great Britain) Ltd.*[127] The solicitors are only brought in for the purpose of making them pay costs. They could leave it to the Stiftung to argue, and abide by the result. Their only interest is to defend themselves against the claim for costs made against them personally on the basis of a breach of warranty of authority: see *Yonge* v. *Toynbee.*[128]

It is argued by the respondents that the solicitors are privies of the Council of Gera, because the council were in control of the previous proceedings. But, in the first place, privity is limited to privity of interest and there is no such privity between the two. In the second place, no one was in control but the Stiftung.

As to the question of privity, there can be privity of interest or privity of contract, but only the former need be considered here. The interest which was the subject of the West German proceedings was a claim by the present appellants that the trade marks registered in West Germany should be assigned to them. There was also an issue whether certain entries in the commercial register should be altered. The solicitors had no interest in any of these things at all; their only interest now is to be paid their fees and to resist an order against them for costs. They have no interest in the question whether or not their clients have any power to institute any proceedings. So far as the Council of Gera are concerned, their interest is quite different from that of the solicitors. The solicitors are looking to the authority of the special board in representing the Stiftung and they represent nobody else. There is no privity between the Stiftung and the Council of Gera in the capacity of special board. As to who are privies, see Spencer Bower on Res Judicata, pp. 130–1, paras. 205 and 206; Halsbury's Laws of England, 3rd ed., Vol. 15, p. 196, para. 372 and *Mercantile Investment and General Trust Co.* v. *River Plate Trust, Loan & Agency Co.*[129]

A decision was made against the Council of Gera in the West German courts. In those proceedings the solicitors had no opportunity of being heard and accordingly they cannot now be estopped from being heard for the purpose of resisting an order that they should pay costs in the present proceedings.

[127] [1916] 2 A.C. 307, 336–7, 348; 32 T.L.R. 624, H.L.(E.).
[128] [1910] 1 K.B. 215, 227, 233–4; 26 T.L.R. 211, C.A.
[129] [1894] 1 Ch. 578; 10 T.L.R. 186.

H. L. (E.)
1966
_____

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
___

A    Take the case of a servant, a chauffeur who having been injured in a road accident brings an action against the driver of the other car.  His master backs him, undertaking to be responsible for his costs.  The action fails on the ground that the accident was caused by a defect in the car which the chauffeur was driving. Afterwards the insurance company brings an action against the same defendant in respect of damage to the car which the chauffeur

B    was driving.  The insurance company would not be estopped from proving that the car was not defective.  The servant's action would not bind the master because the servant's cause of action was not the master's.  *Kinnersley* v. *Orpe* [130] and *Hancock* v. *Welsh and Cooper* [131] do not support the respondents' case: see *Outram* v.

C    *Morewood* [132] and Spencer Bower on Res Judicata, pp. 199–200, para. 339.  The real parties to an issue are those who can be heard and who can oppose it.  There is no proof that the Council of Gera were ever in control of the proceedings.

As to the effect of foreign judgments, it was common ground before Cross J. that if there was to be estoppel per rem judicatam, it could only arise by reason of a decision of the prior court which

D    was a final conclusion on the merits of the matter submitted to it for adjudication, so that the judgment either gives rise to a legal right or obligation or extinguishes such a right or obligation.  If the West German judgment had been of that character, there might have been an estoppel, but that was not the case: see Halsbury's Laws of England, 3rd ed., Vol. 7 (1954), p. 140, para. 249; p. 150,

E    para. 267, and Dicey's Conflict of Laws, 7th ed., pp. 981–985, r. 182; p. 1052, r. 196.

The reason for recognising a foreign judgment is that it gives rise to an obligation: *Godard* v. *Gray.* [133]  From this case it appears that, for example, a foreign judgment on the meaning of the Sale of Goods Act might be challenged in an English court.

F    A foreign judgment does not merge the original cause of action as does an English judgment, and the principles on which we treat a foreign judgment are not the same as the principle of res judicata in England: *Nouvion* v. *Freeman.* [134]

If the West German proceedings had gone to finality and the courts there had decided that there was no passing off and that

G    the trade marks should remain in the hands of the organisation in West Germany, that decision would establish res judicata, since the

---

[130] 2 Dougl. 517.
[131] 1 Stark 347.
[132] (1803) 3 East 346, 366.
[133] L.R. 6 Q.B. 139, 148–9, 152.

[134] (1887) 37 Ch.D. 244, 250, 254–5, 258, C.A.; (1889) 15 App.Cas. 1, 8–9, 13, H.L.(E.).

A.C.                AND PRIVY COUNCIL                              891

A courts would have been deciding finally on matters within their
jurisdiction.  But in the present case the English courts are not
bound to give effect to the decision of the West Germany courts:
see *Harris and Adams* v. *Quine* [135]; *In re Low* [136] and *Henderson*
v. *Henderson*,[137] which illustrate the basis on which res judicata
operates in relation to foreign judgments.  Issue estoppel does not
B come into the matter.  There can be no estoppel in relation to
foreign judgments unless there is a final and conclusive judgment
on the merits on a precise cause of action: see *New Brunswick
Railway Co.* v. *British and French Trust Corporation Ltd.*[138] and
*Callandar* v. *Dittrich*.[139]

It is submitted: (1) The basis of the enforcement of a foreign
C judgment is the arising or extinction of a legal right by that
judgment.  (2) The foreign judgment does not merge the cause of
action.  It is possible to rely either on it (res judicata) or on the
original cause of action.  (3) The right in question must have been
entirely extinguished by the foreign judgment before there can be
res judicata.  (4) The foreign judgment cannot have a greater effect
D in England than it has under the foreign law.  Thus the West
German judgment in the present case cannot prevent this matter
being relitigated in England because it would not prevent it being
relitigated in West Germany.

Issue estoppel does not come into play in the case of foreign
judgment.  But, if it be held that it does, it is limited to the extent
E suggested by the opinion of Lord Romer in the *New Brunswick*
case.[140]  If issue estoppel were applied blindly to foreign judg-
ments, the effects would be startling.  Thus often foreign lawyers
will not take a particular point because their courts will not con-
sider it sympathetically, possibly for political reasons.  It cannot be
that, in such circumstances, the matter will be taken to have been
F decided finally for ever.  In some countries there might be extra-
ordinary procedures which would create situations in which it
would be anomalous and unfair to allow estoppel.

Further, the West German judgment was perverse in the sense
that the court purported to apply, as being the law of East
Germany, a law which it knew to be contrary to that which every
G court in East Germany would apply.  This case comes within the
ratio of *Simpson* v. *Fogo*.[141]  The decision of the West German

H. L. (E.)
1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

---

[135] (1869) L.R. 4 Q.B. 653, 657, D.C.
[136] [1894] 1 Ch. 147, 162–3; 10 T.L.R. 106, C.A.
[137] 3 Hare 100, 110 et seq.
[138] (1939) A.C. 1, 19–20, 28, 37, 41–2.
[139] (1842) 4 Man. & G. 68, 76–7.
[140] (1939) A.C. 1, 42–3.
[141] (1861) 1 H. & M. 195, 240–1, 247.

H. L. (E.)
1966
___
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
___

court should be treated on the same footing as that of the Louisiana    A
court in that case: see also *Castrique* v. *Imrie* [142] and *Liverpool
Marine Credit Co.* v. *Hunter.*[143]    There must come a point when
the English courts will refuse to allow estoppel to operate in
relation to a foreign judgment.    Long before the point at which a
judgment must be treated as perverse in an unpleasant sense the
English courts will refuse to have regard to it.    If necessary, it is    B
submitted that the West German decision was perverse in the full
sense.

As to estoppel: see also *Hall* v. *Odber* [144]; *Smith* v. *Nicholls* [145]
and *Bank of Australia* v. *Harding.*[146]    Canadian authorities on the
subject are *Clergue* v. *Humphrey* [147]; *State Bank of Butler* v.
*Benzonson* [148] and *Davidson* v. *Sharpe.*[149]    C

The reason why English courts recognise foreign judgments is
that under such a judgment an obligation has arisen.    If the foreign
judgment has dismissed a claim it shows that the defendant is free
from any obligation.    A foreign declaratory judgment should be
recognised in the English courts: see Dicey's Conflict of Laws,
7th ed., r. 183, pp. 492, 996; r. 196, p. 1052; r. 197, p. 1054.    The    D
West German judgment, however, is not final and conclusive on
the merits.    A foreign judgment is only prima facie evidence and
is not conclusive.    What Lord Brougham L.C. said in *Houlditch*
v. *Donegal* [150] is unanswerable.    What Lord Lyndhurst L.C. said in
*Ricardo* v. *Garcias,*[151] is not inconsistent with the previous case.
Reliance is placed on *Liverpool, Brazil and River Plate Steam*    E
*Navigation Co. Ltd.* v. *Benham.*[152]    In *In re Queensland Mercantile
and Agency Co.*[153] the Court of Appeal distinguished *Simpson* v.
*Fogo* [154] but recognised it as good law: see Dicey's Conflict of
Laws, 7th ed., p. 549; *London & Mediterranean Bank* v.
*Strutton* [155]; *Luther* v. *Sagor.*[156]

In summary: (1) There is no estoppel against the Stiftung and    F
counsel are entitled to appear on its behalf in the summons to which
it is respondent.    (2) (a) if (which is denied) counsel on this side
are appearing not for the Stiftung, but for the solicitors, then the
solicitors are not privies of the Council of Gera; (b) if (which is

---

[142] L.R. 4, H.L. 414.
[143] (1868) 3 Ch.App. 479.
[144] (1809) 11 East 118.
[145] (1859) 5 Bing.N.C. 208.
[146] (1850) 9 C.B. 661.
[147] (1900) 31 Can.S.C.R. 166.
[148] (1914) 16 D.L.R. 848.
[149] (1920) 60 Can.S.C.R. 72.
[150] (1934) 8 Bligh (N.S.) 301, 338
et seq.

[151] (1845) 12 Cl. & F. 368, 397 et    G
seq.
[152] (1868) L.R. 2 P.C. 193, 202.
[153] [1892] 1 Ch. 219, 224 et seq.; 8
T.L.R. 177, C.A.
[154] 1 H. & M. 195.
[155] (1869) 21 L.T. 415.
[156] [1921] 3 K.B. 532, 558–9.

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A  denied) the term " privy " can include a person who is under the control of another, then it has not been proved that the respondents are under the control of the Council of Gera. (3) Even assuming that the solicitors are the servants of the Council of Gera, they are not estopped from defending themselves against this summons which seeks an order against them personally. No estoppel arises

B  from the West German proceedings in which they had no chance of appearing. (4) The first and second defendants are not privies of the third defendant and cannot take advantage of any estoppel arising from the West German judgment. (5) The West German judgment cannot prevent anyone from contending now that these proceedings are not authorised by the Council of Gera because that

C  judgment did not extinguish any cause of action. (6) The West German judgment did not estop anyone from commencing any proceedings in West Germany. (7) The causes of action in West Germany are different from the causes of action in England: see *Callandar's* case.[157]  (8) The law of issue estoppel does not apply to foreign judgments. (9) If (which is denied) issue estoppel does

D  apply to foreign judgments it is only to the extent stated by Lord Romer in the *New Brunswick* case.[158]  (10) The West German decisions should not be recognised as foreign judgments capable of giving rise to estoppel because they applied, not East German law, but West German law in relation to the Stiftung of Jena. (11) The West German courts did not do their best to come to a

E  judicial decision but, while purporting to apply the law of East Germany, applied a law which they knew was not that law. (12) The West German judgment was not judicial, but political, and had no validity outside West Germany.

   *Mark Littman Q.C.* in reply. Since the application that all proceedings be stayed for want of authority in Courts & Co. the

F  courts have been engaged in deciding that issue between whatever persons were parties to the proceedings. The appellants contend that the proceedings were brought without the authority of the Stiftung because, as a result of the confiscation in East Germany, its organs were paralysed. The respondents contend that Courts & Co. received their authority from the Council of Gera. The

G  appellants say that the matter has been clearly decided in Germany between the same parties or parties so closely connected with them that estoppel arises.

   As to estoppel, it is contended (1) that the Council of Gera was a party to the proceedings in West Germany; (2) that an issue

[157] 4 Man. & G. 68.    [158] [1939] A.C. 1, 41–2.
A.C. 1967.    58

894                    HOUSE OF LORDS                    **[1967]**

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A

identical to the present issue (namely, whether or not the confiscation paralysed the organs of the Stiftung) was decided in West Germany; (3) that this decision was final and conclusive, since it was embodied in an order to determine the case; (4) that in English law it bound the Council of Gera and their privies, and (5) that the contentions sought to be made against the respondents are sought to be made by the Council of Gera or their privies and accordingly estoppel arises: see the *New Brunswick* case [159] and the *Fidelitas* case.[160]

B

It is not contended that a determination by a judge on a point of fact, which was not a necessary link in his chain of reasoning would be res judicata. The point of the principle of res judicata is that there is a public interest in not relitigating the same matters, so that, if any matter raised in an action is an issue which has already been fought between the parties and decided by the court, this doctrine of public policy applies. In the present case the decision on the effect of the confiscation was a question which had in substance been decided in the earlier case. In considering this matter one is not confined to the formal cause of action; one must look behind it and see what were the matters raised: see Halsbury's Laws of England, 3rd ed., Vol. 15, pp. 186–7, paras. 360, 362. Where it can be shown that a particular issue was in fact raised and decided, the earlier judgment is conclusive. Here the issue which was decided was whether or not the Council of Gera ever had authority to act as the special board of the Stiftung. On that depends the question whether or not the confiscation paralysed the Stiftung and whether the Council of Gera is competent to bring the present action. In *Brown* v. *Robinson* [161] the approach of the court was perfectly reasonable and consistent with the underlying doctrine of public policy. It is not inconsistent with what Lord Romer said in the *New Brunswick* case.[162] The cases of *Hartington* [163]; *Marginson* [164]; *Bright* [165]; *Hoystead* [166] and *Fidelitas* [167] and the passages cited from Spencer Bower's book are to be particularly noted and see *Callandar's* case.[168]

C

D

E

F

Assuming that there is such a thing as issue estoppel, it is reasonable that it should apply when the parties have litigated in England and also when they have litigated abroad and the matter

G

[159] Ibid. 19–20, 21, 28, 36–37, 38, 43.
[160] [1966] 1 Q.B. 630, 639–40, 640–1.
[161] [1960] S.R.(N.S.W.) 297, 302.
[162] [1939] A.C. 1, 43.
[163] 6 E. & B. 780.
[164] [1939] 2 K.B. 426.
[165] [1954] P. 270.
[166] [1926] A.C. 155.
[167] [1966] 1 Q.B. 630.
[168] 4 Man. & G. 68, 91, 93.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A has been determined by a court of competent jurisdiction: see *Henderson* v. *Henderson* [169]; *Ricardo* v. *Garcias* [170]; *In re Dulles' Settlement (No. 2)* [171]; *Bell* v. *Holmes* [172]; *Ord* v. *Ord* [173] and Spencer Bower on Res Judicata, pp. 175–7, paras. 294 to 297; see particularly note (m).

When the underlying issues have been decided in a foreign court they should be treated in the same way as if they had been B decided in an English court: see *Randolph* v. *Tuck* [174]; *Wood* v. *Luscombe* [175]; *Duedu* v. *Yiboe* [176] and *Kok Hoong* v. *Leong Cheong Kwang Mines Ltd.* [177] It is conceded that issue estoppel is defeated if one party discovers a fresh point of law or discovers some new evidence.

C The appellants have submitted that foreign judgments differ from English judgments in that an English judgment merges a debt but a foreign judgment does not. But it is extremely doubtful whether this old distinction is still part of English law: see Dicey's Conflict of Laws, 7th ed., rule 182, p. 981, rule 183, p. 992; sub-rule 183, p. 996; rule 185, p. 1002; rule 186, p. 1007 and D Professor Horace Emerson Read's Recognition and Enforcement of Foreign Judgments (1938), pp. 116–8, 120–1.

The appellants also contended that foreign judgments are only prima facie evidence of the facts which they find. But see Spencer Bower on Res Judicata, pp. 37–40, paras. 53–5. It is hard to see how that rule, unless it is purely technical and has nothing to E do with the substance of res judicata, can be consistent with the rule that a final judgment of a foreign court is conclusive, as it is, save in certain circumstances, for example, where there is want of jurisdiction: see *Ricardo* v. *Garcias* [178] and *Barber* v. *Lamb*. [179]

The appellants referred to *Callandar's* case [180] and *Hull* v. *Odber* [181] but they are not applicable to the present case. The F latter is of doubtful validity and does not help on the point of res judicata. They also referred to *In re Low* [182] and *Harris and Adams* v. *Quine* [183] as supporting the proposition that the earlier judgment must be final and conclusive in the merits. But both these cases were decided on the ground that all that had been decided

G  [169] 3 Hare 100, 115.
   [170] 12 Cl. & F. 368, 401.
   [171] [1951] Ch. 842, 849, 851.
   [172] [1956] 1 W.L.R. 1359; [1956] 3 All E.R. 449.
   [173] [1923] 2 K.B. 432; 39 T.L.R. 437, D.C.
   [174] [1962] 1 Q.B. 175.
   [175] [1966] 1 Q.B. 169, 172; [1965] 3 W.L.R. 996; [1964] 3 All E.R. 972.

   [176] [1961] 1 W.L.R. 1040, 1044–5, P.C.
   [177] [1964] A.C. 993, 1010–11.
   [178] 12 Ch. & F. 368.
   [179] (1860) 8 C.B.(N.S.) 95.
   [180] 4 Man. & G. 68.
   [181] 11 East 118.
   [182] [1894] 1 Ch. 147.
   [183] L.R. 4 Q.B. 653.

896                    HOUSE OF LORDS                    **[1967]**

H. L. (E.)
1966
___
Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)
___

at the first trial was that no action lay in the foreign court by    A
reason of the foreign law of limitations which was part of the
lex fori: see *In re Low*.[184]

The appellants cannot say that they did not intend to submit
the matter to the foreign court before which the matter was fought
out and by which it was decided, whatever may have been in the
appellants' minds initially. The parties here are the same as the    B
parties to the case in West Germany or their privies and estoppel
should be held to apply.

It was submitted that the only party for whom counsel were
appearing here was the Stiftung. But this is fallacious. It is not
disputed that the Council of Gera were parties to the proceedings
in West Germany. Who are the parties to the present proceedings?    C
Clearly not the solicitors. Is the Stiftung, then, represented before
the court in the present proceedings? If counsel are making
representations on behalf of the Stiftung, it can only be because
they are instructed by solicitors who have its authority. But if
the respondents are right in their contentions the Stiftung have
never been parties to these proceedings in any form. Over the    D
period of this litigation counsel have been making submissions on
behalf of someone other than the Stiftung. The only lay client
whom they claim to have is not theirs. Either they are on a frolic
of their own or they are representing someone else. In this context
the word " party " has a special meaning. A person who is not
a party on the record is yet a party if he allows someone else to    E
fight his battles for him: see *Bruszewski* v. *United States*.[185] What
is the relationship to be established for persons to be treated as
affected by an estoppel? Here there is a close enough relationship
to make it fair and just for those who directly instruct counsel on
the other side, namely, the solicitors of the Council of Gera, to be
bound by the West German decision. The latter are the clients    F
of the former: see the definition in section 86 (1) of the Solicitors
Act, 1957. The Council of Gera should be responsible for the costs
of this action and the solicitors should likewise be liable on the
principle of breach of warranty of authority if that turns out to be
the case. The solicitors are in the same position vis-á-vis the
Council of Gera who might be liable for the solicitors' costs if    G
they allowed them to hold themselves out as having their
authority. The right inference is that the Council of Gera controls
the solicitors in these proceedings. If it does not, who does? On
it the solicitors rely for their authority to issue the writ and

[184] [1894] 1 Ch. 147, 161, 162–3.    [185] 181 Fed. 2nd 419, 422.

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

A    conduct the proceedings. It was really the council which fought the proceedings in West Germany: see Spencer Bower on Res Judicata, p. 127, para. 198, *Kinnersley* v. *Orpe*[186] and *Hancock* v. *Welsh and Cooper*.[187]

In order to show that a matter is res judicata by local law, it must be established that the judgment was final and conclusive, that is, that it was not reversible by the court which pronounced it.

B    The appellants relied on what Lord Watson said in *Nouvion's* case,[188] but see what was said by Lord Herschell[189]; see also *Pemberton* v. *Hughes*.[190] What has been fought out and decided between the parties binds them. That can be the case even in interlocutory proceedings: *Thoday* v. *Thoday*.[191]

C    In summary: (1) The domicile of the Stiftung, in the relevant sense, is not Jena. (2) Even if one must look to the law in force at Jena, that law is the law of all Germany, the old law which formerly prevailed there. (3) In normal circumstances when dealing with a sovereign state with its own judicial system and Supreme Court a decision of that court on a matter of its own law

D    is the best evidence of the law of that place and it will be accepted as such, save in unusual or special circumstances. (4) What one has here is not a usual case but a highly exceptional case and, taking the circumstances as a whole, it is right that the judgments both of the West German and the East German Supreme Courts should be examined, with the aid of expert evidence, to find what

E    is the relevant law. (5) The sitz of the Stiftung must be taken to be at Jena, but, for the purposes of English conflict rules, that is not the same as domicile. A piece of domestic law gave the Stiftung its seat or principal place of business, but the fact that this is a particular " land " does not prevent the overriding consideration that the law applicable is the law of Germany, for the Stiftung's

F    domicile in the relevant sense was Germany, so the law which was to be applied in East Germany was the law of the Federal Republic, the old law before Germany was divided. (6) The law is not just what the courts say; the courts are applying themselves to something outside themselves, which they apply or interpret. Here one is dealing with the provisions of a code, and, though

G    the decisions of a court are usually the best evidence of what the law is, the English courts are not bound to accept them. (7) The decision of the East German Supreme Court goes very little way to

---

[186] 2 Dougl.K.B. 517.
[187] 1 Stark. 347.
[188] 15 App.Cas. 1, 13.
[189] Ibid. 6–7, 9.

[190] (1899) 1 Ch. 781; 15 T.C.R. 211, C.A.
[191] [1964] P. 181; [1964] 2 W.L.R. 371; [1964] 1 All E.R. 341, C.A.

H. L. (E.)
1966
___
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
___

showing what the law of Germany really is and it cannot be A accepted as conclusive without accepting the postulate behind it that there is a state in East Germany established by the East Germans and not by the occupying power. This is not the ordinary type of case where one can look at the decision of the Supreme Court to see what the law is. (8) The decision of the Federal Supreme Court can be looked at on its merits, whereas the East B German court made its decision politically. (9) On the facts the Stiftung could not continue to act in East Germany, where it was immobilised. (10) Accordingly the House of Lords should adopt the law laid down by the Supreme Court in West Germany.

*Guy Aldous Q.C.* on the new cases cited in reply. As to *Bell v. Holmes*,[192] a parallel might be suggested. Suppose an English C driver in Ruritania carrying a Ruritanian passenger is involved in a collision in which his passenger is slightly injured but the driver of the other car is seriously injured. The passenger sues him in Ruritania and he lets judgment be given against him in default of defence. If the other driver sues him in England, he is not estopped from contesting his liability. As to *Ord* v. *Ord*,[193] the D real distinction is between fact estoppel and cause of action estoppel. As to *Barber* v. *Lamb*,[194] that is explained in Spencer Bower on Res Judicata, p. 183, n. (o) and Professor Read on Recognition and Enforcement of Foreign Judgments, p. 117.

[The cross-appeal was ordered to stand over until the decision on the points argued was formulated.] E

Their Lordships took time for consideration.

May 18. LORD REID. My Lords, in this action the appellants are seeking an injunction against the respondents to restrain them from selling optical instruments under the name Carl Zeiss and F for other relief. The present appeal arises out of a summons taken out by the respondents on February 7, 1956, for an order for a stay of proceedings and dismissal of the action on the ground that it was commenced and is being maintained without the plaintiffs' (the appellants') authority. At various dates thereafter lengthy affidavits were filed and after long cross-examination G Cross J. on March 6, 1964, refused to stay the proceedings, having decided against the respondents on the three grounds then put forward by them. The respondents appealed and, having

[192] [1956] 1 W.L.R. 1359.    [194] 8 C.B.N.S. 195.
[193] [1923] 2 K.B. 432.

