# EXHIBIT I

[HOUSE OF LORDS]                                                A

*D.S.V. SILO- UND VERWALTUNGS-
    GESELLSCHAFT M.B.H. . . . . . APPELLANTS
                        AND
OWNERS OF THE SENNAR
    AND 13 OTHER SHIPS . . . . . . RESPONDENTS    B

[on appeal from THE SENNAR (NO. 2)]

1985 Feb. 18, 19;            Lord Fraser of Tullybelton, Lord Diplock,
     March 21                Lord Roskill, Lord Bridge of Harwich and
                                        Lord Brandon of Oakbrook
                                                                C

*Estoppel—Per rem judicatam—Issue estoppel—Judgment of foreign court—Bill of lading containing exclusive Sudanese jurisdiction clause—Buyers bringing action for damages in Dutch court—Dutch court holding that no jurisdiction to entertain claim by virtue of exclusive jurisdiction clause—Whether buyers' action in English Admiralty Court barred by issue estoppel*
*Ships' Names—Merawi—Sennar*                                    D

In 1973, three contracts on GAFTA forms containing GAFTA arbitration clauses were entered into for the sale of 2,000 tonnes of Sudanese groundnut expellers c.i.f. Rotterdam. All three contracts provided that 1,000 tonnes should be shipped during July and August. In purported performance of the part-shipment of 1,000 tonnes, M., the original sellers, presented to P., the original buyers, shipping documents including a bill of   E
lading containing clauses providing that the law of the Sudan should apply and that all actions under the contract of carriage should be brought only before the court at Khartoum or Port Sudan. The place and date of issue of the bill of lading, expressed to be signed by the master of the *Sennar*, were stated to be Port Sudan, 30 August 1973. In early October, P. presented the same documents to GfG, who took them up and paid for them, and a few days later GfG presented them to E.,   F
who similarly took them up and paid for them. After August 1973, the price of groundnut expellers fell sharply. It became known to E. and GfG that, contrary to the date on the bill of lading, the loading at Port Sudan of the 1,000 tonnes part-shipment had not been completed until 7 September 1973. E. accordingly claimed against GfG to reject the shipping documents and to be repaid the price paid by them. GfG claimed likewise   G
against P., and P. against M. Arbitrations of those claims by GAFTA were in each case in favour of the claimant buyers. In compliance with the award against them in favour of E., GfG took back the shipping documents and repaid the price. They then sought to recover on their award against P. but were unable to do so, P. having become insolvent. They subsequently obtained possession of the goods and sold them to mitigate their loss. Having founded jurisdiction by arresting a sister ship of   H
the *Sennar*, the *El Gezira*, in Rotterdam, they brought an action for damages against the defendant shipowners in the District Court of Rotterdam. The District Court held that GfG were not entitled to found their claim for damages in tort but could only found it on the contract contained in the bill of lading and that, by virtue of the exclusive jurisdiction clause in the bill of lading, a Dutch court was bound to decline jurisdiction in respect of GfG's claim and dismiss the action. That decision

A was upheld by the Dutch Court of Appeal. The plaintiffs, GfG's successors in title, began an action in the Admiralty Court in England claiming against the defendants an indemnity and damages for fraud, breach of duty and negligence. The writ was served on a sister ship of the *Sennar,* the *Merawi,* in Liverpool, and she was arrested there. The action subsequently continued in personam against the defendants, who by notice of motion applied for an order that it be stayed on the ground that the

B parties had by the bill of lading agreed that any action under it should only be brought before the court at Khartoum or Port Sudan and that Sudanese law should apply. Sheen J. held that the plaintiffs' claim founded on deceit or negligence did not fall within the exclusive jurisdiction clause in the bill of lading and that the plaintiffs were not estopped by the decision of the Dutch Court of Appeal from so asserting. Accordingly, he

C dismissed the defendants' application. The Court of Appeal allowed an appeal by the defendants, holding that the plaintiffs were so estopped.

On appeal by the plaintiffs:—

*Held,* dismissing the appeal, (1) that a decision "on the merits" in the context of issue estoppel meant one that established certain facts as proved or not in dispute, stated the

D principles of law applicable to those facts and expressed a conclusion as to the effect of applying those principles to the factual situation; that the decision of the Dutch Court of Appeal to the effect that a Dutch court had no jurisdiction to entertain and adjudicate on the plaintiffs' claim had been a decision "on the merits"; that the issues in the Dutch Court of Appeal and the Admiralty Court had been the same, viz. whether the exclusive jurisdiction clause in the bill of lading applied to the

E plaintiffs' claim; and that, accordingly, the plaintiffs' claim was barred by issue estoppel (post, pp. 493C, D, 495E–F, 499F–H, 500A–B, C–D).

