# EXHIBIT G

Case 1:25-cv-00910-JMF    Document 52-7    Filed 04/07/25    Page 2 of 12

# COPINGER AND SKONE JAMES ON COPYRIGHT

NINETEENTH EDITION

VOLUME ONE

By

GWILYM HARBOTTLE, BA (OXON)
*of Lincoln's Inn, Barrister*

NICHOLAS CADDICK, MA, BCL
*One of His Majesty's Counsel*

UMA SUTHERSANEN
*Professor of Global Intellectual Property Law, Queen Mary University of London, Advocate & Solicitor of the Supreme Court of Singapore*

Sweet & Maxwell



Published in 2025 by Thomson Reuters, trading as Sweet & Maxwell.
Thomson Reuters is registered in England & Wales, Company No.1679046.
Registered Office and address for service:
5 Canada Square, Canary Wharf, London, E14 5AQ.

For further information on our products and services, visit
*http://www.sweetandmaxwell.co.uk*

Computerset by Sweet & Maxwell.

Printed and bound in Great Britain by CPI Group (UK) Ltd,
Croydon, CR0 4YY

A CIP catalogue record for this book is available from the British Library.

ISBN 978-0-414-12119-5 (print)

ISBN 978-0-414-12121-8 (e-book)

ISBN 978-0-414-12120-1 (print and e-book)

Crown copyright material is reproduced with the permission of the
Controller of HMSO and the King's Printer for Scotland.
EU material in this publication is acknowledged as © European Union,
1998–2025. Only EU legislation published in the electronic version of the
Official Journal of the European Union is deemed authentic.

All rights reserved. No part of this publication may be reproduced, or
transmitted in any form, or by any means, or stored in any retrieval system of
any nature, without prior written permission, except for permitted fair dealing
under the Copyright, Designs and Patents Act 1988, or in accordance with the
terms of a licence issued by the Copyright Licensing Agency in respect of
photocopying and/or reprographic reproduction. Application for permission for
other use of copyright material, including permission to reproduce extracts in
other published works, should be made to the publishers. Full
acknowledgement of the author, publisher and source must be given.



Thomson Reuters, the Thomson Reuters Logo and Sweet & Maxwell ® are
trademarks of Thomson Reuters.

© 2025 Thomson Reuters

ing or film.[474] This right ("the equitable remuneration right") is not strictly a right of copyright and is considered further elsewhere.[475] However, under the heading "the unwaivable right to remuneration", the Directive provided for restrictions on the ability of the author to assign such right.[476] This was implemented in the UK by s.93B.

**The nature of the limitation**  Section 93B provides that the equitable remuneration right may not be assigned by the author except to a collecting society for the purpose of enabling the society to enforce the right on the author's behalf.[477] Although the right cannot be assigned by the author, it is however transmissible by testamentary disposition or by operation of law as personal or moveable property.[478] A person into whose hands the right passes on such a transmission may assign or transmit it.[479] No formalities are prescribed,[480] but presumably such an assignment can be effected in law by a transfer complying with the Law of Property Act 1925 s.136, and in equity by a more informal assignment.[481]

4-136

### (b) Reversionary rights under the 1911 Act

**Schedule 1 para.27 of the 1988 Act**  Schedule 1 para.27(1) of the 1988 Act[482] provides that:

4-137

> "Where the author of literary, dramatic, musical or artistic work was the first owner of the copyright in it, no assignment of the copyright and no grant of any interest in it, made by him (otherwise than by will) after the passing of the 1911 Act[483] and before 1 June 1957 shall be operative to vest in the assignee or grantee any rights with respect to the copyright in the work beyond the expiration of 25 years from the death of the author."[484]

This means that, unless some further assignment has been made since 1 June 1957 (see below), any such assignment or grant will only have operated until the end of

