# EXHIBIT J

| | |
|---|---|
| Glasz c. Choko | 2018 QCCS 5020 |

## SUPERIOR COURT

CANADA
PROVINCE OF QUEBEC
DISTRICT OF MONTREAL

No:      500-17-095904-168

DATE:     NOVEMBER 23, 2018
_____

**PRESIDED BY:**      **THE HONOURABLE SILVANA CONTE, J.S.C.**
_____

**MICHAEL GLASZ**
and
**FRASER MUNDEN**
       Plaintiffs
v.
**ALEXANDRE CHOKO**
       Defendant

_____

### JUDGMENT
_____

[1]     The Court must determine who owns the copyright to film footage taken of Mike Tyson and others, by Plaintiffs, during Defendant's promotion of Mike Tyson's one man show, The Undisputed Truth, held in Toronto in September 2014 and his appearance at the Sportel event held in Monaco in October 2014.

## THE FACTS

[2]     Plaintiffs are young professional filmmakers specialized in documentary filmmaking. They operate a production company under the name Thoroughbred Pictures Inc. which was incorporated in 2013.

500-17-095904-168                                                                                                   PAGE: 2

[3]     Plaintiff Fraser Munden is responsible for the creative works whereas Michael Glasz is responsible for the administration of the company.

[4]     Defendant, Alexandre Choko, is a real estate agent who, at all relevant times herein, was a boxing promoter, author of a published work entitled "The Future of Boxing" and boxer.

[5]     In 2014, Defendant was afforded the opportunity to help organize and promote boxer Mike Tyson's one man show "The Undisputed Truth" to be held in Toronto in September 2014 as well as, to bring Mike Tyson to the Sportel event to be held in Monaco in October 2014, where he had a booth to promote his own book.

[6]     In the spring of 2014, Gary Munden met with Defendant and his business associate, Victor Thériault, at a dinner hosted by boxer Ian Clyde. Plaintiff Fraser Munden's father, Gary Munden is a professional photographer.

[7]     Gary Munden spoke of his son Fraser, who was a filmmaker and had received several awards for his short film entitled, The Chaperone. He explained that he was also a boxing fan and had done a short documentary film on boxer Ian Clyde. There was great chemistry between the parties as they all shared passion for boxing.  Gary was invited by Defendant to take photographs backstage of Mike Tyson at the Toronto event and he accepted.

[8]     On May 27, 2014, Gary Munden sent the documentary about Ian Clyde to Defendant who asked if his son would be interested in filming clips to be used in relation to his book, The Future of Boxing or an electronic version of the book[1]. Mr. Munden testified that his son was not interested in doing a "vanity project".

[9]     A few days later, Gary Munden received a call from Defendant and Mr. Thériault. They asked if his son would be interested to film the behind the scenes footage of Mike Tyson at the Toronto event. There was some discussion as to logistics but, as luck would have it, Plaintiffs were scheduled to be filming in Toronto that same week for the University of Toronto in order to promote the University's music department.

[10]    After an exchange of emails on August 30, 2014, Fraser Munden wrote to Defendant and Mr. Theriault to indicate that he would be interested in doing a cinema verité style take on Mike Tyson and also film his meeting scheduled with the Mayor of Toronto[2]. A meeting was scheduled at Defendant's office to discuss the arrangements on September 3, 2014.

[11]    The September 3 meeting was a success. Fraser Munden was accompanied by his business partner, Michael Glasz, and his father Gary Munden. While Defendant said he could not guarantee access to Mike Tyson, he had a very close relationship with

---

[1]  Exhibit P-38.
[2]  Exhibit P-39.

2018 QCCS 5020 (CanLII)

500-17-095904-168                                                                                              PAGE: 3

Mrs. Tyson, for whom he acted as a confidant, and he assured Fraser that he would be able to obtain permission to use the footage to make a creative short film. He showed them a picture of his children playing with the Tyson children to illustrate their close relationship.

[12]     Plaintiffs agreed to make arrangements to arrive earlier in Toronto to film Mike Tyson. There was no discussion at the meeting about copyright. At the end of the meeting, Defendant asked that Plaintiffs send him an email describing who they were and their experience, so he could forward same to Mrs. Tyson, as he needed to reassure her as to the credentials of the individuals filming him.

[13]     In the evening of September 3, 2014, Michael Glasz forwarded Defendant a short email introducing them to Mrs. Tyson and attaching links to their awards and description of their work[3]. After some back and forth as to what should be included in the email to reassure Mrs. Tyson, Defendant asked that they insert a phrase that Defendant would own all footage. He claimed that she was very protective of her husband's image but that he would have no difficulty getting her permission to use his image in the short film.

