# EXHIBIT K

A-883-90

**FWS Joint Sports Claimants** (*Applicant*)

v.

**Copyright Board, Border Broadcasters' Collective, Canadian Broadcasters Retransmission Rights Agency Inc., Canadian Retransmission Collective, Canadian Retransmission Right Association, Composers, Authors and Publishers Association of Canada, Limited, Copyright Collective of Canada, Major League Baseball Collective of Canada, Inc., Performing Rights Organization of Canada Limited, Canadian Cable Television Association, C1 Cablesystems Inc., Canadian Satellite Communications Inc., and the Deputy Attorney General of Canada** (*Respondents*)

INDEXED AS: FWS JOINT SPORTS CLAIMANTS V. CANADA (COPYRIGHT BOARD) (C.A.)

Court of Appeal, Mahoney, MacGuigan and Linden, JJ.A.—Montréal, May 13, 14, 15, 16 and 17; Ottawa, June 3, 1991.

*Copyright — Royalties for retransmission of distant broadcasts of football games — Whether agreement with ABC Television Network assigning rights to NFL — Whether Board erred in admitting parol evidence as to agreement — Board must decide legal existence of right in order to place value thereon — No copyright in playing of football game as outcome uncertain — No copyright in order of transmission of programs — No error in scaling royalty payments according to number of subscribers.*

This was an application for review of a decision of the Copyright Board fixing the royalties to be paid, for the first time, for retransmission of distant radio and television signals, following upon the amendments to the *Copyright Act* pursuant to the *Canada-United States Free Trade Agreement Implementation Act*. The Board held that the contractual arrangements between the National Football League and the ABC Television Network did not alienate the Network's rights in the broadcast of League games. It used a comparable services approach to arrive at the total value, and allocated the global sum based on viewership. It held that there was copyright in the television production of a sports game, but not in the playing thereof. It also held that there was no copyright in the daily schedule of broadcast programs. It used the cost ratio between music and programs to determine the royalty rate for music. It

A-883-90

**FWS Joint Sports Claimants** (*requérante*)

c.

**Commission du droit d'auteur, la Border Broadcasters' Collective, l'Agence des droits de retransmission des radiodiffuseurs canadiens Inc., la Société collective de retransmission du Canada, l'Association du droit de retransmission canadien, l'Association des compositeurs, auteurs et éditeurs du Canada, Limitée, la Société de perception du droit d'auteur du Canada, la Major League Baseball Collective of Canada, Inc., la Société de droits d'exécution du Canada Limitée, l'Association canadienne de télévision par câble, la C1 Cablesystems Inc., les Communications par satellite canadien Inc. et le sous-procureur général du Canada** (*intimés*)

RÉPERTORIÉ: FWS JOINT SPORTS CLAIMANTS C. CANADA (COMMISSION DU DROIT D'AUTEUR) (C.A.)

Cour d'appel, juges Mahoney, MacGuigan et Linden, J.C.A.—Montréal, 13, 14, 15, 16 et 17 mai; Ottawa, 3 juin 1991.

*Droit d'auteur — Droits à verser pour la retransmission de signaux éloignés pour la télédiffusion de matchs de football — L'entente conclue avec le réseau de télévision ABC équivaut-elle à une cession de droits en faveur de la NFL? — La Commission a-t-elle commis une erreur en acceptant le témoignage oral pour ce qui concerne l'entente? — La Commission doit se prononcer sur l'existence légale du droit afin de procéder à son évaluation — Il n'existe pas de droit d'auteur sur un match de football en raison du résultat incertain — Il n'y a pas de droit d'auteur en vue de la retransmission des programmes — La Commission n'a pas commis d'erreur en présentant une échelle des droits à payer en fonction du nombre des abonnés.*

Il s'agissait d'une demande de révision d'une décision par laquelle la Commission du droit d'auteur du Canada a fixé les droits à verser, pour la première fois, pour la retransmission des signaux éloignés de radio et de télévision, à la suite des modifications apportées à la *Loi sur le droit d'auteur* en conformité avec la *Loi de mise en œuvre de l'Accord de libre-échange Canada–États-Unis*. La Commission a jugé que les arrangements contractuels intervenus entre la National Football League et le réseau de télévision ABC n'ont pas aliéné les droits du réseau dans la télédiffusion des matchs de la ligue. Elle a utilisé une méthode fondée sur des services comparables pour arriver à la valeur totale et a alloué le montant global fondé sur l'indice d'écoute. Elle a conclu qu'il existait un droit d'auteur sur la réalisation de la télédiffusion d'un match de sport, mais pas sur le déroulement de celui-ci. Elle a

set a flat rate of $100 per annum for systems having fewer than 1,000 subscribers, and set a series of advantageous rates for systems having between 1,000 and 6,000 subscribers.

*Held*, the application should be dismissed.

Whether the contract between the NFL and ABC assigns copyright is a question of law. The Board may decide such questions and must do so since it can only value a right if it exists. The wording being unclear, the Board properly relied on parol evidence to the effect that the assignment clause was only intended to permit the League to sue bars which showed local games, to encourage local fans to purchase tickets, and that the Network never deals away copyright or retransmission rights. The Board did not err in preferring other evidence to that presented by the applicant as to the value of the retransmission rights, or in allocating payments in a manner which is at variance with the calculations suggested by the applicant. Administrative convenience is a rational factor for the Board to consider.

The Board correctly ruled that, although there is copyright in the coaches' play books and game plans, as well as in team crests and uniform designs, the cable operators do not exploit those, and there is no copyright in the game itself. A mere spectacle standing alone cannot be copyrighted. Nor can changing materials which lack certainty or unity. In spite of the planning which goes into a football game, it is not choreographed in the way that a ballet is. Each team tries to confound the plans of the other, creating the uncertainty which gives the contest its interest. No one ever bet on the outcome of a performance of *Swan Lake*.

There can be no copyright in a compilation of television programs in which others hold copyright. Although the written schedule for the broadcast day is a literary work, the order in which the programs are transmitted does not add a new right for the broadcaster. The Board is given a broad discretion under the Act to fix the amount of royalties to be paid and to determine how the burden of payment is to be borne. Since the Act does not prohibit the creation of classes of intermediate-sized systems, there is no reviewable error in the Board's determination of a scale of royalty payments generally based on the number of subscribers.

également statué qu'il n'existait pas de droit d'auteur sur le calendrier quotidien des programmes de télédiffusion. Elle a utilisé le rapport entre le coût de la musique et le coût des émissions pour déterminer le taux des droits pour la musique. Elle a établi un taux fixe de 100 $ par année pour les systèmes ayant moins de 1 000 abonnés et une série de taux avantageux pour les systèmes de 1 000 à 6 000 abonnés.

