# EXHIBIT L

**Chancellor Management Inc. v. Oasis Homes Ltd., 2002 ABQB 500**

Date: 20020521
Action No. 9901-10407

IN THE COURT OF QUEEN'S BENCH OF ALBERTA
JUDICIAL DISTRICT OF CALGARY

BETWEEN:

CHANCELLOR MANAGEMENT INC. operating as
CHANCELLOR HOMES

Plaintiff

- and -

OASIS HOMES LTD. and JOHN HADDON DESIGN LTD.
operating as JOHN HADDON DESIGN

Defendants

AND BETWEEN:

JOHN HADDON DESIGN LTD.
operating as JOHN HADDON DESIGN

Plaintiff by Counterclaim

- and -

CHANCELLOR MANAGEMENT INC.
operating as CHANCELLOR HOMES

Defendant by Counterclaim

2002 ABQB 500 (CanLII)

Page: 2

2002 ABQB 500 (CanLII)

---

REASONS FOR JUDGMENT
of the
HONOURABLE MR. JUSTICE R.P. FRASER

---

[Note: Additional Reasons for Judgment were filed on July 5, 2002; the text is appended to this Judgment.]

[Note: An Erratum has been filed on September 24, 2002; the correction has been made to the text and the Erratum is appended to this Judgment.]

[Note: An Erratum has been filed on January 17, 2003; the correction has been made to the text and the Erratum is appended to this Judgment.]

APPEARANCES:

A.J. McConnell
    for the Plaintiff/Defendant by Counterclaim

R.J. Simpson
    for the Defendant Oasis Homes

K.T. Lenz
    for the John Haddon Design Ltd., Defendant/Plaintiff by Counterclaim

**INTRODUCTION**

[1]    This Judgment follows the trial of an action arising from an alleged breach of copyright or of contract or both. In this action the Plaintiff, Chancellor Management Inc., operating as Chancellor Homes ("Chancellor"), seeks a declaration that it is the owner of the architectural work represented by the plans for a show home titled "the Cartier" ("the Plans"). Chancellor also seeks: an injunction to enjoin the Defendants Oasis Homes Ltd. ("Oasis") a housebuilder, and John Haddon Design Ltd. ("Haddon Design"), a design firm, from using or reproducing the Plans; damages; and other related remedies.

[2]    The action arises as a result of Chancellor hiring Haddon Design to design the Plans. Chancellor alleges that it instructed Haddon Design, through its principal, John Haddon ("Haddon"), to incorporate certain unique features into the Plans. Chancellor claims authorship to those features and submits that they are not common to other homes. It claims a copyright to the Plans on that basis.

[3]    Haddon Design, also claims authorship of the majority of the unique features over which Chancellor claims authorship. Additionally, Haddon Design claims authorship of other aspects

Page: 3

of the Plans, such as dimensions, placement of windows and a multitude of other details which were necessary components of the Plans. Haddon Design also relies on presumptions within the *Copyright Act*, R.S.C. 1985, c. C-42 ("the *Act*") and an alleged contract between it and Chancellor to support its claim to ownership of copyright in the Plans.

[4]    Oasis is also a home builder. It bought a copy of the Plans from Haddon Design and built a show home based on them which opened in mid-April 1999. Oasis argues that the Plans do not attract the protection of the *Act*. In the alternative, it states that Haddon Design is the owner of the copyright. In the further alternative, it submits that if copyright exists in the Plans and Chancellor owns that copyright, it was not infringed by Oasis.

[5]    Haddon Design has counterclaimed against Chancellor. It alleges that Chancellor breached its contract with Haddon Design, or alternatively, breached Haddon Design's copyright, by building an additional five homes based on the Plans without compensating Haddon Design. It seeks damages in the amount of $4,000.00.

**FACTS**

[6]    Chancellor bought 25 lots in the upscale Hamptons subdivision in Calgary, in the fall of 1995. It wanted to build an impressive show home to assist in the sale of the lots to professional people who were family oriented. At that time, one of the designers Chancellor had previously used to design homes was unavailable and another was in the process of closing shop. Consequently, it approached Haddon Design. As the show home had to be completed by the spring of 1996, the Plans for the show home had to be completed within two to three weeks of Chancellor's initial contact with Haddon Design.

[7]    The principals of Chancellor are Louis and Helen Chan. He is the treasurer and she is the president.

[8]    The Chans met with Haddon on September 12th, 1995. Prior to the meeting they  faxed Haddon a list of "what they were looking for" in the show home (Tab 1, Exhibit 1[1]). Comments arising from the initial discussions between Haddon and the Chans were written by Haddon on a document titled "Hamptons Showhome" (Tab 1) and on another document titled "Summary of Client Information" (Tab 2). Haddon was instructed to prepare a plan based on the criteria described in those documents.

[9]    At the end of their original meeting on September 12th 1995, Haddon placed a document (Tab 3) in front of the Chans. The third page of the document was headed "Policy re: Payment of Fees". The first section of that page dealt with the basis on which fees were charged (i.e. an hourly charge or square footage). The next section was titled "Development Permits [sic] Drawings". The first paragraph of that section, dealing with development permit drawings, was

---

[1]  Note: By agreement a group of documents contained in a loose-leaf folder were entered as Exhibit 1 with each document identified by a Tab number. Subsequent Exhibits were numbered individually.

Page: 4

struck because Chancellor did not require a development permit. The remainder of that page provided as follows:

> This contract gives legal permission for this house plan to be built only once. A separate contract is required each time this plan is used for new construction.

> Please acknowledge your understanding of this policy by signing below.

> "Lewis Chan" [signature]

> POLICY RE: RELEASE OF ORIGINALS AND SIGNAGE

> It is a designer's right to retain all original work. This office will not release the original work.

> The designer may place a sign acknowledging his participation in the project on the site during the construction stage of the house. This is part and parcel of our services to our clients.

> "Lewis Chan" [signature]

The document was signed by Mr. Chan in both of the places indicated.

[10]    Haddon testified that he explained the entire document, including the above quoted provisions, to the Chans. His evidence was that he sat opposite the Chans and, when they arrived at the third page, he rotated the document so that they could read it as it was being discussed. After reviewing the document with the Chans, Haddon asked if they had any questions. Haddon's evidence was that the only provision that concerned Mr. Chan was that paragraph which dealt with Haddon Design placing a sign on the site of the showhome indicating its participation in the project. The Chans did not want this and Haddon conceded. Following the discussion Mr. Chan signed the document.

[11]    Mr. Chan's evidence was that there was no discussion about the document as he and Mrs. Chan were anxious to get going. Mrs. Chan also testified that there was no discussion regarding the terms of the agreement other than the retainer and the overall cost of the Plans. However, she also stated that she was writing out a retainer cheque for Haddon at the time that the document was signed by Mr. Chan and was not paying attention. It is common ground that the cheque was written and delivered at that time.

[12]    On September 18th, Haddon faxed a number of documents to the Chans, including a rough draft of the Plans, pictures of various types of windows and a picture of a front entrance grill (Tab 5). The Chans did not like various aspects of the draft. They faxed Haddon a copy of the floor plans of another Chancellor show home and had a couple of phone conversations with him indicating their concerns. On September 20th, Haddon produced a revised front elevation

2002 ABQB 500 (CanLII)

Page: 5

(Tab 7). It had the massive front of the house look desired by the Chans but also had features which they found unacceptable. The Chans communicated this to Haddon and he responded with revisions immediately (Tab 8). Thereafter, the Chans had another phone conversation with Haddon wherein they supplied him with comments regarding the front elevation and discussed the layout for the interior. Shortly after that conversation the Chans received a revised floor plan which was based on the floor plan of the other Chancellor showhome (Tab 9). They immediately called Haddon to advise him of objections and concerns. Haddon responded again with a revised draft of the first and second floor plans (Tab 10) which were received on September 26th. That design of the first and second floors of the house was also unacceptable to the Chans.

