# EXHIBIT M

**Geoffrey Saldanha, Leueen Saldanha and Dominic Thivy**    *Appellants*

*v.*

**Frederick H. Beals III and Patricia A. Beals**    *Respondents*

INDEXED AS: BEALS *v.* SALDANHA

**Neutral citation: 2003 SCC 72.**

File No.: 28829.

2003: February 20; 2003: December 18.

Present: McLachlin C.J. and Gonthier, Iacobucci, Major, Bastarache, Binnie, Arbour, LeBel and Deschamps JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR ONTARIO

*Conflict of laws — Foreign judgments — Enforcement — Action brought in Florida court over sale of Florida land valued at US$8,000 — Florida court entering default judgment against defendants resident in Ontario — Jury subsequently awarding US$210,000 in compensatory damages and US$50,000 in punitive damages — Defendants not properly defending action according to Florida law and not moving to have default judgment set aside or appealing jury award for damages — Whether "real and substantial connection" test for enforcing interprovincial judgments should be extended to foreign judgments — Whether defence of fraud, public policy or natural justice established so that foreign judgment should not be enforced by Canadian courts — Whether enforcing foreign judgment constitutes violation of s. 7 of Canadian Charter of Rights and Freedoms.*

*Constitutional law — Charter of Rights — Fundamental justice — Whether s. 7 of Canadian Charter of Rights and Freedoms can shield a Canadian defendant from enforcement of foreign judgment.*

*Judgments and orders — Foreign judgments — Enforcement — Rules relating to recognition and*

**Geoffrey Saldanha, Leueen Saldanha et Dominic Thivy**    *Appelants*

*c.*

**Frederick H. Beals III et Patricia A. Beals**    *Intimés*

RÉPERTORIÉ : BEALS *c.* SALDANHA

**Référence neutre : 2003 CSC 72.**

Nº du greffe : 28829.

2003 : 20 février; 2003 : 18 décembre.

Présents : La juge en chef McLachlin et les juges Gonthier, Iacobucci, Major, Bastarache, Binnie, Arbour, LeBel et Deschamps.

EN APPEL DE LA COUR D'APPEL DE L'ONTARIO

*Droit international privé — Jugements étrangers — Exécution — Action intentée devant un tribunal de la Floride relativement à une vente de terrain pour la somme de 8 000 $US — Tribunal de la Floride rendant un jugement par défaut contre des défendeurs résidant en Ontario — Jury accordant par la suite les sommes de 210 000 $US à titre de dommages-intérêts compensatoires et de 50 000 $US à titre de dommages-intérêts punitifs — Défaut des défendeurs de contester l'action correctement selon la loi de la Floride et de chercher à faire annuler le jugement par défaut ou de porter en appel l'attribution de dommages-intérêts par le jury — Le critère du « lien réel et substantiel », applicable à l'exécution des jugements d'une autre province, devrait-il également s'appliquer aux jugements étrangers? — A-t-on établi que le moyen de défense fondé sur la fraude, l'ordre public ou la justice naturelle s'applique de manière à empêcher les tribunaux canadiens d'exécuter le jugement étranger? — L'exécution du jugement étranger viole-t-elle l'art. 7 de la Charte canadienne des droits et libertés?*

*Droit constitutionnel — Charte des droits — Justice fondamentale — L'article 7 de la Charte canadienne des droits et libertés peut-il protéger un défendeur canadien contre l'exécution d'un jugement étranger?*

*Jugements et ordonnances — Jugements étrangers— Exécution — Règles relatives à la reconnaissance*

*enforcement of foreign judgments by Canadian courts — Nature and scope of defences available to judgment debtor.*

The appellants, residents of Ontario, sold a vacant lot situated in Florida to the respondents. A dispute arose as a result of that transaction and in 1986 the respondents sued the appellants and two other defendants in Florida. A defence was filed but the appellants chose not to defend any of the subsequent amendments to the action. Pursuant to Florida law, the failure to defend the amendments had the effect of not defending the action. The appellants were subsequently noted in default and were served with notice of a jury trial to establish damages. They did not respond to the notice nor did they attend the trial. The jury awarded the respondents US$210,000 in compensatory damages and US$50,000 in punitive damages. Upon receipt of the notice of the monetary judgment against them, the appellants sought legal advice. They were advised by an Ontario lawyer that the foreign judgment could not be enforced in Ontario. Relying on this advice, the appellants took no steps to have the judgment set aside or to appeal the judgment in Florida. The damages were not paid and an action was started in Ontario to enforce the Florida judgment. By the time of the hearing in 1998, the foreign judgment with interest had grown to approximately C$800,000. The trial judge dismissed the action for enforcement primarily on the ground that there had been fraud in relation to the assessment of damages. The Court of Appeal allowed the respondents' appeal.

*Held* (Iacobucci, Binnie and LeBel JJ. dissenting): The appeal should be dismissed. The judgment of the Florida court should be enforced.

*Per* McLachlin C.J. and Gonthier, Major, Bastarache, Arbour and Deschamps JJ.: International comity and the prevalence of international cross-border transactions and movement call for a modernization of private international law. Subject to the legislatures adopting a different approach, the "real and substantial connection" test, which has until now only been applied to interprovincial judgments, should apply equally to the recognition and enforcement of foreign judgments. The test requires that a significant connection exist between the cause of action and the foreign court. Here, the "real and substantial connection" test is made out. The appellants entered into a property transaction in Florida when they bought and sold land. As such, there

*et à l'exécution d'un jugement étranger par les tribunaux canadiens — Nature et portée des moyens de défense dont dispose le débiteur judiciaire.*

Les appelants, résidants ontariens, ont vendu aux intimés un terrain vague situé en Floride. Cette opération a engendré un différend et, en 1986, les intimés ont engagé, en Floride, des poursuites contre les appelants et deux autres défendeurs. Les appelants ont produit une défense, mais ils ont choisi de ne pas répondre à aucune des modifications subséquemment apportées à cette action. Selon la loi de la Floride, cette omission revenait à ne pas contester l'action. Le défaut des appelants a été, par la suite, constaté et ceux-ci ont reçu signification d'un avis les informant qu'un procès devant jury serait tenu dans le but d'établir le montant des dommages-intérêts. Ils n'ont ni répondu à cet avis ni assisté au procès. Le jury a accordé aux intimés les sommes de 210 000 $US à titre de dommages-intérêts compensatoires et de 50 000 $US à titre de dommages-intérêts punitifs. Les appelants ont sollicité des conseils juridiques aussitôt qu'ils furent avisés du montant qu'ils étaient condamnés à payer. Ils se sont fait dire par un avocat ontarien que ce jugement étranger était inexécutoire en Ontario. Forts de ce conseil, les appelants n'ont entrepris aucune démarche visant à faire annuler ce jugement ou à le porter en appel en Floride. Les dommages-intérêts n'ont pas été payés et une action en exécution du jugement rendu en Floride a été intentée en Ontario. Au moment de l'audition, en 1998, les dommages-intérêts accordés par le jugement étranger, et les intérêts accumulés, totalisaient environ 800 000 $CAN. Le juge de première instance a rejeté l'action en exécution surtout pour cause de fraude dans l'évaluation des dommages-intérêts. La Cour d'appel a accueilli l'appel des intimés.

*Arrêt* (les juges Iacobucci, Binnie et LeBel sont dissidents) : Le pourvoi est rejeté. Le jugement du tribunal de la Floride doit être exécuté.

*La* juge en chef McLachlin et les juges Gonthier, Major, Bastarache, Arbour et Deschamps : La courtoisie internationale et la prédominance de la circulation et des opérations transfrontalières internationales commandent une modernisation du droit international privé. À moins que les législatures n'adoptent des lois prescrivant une approche différente, le critère du « lien réel et substantiel », jusqu'à maintenant limité aux jugements d'une autre province, devrait également s'appliquer à la reconnaissance et à l'exécution des jugements étrangers. Ce critère requiert l'existence d'un lien important entre la cause d'action et le tribunal étranger. En l'espèce, le critère du « lien réel et substantiel » est respecté. Les appelants ont conclu une opération immobilière en

exists both a real and substantial connection between the Florida jurisdiction, the subject matter of the action and the defendants. Since the Florida court properly took jurisdiction, its judgment must be recognized and enforced by a domestic court provided that no defences bar its enforcement.

While fraud going to jurisdiction can always be raised before a domestic court to challenge the judgment, the merits of a foreign judgment can be challenged for fraud only where the allegations are new and not the subject of prior adjudication. Where material facts not previously discoverable arise that potentially challenge the evidence that was before the foreign court, the domestic court can decline recognition of the judgment. The defendant has the burden of demonstrating that the facts sought to be raised could not have been discovered by the exercise of due diligence prior to the obtaining of the foreign judgment. Here, the defence of fraud is not made out. The appellants have not claimed that there was evidence of fraud that they could not have discovered had they defended the Florida action. In the absence of such evidence, the trial judge erred in concluding that there was fraud. Although the amount of damages awarded may seem disproportionate, it was a palpable and overriding error for the trial judge to conclude on the dollar amount of the judgment alone that the Florida jury must have been misled.

The defence of natural justice is restricted to the form of the foreign procedure and to due process, and does not relate to the merits of the case. If that procedure, while valid there, is not in accordance with Canada's concept of natural justice, the foreign judgment will be rejected. The defendant carries the burden of proof. In the circumstances of this case, the defence does not arise. The appellants failed to raise any reasonable apprehension of unfairness. They were fully informed about the Florida action, were advised of the case to meet and were granted a fair opportunity to do so. They did not defend the action. Once they received notice of the amount of the judgment, the appellants obviously had precise notice of the extent of their financial exposure. Their failure to move to set aside or appeal the Florida judgment when confronted with the size of the award of damages was not due to a lack of notice but due to their reliance upon negligent legal advice. That

Floride quand ils ont acheté et vendu le terrain. Il existe donc un lien tant réel que substantiel entre le ressort de la Floride, l'objet de l'action et les défendeurs. Vu que le tribunal de la Floride a exercé correctement sa compétence, un tribunal national se doit de reconnaître et d'exécuter le jugement qu'il a rendu, pourvu qu'aucun moyen de défense ne vienne en empêcher l'exécution.

Tandis que la fraude touchant la compétence peut toujours être invoquée devant un tribunal national pour attaquer la validité d'un jugement, la fraude ne peut être invoquée pour contester le bien-fondé d'un jugement étranger qu'en présence d'allégations nouvelles qui n'ont pas déjà été examinées et tranchées. Le tribunal national peut refuser de reconnaître le jugement si on lui soumet des faits substantiels impossibles à découvrir antérieurement et susceptibles de mettre en doute la preuve dont le tribunal étranger était saisi. Pour pouvoir invoquer le moyen de défense fondé sur la fraude, le défendeur doit démontrer qu'il n'était pas possible, en faisant montre de diligence raisonnable, de découvrir, avant le prononcé du jugement étranger, les faits maintenant invoqués. Dans la présente affaire, le moyen de défense fondé sur la fraude ne peut pas être invoqué. Les appelants n'ont pas allégué qu'il existait une preuve de fraude qu'ils n'auraient pas pu découvrir s'ils avaient contesté l'action intentée en Floride. En l'absence d'une telle preuve, le juge de première instance a commis une erreur en concluant à l'existence d'une fraude. Bien que le montant des dommages-intérêts accordés puisse paraître démesuré, il reste que le juge de première instance a commis une erreur manifeste et dominante en déduisant, du seul montant accordé par le jugement, que le jury de la Floride avait été induit en erreur.

Le moyen de défense fondé sur la justice naturelle est limité à la forme de la procédure étrangère et à l'application régulière de la loi, et n'a rien à voir avec le bien-fondé de l'affaire. L'exécution du jugement sera refusée dans le cas où, si valide qu'elle soit à l'étranger, la procédure suivie pour le rendre n'est pas conforme à la notion de justice naturelle canadienne. Le fardeau de la preuve incombe au défendeur. En l'espèce, le moyen de défense fondé sur la justice naturelle ne peut pas être invoqué. Les appelants n'ont suscité aucune crainte raisonnable d'injustice. Ils ont été très bien informés de l'action intentée en Floride; ils ont été avisés de la preuve à réfuter et ont eu une possibilité raisonnable de la réfuter. Ils n'ont pas contesté l'action. Il est évident que, lorsqu'ils ont reçu avis du montant accordé par le jugement, les appelants ont alors connu exactement l'ampleur du risque financier auquel ils étaient exposés. Leur défaut de chercher à faire annuler ou de porter en

negligence cannot be a bar to the enforcement of the respondents' judgment.

The public policy defence prevents the enforcement of a foreign judgment which is contrary to the Canadian concept of justice, and turns on whether a foreign law is contrary to our view of basic morality. The award of damages by the Florida jury does not violate our principles of morality such that enforcement of the monetary judgment would shock the conscience of the reasonable Canadian. The sums involved, although they have grown large, are not by themselves a basis to refuse enforcement of the foreign judgment in Canada. The public policy defence is not meant to bar enforcement of a judgment rendered by a foreign court with a real and substantial connection to the cause of action for the sole reason that the claim in that foreign jurisdiction would not yield comparable damages in Canada.

Finally, the recognition and enforcement of the Florida judgment by a Canadian court would not constitute a violation of s. 7 of the *Canadian Charter of Rights and Freedoms*. Given that s. 7 does not shield a Canadian resident from the financial effects of the enforcement of a judgment rendered by a Canadian court, it should not shield a Canadian defendant from the enforcement of a foreign judgment.

*Per* Iacobucci and Binnie JJ. (dissenting): The "real and substantial connection" test provides an appropriate conceptual basis for the enforcement of final judgments obtained in foreign jurisdictions. While there is no doubt the Florida courts had jurisdiction over the dispute since the land was located in that jurisdiction, the question is whether the appellants in this proceeding were sufficiently informed of the case against them to allow them to determine, in a reasonable way, whether to participate in the Florida action, or to let it go by default. In this case, the appellants come within the traditional limits of the natural justice defence and the Ontario courts ought not to give effect to the Florida judgment.

The suggestion that the appellants are the authors of their own misfortune on the basis that if they had hired

appel le jugement obtenu en Floride, face à l'importance du montant des dommages-intérêts accordés, est dû non pas à l'absence d'avis, mais plutôt au fait qu'ils ont suivi les conseils erronés de leur avocat. Ce défaut ne saurait faire obstacle à l'exécution du jugement obtenu par les intimés.

Le moyen de défense fondé sur l'ordre public empêche l'exécution d'un jugement étranger contraire à la notion de justice canadienne et oblige à déterminer si une loi étrangère est contraire à nos valeurs morales fondamentales. Le montant des dommages-intérêts accordés par le jury de la Floride ne fait pas entorse à nos principes au point que l'exécution du jugement l'accordant choquerait la conscience des Canadiens et des Canadiennes raisonnables. Malgré l'ampleur qu'elles ont prise, les sommes en question ne justifient pas, à elles seules, un refus d'exécuter le jugement étranger au Canada. Le moyen de défense fondé sur l'ordre public n'est pas destiné à empêcher l'exécution du jugement d'un tribunal étranger ayant un lien réel et substantiel avec la cause d'action, pour le seul motif que la demande présentée dans ce ressort étranger ne donnerait pas lieu à des dommages-intérêts comparables au Canada.

Enfin, la reconnaissance et l'exécution, par un tribunal canadien, du jugement rendu en Floride ne constituerait pas une violation de l'art. 7 de la *Charte canadienne des droits et libertés*. Vu que l'art. 7 ne protège pas un résidant canadien contre les conséquences financières de l'exécution d'un jugement rendu par un tribunal canadien, il ne doit pas non plus protéger un défendeur canadien contre l'exécution d'un jugement étranger.

*Les* juges Iacobucci et Binnie (dissidents) : Le critère du « lien réel et substantiel » fournit un fondement conceptuel approprié pour exécuter les jugements définitifs obtenus dans des ressorts étrangers. Bien qu'il ne fasse aucun doute que les tribunaux de la Floride étaient compétents pour régler le différend, vu que le terrain était situé dans ce ressort, il faut se demander si l'avis que les appelants en l'espèce ont reçu au sujet du risque auquel ils étaient exposés suffisait pour qu'ils soient en mesure de décider raisonnablement s'ils devaient participer à l'action intentée en Floride ou laisser le tribunal rendre jugement par défaut. Dans la présente affaire, les appelants satisfont aux conditions traditionnelles requises pour pouvoir invoquer la justice naturelle comme moyen de défense, et les tribunaux ontariens doivent s'abstenir de mettre à exécution le jugement de la Floride.

On ne saurait accepter que les appelants sont les artisans de leur malheur en ce sens que l'embauche

BEALS *v.* SALDANHA

a Florida lawyer they would have found out about subsequent developments in the action cannot be accepted. The appellants decided not to defend the case set out against them in the complaint. That case was subsequently transformed. They never had the opportunity to put their minds to the transformed case because they were never told about it.

To make an informed decision, they should have been told in general terms of the case they had to meet on liability and been given an indication of the jeopardy they faced in terms of damages. The respondents' complaint did not adequately convey to the appellants the importance of the decision that would eventually be made in the Florida court.

Cumulatively, the events demonstrate an unfair procedure which in this particular case failed to meet the standards of natural justice. Nowhere was it brought to the appellants' attention that, under the Florida *Rules of Civil Procedure*, they were required to refile their defence every time the respondents amended their complaint against other defendants. In terms of procedural fairness, the appellants were entitled to assume that in the absence of any new allegations against them there was no need to refile a defence that had already been filed in the same action. A Canadian resident is not presumed to know the law of another jurisdiction. As the basis of the respondents' judgment is default of pleading, this lack of notification goes to the heart of the present appeal.

Furthermore, a party must be made aware of the potential jeopardy faced. The appellants received no notice of a 1987 court order striking out the claim for punitive damages against the other defendants — the realtor and the title insurers — on grounds applicable, had they known about it, to the appellants. They were also not told, after being noted in default and before the jury trial, that the respondents had made a deal with the realtor to delete claims against the realtor for treble damages, punitive damages and statutory violations (though these claims were continued on almost identical facts against the appellants). Subsequently, the respondents settled with the realtor and with the title insurers, leaving the appellants as the sole target at the damages trial. They were not told about this. Nor were the appellants served with the court order for mandatory mediation which provided that all parties were required to participate or, as required by the Florida rules, with notice of the experts the respondents proposed to call at the damages assessment. Lastly, the respondents' complaint did not indicate that they were claiming

d'un avocat en Floride leur aurait permis de prendre connaissance de l'évolution subséquente de l'action. Les appelants ont décidé de ne pas contester la preuve déposée contre eux dans la plainte. Cette preuve a été, par la suite, modifiée. Les appelants n'ont jamais eu la possibilité de prendre connaissance de la nouvelle preuve parce qu'on ne leur a jamais fait part de son existence.

Pour qu'ils soient en mesure de prendre une décision éclairée, on aurait dû les informer de la preuve générale qu'ils devaient réfuter et leur faire part des dommages-intérêts auxquels ils risquaient d'être condamnés. La plainte des intimés ne permettait pas aux appelants de saisir la gravité de la décision que pourrait rendre le tribunal de la Floride.

Tout bien considéré, ces événements témoignent d'une procédure inéquitable qui, en l'espèce, ne respectait pas les règles de justice naturelle. Les appelants n'ont jamais été informés que les *Rules of Civil Procedure* de la Floride les obligeaient à déposer de nouveau leur défense chaque fois que les intimés modifiaient leur plainte contre les autres défendeurs. Sur le plan de l'équité procédurale, les appelants étaient en droit de supposer qu'en l'absence de nouvelles allégations contre eux ils n'avaient pas à déposer de nouveau une défense déjà produite en réponse à la même action. Un résidant canadien n'est pas présumé connaître la loi applicable dans un autre ressort. Comme le jugement obtenu par les intimés repose sur le défaut de produire un acte de procédure, cette absence d'avis est cruciale en l'espèce.

En outre, une partie doit être informée du risque auquel elle est exposée. Les appelants n'ont pas été avisés de l'ordonnance dans laquelle le tribunal a annulé, en 1987, la demande de dommages-intérêts punitifs présentée contre les autres défendeurs — l'agent immobilier et la société d'assurance de titres de propriété — pour des raisons qui auraient été applicables aux appelants, s'ils les avaient connues. Ils n'ont pas non plus été informés, après la constatation de leur défaut mais avant le procès devant jury, que les intimés et l'agent immobilier avaient convenu de supprimer les demandes de dommages-intérêts triples, de dommages-intérêts punitifs et d'indemnité pour violation de la loi déposées contre l'agent immobilier (même si ces demandes fondées sur des faits quasi identiques étaient maintenues contre les appelants). Par la suite, les intimés ont réglé à l'amiable avec l'agent immobilier et la société d'assurance de titres de propriétés, de sorte que les appelants sont retrouvés les seuls visés à l'audience relative aux dommages-intérêts. Les appelants n'ont pas été informés de ce changement

2003 SCC 72 (CanLII)

damages on behalf of corporations, whose names appeared nowhere in the pleadings, in which they had an interest, and that they would be seeking damages for a corporation's lost opportunity to build an undefined number of homes on land to which neither the respondents nor the corporation held title.

A judgment based on inadequate notice is violative of natural justice. A default judgment that rests on such an unfair foundation should not be enforced. The fact that the appellants did not appeal the Florida judgment or seek the indulgence of the Florida court to set the default judgment aside for "excusable neglect" is a relevant consideration, but is not necessarily fatal, and in this case does not justify the enforcement in Ontario of the flawed Florida default judgment.

*Per* LeBel J. (dissenting): The "real and substantial connection" test should be modified significantly when it is applied to judgments originating outside the Canadian federation. Specifically, the assessment of the propriety of the foreign court's jurisdiction should be carried out in a way that acknowledges the additional hardship imposed on a defendant who is required to litigate in a foreign country. The purposive, principled framework should not be confined, however, to the question of jurisdiction. The impeachment defences of public policy, fraud and natural justice ought to be reformulated. Liberalizing the jurisdiction side of the analysis while retaining narrow, strictly construed categories on the defence side is not a coherent approach.

The jurisdiction test itself should be applied so that the assumption of jurisdiction will not be recognized if it is unfair to the defendant. This requires taking into account the differences between the international and interprovincial contexts. The integrated character of the Canadian federation makes a high degree of cooperation between the courts of the various provinces a practical necessity. It is also a constitutional imperative, inherent in the relationship between the units of our federal state, that each province must recognize the properly assumed jurisdiction of another, and conversely that no court in a province can intermeddle in matters that are without a constitutionally sufficient connection to that province.

de situation. Ils n'ont pas non plus reçu signification de l'ordonnance judiciaire de médiation obligatoire qui requérait la participation de toutes les parties, ni été avisés — conformément aux règles de la Floride — des experts que les intimés comptaient appeler à témoigner lors de l'évaluation des dommages-intérêts. Enfin, la plainte des intimés n'indiquait pas qu'ils réclamaient des dommages-intérêts au nom de sociétés dont ils étaient actionnaires et dont les noms ne figuraient nulle part dans les actes de procédure, et qu'ils comptaient réclamer des dommages-intérêts pour la possibilité qu'une société avait perdue de construire un nombre indéterminé de maisons sur un terrain qui ne lui appartenait pas et qui n'appartenait pas non plus aux intimés.

Un jugement fondé sur un avis insuffisant est contraire à la justice naturelle. Il n'y a pas lieu d'exécuter un jugement par défaut ayant un fondement aussi inéquitable. Le fait que les appelants n'ont ni porté en appel le jugement rendu en Floride, ni demandé au tribunal de la Floride de faire montre d'indulgence en annulant pour cause de « négligence excusable » le jugement par défaut, est un facteur pertinent, mais non nécessairement fatal, qui, en l'espèce, ne justifie pas l'exécution en Ontario du jugement vicié rendu par défaut en Floride.

*Le* juge LeBel (dissident) : Il y a lieu de modifier sensiblement le critère du « lien réel et substantiel » lorsqu'il s'agit de l'appliquer à des jugements émanant de l'extérieur de la fédération canadienne. Plus précisément, l'évaluation de la légitimité de la compétence du tribunal étranger doit tenir compte des difficultés supplémentaires auxquelles se heurte le défendeur tenu de plaider dans un pays étranger. Cependant, le système téléologique et fondé sur les principes ne devrait pas se limiter à la question de la compétence. Il est souhaitable de reformuler les moyens de défense fondés sur l'ordre public, la fraude et la justice naturelle. Il est illogique de libéraliser le volet « compétence » de l'analyse tout en continuant de répartir le volet « moyens de défense » dans des catégories bien précises et assujetties à une interprétation stricte.

Le critère même de la compétence doit s'appliquer pour empêcher la reconnaissance de la déclaration de compétence qui est injuste pour la partie défenderesse. Cela exige de tenir compte des différences qui existent entre les contextes international et interprovincial. Le caractère unifié de la fédération canadienne commande, en fait, une large mesure de coopération entre les tribunaux des diverses provinces. De même, un impératif constitutionnel, inhérent au lien existant entre les éléments qui forment notre État fédéral, veut que chaque province reconnaisse la compétence qu'une autre province déclare avoir à juste titre et, à l'inverse, qu'aucun tribunal d'une province ne puisse s'immiscer dans des

Comity as between sovereign nations is not an obligation in the same sense. It follows from the contextual and purpose-driven approach that the rules for recognition and enforcement of foreign-country judgments should be carefully fashioned to reflect the realities of the international context, and calibrated to further to the greatest degree possible, the ultimate objective of facilitating international interactions. However, this does not mean that they should be as liberal as the interprovincial rule. Ideally, the "real and substantial connection" test should represent a balance designed to create the optimum conditions favouring the flow of commodities and services across state lines. The connections required before foreign-country judgments will be enforced should be specified more strictly and in a manner that gives due weight to the protection of Canadian defendants without disregarding the legitimate interests of foreign claimants. This approach is consistent with both the flexible nature of international comity as a principle of enlightened self-interest rather than absolute obligation, and the practical differences between the international and interprovincial contexts.

While the test should ensure that, considering the totality of the connections between the forum and all aspects of the action, it is not unfair to expect the defendant to litigate in that forum, it does not follow that there necessarily has to be a connection between the defendant and the forum. There are situations where, given the other connections between the forum and the proceeding, it is a reasonable place for the action to be heard and the defendant can fairly be expected to go there even though he or she personally has no link at all to that jurisdiction. Under this approach, the connection must be strong enough to make it reasonable for the defendant to be expected to litigate there even though that may entail additional expense, inconvenience, and risk. If litigating in the foreign jurisdiction is very burdensome to the defendant, a stronger degree of connection would be required before the originating court's assumption of jurisdiction should be recognized as fair and appropriate. In extreme cases, the foreign legal system itself may be inherently unfair. If the process that led to the judgment was unfair in itself, it is not fair to the defendant to enforce that judgment in any circumstance, even if the forum has very strong connections to the action and appears in every other respect to be the natural place for the action to be heard.

affaires qui, sur le plan constitutionnel, n'ont aucun lien suffisant avec la province où il est situé. La courtoisie entre États souverains ne constitue pas une obligation dans le même sens. L'approche contextuelle et téléologique commande que les règles applicables en matière de reconnaissance et d'exécution des jugements étrangers reflètent fidèlement les réalités du contexte international et soient le plus possible adaptées à la réalisation de l'objectif final qui est de faciliter les relations internationales. Cependant, cela ne signifie pas qu'elles doivent être aussi libérales que la règle interprovinciale. Idéalement, le critère du « lien réel et substantiel » devrait représenter une solution de compromis destinée à créer les conditions les plus propices à la circulation des biens et des services d'un pays à l'autre. Les liens nécessaires à l'exécution des jugements étrangers doivent être précisés davantage de manière à donner à la protection des défendeurs canadiens toute l'importance qu'elle mérite, sans pour autant négliger les intérêts légitimes des demandeurs étrangers. Cette approche reste compatible avec la nature souple de la courtoisie internationale en tant que principe d'individualisme constructif et non en tant qu'obligation absolue, et avec les différences concrètes qui existent entre le contexte international et le contexte interprovincial.

Bien que ce critère doive contribuer à assurer que, compte tenu de l'ensemble des liens entre le ressort et tous les aspects de l'action, il n'est pas déraisonnable de s'attendre à ce que le défendeur y plaide, il ne s'ensuit pas nécessairement qu'un lien doit rattacher le défendeur au ressort. En effet, il arrive qu'en raison de ses autres liens avec l'instance le ressort soit un endroit raisonnable pour instruire l'action et que l'on puisse alors raisonnablement s'attendre à ce que le défendeur s'y rende même si, personnellement, il n'a absolument aucun lien avec ce ressort. Selon cette approche, le lien doit être assez solide pour que l'on puisse raisonnablement s'attendre à ce que le défendeur aille plaider devant ce tribunal malgré les dépenses supplémentaires, les inconvénients et le risque que cela peut lui occasionner. Dans le cas où il deviendrait très onéreux pour le défendeur de plaider dans le ressort étranger, la reconnaissance du caractère juste et approprié de la déclaration de compétence du tribunal d'origine exige la démonstration de l'existence d'un lien plus solide. Dans les pires cas, il se peut que le régime juridique étranger lui-même soit foncièrement inéquitable. Lorsque la procédure suivie pour rendre le jugement en cause était inéquitable en soi, il devient alors injuste d'imposer au défendeur l'exécution du jugement dans tous les cas, même si des liens très solides rattachent l'action au ressort et si ce dernier paraît être, à tous autres égards, l'endroit logique pour l'instruction de l'instance.

It follows from those propositions that the notion of interprovincial reciprocity is not equally applicable internationally. To treat a judgment from a foreign country exactly like one that originates within Canada fails to take into account the differences between the interprovincial and international contexts and fails to reflect the differences between assuming jurisdiction and enforcing a foreign judgment. Lastly, s. 7 *Charter* rights are not usually relevant to jurisdictional issues in civil disputes and do not arise in this case, although it is possible that there may be situations where fundamental interests of the defendant are implicated and s. 7 could come into play.

In this case, Florida was the natural place for the action to be heard because there were very strong connections between that state and every component of the action: the plaintiffs, who live there; the land, which is in Florida; and the defendants, who involved themselves in real estate transactions there.

The public policy defence should be reserved for cases where the objection is to the law of the foreign forum, rather than the way the law was applied, or the size of the award *per se*. It should also apply to foreign laws that offend basic tenets of our civil justice system, principles that are widely recognized as having a quality of essential fairness. Here, the defects in the judgment, while severe, do not engage the public policy defence. The enforcement of such a large award in the absence of a connection either to harm suffered by the plaintiffs and caused by the defendants or to conduct deserving of punishment on the part of the defendants would be contrary to basic Canadian ideas of justice. But there is no evidence that the law of Florida offends these principles. On the contrary, the record indicates that Florida law requires proof of damages in the usual fashion and there is no indication that punitive damages are available where the defendant's conduct is not morally blameworthy.

In general, the rule that the defence of fraud must be based on previously undiscoverable evidence is a reasonably balanced solution. However, the possibility that a broader test should apply to default judgments in cases where the defendant's decision not to participate was a demonstrably reasonable one should not be ruled out. If the defendant ignored what it justifiably considered to be a trivial or meritless claim, and can prove on the civil

Il découle de ces propositions que la notion de réciprocité interprovinciale ne s'applique tout autant aux jugements rendus à l'extérieur du Canada. Traiter un jugement émanant d'un pays étranger exactement sur le même pied qu'un jugement rendu au Canada ne tient pas compte des différences très réelles qui existent entre les contextes interprovincial et international, et ne reflète pas les différences entre la déclaration de compétence et l'exécution d'un jugement étranger. Enfin, les droits garantis par l'art. 7 de la *Charte* ne sont généralement pas pertinents relativement aux questions de compétence soulevées en matière civile et n'interviennent pas en l'espèce, quoiqu'il puisse y avoir des cas où les intérêts fondamentaux du défendeur sont en cause et où l'art. 7 entre alors en jeu.

En l'espèce, la Floride était l'endroit logique pour l'instruction de l'action en raison de l'existence de liens très solides entre cet État et chaque élément de l'action : les demandeurs y vivent, le terrain y est situé et les défendeurs y ont effectué des opérations immobilières.

Il y a lieu de continuer à limiter la possibilité d'invoquer le moyen de défense fondé sur l'ordre public aux cas où l'objection vise le droit applicable dans le ressort étranger et non la manière dont ce droit a été appliqué ou le montant même des dommages-intérêts qui a été accordé. Il doit également pouvoir être invoqué à l'encontre de lois étrangères violant les règles fondamentales de notre système de justice civile, qui sont largement reconnues comme étant essentiellement équitables. Dans la présente affaire, les vices du jugement, si graves soient-ils, ne donnent pas ouverture au moyen de défense fondé sur l'ordre public. À défaut d'un lien soit avec un préjudice causé aux demandeurs par les défendeurs, soit avec une conduite des défendeurs qui mérite d'être punie, l'exécution d'un jugement accordant un montant de dommages-intérêts aussi élevé serait contraire aux notions de justice fondamentales canadiennes. Cependant, rien ne prouve que le droit de la Floride viole ces principes. Au contraire, le dossier indique que le droit de la Floride exige que la preuve du préjudice soit faite de la manière habituelle, et rien n'indique qu'il est possible d'obtenir des dommages-intérêts punitifs lorsque la conduite du défendeur n'est pas moralement répréhensible.

En général, la règle voulant que le moyen de défense fondé sur la fraude ne puisse être invoqué qu'à la lumière d'éléments de preuve impossibles à découvrir antérieurement représente un juste milieu raisonnable. Toutefois, il n'y a pas lieu d'écarter la possibilité d'appliquer un critère plus large aux jugements par défaut dans les situations où la décision du défendeur de ne pas participer à l'instance était manifestement raisonnable. Dans le cas

standard that the plaintiff took advantage of his absence to perpetrate a deliberate deception on the foreign court, it would be inappropriate to insist that a Canadian court asked to enforce the resulting judgment must turn a blind eye to those facts. Accordingly, a more generous version of the fraud defence ought to be available, as required, to address the dangers of abuse associated with the loosening of the jurisdiction test to admit a broad category of formerly unenforceable default judgments. In the present case, the defence of fraud is not made out. All the facts that the appellants raise in this connection were known to them or could have been discovered at the time of the Florida action. Furthermore, even though this is the kind of case for which a more lenient interpretation of the fraud defence would, in principle, be appropriate, because the appellants' decision not to attend the Florida proceedings was a reasonable one, given the lack of evidence, the defence could not succeed even on the view that the judgment could be vitiated by proof of intentional fraud.

The defence of natural justice concerns the procedure by which the foreign court reached its decision. If a defendant can establish that the process by which the foreign judgment was obtained was contrary to the Canadian conception of natural justice, then the foreign judgment should not be enforced. Two developments should be recognized in connection with this defence: the requirements of notice and a hearing should be construed in a purposive and flexible manner, and substantive principles of justice should also be included in the scope of the defence. Notice is adequate when the defendant is given enough information to assess the extent of his or her jeopardy. This means, among other things, that the defendant should be made aware of the approximate amount sought. Adequate notice must also include alerting the defendant to the consequences of any procedural steps taken or not taken, as well as to the allegations that will be adjudicated at trial. In assessing whether the defence of natural justice has been made out, the opportunities for correcting a denial of natural justice that existed in the originating jurisdiction should be assessed in light of all the relevant factors. Here, the Ontario defendants were not given sufficient notice of the extent and nature of the claims against them in the Florida action and its potential ramifications. Furthermore, there was no notice as to the serious consequences to the defendants of failure to refile their defence in response to the

où le défendeur n'a pas réagi à ce qu'il considérait, à juste titre, comme étant une demande futile et dénuée de fondement, et où il peut prouver, selon la norme applicable en matière civile, que le demandeur a profité de son absence pour délibérément induire en erreur le tribunal étranger, on serait malvenu de soutenir qu'un tribunal canadien saisi d'une demande d'exécution du jugement qui a résulté doit fermer les yeux sur ces faits. Par conséquent, une version plus généreuse du moyen de défense fondé sur la fraude devrait pouvoir être invoquée lorsque cela s'avère nécessaire pour réduire les risques d'abus liés à l'assouplissement du critère de compétence qui permet désormais la reconnaissance d'une large catégorie de jugements par défaut auparavant inexécutoires. Le moyen de défense fondé sur la fraude n'est pas recevable en l'espèce. Tous les faits que les appelants évoquent à l'appui de ce moyen de défense étaient connus d'eux ou auraient pu être découverts à l'époque de l'action en Floride. De plus, même s'il s'agit d'un cas où il conviendrait, en principe, de donner une interprétation plus généreuse du moyen de défense fondé sur la fraude parce que la décision des appelants de ne pas participer aux procédures en Floride était raisonnable, il reste qu'en l'absence de preuve ce moyen de défense ne pouvait pas être invoqué avec succès même en tenant pour acquis que le jugement serait vicié si on pouvait établir l'existence d'une fraude commise de propos délibéré.

Le moyen de défense fondé sur la justice naturelle vise la procédure que le tribunal étranger a suivie pour rendre sa décision. Il n'y a pas lieu d'exécuter le jugement étranger lorsque le défendeur peut établir que la procédure suivie pour l'obtenir était contraire à la notion canadienne de justice naturelle. Ce moyen de défense doit être remanié sous deux aspects : les exigences en matière d'avis et d'audience doivent recevoir une interprétation téléologique et souple, et le moyen de défense doit également englober les principes de justice substantiels. L'avis est suffisant lorsque le défendeur reçoit assez de renseignements pour pouvoir mesurer l'ampleur du risque auquel il est exposé. Cela signifie, notamment, que le défendeur doit être informé du montant approximatif réclamé. Pour être suffisant, l'avis doit aussi prévenir le défendeur des conséquences de toutes les démarches procédurales effectuées ou non effectuées, ainsi que des allégations qui seront examinées et tranchées au procès. Pour décider si le moyen de défense fondé sur la justice naturelle peut être invoqué, il convient d'évaluer, à la lumière de tous les facteurs pertinents, la possibilité qu'il y avait, dans le ressort d'origine, d'exercer des recours destinés à corriger un déni de justice naturelle. Dans la présente affaire, les défendeurs ontariens n'ont pas suffisamment été avertis de l'étendue et de la nature des allégations formulées contre eux dans le cadre de l'action intentée en Floride et des conséquences que cette action pourrait

2003 SCC 72 (CanLII)

plaintiffs' repeatedly amended pleadings. As a result, the notice afforded to the defendants did not meet the requirements of natural justice. Finally, the mere fact that the appellants have received mistaken legal advice and did not avail themselves of the remedies available in Florida should not operate to relieve the respondents entirely of the consequences of a significant or substantial failure to observe the rules of natural justice, and it should not, in itself, bar the appellants from relying on this defence. In the circumstances of this case, when all the relevant factors are considered, the appellants' apprehensiveness about going to Florida to seek relief was understandable.

Even if the natural justice defence did not apply, this judgment should not be enforced. The facts raise very serious concerns about the fairness of enforcing the Florida judgment which do not fit easily into the categories identified by the traditional impeachment defences. The circumstances of this case are such that the enforcement of this judgment would shock the conscience of Canadians and cast a negative light on our justice system. The appellants have done nothing that infringes the rights of the respondents and have certainly done nothing to deserve such harsh punishment. Nor can they be said to have sought to avoid their obligations by hiding in their own jurisdiction or to have shown disrespect for the legal system of Florida. They have acted in good faith throughout and have diligently taken all the steps that appeared to be required of them, based on the information and advice they had. The plaintiffs in Florida appear to have taken advantage of the defendants' difficult position to pursue their interests as aggressively as possible and to secure a sizeable windfall. The Ontario court should not have to set its seal of approval on the judgment thus obtained without regard for the dubious nature of the claim, the fact that the parties did not compete on a level playing field, and the lack of transparency in the Florida proceedings. The implication of the majority position is that Canadian defendants will from now on be obliged to participate in foreign lawsuits no matter how meritless the claim or how small the amount of damages appears to be, on pain of potentially devastating consequences from which Canadian courts will be virtually powerless to protect them. Moving the law of conflicts in such a direction should be avoided.

entraîner. Les défendeurs n'ont pas non plus été avisés des risques sérieux auxquels les exposerait le défaut de déposer de nouveau leur défense pour répondre aux actes de procédure maintes fois modifiés des demandeurs. Par conséquent, l'avis donné aux défendeurs ne satisfaisait pas aux exigences de la justice naturelle. Enfin, le simple fait que les appelants aient reçu des conseils juridiques erronés et qu'ils n'aient pas exercé les recours disponibles en Floride ne devrait pas soustraire les intimés à toutes les conséquences d'une violation importante ou substantielle des règles de justice naturelle, ni empêcher, en soi, les appelants d'invoquer ce moyen de défense. Compte tenu de tous les facteurs pertinents, la réticence des appelants à retourner en Floride pour y exercer un recours devenait compréhensible dans les circonstances.

Même s'il n'était pas possible d'invoquer le moyen de défense fondé sur la justice naturelle, il n'y aurait pas lieu d'exécuter ce jugement. Les faits soulèvent de très sérieuses questions au sujet du caractère équitable de l'exécution du jugement de la Floride qui entre difficilement dans les catégories visées par les défenses traditionnelles consistant à attaquer la validité d'un jugement. Les circonstances de la présente affaire sont telles que l'exécution du jugement choquerait la conscience des Canadiens et des Canadiennes et jetterait une ombre sur notre système judiciaire. Les appelants n'ont rien fait qui porte atteinte aux droits des intimés et n'ont certes rien fait qui mérite d'être puni aussi sévèrement. On ne peut pas dire non plus qu'ils ont cherché à se soustraire à leurs obligations en se terrant dans leur propre ressort ou qu'ils ont manqué de respect envers le régime juridique de la Floride. Compte tenu des renseignements et des conseils qui leur avaient été donnés, ils ont agi de bonne foi en tout temps et ont fait montre de diligence en prenant toutes les mesures qui leur semblaient requises. Les demandeurs à l'action intentée en Floride semblent avoir profité de la situation difficile des défendeurs pour protéger leurs intérêts aussi énergiquement que possible, et pour réaliser un profit important et inattendu. En raison de l'inégalité des chances entre les parties et du manque de transparence des procédures qui se sont déroulées en Floride, le tribunal de l'Ontario n'aurait pas dû autoriser l'exécution du jugement ainsi obtenu, sans tenir compte de la nature douteuse de la demande. Le point de vue adopté par les juges majoritaires signifie que les défendeurs canadiens seront désormais tenus de participer aux poursuites intentées à l'étranger — même celles qui peuvent sembler plus ou moins fondées ou si dérisoire que puisse raisonnablement paraître le montant de dommages-intérêts réclamé — sous peine de subir des conséquences potentiellement dévastatrices contre lesquelles les tribunaux canadiens ne pourront pratiquement pas les protéger. Il faut éviter de donner cette orientation au droit international privé.

BEALS *v.* SALDANHA

## Cases Cited

By Major J.

**Applied:** *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077; **referred to:** *Moses v. Shore Boat Builders Ltd.* (1993), 106 D.L.R. (4th) 654, leave to appeal refused, [1994] 1 S.C.R. xi; *United States of America v. Ivey* (1996), 30 O.R. (3d) 370; *Old North State Brewing Co. v. Newlands Services Inc.*, [1999] 4 W.W.R. 573; *Muscutt v. Courcelles* (2002), 213 D.L.R. (4th) 577; *Indyka v. Indyka*, [1969] 1 A.C. 33; *Moran v. Pyle National (Canada) Ltd.*, [1975] 1 S.C.R. 393; *Hunt v. T&N plc*, [1993] 4 S.C.R. 289; *Spar Aerospace Ltd. v. American Mobile Satellite Corp.*, [2002] 4 S.C.R. 205, 2002 SCC 78; *Woodruff v. McLennan* (1887), 14 O.A.R. 242; *Jacobs v. Beaver* (1908), 17 O.L.R. 496; *Roglass Consultants Inc. v. Kennedy, Lock* (1984), 65 B.C.L.R. 393; *Powell v. Cockburn*, [1977] 2 S.C.R. 218.

By Binnie J. (dissenting)

*Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077; *Hunt v. T&N plc*, [1993] 4 S.C.R. 289; *Tolofson v. Jensen*, [1994] 3 S.C.R. 1022; *Spar Aerospace Ltd. v. American Mobile Satellite Corp.*, [2002] 4 S.C.R. 205, 2002 SCC 78; *Baker v. Canada (Minister of Citizenship and Immigration)*, [1999] 2 S.C.R. 817; *Adams v. Cape Industries plc*, [1991] 1 All E.R. 929.

By LeBel J. (dissenting)

*Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077; *Hunt v. T&N plc*, [1993] 4 S.C.R. 289; *Spar Aerospace Ltd. v. American Mobile Satellite Corp.*, [2002] 4 S.C.R. 205, 2002 SCC 78; *Hilton v. Guyot*, 159 U.S. 113 (1895); *Yahoo!, Inc. v. Ligue contre le racisme et l'antisémitisme*, 169 F.Supp.2d 1181 (2001); *Emanuel v. Symon*, [1908] 1 K.B. 302; *Moran v. Pyle National (Canada) Ltd.*, [1975] 1 S.C.R. 393; *Mercandino v. Devoe & Raynolds, Inc.*, 436 A.2d 942 (1981); *United States of America v. Ivey* (1995), 26 O.R. (3d) 533; *Kidron v. Grean* (1996), 48 O.R. (3d) 775; *Boardwalk Regency Corp. v. Maalouf* (1992), 88 D.L.R. (4th) 612; *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996); *Loewen Group, Inc. v. United States of America*, International Centre for Settlement of Investment Disputes, Case No. ARB(AF)/98/3, June 26, 2003; *Woodruff v. McLennan* (1887), 14 O.A.R. 242; *Abouloff v. Oppenheimer* (1882), 10 Q.B.D. 295; *Owens Bank Ltd. v. Bracco*, [1992] 2 All E.R. 193; *Jacobs v. Beaver* (1908), 17 O.L.R. 496; *Duchess of Kingston's Case* (1776), 2 Sm. L.C. (8th ed.) 784; *Powell v. Cockburn*, [1977] 2 S.C.R. 218; *Adams v. Cape Industries plc*, [1991] 1 All E.R. 929; *Cité de Pont Viau v. Gauthier Mfg. Ltd.*, [1978] 2 S.C.R. 516.

## Jurisprudence

Citée par le juge Major

**Arrêt appliqué :** *Morguard Investments Ltd. c. De Savoye*, [1990] 3 R.C.S. 1077; **arrêts mentionnés :** *Moses c. Shore Boat Builders Ltd.* (1993), 106 D.L.R. (4th) 654, autorisation de pourvoi refusée, [1994] 1 R.C.S. xi; *United States of America c. Ivey* (1996), 30 O.R. (3d) 370; *Old North State Brewing Co. c. Newlands Services Inc.*, [1999] 4 W.W.R. 573; *Muscutt c. Courcelles* (2002), 213 D.L.R. (4th) 577; *Indyka c. Indyka*, [1969] 1 A.C. 33; *Moran c. Pyle National (Canada) Ltd.*, [1975] 1 R.C.S. 393; *Hunt c. T&N plc*, [1993] 4 R.C.S. 289; *Spar Aerospace Ltée c. American Mobile Satellite Corp.*, [2002] 4 R.C.S. 205, 2002 CSC 78; *Woodruff c. McLennan* (1887), 14 O.A.R. 242; *Jacobs c. Beaver* (1908), 17 O.L.R. 496; *Roglass Consultants Inc. c. Kennedy, Lock* (1984), 65 B.C.L.R. 393; *Powell c. Cockburn*, [1977] 2 R.C.S. 218.

Citée par le juge Binnie (dissident)

*Morguard Investments Ltd. c. De Savoye*, [1990] 3 R.C.S. 1077; *Hunt c. T&N plc*, [1993] 4 R.C.S. 289; *Tolofson c. Jensen*, [1994] 3 R.C.S. 1022; *Spar Aerospace Ltée c. American Mobile Satellite Corp.*, [2002] 4 R.C.S. 205, 2002 CSC 78; *Baker c. Canada (Ministre de la Citoyenneté et de l'Immigration)*, [1999] 2 R.C.S. 817; *Adams c. Cape Industries plc*, [1991] 1 All E.R. 929.

Citée par le juge LeBel (dissident)

*Morguard Investments Ltd. c. De Savoye*, [1990] 3 R.C.S. 1077; *Hunt c. T&N plc*, [1993] 4 R.C.S. 289; *Spar Aerospace Ltée c. American Mobile Satellite Corp.*, [2002] 4 R.C.S. 205, 2002 CSC 78; *Hilton c. Guyot*, 159 U.S. 113 (1895); *Yahoo!, Inc. c. Ligue contre le racisme et l'antisémitisme*, 169 F.Supp.2d 1181 (2001); *Emanuel c. Symon*, [1908] 1 K.B. 302; *Moran c. Pyle National (Canada) Ltd.*, [1975] 1 R.C.S. 393; *Mercandino c. Devoe & Raynolds, Inc.*, 436 A.2d 942 (1981); *United States of America c. Ivey* (1995), 26 O.R. (3d) 533; *Kidron c. Grean* (1996), 48 O.R. (3d) 775; *Boardwalk Regency Corp. c. Maalouf* (1992), 88 D.L.R. (4th) 612; *BMW of North America, Inc. c. Gore*, 517 U.S. 559 (1996); *Loewen Group, Inc. c. United States of America*, Centre international pour le règlement des différends relatifs aux investissements, nᵒ ARB(AF)/98/3, 26 juin 2003; *Woodruff c. McLennan* (1887), 14 O.A.R. 242; *Abouloff c. Oppenheimer* (1882), 10 Q.B.D. 295; *Owens Bank Ltd. c. Bracco*, [1992] 2 All E.R. 193; *Jacobs c. Beaver* (1908), 17 O.L.R. 496; *Duchess of Kingston's Case* (1776), 2 Sm. L.C. (8th ed.) 784; *Powell c. Cockburn*, [1977] 2 R.C.S. 218; *Adams c. Cape Industries plc*, [1991] 1 All E.R. 929; *Cité de Pont Viau c. Gauthier Mfg. Ltd.*, [1978] 2 R.C.S. 516.

**Statutes and Regulations Cited**

*Canadian Charter of Rights and Freedoms*, s. 7.

*Civil Code of Québec*, S.Q. 1991, c. 64.

Fla. Stat. Ann. R. Civ. P. § 1.190(a) (West 1967).

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, r. 19.02(3).

*United States Constitution*, Article IV, Amendment V, Amendment XIV.

**Authors Cited**

Blom, Joost. "Conflict of Laws — Enforcement of Extraprovincial Default Judgment — Real and Substantial Connection: *Morguard Investments Ltd.* v. *De Savoye*" (1991), 70 *Can. Bar Rev.* 733.

Blom, Joost. "The Enforcement of Foreign Judgments: *Morguard* Goes Forth Into the World" (1997), 28 *Can. Bus. L.J.* 373.

Brown, Donald J. M., and John M. Evans. *Judicial Review of Administrative Action in Canada*. Toronto: Canvasback, 1998 (loose-leaf updated July 2003).

Castel, Jean-Gabriel, and Janet Walker. *Canadian Conflict of Laws*, 5th ed. Toronto: Butterworths, 2002 (loose-leaf updated May 2003, Issue 5).

*Dicey and Morris on the Conflict of Laws*, vol. 1, 13th ed. Under the general editorship of Lawrence Collins. London: Sweet & Maxwell, 2000.

Nygh, P. E. *Conflict of Laws in Australia*, 6th ed. North Ryde: Butterworths, 1995.

Talpis, Jeffrey A., with the collaboration of Shelley L. Kath. "*If I am from Grand-Mère, Why Am I Being Sued in Texas?*" *Responding to Inappropriate Foreign Jurisdiction in Quebec-United States Crossborder Litigation*. Montréal: Thémis, 2001.

Walker, Janet. "*Beals v. Saldanha*: Striking the Comity Balance Anew" (2002), 5 *Can. Int'l Law.* 28.

Watson, Garry D., and Frank Au. "Constitutional Limits on Service Ex Juris: Unanswered Questions from Morguard" (2000), 23 *Advocates' Q.* 167.

Yntema, Hessel E. "The Objectives of Private International Law" (1957), 35 *Can. Bar Rev.* 721.

Ziegel, Jacob S. "Enforcement of Foreign Judgments in Canada, Unlevel Playing Fields, and *Beals v. Saldanha*: A Consumer Perspective" (2003), 38 *Can. Bus. L.J.* 294.

APPEAL from a judgment of the Ontario Court of Appeal (2001), 54 O.R. (3d) 641, 202 D.L.R. (4th) 630, 148 O.A.C. 1, 10 C.P.C. (5th) 191, [2001] O.J. No. 2586 (QL), reversing a judgment of the Ontario Court (General Division) (1998), 42 O.R. (3d) 127, 27 C.P.C. (4th) 144, [1998] O.J. No. 4519 (QL). Appeal dismissed, Iacobucci, Binnie and LeBel JJ. dissenting.

**Lois et règlements cités**

*Charte canadienne des droits et libertés*, art. 7.

*Code civil du Québec*, L.Q. 1991, ch. 64.

*Constitution des États-Unis d'Amérique*, article IV, Cinquième amendement, Quatorzième amendement.

Fla. Stat. Ann. R. Civ. P. § 1.190(a) (West 1967).

*Règles de procédure civile*, R.R.O. 1990, règl. 194, règle 19.02(3).

**Doctrine citée**

Blom, Joost. « Conflict of Laws — Enforcement of Extraprovincial Default Judgment — Real and Substantial Connection : *Morguard Investments Ltd.* v. *De Savoye* » (1991), 70 *R. du B. can.* 733.

Blom, Joost. « The Enforcement of Foreign Judgments : *Morguard* Goes Forth Into the World » (1997), 28 *Rev. can. dr. comm.* 373.

Brown, Donald J. M., and John M. Evans. *Judicial Review of Administrative Action in Canada*. Toronto : Canvasback, 1998 (loose-leaf updated July 2003).

Castel, Jean-Gabriel, and Janet Walker. *Canadian Conflict of Laws*, 5th ed. Toronto : Butterworths, 2002 (loose-leaf updated May 2003, Issue 5).

*Dicey and Morris on the Conflict of Laws*, vol. 1, 13th ed. Under the general editorship of Lawrence Collins. London : Sweet & Maxwell, 2000.

Nygh, P. E. *Conflict of Laws in Australia*, 6th ed. North Ryde : Butterworths, 1995.

Talpis, Jeffrey A., with the collaboration of Shelley L. Kath. « *If I am from Grand-Mère, Why Am I Being Sued in Texas?* » *Responding to Inappropriate Foreign Jurisdiction in Quebec-United States Crossborder Litigation.* Montréal : Thémis, 2001.

Walker, Janet. « *Beals v. Saldanha* : Striking the Comity Balance Anew » (2002), 5 *R.C.D.I.* 28.

Watson, Garry D., and Frank Au. « Constitutional Limits on Service Ex Juris : Unanswered Questions from Morguard » (2000), 23 *Advocates' Q.* 167.

Yntema, Hessel E. « The Objectives of Private International Law » (1957), 35 *R. du B. can.* 721.

Ziegel, Jacob S. « Enforcement of Foreign Judgments in Canada, Unlevel Playing Fields, and *Beals v. Saldanha* : A Consumer Perspective » (2003), 38 *Rev. can. dr. comm.* 294.

POURVOI contre un arrêt de la Cour d'appel de l'Ontario (2001), 54 O.R. (3d) 641, 202 D.L.R. (4th) 630, 148 O.A.C. 1, 10 C.P.C. (5th) 191, [2001] O.J. No. 2586 (QL), infirmant un jugement de la Cour de l'Ontario (Division générale) (1998), 42 O.R. (3d) 127, 27 C.P.C. (4th) 144, [1998] O.J. No. 4519 (QL). Pourvoi rejeté, les juges Iacobucci, Binnie et LeBel sont dissidents.

*J. Brian Casey*, *Janet E. Mills* and *Matthew J. Latella*, for the appellants Geoffrey Saldanha and Leueen Saldanha.

*Neal H. Roth*, for the appellant Dominic Thivy.

*Messod Boussidan*, *Larry J. Levine*, *Q.C.*, and *Kevin D. Sherkin*, for the respondents.

The judgment of McLachlin C.J. and Gonthier, Major, Bastarache, Arbour and Deschamps JJ. was delivered by

Major J. —

I.   Introduction

1    The rules related to the recognition and enforcement of foreign judgments by Canadian courts are the focus of this appeal. "Foreign" in the context of this case refers to a judgment rendered by a court outside Canada, as opposed to an interprovincial judgment.

2    The appellants, residents of Ontario, were the owners of a vacant lot in Sarasota County, Florida. They sold the lot to the respondents. A dispute arose as a result of that transaction. The respondents eventually commenced two actions against the appellants in Florida. Only the second action is relevant to this appeal. The appellants received notice at all stages of the litigation and defended the first action, which was dismissed without prejudice. A defence was filed to the second action without the knowledge of the Saldanhas.

3    The appellants chose not to defend any of the three subsequent amendments to the second action. Pursuant to Florida law, the failure to defend the amendments had the effect of not defending the second action and the appellants were subsequently noted in default.  Damages of US$260,000 were awarded by a jury convened to assess damages. The damages were not paid and an action was started in Ontario to enforce the Florida judgment.

4    We have to first determine the circumstances under which a foreign judgment shall be recognized

*J. Brian Casey*, *Janet E. Mills* et *Matthew J. Latella*, pour les appelants Geoffrey Saldanha et Leueen Saldanha.

*Neal H. Roth*, pour l'appelant Dominic Thivy.

*Messod Boussidan*, *Larry J. Levine*, *c.r.*, et *Kevin D. Sherkin*, pour les intimés.

Version française du jugement de la juge en chef McLachlin et des juges Gonthier, Major, Bastarache, Arbour et Deschamps rendu par

Le juge Major —

I.   Introduction

Les règles relatives à la reconnaissance et à l'exécution d'un jugement étranger par les tribunaux canadiens sont au cœur du présent pourvoi. Le mot « étranger » sert, en l'espèce, à qualifier un jugement rendu à l'extérieur du Canada, comparativement à un jugement rendu dans une autre province ou un autre territoire du Canada.

Les appelants, résidants ontariens, étaient propriétaires d'un terrain vague situé dans le comté de Sarasota, en Floride. Ils ont vendu le terrain aux intimés. Cette opération a engendré un différend. En définitive, les intimés ont intenté en Floride deux actions contre les appelants. Seule la deuxième action est pertinente en l'espèce. Les appelants ont reçu des avis à toutes les étapes du litige et ont contesté la première action, qui a été rejetée sous toutes réserves. À l'insu des Saldanha, une défense a été produite relativement à la deuxième action.

Les appelants ont choisi de ne répondre à aucune des trois modifications subséquemment apportées à la deuxième action. Selon la loi de la Floride, cette omission revenait à ne pas contester la deuxième action, et le défaut des appelants a été, par la suite, constaté. Un jury formé pour évaluer les dommages-intérêts a accordé la somme de 260 000 $US. Ces dommages-intérêts n'ont pas été payés et une action en exécution du jugement rendu en Floride a été intentée en Ontario.

Il nous faut d'abord déterminer les circonstances dans lesquelles il y a lieu de reconnaître et

and enforced in Canada. Next, the nature and scope of the defences available to the judgment debtor must be established. For the purposes of these reasons, I assume the laws of other Canadian provinces are substantially the same as in Ontario and for that reason, Canada and Ontario are used interchangeably. A future case involving another part of Canada will be considered in light of whatever differences, if any, exist there.

## II.  Facts

The appellants were Ontario residents. In 1981, they and Rose Thivy, who is Dominic Thivy's wife and no longer a party to this action, purchased a lot in Florida for US$4,000. Three years later, Rose Thivy was contacted by a real estate agent acting for the respondents as well as for William and Susanne Foody (who assigned their interest to the Bealses' and are no longer parties to this action) enquiring about purchasing the lot. In the name of her co-owners, Mrs. Thivy advised the agent that they would sell the lot for US$8,000. The written offer erroneously referred to "Lot 1" as the lot being purchased instead of "Lot 2". Rose Thivy advised the real estate agent of the error and subsequently changed the number of the lot on the offer to "Lot 2". The amended offer was accepted and "Lot 2" was transferred to the respondents and the Foodys.

The respondents had purchased the lot in question in order to construct a model home for their construction business. Some months later, the respondents learned that they had been building on Lot 1, a lot that they did not own. In February 1985, the respondents commenced what was the first action in Charlotte County, Florida, for "damages which exceed $5,000". This was a customary way of pleading in Florida to give the Circuit Court monetary jurisdiction. The appellants, representing themselves, filed a defence. In September 1986, the appellants were notified that that action had been

d'exécuter un jugement étranger au Canada. Il faut ensuite établir la nature et la portée des moyens de défense dont dispose le débiteur judiciaire. Pour les besoins des présents motifs, je tiens pour acquis que les lois des autres provinces canadiennes sont essentiellement les mêmes qu'en Ontario, et c'est pourquoi j'utiliserai indifféremment les mots « Canada » et « Ontario ». Par contre, les litiges mettant en cause un autre ressort du Canada seront examinés à la lumière de toute différence que pourra comporter ce ressort.

## II.  Les faits

Les appelants étaient des résidants ontariens. En 1981, ils ont acheté un terrain en Floride pour la somme de 4 000 $US, conjointement avec M$^{me}$ Rose Thivy, l'épouse de M. Dominic Thivy, qui elle-même n'est pas partie à la présente action. Trois ans plus tard, un agent immobilier représentant les intimés ainsi que William et Susanne Foody (qui ont cédé leurs droits aux Beals et ne sont plus parties à l'action) a communiqué avec M$^{me}$ Rose Thivy pour discuter de la possibilité d'acheter le terrain. Se faisant la porte-parole des copropriétaires, M$^{me}$ Thivy a informé l'agent immobilier qu'ils seraient disposés à vendre le terrain pour la somme de 8 000 $US. L'offre écrite désignait par erreur le terrain acheté comme étant le « lot 1 » au lieu du « lot 2 ». Madame Rose Thivy a signalé cette erreur à l'agent immobilier et a subséquemment changé le numéro inscrit sur l'offre de manière à y lire « lot 2 ». L'offre modifiée a été acceptée et la propriété du « lot 2 » a été cédée aux intimés et aux Foody.

Les intimés avaient acheté le terrain en question dans le but d'y construire une maison-témoin destinée à leur entreprise de construction. Quelques mois plus tard, ils ont appris qu'ils avaient construit la maison-témoin sur le lot 1, qui ne leur appartenait pas. En février 1985, les intimés ont intenté dans le comté de Charlotte, en Floride, ce qui constituait la première action en [TRADUCTION] « dommages-intérêts supérieurs à 5 000 $ ». En Floride, cette précision était apportée pour que la Cour de circuit ait compétence pour instruire l'affaire. Les appelants, qui n'avaient pas retenu les

5

6

dismissed voluntarily and without prejudice because it had been brought in the wrong county.

7    In September 1986, a second action ("Complaint") was commenced by the respondents in the Circuit Court for Sarasota County, Florida. That Complaint was served on the appellants, in Ontario, to rescind the contract of purchase and sale and claimed damages in excess of US$5,000, treble damages and other relief authorized by statute in Florida. This Complaint was identical to that in the first action except for the addition of allegations of fraud. Shortly thereafter, an Amended Complaint, simply deleting one of the defendants, was served on the appellants. A statement of defence (a duplicate of the defence filed in the first action) was filed by Mrs. Thivy on behalf of the appellants. The trial judge accepted the evidence of the Saldanhas that they had not signed the document. Accordingly, the Saldanhas were found not to have attorned. As discussed further in these reasons, Dominic Thivy's situation differs.

8    In May 1987, the respondents served a Second Amended Complaint which modified allegations brought against a co-defendant who is no longer a party, but included all the earlier allegations brought against the appellants. No defence was filed. A Third Amended Complaint was served on the appellants on May 7, 1990 and again, no defence was filed. Under Florida law, the appellants were required to file a defence to each new amended complaint; otherwise, they risked being noted in default. A motion to note the appellants in default for their failure to file a defence to the Third Amended Complaint and a notice of hearing were served on the appellants in June 1990. The appellants did not respond to this notice. On July 25, 1990, a Florida court entered "default" against the appellants, the effect of which, under Florida law, was that they were deemed to have admitted

services d'un avocat, ont produit une défense. En septembre 1986, ils ont été avisés que cette action avait été rejetée sur requête des demandeurs et sous toutes réserves, pour le motif qu'elle avait été intentée dans le mauvais ressort.

En septembre 1986, les intimés ont intenté une deuxième action (« plainte ») devant la Cour de circuit du comté de Sarasota, en Floride. En Ontario, les appelants ont reçu signification de cette plainte dans laquelle les intimés réclamaient la résiliation du contrat d'achat et des dommages-intérêts supérieurs à 5 000 $US, ainsi que des dommages-intérêts triples et d'autres mesures de réparation autorisées par la loi de la Floride. Hormis les allégations de fraude qui y étaient ajoutées, cette plainte était identique à celle déposée dans le cadre de la première action. Peu après, les appelants ont reçu signification d'une plainte modifiée, dans laquelle on rayait simplement le nom d'un des défendeurs. Madame Thivy a produit, au nom des appelants, une défense identique à celle produite dans le cadre de la première action. Le juge de première instance a accepté le témoignage dans lequel les Saldanha niaient avoir signé la nouvelle défense. Par conséquent, il a estimé que les Saldanha n'avaient pas acquiescé à la nouvelle action. Comme nous le verrons plus loin dans les présents motifs, la situation de Dominic Thivy est différente.

En mai 1987, les intimés ont signifié une deuxième plainte modifiée dans laquelle ils avaient modifié les allégations formulées contre une codéfenderesse, qui n'est plus partie à l'action, mais comportant toutes celles déjà formulées contre les appelants. Aucune défense n'a été produite. Une troisième plainte modifiée a été signifiée aux appelants le 7 mai 1990 et, là encore, aucune défense n'a été produite. Suivant la loi de la Floride, les appelants étaient tenus de produire une défense pour chaque nouvelle plainte modifiée, sans quoi ils pourraient faire l'objet d'une constatation de défaut. En juin 1990, les appelants ont reçu signification du dépôt d'une requête en constatation de défaut en raison de leur omission de produire une défense à l'encontre de la troisième plainte modifiée, ainsi qu'un avis d'audition auquel ils n'ont pas répondu. Le 25 juillet 1990, un tribunal de la Floride a

the allegations contained in the Third Amended Complaint.

The appellants were served with notice of a jury trial to establish damages. They did not respond to the notice nor did they attend the trial held in December 1991. Mr. Foody, the respondent Mr. Beals, and an expert witness on business losses testified at the trial. The jury awarded the respondents damages of US$210,000 in compensatory damages and US$50,000 in punitive damages, plus post-judgment interest of 12 percent per annum. Notice of the monetary judgment was received by the appellants in late December 1991.

Upon receipt of the notice of the monetary judgment against them, the Saldanhas sought legal advice. They were advised by an Ontario lawyer that the foreign judgment could not be enforced in Ontario because the appellants had not attorned to the Florida court's jurisdiction. Relying on this advice, the appellants took no steps to have the judgment set aside, as they were entitled to try and do under Florida law, or to appeal the judgment in Florida. Florida law permitted the appellants ten days to commence an appeal and up to one year to bring a motion to have the judgment obtained there set aside on the grounds of "excusable neglect", "fraud" or "other misconduct of an adverse party".

In 1993, the respondents brought an action before the Ontario Court (General Division) seeking the enforcement of the Florida judgment. By the time of the hearing before that court, in 1998, the foreign judgment, with interest, had grown to approximately C$800,000. The trial judge dismissed the action for enforcement on the ground that there had been fraud in relation to the assessment of damages and for the additional reason of public policy. The Ontario Court of Appeal, Weiler J.A. dissenting, allowed the appeal.

constaté le « défaut » des appelants, de sorte que, selon la loi de la Floride, ceux-ci étaient désormais réputés avoir admis les allégations contenues dans la troisième plainte modifiée.

9  Les appelants ont reçu signification d'un avis les informant qu'un procès devant jury serait tenu dans le but d'établir le montant des dommages-intérêts. Ils n'ont ni répondu à cet avis ni assisté au procès en décembre 1991. Monsieur Foody, l'intimé Beals et un expert en matière de pertes d'entreprise ont témoigné au procès. Le jury a accordé aux intimés la somme de 210 000 $US à titre de dommages-intérêts compensatoires et celle de 50 000 $US à titre de dommages-intérêts punitifs, au taux annuel de 12 pour 100 à compter de la date du jugement. Les appelants ont été avisés, à la fin du mois de décembre 1991, du montant accordé par jugement.

10  Les Saldanha ont sollicité des conseils juridiques aussitôt qu'ils furent avisés du montant qu'ils étaient condamnés à payer. Ils se sont fait dire par un avocat ontarien que ce jugement étranger était inexécutoire en Ontario, vu qu'ils n'avaient pas acquiescé à la compétence du tribunal de la Floride. Forts de ce conseil, les appelants n'ont pas entrepris les démarches prévues par la loi de la Floride en vue de faire annuler ce jugement ou en vue de le porter en appel en Floride. La loi de la Floride leur accordait dix jours pour interjeter appel et jusqu'à un an pour présenter une requête en annulation du jugement du tribunal de cet État pour cause de [TRADUCTION] « négligence excusable » ou de « fraude », ou encore en raison d'une « autre inconduite de la part d'une partie adverse ».

11  En 1993, les intimés ont intenté, devant la Cour de l'Ontario (Division générale), une action en exécution du jugement rendu en Floride. Au moment de l'audition devant cette cour, en 1998, les dommages-intérêts accordés par le jugement étranger, et les intérêts accumulés, totalisaient environ 800 000 $CAN. Le juge de première instance a rejeté l'action en exécution pour cause de fraude dans l'évaluation des dommages-intérêts, invoquant aussi l'ordre public. L'appel interjeté devant la Cour d'appel de l'Ontario a été accueilli, la juge Weiler étant dissidente.

2003 SCC 72 (CanLII)

III. Judgments Below

A. *Ontario Court (General Division)* (1998), 42 O.R. (3d) 127

12    The trial judge declared the Florida judgment unenforceable in Ontario. Having concluded from the verdict of the Florida jury that it had not been made aware of certain facts, the trial judge dismissed the action on the basis of fraud. He also held that the judgment was unenforceable on the grounds of public policy. The trial judge recommended that the defence of public policy be broadened to include a "judicial sniff test" which would permit a domestic court to refuse enforcement of a foreign judgment in cases where the facts did not satisfy any of the three existing defences to enforcement but were nevertheless egregious.

B. *Ontario Court of Appeal* (2001), 54 O.R. (3d) 641

13    A majority of the Ontario Court of Appeal allowed the appeal. Doherty and Catzman JJ.A. concluded that neither the defence of fraud nor of public policy had application to this case.

14    As to the defence of fraud, Doherty J.A. held that that defence was only available where the allegations of fraud rest on "newly discovered facts", that is, facts that a defendant could not have discovered through the exercise of reasonable diligence prior to the granting of the judgment. He concluded that the trial judge erred in relying on assumed facts that conceivably might have been uncovered by the appellants had they chosen to participate in the Florida proceedings. Even if the trial judge had correctly defined the defence of fraud, Doherty J.A. held that there was no evidence that the judgment had been obtained by fraud.

15    On the defence of public policy, Doherty J.A. rejected the need to incorporate a "judicial sniff test" as part of that defence. Assuming a "sniff test"

III. Les instances inférieures

A. *Cour de l'Ontario (Division générale)* (1998), 42 O.R. (3d) 127

Le juge de première instance a déclaré inexécutoire en Ontario le jugement rendu en Floride. Il a rejeté l'action pour cause de fraude, après avoir conclu que le verdict prononcé montrait que le jury de la Floride n'avait pas été informé de certains faits. Le juge de première instance a aussi conclu que le jugement était inexécutoire pour des raisons d'ordre public. Il a recommandé d'élargir le moyen de défense fondé sur l'ordre public de manière à y incorporer un [TRADUCTION] « critère d'intuition judiciaire » (« *judicial sniff test* ») qui permettrait à un tribunal national de refuser l'exécution d'un jugement étranger dans le cas où les faits, quoique inacceptables, ne permettent néanmoins pas d'opposer à son exécution l'un des trois moyens de défense existants.

B. *Cour d'appel de l'Ontario* (2001), 54 O.R. (3d) 641

La Cour d'appel de l'Ontario, à la majorité, a accueilli l'appel. Les juges Doherty et Catzman ont décidé que les moyens de défense fondés sur la fraude et sur l'ordre public ne s'appliquaient pas.

Le juge Doherty a conclu que le moyen de défense fondé sur la fraude n'était opposable que si les allégations de fraude reposaient sur des [TRADUCTION] « faits découverts depuis peu », c'est-à-dire sur des faits qu'un défendeur raisonnablement diligent n'aurait pas pu découvrir avant le prononcé du jugement. Il a affirmé que le juge de première instance avait commis une erreur en se fondant sur des faits présumés que les appelants auraient très bien pu découvrir s'ils avaient choisi de participer à l'instance en Floride. Le juge Doherty considérait que, même à supposer que le juge de première instance ait défini correctement le moyen de défense fondé sur la fraude, rien ne prouvait que le jugement avait été obtenu frauduleusement.

Quant au moyen de défense fondé sur l'ordre public, le juge Doherty a écarté la nécessité d'y incorporer un « critère d'intuition judiciaire ».

was required, he held that no reasons existed in this appeal for public policy to preclude the enforcement of the foreign judgment. He stated (at para. 84):

The Beals and Foodys launched a lawsuit in Florida. Florida was an entirely proper court for the determination of the allegations in that lawsuit. The Beals and Foodys complied with the procedures dictated by the Florida rules. There is no evidence that they misled the Florida court on any matter. Rather, it would seem they won what might be regarded as a very weak case because the respondents chose not to defend the action. I find nothing in the record to support the trial judge's characterization of the conduct of the Beals and Foodys in Florida as "egregious." They brought their allegations in the proper forum, followed the proper procedures, and were immensely successful in no small measure because the respondents chose not to participate in the proceedings.

Weiler J.A., in dissent, would have dismissed the appeal. She concluded that the defences of natural justice and fraud made it inappropriate for a domestic court to enforce the Florida judgment. She stated that the appellants were deprived of natural justice by not having been given sufficient notice to permit them to appreciate the extent of their jeopardy prior to the judgment for damages against them. Weiler J.A. also held that the respondents had concealed certain facts from the Florida jury.

IV.  Analysis

It was properly conceded by the parties, as explained below, in both the trial court and Court of Appeal, that the Florida court had jurisdiction over the respondents' action pursuant to the "real and substantial connection" test set out in *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077. As a result, the issues raised in this appeal were limited to the application and scope of the defences available to a domestic defendant seeking to have a Canadian court refuse enforcement of a foreign judgment.

Selon lui, même en supposant qu'un « critère d'intuition » était nécessaire, il n'y avait, en l'espèce, aucune raison d'ordre public d'empêcher l'exécution du jugement étranger. Voici ce qu'il a dit (au par. 84) :

[TRADUCTION] Les Beals et les Foody ont intenté une action en Floride. Le tribunal de la Floride avait toute la compétence voulue pour se prononcer sur les allégations formulées dans le cadre de cette action. Les Beals et les Foody ont suivi la procédure prescrite par les règles de la Floride. Rien ne prouve qu'ils ont induit en erreur le tribunal de la Floride à quelque égard que ce soit. Au contraire, ils semblent avoir obtenu gain de cause grâce à une preuve susceptible d'être qualifiée de très faible en raison de la décision des intimés de ne pas contester l'action. J'estime que rien dans le dossier ne justifiait le juge de première instance de qualifier d'« inacceptable » la conduite des Beals et des Foody en Floride. Ceux-ci ont formulé leurs allégations devant le tribunal compétent, suivi la procédure indiquée et ont largement obtenu gain de cause en grande part à la suite de la décision des intimés de ne pas participer à l'instance.

La juge Weiler, dissidente, aurait rejeté l'appel. À son avis, les moyens de défense fondés sur la justice naturelle et sur la fraude étaient tels qu'un tribunal national serait malvenu d'exécuter le jugement rendu en Floride. Elle considérait que les appelants avaient été l'objet d'un déni de justice naturelle du fait que l'avis qu'ils avaient reçu ne leur permettait pas de mesurer l'étendue du risque auquel ils étaient exposés avant le prononcé du jugement les condamnant à des dommages-intérêts. Selon la juge Weiler, les intimés avaient également caché certains faits au jury de la Floride.

IV.  Analyse

Comme je l'expliquerai plus loin, les parties ont eu raison de concéder, devant le tribunal de première instance et la Cour d'appel, que le tribunal de la Floride avait compétence pour instruire l'action des intimés, conformément au critère du « lien réel et substantiel » dégagé dans l'arrêt *Morguard Investments Ltd. c. De Savoye*, [1990] 3 R.C.S. 1077. Voilà pourquoi le présent pourvoi porte exclusivement sur l'application et la portée des moyens de défense dont dispose le défendeur canadien qui demande à un tribunal canadien de refuser l'exécution d'un jugement étranger.

16

17

18    In *Morguard*, *supra*, the "real and substantial connection" test for the recognition and enforcement of interprovincial judgments was adopted. *Morguard* did not decide whether that test applied to foreign judgments. However, some courts have extended the application of *Morguard* to judgments rendered outside Canada: *Moses v. Shore Boat Builders Ltd.* (1993), 106 D.L.R. (4th) 654 (B.C.C.A.), leave to appeal refused, [1994] 1 S.C.R. xi; *United States of America v. Ivey* (1996), 30 O.R. (3d) 370 (C.A.); *Old North State Brewing Co. v. Newlands Services Inc.*, [1999] 4 W.W.R. 573 (B.C.C.A.).

19    The question arises whether the "real and substantial connection" test, which is applied to interprovincial judgments, should apply equally to the recognition of foreign judgments. For the reasons that follow, I conclude that it should. While there are compelling reasons to expand the test's application, there does not appear to be any principled reason not to do so. In light of this, the parties' concession on the point was appropriate.

20    *Morguard*, *supra*, altered the old common law rules for the recognition and enforcement of interprovincial judgments. These rules, based on territoriality, sovereignty, independence and attornment, were held to be outmoded. La Forest J. concluded that it had been an error to adopt this approach "even in relation to judgments given in sister-provinces" (p. 1095). Central to the decision to modernize the common law rules was the doctrine of comity. Comity was defined as (at pp. 1095 and 1096, respectively):

. . . the deference and respect due by other states to the actions of a state legitimately taken within its territory. . . .

.    .    .

. . . the recognition which one nation allows within its territory to the legislative, executive and judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own

C'est dans l'arrêt *Morguard*, précité, qu'a été adopté le critère du « lien réel et substantiel » applicable à la reconnaissance et à l'exécution des jugements d'une autre province. Cet arrêt n'a pas tranché la question de savoir si le critère s'appliquait également aux jugements étrangers. Cependant, certains tribunaux ont appliqué l'arrêt *Morguard* à des jugements rendus à l'extérieur du Canada : *Moses c. Shore Boat Builders Ltd.* (1993), 106 D.L.R. (4th) 654 (C.A.C.-B.), autorisation de pourvoi refusée, [1994] 1 R.C.S. xi; *United States of America c. Ivey* (1996), 30 O.R. (3d) 370 (C.A.); *Old North State Brewing Co. c. Newlands Services Inc.*, [1999] 4 W.W.R. 573 (C.A.C.-B.).

Il s'agit de déterminer si le critère du « lien réel et substantiel », applicable aux jugements d'une autre province, devrait également s'appliquer à la reconnaissance de jugements étrangers. Pour les motifs qui suivent, je conclus que oui. Il existe certes des raisons impérieuses d'élargir l'application du critère, alors qu'en principe rien ne semble justifier de ne pas le faire. Cela étant, la concession des parties à cet égard était appropriée.

L'arrêt *Morguard*, précité, a modifié les anciennes règles de common law applicables à la reconnaissance et à l'exécution des jugements d'une autre province. Ces règles fondées sur la territorialité, la souveraineté, l'indépendance et l'acquiescement à la compétence d'un tribunal ont été jugées désuètes. Le juge La Forest a conclu que l'on avait eu tort d'adopter cette approche, « même pour des jugements rendus dans d'autres provinces du pays » (p. 1095). Le principe de la courtoisie est au cœur de la décision de moderniser les règles de common law. La courtoisie a été ainsi définie (aux p. 1095-1096, respectivement) :

. . . la déférence et le respect que des États doivent avoir pour les actes qu'un autre État a légitimement accomplis sur son territoire. . .

.    .    .

. . . la reconnaissance qu'une nation accorde sur son territoire aux actes législatifs, exécutifs ou judiciaires d'une autre nation, compte tenu à la fois des obligations et des convenances internationales et des droits de ses propres

citizens or of other persons who are under the protection of its laws. . . .

Early common law rules were amended by rules intended to facilitate the flow of wealth, skills and people across boundaries, particularly boundaries of a federal state. *Morguard* established that the determination of the proper exercise of jurisdiction by a court depended upon two principles (relied on by the Ontario Court of Appeal in *Muscutt v. Courcelles* (2002), 213 D.L.R. (4th) 577, at para. 34), the first being the need for "order and fairness". The second was the existence of a "real and substantial connection" (see also *Indyka v. Indyka*, [1969] 1 A.C. 33 (H.L.); *Moran v. Pyle National (Canada) Ltd.*, [1975] 1 S.C.R. 393).

Modern ideas of order and fairness require that a court must have reasonable grounds for assuming jurisdiction where the participants to the litigation are connected to multiple jurisdictions.

*Morguard* established that the courts of one province or territory should recognize and enforce the judgments of another province or territory, if that court had properly exercised jurisdiction in the action, namely that it had a real and substantial connection with either the subject matter of the action or the defendant. A substantial connection with the subject matter of the action will satisfy the real and substantial connection test even in the absence of such a connection with the defendant to the action.

A. *The "Real and Substantial Connection" Test and Foreign Judgments*

The question then is whether the real and substantial connection test should apply to the recognition and enforcement of foreign judgments?

In *Moran*, *supra*, at p. 409, it was recognized that where individuals carry on business in another provincial jurisdiction, it is reasonable that those individuals be required to defend themselves there when an action is commenced:

citoyens ou des autres personnes qui sont sous la protection de ses lois. . .

21    Les anciennes règles de common law ont été remplacées par des règles destinées à faciliter la circulation des richesses, des techniques et des personnes d'un pays à l'autre, en particulier à l'intérieur d'un État fédéral. L'arrêt *Morguard* a établi que, pour décider si un tribunal a exercé correctement sa compétence, il faut prendre en considération deux éléments (comme l'a fait la Cour d'appel de l'Ontario dans l'arrêt *Muscutt c. Courcelles* (2002), 213 D.L.R. (4th) 577, par. 34). Le premier est le besoin [TRADUCTION] « d'ordre et d'équité », et le deuxième, l'existence d'un « lien réel et substantiel » (voir aussi *Indyka c. Indyka*, [1969] 1 A.C. 33 (H.L.); *Moran c. Pyle National (Canada) Ltd.*, [1975] 1 R.C.S. 393).

22    Les notions d'ordre et d'équité contemporaines exigent qu'un tribunal ait des motifs raisonnables de se déclarer compétent lorsque les parties à un litige relèvent de plusieurs ressorts.

23    Selon l'arrêt *Morguard*, les tribunaux d'une province ou d'un territoire doivent reconnaître et exécuter les jugements d'une autre province ou d'un autre territoire si le tribunal qui a rendu jugement a exercé correctement sa compétence dans l'action, en ce sens qu'il avait un lien réel et substantiel avec l'objet de l'action ou avec le défendeur. L'existence d'un lien substantiel avec l'objet de l'action permet de satisfaire au critère du « lien réel et substantiel », même en l'absence d'un tel lien avec le défendeur à l'action.

A. *Le critère du « lien réel et substantiel » et les jugements étrangers*

24    Il s'agit maintenant de savoir si le critère du « lien réel et substantiel » doit s'appliquer à la reconnaissance et à l'exécution de jugements étrangers.

25    Dans l'arrêt *Moran*, précité, p. 409, la Cour a reconnu qu'il est raisonnable d'obliger les particuliers qui exploitent une entreprise dans un autre ressort provincial à opposer une défense à l'action intentée contre eux dans ce ressort :

By tendering his products in the market place directly or through normal distributive channels, a manufacturer ought to assume the burden of defending those products wherever they cause harm as long as the forum into which the manufacturer is taken is one that he reasonably ought to have had in his contemplation when he so tendered his goods.

That reasoning is equally compelling with respect to foreign jurisdictions.

26    Although La Forest J. noted in *Morguard* that judgments from beyond Canada's borders could raise different issues than judgments within the federation, he recognized the value of revisiting the rules related to the recognition and enforcement of foreign judgments (at p. 1098):

The business community operates in a world economy and we correctly speak of a world community even in the face of decentralized political and legal power. Accommodating the flow of wealth, skills and people across state lines has now become imperative. Under these circumstances, our approach to the recognition and enforcement of foreign judgments would appear ripe for reappraisal. [Emphasis added.]

Although use of the word "foreign" in the above quotation referred to judgments rendered in a sister province, the need to accommodate "the flow of wealth, skills and people across state lines" is as much an imperative internationally as it is interprovincially.

27    The importance of comity was analysed at length in *Morguard*, *supra*. This doctrine must be permitted to evolve concomitantly with international business relations, cross-border transactions, as well as mobility. The doctrine of comity is

grounded in the need in modern times to facilitate the flow of wealth, skills and people across state lines in a fair and orderly manner.

(*Morguard*, *supra*, at p. 1096)

This doctrine is of particular importance viewed internationally. The principles of order and fairness

En mettant ses produits sur le marché directement ou par l'intermédiaire des voies normales de distribution, un fabricant doit être prêt à les défendre partout où ils causent un préjudice, à condition que le *forum* devant lequel il est convoqué en [soit] un qu'il aurait dû raisonnablement envisager lorsqu'il a mis ainsi ses produits sur le marché.

Ce raisonnement vaut autant en ce qui concerne les ressorts étrangers.

Tout en faisant remarquer que les jugements rendus à l'extérieur du Canada pouvaient soulever des questions différentes de celles soulevées par les jugements rendus par des tribunaux canadiens, le juge La Forest a également reconnu, dans l'arrêt *Morguard*, l'utilité de revoir les règles applicables à la reconnaissance et à l'exécution des jugements étrangers (à la p. 1098) :

Le monde des affaires fonctionne dans une économie mondiale et on parle à juste titre de communauté internationale même si le pouvoir politique et juridique est décentralisé. Il est maintenant devenu impérieux de faciliter la circulation des richesses, des techniques et des personnes d'un pays à l'autre. Dans ces circonstances, il apparaît opportun de réexaminer nos règles relatives à la reconnaissance et à l'exécution des jugements étrangers. [Je souligne.]

Bien que, dans la citation qui précède, l'adjectif qualificatif « étrangers » désigne les jugements rendus dans une autre province, il est devenu aussi impérieux à l'échelle internationale qu'à l'échelle interprovinciale de faciliter « la circulation des richesses, des techniques et des personnes d'un pays à l'autre ».

L'importance de la courtoisie a été analysée en profondeur dans l'arrêt *Morguard*, précité. Ce principe doit pouvoir évoluer au même rythme que les relations commerciales internationales, les opérations transfrontalières et la libre circulation d'un pays à l'autre. Le principe de la courtoisie est

fond[é] sur la nécessité qu'impose l'époque moderne de faciliter la circulation ordonnée et équitable des richesses, des techniques et des personnes d'un pays à l'autre.

(*Morguard*, précité, p. 1096-1097)

Ce principe revêt une importance particulière sur le plan international. Les principes d'ordre et d'équité

ensure security of transactions, which necessarily underlie the modern concept of private international law. Although *Morguard* recognized that the considerations underlying the doctrine of comity apply with greater force between the units of a federal state, the reality of international commerce and the movement of people continue to be "directly relevant to determining the appropriate response of private international law to particular issues, such as the enforcement of monetary judgments" (J. Blom, "The Enforcement of Foreign Judgments: *Morguard* Goes Forth Into the World" (1997), 28 *Can. Bus. L.J.* 373, at p. 375).

International comity and the prevalence of international cross-border transactions and movement call for a modernization of private international law. The principles set out in *Morguard, supra*, and further discussed in *Hunt v. T&N plc*, [1993] 4 S.C.R. 289, can and should be extended beyond the recognition of interprovincial judgments, even though their application may give rise to different considerations internationally. Subject to the legislatures adopting a different approach by statute, the "real and substantial connection" test should apply to the law with respect to the enforcement and recognition of foreign judgments.

Like comity, the notion of reciprocity is equally compelling both in the international and interprovincial context. La Forest J. discussed interprovincial reciprocity in *Morguard, supra*. He stated (at p. 1107):

. . . if this Court thinks it inherently reasonable for a court to exercise jurisdiction under circumstances like those described, it would be odd indeed if it did not also consider it reasonable for the courts of another province to recognize and enforce that court's judgment.

In light of the principles of international comity, La Forest J.'s discussion of reciprocity is also equally applicable to judgments made by courts outside Canada. In the absence of a different statutory

garantissent la sûreté des opérations qui doit soustendre la notion moderne de droit international privé. Bien que, dans l'arrêt *Morguard*, la Cour ait reconnu que les considérations sous-jacentes du principe de la courtoisie s'appliquent d'autant plus entre les éléments qui forment un État fédéral, la réalité du commerce international et la circulation des gens continuent d'être [TRADUCTION] « directement pertinentes pour déterminer la réponse que le droit international privé doit donner à des questions particulières, telle l'exécution des jugements accordant une somme d'argent » (J. Blom, « The Enforcement of Foreign Judgments : *Morguard* Goes Forth Into the World » (1997), 28 *Rev. can. dr. comm.* 373, p. 375).

28    La courtoisie internationale et la prédominance de la circulation et des opérations transfrontalières internationales commandent une modernisation du droit international privé. L'application des principes énoncés dans l'arrêt *Morguard*, précité, et analysés davantage dans l'arrêt *Hunt c. T&N plc*, [1993] 4 R.C.S. 289, peut et doit déborder le cadre de la reconnaissance des jugements d'une autre province, même si elle peut faire intervenir d'autres considérations sur le plan international. À moins que les législatures n'adoptent des lois prescrivant une approche différente, le critère du « lien réel et substantiel » doit s'appliquer en matière de reconnaissance et d'exécution des jugements étrangers.

29    À l'instar de la courtoisie, la notion de réciprocité s'impose autant dans le contexte international que dans le contexte interprovincial. Le juge La Forest a analysé la notion de réciprocité interprovinciale dans l'arrêt *Morguard*, précité, où il affirme (à la p. 1107) :

. . . si notre Cour estime qu'il est intrinsèquement raisonnable qu'un tribunal exerce sa compétence dans des circonstances semblables à celles décrites, il serait vraiment étrange qu'elle ne trouve pas également raisonnable que les tribunaux d'une autre province reconnaissent et appliquent le jugement du premier tribunal.

À la lumière des règles de la courtoisie internationale, l'analyse de la réciprocité par le juge La Forest s'applique tout autant aux jugements rendus à l'extérieur du Canada. En l'absence d'une approche

approach, it is reasonable that a domestic court recognize and enforce a foreign judgment where the foreign court assumed jurisdiction on the same basis as the domestic court would, for example, on the basis of a "real and substantial connection" test.

30   Federalism was a central concern underlying the decisions in *Morguard*, *supra*, and *Hunt*, *supra*. In the latter, La Forest J. stated that he did not think that "litigation engendered against a corporate citizen located in one province by its trading and commercial activities in another province should necessarily be subject to the same rules as those applicable to international commerce" (*Hunt*, *supra*, at p. 323). Recently, *Spar Aerospace Ltd. v. American Mobile Satellite Corp.*, [2002] 4 S.C.R. 205, 2002 SCC 78, suggested, in *obiter*, that it may be necessary to afford foreign judgments a different treatment than that recognized for interprovincial judgments (*per* LeBel J., at para. 51):

However, it is important to emphasize that *Morguard* and *Hunt* were decided in the context of interprovincial jurisdictional disputes. In my opinion, the specific findings of these decisions cannot easily be extended beyond this context. In particular, the two cases resulted in the enhancing or even broadening of the principles of reciprocity and speak directly to the context of interprovincial comity within the structure of the Canadian federation. . . .

Although La Forest J. and LeBel J. suggested that the rules applicable to interprovincial versus foreign judgments should differ, they do not preclude the application of the "real and substantial connection" test to both types of judgments, provided that any unfairness that may arise as a result of the broadened application of that test be taken into account.

31   The appellants submitted that the recognition of foreign judgments rendered by courts with a real and substantial connection to the action or parties is particularly troublesome in the case of foreign default judgments. If the "real and substantial connection" test is applied to the recognition of foreign

différente prescrite par la loi, il est raisonnable qu'un tribunal national reconnaisse et exécute le jugement d'un tribunal étranger qui s'est reconnu compétent comme il l'aurait fait lui-même, c'est-à-dire qui a exercé sa compétence en fonction, par exemple, d'un critère du « lien réel et substantiel ».

Les arrêts *Morguard* et *Hunt*, précités, reposaient essentiellement sur le caractère fédéral du Canada. Dans l'arrêt *Hunt*, le juge La Forest a dit qu'il ne pensait pas que « l'action intentée contre une société située dans une province en raison des activités d'échanges et de commerce auxquelles elle se livre dans une autre province devrait nécessairement être assujettie aux mêmes règles que celles qui s'appliquent au commerce international » (p. 323). Récemment, dans l'arrêt *Spar Aerospace Ltée c. American Mobile Satellite Corp.*, [2002] 4 R.C.S. 205, 2002 CSC 78, par. 51, le juge LeBel a indiqué, dans une remarque incidente, qu'il peut se révéler nécessaire de traiter les jugements étrangers différemment de ceux d'une autre province :

Toutefois, il importe de souligner que les arrêts *Morguard* et *Hunt* ont été jugés dans le contexte de conflits de compétence interprovinciaux. À mon avis, les conclusions précises de ces arrêts ne peuvent facilement déborder de ce contexte. Tout particulièrement, ces deux arrêts ont renforcé et même élargi les principes de réciprocité et ils s'appliquent directement au contexte de courtoisie entre provinces qui s'insère dans la structure de la fédération canadienne . . .

Tout en reconnaissant que les règles applicables aux jugements étrangers devraient différer de celles applicables aux jugements d'une autre province, les juges La Forest et LeBel n'écartent pas la possibilité d'appliquer le critère du « lien réel et substantiel » aux deux types de jugement, pourvu que l'on tienne compte de toute injustice qui pourra éventuellement découler de son application aux jugements étrangers.

Les appelants ont soutenu que la reconnaissance des jugements de tribunaux étrangers ayant un lien réel et substantiel avec l'action ou les parties est particulièrement inquiétante lorsque ces jugements ont été rendus par défaut. Ils font valoir que, pour que le critère du « lien réel et substantiel » puisse

judgments, they argue the test should be modified in the recognition and enforcement of default judgments. In the absence of unfairness or other equally compelling reasons which were not identified in this appeal, there is no logical reason to distinguish between a judgment after trial and a default judgment.

The "real and substantial connection" test requires that a significant connection exist between the cause of action and the foreign court. Furthermore, a defendant can reasonably be brought within the embrace of a foreign jurisdiction's law where he or she has participated in something of significance or was actively involved in that foreign jurisdiction. A fleeting or relatively unimportant connection will not be enough to give a foreign court jurisdiction. The connection to the foreign jurisdiction must be a substantial one.

In the present case, the appellants purchased land in Florida, an act that represents a significant engagement with the foreign jurisdiction's legal order. Where a party takes such positive and important steps that bring him or her within the proper jurisdiction of a foreign court, the fear of unfairness related to the duty to defend oneself is lessened. If a Canadian enters into a contract to buy land in another country, it is not unreasonable to expect the individual to enter a defence when sued in that jurisdiction with respect to the transaction.

The "real and substantial connection" test is made out for all of the appellants. There exists both a real and substantial connection between the Florida jurisdiction, the subject matter of the action and the defendants. As stated in J.-G. Castel and J. Walker, *Canadian Conflict of Laws* (5th ed. (looseleaf)), at p. 14-10:

For the recognition or enforcement in Canada of a foreign judgment *in personam*, the foreign court must have had jurisdiction according to Canadian rules of the conflict of laws.

In light of Canadian rules of conflict of laws, Dominic Thivy attorned to the jurisdiction of the Florida court when he entered a defence to the second action. His subsequent procedural failures under Florida law do not invalidate that attornment.

s'appliquer à la reconnaissance et à l'exécution des jugements par défaut rendus par un tribunal étranger, il est nécessaire de le modifier. En l'absence d'injustice ou d'autres raisons aussi sérieuses non décrites en l'espèce, rien ne justifie logiquement d'établir une distinction entre un jugement rendu à l'issue d'un procès et un jugement par défaut.

32    Le critère du « lien réel et substantiel » requiert l'existence d'un lien important entre la cause d'action et le tribunal étranger. En outre, il est raisonnable d'assujettir au droit d'un ressort étranger le défendeur qui a été un acteur ou qui a participé à quelque chose d'important dans ce ressort. Un lien éphémère ou relativement peu important ne suffit pas pour qu'un tribunal étranger soit compétent. Le lien avec le ressort étranger doit être substantiel.

33    En l'espèce, les appelants ont acheté un terrain en Floride, ce qui représente un engagement important à respecter l'ordre juridique du ressort étranger. Lorsqu'une partie prend des mesures aussi concrètes et importantes qui l'assujettissent à la compétence d'un tribunal étranger, la crainte d'injustice liée à l'obligation de se défendre est moindre. Il n'est pas déraisonnable de s'attendre à ce que le Canadien qui conclut un contrat d'achat de terrain dans un autre pays produise une défense s'il y fait l'objet de poursuites relativement à cette opération.

34    Le critère du « lien réel et substantiel » est respecté en ce qui concerne tous les appelants. Il existe un lien tant réel que substantiel entre le ressort de la Floride, l'objet de l'action et les défendeurs. Comme l'affirment J.-G. Castel et J. Walker dans *Canadian Conflict of Laws* (5e éd. (feuilles mobiles)), p. 14-10 :

[TRADUCTION] Pour qu'un jugement étranger *in personam* soit reconnu et exécuté au Canada, il faut que le tribunal étranger ait eu compétence selon les règles de droit international privé canadiennes.

Selon les règles de droit international privé canadiennes, Dominic Thivy a acquiescé à la compétence du tribunal de la Floride lorsqu'il a produit une défense à la deuxième action. Ses manquements subséquents à la procédure prescrite par la loi de

As such, irrespective of the real and substantial connection analysis, the Florida court would have had jurisdiction over Mr. Thivy for the purposes of enforcement in Ontario.

35    A Canadian defendant sued in a foreign jurisdiction has the ability to redress any real or apparent unfairness from the foreign proceedings and the judgment's subsequent enforcement in Canada. The defences applicable in Ontario are natural justice, public policy and fraud. In addition, defendants sued abroad can raise the doctrine of *forum non conveniens*. This would apply in the usual way where it is claimed that the proceedings are not, on the basis of convenience, expense and other considerations, in the proper forum.

36    Here, the appellants entered into a property transaction in Florida when they bought and sold land. Having taken this positive step to bring themselves within the jurisdiction of Florida law, the appellants could reasonably have been expected to defend themselves when the respondents started an action against them in Florida. The appellants failed to defend the claim pursuant to the Florida rules. Nonetheless, they were still entitled, within ten days, to appeal the Florida default judgment, which they did not. In addition, the appellants did not avail themselves of the additional one-year period to have the Florida judgment for damages set aside. While their failure to move to set aside or appeal the Florida judgment was due to their reliance upon negligent legal advice, that negligence cannot be a bar to the enforcement of the respondents' judgment.

37    There are conditions to be met before a domestic court will enforce a judgment from a foreign jurisdiction. The enforcing court, in this case Ontario, must determine whether the foreign court had a real and substantial connection to the action or the parties, at least to the level established in *Morguard, supra*. A real and substantial connection

la Floride n'invalident pas cet acquiescement. Par conséquent, aux fins d'exécution du jugement en Ontario, le tribunal de la Floride aurait eu compétence à l'égard de M. Thivy indépendamment de l'analyse du lien réel et substantiel.

Un défendeur canadien poursuivi dans un ressort étranger est en mesure de remédier à toute injustice réelle ou apparente qui découle des procédures à l'étranger et de l'exécution subséquente du jugement au Canada. Les moyens de défense disponibles en Ontario sont fondés sur la justice naturelle, l'ordre public et la fraude. De plus, les défendeurs poursuivis à l'étranger peuvent plaider le *forum non conveniens*. D'ordinaire, ce principe peut être invoqué par la partie qui allègue que les procédures n'ont pas été engagées devant le tribunal approprié eu égard aux frais ou pour des raisons de commodité ou autres.

En l'espèce, les appelants ont conclu une opération immobilière en Floride quand ils ont acheté et vendu le terrain. Compte tenu de cette démarche concrète qui a eu pour effet de les assujettir à la loi de la Floride, il était raisonnable de s'attendre à ce que les appelants contestent l'action que les intimés ont intentée contre eux en Floride. Les appelants n'ont pas contesté l'action de la manière prescrite par les règles de la Floride. Ils avaient néanmoins dix jours pour porter en appel le jugement par défaut rendu en Floride, mais ils ne l'ont pas fait. Ils ne se sont pas prévalus non plus du délai supplémentaire d'un an dont ils disposaient pour faire annuler le jugement relatif aux dommages-intérêts. Bien qu'il soit dû au fait qu'ils ont suivi les conseils erronés de leur avocat, le défaut des appelants de chercher à faire annuler ou de porter en appel le jugement obtenu en Floride par les intimés ne saurait faire obstacle à l'exécution de ce jugement.

Pour qu'un tribunal national exécute un jugement rendu dans un ressort étranger, certaines conditions doivent être remplies. Le tribunal saisi de la demande d'exécution, en l'occurrence le tribunal ontarien, doit déterminer si le tribunal étranger avait un lien réel et substantiel avec l'action ou les parties, à tout le moins dans la mesure fixée

is the overriding factor in the determination of jurisdiction. The presence of more of the traditional indicia of jurisdiction (attornment, agreement to submit, residence and presence in the foreign jurisdiction) will serve to bolster the real and substantial connection to the action or parties. Although such a connection is an important factor, parties to an action continue to be free to select or accept the jurisdiction in which their dispute is to be resolved by attorning or agreeing to the jurisdiction of a foreign court.

dans l'arrêt *Morguard*, précité. L'existence d'un lien réel et substantiel est le facteur déterminant en matière de compétence. La présence d'un plus grand nombre d'indices de compétence traditionnels (acquiescement, engagement à se soumettre à une compétence particulière, lieu de résidence et présence dans le ressort étranger) contribue à renforcer le lien réel et substantiel avec l'action ou les parties. Bien que ce lien soit un facteur important, les parties à une action peuvent toujours choisir ou accepter le ressort dans lequel sera tranché leur différend, en acquiesçant ou en s'engageant à se soumettre à la compétence d'un tribunal étranger.

If a foreign court did not properly take jurisdiction, its judgment will not be enforced. Here, it was correctly conceded by the litigants that the Florida court had a real and substantial connection to the action and parties.

Si un tribunal étranger n'a pas exercé correctement sa compétence, le jugement qu'il a rendu ne sera pas exécuté. En l'espèce, les parties au litige ont concédé à juste titre que le tribunal de la Floride avait un lien réel et substantiel avec l'action et avec elles.

38

B.  *Defences to the Enforcement of Judgments*

B.  *Moyens de défense opposables à l'exécution des jugements*

Once the "real and substantial connection" test is found to apply to a foreign judgment, the court should then examine the scope of the defences available to a domestic defendant in contesting the recognition of such a judgment.

Dès qu'il conclut que le critère du « lien réel et substantiel » s'applique à un jugement étranger, le tribunal doit examiner la portée des moyens de défense qu'un défendeur canadien peut opposer à la reconnaissance de ce jugement.

39

The defences of fraud, public policy and lack of natural justice were developed before *Morguard*, *supra*, and still pertain. This Court has to consider whether those defences, when applied internationally, are able to strike the balance required by comity, the balance between order and fairness as well as the real and substantial connection, in respect of enforcing default judgments obtained in foreign courts.

Les moyens de défense fondés sur la fraude, l'ordre public et la justice naturelle existaient avant l'arrêt *Morguard*, précité, et s'appliquent toujours. Notre Cour doit se demander si l'application de ces moyens de défense dans le contexte international peut permettre d'atteindre le juste milieu requis par les règles de la courtoisie — à savoir un juste milieu entre l'ordre et l'équité ainsi que le lien réel et substantiel — lorsqu'il est question d'exécuter un jugement par défaut obtenu à l'étranger.

40

These defences were developed by the common law courts to guard against potential unfairness unforeseen in the drafting of the test for the recognition and enforcement of judgments. The existing defences are narrow in application. They are the

Les tribunaux de common law ont conçu ces moyens de défense dans le but de parer à un risque d'injustice imprévu lors de la formulation du critère applicable à la reconnaissance et à l'exécution des jugements. Les moyens de défense existants ont une

41

most recognizable situations in which an injustice may arise but are not exhaustive.

42    Unusual situations may arise that might require the creation of a new defence to the enforcement of a foreign judgment. However, the facts of this case do not justify speculating on that possibility. Should the evolution of private international law require the creation of a new defence, the courts will need to ensure that any new defences continue to be narrow in scope, address specific facts and raise issues not covered by the existing defences.

### (1)  The Defence of Fraud

43    As a general but qualified statement, neither foreign nor domestic judgments will be enforced if obtained by fraud.

44    Inherent to the defence of fraud is the concern that defendants may try to use this defence as a means of relitigating an action previously decided and so thwart the finality sought in litigation. The desire to avoid the relitigation of issues previously tried and decided has led the courts to treat the defence of fraud narrowly. It limits the type of evidence of fraud which can be pleaded in response to a judgment. If this Court were to widen the scope of the fraud defence, domestic courts would be increasingly drawn into a re-examination of the merits of foreign judgments. That result would obviously be contrary to the quest for finality.

45    Courts have drawn a distinction between "intrinsic fraud" and "extrinsic fraud" in an attempt to clarify the types of fraud that can vitiate the judgment of a foreign court. Extrinsic fraud is identified as fraud going to the jurisdiction of the issuing court or the kind of fraud that misleads the court, foreign or domestic, into believing that it has jurisdiction over

application restreinte. Sans être exhaustifs, ils représentent les situations les plus faciles à reconnaître où il existe un risque d'injustice.

Il peut se présenter des situations inhabituelles où il pourrait se révéler nécessaire de créer un nouveau moyen de défense opposable à l'exécution d'un jugement étranger. Cependant, compte tenu des faits de la présente affaire, il n'est pas nécessaire de s'attarder sur cette possibilité. Si jamais l'évolution du droit international privé commande la création d'un nouveau moyen de défense, les tribunaux devront veiller à ce que tout nouveau moyen de défense ait une portée restreinte, s'applique à des faits particuliers et soulève des questions qui ne sont pas déjà visées par un autre moyen de défense.

### (1)  Le moyen de défense fondé sur la fraude

Il est possible d'affirmer de manière générale, quoiqu'avec réserve, que les jugements obtenus frauduleusement à l'étranger ou au Canada ne seront pas exécutés.

Le moyen de défense fondé sur la fraude suscite inévitablement la crainte que des défendeurs tentent d'utiliser ce moyen de défense pour rouvrir une affaire déjà tranchée et contrecarrer ainsi la recherche du caractère définitif des jugements. Pour éviter de revenir sur des questions déjà examinées et tranchées, les tribunaux en sont venus à donner au moyen de défense fondé sur la fraude une interprétation restrictive limitant le type de preuve de fraude qui peut être opposé à l'exécution d'un jugement. Si notre Cour élargissait la portée du moyen de défense fondé sur la fraude, les tribunaux canadiens seraient alors de plus en plus appelés à réexaminer le bien-fondé de jugements étrangers. Il est évident que ce résultat contrecarrerait la recherche du caractère définitif des jugements.

Afin de clarifier les types de fraude susceptibles de vicier un jugement étranger, les tribunaux ont établi une distinction entre la « fraude intrinsèque » et la « fraude extrinsèque ». La fraude extrinsèque est décrite comme celle qui touche la compétence du tribunal d'origine ou comme le type de fraude qui amène à tort le tribunal étranger ou national à croire

2003 SCC 72 (CanLII)

the cause of action. Evidence of this kind of fraud, if accepted, will justify setting aside the judgment. On the other hand, intrinsic fraud is fraud which goes to the merits of the case and to the existence of a cause of action. The extent to which evidence of intrinsic fraud can act as a defence to the recognition of a judgment has not been as clear as that of extrinsic fraud.

A restrictive application of the defence of fraud was endorsed in *Woodruff v. McLennan* (1887), 14 O.A.R. 242. The Ontario Court of Appeal stated, at pp. 254-55, that the defence could be raised where

the recovery was collusive, [the] defendant had never been served with process, . . . the suit had been undefended without defendant's default, . . . the defendant had been fraudulently persuaded by plaintiff to let judgment go by default . . . or some fraud to defendant's prejudice committed or allowed in the proceedings of the other Court. . . .

*Woodruff* established that evidence of fraud that went to the merits of the case (intrinsic) was inadmissible. Only evidence of fraud which misled a court into taking jurisdiction (extrinsic) was admissible and could bar the enforcement of the judgment.

*Woodruff*, *supra*, was subsequently modified by the Ontario Court of Appeal. See *Jacobs v. Beaver* (1908), 17 O.L.R. 496, at p. 506:

. . . the fraud relied on must be something collateral or extraneous, and not merely the fraud which is imputed from alleged false statements made at the trial, which were met by counter-statements by the other side, and the whole adjudicated upon by the Court and so passed on into the limbo of estoppel by the judgment. This estoppel cannot, in my opinion, be disturbed except upon the allegation and proof of new and material facts, or newly discovered and material facts which were not before the former Court and from which are to be deduced the new proposition that the former judgment was obtained by fraud. The burden of that issue is upon the defendant, and until he at least gives *prima facie* evidence in support of it, the estoppel stands. And it may be, as I have before

que la cause d'action relève de sa compétence. Si elle est retenue, la preuve de ce type de fraude justifie l'annulation du jugement. Par ailleurs, la fraude intrinsèque est celle qui touche le bien-fondé de l'affaire et l'existence d'une cause d'action. La mesure dans laquelle la preuve d'une fraude intrinsèque peut être opposée à la reconnaissance d'un jugement n'est pas aussi claire que dans le cas d'une preuve de fraude extrinsèque.

Dans l'arrêt *Woodruff c. McLennan* (1887), 14 **46** O.A.R. 242, la Cour d'appel de l'Ontario a interprété de manière restrictive le moyen de défense fondé sur la fraude, en affirmant, aux p. 254-255, que ce moyen de défense pouvait être invoqué lorsque

[TRADUCTION] le jugement obtenu résultait d'une collusion, [. . .] les actes de procédure n'avaient jamais été signifiés au défendeur, [. . .] l'omission de contester l'action n'était pas due au défaut d'agir du défendeur, [. . .] le demandeur avait, de manière frauduleuse, convaincu le défendeur de laisser le tribunal rendre jugement par défaut [. . .] ou une fraude au détriment du défendeur avait été commise ou permise au cours de l'instance devant l'autre tribunal . . .

Selon l'arrêt *Woodruff*, la preuve d'une fraude touchant le bien-fondé de l'affaire (fraude intrinsèque) était inadmissible. Seule la preuve d'une fraude ayant amené à tort un tribunal à se déclarer compétent (fraude extrinsèque) était admissible et pouvait faire obstacle à l'exécution du jugement.

La Cour d'appel de l'Ontario a, par la suite, **47** modifié l'arrêt *Woodruff*, précité. Voir *Jacobs c. Beaver* (1908), 17 O.L.R. 496, p. 506 :

[TRADUCTION] . . . la fraude invoquée doit être accessoire ou extrinsèque, et non simplement imputée à de présumées fausses déclarations faites au procès — auxquelles l'autre partie a répondu par d'autres déclarations — que le tribunal a toutes examinées et plongées, par son jugement, dans les limbes de la préclusion. J'estime que la préclusion continuera de s'appliquer, sauf si on allègue et on établit l'existence de faits substantiels nouveaux ou découverts depuis peu, dont l'ancien tribunal n'était pas saisi et qui permettent de conclure que l'ancien jugement a été obtenu frauduleusement. À cet égard, le fardeau de la preuve incombe au défendeur et la préclusion vaut tant et aussi longtemps que celui-ci n'a pas présenté au moins une preuve *prima facie* de

stated, that when such evidence is given, and in order to fully prove this new issue, the whole case should be re-opened. [Emphasis added.]

The court, in *Jacobs*, acknowledged that in addition to evidence of extrinsic fraud, evidence of intrinsic fraud was admissible where the defendant could establish "proof of new and material facts" that, not being available at the time of trial, were not before the issuing court and demonstrate that the judgment sought to be enforced was obtained by fraud.

48    Contrary to the decision of the Ontario Court of Appeal in *Jacobs*, the courts of British Columbia take a different view. In *Roglass Consultants Inc. v. Kennedy, Lock* (1984), 65 B.C.L.R. 393, the British Columbia Court of Appeal maintained the strict approach to the fraud defence set out in *Woodruff*. It held that only extrinsic fraud could be raised in defence of the enforcement of a foreign judgment.

49    In *Powell v. Cockburn*, [1977] 2 S.C.R. 218, it was clear that the aim in refusing recognition of a judgment because of fraud "is to prevent abuse of the judicial process" (p. 234). In that case, the Court did not address fraud going to the merits of a judgment but did confirm that fraud going to jurisdiction (extrinsic fraud) is always open to impeachment.

50    What should be the scope of the defence of fraud in relation to foreign judgments? *Jacobs, supra*, represents a reasonable approach to that defence. It effectively balances the need to guard against fraudulently obtained judgments with the need to treat foreign judgments as final. I agree with Doherty J.A. for the majority in the Court of Appeal that the "new and material facts" discussed in *Jacobs* must be limited to those facts that a defendant could not have discovered and brought

l'existence d'une fraude. Comme je l'ai dit précédemment, il peut parfois se révéler nécessaire, lorsqu'une telle preuve est présentée, de rouvrir toute l'affaire pour que l'existence de la fraude alléguée puisse être entièrement démontrée. [Je souligne.]

Dans l'arrêt *Jacobs*, la cour a reconnu que, outre la preuve d'une fraude extrinsèque, la preuve d'une fraude intrinsèque était admissible lorsque le défendeur pouvait établir [TRADUCTION] « l'existence de faits substantiels nouveaux » qui n'ont pas été soumis au tribunal d'origine parce qu'ils étaient inconnus au moment du procès, et qui démontrent que le jugement dont on demande l'exécution a été obtenu frauduleusement.

Les tribunaux de la Colombie-Britannique adoptent un point de vue différent de celui qui se dégage de l'arrêt *Jacobs* de la Cour d'appel de l'Ontario. Dans l'arrêt *Roglass Consultants Inc. c. Kennedy, Lock* (1984), 65 B.C.L.R. 393, la Cour d'appel de la Colombie-Britannique a donné au moyen de défense fondé sur la fraude l'interprétation restrictive préconisée dans l'arrêt *Woodruff*. Elle a statué que seule la fraude extrinsèque pouvait être invoquée pour contester l'exécution d'un jugement étranger.

Dans l'arrêt *Powell c. Cockburn*, [1977] 2 R.C.S. 218, le refus de reconnaître un jugement entaché de fraude visait clairement à « empêcher que l'on abuse du système judiciaire » (p. 234). Dans cette affaire, la Cour n'a pas examiné la question de la fraude touchant le bien-fondé d'un jugement, mais elle a confirmé que la fraude touchant la compétence (fraude extrinsèque) peut toujours servir à attaquer la validité d'un jugement.

Quelle devrait être la portée du moyen de défense fondé sur la fraude lorsqu'il est question d'un jugement étranger? L'arrêt *Jacobs*, précité, représente une interprétation raisonnable de ce moyen de défense. Il concilie efficacement le besoin de protection contre les jugements obtenus frauduleusement et la nécessité de considérer les jugements étrangers comme étant définitifs. Je conviens avec le juge Doherty, qui s'est exprimé au nom des juges majoritaires de la Cour d'appel, que

to the attention of the foreign court through the exercise of reasonable diligence.

The historic description of and the distinction between intrinsic and extrinsic fraud are of no apparent value and, because of their ability to both complicate and confuse, should be discontinued. It is simpler to say that fraud going to jurisdiction can always be raised before a domestic court to challenge the judgment. On the other hand, the merits of a foreign judgment can be challenged for fraud only where the allegations are new and not the subject of prior adjudication. Where material facts not previously discoverable arise that potentially challenge the evidence that was before the foreign court, the domestic court can decline recognition of the judgment.

Where a foreign judgment was obtained by fraud that was undetectable by the foreign court, it will not be enforced domestically. "Evidence of fraud undetectable by the foreign court" and the mention of "new and material facts" in *Jacobs*, *supra*, demand an element of reasonable diligence on the part of a defendant. To repeat Doherty J.A.'s ruling, in order to raise the defence of fraud, a defendant has the burden of demonstrating that the facts sought to be raised could not have been discovered by the exercise of due diligence prior to the obtaining of the foreign judgment. See para. 43:

A due diligence requirement is consistent with the policy underlying the recognition and enforcement of foreign judgments. In the modern global village, decisions made by foreign courts acting within Canadian concepts of jurisdiction and in accordance with fundamental principles of fairness should be respected and enforced. That policy does not, however, extend to protect decisions which are based on fraud that could not, through the exercise of reasonable diligence, have been brought to the attention of the foreign court. Respect for the

les [TRADUCTION] « faits substantiels nouveaux » analysés dans l'arrêt *Jacobs* doivent être limités à ceux qu'un défendeur raisonnablement diligent n'aurait pas pu découvrir et signaler au tribunal étranger.

La description historique de la fraude intrinsèque et de la fraude extrinsèque et la distinction apportée sont apparemment inutiles et il y a lieu de les écarter en raison des problèmes et de la confusion qu'elles peuvent engendrer. Il est plus simple d'affirmer que la fraude touchant la compétence peut toujours être invoquée devant un tribunal national pour attaquer la validité d'un jugement. Par ailleurs, la fraude ne peut être invoquée pour contester le bien-fondé d'un jugement étranger qu'en présence d'allégations nouvelles qui n'ont pas déjà été examinées et tranchées. Le tribunal national peut refuser de reconnaître le jugement si on lui soumet des faits substantiels impossibles à découvrir antérieurement et susceptibles de mettre en doute la preuve dont le tribunal étranger était saisi. 51

Le jugement étranger obtenu par des manœuvres frauduleuses que le tribunal d'origine ne pouvait pas déceler ne sera pas exécuté au Canada. « La preuve d'une fraude que le tribunal étranger ne pouvait pas déceler » et la mention des [TRADUCTION] « faits substantiels nouveaux » dans l'arrêt *Jacobs*, précité, exigent que le défendeur ait fait montre de diligence raisonnable. Comme l'a dit le juge Doherty dans sa décision, pour pouvoir invoquer le moyen de défense fondé sur la fraude, le défendeur doit démontrer qu'il n'était pas possible, en faisant montre de diligence raisonnable, de découvrir, avant le prononcé du jugement étranger, les faits maintenant invoqués. Voir le par. 43 : 52

[TRADUCTION] L'exigence de diligence raisonnable est compatible avec la politique qui sous-tend la reconnaissance et l'exécution des jugements étrangers. Dans le village global moderne, il y a lieu de reconnaître et d'exécuter les décisions des tribunaux étrangers qui respectent les notions de compétence canadiennes et les principes fondamentaux d'équité. Toutefois, cette politique ne s'applique pas aux décisions obtenues par des manœuvres frauduleuses qu'il n'était pas possible, en faisant montre de diligence raisonnable, de signaler au tribunal

foreign court does not diminish when a refusal to enforce its judgment is based on material that could not, through the exercise of reasonable diligence, have been placed before that court. [Emphasis added.]

Such an approach represents a fair balance between the countervailing goals of comity and fairness to the defendant.

53    Although *Jacobs*, *supra*, was a contested foreign action, the test used is equally applicable to default judgments. Where the foreign default proceedings are not inherently unfair, failing to defend the action, by itself, should prohibit the defendant from claiming that any of the evidence adduced or steps taken in the foreign proceedings was evidence of fraud just discovered. But if there is evidence of fraud before the foreign court that could not have been discovered by reasonable diligence, that will justify a domestic court's refusal to enforce the judgment.

54    In the present case, the appellants made a conscious decision not to defend the Florida action against them. The pleadings of the respondents then became the facts that were the basis for the Florida judgment. As a result, the appellants are barred from attacking the evidence presented to the Florida judge and jury as being fraudulent.

55    The appellants have not claimed that there was evidence of fraud that they could not have discovered had they defended the Florida action. In the absence of newly discovered evidence of fraud, I agree with the Court of Appeal that the trial judge erred in admitting evidence he found established fraud. He erred in law by failing to limit "new and material facts" to facts which could not have been discovered by the appellants by the exercise of reasonable diligence.

*étranger.* Le tribunal étranger n'est pas moins respecté lorsque le refus d'exécuter le jugement qu'il a rendu est fondé sur des faits substantiels qu'il n'était pas possible, en faisant montre de diligence raisonnable, de lui soumettre. [Je souligne.]

Cette interprétation représente un juste milieu entre les objectifs opposés de la courtoisie et de l'équité envers le défendeur.

Bien que l'arrêt *Jacobs*, précité, ait porté sur la contestation d'une action intentée à l'étranger, le critère appliqué vaut tout autant en ce qui concerne les jugements par défaut. Lorsque les procédures par défaut à l'étranger ne sont pas foncièrement inéquitables, l'omission de produire une défense doit suffire pour empêcher le défendeur d'alléguer que l'un des éléments de preuve soumis, ou l'une des mesures prises, dans le cadre de ces procédures est un indice de la fraude qui vient tout juste d'être découverte. Cependant, un tribunal national sera justifié de refuser l'exécution du jugement s'il est prouvé que l'on s'est livré, devant le tribunal étranger, à des manœuvres frauduleuses qu'il n'était pas possible de découvrir en faisant montre de diligence raisonnable.

En l'espèce, les appelants ont sciemment pris la décision de ne pas contester l'action intentée contre eux en Floride. Les actes de procédure des intimés sont alors devenus les faits à partir desquels jugement a été rendu en Floride. Par conséquent, les appelants ne peuvent pas faire valoir que la preuve soumise au juge et au jury de la Floride est entachée de fraude.

Les appelants n'ont pas allégué qu'il existait une preuve de fraude qu'ils n'auraient pas pu découvrir s'ils avaient contesté l'action intentée en Floride. En l'absence d'une preuve de fraude découverte depuis peu, je conviens avec la Cour d'appel que le juge de première instance a commis une erreur en admettant une preuve qui, selon lui, établissait l'existence d'une fraude. Celui-ci a commis une erreur de droit en ne limitant pas les [TRADUCTION] « faits substantiels nouveaux » à ceux que les appelants n'auraient pas pu découvrir en faisant montre de diligence raisonnable.

There was no evidence before the trial judge to support fraud. In fact, the trial judge, himself, stated (at p. 131):

No record of the damage assessment proceedings exists, and the evidence heard by the jury is unknown. There is similarly no record of the instructions given to the jury by the trial judge.

In the absence of such evidence, the trial judge erred in concluding that there was fraud. It is impossible to know whether the evidence now sought to be adduced by the appellants had been previously considered by the jury. The respondent Mr. Beals and an expert on business losses both testified before the Florida jury and gave uncontradicted evidence. Before the Ontario court, Mr. Beals was available for questioning but was not called upon by the appellants to address the allegations of fraud. Similarly, the respondents' counsel in the Florida action testified but no questions of fraud were raised with him.

No evidence was led to show that the jury was misled (deliberately or not) on the extent of the damages. The admitted facts presented to the jury included allegations of fraudulent misrepresentations and loss of profits. The claim by the respondents was for damages to recoup the purchase price of the land, loss of profits and punitive damages. The nature of the damages sought, as well as the admitted facts presented to the Florida jury, was evidence upon which that jury could reasonably reach the damages that it did. I agree with the majority in the Court of Appeal that, although the amount of damages awarded may seem disproportionate, it was a palpable and overriding error for the trial judge to conclude on the dollar amount of the judgment alone that the Florida jury must have been misled.

As the appellants did not provide any evidence of new and previously undiscoverable facts suggestive of fraud, the defence of fraud cannot form the basis

Le juge de première instance ne disposait donc d'aucun élément de preuve étayant l'allégation de fraude. En fait, il a lui-même affirmé ceci (à la p. 131) :

[TRADUCTION] Aucun dossier ne fait état des débats de l'audience relative à l'évaluation des dommages-intérêts et on ne connaît pas la preuve entendue par le jury. De même, aucun dossier ne fait état des directives du juge de première instance au jury.

En l'absence d'une telle preuve, le juge de première instance a commis une erreur en concluant à l'existence d'une fraude. Il est impossible de savoir si le jury avait déjà examiné la preuve que les appelants cherchent maintenant à présenter. L'intimé M. Beals et l'expert en matière de pertes d'entreprise ont tous les deux témoigné devant le jury de la Floride, sans que leur témoignage soit contredit. Devant le tribunal de l'Ontario, les appelants n'ont pas demandé à M. Beals, qui était disponible, de témoigner au sujet de la fraude alléguée. De même, l'avocat des intimés à l'action en Floride a témoigné sans qu'il soit question d'une fraude.

On n'a soumis aucune preuve indiquant que le jury a été (délibérément ou non) induit en erreur au sujet du préjudice causé. Les faits admis qui ont été présentés au jury incluaient des allégations de déclarations inexactes frauduleuses et de perte de profits. Les intimés réclamaient des dommages-intérêts fondés sur le prix d'achat du terrain et une perte de profits, ainsi que des dommages-intérêts punitifs. La nature des dommages-intérêts réclamés ainsi que les faits admis qui ont été présentés au jury de la Floride constituaient des éléments de preuve sur lesquels ce jury pouvait raisonnablement s'appuyer pour accorder le montant des dommages-intérêts auquel il est arrivé. Je souscris à l'opinion majoritaire de la Cour d'appel selon laquelle, bien que le montant des dommages-intérêts accordés puisse paraître démesuré, il reste que le juge de première instance a commis une erreur manifeste et dominante en déduisant, du seul montant accordé par le jugement, que le jury de la Floride avait été induit en erreur.

Vu que les appelants n'ont soumis aucune preuve de faits nouveaux et impossibles à découvrir antérieurement qui indiquerait l'existence d'une fraude,

56

57

58

of a valid challenge to the application for enforcement of the respondents' judgment.

### (2)  The Defence of Natural Justice

59    As previously stated, the denial of natural justice can be the basis of a challenge to a foreign judgment and, if proven, will allow the domestic court to refuse enforcement. A condition precedent to that defence is that the party seeking to impugn the judgment prove, to the civil standard, that the foreign proceedings were contrary to Canadian notions of fundamental justice.

60    A domestic court enforcing a judgment has a heightened duty to protect the interests of defendants when the judgment to be enforced is a foreign one. The domestic court must be satisfied that minimum standards of fairness have been applied to the Ontario defendants by the foreign court.

61    The enforcing court must ensure that the defendant was granted a fair process. Contrary to the position taken by my colleague LeBel J., it is not the duty of the plaintiff in the foreign action to establish that the legal system from which the judgment originates is a fair one in order to seek enforcement. The burden of alleging unfairness in the foreign legal system rests with the defendant in the foreign action.

62    Fair process is one that, in the system from which the judgment originates, reasonably guarantees basic procedural safeguards such as judicial independence and fair ethical rules governing the participants in the judicial system. This determination will need to be made for all foreign judgments. Obviously, it is simpler for domestic courts to assess the fairness afforded to a Canadian defendant in another province in Canada. In the case of judgments made by courts outside Canada, the review may be more difficult but is mandatory

ils ne peuvent pas invoquer le moyen de défense fondé sur la fraude pour contester valablement la demande d'exécution du jugement obtenu par les intimés.

### (2)  Le moyen de défense fondé sur la justice naturelle

Comme nous l'avons vu, le déni de justice naturelle peut être invoqué pour contester un jugement étranger et, si l'existence d'un tel déni est prouvée, le tribunal national peut alors refuser d'exécuter le jugement en question. Pour pouvoir invoquer ce moyen de défense, la partie qui conteste le jugement doit préalablement établir, selon la norme de preuve applicable en matière civile, que les procédures à l'étranger étaient contraires aux notions de justice fondamentale canadiennes.

Un tribunal national saisi d'une demande d'exécution de jugement (« tribunal saisi ») est d'autant plus tenu de protéger les intérêts d'un défendeur lorsque le jugement en question a été rendu à l'étranger. En l'espèce, le tribunal national doit être convaincu que le tribunal étranger a appliqué des normes d'équité minimales à l'égard des défendeurs ontariens.

Le tribunal saisi doit s'assurer que le défendeur a eu droit à une procédure équitable. Contrairement au point de vue exprimé par mon collègue le juge LeBel, il n'appartient pas au demandeur à l'action intentée à l'étranger de démontrer le caractère équitable du régime juridique d'où émane le jugement qu'il veut faire exécuter. Il incombe plutôt au défendeur à l'action intentée à l'étranger d'alléguer que le régime juridique étranger est inéquitable.

La procédure équitable est celle qui, dans le régime d'où émane le jugement, offre raisonnablement des garanties procédurales fondamentales, telles l'indépendance judiciaire et des règles de déontologie équitables régissant la conduite des participants au système judiciaire. Il faut déterminer le caractère équitable de la procédure dans tous les cas où l'exécution d'un jugement étranger est requise. Il est évidemment plus simple pour les tribunaux nationaux d'apprécier l'équité à laquelle a eu droit un défendeur canadien dans une autre

2003 SCC 72 (CanLII)

and the enforcing court must be satisfied that fair process was used in awarding the judgment. This assessment is easier when the foreign legal system is either similar to or familiar to Canadian courts.

In the present case, the Florida judgment is from a legal system similar, but not identical, to our own. If the foreign state's principles of justice, court procedures and judicial protections are not similar to ours, the domestic enforcing court will need to ensure that the minimum Canadian standards of fairness were applied. If fair process was not provided to the defendant, recognition and enforcement of the judgment may be denied.

The defence of natural justice is restricted to the form of the foreign procedure, to due process, and does not relate to the merits of the case. The defence is limited to the procedure by which the foreign court arrived at its judgment. However, if that procedure, while valid there, is not in accordance with Canada's concept of natural justice, the foreign judgment will be rejected. The defendant carries the burden of proof and, in this case, failed to raise any reasonable apprehension of unfairness.

In Canada, natural justice has frequently been viewed to include, but is not limited to, the necessity that a defendant be given adequate notice of the claim made against him and that he be granted an opportunity to defend. The Florida proceedings were not contrary to the Canadian concept of natural justice. The appellants concede that they received notice of all the legal procedure taken in the Florida action and that the judge of the foreign court respected the procedure of that jurisdiction. The appellants submit, however, that they were denied natural justice because they were not given sufficient notice to enable them

province canadienne. Malgré les difficultés plus grandes qu'il peut présenter dans le cas d'un jugement rendu à l'extérieur du Canada, cet examen s'impose, en ce sens que le tribunal saisi doit être convaincu du caractère équitable de la procédure suivie pour rendre jugement. L'appréciation de l'équité est plus facile lorsque le régime juridique étranger est soit semblable à celui qui existe au Canada, soit bien connu des tribunaux canadiens.

En l'espèce, le jugement de la Floride émane d'un régime juridique semblable, mais non identique, au nôtre. Dans le cas où les principes de justice, les règles de procédure et les protections judiciaires de l'État étranger diffèrent des nôtres, le tribunal national saisi doit s'assurer que les normes d'équité minimales canadiennes sont respectées. Il peut refuser de reconnaître et d'exécuter le jugement si le défendeur n'a pas eu droit à une procédure équitable. **63**

Le moyen de défense fondé sur la justice naturelle est limité à la forme de la procédure étrangère et à l'application régulière de la loi, et n'a rien à voir avec le bien-fondé de l'affaire. Ce moyen de défense concerne seulement la procédure que le tribunal étranger a suivie pour arriver à son jugement. Toutefois, l'exécution du jugement sera refusée dans le cas où, si valide qu'elle soit à l'étranger, la procédure suivie pour le rendre n'est pas conforme à la notion de justice naturelle canadienne. Le fardeau de la preuve incombe au défendeur et, en l'espèce, ce dernier n'a suscité aucune crainte raisonnable d'injustice. **64**

Au Canada, on a souvent considéré que la justice naturelle commande notamment de donner au défendeur un avis suffisant de l'action intentée contre lui, ainsi que la possibilité de contester cette action. Les procédures engagées en Floride n'étaient pas contraires à la notion de justice naturelle canadienne. Les appelants concèdent qu'ils ont reçu avis de toutes les démarches juridiques entreprises dans le cadre de l'action intentée en Floride, et que le juge du tribunal étranger a suivi la procédure applicable dans ce ressort. Ils allèguent cependant avoir été l'objet d'un déni de justice naturelle du fait que l'avis qu'ils ont reçu ne leur permettait pas de **65**

to discover the extent of their financial jeopardy.

66     The appellants claim to have been denied the opportunity to assess the extent of their financial jeopardy because the respondents' claim failed to specify the exact dollar amount of damages and types of damages they were seeking. The Florida claims, particularly the Third Amended Complaint, made it clear that the damages sought were potentially significant. The complaints filed in Florida raised allegations of fraud and sought punitive damages, both of which allow for the possibility of a substantial award of damages. Treble damages were sought. Repayment of the purchase price, the amount lost by the respondents due to their inability to construct a model home on the lot, the expenses incurred in preparing that lot and lost revenue due to the respondents' inability to construct a model home to be used in their construction business were all sought in the Third Amended Complaint. In light of knowing the types of damages claimed, not being provided with a specific dollar value of the amount of damages sought cannot constitute a denial of natural justice. The appellants were mistaken when they presumed that the damages award would be approximately US$8,000.

67     The respondents did not give notice that an expert on the assessment of business losses would testify before the Florida jury. The failure to disclose witnesses in a notice of assessment is not a denial of natural justice.

68     LeBel J. would expand the defence of natural justice by interpreting the right to receive notice of a foreign action to include notice of the legal steps to be taken by the defendant where the legal system differs from that of Canada's and of the consequences flowing from a decision to defend, or not defend, the foreign action. Where such notice was not given, he would deny enforcement of the resulting judgment. No such burden should rest with the foreign plaintiff. Within Canada, defendants

mesurer l'ampleur du risque financier auquel ils étaient exposés.

Les appelants affirment qu'ils n'ont pas eu la possibilité de mesurer l'ampleur du risque financier auquel ils étaient exposés parce que la demande des intimés ne faisait état ni du montant exact ni de la nature des dommages-intérêts réclamés. Les allégations formulées en Floride, en particulier la troisième plainte modifiée, montraient clairement que les dommages-intérêts réclamés risquaient d'être élevés. Les plaintes déposées en Floride comportaient des allégations de fraude et une demande de dommages-intérêts punitifs qui, dans les deux cas, risquaient de donner lieu à des dommages-intérêts élevés. Des dommages-intérêts triples étaient réclamés. Dans la troisième plainte modifiée, les intimés réclamaient un remboursement fondé sur le prix d'achat du terrain, la perte due à l'impossibilité de construire une maison-témoin à cet endroit, les dépenses d'aménagement du terrain et la perte de revenu due à l'impossibilité de construire une maison-témoin destinée à leur entreprise de construction. Étant donné que les appelants connaissaient la nature des dommages-intérêts réclamés, l'omission de leur en communiquer le montant exact ne saurait constituer un déni de justice naturelle. Les appelants ont commis une erreur en estimant à environ 8 000 $US le montant des dommages-intérêts qui pourrait être accordé.

Les intimés n'ont pas donné avis du fait qu'un expert en matière d'évaluation des pertes d'entreprise témoignerait devant le jury de la Floride. Le défaut de communiquer l'identité de témoins dans un avis d'évaluation n'est pas un déni de justice naturelle.

Le juge LeBel élargirait la portée du moyen de défense fondé sur la justice naturelle en considérant que le droit d'être avisé de l'introduction d'une action à l'étranger inclut le droit du défendeur d'être avisé des démarches juridiques qu'il doit entreprendre lorsque le régime juridique du ressort étranger diffère de celui du Canada, ainsi que des conséquences d'une décision de contester ou de ne pas contester l'action en question. Le juge LeBel refuserait l'exécution du jugement rendu dans le

are presumed to know the law of the jurisdiction seized with an action against them. Plaintiffs are not required to expressly or implicitly notify defendants of the steps that they must take when notified of a claim against them. This approach is equally appropriate in the context of international litigation. To find otherwise would unduly complicate cross-border transactions and hamper trade with Canadian parties. A defendant to a foreign action instituted in a jurisdiction with a real and substantial connection to the action or parties can reasonably be expected to research the law of the foreign jurisdiction. The Saldanhas and Thivys owned land in the State of Florida and entered into a real estate transaction in that state. When served with notice of an action against them in the State of Florida, the appellants were responsible for gaining knowledge of Florida procedure in order to discover the particularities of that legal system.

My interpretation of the Florida legal system differs from that of LeBel J. in that I am of the opinion that the appellants were fully informed about the Florida action. They were advised of the case to meet and were granted a fair opportunity to do so. They did not defend the action. Once they received notice of the amount of the judgment, the appellants obviously had precise notice of the extent of their financial exposure. Their failure to act when confronted with the size of the award of damages was not due to a lack of notice but due to relying on the mistaken advice of their lawyer.

For these reasons, the defence of natural justice does not arise.

### (3) The Defence of Public Policy

The third and final defence is that of public policy. This defence prevents the enforcement of a

cas où un tel avis n'a pas été donné. Aucun fardeau de cette nature ne devrait incomber au demandeur étranger. Au Canada, les défendeurs sont présumés connaître le droit du ressort dans lequel une action est intentée contre eux. Les demandeurs ne sont pas tenus d'informer explicitement ou implicitement les défendeurs des démarches que ceux-ci doivent entreprendre après avoir reçu avis d'une demande présentée contre eux. Il convient également d'adopter cette approche dans le contexte d'un litige international. Toute autre conclusion compliquerait indûment les opérations transfrontalières et entraverait les échanges avec les résidants canadiens. On peut raisonnablement s'attendre à ce qu'un défendeur à une action intentée dans un ressort étranger ayant un lien réel et substantiel avec l'action ou les parties s'informe du droit applicable dans le ressort en question. Les Saldanha et les Thivy possédaient du terrain en Floride et ont conclu une opération immobilière dans cet État. Lorsque les appelants ont été avisés de l'introduction d'une action contre eux en Floride, il leur incombait dès lors de se renseigner sur la procédure applicable en Floride afin de connaître les particularités du régime juridique de cet État.

Mon interprétation du régime juridique de la Floride diffère de celle du juge LeBel en ce sens que j'estime que les appelants étaient très bien informés de l'action intentée en Floride. Ils ont été avisés de la preuve à réfuter et ont eu une possibilité raisonnable de la réfuter. Ils n'ont pas contesté l'action. Il est évident que, lorsqu'ils ont reçu un avis du montant accordé par le jugement, les appelants ont alors connu exactement l'ampleur du risque financier auquel ils étaient exposés. Leur défaut d'agir face à l'importance du montant des dommages-intérêts accordés est dû non pas à l'absence d'avis, mais plutôt au fait qu'ils ont suivi les conseils erronés de leur avocat. 69

Pour ces motifs, le moyen de défense fondé sur la justice naturelle ne peut pas être invoqué. 70

### (3) Le moyen de défense fondé sur l'ordre public

Le troisième et dernier moyen de défense est fondé sur l'ordre public. Ce moyen de défense 71

foreign judgment which is contrary to the Canadian concept of justice. The public policy defence turns on whether the foreign <u>law</u> is contrary to our view of basic morality. As stated in Castel and Walker, *supra*, at p. 14-28:

. . . the traditional public policy defence appears to be directed at the concept of repugnant laws and not repugnant facts. . . .

72    How is this defence of assistance to a defendant seeking to block the enforcement of a foreign judgment? It would, for example, prohibit the enforcement of a foreign judgment that is founded on a law contrary to the fundamental morality of the Canadian legal system. Similarly, the public policy defence guards against the enforcement of a judgment rendered by a foreign court proven to be corrupt or biassed.

73    The appellants submitted that the defence of public policy should be broadened to include the case where neither the defence of natural justice nor the current defence of public policy would apply but where the outcome is so egregious that it justifies a domestic court's refusal to enforce the foreign judgment. The appellants argued that, as a matter of Canadian public policy, a foreign judgment should not be enforced if the award is excessive, would shock the conscience of, or would be unacceptable to, reasonable Canadians. The appellants claimed that the public policy defence provides a remedy where the judgment, by its amount alone, would shock the conscience of the reasonable Canadian. It was argued that, if the respondents and their witnesses were truthful in the Florida proceeding, it must follow that the laws in Florida permit a grossly excessive award for lost profits absent a causal connection between the acts giving rise to liability and the damages suffered. Such a result, the appellants submitted, would shock the conscience of the reasonable Canadian. I do not agree.

empêche l'exécution d'un jugement étranger contraire à la notion de justice canadienne. Il s'agit de savoir si le <u>droit</u> étranger est contraire à nos valeurs morales fondamentales. Comme l'affirment Castel et Walker, *op. cit.*, p. 14-28 :

[TRADUCTION] . . . le moyen de défense traditionnel fondé sur l'ordre public paraît axé sur la notion de lois répugnantes et non sur la notion de faits répugnants. . .

Quelle est l'utilité de ce moyen de défense pour le défendeur qui veut empêcher l'exécution d'un jugement étranger? Il sert notamment à interdire l'exécution d'un jugement étranger fondé sur une loi contraire aux valeurs morales fondamentales du régime juridique canadien. De même, le moyen de défense fondé sur l'ordre public empêche l'exécution du jugement d'un tribunal étranger indubitablement corrompu ou partial.

Les appelants ont soutenu qu'il y a lieu d'élargir le moyen de défense fondé sur l'ordre public de manière à pouvoir l'invoquer dans le cas où le moyen de défense fondé sur la justice naturelle et l'actuel moyen de défense fondé sur l'ordre public sont inopposables, mais où le jugement rendu à l'étranger est à ce point inacceptable qu'il justifie un refus d'exécution de la part du tribunal national. Les appelants ont fait valoir que, pour des raisons d'ordre public, il n'y a pas lieu d'exécuter, au Canada, un jugement étranger qui accorde une somme démesurée qui choquerait la conscience des Canadiens et des Canadiennes raisonnables ou que ceux-ci jugeraient inacceptable. Ils ont allégué que le moyen de défense fondé sur l'ordre public porte remède dans le cas où le jugement choquerait la conscience des Canadiens et des Canadiennes raisonnables, ne serait-ce à cause du seul montant qu'il accorde. D'après les appelants, si les intimés et leurs témoins ont dit la vérité au cours de l'instance en Floride, il s'ensuit nécessairement que les lois de la Floride permettent d'accorder une indemnité nettement démesurée pour la perte de profits, et ce, en l'absence de lien causal entre le préjudice subi et les actes ayant donné naissance à la responsabilité. Un tel résultat, de prétendre les appelants, choquerait la conscience des Canadiens et des Canadiennes raisonnables. Je ne suis pas d'accord.

Blom, *supra*, predicted the appellants' request for the expansion of the public policy defence (at p. 400):

The only change that the *Morguard* approach to recognition may bring in its wake is a greater temptation to expand the notion of public policy, so as to justify refusing a foreign default judgment that meets the *Morguard* criteria, but whose enforcement nevertheless appears to impose a severe hardship on the defendant.

The use of the defence of public policy to challenge the enforcement of a foreign judgment involves impeachment of that judgment by condemning the foreign law on which the judgment is based. It is not a remedy to be used lightly. The expansion of this defence to include perceived injustices that do not offend our sense of morality is unwarranted. The defence of public policy should continue to have a narrow application.

The award of damages by the Florida jury does not violate our principles of morality. The sums involved, although they have grown large, are not by themselves a basis to refuse enforcement of the foreign judgment in Canada. Even if it could be argued in another case that the arbitrariness of the award can properly fit into a public policy argument, the record here does not provide any basis allowing the Canadian court to re-evaluate the amount of the award. The public policy defence is not meant to bar enforcement of a judgment rendered by a foreign court with a real and substantial connection to the cause of action for the sole reason that the claim in that foreign jurisdiction would not yield comparable damages in Canada.

There was no evidence that the Florida procedure would offend the Canadian concept of justice. I disagree for the foregoing reasons that enforcement of the Florida monetary judgement would shock the conscience of the reasonable Canadian.

Blom, *loc. cit.*, laissait présager la demande des appelants d'élargir la portée du moyen de défense fondé sur l'ordre public (à la p. 400) :

[TRADUCTION] Le seul changement que risque de provoquer la façon dont l'arrêt *Morguard* aborde la reconnaissance est que l'on sera davantage tenté d'élargir la notion d'ordre public pour justifier le refus d'exécuter un jugement rendu par défaut à l'étranger qui respecte les critères de l'arrêt *Morguard*, mais dont l'exécution paraît cependant causer de grandes difficultés au défendeur.

Le recours au moyen de défense fondé sur l'ordre public pour contester l'exécution d'un jugement étranger signifie que l'on attaque la validité de ce jugement en dénonçant la loi étrangère sur laquelle il est fondé. Ce moyen de défense ne doit pas être invoqué à la légère. Rien ne justifie d'en élargir la portée de manière à pouvoir l'invoquer pour remédier à des injustices perçues qui ne heurtent pas notre sens des valeurs. Le moyen de défense fondé sur l'ordre public devrait continuer d'être appliqué d'une manière restrictive.

Le montant des dommages-intérêts accordés par le jury de la Floride ne fait pas entorse à nos principes. Malgré l'ampleur qu'elles ont prise, les sommes en question ne justifient pas, à elles seules, un refus d'exécuter le jugement étranger au Canada. Même s'il était possible, dans une autre affaire, d'invoquer l'ordre public pour faire valoir que le montant accordé est arbitraire, rien dans le dossier soumis en l'espèce n'autorise le tribunal canadien à réévaluer le montant accordé. Le moyen de défense fondé sur l'ordre public n'est pas destiné à empêcher l'exécution du jugement d'un tribunal étranger ayant un lien réel et substantiel avec la cause d'action, pour le seul motif que la demande présentée dans ce ressort étranger ne donnerait pas lieu à des dommages-intérêts comparables au Canada.

Rien ne prouvait que la procédure suivie en Floride était contraire à la notion de justice canadienne. Pour les motifs qui précèdent, je ne suis pas d'accord pour dire que l'exécution du jugement rendu en Floride choquerait la conscience des Canadiens et des Canadiennes raisonnables.

74

75

76

77

C. *Section 7 of the Canadian Charter of Rights and Freedoms*

78    The appellants submitted that the Florida judgment cannot be enforced because its enforcement would force them into bankruptcy. It was argued that the recognition and enforcement of that judgment by a Canadian court would constitute a violation of s. 7 of the *Charter*. The appellants submitted that a *Charter* remedy should be recognized to the effect that, before a domestic court enforces a foreign judgment which would result in the defendant's bankruptcy, the court must be satisfied that the foreign judgment has been rendered in accordance with the principles of fundamental justice. No authority is offered for that proposition with which I disagree but, in any event, the Florida proceedings were conducted in conformity with fundamental justice. The obligation of a domestic court to recognize and enforce a foreign judgment cannot depend on the financial ability of the defendant to pay that judgment. As s. 7 of the *Charter* does not shield a Canadian resident from the financial effects of the enforcement of a judgment rendered by a Canadian court, I have difficulty accepting that s. 7 should shield a Canadian defendant from the enforcement of a foreign judgment.

V. Disposition

79    The parties agreed that the Florida court had a real and substantial connection to the action launched by the respondents. Having properly taken jurisdiction, the judgment of that court must be recognized and enforced by a domestic court, provided that no defences bar its enforcement. None of the existing defences of fraud, natural justice or public policy have been supported by the evidence. Although the damage award may appear disproportionate to the original value of the land in question, that cannot be determinative. The judgment of the Florida court should be enforced.

80    The appeal is dismissed with costs.

C. *L'article 7 de la Charte canadienne des droits et libertés*

Les appelants ont soutenu que le jugement rendu en Floride ne peut être exécuté parce que cela les obligerait à faire faillite. Ils ont allégué que la reconnaissance et l'exécution de ce jugement par un tribunal canadien constituerait une violation de l'art. 7 de la *Charte*. Selon eux, il y a lieu de faire droit à un recours fondé sur la *Charte* étant donné que, pour exécuter un jugement étranger qui entraînerait la faillite du défendeur, le tribunal national doit être convaincu que ce jugement est conforme aux principes de justice fondamentale. Aucune jurisprudence ni aucune doctrine n'est citée à l'appui de cette proposition à laquelle je ne souscris pas, et, quoi qu'il en soit, l'instance en Floride s'est déroulée d'une manière conforme à la justice fondamentale. L'obligation d'un tribunal national de reconnaître et d'exécuter un jugement étranger ne saurait être tributaire de la capacité du défendeur de payer le montant que ce jugement lui ordonne de verser. Vu que l'art. 7 de la *Charte* ne protège pas un résidant canadien contre les conséquences financières de l'exécution d'un jugement rendu par un tribunal canadien, j'ai peine à croire qu'il devrait protéger un défendeur canadien contre l'exécution d'un jugement étranger.

V. Dispositif

Les parties ont convenu que le tribunal de la Floride avait un lien réel et substantiel avec l'action intentée par les intimés. Étant donné que ce tribunal a exercé correctement sa compétence, un tribunal national se doit de reconnaître et d'exécuter le jugement qu'il a rendu, pourvu qu'aucun moyen de défense ne vienne en empêcher l'exécution. En l'espèce, la preuve ne justifie d'invoquer aucun des moyens de défense existants qui sont fondés sur la fraude, la justice naturelle ou l'ordre public. Bien que le montant des dommages-intérêts accordés puisse paraître démesuré par rapport à la valeur initiale du terrain en cause, cela ne saurait être déterminant. Le jugement rendu par le tribunal de la Floride doit être exécuté.

L'appel est rejeté avec dépens.

The reasons of Iacobucci and Binnie JJ. were delivered by

BINNIE J. (dissenting) — The question raised by this appeal is the sufficiency of the notice provided to Ontario defendants (the appellants) of Florida proceedings against them by two Sarasota County real estate developers over the sale of an empty residential building lot in 1984 for US$8,000. The subject matter of their contract turned out to be the wrong lot. The respondents kept the lot (they say they did not intend to purchase) and sued the appellants for damages.

The Florida default judgment now commands payment of over C$1,000,000, an award described by the Ontario trial judge as "breathtaking". The damages were assessed by a Florida jury in less than half a day.

If the notice had been sufficient, I would have agreed reluctantly with the majority of my colleagues that the default judgment against them would be enforceable in Ontario despite the fact the foreign court never got to hear the Ontario defendants' side of the story. Their failure to participate using the procedures open to them in Florida would have bound them to the result. However, in my view, the appellants' inactivity in the face of their mushrooming legal problem is explained by the fact they were kept in the dark about the true nature and extent of their jeopardy. They were not served with some of the more important documents on liability filed in the Florida proceeding before they were noted in default, nor were they served with other important documents relevant to the assessment of damages filed after default but prior to the trial at which judgment was entered against them. Proper notice is a function of the particular circumstances of the case giving rise to the foreign default judgment. In this case, in my view, there was a failure of notification amounting to a breach of natural justice. In these

Version française des motifs des juges Iacobucci et Binnie rendus par

LE JUGE BINNIE (dissident) — La question qui se pose, en l'espèce, est de savoir si des défendeurs ontariens (les appelants) ont reçu de deux promoteurs immobiliers du comté de Sarasota, en Floride, un avis suffisant des poursuites intentées contre eux dans cet État. Ces poursuites concernaient un terrain vague destiné à la construction d'un immeuble résidentiel, qu'ils avaient vendu, en 1984, pour la somme de 8 000 $US. Il s'était révélé que le contrat portait sur le mauvais lot. Les intimés ont conservé le lot qu'ils prétendaient ne pas avoir voulu acheter et ont intenté une action en dommages-intérêts contre les appelants.

Le jugement rendu par défaut en Floride ordonne maintenant le paiement de plus de 1 000 000 $CAN, montant qualifié de [TRADUCTION] « renversant » par le juge de première instance en Ontario. Un jury de la Floride a mis moins d'une demi-journée à évaluer les dommages-intérêts.

Si l'avis donné avait été suffisant, j'aurais souscrit à regret à l'opinion majoritaire de mes collègues voulant que le jugement par défaut prononcé contre les appelants soit exécutoire en Ontario même si le tribunal étranger n'a jamais entendu leur version des faits. Les appelants seraient liés par ce jugement en raison de leur omission de participer à l'instance en Floride par l'exercice des recours disponibles dans ce ressort. J'estime, cependant, que l'inaction des appelants face à leur problème juridique qui s'aggravait très rapidement s'explique par le fait qu'ils ignoraient la nature et l'ampleur véritables du risque auquel ils étaient exposés. On ne leur avait pas signifié certains des plus importants documents concernant leur responsabilité qui avaient été déposés dans le cadre de l'instance en Floride avant même que leur défaut soit constaté. On ne leur avait pas signifié non plus d'autres documents importants utiles pour évaluer les dommages-intérêts qui avaient été déposés après la constatation de leur défaut, mais avant le procès au terme duquel un jugement a été prononcé contre eux. L'avis qui doit être donné

81

82

83

circumstances, the Ontario courts ought not to give effect to the Florida judgment.

## I.  Real and Substantial Connection

84    I agree with Major J. that the "real and substantial connection" test developed in *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077, *Hunt v. T&N plc*, [1993] 4 S.C.R. 289, at p. 325, and *Tolofson v. Jensen*, [1994] 3 S.C.R. 1022, at p. 1058, provides an appropriate conceptual basis for the enforcement in Canada of final judgments obtained in foreign jurisdictions as it does for final judgments obtained in other provinces.

85    That said, I recognize that there are significant differences between enforcement of a foreign judgment and enforcement of judgments from one province or territory to another within the Canadian federation. As La Forest J. observed in *Morguard* (at p. 1098):

The considerations underlying the rules of comity apply with much greater force between the units of a federal state. . . .

*Morguard* went on to refer to "[t]he integrating character of our constitutional arrangements" (p. 1100), including (1) common citizenship, (2) interprovincial mobility of citizens, (3) the common market among the provinces envisaged by our Constitution, and (4) the essentially unitary structure of our judicial system presided over by the Supreme Court of Canada. The constitutional flavour of the *Morguard* analysis was picked up and emphasized in *Hunt*, *supra*, and again in *Spar Aerospace Ltd. v. American Mobile Satellite Corp.*, [2002] 4 S.C.R. 205, 2002 SCC 78, at para. 53. We should not backtrack on the importance of that distinction.

varie selon les circonstances particulières de l'affaire à l'origine du jugement par défaut rendu à l'étranger. J'estime que l'insuffisance de l'avis donné en l'espèce représente un déni de justice naturelle. Dans ces circonstances, les tribunaux ontariens doivent s'abstenir de mettre à exécution le jugement de la Floride.

## I.  Lien réel et substantiel

Je conviens avec le juge Major que le critère du « lien réel et substantiel » élaboré dans les arrêts *Morguard Investments Ltd. c. De Savoye*, [1990] 3 R.C.S. 1077, *Hunt c. T&N plc*, [1993] 4 R.C.S. 289, p. 325, et *Tolofson c. Jensen*, [1994] 3 R.C.S. 1022, p. 1058, fournit, comme dans le cas des jugements définitifs obtenus dans d'autres provinces, un fondement conceptuel approprié pour exécuter au Canada les jugements définitifs obtenus dans des ressorts étrangers.

Cela dit, je reconnais qu'il existe d'importantes différences entre l'exécution d'un jugement étranger et celle d'un jugement d'une province ou d'un territoire par les tribunaux d'une autre province ou d'un autre territoire de la fédération canadienne. Comme le juge La Forest le fait observer dans l'arrêt *Morguard*, p. 1098 :

Les considérations qui sous-tendent les règles de la courtoisie s'appliquent avec beaucoup plus de force entre les éléments d'un État fédéral. . .

L'arrêt *Morguard* mentionne ensuite « [l]e caractère unificateur de nos arrangements constitutionnels » (p. 1100), dont (1) la citoyenneté commune, (2) la mobilité interprovinciale des citoyens, (3) le marché commun interprovincial prévu par notre Constitution, et (4) la structure essentiellement unitaire de notre système judiciaire dont le sommet est occupé par la Cour suprême du Canada. Dans l'arrêt *Hunt*, précité, et ensuite dans l'arrêt *Spar Aerospace Ltée c. American Mobile Satellite Corp.*, [2002] 4 R.C.S. 205, 2002 CSC 78, par. 53, la Cour a relevé et souligné la connotation constitutionnelle de l'analyse effectuée dans l'arrêt *Morguard*. Il n'y a pas lieu de revenir sur l'importance de cette distinction.

Case 1:25-cv-00910-JMF    Document 52-13    Filed 04/07/25    Page 43 of 115

It stands to reason that if the issues posed by the enforcement of foreign judgments differ from the issues encountered in the enforcement of judgments among the provinces and the territories, the legal rules are not going to be identical. Accordingly, while I accept that the *Morguard* test ("real and substantial connection") provides a framework for the enforcement of foreign judgments, it would be prudent at this stage not to be overly rigid in staking out a position on available defences beyond what the facts of this case require. Both Major J. (paras. 39-41) and LeBel J. (paras. 217-18) acknowledge (with varying degrees of enthusiasm) that a greater measure of flexibility may be called for in considering defences to the enforcement of foreign judgments as distinguished from interprovincial judgments. The time will come when such a re-examination of available defences will be necessary. The need for such a re-examination does not arise in this case. The appellants come within the traditional limits of the natural justice defence, and their appeal should be allowed on that ground.

## II.  The Foreign Judgment

In 1981, the appellants bought an empty lot in a Florida real estate subdivision near Sarasota for US$4,000. It was described as Lot 2. They did not build. They did not even visit it. They just paid the municipal taxes. In 1983, they thought they had sold it to the respondents for US$8,000. Despite the fact that all of the closing documentation referred to Lot 2, the respondents (who say they did not "catch" the reference to Lot 2 in the closing document) eventually claimed that they had *intended* to purchase the lot next door — Lot 1 — and that they had been falsely and fraudulently induced to buy Lot 2 by the appellants and a Florida real estate agent called O'Neill.

Il est évident que les règles juridiques applicables ne seront pas les mêmes si les problèmes soulevés par l'exécution de jugements étrangers diffèrent de ceux que pose l'exécution des jugements d'une province ou d'un territoire par les tribunaux d'une autre province ou d'un autre territoire. En conséquence, bien que je reconnaisse que le critère du « lien réel et substantiel » établi dans l'arrêt *Morguard* offre un cadre d'exécution en matière de jugements étrangers, j'estime qu'à ce stade il vaut mieux éviter d'adopter, au sujet des moyens de défense disponibles, un point de vue plus strict que ce que commandent les faits de la présente affaire. Les juges Major (par. 39-41) et LeBel (par. 217-218) reconnaissent (plus ou moins volontiers) qu'en examinant les moyens de défense opposables à l'exécution d'un jugement étranger, il peut être nécessaire de faire montre d'une plus grande souplesse que dans le cas d'un jugement rendu par un tribunal d'une autre province. À la longue, il faudra procéder à un tel réexamen des moyens de défense disponibles, qui ne s'avère toutefois pas nécessaire en l'espèce. Les appelants satisfont aux conditions traditionnelles requises pour pouvoir invoquer la justice naturelle comme moyen de défense, et leur appel devrait être accueilli pour ce motif.

## II.  Le jugement étranger

En 1981, les appelants ont acheté, pour la somme de 4 000 $US, un terrain vague faisant partie d'un lotissement situé près de Sarasota, en Floride. Ce terrain était décrit comme le lot 2. Les appelants n'y ont rien construit et ne l'ont même pas visité. Ils se sont contentés d'en acquitter les taxes municipales. En 1983, ils croyaient l'avoir vendu aux intimés pour la somme de 8 000 $US. Bien que tous les documents requis pour conclure la vente aient mentionné le lot 2, les intimés (qui affirment ne pas avoir « relevé » cette mention du lot 2 dans les documents) ont finalement prétendu avoir eu *l'intention* d'acheter le lot voisin, soit le lot 1, et que les appelants et un agent immobilier de la Floride, appelé O'Neill, les avaient faussement et frauduleusement incités à acheter le lot 2.

2003 SCC 72 (CanLII)

88    No doubt the Florida courts had jurisdiction over the ensuing dispute. The land was located in that jurisdiction. The appellants ought to have anticipated, and probably did anticipate, that disputes over Florida land would be decided by Florida courts. However, they could not fairly have anticipated that this pedestrian real estate deal gone sour would eventually explode into a Florida judgment against them said to be worth in excess of C$800,000 at the time of the trial in Ontario in November 1998 with interest continuing to run for the past five years at 12 percent per annum, producing an ultimate Kafka-esque judgment with an apparent value of over C$1,000,000.

89    It appears that soon after being served with the respondents' Complaint, the appellants decided to tell their story to the Florida court by filing a Statement of Defence, but to forgo the further expense of hiring a Florida lawyer to represent their interests. The costs would likely have exceeded the amount they thought was in issue. As the trial judge in Ontario put it, based on what was disclosed in the Complaint, litigation of an US$8,000 real estate transaction in Florida hardly seemed to be "worth the candle". The fact this evaluation proved to be disastrously wrong is a measure of the inadequacy of what they were told about the Florida proceedings.

90    My colleague Major J. holds, in effect, that the appellants are largely the victims of what he considers to be some ostrich-like inactivity and some poor legal advice from their Ontario solicitor. There is some truth to this, but such a bizarre outcome nevertheless invites close scrutiny of how the Florida proceedings transformed a minor real estate transaction into a major financial bonanza for the respondents.

Il ne fait aucun doute que les tribunaux de la Floride étaient compétents pour régler le différend qui a suivi. Le terrain était situé dans ce ressort. Les appelants auraient dû prévoir, et avaient probablement prévu, que tout différend relatif au terrain en Floride serait tranché par les tribunaux de la Floride. Toutefois, ils ne pouvaient pas vraiment prévoir qu'une banale opération immobilière ayant mal tourné aboutirait à un jugement d'un tribunal de la Floride les condamnant à verser une somme qui était estimée à plus de 800 000 $CAN au moment du procès tenu en Ontario, en novembre 1998, et qui semble maintenant atteindre le montant kafkaïen de plus de 1 000 000 $CAN, en raison des intérêts courus au taux annuel de 12 pour 100 pendant les cinq dernières années.

Il appert que, peu après s'être vu signifier la plainte des intimés, les appelants ont décidé de déposer une défense exposant leur version des faits au tribunal de la Floride, mais d'éviter toute dépense additionnelle liée à l'embauche d'un avocat de la Floride pour défendre leurs intérêts. Ces dépenses auraient probablement été supérieures au montant qui, croyaient-ils, était en litige. Comme l'a dit le juge de première instance en Ontario, compte tenu de ce que révélait la plainte, aller plaider en Floride relativement à une opération immobilière de 8 000 $US ne paraissait guère [TRADUCTION] « en val[oir] la chandelle ». Le désastre auquel a mené cette mauvaise évaluation de la situation montre à quel point l'avis que les appelants ont reçu au sujet de l'instance en Floride était insuffisant.

Mon collègue le juge Major conclut, en effet, que les appelants sont en grande partie victimes de leur inaction qu'il attribue à un genre de refus, de leur part, de voir le danger auquel ils étaient exposés et à des mauvais conseils de la part de leur avocat ontarien. Bien qu'il puisse y avoir une part de vérité dans ces propos, il reste qu'un résultat aussi singulier commande un examen attentif de la façon dont l'instance en Floride a permis aux intimés de tirer un profit important et inattendu d'une opération immobilière mineure.

While the notification procedures under the Florida rules may be considered in Florida to be quite adequate for Florida residents with easy access to advice and counsel from Florida lawyers (and there is no doubt that Florida procedures in general conform to a reasonable standard of fairness), nevertheless the question here is whether the appellants *in this proceeding* were sufficiently informed of the case against them, both with respect to liability and the potential financial consequences, to allow them to determine in a reasonable way whether or not to participate in the Florida action, or to let it go by default.

III.  The Initial Aborted Proceedings

The Florida action was initially commenced on February 15, 1985 by the two respondents and their then partners (who will collectively be referred to as the respondents) in the Twentieth Judicial Circuit in and for Charlotte County, Florida. The appellants duly filed a defence. Eventually, this first action was "voluntarily dismiss[ed] . . . without prejudice" by the Florida court, apparently on the basis that the respondents had commenced their action in the wrong Circuit. The respondents immediately started a second action in the Twelfth Judicial Circuit and again the appellants filed a defence. This suggests that when the appellants were notified of what pleading had to be done, they did it.

IV.  The Nature of the Complaint Against the Appellants

The original plaintiffs, two real estate developers and their wives (including the present respondents), alleged that the appellants misrepresented that they owned building Lot 1, whereas they owned building Lot 2, and that this misrepresentation was "willfully false and fraudulent". The respondents said "they" (i.e., the individual respondents) began building on Lot 1, discovered the error, and "immediately ceased construction".

Il est certes possible de considérer que la procédure prescrite en matière d'avis par les règles de la Floride est tout à fait suffisante en ce qui concerne les résidants de la Floride, qui ont facilement accès aux avis et aux conseils des avocats de cet État (et il ne fait aucun doute que la procédure de la Floride est, de manière générale, conforme à une norme raisonnable d'équité). Néanmoins, il faut se demander si l'avis que les appelants *en l'espèce* ont reçu au sujet du risque auquel ils étaient exposés — tant sur le plan de la responsabilité que sur celui des conséquences financières possibles — suffisait pour qu'ils soient en mesure de décider raisonnablement s'ils devaient participer à l'action intentée en Floride ou laisser le tribunal rendre jugement par défaut.

91

III.  L'instance initiale annulée

Les deux intimés et leurs associés de l'époque (qui seront collectivement appelés « les intimés ») ont intenté l'action initiale, le 15 février 1985, dans le Twentieth Judicial Circuit du comté de Charlotte, en Floride. Les appelants ont dûment produit une défense. Finalement, le tribunal de la Floride a rejeté la première action [TRADUCTION] « sur requête des demandeurs [intimés en l'espèce] et sous toutes réserves », apparemment parce que les intimés avaient intenté leur action dans le mauvais ressort. Les intimés ont aussitôt intenté une deuxième action dans le Twelfth Judicial Circuit et, là encore, les appelants ont produit une défense. Cela montre que, lorsqu'ils ont été avisés de produire un acte de procédure, les appelants l'ont fait.

92

IV.  La nature de la plainte déposée contre les appelants

Les demandeurs initiaux, deux promoteurs immobiliers et leurs épouses (y compris les intimés au présent pourvoi), ont allégué que les appelants leur avaient déclaré qu'ils possédaient le lot 1, alors qu'ils possédaient le lot 2, et que cette déclaration inexacte était [TRADUCTION] « délibérément fausse et frauduleuse ». Les intimés ont affirmé qu'« ils » (c'est-à-dire eux-mêmes personnellement) s'étaient rendu compte de l'erreur après avoir commencé à

93

As a result, the respondents incurred the expenses of preparing the lot for construction and lost revenue because they were unable to construct a model home on Lot 1, which was a corner lot.

94    It is not our function to get into the merits of the Florida case but I note the respondent, Frederick Beals III, eventually acknowledged in the Florida proceedings that work terminated in October 1984 not because of an error in the legal description of the lot but because of a falling out among the respondents. At that time, a "Johnny Quick toilet" had been delivered to the work site but the floor slab had not yet been poured. The error with regard to Lot 1 and Lot 2 was not discovered by the respondents until three months later in January 1985.

95    The total expenditures on the project, including the purchase price, the building permits, the survey tests, trusses and some other materials were about US$14,000. The respondent Beals later testified that the average profit experienced on the houses he built in 1984 was about US$5,000 per home. The respondents' eventual award on account of loss of profit was more than ten times that figure.

96    The Complaint, and each subsequent "as amended" Complaint, simply refers to the respondents' damages on "a model home" (emphasis added). "A" model home is expressed in the singular and would not normally be understood, I think, to encompass an undisclosed and unbuilt residential subdivision which the respondents now say they had in mind.

97    The respondents claimed treble damages, rescission, punitive damages and costs. In the end, the jury seems to have ordered reimbursement of the actual expenditures (about US$14,000) plus loss of profit (about US$56,000), all of which was trebled to make the total of US$210,000, plus punitive

construire sur le lot 1, et qu'ils avaient [TRADUCTION] « aussitôt arrêté les travaux de construction ». Les intimés avaient donc engagé des dépenses d'aménagement du terrain aux fins de construction et subi une perte de revenu due à l'impossibilité de construire une maison-témoin sur le lot 1, qui était un terrain d'angle.

Il ne nous appartient pas d'examiner le bien-fondé de l'instance en Floride, mais je note que l'intimé, Frederick Beals III, a finalement reconnu, dans le cadre de cette instance, que l'arrêt des travaux, en octobre 1984, était dû non pas à une erreur de description cadastrale, mais à une brouille entre les intimés. À cette époque, une toilette chimique avait été livrée sur le chantier alors que la dalle du plancher n'était pas encore coulée. Ce n'est que trois mois plus tard, en janvier 1985, que les intimés se sont rendu compte de l'erreur concernant le lot 1 et le lot 2.

Les dépenses du projet, comprenant le prix d'achat et les sommes déboursées pour les permis de construction, les travaux d'arpentage, les fermes de toit et d'autres matériaux, totalisaient environ 14 000 $US. L'intimé Beals a, par la suite, témoigné que le profit moyen réalisé sur chacune des maisons qu'il avait construites en 1984 était d'environ 5 000 $US. Les intimés ont finalement obtenu, au titre de la perte de profits, un montant dix fois supérieur à cette somme.

La plainte et chaque plainte modifiée qui a suivi font simplement état des dommages-intérêts que les intimés réclamaient pour [TRADUCTION] « une maison-témoin » (je souligne). Vu que l'article « une » est au singulier, je ne crois pas que les termes « une » maison-témoin seraient normalement interprétés comme désignant un lotissement résidentiel non mentionné et non construit, auquel les intimés disent maintenant avoir songé.

Les intimés ont réclamé des dommages-intérêts triples, la résiliation du contrat, des dommages-intérêts punitifs et les dépens. En fin de compte, le jury semble avoir ordonné le remboursement des dépenses réelles (environ 14 000 $US) et de la perte de profit (environ 56 000 $US),

damages of US$50,000. The balance of the current million dollar claim consists of accumulated post-judgment interest compounding at the rate of 12 percent, plus the effect of a less favourable U.S. currency exchange rate.

le tout multiplié par trois pour un total de 210 000 $US, plus le versement de 50 000 $US à titre de dommages-intérêts punitifs. Le reste de la créance actuelle de 1 000 000 $CAN s'explique par les intérêts composés après jugement qui ont couru au taux de 12 pour 100, et par le taux de change moins favorable de la devise américaine.

## V.    The Complaint Against Other Parties

The respondents also alleged in their Complaint that, in August 1984, they — the developers — had initiated contact with a Sarasota real estate firm, O'Neill's Realty, who showed them Lot 1. The respondents go on to state in their Complaint that the realtor was only authorized by the appellants to sell Lot 2 (para. 25). Nevertheless, the realtor (both the corporation and James O'Neill personally), "knowingly and falsely" misrepresented that the appellants owned Lot 1 (para. 27) and "fraudulently" failed to stop the closing of the sale of the wrong lot (paras. 33 and 51). The respondents claimed the same relief against the realtor as they had against the appellants (para. 37). As will be seen, the respondents' allegation in their Complaint against the realtor O'Neill more or less corresponded with the appellants' version of events set out in their Statement of Defence.

The respondents subsequently added a complaint against a new defendant, the Commonwealth Land Title Insurance Company, alleging that the title insurer knew or should have known that all of the closing documentation erroneously referred to the appellants' Lot 2, instead of the desired Lot 1, and by "remaining silent" breached its corporate duty of disclosure.

With respect to the issue of notice, Florida rules require the written Complaint to expressly warn that "[e]ach defendant is hereby required to serve written defenses . . . within 20 days. . . . If a defendant fails to do so, a default [judgment] will be entered against that defendant for the relief demanded . . . ." This is what the appellants were told. The logical implication of this statement, it seems to me, is that if a

## V.    La plainte déposée contre les autres parties

98

Les intimés ont aussi allégué dans leur plainte qu'en août 1984 les promoteurs avaient communiqué avec une société immobilière de Sarasota, O'Neill's Realty, qui leur avait montré le lot 1. Ils ajoutent, dans leur plainte, que les appelants avaient seulement autorisé l'agent immobilier à vendre le lot 2 (par. 25). Néanmoins, l'agent immobilier (la société immobilière et James O'Neill personnellement) a [TRADUCTION] « sciemment et faussement » déclaré que les appelants possédaient le lot 1 (par. 27) et « frauduleusement » omis d'empêcher la vente du mauvais lot (par. 33 et 51). Les intimés ont réclamé de l'agent immobilier la même réparation que celle réclamée des appelants (par. 37). Comme nous le verrons, l'allégation que les intimés ont formulée dans leur plainte contre l'agent immobilier O'Neill recoupait plus ou moins la version des faits énoncée dans la défense des appelants.

99

Les intimés ont, par la suite, déposé contre une nouvelle défenderesse, la Commonwealth Land Title Insurance Company, une plainte dans laquelle ils alléguaient que cette société d'assurance de titres de propriété savait ou aurait dû savoir que tous les documents requis pour conclure la vente décrivaient erronément le lot 2, au lieu du lot 1 désiré, comme étant celui qui appartenait aux appelants, et qu'en [TRADUCTION] « ne disant rien » elle avait manqué à son obligation de divulgation.

100

En ce qui concerne l'avis qui doit être donné, les règles de la Floride exigent que la plainte écrite contienne la mise en garde expresse suivante : [TRADUCTION] « [c]haque défendeur est, par les présentes, tenu de signifier une défense écrite [. . .] dans les 20 jours. [. . .] Si un défendeur omet de le faire, un [jugement par] défaut accordant la réparation demandée sera rendu contre lui . . . » C'est

2003 SCC 72 (CanLII)

written defence were served, the defendants would *not* be in default of the pleading. This also turned out not to be true.

## VI.  The Statement of Defence

101    The appellants filed, then refiled in the different judicial circuit, a Statement of Defence which pleaded in the relevant part, as follows:

2. The facts are as follows:

a) At no time did the Sellers engage the services of O'Neill's Realty, Inc., and/or James O'Neill to sell the property above-referred to or any other property whatsoever.

b) On or about 1984, the Defendant, James O'Neill, contacted the Sellers and informed them that he had a client who wished to purchase the above-referred to property. As there had been no previous communication of any kind whatsoever between the Sellers and James O'Neill, the Sellers believed that he, the said James O'Neill, represented the Plaintiffs.

c) During subsequent telephone conversations in or about August, 1984, the Sellers advised James O'Neill that they had never been in Port Charlotte, Florida, and that the only information in their possession with respect to the above-referred to property was the number allocated to same, that is to say: Lot 2, Block 3694 of Port Charlotte Subdivision, Section 65.

d) James O'Neill assured the Sellers that they were the owners of the land which <u>his</u> client wished to purchase as he, the said James O'Neill, had perused the Public Records for the property in which <u>his</u> client was interested, and the names of the Sellers appeared thereon as owners. The Sellers were satisfied with his representations and therefore proceeded on that basis.

3.  On or about August, 1984, the Sellers received a Contract for Sale of Real Estate which said Contract described the above-referred to property as being Lot 1. The Sellers contacted James O'Neill to advise him of the discrepancy.

4.  James O'Neill once again assured the Sellers that they did own the property in which his client was

ce qui a été dit aux appelants. Il me semble que cet énoncé signifie logiquement que les défendeurs *ne* seraient *pas* en défaut s'ils signifiaient une défense écrite. Cela s'est également révélé faux.

## VI.  La défense

Les appelants ont déposé dans le premier ressort judiciaire, et ensuite dans l'autre ressort, une défense contenant, dans sa partie pertinente, les allégations suivantes :

[TRADUCTION]

2. Les faits sont les suivants :

a)  Les vendeurs n'ont jamais eu recours à O'Neill's Realty, Inc. ou à James O'Neill pour vendre le bien susmentionné ou quelqu'autre bien.

b)  En 1984, ou vers 1984, le défendeur, James O'Neill, a communiqué avec les vendeurs et les a informés qu'un de ses clients souhaitait acheter le bien susmentionné. Comme James O'Neill et les vendeurs n'avaient jamais communiqué ensemble auparavant, les vendeurs ont cru que le dénommé James O'Neill représentait les demandeurs.

c)  Au cours des conversations téléphoniques qui ont suivi en août 1984 ou vers le mois d'août 1984, les vendeurs ont informé James O'Neill qu'ils n'étaient jamais allés à Port Charlotte, en Floride, et qu'ils connaissaient seulement le numéro du bien susmentionné, à savoir qu'il s'agissait du lot 2, bloc 3694 du lotissement de Port Charlotte, section 65.

d)  James O'Neill a assuré aux vendeurs qu'ils étaient les propriétaires du terrain que <u>son</u> client souhaitait acheter, car il avait lui-même, James O'Neill, été en mesure de constater, en examinant les registres publics, que le bien qui intéressait <u>son</u> client y était inscrit comme appartenant aux vendeurs. Les vendeurs ont agi sur la foi de ces dires après les avoir jugés satisfaisants.

3.  En août 1984 ou vers le mois d'août 1984, les vendeurs ont reçu un contrat de vente de bien immeuble indiquant que le bien vendu était le lot 1. Les vendeurs ont communiqué avec James O'Neill pour l'informer de cette disparité.

4.  James O'Neill a de nouveau assuré aux vendeurs qu'ils étaient bel et bien les propriétaires du bien que son

interested and therefore the requisite change to the Contract was made. James O'Neill did not indicate to the Sellers that the change had to be initialled.

5. The Contract was returned to James O'Neill and on or about September 20th, 1984, the Sellers received a Warranty Deed which indicated that the property being sold was Lot 2.

6. As the discrepancy had been discussed with and pointed out to James O'Neill, and as the Warranty Deed specified Lot 2, Block 3694 of Port Charlotte Subdivision, Section 65, the Sellers had no reason to believe that the discrepancy in the Lot Number, that is to say Lot 2 as opposed to Lot 1, had not been discussed with the Plaintiffs and that the matter had not been efficiently and legally resolved. [Emphasis in original.]

The respondents never amended their Complaint against the appellants even though, as we will see, there was a good deal of activity in relation to the other defendants (before and after default was noted against the appellants) prior to the Florida court's final judgment against the appellants dated December 13, 1991.

## VII.  The Appellants' Dilemma

The appellants had to decide how to respond to the Complaint. To make an informed decision, they should have been told in general terms of the case they had to meet on liability and, more importantly on these facts, an indication of the jeopardy they faced in terms of damages. This is not a case where the plaintiffs were satisfied with the damages implicit in a failed minor real estate transaction. The Complaint, in my view, did not adequately convey to the appellants the importance of the decision that would eventually be made in the Florida court. The appellants were merely told, unhelpfully, that the claim exceeded US$5,000.

The appellants were entitled to draw some comfort from the fact that the respondents' guns were trained not on them alone, but on the real estate

client souhaitait acquérir, et la modification qui s'imposait a donc été apportée au contrat. Il n'a cependant pas indiqué aux vendeurs qu'ils devaient parapher cette modification.

5.  Le contrat a été retourné à James O'Neill et, le 20 septembre 1984 ou vers cette date, les vendeurs ont reçu un acte de garantie dans lequel il était indiqué que le bien vendu était le lot 2.

6.  Étant donné que la disparité avait été signalée à James O'Neill et analysée avec lui, et que l'acte de garantie indiquait le lot 2, bloc 3694 du lotissement de Port Charlotte, section 65, rien ne permettait aux vendeurs de croire que la différence de numéro du lot, c'est-à-dire le lot 2 au lieu du lot 1, n'avait pas fait l'objet d'une discussion avec les demandeurs et que le problème n'avait pas été réglé efficacement et légalement. [Souligné dans l'original.]

Les intimés n'ont jamais modifié la plainte qu'ils avaient déposée contre les appelants même si, comme nous le verrons, la situation a beaucoup évolué dans le cas des autres défendeurs (avant et après la constatation du défaut des appelants), avant que le tribunal de la Floride rende un jugement définitif contre les appelants, le 13 décembre 1991.

## VII.  Le dilemme des appelants

Les appelants devaient décider comment répondre à la plainte. Pour qu'ils soient en mesure de prendre une décision éclairée, on aurait dû les informer de la preuve générale qu'ils devaient réfuter en matière de responsabilité et, ce qui est encore plus important compte tenu des faits, leur faire part des dommages-intérêts auxquels ils risquaient d'être condamnés. Il ne s'agit pas d'un cas où les demandeurs se sont contentés des dommages-intérêts normalement liés à l'échec d'une opération immobilière mineure. J'estime que la plainte ne permettait pas aux appelants de saisir la gravité de la décision que pourrait rendre le tribunal de la Floride. Elle ne faisait qu'indiquer, inutilement, aux appelants que le montant réclamé était supérieur à 5 000 $US.

Les appelants étaient en droit de juger rassurant le fait qu'ils n'étaient pas les seuls dans la mire des intimés, vu que l'agent immobilier et la société

102

103

104

agent and the title insurer as well. Moreover, the respondent developers' allegations against the realtor O'Neill coincided with their own Statement of Defence, particularly the allegation that the appellants authorized the realtor to sell only Lot 2 — not Lot 1. On September 12, 1991, prior to the damages trial, the respondents settled with the realtor and the title insurer for US$10,750. This radically transformed the potential jeopardy of the appellants. They were never told of the settlement.

## VIII. The Florida Pleadings Rule

105     Under Rule 1.190(a) of the Florida *Rules of Civil Procedure* (Fla. Stat. Ann. R. Civ. P. § 1.190(a)), the appellants were required to refile their Defence every time the respondents amended their Complaint, even if the amendments were solely directed at other defendants. This was nowhere brought to the appellants' attention. As mentioned earlier, I think the appellants could fairly understand from the "warning" in the original Complaint that only no defence were filed would there be a pleadings default in the action. Otherwise there would be no pleadings default. The respondents never amended their Complaint against the appellants. There was therefore nothing further for the appellants "to answer". They were nevertheless noted in default for failing to file a defence.

106     The respondents' Amended Complaint, Second Amended Complaint, Third Amended Complaint and ultimately Fourth Amended Complaint modified the allegations against other parties. In terms of procedural fairness, I think the appellants were entitled to assume that in the absence of any new allegations against them there was no need to refile a defence that had already been filed in the same action. To non-lawyers, a requirement for such apparently useless duplication would come as a surprise.

107     Yet we are told that:

d'assurance de titres de propriété l'étaient aussi. En outre, les allégations que les intimés ont formulées contre l'agent immobilier O'Neill recoupaient leur propre défense, en particulier lorsqu'ils affirmaient que les appelants avaient seulement autorisé l'agent immobilier à vendre le lot 2 et non pas le lot 1. Le 12 septembre 1991, avant l'audience relative aux dommages-intérêts, les intimés se sont entendus avec l'agent immobilier et la société d'assurance de titres de propriétés pour qu'ils leur versent la somme de 10 750 $US à titre de règlement, ce qui avait pour effet de changer radicalement le risque auquel les appelants étaient exposés. Ces derniers n'ont jamais été informés du règlement.

## VIII. La règle de procédure de la Floride

Aux termes de la règle 1.190a) des *Rules of Civil Procedure* de la Floride (Fla. Stat. Ann. R. Civ. P. § 1.190a)), les appelants devaient déposer de nouveau leur défense chaque fois que les intimés modifiaient leur plainte, même si les modifications apportées ne visaient que les autres défendeurs. Les appelants n'ont jamais été informés de l'existence de cette règle. Je le répète, j'estime que les appelants pouvaient raisonnablement déduire de la « mise en garde » contenue dans la plainte initiale qu'il y aurait défaut de déposer un acte de procédure seulement si aucune défense n'était produite, sans quoi il n'y aurait pas de défaut à cet égard. Les intimés n'ont jamais modifié leur plainte contre les appelants. Par conséquent, rien ne justifiait une autre « réponse » des appelants. Ils ont néanmoins fait l'objet d'une constatation de défaut fondée sur l'omission de produire une défense.

Dans leurs première, deuxième, troisième et, finalement, quatrième plaintes modifiées, les intimés modifiaient les allégations contre les autres parties. Sur le plan de l'équité procédurale, j'estime que les appelants étaient en droit de supposer qu'en l'absence de nouvelles allégations contre eux ils n'avaient pas à déposer de nouveau une défense déjà produite en réponse à la même action. Pour le non-juriste, l'exigence de déposer, apparemment inutilement, un tel acte de procédure aurait de quoi étonner.

Pourtant, on nous dit ceci :

2003 SCC 72 (CanLII)

Under Florida law Dominic Thivy, Rose Thivy, Geoffrey Saldanha and Leueen Saldanha were under a <u>mandatory</u> obligation to deliver a defence to each of the new amended complaints. [Emphasis added.]

It seems to me the appellants were entitled to be told from the outset that their defence would be treated as non-existent if the Complaint were thereafter amended against *other* defendants.

When a Canadian resident is served with a legal process from within his or her own jurisdiction, he or she is presumed to know the law and the risks attendant with the notice. There can be no such presumption across different legal systems.

As the basis of the respondents' judgment is *default of pleading*, this lack of notification goes to the heart of the present appeal.

IX. <u>Other Information the Appellants Did not Know</u>

It is to be remembered that although the appellants had decided not to have a Florida lawyer, they were very much part of the liability phase of the action until noted in default on July 25, 1990, and very much interested in the assessment of damages phase of the action which did not take place until December 11, 1991. Even a defendant who concedes liability (as opposed to one who merely defaults) might want to contest what may appear to be "breathtaking" damages claimed by the successful party. Liability and assessment of damages are two distinct and separate issues. A defendant may choose to concede the one but contest the other.

In administrative law, where issues of notification have been extensively canvassed, albeit in a different context, it is well established that a party must be made aware of "the potential jeopardy faced": D. J. M. Brown and J. M. Evans, *Judicial Review of Administrative Action in Canada*

[TRADUCTION] Suivant la loi de la Floride, Dominic Thivy, Rose Thivy, Geoffrey Saldanha et Leueen Saldanha avaient l'obligation <u>absolue</u> de produire une défense pour chaque nouvelle plainte modifiée. [Je souligne.]

Il me semble que les appelants étaient en droit d'être informés, dès le départ, que leur défense serait considérée comme non existante si la plainte était, par la suite, modifiée à l'égard des *autres* défendeurs.

108 Lorsqu'un résidant canadien se voit signifier un acte de procédure émanant de son propre ressort, il est présumé connaître la loi applicable et les risques que suppose l'avis qui lui est alors donné. Une telle présomption ne s'applique pas lorsqu'un régime juridique différent est en cause.

109 Comme le jugement obtenu par les intimés repose sur le *défaut de produire un acte de procédure*, cette absence d'avis est cruciale en l'espèce.

IX. <u>Autres données inconnues des appelants</u>

110 Il faut se rappeler que, même après avoir décidé de ne pas constituer avocat en Floride, les appelants avaient vraiment participé à l'étape de l'action relative à l'examen de la responsabilité jusqu'à ce leur défaut soit constaté le 25 juillet 1990, et qu'ils étaient des parties indubitablement intéressées à l'étape de l'évaluation des dommages-intérêts qui n'a débuté que le 11 décembre 1991. Même le défendeur qui reconnaît sa responsabilité (contrairement à celui qui est simplement en défaut) pourrait vouloir contester les dommages-intérêts apparemment « renversants » que lui réclame la partie ayant eu gain de cause. La responsabilité et l'évaluation des dommages-intérêts sont deux questions tout à fait distinctes. Un défendeur peut choisir de reconnaître l'un, tout en contestant l'autre.

111 En droit administratif, où des questions en matière d'avis ont été étudiées en profondeur, quoique dans un contexte différent, il est bien établi qu'une partie doit être informée [TRADUCTION] « du risque auquel elle est exposée » : D. J. M. Brown et J. M. Evans, *Judicial Review of Administrative Action in Canada*

(loose-leaf ed.), at para. 9:5222. One of the criteria determining the stringency of natural justice requirements in particular circumstances is "the importance of the decision to the individual or individuals affected": *Baker v. Canada (Minister of Citizenship and Immigration)*, [1999] 2 S.C.R. 817, at para. 25. There is a difference in "importance" between a minor real estate transaction whose defence is "not worth the candle" and a major claim which the respondents have successfully orchestrated into a million dollar liability.

(a) *During the Liability Phase which Concluded July 25, 1990*

112    The appellants received no notice of the court order dated November 6, 1987, striking out the claim for punitive damages against the realtor and the title insurance defendant on the basis, apparently, that treble damages are themselves intended to be punitive, and an additional claim for punitive damages is not permitted under Florida law. Despite this ruling, the appellants, as defaulters, were subsequently held liable for treble damages of US$210,000 *plus* punitive damages of US$50,000. The punitive damages issue went very much to the appellants' potential jeopardy, yet it seems they were not kept in the picture about court orders made in the same action as between the other parties relevant to the same head of damage alleged against them. This event predated being noted in default. If the appellants had received the advantage of this ruling, it would potentially have reduced the eventual damages against them by almost 20 percent. In other words, the oversight, if that is what it was, related to what is now claimed to be worth about a quarter of a million dollars.

113    On June 19, 1990, the appellants were sent a notice that an application would be made to the Florida court to note them in default for failure to file a defence to the Third Amended Complaint or "serve any pleading or other paper as required by

(éd. feuilles mobiles), par. 9:5222. L'un des critères qui détermine la rigueur avec laquelle les règles de la justice naturelle doivent être appliquées dans certaines circonstances est « l'importance de la décision pour les personnes visées » : *Baker c. Canada (Ministre de la Citoyenneté et de l'Immigration)*, [1999] 2 R.C.S. 817, par. 25. L'opération immobilière mineure qui ne vaut pas la peine qu'on se défende n'a pas la même « importance » qu'une réclamation majeure que les intimés ont réussi à transformer en créance de 1 000 000 $.

a) *Pendant l'étape de l'examen de la responsabilité qui a pris fin le 25 juillet 1990*

Les appelants n'ont pas été avisés de l'ordonnance du 6 novembre 1987, dans laquelle le tribunal annulait la demande de dommages-intérêts punitifs présentée contre l'agent immobilier et la société d'assurance de titres de propriété, en raison, semble-t-il, du caractère intrinsèquement punitif des dommages-intérêts triples et du fait que la loi de la Floride interdisait de présenter une demande additionnelle de dommages-intérêts punitifs. Malgré cette décision, les appelants, en tant que parties en défaut, se sont vu par la suite ordonner de payer des dommages-intérêts triples de  210 000 $US, *plus* des dommages-intérêts punitifs de  50 000 $US. Les dommages-intérêts punitifs faisaient étroitement partie du risque auquel les appelants étaient exposés, mais ces derniers ne semblent avoir été informés d'aucune ordonnance judiciaire rendue, dans le cadre de la même action, à l'égard des autres parties et relativement au même préjudice qui leur était reproché. S'ils avaient été avisés de cette ordonnance rendue avant la constatation de leur défaut, les appelants auraient pu voir réduire de presque 20 pour 100 le montant qu'ils se sont vu finalement ordonner de payer. En d'autres mots, l'oubli, si on peut dire, portait sur ce qui est maintenant évalué à un quart de million de dollars.

Le 19 juin 1990, les appelants ont été avisés que le tribunal de la Floride serait saisi d'une requête en constatation de défaut résultant de l'omission de produire une défense à l'encontre de la troisième plainte modifiée ou [TRADUCTION] « de signifier

law". The appellants had no reason to think that the defence they had already filed was not applicable to the Third Amended Complaint. (Indeed, there apparently was a Fourth Amended Complaint but it is not in the record before us.) Unless the appellants were made aware of the Florida pleadings rule, which they were not, such a notice would simply add to their confusion. It may be obvious to a Florida lawyer that every amended Complaint requires a fresh defence even if there are no changes relevant to the defendant called upon to plead, but such a requirement would not be obvious to an Ontario lawyer, still less to self-represented litigants such as the appellants.

un acte de procédure ou autre document requis par la loi ». Les appelants n'avaient aucune raison de croire que la défense qu'ils avaient déjà produite ne s'appliquait pas à la troisième plainte modifiée. (En fait, il y aurait apparemment eu une quatrième plainte modifiée, qui ne figure cependant pas dans le dossier qui nous a été soumis.) À moins que les appelants ne soient informés de la règle de procédure de la Floride, ce qui n'a pas été fait, cet avis était simplement de nature à semer plus de confusion dans leur esprit. Bien qu'elle puisse être évidente pour un avocat de la Floride, l'obligation de déposer une nouvelle défense chaque fois qu'une plainte est modifiée — même si aucune des modifications apportées ne concerne le défendeur appelé à plaider — ne l'est cependant pas pour un avocat ontarien, et encore moins pour des parties, comme les appelants, qui se défendent elles-mêmes.

The appellants were noted in default on July 25, 1990.

Le défaut des appelants a été constaté le 25 juillet 1990.

114

(b) *After Being Noted in Default but Prior to the Jury Trial on December 11, 1991*

b) *Après la constatation du défaut, mais avant la tenue du procès devant jury le 11 décembre 1991*

In some cases, a court making an assessment of unliquidated damages might think it unnecessary to notify the defaulters of the ongoing proceedings. It would depend on the circumstances. For example, in Ontario, Rule 19.02(3) leaves notice in the discretion of the court (*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194). Whatever may be the minimum requirements in some cases, I believe the circumstances here cried out for notice of the subsequent proceedings because in the period between the noting of default on July 25, 1990, and the damages trial on December 11, 1991, the potential jeopardy changed radically to the appellants' disadvantage.

Dans certains cas, le tribunal peut juger inutile d'aviser les parties en défaut de l'évaluation de dommages-intérêts non déterminés à laquelle il procède. Tout dépend des circonstances. Par exemple, la règle ontarienne 19.02(3) laisse à la discrétion du tribunal le soin de donner ou non avis (*Règles de procédure civile*, R.R.O. 1990, règl. 194). Quelles que soient les exigences minimales dans certains cas, je crois que, dans les circonstances de la présente affaire, il était indispensable de donner un avis des procédures subséquentes étant donné qu'entre le 25 juillet 1990, date de la constatation du défaut, et le 11 décembre 1991, date de l'audience relative aux dommages-intérêts, le risque auquel les appelants étaient exposés avait radicalement changé à leur détriment.

115

The appellants were not told that by Stipulation dated October 31, 1990, the respondents and realtor (both corporate and individual) made a deal "to delete claims against [the realtor] for treble damages, punitive damages, and statutory violations", leaving

Les appelants n'ont pas été informés que, par stipulation datée du 31 octobre 1990, les intimés et l'agent immobilier (à la fois la société immobilière et l'agent immobilier lui-même) avaient convenu [TRADUCTION] « de supprimer les demandes

116

the respondents' claim against the realtor (who had been the only contact between the respondents and the appellants) to proceed in simple negligence. The appellants were now the only parties against whom treble damages and punitive damages were sought, but they were not told of that fact. Had they been so advised, they would have been able to consider cross-proceedings against the realtor for indemnification in respect of the more substantial claims now asserted against them alone.

117   Nor were the appellants served with the court order dated March 27, 1991, striking out as improper the respondents' claim for attorney's costs against the realtor and the title insurance company. By way of contrast, the final judgment against the appellants dated December 13, 1991, specifically "reserves jurisdiction to tax costs, prejudgment interest, and attorney's fees" against the appellants.

118   Nor were the appellants served with an order dated June 17, 1991 for mandatory mediation which provided that "[a]ll parties are required to participate" (emphasis added). Even defendants who consider it uneconomical to litigate a US$8,000 building lot deal in a foreign country might well consider it to be in their best interest to participate in a mediation. The respondents say that the appellants were not entitled to notice of the order for mediation but it seems wholly incongruous to have a mediation order requiring "[a]ll parties" to participate when the *only* parties who were now the respondents' target for treble and punitive damages were not even told about it.

119   Nor were the appellants told that on September 12, 1991, the respondents settled with the realtor for US$8,250 and subsequently settled with the title

de dommages-intérêts triples, de dommages-intérêts punitifs et d'indemnité pour violation de la loi déposées contre [l'agent immobilier] », et de laisser la demande des intimés contre l'agent immobilier (qui avait été le seul interlocuteur entre les intimés et les appelants) être examinée et tranchée sous l'angle de la simple négligence. Les appelants, qui étaient dorénavant les seules parties visées par la demande de dommages-intérêts triples et de dommages-intérêts punitifs, n'ont donc pas été avisés de ce fait. Si on les avait avisés, ils auraient pu songer à déposer contre l'agent immobilier une demande entre défendeurs en vue d'être indemnisés pour les réclamations plus substantielles dont ils faisaient désormais seuls l'objet.

Les appelants n'ont pas non plus reçu signification de l'ordonnance judiciaire du 27 mars 1991 annulant pour cause d'irrégularité la réclamation d'honoraires d'avocat que les intimés avaient présentée contre l'agent immobilier et la société d'assurance de titres de propriété. Par contre, le jugement définitif rendu contre les appelants le 13 décembre 1991 précisait que le tribunal [TRADUCTION] « se déclare compétent pour fixer les dépens, les intérêts avant jugement et les honoraires d'avocat » que les appelants pourront être condamnés à payer.

De même, les appelants n'ont pas reçu signification de l'ordonnance du 17 juin 1991 concernant un processus de médiation obligatoire, qui prévoyait que [TRADUCTION] « [t]outes les parties sont tenues de participer » (je souligne). Même le défendeur qui ne juge pas rentable d'aller participer à l'étranger à un litige portant sur la vente d'un terrain à bâtir pour la somme de 8 000 $US pourrait bien considérer qu'il est dans son intérêt de participer à une médiation. Selon les intimés, les appelants n'avaient pas droit à un avis de l'ordonnance de médiation. Toutefois, il semble tout à fait absurde de délivrer une ordonnance requérant la participation de « [t]outes les parties » dans le cas où les *seules* parties désormais visées par la demande des intimés visant à obtenir des dommages-intérêts triples et des dommages-intérêts punitifs n'en avaient même pas été avisées.

Les appelants n'ont pas été informés non plus que, le 12 septembre 1991, les intimés — tout en conservant la propriété du lot 2 — s'étaient

insurers for US$2,500 while still retaining title to Lot 2. This left the appellants as the sole target at the damages trial. According to the documents they had received, the appellants were still entitled to believe that the respondents continued to make against the realtor essentially the same points as those the appellants themselves had set out in their Statement of Defence. This was no longer true. The appellants did not know that they were now on their own.

Nor were the appellants served, as required by the Florida rules, with notice of the experts the respondents proposed to call at the damages assessment. This too might have operated as a wake-up call to the appellants, who at this late stage were drifting obliviously toward financial disaster.

As mentioned above, the Third Amended Complaint claimed the <u>respondents</u>' damages on underlined{a} model home. It is true that by their default, the appellants admitted the allegations of fact in the Complaint, but the facts thus admitted were specific to the respondents and to a single model home. There is surely a significant difference between damages on a single home (even a "model" home) and damages on a theory of lost profit from the construction of a non-existent residential subdivision. Yet it is a judgment largely based on the latter allegation, not the allegation in the Complaint, that is the basis of the bulk of the million dollar judgment now sought to be enforced against the appellants in Ontario.

On December 11, 1991, the Florida court entered a directed verdict for unliquidated damages against the appellants, and assessed the damages at US$210,000 plus US$50,000 punitive damages. It now appears that the out-of-pocket construction costs which formed a substantial part of the award of compensatory damages against the appellants

entendus avec l'agent immobilier et ensuite avec la société d'assurance de titres de propriétés pour qu'ils leur versent respectivement les sommes de 8 250 $US et de 2 500 $US, à titre de règlement. Les appelants se retrouvaient ainsi les seuls visés à l'audience relative aux dommages-intérêts. Selon les documents qu'ils avaient reçus, les appelants étaient toujours en droit de croire que les intimés maintenaient contre l'agent immobilier essentiellement les mêmes allégations que celles qu'ils avaient eux-mêmes incluses dans leur défense. Ce n'était toutefois plus le cas. Les appelants ignoraient qu'ils se retrouvaient désormais seuls.

En plus, contrairement aux règles de la Floride, les appelants n'ont pas été avisés des experts que les intimés comptaient appeler à témoigner lors de l'évaluation des dommages-intérêts. Un tel avis aurait pu également sonner l'alarme aux appelants qui, à cette étape tardive, se dirigeaient inconsciemment vers un désastre financier.

Comme nous l'avons vu, la troisième plainte modifiée parlait des dommages-intérêts que les underlined{intimés} réclamaient pour <u>une</u> maison-témoin. Il est vrai que le défaut des appelants signifiait qu'ils admettaient le bien-fondé des allégations de fait contenues dans la plainte, mais les faits ainsi admis se rapportaient uniquement aux intimés et à une maison-témoin. Il y a sûrement une différence importante entre réclamer des dommages-intérêts pour une seule maison (même une « maison-témoin ») et réclamer des dommages-intérêts pour la perte théorique de profits relativement à un lotissement résidentiel n'ayant jamais été construit. Cependant, le jugement accordant la somme de 1 000 000 $ — dont on demande maintenant l'exécution contre les appelants en Ontario — repose essentiellement sur une opinion largement fondée sur la dernière allégation et non sur celle contenue dans la plainte.

Le 11 décembre 1991, le tribunal de la Floride a inscrit un verdict imposé dans lequel il ordonnait aux appelants de verser des dommages-intérêts non déterminés répartis ainsi : la somme de 210 000 $US à titre de dommages-intérêts, et celle de 50 000 $US à titre de dommages-intérêts punitifs. Il se révèle maintenant que les coûts de

120

121

122

were not incurred by the respondents, as had been alleged in their Complaint, but by Fox Chase Homes of Sarasota, Inc. or Fox Chase Homes of Charlotte County, Inc., whose names appeared nowhere in the pleadings. In the Ontario action, the trial judge found that under Florida law "causes of action of a corporation such as Fox Chase are the property of the corporation and cannot be passed through to its shareholders. Dissolved corporations cannot maintain actions except through their last directors with appropriate description in the Style of Cause not present in this matter." There was no such "appropriate description" in the Florida style of cause. In my view, the intervention of one or two corporate entities could raise a number of potential defences not otherwise available in the assessment of damages. The purpose of a pleading is to give notice. It is certainly not implicit in anything said in the Complaint that the respondents were claiming damages on behalf of corporations in which they had an interest.

123    The appellants had not even been told that the respondents would be seeking damages for the <u>corporation's</u> lost opportunity to build an undefined number of homes on land to which neither the respondents nor the corporation held title.

124    I do not accept the suggestion that the appellants are the authors of their own misfortune on the basis that if they had hired a Florida lawyer they would have found out about all of these developments. The appellants decided not to defend the case set out against them in the Complaint. That case was subsequently transformed. They never had the opportunity to put their minds to the transformed case because they were never told about it.

125    I do not suggest that any one of the foregoing omissions of notice would necessarily have been

construction, qui représentaient une partie substantielle des dommages-intérêts compensatoires auxquels les appelants étaient condamnés, ont été engagés non pas par les intimés, comme ils l'alléguaient dans leur plainte, mais plutôt par la Fox Chase Homes de Sarasota, Inc. ou la Fox Chase Homes of Charlotte County, Inc., dont les noms ne figurent nulle part dans les actes de procédure. Dans le cadre de l'action intentée en Ontario, le juge de première instance a conclu que, selon la loi de la Floride, [TRADUCTION] « les causes d'action d'une société comme la Fox Chase sont sa propriété et ne peuvent être cédées à ses actionnaires. Les sociétés dissoutes ne peuvent poursuivre une action que par l'intermédiaire de leurs derniers administrateurs désignés de manière appropriée dans l'intitulé de la cause, ce qui n'est pas le cas en l'espèce. » Une telle « désignation appropriée » ne figure pas dans l'intitulé de la cause en Floride. À mon avis, l'intervention d'une ou deux personnes morales aurait pu permettre d'invoquer un certain nombre de moyens de défense qui n'étaient pas par ailleurs disponibles lors de l'évaluation des dommages-intérêts. Un acte de procédure sert à aviser. Il est certain que rien de ce qui est mentionné dans la plainte ne laisse entendre que les intimés réclamaient des dommages-intérêts au nom de sociétés dont ils étaient actionnaires.

Les appelants n'ont même pas été informés que les intimés comptaient réclamer des dommages-intérêts pour la possibilité que la <u>société</u> avait perdue de construire un nombre indéterminé de maisons sur un terrain qui ne lui appartenait pas et qui n'appartenait pas non plus aux intimés.

Je rejette l'idée que les appelants sont les artisans de leur malheur en ce sens que l'embauche d'un avocat en Floride leur aurait permis de prendre connaissance de tous ces changements de situation. Les appelants ont décidé de ne pas contester la preuve déposée contre eux dans la plainte. Cette preuve a été, par la suite, modifiée. Les appelants n'ont jamais eu la possibilité de prendre connaissance de la nouvelle preuve parce qu'on ne leur a jamais fait part de son existence.

Je n'insinue pas que l'une ou l'autre des omissions de donner avis susmentionnées aurait

fatal to enforcement of the respondents' default judgment in Ontario. Cumulatively, at all events, these continuing omissions seem to me to demonstrate an unfair procedure which in this particular case failed to meet the standards of natural justice.

## X.  Availability of an Appeal

The appellants had ten days to appeal the default judgment. They did not do so, apparently based on advice from their Ontario solicitor. I agree with Major J. that the appellants cannot be relieved of the consequences of their failure to appeal simply because they acted on legal advice.

The failure to exhaust local remedies in the foreign court is ordinarily a factor to be taken into account in determining whether a foreign judgment is enforceable in Ontario, but I do not think it is fatal here. We are dealing with a *default* judgment obtained, in my view, without compliance with the rules of natural justice. Morever, even if the appellants had appealed, we are told that no record of the damage assessment proceedings exists. There is no transcript of the evidence heard by the jury. There is similarly no record of the instructions given to the jury by the trial judge. If the respondents complied with the letter of the Florida rules, as they say they did, a Florida appellate court might well uphold the default judgment. The Ontario court is faced with a *different* issue than that which would have confronted a Florida appellate court. Was the notice, notwithstanding presumed compliance with Florida court rules, sufficient to alert the *foreign* defendants to the case they had to meet, and the potential jeopardy they faced?

I agree in this respect with the view of the English Court of Appeal in *Adams v. Cape Industries plc*, [1991] 1 All E.R. 929, at pp. 1052-53, that the availability of an appeal in the foreign jurisdiction is not necessarily determinative.

nécessairement rendu inexécutoire en Ontario le jugement par défaut obtenu par les intimés. Tout bien considéré, il me semble que ces omissions continues témoignent d'une procédure inéquitable qui, en l'espèce, ne respectait pas les règles de justice naturelle.

## X.  L'existence d'un droit d'appel

126 Les appelants avaient dix jours pour porter en appel le jugement par défaut. Ils ne l'ont pas fait, apparemment sur le conseil de leur avocat ontarien. Je conviens avec le juge Major que les appelants ne peuvent pas échapper aux conséquences de leur défaut d'interjeter appel simplement parce qu'ils ont agi sur le conseil d'un avocat.

127 Le défaut d'épuiser les recours disponibles sur place dans le ressort étranger est habituellement un facteur dont il faut tenir compte pour décider si un jugement est exécutoire en Ontario, mais je ne crois pas que ce défaut soit fatal en l'espèce. Nous sommes en présence d'un jugement *par défaut* obtenu, selon moi, d'une manière contraire aux règles de justice naturelle. Qui plus est, même si les appelants avaient interjeté appel, il reste, nous dit-on, qu'aucun dossier ne fait état des débats de l'audience relative à l'évaluation des dommages-intérêts. Il n'existe aucune transcription de la preuve entendue par le jury. De même, aucun dossier ne fait état des directives du juge de première instance au jury. Si les intimés avaient respecté à la lettre les règles de la Floride, comme ils le prétendent, un tribunal d'appel de la Floride pourrait bien confirmer la validité du jugement par défaut. La question en litige dont est saisi le tribunal ontarien est *différente* de celle qu'un tribunal d'appel de la Floride aurait été appelé à trancher. Même en présumant que les règles de pratique de la Floride ont été respectées, on peut se demander si l'avis donné était suffisant pour prévenir les défendeurs *étrangers* de la preuve à réfuter et du risque auquel ils étaient exposés.

128 À ce propos, je partage l'opinion de la Cour d'appel d'Angleterre dans l'arrêt *Adams c. Cape Industries plc*, [1991] 1 All E.R. 929, p. 1052-1053, selon laquelle l'existence d'un droit d'appel dans le ressort étranger n'est pas nécessairement

*Cape Industries* was also a case of a default judgment.

129    I would also reject the argument that the appeal should be dismissed because the appellants ought to have moved "promptly" to set aside the default judgment for "excusable neglect". Such relief is normally available to a defendant who has formed an intention to defend but for some "excusable" reason had "delayed" in taking appropriate steps. The problem here is that the appellants had in fact filed a Statement of Defence but had decided, based on what they were told about the respondents' action, not to defend it further. The appellants' problem was not that they failed to implement an intention to defend, but that their intention not to further defend was based on a different case.

130    In these circumstances, I would not enforce a judgment based on (in my view) inadequate notice — and thus violative of natural justice — just because the appellants did not appeal the Florida judgment to the Florida appellate court, or seek the indulgence of the Florida court to set aside for "excusable neglect" a default judgment that rests on such a flawed foundation.

XI.  Disposition

131    I would allow the appeal to dismiss the action, with costs throughout to the appellants.

The following are the reasons delivered by

LeBel J. (dissenting) —

I.  Introduction

132    The enforcement of this judgment, which has its origins in a straightforward sale of land for US$8,000 and has now grown to well over C$800,000, is unusually harsh. In my view, our law should be flexible enough to recognize and avoid such harshness in circumstances like these, where

déterminante. Il était également question d'un jugement par défaut dans l'arrêt *Cape Industries*.

Je rejetterais aussi l'argument voulant que le pourvoi soit rejeté parce que les appelants aurait dû demander [TRADUCTION] « promptement » l'annulation du jugement par défaut pour cause de « négligence excusable ». Ce recours peut normalement être exercé par le défendeur qui avait l'intention de se défendre mais qui, pour une raison « excusable », a « tardé » à prendre les mesures appropriées. En l'espèce, le problème tient au fait que les appelants avaient effectivement produit une défense et qu'ils ont ensuite décidé de tout abandonner, sur la foi de ce qui leur avait été dit au sujet de l'action des intimés. Le problème des appelants tient non pas au fait de ne pas avoir mis à exécution leur intention de se défendre, mais plutôt au fait que leur décision de cesser de se défendre reposait sur des allégations différentes.

Dans ces circonstances, je n'exécuterais pas un jugement fondé (selon moi) sur un avis insuffisant — et donc contraire à la justice naturelle — simplement parce que les appelants n'ont ni appelé du jugement rendu en Floride devant le tribunal d'appel de la Floride, ni demandé au tribunal de la Floride de faire montre d'indulgence en annulant pour cause de « négligence excusable » un jugement par défaut ayant un fondement aussi vicié.

XI.  Dispositif

J'accueillerais le pourvoi visant à faire rejeter l'action, les appelants ayant droit à leurs dépens dans toutes les cours.

Version française des motifs rendus par

Le juge LeBel (dissident) —

I.  Introduction

L'exécution du présent jugement qui résulte d'une simple vente de terrain pour la somme de 8 000 $US et dont le montant accordé s'élève maintenant à plus de 800 000 $CAN est d'une sévérité inhabituelle. À mon avis, notre droit devrait être assez souple pour reconnaître et éviter une telle

the respondents' original claim was dubious in the extreme and the appellants are guilty of little more than bad luck. To hold that the appellants are the sole authors of their own misfortune, it seems to me, is to rely heavily on the benefit of hindsight; and to characterize the respondents' case in the original action as merely weak is something of an understatement. The implication of the position of the majority is that Canadian defendants will from now on be obliged to participate in foreign lawsuits no matter how meritless the claim or how small the amount of damages in issue reasonably appears to be, on pain of potentially devastating consequences from which Canadian courts will be virtually powerless to protect them.

In my opinion, this Court should avoid moving the law of conflicts in such a direction. Thus, I respectfully disagree with the reasons of the majority on two points. I would hold that this judgment should not be enforced because a breach of natural justice occurred in the process by which it was obtained. I also have concerns about the way the "real and substantial connection" test, in its application to foreign-country judgments, is articulated by the majority.

Although I agree both that the "real and substantial connection" test should be extended to judgments from outside Canada and that the Florida court properly took jurisdiction over the defendants in this particular case, in my view the test should be modified significantly when it is applied to judgments originating outside the Canadian federation. Specifically, the assessment of the propriety of the foreign court's jurisdiction should be carried out in a way that acknowledges the additional hardship imposed on a defendant who is required to litigate in a foreign country.

Furthermore, the philosophy of *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077, which replaces traditional categories with a purposive, principled framework, should not be

sévérité dans un cas comme celui qui nous occupe, où la demande initiale des intimés était extrêmement douteuse et où les appelants peuvent, tout au plus, être blâmés d'avoir joué de malchance. Il me semble que conclure que les appelants sont les artisans de leur malheur est avant tout une conclusion a posteriori, et que qualifier de simplement faible la preuve produite par les intimés dans le cadre de leur action initiale est un euphémisme. Le point de vue adopté par les juges majoritaires signifie que les défendeurs canadiens seront désormais tenus de participer aux poursuites intentées à l'étranger — même celles qui peuvent raisonnablement sembler plus ou moins fondées ou si dérisoire que puisse raisonnablement paraître le montant de dommages-intérêts réclamé — sous peine de subir des conséquences potentiellement dévastatrices contre lesquelles les tribunaux canadiens ne pourront pratiquement pas les protéger.

133    À mon avis, notre Cour devrait éviter de donner cette orientation au droit international privé. Par conséquent, je ne souscris pas aux motifs majoritaires à deux égards. Je conclurais qu'il n'y a pas lieu d'exécuter le présent jugement parce qu'un déni de justice naturelle entache la procédure suivie pour l'obtenir. Je suis également préoccupé par la façon dont les juges majoritaires formulent le critère du « lien réel et substantiel » dans le cas des jugements étrangers.

134    Tout en reconnaissant que le critère du « lien réel et substantiel » doit s'appliquer aux jugements rendus à l'extérieur du Canada et que le tribunal de la Floride a eu raison de se déclarer compétent à l'égard des défendeurs en l'espèce, j'estime qu'il y a lieu de modifier sensiblement ce critère lorsqu'il s'agit de l'appliquer à des jugements émanant de l'extérieur de la fédération canadienne. Plus précisément, l'évaluation de la légitimité de la compétence du tribunal étranger doit tenir compte des difficultés supplémentaires auxquelles se heurte le défendeur tenu de plaider dans un pays étranger.

135    En outre, la philosophie sous-jacente de l'arrêt *Morguard Investments Ltd. c. De Savoye*, [1990] 3 R.C.S. 1077, qui remplace les catégories traditionnelles par un système téléologique et fondé

confined to the question of jurisdiction, but should also be extended to the defences. In my view, liberalizing the jurisdiction side of the analysis while retaining narrow, strictly construed categories on the defence side is not a coherent approach. I would adopt a more flexible approach to the defences than the majority, and on that approach it is my view that the appellants have made out the defence of natural justice.

136    The solution that the majority sets out to the question of recognition and enforcement of foreign judgments appears to go further than courts have gone in other Commonwealth jurisdictions or in the United States (as I will discuss below). This discrepancy may place Canadian defendants in a disadvantageous position in international litigation against foreign plaintiffs. As a result, the risks and thus the transaction costs to our citizens of cross-border ventures will be increased, in some cases beyond what commercially reasonable people would consider acceptable. Canadian residents may consequently be deterred from entering into international transactions — an outcome that frustrates, rather than furthers, the purpose of private international law.

## II.  Background

137    I agree with Major J.'s outline of the facts. I would, however, place additional emphasis on a number of details that emerge from the record.

138    The Saldanhas and the Thivys (to whom I will refer collectively as the "Sellers") purchased the lot in Florida thinking that they might eventually build a vacation home on it. In the meantime, they had little to do with it. They purchased it without having visited it, and they never saw it. They did not think seriously about selling the land until they received the unsolicited offer from the Bealses and Foodys (the "Buyers") in 1984. This was a relatively small investment from which they anticipated no more than modest returns and on which, it seems

sur des principes, devrait non pas se limiter à la question de la compétence, mais également s'appliquer aux moyens de défense. À mon avis, il est illogique de libéraliser le volet « compétence » de l'analyse tout en continuant de répartir le volet « moyens de défense » dans des catégories bien précises et assujetties à une interprétation stricte. Je suis d'avis d'appliquer aux moyens de défense une approche plus souple que celle des juges majoritaires et, selon cette approche, j'estime que les appelants ont démontré qu'ils étaient justifiés d'invoquer la justice naturelle comme moyen de défense.

La solution que les juges majoritaires énoncent en matière de reconnaissance et d'exécution des jugements étrangers paraît aller plus loin que ce qu'ont proposé les tribunaux d'autres pays du Commonwealth ou des États-Unis (comme je l'expliquerai plus bas). Cette disparité pourra avoir pour effet de désavantager les citoyens canadiens appelés à se défendre contre les demandeurs qui les poursuivent à l'étranger. Il en résultera, pour nos citoyens participant à des entreprises transfrontalières, une augmentation des risques et, par le fait même, des coûts d'opération qui, dans certains cas, sera supérieure à ce que des gens d'affaires raisonnables jugeraient acceptable. Les résidants canadiens pourront donc être dissuadés de conclure des opérations internationales — résultat qui contrecarrera l'objet du droit international privé au lieu d'en favoriser la réalisation.

## II.  Les faits

Je souscris à l'exposé des faits du juge Major. Cependant, j'insisterais davantage sur un certain nombre de détails qui ressortent du dossier.

Les Saldanha et les Thivy (que j'appellerai collectivement les « vendeurs ») ont acheté le terrain en Floride dans le but d'y construire éventuellement une résidence secondaire. Dans l'intervalle, ils ne s'en sont guère occupé. Ils l'ont acheté sans l'avoir visité et, en fait, ne l'ont jamais vu. Ils ne songeaient pas sérieusement à le vendre jusqu'à ce qu'ils reçoivent, en 1984, l'offre spontanée des Beals et des Foody (les « acheteurs »). Il s'agissait pour les vendeurs d'un placement relativement peu coûteux dont ils n'espéraient tirer rien de plus qu'un léger

2003 SCC 72 (CanLII)

reasonable to infer, they did not expect to expend much energy.

The Sellers received the Buyers' offer to purchase from a Florida real estate agent, a Mr. O'Neill, in August 1984. They had had no prior dealings with Mr. O'Neill. Mrs. Rose Thivy, who worked in a law office and had done some work as a law clerk as well as some title searching and conveyancing, dealt with Mr. O'Neill on behalf of the group. She testified that she asked Mr. O'Neill how he found her telephone number, and he told her that he had searched the County records to find the owners of the lot his clients wanted to buy.

The Buyers' written offer was sent to Mrs. Thivy. She noticed that it erroneously referred to "Lot 1". She assumed that the Buyers were not interested in buying the Sellers' property and that the deal would not proceed. The Sellers did not pursue the matter. Mr. O'Neill then contacted Mrs. Thivy to ask why there had been no response to the offer. Mrs. Thivy pointed out the misidentification of the lot to Mr. O'Neill, who insisted that the Sellers were the registered owners of the lot the Buyers wanted. Mrs. Thivy changed the number on the document to "Lot 2". The Buyers accepted this counteroffer. Subsequently, the Sellers received a deed and other closing documents in the mail. All the documents referred to Lot 2 and not to Lot 1.

In January 1985, Mr. Beals telephoned Mrs. Thivy and complained that he had been sold the wrong lot. Mrs. Thivy told him about her conversation with Mr. O'Neill, and suggested that Mr. Beals resolve the problem with him.

In March 1985, the Sellers received a copy of a pleading initiating an action by the Buyers in a Florida Circuit Court (the "Complaint"). The Complaint stated that it related to "an action for

profit et auquel, peut-on raisonnablement supposer, ils ne s'attendaient pas à consacrer beaucoup d'énergie.

L'offre d'achat des acheteurs a été transmise aux vendeurs, en août 1984, par un agent immobilier de la Floride, un certain M. O'Neill. Les vendeurs n'avaient jamais traité avec M. O'Neill. Madame Rose Thivy, qui travaillait dans un cabinet d'avocats et qui avait accompli certaines tâches à titre de technicienne juridique et effectué des recherches et transferts de titres, a négocié avec M. O'Neill pour le compte du groupe. D'après son témoignage, elle a demandé à M. O'Neill comment il avait obtenu son numéro de téléphone, et celui-ci lui a répondu l'avoir trouvé en cherchant, dans les registres du comté, le nom des propriétaires du terrain que ses clients voulaient acquérir.    139

L'offre écrite des acheteurs a été envoyée à M^me Thivy. Celle-ci a remarqué que l'on y mentionnait par erreur le « lot 1 ». Elle a présumé que les acheteurs n'étaient pas intéressés à acheter le terrain des vendeurs et que la vente n'aurait donc pas lieu. Les vendeurs n'ont pas donné suite. Monsieur O'Neill a alors communiqué avec M^me Thivy pour lui demander pourquoi on n'avait pas répondu à l'offre. Madame Thivy a signalé l'erreur de désignation du lot à M. O'Neill, qui a tenu à préciser que les vendeurs étaient les propriétaires inscrits du terrain que les acheteurs voulaient acquérir. Madame Thivy a changé le numéro inscrit sur le document de manière à y lire « lot 2 ». Les acheteurs ont accepté cette contre-offre. Par la suite, les vendeurs ont reçu par la poste un acte et les autres documents requis pour conclure la vente. Tous les documents indiquaient le lot 2 et non le lot 1.    140

En janvier 1985, M. Beals a téléphoné à M^me Thivy pour se plaindre du fait qu'on lui avait vendu le mauvais terrain. Madame Thivy lui a raconté la conversation qu'elle avait eue avec M. O'Neill et lui a suggéré de s'adresser à lui pour régler le problème.    141

En mars 1985, les vendeurs ont reçu une copie d'un acte introductif d'instance (la « plainte ») déposé par les acheteurs devant une cour de circuit de la Floride. Il y était indiqué qu'il s'agissait d'une    142

damages which exceeds $5,000", as was required to give the Circuit Court monetary jurisdiction over the matter, but otherwise did not specify the quantum of damages claimed.

143    The Complaint alleged that the Sellers had fraudulently induced the Buyers to purchase the wrong lot. The Buyers claimed damages based on the purchase price of the lot, the expenses they had incurred in preparing the lot for construction, and revenue they had lost because they had been unable to build a model home on Lot 1. There were also claims against two other defendants, O'Neill's Realty and the Buyers' title insurance company. Attached to the Complaint was the original offer to purchase referring to Lot 1. The contract of purchase and sale referring to Lot 2 was not attached.

144    Mrs. Thivy and Mr. Saldanha both testified that the Sellers had hoped to "rectify the situation" with the Buyers, perhaps by rescinding the transaction and refunding the Buyers' money. When they received the Complaint, however, they decided to defend the lawsuit. Mrs. Thivy telephoned the Florida court for instructions on procedure and form. She then drafted a defence for all the Sellers to sign, and sent it to the court in Florida. In the defence, the Sellers denied that they had ever represented that they owned Lot 1.

145    In the fall of 1986, the Sellers received notice that the action in Florida had been voluntarily dismissed, without prejudice. Mr. Saldanha testified that he thought the reason the action had been dismissed was that the facts the Sellers had set out in their defence were dispositive. As he put it, "when it went away I said, 'Okay, people know the facts, it's over'."

146    But it was not over. A short time later, the Buyers commenced a second action in the Florida court, and the Sellers received a new Complaint in the mail (the "Amended Complaint"). The Amended Complaint set out essentially the same allegations

[TRADUCTION] « action en dommages-intérêts supérieurs à 5 000 $ » — comme cela devait être fait pour que la Cour de circuit ait compétence en la matière —, sans toutefois préciser le montant des dommages-intérêts réclamés.

Il était allégué dans la plainte que les vendeurs avaient frauduleusement incité les acheteurs à acquérir le mauvais terrain. Les acheteurs réclamaient des dommages-intérêts fondés sur le prix d'achat du terrain, les dépenses d'aménagement du terrain aux fins de construction et la perte de revenu due à l'impossibilité de construire une maison-témoin sur le lot 1. Ils réclamaient aussi des dommages-intérêts à deux autres défendeurs, à savoir O'Neill's Realty et la société d'assurance de titres de propriété avec qui ils avaient traité. L'offre d'achat initiale mentionnant le lot 1 était annexée à la plainte, mais non le contrat d'achat mentionnant le lot 2.

Madame Thivy et M. Saldanha ont tous les deux témoigné que les vendeurs avaient espéré [TRADUCTION] « remédier à la situation » avec les acheteurs en annulant éventuellement la vente et en les remboursant. Toutefois, lorsqu'ils ont reçu la plainte, ils ont décidé de contester. Madame Thivy a téléphoné au tribunal de la Floride pour obtenir des directives sur la procédure à suivre. Elle a ensuite rédigé une défense qu'elle a fait signer par tous les vendeurs et l'a envoyée au tribunal de la Floride. Dans leur défense, les vendeurs niaient s'être fait passer, à quelque moment que ce soit, pour les propriétaires du lot 1.

À l'automne de 1986, les vendeurs ont reçu un avis les informant que l'action intentée en Floride avait été rejetée sur requête des demandeurs et sous toutes réserves. Monsieur Saldanha a témoigné avoir cru que l'action avait été rejetée parce que les faits énoncés dans la défense des vendeurs étaient concluants. Comme il l'a affirmé, [TRADUCTION] « au moment où cela a cessé, je me suis dit : "bien, ils connaissent les faits, c'est terminé". »

Tout n'était cependant pas terminé. Peu après, les acheteurs ont intenté une deuxième action devant le tribunal de Floride et les vendeurs ont reçu une nouvelle plainte par la poste (la « plainte modifiée »). On y trouvait essentiellement les mêmes allégations

as the previous one. A claim for treble damages was added against the Sellers, and the language was somewhat different, alleging that "wilfully false and fraudulent" misrepresentations were made by the Sellers both directly and through Mr. O'Neill. The Amended Complaint also said that the Sellers had "willingly and wilfully" changed the contract of purchase and sale to read "Lot 2", without informing the Buyers. The damages claimed were spelled out in more detail than before; the Buyers claimed three times the amount they had paid for the land, three times their construction expenses and business losses, rescission of the contract and return of the purchase price, punitive damages, attorney's fees and court costs. Again, the original offer referring to Lot 1, without the Sellers' signatures, was attached, but the contract of purchase and sale, and the other closing documents which identified Lot 2 as the property being transferred, were not.

Mrs. Thivy prepared a new defence, which was simply a copy of the old one, and sent it to the Florida court purportedly on behalf of all four defendants. The trial judge accepted the evidence of the Saldanhas, which differed from that of the Thivys on this point, that the Saldanhas chose not to defend the second action and that Mrs. Thivy signed their names to the new defence without their authorization. The Saldanhas therefore did not attorn to the reinstated action, although the Thivys did.

Mr. Saldanha testified that when he and his wife learned of the Amended Complaint, they discussed the matter, and decided that "we were not going to respond to this, because we had already responded". Mr. Saldanha thought that the resurrection of the action was an error of some kind, because the new complaint "seemed to be the same thing regurgitated again" and, in his view, the Sellers had already informed the Florida court of facts that disproved the regurgitated allegations. At this point, as the trial judge put it, "[g]iven their share of the amount at issue, which they assumed to be one-half of $8,000 US, [the Saldanhas] decided the game was

que dans la plainte précédente. Dans une demande de dommages-intérêts triples, ajoutée contre les vendeurs et formulée quelque peu différemment, il était allégué que les vendeurs avaient, directement et par l'intermédiaire de M. O'Neill, fait des déclarations inexactes [TRADUCTION] « délibérément fausses et frauduleuses ». La plainte modifiée précisait aussi que les vendeurs avaient « volontairement et délibérément » modifié le contrat d'achat de manière à y lire « lot 2 », et ce, sans en informer les acheteurs. Les dommages-intérêts réclamés étaient plus détaillés qu'auparavant; les acheteurs réclamaient trois fois le montant payé pour le terrain, trois fois le montant de leurs dépenses de construction et pertes d'entreprise, la résiliation du contrat et le remboursement du prix d'achat, des dommages-intérêts punitifs, les honoraires d'avocat et les dépens. Là encore, l'offre initiale mentionnant le lot 1 et non signée par les vendeurs était annexée, mais non le contrat d'achat et les autres documents requis pour conclure la vente qui désignaient le lot 2 comme étant le bien cédé.

147    Madame Thivy a préparé une nouvelle défense, tout simplement identique à l'ancienne, et l'a envoyée au tribunal de la Floride, apparemment au nom des quatre défendeurs. Le juge de première instance a accepté le témoignage — divergent de celui des Thivy à cet égard — dans lequel les Saldanha affirmaient qu'ils avaient choisi de ne pas contester la deuxième action et que M^me Thivy avait signé leur nom sur la nouvelle défense, sans leur autorisation. Les Saldanha n'avaient donc pas acquiescé à la nouvelle action, alors que les Thivy l'avaient fait.

148    Monsieur Saldanha a affirmé qu'au moment où son épouse et lui ont appris l'existence de la plainte modifiée, ils ont décidé, après discussion, qu'[TRADUCTION] « ils n'y répondraient pas parce qu'ils l'avaient déjà fait ». Monsieur Saldanha a cru que la réintroduction de l'action résultait d'une erreur quelconque, du fait que la nouvelle plainte [TRADUCTION] « semblait réitérer les mêmes allégations » et qu'à son avis, les vendeurs avaient déjà communiqué au tribunal de la Floride des faits réfutant ces allégations. C'est alors, comme l'a affirmé le juge de première instance, que [TRADUCTION] « [c]ompte tenu de leur part du montant en litige,

not worth the candle, and they would participate no further" ((1998), 42 O.R. (3d) 127, at p. 130).

149    The Thivys seem to have come to the same conclusion not long afterwards. After the action was relaunched, the Amended Complaint was amended three times, and the Sellers duly received copies of each new version. The Thivys sent their initial defence to the Florida court, but did not respond to any of the new versions of the Amended Complaint. Mrs. Thivy testified that they decided "just to forget about it" because defending the action would probably cost them just as much as the lawsuit was worth, and because they thought that the Florida courts had no jurisdiction over them.

150    The successive versions of the Amended Complaint did not change the allegations against the Sellers in any way. The only changes were to claims against other defendants. Mr. Richard Groner, who acted for the respondents in the litigation in Florida, testified at the Ontario trial as an expert in Florida civil procedure. He testified that, under the applicable rules, each amendment to a complaint requires a response from all the parties on whom it is served, even parties to whom the changes in the pleading have no relevance. Such a party may simply resubmit a copy of his or her earlier defence, or may seek the court's permission to let the earlier defence stand over, but if these steps are not taken the defence that has already been filed ceases to have any legal effect. Therefore, the result of the Sellers' failure to respond to new versions of the Amended Complaint was that they were viewed under the Florida rules as not having raised any defence at all. There was nothing in the documents served on the Sellers to notify them that this was a potential consequence of failure to refile their defence.

151    The Sellers received notice of a default hearing on July 25, 1990, but did not attend or respond. In due course, they were noted in default. As a result,

qu'ils évaluaient à la moitié de 8 000 $US, [les Saldanha] ont décidé que le jeu n'en valait pas la chandelle et qu'ils n'iraient pas plus loin » ((1998), 42 O.R. (3d) 127, p. 130).

Les Thivy semblent être arrivés à la même conclusion un peu plus tard. Après la réintroduction de l'action, la plainte modifiée a été modifiée de nouveau à trois reprises et les vendeurs ont dûment reçu copie de chaque nouvelle version. Les Thivy ont envoyé leur défense initiale au tribunal de la Floride, mais n'ont répondu à aucune des autres versions de la plainte modifiée. Madame Thivy a témoigné qu'ils avaient décidé de [TRADUCTION] « simplement tout oublier » parce que, pour contester l'action, ils devraient probablement débourser autant que le montant réclamé et qu'ils croyaient que les tribunaux de la Floride n'avaient pas compétence à leur égard.

Les allégations formulées contre les vendeurs sont restées les mêmes dans chacune des versions successives de la plainte modifiée. Seules les demandes présentées contre les autres défendeurs étaient modifiées. Lors du procès en Ontario, Me Richard Groner, qui avait représenté les intimés au cours de l'instance en Floride, est venu témoigner en qualité d'expert en procédure civile de la Floride. Il a affirmé que, selon les règles applicables, chaque modification apportée à une plainte exige une réponse de toutes les parties à qui elle est signifiée, mêmes celles qui ne sont pas touchées par ces modifications. Les parties peuvent alors simplement produire de nouveau une copie de leur défense antérieure ou encore demander au tribunal la permission de maintenir leur défense antérieure, sans quoi la défense déposée antérieurement perd tout effet juridique. Par conséquent, du fait qu'ils n'avaient pas répondu aux autres versions de la plainte modifiée, les vendeurs étaient considérés, sous le régime des règles de la Floride, comme n'ayant présenté aucune défense. Rien dans les documents qui leur ont été signifiés n'indiquait aux vendeurs que c'était un risque auquel ils seraient exposés s'ils ne déposaient pas de nouveau leur défense.

Le 25 juillet 1990, les vendeurs ont reçu un avis d'audience sur défaut, mais ils n'y ont pas répondu et n'ont pas assisté à l'audience. Leur défaut a été

they were deemed to have admitted all the allegations in the Amended Complaint so far as they related to liability. Damages were still a live issue. A hearing was held before a judge and a jury in Florida to assess damages. The Sellers received notice of this hearing, too, but again they did not respond.

We do not know much about what was said in the damages hearing. There is no transcript of that proceeding. Mr. Groner testified that in Florida courts transcripts are not mandatory for civil trials; a reporter is provided at the option of and at the expense of the litigants. In this case, he decided not to incur the expense. There is no record of the judge's instructions to the jury. An expert witness testified on the valuation of the Buyers' business losses. No expert's report was filed. Mr. Groner testified that it is usual in civil litigation in Florida for parties to obtain information about an expert witness's qualifications and proposed testimony through the discovery process. Expert reports are generally not submitted to the court. All that survives to provide some clue as to how a simple $8,000 land transaction turned into the extraordinary amount now at stake in this appeal is a "Memorandum of Lost Profits Damage" prepared by Mr. Groner, which he submitted to the trial judge in Florida to support his submissions on jury instructions.

In late December 1991, the Sellers received the judgment of the Florida court in the mail. The total amount of the judgment was slightly over $270,000, of which $50,000 was punitive damages, with interest set at 12 percent per annum from the date of the judgment, December 12, 1991 (there seems some confusion in the record over the amount awarded, which the trial judge said was $260,000; the copy of the Florida court's judgment filed in the record is for two amounts which together total $270,886.57). The Sellers were surprised and dismayed at the size of this amount. Mr. Saldanha testified that at first he

constaté en temps utile. Ils étaient donc considérés comme ayant reconnu le bien-fondé de toutes les allégations ayant trait à la responsabilité dans la plainte modifiée. Cependant, la question des dommages-intérêts se posait toujours. Une audience devant un juge et un jury a eu lieu en Floride en vue d'évaluer les dommages-intérêts. Les vendeurs ont également été avisés de cette audience, mais là encore, ils n'ont pas répondu.

Nous n'en savons pas beaucoup sur ce qui s'est dit à l'audience relative aux dommages-intérêts. Il n'existe aucune transcription des débats de cette audience. Maître Groner a affirmé que, devant les tribunaux de la Floride, les transcriptions ne sont pas obligatoires en matière civile. Toutefois, les parties peuvent retenir, à leurs frais, les services d'un sténographe. En l'espèce, il a décidé de ne pas engager cette dépense. Aucun dossier ne fait état des directives du juge au jury. Un expert a témoigné au sujet de l'évaluation des pertes d'entreprise subies par les acheteurs, mais aucun rapport d'expert n'a été produit. Maître Groner a affirmé que les parties à une instance civile en Floride ont l'habitude de recourir à l'interrogatoire préalable pour obtenir des renseignements sur les qualifications d'un témoin expert et sur le témoignage qu'il compte faire. En général, aucun rapport d'expert n'est soumis au tribunal. Tout ce qui reste pour aider à comprendre comment une simple opération immobilière de 8 000 $ a pu aboutir au montant exceptionnellement élevé qui est réclamé en l'espèce est le [TRADUCTION] « Mémoire concernant le préjudice causé par la perte de profits » que M^e Groner a préparé et présenté au juge de première instance en Floride pour étayer ses observations sur les directives au jury.

Vers la fin de décembre 1991, les vendeurs ont reçu par la poste le jugement du tribunal de la Floride. Le montant total accordé dans ce jugement était légèrement supérieur à 270 000 $, dont 50 000 $ de dommages-intérêts punitifs au taux annuel de 12 pour 100 à compter de la date du jugement, soit le 12 décembre 1991 (il semble régner dans le dossier une certaine confusion au sujet du montant accordé qui, selon le juge de première instance, était de 260 000 $; la copie du jugement rendu en Floride qui a été versée au dossier fait état de deux montants totalisant 270 886,57 $). Les

152

153

thought it was a joke. Mrs. Saldanha testified that when she read the number in print "it was like a real blow to the stomach".

154    The Sellers realized only at this point that the Florida action was not, as they had assumed, a minor dispute that would be more expensive to defend than to lose. They recognized that they needed to seek legal advice immediately. The Thivys and the Saldanhas separately consulted lawyers. They were advised that the judgment would not be enforced in Ontario because the Florida court did not have jurisdiction over them. Acting on this advice, the Sellers did not avail themselves of the various means available to them in the Florida system to challenge the judgment.

155    Mr. Beals was examined for discovery in the proceedings in Ontario, and his testimony was read in. His deposition in the Florida proceedings was also an exhibit in the Ontario trial. Based on that evidence, the trial judge made findings of fact that included the following:

–    Mr. Beals signed all the closing documents referring to Lot 2 without reading them.

–    Construction of the model home on Lot 1 stopped before the Buyers learned that they had bought the wrong lot. Mr. Beals and Mr. Foody decided to discontinue their business relationship for unrelated reasons, and Mr. Beals bought out his partner's interest in the company.

–    Mr. Beals's company, Fox Chase Homes, was dissolved before the Florida action was commenced.

There is no suggestion that these factual findings were in error.

156    Mr. David Mulock, a Florida litigator, testified for the appellants as an expert on Florida procedural

vendeurs ont été surpris et consternés devant l'importance de ce montant. Monsieur Saldanha a témoigné qu'il avait d'abord cru à une blague. Quant à M^me Saldanha, elle a déclaré avoir eu [TRADUCTION] « l'impression de recevoir un coup à l'abdomen » en apercevant le chiffre inscrit.

Ce n'est qu'à ce moment que les vendeurs se sont rendu compte que l'action intentée en Floride n'était pas, comme ils l'avaient présumé, un différend mineur où le coût d'une contestation dépasserait celui d'un échec. Ils ont immédiatement compris qu'ils avaient besoin de conseils juridiques. Les Thivy et les Saldanha ont, chacun de leur côté, consulté un avocat. Ils se sont fait dire que le jugement ne serait pas exécuté en Ontario parce que le tribunal de la Floride n'avait pas compétence à leur égard. Forts de ce conseil, les vendeurs ne se sont pas prévalus des divers moyens de contester le jugement que le régime juridique de la Floride mettait à leur disposition.

Monsieur Beals a subi un interrogatoire préalable dans le cadre de l'instance en Ontario et son témoignage a été consigné en preuve. La déposition qu'il a faite dans le cadre de l'instance en Floride a également servi de pièce justificative lors du procès en Ontario. Compte tenu de ces éléments de preuve, le juge de première instance a notamment tiré les conclusions de fait suivantes :

–    Monsieur Beals a signé, sans les lire, tous les documents requis pour conclure la vente qui mentionnaient le lot 2.

–    La construction de la maison-témoin sur le lot 1 a cessé avant même que les acheteurs apprennent qu'ils avaient acquis le mauvais terrain. Messieurs Beals et Foody ont décidé de mettre fin à leur relation d'affaires pour d'autres motifs, et M. Beals a acquis la participation de son associé dans la société.

–    La société de M. Beals, la Fox Chase Homes, a été dissoute avant l'introduction de l'action en Floride.

Rien ne semble indiquer que ces conclusions de fait étaient erronées.

Maître David Mulock, un avocat qui exerce devant les tribunaux de la Floride, a témoigné,

and substantive law. He testified that justifiable reliance is one of the essential components of a fraud claim in Florida law. He stated his opinion that reliance by the Buyers on misrepresentations that they were buying Lot 1 could not have been reasonable, because the ownership of land is a matter of public record which can easily be checked, and routinely is checked in any real estate transaction. Mr. Mulock said that the allegations in the Complaint, even if true, were therefore insufficient to support damages for fraud.

Mr. Mulock also testified that when a corporation that has a claim for damages is dissolved, its last directors can pursue the cause of action as long as they indicate in the pleadings that they do so in the capacity of representatives of the corporation. None of the many versions of the Complaint in the Florida action made any reference to Fox Chase Homes.

The trial judge inferred from the contents of the Memorandum of Lost Profits Damage and from the verdict reached by the Florida jury that the jury had not been informed of several key facts: that the decision to stop construction and the winding-up of Fox Chase Homes were unrelated to the mistake in the land transaction; that the corporation that had allegedly suffered business losses was not a party to the action; and that there was a contract of purchase and sale signed by both the Buyers and the Sellers referring to Lot 2. This was the basis for his finding that the jury was deliberately misled and the defence of fraud was made out.

### III. The Extension of the "Real and Substantial Connection" Test to Foreign-Country Judgments

#### A. *The Need for Clarification*

The parties agreed before the trial judge that the Florida court had properly assumed jurisdiction. As a result, it is not strictly necessary to deal with the application of the "real and substantial

au nom des appelants, à titre d'expert en droit procédural et substantiel de la Floride. Il a déclaré que la confiance justifiable est l'un des éléments essentiels d'une allégation de fraude selon le droit de la Floride. Il s'est dit d'avis que les acheteurs n'avaient aucune raison de se fier aux déclarations inexactes selon lesquelles ils achetaient le lot 1, étant donné que le titre de propriété d'un terrain est consigné dans un registre public qui peut facilement être consulté — et l'est systématiquement — dans le cadre d'une opération immobilière. Maître Mulock a ajouté que, par conséquent, même si elles étaient vraies, les allégations contenues dans la plainte ne justifieraient pas l'attribution de dommages-intérêts pour fraude.

157 Toujours selon M[e] Mulock, si la société qui réclame des dommages-intérêts est dissoute, ses derniers administrateurs peuvent faire valoir la cause d'action pourvu qu'ils indiquent, dans leurs actes de procédure, qu'ils le font en qualité de représentants de la société. Aucune des nombreuses versions de la plainte déposée dans le cadre de l'action en Floride ne mentionne la Fox Chase Homes.

158 Le juge de première instance a inféré du contenu du mémoire concernant le préjudice causé par la perte de profits et du verdict du jury de la Floride que ce dernier n'avait pas été informé de plusieurs faits déterminants : l'arrêt des travaux de construction et la liquidation de la Fox Chase Homes n'étaient pas liés à l'erreur commise dans l'opération immobilière; la société qui aurait subi des pertes d'entreprise n'était pas partie à l'action; le fait que le contrat d'achat signé par les acheteurs et les vendeurs mentionnait le lot 2. C'est ce qui explique sa conclusion que le jury a été délibérément induit en erreur et que le moyen de défense fondé sur la fraude pouvait être invoqué.

### III. L'application du critère du « lien réel et substantiel » aux jugements étrangers

#### A. *Le besoin de clarification*

159 Les parties ont convenu devant le juge de première instance que le tribunal de la Floride avait eu raison de se déclarer compétent. Pour statuer sur le présent pourvoi, il n'est donc pas vraiment

connection" test to foreign-country judgments to dispose of this appeal. Although the issue is moot between these parties, the Court asked for additional submissions on it. My discussion of the jurisdiction question is more extensive than would ordinarily be necessary in light of the appellants' concession of this point and of my agreement with Major J. on what the result of the jurisdiction analysis should be in this case. I have set out my views on this issue in detail because the principles that ought to shape the jurisdiction analysis should also inform the interpretation of the defences, on which I disagree with the majority.

160    I will follow Major J. in assuming that the relevant laws of other Canadian provinces are substantially the same as those of Ontario. I will be referring to Canada and Ontario interchangeably, except where the context indicates otherwise.

161    *Morguard*, *supra*, marked the beginning of a new era in Canadian conflicts law, and set out the basic principles and policy objectives underlying that new legal framework. At a practical level, however, it left many questions unanswered. Among them are whether the "real and substantial connection" test applies in international situations, and the precise nature of the connections that support the recognition of jurisdiction. The present appeal is a suitable occasion within which to clarify some of the implications of *Morguard* and to develop its ramifications in the international context. For these reasons, this Court decided to hear submissions on the international application of the test, in the hope of providing some guidance to lower courts on the issues that this case raises although those issues are no longer live between the parties.

162    Under the approach adopted by the majority, the "real and substantial connection" test applies in the international context just as it does within Canada, and if any unfairness results it may be dealt with

nécessaire d'examiner la question de l'application du critère du « lien réel et substantiel » aux jugements étrangers. En dépit du caractère théorique que la question revêt à l'égard des parties au présent litige, la Cour a demandé des observations supplémentaires à ce sujet. Mon analyse de la question de la compétence est donc plus approfondie qu'elle devrait l'être normalement, en raison de la concession des appelants à ce sujet et de mon accord avec l'opinion du juge Major sur ce qui devrait résulter de l'analyse de la compétence en l'espèce. J'ai exposé en détail mon point de vue sur cette question parce que les principes appelés à encadrer l'analyse de la compétence doivent aussi s'appliquer à l'interprétation des moyens de défense à l'égard de laquelle je ne partage pas l'opinion des juges majoritaires.

À l'instar du juge Major, je présume que les lois pertinentes des autres provinces canadiennes sont essentiellement les mêmes que celles de l'Ontario. Je renverrai indifféremment au Canada et à l'Ontario, à moins que le contexte exige d'être plus précis.

L'arrêt *Morguard*, précité, qui a marqué le début d'une nouvelle ère en droit international privé canadien, a énoncé les principes fondamentaux et les objectifs de politique générale qui sous-tendent ce nouveau cadre juridique. En pratique, toutefois, il a laissé maintes questions sans réponse, notamment celle de savoir si le critère du « lien réel et substantiel » s'applique dans un contexte international, et celle de la nature précise des liens justifiant la reconnaissance de compétence. Le présent pourvoi offre ainsi une bonne occasion de clarifier certaines conséquences de l'arrêt *Morguard* et d'expliquer les ramifications de cet arrêt sur le plan international. Pour ces motifs, notre Cour a décidé d'entendre des observations concernant l'application internationale du critère dans l'espoir d'offrir aux tribunaux inférieurs certaines indications sur les questions soulevées en l'espèce, même si elles ne se posent plus à l'égard des parties.

Selon l'approche adoptée par les juges majoritaires, le critère du « lien réel et substantiel » s'applique dans le contexte international exactement de la même façon qu'au Canada et, pour remédier

only by arguing *forum non conveniens* in the foreign forum or invoking defences to the enforcement of the final judgment. My view is different. The jurisdiction test itself should be applied so that the assumption of jurisdiction will not be recognized if it is unfair to the defendant. To do so requires taking into account the differences between the international and interprovincial contexts as well as between the rationales that structure our conflicts law in these two spheres.

### B. *Constitutional Imperatives Versus International Comity*

The adoption in *Morguard* of new, liberal and purposive rules governing recognition and enforcement of judgments from one province by the courts of another was based on two underlying rationales: constitutional considerations, particularly the intention of the framers of the Constitution to create an integrated national economy; and considerations of international comity, which La Forest J. held should be evaluated anew "in the light of a changing world order" (p. 1097). While the latter rationale extends to foreign-country judgments, the former does not.

In *Morguard*, La Forest J. emphasized that the integrated character of the Canadian federation makes a high degree of cooperation between the courts of the various provinces a practical necessity. As this Court later confirmed in *Hunt v. T&N plc*, [1993] 4 S.C.R. 289, it is a "constitutional imperative", inherent in the relationship between the units of our federal state, that each province must recognize the properly assumed jurisdiction of another, and conversely that no court in a province can intermeddle in matters that are without a constitutionally sufficient connection to that province. Provided that a court's assumption of jurisdiction is based on a real and substantial connection to the forum, the matter is within the sphere of provincial authority, and the resulting judgment is entitled to "full faith and credit", to borrow the

à toute injustice qui peut en résulter, il suffit d'invoquer le principe du *forum non conveniens* devant le tribunal étranger ou d'opposer des moyens de défense à l'exécution du jugement définitif. Je ne partage pas cet avis. Le critère même de la compétence doit s'appliquer pour empêcher la reconnaissance de la déclaration de compétence qui est injuste pour la partie défenderesse. Pour ce faire, il faut tenir compte des différences qui existent entre les contextes international et interprovincial, de même qu'entre les raisonnements qui définissent notre droit international privé à ces deux égards.

### B. *Impératifs constitutionnels par opposition à courtoisie internationale*

163 Deux types de considérations sous-tendent l'adoption, dans l'arrêt *Morguard*, de nouvelles règles libérales et téléologiques en matière de reconnaissance et d'exécution des jugements d'une province par les tribunaux d'une autre province : des considérations constitutionnelles, en particulier l'intention des rédacteurs de la Constitution de créer une économie nationale intégrée, et des considérations de courtoisie internationale qui, selon le juge La Forest, doivent être réévaluées en fonction des « changements de l'ordre mondial » (p. 1097). Seul le dernier type de considérations s'applique aux jugements étrangers.

164 Dans l'arrêt *Morguard*, le juge La Forest a souligné que le caractère unifié de la fédération canadienne, en fait, une large mesure de coopération entre les tribunaux des diverses provinces. Comme notre Cour l'a confirmé plus tard dans l'arrêt *Hunt c. T&N plc*, [1993] 4 R.C.S. 289, un « impératif constitutionnel », inhérent au lien existant entre les éléments qui forment notre État fédéral, veut que chaque province reconnaisse la compétence qu'une autre province déclare avoir à juste titre et, à l'inverse, qu'aucun tribunal d'une province ne puisse s'immiscer dans des affaires qui, sur le plan constitutionnel, n'ont aucun lien suffisant avec la province où il est situé. Pourvu que la déclaration de compétence d'un tribunal repose sur l'existence d'un lien réel et substantiel avec le ressort, l'affaire relève de la compétence provinciale et le jugement

2003 SCC 72 (CanLII)

language of the United States Constitution (Article IV), in all the other provinces.

165    As I observed in *Spar Aerospace Ltd. v. American Mobile Satellite Corp.*, [2002] 4 S.C.R. 205, 2002 SCC 78, at para. 53, it is clear from the reasoning in both *Morguard* and in *Hunt*, *supra*, "that federalism was the central concern underlying both decisions". At the same time, *Morguard* left little doubt that the old common law rules were as outdated in the international sphere as they were inappropriate in the interprovincial context. La Forest J. noted that international borders are far more permeable, and international travel and communications much easier, than was the case when the traditional rules were developed in the nineteenth century. Business dealings with residents of other states are both commonplace and essential for any sophisticated modern economy. It is contrary to the interests of a modern state to retain rules of private international law that impede its citizens' participation in the increasingly integrated world economy. La Forest J. endorsed the view of H. E. Yntema that the rules of private international law ought to "promote suitable conditions of interstate and international commerce" ("The Objectives of Private International Law" (1957), 35 *Can. Bar Rev.* 721, at p. 741, cited in *Morguard*, at p. 1097).

166    *Morguard* thus strongly suggested that the recognition and enforcement of foreign-country judgments should be subject to a more liberal test informed by an updated understanding of international comity. It is equally clear from a reading of *Morguard* and its progeny that the considerations informing the application of the test to foreign-country judgments are not identical to those that shape conflict rules within Canada. As I observed in *Spar*, *supra*, at para. 51, "it is important to emphasize that *Morguard* and *Hunt* were decided in the context of interprovincial jurisdictional disputes . . . [and that] the specific findings of these decisions cannot easily be extended beyond this context". See

qui s'ensuit a droit à une « reconnaissance totale » (« *full faith and credit* »), pour reprendre l'expression figurant dans la Constitution américaine (article IV)) de la part de toutes les autres provinces.

Comme je l'ai fait remarquer dans l'arrêt *Spar Aerospace Ltée c. American Mobile Satellite Corp.*, [2002] 4 R.C.S. 205, 2002 CSC 78, par. 53, il ressort clairement du raisonnement tenu dans les arrêts *Morguard* et *Hunt*, précités, « que les décisions reposaient essentiellement sur le caractère fédéral du Canada ». En même temps, selon l'arrêt *Morguard*, il n'existe plus guère de doute que les anciennes règles de common law étaient devenues aussi désuètes sur le plan international qu'inappropriées dans le contexte interprovincial. Le juge La Forest a noté que les frontières internationales sont désormais beaucoup plus perméables et que les communications et les déplacements internationaux sont beaucoup plus faciles qu'à l'époque où les règles traditionnelles ont été établies, c'est-à-dire au XIX$^e$ siècle. Les opérations commerciales avec les résidants d'autres pays sont maintenant courantes et essentielles à une économie moderne avancée. Un État moderne n'a pas intérêt à conserver des règles de droit international privé qui empêchent ses citoyens de participer à une économie mondiale de plus en plus intégrée. Le juge La Forest a souscrit au point de vue de H. E. Yntema selon lequel les règles de droit international privé doivent « promouvoir des conditions propices au commerce international » (« The Objectives of Private International Law » (1957), 35 *R. du B. can.* 721, p. 741, cité dans l'arrêt *Morguard*, p. 1097).

L'arrêt *Morguard* laissait donc fortement entendre que la reconnaissance et l'exécution des jugements étrangers doivent être assujetties à un critère plus libéral reposant sur une interprétation actualisée de la courtoisie internationale. Il ressort tout aussi clairement de l'arrêt *Morguard* et de la jurisprudence qui l'a suivi que les considérations qui sous-tendent l'application du critère aux jugements étrangers ne sont pas identiques à celles qui déterminent les règles de droit international privé au Canada. Comme je l'ai fait observer dans l'arrêt *Spar*, précité, par. 51, « il importe de souligner que les arrêts *Morguard* et *Hunt* ont été jugés dans le contexte de conflits de compétence

also *Hunt*, *supra*, at p. 328. Although constitutional considerations and considerations of international comity both point towards a more liberal jurisdiction test, important differences remain between them.

One of those differences is that the rules that apply within the Canadian federation are "constitutional imperatives". Comity as between sovereign nations is not an obligation in the same sense, although it is more than a matter of mere discretion or preference. In *Morguard*, La Forest J. adopted the definition of comity stated by the United States Supreme Court in *Hilton v. Guyot*, 159 U.S. 113 (1895), at pp. 163-64 (cited in *Morguard*, at p. 1096):

"Comity," in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

The phrase "international duty and convenience" does not refer to a legally enforceable duty. No super-national legal authority can impose on sovereign states the obligation to honour the principle of comity. Rather, states choose to cooperate with other states out of self-interest, because it is convenient to do so, and out of "duty" in the sense that it is fair and sensible for State A to recognize the acts of State B if it expects State B to recognize its own acts.

The provinces, on the other hand, are constitutionally bound both to observe the limits on their own power to assert jurisdiction over defendants outside the province, and to recognize the properly assumed jurisdiction of courts in sister provinces; for them, this is "a matter of absolute obligation". This obligation reflects the unity in diversity that

interprovinciaux [. . .] [et que] les conclusions précises de ces arrêts ne peuvent facilement déborder de ce contexte ». Voir également l'arrêt *Hunt*, précité, p. 328. Bien que les considérations constitutionnelles et les considérations de courtoisie internationale laissent entrevoir un critère de compétence plus libéral, d'importantes différences subsistent toutefois entre elles.

167

L'une de ces différences tient au fait que les règles applicables dans la fédération canadienne représentent des « impératifs constitutionnels ». La courtoisie entre États souverains ne constitue pas une obligation dans le même sens, bien qu'elle ne se réduise pas à une simple question de discrétion ou de préférence. Dans l'arrêt *Morguard*, précité, p. 1096, le juge La Forest a adopté la définition de la courtoisie donnée par la Cour suprême des États-Unis dans l'arrêt *Hilton c. Guyot*, 159 U.S. 113 (1895), p. 163-164 :

[TRADUCTION] La « courtoisie » au sens juridique n'est ni une question d'obligation absolue d'une part ni de simple politesse et de bonne volonté de l'autre. Mais c'est la reconnaissance qu'une nation accorde sur son territoire aux actes législatifs, exécutifs ou judiciaires d'une autre nation, compte tenu à la fois des obligations et des convenances internationales et des droits de ses propres citoyens ou des autres personnes qui sont sous la protection de ses lois.

168

L'expression « obligations et [. . .] convenances internationales » ne désigne pas une obligation ayant force exécutoire. Aucune instance judiciaire supranationale ne peut forcer les États souverains à respecter le principe de la courtoisie. Au contraire, des États choisissent de collaborer avec d'autres États par intérêt en ce sens que cela leur convient et par « obligation » en ce sens qu'il est juste et sensé que l'État A, qui s'attend à ce que l'État B reconnaisse ses actes, reconnaisse lui-même les actes de l'État B.

169

Par ailleurs, une province est constitutionnellement tenue de respecter les limites de son propre pouvoir de se déclarer compétente à l'égard de défendeurs provenant d'une autre province, et de reconnaître la compétence exercée à bon droit par les tribunaux des autres provinces; il s'agit là d'une « obligation absolue » pour les provinces.

is characteristic of our federal state. In *Morguard*, *supra*, this Court acknowledged the shared values of the Canadian justice system which, as we know, fully accepts the relevance and importance of its two great legal systems, common law and civil law. The *Morguard* rule was designed in full awareness that Canada shares two legal systems.

170    A further point is that there are significant factual differences between the international and interprovincial contexts that should be reflected in the private international law rules applicable to each. These contextual differences are important because the doctrine of comity should be applied in a context-sensitive manner. The ultimate purpose of rules based on the idea of comity is to "facilitate the flow of wealth, skills and people across state lines in a fair and orderly manner" (*Morguard*, *supra*, at p. 1096). How this purpose is best to be achieved depends on the context in which the rules operate.

171    A context-sensitive jurisdiction test ought to take into account the difficulty of defending in a foreign jurisdiction and the possibility that the quality of justice there may not meet Canadian standards. Judgments should travel more easily across provincial borders than across international ones, both because of the relative ease of mobility between the provinces and because of the consistent nationwide standards of the Canadian justice system. When a judgment comes from a foreign country, the logistical difficulties of defending in the originating forum may be much greater, and the foreign legal system may be different from those with which Canadians are familiar. Canada is a single country with a fully integrated economy, but the world is not. In *Morguard*, at p. 1095, this Court rightly emphasized that "[m]odern states . . . cannot live in splendid isolation." But we still do not live in a borderless global village; our modern world is "home to widely varied cultures with radically divergent value systems" (*Yahoo!*,

Cette obligation reflète l'unité dans la diversité qui caractérise notre État fédéral. Dans l'arrêt *Morguard*, précité, notre Cour a reconnu de cette manière les valeurs communes du système judiciaire canadien qui, comme nous le savons, reconnaît pleinement l'utilité et l'importance des deux grands régimes juridiques de notre pays, la common law et le droit civil. La règle établie dans l'arrêt *Morguard* tient parfaitement compte de l'existence de deux régimes juridiques au Canada.

En outre, les règles de droit international privé respectivement applicables au contexte international et au contexte interprovincial doivent refléter les différences factuelles importantes qui existent entre ces deux contextes. L'importance de ces différences tient au fait que l'application du principe de la courtoisie doit tenir compte du contexte en présence. Les règles fondées sur la notion de courtoisie visent, en fin de compte, à « faciliter la circulation ordonnée et équitable des richesses, des techniques et des personnes d'un pays à l'autre » (*Morguard*, précité, p. 1096-1097). La meilleure façon de réaliser cet objectif dépend du contexte dans lequel s'appliquent les règles.

Un critère de compétence tributaire du contexte doit tenir compte de la difficulté de se défendre dans un ressort étranger et de la possibilité que la qualité de la justice dans ce ressort ne réponde pas aux normes canadiennes. Les jugements doivent traverser les frontières interprovinciales plus facilement que les frontières internationales, tant en raison de la facilité relative de circuler entre les provinces que des normes homogènes du système judiciaire canadien. Lorsqu'un jugement émane d'un pays étranger, il peut se révéler beaucoup plus difficile, sur le plan logistique, de se défendre devant le tribunal qui l'a rendu, sans compter que le régime juridique étranger peut être différent de celui que connaissent les Canadiens et les Canadiennes. Le Canada constitue un seul et même pays doté d'une économie entièrement intégrée, ce qui n'est pas le cas du monde entier. Dans l'arrêt *Morguard*, p. 1095, notre Cour a souligné à juste titre que « [l]es États modernes ne peuvent [. . .] pas vivre dans l'isolement le plus complet. » Toutefois, nous ne vivons

*Inc. v. Ligue contre le racisme et l'antisémitisme*, 169 F.Supp.2d 1181 (N.D. Cal. 2001), at p. 1186).

In my view, it follows from the contextual and purpose-driven approach adopted in *Morguard* that the rules for recognition and enforcement of foreign-country judgments should be carefully fashioned to reflect the realities of the international context, and calibrated to further to the greatest degree possible, the ultimate objective of facilitating international interactions. This means that the rule should be far more liberal than the categorical approach that was followed before *Morguard* (and most influentially stated in *Emanuel v. Symon*, [1908] 1 K.B. 302 (C.A.)), but by no means does it follow that it should be as liberal as the interprovincial rule.

The traditional rules impeded cross-border commerce by making it difficult for judgment creditors to obtain effective remedies against defendants resident in other countries, thus undermining the security of transactions. But an excessively generous test would be unduly burdensome for defendants and might discourage persons with assets in Canada from entering into transactions that could eventually get them involved in international disputes. This result, too, would frustrate the purpose of private international law. Ideally, the test should represent a balance designed to create the optimum conditions favouring the flow of commodities and services across state lines. In our enthusiasm to advance beyond the parochialism of the past, we should be careful not to overshoot this goal.

I would conclude that the "real and substantial connection" test should apply to foreign-country judgments, but the connections required before such judgments will be enforced should be specified more strictly and in a manner that gives due weight to the protection of Canadian defendants without disregarding the legitimate interests of foreign claimants.

pas encore dans un village planétaire sans frontières; notre monde moderne [TRADUCTION] « comporte des cultures très différentes et des échelles de valeurs fondamentalement divergentes » (*Yahoo!, Inc. c. Ligue contre le racisme et l'antisémitisme*, 169 F.Supp.2d 1181 (N.D. Cal. 2001), p. 1186).

J'estime que l'approche contextuelle et téléologique adoptée dans l'arrêt *Morguard* commande que les règles applicables en matière de reconnaissance et d'exécution des jugements étrangers reflètent fidèlement les réalités du contexte international et soient le plus possible adaptées à la réalisation de l'objectif final qui est de faciliter les relations internationales. C'est donc dire que la règle applicable doit être beaucoup plus libérale que l'approche par catégorisation suivie avant l'arrêt *Morguard* (et dont l'énoncé le plus influent se trouve dans la décision *Emanuel c. Symon*, [1908] 1 K.B. 302 (C.A.)), mais il ne s'ensuit aucunement qu'elle doit être aussi libérale que la règle interprovinciale.

Les règles traditionnelles gênaient le commerce transfrontalier en rendant difficile pour les créanciers judiciaires d'obtenir une réparation efficace de la part des défendeurs résidant à l'étranger, ce qui avait pour effet de nuire à la sécurité des opérations. Cependant, un critère trop généreux imposerait aux défendeurs un fardeau excessif et serait susceptible de dissuader les propriétaires de biens situés au Canada d'effectuer des opérations susceptibles de les entraîner dans des litiges internationaux. Ce résultat contrecarrerait lui aussi l'objet du droit international privé. Idéalement, le critère devrait représenter une solution de compromis destinée à créer les conditions les plus propices à la circulation des biens et des services d'un pays à l'autre. Dans notre empressement à mettre de côté le chauvinisme du passé, nous devons prendre soin de ne pas dépasser cet objectif.

Je conclurais que le critère du « lien réel et substantiel » doit s'appliquer aux jugements étrangers, mais que les liens nécessaires à l'exécution de ces jugements doivent être précisés davantage de manière à donner à la protection des défendeurs canadiens toute l'importance qu'elle mérite, sans pour autant négliger les intérêts légitimes des

172

173

174

In my view, this approach is consistent with both the flexible nature of international comity as a principle of enlightened self-interest rather than absolute obligation and the practical differences between the international and interprovincial contexts.

### C. *The Nature of the Requisite Connecting Factors*

175    The "real and substantial connection" test is simply a way of asking whether it was appropriate for the originating forum to take jurisdiction over the matter. If the originating court is an appropriate forum, then it is reasonable to expect the defendant to defend his interests there and to live with the consequences if he decides not to do so. Conversely, if it is not reasonable in the circumstances to expect the defendant to go to the originating court, then it was probably not appropriate for it to take jurisdiction. I would also emphasize at the outset that the requirement that the originating court act "with properly restrained jurisdiction" was expressly recognized by La Forest J. as a means of ensuring fairness to the defendant (*Morguard*, *supra*, at p. 1103).

176    In my view, it is important to take into account the burdens that defending in the foreign forum would impose on a defendant, in order to determine whether it is reasonable to expect the defendant to accept them. Among the factors that affect the onerousness of defending in a foreign forum are the difficulty and expense of travelling there and the juridical disadvantage that the defendant may face as a result of differences between the foreign legal system and our own. In *Morguard*, *supra*, this Court recognized the unfairness of forcing a plaintiff to bring an action in the place where the defendant now resides, "whatever the inconvenience and costs this may bring" (p. 1103). Correlatively, defendants should not be compelled to defend in the jurisdiction of the plaintiff's choosing regardless of the inconvenience and expense entailed; all of these factors

demandeurs étrangers. Selon moi, cette approche reste compatible avec la nature souple de la courtoisie internationale en tant que principe d'individualisme constructif et non en tant qu'obligation absolue, et avec les différences concrètes qui existent entre le contexte international et le contexte interprovincial.

### C. *La nature des liens requis*

Le critère du « lien réel et substantiel » correspond simplement à une façon de se demander s'il convenait que le tribunal ayant rendu le jugement dont on demande l'exécution (le « tribunal d'origine ») se déclare compétent en la matière. Si le tribunal d'origine est compétent, il devient alors raisonnable de s'attendre à ce que le défendeur aille y défendre ses intérêts et à ce qu'il subisse les conséquences d'une décision de ne pas le faire. À l'inverse, si, dans les circonstances, il n'est pas raisonnable de s'attendre à ce que le défendeur se présente devant le tribunal d'origine, il ne convenait alors probablement pas que ce tribunal se déclare compétent. Je tiens également à souligner, au départ, que le juge La Forest a expressément reconnu que la condition que le tribunal d'origine agisse « avec retenue dans l'exercice de sa compétence » est un moyen de garantir l'équité envers le défendeur (*Morguard*, précité, p. 1103).

À mon avis, il importe de tenir compte du fardeau que la présentation d'une défense devant le tribunal étranger imposerait au défendeur, afin de déterminer s'il est raisonnable de s'attendre à ce qu'il accepte de s'en acquitter. Parmi les facteurs qui peuvent rendre onéreuse la présentation d'une défense devant un tribunal étranger, on retrouve la difficulté et les dépenses liées à la nécessité de se déplacer, ainsi que le désavantage que le défendeur peut subir sur le plan juridique en raison de différences entre le régime de droit étranger et le nôtre. Dans l'arrêt *Morguard*, précité, notre Cour a reconnu qu'il est injuste de forcer un demandeur à intenter une action dans le ressort où réside présentement le défendeur « quels que soient les inconvénients et le coût que cela puisse entraîner » (p. 1103). Logiquement, les défendeurs ne devraient donc pas être contraints

should be taken into account by the court in arriving at a solution that justly accommodates the legitimate interests of both parties.

à se défendre dans le ressort choisi par le demandeur, sans égard aux inconvénients et aux coûts que cela peut occasionner. Le tribunal devrait ainsi prendre en considération tous ces facteurs afin d'arriver à une solution équitable qui tienne compte des intérêts légitimes des deux parties.

One question left open in *Morguard* was exactly what must be connected to the forum to satisfy the "real and substantial connection" test. At various points, La Forest J. refers to "significant contacts with the subject-matter of the action" (p. 1103), "contacts . . . to the defendant or the subject-matter of the suit" (p. 1103), "a nexus . . . between the subject-matter of the action and the territory where the action is brought" (p. 1104), a "connection between the damages suffered and the jurisdiction", and a "connection with the transaction or the parties" (p. 1108) (see J. Blom, "Conflict of Laws — Enforcement of Extraprovincial Default Judgment — Real and Substantial Connection: *Morguard Investments Ltd.* v. *De Savoye*" (1991), 70 *Can. Bar Rev.* 733; G. D. Watson and F. Au, "Constitutional Limits on Service Ex Juris: Unanswered Questions from Morguard" (2000), 23 *Advocates' Q.* 167, at p. 200).

L'arrêt *Morguard* a laissé sans réponse la question de la nature exacte du lien qui doit exister avec le ressort pour que le critère du « lien réel et substantiel » soit respecté. À différentes occasions, le juge La Forest parle du ressort « qui avait [. . .] des liens substantiels avec [l'objet de l'action] » (p. 1103), « du lien [. . .] avec le défendeur ou l'objet de l'action » (p. 1103), du « lien entre l'objet de l'action et le ressort où l'action est intentée » (p. 1104), du « lien [. . .] entre le préjudice subi et le ressort » et du « lien avec l'opération ou les parties » (p. 1108) (voir J. Blom, « Conflict of Laws — Enforcement of Extraprovincial Default Judgment — Real and Substantial Connection : *Morguard Investments Ltd.* v. *De Savoye* » (1991), 70 *R. du B. can.* 733; G. D. Watson et F. Au, « Constitutional Limits on Service Ex Juris : Unanswered Questions from Morguard » (2000), 23 *Advocates' Q.* 167, p. 200).

177

The justification for requiring a defendant to go to the foreign forum is generally strongest when there is a link to the defendant. If the defendant has become involved in activities in the jurisdiction, or in activities with foreseeable effects in the jurisdiction, it is hardly reasonable for her to claim that she should be shielded from the process of that jurisdiction's courts. This reasoning is reflected in *Moran v. Pyle National (Canada) Ltd.*, [1975] 1 S.C.R. 393, a case relied on in *Morguard*. In *Moran* it was held that, in a products liability tort case, the place where the victim suffered damages could assume jurisdiction over a foreign defendant manufacturer who knew or ought to have known that the defective product "would be used or consumed where the plaintiff used or consumed it" — i.e., if there was an indirect but substantial connection between the defendant and the forum (*Moran*, *supra*, at p. 409, cited in *Morguard*, at p. 1106).

En général, l'existence d'un lien avec le défendeur est la meilleure raison de l'obliger à se présenter devant le tribunal étranger. Le défendeur qui a participé à des activités dans le ressort concerné ou à des activités qui ont des effets prévisibles dans ce dernier ne saurait raisonnablement prétendre qu'il doit être soustrait à la compétence de ses tribunaux. L'arrêt *Moran c. Pyle National (Canada) Ltd.*, [1975] 1 R.C.S. 393, invoqué dans *Morguard*, illustre ce raisonnement. La Cour y a décidé que, dans une affaire de responsabilité délictuelle du fabricant, le tribunal de l'endroit où la victime avait subi un préjudice pouvait se déclarer compétent à l'égard d'un fabricant défendeur étranger qui savait ou aurait dû savoir que le produit défectueux « serait utilisé ou consommé à l'endroit où le demandeur l'a effectivement utilisé ou consommé » — c'est-à-dire s'il existait un lien indirect mais substantiel entre le défendeur et le ressort en question (*Moran*, précité, p. 409, cité dans *Morguard*, p. 1106).

178

179    But there may be good reasons why jurisdiction should be recognized even where there is little or no connection to the defendant, particularly when other considerations, such as fairness to the plaintiff and the importance of administering the justice system in an efficient manner, are taken into account along with the interests of the defendant. It is not unusual for cross-border litigation to arise out of complex transactions involving a number of parties with connections to several jurisdictions. Watson and Au, *supra*, point out, at p. 200, that when litigation involves "multiple defendants in different jurisdictions, insisting on a substantial connection between each defendant and the forum can lead to a multiplicity of actions and inconsistent findings". In such circumstances, a test that recognizes jurisdiction based on a connection to the subject matter of the action seems better suited to identifying whether the forum is a reasonable place for the action to be heard.

180    Moreover, the Canadian Constitution does not mandate that the jurisdiction test provide a minimum level of procedural protection to the defendant, regardless of other factors (see Watson and Au, *supra*, at p. 180). In this respect, Canada's Constitution can be contrasted with that of the United States. In the U.S., defendants are protected by the due process clauses of the Fifth and Fourteenth Amendments, which expressly provide that a person cannot be deprived of property without due process of law. Because the defendant in a civil case stands to be deprived of property by an adverse judgment, the court's jurisdiction will not be recognized unless it accords with the defendant's due process rights — a requirement which has been interpreted to mean that there must be certain minimum connections between the defendant and the forum. By contrast, in the *Canadian Charter of Rights and Freedoms*, due process is enshrined in s. 7, which protects "life, liberty and security of the person", but not property rights. As a general rule, the defendant's life, liberty and security of the person are unaffected by the outcome of civil litigation. In Canada, therefore, the defendant's individual constitutional rights are not the starting point for jurisdictional analysis as they are in the U.S. — nor, indeed,

De bonnes raisons de reconnaître la compétence peuvent se présenter même dans le cas où il existe peu de liens, voire aucun, avec le défendeur, en particulier lorsque d'autres facteurs, telles l'équité envers le demandeur et l'importance de gérer efficacement le système judiciaire, sont pris en compte en même temps que les intérêts du défendeur. Un litige transfrontalier résulte souvent d'opérations complexes mettant en cause un certain nombre de parties ayant des liens avec plusieurs ressorts. Watson et Au, *loc. cit.*, p. 200, soulignent que, dans le cas où un litige met en cause [TRADUCTION] « maints défendeurs dans différents ressorts, l'exigence d'un lien substantiel entre chaque défendeur et le ressort en question peut contribuer à multiplier les actions et mener ainsi à des conclusions contradictoires ». En pareil cas, le critère qui reconnaît la compétence fondée sur l'existence d'un lien avec l'objet de l'action semble mieux répondre à la question de savoir si le ressort en question est un endroit raisonnable pour instruire l'action.

En outre, la Constitution canadienne n'exige pas que le critère de compétence assure au défendeur un minimum de protection procédurale indépendamment des autres facteurs (voir Watson et Au, *loc. cit.*, p. 180). À cet égard, la Constitution canadienne peut se comparer à celle des États-Unis. Aux États-Unis, les défendeurs sont protégés par les dispositions des cinquième et quatorzième amendements relatives à l'application régulière de la loi, qui prévoient expressément que nul ne peut être privé de ses biens sans application régulière de la loi. Étant donné qu'en matière civile le défendeur risque d'être privé d'un bien à la suite d'un jugement défavorable, la compétence du tribunal ne sera reconnue que si elle respecte les droits du défendeur à l'application régulière de la loi — une exigence interprétée comme signifiant qu'il doit exister au moins certains liens entre le défendeur et le ressort en question. Par contre, dans la *Charte canadienne des droits et libertés*, le droit à l'application régulière de la loi est consacré à l'art. 7 qui garantit le droit de chacun « à la vie, à la liberté et à la sécurité de sa personne », mais non le droit de propriété. En général, l'issue d'un litige civil n'a aucune incidence sur la vie, la liberté et la sécurité du défendeur. Par conséquent, au Canada, les droits constitutionnels qu'un

would s. 7 rights usually be relevant to jurisdictional issues in civil disputes, although it is possible that there may be situations where fundamental interests of the defendant are implicated and s. 7 could come into play.

défendeur possède à titre individuel ne servent pas de point de départ à une analyse de la compétence, contrairement à la situation aux États-Unis, — en fait, pas plus que les droits garantis par l'art. 7 sont généralement pertinents relativement aux questions de compétence soulevées en matière civile, quoi-qu'il puisse survenir des cas où les intérêts fonda-mentaux du défendeur sont en cause et où l'art. 7 entre alors en jeu.

A broad interpretation of the "real and substantial connection" test, whereby the test may be satisfied even in the absence of a connection to the defend-ant, seems appropriate given both our constitutional arrangements and the ultimate objective of facilitat-ing the flow of goods and services across borders. Jurisdiction should be acknowledged as proper where the forum was a reasonable place to hear the action, taking into account all the circumstances, including judicial efficiency and the legitimate inter-ests of both parties. At the same time, it should not be forgotten that the jurisdiction test is a safeguard of fairness to the defendant.

Une interprétation large du critère du « lien réel et substantiel », qui permet de satisfaire au critère même en l'absence d'un lien avec le défendeur, semble appropriée compte tenu de nos arrangements constitutionnels et de l'objectif final qui est de faci-liter la circulation transfrontalière des biens et des services. On doit alors reconnaître la compétence d'un ressort, lorsque celui-ci est un endroit raison-nable pour instruire l'action, compte tenu de l'en-semble des circonstances, notamment de l'efficacité du système judiciaire et des intérêts légitimes des deux parties. En même temps, il ne faut pas oublier que le critère de compétence demeure une garantie d'équité envers le défendeur. **181**

The test should ensure that, considering the totality of the connections between the forum and all aspects of the action, it is not unfair to expect the defendant to litigate in that forum. It does not follow that there necessarily has to be a connection between the defendant and the forum. There are sit-uations where, given the other connections between the forum and the proceeding, it is a reasonable place for the action to be heard and the defendant can fairly be expected to go there even though he personally has no link at all to that jurisdiction.

Ce critère devrait contribuer à assurer que, compte tenu de l'ensemble des liens entre le ressort et tous les aspects de l'action, il n'est pas déraison-nable de s'attendre à ce que le défendeur y plaide. Il ne s'ensuit pas nécessairement qu'un lien doit ratta-cher le défendeur au ressort. En effet, il arrive qu'en raison de ses autres liens avec l'instance, le ressort soit un endroit raisonnable pour instruire l'action et que l'on puisse alors raisonnablement s'attendre à ce que le défendeur s'y rende même si, personnelle-ment, il n'a absolument aucun lien avec ce ressort. **182**

D.  *Balancing Hardship to the Defendant Against the Strength of the Connections*

D.  *L'évaluation des difficultés causées au défen-deur en fonction de la solidité des liens qui existent*

The approach outlined above suggests that when a court is asked to recognize and enforce a foreign judgment, and questions whether the originat-ing court's jurisdiction was properly restrained, it should inquire into the connections between the forum and all aspects of the action, on the one hand, and the hardship that litigation in the foreign forum would impose on the defendant, on the other. The

Selon l'approche exposée ci-haut, le tribunal saisi d'une demande de reconnaissance et d'exécution d'un jugement étranger, qui se demande si le tribu-nal d'origine a agi avec retenue dans l'exercice de sa compétence, doit examiner les liens qui existent entre le ressort et tous les aspects de l'action, d'une part, et les difficultés que causerait au défendeur un procès dans le ressort étranger, d'autre part. Il s'agit **183**

question is how real and how substantial a connection has to be to support the conclusion that the originating court was a reasonable place for the action to be heard. The answer is that the connection must be strong enough to make it reasonable for the defendant to be expected to litigate there even though that may entail additional expense, inconvenience and risk. If litigating in the foreign jurisdiction is very burdensome to the defendant, a stronger degree of connection would be required before the originating court's assumption of jurisdiction should be recognized as fair and appropriate.

184    In some respects, this formulation of the jurisdiction test might overlap with the doctrine of *forum non conveniens*, although it is not exactly the same. Certain considerations, such as juridical disadvantage to a defendant required to litigate in the foreign forum, are relevant to both inquiries. When the issue is jurisdiction, however, the court should restrict itself to asking whether the forum was a reasonable place for the action to be heard, and should not inquire into whether another place would have been more reasonable.

185    There is an important difference between the inquiry conducted by a court assuming jurisdiction at the outset of the action and the test applied by a court asked to recognize and enforce a judgment at the end. In the former case, two steps are involved: the court must first determine that it has a basis for jurisdiction, and if it does it must go on to decide whether it should nevertheless decline to exercise that jurisdiction because another forum is clearly more appropriate for the hearing of the action. In the latter case of a receiving court, only the first step in this inquiry is relevant. Provided that the originating court had a reasonable basis for jurisdiction, the defendant had its chance to appear there and argue *forum non conveniens*, and cannot question the originating court's decision on that issue in the receiving court.

de déterminer à quel point le lien doit être réel et substantiel pour que l'on puisse conclure que le tribunal d'origine était un endroit raisonnable pour instruire l'action. La réponse est que le lien doit être assez solide pour que l'on puisse raisonnablement s'attendre à ce que le défendeur aille plaider devant ce tribunal malgré les dépenses supplémentaires, les inconvénients et le risque que cela peut lui occasionner. Dans le cas où il deviendrait très onéreux pour le défendeur de plaider dans le ressort étranger, la reconnaissance du caractère juste et approprié de la déclaration de compétence du tribunal d'origine exige la démonstration de l'existence d'un lien plus solide.

À certains égards, cette formulation du critère de compétence est susceptible de recouper le principe du *forum non conveniens*, bien qu'elle ne coïncide pas exactement avec la teneur de celui-ci. Certains facteurs, comme le désavantage juridique dont est l'objet le défendeur tenu de plaider dans le ressort étranger, sont pertinents dans les deux cas. Toutefois, lorsque la compétence est en cause, le tribunal doit se demander uniquement si le ressort en question représente un endroit raisonnable pour instruire l'action et non s'il aurait été plus raisonnable de l'instruire ailleurs.

Il existe une différence importante entre la recherche que le tribunal d'origine effectue pour se déclarer compétent au début de l'action, et le critère qu'applique, à la fin, le tribunal saisi d'une demande de reconnaissance et d'exécution du jugement rendu (le « tribunal saisi »). Dans le premier cas, la recherche comporte deux étapes : le tribunal doit commencer par se demander s'il a une raison de se déclarer compétent et, dans l'affirmative, il doit ensuite décider s'il y a néanmoins lieu de refuser de l'exercer parce qu'un autre tribunal est manifestement plus compétent pour instruire l'action. Dans le cas du tribunal saisi, seule la première étape s'avère pertinente. Pour autant que le tribunal d'origine ait eu un motif raisonnable de se déclarer compétent, le défendeur — qui avait la possibilité de comparaître devant lui et d'invoquer le principe du *forum non conveniens* — ne peut pas contester devant le tribunal saisi la décision rendue à ce sujet par le tribunal d'origine.

2003 SCC 72 (CanLII)

Nevertheless, the receiving court is not bound to agree with the originating court's opinion that it had a reasonable basis on which to assume jurisdiction. If the connections to the originating forum are tenuous or greatly outweighed by the hardship imposed on the defendant forced to litigate there, the receiving court may conclude that it was not even <u>a</u> reasonable place for the action to be heard. It is no good to say that the defendant should have raised the question of hardship by arguing *forum non conveniens* before the foreign court. If it is unfair to expect the defendant to litigate on the merits in the foreign jurisdiction, it is probably unfair to expect the defendant to appear there to argue *forum non conveniens*.

Néanmoins, le tribunal saisi n'est pas tenu de souscrire à l'opinion du tribunal d'origine selon laquelle il avait un motif raisonnable de se déclarer compétent. Si les liens avec le tribunal d'origine sont ténus ou largement dépassés par l'importance des difficultés que connaît le défendeur forcé de plaider devant lui, le tribunal saisi peut conclure qu'il ne s'agissait même pas d'<u>un</u> endroit raisonnable pour instruire l'action. On ne saurait se contenter d'affirmer que le défendeur aurait dû soulever la question des difficultés en invoquant le principe du *forum non conveniens* devant le tribunal étranger. S'il est déraisonnable de s'attendre à ce que le défendeur plaide sur le fond dans le ressort étranger, il demeure probablement tout aussi déraisonnable de s'attendre à ce qu'il aille y invoquer le principe du *forum non conveniens*. 186

E.  *The Application of the Test in the Canadian and International Contexts*

E.  *Application du critère dans les contextes canadien et international*

A test which balances hardship to the defendant (with due regard to the interests of the plaintiff) against the factors connecting the action to the forum — including links to either party or any other aspect of the action — leads to a very generous approach to the recognition and enforcement of judgments originating in other Canadian provinces. The reason for this is that the hardship imposed on a defendant who has to appear in another province within the Canadian federation will generally be minimal and will usually be outweighed by a genuine connection between the forum and the defendant, the subject-matter of the action or the damages suffered — all of which are invoked as bases of jurisdiction in provincial service *ex juris* statutes and in the *Civil Code of Québec*, S.Q. 1991, c. 64, and each of which, as I noted in *Spar*, *supra*, at para. 56, appears to be an example of a real and substantial connection.

Un critère consistant à soupeser les difficultés du défendeur (en tenant dûment compte des intérêts du demandeur) en fonction des facteurs qui rattachent l'action au ressort — y compris les liens avec l'une ou l'autre des parties ou avec tout autre aspect de l'action — mène à une approche très libérale en matière de reconnaissance et d'exécution des jugements émanant d'autres provinces canadiennes. Un tel résultat s'explique par le fait que les difficultés que connaît le défendeur tenu de comparaître dans une autre province de la fédération canadienne se révèlent généralement minimes et habituellement plus que compensées par l'existence d'un lien véritable entre le ressort et le défendeur, l'objet de l'action ou le préjudice subi. Un tel lien justifie, dans chaque cas, une déclaration de compétence selon les lois provinciales relatives à la signification *ex juris* et selon le *Code civil du Québec*, L.Q. 1991, ch. 64, et, comme je l'ai noté dans l'arrêt *Spar*, précité, par. 56, paraît constituer un exemple de lien réel et substantiel. 187

Litigation outside the defendant's home forum may entail a number of burdens, which vary depending on the context. Those burdens potentially include the expense and inconvenience of

Un litige à l'extérieur du ressort du défendeur peut imposer à celui-ci un certain nombre de fardeaux variant en fonction du contexte. Ces fardeaux peuvent comprendre les dépenses et les 188

travelling, the need to obtain legal advice in the foreign jurisdiction, the perils of navigating an unfamiliar legal system whose substantive and procedural rules may be quite different from those that apply in the defendant's home jurisdiction, and even the possibility that the foreign court may be biassed against foreign defendants or generally corrupt.

189     Within Canada, most of these problems do not arise. It is true that physical distances within this country can be significant, and the expense and inconvenience to a defendant in Newfoundland who is required to litigate in British Columbia, for example, would not be inconsiderable. As a rule, however, the distances involved are manageable for citizens of a modern country with an efficient transportation infrastructure. In any event, it may not be necessary for the defendant to go to the jurisdiction in person. Given the relative ease of travel and communications today, it is usually not an extraordinary burden to litigate in another Canadian province.

190     More importantly, there is very little concern that the defendant will be at a disadvantage because she is not familiar with the legal system in the other province, and still less that the legal systems applied in Canada will actually treat her unfairly. As La Forest J. pointed out in *Morguard*, *supra*, there can be no genuine concern about "differential quality of justice among the provinces" (p. 1100). Indeed, *Morguard* establishes that the Canadian justice system should be understood as an integrated whole. Differences exist in both procedural and substantive matters, but the same basic values apply across the country, and our judicial system is basically unitary. Excessive discrepancies between the provinces will tend to become harmonized under the guidance of the federally appointed judiciary and the overall superintending authority of the Supreme Court of Canada. Furthermore, interprovincial law firms have become commonplace and lawyers across the country

inconvénients liés à la nécessité de se déplacer, la nécessité d'obtenir des conseils juridiques dans le ressort étranger, les risques liés à la nécessité de se débrouiller dans un régime juridique que l'on connaît mal et dont les règles substantielles et procédurales peuvent être fort différentes de celles qui s'appliquent dans le ressort du défendeur, et même la possibilité que le tribunal étranger conserve un parti pris contre les défendeurs étrangers ou qu'il soit généralement corrompu.

Au Canada, la plupart de ces problèmes ne se posent pas. Certes, dans notre pays, les distances à parcourir peuvent être grandes et les dépenses et les inconvénients occasionnés, par exemple, au défendeur de Terre-Neuve appelé à aller plaider en Colombie-Britannique ne seraient pas négligeables. En règle générale, toutefois, les distances en cause sont surmontables pour les citoyens d'un pays moderne doté d'une infrastructure de transport efficace. Quoi qu'il en soit, il se peut que le défendeur n'ait pas à se rendre personnellement dans le ressort en question. Vu la facilité relative avec laquelle il est possible de se déplacer et de communiquer de nos jours, l'obligation de plaider dans une autre province canadienne ne constitue généralement pas un fardeau démesuré.

Qui plus est, on se préoccupe très peu de la possibilité que le défendeur soit désavantagé par sa mauvaise connaissance du régime juridique de l'autre province, et encore moins de celle que les régimes juridiques en vigueur au Canada lui réservent un traitement inéquitable. Comme le juge La Forest l'a souligné dans l'arrêt *Morguard*, précité, p. 1100, toute crainte de « différence de qualité de justice d'une province à l'autre » ne saurait être vraiment fondée. En fait, l'arrêt *Morguard* établit que le système judiciaire canadien doit être perçu comme un tout. Il existe des différences sur les plans de la procédure et du fond, mais les mêmes valeurs fondamentales s'appliquent partout au pays, et notre système judiciaire est essentiellement unitaire. Les juges nommés par le gouvernement fédéral et le pouvoir général de surveillance de la Cour suprême du Canada contribuent à aplanir les disparités démesurées qui peuvent exister d'une province à l'autre. En outre, les cabinets d'avocats multiprovinciaux

are required to abide by the same ethical standards (*Morguard*, at p. 1100).

It follows that the assumption of jurisdiction by a sister province, provided that it does not exceed the province's constitutional authority over property, civil rights and the administration of justice in the province and is not prompted by unfair forum-shopping tactics on the plaintiff's part, should be entitled to full recognition and enforcement throughout Canada. A connection to the subject matter of the action should usually suffice to meet the "real and substantial connection" test.

Exceptions may arise in cases where litigation away from home would involve travel of a particularly arduous nature for the defendant (which might arise, for example, where the defendant resides in the far north) and, at the same time, the connections to the forum are not especially strong (an example might be a case where all the facts giving rise to the cause of action took place outside the jurisdiction and the only connection is that the plaintiff has suffered damages there). Absent such exceptional circumstances, grounds such as a wrong committed in the jurisdiction or damages suffered there would probably support the assumption of jurisdiction by the province in accordance with the requirements of order and fairness.

A judgment which comes to a Canadian court from beyond our international borders is another matter altogether. The distances involved and the difficulty of travelling can be considerably greater when litigation is in a foreign country, and a Canadian defendant faced with a lawsuit outside this country will have to deal with an unfamiliar, and in some cases a very different, legal system.

In extreme cases, the foreign legal system itself may be inherently unfair. It is an unfortunate fact that not every country's courts are free of official corruption or systemic bias. In my opinion, it is to this possibility that La Forest J. alluded when he specified that "fairness to the defendant requires that the judgment be issued by a court acting <u>through fair</u>

sont désormais un phénomène courant et les mêmes normes de déontologie s'appliquent à tous les avocats exerçant au Canada (*Morguard*, p. 1100).

191    Il y a donc lieu de reconnaître la déclaration de compétence d'une autre province et de lui donner pleinement effet partout au Canada, pourvu qu'elle n'excède pas les pouvoirs que la Constitution attribue à cette province relativement à la propriété, aux droits civils et à l'administration de la justice sur son territoire, et qu'elle ne résulte pas d'une stratégie de recherche du tribunal le plus favorable adoptée par le défendeur. Un lien avec l'objet de l'action devrait normalement suffire pour assurer le respect du critère du « lien réel et substantiel ».

192    Des exceptions à ce principe peuvent survenir dans les cas où, pour aller plaider loin de chez lui, le défendeur devrait effectuer un déplacement particulièrement pénible (ce qui serait notamment le cas d'un résidant du Grand Nord) et où, en même temps, les liens avec le ressort ne sont pas très solides (lorsque, par exemple, tous les faits à l'origine de la cause d'action sont survenus en dehors du ressort et où le seul lien qui existe tient au fait que le demandeur y a subi un préjudice). En dehors de ces circonstances exceptionnelles, des motifs tels que la faute commise dans le ressort où le préjudice a été subi permettraient vraisemblablement à la province de se déclarer compétente, tout en respectant les exigences d'ordre et d'équité.

193    Il en va tout autrement lorsqu'un tribunal canadien est saisi d'un jugement rendu à l'étranger. Les distances à parcourir et la difficulté de se déplacer peuvent être beaucoup plus grandes dans le cas d'un litige à l'étranger, et le défendeur canadien qui fait l'objet de poursuites intentées à l'extérieur du Canada se voit alors confronté avec un régime juridique qu'il connaît mal et qui, dans certains cas, est fort différent.

194    Dans les pires cas, il se peut que le régime juridique étranger lui-même soit foncièrement inéquitable. Malheureusement, les tribunaux qui existent dans le monde ne soient pas tous exempts de corruption officielle ou de partialité systémique. À mon avis, le juge La Forest faisait allusion à cette possibilité lorsqu'il a précisé que « l'équité envers

process and with properly restrained jurisdiction" (*Morguard*, at p. 1103 (emphasis added)). If the process that led to the judgment was unfair in itself, it is not fair to the defendant to enforce that judgment in any circumstance, even if the forum has very strong connections to the action and appears in every other respect to be the natural place for the action to be heard.

195     It should therefore be part of the plaintiff's burden in establishing a *prima facie* case of enforceability to prove that the system from which the judgment came is basically fair. When the originating jurisdiction is another democratic country with fair institutions, this burden will be easily met and may call for nothing more than reliance on judicial notice that the judgment emanates from a legitimate and respected legal system.

196     A less troubling but more common situation arises when there is nothing inherently wrong with the foreign legal system, but it is different enough from ours that a Canadian defendant may encounter considerable difficulties understanding her rights and obligations and the steps she needs to take to defend herself. To take a simple example, a defendant from a Canadian common law province may find a civilian system such as that of France or Germany quite unfamiliar. Continental legal systems are, of course, just as fair and sophisticated as the legal system of Ontario. The fact remains that an Ontario defendant who is used to a very different system may suffer prejudice as a result of the foreign system's unfamiliarity. Such a defendant cannot hope to protect herself unless she retains local counsel who can both negotiate the process on her behalf and explain it to her in a language she knows. It is not a simple thing to find trustworthy, competent, bilingual counsel in a foreign country; nor is it cheap. The plaintiff, who chose the forum, will presumably not face these difficulties, and therefore the parties will not be on a level playing field. (Conversely, the plaintiff would face the same kind of disadvantage if required to come to Ontario to pursue his case; it is

le défendeur exige que le jugement soit rendu par un tribunal qui agit avec équité et avec retenue dans l'exercice de sa compétence » (*Morguard*, p. 1103 (je souligne)). Lorsque la procédure suivie pour rendre le jugement en cause était inéquitable en soi, il devient alors injuste d'imposer au défendeur l'exécution du jugement dans tous les cas, même si des liens très solides rattachent l'action au ressort et si ce dernier paraît être, à tous autres égards, l'endroit logique pour l'instruction de l'instance.

Donc, en s'acquittant de l'obligation d'établir une preuve *prima facie* de la force exécutoire, le demandeur doit notamment démontrer le caractère foncièrement équitable du régime juridique d'où émane cette décision. Lorsque le ressort d'origine est un autre pays démocratique doté d'institutions équitables, cette obligation s'exécute facilement et peut simplement se réduire à une reconnaissance d'office que le jugement provient d'un régime juridique légitime et respecté.

Il survient des situations moins préoccupantes, mais plus fréquentes, où le régime juridique étranger n'a rien de foncièrement mauvais, mais diffère suffisamment du nôtre pour qu'un défendeur canadien éprouve des difficultés considérables à comprendre la nature de ses droits et obligations et celle des mesures qu'il doit prendre pour se défendre. Par exemple, il se peut qu'un défendeur provenant d'une province de common law canadienne connaisse très mal un régime de droit civil comme celui de la France ou de l'Allemagne. Les régimes juridiques européens sont, bien sûr, aussi équitables et perfectionnés que le régime juridique de l'Ontario. Il reste qu'un défendeur ontarien, habitué à un régime très différent, peut subir un préjudice en raison de sa mauvaise connaissance du régime étranger. Ce défendeur ne peut espérer se défendre qu'en retenant les services d'un avocat de l'endroit qui pourra négocier la procédure en son nom et la lui expliquer dans des mots qu'il connaît. Trouver un avocat bilingue, compétent et fiable dans un pays étranger exige des efforts souvent importants et des dépenses considérables. Le demandeur, qui a choisi le ressort, ne connaîtra vraisemblablement pas ces

in the nature of international litigation that one party or the other must accept the hardship of litigation in a foreign jurisdiction. The touchstone for an enforcing court in reaching a fair decision as to which of them should bear this burden is the strength of the connections between the action and the originating jurisdiction.)

Even legal systems that are relatively similar to Canada's can differ from our system significantly, and in ways that affect a Canadian defendant's ability to make his case effectively and to understand the strengths and weaknesses of his position. The common law system in the United States remains very close in many respects to that of Canada. Yet this action itself provides numerous examples of substantive and procedural differences between the legal system in Florida and that of Ontario which created unforeseen perils for the Ontario defendants. Those differences include the following:

–   Discovery in Florida is even broader in scope than it is in Ontario, and some of the functions of pleadings in Ontario are left to the discovery process. The record in this case indicates that it is standard practice for pleadings to disclose no more than a rough outline of the plaintiff's claim and for the defendant to find out the specifics through discovery. Thus, the Amended Complaint did not set out the amount of damages claimed, but simply stated a minimum amount necessary to support the monetary jurisdiction of the Circuit Court. The expert witness, Mr. Groner, testified that the Ontario defendants were expected to ascertain the actual amount being sought through the discovery process. This would, of course, involve expense and would probably necessitate retaining local counsel in Florida.

difficultés, d'où l'inégalité des chances entre les parties. (À l'inverse, le demandeur serait désavantagé de la même façon s'il devait intenter son action en Ontario; il est normal, dans un litige international, que l'une ou l'autre des parties doive accepter les difficultés liées à un procès dans un ressort étranger. La solidité des liens entre l'action et le ressort d'origine constitue alors le critère qui permet au tribunal saisi de décider de manière équitable à qui doit incomber ce fardeau.)

Même les régimes juridiques relativement semblables à celui du Canada peuvent différer considérablement de celui-ci, et ce, à tel point que la capacité d'un défendeur canadien d'exposer efficacement son point de vue et de comprendre les forces et les faiblesses de sa position peut s'en ressentir. Le régime de common law américain reste, à bien des égards, très proche de celui du Canada. Pourtant, l'action même dont il est question en l'espèce illustre abondamment les différences substantielles et procédurales qui existent entre le régime juridique de la Floride et celui de l'Ontario, et qui ont créé des risques que les défendeurs ontariens ne pouvaient pas prévoir. Ces différences sont notamment les suivantes :

–   En Floride, l'interrogatoire préalable a une portée encore plus large qu'en Ontario, et certaines fonctions des actes de procédure en Ontario relèvent du processus d'interrogatoire préalable. D'après le dossier en l'espèce, il est normal que les actes de procédure n'exposent rien de plus que les grandes lignes de la demande du demandeur et qu'il revienne au défendeur d'en découvrir les détails lors de l'interrogatoire préalable. Ainsi, la plainte modifiée ne précisait pas le montant des dommages-intérêts réclamés, mais faisait seulement état du montant minimum nécessaire pour que la Cour de circuit ait compétence. Le témoin expert, M$^e$ Groner, a affirmé que l'on s'attendait à ce que les défendeurs ontariens s'enquièrent du véritable montant réclamé lors de l'interrogatoire préalable. Cela leur occasionnerait évidemment des dépenses et les obligerait vraisemblablement à retenir les services d'un avocat de la Floride.

–   Under Florida's procedural rules, the defence filed by the appellants ceased to have any effect once a new version of the Amended Complaint was filed, in spite of the fact that the allegations concerning the appellants were unchanged and the lack of any notification to the appellants that they were supposed to file a new defence.

–   Even in cases where significant sums of money are at stake, transcripts are not produced in the Florida courts as a matter of course, but at the option and expense of the litigants. In a default case, this effectively means the plaintiff has complete control over whether there will be a record of what is said in the proceedings.

–   Punitive damages appear to be available in a wider range of cases and in much larger amounts under Florida law than they are under Ontario law. An Ontario defendant sued in Florida may therefore be at risk of a far higher damage award than would be contemplated in Ontario.

198    These differences illustrate that for an Ontario defendant, litigation in Florida entails greater hardship and risk than litigation in another Canadian province — and of all 'truly foreign' jurisdictions, Florida, which is not very far away and has a legal system essentially similar to Ontario's, is one of the least foreign. In my opinion, therefore, fairness to defendants requires a stronger degree of connection to support Florida's assumption of jurisdiction than would be the case if the originating court were in a sister province. Furthermore, if the judgment had originated from a more 'foreign' jurisdiction which involved greater difficulties for the defendant, the requisite degree of connection would be even higher.

199    In this case, the jurisdictional point is easily dealt with, not only because of the appellants' concession, but also because there were very strong connections between Florida and every component of

–   Selon les règles de procédure de la Floride, la défense produite par les appelants cessait d'avoir effet dès le dépôt d'une autre version de la plainte modifiée, en dépit du maintien intégral des allégations concernant les appelants et du fait que les appelants n'avaient pas été avisés qu'ils étaient censés produire une nouvelle défense.

–   Même dans les cas où d'importantes sommes d'argent sont en jeu, on ne procède pas systématiquement à la transcription des débats devant les tribunaux de la Floride; cependant, la transcription peut être effectuée au choix et aux frais des parties au litige. Dans le cas d'une instance par défaut, cela signifie, en fait, que le demandeur décide seul de faire transcrire ou non les débats.

–   Les tribunaux semblent pouvoir accorder des dommages-intérêts punitifs dans un plus grand nombre de cas et pour des montants beaucoup plus élevés en Floride qu'en Ontario. Un défendeur ontarien poursuivi en Floride risque donc de devoir verser des dommages-intérêts beaucoup plus élevés que ce à quoi il pourrait s'attendre en Ontario.

Ces différences montrent que, pour un défendeur ontarien, un litige en Floride comporte des difficultés et des risques beaucoup plus grands qu'un litige dans une autre province canadienne — et de tous les ressorts « véritablement étrangers », la Floride, qui n'est pas située très loin et dont le régime juridique s'apparente, pour l'essentiel, à celui de l'Ontario, est l'un des moins étrangers. J'estime donc que l'équité envers les défendeurs exige que le lien nécessaire à une déclaration de compétence en Floride soit plus fort que si le tribunal d'origine était situé dans une autre province canadienne. En outre, le lien requis devrait être encore plus solide lorsque le fait que le jugement émane d'un ressort plus « étranger » entraîne de plus grandes difficultés pour le défendeur.

En l'espèce, la question de la compétence se résout facilement en raison non seulement de la concession des appelants, mais encore de l'existence de liens très solides entre la Floride et chaque élément

the action: the plaintiffs, who live there; the land, which is in Florida; and the defendants, who involved themselves in real estate transactions there. Florida was the natural place for the action to be heard. If the connections were less robust, however, the conclusion might be different. For example, in a case where the only connection to Florida is that the plaintiffs are Florida residents and suffer damages there, it would, as a rule, be unfair to Canadian defendants to expect them to face the expense and risks of litigation in Florida.

### F.   *Should the Test for Jurisdiction Be Based on "Reciprocity"?*

It follows from the propositions set out above that I do not agree with the majority that the notion of "interprovincial reciprocity" is "equally applicable to judgments made by courts outside Canada" (Major J., at para. 29). The argument is that if the circumstances are such that an Ontario court could reasonably take jurisdiction based on equivalent connecting factors to Ontario, then the Ontario court should recognize the jurisdiction of the foreign court. Although there is some initial appeal to this idea, ultimately I do not agree with it. Its effect is to treat a judgment from a foreign country exactly like one that originates within Canada. This approach, in my view, fails to take into account the very real differences between the interprovincial and international contexts.

A few preliminary words should be said about the concept of "reciprocity". Some ambiguity is associated with this term. It is sometimes used to refer to the idea that State A should recognize the jurisdiction of State B's courts if State B would do the same for State A in the same circumstances. On the other hand, "reciprocity" sometimes refers to the quite different notion (invoked by the majority here) that State A should recognize the jurisdiction of State B if State A would have assumed jurisdiction in the same circumstances (see *Dicey and Morris on the Conflict of Laws* (13th ed. 2000), vol. 1, at p. 501). Blom has suggested that the latter approach is more properly one of "equivalence of

de l'action : les demandeurs y vivent, le terrain y est situé et les défendeurs y ont effectué des opérations immobilières. La Floride était ainsi l'endroit logique pour l'instruction de l'action. Cependant, la conclusion pourrait différer en présence de liens moins solides. Par exemple, si le seul facteur de rattachement avec la Floride se résumait au fait que les demandeurs résident dans cet État et y ont subi un préjudice, il serait généralement déraisonnable de s'attendre à ce que les défendeurs canadiens aillent plaider dans cet endroit malgré les dépenses et les risques que cela occasionnerait.

### F.   *Le critère de compétence doit-il être fondé sur la « réciprocité »?*

200

Il découle des propositions énoncées plus haut que je ne partage pas l'opinion des juges majoritaires selon laquelle la notion de « réciprocité interprovinciale » « s'applique tout autant aux jugements rendus à l'extérieur du Canada » (le juge Major, par. 29). Celui-ci affirme que, dans le cas où un tribunal ontarien pourrait raisonnablement se déclarer compétent à cause de l'existence de liens équivalents avec l'Ontario, le tribunal ontarien devrait alors reconnaître la compétence du tribunal étranger. Bien qu'elle présente quelque attrait au départ, je ne souscris pas à cette idée en définitive. Elle a pour effet de traiter un jugement émanant d'un pays étranger exactement sur le même pied qu'un jugement rendu au Canada. Selon moi, cette approche ne tient pas compte des différences très réelles qui existent entre les contextes interprovincial et international.

201

Il importe, au départ, d'ajouter quelques observations au sujet de la notion de « réciprocité ». Ce terme demeure en partie ambigu. Il sert parfois à rendre l'idée que l'État A doit reconnaître la compétence des tribunaux de l'État B dans le cas où, dans des circonstances analogues, l'État B ferait la même chose pour l'État A. Par contre, la « réciprocité » sert parfois à transposer l'idée très différente (évoquée par les juges majoritaires en l'espèce) que l'État A doit reconnaître la compétence de l'État B dans le cas où, dans les mêmes circonstances, l'État A se serait déclaré compétent (voir *Dicey and Morris on the Conflict of Laws* (13e éd. 2000), vol. 1, p. 501). Le professeur Blom a laissé

jurisdiction" rather than "reciprocity" (Blom, *supra*, at p. 735).

202    I would note that in *Morguard*, *supra*, La Forest J. rejected reciprocity in the latter sense (equivalence of jurisdiction) as the basis for a new jurisdiction test in the interprovincial context, and also questioned its usefulness on the international plane (see *Morguard*, at p. 1104; Blom, *supra*, at p. 735). Instead, he espoused an approach whereby the assumption of jurisdiction by a court in a province would be governed by the same principles of order and fairness that guide a court in another province when it determines whether to recognize the first court's jurisdiction. Within Canada, the bases for assuming jurisdiction and the bases for recognizing it should be correlative; as La Forest J. pointed out, "[i]f it is fair and reasonable for the courts of one province to exercise jurisdiction over a subject-matter, it should as a general principle be reasonable for the courts of another province to enforce the resultant judgment" (p. 1094). The logic underlying this statement is not that the forum should recognize a jurisdiction that it claims for itself, but rather that the same principles define when it is reasonable to assume jurisdiction and when it is reasonable to recognize it.

203    It makes sense that the jurisdictional rules on assumption and recognition should dovetail together in a federal state where the justice systems of the various provinces are interconnected parts of a harmonized whole. This reasoning does not extend to the international setting.

204    Nor does the concept of reciprocity in the sense of equivalence of jurisdiction serve the purposes of private international law well. This idea fails to reflect the differences between assuming jurisdiction and enforcing a foreign judgment. When a Canadian court takes jurisdiction over a foreign defendant, it need not inquire into the fairness of

entendre que la dernière approche tient davantage de l'[TRADUCTION] « équivalence des compétences » que de la « réciprocité » (Blom, *loc. cit.*, p. 735).

Je tiens à souligner que, dans l'arrêt *Morguard*, précité, le juge La Forest a rejeté la réciprocité, au sens d'équivalence des compétences, comme fondement d'un nouveau critère de compétence dans le contexte interprovincial, et qu'il en a également mis en doute l'utilité sur le plan international (voir *Morguard*, p. 1104; Blom, *loc. cit.*, p. 735). Il a plutôt adopté le point de vue selon lequel la déclaration de compétence d'un tribunal d'une province doit être régie par les mêmes principes d'ordre et d'équité qui guident la décision d'un tribunal d'une autre province de reconnaître la compétence du premier tribunal ou de ne pas la reconnaître. Au Canada, les raisons de se déclarer compétent et celles de reconnaître la compétence doivent être corrélatives. Comme l'a souligné le juge La Forest, « [s]'il est équitable et raisonnable que les tribunaux d'une autre province exercent leur compétence en une matière, il serait, en règle générale, raisonnable que les tribunaux d'une autre province exécutent le jugement qui en résulte » (p. 1094). Selon le raisonnement qui sous-tend cet énoncé, le tribunal doit non pas reconnaître la compétence qu'il prétend lui-même avoir, mais plutôt appliquer les mêmes principes pour déterminer dans quel cas il est raisonnable de se déclarer compétent et dans quel cas il convient de reconnaître la compétence du tribunal d'origine.

En bonne logique, les règles applicables à la déclaration de compétence et celles applicables à la reconnaissance de compétence concordent dans un État fédéral où les systèmes judiciaires des différentes provinces sont les éléments interreliés d'un ensemble harmonisé. Toutefois, ce raisonnement ne s'applique pas dans le contexte international.

D'ailleurs, la notion de réciprocité au sens d'équivalence des compétences ne se révèle pas plus utile pour atteindre les objectifs du droit international privé. Elle ne reflète pas les différences entre la déclaration de compétence et l'exécution d'un jugement étranger. Lorsqu'un tribunal canadien se déclare compétent à l'égard d'un défendeur

its own process, which can be taken for granted. Potential hardship to the defendant can be dealt with under *forum non conveniens*. The ultimate practical effect of the court's judgment will not be determined by its own decision to take jurisdiction, but by the decision of the courts in the defendant's home jurisdiction whether or not to recognize and enforce the Canadian judgment based on that jurisdiction's own domestic law and policy. Conversely, when a foreign judgment arrives in Canada, the enforcing court is the last line of defence for the Canadian defendant. The court should have a discretion to decide that it is not fair to the defendant to recognize the jurisdiction of the foreign court, even if the Canadian court would have decided it was fair to take jurisdiction itself based on the same connecting factors.

### G. *Conclusion on Jurisdiction*

In conclusion, I agree with Major J. that considerations of comity, order and fairness support the application of the "real and substantial connection" test to the recognition and enforcement of judgments originating in foreign countries. In my view, however, the application of the test should be purpose-driven and contextual. What constitutes a connection sufficient to meet the test will not be the same in every context. The jurisdiction test should reflect the difference between the international and interprovincial contexts and the greater hardship that litigation in a foreign country can entail. There is no good reason why Ontario courts should have to treat a judgment from Florida — or one from China, Turkmenistan or Sierra Leone — exactly like a judgment from another Canadian province.

I would also question whether international comity requires us to move as far as the majority does in the direction of openness to foreign judgments when the position of jurisdictions with which we tend to compare ourselves is less generous. In England and Australia, for example, the *Emanuel*

étranger, il ne s'interroge pas sur l'équité de sa propre procédure, qu'il peut tenir pour acquise. Le défendeur peut régler les difficultés qu'il est susceptible de connaître en invoquant le principe du *forum non conveniens*. L'effet concret que le jugement du tribunal aura dépendra en définitive non pas de sa propre décision de se déclarer compétent, mais plutôt de celle de reconnaître et d'exécuter le jugement canadien — ou de ne pas le faire — que les tribunaux du ressort du défendeur prendront à la lumière du droit et des politiques en vigueur dans ce ressort. À l'inverse, lorsqu'un jugement étranger arrive au Canada, le tribunal saisi de la demande d'exécution de ce jugement constitue le dernier rempart dont dispose le défendeur canadien. Le tribunal canadien devrait pouvoir décider que la reconnaissance de la compétence du tribunal étranger serait inéquitable pour le défendeur, même dans le cas où il aurait jugé équitable de se déclarer lui-même compétent en fonction des mêmes facteurs de rattachement.

### G. *Conclusion sur la question de la compétence*

Somme toute, je conviens avec le juge Major que des considérations de courtoisie, d'ordre et d'équité justifient l'application du critère du « lien réel et substantiel » à la reconnaissance et à l'exécution des jugements émanant de pays étrangers. J'estime, cependant, que ce critère doit s'appliquer selon une approche téléologique et contextuelle. Le lien suffisant pour satisfaire au critère peut varier d'un contexte à l'autre. Le critère de compétence doit alors refléter la différence entre le contexte international et le contexte interprovincial, ainsi que les difficultés accrues que peut occasionner un litige à l'étranger. Aucune raison valable n'oblige les tribunaux ontariens à traiter un jugement de la Floride — ou de la Chine, du Turkménistan ou de la Sierra Leone — exactement de la même manière qu'un jugement d'une autre province canadienne.

Je me demande également si la courtoisie internationale exige une aussi grande ouverture d'esprit que celle que proposent les juges majoritaires en ce qui concerne les jugements étrangers, compte tenu du fait que les ressorts auxquels nous avons tendance à nous comparer ne font pas preuve d'autant

205

206

*v. Symon*, *supra*, framework remains substantially unchanged and the jurisdiction of a foreign court must be based on the presence or residence of the defendant in the foreign jurisdiction or on the defendant's voluntary submission (see, e.g., *Dicey and Morris on the Conflict of Laws*, *supra*, at pp. 487 and 503; P. E. Nygh, *Conflict of Laws in Australia* (6th ed. 1995), at p. 138). The U.S. position is more liberal, but still does not go as far as the majority does in this case. Generally, U.S. states will apply the "minimum contact test" to foreign-country judgments as they do to judgments of sister states. This test is made out when a non-resident defendant seeking to avail himself of some benefit within a state affirmatively acts in a manner which he knows or should know will result in a significant impact within the forum state (see, e.g., *Mercandino v. Devoe & Raynolds, Inc*., 436 A.2d 942 (N.J. Super. App. Div. 1981), at p. 943). Thus, a connection between the foreign jurisdiction and the cause of action alone, in the absence of purposive conduct by the defendant establishing a connection between himself and the forum, would be insufficient as a basis for jurisdiction and enforceability in the U.S. In such a case, however, the "real and substantial connection" test as it is interpreted by the majority would always be satisfied.

207    Finally, I would note that the logic on which the *Morguard* test is founded suggests that it should supersede, rather than complement, the traditional common law bases of jurisdiction. In my view, it is not necessary to ask whether any of the traditional grounds are present and then go on to ask whether there is a real and substantial connection (as the majority reasons suggest, at para. 37). There should be just one question: is the "real and substantial connection" test made out?

208    This Court noted in *Hunt*, *supra*, that the traditional grounds were generally sound bases of jurisdiction and were "a good place to start", but also observed that "some of these may well require reconsideration in light of *Morguard*" (p. 325). Such

de générosité. En Angleterre et en Australie par exemple, le cadre établi par l'arrêt *Emanuel c. Symon*, précité, demeure essentiellement le même et la compétence d'un tribunal étranger doit être fondée sur la présence ou la résidence du défendeur dans le ressort étranger ou sur la soumission volontaire de ce défendeur (voir, par exemple, *Dicey and Morris on the Conflict of Laws*, *op. cit*., p. 487 et 503; P. E. Nygh, *Conflict of Laws in Australia* (6e éd. 1995), p. 138). Plus libérale, la position américaine ne va toutefois pas aussi loin que celle des juges majoritaires en l'espèce. En général, les États américains appliquent aux jugements étrangers le critère des « liens minimaux » (« *minimum contacts* ») de la même manière qu'un État le fait à l'égard des jugements d'un autre État. Ce critère est respecté lorsqu'un défendeur non résidant, qui cherche à se prévaloir d'un avantage dans un État, agit résolument d'une manière qui, comme il le sait ou devrait le savoir, aura une incidence importante dans l'État du for (voir, par exemple, *Mercandino c. Devoe & Raynolds, Inc*., 436 A.2d 942 (N.J. Super. App. Div. 1981), p. 943). Donc, la seule existence d'un lien entre le ressort étranger et la cause d'action — en l'absence d'une conduite intentionnelle du défendeur établissant un lien entre lui et le ressort en question — ne suffirait pas pour reconnaître la compétence de ce dernier et justifier l'exécution aux États-Unis. En pareil cas, cependant, le critère du « lien réel et substantiel », tel que l'interprètent les juges majoritaires, serait toujours respecté.

Enfin, je tiens à souligner que le raisonnement qui sous-tend le critère de l'arrêt *Morguard* indique qu'il doit remplacer et non compléter les motifs traditionnels de compétence en common law. À mon avis, il n'est pas nécessaire de se demander d'abord si l'un des motifs traditionnels existe, et ensuite s'il existe un lien réel et substantiel (comme le suggèrent les juges majoritaires, au par. 37 de leurs motifs). Une seule question doit être posée : le critère du « lien réel et substantiel » est-il respecté?

Dans l'arrêt *Hunt*, précité, p. 325, notre Cour a fait remarquer que les motifs traditionnels constituaient des fondements de compétence solides et « un bon point de départ », mais elle a également signalé qu'« il peut bien être

factors as contractual agreement to accept jurisdiction and habitual residence in the foreign forum are usually very clear examples of the kind of connection that reasonably supports the assumption of jurisdiction. Attornment by actively defending the action in the foreign jurisdiction is a slightly different kind of connection; because the defendant has chosen to have his day in court in the foreign forum, no unfairness results from the enforcement of the foreign court's judgment.

In some cases, however, the traditional grounds may be more arbitrary and formalistic than they are fair and reasonable. Under the traditional rules, for example, jurisdiction could be acquired by serving a defendant who was present in the jurisdiction, even if her presence was only fleeting and was completely unconnected to the action, and in the absence of any other factor supporting jurisdiction. Another example is the common law rule that an appearance solely for the purpose of challenging the jurisdiction of the foreign court was an attornment to its jurisdiction, which was argued (but not commented on by the court) in *United States of America v. Ivey* (1995), 26 O.R. (3d) 533 (Gen. Div.). Circumstances such as these may not amount to a real and substantial connection, and in my view they should not continue to be recognized as bases for jurisdiction just because they were under the traditional rules.

## IV.  The Impeachment Defences

### A.  *The Principle Behind the Defences*

Claimants who seek to have foreign judgments recognized or enforced in this country ask for the support and cooperation of Canadian courts. They thus face the initial burden of showing that the judgment is valid on its face and was issued by a court acting through fair process and with properly restrained jurisdiction based on a real and substantial connection to the action. The petitioner must convince the receiving court that the values of

nécessaire d'en réexaminer certains à la lumière de l'arrêt *Morguard* ». Des facteurs tels l'engagement contractuel à se soumettre à une compétence particulière et le lieu de résidence habituel dans le ressort étranger sont généralement des exemples très clairs du genre de facteur de rattachement qui justifie raisonnablement la reconnaissance de la compétence. L'acquiescement qui consiste à se défendre activement contre l'action intentée dans le ressort étranger constitue un type de lien légèrement différent. Puisque le défendeur a choisi de se présenter devant le tribunal étranger, l'exécution du jugement rendu par le tribunal étranger n'a rien d'inéquitable.

Dans certains cas, cependant, les motifs traditionnels peuvent devenir plus arbitraires et formalistes qu'équitables et raisonnables. Selon les règles traditionnelles, par exemple, la compétence pourrait résulter exclusivement de la signification faite au défendeur au moment où il se trouvait dans le ressort, même si sa présence n'a été que brève et n'avait absolument rien à voir avec l'action. Un autre exemple est celui de la règle de common law selon laquelle la comparution destinée seulement à contester la compétence du tribunal étranger vaut acquiescement à la compétence de ce tribunal, ce que le tribunal a affirmé (mais non commenté) dans l'arrêt *United States of America c. Ivey* (1995), 26 O.R. (3d) 533 (Div. gén.). Il se peut qu'il n'y ait pas de lien réel et substantiel dans ces circonstances qui, à mon avis, ne devraient plus être considérées comme des motifs de compétence uniquement parce que le régime des règles traditionnelles les considérait comme telles.

## IV.  Les défenses consistant à attaquer la validité du jugement

### A.  *Le principe qui sous-tend ces défenses*

Les demandeurs qui cherchent à obtenir la reconnaissance et l'exécution des jugements étrangers au Canada sollicitent l'appui et la coopération des tribunaux canadiens. Il leur incombe donc, au départ, de démontrer que le jugement est valide à première vue et qu'il a été rendu par un tribunal ayant agi avec équité et avec retenue dans l'exercice d'une compétence fondée sur l'existence d'un lien réel et substantiel avec l'action. Le requérant doit convaincre le

209

210

international comity require it to exercise its power in favour of enforcing the judgment. Once this burden has been met, the judgment is *prima facie* enforceable by a Canadian court. The common law has long recognized, however, that the defendant can still establish that the judgment should not be enforced by showing that one of a number of defences to recognition and enforcement applies. The defences relevant to this appeal are commonly grouped under the heading of "impeachment" defences, since all are based on the notion that the way the foreign judgment was obtained was in some way tainted or contrary to Canadian notions of justice. (Other potential defences, such as the foreign public law exception to enforceability in Canada, which might apply, for example, to a tax claim, are not implicated by the facts of this case.)

tribunal saisi que les valeurs de la courtoisie internationale lui commandent d'exercer son pouvoir d'exécuter le jugement. Dès que cette obligation est remplie, le jugement en question est exécutoire *prima facie* au Canada. Toutefois, la common law reconnaît depuis longtemps que le défendeur peut toujours établir qu'il n'y a pas lieu d'exécuter ce jugement, par la démonstration de l'application de l'un des nombreux moyens de défense opposables à la reconnaissance et à l'exécution d'un jugement. Les moyens de défense pertinents en l'espèce sont souvent regroupés sous le nom de « *"impeachment" defences* » (« défenses consistant à attaquer la validité du jugement ») car ils reposent tous sur l'idée que la procédure suivie pour obtenir le jugement étranger était en quelque sorte viciée ou contraire aux notions de justice canadiennes. (Les faits de la présente affaire ne justifient pas le recours à d'autres défenses — telle l'exception du droit public étranger prévoyant l'inexécution au Canada — qui pourraient éventuellement s'appliquer, par exemple, à une créance fiscale.)

211    A foreign judgment may be impeached on the basis that its recognition or enforcement would be contrary to public policy, that it was obtained by fraud, or that the foreign proceedings were contrary to natural justice. The burden is on the party raising one of these defences to prove that it applies; the foreign judgment is presumed to be valid, and there is a basic principle that the domestic court will not permit relitigation of matters tried before the foreign court (J.-G. Castel and J. Walker, *Canadian Conflict of Laws* (5th ed. (loose-leaf)), at p. 14-24). At the same time, the receiving court has both the authority and the responsibility to uphold the essential values of the domestic legal system and to protect citizens under the protection of its laws from unfairness. The three impeachment defences are established situations where the domestic court will intervene and refuse to enforce the judgment because the law on which it is based or the way it was obtained is simply too offensive to local notions of what is just and reasonable.

Un jugement étranger peut être attaqué pour le motif que sa reconnaissance ou son exécution serait contraire à l'ordre public, qu'il a été obtenu frauduleusement, ou que les procédures à l'étranger constituaient un déni de justice naturelle. Il incombe à la partie qui invoque l'un de ces moyens de défense de prouver qu'il s'applique. En effet, le jugement étranger est présumé valide. Un principe fondamental veut alors que le tribunal national n'autorise pas la tenue d'un nouveau procès relativement à des questions déjà examinées et tranchées par le tribunal étranger (J.-G. Castel et J. Walker, *Canadian Conflict of Laws* (5ᵉ éd. (feuilles mobiles)), p. 14-24). En même temps, le tribunal saisi a, à la fois, le pouvoir et la responsabilité de défendre les valeurs essentielles du régime juridique national et d'empêcher que les citoyens protégés par ses lois subissent une injustice. Les trois défenses consistant à attaquer la validité du jugement correspondent à des situations bien déterminées où le tribunal national intervient et refuse d'exécuter le jugement dont il est saisi, parce que le droit sur lequel il repose ou la façon dont il a été obtenu dévie simplement trop des notions locales de ce qui est juste et raisonnable.

B. *The Need to Reconsider the Impeachment Defences as a Result of the Change in the Jurisdiction Test*

An intrinsic tension arises between the impeachment defences and the principle that the law and facts on which the foreign judgment is based cannot be reargued. Acknowledging the foreign court's jurisdiction would mean very little if the defences could be routinely used to discredit the legal, factual or procedural basis of its judgment. On the other hand, the principle of finality of judgments has its limits; it does not and should not mean that the enforcing court can do no more than rubber-stamp the foreign judgment while turning a blind eye to unfairness or impropriety in its provenance.

The impeachment defences represent the balance that the courts have found to be appropriate between security of transactions, on the one hand, and fairness in the individual case, on the other. Traditionally, they have been narrow in scope. The old, strict approach to these defences struck a balance appropriate to the requirements of international comity under the pre-*Morguard* common law, when the jurisdiction test was a difficult threshold for foreign plaintiffs to cross. Nearly all judgments that passed it did so because the defendant had either participated in the action in the foreign forum or selected it by agreement. As J. Walker notes in a comment on this case:

Under such conditions, defendants resisting the enforcement of foreign judgments could be presumed to have defended the actions against them and to have benefited from the procedural safeguards available in the foreign legal systems. Alternatively, defendants could be presumed to have chosen, on the strength of some familiarity with the foreign legal systems, to let their matters be decided in default.

("*Beals v. Saldanha*: Striking the Comity Balance Anew" (2002), 5 *Can. Int'l Law.* 28, at p. 30)

B. *La nécessité de reconsidérer les défenses consistant à attaquer la validité du jugement à la suite de la modification du critère de compétence*

Une tension intrinsèque règne entre les défenses consistant à attaquer la validité du jugement étranger et le principe voulant que le droit et les faits qui sous-tendent ce jugement ne puissent être débattus de nouveau. La reconnaissance de la compétence du tribunal étranger aurait très peu de sens si les moyens de défense invoqués pouvaient régulièrement servir à contester le fondement juridique, factuel ou procédural de son jugement. Par contre, le principe du caractère définitif des jugements a ses limites, car il ne signifie pas, et ne devrait pas signifier, que le tribunal saisi ne peut rien faire de plus que reconnaître automatiquement la validité du jugement étranger, tout en fermant les yeux sur les injustices ou les irrégularités à l'origine de ce dernier.

Les défenses consistant à attaquer la validité du jugement représentent la solution de compromis que les tribunaux ont jugé appropriée pour assurer la sécurité des opérations, d'une part, et l'équité dans l'affaire donnée, d'autre part. Leur portée demeure habituellement limitée. À l'époque où le critère de compétence constituait un obstacle difficile à franchir pour les demandeurs étrangers, l'ancienne interprétation stricte de ces défenses permettait d'atteindre un juste milieu qui, sous le régime de la common law antérieure à l'arrêt *Morguard*, répondait aux exigences de la courtoisie internationale. Dans presque tous les cas où un jugement étranger franchissait cet obstacle, le défendeur avait soit participé à l'action dans le ressort étranger, soit convenu de choisir ce ressort. Comme J. Walker le souligne dans un commentaire sur la présente affaire :

[TRADUCTION] Dans ces conditions, on pourrait présumer que le défendeur qui s'oppose à l'exécution d'un jugement étranger a contesté l'action intentée contre lui et bénéficié des garanties procédurales offertes dans le régime juridique étranger. Subsidiairement, on pourrait présumer que le défendeur, fort d'une certaine connaissance du régime juridique étranger, a choisi de laisser son dossier être instruit par défaut.

(« *Beals v. Saldanha* : Striking the Comity Balance Anew » (2002), 5 *R.C.D.I.* 28, p. 30)

212

213

In short, the potential for unfairness to the defendant was minimal, and accordingly there was no need for courts to be concerned with shortcomings in the way the judgment was obtained absent "some egregiously bad feature of the process or the result" (Walker, *supra*, at p. 30).

214     The balance that existed under the traditional approach is lacking in the new test set out by the majority. The category of foreign judgments that are *prima facie* enforceable in this country has been greatly expanded by virtue of the adoption of the *Morguard* test for foreign-country judgments. The law as it now stands will admit a default judgment emanating from a forum that the defendant did not consent to and may have been connected to only indirectly or not at all. This is a salutary development in our law on jurisdiction; if there are sufficient connections between the action and the forum, the judgment should not be shut out on the basis that the forum was inappropriate. But the possibility that the judgment should be unenforceable for some other reason should be considered anew in light of this new context. Castel and Walker, *supra*, have commented that if this Court confirms the application of the *Morguard* test to foreign judgments, "it would seem necessary to revise the defences . . . so as to protect persons in Canada who have been sued in foreign courts from the particular kinds of unfairness that can arise in crossborder litigation, and so as to prevent abuse from occurring as a result of liberal rules for the enforcement of foreign default judgments" (p. 14-26).

215     One example of the kind of unfairness Castel and Walker refer to is the increased vulnerability of Canadian residents to nuisance lawsuits in other countries. A defendant may be confronted with a claim that he knows to be frivolous brought by an overseas claimant. His choices are to defend, to settle, or to ignore the claim. Defending in a foreign country is often expensive and difficult. Many foreign jurisdictions do not award costs to the successful party, so that the defendant will have to bear the expenses of litigation even if his position is fully

Bref, le risque d'injustice pour le défendeur s'avérait minime, et les tribunaux n'avaient donc pas à se soucier des lacunes de la procédure suivie pour obtenir le jugement, en l'absence d'un [TRADUCTION] « défaut très grave de la procédure ou du résultat » (Walker, *loc. cit.*, p. 30).

Le nouveau critère préconisé par les juges majoritaires ne permet pas d'établir l'équilibre que réalisait l'approche traditionnelle. L'application du critère de l'arrêt *Morguard* aux jugements étrangers a contribué à élargir considérablement la catégorie des jugements étrangers exécutoires *prima facie* dans notre pays. Le droit dans son état actuel permet de reconnaître un jugement par défaut émanant d'un ressort que le défendeur n'a pas convenu de choisir et auquel il n'est qu'indirectement, voire aucunement, lié. Il s'agit là d'une évolution salutaire de nos règles de droit en matière de compétence. S'il existe des liens suffisants entre l'action et le ressort, on ne doit pas faire obstacle à l'exécution du jugement pour le motif que le tribunal qui l'a rendu n'était pas compétent. Cependant, il devient nécessaire de réexaminer, à la lumière de cette nouvelle réalité, la possibilité que le jugement soit inexécutoire pour une autre raison. Castel et Walker, *op. cit.*, ont fait observer que, si notre Cour confirmait l'application du critère de l'arrêt *Morguard* aux jugements étrangers, [TRADUCTION] « il semblerait alors nécessaire de revoir les moyens de défense [. . .] afin de protéger, au Canada, les personnes ayant fait l'objet de poursuites à l'étranger contre les injustices particulières qui peuvent résulter d'un litige transfrontalier, et de prévenir les abus auxquels peuvent donner lieu des règles libérales en matière d'exécution des jugements rendus par défaut à l'étranger » (p. 14-26).

Un exemple d'injustice mentionnée par Castel et Walker est l'exposition accrue des résidants canadiens aux poursuites malveillantes à l'étranger. Un défendeur peut être confronté à une action — qu'il sait frivole — intentée par un demandeur outre-mer. Il a le choix de se défendre, de régler à l'amiable ou encore de ne tenir aucun compte de l'action intentée contre lui. Il est souvent onéreux et difficile de se défendre dans un pays étranger. Dans bien des ressorts étrangers, la partie qui obtient gain de cause n'a droit à aucuns dépens, ce qui oblige le défendeur

vindicated. On the other hand, failure to defend brings with it considerable risk. The defendant may have little or no knowledge of the legal system and may be unable to predict with confidence that the foreign court will not be persuaded, or required by the operation of its own rules, to uphold a meritless claim.

A defendant faced with this dilemma ought to be afforded some protection by Canadian courts against foreign judgments that are clearly flawed, even if the flaws do not meet the stringent tests that traditionally defined the impeachment defences. If no such protection is available, in many cases the only safe option for defendants will be to settle with the claimant despite the fact that the claim is baseless. If the position of the Canadian courts is to be that defendants who fail to defend in the foreign forum do so entirely at their peril, regardless of whether the decision not to defend was based on a rational cost-benefit analysis and irrespective of the frivolousness of the claim and of the use of improper means to persuade the foreign court that it should succeed, Canadian residents may become attractive targets for opportunistic plaintiffs' lawyers in other jurisdictions.

In my opinion, the impeachment defences, particularly the defences of fraud and natural justice, ought to be reformulated. The law of conflicts needs to take these new possibilities for abuse into account and to ensure an appropriate recalibration of the balance between respect for the finality of foreign judgments and protection of the rights of Canadian defendants.

Furthermore, the nominate defences should be looked at as examples of a single underlying principle governing the exercise of the receiving court's power to recognize and enforce a foreign judgment.

à supporter les dépenses engagées pour contester l'action, même dans le cas où on lui donne entièrement raison. Par ailleurs, l'omission d'opposer une défense comporte un risque considérable. Il se peut que le défendeur connaisse peu ou pas du tout le régime juridique applicable, qu'il lui soit impossible de prévoir avec certitude que le tribunal étranger ne sera pas convaincu, ou tenu en vertu de ses propres règles, de faire droit à une demande dénuée de fondement.

Le défendeur placé devant ce dilemme devrait se voir accorder par les tribunaux canadiens une certaine protection contre un jugement étranger manifestement vicié, même si les vices qui entachent ce jugement ne satisfont pas aux conditions strictes auxquelles est traditionnellement assujetti le recours aux défenses consistant à attaquer la validité d'un jugement. En l'absence d'une telle protection, le seul choix que, dans bien des cas, le défendeur peut faire sans risquer de se tromper est de transiger avec le demandeur même dans le cas d'une demande dénuée de fondement. Les résidants canadiens pourront devenir des cibles attrayantes pour les avocats représentant des demandeurs opportunistes dans d'autres ressorts, si jamais les tribunaux canadiens adoptent le point de vue selon lequel les défendeurs qui décident de ne pas s'opposer une défense dans le ressort étranger le font entièrement à leurs risques et périls, peu importe que leur décision résulte d'une analyse rationnelle des coûts et des avantages, et indépendamment du caractère frivole de la demande et des moyens irréguliers utilisés pour convaincre le tribunal étranger de l'accueillir.

J'estime qu'il est souhaitable de reformuler les défenses consistant à attaquer la validité d'un jugement, en particulier celles fondées sur la fraude et sur la justice naturelle. Le droit international privé doit tenir compte de ces nouvelles possibilités d'abus et veiller à rétablir l'équilibre entre le respect du caractère définitif des jugements étrangers et la protection des droits des défendeurs canadiens.

En outre, les moyens de défense spécifiques devraient être perçus comme des illustrations d'un seul principe sous-jacent qui régit l'exercice du pouvoir du tribunal saisi de reconnaître et d'exécuter un

216

217

218

The claimant must come before the Canadian court with clean hands, and the court will not accept a judgment whose enforcement would amount to an abuse of its process or bring the administration of justice in Canada into disrepute. Serious consideration should be given to the possibility of a residual category of judgments, beyond those addressed by the defences of public policy, fraud and natural justice, that should not be enforced because they, too, engage this principle — in short, because their enforcement would shock the conscience of Canadians.

### C.  *Reformulation of the Nominate Defences*

#### (1)  Public Policy

219    If the enforcement of a foreign judgment in Canada would be contrary to Canadian public policy, the judgment will not be enforced here. This defence addresses objections to the foreign law on which the judgment was based. It will be engaged if the foreign law is either contrary to basic morality or contrary to the fundamental tenets of justice recognized by our legal system.

220    The trial judge held that the public policy defence should be expanded to incorporate a "judicial sniff test" that would allow enforcing courts to reject foreign judgments obtained through questionable or egregious conduct (Jennings J., at p. 144). It has also been suggested that excessively high punitive damage awards should be unenforceable in whole or in part as a matter of public policy; see, e.g., J. S. Ziegel, "Enforcement of Foreign Judgments in Canada, Unlevel Playing Fields, and *Beals v. Saldanha*: A Consumer Perspective" (2003), 38 *Can. Bus. L.J.* 294, at pp. 306-7; *Kidron v. Grean* (1996), 48 O.R. (3d) 775 (Gen. Div.) (where the court refused to enforce on summary judgment a foreign judgment for $15 million for emotional distress based on evidence of "hurt feelings"). Ziegel notes that the Preliminary Draft Convention on Jurisdiction and Foreign Judgments in Civil and Commercial Matters adopted in October 1999, and revised in June 2001, by the Special Commission of the Hague Conference on Private International Law,

jugement étranger. Le demandeur qui se présente devant le tribunal canadien doit être sans reproche, et le tribunal ne reconnaîtra pas un jugement dont l'exécution constituerait un abus de sa procédure ou déconsidérerait l'administration de la justice au Canada. Il faut alors penser sérieusement à ajouter aux catégories de jugements visées par les moyens de défense fondés sur l'ordre public, la fraude et la justice naturelle une catégorie résiduelle de jugements à ne pas exécuter parce qu'ils dérogent eux aussi à ce principe — bref, parce que leur exécution choquerait la conscience des Canadiens et des Canadiennes.

### C.  *Reformulation des moyens de défense spécifiques*

#### (1)  L'ordre public

Un jugement étranger ne sera pas exécuté au Canada dans le cas où son exécution violera l'ordre public canadien. Ce moyen de défense répond aux objections formulées au sujet du droit étranger appliqué pour rendre le jugement en question. Il peut être invoqué si le droit étranger est contraire aux valeurs morales ou aux préceptes de justice fondamentaux reconnus par notre régime juridique.

Le juge de première instance a conclu qu'il y avait lieu d'élargir le moyen de défense fondé sur l'ordre public de manière à y incorporer un [TRADUCTION] « critère d'intuition judiciaire » (« *judicial sniff test* ») qui permettrait aux tribunaux saisis de rejeter les jugements étrangers obtenus grâce à un comportement douteux ou inacceptable (le juge Jennings, p. 144). On a également laissé entendre qu'un jugement accordant des dommages-intérêts punitifs excessifs devrait être inexécutoire, en totalité ou en partie, pour des raisons d'ordre public; voir, par exemple, J. S. Ziegel, « Enforcement of Foreign Judgments in Canada, Unlevel Playing Fields, and *Beals v. Saldanha* : A Consumer Perspective » (2003), 38 *Rev. can. dr. comm.* 294, p. 306-307; *Kidron c. Grean* (1996), 48 O.R. (3d) 775 (Div. gén.) (refus d'exécuter par jugement sommaire un jugement étranger accordant 15 millions de dollars pour troubles émotionnels, à la lumière d'une preuve d'[TRADUCTION] « amour-propre écorché »). Ziegel souligne que l'avant-projet de la Convention de

provides that a court asked to enforce an award of non-compensatory damages may, if satisfied that the amount awarded is "grossly excessive", limit enforcement to a lesser amount (Article 33(2)). The Draft Convention may reflect an international consensus that large punitive damage awards can raise serious concerns, although this idea does not rise to the level of a customary norm.

In my view, the better approach is to continue to reserve the public policy defence for cases where the objection is to the law of the foreign forum, rather than the way the law was applied, or the size of the award *per se*. In other words, this defence should continue to be, as the trial judge put it, "directed at the concept of repugnant *laws*, not repugnant *facts*" (p. 144 (emphasis in original)). Public policy is potentially an expansive enough concept to subsume the other two defences; it is, of course, contrary to public policy in a broad sense to enforce a judgment that was fraudulently or unfairly obtained. But it is useful to maintain an analytical distinction between the three defences. Furthermore, the defence of public policy has long been associated with condemnation of the foreign jurisdiction's law. To extend it to cover situations where there is nothing objectionable about the foreign law but, rather, a defect in the way the law was applied might send the wrong message, one that conflicts with the norms of international cooperation and respect for other legal systems underlying the doctrine of comity.

In *Boardwalk Regency Corp. v. Maalouf* (1992), 88 D.L.R. (4th) 612, the Ontario Court of Appeal held that the public policy defence applies to laws

La Haye sur la compétence et les jugements étrangers en matière civile et commerciale — adopté en octobre 1999 et révisé, en juin 2001, par la Commission spéciale de la Conférence de La Haye de droit international privé — prévoit qu'un tribunal saisi d'une demande d'exécution d'un jugement accordant des dommages-intérêts non compensatoires peut en limiter la reconnaissance à un montant inférieur, s'il est convaincu que le montant accordé est « manifestement excessif » (paragraphe 33(2)). L'avant-projet de Convention peut traduire un consensus international voulant que l'attribution de dommages-intérêts punitifs élevés puisse soulever de sérieuses questions, bien qu'il ne s'agisse pas là d'une règle coutumière.

221 À mon avis, la meilleure solution est de continuer à limiter la possibilité d'invoquer le moyen de défense fondé sur l'ordre public aux cas où l'objection vise le droit applicable dans le ressort étranger et non la manière dont ce droit a été appliqué ou le montant même des dommages-intérêts qui a été accordé. Autrement dit, comme l'a affirmé le juge de première instance, ce moyen de défense devrait continuer d'être [TRADUCTION] « axé sur la notion de *lois* répugnantes et non sur la notion de *faits* répugnants » (p. 144 (en italique dans l'original)). La notion d'ordre public peut être assez large pour englober les deux autres moyens de défense. Il est, bien sûr, contraire à l'ordre public au sens large d'exécuter un jugement obtenu d'une manière frauduleuse ou inéquitable. Cependant, il reste utile de maintenir une distinction analytique entre les trois moyens de défense. En outre, le moyen de défense fondé sur l'ordre public a longtemps été assimilé à une dénonciation du droit applicable dans le ressort étranger. L'application de ce moyen de défense aux cas où le droit étranger n'a rien de répréhensible, mais a plutôt été mal appliqué, risque de transmettre le mauvais message, à savoir un message incompatible avec les règles de coopération internationale et de respect pour les autres régimes juridiques, qui sous-tendent le principe de la courtoisie.

222 Dans l'arrêt *Boardwalk Regency Corp. c. Maalouf* (1992), 88 D.L.R. (4th) 612, la Cour d'appel de l'Ontario a conclu que le moyen de

that violate "conceptions of essential justice and morality" (p. 615). As an example, the court cited a contract relating to the corruption of children (p. 622). It emphasized that a mere difference between the policy choices reflected in the foreign law and those that prevail in Canada is not enough to engage the defence (pp. 615-16). This approach reflects the principle that diversity among the legal systems of the world should be respected, while at the same time establishing the limits of that principle. A law that offends fundamental or essential moral precepts will not be enforced. While the question is always whether the foreign law violates Canadian ideas of essential justice and morality, the relevant precepts of morality and justice are so basic that they can be said to have a universal character and will generally be respected by all fair legal systems.

223    The defence of public policy should not, however, be reserved for such shockingly immoral laws that one would be hard-pressed to find a non-hypothetical example of the kind of law that would engage it. In my opinion, there is more work for this defence to do. It should also apply to foreign laws that offend basic tenets of our civil justice system, principles that are widely recognized as having a quality of essential fairness. Among these, I would include the idea that civil damages should only be awarded when the defendant is responsible for harm to the plaintiff, and the rule that punitive damages are available when the defendant's conduct goes beyond mere negligence and is morally blameworthy in some way. These are basic principles of justice that are reflected in some form in most developed legal systems, although the particular form in which they are expressed may vary.

défense fondé sur l'ordre public peut être invoqué dans le cas où des règles de droit violent les [TRADUCTION] « notions de justice essentielle et de moralité » (p. 615). La cour a cité l'exemple d'un contrat relatif à la corruption d'enfants (p. 622). Elle a souligné qu'une simple différence entre les choix de politique générale que traduit le droit étranger et ceux qui ont été faits au Canada n'est pas suffisante pour que ce moyen de défense puisse être invoqué (p. 615-616). Cette approche reflète le principe voulant qu'il faille respecter la diversité des régimes juridiques qui existent dans le monde, tout en fixant des limites à ce principe. La règle de droit qui viole des préceptes moraux essentiels ou fondamentaux ne sera pas appliquée. Bien que la question soit toujours de savoir si le droit étranger viole les notions de justice essentielle et de moralité canadiennes, les préceptes de moralité et de justice applicables sont si fondamentaux qu'on peut affirmer qu'ils possèdent un caractère universel et qu'ils seront généralement respectés par tous les régimes juridiques équitables.

Cependant, le moyen de défense fondé sur l'ordre public ne doit pas être limité aux lois qui sont d'une immoralité si inacceptable qu'il serait difficile de trouver un exemple concret de cas où il serait possible de l'invoquer. J'estime que l'application de ce moyen de défense ne doit pas s'arrêter là. Il doit également pouvoir être invoqué à l'encontre de lois étrangères violant les règles fondamentales de notre système de justice civile, qui sont largement reconnues comme étant essentiellement équitables. J'inclurais notamment dans ces règles l'idée que des dommages-intérêts civils ne doivent être accordés que si le défendeur est responsable du préjudice subi par le demandeur, ainsi que la règle voulant qu'il soit possible d'accorder des dommages-intérêts punitifs lorsque la conduite du défendeur est plus que simplement négligente et est, dans un certain sens, moralement répréhensible. Ce sont là des principes de justice fondamentaux qui se retrouvent dans la plupart des régimes juridiques évolués, bien que la façon de les exprimer puisse varier d'un régime à l'autre.

A law which violates these basic tenets of justice would be fundamentally unfair and worthy of condemnation. A Canadian court presented with a judgment from a jurisdiction whose law provides, for example, that punitive damages can be awarded on the basis of simple negligence or strict liability ought to have a discretion to deny or limit the enforceability of the judgment on grounds of public policy.

This does not dispose of all the difficulties raised by large punitive damage awards, which in practice seldom result from the application of unjust laws. The most common source of punitive damage awards that are unusually high by international standards is the United States. In that country, it is more common to use punitive damages as an instrument of social engineering than it is in Canada, and American law tends to permit larger awards as a way of modifying the behaviour of well-funded defendants. There is nothing about that approach that is inherently offensive to Canadian ideas of basic fairness; it is simply a different policy choice, and it affords U.S. plaintiffs a level of protection of which they ought not necessarily to be deprived just because the defendant's assets are here. As far as I know, U.S. federal and state law generally allows for punitive damages only when the defendant's behaviour is morally blameworthy in some way. In this sense, their policy is similar in principle to ours even though the amounts awarded are sometimes startlingly high to Canadian eyes.

Serious problems can, however, arise when an exorbitant damage award is granted against a defendant whose actions were merely careless, rather than reprehensible, or where the defendant's actions were blameworthy enough to merit punitive damages in some amount but the amount awarded is so unimaginably large that it would only be justified as a response to the most heinous and despicable conduct. In many such cases, the applicable

224

Une loi violant ces principes de justice fondamentaux serait profondément inéquitable et mériterait d'être dénoncée. Ainsi, lorsqu'il est saisi d'un jugement émanant d'un ressort où la loi prévoit, par exemple, la possibilité d'accorder des dommages-intérêts punitifs pour cause de simple négligence ou de responsabilité stricte, un tribunal canadien devrait pouvoir en refuser ou en limiter l'exécution pour des raisons d'ordre public.

225

Cela ne résout pas toutes les difficultés posées par l'attribution de dommages-intérêts punitifs élevés qui, en pratique, découle rarement de l'application de lois injustes. C'est aux États-Unis que les dommages-intérêts punitifs sont le plus souvent extraordinairement élevés par rapport à ceux accordés dans d'autres pays. Dans ce pays, on recourt plus souvent qu'au Canada aux dommages-intérêts punitifs pour tenter de transformer la société, et le droit américain tend à percevoir l'attribution de montants plus élevés comme un moyen de changer le comportement des défendeurs bien nantis. Cette approche n'a en soi rien de contraire aux notions d'équité fondamentale canadiennes; elle représente simplement un choix stratégique différent qui assure aux demandeurs américains une protection dont ils ne devraient pas nécessairement être privés du seul fait que les biens du défendeur sont situés au Canada. À ma connaissance, les lois américaines, tant fédérales que celles des États, ne permettent généralement l'attribution de dommages-intérêts punitifs que si le comportement du défendeur est, dans un certain sens, moralement répréhensible. À cet égard, leur politique sous-jacente est, en principe, semblable à la nôtre même si les montants accordés peuvent parfois paraître excessifs aux yeux des Canadiens et des Canadiennes.

226

De graves problèmes peuvent toutefois survenir dans le cas où un défendeur ayant simplement agi de façon négligente, mais non répréhensible, se voit ordonner de verser des dommages-intérêts exorbitants, ou dans celui où les actes du défendeur sont assez répréhensibles pour justifier un certain montant de dommages-intérêts punitifs, mais où le montant accordé est si incroyablement élevé qu'il ne saurait être justifié que pour

law does not, in theory at least, support the size of the damage award. Such awards may be fixed by juries or judges who may not apply the law with the utmost scrupulousness, and they are often overturned on appeal.

227    Some very large judgments of this kind have gained a certain level of notoriety and are probably the first to come to mind when concerns about the size of punitive damage awards are raised. A well-known example is *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), where the United States Supreme Court overturned a judgment of the Alabama Supreme Court which had awarded $2 million against BMW because they had sold the defendant a car without revealing that it had been repainted.

228    Another example is the *Loewen* case, where a Mississippi jury awarded $500 million (including punitive damages of $400 million) against a funeral company based in British Columbia for anti-competitive behaviour. The Mississippi court rules made the defendant's right to appeal conditional on the posting of a bond worth 125 percent of the damages owed. The defendants settled the case in 1996, and went on to file a NAFTA claim against the United States, arguing that the verdict amounted to an uncompensated appropriation of foreign investors' assets. This claim is ultimately unsuccessful, but the NAFTA tribunal remarked on the unfairness of the verdict and the appearance that improper considerations had played a part in inflating it; the trial judge had allowed the plaintiff's attorney to make irrelevant and prejudicial references to matters of race and class and to the fact that the defendants were foreign nationals (*Loewen Group, Inc. v. United States of America*, International Centre for Settlement of Investment Disputes, Case No. ARB(AF)/98/3, June 26, 2003, at para. 4). See also J. A. Talpis, "*If I am from Grand-Mère, Why Am I Being Sued in Texas?*" *Responding to Inappropriate Foreign Jurisdiction*

le comportement le plus haineux et le plus ignoble. Dans bon nombre de ces situations, le droit applicable ne justifie pas, en théorie du moins, le montant des dommages-intérêts accordés. Ces dommages-intérêts peuvent être fixés par des jurys ou des juges qui ne sont pas toujours susceptibles d'appliquer la loi avec le plus de rigueur, et sont souvent annulés en appel.

Certains jugements de cette nature, qui accordent des sommes très élevées, ont acquis une certaine notoriété et sont probablement les premiers qui viennent à l'esprit lorsque des questions sont soulevées au sujet de l'importance des dommages-intérêts punitifs accordés. Un exemple bien connu est l'arrêt *BMW of North America, Inc. c. Gore*, 517 U.S. 559 (1996), où la Cour suprême des États-Unis a infirmé le jugement de la Cour suprême de l'Alabama ordonnant à BMW de verser 2 millions de dollars parce qu'elle avait vendu une voiture au défendeur sans l'informer qu'elle avait été repeinte.

Un autre exemple est l'affaire *Loewen*, où un jury du Mississippi a ordonné à une société de pompes funèbres ayant son siège social en Colombie-Britannique de verser 500 millions de dollars (incluant des dommages-intérêts punitifs de 400 millions de dollars) pour cause de comportement anticoncurrentiel. Les règles de procédure du Mississippi subordonnaient le droit d'appel du défendeur au dépôt d'un cautionnement équivalant à 125 pour 100 des dommages-intérêts dûs. Les défendeurs ont réglé l'affaire en 1996, et ont ensuite intenté contre les États-Unis une action fondée sur l'ALÉNA, dans laquelle ils alléguaient que le verdict équivalait à une appropriation, sans contrepartie, des biens d'un investisseur étranger. En définitive, leur action a été rejetée, mais le tribunal de l'ALÉNA a commenté le caractère inéquitable du verdict et le fait que des facteurs inappropriés semblaient avoir contribué à gonfler le montant accordé; le juge de première instance avait permis à l'avocat du demandeur de s'éloigner du sujet et de causer un préjudice en le laissant évoquer des questions de race et de classe sociale ainsi que le fait que les défendeurs étaient des ressortissants étrangers (*Loewen Group, Inc. c. United States*

2003 SCC 72 (CanLII)

*in Quebec-United States Crossborder Litigation* (2001).

*of America*, Centre international pour le règlement des différends relatifs aux investissements, n° ARB(AF)/98/3, 26 juin 2003, par. 4). Voir aussi J. A. Talpis, « *If I am from Grand-Mère, Why Am I Being Sued in Texas?* » *Responding to Inappropriate Foreign Jurisdiction in Quebec-United States Crossborder Litigation* (2001).

In cases like those referred to above, the problem is not that the law of the foreign jurisdiction conflicts with Canadian public policy, but that the facts of the case do not really justify the size of the award even under the foreign law. These are issues that, in my view, engage the defence of natural justice rather than that of public policy.

Dans les affaires comme celles mentionnées plus haut, le problème tient non pas à ce que le droit du ressort étranger est contraire à l'ordre public canadien, mais plutôt à ce que les faits de l'affaire ne justifient pas vraiment le montant accordé, même sous le régime du droit étranger. À mon avis, de telles questions donnent ouverture au moyen de défense fondé sur la justice naturelle et non à celui fondé sur l'ordre public.    229

### (2) Fraud

### (2) La fraude

Fraud perpetrated on the court that issued the foreign judgment is a defence to its enforcement in Canada. The defence of fraud is hard to reconcile with the principle that the original court's findings of fact are final and binding. As Castel and Walker, *supra*, observe, "[t]he difficulty lies in defining the extent to which the defence of fraud can be considered without reviewing the deliberations of the foreign court or reconsidering the merits of the claims or defences adjudicated in the foreign proceeding" (pp. 14-24 and 14-25).

La fraude dont a été l'objet le tribunal qui a rendu le jugement étranger constitue un moyen de défense opposable à l'exécution de ce jugement au Canada. Le moyen de défense fondé sur la fraude se concilie difficilement avec le principe voulant que les conclusions de fait du tribunal d'origine aient force de chose jugée. Comme le font observer Castel et Walker, *op. cit.*, [TRADUCTION] « [i]l est difficile de déterminer la mesure dans laquelle il est possible d'apprécier le moyen de défense fondé sur la fraude sans réexaminer les délibérations du tribunal étranger ou le bien-fondé des allégations ou des moyens de défense sur lesquels le tribunal s'est prononcé au cours de l'instance à l'étranger » (p. 14-24 et 14-25).    230

Courts have attempted to resolve this conflict by distinguishing between the kind of fraud of which evidence will be admitted by the domestic court, and allegations of fraud which are considered to have been directly or impliedly disposed of by the foreign judgment and cannot be raised again. Different courts have drawn the line in different places. At one end of the spectrum is the very strict rule followed in *Woodruff v. McLennan* (1887), 14 O.A.R. 242, admitting only evidence of "extrinsic fraud" (fraud going to the jurisdiction of the court that issued the judgment, or affecting the defendant's opportunity to present her case). At the other is the liberal

Les tribunaux ont tenté de résoudre ce problème en établissant une distinction entre le type de fraude dont la preuve sera admise par le tribunal national et les allégations de fraude sur lesquelles, considère-t-on, le tribunal étranger s'est prononcé directement ou implicitement dans son jugement et qui ne peuvent être réitérées. L'endroit où les tribunaux ont tracé la ligne n'est pas le même dans tous les cas. À une extrémité du spectre, on retrouve la règle très stricte appliquée dans l'affaire *Woodruff c. McLennan* (1887), 14 O.A.R. 242, voulant que seule soit recevable la preuve de « fraude extrinsèque » (la fraude ayant une incidence sur la compétence du    231

rule followed by the English courts in *Abouloff v. Oppenheimer* (1882), 10 Q.B.D. 295 (C.A.), and recently affirmed by the House of Lords in *Owens Bank Ltd. v. Bracco*, [1992] 2 All E.R. 193, whereby the judgment will be vitiated by evidence that the foreign court was deliberately deceived on any matter, including on the merits of the case. A middle position was taken by the Ontario Court of Appeal in *Jacobs v. Beaver* (1908), 17 O.L.R. 496, and in this case, where it was held that fraud can only be argued on the basis of fresh evidence that was not known, and could not have been discovered with reasonable effort, at the time of the original decision.

232    It should be noted that each of these approaches represents a compromise between the conflicting propositions that the original judgment is conclusive and that a judgment obtained by deception or based on false facts should not be enforced. Even under the permissive English rule, the foreign court's factual conclusions can only be displaced by proof of conscious and intentional deception; it is not enough to argue that the foreign court drew the wrong conclusion from the evidence. In the *Duchess of Kingston's Case* (1776), 2 Sm. L.C. (8th ed.) 784 (cited in *Abouloff*, *supra*, at p. 300), de Grey C.J. remarked that "although it is not permitted to show that the [foreign] Court was mistaken, it may be shown that they were misled" (p. 794). None of these compromises has an absolute claim to be the correct solution to the conundrum. What is the best approach depends on the context in which the rule is applied, and the most appropriate rule will be the one that is most conducive in the circumstances to furthering the objectives of private international law.

233    I agree with Major J. that in general the rule that the defence of fraud must be based on previously

tribunal ayant prononcé le jugement ou sur la possibilité pour le défendeur d'exposer son point de vue). À l'autre extrémité du spectre, on rencontre la règle libérale que les tribunaux anglais ont appliquée dans l'affaire *Abouloff c. Oppenheimer* (1882), 10 Q.B.D. 295 (C.A.), et que la Chambre des lords a récemment confirmée dans l'arrêt *Owens Bank Ltd. c. Bracco*, [1992] 2 All E.R. 193. Selon cette règle, le jugement est vicié s'il est prouvé que le tribunal étranger a délibérément été induit en erreur sur une question, y compris celle du bien-fondé de l'affaire. Dans l'arrêt *Jacobs c. Beaver* (1908), 17 O.L.R. 496, comme dans la présente affaire, la Cour d'appel de l'Ontario a adopté une solution de compromis en statuant que la fraude ne peut être invoquée qu'à la lumière de nouveaux éléments de preuve qui, à l'époque de la décision initiale, étaient inconnus et impossibles à découvrir au prix d'un effort raisonnable.

Il convient de noter que chacune de ces approches représente un compromis entre les propositions contradictoires voulant que le jugement initial soit définitif et qu'il n'y ait pas lieu d'exécuter un jugement obtenu par supercherie ou fondé sur de faux faits. Même selon la règle anglaise permissive, les conclusions de fait du tribunal étranger ne peuvent être écartées que s'il est prouvé qu'une supercherie a été commise sciemment et de propos délibéré. Il ne suffit pas d'alléguer que le tribunal étranger n'a pas tiré la bonne conclusion de la preuve. Dans l'affaire *Duchess of Kingston's Case* (1776), 2 Sm. L.C. (8th ed.) 784 (citée dans l'arrêt *Abouloff*, précité, p. 300), le juge en chef de Grey a fait remarquer, à la p. 794, que [TRADUCTION] « quoiqu'il ne soit pas permis de démontrer que le tribunal [étranger] a commis une erreur, on peut prouver qu'[il] a été induit en erreur ». Aucun de ces compromis ne saurait être considéré comme étant incontestablement la bonne façon de résoudre ce problème épineux. La meilleure approche dépend du contexte dans lequel la règle est appliquée, et la règle la plus appropriée est celle qui, dans les circonstances, contribue le mieux à réaliser les objectifs du droit international privé.

Je conviens avec le juge Major qu'en général la règle voulant que le moyen de défense fondé sur

undiscoverable evidence is a reasonably balanced solution. The distinction between extrinsic and intrinsic fraud is, as Major J. says, an obscure one which creates uncertainty. It is also unduly strict; as Jennings J. noted in the court below, it leaves space for the fraud defence that is not already occupied by a principled jurisdiction test and by the defence of natural justice (p. 140). On the other hand, defendants usually should not be allowed to reargue matters that they already raised before the foreign court, or chose not to raise there. These considerations suggest that the "extrinsic fraud" approach is too narrow and the "intentional fraud" approach too broad; the rule that only fresh evidence of fraud can be looked at by the enforcing court is, generally speaking, a good compromise.

I would not, however, rule out the possibility that a broader test should apply to default judgments in cases where the defendant's decision not to participate was a demonstrably reasonable one. If the defendant ignored what it justifiably considered to be a trivial or meritless claim, and can prove on the civil standard that the plaintiff took advantage of his absence to perpetrate a deliberate deception on the foreign court, it would be inappropriate to insist that a Canadian court asked to enforce the resulting judgment must turn a blind eye to those facts. In *Powell v. Cockburn*, [1977] 2 S.C.R. 218, at p. 234, Dickson J. (as he then was) observed that "[t]he aim of the Courts, in refusing recognition because of fraud, is to prevent abuse of the judicial process." In my opinion, enforcement of a judgment that was obtained by intentionally misleading the foreign court in the kind of circumstances I have outlined could well amount to an abuse of the judicial process. In my opinion, a more generous version of the fraud defence ought to be available, as required, to address the dangers of abuse associated with the loosening of the jurisdiction test to admit a broad

la fraude ne puisse être invoqué qu'à la lumière d'éléments de preuve impossibles à découvrir antérieurement représente un juste milieu raisonnable. Comme l'affirme le juge Major, la distinction entre la fraude extrinsèque et la fraude intrinsèque est une distinction obscure qui crée de l'incertitude. Elle est également trop stricte; comme le juge Jennings l'a fait remarquer en première instance, la place qu'elle fait au moyen de défense fondé sur la fraude n'est pas déjà occupée par un critère de compétence fondé sur des principes et par le moyen de défense fondé sur la justice naturelle (p. 140). Par ailleurs, les défendeurs ne devraient généralement pas être admis à débattre à nouveau des questions qu'ils ont déjà soulevées devant le tribunal étranger ou qu'ils avaient décidé de ne pas y soulever. Ces facteurs indiquent que l'approche fondée sur la « fraude extrinsèque » demeure trop restrictive et que celle fondée sur la « fraude commise de propos délibéré » devient trop large. De façon générale, la règle voulant que le tribunal saisi puisse examiner seulement une nouvelle preuve de fraude représente un bon compromis.

234

Cependant, je n'écarterais pas la possibilité d'appliquer un critère plus large aux jugements par défaut dans les situations où la décision du défendeur de ne pas participer à l'instance était manifestement raisonnable. Dans le cas où le défendeur n'a pas réagi à ce qu'il considérait, à juste titre, comme étant une demande futile et dénuée de fondement, et où il peut prouver, selon la norme applicable en matière civile, que le demandeur a profité de son absence pour délibérément induire en erreur le tribunal étranger, on serait malvenu de soutenir qu'un tribunal canadien saisi d'une demande d'exécution du jugement qui a résulté doit fermer les yeux sur ces faits. Dans l'arrêt *Powell c. Cockburn*, [1977] 2 R.C.S. 218, p. 234, le juge Dickson (plus tard Juge en chef) a d'ailleurs signalé qu' « [e]n refusant de reconnaître les jugements entachés de fraude, les tribunaux essaient d'empêcher que l'on abuse du système judiciaire. » Selon moi, l'exécution d'un jugement que l'on a obtenu en induisant délibérément en erreur le tribunal étranger, dans des circonstances comme celles que j'ai exposées, pourrait bien constituer un abus du système judiciaire. J'estime que l'on devrait

category of formerly unenforceable default judgments.

### (3) Natural Justice

235    A foreign judgment will not be enforced in Canada if the foreign proceedings were contrary to natural justice. The defence concerns the procedure by which the foreign court reached its decision. The clearest examples of a deprivation of natural justice occur when the defendant lacks notice of the foreign proceedings or an opportunity to present his case to the court.

236    In my opinion, two developments should be recognized in connection with this defence. First, the requirements of notice and a hearing should be construed in a purposive and flexible manner. Secondly, substantive principles of justice should also be included in the scope of the defence. The ultimate inquiry is always whether the foreign judgment was obtained in a manner that was fair to the defendant and consistent with basic Canadian notions of justice.

237    The purposive interpretation of the notice requirement was addressed in some detail by Weiler J.A. in her dissenting opinion in the court below ((2001), 54 O.R. (3d) 641). The notice requirement is based on "the underlying fundamental principle of justice that defendants have a right to know the case against them and to make an informed decision as to whether or not to present a defence" (pp. 675-76).

238    Notice is adequate when the defendant is given enough information to assess the extent of his or her jeopardy. This means, among other things, that the defendant should be made aware of the approximate amount sought. Canadian procedural rules require that the amount of damages claimed be stated in the pleadings (Weiler J.A., at p. 676). This is not

pouvoir invoquer une version plus généreuse du moyen de défense fondé sur la fraude lorsque cela s'avère nécessaire pour réduire les risques d'abus liés à l'assouplissement du critère de compétence qui permet désormais la reconnaissance d'une large catégorie de jugements par défaut auparavant inexécutoires.

### (3) La justice naturelle

Un jugement étranger ne sera pas exécuté au Canada si l'instance à l'étranger a violé les règles de justice naturelle. Le moyen de défense dont il est ici question vise la procédure que le tribunal étranger a suivie pour rendre sa décision. Les cas les plus évidents de déni de justice naturelle sont ceux où le défendeur n'est pas avisé des procédures à l'étranger ou n'a pas la possibilité d'exposer son point de vue devant le tribunal.

À mon avis, ce moyen de défense doit être remanié sous deux aspects. Premièrement, les exigences en matière d'avis et d'audience doivent recevoir une interprétation téléologique et souple. Deuxièmement, ce moyen de défense doit également englober les principes de justice substantiels. En définitive, il s'agit toujours de déterminer si le jugement étranger a été obtenu d'une manière à la fois équitable pour le défendeur et conforme aux notions de justice fondamentales canadiennes.

Dans ses motifs dissidents en Cour d'appel ((2001), 54 O.R. (3d) 641), la juge Weiler a soumis à un examen assez approfondi la question de l'interprétation téléologique de l'obligation de donner avis. Cette obligation repose sur [TRADUCTION] « le principe de justice fondamentale voulant que les défendeurs aient le droit de connaître ce qui leur est reproché et de prendre une décision éclairée quant à savoir s'ils présenteront ou non une défense » (p. 675-676).

L'avis est suffisant lorsque le défendeur reçoit assez de renseignements pour pouvoir mesurer l'ampleur du risque auquel il est exposé. Cela signifie, notamment, que le défendeur doit être informé du montant approximatif réclamé. Les règles de procédure canadiennes exigent que les actes de procédure précisent le montant des dommages-intérêts

the rule in all jurisdictions, and notice will still be adequate even where the pleadings do not conform to Canadian standards as long as the defendant is informed in some other way of the amount in issue.

A requirement of particular relevance to this appeal is that adequate notice must include alerting the defendant to the consequences of any procedural steps taken or not taken, to the extent that those consequences would not be reasonably apparent to someone in the defendant's position. The claimant bears a certain responsibility for ensuring that a defendant who is not reasonably in a position to understand the particular workings of the foreign process does not inadvertently give up defences or waive rights as a result.

Proper notice also requires alerting the defendant to the allegations that will be adjudicated at trial. The defendant must be informed, by the pleadings or otherwise, of the basis on which damages are sought and the case to be answered. As Weiler J.A. noted, if in fact damages are assessed "beyond the pleadings", then the defendant will not have had true notice of what would take place in the proceedings and will have been deprived of the opportunity to make an informed decision as to whether to participate (p. 676).

Authority for the proposition that natural justice comprises substantive principles of justice, as well as minimum procedural standards, is to be found in the judgment of the English Court of Appeal in *Adams v. Cape Industries plc*, [1991] 1 All E.R. 929, the leading English case on the enforcement of foreign judgments. The judgment sought to be enforced in that case originated in Texas and arose from a complex asbestos-poisoning action involving numerous plaintiffs and defendants. Damages were assessed in a rather unconventional way. On the suggestion of plaintiffs' counsel, the judge arrived at a global amount of damages to be distributed among

réclamés (la juge Weiler, p. 676). Ce n'est pas le cas dans tous les ressorts et, pourvu que le défendeur soit informé de quelque autre manière du montant réclamé, l'avis sera suffisant même si les actes de procédure ne respectent pas les normes canadiennes.

239   Une exigence particulièrement pertinente en l'espèce veut que, pour être suffisant, l'avis doive prévenir le défendeur des conséquences de toutes les démarches procédurales effectuées ou non effectuées, dans la mesure où ces conséquences ne seraient pas raisonnablement évidentes pour une personne dans la situation du défendeur. Jusqu'à un certain point, il incombe au demandeur d'éviter qu'un défendeur qui n'est pas raisonnablement en mesure de comprendre les particularités de la procédure étrangère renonce par inadvertance à des moyens de défense et, par le fait même, à des droits.

240   L'avis doit également prévenir le défendeur des allégations qui seront examinées et tranchées au procès. Le défendeur doit être informé, au moyen des actes de procédure ou autrement, des raisons pour lesquelles des dommages-intérêts sont réclamés, ainsi que de la preuve à réfuter. Comme la juge Weiler l'a souligné, si, en réalité, les dommages-intérêts sont évalués [TRADUCTION] « après la signification des actes de procédure », le défendeur n'est pas alors véritablement avisé de ce qui se passera au cours de l'instance et n'est pas non plus en mesure de prendre une décision éclairée quant à savoir s'il participera ou non (p. 676).

241   La proposition voulant que la justice naturelle englobe les principes de justice substantiels ainsi que des normes procédurales minimales trouve appui dans l'arrêt de la Cour d'appel d'Angleterre *Adams c. Cape Industries plc*, [1991] 1 All E.R. 929, qui est l'arrêt de principe en matière d'exécution des jugements étrangers en Angleterre. Dans cette affaire, le jugement dont on sollicitait l'exécution émanait du Texas et découlait d'une action complexe en matière d'empoisonnement à l'amiante, à laquelle avaient participé de nombreux demandeurs et défendeurs. L'évaluation des dommages-intérêts avait été effectuée d'une manière assez peu conventionnelle. À la

the plaintiffs in fixed amounts which were not based on proof of the damages suffered by each individual plaintiff. This method of calculating damages was held by the English court to be contrary to natural justice because it was "not the result of a judicial assessment of the individual entitlements of the respective plaintiffs" and because no proper judicial hearing had been held on the quantum of damages (*Adams*, *supra*, at p. 1042). Slade L.J. held that it was a principle of substantive justice that unliquidated damages must be assessed "objectively by the independent judge on proof by the plaintiff of the relevant facts" (p. 1050).

242    *Adams* sets out a flexible and pragmatic approach to the natural justice defence which is appropriate for the Canadian context following *Morguard*. I agree with the English Court of Appeal that the defence can be triggered by principles of substantive justice, such as the proposition that damages should be based on objective proof and judicial assessment. In Weiler J.A.'s words, "the ultimate guidepost in deciding whether the defence of natural justice may be raised is procedural fairness based on underlying fundamental principles of justice" (p. 675). The category is not closed. If a defendant can establish that the process by which the foreign judgment was obtained was contrary to the Canadian conception of natural justice — because the process itself is flawed, by reason of the way the plaintiff manipulated the process, or both — then the foreign judgment should not be enforced.

243    Weiler J.A. understood La Forest J.'s allusion to "fair process" in *Morguard* to refer to the rules of natural justice (p. 671). My colleague Major J. also appears to be of this opinion when he states, under the heading of "The Defence of Natural Justice", that the enforcing court must ensure that the judgment originates from a fair legal system (para. 61).

suggestion de l'avocat des demandeurs, le juge avait fixé un montant global de dommages-intérêts qu'il avait réparti en parts fixes entre les demandeurs, sans se fonder sur une preuve du préjudice qu'ils avaient respectivement subi. La Cour anglaise a jugé que cette méthode de calcul des dommages-intérêts violait les règles de justice naturelle du fait qu'elle [TRADUCTION] « ne consistait pas en une évaluation judiciaire de ce à quoi chaque demandeur avait droit respectivement », et qu'aucune audience judiciaire régulière n'avait porté sur le montant des dommages-intérêts (*Adams*, précité, p. 1042). Le lord juge Slade a alors conclu qu'un principe de justice substantielle voulait que les dommages-intérêts non déterminés soient évalués [TRADUCTION] « objectivement par le juge indépendant après la présentation d'une preuve des faits pertinents par le demandeur » (p. 1050).

L'arrêt *Adams* applique au moyen de défense fondé sur la justice naturelle une approche à la fois souple, pragmatique et adaptée au contexte canadien postérieur à l'arrêt *Morguard*. Je conviens avec la Cour d'appel d'Angleterre que les principes de justice substantielle — comme celui voulant que les dommages-intérêts soient fondés sur une preuve objective et une évaluation judiciaire — peuvent permettre d'invoquer ce moyen de défense. Pour reprendre les termes utilisés par la juge Weiler, [TRADUCTION] « l'équité procédurale fondée sur les principes de justice fondamentale est la balise par excellence en matière de décision relative à la possibilité d'invoquer le moyen de défense fondé sur la justice naturelle » (p. 675). Cette catégorie n'est pas exhaustive. Il n'y a pas lieu d'exécuter le jugement étranger lorsque le défendeur peut établir que la procédure suivie pour l'obtenir était contraire à la notion canadienne de justice naturelle — du fait qu'elle est elle-même viciée ou à cause de l'utilisation qu'en a fait le demandeur, ou les deux à la fois.

La juge Weiler a considéré que, lorsqu'il fait allusion à « l'équité de la procédure » dans l'arrêt *Morguard*, le juge La Forest parle, en fait, des règles de justice naturelle (p. 671). Mon collègue le juge Major paraît être du même avis lorsqu'il déclare, sous la rubrique « Le moyen de défense fondé sur la justice naturelle », que le tribunal saisi doit s'assurer

While these concepts are certainly related, in my view there is a meaningful distinction between the fairness of the legal system from which the judgment came and the fairness of the procedure followed in the particular case. Slade L.J. underlined this distinction in *Adams*, *supra*, when he observed that the Texas judgment originated from "an unimpeachable system of justice within one of the great common law jurisdictions of the world" (p. 1048). The defendants in *Adams* argued not that the judgment was a product of an unfair system of justice, but that the judge's method of assessing damages did not comply with the rules of that system.

I would also note that La Forest J. expressly stated, in *Morguard*, *supra*, at p. 1103, that "fair process is not an issue within the Canadian federation". I would not take this to mean that the defence of natural justice can never be available against enforcement of a Canadian judgment. Although the justice system in Canada is fair, it is possible for failures of the system to occur in individual cases. For these reasons, I would hold that the "fair process" referred to in *Morguard* means a legal system that is free from corruption and bias — a requirement which, it seems to me, is relevant to the questions of whether the foreign court's jurisdiction should be recognized at all. The defence of natural justice, on the other hand, is concerned with whether the procedural steps followed in the particular case ensured that the defendant was treated with basic fairness.

Finally, the obligation of a defendant to pursue remedies available in the originating jurisdiction must be addressed. In *Adams*, *supra*, Slade L.J. held that opportunities for correcting a denial of natural justice that existed in the originating jurisdiction should be taken into account in assessing whether the defence of natural justice has been made out. It does not follow that the existence of such remedies automatically cures a failure of natural justice. Slade L.J. also recognized that the significance and weight

que le jugement émane d'un régime juridique équitable (par. 61). En dépit des liens indéniables entre ces notions, j'estime qu'il existe une différence significative entre l'équité du régime juridique d'où émane le jugement et l'équité de la procédure suivie dans l'affaire en cause. Le lord juge Slade a souligné cette différence dans l'arrêt *Adams*, précité, en faisant observer que le jugement du Texas émanait [TRADUCTION] « d'un système judiciaire irréprochable de l'un des plus grands ressorts de common law qui existe » (p. 1048). Dans l'arrêt *Adams*, les défendeurs ont soutenu non pas que le jugement émanait d'un système judiciaire inéquitable, mais plutôt que le juge avait utilisé une méthode d'évaluation des dommages-intérêts non conforme aux règles de ce système.

244   J'ajoute que, dans l'arrêt *Morguard*, précité, p. 1103, le juge La Forest a expressément déclaré que « l'équité de la procédure n'est pas en cause à l'intérieur de la fédération canadienne ». Selon moi, cela ne signifie pas qu'il n'est jamais possible d'opposer le moyen de défense fondé sur la justice naturelle à l'exécution d'un jugement prononcé au Canada. Bien que le système judiciaire canadien soit équitable, il se peut, dans certains cas, qu'il n'offre pas ce qu'on est en droit d'attendre de lui. Pour ces raisons, je conclus que « l'équité de la procédure » mentionnée dans l'arrêt *Morguard* s'entend d'un régime juridique libre de toute corruption et de tout parti pris — une exigence qui me semble utile pour décider s'il y a tout simplement lieu de reconnaître la compétence du tribunal étranger. Par contre, le moyen de défense fondé sur la justice naturelle touche à la question de savoir si la procédure suivie dans l'affaire en cause a permis au défendeur d'être traité avec un minimum d'équité.

245   Enfin, il faut examiner la question de l'obligation du défendeur d'exercer les recours disponibles dans le ressort d'origine. Dans l'arrêt *Adams*, précité, le lord juge Slade a conclu que, pour décider si le moyen de défense fondé sur la justice naturelle peut être invoqué, il convient de tenir compte de la possibilité qu'il y avait, dans le ressort d'origine, d'exercer des recours destinés à corriger un déni de justice naturelle. Il ne s'ensuit pas que l'existence de tels recours porte remède automatiquement aux

of the fact that remedies were available in the originating forum must be assessed in light of all the relevant factors, including "the reasonableness in the circumstances of requiring or expecting that [the defendants] made use of the remedy in all the particular circumstances" (pp. 1052-53).

### D. *Application of the Impeachment Defences to the Facts of this Case*

#### (1) Public Policy

246    If the defence of public policy is understood as a bar to enforcing immoral or unjust foreign laws, it is not met here. The enforcement of such a large award in the absence of a connection either to harm suffered by the plaintiffs and caused by the defendants or to conduct deserving of punishment on the part of the defendants would be contrary to basic Canadian ideas of justice. But there is no evidence that the law of Florida offends these principles. On the contrary, the record indicates that Florida law requires proof of damages in the usual fashion. Treble damages are only available by statute to victims of crimes. There is no indication that punitive damages are available where the defendant's conduct is not morally blameworthy.

247    In my view, the defects in the judgment, while severe, do not engage the public policy defence.

#### (2) Fraud

248    Under the rule that an allegation of fraud can only be considered if based on fresh evidence, the defence of fraud is not made out. All the facts that the appellants raise in this connection were known to them or could have been discovered at the time of the Florida action.

conséquences d'un déni de justice naturelle. Le lord juge Slade a ainsi reconnu que la portée et l'importance du fait que des recours pouvaient être exercés dans le ressort d'origine doivent être appréciés à la lumière de tous les facteurs pertinents, notamment [TRADUCTION] « la question de savoir s'il était raisonnable, dans les circonstances, d'exiger que [les défendeurs] exercent le recours dont ils disposaient, ou de s'attendre qu'ils le feraient » (p. 1052-1053).

### D. *Application aux faits de la présente affaire des défenses consistant à attaquer la validité du jugement*

#### (1) L'ordre public

Si on perçoit le moyen de défense fondé sur l'ordre public comme un obstacle à l'application des lois étrangères immorales ou inéquitables, il n'est pas possible de l'invoquer en l'espèce. À défaut d'un lien soit avec un préjudice causé aux demandeurs par les défendeurs, soit avec une conduite des défendeurs qui mérite d'être punie, l'exécution d'un jugement accordant un montant de dommages-intérêts aussi élevé serait contraire aux notions de justice fondamentales canadiennes. Cependant, rien ne prouve que le droit de la Floride viole ces principes. Au contraire, le dossier indique que le droit de la Floride exige que la preuve du préjudice soit faite de la manière habituelle. La loi limite aux victimes d'acte criminel la possibilité d'obtenir des dommages-intérêts triples. Rien n'indique qu'il est possible d'obtenir des dommages-intérêts punitifs lorsque la conduite du défendeur n'est pas moralement répréhensible.

À mon avis, les vices du jugement, si graves soient-ils, ne donnent pas ouverture au moyen de défense fondé sur l'ordre public.

#### (2) La fraude

Compte tenu de la règle prévoyant qu'une allégation de fraude ne peut être examinée que si elle repose sur de nouveaux éléments de preuve, le moyen de défense fondé par la fraude n'est pas recevable en l'espèce. Tous les faits que les appelants évoquent à l'appui de ce moyen de défense étaient connus d'eux ou auraient pu être découverts à l'époque de l'action en Floride.

A further issue arises as to whether evidence of deliberate deception would be enough to vitiate the judgment. In my opinion, this is the kind of case for which a more lenient interpretation of the fraud defence would, in principle, be appropriate, because the appellants' decision not to attend the Florida proceedings was a reasonable one. Full participation in the Florida action would have been expensive, time-consuming and difficult. The appellants' own knowledge of the facts convinced them that the claim was frivolous, to say the least; they were amazed that it even resulted in a lawsuit. They thought, and they had every reason to think, that even if the claim succeeded they would be liable for no more than about US$8,000. Their conclusion that "the game was not worth the candle" was reasonable in the circumstances. Mr. Mulock testified that the defendants' non-participation might well have qualified as "excusable neglect" under Florida law due to the weakness of the claim and the fact that the defendants were foreign residents, among other factors. I see no reason why our law should deem these factors to be irrelevant.

If, in these circumstances, the plaintiffs took advantage of the opportunity to deceive the court by putting forward perjured or misleading evidence in order to obtain a higher award of damages, it would be unfair and contrary to the interests of the Canadian justice system for our courts to be obliged to enforce the judgment in spite of the fact that it was obtained by deception. Such conduct by counsel for the Florida plaintiffs would be contrary to the ethical obligations of Ontario lawyers to pursue their clients' interests by fair and honourable means and without misrepresentation of the facts, and Ontario courts should not be put in the position of having to reward that conduct handsomely when the perpetrator is a lawyer in another jurisdiction.

The difficulty the appellants face is that there is no evidence that anything of this kind happened,

249    Il faut alors également se demander si la preuve d'une supercherie commise de propos délibéré suffirait pour vicier le jugement. À mon avis, nous sommes en présence d'un cas où il conviendrait, en principe, de donner une interprétation plus généreuse du moyen de défense fondé sur la fraude, parce que la décision des appelants de ne pas participer aux procédures en Floride était raisonnable. En plus d'être onéreuse sur les plans du temps et de l'argent, leur pleine participation à l'action intentée contre eux en Floride aurait comporté une part de difficultés. En raison des faits qu'ils connaissaient, les défendeurs étaient persuadés que la demande en question était pour le moins frivole. Ils étaient même étonnés de constater qu'elle avait donné lieu à des poursuites en justice. Ils ont cru, et avaient toutes les raisons de croire, que même si les demandeurs avaient gain de cause, ils seraient tout au plus tenus de verser 8 000 $US. Leur conclusion que [TRADUCTION] « le jeu n'en valait pas la chandelle » demeurait raisonnable dans les circonstances. Maître Mulock a affirmé que la non-participation des défendeurs aurait bien pu être qualifiée de [TRADUCTION] « négligence excusable » en droit de la Floride, à cause notamment de la faiblesse des allégations et du fait qu'ils résidaient à l'étranger. Je ne vois pas pourquoi notre droit devrait considérer que ces facteurs ne sont pas pertinents.

250    Si les demandeurs ont profité de ces circonstances pour induire le tribunal en erreur au moyen de parjures ou de tromperies dans le but d'obtenir des dommages-intérêts plus élevés, il serait inéquitable et contraire aux intérêts du système judiciaire canadien que nos tribunaux soient tenus d'exécuter le jugement même dans le cas où il a été obtenu par supercherie. Une telle conduite de la part de l'avocat des demandeurs en Floride contredirait les principes du code de déontologie des avocats ontariens qui les obligent à défendre les intérêts de leurs clients par des moyens équitables et honnêtes, sans faire de présentation inexacte des faits. En outre, les tribunaux de l'Ontario ne devraient pas être tenus de récompenser généreusement une pareille conduite, même lorsque son auteur exerce dans un autre ressort.

251    La difficulté à laquelle se heurtent les appelants tient à ce que rien ne prouve que quelque chose du

because no record exists of the evidence and arguments put forward in the Florida damages hearing. Given the jury's findings, it is certainly a possibility, perhaps a strong possibility, that they were deliberately misled, but there are other possible explanations — for example, the plaintiffs may have presented only true facts and the jury might have misunderstood how the law applied to those facts. The allegation of fraud is a serious one, and the onus remains on the appellants to support it. It is significant that the appellants did not use their opportunity to question Mr. Beals or Mr. Groner, either in discovery or at trial, as to what was said in the damages hearing. Given the lack of evidence, even on the view that this judgment could be vitiated by proof of intentional fraud, the defence has not been made out. I agree with Major J. that the trial judge's findings of fact that the plaintiffs deliberately misled the jury are unsupported by the evidence and should not be upheld. The defence of fraud therefore does not apply. Natural justice, though, is a different matter.

### (3) Natural Justice

252    The Ontario defendants were not given sufficient notice of the extent and nature of the claims against them in the Florida action. The claimants failed to give the defendants proper notice of the true nature of their claim and its potential ramifications. Furthermore, there was no notice as to the serious consequences to the defendants of failure to refile their defence in response to the claimant's repeatedly amended pleadings. As a result, the notice afforded to the defendants did not meet the requirements of natural justice.

253    The amount of damages claimed was not stated in the Amended Complaint. The only mention of a monetary amount was the formulaic reference to

genre s'est produit, vu l'absence de dossier faisant état des éléments de preuve et des arguments présentés en Floride lors de l'audience relative aux dommages-intérêts. Toutefois, à la lumière des conclusions qu'il a tirées, il y a de bonnes chances, voire même de fortes chances, que le jury ait été délibérément induit en erreur. Cependant, il existe d'autres explications possibles; par exemple, il se peut que les demandeurs n'aient présenté que des faits véridiques et que le jury ait mal compris la façon d'appliquer la loi à ces faits. L'allégation de fraude constitue une allégation grave et il appartient aux appelants de l'étayer. Fait révélateur, ceux-ci n'ont pas saisi l'occasion que leur offraient l'interrogatoire préalable et le procès pour interroger M. Beals ou Me Groner sur ce qui s'était dit à l'audience relative aux dommages-intérêts. En l'absence de preuve, il n'est pas possible d'invoquer ce moyen de défense même en tenant pour acquis que le jugement serait vicié si on pouvait établir l'existence d'une fraude commise de propos délibéré. Je partage l'avis du juge Major que, parce qu'elles ne sont pas étayées par la preuve, on ne peut retenir les conclusions de fait du juge de première instance selon lesquelles les demandeurs ont délibérément induit en erreur le jury. Le moyen de défense fondé sur la fraude ne peut donc pas être invoqué. Toutefois, il en va tout autrement en ce qui concerne la justice naturelle.

### (3) La justice naturelle

Les défendeurs ontariens n'ont pas suffisamment été avertis de l'étendue et de la nature des allégations formulées contre eux dans le cadre de l'action intentée en Floride. Les demandeurs n'ont pas informé correctement les défendeurs de la véritable nature de leur demande et des conséquences qu'elle pourrait entraîner. Les défendeurs n'ont pas non plus été avisés des risques sérieux auxquels les exposerait le défaut de déposer de nouveau leur défense pour répondre aux actes de procédure maintes fois modifiés des demandeurs. Par conséquent, l'avis donné aux défendeurs ne satisfaisait pas aux exigences de la justice naturelle.

La plainte modifiée n'indiquait pas le montant des dommages-intérêts réclamés. Le seul montant indiqué se trouvait dans la mention des

damages over $5,000 required to give the Florida Circuit Court monetary jurisdiction. This form of pleading did not give the defendants a clear picture of what was at stake. Indeed, Mr. Groner testified that as a matter of Florida practice they were expected to find out exactly what was being claimed through discovery.

Nor did the Amended Complaint set out with any precision the allegations on the basis of which damages, beyond the sale price of the land, were claimed. There is reference to construction costs and lost revenue, but none to the plaintiffs' assertion that the planned model home was to be rented to their company, Fox Chase Homes, and used to obtain further construction contracts. In fact, there is no mention at all of Fox Chase Homes. As Weiler J.A. noted, the plaintiffs could easily have provided the defendants with a copy of Mr. Beals's deposition, where he explained these matters, and thus ensured that the defendants were aware that significant business losses were being claimed (p. 677). But the plaintiffs failed to alert the defendants to the peril they faced in this or any other way.

Perhaps the most important failure of natural justice in this case is the fact that the defendants were not given notice of the consequences of failing to continue to file new defences to the repeated changes to the Amended Complaint. There was nothing on the face of the Amended Complaint that would alert them to the need to refile, especially since the allegations against them remained unaltered. The annulment of their defence resulted from a technicality of Florida procedure of which defendants from a foreign jurisdiction could hardly be expected to be aware. Again, the plaintiffs could easily have advised them that a new defence was required, but they did not. The defendants had no warning of the danger in which they placed themselves simply by assuming that their initial defence was, as it appeared to be, an adequate response to the Amended Complaint. Not only did they lack the information they needed to assess whether or not

dommages-intérêts supérieurs à 5 000 $ requise pour que la Cour de circuit de la Floride ait compétence. Cette forme d'acte de procédure ne donnait pas aux défendeurs une idée précise de ce qui était en jeu. En fait, M[e] Groner a témoigné que, conformément à une règle de pratique de la Floride, on s'attendait à ce que les défendeurs prennent connaissance du montant exact de la réclamation à l'interrogatoire préalable.

254

La plainte modifiée ne précisait pas non plus les allégations qui sous-tendaient la réclamation de dommages-intérêts supérieurs au prix de vente du terrain. Elle faisait état des coûts de construction et de la perte de revenus, mais non de l'affirmation des demandeurs que la maison-témoin projetée serait louée à leur société, la Fox Chase Homes, et servirait à obtenir d'autres contrats de construction. En réalité, il n'y est absolument pas question de la Fox Chase Homes. Comme l'a fait remarquer la juge Weiler, les demandeurs auraient pu aisément fournir aux défendeurs une copie de la déposition contenant ces explications de M. Beals et, par le fait même, s'assurer que les défendeurs sauraient qu'un montant élevé leur était réclamé pour des pertes d'entreprise (p. 677). Cependant, les demandeurs n'ont pas prévenu les défendeurs du risque auquel ils étaient exposés à cet égard ou à tout autre égard.

255

En l'espèce, le déni de justice naturelle le plus grave tient peut-être au fait que les défendeurs n'ont pas été informés des conséquences que pourrait entraîner leur défaut de déposer de nouveau leur défense chaque fois que la plainte modifiée était modifiée de nouveau. A priori, la plainte modifiée ne les prévenait pas de la nécessité de déposer de nouveau leur défense, d'autant plus que les allégations formulées contre eux restaient les mêmes. L'annulation de leur défense résultait d'un détail de la procédure de la Floride, que des défendeurs dans un ressort étranger n'étaient guère réputés connaître. Là encore, les demandeurs auraient pu facilement avertir les défendeurs de la nécessité de produire une nouvelle défense, mais ils ne l'ont pas fait. Les défendeurs n'ont pas été prévenus du risque auquel ils seraient exposés s'ils se contentaient de présumer que leur défense initiale se révélerait une réponse suffisante à la plainte modifiée. Non seulement ne

they should defend; their failure to defend was not in any genuine sense a product of their own volition.

256   A foreign plaintiff who expects to have a judgment in his or her favour enforced by a Canadian court has a responsibility to ensure that the defendant is in a position to make an informed decision about how to respond. If the defendant can show that the plaintiff failed to discharge that responsibility, the court should refuse to enforce the judgment on the basis that the defendant was deprived of proper notice, a basic condition of natural justice. In this case, the Florida claimants should have notified the appellants of the steps they could take after new versions of the Amended Complaint were filed and, more importantly, of the consequences of not taking those steps. Because they failed to do so, the appellants were unaware of the danger that their defence would lapse.

257   I would also note that in this case it appears that the judgment may have offended substantive principles of natural justice of the kind addressed in *Adams, supra*. It seems likely that the quantum of damages was fixed without proof that damages flowed from harm suffered by the plaintiffs as a result of the defendants' actions, and that punitive damages were awarded without demonstration of conduct on the defendants' part that was deserving of punishment. The problem, again, is that we do not know what was offered in evidence in the damages hearing in Florida. The conclusion seems all but inescapable that one of two things happened: either the Florida court was presented with false evidence on the damages issue, or it reached its conclusion without a proper judicial assessment of the conditions required, both by Florida law and as a matter of natural justice, to support an award of unliquidated damages. But because there is no transcript of the damages hearing and no other clear evidence of what took place there, neither scenario has been proven.

possédaient-ils pas toute l'information requise pour décider s'ils se défendraient ou non, mais encore l'omission de se défendre n'était pas vraiment délibérée de leur part.

Un demandeur étranger qui s'attend à ce qu'un tribunal canadien exécute un jugement prononcé en sa faveur doit s'assurer que le défendeur est en mesure de prendre une décision éclairée sur la réponse qu'il donnera. Si le défendeur peut démontrer que le demandeur ne s'est pas acquitté de cette obligation, le tribunal doit alors refuser d'exécuter le jugement pour le motif que le défendeur n'a pas été informé correctement, contrairement à une exigence fondamentale de la justice naturelle. En l'espèce, les demandeurs en Floride auraient dû aviser les appelants des mesures qu'ils pourraient prendre à la suite du dépôt d'autres versions de la plainte modifiée et, qui plus est, des conséquences qu'entraînerait leur défaut de prendre ces mesures. En l'absence d'un tel avertissement, les appelants n'étaient pas conscients du risque que leur défense tombe en désuétude.

Je tiens également à souligner la possibilité qu'en l'espèce le jugement ait violé des règles substantielles de justice naturelle comme celles examinées dans l'arrêt *Adams*, précité. Il semble probable que le montant des dommages-intérêts a été fixé sans qu'il ait été établi que les actes des défendeurs avaient causé un préjudice aux demandeurs, et que les dommages-intérêts punitifs ont été accordés sans qu'on ait démontré que la conduite des défendeurs méritait d'être punie. Là encore, le problème tient au fait que nous ignorons la nature de la preuve présentée en Floride lors de l'audience relative aux dommages-intérêts. Force, semble-t-il, est de conclure que l'un des deux scénarios suivants a pris place : le tribunal de la Floride a soit entendu des faux témoignages sur la question des dommages-intérêts, soit tiré sa conclusion après avoir mal évalué les conditions qui, selon la loi de la Floride et les règles de justice naturelle, devaient être remplies pour qu'il puisse accorder des dommages-intérêts non déterminés. Cependant, il a été impossible d'établir l'existence de l'un ou l'autre de ces scénarios en l'absence de transcription des débats de l'audience relative aux dommages-intérêts et de preuve claire de ce qui s'y est passé.

A deficiency in the fairness of the procedure by which the Florida court reached its decision having been established, the availability of remedies for that deficiency in Florida falls to be considered. The defendants did have options for correcting the problem in Florida. They could have moved for relief based on excusable neglect, or appealed. They did not avail themselves of those remedies.

What this means for the appellants' entitlement to rely on the natural justice defence must be ascertained by considering the reasonableness in all the circumstances of requiring them to make use of the remedies available in Florida. We must look at the reasons why they decided not to go to Florida to attack the judgment, but chose instead to trust that the Ontario courts would not enforce it.

The defendants' main reason for deciding as they did was that they were following the advice (which turned out to be erroneous) of legal counsel. They were told that if they went to Florida to challenge the judgment, Ontario courts would regard them as having attorned to Florida's jurisdiction and would be more likely to enforce the judgment against them. Given the information they had, the decision not to take steps in Florida was not only understandable but the only sensible option.

The majority appears to be of the view that the appellants are not entitled to any relief from the consequences of relying on mistaken legal advice. In my view, the mere fact that a defendant has received mistaken legal advice should not operate to relieve the claimant entirely of the consequences of a significant or substantial failure to observe the rules of natural justice, and it should not, in itself, bar the appellants from relying on this defence. I agree with Weiler J.A. that the reasonableness of expecting a defendant to use a remedy in a foreign jurisdiction must be assessed from that person's point of view. If the defendants were under a misapprehension as a result of reasonable reliance on the advice of counsel as to the relative risks of the options open

258  Après avoir démontré que la procédure que le tribunal de la Floride a suivie pour arriver à sa décision était inéquitable, il reste à examiner les recours qui pouvaient alors être exercés. Les défendeurs avaient la possibilité de remédier au problème en Floride soit en plaidant la négligence excusable pour faire annuler le jugement rendu par défaut contre eux, soit en portant ce jugement en appel. Cependant, ils n'ont pas exercé ces recours.

259  Pour déterminer l'incidence du défaut d'exercer ces recours sur le droit des appelants d'invoquer la justice naturelle comme moyen de défense, il faut décider si, dans les circonstances, il aurait été raisonnable de les obliger à exercer les recours disponibles en Floride. On doit se demander pourquoi ils ont choisi non pas de se rendre en Floride pour contester le jugement, mais plutôt de compter sur son inexécution par les tribunaux ontariens.

260  La décision des défendeurs était surtout motivée par les conseils — qui se sont, par la suite, révélés erronés — obtenus auprès d'un conseiller juridique. Celui-ci leur avait donné l'opinion que, s'ils allaient contester le jugement en Floride, les tribunaux ontariens considéraient cela comme un acquiescement à la compétence du tribunal de la Floride et seraient plus susceptibles d'exécuter le jugement prononcé contre eux. Compte tenu de ce qu'ils savaient, leur décision de s'abstenir d'entreprendre des démarches en Floride était non seulement compréhensible, mais encore représentait le seul choix raisonnable.

261  Les juges majoritaires semblent être d'avis que les appelants ne sauraient d'aucune manière échapper aux conséquences de leur décision de suivre des conseils juridiques erronés. Selon moi, le simple fait qu'un défendeur ait reçu des conseils juridiques erronés ne devrait ni soustraire le demandeur à toutes les conséquences d'une violation importante ou substantielle des règles de justice naturelle, ni empêcher, en soi, les appelants d'invoquer ce moyen de défense. Je souscris à l'opinion de la juge Weiler selon laquelle il faut se placer du point de vue du défendeur pour décider si on pouvait raisonnablement s'attendre à ce qu'il exerce un recours dans un ressort étranger. S'il était raisonnable que les défendeurs ajoutent foi à l'opinion qu'un avocat leur avait

to them, their assessment of the risks should not for that reason be discounted. This Court recognized in *Cité de Pont Viau v. Gauthier Mfg. Ltd.*, [1978] 2 S.C.R. 516, that a party should not be penalized for an error which is solely that of counsel, where the party itself has acted with diligence. This is not to say that a lawyer's mistake will always be an excuse for not participating in foreign proceedings. The totality of the circumstances must be examined. In this case, the appellants did their best to deal with the dispute conscientiously. In retrospect, it seems that applying for relief in the Florida court would have been a wiser choice, but no reasonable person in their position would have thought so at the time the choice was made.

262    A second factor relevant to the appellants' decision not to make use of remedies in Florida is their knowledge of the circumstances that would entitle them to such a remedy. In *Adams*, *supra*, the defendants' failure to appeal the judgment in Texas was not dispositive, because the procedural irregularities that would have formed the basis of an appeal were not apparent on the face of the judgment. The only way that the defendants could have known about those defects was if they had participated in the proceedings. The court did not consider it fair to charge the defendants with knowledge of procedural irregularities that they would have known about had they attended the proceedings. The plaintiffs had the responsibility of avoiding procedural errors that would prevent enforcement in England. I agree with this reasoning, which in my view is also applicable to the present case. When the appellants received the Florida judgment, all they knew was the amount awarded against them. There was nothing to inform them of the method by which the Florida court reached its conclusion or to alert them to problems with that method that might form the basis of an appeal or a motion to set the judgment aside.

donnée au sujet des risques relatifs que comportaient les choix qui s'offraient à eux, il faut alors éviter de minimiser l'importance de leur mauvaise évaluation des risques auxquels ils étaient exposés. Dans l'arrêt *Cité de Pont Viau c. Gauthier Mfg. Ltd.*, [1978] 2 R.C.S. 516, notre Cour a reconnu que la partie qui a elle-même agi avec diligence ne doit pas être pénalisée pour une erreur commise uniquement par son avocat. Cela ne signifie pas que l'erreur d'un avocat excuse, dans tous les cas, la non-participation à une instance à l'étranger. Il faut examiner l'ensemble des circonstances. En l'espèce, les appelants ont fait de leur mieux pour conclure ce litige de manière raisonnable. Avec le bénéfice du recul, il semble qu'il aurait été plus sage d'exercer un recours devant le tribunal de la Floride, mais aucune personne raisonnable se trouvant dans la situation des appelants n'aurait pu le croire à l'époque où ils ont fait leur choix.

La décision des appelants de ne pas exercer un recours en Floride s'explique également par la connaissance qu'ils avaient des conditions requises pour pouvoir l'exercer. Dans l'arrêt *Adams*, précité, l'omission des défendeurs de porter le jugement en appel au Texas n'était pas déterminante puisque les irrégularités procédurales qui auraient justifié un appel ne ressortaient pas a priori du jugement. Seule la participation à l'instance aurait permis aux défendeurs de prendre connaissance de ces irrégularités. Selon le tribunal, il n'était pas juste de reprocher aux défendeurs d'avoir été au fait d'irrégularités procédurales dont ils n'auraient pu prendre connaissance que s'ils avaient participé à l'instance. Il incombait aux demandeurs d'éviter de commettre des erreurs procédurales qui empêcheraient l'exécution du jugement en Angleterre. Je souscris à ce raisonnement qui, selon moi, s'applique également en l'espèce. Lorsqu'ils ont reçu le jugement de la Floride, les appelants ont seulement pris connaissance du montant de dommages-intérêts qu'ils étaient condamnés à verser. Rien ne les renseignait sur la procédure que le tribunal de la Floride avait suivie pour arriver à sa conclusion, ni ne les prévenait des problèmes liés à cette procédure qui pourraient éventuellement justifier un appel ou une requête en annulation de jugement.

Finally, the appellants' perception of the quality of justice they were likely to receive in Florida must be taken into consideration. The evidence at trial was that Florida's legal system provides all the appropriate protections for judgment debtors in the appellants' position, and probably would have afforded them a remedy in these circumstances. But at the relevant time the appellants did not know this; they only knew that Florida's legal system had produced a judgment against them for an astronomical amount, a verdict that was difficult to reconcile with the simple facts they had set out in their defence. Their apprehensiveness about going back to that very legal system to seek relief was, in the circumstances, understandable.

#### (4) Residual Concerns

The facts of this appeal raise very serious concerns about the fairness of enforcing the Florida judgment which do not fit easily into the categories identified by the traditional impeachment defences. I have stated my conclusion that the facts do trigger the defence of natural justice, if it is interpreted in a purposive and flexible manner. Even if the natural justice defence did not apply, however, I would hold that this judgment should not be enforced.

The circumstances of this case are such that the enforcement of this judgment would shock the conscience of Canadians and cast a negative light on our justice system. The appellants have done nothing that infringes the rights of the respondents and have certainly done nothing to deserve such harsh punishment. Nor can they be said to have sought to avoid their obligations by hiding in their own jurisdiction or to have shown disrespect for the legal system of Florida. They have acted in good faith throughout and have diligently taken all the steps that appeared to be required of them, based on the information and advice they had. The plaintiffs in Florida appear to have taken advantage of the

Enfin, il faut également tenir compte de la perception que les appelants avaient de la qualité de la justice qui leur serait probablement offerte en Floride. Selon la preuve présentée lors du procès, le régime juridique de la Floride offre toutes les mesures de protection voulues aux débiteurs judiciaires qui se trouvent dans la même situation que les appelants, à qui il aurait probablement permis d'exercer un recours dans ces circonstances. Cependant, les appelants ignoraient cela à l'époque pertinente. Ils savaient seulement que le régime juridique de la Floride avait produit un jugement qui leur ordonnait de verser une somme astronomique, verdict qui n'était guère conciliable avec les simples faits exposés dans leur défense. Leur réticence à retourner dans le ressort où s'appliquait ce régime juridique, pour y exercer un recours, devenait compréhensible dans les circonstances.

#### (4) Les questions résiduelles

Les faits du présent pourvoi soulèvent de très sérieuses questions au sujet du caractère équitable de l'exécution du jugement de la Floride qui entre difficilement dans les catégories visées par les défenses traditionnelles consistant à attaquer la validité d'un jugement. J'ai exposé ma conclusion que les faits donnent ouverture au moyen de défense fondé sur la justice naturelle, si on lui donne une interprétation téléologique et souple. Cependant, même s'il n'était pas possible d'invoquer le moyen de défense fondé sur la justice naturelle, je persisterais à conclure que ce jugement ne doit pas être exécuté.

Les circonstances de la présente affaire sont telles que l'exécution du jugement choquerait la conscience des Canadiens et des Canadiennes et jetterait une ombre sur notre système judiciaire. Les appelants n'ont rien fait qui porte atteinte aux droits des intimés et n'ont certes rien fait qui mérite d'être puni aussi sévèrement. On ne peut pas dire non plus qu'ils ont cherché à se soustraire à leurs obligations en se terrant dans leur propre ressort ou qu'ils ont manqué de respect envers le régime juridique de la Floride. Compte tenu des renseignements et des conseils qui leur avaient été donnés, ils ont agi de bonne foi en tout temps et ont fait montre de diligence en prenant toutes les mesures qui leur

263

264

265

defendants' difficult position to pursue their interests as aggressively as possible and to secure a sizeable windfall. In an adversarial legal system, it was, of course, open to them to do so, but the Ontario court should not have to set its seal of approval on the judgment thus obtained without regard for the dubious nature of the claim, the fact that the parties did not compete on a level playing field and the lack of transparency in the Florida proceedings.

266    On this last point, I would add that their failure to obtain a record of the proceedings in the Florida court does not reflect well on the respondents. In this case, the appellants, who had the burden of proving that one of the impeachment defences applied, failed to pursue their opportunity to investigate what transpired in the damages hearing by questioning those who were there. As a result, it would be inappropriate to draw any negative inference in their favour from the lack of evidence about the Florida proceedings. But defendants will not always have such an opportunity. When one party entirely controls whether there will be a transcript of the proceedings in the foreign court and chooses not to get one, thus depriving the enforcing court of a full record of what happened and an opportunity to verify that there was no fraud and no procedural irregularities, Canadian courts should be highly circumspect about giving effect to the judgment.

## V. Conclusion

267    In my view, this judgment should not be enforced in Canada. I would allow the appeal with costs to the appellants.

*Appeal dismissed with costs,* IACOBUCCI, BINNIE *and* LEBEL JJ. *dissenting.*

*Solicitors for the appellants Geoffrey Saldanha and Leueen Saldanha: Baker & McKenzie, Toronto.*

semblaient requises. Les demandeurs à l'action intentée en Floride semblent avoir profité de la situation difficile des défendeurs pour protéger leurs intérêts aussi énergiquement que possible, et pour réaliser un profit important et inattendu. Il leur était évidemment loisible de le faire dans un système judiciaire accusatoire, mais en raison de l'inégalité des chances entre les parties et du manque de transparence des procédures qui se sont déroulées en Floride, le tribunal de l'Ontario n'aurait pas dû autoriser l'exécution du jugement ainsi obtenu, sans tenir compte de la nature douteuse de la demande.

J'ajouterais, au sujet de ce dernier point, que le défaut des intimés de faire consigner les débats devant le tribunal de la Floride ne laisse pas une très bonne image de leur attitude. Certes, en l'espèce, les appelants, à qui il appartenait de prouver qu'ils pouvaient opposer l'une des défenses consistant à attaquer la validité du jugement, n'ont pas pris la peine d'interroger les personnes qui avaient assisté à l'audience relative aux dommages-intérêts afin de savoir ce qui s'y était passé. Par conséquent, il ne convient pas qu'ils bénéficient d'une conclusion défavorable tirée de l'absence de preuve concernant les procédures qui se sont déroulées en Floride. Cependant, les défendeurs n'ont pas toujours cette possibilité. Lorsqu'il appartient à une seule partie de demander une transcription des débats devant un tribunal étranger et que celle-ci choisit de ne pas le faire, empêchant de ce fait le tribunal saisi de disposer d'un dossier complet sur ce qui s'est passé et de s'assurer de l'absence de fraude ou d'irrégularité procédurale, les tribunaux canadiens devraient hésiter énormément à mettre à exécution le jugement obtenu dans de telles conditions.

## V. Conclusion

Selon moi, il n'y a pas lieu d'exécuter ce jugement au Canada. J'accueillerais le pourvoi, avec dépens en faveur des appelants.

*Pourvoi rejeté avec dépens, les juges* IACOBUCCI, BINNIE *et* LEBEL *sont dissidents.*

*Procureurs des appelants Geoffrey Saldanha et Leueen Saldanha : Baker & McKenzie, Toronto.*

*Solicitor for the appellant Dominic Thivy: Neal H. Roth, Toronto.*

*Solicitors for the respondents: Levine, Sherkin, Boussidan, North York.*

*Procureur de l'appelant Dominic Thivy : Neal H. Roth, Toronto.*

*Procureurs des intimés : Levine, Sherkin, Boussidan, North York.*