# EXHIBIT N

2001 SCC 44 (CanLII)

**Mary Danyluk**   *Appellant*

*v.*

**Ainsworth Technologies Inc., Ainsworth Electric Co. Limited, F. Jack Purchase, Paul S. Gooderham, Jack A. Taylor, Ross A. Pool, Donald W. Roberts, Timothy I. Pryor, Clifford J. Ainsworth, John F. Ainsworth, Kenneth D. Ainsworth, Melville O'Donohue, Donald J. Hawthorne, William I. Welsh and Joseph McBride Watson**   *Respondents*

INDEXED AS: DANYLUK *v.* AINSWORTH TECHNOLOGIES INC.

**Neutral citation: 2001 SCC 44.**

File No.: 27118.

2000: October 31; 2001: July 12.

Present: McLachlin C.J. and Iacobucci, Major, Bastarache, Binnie, Arbour and LeBel JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR ONTARIO

*Administrative law — Issue estoppel — Employee filing complaint against employer under Employment Standards Act seeking unpaid wages and commissions — Employee subsequently commencing court action against employer for wrongful dismissal and unpaid wages and commissions — Employment standards officer dismissing employee's complaint — Employer arguing that employee's claim for unpaid wages and commissions before court barred by issue estoppel — Whether officer's failure to observe procedural fairness in deciding employee's complaint preventing application of issue estoppel — Whether preconditions to application of issue estoppel satisfied — If so, whether this Court should exercise its discretion and refuse to apply issue estoppel.*

In 1993, an employee became involved in a dispute with her employer over unpaid commissions. No agreement was reached, and the employee filed a complaint under the *Employment Standards Act* ("ESA") seeking

**Mary Danyluk**   *Appelante*

*c.*

**Ainsworth Technologies Inc., Ainsworth Electric Co. Limited, F. Jack Purchase, Paul S. Gooderham, Jack A. Taylor, Ross A. Pool, Donald W. Roberts, Timothy I. Pryor, Clifford J. Ainsworth, John F. Ainsworth, Kenneth D. Ainsworth, Melville O'Donohue, Donald J. Hawthorne, William I. Welsh et Joseph McBride Watson**   *Intimés*

RÉPERTORIÉ : DANYLUK *c.* AINSWORTH TECHNOLOGIES INC.

**Référence neutre : 2001 CSC 44.**

Nº du greffe : 27118.

2000 : 31 octobre; 2001 : 12 juillet.

Présents : Le juge en chef McLachlin et les juges Iacobucci, Major, Bastarache, Binnie, Arbour et LeBel.

EN APPEL DE LA COUR D'APPEL DE L'ONTARIO

*Droit administratif — Préclusion découlant d'une question déjà tranchée — Plainte déposée par une employée contre son employeur en vertu de la Loi sur les normes de l'emploi et réclamant le versement de salaire et commissions impayés — Action en dommages-intérêts pour congédiement injustifié et pour salaire et commissions impayés intentée subséquemment par l'employée contre l'employeur — Rejet de la plainte par l'agente des normes d'emploi — Préclusion découlant d'une question déjà tranchée plaidée par l'employeur à l'égard de la réclamation pour salaire et commissions impayés — L'inobservation de l'équité procédurale par l'agente des normes dans sa décision sur la plainte de l'employée empêche-t-elle l'application de cette doctrine? — Les conditions d'application de la préclusion découlant d'une question déjà tranchée sont-elles réunies? — Dans l'affirmative, notre Cour doit-elle exercer son pouvoir discrétionnaire et refuser d'appliquer cette doctrine?*

En 1993, un différend relatif à des commissions impayées a opposé une employée et son employeur. Aucune entente n'est intervenue et l'employée a déposé, en vertu de la *Loi sur les normes d'emploi* (la « LNE »),

unpaid wages, including commissions. The employer rejected the claim for commissions and eventually took the position that the employee had resigned. An employment standards officer spoke with the employee by telephone and met with her for about an hour. Before the decision was made, the employee commenced a court action claiming damages for wrongful dismissal and the unpaid wages and commissions. The ESA proceedings continued, but the employee was not made aware of the employer's submissions in the ESA claim or given an opportunity to respond to them. The ESA officer rejected the employee's claim and ordered the employer to pay her $2,354.55, representing two weeks' pay in lieu of notice. She advised the employer of her decision and, 10 days later, notified the employee. Although she had no appeal as of right, the employee was entitled to apply under the ESA for a statutory review of this decision. She elected not to do so and carried on with her wrongful dismissal action. The employer moved to strike the part of the statement of claim that overlapped the ESA proceeding. The motions judge considered the ESA decision to be final and concluded that the claim for unpaid wages and commissions was barred by issue estoppel. The Court of Appeal affirmed the decision.

*Held*: The appeal should be allowed.

Although, in general, issue estoppel is available to preclude an unsuccessful party from relitigating in the courts what has already been litigated before an administrative tribunal, this is not a proper case for its application. Finality is a compelling consideration and judicial decisions should generally be conclusive of the issues decided unless and until reversed on appeal. However, estoppel is a public policy doctrine designed to advance the interests of justice. Where, as here, its application bars the courthouse door against a claim because of an administrative decision made in a manifestly improper and unfair manner, a re-examination of some basic principles is warranted.

une plainte dans laquelle elle réclamait le versement de salaire impayé, y compris des commissions. L'employeur a rejeté sa demande de commissions et a finalement considéré qu'elle avait remis sa démission. Une agente des normes d'emploi a eu un entretien téléphonique avec l'employée, qu'elle a ensuite rencontrée pendant environ une heure. Avant que la décision soit rendue, l'employée a intenté une action en dommages-intérêts pour congédiement injustifié dans laquelle elle demandait le paiement du salaire et des commissions. La procédure prévue par la LNE a suivi son cours, mais l'employée n'a pas été avisée des arguments invoqués par l'employeur au sujet de sa plainte et elle n'a pas eu la possibilité d'y répondre. L'agente des normes d'emploi a rejeté la réclamation de l'employée et a ordonné à l'employeur de verser à cette dernière la somme de 2 354,55 $, soit deux semaines de salaire, à titre d'indemnité de préavis. Elle a informé l'employeur de sa décision et, 10 jours plus tard, elle en a avisé l'employée. L'employée ne pouvait interjeter appel de plein droit mais elle avait, en vertu de la LNE, le droit de demander la révision de cette décision. Elle a choisi de ne pas le faire et a plutôt poursuivi son action en dommages-intérêts pour congédiement injustifié. L'employeur a présenté une requête en radiation de la partie de la déclaration qui recoupait la procédure engagée en vertu de la LNE. Le juge des requêtes a considéré que la décision fondée sur la LNE était définitive et il a conclu que la préclusion découlant d'une question déjà tranchée faisait obstacle à la réclamation pour salaire et commissions impayés. La Cour d'appel a confirmé la décision.

*Arrêt* : Le pourvoi est accueilli.

Bien que, en règle générale, la préclusion découlant d'une question déjà tranchée (*issue estoppel*) puisse être invoquée pour empêcher une partie déboutée de saisir les cours de justice d'une question qu'elle a déjà plaidée sans succès devant un tribunal administratif, il ne s'agit pas en l'espèce d'une affaire où il convient d'appliquer cette doctrine. Le caractère définitif des instances est une considération impérieuse et, en règle générale, une décision judiciaire devrait trancher les questions litigieuses de manière définitive, tant qu'elle n'est pas infirmée en appel. Toutefois, la préclusion est une doctrine d'intérêt public qui tend à favoriser les intérêts de la justice. Dans les cas où, comme en l'espèce, par suite d'une décision administrative prise à l'issue d'une procédure qui était manifestement inappropriée et inéquitable, l'application de cette doctrine empêche le recours aux cours de justice, il convient de réexaminer certains principes fondamentaux.

The preconditions to the operation of issue estoppel are threefold: (1) that the same question has been decided in earlier proceedings; (2) that the earlier judicial decision was final; and (3) that the parties to that decision or their privies are the same in both proceedings. If the moving party successfully establishes these preconditions, a court must still determine whether, as a matter of discretion, issue estoppel ought to be applied.

The preconditions require the prior proceeding to be judicial. Here, the ESA decision was judicial. First, the administrative authority issuing the decision is capable of receiving and exercising adjudicative authority. Second, as a matter of law, the decision was required to be made in a judicial manner. While the ESA officers utilize procedures more flexible than those that apply in the courts, their adjudicative decisions must be based on findings of fact and the application of an objective legal standard to those facts.

The appellant denies the applicability of issue estoppel because, as found by the Court of Appeal, the ESA decision was taken without proper notice to the appellant and she was not given an opportunity to meet the employer's case. It is clear that an administrative decision which is made without jurisdiction from the outset cannot form the basis of an estoppel. Where an administrative officer or tribunal initially possessed the jurisdiction to make a decision in a judicial manner but erred in the exercise of that jurisdiction, the resulting decision is nevertheless capable of forming the basis of an estoppel. Alleged errors in carrying out the mandate are matters to be considered by the court in the exercise of its discretion. This result makes the principle governing estoppel consistent with the law governing judicial review in *Harelkin* and collateral attack in *Maybrun*.

In this case, the pre-conditions for issue estoppel have been met: the same issue is raised in both proceedings, the decision of the ESA officer was final for the purposes of the Act since neither the employer nor the employee took advantage of the internal review procedure, and the parties are identical. The Court must therefore decide whether to refuse to apply estoppel as a mat-

Les conditions d'application de la préclusion découlant d'une question déjà tranchée sont au nombre de trois : (1) que la même question ait été décidée dans une procédure antérieure; (2) que la décision judiciaire antérieure soit définitive; (3) que les parties ou leurs ayants droit soient les mêmes dans chacune des instances. Si le requérant réussit à établir l'existence des conditions d'application, la cour doit ensuite se demander, dans l'exercice de son pouvoir discrétionnaire, si cette forme de préclusion devrait être appliquée.

Suivant ces conditions, la décision antérieure doit être une décision judiciaire. En l'espèce, la décision fondée sur la LNE était judiciaire. Premièrement, le décideur administratif ayant rendu la décision peut être investi d'un pouvoir juridictionnel et il est capable d'exercer ce pouvoir. Deuxièmement, sur le plan juridique, la décision devait être prise judiciairement. Bien que les agents des normes d'emploi aient recours à des procédures plus souples que celles des cours de justice, leurs décisions juridictionnelles doivent s'appuyer sur des conclusions de fait et sur l'application à ces faits d'une norme juridique objective.

L'appelante conteste l'application de la préclusion découlant d'une question déjà tranchée parce que, conformément à la conclusion de la Cour d'appel, la décision fondée sur la LNE a été rendue sans qu'on donne à l'appelante un préavis suffisant et la possibilité de répondre aux prétentions de l'employeur. Il est clair qu'une décision administrative qui a au départ été prise sans la compétence requise ne peut fonder l'application de la préclusion. Lorsque le décideur administratif — fonctionnaire ou tribunal — avait initialement compétence pour rendre une décision de manière judiciaire, mais a commis une erreur dans l'exercice de cette compétence, la décision rendue est néanmoins susceptible de fonder l'application de la préclusion. Les erreurs qui auraient été commises dans l'accomplissement du mandat doivent être prises en considération par la cour de justice dans l'exercice de son pouvoir discrétionnaire. Cela a pour effet d'assurer la conformité du principe régissant la préclusion avec les règles de droit relatives au contrôle judiciaire énoncées dans l'arrêt *Harelkin* et celles relatives aux contestations indirectes énoncées dans l'arrêt *Maybrun*.

En l'espèce, les conditions d'application de la préclusion découlant d'une question déjà tranchée sont réunies : la même question est à l'origine des deux instances, la décision de l'agente des normes avait un caractère définitif pour l'application de la Loi en raison du fait que ni l'employeur ni l'employée ne se sont prévalus du mécanisme de révision interne, et les parties

2001 SCC 44 (CanLII)

ter of discretion. Here this Court is entitled to intervene because the lower courts committed an error of principle in failing to address the issue of the discretion. The list of factors to be considered with respect to its exercise is open. The objective is to ensure that the operation of issue estoppel promotes the orderly administration of justice, but not at the cost of real injustice in the particular case. The factors relevant to this case include the wording of the statute from which the power to issue the administrative order derives, the purpose of the legislation, the availability of an appeal, the safeguards available to the parties in the administrative procedure, the expertise of the administrative decision maker, the circumstances giving rise to the prior administrative proceeding and, the most important factor, the potential injustice. On considering the cumulative effect of the foregoing factors, the Court in its discretion should refuse to apply issue estoppel in this case. The stubborn fact remains that the employee's claim to commissions worth $300,000 has simply never been properly considered and adjudicated.

sont les mêmes. La Cour doit par conséquent décider si elle doit exercer son pouvoir discrétionnaire et refuser d'appliquer la préclusion. En l'espèce, notre Cour a le droit d'intervenir puisque les tribunaux de juridiction inférieure ont commis une erreur de principe en omettant d'examiner la question de l'exercice du pouvoir discrétionnaire. La liste des facteurs à considérer pour l'exercice de ce pouvoir n'est pas exhaustive. L'objectif est de faire en sorte que l'application de la préclusion découlant d'une question déjà tranchée favorise l'administration ordonnée de la justice, mais pas au prix d'une injustice dans une affaire donnée. Parmi les facteurs pertinents en l'espèce, mentionnons : le libellé du texte de loi accordant le pouvoir de rendre l'ordonnance administrative, l'objet du texte de la loi, l'existence d'un droit d'appel, les garanties offertes aux parties dans le cadre de l'instance administrative, l'expertise du décideur administratif, les circonstances ayant donné naissance à l'instance administrative initiale et, facteur le plus important, le risque d'injustice. Vu l'effet cumulatif des facteurs susmentionnés, la Cour, dans l'exercice de son pouvoir discrétionnaire, doit refuser d'appliquer en l'espèce la préclusion découlant d'une question déjà tranchée. En effet, le fait demeure que la réclamation de l'employée visant des commissions totalisant 300 000 $ n'a tout simplement jamais été examinée et tranchée adéquatement.

## Cases Cited

**Considered:** *Angle v. Minister of National Revenue*, [1975] 2 S.C.R. 248; **disapproved in part:** *Rasanen v. Rosemount Instruments Ltd.* (1994), 17 O.R. (3d) 267; **referred to:** *Re Downing and Graydon* (1978), 21 O.R. (2d) 292; *Farwell v. The Queen* (1894), 22 S.C.R. 553; *Wilson v. The Queen*, [1983] 2 S.C.R. 594; *R. v. Litchfield*, [1993] 4 S.C.R. 333; *R. v. Sarson*, [1996] 2 S.C.R. 223; *Robinson v. McQuaid* (1854), 1 P.E.I.R. 103; *Bell v. Miller* (1862), 9 Gr. 385; *Raison v. Fenwick* (1981), 120 D.L.R. (3d) 622; *Wong v. Shell Canada Ltd.* (1995), 15 C.C.E.L. (2d) 182; *Machin v. Tomlinson* (2000), 194 D.L.R. (4th) 326; *Hamelin v. Davis* (1996), 18 B.C.L.R. (3d) 112; *Thrasyvoulou v. Environment Secretary*, [1990] 2 A.C. 273; *R. v. Consolidated Maybrun Mines Ltd.*, [1998] 1 S.C.R. 706; *McIntosh v. Parent*, [1924] 4 D.L.R. 420; *British Columbia (Minister of Forests) v. Bugbusters Pest Management Inc.* (1998), 50 B.C.L.R. (3d) 1; *Schweneke v. Ontario* (2000), 47 O.R. (3d) 97; *Braithwaite v. Nova Scotia Public Service Long Term Disability Plan Trust Fund* (1999), 176 N.S.R. (2d) 173; *Guay v. Lafleur*, [1965] S.C.R. 12; *Thoday v. Thoday*, [1964] P. 181; *Machado*

## Jurisprudence

**Arrêt examiné :** *Angle c. Ministre du Revenu national*, [1975] 2 R.C.S. 248; **arrêt critiqué en partie :** *Rasanen c. Rosemount Instruments Ltd.* (1994), 17 O.R. (3d) 267; **arrêts mentionnés :** *Re Downing and Graydon* (1978), 21 O.R. (2d) 292; *Farwell c. La Reine* (1894), 22 R.C.S. 553; *Wilson c. La Reine*, [1983] 2 R.C.S. 594; *R. c. Litchfield*, [1993] 4 R.C.S. 333; *R. c. Sarson*, [1996] 2 R.C.S. 223; *Robinson c. McQuaid* (1854), 1 P.E.I.R. 103; *Bell c. Miller* (1862), 9 Gr. 385; *Raison c. Fenwick* (1981), 120 D.L.R. (3d) 622; *Wong c. Shell Canada Ltd.* (1995), 15 C.C.E.L. (2d) 182; *Machin c. Tomlinson* (2000), 194 D.L.R. (4th) 326; *Hamelin c. Davis* (1996), 18 B.C.L.R. (3d) 112; *Thrasyvoulou c. Environment Secretary*, [1990] 2 A.C. 273; *R. c. Consolidated Maybrun Mines Ltd.*, [1998] 1 R.C.S. 706; *McIntosh c. Parent*, [1924] 4 D.L.R. 420; *British Columbia (Minister of Forests) c. Bugbusters Pest Management Inc.* (1998), 50 B.C.L.R. (3d) 1; *Schweneke c. Ontario* (2000), 47 O.R. (3d) 97; *Braithwaite c. Nova Scotia Public Service Long Term Disability Plan Trust Fund* (1999), 176 N.S.R. (2d) 173; *Guay c. Lafleur*, [1965] R.C.S. 12; *Thoday c. Thoday*,

*v. Pratt & Whitney Canada Inc.* (1995), 12 C.C.E.L. (2d) 132; *Randhawa v. Everest & Jennings Canadian Ltd.* (1996), 22 C.C.E.L. (2d) 19; *Heynen v. Frito-Lay Canada Ltd.* (1997), 32 C.C.E.L. (2d) 183; *Perez v. GE Capital Technology Management Services Canada Inc.* (1999), 47 C.C.E.L. (2d) 145; *Munyal v. Sears Canada Inc.* (1997), 29 C.C.E.L. (2d) 58; *Alderman v. North Shore Studio Management Ltd.*, [1997] 5 W.W.R. 535; *R. v. Nat Bell Liquors Ltd.*, [1922] 2 A.C. 128; *Harelkin v. University of Regina*, [1979] 2 S.C.R. 561; *Poucher v. Wilkins* (1915), 33 O.L.R. 125; *Minott v. O'Shanter Development Co.* (1999), 42 O.R. (3d) 321; *Saskatoon Credit Union Ltd. v. Central Park Ent. Ltd.* (1988), 22 B.C.L.R. (2d) 89; *General Motors of Canada Ltd. v. Naken*, [1983] 1 S.C.R. 72; *Arnold v. National Westminster Bank plc*, [1991] 3 All E.R. 41; *Susan Shoe Industries Ltd. v. Ricciardi* (1994), 18 O.R. (3d) 660; *Iron v. Saskatchewan (Minister of the Environment & Public Safety)*, [1993] 6 W.W.R. 1.

