# EXHIBIT O

2011 SCC 52 (CanLII)

**Workers' Compensation Board of British Columbia** *Appellant*

*v.*

**Guiseppe Figliola, Kimberley Sallis, Barry Dearden and British Columbia Human Rights Tribunal** *Respondents*

and

**Attorney General of British Columbia, Coalition of BC Businesses, Canadian Human Rights Commission, Alberta Human Rights Commission and Vancouver Area Human Rights Coalition Society** *Interveners*

Indexed as: British Columbia (Workers' Compensation Board) *v.* Figliola

**2011 SCC 52**

File No.: 33648.

2011: March 16; 2011: October 27.

Present: McLachlin C.J. and Binnie, LeBel, Deschamps, Fish, Abella, Charron, Rothstein and Cromwell JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR BRITISH COLUMBIA

*Administrative law — Judicial review — Standard of review — Patent unreasonableness — Injured workers receiving compensation pursuant to British Columbia's Workers' Compensation Board chronic pain policy — Workers filing appeal with Board's Review Division claiming policy breached s. 8 of British Columbia Human Rights Code — Board rejecting that policy breached Human Rights Code — Workers subsequently filing complaints with Human Rights Tribunal repeating same arguments — Human Rights Tribunal deciding that this was appropriate question for Tribunal to determine — What is the scope of Tribunal's discretion to determine whether the substance of a complaint has been "appropriately dealt with" when two bodies share jurisdiction over human rights — Whether exercise of discretion by Tribunal was patently unreasonable — Human Rights*

**Workers' Compensation Board de la Colombie-Britannique** *Appelante*

*c.*

**Guiseppe Figliola, Kimberley Sallis, Barry Dearden et British Columbia Human Rights Tribunal** *Intimés*

et

**Procureur général de la Colombie-Britannique, Coalition of BC Businesses, Commission canadienne des droits de la personne, Alberta Human Rights Commission et Vancouver Area Human Rights Coalition Society** *Intervenants*

Répertorié : Colombie-Britannique (Workers' Compensation Board) *c.* Figliola

**2011 CSC 52**

Nᵒ du greffe : 33648.

2011 : 16 mars; 2011 : 27 octobre.

Présents : La juge en chef McLachlin et les juges Binnie, LeBel, Deschamps, Fish, Abella, Charron, Rothstein et Cromwell.

EN APPEL DE LA COUR D'APPEL DE LA COLOMBIE-BRITANNIQUE

*Droit administratif — Contrôle judiciaire — Norme de contrôle — Décision manifestement déraisonnable — Indemnisation des accidents du travail en application de la politique de la Workers' Compensation Board de la Colombie-Britannique relative aux douleurs chroniques — Appel interjeté devant la Section de révision de la Commission au motif que la politique contrevient à l'art. 8 du Human Rights Code de la Colombie-Britannique — La Commission ne conclut pas à une contravention au Code — Travailleurs reprenant les mêmes arguments dans des plaintes subséquentes auprès du tribunal des droits de la personne — Le tribunal estime qu'il s'agit d'une question qu'il peut à bon droit considérer — Quelle est la portée du pouvoir discrétionnaire du tribunal de juger s'il a « été statué de façon appropriée sur le fond de la plainte » dans les cas où deux organismes*

*Code, R.S.B.C. 1996, c. 210, ss. 8, 27(1) — Administrative Tribunals Act, S.B.C. 2004, c. 45, s. 59.*

The complainant workers suffered from chronic pain and sought compensation from British Columbia's Workers' Compensation Board. Pursuant to the Board's chronic pain policy, they received a fixed compensation award. They appealed to the Board's Review Division, arguing that a policy which set a fixed award for chronic pain was patently unreasonable, unconstitutional and discriminatory on the grounds of disability under s. 8 of the British Columbia *Human Rights Code* ("*Code*"). The Review Officer accepted that he had jurisdiction over the *Human Rights Code* complaint and concluded that the Board's chronic pain policy was not contrary to s. 8 of the *Code* and therefore not discriminatory.

The complainants appealed this decision to the Workers' Compensation Appeal Tribunal ("WCAT"). Before the appeal was heard, the legislation was amended removing WCAT's authority to apply the *Code*. Based on the amendments, the complainants' appeal of the Review Officer's human rights conclusions could not be heard by WCAT, but judicial review remained available. Instead of applying for judicial review, the complainants filed new complaints with the Human Rights Tribunal, repeating the same s. 8 arguments about the Board's chronic pain policy that they had made before the Review Division.

The Workers' Compensation Board brought a motion asking the Tribunal to dismiss the new complaints, arguing that under s. 27(1)(a) of the *Code*, the Tribunal had no jurisdiction, and that under s. 27(1)(f) of the *Code*, the complaints had already been "appropriately dealt with" by the Review Division. The Tribunal rejected both arguments and found that the issue raised was an appropriate question for the Tribunal to consider and that the parties to the complaints should receive the benefit of a full Tribunal hearing. On judicial review, the Tribunal's decision was set aside. The Court of Appeal, however, concluded that the Tribunal's decision was not patently unreasonable and restored its decision.

*ont compétence en matière de droits de la personne? — L'exercice par le tribunal de son pouvoir discrétionnaire était-il manifestement déraisonnable? — Human Rights Code, R.S.B.C. 1996, ch. 210, art. 8, 27(1) — Administrative Tribunals Act, S.B.C. 2004, ch. 45, art. 59.*

Les plaignants, des travailleurs, souffraient de douleurs chroniques et ont soumis une demande d'indemnisation à la Workers' Compensation Board de la Colombie-Britannique (la « Commission »). En application de la politique de la Commission relative aux douleurs chroniques, les plaignants ont touché une indemnité d'un montant fixe. Ils ont interjeté appel devant la Section de révision de la Commission, soutenant que la politique de l'indemnité fixe pour les douleurs chroniques était manifestement déraisonnable, qu'elle était inconstitutionnelle et qu'elle constituait de la discrimination fondée sur la déficience interdite à l'art. 8 du *Human Rights Code* de la Colombie-Britannique (« *Code* »). L'agent de révision, s'estimant compétent pour entendre la plainte fondée sur le *Code*, a conclu que la politique de la Commission relative à la douleur chronique n'enfreignait pas l'art. 8 du *Code* et n'était donc pas discriminatoire.

Les plaignants ont porté cette décision en appel devant le Workers' Compensation Appeal Tribunal (« WCAT »). Avant l'instruction de l'appel, une modification législative a retiré au WCAT sa compétence en matière d'application du *Code*. Du fait de cette modification, le WCAT ne pouvait plus entendre l'appel des plaignants à l'encontre des conclusions de l'agent de révision relatives aux droits de la personne, mais il était toujours loisible aux plaignants de demander un contrôle judiciaire. Ces derniers ont plutôt déposé devant le tribunal des droits de la personne (« Tribunal ») de nouvelles plaintes, reprenant au sujet de la politique de la Commission en matière de douleur chronique les mêmes arguments fondés sur l'art. 8 du *Code* que ceux qu'ils avaient soumis à la Section de révision.

La Commission a présenté au Tribunal une requête pour rejet des nouvelles plaintes, soutenant, d'une part, que le Tribunal n'avait pas compétence aux termes de l'al. 27(1)a) du *Code* et, d'autre part, que la Section de révision avait déjà « statué de façon appropriée » sur le fond de la plainte suivant l'al. 27(1)f) du *Code*. Le Tribunal a rejeté les deux arguments, estimant que la question soulevée était une question que le Tribunal pouvait à bon droit considérer et qu'il convenait que les parties puissent bénéficier d'une audience en bonne et due forme par le Tribunal. À l'issue d'un contrôle judiciaire, la décision du Tribunal a été annulée, mais la Cour d'appel l'a rétablie, concluant que cette décision du Tribunal n'était pas manifestement déraisonnable.

*Held*: The appeal should be allowed, the Tribunal's decision set aside and the complaints dismissed.

*Per* LeBel, Deschamps, Abella, Charron and Rothstein JJ.: Section 27(1)(f) of the *Code* is the statutory reflection of the collective principles underlying the doctrines of issue estoppel, collateral attack and abuse of process — doctrines used by the common law as vehicles to transport and deliver to the litigation process principles of finality, the avoidance of multiplicity of proceedings, and protection for the integrity of the administration of justice, all in the name of fairness.

Read as a whole, s. 27(1)(f) does not codify these actual doctrines or their technical explications, it embraces their underlying principles. As a result, the Tribunal should be guided less by precise doctrinal catechisms and more by the goals of the fairness of finality in decision-making and the avoidance of the relitigation of issues already decided by a decision-maker with the authority to resolve them. Relying on these principles will lead the Tribunal to ask itself whether there was concurrent jurisdiction to decide the issues; whether the previously decided legal issue was essentially the same as what is being complained of to the Tribunal; and whether there was an opportunity for the complainants or their privies to know the case to be met and have the chance to meet it, regardless of how closely the previous process procedurally mirrored the one the Tribunal prefers or uses itself. All of these questions go to determining whether the substance of a complaint has been "appropriately dealt with" under s. 27(1)(f). The Tribunal's strict adherence to the application of issue estoppel was an overly formalistic interpretation of s. 27(1)(f), particularly of the phrase "appropriately dealt with", and had the effect of obstructing rather than implementing the goal of avoiding unnecessary relitigation.

Section 27(1)(f) does not represent a statutory invitation either to judicially review another tribunal's decision, or to reconsider a legitimately decided issue in order to explore whether it might yield a different outcome. The section is oriented instead towards creating territorial respect among neighbouring tribunals, including respect for their right to have their own vertical lines of review protected from lateral adjudicative poaching. When an adjudicative body decides an issue within its jurisdiction, and the parties who participated in the process are entitled to assume that, subject to appellate or judicial review, its decision will not only be final, it will be treated as such by other adjudicative bodies.

*Arrêt* : Le pourvoi est accueilli, la décision du Tribunal est annulée et les plaintes sont rejetées.

*Les* juges LeBel, Deschamps, Abella, Charron et Rothstein : L'alinéa 27(1)f) codifie l'ensemble des principes sous-jacents des règles en matière de préclusion découlant d'une question déjà tranchée, de contestation indirecte et d'abus de procédure — auxquelles la common law a eu recours comme véhicule pour porter, en contexte de procédures judiciaires, les principes de caractère définitif des instances, de prévention de leur multiplication et de protection de l'intégrité de l'administration de la justice, dans chaque cas, par souci d'équité.

Considéré dans son ensemble, l'al. 27(1)f) ne codifie pas les doctrines elles-mêmes ou leurs explications techniques, il englobe les principes sous-jacents. Il s'ensuit que ce ne sont pas tant des dogmes doctrinaux précis qui devraient guider le Tribunal que les objets de la disposition, qui sont d'assurer l'équité du caractère définitif du processus décisionnel et d'éviter la remise en cause de questions déjà tranchées par un décideur ayant compétence pour en connaître. En s'appuyant sur ces principes, le Tribunal est appelé à se demander s'il existe une compétence concurrente pour statuer sur ces questions, si la question juridique tranchée par la décision antérieure était essentiellement la même que celle qui est soulevée dans la plainte dont il est saisi et si le processus antérieur, qu'il ressemble ou non à la procédure que le Tribunal préfère ou utilise lui-même, a offert la possibilité aux plaignants ou à leurs ayants droit de connaître les éléments invoqués contre eux et de les réfuter. Toutes ces questions visent à déterminer s'il « a été statué de façon appropriée » sur le fond de la plainte, le critère établi à l'al. 27(1)f). En s'en tenant à l'application stricte de la préclusion découlant d'une question déjà tranchée, le Tribunal a donné une interprétation trop formaliste à l'al. 27(1)f) et, plus particulièrement, aux mots « a été statué de façon appropriée ». Plutôt que de donner effet à l'objectif de prévention des remises en cause inutiles, une telle interprétation y fait obstacle.

L'alinéa 27(1)f) ne constitue pas une invitation au contrôle judiciaire de la décision d'un autre tribunal ou au réexamen d'une question dûment tranchée pour voir si un résultat différent pourrait en émerger. Cet alinéa vise plutôt à instaurer un respect juridictionnel entre tribunaux administratifs voisins, englobant le respect du droit à la protection de leur propre voie verticale de révision contre les empiétements indirects. L'organisme juridictionnel qui se prononce sur une question qui est de son ressort et les parties en cause doivent tenir pour acquis que, sous réserve d'un appel ou d'un contrôle judiciaire, non seulement la décision sera-t-elle définitive, mais elle sera considérée telle par les autres organismes juridictionnels.

2011 SCC 52 (CanLII)

The discretion in s. 27(1)(f) was intended to be limited. This is based not only on the language of s. 27(1)(f) and the legislative history, but also on the character of the other six categories of complaints in s. 27(1), all of which refer to circumstances that make hearing the complaint presumptively unwarranted, such as complaints that are not within the Tribunal's jurisdiction, allege acts or omissions that do not contravene the *Code*, have no reasonable prospect of success, would not be of any benefit to the complainant or further the purposes of the *Code*, or are made for improper motives or bad faith.

What the complainants in this case were trying to do is relitigate in a different forum. Rather than challenging the Review Officer's decision through the available review route of judicial review, they started fresh proceedings before a different tribunal in search of a more favourable result. This strategy represented a "collateral appeal" to the Tribunal, the very trajectory that s. 27(1)(f) and the common law doctrines were designed to prevent. The Tribunal's analysis made it complicit in this attempt to collaterally appeal the merits of the Board's decision and decision-making process. Its analysis represents a litany of factors having to do with whether it was comfortable with the process and merits of the Review Officer's decision: it questioned whether the Review Division's process met the necessary procedural requirements; it criticized the Review Officer for the way he interpreted his human rights mandate; it held that the decision of the Review Officer was not final; it concluded that the parties were not the same before the Workers' Compensation Board as they were before the Tribunal; and it suggested that Review Officers lacked expertise in interpreting or applying the *Code*.

The standard of review designated under s. 59 of the *Administrative Tribunals Act* is patent unreasonableness. Because the Tribunal based its decision to proceed with these complaints and have them relitigated on predominantly irrelevant factors and ignored its true mandate under s. 27(1)(f), its decision is patently unreasonable.

*Per* McLachlin C.J. and Binnie, Fish and Cromwell JJ.: Both the common law and in particular s. 27(1)(f) of the *Code* are intended to achieve the necessary balance between finality and fairness through the exercise of discretion. It is this balance which is at the heart of both

Le pouvoir discrétionnaire conféré par l'al. 27(1)f) se voulait restreint, non seulement en raison du texte de cette disposition et de l'historique législatif, mais également de la nature des six autres catégories de plaintes mentionnées au par. 27(1), faisant chacune référence à des circonstances qui laissent présumer qu'il ne serait pas justifié d'entendre la plainte : les plaintes qui ne relèvent pas de la compétence du Tribunal, celles qui allèguent des actes ou des omissions qui ne contreviennent pas au *Code*, s'il n'existe aucune possibilité raisonnable que le plaignant ait gain de cause, si les plaintes n'apporteraient rien au plaignant et ne serviraient pas les fins poursuivies par le *Code* ou si elles ont été déposées de mauvaise foi ou à des fins illégitimes.

En l'espèce, les plaignants cherchaient à soulever de nouveau la question devant un autre forum. Plutôt que d'emprunter la voie du contrôle judiciaire, qui leur était ouverte, pour contester la décision de l'agent de révision, ils ont engagé une nouvelle instance devant un autre tribunal administratif dans l'espoir d'obtenir un résultat plus favorable. Cette stratégie constituait un « appel indirect », une démarche que l'al. 27(1)f) et les doctrines de common law visent précisément à éviter. L'analyse du Tribunal l'a rendu complice de cette tentative de contester indirectement le bien-fondé de la décision de la Commission et du processus suivi; on y trouve une myriade de facteurs en fonction desquels le Tribunal s'est demandé s'il était à l'aise avec le processus de l'instance antérieure et avec les motifs de la décision de l'agent de révision. Il s'est demandé si le processus suivi devant la Section de révision satisfaisait aux exigences procédurales; il a critiqué l'interprétation que l'agent de révision a faite de son mandat en matière de droits de la personne; il a conclu que la décision de l'agent de révision n'était pas définitive; il a conclu que les parties qu'il avait devant lui n'étaient pas les mêmes que celles qui s'étaient présentées devant la Commission; et il a indiqué que l'agent de révision n'avait pas l'expertise voulue pour interpréter ou appliquer le *Code*.

La norme de contrôle applicable est celle de la décision manifestement déraisonnable, aux termes de l'art. 59 de l'*Administrative Tribunals Act*. Parce que la décision du Tribunal de recevoir ces plaintes et de les entendre de nouveau repose principalement sur des facteurs non pertinents et ne tient pas compte du mandat véritable que lui confère l'al. 27(1)f), elle est manifestement déraisonnable.

*La* juge en chef McLachlin et les juges Binnie, Fish et Cromwell : La common law et en particulier l'al. 27(1)f) du *Code* tendent tous deux à la réalisation de ce nécessaire équilibre entre le caractère définitif des décisions et l'équité, et ce, par l'exercice du pouvoir discrétionnaire

the common law finality doctrines and the legislative intent in enacting s. 27(1)(f). A narrow interpretation of the Tribunal's discretion under s. 27(1)(f) does not reflect the clear legislative intent in enacting the provision. Rather, s. 27(1)(f) confers, in very broad language, a flexible discretion on the Human Rights Tribunal to enable it to achieve that balance in the multitude of contexts in which another tribunal may have dealt with a point of human rights law.

The grammatical and ordinary meaning of the words of s. 27(1)(f) support an expansive view of the discretion, not a narrow one. Nor can it be suggested that s. 27(1)(f) be read narrowly because of the character of the other six categories of discretion conferred by s. 27(1). The provision's legislative history also confirms that it was the Legislature's intent to confer a broad discretion to dismiss or not to dismiss where there had been an earlier proceeding. The intent was clearly to broaden, not to narrow, the range of factors which a tribunal could consider.

The Court's jurisprudence recognizes that, in the administrative law context, common law finality doctrines must be applied flexibly to maintain the necessary balance between finality and fairness. This is done through the exercise of discretion taking into account a wide variety of factors which are sensitive to the particular administrative law context in which the case arises and to the demands of substantial justice in the particular circumstances of each case. Finality and requiring parties to use the most appropriate mechanisms for review are of course important considerations. But they are not the only, or even the most important considerations. The need for this necessarily broader discretion in applying the finality doctrines in the administrative law setting is well illustrated by the intricate and changing procedural context in which the complainants found themselves in this case and underlines the wisdom of applying finality doctrines with considerable flexibility in the administrative law setting. The most important consideration is whether giving the earlier proceeding final and binding effect will work an injustice. If there is substantial injustice, or a serious risk of it, poor procedural choices by the complainant should generally not be fatal to an appropriate consideration of his or her complaint on its merits.

du Tribunal. C'est la recherche de cet équilibre qui est au cœur tant des doctrines de la common law relatives au caractère définitif des décisions que de l'intention du législateur en édictant l'al. 27(1)f). En donnant une portée étroite au pouvoir discrétionnaire que l'al. 27(1)f) confère au Tribunal, on ne tient pas compte de cette intention claire du législateur. En fait, l'al. 27(1)f) confère en termes très larges au Tribunal un pouvoir discrétionnaire souple propre à lui permettre de réaliser cet équilibre dans la multitude de contextes où d'autres tribunaux administratifs ont pu se prononcer sur une question relevant des droits de la personne.

Le sens ordinaire et grammatical des termes de l'al. 27(1)f) permet de donner une large portée au pouvoir discrétionnaire, non une portée restreinte. On ne peut considérer qu'il faille interpréter l'al. 27(1)f) de façon restrictive en raison de la nature des six autres catégories de pouvoirs discrétionnaires conférés au par. 27(1). L'historique législatif de la disposition confirme également que, pour ce qui est du rejet d'une plainte ayant fait l'objet d'une instance antérieure, le législateur a voulu conférer un pouvoir discrétionnaire étendu. Le législateur voulait manifestement élargir et non rétrécir l'éventail des facteurs qu'un tribunal doit prendre en compte.

La jurisprudence de notre Cour reconnaît qu'en contexte de droit administratif, il convient d'appliquer avec souplesse les doctrines de la common law relatives au caractère définitif des décisions afin de maintenir le nécessaire équilibre entre le caractère définitif et l'équité des décisions. À cette fin, l'exercice du pouvoir discrétionnaire nécessite la prise en compte d'un large éventail de facteurs pertinents aux particularités du contexte administratif en cause et aux exigences à satisfaire pour que justice soit rendue dans les circonstances de chaque cas. Le caractère définitif de la décision et l'obligation faite aux parties de recourir aux mécanismes de révision les plus appropriés sont certes des facteurs importants, mais ils ne sont ni les seuls, ni même les plus importants. Le contexte procédural complexe et changeant en cause en l'espèce illustre bien la nécessité du recours à ce pouvoir discrétionnaire nécessairement plus étendu lorsqu'il s'agit d'appliquer les doctrines relatives au caractère définitif des décisions en contexte de droit administratif et montre qu'il n'est que sage d'appliquer avec beaucoup de souplesse, dans le contexte du droit administratif, les doctrines relatives au caractère définitif des décisions. Le facteur le plus important consiste à déterminer si une injustice peut résulter de l'attribution d'une portée définitive et exécutoire à l'instance antérieure. En cas d'injustice substantielle ou de risque sérieux d'une telle injustice, les choix procéduraux malavisés du plaignant ne devraient généralement pas sonner le glas d'un examen au fond approprié de sa plainte.

2011 SCC 52 (CanLII)

2011 SCC 52 (CanLII)

In this case, the Tribunal's decision not to dismiss the complaint under s. 27(1)(f) was patently unreasonable. While the Tribunal was entitled to take into account the alleged procedural limitations of the proceedings before the Review Officer, it committed a reversible error by basing its decision on the alleged lack of independence of the Review Officer and by ignoring the potential availability of judicial review to remedy any procedural defects. More fundamentally, it failed to consider whether the substance of the complaint had been addressed and thereby failed to take this threshold statutory requirement into account. This requires looking at such factors as the issues raised in the earlier proceedings; whether those proceedings were fair; whether the complainant had been adequately represented; whether the applicable human rights principles had been canvassed; whether an appropriate remedy had been available and whether the complainant chose the forum for the earlier proceedings. This flexible and global assessment seems to be exactly the sort of approach called for by s. 27(1)(f). The Tribunal also failed to have regard to the fundamental fairness or otherwise of the earlier proceeding. All of this led the Tribunal to give no weight at all to the interests of finality and to largely focus instead on irrelevant considerations of whether the strict elements of issue estoppel were present.

The appeal should be allowed and the application of the Workers' Compensation Board under s. 27(1)(f) should be remitted to the Tribunal for reconsideration.

## Cases Cited

By Abella J.

