# EXHIBIT P

2003 SCC 63 (CanLII)

**Canadian Union of Public Employees, Local 79**　*Appellant*

*v.*

**City of Toronto and Douglas C. Stanley**　*Respondents*

and

**Attorney General of Ontario**　*Intervener*

Indexed as: Toronto (City) *v.* C.U.P.E., Local 79

Neutral citation: 2003 SCC 63.

File No.: 28840.

2003: February 13; 2003: November 6.

Present: McLachlin C.J. and Gonthier, Iacobucci, Major, Bastarache, Binnie, Arbour, LeBel and Deschamps JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR ONTARIO

*Labour law — Arbitration — Dismissal without just cause — Evidence — Recreation instructor dismissed after being convicted of sexual assault — Conviction upheld on appeal — Arbitrator ruling that instructor had been dismissed without just cause — Whether union entitled to relitigate issue decided against employee in criminal proceedings — Evidence Act, R.S.O. 1990, c. E.23, s. 22.1 — Labour Relations Act, S.O. 1995, c. 1, Sch. A, s. 48.*

*Judicial review — Standard of review — Labour arbitration — Recreation instructor dismissed after being convicted of sexual assault — Arbitrator ruling that instructor had been dismissed without just cause — Whether arbitrator entitled to revisit conviction — Whether correctness is appropriate standard of review — Evidence Act, R.S.O. 1990, c. E.23, s. 22.1 — Labour Relations Act, S.O. 1995, c. 1, Sch. A, s. 48.*

O worked as a recreation instructor for the respondent City. He was charged with sexually assaulting a boy under his supervision. He pleaded not guilty. At trial before a judge alone, he testified and was cross-

**Syndicat canadien de la fonction publique, section locale 79**　*Appelant*

*c.*

**Ville de Toronto et Douglas C. Stanley**　*Intimés*

et

**Procureur général de l'Ontario**　*Intervenant*

Répertorié : Toronto (Ville) *c.* S.C.F.P., section locale 79

Référence neutre : 2003 CSC 63.

Nᵒ du greffe : 28840.

2003 : 13 février; 2003 : 6 novembre.

Présents : La juge en chef McLachlin et les juges Gonthier, Iacobucci, Major, Bastarache, Binnie, Arbour, LeBel et Deschamps.

EN APPEL DE LA COUR D'APPEL DE L'ONTARIO

*Droit du travail — Arbitrage — Congédiement sans motif valable — Preuve — Instructeur en loisirs congédié après avoir été déclaré coupable d'agression sexuelle — Déclaration de culpabilité confirmée en appel — Arbitre ayant statué que l'instructeur avait été congédié sans motif valable — Le syndicat est-il habilité à remettre en cause une question tranchée à l'encontre de l'employé dans une instance criminelle? — Loi sur la preuve, L.R.O. 1990, ch. E.23, art. 22.1 — Loi sur les relations de travail, L.O. 1995, ch. 1, ann. A, art. 48.*

*Contrôle judiciaire — Norme de contrôle — Arbitrage en relations du travail — Instructeur en loisirs congédié après avoir été déclaré coupable d'agression sexuelle — Arbitre ayant statué que l'instructeur avait été congédié sans motif valable — L'arbitre est-il habilité à revenir sur la déclaration de culpabilité? — La norme de contrôle appropriée est-elle celle de la décision correcte? — Loi sur la preuve, L.R.O. 1990, ch. E.23, art. 22.1 — Loi sur les relations de travail, L.O. 1995, ch. 1, ann. A, art. 48.*

O travaillait comme instructeur en loisirs pour la Ville intimée. Il a été accusé d'agression sexuelle contre un garçon confié à sa surveillance. Il a plaidé non coupable. Lors de son procès devant un juge seul, il a témoigné

examined. The trial judge found that the complainant was credible and that O was not. He entered a conviction, which was affirmed on appeal. The City fired O a few days after his conviction. O grieved the dismissal. At the arbitration hearing, the City submitted the complainant's testimony from the criminal trial and the notes of O's supervisor, who had spoken to the complainant at the time. The complainant was not called to testify. O testified, claiming that he had never sexually assaulted the boy. The arbitrator ruled that the criminal conviction was admissible evidence, but that it was not conclusive as to whether O had sexually assaulted the boy. No fresh evidence was introduced. The arbitrator held that the presumption raised by the criminal conviction had been rebutted, and that O had been dismissed without just cause. The Divisional Court quashed the arbitrator's ruling. The Court of Appeal upheld that decision.

*Held*: The appeal should be dismissed.

*Per* McLachlin C.J. and Gonthier, Iacobucci, Major, Bastarache, Binnie and Arbour JJ.: When asked to decide whether a criminal conviction, *prima facie* admissible in a proceeding under s. 22.1 of the Ontario *Evidence Act*, ought to be rebutted or taken as conclusive, courts will turn to the doctrine of abuse of process to ascertain whether relitigation would be detrimental to the adjudicative process. The doctrine engages the inherent power of the court to prevent the misuse of its procedure, in a way that would bring the administration of justice into disrepute. It has been applied to preclude relitigation in circumstances where the strict requirements of issue estoppel are not met, but where allowing litigation to proceed would nonetheless violate such principles as judicial economy, consistency, finality and the integrity of the administration of justice. The motive of the party who seeks to relitigate, and the capacity in which he or she does so, cannot be decisive factors in the application of the bar against relitigation. What is improper is to attempt to impeach a judicial finding by the impermissible route of relitigation in a different forum. A proper focus on the process, rather than on the interests of a party, will reveal why relitigation should not be permitted. From the system's point of view, relitigation carries serious detrimental effects and should be avoided unless the circumstances dictate that relitigation is necessary to enhance the credibility and the effectiveness of the adjudicative process as a whole. Casting doubt over the validity of a criminal conviction is a very serious matter. Collateral attacks and relitigation are not appropriate methods of redress since they inordinately tax the adjudicative process while doing nothing to ensure a more trustworthy

et a subi un contre-interrogatoire. Le juge du procès a conclu que le plaignant était crédible, contrairement à O. Il a rendu un verdict de culpabilité, qui a par la suite été confirmé en appel. La Ville a congédié O quelques jours après le prononcé du verdict. O a déposé un grief contestant son congédiement. À l'audition du grief, la Ville a déposé en preuve le témoignage que le plaignant avait donné lors du procès criminel ainsi que les notes du superviseur de O, lequel avait rencontré le plaignant à l'époque. Le plaignant n'a pas été cité comme témoin. O a témoigné, affirmant qu'il n'avait jamais agressé sexuellement le garçon. L'arbitre a statué que la déclaration de culpabilité était recevable en preuve, mais qu'elle ne constituait pas une preuve concluante que O s'était livré à une agression sexuelle sur le garçon. Aucune nouvelle preuve n'a été présentée. L'arbitre a conclu que la présomption née de la déclaration de culpabilité avait été repoussée, et que O avait été congédié sans motif valable. La Cour divisionnaire a annulé la décision de l'arbitre. La Cour d'appel a confirmé cette décision.

*Arrêt* : Le pourvoi est rejeté.

*La* juge en chef McLachlin et les juges Gonthier, Iacobucci, Major, Bastarache, Binnie et Arbour : Lorsqu'ils doivent décider si une déclaration de culpabilité, recevable *prima facie* en vertu de l'art. 22.1 de la *Loi sur la preuve* de l'Ontario, devrait être réfutée ou considérée comme concluante, les tribunaux font appel à la doctrine de l'abus de procédure pour déterminer si la remise en cause porterait atteinte au processus décisionnel judiciaire. La doctrine de l'abus de procédure fait intervenir le pouvoir inhérent du tribunal d'empêcher que sa procédure soit utilisée abusivement d'une manière qui aurait pour effet de discréditer l'administration de la justice. Elle a été appliquée pour empêcher la réouverture de litiges dans des circonstances où les exigences strictes de la préclusion découlant d'une question déjà tranchée n'étaient pas remplies, mais où la réouverture aurait néanmoins porté atteinte aux principes d'économie, de cohérence, de caractère définitif des instances et d'intégrité de l'administration de la justice. La raison pour laquelle la partie cherche à rouvrir le débat, et le titre auquel elle le fait, ne sauraient constituer des facteurs décisifs pour l'application de la règle interdisant la remise en question. Ce qui n'est pas permis, c'est d'attaquer un jugement en tentant de soulever de nouveau la question devant un autre forum. C'est l'accent correctement mis sur le processus plutôt que sur l'intérêt des parties qui révèle pourquoi il ne devrait pas y avoir remise en cause. D'un point de vue systémique, la remise en cause s'accompagne de graves effets préjudiciables et il faut s'en garder à moins que des circonstances n'établissent qu'elle est, dans les faits, nécessaire à la crédibilité et à l'efficacité du processus juridictionnel dans son ensemble. Mettre en

result. The common law doctrines of issue estoppel, collateral attack and abuse of process adequately capture the concerns that arise when finality in litigation must be balanced against fairness to a particular litigant. There is no need to endorse a self-standing and independent "principle of finality" as either a separate doctrine or as an independent test to preclude relitigation.

The appellant union was not entitled, either at common law or under statute, to relitigate the issue decided against the grievor in the criminal proceedings. The facts in this appeal point to the blatant abuse of process that results when relitigation of this sort is permitted. O was convicted in a criminal court and he exhausted all his avenues of appeal. In law, his conviction must stand, with all its consequent legal effects. There is nothing in this case that militates against the application of the doctrine of abuse of process to bar the relitigation of O's criminal conviction. The arbitrator was required as a matter of law to give full effect to the conviction. As a result of that error of law, the arbitrator reached a patently unreasonable conclusion. Properly understood in the light of correct legal principles, the evidence before the arbitrator could only lead him to conclude that the respondent City had established just cause for O's dismissal.

Issue estoppel has no application in this case since the requirement of mutuality of parties has not been met. With respect to the collateral attack doctrine, the appellant does not seek to overturn the sexual abuse conviction itself, but rather contest, for the purposes of a different claim with different legal consequences, whether the conviction was correct.

*Per* LeBel and Deschamps JJ.: As found by the majority, this case is appropriately decided on the basis of the doctrine of abuse of process, rather than the narrower and more technical doctrines of either collateral attack or issue estoppel. There was also agreement that the appropriate standard of review for the question of whether a criminal conviction may be relitigated in a grievance proceeding is correctness. This is a question of law involving the interpretation of the arbitrator's constituent statute,

doute la validité d'une déclaration de culpabilité est une action très grave. La contestation indirecte et la remise en cause ne constituent pas des moyens appropriés car elles imposent au processus juridictionnel des contraintes excessives et ne font rien pour garantir un résultat plus fiable. Les doctrines de la préclusion découlant d'une question déjà tranchée, de la contestation indirecte et de l'abus de procédure, reconnues en common law, répondent adéquatement aux préoccupations qui surgissent lorsqu'il faut pondérer le principe de l'irrévocabilité des jugements et celui de l'équité envers un justiciable particulier. Il n'est nul besoin d'ériger le principe de l'irrévocabilité en doctrine distincte ou critère indépendant pour interdire la remise en cause.

Le syndicat appelant n'était pas, en vertu de la common law ou d'une disposition législative, habilité à remettre en cause la question tranchée à l'encontre de l'employé dans l'instance criminelle. Les faits du présent pourvoi illustrent l'abus flagrant de procédure qui résulte de l'autorisation de ce type de remise en cause. O avait été déclaré coupable par un tribunal criminel et il avait épuisé toutes les voies d'appel. La déclaration de culpabilité était valide en droit, avec tous les effets juridiques en découlant. Il n'y a rien en l'espèce qui milite contre l'application de la doctrine de l'abus de procédure pour interdire la remise en cause de la déclaration de culpabilité de O. L'arbitre était juridiquement tenu de donner plein effet à la déclaration de culpabilité. L'erreur de droit qu'il a commise lui a fait tirer une conclusion manifestement déraisonnable. S'il avait bien compris la preuve et tenu compte des principes juridiques applicables, il n'aurait pu faire autrement que de conclure que la Ville intimée avait démontré l'existence d'un motif valable pour le congédiement de O.

La préclusion découlant d'une question déjà tranchée ne s'applique pas en l'espèce étant donné que l'exigence de réciprocité n'a pas été remplie. En ce qui concerne la doctrine de la contestation indirecte, l'appelant ne cherche pas à faire infirmer la déclaration de culpabilité pour agression sexuelle, mais conteste simplement, dans le cadre d'une demande différente comportant des conséquences juridiques différentes, le bien-fondé de cette déclaration.

*Les* juges LeBel et Deschamps : Comme le concluent les juges majoritaires, il convient de régler ce pourvoi en fonction de la doctrine de l'abus de procédure, et non des doctrines plus restreintes et plus techniques de la contestation indirecte ou de la préclusion découlant d'une question déjà tranchée (*issue estoppel*). Il y a également accord avec l'opinion majoritaire selon laquelle, lorsqu'une déclaration de culpabilité est remise en cause dans le cadre d'une procédure de grief, la norme

2003 SCC 63 (CanLII)

an external statute, and a complex body of common law rules and conflicting jurisprudence dealing with relitigation, an issue at the heart of the administration of justice. The arbitrator's determination in this case that O's criminal conviction could indeed be relitigated during the grievance proceeding was incorrect. As a matter of law, the arbitrator was required to give full effect to O's conviction. His failure to do so was sufficient to render his ultimate decision that O had been dismissed without just cause — a decision squarely within the arbitrator's area of specialized expertise and thus reviewable on a deferential standard — patently unreasonable, according to the jurisprudence of the Court.

Because of growing concerns with the ways in which the standards of review currently available within the pragmatic and functional approach are conceived of and applied, the administrative law aspects of this case require further discussion. The patent unreasonableness standard does not currently provide sufficiently clear parameters for reviewing courts to apply in assessing the decisions of administrative adjudicators. Certain fundamental legal questions — for instance constitutional and human rights questions and those involving civil liberties, as well as other questions that are of central importance to the legal system as a whole, such as the issue of relitigation — typically fall to be decided on the correctness standard. Not all questions of law, however, must be reviewed under a standard of correctness. Resolving general legal questions may be an important component of the work of some administrative adjudicators. In many instances, the appropriate standard of review in respect of the application of general common or civil law rules by specialized adjudicators should not be one of correctness, but rather of reasonableness. If the general question of law is closely connected to the adjudicator's core area of expertise, the decision will typically be entitled to deference.

In reviewing a decision under the existing standard of patent unreasonableness, the court's role is not to identify the correct result. To pass a review for patent unreasonableness, a decision must be one that can be rationally supported. It would be wrong for a reviewing court to intervene in decisions that are incorrect, rather than limiting its intervention to those decisions that lack a rational foundation. If this occurs, the line between correctness on the one hand, and patent unreasonableness, on the other, becomes blurred. The boundaries between

de contrôle applicable est celle de la décision correcte. Cette question de droit exigeait l'interprétation de la loi constitutive de l'arbitre, d'une loi non constitutive ainsi que d'un ensemble complexe de règles de common law et d'une jurisprudence contradictoire ayant trait à la remise en cause, question qui est au cœur de l'administration de la justice. La décision de l'arbitre qui permettrait de remettre la déclaration de culpabilité de O en cause pendant l'examen du grief n'était pas correcte. Légalement, l'arbitre devait donner pleinement effet à la déclaration de culpabilité de O. L'omission de le faire a suffi pour rendre la décision ultime portant que O avait été congédié sans motif valable — décision ressortissant entièrement au domaine d'expertise de l'arbitre et donc révisable selon une norme commandant la déférence — manifestement déraisonnable suivant la jurisprudence de la Cour.

En raison des préoccupations croissantes liées à la manière dont sont conçues et appliquées les normes de contrôle qu'offre actuellement l'analyse pragmatique et fonctionnelle, il est opportun d'approfondir l'analyse des aspects du pourvoi relevant du droit administratif. À l'heure actuelle, la norme de la décision manifestement déraisonnable n'offre pas aux cours de justice des paramètres suffisamment clairs pour contrôler les décisions des tribunaux administratifs. Certaines questions de droit fondamentales — notamment en ce qui concerne la Constitution et les droits de la personne, de même que les libertés civiles, ainsi que d'autres questions revêtant une importance centrale pour le système juridique dans son ensemble, comme celle de la remise en cause — commandent généralement l'application de la norme de la décision correcte. Toute décision sur une question de droit, cependant, n'est pas assujettie à la norme de la décision correcte. Le règlement de questions de droit générales peut constituer un aspect important de la tâche dévolue à certains tribunaux administratifs. Dans bien des cas, la norme de contrôle appropriée à l'application des règles générales de la common law ou du droit civil par un tribunal spécialisé ne devrait pas être la norme de la décision correcte mais plutôt celle de la décision raisonnable. Si la question de droit générale est étroitement liée au domaine d'expertise fondamentale du décideur, sa décision fera généralement l'objet de déférence.

La cour appelée à contrôler une décision selon la norme actuelle du manifestement déraisonnable n'a pas à déterminer la décision correcte. Pour résister à l'analyse selon la norme du manifestement déraisonnable, la décision doit avoir un fondement rationnel. La cour de révision aurait tort de modifier une décision incorrecte, et non seulement une décision sans fondement rationnel. Si cela se produit, la ligne de démarcation entre la norme de la décision correcte, d'une part, et la norme de la décision manifestement déraisonnable, d'autre part, s'obscurcit.

patent unreasonableness and reasonableness *simpliciter* are even less clear and approaches to sustain a workable distinction between them raise their own problems. In the end, the essential question remains the same under both standards: was the decision of the adjudicator taken in accordance with reason? In summary, the current framework exhibits several drawbacks. These include the conceptual and practical difficulties that flow from the overlap between patent unreasonableness and reasonableness *simpliciter*, and the difficulty caused at times by the interplay between patent unreasonableness and correctness.

The role of a court in determining the standard of review is to be faithful to the intent of the legislature that empowered the administrative adjudicator to make the decision, as well as to the animating principle that, in a society governed by the rule of law, power is not to be exercised arbitrarily or capriciously. Judicial review on substantive grounds ensures that the decisions of administrative adjudicators are capable of rational justification; review on procedural grounds ensures that they are fair.

Administrative law has developed considerably over the last 25 years. This evolution, which reflects a strong sense of deference to administrative decision makers and an acknowledgment of the importance of their role, has given rise to some problems or concerns. It remains to be seen, in an appropriate case, what should be the solution to these difficulties. Should courts move to a two standard system of judicial review, correctness and a revised unified standard of reasonableness? Should we attempt to more clearly define the nature and scope of each standard or rethink their relationship and application? This is perhaps some of the work which lies ahead for courts, building on the developments of recent years as well as on the legal tradition which created the framework of the present law of judicial review.

La frontière entre le caractère manifestement déraisonnable et le caractère raisonnable *simpliciter* est encore moins claire, et les tentatives pour établir une distinction valable entre elles comportent leurs propres difficultés. En fin de compte, la question essentielle demeure la même pour les deux normes : la décision du tribunal était-elle conforme à la raison? En résumé, le cadre actuel présente plusieurs inconvénients, dont les difficultés conceptuelles et pratiques découlant du chevauchement entre la norme du manifestement déraisonnable et celle du raisonnable *simpliciter*, de même que la difficulté résultant parfois de l'interaction entre la norme du manifestement déraisonnable et celle de la décision correcte.

La cour appelée à déterminer la norme de contrôle doit rester fidèle à la volonté du législateur d'investir le tribunal administratif du pouvoir de rendre la décision. Elle doit en outre respecter le principe fondamental selon lequel, dans une société où prime le droit, le pouvoir ne doit pas être exercé de manière arbitraire. Le contrôle judiciaire axé sur le fond vise à déterminer si la décision du tribunal administratif peut se justifier rationnellement, et celui axé sur la procédure, si elle est équitable.

Le droit administratif a connu un développement considérable au cours des 25 dernières années. Cette évolution, qui témoigne d'une grande déférence envers les décideurs administratifs et reconnaît l'importance de leur rôle, a soulevé certaines difficultés ou préoccupations. Il restera à examiner, dans une affaire qui s'y prête, la solution qu'il conviendrait d'apporter à ces difficultés. Les tribunaux devraient-ils passer à un système de contrôle judiciaire comportant deux normes, celle de la décision corrrecte et une norme révisée et unifiée de raisonnabilité? Devrions-nous tenter de définir plus clairement la nature et la portée de chaque norme ou repenser leur relation et leur application? Voilà peut-être une partie de la tâche qui attend les cours de justice : construire à partir de l'évolution récente tout en s'appuyant sur la tradition juridique qui a façonné le cadre des règles actuelles de droit en matière de contrôle judiciaire.

**Cases Cited**

By Arbour J.

**Referred to:** *Ontario v. O.P.S.E.U.*, [2003] 3 S.C.R. 149, 2003 SCC 64; *Dr. Q v. College of Physicians and Surgeons of British Columbia*, [2003] 1 S.C.R. 226, 2003 SCC 19; *Law Society of New Brunswick v. Ryan*, [2003] 1 S.C.R. 247, 2003 SCC 20; *Pushpanathan v. Canada (Minister of Citizenship and Immigration)*, [1998] 1 S.C.R. 982; *Toronto (City) Board of Education v. O.S.S.T.F., District 15*, [1997] 1 S.C.R. 487; *Parry Sound (District) Social Services Administration Board v. O.P.S.E.U., Local 324*, [2003] 2 S.C.R. 157, 2003 SCC

**Jurisprudence**

Citée par la juge Arbour

**Arrêts mentionnés :** *Ontario c. S.E.E.F.P.O.*, [2003] 3 R.C.S. 149, 2003 CSC 64; *Dr Q c. College of Physicians and Surgeons of British Columbia*, [2003] 1 R.C.S. 226, 2003 CSC 19; *Barreau du Nouveau-Brunswick c. Ryan*, [2003] 1 R.C.S. 247, 2003 CSC 20; *Pushpanathan c. Canada (Ministre de la Citoyenneté et de l'Immigration)*, [1998] 1 R.C.S. 982; *Conseil de l'éducation de Toronto (Cité) c. F.E.E.E.S.O., district 15*, [1997] 1 R.C.S. 487; *Parry Sound (District), Conseil d'administration des services sociaux c. S.E.E.F.P.O.,*

42; *Demeter v. British Pacific Life Insurance Co.* (1983), 150 D.L.R. (3d) 249, aff'd (1984), 48 O.R. (2d) 266; *Hunter v. Chief Constable of the West Midlands Police*, [1982] A.C. 529, aff'g *McIlkenny v. Chief Constable of the West Midlands*, [1980] 1 Q.B. 283; *Re Del Core and Ontario College of Pharmacists* (1985), 51 O.R. (2d) 1; *Danyluk v. Ainsworth Technologies Inc.*, [2001] 2 S.C.R. 460, 2001 SCC 44; *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979); *R. v. Regan*, [2002] 1 S.C.R. 297, 2002 SCC 12; *Lemay v. The King*, [1952] 1 S.C.R. 232; *R. v. Banks*, [1916] 2 K.B. 621; *Wilson v. The Queen*, [1983] 2 S.C.R. 594; *R. v. Sarson*, [1996] 2 S.C.R. 223; *R. v. Consolidated Maybrun Mines Ltd.*, [1998] 1 S.C.R. 706; *R. v. Power*, [1994] 1 S.C.R. 601; *R. v. Conway*, [1989] 1 S.C.R. 1659; *R. v. Scott*, [1990] 3 S.C.R. 979; *Blencoe v. British Columbia (Human Rights Commission)*, [2000] 2 S.C.R. 307, 2000 SCC 44; *R. v. O'Connor*, [1995] 4 S.C.R. 411; *United States of America v. Shulman*, [2001] 1 S.C.R. 616, 2001 SCC 21; *Canam Enterprises Inc. v. Coles* (2000), 51 O.R. (3d) 481, rev'd [2002] 3 S.C.R. 307, 2002 SCC 63; *Franco v. White* (2001), 53 O.R. (3d) 391; *Bomac Construction Ltd. v. Stevenson*, [1986] 5 W.W.R. 21; *Bjarnarson v. Government of Manitoba* (1987), 38 D.L.R. (4th) 32, aff'd (1987), 21 C.P.C. (2d) 302; *R. v. McIlkenny* (1991), 93 Cr. App. R. 287; *United States v. Burns*, [2001] 1 S.C.R. 283, 2001 SCC 7; *R. v. Bromley* (2001), 151 C.C.C. (3d) 480; *Q. v. Minto Management Ltd.* (1984), 46 O.R. (2d) 756; *Nigro v. Agnew-Surpass Shoe Stores Ltd.* (1977), 18 O.R. (2d) 215, aff'd (1978), 18 O.R. (2d) 714; *Germscheid v. Valois* (1989), 68 O.R. (2d) 670; *Simpson v. Geswein* (1995), 25 C.C.L.T. (2d) 49; *Roenisch v. Roenisch* (1991), 85 D.L.R. (4th) 540; *Saskatoon Credit Union, Ltd. v. Central Park Enterprises Ltd.* (1988), 47 D.L.R. (4th) 431; *Canadian Tire Corp. v. Summers* (1995), 23 O.R. (3d) 106.

By LeBel J.

**Referred to:** *Chamberlain v. Surrey School District No. 36*, [2002] 4 S.C.R. 710, 2002 SCC 86; *Ontario v. O.P.S.E.U.*, [2003] 3 S.C.R. 149, 2003 SCC 64; *C.U.P.E. v. Ontario (Minister of Labour)*, [2003] 1 S.C.R. 539, 2003 SCC 29; *Dr. Q v. College of Physicians and Surgeons of British Columbia*, [2003] 1 S.C.R. 226, 2003 SCC 19; *Miller v. Workers' Compensation Commission (Nfld.)* (1997), 154 Nfld. & P.E.I.R. 52; *Toronto (City) Board of Education v. O.S.S.T.F., District 15*, [1997] 1 S.C.R. 487; *Canada (Attorney General) v. Public Service Alliance of Canada*, [1993] 1 S.C.R. 941; *Ivanhoe inc. v. UFCW, Local 500*, [2001] 2 S.C.R. 565, 2001 SCC 47; *Canadian Broadcasting Corp. v. Canada (Labour Relations Board)*, [1995] 1 S.C.R. 157; *Pushpanathan v. Canada (Minister of Citizenship and Immigration)*,

*section locale 324*, [2003] 2 R.C.S. 157, 2003 CSC 42; *Demeter c. British Pacific Life Insurance Co.* (1983), 150 D.L.R. (3d) 249, conf. par (1984), 48 O.R. (2d) 266; *Hunter c. Chief Constable of the West Midlands Police*, [1982] A.C. 529, conf. *McIlkenny c. Chief Constable of the West Midlands*, [1980] 1 Q.B. 283; *Re Del Core and Ontario College of Pharmacists* (1985), 51 O.R. (2d) 1; *Danyluk c. Ainsworth Technologies Inc.*, [2001] 2 R.C.S. 460, 2001 CSC 44; *Parklane Hosiery Co. c. Shore*, 439 U.S. 322 (1979); *R. c. Regan*, [2002] 1 R.C.S. 297, 2002 CSC 12; *Lemay c. The King*, [1952] 1 R.C.S. 232; *R. c. Banks*, [1916] 2 K.B. 621; *Wilson c. La Reine*, [1983] 2 R.C.S. 594; *R. c. Sarson*, [1996] 2 R.C.S. 223; *R. c. Consolidated Maybrun Mines Ltd.*, [1998] 1 R.C.S. 706; *R. c. Power*, [1994] 1 R.C.S. 601; *R. c. Conway*, [1989] 1 R.C.S. 1659; *R. c. Scott*, [1990] 3 R.C.S. 979; *Blencoe c. Colombie-Britannique (Human Rights Commission)*, [2000] 2 R.C.S. 307, 2000 CSC 44; *R. c. O'Connor*, [1995] 4 R.C.S. 411; *États-Unis d'Amérique c. Shulman*, [2001] 1 R.C.S. 616, 2001 CSC 21; *Canam Enterprises Inc. c. Coles* (2000), 51 O.R. (3d) 481, inf. par [2002] 3 R.C.S. 307, 2002 CSC 63; *Franco c. White* (2001), 53 O.R. (3d) 391; *Bomac Construction Ltd. c. Stevenson*, [1986] 5 W.W.R. 21; *Bjarnarson c. Government of Manitoba* (1987), 38 D.L.R. (4th) 32, conf. par (1987), 21 C.P.C. (2d) 302; *R. c. McIlkenny* (1991), 93 Cr. App. R. 287; *États-Unis c. Burns*, [2001] 1 R.C.S. 283, 2001 CSC 7; *R. c. Bromley* (2001), 151 C.C.C. (3d) 480; *Q. c. Minto Management Ltd.* (1984), 46 O.R. (2d) 756; *Nigro c. Agnew-Surpass Shoe Stores Ltd.* (1977), 18 O.R. (2d) 215, conf. par (1978), 18 O.R. (2d) 714; *Germscheid c. Valois* (1989), 68 O.R. (2d) 670; *Simpson c. Geswein* (1995), 25 C.C.L.T. (2d) 49; *Roenisch c. Roenisch* (1991), 85 D.L.R. (4th) 540; *Saskatoon Credit Union, Ltd. c. Central Park Enterprises Ltd.* (1988), 47 D.L.R. (4th) 431; *Canadian Tire Corp. c. Summers* (1995), 23 O.R. (3d) 106.

Citée par le juge LeBel

**Arrêts mentionnés :** *Chamberlain c. Surrey School District No. 36*, [2002] 4 R.C.S. 710, 2002 CSC 86; *Ontario c. S.E.E.F.P.O.*, [2003] 3 R.C.S. 149, 2003 CSC 64; *S.C.F.P. c. Ontario (Ministre du Travail)*, [2003] 1 R.C.S. 539, 2003 CSC 29; *Dr Q c. College of Physicians and Surgeons of British Columbia*, [2003] 1 R.C.S. 226, 2003 CSC 19; *Miller c. Workers' Compensation Commission (Nfld.)* (1997), 154 Nfld. & P.E.I.R. 52; *Conseil de l'éducation de Toronto (Cité) c. F.E.E.E.S.O., district 15*, [1997] 1 R.C.S. 487; *Canada (Procureur général) c. Alliance de la fonction publique du Canada*, [1993] 1 R.C.S. 941; *Ivanhoe inc. c. TUAC, section locale 500*, [2001] 2 R.C.S. 565, 2001 CSC 47; *Société Radio-Canada c. Canada (Conseil des relations du travail)*, [1995] 1 R.C.S. 157; *Pushpanathan*

[1998] 1 S.C.R. 982; *Canada (Director of Investigation and Research) v. Southam Inc.*, [1997] 1 S.C.R. 748; *Pezim v. British Columbia (Superintendent of Brokers)*, [1994] 2 S.C.R. 557; *National Corn Growers Assn. v. Canada (Import Tribunal)*, [1990] 2 S.C.R. 1324; *Canada (Attorney General) v. Mossop*, [1993] 1 S.C.R. 554; *Pasiechnyk v. Saskatchewan (Workers' Compensation Board)*, [1997] 2 S.C.R. 890; *Macdonell v. Quebec (Commission d'accès à l'information)*, [2002] 3 S.C.R. 661, 2002 SCC 71; *Canadian Union of Public Employees, Local 963 v. New Brunswick Liquor Corp.*, [1979] 2 S.C.R. 227; *Law Society of New Brunswick v. Ryan*, [2003] 1 S.C.R. 247, 2003 SCC 20; *Service Employees' International Union, Local No. 333 v. Nipawin District Staff Nurses Association*, [1975] 1 S.C.R. 382; *Anisminic Ltd. v. Foreign Compensation Commission*, [1969] 2 A.C. 147; *Metropolitan Life Insurance Co. v. International Union of Operating Engineers, Local 796*, [1970] S.C.R. 425; *CAIMAW v. Paccar of Canada Ltd.*, [1989] 2 S.C.R. 983; *Canadian Union of Public Employees, Local 301 v. Montreal (City)*, [1997] 1 S.C.R. 793; *Domtar Inc. v. Quebec (Commission d'appel en matière de lésions professionnelles)*, [1993] 2 S.C.R. 756; *Canada Safeway Ltd. v. RWDSU, Local 454*, [1998] 1 S.C.R. 1079; *Lester (W.W.) (1978) Ltd. v. United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry, Local 740*, [1990] 3 S.C.R. 644; *Hao v. Canada (Minister of Citizenship and Immigration)* (2000), 184 F.T.R. 246; *United Brotherhood of Carpenters and Joiners of America, Local 579 v. Bradco Construction Ltd.*, [1993] 2 S.C.R. 316; *Baker v. Canada (Minister of Citizenship and Immigration)*, [1999] 2 S.C.R. 817; *Reference re Resolution to Amend the Constitution*, [1981] 1 S.C.R. 753; *Reference re Secession of Quebec*, [1998] 2 S.C.R. 217.

### Statutes and Regulations Cited

*Canadian Charter of Rights and Freedoms*.
*Evidence Act*, R.S.O. 1990, c. E.23, s. 22.1 [ad. 1995, c. 6, s. 6(3)].
*Labour Relations Act, 1995*, S.O. 1995, c. 1, Sch. A, s. 48(1).

### Authors Cited

Allars, Margaret. "On Deference to Tribunals, With Deference to Dworkin" (1994), 20 *Queen's L.J.* 163.
Comtois, Suzanne. *Vers la primauté de l'approche pragmatique et fonctionnelle: Précis du contrôle judiciaire des décisions de fond rendues par les organismes administratifs*. Cowansville, Qué.: Yvon Blais, 2003.

*c. Canada (Ministre de la Citoyenneté et de l'Immigration)*, [1998] 1 R.C.S. 982; *Canada (Directeur des enquêtes et recherches) c. Southam Inc.*, [1997] 1 R.C.S. 748; *Pezim c. Colombie-Britannique (Superintendent of Brokers)*, [1994] 2 R.C.S. 557; *National Corn Growers Assn. c. Canada (Tribunal des importations)*, [1990] 2 R.C.S. 1324; *Canada (Procureur général) c. Mossop*, [1993] 1 R.C.S. 554; *Pasiechnyk c. Saskatchewan (Workers' Compensation Board)*, [1997] 2 R.C.S. 890; *Macdonell c. Québec (Commission d'accès à l'information)*, [2002] 3 R.C.S. 661, 2002 CSC 71; *Syndicat canadien de la Fonction publique, section locale 963 c. Société des alcools du Nouveau-Brunswick*, [1979] 2 R.C.S. 227; *Barreau du Nouveau-Brunswick c. Ryan*, [2003] 1 R.C.S. 247, 2003 CSC 20; *Union internationale des employés des services, local n$^o$ 333 c. Nipawin District Staff Nurses Association*, [1975] 1 R.C.S. 382; *Anisminic Ltd. c. Foreign Compensation Commission*, [1969] 2 A.C. 147; *Metropolitan Life Insurance Co. c. International Union of Operating Engineers, Local 796*, [1970] R.C.S. 425; *CAIMAW c. Paccar of Canada Ltd.*, [1989] 2 R.C.S. 983; *Syndicat canadien de la fonction publique, section locale 301 c. Montréal (Ville)*, [1997] 1 R.C.S. 793; *Domtar Inc. c. Québec (Commission d'appel en matière de lésions professionnelles)*, [1993] 2 R.C.S. 756; *Canada Safeway Ltd. c. SDGMR, section locale 454*, [1998] 1 R.C.S. 1079; *Lester (W.W.) (1978) Ltd. c. Association unie des compagnons et apprentis de l'industrie de la plomberie et de la tuyauterie, section locale 740*, [1990] 3 R.C.S. 644; *Hao c. Canada (Ministre de la Citoyenneté et de l'Immigration)*, [2000] A.C.F. n$^o$ 296 (QL); *Fraternité unie des charpentiers et menuisiers d'Amérique, section locale 579 c. Bradco Construction Ltd.*, [1993] 2 R.C.S. 316; *Baker c. Canada (Ministre de la Citoyenneté et de l'Immigration)*, [1999] 2 R.C.S. 817; *Renvoi : Résolution pour modifier la Constitution*, [1981] 1 R.C.S. 753; *Renvoi relatif à la sécession du Québec*, [1998] 2 R.C.S. 217.

