**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARK WARREN PEARY,

            Plaintiff,

    v.

DC COMICS, INC.; DC COMICS; DC
ENTERTAINMENT, INC.; WARNER BROS.
DISCOVERY, INC.; and DOES 1-10,

            Defendants.

Case No. 1:25-cv-00910-JMF

**DECLARATION OF GIANCARLO
SALIZZO IN SUPPORT OF
DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION**

I, Giancarlo "Carlo" Salizzo, declare and state as follows:

1.      I am a Partner at Matheson LLP, a large full-service law firm with its

headquarters in Dublin, Ireland.  My practice is within the firm's Technology & Innovation

Group and our internal Digital Economy Group, and includes our intellectual property practice,

which deals with both contentious and non-contentious matters relating to intellectual property

including copyright.  I regularly advise clients on matters of intellectual property licensing,

registration, protection, and commercialisation, and am a member of the Law Society of

Ireland's Intellectual Property & Data Protection Committee.  A copy of my curriculum vitae is

attached to this Declaration as **Exhibit A**.

2.      The content of this Declaration is based on my knowledge and experience as a

legal practitioner in Ireland.  If called as a witness, I could and would competently testify to said

content.

3.      In preparing this Declaration, I have reviewed the following documents:

- Plaintiff's Complaint, dated January 31, 2025
- Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for a
  Preliminary Injunction, dated February 28, 2025
- The Central District of California's decision in *DC Comics v. Pacific Pictures
  Corp.*, 2012 WL 4936588 (C.D. Cal. 2012) ("*Superman I*")

-1-

- The Ninth Circuit Court of Appeal's decision in *DC Comics v. Pacific Pictures Corp.*, 545 F. App'x 678 (9th Cir. 2013) ("*Superman II*")

- The agreement between DC Comics Inc., Frank Shuster, and Jean Shuster Peavy (dated as of August 1, 1992)

4.      I have been asked to provide my expert opinion on certain issues of Irish law that are implicated in Plaintiff's preliminary injunction motion.  Specifically, I have been asked, as a matter of Irish law, whether:

(a) The 1938 Grant[1] could be subject to a "*reversionary interest*" under the Copyright and Related Rights Act 2000?

(b) If the 1938 Grant were subject to such a "*reversionary interest*", this interest devolved to Ms Jean Shuster Peavy ("**Ms Peavy**") —who was named sole heir and executor in Mr Joseph Shuster's (**"Mr Shuster"**) will—when Mr Shuster died in 1992?

(c) If any reversionary interest did devolve to Ms Peavy, she effectively assigned that "*reversionary interest*" to DC Comics in the 1992 Agreement?

5.      For the convenience of the Court, I have summarised my opinions on these questions as follows:

6.      **Question (a).**  Under Paragraph 16(1) (as defined below), a "*reversionary interest*" only arises in Irish law in the context of: (a) an assignment of, and / or grant of interest in, copyright made; (b) other than by will; (c) by an author (or authors), as first owner(s) of copyright in a work; (d) between 28 May 1927 and 30 September 1964.

7.      Assuming that the assignment of copyright contained in the 1938 Grant would fall within Paragraph 16(1) (on the assumed facts that, for example, Mr Shuster was an author and first owner of copyright in a work), because the 1992 Agreement was determined by a competent U.S. court to have extinguished any grant of copyright that fell within the relevant temporal period (1927-1964), there does not appear to be any effective "*reversionary interest*" under the Copyright and Related Rights Act 2000.

---

[1] For purposes of this Declaration, I adopt the terms "**1938 Grant**" and "**1992 Agreement**" as they are defined in Plaintiff's Complaint.

8.      Paragraph 16(1) provides that any grant and / or assignment which is subject to a "*reversionary interest*" "*shall not operate to vest in the assignee or grantee any rights with respect to the copyright in the work beyond the expiration of 25 years after the death of the author*".

9.      Pursuant to the judgment of the Ninth Circuit Court of Appeals (the "**Ninth Circuit Court**") in *Superman II*, the 1992 Agreement "*superseded the 1938 assignment of copyrights to DC, and therefore operated to revoke that assignment and re-grant the Superman copyrights to DC*" and an Irish court would almost certainly treat this determination as authoritative (or at the very least, highly persuasive). As the Irish courts would likely find that the 1938 Grant ceased to exist in 1992, there was no grant and / or assignment subject to a "*reversionary interest*", nor were there any copyright interests under such grant and / or assignment which remained to be reverted, by the time the 25-year waiting period expired. Instead, all copyright interests in Superman were, by that time, already held by DC Comics through the 1992 Agreement which, as a grant made after 30 September 1964, is itself not subject to a "*reversionary interest*" under Irish law. Even if this were not the case, as addressed below, the Irish courts would likely interpret the 1992 Agreement as an assignment of any as-yet-unvested reversionary interest to DC Comics.

