# EXHIBIT G

# THE SUPREME COURT

283/94

*O'Flaherty, J.*
*Keane, J.*
*Murphy, J.*

## IN THE MATTER OF THE MALICIOUS INJURIES ACT 1981 SECTION 21

## IN THE MATTER OF AN APPLICATION

BETWEEN

### CHRISTOPHER BELTON

#### Applicant

### AND

### CARLOW COUNTY COUNCIL

#### Respondent

### AND

### WILLIAM PRENDERGAST AND CHRISTOPHER PRENDERGAST

#### Third Parities

## JUDGMENT  delivered the 25th day of  February, 1997 by Keane J.

In January 1986 a factory in Leighlinbridge, County Carlow, together

with its contents was destroyed by fire.  The factory was owned by W.J.

– 0398

- 2 -

Prendergast & Son Limited (hereafter "the company") the proprietors of which were the third parties in the present proceedings. An application was made to the Circuit Court on behalf of the company under the Malicious Injuries Act 1981 (hereafter "the 1981 Act"), claiming compensation from the Respondent (hereafter "the local authority") for the loss sustained by the company as a result of the fire. The amount claimed was in excess of 1 million pounds. The application was resisted by the local authority on two grounds, only one of which is material, i.e. that the fire was not caused by any other party. Since there was clear evidence, apparently accepted by the local authority, that the fire had been deliberately started, that amounted to an assertion on behalf of the local authority that the fire had been caused deliberately by the third parties. The learned Circuit Court judge found in favour of the company, but his judgment was reversed on appeal by the High Court on Circuit (O'Hanlon J.). After the determination of the case in the High Court, the company applied to O'Hanlon J. to state a case for the opinion of this court on a matter of law. That application was refused by the learned High Court judge and this court declined to entertain an appeal from that refusal, since it had no jurisdiction in the matter once the appeal to the High Court had been determined. (See <u>Prendergast (WJ) & Son Ltd v. Carlow Co. Council</u>, [1990] 2 IR 482).

As a result of the fire, damage was also caused to an adjoining premises owned by the Applicant. The learned Circuit Court judge (Judge Sheridan) gave a decree in favour of the Applicant in the sum of £4,500, liability not being in issue as between the Applicant and the County Council. The County Council, however, claimed to be entitled to be indemnified by the third parties under the provisions of the 1981 Act in respect of the entire of that sum. A preliminary issue was tried in the Circuit Court as to whether the third parties were estopped by the judgment and order of O'Hanlon J. from litigating the issue as to whether they had deliberately started the fire. That issue having been resolved in favour of the third parties by the learned Circuit Court judge, an appeal was taken from his decision to the High Court on Circuit (Johnson J.). At the request of both the local authority and the third parties, Johnson J. stated a case for the opinion of this court.

The question of law for the determination of this court posed by the Case Stated is as follows:-

*"Are the third parties estopped from adducing facts in these proceedings to establish the cause of the said fire on the premises of (the company) on the grounds that the determination of those issues of fact are <u>res</u>*

*judicata and subject to estoppel pursuant to the provisions of s.29(6)(a)*

*of the Civil Liability Act 1961 that is to say the judgment of O'Hanlon J.*

*delivered the 3rd day of June of 1988 in proceedings entitled The High*

*Court, Eastern Circuit, County of Carlow, Between (the Company) and*

*(the County Council)?"*

Section 29(6)(a) of the Civil Liability Act 1961 precludes the third

parties from contending that the local authority were not liable to pay the

Applicant compensation but otherwise preserves the rights of the local

authorities and the third parties to rely on the general law of estoppel.