A  received new advice, put forward a new and quite different ground based on the non-recognition by Her Majesty's Government of the German Democratic Republic. The Court of Appeal on December 17, 1964, allowed the respondents' appeal on this new ground and so found it unnecessary to reach any decision on the grounds maintained before Cross J.

B  I think that it will be convenient first to deal with the new point raised for the first time in the Court of Appeal and then to deal separately with the other grounds. The issues raised are complex and difficult and your Lordships are confronted with some 1,500 pages of affidavits, cross-examination and documents. I shall therefore try to restrict my narrative to those matters

C  which are directly relevant to the issues to be decided.

It is necessary to have the appellants' history in mind. About 1846 Carl Zeiss founded an optical business in Jena. He later assumed as a partner Ernst Abbe of Jena University. Then they and Otto Schott founded a glass works. By 1891 Abbe was the owner of the whole (subject to Schott's interest) and he

D  decided to set up a Stiftung or charitable foundation to own and carry on the two businesses under the name of the Carl-Zeiss-Stiftung. The main objects were to promote " precise technical industry " (which may not be an adequate translation) and to benefit the employees and the working population of Jena.

The constitution of the Stiftung was elaborately set out. First

E  there was to be a special board for the administration of its estate and the supreme direction of its affairs and the rights and duties of the special board were to pertain to " that department of the state service of the Grand Duchy of Saxe-Weimar under which the affairs of the University of Jena are for the time being placed." Then " for directing the industrial operations of the

F  Stiftung " there were to be " boards of management of the various establishments of the Stiftung for the time being " and a permanent official, the Deputy (Stiftungs Kommissar), was to be appointed to represent the special board on the boards of management, and finally article 113 provided:

G  " Should, in consequence of political changes in the state, the provision according to 5 of this statute with reference to the representation of the Stiftung become untenable, this representation including the appointment of the Deputy of the Stiftung within the meaning of 5 and the statutory administration of the Carl-Zeiss-Stiftung shall be made over to that department of state, which with regard to the University of Jena occupies the place of the State Department of the Grand Duchy of Saxe-Weimar acting as special board,

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord Reid

H. L. (E.)
1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

A
  provided that its seat is in Thuringia, otherwise to the highest administrative authorities in Thuringia."

In 1918 under the Weimar Republic the Grand Duchy was abolished and a new state of Thüringia was set up: thereupon the Minister of Education of that state became the special board. Then after 1935 under the National Socialist régime his place was taken by a Reichs-Stathalter. And when Thuringia was occupied by American forces in 1945 a new provincial government of Thuringia was set up by them and its Ministry of Education became the special board. On July 1, 1945, by agreement between the allied powers Thuringia came under Russian occupation and the present controversy turns on what happened thereafter.

We do not have precise evidence about this, but it is said that in 1949 the U.S.S.R. set up the German Democratic Republic to govern that part of Germany then occupied by Russia, and purported to make it an independent state. And it is further said that thereafter the German Democratic Republic purported to act as an independent state in legislating for and administering the Russian zone of Germany. That there is a body calling itself the German Democratic Republic and that it does operate in that zone is, I think, common knowledge. I do not think that common knowledge goes farther than that, but, for the purposes of this appeal, I am prepared to assume that the U.S.S.R. did purport to confer independence on the Democratic Republic and that that body does purport to act as if it were an independent state.

Shortly stated, the respondents' case is that we are bound to have regard to the basis on which the Democratic Republic purports to act, and that as Her Majesty's Government has never granted recognition de jure or de facto to that Republic or its Government, we must refuse to recognise as effective all legislation emanating from it, and all acts done under such legislation. For reasons which I shall give later I do not think that that is right, but first I shall explain why, if it were right, it would be decisive of the point I am now dealing with.

In 1952 the Democratic Republic passed legislation re-organising local government in its "territory," and in fact this legislation was put into effect. The old state or land of Thuringia was abolished and in its place Districts were created, each with a Diet and a Council or Rat. Jena fell within the District of Gera, and the Council of Gera did in fact operate as the special board

H. L. (E.)
1966
___
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
___
LORD REID
___

A    of the appellants, and did in fact authorise the raising of the present action. If the respondents' argument based on non-recognition is well founded, then it must follow that British courts cannot recognise either the existence of the Council of Gera or the validity of anything done by it, and in particular cannot recognise any authority given by it for the raising of the

B    present action. So I must now examine the principles on which this argument is founded.

In the normal case a law is made either by the sovereign directly or by some body entitled under the constitution of the country to make it or by some person or body to which the sovereign has delegated authority to make it. On the other hand, there are

C    many cases where laws have been made against the will of the sovereign by persons engaged in a rebellion or revolution: then until such persons or the government which they set up have been granted de facto recognition by the Government of this country, their laws cannot be recognised by the courts of this country, but after de facto recognition such laws will be recognised. So

D    far there is no difficulty. But the present case does not fit neatly into any of these categories. We are considering whether the law of 1952 under which the Council of Gera was set up can be recognised by our courts and therefore we must ascertain what was the situation in East Germany in 1952.

It is a firmly established principle that the question whether

E    a foreign state ruler or government is or is not sovereign is one on which our courts accept as conclusive information provided by Her Majesty's Government: no evidence is admissible to contradict that information.

"It has for some time been the practice of our courts . . . to take judicial notice of the sovereignty of a state, and for

F    that purpose (in any case of uncertainty) to seek information from a Secretary of State; and when information is so obtained the court does not permit it to be questioned by the parties" (*per* Lord Cave in *Duff Development Co. Ltd.* v. *Government of Kelantan* [1]).

"Such information is not in the nature of evidence; it is a statement by the sovereign of this country through one

G    of his ministers upon a matter which is peculiarly within his cognizance" (*per* Lord Finlay [2]).

In the present case the Court of Appeal twice received such information from the Foreign Secretary. First on September 16, 1964, it was stated: "Her Majesty's Government has not granted

[1] [1924] A.C. 797, 805–806; 40    [2] [1924] A.C. 797, 813.
T.L.R. 566, H.L.(E.).

H. L. (E.)
1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

Lord Reid

any recognition de jure or de facto to (a) the ' German Democratic    A
Republic ' or (b) its ' Government,' " and secondly on Novem-
ber 6, 1964, a further answer was given to questions which had
been asked on October 29.

In my opinion, this latter answer is decisive on the question
which I am now considering and I must therefore quote the rele-
vant question and the relevant parts of the answer or certificate    B
given by the Foreign Secretary. The question was:

> " What (a) states or (b) governments or (c) authorities (if
> any) have since July 1, 1945, up to the present date been
> recognised by Her Majesty's Government as (a) entitled to
> exercise or (b) exercising governing authority in the area of
> Germany outside the zones allocated to the Governments of    C
> the United Kingdom, the United States of America and the
> French Republic by the protocol of September 12, 1944, and
> the agreement of July 26, 1945, concluded between the
> Governments of the said states and the Union of Soviet
> Socialist Republics. Has such recognition been de jure or
> de facto."

The relevant parts of the certificate are as follows:    D

> " The area of Germany to which the question is under-
> stood to refer comprises (a) the zone of occupation allocated
> to the Union of Soviet Socialist Republics under the proto-
> col of September 12, 1944, and the agreement of July 26,
> 1945, as modified by the protocol of the proceedings of the
> Berlin Conference of August 2, 1945, and (b) the ' Greater    E
> Berlin ' area. The question is understood not to relate to the
> areas of Germany placed under Soviet or Polish administra-
> tion in pursuance of the aforesaid protocol of August 2, 1945.
> " (a) From the zone allocated to the Union of Soviet
> Socialist Republics Allied forces under the Supreme Allied
> Commander, General Eisenhower, withdrew at or about the
> end of June, 1945. Since that time and up to the present date
> Her Majesty's Government have recognised the state and    F
> Government of the Union of Soviet Socialist Republics as
> de jure entitled to exercise governing authority in respect of
> that zone. In matters affecting Germany as a whole, the
> states and Governments of the French Republic, the United
> Kingdom of Great Britain and Northern Ireland, the United
> States of America and the Union of Soviet Socialist Republics
> were jointly entitled to exercise governing authority. In the    G
> period from August 30, 1945, to March 20, 1948, they did
> exercise such joint authority through the Control Council for
> Germany. Apart from the states, Governments and Control
> Council aforementioned, Her Majesty's Government have not
> recognised either de jure or de facto any other authority
> purporting to exercise governing authority in or in respect of
> the zone. Her Majesty's Government, however, regard the

A    aforementioned Governments as retaining rights and respon-
sibilities in respect of Germany as a whole."

It was not argued that the matter which I am now considering
is one affecting Germany as a whole; so the rights of the other
three allied Governments do not affect this question, and I need
only consider what the certificate says with regard to the U.S.S.R.
B    and the inferences which must be drawn from it.

The purpose of a certificate is to provide information about
the status of foreign governments and states and therefore the
statement that since June, 1945, " Her Majesty's Government have
recognised the state and Government of the Union of Soviet
C    Socialist Republics as de jure entitled to exercise governing
authority in respect of that zone " cannot merely mean that Her
Majesty's Government have granted this recognition so as to leave
the courts of this country free to receive evidence as to whether in
fact the U.S.S.R. are still entitled to exercise governing authority
there. The courts of this country are no more entitled to hold that
D    a sovereign, still recognised by our Government, has ceased in
fact to be sovereign de jure, than they are entitled to hold that a
government not yet recognised has acquired sovereign status. So
this certificate requires that we must take it as a fact that the
U.S.S.R. have been since 1945 and still are de jure entitled to
E    exercise that governing authority. The certificate makes no
distinction between the period before and the period after the
German Democratic Republic was set up. So we are bound to
hold that the setting up of that Republic made no difference in
the right of the U.S.S.R. to exercise governing authority in the
zone. And it must follow from that that the U.S.S.R. could at any
F    time lawfully bring to an end the German Democratic Republic
and its Government and could then resume direct rule of the zone.
But that is quite inconsistent with there having in fact been any
abdication by the U.S.S.R. of its rights when the German
Democratic Republic was set up.

The judgment of the Court of Appeal appears to me to be
G    based on the view that the courts of this country can and must
accept the position that the U.S.S.R. have recognised the German
Democratic Republic as an independent sovereign state. Har-
man L.J. says [3]: " It is in fact notorious that the U.S.S.R. has
recognised the German Democratic Republic as a sovereign state

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord Reid

[3] [1965] Ch. 596, 651; [1965] 2 W.L.R. 277; [1965] 1 All E.R. 300, C.A.

H. L. (E.)

1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

Lord Reid

A

and treats its law-making capacity accordingly." And Diplock L.J. says [4]:

> " All that I am prepared to assume—and I think it is a matter of which I can take judicial notice—is that the Government of the U.S.S.R. recognises the 'Government of the German Democratic Republic' as the independent sovereign government of an independent sovereign state for whose territory the Government of the U.S.S.R. claims no power to make laws."

B

But the learned judges of the Court of Appeal do not appear to have had their attention directed to the true import of the certificate of the Secretary of State. The U.S.S.R. may have purported to confer independence or sovereignty on the German Democratic Republic but, in my judgment, that certificate clearly requires us to hold that, whatever the U.S.S.R. may have purported to do, they did not in fact set up the German Democratic Republic as a sovereign or independent state. If they retained their right to govern its territory, they could not possibly have done so; and the certificate requires us to hold that they did retain that right.

C

D

If we are bound to hold that the German Democratic Republic was not in fact set up as a sovereign independent state, the only other possibility is that it was set up as a dependent or subordinate organisation through which the U.S.S.R. is entitled to exercise indirect rule. I do not think that we are concerned to enquire or to know to what extent the U.S.S.R. in fact exercise their right of control. At a late stage in the argument before your Lordships counsel for the respondents made an application that further questions should be addressed to Her Majesty's Government. That would be a perfectly proper thing to do if your lordships were of the opinion that the existing certificate is ambiguous or insufficient. But I can see no ambiguity or insufficiency in this certificate and therefore I agree that this application was properly refused.

E

F

It was argued that the present case is analogous to cases where subjects of an existing sovereign have rebelled and have succeeded in gaining control of a part of the old sovereign's dominions. When they set up a new government in opposition to the de jure sovereign that new government does not and cannot derive any authority or right from the de jure sovereign, and our courts must regard its acts and the acts of its organs or officers as nullities until it has established and consolidated its position to such an extent as to warrant our government according de facto recognition of it.

G

[4] [1965] Ch. 596, 664.

A  The case of *Banco de Bilbao* v. *Sancha* [5] affords a fairly recent example of this: there General Franco's adherents had succeeded in gaining control of a large part of Spain and the government which they set up in opposition to the Republican Government was recognised de facto by the British Government. Giving the judgment of the Court of Appeal, Clauson L.J. said [6]:

B  " . . . this court is bound to treat the acts of the government which His Majesty's Government recognise as the de facto government of the area in question as acts which cannot be impugned as the acts of an usurping government, and conversely the court must be bound to treat the acts of a rival government claiming jurisdiction over the same area, even if the latter government be recognised by His Majesty's Government as the de jure government of the area, as a mere nullity, and as matters which cannot be taken into account in any way in any of His Majesty's courts."

*Aksionairnoye Obschestvo A.M. Luther* v. *James Sagor & Co.* [7] is another good example. The case turned on whether the courts of this country could recognise a decree made in 1918 by officers D  of the U.S.S.R. which had by revolutionary means assumed power in Russia. At the time when the case came before Roche J. His Majesty's Government had not recognised the U.S.S.R. and therefore Roche J. properly held that he could not give effect to that decree. But before the case was decided by the Court of Appeal the court were informed by the Secretary of State that His E  Majesty's Government recognised the Soviet Government as the de facto government of Russia. Accordingly the Court of Appeal were able to give effect to the decree.

But the present case is essentially different. The German Democratic Republic was set up by the U.S.S.R. and it derived its authority and status from the Government of the U.S.S.R. So F  the only question could be whether or not it was set up as a sovereign state. But the certificate of our Government requires us to hold that it was not set up as a sovereign state because it requires us to hold that the U.S.S.R. remained de jure sovereign and therefore did not voluntarily transfer its sovereignty to the Democratic Republic. And, if the Democratic Republic did not become a G  sovereign state at its inception, there is no suggestion that it has at any subsequent time attempted to deprive the U.S.S.R. of rights which were not granted to it at its inception. The courts of this country must disregard any declarations of the Government

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

---

[5] [1938] 2 K.B. 176; 54 T.L.R. 603; [1938] 2 All E.R. 253, C.A.
[6] [1938] 2 K.B. 176, 195–196.
[7] [1921] 1 K.B. 456; 37 T.L.R. 282; [1921] 3 K.B. 532; 37 T.L.R. 777, C.A.

906                          HOUSE OF LORDS                    **[1967]**

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd
(No. 2)

LORD REID

of the U.S.S.R. in so far as they conflict with the certificate of    A
Her Majesty's Secretary of State, and we must therefore hold that
the U.S.S.R. set up the German Democratic Republic, not as a
sovereign state, but as an organisation subordinate to the U.S.S.R.
If that is so, then mere declarations by the Government of the
Democratic Republic that it is acting as the government of an
independent state cannot be regarded as proof that its initial    B
status has been altered, and we must regard the acts of the
German Democratic Republic, its government organs and officers
as acts done with the consent of the Government of the U.S.S.R.
as the government entitled to exercise governing authority.

It appears to me to be impossible for any de jure sovereign
governing authority to disclaim responsibility for acts done by    C
subordinate bodies which it has set up and which have not
attempted to usurp its sovereignty. So, in my opinion, the courts
of this country cannot treat as nullities acts done by or on behalf
of the German Democratic Republic. De facto recognition is
appropriate—and, in my view, is only appropriate—where the
new government have usurped power against the will of the    D
de jure sovereign. I would think that where a sovereign has
granted independence to a dependency any recognition of the new
state would be a recognition de jure.

The general practice of the British Government was stated in
Parliament on March 21, 1951, by the Secretary of State for
Foreign Affairs (Hansard, Vol. 485, col. 2410) as follows:    E

" . . . it is international law which defines the conditions under
which a government should be recognised de jure or de facto,
and it is a matter of judgment in each particular case whether
a régime fulfils the conditions. The conditions under inter-
national law for the recognition of a new régime as the de
facto government of a state are that the new régime has in    F
fact effective control over most of the state's territory and that
this control seems likely to continue. The conditions for the
recognition of a new régime as the de jure government of a
state are that the new régime should not merely have effective
control over most of the state's territory, but that it should,
in fact, be firmly established. His Majesty's Government
consider that recognition should be accorded when the con-
ditions specified by international law are, in fact, fulfilled    G
and that recognition should not be given when these con-
ditions are not fulfilled. The recognition of a government
de jure or de facto should not depend on whether the
character of the régime is such as to command His Majesty's
Government's approval."

Recognition implies independence and refusal to recognise

A.C.                    AND PRIVY COUNCIL                    907

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
Lord Reid

A    the German Democratic Republic or its Government is entirely
consistent with that statement if independence was never in fact
granted by the U.S.S.R., for no one suggests that the Democratic
Republic has, or could have, seized independence in defiance of
the U.S.S.R. So there can, in my view, be no question of awaiting
de facto recognition before we can recognise as lawful the acts of
B    the German Democratic Republic. We recognise them, not
because they are acts of a sovereign state, but because they are
acts done by a subordinate body which the U.S.S.R. set up to act
on its behalf.

I am reinforced in my opinion by a consideration of the con-
sequences which would follow if the view taken by the Court of
C    Appeal were correct. Counsel for the respondents did not dispute
that in that case we must not only disregard all new laws and
decrees made by the Democratic Republic or its Government, but
we must also disregard all executive and judicial acts done by
persons appointed by that Government because we must regard
their appointments as invalid. The result of that would be
D    far-reaching. Trade with the Eastern Zone of Germany is not dis-
couraged. But the incorporation of every company in East
Germany under any new law made by the Democratic Republic
or by the official act of any official appointed by its Government
would have to be regarded as a nullity, so that any such company
could neither sue nor be sued in this country. And any civil
E    marriage under any such new law, or owing its validity to the act
of any such official, would also have to be treated as a nullity, so
that we should have to regard the children as illegitimate. And
the same would apply to divorces and all manner of judicial
decisions, whether in family or commercial questions. And that
would affect not only status of persons formerly domiciled in
F    East Germany but property in this country the devolution of
which depended on East German law.

It was suggested that these consequences might be mitigated
if the courts of this country could adopt doctrines which have
found some support in the United States of America. Difficult
questions arose there with regard to acts of administration in the
G    Confederate states during the Civil War and again out of the
delay in recognition of the U.S.S.R. A solution of the earlier
difficulty was found by the Supreme Court in *U.S.* v. *Insurance
Companies* [8] and other similar cases. And for the latter difficulty
solutions were suggested, particularly by Cardozo C.J. in such

[8] (1874) 89 U.S. 99.

H. L. (E.)
1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

cases as *Sokoloff* v. *National City Bank of New York*[9] and     A
*Petrogradsky Mejdunarodny Kom. Merchesky Bank* v. *National
City Bank of New York.*[10] In the view which I take of the present
case, it is unnecessary to express any opinion whether it would be
possible to adopt any similar solutions in this country, if the need
should ever arise.

Finally, on this branch of the case I must deal briefly with     B
three grounds on which the appellants argued that the raising of
this action should be held to have been properly authorised, even
if the actions of the Council of Gera must be disregarded. These
grounds involved the interpretation and effect of a power of
attorney granted to Dr. Schrade in 1951 and questions as to his
powers by virtue of appointments in the Stiftung which he then     C
held. These matters involve German law. They only became
important after the respondents put forward their new case in the
Court of Appeal, so they were only dealt with cursorily, if at all,
in the affidavits and in the evidence led before Cross J. The Court
of Appeal found it possible to decide these questions without
receiving further evidence of German law, which the appellants     D
wished to adduce. In my opinion, these questions could not
properly be decided on the evidence as it stands, and, if they
should ever arise in any other litigation, the judgment of the Court
of Appeal cannot be regarded as res judicata or as having binding
effect.

The next question for consideration is whether by reason of a     E
decision of the Federal Supreme Court of West Germany the
subject-matter of the issue now before this House is res judicata
so that the respondents must succeed without further inquiry.
I can deal briefly with the events which led up to that decision.
When the American forces left Jena in 1945 a number of officers
of the Stiftung and of the firm Carl Zeiss went with them to     F
West Germany. The Stiftung and the firm already had interests
there and these were developed in particular by three of these
officers. After a time relations between them and Jena became
strained and legal proceedings of various kinds were begun.
Decrees were obtained in West Germany to the effect that the
domicile of the Stiftung was removed from Jena to Heidenheim     G
in Würthemberg, and goods were manufactured and sold under
the name Carl Zeiss. Then the West German firm Carl Zeiss
sought to prevent sale in West Germany of the products made in
Jena, and in 1953 an action was commenced at Stuttgart by " the

9 (1924) 145 N.E. 917.              10 (1930) 170 N.E. 479.

A
Carl-Zeiss-Stiftung of Jena represented by the Council of the District of Gera " against the firm Carl Zeiss of Heidenheim and the three individuals who were directing it. The main purpose of this action was to restrain these defendants from using the name Carl Zeiss.

H. L. (E.)
1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

Lord Reid

B
Those defendants at once raised the preliminary objection that the Stiftung was not properly before the court, as the Council of Gera was not the legal representative of the Stiftung. The proceedings on this objection were elaborate and prolonged, but ultimately on November 15, 1960, it was sustained by the Federal Supreme Court. I do not attempt at this point even to summarise the reasons: the various judgments given in this action occupy

C
over 200 closely typed pages of which the final judgment occupies more than 30.

The respondents maintain that this decision must be held decisive of the question now before this House, because the issue in this appeal is the same as that which was decided by the Federal Supreme Court. So, in the first place, it is necessary to

D
make clear what is the question now before this House. On February 7, 1956, the respondents took out a summons

> " for an order that all further proceedings in this action be stayed and that this action be dismissed on the ground that the same was commenced and is being maintained without the plaintiffs' authority and that Messrs. Courts & Co., the solicitors purporting to act for the plaintiffs herein, do pay to the defendants the costs of this action . . . to be taxed as between solicitor and client."

E

This question, whether these solicitors are maintaining this action without the authority of the Stiftung, is the sole question which your Lordships now have to determine.

F
There is a vast amount of authority on estoppel per rem judicatam.

> " The object of the rule of res judicata is always put upon two grounds—the one public policy, that it is the interest of the state that there should be an end of litigation, and the other, the hardship on the individual, that he should be vexed twice for the same cause " (*per* Lord Blackburn in *Lockyer v. Ferryman*.[11])

G

And the general principle is clear that the earlier judgment relied on must have been a final judgment, and that there must be identity of parties and of subject matter in the former and in the

[11] (1877) 2 App.Cas. 519, 530, H.L.(Sc.).

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

present litigation. But each of these three requirements can give  A
rise—and in the present case does give rise—to difficult questions.

Let me take first identity of parties. In this preliminary or
interlocutory matter the issue is whether the nominal plaintiff is
before the court at all. If it is decided in favour of the defendant,
that establishes that the nominal plaintiff never was before the
court. So I do not see how the nominal plaintiff, here the Stiftung,  B
can be a party to that issue. And it is admitted that the Stiftung
was not a party to the German proceedings. The defendants are
of course parties—they raise the issue. But who is their opponent?
We are not told the precise implications of the requirement of
German procedure as to "representation," but I am content to
assume that the Council of Gera was a party to the German  C
proceedings: that council was ordered to pay the costs. But who
is the appellant in this House? Again, I think, not the Stiftung.
The issue is whether the solicitors are maintaining the action
without authority and surely they must be parties—how else
could they be made personally liable to the respondents in costs.
And I can see no other party—no other appellant. It was argued  D
that the Council of Gera can be regarded as parties but I can see
no ground for that. There may be a question when I come to
deal with privity. But the Council of Gera has never sought to
be a party and no one has sought to make them a party.