*Carl Zeiss Stiftung v. Rayner & Keeler Ltd. (No. 2)* [1967] 1 A.C. 853, H.L.(E.) applied.

(2) That, on the facts, having regard especially to the fact that the plaintiffs' claim had no connection with England save

F that they had been able to arrest the *Merawi* and found jurisdiction here, there was no ground for interfering with the exercise by the Court of Appeal of its discretion to grant the defendants the stay sought (post, pp. 493C, D, 495E–F, 501A–C)

*Aratra Potato Co. Ltd. v. Egyptian Navigation Co. (The El Amria)* [1981] 2 Lloyd's Rep. 119, C.A. applied.

*Per curiam.* It is far too late, at this stage of the development

G of the doctrine, to question that issue estoppel can be created by the judgment of a foreign court if that court is recognised in English private international law as being a court of competent jurisdiction. Issue estoppel operates regardless of whether or not an English court would regard the reasoning of the foreign judgment as open to criticism (post, pp. 493C, F–G, 495E–F).

Decision of the Court of Appeal [1984] 2 Lloyd's Rep. 142

H affirmed.

The following cases are referred to in the opinion of Lord Brandon of Oakbrook:

*Aratra Potato Co. Ltd. v. Egyptian Navigation Co. (The El Amria)* [1981] 2 Lloyd's Rep. 119, C.A.

*Carl Zeiss Stiftung v. Rayner & Keeler Ltd. (No. 2)* [1967] 1 A.C. 853; [1966] 3 W.L.R. 125; [1966] 2 All E.R. 536, H.L.(E.)

The following additional cases were cited in argument:

A

*Adolf Warski, The* [1976] 1 Lloyd's Rep. 107; [1976] 2 Lloyd's Rep. 241, C.A.

*Black-Clawson International Ltd. v. Papierwerke Waldhof-Aschaffenburg A.G.* [1975] A.C. 591; [1975] 2 W.L.R. 513; [1975] 1 All E.R. 810, H.L.(E.)

*Blue Wave, The* [1982] 1 Lloyd's Rep. 151

*Bracconot (J.) et Cie. v. Compagnie des Messageries Maritimes (The Sindh)* [1975] 1 Lloyd's Rep. 372, C.A.

B

*Brown Jenkinson & Co. Ltd. v. Percy Dalton (London) Ltd.* [1957] 2 Q.B. 621; [1957] 3 W.L.R. 403; [1957] 2 All E.R. 844, C.A.

*Carl Zeiss Stiftung v. Rayner & Keeler Ltd. (No. 3)* [1970] Ch. 506; [1969] 3 W.L.R. 991; [1969] 3 All E.R. 897

*Coupland v. Arabian Gulf Oil Co.* [1983] 1 W.L.R. 1136; [1983] 2 All E.R. 434; [1983] 3 All E.R. 226, Hodgson J. and C.A.

C

*Derry v. Peek* (1889) 14 App.Cas. 337, H.L.(E.)

*Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.* [1964] A.C. 465; [1963] 3 W.L.R. 101; [1963] 2 All E.R. 575, H.L.(E.)

*King v. Henderson* [1898] A.C. 720, P.C.

*Society of Medical Officers of Health v. Hope* [1960] A.C. 551; [1960] 2 W.L.R. 404; [1960] 1 All E.R. 317, H.L.(E.)

*Tracomin S.A. v. Sudan Oil Seeds Co. Ltd.* [1983] 1 W.L.R. 662; [1983] 1 All E.R. 404

D

APPEAL from the Court of Appeal.

By writ dated 21 May 1980, the plaintiffs, D.S.V. Silo- und Verwaltungsgesellschaft m.b.H., claimed against the defendants, the owners of the *Sennar* and 13 sister ships, an indemnity and/or damages for fraud and/or breach of duty and/or negligence in connection with the shipment of a cargo of Sudanese groundnut expellers in the *Sennar* at Port Sudan during August/September 1973; the plaintiffs sued as successors in title to Gesellschaft für Getreidehandel m.b.H., which company had incurred liabilities to third parties pursuant to an arbitration award and an appeal therefrom dated 22 May 1974 and had further incurred costs and other incidental expenses in connection with the discharging and storage of the cargo until delivery; such liabilities, costs and expenses had resulted from the defendants, their servants or agents, wrongfully and in breach of duty placing the incorrect date of shipment on the bill of lading issued by them in respect of the cargo.