---

[474] A similar right was created in favour of performers. See CDPA 1988 s.191G and para.11-74.
[475] See para.6-161.
[476] See art.4 of Directive 92/100. See now art.5 of Directive 2006/115/EC.
[477] CDPA 1988 s.93B(2). For this purpose, a collecting society means a society or other organisation which has as its main object, or one of its main objects, the exercise of the equitable remuneration right on behalf of more than one author. See s.93B(7).
[478] s.93B(2).
[479] s.93B(2).
[480] cf. the formalities prescribed for an assignment of copyright by s.90(3).
[481] See J. McGhee QC, *Snell's Equity*, 34th edn (London: Sweet & Maxwell, 2019), para.3-005, et seq. (assignment under the 1925 Act) and para.3-012, et seq. (equitable assignment).
[482] CDPA 1988 Sch.1 para.27(1) governs the position today: *Novello & Co Ltd v Keith Prowse Music Publishing Co Ltd* [2004] EWHC (Ch) 766 at [7]; [2004] R.P.C. 48. And see *Novello & Co Ltd v Keith Prowse Music Publishing Co Ltd* [2004] EWCA Civ 1776; [2005] R.P.C. 23 at [22]–[24] (Lloyd J in the Court of Appeal). The provision was originally contained in the proviso to s.5(2) of the 1911 Act and its effect was continued by the 1956 Act Sch.8 para.6 and Sch.7 para.28.
[483] i.e. on 16 December 1911.
[484] CDPA 1988 Sch.1 para.27(1). Given that para.25 of Sch.1 preserves the effect of pre-1988 Act assignments (see para.4-91), para.27 may have been unnecessary, but it follows the pattern of the 1956 Act and may in any event have been necessary to preserve the statutory vesting of the reversionary interest in the author's personal representatives (see para.4-140): *Novello & Co Ltd v Keith Prowse Music Publishing Co Ltd* [2004] EWCA Civ 1776 at [11].

this 24-year period.[485]

**4-138** *Background*   This limitation can be traced back to the 1911 Act where its object was to protect authors and their heirs from the consequences of the imprudent disposition of the fruits of their special talent and, originality.[486] However, for the reasons which are discussed below, the benefits conferred by this limitation were largely illusory. Following a recommendation of the Gregory Committee in 1952,[487] the provision was repealed by the 1956 Act although its effect was continued in respect of assignments entered into before the commencement of the 1956 Act. This is also the position under the 1988 Act, albeit with some further amendments and clarification. The limitation, therefore, still has important implications for agreements entered into before 1 June 1957 and can be something of a trap.

**4-139** *"Grant of any interest"*   Schedule 1 para.27 refers to a "grant of any interest". It is unclear what these words mean in this context. Their use is referable back to the 1911 Act which provided that the owner of the copyright in a work might assign the right, either wholly or partially, and might grant "any interest in the right by licence", but that no such assignment or grant should be valid unless it was in writing and signed by the owner or the owner's agent.[488] The words of the reverter proviso then went on to apply in the case of any "assignment" or "grant of any interest" in the copyright by the author/first owner. It was clear that a mere consent, even oral or implied from conduct, although always a defence to a claim for infringement,[489] did not amount to the grant of an interest in the copyright such that, for example, the person with the benefit of the consent could sue a third-party infringer.[490] It seems, therefore, that a distinction was being drawn between such a consent and some other, more formal licence in writing by which a proprietary interest in the copyright was granted coupled with a licence to exercise it.[491] What might have amounted to such a grant has always been unclear,[492] but it is suggested the section was intended to apply to a grant which, although it could have been the subject of an assignment, was in fact by way of exclusive licence.[493]

**4-140** *Further points*   The following further points should be noted.

(a) *First assignment or grant after 1 June 1957:* A first assignment of copyright or grant of an interest in it in respect of a pre-1956 Act work made by the author on or after 1 June 1957 is unaffected by the limitation. The assignee