[14]     Michael Glasz did not immediately agree. He was a first year law student and spoke to Fraser Munden about the risk of writing that in the email to reassure Mrs. Tyson. However, Plaintiffs decided that the parties were all acting in good faith and agreed that this was necessary to move forward with the project. A final email was forwarded to Defendant indicating that he would personally own all of the footage[4].

[15]     At trial, Defendant admitted that Mrs. Tyson never insisted that ownership of the footage belong to Defendant.

[16]     As the Toronto event was to take place in a few days, Plaintiffs rented their equipment and made arrangements to hire a cameraman for the University contract which overlapped with the Toronto event[5]. They stayed at a friend's apartment with Gary Munden. Defendant gave them access to film Mike Tyson but otherwise Plaintiffs had free reign to film what they wanted and they were not remunerated in any way for their work.

[17]     The Toronto event lasted three days and, as Tyson's entourage were held up at the border, Plaintiffs were given intimate access to Mike Tyson in his hotel room, the gym and at other events. In particular, as The International Film Festival was being held that same week in Toronto, Plaintiffs were afforded with some interesting opportunities.

[18]     In particular, Plaintiffs filmed an explosive exchange between Mike Tyson and a television reporter during a live broadcast as well as, exchanges before and afterward

---

[3]   Exhibit P-1a.
[4]   Exhibit P-1.
[5]   Exhibits P-20 and P-21.

2018 QCCS 5020 (CanLII)

500-17-095904-168    PAGE: 4

that no one else captured on film that did not show Mike Tyson in the best light. Mike Tyson later apologized to them for his outburst, which he regretted, but it was the general consensus that he was mistreated by the reporter.

[19] Plaintiffs also accompanied Mike Tyson to a private meeting that Defendant organized with the mayor of Toronto, the late Rob Ford, who candidly spoke to Mike Tyson about his own addiction issues. Plaintiffs were the only crew filming that rather intimidate meeting. Each evening, Fraser Munden would review the raw footage and make the appropriate edits to be saved and then get ready for the next day.

[20] Plaintiffs indicate that it became apparent, in Toronto, that Defendant had exaggerated his friendship with the Tysons. Mike Tyson was visibly annoyed by Defendant's constant presence and insertion into his interviews and photo opportunities. It appeared that Defendant was interested in using the opportunity to promote his book on boxing which he carried with him everywhere. Nevertheless, the experience was very interesting and, immediately thereafter, Plaintiffs continued on in Toronto to complete the project for the University of Toronto.

[21] While filming at the University, Michael Glasz received a call from Gary Munden giving him the heads up that Defendant was frantically trying to reach them as he wanted the footage of the Tyson outburst on live television as well as, the footage of the events before and after the interview.

[22] It appears that the Tyson interview went viral on you tube and Plaintiffs understood that Defendant was seeking to sell to the footage they captured to the fight network. Defendant claims that he wanted to do damage control by providing context for the exchange.

[23] In any event, Plaintiffs refused to hand over the footage as they felt it would be a betrayal of Mike Tyson's trust and was unethical. Moreover, it would jeopardize their short film project. This angered Defendant who claimed that he was the owner of the footage. He then became aggressive and asked where they were staying, threatening to send someone over to break in to get back his property.

[24] Upon their return to Montreal, Plaintiffs decided to end their association with Defendant. It is at this time that they realized that Defendant considered the email exchange was a binding agreement which granted him ownership of their work. Plaintiffs disagreed and revoked their assignment.

[25] Peter Georges, an associate of Defendant, communicated with them and agreed to act as the go between for the parties to settle their dispute and move forward with the project.

[26] Defendant eventually apologized and thanked them for refusing to sell the footage. Plaintiffs assumed there was some sort of misunderstanding and agreed to

2018 QCCS 5020 (CanLII)

500-17-095904-168                                                                PAGE: 5

enter into another agreement with him which they negotiated over the course of several weeks with Peter Georges.

[27]   On October 3, 2014, the parties signed a short form agreement which acknowledged that Defendant was owner of all of the footage taken in Toronto and Monaco but for archival purposes only[6]. Fraser Munden was granted an exclusive and irrevocable licence to use the footage to create derivative works. He was given a 12 month period to prepare the short film and provide Defendant with any other clip that he could use for the promotion of his book so long as Fraser Munden considered it did not impact on his creative project. Defendant was to use best efforts to obtain person to use Mike Tyson's image.