*Arrêt*: la demande devrait être rejetée.

Pour ce qui est de savoir si le contrat intervenu entre la NFL et le réseau ABC équivaut à une cession de droits, c'est une question de droit. La Commission peut trancher des questions de ce genre et doit forcément le faire puisqu'on ne peut évaluer un droit que s'il existe. Comme le libellé n'était pas clair, la Commission a eu raison de se fonder sur le témoignage oral selon lequel la clause relative à la cession visait seulement à permettre à la Ligue, pour inciter les partisans de la ville à acheter des billets, de poursuivre les bars de la ville qui présentaient des matchs locaux et selon lequel aussi le réseau ne se départit jamais des droits d'auteur ou de retransmission. La Commission n'a pas commis d'erreur en préférant accepter une autre preuve que celle présentée par la requérante en ce qui concerne la valeur des droits de retransmission ou en accordant des paiements d'une manière qui ne s'accorde pas avec les calculs proposés par la requérante. La commodité sur le plan administratif est un facteur logique que la Commission peut prendre en considération.

La Commission a eu raison de statuer que, même s'il existait un droit d'auteur sur les livres de jeux et les plans de matchs écrits des entraîneurs, ainsi que sur les insignes des équipes et le dessin des uniformes, ils ne sont pas utilisés par les systèmes de télévision par câble et il n'existe pas de droit d'auteur sur le match lui-même. Un simple spectacle autonome ne peut pas être protégé par le droit d'auteur. Les matériaux changeants qui manquent de certitude ou d'unité ne le peuvent pas non plus. Malgré le degré de planification auquel est soumis un match de football, il ne fait pas l'objet d'une chorégraphie de la même façon qu'un ballet. Chaque équipe essaie de mêler les plans de l'autre et crée l'incertitude qui donnera son intérêt au match. Personne n'a jamais parié sur l'issue d'une représentation du *Lac des cygnes*.

Il ne peut pas y avoir de droit d'auteur sur une compilation de programmes de télévision sur lesquels d'autres sont titulaires d'un droit d'auteur. Même si l'horaire écrit d'une journée de diffusion est une œuvre littéraire, l'ordre selon lequel les programmes sont diffusés n'ajoute pas un nouveau droit pour le diffuseur. La Commission s'est vu conférer par la Loi un vaste pouvoir discrétionnaire de fixer le montant des droits à payer et de déterminer de quelle façon serait supporté le poids de ces paiements. Vu que la Loi n'interdit pas expressément la création de catégories de systèmes de taille intermédiaire, la Cour ne décèle aucune erreur susceptible de révision dans la décision de la Commission de fixer une échelle de droits fondés en général sur le nombre d'abonnés.

1991 CanLII 8292 (FCA)

STATUTES AND REGULATIONS JUDICIALLY CONSIDERED

*Canada-United States Free Trade Agreement Implementation Act*, S.C. 1988, c. 65.
*Copyright Act*, R.S.C., 1985, c. C-42, ss. 2 (as am. by R.S.C., 1985 (4th Supp.), c. 10, s. 1; S.C. 1988, c. 65, s. 61), 70.63 (as enacted by S.C. 1988, c. 65, s. 65), 70.64 (as am. *idem*).
*Definition of Small Retransmission Systems Regulations*, SOR/89-255, s. 3(1).
*Federal Court Act*, R.S.C., 1985, c. F-7, s. 28.

CASES JUDICIALLY CONSIDERED

REFERRED TO:

*Pioneer Shipping Ltd v BTP Tioxide Ltd*, [1981] 2 All ER 1030 (H.L.); *Alampi v. Swartz*, [1964] 1 O.R. 488; (1964), 43 D.L.R. (2d) 11 (C.A.); *Posen v. Minister of Consumer and Corporate Affairs Canada*, [1980] 2 F.C. 259; (1979), 46 C.P.R. 2d 63; 36 N.R. 572 (C.A.); *Re Rohm & Haas Canada Ltd. and Anti-dumping Tribunal* (1978), 91 D.L.R. (3d) 212; 22 N.R. 175 (F.C.A.); *Canadian Admiral Corpn. Ltd. v. Rediffusion Inc.*, [1954] Ex.C.R. 382; (1954), 20 C.P.R. 75; 14 Fox Pat. C. 114; *Tate v. Fulbrook*, [1908] 1 K.B. 821 (C.A.); *Green v Broadcasting Corp of New Zealand*, [1989] 2 All ER 1056 (P.C.); *Kantel, Frederick W. v. Frank E. Grant et al.*, [1933] Ex. C.R. 84; *Wilson v. Broadcasting Corporation of New Zealand*, [1990] 2 NZLR 565 (H.C.); *Baltimore Orioles, Inc. v. Major League Baseball*, 805 F. 2d 663 (7th Circ. 1986); *Macmillan & Co. v. Cooper* (1923), 93 L.J.P.C. 113; *Football League Ltd. v. Littlewood's Pools Ltd.*, [1959] Ch. 637; *Ladbroke (Football), Ltd. v. William Hill (Football) Ltd.*, [1964] 1 All E.R. 465 (H.L.); *Express Newspapers Plc. v. Liverpool Daily Post & Echo Plc.*, [1985] 1 W.L.R. 1089 (Ch. D.).

AUTHORS CITED

Fox, Harold G. *The Canadian Law of Copyright and Industrial Designs*, 2nd ed., Toronto: Carswell Co. Ltd., 1967.
Nimmer, Melville and Nimmer, David. *Nimmer on Copyright*, vol. 1, New York: Matthew Bender & Co. Inc., 1990.

COUNSEL:

*Daniel R. Bereskin* and *G. A. Piasetski* for applicant.
*Mario Bouchard* for respondent Copyright Board.
*Gilles Marc Daigle* for respondent Border Broadcasters' Collective.

LOIS ET RÈGLEMENTS

*Loi de mise en œuvre de l'Accord de libre–échange Canada–États-Unis*, L.C. 1988, chap. 65.
*Loi sur la Cour fédérale*, L.R.C. (1985), chap. F-7, art. 28.
*Loi sur le droit d'auteur*, L.R.C. (1985), chap. C-42, art. 2 (mod. par L.R.C. (1985) (4ᵉ suppl.), chap. 10, art. 1; L.C. 1988, chap. 65, art. 61), 70.63 (édicté par L.C. 1988, chap. 65, art. 65), 70.64 (mod., idem).
*Règlement sur la définition de petit système de retransmission*, DORS/89-255, art. 3(1).