[13]    As the Chans were still not happy with the plans they contacted Ms. Shelagh Dobbyn ("Dobbyn"), an interior designer, on September 26th immediately after they received the Tab 10 documents. She had assisted the Chans with interior design in the past. Dobbyn was retained to review and revise the plans together with Mrs. Chan. They revised the last draft of the first and second floor plans submitted by Haddon  (Tab 11) and then forwarded their revision to him. He revised the plans again to incorporate the suggestions included in the Tab 11 draft (Tab 12). In addition to adding those suggestions, Haddon added dimensions, chose window sizes and added a number of other features or details which, to use his words, determined what "the rooms would look like". That revised draft was faxed to the Chans on September 29th, following receipt of which they suggested further revisions which Haddon incorporated (Tab 12A). The preparation of the working drawings followed. They were done by Andre Haesler, an employee of Haddon Design.

[14]    The foundation and basement plans were initially done by Haddon. His plan was rejected and the basement design was set aside, according to the Chans, until the upstairs design was completed. The outside parameters were then settled, followed by the foundation and basement plans which were done by Haddon.

[15]    The Cartier showhome opened in the early spring of 1996. Chancellor later built another five homes based on the Plans.

[16]    The Chans state that the combination of a number of the design elements in the Cartier Plans is unique, including:

      - the barrel-vaulted ceiling of the front foyer;
      - the raised loft above the front foyer;
      - the two step rise of the level of the den floor above the level of the remainder of
      the ground floor;
      - the shape of the breakfast nook;
      - the configuration of the rooms on the main floor such that the den was located
      between the living room and the family room;
      - the Gothic grill windows; and
      - the use of glass blocks dividing the dining room and the front hall.

2002 ABQB 500 (CanLII)

Page: 6

[17]    In April 1998, Haddon Design sold a copy of the Plans to Oasis. Oasis subsequently used the Plans to build a show home called "The Buckingham". Mr. Chan discovered the similarity between the Cartier and the Buckingham and on April 30, 1999 he instructed his counsel at the time to forward a letter to Oasis alleging a breach of copyright. Despite that notice the Buckingham showhome remained open.

**ISSUES**

1. Does copyright exist in the Plans?

2. If copyright does exist in the Plans, who is the owner of that copyright interest?

3. If Chancellor owns the copyright, has Oasis infringed that copyright in any way?

4. If there has been an infringement, is Chancellor entitled to a remedy against Oasis under the *Act*?

5. Did Chancellor Commit a Breach of Contract and/or Copyright?

**EXECUTIVE SUMMARY OF THE DECISION**

[18]    Based on the reasoning and analysis that follow, I have found that the Plans are protected by copyright. I have found further that the contract executed by Mr. Chan between Chancellor and Haddon Design gives Haddon Design ownership of the copyright, regardless of who came up with ideas for which Chancellor claims authorship.

[19]    I am also of the view that, even without the contract, Chancellor could not have claimed ownership in the copyright. In this regard, I note section 34(4)(a) of the *Act* which presumes Haddon Design to be the author of the Plans as its name is printed on the Plans themselves. Further, as Chancellor did not express the majority of the ideas it claims authorship over it is unable to rebut this presumption. Accordingly, Haddon Design, which is the presumed author, is presumed also to be the owner of the copyright in accordance with section 34(3)(b).

**ANALYSIS**

**1. Does copyright exist in the Plans?**

[20]    Chancellor submits that a copyright can exist in house plans. It relies on section 5(1) of the *Act; Hay* **v.** *Sloan* (1957), 12 D.L.R. (2d) 397 (Ont. H.C.); and *Randall Homes Ltd.* **v.** *Harwood Homes Ltd.,* [1987] 4 W.W.R. 705 (Man. Q.B.), as support for that proposition. For house plans to become subject to copyright protection, Chancellor argues, that the design elements in the plans, either alone or in combination with other elements, must be "original". Originality in this context, it submits, is established by proving that a party's expressions contributed to a work and that those expressions originated from him or her and were not copied.

[21]    Chancellor concedes that some of these design elements it claims authorship over are not new. However, it maintains that these elements in the combination in which they exist in the Plans have an original character.

Page: 7

[22]    Oasis acknowledges that copyright may exist in house plans, however, it takes the position that a house plan must be unique before it will be protected by copyright. In that regard Oasis relies on ***Randall Homes***, *supra*; ***Hay***, *supra*; ***Viceroy Homes Ltd.* v. *Ventury Homes Inc.*** (1991), 34 C.P.R. (3d) 385 (Ont. Gen Div.), aff'd (1996), 69 C.P.R. (3d) 459 (Ont. C.A.); and ***Lifestyle Homes Ltd.* v. *Randall Homes Ltd.*** (1991), 34 C.P.R. (3d) 505 (Man. C.A.), aff'g (1990) 30 C.P.R. (3d) 76 (Man. Q.B.). In that regard it states that it is the court that must decide whether the house design is sufficiently distinctive, so as to obtain protection under the *Act*. The Cartier, it submits, is not unique in that sense. Specifically, with respect to the design features which the Chans argue are unique, Oasis states:

- Barrel vaulted ceilings have existed in architecture for centuries;

- Both Mr. Frank Drewniak, who was qualified as an expert in the area of architectural design of single family residential housing, and Mr Chan conceded that the floor level of the den had to be raised as the entrance to the den was located on the stair landing of the stairs from the foyer to the second floor. Both admitted that neither the stairs nor the den could have been built in any other way to fit within the space available. They also conceded that having stairs or different levels on a floor of a house was not an uncommon feature;

- Both Mr. Chan and Mr. Drewniak conceded that the loft had to be raised to accommodate the barrel vaulted ceiling;

- Mr. Drewniak and Mr. Chan conceded that Gothic window grills have existed for centuries;

- Even Haddon said the floor layouts are typical;

- The evidence establishes that curved glass blocks have been used in houses in Calgary for several years; and

- The three bay window in the walls of the nook is common in Calgary.

[23]    On the basis of those submissions, Oasis takes the position that the Plans are not unique and are not subject to copyright protection.

[24]    Haddon Design submits that it is not necessary for a court to find a work unique in order for copyright to attach. It argues that the only requirement is that the work, as a whole, be original. Originality, it submits, exists where a court finds that the requisite labour, skill and imagination went into a work. It states that there was a sufficient degree of all of those qualities employed in the creation of the Plans so as to make them original. On that basis, Haddon Designs argues that the Plans are subject to copyright protection.

[25]    Section 2 of the *Act* defines "artistic work" to include "plans" and "architectural works". "Architectural works" is defined in that section as "any building or structure or any model of a building or structure". Section 5(1) states:

> 5.(1) Subject to this Act, copyright shall subsist in Canada, for the term hereinafter mentioned, in every *original* literary, dramatic, musical and artistic work . . . [Emphasis added.]

[26]    Subsection 34(3) of the *Act* sets out the following presumption:

> 34(3) In any action for infringement of copyright in any work in which the defendant puts in issue either the existence of the copyright or the title of the plaintiff thereto,
>
> (a) the work shall, unless the contrary is proved, be presumed to be a work in which copyright subsists . . .