[1964] P. 181; *Machado c. Pratt & Whitney Canada Inc.* (1995), 12 C.C.E.L. (2d) 132; *Randhawa c. Everest & Jennings Canadian Ltd.* (1996), 22 C.C.E.L. (2d) 19; *Heynen c. Frito-Lay Canada Ltd.* (1997), 32 C.C.E.L. (2d) 183; *Perez c. GE Capital Technology Management Services Canada Inc.* (1999), 47 C.C.E.L. (2d) 145; *Munyal c. Sears Canada Inc.* (1997), 29 C.C.E.L. (2d) 58; *Alderman c. North Shore Studio Management Ltd.*, [1997] 5 W.W.R. 535; *R. c. Nat Bell Liquors Ltd.*, [1922] 2 A.C. 128; *Harelkin c. Université de Regina*, [1979] 2 R.C.S. 561; *Poucher c. Wilkins* (1915), 33 O.L.R. 125; *Minott c. O'Shanter Development Co.* (1999), 42 O.R. (3d) 321; *Saskatoon Credit Union Ltd. c. Central Park Ent. Ltd.* (1988), 22 B.C.L.R. (2d) 89; *General Motors of Canada Ltd. c. Naken*, [1983] 1 R.C.S. 72; *Arnold c. National Westminster Bank plc*, [1991] 3 All E.R. 41; *Susan Shoe Industries Ltd. c. Ricciardi* (1994), 18 O.R. (3d) 660; *Iron c. Saskatchewan (Minister of the Environment & Public Safety)*, [1993] 6 W.W.R. 1.

**Statutes and Regulations Cited**

*Courts of Justice Act*, R.S.O. 1990, c. C.43, s. 23(1).
*Employment Standards Act*, R.S.O. 1990, c. E.14, ss. 1 "wages", 2(2), 6, 65(1)(a), (b), (c) [rep. & sub. 1991, c. 16 (Supp.), s. 9(1)], (7) [ad. *idem*, s. 9(2)], 67(1) [am. *idem*, s. 10(1)], (2) [rep. & sub. *idem*, s. 10(2)], (3) [ad. *idem*], (5) [*idem*], (7) [*idem*], 68(1) [am. *idem*, s. 11(1); am. 1991, c. 5, s. 16; am. 1993, c. 27, sch.], (3) [rep. & sub. 1991, c. 16 (Supp.), s. 11(2)], (7).
*Employment Standards Improvement Act, 1996*, S.O. 1996, c. 23, s. 19(1).
O. Reg. 626/00, s. 1(1).

**Lois et règlements cités**

*Loi de 1996 sur l'amélioration des normes d'emploi*, L.O. 1996, ch. 23, art. 19(1).
*Loi sur les normes d'emploi*, L.R.O. 1990, ch. E.14, art. 1 « salaire », 2(2), 6, 65(1)a), b), c) [abr. & rempl. 1991, ch. 16 (suppl.), art. 9(1)], (7) [aj. *idem*, art. 9(2)], 67(1) [mod. *idem*, art. 10(1)], (2) [abr. & rempl. *idem*, art. 10(2)], (3) [aj. *idem*], (5) [*idem*], (7) [*idem*], 68(1) [mod. *idem*, art. 11(1); mod. 1991, ch. 5, art. 16; mod. 1993, ch. 27, ann.], (3) [abr. & rempl. 1991, ch. 16 (suppl.), art. 11(2)], (7).
*Loi sur les tribunaux judiciaires*, L.R.O. 1990, ch. C.43, art. 23(1).
Règl. de l'Ont. 626/00, art. 1(1).

**Authors Cited**

American Law Institute. *Restatement of the Law, Second: Judgments 2d*, vol. 2. St. Paul, Minn.: American Law Institute Publishers, 1982.
Brown, Donald J. M., and John M. Evans. *Judicial Review of Administrative Action in Canada*, vol. 2. Toronto: Canvasback, 1998 (loose-leaf updated 2001, release 2).
Handley, K. R. "Res Judicata: General Principles and Recent Developments" (1999), 18 *Aust. Bar Rev.* 214.
Holmested, George Smith, and Garry D. Watson. *Ontario Civil Procedure*, vol. 3 Supp. Toronto: Carswell, 1984 (loose-leaf updated 2000, release 3).

**Doctrine citée**

American Law Institute. *Restatement of the Law, Second : Judgments 2d*, vol. 2. St. Paul, Minn. : American Law Institute Publishers, 1982.
Brown, Donald J. M., and John M. Evans. *Judicial Review of Administrative Action in Canada*, vol. 2. Toronto : Canvasback, 1998 (loose-leaf updated 2001, release 2).
Handley, K. R. « Res Judicata : General Principles and Recent Developments » (1999), 18 *Aust. Bar Rev.* 214.
Holmested, George Smith, and Garry D. Watson. *Ontario Civil Procedure*, vol. 3 Supp. Toronto : Carswell, 1984 (loose-leaf updated 2000, release 3).

Lange, Donald J. *The Doctrine of Res Judicata in Canada*. Markham, Ont.: Butterworths, 2000.

Sopinka, John, Sidney N. Lederman, and Alan W. Bryant. *The Law of Evidence in Canada*, 2nd ed. Toronto: Butterworths, 1999.

Spencer Bower, George, and Sir Alexander Kingcome Turner. *The Doctrine of Res Judicata*, 3rd ed. by K. R. Handley. London, U.K.: Butterworths, 1996.

Watson, Garry D. "Duplicative Litigation: Issue Estoppel, Abuse of Process and the Death of Mutuality" (1990), 69 *Can. Bar Rev.* 623.

APPEAL from a judgment of the Ontario Court of Appeal (1998), 42 O.R. (3d) 235, 167 D.L.R. (4th) 385, 116 O.A.C. 225, 12 Admin. L.R. (3d) 1, 41 C.C.E.L. (2d) 19, 27 C.P.C. (4th) 91, [1998] O.J. No. 5047 (QL), dismissing the appellant's appeal from a decision of the Ontario Court (General Division) rendered on June 10, 1996. Appeal allowed.

*Howard A. Levitt* and *J. Michael Mulroy*, for the appellant.

*John E. Brooks* and *Rita M. Samson*, for the respondents.

The judgment of the Court was delivered by

BINNIE J. — The appellant claims that she was fired from her position as an account executive with the respondent Ainsworth Technologies Inc. on October 12, 1993. She says that at the time of her dismissal she was owed by her employer some $300,000 in unpaid commissions. The courts in Ontario have held that she is "estopped" from having her day in court on this issue because of an earlier failed attempt to claim the same unpaid monies under the *Employment Standards Act*, R.S.O. 1990, c. E.14 ("ESA" or "Act"). An employment standards officer, adopting a procedure which the Ontario Court of Appeal held to be improper and unfair, denied the claim. I agree that in general issue estoppel is available to preclude an unsuccessful party from relitigating in the courts what has already been unsuccessfully litigated before an administrative tribunal, but in my view this was not a proper case for its application. A judicial doctrine developed to serve the ends of justice

Lange, Donald J. *The Doctrine of Res Judicata in Canada*. Markham, Ont. : Butterworths, 2000.

Sopinka, John, Sidney N. Lederman, and Alan W. Bryant. *The Law of Evidence in Canada*, 2nd ed. Toronto : Butterworths, 1999.

Spencer Bower, George, and Sir Alexander Kingcome Turner. *The Doctrine of Res Judicata*, 3rd ed. by K. R. Handley. London, U.K. : Butterworths, 1996.

Watson, Garry D. « Duplicative Litigation : Issue Estoppel, Abuse of Process and the Death of Mutuality » (1990), 69 *R. du B. can.* 623.

POURVOI contre un arrêt de la Cour d'appel de l'Ontario (1998), 42 O.R. (3d) 235, 167 D.L.R. (4th) 385, 116 O.A.C. 225, 12 Admin. L.R. (3d) 1, 41 C.C.E.L. (2d) 19, 27 C.P.C. (4th) 91, [1998] O.J. No. 5047 (QL), qui a rejeté l'appel formé par l'appelante contre une décision de la Cour de l'Ontario (Division générale) rendue le 10 juin 1996. Pourvoi accueilli.

*Howard A. Levitt* et *J. Michael Mulroy*, pour l'appelante.

*John E. Brooks* et *Rita M. Samson*, pour les intimés.

Version française du jugement de la Cour rendu par

LE JUGE BINNIE — L'appelante prétend que, le 12 octobre 1993, elle a été congédiée du poste de chargée de projet qu'elle occupait chez l'intimée Ainsworth Technologies Inc. Elle soutient que, au moment de son congédiement, son employeur lui devait quelque 300 000 $ en commissions impayées. Les cours de justice ontariennes ont jugé que l'appelante était préclue (« *estopped* ») de saisir les tribunaux de ce différend en raison de sa tentative infructueuse d'obtenir le paiement de cette somme en vertu de la *Loi sur les normes d'emploi*, L.R.O. 1990, ch. E.14 (la « LNE » ou la « Loi »). Adoptant une procédure que la Cour d'appel de l'Ontario a jugé inappropriée et inéquitable, une agente des normes d'emploi a rejeté la demande de l'appelante. En règle générale, la préclusion découlant d'une question déjà tranchée (« *issue estoppel* ») peut, j'en conviens, être invoquée pour empêcher une partie déboutée de saisir les cours de justice d'une question qu'elle a déjà plaidée sans succès devant un tribunal administratif. Toutefois, je suis d'avis que la présente espèce

2001 SCC 44 (CanLII)

1

should not be applied mechanically to work an injustice. I would allow the appeal.

## I. Facts

2    In the fall of 1993, the appellant became involved in a dispute with her employer, the respondent Ainsworth Technologies Inc., over unpaid commissions. The appellant met with her superiors and sent various letters to them outlining her position. These letters were generally copied to her lawyer, Mr. Howard A. Levitt. Her principal complaint concerned an alleged entitlement to commissions of about $200,000 in respect of a project known as the CIBC Lan project, plus other commissions which brought the total to about $300,000.

3    The appellant rejected a proposed settlement from the employer. On October 4, 1993, she filed a complaint under the ESA seeking unpaid wages, including commissions. It is not clear on the record whether she had legal advice on this aspect of the matter. On October 5, the employer wrote to the appellant rejecting her claim for commissions and eventually took the position that she had resigned and physically escorted her off the premises.

4    An employment standards officer, Ms. Caroline Burke, was assigned to investigate the appellant's complaint. She spoke with the appellant by telephone and on or about January 30, 1994 met with her for about an hour. The appellant gave Ms. Burke various documents including her correspondence with the employer. They had no further meetings.

5    On March 21, 1994, more than six months after filing her claim under the Act, but as yet without an ESA decision, the appellant, through Mr. Levitt, commenced a court action in which she claimed

n'est pas une affaire où il convenait d'appliquer cette doctrine. Une doctrine élaborée par les tribunaux dans l'intérêt de la justice ne devrait pas être appliquée mécaniquement et donner lieu à une injustice. J'accueillerais le pourvoi.

## I. Les faits

À l'automne 1993, un différend relatif à des commissions impayées a opposé l'appelante et son employeur, l'intimée Ainsworth Technologies Inc. L'appelante a rencontré ses supérieurs et elle leur a envoyé diverses lettres exposant son point de vue. Copie conforme de chacune de ces lettres était généralement transmise à son avocat, Mᵉ Howard A. Levitt. L'appelante prétendait principalement avoir droit à environ 200 000 $ à titre de commissions à l'égard d'un projet connu sous le nom de projet CIBC Lan, ainsi qu'à d'autres commissions portant à approximativement 300 000 $ la somme totale réclamée.

L'appelante a rejeté le règlement proposé par l'employeur. Le 4 octobre 1993, elle a déposé, en vertu de la LNE, une plainte dans laquelle elle réclamait le versement de salaire impayé, y compris des commissions. Le dossier n'indique pas clairement si elle a profité des conseils d'un avocat sur cet aspect du litige. Le 5 octobre, l'employeur a écrit à l'appelante, lui indiquant qu'il rejetait sa demande visant les commissions. Subséquemment, lorsqu'elle s'est présentée au travail, il l'a fait conduire hors de ses locaux, considérant qu'elle avait remis sa démission.

On a demandé à une agente des normes d'emploi, Mᵐᵉ Caroline Burke, d'enquêter sur la plainte déposée par l'appelante. Madame Burke a d'abord eu un entretien téléphonique avec l'appelante puis, vers le 30 janvier 1994, elle l'a rencontrée pendant environ une heure. L'appelante a remis à Mᵐᵉ Burke divers documents, dont sa correspondance avec l'employeur. Aucune autre rencontre n'a eu lieu par la suite.

Le 21 mars 1994, plus de 6 mois après avoir déposé sa plainte en vertu de la Loi, mais sans qu'une décision ait encore été rendue à cet égard, l'appelante a intenté, par l'entremise de Mᵉ Levitt,

damages for wrongful dismissal. She also claimed the unpaid wages and commissions that were already the subject-matter of her ESA claim.

On June 1, 1994, solicitors for the employer wrote to Ms. Burke responding to the appellant's claim. The employer's letter included a number of documents to substantiate its position. None of this was copied to the appellant. Nor did Ms. Burke provide the appellant with information about the employer's position; nor did she give the appellant the opportunity to respond to whatever the appellant may have assumed to be the position the employer was likely to take. The appellant, in short, was left out of the loop.

On September 23, 1994, the ESA officer advised the respondent employer (but not the appellant) that she had rejected the appellant's claim for unpaid commissions. At the same time she ordered the employer to pay the appellant $2,354.55, representing two weeks' pay in lieu of notice. Ten days later, by letter dated October 3, 1994, Ms. Burke for the first time advised the appellant of the order made against the employer for two weeks' termination pay and the rejection of her claim for the commissions. The letter stated in part: "[w]ith respect to your claim for unpaid wages, the investigation revealed there is no entitlement to $300,000.00 commission as claimed by you". The letter went on to explain that the appellant could apply to the Director of Employment Standards for a review of this decision. Ms. Burke repeated this advice in a subsequent telephone conversation with the appellant. The appellant did not apply to the Director for a review of Ms. Burke's decision; instead, she decided to carry on with her wrongful dismissal action in the civil courts.

The respondents contended that the claim for unpaid wages and commissions was barred by issue estoppel. They brought a motion in the appellant's civil action to strike the relevant paragraphs

une action en dommages-intérêts pour congédiement injustifié dans laquelle elle demandait également le paiement du salaire et des commissions impayés qui faisaient déjà l'objet de la plainte qu'elle avait présentée en vertu de la LNE.

Le 1er juin 1994, les procureurs de l'employeur ont écrit à Mme Burke au sujet de la plainte de l'appelante. La lettre de l'employeur était accompagnée d'un certain nombre de documents étayant la thèse de ce dernier. Aucun de ces documents n'a été communiqué à l'appelante. Madame Burke n'a pas non plus fourni d'information à l'appelante relativement à la thèse de l'employeur et elle ne lui a pas donné la possibilité de répondre aux arguments qui, selon l'appelante, seraient vraisemblablement avancés par l'employeur. Bref, l'appelante a été tenue à l'écart.

Le 23 septembre 1994, l'agente des normes d'emploi a informé l'employeur intimé (mais non l'appelante) qu'elle avait rejeté la réclamation de l'appelante pour commissions impayées. Par contre, elle a ordonné à l'employeur de verser à l'appelante la somme de 2 354,55 $, soit deux semaines de salaire, à titre d'indemnité de préavis. Dix jours plus tard, dans une lettre datée du 3 octobre 1994, Mme Burke a informé l'appelante de l'ordonnance intimant à l'employeur de lui verser deux semaines de salaire à titre d'indemnité de licenciement et du rejet de la réclamation visant les commissions. La lettre disait notamment ce qui suit : [TRADUCTION] « [r]elativement à votre réclamation pour salaire impayé, l'enquête a révélé que vous n'avez pas droit aux 300 000,00 $ que vous réclamez à titre de commissions ». Elle ajoutait que l'appelante pouvait présenter au directeur des normes d'emploi une demande de révision de cette décision, information que Mme Burke a répétée lors d'un entretien téléphonique subséquent avec l'appelante. L'appelante n'a toutefois pas demandé la révision de la décision de Mme Burke, décidant plutôt de poursuivre son action en dommages-intérêts pour congédiement injustifié déposée au civil.

Les intimés ont invoqué la préclusion découlant d'une question déjà tranchée à l'encontre de la réclamation pour salaire et commissions impayés. Dans le cadre de l'instance civile engagée par l'ap-

6

7

8

from the statement of claim. On June 10, 1996, McCombs J. of the Ontario Court (General Division) granted the respondents' motion. Only her claim for damages for wrongful dismissal was allowed to proceed. On December 2, 1998, the appellant's appeal was dismissed by the Court of Appeal for Ontario.

## II. Judgments

### A. *Ontario Court (General Division)* (June 10, 1996)

9    The issue before McCombs J. was whether the doctrine of issue estoppel applied in the present case. Following *Rasanen v. Rosemount Instruments Ltd.* (1994), 17 O.R. (3d) 267 (C.A.), he concluded that issue estoppel could apply to issues previously determined by an administrative officer or tribunal. In his view, the sole issue to be determined was whether the ESA officer's decision was a final determination. The motions judge noted that the appellant did not seek to appeal or review the ESA officer's decision under s. 67(2) of the Act, as she was entitled to do if she wished to contest that decision. He considered the ESA decision to be final. The criteria for the application of issue estoppel were therefore met. The paragraphs relating to the appellant's claim for unpaid wages and commissions were struck from her statement of claim.

### B. *Court of Appeal for Ontario* (1998), 42 O.R. (3d) 235

10    After reviewing the facts of the case, Rosenberg J.A. for the court identified, at pp. 239-40, the issues raised by the appellant's appeal:

This case concerns the second requirement of issue estoppel, that the decision which is said to create the estoppel be a final judicial decision. The appellant submits that the decision of an employment standards officer is neither judicial nor final. She also submits that, in any event, the process followed by Ms. Burke in this particular case was unfair and therefore her decision

pelante, ils ont présenté une requête en radiation des paragraphes pertinents de la déclaration. Le 10 juin 1996, le juge McCombs de la Cour de l'Ontario (Division générale) a accueilli cette requête. Seule la demande de dommages-intérêts pour congédiement injustifié a pu suivre son cours. Le 2 décembre 1998, la Cour d'appel de l'Ontario a rejeté l'appel formé par l'appelante.