**Referred to:** *Tranchemontagne v. Ontario (Director, Disability Support Program)*, 2006 SCC 14, [2006] 1 S.C.R. 513; *British Columbia (Ministry of Competition, Science & Enterprise) v. Matuszewski*, 2008 BCSC 915, 82 Admin. L.R. (4th) 308; *Danyluk v. Ainsworth Technologies Inc.*, 2001 SCC 44, [2001] 2 S.C.R. 460; *Workers' Compensation Appeal Tribunal (B.C.) v. Hill*, 2011 BCCA 49, 299 B.C.A.C. 129; *Berezoutskaia v. Human Rights Tribunal (B.C.)*, 2006 BCCA 95, 223 B.C.A.C. 71; *Hines v. Canpar Industries Ltd.*, 2006 BCSC 800, 55 B.C.L.R. (4th) 372; *Boucher v. Stelco Inc.*, 2005 SCC 64, [2005] 3 S.C.R. 279; *Rocois Construction Inc. v. Québec Ready Mix Inc.*, [1990] 2 S.C.R. 440; *Angle v. Minister of National Revenue*, [1975] 2 S.C.R. 248; *Canada (Attorney General) v. TeleZone Inc.*, 2010 SCC 62, [2010] 3 S.C.R. 585; *Garland v. Consumers'*

En l'espèce, en refusant de rejeter la plainte en application de l'al. 27(1)f), le Tribunal a rendu une décision manifestement déraisonnable. Certes, le Tribunal pouvait tenir compte des allégations relatives aux limites procédurales du recours devant l'agent de révision, mais il a commis une erreur justifiant l'annulation de sa décision en fondant cette dernière sur le prétendu manque d'indépendance de l'agent de révision et en faisant abstraction de la possibilité de recourir au contrôle judiciaire pour corriger tout vice procédural. Plus fondamentalement encore, il n'a pas examiné s'il avait été statué sur le fond de la plainte, omettant ainsi de prendre en considération une condition imposée par la Loi. Il lui faut tenir compte d'éléments comme les questions soulevées dans l'instance antérieure et les questions de savoir si cette instance s'est déroulée de façon équitable, si le plaignant était bien représenté, si les principes applicables en matière de droits de la personne ont été examinés, si une réparation appropriée pouvait être accordée et si le choix du forum antérieur relevait du plaignant. Cette évaluation globale et souple paraît être exactement la démarche que requiert l'al. 27(1)f). En outre, le Tribunal n'a pas pris en compte l'équité, fondamentale ou autre, de l'instance antérieure. Tout cela a fait en sorte que le Tribunal n'a accordé aucun poids aux intérêts en jeu en matière de caractère définitif de la décision, et qu'il a largement fondé son analyse, plutôt, sur des facteurs non pertinents rattachés à l'existence des stricts éléments constitutifs de la préclusion fondée sur une question déjà tranchée.

Il y a lieu d'accueillir le pourvoi et de renvoyer au Tribunal, pour qu'il la réexamine, la demande de la Workers' Compensation Board présentée aux termes de l'al. 27(1)f).

## Jurisprudence

Citée par la juge Abella

**Arrêts mentionnés :** *Tranchemontagne c. Ontario (Directeur du Programme ontarien de soutien aux personnes handicapées)*, 2006 CSC 14, [2006] 1 R.C.S. 513; *British Columbia (Ministry of Competition, Science & Enterprise) c. Matuszewski*, 2008 BCSC 915, 82 Admin. L.R. (4th) 308; *Danyluk c. Ainsworth Technologies Inc.*, 2001 CSC 44, [2001] 2 R.C.S. 460; *Workers' Compensation Appeal Tribunal (B.C.) c. Hill*, 2011 BCCA 49, 299 B.C.A.C. 129; *Berezoutskaia c. Human Rights Tribunal (B.C.)*, 2006 BCCA 95, 223 B.C.A.C. 71; *Hines c. Canpar Industries Ltd.*, 2006 BCSC 800, 55 B.C.L.R. (4th) 372; *Boucher c. Stelco Inc.*, 2005 CSC 64, [2005] 3 R.C.S. 279; *Rocois Construction Inc. c. Québec Ready Mix Inc.*, [1990] 2 R.C.S. 440; *Angle c. Ministre du Revenu National*, [1975] 2 R.C.S. 248; *Canada (Procureur général)*

*Gas Co.*, 2004 SCC 25, [2004] 1 S.C.R. 629; *Toronto (City) v. C.U.P.E., Local 79*, 2003 SCC 63, [2003] 3 S.C.R. 77; *R. v. Mahalingan*, 2008 SCC 63, [2008] 3 S.C.R. 316; *Rasanen v. Rosemount Instruments Ltd.* (1994), 112 D.L.R. (4th) 683; *Nova Scotia (Workers' Compensation Board) v. Martin*, 2003 SCC 54, [2003] 2 S.C.R. 504; *Council of Canadians with Disabilities v. VIA Rail Canada Inc.*, 2007 SCC 15, [2007] 1 S.C.R. 650.

By Cromwell J.

**Referred to:** *Danyluk v. Ainsworth Technologies Inc.*, 2001 SCC 44, [2001] 2 S.C.R. 460; *Toronto (City) v. C.U.P.E., Local 79*, 2003 SCC 63, [2003] 3 S.C.R. 77; *British Columbia (Minister of Forests) v. Bugbusters Pest Management Inc.* (1998), 50 B.C.L.R. (3d) 1; *Tranchemontagne v. Ontario (Director, Disability Support Program)*, 2006 SCC 14, [2006] 1 S.C.R. 513; *Bell ExpressVu Limited Partnership v. Rex*, 2002 SCC 42, [2002] 2 S.C.R. 559; *Rizzo & Rizzo Shoes Ltd. (Re)*, [1998] 1 S.C.R. 27; *Becker v. Cariboo Chevrolet Oldsmobile Pontiac Buick GMC Ltd.*, 2006 BCSC 43, 42 Admin. L.R. (4th) 266; *Weber v. Ontario Hydro*, [1995] 2 S.C.R. 929; *Villella v. Vancouver (City)*, 2005 BCHRT 405, [2005] B.C.H.R.T.D. No. 405 (QL); *Schweneke v. Ontario* (2000), 47 O.R. (3d) 97; *Workers' Compensation Appeal Tribunal (B.C.) v. Hill*, 2011 BCCA 49, 299 B.C.A.C. 129; *Allman v. Amacon Property Management Services Inc.*, 2007 BCCA 302, 243 B.C.A.C. 52.

## Statutes and Regulations Cited

*Administrative Tribunals Act*, S.B.C. 2004, c. 45, ss. 44, 59.

*Attorney General Statutes Amendment Act, 2007*, S.B.C. 2007, c. 14, s. 3.

*Canadian Charter of Rights and Freedoms*, s. 15.

*Civil Code of Québec*, S.Q. 1991, c. 64, art. 2848.

*Human Rights Amendment Act, 1995*, S.B.C. 1995, c. 42.

*Human Rights Code*, R.S.B.C. 1996, c. 210, ss. 8, 25(2) [rep. & sub. 2002, c. 62, s. 11], (3) [rep. *idem*], 27(1), (2) [rep. & sub. *idem*, s. 12].

*Human Rights Code Amendment Act, 2002*, S.B.C. 2002, c. 62.

*Workers Compensation Act*, R.S.B.C. 1996, c. 492, ss. 96.4(2), 99, 245 to 250, 251.

## Authors Cited

British Columbia. *Official Report of Debates of the Legislative Assembly (Hansard)*, vol. 9, 3rd Sess., 37th Parl., October 28, 2002, p. 4094.

*c. TeleZone Inc.*, 2010 CSC 62, [2010] 3 R.C.S. 585; *Garland c. Consumers' Gas Co.*, 2004 CSC 25, [2004] 1 R.C.S. 629; *Toronto (Ville) c. S.C.F.P., section locale 79*, 2003 CSC 63, [2003] 3 R.C.S. 77; *R. c. Mahalingan*, 2008 CSC 63, [2008] 3 R.C.S. 316; *Rasanen c. Rosemount Instruments Ltd.* (1994), 112 D.L.R. (4th) 683; *Nouvelle-Écosse (Workers' Compensation Board) c. Martin*, 2003 CSC 54, [2003] 2 R.C.S. 504; *Conseil des Canadiens avec déficiences c. VIA Rail Canada Inc.*, 2007 CSC 15, [2007] 1 R.C.S. 650.

Citée par le juge Cromwell

**Arrêts mentionnés :** *Danyluk c. Ainsworth Technologies Inc.*, 2001 CSC 44, [2001] 2 R.C.S. 460; *Toronto (Ville) c. S.C.F.P., section locale 79*, 2003 CSC 63, [2003] 3 R.C.S. 77; *British Columbia (Minister of Forests) c. Bugbusters Pest Management Inc.* (1998), 50 B.C.L.R. (3d) 1; *Tranchemontagne c. Ontario (Directeur du Programme ontarien de soutien aux personnes handicapées)*, 2006 CSC 14, [2006] 1 R.C.S. 513; *Bell ExpressVu Limited Partnership c. Rex*, 2002 CSC 42, [2002] 2 R.C.S. 559; *Rizzo & Rizzo Shoes Ltd. (Re)*, [1998] 1 R.C.S. 27; *Becker c. Cariboo Chevrolet Oldsmobile Pontiac Buick GMC Ltd.*, 2006 BCSC 43, 42 Admin. L.R. (4th) 266; *Weber c. Ontario Hydro*, [1995] 2 R.C.S. 929; *Villella c. Vancouver (City)*, 2005 BCHRT 405, [2005] B.C.H.R.T.D. No. 405 (QL); *Schweneke c. Ontario* (2000), 47 O.R. (3d) 97; *Workers' Compensation Appeal Tribunal (B.C.) c. Hill*, 2011 BCCA 49, 299 B.C.A.C. 129; *Allman c. Amacon Property Management Services Inc.*, 2007 BCCA 302, 243 B.C.A.C. 52.

## Lois et règlements cités

*Administrative Tribunals Act*, S.B.C. 2004, ch. 45, art. 44, 59.

*Attorney General Statutes Amendment Act, 2007*, S.B.C. 2007, ch. 14, art. 3.

*Charte canadienne des droits et libertés*, art. 15.

*Code civil du Québec*, L.Q. 1991, ch. 64, art. 2848.

*Human Rights Amendment Act, 1995*, S.B.C. 1995, ch. 42.

*Human Rights Code*, R.S.B.C. 1996, ch. 210, art. 8, 25(2) [abr. & rempl. 2002, ch. 62, art. 11], (3) [abr. *idem*], 27(1), (2) [abr. & rempl. *idem*, art. 12].

*Human Rights Code Amendment Act, 2002*, S.B.C. 2002, ch. 62.

*Workers Compensation Act*, R.S.B.C. 1996, ch. 492, art. 96.4(2), 99, 245 à 250, 251.

## Doctrine citée

Colombie-Britannique. *Official Report of Debates of the Legislative Assembly (Hansard)*, vol. 9, 3rd Sess., 37th Parl., October 28, 2002, p. 4094.

British Columbia. *Official Report of Debates of the Legislative Assembly (Hansard)*, vol. 21, 3rd Sess., 38th Parl., May 16, 2007, pp. 8088-93.

British Columbia. *Official Report of Debates of the Legislative Assembly (Hansard)*, vol. 21, 4th Sess., 35th Parl., June 22, 1995, p. 16062.

British Columbia. Workers' Compensation Board. *Rehabilitation Services and Claims Manual*, vols. I and II, updated June 2011 (online: http://www.worksafebc.com/publications/policy_manuals/rehabilitation_services_and_claims_manual/default.asp).

Lange, Donald J. *The Doctrine of Res Judicata in Canada*, 3rd ed. Markham, Ont.: LexisNexis Canada, 2010.

Lovett, Deborah K., and Angela R. Westmacott. "Human Rights Review: A Background Paper", prepared for Administrative Justice Project, Ministry of Attorney General of British Columbia, 2001 (online: http://www.llbc.leg.bc.ca/public/PubDocs/bcdocs/350060/hrr.pdf).

Colombie-Britannique. *Official Report of Debates of the Legislative Assembly (Hansard)*, vol. 21, 3rd Sess., 38th Parl., May 16, 2007, pp. 8088-93.

Colombie-Britannique. *Official Report of Debates of the Legislative Assembly (Hansard)*, vol. 21, 4th Sess., 35th Parl., June 22, 1995, p. 16062.

Colombie-Britannique. Workers' Compensation Board. *Rehabilitation Services and Claims Manual*, vols. I and II, updated June 2011 (online : http://www.worksafebc.com/publications/policy_manuals/rehabilitation_services_and_claims_manual/default.asp).

Lange, Donald J. *The Doctrine of Res Judicata in Canada*, 3rd ed. Markham, Ont. : LexisNexis Canada, 2010.

Lovett, Deborah K., and Angela R. Westmacott. « Human Rights Review : A Background Paper », prepared for Administrative Justice Project, Ministry of Attorney General of British Columbia, 2001 (online : http://www.llbc.leg.bc.ca/public/PubDocs/bcdocs/350060/hrr.pdf).

APPEAL from a judgment of the British Columbia Court of Appeal (Huddart, Frankel and Tysoe JJ.A.), 2010 BCCA 77, 2 B.C.L.R. (5th) 274, 316 D.L.R. (4th) 648, 284 B.C.A.C. 50, 481 W.A.C. 50, 3 Admin. L.R. (5th) 49, [2010] B.C.J. No. 259 (QL), 2010 CarswellBC 330, setting aside a decision of Stromberg-Stein J., 2009 BCSC 377, 93 B.C.L.R. (4th) 384, 96 Admin. L.R. (4th) 250, [2009] B.C.J. No. 554 (QL), 2009 CarswellBC 737. Appeal allowed.

POURVOI contre un arrêt de la Cour d'appel de la Colombie-Britannique (les juges Huddart, Frankel et Tysoe), 2010 BCCA 77, 2 B.C.L.R. (5th) 274, 316 D.L.R. (4th) 648, 284 B.C.A.C. 50, 481 W.A.C. 50, 3 Admin. L.R. (5th) 49, [2010] B.C.J. No. 259 (QL), 2010 CarswellBC 330, qui a annulé une décision de la juge Stromberg-Stein, 2009 BCSC 377, 93 B.C.L.R. (4th) 384, 96 Admin. L.R. (4th) 250, [2009] B.C.J. No. 554 (QL), 2009 CarswellBC 737. Pourvoi accueilli.

*Scott A. Nielsen* and *Laurel Courtenay*, for the appellant.

*Scott A. Nielsen* et *Laurel Courtenay*, pour l'appelante.

*Lindsay Waddell*, *James Sayre* and *Kevin Love*, for the respondents Guiseppe Figliola, Kimberley Sallis and Barry Dearden.

*Lindsay Waddell*, *James Sayre* et *Kevin Love*, pour les intimés Guiseppe Figliola, Kimberley Sallis et Barry Dearden.

*Jessica M. Connell* and *Katherine Hardie*, for the respondent the British Columbia Human Rights Tribunal.

*Jessica M. Connell* et *Katherine Hardie*, pour l'intimé British Columbia Human Rights Tribunal.

*Jonathan G. Penner*, for the intervener the Attorney General of British Columbia.

*Jonathan G. Penner*, pour l'intervenant le procureur général de la Colombie-Britannique.

*Peter A. Gall*, *Q.C.*, and *Nitya Iyer*, for the intervener the Coalition of BC Businesses.

*Peter A. Gall*, *c.r.*, et *Nitya Iyer*, pour l'intervenante Coalition of BC Businesses.

*Sheila Osborne-Brown* and *Philippe Dufresne*, for the intervener the Canadian Human Rights Commission.

*Sheila Osborne-Brown* et *Philippe Dufresne*, pour l'intervenante la Commission canadienne des droits de la personne.

*Janice R. Ashcroft*, for the intervener the Alberta Human Rights Commission.

*Ryan D. W. Dalziel*, for the intervener the Vancouver Area Human Rights Coalition Society.

The judgment of LeBel, Deschamps, Abella, Charron and Rothstein JJ. was delivered by

[1]    ABELLA J. — Litigants hope to have their legal issues resolved as equitably and expeditiously as possible by an authoritative adjudicator. Subject only to rights of review or appeal, they expect, in the interests of fairness, to be able to rely on the outcome as final and binding. What they do not expect is to have those same issues relitigated by a different adjudicator in a different forum at the request of a losing party seeking a different result. On the other hand, it may sometimes be the case that justice demands fresh litigation.

[2]    In British Columbia, there is legislation giving the Human Rights Tribunal a discretion to refuse to hear a complaint if the substance of that complaint has already been appropriately dealt with in another proceeding. The issue in this appeal is how that discretion ought to be exercised when another tribunal with concurrent human rights jurisdiction has disposed of the complaint.

Background

[3]    Guiseppe Figliola, Kimberley Sallis, and Barry Dearden suffered from chronic pain. Mr. Figliola suffered a lower back injury while trying to place a sixty-pound, steel airshaft in the centre of a roll of paper. Ms. Sallis fell down a set of slippery stairs while delivering letters for Canada Post. Mr. Dearden, who also worked for Canada Post, developed back pain while delivering mail.

[4]    Each of them sought compensation from the British Columbia's Workers' Compensation Board

*Janice R. Ashcroft*, pour l'intervenante Alberta Human Rights Commission.

*Ryan D. W. Dalziel*, pour l'intervenante Vancouver Area Human Rights Coalition Society.

Version française du jugement des juges LeBel, Deschamps, Abella, Charron et Rothstein rendu par

[1]    LA JUGE ABELLA — Quiconque est partie à un litige souhaite que les questions juridiques en cause soient tranchées le plus équitablement et rapidement possible par un décideur faisant autorité et, par souci d'équité, veut l'assurance que la décision rendue sera définitive et exécutoire, exception faite du droit d'en demander le contrôle judiciaire ou d'interjeter appel. Personne ne s'attend à ce que les mêmes questions soient réexaminées devant un autre forum à la demande d'une partie déboutée cherchant à obtenir un résultat différent. Il y a cependant des cas où la justice impose de reprendre le litige.

[2]    En Colombie-Britannique, la loi confère au tribunal des droits de la personne le pouvoir discrétionnaire de refuser d'entendre une plainte sur le fond de laquelle un décideur s'est déjà prononcé de façon appropriée. En l'espèce, la Cour est appelée à déterminer comment doit s'exercer ce pouvoir discrétionnaire lorsqu'un autre tribunal administratif, qui a une compétence concurrente en matière de droits de la personne, a déjà rendu une décision.

Contexte

[3]    Guiseppe Figliola, Kimberley Sallis et Barry Dearden sont aux prises avec des douleurs chroniques. M. Figliola s'est blessé dans la région lombaire en tentant d'installer une tige d'aération en acier de soixante livres au centre d'un rouleau de papier. M^me Sallis est tombée dans un escalier glissant en livrant du courrier pour Postes Canada. M. Dearden, qui travaillait lui aussi pour Postes Canada, a commencé à éprouver des douleurs au dos en livrant du courrier.

[4]    Chacun d'eux a soumis à la Workers' Compensation Board de la Colombie-Britannique

for, among other things, their chronic pain. The employers were notified in each case.

[5]   The Board's chronic pain policy, set by its board of directors, provided for a fixed award for such pain:

> Where a Board officer determines that a worker is entitled to [an] award for chronic pain . . . an award equal to 2.5% of total disability will be granted to the worker.

(*Rehabilitation Services and Claims Manual*, vol. I, Policy No. 39.01, Chronic Pain, at para. 4(b); later replaced by vol. II, Policy No. 39.02, Chronic Pain (online).)

[6]   Pursuant to this policy, the complainants received a fixed compensation award amounting to 2.5% of total disability for their chronic pain. The Workers' Compensation Board expresses partial disability as a percentage of the disability suffered by a completely disabled worker. This is intended to reflect "the extent to which a particular injury is likely to impair a worker's ability to earn in the future" (*Rehabilitation Services and Claims Manual*, vol. II, Policy No. 39.00).

[7]   Each complainant appealed to the Board's Review Division, arguing that a policy which set a fixed award for chronic pain was patently unreasonable, unconstitutional under s. 15 of the *Canadian Charter of Rights and Freedoms*, and discriminatory on the grounds of disability under s. 8 of the *Human Rights Code*, R.S.B.C. 1996, c. 210.

[8]   At the Review Division, the Review Officer, Nick Attewell, found that only the Workers' Compensation Appeal Tribunal ("WCAT") had the authority to scrutinize policies for patent

(la « Commission ») une demande d'indemnisation fondée, entre autres, sur leurs douleurs chroniques. L'employeur a été avisé dans chaque cas.

[5]   La politique de la Commission, établie par le comité de direction de l'organisme, prévoit une indemnité d'un montant fixe dans les cas de douleur chronique :

> [TRADUCTION] Lorsqu'un agent de la Commission conclut qu'un travailleur a droit à l'indemnité pour douleur chronique [. . .], celle-ci équivaut à 2,5 % de l'indemnité à laquelle il aurait droit en cas d'invalidité totale.

(*Rehabilitation Services and Claims Manual*, vol. I, politique nᵒ 39.01, Chronic Pain, al. 4*b*); remplacée par vol. II, politique nᵒ 39.02, Chronic Pain (en ligne).)

[6]   En application de cette politique, les plaignants ont touché, pour leurs douleurs chroniques, une indemnité d'un montant fixe équivalant à 2,5 % du montant qui aurait été alloué en cas d'invalidité totale. Pour la Commission, l'invalidité partielle s'exprime sous forme de pourcentage de l'incapacité d'un travailleur totalement invalide. On vise ainsi à rendre compte de [TRADUCTION] « la mesure dans laquelle une blessure particulière est susceptible de nuire à la capacité du travailleur de gagner un revenu » (*Rehabilitation Services and Claims Manual*, vol. II, politique nᵒ 39.00).

[7]   Chaque plaignant a interjeté appel devant la *Review Division* de la Commission (la « Section de révision »), soutenant que la politique de l'indemnité fixe pour les douleurs chroniques était manifestement déraisonnable, qu'elle était inconstitutionnelle au regard de l'art. 15 de la *Charte canadienne des droits et libertés* et qu'elle constituait de la discrimination fondée sur la déficience au sens où il faut l'entendre pour l'application de l'art. 8 du *Human Rights Code*, R.S.B.C. 1996, ch. 210 (« *Code* »).

[8]   L'agent de révision, Nick Attewell, a conclu que la question de savoir si une politique de la Commission était manifestement déraisonnable relevait exclusivement du Workers' Compensation

unreasonableness. He also concluded that, since the combination of s. 44 of the *Administrative Tribunals Act*, S.B.C. 2004, c. 45 ("*ATA*"), and s. 245.1 of the *Workers Compensation Act*, R.S.B.C. 1996, c. 492, expressly deprived the WCAT of jurisdiction over constitutional questions, this meant that he too had no such jurisdiction.

[9]    The Review Officer accepted that he had jurisdiction over the *Human Rights Code* complaint. This authority flowed from this Court's decision in *Tranchemontagne v. Ontario (Director, Disability Support Program)*, 2006 SCC 14, [2006] 1 S.C.R. 513, where the majority concluded that human rights tribunals did not have exclusive jurisdiction over human rights cases and that unless there was statutory language to the contrary, other tribunals had concurrent jurisdiction to apply human rights legislation.

[10]    In careful and thorough reasons, the Review Officer concluded that the Board's chronic pain policy was not contrary to s. 8 of the *Code* and therefore not discriminatory.

[11]    The complainants appealed Mr. Attewell's decision to the WCAT. Before the appeal was heard, the B.C. legislature amended the *Administrative Tribunals Act* and the *Workers Compensation Act*, removing the WCAT's authority to apply the *Code* (*Attorney General Statutes Amendment Act, 2007*, S.B.C. 2007, c. 14). The effect of this amendment on a Review Officer's authority to address the *Code* is not before us and was not argued by any of the parties.

[12]    Based on the amendments, the complainants' appeal of the Review Officer's human rights conclusions could not be heard by the WCAT, but judicial review remained available. Instead of applying for judicial review, however, the complainants filed new complaints with the Human Rights Tribunal, repeating the same s. 8 arguments about the Board's chronic pain policy that they had made before the Review Division. They did not proceed

Appeal Tribunal (« WCAT »). Il a aussi conclu que le WCAT étant expressément privé de compétence en matière constitutionnelle par effet combiné de l'art. 44 de l'*Administrative Tribunals Act*, S.B.C. 2004, ch. 45 (« *ATA* »), et de l'art. 245.1 de la *Workers Compensation Act*, R.S.B.C. 1996, ch. 492, il en était lui aussi dépourvu.