### Lois et règlements cités

*Charte canadienne des droits et libertés*.
*Loi de 1995 sur les relations de travail*, L.O. 1995, ch. 1, ann. A, art. 48(1).
*Loi sur la preuve*, L.R.O. 1990, ch. E.23, art. 22.1 [aj. 1995, ch. 6, art. 6(3)].

### Doctrine citée

Allars, Margaret. « On Deference to Tribunals, With Deference to Dworkin » (1994), 20 *Queen's L.J.* 163.
Barreau du Haut-Canada. *Code de déontologie*. Toronto : Barreau du Haut-Canada, 2000.

Cowan, Jeff G. "The Standard of Review: The Common Sense Evolution?", paper presented to the Administrative Law Section Meeting, Ontario Bar Association, January 21, 2003.

Dyzenhaus, David. "The Politics of Deference: Judicial Review and Democracy", in Michael Taggart, ed., *The Province of Administrative Law*. Oxford: Hart Publishing, 1997, 279.

Elliott, David W. "*Suresh* and the Common Borders of Administrative Law: Time for the Tailor?" (2002), 65 *Sask. L. Rev.* 469.

Evans, J. M., et al. *Administrative Law: Cases, Text, and Materials*, 3rd ed. Toronto: Emond Montgomery, 1989.

Falzon, Frank A. V. "Standard of Review on Judicial Review or Appeal", in *Administrative Justice Review Background Papers: Background Papers prepared by Administrative Justice Project for the Attorney General of British Columbia*, June 2002.

Garant, Patrice. *Droit administratif*, vol. 2, 4ᵉ éd. Cowansville, Qué.: Yvon Blais, 1996.

Holloway, Ian. "'A Sacred Right': Judicial Review of Administrative Action as a Cultural Phenomenon" (1993), 22 *Man. L.J.* 28.

Howard, M. N., Peter Crane and Daniel A. Hochberg. *Phipson on Evidence*, 14th ed. London: Sweet & Maxwell, 1990.

Jones, David Phillip. "Notes on *Dr. Q* and *Ryan*: Two More Decisions by the Supreme Court of Canada on the Standard of Review in Administrative Law", paper presented at the Canadian Institute for the Administration of Justice, Western Roundtable, Edmonton, April 25, 2003.

Lange, Donald J. *The Doctrine of Res Judicata in Canada*. Markham, Ont.: Butterworths, 2000.

Law Society of Upper Canada. *Rules of Professional Conduct*. Toronto: Law Society of Upper Canada, 2000.

Lovett, Deborah K. "That Curious Curial Deference Just Gets Curiouser and Curiouser — *Canada (Director of Investigation and Research) v. Southam Inc.*" (1997), 55 *Advocate (B.C.)* 541.

MacLauchlan, H. Wade. "Transforming Administrative Law: The Didactic Role of the Supreme Court of Canada" (2001), 80 *Can. Bar Rev.* 281.

McLachlin, Beverley. "The Roles of Administrative Tribunals and Courts in Maintaining the Rule of Law" (1998-1999), 12 *C.J.A.L.P.* 171.

Mullan, David J. *Administrative Law*. Toronto: Irwin Law, 2001.

Mullan, David J. "Of Chaff Midst the Corn: American Farm Bureau Federation v. Canada (Canadian Import

Comtois, Suzanne. *Vers la primauté de l'approche pragmatique et fonctionnelle : Précis du contrôle judiciaire des décisions de fond rendues par les organismes administratifs.* Cowansville, Qué. : Yvon Blais, 2003.

Cowan, Jeff G. « The Standard of Review : The Common Sense Evolution? », paper presented to the Administrative Law Section Meeting, Ontario Bar Association, 21 janvier, 2003.

Dyzenhaus, David. « The Politics of Deference : Judicial Review and Democracy », in Michael Taggart, ed., *The Province of Administrative Law*. Oxford : Hart Publishing, 1997, 279.

Elliott, David W. « *Suresh* and the Common Borders of Administrative Law : Time for the Tailor? » (2002), 65 *Sask. L. Rev.* 469.

Evans, J. M., et al. *Administrative Law : Cases, Text, and Materials*, 3rd ed. Toronto : Emond Montgomery, 1989.

Falzon, Frank A. V. « Standard of Review on Judicial Review or Appeal », in *Administrative Justice Review Background Papers : Background Papers prepared by Administrative Justice Project for the Attorney General of British Columbia*, June 2002.

Garant, Patrice. *Droit administratif*, vol. 2, 4ᵉ éd. Cowansville, Qué. : Yvon Blais, 1996.

Holloway, Ian. « "A Sacred Right" : Judicial Review of Administrative Action as a Cultural Phenomenon » (1993), 22 *R.D. Man.* 28.

Howard, M. N., Peter Crane and Daniel A. Hochberg. *Phipson on Evidence*, 14th ed. London : Sweet & Maxwell, 1990.

Jones, David Phillip. « Notes on *Dr. Q* and *Ryan* : Two More Decisions by the Supreme Court of Canada on the Standard of Review in Administrative Law », paper presented at the Canadian Institute for the Administration of Justice, Western Roundtable, Edmonton, April 25, 2003.

Lange, Donald J. *The Doctrine of Res Judicata in Canada*. Markham, Ont. : Butterworths, 2000.

Lovett, Deborah K. « That Curious Curial Deference Just Gets Curiouser and Curiouser — *Canada (Director of Investigation and Research) v. Southam Inc.* » (1997), 55 *Advocate (B.C.)* 541.

MacLauchlan, H. Wade. « Transforming Administrative Law : The Didactic Role of the Supreme Court of Canada » (2001), 80 *R. du B. can.* 281.

McLachlin, Beverley. « The Roles of Administrative Tribunals and Courts in Maintaining the Rule of Law » (1998-1999), 12 *C.J.A.L.P.* 171.

Mullan, David J. *Administrative Law*. Toronto : Irwin Law, 2001.

Tribunal) and Patent Unreasonableness Review"
(1991), 45 Admin. L.R. 264.

Mullan, David J. "Recent Developments in Standard of
Review", in *Taking the Tribunal to Court: A Practical
Guide for Administrative Law Practitioners*. Canadian
Bar Association (Ontario), October 20, 2000.

Paciocco, David M., and Lee Stuesser. *The Law of
Evidence*, 3rd ed. Toronto: Irwin Law, 2002.

Perell, Paul M. "Res Judicata and Abuse of Process"
(2001), 24 *Advocates' Q.* 189.

Perrault, Gabrielle. *Le contrôle judiciaire des décisions
de l'administration: De l'erreur juridictionnelle à
la norme de contrôle.* Montréal: Wilson & Lafleur,
2002.

Sossin, Lorne. "Developments in Administrative Law:
The 1997-98 and 1998-99 Terms" (2000), 11 *S.C.L.R.*
(2d) 37.

Sprague, James L. H. "Another View of *Baker*" (1999), 7
*Reid's Administrative Law* 163.

Sullivan, Ruth. *Sullivan and Driedger on the Construction
of Statutes*, 4th ed. Markham, Ont.: Butterworths,
2002.

Teplitsky, Martin. "Prior Criminal Convictions: Are They
Conclusive Proof? An Arbitrator's Perspective", in K.
Whitaker et al., eds., *Labour Arbitration Yearbook
2001-2002*, vol. I. Toronto: Lancaster House, 2002,
279.

Watson, Garry D. "Duplicative Litigation: Issue Estoppel,
Abuse of Process and the Death of Mutuality" (1990),
69 *Can. Bar Rev.* 623.

Mullan, David J. « Of Chaff Midst the Corn : American
Farm Bureau Federation v. Canada (Canadian Import
Tribunal) and Patent Unreasonableness Review »
(1991), 45 Admin. L.R. 264.

Mullan, David J. « Recent Developments in Standard
of Review », in *Taking the Tribunal to Court : A
Practical Guide for Administrative Law Practitioners*.
Association du Barreau canadien (Ontario), 20 octo-
bre 2000.

Paciocco, David M., and Lee Stuesser. *The Law of
Evidence*, 3rd ed. Toronto : Irwin Law, 2002.

Perell Paul M. « Res Judicata and Abuse of Process »
(2001), 24 *Advocates' Q.* 189.

Perrault, Gabrielle. *Le contrôle judiciaire des décisions
de l'administration : De l'erreur juridictionnelle à
la norme de contrôle.* Montréal : Wilson & Lafleur,
2002.

Sossin, Lorne. « Developments in Administrative Law :
The 1997-98 and 1998-99 Terms » (2000) 11 *S.C.L.R.*
(2d) 37.

Sprague, James L. H. « Another View of *Baker* » (1999),
7 *Reid's Administrative Law* 163.

Sullivan, Ruth. *Sullivan and Driedger on the Construction
of Statutes*, 4th ed. Markham, Ont. : Butterworths,
2002.

Teplitsky, Martin. "Prior Criminal Convictions : Are
They Conclusive Proof? An Arbitrator's Perspective",
in K. Whitaker et al., eds., *Labour Arbitration
Yearbook 2001-2002*, vol. I. Toronto : Lancaster
House, 2002, 279.

Watson, Garry D. « Duplicative Litigation : Issue
Estoppel, Abuse of Process and the Death of
Mutuality » (1990), 69 *R. du B. can.* 623.

APPEAL from a judgment of the Ontario Court
of Appeal (2001), 55 O.R. (3d) 541, 205 D.L.R.
(4th) 280, 149 O.A.C. 213, 45 C.R. (5th) 354, 37
Admin. L.R. (3d) 40, 2002 CLLC ¶220-014, [2001]
O.J. No. 3239 (QL), affirming a judgment of the
Divisional Court (2000), 187 D.L.R. (4th) 323, 134
O.A.C. 48, 23 Admin. L.R. (3d) 72, 2000 CLLC
¶220-038, [2000] O.J. No. 1570 (QL). Appeal dis-
missed.

*Douglas J. Wray* and *Harold F. Caley*, for the
appellant.

*Jason Hanson*, *Mahmud Jamal* and *Kari M.
Abrams*, for the respondent the City of Toronto.

No one appeared for the respondent Douglas C.
Stanley.

POURVOI contre un arrêt de la Cour d'appel
de l'Ontario (2001), 55 O.R. (3d) 541, 205 D.L.R.
(4th) 280, 149 O.A.C. 213, 45 C.R. (5th) 354, 37
Admin. L.R. (3d) 40, 2002 CLLC ¶220-014, [2001]
O.J. No. 3239 (QL), qui a confirmé un jugement de
la Cour divisionnaire (2000), 187 D.L.R. (4th) 323,
134 O.A.C. 48, 23 Admin. L.R. (3d) 72, 2000 CLLC
¶220-038, [2000] O.J. No. 1570 (QL). Pourvoi
rejeté.

*Douglas J. Wray* et *Harold F. Caley*, pour l'appe-
lant.

*Jason Hanson*, *Mahmud Jamal* et *Kari M.
Abrams*, pour l'intimée la Ville de Toronto.

Personne n'a comparu pour l'intimé Douglas C.
Stanley.

*Sean Kearney*, *Mary Gersht* and *Meredith Brown*, for the intervener.

The judgment of McLachlin C.J. and Gonthier, Iacobucci, Major, Bastarache, Binnie and Arbour JJ. was delivered by

Arbour J. —

## I.   Introduction

1    Can a person convicted of sexual assault, and dismissed from his employment as a result, be reinstated by a labour arbitrator who concludes, on the evidence before him, that the sexual assault did not take place? This is essentially the issue raised in this appeal.

2    Like the Court of Appeal for Ontario and the Divisional Court, I have come to the conclusion that the arbitrator may not revisit the criminal conviction. Although my reasons differ somewhat from those of the courts below, I would dismiss the appeal.

## II.   Facts

3    Glenn Oliver worked as a recreation instructor for the respondent City of Toronto. He was charged with sexually assaulting a boy under his supervision. He pleaded not guilty. At trial before a judge alone, he testified and was cross-examined. He called several defence witnesses, including character witnesses. The trial judge found that the complainant was credible and that Oliver was not. He entered a conviction, which was later affirmed on appeal. He sentenced Oliver to 15 months in jail, followed by one year of probation.

4    The respondent City of Toronto fired Oliver a few days after his conviction, and Oliver grieved his dismissal. At the hearing, the City of Toronto submitted the boy's testimony from the criminal trial and the notes of Oliver's supervisor, who had spoken to the boy at the time. The City did not call the boy to

*Sean Kearney*, *Mary Gersht* et *Meredith Brown*, pour l'intervenant.

Version française du jugement de la juge en chef McLachlin et des juges Gonthier, Iacobucci, Major, Bastarache, Binnie et Arbour rendu par

La juge Arbour —

## I.   Introduction

Une personne déclarée coupable d'agression sexuelle et congédiée par son employeur pour cette raison peut-elle être réintégrée dans ses fonctions par un arbitre qui conclut, eu égard à la preuve dont il dispose, qu'il n'y a pas eu d'agression sexuelle? C'est essentiellement la question que pose le présent pourvoi.

Comme la Cour d'appel de l'Ontario et la Cour divisionnaire, je conclus qu'un arbitre ne peut réexaminer une déclaration de culpabilité. Je suis donc d'avis de rejeter le pourvoi, bien que pour des motifs qui diffèrent quelque peu de ceux des juridictions inférieures.

## II.   Les faits

Glenn Oliver travaillait comme instructeur en loisirs pour la Ville de Toronto, intimée en l'instance. Il a été accusé d'agression sexuelle contre un jeune garçon confié à sa surveillance, et il a plaidé non coupable. Lors de son procès devant un juge seul, il a témoigné et a subi un contre-interrogatoire. Il a cité plusieurs témoins en défense, dont des témoins de moralité. Le juge du procès a conclu que le plaignant était crédible mais non Oliver. Il a rendu un verdict de culpabilité, qui a par la suite été confirmé en appel. Il a condamné Oliver à une peine d'emprisonnement de 15 mois et à un an de probation.

La Ville de Toronto intimée a congédié Oliver quelques jours après le prononcé du verdict, et Oliver a déposé un grief contestant son congédiement. À l'audition du grief, la Ville a déposé en preuve le témoignage que le jeune garçon avait donné lors du procès criminel ainsi que les notes du

testify. Oliver again testified on his own behalf and claimed that he had never sexually assaulted the boy.

The arbitrator ruled that the criminal conviction was admissible as *prima facie* but not conclusive evidence that Oliver had sexually assaulted the boy. No evidence of fraud nor any fresh evidence unavailable at trial was introduced in the arbitration. The arbitrator held that the presumption raised by the criminal conviction had been rebutted, and that Oliver had been dismissed without just cause.

### III. Procedural History

#### A. *Superior Court of Justice (Divisional Court)* (2000), 187 D.L.R. (4th) 323

At Divisional Court the application for judicial review was granted and the decision of the arbitrator was quashed. The Divisional Court heard this case and *Ontario v. O.P.S.E.U.* at the same time. (*Ontario v. O.P.S.E.U.*, [2003] 3 S.C.R. 149, 2003 SCC 64, is being released concurrently by this Court.) O'Driscoll J. found that while s. 22.1 of the *Evidence Act*, R.S.O. 1990, c. E.23, applied to all the arbitrations, relitigation of the cases was barred by the doctrines of collateral attack, issue estoppel and abuse of process. The court noted that criminal convictions are valid judgments that cannot be collaterally attacked at a later arbitration (paras. 74-79). With respect to issue estoppel, under which an issue decided against a party is protected from collateral attack barring decisive new evidence or a showing of fraud, the court found that relitigation was also prevented, rejecting the appellant's argument that there had been no privity because the union, and not the grievor, had filed the grievance. The court also held that the doctrine of abuse of process, which denies a collateral attack upon a final decision of another court where the party had "a full opportunity of contesting the decision", applied (paras. 81 and 90). Finally, O'Driscoll J. found that whether the standard of review was correctness or patent unreasonableness in each

superviseur d'Oliver, lequel avait rencontré le jeune garçon à l'époque, mais elle n'a pas cité le garçon comme témoin. Encore une fois, Oliver a témoigné et a affirmé qu'il n'avait pas commis d'agression sexuelle contre le jeune garçon.

L'arbitre a déterminé que la déclaration de culpabilité était recevable à titre de preuve *prima facie* mais qu'elle ne constituait pas une preuve concluante qu'Oliver s'était livré à une agression sexuelle sur le garçon. On n'a présenté à l'audition aucune preuve de fraude ni aucun nouvel élément de preuve non disponible au procès. L'arbitre a conclu que la présomption née de la déclaration de culpabilité avait été repoussée et qu'Oliver avait été congédié sans motif valable.

### III. Historique des procédures judiciaires

#### A. *Cour supérieure de justice (Cour divisionnaire)* (2000), 187 D.L.R. (4th) 323

La Cour divisionnaire a accueilli la demande de contrôle judiciaire et annulé la décision de l'arbitre. Elle a entendu cette affaire en même temps que l'affaire *Ontario c. S.E.E.F.P.O.* (*Ontario c. S.E.E.F.P.O.*, [2003] 3 R.C.S. 149, 2003 CSC 64, dont jugement est rendu simultanément par la Cour.) Le juge O'Driscoll a déterminé que bien que l'art. 22.1 de la *Loi sur la preuve*, L.R.O. 1990, ch. E.23, s'appliquât à tous les arbitrages, la remise en cause était interdite par les doctrines de la contestation indirecte, de la préclusion découlant d'une question déjà tranchée (*issue estoppel*) et de l'abus de procédure. Il a fait observer que les déclarations de culpabilité constituent des jugements valides qui ne peuvent faire l'objet de contestation indirecte dans le cadre d'un arbitrage subséquent (par. 74-79). Relativement à la doctrine de la préclusion découlant d'une question déjà tranchée, en vertu de laquelle la décision rendue contre une partie est à l'abri des contestations indirectes à moins que de nouveaux éléments de preuve déterminants soient présentés ou que la fraude soit établie, le juge a statué qu'elle interdisait elle aussi la remise en cause, et il a rejeté l'argument de l'appelant selon lequel il n'y avait pas de connexité d'intérêts parce que le syndicat, non l'employé, avait déposé le grief. Le juge a également statué que la doctrine de l'abus

5

6

case, the standard for judicial review had been met (para. 86).

### B. *Court of Appeal for Ontario* (2001), 55 O.R. (3d) 541

7    Doherty J.A. for the court held that because the crux of the issue was whether the Canadian Union of Public Employees (CUPE or the union) was permitted to relitigate the issue decided in the criminal trial, and because this analysis "turned on [the arbitrator's] understanding of the common law rules and principles governing the relitigation of issues finally decided in a previous judicial proceeding", the appropriate standard of review was correctness (paras. 22 and 38).

8    Doherty J.A. concluded that issue estoppel did not apply. Even if the union was the employee's privy, the respondent City of Toronto had played no role in the criminal proceeding and had no relationship to the Crown. He also found that describing the appellant union's attempt to relitigate the employee's culpability as a collateral attack on the order of the court did not assist in determining whether relitigation could be permitted. Commenting that the phrase "abuse of process" was perhaps best limited to describe those cases where the plaintiff has instigated litigation for some improper purpose, Doherty J.A. went on to consider what he called "the finality principle" in considerable depth.

9    Doherty J.A. dismissed the appeal on the basis of this principle. He held that the *res judicata* jurisprudence required a court to balance the importance of finality, which reduces uncertainty and inconsistency in results, and which serves to conserve the

de procédure, laquelle empêche la contestation indirecte de la décision d'un autre tribunal par une partie qui [TRADUCTION] « a eu l'entière possibilité de contester la décision », s'appliquait en l'espèce (par. 81 et 90). Enfin, le juge O'Driscoll a conclu que dans chaque cas il avait été satisfait à la norme de contrôle, qu'il s'agisse de la norme de la décision correcte ou de celle de la décision manifestement déraisonnable (par. 86).

### B. *Cour d'appel de l'Ontario* (2001), 55 O.R. (3d) 541

Rendant jugement pour la cour, le juge Doherty a statué que, comme il s'agissait essentiellement de déterminer si le Syndicat canadien de la fonction publique (SCFP ou le syndicat) pouvait remettre en cause la question tranchée dans le procès criminel et que cette analyse [TRADUCTION] « reposait sur l'interprétation [par l'arbitre] des règles et principes de la common law relatifs à la remise en cause de questions ayant donné lieu à une décision définitive dans une instance antérieure », la norme de contrôle applicable était la norme de la décision correcte (par. 22 et 38).

Le juge Doherty a conclu que la doctrine de la préclusion découlant d'une question déjà tranchée ne s'appliquait pas. Même s'il existait un lien de droit entre le syndicat et l'employé, la Ville de Toronto intimée n'avait joué aucun rôle dans le procès criminel et n'avait aucun lien avec le ministère public. Il a également conclu que pour déterminer si la remise en cause était permise, il n'était guère utile d'assimiler la tentative du syndicat appelant de débattre à nouveau de la culpabilité de l'employé à une contestation indirecte de l'ordonnance du tribunal. Puis, affirmant qu'il valait peut-être mieux limiter l'emploi des mots « abus de procédure » aux cas où les demandeurs engagent des poursuites judiciaires pour des motifs illégitimes, il a entrepris l'examen approfondi de ce qu'il a appelé [TRADUCTION] « le principe de l'irrévocabilité ».

Le juge Doherty a rejeté l'appel en se fondant sur ce principe. Il a statué que suivant la jurisprudence sur l'autorité de la chose jugée, les tribunaux devaient mettre en balance l'importance de l'irrévocabilité — qui réduit l'incertitude et les résultats

resources of both the parties and the judiciary, with the "search for justice in each individual case" (para. 94). Doherty J.A. held that the following approach should be taken when weighing finality claims against an individual litigant's claim to access to justice (at para. 100):

- Does the *res judicata* doctrine apply?

- If the doctrine applies, can the party against whom it applies demonstrate that the justice of the individual case should trump finality concerns?

- If the doctrine does not apply, can the party seeking to preclude relitigation demonstrate that finality concerns should be given paramountcy over the claim that justice requires relitigation?

Ultimately, Doherty J.A. dismissed the appeal, concluding that "finality concerns must be given paramountcy over CUPE's claim to an entitlement to relitigate Oliver's culpability" (para. 102). He so concluded because there was no suggestion of fraud at the criminal trial, because the underlying charges were serious enough that the employee was likely to have litigated them to the fullest, and because there was no new evidence presented at arbitration (paras. 103-108).

## IV. Relevant Statutory Provisions

*Evidence Act*, R.S.O. 1990, c. E.23

22.1 (1) Proof that a person has been convicted or discharged anywhere in Canada of a crime is proof, in the absence of evidence to the contrary, that the crime was committed by the person, if,

  (a) no appeal of the conviction or discharge was taken and the time for an appeal has expired; or

  (b) an appeal of the conviction or discharge was taken but was dismissed or abandoned and no further appeal is available.

contradictoires tout en permettant d'économiser les ressources des parties et de l'appareil judiciaire — et [TRADUCTION] « la recherche de la justice dans chaque affaire » (par. 94). Il a exposé les questions auxquelles il fallait répondre lorsqu'il s'agit de pondérer la prétention à l'irrévocabilité et l'accès d'un justiciable particulier à la justice (au par. 100) :

[TRADUCTION]

- La doctrine de la chose jugée s'applique-t-elle?

- Si la doctrine s'applique, la partie contre qui elle s'applique peut-elle démontrer que la recherche de la justice devrait l'emporter sur le principe de l'irré-vocabilité?

- Si la doctrine ne s'applique pas, la partie qui cherche à empêcher la remise en cause peut-elle démontrer que le principe de l'irrévocabilité devrait l'empor-ter sur la prétention voulant que la justice exige la remise en cause?

En fin de compte, le juge Doherty a rejeté l'ap-pel, concluant que [TRADUCTION] « les considéra-tions relatives à l'irrévocabilité doivent l'emporter sur le droit allégué du SCFP de remettre en cause la culpabilité d'Oliver » (par. 102). Il a tiré cette con-clusion parce qu'il n'y avait pas eu d'allégation que le procès criminel était entaché de fraude, parce que les accusations en cause étant graves, il était pro-bable que l'employé leur avait opposé la meilleure défense possible, et parce qu'aucun nouvel élément de preuve n'avait été présenté lors de l'arbitrage (par. 103-108).

## IV. Les dispositions législatives applicables

*Loi sur la preuve*, L.R.O. 1990, ch. E.23

22.1 (1) La preuve qu'une personne a été déclarée coupable ou libérée au Canada à l'égard d'un acte crimi-nel constitue la preuve, en l'absence de preuve contraire, que l'acte criminel a été commis par la personne si, selon le cas :

  a) il n'a pas été interjeté appel de la déclaration de culpabilité ou de la libération et le délai d'appel est expiré;

  b) il a été interjeté appel de la déclaration de culpa-bilité ou de la libération, mais l'appel a été rejeté ou a fait l'objet d'un désistement et aucun autre appel n'est prévu.

10

11

(2) Subsection (1) applies whether or not the convicted or discharged person is a party to the proceeding.

(3) For the purposes of subsection (1), a certificate containing the substance and effect only, omitting the formal part, of the charge and of the conviction or discharge, purporting to be signed by the officer having the custody of the records of the court at which the offender was convicted or discharged, or by the deputy of the officer, is, on proof of the identity of the person named as convicted or discharged person in the certificate, sufficient evidence of the conviction or discharge of that person, without proof of the signature or of the official character of the person appearing to have signed the certificate.

*Labour Relations Act, 1995*, S.O. 1995, c. 1, Sch. A

**48.** (1) Every collective agreement shall provide for the final and binding settlement by arbitration, without stoppage of work, of all differences between the parties arising from the interpretation, application, administration or alleged violation of the agreement, including any question as to whether a matter is arbitrable.

V.   Analysis

A.   *Standard of Review*

12    My colleague LeBel J. discusses at length our jurisprudence on standards of review. He reviews concerns and criticisms about the three standard system of judicial review. Given that these issues were not argued before us in this case, and without the benefit of a full adversarial debate, I would not wish to comment on the desirability of a departure from our recently affirmed framework for standards of review analysis. (See this Court's unanimous decisions of *Dr. Q v. College of Physicians and Surgeons of British Columbia*, [2003] 1 S.C.R. 226, 2003 SCC 19, and *Law Society of New Brunswick v. Ryan*, [2003] 1 S.C.R. 247, 2003 SCC 20.)

13    The Court of Appeal properly applied the functional and pragmatic approach as delineated in *Pushpanathan v. Canada (Minister of Citizenship and Immigration)*, [1998] 1 S.C.R. 982 (see also

(2) Le paragraphe (1) s'applique que la personne déclarée coupable ou libérée soit une partie à l'instance ou non.

(3) Pour l'application du paragraphe (1), un certificat énonçant seulement la substance et l'effet de l'accusation et de la déclaration de culpabilité ou de la libération, et omettant la partie de forme, qui se présente comme étant signé par l'officier ayant la garde des archives du tribunal qui a déclaré le contrevenant coupable ou qui l'a libéré, ou par son adjoint, constitue une preuve suffisante de la déclaration de culpabilité ou de la libération de la personne, une fois prouvé que la personne est bien celle désignée sur le certificat comme ayant été déclarée coupable ou libérée, sans qu'il soit nécessaire d'établir l'authenticité de la signature ni la qualité officielle de la personne qui paraît être le signataire.

*Loi de 1995 sur les relations de travail*, L.O. 1995, ch. 1, ann. A

**48.** (1) Chaque convention collective contient une disposition sur le règlement, par voie de décision arbitrale définitive et sans interruption du travail, de tous les différends entre les parties que soulèvent l'interprétation, l'application, l'administration ou une prétendue violation de la convention collective, y compris la question de savoir s'il y a matière à arbitrage.

V.   Analyse

A.   *La norme de contrôle*

Mon collègue le juge LeBel examine en détail la jurisprudence de notre Cour concernant les normes de contrôle. Il passe en revue les préoccupations et critiques que soulève le système de contrôle judiciaire à triple norme. Ces questions n'ayant pas été débattues devant nous en l'espèce et, sans l'éclairage qu'apporterait un véritable débat contradictoire sur ce point, je ne souhaite pas formuler de commentaires sur l'opportunité de s'écarter du cadre d'analyse des normes de contrôle que nous avons récemment réitéré. (Voir les arrêts unanimes de notre Cour *Dr Q c. College of Physicians and Surgeons of British Columbia*, [2003] 1 R.C.S. 226, 2003 CSC 19, et *Barreau du Nouveau-Brunswick c. Ryan*, [2003] 1 R.C.S. 247, 2003 CSC 20.)

La Cour d'appel a bien appliqué les principes de l'analyse pragmatique et fonctionnelle énoncés dans l'arrêt *Pushpanathan c. Canada (Ministre de la Citoyenneté et de l'Immigration)*, [1998] 1 R.C.S.

*Dr. Q*, *supra*), to determine the extent to which the legislature intended that courts should review the tribunals' decisions.

Doherty J.A. was correct to acknowledge patent unreasonableness as the general standard of review of an arbitrator's decision as to whether just cause has been established in the discharge of an employee. However, and as he noted, the same standard of review does not necessarily apply to every ruling made by the arbitrator in the course of the arbitration. This follows the distinction drawn by Cory J. for the majority in *Toronto (City) Board of Education v. O.S.S.T.F., District 15*, [1997] 1 S.C.R. 487, where he said, at para. 39:

It has been held on several occasions that the expert skill and knowledge which an arbitration board exercises in interpreting a collective agreement does not usually extend to the interpretation of "outside" legislation. The findings of a board pertaining to the interpretation of a statute or the common law are generally reviewable on a correctness standard. . . . An exception to this rule may occur where the external statute is intimately connected with the mandate of the tribunal and is encountered frequently as a result. [Emphasis added.]

In this case, the reasonableness of the arbitrator's decision to reinstate the grievor is predicated on the correctness of his assumption that he was not bound by the criminal conviction. That assumption rested on his analysis of complex common law rules and of conflicting jurisprudence. The body of law dealing with the relitigation of issues finally decided in previous judicial proceedings is not only complex; it is also at the heart of the administration of justice. Properly understood and applied, the doctrines of *res judicata* and abuse of process govern the interplay between different judicial decision makers. These rules and principles call for a judicial balance between finality, fairness, efficiency and authority of judicial decisions. The application of these rules, doctrines and principles is clearly outside the sphere of expertise of a labour arbitrator who may be called to have recourse to them. In such a case, he or she

982 (voir aussi *Dr Q*, précité), pour déterminer l'intention du législateur quant à l'étendue du contrôle judiciaire des décisions des tribunaux administratifs.

Le juge Doherty a correctement déterminé que la norme de la décision manifestement déraisonnable est la norme générale de contrôle applicable à la décision d'un arbitre sur la question de savoir si l'existence d'un motif valable de congédiement a été établie. Comme il l'a signalé, toutefois, les décisions que les arbitres ont à rendre au cours d'un arbitrage n'appellent pas nécessairement toutes la même norme de contrôle. Cette remarque va dans le sens de la distinction établie par le juge Cory, s'exprimant au nom des juges majoritaires, dans l'arrêt *Conseil de l'éducation de Toronto (Cité) c. F.E.E.E.S.O., district 15*, [1997] 1 R.C.S. 487, où il a dit, au par. 39 :

Il a été statué à plusieurs reprises que les connaissances et l'expertise que possède un conseil d'arbitrage en matière d'interprétation d'une convention collective ne s'étendent habituellement pas à l'interprétation de mesures législatives extrinsèques. Les conclusions d'un conseil sur l'interprétation d'une loi ou de la common law peuvent généralement faire l'objet d'un examen selon la norme de la décision correcte. [. . .] Il peut y avoir dérogation à cette règle dans des cas où la loi est intimement liée au mandat du tribunal et où celui-ci est souvent appelé à l'examiner. [Je souligne.]

En l'espèce, le caractère raisonnable de la décision de l'arbitre de réintégrer l'employé dans ses fonctions dépend du bien-fondé de sa prémisse selon laquelle il n'était pas lié par la déclaration de culpabilité, prémisse qui reposait sur son analyse de règles complexes de common law et de décisions contradictoires. Le droit en matière de remise en cause de questions ayant fait l'objet de décisions judiciaires définitives antérieures n'est pas seulement complexe; il joue également un rôle central dans l'administration de la justice. Bien interprétées et bien appliquées, les doctrines de l'autorité de la chose jugée et de l'abus de procédure règlent les interactions entre les différents décideurs judiciaires. Ces règles et principes exigent des décideurs qu'ils réalisent un équilibre entre l'irrévocabilité, l'équité, l'efficacité et l'autorité des décisions judiciaires. L'application de ces règles, doctrines et principes

14

15

must correctly answer the question of law raised. An incorrect approach may be sufficient to lead to a patently unreasonable outcome. This was reiterated recently by Iacobucci J. in *Parry Sound (District) Social Services Administration Board v. O.P.S.E.U., Local 324*, [2003] 2 S.C.R. 157, 2003 SCC 42, at para. 21.

16    Therefore I agree with the Court of Appeal that the arbitrator had to decide correctly whether CUPE was entitled, either at common law or under a statute, to relitigate the issue decided against the grievor in the criminal proceedings.

B. *Section 22.1 of Ontario's Evidence Act*

17    Section 22.1 of the Ontario *Evidence Act* is of limited assistance to the disposition of this appeal. It provides that proof that a person has been convicted of a crime is proof, "in the absence of evidence to the contrary", that the crime was committed by that person.

18    As Doherty J.A. correctly pointed out, at para. 42, s. 22.1 contemplates that the validity of a conviction may be challenged in a subsequent proceeding, but the section says nothing about the circumstances in which such challenge is or is not permissible. That issue is determined by the application of such common law doctrines as *res judicata*, issue estoppel, collateral attack and abuse of process. Section 22.1 speaks of the admissibility of the fact of the conviction as proof of the truth of its content, and speaks of its conclusive effect if unchallenged. As a rule of evidence, the section addresses in part the hearsay rule, by making the conviction — the finding of another court — admissible for the truth of its content, as an exception to the inadmissibility of hearsay (D. M. Paciocco and L. Stuesser, *The Law of Evidence* (3rd ed. 2002), at p. 120; *Phipson on Evidence* (14th ed. 1990), at paras. 33-94 and 33-95).

échappe clairement au domaine d'expertise des arbitres du travail qui peuvent devoir y faire appel. Lorsque cela se produit, les arbitres doivent trancher correctement la question de droit posée. Une analyse incorrecte peut suffire à entraîner un résultat manifestement déraisonnable. Ces observations ont récemment été réitérées par le juge Iacobucci dans l'arrêt *Parry Sound (District), Conseil d'administration des services sociaux c. S.E.E.F.P.O., section locale 324*, [2003] 2 R.C.S. 157, 2003 CSC 42, par. 21.

La Cour d'appel avait donc raison, selon moi, de statuer que l'arbitre devait décider correctement si le SCFP était, en vertu de la common law ou d'une disposition législative, habilité à remettre en cause la question tranchée à l'encontre de l'employé dans l'instance criminelle.

B. *L'article 22.1 de la Loi sur la preuve de l'Ontario*

L'article 22.1 de la *Loi sur la preuve* de l'Ontario n'est pas d'un grand secours pour trancher le présent pourvoi. Il énonce que la preuve qu'une personne a été déclarée coupable d'un acte criminel fait preuve, « en l'absence de preuve contraire », que l'acte criminel a été commis par cette personne.

Comme le juge Doherty le souligne avec raison (au par. 42), l'art. 22.1 prévoit que la validité d'une déclaration de culpabilité peut être contestée dans une instance subséquente, mais il est muet sur les circonstances susceptibles de permettre ou non une telle contestation. Ce sont les doctrines de common law relatives à l'autorité de la chose jugée, à la préclusion découlant d'une question déjà tranchée, à la contestation indirecte et à l'abus de procédure qui règlent cette question. L'article 22.1 pose le principe de la recevabilité de la déclaration de culpabilité comme preuve de son contenu et établit son caractère probant en l'absence de réfutation. En tant que règle de preuve, cette disposition touche en partie au ouï-dire, en ce qu'elle établit la recevabilité de la déclaration de culpabilité — la conclusion d'un autre tribunal — comme preuve de son contenu, par dérogation à la règle interdisant le ouï-dire (D. M. Paciocco et L. Stuesser, *The Law of Evidence* (3e éd. 2002), p. 120; *Phipson on Evidence* (14e éd. 1990), par. 33-94 et 33-95).