10.      **Question (b).**  Pursuant to Paragraph 16(2) (as defined below), in the absence of a prior assignment by the author, any "*reversionary interest*" will devolve to the author's "*legal personal representative*" upon their death. Neither Paragraph 16(2) nor any other provision of the Copyright and Related Rights Act 2000 expressly defines "*legal personal representative*" for these purposes, and I am not aware of any Irish case law dealing with the issue. In the absence of Irish authority, an Irish court is likely to treat any English authority as persuasive. I note that the English case of *Redwood Music Ltd. v. B. Feldman & Co. Ltd.* [1979] R.P.C. 1 treated executors named under a foreign-domiciled testator's will as "*legal personal representatives*" for the purposes of U.K. law's (materially identical) "reversionary interest" provisions. This was regardless of whether that executor had already obtained a grant of probate. In light of that, an

Irish court would likely treat Ms Peavy (as the sole named executor under Mr Shuster's will) as Mr Shuster's "*legal personal representative*" and the person to whom any "*reversionary interest*" under the 1938 Grant would have devolved for the purposes of Paragraph 16(2) immediately upon Mr Shuster's death.

11.    **Question (c).**    Irish law permits an author's "*legal personal representative*" to assign the "*reversionary interest*" devolved to them by virtue of Paragraphs 16(1) and 16(2) at any time after the author's death—including before expiration of the 25-year vesting period. The *Superman I* and *Superman II* decisions explained that the 1992 Agreement granted "*all*" rights that Ms Peavy "*may have under any . . . agreement or otherwise, whether now or hereafter existing regarding any copyrights . . . in any and all work created in whole or in part by* [Mr Shuster]." An Irish court would almost certainly conclude, based on the *Superman I* and *Superman II* decisions and the very plain language of the 1992 Agreement, that this grant of "*all*" rights included any "*reversionary interest*" that may have previously devolved to Ms Peavy under Irish law.

12.    These opinions should not be construed as an exhaustive recitation of the impediments Plaintiff's claims face under Irish law. Given the short timeline allotted to respond to Plaintiff's preliminary injunction motion, I have focused this opinion on the three issues above.

## EXISTENCE OF RELEVANT "*REVERSIONARY INTERESTS*" UNDER IRISH LAW

### *Paragraph 16, Part I, First Schedule, Copyright and Related Rights Act 2000*

13.    The copyright architecture of Ireland, much like its broader legal system, is closely tied to that of the United Kingdom. Ireland was previously part of the United Kingdom of Great Britain and Ireland (a predecessor to the present United Kingdom of Great Britain and Northern Ireland, commonly known as the "*United Kingdom*" or "*U.K.*"), until it seceded by treaty in 1922 to become its own nation-state.

-4-

14.      Copyright law in Ireland is today effectively codified (to the extent relevant for the purposes of this Declaration) by the Copyright and Related Rights Act 2000 (the "**CRRA**"). As regards copyright 'reversion', paragraph 16 of Part I to the First Schedule of the CRRA ("**Paragraph 16**") (**Exhibit B**) states, in relevant part for the purposes of this analysis, that:

> *"(1) Where the author of a literary, dramatic, musical or artistic work was the first owner of the copyright in the work, an assignment of the copyright and a grant of any interest in it, made by him or her (otherwise than by will) after the passing of the Act of 1927 and before the first day of October, 1964, shall not operate to vest in the assignee or grantee any rights with respect to the copyright in the work beyond the expiration of 25 years after the death of the author.*
>
> *(2) The reversionary interest in the copyright expectant on the expiration of the period referred to in subparagraph (1) may, after the commencement of Part II of this Act, be assigned by the author during his or her life but in the absence of any assignment shall, on his or her death, devolve on his or her legal personal representatives as part of his or her estate.*
>
> *(3) Nothing in this paragraph affects—*
>
>> *(a) an assignment of the reversionary interest by a person to whom it has been assigned,*
>>
>> *(b) an assignment of the reversionary interest after the death of the author by his or her personal representatives or any person becoming entitled to it, or*
>>
>> *(c) any assignment of the copyright after the reversionary interest has fallen in."*

15.      I understand that these provisions are virtually identical to the currently-operative 'reversionary interest' provisions under U.K. law.[2]

16.      As I understand is the case with U.K. law, the existence of such a "*reversionary interest*" in Irish law can be traced back to section 5(2) of the Copyright Act 1911, an Act of the Parliament of the United Kingdom (as it then was) which applied to all British "*dominions*" (which, at the time, included Ireland) (the "**1911 Act**").