The facts as found by O'Hanlon J. on the hearing of the original

application under the 1981 Act can be shortly summarised. The third parties

(William J. Prendergast and his son Christopher) were at the time of the fire

living in the vicinity of the town of Carlow and about ten or eleven miles from

the factory premises. One or other of them locked up and secured the factory

premises each evening at the end of the day's work: William J. Prendergast

attended to this on the day of the fire. The factory was situated in what the

learned trial judge described as "a type of compound" and, while some strands

of wire had been tampered with or severed, the impression left on him was of a

"quite substantial fortification against intruders". The factory was also fitted with a fairly sophisticated burglary alarm involving an electronic beam which, if breached anywhere inside, would set off alarms inside and outside the factory and flashing lights on the exterior. It would also register with the firm in Dublin who installed the system and they in turn were required to notify Mr. Prendergast at his home and (apparently) the Garda Siochana in Carlow. The control panel in the main office of the factory (where the alarm system could be switched on and off) contained a plan which lit up so as to indicate the precise area of the premises in which the alarm had been activated.

Mr. Prendergast, Senior, having locked up the premises and set the alarm on the evening of the fire, went home and had an evening meal. He then went to a hotel in Carlow as a blood donor and returned home at about 8.55 pm. On his arrival, he was told by his wife that the alarm had gone off in the factory and that she, in turn, had telephoned Christopher to ask him to call out and find what was happening.

Mr. Prendergast, Senior said that he decided to wait at home until he was contacted by his son. He accordingly sat watching the news on television until about 9.30. Not having heard from Christopher, he telephoned the factory and spoke to him but was told by him that the only suspicious

evidence was a van from which the petrol cap had been removed: a length of hose had been inserted into the petrol tank. He decided to go out and said he arrived at the factory shortly before 10 pm. He was met by Christopher and the two men went to look at the van, which was parked near a window along the side wall of the factory. Mr. Prendergast, Senior said that he noticed that the window was partly open and on looking in he saw a "shining glow" in the knitting room, about four yards in from the window on his left, as he put his head in the window, and between some stacks of materials.

He and Christopher went down to the office at the front of the factory and went through the building to the knitting room. They said that, when they opened the door, smoke came rolling out and it was impossible for them to advance any further into the room. They made a "999" call and in due course the gardai and the fire brigade arrived.

There was evidence from a fire consultant that kerosene vapours were present in at least three locations within the building, one area being the office at the front of the building where Christopher Prendergast had been sitting for half an hour and upwards awaiting the arrival of his father.

There was no suggestion of any manifestations of ill-will on the part of any third party towards Mr. Prendergast and his son prior to the fire. The

- 7 -

business was said to be extremely successful and gave a lot of employment in the locality. The suggestion made on behalf of the third parties was that what took place on the night of the fire was, in all probability, a wanton act of vandalism on the part of some arsonist, who broke in and set the place on fire without any motive other than the desire to cause damage and destruction, or an accidental fire caused by an intruder. It was common case that an electrical fault was not the cause and there was evidence that all the normal precautions had been taken to prevent an outbreak of fire.

Having summarised this evidence, O'Hanlon J. went on to refer to what he described as "certain difficulties" involved in accepting the hypothesis advanced on behalf of the third parties as the probable explanation for the fire. Having referred to aspects of the evidence given by the third parties which he found strange or incomprehensible, he concluded thus:-

> "One of the most extraordinary features of the case is to find the co-director of the applicant company sitting in the factory office for half an hour or more reading a magazine, while the fire in a knitting room full of highly inflammable materials is smouldering gently in the background. The suggestion is that by some form of delayed action

- 8 -

*the major outbreak was held back for about one and a half hours from the time the burglary alarm was set off and only took hold when the internal door was opened after the arrival of Mr. Prendergast, Senior. This, notwithstanding that the window to the knitting room was partly open at all times. A previous fire which occurred in the premises in 1969 had become a conflagration almost immediately.*

*"Mr. Skelton, the fire consultant who gave evidence on behalf of the (local authority), gave as his opinion that a fire set by an arsonist, or occurring accidentally in the knitting room, would have quickly become a conflagration, or else would have smouldered and died out completely within a comparatively short time. He further said that if smouldering in a room stacked with acrylic type materials, it would have given off pungent fumes which would have percolated rapidly to every part of the factory and should have been apparent in the office where Christopher Prendergast sat reading for a considerable time while awaiting the arrival of his father. I find this evidence quite convincing.*