Again there is no doubt that the requirement of identity of
parties is satisfied if there is privity between a party to the former  E
litigation and a party to the present litigation. The only way in
which that could be satisfied in this case would be if there were
privity between the Council of Gera and the solicitors. We have
a letter from the Council of Gera in their capacity of special board
of the Stiftung authorising the raising of this action, but we do not
know whether that council has taken any further part, whether it  F
has given any further instructions, or whether it is using the funds
of the Stiftung to finance this litigation. The most that can be said
is that the council is the "client" instructing the solicitors,
though I doubt whether that is proved; the real question may be
whether there is a "client" at all. Does this make them privies?
It has always been said that there must be privity of blood, title  G
or interest: here it would have to be privity of interest. That can
arise in many ways, but it seems to me to be essential that the
person now to be estopped from defending himself must have had
some kind of interest in the previous litigation or its subject-
matter. I have found no English case to the contrary. If that is

A right, then there can be no privity here because these solicitors had no connection with and certainly no interest in the German litigation.

There does, however, seem to me to be a possible extension of the doctrine of privity as commonly understood. A party against whom a previous decision was pronounced may employ a
B servant or engage a third party to do something which infringes the right established in the earlier litigation and so raise the whole matter again in his interest. Then, if the other party to the earlier litigation brings an action against the servant or agent, the real defendant could be said to be the employer, who alone has the real interest, and it might well be thought unjust if he could vex
C his opponent by relitigating the original question by means of the device of putting forward his servant. But this is not a case of that character. The Council of Gera has no substantial interest in this litigation. If the plaintiff succeeds, the only persons who can benefit are the Stiftung or the two nationalised firms in Jena to which I shall refer later. The Council of Gera is merely a
D local public authority, like a county council, on which there has been imposed the duty of acting as the special board of the Stiftung and there is nothing to show that the council or any of its members will gain anything if the plaintiff wins, or lose anything if the plaintiff loses this case. And here the respondents are seeking to make these solicitors personally liable to them in
E solicitor and client costs—in effect seeking damages against them for breach of warranty of authority. In my view, the solicitors cannot properly be held to be estopped from defending themselves, and showing that they have authority to act, by a judgment which had nothing to do with them.

There is little authority bearing on a question of this kind.
F The only modern English case cited was *Mercantile Investment and General Trust Co.* v. *River Plate Trust, Loan and Agency Co.*[12] The facts were complicated but it is sufficient, for present purposes, to say that the plaintiffs in this action had obtained a judgment against another company (" the American company ")
G and they maintained this as an estoppel against the defendants in this action (" the English company ") on the ground that, by reason of an indemnity given by the English company, the English company had assisted the American company in the previous action and had paid their costs, so that they were virtually parties

[12] [1894] 1 Ch. 578; 10 T.L.R. 186.

H. L. (E.)
1966
───
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
───
LORD REID
──

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

to the previous action. Romer J. dealt with this point very
briefly and held that there was no estoppel.

I should also refer to *Kinnersley* v. *Orpe* [13] which was cited as
relevant on privity. There Dr. Cotton claimed a right to fish and
sent a servant, Orpe, to assert it. Kinnersley brought an action of
trespass and succeeded. Then Dr. Cotton sent another servant,
also called Orpe, to fish and this action was brought against him.
The plaintiff simply produced the record in the former case and
Perryn B. held this evidence conclusive, " both the Orpes having
acted under the authority of Cotton, who was the real defendant
in both causes." On a rule " the court also thought that the
record in the former cause, though admissible evidence, was not
conclusive." With regard to this case Lord Ellenborough C.J.
said in *Outram* v. *Morewood* [14]:

" As to the case of *Kinnersley* v. *Orpe*,[15] it is extraordinary
that it should ever have been for a moment supposed that
there could be an estoppel in such a case. It was not pleaded
as such; neither were the parties in the second suit the same
with those in the first."

And a little later he referred to " the defendant, who was no party
to the former action."

One should not attach too much weight to this, because it was
a very minor point in Lord Ellenborough's elaborate and learned
judgment. But at least it never occurred to him that the doctrine
of privity could be stretched to affect a defendant from whom a
penalty was claimed and who had no connection with the previous
case, merely because his employer had been concerned with it.

The respondent sought to rely on American authorities.
Their effect is summarised in the American Restatement (Judg-
ments), Chap. IV. The only section which seemed to me to
come near to applying to the appellant solicitors is at pp. 402–403,
s. 85 (2):

" Where a person is bound by or entitled to the benefit of the
rules of res judicata because of a judgment for or against him
with reference to a particular subject-matter, such rules apply
in a subsequent action brought or defended by another on
his account."

With that I would agree; and, if these solicitors were bringing this
action on account of or for the benefit of the Council of Gera,
I would hold that res judicata could be pleaded against them.

[13] (1780) 2 Dougl.K.B. 517, 518.    [15] 2 Dougl.K.B. 517.
[14] (1803) 3 East 346, 366.

A    But I have already stated my view that this action is not brought on account of or for the benefit of the Council of Gera and, in particular, these solicitors are not contesting the issue now before your Lordships for the benefit of that council. In so far as they are not acting to protect their own interests they are seeking to act for the benefit of the Stiftung, and it is not alleged

B    that the plea of res judicata would be good against the Stiftung.

    The second requirement for res judicata is identity of subject-matter. As to this, it has become common to distinguish between cause of action estoppel and issue estoppel. There is certainly no cause of action estoppel here. The question before the German

C    court was whether the Council of Gera were the legal representatives of the Stiftung at one date. The question here is whether at a different date the solicitors had the authority of the Stiftung to raise this action. An answer, yes or no, to the first question does not necessarily imply a similar answer to the second. What the respondents maintain is that the grounds on which the German

D    court in fact decided the first question are such that we cannot decide this case in favour of the solicitors without disagreeing with at least some of the findings on which the German court based their decision. I think that that is true and the question is whether we are entitled to do that.

E    Issue estoppel may be a comparatively new phrase, but I think that the law of England—unlike the law of some other countries—has always recognised that estoppel per rem judicatam includes more than merely cause of action estoppel. The earliest case commonly referred to on res judicata is *The Duchess of Kingston's* case [16] in 1776. The Duchess of Kingston was prosecuted for bigamy in this House. She put forward in defence a

F    decision of an ecclesiastical court that her first marriage was invalid. The first question put to the judges who were in attendance was whether a sentence of the spiritual court against the marriage was conclusive evidence. The unanimous opinion of the judges was given by De Grey C.J. and in the course of it he said [17]:

G    " From the variety of cases relative to judgments being given in evidence in civil suits, these two deductions seem to follow as generally true: first, that the judgment of a court of concurrent jurisdiction, directly upon the point, is as a plea, a bar, or as evidence, conclusive, between the same parties, upon the same matter, directly in question in another court:

[16] (1776) 20 St. Tr. 355.    [17] Ibid. 538 n.

H. L. (E.)

1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

Lord Reid

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord Reid

A

secondly, that the judgment of a court of exclusive jurisdiction, directly upon the point, is, in like manner, conclusive upon the same matter, between the same parties, coming incidentally in question in another court, for a different purpose. But neither the judgment of a concurrent or exclusive jurisdiction is evidence, of any matter which comes collaterally in question, though within their jurisdiction; nor of any matter incidentally cognizable: nor of any matter to be inferred by argument from the judgment."

B

In referring to a judgment being conclusive on the same matter " coming incidentally in question in another court for a different purpose " the judges were clearly going beyond cause of action estoppel, but I need not attempt to discover just how far they meant to go because this has been developed in many later decisions.

C

In *Reg.* v. *Inhabitants of the Township of Hartington Middle Quarter* [18] it appeared that in a previous litigation it had been decided that two young children had a settlement in the defendants' township. The question at issue in this case was the settlement of their mother and it was held that the defendants were estopped from denying that she had the same settlement. The cause of action was obviously not the same. Coleridge J., in delivering the judgment of the court, said [19]:

D

" The question then is, whether the [former] judgment concludes, not merely as to the point actually decided, but as to a matter which it was necessary to decide, and which was actually decided, as the groundwork of the decision itself, though not then directly the point at issue. And we think it does conclude to that extent. . . . Now, it cannot be said that the facts we are considering were merely collateral to the decision in the former case. The question then was where two unemancipated children were settled: and it was answered by showing that they were the legitimate issue of William and Esther, that is, that these two were lawfully married, and the children born after, and that William was settled with the now appellants. Strike either of these facts out, and there is no ground for the decision: these facts therefore were necessarily and directly matter of enquiry. The question now is, where is Esther settled? and this is answered by showing the same two facts, the marriage of Esther and William, and the settlement of William, the two facts already decided. The judgments in the two cases therefore rest on the same foundation; which, having been settled in the first, cannot be, as between the same parties, unsettled in the latter."

E

F

G

[18] (1855) 4 E. & B. 780.          [19] Ibid. 794–795.

H. L. (E.)

1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

A    In *Flitters* v. *Allfrey*[20] a landlord alleging a weekly tenancy obtained a warrant for the eviction of the tenant and then sued him in the county court for 29 weeks' rent. He failed in this action because the judge held there was a yearly tenancy. Then the tenant sued for damages for eviction. Lord Coleridge C.J. said[21]:

B    "The now plaintiff succeeded upon the trial of a plaint in the county court which involved the same question of fact as that which was in issue in this cause, viz., whether his tenancy under the defendant was a weekly or a yearly tenancy. The defendant thought the decision of the county court wrong. Upon the trial of this cause, the jury thought so too; and I agreed with them: but the plaintiff, against the
C    right, succeeded upon an estoppel."

Counsel had pointed out that failure to succeed in the action for rent did not on the face of it or necessarily involve any decision that the tenancy was yearly and not weekly: but that was in fact the ground on which the county court judge decided the case and
D    the landlord was not allowed to relitigate that issue in the tenant's subsequent action for damages.

These two cases appear to me to be authorities directly in favour of issue estoppel, but the complications in each were such that it is easy to miss the point, and little attention seems to have been paid to this form of estoppel until comparatively recently.

E    A case which has given rise to some difficulties is *Hoystead* v. *Commissioner of Taxation.*[22] There an appeal with regard to income tax for an earlier year had been decided on an assumption that certain beneficiaries under a will were joint owners. Then in a case as to liability to tax in a later year the commissioner tried to maintain that that assumption had been wrong but he was held
F    to be estopped. Lord Shaw in delivering the judgment of the board, after citing numerous authorities, including the judgment of Lord Ellenborough C.J. in *Outram* v. *Morewood,*[23] said[24]:

"It is seen from this citation of authority that if in any court of competent jurisdiction a decision is reached, a party
G    is estopped from questioning it in a new legal proceeding. But the principle also extends to any point, whether of assumption or admission, which was in substance the ratio of and fundamental to the decision."

[20] (1874) L.R. 10 C.P. 29.          [23] 3 East 346.
[21] Ibid. 43.                        [24] [1926] A.C. 155, 170.
[22] [1926] A.C. 155; 42 T.L.R. 207,
P.C.

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

Comments were made on that passage in *New Brunswick Railway Co.* v. *British and French Trust Corporation Ltd.*[26] by Lord Russell[27] and Lord Romer[28] and in *Society of Medical Officers of Health* v. *Hope*[29] by Lord Radcliffe. And there may well be a difference between a case where an issue was in fact decided in the earlier case and a case where it was not in fact decided because the earlier judgment went by default or was founded on an assumption. Indeed, I think that some confusion has been introduced by applying to issue estoppel without modification rules which have been evolved to deal with cause of action estoppel, such as the oft-quoted passage from the judgment of Wigram V.-C. in *Henderson* v. *Henderson.*[30] But it is unnecessary to pursue that matter because in the present case the issues with regard to which the respondents plead estoppel were fully litigated in the West German court.

In *Marginson* v. *Blackburn Borough Council*[31] both the parties had been defendants in a county court action in which a plaintiff claimed damages for negligence and they had been held both to blame. This was held to estop the plaintiff in this action from maintaining (in his personal capacity) that he was not to blame.

> " In such a case the question arises, what was the question of law or fact which was decided [in the earlier case]? And for this purpose, it may be vital in many cases to consider the actual history of the proceedings " (*per* Slesser L.J., delivering the judgment of the court[32]).

*Thoday* v. *Thoday*[33] is the most recent of a series of matrimonial cases raising this question. There are special considerations in this field, so Willmer L.J. only says[34]:

> " . . . there may be cases in which a party may be held to be estopped from raising particular issues, if those issues are precisely the same as issues which have been previously raised and have been the subject of adjudication."

But Diplock L.J. dealt with the matter on more general lines and what he says is further explained in *Fidelitas Shipping Co. Ltd.* v. *V. O. Exportchleb.*[35] He draws a distinction between issue estoppel and fact estoppel which I find difficult to understand.

A
B
C
D
E
F
G

[26] [1939] A.C. 1; 55 T.L.R. 260; [1938] 4 All E.R. 747, H.L.(E.).
[27] [1939] A.C. 1, 28.
[28] Ibid. 42.
[29] [1960] A.C. 551, 566; [1960] 2 W.L.R. 404; [1960] 1 All E.R. 317, H.L.(E.).
[30] (1843) 3 Hare 100.

[31] [1939] 2 K.B. 426; 55 T.L.R. 389; [1939] 1 All E.R. 273, C.A.
[32] [1939] 2 K.B. 426, 437.
[33] [1964] P. 181; [1964] 2 W.L.R. 371; [1964] 1 All E.R. 341, C.A.
[34] [1964] P. 181, 191.
[35] [1966] 1 Q.B. 630; [1965] 2 W.L.R. 1059; [1965] 2 All E.R. 4, C.A.

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

A  Suppose that as an essential step towards the judgment in an earlier case it was decided (a) that on a particular date A owed B £100 or (b) that on that date A was alive. The first is, or at least probably is, a question of law, the second is a pure question of fact. Are these findings to be treated differently when issue estoppel is pleaded in a later case? Or take marriage—an issue in

B  the earlier case may have been whether there ever was a ceremony (a pure question of fact) or it may have been whether the ceremony created a marriage (a question of law). I cannot think that this would make any difference if in a later case about quite different subject matter the earlier finding for or against marriage was pleaded as creating issue estoppel.

C  The difficulty which I see about issue estoppel is a practical one. Suppose the first case is one of trifling importance but it involves for one party proof of facts which would be expensive and troublesome; and that party can see the possibility that the same point may arise if his opponent later raises a much more important claim. What is he to do? The second case may never

D  be brought. Must he go to great trouble and expense to forestall a possible plea of issue estoppel if the second case is brought? This does not arise in cause of action estoppel: if the cause of action is important, he will incur the expense: if it is not, he will take the chance of winning on some other point. It seems to me that there is room for a good deal more thought before we settle

E  the limits of issue estoppel. But I have no doubt that issue estoppel does exist in the law of England. And, if it does, it would apply in the present case, if the earlier judgment had been a final judgment of an English court.

Next I must consider whether it makes any difference that the former judgment was the judgment of a foreign court. At one

F  time foreign judgments were regarded as being only evidence and not conclusive. But at least since the decision in *Godard* v. *Gray* [36] they have been regarded as equally conclusive with English judgments (subject to any difference there may be resulting from there being no merger of a cause of action in a foreign judgment). The same pleas, for example, fraud or lack of jurisdiction, are good

G  against both. It would seem that the only plea which may be available against foreign judgments alone is perversity, if *Simpson* v. *Fogo* [37] was rightly decided. In that case Page Wood V.-C. refused to give effect to a judgment of the Supreme Court of Louisiana. There was no question of perversity in the ordinary

[36] (1870) L.R. 6 Q.B. 139.     [37] (1862) 1 H. & M. 195.

H. L. (E.)
1966
———
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
———
Lord Reid
———

sense of obstinately or dishonestly shutting one's eyes to what   A
one knows to be right. The Supreme Court had applied what they
believed to be their common law, but it was at variance with a
generally accepted rule of private international law, which
required foreign (in this case, English) law to be applied in the
circumstances of that case. Page Wood V.-C. called [38] this " a
perverse and deliberate refusal to recognise the law of the   B
country by which title has been validly conferred." I shall have to
return to this case later.

I can see no reason in principle why we should deny the
possibility of issue estoppel based on a foreign judgment, but
there appear to me to be at least three reasons for being cautious
in any particular case. In the first place, we are not familiar with   C
modes of procedure in many foreign countries, and it may not be
easy to be sure that a particular issue has been decided or that
its decision was a basis of the foreign judgment and not merely
collateral or obiter. Secondly, I have already alluded to the
practical difficulties of a defendant in deciding whether, even in
this country, he should incur the trouble and expense of deploying   D
his full case in a trivial case: it might be most unjust to hold that
a litigant here should be estopped from putting forward his case
because it was impracticable for him to do so in an earlier case of
a trivial character abroad, with the result that the decision in that
case went against him. These two reasons do not apply in the
present case. The case for the Stiftung, or on this issue those who   E
purported to represent it, was fought as tenaciously in West
Germany as this case has been fought here, and it is not difficult
to see what were the grounds on which the West German judg-
ment was based. But the third reason for caution does raise a
difficult problem with which I must now deal.

It is clear that there can be no estoppel of this character   F
unless the former judgment was a final judgment on the merits.
But what does that mean in connection with issue estoppel? When
we are dealing with cause of action estoppel it means that the
merits of the cause of action must be finally disposed of so that
the matter cannot be raised again in the foreign country. In this
connection the case of *Nouvion* v. *Freeman* [39] is important. There   G
had been in Spain a final judgment in a summary form of proce-
dure. But that was not necessarily the end of the matter, because
it was possible to reopen the whole question by commencing a
different kind of action: so the summary judgment was not res

———

[38] 1 H. & M. 195, 247.          [39] (1889) 15 App.Cas. 1, H.L.

A  judicata in Spain. I do not find it surprising that the House unanimously refused to give effect in England to that summary judgment.

When we come to issue estoppel I think that, by parity of reasoning, we should have to be satisfied that the issues in question cannot be relitigated in the foreign country. In other

B  words, it would have to be proved in this case that the courts of the German Federal Republic would not allow the re-opening in any new case between the same parties of the issues decided by the Supreme Court in 1960, which are now said to found an estoppel here. There would seem to be no authority of any kind on this matter, but it seems to me to verge on absurdity that

C  we should regard as conclusive something in a German judgment which the German courts themselves would not regard as conclusive. It is quite true that estoppel is a matter for the lex fori but the lex fori ought to be developed in a manner consistent with good sense.

D  The need to prove whether West German law would permit these issues to be re-opened there appears to have escaped the notice of the appellants' advisers and your Lordships are left in considerable difficulty. On the one hand, there is always a presumption that the foreign law on any particular question is the same as English law unless the contrary is proved. On the other

E  hand, it would be remarkable if German law had reached precisely the same stage of development on issue estoppel as the law of England has, and there are some indications in the German judgments that it has not. I have had an opportunity of reading the views of my noble and learned friend, Lord Wilberforce, on this matter. I do not dissent from them. But I must rest my

F  judgment that there is here no res judicata or estoppel on there being no sufficient identity of parties in the West German proceedings and in the matter now before your Lordships.

As I am of opinion that the respondents do not succeed on these preliminary pleas I must now turn to the substantial question in this appeal—have the respondents proved that the plaintiff's

G  solicitors have commenced and are maintaining this action without the plaintiff's authority? The plaintiff is a foreign corporation and it is not maintained that it has ceased to exist. Further, it is not disputed that the capacity of a foreign corporation and the functions and powers of its organs or officers are matters for the law of its domicile. So the first question is—what is the legal domicile of the Stiftung? Its constitution provides in article 3:

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord Reid

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

"The legal domicile of the Stiftung shall be Jena." I have men-    A
tioned West German decrees to the effect that the domicile
shall be Heidenheim, but counsel for the respondents stated that
he did not rely on these decrees in the present appeal. He did,
however, argue that, according to German law, its domicile is
in Germany as a whole. But Germany is, for the time being at
least, divided; the Federal Republic being sovereign in West    B
Germany, and the U.S.S.R. having sovereign authority in the
Eastern Zone. And the law in those two parts of Germany may
now not be the same.

The respondents submitted in argument that we must regard
the law of West Germany as paramount. They relied on the
language of the second Foreign Office certificate given on    C
November 6, 1964. This contained an extract from a Foreign
Minister's communiqué which stated:

> "Pending the unification of Germany, the three Governments
> consider the Government of the Federal German Republic
> as the only German government freely and legitimately
> constituted and, therefore, entitled to speak for Germany as    D
> the representative of the German people in international
> affairs."

This is followed in the certificate by the following words: "This
statement does not constitute recognition of the Government of
the Federal Republic of Germany as the de jure Government of
all Germany." It was argued that the determination of the status    E
of and the right to represent a body incorporated under the law
of the State of Germany prior to 1945 are matters which affect
Germany as a whole and which, if arising outside Germany, are
within the scope of the Foreign Office communiqué. But for the
reason given by my noble and learned friend, Lord Hodson, I
cannot accept this argument.    F

What, then, is the law of the Eastern Zone with regard to
these matters? It is well settled that you do not take the code
or statutes or other sources of law and construe them according
to English ideas. Foreign law is a question of fact to be decided
by evidence.

> "The evidence it is clear must be that of qualified experts in    G
> the foreign law. If the law is contained in a code or written
> form, the question is not as to the language of the written law,
> but what the law is as shown by its exposition, interpretation
> and adjudication" (*per* Lord Wright in *Lazard Brothers &
> Co.* v. *Midland Bank Ltd.*[40]).

[40] [1933] A.C. 289, 298; 49 T.L.R. 94, H.L.(E.).

A    On several occasions it has been necessary to decide in a case here what is the law of a foreign country on a point which has already been the subject of a decision by a court of that country. A good example is *Bankers and Shippers Insurance Co. of New York* v. *Liverpool Marine and General Insurance Co. Ltd.*[41]

In that case the question was whether according to the law

B    of New York State it was necessary to the validity of an award that an order of court should have been obtained. The Court of Appeal in England held that it was not. Then in another case, *Bullard* v. *Morgan H. Grace & Co.*[42] the Court of Appeal of New York decided that it was necessary. Then this House reversed the decision of the Court of Appeal and followed the American

C    decision. Lord Buckmaster said [43]: " Unaided by that authority your Lordships would, I think, have supported the judgment appealed from." Lord Sumner said [44]:

"Evidence of the opinion of the highest court of the foreign state whose law happens to form the subject matter of proof in this country, is obviously for an English court the best

D    available evidence upon the question, and is such that, if it is clearly directed to the point in dispute and is insusceptible of any but one interpretation, other evidence of that law could hardly be set against it."

There is a quotation with approval of what Scrutton L.J. had said in the Court of Appeal [45]:

E    " I agree with the view of Lord Sterndale in *Hannay's* case [46] that while it is almost certain that an English court would not differ from a decision of the Supreme Court of the state on the law of that state, the decision of a subordinate court is only an ' opinion of an expert on the fact, to be treated with respect, but not necessarily conclusive '."

F    In the present case we have not only two judgments of the Supreme Court of the Eastern Zone but also uncontradicted evidence of skilled witnesses that every court in the Eastern Zone would hold that the Council of Gera is entitled to act as the special board of the Stiftung. And we have evidence that the Stiftung has brought a number of actions in recent years in East Germany and has obtained judgments in its favour. How,

G    then, did the West German courts come to decide as they did?

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord Reid

[41] (1926) 24 Ll.L.R. 85 H.L.(E.).
[42] (1924) 206 N.Y.S. 335.
[43] 24 Ll.L.R. 85, 88.
[44] Ibid. 94.
[45] (1925) 21 Ll.L.R. 86, 91, C.A.
[46] [1918] 2 K.B. 623, 667; 34 T.L.R. 427, C.A. (In the report of the *Bankers and Shippers Insurance* case (supra) the dictum from *Guaranty Trust Co. of New York* v. *Hannay & Co.* (supra) is erroneously attributed to Lord Sterndale and in fact appears in the judgment of Scrutton L.J. in the latter case.)