E

F

By notice of motion dated 13 February 1981, the defendants sought an order that under section 41 of the Supreme Court of Judicature (Consolidation) Act 1925 and/or under the inherent jurisdiction of the court all further proceedings be stayed on the ground that: (a) by the terms of the bill of lading referred to in the indorsement on the writ and/or other relevant bills of lading, the plaintiffs, owners of cargo lately laden on board the *Sennar*, had agreed that any actions arising under the contract should be brought before the court at Khartoum or Port Sudan and that no other court should have jurisdiction with regard to any such action unless the carrier should appeal to another jurisdiction or voluntarily submit himself thereto, and it had also been agreed in the bills of lading that the law of the Sudan should apply thereto; and/or (b) in all the circumstances of the case the action ought to be tried in the Sudan.

G

H

On 24 June 1983, Sheen J. [1983] 2 Lloyd's Rep. 399 dismissed the defendants' motion, giving them leave to appeal.

A   On 24 May 1984, the Court of Appeal (Cumming-Bruce and Kerr L.JJ. and Sir Denys Buckley) [1984] 2 Lloyd's Rep. 142 allowed an appeal by the defendants and ordered that the plaintiffs' action be stayed, refusing the plaintiffs leave to appeal to the House of Lords.

On 25 July 1984, the Appeal Committee of the House of Lords (Lord Fraser of Tullybelton, Lord Bridge of Harwich and Lord Templeman) allowed a petition by the plaintiffs for leave to appeal. They appealed.

B   The facts are set out in the opinion of Lord Brandon of Oakbrook.

*Jonathan Mance* Q.C. and *Jeremy Cooke* for the plaintiffs.
*Nicholas Phillips* Q.C. and *Steven Gee* for the defendants.

C   Their Lordships took time for consideration.

21 March. LORD FRASER OF TULLYBELTON. My Lords, I have had the advantage of reading in draft the speeches of my noble and learned friends, Lord Diplock and Lord Brandon of Oakbrook. I agree with them, and for the reasons given by them I would dismiss this appeal.

D

LORD DIPLOCK. My Lords, the facts that have given rise to this appeal are set out in the speech to be delivered by my noble and learned friend, Lord Brandon of Oakbrook, with whose conclusions and reasons for them I agree. His speech, in which he refers to the three issues that have been argued before this House as issue 1, issue 2 and
E   issue 3, should be read before these few more general comments of my own on Issue 2 which I venture to add because the ability to found jurisdiction in many different countries, by arrest of a ship belonging to proposed defendants which enters their territorial waters, makes maritime claims particularly vulnerable to forum shopping, of which the instant case provides what is, in my view, a particularly blatant example.

In English law when a plaintiff, who, basing his claim on a particular
F   set of facts, has already sued the defendant to final judgment in a foreign court of competent jurisdiction and lost, then seeks to enforce a cause of action in an English court against the same defendant based on the same set of facts, the defendant's remedy against such double jeopardy is provided by the doctrine of issue estoppel.

It is far too late, at this stage of the development of the doctrine, to
G   question that issue estoppel can be created by the judgment of a foreign court if that court is recognised in English private international law as being a court of competent jurisdiction. Issue estoppel operates regardless of whether or not an English court would regard the reasoning of the foreign judgment as open to criticism. Although in the instant case some 15 days were taken up by oral argument in the courts below, together with voluminous citation of authorities, nevertheless the facts appear to
H   me to present a case to which the now well-established doctrine of issue estoppel resulting from a foreign judgment incontestably applies.

To make available an issue estoppel to a defendant to an action brought against him in an English court upon a cause of action to which the plaintiff alleges a particular set of facts give rise, the defendant must be able to show: (1) that the same set of facts has previously been relied upon as constituting a cause of action in proceedings brought by that plaintiff against that defendant in a foreign court of competent

jurisdiction; and (2) that a final judgment has been given by that foreign court in those proceedings.

It is often said that the final judgment of the foreign court must be "on the merits." The moral overtones which this expression tends to conjure up may make it misleading. What it means in the context of judgments delivered by courts of justice is that the court has held that it has jurisdiction to adjudicate upon an issue raised in the cause of action to which the particular set of facts give rise; and that its judgment on that cause of action is one that cannot be varied, re-opened or set aside by the court that delivered it or any other court of co-ordinate jurisdiction although it may be subject to appeal to a court of higher jurisdiction.