---

[485] For choice of law issues in relation to such assignments, see P. Torremans, "Reversionary copyright: a ghost of the past or a current trap to assignments of copyright?" [2012] I.P.Q 77.
[486] *Redwood Music Ltd v B Feldman & Co Ltd* [1979] R.P.C. 385 at 402; *Chappell & Co Ltd v Redwood Music Ltd* [1981] R.P.C. 337.
[487] Cmnd. 8662. In fact the reasons for the repeal were other than the illusory nature of the benefit. See further para.4-149.
[488] Copyright Act 1911 s.5(2).
[489] See the 1911 Act s.2(1) and para.4-236.
[490] See para.4-236.
[491] See *British Actors Film Co Ltd v Glover* [1918] 1 K.B. 299 at 307, 308.
[492] In cases where the question might have arisen, the agreement was construed as an assignment and not a licence, and so did not have to be answered. See *British Actors Film Co Ltd v Glover* [1918] 1 K.B. 299; *Jonathan Cape Ltd v Consolidated Press Ltd* [1954] 1 W.L.R. 1313. But see *Kinekor Film (Pty) Ltd v Movie Time* [1976] (1) S.A. 649.
[493] See *Copinger*, 8th edn, p.115. Note that today an exclusive licence in writing from the copyright owner confers procedural but not proprietary rights on the licensee. See para.4-246, et seq. See further, as to the 1911 Act and exclusive licences, para.4-253.

or grantee takes freely under the terms of such instrument. The position of an author who made a pre-1 June 1957 assignment or grant and then, on or after 1 June 1957, deals with the reversionary interest is considered below.[494]

(b) *Pre-1 June 1957 assignments of future works:* As the law stood under the 1911 Act, an author could not assign the legal title to the copyright in a "future" work of the author, such an assignment at best operating as an agreement to assign, creating an equitable interest in the assignee.[495] To the extent that an author (before 1 June 1957) purported to assign or grant an interest in the copyright in such a future work (including a work made on or after 1 June 1957), that assignment or grant would have been ineffective to vest in the assignee or grantee any rights in the period after 25 years from the death of the author.[496]

(c) *Devolvement on personal representatives:* As a general rule, the reversionary interest in the copyright expectant on the determination of the 24-year period will, on the death of the author, devolve on the author's legal personal representatives as part of the author's estate.[497] If, however, the author has executed a further assignment on or after 1 June 1957 which includes the reversionary interest, this will now take full effect. This is made clear by express statutory provision in the case of assignments made on or after 1 August 1989,[498] and has been established also to be the position in the case of an assignment made between 1 June 1957 and 1 August 1989.[499] An author who had purported to assign away the copyright in their work for the full term before 1 June 1957 may therefore at any time since then freely dispose of their reversionary interest.

(d) *Meaning of "legal personal representatives":* The devolution of the reversionary interest on the "legal personal representatives" probably refers only to those obtaining an English grant but in any event certainly does not extend to heirs, next-of-kin, devisees, legatees or creditors in respect of whom no grant or order of any court, English or foreign, has been made as

---

[494] As to assignments made before the passing of the 1911 Act, see further, para.4-145.

[495] Such an agreement, or any purported assignment, could not in any event have been effective at that time to transfer the legal title to the promisee. See para.4-125.

[496] This was made clear by the wording of the proviso to s.5(2) of the 1911 Act. The proviso also provided that the reversionary interest arising as a result devolved on the death of the author on their personal representatives and that any agreement entered into by the author as to the disposition of the reversionary interest was to be null and void. See *Novello & Co Ltd v Keith Prowse Music Publishing Co Ltd* [2004] EWHC 766 (Ch) at [21]; [2004] R.P.C. 48.

[497] CDPA 1988 Sch.1 para.27(2), thus effecting a statutory revesting of the reversionary period without the need for any re-assignment. See *Novello & Co Ltd v Keith Prowse Music Publishing Co Ltd* [2004] EWHC 766 (Ch) at [10].

[498] CDPA 1988 Sch.1 para.27(2).