[28]   The short form agreement also provided that a promotional clip would be prepared by Fraser Munden with footage from the Toronto event and used by Defendant in association with the promotion of his book at the Sportel conference to be held in Monaco on October 7, 2014.

[29]   On October 4, 2014, Defendant forwarded the short form agreement to his attorney, Joe Sisto, and asked him to prepare a formal longer form agreement that would protect the parties[7]. Neither party was happy with the contents as it was a compromise agreement which allowed the Plaintiffs to move forward with the Tyson project.

[30]   A short promotional clip was prepared and remitted to Defendant for use at his booth at the Sportel event in Monaco in order to promote his book, The Future of Boxing. Defendant agreed to pay for their flight and hotel stay in Monaco so that they could film the experience in Monaco.

[31]   The parties agree that Monaco was a totally different experience. Mike Tyson's entourage limited access to him such that they had few opportunities to film him.

[32]   On their return from Monaco, Plaintiffs provided Defendant with several screenings so that he could view the entirety of the footage.

[33]   There was a meeting held over the summer at Defendant's lawyer's office and a more formal agreement was to be circulated to the parties regarding copyright to the footage. However, Plaintiffs never heard back from Defendant or his attorney.

[34]   Gary Munden became gravely ill with a rare form of cancer but on October 14, 2015, Fraser Munden managed to complete his short film and confirmed same to Defendant by email just before the 12 month deadline expired[8].

---

[6]   Exhibit P-2.
[7]   Exhibit D-2.
[8]   Exhibit P-8.

2018 QCCS 5020 (CanLII)

500-17-095904-168                                                                            PAGE: 6

[35]   Defendant was in Monaco and asked to see the short film. He also sought proof of financing, which was provided[9].

[36]   Plaintiffs did not want to send the short film to Defendant by email and it was agreed that they would show it to Defendant in person. However, Plaintiffs erred on the dates for the meeting and had to reschedule for a later date.

[37]   On December 15, 2015, Plaintiffs received a letter of demand from Defendant's attorney seeking a copy of the footage and terminating the short form agreement[10].

[38]   On January 21, 2015, Plaintiffs' attorney replied to the letter of demand seeking damages due to Defendant's breach of the agreement which was to use his best efforts to obtain permission from Mike Tyson to use his image[11].

[39]   On March 22, 2016, Defendant wrote to Fraser Munden and sent a link on Rob Ford's death asking for a meeting with him and his father to resolve their differences. What followed was a series of email offers exchanged between the parties but with no success[12].

[40]   Defendant became increasingly frustrated by his inability to obtain the footage and left several messages for both Fraser Munden and his father Gary Munden.

[41]   On June 21, 2016, Defendant left a message for Gary Munden that Plaintiffs and their father considered a veiled threat. In it, Defendant advised Gary Munden to expect a visit to resolve the issue[13]. After seeking counsel from a family friend who is a criminal lawyer, Plaintiffs took the recorded message to the police who said they would call Defendant. Plaintiff Michael Glasz also bought a security system for the Munden home.

[42]   Defendant denied that the recording was a threat and said he wanted to meet Gary with an associate in order to resolve their dispute. He confirmed receiving the call from the police and agreed to stop calling Gary Munden or Plaintiffs.

[43]   Plaintiffs then shared the recording with their investor and family friend who decided to pull out of the short film project, leaving them without any financing.

[44]   On October 13, 2016, Plaintiffs instituted the present action seeking the nullity of the October 2014 agreement as well as, the nullity of the September email agreement assigning the footage.

---

[9]   Exhibits P-9 and D-5.
[10]  Exhibit P-13.
[11]  Exhibit P-14.
[12]  Exhibit D-6.
[13]  Exhibit P-34.

2018 QCCS 5020 (CanLII)

500-17-095904-168 PAGE: 7

[45]   Defendant filed a Defense and Cross-Claim which was amended at trial to invoke the nullity of the October 2014 short form agreement, after seeking advice from his counsel, at the Court's request.

## ARGUMENT

[46]   Plaintiffs argue that they are the owners of the copyright in the footage taken at the Toronto and Monaco events. They seek to declare the September 4, 2014 email null and void due to Defendant's fraudulent misrepresentation that Mrs. Tyson required that Defendant be owner of the footage. Alternatively, they argue that they have revoked the assignment of copyright.