JURISPRUDENCE

DÉCISIONS CITÉES:

*Pioneer Shipping Ltd v BTP Tioxide Ltd*, [1981] 2 All ER 1030 (H.L.); *Alampi v. Swartz*, [1964] 1 O.R. 488; (1964), 43 D.L.R. (2d) 11 (C.A.); *Posen c. Le ministre de la Consommation et des Corporations du Canada*, [1980] 2 C.F. 259; (1979), 46 C.P.R. 2d 63; 36 N.R. 572 (C.A.); *Re Rohm & Haas Canada Ltd. et le Tribunal antidumping* (1978), 91 D.L.R. (3d) 212; 22 N.R. 175 (C.A.F.); *Canadian Admiral Corpn. Ltd. v. Rediffusion Inc.*, [1954] R.C.É. 382; (1954), 20 C.P.R. 75; 14 Fox Pat. C. 114; *Tate v. Fulbrook*, [1908] 1 K.B. 821 (C.A.); *Green v Broadcasting Corp of New Zealand*, [1989] 2 All ER 1056 (P.C.); *Kantel, Frederick W. v. Frank E. Grant et al.*, [1933] R.C.É. 84; *Wilson v. Broadcasting Corporation of New Zealand*, [1990] 2 NZLR 565 (H.C.); *Baltimore Orioles, Inc. v. Major League Baseball*, 805 F. 2d 663 (7th Circ. 1986); *Macmillan & Co. v. Cooper* (1923), 93 L.J.P.C. 113; *Football League Ltd. v. Littlewood's Pools Ltd.*, [1959] Ch. 637; *Ladbroke (Football), Ltd. v. William Hill (Football) Ltd.*, [1964] 1 All E.R. 465 (H.L.); *Express Newspapers Plc. v. Liverpool Daily Post & Echo Plc.*, [1985] 1 W.L.R. 1089 (Ch. D.).

DOCTRINE

Fox, Harold G. *The Canadian Law of Copyright and Industrial Designs*, 2nd ed., Toronto: Carswell Co. Ltd., 1967.
Nimmer, Melville and Nimmer, David. *Nimmer on Copyright*, vol. 1, New York: Matthew Bender & Co. Inc., 1990.

AVOCATS:

*Daniel R. Bereskin* et *G. A. Piasetski* pour la requérante.
*Mario Bouchard* pour l'intimée la Commission du droit d'auteur.
*Gilles Marc Daigle* pour l'intimée la Border Broadcasters' Collective.

*D. W. Kent* for respondent Canadian Broadcasters Retransmission Rights Agency Inc.

*H. G. Intven* for respondent Canadian Retransmission Collective.

*Jacques R. Alleyn* and *Peter E. Robinson* for respondent Canadian Retransmission Rights Association.

*Y. A. George Hynna* for respondents Composers, Authors and Publishers Association of Canada, Limited and Performing Rights Organization of Canada Limited.

*G. A. Hainey* and *M. S. Koch* for respondent Copyright Collective of Canada.

*Richard Storrey* for respondent Major League Baseball Collective of Canada, Inc.

*Michael K. Eisen* and *Stephen G. Rawson* for respondent Canadian Cable Television Association.

*J. A. O'Neill* for respondents Canadian Satellite Communications Inc. and C1 Cablesystems Inc.

*D. W. Kent* pour l'intimée l'Agence des droits de retransmission des radiodiffuseurs canadiens Inc.

*H. G. Intven* pour l'intimée la Société collective de retransmission du Canada.

*Jacques R. Alleyn* et *Peter E. Robinson* pour l'intimée l'Association du droit de retransmission canadien

*Y. A. George Hynna* pour les intimées l'Association des compositeurs, auteurs et éditeurs du Canada, Limitée et la Société de droits d'exécution du Canada Limitée.

*G. A. Hainey* et *M. S. Koch* pour l'intimée la Société de perception du droit d'auteur du Canada.

*Richard Storrey* pour l'intimée la Major League Baseball Collective of Canada, Inc.

*Michael K. Eisen* et *Stephen G. Rawson* pour l'intimée l'Association canadienne de télévision par câble.

*J. A. O'Neill* pour les intimées les Communications par satellite canadien Inc. et la C1 Cablesystems Inc.

SOLICITORS:

*Rogers, Bereskin & Parr*, Toronto, for applicant.

*Copyright Board* for respondent Copyright Board.

*Gowling, Strathy & Henderson*, Ottawa, for respondent Border Broadcasters' Collective.

*McMillan Binch*, Toronto, for respondent Canadian Broadcasters Retransmission Rights Agency Inc.

*McCarthy Tétrault*, Toronto, for respondent Canadian Retransmission Collective.

*Canadian Broadcasting Corporation*, Ottawa, for respondent Canadian Retransmission Right Association.

*Gowling, Strathy & Henderson*, Ottawa, for respondents Composers, Authors and Publishers Association of Canada, Limited and Performing Rights Organization of Canada Limited.

*Smith, Lyons, Torrance, Stevenson & Mayer*, Toronto, for respondent Copyright Collective of Canada.

PROCUREURS:

*Rogers, Bereskin & Parr*, Toronto, pour la requérante.

*La Commission du droit d'auteur* pour l'intimée la Commission du droit d'auteur.

*Gowling, Strathy & Henderson*, Ottawa, pour l'intimée la Border Broadcasters' Collective.

*McMillan Binch*, Toronto, pour l'intimée l'Agence des droits de retransmission des radiodiffuseurs canadiens Inc.

*McCarthy Tétrault*, Toronto, pour l'intimée la Société collective de retransmission du Canada.

*La Société Radio-Canada*, Ottawa, pour l'intimée l'Association du droit de retransmission canadien.

*Gowling, Strathy & Henderson*, Ottawa, pour les intimées l'Association des compositeurs, auteurs et éditeurs du Canada, Limitée et la Société de droits d'exécution du Canada Limitée.

*Smith, Lyons, Torrance, Stevenson & Mayer*, Toronto, pour l'intimée la Société de perception du droit d'auteur du Canada.

*Goodman & Goodman*, Toronto, for respondent Major League Baseball Collective of Canada, Inc.
*Morris/Rose/Ledgett*, Toronto, for respondent Canadian Cable Television Association.
*Johnston & Buchan*, Ottawa, for respondents Canadian Satellite Communications Inc. and C1 Cablesystems Inc.