[27]    Thus, the *Act* makes clear that house plans may be subject to copyright protection, so long as they are original. What constitutes "original" in this context and whether an element of uniqueness is also required before copyright protection will obtain, as Oasis suggests, remains in issue.

[28]    The requirements of originality and uniqueness have been considered in a number of cases. In **Hay***, supra*, the Ontario High Court found that "originality" was required in order for a work to be protected by copyright. It held that the requirement of originality relates to the expression of thought, in that it must not be copied, but must originate from the author. The Court also found that one should consider the intent of the creator rather than exercise a personal aesthetic judgement, in determining whether an architectural work of art possesses sufficient artistic character and design so as to attract the protection of the *Act*. In determining whether the subject house satisfied those requirements, the Court reviewed evidence to the effect that: the outward appearance of the house was "quite different"; that "there were many distinctive features  and that it had "something that others don't have".

[29]    Scott C.J.M, in the dissent in **Lifestyle Homes**, *supra*, held that originality did not require a brand new idea. Rather, he found that the relevant question was whether the plans were sufficiently distinctive and were an original product. The majority, in **Lifestyle Homes**, per Hubband J.A., quoted with approval from **Blake v. Warren** (1931), Macg. Cop. Cas. 268 (K.B.) in considering what constituted an "original architectural work of art":

> There must be something apart from the common stock of ideas. There must be something that strikes the eye as uncommon.

[30]    The Court in **Randall Homes***, supra*, in considering whether a home could possess originality or uniqueness, stated:

2002 ABQB 500 (CanLII)

Page: 9

2002 ABQB 500 (CanLII)

> I cannot agree that there can be no artistic work in a home, for once in a while a designer can come up with a quite creative, original design which creates a home with flair, artistic panache, an appeal with unique qualities in form, appearance and function, not simply a copy from the neighbour's home, but a fundamental creation of his own talents.

[31]    In *Viceroy Homes, supra,* Potts J., of the Ontario General Division, held that both originality and uniqueness were required in order to attract the protection of the *Act*. The Court noted that the definition of "architectural work of art" required that a structure possess "artistic character or design". The Court then determined that the cases had consistently found that artistry includes an element of uniqueness. The Court defined the term "unique" as meaning distinctive. As to "originality", the Court found that a number of cases including *Hay, supra;* and *Randall Homes, supra,* found that that term referred to:

> the overall concern of the Copyright Act with the idea that work must not be copied and 'that it should originate from the author'.

[32]    Potts J. in *Viceroy Homes*, *supra*, also cited H.G. Fox, *The Canadian Law of Copyright and Industrial Designs,* 2nd ed. (Toronto: Carswell, 1967) at 41, wherein the author states:

> The effective meaning of the requirement of originality is that the work must not be copied from another, or must not have been in the public domain.

[33]    "Original" was similarly defined in *Canadian Admiral Corporation* **v.** *Rediffusion Inc*, [1954] Ex. C.R. 382 (Can. Ex. Ct.) at p. 398:

> For a work to be "original" it must originate from the author; it must be the product of his labour and skill and it must be the expression of his thoughts.

[34]    I accept the definition of originality set out in *The Canadian Law of Copyright and Industrial Design*; *Canadian Admiral Corporation, supra;* and *Viceroy Homes, supra* - that the work must be the work of the author and not simply a copy of someone else's production. In my view the Plans satisfy the criteria of originality in that sense.

[35]    I find further that house plans are not required to be  unique, in the sense that the elements contained therein have never been seen before, in order to engage copyright protection. Whether a work is required to be unique in the sense that it is distinctive, however, is not as clear. In that regard, I would note that the definition of "architectural work of art" was amended in 1993. Before that time, section 2 defined "architectural work of art" as:

> any building or structure *having an artistic character or design*, in respect of that character or design, or any model for the building or structure, but the protection

Page: 10

afforded by this Act is confined to the artistic character and design, and does not extend to processes or methods of construction. [Emphasis added.]

[36]    In the 1995 version of the *Act*, which is under consideration here, "architectural work" was defined as meaning any building or structure or any model of a building or structure. Without determining whether the scope of that definition would include plans, I note that the 1995 definition no longer required an element of "artistic character or design". This materially distinguishes the cases cited by Oasis in support of its position that distinctiveness is required before copyright can exist in house plans. In other words, distinctiveness may no longer be required in order for house plans to be subject to copyright under the definition of "architectural work".

[37]    In the circumstances of the present case, however, I need not finally determine this  issue as I find that the Plans are sufficiently distinctive to satisfy any requirement in that regard. Specifically, I find that the various design elements used in the combination set out in the Plans are unique in the sense that they are distinctive.

[38]    Given my finding in this regard, I need not comment on whether an artistic element is required in an architectural work or plans in order for those works to become subject to copyright under the general definition of "artistic work". I would, however, note the judgement of Reed J. in *DRG. Inc.* v. *Datafile Ltd.* (1987), 18 C.P.R. (3d) 538 (Fed. T.D.); affd 35 C.P.R. (3d) 243 (Fed. C.A.), wherein she expressly declined to state whether "artistic"-ness must be found in architecture in order to satisfy the definition of "artistic work". As to other works enumerated under "artistic works", however, she concluded that "artistic" was merely a general description used for works which find expression in a visual medium.

[39]    I wish to emphasize that, although I have found the Plans to be distinctive as a result of the combination of the various design elements over which both Haddon Design and Chancellor claim ownership, it is the Plans as a whole, not their constituent parts, which attract copyright protection in this case. In this regard I note the judgement of McLaughlin J., as she then was, in *Slumber-Magic Adjustable Bed Co. Ltd.* v. *Sleep- King Adjustable Bed Co.* (1984), 3 C.P.R. (3d) 81 (B.C.S.C.), at 84:

It is well established that compilations of material produced by others may be protected by copyright, provided that the arrangement of the elements taken from other sources is the product of the plaintiff's thought, selection and work. It is not the several components that are the subject of the copyright, but the over-all arrangement of them which the plaintiff through his industry has produced. . . In the case of a compilation, the originality requisite to copyright is a matter of degree depending on the amount of skill, judgement, or labour that has been involved in making the compilation: Ladbroke (Football), Ltd. v. William Hill (Football), Ltd., [1964] 1 All E.R. 465 (H.L.). Where copyright is claimed in a compilation it is not the correct approach to dissect the work in fragments and, if the fragments are not entitled to copyright, then deduce that the whole

compilation is not so entitled; rather, the court should canvas the degree of industry, skill or judgement which has gone into the over-all arrangement [cites omitted.]

[40]    Although **Slumber-Magic** is not directly on point, I find it instructive. I acknowledge that partial copyright may exist in some cases: J.S. McKeown, *Fox Canadian Law of Copyright and Industrial Designs*, 3rd ed. (Scarborough: Carswell, 2000) at 63. However, in the case at bar, the pleadings and the entire case were argued on the basis that it was the Plans as a whole which were the subject of copyright, not simply those design elements which the parties both claim to have authored. Further, it is the combination of these design elements which is subject to copyright and that combination exists in the Plans as a whole.

[41]    Accordingly, I find that the presumption at subsection 34(3)(a) applies to the Plans. I find further that Oasis has failed to rebut that presumption and, as a result, the Plans are subject to copyright protection. However, the question remains as to who owns that copyright interest.