## II. Les décisions des juridictions inférieures

### A. *Cour de l'Ontario (Division générale)* (10 juin 1996)

Le juge McCombs devait décider si la doctrine de la préclusion découlant d'une question déjà tranchée s'appliquait en l'espèce. S'appuyant sur l'arrêt *Rasanen c. Rosemount Instruments Ltd.* (1994), 17 O.R. (3d) 267 (C.A.), il a estimé que cette doctrine pouvait s'appliquer à une question déjà tranchée par un décideur administratif — fonctionnaire ou tribunal. Selon lui, la seule question à trancher était de savoir si la décision de l'agente des normes d'emploi était une décision définitive. Le juge des requêtes a souligné que l'appelante n'avait pas demandé la révision de la décision de l'agente des normes d'emploi ainsi que le lui permettait le par. 67(2) de la Loi. Il a considéré que la décision de l'agente des normes d'emploi était définitive. Les critères d'application de la doctrine de la préclusion découlant d'une question déjà tranchée étaient donc respectés. Les paragraphes de la déclaration de l'appelante ayant trait aux salaire et commissions impayés ont été radiés.

### B. *Cour d'appel de l'Ontario* (1998), 42 O.R. (3d) 235

Après examen des faits de l'espèce, le juge Rosenberg, s'exprimant pour la Cour d'appel, a fait état des questions que soulevait l'appel aux p. 239-240 :

[TRADUCTION] La présente affaire porte sur la seconde condition d'application de la préclusion découlant d'une question déjà tranchée, savoir celle voulant que la décision qui, affirme-t-on, donne ouverture à la préclusion soit une décision judiciaire définitive. L'appelante prétend que la décision que rend un agent des normes d'emploi n'est ni judiciaire ni définitive. Elle soutient

should not create an estoppel. Specifically, the appellant argues she was not treated fairly as she was not provided with a copy of the submissions made by the employer and thus not given an opportunity to respond to those submissions.

In rejecting these submissions, Rosenberg J.A. grouped them under three headings: whether the ESA officer's decision was final; whether the ESA officer's decision was judicial; and the effect of procedural unfairness on the application of the doctrine of issue estoppel.

In his view, the decision of the officer in the present case was final because neither party exercised the right of internal appeal under s. 67(2) of the Act. Moreover, while not all administrative decisions that finally determine the rights of parties will be "judicial" for purposes of issue estoppel, Rosenberg J.A. found that the statutory procedure set out in the Act satisfied the requirements. He considered *Re Downing and Graydon* (1978), 21 O.R. (2d) 292 (C.A.), to be "determinative of this issue" (p. 249).

Lastly, Rosenberg J.A. addressed the issue of whether failure by the ESA officer to observe procedural fairness affected the application of the doctrine of issue estoppel in this case. He agreed that the ESA officer had in fact failed to observe procedural fairness in deciding upon the appellant's complaint. Nevertheless, this failure did not prevent the operation of issue estoppel (at p. 252):

The officer was required to give the appellant access to, and an opportunity to refute, any information gathered by the officer in the course of her investigation that was prejudicial to the appellant's claim. At a minimum, the appellant was entitled to a copy of the June 1, 1994 letter and a summary of any other information gathered in the course of the investigation that was prejudicial to her claim. She was also entitled to a fair opportunity to con-

également que, quoiqu'il en soit, la procédure suivie par M^me Burke en l'espèce était inéquitable et donc que sa décision ne devrait pas donner naissance à la préclusion. De façon plus particulière, l'appelante plaide qu'elle n'a pas été traitée équitablement puisqu'on ne lui a pas remis copie des observations de l'employeur et qu'on ne lui a pas, de ce fait, accordé la possibilité de les réfuter.

Le juge Rosenberg a rejeté les prétentions de l'appelante, qu'il a regroupées sous les trois questions suivantes : La décision de l'agente des normes d'emploi était-elle une décision définitive? Cette décision était-elle une décision judiciaire? Quel est l'effet d'une iniquité procédurale sur l'application de la doctrine de la préclusion découlant d'une question déjà tranchée?

Selon lui, la décision de l'agente était une décision définitive, étant donné que ni l'une ni l'autre des parties n'avaient exercé le droit d'appel interne prévu au par. 67(2) de la Loi. De plus, bien que les décisions administratives statuant définitivement sur les droits des parties ne soient pas toutes considérées comme « judiciaires » pour l'application de la doctrine de la préclusion découlant d'une question déjà tranchée, le juge Rosenberg a estimé que la procédure établie par la Loi respectait les conditions requises. Il a jugé que l'arrêt *Re Downing and Graydon* (1978), 21 O.R. (2d) 292 (C.A.), était [TRADUCTION] « décisif à cet égard » (p. 249).

Enfin, le juge Rosenberg s'est demandé si l'inobservation par l'agente des normes d'emploi des règles d'équité procédurale avait un effet en l'espèce sur l'application de la doctrine de la préclusion découlant d'une question déjà tranchée. Il a reconnu que l'agente des normes avait effectivement manqué à ces règles en statuant sur la plainte de l'appelante. Il a néanmoins jugé que ce manquement ne faisait pas obstacle à l'application de la doctrine (à la p. 252):

[TRADUCTION] L'agente était tenue de donner à l'appelante la possibilité de consulter et de réfuter toute information préjudiciable à sa réclamation recueillie par l'agente dans le cours de l'enquête. L'appelante aurait dû tout au moins recevoir copie de la lettre du 1^er juin 1994 ainsi qu'un résumé de toute autre information préjudiciable à sa réclamation recueillie dans le cours de l'enquête. Elle aurait également dû se voir accorder la

sider and reply to that information. The appellant was denied the opportunity to know the case against her and have an opportunity to meet it: Ms. Burke failed to act judicially. In this particular case, this failure does not, however, affect the operation of issue estoppel.

14    In Rosenberg J.A.'s view, although ESA officers are obliged to act judicially, failure to do so in a particular case, at least if there is a possibility of appeal, will not preclude the operation of issue estoppel. This conclusion is based on the policy considerations underlying two rules of administrative law (at p. 252):

These two rules are: (1) that the discretionary remedies of judicial review will be refused where an adequate alternative remedy exists; and (2) the rule against collateral attack. These rules, in effect, require that the parties pursue their remedies through the administrative process established by the legislature. Where an appeal route is available the parties will not be permitted to ignore it in favour of the court process.

15    Rosenberg J.A. noted that if the appellant had applied, under s. 67(3) of the Act for a review of the ESA officer's decision, the adjudicator conducting such a review would have been required to hold a hearing. This supported his view that the review process provided by the Act is an adequate alternative remedy. Rosenberg J.A. concluded, at p. 256:

In summary, Ms. Burke did not accord this appellant natural justice. The appellant's recourse was to seek review of Ms. Burke's decision. She failed to do so. That decision is binding upon her and her employer.

16    The court thus applied the doctrine of issue estoppel and dismissed the appellant's appeal.

possibilité d'examiner cette information et d'y répondre. L'appelante n'a pas reçu communication des allégations formulées contre elle et elle a été privée de la possibilité de les réfuter : M^me Burke n'a donc pas agi judiciairement. En l'espèce, toutefois, ce manquement n'empêche pas l'application de la doctrine de la préclusion découlant d'une question déjà tranchée.

De l'avis du juge Rosenberg, même si les agents des normes d'emploi ont l'obligation d'agir judiciairement, le manquement à cette obligation dans un cas donné, du moins lorsqu'il est possible d'interjeter appel, ne fait pas obstacle à l'application de la préclusion découlant d'une question déjà tranchée. Sa conclusion s'appuie sur les considérations de politique d'intérêt général qui sont à la base de deux règles de droit administratif (à la p. 252):

[TRADUCTION] Ces deux règles sont les suivantes : (1) la règle écartant les recours discrétionnaires en matière de contrôle judiciaire lorsqu'il existe un autre recours approprié; (2) la règle prohibant les contestations indirectes. Dans les faits, ces règles exigent que les parties demandent réparation au moyen de la procédure administrative établie par le législateur. Lorsque les parties disposent d'une voie d'appel, elles ne sont pas admises à l'écarter pour s'adresser aux cours de justice.

Le juge Rosenberg de la Cour d'appel a souligné que, si l'appelante avait demandé la révision de la décision de l'agente des normes d'emploi en vertu du par. 67(3) de la Loi, l'arbitre saisi de l'affaire aurait dû tenir une audience. Cette constatation étayait son opinion selon laquelle la procédure de révision prévue par la Loi constitue un autre recours approprié. Le juge Rosenberg a conclu ainsi, à la p. 256 :

[TRADUCTION] En résumé, M^me Burke n'a pas accordé à l'appelante le bénéfice des règles de justice naturelle. Le recours qui s'offrait à cette dernière était de demander la révision de la décision de l'agente. Elle ne l'a pas fait. Elle et son employeur sont liés par cette décision.

La Cour d'appel a en conséquence appliqué la doctrine de la préclusion découlant d'une question déjà tranchée et a débouté l'appelante.

2001 SCC 44 (CanLII)

III. Relevant Statutory Provisions

*Employment Standards Act*, R.S.O. 1990, c. E.14

**1.** In this Act,

.   .   .

"wages" means any monetary remuneration payable by an employer to an employee under the terms of a contract of employment, oral or written, express or implied, any payment to be made by an employer to an employee under this Act and any allowances for room or board as prescribed in the regulations or under an agreement or arrangement therefor but does not include,

(a) tips and other gratuities,

(b) any sums paid as gifts or bonuses that are dependent on the discretion of the employer and are not related to hours, production or efficiency,

(c) travelling allowances or expenses,

(d) contributions made by an employer to a fund, plan or arrangement to which Part X of this Act applies; ("salaire")

.   .   .

**6.** — (1) No civil remedy of an employee against his or her employer is suspended or affected by this Act.

(2) Where an employee initiates a civil proceeding against his or her employer under this Act, notice of the proceeding shall be served on the Director in the prescribed form on the same date the civil proceeding is set down for trial.

**65.** — (1) Where an employment standards officer finds that an employee is entitled to any wages from an employer, the officer may,

(a) arrange with the employer that the employer pay directly to the employee the wages to which the employee is entitled;

(b) receive from the employer on behalf of the employee any wages to be paid to the employee as the result of a compromise or settlement; or

(c) issue an order in writing to the employer to pay forthwith to the Director in trust any wages to which an employee is entitled and in addition such order shall provide for payment, by the employer to the

III. Les dispositions législatives pertinentes

*Loi sur les normes d'emploi*, L.R.O. 1990, ch. E.14

**1** Les définitions qui suivent s'appliquent à la présente loi.

.   .   .

« salaire » Rémunération en espèces payable par un employeur à un employé aux termes d'un contrat de travail, verbal ou écrit, exprès ou implicite, paiement qu'un employeur doit verser à un employé en vertu de la présente loi, et allocations de logement ou de repas prescrites par les règlements ou prévues par un accord ou un arrangement à cette fin, à l'exclusion des éléments suivants :

a) les pourboires et autres gratifications,

b) les sommes versées à titre de cadeaux ou de primes qui sont laissées à la discrétion de l'employeur et qui ne sont pas liées au nombre d'heures qu'un employé a travaillé, à sa production ou à son efficacité,

c) les allocations ou indemnités de déplacement,

d) les cotisations de l'employeur à une caisse, un régime ou un arrangement auxquels la partie X de la présente loi s'applique. (« wages »)

.   .   .

**6** (1) La présente loi ne suspend pas les recours civils dont dispose un employé contre son employeur ni n'y porte atteinte.

(2) Si un employé introduit une instance civile contre son employeur en vertu de la présente loi, l'avis d'instance est signifié au directeur, selon la formule prescrite, le jour même où l'instance civile est inscrite au rôle.

**65** (1) Si l'agent des normes d'emploi conclut qu'un employé a le droit de percevoir un salaire d'un employeur, il peut, selon le cas :

a) s'entendre avec l'employeur pour que celui-ci verse directement à l'employé le salaire auquel ce dernier a droit;

b) recevoir de l'employeur, au nom de l'employé, le salaire qui doit être versé à ce dernier par suite d'une transaction;

c) ordonner, par écrit, que l'employeur verse sans délai au directeur, en fiducie, le salaire auquel un employé a droit; il ordonne également à l'employeur de verser au directeur, à titre de frais d'administration, celle

17

Director, of administration costs in the amount of 10 per cent of the wages or $100, whichever is the greater.

.  .  .

(7) If an employer fails to apply under section 68 for a review of an order issued by an employment standards officer, the order becomes final and binding against the employer even though a review hearing is held to determine another person's liability under this Act.

.  .  .

67. — (1) Where, following a complaint in writing by an employee, an employment standards officer finds that an employer has paid the wages to which an employee is entitled or has found that the employee has no other entitlements or that there are no actions which the employer is to do or is to refrain from doing in order to be in compliance with this Act, the officer may refuse to issue an order to an employer and upon refusing to do so shall advise the employee of the refusal by prepaid letter addressed to the employee at his or her last known address.

(2) An employee who considers himself or herself aggrieved by the refusal to issue an order to an employer or by the issuance of an order that in his or her view does not include all of the wages or other entitlements to which he or she is entitled may apply to the Director in writing within fifteen days of the date of the mailing of the letter mentioned in subsection (1) or the date of the issue of the order or such longer period as the Director may for special reasons allow for a review of the refusal or of the amount of the order.

(3) Upon receipt of an application for review, the Director may appoint an adjudicator who shall hold a hearing.

.  .  .

(5) The adjudicator who is conducting the hearing may with necessary modifications exercise the powers conferred on an employment standards officer under this Act and may make an order with respect to the refusal or an order to amend, rescind or affirm the order of the employment standards officer.

.  .  .

des deux sommes suivantes qui est la plus élevée, à savoir : 10 pour cent du salaire ou 100 $.

.  .  .

(7) Si un employeur ne fait pas la demande visée à l'article 68 en vue de la révision d'une ordonnance rendue par un agent des normes d'emploi, l'ordonnance devient sans appel et lie l'employeur même si une audience en révision est tenue afin de déterminer l'obligation d'une autre personne aux termes de la présente loi.

.  .  .

67 (1) Si, à la suite d'une plainte par écrit d'un employé, l'agent des normes d'emploi conclut que l'employeur a versé à un employé le salaire auquel ce dernier a droit ou a conclu que l'employé n'a droit à rien d'autre ou qu'il n'y a rien que l'employeur doive faire ou s'abstenir de faire pour se conformer à la présente loi, il peut refuser de rendre une ordonnance visant l'employeur. Il en avise l'employé par lettre affranchie à sa dernière adresse connue.

(2) L'employé qui se croit lésé par le refus de l'agent de rendre une ordonnance contre l'employeur ou par une ordonnance qui, à son avis, ne comprend pas le salaire complet auquel il a droit ni ses autres droits peut, dans les quinze jours de la mise à la poste de la lettre visée au paragraphe (1) ou de la date où l'ordonnance a été rendue ou dans le délai plus long que le directeur peut autoriser pour des motifs particuliers, demander au directeur, par écrit, de réviser le refus ou le montant fixé dans l'ordonnance.

(3) Sur réception de la demande de révision, le directeur peut nommer un arbitre de griefs pour tenir une audience.

.  .  .

(5) L'arbitre de griefs qui tient l'audience peut exercer, avec les adaptations nécessaires, les pouvoirs que la présente loi confère à un agent des normes d'emploi, et peut rendre une ordonnance à l'égard du refus ou une ordonnance modifiant, annulant ou confirmant l'ordonnance de l'agent des normes d'emploi.

.  .  .

(7) The order of the adjudicator is not subject to a review under section 68 and is final and binding on the parties.

**68.** — (1) An employer who considers themself aggrieved by an order made under section 45, 48, 51, 56.2, 58.22 or 65, upon paying the wages ordered to be paid and the penalty thereon, if any, may, within a period of fifteen days after the date of delivery or service of the order, or such longer period as the Director may for special reasons allow and provided that the wages have not been paid out under subsection 72 (2), apply for a review of the order by way of a hearing.

.    .    .

(3) The Director shall select a referee from the panel of referees to hear the review.

.    .    .

(7) A decision of the referee under this section is final and binding upon the parties thereto and such other parties as the referee may specify.

## IV. Analysis

The law rightly seeks a finality to litigation. To advance that objective, it requires litigants to put their best foot forward to establish the truth of their allegations when first called upon to do so. A litigant, to use the vernacular, is only entitled to one bite at the cherry. The appellant chose the ESA as her forum. She lost. An issue, once decided, should not generally be re-litigated to the benefit of the losing party and the harassment of the winner. A person should only be vexed once in the same cause. Duplicative litigation, potential inconsistent results, undue costs, and inconclusive proceedings are to be avoided.

Finality is thus a compelling consideration and judicial decisions should generally be conclusive of the issues decided unless and until reversed on appeal. However, estoppel is a doctrine of public policy that is designed to advance the interests of

(7) L'ordonnance de l'arbitre de griefs n'est pas susceptible de révision dans le cadre de l'article 68. Elle est sans appel et lie les parties.

**68** (1) Après avoir versé le salaire qu'il lui est ordonné de payer ainsi que la somme à titre de pénalité qui s'y rapporte, s'il y a lieu, l'employeur qui s'estime lésé par une ordonnance rendue en vertu de l'article 45, 48, 51, 56.2, 58.22 ou 65 peut, dans les quinze jours qui suivent la remise ou la signification de l'ordonnance ou dans le délai plus long que le directeur peut autoriser pour des motifs particuliers, et à la condition que le salaire n'ait pas été versé en vertu du paragraphe 72 (2), demander que l'ordonnance fasse l'objet d'une révision par voie d'audience.

.    .    .

(3) Le directeur choisit un arbitre au sein du tableau des arbitres pour tenir l'audience de révision.

.    .    .

(7) La décision que l'arbitre prend en vertu du présent article est sans appel et lie les parties et les autres personnes que l'arbitre peut préciser.