[9]    L'agent de révision s'est toutefois estimé compétent pour entendre la plainte fondée sur le *Code* en raison de l'arrêt *Tranchemontagne c. Ontario (Directeur du Programme ontarien de soutien aux personnes handicapées)*, 2006 CSC 14, [2006] 1 R.C.S. 513, dans lequel notre Cour a conclu, à la majorité, que les tribunaux des droits de la personne n'étaient pas investis d'une compétence exclusive et, que, à moins de dispositions législatives contraires, d'autres tribunaux administratifs pouvaient exercer une compétence concurrente en matière d'application des lois sur les droits de la personne.

[10]    Au terme de motifs minutieux et approfondis, l'agent de révision a conclu que la politique de la Commission relative à la douleur chronique n'enfreignait pas l'art. 8 du *Code* et qu'elle n'était donc pas discriminatoire.

[11]    Les plaignants ont porté la décision de M. Attewell en appel devant le WCAT. Avant l'instruction de l'appel, la législature de la Colombie-Britannique a modifié l'*Administrative Tribunals Act* et la *Workers Compensation Act*, et supprimé la compétence du WCAT en matière d'application du *Code* (*Attorney General Statutes Amendment Act, 2007*, S.B.C. 2007, ch. 14). Aucune des parties n'a soulevé la question de l'effet de cette modification sur le pouvoir de l'agent de révision de se prononcer sur une question relevant du *Code* et nous n'en sommes pas saisis.

[12]    Compte tenu des modifications, l'appel interjeté par les plaignants des conclusions de l'agent de révision relatives aux droits de la personne ne pouvait pas être entendu par le WCAT, mais il leur était toujours loisible de demander un contrôle judiciaire. Or, plutôt que de procéder ainsi, les plaignants ont déposé devant le tribunal des droits de la personne (« Tribunal ») de nouvelles plaintes dans lesquelles ils reprenaient l'argument qu'ils avaient soumis à la

with their appeal to the WCAT from the conclusions of the Review Officer dealing with whether he had jurisdiction to find the chronic pain policy to be patently unreasonable.

[13]   The Workers' Compensation Board brought a motion asking the Tribunal to dismiss the new complaints, arguing that under s. 27(1)(a) of the *Code*, the Tribunal had no jurisdiction, and that under s. 27(1)(f), the complaints had already been appropriately dealt with by the Review Division. Those provisions state:

27 (1)   A member or panel may, at any time after a complaint is filed and with or without a hearing, dismiss all or part of the complaint if that member or panel determines that any of the following apply:

    (a)   the complaint or that part of the complaint is not within the jurisdiction of the tribunal;

.  .  .

    (f)   the substance of the complaint or that part of the complaint has been appropriately dealt with in another proceeding;

[14]   The Tribunal rejected both arguments (2008 BCHRT 374 (CanLII)). Of particular relevance, it did not agree that the complaints should be dismissed under s. 27(1)(f). Citing *British Columbia (Ministry of Competition, Science & Enterprise) v. Matuszewski*, 2008 BCSC 915, 82 Admin. L.R. (4th) 308, and relying on this Court's decision in *Danyluk v. Ainsworth Technologies Inc.*, 2001 SCC 44, [2001] 2 S.C.R. 460, the Tribunal concluded that "the substance of the Complaints was not appropriately dealt with in the review process. . . . [T]he issue raised is an appropriate question for the Tribunal to consider and the parties to the Complaints should receive the benefit of a full Tribunal hearing" (para. 50).

Section de révision, selon lequel la politique de la Commission en matière de douleur chronique était contraire à l'art. 8 du *Code*. Ils n'ont pas poursuivi l'appel interjeté devant le WCAT à l'encontre de la conclusion de l'agent de révision relative à sa compétence pour décider si cette politique est manifestement déraisonnable.

[13]   La Commission a présenté au Tribunal une requête pour rejet des nouvelles plaintes, dans laquelle elle soutenait, d'une part, que le Tribunal n'avait pas compétence pour les entendre (27(1)a) du *Code*) et, d'autre part, que la Section de révision avait déjà statué de façon appropriée sur le fond de la plainte (27(1)f) du *Code*). Voici le texte de ces dispositions :

[TRADUCTION]

27 (1)   Un membre ou une formation peut, à tout moment après le dépôt d'une plainte, la rejeter en totalité ou en partie, avec ou sans audience si, à son avis, l'une ou l'autre des circonstances suivantes est applicable :

    a)   la plainte ou une partie de la plainte ne relève pas de la compétence du tribunal;

.  .  .

    f)   il a été statué de façon appropriée sur le fond de la plainte dans une autre instance;

[14]   Le Tribunal a rejeté les deux arguments (2008 BCHRT 374 (CanLII)). Il a notamment conclu qu'il n'y avait pas lieu de rejeter les plaintes en vertu de l'al. 27(1)f), conclusion qui intéresse particulièrement la présente espèce. Citant *British Columbia (Ministry of Competition, Science & Enterprise) c. Matuszewski*, 2008 BCSC 915, 82 Admin. L.R. (4th) 308, et s'appuyant sur l'arrêt *Danyluk c. Ainsworth Technologies Inc.*, 2001 CSC 44, [2001] 2 R.C.S. 460, de notre Cour, le Tribunal a jugé qu'il [TRADUCTION] « n'a pas été statué de façon appropriée sur le fond de la plainte dans le cadre du processus de révision. [. . .] [L]a question soulevée est une question que le Tribunal peut à bon droit considérer et il convient que les parties puissent bénéficier d'une audience en bonne et due forme par le tribunal » (par. 50).

[15]   On judicial review, the Tribunal's decision was set aside by Justice Stromberg-Stein (2009 BCSC 377, 93 B.C.L.R. (4th) 384). She concluded that the same issues had already been "conclusively decided" by the Review Division and that the Tribunal had failed to take into proper account the principles of *res judicata*, collateral attack, and abuse of process (paras. 40 and 54). She found that for the Tribunal to proceed would be a violation of the principles of consistency, finality and the integrity of the administration of justice. In her view, the complaints to the Tribunal were merely a veiled attempt to circumvent judicial review:

The Tribunal would be ruling on the correctness of the Review Division decision. That is not the role of the Tribunal and to do so constitutes an abuse of process. [para. 56]

[16]   As for which standard of review applied, her view was that the Tribunal's decision ought to be set aside whether the standard was correctness or patent unreasonableness.

[17]   The Court of Appeal restored the Tribunal's decision (2010 BCCA 77, 2 B.C.L.R. (5th) 274). It interpreted s. 27(1)(f) as reflecting the legislature's intention to confer jurisdiction on the Tribunal to adjudicate human rights complaints even when the same issue had previously been dealt with by another tribunal. This did not represent the Tribunal exercising appellate review over the other proceeding, it flowed from the Tribunal's role in determining whether the previous proceeding had substantively addressed the human rights issues.

[18]   On the question of the standard of review, the Court of Appeal concluded that the issue revolved around s. 27(1)(f). Since a decision under s. 27(1)(f) is discretionary, the appropriate standard according to the jurisprudence is patent unreasonableness: see *Workers' Compensation Appeal Tribunal (B.C.) v. Hill*, 2011 BCCA 49, 299 B.C.A.C. 129;

[15]   À l'issue d'un contrôle judiciaire, la juge Stromberg-Stein a annulé cette décision (2009 BCSC 377, 93 B.C.L.R. (4th) 384), estimant que l'agent de révision avait déjà [TRADUCTION] « statué de façon définitive » sur les mêmes questions et que le Tribunal n'avait pas dûment tenu compte des principes applicables en matière d'autorité de la chose jugée, de contestation indirecte et d'abus de procédure (par. 40 et 54). Elle a conclu que, si le Tribunal entendait les plaintes, cela violerait les principes de cohérence, de caractère définitif des instances et d'intégrité de l'administration de la justice. Selon elle, les plaintes déposées devant le Tribunal relevaient d'une tentative déguisée d'éluder le contrôle judiciaire :

[TRADUCTION] Le Tribunal se trouverait à se prononcer sur le bien-fondé de la décision de la Section de révision. Ce n'est pas son rôle, et il y aurait abus de procédure s'il le faisait. [par. 56]

[16]   S'agissant de la norme de contrôle applicable, la juge a exprimé l'avis que la décision du Tribunal devait être annulée que l'on applique la norme de la décision correcte ou celle de la décision manifestement déraisonnable.

[17]   La Cour d'appel a rétabli la décision du Tribunal (2010 BCCA 77, 2 B.C.L.R. (5th) 274). Suivant son interprétation de l'al. 27(1)f), cette disposition reflète l'intention du législateur de conférer au Tribunal la compétence de statuer sur les plaintes relevant des droits de la personne, même lorsqu'un autre tribunal s'est déjà prononcé sur les mêmes questions. Cet examen par le Tribunal ne constituait pas l'exercice d'une compétence d'appel, mais découlait de son rôle consistant à déterminer si l'instance antérieure avait permis de statuer de façon appropriée sur le fond des questions relatives aux droits de la personne.

[18]   Au sujet de la norme de contrôle, la Cour d'appel a conclu que la question mettait en cause l'al. 27(1)f) et que, compte tenu de la nature discrétionnaire des décisions fondées sur cette disposition, la norme applicable, suivant la jurisprudence, est celle de la décision manifestement déraisonnable :   voir *Workers' Compensation*

*Berezoutskaia v. Human Rights Tribunal (B.C.)*, 2006 BCCA 95, 223 B.C.A.C. 71; *Hines v. Canpar Industries Ltd.*, 2006 BCSC 800, 55 B.C.L.R. (4th) 372; and *Matuszewski*. This was based on s. 59(3) of the *ATA*, which sets out the relevant standard, and on s. 59(4), which sets out a number of indicia:

**59**  (1)  In a judicial review proceeding, the standard of review to be applied to a decision of the tribunal is correctness for all questions <u>except those respecting the exercise of discretion</u>, findings of fact and the application of the common law rules of natural justice and procedural fairness.

.  .  .

(3)  A court must not set aside a discretionary decision of the tribunal unless it is patently unreasonable.

(4)  For the purposes of subsection (3), a discretionary decision is patently unreasonable if the discretion

(a)  is exercised arbitrarily or in bad faith,

(b)  is exercised for an improper purpose,

(c)  is based entirely or predominantly on irrelevant factors, or

(d)  fails to take statutory requirements into account.

[19]  The Court of Appeal concluded that the Tribunal's decision was not patently unreasonable.

[20]  I agree with the conclusion that, based on the directions found in s. 59(3) of the *ATA*, the Tribunal's decision is to be reviewed on a standard of patent unreasonableness. In my respectful view, however, I see the Tribunal's decision not to dismiss the complaints in these circumstances as reaching that threshold.

*Appeal Tribunal (B.C.) c. Hill*, 2011 BCCA 49, 299 B.C.A.C. 129; *Berezoutskaia c. Human Rights Tribunal (B.C.)*, 2006 BCCA 95, 223 B.C.A.C. 71; *Hines c. Canpar Industries Ltd.*, 2006 BCSC 800, 55 B.C.L.R. (4th) 372; et *Matuszewski*. La cour a fondé cette conclusion sur le par. 59(3) de l'*ATA*, qui définit la norme applicable, et sur le par. 59(4), qui énonce différents critères présidant à son application :

[TRADUCTION]

**59**  (1)  Le contrôle judiciaire d'une décision du tribunal s'effectue suivant la norme de la décision correcte, <u>sauf à l'égard des questions relatives à l'exercice d'un pouvoir discrétionnaire</u>, des conclusions de fait et des questions d'application des règles de la common law en matière de justice naturelle et d'équité procédurale.

.  .  .

(3)  Une décision discrétionnaire du tribunal n'est susceptible d'annulation par un tribunal judiciaire que si elle est manifestement déraisonnable.

(4)  Pour l'application du paragraphe précédent, est manifestement déraisonnable une décision discrétionnaire, si le pouvoir discrétionnaire a été exercé de l'une ou l'autre des façons suivantes :

a)  arbitrairement ou de mauvaise foi;

b)  à des fins illégitimes;

c)  entièrement ou principalement sur le fondement de facteurs non pertinents;

d)  sans tenir compte d'exigences prévues par la loi.

[19]  La Cour d'appel a conclu que la décision du Tribunal n'était pas manifestement déraisonnable.

[20]  Je souscris à la conclusion que, compte tenu des dispositions du par. 59(3) de l'*ATA*, la norme de contrôle applicable est celle de la décision manifestement déraisonnable. Cela dit, j'estime toutefois respectueusement que la décision du Tribunal de ne pas rejeter les plaintes répond à cette norme.

Analysis

[21]   The question of jurisdiction is not seriously at issue in this appeal. Since *Tranchemontagne*, tribunals other than human rights commissions have rightly assumed that, absent legislative intent to the contrary, they have concurrent jurisdiction to apply human rights legislation. That means that at the time these complaints were brought, namely, before the amendments to the *ATA* removed the WCAT's human rights jurisdiction, both the Workers' Compensation Board *and* the Human Rights Tribunal had ostensible authority to hear human rights complaints. Since the complainants brought their complaints to the Board, and since either the Board or the Tribunal was entitled to hear the issue, the Board had jurisdiction when it decided the complainants' human rights issues. But based on their concurrent jurisdiction when this complaint was brought to the Board, there is no serious question that the Tribunal, in theory, also had authority over these human rights complaints. This means that s. 27(1)(a) of the *Code* is not in play.

[22]   The question then arises: when two bodies share jurisdiction over human rights, what ought to guide the Tribunal under s. 27(1)(f) in deciding when to dismiss all or part of a complaint that has already been decided by the other tribunal?

[23]   In *Matuszewski*, Pitfield J. explored the contours and concepts of this provision. In that case, the collective agreement had banned the accrual of seniority while an employee was on long-term disability. The union grieved, alleging that the provision was discriminatory. The arbitrator concluded that it was not. The union did not seek judicial review from the arbitrator's decision. One of the employees in the bargaining unit filed a complaint with the Human Rights Tribunal alleging that the same collective agreement provision was discriminatory.

Analyse

[21]   La question de la compétence ne se pose pas véritablement en l'espèce. Depuis l'arrêt *Tranchemontagne*, les tribunaux administratifs autres que les commissions des droits de la personne ont raison de considérer que, lorsque le législateur n'exprime pas d'intention contraire, ils exercent une compétence concurrente en matière d'application des lois sur les droits de la personne. Il s'ensuit que, à l'époque où les plaintes en cause en l'espèce ont été déposées, soit avant les modifications à l'*ATA* ne retirent au WCAT sa compétence en matière de droits de la personne, la Commission *et* le Tribunal avaient manifestement tous deux compétence pour entendre des plaintes en cette matière. Puisque les plaignants ont saisi la Commission, et puisque celle-ci était habilitée, tout autant que le Tribunal, à entendre l'affaire, la Commission agissait dans le cadre de sa compétence lorsqu'elle s'est prononcée sur les questions de droits de la personne. Cependant, vu leur compétence concurrente au moment où la Commission a été saisie de l'affaire, on ne peut guère douter que le Tribunal était lui aussi habilité, en théorie, à connaître de ces plaintes relatives aux droits de la personne. Par conséquent, l'al. 27(1)a) du *Code* ne joue pas en l'espèce.

[22]   La question qui se pose alors est donc celle de savoir sur quoi doit se fonder le Tribunal, en cas de compétence concurrente en matière de droits de la personne, pour déterminer s'il y a lieu de rejeter une plainte en totalité ou en partie en application de l'al. 27(1)f) parce qu'un autre tribunal administratif a déjà statué sur le fond de l'affaire.

[23]   Dans *Matuszewski*, le juge Pitfield a examiné les limites de cette disposition ainsi que les concepts qu'elle vise. Dans cette affaire, il était question d'une convention collective qui suspendait l'accumulation d'ancienneté pendant les périodes d'incapacité prolongée. Le syndicat avait soumis un grief fondé sur le caractère discriminatoire de la clause. L'arbitre avait toutefois conclu qu'il n'y avait pas discrimination, et le syndicat n'avait pas exercé de recours en contrôle judiciaire. Un employé de l'unité de négociation avait déposé,

The Human Rights Tribunal refused to dismiss this fresh complaint.

[24]    On judicial review of the Tribunal's decision, Pitfield J. concluded that the Tribunal's refusal to dismiss the complaint was patently unreasonable. In his view, s. 27(1)(f) is the statutory mechanism through which the Tribunal can prevent conflicting decisions arising from the same issues. This flows from the concurrent jurisdiction exercised over the *Code* by the Tribunal and other tribunals. While s. 27(1)(f) does not call for a strict application of the doctrines of issue estoppel, collateral attack, or abuse of process, the principles underlying all three of these doctrines are "factors of primary importance that must be taken into account when exercising discretion under s. 27(1)(f) of the *Human Rights Code* to proceed, or to refrain from proceeding, with the hearing of a complaint" (para. 31).

[25]    I agree with Pitfield J.'s conclusion that s. 27(1)(f) is the statutory reflection of the collective principles underlying those doctrines, doctrines used by the common law as vehicles to transport and deliver to the litigation process principles of finality, the avoidance of multiplicity of proceedings, and protection for the integrity of the administration of justice, all in the name of fairness. They are vibrant principles in the civil law as well (*Civil Code of Québec*, S.Q. 1991, c. 64, art. 2848; *Boucher v. Stelco Inc.*, 2005 SCC 64, [2005] 3 S.C.R. 279; *Rocois Construction Inc. v. Québec Ready Mix Inc.*, [1990] 2 S.C.R. 440, at p. 448).

[26]    As a result, given that multiple tribunals frequently exercise concurrent jurisdiction over the same issues, it is not surprising that the common law doctrines also find expression in the administrative law context through statutory mechanisms such as s. 27(1)(f). A brief review of these doctrines, therefore, can be of assistance in better assessing whether their underlying principles have been respected in this case.

devant le Tribunal des droits de la personne, une plainte alléguant que la même clause de la convention collective était discriminatoire. Le Tribunal a refusé de rejeter la nouvelle plainte.

[24]    Saisi d'une demande de contrôle judiciaire, le juge Pitfield a conclu que la décision du Tribunal de ne pas rejeter la plainte était manifestement déraisonnable. Selon lui, l'al. 27(1)f) est le moyen que le législateur a mis à la disposition du Tribunal pour éviter le prononcé de décisions contradictoires dans des affaires portant sur les mêmes faits, situation qui peut se produire en raison de la compétence concurrente que le Tribunal et d'autres tribunaux administratifs exercent à l'égard du *Code*. Bien que l'al. 27(1)f) n'exige pas la stricte application des règles en matière de préclusion découlant d'une question déjà tranchée, de contestation indirecte ou d'abus de procédure, les principes fondateurs de ces trois doctrines demeurent [TRADUCTION] « des facteurs primordiaux à prendre en compte dans l'exercice du pouvoir discrétionnaire d'entendre ou non une plainte conféré par l'al. 27(1)f) du *Human Rights Code* » (par. 31).

[25]    Comme le juge Pitfield, je suis d'avis que l'al. 27(1)f) reflète l'ensemble des principes sous-jacents de ces règles, auxquelles la common law a eu recours comme véhicule pour porter, en contexte de procédures judiciaires, les principes de caractère définitif des instances, de prévention de leur multiplication et de protection de l'intégrité de l'administration de la justice, dans chaque cas, par souci d'équité. Ces principes animent également le droit civil (*Code civil du Québec*, L.Q. 1991, ch. 64, art. 2848; *Boucher c. Stelco Inc.*, 2005 CSC 64, [2005] 3 R.C.S. 279; *Rocois Construction Inc. c. Québec Ready Mix Inc.*, [1990] 2 R.C.S. 440, p. 448).

[26]    Puisque de multiples tribunaux exercent fréquemment des compétences concurrentes quant aux mêmes questions, il n'est pas surprenant que les doctrines de common law s'appliquent également en contexte de droit administratif sous la forme de mécanismes légaux comme celui qu'établit l'al. 27(1)f). Par conséquent, un bref examen de ces doctrines pourrait permettre de mieux évaluer si leurs principes sous-jacents ont été respectés en l'espèce.

2011 SCC 52 (CanLII)

Case 1:25-cv-00910-JMF    Document 52-15    Filed 04/07/25    Page 18 of 50

438        WORKERS' COMPENSATION BOARD  *v.* FIGLIOLA   *Abella J.*        [2011] 3 S.C.R.

[27]   The three preconditions of issue estoppel are whether the same question has been decided; whether the earlier decision was final; and whether the parties, or their privies, were the same in both proceedings (*Angle v. Minister of National Revenue*, [1975] 2 S.C.R. 248, at p. 254). These concepts were most recently examined by this Court in *Danyluk*, where Binnie J. emphasized the importance of finality in litigation: "A litigant . . . is only entitled to one bite at the cherry. . . . Duplicative litigation, potential inconsistent results, undue costs, and inconclusive proceedings are to be avoided" (para. 18). Parties should be able to rely particularly on the conclusive nature of administrative decisions, he noted, since administrative regimes are designed to facilitate the expeditious resolution of disputes (para. 50). All of this is guided by the theory that "estoppel is a doctrine of public policy that is designed to advance the interests of justice" (para. 19).

[28]   The rule against collateral attack similarly attempts to protect the fairness and integrity of the justice system by preventing duplicative proceedings. It prevents a party from using an institutional detour to attack the validity of an order by seeking a different result from a different forum, rather than through the designated appellate or judicial review route: see *Canada (Attorney General) v. TeleZone Inc.*, 2010 SCC 62, [2010] 3 S.C.R. 585, and *Garland v. Consumers' Gas Co.*, 2004 SCC 25, [2004] 1 S.C.R. 629.

[29]   Both collateral attack and *res judicata* received this Court's attention in *Boucher*. The Ontario Superintendent of Pensions had ordered and approved a partial wind-up report according to which members of the plan employed in Quebec were not to receive early retirement benefits, due to the operation of Quebec law. The employees were notified, but chose not to contest the Superintendent's decision to approve the report. Instead, several of them started an action against their employer in the Quebec Superior Court claiming their entitlement to early retirement benefits. LeBel J. rejected the employees'

[27]   Les trois conditions d'application de la préclusion découlant d'une question déjà tranchée sont que la même question ait été décidée, que la décision déjà rendue soit définitive et que les parties, ou leurs ayants droit, soient les mêmes (*Angle c. Ministre du Revenu National*, [1975] 2 R.C.S. 248, p. 254). La décision la plus récente de notre Cour sur ces notions est l'arrêt *Danyluk*; le juge Binnie y a souligné l'importance du caractère définitif des litiges : « . . . un plaideur n'a droit qu'à une seule tentative. [. . .] Les instances faisant double emploi, les risques de résultats contradictoires, les frais excessifs et les procédures non décisives doivent être évités » (par. 18). Il a indiqué que les parties devaient pouvoir être assurées du caractère définitif des décisions administratives, en particulier, parce que ces régimes visent à faciliter le règlement rapide des différends (par. 50). Tout cela repose sur le principe que « la préclusion est une doctrine d'intérêt public qui tend à favoriser les intérêts de la justice » (par. 19).

[28]   La règle interdisant la contestation indirecte vise elle aussi la protection de l'équité et de l'intégrité du système judiciaire en empêchant la répétition des instances. Elle empêche les détours institutionnels ayant pour but d'attaquer la validité d'une ordonnance en tentant d'obtenir un résultat différent devant un forum différent plutôt qu'en suivant la procédure d'appel ou de contrôle judiciaire prescrite : voir *Canada (Procureur général) c. TeleZone Inc.*, 2010 CSC 62, [2010] 3 R.C.S. 585, et *Garland c. Consumers' Gas Co.*, 2004 CSC 25, [2004] 1 R.C.S. 629.