Here, however, the admissibility of the conviction is not in issue. Section 22.1 renders the proof of the conviction admissible. The question is whether it can be rebutted by "evidence to the contrary". There are circumstances in which evidence will be admissible to rebut the presumption that the person convicted committed the crime, in particular where the conviction in issue is that of a non-party. There are also circumstances in which no such evidence may be tendered. If either issue estoppel or abuse of process bars the relitigation of the facts essential to the conviction, then no "evidence to the contrary" may be tendered to displace the effect of the conviction. In such a case, the conviction is conclusive that the person convicted committed the crime.

This interpretation is consistent with the rule of interpretation that legislation is presumed not to depart from general principles of law without an express indication to that effect. This presumption was reviewed and applied by Iacobucci J. in *Parry Sound*, *supra*, at para 39. Section 22.1 reflected the law established in the leading Canadian case of *Demeter v. British Pacific Life Insurance Co.* (1983), 150 D.L.R. (3d) 249 (Ont. H.C.), at p. 264, aff'd (1984), 48 O.R. (2d) 266 (C.A.), wherein after a thorough review of Canadian and English jurisprudence, Osler J. held that a criminal conviction is admissible in subsequent civil litigation as *prima facie* proof that the convicted individual committed the alleged act, "subject to rebuttal by the plaintiff on the merits". However, the common law also recognized that the presumption of guilt established by a conviction is rebuttable only where the rebuttal does not constitute an abuse of the process of the court (*Demeter* (H.C.), *supra*, at p. 265; *Hunter v. Chief Constable of the West Midlands Police*, [1982] A.C. 529 (H.L.), at p. 541; see also *Re Del Core and Ontario College of Pharmacists* (1985), 51 O.R. (2d) 1 (C.A.), at p. 22, *per* Blair J.A.). Section 22.1 does not change this; the legislature has not explicitly displaced the common law

En l'espèce, toutefois, la recevabilité de la déclaration de culpabilité n'est pas en cause : la déclaration de culpabilité est recevable en preuve en vertu de l'art. 22.1. Il faut cependant déterminer si elle peut être réfutée par une « preuve contraire ». Il y a des circonstances où des éléments de preuve visant à réfuter la présomption que la personne déclarée coupable a commis le crime sont recevables, en particulier lorsque la déclaration concerne une personne autre qu'une partie, mais il y a également des circonstances où la présentation de tels éléments de preuve n'est pas permise. Si la doctrine de la préclusion découlant d'une question déjà tranchée ou encore celle de l'abus de procédure interdisent la remise en cause des faits essentiels de la déclaration de culpabilité, aucune « preuve contraire » ne pourra en écarter l'effet. La déclaration de culpabilité constitue alors une preuve concluante que la personne qui y est visée a commis le crime.

Cette interprétation est conforme à la règle d'interprétation posant qu'en l'absence d'indication expresse au contraire la loi est présumée ne pas s'écarter des principes généraux de droit. Dans *Parry Sound*, précité, par. 39, le juge Iacobucci a analysé et appliqué cette présomption. L'article 22.1 codifie le principe établi dans la décision canadienne clé *Demeter c. British Pacific Life Insurance Co.* (1983), 150 D.L.R. (3d) 249 (H.C. Ont.), p. 264, conf. par (1984), 48 O.R. (2d) 266 (C.A.), où après un examen approfondi de la jurisprudence canadienne et anglaise, le juge Osler a statué qu'une déclaration de culpabilité est recevable dans une instance civile subséquente comme preuve *prima facie* que la personne qui y est mentionnée a commis l'acte allégué, [TRADUCTION] « sous réserve de réfutation au fond ». Toutefois, la common law reconnaît également que la présomption de culpabilité établie par une déclaration de culpabilité ne peut être repoussée que lorsque la réfutation ne constitue pas un abus de procédure (*Demeter* (H.C.), précité, p. 265; *Hunter c. Chief Constable of the West Midlands Police*, [1982] A.C. 529 (H.L.), p. 541; voir aussi *Re Del Core and Ontario College of Pharmacists* (1985), 51 O.R. (2d) 1 (C.A.), p. 22, le juge Blair). L'article 22.1 ne change rien à cette situation; le législateur n'a pas explicitement écarté

doctrines and the rebuttal is consequently subject to them.

21    The question therefore is whether any doctrine precludes in this case the relitigation of the facts upon which the conviction rests.

### C. *The Common Law Doctrines*

22    Much consideration was given in the decisions below to the three related common law doctrines of issue estoppel, abuse of process and collateral attack. Each of these doctrines was considered as a possible means of preventing the union from relitigating the criminal conviction of the grievor before the arbitrator. Although both the Divisional Court and the Court of Appeal concluded that the union could not relitigate the guilt of the grievor as reflected in his criminal conviction, they took different views of the applicability of the different doctrines advanced in support of that conclusion. While the Divisional Court concluded that relitigation was barred by the collateral attack rule, issue estoppel and abuse of process, the Court of Appeal was of the view that none of these doctrines as they presently stand applied to bar the rebuttal. Rather, it relied on a self-standing "finality principle". I think it is useful to disentangle these various rules and doctrines before turning to the applicable one here. I stress at the outset that these common law doctrines are interrelated and in many cases more than one doctrine may support a particular outcome. Even though both issue estoppel and collateral attacks may properly be viewed as particular applications of a broader doctrine of abuse of process, the three are not always entirely interchangeable.

#### (1) Issue Estoppel

23    Issue estoppel is a branch of *res judicata* (the other branch being cause of action estoppel), which precludes the relitigation of issues previously decided

les doctrines de common law et, par conséquent, la réfutation y est assujettie.

Il faut donc examiner si l'application d'une de ces doctrines interdit en l'espèce la remise en cause des faits qui fondent la déclaration de culpabilité.

### C. *Les doctrines de common law*

Les décisions des juridictions inférieures, en l'espèce, ont traité abondamment des trois doctrines de common law connexes que sont la préclusion découlant d'une question déjà tranchée, l'abus de procédure et la contestation indirecte. On a vu dans chacune de ces doctrines un moyen possible d'empêcher le syndicat de remettre en cause devant l'arbitre la déclaration de culpabilité de l'employé. Bien que la Cour divisionnaire et la Cour d'appel aient toutes deux conclu que le syndicat ne pouvait débattre à nouveau de la culpabilité attestée par la condamnation, elles ont exprimé des vues divergentes sur l'applicabilité des différentes doctrines invoquées à l'appui de cette conclusion. La Cour divisionnaire s'est dite d'avis que la remise en cause était interdite par les doctrines de la contestation indirecte, de la préclusion découlant d'une question déjà tranchée et de l'abus de procédure, tandis que la Cour d'appel, estimant qu'aucune de ces doctrines ne pouvaient, dans l'état où elles se trouvent, avoir pour effet d'empêcher la réfutation, s'est plutôt appuyée sur le principe autonome de « l'irrévocabilité ». Je crois utile de démêler ces diverses règles et doctrines avant d'examiner celle qui s'applique en l'espèce. Je souligne d'entrée de jeu que ces doctrines de common law sont interreliées et que souvent plus d'une doctrine permettra d'arriver à un résultat particulier. Même si la préclusion découlant d'une question déjà tranchée et la contestation indirecte peuvent être toutes deux considérées comme des applications particulières de la doctrine plus large de l'abus de procédure, les trois ne sont pas toujours entièrement interchangeables.

#### (1) La préclusion découlant d'une question déjà tranchée

La préclusion découlant d'une question déjà tranchée est un volet du principe de l'autorité de la chose jugée (l'autre étant la préclusion fondée

in court in another proceeding. For issue estoppel to be successfully invoked, three preconditions must be met: (1) the issue must be the same as the one decided in the prior decision; (2) the prior judicial decision must have been final; and (3) the parties to both proceedings must be the same, or their privies (*Danyluk v. Ainsworth Technologies Inc.*, [2001] 2 S.C.R. 460, 2001 SCC 44, at para. 25, *per* Binnie J.). The final requirement, known as "mutuality", has been largely abandoned in the United States and has been the subject of much academic and judicial debate there as well as in the United Kingdom and, to some extent, in this country. (See G. D. Watson, "Duplicative Litigation: Issue Estoppel, Abuse of Process and the Death of Mutuality" (1990), 69 *Can. Bar Rev.* 623, at pp. 648-51.) In light of the different conclusions reached by the courts below on the applicability of issue estoppel, I think it is useful to examine that debate more closely.

The first two requirements of issue estoppel are met in this case. The final requirement of mutuality of parties has not been met. In the original criminal case, the *lis* was between Her Majesty the Queen in right of Canada and Glenn Oliver. In the arbitration, the parties were CUPE and the City of Toronto, Oliver's employer. It is unnecessary to decide whether Oliver and CUPE should reasonably be viewed as privies for the purpose of the application of the mutuality requirement since it is clear that the Crown, acting as prosecutor in the criminal case, is not privy with the City of Toronto, nor would it be with a provincial, rather than a municipal, employer (as in the *Ontario v. O.P.S.E.U.* case, released concurrently).

There has been much academic criticism of the mutuality requirement of the doctrine of issue estoppel. In his article, Professor Watson, *supra*, argues that explicitly abolishing the mutuality requirement,

sur la cause d'action), qui interdit de soumettre à nouveau aux tribunaux des questions déjà tranchées dans une instance antérieure. Pour que le tribunal puisse accueillir la préclusion découlant d'une question déjà tranchée, trois conditions préalables doivent être réunies : (1) la question doit être la même que celle qui a été tranchée dans la décision antérieure; (2) la décision judiciaire antérieure doit avoir été une décision finale; (3) les parties dans les deux instances doivent être les mêmes ou leurs ayants droit (*Danyluk c. Ainsworth Technologies Inc.*, [2001] 2 R.C.S. 460, 2001 CSC 44, par. 25 (le juge Binnie)). La dernière exigence, à laquelle on a donné le nom de « réciprocité », a été largement abandonnée aux États-Unis et, dans ce pays ainsi qu'au Royaume-Uni, elle a suscité un ample débat en doctrine et en jurisprudence, comme elle l'a fait dans une certaine mesure ici (voir G. D. Watson, « Duplicative Litigation : Issue Estoppel, Abuse of Process and the Death of Mutuality » (1990), 69 *R. du B. can.* 623, p. 648-651). Compte tenu des conclusions différentes tirées par les tribunaux inférieurs sur l'applicabilité de la préclusion découlant d'une question déjà tranchée, je crois utile d'examiner ce débat d'un peu plus près.

24

Les deux premières exigences de la préclusion découlant d'une question déjà tranchée sont remplies en l'espèce. La dernière, celle de la réciprocité, ne l'est pas. Dans la poursuite criminelle initiale, le litige opposait Sa Majesté la Reine du chef du Canada et Glenn Oliver. Dans l'arbitrage, les parties étaient le SCFP et la Ville de Toronto, l'employeur d'Oliver. Il n'est pas nécessaire, pour l'application de l'exigence de la réciprocité, de décider si l'on peut raisonnablement conclure à l'existence d'un rapport d'auteur à ayant droit entre Oliver et le SCFP, puisqu'il est clair qu'il n'en existe pas entre la Couronne, en sa qualité de poursuivant dans l'instance criminelle, et la Ville de Toronto, et qu'il n'y en aurait pas non plus s'il s'agissait d'un employeur provincial plutôt que municipal (comme dans le pourvoi connexe *Ontario c. S.E.E.F.P.O.*).

25

De nombreux auteurs ont critiqué l'exigence de la réciprocité en matière de préclusion découlant d'une question déjà tranchée. Dans son article, le professeur Watson, *loc. cit.*, soutient que l'abolition

as has been done in the United States, would both reduce confusion in the law and remove the possibility that a strict application of issue estoppel may work an injustice. The arguments made by him and others (see also D. J. Lange, *The Doctrine of Res Judicata in Canada* (2000)), urging Canadian courts to abandon the mutuality requirement have been helpful in articulating a principled approach to the bar against relitigation. In my view, however, appropriate guidance is available in our law without the modification to the mutuality requirement that this case would necessitate.

26    In his very useful review of the abandonment of the mutuality requirement in the United States, Professor Watson, at p. 631, points out that mutuality was first relaxed when issue estoppel was used defensively:

The defensive use of non-mutual issue estoppel is straight forward. If P, having litigated an issue with D1 and lost, subsequently sues D2 raising the same issue, D2 can rely defensively on the issue estoppel arising from the former action, unless this action did not provide a full and fair opportunity to litigate or other factors make it unfair or unwise to permit preclusion. The rationale is that P should not be allowed to relitigate an issue already lost by simply changing defendants . . . .

27    Professor Watson then exposes the additional difficulties that arise if the mutuality requirement is removed when issue estoppel is raised offensively, as was done by the United States Supreme Court in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979). He describes the offensive use of non mutual issue estoppel as follows (at p. 631):

The power of this offensive non-mutual issue estoppel doctrine is illustrated by single event disaster cases, such as an airline crash. Assume P1 sues Airline for negligence in the operation of the aircraft and in that action Airline is found to have been negligent. Offensive non-mutual issue estoppel permits P2 through P20, *etc.*, now to sue Airline and successfully plead issue estoppel on the question of the airline's negligence. The rationale is that if Airline fully and fairly litigated the issue of its negligence in action #1 it has had its day in court; it has had due

explicite de cette condition, comme aux États-Unis, réduirait la confusion juridique et supprimerait la possibilité que l'application stricte de la doctrine conduise à une injustice. Les arguments que cet auteur et d'autres (voir aussi D. J. Lange, *The Doctrine of Res Judicata in Canada* (2000)) ont mis de l'avant pour exhorter les tribunaux canadiens à abandonner l'exigence de la réciprocité ont contribué à l'élaboration des principes fondant l'interdiction de la remise en cause. Je suis toutefois d'avis que notre droit comporte les outils appropriés et qu'il n'y a pas lieu de modifier l'exigence de la réciprocité, comme le nécessiterait la présente affaire.

Dans l'étude très éclairante qu'il a consacrée à l'abandon de l'exigence de la réciprocité aux États-Unis, le professeur Watson signale, à la p. 631, que la condition a d'abord cessé d'être exigée lorsque la préclusion était invoquée en défense :

[TRADUCTION] L'utilisation défensive de la préclusion lorsqu'il n'y a pas réciprocité est simple. Si P, n'ayant pas eu gain de cause dans une poursuite l'ayant opposé à D1, poursuit ensuite D2 pour la même question, D2 peut invoquer en défense la préclusion découlant de la précédente poursuite, à moins que l'instance n'ait pas offert l'entière possibilité de débattre équitablement de la question ou qu'en raison d'autres facteurs il soit injuste ou déraisonnable de permettre la préclusion. Le raisonnement est que P ne devrait pas être autorisé à intenter de nouveau un procès qu'il a déjà perdu simplement en changeant de défendeur . . .

Le professeur Watson expose ensuite les difficultés qui surgissent si l'on abandonne l'exigence de la réciprocité lorsque la préclusion découlant d'une question déjà tranchée est invoquée en demande, comme l'a fait la Cour suprême des États-Unis dans *Parklane Hosiery Co. c. Shore*, 439 U.S. 322 (1979). Il décrit ainsi l'utilisation offensive de la préclusion (à la p. 631) :

[TRADUCTION] La force de cette doctrine offensive de la préclusion sans exigence de réciprocité est illustrée par les instances afférentes à des désastres résultant d'une cause unique, comme un écrasement d'avion. Supposons que P1 poursuit le transporteur aérien pour négligence dans l'exploitation de l'appareil et que le tribunal lui donne raison. La préclusion offensive sans réciprocité permet alors à une succession de P de poursuivre le transporteur et de plaider que la question de la négligence a déjà été tranchée. Cela, parce que si le transporteur aérien

process and it should not be permitted to re-litigate the negligence issue. However, the court in *Parklane* realized that in order to ensure fairness in the operation of offensive non-mutual issue estoppel the doctrine has to be subject to qualifications.

Properly understood, our case could be viewed as falling under this second category — what would be described in U.S. law as "non-mutual offensive preclusion". Although technically speaking the City of Toronto is not the "plaintiff" in the arbitration proceedings, the City wishes to take advantage of the conviction obtained by the Crown against Oliver in a different, prior proceeding to which the City was not a party. It wishes to preclude Oliver from relitigating an issue that he fought and lost in the criminal forum. U.S. law acknowledges the peculiar difficulties with offensive use of non-mutual estoppel. Professor Watson explains, at pp. 632-33:

First, the court acknowledged that the effects of non-mutuality differ depending on whether issue estoppel is used offensively or defensively. While defensive preclusion helps to reduce litigation offensive preclusion, by contrast, encourages potential plaintiffs not to join in the first action. "Since a plaintiff will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins, the plaintiff has every incentive to adopt a 'wait and see' attitude, in the hope that the first action by another plaintiff will result in a favorable judgment". Thus, without some limit, non-mutual offensive preclusion would increase rather than decrease the total amount of litigation. To meet this problem the *Parklane* court held that preclusion should be denied in action #2 "where a plaintiff could have easily joined in the earlier action".

Second, the court recognized that in some circumstances to permit non-mutual preclusion "would be unfair to the defendant" and the court referred to specific situations of unfairness: (a) the defendant may have had little incentive to defend vigorously the first action, that

a équitablement pu opposer une défense entière à l'allégation de négligence dans la poursuite nᵒ 1, il a eu la possibilité d'être entendu, il a bénéficié de l'application régulière de la loi et ne devrait pas être autorisé à remettre en cause la question de la négligence. Dans *Parklane*, la cour s'est toutefois rendu compte que pour statuer en toute équité sur l'utilisation offensive de la préclusion sans exigence de réciprocité, il fallait apporter des réserves à la doctrine.

Ainsi comprise, la présente espèce pourrait être classée dans la seconde catégorie — ce qu'en droit américain on appellerait la [TRADUCTION] « préclusion offensive sans exigence de réciprocité ». En effet, bien que strictement parlant la Ville de Toronto ne soit pas « en demande » dans l'arbitrage, elle cherche à bénéficier de la déclaration de culpabilité que le ministère public a obtenue contre Oliver dans une poursuite distincte antérieure à laquelle la Ville n'était pas partie. Elle souhaite empêcher Oliver de débattre à nouveau d'une question qu'il a contestée au cours de la poursuite criminelle et sur laquelle il n'a pas eu gain de cause. Le droit américain reconnaît les difficultés particulières que pose cette catégorie. Le professeur Watson explique ce qui suit aux p. 632-633 :

[TRADUCTION] Premièrement, la cour a reconnu que la disparition de l'exigence de la réciprocité entraînait des effets différents selon que la préclusion découlant d'une question déjà tranchée était invoquée en demande ou en défense. Lorsque le moyen est invoqué en défense, il contribue à limiter les litiges, mais invoqué en demande, il encourage plutôt les demandeurs potentiels à ne pas prendre part à la première action. « Puisqu'un demandeur peut invoquer un jugement antérieur prononcé contre un défendeur, mais qu'il n'est pas lié par un jugement antérieur donnant gain de cause au défendeur, il sera plus enclin à opter pour l'attentisme dans l'espoir que la première action intentée par un autre demandeur produira un jugement favorable. » Si le moyen n'est pas assorti de limites, la préclusion offensive sans exigence de réciprocité risque donc d'accroître et non de réduire le nombre de litiges. Pour résoudre ce problème, la cour a statué, dans *Parklane*, qu'il conviendrait de rejeter la préclusion dans l'action nᵒ 2 « lorsqu'un demandeur aurait aisément pu se joindre à l'action antérieure ».

Deuxièmement, la cour a reconnu que dans certaines circonstances, « il serait injuste pour le défendeur » de recevoir la préclusion sans exigence de réciprocité, et elle a donné des exemples de situations inéquitables : a) il est possible que la partie défenderesse n'ait pas été très

is, if she was sued for small or nominal damages, particularly if future suits were not foreseeable; (b) offensive preclusion may be unfair if the judgment relied upon as a basis for estoppel is itself inconsistent with one or more previous judgments in favour of the defendant; or (c) the second action affords to the defendant procedural opportunities unavailable in the first action that could readily result in a different outcome, that is, where the defendant in the first action was forced to defend in an inconvenient forum and was unable to call witnesses, or where in the first action much more limited discovery was available to the defendant than in the second action.

In the final analysis the court declared that the general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where, either for the reasons discussed or for other reasons, the application of offensive estoppel would be unfair to the defendant, a trial judge should not allow the use of offensive collateral estoppel.

29     It is clear from the above that American non-mutual issue estoppel is not a mechanical, self-applying rule as evidenced by the discretionary elements which may militate against granting the estoppel. What emerges from the American experience with the abandonment of mutuality is a twofold concern: (1) the application of the estoppel must be sufficiently principled and predictable to promote efficiency; and (2) it must contain sufficient flexibility to prevent unfairness. In my view, this is what the doctrine of abuse of process offers, particularly, as here, where the issue involves a conviction in a criminal court for a serious crime. In a case such as this one, the true concerns are not primarily related to mutuality. The true concerns, well reflected in the reasons of the Court of Appeal, are with the integrity and the coherence of the administration of justice. This will often be the case when the estoppel originates from a finding made in a criminal case where many of the traditional concerns related to mutuality lose their significance.

30     For example, there is little relevance to the concern about the "wait and see" plaintiff, the "free

motivée à présenter une défense vigoureuse à la première action si, par exemple, le montant de dommages-intérêts réclamé était minime ou symbolique, en particulier s'il était prévisible que des actions subséquentes soient intentées, b) la préclusion en demande peut être injuste si le jugement invoqué est lui-même incompatible avec un ou plusieurs jugements antérieurs rendus en faveur de la partie défenderesse, c) la deuxième action offre à la partie défenderesse des moyens procéduraux dont elle ne disposait pas dans la première et qui pourraient facilement entraîner un résultat différent, par exemple lorsque la partie défenderesse a dû présenter sa défense devant un forum peu propice où elle ne pouvait citer de témoins ou lorsqu'elle jouissait de possibilités beaucoup moindres de communication de la preuve dans la première action.

En définitive, la cour a statué qu'en règle générale les affaires où un demandeur aurait facilement pu se porter codemandeur à la première action ou lorsque, pour les raisons susmentionnées ou pour d'autres, l'application du moyen en demande serait injuste pour la partie défenderesse, le juge de première instance ne devrait pas autoriser le recours à la préclusion offensive.

Il ressort clairement du passage précédent que la doctrine américaine de la préclusion découlant d'une question déjà tranchée, sans exigence de réciprocité, n'est pas d'application automatique, comme le démontrent les éléments discrétionnaires susceptibles d'entraîner le rejet de ce moyen. L'expérience américaine indique que l'abandon de l'exigence de la réciprocité suscite une double préoccupation : (1) l'application de la préclusion doit être suffisamment encadrée et prévisible pour assurer l'efficacité, et (2) elle doit comporter assez de souplesse pour empêcher les injustices. Selon moi, c'est ce qu'offre la doctrine de l'abus de procédure, en particulier dans des affaires mettant en cause une déclaration de culpabilité relative à un acte criminel grave, comme la présente espèce. Dans de tels cas, les véritables préoccupations, que la Cour d'appel a exposées avec justesse dans ses motifs, ne se rattachent pas tant à la réciprocité qu'à l'intégrité et à la cohérence de l'administration de la justice. Ce sera souvent le cas lorsque la préclusion reposera sur une conclusion prononcée en matière criminelle où beaucoup des préoccupations traditionnelles relatives à la réciprocité perdent de leur importance.

Par exemple, la notion du demandeur « attentiste » et « opportuniste » qui évite délibérément

rider" who will deliberately avoid the risk of joining the original litigation, but will later come forward to reap the benefits of the victory obtained by the party who should have been his co-plaintiff. No such concern can ever arise when the original action is in a criminal prosecution. Victims cannot, even if they wanted to, "join in" the prosecution so as to have their civil claim against the accused disposed of in a single trial. Nor can employers "join in" the criminal prosecution to have their employee dismissed for cause.

On the other hand, even though no one can join the prosecution, the prosecutor as a party represents the public interest. He or she represents a collective interest in the just and correct outcome of the case. The prosecutor is said to be a minister of justice who has nothing to win or lose from the outcome of the case but who must ensure that a just and true verdict is rendered. (See Law Society of Upper Canada, *Rules of Professional Conduct* (2000), Commentary Rule 4.01(3), at p. 61; *R. v. Regan*, [2002] 1 S.C.R. 297, 2002 SCC 12; *Lemay v. The King*, [1952] 1 S.C.R. 232, at pp. 256-57, *per* Cartwright J.; and *R. v. Banks*, [1916] 2 K.B. 621 (C.C.A.), at p. 623.) The mutuality requirement of the doctrine of issue estoppel, which insists that only the Crown and its privies be precluded from relitigating the guilt of the accused, is hardly reflective of the true role of the prosecutor.

As the present case illustrates, the primary concerns here are about the integrity of the criminal process and the increased authority of a criminal verdict, rather than some of the more traditional issue estoppel concerns that focus on the interests of the parties, such as costs and multiple "vexation". For these reasons, I see no need to reverse or relax the long-standing application of the mutuality requirement in this case and I would conclude that issue estoppel has no application. I now turn to the question of whether the decision of the

de prendre le risque de se joindre à la poursuite initiale mais qui cherche plus tard à profiter de la victoire obtenue par la partie qui aurait dû être sa codemanderesse, a peu de pertinence. Il n'y a pas lieu de craindre que cela se produise lorsque la première instance est une poursuite criminelle. Même si elles le voulaient, les victimes ne pourraient se porter partie à la poursuite criminelle de façon à ce que leur action civile contre l'accusé soit jugée dans un même procès. Les employeurs ne sont pas admis non plus à participer à la poursuite criminelle pour que leur employé soit par la même occasion congédié pour motif valable.

31

Par contre, malgré le fait que personne ne peut se joindre à la poursuite criminelle, le poursuivant, en tant que partie, représente l'intérêt public. Il représente un intérêt collectif dans le règlement juste et régulier de la poursuite. On le considère comme un ministre de la justice qui n'a rien à gagner ni à perdre dans l'issue des procès mais qui doit veiller à ce que les tribunaux rendent des verdicts justes et bien fondés. (Voir Barreau du Haut-Canada, *Code de déontologie* (2000), règle 4.01(3) et le commentaire afférent, p. 62; *R. c. Regan*, [2002] 1 R.C.S. 297, 2002 CSC 12; *Lemay c. The King*, [1952] 1 R.C.S. 232, p. 256-257, le juge Cartwright; et *R. c. Banks*, [1916] 2 K.B. 621 (C.C.A.), p. 623.) L'exigence de réciprocité de la doctrine de la préclusion découlant d'une question déjà tranchée, qui veut que seul le ministère public et ses ayants droit soient irrecevables à remettre en cause la culpabilité de l'accusé, ne rend guère compte du vrai rôle du poursuivant.

32

Comme l'illustre la présente espèce, ce sont l'intégrité du système de justice criminel et l'autorité accrue du verdict de culpabilité qui sont les considérations primordiales, et non certaines des préoccupations plus traditionnelles de la préclusion découlant d'une question déjà tranchée où l'accent est mis sur les intérêts des parties, comme les dépens et les « incidents vexatoires » multiples. Pour ces motifs, il n'y a à mon sens aucune nécessité en l'espèce de supprimer ou d'assouplir l'exigence de la réciprocité, établie depuis longtemps, et je conclurais que

TORONTO (CITY) *v.* C.U.P.E.    *Arbour J.*    [2003] 3 S.C.R.

arbitrator amounted to a collateral attack on the verdict of the criminal court.

### (2) Collateral Attack

33    The rule against collateral attack bars actions to overturn convictions when those actions take place in the wrong forum. As stated in *Wilson v. The Queen*, [1983] 2 S.C.R. 594, at p. 599, the rule against collateral attack

has long been a fundamental rule that a court order, made by a court having jurisdiction to make it, stands and is binding and conclusive unless it is set aside on appeal or lawfully quashed. It is also well settled in the authorities that such an order may not be attacked collaterally — and a collateral attack may be described as an attack made in proceedings other than those whose specific object is the reversal, variation, or nullification of the order or judgment.

Thus, in *Wilson*, *supra*, the Court held that an inferior court judge was without jurisdiction to pass on the validity of a wiretap authorized by a superior court. Other cases that form the basis for this rule similarly involve attempts to overturn decisions in other fora, and not simply to relitigate their facts. In *R. v. Sarson*, [1996] 2 S.C.R. 223, at para. 35, this Court held that a prisoner's *habeas corpus* attack on a conviction under a law later declared unconstitutional must fail under the rule against collateral attack because the prisoner was no longer "in the system" and because he was "in custody pursuant to the judgment of a court of competent jurisdiction". Similarly, in *R. v. Consolidated Maybrun Mines Ltd.*, [1998] 1 S.C.R. 706, this Court held that a mine owner who had chosen to ignore an administrative appeals process for a pollution fine was barred from contesting the validity of that fine in court because the legislation directed appeals to an appellate administrative body, not to the courts. Binnie J. described the rule against collateral attack in *Danyluk*, *supra*, at para. 20, as follows: "that a judicial order pronounced by a court of competent jurisdiction should not be brought into question in

la préclusion découlant d'une question déjà tranchée n'est pas applicable. Se pose maintenant la question de savoir si la décision de l'arbitre équivalait à une contestation indirecte du verdict du tribunal criminel.

### (2) La contestation indirecte

La règle interdisant les contestations indirectes rend irrecevables les actions visant l'infirmation de déclarations de culpabilité par des tribunaux n'ayant pas compétence en cette matière. Comme la Cour l'a affirmé dans l'arrêt *Wilson c. La Reine*, [1983] 2 R.C.S. 594, p. 599, cette règle est

un principe fondamental établi depuis longtemps [selon lequel] une ordonnance rendue par une cour compétente est valide, concluante et à force exécutoire, à moins d'être infirmée en appel ou légalement annulée. De plus, la jurisprudence établit très clairement qu'une telle ordonnance ne peut faire l'objet d'une attaque indirecte; l'attaque indirecte peut être décrite comme une attaque dans le cadre de procédures autres que celles visant précisément à obtenir l'infirmation, la modification ou l'annulation de l'ordonnance ou du jugement.

Ainsi, la Cour a jugé, dans *Wilson*, précité, qu'un juge d'une juridiction inférieure n'avait pas compétence pour examiner la validité d'une autorisation d'écoute électronique délivrée par une cour supérieure. D'autres décisions jurisprudentielles constituant l'assise de cette règle avaient aussi pour contexte des tentatives de faire infirmer des décisions d'autres tribunaux et non une simple remise en cause des faits de l'espèce. Dans *R. c. Sarson*, [1996] 2 R.C.S. 223, par. 35, notre Cour a statué qu'en raison de la règle interdisant les contestations indirectes, le recours en *habeas corpus* par lequel un détenu contestait une déclaration de culpabilité fondée sur une disposition législative subséquemment jugée inconstitutionnelle ne pouvait être accueilli parce que l'affaire du détenu n'était plus « en cours » et que celui-ci « était détenu conformément au jugement d'un tribunal compétent ». De la même façon, la Cour a jugé, dans l'arrêt *R. c. Consolidated Maybrun Mines Ltd.*, [1998] 1 R.C.S. 706, que le propriétaire d'une mine qui avait décidé de ne pas suivre le processus administratif d'appel applicable relativement à une amende pour pollution n'était pas admis à contester la validité de la

subsequent proceedings except those provided by law for the express purpose of attacking it" (emphasis added).

Each of these cases concerns the appropriate forum for collateral attacks upon the judgment itself. However, in the case at bar, the union does not seek to overturn the sexual abuse conviction itself, but simply contest, for the purposes of a different claim with different legal consequences, whether the conviction was correct. It is an implicit attack on the correctness of the factual basis of the decision, not a contest about whether that decision has legal force, as clearly it does. Prohibited "collateral attacks" are abuses of the court's process. However, in light of the focus of the collateral attack rule on attacking the order itself and its legal effect, I believe that the better approach here is to go directly to the doctrine of abuse of process.

### (3) Abuse of Process

Judges have an inherent and residual discretion to prevent an abuse of the court's process. This concept of abuse of process was described at common law as proceedings "unfair to the point that they are contrary to the interest of justice" (*R. v. Power*, [1994] 1 S.C.R. 601, at p. 616), and as "oppressive treatment" (*R. v. Conway*, [1989] 1 S.C.R. 1659, at p. 1667). McLachlin J. (as she then was) expressed it this way in *R. v. Scott*, [1990] 3 S.C.R. 979, at p. 1007:

. . . abuse of process may be established where: (1) the proceedings are oppressive or vexatious; and, (2) violate the fundamental principles of justice underlying the community's sense of fair play and decency. The concepts of

pénalité devant un tribunal judiciaire parce que la loi prévoyait que les appels étaient entendus par un tribunal administratif. Dans l'arrêt *Danyluk*, précité, par. 20, le juge Binnie a défini la règle prohibant les contestations indirectes comme « la règle selon laquelle l'ordonnance rendue par un tribunal compétent ne doit pas être remise en cause dans des procédures subséquentes, sauf celles prévues par la loi dans le but exprès de contester l'ordonnance » (je souligne).

Chacune des affaires susmentionnées soulève la question du tribunal compétent pour connaître de contestations relatives au jugement lui-même. En l'espèce, toutefois, le syndicat ne cherche pas à faire infirmer la déclaration de culpabilité pour agression sexuelle, mais conteste simplement, dans le cadre d'une demande différente comportant des conséquences juridiques différentes, le bien-fondé de cette déclaration. Il s'agit d'une attaque implicite du bien-fondé factuel de la décision, non pas de la contestation de la validité juridique de celle-ci, puisqu'elle est manifestement valide. Les « contestations indirectes » prohibées constituent un abus du processus judiciaire. Or, comme la règle qui prohibe les contestations indirectes met l'accent sur la contestation de l'ordonnance elle-même et de ses effets juridiques, la meilleure façon d'aborder la question en l'espèce me paraît être de recourir directement à la doctrine de l'abus de procédure.

### (3) L'abus de procédure

Les juges disposent, pour empêcher les abus de procédure, d'un pouvoir discrétionnaire résiduel inhérent. L'abus de procédure a été décrit, en common law, comme consistant en des procédures « injustes au point qu'elles sont contraires à l'intérêt de la justice » (*R. c. Power*, [1994] 1 R.C.S. 601, p. 616) et en un traitement « oppressif » (*R. c. Conway*, [1989] 1 R.C.S. 1659, p. 1667). La juge McLachlin (plus tard Juge en chef) l'a défini de la façon suivante dans l'arrêt *R. c. Scott*, [1990] 3 R.C.S. 979, p. 1007 :

. . . l'abus de procédure peut avoir lieu si : (1) les procédures sont oppressives ou vexatoires; et (2) elles violent les principes fondamentaux de justice sous-jacents au sens de l'équité et de la décence de la société. La première

oppressiveness and vexatiousness underline the interest of the accused in a fair trial. But the doctrine evokes as well the public interest in a fair and just trial process and the proper administration of justice.

36    The doctrine of abuse of process is used in a variety of legal contexts. The unfair or oppressive treatment of an accused may disentitle the Crown to carry on with the prosecution of a charge: *Conway*, *supra*, at p. 1667. In *Blencoe v. British Columbia (Human Rights Commission)*, [2000] 2 S.C.R. 307, 2000 SCC 44, this Court held that unreasonable delay causing serious prejudice could amount to an abuse of process. When the *Canadian Charter of Rights and Freedoms* applies, the common law doctrine of abuse of process is subsumed into the principles of the *Charter* such that there is often overlap between abuse of process and constitutional remedies (*R. v. O'Connor*, [1995] 4 S.C.R. 411). The doctrine nonetheless continues to have application as a non-*Charter* remedy: *United States of America v. Shulman*, [2001] 1 S.C.R. 616, 2001 SCC 21, at para. 33.