---

[2] I understand that Plaintiff's counsel has provided the Court with copies of the relevant Acts, and, therefore, I do not separately attach them here.

17.     Whilst the entirety of the 1911 Act (including its section 5(2)) was repealed in Ireland with effect from 1 October 1927[3], various savings provisions[4] retained its concept of a 'reversionary interest' in Irish law, culminating in the present Paragraph 16.

18.     As reflected in the language above, the "*reversionary interest*" provision, as retained in Irish law, is subject to various limitations, including that it applies only to assignments and / or grants of copyright: (a) by an "*author*" who is "*the first owner of the copyright in the work*"; and (b) made "*otherwise than by will*" within the period "*after the passing of the Act of 1927 and before the first day of October, 1964*". I believe that both of these limitations are relevant to the question of whether the 1938 Grant and / or 1992 Agreement was subject to a "*reversionary interest*" under Irish law and, for that reason, will consider them in more detail below.

### *Limitations on Paragraph 16(1) – Assignments / grants by "the first owner"*

19.     An important limitation within the express language of subsection 1 to Paragraph 16 ("**Paragraph 16(1)**") is that a "*reversionary interest*" arises only in respect of assignments / grants of copyright by an "*author*" who is the "*first owner of the copyright in the work*".

20.     Section 23(1) of the CRRA clarifies that, as a general matter, the "*author of a work shall be the first owner of the copyright*". Section 21 of the CRRA states that an "*author*" is "*the person who creates a work*".

21.     For purposes of this Declaration only, I will assume that Mr Shuster and Mr Jerome Siegel ("**Mr Siegel**") "*were the joint authors and the original joint owners of* [a Superman work ("**Superman**")] *and the 1938 Grant was made by them as joint authors and owners*", as Plaintiff alleges. Compl. ¶ 51.

---

[3] Pursuant to the First Schedule to the Industrial and Commercial Property (Protection) Act, 1927, in combination with S.I. No. 60/1927 - Industrial and Commercial Property (Protection) Act, 1927 (Commencement) Order, 1927.
[4] Namely, section 158(2) of the Industrial and Commercial Property (Protection) Act, 1927 and paragraph 25(3) of Part VI to the First Schedule of the Copyright Act 1963.

22.     Accordingly, Paragraph 16(1) can apply only to grants and / or assignments of copyright in Superman made by Mr Shuster and Mr Siegel (other than by will).

### *Limitations on Paragraph 16(1) – Temporal Limitation*

23.     The existence of a "*reversionary interest*" over any grant and / or assignment of copyright is also subject to a temporal limitation.   Paragraph 16(1) expressly states that it applies only to relevant assignments and / or grants made after "*the passing of the Act of 1927*" and before "*the first day of October, 1964*".

24.     Paragraph 1(1) of Part I to the First Schedule of the CRRA clarifies that the reference to "*the Act of 1927*" here should be interpreted as a reference to "*the Industrial and Commercial Property (Protection) Act, 1927*", which was signed into law on 27 May 1927.

25.     Therefore, Paragraph 16(1) applies only to relevant assignments and / or grants made between 28 May 1927 and 30 September 1964.

### *Application of Paragraph 16(1) to the present facts*

26.     In the present case, I understand that there are two key agreements which may be deemed to be assignments of, and / or grants of interest in, the copyright in Superman:

    a.    The agreement between Mr Shuster, Mr Siegel and Detective Comics, Inc. dated 1 March 1938 (the "**1938 Grant**"); and

    b.    The agreement between Mr Frank Shuster, Ms Peavy and DC Comics dated 1 August 1992 (the "**1992 Agreement**").