- 9 -

*"I find the evidence in support of the Applicant's claim in relation to these matters, which I regard as crucial to the case, so unsatisfactory and so unconvincing, that I am unable to come to a conclusion that as a matter of probability the fire was caused by the malicious act of a third party in circumstances giving rise to a claim for compensation under the provisions of the Malicious Injuries Act, 1981. I therefore have to determine the issue of liability against the Applicant and in favour of the Respondent and I propose to reverse the order already made by the learned Circuit Court judge and to dismiss the claim."*

Mr. Sean Ryan, S.C. on behalf of the local authority submitted that as the issue as to the liability for the damage caused by the fire had been finally determined by O'Hanlon J, the third parties were not now entitled to reopen the entire issue. He submitted that the matter was now *res judicata*, either on the basis of "issue estoppel" or because to allow the third parties to litigate the issue as to how the fire had been caused again would be an abuse of the process of the court. He cited in support of these submissions the decisions of the English Court of Appeal and the House of Lords in <u>McIlkenny v. Chief Constable of the West Midlands & Ors.</u> [1980] QB 283; reported *sub.nom*

Hunter v. Chief Constable of the West Midlands Police & Ors. [1980] AC 529

and of the High Court in Kelly v. Ireland [1986] ILMR 318 and Breathnach v.

Ireland [1989] IR 489.

Mr. Reidy, S.C. on behalf of the third parties submitted that the

determination by O'Hanlon J. amounted at best from the local authority's point

of view to no more than a finding that one or other of the third parties had been

involved in starting the fire. He further submitted that the only finding made

by O'Hanlon J. was that the company had failed to discharge the onus of proof

that lay on them of establishing that the fire had been caused maliciously by

another party. He said that it appeared from the judgment that O'Hanlon J. had

erroneously concluded that the onus was on the company to establish that the

fire had not been caused by the third parties and that, accordingly, the issue

which fell to be determined in the present proceedings had not in fact been

determined by O'Hanlon J. He also submitted that, in any event, the company

and the third parties were in law distinct legal entities and that the latter could

not be bound by any finding in proceedings between the local authority and a

third party, i.e. the company. He cited in this connection the decisions in

Salomon v. Salomon & Company [1897] AC 22 and Taylor v. Smyth & Ors

[1991]1 IR 142.

Section 12(3) (a) of the Malicious Injuries Act 1981 provides that :-

> *"(3) Compensation shall not be payable under this Act -*
>
> *(a) where it is proven to the satisfaction of the court that the person who suffered the damage or loss to which the application relates connived at, assisted in or actively facilitated the causing of the damage or loss or was, at or about the time the damage was caused or the loss was suffered, associated with, combined with, or in league with the person by whom the damage or loss was caused."*

Section 21 (1) of the same Act provides that:

> *"For the purpose, and only for the purpose, of the recovery of contribution by a local authority against which an award has been made on an application for compensation under this act, the local authority and the person or persons who caused the damage or loss to which the application relates shall be deemed to be concurrent wrongdoers within the meaning of the Civil Liability Act, 1961, and the provisions of*

- 12 -

*Chapter 2 of Part 3 of that Act shall, insofar as they are applicable for the purpose of this section, apply and have effect."*

In considering the law which O'Hanlon J. was required to apply at the hearing before him, it must be remembered that, altogether apart from the provisions of s.12(3) of the 1981 Act, compensation could not be recovered by an applicant who was himself the perpetrator of the damage: see the decision of the Supreme Court of Saorstat Eireann in <u>Artificial Coal Company and Hamon v. Minister for Finance</u> [1928] IR 238 at p.244 per Kennedy C.J. The intention of s.12(3) (a), which was closely modeled on s.4(3) of the Northern Ireland (Criminal Injuries) Act 1956 appears to be to extend that principle to a case where the Applicant is a member of an organisation (such as an illegal para-military group) which is responsible for the damage. It does not appear from his judgment that any argument was advanced to O'Hanlon J, based on the well-known principle in <u>Salamon v. Salamon & Company</u>, that if the damage had been perpetrated by one or other or both of the third parties, the company, as the applicant, could not in law be identified with them. Whether this was because it was thought that the terms of s.12 (3) (a) were sufficiently broad to relieve the local authority of liability in such circumstances need not