H. L. (E.)
1966
──────
Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)
──────
LORD REID
──

Cross J. was inclined to hold that the West German courts    A
were acting perversely in disregarding the judgments of the Eastern
courts. I do not take that view. I am certainly not prepared to
hold that the West German courts gave judgments which they
knew to be wrong. They may have erred, but honest error is a
very different thing from perversity. Counsel for the appellants
argued that this case fell within the ratio of *Simpson* v. *Fogo*,[47]    B
to which I have already referred. That case was cited more than
once with approval in the nineteenth century but in *Aksionairnoye
Obschestvo A.M. Luther* v. *James Sagor & Co.*[48] Scrutton L.J. said
that it had been the subject of considerable adverse comment. In
my view, if *Simpson* v. *Fogo* [49] can stand at all it must be limited
to cases where the law of the foreign country applied in the foreign    C
judgment is at variance with generally accepted doctrines of private
international law. But then one must bear in mind what was said
by Lindley L.J. in *In re Queensland Mercantile and Agency Co.*[50]
about different countries taking different views on international law.
And Page Wood V.-C. himself indicates that there might be a
difference if the foreign judgment were founded on a statute [51] or
on mistake [52]—distinctions which I have difficulty in appreciating.    D
To distinguish *Simpson* v. *Fogo* [53] it is sufficient to say that the
West German courts did not refuse to apply the law of East
Germany: they applied what they thought was the law of East
Germany.

It is not easy to summarise the long judgment of the Federal    E
Supreme Court, but it appears to me to be based on the view
that Germany is still one country and that the law of Germany
applies equally in the East as in the West, subject only to new
local enactments, of which there are none relevant to this case.
On that view the West German courts hold themselves entitled
to override the decisions of the East German courts, if they    F
regard those decisions as wrong in law.

The main question which has given rise to this conflict in
the present case is the effect of confiscatory decrees of the Russian
Military Administration. It is not disputed that as a result there
was confiscation of the assets of the two firms Carl Zeiss and
Schott & Co., and these two businesses were then carried on as    G
nationalised industries—Volks Eigene Betriebe, referred to as
VEBs. But it is not clear how far this affected other assets of

──────────

[47] 1 H. & M. 195.
[48] [1921] 3 K.B. 532.
[49] 1 H. & M. 195.
[50] [1892] 1 Ch. 219, 226; 8 T.L.R.
177, C.A.

[51] 1 H. & M. 195, 234.
[52] Ibid. 242.
[53] 1 H. & M. 195.

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

A    the Stiftung, and it is proved that in recent years the Stiftung has been treated by the East German authorities as owning a large amount of property; it has an annual revenue of some £180,000 and employs a staff of about 170. And the Council of Gera has in fact acted as the special board and in particular has authorised the raising of various local proceedings in the Eastern

B    Zone.

The main ground of the West German judgment is that after the businesses of these two firms were separated from the Stiftung by confiscation it became legally impossible under its constitution for the Stiftung to carry on any activities. The only lawful course was to wind up the Stiftung as provided in its

C    constitution, and neither the Stiftung nor any of its organs had any power to carry on any other activity; so the Council of Gera could not authorise the proceedings in West Germany which were brought to an end by the judgment of the Supreme Court. That court was aware that the East German Supreme Court had reached a decision to the contrary, but in effect it held that the

D    East German court had wrongly applied the law of Germany.

I am not impressed by the reasoning in this judgment but, even if it were convincing, I cannot see how it would be relevant. The West German courts have no jurisdiction over East Germany. The two parts of Germany are at present under different sovereignties: they have separate legal systems and are separate jurisdic-

E    tions. According to the commonly accepted doctrine of private international law, the courts of one state or jurisdiction cannot of their own knowledge determine what is the law in a different state or jurisdiction. That has to be proved by evidence and, if it is clear, as in this case it was, and is, that all courts in one state or jurisdiction have decided and will decide a particular

F    question in one way, the courts of another state or jurisdiction have no right to decide that that question ought to have been decided in a different way.

Let me take an analogy. Many countries formerly under the British Crown still follow the common law. Suppose that this House were to reach a decision on a point of common law which

G    did not meet with general acceptance. All courts in this country must follow that decision, but courts in other common law jurisdictions are free to decide otherwise. Suppose, however, that in one of those other countries a question arose as to what is the law of England on that point: the principles of private international law would require the courts of that other country to

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

decide that the law of England is what the House of Lords has A
said it is, and they could not say that the House of Lords had
reached a wrong decision on this point of common law, however
much they might disagree with it. If they did substitute their
own view for that of the supreme authority in England, they
would then be deciding what they thought the law of England B
ought to be and not what in fact it is. It appears to me that the
only legitimate ground for rejecting a decision of a foreign court
as to its own law is an expectation that, if the point arose again
in the foreign country and were carried to the Supreme Court,
it would be decided differently. The West German courts appear
to take a different view of the principles of private international C
law. The German Federal Republic is a sovereign state and its
courts are entitled to their own view. But so are we. And I
would not accept their view.

But then it is said that the courts of East Germany are
influenced by political considerations. It is true that when one
examines the judgments of the East German Supreme Court— D
and particularly the second of them—one finds them plentifully
sprinkled with Communist clichés. No doubt professing Com-
munists find it necessary to adopt this form of embellishment. But
going behind this ornamentation I find a judicial approach and
a reasonable result. And, even if political considerations were
apparent, it would remain true that what the courts have decided E
is in fact the law which is being enforced in the foreign
country.

And finally it is said that because the members of the Council of
Gera are Communists and bound to act as Communist theory
and government directions require, therefore they cannot act as
the special board in the interests of the Stiftung as the constitu- F
tion of the Stiftung requires. This may be common knowledge
in West Germany, but I cannot agree that it is common know-
ledge here. On the contrary, it is common knowledge here that
individuals often fail to live up to—or to live down to—their
principles. This is an action to vindicate the right of the Stiftung
to its own property: this Communist body has authorised it, G
whatever view Communist theory might take about it.

That brings me to an important question which was raised
in the West German case and before Cross J. The respondents
found on the principle that English courts will not assist the
enforcement of foreign confiscatory laws, and argue that therefore
the appellants cannot be given the relief which they seek in this

A    case. Your Lordships did not permit that matter to be argued in
this appeal because it is not relevant on the only question now
before this House—the authority of the solicitors to act for the
Stiftung. But the respondents will be free to raise that issue in
their pleadings and at the trial of this action, and nothing that
Cross J. may have said on this matter can hamper or limit the
B    power of the trial judge to deal with it.

On the whole matter I would allow this appeal and restore
the order of Cross J.

LORD HODSON. My Lords, on the first part of the case I agree
entirely with the opinion which has been given by my noble and
learned friend, Lord Reid. In my view, the Foreign Office
C    certificate was conclusive against the view taken by the Court
of Appeal. The U.S.S.R. having the de jure sovereignty over the
so-called German Democratic Republic there is no room for any
other de facto recognition and the courts of this country must
hold that the U.S.S.R. is still entitled to exercise authority over
D    the territory and to bring to an end the German Democratic
Republic which only exists on sufferance. This effect of the
certificate holds good so far as this country is concerned and is
not affected by any pronouncement of the U.S.S.R. itself as to
whether or not it recognises the German Democratic Republic
as a sovereign state.

E    On the second part of the case, the respondents have argued
that the solicitors, Messrs. Courts & Co., who have the conduct
of these proceedings on behalf of the appellant have no authority
to do so, since they are estopped by the judgment of the Supreme
Court of the Federal Republic of Germany in an action brought
in the name of the appellants as plaintiffs against the respondents
in this action. This is a formidable argument and involves con-
F    sideration of the operation and effect of foreign judgments.

The courts have moved a long way since the opinion was
expressed by Lord Brougham L.C. in 1834 in the Irish appeal of
*Houlditch* v. *Donegal* [54] that " the judgment of a foreign court in
courts of this country is only prima facie evidence—is liable to be
J    averred against, and not conclusive." The modern doctrine
accepted since the decision of *Godard* v. *Gray* [55] is that a foreign
judgment may be pleaded and is conclusive.

If this is so, I see no reason why the rule of estoppel per rem
judicatam should not be applied, subject to the caution contained

[54] (1834) 8 Bligh (N.S.) 301, 338,        [55] L.R. 6 Q.B. 139.
H.L.(Ir.).

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD REID

926                              HOUSE OF LORDS                        **[1967]**

H. L. (E.)
· 1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
LORD
HODSON

in Lord Brougham's observations in *Houlditch* v. *Donegal* [56] as
to the difficulties which arise from the differences in the course
of procedure as between one jurisdiction and another.

Although estoppel operates most commonly in those cases
which cover " cause of action," the English rule has always been
wide enough to cover " issue estoppel "—see *The Duchess of
Kingston's Case*,[57] a passage from which has been quoted by my
noble and learned friend, Lord Reid, and *Reg.* v. *Inhabitants of
the Township of Hartington Middle Quarter*,[58] likewise quoted
by my noble and learned friend. The estoppel here, if any, must
be issue estoppel, the issue being that of want of authority to bring
an action. Upon this the respondent succeeded in the West
German action in which judgment was delivered by the Federal
Supreme Court on November 15, 1960. On principle the judg-
ment should be binding on the parties and their privies, to
whom I will later refer. There may be difficulties in applying the
principle through the necessity of following the course of pro-
cedure when pleadings and evidence have to be examined to
ascertain what issues have been determined. There may be cases
of manifest injustice, that is, in a case, perhaps, where a defen-
dant having a minimal interest in a matter allows a case to go by
default, exposing himself to the risk of being bound by the judg-
ment when the issue turns out to be more serious for him. None
of these difficulties appears to exist in this case. The West
German judgment is detailed and elaborate and leaves no doubt
as to the precise issue about which the parties were contending,
an issue which was regarded as of prime importance by both sides.

In order to comply with rule 183 as stated in Dicey's Conflict of
Laws, 7th ed. (1958), p. 992, the judgment must be conclusive in
order to create an estoppel. In section 1 (2) (*a*) of the Foreign
Judgments (Reciprocal Enforcement) Act, 1933, the expression
" final and conclusive " is to be found, but these words are repetitive
and " conclusive " in the sense of the rule must mean that it
cannot, although it may be subject to appeal, be varied by the
court which made it, as are, for example, some maintenance or
alimony orders. *Nouvion* v. *Freeman* [59] is an example of an
action which had been tried in Spain under a summary form of
procedure leading to a " remate " judgment but held by this House
not to amount to res judicata, since it was possible to reopen the
matter which had been tried and obtain a " plenary " judgment

H. L. (E.)

1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

LORD
HODSON

A  rendering the "remate" judgment inoperative. One asks, about what is the judgment to be final and conclusive? The answer is that it must be on the merits and not only as to some interlocutory matter not affecting the merits. The question here may, I think, properly be described as "on the merits," the issue being whether or not there was authority to proceed in an action representing
B  the foundation.

On this point I would respectfully dissent from the opinion expressed by Cross J., although I do not disagree with his main conclusion which distinguishes this action from that commenced by the foundation suing by the Council of Gera. There was, in my opinion, a decision against the Council of Gera on the merits
C  of its claim to represent the foundation.

There is admittedly a gap in the evidence as to whether the judgment was final and conclusive. It is for the defendants to show the estoppel and, to prove it, they must establish as a matter of German law that the judgment is final and conclusive. This they have failed to do by express evidence and, as my noble
D  and learned friend, Lord Wilberforce, points out in his opinion, there are passages in the evidence which at least suggest the possibility of want of authority being relitigated in the German courts.

For my part, I think it would be legitimate to rely on the assumption commonly made in English courts that in the absence
E  of evidence of foreign law it is taken to be the same as English law and to hold that the judgment relied on for the estoppel is final and conclusive.

Another argument against the estoppel was put forward by the appellants which I do not find it possible to accept. It was based
F  on the rule which still subsists in English law, notwithstanding animadversions which have been passed on it, that the cause of action in a foreign case does not merge in the judgment but remains available to be sued upon, the foreign judgment being only evidence of the cause of action not, as in this country, that in which the cause of action has merged. It seems to me that this
J  argument does not logically involve that there can be no estoppel in the case of a foreign judgment. Indeed, the cases are consistent in admitting that there may be an estoppel notwithstanding the absence of merger.

If the fact that the cause of action does not merge prevents the estoppel where issue estoppel is concerned, it must similarly,

928    HOUSE OF LORDS    **[1967]**

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
HODSON

one would suppose, do so where cause of action is in question. No one has suggested that the latter contention is sound.

There was a further contention, accepted by the learned judge, that there could be no estoppel because the judgment of the West German court was perverse in that they knowingly and wilfully declined to give effect to the relevant law, that of East Germany. Like others of your Lordships, I find this conclusion too difficult to sustain, although, in fairness to the learned judge, it should be said that there was strong support for this conclusion in the case of *Simpson* v. *Fogo*,[60] upon which reliance was placed on behalf of the appellants. " Perverse " is a strong word in this context, meaning, I would say, " obstinate in error " and inappropriate to describe the reasoning of the West German court.

There remains only the question of privity. On this I am in agreement with the learned judge. There was here no privity in estate. The only privity could be privity in interest. The action in West Germany was begun by the Council of Gera claiming to represent the foundation and, upon the issue of the right to represent, judgment was given against the Council of Gera, which was ordered to pay the costs. The Council of Gera itself never had any interest in the subject-matter of the action. It was only required to act in order that the foundation might seek to enforce its rights, that is to say, the rights of the foundation itself.

This action is in truth an action by the foundation suing by Messrs. Courts & Co., a firm of solicitors, who again have themselves no interest in the subject-matter of the action. The Council of Gera is not itself before the court. The way in which the respondents seek to put the matter of privity is founded on an extended view of privity taken in America, where authorities show a broader concept of the privity necessary to establish estoppel. This is to be found in the American Restatement (Judgments), Chap. IV, s. 85 (2) which reads:

> " Where a person is bound by or entitled to the benefit of the rules of res judicata . . . such rules apply in a subsequent action brought or defended by another on his account."

The argument is that the solicitors are bringing this action on account of the Council of Gera but this is not my view of the case. They are acting on behalf of the foundation, and the judgment given in the West German court against the Council of

[60] 1 H. & M. 195.

A

Gera on their claim to represent the foundation does not raise an estoppel against the solicitors acting in this action.

It is upon this last ground, namely, absence of privity, that I would hold that there is no estoppel against the solicitors, preventing them from representing the foundation in this action.

B

If there is no estoppel, there remains to be considered whether the effect of the confiscation of the foundation's business was to make it legally impossible to carry on under its constitution. On this question I am in entire agreement with the learned judge, and would accept his finding that the foundation still maintained its existence so as to enable it to give authority to the solicitors to sue on its behalf. This is partly a question of law and partly

C

one of fact. If it is right to apply the law of the domicile of the foundation—Jena is in East Germany and the law applicable is that administered in the court of that part of Germany. The respondents argued that the law applicable to the matters in dispute between the parties should, in any event, be the law of the Federal German Republic. They relied on the language of the

D

second Foreign Office certificate given on November 5, 1964. This contained an extract from a Foreign Ministers' communiqué which stated:

> " Pending the unification of Germany, the three Governments consider the Government of the Federal German Republic as the only German government freely and legitimately constituted

E

> and, therefore, entitled to speak for Germany as the representative of the German people in international affairs."

This is followed in the certificate by the following words: " This statement does not constitute recognition of the Government of the Federal Republic of Germany as the de jure government of all Germany."

F

It was argued that the determination of the status of and the right to represent a body incorporated under the law of the State of Germany prior to 1945 and now having its " Sitz " in the territory of the zone allocated to the U.S.S.R. are matters which affect Germany as a whole and, if arising outside Germany, are within the scope of the Foreign Office communiqué.

G

True that the judicial system is an organ of the sovereign power, but the explanatory footnote to the communiqué indicates the limits to be put on the Foreign Office certificate and does not support the contention that the West German courts, as courts of the Federal German Republic, are entitled to speak for Germany as a whole. That the communiqué is directed to

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
HODSON

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
HODSON

political representation only is, I think, clear from the language       A
of the certificate, which makes clear that the Government of .
the Federal Republic is not thereby to be regarded as being
recognised as the de jure government of all Germany. There are
in the two parts of Germany two separate legal systems operat-
ing independently of one another, the East German courts deriving
their authority from the sovereignty of the U.S.S.R. and the West       B
German courts from the sovereignty which lies in the Federal
Republic of Germany as at present constituted. I do not think
that there is any justification for the view that the law common
to the whole of Germany as distinguished from zonal law should
be applied on the ground that the Carl-Zeiss-Stiftung came into
existence many years ago before Germany was divided and that       C
this case concerns operations and issues outside Germany as a
whole, namely, in England and not in the Soviet Zone itself. The
law in the two parts of Germany not being the same, we must
apply the law of the Eastern Zone.

The facts as to the activities of the foundation are not in
dispute, and if the law in operation in the Eastern Zone is       D
applied to those facts the appellant must succeed on this issue.

I would allow the appeal.

LORD GUEST. My Lords, the somewhat complicated facts out of
which this appeal arises have been so fully rehearsed in the
courts below that I find it necessary only to state them in broad       E
outline in order to decide the various points at present in issue
between the parties.

The history of Carl-Zeiss-Stiftung begins in 1846, when optical
works at Jena were founded by Carl Zeiss. Thereafter, glass
works were founded and Zeiss was joined by Ernst Abbe and
Otto Schott. In 1891 a " Stiftung " or foundation was formed       F
which was administered by a special board, the optical business
and the glass business being run by two separate boards of
management. The articles of the Stiftung and constitution have
been set out in the courts below, and it is only necessary now to
state that the legal domicile of the Stiftung was Jena (article 3)
and that the organisation of the Stiftung was to be, by article 4,       G
by a special board for representing the Stiftung as an incorporated
body, for the administration of its estate and effects and for the
supreme direction of its affairs. Article 113 is in the following
terms :

" Should, in consequence of political changes in the state,
the provision according to 5 of this statute with reference to

the representation of the Stiftung become untenable, this representation including the appointment of the Deputy of the Stiftung within the meaning of 5 and the statutory administration of the Carl-Zeiss-Stiftung shall be made over to that department of state, which with regard to the University of Jena occupies the place of the State Department of the Grand Duchy of Saxe-Weimar acting as special board, provided that its seat is in Thuringia, otherwise to the highest administrative authorities in Thuringia."

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
LORD GUEST

The business owned by the Stiftung prospered and their products have become world famous. Besides the business the Stiftung owned a large amount of property and substantial capital investments.

In terms of article 113, owing to the changing political situation in Germany, certain changes in the constitution of the special board took place. Upon the amalgamation in 1918 of certain States in Germany, including the Grand Duchy of Saxe-Weimar-Eisanach, in which Jena was situated, into the state of Thuringia, the Thuringia Minister of Education became the special board. In 1935, when the Weimar Republic was replaced by the Third Reich, the " Reichs-Stathalter " as the highest administrative authority in Thuringia became the special board of the Stiftung.

In April, 1945, when the Hitler régime collapsed, the office of Reichs-Stathalter was abolished. Jena was first occupied by American troops, but shortly after it became part of the Russian Zone of Occupation and on July 1, 1945, it was occupied by the Soviet forces. When the Americans left they took with them all the members of the boards of management, a number of leading scientists, engineers and senior executives and a large amount of material.

On October 30, 1945, Marshal Zhukov, Head of the Russian Military Administration, made an order, " SMAD 124," providing for the sequestration of certain types of property within the Russian Zone which included the foundation. Russian officers were stationed in the works until March, 1947, and nearly all the machinery and plant was taken to Russia by way of reparations, together with a number of workpeople. At the same time great efforts were made on the German side to get the works running again, and by the beginning of 1948 the works at Jena had been re-equipped.

In January, 1948, a central body known as the German Economic Council was set up with legislative authority in East Germany, subject to the overriding power of the Russian Military

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD GUEST

Administration. Between April and June, 1948, orders were    A
made by the Russian authorities confiscating the optical and
glass business of the Stiftung. The confiscated business became
the "People's Owned Enterprises"—"Volks Eigene Betriebe"
(VEBs)— and became known as VEB Carl-Zeiss Jena and VEB
Schott Jena respectively.

It is now possible to pass over a great amount of history    B
recited in the opinion of Cross J. and come to 1949. In that year
the German Democratic Republic came into being. As a result
of an East German law dated July 23, 1952, and an order made
under it, the Province of Thüringia was divided into three dis-
tricts and the governmental functions of the province transferred
to the administrative organs of the respective districts. The    C
district in which Jena is situated is the District of Gera, and this
body, which stands in the same relation to the University of Jena
as the State Department of the Grand Duchy stood to it in the old
days, is the Council (Rat) of Gera. It is common ground that,
as a matter of political geography, the Council of Gera would
be the special board within the meaning of article 113.    D

This action, which is an action for passing off, was commenced
on October 20, 1955, by the appellants. On February 7, 1956,
the respondents issued a summons against the appellants asking
that all further proceedings in the action be stayed and the action
dismissed on the ground that it had been commenced and was    E
being maintained without the appellants' authority. Affidavits
were lodged by both parties and the application to stay was
heard by Cross J. with cross-examination during November and
December, 1963, and January, 1964. The judge gave judgment
on March 6, 1964, dismissing the summons. When the case came
before the Court of Appeal the respondents applied for an order    F
that a letter be addressed to Her Majesty's Secretary of State for
Foreign Affairs concerning the recognition of the German Demo-
cratic Republic, a point which had not been taken in the court
below, and had been expressly disclaimed before Cross J.

The Court of Appeal accepted the respondents' arguments
based upon the non-recognition by Her Majesty's Government of    G
the German Democratic Republic and ordered that the writ and
all subsequent proceedings be set aside on the grounds that the
action was instituted and all subsequent proceedings on behalf of
the appellants have been taken without the authority of the
appellants.

The position, accordingly, is that the special board of the

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
Lord Guest

A  Stiftung is now, as a matter of geography, the Council of Gera, established by the law passed on July 23, 1952, by the German Democratic Republic. The decision of the Court of Appeal was that as the Council of Gera was set up by the German Democratic Republic, a government not recognised by Her Majesty's Government, the special board has no locus to commence proceedings in the English courts, and the action accordingly was commenced without authority.

B

Several arguments not including the non-recognition point were taken before Cross J. and decided adversely to the respondents. The Court of Appeal, in view of their decision on the non-recognition point, did not deal with these other points.

C  I have had the advantage of reading in advance the speech prepared by my noble and learned friend, Lord Reid, on the question of the recognition by the English courts of the Council of Gera as authorising the present action. I agree with his opinion, and I have nothing to add.

The first question which arises on what may conveniently be
D  described as the second stage of the case is whether the appellants are estopped per rem judicatam by the judgment of the West German court from arguing, in answer to the respondents' summons to stay the proceedings, that the appellants have authority to raise this action in name of the Carl-Zeiss-Stiftung. A considerable part of the argument was devoted to this question,
E  which is not without difficulty and raises a number of complicated issues.

The doctrine of estoppel per rem judicatam is reflected in two Latin maxims, (1) interest rei publicae ut sit finis litium, and (2) nemo debet bis vexari pro una et eadem causa. The former is public policy and the latter is private justice. The rule of estoppel
F  by res judicata, which is a rule of evidence, is that where a final decision has been pronounced by a judicial tribunal of competent jurisdiction over the parties to and the subject-matter of the litigation, any party or privy to such litigation as against any other party or privy is estopped in any subsequent litigation from disputing or questioning such decision on the merits (Spencer Bower
G  on Res Judicata, p. 3).