My Lords, misdated bills of lading are regrettably not unknown in the commodity markets in which prices are liable to large and rapid changes. What takes the instant case out of the general run of cases where there has been a string of contracts of sale between dealers in the market in the form of GAFTA 100 and it is discovered after the documents have been accepted that a false date of shipment has been inserted in the bill of lading, is that a buyer lower in the string returns the documents to his immediate seller and recovers from him the price that he had paid and so on up the string. The shipowner who signed the misdated bill of lading (usually at the request of the shipper) is not normally brought into the proceedings between the parties to the string at all. It was only because the appellants' (whom I refer to hereafter as "the dealers") immediate seller, Pagco, became insolvent that they decided to bring proceedings against the respondents ("the shipowners") for damages for fraudulent misrepresentation contained in the bill of lading and consisting of the statement that the Sudanese groundnut expellers covered by the bill of lading no. 7 were received on board the *Sennar* on 30 August 1973.

The jurisdiction of the Dutch courts was invoked by the dealers by their arrest at Rotterdam of a sister ship of the *Sennar*. The particular set of facts relied upon by the dealers as constituting a cause of action against the shipowners in the Dutch proceedings was identical with the facts upon which the dealers sought to rely in the English proceedings which the Court of Appeal has ordered to be stayed.

At the hearing of the appeal from that stay it was repeatedly urged upon your Lordships that all that the judgment of the Dutch Court of Appeal had done was no more than to hold that it had no jurisdiction over the dealers' claim against the shipowners and so did not fall into the category of a judgment on the merits. But this is to confuse issue estoppel with cause of action estoppel.

I ventured in the course of the hearing to summarise in a single sentence what the Dutch Court of Appeal had decided by its judgment of 21 March 1980:

> "Upon the particular set of facts on which the dealers relied in the Dutch action their only claim against the shipowners is for breach of the contract of carriage which, as a result of the Sudanese jurisdiction clause that it contains, is enforceable in the courts of the Sudan and nowhere else."

In my view that constitutes a final judgment "on the merits" (as I have interpreted that term) upon two issues: *the first* is that the dealers have no claim against the shipowners for their wrongful act of inserting

A  a false date upon the bill of lading, other than a claim for breach of the contract of carriage; *the second* is that the effect of the jurisdiction clause in the contract of carriage is to make any remedy for breach of that contract enforceable only in a Sudanese court unless the shipowners elect otherwise.

So much for what has been referred to in this appeal as issue 2. On issue 3, discretion, I have nothing to add to what is said by my noble

B  and learned friend, Lord Brandon of Oakbrook. This results in its being unnecessary to decide Issue 1: whether in English law the dealers have a cause of action against the shipowners for the tort of fraudulent or negligent misrepresentation. I cannot, however, resist the temptation to point out that the misrepresentation was in writing and was made when the bill of lading was examined by the dealers or their bankers on their

C  behalf. This occurred on 2 October 1973 in Germany and the damage caused by the misrepresentation was incurred upon the same date when the bankers paid for the shipping documents which included in the bill of lading the price under a June contract for goods shipped on board on or before the end of August 1973 instead of the lesser price obtainable under a contract made on 7 September 1973 for goods that had not been shipped on board until that date. This was more than six years before 21

D  May 1980 when the writ was issued in the English proceedings and any claim in those proceedings based upon the misrepresentation made in Germany on this occasion would have been time-barred in any proceedings brought in England. On any subsequent occasion when the bill of lading with its misrepresentation about the date of shipment came into the possession of the dealers, this was after the GAFTA arbitration

E  and the dealers knew that the date of shipment appearing on it was false. They were not deceived by it and so it gave rise to no fresh cause of action in English law.

LORD ROSKILL. My Lords, I have had the advantage of reading in draft the speeches of my noble and learned friends Lord Diplock and Lord Brandon of Oakbrook. I agree with both speeches, and for the

F  reasons they give I would dismiss this appeal.

LORD BRIDGE OF HARWICH. My Lords, for the reasons given in the speeches of my noble and learned friends Lord Diplock and Lord Brandon of Oakbrook, with both of which I agree, I would dismiss this appeal.