[499] *Novello & Co Ltd v Keith Prowse Music Publishing Co Ltd* [2004] EWHC 766 (Ch). The decision of Patten J was upheld on appeal: see [2004] EWCA Civ 1776; [2005] R.P.C. 23. The Whitford Committee thought that whether an author could assign the reversion after the commencement of the 1956 Act was not free from doubt and recommended that, to the extent it was not already clear, it ought to be provided that an author might be able to do so at any time. See Cmnd. 6732, paras 620 and 622. The draftsman of the 1988 Act presumably also thought that the position was unsettled but took the view that any doubt should be resolved by the courts rather than risk altering established rights by statute. This is probably why the 1988 Act only makes express provision for the position after the commencement of that Act. See *Novello & Co Ltd v Keith Prowse Music Publishing Co Ltd* [2004] EWHC 766 (Ch) at [13] and on appeal [2004] EWCA Civ 1776 at [24].

to title to or as to the vesting of the deceased's personal property.[500] Accordingly, where there were no "legal personal representatives" in this sense the reversionary rights vested in the Public Trustee.[501] The term probably also includes executors named in the will of a person who has died domiciled abroad even if they have not proved the will in England and Wales.[502]

(e) *Three exceptions from the application of Sch.1 para.27:* Nothing in Sch.1 para.27 affects three kinds of assignment relating to reversionary interests, namely[503]:
  (i) An assignment of the reversionary interest by a person to whom it has been assigned. A person to whom the reversion had been assigned by the personal representatives (see next paragraph) might therefore have it assigned to themselves at any time, as may a person to whom the author, after 1 June 1957 has assigned the reversion (see previous paragraph).
  (ii) An assignment of the reversionary interest after the death of the author by the author's personal representatives or any person becoming entitled to it. Any such assignment by the personal representatives is therefore valid, even made while the 1911 Act was in force.[504] There is therefore no requirement that the personal representatives must wait until the reversion falls in. The purpose of the Act was only to prevent a disposal by the author.[505]
  (iii) Any assignment of the copyright after the reversionary interest has fallen in.
(f) *Another exception:* It is further provided that nothing in Sch.1 para.27 is to be construed as applying to the assignment of the copyright in a collective work, or to a licence to publish a work or part of a work as part of a collective work.[506]
(g) *Partial assignments:* The limitation applied to partial assignments of copyright just as it did to assignments of the whole copyright in a work.[507]
(h) *Reverter applies to the grant of any "interest":* The reverter provision applies not only to an assignment of the copyright, but also to the "grant of any interest in [the copyright]", such as, for example, the grant of an

---

[500] *Peer International Corp v Termidor Music Publishers Ltd* [2006] EWHC 2883 (Ch); [2007] E.C.D.R. 1 at [72]. As to the doubt, see previous footnote.
[501] *Peer International Corp v Termidor Music Publishers Ltd* [2006] EWHC 2883 (Ch) at [73], where the authors had died intestate and there had been no English grant.
[502] *Redwood Music Ltd v B Feldman & Co Ltd* [1979] R.P.C. 1. In *Peer International Corp v Termidor Music Publishers Ltd* [2006] EWHC 2883 (Ch), Lindsay J stated that the reasoning in Redwood was "not above doubt" (at [68]), particularly insofar as the judge (Robert Goff J) had relied by analogy on the provisions of s.19 of the Revenue Act 1889 ([70]). Lindsay J's preferred alternative construction of the term "legal personal representatives" are stated in the text (in subpara.(d)). Clearly, the decision in *Redwood v Feldman* is inconsistent with Lindsay J's preferred construction but presumably is reconcilable because the claimants in Redwood claimed through named executors as opposed to heirs, etc. (It is however noteworthy that Lindsay J (at [67]) took the view that there might well have been a US grant.)
[503] CDPA 1988 Sch.1 para.27(3). These provisions were not contained in the 1911 or 1956 Acts but their inclusion in the 1988 Act did not, it is thought, change the existing position. They were inserted for clarification. See the Whitford Committee Report, Cmnd. 6732, paras 620 and 622.
[504] *Chappell & Co Ltd v Redwood Music Ltd* [1981] R.P.C. 337 at 347.
[505] As to the consequence of this in practice, see para.4-148.
[506] CDPA 1988 Sch.1 para.27(4). See, further, para.4-141.
[507] *Redwood Music Ltd v Francis Day & Hunter Ltd* [1978] R.P.C. 429 at 449.