[47]   Mr. Choko argues that he was assigned the copyright to the footage by way of the September 4, 2014 email. He further argues that he is the owner of the footage as Plaintiffs were working for him as cameramen in the context of employment contract. He adds that it would be unprecedented to affirm that cameramen are the owners of copyright when working for a producer.

## QUESTIONS

[48]   The parties agree that the footage is an original cinematographic work within the meaning of section 2 of the *Copyright Act (the "Act")*[14]. The Court must determine who owns the copyright in the footage taken at the September and October 2014 events. The following are the questions in dispute:

48.1.   Was the work produced in the course of employment?

48.2.   If not, was the copyright ownership to the footage assigned to Defendant?

47.3   If so, are Plaintiffs entitled to annul the assignment due to the fraudulent misrepresentations of Defendant? Alternatively, did Plaintiffs revoke that assignment?

47.4   Are the respective damage claims well-founded?

47.5   What restitution should be ordered as a result of the nullity of the assignment?

## ANALYSIS

### Copyright

[49]   The *Act* protects original literary, dramatic, musical, and artistic works[15]. Justice Binnie stated in *Théberge v. Galerie d'Art du Petit Champlain inc.,* [16] that the Act seeks

---

[14]   *Copyright Act,* R.S.C., 1985 c. C-42.
[15]   Section 5 of the *Act*.

2018 QCCS 5020 (CanLII)

500-17-095904-168                                                                                                          PAGE: 8

"a balance between promoting the public interest in the encouragement and dissemination of works of the arts and intellect and obtaining a just reward for the creator (or, more accurately, to prevent someone other than the creator from appropriating whatever benefits may be generated)".

[50]    An original work is defined as the expression of an idea through the exercise of skill and judgment[17]. In this case, the film footage constitutes an original cinematographic work within the meaning of section 2 the *Act*[18].

[51]    Section 13(1) of the *Act* states that subject to the *Act*, the author of a work shall be the first owner of the copyright therein. The term "author" is not defined in the *Act*. Doctrine and caselaw recognize that the author is the person who exercised his skill and judgment to express an idea or to fix it in material form[19]. In this case, the evidence is clear that Plaintiff Frasr Munden is the author of the work. Defendant provided Plaintiffs with access to the events to be filmed but Fraser Munden had carte blanche to use their skill, judgment and creativity in the filming and editing of the events without any input or direction from Defendant.

[52]    As author of the work, Plaintiff is also presumed to be the owner of the copyright except where the work was made in the course of employment or where there is a written assignment of copyright signed by him or his duly authorized representative.

[53]    Subsections 13 (3) and (4) of the *Act* provide as follows:

> Work made in the course of employment
>
> (3) Where the author of a work was in the employment of some other person under a contract of service or apprenticeship and the work was made in the course of his employment by that person, the person by whom the author was employed shall, in the absence of any agreement to the contrary, be the first owner of the copyright, but where the work is an article or other contribution to a newspaper, magazine or similar periodical, there shall, in the absence of any agreement to the contrary, be deemed to be reserved to the author a right to restrain the publication of the work, otherwise than as part of a newspaper, magazine or similar periodical.
>
> Assignments and licences
>
> (4) The owner of the copyright in any work may assign the right, either wholly or partially, and either generally or subject to limitations relating to territory, medium or sector of the market or other limitations relating to the scope of the

2018 QCCS 5020 (CanLII)

---

[16]  [2002] 2 SCR 336; *CCH Canadian Ltd*. v. *Law Society of Upper Canada*, [2004] 1 SCR 339 at para 15.
[17]  *CCH, supra* note 16 at para 16.
[18]  *Denny* v. *Dennis* et al., 2016 BCPC 152 (CanLII).
[19]  *CCH*, *supra* note 16 at paras 8 and 25; Fox, Harold G., *The Canadian Law of Copyright and Industrial Designs*, 2nd ed. (1967) at 17-7.

assignment, and either for the whole term of the copyright or for any other part thereof, and may grant any interest in the right by licence, but no assignment or grant is valid unless it is in writing signed by the owner of the right in respect of which the assignment or grant is made, or by the owner's duly authorized agent.

[54]     Defendant claims that he is the owner of the copyright pursuant to both of these exceptions.

[55]     As Plaintiff Fraser Munden is presumed to be the owner of the copyright, Defendant has the burden of proof[20].