*The following are the reasons for judgment rendered in English by*

LINDEN J.A.: On October 2, 1990, the Copyright Board of Canada released its decision Statement of Royalties to be Paid for the Retransmission of Distant Radio and Television Signals. This was its first consideration of the amendments to the *Copyright Act*, R.S.C., 1985, c. C-42, which were enacted pursuant to the *Canada-United States Free Trade Agreement Implementation Act* (S.C. 1988, c. 65). Prior to the passage of this legislation, there were no royalties payable by those who retransmitted these distant signals, which lacuna in the law was filled by the new legislation. The Board was, among other things, mandated by the legislation (section 70.63 [as enacted by S.C. 1988, c. 65, s. 65]) to establish "a manner of determining the amount of the royalties to be paid by each class of transmitter" and to "determine what portion of the royalties ... is to be paid to each collecting body." Using the value of the Arts and Entertainment channel as a proxy, the Board fixed the total amount to be paid at approximately 51 million dollars for each of 1990 and 1991. This amount was then apportioned among the various collectives as follows:

| CCC    | 57.087 (per cent) |
|--------|-------------------|
| CRC    | 12.806            |
| CRRA   | 11.752            |
| CBRRA  | 5.814             |
| BBC    | 2.938             |
| FWS    | 2.711             |
| MLB    | 3.588             |
| CAPAC  | 1.980             |
| PROCAN | 1.320             |
| TOTAL  | 99.996            |

*Goodman & Goodman*, Toronto, pour l'intimée la Major League Baseball Collective of Canada, Inc.
*Morris/Rose/Ledgett*, Toronto, pour l'intimée l'Association canadienne de télévision par câble.
*Johnston & Buchan*, Ottawa, pour les intimées les Communications par satellite canadien Inc. et la C1 Cablesystems Inc.

*Ce qui suit est la version française des motifs du jugement rendus par*

LE JUGE LINDEN, J.C.A.: Le 2 octobre 1990, la Commission du droit d'auteur du Canada a rendu sa décision sur les droits à verser pour la retransmission des signaux éloignés de radio et de télévision. C'était la première fois qu'elle devait tenir compte des modifications apportées à la *Loi sur le droit d'auteur*, L.R.C. (1985), chap. C-42, qui ont été adoptées en conformité avec la *Loi de mise en œuvre de l'Accord de libre-échange Canada-États-Unis* (L.C. 1988, chap. 65). Avant l'adoption de cette Loi, il n'y avait aucun droit à payer par ceux qui retransmettaient des signaux éloignés, lacune que la nouvelle Loi est venue combler. La Commission s'est vu, entre autres, confier par la Loi (l'article 70.63 [édicté par S.C. 1988, chap. 65, art. 65]) la mission d'établir «la formule tarifaire qui permet de déterminer les droits à payer par chaque catégorie de retransmetteurs» et de «détermine[r] la quote-part de chaque société de perception dans ces droits». En se servant de la valeur de la chaîne Arts and Entertainment en tant que substitut, la Commission a fixé le montant total à payer à environ 51 millions de dollars pour chacune des années 1990 et 1991. Ce montant a alors été réparti de la façon suivante entre les différentes sociétés collectives:

| SPDAC  | 57,087 (pour cent) |
|--------|--------------------|
| SCR    | 12,806             |
| ADRC   | 11,752             |
| ADRRC  | 5,814              |
| BBC    | 2,938              |
| FWS    | 2,711              |
| MLB    | 3,588              |
| CAPAC  | 1,980              |
| SDE    | 1,320              |
| TOTAL  | 99,996             |

1991 CanLII 8292 (FCA)

The decision was attacked in three separate section 28 [*Federal Court Act*, R.S.C., 1985, c. F-7] applications, which were heard together. Various parties objected to different aspects of the Board's decision. The Canadian Cable Television Association (CCTA), in the first application (File No. A-832-90), attacked the entire decision, FWS Joint Sports Claimants challenged certain elements of the decision (File No. A-883-90), other parties, as respondents, objected to several points, and there was another application, as well (File No. A-834-90), which was withdrawn. The CCTA application was dismissed in a unanimous decision of this Court, written by Mr. Justice MacGuigan. The application of FWS is being dealt with separately in these reasons. There are eight remaining issues which must be considered here.

Three issues were raised by FWS Joint Sports Claimants, which is the collecting body for the National Hockey League (NHL), the Canadian Football League (CFL), the National Football League (NFL) and the National Basketball Association (NBA).

The first issue concerned the interpretation of a contract between the NFL and the ABC Television Network, whereby the retransmission rights were held to belong to ABC and its collecting body, the Canadian Retransmission Right Association (CRRA).

The contractual provision in question, which is not a model of precision, reads as follows:

9. Copyright. Network will cause each live telecast to be simultaneously videotaped and will deliver tapes to League upon request (but tapes need not be preserved more than 30 days after the original telecast). Network hereby assigns to League those protectible copyright elements in the telecast of each game necessary to enable League to sue to prevent threatened infringement or for damages. Network will cooperate in any such suit and any substantial expenses will be reimbursed by League. Network may sue in its own name and at its own expense to prevent threatened infringement or for damages (and may retain any damages it recovers) if League is asked but declines to do so. In such cases, League will cooperate, and any substantial expenses will be reimbursed by Network. Network also agrees to air notices of League and member club ownership and proprietary rights in each game telecast, consistent with the past. League by this assignment of

copyright does not acquire the right to exploit the videotaped recordings in any media without Network's prior consent.

This language, it is argued, amounts to an assignment of the copyright in the telecast to the NFL, but that interpretation is contested. It is not contested that this issue is a question of law (*Pioneer Shipping Ltd v BTP Tioxide Ltd*, [1981] 2 All ER 1030 (H.L.) at page 1035). Although it does appear that certain elements of the copyright are assigned to the League by the contract terms, there are other elements that are not assigned. Cooperation is required in certain circumstances. Nothing is expressly included about retransmission rights, but the video rights could not be exploited without the consent of the network. In short, it is not clear from the wording that there has been an assignment of the retransmission rights. In these circumstances, parol evidence may be considered (*Alampi v. Swartz*, [1964] 1 O.R. 488 (C.A.)). Having considered the parol evidence of Mr. Stanford and Mr. Vanderstar, the Board concluded, and I agree, that the purpose of the assignment clause in the contract was merely to permit the League, in order to ensure better attendance at home games, to sue local bars that showed the games to their patrons. The wording was drafted by ABC and the League felt it could not "quibble" with someone who paid all those millions for the broadcast rights. The evidence is that there was no intention to assign the entire copyright nor the retransmission rights to the League. Indeed, if the League had asked for that during the negotiations, the ABC would have responded that they never give those rights away, as Mr. Stanford testified. Consequently, I am of the view that the Board did not err in interpreting the contract as it did. In future negotiations, now that the situation regarding retransmission rights has changed, this matter will undoubtedly be covered with more exactitude than it was in the agreement in question.

tée à le faire mais s'y refuse. Dans ces cas, la Ligue apportera sa collaboration, et le Réseau lui remboursera toutes les dépenses importantes. Le Réseau convient également de diffuser des avis relatifs aux droits de propriété de la Ligue et des clubs membres sur la télédiffusion de chaque match, comme par le passé. Par cette cession du droit d'auteur, la Ligue n'acquiert pas le droit d'exploiter les enregistrements sur magnétoscope dans les médias sans l'accord préalable du Réseau.