## 2. Who owns the copyright interest?
a. <u>The Contract</u>
[42]    Oasis takes the position that the contract is determinative of the ownership of the copyright in the Plans. It submits that section 3 of the *Act* gives the owner the sole right to reproduce the work. As those are the rights that Haddon Design gave itself *via* the contract, it submits that Haddon Design owns the copyright.

[43]    Oasis also points out that the contract states that "it is the designer's right to retain his original work". As the *Act* excludes others from copying "works" which are required to be original, Oasis argues that these words constitute an agreement between Chancellor and Haddon Design that Haddon Design would retain the copyright in the Plans.

[44]    Haddon Design also submits that the contract is conclusive on this issue. It submits that the contract, reasonably interpreted, gives copyright in the Plans to Haddon Design. As Mr. Chan signed the contract Haddon Design argues that Chancellor is bound by its terms. Whether Mr. Chan read the documents it argues, is immaterial. In support of that proposition Haddon Design quotes Lord Justice Scrutton in L'Estrange v. Graucob [1934] 2 K.B. 394 at 403, as excerpted from S.M. Waddams, et al., Cases and Materials on Contracts (Tontonto: Emond Montgomery Publications Limited, 1994) at 454:

> In cases in which the contract is contained in a railway ticket or other unsigned document, it is necessary to prove that an alleged party was aware, or ought to have been aware of its terms and conditions. These cases have no application when the document has been signed. When a document containing contractual terms is signed, then, in the absence of fraud, or, I will add, misrepresentation, the party signing it is bound, and it is wholly immaterial whether he has read the document or not.

Page: 12

[45]     Chancellor submits that the document titled *Policy Re: Payment of Fees* does not contain any words which could be interpreted to transfer or assign a copyright from Chancellor to Haddon Design. Rather, it submits that the wording of the agreement simply restates the self evident proposition that if Haddon Design creates an "original work" it will be the owner of that work. This of course is what the *Act* provides for. In other words, Chancellor argues that, if copyright arises in favour of Chancellor, there is nothing in the agreement which would effectively assign it to Haddon Design.

[46]     Chancellor also argues in its reply brief that the design process which ensued following the execution of the agreement was not what the parties had anticipated. Specifically, it states that Haddon Design did not develop an "original" plan as was contemplated at the time that the contract was entered into. Rather, it contends that it was the Chans that authored the original design elements. As such, Chancellor submits that it is the party that is entitled to the copyright.

[47]     I agree with Haddon Design and Oasis that the contract is determinative of the issue and that it gives ownership of the copyright to Haddon Design.

[48]     The relevant portions of the document signed by Mr. Chan are reprinted below:

> NOTE: IT IS THE DESIGNERS RIGHT TO RETAIN HIS ORIGINAL WORK AND THEREFORE CHARGE A STOCK PLAN FEE EACH TIME A DESIGN IS BUILT MORE THAN ONCE.
> . . .

> This contact gives legal permission for this house plan to be built only once. A separate contract is required each time this plan is used for new construction.

> Please acknowledge your understanding of this policy by signing below.

> <u>"Lewis Chan"</u> [signature]

> POLICY RE: RELEASE OF ORIGINALS AND SIGNAGE

> It is a designer's right to retain all original work. This office will not release the original work.

[49]     The object of the construction of contractual terms is to discover the intention of the parties: H.G. Beale, ed., *Chitty on Contracts*, Vol. 1, 28th ed. (London: Sweet & Maxwell, 1999) at para. 12-042. The cardinal presumption is that the parties have intended what they have actually written with the result that the meaning of the document is to be sought in the document itself: *Chitty on Contracts, supra,* at para. 12-043. It is also clear that contracts are to be interpreted based on the ordinary meaning of the language used therein: *Chitty on Contracts, supra,* at para. 12-050.

Page: 13

[50]    The ordinary meaning of the language used in the above provisions clearly indicates that Haddon Design is to retain ownership in the designs and is to control who constructs homes based on the Plans. Section 3 of the *Act* gives the owner of a copyright the sole right to produce or reproduce the work or any substantial part thereof. Thus, as argued by Oasis and Haddon Design, the contractual provisions reprinted above effectively give Haddon Design ownership of the copyright in the Plans. There is no other reasonable interpretation of these provisions. On that basis I reject Chancellor's argument that the language in the contract is insufficient to transfer any ownership in the copyright that the Chans may have had in the Plans to Haddon Design or to acknowledge that Haddon Design is owner of the copyright.

[51]    I would also note, as will be discussed later, that there can be no copyright in ideas, only in their expression. There is nothing in the contract that detracts from that principle.

[52]    In addition to the contract itself, the blueprints state:

> ALL DRAWINGS AND SPECIFICATIONS ARE THE PROPERTY OF THE DESIGNER AND MAY NOT BE REPRODUCED WITHOUT WRITTEN PERMISSION FROM THE DESIGNER.

[53]    That notice is consistent with my interpretation of the contract.

[54]    Finally, I would note that Chancellor has not alleged fraud or any other grounds which would detract from the enforceability of the contract. The only other argument raised by Chancellor was its submission that, at the time that the contract was executed, it contemplated that Haddon Design would come up with an "original" plan. As noted, Chancellor submits that ultimately it was the Chans who came up with the  "original" Plan and, on that basis, it states that it is entitled to ownership of the copyright.

[55]    It is unclear what exactly Chancellor is arguing here. It may be alleging that the contract ought to be discharged either on the grounds of frustration or due to a breach of contract. This was not explained in the written briefs, nor were these arguments specifically raised during oral argument. In any event, the doctrine of frustration would not assist Chancellor in the case at bar as there was no event that occurred which could be considered "frustrating" in the sense that it rendered the contract impossible to perform or radically transformed the obligation thereunder. Nor, as will be seen, would a breach of contract argument assist, as I have found that Haddon was the author of the Plans.

[56]    Alternatively, Chancellor may simply be arguing that the Chans were the authors and, therefore, are entitled to ownership of the copyright. Such an argument, in my view, entirely ignores the contract. The contract clearly provides that Chancellor had the right to build the Plans only once. That provision alone is entirely inconsistent with Chancellor being entitled to retain any copyright interest in the plans which it may otherwise have had. Simply put, if Chancellor wanted the right  to build more homes based on the Plans and prevent others from doing so, it should have bargained for those rights and amended the contract accordingly.

Page: 14

2002 ABQB 500 (CanLII)

b. <u>Presumptions</u>

[57]    Had I not found that the contract was determinative of the issue, there are two presumptions which would bear upon the issue of ownership of the copyright. Specifically, sections 34(3)(b) and 34(4)(a). Those subsections state:

> 34 (3) In any action for infringement of copyright in any work in which the defendant puts in issue either the existence of the copyright or the title of the plaintiff thereto,
>                . . .
>
> (b) the author of the work shall, unless the contrary is proved, be presumed to be the owner of the copyright.
>
> 34 (4) Where any question referred to in subsection (3) is at issue, and no grant of the copyright or of an interest in the copyright, either by assignment or license, has been registered under this Act,
>
> (a) if a name purporting to be that of the author of the work is printed or otherwise indicated thereon in the usual manner, the person whose name is so printed or indicated shall, unless the contrary is proved, be presumed to be the author of the work;

[58]    Chancellor contends that, as it claims to be the author of the Plans, these two presumptions conflict. As a result, it suggests that it is left with the normal onus of proving its case on a balance of probabilities. Alternatively, Chancellor submits that subsection 34(4)(a) is rebuttable.