## IV. L'analyse

Le droit tend à juste titre à assurer le caractère définitif des instances. Pour favoriser la réalisation de cet objectif, le droit exige des parties qu'elles mettent tout en œuvre pour établir la véracité de leurs allégations dès la première occasion qui leur est donnée de le faire. Autrement dit, un plaideur n'a droit qu'à une seule tentative. L'appelante a décidé de se prévaloir du recours prévu par la LNE. Elle a perdu. Une fois tranché, un différend ne devrait généralement pas être soumis à nouveau aux tribunaux au bénéfice de la partie déboutée et au détriment de la partie qui a eu gain de cause. Une personne ne devrait être tracassée qu'une seule fois à l'égard d'une même cause d'action. Les instances faisant double emploi, les risques de résultats contradictoires, les frais excessifs et les procédures non décisives doivent être évités.

Le caractère définitif des instances est donc une considération impérieuse et, en règle générale, une décision judiciaire devrait trancher les questions litigieuses de manière définitive, tant qu'elle n'est pas infirmée en appel. Toutefois, la préclusion est

18

19

2001 SCC 44 (CanLII)

justice. Where as here, its application bars the courthouse door against the appellant's $300,000 claim because of an administrative decision taken in a manner which was manifestly improper and unfair (as found by the Court of Appeal itself), a re-examination of some basic principles is warranted.

20    The law has developed a number of techniques to prevent abuse of the decision-making process. One of the oldest is the doctrine estoppel *per rem judicatem* with its roots in Roman law, the idea that a dispute once judged with finality is not subject to relitigation: *Farwell v. The Queen* (1894), 22 S.C.R. 553, at p. 558; *Angle v. Minister of National Revenue*, [1975] 2 S.C.R. 248, at pp. 267-68. The bar extends both to the cause of action thus adjudicated (variously referred to as claim or cause of action or action estoppel), as well as precluding relitigation of the constituent issues or material facts necessarily embraced therein (usually called issue estoppel): G. S. Holmested and G. D. Watson, *Ontario Civil Procedure* (loose-leaf), vol. 3 Supp., at 21§17 *et seq.* Another aspect of the judicial policy favouring finality is the rule against collateral attack, i.e., that a judicial order pronounced by a court of competent jurisdiction should not be brought into question in subsequent proceedings except those provided by law for the express purpose of attacking it: *Wilson v. The Queen*, [1983] 2 S.C.R. 594; *R. v. Litchfield*, [1993] 4 S.C.R. 333; *R. v. Sarson*, [1996] 2 S.C.R. 223.

21    These rules were initially developed in the context of prior court proceedings. They have since been extended, with some necessary modifications, to decisions classified as being of a judicial or quasi-judicial nature pronounced by administrative officers and tribunals. In that context the more specific objective is to balance fairness to the parties with the protection of the administrative decision-

une doctrine d'intérêt public qui tend à favoriser les intérêts de la justice. Dans les cas où, comme en l'espèce, par suite d'une décision administrative prise à l'issue d'une procédure qui était manifestement inappropriée et inéquitable (conclusion tirée par la Cour d'appel elle-même), l'application de cette doctrine empêche l'appelante de s'adresser aux cours de justice pour réclamer les 300 000 $ qui lui seraient dus, il convient de réexaminer certains principes fondamentaux.

Le droit s'est doté d'un certain nombre de moyens visant à prévenir les recours abusifs. L'un des plus anciens est la doctrine de la préclusion *per rem judicatem*, qui tire son origine du droit romain et selon laquelle, une fois le différend tranché définitivement, il ne peut être soumis à nouveau aux tribunaux : *Farwell c. La Reine* (1894), 22 R.C.S. 553, p. 558, et *Angle c. Ministre du Revenu national*, [1975] 2 R.C.S. 248, p. 267-268. La doctrine est opposable tant à l'égard de la cause d'action ainsi décidée (on parle de préclusion fondée sur la demande, sur la cause d'action ou sur l'action) que des divers éléments constitutifs ou faits substantiels s'y rapportant nécessairement (on parle alors généralement de préclusion découlant d'une question déjà tranchée) : G. S. Holmested et G. D. Watson, *Ontario Civil Procedure* (feuilles mobiles), vol. 3 suppl., 21§17 et suiv. Un autre aspect de la politique établie par les tribunaux en vue d'assurer le caractère définitif des instances est la règle qui prohibe les contestations indirectes, c'est-à-dire la règle selon laquelle l'ordonnance rendue par un tribunal compétent ne doit pas être remise en cause dans des procédures subséquentes, sauf celles prévues par la loi dans le but exprès de contester l'ordonnance : *Wilson c. La Reine*, [1983] 2 R.C.S. 594; *R. c. Litchfield*, [1993] 4 R.C.S. 333; *R. c. Sarson*, [1996] 2 R.C.S. 223.

Initialement, ces règles ont été établies dans le contexte de procédures judiciaires antérieures. Leur champ d'application a depuis été élargi, avec les adaptations nécessaires, aux décisions de nature judiciaire ou quasi judiciaire rendues par les juridictions administratives — fonctionnaires ou tribunaux. Dans ce contexte, l'objectif spécifique poursuivi consiste à assurer l'équilibre entre le respect

making process, whose integrity would be undermined by too readily permitting collateral attack or relitigation of issues once decided.

The extension of the doctrine of issue estoppel in Canada to administrative agencies is traced back to cases in the mid-1800s by D. J. Lange in *The Doctrine of Res Judicata in Canada* (2000), at p. 94 *et seq.*, including *Robinson v. McQuaid* (1854), 1 P.E.I.R. 103 (S.C.), at pp. 104-5, and *Bell v. Miller* (1862), 9 Gr. 385 (U.C. Ch.), at p. 386. The modern cases at the appellate level include *Raison v. Fenwick* (1981), 120 D.L.R. (3d) 622 (B.C.C.A.); *Rasanen*, *supra*; *Wong v. Shell Canada Ltd.* (1995), 15 C.C.E.L. (2d) 182 (Alta. C.A.); *Machin v. Tomlinson* (2000), 194 D.L.R. (4th) 326 (Ont. C.A.); and *Hamelin v. Davis* (1996), 18 B.C.L.R. (3d) 112 (C.A.). See also *Thrasyvoulou v. Environment Secretary*, [1990] 2 A.C. 273 (H.L.). Modifications were necessary because of the "major differences that can exist between [administrative orders and court orders] in relation, *inter alia*, to their legal nature and the position within the state structure of the institutions that issue them": *R. v. Consolidated Maybrun Mines Ltd.*, [1998] 1 S.C.R. 706, at para. 4. There is generally no dispute that court orders are judicial orders; the same cannot be said of the myriad of orders that are issued across the range of administrative tribunals.

In this appeal the parties have not argued "cause of action" estoppel, apparently taking the view that the statutory framework of the ESA claim sufficiently distinguishes it from the common law framework of the court case. I therefore say no more about it. They have however, joined issue on

de l'équité envers les parties et la protection du processus décisionnel administratif, dont l'intégrité serait compromise si on autorisait trop facilement les contestations indirectes ou l'engagement d'une nouvelle instance à l'égard de questions déjà tranchées.

Dans *The Doctrine of Res Judicata in Canada* (2000), p. 94 et suiv., D. J. Lange attribue l'application aux organismes administratifs canadiens de la doctrine de la préclusion découlant d'une question déjà tranchée à certaines décisions datant du milieu du XIXᵉ siècle — notamment les affaires *Robinson c. McQuaid* (1854), 1 P.E.I.R. 103 (C.S.), p. 104-105, et *Bell c. Miller* (1862), 9 Gr. 385 (Ch. H.-C.), p. 386. Parmi les arrêts contemporains rendus par des cours d'appel, mentionnons les suivants : *Raison c. Fenwick* (1981), 120 D.L.R. (3d) 622 (C.A.C.-B.); *Rasanen*, précité; *Wong c. Shell Canada Ltd.* (1995), 15 C.C.E.L. (2d) 182 (C.A. Alb.); *Machin c. Tomlinson* (2000), 194 D.L.R. (4th) 326 (C.A. Ont.); et *Hamelin c. Davis* (1996), 18 B.C.L.R. (3d) 112 (C.A.). Voir également *Thrasyvoulou c. Environment Secretary*, [1990] 2 A.C. 273 (H.L.). Des modifications s'imposaient en raison des « différences importantes qui peuvent exister entre ces deux types d'ordonnances [c.-à-d. les ordonnances administratives et les ordonnances judiciaires], notamment quant à leur nature juridique et la place des institutions qui les rendent à l'intérieur de la structure étatique » : *R. c. Consolidated Maybrun Mines Ltd.*, [1998] 1 R.C.S. 706, par. 4. On s'entend généralement pour dire que les ordonnances des cours de justice sont des ordonnances de nature judiciaire; il n'en est pas de même pour les innombrables ordonnances rendues par les différents tribunaux administratifs.

Dans le présent pourvoi, les parties n'ont pas plaidé la préclusion fondée sur la « cause d'action », estimant apparemment que le cadre législatif de la demande fondée sur la LNE distingue suffisamment cette demande du cadre juridique de common law de l'instance judiciaire. Je n'en dirai par conséquent pas davantage à ce sujet. Les parties ont cependant lié contestation quant à l'application de la préclusion découlant d'une question

the application of issue estoppel and the relevance of the rule against collateral attack.

24    Issue estoppel was more particularly defined by Middleton J.A. of the Ontario Court of Appeal in *McIntosh v. Parent*, [1924] 4 D.L.R. 420, at p. 422:

When a question is litigated, the judgment of the Court is a final determination as between the parties and their privies. Any right, question, or fact <u>distinctly put in issue and directly determined</u> by a Court of competent jurisdiction as a ground of recovery, or as an answer to a claim set up, cannot be re-tried in a subsequent suit between the same parties or their privies, though for a different cause of action. The right, question, or fact, <u>once determined</u>, must, as between them, be taken to be conclusively established so long as the judgment remains. [Emphasis added.]

This statement was adopted by Laskin J. (later C.J.), dissenting in *Angle*, *supra*, at pp. 267-68. This description of the issues subject to estoppel ("[a]ny right, question or fact distinctly put in issue and directly determined") is more stringent than the formulation in some of the older cases for cause of action estoppel (e.g., "all matters which were, or might properly have been, brought into litigation", *Farwell*, *supra*, at p. 558). Dickson J. (later C.J.), speaking for the majority in *Angle*, *supra*, at p. 255, subscribed to the more stringent definition for the purpose of issue estoppel. "It will not suffice" he said, "if the question arose collaterally or incidentally in the earlier proceedings or is one which must be inferred by argument from the judgment." The question out of which the estoppel is said to arise must have been "fundamental to the decision arrived at" in the earlier proceeding. In other words, as discussed below, the estoppel extends to the material facts and the conclusions of law or of mixed fact and law ("the questions") that

déjà tranchée et à la pertinence de la règle prohibant les contestations indirectes.

La préclusion découlant d'une question déjà tranchée a été définie de façon précise par le juge Middleton de la Cour d'appel de l'Ontario dans l'arrêt *McIntosh c. Parent*, [1924] 4 D.L.R. 420, p. 422 :

[TRADUCTION] Lorsqu'une question est soumise à un tribunal, le jugement de la cour devient une décision définitive entre les parties et leurs ayants droit. Les droits, questions ou faits <u>distinctement mis en cause et directement réglés</u> par un tribunal compétent comme motifs de recouvrement ou comme réponses à une prétention qu'on met de l'avant, ne peuvent être jugés de nouveau dans une poursuite subséquente entre les mêmes parties ou leurs ayants droit, même si la cause d'action est différente. Le droit, la question ou le fait, <u>une fois qu'on a statué à son égard</u>, doit être considéré entre les parties comme établi de façon concluante aussi longtemps que le jugement demeure. [Je souligne.]

Le juge Laskin (plus tard Juge en chef) a souscrit à cet énoncé dans ses motifs de dissidence dans l'arrêt *Angle*, précité, p. 267-268. Cette description des aspects visés par la préclusion (« [l]es droits, questions ou faits distinctement mis en cause et directement réglés ») est plus exigeante que celle utilisée dans certaines décisions plus anciennes à l'égard de la préclusion fondée sur la cause d'action (par exemple [TRADUCTION] « toute question ayant été débattue ou qui aurait pu à bon droit l'être », *Farwell*, précité, p. 558). S'exprimant au nom de la majorité dans l'arrêt *Angle*, précité, p. 255, le juge Dickson (plus tard Juge en chef) a également fait sienne la définition plus exigeante de l'objet de la préclusion découlant d'une question déjà tranchée. « Il ne suffira pas », a-t-il dit, « que la question ait été soulevée de façon annexe ou incidente dans l'affaire antérieure ou qu'elle doive être inférée du jugement par raisonnement. » La question qui est censée donner naissance à la préclusion doit avoir été « fondamentale à la décision à laquelle on est arrivé » dans l'affaire antérieure. En d'autres termes, comme il est expliqué plus loin, la préclusion vise les faits substantiels, les conclusions de droit ou les conclusions mixtes de fait et de droit (« les questions ») à l'égard desquels on a nécessairement statué (même si on ne

were necessarily (even if not explicitly) determined in the earlier proceedings.

The preconditions to the operation of issue estoppel were set out by Dickson J. in *Angle*, *supra*, at p. 254:

(1) that the same question has been decided;

(2) that the judicial decision which is said to create the estoppel was final; and,

(3) that the parties to the judicial decision or their privies were the same persons as the parties to the proceedings in which the estoppel is raised or their privies.

The appellant's argument is that even though the ESA officer was required to make a decision in a judicial manner, she failed to do so. Although she had jurisdiction under the ESA to deal with the claim, the ESA officer lost jurisdiction when she failed to disclose to the appellant the case the appellant had to meet and to give the appellant the opportunity to be heard in answer to the case put against her. The ESA officer therefore never made a "judicial decision" as required. The appellant also says that her own failure to exercise her right to seek internal administrative review of the decision should not be given the conclusive effect adopted by the Ontario Court of Appeal. Even if the conditions precedent to issue estoppel were present, she says, the court had a discretion to relieve against the harsh effects of estoppel *per rem judicatem* in the circumstances of this case, and erred in failing to do so.

A.  *The Statutory Scheme*

1.  The Employment Standards Officer

The ESA applies to "every contract of employment, oral or written, express or implied" in Ontario (s. 2(2)) subject to certain exceptions under the regulations, and establishes a number of minimum

l'a pas fait de façon explicite) dans le cadre de l'instance antérieure.

Les conditions d'application de la préclusion découlant d'une question déjà tranchée ont été énoncées par le juge Dickson dans l'arrêt *Angle*, précité, p. 254 : 25

(1) que la même question ait été décidée;

(2) que la décision judiciaire invoquée comme créant la [préclusion] soit finale; et

(3) que les parties dans la décision judiciaire invoquée, ou leurs ayants droit, soient les mêmes que les parties engagées dans l'affaire où la [préclusion] est soulevée, ou leurs ayants droit.

L'appelante soutient que l'agente des normes d'emploi n'a pas — bien quelle ait été tenue de le faire — pris sa décision de manière judiciaire. L'agente disposait, en vertu de la LNE, de la compétence nécessaire pour connaître de la réclamation, mais elle a perdu cette compétence en omettant de communiquer à l'appelante les prétentions de l'employeur et de lui donner la possibilité de les réfuter. L'agente n'a donc jamais rendu une « décision judiciaire » comme elle était tenue de le faire. L'appelante soutient en outre que sa propre omission d'exercer son droit de demander la révision administrative interne de la décision de l'agente ne devrait pas se voir accorder l'effet déterminant que lui a attribué la Cour d'appel de l'Ontario. Selon elle, même si les conditions d'application de la préclusion découlant d'une question déjà tranchée étaient réunies, la cour avait, dans les circonstances de l'espèce, le pouvoir discrétionnaire de soustraire aux effets draconiens de la préclusion *per rem judicatem*, et elle a commis une erreur en s'abstenant de le faire. 26

A.  *Le cadre législatif*

1.  L'agent des normes d'emploi

La LNE s'applique à « tout contrat de travail, verbal ou écrit, exprès ou implicite » en Ontario (par. 2(2)), sous réserve de certaines exceptions prévues par règlement, et elle établit un certain 27

employment standards for the protection of employees. These include hours of work, minimum wages, overtime pay, benefit plans, public holidays and vacation with pay. More specifically, the Act provides a summary procedure under which aggrieved employees can seek redress with respect to an employer's alleged failure to comply with these standards. The objective is to make redress available, where it is appropriate at all, expeditiously and cheaply. In the first instance, the dispute is referred to an employment standards officer. ESA officers are public servants in the Ministry of Labour. They are generally not legally trained, but have some experience in labour relations. The statute does not set out any particular procedure that must be followed in disposing of claims. ESA officers are given wide powers to enter premises, inspect and remove documents and make other relevant inquiries. If liability is found, ESA officers have broad powers of enforcement (s. 65).

nombre de normes d'emploi minimales en vue de protéger les employés. Ces normes portent notamment sur les heures de travail, le salaire minimum, le salaire pour les heures supplémentaires, les régimes d'avantages sociaux, les jours fériés et les congés payés. Plus particulièrement, la Loi établit une procédure sommaire permettant aux employés qui s'estiment lésés parce que leur employeur aurait omis de se conformer à ces normes de demander réparation à cet égard. L'objectif est d'offrir, dans les cas appropriés, un recours rapide et peu coûteux. Au premier palier, l'examen du différend est confié à un agent des normes d'emploi. Fonctionnaires du ministère du Travail, ces personnes n'ont généralement pas de formation juridique, mais elles possèdent une certaine expérience en matière de relations de travail. La Loi ne prescrit pas la procédure à suivre pour statuer sur les demandes. L'agent des normes d'emploi dispose de pouvoirs étendus qui l'autorisent notamment à pénétrer dans des locaux, à effectuer des inspections, à emporter des documents avec lui et à interroger toute personne à l'égard de questions pertinentes. S'il constate l'inobservation de la loi, l'agent dispose de larges pouvoirs afin de la faire respecter (art. 65).

28    On receipt of an employee demand, generally speaking, the ESA officer contacts the employer to ascertain whether in fact wages are unpaid and if so for what reason. Although in this case there was a one-hour meeting between the ESA officer and the appellant, there is no requirement for such a face-to-face meeting, and clearly there is no contemplation of any sort of oral hearing in which both parties are present. It is a rough-and-ready procedure that is wholly inappropriate, one might think, to the definitive resolution of a contractual claim of some legal and factual complexity.

En règle générale, sur réception de la demande d'un employé, l'agent des normes d'emploi communique avec l'employeur pour vérifier si le salaire est effectivement impayé et, dans l'affirmative, pour connaître la raison du non-paiement. Bien que, dans la présente affaire, l'agente des normes d'emploi se soit entretenue avec l'appelante pendant une heure, rien n'exige la tenue d'une telle rencontre et, manifestement, aucune audience à laquelle participeraient les deux parties n'est envisagée. D'aucuns estimeraient qu'il s'agit d'une procédure expéditive tout à fait inappropriée pour trancher de façon définitive des prétentions contractuelles présentant une certaine complexité sur les plans juridique et factuel.