[29]   Dans *Boucher*, notre Cour a examiné tant la contestation indirecte que le principe de l'autorité de la chose jugée. Le surintendant des régimes de retraite de l'Ontario avait ordonné une liquidation partielle et approuvé un rapport de liquidation prévoyant que, conformément au droit québécois, les participants employés au Québec ne toucheraient pas de pension anticipée. Les employés ont été prévenus, mais ont décidé de ne pas contester la décision du surintendant d'approuver le rapport. Certains d'entre eux ont plutôt revendiqué leur droit à une pension anticipée dans une action contre leur employeur intentée en Cour supérieure du Québec.

claim. Administrative law, he noted, has review mechanisms in place for reducing error or injustice. Those are the mechanisms parties should use. The decision to pursue a court action instead of judicial review resulted in "an impermissible collateral attack on the Superintendent's decision":

Modern adjective law and administrative law have gradually established various appeal mechanisms and sophisticated judicial review procedures, so as to reduce the chance of errors or injustice. Even so, the parties must avail themselves of those options properly and in a timely manner. Should they fail to do so, the case law does not in most situations allow collateral attacks on final decisions . . . . [para. 35]

[30]    In other words, the harm to the justice system lies not in challenging the correctness or fairness of a judicial or administrative decision in the proper forums, it comes from inappropriately circumventing them (*Toronto (City) v. C.U.P.E., Local 79*, 2003 SCC 63, [2003] 3 S.C.R. 77, at para. 46).

[31]    And finally, we come to the doctrine of abuse of process, which too has as its goal the protection of the fairness and integrity of the administration of justice by preventing needless multiplicity of proceedings, as was explained by Arbour J. in *Toronto (City)*. The case involved a recreation instructor who was convicted of sexually assaulting a boy under his supervision and was fired after his conviction. He grieved the dismissal. The arbitrator decided that the conviction was admissible evidence but not binding on him. As a result, he concluded that the instructor had been dismissed without cause.

[32]    Arbour J. found that the arbitrator was wrong not to give full effect to the criminal conviction even though neither *res judicata* nor the rule against collateral attack strictly applied. Because the effect of the arbitrator's decision was to relitigate

Le juge LeBel a rejeté leur prétention, indiquant que le droit administratif établit des mécanismes de révision visant à réduire les possibilités d'erreur ou d'injustice et que ce sont là les mécanismes auxquels les parties doivent avoir recours. La décision d'intenter une action plutôt que de recourir au contrôle judiciaire constituait « la contestation indirecte inadmissible de la décision du surintendant » :

Le droit judiciaire et le droit administratif modernes ont graduellement établi des mécanismes d'appel divers, voire des procédures élaborées de contrôle judiciaire, pour réduire les possibilités d'erreur ou d'injustice. Encore faut-il que les parties sachent les utiliser à bon escient et en temps opportun. À défaut, la jurisprudence ne permettra pas, en règle générale, la contestation indirecte d'une décision devenue finale . . . [par. 35]

[30]    Autrement dit, ce n'est pas la contestation du bien-fondé ou de l'équité d'une décision judiciaire ou administrative devant les forums compétents qui est préjudiciable au système judiciaire, c'est le fait d'éluder ces mécanismes de révision (*Toronto (Ville) c. S.C.F.P., section locale 79*, 2003 CSC 63, [2003] 3 R.C.S. 77, par. 46).

[31]    La dernière règle est celle qui régit l'abus de procédure. Elle vise aussi à protéger l'équité et l'intégrité de l'administration de la justice en empêchant le dédoublement inutile d'instances, comme l'a expliqué la juge Arbour dans *Toronto (Ville)*. Dans cette affaire, la municipalité avait congédié un instructeur en loisirs qui avait été déclaré coupable d'agression sexuelle sur la personne d'un jeune garçon confié à sa surveillance. Un grief contestant le congédiement avait été déposé, et l'arbitre qui en avait été saisi, après avoir indiqué que la déclaration de culpabilité était recevable en preuve, mais qu'elle ne le liait pas, avait jugé que l'instructeur avait été congédié sans motif valable.

[32]    La juge Arbour a conclu que l'arbitre avait eu tort de ne pas donner plein effet à la déclaration de culpabilité même si, strictement parlant, les doctrines de l'autorité de la chose jugée ou de l'interdiction de la contestation indirecte ne s'appliquaient

the conviction for sexual assault, the proceeding amounted to a "blatant abuse of process" (para. 56).

[33]    Even where *res judicata* is not strictly available, Arbour J. concluded, the doctrine of abuse of process can be triggered where allowing the litigation to proceed would violate principles such as "judicial economy, consistency, finality and the integrity of the administration of justice" (para. 37). She stressed the goals of avoiding inconsistency and wasting judicial and private resources:

[Even] if the same result is reached in the subsequent proceeding, the relitigation will prove to have been a waste of judicial resources as well as an unnecessary expense for the parties and possibly an additional hardship for some witnesses. Finally, if the result in the subsequent proceeding is different from the conclusion reached in the first on the very same issue, the inconsistency, in and of itself, will undermine the credibility of the entire judicial process, thereby diminishing its authority, its credibility and its aim of finality. [para. 51]

(See also *R. v. Mahalingan*, 2008 SCC 63, [2008] 3 S.C.R. 316, at para. 106, *per* Charron J.)

[34]    At their heart, the foregoing doctrines exist to prevent unfairness by preventing "abuse of the decision-making process" (*Danyluk*, at para. 20; see also *Garland*, at para. 72, and *Toronto (City)*, at para. 37). Their common underlying principles can be summarized as follows:

- It is in the interests of the public and the parties that the finality of a decision can be relied on (*Danyluk*, at para. 18; *Boucher*, at para. 35).

- Respect for the finality of a judicial or administrative decision increases fairness and the integrity of the courts, administrative tribunals and the administration of justice; on the other hand, relitigation of issues that have been previously decided in an appropriate forum may undermine confidence in this fairness

pas. Parce que la décision de l'arbitre avait pour effet de remettre en cause la déclaration de culpabilité pour agression sexuelle, l'instance constituait un « abus flagrant de procédure » (par. 56).

[33]    La juge Arbour a conclu que la doctrine de l'abus de procédure peut entrer en jeu, même lorsque les exigences du principe de l'autorité de la chose jugée ne sont pas strictement remplies, lorsqu'il y aurait violation de principes comme ceux « d'économie, de cohérence, de caractère définitif des instances et d'intégrité de l'administration de la justice » si l'instance était autorisée à aller de l'avant (par. 37). La juge a insisté sur l'importance d'éviter les contradictions et le gaspillage de ressources judiciaires et privées :

[Même] si l'instance subséquente donne lieu à une conclusion similaire, la remise en cause aura été un gaspillage de ressources judiciaires et une source de dépenses inutiles pour les parties sans compter les difficultés supplémentaires qu'elle aura pu occasionner à certains témoins. Troisièmement, si le résultat de la seconde instance diffère de la conclusion formulée à l'égard de la même question dans la première, l'incohérence, en soi, ébranlera la crédibilité de tout le processus judiciaire et en affaiblira ainsi l'autorité, la crédibilité et la vocation à l'irrévocabilité. [par. 51]

(Voir aussi *R. c. Mahalingan*, 2008 CSC 63, [2008] 3 R.C.S. 316, par. 106, la juge Charron.)

[34]    Ces doctrines existent essentiellement pour prévenir l'inéquité en empêchant « les recours abusifs » (*Danyluk*, par. 20; voir aussi *Garland*, par. 72, et *Toronto (Ville)*, par. 37). On peut résumer ainsi leurs principes sous-jacents communs :

- La capacité de se fier au caractère définitif d'une décision sert l'intérêt public et celui des parties (*Danyluk*, par. 18; *Boucher*, par. 35).

- Le respect du caractère définitif d'une décision judiciaire ou administrative renforce l'équité et l'intégrité des tribunaux judiciaires et administratifs ainsi que de l'administration de la justice; à l'opposé, la remise en cause de questions déjà tranchées par un forum compétent peut miner la confiance envers l'équité et l'intégrité

and integrity by creating inconsistent results and unnecessarily duplicative proceedings (*Toronto (City)*, at paras. 38 and 51).

- The method of challenging the validity or correctness of a judicial or administrative decision should be through the appeal or judicial review mechanisms that are intended by the legislature (*Boucher*, at para. 35; *Danyluk*, at para. 74).

- Parties should not circumvent the appropriate review mechanism by using other forums to challenge a judicial or administrative decision (*TeleZone*, at para. 61; *Boucher*, at para. 35; *Garland*, at para. 72).

- Avoiding unnecessary relitigation avoids an unnecessary expenditure of resources (*Toronto (City)*, at paras. 37 and 51).

[35]   These are the principles which underlie s. 27(1)(f). Singly and together, they are a rebuke to the theory that access to justice means serial access to multiple forums, or that more adjudication necessarily means more justice.

[36]   Read as a whole, s. 27(1)(f) does not codify the actual doctrines or their technical explications, it embraces their underlying principles in pursuit of finality, fairness, and the integrity of the justice system by preventing unnecessary inconsistency, multiplicity and delay. That means the Tribunal should be guided less by precise doctrinal catechisms and more by the goals of the fairness of finality in decision-making and the avoidance of the relitigation of issues already decided by a decision-maker with the authority to resolve them. Justice is enhanced by protecting the expectation that parties will not be subjected to the relitigation in a different forum of matters they thought had been conclusively resolved. Forum shopping for a different and better result can be dressed up in many attractive adjectives, but fairness is not among them.

du système en créant de l'incohérence et en suscitant des recours faisant inutilement double emploi (*Toronto (Ville)*, par. 38 et 51).

- La contestation de la validité ou du bien-fondé d'une décision judiciaire ou administrative se fait au moyen de la procédure d'appel ou de contrôle judiciaire prévue par le législateur (*Boucher*, par. 35; *Danyluk*, par. 74).

- Les parties ne doivent pas éluder le mécanisme de révision prévu en s'adressant à un autre forum pour contester une décision judiciaire ou administrative (*TeleZone*, par. 61; *Boucher*, par. 35; *Garland*, par. 72).

- En évitant les remises en cause inutiles, on évite le gaspillage de ressources (*Toronto (Ville)*, par. 37 et 51).

[35]   C'est sur ces principes que repose l'al. 27(1)f). Individuellement et collectivement, ils font échec aux arguments voulant que l'accessibilité à la justice soit synonyme d'accès successifs à de multiples forums ou que plus on rend de décisions plus on s'approche de la justice.

[36]   Considéré dans son ensemble, l'al. 27(1)f) ne codifie pas les doctrines elles-mêmes ou leurs explications techniques, il en englobe les principes sousjacents afin d'assurer le caractère définitif des instances, l'équité et l'intégrité du système judiciaire en prévenant les incohérences, les dédoublements et les délais inutiles. Il s'ensuit que ce ne sont pas tant des dogmes doctrinaux précis qui devraient guider le Tribunal que les objets de la disposition, qui sont d'assurer l'équité du caractère définitif du processus décisionnel et d'éviter la remise en cause de questions déjà tranchées par un décideur ayant compétence pour en connaître. La justice est accrue par la protection de l'attente des parties qu'elles ne soient pas sujettes à des instances supplémentaires, devant un forum différent, pour des questions qu'elles estimaient résolues définitivement. Le magasinage de forum pour que l'issue d'un litige soit différente et meilleure peut être maquillé de nombreux qualificatifs attrayants, l'équité n'en fait toutefois pas partie.

[37]    Relying on these underlying principles leads to the Tribunal asking itself whether there was concurrent jurisdiction to decide human rights issues; whether the previously decided legal issue was essentially the same as what is being complained of to the Tribunal; and whether there was an opportunity for the complainants or their privies to know the case to be met and have the chance to meet it, regardless of how closely the previous process procedurally mirrored the one the Tribunal prefers or uses itself. All of these questions go to determining whether the substance of a complaint has been "appropriately dealt with". At the end of the day, it is really a question of whether it makes sense to expend public and private resources on the relitigation of what is essentially the same dispute.

[38]    What I do *not* see s. 27(1)(f) as representing is a statutory invitation either to "judicially review" another tribunal's decision, or to reconsider a legitimately decided issue in order to explore whether it might yield a different outcome. The section is oriented instead towards creating territorial respect among neighbouring tribunals, including respect for their right to have their own vertical lines of review protected from lateral adjudicative poaching. When an adjudicative body decides an issue within its jurisdiction, it and the parties who participated in the process are entitled to assume that, subject to appellate or judicial review, its decision will not only *be* final, it will be treated as such by other adjudicative bodies. The procedural or substantive correctness of the previous proceeding is not meant to be bait for another tribunal with a concurrent mandate.

[39]    I see the discretion in s. 27(1)(f), in fact, as being limited, based not only on the language of s. 27(1)(f), but also on the character of the other six categories of complaints in s. 27(1) in whose company it finds itself. Section 27(1) states:

27    (1)    A member or panel may, at any time after a complaint is filed and with or without a

[37]    En s'appuyant sur ces principes sous-jacents, le Tribunal est appelé à se demander s'il existe une compétence concurrente pour statuer sur les questions relatives aux droits de la personne, si la question juridique tranchée par la décision antérieure était essentiellement la même que celle qui est soulevée dans la plainte dont il est saisi et si le processus antérieur, qu'il ressemble ou non à la procédure que le Tribunal préfère ou utilise lui-même, a offert la possibilité aux plaignants ou à leurs ayants droit de connaître les éléments invoqués contre eux et de les réfuter. Toutes ces questions visent à déterminer s'il [TRADUCTION] « a été statué de façon appropriée » sur le fond de la plainte. Il s'agit, en définitive, de se demander s'il est logique de consacrer des ressources publiques et privées à la remise en cause de ce qui est essentiellement le même litige.

[38]    Ce que *ne* fait *pas* l'al. 27(1)f), selon moi, c'est inviter au « contrôle judiciaire » de la décision d'un autre tribunal ou au réexamen d'une question dûment tranchée pour voir si un résultat différent pourrait en émerger. Cet alinéa vise plutôt à instaurer un respect juridictionnel entre tribunaux administratifs voisins, englobant le respect du droit à la protection de leur propre voie verticale de révision contre les empiétements indirects. L'organisme juridictionnel qui se prononce sur une question qui est de son ressort et les parties en cause doivent pouvoir tenir pour acquis que, sous réserve d'un appel ou d'un contrôle judiciaire, non seulement la décision *sera-t-elle* définitive, mais elle sera considérée telle par les autres organismes juridictionnels. La justesse de l'instance antérieure quant au fond ou à la forme ne saurait servir d'appât pour d'autres tribunaux administratifs exerçant une compétence concurrente.

[39]    Tel que je le conçois, le pouvoir discrétionnaire conféré par l'al. 27(1)f) est en fait restreint, non seulement en raison du texte de cette disposition, mais également de la nature des six autres catégories de plaintes mentionnées au par. 27(1), lequel prévoit ce qui suit :

[TRADUCTION]

27    (1)    Un membre ou une formation peut, à tout moment après le dépôt d'une plainte, rejeter

hearing, dismiss all or part of the complaint if that member or panel determines that any of the following apply:

(a) the complaint or that part of the complaint is not within the jurisdiction of the tribunal;

(b) the acts or omissions alleged in the complaint or that part of the complaint do not contravene this Code;

(c) there is no reasonable prospect that the complaint will succeed;

(d) proceeding with the complaint or that part of the complaint would not

  (i) benefit the person, group or class alleged to have been discriminated against, or

  (ii) further the purposes of this Code;

(e) the complaint or that part of the complaint was filed for improper motives or made in bad faith;

(f) the substance of the complaint or that part of the complaint has been appropriately dealt with in another proceeding;

(g) the contravention alleged in the complaint or that part of the complaint occurred more than 6 months before the complaint was filed unless the complaint or that part of the complaint was accepted under section 22(3).

[40] Each subsection in s. 27(1) refers to circumstances that make hearing the complaint presumptively unwarranted: complaints that are not within the Tribunal's jurisdiction; allege acts or omissions that do not contravene the *Code*; have no reasonable prospect of success; would not be of any benefit to the complainant or further the purposes of the *Code*; or are made for improper motives or in bad faith. These are the statutory companions for s. 27(1)(f). The fact that the word "may" is used in the preamble to s. 27(1) means that the Tribunal does have an element of discretion in deciding whether to dismiss these complaints. But it strikes me as counterintuitive to think that the legislature intended to give the Tribunal a wide berth to

une plainte en totalité ou en partie, avec ou sans audience si, à son avis, l'une ou l'autre des circonstances suivantes est applicable :

a) la plainte ou une partie de la plainte ne relève pas de la compétence du tribunal;

b) les actes ou omissions allégués ne contreviennent pas au présent Code;

c) il n'existe aucune possibilité raisonnable que le plaignant ait gain de cause;

d) connaître en totalité ou en partie de la plainte :

  (i) n'apporterait rien à la personne, au groupe ou à la catégorie censés avoir été victime de discrimination;

  (ii) ne servirait pas les fins poursuivies par le présent Code;

e) la totalité ou partie de la plainte a été déposée de mauvaise foi ou à des fins illégitimes;

f) il a été statué de façon appropriée sur le fond de la plainte dans une autre instance;

g) la contravention alléguée dans la plainte ou dans une partie de la plainte est survenue plus de six mois avant le dépôt de la plainte, sauf s'il y a eu acceptation de la plainte en totalité ou en partie en vertu du paragraphe 22(3).

[40] Chaque alinéa du par. 27(1) fait référence à des circonstances qui laissent présumer qu'il ne serait pas justifié d'entendre la plainte : les plaintes qui ne relèvent pas de la compétence du Tribunal, celles qui allèguent des actes ou des omissions qui ne contreviennent pas au *Code*, s'il n'existe aucune possibilité raisonnable que le plaignant ait gain de cause, si les plaintes n'apporteraient rien au plaignant et ne serviraient pas les fins poursuivies par le *Code* ou si elles ont été déposées de mauvaise foi ou à des fins illégitimes. Voilà quelles sont les dispositions qui accompagnent l'al. 27(1)f). La présence du verbe « peut » dans le passage introductif du par. 27(1) signifie que le Tribunal dispose d'un certain pouvoir discrétionnaire lorsqu'il décide de

decide, for example, whether or not to dismiss complaints it has no jurisdiction to hear, are unlikely to succeed, or are motivated by bad faith.

[41]   This is the context in which the words "appropriately dealt with" in s. 27(1)(f) should be understood. All of the other provisions with which s. 27(1)(f) is surrounded lean towards encouraging dismissal. On its face, there is no principled basis for interpreting s. 27(1)(f) idiosyncratically from the rest of s. 27(1). I concede that the word "appropriately" is, by itself, easily stretched into many linguistic directions. But our task is not to define the word, it is to define it in its statutory context so that, to the extent reasonably possible, the legislature's intentions can be respected.

[42]   Nor does the legislative history of s. 27(1)(f) support the theory that the legislature intended to give the Tribunal a wide discretion to re-hear complaints decided by other tribunals. Formerly, ss. 25(3) and 27(2) of the *Code* required the Tribunal to consider the subject matter, nature, and available remedies of the earlier proceeding in deciding whether to defer or dismiss a complaint without a hearing. These factors were interpreted by the Human Rights Commission to include the administrative fairness of the earlier proceeding, the expertise of the decision-maker, which forum was more appropriate for discussing the issues, and whether the earlier proceeding could deliver an adequate remedy, factors which provided hurdles to the dismissal of complaints: see D. K. Lovett and A. R. Westmacott, "Human Rights Review: A Background Paper" (2001) (online), at pp. 100-101.

[43]   The legislature removed these limiting factors in 2002 in the *Human Rights Code Amendment*

rejeter ou non ce type de plaintes. Mais il me semble contre-intuitif de penser que le législateur aurait eu l'intention de conférer au Tribunal une grande latitude pour décider, par exemple, s'il convient de rejeter les plaintes qui ne relèvent pas de sa compétence, qui ne risquent pas d'être accueillies ou qui ont été déposées de mauvaise foi.

[41]   C'est dans ce contexte qu'il faut comprendre l'expression [TRADUCTION] « statué de façon appropriée » qui figure à l'al. 27(1)f). Toutes les autres dispositions qui entourent cet alinéa tendent à encourager le rejet. À première vue, il n'existe aucun fondement rationnel pour interpréter l'al. 27(1)f) indépendamment du reste du par. 27(1). Certes, pris isolément, le sens de l'adjectif « approprié » peut facilement, sur le plan linguistique, être étiré dans plusieurs directions. Cela étant dit, notre tâche ne consiste pas à définir ce mot, elle consiste à le définir dans le contexte de la disposition où il se trouve de sorte que, dans la mesure du possible, les intentions du législateur puissent être respectées.

[42]   L'historique de l'al. 27(1)f) n'appuie pas non plus la thèse selon laquelle le législateur avait l'intention de donner au Tribunal un vaste pouvoir discrétionnaire de réentendre les plaintes à l'égard desquelles d'autres tribunaux s'étaient déjà prononcés. Antérieurement, les par. 25(3) et 27(2) du *Code* exigeaient que le Tribunal tienne compte du sujet de la procédure antérieure, de sa nature ainsi que des mesures de réparations offertes pour décider s'il reportait ou rejetait une plainte sans audience. Selon l'interprétation qu'en a donné la Commission des droits de la personne, ces facteurs comprenaient l'équité administrative de l'instance antérieure, l'expertise du décideur, une réflexion sur le forum qui était le plus approprié pour discuter des questions en litige et une autre sur la question de savoir si l'instance antérieure permettait d'obtenir une réparation adéquate, tous des facteurs qui étaient des obstacles au rejet des plaintes : voir D. K. Lovett et A. R. Westmacott, « Human Rights Review : A Background Paper » (2001) (en ligne), p. 100 et 101.

[43]   Le législateur a retiré ces facteurs limitatifs en 2002, lors de l'édiction du *Human Rights*

*Act, 2002*, S.B.C. 2002, c. 62. By removing factors which argued *against* dismissing a complaint, the legislature may well be taken to have intended that a different approach be taken by the Tribunal, namely, one that made it easier to dismiss complaints. This is consistent with the statement of the then Minister of Government Services, the Hon. U. Dosanjh, on second reading of the *Human Rights Amendment Act, 1995*, S.B.C. 1995, c. 42, which included s. 22(1), the almost identically worded predecessor to s. 27(1). While he did not specifically refer to each of the subsections of s. 22(1) or their discrete purposes, it is clear that his overriding objective in introducing this legislative package, which included these provisions, was to reduce a substantial backlog and ensure "a system . . . which will be efficient and streamlined":

In this proposed legislation, you now have the power to defer consideration of a complaint pending the outcome of another proceeding, so that there is no unnecessary overlap in the proceedings.

. . .

You have the power to dismiss the complaints, as I indicated, and that has been expanded. [Emphasis added.]

(British Columbia, *Official Report of Debates of the Legislative Assembly (Hansard)*, vol. 21, 4th Sess., 35th Parl., June 22, 1995, at p. 16062)

[44]    This then brings us to the Tribunal's use of the *Danluk* factors. Not only do I resist reintroducing by judicial fiat the types of factors that the legislature has expressly removed, it is not clear to me that the *Danluk* factors even apply. They were developed to assist courts in applying the doctrine of issue estoppel. Section 27(1)(f), on the other hand, is not limited to issue estoppel. As Pitfield J. explained in *Matuszewski*, s. 27(1)(f) does not call for the technical application of any of the common law doctrines — issue estoppel, collateral attack or

*Code Amendment Act, 2002*, S.B.C. 2002, ch. 62. En procédant ainsi au retrait de facteurs qui militaient *contre* le rejet d'une plainte, on peut en déduire à bon droit que le législateur avait l'intention que le Tribunal adopte une approche différente, soit, une approche qui facilite le rejet des plaintes. Cette interprétation est d'ailleurs compatible avec la déclaration suivante qu'avait faite le ministre des Services gouvernementaux de l'époque, l'honorable U. Dosanjh, lors de la seconde lecture du *Human Rights Amendment Act, 1995*, S.B.C. 1995, ch. 42, qui comprenait le par. 22(1), devenu par la suite le par. 27(1), dont le libellé était pratiquement le même que celui de la disposition antérieure. Bien qu'il n'ait pas fait référence spécifiquement à chaque alinéa du par. 22(1) ou à leurs objets distincts, il est manifeste que l'objectif primordial en présentant l'ensemble législatif en question qui comprenait ces dispositions, consistait à réduire un arriéré considérable et à garantir la mise en place d'[TRADUCTION] « un système [. . .] qui sera efficace et simplifié » :

[TRADUCTION] Selon ce projet de loi, vous aurez dorénavant le pouvoir de reporter l'examen d'une plainte jusqu'à l'issue d'une autre instance, de manière à éviter les chevauchements inutiles de procédures.