37    In the context that interests us here, the doctrine of abuse of process engages "the inherent power of the court to prevent the misuse of its procedure, in a way that would . . . bring the administration of justice into disrepute" (*Canam Enterprises Inc. v. Coles* (2000), 51 O.R. (3d) 481 (C.A.), at para. 55, *per* Goudge J.A., dissenting (approved [2002] 3 S.C.R. 307, 2002 SCC 63)). Goudge J.A. expanded on that concept in the following terms at paras. 55-56:

    The doctrine of abuse of process engages the inherent power of the court to prevent the misuse of its procedure, in a way that would be manifestly unfair to a party to the litigation before it or would in some other way bring the administration of justice into disrepute. It is a flexible doctrine unencumbered by the specific requirements of concepts such as issue estoppel. See *House of Spring Gardens Ltd. v. Waite*, [1990] 3 W.L.R. 347 at p. 358, [1990] 2 All E.R. 990 (C.A.).

condition, à savoir que les poursuites sont oppressives ou vexatoires, se rapporte au droit de l'accusé d'avoir un procès équitable. Cependant, la notion fait aussi appel à l'intérêt du public à un régime de procès justes et équitables et à la bonne administration de la justice.

La doctrine de l'abus de procédure s'applique dans des contextes juridiques divers. Le traitement injuste ou oppressif d'un accusé peut priver le ministère public du droit de continuer les poursuites relatives à une accusation : *Conway*, précité, p. 1667. Dans l'arrêt *Blencoe c. Colombie-Britannique (Human Rights Commission)*, [2000] 2 R.C.S. 307, 2000 CSC 44, notre Cour a statué qu'un délai déraisonnable causant un préjudice grave peut constituer un abus de procédure. Lorsque la *Charte canadienne des droits et libertés* est invoquée, la doctrine de l'abus de procédure reconnue en common law est subsumée sous les principes de la *Charte* de telle sorte que les principes de l'abus de procédure et les recours constitutionnels empiètent souvent les uns sur les autres (*R. c. O'Connor*, [1995] 4 R.C.S. 411). La doctrine continue néanmoins de trouver application comme réparation non fondée sur la *Charte* : *États-Unis d'Amérique c. Shulman*, [2001] 1 R.C.S. 616, 2001 CSC 21, par. 33.

Dans le contexte qui nous intéresse, la doctrine de l'abus de procédure fait intervenir [TRADUCTION] « le pouvoir inhérent du tribunal d'empêcher que ses procédures soient utilisées abusivement, d'une manière [. . .] qui aurait [. . .] pour effet de discréditer l'administration de la justice » (*Canam Enterprises Inc. c. Coles* (2000), 51 O.R. (3d) 481 (C.A.), par. 55, le juge Goudge, dissident, approuvé par [2002] 3 R.C.S. 307, 2002 CSC 63). Le juge Goudge a développé la notion de la façon suivante aux par. 55 et 56 :

    [TRADUCTION] La doctrine de l'abus de procédure engage le pouvoir inhérent du tribunal d'empêcher que ses procédures soient utilisées abusivement, d'une manière qui serait manifestement injuste envers une partie au litige, ou qui aurait autrement pour effet de discréditer l'administration de la justice. C'est une doctrine souple qui ne s'encombre pas d'exigences particulières telles que la notion d'irrecevabilité (voir *House of Spring Gardens Ltd. c. Waite*, [1990] 3 W.L.R. 347, p. 358, [1990] 2 All E.R. 990 (C.A.).

One circumstance in which abuse of process has been applied is where the litigation before the court is found to be in essence an attempt to relitigate a claim which the court has already determined. [Emphasis added.]

As Goudge J.A.'s comments indicate, Canadian courts have applied the doctrine of abuse of process to preclude relitigation in circumstances where the strict requirements of issue estoppel (typically the privity/mutuality requirements) are not met, but where allowing the litigation to proceed would nonetheless violate such principles as judicial economy, consistency, finality and the integrity of the administration of justice. (See, for example, *Franco v. White* (2001), 53 O.R. (3d) 391 (C.A.); *Bomac Construction Ltd. v. Stevenson*, [1986] 5 W.W.R. 21 (Sask. C.A.); and *Bjarnarson v. Government of Manitoba* (1987), 38 D.L.R. (4th) 32 (Man. Q.B.), aff'd (1987), 21 C.P.C. (2d) 302 (Man. C.A.).) This has resulted in some criticism, on the ground that the doctrine of abuse of process by relitigation is in effect non-mutual issue estoppel by another name without the important qualifications recognized by the American courts as part and parcel of the general doctrine of non-mutual issue estoppel (Watson, *supra*, at pp. 624-25).

It is true that the doctrine of abuse of process has been extended beyond the strict parameters of *res judicata* while borrowing much of its rationales and some of its constraints. It is said to be more of an adjunct doctrine, defined in reaction to the settled rules of issue estoppel and cause of action estoppel, than an independent one (Lange, *supra*, at p. 344). The policy grounds supporting abuse of process by relitigation are the same as the essential policy grounds supporting issue estoppel (Lange, *supra*, at pp. 347-48):

The two policy grounds, namely, that there be an end to litigation and that no one should be twice vexed by the same cause, have been cited as policies in the application

Un cas d'application de l'abus de procédure est lorsque le tribunal est convaincu que le litige a essentiellement pour but de rouvrir une question qu'il a déjà tranchée. [Je souligne.]

Ainsi qu'il ressort du commentaire du juge Goudge, les tribunaux canadiens ont appliqué la doctrine de l'abus de procédure pour empêcher la réouverture de litiges dans des circonstances où les exigences strictes de la préclusion découlant d'une question déjà tranchée (généralement les exigences de lien de droit et de réciprocité) n'étaient pas remplies, mais où la réouverture aurait néanmoins porté atteinte aux principes d'économie, de cohérence, de caractère définitif des instances et d'intégrité de l'administration de la justice. (Voir par exemple *Franco c. White* (2001), 53 O.R. (3d) 391 (C.A.); *Bomac Construction Ltd. c. Stevenson*, [1986] 5 W.W.R. 21 (C.A. Sask.); et *Bjarnarson c. Government of Manitoba* (1987), 38 D.L.R. (4th) 32 (B.R. Man.), conf. par (1987), 21 C.P.C. (2d) 302 (C.A. Man.).) Cette application a suscité des critiques, certains disant que la doctrine de l'abus de procédure pour remise en cause n'est ni plus ni moins que la doctrine générale de la préclusion découlant d'une question déjà tranchée, sans exigence de réciprocité, à laquelle il manque les importantes conditions que les tribunaux américains ont reconnues comme parties intégrantes de la doctrine (Watson, *loc. cit.*, p. 624-625).

Certes, la doctrine de l'abus de procédure a débordé des stricts paramètres du principe de l'autorité de la chose jugée tout en lui empruntant beaucoup de ses fondements et quelques-unes de ses restrictions. D'aucuns la voient davantage comme une doctrine auxiliaire, élaborée en réaction aux règles établies de la préclusion (découlant d'une question déjà tranchée ou fondée sur la cause d'action), que comme une doctrine indépendante (Lange, *op. cit.*, p. 344). Les raisons de principes étayant la doctrine de l'abus de procédure pour remise en cause sont identiques à celles de la préclusion découlant d'une question déjà tranchée (Lange, *op. cit.*, p. 347-348) :

[TRADUCTION] Les deux raisons de principe, savoir qu'un litige puisse avoir une fin et que personne ne puisse être tracassé deux fois par la même cause d'action, ont

38

of abuse of process by relitigation. Other policy grounds have also been cited, namely, to preserve the courts' and the litigants' resources, to uphold the integrity of the legal system in order to avoid inconsistent results, and to protect the principle of finality so crucial to the proper administration of justice.

39    The *locus classicus* for the modern doctrine of abuse of process and its relationship to *res judicata* is *Hunter*, *supra*, aff'g *McIlkenny v. Chief Constable of the West Midlands*, [1980] Q.B. 283 (C.A.). The case involved an action for damages for personal injuries brought by the six men convicted of bombing two pubs in Birmingham. They claimed that they had been beaten by the police during their interrogation. The plaintiffs had raised the same issue at their criminal trial, where it was found by both the judge and jury that the confessions were voluntary and that the police had not used violence. At the Court of Appeal, Lord Denning, M.R., endorsed non-mutual issue estoppel and held that the question of whether any beatings had taken place was estopped by the earlier determination, although it was raised here against a different opponent. He noted that in analogous cases, courts had sometimes refused to allow a party to raise an issue for a second time because it was an "abuse of the process of the court", but held that the proper characterization of the matter was through non-mutual issue estoppel.

40    On appeal to the House of Lords, Lord Denning's attempt to reform the law of issue estoppel was overruled, but the higher court reached the same result via the doctrine of abuse of process. Lord Diplock stated, at p. 541:

   The abuse of process which the instant case exemplifies is the initiation of proceedings in a court of justice for the purpose of mounting a collateral attack upon a final decision against the intending plaintiff which has been made by another court of competent jurisdiction in

été invoquées comme principes fondant l'application de la doctrine de l'abus de procédure pour remise en cause. D'autres principes ont également été invoqués : la préservation des ressources des tribunaux et des parties, le maintien de l'intégrité du système judiciaire afin d'éviter les résultats contradictoires et la protection du principe du caractère définitif des instances si important pour la bonne administration de la justice.

   L'énoncé classique de la doctrine moderne de l'abus de procédure et de ses liens avec l'autorité de la chose jugée se trouve dans la décision *Hunter*, précitée, confirmant *McIlkenny c. Chief Constable of the West Midlands*, [1980] Q.B. 283 (C.A.). Il s'agissait d'une poursuite en dommages-intérêts pour préjudice corporel intentée par les six hommes reconnus coupables de l'explosion de deux pubs de Birmingham. Ils prétendaient avoir été battus par la police pendant leur interrogatoire. Les demandeurs avaient soulevé le même grief lors du procès criminel, mais le juge et le jury avaient conclu que les confessions avaient été volontaires et que la police n'avait pas eu recours à la violence. Lord Denning, M.R., de la Cour d'appel, a appliqué la préclusion découlant d'une question déjà tranchée, sans exigence de réciprocité, et a statué que le jugement antérieur empêchait l'examen de la question de savoir si la police avait usé de violence, même si cette question était invoquée contre un nouvel adversaire. Signalant que dans des affaires analogues, les tribunaux avaient parfois refusé d'autoriser une partie à soulever de nouveau une question parce qu'il s'agissait d'un abus de procédure, lord Denning a estimé que le principe applicable était plutôt celui de la préclusion découlant d'une question déjà tranchée, sans exigence de réciprocité.

   La Chambre des lords, statuant en appel, n'a pas endossé la tentative de lord Denning de modifier le principe de la préclusion découlant d'une question déjà tranchée, mais elle est parvenue à une conclusion identique en appliquant la doctrine de l'abus de procédure. Lord Diplock s'est exprimé en ces termes, à la p. 541 :

   [TRADUCTION] L'abus de procédure illustré en l'espèce est l'introduction d'une instance devant un tribunal judiciaire dans le but d'attaquer indirectement une décision définitive rendue contre le demandeur par un autre tribunal compétent dans une instance antérieure, où le

previous proceedings in which the intending plaintiff had a full opportunity of contesting the decision in the court by which it was made.

It is important to note that a public inquiry after the civil action of the six accused in *Hunter*, *supra*, resulted in the finding that the confessions of the Birmingham six had been extracted through police brutality (see *R. v. McIlkenny* (1991), 93 Cr. App. R. 287 (C.A.), at pp. 304 *et seq.*). In my view, this does not support a relaxation of the existing procedural mechanisms designed to ensure finality in criminal proceedings. The danger of wrongful convictions has been acknowledged by this Court and other courts (see *United States v. Burns*, [2001] 1 S.C.R. 283, 2001 SCC 7, at para. 1; and *R. v. Bromley* (2001), 151 C.C.C. (3d) 480 (Nfld. C.A.), at pp. 517-18). Although safeguards must be put in place for the protection of the innocent, and, more generally, to ensure the trustworthiness of court findings, continuous re-litigation is not a guarantee of factual accuracy.

The attraction of the doctrine of abuse of process is that it is unencumbered by the specific requirements of *res judicata* while offering the discretion to prevent relitigation, essentially for the purpose of preserving the integrity of the court's process. (See Doherty J.A.'s reasons, at para. 65; see also *Demeter* (H.C.), *supra*, at p. 264, and *Hunter*, *supra*, at p. 536.)

Critics of that approach have argued that when abuse of process is used as a proxy for issue estoppel, it obscures the true question while adding nothing but a vague sense of discretion. I disagree. At least in the context before us, namely, an attempt to relitigate a criminal conviction, I believe that abuse of process is a doctrine much more responsive to the real concerns at play. In all of its applications, the primary focus of the doctrine of abuse of process is the integrity of the adjudicative functions of courts. Whether it serves to disentitle the Crown from proceeding because of undue delays (see *Blencoe*, *supra*), or whether it prevents a civil party from using the courts for an improper purpose (see *Hunter*, *supra*, and *Demeter*, *supra*), the focus is less

demandeur a eu l'entière possibilité de contester la décision devant le tribunal qui l'a rendue.

Il importe de signaler qu'une enquête publique instituée après la poursuite civile intentée par les six accusés dans l'affaire *Hunter*, précitée, a donné lieu à la conclusion que les aveux des accusés de Birmingham avaient été obtenus par suite de brutalités policières (voir *R. c. McIlkenny* (1991), 93 Cr. App. R. 287 (C.A.), p. 304 et suiv.). À mon avis, cela ne saurait justifier d'alléger les mécanismes procéduraux mis en place pour assurer le caractère définitif des instances en matière criminelle. Notre Cour et d'autres tribunaux ont reconnu l'existence du risque d'erreur judiciaire (voir *États-Unis c. Burns*, [2001] 1 R.C.S. 283, 2001 CSC 7, par. 1; et *R. c. Bromley* (2001), 151 C.C.C. (3d) 480 (C.A.T.-N.), p. 517-518). Bien qu'il faille prévoir des garanties pour protéger les innocents et, de façon plus générale, pour inspirer confiance dans les décisions judiciaires, la remise en cause perpétuelle n'est pas pour autant garante de l'exactitude factuelle.

L'attrait de la doctrine de l'abus de procédure provient de ce qu'elle n'est pas alourdie par les exigences précises du principe de l'autorité de la chose jugée tout en ménageant le pouvoir discrétionnaire d'empêcher la remise en cause de litiges et ce, essentiellement dans le but de préserver l'intégrité du processus judiciaire. (Voir les motifs du juge Doherty, par. 65; voir également *Demeter* (H.C.), précité, p. 264, et *Hunter*, précité, p. 536.)

Ceux qui critiquent cette doctrine font valoir que l'utilisation de l'abus de procédure à la place de la préclusion brouille la vraie question sans rien ajouter d'autre qu'une vague impression de pouvoir discrétionnaire. Je ne partage pas cette vue. À tout le moins dans des circonstances comme celles de la présente espèce, c'est-à-dire une tentative de remettre en cause une déclaration de culpabilité, j'estime que cette doctrine répond beaucoup mieux aux véritables enjeux. Dans tous ses cas d'application, la doctrine de l'abus de procédure vise essentiellement à préserver l'intégrité de la fonction judiciaire. Qu'elle ait pour effet de priver le ministère public du droit de continuer la poursuite à cause de délais inacceptables (voir *Blencoe*, précité), ou d'empêcher

41

42

43

on the interest of parties and more on the integrity of judicial decision making as a branch of the administration of justice. In a case such as the present one, it is that concern that compels a bar against relitigation, more than any sense of unfairness to a party being called twice to put its case forward, for example. When that is understood, the parameters of the doctrine become easier to define, and the exercise of discretion is better anchored in principle.

44    The adjudicative process, and the importance of preserving its integrity, were well described by Doherty J.A. He said, at para. 74:

The adjudicative process in its various manifestations strives to do justice. By the adjudicative process, I mean the various courts and tribunals to which individuals must resort to settle legal disputes. Where the same issues arise in various forums, the quality of justice delivered by the adjudicative process is measured not by reference to the isolated result in each forum, but by the end result produced by the various processes that address the issue. By justice, I refer to procedural fairness, the achieving of the correct result in individual cases and the broader perception that the process as a whole achieves results which are consistent, fair and accurate.

45    When asked to decide whether a criminal conviction, *prima facie* admissible in a proceeding under s. 22.1 of the Ontario *Evidence Act*, ought to be rebutted or taken as conclusive, courts will turn to the doctrine of abuse of process to ascertain whether relitigation would be detrimental to the adjudicative process as defined above. When the focus is thus properly on the integrity of the adjudicative process, the motive of the party who seeks to relitigate, or whether he or she wishes to do so as a defendant rather than as a plaintiff, cannot be decisive factors in the application of the bar against relitigation.

46    Thus, in the case at bar, it matters little whether Oliver's motive for relitigation was primarily to

une partie civile de faire appel aux tribunaux à mauvais escient (voir *Hunter*, précité, et *Demeter*, précité), l'accent est mis davantage sur l'intégrité du processus décisionnel judiciaire comme fonction de l'administration de la justice que sur l'intérêt des parties. Dans une affaire comme la présente espèce, c'est cette préoccupation qui commande d'interdire la remise en cause, plus que toute perception d'injustice envers une partie qui serait de nouveau appelée à faire la preuve de ses prétentions, par exemple. Cela compris, il est plus facile d'établir les paramètres de la doctrine et de définir les principes applicables à l'exercice du pouvoir discrétionnaire.

Le processus décisionnel judiciaire, et l'importance d'en préserver l'intégrité, ont été bien décrits par le juge Doherty. Voici ce qu'on peut lire au par. 74 de ses motifs :

[TRADUCTION] Dans ses diverses manifestations, le processus décisionnel judiciaire vise à rendre justice. Par processus décisionnel judiciaire, j'entends les divers tribunaux judiciaires ou administratifs auxquels il faut s'adresser pour le règlement des litiges. Lorsque la même question est soulevée devant divers tribunaux, la qualité des décisions rendues au terme du processus judiciaire se mesure non par rapport au résultat particulier obtenu de chaque forum, mais par le résultat final découlant des divers processus. Par justice, j'entends l'équité procédurale, l'obtention du résultat approprié dans chaque affaire et la perception plus générale que l'ensemble du processus donne des résultats cohérents, équitables et exacts.

Lorsqu'ils doivent décider si une déclaration de culpabilité, recevable *prima facie* en vertu de l'art. 22.1 de la *Loi sur la preuve* de l'Ontario, devrait être réfutée ou considérée comme concluante, les tribunaux font appel à la doctrine de l'abus de procédure pour déterminer si la remise en cause porterait atteinte au processus décisionnel judiciaire défini précédemment. Lorsque l'accent est correctement mis sur l'intégrité du processus, la raison pour laquelle la partie cherche à rouvrir le débat ou sa qualité de défendeur plutôt que de demandeur dans le nouveau litige ne sauraient constituer des facteurs décisifs pour l'application de la règle interdisant la remise en question.

En l'espèce, il importe donc peu qu'Oliver veuille principalement rouvrir le débat pour être réengagé et

secure re-employment, rather than to challenge his criminal conviction in an attempt to undermine its validity. Reliance on *Hunter*, *supra*, and on *Demeter* (H.C.), *supra*, for the purpose of enhancing the importance of motive is misplaced. It is true that in both cases the parties wishing to relitigate had made it clear that they were seeking to impeach their earlier convictions. But this is of little significance in the application of the doctrine of abuse of process. A desire to attack a judicial finding is not in itself an improper purpose. The law permits that objective to be pursued through various reviewing mechanisms such as appeals or judicial review. Indeed reviewability is an important aspect of finality. A decision is final and binding on the parties only when all available reviews have been exhausted or abandoned. What is improper is to attempt to impeach a judicial finding by the impermissible route of relitigation in a different forum. Therefore, motive is of little or no import.

There is also no reason to constrain the doctrine of abuse of process only to those cases where the plaintiff has initiated the relitigation. The designation of the parties to the second litigation may mask the reality of the situation. In the present case, for instance, aside from the technical mechanism of the grievance procedures, who should be viewed as the initiator of the employment litigation between the grievor, Oliver, and his union on the one hand, and the City of Toronto on the other? Technically, the union is the "plaintiff" in the arbitration procedure. But the City of Toronto used Oliver's criminal conviction as a basis for his dismissal. I cannot see what difference it makes, again from the point of view of the integrity of the adjudicative process, whether Oliver is labelled a plaintiff or a defendant when it comes to relitigating his criminal conviction.

The appellant relies on *Re Del Core*, *supra*, to suggest that the abuse of process doctrine only applies to plaintiffs. *Re Del Core*, however, provided no majority opinion as to whether and when public policy would preclude relitigation of issues

non pour contester sa déclaration de culpabilité afin d'en attaquer la validité. Il n'y a pas lieu ici d'invoquer les arrêts *Hunter* et *Demeter* (H.C.), précités, pour souligner l'importance de la raison de la remise en cause. Il était certes évident, dans les deux affaires, que les parties cherchant à rouvrir le débat voulaient faire casser leur déclaration de culpabilité, mais cela a peu d'importance dans l'application de la doctrine de l'abus de procédure. Il n'est pas illégitime en soi de vouloir attaquer un jugement; la loi permet de poursuivre cet objectif par divers mécanismes de révision comme l'appel ou le contrôle judiciaire. De fait, la possibilité de faire réviser un jugement constitue un aspect important du principe de l'irrévocabilité des décisions. Une décision est irrévocable ou définitive et elle lie les parties seulement lorsque tous les recours possibles en révision sont épuisés ou ont été abandonnés. Ce qui n'est pas permis, c'est d'attaquer un jugement en tentant de soulever de nouveau la question devant un autre forum. Par conséquent, les raisons animant la partie ont peu ou pas d'importance.

Il n'y a pas de raison non plus de restreindre l'application de la doctrine de l'abus de procédure aux seuls cas où la remise en cause est le fait du demandeur. La désignation des parties au second litige peut masquer la situation réelle. En l'espèce, par exemple, indépendamment des formalités de la procédure de grief, qui d'Oliver et de son syndicat ou de la Ville de Toronto faudrait-il considérer comme à l'origine du différend en matière de travail? D'un point de vue formaliste, c'est le syndicat qui est la partie demanderesse dans la procédure d'arbitrage, mais c'est la Ville qui a invoqué la déclaration de culpabilité d'Oliver comme motif de congédiement. Du point de vue de l'intégrité du processus juridictionnel, toutefois, je ne vois pas quelle différence il y a entre caractériser Oliver comme demandeur ou le caractériser comme défendeur relativement à la remise en cause de sa déclaration de culpabilité.

47

L'appelant invoque *Re Del Core*, précité, à l'appui de sa prétention que la doctrine de l'abus de procédure ne s'applique qu'aux demandeurs. Dans cet arrêt, toutefois, les juges majoritaires ne se sont pas prononcés sur la question de savoir dans quelles

48

determined in a criminal proceeding. For one, Blair J.A. did not limit the circumstances in which relitigation would amount to an abuse of process to those cases in which a person convicted sought to relitigate the validity of his conviction in subsequent proceedings which he himself had instituted (at p. 22):

The right to challenge a conviction is subject to an important qualification. A convicted person cannot attempt to prove that the conviction was wrong in circumstances where it would constitute an abuse of process to do so. . . . Courts have rejected attempts to relitigate the very issues dealt with at a criminal trial where the civil proceedings were perceived to be a collateral attack on the criminal conviction. The ambit of this qualification remains to be determined . . . . [Emphasis added.]

49    While the authorities most often cited in support of a court's power to prevent relitigation of decided issues in circumstances where issue estoppel does not apply are cases where a convicted person commenced a civil proceeding for the purpose of attacking a finding made in a criminal proceeding against that person (namely *Demeter* (H.C.), *supra*, and *Hunter*, *supra*; see also *Q. v. Minto Management Ltd.* (1984), 46 O.R. (2d) 756 (H.C.), *Franco*, *supra*, at paras. 29-31), there is no reason in principle why these rules should be limited to such specific circumstances. Several cases have applied the doctrine of abuse of process to preclude defendants from relitigating issues decided against them in a prior proceeding. See for example *Nigro v. Agnew-Surpass Shoe Stores Ltd.* (1977), 18 O.R. (2d) 215 (H.C.), at p. 218, aff'd without reference to this point (1978), 18 O.R. (2d) 714 (C.A.); *Bomac*, *supra*, at pp. 26-27; *Bjarnarson*, *supra*, at p. 39; *Germscheid v. Valois* (1989), 68 O.R. (2d) 670 (H.C.); *Simpson v. Geswein* (1995), 25 C.C.L.T. (2d) 49 (Man. Q.B.), at p. 61; *Roenisch v. Roenisch* (1991), 85 D.L.R. (4th) 540 (Alta. Q.B.), at p. 546; *Saskatoon Credit Union, Ltd. v. Central Park Enterprises Ltd.* (1988), 47 D.L.R. (4th) 431 (B.C.S.C.), at p. 438; *Canadian Tire Corp. v. Summers* (1995), 23 O.R. (3d) 106 (Gen. Div.), at p. 115; see also

circonstances, le cas échéant, l'intérêt public peut empêcher la remise en question de conclusions formulées dans une instance criminelle. Le juge Blair, notamment, n'a pas limité les circonstances permettant de conclure à l'abus de procédure aux seules affaires où une personne déclarée coupable cherche à remettre en question la validité de cette déclaration dans une instance subséquente qu'elle-même a engagée (à la p. 22) :

[TRADUCTION] Le droit de contester une déclaration de culpabilité est assorti d'une importante réserve. Une personne visée par une déclaration de culpabilité ne peut tenter de prouver que la déclaration était erronée lorsque dans les circonstances cela constituerait un abus de procédure. [. . .] Les tribunaux ont rejeté les tentatives de remettre en cause les questions mêmes qui avaient été examinées au procès criminel, dans les cas où ils estimaient que l'instance civile constituait une contestation indirecte de la déclaration de culpabilité. La portée de cette réserve reste à déterminer . . . [Je souligne.]

S'il est vrai que la jurisprudence le plus souvent citée à l'appui du pouvoir des tribunaux d'empêcher la remise en cause de questions sur lesquelles il a déjà été statué, lorsque la préclusion découlant d'une question déjà tranchée n'est pas applicable, se rapporte à des affaires où une personne déclarée coupable a intenté une action civile dans le but d'attaquer une conclusion formulée dans l'instance criminelle (savoir *Demeter* (H.C.), précité, et *Hunter*, précité; voir aussi *Q. c. Minto Management Ltd.* (1984), 46 O.R. (2d) 756 (H.C.), et *Franco*, précité, par. 29-31), il n'existe aucune raison de principe pour que ce droit ne s'exerce que dans ces circonstances. Les tribunaux ont appliqué la doctrine de l'abus de procédure à plusieurs reprises pour empêcher un défendeur de remettre en cause des conclusions formulées contre lui dans une instance antérieure. Voir notamment *Nigro c. Agnew-Surpass Shoe Stores Ltd.* (1977), 18 O.R. (2d) 215 (H.C.), p. 218, conf. sans mention de ce point par (1978), 18 O.R. (2d) 714 (C.A.); *Bomac*, précité, p. 26-27; *Bjarnarson*, précité, p. 39; *Germscheid c. Valois* (1989), 68 O.R. (2d) 670 (H.C.); *Simpson c. Geswein* (1995), 25 C.C.L.T. (2d) 49 (B.R. Man.), p. 61; *Roenisch c. Roenisch* (1991), 85 D.L.R. (4th) 540 (B.R. Alb.), p. 546; *Saskatoon Credit Union, Ltd. c. Central Park Enterprises Ltd.* (1988), 47 D.L.R. (4th) 431 (C.S.C.-B.), p. 438; *Canadian Tire*

P. M. Perell, "Res Judicata and Abuse of Process" (2001), 24 *Advocates' Q.* 189, at pp. 196-97; and Watson, *supra*, at pp. 648-51.

It has been argued that it is difficult to see how mounting a defence can be an abuse of process (see M. Teplitsky, "Prior Criminal Convictions: Are They Conclusive Proof? An Arbitrator's Perspective", in K. Whitaker et al., eds., *Labour Arbitration Yearbook 2001-2002* (2002), vol. I, 279). A common justification for the doctrine of *res judicata* is that a party should not be twice vexed in the same cause, that is, the party should not be burdened with having to relitigate the same issue (Watson, *supra*, at p. 633). Of course, a defendant may be quite pleased to have another opportunity to litigate an issue originally decided against him. A proper focus on the process, rather than on the interests of a party, will reveal why relitigation should not be permitted in such a case.

Rather than focus on the motive or status of the parties, the doctrine of abuse of process concentrates on the integrity of the adjudicative process. Three preliminary observations are useful in that respect. First, there can be no assumption that relitigation will yield a more accurate result than the original proceeding. Second, if the same result is reached in the subsequent proceeding, the relitigation will prove to have been a waste of judicial resources as well as an unnecessary expense for the parties and possibly an additional hardship for some witnesses. Finally, if the result in the subsequent proceeding is different from the conclusion reached in the first on the very same issue, the inconsistency, in and of itself, will undermine the credibility of the entire judicial process, thereby diminishing its authority, its credibility and its aim of finality.

In contrast, proper review by way of appeal increases confidence in the ultimate result and affirms both the authority of the process as well as the finality of the result. It is therefore apparent that

*Corp. c. Summers* (1995), 23 O.R. (3d) 106 (Div. gén.), p. 115; voir aussi P. M. Perell, « Res Judicata and Abuse of Process » (2001), 24 *Advocates Q.* 189, p. 196-197; et Watson, *loc. cit.*, p. 648-651.

Des auteurs ont soutenu qu'il est difficile de concevoir comment le fait de se défendre peut constituer un abus de procédure (voir M. Teplitsky, « Prior Criminal Convictions : Are They Conclusive Proof? An Arbitrator's Perspective », dans K. Whitaker et autres, dir., *Labour Arbitration Yearbook 2001-2002* (2002), vol. I, 279). On donne souvent comme raison d'être du principe de l'autorité de la chose jugée qu'une partie ne devrait pas être tracassée deux fois pour la même cause d'action, c'est-à-dire qu'on ne devrait pas lui imposer le fardeau de débattre une autre fois de la même question (Watson, *loc. cit.*, p. 633). Bien sûr, un défendeur peut se réjouir d'avoir une autre occasion de mettre en cause une question tranchée contre lui. C'est l'accent correctement mis sur le processus plutôt que sur l'intérêt des parties qui révèle pourquoi il ne devrait pas y avoir remise en cause dans un tel cas.

La doctrine de l'abus de procédure s'articule autour de l'intégrité du processus juridictionnel et non autour des motivations ou de la qualité des parties. Il convient de faire trois observations préliminaires à cet égard. Premièrement, on ne peut présumer que la remise en cause produira un résultat plus exact que l'instance originale. Deuxièmement, si l'instance subséquente donne lieu à une conclusion similaire, la remise en cause aura été un gaspillage de ressources judiciaires et une source de dépenses inutiles pour les parties sans compter les difficultés supplémentaires qu'elle aura pu occasionner à certains témoins. Troisièmement, si le résultat de la seconde instance diffère de la conclusion formulée à l'égard de la même question dans la première, l'incohérence, en soi, ébranlera la crédibilité de tout le processus judiciaire et en affaiblira ainsi l'autorité, la crédibilité et la vocation à l'irrévocabilité.

La révision de jugements par la voie normale de l'appel, en revanche, accroît la confiance dans le résultat final et confirme l'autorité du processus ainsi que l'irrévocabilité de son résultat. D'un

50

51

52

from the system's point of view, relitigation carries serious detrimental effects and should be avoided unless the circumstances dictate that relitigation is in fact necessary to enhance the credibility and the effectiveness of the adjudicative process as a whole. There may be instances where relitigation will enhance, rather than impeach, the integrity of the judicial system, for example: (1) when the first proceeding is tainted by fraud or dishonesty; (2) when fresh, new evidence, previously unavailable, conclusively impeaches the original results; or (3) when fairness dictates that the original result should not be binding in the new context. This was stated unequivocally by this Court in *Danyluk*, *supra*, at para. 80.

53    The discretionary factors that apply to prevent the doctrine of issue estoppel from operating in an unjust or unfair way are equally available to prevent the doctrine of abuse of process from achieving a similar undesirable result. There are many circumstances in which the bar against relitigation, either through the doctrine of *res judicata* or that of abuse of process, would create unfairness. If, for instance, the stakes in the original proceeding were too minor to generate a full and robust response, while the subsequent stakes were considerable, fairness would dictate that the administration of justice would be better served by permitting the second proceeding to go forward than by insisting that finality should prevail. An inadequate incentive to defend, the discovery of new evidence in appropriate circumstances, or a tainted original process may all overcome the interest in maintaining the finality of the original decision (*Danyluk*, *supra*, at para. 51; *Franco*, *supra*, at para. 55).

54    These considerations are particularly apposite when the attempt is to relitigate a criminal conviction. Casting doubt over the validity of a criminal conviction is a very serious matter. Inevitably in a case such as this one, the conclusion of the arbitrator has precisely that effect, whether this was intended

point de vue systémique, il est donc évident que la remise en cause s'accompagne de graves effets préjudiciables et qu'il faut s'en garder à moins que des circonstances n'établissent qu'elle est, dans les faits, nécessaire à la crédibilité et à l'efficacité du processus juridictionnel dans son ensemble. Il peut en effet y avoir des cas où la remise en cause pourra servir l'intégrité du système judiciaire plutôt que lui porter préjudice, par exemple : (1) lorsque la première instance est entachée de fraude ou de malhonnêteté, (2) lorsque de nouveaux éléments de preuve, qui n'avaient pu être présentés auparavant, jettent de façon probante un doute sur le résultat initial, (3) lorsque l'équité exige que le résultat initial n'ait pas force obligatoire dans le nouveau contexte. C'est ce que notre Cour a dit sans équivoque dans l'arrêt *Danyluk*, précité, par. 80.

Les facteurs discrétionnaires qui visent à empêcher que la préclusion découlant d'une question déjà tranchée ne produise des effets injustes, jouent également en matière d'abus de procédure pour éviter de pareils résultats indésirables. Il existe de nombreuses circonstances où l'interdiction de la remise en cause, qu'elle découle de l'autorité de la chose jugée ou de la doctrine de l'abus de procédure, serait source d'inéquité. Par exemple, lorsque les enjeux de l'instance initiale ne sont pas assez importants pour susciter une réaction vigoureuse et complète alors que ceux de l'instance subséquente sont considérables, l'équité commande de conclure que l'autorisation de poursuivre la deuxième instance servirait davantage l'administration de la justice que le maintien à tout prix du principe de l'irrévocabilité. Une incitation insuffisante à opposer une défense, la découverte de nouveaux éléments de preuve dans des circonstances appropriées, ou la présence d'irrégularités dans le processus initial, tous ces facteurs peuvent l'emporter sur l'intérêt qu'il y a à maintenir l'irrévocabilité de la décision initiale (*Danyluk*, précité, par. 51; *Franco*, précité, par. 55).

Ces considérations revêtent une pertinence particulière s'agissant de la tentative de remettre en cause une déclaration de culpabilité. Mettre en doute la validité d'une déclaration de culpabilité est une action très grave et, dans un cas comme celui qui nous intéresse, il est inévitable que la conclusion de

or not. The administration of justice must equip itself with all legitimate means to prevent wrongful convictions and to address any real possibility of such an occurrence after the fact. Collateral attacks and relitigation, however, are not in my view appropriate methods of redress since they inordinately tax the adjudicative process while doing nothing to ensure a more trustworthy result.

In light of the above, it is apparent that the common law doctrines of issue estoppel, collateral attack and abuse of process adequately capture the concerns that arise when finality in litigation must be balanced against fairness to a particular litigant. There is therefore no need to endorse, as the Court of Appeal did, a self-standing and independent "finality principle" either as a separate doctrine or as an independent test to preclude relitigation.