27.     As the 1992 Agreement was neither a grant and / or assignment of copyright made: (a) by the author and first owner of copyright in Superman; nor (b) within the relevant temporal period, Paragraph 16(1) does not apply to it.   Therefore, neither it, nor any grant and / or assignment of copyright effected through it, would be subject to any "*reversionary interest*" under Irish law.   In other words, Irish law does not require that the 1992 Agreement be revoked and / or any copyright interests assigned and / or granted under it be re-transferred to any party by operation of law.

-7-

28.     On the other hand, based on the assumptions above, the 1938 Grant could fall within the scope of Paragraph 16(1) as an assignment of copyright in Superman, other than by will, by the authors and first owners of copyright in Superman within the temporal period.[5]

29.     Whether this has any practical implications, however, would depend on whether the 1992 Agreement was still in force (and still vesting rights with respect to Superman in DC Comics) at the expiry of the 25-year vesting period.  I understand that this, and in particular, whether the 1992 Agreement revoked and replaced the 1938 Grant, is an issue that was disputed and resolved by U.S. courts in *Superman I* and *Superman II*.

30.     Under Irish law, the nature and effect of a contract will be determined based on its governing law.  In the absence of the parties' express choice, the Irish courts will determine the governing law of a contract based on the "*law most closely connected with the contract*".[6]

31.     In circumstances where the 1992 Agreement was prepared in New York, and at least some of the parties to that contract resided in and executed that contract in New York, it is likely that an Irish court would interpret it to be properly governed by New York law.

32.     Indeed, we understand that it has previously been accepted that New York law applies to the 1992 Agreement in various U.S. proceedings, including by the U.S. District Court for the Central District of California in *Superman I* and the Ninth Circuit Court in *Superman II*. In my opinion, the Irish courts would likely also consider these prior determinations by U.S. courts to be persuasive in establishing that New York law ought to govern the 1992 Agreement.

33.     On the basis of my opinion that an Irish court would determine that New York law applied to the 1992 Agreement, I am of the view that it would go on to recognise that it is

---

[5] I note that the Plaintiff seeks to interpret the language of Paragraph 16(1) to mean that, in the case of joint authors, the "*reversionary interest*" would crystallise in respect of each author separately, 25 years after each of their deaths.  While not relevant for the purposes of the present Declaration, for the avoidance of doubt, I do not accept that this is necessarily the correct interpretation of Paragraph 16.

[6] For contracts executed on or after 1 January 1992, this is pursuant to Article 4 of the Convention on the Law Applicable to Contractual Obligations 1980 (**Exhibit C**).  Prior to this, Irish common law applied a similar approach (see, for example, *John Francis Kutchera v. Buckingham International Holdings Ltd* [1988] I.L.R.M. 1 (**Exhibit D**)).

not competent to rule on matters of New York law, and would show significant deference to any previous decision of a U.S. court applying New York law to determine the nature and / or effect of the 1992 Agreement.

34.    Such deference would also likely be shown as a result of the Irish law principles of comity (i.e., Irish courts will generally recognise and enforce the decisions of foreign courts[7]) and issue estoppel (i.e., Irish courts will generally refuse to allow the re-litigation of issues that have already been authoritatively decided[8]).

35.    In the present circumstances, an Irish court would likely find that the relationship between the 1938 Grant and 1992 Agreement has already been authoritatively determined by the Ninth Circuit Court in *Superman II*, where the court held "*that the 1992 Agreement, as a matter of New York law, superseded the 1938 assignment of copyrights to DC, and therefore operated to revoke that assignment and re-grant the Superman copyrights to DC*".

36.    Taking into account the above points around expertise in New York law, comity and estoppel, as well as the vigorous litigation over the 1992 Agreement in *Superman I* and Superman *II*, I think it is highly likely that an Irish court would treat those decisions as having definitively determined that the 1938 Grant was extinguished by the 1992 Agreement; long before any "*reversionary interest*" provided for in Paragraph 16 could have vested.

37.    In other words, by the time the 25-year period provided for by Paragraph 16(1) (and all of its predecessor provisions) had expired, the 1938 Grant had already ceased to exist.