detain us.  It is, however, clear that if, in the present proceedings, the local

authority had sought an indemnity from the company rather than the third

parties, they might well have been met with a defence that the company were

not "concurrent wrongdoers" within the meaning of s.21 (1) of the 1981Act,

since they could not be vicariously responsible for actions of this nature even

when committed by directors or principal shareholders.  Again, however, it is

unnecessary to express any view as to whether the local authority were correct

in so assuming, since it is the third parties only against whom the claim for

indemnity is made.

The law as to issue estoppel was stated by Sir Owen Dixon in Blair

-v- Curran (62 CLR 464 (High Court of Australia) at pp 531/2) as follows:-

> "*A judicial determination directly involving an issue of fact or of law*
>
> *disposes once for all of the issue, so that it cannot afterwards be*
>
> *raised between the same parties or their privies.  The estoppel covers*
>
> *only those matters which the prior judgment, decree or order*
>
> *necessarily established as the legal foundation or justification of its*
>
> *conclusion, whether that conclusion is that a money sum be recovered*
>
> *or that the doing of an act be commanded or be restrained or that*

- 14 -

*rights be declared. The distinction between <u>res judicata</u> and issue-*

*estoppel is that in the first the very right or cause of action claimed or*

*put in suit has in the formal proceedings passed into judgment, so*

*that it is merged and has no longer an independent existence, while in*

*the second, for the purpose of some other claim or cause of action, a*

*state of fact or law is alleged or denied the existence of which is a*

*matter necessarily decided by the prior judgment, decree or order."*


The first matter to be decided in the present case is, accordingly,

whether the same issue is raised in the present proceedings as was determined

by O'Hanlon J. in the original application. I attach no significance in this

context to the fact that O'Hanlon J, in reaching his conclusion, used language

which, on one view, would suggest that he regarded the onus of establishing

that the fire had not been caused by the company as resting on them. I would,

to put it mildly, be surprised if a judge of his experience and knowledge of the

law would have proceeded on so erroneous a view of the law. It is, however,

sufficient to say that even making the assumption that he did err to that extent,

his judgment, as between the parties and their privies, remains conclusive as to

all matters of law and fact on which it was founded. An issue estoppel will rise

if the third parties are now seeking to litigate an issue determined by O'Hanlon
J. which necessarily and fundamentally formed the basis of his judgment and if
those proceedings can be regarded as having been between the same parties or
their privies as are party to the present proceedings. (See <u>Hoysted v. Taxation
Commissioner</u> [1921], 29 CLR 537 (High Court of Australia) at p.161 per
Higgins J. Although Higgins J. dissented from the majority in that case, their
judgment was later reversed by the Judicial Committee of the Privy Council
[1926] AC 155 who expressly adopted the proposition in the judgment of
Higgins J. )

It is clear that the issue that arises in the present proceeding - i.e.
as to whether the fire was caused by the third parties or by some intruder - has
been determined by O'Hanlon J. and that his resolution of that issue was
necessarily and fundamentally the basis of the judgment which he delivered.
The next question that arises is as to whether those proceedings were between
the same parties or their privies as the present proceedings. The application
before O'Hanlon J. having been between the company and the local authority,
that in turn resolves itself into a question as to whether the third parties are
properly regarded as the privies of the company and hence bound by the
determination of the issue in the earlier proceedings.

In <u>Shaw v. Sloan</u> [1982] NIR 393 a decision cited with approval by this court in <u>Lawless v. Bus Eireann</u> [1994] 1 IR 475. Lord Lowry LCJ, in considering issue estoppel said that:

"*A party is the privy of another by blood, title or interest when he stands in his shoes and claims through or under him.*"

In this case, no question of privity by reason of blood or succession of title arises. We are solely concerned with a question as to whether there was a privity of interest between the company and third party sufficient to satisfy the requirements of issue estoppel.