As originally categorised, res judicata was known as "estoppel by record." But as it is now quite immaterial whether the judicial decision is pronounced by a tribunal which is required to keep a written record of its decisions, this nomenclature has disappeared and it may be convenient to describe res judicata in its true and

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord Guest

original form as " cause of action estoppel." This has long been    A
recognised as operating as a complete bar if the necessary con-
ditions are present. Within recent years the principle has deve-
loped so as to extend to what is now described as " issue estoppel,"
that is to say, where in a judicial decision between the same parties
some issue which was in controversy between the parties and was
incidental to the main decision has been decided, then that may    B
create an estoppel per rem judicatam. The issue arising upon the
summons to stay the proceedings is whether Messrs. Courts,
purporting to act for the plaintiffs, the Carl-Zeiss-Stiftung, have
the necessary authority to raise the action in name of the Carl-
Zeiss-Stiftung. The estoppel which is alleged to have been created
is by the decision of the West German courts where in an action    C
between the Carl-Zeiss-Stiftung of Jena, represented by the
Council of the District of Gera, and the Carl-Zeiss-Stiftung
Heidenheim, Brenz, the present respondents, to restrain the
defendants from, inter alia, using the name of Zeiss or Carl Zeiss
and from using certain trade marks, it was held that the action
was inadmissible on the ground that the constitution of the    D
Stiftung is no longer effective, so that the legal basis for adminis-
tration of the Stiftung in accordance with the article has been
removed and that the Council of Gera has no authority to repre-
sent the Carl-Zeiss-Stiftung before the court. The English action
is of a different character, namely, a summons to stay proceedings
on the ground of lack of authority. It is, therefore, plain that    E
there is no cause of action estoppel because the cause of action in
each case is different. Accordingly, if there is estoppel it must be
" issue estoppel."

The law on the matter is not altogether clear, but I am pre-
pared to assume that, at any rate in relation to estoppel founded
on an English judgment there may be issue estoppel. This was    F
referred to as early as 1776 in *The Duchess of Kingston's Case*,[61]
as interpreted in *Reg. v. Hartington Middle Quarter (Inhabi-
tants)*.[62] It has been approved recently by Lord Denning M.R.
and Diplock L.J. in *Fidelitas Shipping Co. Ltd.* v. *V/O Export-
chleb*.[63] (See also *Thoday* v. *Thoday*,[64] Diplock L.J.) Although    G
not described as " issue estoppel," it is inferentially approved in
the most recent textbook on Res Judicata by Spencer Bower at p. 9,
where he speaks of a judicial decision which involved " a determi-
nation of the same question as that sought to be contraverted in

61 20 St.Tr. 355.                    63 [1966] 1 Q.B. 630, 640–1.
62 4 E. & B. 780.                    64 [1964] P. 181, 197–198.

A the litigation in which the estoppel is raised." The doctrine of issue estoppel has also been accepted as good law by the courts in Australia for a number of years.

The requirements of issue estoppel still remain (1) that the same question has been decided; (2) that the judicial decision which is said to create the estoppel was final; and, (3) that the B parties to the judicial decision or their privies were the same persons as the parties to the proceedings in which the estoppel is raised or their privies. I have for the moment postponed the question whether issue estoppel, if valid in relation to an English judgment, applies to a foreign judgment. There is little doubt that the same question was incidentally decided in the West C German action as arises in the present summons, namely, whether the Council of Gera have authority to raise the action in name of the Carl-Zeiss-Stiftung.

I turn, therefore, at once to the question of finality. This is understood to mean " final and conclusive on the merits " of the cause (Dicey, Conflict of Laws, 7th ed., r. 196, p. 1052). The D decision upon which the issue estoppel arises must itself be final in this sense. In other words, the cause of action must be extinguished by the decision which is said to create the estoppel (see *Nouvion* v. *Freeman*,[65] Lord Herschell: " It puts an end to and absolutely concludes that particular action.") The West German judgment was not a judgment on the merits, but on a preliminary E point relating to the capacity of the Carl-Zeiss-Stiftung to sue and it was there held that the Council of Gera had no authority to raise the action in name of the Carl-Zeiss-Stiftung. I have difficulty in seeing how a decision on capacity to sue can ever be final or conclusive. The West German judgment related to the position in 1960 when it was pronounced, but non constat the position is F the same when the English action was tried. The appellants would clearly be entitled to show that a change of circumstances had occurred to affect their capacity to sue. If this is so, it would defeat the whole purpose of estoppel which is to preclude them from leading evidence to that effect. I can best illustrate the position by reference to what would happen if the decision in G West Germany had been given by the Scots courts. The decision would have been to sustain the plea of " No title to sue," but this would not have been final and conclusive as the interlocutor sustaining the plea would have been one of dismissal. A subsequent action would not be barred per rem judicatam.

H. L. (E.)
1966
___
Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)
___
Lord Guest
___

[65] 15 App.Cas. 1, 9.

936                           HOUSE OF LORDS                    **[1967]**

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD GUEST

Another aspect of finality relates to the requirement that the    A
decision relied upon as estoppel must itself be res judicata in the
country in which it is made. This is made clear in *Nouvion* v.
*Freeman*.[65]  (See also Cheshire, Private International Law, 7th ed.
(1965), p. 562; Dicey, Conflict of Laws 7th ed., p. 1036.)  It would,
indeed, be illogical if the decision were to be res judicata in
England, if it were not also res judicata in the foreign jurisdiction.    B
I am not satisfied that the respondents have discharged the burden
of proof upon them of establishing that the West German judgment
is res judicata in West Germany.  I would, accordingly, hold that
the West German judgment is not final and conclusive and for these
reasons does not create an estoppel.

The next requirement is that the judgment should have been    C
between the same parties or their privies.  The parties to the West
German judgment, it is conceded, were the Council of Gera, on
the one hand, and the respondents on the other hand.  The parties
to the present proceedings are the respondents and the Carl-Zeiss-
Stiftung.  As the question is whether the Carl-Zeiss-Stiftung is
properly a party to the proceedings, the Stiftung is plainly not    D
the other party for the purposes of res judicata, notwithstanding
Mr. Aldous's ingenious argument that the only party he appears
for is the Stiftung.  Who are the other parties?  I am unable to
agree that the Council of Gera are parties.  They do not appear
on the proceedings as parties, they are not represented, and no
order for costs could be made against them.  They have no    E
interest in the subject-matter of these proceedings.  They only
come into the picture as the body who, according to article 4 of
the Code, are entitled to represent the Carl-Zeiss-Stiftung.  In
these circumstances, the only other possible parties to the proceed-
ings are the solicitors, Messrs. Courts, to whom the summons is
directed.  As they were not parties to the West German proceed-    F
ings, they would only be obnoxious to the plea of res judicata, if
they were the privies of the Council of Gera.  There is a dearth
of authority in England upon the question of privies.  The two
cases of *Kinnersley* v. *Orpe* [66] and *Hancock* v. *Welsh and Cooper*,[67]
referred to by the respondents are, in my opinion, of no assistance.
" Privies " have been described as those who are " privy to [the    G
party] in estate or interest " (Spencer Bower on Res Judicata,
p. 130).  Before a person can be privy to a party there must be
community or privity of interest between them.  Messrs. Courts

---

[65] 15 App.Cas. 1.                     [67] (1816) 1 Stark. 347.
[66] 2 Dougl.K.B. 517.

A.C.                    AND PRIVY COUNCIL                    937

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD GUEST

A   have no interest in the merits of this action. Their interest is merely to defend themselves against the claim made against them for costs by the respondents which is on the basis of breach of warranty of authority (see *Yonge* v. *Toynbee* [68]). In this matter the Council of Gera have no interest. It is only, as I understand, by the form of procedure chosen by the respondents that Messrs.

B   Courts have been made parties to these proceedings. Assuming that the summons had not been directed to them, but that the respondents had been successful in the West German proceedings and in this summons, the latter would then have been entitled on the authorities to raise an action against the solicitors for breach of warranty of authority claiming the costs in the action. Could

C   it possibly have been said in these circumstances that the solicitors were estopped by the West German judgment, of which they had no knowledge, from arguing that they had authority to raise the present action? I apprehend not, and this must be on the basis that they are not privies to the Council of Gera. It was argued for the respondents, although without clear authority in this country,

D   that " privy " covers a person who is in control of the proceedings. Reference was made to the American Restatement of the Law (Judgments) (1942), s. 84, where it is said that a person who is not a party but who controls an action is bound by the judgment as if he were a party if he has a proprietary or financial interest in the judgment as a privy. But this cannot apply to the solicitors

E   who are not in control of the proceedings and have no proprietary or financial interest in the judgment. They are instructed by the Carl-Zeiss-Stiftung who, on their side, control the proceedings. No case has been referred to in England in which a solicitor has been held privy to the party instructing him. In Scotland an attempt to make a solicitor a party for the purpose of res judicata

F   failed (*Laidlaw* v. *Blackwood* [69]). We were referred to a number of American cases dealing with privies. I am not prepared in this country to extend the doctrine to the extent which it apparently has reached in that country.

   I now pass to the question reserved in an earlier part of my speech, namely, whether issue estoppel can ever be operated by a

G   foreign judgment. This was doubted by Cross J. It is clear that a foreign judgment can operate as res judicata in a cause of action estoppel properly so called (Dicey's Conflict of Laws, 7th ed. rr. 182 and 183, pp. 981 and 992). But different considerations

[68] [1910] 1 K.B. 215; 26 T.L.R.        [69] (1843) 15 Sc.Jur. 484.
211, C.A.

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord Guest

A

may, I apprehend, apply to issue estoppel. The first matter to be observed is that a foreign judgment does not have the same finality and conclusiveness as an English judgment. In the case of the latter the cause of action is merged with the judgment, so that action can only be brought to enforce the judgment. Not so in the case of foreign judgments. Sub-rule 183 of Dicey's Conflict of Laws, p. 996, states: "A foreign judgment does not of itself extinguish the original cause of action in respect of which the judgment was given." The plaintiff, therefore, has the option either of suing on the judgment or on the original cause of action. The doctrine of non-merger stated in *Nouvion* v. *Freeman*[70] is still, as I understand it, good law, notwithstanding the animadversions of Professor Horace Emerson Read in his book, Recognition and Enforcement of Foreign Judgments (1938), pp. 120–121 and the doubt expressed by Dicey in his Conflict of Laws on p. 997. If this be sound, it means that the unsuccessful litigant can, if he is defendant, table fresh defences to the original cause of action. From this it follows that "issue estoppel" could never operate to shut out the defendant from litigating issues which may have incidentally been determined in the foreign suit.

B

C

D

There are, in my view, moreover, considerations of policy and expediency which make it undesirable that the doctrine of issue estoppel should be introduced in the case of foreign judgments. There has been no case in which it has been applied in England and while, perhaps, not all estoppels are odious, considerable caution, in my view, should be exercised before the principle is extended any further. In operating issue estoppel it may be necessary, in order to ascertain what issues have been inferentially or incidentally decided, to look, not only at the judgment, but also at the pleadings and, it may be, at the evidence. We are not familiar in this country with the practice and procedure in foreign countries, and it may be a matter of considerable nicety in certain cases to find out what issues were determined and whether they were incidental or collateral to the main decision.

E

F

For all these reasons I would concur with Cross J. in holding that the plea of res judicata is not open to the respondents.

If the appellants are not estopped per rem judicatam by the West German judgment from arguing that the Council of Gera are entitled to represent the Carl-Zeiss-Stiftung, then the matter is at large for the decision of this House. Whether this action is properly authorised by the Carl-Zeiss-Stiftung is a question of

G

[70] 15 App.Cas. 1.

A.C.                    AND PRIVY COUNCIL                    939

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD GUEST

A    foreign law to be decided as a question of fact. The law to be
applied is the law of the domicile of the Stiftung, which is in Jena,
and the law is that of East Germany as shown by " its exposition,
interpretation and adjudication " (*Lazard Brothers & Co.* v.
*Midland Bank Ltd.*) [71] It must be the law as in practice inter-
preted and enforced by the courts of law of the foreign country.
B    A considerable volume of expert evidence on both sides was
devoted to the question. But in this case one starts with the
judgment of the East German courts that the Carl-Zeiss-Stiftung
still exists as a juristic person, notwithstanding the confiscation of
its assets in East Germany by the Soviet authorities. This judg-
ment is embodied in the opinion of the Supreme Court of the
C    German Democratic Republic, dated April 6, 1954, as confirmed
by the judgment of the German Democratic Republic Supreme
Court, dated March 23, 1961, affirming the judgment of the
District Court of Leipzig. Technically, no foreign judgment
would bind the courts of this country, but prima facie a judgment
would be accepted by the English courts as representing the law:
D    "  . . . the comity of international affairs would require special
and unusual circumstances to lead this House away from the
clear decision of a final court " (*Bankers and Shippers Insurance
Co. of New York* v. *Liverpool Marine and General Insurance Co.
Ltd.*,[72] Lord Buckmaster).

E       " Evidence of the opinion of the highest court of the foreign
    state whose law happens to form the subject-matter of
    proof in this country, is obviously for an English court the
    best available evidence upon the question, and is such that,
    if it is clearly directed to the point in dispute and is unsus-
    ceptible of any but one interpretation, other evidence of that
    law could hardly be set against it " (Lord Sumner [73]).

F    The experts on foreign law from both sides were unanimous that
all East German courts would follow the decision of the Supreme
Court of the German Democratic Republic that the Carl-Zeiss-
Stiftung still exists as a juristic person with its domicile at Jena,
and that the Carl-Zeiss-Stiftung had the capacity to sue for the
protection of its name, trade-marks and goodwill. The only criti-
G    cism which is made by the West German lawyers of the East
German judgment is that there are no free judges in East Germany
and that no East German court would dare to come to a contrary
conclusion. But this is only the opinion of the West German
lawyers, and there is not a shred of evidence to support it. Upon

[71] [1933] A.C. 289, 298.        [73] Ibid. 94.
[72] 24 Ll.L.Rep. 85, 87.

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

LORD GUEST
—

·A

the question of fact as to what the East German law is, the evidence is really all the one way, consisting of the judgment of the highest court in East Germany and the opinion of the East and West German lawyers who gave evidence.

In this state of evidence there is no need to examine further the decisions of the West German courts or the East German courts. Indeed, in this state of affairs the English courts would not be entitled, in my view, to express their views as to the soundness or otherwise of either decision (see *Buerger* v. *New York Life Assurance Co.*) [74]  The English courts must accept the East German decision as being the law of East Germany.

Upon the whole matter, I would allow the appeal and restore the judgment of Cross J.

LORD UPJOHN. My Lords, the issues between the parties in this singularly complicated appeal fall into two watertight compartments.

Into the first compartment falls an issue which has been described in argument as the " non-recognition " point. It has been admirably and elaborately argued before your Lordships, but in the end the point may shortly be stated: whether the English courts will recognise the legislative and other acts of the German Democratic Republic which operates in the Russian Zone of Germany, having regard to the fact that Her Majesty's Government has not granted any de jure or de facto recognition to that Republic or its Government. This issue was raised for the first time in the Court of Appeal, who held that, as it was common knowledge that the U.S.S.R. had recognised the German Democratic Republic as an independent sovereign state but Her Majesty's Government had not done so, the courts of this country would not recognise any acts done by that Government or by any person appointed by it. This conclusion necessarily led to the result on the facts of this case, to which I shall refer later, that the action was not properly authorised and that the solicitors who issued the writ were acting without authority to do so. The result of the decision of the Court of Appeal is of course to deny in the courts of this country to the inhabitants, organisations and institutions of East Germany any lawful origin to any acts or events based on any executive, judicial or legislative acts or directions of the Government of the German Democratic Republic since it was set up by the U.S.S.R.: a most deplorable result in

A

B

C

D

E

F

G

[74] (1927) 96 L.J.K.B. 930; 43 T.L.R. 601, C.A.

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
LORD UPJOHN

A respect of any highly civilised community, with which we have substantial trading relationships, I believe, which should be avoided unless our law compels that conclusion.

My Lords, my noble and learned friend, Lord Reid, whose opinion I have had an opportunity of reading, has advanced very powerful reasons for preferring the view that the answers of Her

B Majesty's Secretary of State for Foreign Affairs, to the requests for information submitted to him by the Court of Appeal in accordance with the well-settled practice, must lead to the conclusion that, so far as the courts of this country are concerned, we ought to assume that, whatever may be thought to be common knowledge on this point, the German Democratic Republic is a

C subordinate body set up by the U.S.S.R. as the de jure Government of East Germany to act upon its behalf, and that its legislative executive and judicial acts must receive recognition. I agree entirely with the reasons and conclusions of my noble and learned friend, and I cannot usefully add anything upon this issue.

It, therefore, becomes necessary to examine the second com-

D partment with which the Court of Appeal quite reasonably did not deal, having regard to their decision on the non-recognition point.

The issues here are even more complex, and are threefold. Taking them in the order which I think is most convenient, they

E may be described (as in the arguments addressed to your Lordships) as (1) the confiscation point, (2) the estoppel point, (3) the Supreme Court point.

The confiscation point depends on proof of the fact that the commercial assets of the Stiftung (Jena) abroad have been confiscated by legislation in East Germany and upon the respondents'

F argument that in such event the English courts would not assist the enforcement of expropriatory or penal legislation outside the territorial jurisdiction of that country.

But that plainly is an issue in the action itself; it is a matter for allegation in the pleadings and goes to the question of the relief (if any) that should be granted.

G It is not a matter which can be dealt with on this appeal, which is concerned solely with the authority of Courts & Co. to issue a writ in the courts of this country on behalf of the Stiftung, which has nothing to do with the issues in the action, a matter I shall develop later.

Apart from this, I should be very reluctant to deal with this matter, even if it were open to your Lordships to do so, on the

942                          HOUSE OF LORDS                    **[1967]**

H. L. (E.)

1966

———

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

———

LORD UPJOHN

———

A    materials at present available. Plainly there is much scope for further exploration of the relevant facts before this issue in the action can be satisfactorily decided. When (if pleaded) the matter comes on for trial the learned trial judge must not consider himself hampered, restricted in any way bound by any findings or observations of Cross J. on this matter.

B    I turn, then, to the estoppel point. This raises a matter of some general importance.

This is an appeal based on a summons dated February 7, 1956, whereby the respondents claimed against the solicitors, Courts & Co. (respondents to the summons), that they issued a writ in the name of the Stiftung as plaintiffs without authority to do so and that, therefore, the action should be stayed and Courts & Co.

C    ordered to pay the respondents' costs on a common fund basis.

This form of summons is well known and is based not on any misconduct on the part of the solicitor, as was at one time thought to be necessary to empower the court to exercise its summary jurisdiction over a solicitor, but, as was pointed out by Lord Porter

D    in *Myers* v. *Elman*,[75] is based on the proposition that the solicitor is not party to the action, but that the court exercises its summary powers over the solicitor who by issuing a writ warrants his authority to do so, and so, if he has no authority, may I add, commits a tort against the so-called defendants; he therefore has to pay them damages by indemnifying them against the expenses to which they have been put by paying costs taxed on the common

E    fund basis rather than on a party and party basis.

It is alleged by the respondents that upon this summons Courts & Co. cannot contest this issue, for it has already been tried conclusively between the parties or their privies in earlier proceedings in the West German Federal Court so that they are estopped per rem judicatam, or more shortly this matter is res

F    judicata. It is clear that a party relying on such a plea must at least prove that the earlier proceedings were determinative of the issues arising in the second proceedings; that the same parties or their privies are common to both proceedings and that the earlier proceedings were within the jurisdiction of the court and were final and conclusive of the relevant issues.

G    This makes it necessary to answer to a number of questions: 1. Are the issues in the former proceedings the same as in the latter? 2. Who are the parties to the earlier proceedings? 3. Who are the parties to these subsequent proceedings? 4. If there is no

———

[75] [1940] A.C. 282, 336; 56 T.L.R. 177; [1939] 4 All E.R. 484, H.L.

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
Lord Upjohn

A    complete identity of parties in (2) and (3) above, are the different parties properly described as in privity one with another for the purpose of the doctrine? 5. Even if the answer to question (1) is yes, is the matter of the lis between the parties such as to give rise to res judicata? 6. Does the doctrine if applicable between two sets of English proceedings apply where the former proceedings

B    were in a foreign court? And, if so, 7. Were these proceedings final and conclusive between the parties?

To answer these questions some facts must necessarily be set out but I shall be as brief as I can. For this purpose it may be taken as common ground that a local government body acting in that part of Eastern Germany known as Thuringia and called the

C    Council of Gera (to which I will refer as " the council ") is the special board within the meaning of article 113 of the articles of association of the Stiftung and, as such (as provided by article 4), entitled to represent the Stiftung in the supreme direction of its affairs, including, of course, the power and right to instruct its legal advisers to bring or defend actions on its behalf. However,

D    in proceedings culminating in the Supreme Court of the Federal Republic of West Germany it was held that the council had no right to instruct anyone to act for the Stiftung in proceedings in those courts because, since the confiscation of its industrial assets by certain decrees of the Russian occupying forces in 1948, the Stiftung, though continuing as a legal entity, became an empty

E    shell incapable of giving any instructions and the council was in effect divested of its powers to act on its behalf. Whether this is a correct conclusion is the Supreme Court point which I shall examine later, though with extreme brevity.

It must be noted that in contrast to our procedure it appears that in the West German courts the person giving the instructions

F    on the part of a purely juridical person appears on the record; at all events, in the West German proceedings in the Supreme Court the plaintiff is described as " the Carl Zeiss Foundation of Jena represented by the Council of the District of Gera plaintiffs and appellant."

In the proceedings before your Lordships Courts & Co. at

G    once concede that they have received instructions to issue the writ in the name of the Stiftung from the council. That is a sufficient statement of the facts to answer the first two questions: 1. The issue whether the council had authority to give instructions to begin proceedings in the name of the Stiftung in this country depends on precisely the same facts, circumstances and arguments

944                              HOUSE OF LORDS                    **[1967]**

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD UPJOHN

as were advanced before the West German courts and decided    A
against it.  It is not suggested that there has been any relevant
change in those facts or circumstances since 1960, when judgment
was delivered in the Supreme Court. 2. The parties to the West
German proceedings, I am prepared to assume, are (a) the council
and, (b), the third respondents.

The third question has given rise to much argument and some    B
difference of opinion among your Lordships.  Counsel for the
appellants has argued that the Stiftung are parties to the summons;
a somewhat dangerous argument, I would have thought, for it
seems to presuppose that, regardless of the question of Courts &
Co.'s authority to sue, they are parties and so the same argument
must apply to the West German proceedings and, if so, identity of    C
parties seems to be established.

However, I reject the argument.  If the summons succeeds it
does so on the footing that the Stiftung is not a party to the
writ or the summons and for that reason the action is stayed and
the solicitor made personally liable for breach of warranty of
authority.  Under our procedure in such circumstances no order    D
of any kind, even for costs, can be made against the Stiftung.

Secondly, it seems to me clear that the council are not, under
our procedure, parties to the writ or the summons.  It can make
no difference that in this case in some earlier proceedings in
another country they are named in the record of those proceed-
ings.  The solicitor is in a special position, for, in respect of a    E
purely juridical person, only a solicitor can issue a writ.  He does
not thereby, become a party to the proceedings but, for the
reasons already mentioned, as an officer of the court, he can be
made a respondent to a summons to strike out the writ.  His
liability depends not on agency, for if the summons succeeds he
has no principal; it depends solely upon his position as a solicitor    F
issuing a writ and thereby warranting his authority to do so to
the defendants named in the writ.  I am quite unable to under-
stand the argument that those de facto instructing him become
parties to the writ or to the summons seeking to strike out the
writ.  It may be that such body of persons may be liable to the
solicitor for breach of warranty of authority, if they have no    G
principal, but that does not make them party to the proceedings
nor liable for breach of warranty to the defendants for they,
unlike the solicitor who has issued the writ, have warranted
nothing to them.  To hold the contrary would make all those
along the line who may have given instructions to the solicitors to

A    issue a writ from a junior clerk of the instructing body upwards liable as parties to the defendants; but this has never been the law of our country.

So I answer this question by saying that the parties to the summons under appeal are (a) the third respondents, (b) Courts & Co.

B    As to question four, the third respondents are parties to both proceedings but there is no identity between the Council and Courts & Co.; so the next question is whether they are in privity one with another for the purpose of the doctrine.

The position of the solicitor in proceedings such as these is clear-cut; as I have already pointed out, he is no party to the
C    proceedings; the sole question is as to his authority to initiate proceedings. It is not an issue in the action at all, and that is why it cannot be taken as a plea in defence in contrast to the confiscation point.