G  LORD BRANDON OF OAKBROOK. My Lords, the appellants in this case are D.S.V. Silo- und Verwaltungsgesellschaft m.b.H., a company incorporated in the Federal Republic of Germany. They are the successors in title, as regards both rights and obligations, of Gesellschaft für Getreidehandel m.b.H, another company incorporated in the same country, which I shall call "GfG." The respondents are the owners of

H  the Sudanese ship, the *Sennar,* and also of 13 sister ships of hers, including the *El Gezira* and the *Merawi.*

By a writ issued on 21 May 1980 the appellants began in the Admiralty Court an action in rem against the *Sennar* and her 13 sister ships. The claim endorsed on the back of the writ was in these terms:

"The plaintiffs' claim is for an indemnity and/or damages for fraud and/or breach of duty and/or negligence in connection with the shipment of a cargo of Sudanese groundnut expellers in the vessel

*Sennar* at Port Sudan during August/September 1973. The plaintiffs sue as successors in title to Gesellschaft für Getreidehandel m.b.H., which company incurred liabilities to third parties pursuant to an arbitration award and an appeal therefrom dated 22 May 1974 and has further incurred costs and other incidental expenses in connection with the discharging and storage of the said cargo until delivery. Such liabilities, costs and expenses resulted from the defendants, their servants or agents, wrongfully and in breach of duty placing the incorrect date of shipment on the bill of lading issued by them in respect of the said cargo."

On 30 January 1981 the writ was served on the *Merawi*, then in the port of Liverpool, and she was arrested there. On 5 February 1981, following the giving of an undertaking to the appellants by a well known protection and indemnity association, solicitors acting for the respondents filed an acknowledgment of service in the Admiralty Registry and the *Merawi* was released from arrest. In the result the action, which had been begun in rem against the *Merawi*, continued as an action in personam against the respondents.

By notice of motion dated 13 February 1981 the respondents applied to the Admiralty Court for an order that the action should be stayed on the ground that the parties had, by the terms of the bill of lading referred to in the appellants' claim, agreed that any action under it should be brought, and brought only, before the court at Khartoum or Port Sudan, and that Sudanese law should apply to such action.

The motion came before Sheen J. who, by order dated 24 June 1983, dismissed the respondents' application for an indefinite stay, but gave them leave to appeal to the Court of Appeal and granted an interim stay pending the outcome of any appeal which might be brought. The respondents appealed to the Court of Appeal (Cumming-Bruce and Kerr L.JJ. and Sir Denys Buckley), which, by order dated 24 May 1984, allowed the appeal and granted the respondents an indefinite stay of the action. The Court of Appeal refused the appellants leave to appeal to your Lordships' House, but leave for them to do so was later given by the Appeal Committee. The judgment of Sheen J. is reported in [1983] 2 Lloyd's Rep. 399, and that of the Court of Appeal in [1984] 2 Lloyd's Rep. 142.

My Lords, the background of the appellants' claim is to be found in a string of contracts made in 1973 for the sale of 2,000 tonnes of Sudanese groundnut expellers c.i.f. Rotterdam. The first contract in the string was made on or about 22 June 1973 between a Sudanese company, Malik Industrial Co. Ltd. ("Malik"), as sellers and a Swiss company, Pagco S.A. ("Pagco"), as buyers; the second contract in the string was made on or about the same date between Pagco as sellers and GfG as buyers; and the third contract in the string was made on or about 25 June 1973 between GfG as sellers, and an English company, European Grain & Shipping Ltd. ("European"), as buyers. All three contracts provided that 1,000 tonnes of the 2,000 tonnes sold should be shipped during July/August. All three contracts were further on GAFTA forms containing GAFTA arbitration clauses.

In purported performance of the part-shipment of 1,000 tonnes referred to above, Malik presented to Pagco, and Pagco took up and paid for, shipping documents which included a bill of lading no. 7. Early in October 1973 Pagco presented to GfG, and GfG took up and paid

A  for, the same shipping documents; and a few days later GfG presented those documents to European, who likewise took up and paid for them.

In bill of lading no. 7 the carriers were shown as Sudan Shipping Line Ltd. of Port Sudan; the shipper was described as Malik; the carrying ship was described as the *Sennar;* the port of loading was stated to be Port Sudan; the port of discharge was stated to be Rotterdam; the goods, which were acknowledged to have been shipped on board, were
B  described as 1,001,248 kilos of Sudanese decorticated groundnut expellers, partly in bags and partly in bulk; and the goods were stated to be consigned "to order." The bill of lading was expressed to be signed by the master, and the place and date of issue were stated to be Port Sudan 30 August 1973.

Bill of lading no. 7 further contained a large number of printed
C  clauses on its reverse side incorporated into it by an express reference on its face. These clauses included:

> "25. Law of application. In so far as anything has not been dealt with by the provisions of this bill of lading the law of the Sudan shall apply.
> "27. Jurisdiction. All actions under this contract of carriage shall be
D  brought before the court at Khartoum or Port Sudan and no other court shall have jurisdiction with regard to any such action unless the carrier appeals to another jurisdiction or voluntarily submits himself thereto."