exclusive licence extending into the period starting 25 years after the death of the author.[508]

(i) *Reverter only applies where the author was the first owner:* On the wording of Sch.1 para.27(1), the reverter only applies in cases where the author was the first owner of the copyright. The author may not have been the first owner where the work was made in the course of the author's employment or where the work was a commissioned engraving, photograph or portrait.[509] The first owner of the copyright in such cases was at liberty to assign it for the full term.

**Reverter does not apply to collective works**   The reverter does not apply:   **4-141**

"… to the assignment of the copyright in a collective work or a licence to publish a work or part of a work as part of a collective work."[510]

(a) *Meaning of collective work:* A collective work means: (a) an encyclopaedia, dictionary, year book, or similar work; (b) a newspaper, review, magazine, or similar periodical; and (c) any work written in distinct parts by different authors, or in which works or parts of works of different authors are incorporated.[511]

(b) *What copyrights might be involved:* In a collective work, there may be several distinct copyrights, namely, the copyright in the complete work, considered as a whole, in addition to the various copyrights in the distinct contributions to the work. Thus, an anthology enjoys a copyright of its own, as a compilation arising out of the original literary effort and judgment involved in the selection and arrangement of the subject-matter of the compilation. The copyright in the compilation is additional to, and independent of, and different from whatever copyright or copyrights may subsist in the component parts of the compilation. On the other hand, in the case, for example, of a song, there is no copyright in it as an entity: the words and the music each attract separate copyrights.

(c) *Application of the reverter provision:* As the reverter does not apply to the disposition of the copyright in a compilation (as distinct from the disposition of the copyright in the separate parts),[512] an "assignment" of that copyright (if a collective work) could therefore have been made for the full period of copyright, as could a licence to publish a contribution as part of the collective work. By contrast, assignments of the copyright in the contributions themselves could not have been made for the full period. In other words, the expression "the copyright in a collective work" refers only to that "compilation copyright" which exists, if at all, in addition to and apart from any separate copyright which may exist in the constituent parts of the collective work: it does not refer to the copyright in the separate constituent parts. Thus, in the case of a song, assignments of the distinct

---

[508] See, for example, the reference in subpara.(4) to a licence to publish a work as part of a collective work. See para.4-139 as to the meaning of "grant of any interest".
[509] Copyright Act 1911 s.5(1)(a) and (b). See paras 4-09 and 4-35, respectively.
[510] CDPA 1988 Sch.1 para.27(4).
[511] CDPA 1988 Sch.1 para.27(5). The wording repeats that of the 1911 Act s.5(2), proviso, hence the particular language.
[512] *Chappell & Co Ltd v Redwood Music Ltd* [1981] R.P.C. 337; *Redwood Music Ltd v B Feldman & Co Ltd* [1979] R.P.C. 385; *Redwood Music Ltd v Chappell & Co Ltd* [1982] R.P.C. 109.