**Contract of employment**

[56]     In *Lachance v. Productions Marie Eykel inc.*,[21] the Court of Appeal confirmed that subsection 13 (3) of the *Act* should be given a restrictive interpretation as it derogates from the general rule that the author of the work is the owner of copyright. The Court further held that the employer must establish the following conditions in order to claim ownership of copyright: 1) the work was created in the context of a contract of employment; 2) the work was created during the course of employment; and 3) there is no agreement to the contrary[22].

[57]     Article 2085 CCQ defines a contact of employment as "a contract by which a person, the employee, undertakes for a limited period to do work for remuneration, according to the instructions and under the direction or control of another person, the employer". It is this last criteria which often distinguishes the contract of employment from a contract of enterprise under article 2098 CCQ[23].

[58]     In the present case, Fraser Munden was not employed by Defendant. He was an independent contractor who filmed the Toronto and Monaco events, for no remuneration, with the sole purpose of creating a documentary on Mike Tyson. He leased his own equipment, travelled to Toronto at his own cost and filmed the events without any creative direction or control by Defendant. Moreover, Defendant was not a film producer. He co-promoted the Mike Tyson show which Plaintiff did not film.

**Assignment of Copyright**

[59]     The September 4, 2014 email confirmed that Plaintiffs would be documenting the Toronto event and that Defendant would "personally own all the footage"[24]. Defendant relies on that email to establish that copyright ownership was transferred to him.

---

[20]   Section 34.1 (1) of the *Act*; *Cinar Corporation v. Robinson*, [2013] 3 SCR 1168, 2013 SCC 73 (CanLII), at para 21.
[21]   *Lachance v. Productions Marie Eykel inc.*, 2014 QCCA 158 (CanLII).
[22]   *Id.*, at para 11.
[23]   Robert P. Gagnon, *Le droit du travail du Québec*, 7th ed. Cowansville, Éditions Yvon Blais, 2013, at 92-93.
[24]   Exhibit P-1.

500-17-095904-168 PAGE: 10

[60] There is no specific language that needs to be employed to convey an assignment of copyright. Author Normand Tamaro wrote[25]:

> Il n'existe pas de formule miracle pour déterminer si un contrat transfère un droit d'auteur exclusif. Dans toutes les situations qui lui sont soumises, un tribunal analyse les stipulations du contrat et se demande s'il laisse voir un véritable transfert de droit de propriété sur l'un ou l'autre des droits exclusifs.

[61] Therefore, the Court must examine the intention of the parties in order to determine whether copyright was assigned. In some cases, the assignment of the copyright can be implied from the evidence. In *Turgeon v. Michaud*, the Court of Appeal confirmed that the assignment is governed by the principles of civil law applicable to contracts as follows[26]:

> [71] Il me paraît, par ailleurs, déraisonnable d'invalider une cession écrite pour le simple motif qu'elle n'utilise pas une formulation expresse, alors qu'il ressort de l'écrit que l'intention des parties était de procéder à une telle cession. À mon avis, pour qu'une cession soit valide, il suffit d'être en présence d'un écrit signé par le titulaire du droit et qu'il en ressorte clairement que la véritable intention de celui-ci était de céder ce droit.
>
> [72] Bien que l'objet du protocole soit une œuvre protégée au sens de la LDA, ce dernier demeure un contrat soumis au droit civil québécois (Electric Fireproofing Co. of Canada c. Electric Fireproofing Company, (1909) 1910 CanLII 66 (SCC), 43 R.C.S. 182, aux pp. 193-194) qui demande qu'on recherche qu'elle a été la commune intention des parties.

[62] The evidence establishes that at the September 3, 2014 meeting there was a loose arrangement whereby Defendant would get some photographs and film footage for his personal use and also to help promote his coffee table book, The Future of Boxing. In exchange, Plaintiffs were given access to Mike Tyson to create a short film or documentary. The parties did not discuss copyright. However, when there was an exchange of the draft email to be sent to Mrs. Tyson, Defendant requested that he personally own all the footage. This request was not accepted at first but Defendant claimed that Mrs. Tyson made it a condition that he personally own all of the footage. As a result, Plaintiffs consented to assigning ownership of the copyright in the footage on the understanding that it was a condition to filming Mike Tyson.

[63] However, Plaintiffs later learned that Defendant's representation regarding Mrs. Tyson was not true. At trial, Defendant admitted that Mrs. Tyson did not request that he personally own the footage. Fraser Munden testified that he would not have agreed that Defendant own the copyright had he known that Mrs. Tyson did not require it for the

---

[25] Tamaro, Normand, *Le droit d'auteur, fondements et principes*, Montréal, Les Presses de l'Université de Montréal, 1994, at 187.
[26] *Turgeon* v. *Michaud*, 2003 CanLII 4735 (QC CA) at paras 71-72.