Ce libellé, soutient-on, équivaut à une cession du droit d'auteur sur l'émission de télévision à la NFL, mais cette interprétation est contestée. On ne conteste pas qu'il s'agisse d'une question de droit (*Pioneer Shipping Ltd v BTP Tioxide Ltd*, [1981] 2 All ER 1030 (H.L.), à la page 1035). Bien qu'il semble effectivement y avoir cession de certains éléments du droit d'auteur à la Ligue selon les termes du contrat, il existe d'autres éléments qui ne sont pas cédés. La collaboration de l'autre partie est requise dans certaines circonstances. Rien n'est mentionné expressément en ce qui concerne les droits de retransmission, mais les droits vidéo ne pourraient pas être exploités sans le consentement du réseau. En résumé, il ne ressort pas clairement du libellé utilisé qu'il y a eu cession des droits de retransmission. Dans ces cas-là, on peut prendre le témoignage oral en considération (*Alampi v. Swartz*, [1964] 1 O.R. 488 (C.A.)). Après examen du témoignage oral de M. Stanford et de M. Vanderstar, la Commission a conclu, et je suis d'accord avec elle, que la clause relative à la cession figurant dans le contrat visait simplement à permettre à la Ligue, pour s'assurer une assistance plus nombreuse aux matchs locaux, de poursuivre les bars de la ville qui présentaient les matchs à l'intention de leurs clients. Le texte en avait été rédigé par ABC, et la Ligue estimait qu'elle ne pouvait pas ergoter avec quelqu'un qui versait tous ces millions pour les droits de diffusion. Il ressort de la preuve que l'on n'avait nullement l'intention de céder l'ensemble du droit d'auteur ni les droits de retransmission à la Ligue. En effet, si la Ligue avait fait une telle demande durant les négociations, le réseau ABC aurait répondu qu'il ne se départit jamais de ces droits, comme M. Stanford l'a mentionné dans son témoignage. Je suis donc d'avis que la Commission n'a pas commis d'erreur dans son interprétation du contrat. Dans les négociations à venir, maintenant que la situation a changé en ce qui concerne les droits de retransmission, cette question sera sans doute traitée avec plus de précision que dans le contrat en question.

1991 CanLII 8292 (FCA)

As for the matter of the Board deciding questions of contractual rights, it is clear that the Board must do so, at least in a preliminary way, as a necessary incident to the exercise of its jurisdiction. It cannot value a right unless it exists. The Board's conclusion as to legal rights may not bind everyone for all time, but it cannot perform its mandate without making a legal determination about these rights. It may be different, however, where all that the Board is asked to do is to determine the rights of the parties (see *Posen v. Minister of Consumer and Corporate Affairs Canada*, [1980] 2 F.C. 259 (C.A.)).

The second issue raised by FWS is that the Board ignored its evidence of fair market value and relied exclusively on viewership in evaluating its claim. It further complained that it was required by the Board to offer evidence to assist in determining a universal scheme for allocation, when it sought only to offer evidence about the value of its own claim. The Board, it was suggested, fettered its discretion in so doing.

I am not convinced that the Board erred in its treatment of the FWS evidence. The Board did not ignore the evidence, it just did not accept it. The Board did not force parties to offer evidence of a universal scheme, thereby fettering its discretion, it just preferred the evidence of those who did. The evidence of FWS was certainly plausible, but the Board, after considering it, preferred to accept the evidence of others in deciding how to allocate the royalties. The Board, basing itself on other evidence, chose a comparable services approach, using the Arts and Entertainment Network cost as a starting point for the global sum and then it used a viewership approach based on a test year for the allocation. This was not inconsistent with its statutory authority, nor did it violate any principle of law or natural justice, even though FWS may feel that its sports programs are being undervalued by this method. Administrative convenience is a rational factor for the Board to consider in choosing a method of evaluation and allocation. It was not the only factor it assessed. The Board did not err in doing so. In my view, the requirements

of *Re Rohm & Haas Canada Ltd. and Anti-dumping Tribunal* (1978), 91 D.L.R. (3d) 212 (F.C.A.), at page 214 have not been met by FWS.

The third issue argued by FWS was whether there is a copyright in the playing of a sports game. The Board decided there was no such copyright, although there was in the television production of a game. It also held that there was copyright in the coaches' written play books and game plans, as well as in the team crests and uniform designs, but that these were not used by the cable operators. As for the playing of the game itself, even though it is played as much as possible in accordance with those plans, the Board found that this was not copyrightable, since it was not a "choreographic work, because, unlike dance, a sporting event is for the most part a random series of events. The unpredictability of the action is inconsistent with the concept of choreography."

I agree with the Board. Even though sports teams may seek to follow the plays as planned by their coaches, as actors follow a script, the other teams are dedicated to preventing that from occurring and often succeed. As well, the opposing team tries to follow its own game plan, which, in turn, the other team tries to thwart. In the end, what transpires on the field is usually not what is planned, but something that is totally unpredictable. That is one of the reasons why sports games are so appealing to their spectators. No one can forecast what will happen. This is not the same as a ballet, where, barring an unforeseen accident, what is performed is exactly what is planned. No one bets on the outcome of a performance of *Swan Lake*. Ballet is, therefore, copyrightable, but team sports events, despite the high degree of planning now involved in them, are not. (See Fox, *The Canadian Law of Copyright and Industrial Designs*

luées au moyen de cette méthode. La commodité sur le plan administratif est un facteur logique que la Commission prend en considération pour choisir une méthode d'évaluation et de répartition. Ce ne fut pas le seul facteur à être évalué. La Commission n'a pas commis d'erreur en agissant ainsi. À mon avis, la FWS n'a pas satisfait aux exigences énoncées dans *Re Rohm & Haas Canada Ltd. et le Tribunal anti-dumping* (1978), 91 D.L.R. (3d) 212 (C.A.F.), à la page 214.