[59]    Chancellor takes the position that the question is whether the contested design elements were authored by the Chans or by Haddon. In this regard Chancellor submits that the unique design elements were the Chans ideas. It states that Haddon merely recorded those ideas and, as such, he acted as a scribe, which is insufficient to ground authorship. Finally, Chancellor submits that where the Chans' evidence differs from Haddon's, their evidence ought to be accepted.

[60]    Haddon Design and Oasis state that the *Act* presumes Haddon Design to be the author as each page of the Plans bears the name "John Haddon Design". Accordingly, they state that the onus falls upon Chancellor to rebut the presumption, which they submit it cannot do as Haddon is, in fact, the author of the Plans as he was the party that put the Plans to paper.

[61]    I agree with the submission of Haddon Design and Oasis that, as the name "John Haddon Design" is printed on each page of the Plans, section 34(4)(a) presumes that Haddon Design is the author. The issue then is whether Chancellor has rebutted this presumption.

2002 ABQB 500 (CanLII)

[62]    There was conflicting evidence regarding who, as between the Chans and Haddon, came up with the ideas for a number of the design elements at issue. There was little conflict, however, as to who put those ideas to paper. The evidence clearly disclosed that, but for the documents at Tab 11 which Mrs. Chan and Dobbyn drafted, Chancellor did not put any ideas to paper.

[63]    There can be no copyright in ideas, rather, it is the expression of ideas that attracts copyright: *John Maryon International Ltd.* **v.** *New Brunswick Telephone Co.* (1982), 141 D.L.R. (3d) 193 (N.B.C.A.); leave to appeal to S.C.C. refused (1982) 43 N.B.R. (2d) 468 and R.T. Hughes *et al.*, *Hughes on Copyright and Industrial Design*, looseleaf (Markham: Butterworths, 1984) at p. 341.

[64]    Haddon Design was responsible for drawing the Plans in their final form and for drawing the vast majority of the drafts which preceded them. Accordingly, even if one were to concede that the Chans came up with ideas for the various design elements, Chancellor would still not enjoy authorship in the Plans as it was Haddon Design that put those ideas to paper. As noted, the only ideas that were put to paper by Chancellor were those included in the draft that Mrs. Chan and Dobbyn created (Tab 11). However, that draft was traced from and was largely a reorganization of an earlier draft produced by Haddon Design. Furthermore, the draft prepared by Mrs. Chan and Dobbyn was not to scale, was two dimensional and was in very rudimentary form. It required the application of Haddon's skill and ability to make it a workable plan. In short, I agree with the submission of Haddon Design that the Chans' involvement in the Plans was essentially limited to suggesting certain design elements in a general way. It was then up to Haddon to implement and design those suggestions.

[65]    I agree with Chancellor's submission that where one simply acts as a scribe it is insufficient to establish authorship. As stated in *John Maryon International, supra*, at page 244:

> The term "author" is not defined in the *Act*, but reference was made to the statement in Fox, *The Canadian Law of Copyright*, 2nd ed., p. 239, that it is the person who actually writes, draws or composes a work. However, this idea must not be carried too far. The cases reveal that the person who "actually writes" must not be equated to a mere scribe or amanuenses: see *University of London Press Ltd. v. University Tutorial Press Ltd.*, [cite omitted]. On the other hand, a person who merely gives ideas to a person is not the author: see *Commercial Signs v. General Motors Products of Canada Ltd. et al.* [cite omitted].

[66]    Chancellor's argument, however, that Haddon simply recorded the ideas that the Chans allege that they came up with has no merit. Haddon was responsible for hundreds of decisions that resulted in the Plans, including: creating the basic structure of the home; determining the vast majority of the dimensions; designing and placing of most of the windows in the house; and designing the roof including the overhangs. In fact, even the implementation of the disputed design elements required Haddon to make a number of choices and ultimately to apply his skill as a designer. It simply cannot be said that Haddon was merely a draftsperson.

Page: 16

[67]    In summary, Haddon Design is presumed to be the author of the Plans (s.34(4)(a)). Chancellor is unable to rebut this presumption as it did not "express" any of the ideas that it takes credit for. Accordingly, Haddon Design is presumed to be the owner of the Plans (s.34(3)(b)). Thus, even if the contract did not dispose of the issue, as I have found that it does, I would not have found that Chancellor was the author or the owner of the copyright.

**3. If Chancellor owns the copyright, has Oasis infringed that copyright in any way?**

[68]    As I have found that Haddon Design owns the copyright in the Plans, I need not consider this issue.

**4. If there has been an infringement, is Chancellor entitled to a remedy against Oasis under the *Act*?**

[69]    Given my findings above, it is unnecessary for me to address this issue.

**5. Did Chancellor Commit a Breach of Contract and/or Copyright?**

[70]    I find that Chancellor did breach both the contract between itself and Haddon Design and Haddon Design's copyright in the Plans by building five additional houses based on the Plans. In terms of damages, Haddon Design is seeking its standard stock price of $800.00 for each time the Plans were used by Chancellor.

[71]    The contract provided that "a stock plan fee is charged each time a design is built more than once". I find this to be the appropriate calculation of damages and, accordingly, I order that Chancellor pay Haddon Design $4,000.

**COSTS**

[72]    Counsel may speak to costs within the next 90 days in the event that the parties are unable to agree.

HEARD on the 15th day of October 2001.
**DATED** at Calgary, Alberta this 21st day of May 2002.

_____
                                              **J.C.Q.B.A.**

Page: 17

ADDENDUM TO
REASONS FOR JUDGMENT
of the
HONOURABLE MR. JUSTICE R.P. FRASER

_____

APPEARANCES:

A.J. McConnell
     for the Plaintiff/Defendant by Counterclaim

R.J. Simpson
     for the Defendant Oasis Homes Ltd.

K.T. Lenz
     for John Haddon Design Ltd., Defendant/Plaintiff by Counterclaim

[1]    This is an Addendum to Reasons for Judgment which I issued May 21, 2002 following a trial which by agreement was restricted to issues of copyright and infringement of copyright.

[2]    In the Reasons of May 21st 2002, the Court held that the plans for a home which were the subject of the action (the "Plans") were subject to copyright protection and that the Defendant John Haddon Design Ltd. (the "Defendant Haddon") owned the copyright in the Plans. That determination effectively disposed of the claims of the Plaintiff Chancellor Management Inc. operating as Chancellor Homes (the "Plaintiff Chancellor") against the Defendant Oasis Homes Ltd. (the "Defendant Oasis") which were based on ownership by the Plaintiff Chancellor of the copyright in the Plans. The action is therefore dismissed as against the Defendant Oasis. For reasons which are set out below, the trial of the action against the Defendant Haddon is adjourned sine die.

[3]    The parties are unable to agree on costs incurred with respect to the proceedings taken to date and have applied for directions. The issues between the parties are the scale of costs to be used for their determination and the possible application to the costs of each Defendant of Rule 174 as a result of the service of an Offer of Judgment by each Defendant pursuant to Rule 169(1).

[4]    The action arose as a result of the Plaintiff Chancellor hiring the Defendant Haddon to design the Plans. The Plaintiff Chancellor claimed as against the Defendant Haddon authorship of a majority of unique features of the home and a copyright to the Plans on that basis. The Plaintiff Chancellor also claimed an injunction and damages based, among other things, on any profits earned by the Defendant Haddon as a result of alleged breaches of copyright.