29    There are many advantages to the employee in such a forum. The services of the ESA officer are supplied free of charge. Legal representation is unnecessary. The process moves more rapidly than could realistically be expected in the courts. There

Ce mécanisme présente de nombreux avantages pour les employés. Les services de l'agent des normes d'emploi sont gratuits. La représentation par avocat n'est pas nécessaire. L'instance se déroule plus rapidement que ce à quoi on pourrait

are corresponding disadvantages. The ESA officer is likely not to have legal training and has neither the time nor the resources to deal with a contract claim in a manner comparable to the courtroom setting. At the time of these proceedings a double standard was applied to an appeal (or, as it is called, a "review"). The employer was entitled as of right to a review (s. 68) but, as discussed below, the employee could ask for one but the request could be refused by the Director (s. 67(3)). At the time, as well, there was no monetary limit on the ESA officer's jurisdiction. The Act has since been amended to provide an upper limit on claims of $10,000 (S.O. 1996, c. 23, s. 19(1)). Had the ESA officer's determination gone the other way, the employer could have been saddled with a $300,000 liability arising out of a deeply flawed decision unless reversed on an administrative review or quashed by a supervising court.

vraisemblablement s'attendre devant les tribunaux judiciaires. À ces avantages correspondent toutefois des désavantages. Il est probable que l'agent n'a pas de formation juridique et qu'il n'a ni le temps ni les ressources nécessaires pour examiner une demande de nature contractuelle comme cela se passerait dans la salle d'audience d'une cour de justice. Au moment où ces procédures se sont déroulées, des règles inégales s'appliquaient en matière d'appel (ou de « révision » selon les termes de la Loi). En effet, l'employeur pouvait demander de plein droit la révision de la décision (art. 68). Toutefois, comme nous le verrons plus loin, l'employé pouvait lui aussi présenter une demande de révision, mais le directeur pouvait refuser d'y donner suite (par. 67(3)). De même, au cours de la période pertinente le montant des demandes à l'égard desquelles l'agent des normes d'emploi avait compétence n'était pas plafonné. La Loi a depuis été modifiée et seules les réclamations d'au plus 10 000 $ sont maintenant visées (L.O. 1996, ch. 23, par. 19(1)). Si, en l'espèce, l'agente avait statué en faveur de l'employée, l'employeur aurait pu devoir supporter une obligation de 300 000 $ découlant d'une décision présentant de profondes lacunes, à moins d'avoir gain de cause à la suite d'une révision administrative ou d'un contrôle judiciaire.

### 2. The Review Process

The employee, as stated, has no appeal as of right. Section 67(2) of the Act provides that an employee dissatisfied with the decision at first instance may apply to the Director for an administrative review in writing within 15 days of the date of the mailing of the employment standards officer's decision. Under s. 67(3), "the Director <u>may</u> appoint an adjudicator who shall hold a hearing" (emphasis added). The word "may" grants the Director a discretion to hold or not to hold a hearing. The Ontario Court of Appeal noted this point, but said the parties had attached little importance to it.

### 2. La procédure de révision

Comme nous l'avons indiqué, les employés ne peuvent pas interjeter appel de plein droit. En vertu du par. 67(2) de la Loi, l'employé insatisfait de la décision rendue au premier palier peut, dans les 15 jours qui suivent la mise à la poste de la décision, demander par écrit au directeur de réviser cette décision. Aux termes du par. 67(3), « le directeur <u>peut</u> nommer un arbitre de griefs pour tenir une audience » (je souligne). L'emploi du mot « peut » confère au directeur le pouvoir discrétionnaire de décider s'il y aura ou non une audience. La Cour d'appel de l'Ontario a souligné ce point, mais a affirmé que les parties y avaient attaché peu d'importance.

30

It seems clear the legislature did not intend to confer an appeal as of right. Where the Director

Il paraît clair que le législateur n'a pas voulu créer un appel de plein droit. Lorsque le directeur

31

does appoint an adjudicator a hearing is mandated by the Act. Further delay and expense to the Ministry and the parties would follow as a matter of course. The juxtaposition in s. 67(3) of "may" and "shall" (and in the French text, the instruction that the Director "*peut nommer un arbitre de griefs pour tenir une audience*" (emphasis added)) puts the matter beyond doubt. The Ontario legislature intended the Director to have a discretion to decline to refer a matter to an adjudicator which, in his or her opinion, is simply not justified. Even the adjudicators hearing a review under s. 67(3) of the Act are not by statute required to be legally trained. It was likely considered undesirable by the Ontario legislature to give each and every dissatisfied employee a review as of right, particularly where the amounts in issue are often relatively modest. The discretion must be exercised according to proper principles, of course, but a discretion it remains.

32    If an internal review were ordered, an adjudicator would then have looked at the appellant's claim *de novo* and would undoubtedly have shared the employer documents with the appellant and given her every opportunity to respond and comment. I agree that under the scheme of the Act procedural defects at the ESA officer level, including a failure to provide proper notice and an opportunity to be heard in response to the opposing case, can be rectified on review. The respondent says the appellant, having elected to proceed under the Act, was required to seek an internal review if she was dissatisfied with the initial outcome. Not having done so, she is estopped from pursuing her $300,000 claim. The appellant says that the ESA procedure was so deeply flawed that she was entitled to walk away from it.

nomme un arbitre de griefs, la Loi exige la tenue d'une audience. Il en résulte évidemment des délais et des dépenses supplémentaires pour le ministère et les parties. La juxtaposition des auxiliaires « *may* » et « *shall* » dans la version anglaise du par. 67(3) (et, dans la version française, l'indication que le directeur « peut nommer un arbitre de griefs pour tenir une audience » (je souligne)) écarte tout doute à cet égard. Le législateur ontarien entendait que le directeur dispose du pouvoir discrétionnaire de refuser de saisir un arbitre de griefs d'une demande qui, à son avis, n'est tout simplement pas justifiée. Même les arbitres chargés de la révision prévue au par. 67(3) de la LNE ne sont pas tenus par la loi de posséder une formation juridique. Le législateur ontarien a probablement jugé qu'il n'était pas souhaitable que tout employé insatisfait d'une décision puisse obtenir de plein droit la révision de celle-ci, compte tenu particulièrement du fait que la somme en jeu est souvent relativement modeste. Il va de soi que ce pouvoir discrétionnaire doit être exercé en conformité avec les principes pertinents, mais il n'en demeure pas moins un pouvoir discrétionnaire.

Si une révision interne avait été ordonnée, un arbitre aurait alors examiné *de novo* la demande de l'appelante et aurait sans aucun doute permis à cette dernière de prendre connaissance des documents de l'employeur et lui aurait donné la possibilité d'y répondre et de les commenter. Je reconnais que, sous le régime de la Loi, les vices procéduraux qui surviennent à l'étape de la décision initiale, y compris l'omission de donner aux intéressés un préavis suffisant et la possibilité de se faire entendre pour réfuter la thèse de la partie adverse, peuvent être corrigés à l'étape de la révision. L'intimée soutient que, du fait que l'appelante a choisi de se prévaloir de la Loi, elle devait recourir au mécanisme de révision prévue pour celle-ci si elle était insatisfaite de la décision rendue au premier palier. Comme elle ne l'a pas fait, elle est précluse de continuer de réclamer la somme de 300 000 $. L'appelante réplique que la procédure prévue par la LNE souffrait de lacunes si profondes qu'il lui était loisible de renoncer à y recourir.

2001 SCC 44 (CanLII)

B. *The Applicability of Issue Estoppel*

1. Issue Estoppel: A Two-Step Analysis

The rules governing issue estoppel should not be mechanically applied. The underlying purpose is to balance the public interest in the finality of litigation with the public interest in ensuring that justice is done on the facts of a particular case. (There are corresponding private interests.) The first step is to determine whether the moving party (in this case the respondent) has established the preconditions to the operation of issue estoppel set out by Dickson J. in *Angle*, *supra*. If successful, the court must still determine whether, as a matter of discretion, issue estoppel *ought* to be applied: *British Columbia (Minister of Forests) v. Bugbusters Pest Management Inc.* (1998), 50 B.C.L.R. (3d) 1 (C.A.), at para. 32; *Schweneke v. Ontario* (2000), 47 O.R. (3d) 97 (C.A.), at paras. 38-39; *Braithwaite v. Nova Scotia Public Service Long Term Disability Plan Trust Fund* (1999), 176 N.S.R. (2d) 173 (C.A.), at para. 56.

The appellant was quite entitled, in the first instance, to invoke the jurisdiction of the Ontario superior court to deal with her various monetary claims. The respondent was not entitled as of right to the imposition of an estoppel. It was up to the court to decide whether, in the exercise of its discretion, it would decline to hear aspects of the claims that were previously the subject of ESA administrative proceedings.

2. The Judicial Nature of the Decision

A common element of the preconditions to issue estoppel set out by Dickson J. in *Angle*, *supra*, is the fundamental requirement that the decision in the prior proceeding be a judicial decision. According to the authorities (see e.g., G. Spencer Bower, A. K. Turner and K. R. Handley, *The Doc-*

B. *L'applicabilité de la préclusion découlant d'une question déjà tranchée*

1. Préclusion découlant d'une question déjà tranchée : analyse à deux volets

Les règles régissant la préclusion découlant d'une question déjà tranchée ne doivent pas être appliquées machinalement. L'objectif fondamental est d'établir l'équilibre entre l'intérêt public qui consiste à assurer le caractère définitif des litiges et l'autre intérêt public qui est d'assurer que, dans une affaire donnée, justice soit rendue. (Il existe des intérêts privés correspondants.) Il s'agit, au cours de la première étape, de déterminer si le requérant (en l'occurrence l'intimée) a établi l'existence des conditions d'application de la préclusion découlant d'une question déjà tranchée énoncées par le juge Dickson dans l'arrêt *Angle*, précité. Dans l'affirmative, la cour doit ensuite se demander, dans l'exercice de son pouvoir discrétionnaire, si cette forme de préclusion *devrait* être appliquée : *British Columbia (Minister of Forests) c. Bugbusters Pest Management Inc.* (1998), 50 B.C.L.R. (3d) 1 (C.A.), par. 32; *Schweneke c. Ontario* (2000), 47 O.R. (3d) 97 (C.A.), par. 38-39; *Braithwaite c. Nova Scotia Public Service Long Term Disability Plan Trust Fund* (1999), 176 N.S.R. (2d) 173 (C.A.), par. 56.

L'appelante avait parfaitement le droit, en première instance, de saisir la Cour supérieure de l'Ontario de ses diverses réclamations financières. L'intimée ne pouvait se voir accorder de plein droit l'application de la préclusion. Il appartenait à la cour de décider, dans l'exercice de son pouvoir discrétionnaire, s'il convenait qu'elle refuse de connaître ou non de certains aspects de la demande ayant déjà fait l'objet de la procédure administrative engagée sous le régime de la LNE.

2. La nature judiciaire de la décision

L'exigence fondamentale selon laquelle la décision antérieure doit être une décision judiciaire est un élément qui est commun aux conditions préalables à l'application de la préclusion découlant d'une question déjà tranchée énoncées par le juge Dickson dans l'arrêt *Angle*, précité. Selon la doc-

33

34

35

*trine of Res Judicata* (3rd ed. 1996), at paras. 18-20), there are three elements that may be taken into account. First is to examine the nature of the administrative authority issuing the decision. Is it an institution that is capable of receiving and exercising adjudicative authority? Secondly, as a matter of law, is the particular decision one that was required to be made in a judicial manner? Thirdly, as a mixed question of law and fact, *was* the decision made in a judicial manner? These are distinct requirements:

> It is of no avail to prove that the alleged *res judicata* was a decision, or that it was pronounced according to judicial principles, unless it emanated from such a tribunal in the exercise of its adjudicative functions; nor is it sufficient that it was pronounced by such a tribunal unless it was a judicial decision on the merits. It is important, therefore, at the outset to have a proper understanding of what constitutes a judicial tribunal and a judicial decision for present purposes.

(Spencer Bower, Turner and Handley, *supra*, para. 20)

36    As to the third aspect, whether or not the particular decision in question was actually made in accordance with judicial requirements, I note the recent *ex curia* statement of Handley J. (the current editor of *The Doctrine of Res Judicata*) that:

> The prior decision judicial, arbitral, or administrative, must have been made within jurisdiction before it can give rise to *res judicata* estoppels.

("Res Judicata: General Principles and Recent Developments" (1999), 18 *Aust. Bar Rev.* 214, at p. 215)

37    The main controversy in this case is directed to this third aspect, i.e., is a decision taken without regard to requirements of notice and an opportunity to be heard *capable* of supporting an issue

trine (voir, par exemple, G. Spencer Bower, A. K. Turner et K. R. Handley, *The Doctrine of Res Judicata* (3e éd. 1996), par. 18-20), trois éléments peuvent être pris en considération. Premièrement, il faut se pencher sur la nature du décideur administratif ayant rendu la décision. S'agit-il d'un organe pouvant être investi d'un pouvoir juridictionnel et capable d'exercer ce pouvoir? Deuxièmement, sur le plan juridique, la décision litigieuse devait-elle être prise judiciairement? Troisièmement — question mixte de fait et de droit — la décision *a-t-elle été* rendue de manière judiciaire? Il s'agit d'exigences distinctes :

> [TRADUCTION] Il ne sert à rien de prouver que la prétendue chose jugée était une décision ou qu'elle a été prononcée conformément aux principes applicables aux tribunaux judiciaires à moins qu'elle ait été rendue par un tel tribunal dans l'exercice de son pouvoir juridictionnel; il ne suffit pas non plus qu'elle ait été prononcée par un tel tribunal, sauf s'il s'agit d'une décision judiciaire sur le fond. Par conséquent, il importe de bien saisir dès le départ ce qu'est un tribunal judiciaire et ce qu'est une décision judiciaire pour les fins qui nous occupent.

(Spencer Bower, Turner et Handley, *op. cit.*, par. 20)

En ce qui concerne le troisième élément, soit la question de savoir si la décision en cause a effectivement été rendue conformément aux exigences applicables aux décisions judiciaires, je souligne l'affirmation suivante, faite récemment par le juge Handley (éditeur actuel de l'ouvrage *The Doctrine of Res Judicata*) en dehors du cadre de ses fonctions de juge :

> [TRADUCTION] La décision antérieure — qu'elle soit judiciaire, arbitrale ou administrative — doit avoir été rendue dans les limites de la compétence du décideur pour que puisse être plaidée la préclusion découlant d'une question déjà tranchée.

(« Res Judicata : General Principles and Recent Developments » (1999), 18 *Aust. Bar Rev.* 214, p. 215)

En l'espèce, le désaccord porte principalement sur ce troisième élément : une décision prise sans avoir respecté les exigences en matière de préavis et sans avoir donné à l'intéressé la possibilité de se

estoppel? In my opinion, the answer to this question is yes.

### (a) *The Institutional Framework*

The decision relied on by Rosenberg J.A. in this respect relates to the generic role and function of the ESA officer: *Re Downing and Graydon*, *supra*, *per* Blair J.A., at p. 305:

> In the present case, the employment standards officers have the power to adjudicate as well as to investigate. Their investigation is made for the purpose of providing them with information on which to base the decision they must make. The duties of the employment standards officers embrace all the important *indicia* of the exercise of a judicial power including the ascertainment of facts, the application of the law to those facts and the making of a decision which is binding upon the parties.

The parties did not dispute that ESA officials could properly be given adjudicative responsibilities to be discharged in a judicial manner. An earlier legislative limit of $4,000 on unpaid wages (excluding severance pay and benefits payable under pregnancy and parental provisions) was eliminated in 1991 by S.O. 1991, c. 16, s. 9(1), but subsequent to the ESA decision in the present case a new limit of $10,000 was imposed. This is the same limit as is imposed on the Small Claims Court by the *Courts of Justice Act*, R.S.O. 1990, c. C.43, s. 23(1), and O. Reg. 626/00, s. 1(1).

### (b) *The Nature of ESA Decisions Under Section 65(1)*

An administrative tribunal may have judicial as well as administrative or ministerial functions. So may an administrative officer.

One distinction between administrative and judicial decisions lies in differentiating adjudica-

faire entendre est-elle *capable* de fonder l'application de la préclusion découlant d'une question déjà tranchée? À mon avis, la réponse à cette question est oui.

### a) *Le cadre institutionnel*

La décision sur laquelle s'est appuyé le juge Rosenberg de la Cour d'appel de l'Ontario à cet égard a trait à la fonction et au rôle génériques de l'agent des normes d'emploi : *Re Downing and Graydon*, précité, le juge Blair, p. 305 :

> [TRADUCTION] En l'espèce, l'agent des normes d'emploi a le pouvoir de décider ainsi que celui d'enquêter. Il fait enquête afin de recueillir les renseignements qui fonderont la décision qu'il doit rendre. Ses fonctions comportent tous les indices importants de l'exercice d'un pouvoir judiciaire, notamment la détermination des faits, l'application du droit à ces faits et la prise d'une décision liant les parties.

Les parties ne contestent pas le fait que les fonctionnaires chargés de l'application de la LNE pouvaient à bon droit être investis de fonctions juridictionnelles devant être exercées de manière judiciaire. Le plafond de 4 000 $ que prévoyait la Loi à l'égard des réclamations pour salaire impayé (à l'exclusion de l'indemnité de cessation d'emploi et des prestations payables au titre des dispositions relatives au congé de maternité et au congé parental) a été aboli en 1991 par L.O. 1991, ch. 16, par. 9(1), mais après la décision rendue en application de la LNE dans la présente affaire, un nouveau plafond de 10 000 $ a été fixé. Il s'agit du même plafond auquel est assujettie la Cour des petites créances par la *Loi sur les tribunaux judiciaires*, L.R.O. 1990, ch. C.43, par. 23(1), et le Règl. de l'Ont. 626/00, par. 1(1).

### b) *La nature des décisions rendues en application du par. 65(1)*

Un tribunal administratif peut exercer des fonctions judiciaires ainsi que des fonctions administratives ou ministérielles. Il en est de même d'un fonctionnaire.