. . .

Vous aurez le pouvoir de rejeter les plaintes, comme je l'ai mentionné, et ce pouvoir a été étendu. [Je souligne.]

(Colombie-Britannique, *Official Report of Debates of the Legislative Assembly (Hansard)*, vol. 21, 4e sess., 35e lég., 22 juin 1995, p. 16062)

[44]    Cela nous amène à nous pencher sur l'utilisation par le Tribunal des facteurs énoncés dans *Danluk*. Non seulement suis-je réticente à réintroduire au moyen d'une ordonnance judiciaire les types de facteurs que le législateur a expressément retranchés, mais il ne me semble pas évident qu'il faille même appliquer les critères élaborés dans *Danluk*. Ces critères ont été élaborés pour aider les tribunaux à appliquer la doctrine de la préclusion découlant d'une question déjà tranchée. Or, la portée de l'al. 27(1)f) ne se limite pas

abuse of process — it calls instead for an approach that applies their combined principles. Notably, neither Stromberg-Stein J. nor the Court of Appeal referred to the *Danluk* factors in their respective analyses.

[45]  Moreover, importing the *Danluk* factors into s. 27(1)(f) would undermine what this Court mandated in *Tranchemontagne* when it directed that, absent express language to the contrary, all administrative tribunals have concurrent jurisdiction to apply human rights legislation. That means that *Danluk* factors such as the prior decision-maker's mandate and expertise, are presumed to be satisfied. Encouraging the Tribunal to nonetheless apply a comparative mandate and expertise approach would erode Bastarache J.'s conclusion that human rights tribunals are not the exclusive "guardian or the gatekeeper for human rights law" (*Tranchemontagne*, at para. 39).

[46]  This brings us to how the Tribunal exercised its discretion in this case. Because I see s. 27(1)(f) as reflecting the principles of the common law doctrines rather than the codification of their technical tenets, I find the Tribunal's strict adherence to the application of issue estoppel to be an overly formalistic interpretation of the section, particularly of the phrase "appropriately dealt with". With respect, this had the effect of obstructing rather than implementing the goal of avoiding unnecessary relitigation. In acceding to the complainant's request for relitigation of the same s. 8 issue, the Tribunal was disregarding Arbour J.'s admonition in *Toronto (City)* that parties should not try to

à la question de la préclusion découlant d'une question déjà tranchée. Comme l'a expliqué le juge Pitfield dans *Matuszewski*, l'al. 27(1)f) ne commande pas l'application technique de l'une ou l'autre des doctrines de common law — la préclusion découlant d'une question déjà tranchée, la contestation indirecte ou l'abus de procédure — il invite plutôt à adopter une approche qui combine les principes applicables à ces doctrines. D'ailleurs, il convient de le souligner, ni la juge Stromberg-Stein ni la Cour d'appel n'ont fait référence aux critères de *Danluk* dans leur analyse respective.

[45]  En outre, si les critères de *Danluk* étaient importés dans l'al. 27(1)f), cela contrecarrerait ce que la Cour a prescrit dans *Tranchemontagne* lorsqu'elle a indiqué que, en l'absence d'une disposition expresse à l'effet contraire, tous les tribunaux administratifs ont une compétence concurrente en matière d'application des mesures législatives relatives aux droits de la personne. Cela signifie qu'il doit être présumé qu'il a été satisfait aux critères énoncés dans *Danluk* tel celui quant au mandat et à l'expertise du décideur dans l'instance antérieure. Encourager le Tribunal à appliquer malgré tout une approche fondée sur une comparaison des mandats et de l'expertise éroderait la conclusion du juge Bastarache selon laquelle les tribunaux des droits de la personne ne sont pas les seuls « gardien[s] des lois relatives aux droits de la personne » (*Tranchemontagne*, par. 39).

[46]  Cela nous amène à l'examen de l'exercice de son pouvoir discrétionnaire par le Tribunal en l'espèce. Parce que je vois dans l'al. 27(1)f) l'expression des principes fondant les doctrines de common law plutôt qu'une codification de leurs éléments techniques, je conclus qu'en s'en tenant à l'application stricte de la préclusion découlant d'une question déjà tranchée, le Tribunal a donné une interprétation trop formaliste à la disposition et, plus particulièrement, aux mots [TRADUCTION] « a été statué de façon appropriée ». Selon moi, plutôt que de donner effet à l'objectif de prévention des remises en cause inutiles, une telle interprétation y fait obstacle. En accédant à la demande des plaignants

impeach findings by the "impermissible route of relitigation in a different forum" (para. 46).

[47]   "Relitigation in a different forum" is exactly what the complainants in this case were trying to do. Rather than challenging the Review Officer's decision through the available review route of judicial review, they started fresh proceedings before a different tribunal in search of a more favourable result. This strategy represented, as Stromberg-Stein J. noted, a "collateral appeal" to the Tribunal (para. 52), the very trajectory that s. 27(1)(f) and the common law doctrines were designed to prevent:

. . . this case simply boils down to the complainants wanting to reargue the very same issue that has already been conclusively decided within the same factual and legal matrix. The complainants are attempting to pursue the matter again, within an administrative tribunal setting where there is no appellate authority by one tribunal over the other. [para. 54]

[48]   The Tribunal's analysis made it complicit in this attempt to collaterally appeal the merits of the Board's decision and decision-making process. Its analysis represents a litany of factors having to do with whether it was comfortable with the process and merits of the Review Officer's decision.

[49]   To begin, it questioned whether the Review Division's process met the necessary procedural requirements. This is a classic judicial review question and not one within the mandate of a concurrent decision-maker. While the Tribunal may inquire into whether the parties had notice of the case to be met and were given an opportunity to respond, that does not mean that it can require that the prior process be a procedural mimic of the Tribunal's own, more elaborate one. But in any event, I agree with Stromberg-Stein J. that there were no complaints

de reprendre l'examen de la même question relative à l'art. 8, le Tribunal n'a pas tenu compte de la mise en garde donnée par la juge Arbour dans *Toronto (Ville)*, qu'il « n'est pas permis [. . .] d'attaquer un jugement en tentant de soulever de nouveau la question devant un autre forum » (par. 46).

[47]   En l'espèce, les plaignants cherchaient précisément à « soulever de nouveau la question devant un autre forum ». Plutôt que d'emprunter la voie du contrôle judiciaire, qui leur était ouverte, pour contester la décision de l'agent de révision, ils ont engagé une nouvelle instance devant un autre tribunal administratif dans l'espoir d'obtenir un résultat plus favorable. Comme la juge Stromberg-Stein l'a indiqué, cette stratégie constituait un [TRADUCTION] « appel indirect » (par. 52), une démarche que l'al. 27(1)f) et les doctrines de common law visent précisément à éviter :

[TRADUCTION] . . . la présente espèce n'est que la tentative des plaignants de rouvrir un débat qui a déjà été tranché de façon définitive en fonction du même fondement factuel et juridique. Ils cherchent à remettre la même question en cause dans un contexte juridictionnel administratif où le nouveau tribunal saisi n'exerce aucune compétence d'appel à l'égard du précédent. [par. 54]

[48]   L'analyse du Tribunal l'a rendu complice de cette tentative de contester indirectement le bien-fondé de la décision de la Commission et du processus suivi; on y trouve une myriade de facteurs en fonction desquels le Tribunal s'est demandé s'il était à l'aise avec le processus de l'instance antérieure et avec les motifs de la décision de l'agent de révision.

[49]   Il s'est d'abord demandé si le processus suivi devant la Section de révision satisfaisait aux exigences procédurales. Il s'agit là d'une question de contrôle judiciaire classique et non d'une question que se pose un décideur dans l'exercice d'une compétence concurrente. Certes, le Tribunal peut se demander si les parties ont été informées de ce qui était invoqué contre elles et si elles ont pu y répondre, mais cela ne signifie pas qu'il peut exiger que le processus antérieur soit une réplique de celui qui se déroule devant lui, soit un processus plus

2011 SCC 52 (CanLII)

about the complainants' ability to know the case to be met or the Board's jurisdiction to hear it:

> Each of the complainants participated fully in the proceedings; each knew the case to be met and had the chance to meet it. Each of the complainants had the benefit of competent and experienced counsel who raised the human rights issues within the workers' compensation context. The issues were analyzed and addressed fully by the Review Division. It was implicit in their submissions to the Review Division that they accepted the Review Division had full authority to decide the human rights issue. [para. 52]

(See also *Rasanen v. Rosemount Instruments Ltd.* (1994), 112 D.L.R. (4th) 683 (Ont. C.A.), at p. 705.)

As long as the complainants had a chance to air their grievances before an authorized decision-maker, the extent to which they received traditional "judicial" procedural trappings should not be the Tribunal's concern.

[50]   The Tribunal also criticized the Review Officer for the way he interpreted his human rights mandate:

> . . . the Review Officer, who, in the absence of evidence, made findings about the appropriate comparator group, that the dignity of the Complainants was not impacted by the Policy, and that there was a [*bona fide* justification] for the Policy. There was no analysis regarding where the onus lay in establishing a [*bona fide* justification] or what the applicable interpretive principles with respect to human rights legislation are. . . . Further, any discriminatory rule must not discriminate more than is necessary; hence, there must be consideration given to possible alternatives to the impugned rule which would be less . . . . discriminatory while still achieving the objective . . . . [para. 46]

These too are precisely the kinds of questions about the merits that are properly the subject of judicial review, not grounds for a collateral attack by a human rights tribunal under the guise of s. 27(1)(f).

complexe. Quoi qu'il en soit, je souscris à la conclusion de la juge Stromberg-Stein selon laquelle la capacité des plaignants de connaître les éléments invoqués contre eux et de les réfuter n'était pas en cause :

> [TRADUCTION] Chaque plaignant a pleinement participé à l'instance; chacun savait ce qui était invoqué contre lui et a eu l'occasion d'y répondre. Chacun d'eux était représenté par un avocat compétent et expérimenté qui a soulevé les questions relatives aux droits de la personne dans le contexte de l'indemnisation des accidents de travail. La Section de révision a pris ces questions en compte et les a analysées en détail. Il ressort implicitement de l'argumentation qu'ils ont soumise à la Section de révision qu'ils reconnaissaient que celle-ci avait entière compétence pour statuer en matière de droits de la personne. [par. 52]

(Voir aussi *Rasanen c. Rosemount Instruments Ltd.* (1994), 112 D.L.R. (4th) 683 (C.A. Ont.), p. 705.)

Du moment que les plaignants ont eu la possibilité d'être entendus par un décideur compétent en la matière, l'appréciation du caractère « judiciaire » classique de la procédure n'est aucunement du ressort du Tribunal.

[50]   Le Tribunal a également critiqué l'interprétation que l'agent de révision a faite de son mandat en matière de droits de la personne :

> [TRADUCTION] . . . en l'absence de preuve, l'agent de révision a formulé des conclusions au sujet du groupe de comparaison et a déterminé que la politique n'avait pas eu d'incidence sur la dignité des plaignants et conclu qu'il existait un motif justifiable de l'adopter. Il n'a pas examiné à qui incombe la preuve du motif justifiable ni quels sont les principes d'interprétation à appliquer aux dispositions législatives relatives aux droits de la personne. [. . .] De plus, une règle discriminatoire ne doit pas aller au-delà de ce qui est nécessaire; il faut donc tenir compte de solutions de rechange possibles permettant d'atteindre l'objectif poursuivi en étant moins discriminatoires . . . [par. 46]

Il s'agit encore là précisément de questions se rapportant au bien-fondé qui relèvent du contrôle judiciaire et qui ne sauraient autoriser un tribunal des droits de la personne à accueillir une contestation indirecte sous le régime de l'al. 27(1)f).

[51]   In addition, the Tribunal held that the decision of the Review Officer was not final. It is not clear to me what the Tribunal was getting at. "Final" means that all available means of review or appeal have been exhausted. Where a party chooses not to avail itself of those steps, the decision is final. Even under the strict application of issue estoppel, which in my view is not in any event what s. 27(1)(f) was intended to incorporate, the Review Officer's decision was a final one in these circumstances. Having chosen not to judicially review the decision as they were entitled to do, the complainants cannot then claim that because the decision lacks "finality" they are entitled to start all over again before a different decision-maker dealing with the same subject matter (*Danyluk*, at para. 57).

[52]   The Tribunal concluded that the parties were not the same before the Workers' Compensation Board as they were before the Tribunal. This, the Tribunal held, precluded the application of the doctrine of issue estoppel. This too represents the strict application of issue estoppel rather than of the principles underlying all three common law doctrines. Moreover, it is worth noting, as Arbour J. observed in *Toronto (City)*, that the absence of "mutuality" does not preclude the application of abuse of process to avoid undue multiplicity (para. 37).

[53]   Finally, the Tribunal suggested that Review Officers lacked expertise in interpreting or applying the *Code*. As previously mentioned, since both adjudicative bodies had concurrent jurisdiction at the time the complaint was heard and decided, this is irrelevant. Bastarache J., in *Tranchemontagne*, expressly rejected the argument that the quasi-constitutional status of human rights legislation required that there be an expert human rights body exercising a supervisory role over human rights jurisprudence. As he explained, human rights legislation must be offered accessible application to further the purposes of the *Code* by fostering "a general culture of respect for human rights in the

[51]   Le Tribunal a, en outre, conclu que la décision de l'agent de révision n'était pas définitive. Ce que le Tribunal voulait dire ne m'apparaît pas clair. Une décision est « définitive » lorsque toutes les voies d'appel ou de contrôle judiciaire ont été épuisées. Lorsqu'une partie décide de ne pas se prévaloir de ces mesures, la décision est définitive. Dans ces circonstances, la décision de l'agent de révision était définitive, même au regard de l'application stricte des règles de la préclusion découlant d'une question déjà tranchée — que le législateur n'avait pas, selon moi, l'intention d'incorporer à l'al. 27(1)f). Les plaignants, après avoir décidé de ne pas exercer leur droit de demander le contrôle judiciaire de la décision, ne peuvent prétendre que l'absence de « caractère définitif » de la décision les autorise à remettre la même question en jeu devant un autre décideur (*Danyluk*, par. 57).

[52]   Le Tribunal a conclu que les parties qu'il avait devant lui n'étaient pas les mêmes que celles qui s'étaient présentées devant la Commission, de sorte que les règles de la préclusion découlant d'une question déjà tranchée étaient inapplicables. Cette conclusion également procède d'une application stricte des règles plutôt que des principes sous-jacents aux trois doctrines de common law. Il importe en outre de rappeler l'observation formulée par la juge Arbour dans *Toronto (Ville)*, selon laquelle l'absence de « réciprocité » n'est pas un obstacle à l'application des règles régissant l'abus de procédure afin d'éviter la multiplication indue des litiges (par. 37).

[53]   Enfin, le Tribunal a indiqué que l'agent de révision n'avait pas l'expertise voulue pour interpréter ou appliquer le *Code*. Tel que mentionné précédemment, cette conclusion est dépourvue de pertinence puisque les deux organismes avaient une compétence concurrente en cette matière à l'époque où les plaintes ont été entendues et tranchées. Dans *Tranchemontagne*, le juge Bastarache a expressément rejeté l'argument voulant que la nature quasi constitutionnelle des lois sur les droits de la personne exige qu'un organisme spécialisé exerce une fonction de surveillance sur la jurisprudence rendue en cette matière. Comme il l'a expliqué, il faut assurer à ces lois une application accessible

administrative system" (paras. 33 and 39; *Nova Scotia (Workers' Compensation Board) v. Martin*, 2003 SCC 54, [2003] 2 S.C.R. 504; and *Council of Canadians with Disabilities v. VIA Rail Canada Inc.*, 2007 SCC 15, [2007] 1 S.C.R. 650).

[54]    Because the Tribunal based its decision to proceed with these complaints and have them relitigated on predominantly irrelevant factors and ignored its true mandate under s. 27(1)(f), its decision, in my respectful view, is patently unreasonable. Since it was patently unreasonable in large part because it represented the unnecessary prolongation and duplication of proceedings that had already been decided by an adjudicator with the requisite authority, I see no point in wasting the parties' time and resources by sending the matter back for an inevitable result.

[55]    I would therefore allow the appeal, set aside the Tribunal's decision and dismiss the complaints. In accordance with the Board's request, there will be no order for costs.

The reasons of McLachlin C.J. and Binnie, Fish and Cromwell JJ. were delivered by

CROMWELL J. —

I.    Introduction

[56]    I agree with my colleague Abella J. that the decision of the Human Rights Tribunal was patently unreasonable (2008 BCHRT 374 (CanLII)). However, I do not, with respect, share Abella J.'s interpretation of the discretion conferred by s. 27(1)(f) of the *Human Rights Code*, R.S.B.C. 1996, c. 210, nor do I agree with her decision not to remit the complaints to the Tribunal.

pour favoriser l'atteinte des objets du *Code* en développant « une culture générale de respect des droits de la personne dans le système administratif » (par. 33 et 39; *Nouvelle-Écosse (Workers' Compensation Board) c. Martin*, 2003 CSC 54, [2003] 2 R.C.S. 504; et *Conseil des Canadiens avec déficiences c. VIA Rail Canada Inc.*, 2007 CSC 15, [2007] 1 R.C.S. 650).

[54]    Parce que la décision du Tribunal de recevoir ces plaintes et de les entendre de nouveau repose principalement sur des facteurs non pertinents et ne tient pas compte du mandat véritable que lui confère l'al. 27(1)f), elle est, à mon avis, manifestement déraisonnable. Puisque ce caractère manifestement déraisonnable tient en grande partie au fait que la décision a entraîné la prolongation et le dédoublement inutiles d'une instance sur laquelle un décideur investi de la compétence voulue avait déjà statué, je ne vois pas l'utilité de faire perdre du temps et de l'argent aux parties par un renvoi de l'instance au Tribunal alors que le résultat est inévitable.

[55]    Je suis donc d'avis d'accueillir le pourvoi, d'annuler la décision du Tribunal et de rejeter les plaintes. Conformément à la demande de la Commission, il n'y aura pas d'ordonnance quant aux dépens.

Version française des motifs de la juge en chef McLachlin et des juges Binnie, Fish et Cromwell rendus par

LE JUGE CROMWELL —

I.    Introduction

[56]    Tout comme ma collègue la juge Abella, j'estime que la décision du tribunal des droits de la personne (« Tribunal ») était manifestement déraisonnable (2008 BCHRT 374 (CanLII)). Toutefois, avec respect pour l'opinion qu'elle exprime, je ne partage pas son interprétation du pouvoir discrétionnaire que confère l'al. 27(1)f) du *Human Rights Code*, R.S.B.C. 1996, ch. 210, et je ne puis souscrire à sa décision de ne pas renvoyer les plaintes devant le Tribunal.

[57]   I do not subscribe to my colleague's understanding of what lies at the heart of the common law finality doctrines or of the principles underlying s. 27(1)(f) of the *Human Rights Code*. Abella J. writes that what is at the heart of these finality doctrines is preventing abuse of the decision-making process and that the discretion conferred by s. 27(1)(f) is a limited one, concerned only with finality, avoiding unnecessary relitigation and pursuing the appropriate review mechanisms. I respectfully disagree.

[58]   The common law has consistently seen these finality doctrines as being concerned with striking an appropriate balance between the important goals of finality and fairness, more broadly considered. Finality is one aspect of fairness, but it does not exhaust that concept or trump all other considerations. As for s. 27(1)(f), it confers, in very broad language, a flexible discretion on the Human Rights Tribunal to enable it to achieve that balance in the multitude of contexts in which another tribunal may have dealt with a point of human rights law. In my view, both the common law and in particular s. 27(1)(f) of the *Code* are intended to achieve the necessary balance between finality and fairness through the exercise of discretion. It is this balance which is at the heart of both the common law finality doctrines and the legislative intent in enacting s. 27(1)(f). In my respectful view, a narrow interpretation of the Tribunal's discretion under s. 27(1)(f) does not reflect the clear legislative intent in enacting the provision.

[59]   I would allow the appeal and remit the Workers' Compensation Board's motion to dismiss the complaints under s. 27(1)(f) to the Tribunal for reconsideration in light of the principles I set out.

[57]   Je n'adhère pas à l'interprétation que donne ma collègue de la nature fondamentale des doctrines de la common law relatives au caractère définitif des décisions ou des principes qui sous-tendent l'al. 27(1)f) du *Human Rights Code*. La juge Abella écrit que ces doctrines ont essentiellement pour effet d'éviter que l'on abuse du processus décisionnel, et que le pouvoir discrétionnaire conféré par l'al. 27(1)f) n'a qu'une portée restreinte et ne vise qu'à assurer le caractère définitif des décisions, qu'à éviter que des questions soient inutilement redébattues et qu'à voir à l'utilisation des mécanismes de révision appropriés. Je ne saurais partager cet avis.

[58]   La common law considère depuis toujours que le rôle de ces doctrines consiste à établir un juste équilibre entre deux objectifs importants, à savoir le caractère définitif des décisions et l'équité, envisagée plus globalement. Le caractère définitif des décisions est un aspect de l'équité, mais il ne recoupe pas entièrement cette notion ni ne supplante toutes les autres considérations. Quant à l'al. 27(1)f), il confère en termes très larges au Tribunal un pouvoir discrétionnaire souple propre à lui permettre de réaliser cet équilibre dans la multitude de contextes où d'autres tribunaux administratifs ont pu se prononcer sur une question relevant des droits de la personne. Selon moi, la common law et en particulier l'al. 27(1)f) du *Code* tendent tous deux à la réalisation de ce nécessaire équilibre entre le caractère définitif des décisions et l'équité, et ce, par l'exercice du pouvoir discrétionnaire du Tribunal. C'est la recherche de cet équilibre qui est au cœur tant des doctrines relatives au caractère définitif des décisions que de l'intention que poursuit le législateur en édictant l'al. 27(1)f). Avec respect pour l'opinion qu'exprime ma collègue, je suis d'avis qu'en donnant une portée étroite au pouvoir discrétionnaire prévu à l'al. 27(1)f), on ne tient pas compte de cette intention claire du législateur.

[59]   Je suis d'avis d'accueillir le pourvoi et de renvoyer au Tribunal, pour qu'il la réexamine à la lumière des principes qui suivent, la requête pour rejet des plaintes présentée par la Workers' Compensation Board (la « Commission ») aux termes de l'al. 27(1)f).

452    WORKERS' COMPENSATION BOARD *v.* FIGLIOLA    *Cromwell J.*    [2011] 3 S.C.R.

## II. Analysis

### A. *Common Law Finality Doctrines*

[60]    The leading authorities from this Court on the application of finality doctrines in the administrative law context are *Danyluk v. Ainsworth Technologies Inc.*, 2001 SCC 44, [2001] 2 S.C.R. 460, and *Toronto (City) v. C.U.P.E., Local 79*, 2003 SCC 63, [2003] 3 S.C.R. 77. Both emphasized the importance of balance and discretion in applying these finality doctrines.