D. *Application of Abuse of Process to Facts of the Appeal*

I am of the view that the facts in this appeal point to the blatant abuse of process that results when relitigation of this sort is permitted. The grievor was convicted in a criminal court and he exhausted all his avenues of appeal. In law, his conviction must stand, with all its consequent legal effects. Yet as pointed out by Doherty J.A. (at para. 84):

Despite the arbitrator's insistence that he was not passing on the correctness of the decision made by Ferguson J., that is exactly what he did. One cannot read the arbitrator's reasons without coming to the conclusion that he was convinced that the criminal proceedings were badly flawed and that Oliver was wrongly convicted. This conclusion, reached in proceedings to which the prosecution was not even a party, could only undermine the integrity of the criminal justice system. The reasonable observer would wonder how Oliver could be found guilty beyond a reasonable doubt in one proceeding and after the Court of Appeal had affirmed that finding, be found in a separate proceeding not to have committed the very same assault. That reasonable observer would also not understand how Oliver could be found to be properly convicted of

l'arbitre ait précisément cet effet, qu'il ait été voulu ou non. L'administration de la justice doit disposer de tous les moyens légitimes propres à prévenir les déclarations de culpabilité injustifiées et à y remédier s'il s'en présente. La contestation indirecte et la remise en cause, toutefois, ne constituent pas des moyens appropriés, selon moi, car elles imposent au processus juridictionnel des contraintes excessives et ne font rien pour garantir un résultat plus fiable.

Compte tenu de ce qui précède, il est clair que les doctrines de la préclusion découlant d'une question déjà tranchée, de la contestation indirecte et de l'abus de procédure, reconnues en common law, répondent adéquatement aux préoccupations qui surgissent lorsqu'il faut pondérer le principe de l'irrévocabilité des jugements et celui de l'équité envers un justiciable particulier. Il n'est donc nul besoin, comme l'a fait la Cour d'appel, d'ériger le principe de l'irrévocabilité en doctrine distincte ou critère indépendant pour interdire la remise en cause.

D. *L'application de la doctrine de l'abus de procédure en l'espèce*

À mon avis, les faits de la présente espèce illustrent l'abus flagrant de procédure qui résulte de l'autorisation de ce type de remise en cause. L'employé avait été déclaré coupable par un tribunal criminel et il avait épuisé toutes les voies d'appel. La déclaration de culpabilité était valide en droit, avec tous les effets juridiques en découlant. Pourtant, comme l'a signalé le juge Doherty (au par. 84) :

[TRADUCTION] Même si l'arbitre s'est défendu d'avoir examiné le bien-fondé de la décision du juge Ferguson, c'est exactement ce qu'il a fait. Il est impossible de ne pas conclure, à la lecture des motifs de l'arbitre, qu'il avait la conviction que l'instance criminelle était entachée de graves erreurs et qu'Oliver avait été condamné à tort. Cette conclusion tirée à l'occasion d'une instance à laquelle la poursuite n'était pas même partie ne peut que porter atteinte à l'intégrité du système de justice criminel. Tout observateur sensé se demanderait comment il se peut qu'un tribunal ait conclu hors de tout doute raisonnable qu'Oliver était coupable, et qu'après confirmation du verdict par la Cour d'appel, il soit déterminé, dans une autre instance, qu'il n'a pas commis cette même agression. Cet observateur ne comprendrait pas non plus qu'Oliver

55

56

sexually assaulting the complainant and deserving of 15 months in jail and yet also be found in a separate proceeding not to have committed that sexual assault and to be deserving of reinstatement in a job which would place young persons like the complainant under his charge.

57    As a result of the conflicting decisions, the City of Toronto would find itself in the inevitable position of having a convicted sex offender reinstated to an employment position where he would work with the very vulnerable young people he was convicted of assaulting. An educated and reasonable public would presumably have to assess the likely correctness of one or the other of the adjudicative findings regarding the guilt of the convicted grievor. The authority and finality of judicial decisions are designed precisely to eliminate the need for such an exercise.

58    In addition, the arbitrator is considerably less well equipped than a judge presiding over a criminal court — or the jury —, guided by rules of evidence that are sensitive to a fair search for the truth, an exacting standard of proof and expertise with the very questions in issue, to come to a correct disposition of the matter. Yet the arbitrator's conclusions, if challenged, may give rise to a less searching standard of review than that of the criminal court judge. In short, there is nothing in a case like the present one that militates against the application of the doctrine of abuse of process to bar the relitigation of the grievor's criminal conviction. The arbitrator was required as a matter of law to give full effect to the conviction. As a result of that error of law, the arbitrator reached a patently unreasonable conclusion. Properly understood in the light of correct legal principles, the evidence before the arbitrator could only lead him to conclude that the City of Toronto had established just cause for Oliver's dismissal.

VI. Disposition

59    For these reasons, I would dismiss the appeal with costs.

ait pu à bon droit être reconnu coupable d'agression sexuelle contre le plaignant et condamné à quinze mois d'emprisonnement, mais qu'une autre instance donne lieu à la conclusion qu'il n'a pas commis l'agression sexuelle et qu'il doit être réintégré dans des fonctions où des jeunes comme le plaignant seraient placés sous sa surveillance.

Ces décisions contradictoires mettraient inévitablement la Ville de Toronto dans une situation où une personne condamnée pour agression sexuelle est rétablie dans un emploi qui la met en contact avec des jeunes très vulnérables comme la victime de l'agression dont elle a été déclarée coupable. On peut supposer que cela induirait le public informé et sensé à évaluer le bien-fondé de l'un ou l'autre des jugements relatifs à la culpabilité de l'employé. L'autorité et l'irrévocabilité des décisions de justice visent précisément à éliminer la nécessité d'un tel exercice.

De plus, l'arbitre est beaucoup moins en mesure de rendre une décision correcte sur la culpabilité que le juge présidant une instance criminelle — ou que le jury —, qui dispose pour le guider de règles de preuve axées sur la recherche équitable de la vérité ainsi que d'une norme de preuve exigeante, et qui a l'expérience des questions en cause. Qui plus est, la norme de contrôle applicable aux conclusions de l'arbitre, en cas de contestation, est moins exigeante que celle qui s'applique aux décisions des juges de cours criminelles. Bref, il n'y a rien, dans une affaire comme la présente espèce, qui milite contre l'application de la doctrine de l'abus de procédure pour interdire la remise en cause de la déclaration de culpabilité de l'employé. L'arbitre était juridiquement tenu de donner plein effet à la déclaration de culpabilité. L'erreur de droit qu'il a commise lui a fait tirer une conclusion manifestement déraisonnable. S'il avait bien compris la preuve et tenu compte des principes juridiques applicables, il n'aurait pu faire autrement que de conclure que la Ville de Toronto avait démontré l'existence d'un motif valable pour le congédiement d'Oliver.

VI. Dispositif

Pour ces motifs, je suis d'avis de rejeter le pourvoi avec dépens.

The reasons of LeBel and Deschamps JJ. were delivered by

LeBel J. —

## I. Introduction

I have had the benefit of reading Arbour J.'s reasons and I concur with her disposition of the case. I agree that this case is appropriately decided on the basis of the doctrine of abuse of process, rather than the narrower and more technical doctrines of either collateral attack or issue estoppel. I also agree that the appropriate standard of review for the question of whether a criminal conviction may be relitigated in a grievance proceeding is correctness. This is a question of law requiring an arbitrator to interpret not only the *Labour Relations Act, 1995*, S.O. 1995, c. 1, Sch. A, but also the *Evidence Act*, R.S.O. 1990, c. E.23, as well as to rule on the applicability of a number of common law doctrines dealing with relitigation, an issue that is, as Arbour J. notes, at the heart of the administration of justice. Finally, I agree that the arbitrator's determination in this case that Glenn Oliver's criminal conviction could indeed be relitigated during the grievance proceeding was incorrect. As a matter of law, the arbitrator was required to give full effect to Oliver's conviction. His failure to do so was sufficient to render his ultimate decision that Oliver had been dismissed without just cause — a decision squarely within the arbitrator's area of specialized expertise and thus reviewable on a deferential standard — patently unreasonable, according to the jurisprudence of our Court.

While I agree with Arbour J.'s disposition of the appeal, I am of the view that the administrative law aspects of this case require further discussion. In my concurring reasons in *Chamberlain v. Surrey School District No. 36*, [2002] 4 S.C.R.

Version française des motifs des juges LeBel et Deschamps rendus par

Le juge LeBel —

## I. Introduction

J'ai pris connaissance des motifs de la juge Arbour et je souscris au dispositif qu'elle propose dans le présent pourvoi. Je conviens que le sort de ce pourvoi doit être réglé en fonction de l'abus de procédure, et non des principes plus restreints et plus techniques de la contestation indirecte ou de la préclusion découlant d'une question déjà tranchée (*issue estoppel*). Je conviens également que la norme de contrôle appropriée est celle de la décision correcte, à l'égard de la question de la remise en cause d'une déclaration de culpabilité dans le cadre d'une procédure de grief. La nature de cette question de droit demandait de l'arbitre qu'il interprète non seulement la *Loi de 1995 sur les relations de travail*, L.O. 1995, ch. 1, ann. A, mais aussi la *Loi sur la preuve*, L.R.O. 1990, ch. E.23, et qu'il statue sur l'applicabilité d'un certain nombre de principes de common law portant sur la remise en cause de questions déjà décidées dans le cadre d'un litige antérieur. Comme le fait remarquer la juge Arbour, ce problème se situe au cœur de l'administration de la justice. Enfin, je conviens que la décision de l'arbitre qui permettait de remettre la déclaration de culpabilité de Glenn Oliver en cause pendant l'examen du grief n'était pas correcte. Légalement, l'arbitre devait donner pleinement effet à cette déclaration de culpabilité. L'omission de le faire a suffi pour rendre manifestement déraisonnable, suivant la jurisprudence de notre Cour, la décision finale selon laquelle Oliver avait été congédié sans motif valable — une décision qui ressortissait entièrement au domaine d'expertise de l'arbitre et devait donc faire l'objet d'un contrôle selon une norme commandant la déférence.

Même si je suis d'accord avec la conclusion de la juge Arbour en l'espèce, j'estime opportun d'approfondir l'examen des aspects du pourvoi relevant du droit administratif. Dans mes motifs concourants dans *Chamberlain c. Surrey School*

60

61

2003 SCC 63 (CanLII)

710, 2002 SCC 86, I raised concerns about the appropriateness of treating the pragmatic and functional methodology as an overarching analytical framework for substantive judicial review that must be applied, without variation, in all administrative law contexts, including those involving non-adjudicative decision makers. In certain circumstances, such as those at issue in *Chamberlain* itself, applying this methodological approach in order to determine the appropriate standard of review may in fact obscure the real issue before the reviewing court.

62    In the instant appeal and the appeal in *Ontario v. O.P.S.E.U.*, [2003] 3 S.C.R. 149, 2003 SCC 64, released concurrently, both of which involve judicial review of adjudicative decision makers, my concern is not with the applicability of the pragmatic and functional approach itself. Having said this, I would note that in a case such as this one, where the question at issue is so clearly a question of law that is both of central importance to the legal system as a whole and outside the adjudicator's specialized area of expertise, it is unnecessary for the reviewing court to perform a detailed pragmatic and functional analysis in order to reach a standard of review of correctness. Indeed, in such circumstances reviewing courts should avoid adopting a mechanistic approach to the determination of the appropriate standard of review, which risks reducing the pragmatic and functional analysis from a contextual, flexible framework to little more than a *pro forma* application of a checklist of factors (see *C.U.P.E. v. Ontario (Minister of Labour)*, [2003] 1 S.C.R. 539, 2003 SCC 29, at para. 149; *Dr. Q v. College of Physicians and Surgeons of British Columbia*, [2003] 1 S.C.R. 226, 2003 SCC 19, at para. 26; *Chamberlain*, *supra*, at para. 195, *per* LeBel J.).

63    The more particular concern that emerges out of this case and *Ontario v. O.P.S.E.U.* relates to what in my view is growing criticism with the ways in which the standards of review currently available within the

*District No. 36*, [2002] 4 R.C.S. 710, 2002 CSC 86, j'ai soulevé quelques inquiétudes quant au caractère approprié d'une approche qui traiterait la méthode pragmatique et fonctionnelle comme cadre d'analyse fondamental destiné à s'appliquer sans flexibilité lors du contrôle judiciaire sur le fond dans toutes les affaires de droit administratif, y compris celles relatives à la décision d'une instance juridictionnelle. Dans certaines circonstances, comme celles de *Chamberlain*, le recours à ce cadre d'analyse pour circonscrire la norme de contrôle appropriée risque d'occulter la véritable question que doit trancher la cour de justice chargée du contrôle.

Dans le présent pourvoi et *Ontario c. S.E.E.F.P.O.*, [2003] 3 R.C.S. 149, 2003 CSC 64, sur lesquels statue simultanément notre Cour et qui portent tous deux sur le contrôle judiciaire de la décision d'une instance juridictionnelle, je ne suis pas préoccupé par l'applicabilité de l'analyse pragmatique et fonctionnelle proprement dite. Cependant, lorsque, comme en l'espèce, la question en litige constitue si clairement une question de droit, à la fois, d'une importance capitale pour le système juridique dans son ensemble et étrangère au domaine d'expertise de l'arbitre, il devient inutile qu'une cour se livre à une analyse pragmatique et fonctionnelle détaillée pour identifier une norme de contrôle fondée sur la décision correcte. En pareilles circonstances, pour déterminer la norme de contrôle applicable, la cour doit en fait éviter d'adopter une démarche rigide. En effet, celle-ci risquerait de réduire l'analyse pragmatique et fonctionnelle et le cadre souple et contextuel qu'elle offre à la vérification et à l'application pure et simple d'une liste de facteurs prédéterminés (voir *S.C.F.P. c. Ontario (Ministre du Travail)*, [2003] 1 R.C.S. 539, 2003 CSC 29, par. 149; *Dr Q c. College of Physicians and Surgeons of British Columbia*, [2003] 1 R.C.S. 226, 2003 CSC 19, par. 26; *Chamberlain*, précité, par. 195, le juge LeBel).

La présente espèce et le pourvoi connexe *Ontario c. S.E.E.F.P.O.* soulèvent une question plus particulière, celle des préoccupations croissantes liées à la manière dont sont conçues et appliquées les normes

pragmatic and functional framework are conceived of and applied. Academic commentators and practitioners have raised some serious questions as to whether the conceptual basis for each of the existing standards has been delineated with sufficient clarity by this Court, with much of the criticism directed at what has been described as "epistemological" confusion over the relationship between patent unreasonableness and reasonableness *simpliciter* (see, for example, D. J. Mullan, "Recent Developments in Standard of Review", in Canadian Bar Association (Ontario), *Taking the Tribunal to Court: A Practical Guide for Administrative Law Practitioners* (2000), at p. 26; J. G. Cowan, "The Standard of Review: The Common Sense Evolution?", paper presented to the Administrative Law Section Meeting, Ontario Bar Association, January 21, 2003, at p. 28; F. A. V. Falzon, "Standard of Review on Judicial Review or Appeal", in *Administrative Justice Review Background Papers: Background Papers prepared by Administrative Justice Project for the Attorney General of British Columbia* (2002), at pp. 32-33). Reviewing courts too, have occasionally expressed frustration over a perceived lack of clarity in this area, as the comments of Barry J. in *Miller v. Workers' Compensation Commission (Nfld.)* (1997), 154 Nfld. & P.E.I.R. 52 (Nfld. S.C.T.D.), at para. 27, illustrate:

In attempting to follow the court's distinctions between "patently unreasonable", "reasonable" and "correct", one feels at times as though one is watching a juggler juggle three transparent objects. Depending on the way the light falls, sometimes one thinks one can see the objects. Other times one cannot and, indeed, wonders whether there are really three distinct objects there at all.

The Court cannot remain unresponsive to sustained concerns or criticism coming from the legal community in relation to the state of Canadian jurisprudence in this important part of the law. It is true that the parties to this appeal made no submissions putting into question the standards of review jurisprudence. Nevertheless, at times, an in-depth discussion or review of the state of the law may become necessary despite the absence of particular

de contrôle qu'offre actuellement l'analyse pragmatique et fonctionnelle. Des auteurs et avocats ont affirmé douter sérieusement que notre Cour ait exposé de manière suffisamment claire le fondement théorique de chacune des normes existantes. Une bonne partie de leurs critiques vise ce qu'ils ont qualifié de confusion « épistémologique » qui entourerait la relation entre le manifestement déraisonnable et le raisonnable *simpliciter* (voir, par exemple, D. J. Mullan, « Recent Developments in Standard of Review », dans l'Association du Barreau canadien (Ontario), *Taking the Tribunal to Court : A Practical Guide for Administrative Law Practitioners* (2000), p. 26; J. G. Cowan, « The Standard of Review : The Common Sense Evolution? », exposé présenté initialement à la rencontre de la section du droit administratif, Association du Barreau de l'Ontario, 21 janvier 2003, p. 28; F. A. V. Falzon, « Standard of Review on Judicial Review or Appeal », dans *Administrative Justice Review Background Papers : Background Papers prepared by Administrative Justice Project for the Attorney General of British Columbia* (2002), p. 32-33). Les cours de justice chargées de contrôles ont parfois également exprimé de la frustration à l'égard de ce qu'elles perçoivent comme un manque apparent de clarté dans ce domaine, comme l'illustrent les propos du juge Barry dans *Miller c. Workers' Compensation Commission (Nfld.)* (1997), 154 Nfld. & P.E.I.R. 52 (C.S.T.-N. (1$^{re}$ inst.)), par. 27 :

[TRADUCTION] Tenter de comprendre les distinctions établies par la cour entre la décision « manifestement déraisonnable », « raisonnable » ou « correcte » s'apparente parfois à observer un jongleur maniant trois objets transparents. Selon l'éclairage, à certains moments l'on croit apercevoir les objets. Mais à d'autres, l'on ne voit rien et l'on se demande en fait s'il y a vraiment trois objets distincts.

La Cour ne peut rester insensible aux préoccupations ou critiques constantes de la communauté juridique concernant l'état de la jurisprudence canadienne dans une partie importante du droit. Il est vrai que les parties au présent pourvoi n'ont pas présenté d'observations qui remettaient en cause la jurisprudence en matière de normes de contrôle. Il n'en reste pas moins qu'à l'occasion une analyse ou un examen en profondeur de l'état du droit

64

representations in a specific case. Given its broad application, the law governing the standards of review must be predictable, workable and coherent. Parties to litigation often have no personal stake in assuring the coherence of our standards of review jurisprudence as a whole and the consistency of their application. Their purpose, understandably, is to show how the positions they advance conform with the law as it stands, rather than to suggest improvements of that law for the benefit of the common good. The task of maintaining a predictable, workable and coherent jurisprudence falls primarily on the judiciary, preferably with, but exceptionally without, the benefit of counsel. I would add that, although the parties made no submissions on the analysis that I propose to undertake in these reasons, they will not be prejudiced by it.

65     In this context, this case provides an opportunity to reevaluate the contours of the various standards of review, a process that in my view is particularly important with respect to patent unreasonableness. To this end, I review below:

– the interplay between correctness and patent unreasonableness both in the instant case and, more broadly, in the context of judicial review of adjudicative decision makers generally, with a view to elucidating the conflicted relationship between these two standards; and,

– the distinction between patent unreasonableness and reasonableness *simpliciter*, which, despite a number of attempts at clarification, remains a nebulous one.

66     As the analysis that follows indicates, the patent unreasonableness standard does not currently provide sufficiently clear parameters for reviewing courts to apply in assessing the decisions of administrative adjudicators. From the beginning, patent unreasonableness at times shaded uncomfortably into what should presumably be its antithesis, the correctness review. Moreover, it is increasingly difficult to distinguish from what is ostensibly its less

peut s'avérer nécessaire malgré l'absence d'observations particulières dans une espèce donnée. Étant donné leur vaste domaine d'application, les règles de droit qui régissent les normes de contrôle doivent être prévisibles, pratiques et cohérentes. Les parties à un litige n'ont souvent aucun intérêt personnel à assurer la cohérence globale de notre jurisprudence en matière de normes de contrôle et l'uniformité de son application. Leur objectif, bien compréhensible, consiste à démontrer en quoi les positions qu'elles avancent sont conformes aux règles de droit telles qu'elles existent, et non de suggérer des améliorations à ces règles pour le bénéfice du bien commun. La tâche d'assurer le caractère prévisible, pratique et cohérent de la jurisprudence incombe en premier lieu aux juges, tâche qu'ils accomplissent de préférence avec, mais exceptionnellement sans le concours des avocats. J'ajouterais que, même si les parties n'ont pas présenté d'observations sur l'analyse que je me propose d'entreprendre dans les présents motifs, elles n'en subiront aucun préjudice.

Dans ce contexte, le présent pourvoi nous offre l'occasion de réévaluer les contours des différentes normes de contrôle, ce qui s'impose particulièrement, selon moi, à l'égard de la norme du manifestement déraisonnable. J'examinerai donc :

– l'interaction entre la décision correcte et la décision manifestement déraisonnable, tant en l'espèce que dans le contexte du contrôle judiciaire de la décision d'une instance juridictionnelle en général, afin de clarifier la relation conflictuelle entre ces deux normes;

– la distinction entre le manifestement déraisonnable et le raisonnable *simpliciter*, qui demeure nébuleuse malgré bien des tentatives d'explication.

Comme le confirme l'analyse qui suit, à l'heure actuelle, la norme de la décision manifestement déraisonnable n'offre pas aux cours de justice des paramètres suffisamment clairs pour contrôler les décisions des tribunaux administratifs. Dès le début, la norme du manifestement déraisonnable a parfois été confondue, de manière préoccupante, avec ce qui devrait être son antithèse, la norme de la décision correcte. En outre, il devient de plus en plus

deferential counterpart, reasonableness *simpliciter*. It remains to be seen how these difficulties can be addressed.

## II.  Analysis

### A.  *The Two Standards of Review Applicable in This Case*

Two standards of review are at issue in this case, and the use of correctness here requires some preliminary discussion. As I noted in brief above, certain fundamental legal questions — for instance, constitutional and human rights questions and those involving civil liberties, as well as other questions that are of central importance to the legal system as a whole, such as the issue of relitigation — typically fall to be decided on a correctness standard. Indeed, in my view, it will rarely be necessary for reviewing courts to embark on a comprehensive application of the pragmatic and functional approach in order to reach this conclusion. I would not, however, want either my comments in this regard or the majority reasons in this case to be taken as authority for the proposition that correctness is the appropriate standard whenever arbitrators or other specialized administrative adjudicators are required to interpret and apply general common law or civil law rules. Such an approach would constitute a broad expansion of judicial review under a standard of correctness and would significantly impede the ability of administrative adjudicators, particularly in complex and highly specialized fields such as labour law, to develop original solutions to legal problems, uniquely suited to the context in which they operate. In my opinion, in many instances the appropriate standard of review in respect of the application of general common or civil law rules by specialized adjudicators should not be one of correctness, but rather of reasonableness. I now turn to a brief discussion of the rationale behind this view.

difficile de distinguer la norme de ce qui est réputé représenter sa contrepartie, commandant une moins grande déférence, la norme de la décision raisonnable *simpliciter*. Il reste à voir comment il est possible de résoudre ces difficultés.

## II.  Analyse

### A.  *Les deux normes de contrôle applicables en l'espèce*

Deux normes de contrôle entrent en jeu en l'espèce, et certaines précisions s'imposent au préalable sur l'application de la norme de la décision correcte. Comme je l'ai déjà signalé brièvement, certaines questions de droit fondamentales — notamment en ce qui concerne la Constitution et les droits de la personne, de même que les libertés civiles, ainsi que d'autres questions revêtant une importance centrale pour le système juridique dans son ensemble, comme celle de la remise en cause — commandent généralement l'application de la norme de la décision correcte. À mon avis, la cour de justice chargée du contrôle devra rarement se livrer à l'analyse pragmatique et fonctionnelle de manière exhaustive pour conclure en ce sens. Je ne voudrais pas, cependant, que l'on déduise de mes propos à ce sujet ou des motifs des juges majoritaires en l'espèce qu'il faut appliquer la norme de la décision correcte chaque fois qu'un arbitre ou une autre instance administrative spécialisée est appelé à interpréter et à appliquer les règles générales de la common law ou du droit civil. S'il en allait ainsi, le contrôle judiciaire selon la norme de la décision correcte verrait sa portée s'accroître sensiblement. Une telle approche rendrait les tribunaux administratifs moins aptes, spécialement dans les domaines complexes et très spécialisés comme le droit du travail, à apporter à un problème juridique une solution originale particulièrement adaptée au contexte. À mon sens, dans bien des cas, la norme de contrôle appropriée à l'application des règles générales de la common law et du droit civil par un tribunal spécialisé ne devrait pas être la norme de la décision correcte mais plutôt celle de la décision raisonnable. De brèves explications s'imposent.

2003 SCC 63 (CanLII)

67

### (1) The Correctness Standard of Review

68    This Court has repeatedly stressed the importance of judicial deference in the context of labour law. Labour relations statutes typically bestow broad powers on arbitrators and labour boards to resolve the wide range of problems that may arise in this field and protect the decisions of these adjudicators by privative clauses. Such legislative choices reflect the fact that, as Cory J. noted in *Toronto (City) Board of Education v. O.S.S.T.F., District 15*, [1997] 1 S.C.R. 487, at para. 35, the field of labour relations is "sensitive and volatile" and "[i]t is essential that there be a means of providing speedy decisions by experts in the field who are sensitive to the situation, and which can be considered by both sides to be final and binding" (see also *Canada (Attorney General) v. Public Service Alliance of Canada*, [1993] 1 S.C.R. 941 ("*PSAC*"), at pp. 960-61; and *Ivanhoe inc. v. UFCW, Local 500*, [2001] 2 S.C.R. 565, 2001 SCC 47, at para. 32). The application of a standard of review of correctness in the context of judicial review of labour adjudication is thus rare.

69    While in this case and in *Ontario v. O.P.S.E.U.* I agree that correctness is the appropriate standard of review for the arbitrator's decision on the relitigation question, I think it necessary to sound a number of notes of caution in this regard. It is important to stress, first, that while the arbitrator was required to be correct on this question of law, this did not open his decision as a whole to review on a correctness standard (see *Canadian Broadcasting Corp. v. Canada (Labour Relations Board)*, [1995] 1 S.C.R. 157, at para. 48). The arbitrator was entitled to deference in the determination of whether Oliver was dismissed without just cause. To say that, in the circumstances of this case, the arbitrator's incorrect decision on the question of law affected the overall reasonableness of his decision, is very different from saying that the arbitrator's finding on the ultimate

### (1) La norme de la décision correcte

Notre Cour a à maintes reprises souligné l'importance de la déférence judiciaire dans le domaine du droit du travail. En général, les lois régissant les relations de travail confèrent aux arbitres et aux commissions ou conseils des relations de travail de larges pouvoirs pour le règlement de la vaste gamme de problèmes susceptibles de se poser dans ce domaine et elles font bénéficier les décisions de ces instances de la protection d'une clause privative. Si le législateur en a décidé ainsi c'est que, comme l'a signalé le juge Cory dans *Conseil de l'éducation de Toronto (Cité) c. F.E.E.E.S.O., district 15*, [1997] 1 R.C.S. 487, par. 35, le domaine des relations de travail est « délicat et explosif » et « [i]l est essentiel de disposer d'un moyen de pourvoir à la prise de décisions rapides, par des experts du domaine sensibles à la situation, décisions qui peuvent être considérées définitives par les deux parties » (voir également *Canada (Procureur général) c. Alliance de la fonction publique du Canada*, [1993] 1 R.C.S. 941 (« *AFPC* »), p. 960-961; *Ivanhoe inc. c. TUAC, section locale 500*, [2001] 2 R.C.S. 565, 2001 CSC 47, par. 32). Il est donc rare qu'une cour de justice appelée à contrôler une décision en matière de relations de travail applique la norme de la décision correcte.

En l'espèce et dans *Ontario c. S.E.E.F.P.O.*, je conviens qu'il y a lieu d'appliquer la norme de la décision correcte à la décision de l'arbitre relative à la remise en cause de la déclaration de la culpabilité, mais un certain nombre de mises en garde me paraissent indispensables. Tout d'abord, même si l'arbitre était tenu de rendre une décision correcte relativement à cette question de droit, ceci n'entraînait pas pour autant l'application d'un contrôle fondé sur la norme de la décision correcte à l'ensemble de sa décision (voir *Société Radio-Canada c. Canada (Conseil des relations du travail)*, [1995] 1 R.C.S. 157, par. 48). La déférence s'imposait à l'égard de la décision de l'arbitre sur l'existence d'un motif de congédiement valable dans le cas d'Oliver. Dire que, compte tenu des faits de l'espèce, la décision incorrecte de l'arbitre concernant la question de

question of just cause had to be correct. To fail to make this distinction would be to risk "substantially expand[ing] the scope of reviewability of administrative decisions, and unjustifiably so" (see *Canadian Broadcasting Corp.*, *supra*, at para. 48).

Second, it bears repeating that the application of correctness here is very much a product of the nature of this particular legal question: determining whether relitigating an employee's criminal conviction is permissible in an arbitration proceeding is a question of law involving the interpretation of the arbitrator's constitutive statute, an external statute, and a complex body of common law rules and conflicting jurisprudence. More than this, it is a question of fundamental importance and broad applicability, with serious implications for the administration of justice as a whole. It is, in other words, a question that engages the expertise and essential role of the courts. It is not a question on which arbitrators may be said to enjoy any degree of relative institutional competence or expertise. As a result, it is a question on which the arbitrator must be correct.

This Court has been very careful to note, however, that not all questions of law must be reviewed under a standard of correctness. As a prefatory matter, as the Court has observed, in many cases it will be difficult to draw a clear line between questions of fact, mixed fact and law, and law; in reality, such questions are often inextricably intertwined (see *Pushpanathan v. Canada (Minister of Citizenship and Immigration)*, [1998] 1 S.C.R. 982, at para. 37; *Canada (Director of Investigation and Research) v. Southam Inc.*, [1997] 1 S.C.R. 748, at para. 37). More to the point, as Bastarache J. stated in *Pushpanathan*, *supra*, "even pure questions of law may be granted a wide degree of deference where other factors of the pragmatic and functional analysis suggest that such deference is the legislative intention"

droit a eu une incidence sur le caractère raisonnable de l'ensemble de sa décision diffère sensiblement de l'affirmation selon laquelle la décision de l'arbitre sur la question ultime du congédiement injustifié devait être correcte. L'absence d'une telle distinction risque de provoquer un « élargissement considérable et injustifié des possibilités de contrôler les décisions administratives » (voir *Société Radio-Canada*, précité, par. 48).

70

Deuxièmement, il importe de rappeler que, en l'espèce, l'application de la norme de la décision correcte est intimement liée à la nature de cette question de droit en particulier : la déclaration de culpabilité d'un employé peut-elle être remise en cause dans le cadre d'un arbitrage? Cette question de droit exigeait l'interprétation de la loi constitutive de l'instance administrative, une mesure législative extrinsèque, ainsi que d'un ensemble complexe de règles de common law et d'une jurisprudence contradictoire. Qui plus est, il s'agit d'une question d'une importance fondamentale, de grande portée et susceptible d'avoir de graves répercussions sur l'administration de la justice dans son ensemble. En d'autres termes, cette question mettait en jeu l'expertise et le rôle essentiel des cours de justice. L'on ne saurait prétendre que le décideur jouit à son égard d'une quelconque compétence ou expertise institutionnelle relative. Par conséquent, sa décision doit être correcte sur ce point.

Cependant, notre Cour s'est montrée très prudente en signalant que toute décision sur une question de droit n'était pas assujettie à la norme de la décision correcte. Tout d'abord, comme notre Cour l'a fait observer, dans bien des cas il est difficile d'établir une ligne de démarcation claire entre une question de fait, une question mixte de fait et de droit et une question de droit; en fait, ces questions sont souvent inextricablement liées (voir *Pushpanathan c. Canada (Ministre de la Citoyenneté et de l'Immigration)*, [1998] 1 R.C.S. 982, par. 37; *Canada (Directeur des enquêtes et recherches) c. Southam Inc.*, [1997] 1 R.C.S. 748, par. 37). De manière encore plus précise, comme l'a écrit le juge Bastarache dans *Pushpanathan*, précité, « il peut convenir de faire preuve d'un degré élevé de retenue même à l'égard de pures questions de

71

(para. 37). The critical factor in this respect is expertise.

72    As Bastarache J. noted in *Pushpanathan*, *supra*, at para. 34, once a "broad relative expertise has been established", this Court has been prepared to show "considerable deference even in cases of highly generalized statutory interpretation where the instrument being interpreted is the tribunal's constituent legislation": see, for example, *Pezim v. British Columbia (Superintendent of Brokers)*, [1994] 2 S.C.R. 557, and *National Corn Growers Assn. v. Canada (Import Tribunal)*, [1990] 2 S.C.R. 1324. This Court has also held that, while administrative adjudicators' interpretations of external statutes "are generally reviewable on a correctness standard", an exception to this general rule may occur, and deference may be appropriate, where "the external statute is intimately connected with the mandate of the tribunal and is encountered frequently as a result": see *Toronto (City) Board of Education*, *supra*, at para. 39; *Canadian Broadcasting Corp.*, *supra*, at para. 48. And, perhaps most importantly in light of the issues raised by this case, the Court has held that deference may be warranted where an administrative adjudicator has acquired expertise through its experience in the application of a general common or civil law rule in its specialized statutory context: see *Ivanhoe*, *supra*, at para. 26; L'Heureux-Dubé J. (dissenting) in *Canada (Attorney General) v. Mossop*, [1993] 1 S.C.R. 554, at pp. 599-600, endorsed in *Pushpanathan*, *supra*, at para. 37.

73    In the field of labour relations, general common and civil law questions are often closely intertwined with the more specific questions of labour law. Resolving general legal questions may thus be an important component of the work of some administrative adjudicators in this field. To subject all such decisions to correctness review would be to expand the scope of judicial review considerably beyond what the legislature intended, fundamentally undermining the ability of labour adjudicators to develop

droit, si d'autres facteurs de l'analyse pragmatique et fonctionnelle semblent indiquer que cela correspond à l'intention du législateur » (par. 37). Le facteur crucial à cet égard demeure l'expertise.

Comme le juge Bastarache l'a signalé dans *Pushpanathan*, précité, par. 34, « une fois établie l'expertise relative », notre Cour s'est montrée disposée à faire preuve « de beaucoup de retenue même dans des cas faisant jouer des questions très générales d'interprétation de la loi, si le texte en cause est la loi constitutive du tribunal » : voir par exemple *Pezim c. Colombie-Britannique (Superintendent of Brokers)*, [1994] 2 R.C.S. 557, et *National Corn Growers Assn. c. Canada (Tribunal des importations)*, [1990] 2 R.C.S. 1324. Notre Cour a par ailleurs statué que même si les interprétations de mesures législatives intrinsèques par les tribunaux administratifs « peuvent généralement faire l'objet d'un examen selon la norme de la décision correcte », des exceptions peuvent exister à cette règle générale et la déférence peut s'imposer lorsque « la loi est intimement liée au mandat du tribunal et [que] celui-ci est souvent appelé à l'examiner » : voir *Conseil de l'éducation de Toronto (Cité)*, précité, par. 39; *Société Radio-Canada*, précité, par. 48. Et, ce qui importe peut-être davantage à la lumière des questions que soulève le présent pourvoi, notre Cour a décidé que la déférence peut s'imposer lorsque, avec le temps, le tribunal administratif a acquis une expertise dans l'application d'une règle générale de common law ou de droit civil dans son domaine spécialisé : voir *Ivanhoe*, précité, par. 26; la juge L'Heureux-Dubé (dissidente), dans *Canada (Procureur général) c. Mossop*, [1993] 1 R.C.S. 554, p. 599-600, motifs approuvés dans *Pushpanathan*, précité, par. 37.