---

[7] See, for example, Clarke J's discussion of the principle in *Ranbaxy Laboratories Limited, Ranbaxy Europe Limited, Ranbaxy Ireland Limited v. Warner-Lambert Company* [2007] IEHC 256 (**Exhibit E**). The *Ranbaxy* approach to comity has been subsequently cited with approval in multiple Court of Appeal judgments, including, for example, *Gilead Sciences, Inc. and Gilead Biopharmaceutics Ireland UC v. Mylan S.A.S. Generics (U.K.) Limited T/A Mylan and McDermott Laboratories Limited T/A Gerard Laboratories T/A Mylan Dublin* and *Gilead Sciences Inc and Gilead Biopharmaceutics Ireland UC v. Teva B.V. and Norton (Waterford) Limited T/A Teva Pharmaceuticals Ireland* [2021] IECA 22 (**Exhibit F**).
[8] The Supreme Court summarised the Irish concept of issue estoppel, per Keane J, in *Belton v. Carlow County Council and Prendergast* 1998 WJSC-SC 397 at 409 (**Exhibit G**). The important public policy considerations underlying this principle (and the related concept of *res judicata*) in Irish law were succinctly addressed in *Dublin Corporation v. Building and Allied Trades Union* [1996] 2 I.L.R.M 547 (**Exhibit H**).

Any automatic reversion of the 1938 Grant by operation of Paragraphs 16(1) and 16(2) (as defined below) would have been rendered futile in circumstances where that Grant had already been extinguished long beforehand and DC Comics now held all copyright interests in Superman by virtue of an entirely separate contract that fell outside the scope of Paragraph 16(1) (i.e., the 1992 Agreement).

38.    I believe that this finding would be dispositive of any infringement proceedings brought by the Plaintiff against the Defendants on the basis of an alleged "*reversionary interest*" under Irish law.

## ASSIGNMENT OF ANY RELEVANT REVERSIONARY INTEREST

### *Devolution of any "reversionary interest" to Ms Peavy*

39.    Where an assignment and / or grant of copyright falls within Paragraph 16(1), subsection 2 to Paragraph 16 ("**Paragraph 16(2)**") provides that the "*reversionary interest in the copyright expectant on the expiration of the period referred to in subparagraph (1)* [i.e., "*beyond the expiration of 25 years after the death of the author*"] *may . . . be assigned by the author during his or her life but in the absence of any assignment shall, on his or her death, devolve on his or her legal personal representatives as part of his or her estate*".

40.    I understand that Mr Shuster did not assign any "*reversionary interest*" expectant under Irish law during his lifetime.  Therefore, assuming the existence of a "*reversionary interest*" in the 1938 Grant, it would have automatically devolved to Mr Shuster's "*legal personal representative*" upon his death.

41.    The term "*legal personal representative*" is not defined in Paragraph 16 or in any other provision of the CRRA.  Having carried out appropriate research, I do not believe that the term has been interpreted by the Irish courts in this specific context.

42.    In the absence of Irish law authority on the point, the Irish courts would likely place significant weight on any English authority interpreting the term in an analogous context.  Irish courts often cite, and place reliance upon, English case law.  This is for a variety of reasons,

-10-

including our shared common law tradition, the similarity between various English and Irish law regimes and the relatively wider availability of judgments of the Senior Courts of England and Wales. Indeed, in circumstances where, as set out above, Ireland's current "*reversionary interest*" provisions find their genesis in an Act of the Parliament of the United Kingdom (as it then was) and are materially identical to the contemporary U.K. provisions, any English case law is likely to be particularly persuasive.

43.     I note that, in the English case of *Redwood Music Ltd. v. B. Feldman & Co. Ltd.* [1979] R.P.C. 1 (**Exhibit I**) (the "**Redwood Case**"), the English High Court indicated that the term "*legal personal representative*" for the purposes of English law's 'reversionary interest' provisions (which were materially identical to Paragraph 16(2)) included any executor named in a foreign-domiciled testator's will. This, the English High Court suggested, was true regardless of whether that executor had already obtained a grant of probate to deal with English property.

44.     My understanding is that the English High Court reached its position in the Redwood Case largely on the basis that, under well-established principles of English law, assets of a deceased pass automatically upon their death to their executor(s) by virtue of the will and that "*[t]he grant of probate proves the will; it does not confer title on the executor, but proves the document from which he derives his title*" (at 6–7).

45.     Irish law operates in the same way, namely with the overarching principle that "*an executor derives his title and authority from the will of his testator and not from any grant of probate*," and accordingly "*the personal property of the testator . . . vests in* [the executor] *upon the testator's death*" (*Meyappa Chetty v. Supramanian Chetty* [1916] 1 AC 603 at 608 (**Exhibit J**)). Speirin's *The Succession Act 1965 and Related Legislation: A Commentary* (6th ed.) (**Exhibit K**) comments that "*an executor derives his or her title under the will . . . the real and personal estate of the deceased vests in the executor immediately upon the death of the deceased, although he or she holds the property upon trust for the persons by law entitled thereto. A grant of probate simply confirms the authority of the executor*" (emphasis added).