Assuming that the third parties are the owners of all the shares in the company and are the only directors (as to which there is no finding of fact in the Case Stated), I am satisfied that there is no such privity of interest between them and the company. It has, of course, been settled law since the decision in <u>Salomon v. Salomon</u> that the company on the one hand and its shareholders on the other are separate and distinct legal entities. Moreover, while the interest of the company and its controlling shareholders may very often coincide, that is not is not always the case. The interest of the

shareholders is to receive a dividend, in the event of the company's profits allowing it to be paid, and to share in any surplus assets of the company on a winding-up. The company's affairs must, however, be conducted by the directors, not merely in the interests of the shareholders, but of those of any persons who may have an interest in its financial well being: specifically the creditors, whether secured or unsecured. In the event of the company becoming insolvent (and it should be said that there is no evidence that this was at any stage the case with this company) the latter's interests will become paramount: see the decision of this court in in re Frederick Inns Limited [1991] ILRM 582.

This lack of privity is clearly demonstrated by the facts of the present case. Although it was indicated in the course of argument that the malicious injury application heard by O'Hanlon J, while nominally brought by the company, was in fact brought by their insurers, who would have been entitled, by subrogation pro tanto, to the proceeds of the claim, I will assume that the third parties had some control over the proceedings. (If they had none, that of itself might be a ground for saying that there was no privity.) Even making that assumption, however, their interests are not identical with the company's: the proceeds of a successful application would become the assets

- 18 -

of the company and would fall to be dealt with in accordance with the memorandum and articles and the applicable legislation. Similarly, in the event of the application being unsuccessful, the consequent liability for costs would be that of the company alone and in no sense the personal liability of the third parties. By contrast, in the present proceedings, the third parties alone will be liable, in the event of the local authority's claim succeeding and the company has no interest, present or contingent, in the outcome.

The alternative basis on which the doctrine of *res judicata* has been invoked can be disposed of more briefly. The latter doctrine reflects, of course, the maxim *interest rei publicae ut sit finis litium* as does the overlapping principle which has on occasions been invoked to prevent what would otherwise be an abuse of the process of the court. In Reichel v. McGrath [1889] 14 App. Cas., 665, Lord Halsbury L.C. said:-

> *"I think it would be a scandal to the administration of justice if, the same question having been disposed of by one case, the litigant were to be permitted by changing the form of the proceedings to set up the same case again."*

To the same effect is the following passage from the speech of Lord Diplock in

Hunter v. Chief Constable of the West Midlands Police and Ors.:

> *"The abuse of process which the instant case exemplifies is the initiation*
>
> *of proceedings in a court of justice for the purpose of mounting a*
>
> *collateral attack upon a final decision against the intending plaintiff*
>
> *which has been made by another court of competent jurisdiction in*
>
> *previous proceedings in which the intending plaintiff had a full*
>
> *opportunity of contesting the decision in the court by which it was*
>
> *made."*

Passages from the speech of Lord Diplock and from the judgments in the Court of Appeal in the same proceedings were cited by O'Hanlon J. *in Kelly v. Ireland* and Lardner J. in *Breathnach v. Ireland.*

Doubts have been expressed as to whether the two last mentioned cases and the judgments of the majority of the Court of Appeal in McIlkenny correctly state the law. Since, however, they proceeded upon the basis of issue estoppel and not of abuse of process, they do not require further consideration in the present context.

It is sufficient to say that, adopting the passage already cited as a correct statement of the law, at least in cases where no question of the application of issue estoppel arising out of criminal proceedings is before the court, I am satisfied that it is of no assistance to the local authority in the present case.    The third parties have not initiated any proceeding for the purpose of mounting any form of attack upon the decision of O'Hanlon J.    On the contrary, the proceedings have been initiated by the local authority and their invocation of the abuse of process principle is intended to deprive the defendants of a defence, which they might otherwise have upon the merits, to the present claim.    That is not a necessary consequence of the maxim *interest rei publica ut sit finis litium* and would unjustly deprive the third parties of their rights as litigants to resist the claim now being made.

I would answer the question in the Case Stated in the negative.