This House in *Russian Commercial and Industrial Bank* v. *Comptoir D'Escompte de Mulhouse* [76] approved the decision of
D    Warrington J. in *Richmond* v. *Branson & Son* [77] where he said:

"But the real question is the authority of the solicitor. Is that a question which can be raised as a relevant issue in the action and at the trial? . . . it is impossible, according to the ordinary practice and procedure of the court, to justify that proposition."

E    The solicitor has no interest in the action as such, nor under our system (unlike that pertaining, for example, in the U.S.A.) is he permitted even to participate in the proceeds of a successful judgment. His duty is to render his services to his client in the litigation to the best of his skill and ability and his sole reward is the costs which by law he may charge.

F    I can see nothing in the solicitors' relationship with his client which renders them privy to one another in the ordinary sense in which privy or privity is used for the purposes of the doctrine.

As has been said in Halsbury's Laws of England, 3rd ed., Vol. 15 (1956), pp. 196–197, para. 372, privies are of three classes: (1) privies in blood, (2) privies in law and (3) privies in estate,
G    but they all have an interest in the subject-matter of the action. Though your Lordships have been referred to a number of authorities in other courts which may expand the meaning of privy, none touch on the question before your Lordships, where the lis has nothing to do with the substance of the action itself.

H. L. (E.)
1966
Carl Zeiss Stiftung
v.
Rayner & Keeler Ltd.
(No 2)
Lord Upjohn

[76] [1925] A.C. 112; 40 T.L.R. 837,    [77] [1914] 1 Ch. 968, 974. H.L.(E.).

H. L. (E.)

1966

———

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD UPJOHN
——

In my opinion, Courts & Co. cannot be described as privy to    A
the council so as to preclude them from trying to establish their
authority to issue the writ, unless, by reason of some requirement
of the law to meet new conditions, a greatly extended meaning
beyond anything it has borne before is to be given to the word, a
matter to which I shall return later.

I turn to the fifth question I have posed. Res judicata may be    B
divided into a number of classes or branches. The most ancient
is estoppel by record, strictly so called. It still exists, though is
usually overtaken by the broader principles I shall next discuss.
A defendant who has failed even to enter an appearance and who
has taken no part in the earlier litigation may be estopped by
record if his defence in the second action was necessarily and    C
with complete precision decided by the previous judgment (see
per Lord Maugham L.C. in *New Brunswick Railway Co.* v.
*British & French Trust Corporation Ltd.*).[78]    How narrow is the
estoppel in such a case is shown by the actual decision there.
This narrow concept of estoppel has no application to the present
case, for the questions are different; the first is as to the authority    D
of the council to initiate proceedings on behalf of the Stiftung in
West Germany, and the second as to the authority to initiate
proceedings in these courts. Nor is the judgment of the foreign
court one of record.

The broader principle of res judicata is founded upon the
twin principles so frequently expressed in Latin that there should    E
be an end to litigation and justice demands that the same party
shall not be harassed twice for the same cause. It goes beyond the
mere record; it is part of the law of evidence for, to see whether it
applies, the facts established and reasons given by the judge, his
judgment, the pleadings, the evidence and even the history of the
matter may be taken into account (see *Marginson* v. *Blackburn*    F
*Borough Council*[79]). Res judicata itself has two branches: (1) cause
of action estoppel—that is where the cause of action in the second
case has already been determined in the first. To such a case the
observations of Wigram V.-C. in *Henderson* v. *Henderson*[80]
apply in their full rigour. These observations have been so often
approved in your Lordships' House that I will not repeat them.    G
I need not pursue this matter further for the alleged res judicata
with which your Lordships are concerned certainly has nothing
to do with any cause of action in the proceedings. (2) Issue

[78] [1939] A.C. 1, 21.                [80] 3 Hare 100, 115.
[79] [1939] 2 K.B. 426.

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord Upjohn

A  estoppel—a convenient phrase first coined apparently by Higgins J.
in the High Court of Australia in *Hoystead* v. *Federal Commissioner of Taxation*,[81] whose dissenting judgment was upheld by
the Privy Council in 1926.[82] But issue estoppel has been recognised ever since *The Duchess of Kingston's Case* [83] and there are
many quite early examples of it, see, for example, *Reg.* v. *Inhabitants of the Township of Hartington Middle Quarter* [84] and many
B  others.

Recently in *Thoday* v. *Thoday* [85] and in *Fidelitas Shipping Co.
Ltd.* v. *V.O. Exportchleb* [86] the Court of Appeal applied to issue
estoppel the full breadth of the observations of Wigram V.-C. in
*Henderson* v. *Henderson*.[87] While in this case it is not necessary
C  to decide whether that is right, because for the reasons given in
the answer to the first question that I posed for myself it does
not arise, I should be reluctant to support that view. As my
noble and learned friend, Lord Reid, has already pointed out
there may be many reasons why a litigant in the earlier litigation
has not pressed or may even for good reason have abandoned a
D  particular issue. It may be most unjust to hold him precluded from
raising that issue in subsequent litigation and see Lord Maugham's
observations in the *New Brunswick* case.[88] All estoppels are not
odious but must be applied so as to work justice and not injustice
and I think the principle of issue estoppel must be applied to the
circumstances of the subsequent case with this overriding
E  consideration in mind.

My Lords, I only desire to add one observation upon those
cases; once it is clear that the principle of res judicata is part of
the law of evidence I find it difficult to understand the distinction
drawn by Diplock L.J. in *Thoday* v. *Thoday* [89] between issue
estoppel and fact estoppel, but that does not call for further
F  consideration here.

So if Courts & Co. are debarred from arguing their authority
to issue the writ, it is because of an issue estoppel. But I have
already shown that this lis is not and cannot be an issue in the
action at all. It is a matter which would seem, to paraphrase the
words of De Grey C.J. in *The Duchess of Kingston's Case* [90]
G  quoted by Lord Reid, to be a matter collateral or incidentally
cognisable and therefore not the subject of estoppel. No authority

[81] (1921) 29 C.L.R. 537, 561.
[82] [1926] A.C. 155; 42 T.L.R. 207, P.C.
[83] 20 St.Tr. 355.
[84] 4 E. & B. 780.
[85] [1964] P. 181.
[86] [1966] 1 Q.B. 630.
[87] 3 Hare 100.
[88] [1939] A.C. 1, 21.
[89] [1964] P. 181.
[90] 20 St.Tr. 355, 538 n.

H. L. (E.)
1966
_____
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
_____
Lord Upjohn
_____

has been cited to your Lordships which bears any resemblance    A
to the present case.

All the authorities we have examined on issue estoppel have
been cases where the earlier action dealt with issues or points
which, however inferentially or incidentally, arose in the course of
trying the substance of the issues between the parties to the action;
not with a lis having nothing to do with those issues, which arises    B
only between the defendant and the solicitor issuing the writ.

Ought the principles of issue estoppel to be extended to a case
such as this? I can see no reason for doing so. Under our system
the respondent to the summons is necessarily a solicitor, an
officer of the court. It would require strong reasons to preclude
him from defending his issue of a writ by reason of some decision    C
to which he was no party and of which he may be in complete
ignorance. Justice does not require the invocation of the doctrine
to protect the defendant from being doubly harassed, for if an
officer of the court with full knowledge of some earlier proceedings
in these courts which covers exactly and precisely the question
of his authority issues a writ, the arm of the court is long enough    D
and strong enough to prevent an abuse of its process without resort
to the doctrine.

The application of the doctrine may, on the other hand, lead
to much injustice. Such summonses are normally heard at a very
early stage of the proceedings on evidence frequently hurriedly
prepared (in marked contrast to this most exceptional case) and    E
some point may have been overlooked or misunderstood in the
earlier proceedings.

I would deny to these purely incidental proceedings in the
action the doctrine of issue estoppel and for the same reasons I
would refuse to extend the meaning of the word privy to cover
the case of two successive solicitors (for that is what it amounts    F
to) who have issued writs in the name of a common principal;
the only so called privity between them is that they have succes-
sively issued writs upon the instructions of some persons purport-
ing to act for the principal but that person cannot himself or itself
be a party to any proceedings. So I would regard the doctrine as
entirely inappropriate to this form of proceedings.    G

My Lords, in these circumstances, I can answer the remaining
questions nos. 6 and 7 very shortly.

I accept at once that for the purpose of the doctrine of res
judicata in general a prior foreign judgment may be just as
effective as an English one. But, even if I had come to the

H. L. (E.)
1966
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
Lord Upjohn

A  conclusion that the doctrine applied to successive summonses, the first of which was decided in our courts, raising the question of authority to issue a writ, I would deny the benefit of the doctrine to a prior foreign judgment, for the simple reason that I do not think it is necessary in the interests of justice to do so and it may easily be productive of grave injustice. Questions of authority

B  and, indeed, the very concept of authority for this purpose depend so much on matters of procedure in each court and on the precise rules governing the issue of writs therein by persons other than the parties themselves that it is difficult to apply a judgment in the one case to another under a different jurisprudence. This case provides a good example; under our system the council

C  could never be a party to the writ or the summons.

Finally, with regard to question no. 7, the respondents have failed to prove that the proceedings in West Germany were final and conclusive as must necessarily be proved for an estoppel to be successfully established (see *Nouvion* v. *Freeman* [91]).

In conclusion upon the estoppel point, even if I had reached

D  a contrary conclusion as between the third respondents and Messrs. Courts & Co., I should require much persuasion that the first and second respondents who are alleged to be passing off the goods of the third respondents as and for the goods of the Stiftung and thus committing independent torts in this country, are entitled to the benefit of the alleged estoppel, but the point is not an

E  important one.

So it is necessary to turn to the Supreme Court point. I have already set out very briefly the grounds upon which the West German Federal Court held that the council had not authority to act for the Stiftung, and the real issue is whether that decision is right or whether on the same facts the decision of the Supreme Court of the East German Republic deciding that the council had

F  authority to issue a writ is to be preferred. This is a question of foreign law which by the law of this country is essentially a matter of fact. It has been discussed very fully by my noble and learned friend, Lord Reid, in his opinion and by Cross J. in the court of first instance. I agree entirely with what my noble and learned friend has said and also with what Cross J. said, though I think

G  he went too far in describing the judgment of the West German Supreme Court as perverse. As a piece of legal reasoning the decision of the West German courts seems to me quite unconvincing and, for my part, I can see no ground for holding that the

[91] 15 App.Cas. 1.

H. L. (E.)
1966
───────
Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)
───────
Lord Upjohn
───

council ceased to have any authority to act on behalf of the   A
Stiftung or that the Stiftung itself was but an empty shell in exis-
tence but incapable of acting when all the known facts indicate
the contrary. I only desire to add that the respondents, in inviting
us to prefer the decision of the West German Federal Supreme
Court, advanced an argument based on the certificate dated
November 6, 1964, given by Her Majesty's Secretary of State for   B
Foreign Affairs when in answer to question (2) submitted to him
he quoted a communiqué dated September 19, 1950, where it was
stated that

> " Pending the unification of Germany the three Governments
> consider the Government of the Federal Republic as the only
> German Government freely and legitimately constituted and   C
> therefore entitled to speak for Germany as the representative
> of the German people, in international affairs."

It was said that this statement authorised the West German
Government to speak in the name of the whole German people
and this gave a superior sanctity to the decision of the West
German Supreme Court over the decision of the East German   D
Supreme Court. The argument seems to me to be fallacious. It
has never been the practice of Her Majesty's Secretaries of State
to express any views upon the law. While they constantly express
views on recognition in answer to questions submitted to them
by the courts, the legal consequences that flow from recognition
is a matter which is always left to these courts.   E

My Lords, for these reasons I would allow this appeal and
restore the order of Cross J.

Lord Wilberforce. My Lords, the substantive issue in this
litigation is whether the right to use in this country the name of
Carl Zeiss, or Zeiss, in relation to certain glass, or optical, goods,   F
and to profit from the goodwill attached to those names, belongs
to a body of persons in the West German Federal Republic, or to
a body of persons in that part of Germany which is outside of,
and to the east of the Republic, which I will call for convenience
" East Germany." The rights in question are claimed by both
sides to belong to a corporate entity called Carl-Zeiss-Stiftung   G
(the word " Stiftung " denotes approximately a foundation with
corporate status), the contest being as to which body of persons
is entitled to control that corporate entity. The writ in the
action was issued in the name of the Stiftung through English
solicitors on the authority of a Dr. Schrade, who in turn claimed
to act on the authority of the Council of Gera (alleged to be

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

A    the "special board" of the Stiftung), and also in other capacities, and in accordance with accepted procedure, the issue must be tested in limine, whether the Stiftung is legally before the court. This procedure has some inconveniences, both because it normally (and here) takes the form of an application against the solicitors (the difficulty as to which will hereafter appear) and also in that

B    it is traditionally carried out by a motion or summons, supported by affidavit evidence, but without pleadings defining the precise matters in dispute. In a case such as the present, where important and difficult questions of law, including foreign law, arise this may result in some confusion, and I think that it would be advantageous if some method could be found in such cases of

C    defining the issues to be presented to the court.

The issues as to the right or otherwise of Dr. Schrade to authorise the proceedings on behalf of the Carl-Zeiss-Stiftung, as these were debated before Cross J. in the Chancery Division, and to which the evidence was directed, were issues, under several headings, of German law and no question arose as to the status,

D    internationally, of East Germany or of the "government" which claims authority in Eastern Germany. The affidavits on either side were drafted on the basis that, for the purpose of the summons to stay the proceedings, no challenge was made to the validity of East German legislation, and before the court leading counsel for the defendants (the respondents in this appeal) dis-

E    claimed any intention to question the status of that government, or to inquire whether it was recognised by Her Majesty's Government. The facts with regard to, or bearing upon recognition, were therefore not examined at that stage. But in the Court of Appeal the respondents sought to base their case upon non-recognition of the "government" in East Germany and that court, inevitably,

F    as I think, because of the public interest involved, allowed them to take the point. Inquiry was made in the usual manner of the Secretary of State and, certificates given by him having shown that Her Majesty's Government does not recognise the "govern-    `
ment" of East Germany either de jure or de facto, the respondents argued, and the Court of Appeal accepted, that the ground on

G    which Cross J. held the action to be validly commenced no longer existed. The Court of Appeal also decided against various alternative claims by the appellants as to the authorisation of the proceedings, which Cross J. had not found it necessary to consider. Correspondingly, the Court of Appeal did not find it necessary to deal with some difficult issues decided in the

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord
Wilberforce

appellants' favour by Cross J.  I leave all these aside for the    **A**
moment in order to concentrate upon that contention which is
affected by the non-recognition argument.

First, I must explain how the right of Dr. Schrade to authorise
the proceedings is connected with the question of non-recognition.
I can do this quite summarily, since the history and the constitution
of the Carl-Zeiss-Stiftung have already been fully explained.    **B**

Since the establishment of the Carl-Zeiss-Stiftung in 1891 at
Jena as a charitable foundation, it has by its constitution been
linked with the public administration of that district in Germany
in which Jena lies.  This was at that time the Grand Duchy of
Saxe-Weimar.  The "special board" of the foundation, which
is the organ of the Stiftung which (under the issue I am now    **C**
considering) authorised the present action to be brought, was
then the department responsible for the University of Jena.
Later, under the Weimar Republic, the appropriate district was
the state of Thuringia and the authority its Minister of Educa-
tion.  There was a displacement during the National Socialist
régime but in 1945, when American forces occupied this part of    **D**
Germany, Thuringia was restored as a province or Land and its
Minister again became the special board.  It is interesting, and
relevant to a later argument, to note that this reconstitution of
the regional administration in this part of Germany was apparently
accomplished without any formality; it simply took place under
the authority of the occupant and, as one of the expert witnesses    **E**
said, I think correctly, the fact, that the occupation authorities
allowed the Ministry of Education to operate, endowed the acts
of that Ministry with legal validity.  This factual state of affairs
seems to have continued without change when in July, 1945,
East Germany, including Thuringia, was taken over by the forces
of the U.S.S.R.  The local administration continued: the Minister    **F**
continued to act as the special board and, as regards this period
which lasted until 1952, no challenge has been made to the validity
of that board or to action taken by it.  Its legal life-blood can only
have been derived from the Minister of Thuringia, who in turn
derived authority either from the U.S.S.R. as the holder of sovereign
power (I shall explain this later) or possibly from the previous    **G**
authority of the U.S.A.

It is upon events occurring in 1952 that the respondents rely
for their contention that the special board which authorised this
action had, so far as the courts of this country are concerned, no
legal existence.  On July 23, 1952, under a "law" passed by the

A.C.                AND PRIVY COUNCIL                953

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

A  " government " of the German Democratic Republic (as East
Germany is called by those in control of it) and an order made on
the following day under that law, the Province or Land of
Thüringia was divided into three districts and its functions were
transferred to the administrative organs of the respective districts.
The district in which Jena is situated is that of Gera and the
B  body which (admittedly) assumed the position corresponding to
the former Minister of Thuringia was the Council of Gera.

On these facts, the respondents contend that, since the Coun-
cil of Gera depends for its creation upon a legislative act of the
" government of the German Democratic Republic " and as no
such government is recognised in this country, there is no legal
C  basis for the Council of Gera as the special board, so that the
purported authority is simply a nullity.

It is as well, before considering the legal consequences of non-
recognition, to appreciate what the respondents' contention in-
volves. The Stiftung is a corporate body established for industrial
and trading purposes under the law of Germany; one of whose
D  constitutional organs—the special board—is an administrative
authority exercising power at the place of the body's operations.
As a fact, there is no doubt that at the relevant date this authority
was there, that it was exercising its functions, that it was operat-
ing as the special board, that (this is proved by the evidence) it
would be recognised by the local courts as so doing. Yet, so it is
E  said, because the law and the order which set it up are derived
from a body not recognised as a lawful government, this authority,
qua organ of the Stiftung, has no legal existence: all its trans-
actions in private law are void, as are presumably all other
transactions carried out under its authority or by persons who
F  derive their authority from it. By logical extension it seems to
follow, and counsel for the respondents accepted, that there is,
for many years has been and, until the attitude of Her Majesty's
Government changes, will be, in East Germany a legal vacuum;
subject only, it may be, to the qualification that pre-existing
German law, so far as it can continue to be operated or have
G  effect, may continue in force. Whether in fact it can continue to
be operated to any great extent if its operation depends upon
administrative or judicial authorities set up by the non-existent
" government " must be doubtful. But the respondents, so far
from shrinking from these consequences, insist upon them as the
necessary and, as they say, intended consequences of non-recogni-
tion. And correspondingly, they argue that if recognition were to be

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

given by the courts to legislative acts of the non-recognised    A
"government" that would be tantamount to recognition of that
government, and so in conflict with the policy of the executive.

My Lords, if the consequences of non-recognition of the East
German "government" were to bring in question the validity of
its legislative acts, I should wish seriously to consider whether
the invalidity so brought about is total, or whether some mitiga-    B
tion of the severity of this result can be found. As Locke said:
"A government without laws is, I suppose, a mystery in politics,
inconceivable to human capacity and inconsistent with human
society," and this must be true of a society—at least a civilised
and organised society—such as we know to exist in East Germany.
In the United States some glimmerings can be found of the idea    C
that non-recognition cannot be pressed to its ultimate logical
limit, and that where private rights, or acts of everyday occurence,
or perfunctory acts of administration are concerned (the scope
of these exceptions has never been precisely defined) the courts
may, in the interests of justice and common sense, where no con-
sideration of public policy to the contrary has to prevail, give    D
recognition to the actual facts or realities found to exist in the
territory in question. These ideas began to take shape on the
termination of the Civil War (see *U.S.* v. *Insurance Companies* [92]),
and have been developed and reformulated, admittedly as no
more than dicta, but dicta by judges of high authority, in later
cases. I mention two of these, *Sokoloff* v. *National City Bank* [93]    E
and *Upright* v. *Mercury Business Machines Co. Inc.*,[94] a case
which was concerned with a corporate body under East German
law. Other references can be found conveniently assembled in
Professor D. P. O'Connell's International Law (1965) vol. I, pp.
189 et seq. No trace of any such doctrine is yet to be found in
English law, but equally, in my opinion, there is nothing in those    F
English decisions, in which recognition has been refused to par-
ticular acts of non-recognised governments, which would prevent
its acceptance or which prescribes the absolute and total invalidity
of all laws and acts flowing from unrecognised governments. In
view of the conclusion I have reached on the effect to be attributed
to non-recognition in this case, it is not necessary here to resort to    G
this doctrine but, for my part, I should wish to regard it as an
open question, in English law, in any future case whether and to
what extent it can be invoked.

[92] 89 U.S. 99.                    [94] (1961) 13 App.Div. 2d 36; 213
[93] 145 N.E. 917.                    N.Y. 2d 417.

A    I return now to consideration of the effect of the refusal to recognise the "government" of East Germany. The respondents, claiming that non-recognition of a government entails automatically non-recognition of all laws enacted by that government, rely upon the well-known line of cases following upon *Aksionairnoye Obschestvo A.M. Luther v. James Sagor & Co.*,[95] where non-

B    recognition had these consequences.

But before their argument can be made good, they must show that the present refusal of recognition is given in a situation comparable with that which is found in the cases. This is the critical issue here and it is on this that the respondents' argument, in my opinion, breaks down. For the present situation, as regards sovereignty in Germany, is incomparable with any that

C    has previously come before our courts and, as I shall hope to show, gives rise to different consequences.

The classic cases of non-recognition of governments arise in two types of situation: first, where some new state comes into existence, as by separation from another state or states (in such

D    a case there may be a question of non-recognition of the state itself as well as of the government); instances of this are cases concerned with breakaway Spanish colonies—*Jones v. Garcia del Rio*[96] (Peru); *Thompson v. Powles*[97] (Guatemala); *Taylor v. Barclay*[98] (Colombia); secondly, where a new government claims authority over an existing state, or part of it. Instances of this are

E    *City of Berne v. Bank of England*[99]; *Aksionairnoye Obschestvo A.M. Luther v. James Sagor & Co.*[100] (U.S.S.R.); *White, Child & Beney Ltd. v. Simmons*[101] (U.S.S.R.) and numerous cases relating to Russian banks. But neither of these is the situation in East Germany. When Germany surrendered unconditionally to the Allied Powers in 1945, instead of proceeding to the traditional

F    status of belligerent occupancy, they brought a novel legal situation into being. The state of Germany remained (and remains) in existence; governing authority or supreme authority in respect of Germany as a whole was reserved to the four Allied Powers acting jointly, and governing authority in respect of each zone was left to be exercisable by that one of the Allied Powers to which the zone

G    was allocated; in the Eastern part of Germany in which Jena is situated by the U.S.S.R. There is no controversy about this: the facts were so stated by the executive and accepted by the courts

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No 2)

Lord
Wilberforce

[95] [1921] 1 K.B. 456; [1921] 3 K.B. 532, C.A.
[96] (1823) Turn. & R. 297.
[97] (1828) 2 Sim. 194.
[98] (1828) 2 Sim. 213.
[99] (1804) 9 Ves. 347.
[100] [1921] 3 K.B. 532.
[101] (1922) 127 L.T. 571; 38 T.L.R. 616, C.A.

956                    HOUSE OF LORDS                **[1967]**

H. L. (E.)
1966
___
Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)
___
LORD
WILBERFORCE
___

in the cases of *Rex* v. *Bottrill, Ex parte Kuechenmeister* [102] and   **A**
*Preston* (*orse. Putynski*) v. *Preston* (*orse. Putynska*) (*orse.*
*Basinska*).[103]   It is against this background that the certificates of
the Secretary of State were given in these proceedings in September
and November, 1964.   The certificate of November 6, 1964, and
the questions to which it was directed have been set out in the
opinion of my noble and learned friend, Lord Reid, and I shall not   **B**
repeat them here.   The following are, in my opinion, the conclu-
sions to be drawn from the certificate:

> (1) The governments of the four Allied Powers retain
> rights and responsibilities in respect of Germany as a whole;
> (2) In respect of the Eastern Zone—called " the zone of
> occupation allocated to the U.S.S.R." in which Jena is—the   **C**
> state and Government of the U.S.S.R. are recognised as de
> jure entitled to exercise governing authority;
> (3) This recognition is stated to extend to the period
> since " at or about the end of June, 1945 " to the " present
> date," that is, November 6, 1964;
> (4) Apart from the four Allied states and their Govern-
> ments and the Control Council for Germany (an organ of
> the four Allied Governments) Her Majesty's Government   **D**
> have not recognised de jure or de facto any other authority
> purporting to exercise governing authority in or in respect
> of the Eastern Zone.