Meanwhile two significant events had occurred. The first such event was that, after the end of August 1973, the market price of Sudanese
E  groundnut expellers had fallen sharply. The second such event was that it had become known to both European and GfG that, although bill of lading no. 7 was dated 30 August 1973, the loading at Port Sudan of the goods referred to in it had not been completed until 7 September 1973. In these circumstances European claimed, as against GfG, to reject the shipping documents presented to them in respect of the goods to which bill of lading no. 7 related and repayment of the price paid by them on
F  the taking up of such documents. GfG in turn claimed a like entitlement as against Pagco, and Pagco as against Malik.

The three claims, by European against GfG, by GfG against Pagco and by Pagco against Malik, went to arbitration by GAFTA. The three arbitrations, which were concluded after appeals on 22 May 1984, were in favour of the claimants in each case. GfG, in compliance with the
G  award obtained against them by European, took back the relevant shipping documents, including bill of lading no. 7, and repaid the price previously paid for them. GfG then sought to recover on the award obtained by them against Pagco; but, because Pagco was by then insolvent, were unable to do so.

Later, in October 1975, GfG presented bill of lading no. 7 to F. A. Voigt & Co., in whose warehouse at Rotterdam the goods to which that
H  bill of lading related had been stored after being discharged from the *Sennar* at that port, and thereby obtained possession of such goods. Subsequently GfG sold the goods on the market in order to mitigate the loss which they had suffered as a result of their inability to enforce the award which they had obtained against Pagco.

Meanwhile GfG had taken other steps in order to recover their loss. On 16 January 1975 they began an action against the respondents in the District Court at Rotterdam, having founded jurisdiction there by

Lord Brandon of Oakbrook     The Sennar (No. 2) (H.L.(E.))     [1985]

arresting the *El Gezira*. The amount claimed in the action was DM. 731,960.50 with interest. The ground of the claim was as follows. The master of the *Sennar* had committed a tort against GfG by dating bill of lading no. 7 30 August 1973 instead of 7 September 1973 as he should have done. As a result of that tort GfG had taken up and paid for shipping documents, including bill of lading no. 7, which, if the latter had been correctly dated, they would have justifiably rejected. As a result of taking up and paying for those documents they had suffered loss in the amount claimed.

The District Court of Rotterdam dismissed GfG's claim. The ground of that decision, which was based on Dutch law, can be summaried as follows. GfG had become a regular holder of bill of lading no. 7, (a) by taking it up early in October 1973 when it was presented to them by Pagco and (b) by re-taking possession of it in compliance with the GAFTA award in the arbitration between GfG and European. As regular holder of bill of lading no. 7 GfG were parties to the contract of carriage contained in it, and were therefore bound by all its terms, including clause 27, the exclusive Sudanese jurisdiction clause. In these circumstances GfG were not entitled to found their claim for damages on tort but could only found it on the contract between the parties contained in the bill of lading. Since that contract had in it clause 27, the exclusive Sudanese jurisdiction clause, a Dutch court was bound to decline jurisdiction in respect of GfG's claim and dismiss the action.

GfG appealed from the decision of the District Court at Rotterdam to the Dutch Court of Appeal at The Hague. That court upheld the decision appealed from and dismissed the appeal. In doing so the Court of Appeal relied not only on Dutch law to support its conclusions, but also on Sudanese law, of which evidence was for the first time adduced before it, and which the Court of Appeal found produced the same result as Dutch law.

My Lords, having given this account of the background of the action brought by the appellants in the Admiralty Court, I now return to that action and to the question whether the Court of Appeal were right to order that it should be stayed. It is common ground that, potentially at least, three issues arise for decision. Issue 1 is whether the appellants' claim founded on deceit or negligence of the respondents, their servants or agents in ante-dating bill of lading no. 7 is such as to fall within clause 27 of that bill of lading providing for the exclusive jurisdiction of two specified courts in the Sudan. Issue 2 is whether, whatever the answer to issue 1 may be, the appellants are estopped by the decision of the Dutch Court of Appeal from asserting that their claim does not fall within clause 27. Issue 3 is whether, assuming that the answer to issue 2 is in the affirmative, the court should exercise its discretion by granting or refusing a stay of the action.

Sheen J. answered issues 1 and 2 in the negative, so that no occasion for the exercise by him of any discretion to grant or refuse a stay of the action (otherwise than on an interim basis pending any appeal) arose. The Court of Appeal answered issue 2 in the affirmative and issue 3 by exercising its discretion to grant a stay of the action. In view of its decision on those two issues, it found it unnecessary to deal with issue 1.