TITLE AND LICENCES

copyrights in the words and music written by different persons will not have been effective beyond the expiration of 25 years after the death of the respective authors. There is no independent copyright attributable to a song as a compilation and, therefore, nothing to fall within the exception to the proviso. What purports, however, to be an assignment of copyright in a work for use only as part of a collective work may amount to no more than a licence for that purpose and fall within the second half of the exception.[513]

**4-142** **Reverter does apply to works of joint authorship** Although the reverter provision does not apply to collective works, it does apply to works of joint authorship.[514] As has been seen, under s.5(2) of the 1911 Act, the period when rights revert commences on "the expiration of twenty-five years from the death of the author". In the case of a work of single authorship, the reversionary period lasts for 25 years.[515] To cater for cases where the work was one of joint authorship, s.16(1) of the 1911 Act provided that:

> "… references in this Act to the period after the expiration of any specified number of years from the death of the author shall be construed as references to the period after the expiration of the like number of years from the death of the author who dies first or after the death of the author who dies last, whichever period may be the shorter."[516]

The effect of this would appear to be that, where the reversion takes place, it takes place in respect of the shares of all joint authors at the same time. The reversionary period in such cases is the shorter of two periods, namely: (1) the period of 25 years starting with the death of the author who dies first, or (2) the period starting with the death of the last joint author to die and lasting until the expiry of copyright which, under s.16(1) of the 1911 Act, is 50 years from the death of the first joint author to die.

**4-143** *Examples* The operation of the provision in the case of published joint works is illustrated in the following examples in which A and B are joint authors of the relevant work.

(a) A dies in 1912. B dies in 1917. Under (1) above, the reversionary period would be 25 years (i.e. the 25 years from A's death), under (2) the reversionary period would be 45 years (i.e. the period of copyright remaining after B's death until the expiry of copyright in 1962). Period (1) is the shorter period. The reversion will therefore take effect 25 years after the death of A.

(b) A dies in 1912. B dies in 1942. Under (1) above, the reversionary period would, again, be 25 years (i.e. the 25 years from A's death), under (2) the reversionary period would be 20 years (i.e. the period of copyright remaining after B's death until the expiry of copyright in 1962). On these facts, period (2) is the shorter. Accordingly, the reversion would take effect on the death of B.

(c) A dies in 1912. B dies in 1963. Under (1) above, the reversionary period

---

[513] *Chappell & Co Ltd v Redwood Music Ltd* [1981] R.P.C. 337; *Redwood Music Ltd v B Feldman & Co Ltd* [1979] R.P.C. 385; *Redwood Music Ltd v Chappell & Co Ltd* [1982] R.P.C. 109.
[514] *Redwood Music Ltd v B Feldman & Co Ltd* [1979] R.P.C. 1; [1979] R.P.C. 385 at 406.
[515] This is because copyright expires 50 years from the death of the author (s.3 of the 1911 Act) and the reversionary period starts 25 years from the author's death (s.5(2) of the 1911 Act).
[516] Copyright Act 1911 s.16(1).

would, again, be 25 years (i.e. the 25 years from A's death), under (2) there would be no reversion as B's death took place after the expiry of copyright in 1962.

It follows from these examples that it is impossible to know at the time of A's death when the reversion will occur, or, indeed, if it will occur at all. This can only be known on the death of B, the author who dies last.

**The 1988 Act**  The 1988 Act provides that any document made before 1 August 1989 which had any operation affecting the ownership of the copyright in an existing work or creating, transferring or terminating any interest, right or licence in respect of the copyright in an existing work, has the corresponding operation in relation to copyright in the work under the 1988 Act.[517] Thus, an assignment of a share in the copyright in a work of joint authorship to which the reverter provision applied, operates, in relation to the copyright subsisting under the 1988 Act, as it would have done in relation to the copyright subsisting under the 1911 Act.[518] The position under the 1956 Act was the same.[519] It would also appear that, where an assignment was made in respect of a work of joint authorship before 1956, and the copyright was still subsisting at the commencement of the 1956 Act, then the work enjoyed the extended term, ascertained by reference to the author who died last.  4-144