500-17-095904-168                                                              PAGE: 11

purposes of their film project. This was an essential element of the assignment of ownership to the footage. Fraser Munden's testimony was very credible and sincere and was not contradicted by Defendant.

[64]   The Court concludes that Fraser Munden' consent was vitiated by error induced as a result of Defendant's misrepresentation on an essential consideration for the assignment. As such, the September 4, 2014 assignment of copyright is null and void in accordance with articles 1399, 1401 and 1407 CCQ.

[65]   In addition event, the Court underlines that even if the assignment were valid, as there was no consideration given by Defendant for the transfer of ownership, the assignment could be withdrawn or revoked at any time[27].

[66]   On the facts of this case, Fraser Munden revoked the assignment of copyright in September 2014 when he refused to provide the footage to Defendant, upon his request, in Toronto. This was confirmed orally upon his return to Montreal and, in writing, on October 2, 2014, in Mr. Glasz' email to Defendant confirming that Fraser Munden was the owner of the footage[28]. It was reiterated again at trial.

[67]   Mr. Choko argued that the "experience" of meeting Mike Tyson constituted the "consideration" given in return for the assignment of copyright. However, every creative work can arguably be said to involve an experience, such that, there would never be a need to remunerate the author for the assignment of copyright in his work. This result is contrary to one of the objectives of the *Act* which is to ensure that the author obtains a just monetary reward for his work[29].

[68]   Therefore, the Court concludes that Fraser Munden owns the copyright in the footage taken at the September and October 2014 events.

**Restitution and damages**

[69]   As the parties have agreed to annul the October 2014 short film agreement, the Court will order restitution to Defendant of the transportation and accommodation fees, in the amount of $3,000[30], incurred on Plaintiffs' behalf in order that they attend the Monaco event.

[70]   Moreover, Plaintiffs seek payment for their professional services in the amount of $4,000 for the production of the promotional clip provided to Defendant for his book, The Future of Boxing.

2018 QCCS 5020 (CanLII)

---

[27]   Fox, *supra* note 19 at 339; *Stoyanova* v. *Disques Mile-End inc.*, 2016 QCCS 5093 (CanLII) at para 67; *Seggie* v. *Roofdog Games Inc.*, 2015 QCCS 6462 (CanLII) at para 82.
[28]   Exhibit P-25.
[29]   *Robinson, supra* note 20 at para 23.
[30]   Exhibit D-3.

500-17-095904-168                                                                                                          PAGE: 12

[71]    Defendant argued that Plaintiffs revoked his right to use the photographs in the clip and, therefore, he cannot use the clip without incurring the expense of editing same to remove the photographs. In light of this argument, the Court reduces the Plaintiffs' claim to $3,000.

**FOR THESE REASONS, THE COURT**:

[72]    **GRANTS** Plaintiffs' action, in part;

[73]    **GRANTS** Defendant's Defence and Cross-Claim, in part;

[74]    **DECLARES** the September 4, 2014 email assignment (Exhibit P-1) as well as, the October 3, 2014 short form agreement (Exhibit P-2) null and void;

[75]    **DECLARES** Plaintiff Fraser Munden to be the author and sole owner of the copyright in the film footage taken at the Toronto and Monaco events held in September and October 2014;

[76]    **CONDEMNS** Defendant to pay Plaintiffs the amount of $3,000 for their professional services in the creation of a promotional clip to promote his book, The Future of Boxing, with interest at the legal rate and the additional indemnity provided by law, calculated from the date of the institution of the proceedings;

[77]    **CONDEMNS** Plaintiffs to pay Defendant the amount of $3,000 as restitution for the expenses incurred for them to attend the Monaco event in October 2014, with interest at the legal rate and the additional indemnity provided by law, calculated from the date of the institution of the proceedings;

**THE WHOLE** without legal costs.

                                                                                                        _____
                                                                                                        SILVANA CONTE, J.S.C.

Mr. Michael Glasz
Plaintiff

Me Helen Miedzigorski
**HELEN MIEDZIGORSKI**
Attorney for Plaintiff Mr. Fraser Munden

Mr. Alexandre Choko
Defendant

Dates of hearing:    October 15, 16, 17,18, 19 and 22, 2018

2018 QCCS 5020 (CanLII)