La troisième question avancée par la FWS était de savoir s'il existe un droit d'auteur sur le déroulement d'une activité sportive. La Commission a jugé qu'il n'existait aucun droit d'auteur de ce genre, bien qu'il y en ait un sur la réalisation de la télédiffusion d'un match. Elle a également statué qu'il existait un droit d'auteur sur les livres de jeux et les plans de matchs écrits des entraîneurs, ainsi que sur les insignes des équipes et le dessin des uniformes, mais que ceux-ci n'étaient pas utilisés par les systèmes de télédiffusion. Quant au déroulement du match lui-même, même s'il se joue le plus possible en conformité avec ces plans, la Commission a conclu qu'il ne pouvait pas être protégé par le droit d'auteur, car ce n'était pas une «œuvre chorégraphique puisque, contrairement à la danse, un événement sportif est essentiellement une série d'événements fortuits. Le déroulement du match est imprévisible, ce qui est tout à fait contraire à la notion même de chorégraphie».

Je suis d'accord avec la Commission. Même si les équipes sportives peuvent essayer de suivre les jeux qui ont été planifiés par leurs entraîneurs, comme les acteurs suivent un scénario, les autres équipes ont pour tâche de les empêcher d'arriver à leurs fins et souvent y réussissent. En outre, l'équipe adverse tente de suivre son propre plan de jeux, qu'à son tour, l'autre équipe essaie de contrecarrer. À la fin, ce qui survient sur le terrain n'est pas habituellement ce qui avait été planifié, mais quelque chose qui est tout à fait imprévisible. C'est l'une des raisons pour lesquelles les matchs sportifs sont si attirants pour les spectateurs. Personne ne peut prévoir ce qui arrivera. Ce n'est pas comme un ballet, où, sauf imprévu, on exécute exactement ce qui est planifié. Personne ne gage sur l'issue d'une représentation du *Lac des cygnes*. Le ballet peut donc être protégé par le droit d'auteur, mais les événements sportifs par équipe ne

(2nd ed., 1967), page 139; *Nimmer on Copyright* (1990), at page 2-138; *Canadian Admiral Corpn. Ltd. v. Rediffusion Inc.*, [1954] Ex.C.R. 382, at page 400.) A "mere spectacle standing alone" cannot be copyrighted. (See *Tate v. Fulbrook*, [1908] 1 K.B. 821 (C.A.), at page 832.) It is necessary for copyright not to have "changing materials" that are "lacking in certainty" or "unity". (See *Green v Broadcasting Corp of New Zealand*, [1989] 2 All ER 1056 (P.C.), at page 1058 *per* Lord Bridge), even though some variations could be permitted (see *Kantel, Frederick W. v. Frank E. Grant et al.*, [1933] Ex.C.R. 84, at page 95; see also *Wilson v. Broadcasting Corporation of New Zealand*, [1990] 2 NZLR 565 (H.C.)). The unpredictability in the playing of a football or hockey game is so pervasive, despite the high degree of planning, that it cannot be said to be copyrightable. The American cases are not helpful here, given the different statutory provisions and jurisprudence. (See, for example, *Baltimore Orioles, Inc. v. Major League Baseball*, 805 F. 2d 663 (7th Circ. 1986).)

The fourth issue is whether there can be copyright in the compilation of television programs in which others own the copyright. This combination or scheduling of programs, sometimes called the "broadcast day" requires considerable skill and effort to organize. Thus, it is argued by the Canadian Broadcasters Retransmission Rights Agency Inc. (CBRRA) that the "broadcaster's telecommunication [is] equivalent to a printed compilation such as an anthology." There are not only daily, but weekly, seasonal and yearly schedules designed. The majority of the Board recognized the expertise and creativity required to make these compilations, which might lead to copyright protection for the written schedule itself, in accordance with section 2, *Copyright Act* [as am. by R.S.C., 1985 (4th Supp.), c. 10, s. 1; S.C. 1988, c. 65, s. 61], which reads:

peuvent pas l'être malgré le degré élevé de planification dont ils font maintenant l'objet. (Voir Fox, *The Canadian Law of Copyright and Industrial Designs*, 2ᵉ éd., 1967, à la page 139; *Nimmer on Copyright*, 1990, à la page 2-138; *Canadian Admiral Corpn. Ltd. v. Rediffusion Inc.*, [1954] R.C.É. 382, à la page 400.) Un [TRADUCTION] «simple spectacle autonome» ne peut pas être protégé par le droit d'auteur. (Voir *Tate v. Fulbrook*, [1908] 1 K.B. 821 (C.A.), à la page 832.) Pour que le droit d'auteur existe, il ne faut pas être en présence de [TRADUCTION] «matériaux changeants» qui «manquent de certitude» ou «d'unité». (Voir *Green v Broadcasting Corp of New Zealand*, [1989] 2 ALL ER 1056 (P.C.), à la page 1058, lord Bridge), même si certaines variations peuvent être permises (voir *Kantel, Frederick W. v. Frank E. Grant et al.*, [1933] R.C.É. 84, à la page 95; voir également *Wilson v. Broadcasting Corporation of New Zealand*, [1990] 2 NZLR 565 (H.C.)). Le déroulement d'un match de football ou de hockey est si imprévisible, malgré le degré élevé de planification, qu'on ne peut pas le considérer comme pouvant être protégé par le droit d'auteur. Les arrêts américains ne sont d'aucune utilité en l'espèce, étant donné les différences qui existent au niveau des dispositions législatives et de la jurisprudence. (Voir, par exemple, *Baltimore Orioles, Inc. v. Major League Baseball*, 805 F. 2d 663 (7th Circ. 1986).)

Quant à la quatrième question, il s'agit de savoir s'il peut y avoir un droit d'auteur sur la compilation d'émissions de télévision sur lesquelles d'autres possèdent le droit d'auteur. Cette combinaison ou cet horaire d'émissions, qu'on désigne parfois par l'expression «journée de radiodiffusion», exige beaucoup d'aptitudes et d'efforts sur le plan de l'organisation. Ainsi, l'Agence des droits de retransmission des radiodiffuseurs canadiens Inc. (ADRRC) allègue que la [TRADUCTION] «télécommunication faite par les radiodiffuseurs équivaut à une compilation publiée telle qu'une anthologie». On conçoit non seulement des horaires quotidiens, mais également des horaires hebdomadaires, saisonniers et annuels. La majorité des commissaires ont reconnu les connaissances et la créativité qu'il faut pour faire ces compilations, ce qui pourrait avoir pour effet que l'horaire écrit lui-même pourrait être protégé par le droit d'auteur, conformément à l'article 2 de la *Loi sur le droit d'auteur*

2. ...
"literary" work includes tables, compilations, translations and computer programs.