2002 ABQB 500 (CanLII)

Page: 18

[5]     The action included a claim by the Plaintiff Chancellor against the Defendant Oasis for damages for breach of copyright. The Defendant Oasis was alleged to have built showhomes using the Plans in breach of the copyright owned by the Plaintiff Chancellor in respect of the Plans.

[6]     In its original Statement of Claim in its action the Plaintiff Chancellor alleged that it had suffered damages in an estimated amount of $450,000.00. Prior to the commencement of trial the Statement of Claim was amended to delete any reference to the quantum of damages incurred by the Plaintiff Chancellor. The result was that, contrary to Rule 606, the amount of money claimed by the Plaintiff Chancellor in the action in respect of damages was not stated. No objection was made during the trial to this omission. Pursuant to the agreement referred to above, no evidence was heard at trial with respect to damages incurred by Chancellor on profits improperly earned by either Defendant.

[7]     The Defendant Haddon Counterclaimed against the Plaintiff for an accounting of profits and damages for breach of copyright. As a result of this agreement referred to above, no evidence has been led with respect to the damages incurred by the Defendant (Plaintiff by Counterclaim) Haddon.

[8]     Reference was made in argument at the hearing about revenue and expense attributable to the homes built by each of the Defendants. The information was contained in correspondence and answers to undertakings given at the discoveries. The information was not put into evidence and would therefore not be considered as evidence for the purpose of establishing the possible amount of the Plaintiff's claims for damages. There was evidence however that the Plaintiff had earned profits of about $50,000.00 per home for the six homes that were built by it according to the Plans.

[9]     Apart from the claims for damages the primary claims in the action were for a declaration and an injunction. Those claims involved a detailed analysis of the basis of copyright of the Plans and the need for uniqueness of design and originality. The analysis resulted in a decision, contrary to the submission of the Plaintiff, that the Plans were subject to copyright and that the copyright for reasons of contract and statute were the property of the Defendant Haddon. The issues stated appear to be of public interest because of their relevance to the construction industry, particularly of home building.

[10]    The trial took about one week to try. All but one of the witnesses heard were called by the Plaintiff Chancellor.

[11]    Rule 605 provides that when relief other than for the payment of money is claimed, costs are to be taxed according to Column One of Schedule C, being the lowest scale on which costs are normally taxed pursuant to the Alberta Rules of Court. The Court however has the discretion to vary the scale of costs provided in Schedule C. Because of the complexity of the issues, the substantial amounts of profits apparently earned in the construction of the houses involved and the probability of public interest, particularly in the construction industry in the

Page: 19

issues involved, the Defendants are held to be entitled to a special award of costs. I will therefore direct below that costs be taxed according to a column of Schedule C of the Alberta Rules of Court other than Column One which would normally be applied.

[12]    With respect to the second issue, it should be noted that Rule 169(1) reads as follows:
169(1) At any time before the commencement of trial, a defendant may serve upon the plaintiff an offer of judgment specifying the terms upon which he is willing to settle a claim, or, where there is more than one, any of them.

Further, Rules 174(1) and Rule 174(1)1.1 provide in part:
174(1) Where a plaintiff does not
...
(b) with respect to an offer of judgment made under Rule 169, recover a judgment <u>greater than</u> the judgment offered therein,
the judge or the Court of Appeal shall, unless for special reason, award costs to the defendant for all steps in relation to that claim after the service of notice.

(1.1) When costs are payable to the defendant under subrule (1) and the action is dismissed entirely, those costs shall, unless for special reason, be double the amount of costs (excluding disbursements) the defendant would otherwise have recovered for all steps in relation to the defence after the service of the notice of ... the offer.
[Emphasis added]

[13]    Prior to the trial, each of the Defendants served an Offer of Judgment on the Plaintiff. Each Defendant now argues that the Plaintiff did not recover a judgment greater than the Judgment offered to it and is accordingly under Rule 174(1)1.1 entitled to double the amount of costs for steps taken in the action after service of the Offer of Judgment on it.

[14]    The offer of judgment served by the Defendant Oasis read as follows:
TAKE NOTICE that the Defendant, Oasis Homes Ltd., hereby offers to settle the Plaintiff's claim as against it on the following terms:
1. Oasis Homes Ltd. agrees to discontinue marketing for sale houses based upon the Oasis Homes' Buckingham design as of October 8th, 2001;
2. Oasis Homes Ltd. agrees to cease constructing houses based upon the Oasis Homes' Buckingham design, other than the house which is based upon the Oasis Homes Ltd. Buckingham design which Oasis Homes Ltd. has contracted to build for Puri in the Royal Oak subdivision located in the northwest of the City of Calgary;
3. The Plaintiff will consent to an Order dismissing the Plaintiff's claims as against Oasis Homes Ltd. for copyright infringement and any of those claims and remedies claimed in Court of Queen's Bench Action No. 9901-10407;
4. The Plaintiff will release Oasis Homes Ltd. from all claims the Plaintiff may have which in any way relate to Oasis Homes' marketing, sale, or construction of homes based on Oasis Homes' Buckingham design; and

Page: 20

5. The Plaintiff will pay Oasis Homes Ltd. seventy-five (75%) percent of Oasis Homes Ltd.'s taxable costs incurred in relation to the above referenced action calculated under Column 2 of Schedule "C" of the Rules of Court.

This Offer of Settlement is open for acceptance until the start of the trial of this action scheduled to commence at 10:00 a.m. October 8th, 2001.

AND TAKE NOTICE that this Offer of Judgment is made under Rule 169(1) of the Rules of Court.

The Offer of Judgment made by the Defendant Oasis was neither accepted nor withdrawn. The Defendant Oasis now asks for double costs on the basis of Rule 174(1)1.1. It must therefore be considered whether double costs should be awarded on the basis that the judgment recovered by it against the Plaintiff Chancellor is "greater" than the judgment which it offered to such party.

[15]    The result of the trial was that the Defendant Haddon has been held to be the owner of the copyright in the Plans. All of the claims of the Plaintiff Chancellor are dismissed as against both Defendants.

[16]    Dealing first with costs in respect of the claim against Oasis, it is fair to say that given the dismissal of the claims of the Plaintiff Chancellor for ownership of the copyright and claims based on ownership, the judgment is more favourable to Oasis than to Haddon. However, the question remains whether it is "greater" in the sense of being greater in number than the judgment that is described in the Offer of Judgment made by the Defendant Oasis. For assistance in answering this question, reference is made first to a dictionary definition. In the *Oxford International Dictionary of the English Language*, Leland Publishing Company, Ltd.,Toronto, 1957, "Greater" as an adjective is defined as the comparative of "great". "Great" in turn is defined as having a high position in a scale of measurement. (Opposite to small or little.) Logic would therefore require that objects being compared on a scale of measurement be compared on the basis of amounts or quantities. Support for this view is found in ***Ness v. Leveridge*** (1995), 34 Alta.L.R. (3d) 407 in which the Alberta Court of Appeal in discussing whether Section B benefits should be included or excluded from offer assessments, stated at 411:

> The cost sanction provided by R.174(1) arises where the "judgment" recovered at trial does not exceed the "judgment" offered in the Offer of Judgment. The two "judgments" must refer to amounts calculated in the same manner.

[17]    There appears to be no other Alberta case law which applies. However the issue was considered in ***Merrill Lynch Canada Inc. v. Cassina*** (1992) 15 C.P.C. (3d) 264 where the Ontario Court of Justice, General Division, was asked to determine whether an offer was more or less favourable than a judgment granted at trial. It held at 266:

> The proper test is to look at the offer compared with the amount recovered plus interest, plus costs up to the date of the offer.