Une des caractéristiques qui distinguent les décisions administratives des décisions judiciaires est

38

39

40

tive from investigative functions. In the latter mode the ESA officer is taking the initiative to gather information. The ESA officer acts as a self-starting investigator who is not confined within the limits of the adversarial process. The distinction between investigative and adjudicative powers is discussed in *Guay v. Lafleur*, [1965] S.C.R. 12, at pp. 17-18. The inapplicability of issue estoppel to investigations is noted by Diplock L.J. in *Thoday v. Thoday*, [1964] P. 181 (Eng. C.A.), at p. 197.

41    Although ESA officers may have non-adjudicative functions, they must exercise their adjudicative functions in a judicial manner. While they utilize procedures more flexible than those that apply in the courts, their decisions must be based on findings of fact and the application of an objective legal standard to those facts. This is characteristic of a judicial function: D. J. M. Brown and J. M. Evans, *Judicial Review of Administrative Action in Canada* (1998), vol. 2, § 7:1310, p. 7-7.

42    The adjudication of the claim, once the relevant information had been gathered, is of a judicial nature.

(c) *Particulars of the Decision in Question*

43    The Ontario Court of Appeal concluded that the decision of the ESA officer in this case was in fact reached contrary to the principles of natural justice. The appellant had neither notice of the employer's case nor an opportunity to respond.

44    The appellant contends that it is not enough to say the decision *ought* to have been reached in a judicial manner. The question is: Was it decided in a judicial manner in this case? There is some support for this view in *Rasanen*, *supra*, *per* Abella J.A., at p. 280:

la différence qui existe entre des fonctions juridictionnelles et des fonctions d'enquête. Dans l'exercice des secondes, l'agent des normes d'emploi prend l'initiative de recueillir des éléments d'information. Il agit en tant qu'enquêteur autonome et n'est pas assujetti aux contraintes de la procédure contradictoire. La distinction entre les pouvoirs d'enquête et les pouvoirs juridictionnels a été examinée dans l'arrêt *Guay c. Lafleur*, [1965] R.C.S. 12, p. 17-18. L'inapplicabilité de la préclusion découlant d'une question déjà tranchée aux enquêtes administratives a été mentionnée par le lord juge Diplock dans *Thoday c. Thoday*, [1964] P. 181 (C.A. Angl.), p. 197.

Quoique les agents des normes d'emploi puissent avoir des fonctions non juridictionnelles, lorsqu'ils accomplissent des fonctions juridictionnelles ils sont tenus de le faire de manière judiciaire. Bien qu'ils aient recours à des procédures plus souples que celles des cours de justice, leurs décisions doivent s'appuyer sur des conclusions de fait et sur l'application à ces faits d'une norme juridique objective. Il s'agit là d'une caractéristique de fonctions judiciaires : D. J. M. Brown et J. M. Evans, *Judicial Review of Administrative Action in Canada* (1998), vol. 2, par. 7:1310, p. 7-7.

La décision qui statue sur une plainte après l'obtention de l'information pertinente est une décision de nature judiciaire.

c) *Le détail de la décision en cause*

La Cour d'appel de l'Ontario a conclu que la décision de l'agente des normes d'emploi avait de fait été rendue au mépris des principes de justice naturelle. L'appelante n'a pas été informée des prétentions de l'employeur et n'a pas eu la possibilité de les réfuter.

L'appelante soutient qu'il ne suffit pas de dire que la décision *aurait dû* être prise de manière judiciaire, mais qu'il faut plutôt se demander : La décision a-t-elle été prise de manière judiciaire en l'espèce? Cet argument trouve un certain appui dans l'arrêt *Rasanen*, précité, où madame le juge Abella de la Cour d'appel de l'Ontario a dit ceci, à la p. 280 :

As long as the hearing process in the tribunal provides parties with an opportunity to know and meet the case against them, and so long as the decision is within the tribunal's jurisdiction, then regardless of how closely the process mirrors a trial or its procedural antecedents, I can see no principled basis for exempting issues adjudicated by tribunals from the operation of issue estoppel in a subsequent action. [Emphasis added.]

[TRADUCTION] Pour autant que la procédure d'instruction du tribunal administratif donne à chacune des parties la possibilité de connaître les prétentions de l'autre et de les réfuter et que la décision rendue relève de la compétence du tribunal, peu importe alors à quel point la procédure s'apparente à un procès ou aux procédures préalables à celui-ci, je ne vois aucune raison fondée sur des principes qui justifierait, dans le cadre d'une action subséquente, de soustraire les questions décidées par un tribunal administratif à l'application de la préclusion découlant d'une question déjà tranchée. [Je souligne.]

Trial level decisions in Ontario subsequently adopted this approach: *Machado v. Pratt & Whitney Canada Inc.* (1995), 12 C.C.E.L. (2d) 132 (Ont. Ct. (Gen. Div.)); *Randhawa v. Everest & Jennings Canadian Ltd.* (1996), 22 C.C.E.L. (2d) 19 (Ont. Ct. (Gen. Div.)); *Heynen v. Frito-Lay Canada Ltd.* (1997), 32 C.C.E.L. (2d) 183 (Ont. Ct. (Gen. Div.)); *Perez v. GE Capital Technology Management Services Canada Inc.* (1999), 47 C.C.E.L. (2d) 145 (Ont. S.C.J.). The statement of Métivier J. in *Munyal v. Sears Canada Inc.* (1997), 29 C.C.E.L. (2d) 58 (Ont. Ct. (Gen. Div.)), at p. 60, reflects that position:

Cette approche a subséquemment été retenue par des tribunaux de première instance en Ontario : *Machado c. Pratt & Whitney Canada Inc.* (1995), 12 C.C.E.L. (2d) 132 (C. Ont. (Div. gén.)); *Randhawa c. Everest & Jennings Canadian Ltd.* (1996), 22 C.C.E.L. (2d) 19 (C. Ont. (Div. gén.)); *Heynen c. Frito-Lay Canada Ltd.* (1997), 32 C.C.E.L. (2d) 183 (C. Ont. (Div. gén.)); *Perez c. GE Capital Technology Management Services Canada Inc.* (1999), 47 C.C.E.L. (2d) 145 (C.S.J.). Les propos suivants du juge Métivier dans l'affaire *Munyal c. Sears Canada Inc.* (1997), 29 C.C.E.L. (2d) 58 (C. Ont. (Div. gén.)), p. 60, reflètent ce point de vue :

The plaintiff relies on [*Rasanen*] and other similar decisions to assert that the principle of issue estoppel should apply to administrative decisions. This is true only where the decision is the result of a fair, unbiased adjudicative process where "the hearing process provides parties with an opportunity to know and meet the case against them".

[TRADUCTION] La partie demanderesse s'appuie sur [l'arrêt *Rasanen*] et sur d'autres décisions au même effet pour affirmer que le principe de la préclusion découlant d'une question déjà tranchée devrait s'appliquer aux décisions administratives. Ce n'est le cas que lorsque la décision est le fruit d'un processus décisionnel équitable et impartial « comportant une audience dans le cadre de laquelle chacune des parties a la possibilité de prendre connaissance des prétentions de l'autre et de les réfuter ».

In *Wong*, *supra*, the Alberta Court of Appeal rejected an attack on the decision of an employment standards review officer and held that the ESA decision was adequate to create an estoppel as long as "the appellant knew of the case against him and was given an opportunity to state his position" (para. 20). See also *Alderman v. North Shore Studio Management Ltd.*, [1997] 5 W.W.R. 535 (B.C.S.C.).

Dans l'arrêt *Wong*, précité, la Cour d'appel de l'Alberta a rejeté une contestation visant la décision d'un agent de révision en matière de normes d'emploi et a conclu qu'il était possible de plaider la préclusion à l'égard de cette décision dans la mesure où [TRADUCTION] « l'appelant connaissait les prétentions formulées contre lui et avait eu la possibilité de faire valoir son point de vue » (par. 20). Voir également *Alderman c. North Shore Studio Management Ltd.*, [1997] 5 W.W.R. 535 (C.S.C.-B.).

45

46

47    In my view, with respect, the theory that a denial of natural justice deprives the ESA decision of its character as a "judicial" decision rests on a misconception. Flawed the decision may be, but "judicial" (as distinguished from administrative or legislative) it remains. Once it is determined that the decision maker was capable of receiving and exercising adjudicative authority and that the particular decision was one that was required to be made in a judicial manner, the decision does not cease to have that character ("judicial") because the decision maker erred in carrying out his or her functions. As early as *R. v. Nat Bell Liquors Ltd.*, [1922] 2 A.C. 128 (H.L.), it was held that a conviction entered by an Alberta magistrate could not be quashed for lack of jurisdiction on the grounds that the depositions showed that there was no evidence to support the conviction or that the magistrate misdirected himself in considering the evidence. The jurisdiction to try the charges was distinguished from alleged errors in "the observance of the law in the course of its exercise" (p. 156). If the conditions precedent to the exercise of a judicial jurisdiction are satisfied (as here), subsequent errors in its exercise, including violations of natural justice, render the decision voidable, not void: *Harelkin v. University of Regina*, [1979] 2 S.C.R. 561, at pp. 584-85. The decision remains a "judicial decision", although seriously flawed by the want of proper notice and the denial of the opportunity to be heard.

48    I mentioned at the outset that estoppel *per rem judicatem* is closely linked to the rule against collateral attack, and indeed to the principles of judicial review. If the appellant had gone to court to seek judicial review of the ESA officer's decision without first following the internal administrative review route, she would have been confronted with the decision of this Court in *Harelkin, supra*. In that case a university student failed in his judicial review application to quash the decision of a

En toute déférence, j'estime que la thèse voulant que l'inobservation des principes de justice naturelle ait pour effet d'enlever tout caractère « judiciaire » à la décision fondée sur la LNE repose sur une idée fausse. Il se peut que la décision présente des failles, mais elle demeure « judiciaire » (plutôt qu'administrative ou législative). Une fois qu'il est établi que l'auteur de la décision pouvait être investi d'un pouvoir juridictionnel, qu'il pouvait exercer ce pouvoir et que la décision litigieuse devait être rendue de manière judiciaire, celle-ci ne perd pas son caractère « judiciaire » parce que son auteur a commis une erreur dans l'accomplissement de ses fonctions. Dans un vieil arrêt, *R. c. Nat Bell Liquors Ltd.*, [1922] 2 A.C. 128 (H.L.), il a été jugé que la déclaration de culpabilité inscrite par un magistrat albertain ne pouvait être annulée pour cause d'absence de compétence sur le fondement que les témoignages ne révélaient aucune preuve étayant la déclaration de culpabilité ou parce que le magistrat s'était donné des directives erronées dans l'examen de la preuve. Une distinction a été établie entre le pouvoir de juger les accusations et les erreurs qui auraient été commises en matière d'[TRADUCTION] « observation de la loi dans l'exercice de ce pouvoir » (p. 156). Si les conditions préalables à l'exercice d'une compétence de nature judiciaire sont réunies (comme c'est le cas en l'espèce), toute erreur subséquente dans l'exercice de cette compétence, y compris les manquements aux règles de la justice naturelle, ne rend pas la décision nulle mais annulable : *Harelkin c. Université de Regina*, [1979] 2 R.C.S. 561, p. 584-585. La décision reste une décision « judiciaire », quoiqu'elle souffre de sérieuses lacunes du fait de l'absence de préavis suffisant et du défaut d'accorder la possibilité de se faire entendre.

Comme je l'ai mentionné plus tôt, la préclusion *per rem judicatem* est étroitement liée à la règle prohibant les contestations indirectes et, de fait, aux principes régissant le contrôle judiciaire. Si l'appelante s'était adressée à une cour de justice pour demander le contrôle judiciaire de la décision de l'agente des normes d'emploi sans se prévaloir au préalable du mécanisme de révision administrative interne, on lui aurait opposé l'arrêt *Harelkin*, précité, de notre Cour. Dans cette affaire, la

faculty committee of the University of Regina which found his academic performance to be unsatisfactory. The faculty committee was required to act in a judicial manner but failed, as here, to give proper notice and an opportunity to be heard. It was held that the failure did not deprive the faculty committee of its adjudicative jurisdiction. Its decision was subject to judicial review, but this was refused in the exercise of the Court's discretion. Adoption of the appellant's theory in this case would create an anomalous result. If she is correct that the ESA officer stepped outside her judicial role and lost jurisdiction for all purposes, including issue estoppel, the *Harelkin* barrier to judicial review would be neatly sidestepped. She would have no need to seek judicial review to set aside the ESA decision. She would be, on her theory, entitled as of right to have it ignored in her civil action.

The appellant's position would also create an anomalous situation under the rule against collateral attack. As noted by the respondent, the rejection of issue estoppel in this case would constitute, in a sense, a successful collateral attack on the ESA decision, which has been impeached neither by administrative review nor judicial review. On the appellant's theory, an excess of jurisdiction in the course of the ESA proceeding would prevent issue estoppel, even though *Maybrun*, *supra*, says that an act in excess of a jurisdiction which the decision maker initially possessed does not necessarily open the decision to collateral attack. It depends, according to *Maybrun*, on which forum

demande de contrôle judiciaire qu'avait présentée un étudiant de l'université de Regina en vue d'obtenir l'annulation de la décision rendue par un comité d'une faculté de cet établissement et portant que ses notes étaient insatisfaisantes a été rejetée. Ce comité était tenu d'agir judiciairement, mais, tout comme en l'espèce, il avait omis de donner à l'étudiant un préavis suffisant et la possibilité de se faire entendre. Il a été jugé que cette omission n'avait pas fait perdre au comité sa compétence juridictionnelle. La décision du comité était susceptible de contrôle judiciaire, mais notre Cour, dans l'exercice de son pouvoir discrétionnaire, a refusé de faire droit à ce recours. Retenir la thèse de l'appelante en l'espèce entraînerait un résultat anormal. Si elle a raison de prétendre que l'agente des normes d'emploi a cessé d'agir judiciairement et a perdu compétence, à tout point de vue, y compris pour l'application de la préclusion découlant d'une question déjà tranchée, l'obstacle au contrôle judiciaire que constitue l'arrêt *Harelkin* serait habilement contourné. Elle n'aurait en effet pas besoin de demander le contrôle judiciaire de la décision de l'agente pour la faire annuler puisque, selon ce qu'elle soutient, elle a d'office droit à ce qu'on n'en tienne pas compte dans le cadre de son action au civil.

49

La thèse avancée par l'appelante créerait également une situation anormale pour ce qui concerne la règle prohibant les contestations indirectes. Comme l'a souligné l'intimée, le refus d'appliquer la préclusion découlant d'une question déjà tranchée en l'espèce équivaudrait, en un sens, à faire droit à une contestation indirecte de la décision de l'agente des normes d'emploi, décision qui n'a été contestée ni par voie de révision administrative ni par voie de contrôle judiciaire. Suivant la thèse de l'appelante, un excès de compétence pendant le déroulement de la procédure administrative prévue par la LNE empêche l'application de la préclusion découlant d'une question déjà tranchée, bien que dans l'arrêt *Maybrun*, précité, notre Cour ait dit qu'une mesure outrepassant la compétence que possédait initialement le décideur ne donne pas nécessairement ouverture aux contestations indirectes de cette décision. Suivant cet arrêt, tout dépend du forum devant lequel le législateur a

the legislature intended the jurisdictional attack to
be made in, the administrative review forum or the
court (para. 49).

50    It seems to me that the unsuccessful litigant in
administrative proceedings should be encouraged
to pursue whatever administrative remedy is avail-
able. Here, it is worth repeating, she elected the
ESA forum. Employers and employees should be
able to rely on ESA determinations unless steps
are taken promptly to set them aside. One major
legislative objective of the ESA scheme is to facili-
tate a quick resolution of termination benefits so
that both employee and employer can get on to
other things. Where, as here, the ESA issues are
determined within a year, a contract claim could
nevertheless still be commenced thereafter in
Ontario within six years of the alleged breach, pro-
ducing a lingering five years of uncertainty. This is
to be discouraged.

51    In summary, it is clear that an administrative
decision which is made without jurisdiction from
the outset cannot form the basis of an estoppel.
The conditions precedent to the adjudicative juris-
diction must be satisfied. Where arguments can be
made that an administrative officer or tribunal ini-
tially possessed the jurisdiction to make a decision
in a judicial manner but erred in the exercise of
that jurisdiction, the resulting decision is neverthe-
less capable of forming the basis of an estoppel.
Alleged errors in carrying out the mandate are
matters to be considered by the court in the exer-
cise of its discretion. This result makes the princi-
ple governing estoppel consistent with the law

voulu que soit présentée la contestation d'ordre
juridictionnel, savoir le tribunal administratif
chargé de la révision ou une cour de justice
(par. 49).

À mon sens, il faut inciter le plaideur qui n'a pas
gain de cause dans le cadre d'une instance admi-
nistrative à se prévaloir de tous les recours admi-
nistratifs qui lui sont ouverts. Il convient de rappe-
ler que, en l'espèce, l'appelante a opté pour le
recours prévu par la LNE. Tant les employeurs que
les employés doivent être en mesure de s'en remet-
tre aux décisions rendues sous le régime de la LNE
à moins qu'une mesure ne soit prise rapidement
pour en obtenir l'annulation. Un objectif important
du régime établi par le législateur dans la LNE est
de faciliter le règlement rapide des différends por-
tant sur les indemnités de licenciement, de sorte
que l'employé et l'employeur puissent tourner la
page. Dans les cas où, comme en l'espèce, les
questions touchant à l'application de la LNE sont
tranchées dans un délai d'un an ou moins, il est
néanmoins possible, en Ontario, d'intenter une
action contractuelle dans les six ans qui suivent le
manquement allégué, ce qui peut donner lieu à
cinq années d'incertitude. De telles situations doi-
vent être évitées.

En résumé, il est clair qu'une décision adminis-
trative qui a au départ été prise sans la compétence
requise ne peut fonder l'application de la préclu-
sion. Les conditions préalables à l'exercice de la
compétence juridictionnelle doivent être réunies.
Lorsqu'il est possible d'affirmer que le décideur
administratif — fonctionnaire ou tribunal — avait
initialement compétence pour rendre une décision
de manière judiciaire, mais qu'il a commis une
erreur dans l'exercice de cette compétence, la déci-
sion rendue est néanmoins susceptible de fonder
l'application de la préclusion. Les erreurs qui
auraient été commises dans l'accomplissement du
mandat doivent être prises en considération par la
cour de justice dans l'exercice de son pouvoir dis-
crétionnaire. Cela a pour effet d'assurer la confor-
mité du principe régissant la préclusion avec les
règles de droit relatives au contrôle judiciaire
énoncées dans l'arrêt *Harelkin*, précité, et celles

governing judicial review in *Harelkin*, *supra*, and collateral attack in *Maybrun*, *supra*.