[61]    In *Danyluk*, the question was whether Ms. Danyluk's court action for damages for wrongful dismissal was barred by issue estoppel arising from an adverse decision of an employment standards officer. Writing for a unanimous Court, Binnie J. noted that while finality is a compelling consideration, issue estoppel is a public policy doctrine designed to advance the interests of justice (para. 19). He noted that the common law finality doctrines of cause of action estoppel, issue estoppel, and collateral attack have been extended to the decisions of administrative officers. Importantly, however, he added that in the administrative law context, "the more specific objective [of applying these doctrines] is to balance fairness to the parties with the protection of the administrative decision-making process" (para. 21). Thus, even when the traditional elements of the finality doctrines are present, the court must go on to exercise a discretion as to whether or not to allow the claim to proceed. He noted that this discretion existed even when the estoppel was alleged to arise from a court decision, but added that such discretion "is <u>necessarily broader in relation to the prior decisions of administrative tribunals</u> because of the enormous range and diversity of the structures, mandates and procedures of administrative decision makers": para. 62 (emphasis added); see also D. J. Lange, *The Doctrine of Res Judicata in Canada* (3rd ed. 2010), at pp. 227-29. Binnie J. quoted Finch J.A. (as he then was) to the effect that "[t]he doctrine of issue estoppel is designed as an implement of justice, and a protection against injustice. It inevitably

## II. Analyse

### A. *Les doctrines de la common law relatives au caractère définitif des décisions*

[60]    Les décisions clés de notre Cour sur l'application de ces doctrines dans le contexte du droit administratif sont les arrêts *Danyluk c. Ainsworth Technologies Inc.*, 2001 CSC 44, [2001] 2 R.C.S. 460, et *Toronto (Ville) c. S.C.F.P., section locale 79*, 2003 CSC 63, [2003] 3 R.C.S. 77. Dans les deux cas, on a souligné l'importance de l'équilibre et du pouvoir discrétionnaire lorsqu'il s'agit d'appliquer les doctrines susmentionnées.

[61]    Dans *Danyluk*, la Cour devait établir si l'action en dommages-intérêts intentée par M$^{me}$ Danyluk pour congédiement injustifié était irrecevable du fait de la préclusion découlant de la décision négative déjà rendue par une agente des normes d'emploi. Rédigeant l'opinion unanime de la Cour, le juge Binnie a indiqué que, bien que le caractère définitif des décisions constitue une considération impérieuse, la préclusion découlant d'une question déjà tranchée est une doctrine d'intérêt public qui tend à favoriser les intérêts de la justice (par. 19). Il a souligné que l'application des doctrines de la common law relatives au caractère définitif des décisions — la préclusion fondée sur la cause d'action, la préclusion découlant d'une question déjà tranchée et la règle interdisant les contestations indirectes — a été étendue aux décideurs administratifs. Fait important, il a ajouté que, en contexte de droit administratif, « l'objectif spécifique poursuivi [par l'application de ces doctrines] consiste à assurer l'équilibre entre le respect de l'équité envers les parties et la protection du processus décisionnel administratif » (par. 21). Ainsi, même lorsque les éléments traditionnels de ces doctrines sont présents, les tribunaux judiciaires doivent exercer leur pouvoir discrétionnaire pour décider s'il y a lieu de permettre ou non l'instruction de la demande. Il a fait remarquer que l'exercice de ce pouvoir discrétionnaire était possible même lorsque la préclusion pourrait découler d'une décision judiciaire, ajoutant cependant que ce pouvoir « est <u>nécessairement plus étendu à l'égard des décisions des tribunaux administratifs,</u>

calls upon the exercise of a judicial discretion to achieve fairness according to the circumstances of each case": *British Columbia (Minister of Forests) v. Bugbusters Pest Management Inc.* (1998), 50 B.C.L.R. (3d) 1 (C.A.), at para. 32, cited in *Danyluk*, at para. 63. Binnie J. then held that it is "an error of principle not to address the factors for and against the exercise of the discretion . . . . The objective is to ensure that the operation of issue estoppel promotes the orderly administration of justice but not at the cost of real injustice" (paras. 66-67).

[62]   To assist decision-makers in achieving the appropriate balance, the Court set out a detailed (although non-exhaustive) list of factors for a court to consider when exercising its discretion: the wording of the statute from which the power to issue the administrative order derives; the purpose of the legislation; the availability of an appeal; the safeguards available to the parties in the administrative procedure; the expertise of the administrative decision-maker; the circumstances giving rise to the prior administrative proceedings; and the potential injustice (*Danyluk*, at paras. 68-80). I note in passing that this list reflects a much broader conception of the discretion at common law than my colleague Abella J. envisions under s. 27(1)(f). The three factors to be considered set out at para. 37 of her reasons are limited to whether the previous decision-maker had concurrent authority to decide the matter, whether the issue was essentially the same and whether in the earlier proceeding the parties (or their privies) had an

étant donné la diversité considérable des structures, missions et procédures des décideurs administratifs » : par. 62 (je souligne); voir aussi D. J. Lange, *The Doctrine of Res Judicata in Canada* (3ᵉ éd. 2010), p. 227-229. Le juge Binnie a aussi cité le juge Finch (plus tard Juge en chef de la Colombie-Britannique), selon lequel [TRADUCTION] « [l]a doctrine de la préclusion découlant d'une question déjà tranchée se veut un moyen de rendre justice et de protéger contre l'injustice. Elle implique inévitablement l'exercice par la cour de son pouvoir discrétionnaire pour assurer le respect de l'équité selon les circonstances propres à chaque espèce » : *British Columbia (Minister of Forests) c. Bugbusters Pest Management Inc.* (1998), 50 B.C.L.R. (3d) 1 (C.A.), par. 32, cité au par. 63 de *Danyluk*. Le juge Binnie a ensuite statué qu'on commettait « une erreur de principe en omettant de soupeser les facteurs favorables et défavorables à l'exercice du pouvoir discrétionnaire [. . .] L'objectif est de faire en sorte que l'application de la préclusion découlant d'une question déjà tranchée favorise l'administration ordonnée de la justice, mais pas au prix d'une injustice concrète » (par. 66-67).

[62]   Pour aider les décideurs à réaliser l'équilibre recherché, la Cour a dressé une liste détaillée (mais non exhaustive) de facteurs à prendre en compte dans l'exercice du pouvoir discrétionnaire : le libellé du texte de loi accordant le pouvoir de rendre l'ordonnance administrative, l'objet de la loi, l'existence d'un droit d'appel, les garanties offertes aux parties dans le cadre de l'instance administrative, l'expertise du décideur administratif, les circonstances ayant donné naissance à l'instance administrative initiale et le risque d'injustice (*Danyluk*, par. 68-80). Je fais incidemment remarquer que cette liste témoigne d'une interprétation du pouvoir discrétionnaire reconnu en common law beaucoup plus large que celle qu'envisage ma collègue la juge Abella à l'égard du pouvoir conféré par l'al. 27(1)f). Les trois facteurs qu'elle énumère au par. 37 de ses motifs se limitent aux questions de savoir si le décideur antérieur avait une compétence concurrente pour trancher la question, si la question était essentiellement la même et si l'instance

opportunity to know the case and have a chance to meet it.

[63]  Nothing would be served by my reviewing the *Danyluk* factors in detail. It is particularly noteworthy, however, that in that case, the Court refused to apply issue estoppel even though Ms. Danyluk, represented by counsel, had not pursued an administrative review of the employment standards officer's decision and that her claim of substantial injustice turned largely on the facts that she had received neither notice of the employer's allegation nor an opportunity to respond (para. 80). Also of importance was that the legislation did not view the employment standards proceedings as an exclusive forum for complaints of this nature (para. 69). To characterize *Danyluk* as simply emphasizing the importance of finality in litigation is an incomplete account of the Court's approach in that case.

[64]  I turn next to *Toronto (City) v. C.U.P.E., Local 79*. It concerned the role of the abuse of process doctrine when an arbitrator reviewing an employee's dismissal decided to make his own assessment of the facts relating to the conduct giving rise to a criminal conviction and on which the dismissal was based. Front and centre in Arbour J.'s analysis (on behalf of a unanimous Court on this point) was the importance of maintaining a "judicial balance between finality, fairness, efficiency and authority of judicial decisions" (para. 15). Referring to *Danyluk*, she acknowledged that there are many circumstances in which barring relitigation would create unfairness and held that "[t]he discretionary factors that apply to prevent the doctrine of issue estoppel from operating in an unjust or unfair way are equally available to prevent the doctrine of abuse of process from achieving a similar undesirable result" (para. 53). She thus emphasized the importance of maintaining a balance between fairness and finality and the need for a flexible discretion to ensure that this is done.

antérieure a offert la possibilité aux plaignants (ou à leurs ayants droit) de connaître les éléments invoqués contre eux et de les réfuter.

[63]  Il serait inutile d'examiner en détail les facteurs énumérés dans *Danyluk*. Il importe cependant de signaler que dans cette affaire, la Cour a refusé d'appliquer la préclusion même si M^me Danyluk, qui était représentée par avocat, n'avait pas demandé une révision administrative de la décision rendue par l'agente des normes d'emploi, et que l'injustice importante qu'elle alléguait était largement attribuable aux faits qu'elle n'avait pas été informée des allégations de l'employeur et n'avait pas eu la possibilité d'y répondre (par. 80). Autre élément important, selon la loi, l'agent des normes d'emploi ne constituait pas un forum exclusif pour les plaintes de cette nature (par. 69). On ne rend pas entièrement compte du raisonnement de la Cour dans *Danyluk* si l'on considère que cet arrêt souligne simplement l'importance du caractère définitif des décisions rendues dans les litiges.

[64]  Quand à l'arrêt *Toronto (Ville) c. S.C.F.P., section locale 79*, il portait sur le rôle de la doctrine de l'abus de procédure, dans un contexte d'arbitrage de grief en matière de congédiement où l'arbitre avait décidé de procéder à sa propre appréciation des faits ayant mené à la déclaration de culpabilité au criminel à l'origine du congédiement. La juge Arbour (qui exposait l'opinion unanime de la Cour sur ce point) a articulé son analyse autour de l'importance de réaliser un « équilibre entre l'irrévocabilité, l'équité, l'efficacité et l'autorité des décisions judiciaires » (par. 15). Mentionnant l'arrêt *Danyluk*, elle a reconnu que, dans de nombreuses circonstances, empêcher la réouverture d'un litige serait source d'inéquité, et elle a affirmé que « [l]es facteurs discrétionnaires qui visent à empêcher que la préclusion découlant d'une question déjà tranchée ne produise des effets injustes, jouent également en matière d'abus de procédure pour éviter de pareils résultats indésirables » (par. 53). Elle a ainsi souligné l'importance de maintenir un juste équilibre entre l'équité et le caractère définitif de la décision, de même que la nécessité d'un exercice souple du pouvoir discrétionnaire en vue d'assurer le maintien de cet équilibre.

[65]   I conclude that the Court's jurisprudence recognizes that, in the administrative law context, common law finality doctrines must be applied flexibly to maintain the necessary balance between finality and fairness. This is done through the exercise of discretion, taking into account a wide variety of factors which are sensitive to the particular administrative law context in which the case arises and to the demands of substantial justice in the particular circumstances of each case. Finality and requiring parties to use the most appropriate mechanisms for review are of course important considerations. But they are *not* the *only*, or even the most important considerations.

[66]   The need for this "necessarily broader" discretion (to use Binnie J.'s words at para. 62 of *Danyluk*) in applying the finality doctrines in the administrative law setting is well illustrated by the intricate and changing procedural context in which the complainant workers found themselves in this case. I will use the facts of Mr. Figliola's case as an example.

[67]   As a result of a workplace injury, Mr. Figliola received a 3.5% functional disability award from the Workers' Compensation Board, consisting of 1% for lumbar spine and 2.5% for chronic pain, determined under the Board's Policy No. 39.01. He appealed the Board's decision to the Review Division which is an internal appeal body. He raised four issues. He complained that his injury had not been properly assessed under the policy and in addition that the policy was patently unreasonable, violated s. 15 of the *Canadian Charter of Rights and Freedoms* and was contrary to the *Human Rights Code*.

[68]   Subject to Board practices and procedures, the Review Officer may conduct a review as the officer considers appropriate: *Workers Compensation Act*, R.S.B.C. 1996, c. 492 ("Act"), s. 96.4(2). As I understand the record, the review in this case was a paper review on the basis of written submissions on behalf of Mr. Figliola. His employer

[65]   En conclusion, la jurisprudence de notre Cour reconnaît qu'en contexte de droit administratif, il convient d'appliquer avec souplesse les doctrines de la common law relatives au caractère définitif des décisions afin de maintenir le nécessaire équilibre entre le caractère définitif et l'équité des décisions. À cette fin, l'exercice du pouvoir discrétionnaire nécessite la prise en compte d'un large éventail de facteurs pertinents aux particularités du contexte administratif en cause et aux exigences à satisfaire pour que justice soit rendue dans les circonstances de chaque cas. Le caractère définitif de la décision et l'obligation faite aux parties de recourir aux mécanismes de révision les plus appropriés sont certes des facteurs importants, mais ils ne sont *ni les seuls*, ni même les plus importants.

[66]   Le contexte procédural complexe et changeant en cause en l'espèce illustre bien la nécessité du recours à ce pouvoir discrétionnaire « nécessairement plus étendu » (les termes qu'emploie le juge Binnie au par. 62 de *Danyluk*) lorsqu'il s'agit d'appliquer les doctrines relatives au caractère définitif des décisions en contexte de droit administratif. Le cas de M. Figliola me servira d'exemple.

[67]   Victime d'un accident du travail, M. Figliola s'est vu attribuer par la Commission une indemnité d'invalidité fonctionnelle de 3,5 %, soit 1 % pour douleur lombaire et 2,5 % pour douleur chronique, en application de la politique 39.01 de la Commission. Il a porté la décision en appel devant la Review Division (la « Section de révision ») — un organe de révision interne — invoquant quatre points. Il a allégué que sa lésion n'avait pas été évaluée comme il se doit sous le régime de la politique et que la politique était manifestement déraisonnable, violait l'art. 15 de la *Charte canadienne des droits et libertés* et contrevenait au *Human Rights Code*.

[68]   Sous réserve des règles de pratique et de procédure de la Commission, un agent de révision peut procéder à la révision de la décision de la manière qu'il estime indiquée : *Workers Compensation Act*, R.S.B.C. 1996, ch. 492 (la « Loi »), par. 96.4(2). Je crois comprendre qu'en l'espèce, il a mené une révision sur dossier, sur la base d'observations écrites

did not participate and there was no oral hearing. Although the Review Officer was undoubtedly the only appropriate forum in which to review the application of the Board's policy to the facts of Mr. Figliola's case, the role of the Review Officer with respect to his other complaints is much less clear.

[69]  With respect to Mr. Figliola's claims that the policy was patently unreasonable, the Review Officer found that he had no authority at all. He noted that he was bound by s. 99 of the Act to apply a Board policy that applied to the case. While the appeals tribunal to which appeals lie from the Review Division had authority to consider the validity of a policy (s. 251 of the Act), even it had no authority "to make binding determinations as to the validity of policy. Rather, it is required to refer to the Board of Directors its determinations and is bound by the decision of the Board of Directors as to whether the policy should be maintained or changed" (A.R., vol. I, at p. 6). The Review Officer reasoned that "[i]t would be odd if [the appeals tribunal] was required to go through such a process but the Review Division had even greater authority of considering and deciding whether a policy was valid" (*ibid.*). He therefore concluded that the Review Division had no general jurisdiction to find a policy of the Board invalid on the basis that it was patently unreasonable.

[70]  As for Mr. Figliola's *Charter* claims, the Review Officer similarly found that he had no jurisdiction to consider them at all. As he put it,

[a]mendments to the *Act* resulting from the *Administrative Tribunals Act* (the "*ATA*") took effect on December 3, 2004. Those amendments stated that [the appeals tribunal] has no jurisdiction over constitutional questions . . . . Although this change did not specifically refer to the Review Division, the Review Division considers that the change indicates a statutory intent that it does not have jurisdiction over constitutional questions, including *Charter* questions. [A.R., vol. I, at p. 7]

soumises au nom de M. Figliola. L'employeur n'a pas participé à la révision et il n'y a pas eu d'audience. Bien que l'agent de révision constituait sans aucun doute le seul forum approprié permettant l'examen de l'application de la politique de la Commission au cas de M. Figliola, le rôle de l'agent de révision à l'égard des autres moyens invoqués par l'intéressé est beaucoup moins clair.

[69]  L'agent de révision a considéré qu'il n'avait nullement compétence pour examiner la prétention de M. Figliola que la politique était manifestement déraisonnable. Il a signalé qu'aux termes de l'art. 99 de la Loi, il était tenu d'appliquer une politique de la Commission. Alors que le tribunal d'appel des décisions de la Section de révision avait compétence pour examiner la validité d'une politique (art. 251 de la Loi), même lui n'avait pas compétence pour [TRADUCTION] « rendre des décisions exécutoires sur la validité d'une politique. Il doit plutôt déférer la question au conseil d'administration de la Commission, et il est lié par la décision de ce dernier quant au maintien ou à la modification de la politique » (d.a., vol. I, p. 6). Suivant le raisonnement de l'agent de révision, [TRADUCTION] « [i]l serait étrange que le [tribunal d'appel] soit tenu de procéder ainsi mais que la Section de révision jouisse du pouvoir plus étendu d'examiner et de trancher la question de la validité d'une politique » (*ibid.*). Il a donc conclu que la Section de révision ne dispose pas de la compétence générale de déclarer une politique de la Commission invalide en raison de son caractère manifestement déraisonnable.

[70]  L'agent de révision a pareillement jugé qu'il n'avait pas compétence pour connaître de la prétention de M. Figliola fondée sur la *Charte*. Ainsi qu'il l'a exposé,

[TRADUCTION] [l]es modifications apportées à la Loi par l'*Administrative Tribunals Act* (l'« *ATA* ») sont entrées en vigueur le 3 décembre 2004. Selon ces modifications, le [tribunal d'appel] n'a pas compétence en matière constitutionnelle [. . .] Bien que la Section de révision n'y soit pas expressément mentionnée, elle voit dans ce changement l'indication de l'intention du législateur de ne pas lui donner compétence en matière constitutionnelle, y compris à l'égard des questions relatives à la *Charte*. [d.a., vol. I, p. 7]

[71] Turning finally to Mr. Figliola's claims under the *Human Rights Code*, the Review Officer relied on *Tranchemontagne v. Ontario (Director, Disability Support Program)*, 2006 SCC 14, [2006] 1 S.C.R. 513, for his conclusion that he had authority to decline to apply the policy if it conflicted with the *Code*, given the provision in s. 4 of the *Code* that it prevails in the event of conflict with any other enactment. If I am reading the Review Officer's decision correctly, I understand him to reason that his statutory obligation to apply Board policies (s. 99 of the Act) conflicts with the *Code*'s prohibitions against discrimination. However, because the *Code* prevails in the event of conflict, the Review Officer can determine whether the policy is consistent with the *Code*. Assuming, without deciding, that this is the correct view and therefore that the Review Officer can assess the policy's compliance with the *Code*, there remains the question of what remedy the Review Officer can fashion if he or she concludes that the policy is not compliant. According to the Board's submissions, the process that was followed at the relevant time (although it was not formalized until later) was this: if the Review Officer found the *Code* challenge had merit, he or she would not apply the policy to the particular case. The policy itself would be referred to the Board "for inclusion in the Policy and Research Division's work plan as a high priority project" (A.F., at para. 59).

[72]  As noted earlier, the Review Officer's decisions are appealable to the Workers' Compensation Appeal Tribunal ("WCAT"), with certain exclusions not relevant here. Mr. Figliola pursued such an appeal and it was set down for an oral hearing. The WCAT, it should be noted, has extensive authority to review the matter, including hearing evidence; it is not simply an appeal in the usual sense (ss. 245 to 250 of the Act). However, the *Administrative Tribunals Act*, S.B.C. 2004, c. 45 ("*ATA*"), was amended effective October 18, 2007, removing the WCAT's jurisdiction to apply the *Code*: *Attorney General Statutes Amendment Act, 2007*, S.B.C. 2007, c. 14, s. 3. Thus in midstream, Mr. Figliola lost the right to a thorough, evidence-based review

[71]  Enfin, pour ce qui est des prétentions de M. Figliola relevant du *Human Rights Code*, l'agent de révision, s'appuyant sur l'arrêt *Tranchemontagne c. Ontario (Directeur du Programme ontarien de soutien aux personnes handicapées)*, 2006 CSC 14, [2006] 1 R.C.S. 513, a conclu que, compte tenu de l'art. 4 du *Code* portant que ses dispositions ont préséance en cas de conflit avec celles de toute autre loi, il était habilité à refuser d'appliquer la politique si elle entrait en conflit avec le *Code*. Si j'interprète correctement la décision de l'agent de révision, il a estimé que l'obligation légale qui lui est faite d'appliquer les politiques de la Commission (art. 99 de la Loi) entre en conflit avec les dispositions du *Code* interdisant la discrimination. Toutefois, vu la préséance du *Code* en cas de conflit, l'agent de révision peut se prononcer sur la conformité de la politique au *Code*. En supposant, sans en décider, que ce raisonnement soit juste et que l'agent de révision puisse donc évaluer la conformité de la politique au *Code*, il reste quand même à déterminer la réparation qu'il peut accorder s'il conclut que la politique n'est pas conforme au *Code*. La Commission plaide que le processus appliqué pendant la période en cause (bien qu'il n'ait été officialisé que plus tard) était le suivant : l'agent de révision qui estimait fondé le motif de contestation relevant du *Code* n'appliquait pas la politique. La politique elle-même était déférée à la Commission [TRADUCTION] « qui devait lui accorder une priorité élevée dans le plan de travail de la Policy and Research Division » (m.a., par. 59).

[72]  Ainsi que je l'ai déjà indiqué, les décisions des agents de révision sont susceptibles d'appel devant le Workers' Compensation Appeal Tribunal (« WCAT »), sous réserve de certaines exclusions non pertinentes en l'espèce. M. Figliola s'est adressé à ce tribunal et une date d'audience a été fixée. Il convient de signaler que le WCAT jouit d'un pouvoir de révision étendu lui permettant notamment de recevoir des éléments de preuve; il n'entend pas un appel au sens usuel de ce terme (art. 245 à 250 de la Loi). Par suite de modifications apportées à l'*Administrative Tribunals Act*, S.B.C. 2004, ch. 45 (« *ATA* ») et entrées en vigueur le 18 octobre 2007, toutefois, le WCAT n'a plus compétence pour appliquer le *Code* : *Attorney General Statutes*

of the merits of the Review Officer's decision on the human rights issue.

[73]    The question of what this amendment did to the Review Officer's authority to address the *Code* issues is not before us. However, the amendment taking away the WCAT's jurisdiction would appear to engage the same reasoning that led the Review Officer to conclude that he had no jurisdiction with respect to the attacks on the Board's policy as being patently unreasonable and contrary to the *Charter*. As noted earlier, the Review Officer reasoned that as the WCAT did not have this jurisdiction, it followed that the Review Division did not have that jurisdiction either. Thus it seems (although I need not decide the point) that the *ATA* amendments taking away the WCAT's *Code* jurisdiction not only took away a right of review on the merits, but also had the effect of taking away the Review Officer's authority to test Board policies against the *Code* which he exercised in this case. I recognize that the Board takes the opposite view, maintaining that even though *Code* jurisdiction was removed from the WCAT, a review officer may still review Board policies for consistency with the *Code*. It is not my task to resolve this issue here. One thing is certain, however. The amendments were intended to reverse the effects of the Court's decision in *Tranchemontagne* in relation to the human rights jurisdiction of the WCAT (British Columbia, *Official Report of Debates of the Legislative Assembly (Hansard)*, vol. 21, 3rd Sess., 38th Parl., May 16, 2007, at pp. 8088-93).