Dans le domaine des relations de travail, les questions générales relevant de la common law et du droit civil se trouvent souvent étroitement imbriquées avec celles qui relèvent plus particulièrement du droit du travail. Le règlement de questions de droit générales peut donc constituer un aspect important de la tâche dévolue à certains tribunaux administratifs dans ce domaine. L'assujettissement de toutes ces décisions à la norme de décision correcte donnerait au contrôle judiciaire une portée

a body of jurisprudence that is tailored to the specialized context in which they operate.

Where an administrative adjudicator must decide a general question of law in the course of exercising its statutory mandate, that determination will typically be entitled to deference (particularly if the adjudicator's decisions are protected by a privative clause), inasmuch as the general question of law is closely connected to the adjudicator's core area of expertise. This was essentially the holding of this Court in *Ivanhoe*, *supra*. In *Ivanhoe*, after noting the presence of a privative clause, Arbour J. held that, while the question at issue involved both civil and labour law, the labour commissioners and the Labour Court were entitled to deference because "they have developed special expertise in this regard which is adapted to the specific context of labour relations and which is not shared by the courts" (para. 26; see also *Pasiechnyk v. Saskatchewan (Workers' Compensation Board)*, [1997] 2 S.C.R. 890). This appeal does not represent a departure from this general principle.

The final note of caution that I think must be sounded here relates to the application of two standards of review in this case. This Court has recognized on a number of occasions that it may, in certain circumstances, be appropriate to apply different standards of deference to different decisions taken by an administrative adjudicator in a single case (see *Pushpanathan*, *supra*, at para. 49; *Macdonell v. Quebec (Commission d'accès à l'information)*, [2002] 3 S.C.R. 661, 2002 SCC 71, at para. 58, *per* Bastarache and LeBel JJ., dissenting). This case provides an example of one type of situation where this may be the proper approach. It involves a fundamental legal question falling outside the arbitrator's area of expertise. This legal question, though foundational to the decision as a whole, is easily differentiated from a second question on which the arbitrator was entitled to deference: the determination of whether there was just cause for Oliver's dismissal.

However, as I have noted above, the fact that the question adjudicated by the arbitrator in this case can

beaucoup plus grande que celle voulue par le législateur, ce qui affaiblirait fondamentalement la capacité des tribunaux du travail à développer une jurisprudence adaptée à ce domaine spécialisé.

74 Lorsqu'un tribunal administratif doit trancher une question de droit générale dans l'accomplissement de son mandat légal, sa décision fera généralement l'objet de déférence (surtout en présence d'une clause privative), pour autant que la question soit étroitement liée au domaine d'expertise fondamentale du tribunal. C'est ce qu'a essentiellement conclu notre Cour dans *Ivanhoe*, précité, où, après avoir relevé l'existence d'une clause privative, la juge Arbour a ajouté que, même si la question en litige relevait tant du droit civil que du droit du travail, les commissaires du travail et le tribunal du travail avaient droit à la déférence judiciaire parce qu'ils « ont développé [. . .] une expertise particulière en la matière, adaptée au contexte spécifique des relations de travail, qui n'est pas partagée par les cours de justice » (par. 26; voir également *Pasiechnyk c. Saskatchewan (Workers' Compensation Board)*, [1997] 2 R.C.S. 890). Dans le présent pourvoi, notre Cour ne déroge pas à ce principe général.

75 La dernière mise en garde qui s'impose selon moi a trait à l'application de deux normes de contrôle en l'espèce. Notre Cour a reconnu à un certain nombre d'occasions que les différentes décisions d'un tribunal administratif dans une affaire donnée peuvent commander différents degrés de déférence, selon les circonstances (voir *Pushpanathan*, précité, par. 49; *Macdonell c. Québec (Commission d'accès à l'information)*, [2002] 3 R.C.S. 661, 2002 CSC 71, par. 58, les juges Bastarache et LeBel, dissidents). Ce pourrait être le cas dans la présente affaire où l'arbitre a statué sur une question de droit fondamentale échappant à son domaine d'expertise. Cette question de droit, malgré son caractère fondamental pour l'appréciation de la décision dans son ensemble, se distingue aisément d'une deuxième question pour laquelle la décision de l'arbitre appelait la déférence : Oliver a-t-il été congédié pour un motif valable?

76 Toutefois, je le répète, même si la question tranchée par l'arbitre en l'espèce peut se scinder en

be separated into two distinct issues, one of which is reviewable on a correctness standard, should not be taken to mean that this will often be the case. Such cases are rare; the various strands that go into a decision are more likely to be inextricably intertwined, particularly in a complex field such as labour relations, such that the reviewing court should view the adjudicator's decision as an integrated whole.

#### (2) The Patent Unreasonableness Standard of Review

77   In these reasons, I explore the way in which patent unreasonableness is currently functioning, having regard to the relationships between this standard and both correctness and reasonableness *simpliciter*. My comments in this respect are intended to have application in the context of judicial review of adjudicative administrative decision making.

#### (a) *The Definitions of Patent Unreasonableness*

78   This Court has set out a number of definitions of "patent unreasonableness", each of which is intended to indicate the high degree of deference inherent in this standard of review. There is some overlap between the definitions and they are often used in combination. I would characterize the two main definitional strands as, first, those that emphasize the magnitude of the defect necessary to render a decision patently unreasonable and, second, those that focus on the "immediacy or obviousness" of the defect, and thus the relative invasiveness of the review necessary to find it.

79   In considering the leading definitions, I would place in the first category Dickson J.'s (as he then was) statement in *Canadian Union of Public Employees, Local 963 v. New Brunswick Liquor Corp.*, [1979] 2 S.C.R. 227 ("*CUPE*"), that a decision will only be patently unreasonable if it "cannot be rationally supported by the relevant legislation" (p. 237). Cory J.'s characterization in *PSAC*, *supra*, of patent unreasonableness as a "very strict test",

deux questions distinctes dont l'une peut faire l'objet d'un contrôle judiciaire fondé sur la norme de la décision correcte, cela n'arrive que rarement. Les divers éléments qui sous-tendent une décision ont plus de chance d'être inextricablement liés les uns aux autres, en particulier dans un domaine complexe comme celui des relations de travail, de sorte que la cour de justice chargée du contrôle doit considérer que la décision du tribunal forme un tout.

#### (2) La norme de la décision manifestement déraisonnable

Dans les présents motifs, je me penche sur la manière dont le critère de la décision manifestement déraisonnable s'applique à l'heure actuelle, compte tenu des liens existant entre cette norme et celles de la décision correcte et de la décision raisonnable *simpliciter*. Mes observations à cet égard valent dans le contexte du contrôle judiciaire de la décision d'une instance administrative de nature juridictionnelle.

#### a) *Les définitions du caractère manifestement déraisonnable*

Notre Cour a donné un certain nombre de définitions du « caractère manifestement déraisonnable », chacune d'elles devant indiquer le degré élevé de déférence inhérent à cette norme de contrôle. L'on observe un chevauchement entre les définitions, qui sont souvent combinées les unes aux autres. Elles appartiennent à deux catégories principales. La première met l'accent sur l'importance du défaut requis pour qu'une décision soit manifestement déraisonnable. La deuxième insiste sur le caractère « flagrant ou évident » du défaut et, par conséquent, sur le caractère plus ou moins envahissant du contrôle nécessaire à sa mise au jour.

Pour analyser les principales définitions, je mettrais dans la première catégorie celle du juge Dickson (plus tard Juge en chef) dans *Syndicat canadien de la Fonction publique, section locale 963 c. Société des alcools du Nouveau-Brunswick*, [1979] 2 R.C.S. 227 (« *SCFP* ») : une décision n'est manifestement déraisonnable que si elle est « déraisonnable au point de ne pouvoir rationnellement s'appuyer sur la législation pertinente »

which will only be met where a decision is "clearly irrational, that is to say evidently not in accordance with reason" (pp. 963-64), would also fit into this category (though it could, depending on how it is read, be placed in the second category as well).

In the second category, I would place Iacobucci J.'s description in *Southam*, *supra*, of a patently unreasonable decision as one marred by a defect that is characterized by its "immediacy or obviousness": "If the defect is apparent on the face of the tribunal's reasons, then the tribunal's decision is patently unreasonable. But if it takes some significant searching or testing to find the defect, then the decision is unreasonable but not patently unreasonable" (para. 57).

More recently, in *Law Society of New Brunswick v. Ryan*, [2003] 1 S.C.R. 247, 2003 SCC 20, Iacobucci J. characterized a patently unreasonable decision as one that is "so flawed that no amount of curial deference can justify letting it stand", drawing on both of the definitional strands that I have identified in formulating this definition. He wrote, at para. 52:

In *Southam*, *supra*, at para. 57, the Court described the difference between an unreasonable decision and a patently unreasonable one as rooted "in the immediacy or obviousness of the defect". Another way to say this is that a patently unreasonable defect, once identified, can be explained simply and easily, leaving no real possibility of doubting that the decision is defective. A patently unreasonable decision has been described as "clearly irrational" or "evidently not in accordance with reason" (*Canada (Attorney General) v. Public Service Alliance of Canada*, [1993] 1 S.C.R. 941, at pp. 963-64, *per* Cory J.; *Centre communautaire juridique de l'Estrie v. Sherbrooke (City)*, [1996] 3 S.C.R. 84, at paras. 9-12, *per* Gonthier J.). A decision that is patently unreasonable is so flawed that no amount of curial deference can justify letting it stand.

(p. 237). Dans *AFPC*, précité, le juge Cory qualifie la norme de la décision manifestement déraisonnable de « critère très strict », qui n'est respecté que lorsqu'une décision est « clairement irrationnelle, c'est-à-dire, de toute évidence non conforme à la raison » (p. 963-964). Cette définition appartient également à la première catégorie (bien qu'elle puisse également faire partie de la seconde, selon l'interprétation qu'on en fait).

Figure dans la seconde catégorie la définition 80 proposée par le juge Iacobucci dans *Southam*, précité, savoir une décision entachée, de manière « flagrante ou évidente » d'un défaut : « Si le défaut est manifeste au vu des motifs du tribunal, la décision de celui-ci est alors manifestement déraisonnable. Cependant, s'il faut procéder à un examen ou à une analyse en profondeur pour déceler le défaut, la décision est alors déraisonnable mais non manifestement déraisonnable » (par. 57).

Plus récemment, dans *Barreau du Nouveau-* 81 *Brunswick c. Ryan*, [2003] 1 R.C.S. 247, 2003 CSC 20, le juge Iacobucci a qualifié de manifestement déraisonnable la décision qui est « à ce point viciée qu'aucun degré de déférence judiciaire ne peut justifier de la maintenir », en faisant appel aux deux catégories susmentionnées pour concevoir cette définition. Voici ses commentaires à ce propos (au par. 52) :

Dans *Southam*, précité, par. 57, la Cour explique que la différence entre une décision déraisonnable et une décision manifestement déraisonnable réside « dans le caractère flagrant ou évident du défaut ». Autrement dit, dès qu'un défaut manifestement déraisonnable a été relevé, il peut être expliqué simplement et facilement, de façon à écarter toute possibilité réelle de douter que la décision est viciée. La décision manifestement déraisonnable a été décrite comme étant « clairement irrationnelle » ou « de toute évidence non conforme à la raison » (*Canada (procureur général) c. Alliance de la Fonction publique du Canada*, [1993] 1 R.C.S. 941, p. 963-964, le juge Cory; *Centre communautaire juridique de l'Estrie c. Sherbrooke (Ville)*, [1996] 3 R.C.S. 84, par. 9-12, le juge Gonthier). Une décision qui est manifestement déraisonnable est à ce point viciée qu'aucun degré de déférence judiciaire ne peut justifier de la maintenir.

82    Similarly, in *C.U.P.E. v. Ontario*, *supra*, Binnie J. yoked together the two definitional strands, describing a patently unreasonable decision as "one whose defect is 'immedia[te] and obviou[s]' (*Southam*, *supra*, at para. 57), and so flawed in terms of implementing the legislative intent that no amount of curial deference can properly justify letting it stand (*Ryan*, *supra*, at para. 52)" (para. 165 (emphasis added)).

83    It has been suggested that the Court's various formulations of the test for patent unreasonableness are "not independent, alternative tests. They are simply ways of getting at the single question: What makes something patently unreasonable?" (*C.U.P.E. v. Ontario*, *supra*, at para. 20, *per* Bastarache J., dissenting). While this may indeed be the case, I nonetheless think it important to recognize that, because of what are in some ways subtle but nonetheless quite significant differences between the Court's various answers to this question, the parameters of "patent unreasonableness" are not as clear as they could be. This has contributed to the growing difficulties in the application of this standard that I discuss below.

(b) *The Interplay Between the Patent Unreasonableness and Correctness Standards*

84    As I observed in *Chamberlain*, *supra*, the difference between review on a standard of correctness and review on a standard of patent unreasonableness is "intuitive and relatively easy to observe" (*Chamberlain*, *supra*, at para. 204, *per* LeBel J.). These standards fall on opposite sides of the existing spectrum of curial deference, with correctness entailing an exacting review and patent unreasonableness leaving the issue in question to the near exclusive determination of the decision maker (see *Dr. Q*, *supra*, at para. 22). Despite the clear conceptual boundary between these two standards, however, the distinction between them is not always as readily discernable in practice as one would expect.

De même, dans *S.C.F.P. c. Ontario*, précité, le juge Binnie a lié les deux catégories en qualifiant de décision manifestement déraisonnable « celle qui comporte un défaut "flagrant et évident" (*Southam*, précité, par. 57) et qui est à ce point viciée, pour ce qui est de mettre à exécution l'intention du législateur, qu'aucun degré de déférence judiciaire ne peut justifier logiquement de la maintenir (*Ryan*, précité, par. 52) » (par. 165 (je souligne)).

L'on a suggéré à propos des différentes formulations du critère par notre Cour qu'« [i]l s'[agissait] non pas de critères indépendants ou de rechange, mais simplement de façons d'exprimer la seule question qui se pose : qu'est-ce qui fait qu'une chose est manifestement déraisonnable ? » (*S.C.F.P. c. Ontario*, précité, par. 20, le juge Bastarache, dissident). Bien que ce puisse être effectivement le cas, il me paraît néanmoins important de reconnaître que, en raison de ce qui constitue, sous certains rapports, des différences subtiles, mais quand même assez importantes entre les diverses réponses de notre Cour à cette question, les paramètres du « manifestement déraisonnable » ne sont pas aussi clairs qu'ils pourraient l'être. Ce qui a contribué à rendre de plus en plus difficile l'application de cette norme, ce sur quoi je me penche ci-après.

b) *L'interaction entre la norme du manifestement déraisonnable et celle de la décision correcte*

Comme je l'ai fait remarquer dans *Chamberlain*, précité, la différence entre le contrôle selon la norme de la décision correcte et le contrôle selon la norme de la décision manifestement déraisonnable est « intuitive et relativement facile à constater » (*Chamberlain*, précité, par. 204, le juge LeBel). Ces normes se situent aux deux extrémités de l'échelle de la déférence judiciaire, un contrôle judiciaire serré s'imposant dans le cas de la première et la question étant laissée à l'appréciation quasi exclusive du décideur dans le cas de la seconde (voir *Dr Q*, précité, par. 22). Malgré la frontière conceptuelle qui sépare clairement ces deux normes, en pratique, il n'est pas toujours aussi facile que l'on pourrait le croire de les distinguer.

### (i) Patent Unreasonableness and Correctness in Theory

In terms of understanding the interplay between patent unreasonableness and correctness, it is of interest that, from the beginning, there seems to have been at least some conceptual uncertainty as to the proper breadth of patent unreasonableness review. In *CUPE*, *supra*, Dickson J. offered two characterizations of patent unreasonableness that tend to pull in opposite directions (see D. J. Mullan, *Administrative Law* (2001), at p. 69; see also H. W. MacLauchlan, "Transforming Administrative Law: The Didactic Role of the Supreme Court of Canada" (2001), 80 *Can. Bar Rev.* 281, at pp. 285-86).

Professor Mullan explains that, on the one hand, Dickson J. rooted review for patent unreasonableness in the recognition that statutory provisions are often ambiguous and thus may allow for multiple interpretations; the question for the reviewing court is whether the adjudicator's interpretation is one that can be "rationally supported by the relevant legislation" (*CUPE*, *supra*, at p. 237). On the other hand, Dickson J. also invoked an idea of patent unreasonableness as a threshold defined by certain nullifying errors, such as those he had previously enumerated in *Service Employees' International Union, Local No. 333 v. Nipawin District Staff Nurses Association*, [1975] 1 S.C.R. 382 ("*Nipawin*"), at p. 389, and in *CUPE*, *supra*, at p. 237:

. . . acting in bad faith, basing the decision on extraneous matters, failing to take relevant factors into account, breaching the provisions of natural justice or misinterpreting provisions of the Act so as to embark on an inquiry or answer a question not remitted to it.

Curiously, as Mullan notes, this list "repeats the list of 'nullifying' errors that Lord Reid laid out in the landmark House of Lords' judgment" in *Anisminic Ltd. v. Foreign Compensation Commission*, [1969]

### (i) La norme de la décision manifestement déraisonnable et celle de la décision correcte, en théorie

Pour comprendre l'interaction entre la norme du manifestement déraisonnable et celle de la décision correcte, il vaut la peine de signaler que, dès le début, il semble avoir existé, à tout le moins, un certain degré d'incertitude conceptuelle quant à la juste portée du contrôle selon la norme de la décision manifestement déraisonnable. Dans *SCFP*, précité, le juge Dickson a défini le caractère manifestement déraisonnable de deux manières, qui tendaient à orienter la mise en application de ce critère dans des directions opposées (voir D. J. Mullan, *Administrative Law* (2001), p. 69; voir également H. W. MacLauchlan, « Transforming Administrative Law : The Didactic Role of the Supreme Court of Canada » (2001), 80 *R. du B. can.* 281, p. 285-286).

85

Le professeur Mullan explique que, d'une part, le juge Dickson a justifié le contrôle visant à faire ressortir le caractère manifestement déraisonnable par le fait que les dispositions législatives sont souvent ambiguës et peuvent donc se prêter à de multiples interprétations; la question que doit poser la cour est de savoir si l'interprétation du tribunal peut « rationnellement s'appuyer sur la législation pertinente » (*SCFP*, précité, p. 237). D'autre part, le juge Dickson a également assimilé la décision manifestement déraisonnable à une décision entachée de certaines erreurs emportant annulation, comme celles qu'il avait auparavant énumérées dans *Union internationale des employés des services, local nº 333 c. Nipawin District Staff Nurses Association*, [1975] 1 R.C.S. 382 (« *Nipawin* »), p. 389, et *SCFP*, précité, p. 237 :

86

. . . le fait d'agir de mauvaise foi, de fonder la décision sur des données étrangères à la question, d'omettre de tenir compte de facteurs pertinents, d'enfreindre les règles de la justice naturelle ou d'interpréter erronément les dispositions du texte législatif de façon à entreprendre une enquête ou répondre à une question dont il n'est pas saisi.

Curieusement, comme le fait observer Mullan, cette énumération [TRADUCTION] « reprend la liste des erreurs emportant annulation que lord Reid a dressée dans l'arrêt de principe de la

87

2 A.C. 147. *Anisminic* "is usually treated as the foundation case in establishing in English law the reviewability of all issues of law on a <u>correctness</u> basis" (emphasis added), and, indeed, the Court "had cited with approval this portion of Lord Reid's judgment and deployed it to justify judicial intervention in a case described as the 'high water mark of activist' review in Canada: *Metropolitan Life Insurance Co. v. International Union of Operating Engineers, Local 796*", [1970] S.C.R. 425 (see Mullan, *Administrative Law*, *supra*, at pp. 69-70; see also *National Corn Growers*, *supra*, at p. 1335, *per* Wilson J.).

88    In characterizing patent unreasonableness in *CUPE*, then, Dickson J. simultaneously invoked a highly deferential standard (choice among a range of reasonable alternatives) and a historically interventionist one (based on the presence of nullifying errors). For this reason, as Mullan acknowledges, "it is easy to see why Dickson J.'s use of [the quotation from *Anisminic*] is problematic" (Mullan, *Administrative Law*, *supra*, at p. 70).

89    If Dickson J.'s reference to *Anisminic* in *CUPE*, *supra*, suggests some ambiguity as to the intended scope of "patent unreasonableness" review, later judgments also evidence a somewhat unclear relationship between patent unreasonableness and correctness in terms of establishing and, particularly, applying the methodology for review under the patent unreasonableness standard. The tension in this respect is rooted, in part, in differing views of the premise from which patent unreasonableness review should begin. A useful example is provided by *CAIMAW v. Paccar of Canada Ltd.*, [1989] 2 S.C.R. 983 ("*Paccar*").

90    In *Paccar*, Sopinka J. (Lamer J. (as he then was) concurring) described the proper approach under the patent unreasonableness standard as

Chambre des lords » *Anisminic Ltd. c. Foreign Compensation Commission*, [1969] 2 A.C. 147. Cet arrêt [TRADUCTION] « est habituellement considéré comme fondamental, en droit anglais, pour ce qui est de l'assujettissement de toutes les décisions relatives à une question de droit au contrôle selon la <u>norme de la décision correcte</u> » (je souligne). En fait, notre Cour [TRADUCTION] « a cité en l'approuvant cet extrait des motifs de lord Reid en l'a invoqué pour justifier l'intervention judiciaire dans une affaire qualifiée de "point culminant" du contrôle "activiste" au Canada : *Metropolitan Life Insurance Co. c. International Union of Operating Engineers, Local 796* », [1970] R.C.S. 425 (voir Mullan, *Administrative Law*, *op. cit.*, p. 69-70; voir également *National Corn Growers*, précité, p. 1335, la juge Wilson).

Dans *SCFP*, pour caractériser la norme du manifestement déraisonnable, le juge Dickson a ensuite invoqué simultanément un degré élevé de déférence (choix parmi un ensemble de solutions raisonnables possibles) et une attitude historiquement interventionniste (fondée sur l'existence d'erreurs emportant annulation). C'est pourquoi, pour citer Mullan, [TRADUCTION] « il est facile de comprendre que le renvoi à *Anisminic* soit problématique » (Mullan, *Administrative Law*, *op. cit.*, p. 70).

Si, dans *SCFP*, précité, le renvoi du juge Dickson à *Anisminic* suggère la présence d'une certaine ambiguïté quant à la portée prévue du contrôle selon la norme du manifestement déraisonnable, des jugements ultérieurs ont également fait ressortir l'existence d'un rapport quelque peu problématique entre cette norme et celle de la décision correcte pour ce qui est de l'établissement et, surtout, de l'application de la démarche que commande la norme du manifestement déraisonnable. La tension à cet égard tient en partie à des désaccords sur l'hypothèse de départ du contrôle selon la norme du manifestement déraisonnable. *CAIMAW c. Paccar of Canada Ltd.*, [1989] 2 R.C.S. 983 (« *Paccar* »), en est un bon exemple.

Dans *Paccar*, le juge Sopinka (motifs concourants du juge Lamer (plus tard Juge en chef)) a dit que, dans le cadre de la démarche appropriée

one in which the reviewing court first queries whether the administrative adjudicator's decision is correct: "curial deference does not enter the picture until the court finds itself in disagreement with the tribunal. Only then is it necessary to consider whether the error (so found) is within or outside the boundaries of reasonableness" (p. 1018). As Mullan has observed, this approach to patent unreasonableness raises concerns in that it not only conflicts "with the whole notion espoused by Dickson J. in [*CUPE*, *supra*] of there often being no single correct answer to statutory interpretation problems but it also assumes the primacy of the reviewing court over the agency or tribunal in the delineation of the meaning of the relevant statute" (Mullan, "Recent Developments in Standard of Review", *supra*, at p. 20).

In my view, this approach presents additional problems as well. Reviewing courts may have difficulty ruling that "an error has been committed but . . . then do[ing] nothing to correct that error on the basis that it was not as big an error as it could or might have been" (see Mullan, "Recent Developments in Standard of Review", *supra*, at p. 20; see also D. J. Mullan, "Of Chaff Midst the Corn: American Farm Bureau Federation v. Canada (Canadian Import Tribunal) and Patent Unreasonableness Review" (1991), 45 Admin. L.R. 264, at pp. 269-70). Furthermore, starting from a finding that the adjudicator's decision is incorrect may colour the reviewing court's subsequent assessment of the reasonableness of competing interpretations (see M. Allars, "On Deference to Tribunals, With Deference to Dworkin" (1994), 20 *Queen's L.J.* 163, at p. 187). The result is that the critical distinction between that which is, in the court's eyes, "incorrect" and that which is "not rationally supportable" is undermined.

The alternative approach is to leave the "correctness" of the adjudicator's decision undecided (see Allars, *supra*, at p. 197). This is essentially the approach that La Forest J. (Dickson C.J.

pour l'application de la norme du manifestement déraisonnable, la cour de justice se demande tout d'abord si la décision du tribunal administratif est correcte : « la retenue judiciaire n'entre en jeu que si la cour de justice est en désaccord avec le tribunal administratif. Ce n'est qu'à ce moment-là qu'il est nécessaire de se demander si l'erreur (ainsi découverte) est raisonnable ou déraisonnable » (p. 1018). Comme Mullan le fait observer, cette démarche soulève des inquiétudes en ce que non seulement elle est entièrement incompatible [TRADUCTION] « avec la position du juge Dickson dans [*SCFP*, précité], savoir qu'il arrive souvent qu'un problème d'interprétation législative n'appelle pas qu'une seule solution, mais elle suppose également la prépondérance de la cour de justice sur l'organisme ou le tribunal administratif lorsqu'il s'agit de circonscrire la portée des dispositions en cause » (Mullan, « Recent Developments in Standard of Review », *loc. cit.*, p. 20).

À mon avis, cette démarche comporte des difficultés supplémentaires. Il peut être difficile pour une cour de justice de conclure qu'[TRADUCTION] « une erreur a été commise [. . .] et de s'abstenir de la corriger au motif qu'elle n'est pas aussi importante qu'elle aurait pu l'être » (voir Mullan, « Recent Developments in Standard of Review », *loc. cit.*, p. 20; voir également D. J. Mullan, « Of Chaff Midst the Corn : American Farm Bureau Federation v. Canada (Canadian Import Tribunal) and Patent Unreasonableness Review » (1991), 45 Admin. L.R. 264, p. 269-270). De plus, conclure tout d'abord que la décision du tribunal est incorrecte peut orienter l'analyse subséquente visant à déterminer si d'autres interprétations sont raisonnables (voir M. Allars, « On Deference to Tribunals, With Deference to Dworkin » (1994), 20 *Queen's L.J.* 163, p. 187). La distinction cruciale entre ce qui, de l'avis de la cour de justice, est « incorrect » et ce qui « n'est pas rationnellement défendable » est alors compromise.

91

L'autre solution veut que la cour de justice s'abstienne de décider si la décision du tribunal administratif est « correcte » (voir Allars, *loc. cit.*, p. 197). Il s'agit essentiellement de la

92

concurring) took to patent unreasonableness in *Paccar*, *supra*. He wrote, at pp. 1004 and 1005:

The courts must be careful to focus their inquiry on the existence of a rational basis for the decision of the tribunal, and not on their agreement with it.

. . .

I do not find it necessary to conclusively determine whether the decision of the Labour Relations Board is "correct" in the sense that it is the decision I would have reached had the proceedings been before this Court on their merits. It is sufficient to say that the result arrived at by the Board is not patently unreasonable.

93    It is this theoretical view that has, at least for the most part, prevailed. As L'Heureux-Dubé J. observed in *Canadian Union of Public Employees, Local 301 v. Montreal (City)*, [1997] 1 S.C.R. 793 ("*CUPE, Local 301*"), "this Court has stated repeatedly, in assessing whether administrative action is patently unreasonable, the goal is not to review the decision or action on its merits but rather to determine whether it is patently unreasonable, given the statutory provisions governing the particular body and the evidence before it" (para. 53). Patent unreasonableness review, in other words, should not "become an avenue for the court's substitution of its own view" (*CUPE, Local 301*, *supra*, at para. 59; see also *Domtar Inc. v. Quebec (Commission d'appel en matière de lésions professionnelles)*, [1993] 2 S.C.R. 756, at pp. 771 and 774-75).

94    This view was recently forcefully rearticulated in *Ryan*, *supra*. Iacobucci J. wrote, at paras. 50-51:

[W]hen deciding whether an administrative action was unreasonable, a court should not at any point ask itself what the correct decision would have been. . . . The standard of reasonableness does not imply that a decision maker is merely afforded a "margin of error" around what the court believes is the correct result.

démarche préconisée par le juge La Forest (motifs concourants du juge en chef Dickson) dans *Paccar*, précité. Il a dit aux p. 1004 et 1005 :

Les cours de justice doivent prendre soin de vérifier si la décision du tribunal a un fondement rationnel plutôt que de se demander si elles sont d'accord avec celle-ci.

. . .

J'estime qu'il n'est pas nécessaire de déterminer de façon concluante si la décision de la Commission est « juste » en ce sens que c'est la décision à laquelle je serais parvenu si la cause avait été entendue quant au fond par notre Cour. Il suffit de dire que le résultat auquel la Commission est arrivée n'est pas manifestement déraisonnable.

Cette thèse, du moins pour l'essentiel, l'a emporté. Comme l'a fait remarquer la juge L'Heureux-Dubé dans *Syndicat canadien de la fonction publique, section locale 301 c. Montréal (Ville)*, [1997] 1 R.C.S. 793 (« *SCFP, section locale 301* »), « notre Cour l'a mentionné à plusieurs reprises, lorsqu'on évalue si une action de nature administrative est manifestement déraisonnable, l'objectif n'est pas de réviser la décision ou l'action quant au fond mais plutôt de déterminer si elle est manifestement déraisonnable, étant donné les dispositions législatives régissant ce conseil en particulier et la preuve présentée devant lui » (par. 53). En d'autres termes, l'application de la norme du manifestement déraisonnable ne doit pas « devenir un moyen pour permettre à une cour de justice de substituer sa propre opinion » (*SCFP, section locale 301*, précité, par. 59; voir également *Domtar Inc. c. Québec (Commission d'appel en matière de lésions professionnelles)*, [1993] 2 R.C.S. 756, p. 771 et 774-775).

Récemment, notre Cour a reformulé ce point de vue avec fermeté dans *Ryan*, précité, par la voix du juge Iacobucci (aux par. 50-51) :

[L]orsqu'elle décide si une mesure administrative est déraisonnable, la cour ne doit à aucun moment se demander ce qu'aurait été la décision correcte. [. . .] La norme de la décision raisonnable n'implique pas que l'instance décisionnelle dispose simplement d'une « marge d'erreur » par rapport à ce que la cour estime être la solution correcte.

. . . Unlike a review for correctness, there will often be no single right answer to the questions that are under review against the standard of reasonableness. . . . Even if there could be, notionally, a single best answer, it is not the court's role to seek this out when deciding if the decision was unreasonable.

Though Iacobucci J.'s comments here were made in relation to reasonableness *simpliciter*, they are also applicable to the more deferential standard of patent unreasonableness.

I think it important to emphasize that neither the case at bar, nor the companion case of *Ontario v. O.P.S.E.U.*, should be misinterpreted as a retreat from the position that in reviewing a decision under the existing standard of patent unreasonableness, the court's role is not to identify the "correct" result. In each of these cases, there were two standards of review in play: there was a fundamental legal question on which the adjudicators were subject to a standard of correctness — whether the employees' criminal convictions could be relitigated — and there was a question at the core of the adjudicators' expertise on which they were subject to a standard of patent unreasonableness — whether the employees had been dismissed for just cause. As Arbour J. has outlined, the adjudicators' failure to decide the fundamental relitigation question correctly was sufficient to lead to a patently unreasonable outcome. Indeed, in circumstances such as those at issue in the case at bar, this cannot but be the case: the adjudicators' incorrect decisions on the fundamental legal question provided the entire foundation on which their legal analyses, and their conclusions as to whether the employees were dismissed with just cause, were based. To pass a review for patent unreasonableness, a decision must be one that can be "rationally supported"; this standard cannot be met where, as here, what supports the adjudicator's decision — indeed, what that decision is wholly premised on — is a legal determination that the adjudicator was required, but failed, to decide correctly. To say, however, that in such circumstances a decision will be patently unreasonable — a conclusion that flows from the applicability of two separate standards of review — is very different from suggesting

. . . À la différence d'un examen selon la norme de la décision correcte, il y a souvent plus d'une seule bonne réponse aux questions examinées selon la norme de la décision raisonnable. [. . .] Même dans l'hypothèse où il y aurait une réponse meilleure que les autres, le rôle de la cour n'est pas de tenter de la découvrir lorsqu'elle doit décider si la décision est déraisonnable.

Même si le juge Iacobucci a tenu ces propos en liaison avec la norme de la décision raisonnable *simpliciter*, ils s'appliquent également à la norme de la décision manifestement déraisonnable, qui commande une plus grande déférence.

Il me paraît important de préciser que ni les présents motifs ni ceux de l'arrêt connexe *Ontario c. S.E.E.F.P.O.* n'entendent déroger au principe voulant que la cour appelée à contrôler une décision selon la norme actuelle du manifestement déraisonnable n'ait pas à déterminer la décision « correcte ». Dans chacun de ces pourvois, deux normes de contrôle étaient en cause : la norme de la décision correcte s'appliquait à une question de droit fondamentale — les déclarations de culpabilité des employés pouvaient-elles être remises en cause — et celle de la décision manifestement déraisonnable s'appliquait à une question relevant de l'expertise même du tribunal — les employés avaient-ils été congédiés pour un motif valable. Comme l'a estimé la juge Arbour, l'omission des arbitres de trancher correctement la question fondamentale de la remise en cause était suffisante pour conclure au caractère manifestement déraisonnable de leurs décisions. En effet, dans des circonstances comme celles de la présente espèce, il ne peut en être qu'ainsi : les décisions incorrectes que les arbitres ont rendues relativement à la question de droit fondamentale ont entièrement fondé leurs analyses juridiques, de même que leurs conclusions quant à savoir si les employés avaient été congédiés pour un motif valable. Pour résister à l'analyse selon la norme du manifestement déraisonnable, la décision doit avoir un fondement rationnel; ce critère ne peut être respecté lorsque, comme en l'espèce, ce qui fonde la décision du décideur — et la sous-tend de fait en entier — est une conclusion de droit qui aurait dû être tirée correctement, ce qui n'a pas été le cas. Cependant, l'affirmation qu'en pareils cas une décision sera manifestement déraisonnable — une conclusion qui découle

that a reviewing court, before applying the standard of patent unreasonableness, must first determine whether the adjudicator's decision is (in)correct or that in applying patent unreasonableness the court should ask itself at any point in the analysis what the correct decision would be. In other words, the application of patent unreasonableness itself is not, and should not be, understood to be predicated on a finding of incorrectness, for the reasons that I discussed above.

### (ii) Patent Unreasonableness and Correctness in Practice

96    While the Court now tends toward the view that La Forest J. articulated in *Paccar*, at p. 1004 — "courts must be careful [under a standard of patent unreasonableness] to focus their inquiry on the existence of a rational basis for the decision of the tribunal, and not on their agreement with it" — the tension between patent unreasonableness and correctness has not been completely resolved. Slippage between the two standards is still evident at times in the way in which patent unreasonableness is applied.

97    In analyzing a number of recent cases, commentators have pointed to both the intensity and the underlying character of the review in questioning whether the Court is applying patent unreasonableness in a manner that is in fact deferential. In this regard, the comments of Professor Lorne Sossin on the application of patent unreasonableness in *Canada Safeway Ltd. v. RWDSU, Local 454*, [1998] 1 S.C.R. 1079, are illustrative:

Having established that deference was owed to the statutory interpretation of the Board, the Court proceeded to dissect its interpretation. The majority was of the view that the Board had misconstrued the term "constructive lay-off" and had failed to place sufficient emphasis on the terms of the collective agreement. The majority reasons convey clearly why the Court would adopt a different approach to the Board. They are less clear as to why the Board's approach lacked a rational foundation. Indeed,

de l'applicabilité de <u>deux</u> normes de contrôle <u>distinctes</u> — diffère sensiblement de la proposition que, avant d'appliquer la norme du manifestement déraisonnable, la cour doive décider si la décision du tribunal est correcte ou non ou que, pour appliquer cette norme, la cour doive chercher, au cours de son analyse, à déterminer la décision correcte. En d'autres mots, pour les motifs exposés précédemment, l'application de la norme du manifestement déraisonnable ne saurait reposer sur la conclusion que la décision est incorrecte.