46.    Given the similarity between the English and Irish legal regimes and their 'reversionary interest' provisions, an Irish court is likely to find the English High Court's approach in the Redwood Case to be highly persuasive.

47.    Thus, in my view, an Irish court is likely to find that the executor named in Mr Shuster's will was his "*legal personal representative*" for the purposes of Paragraph 16(2) and that any "*reversionary interest*" under the 1938 Grant devolved to that person immediately upon his death.

48.    I understand that Ms Peavy was named sole executor under Mr Shuster's will, that Ms Peavy signed an affidavit identifying herself as Mr Shuster's "*successor*" and sole heir and requesting that certain property be "*paid, delivered, or transferred to her*", and that she also held herself out to DC Comics as the executor of Mr Shuster's estate (facts which, I understand, were treated as undisputed by the Central District of California in *Superman I* (at *1–2)).  In my view, Ms Peavy's conduct would likely be deemed to demonstrate her ability and willingness to act as Mr Shuster's executor in the period immediately following his death (including on and around the date of execution of the 1992 Agreement).

49.    Taking all of the above into account, I believe that it is likely that an Irish court would find that Ms Peavy (as the sole named executor in Mr Shuster's will) was Mr Shuster's "*legal personal representative*" for the purposes of Paragraph 16(2) and that any "*reversionary interest*" in the 1938 Grant, therefore, devolved to her immediately upon Mr Shuster's death.

### *Potential for assignment of any "reversionary interest" by Ms Peavy*

50.    Subsection 3 to Paragraph 16 states that the "*reversionary interest*" provision contained in Paragraph 16(1) does not affect, *inter alia*, "*an assignment of the reversionary interest after the death of the author by his or her personal representatives*" ("**Paragraph 16(1)(c)**").

51.    Although any "*reversionary interest*" does not fall in or vest until the 25-year waiting period specified in Paragraph 16(1) has expired, an assignment of the "*reversionary*

*interest*" under Paragraph 16(1)(c) may occur at any time after the death of the author.  There is no requirement to wait until after the 25-year period has elapsed or the interest has vested, and this is supported by the difference in language between Paragraph 16(1)(c) and subsection 1(d) to Paragraph 16, which separately refers to assignments of "*the copyright after the reversionary interest has fallen in*".

52.    The absence of any such waiting requirement is also supported by English authorities which, given the materially identical wording of the U.K. 'reversionary interest' provisions, are likely to be treated as persuasive by an Irish court.  For example, in the English case of *Chappell & Co. Ltd. and Others v. Redwood Music Ltd. Redwood Music Ltd. v. Francis, Day & Hunter Ltd. and Another* [1981] R.P.C. 337 (**Exhibit L**), it was held that the 1911 Act "*made* [it] *impossible for the author either to assign or license, or to contract to assign or license, in manner extending into the reversionary 25 year period, **though his legal personal representatives (or a beneficiary after assent) can do so at any time after the author's death***" *id*. at 347 (emphasis added) (see also the treatise *Copinger and Skone James on Copyright* (19th ed.) (**Exhibit M**) which states, at § 4-140(e)(ii), that the near-identical U.K. 'reversionary interest' provisions do not hinder "[a]*n assignment of the reversionary interest after the death of the author by the author's personal representatives*" and "[a]*ny such assignment by the personal representatives is therefore valid*" with "*no requirement that the personal representatives must wait until the reversion falls in*").

53.    Further, neither Paragraph 16 nor the rest of CRRA sets out any specific language that a "*legal personal representative*" must use in order to effectively assign a "*reversionary interest*".  In the absence of such special provisions, the validity of any purported assignment would likely be assessed under Irish law by applying general principles of contractual interpretation.

### *Application of Paragraph 16(1)(c) to the present facts*

54.    As set out above, an Irish court would likely find Ms Peavy to have been Mr Shuster's "*legal personal representative*" and that any "*reversionary interest*" under the 1938

Grant would have devolved to her immediately upon Mr Shuster's death. This would have been regardless of whether she had already obtained a formal grant of probate. Pursuant to paragraph 16(1)(c), therefore, it was within Ms Peavy's power to assign any such "*reversionary interest*" to any party immediately following Mr Shuster's death.