There should be added to these facts that stated by the earlier
certificate dated September 16, 1964, that

                                                                       **E**
> (5) Her Majesty's Government have not granted any
> recognition de jure or de facto to the " German Democratic
> Republic " or its " Government "—the inverted commas are
> as in the certificate itself.

The first question for a court when presented with this certifi-
cate (for convenience I treat the two as a single statement) is to
consider whether it completely states the facts and whether there   **F**
is any ambiguity in it. If so, it may be appropriate to ask the
Secretary of State for a supplementary statement. There are
only two questions which might arise in relation to the Eastern
Zone. The first is whether it is admissible in the courts of this
country to take account of the fact (if such be the case, as to
which I shall make some observation later) that the U.S.S.R.   **G**
itself considers that there is in existence in the Eastern Zone
a government independent of the U.S.S.R., viz., the " government "
of the " German Democratic Republic." In my opinion, the

[102] [1947] K.B. 41; 62 T.L.R. 570;   [103] [1936] P. 141; [1963] 2 W.L.R.
[1946] 2 All E.R. 434, C.A.         1435; [1963] 2 All E.R. 405, C.A.

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

A  answer to this must be negative: to make any such assertion
would be in direct contradiction to the certificate which states
without qualification that the U.S.S.R. and its Government is
entitled de jure to exercise governing authority there and that
nobody else is, either de jure or de facto. What view another
state may take as to the legal or factual situation in any territory
B  is irrelevant to the recognising (or non-recognising) state and,
after the latter has defined its own attitude, is inadmissible in
its courts. As a well-known international law authority puts it:
" The recognising state is not concerned with the question whether
the state of things which it is recognising "—and I add " or not
recognising "—" is legal by the national law of another state "
C  (The Law of Nations (1963) Brierly/Waldock, p. 147). The
second question is whether consistently with the certificate it is
possible to assert that the U.S.S.R. is not de facto exercising
governing authority or control in the Eastern Zone. It was,
indeed, suggested by the respondents that there was a deliberate
and significant abstention in the certificate from any positive asser-
D  tion to this effect, two points being particularly relied on. First
it was said that although the question was put what state or
governments have been recognised as " exercising governing
authority " in the Eastern Zone, no answer to this was specifically
given. Secondly, although in relation to Germany as a whole it
was said that until March 20, 1948, the four Allied Powers " did
E  exercise . . . joint authority through the Control Council for
Germany " no comparable statement was made concerning the
Eastern Zone. Either, therefore, the inference should be drawn
that Her Majesty's Government did not regard the U.S.S.R. as
" exercising governing authority " in the Eastern Zone, or at least
the certificates were ambiguous and further inquiry ought to be
F  made.
    I have no temptation, in a matter of this kind, to speculate or
to read into the certificate anything which is not there, but I
cannot find that the certificate is either incomplete or ambiguous.
In stating that the U.S.S.R. is exercising de jure governing
authority and that no other body is exercising de facto authority,
G  the two certificates to my mind say all that need or can be said.
De jure recognition in all cases but one is the fullest recognition
which can be given: the one exception is the case where there
is concurrently some other body de facto exercising a rival
authority to that of the " de jure " sovereign (as in the case of
*Banco de Bilbao* v. *Sancha* [104]). But any such possibility as this is

[104] [1938] 2 K.B. 176; 54 T.L.R. 603; [1938] 2 All E.R. 253, C.A.

958                              HOUSE OF LORDS                         **[1967]**

H. L. (E.)
1966
————
Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)
————
LORD
WILBERFORCE
————

excluded by the terms of the certificates. Moreover, some more    A
enlightenment (if any be needed) as to what is meant by de jure
recognition may be drawn from the official statement made by
Mr. Secretary Morrison on March 21, 1921, (quoted in full by my
noble and learned friend, Lord Reid) in which he said:

> " The conditions for the recognition of a new régime as the
> de jure government of a state are that the new régime should    B
> not merely have effective control over most of the state
> territory, but that it should, in fact, be firmly established "

—a statement which is not necessarily binding on successor
Secretaries of State but which is reproduced, as still effective,
in the 1963 edition of Brierly's Laws of Nations (p. 148).  This
shows that, if nothing more is said, de jure recognition presup-    C
poses effective control in fact.  It is consistent with this approach
that Mr. Secretary Gordon Walker, when asked what states or
governments are recognised as (a) entitled to exercise or (b)
exercising governing authority, answered only the first question:
after doing so there was no occasion to go further.  That in doing
so there was no intention to deny effective control in fact to the    D
de jure sovereign is shown by the fact that the reply relates, with-
out distinction, to the whole period from 1945–1964.  For at any
rate for some years after 1945, it would not be possible to dispute
that the U.S.S.R. was directly governing the Eastern Zone, which
must dispose of any conjecture that in the words he has used for
the period as a whole the Secretary of State is distinguishing be-    E
tween what could be done and the actuality of the situation.
The certificates therefore in my opinion establish the U.S.S.R.
as de jure entitled to exercise governing authority and in full
control of the area of the Eastern Zone.

   This makes possible a determination of what is the legal
character of enactments by the " German Democratic Republic."    F
To say that this is an unrecognised government, though in a
sense correct, may be misleading: it is so in a sense quite different
from the sense in which the expression was used of, for example,
the Russian revolutionary government prior to (de facto) recogni-
tion in 1921, whose status and the validity of whose legislation
was considered in *Aksionairnoye Obschestvo A.M. Luther* v.    G
*James Sagor & Co.*[105]  If that government was not recognised,
there was nothing which could give international validity to
its laws.  But the " German Democratic Republic " is mak-
ing laws in and as to a territory where a recognised

[105] [1921] 3 K.B. 532.

**A.C.**                    AND PRIVY COUNCIL                    959

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord
Wilberforce

A    " sovereign " exists. Is there, then, any reason for denying validity to its acts? The respondents say that there is: that no documentary authority has been proved to show that the " German Democratic Republic " had power, under the U.S.S.R., to make the law in question, or any law: that there must be either a constitution, or some enabling provision, or some express authority from the " sovereign " or proof positive of some other connection with the government, to avoid the consequences that the law is simply a nullity, and that none such has been proved.

This argument, in my opinion, is unduly formalistic. The U.S.S.R. and the other Allied Powers assumed power in Germany after a military collapse followed by a declaration that they had done so: an exceptional, if not unprecedented step which, and the consequences of which, however, we are bound to recognise. Thereafter, for a period, they exercised their power directly through their military commanders-in-chief. After a time they set up or allowed to be set up zonal or regional authorities to carry out tasks of government or administration. The United States military authorities, as we know, set up or allowed a " government " in the Land of Thuringia, which was continued by the U.S.S.R. when they took over. It is unnecessary in circumstances such as these to seek for a formal constitutional chain of power. Given the continuance of de jure authority and complete control, it follows that acts done by what are (as we are bound to hold) necessarily subordinate bodies are done under the governing authority of the occupying power. The argument to the contrary becomes all the more unrealistic when it is seen that the respondents themselves, in the evidence filed in these proceedings, have gone to considerable pains to demonstrate the subservient, or puppet, character of the " German Democratic Republic " and its Government. Thus Dr. Walter David, after stating that the Eastern section of Germany (including Jena) remains under the occupation of a foreign power, Russia, continues that the intentions of Dr. Abbé, the founder of the Carl-Zeiss-Stiftung, " cannot be implemented if the Council of Gera (*or indeed any authority under Russian or communist control*) were the special board." And Dr. Richard Moser von Filseck says:

> " In East Germany a centralised régime *has been set up by the Soviet Union to which it is subservient. . . .* The Council of Gera is, therefore, the *representative of that political power* which carried out the expropriation of the assets of the foundation enterprises."

A.C. 1967.                                      62 (2)

H. L. (E.)
1966
___
Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)
___
LORD
WILBERFORCE
___

The latter power was the U.S.S.R. Other passages are to a similar effect. Together with the certificate they present a consistent picture of subordinate central and local authorities exercising authority under the sovereignty or control of the U.S.S.R. as occupying power.

I must notice here two arguments:

(i) In the Court of Appeal, it was assumed, as a matter of which judicial notice should be taken, that the "German Democratic Republic" was independent of the U.S.S.R., the conclusion from this being that its acts could not be derived from or attributed to the authority of the latter. Thus Harman L.J. said [106]:

> "It is in fact notorious that the U.S.S.R. has recognised the German Democratic Republic as a sovereign state and treats its law-making capacity accordingly."

And Diplock L.J.[107] thought that he could take judicial notice that

> ". . . the Government of the U.S.S.R. recognises the 'Government of the German Democratic Republic' as the independent sovereign government of an independent sovereign state for whose territory the Government of the U.S.S.R. claims no power to make laws."

I have already stated my opinion that, in the face of the Foreign Office certificate, recognition (if given) by the U.S.S.R. of the German Democratic Republic is something of which the courts of this country cannot take account. But, in addition, as to judicial knowledge, or notoriety, it is not shown, at any rate to my satisfaction, that *in 1952* when the critical " law " was enacted even the U.S.S.R. was claiming that the German Democratic Republic was independent of it or was disclaiming its own authority. Without elaboration, it is sufficient to say that from official documents to be found in Command Paper 1552, which the respondents made available to us, the contrary is seen to be clearly the case, and such is also the effect of the respondents' evidence. There is only one piece of evidence to the contrary, a single answer given by Professor von Moser in cross examination to the effect that sovereignty was transferred to the German Democratic Republic in 1949. But this was not directed to the issue now being considered (which had not at that time been raised) and its true meaning was not explored; its apparent meaning seems to be contradicted both by the facts and by the considered evidence on

A

B

C

D

E

F

G

---

[106] [1965] Ch. 596, 651.          [107] Ibid. 664.

A    affidavit of the same witness to which I have referred. The Court
of Appeal did not rely on it and it should be disregarded.

(ii) It was said by the respondents that to recognise the law
setting up the Council of Gera of July 23, 1952, would in effect
be to recognise the Government of East Germany and to create a
conflict with the views of the executive. The principle is well
B    established that the courts of Her Majesty do not speak with a
different voice from that of Her Majesty's executive government
(it was stated as early at *Taylor* v. *Barclay* [108] and has been
accepted ever since) but we are not here under the risk of com-
mitting the courts to action of this kind. Merely because in the
class of case, of which *Aksionairnoye Obschestvo A.M. Luther*
C    v. *James Sagor & Co.* [109] is an example, non-recognition of
a "government" entails non-recognition of its laws, or
some of them, it does not follow that in a different situation
this is so, nor that recognition of a law entails recognition of the
law-maker as a government with sovereign power. The primary
D    effect and intention of non-recognition by the executive is that
the non-recognised "government" has no standing to repre-
sent the state concerned whether in public or private matters.
Whether this entails non-recognition of its so-called laws, or acts,
is a matter for the courts to pronounce on, having due regard to
the situation as regards sovereignty in the territory where the
E    "laws" are enacted and, no doubt, to any relevant consideration
of public policy. I can see no inconsistency in (a) accepting the
view of the executive that there is no recognised (that is, inde-
pendent) government in the Eastern Zone apart from the de jure
governing authority of the U.S.S.R. and (b) attributing legal
validity, if no other legal obstacle exists, to a "law" or act of
F    that "government" as a subordinate or dependent body.

On consideration, therefore, of the whole of the situation in
the Eastern Zone of Germany I reach the conclusion that the
challenge to the validity of the law of July 23, 1952, setting up
the Council of Gera fails. I should add that, even if there was a
change in the situation in the Eastern Zone between 1952 and the
G    issue of the writ in 1955 (in the direction of a discontinuance of
Russian control), it has not been suggested that this would have
invalidated a law already passed.

I must next mention the alternative contentions of the appel-
lants with regard to the right to institute the present proceedings.

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

[108] 2 Sim. 213.                    [109] [1921] 3 K.B. 532.

H. L. (E.)
1966
———
Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)
———
Lord
Wilberforce
———

These are three, namely, that Dr. Schrade (who instructed solici-    A
tors on behalf of the plaintiffs) had authority so to do  (i) under a
power of attorney granted on June 29, 1951, by the then special
board, namely the Ministry of Education of the Land of Thüringia,
(ii) as mandatory or proxy mandatory under article 9 of the
constitution, (iii) as the (i.e., the sole member of the) board of
management of the optical works, entitled to act, under article    B
114, in the absence of a special board.

These alternative contentions were not dealt with by Cross J.
because he held that the action was validly authorised by the
Council of Gera as the special board so that the alternatives did
not arise. They were considered by the Court of Appeal and
rejected there after careful examination by both Harman L.J. and    C
Diplock L.J. It was complained by counsel for the appellants that
the learned Lords Justices, on certain points, came to conclusions
on what were essentially matters of German law without sufficient
evidence, and your Lordships were invited to receive fresh affidavits
as to these matters. In my opinion, the expert evidence filed at
the trial by either side was on some points incomplete and    D
obscure, and if these three points had to be decided it would be
unsafe to agree or disagree with the conclusions of the Court
of Appeal on the existing material.

If, however, the appellants are entitled to succeed on the other
points raised in this appeal, it would be unnecessary for them to
rely on these alternatives or to call any further evidence, and they    E
could be left undetermined, as they were left by Cross J. I pro-
ceed, therefore, to consider the issues which Cross J. decided in
favour of the appellants, and which the respondents now contest.
These are: (1) Whether the appellants are estopped from con-
tending that the Council of Gera had authority to commence this    F
action on behalf of the Stiftung by certain judgments given in the
Federal Republic of Germany; (2) Whether, if there is no estop-
pel, it has been established on the evidence that the Council of
Gera had such authority; (3) Whether the appellants are entitled
to bring the present proceedings in view of the confiscation in
East Germany of the optical business. The third question was    G
dealt with briefly by Cross J. but he expressed some doubt whether
it was not more properly one which should be left for decision at
the trial rather than decided at the present preliminary stage. In
my opinion, this doubt was justified and the issue, which may be
a substantial and difficult one, cannot properly be decided on
this appeal. It should be left to the trial as an open issue on

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

A    which the parties can put their case unfettered by the tentative conclusions of Cross J. The remaining two questions require decision.

(1) *Estoppel*: The judgment mainly relied on by way of estoppel is the judgment in West Germany of the Federal High Court (I take the translation which was used before Cross J.) of
B    November 15, 1960. There are other decisions, but they carry the matter no further. This judgment was given in proceedings commenced in the Provincial Court (Landgericht) at Stuttgart on April 28, 1954, the parties to which were the Carl-Zeiss-Stiftung represented by the Council of Gera as plaintiff and three individuals (Bauersfeld, Heinrichs and Kuppenbender) and the firm of Carl
C    Zeiss of Heidenheim as defendants. As regards these parties it is not disputed (a) that the Carl-Zeiss-Stiftung named as plaintiff is the same as the body named as plaintiff in this action, (b) that the firm Carl-Zeiss of Heidenheim named as defendant is the same body as that named as the third defendant to this action. It was also accepted that the effective plaintiff in those pro-
D    ceedings was the Council of Gera and that the substantive claim sought to be brought for trial related to the use of the names Zeiss or Carl-Zeiss and of certain trade marks in the Federal Republic of Germany, so differing from the substantive claim in the present action, which relates to similar matters in this country.

E    Objection was taken, before the West German action could be tried on the merits, to the right of the Council of Gera to represent the Stiftung and proceedings on this preliminary issue went through a number of stages and appeals. Finally, the Federal High Court, by its judgment of November 15, 1960, held that the action was inadmissible, on the ground that the Council
F    of Gera had no authority to represent the Carl-Zeiss-Stiftung. The action was, therefore, dismissed and the Council of Gera was ordered to pay the costs.

Several questions, some of difficulty, arise in considering whether the respondents in the present action can rely on the
G    judgment of the Federal High Court by way of estoppel or as res judicata. The first question arises from the fact that what is relied on here is not the mere fact of a judgment and not a decision on the substantive " cause of action " or claim which the Carl-Zeiss-Stiftung was trying to make good, but only a decision on a particular issue: in other words, what has come to be called an " issue estoppel." I must begin by ascertaining what is meant by

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

"issue estoppel" in English law and then consider how far this    A
kind of estoppel, or something analogous to it, may be applied
to judgments of foreign courts.

A convenient starting point, as regards the English doctrine,
is to be found in the judgments of the Court of Appeal in *Fidelitas
Shipping Co. Ltd.* v. *V/O Exportchleb.*[110]  The case was con-
cerned with an interim award made in a commercial dispute        B
embodied in a special case on which the court had given a decision
and it was held that an issue raised by the special case so deter-
mined was the subject of "issue estoppel" so that it could not
be raised again. Lord Denning M.R. said this[111]:

> "The law, as I understand it, is this: if one party brings
> an action against another for a particular cause and judg-   C
> ment is given on it, there is a strict rule of law that he can-
> not bring another action against the same party for the same
> cause. Transit in rem judicatam; see *King* v. *Hoare.*[112] But
> within one cause of action, there may be several issues raised
> which are necessary for the determination of the whole case.
> The rule then is that, once an issue has been raised and dis-
> tinctly determined between the parties, then, as a general    D
> rule, neither party can be allowed to fight that issue all over
> again. . . ."

He goes on to deal with "points" within issues, including those
which though not actually raised could have been raised, an
argument which is not material here, and which I prefer to leave
open.                                                            E

Similarly in the judgment of Diplock L.J. there is a useful
passage which contains these words.[113]

> "The final resolution of a dispute between parties as to
> their respective legal rights or duties may involve the deter-
> mination of a number of different 'issues,' that is to say, a
> number of decisions as to the legal consequences of particular
> facts, each of which decisions constitutes a necessary step in   F
> determining what are the legal rights and duties of the parties
> resulting from the totality of the facts. . . ."

He continues by making a distinction between issue estoppel and
fact estoppel which may deserve some further exploration, but it
does not arise here.                                            G

The doctrine of issue estoppel generally is not a new one.
It can certainly be found in the opinion of the judges delivered
by De Grey C.J. in *The Duchess of Kingston's Case,*[114] a pas-
sage from which has been quoted by my noble and learned friend,

---

[110] [1966] 1 Q.B. 630.          [113] [1966] 1 Q.B. 630, 641–2.
[111] Ibid. 640.                  [114] 20 St.Tr. 355, 538n.
[112] (1844) 13 M. & W. 494, 504.

H. L. (E.)

1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

A  Lord Reid, and an accepted re-statement of it was given by Coleridge J. in *Reg.* v. *Inhabitants of the Township of Hartington Middle Quarter*,[115] which is also quoted by my noble and learned friend. Mr. Spencer Bower, in his work on Res Judicata states the principle as being " that the judical decision *was, or involved,* a determination of the same question as that sought to be contro-

B  verted in the litigation in which the estoppel is raised " (Res Judicata, p. 9)—a formulation which invites the inquiry how what is " involved " in a decision is to be ascertained. One way of answering this is to say that any determination is involved in a decision if it is a " necessary step " to the decision or a " matter which it was necessary to decide, and which was actually decided,

C  as the groundwork of the decision " (*Reg.* v. *Inhabitants of Hartington Middle Quarter Township* [115]). And from this it follows that it is permissible to look not merely at the record of the judgment relied on, but at the reasons for it, the pleadings, the evidence (*Brunsden* v. *Humphrey* [116]) and if necessary other material to show what was the issue decided (*Flitters* v. *Allfrey* [117]).

D  The fact that the pleadings and the evidence may be referred to, suggests that the task of the court in the subsequent proceeding must include that of satisfying itself that the party against whom the estoppel is set up did actually raise the critical issue, or possibly, though I do not think that this point has yet been decided, that he had a fair opportunity, or that he ought to

E  have raised it.

This being the position as regards English judgments, one must next inquire whether a similar principle should apply as regards foreign judgments. It has taken some time before the recognition of foreign judgments by English courts was placed on a logical footing. Unlike English judgments, they were not

F  considered to be judgments of a court of record so that the simplest form of estoppel—by record—could not be applied to them. They were, in the early stages of private international law, considered only to be prima facie evidence of the rights of the parties and were examinable on the merits. This attitude can be found as late as 1834 in the Irish appeal of *Houlditch* v. *Donegal* [118]

G  where Lord Brougham L.C. expressed his disagreement with the opinion of the Lord Chancellor of Ireland that an English Chancery decree was conclusive, in strong terms. He said:

" The leaning of my opinion is so strong that I can hardly call it the inclination of an opinion; and we know it is the

---

[115] 4 E. & B. 780, 794.                [117] L.R. 10 C.P. 29.
[116] (1884) 14 Q.B.D. 141, C.A.        [118] 8 Bligh(N.S.) 301, 338.

966                      HOUSE OF LORDS                 **[1967]**

H. L. (E.)

1966
___

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)
___
LORD
WILBERFORCE
___

general sense of lawyers in Westminster Hall (notwithstanding      A
dicta of considerable weight coming from very learned judges'
obiter dicta to the contrary) that the judgment of a foreign
court in courts of this country is only prima facie evidence—
is liable to be averred against and not conclusive. One argu-
ment is clear—that the law in the course of procedure abroad
sometimes differs so mainly from ours in the principles upon
which it is bottomed, that it would seem a strong thing to      B
hold that our courts were bound conclusively to give execu-
tion to the sentence of foreign courts. . . ."

But the Lord Chancellor's remarks showed that the tide was
running in the direction of recognition and in *Ricardo* v. *Garcias* [119]
this House assented to the view that when a foreign judgment
comes in collaterally, or the defendant relies upon it under the      C
exceptio rei judicatae, it is then received as conclusive and
Lord Brougham's earlier remarks came to be explained as refer-
ring only to the limited grounds on which foreign judgments may
be examined such as fraud, public policy or want of jurisdiction
(see Spencer Bower on Res Judicata, p. 38). In this respect,
foreign judgments retain their distinction from English judgments.      D
But, these limitations apart, the modern doctrine (usually derived
from *Godard* v. *Gray* [120]) is that a foreign judgment may be
pleaded and is conclusive.

Is, then, what may be pleaded in defence to a claim limited
to what may be called " cause of action " estoppel, that is, a
judgment which negatives the plaintiff's cause of action, or does      E
it extend to any matter raised between the parties necessary to
the decision and actually decided? There is no clear authority on
the point. *Henderson* v. *Henderson,*[121] in any event a decision of
a colonial court, was a simple example of cause of action estoppel,
and the same appears to be true of the more complicated case
of *Callandar* v. *Dittrich.*[122]      F

The appellants, arguing against issue estoppel in the case of
foreign judgments, invoke a rule by which it appears that a plain-
tiff who has obtained a foreign judgment may sue here either on
that judgment or on his original cause of action, a rule vouched
by a number of decided cases, which maintains a precarious
foothold as a sub-rule in Dicey's Conflict of Laws, 7th ed., p. 996.      G
But this rule, which, if surviving at all, is an illogical survival,
affords no sound basis for denying a defendant the benefit of a
decision on an issue; if it proves anything it proves too much, and

[119] (1845) 12 Cl. & F. 368 H.L.      [121] 3 Hare 100.
(E.).                                   [122] (1842) 4 Man. & G. 68.
[120] L.R. 6 Q.B. 139.

A    would deny both parties to a foreign proceeding the benefit of any
estoppel at all.