My Lords, as Kerr L.J. in the Court of Appeal pointed out, issue 2 is logically the first issue to be decided, and I propose therefore to follow his course in dealing with it first.

A　　Having regard to the decision of your Lordships' House in *Carl Zeiss Stiftung v. Rayner & Keeler Ltd. (No. 2)* [1967] 1 A.C. 853 ("the *Carl Zeiss* case") two matters were not in dispute. The first matter is that, if an estoppel exists at all, it is that kind of estoppel which is known as issue estoppel per rem judicatam. The second matter is that, in order to create an estoppel of that kind, three requirements have to be satisfied. The first requirement is that the judgment in the earlier action relied on
B　as creating an estoppel must be (a) of a court of competent jurisdiction, (b) final and conclusive and (c) on the merits. The second requirement is that the parties (or privies) in the earlier action relied on as creating an estoppel, and those in the later action in which that estoppel is raised as a bar, must be the same. The third requirement is that the issue in the later action, in which the estoppel is raised as a bar, must be the
C　same issue as that decided by the judgment in the earlier action.

　　My Lords, counsel for the appellants, Mr. Mance, accepted that, in the present case, the Dutch Court of Appeal was a court of competent jurisdiction and that its decision was final and conclusive, so that parts (a) and (b) of the first requirement were satisfied; he accepted further that the parties (or privies) in the Dutch action were the same as those in the Admiralty Court here, so that the second requirement was also
D　satisfied. He argued strenuously, however, that the decision of the Dutch Court of Appeal was not on the merits, so that part (c) of the first requirement was not satisfied; and further that the issue in the Dutch action and the issue in the action in the Admiralty Court were not the same, so that the third requirement was not satisfied either. I shall examine these two contentions in turn.

E　　The argument in relation to the first contention was that the judgment of the Dutch Court of Appeal was procedural in nature, in that it consisted only of a decision that a Dutch court had no jurisdiction to entertain and adjudicate upon the appellants' claim, and did not pronounce in any way on the question whether the claim itself, or any substantive issue in it, if it were to be entertained and adjudicated on, would succeed or fail. In my opinion, this argument is based on a
F　misconception with regard to the meaning of the expression "on the merits" as used in the context of the doctrine of issue estoppel. Looking at the matter negatively a decision on procedure alone is not a decision on the merits. Looking at the matter positively a decision on the merits is a decision which establishes certain facts as proved or not in dispute; states what are the relevant principles of law applicable to such facts; and expresses a conclusion with regard to the effect of applying those
G　principles to the factual situation concerned. If the expression "on the merits" is interpreted in this way, as I am clearly of opinion that it should be, there can be no doubt whatever that the decision of the Dutch Court of Appeal in the present case was a decision on the merits for the purposes of the application of the doctrine of issue estoppel. In my view, therefore, the argument for the appellants on this point is
H　misconceived and should be rejected.

　　The argument in relation to the second contention was that the issues in the Dutch Court of Appeal and the Admiralty Court here were entirely different. The issue in the Dutch Court of Appeal, it was said, was whether the appellants' claim could be founded on tort as distinct from contract, and, if not, whether the exclusive Sudanese jurisdiction clause contained in clause 27 of the bill of lading no. 7 applied to it. By contrast, the issue in the Admiralty Court here was not whether the

appellants' claim could be founded in tort as distinct from contract: it was indisputable, on general principles of English law, that it could. The issue was rather whether, even if the appellants' claim was framed in tort, it would still come within the exclusive Sudanese jurisdiction clause. In my opinion there is no substance in this alleged difference between the issues in the two courts. The issue in both courts was one and the same, namely whether, even though the appellants' claim, based in either case on the same facts, was framed in tort rather than in contract, the exclusive jurisdiction clause in bill of lading no. 7 applied to such claim. In my view, therefore, the argument for the appellants on this point also fails.

Mr. Mance relied on the fact that in the *Carl Zeiss* case [1967] 1 A.C. 853 several of their Lordships indicated the need for caution in the application of the doctrine of issue estoppel, especially in cases where the estoppel relied on was sought to be founded on the judgment of a foreign court. With regard to this, I would only say that the reasons given for the need for such caution do not apply in any way to the present case.