**Reverter applies to pre-1911 Act works, but not to pre-1911 Act assignments**  The references in the reverter provision contained in the 1911 Act to "the copyright" referred to the copyright as conferred by the 1911 Act and not the rights which existed previously.[520] An assignment or grant made before the commencement of the 1911 Act which dealt with the copyright in an existing work was therefore unaffected by the reverter provision.[521] This is clearly so in the case of assignments made before the passing of the Act but even in the case of assignments made between the passing and commencement of the Act, the express reference in the reverter provision to an assignment made "after the passing" of the Act did not affect assignments made in this period of the pre-1911 Act rights. It concerned only assignments of the future copyright in works which might come into existence after the commencement of the Act.[522] On the other hand, the provision applies to assignments made by an author after commencement in respect of pre-commencement works, since the subject matter of the assignment will necessarily have been the new copyright which was conferred by the 1911 Act on such works.[523]  4-145

**Doubt as to photographs**  It is uncertain whether the reverter provision applies to photographs, the copyright in which was for a period of 50 years from the date of the making of the negative, and which first vested in the owner of the negative,  4-146

---

[517] CDPA 1988 Sch.1 para.25(1). See also *Novello & Co Ltd v Keith Prowse Music Publishing Co Ltd* [2004] EWHC 766 (Ch); [2004] R.P.C. 48. The decision of Patten J was upheld on appeal: see [2004] EWCA Civ 1776; [2005] R.P.C. 23.
[518] *Redwood Music Ltd v B Feldman & Co Ltd* [1979] R.P.C. 1; [1979] R.P.C. 385 at 406.
[519] Copyright Act 1956 Sch.7 para.25(1).
[520] *Coleridge-Taylor v Novello & Co Ltd* [1938] Ch. 850.
[521] Such assignments were, however, governed by the provisions of s.24 of the 1911 Act. See para.4-182, et seq.
[522] *Coleridge-Taylor v Novello & Co Ltd* [1938] Ch. 850. Such an assignment could pass the equitable title but not the legal one.
[523] *Chappell & Co Ltd v Redwood Music Ltd* [1982] R.P.C. 109.

who was "deemed" to be the author of the work.[524] It would seem that the draftsman of the reverter provision overlooked the fact that in the case of these works, the period of copyright protection bore no relation to the life of the author, and that the author might have been a company. Although, therefore, the words of the reverter provision are prima facie wide enough to cover photographs, it is suggested that it does not in fact apply to such works.[525] One reason for excluding photographs from the provision is that, as noted, a corporation could have been the "author" of such works and, in such a case, the reverter provision could have no possible application. Again, one reason for fixing the period of 25 years from the death of an author as the limit of the assignability of copyright was because, at that date, a work ceased to have exclusive copyright, and any person—including, of course, the assignee of the copyright, who then ceased to have the benefit of that assignment—could have reproduced the work for sale upon a royalty basis.[526] It is, however, doubtful whether a photograph could have been exploited upon this basis.[527] The assignee of the copyright in a photograph whose author died shortly after the making of the negative or plate would therefore be in a worse position as compared to an assignee of, say, literary copyright. Again, the provision refers to the interest of the author after the termination of the period of their assignment as "the reversionary interest in the copyright expectant on the termination of that period". If works for which the existence of any reversionary period was problematical (for the author of a photograph might live for 25 years after the making of the photograph) were intended to be included, it might have been expected that there would have been added, after the words "reversionary interest", the words "if any".

4-147 **Arrangements and adaptations** After the copyright in the work had been assigned by the author-first owner, original arrangements or adaptations of the work may have been made by or with the licence of the assignee and given rise to fresh and independent copyrights in the arrangements or adaptations. These copyrights will vest in the person who made the arrangements or adaptations, or that person's employer, assignee, etc. At the end of the 24-year period they do not revert to the author of the original work from which the arrangements or adaptations were made because that person was not the first owner of the copyright in them. All that reverts to that person is the copyright in the underlying work of which they were the author and first owner. This is the case even with arrangements and adaptations which were made without the licence of the author-first owner after the reversion has taken place.[528]

4-148 **Illusory nature of the benefits conferred by the reverter** The reverter provision was inserted in the 1911 Act in the interest of an author's family, to prevent, if possible, successful authors from making improvident contracts for the fruits of