The Board, however, decided against according copyright protection to these programs as they are broadcast in totality in accordance with the agenda that has been prepared. The Board wrote [at page 56]:

A broadcaster's program schedule is a literary work; however the retransmission of the programs listed in the schedule does not constitute a retransmission of the schedule.

A "broadcast day", in other words, is not a literary work as broadcast, even though the written schedule for it may be such a work.

The Court recognizes the difference between there being no copyright in a broadcast *per se* and there being no copyright in a broadcast according to a schedule of certain programs that are then "logged" or "recorded". In either case, there is nothing to be copyrighted in addition to the actual shows being broadcast, which have already been copyrighted by their owners. It is not a new work. There is no editing or creative input added to the shows themselves. The written compilation may be a collection of literary or dramatic works, but that does not make the broadcast day a literary or dramatic work itself. Nor is the broadcast day a cinematographic production. The compilation is not unlike the playbooks of the coaches in sports games. The Board was correct in denying copyright protection to the broadcast day. (See *Macmillan & Co. v. Cooper* (1923), 93 L.J.P.C. 113; *Football League Ltd. v. Littlewood's Pools Ltd.*, [1959] Ch. 637; *Ladbroke (Football), Ltd. v. William Hill (Football) Ltd.*, [1964] 1 All E.R. 465 (H.L.); *Express Newspapers Plc. v. Liverpool Daily Post & Echo Plc.*, [1985] 1 W.L.R. 1089 (Ch.D.).)

The fifth issue was raised by the Performing Rights Organization of Canada Limited (PROCAN)

[mod. par L.R.C. (1985) (4$^e$ supp.), chap. 10, art 1; L.C. 1988, chap. 65, art. 61], qui est libellé ainsi:

2. ...
«œuvre littéraire» sont assimilés à une œuvre littéraire, les tableaux, les compilations, les traductions et les programmes d'ordinateur.

La Commission s'est toutefois prononcée contre le fait d'accorder la protection du droit d'auteur à ces émissions car elles sont diffusées en entier en conformité avec le programme qui a été préparé. La Commission a dit [à la page 56]:

L'horaire des émissions d'un radiodiffuseur est une œuvre littéraire, mais on ne peut assimiler la retransmission des émissions qui y sont inscrites à la retransmission de l'horaire.

En d'autres mots, une «journée de radiodiffusion» ne constitue pas une œuvre littéraire en tant que radiodiffusion, même si l'horaire écrit la concernant peut être une œuvre de ce genre.

La Cour admet la différence qui existe entre le fait qu'il n'y a pas de droit d'auteur sur une radiodiffusion en soi et le fait qu'il n'y a pas de droit d'auteur sur une radiodiffusion suivant un horaire de certaines émissions qui sont alors «enregistrées». Dans l'un ou l'autre cas, il n'y a rien sur lequel on puisse obtenir les droits exclusifs en plus des spectacles mêmes qui sont radiodiffusés, sur lesquels leurs propriétaires ont déjà obtenu les droits exclusifs. Ce n'est pas une nouvelle œuvre. Il n'y a aucun montage ni donnée créatrice qui soit ajouté aux spectacles eux-mêmes. La compilation écrite peut être une collection d'œuvres littéraires ou dramatiques, mais cela ne fait pas de la journée de radiodiffusion une œuvre littéraire ou dramatique. La journée de radiodiffusion n'est pas non plus une production cinématographique. La compilation ne diffère pas des livres de jeux des entraîneurs dans les matchs sportifs. La Commission n'a pas commis d'erreur en refusant que la journée de radiodiffusion soit protégée par le droit d'auteur. (Voir *Macmillan & Co. v. Cooper* (1923), 93 L.J.P.C. 113; *Football League Ltd. v. Littlewood's Pools Ltd.*, [1959] Ch. 637; *Ladbroke (Football), Ltd. v. William Hill (Football) Ltd.*, [1964] 1 All E.R. 465 (H.L.); *Express Newspapers Plc. v. Liverpool Daily Post & Echo Plc.*, [1985] 1 W.L.R. 1089 (Ch.D.).)

La cinquième question a été soulevée par la Société de droits d'exécution du Canada Limitée

1991 CanLII 8292 (FCA)

and Composers, Authors and Publishers Association of Canada (CAPAC) who contend that the Board failed to value the music component of programming or take it into account in its considerations of the total royalties payable. They argued that the evidence showed that the basis of comparison used by the Board—the Arts and Entertainment network—was inappropriate, since the wholesale price of this network did not include any amount for royalties for music.

This Court is not persuaded by that argument. The Board's decision discloses that it did value the music component of programming. However, rather than accept the 2.1 per cent royalty rate suggested by the music collectives (based on the gross revenues paid by the commercial television industry in Canada) the Board preferred the argument of the CRC that the "ratio of the payment for the music and the retransmission royalties should be the same as the ratio between the cost of music and the cost of programs to the industry." While this resulted in a lower royalty rate than that sought by PROCAN and CAPAC, it cannot be considered a reviewable error.

The sixth issue, which was also advanced by PROCAN and CAPAC, was that, in allocating the royalties, the method used to determine the royalty rate was not relevant for establishing the value of the music component of the programming retransmitted by the cable industry. This formula was argued to be inequitable to the music collectives because there is no rational connection between the cost of music and the cost of programs to originating broadcasters.

Once again, this Court is not convinced by the argument of the music collectives. The Board specifically gave its rationale for preferring the formula for the allocation of royalties to the music collectives as follows [at page 69]:

> The Board finds this ratio more appropriate since the royalties represent the costs to the retransmitters of all programming on distant signals.

It was within the Board's discretion to prefer this method to that proposed by the music collectives. In allocating the royalties, the Board had to balance a number of competing interests and it chose this method as the one which most fairly addressed the various concerns. I am not persuaded that there is any basis for this Court to interfere with the Board's allocation.