2002 ABQB 500 (CanLII)

Page: 21

[18]    It must be acknowledged that the Alberta Civil Procedure Handbook 2002 by Stevenson & Côté, Juriliber, Edmonton refers in its discussion of Rule 174(1) to the situation in which a plaintiff at trial does not get a judgment "better than" the defendant's offer or payment in .... The use of the words "better than" may arguably be taken to support an analysis of the benefits of the judgment and the offer on the basis of value or attractiveness. Notwithstanding such an argument, the words used in the Rule are "greater than" which in my view invite a comparison on the basis of amounts or numbers instead of the alternative. The discussion in Stevenson & Côté does not in my view preclude this interpretation.

[19]    A contrary view was expressed in ***Arrotta v. AVVA Light Corp*** (1995), 36 Alta.L.R. (3d) 134 (Alta.Q.B.) in which Sullivan, J. had before him an action brought by a shareholder alleging oppression and he concluded that Rule 174 did apply to such a claim. At p.138, His Lordship said:

> On the 28th day of July 1995 the plaintiffs served on the defendant's counsel an Offer to Settle. I am of the view that Rule 174(2) does apply and with respect disagree with the ruling in ***McCardell Estate v. Cushman*** where the learned trial judge appearing to restrict the Rules states, at ... [page 27] (referring to the same rules):
>
> "Reading these Rules together makes it clear that they are concerned with claims for sums of money."
>
> This vehicle, the offer to settle, provides an opportunity to litigants to avail themselves of the ability to compromise using Court process and this process must be expanded, not restricted, so that every reasonable opportunity prior to litigation in the Court and prior to trial be explored. This is an important tool of negotiation in settlement. It is my view that the Court should construe this Rule as broadly as possible.

The Court of Appeal (1995) 36 Alta.L.R. (3d) 139 overturned Sullivan, J.'s order, however it did not comment on whether Rule 174 should apply to a situation such as the one under discussion.

[20]    I respond to Justice Sullivan's broad interpretation of Rule 174 by referring to the following comment of MacLean, J. in ***Laframboise v. Billett*** (1991) 81 Alta.L.R. (2d) 285 (Alta.Q.B.):

> The consequences of the rules as to costs contained in Pt.12 of the Rules of Court are punitive and therefore demand a very high degree of certainty and exactness.

That statement was quoted by Brooker, J. of this Court in ***Madge v. Meyer*** (2000) 77 Alta.L.R.(3d) 391 with the comment that the offer there under consideration "did not have any real certainty or exactness". I would, with respect, apply the same principle to the proposition that Rule 174 should be interpreted as broadly as possible.

2002 ABQB 500 (CanLII)

Page: 22

[21]    Support for the foregoing view is also found in the judgment in ***McCardell Estate v. Cushman*** (1990) 104 A.R. 23 (Alta Q.B.). as noted above, in which the late D.C. McDonald, J. (as he then was) held that Rule 174 applied only to claims for money. At p.27 His Lordship said:

> ... Rules 169 and 170 and 174 speak of settling a claim (not compromise), and of the plaintiff (in the case of Rules 169 and 174(1)(b) not recovering "a sum greater than the payment offered", and (in the case of Rules 170 and 174(2)) of a plaintiff recovering "a sum equal to or greater than the amount of his offer". Reading these Rules together makes it clear that they are concerned with claims for sums of money.

[22]    In considering whether the word "greater" should be applied to describe the terms of the judgment as distinct from those of the offer, it is relevant to note that the objects of the comparison are a declaration of copyright and the remedies of damages and an injunction on the one hand, and a dismissal of the claims on the other. With the possible exception of the claim for damages, no numerical value for purposes of comparison attaches to the copyright or the injunction which could be compared to a zero value of the dismissal.

[23]    Having regard to the reasons set out, I am of the view that the judgment recovered by the Defendant Oasis cannot be held to be greater than the judgment offered by it. This view is based partly on the language used in Rule 174(1)(a) and partly on the decision in the ***Ness*** case referred to above. This being the situation, no costs may be awarded under Rule 174(1)(b), or under Rule 174(1)1.1. The reason for the latter is that the Rule applies only when costs are payable under Rule 174(1).

[24]    Application of the foregoing opinion to the circumstances under consideration means that the Defendant Oasis, having been successful at trial, is left without a right to claim any costs under Rule 174. In that event it is entitled under Rule 601(3) as a successful party to the costs of the action which I direct  shall be taxed under Column 3 of Schedule C. Its entitlement to costs on this basis exists because in my view the matter must be approached as if there had been no offer of judgment which would bring into operation Rule 174(1)(b).

[25]    Support for the view expressed in the latter paragraph is found in the decision in ***McCardell Estate v. Cushman (supra)***, in the third last paragraph of the judgment. That decision related to a matter in which a party claimed a right to benefit from Rule 174 in respect of two offers of settlement which had been made and subsequently withdrawn. The Court held that the offers should be ignored because they had been withdrawn. The matter would therefore have to be approached as if there had never been such an offer. Applying the same reasoning to the entitlement of the Defendant Oasis to costs in the circumstances described above, Rule 174(1)(b) has no application to the claim for costs of the Defendant Oasis. Its entitlement to costs must therefore be approached as if there had never been an Offer of Judgment and a normal approach under Rule 601(3) would be applied.

Page: 23

[26]    The Defendant Haddon in its capacity of Plaintiff by Counterclaim also served an Offer of Judgment on the Plaintiff Chancellor. The Offer included conditions which in substance were to the following effect:

> (a) All parties would consent to an Order that the Plaintiff Chancellor has the copyright, that the Defendant Oasis is granted a permanent licence with respect to the Plans and the Defendant Oasis would release the Plans to the Plaintiff Chancellor.
> (b) The Plaintiff Chancellor would pay the Defendant Haddon one half of its taxable costs to the date of acceptance of the Offer and Oasis all of its taxable costs and disbursements to the date of the Offer.
> (c) The parties would otherwise release each other from the claims arising in the action.

The Defendant and Plaintiff by Counterclaim also advances a claim for double costs under Rule 174(1)1.1.

[27]    The Offer of Judgment of the Defendant Haddon was not accepted. As noted above, the claims of the Plaintiff Chancellor against the Defendant Haddon are all dismissed. However the Judgment in the Counterclaim against the Plaintiff Chancellor has not been and cannot be dealt with in this Addendum because of the agreement made at trial and the lack of any evidence of the quantum of profits of Chancellor or otherwise of the damages incurred by it. A decision as to any award of costs to the Defendant Haddon should await finalization of these matters. The application of the Defendant Haddon for an award of costs to it with respect to the action is accordingly adjourned *sine die.*

[28]    Counsel may speak to me with respect to any other direction required concerning costs or the continuation of the trial, or to the case management judge regarding the latter point.

[29]    The other cases cited to me by counsel include the following: ***Steve's Contracting Ltd. v. Williams***, [1997] A.J. No.911 (Alta.Q.B.); ***Campbell v. Moxness***, [1975] 2 W.W.R. 64 (Alta C.A.); and ***Pharand Ski Corporation v. R. in Right of Alberta*** (1991) 83 Alta.L.R. (2d) 152 (Alta Q.B.

HEARD on the 15th day of October, 2001.
**DATED** at Calgary, Alberta this 5th day of July, 2002.