Where I differ from the Ontario Court of Appeal in this case is in its conclusion that the failure of the appellant to seek such an administrative review of the ESA officer's flawed decision was fatal to her position. In my view, with respect, the refusal of the ESA officer to afford the appellant proper notice and the opportunity to be heard are matters of great importance in the exercise of the court's discretion, as will be seen.

I turn now to the three preconditions to issue estoppel set out by Dickson J. in *Angle*, *supra*, at p. 254.

### 3. Issue Estoppel: Applying the Tests

#### (a) *That the Same Question Has Been Decided*

A cause of action has traditionally been defined as comprising every fact which it would be necessary for the plaintiff to prove, if disputed, in order to support his or her right to the judgment of the court: *Poucher v. Wilkins* (1915), 33 O.L.R. 125 (C.A.). Establishing each such fact (sometimes referred to as material facts) constitutes a precondition to success. It is apparent that different causes of action may have one or more material facts in common. In this case, for example, the existence of an employment contract is a material fact common to both the ESA proceeding and to the appellant's wrongful dismissal claim in court. Issue estoppel simply means that once a material fact such as a valid employment contract is found to exist (or not to exist) by a court or tribunal of competent jurisdiction, whether on the basis of evidence or admissions, the same issue cannot be relitigated in subsequent proceedings between the same parties. The estoppel, in other words, extends to the issues of fact, law, and mixed fact and law

relatives aux contestations indirectes énoncées dans l'arrêt *Maybrun*, précité.

Là où je diverge d'opinion avec la Cour d'appel de l'Ontario, c'est relativement à sa conclusion que le fait pour l'appelante de ne pas avoir demandé la révision administrative de la décision lacunaire de l'agente porte un coup fatal à la thèse de l'appelante. En toute déférence, je suis d'avis que le refus de l'agente des normes d'emploi de donner à l'appelante un préavis suffisant et la possibilité de se faire entendre est un facteur très important dans l'exercice du pouvoir discrétionnaire de la cour, comme nous le verrons plus loin.

Je vais maintenant examiner les trois conditions d'application de la préclusion découlant d'une question déjà tranchée énoncées par le juge Dickson dans l'arrêt *Angle*, précité, p. 254.

#### 3. La préclusion découlant d'une question déjà tranchée : application des conditions

#### a) *La condition requérant que la même question ait déjà été tranchée*

Traditionnellement, on définit la cause d'action comme étant tous les faits que le demandeur doit prouver, s'ils sont contestés, pour étayer son droit d'obtenir jugement de la cour en sa faveur : *Poucher c. Wilkins* (1915), 33 O.L.R. 125 (C.A.). Pour que le demandeur ait gain de cause, chacun de ces faits (souvent qualifiés de faits substantiels) doit donc être établi. Il est évident que des causes d'action différentes peuvent avoir en commun un ou plusieurs faits substantiels. En l'espèce, par exemple, l'existence d'un contrat de travail est un fait substantiel commun au recours administratif et à l'action pour congédiement injustifié intentée au civil par l'appelante. L'application de la préclusion découlant d'une question déjà tranchée signifie simplement que, dans le cas où le tribunal judiciaire ou administratif compétent a conclu, sur le fondement d'éléments de preuve ou d'admissions, à l'existence (ou à l'inexistence) d'un fait pertinent — par exemple un contrat de travail valable — , cette même question ne peut être débattue à nouveau dans le cadre d'une instance ultérieure opposant les mêmes parties. En d'autres termes, la pré-

52

53

54

that are necessarily bound up with the determination of that "issue" in the prior proceeding.

55    The parties are agreed here that the "same issue" requirement is satisfied. In the appellant's wrongful dismissal action, she is claiming $300,000 in unpaid commissions. This puts in issue the same entitlement as was refused her in the ESA proceeding. One or more of the factual or legal issues essential to this entitlement were necessarily determined against her in the earlier ESA proceeding. If issue estoppel applies, it prevents her from asserting that these adverse findings ought now to be found in her favour.

(b) *That the Judicial Decision Which Is Said to Create the Estoppel Was Final*

56    As already discussed, the requirement that the prior decision be "judicial" (as opposed to administrative or legislative) is satisfied in this case.

57    Further, I agree with the Ontario Court of Appeal that the employee not having taken advantage of the internal review procedure, the decision of the ESA officer was final for the purposes of the Act and therefore capable in the normal course of events of giving rise to an estoppel.

58    I have already noted that in this case, unlike *Harelkin*, *supra*, the appellant had no right of appeal. She could merely make a request to the ESA Director for a review by an ESA adjudicator. While this may be a factor in the exercise of the discretion to deny issue estoppel, it does not affect the finality of the ESA decision. The appellant could fairly argue on a judicial review application that unlike Harelkin she had no "adequate alternative remedy" available to her as of right. The ESA

clusion vise les questions de fait, les questions de droit ainsi que les questions mixtes de fait et de droit qui sont nécessairement liées à la résolution de cette « question » dans l'instance antérieure.

En l'espèce, les parties conviennent que la condition relative à l'existence d'une « même question » est remplie. Dans son action pour congédiement injustifié, l'appelante réclame 300 000 $ à titre de commissions impayées. Cela met en jeu le droit même qui lui a été refusé dans le cadre de l'instance fondée sur la LNE. Une ou plusieurs des questions de fait ou de droit essentielles à la reconnaissance de ce droit ont nécessairement été tranchées en faveur de l'employeur dans le cadre de la procédure administrative. Si la préclusion découlant d'une question déjà tranchée s'applique, cela a pour effet d'empêcher l'appelante de soutenir que ces questions devraient maintenant être tranchées en sa faveur.

b) *La condition requérant que la décision judiciaire qui entraînerait l'application de la préclusion ait un caractère définitif*

Comme il a été indiqué plus tôt, la condition requérant que la décision antérieure soit une décision « judiciaire » (plutôt qu'administrative ou législative) est satisfaite en l'espèce.

En outre, je souscris à l'opinion de la Cour d'appel de l'Ontario selon laquelle, en raison du fait que l'employée ne s'est pas prévalue du mécanisme de révision interne, la décision de l'agente des normes d'emploi avait un caractère définitif pour l'application de la Loi et était donc susceptible, dans le cours normal des choses, de faire naître la préclusion.

J'ai déjà souligné que, en l'espèce, contrairement à l'affaire *Harelkin*, précitée, l'appelante ne disposait d'aucun droit d'appel. Elle pouvait uniquement demander au directeur de faire réviser par un arbitre la décision de l'agente des normes d'emploi. Bien qu'il puisse s'agir d'un facteur à prendre en considération dans l'exercice du pouvoir discrétionnaire de refuser l'application de la préclusion découlant d'une question déjà tranchée, il n'a aucun effet sur le caractère définitif de la décision.

decision must nevertheless be treated as final for present purposes.

(c) *That the Parties to the Judicial Decision or Their Privies Were the Same Persons as the Parties to the Proceedings in Which the Estoppel Is Raised or Their Privies*

This requirement assures mutuality. If the limitation did not exist, a stranger to the earlier proceeding could insist that a party thereto be bound in subsequent litigation by the findings in the earlier litigation even though the stranger, who became a party only to the subsequent litigation, would not be: *Machin, supra*; *Minott v. O'Shanter Development Co.* (1999), 42 O.R. (3d) 321 (C.A.), *per* Laskin J.A., at pp. 339-40. The mutuality requirement was subject to some critical comment by McEachern C.J.B.C. when sitting as a trial judge in *Saskatoon Credit Union Ltd. v. Central Park Ent. Ltd.* (1988), 22 B.C.L.R. (2d) 89 (S.C.), at p. 96, and has been substantially modified in many jurisdictions in the United States: see Holmested and Watson, *supra*, at 21§24, and G. D. Watson, "Duplicative Litigation: Issue Estoppel, Abuse of Process and the Death of Mutuality" (1990), 69 *Can. Bar Rev.* 623.

The concept of "privity" of course is somewhat elastic. The learned editors of J. Sopinka, S. N. Lederman and A. W. Bryant in *The Law of Evidence in Canada* (2nd ed. 1999), at p. 1088 say, somewhat pessimistically, that "[i]t is impossible to be categorical about the degree of interest which will create privity" and that determinations must be made on a case-by-case basis. In this case, the parties are identical and the outer limits of "mutuality" and of the "same parties" requirement need not be further addressed.

L'appelante pourrait à juste titre prétendre, dans le cadre d'une demande de contrôle judiciaire, que contrairement à M. Harelkin elle ne disposait pas, de plein droit, d'un autre « recours approprié ». Néanmoins, la décision de l'agente des normes d'emploi doit être tenue pour définitive pour les fins du présent pourvoi.

c) *La condition requérant que les parties à la décision judiciaire invoquée, ou leurs ayants droit, soient les mêmes que les parties aux procédures au cours desquelles la préclusion est plaidée, ou leurs ayants droit*

Cette condition garantit la réciprocité. Si elle ne s'appliquait pas, un tiers aux procédures antérieures pourrait exiger qu'une partie à celles-ci soit considérée comme liée, dans le cadre d'une instance ultérieure, par les conclusions tirées au cours des premières procédures, alors que ce tiers, qui ne serait partie qu'à la seconde instance, ne serait pas lié par ces conclusions : *Machin,* précité; *Minott c. O'Shanter Development Co.* (1999), 42 O.R. (3d) 321 (C.A.), le juge Laskin, p. 339-340. Cette condition de réciprocité a fait l'objet de certaines critiques par le juge McEachern (plus tard Juge en chef de la Colombie-Britannique), pendant qu'il siégeait en première instance, dans l'affaire *Saskatoon Credit Union Ltd. c. Central Park Ent. Ltd.* (1988), 22 B.C.L.R. (2d) 89 (C.S.), p. 96, et elle a été modifiée de façon substantielle dans bon nombre d'États américains : voir Holmested et Watson, *op. cit.*, 21§24, et G. D. Watson, « Duplicative Litigation : Issue Estoppel, Abuse of Process and the Death of Mutuality » (1990), 69 *R. du B. can.* 623.

Évidemment, la notion de « lien de droit » est assez élastique. J. Sopinka, S. N. Lederman et A. W. Bryant, les éminents éditeurs de l'ouvrage *The Law of Evidence in Canada* (2e éd. 1999), affirment avec un certain pessimisme, à la p. 1088, qu'[TRADUCTION] « [i]l est impossible d'être catégorique quant à l'étendue de l'intérêt qui crée un lien de droit » et qu'il faut trancher au cas par cas. En l'espèce, les parties sont les mêmes et il n'y a pas lieu d'explorer davantage les confins des notions de « réciprocité » et d'« identité des parties ».

59

60

61     I conclude that the preconditions to issue estoppel are met in this case.

#### 4. The Exercise of the Discretion

62     The appellant submitted that the Court should nevertheless refuse to apply estoppel as a matter of discretion. There is no doubt that such a discretion exists. In *General Motors of Canada Ltd. v. Naken*, [1983] 1 S.C.R. 72, Estey J. noted, at p. 101, that in the context of court proceedings "such a discretion must be very limited in application". In my view the discretion is necessarily broader in relation to the prior decisions of administrative tribunals because of the enormous range and diversity of the structures, mandates and procedures of administrative decision makers.

63     In *Bugbusters*, *supra*, Finch J.A. (now C.J.B.C.) observed, at para. 32:

> It must always be remembered that although the three requirements for issue estoppel must be satisfied before it can apply, the fact that they may be satisfied does not automatically give rise to its application. Issue estoppel is an equitable doctrine, and as can be seen from the cases, is closely related to abuse of process. The doctrine of issue estoppel is designed as an implement of justice, and a protection against injustice. It inevitably calls upon the exercise of a judicial discretion to achieve fairness according to the circumstances of each case.

Apart from noting parenthetically that estoppel *per rem judicatem* is generally considered a common law doctrine (unlike promissory estoppel which is clearly equitable in origin), I think this is a correct statement of the law. Finch J.A.'s *dictum* was adopted and applied by the Ontario Court of Appeal in *Schweneke*, *supra*, at paras. 38 and 43:

#### 4. L'exercice du pouvoir discrétionnaire

     L'appelante fait valoir que la Cour doit néanmoins exercer son pouvoir discrétionnaire et refuser l'application de la préclusion. Il ne fait aucun doute que ce pouvoir discrétionnaire existe. Dans l'arrêt *General Motors of Canada Ltd. c. Naken*, [1983] 1 R.C.S. 72, le juge Estey a souligné, à la p. 101, que dans le contexte d'une instance judiciaire « ce pouvoir discrétionnaire est très limité dans son application ». À mon avis, le pouvoir discrétionnaire est nécessairement plus étendu à l'égard des décisions des tribunaux administratifs, étant donné la diversité considérable des structures, missions et procédures des décideurs administratifs.

     Dans l'arrêt *Bugbusters*, précité, le juge Finch de la Cour d'appel (maintenant Juge en chef de la Colombie-Britannique) a fait les observations suivantes, au par 32 :

> [TRADUCTION] Il faut toujours se rappeler que, bien que les trois conditions d'application de la préclusion découlant d'une question déjà tranchée doivent être réunies pour que celle-ci puisse être invoquée, le fait que ces conditions soient présentes n'emporte pas nécessairement l'application de la préclusion. Il s'agit d'une doctrine issue de l'*equity* et, comme l'indique la jurisprudence, elle présente des liens étroits avec l'abus de procédure. Elle se veut un moyen de rendre justice et de protéger contre l'injustice. Elle implique inévitablement l'exercice par la cour de son pouvoir discrétionnaire pour assurer le respect de l'équité selon les circonstances propres à chaque espèce.

Mis à part, entre parenthèses, le fait que la préclusion *per rem judicatem* soit généralement considérée comme une doctrine de common law (contrairement à la préclusion fondée sur une promesse, qui tire clairement son origine de l'*equity*), j'estime qu'il s'agit d'un énoncé fidèle du droit applicable. Cette remarque incidente du juge Finch a été retenue et appliquée par la Cour d'appel de l'Ontario dans l'affaire *Schweneke*, précitée, par. 38 et 43 :

The discretion to refuse to give effect to issue estoppel becomes relevant only where the three prerequisites to the operation of the doctrine exist. . . . The exercise of the discretion is necessarily case specific and depends on the entirety of the circumstances. In exercising the discretion the court must ask — is there something in the circumstances of this case such that the usual operation of the doctrine of issue estoppel would work an injustice?

.   .   .

. . . The discretion must respond to the realities of each case and not to abstract concerns that arise in virtually every case where the finding relied on to support the doctrine was made by a tribunal and not a court.

See also *Braithwaite*, *supra*, at para. 56.

Courts elsewhere in the Commonwealth apply similar principles. In *Arnold v. National Westminster Bank plc*, [1991] 3 All E.R. 41, the House of Lords exercised its discretion against the application of issue estoppel arising out of an earlier arbitration, *per* Lord Keith of Kinkel, at p. 50:

One of the purposes of estoppel being to work justice between the parties, it is open to courts to recognise that in special circumstances inflexible application of it may have the opposite result . . . .

In the present case Rosenberg J.A. noted in passing at pp. 248-49 the possible existence of a potential discretion but, with respect, he gave it short shrift. There was no discussion or analysis of the merits of its exercise. He simply concluded, at p. 256:

In summary, Ms. Burke did not accord this appellant natural justice. The appellant's recourse was to seek review of Ms. Burke's decision. She failed to do so. That decision is binding upon her and her employer.

In my view it was an error of principle not to address the factors for and against the exercise of

[TRADUCTION] Le pouvoir discrétionnaire de refuser de donner effet à la préclusion découlant d'une question déjà tranchée ne naît que lorsque les trois conditions d'application de la doctrine sont réunies. [. . .] Ce pouvoir discrétionnaire est nécessairement exercé au cas par cas et son application dépend de l'ensemble des circonstances. Dans l'exercice de ce pouvoir discrétionnaire, la cour doit se poser la question suivante : existe-t-il, en l'espèce, une circonstance qui ferait en sorte que l'application normale de la doctrine créerait une injustice?

.   .   .

. . . L'exercice du pouvoir discrétionnaire doit tenir compte des réalités propres à chaque affaire et non de préoccupations abstraites, qui sont présentes dans pratiquement tous les cas où la décision invoquée au soutien de la demande d'application a été rendue par un tribunal administratif et non par un tribunal judiciaire.

Voir également *Braithwaite*, précité, par. 56.

64   Les cours de justice d'autres pays du Commonwealth appliquent des principes analogues. Dans l'arrêt *Arnold c. National Westminster Bank plc*, [1991] 3 All E.R. 41, la Chambre des lords a exercé son pouvoir discrétionnaire et refusé d'appliquer la préclusion découlant d'une question déjà tranchée à l'égard d'une sentence arbitrale. Voici ce qu'a dit lord Keith of Kinkel, à la p. 50 :

[TRADUCTION] L'une des raisons d'être de la préclusion étant de rendre justice aux parties, il est loisible aux cours de justice de reconnaître que, dans certaines circonstances, son application rigide produirait l'effet contraire. . .

65   Dans la présente affaire, le juge Rosenberg a mentionné, aux p. 248-249, l'existence possible d'un pouvoir discrétionnaire potentiel mais, en toute déférence, il ne s'y est pas attardé. Il n'a ni examiné ni analysé le bien-fondé de l'exercice de ce pouvoir. Il a simplement conclu ainsi, à la p. 256 :

[TRADUCTION] En résumé, M^me Burke n'a pas accordé à l'appelante le bénéfice des règles de justice naturelle. Le recours qui s'offrait à cette dernière était de demander la révision de la décision de l'agente. Elle ne l'a pas fait. Elle et son employeur sont liés par cette décision.

66   Je suis d'avis que la Cour d'appel a commis une erreur de principe en omettant de soupeser les fac-

the discretion which the court clearly possessed. This is not a situation where this Court is being asked by an appellant to substitute its opinion for that of the motions judge or the Court of Appeal. The appellant is entitled at some stage to appropriate consideration of the discretionary factors and to date this has not happened.

67    The list of factors is open. They include many of the same factors listed in *Maybrun* in connection with the rule against collateral attack. A similarly helpful list was proposed by Laskin J.A. in *Minott*, *supra*. The objective is to ensure that the operation of issue estoppel promotes the orderly administration of justice but not at the cost of real injustice in the particular case. Seven factors, discussed below, are relevant in this case.

(a) *The Wording of the Statute from which the Power to Issue the Administrative Order Derives*

68    In this case the ESA includes s. 6(1) which provides that:

No civil remedy of an employee against his or her employer is suspended <u>or affected</u> by this Act. [Emphasis added.]