[74]    I simply wish to note the rather complex, changing and at times uncertain process available in the workers' compensation system to address the human rights issue in this case. To my mind, this underlines the wisdom of applying finality doctrines

*Amendment Act, 2007*, S.B.C. 2007, ch. 14, art. 3. Ainsi, M. Figliola a perdu, à mi-parcours, le droit de soumettre à un examen approfondi reposant sur des éléments de preuve le bien-fondé de la décision de l'agent de révision relative à la question des droits de la personne.

[73]    La question de l'effet de ces modifications législatives sur la compétence des agents de révision en matière d'examen des dispositions du *Code* ne nous a pas été soumise. Il semble toutefois que le retrait de la compétence du WCAT en cette matière permette de tenir le même raisonnement que celui qui a amené l'agent de révision à se déclarer sans compétence pour connaître de la prétention suivant laquelle la politique de la Commission est manifestement déraisonnable ou qu'elle est contraire à la *Charte*. Comme je l'ai indiqué, l'agent de révision a considéré que, puisque le WCAT ne possède pas cette compétence, la Section de révision ne peut elle non plus l'exercer. Il semble donc (bien que je n'aie pas à me prononcer sur ce point) que les modifications apportées à l'*ATA* qui ont aboli la compétence du WCAT relative au *Code* ont non seulement supprimé le droit à une révision du bien-fondé des décisions mais ont également enlevé aux agents de révision le pouvoir d'examiner la conformité au *Code* des politiques de la Commission, pouvoir que l'agent avait exercé en l'espèce. Je reconnais que la Commission soutient le contraire, affirmant que malgré le retrait de la compétence du WCAT relative au *Code*, les agents de révision peuvent encore déterminer si les politiques de la Commission sont conformes au *Code*. Il ne m'appartient pas ici de trancher cette question. Une chose est certaine toutefois. Les modifications visaient à annuler l'effet de la décision de notre Cour dans *Tranchemontagne* relativement à la compétence du WCAT en matière de droits de la personne (Colombie-Britannique, *Official Report of Debates of the Legislative Assembly (Hansard)*, vol. 21, 3ᵉ sess., 38ᵉ lég., 16 mai 2007, p. 8088-8093).

[74]    Je tiens simplement à montrer le caractère passablement complexe, changeant et, parfois, incertain du mécanisme prévu par le régime d'indemnisation des accidents du travail pour trancher dans le présent cas la question des droits de

with considerable flexibility in the administrative law setting. The decision that is relied on by the Board in this case as being a final determination is in fact an internal review decision given after a paper review in which the employer did not participate. Whether the Review Officer had authority to consider the question is at least debatable. (Of course, Mr. Figliola's position before the Review Officer was that he did have authority.) The remedy available in the proceedings was a decision not to apply the policy and refer it to the Board for study. At the time Mr. Figliola raised the point before the Review Officer, there was a right of appeal to the WCAT which included the opportunity to call evidence. In the midst of the proceedings, that right was removed and indeed the whole authority of the WCAT to even consider *Code* issues was removed. It surely cannot be said that there was any legislative intent that the Review Officer was to have exclusive jurisdiction over the human rights questions.

[75]  It seems to me that whether a Review Officer's decision in these circumstances should bar any future consideration by the Human Rights Tribunal of the underlying human rights complaint cannot properly be addressed by simply looking at the three factors identified by my colleague, viz., whether the Review Officer had concurrent jurisdiction to decide a point that was essentially the same as the one before the Human Rights Tribunal and whether there had been an opportunity to know the case to meet and a chance to meet it. There is, as *Danyluk* shows, a great deal more to it than that. The kinds of complications we see in this case are not uncommon in administrative law, although this case may present an unusually cluttered jurisdictional and procedural landscape. The point, to my way of thinking, is that these are the types of factors that call for a highly flexible approach to applying the finality doctrines, a flexibility that in my view exists both at the common law and, as I will discuss next, under s. 27(1)(f) of the *Code*.

la personne. Selon moi, cela montre qu'il n'est que sage d'appliquer avec beaucoup de souplesse, dans le contexte du droit administratif, les doctrines relatives au caractère définitif des décisions. La décision dont la Commission invoque le caractère définitif en l'espèce est en fait une décision interne de révision rendue à la suite d'un examen sur dossier auquel l'employeur n'a pas pris part. La compétence de l'agent de révision d'examiner la question était à tout le moins contestable. (M. Figliola a bien sûr soutenu devant l'agent de révision que celui-ci avait compétence.) La réparation qui pouvait être accordée au terme du processus consistait en une décision de ne pas appliquer la politique et de la soumettre à la Commission pour analyse. Quand M. Figliola a soulevé ce point devant l'agent de révision, il pouvait exercer devant le WCAT un droit d'appel comportant la possibilité de présenter des éléments de preuve. Pendant l'instance, ce droit a été aboli, et le WCAT a même perdu toute compétence relativement au *Code*. On ne peut certes pas dire que l'intention du législateur était d'investir les agents de révision d'une compétence exclusive en matière de droits de la personne.

[75]  Il me semble qu'un simple examen des trois facteurs énumérés par ma collègue — la compétence concurrente de l'agent de révision de statuer sur un point qui était essentiellement le même que celui qui a été soumis au Tribunal, l'existence d'une possibilité de connaître les éléments invoqués, et une occasion de les réfuter — ne permet pas d'examiner comme il se doit la question de savoir si la décision d'un agent de révision dans ces circonstances devrait empêcher tout examen ultérieur par le Tribunal des aspects de la plainte qui relèvent des droits de la personne. Comme le montre l'arrêt *Danyluk*, beaucoup d'autres considérations entrent en ligne de compte. Bien que le contexte juridictionnel et procédural de la présente affaire paraisse anormalement confus, des complications de cette nature ne sont pas inhabituelles en droit administratif. C'est à cause de considérations de ce genre qu'il faut selon moi appliquer avec une plus grande souplesse les doctrines relatives au caractère définitif des décisions, et j'estime que tant la common law que l'al. 27(1)f) du *Code*, comme je l'explique ci-après, autorisent cette souplesse.

B.  *Statutory Interpretation*

[76]   My colleague is of the view that s. 27(1)(f) confers a "limited" discretion, the exercise of which is to be guided uniquely "by the goals of the fairness of finality in decision-making and the avoidance of the relitigation of issues" (para. 36). Putting aside for the moment whether the discretion is "limited" or "broad", I have difficulty with my colleague's treatment of the relevant factors which she identifies.

[77]   I repeat the three factors identified as those to be considered: whether the previous adjudicator had concurrent authority to decide the matter, whether the issue decided was essentially the same, and whether the previous process provided an opportunity to the parties or their privies to know the case to be met and have a chance to meet it (Abella J.'s reasons, at para. 37). However, at para. 49 of my colleague's reasons, the question of whether the Review Division's process met the "necessary procedural requirements" is dismissed as "a classic judicial review question and not one within the mandate of a concurrent decision-maker". Thus if I understand correctly, the Tribunal is to consider whether the earlier process was fair but cannot consider at all whether the earlier process met the "necessary procedural requirements". I would have thought that the "necessary procedural requirements" would include the obligation to act fairly. But if that is so, I do not understand how procedural fairness can be at the same time a question beyond the concurrent decision-maker's mandate (para. 49) and a proper factor for the Tribunal to consider in exercising its discretion under s. 27(1)(f) (para. 37).

[78]   It would also seem to me that whether the adjudicator had authority to decide the matter is generally the sort of issue that is raised on judicial review, but it figures here as a factor to be considered in exercising the Tribunal's discretion (para. 37). In my respectful view, relevant factors cannot

B.  *Interprétation législative*

[76]   Selon ma collègue, l'al. 27(1)f) confère un pouvoir discrétionnaire « restreint » dont l'exercice doit être guidé uniquement « [par] les objets de la disposition, qui sont d'assurer l'équité du caractère définitif du processus décisionnel et d'éviter la remise en cause de questions déjà tranchées » (par. 36). Écartant provisoirement la question du caractère « restreint » ou « large » de ce pouvoir, j'ai de la difficulté à accepter l'analyse que fait ma collègue des facteurs applicables qu'elle a relevés.

[77]   Je répète les trois facteurs à examiner que relève ma collègue : si le décideur antérieur avait compétence concurrente pour trancher la question, si la question tranchée était essentiellement la même, et si le processus antérieur a offert la possibilité aux parties ou à leurs ayants droit de connaître les éléments invoqués contre eux et de les réfuter (motifs de la juge Abella, par. 37). Toutefois, ma collègue écarte, au par. 49 de ses motifs, la question de savoir si le processus suivi devant la Section de révision satisfait aux « exigences procédurales », estimant qu'il s'agit là d'une « question de contrôle judiciaire classique et non d'une question que se pose un décideur dans l'exercice d'une compétence concurrente ». Donc, si je comprends bien, le Tribunal doit vérifier l'équité du processus antérieur, mais il ne peut d'aucune façon déterminer si ce processus satisfait aux « exigences procédurales ». Je serais enclin à penser que l'obligation d'agir équitablement est incluse dans les « exigences procédurales ». Mais, si tel est le cas, je ne m'explique pas comment l'équité procédurale peut à la fois excéder la compétence concurrente du décideur (par. 49) et constituer un facteur que le Tribunal doit considérer dans l'exercice du pouvoir discrétionnaire conféré à l'al. 27(1)f) (par. 37).

[78]   Il me semble aussi que la compétence d'un décideur de trancher un point est généralement une question qui se pose lors d'un contrôle judiciaire, mais elle fait ici partie des facteurs à prendre en compte dans l'exercice du pouvoir discrétionnaire du Tribunal (par. 37). À mon avis, on ne peut

simply be dismissed as "classic judicial review question[s]" and therefore "not one within the mandate of a concurrent decision-maker" (para. 49). This was not the approach in *Danyluk*. Rather, all relevant factors need to be considered and weighed in exercising the discretion.

[79]   Be that as may be, it remains that my colleague's conception of s. 27(1)(f) is that it confers a more limited discretion to apply the finality doctrines than has been recognized at common law with respect to decisions of administrative decision-makers. With respect, and for the following reasons, I cannot accept this interpretation of the provision.

[80]   We must interpret the words of the provision "in their entire context and in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the intention of Parliament": *Bell ExpressVu Limited Partnership v. Rex*, 2002 SCC 42, [2002] 2 S.C.R. 559, at para. 26, quoting E. A. Driedger, *Construction of Statutes* (2nd ed. 1983), at p. 87; *Rizzo & Rizzo Shoes Ltd. (Re)*, [1998] 1 S.C.R. 27, at para. 21.

[81]   I turn first to the grammatical and ordinary sense of the words. It is difficult for me to imagine broader language to describe a discretionary power than to say the Tribunal may dismiss a complaint if the substance of it has been appropriately dealt with elsewhere. To my way of thinking, the grammatical and ordinary meaning of the words support an expansive view of the discretion, not a narrow one. I agree with my colleague that this provision reflects the principles of the finality doctrines rather than codifies their technical tenets (para. 46). However, as I discussed earlier, the "principles" of those doctrines, especially as they have developed in administrative law, include a search for balance between finality and fairness and a large measure of discretion to allow that balance to be struck in the wide variety of decision-making contexts in which they may have to be applied. The provision's focus on the "substance" of the complaint and the use of the broad words "appropriately dealt

simplement écarter un facteur pertinent parce qu'il s'agit d'une « question de contrôle judiciaire classique » qui, par conséquent, n'est pas de celles « que se pose un décideur dans l'exercice d'une compétence concurrente » (par. 49). Telle n'était pas la démarche retenue dans *Danyluk*. Il faut plutôt, dans l'exercice du pouvoir discrétionnaire, prendre en compte et apprécier tous les facteurs pertinents.

[79]   Quoi qu'il en soit, il reste que, tel que ma collègue le conçoit, l'al. 27(1)f) confère, en matière d'application des doctrines relatives au caractère définitif des décisions, un pouvoir discrétionnaire plus restreint que celui qui a été reconnu en common law à l'égard des décisions administratives. Avec égards, et pour les motifs exposés ci-dessous, je ne puis souscrire à cette interprétation.

[80]   Il faut interpréter les termes de cette disposition [TRADUCTION] « dans leur contexte global en suivant le sens ordinaire et grammatical qui s'harmonise avec l'esprit de la loi, l'objet de la loi et l'intention du législateur » : *Bell ExpressVu Limited Partnership c. Rex*, 2002 CSC 42, [2002] 2 R.C.S. 559, par. 26, citant E. A. Driedger, *Construction of Statutes* (2e éd. 1983), p. 87; *Rizzo & Rizzo Shoes Ltd. (Re)*, [1998] 1 R.C.S. 27, par. 21.

[81]   Considérons d'abord le sens ordinaire et grammatical des termes. Il m'est difficile d'envisager l'octroi d'un pouvoir discrétionnaire en des termes plus larges si l'on dit que le tribunal peut rejeter une plainte s'il a été statué de façon appropriée sur le fond de la plainte dans une autre instance. Selon moi, le sens ordinaire et grammatical de ces termes permet de donner une large portée au pouvoir discrétionnaire, non une portée restreinte. Je considère tout comme ma collègue que la disposition est l'expression des principes fondant les doctrines relatives au caractère définitif des décisions plutôt qu'une codification de leurs éléments techniques (par. 46). Toutefois, comme je l'ai déjà indiqué, ces « principes », tels qu'ils ont évolué en droit administratif en particulier, comportent la recherche d'un juste équilibre entre, d'une part, le caractère définitif et l'équité, et, d'autre part, un pouvoir discrétionnaire d'une ampleur propre à réaliser cet équilibre dans la multitude des contextes

Case 1:25-cv-00910-JMF    Document 52-15    Filed 04/07/25    Page 42 of 50

462        WORKERS' COMPENSATION BOARD *v.* FIGLIOLA    *Cromwell J.*        [2011] 3 S.C.R.

with" seem to me clear indications that the breadth of the common law discretion is expanded, not restricted.

[82]    I turn next to look at the provision in the context of the rest of the section in which it is found. It is suggested that s. 27(1)(f) should be read narrowly because the character of the other six categories of discretion conferred by s. 27(1) relates to clear circumstances in which dismissal would be appropriate. The premise of this view is that all of the other parts of s. 27(1) clearly call for a narrow discretion. Respectfully, I do not accept this premise. It is the case, of course, that some of the other grounds of discretionary dismissal set out in s. 27(1) do indeed arise in circumstances in which it would be demonstrably undesirable to proceed with the complaint: Abella J.'s reasons, at paras. 39-41. For example, it is hard to see how the Tribunal has discretion, in any meaningful sense of the word, to refuse to dismiss a complaint not within its jurisdiction (s. 27(1)(a)), or which discloses no contravention of the *Code* (s. 27(1)(b)). However, not all of the categories set out in s. 27(1) are of this character: see, e.g., *Becker v. Cariboo Chevrolet Oldsmobile Pontiac Buick GMC Ltd.*, 2006 BCSC 43, 42 Admin. L.R. (4th) 266, at paras. 38-42. In my view, the nature of the discretion in the various paragraphs of s. 27(1) is influenced by the content of each paragraph rather than the use of "may" in the section's opening words.

[83]    Section 27(1)(d) confers discretion to dismiss where the proceeding would not benefit the person, group or class alleged to have been discriminated against or would not further the purposes of the *Code*. Exercising this discretion requires the Tribunal to consider fundamental questions about the role of human rights legislation and human rights adjudication. The discretion with respect to these matters is thus wide-ranging, grounded in policy and in the Tribunal's specialized human

décisionnels où ils sont appelés à s'appliquer. La disposition met l'accent sur le [TRADUCTION] « fond » de la plainte, et l'emploi des termes larges « a été statué de façon appropriée » indique clairement, selon moi, qu'elle élargit plutôt qu'elle ne restreint la portée du pouvoir discrétionnaire prévu par la common law.

[82]    Examinons ensuite la disposition dans le contexte du reste de l'article. Ma collègue considère qu'il faut interpréter l'al. 27(1)f) de façon restrictive parce que les six autres catégories de pouvoirs discrétionnaires conférés au par. 27(1) ont trait, de par leur nature, à des circonstances où le rejet de la plainte est clairement approprié. Ce raisonnement repose sur la prémisse que tous les autres alinéas du par. 27(1) confèrent clairement un pouvoir discrétionnaire restreint. Je ne puis accepter cette prémisse. Certes, certains des autres motifs de rejet discrétionnaire énumérés au par. 27(1) s'appliquent effectivement dans des circonstances où il ne serait nettement pas souhaitable de donner suite à la plainte : motifs de la juge Abella, par. 39-41. On voit difficilement, par exemple, comment le Tribunal pourrait jouir du pouvoir discrétionnaire réel de refuser de rejeter une plainte qui ne relèverait pas de sa compétence (al. 27(1)a)), ou qui ne révélerait aucune contravention au *Code* (al. 27(1)b)). Ce ne sont pas toutes les catégories mentionnées au par. 27(1) qui sont de cette nature, cependant : voir, p. ex., *Becker c. Cariboo Chevrolet Oldsmobile Pontiac Buick GMC Ltd.*, 2006 BCSC 43, 42 Admin. L.R. (4th) 266, par. 38-42. Selon moi, c'est plutôt le contenu des différents alinéas du par. 27(1) et non le mot [TRADUCTION] « peut », employé dans les premiers mots de cet article, qui influe sur la nature du pouvoir discrétionnaire.

[83]    L'alinéa 27(1)d) investit le Tribunal du pouvoir discrétionnaire de rejeter une plainte qui n'apporterait rien à la personne, au groupe ou à la catégorie censés avoir été victimes de discrimination, ou qui ne servirait pas les fins du *Code*. L'exercice de ce pouvoir oblige le Tribunal à faire l'examen de questions fondamentales concernant le rôle de la législation relative aux droits de la personne et des instances décisionnelles chargées de l'appliquer. Il s'agit donc là d'un pouvoir discrétionnaire large

rights mandate (*Becker*, at para. 42). It does not share the character of some of the other more straightforward provisions in s. 27(1), but is similar in breadth to the discretion set out in s. 27(1)(f). In s. 27(1)(f), the breadth of the discretion is apparent from the very general language relating to the "substance" of the complaint and whether it has been dealt with "appropriately". I see nothing in the structure of or the context provided by s. 27(1) read as a whole that suggests a narrow interpretation of the discretion to dismiss where the "substance" of a complaint has been "appropriately" dealt with.

[84]   A further element of the statutory context is the provision's legislative history. That history confirms that it was the legislature's intent to confer a broad discretion to dismiss or not to dismiss where there had been an earlier proceeding. It is significant that the *Human Rights Code* previously set out in s. 25(3) mandatory factors to take into account in the exercise of this discretion in *deferring* a complaint. The now repealed s. 27(2) provided that those same factors had to be considered when *dismissing* a complaint. These factors included the subject matter and nature of the other proceeding and the adequacy of the remedies available in the other proceeding in the circumstances. However, the legislature removed these specified factors (*Human Rights Code Amendment Act, 2002*, S.B.C. 2002, c. 62, ss. 11 and 12). This is consistent with an intention to confer a more open-ended discretion. That intention is explicit in the *Official Report of Debates of the Legislative Assembly (Hansard)*. Indeed, in response to the question as to why the mandatory factors were removed, the Honourable Geoff Plant, then-Attorney General of British Columbia and responsible minister for this legislation, said the following:

fondé sur des considérations de politique générale et sur la mission spécialisée du Tribunal en matière de droits de la personne (*Becker*, par. 42). Le pouvoir n'est pas de la même nature que celui conféré par certaines des autres dispositions plus simples du par. 27(1), mais son étendue est comparable à celle du pouvoir discrétionnaire prévu à l'al. 27(1)f). Dans ce dernier alinéa, la portée du pouvoir discrétionnaire se dégage des termes très généraux employés, concernant le [TRADUCTION] « fond » de la plainte et la question de savoir s'il a été statué sur ce fond « de façon appropriée ». Je ne relève dans la structure ou le contexte du par. 27(1) pris dans son ensemble aucune indication qu'il faille interpréter restrictivement le pouvoir discrétionnaire de rejet lorsqu'il a été statué « de façon appropriée » sur le « fond » d'une plainte.

[84]   L'historique législatif d'une disposition fait également partie de son contexte. Cet historique confirme que, pour ce qui est du rejet d'une plainte ayant fait l'objet d'une instance antérieure, le législateur a voulu conférer un pouvoir discrétionnaire étendu. Il est significatif que le *Human Rights Code* ait déjà énuméré, au par. 25(3), des facteurs qui devaient être pris en compte dans l'exercice du pouvoir discrétionnaire d'*ajourner* ou non l'examen d'une plainte. Le par. 27(2), maintenant abrogé, exigeait l'examen de ces mêmes facteurs lorsqu'il s'agissait de *rejeter* une plainte. Ces facteurs comprenaient l'objet et la nature de l'autre instance ainsi que le caractère suffisant des mesures de réparation offertes dans l'autre instance dans les circonstances. Toutefois, le législateur a aboli ces facteurs (*Human Rights Code Amendment Act, 2002*, S.B.C. 2002, ch. 62, art. 11 et 12), ce qui manifeste une intention de conférer un pouvoir discrétionnaire moins limitatif. Cette intention est explicitement formulée dans le *Official Report of Debates of the Legislative Assembly (Hansard)* de l'assemblée législative. Interrogé au sujet des raisons de la suppression des facteurs obligatoires, l'honorable Geoff Plant, qui était procureur général de la Colombie-Britannique et ministre responsable de l'application de cette loi à l'époque, a répondu ce qui suit :

The fundamental issue in any attempt to seek the exercise of this power is whether there is another proceeding capable of appropriately dealing with the substance of the complaint. Our view is that that test is sufficient to ensure that the power is exercised in a case-by-case way in accordance with the principles and purposes of the code. It may well be that the panel members will consider the facts and factors that are now referred to in subsection (3), but we did not think it was necessary to tie the hands of a panel or a tribunal member with those specific criteria.

.   .   .

. . . [What the amendment] does is express the principle or the test pretty broadly and pretty generally. [Emphasis added.]

(*Official Report of Debates of the Legislative Assembly (Hansard)*, vol. 9, 3rd Sess., 37th Parl., October 28, 2002, at p. 4094)

[85]   The intent was clearly to broaden, not to narrow, the range of factors which a tribunal could consider. I would also add, with respect, that the comments of the Minister of Government Services at second reading of the *Human Rights Amendment Act, 1995*, S.B.C. 1995, c. 42, cited by Abella J., at para. 43, have nothing to do with the scope of discretion under s. 27(1)(f) or its predecessor provisions.

[86]   A further aspect of the legislative context is the legal framework in which the legislation is to operate. I have developed earlier my understanding of the common law approach to the discretionary application of finality doctrines in the administrative law context. Read against that background, my view is that the provision may most realistically be viewed as further loosening the strictures of the common law doctrines.

[87]   It is also part of the pre-existing legal framework that under earlier legislation (*Human Rights Code*, R.S.B.C. 1996, c. 210, s. 27), the Commissioner of Investigation and Mediation had developed a policy about how to decide whether to proceed with a complaint that had been the subject

[TRADUCTION] La question essentielle qui se pose chaque fois que l'on envisage l'exercice de ce pouvoir est celle de l'existence d'un autre mécanisme permettant de statuer de façon appropriée sur le fond de la plainte. Selon nous, il s'agit là d'un test suffisant pour faire en sorte que le pouvoir soit exercé dans chaque cas conformément aux principes et aux objectifs du *Code*. Il est fort possible que les membres du Tribunal prennent en compte les faits et les facteurs qui sont à présent mentionnés au paragraphe (3), mais nous n'avons pas jugé nécessaire que ces critères particuliers lient les membres du Tribunal.