### (ii) La norme de la décision manifestement déraisonnable et celle de la décision correcte, en pratique

Bien que notre Cour incline désormais à partager l'avis du juge La Forest dans *Paccar*, p. 1004 — « [l]es cours de justice doivent prendre soin [pour l'application de la norme du manifestement déraisonnable] de vérifier si la décision du tribunal a un fondement rationnel plutôt que de se demander si elles sont d'accord avec celle-ci » —, le problème de la tension entre la norme du manifestement déraisonnable et celle de la décision correcte n'a pas été entièrement résolu. Le glissement de l'une à l'autre ressort encore parfois de la manière dont est appliquée la norme de la décision manifestement déraisonnable.

Après avoir analysé un certain nombre de décisions récentes, les observateurs ont signalé l'intensité et le caractère fondamental du contrôle en se demandant si notre Cour appliquait la norme de la décision manifestement déraisonnable en faisant preuve, dans les faits, de déférence. Je cite, à titre d'exemple, les observations du professeur Lorne Sossin sur l'application de ce critère dans *Canada Safeway Ltd. c. SDGMR, section locale 454*, [1998] 1 R.C.S. 1079 :

[TRADUCTION] Après avoir établi que la déférence s'imposait à l'égard de l'interprétation des dispositions législatives par le Conseil, la Cour a procédé à l'analyse approfondie de cette interprétation. Les juges majoritaires ont estimé que le Conseil avait mal interprété l'expression « mise à pied déguisée » et avait omis d'accorder suffisamment d'importance aux dispositions de la convention collective. Leurs motifs expliquent clairement la préférence d'une autre interprétation que celle

there is very little evidence of the Court according deference to the Board's interpretation of its own statute, or to its choice as to how much weight to place on the terms of the collective agreement. *Canada Safeway* raises the familiar question of how a court should demonstrate its deference, particularly in the labour relations context.

(L. Sossin, "Developments in Administrative Law: The 1997-98 and 1998-99 Terms" (2000), 11 *S.C.L.R.* (2d) 37, at p. 49)

Professor Ian Holloway makes a similar observation with regard to *Lester (W.W.) (1978) Ltd. v. United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry, Local 740*, [1990] 3 S.C.R. 644:

In her judgment, [McLachlin J. (as she then was)] quoted from the familiar passages of *CUPE*, yet she . . . reached her decision on the basis of a review of the case law. She did not ask whether, despite the fact that it differed from holdings in other jurisdictions, the conclusion of the Newfoundland Labour Relations Board could be "rationally supported" on the basis of the wording of the successorship provisions of the *Labour Relations Act*. Instead, she looked at whether the Board had reached the correct legal interpretation of the Act in the same manner that a court of appeal would determine whether a trial judge had made a correct interpretation of the law. In other words, she effectively *equated patent unreasonability with correctness at law*.

(I. Holloway, "'A Sacred Right': Judicial Review of Administrative Action as a Cultural Phenomenon" (1993), 22 *Man. L.J.* 28, at pp. 64-65 (emphasis in original); see also Allars, *supra*, at p. 178.)

At times the Court's application of the standard of patent unreasonableness may leave it vulnerable to criticism that it may in fact be doing implicitly what it has rejected explicitly: intervening in decisions that are, in its view, incorrect, rather than limiting any intervention to those decisions that lack a rational foundation. In the process, what should be an indelible line between correctness, on the one hand, and patent unreasonableness, on the other, becomes blurred. It may very well be that review

retenue par le Conseil. Ils sont moins explicites quant à l'absence de fondement rationnel de cette dernière. En fait, la Cour ne fait guère preuve de déférence vis-à-vis de l'interprétation, par le Conseil, de sa propre loi constitutive ou de sa détermination du poids à accorder aux dispositions de la convention collective. *Canada Safeway* soulève la question habituelle : comment une cour de justice doit-elle manifester sa déférence, en particulier dans le domaine des relations de travail?

(L. Sossin, « Developments in Administrative Law : The 1997-98 and 1998-99 Terms » (2000), 11 *S.C.L.R.* (2d) 37, p. 49)

Le professeur Ian Holloway formule des observations semblables relativement à *Lester (W.W.) (1978) Ltd. c. Association unie des compagnons et apprentis de l'industrie de la plomberie et de la tuyauterie, section locale 740*, [1990] 3 R.C.S. 644 : 98

[TRADUCTION] Dans ses motifs, [la juge McLachlin (maintenant Juge en chef)] a cité les extraits familiers de *SCFP*, mais elle a fondé sa décision sur la jurisprudence. Elle ne s'est pas demandé si, malgré le fait qu'elle différait des décisions rendues dans d'autres ressorts, la conclusion de la Commission des relations de travail de Terre-Neuve pouvait « rationnellement » s'appuyer sur les dispositions de la *Labour Relations Act* relatives à l'obligation du successeur. Elle s'est plutôt demandé si la Commission avait correctement interprété la loi, tout comme l'aurait fait une cour d'appel pour la décision d'un juge de première instance. En d'autres termes, elle a effectivement *établi une équivalence entre la norme du manifestement déraisonnable et celle de la décision fondée en droit*.

(I. Holloway, « "A Sacred Right" : Judicial Review of Administrative Action as a Cultural Phenomenon » (1993) 22 *R.D. Man.* 28, p. 64-65 (en italique dans l'original); voir également Allars, *loc. cit.*, p. 178.)

Dans certains cas, lorsqu'elle applique la norme de la décision manifestement déraisonnable, l'on peut reprocher à notre Cour de faire implicitement ce qu'elle rejette explicitement, soit modifier une décision qu'elle juge incorrecte, et non seulement une décision sans fondement rationnel. Dès lors, la ligne de démarcation entre la norme de la décision correcte, d'une part, et la norme de la décision manifestement déraisonnable, d'autre part, s'obscurcit. Il est fort possible qu'un tel risque soit inhérent au 99

under any standard of reasonableness, given the nature of the intellectual process it involves, entails such a risk. Nevertheless, the existence of two standards of reasonableness appears to have magnified the underlying tension between the two standards of reasonableness and correctness.

(c) *The Relationship Between the Patent Unreasonableness and Reasonableness Simpliciter Standards*

100    While the conceptual difference between review on a correctness standard and review on a patent unreasonableness standard may be intuitive and relatively easy to observe (though in practice elements of correctness at times encroach uncomfortably into patent unreasonableness review), the boundaries between patent unreasonableness and reasonableness *simpliciter* are far less clear, even at the theoretical level.

(i) The Theoretical Foundation for Patent Unreasonableness and Reasonableness *Simpliciter*

101    The lack of sufficiently clear boundaries between patent unreasonableness and reasonableness *simpliciter* has its origins in the fact that patent unreasonableness was developed prior to the birth of the pragmatic and functional approach (see *C.U.P.E. v. Ontario*, *supra*, at para. 161) and, more particularly, prior to (rather than in conjunction with) the formulation of reasonableness *simpliciter* in *Southam*, *supra*. Because patent unreasonableness, as a posture of curial deference, was conceived in opposition only to a correctness standard of review, it was sufficient for the Court to emphasize in defining its scope the principle that there will often be no one interpretation that can be said to be correct in interpreting a statute or otherwise resolving a legal dispute, and that specialized administrative adjudicators may, in many circumstances, be better equipped than courts to choose between the possible interpretations. Where this is the case, provided that the adjudicator's decision is one that can be "rationally supported on a construction which the relevant legislation may reasonably be considered to bear",

contrôle selon une norme de raisonnabilité, quelle qu'elle soit, étant donné la nature du processus intellectuel que ce contrôle suppose. Néanmoins, l'existence de deux normes de raisonnabilité paraît avoir accentué la tension sous-jacente entre ces deux normes et la norme de la décision correcte.

c) *L'interaction entre la norme du manifestement déraisonnable et celle de la décision raisonnable simpliciter*

La différence conceptuelle entre le contrôle selon la norme de la décision correcte et le contrôle selon la norme du manifestement déraisonnable peut être intuitive et relativement facile à constater (bien que, en pratique, des éléments du premier empiètent parfois de manière inquiétante sur le second), toutefois la frontière entre le caractère manifestement déraisonnable et le caractère raisonnable *simpliciter* est encore moins claire, même sur le plan théorique.

(i) Le fondement théorique de la norme du manifestement déraisonnable et de la norme du raisonnable *simpliciter*

L'absence d'une frontière suffisamment claire entre ces deux normes est attribuable au fait que celle du manifestement déraisonnable est apparue avant l'adoption de l'analyse pragmatique et fonctionnelle (voir *S.C.F.P. c. Ontario*, précité, par. 161) et, plus particulièrement, avant (et non en même temps que) la formulation de la norme de la décision raisonnable *simpliciter* dans *Southam*, précité. Puisque la norme de la décision manifestement déraisonnable, qui traduit une attitude de déférence judiciaire, avait été conçue par opposition uniquement à la norme de la décision correcte, il suffisait, pour en circonscrire la portée, que notre Cour mette l'accent sur l'idée que l'interprétation d'une loi ou le règlement d'un litige appelle souvent plus d'une interprétation correcte et que, dans certains cas, un tribunal administratif spécialisé peut être plus à même qu'une cour de justice de choisir entre les interprétations possibles. Le cas échéant, à condition que la décision puisse « rationnellement s'appuyer sur une interprétation qu'on peut raisonnablement considérer comme étayée par la législation

the reviewing court should not intervene (*Nipawin*, *supra*, at p. 389).

Upon the advent of reasonableness *simpliciter*, however, the validity of multiple interpretations became the underlying premise for this new variant of reasonableness review as well. Consider, for instance, the discussion of reasonableness *simpliciter* in *Ryan*, that I cited above:

Unlike a review for correctness, there will often be no single right answer to the questions that are under review against the standard of reasonableness. . . . Even if there could be, notionally, a single best answer, it is not the court's role to seek this out when deciding if the decision was unreasonable.

(*Ryan*, *supra*, at para. 51; see also para. 55.)

It is difficult to distinguish this language from that used to describe patent unreasonableness not only in the foundational judgments establishing that standard, such as *Nipawin*, *supra*, and *CUPE*, *supra*, but also in this Court's more contemporary jurisprudence applying it. In *Ivanhoe*, *supra*, for instance, Arbour J. stated that "the recognition by the legislature and the courts that there are many potential solutions to a dispute is the very essence of the patent unreasonableness standard of review, which would be meaningless if it was found that there is only one acceptable solution" (para. 116).

Because patent unreasonableness and reasonableness *simpliciter* are both rooted in this guiding principle, it has been difficult to frame the standards as analytically, rather than merely semantically, distinct. The efforts to sustain a workable distinction between them have taken, in the main, two forms, which mirror the two definitional strands of patent unreasonableness that I identified above. One of these forms distinguishes between patent unreasonableness and reasonableness *simpliciter* on the basis of the relative magnitude of the defect. The other looks to the "immediacy or obviousness" of the defect, and thus the relative invasiveness of the review necessary to

pertinente », la cour doit s'abstenir de la modifier (*Nipawin*, précité, p. 389).

L'adoption de la norme du raisonnable *simpliciter* a cependant changé la donne, la validité d'interprétations multiples constituant également la prémisse de cette nouvelle variante du contrôle selon la norme de la décision raisonnable. Considérons par exemple l'extrait suivant de *Ryan*, cité précédemment, sur la norme de la décision raisonnable *simpliciter* :

À la différence d'un examen selon la norme de la décision correcte, il y a souvent plus d'une seule bonne réponse aux questions examinées selon la norme de la décision raisonnable. [. . .] Même dans l'hypothèse où il y aurait une réponse meilleure que les autres, le rôle de la cour n'est pas de tenter de la découvrir lorsqu'elle doit décider si la décision est déraisonnable.

(*Ryan*, précité, par. 51; voir également par. 55.)

Il est difficile de distinguer ces propos de ceux tenus pour décrire la norme du manifestement déraisonnable, non seulement dans les arrêts ayant établi cette norme, comme *Nipawin* et *SCFP*, précités, mais aussi dans les arrêts plus récents où notre Cour l'a appliquée. Par exemple, dans *Ivanhoe*, précité, la juge Arbour fait observer que « la reconnaissance par le législateur et les tribunaux de la multiplicité de solutions qui peuvent être apportées à un différend constitue l'essence même de la norme de contrôle du manifestement déraisonnable, qui perdrait tout son sens si l'on devait juger qu'une seule solution est acceptable » (par. 116).

Comme la norme du manifestement déraisonnable et celle du raisonnable *simpliciter* se fondent toutes deux sur ce principe directeur, il a été difficile de concevoir qu'elles étaient distinctes du point de vue analytique, et non sur le seul plan sémantique. Les tentatives pour établir une distinction valable entre les deux normes ont principalement revêtu deux formes reflétant les deux catégories de définitions du caractère manifestement déraisonnable. L'une d'elles distingue entre manifestement déraisonnable et raisonnable *simpliciter* en fonction de l'importance relative du défaut. L'autre met l'accent sur le caractère « flagrant ou évident » du défaut et, partant sur le caractère plus ou moins envahissant

102

103

find it. Both approaches raise their own problems.

#### (ii) The Magnitude of the Defect

104    In *PSAC*, *supra*, at pp. 963-64, Cory J. described a patently unreasonable decision in these terms:

> In the Shorter Oxford English Dictionary "patently", an adverb, is defined as "openly, evidently, clearly". "Unreasonable" is defined as "[n]ot having the faculty of reason; irrational. . . . Not acting in accordance with reason or good sense". Thus, based on the dictionary definition of the words "patently unreasonable", it is apparent that if the decision the Board reached, acting within its jurisdiction, is not clearly irrational, that is to say evidently not in accordance with reason, then it cannot be said that there was a loss of jurisdiction.

> While this definition may not be inherently problematic, it has become so with the emergence of reasonableness *simpliciter*, in part because of what commentators have described as the "tautological difficulty of distinguishing standards of rationality on the basis of the term 'clearly'" (see Cowan, *supra*, at pp. 27-28; see also G. Perrault, *Le contrôle judiciaire des décisions de l'administration: De l'erreur juridictionnelle à la norme de contrôle* (2002), at p. 116; S. Comtois, *Vers la primauté de l'approche pragmatique et fonctionnelle: Précis du contrôle judiciaire des décisions de fond rendues par les organismes administratifs* (2003), at pp. 34-35; P. Garant, *Droit administratif* (4th ed. 1996), vol. 2, at p. 193).

105    Mullan alludes to both the practical and the theoretical difficulties of maintaining a distinction based on the magnitude of the defect, i.e., the degree of irrationality, that characterizes a decision:

> . . . admittedly in his judgment in *PSAC*, Cory J. did attach the epithet "clearly" to the word "irrational" in delineating a particular species of patent unreasonableness. However, I would be most surprised if, in so doing, he was using the term "clearly" for other than rhetorical effect. Indeed, I want to suggest . . . that to maintain a position that it is only the "clearly irrational" that will cross the threshold of patent unreasonableness while irrationality <u>simpliciter</u> will not is to make a nonsense

du processus d'analyse nécessaire à sa mise au jour. Chacune comporte ses propres difficultés.

#### (ii) L'importance du défaut

Dans *AFPC*, précité, p. 963-964, le juge Cory a décrit comme suit la décision manifestement déraisonnable :

> Dans le Grand Larousse de la langue française, l'adjectif manifeste est ainsi défini : « Se dit d'une chose que l'on ne peut contester, qui est tout à fait évidente ». On y trouve pour le terme déraisonnable la définition suivante : « Qui n'est pas conforme à la raison; qui est contraire au bon sens ». Eu égard donc à ces définitions des mots « manifeste » et « déraisonnable », il appert que si la décision qu'a rendue la Commission, agissant dans le cadre de sa compétence, n'est pas clairement irrationnelle, c'est-à-dire, de toute évidence non conforme à la raison, on ne saurait prétendre qu'il y a eu perte de compétence.

> Cette définition n'était peut-être pas problématique en soi, mais elle l'est devenue lorsque la norme de la décision raisonnable *simpliciter* a vu le jour, en partie à cause de ce que les observateurs ont appelé la [TRADUCTION] « difficulté tautologique de distinguer des normes de rationalité à partir du terme "clairement" » (voir Cowan, *op. cit.*, p. 27-28; voir également G. Perrault, *Le contrôle judiciaire des décisions de l'administration : De l'erreur juridictionnelle à la norme de contrôle* (2002), p. 116; S. Comtois, *Vers la primauté de l'approche pragmatique et fonctionnelle : Précis du contrôle judiciaire des décisions de fond rendues par les organismes administratifs* (2003), p. 34-35; P. Garant, *Droit administratif* (4e éd. 1996), vol. 2, p. 193).

> Mullan fait allusion aux difficultés tant pratiques que théoriques du maintien d'une distinction fondée sur l'importance du défaut, c'est-à-dire sur le degré d'irrationalité d'une décision :

> [TRADUCTION] . . . il est vrai que dans *AFPC*, le juge Cory a accolé l'épithète « clairement » au mot « irrationnelle » en faisant état d'un cas particulier de décision manifestement déraisonnable. Cependant, je serais fort étonné qu'il ait employé l'adverbe « clairement » pour autre chose qu'un effet de rhétorique. En fait, soutenir que seule la décision « clairement irrationnelle » est manifestement déraisonnable, à l'exclusion de celle qui est irrationnelle <u>simpliciter</u>, vide de sens la règle de droit.

of the law. Attaching the adjective "clearly" to irrational is surely a tautology. Like "uniqueness", irrationality either exists or it does not. There cannot be shades of irrationality. In other words, I defy any judge or lawyer to provide a concrete example of the difference between the merely irrational and the clearly irrational! In any event, there have to be concerns with a regime of judicial review which would allow any irrational decision to escape rebuke even under the most deferential standard of scrutiny.

(Mullan, "Recent Developments in Standard of Review", *supra*, at pp. 24-25)

Also relevant in this respect are the comments of Reed J. in *Hao v. Canada (Minister of Citizenship and Immigration)* (2000), 184 F.T.R. 246, at para. 9:

I note that I have never been convinced that "patently unreasonable" differs in a significant way from "unreasonable". The word "patently" means clearly or obviously. If the unreasonableness of a decision is not clear or obvious, I do not see how that decision can be said to be unreasonable.

Even a brief review of this Court's descriptions of the defining characteristics of patently unreasonable and unreasonable decisions demonstrates that it is difficult to sustain a meaningful distinction between two forms of reasonableness on the basis of the magnitude of the defect, and the extent of the decision's resulting deviation from the realm of the reasonable. Under both standards, the reviewing court's inquiry is focussed on "the existence of a rational basis for the [adjudicator's] decision" (see, for example, *Paccar*, *supra*, at p. 1004, *per* La Forest J.; *Ryan*, *supra*, at paras. 55-56). A patently unreasonable decision has been described as one that "cannot be sustained on any reasonable interpretation of the facts or of the law" (*National Corn Growers*, *supra*, at pp. 1369-70, *per* Gonthier J.), or "rationally supported on a construction which the relevant legislation may reasonably be considered to bear" (*Nipawin*, *supra*, at p. 389). An unreasonable decision has been described as one for which there are "no lines of reasoning supporting the decision which could reasonably lead

Rattacher l'adverbe « clairement » à l'adjectif « irrationnelle » est certes une tautologie. Tout comme l'« unicité », l'irrationalité est ou n'est pas. Une décision ne peut être un peu irrationnelle. En d'autres termes, je mets au défi tout juge ou avocat d'illustrer concrètement la différence entre une décision simplement irrationnelle et une décision clairement irrationnelle! Quoi qu'il en soit, il y a lieu de s'inquiéter d'un régime de contrôle judiciaire qui permet le maintien d'une décision irrationnelle, même lorsque s'applique la norme commandant le degré le plus élevé de déférence.

(Mullan, « Recent Developments in Standard of Review », *loc. cit.*, p. 24-25)

Sont également pertinentes à ce propos ces observations de la juge Reed dans *Hao c. Canada (Ministre de la Citoyenneté et de l'Immigration)*, [2000] A.C.F. no 296 (QL) (1re inst.), par. 9 :

Je fais remarquer que je n'ai jamais été convaincue que la norme de la « décision manifestement déraisonnable » différait sensiblement de celle de la « décision déraisonnable ». Le mot « manifestement » veut dire clairement ou de toute évidence. Si le caractère déraisonnable d'une décision n'est ni clair, ni évident, je ne vois pas comment cette décision peut être considérée comme déraisonnable.

106

Même un bref examen des caractéristiques que notre Cour a attribuées aux décisions manifestement déraisonnables et aux décisions déraisonnables fait ressortir qu'il est extrêmement difficile, sinon impossible, de maintenir entre ces deux formes du critère de la décision raisonnable une distinction véritable fondée sur la gravité du défaut et l'importance de l'écart entre la décision et une décision raisonnable. Pour l'application de l'une et l'autre des normes, la cour doit prendre soin de vérifier « si la décision du tribunal a un fondement rationnel » (voir par exemple *Paccar*, précité, p. 1004, le juge La Forest; *Ryan*, précité, par. 55-56). L'on a affirmé de la décision manifestement déraisonnable qu'elle « ne saurait être maintenue selon une interprétation raisonnable des faits ou du droit » (*National Corn Growers*, précité, p. 1369, le juge Gonthier) ni « rationnellement s'appuyer sur une interprétation qu'on peut raisonnablement considérer comme étayée par la législation pertinente » (*Nipawin*, précité, p. 389). Notre Cour a ajouté par ailleurs de la décision déraisonnable qu'« aucun des raisonnements

that tribunal to reach the decision it did" (*Ryan*, *supra*, at para. 53).

107     Under both patent unreasonableness and reasonableness *simpliciter*, mere disagreement with the adjudicator's decision is insufficient to warrant intervention (see, for example, *Paccar*, *supra*, at pp. 1003-4, *per* La Forest J., and *Chamberlain*, *supra*, at para. 15, *per* McLachlin C.J.). Applying the patent unreasonableness standard, "the court will defer even if the interpretation given by the tribunal . . . is not the 'right' interpretation in the court's view nor even the 'best' of two possible interpretations, so long as it is an interpretation reasonably attributable to the words of the agreement" (*United Brotherhood of Carpenters and Joiners of America, Local 579 v. Bradco Construction Ltd.*, [1993] 2 S.C.R. 316, at p. 341). In the case of reasonableness *simpliciter*, "a decision may satisfy the . . . standard if it is supported by a tenable explanation even if this explanation is not one that the reviewing court finds compelling" (*Ryan*, *supra*, at para. 55). There seems to me to be no qualitative basis on which to differentiate effectively between these various characterizations of a rationality analysis; how, for instance, would a decision that is not "tenably supported" (and is thus "merely" unreasonable) differ from a decision that is not "rationally supported" (and is thus patently unreasonable)?

108     In the end, the essential question remains the same under both standards: was the decision of the adjudicator taken in accordance with reason? Where the answer is no, for instance because the legislation in question cannot rationally support the adjudicator's interpretation, the error will invalidate the decision, regardless of whether the standard applied is reasonableness *simpliciter* or patent unreasonableness (see D. K. Lovett, "That Curious Curial Deference Just Gets Curiouser and Curiouser — *Canada (Director of Investigation and Research) v. Southam Inc.*" (1997), 55 *Advocate (B.C.)* 541, at p. 545). Because the two variants of reasonableness

avancés pour étayer la décision ne pouvait raisonnablement amener le tribunal à rendre la décision prononcée » (*Ryan*, précité, par. 53).

Suivant les normes actuelles du manifestement déraisonnable et du raisonnable *simpliciter*, le seul désaccord avec la décision du tribunal ne suffit pas pour justifier l'intervention de la cour (voir par exemple *Paccar*, précité, p. 1003-1004, le juge La Forest, et *Chamberlain*, précité, par. 15, la juge en chef McLachlin). Lorsqu'elle appliquera la norme de la décision manifestement déraisonnable, « la cour de justice fera preuve de retenue même si, à son avis, l'interprétation qu'a donnée le tribunal [. . .] n'est pas la "bonne" ni même la "meilleure" de deux interprétations possibles, pourvu qu'il s'agisse d'une interprétation que peut raisonnablement souffrir le texte de la convention » (*Fraternité unie des charpentiers et menuisiers d'Amérique, section locale 579 c. Bradco Construction Ltd.*, [1993] 2 R.C.S. 316, p. 341). Au regard de la norme de la décision raisonnable *simpliciter*, « une décision peut satisfaire à la norme du raisonnable si elle est fondée sur une explication défendable, même si elle n'est pas convaincante aux yeux de la cour de révision » (*Ryan*, précité, par. 55). Il me paraît n'y avoir aucune différence qualitative réelle entre ces définitions d'une analyse axée sur la recherche d'un fondement rationnel; comment, par exemple, une décision non « fondée sur une explication raisonnable » (et donc « simplement » déraisonnable) se distingue-t-elle d'une décision qui ne peut « raisonnablement s'appuyer » sur la législation pertinente (et qui est donc manifestement déraisonnable)?

En fin de compte, la question essentielle demeure la même pour les deux normes : la décision du tribunal est-elle conforme à la raison? Si la réponse est négative du fait que, par exemple, les dispositions en cause ne peuvent rationnellement appuyer l'interprétation du tribunal, l'erreur entraîne l'invalidation de la décision, que la norme appliquée soit celle du raisonnable *simpliciter* ou du manifestement déraisonnable (voir D. K. Lovett, « That Curious Curial Deference Just Gets Curiouser and Curiouser — *Canada (Director of Investigation and Research) v. Southam Inc.* » (1997), 55 *Advocate (B.C.)* 541, p. 545). Puisque les deux variantes de la norme de

are united at their theoretical source, the imperative for the reviewing court to intervene will turn on the conclusion that the adjudicator's decision deviates from what falls within the ambit of the reasonable, not on "fine distinctions" between the test for patent unreasonableness and reasonableness *simpliciter* (see Falzon, *supra*, at p. 33).

The existence of these two variants of reasonableness review forces reviewing courts to continue to grapple with the significant practical problems inherent in distinguishing meaningfully between the two standards. To the extent that a distinction is advanced on the basis of the relative severity of the defect, this poses not only practical difficulties but also difficulties in principle, as this approach implies that patent unreasonableness, in requiring "clear" rather than "mere" irrationality, allows for a margin of appreciation for decisions that are not in accordance with reason. In this respect, I would echo Mullan's comments that there would "have to be concerns with a regime of judicial review which would allow any irrational decision to escape rebuke even under the most deferential standard of scrutiny" (Mullan, "Recent Developments in Standard of Review", *supra*, at p. 25).

### (iii) The "Immediacy or Obviousness" of the Defect

There is a second approach to distinguishing between patent unreasonableness and reasonableness *simpliciter* that requires discussion. *Southam*, *supra*, at para. 57, emphasized the "immediacy or obviousness" of the defect:

The difference between "unreasonable" and "patently unreasonable" lies in the immediacy or obviousness of the defect. If the defect is apparent on the face of the tribunal's reasons, then the tribunal's decision is patently unreasonable. But if it takes some significant searching or testing to find the defect, then the decision is unreasonable but not patently unreasonable.

In my view, two lines of difficulty have emerged from emphasizing the "immediacy or obvious-

la décision raisonnable possèdent le même fondement théorique, l'intervention de la cour de justice s'appuiera sur sa conclusion selon laquelle la décision du tribunal déborde des limites du raisonnable, et non sur de « subtiles nuances » entre le critère du manifestement déraisonnable et celui du raisonnable *simpliciter* (voir Falzon, *loc. cit.*, p. 33).

109 L'existence de ces deux variantes de la norme de la décision raisonnable contraint la cour chargée du contrôle à continuer à affronter les grandes difficultés d'ordre pratique que comporte en soi l'établissement d'une distinction réelle entre les deux normes. Une distinction proposée sur le fondement de la gravité relative du défaut comporte non seulement des difficultés d'ordre pratique, mais soulève également des questions de principe, en ce qu'elle suppose que la norme du manifestement déraisonnable, en exigeant que la décision soit « clairement », et non « simplement », irrationnelle, offre une marge de manœuvre dans l'appréciation des décisions qui ne sont pas conformes à la raison. À cet égard, je me permets de rappeler les propos de Mullan selon lesquels [TRADUCTION] « il y a lieu de s'inquiéter d'un régime de contrôle judiciaire qui permet le maintien d'une décision irrationnelle, même lorsque s'applique la norme commandant le degré le plus élevé de déférence » (Mullan, « Recent Developments in Standard of Review », *loc. cit.*, p. 25).

### (iii) Le caractère flagrant ou évident du défaut

110 Il convient d'examiner un autre critère appliqué pour distinguer entre le manifestement déraisonnable et le raisonnable *simpliciter*. Dans *Southam*, précité, par. 57, notre Cour a mis l'accent sur le caractère « flagrant ou évident » du défaut :

La différence entre « déraisonnable » et « manifestement déraisonnable » réside dans le caractère flagrant ou évident du défaut. Si le défaut est manifeste au vu des motifs du tribunal, la décision de celui-ci est alors manifestement déraisonnable. Cependant, s'il faut procéder à un examen ou à une analyse en profondeur pour déceler le défaut, la décision est alors déraisonnable mais non manifestement déraisonnable.

111 À mon avis, l'insistance sur le caractère « flagrant ou évident » du défaut et, partant, sur la nature

ness" of the defect, and thus the relative invasiveness of the review necessary to find it, as a means of distinguishing between patent unreasonableness and reasonableness *simpliciter*. The first is the difficulty of determining how invasive a review is invasive enough, but not too invasive, in each case. The second is the difficulty that flows from ambiguity as to the intended meaning of "immediacy or obviousness" in this context: is it the obviousness of the defect in the sense of its transparency on the face of the decision that is the defining characteristic of patent unreasonableness review (see J. L. H. Sprague, "Another View of *Baker*" (1999), 7 *Reid's Administrative Law* 163, at pp. 163 and 165, note 5), or is it rather the obviousness of the defect in terms of the ease with which, once found, it can be identified as severe? The latter interpretation may bring with it difficulties of the sort I referred to above — i.e., attempting to qualify degrees of irrationality. The former interpretation, it seems to me, presents problems of its own, which I discuss below.

112    Turning first to the difficulty of actually applying a distinction based on the "immediacy or obviousness" of the defect, we are confronted with the criticism that the "somewhat probing examination" criterion (see *Southam*, *supra*, at para. 56) is not clear enough (see D. W. Elliott, "*Suresh* and the Common Borders of Administrative Law: Time for the Tailor?" (2002), 65 *Sask. L. Rev.* 469, at pp. 486-87). As Elliott notes: "[t]he distinction between a 'somewhat probing examination' and those which are simply probing, or are less than probing, is a fine one. It is too fine to permit courts to differentiate clearly among the three standards."

113    This Court has itself experienced some difficulty in consistently performing patent unreasonableness review in a way that is less probing than the "somewhat probing" analysis that is the hallmark of reasonableness *simpliciter*. Despite the fact that a less invasive review has been described as a defining characteristic of the standard of patent unreasonableness, in a number of the Court's recent decisions, including *Toronto (City) Board of Education*, *supra*,

plus ou moins envahissante de l'examen nécessaire à sa découverte, pour distinguer entre le manifestement déraisonnable et le raisonnable *simpliciter*, a fait naître deux difficultés. La première est de circonscrire dans chacun des cas l'examen qui est assez envahissant sans l'être trop. La deuxième se retrouve dans l'ambiguïté de la définition du caractère « flagrant ou évident » dans ce contexte : est-ce le caractère évident du défaut, le fait qu'il ressorte à première vue de la décision, qui définit fondamentalement le contrôle selon la norme du manifestement déraisonnable (voir J. L. H. Sprague, « Another View of *Baker* » (1999), 7 *Reid's Administrative Law* 163, p. 163 et 165, note 5) ou s'agit-il plutôt du caractère évident du défaut, compte tenu de la facilité avec laquelle il peut être qualifié de grave après sa découverte? Cette dernière interprétation peut poser des problèmes semblables à ceux mentionnés précédemment — l'établissement d'une échelle de l'irrationalité. La première interprétation me paraît comporter ses propres difficultés, dont je fais état ci-après.

En ce qui concerne tout d'abord la difficulté d'appliquer *de facto* une distinction fondée sur le caractère « flagrant ou évident » du défaut, d'aucuns ont déploré que le critère de l'« examen assez poussé » (voir *Southam*, précité, par. 56) ne soit pas suffisamment clair (voir D. W. Elliott, « *Suresh* and the Common Borders of Administrative Law : Time for the Tailor? » (2002), 65 *Sask. L. Rev.* 469, p. 486-487). Comme le fait observer Elliott : [TRADUCTION] « [l]a nuance entre un « examen assez poussé » et un examen simplement poussé ou moins poussé, est subtile. Elle est trop subtile pour permettre aux cours de justice de différencier clairement les trois normes. »

Notre Cour a elle-même eu du mal à effectuer, dans tous les cas d'application de la norme du manifestement déraisonnable, un examen moins poussé par rapport à l'examen « assez poussé » qui caractérise la norme du raisonnable *simpliciter*. Même si l'on a affirmé qu'un examen moins envahissant constituait la caractéristique fondamentale de la norme du manifestement déraisonnable, dans un certain nombre d'arrêts récents, y compris *Conseil*

and *Ivanhoe*, *supra*, one could fairly characterize the Court's analysis under this standard as at least "somewhat" probing in nature.

Even prior to *Southam* and the development of reasonableness *simpliciter*, there was some uncertainty as to how intensely patent unreasonableness review is to be performed. This is particularly evident in *National Corn Growers*, *supra* (see generally Mullan, "Of Chaff Midst the Corn", *supra*; Mullan, *Administrative Law*, *supra*, at pp. 72-73). In that case, while Wilson J. counselled restraint on the basis of her reading of *CUPE*, *supra*, Gonthier J., for the majority, performed quite a searching review of the decision of the Canadian Import Tribunal. He reasoned, at p. 1370, that "[i]n some cases, the unreasonableness of a decision may be apparent without detailed examination of the record. In others, it may be no less unreasonable but this can only be understood upon an in-depth analysis."

*Southam* itself did not definitively resolve the question of how invasively review for patent unreasonableness should be performed. An intense review would seem to be precluded by the statement that, "if it takes some significant searching or testing to find the defect, then the decision is unreasonable but not patently unreasonable" (para. 57). The possibility that, in certain circumstances, quite a thorough review for patent unreasonableness will be appropriate, however, is left open: "[i]f the decision under review is sufficiently difficult, then perhaps a great deal of reading and thinking will be required before the judge will be able to grasp the dimensions of the problem" (para. 57).

This brings me to the second problem: in what sense is the defect immediate or obvious? *Southam* left some ambiguity on this point. As I have outlined, on the one hand, a patently unreasonable decision is understood as one that is

*de l'éducation de Toronto (Cité)* et *Ivanhoe*, précités, l'on peut qualifier d'« assez » poussée, à tout le moins, l'analyse que notre Cour a effectuée en fonction de cette norme.

Même avant *Southam* et l'élaboration de la norme du raisonnable *simpliciter*, un degré d'incertitude régnait quant au caractère plus ou moins approfondi que devait revêtir le contrôle en fonction de la norme du manifestement déraisonnable. Cela ressort particulièrement de *National Corn Growers*, précité (voir généralement Mullan, « Of Chaff Midst the Corn », *loc. cit.*; Mullan, *Administrative Law*, *op. cit.*, p. 72-73). Dans cette affaire, alors que, se fondant sur son interprétation de *SCFP*, précité, la juge Wilson préconise la retenue, le juge Gonthier, au nom des juges majoritaires, se livre à un examen plutôt approfondi de la décision du Tribunal canadien des importations. Selon lui, « [d]ans certains cas, le caractère déraisonnable d'une décision peut ressortir sans qu'il soit nécessaire d'examiner en détail le dossier. Dans d'autres cas, il se peut qu'elle ne soit pas moins déraisonnable mais que cela ne puisse être constaté qu'après une analyse en profondeur » (p. 1370).