55.    As set out above, no specific language or formal requirements are required to assign a "*reversionary interest*". The effect of the 1992 Agreement, therefore, must be judged based on general principles of contractual interpretation.

56.    As further set out above, it is likely that an Irish court would determine that the 1992 Agreement was governed by New York law, given that U.S. courts have already made that determination and that, in any event, New York law has the "*closest connection*" to the Agreement. An Irish court would also be likely to show significant deference to any existing judgements from U.S. courts on the nature and / or effect of the 1992 Agreement.

57.    In *Superman I* and *Superman II*, U.S. courts already concluded that the 1992 Agreement granted DC Comics "*any*" and "*all*" rights Ms. Peavy "*may have under any . . . agreement or otherwise, whether now or hereafter existing regarding any copyrights . . . in any and all work created in whole or in part by* [Mr Shuster]". Those courts confirmed that the 1992 Agreement was a "*broad release*" with "*all-encompassing language.*" *Superman I*, 2012 WL 4936588, at *4–7; *Superman II*, 545 F. App'x at 680–81. Those prior judicial determinations would very likely lead any Irish court to find that the 1992 Agreement assigned to DC Comics any "*reversionary interest*" in Superman devolved to Ms Peavy by virtue of Irish law.

58.    Although unlikely, to the extent that an Irish court would not defer to U.S. courts' determinations regarding the scope and effect of the 1992 Agreement, I believe that an Irish court would nevertheless likely find that the 1992 Agreement was, at minimum, an assignment to DC Comics of all of the present and future rights in Superman held by Ms Peavy, including any "*reversionary interest*" under the 1938 Grant. As a result, any infringement claim brought by the

Plaintiff against the Defendants on the basis of an Irish law "*reversionary interest*" would likely fail.

59.    This is particularly the case given that a fundamental principle of contractual interpretation under Irish law is that, as far as possible, the express language of a contract should be given its natural and ordinary meaning.[9] Further, Irish courts will only imply terms into contracts in very limited circumstances.[10]

60.    Applying this principle, I note that the 1992 Agreement states, *inter alia*, that it "*fully settles all claims to any payments or other rights or remedies which* [Ms Peavy or Mr Frank Shuster] *may have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by* [their] *brother, Joseph Shuster, or any works based thereon*" and that, in any event, Ms Peavy and Mr Frank Shuster were, through the 1992 Agreement, now granting to DC Comics "*any such rights and releas*[ing] [DC Comics], [its] *licensees and all others acting with* [its] *permission, and covenant*[ing] *not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever*".

61.    This language would almost certainly be interpreted under Irish law as broad enough to include the assignment by Ms Peavy to DC Comics of any "*reversionary interest*" which may have existed under the 1938 Grant and which could have devolved to her upon the death of Mr Shuster. Indeed, the 1992 Agreement's language specifically includes those rights Ms Peavy had "*other*[]" than by an agreement, which would include rights conferred by statute. It is notable that the language also encompasses all rights "*hereafter existing*", to the extent that the Plaintiff may (clearly incorrectly, in my view) argue that the "*reversionary interest*" had not yet fully vested or devolved to Ms Peavy at the time of the 1992 Agreement.

---

[9] *The Law Society of Ireland v. The Motor Insurers' Bureau of Ireland* [2017] IESC 31 (**Exhibit N**).
[10] *Dakota Packaging Ltd v. AHP Manufacturing BV* [2004] IESC 102 (**Exhibit O**).  For a discussion of the situations in which an Irish court may imply a contractual term, see Chapter 6 (Implied Terms) in Clark, Contract Law in Ireland (9th ed.).

62.     In my view, the Irish courts would likely rule that "*all*" simply means "*all*" and that the natural and ordinary meaning of the words used in the 1992 Agreement is clear and should be given effect.

63.     Therefore, to the extent that any "*reversionary interest*" under the 1938 Grant ever crystallised under Irish law (which, as set out above, appears unlikely, but is being dealt with here for completeness), the right to such "*reversionary interest*" had, by that time, already been validly assigned to DC Comics.  As a result, any claim by the Plaintiff against the Defendants based on an alleged "*reversionary interest*" under Irish law is baseless.


I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.  Executed on 7 April 2025.


BY: _____
                        Giancarlo Salizzo