As a matter of principle (and we are really thrown back upon
principle), whether the recognition of judgments is based upon a
recognition of vested rights, or upon considerations of public
interest in limiting relitigation, there seems to be no acceptable
B    reason why the recognition of foreign judgments should not
extend to the recognition of issue decisions. From the nature of
things (and here it is right to recall Lord Brougham's warning)
this, in the case of foreign judgments, may involve difficulties and
necessitate caution. The right to ascertain the precise issue
decided, by examination of the court's judgment, of the pleadings
C    and possibly of the evidence, may well, in the case of courts
whose procedure, decision-making technique, and substantive law
is not the same as our own, make it difficult or even impossible to
establish the identity of the issue there decided with that attempted
here to be raised, or the necessity for the foreign decision. And
I think that it would be right for a court in this country, when
D    faced with a claim of issue estoppel arising out of foreign proceed-
ings, to receive the claim with caution in circumstances where the
party against whom the estoppel is raised might not have had
occasion to raise the particular issue. The fact that the court can
(as I have stated) examine the pleadings, evidence and other
material, seems fully consistent with its right to take a broad view
E    of the result of the foreign decision. But with these reservations,
where after careful examination there appears to have been a
full contestation and a clear decision on an issue, it would in my
opinion be unfortunate to exclude estoppel by issue decision from
the sphere of recognition. If that is so, in this case where an
explicit statement is available of the decision of the Federal High
F    Court, of the reasons for it, and of the issue as defined between
the parties to it, and where the English court has the assistance
of expert witnesses to explain the foreign decision, the difficulty
should not be too great in ascertaining whether the same issues as
were there decided are involved in the present action.

The appellants, indeed, say that the issue is not the same:
G    that in the German proceedings it was whether the Council of
Gera representing the Carl-Zeiss-Stiftung could sue in respect of
certain matters in Germany and that here the issue is whether
this can be done in respect of matters arising here. But that is to
argue for " cause of action " estoppel only: if issue estoppel
exists, the issue is whether (briefly) the Carl-Zeiss-Stiftung has

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord
Wilberforce

A

become paralysed or its organs rendered ineffective so that it cannot act in the manner in which it is purporting to act. Identity of issue is, to my mind, clearly shown.

Next as to identity of parties. Normally to establish this should be the simplest part of the case. But there is a peculiar difficulty here because of the way in which the present issue arises. The proceedings profess to be brought by the Carl-Zeiss-Stiftung but since it is a legal person there must be some actual person, or persons, to bring it before the court, who has or have power to do so. The Council of Gera claims to be the relevant organ for this purpose; and it is clear that it is on their authority that the action was started. The question to be decided is whether the Carl-Zeiss-Stiftung is before the court or whether it is not: so according to the eventual decision the plaintiff may or may not be the Carl-Zeiss-Stiftung. Obviously in these circumstances the test of identity of parties cannot be the formal test of identity on the record, so what is it to be? Cross J. decided that there was not identity of parties and I understand that the majority of your Lordships agree with him. I regret that I cannot share this view. The point, no doubt, merits longer argument, but in view of the numerous points discussed in this appeal I shall abstain from giving at any length the reasons why I think identity of parties exists. Briefly, in my opinion, one must look to see who in reality is behind the action: and the reality is that a body of persons, namely, the Council of Gera, is seeking in these proceedings, precisely as in Germany they sought, to set the Carl-Zeiss-Stiftung as plaintiff in motion before the court. One may consider the simpler case of a limited company. If certain persons, claiming to be its directors, start an action in the company's name, the defendant may seek and may obtain a decision that the company is not properly before the court because the persons concerned had no right to commit the company to the action. As a result the action is struck out. Can it be that those same persons may start another action in the company's name against the same defendant making the same claim? According to the appellants' argument the relevant party as regards the application to strike out the action is the solicitors, so that if the directors started their second action through the same firm there would be an estoppel; but if they employed a second—or a third—firm there would not be. I can hardly think so bizarre an argument can be correct. There must surely be an estoppel in the second action for the reason that the effective party to the decided issue (not to the action) is the same

B

C

D

E

F

G

A.C.                    AND PRIVY COUNCIL                    969

H. L. (E.)

1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

A    in each case—namely the directors. Admittedly, as I mentioned at the start of this opinion, the involvement of the solicitors in the proceedings, according to our practice, introduces a complication. But this does not, to my mind, prevent the party to the proceedings (who is behind the solicitors as we know) being the Council of Gera. To treat the solicitors as the parties to these

B    proceedings seems to me, with respect to the argument, both lacking in reality and unduly technical. There is naturally no authority which deals with such a situation as this but I find of assistance a passage from the American Restatement (Judgments), s. 85 (2), which reads:

C        " Where a person is bound by or entitled to the benefit of the rules of res judicata . . . such rules apply in a subsequent action brought or defended by another on his account."

We were also referred to passages from the Corpus Juris Secundum, Tit. Judgments, ss. 756 et. seq., and to American authorities there cited which show that U.S. courts take a flexible view of the requirements of these estoppel rules. The present case seems to

D    me one which does not require much, if any, adjustment, to fit into the rules as to parties. If the Council of Gera is not itself the party, then the case seems to fall within the " Restatement " rule. So I do not think that the estoppel fails on this ground.

To my mind, a more serious obstacle to the efficacy of the estoppel is to be found in the requirement that the foreign judg-

E    ment should be final and conclusive or, as it is sometimes put, conclusive on the merits. I have no difficulty as to the latter element, for I cannot accept the argument that, for this purpose, the merits means the merits of the action as stated in the plaintiff's claim. The defendants' contention that the Stiftung's ability to

F    act has been fatally impaired is just as much an argument on the merits: indeed, the issue which group of persons is entitled to control the Stiftung is at the root of the present dispute. But the remaining requirement is more difficult.

The textbooks are in agreement in stating that for a foreign judgment to be set up as a bar in this country it must be res

G    judicata in the country in which it is given (see Dicey, Conflict of Laws, 7th ed., p. 1036; Cheshire Private International Law, 7th ed., p. 562). The chief authority cited for this is *Nouvion* v. *Freeman*,[123] in which both Lindley L.J. in the Court of Appeal and Lord Herschell in this House expressed themselves strongly in this sense. No doubt that was rather a special case since the

[123] (1887) 37 Ch.D. 244; 3 T.L.R. 566, C.A.; 15 App.Cas. 1, H.L.

H. L. (E.)
1966
———
Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)
———
LORD
WILBERFORCE
———

remate judgment was no more than provisional, but, generally, it     **A**
would seem unacceptable to give to a foreign judgment a more
conclusive force in this country than it has where it was given.
In relation to the present case I think that " conclusive " must be
taken in the sense that if the Stiftung represented by the Council
of Gera were to attempt to commence another action in West
Germany against the same defendants as were parties to the     **B**
previous action they would, by the force of the previous judgment,
be prevented from proceeding with it. Moreover, I think that it is
for the defendant, who sets up the bar, to establish the conclusive
character of the judgment. This must be so on principle and
there is support for it in *Behrens* v. *Sieveking*.[124] Unfortunately
there is no clear evidence whether the judgment of the Federal     **C**
High Court is res judicata (in the sense I have mentioned) in
Germany or not. The respondents rely on the accepted presump-
tion that the foreign law is the same as English law, but this
presumption, never more than a fragile support, is less than ever
reliable here when the question is what is the effect of a particular
judgment which has no exact parallel in English law. There are in     **D**
fact indications in the evidence to the contrary.

In 1957 an action, commenced in Dusseldorf in West Ger-
many, came on appeal before the Federal High Court. The parties
to that action were " the firm Carl Zeiss of Heidenheim, repre-
sented by Dr. Bauersfeld " as plaintiff and (inter alios) V.E.B.
Carl Zeiss Jena as defendants. The defendants took the point that     **E**
the plaintiff lacked capacity to sue and was not properly repre-
sented, alleging that Dr. Bauersfeld had resigned from the board
of management of the Stiftung. The Federal High Court in its
decision of July 24, 1957, rejected this objection, on the ground
that it was not satisfied that Dr. Bauersfeld had resigned.

In 1959 another action, also commenced in Dusseldorf in     **F**
West Germany, came on appeal before the Federal High Court
with the same plaintiff and (inter alios) the same defendants as in
the 1957 appeal. The defendants again took the point that the
plaintiff had not the capacity to sue and was not properly repre-
sented because Dr. Bauersfeld had resigned from the board of
management of the Stiftung. The Federal High Court again     **G**
rejected the objection and in doing so used these words:

"It had already negatived the question by its judgment dated
July 24, 1957, with detailed reasons. This must stand even
after repeated examination and assessment of the objections
raised against it by the appeal ";

[124] (1837) 2 Myl. & Cr. 602.

A.C.    AND PRIVY COUNCIL    971

H. L. (E.)
1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

Lord
Wilberforce

A    and later: "The court maintains its view even after a re-examination." The significance of these two judgments in relation to the conclusive effect, in a subsequent action, of a decision, by way of objection, that a plaintiff was not properly represented in an earlier proceeding between the same parties, was not explored at the trial. But, if the fate of the estoppel turned on

B    this point (as it would on my view as to identity of parties) I should be strongly inclined to hold that the defendants (the present respondents) had not established to the satisfaction of the court that the judgment of November 15, 1960, was conclusive in West Germany as regards other proceedings, even between the same parties, and that consequently it could not be conclusive as

C    regards other proceedings here. The estoppel fails in any event in view of the conclusion reached by your Lordships as to identity of parties. This being so, it is not necessary to consider whether the appellants, for their part, could set up the judgments given in East Germany as a counter-estoppel, or to decide on the effect of an estoppel as regards the first and second defendants to the

D    present action.

(2) I now consider, free from any estoppel, whether the Council of Gera had authority to commence these proceedings on behalf of the Stiftung. The evidence before the learned judge consisted in the main, of decisions of courts in both East and West Germany. There were also affidavits by experts on each side, on

E    which extensive cross-examination took place. On the appellants' side most reliance was placed on two judgments of the Supreme Court in East Germany, an advisory opinion given on April 6, 1954, and a judgment on appeal from the District Court of Leipzig dated March 23, 1961. This judgment was given in proceedings

F    brought by the Stiftung (represented by the Council of Gera as the special board and by its mandatory, Dr. Schrade) and V.E.B. Carl Zeiss (the public body which had taken over the optical works in 1940) against "the firm Carl Zeiss of Oberkochen" (a description intended to apply to the present third defendants) to restrain them from using the name Carl-Zeiss in the German

G    Democratic Republic. Notice of these proceedings was apparently given to the defendants but they did not appear or take any part in the action. These two decisions, which enter in great detail into both the facts and the law, state as the conclusions of the Supreme Court, (i) that the Stiftung continued to exist as a legal entity, (ii) that the Council of Gera was the special board of the

H. L. (E.)
1966
———
Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)
———
LORD
WILBERFORCE
———

Stiftung, (iii) that article 116, which provided for liquidation of the Stiftung, had not come into play.

    A

    On the side of the respondents, reliance was in the main placed on the judgment of the Federal High Court of West Germany of November 15, 1960, coupled with that of the Provincial Court of Appeal of Stuttgart dated October 29, 1958, the reasoning of which was approved by the Federal High Court. The effect of these judgments was that, under East German law, the articles of the Stiftung had been inoperable since and by reason of the confiscations of the undertakings of the Stiftung in 1948 and that in any event the Council of Gera was not capable of exercising the functions of the special board by reason (inter alia) of the political and economic conditions in the " German Democratic Republic."

    B

    C

    There is thus a direct conflict between the views of the two highest courts. The expert evidence divides itself similarly into two sides supporting the one or the other set of judgments. The existence of the Stiftung as a legal entity, though at one time disputed, is now accepted by both sides and the essential questions which have to be decided may be summarised as being (1) whether the Stiftung, from 1948 onwards, was incapable of acting and its articles were inoperative and (2) whether the Council of Gera was capable or incapable of fulfilling the functions conferred by the articles on the special board.

    D

    Each of these questions may be " classified " as questions relating to the constitution of a foreign corporation, and so, according to English private international law, to be decided according to the law prevailing at the place where the Stiftung was incorporated (see Dicey, Conflict of Laws, 7th ed., r. 78 (2)). So far as German private international law is concerned, it appears that account is taken of the law prevailing at the place of the " domicile " of the corporation. There is no dispute that the place of incorporation was Jena, and although an attempt has been made to transfer the domicile or seat of the Stiftung to West Germany, the courts of West Germany have been prepared to assume for the purpose of their decisions (rightly in my opinion) that this remains in Jena. The question, then, on either approach, is, what is the relevant applicable law prevailing at Jena? The expert evidence establishes, in my opinion, that the law applicable to Stiftungen in Germany rests on the triple foundation of (i) the German Civil Code (BGB) of 1900 and in particular articles 80–88; (ii) the Legal Code of the Land of Thuringia of 1923, and (iii) the articles. From this it would seem to follow

    E

    F

    G

A.C.                    AND PRIVY COUNCIL                    973

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

A    that the relevant law should be that stated by the courts having
jurisdiction in Thuringia, or whatever geographical area corresponds to Thuringia, namely, the Provincial Court at Leipzig and
on appeal the Supreme Court in East Germany.

In general, it may be taken to be the case that the best evidence
as to the law of a foreign country is the law as stated by its court
B    of last resort. All five speeches in this House in *Bankers and
Shippers Insurance Co. of New York* v. *Liverpool Marine &
General Insurance Co.*[125] accepted this. Lord Buckmaster, after
pointing out that no foreign judgment is technically binding, said that [126] it would require " special and unusual circumstances " to lead the House away from a clear decision of a final
C    court. His opinion was expressed in relation to a matter of
construction of a statute, but the principle must apply equally to
other matters of foreign law. I need not quote from the other
speeches which were, if anything, expressed in still stronger
terms. Similarly, in *Lazard Brothers & Co.* v. *Midland Bank
Ltd.*,[127] Lord Wright said that the question is what the foreign
D    law is shown to be by its exposition, interpretation and adjudication. So it would seem that there are strong reasons—if not quite
conclusive—why courts in this country should accept the East
German judgments as stating the relevant law.

The respondents contest this conclusion on several grounds.
They submit that the questions of law, as to the constitution of
E    the Stiftung, should properly be considered to be questions not of
East German law but of German law. The questions relate, they
say, to the issue how the Stiftung may be represented in Germany
as a whole and internationally and how, if at all, it may protect
assets outside the Eastern Zone. Formally, the questions of law
concern the interpretation, or application of the German Civil
F    Code, under which the Stiftung was formed, not of any zonal law.
As to such a legal question the decisions of courts of the Federal
Republic of Germany have a superior or (alternatively) an equal
right to international recognition as compared with those of
East German courts.

The claim for superior status was based principally upon the
G    terms of the certificate of the Secretary of State given on November 6, 1964, already considered in another context and set out in
the opinion of my noble and learned friend, Lord Reid. This
certificate makes it clear, so it is said, that the rights of the

[125] 24 Ll.L.R. 85.                [127] [1933] A.C. 289, 298.
[126] Ibid. 87.

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

U.S.S.R. as de jure " sovereign " in the Eastern Zone are confined    A
to that zone and explicitly recognises (following a communiqué
of the Western Allies on September 19, 1950) the Government of
the Federal Republic as " entitled to speak for Germany as the
representative of the German people in international affairs." So,
it is argued, in what is essentially an international matter, the
courts of the Federal Republic should be accepted as the proper    B
organ to declare what the law of Germany is.

I recognise the ingenuity of this argument but I am not con-
vinced by it. Read as a whole, the certificate gives recognition to
the U.S.S.R. as de jure entitled to exercise governing authority in
respect of the Eastern Zone; and (negatively) the certificate also
states, after the passage on which the respondents rely, that the    C
communiqué of 1950 does not constitute recognition of the
Government of the Federal Republic as the de jure Government
of all Germany. The right to exercise governing authority
includes, in my opinion, the right to set up or maintain courts and
the recognition of the one carries with it the recognition, as a
source of law, of the decisions of the courts. The right to " speak    D
for Germany as the representative of the German people in inter-
national affairs " is a right of diplomatic representation which is
not coincident with, and does not impinge upon, the right of the
governing authority in each part of Germany to make and state
the law in the part over which it has power. Furthermore, it by
no means follows from the fact that the present claim of the    E
Stiftung extends beyonds the frontiers of East Germany that the
legal question we are considering is one of international or inter-
zonal concern. The legal question relates to the constitution of
the Stiftung, which depends on the law of the place where it is
localised. Your Lordships were invited by the respondents to
consult the Secretary of State on the matters discussed above, and    F
to seek a further certificate as to the proper authority to determine
the status of and right to represent the Stiftung. This course, in
my opinion, should not be followed. The questions, which it was
suggested should be asked, were questions of law which it is the
function of the courts to determine and which they are in a
position to determine on the basis of the certificate previously    G
given, the terms of which are sufficiently clear.

The argument, therefore, that superior recognition should be
given to the West German judgments, in my opinion, should not
be accepted. But there remains the further submission that the
West German judgments should at least be considered side by

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

A  side with those of the East German courts—as rival pieces of evidence entitled to equal weight—and a decision reached on their respective merits. The arguments for this are that the circumstances prevailing in Germany are unusual, that the legal questions involved are common to both parts of divided Germany, that the East German judgments consist of an advisory opinion

B  and a default judgment, whereas those of West Germany were given in contested proceedings brought at the present appellants' choice in the courts of West Germany, and (ultimately if the comparison is admissible) that the West German judgments are superior in legal reasoning.

These are difficult questions indeed. I am prepared to go so

C  far with the respondents as to agree that it may be right in the present circumstances to look beyond the decisions of the East German courts and to consider, and at least to test them by, the rival decisions in West Germany. But, in making this comparison, there are two points to bear in mind. First: the question to be resolved is not merely one of interpretation of a common code—

D  the Civil Code of 1900—(I pass over for this purpose the Thüringian Law of 1923, whose provisions are of a general character with no direct bearing on the issues). It is a question of the application of the somewhat general provisions of the Civil Code to a factual situation peculiar to the Eastern Zone, the answer to which, by agreement of both sets of courts, depends upon a

E  consideration of the effect of the 1948 (Eastern Zone) decrees on the actual business undertaking in Jena of the Stiftung. Both sets of courts in fact give considerable attention to the factual situation prevailing in Jena since 1948. On such matters, prima facie, preference should be given to the East German courts, as the appropriate tribunal to deal with the impact of East German

F  legislation on an organisation in their zone. Secondly: in so far as the questions for decision are general questions of law, rather than questions depending on local considerations, there is no reason why, given a separation of de jure sovereignty between the two parts of Germany, there should not be differences of interpretation and application of rules of law formerly common

G  to the whole of Germany. The respondents' experts, indeed, asserted that there were such differences: their contentions were that decisions in East Germany were those appropriate to a centralised socialist state whose courts were guided by considerations of policy. If this argument could have been carried to the point of showing that the courts of East Germany are not courts

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord
Wilberforce

A

of law at all or that their decisions were corrupt or perverse, that might (I do not say would) be a ground for disregarding them in favour of decisions of other courts shown to act more judicially. But the evidence did not, in my opinion, approach this point, and a mere difference in philosophy, or even of method, so far from entitling us to prefer the West German approach, on the contrary gives support to those who argue that the East German variety of German law should be taken as being the law in East Germany. With these considerations in mind, I consider the two sets of judgments. They have been analysed in detail by Cross J. and (subject to the one point to which I return later) I am satisfied to accept his analysis. I only make some observations of my own in recognition of their careful re-examination by counsel in the present appeal and because these issues have not been considered by the Court of Appeal.

B

C

The East German Supreme Court bases its decisions on the following main points: (1) the confiscations which took place in 1948 were not of the whole business of the Stiftung but were separate acts of confiscation of the assets of the two individual businesses—the optical works and the glass works; (2) the Stiftung as such retains considerable assets: these produce an income of some £180,000 per annum. It is able with these assets to fulfil many of the charitable functions for which it was created. The Supreme Court refers to establishments for the development and training of optical personnel, for the promotion of studies, research and training in natural sciences and mathematics, as well as for social and health care of the employees of the plants of the foundation, for example, schools for opticians, libraries, clinics, recreation and rest homes, and their findings as to these matters were supported by evidence before Cross J. There was also evidence as to the ownership of trade marks and other industrial property and as to assets of the Stiftung outside East Germany, but this was perhaps controversial and it is safer to leave these matters out of account; (3) the Stiftung employs over 400 persons and there are about 4,000 pensioners who are paid according to the pensions statute of the Stiftung. There remain also other beneficiaries within the purposes of the Stiftung; (4) the Stiftung is in a position to take and does take legal action for the protection of its assets; (5) the resolution of the German Economic Commission of June 16, 1948, contemplated that the Stiftung should remain in existence and that its constitution should be amended to reflect its changed position. This was not done, but

D

E

F

G

A.C.                    AND PRIVY COUNCIL                    977

H. L. (E.)
1966

Carl Zeiss
Stiftung
v.
Rayner &
Keeler Ltd.
(No. 2)

Lord
Wilberforce

A  it is consistent with the resolution to hold that the original articles continue in effect.

The principal reasons for the judgment of the West German Supreme Court are (1) that the articles became unworkable after 1948 because they were dependent for their working on the continued ownership of some business by the Stiftung. After

B  1948 the Foundation ceased to have any interest in its former businesses which became nationalised undertakings. According to the "Soviet Zone view," as interpreted by the Federal High Court, this interfered with the organisation of the Stiftung to such a far-reaching effect that in the Eastern Zone the Stiftung no longer had capacity to act as a juristic person; (2) that the centre

C  of gravity of the Stiftung's organisation lay in the industrial enterprises and the removal of these destroyed the balance on which the organisation of the governing bodies of the Stiftung depended; (3) that the Council of Gera, because of its political complexion, cannot act as a special board or represent the interests of the Stiftung or carry on the affairs of the Stiftung

D  consistently with the intentions of the founder, Abbé.

As between these opinions, and taking also into account the expert evidence on them, much of which was not challenged, and certain supplementary evidence (particularly of Dr. Schrade) regarding the factual position at Jena, I think that the learned judge was fully justified in coming to the conclusion that the

E  East German decisions should be preferred. The decisions of the West German courts carry less conviction: on points (1) and (2) because they were less fully informed than the East German courts as to the existing activity and assets of the Stiftung and because they based their decisions on a view as to the law in the Eastern Zone which is not in agreement with that law as declared

F  by the Supreme Court in that zone; on point (3) because it is really impossible to say that, and if so when, the authority designated as the special board diverged from the intentions of the founder so radically that it ceased to be capable of acting. In fact both Supreme Courts claimed that the intentions of the founder were reflected in the very different philosophies prevailing

G  in their respective zones so that, as Cross J. observed, the only safe course is to keep to the natural sense of the articles which base the constitution of the special board on considerations of administrative geography.

I must add one point as to the respective merits of the judgments. The learned judge, in that part of his judgment dealing

H. L. (E.)
1966

Carl Zeiss
Stiftung
*v.*
Rayner &
Keeler Ltd.
(No. 2)

LORD
WILBERFORCE

with res judicata, after a careful analysis of the West German    A
judgments, expressed the view that these were perverse, and so in
any case ought to be disregarded. He, of course, had the advan-
tage of hearing the expert witnesses which we have not, but even
allowing for this, I do not think that a finding of perversity ought
to stand. In my opinion, the case amounts to this: (1) that the
law prevailing in East Germany should be taken to be that declared    B
by the East German courts; (2) that the West German decisions
proceeded on a view as to the law in East Germany which, for
reasons I have given, ought not to be accepted in preference to
the view of the East German courts themselves. Further than this
I do not think that the evidence requires or indeed entitles us to
go. For my part, I accept the West German decisions as judicial    C
in the fullest sense, which could readily be accepted if they stood
alone. This being so, I do not consider it necessary (as on some
future occasion it may be) to examine the limits in law of the
doctrine of perversity, some of the authorities on which (for
example, *Simpson* v. *Fogo* [128]) seem to me to present difficulties.

My Lords, in this long and involved case we have heard many    D
arguments from counsel on either side and many authorities have
been referred to. It involves I hope no disrespect to those argu-
ments not to examine them all. In the end, and on the whole of
the case, the conclusion emerges that the respondents' preliminary
attack on the validity of the action fails: I would allow the appeal
and restore the judgment of Cross J.                                 E

*Appeal allowed.*

Solicitors: *Courts & Co.; Herbert Smith & Co.*

F. C.

F

[128] 1 H. & M. 195.

END OF VOLUME 1

G