In the result I would hold that this is a classic case of issue estoppel created by the judgment of a foreign court of competent jurisdiction, in which all three of the requirements for the existence of such an estoppel laid down in the *Carl Zeiss* case are fully satisfied. It follows that, like the Court of Appeal, I would answer issue 2 in the affirmative, so making it unnecessary to express any view on issue 1.

My Lords, I turn now to issue 3. The first point to observe is that, on the footing that the appellants are estopped from denying the application to their claim in the Admiralty Court here of the exclusive Sudanese jurisdiction clause, it was a matter for the exercise of the Court of Appeal's discretion whether to grant or refuse the respondents' application for a stay. That court having exercised its discretion by granting a stay, it could only be on strictly limited grounds, too well known for it to be necessary for me to set them out again here, that your Lordships' House would be entitled to interfere with such exercise.

In the Court of Appeal both Kerr L.J. and Sir Denys Buckley expressly directed themselves by reference to the guidelines for the exercise of a court's discretion in cases of this kind set out in *Aratra Potato Co. Ltd. v. Egyptian Navigation Co. (The El Amria)* [1981] 2 Lloyd's Rep. 119. Those guidelines are quoted in the judgment of Kerr L.J. [1984] 2 Lloyd's Rep. 142, 154–155 and it is unnecessary to set them out again here. Mr. Mance accepted that the guidelines concerned are correct in law. He complained, however, that, in applying them to the facts of the present case, the Court of Appeal either disregarded, or gave wholly insufficient weight to, a number of what he submitted were relevant factors.

Some of these factors appear to me to be of such little significance as not to merit any examination by your Lordships. There were, however, two factors in respect of which the complaint referred to above was made with which I think it right that I should deal. The first factor was that it was only in consequence of the fraudulent ante-dating of bill of lading no. 7 by the respondents, their servants or agents that the appellants ever became parties to the contract contained in that bill of lading at all. The second factor was that the appellants, if compelled to sue in the Sudan, would almost certainly be faced with one or more inescapable time-bars. In my opinion there is no merit in either of these

A    complaints. Kerr L.J. dealt with both factors in an exemplary way, at p. 155, and both Cumming-Bruce L.J. and Sir Denys Buckley expressed their agreement with him. The simple fact is that the appellants' claim against the respondents, while having connections with both Holland and the Sudan, has no connection whatever with England, save only that, because of the presence of a sister ship of the *Sennar* in an English port, the appellants were able to arrest her and found jurisdiction here.

B    In these circumstances this is not a case where a careful and meticulous weighing of the factors for and against a stay of the action is necessary. Rather is it a case in which only a perverse exercise by a court of its discretion could have led it to refuse the respondents the stay for which they asked. The appellants elected to have one good long bite at the cherry before the Dutch courts between 1975 and 1980. They lost before

C    those courts and there is no possible justification for allowing them to harass the respondents by taking a further long bite at the same cherry in the action which they have brought in the Admiralty Court here.

    My Lords, for the reasons which I have given, I would affirm the decision of the Court of Appeal, which seems to me quite unassailable, and dismiss the appeal.

D                                            *Appeal dismissed with costs.*

Solicitors: *Sinclair Roche & Temperley; Holman Fenwick & Willan.*

                                                             M. G.

E

[COURT OF APPEAL]

\*WILLIAMS v. FAWCETT

1985 Feb. 13, 14                          Sir John Donaldson M.R., Dillon L.J. and Mustill J.

F

*Contempt of Court—Committal order—County Court—Form—Notice to show cause why order of committal should not be made—Notice failing to particularise alleged contempt—Notice not signed by proper officer of court—Whether notice valid—County Court Rules 1981 (S.I. 1981 No. 1687 (L. 20)), Ord. 29, r. 1(4)—County Court (Forms) Rules 1982 (S.I. 1982 No. 586 (L. 16)), r. 2(1)*

G

    A notice to show cause why a committal order should not be made for breach of an undertaking or a court order must specify the particulars of the breach alleged and must be issued by "the proper officer" in order to comply with Ord. 29, r. 1(4) of the County Court Rules 1981[1] and rule 2(1) of the County Court (Forms) Rules 1982[2], but there is no requirement that it must be signed by him (post, pp. 505E–G, 510D–E, 511D–E,

H    512A–B, D–E).

    Where, therefore, such a notice relating to breaches of undertakings not to molest the applicant or return to her house failed to specify the breaches complained of by the applicant, and the judge refused to grant the respondent an adjournment of the committal hearing:—

[1] County Court Rules 1981, Ord. 29, r. 1(4): see post, p. 504A–B.
[2] County Court (Forms) Rules 1982, r. 2(1): see post, p. 504F–G.