---

[524] Copyright Act 1911 ss.19 and 21.
[525] A similar doubt previously existed in relation to "mechanical contrivances", which were protected under the 1911 Act as musical works (see s.19 of the 1911 Act). Such 1911 Act works are now protected as sound recordings and are thus clearly outside the scope of the reverter provision, which applies only to literary, dramatic, musical and artistic works.
[526] 1911 Act s.3, proviso. See *Copinger*, 12th edn, para.296, et seq.
[527] See *Copinger*, 12th edn, para.303.
[528] *Redwood Music Ltd v Chappell & Co Ltd* [1982] R.P.C. 109.

their talents and originality to the detriment of their dependants.[529] Such reversionary interests became assets of authors' estates and assignable immediately upon their deaths by their personal representatives or by a beneficiary after assent.[530] Such interests might therefore have been sold by the personal representatives for the payment of estate and, even if not required for that purpose, it was frequently the duty of the personal representatives to realise such interests for the purpose of winding up authors' estates.[531] Even where authors made specific bequests of their reversionary interests in copyright, a specific legatee would probably be ready to sell that interest at once, rather than wait for a chance of income 25 years later. The amount which purchasers would be prepared to give for reversionary interests in copyright falling into possession 25 years later was not likely to have been very large, particularly bearing in mind that they would in any event be entitled to publish the work upon payment of a royalty and, for the same reason, would not acquire exclusive rights if they did purchase.[532] It was also the fact that in the case of works originating in the USA, the descendants of a deceased author often executed assignments in favour of publishers with the primary purpose of transferring to the publishers the renewal rights in the works arising under American law at the expiration of 28 years from the date of first publication. Such agreements may, on their true construction according to the proper law of the agreements, have been effective to transfer to the publishers the reversionary copyright arising under English law.[533]

**Recommendation of 1952 Copyright Committee**  The Gregory Committee recommended that this provision should not be continued on the ground that since it was recommending the omission of the right to publish works on compulsory royalty terms at the end of the 24-year period,[534] the reverter provision should also go, taking the view that it had been inserted so as to give the compulsory royalty to the personal representatives of the author.[535] These recommendations were carried into effect by the 1956 Act, together with transitional provisions which, together with clarifications and further amendment, are contained in the 1988 Act, as discussed above. 4-149

C. Transmission by Testamentary Disposition and Operation of Law

**Transmissibility of copyright**  As has been seen, the 1988 Act provides that copyright is transmissible by testamentary disposition or by operation of law, as personal or moveable property.[536] On such a transmission, copyright may be divided 4-150

---

[529] *Redwood Music Ltd v B Feldman & Co Ltd* [1979] R.P.C. 385 at 402; *Chappell & Co Ltd v Redwood Music Ltd* [1981] R.P.C. 337 at 344.
[530] *Chappell & Co Ltd v Redwood Music Ltd* [1981] R.P.C. 337 at 344.
[531] For instance, the rule well known to equity lawyers as the rule in *Howe v Lord Dartmouth* (1802) 7 Ves. 137 would apply. cf. *Pickering v Evans* [1921] 2 Ch. 309.
[532] Copyright Act 1911 s.3.
[533] Although there is no necessary implication that they do so when they are executed in the context of American renewal rights. See *Redwood Music Ltd v B Feldman & Co Ltd* [1979] R.P.C. 385 at 403; *Chappell & Co Ltd v Redwood Music Ltd* [1981] R.P.C. 337 at 350.
[534] 1911 Act s.3. See para.4-164.
[535] Cmnd.8662, para.23. It is unclear from the Parliamentary debates at the time that this was in fact the case. See also para.4-138, as to the objective of the reverter provision.
[536] CDPA 1988 s.90(1). Section 36(1) of the 1956 Act made the same provision. There was no express provision to this effect in the 1911 Act, although it is thought it was to the same effect.