The seventh issue is whether the Board erred in fixing a rate of $100 per annum for each small system, that is, one having no more than 1,000 subscribers (*Copyright Act*, subsection 70.64(2) [as enacted by S.C. 1988, c. 65, s. 65]; *Definition of Small Retransmission Systems Regulations*, SOR/89-255, subsection 3(1)). It was argued that subsection 70.64(1) [as enacted by S.C. 1988, c. 65, s. 65] of the Act required a "preferential" rate for these small systems, but that this figure was not that—rather it was merely a "nominal" rate which did not reflect the value of the property rights nor the factors which influenced the fixing of the non-preferential rate, and hence should be set aside as irrational.

The Board was given a broad discretion under this Act to fix the amount of royalties to be paid and to determine how the burden of these payments would be borne. In deciding that $100 was an appropriate figure for these small systems, the Board offered three reasons. A flat rate reduced the administrative and reporting burden on small systems. It made the royalty burden smaller than that carried by large systems for all small systems with over 41 subscribers. The $100 amount recognized the obligation of the small system to pay for the use of distant signals. This Court can see no reviewable error in these reasons, even though it can understand why PROCAN and CAPAC would object to this rather unscientific method of rate-fixing. The Board was within its discretion in setting a $100 amount for small systems.

La Commission avait le pouvoir de préférer cette méthode à celle que proposaient les sociétés collectives de musique. Dans la répartition des droits, la Commission devait comparer entre eux un certain nombre de droits concurrents et elle a choisi cette méthode comme étant celle qui abordait le plus équitablement les différents problèmes. Je ne suis pas persuadé de l'existence de quelque fondement qui permette à notre Cour de modifier la répartition établie par la Commission.

En ce qui concerne la septième question, il s'agit de savoir si la Commission a commis une erreur en fixant un taux de 100 $ par année pour chacun des petits systèmes, c'est-à-dire ceux qui n'ont pas plus de 1 000 abonnés (*Loi sur le droit d'auteur*, paragraphe 70.64(2) [édicté par L.C. 1988, chap. 65, art. 65]; *Règlement sur la définition de petit système de retransmission*, DORS/89-255, paragraphe 3(1)). On a soutenu que le paragraphe 70.64(1) [édicté par L.C. 1988, chap. 65, art. 65] exigeait un taux «préférentiel» dans le cas des petits systèmes, mais que ce chiffre n'en constituait pas un—il s'agissait plutôt d'un simple taux «nominal» qui ne reflétait pas la valeur des droits de propriété ni les facteurs qui influaient sur la fixation du taux non préférentiel, et que par conséquent il devrait être annulé parce qu'il n'est pas raisonnable.

La Commission s'est vu conférer par cette Loi un vaste pouvoir discrétionnaire de fixer le montant des droits à payer et de déterminer de quelle façon serait supporté le poids de ces paiements. La Commission a exposé trois motifs pour établir que la somme de 100 $ constituait un montant approprié pour ces petits systèmes. Le recours à un taux fixe allégeait le fardeau administratif et les exigences de rapport pour les petits systèmes. Il rendait le poids des droits moins lourd à supporter pour tous les petits systèmes de plus de 41 abonnés que pour les grands systèmes. Le taux de 100 $ reconnaissait l'obligation faite au petit système de payer pour l'utilisation des signaux éloignés. Notre Cour ne peut relever aucune erreur susceptible de révision dans ces motifs, même si elle peut comprendre les raisons pour lesquelles la SDE et la CAPAC s'opposeraient à cette méthode assez peu scientifique de fixation des taux. La Commission n'a pas outrepassé son pouvoir discrétionnaire en fixant un montant de 100 $ pour les petits systèmes.

1991 CanLII 8292 (FCA)

The eighth issue to be considered, also raised by CAPAC and PROCAN, was whether the Board erred in setting a series of different, advantageous rates for systems having between 1,000 and 6,000 subscribers. It is contended that there was no specific statutory authorization for the Board to do this, as there was in the case of small systems. It is also argued that a system of preferential rates was established for some of the "large" systems, whereas the statute provided for such a benefit only for "small" systems as defined in the regulations.

In arriving at its decision, the Board mentioned the "special concerns of small systems" beyond "the boundary between small and large systems" and responded to them by creating a series of increasing rates for the systems with 1,000 to 6,000 subscribers, even though these systems used distant signals to a larger extent than the larger systems. In making use of its broad discretion, the Board took as its guiding principle that the rates it set be fair and equitable. Many of the parties proposed taking the number of subscribers into account in rate-fixing so that clearly they did not feel this to be an unfair or inequitable method of allocation. Consequently, the Board set out a scale of royalty payments generally based on the number of subscribers to each system. Given that the Act does not expressly prohibit the creation of classes of intermediate-sized systems, the Court can find no reviewable error in this determination.

In the result, this section 28 application will be dismissed.

MAHONEY J.A.: I agree.

MACGUIGAN J.A.: I agree.

La huitième question à examiner, qui a été soulevée également par la SDE et la CAPAC, est celle de savoir si la Commission a commis une erreur en fixant une série de taux avantageux différents pour les systèmes de 1 000 à 6 000 abonnés. Il est allégué que la Commission n'avait aucun pouvoir légal précis d'agir ainsi, comme dans le cas des petits systèmes. On soutient également qu'un système de taux préférentiels a été établi pour certains des «grands» systèmes, tandis que la Loi prévoyait un tel avantage seulement pour les «petits» systèmes comme ceux qui sont définis dans le règlement.

Pour aboutir à sa décision, la Commission a mentionné les «préoccupations spéciales des petits systèmes» au-delà «de la ligne de démarcation entre les petits et les grands systèmes» et y a répondu en créant une série de taux croissants pour les systèmes de 1 000 à 6 000 abonnés, même si ces systèmes utilisaient des signaux éloignés dans une plus grande mesure que les grands systèmes. Dans l'utilisation de son vaste pouvoir discrétionnaire, la Commission s'est guidée sur le principe selon lequel les taux qu'elle établissait étaient justes et équitables. Plusieurs des parties ont proposé de tenir compte du nombre d'abonnés dans la fixation des taux de sorte qu'elles ne peuvent manifestement pas estimer que cela constitue une méthode de répartition injuste ou inéquitable. Par conséquent, la Commission a présenté une échelle de droits fondés en général sur le nombre d'abonnés à chacun des systèmes. Vu que la Loi n'interdit pas expressément la création de catégories de systèmes de taille intermédiaire, la Cour ne décèle aucune erreur susceptible de révision dans cette décision-là.

La présente demande fondée sur l'article 28 est donc rejetée.

LE JUGE MAHONEY, J.C.A.: Je suis d'accord avec les présents motifs.

LE JUGE MACGUIGAN, J.C.A.: Je suis d'accord avec les présents motifs.