_____
                                                                        **J.C.Q.B.A.**

Page: 24

An errata has been issued for the above judgment as follows:

ERRATA OF THE REASONS FOR JUDGMENT
of the HONOURABLE MR. JUSTICE R.P. FRASER

1.      In para.57, third line:
        "33(4)(a)" should read "34(4)(a)".

2.      In para.57, fourth block of typing:
        "subsection (2)" should read "subsection (3)".

3.      In para 64, second line:
        the word "proceeded" should read "preceded".

        Please amend your copy of the judgment.

Page: 25

2002 ABQB 500 (CanLII)

_____

SECOND ADDENDUM TO
REASONS FOR JUDGMENT
of the
HONOURABLE MR. JUSTICE R.P. FRASER

[1]     This is the second Addendum to the Reasons for Judgment which I issued May 21, 2000 following a trial concerning copyright and infringement of copyright. The first Addendum concerned the award of costs as between the Plaintiff Chancellor Management Inc. operating as Chancellor Homes ("the Plaintiff Chancellor") and the Defendant Oasis Homes Ltd. ("the Defendant Oasis"). This Addendum deals with the application of the second Defendant, John Haddon Design Ltd. operating as John Haddon Design ("the Defendant Haddon") for directions with respect to the costs of the action.

[2]     As discussed with respect to the previous application by Oasis, the issues are the scale of costs to be used and the possible application of Rule 174 which would double the fees involved.

[3]     The Plaintiff Chancellor claimed damages of an unstated amount against each of the Defendants Haddon and Oasis for infringement of copyright owned by the Plaintiff Chancellor. Those and related claims were all dismissed on the basis that the Defendant Haddon was held to own the copyright at issue.

[4]     I directed with respect to Oasis in the first Addendum that costs be taxed by Oasis against Chancellor under Column 3 of Schedule C. Column 3 was used instead of Column 1 which would without my direction have applied under Rule 605 because the relief claimed in the action was for remedies other than money. Column 3 increased the fees involved. In general terms the increase was directed because of the complexity of issues, the substantial profits apparently earned by the Defendant Oasis in the construction of the houses for which the plans were used, and the probability of public interest in the issues involved.

[5]     The first and third of the considerations applying to the increase in costs granted to Oasis apply with respect to the claim for costs by the Defendant Haddon against the Plaintiff Chancellor. However the second consideration relating to the profits earned by the Defendant Haddon for the use of the plans would apply to a lesser extent because of the difference in the amounts of profit which might arguably have been earned by the Defendant Haddon from the use of the plan and for which it might have been accountable to the Plaintiff Chancellor in damages if it, the Defendant Haddon, had lost at trial. Haddon was selling copies of the plan at a price of $1,000.00 each. The profits which might be available to it from use of the plan would have been much smaller than the profits potentially available from construction of five or six houses according to the plan (which Chancellor estimates averaged about $50,000.00 per house). This is a valid argument. Applying it to the award of costs to Haddon as a winning

Page: 26

party, I direct that costs of the action payable to Defendant Haddon be taxed on Column 2 instead of Column 1.

[6]     The second issue relates to the application of Rule 174 to the costs claimed by the Defendant Haddon as a winning party in the action. As noted in the first Addendum to the judgment, the Defendant Haddon in its capacity of Plaintiff-by-Counterclaim served an Offer of Judgment on the Plaintiff Chancellor. The offer included conditions which in substance were to the following effect:

> a. All parties would consent to an Order that the Plaintiff Chancellor has the copyright, that the Defendant Oasis is granted a permanent licence with respect to the Plans and the Defendant Oasis would release the Plans to the Plaintiff Chancellor.
> b. The Plaintiff Chancellor would pay the Defendant Haddon one half of its taxable costs to the date of acceptance of the Offer and Oasis all of its taxable costs and disbursements to the date of the Offer.
> c. The parties would otherwise release each other from the claims arising in the action.

[7]     The result of the trial was that the claims of the Plaintiff Chancellor were, as noted above, dismissed entirely as against the Defendant Haddon.

[8]     Rule 174(1) provides in part as follows:

> 174(1) Where a plaintiff does not
> ...
> (b) with respect to an offer of judgment made under Rule 169, recover a judgment greater than the judgment offered therein,
>
> the judge ... shall, unless for special reason, award costs to the defendant for all steps in relation to that claim after the service of notice.

The application of Rule 174(1) would therefore direct the award of costs to the Defendant Haddon for all steps in relation to those claims after service of notice of the Offer. No argument is made that special reasons exist why costs should not be awarded to the Defendant Haddon. Subject to Rule 174(1.1), costs would therefore be awarded to the Defendant Haddon pursuant to Rule 174(1).

[9]     The Defendant Haddon also appears to be entitled to double costs pursuant to Rule 174(1.1). It reads as follows:

> When costs are payable to the defendant under subrule (1) and the action is dismissed entirely, those costs shall, unless for special reason, be double the amount of costs (excluding disbursements) the defendant would otherwise have recovered for all steps in relation to the defence after the service of the notice of payment or the offer.

Page: 27

As I have noted, the action was dismissed entirely as against the Defendant Haddon. Costs should therefore be awarded to the Defendant Haddon under Rule 174(1). Accordingly the Defendant Haddon is entitled to and is awarded double costs under Rule 174(1.1).

[10]    The Defendant Haddon also applies for double costs under Rule 174(2). It reads as follows:

> (2) Where a plaintiff, with respect to the matters specified by him in his offer to settle under Rule 170, recovers a judgment equal to or greater than the judgment offered, the judge or the Court of Appeal shall, unless for special reason, award the plaintiff double the amount of costs (excluding disbursements) he would otherwise have recovered for all steps in relation to the claim after the service of the offer.

[11]    The application under Rule 174(2) is also made on the basis that Haddon as Plaintiff by Counterclaim recovered a judgment for $4,000 against the Plaintiff Chancellor. Given this result, the Defendant Haddon argues that it recovered a judgment against the Plaintiff Chancellor greater than the judgment Haddon had offered which provided for no monetary recovery. While this argument appears to be valid, its acceptance in view of the application of Rule 174(1) above would mean that the Defendant Haddon would be entitled to have its fees doubled twice. I would treat this as a special reason why double costs should not under the circumstances be awarded under Rule 174(2).

[12]    There is an additional reason why this should not be done. The offer of settlement included provisions that the Defendant Oasis would be granted a permanent licence with respect to the Plans and that the Defendant Oasis would release the Plans to the Plaintiff Chancellor. Those provisions were not severable from the financial provision of the Offer. The judgment did not include the provisions about the licence and the Plans. Therefore the Defendant Haddon could not be said to have recovered a judgment which treats the provisions about the licence and the Plans as financial terms which bettered the terms of the Offer. (Apart from the fact that the provisions about the licence and Plans could not be severed, they did not refer to amounts. They could not therefore be used to satisfy the test imposed by Rule 174(2). See Paragraphs 16 to 23 of the (first) Addendum to this judgment.) Rule 174(2) therefore does not apply and the Defendant Haddon is not entitled to double costs under this Rule.

[13]    No costs are awarded in respect of the application by the Defendant Haddon for direction concerning costs. This is because success was mixed.

HEARD on the 18th day of December, 2002.
**DATED** at Calgary, Alberta this 17th day of January, 2003.

_____
                                          **J.C.Q.B.A.**

2002 ABQB 500 (CanLII)

Page: 28

2002 ABQB 500 (CanLII)