69    This provision suggests that at the time the Ontario legislature did not intend ESA proceedings to become an exclusive forum. (Recent amendments to the Act now require an employee to elect either the ESA procedure or the court. Even prior to the new amendments, however, a court could properly conclude that relitigation of an issue would be an abuse: *Rasanen*, *supra*, *per* Morden A.C.J.O., at p. 293, Carthy J.A., at p. 288.)

teurs favorables et défavorables à l'exercice du pouvoir discrétionnaire dont elle était clairement investie. Il ne s'agit pas d'un cas où notre Cour est invitée par la partie appelante à substituer son opinion à celle du juge des requêtes ou de la Cour d'appel. L'appelante a droit à ce que, à un certain point dans le processus, on examine de façon appropriée les facteurs pertinents à l'exercice du pouvoir discrétionnaire, et jusqu'à maintenant on ne l'a pas fait.

La liste de ces facteurs n'est pas exhaustive. Elle comporte bon nombre de ceux qui ont été mentionnés dans l'arrêt *Maybrun* en rapport avec la règle prohibant les contestations indirectes. Le juge Laskin a lui aussi proposé une liste fort utile dans l'affaire *Minott*, précitée. L'objectif est de faire en sorte que l'application de la préclusion découlant d'une question déjà tranchée favorise l'administration ordonnée de la justice, mais pas au prix d'une injustice concrète dans une affaire donnée. Sept facteurs, mentionnés ci-après, sont pertinents dans la présente affaire.

a) *Le libellé du texte de loi accordant le pouvoir de rendre l'ordonnance administrative*

En l'espèce, la LNE comporte le par. 6(1), qui prévoit ce qui suit :

La présente loi ne suspend pas les recours civils dont dispose un employé contre son employeur <u>ni n'y porte atteinte</u>. [Je souligne.]

Cette disposition tend à indiquer que, à l'époque pertinente, le législateur ontarien n'entendait pas que le forum prévu par la LNE ait pour effet d'exclure tous les autres. (De récentes modifications apportées à la Loi obligent désormais l'employé à choisir entre la procédure prévue par la LNE ou le recours aux tribunaux judiciaires. Cependant, même avant ces modifications, les cours de justice pouvaient à bon droit conclure que l'engagement de nouvelles procédures à l'égard d'une question constituait un abus : *Rasanen*, précité, le juge en chef adjoint Morden de la Cour d'appel de l'Ontario, p. 293, le juge Carthy, p. 288.)

While it is generally reasonable for defendants to expect to be able to move on with their lives once one set of proceedings — including any available appeals — has ended in a rejection of liability, here, the appellant commenced his civil action against the respondents before the ESA officer reached a decision (as was clearly authorized by the statute at that time). Thus, the respondents were well aware, in law and in fact, that they were expected to respond to parallel and to some extent overlapping proceedings.

### (b) *The Purpose of the Legislation*

The focus of an earlier administrative proceeding might be entirely different from that of the subsequent litigation, even though one or more of the same issues might be implicated. In *Bugbusters*, *supra*, a forestry company was compulsorily recruited to help fight a forest fire in British Columbia. It subsequently sought reimbursement for its expenses under the B.C. *Forest Act*, R.S.B.C. 1979, c. 140. The expense claim was allowed *despite* an allegation that the fire had been started by a Bugbusters employee who carelessly discarded his cigarette. (This, if proved, would have disentitled Bugbusters to reimbursement.) The Crown later started a $5 million negligence claim against Bugbusters, for losses occasioned by the forest fire. Bugbusters invoked issue estoppel. The court, in the exercise of its discretion, denied relief. One reason, *per* Finch J.A., at para. 30, was that

a final decision on the Crown's right to recover its losses was not within the reasonable expectation of either party at the time of those [reimbursement] proceedings [under the *Forest Act*].

A similar point was made in *Rasanen*, *supra*, by Carthy J.A., at p. 290:

It would be unfair to an employee who sought out immediate and limited relief of $4,000, forsaking dis-

Bien qu'il soit généralement raisonnable pour un défendeur d'escompter pouvoir tourner la page après des procédures — y compris tout appel possible — au terme desquelles sa responsabilité n'a pas été retenue, en l'espèce l'appelante a intenté son action civile contre les intimés avant que l'agente des normes d'emploi n'ait rendu sa décision (comme l'y autorisait clairement la loi pertinente à l'époque). En conséquence, les intimés savaient parfaitement, en droit et en fait, qu'ils devaient se défendre dans des procédures parallèles se chevauchant dans une certaine mesure.

### b) *L'objet de la loi*

Il est fort possible que le nœud d'une instance administrative soit totalement différent de celui d'un litige subséquent, même si une ou plusieurs des questions litigieuses sont les mêmes. Dans l'affaire *Bugbusters*, précitée, une entreprise forestière a été conscrite afin d'aller combattre un incendie de forêt en Colombie-Britannique. Elle a par la suite demandé le remboursement de ses dépenses en vertu de la *Forest Act*, R.S.B.C. 1979, ch. 140, de cette province. On a fait droit à sa demande *malgré* des allégations selon lesquelles l'incendie avait été causé par un de ses employés qui aurait négligemment jeté une cigarette. (Si l'allégation avait été prouvée, Bugbusters n'aurait pas eu droit au remboursement.) Sa Majesté a par la suite intenté une action en négligence de 5 000 000 $ contre Bugbusters pour être indemnisée des pertes occasionnées par le feu de forêt. Cette dernière a plaidé la préclusion découlant d'une question déjà tranchée. Exerçant son pouvoir discrétionnaire, la Cour d'appel a refusé d'appliquer la doctrine, notamment pour le motif suivant, exposé par le juge Finch, au par. 30 :

[TRADUCTION] . . . pendant l'instance [en remboursement fondée sur la *Forest Act*], aucune des parties ne pouvait raisonnablement s'attendre à ce qu'il soit statué définitivement sur le droit de Sa Majesté d'être indemnisée de ses pertes.

Une remarque au même effet a été formulée par le juge Carthy dans l'affaire *Rasanen*, précitée, p. 290 :

[TRADUCTION] Il serait injuste vis-à-vis d'un employé qui a demandé sans délai une indemnité limitée de

70

71

covery and representation in doing so, to then say that he is bound to the result as it affects a claim for ten times that amount.

A similar qualification is made in the American *Restatement of the Law, Second: Judgments 2d* (1982), vol. 2 § 83(2)(e), which refers to

procedural elements as may be necessary to constitute the proceeding a sufficient means of conclusively determining the matter in question, having regard for the magnitude and complexity of the matter in question, the urgency with which the matter must be resolved, and the opportunity of the parties to obtain evidence and formulate legal contentions.

72    I am mindful, of course, that here the appellant chose the ESA forum. Counsel for the respondent justly observed, with some exasperation:

As the record makes clear, Danyluk was represented by legal counsel prior to, at the time of, and subsequent to the cessation of her employment. Danyluk and her counsel were well aware of the fact that Danyluk had an initial choice of forums with respect to her claim for unpaid commissions and wages. . . .

73    Nevertheless, the purpose of the ESA is to provide a relatively quick and cheap means of resolving employment disputes. Putting excessive weight on the ESA decision in terms of issue estoppel would likely compel the parties in such cases to mount a full-scale trial-type offence and defence, thus tending to defeat the expeditious operation of the ESA scheme as a whole. This would undermine fulfilment of the purpose of the legislation.

(c) *The Availability of an Appeal*

74    This factor corresponds to the "adequate alternative remedy" issue in judicial review: *Harelkin*, *supra*, at p. 592. Here the employee had no *right* of appeal, but the existence of a potential administrative review and her failure to take advantage of it

4 000 $, renonçant de ce fait à la communication de la preuve et au droit d'être représenté par avocat, de lui opposer ensuite qu'il est lié par le résultat de ce recours et par son effet sur la réclamation d'une somme dix fois plus élevée.

Une réserve semblable est formulée dans l'ouvrage américain *Restatement of the Law, Second : Judgments 2d* (1982), vol. 2, § 83(2)(e), où l'on fait état

[TRADUCTION] . . . des éléments procéduraux requis pour que l'instance permette de régler décisivement le différend, compte tenu de l'ampleur et de la complexité de celui-ci, de l'urgence avec laquelle il faut le trancher et de la possibilité pour les parties de recueillir de la preuve et de formuler des arguments juridiques.

Je suis bien sûr conscient du fait que, en l'espèce, l'appelante a choisi la procédure prévue par la LNE. L'avocat de l'intimée a fait remarquer à juste titre, non sans une certaine exaspération :

[TRADUCTION] Comme l'indique clairement le dossier, M^me Danyluk était représentée par avocat avant la cessation d'emploi, au moment de celle-ci et par la suite. Son avocat et elle savaient fort bien qu'elle avait au départ le choix du forum devant lequel présenter sa réclamation pour salaire et commissions impayés. . .

Néanmoins, l'objet de la LNE est d'offrir un moyen relativement rapide et peu coûteux de régler les différends entre employés et employeurs. Accorder un poids excessif aux décisions prises en vertu de la LNE, dans le contexte de l'application de la préclusion découlant d'une question déjà tranchée, obligerait vraisemblablement les parties, en pareils cas, à préparer une demande et une défense équivalentes à celles préparées dans le cadre d'un véritable procès et tendrait ainsi à enlever à l'ensemble du régime établi par la LNE son caractère expéditif. Cette situation compromettrait l'objectif visé par la loi.

c) *L'existence d'un droit d'appel*

Ce facteur correspond à celui de l'autre « recours approprié » applicable en matière de contrôle judiciaire : *Harelkin*, précité, p. 592. Dans la présente affaire, l'employée ne disposait d'aucun *droit* d'appel, mais la possibilité d'une révision

must be counted against her: *Susan Shoe Industries Ltd. v. Ricciardi* (1994), 18 O.R. (3d) 660 (C.A.), at p. 662.

#### (d) *The Safeguards Available to the Parties in the Administrative Procedure*

As already mentioned, quick and expeditious procedures suitable to accomplish the objectives of the ESA scheme may simply be inadequate to deal with complex issues of fact or law. Administrative bodies, being masters of their own procedures, may exclude evidence the court thinks probative, or act on evidence the court considers less than reliable. If it has done so, this may be a factor in the exercise of the court's discretion. Here the breach of natural justice is a key factor in the appellant's favour.

Morden A.C.J.O. pointed out in his concurring judgment in *Rasanen*, *supra*, at p. 295: "I do not exclude the possibility that deficiencies in the procedure relating to the first decision could properly be a factor in deciding whether or not to apply issue estoppel." Laskin J.A. made a similar point in *Minott*, *supra*, at pp. 341-42.

#### (e) *The Expertise of the Administrative Decision Maker*

In this case the ESA officer was a non-legally trained individual asked to decide a potentially complex issue of contract law. The rough-and-ready approach suitable to getting things done in the vast majority of ESA claims is not the expertise required here. A similar factor operates with respect to the rule against collateral attack (*Maybrun*, *supra*, at para. 50):

administrative et l'omission de s'en prévaloir doivent être retenues contre elle : *Susan Shoe Industries Ltd. c. Ricciardi* (1994), 18 O.R. (3d) 660, (C.A.), p. 662.

#### d) *Les garanties offertes aux parties dans le cadre de l'instance administrative*

Comme il a été mentionné précédemment, la procédure expéditive propre à permettre la réalisation des objectifs de la LNE peut tout simplement ne pas convenir pour l'examen de complexes questions de fait ou de droit. Étant maîtres de leur procédure, les organismes administratifs peuvent écarter des éléments de preuve que les cours de justice estiment probants ou encore agir sur le fondement d'éléments que ces dernières ne jugent pas fiables. Si cela s'est produit, il peut s'agir d'un facteur à prendre en compte dans l'exercice du pouvoir discrétionnaire de la cour. En l'espèce, le manquement aux règles de justice naturelle est un facteur clé en faveur de l'appelante.

Dans l'affaire *Rasanen*, précitée, p. 295, le juge en chef adjoint Morden a souligné le point suivant, dans ses motifs de jugement concourants : [TRADUCTION] « Je n'exclus pas la possibilité que des lacunes dans la procédure ayant conduit à la première décision puissent à juste titre constituer un facteur dans la décision d'appliquer ou non la préclusion découlant d'une question déjà tranchée. » Le juge Laskin de la Cour d'appel de l'Ontario a tenu des propos analogues dans l'affaire *Minott*, précitée, p. 341-342.

#### e) *L'expertise du décideur administratif*

Dans la présente affaire, l'agente des normes d'emploi, qui n'avait aucune formation juridique, était appelée à trancher une question potentiellement complexe en matière de droit des contrats. L'approche expéditive qui convient pour la grande majorité des demandes fondées sur la LNE n'est pas le genre d'expertise requise en l'espèce. Un facteur similaire s'applique à l'égard de la règle prohibant les contestations indirectes (*Maybrun*, précité, par. 50) :

75

76

77

. . . where an attack on an order is based on considerations which are foreign to an administrative appeal tribunal's expertise or *raison d'être*, this suggests, although it is not conclusive in itself, that the legislature did not intend to reserve the exclusive authority to rule on the validity of the order to that tribunal.

(f) *The Circumstances Giving Rise to the Prior Administrative Proceedings*

78     In the appellant's favour, it may be said that she invoked the ESA procedure at a time of personal vulnerability with her dismissal looming. It is unlikely the legislature intended a summary procedure for smallish claims to become a barrier to closer consideration of more substantial claims. (The legislature's subsequent reduction of the monetary limit of an ESA claim to $10,000 is consistent with this view.) As Laskin J.A. pointed out in *Minott*, *supra*, at pp. 341-42:

. . . employees apply for benefits when they are most vulnerable, immediately after losing their job. The urgency with which they must invariably seek relief compromises their ability to adequately put forward their case for benefits or to respond to the case against them . . . .

79     On the other hand, in this particular case it must be said that the appellant with or without legal advice, included in her ESA claim the $300,000 commissions, and she must shoulder at least part of the responsibility for her resulting difficulties.

(g) *The Potential Injustice*

80     As a final and most important factor, the Court should stand back and, taking into account the entirety of the circumstances, consider whether application of issue estoppel in the particular case would work an injustice. Rosenberg J.A. concluded that the appellant had received neither notice of the respondent's allegation nor an opportunity to respond. He was thus confronted with the

. . . le fait que la contestation de l'ordonnance repose sur des considérations étrangères à l'expertise ou à la raison d'être d'une instance administrative d'appel suggère, sans toutefois être déterminant en lui-même, que le législateur n'a pas voulu réserver à cette instance le pouvoir exclusif de se prononcer sur la validité de l'ordonnance.

f) *Les circonstances ayant donné naissance à l'instance administrative initiale*

Un argument qui peut être avancé en faveur de l'appelante est qu'elle s'est prévalue du recours fondé sur la LNE à un moment où l'imminence de son congédiement faisait d'elle une personne vulnérable. Il est peu probable que le législateur ait voulu qu'une procédure sommaire applicable à la réclamation de petites sommes fasse obstacle à l'examen approfondi de réclamations plus considérables. (La décision ultérieure du législateur de plafonner à 10 000 $ les réclamations pouvant être présentées en vertu de la LNE concorde avec cette interprétation.) Comme l'a fait observer le juge Laskin dans l'arrêt *Minott*, précité, p. 341-342 :

[TRADUCTION] . . . les employés présentent une demande au moment où ils sont le plus vulnérables, soit immédiatement après la perte de leur emploi. Le fait qu'ils doivent invariablement agir rapidement pour demander réparation compromet leur aptitude à présenter adéquatement leur point de vue ou à réfuter la thèse de la partie adverse. . .

Par contre, il convient de rappeler que dans la présente affaire l'appelante, agissant alors de son propre chef ou sur les conseils de son avocat, a inclus dans sa demande fondée sur la LNE les 300 000 $ réclamés à titre de commissions et elle doit assumer la responsabilité d'au moins une partie des difficultés résultant de cette décision.

g) *Le risque d'injustice*

Suivant ce dernier facteur, qui est aussi le plus important, notre Cour doit prendre un certain recul et, eu égard à l'ensemble des circonstances, se demander si, dans l'affaire dont elle est saisie, l'application de la préclusion découlant d'une question déjà tranchée entraînerait une injustice. Le juge Rosenberg de la Cour d'appel a conclu que l'appelante n'avait pas été informée des allégations

problem identified by Jackson J.A., dissenting, in *Iron v. Saskatchewan (Minister of the Environment & Public Safety)*, [1993] 6 W.W.R. 1 (Sask. C.A.), at p. 21:

The doctrine of res judicata, being a means of doing justice between the parties in the context of the adversarial system, carries within its tenets the seeds of injustice, particularly in relation to issues of allowing parties to be heard.

Whatever the appellant's various procedural mistakes in this case, the stubborn fact remains that her claim to commissions worth $300,000 has simply never been properly considered and adjudicated.

On considering the cumulative effect of the foregoing factors it is my view that the Court in its discretion should refuse to apply issue estoppel in this case.

V.  Disposition

I would therefore allow the appeal with costs throughout.

*Appeal allowed with costs.*

*Solicitors for the appellant: Lang Michener, Toronto.*

*Solicitors for the respondents: Heenan Blaikie, Toronto.*

de l'intimée et n'avait pas eu la possibilité d'y répondre. Le juge Rosenberg était donc aux prises avec le problème signalé par le juge Jackson, dans ses motifs dissidents dans l'arrêt *Iron c. Saskatchewan (Minister of the Environment & Public Safety)*, [1993] 6 W.W.R. 1 (C.A. Sask.), p. 21 :

[TRADUCTION] Constituant un moyen de rendre justice aux parties dans le contexte d'une procédure contradictoire, la doctrine de l'autorité de la chose jugée porte en elle-même le germe de l'injustice, spécialement lorsque le droit des parties de se faire entendre est en jeu.

Indépendamment des diverses erreurs de nature procédurale commises par l'appelante en l'espèce, il n'en demeure pas moins que sa réclamation visant des commissions totalisant 300 000 $ n'a tout simplement jamais été examinée et tranchée adéquatement.

81  Vu l'effet cumulatif des facteurs susmentionnés, je suis d'avis que notre Cour doit exercer son pouvoir discrétionnaire et refuser d'appliquer en l'espèce la préclusion découlant d'une question déjà tranchée.

V.  Le dispositif

82  Je suis d'avis d'accueillir le pourvoi avec dépens devant toutes les cours.

*Pourvoi accueilli avec dépens.*

*Procureurs de l'appelante : Lang Michener, Toronto.*

*Procureurs des intimés : Heenan Blaikie, Toronto.*