.   .   .

. . . [Ce qu'accomplit la modification], c'est exprimer le principe ou le test de façon assez large et générale. [Je souligne.]

(*Official Report of Debates of the Legislative Assembly (Hansard)*, vol. 9, 3ᵉ sess., 37ᵉ lég., 28 octobre 2002, p. 4094)

[85]   Le législateur voulait manifestement élargir l'éventail des facteurs qu'un tribunal peut prendre en compte, et non le rétrécir. J'ajouterais que les observations qu'a faites le ministre des Services gouvernementaux en deuxième lecture de la *Human Rights Amendment Act, 1995*, S.B.C. 1995, ch. 42, que cite la juge Abella au par. 43, n'ont aucun rapport avec la portée du pouvoir discrétionnaire exercé aux termes de l'al. 27(1)f) ou des dispositions qui l'ont précédé.

[86]   Le cadre législatif dans lequel s'inscrit cette Loi constitue un autre aspect de son contexte législatif. J'ai déjà exposé mon interprétation des principes de la common law régissant l'application discrétionnaire des doctrines relatives au caractère définitif des décisions en droit administratif. Dans ce contexte, j'estime qu'il est plus réaliste de voir dans la disposition en cause un assouplissement des restrictions posées par la common law.

[87]   Le cadre juridique préexistant comportait aussi une politique élaborée par le commissaire aux enquêtes et à la médiation sous le régime de la loi antérieure (*Human Rights Code*, R.S.B.C. 1996, ch. 210, art. 27) pour guider la prise de décision au sujet des suites à donner à une plainte ayant fait

of other proceedings. That policy called for consideration of factors such as these:

(1) the administrative fairness of the other proceeding; (2) the expertise of the decision-makers and investigators; (3) whether the case involves important human rights issues which invoke the public interest enunciated by the Code; (4) which forum is more appropriate for discussion of the issues; (5) whether the other proceeding protects the complainant against the discriminatory practice; and (6) whether there is a conflict between the goals and intent of the Code and the other proceedings, and practical issues including the time which each procedure would take and the consequences in terms of emotional strain, personal relations and long term outcome of processes.

(D. K. Lovett and A. R. Westmacott, "Human Rights Review: A Background Paper" (2001) (online), at p. 100, fn. 128)

[88]  The use of the broad language employed in s. 27(1)(f), introduced into the pre-existing practice, does not support the view that the discretion was narrowly conceived; it supports the opposite inference.

[89]  A final contextual element relates to the similarly worded power to defer a complaint pending its resolution in another forum under s. 25(2) of the *Code*. That provision reads as follows:

**25.** . . .

    (2)  If at any time after a complaint is filed a member or panel determines that <u>another proceeding is capable of appropriately dealing with the substance of a complaint</u>, the member or panel may defer further consideration of the complaint until the outcome of the other proceeding.

[90]  The power to defer a complaint is not based on the finality doctrines because when deferral is being considered there has been no other final decision. Nonetheless, the legislature chose to use essentially the same language to confer discretion to defer as it did to confer the discretion to dismiss. The repetition of this language in s. 27(1)(f)

l'objet d'une autre instance. Cette politique demandait l'examen de facteurs tels les suivants :

[TRADUCTION] (1) l'équité administrative de l'autre instance, (2) l'expertise des décideurs et enquêteurs, (3) la possibilité que l'instance comporte l'examen d'importantes questions de droits de la personne relevant des considérations d'intérêt public énoncées au Code, (4) le forum le plus approprié pour l'examen de ces questions, (5) la protection que l'autre instance offre au plaignant contre la pratique discriminatoire, et (6) l'existence d'un conflit entre les buts et objets du Code et l'autre instance, et des considérations pratiques incluant la durée probable de chaque instance, leurs conséquences en termes de tension psychologique et de relations personnelles et le résultat à long terme des processus.

(D. K. Lovett et A. R. Westmacott, « Human Rights Review : A Background Paper » (2001) (en ligne), p. 100, note 128)

[88]  La formulation générale employée à l'al. 27(1)f), introduite dans la pratique préexistante, ne renforce pas le point de vue selon lequel on voulait donner une portée étroite au pouvoir discrétionnaire; elle permet de déduire le contraire.

[89]  Le pouvoir d'ajourner l'examen d'une plainte jusqu'à ce qu'elle soit tranchée dans un autre forum, conféré en termes similaires au par. 25(2) du *Code*, fournit un dernier élément contextuel. Voici le texte de cette disposition :

[TRADUCTION]

**25.** . . .

    (2)  Un membre ou une formation qui est d'avis qu'<u>une autre instance permet de statuer de façon appropriée sur le fond de la plainte</u> peut à tout moment après le dépôt de celle-ci en ajourner l'examen jusqu'à l'issue de l'autre instance.

[90]  Le pouvoir discrétionnaire d'ajourner l'examen d'une plainte ne repose pas sur les doctrines relatives au caractère définitif des décisions parce qu'au moment de l'examen de l'ajournement, aucune autre décision définitive n'a encore été rendue. Néanmoins, le législateur a choisi de conférer le pouvoir dans les termes mêmes qu'il a

suggests to me that a broad and flexible discretion was intended.

[91]    Looking at the text, context and purpose of the provision, I conclude that the discretion conferred under s. 27(1)(f) was conceived of as a broad discretion.

## C. *Exercising the Discretion*

[92]    As I see it, s. 27(1)(f) broadens the common law approach to the finality doctrines in two main ways. By asking whether the substance of the complaint has been addressed elsewhere, the focus must be on the substance of the complaint — its "essential character" to borrow a phrase from *Weber v. Ontario Hydro*, [1995] 2 S.C.R. 929, at para. 52; and *Villella v. Vancouver (City)*, 2005 BCHRT 405, [2005] B.C.H.R.T.D. No. 405 (QL), at para. 21. The focus is not on the technical requirements of the common law finality doctrines, such as identity of parties, mutuality, identity of claims and so forth. The section compels attention to the substance of the matter, not to technical details of pleading or form. If the Tribunal concludes that the substance of the complaint has not in fact been dealt with previously, then its inquiry under s. 27(1)(f) is completed and there is no basis to dismiss the complaint. Where the substance of the matter has been addressed previously, the important interests in finality and adherence to proper review mechanisms are in play. It then becomes necessary for the Tribunal to exercise its discretion, recognizing that those interests must be given significant weight.

[93]    Faced with a complaint, the substance of which has been addressed elsewhere, the Tribunal must decide whether there is something in the circumstances of the particular case to make it inappropriate to apply the general principle that the earlier resolution of the matter should be final. Other than by providing that the previous dealing with the substance of the complaint has been appropriate, the statute is silent on the factors that may properly be considered by the Tribunal in exercising its

employés pour conférer le pouvoir discrétionnaire de rejeter une plainte. Ce recours à la même formulation à l'al. 27(1)f) indique à mon avis que le législateur souhaitait accorder un pouvoir discrétionnaire large et souple.

[91]    Compte tenu du texte, du contexte et de l'objectif de l'al. 27(1)f), je suis d'avis que le pouvoir discrétionnaire qu'il confère se voulait large.

## C. *L'exercice du pouvoir discrétionnaire*

[92]    À mon sens, l'al. 27(1)f) élargit de deux façons la portée des doctrines de la common law relatives au caractère définitif des décisions. Puisqu'il faut déterminer si le fond de la plainte a été examiné dans une autre instance, l'accent doit porter sur le fond de la plainte — son « essence », pour reprendre le terme employé dans *Weber c. Ontario Hydro*, [1995] 2 R.C.S. 929, par. 52; et *Villella c. Vancouver (City)*, 2005 BCHRT 405, [2005] B.C.H.R.T.D. No. 405 (QL), par. 21. Il ne porte pas sur les exigences techniques de ces doctrines, telles l'identité des parties, la réciprocité, l'identité des demandes, etc. Cette disposition fait porter l'attention sur le fond de l'affaire, non sur les aspects procéduraux ou formels. Si le Tribunal conclut qu'il n'a pas dans les faits été statué sur le fond de la plainte, l'examen prévu à l'al. 27(1)f) est terminé, et le rejet de la plainte n'est pas fondé. Si la plainte a déjà été examinée au fond, les intérêts importants que revêtent le caractère définitif de la décision et le recours aux mécanismes de révision applicables entrent en jeu, et le Tribunal doit alors exercer son pouvoir discrétionnaire en reconnaissant qu'il y a lieu d'attribuer à ces intérêts un poids appréciable.

[93]    Si le fond de la plainte a fait l'objet d'un examen dans une autre instance, le Tribunal doit établir si un élément des circonstances de l'affaire fait en sorte qu'il ne conviendrait pas d'appliquer le principe général du caractère définitif de la décision antérieure. La Loi ne mentionne aucun facteur que le Tribunal doit prendre en compte dans l'exercice de son pouvoir discrétionnaire de rejeter ou non la plainte, hormis le caractère approprié de son examen antérieur au fond. Ce pouvoir discrétionnaire est

discretion to dismiss or not to dismiss. This exercise of discretion is "necessarily case specific and depends on the entirety of the circumstances": *Schweneke v. Ontario* (2000), 47 O.R. (3d) 97 (C.A.), at paras. 38 and 43, cited with approval in *Danyluk*, at para. 63. *Danyluk*, however, provides a useful starting point for assembling a non-exhaustive group of relevant considerations.

[94]   The mandate of the previous decision-maker and of the Tribunal should generally be considered. Is there a discernable legislative intent that the other decision-maker was intended to be an exclusive forum or, on the contrary, that the opposite appears to have been contemplated? The purposes of the legislative schemes should also generally be taken into account. For example, if the focus and purpose of the earlier administrative proceeding was entirely different from proceedings before the Human Rights Tribunal, there may be reason to question the appropriateness of giving conclusive weight to the outcome of those earlier proceedings. The existence of review mechanisms for the earlier decision is also a relevant consideration. Failure to pursue appropriate means of review will generally count against permitting the substance of the complaint to be relitigated in another forum. However, as *Danyluk* shows, this is not always a decisive consideration (paras. 74 and 80). The Tribunal may also consider the safeguards available to the parties in the earlier administrative proceedings. Such factors as the availability of evidence and the opportunity of the party to fully present his or her case should be taken into account. A further relevant consideration is the expertise of the earlier administrative decision-maker. As Binnie J. noted in *Danyluk*, the rule against collateral attack has long taken this factor into account. While not conclusive, the fact that the earlier decision is "based on considerations which are foreign to an administrative appeal tribunal's expertise or *raison d'être*" may suggest that it did not appropriately deal with the matter: para. 77, citing *R. v. Consolidated Maybrun Mines Ltd.*, [1998] 1 S.C.R. 706, at para. 50. The circumstances giving rise to the prior administrative proceedings may also be a relevant consideration. In *Danyluk*, for example, the fact that the employee had undertaken the earlier administrative proceedings at a

[TRADUCTION] « nécessairement exercé au cas par cas et son application dépend de l'ensemble des circonstances » : *Schweneke c. Ontario* (2000), 47 O.R. (3d) 97 (C.A.), par. 38 et 43, cité et approuvé dans *Danyluk*, au par. 63. Toutefois, l'arrêt *Danyluk* expose un point de départ utile pour l'établissement d'un ensemble non exhaustif de facteurs pertinents.

[94]   Il faut généralement considérer la mission du décideur antérieur et celle du tribunal. Peut-on discerner une intention du législateur de conférer une compétence exclusive à l'autre décideur ou plutôt l'intention opposée? Il convient habituellement aussi de prendre en compte les objectifs des deux régimes établis par la loi. Par exemple, si l'orientation et l'objet de l'instance administrative antérieure différaient complètement de ceux d'une instance devant le Tribunal, il y a peut-être lieu de se demander s'il convient d'attribuer un caractère concluant au résultat de l'instance antérieure. L'existence de mécanismes de révision de la décision antérieure constitue aussi un facteur pertinent. L'omission de se prévaloir des voies de révision appropriées militera généralement contre la remise en cause du fond d'une plainte devant un autre forum. Comme l'illustre l'arrêt *Danyluk*, toutefois, il ne s'agit pas toujours là d'un facteur déterminant (par. 74 et 80). Le Tribunal peut également examiner les garanties offertes aux parties dans l'instance administrative antérieure. Des critères comme la disponibilité d'éléments de preuve et la possibilité pour l'intéressé de faire valoir tous ses moyens devraient être pris en compte. L'expertise du décideur administratif antérieur est aussi un facteur pertinent. Comme le juge Binnie l'a indiqué dans *Danyluk*, ce facteur intervient depuis longtemps dans l'application de la règle prohibant les contestations indirectes. Le fait que la décision antérieure « repose sur des considérations étrangères à l'expertise ou à la raison d'être d'une instance administrative d'appel », bien qu'il ne soit pas déterminant, peut indiquer qu'il n'a pas été statué de façon appropriée sur la question : par. 77, citant *R. c. Consolidated Maybrun Mines Ltd.*, [1998] 1 R.C.S. 706, par. 50. Les circonstances ayant mené à l'instance antérieure peuvent aussi constituer un facteur pertinent. Dans *Danyluk*, par exemple, le fait que l'employée ait entrepris le

Case 1:25-cv-00910-JMF   Document 52-15   Filed 04/07/25   Page 48 of 50

468   WORKERS' COMPENSATION BOARD *v.* FIGLIOLA   *Cromwell J.*   [2011] 3 S.C.R.

time of "personal vulnerability" was taken into account (para. 78).

[95]   The most important consideration, however, is the last one noted by Binnie J. in *Danyluk*, at para. 80: whether giving the earlier proceeding final and binding effect will work an injustice. If there is substantial injustice, or a serious risk of it, poor procedural choices by the complainant should generally not be fatal to an appropriate consideration of his or her complaint on its merits.

[96]   The Tribunal's approach to the s. 27(1)(f) discretion is in line with the *Danyluk* factors. For example, in *Villella*, the Tribunal discussed a number of the factors which it should consider. It emphasized that the question was not whether, in its view, the earlier proceeding was correctly decided or whether the process was the same as the Tribunal's process. The Tribunal recognized that it is the clear legislative intent of s. 25 that proceedings before the Tribunal are not the sole means through which human rights issues can be appropriately addressed. However, the Tribunal also noted that s. 27(1)(f) obliged it to examine the substance of the matter and not to simply "rubber stamp" the previous decision (para. 19). This requires looking at such factors as the issues raised in the earlier proceedings; whether those proceedings were fair; whether the complainant had been adequately represented; whether the applicable human rights principles had been canvassed; whether an appropriate remedy had been available; and whether the complainant chose the forum for the earlier proceedings. This flexible and global assessment seems to me to be exactly the sort of approach called for by s. 27(1)(f).

D.   *Application*

[97]   At the end of the day, I agree with Abella J.'s conclusion that the Tribunal's decision not to dismiss the complaint under s. 27(1)(f) was patently unreasonable within the meaning of s. 59 of the

recours administratif antérieur à un moment qui faisait d'elle une « personne vulnérable » a été pris en compte (par. 78).

[95]   Le facteur le plus important, toutefois, est celui que le juge Binnie mentionne en dernier lieu dans *Danyluk*, au par. 80 : l'injustice pouvant résulter de l'attribution d'une portée définitive et exécutoire à l'instance antérieure. En cas d'injustice substantielle ou de risque sérieux d'une telle injustice, les choix procéduraux malavisés du plaignant ne devraient généralement pas sonner le glas d'un examen au fond approprié de sa plainte.

[96]   La façon dont le Tribunal a abordé l'exercice du pouvoir discrétionnaire prévu à l'al. 27(1)f) est conforme aux facteurs énumérés dans *Danyluk*. Par exemple, dans *Villella*, il a examiné un certain nombre de facteurs à prendre en compte. Il a souligné que la question n'était pas de savoir si, à son avis, la décision antérieure était bien fondée ou si la procédure appliquée était la même que celle devant le Tribunal. Il a reconnu que selon l'intention législative claire à la base de l'art. 25, le recours devant le Tribunal n'est pas le seul moyen permettant qu'il soit statué de façon appropriée sur une question de droits de la personne. Il a également indiqué, toutefois, que l'al. 27(1)f) l'oblige à examiner le fond de la plainte et non à simplement entériner [TRADUCTION] « les yeux fermés » la décision antérieure (par. 19). Il lui faut, en conséquence, tenir compte d'éléments comme les questions soulevées dans l'instance antérieure et les questions de savoir si cette instance s'est déroulée de façon équitable, si le plaignant était bien représenté, si les principes applicables en matière de droits de la personne ont été examinés, si une réparation appropriée pouvait être accordée et si le choix du forum antérieur relevait du plaignant. Cette évaluation globale et souple me paraît être exactement la démarche que requiert l'al. 27(1)f).

D.   *Application*

[97]   En dernière analyse, je souscris à la conclusion de la juge Abella qu'en refusant de rejeter la plainte en application de l'al. 27(1)f), le Tribunal a rendu une décision manifestement déraisonnable

*ATA*. For the purposes of that section, a discretionary decision is patently unreasonable if, among other things, it "is based entirely or predominantly on irrelevant factors" (s. 59(4)(c)), or "fails to take statutory requirements into account" (s. 59(4)(d)). While in my view, the Tribunal was entitled to take into account the alleged procedural limitations of the proceedings before the Review Officer, it committed a reversible error by basing its decision on the alleged lack of independence of the Review Officer and by ignoring the potential availability of judicial review to remedy any procedural defects. More fundamentally, it failed to consider whether the "substance" of the complaint had been addressed and thereby failed to take this threshold statutory requirement into account. It also, in my view, failed to have regard to the fundamental fairness or otherwise of the earlier proceeding. All of this led the Tribunal to give no weight at all to the interests of finality and to largely focus instead on irrelevant considerations of whether the strict elements of issue estoppel were present.

[98]  However, I do not agree with my colleague's proposed disposition of the appeal. In her reasons, Abella J. would allow the appeal, set aside the Tribunal's decision and dismiss the complaints. In my opinion, the appeal should be allowed and, in accordance with what I understand to be the general rule in British Columbia, the Workers' Compensation Board's application to dismiss the complaints under s. 27(1)(f) should be remitted to the Tribunal for reconsideration. As the Court of Appeal held in *Workers' Compensation Appeal Tribunal (B.C.) v. Hill*, 2011 BCCA 49, 299 B.C.A.C. 129, at para. 51, "the general rule is that where a party succeeds on judicial review, the appropriate disposition is to order a rehearing or reconsideration before the administrative decision-maker, unless exceptional circumstances indicate the court should make the decision the legislation has assigned to the administrative body" (see also *Allman v. Amacon Property Management Services*

au sens de l'art. 59 de l'*ATA*. Suivant cet article, est manifestement déraisonnable une décision procédant d'un pouvoir discrétionnaire exercé [TRADUCTION] « entièrement ou principalement sur le fondement de facteurs non pertinents » (al. 59(4)c)) ou « sans tenir compte d'exigences prévues par la loi » (al. 59(4)d)). Or, bien que j'estime que le Tribunal pouvait tenir compte des allégations relatives aux limites procédurales du recours devant l'agent de révision, il a selon moi commis une erreur justifiant l'annulation de sa décision en fondant cette dernière sur le prétendu manque d'indépendance de l'agent de révision et en faisant abstraction de la possibilité de recourir au contrôle judiciaire pour corriger tout vice procédural. Plus fondamentalement encore, il n'a pas examiné s'il avait été statué sur le « fond » de la plainte, omettant ainsi de prendre en considération une condition imposée par la Loi. Je suis également d'avis qu'il n'a pas pris en compte l'équité, fondamentale ou autre, de l'instance antérieure. Tout cela a fait en sorte que le Tribunal n'a accordé aucun poids aux intérêts en jeu en matière de caractère définitif de la décision, et qu'il a largement fondé son analyse, plutôt, sur des facteurs non pertinents rattachés à l'existence des stricts éléments constitutifs de la préclusion fondée sur une question déjà tranchée.

[98]  Toutefois, je ne puis souscrire à la solution que propose ma collègue dans ce pourvoi. Dans ses motifs, la juge Abella se dit d'avis d'accueillir le pourvoi, d'annuler la décision du Tribunal et de rejeter les plaintes. Selon moi, il y a lieu d'accueillir le pourvoi et, comme le veut à mon avis la règle générale en Colombie-Britannique, de renvoyer au Tribunal, pour qu'il la réexamine, la demande de rejet des plaintes présentée par la Commission aux termes de l'al. 27(1)f). Comme l'a affirmé la Cour d'appel dans *Workers' Compensation Appeal Tribunal (B.C.) c. Hill*, 2011 BCCA 49, 299 B.C.A.C. 129, par. 51, [TRADUCTION] « suivant la règle générale, lorsqu'une partie a gain de cause à l'issue d'un contrôle judiciaire, il convient d'ordonner une nouvelle audition ou un nouvel examen devant le décideur administratif, à moins que des circonstances exceptionnelles justifient la cour de rendre la décision qui, selon la loi, appartient à l'organisme administratif » (voir également *Allman c.*

*Inc.*, 2007 BCCA 302, 243 B.C.A.C. 52). This case does not present exceptional circumstances justifying diverging from this general rule.

[99]  I would therefore allow the appeal without costs and remit the Workers' Compensation Board's application under s. 27(1)(f) to the Tribunal for reconsideration.

> *Appeal allowed.*

> *Solicitor for the appellant: Workers' Compensation Board, Richmond.*

> *Solicitor for the respondents Guiseppe Figliola, Kimberley Sallis and Barry Dearden: Community Legal Assistance Society, Vancouver.*

> *Solicitor for the respondent the British Columbia Human Rights Tribunal: British Columbia Human Rights Tribunal, Vancouver.*

> *Solicitor for the intervener the Attorney General of British Columbia: Attorney General of British Columbia, Victoria.*

> *Solicitors for the intervener the Coalition of BC Businesses: Heenan Blaikie, Vancouver.*

> *Solicitor for the intervener the Canadian Human Rights Commission: Canadian Human Rights Commission, Ottawa.*

> *Solicitor for the intervener the Alberta Human Rights Commission: Alberta Human Rights Commission, Calgary.*

> *Solicitors for the intervener the Vancouver Area Human Rights Coalition Society: Bull, Housser & Tupper, Vancouver.*

*Amacon Property Management Services Inc.*, 2007 BCCA 302, 243 B.C.A.C. 52). En l'espèce, aucune circonstance exceptionnelle ne justifie que l'on écarte cette règle générale.

[99]  Je suis donc d'avis d'accueillir le pourvoi sans dépens et de renvoyer au Tribunal, pour qu'il la réexamine, la demande de la Commission présentée aux termes de l'al. 27(1)f).

> *Pourvoi accueilli.*

> *Procureur de l'appelante : Workers' Compensation Board, Richmond.*

> *Procureur des intimés Guiseppe Figliola, Kimberley Sallis et Barry Dearden : Community Legal Assistance Society, Vancouver.*

> *Procureur de l'intimé British Columbia Human Rights Tribunal : British Columbia Human Rights Tribunal, Vancouver.*

> *Procureur de l'intervenant le procureur général de la Colombie-Britannique : Procureur général de la Colombie-Britannique, Victoria.*

> *Procureurs de l'intervenante Coalition of BC Businesses : Heenan Blaikie, Vancouver.*

> *Procureur de l'intervenante la Commission canadienne des droits de la personne : Commission canadienne des droits de la personne, Ottawa.*

> *Procureur de l'intervenante Alberta Human Rights Commission : Alberta Human Rights Commission, Calgary.*

> *Procureurs de l'intervenante Vancouver Area Human Rights Coalition Society : Bull, Housser & Tupper, Vancouver.*