À lui seul, *Southam* n'a pas réglé définitivement la question de l'examen plus ou moins envahissant que commande la norme du manifestement déraisonnable. L'énoncé « s'il faut procéder à un examen ou à une analyse en profondeur pour déceler le défaut, la décision est alors déraisonnable mais non manifestement déraisonnable » (par. 57) paraît militer contre un examen en profondeur. Cependant, l'énoncé suivant laisse planer la possibilité que, dans certains cas, la norme de la décision manifestement déraisonnable commande un examen assez approfondi : « Si la décision contrôlée par un juge est assez complexe, il est possible qu'il lui faille faire beaucoup de lecture et de réflexion avant d'être en mesure de saisir toutes les dimensions du problème » (par. 57).

Ces réflexions nous amènent à l'examen de la deuxième difficulté : qu'entend-on par défaut flagrant ou évident? L'arrêt *Southam* reste ambigu sur ce point. Comme je l'ai exposé, d'une part, l'on entend par décision manifestement déraison-

114

115

116

flawed by a defect that is evident on the face of the decision, while an unreasonable decision is one that is marred by a defect that it takes significant searching or testing to find. In other places, however, *Southam* suggests that the "immediacy or obviousness" of a patently unreasonable defect refers not to the ease of its detection, but rather to the ease with which, once detected, it can be identified as severe. Particularly relevant in this respect is the statement that "once the lines of the problem have come into focus, if the decision is patently unreasonable, then the unreasonableness will be evident" (para. 57). It is the (admittedly sometimes only tacit) recognition that what must in fact be evident — i.e., clear, obvious, or immediate — is the defect's magnitude upon detection that allows for the possibility that in certain circumstances "it will simply not be possible to understand and respond to a patent unreasonableness argument without a thorough examination and appreciation of the tribunal's record and reasoning process" (see Mullan, *Administrative Law*, *supra*, at p. 72; see also *Ivanhoe*, *supra*, at para. 34).

117    Our recent decision in *Ryan* has brought more clarity to *Southam*, but still reflects a degree of ambiguity on this issue. In *Ryan*, at para. 52, the Court held:

> In *Southam*, *supra*, at para. 57, the Court described the difference between an unreasonable decision and a patently unreasonable one as rooted "in the immediacy or obviousness of the defect". Another way to say this is that a patently unreasonable defect, once identified, can be explained simply and easily, leaving no real possibility of doubting that the decision is defective. A patently unreasonable decision has been described as "clearly irrational" or "evidently not in accordance with reason" (*Canada (Attorney General) v. Public Service Alliance of Canada*, [1993] 1 S.C.R. 941, at pp. 963-64, *per* Cory J.; *Centre communautaire juridique de l'Estrie v. Sherbrooke (City)*, [1996] 3 S.C.R. 84, at paras. 9-12, *per* Gonthier J.). A decision that is patently unreasonable is so flawed that no amount of curial deference can justify letting it stand. [Emphasis added.]

nable la décision qui, à première vue, est entachée d'un défaut, alors que la décision déraisonnable est celle qui est affectée d'un défaut dont la découverte exige maintes recherches ou vérifications. Toutefois, dans *Southam*, notre Cour laisse entendre par ailleurs que le caractère « flagrant ou évident » d'un défaut manifestement déraisonnable ne tient pas à la facilité de sa détection mais bien à celle de sa qualification de grave une fois qu'il a été découvert. Revêt alors une importance particulière à cet égard l'énoncé selon lequel « une fois que les contours du problème sont devenus apparents, si la décision est manifestement déraisonnable, son caractère déraisonnable ressortira » (par. 57). On reconnaît ainsi (parfois seulement tacitement, il est vrai) que ce qui doit en fait ressortir — c'est-à-dire être clair, manifeste ou flagrant — c'est l'importance du défaut lors de sa mise au jour et admettre que, dans certains cas, [TRADUCTION] « il ne sera tout simplement pas possible de comprendre l'argumentation relative au caractère manifestement déraisonnable et d'y répondre sans procéder à une analyse et à une évaluation approfondies du dossier du tribunal et de son raisonnement » (voir Mullan, *Administrative Law*, *op. cit.*, p. 72; voir également *Ivanhoe*, précité, par. 34).

Dans le récent arrêt *Ryan*, par. 52, notre Cour a apporté plus de clarté à l'arrêt *Southam*, malgré la persistance d'une part d'ambiguïté :

> Dans *Southam*, précité, par. 57, la Cour explique que la différence entre une décision déraisonnable et une décision manifestement déraisonnable réside « dans le caractère flagrant ou évident du défaut ». Autrement dit, dès qu'un défaut manifestement déraisonnable a été relevé, il peut être expliqué simplement et facilement, de façon à écarter toute possibilité réelle de douter que la décision est viciée. La décision manifestement déraisonnable a été décrite comme étant « clairement irrationnelle » ou « de toute évidence non conforme à la raison » (*Canada (Procureur général) c. Alliance de la Fonction publique du Canada*, [1993] 1 R.C.S. 941, p. 963-964, le juge Cory; *Centre communautaire juridique de l'Estrie c. Sherbrooke (Ville)*, [1996] 3 R.C.S. 84, par. 9-12, le juge Gonthier). Une décision qui est manifestement déraisonnable est à ce point viciée qu'aucun degré de déférence judiciaire ne peut justifier de la maintenir. [Je souligne.]

This passage moves the focus away from the obviousness of the defect in the sense of its transparency "on the face of the decision", to the obviousness of its magnitude once it has been identified. At other points, however, the relative invasiveness of the review required to identify the defect is emphasized as the means of distinguishing between patent unreasonableness and reasonableness *simpliciter*:

A decision may be unreasonable without being patently unreasonable when the defect in the decision is less obvious and might only be discovered after "significant searching or testing" (*Southam*, *supra*, at para. 57). Explaining the defect may require a detailed exposition to show that there are no lines of reasoning supporting the decision which could reasonably lead that tribunal to reach the decision it did.

(*Ryan*, *supra*, at para. 53)

Such ambiguity led commentators such as David Phillip Jones to continue to question in light of *Ryan* whether

whatever it is that makes the decision "patently unreasonable" [must] appear on the face of the record . . . Or can one go beyond the record to demonstrate — "identify" — why the decision is patently unreasonable? Is it the "immediacy and obviousness of the defect" which makes it patently unreasonable, or does patently unreasonable require outrageousness so that the decision is so flawed that no amount of curial deference can justify letting it stand?

(D. P. Jones, "Notes on *Dr. Q* and *Ryan*: Two More Decisions by the Supreme Court of Canada on the Standard of Review in Administrative Law", paper originally presented at the Canadian Institute for the Administration of Justice, Western Roundtable, Edmonton, April 25, 2003, at p. 10.)

As we have seen, the answers to such questions are far from self-evident, even at the level of theoretical abstraction. How much more difficult must they be for reviewing courts and counsel struggling to apply not only patent unreasonableness, but also reasonableness *simpliciter*? (See, in this regard, the comments of Mullan in "Recent Developments in Standard of Review", *supra*, at p. 4.)

Cet extrait met l'accent non plus sur le caractère évident du défaut en ce qu'il ressort à première vue de la décision, mais sur celui de l'importance du défaut une fois qu'il est découvert. Un autre passage, cependant, insiste plutôt sur le caractère plus ou moins envahissant de l'examen qui s'impose pour découvrir le défaut comme critère de distinction entre le manifestement déraisonnable et le raisonnable *simpliciter* :

Une décision peut être déraisonnable sans être manifestement déraisonnable lorsque le défaut dans la décision est moins évident et qu'il ne peut être décelé qu'après « une analyse en profondeur » (*Southam*, précité, par. 57). L'explication du défaut peut exiger une explication détaillée pour démontrer qu'aucun des raisonnements avancés pour étayer la décision ne pouvait raisonnablement amener le tribunal à rendre la décision prononcée.

(*Ryan*, précité, p. 53)

118

Cette ambiguïté a incité des observateurs comme David Phillip Jones à se demander encore, à la lumière de *Ryan*, si

[TRADUCTION] ce qui rend la décision « manifestement déraisonnable » doit ressortir à première vue du dossier [. . .] Ou peut-on tenir compte d'autres facteurs que le dossier pour établir en quoi la décision est manifestement déraisonnable? Est-ce le caractère « flagrant ou évident du défaut » qui la rend manifestement déraisonnable ou cette norme exige-t-elle une extravagance viciant à tel point la décision qu'aucun degré de déférence judiciaire ne peut justifier son maintien?

(D. P. Jones, « Notes on *Dr. Q* and *Ryan* : Two More Decisions by the Supreme Court of Canada on the Standard of Review in Administrative Law », exposé initialement présenté à l'Institut canadien d'administration de la justice, table ronde de l'Ouest, Edmonton, 25 avril 2003, p. 10.)

119

Comme nous l'avons vu, les réponses à ces questions sont loin d'aller de soi, même sur le plan théorique. Quand jugera-t-on excessif le mal que doivent se donner pour y répondre les cours de justice et les avocats s'efforçant d'appliquer non seulement la norme du manifestement déraisonnable, mais aussi celle du raisonnable *simpliciter*? (Voir à cet égard les observations de Mullan dans « Recent Developments in Standard of Review », *loc. cit.*, p. 4.)

120    Absent reform in this area or a further clarification of the standards, the "epistemological" confusion over the relationship between patent unreasonableness and reasonableness *simpliciter* will continue. As a result, both the types of errors that the two variants of reasonableness are likely to catch — i.e., interpretations that fall outside the range of those that can be "reasonably", "rationally" or "tenably" supported by the statutory language — and the way in which the two standards are applied will in practice, if not necessarily in theory, be much the same.

121    There is no easy way out of this conundrum. Whatever attempts are made to clarify the contours of, or the relationship between, the existing definitional strands of patent unreasonableness, this standard and reasonableness *simpliciter* will continue to be rooted in a shared rationale: statutory language is often ambiguous and "admits of more than one possible meaning"; provided that the expert administrative adjudicator's interpretation "does not move outside the bounds of reasonably permissible visions of the appropriate interpretation, there is no justification for court intervention" (Mullan, "Recent Developments in Standard of Review", *supra*, at p. 18). It will thus remain difficult to keep these standards conceptually distinct, and I query whether, in the end, the theoretical efforts necessary to do so are productive. Obviously any decision that fails the test of patent unreasonableness must also fall on a standard of reasonableness *simpliciter*, but it seems hard to imagine situations where the converse is not also true: if a decision is not supported by a tenable explanation (and is thus unreasonable) (*Ryan*, *supra*, at para. 55), how likely is it that it could be sustained on "any reasonable interpretation of the facts or of the law" (and thus not be patently unreasonable) (*National Corn Growers*, *supra*, at pp. 1369-70, *per* Gonthier J.)?

122    Thus, both patent unreasonableness and reasonableness *simpliciter* require that reviewing courts pay "respectful attention" to the reasons of adjudicators

À défaut d'une réforme en la matière ou d'une clarification des normes, la confusion « épistémologique » entourant la relation entre le manifestement déraisonnable et le raisonnable *simpliciter* persistera. Ainsi, tant les types d'erreurs que les deux variantes de la norme de la décision raisonnable permettent de déceler — soit les interprétations qui ne peuvent être tenues pour « raisonnables », « rationnelles » ou « défendables » compte tenu des dispositions en cause — que la manière dont les deux normes sont appliquées seront en pratique, si ce n'est nécessairement en théorie, essentiellement les mêmes.

Il n'existe pas de solution facile à ce problème délicat. En dépit des mesures prises pour préciser le contenu des catégories actuelles de décisions manifestement déraisonnables ou la relation existant entre elles, cette norme et celle de la décision raisonnable *simpliciter* continueront d'avoir une raison d'être commune : il arrive souvent que le législateur s'exprime de manière équivoque et qu'une disposition [TRADUCTION] « se prête à plus d'une interprétation »; tant que l'interprétation du tribunal administratif spécialisé [TRADUCTION] « ne dépasse pas les limites d'une conception raisonnable de l'interprétation qui s'impose, rien ne justifie la cour d'intervenir » (Mullan, « Recent Developments in Standard of Review », *loc. cit.*, p. 18). Il demeurera donc difficile d'assurer l'étanchéité conceptuelle de ces normes et je m'interroge sur l'utilité, au bout du compte, des efforts théoriques que cet exercice exige. De toute évidence, la décision qui ne satisfait pas à la norme du manifestement déraisonnable ne répond pas non plus à celle du raisonnable *simpliciter*, mais il paraît difficile de concevoir un cas où l'inverse n'est pas également vrai : lorsqu'une décision n'est pas fondée sur une explication défendable (et est de ce fait déraisonnable) (*Ryan*, précité, par. 55), quelle est la possibilité de sa confirmation « selon une interprétation raisonnable des faits ou du droit » (sans qu'elle soit tenue par manifestement déraisonnable) (*National Corn Growers*, précité, le juge Gonthier, p. 1369)?

Ainsi, la norme du manifestement déraisonnable et celle du raisonnable *simpliciter* exigent des cours de justice qu'elles accordent une « attention

in assessing the rationality of administrative decisions (see *Baker v. Canada (Minister of Citizenship and Immigration)*, [1999] 2 S.C.R. 817, at para. 65, *per* L'Heureux-Dubé J., citing D. Dyzenhaus, "The Politics of Deference: Judicial Review and Democracy", in M. Taggart, ed., *The Province of Administrative Law* (1997), 279, at p. 286, and *Ryan*, *supra*, at para. 49).

Attempting to differentiate between these two variants of curial deference by classifying one as "somewhat more probing" in its attentiveness than the other is unlikely to prove any more successful in practice than it has proven in the past. Basing the distinction on the relative ease with which a defect may be detected also raises a more theoretical quandary: the difficulty of articulating why a defect that is obvious on the face of a decision should present more of an imperative for court intervention than a latent defect. While a defect may be readily apparent because it is severe, a severe defect will not necessarily be readily apparent; by the same token, a flaw in a decision may be immediately evident, or obvious, but relatively inconsequential in nature.

On the other hand, the effect of clarifying that the language of "immediacy or obviousness" goes not to ease of detection, but rather to the ease with which, once detected (on either a superficial or a probing review), a defect may be identified as severe might well be to increase the regularity with which reviewing courts subject decisions to as intense a review on a standard of patent unreasonableness as on a standard of reasonableness *simpliciter*, thereby further eliding any difference between the two.

An additional effect of clarifying that the "immediacy or obviousness" of the defect refers not to its transparency on the face of the decision but rather to its magnitude upon detection is to suggest that it is feasible and appropriate for reviewing courts to attempt to qualify degrees of irrationality in assessing the decisions of administrative adjudicators: i.e., this decision is irrational enough to be unreasonable, but not so irrational as to be

respectueuse » aux motifs des tribunaux administratifs en se prononçant sur la rationalité de leurs décisions (voir *Baker c. Canada (Ministre de la Citoyenneté et de l'Immigration)*, [1999] 2 R.C.S. 817, par. 65, la juge L'Heureux-Dubé, citant D. Dyzenhaus, « The Politics of Deference : Judicial Review and Democracy », dans M. Taggart, dir., *The Province of Administrative Law* (1997), 279, p. 286, et *Ryan*, précité, par. 49).

Il est peu probable que, en pratique, les efforts visant à distinguer ces deux variantes de la déférence judiciaire en qualifiant l'examen que commande l'une d'elles d'« un peu plus poussé » se révèlent plus fructueux que par le passé. Fonder la distinction sur l'aisance relative avec laquelle peut être découvert le défaut crée par ailleurs un dilemme plus théorique : pourquoi un défaut ressortant à première vue de la décision justifierait-il davantage la cour d'intervenir qu'un défaut caché? Même si un défaut peut être aisément décelé en raison de sa gravité, un défaut grave ne sera pas nécessairement facile à découvrir; par ailleurs, une erreur peut être d'emblée évidente ou manifeste, mais sans avoir d'effet sérieux.

Par contre, préciser que le caractère « flagrant ou évident » ne tient pas à la facilité de la détection du défaut, mais bien à la facilité avec laquelle, une fois mis au jour (à l'issue d'un examen superficiel ou poussé), le défaut peut être qualifié de grave pourrait bien amener les cours de justice à soumettre plus fréquemment les décisions qu'elles contrôlent en fonction de la norme du manifestement déraisonnable à un examen aussi approfondi que celui effectué au regard de la norme du raisonnable *simpliciter*, gommant ainsi davantage la différence, s'il en est, entre les deux.

Préciser que le caractère « flagrant ou évident » du défaut ne renvoie pas au fait qu'il ressort à première vue de la décision, mais plutôt à son importance, une fois découvert, donne également à penser qu'il est possible et opportun qu'une cour de justice tente de recourir à une échelle de l'irrationalité lorsqu'elle évalue la décision d'un tribunal administratif. Par exemple, telle décision est suffisamment irrationnelle pour être déraisonnable, mais elle ne

123

124

125

overturned on a standard of patent unreasonableness. Such an outcome raises questions as to whether the legislative intent could ever be to let irrational decisions stand. In any event, such an approach would seem difficult to reconcile with the rule of law.

126    I acknowledge that there are certain advantages to the framework to which this Court has adhered since its adoption in *Southam*, *supra*, of a third standard of review. The inclusion of an intermediate standard does appear to provide reviewing courts with an enhanced ability to tailor the degree of deference to the particular situation. In my view, however, the lesson to be drawn from our experience since then is that those advantages appear to be outweighed by the current framework's drawbacks, which include the conceptual and practical difficulties that flow from the overlap between patent unreasonableness and reasonableness *simpliciter*, and the difficulty caused at times by the interplay between patent unreasonableness and correctness.

127    In particular, the inability to sustain a viable analytical distinction between the two variants of reasonableness has impeded their application in practice in a way that fulfils the theoretical promise of a more precise reflection of the legislature's intent. In the end, attempting to distinguish between the unreasonable and the patently unreasonable may be as unproductive as attempting to differentiate between the "illegible" and the "patently illegible". While it may be possible to posit, in the abstract, some kind of conceptual distinction, the functional reality is that once a text is illegible — whether its illegibility is evident on a cursory glance or only after a close examination — the result is the same. There is little to be gained from debating as to whether the text is illegible *simpliciter* or patently illegible; in either case it cannot be read.

128    It is also necessary to keep in mind the theoretical foundations for judicial review and its ultimate purpose. The purpose of judicial review is to uphold the normative legal order by ensuring that the

l'est pas assez pour être infirmée suivant la norme du manifestement déraisonnable. Un tel résultat conduit à se demander si le législateur a pu vouloir qu'une décision irrationnelle soit maintenue. Quoi qu'il en soit, une telle interprétation paraît difficile à concilier avec les exigences d'un régime juridique fondé sur la règle de droit.

Je reconnais que le cadre établi par notre Cour depuis l'adoption, dans *Southam*, précité, d'une troisième norme de contrôle, comporte certains avantages, du moins en théorie. L'existence d'une norme intermédiaire paraît permettre aux cours de justice de mieux adapter le degré de déférence à la situation considérée. Toutefois, j'estime qu'une leçon doit être tirée de notre expérience : les inconvénients du cadre actuel, y compris les difficultés conceptuelles et pratiques découlant du chevauchement entre la norme du manifestement déraisonnable et celle du raisonnable *simpliciter*, de même que la difficulté résultant de l'interaction paradoxale entre la norme du manifestement déraisonnable et celle de la décision correcte, paraissent l'emporter sur ces avantages.

Plus particulièrement, l'impossibilité de maintenir une distinction analytique viable entre les deux variantes de la norme de la décision raisonnable a fait obstacle, en pratique, à une application présumément plus fidèle à l'intention du législateur. En fin de compte, tenter d'établir une distinction entre une décision déraisonnable et une décision manifestement déraisonnable peut être aussi stérile que d'essayer de distinguer ce qui est « illisible » de ce qui est « manifestement illisible ». Même s'il est possible d'établir, dans l'abstrait, une distinction conceptuelle, la réalité fonctionnelle veut que, une fois le texte jugé illisible — que cette illisibilité ressorte d'un examen sommaire ou uniquement d'une analyse en profondeur —, le résultat demeure le même. Il serait vain de chercher à savoir si le texte est illisible *simpliciter* ou manifestement illisible; dans l'un et l'autre des cas, il ne peut être lu.

Il ne faut pas non plus perdre de vue les fondements théoriques et l'objectif ultime du contrôle judiciaire. Le contrôle judiciaire vise à maintenir l'ordre juridique normatif en s'assurant que les

decisions of administrative decision makers are both procedurally sound and substantively defensible. As McLachlin C.J. explained in *Dr. Q*, *supra*, at para. 21, the two touchstones of judicial review are legislative intent and the rule of law:

[In *Pushpanathan*,] Bastarache J. affirmed that "[t]he central inquiry in determining the standard of review exercisable by a court of law is the legislative intent of the statute creating the tribunal whose decision is being reviewed" (para. 26). However, this approach also gives due regard to "the consequences that flow from a grant of powers" (*Bibeault*, *supra*, at p. 1089) and, while safeguarding "[t]he role of the superior courts in maintaining the rule of law" (p. 1090), reinforces that this reviewing power should not be employed unnecessarily. In this way, the pragmatic and functional approach inquires into legislative intent, but does so against the backdrop of the courts' constitutional duty to protect the rule of law.

In short, the role of a court in determining the standard of review is to be faithful to the intent of the legislature that empowered the administrative adjudicator to make the decision, as well as to the animating principle that, in a society governed by the rule of law, power is not to be exercised arbitrarily or capriciously.

As this Court has observed, the rule of law is a "highly textured expression, importing many things which are beyond the need of these reasons to explore but conveying, for example, a sense of orderliness, of subjection to known legal rules and of executive accountability to legal authority" (*Reference re Resolution to Amend the Constitution*, [1981] 1 S.C.R. 753, at pp. 805-6). As the Court elaborated in *Reference re Secession of Quebec*, [1998] 2 S.C.R. 217, at para. 71:

In the *Manitoba Language Rights Reference*, *supra*, at pp. 747-52, this Court outlined the elements of the rule of law. We emphasized, first, that the rule of law provides that the law is supreme over the acts of both government and private persons. There is, in short, one law for all. Second, we explained, at p. 749, that "the rule of law requires the creation and maintenance of an actual order of positive laws which preserves and embodies the more general principle of normative order". . . . A third aspect of the rule of law is . . . that "the exercise of all public

décisions des tribunaux administratifs soient rendues conformément à la procédure établie et soient défendables quant au fond. Comme l'a expliqué la juge en chef McLachlin dans *Dr Q*, précité, par. 21, les deux fondements du contrôle judiciaire sont l'intention du législateur et la primauté du droit :

[Dans *Pushpanathan*,] [l]e juge Bastarache affirme que « [l]a détermination de la norme de contrôle que la cour de justice doit appliquer est centrée sur l'intention du législateur qu'a créé le tribunal dont la décision est en cause » (par. 26). Cependant, cette méthode tient aussi dûment compte des « conséquences qui découlent d'un octroi de pouvoir » (*Bibeault*, p. 1089) et, tout en sauvegardant « [l]e rôle des cours supérieures dans le maintien de la légalité » (p. 1090), renforce le principe selon lequel il ne faut pas recourir sans nécessité à ce pouvoir de surveillance. La méthode pragmatique et fonctionnelle implique ainsi l'examen de l'intention du législateur, mais sur l'arrière-plan de l'obligation constitutionnelle des tribunaux de protéger la légalité.

En somme, la cour appelée à déterminer la norme de contrôle applicable doit rester fidèle à la volonté du législateur d'investir le tribunal administratif du pouvoir de rendre la décision. Elle doit en outre respecter le principe fondamental selon lequel, dans une société où prime le droit, le pouvoir ne doit pas être exercé de manière arbitraire.

Comme notre Cour l'a signalé, « la règle de droit » est une « expression haute en couleur qui, sans qu'il soit nécessaire d'en examiner ici les nombreuses implications, communique par exemple un sens de l'ordre, de la sujétion aux règles juridiques connues et de la responsabilité de l'exécutif devant l'autorité légale » (*Renvoi : Résolution pour modifier la Constitution*, [1981] 1 R.C.S. 753, p. 805-806). Notre Cour a développé sa pensée sur le sujet dans *Renvoi relatif à la sécession du Québec*, [1998] 2 R.C.S. 217, par. 71 :

Dans le *Renvoi relatif aux droits linguistiques au Manitoba*, précité, aux pp. 747 à 752, notre Cour a défini les éléments de la primauté du droit. Nous avons souligné en premier lieu la suprématie du droit sur les actes du gouvernement et des particuliers. En bref, il y a une seule loi pour tous. Deuxièmement, nous expliquons, à la p. 749, que « la primauté du droit exige la création et le maintien d'un ordre réel de droit positif qui préserve et incorpore le principe plus général de l'ordre normatif ». [. . .] Un troisième aspect de la primauté du droit

power must find its ultimate source in a legal rule". Put another way, the relationship between the state and the individual must be regulated by law. Taken together, these three considerations make up a principle of profound constitutional and political significance.

"At its most basic level", as the Court affirmed, at para. 70, "the rule of law vouchsafes to the citizens and residents of the country a stable, predictable and ordered society in which to conduct their affairs. It provides a shield for individuals from arbitrary state action."

130    Because arbitrary state action is not permissible, the exercise of power must be justifiable. As the Chief Justice has noted,

. . . societies governed by the Rule of Law are marked by a certain *ethos of justification*. In a democratic society, this may well be the general characteristic of the Rule of Law within which the more specific ideals . . . are subsumed. Where a society is marked by a culture of justification, an exercise of public power is only appropriate where it can be justified to citizens in terms of *rationality and fairness.*

(See the Honourable Madam Justice B. McLachlin, "The Roles of Administrative Tribunals and Courts in Maintaining the Rule of Law" (1998-1999), 12 *C.J.A.L.P.* 171, at p. 174 (emphasis in original); see also MacLauchlan, *supra*, at pp. 289-91.)

Judicial review on substantive grounds ensures that the decisions of administrative adjudicators are capable of rational justification; review on procedural grounds (i.e., does the decision meet the requirements of procedural fairness?) ensures that they are fair.

131    In recent years, this Court has recognized that both courts and administrative adjudicators have an important role to play in upholding and applying the rule of law. As Wilson J. outlined in *National Corn Growers*, *supra*, courts have come to accept that "statutory provisions often do not yield a single, uniquely correct interpretation" and that an expert administrative adjudicator may be "better equipped than a reviewing court to resolve the ambiguities and fill the voids in the statutory language" in a

[. . .] tient à ce que l'« exercice de tout pouvoir public doit en bout de ligne tirer sa source d'une règle de droit ». En d'autres termes, les rapports entre l'État et les individus doivent être régis par le droit. Pris ensemble, ces trois volets forment un principe d'une profonde importance constitutionnelle et politique.

« À son niveau le plus élémentaire », notre Cour a-t-elle ajouté, au par. 70, « le principe de la primauté du droit assure aux citoyens et résidents une société stable, prévisible et ordonnée où mener leurs activités. Elle fournit aux personnes un rempart contre l'arbitraire de l'État. »

Parce que l'État ne peut agir arbitrairement, l'exercice du pouvoir doit être justifiable. Comme la Juge en chef l'a fait observer :

[TRADUCTION] . . . les sociétés où prime le droit se caractérisent par une certaine *obligation de justification*. Dans une société démocratique, ce pourrait bien être la caractéristique générale de la primauté du droit dans laquelle sont subsumés les idéaux plus spécifiques. Dans une société caractérisée par une culture de la justification, l'exercice d'un pouvoir public n'est opportun que s'il peut être justifié aux yeux des citoyens sur les plans *de la rationalité et de l'équité.*

(Voir madame la juge B. McLachlin, « The Roles of Administrative Tribunals and Courts in Maintaining the Rule of Law » (1998-1999), 12 *C.J.A.L.P.* 171, p. 174 (en italique dans l'original); voir également MacLauchlan, *loc. cit.*, p. 289-291.)

Le contrôle judiciaire axé sur le fond vise à déterminer si la décision du tribunal administratif peut se justifier rationnellement, et celui axé sur la procédure (la décision satisfait-elle aux exigences de l'équité procédurale?), si elle est équitable.

Au cours des dernières années, notre Cour a reconnu que tant les cours de justice que les tribunaux administratifs ont un rôle important à jouer dans le maintien et l'application de la primauté du droit. Comme l'a souligné la juge Wilson dans *National Corn Growers*, précité, les cours de justice ont conclu que « souvent, les dispositions législatives ne se prêtent pas à une seule interprétation qui soit particulièrement juste » et qu'un tribunal administratif peut être « mieux en mesure que la cour

way that makes sense in the specialized context in which that adjudicator operates (p. 1336, citing J. M. Evans et al., *Administrative Law* (3rd ed. 1989), at p. 414). The interpretation and application of the law is thus no longer seen as exclusively the province of the courts. Administrative adjudicators play a vital and increasing role. As McLachlin J. helpfully put it in a recent speech on the roles of courts and administrative tribunals in maintaining the rule of law: "A culture of justification shifts the analysis from the institutions themselves to, more subtly, what those institutions are capable of doing for the rational advancement of civil society. The Rule of Law, in short, can speak in several voices so long as the resulting chorus echoes its underlying values of fairness and rationality" (McLachlin, *supra*, at p. 175).

chargée du contrôle de dissiper les ambiguïtés dans le texte d'une loi et d'en combler les lacunes » d'une manière judicieuse dans son domaine spécialisé (p. 1336, citant J. M. Evans et autres, *Administrative Law* (3ᵉ éd. 1989), p. 414). L'interprétation et l'application du droit ne ressortissent donc plus uniquement aux cours de justice. Les tribunaux administratifs jouent un rôle vital, un rôle de plus en plus important. Comme la juge McLachlin l'a dit fort à-propos dans une récente allocution sur le rôle des cours de justice et des tribunaux administratifs dans le maintien de la primauté du droit : [TRADUCTION] « Une culture de la justification fait en sorte que l'analyse ne porte plus sur les institutions elles-mêmes, mais, plus subtilement, sur ce qu'elles sont en mesure de faire pour le progrès rationnel de la société civile. Bref, la primauté du droit peut s'exprimer par plusieurs voix, à condition que l'harmonie qui en résulte se fasse l'écho des valeurs d'équité et de rationalité qui la sous-tendent » (McLachlin, *loc. cit.*, p. 175).

In affirming the place for administrative adjudicators in the interpretation and application of the law, however, there is an important distinction that must be maintained: to say that the administrative state is a legitimate player in resolving legal disputes is properly to say that administrative adjudicators are capable (and perhaps more capable) of choosing among reasonable decisions. It is not to say that unreasonable decision making is a legitimate presence in the legal system. Is this not the effect of a standard of patent unreasonableness informed by an intermediate standard of reasonableness *simpliciter*?

En confirmant le rôle des tribunaux administratifs dans l'interprétation et l'application du droit, il convient cependant de rappeler une distinction importante : dire que l'Administration a un rôle légitime à jouer dans le règlement des litiges équivaut à affirmer que les tribunaux administratifs sont aptes (et peut-être plus aptes) à choisir entre plusieurs décisions raisonnables. Ce n'est pas conclure que le prononcé de décisions déraisonnables a place dans le système de justice. N'est-ce pas là l'effet de l'application d'une norme de la décision manifestement déraisonnable eu égard à une norme intermédiaire de la décision raisonnable *simpliciter*?    132

On the assumption that we can distinguish effectively between an unreasonable and a patently unreasonable decision, there are situations where an unreasonable (i.e., irrational) decision must be allowed to stand. This would be the case where the standard of review is patent unreasonableness and the decision under review is unreasonable, but not patently so. As I have noted, I doubt that such an outcome could be reconciled with the intent of the legislature which, in theory, the pragmatic and functional analysis aims to reflect as faithfully as possible. As a matter of statutory interpretation, courts

À supposer que l'on puisse effectivement distinguer entre une décision déraisonnable et une décision manifestement déraisonnable, il arrivera qu'une décision déraisonnable (c'est-à-dire irrationnelle) doive être maintenue. Ceci se produira si la norme de contrôle est celle du manifestement déraisonnable lorsque la décision contestée est déraisonnable, sans l'être manifestement. Je le répète, je doute qu'un tel résultat puisse être concilié avec l'intention du législateur, l'analyse pragmatique et fonctionnelle devant, en théorie, refléter le plus fidèlement possible cette volonté législative. En matière    133

should always be very hesitant to impute to the legislature any intent to let irrational administrative acts stand, absent the most unequivocal statement of such an intent (see *Sullivan and Driedger on the Construction of Statutes* (4th ed. 2002), at pp. 367-68). As a matter of theory, the constitutional principle of the primacy of the rule of law, which is an ever-present background principle of interpretation in this context, reinforces the point: if a court concludes that the legislature intended that there be no recourse from an <u>irrational</u> decision, it seems highly likely that the court has misconstrued the intent of the legislature.

134    Administrative law has developed considerably over the last 25 years since *CUPE*. This evolution, which reflects a strong sense of deference to administrative decision makers and an acknowledgment of the importance of their role, has given rise to some problems or concerns. It remains to be seen, in an appropriate case, what should be the solution to these difficulties. Should courts move to a two standard system of judicial review, correctness and a revised unified standard of reasonableness? Should we attempt to more clearly define the nature and scope of each standard or rethink their relationship and application? This is perhaps some of the work which lies ahead for courts, building on the developments of recent years as well as on the legal tradition which created the framework of the present law of judicial review.

III.  <u>Disposition</u>

135    Subject to my comments in these reasons, I concur with Arbour J.'s disposition of the appeal.

*Appeal dismissed with costs.*

*Solicitors for the appellant: Caley & Wray, Toronto.*

*Solicitors for the respondent the City of Toronto: Osler, Hoskin & Harcourt, Toronto.*

*Solicitor for the intervener: Attorney General of Ontario, Toronto.*

d'interprétation législative, une cour de justice doit toujours être très réticente à imputer au législateur l'intention de laisser l'Administration accomplir un acte irrationnel, à moins que cette intention ne soit formulée sans aucune équivoque (voir *Sullivan and Driedger on the Construction of Statutes* (4$^e$ éd. 2002), p. 367-368). Sur le plan théorique, le principe constitutionnel de la primauté du droit, un principe fondamental d'interprétation toujours applicable dans ce contexte, le confirme : lorsqu'une cour de justice conclut que le législateur a voulu qu'il n'existe aucun recours contre une décision <u>irrationnelle</u>, il paraît très probable qu'elle a mal interprété l'intention du législateur.

Le droit administratif a connu un développement considérable au cours des 25 dernières années, soit depuis l'arrêt *SCFP*. Cette évolution, qui témoigne d'une grande déférence envers les décideurs administratifs et reflète l'importance de leur rôle, a soulevé certaines difficultés ou préoccupations. Il restera à examiner, dans une affaire qui s'y prête, la solution qu'il conviendrait d'apporter à ces difficultés. Les tribunaux devraient-ils passer à un système de contrôle judiciaire comportant deux normes, celle de la décision correcte et une norme révisée et unifiée de raisonnabilité? Devrions-nous tenter de définir plus clairement la nature et la portée de chaque norme ou repenser leur relation et leur application? Voilà peut-être une partie de la tâche qui attend les cours de justice : construire à partir de l'évolution récente tout en s'appuyant sur la tradition juridique qui a façonné le cadre des règles actuelles de droit en matière de contrôle judiciaire.

III.  <u>Dispositif</u>

Sous réserve des observations formulées dans les présents motifs, je souscris au dispositif que la juge Arbour propose dans le présent pourvoi.

*Pourvoi rejeté avec dépens.*

*Procureurs de l'appelant : Caley & Wray, Toronto.*

*Procureurs de l'intimée la Ville de Toronto : Osler, Hoskin & Harcourt, Toronto.*

*Procureur de l'intervenant : Procureur général de l'Ontario, Toronto.*