# EXHIBIT H

3245

# THE SUPREME COURT

*112/96*

*Hamilton C.J.*
*O'Flaherty J.*
*Blayney J.*
*Barrington J.*
*Keane J.*


BETWEEN:


## THE RIGHT HONOURABLE THE LORD MAYOR ALDERMEN AND BURGESSES OF THE CITY OF DUBLIN

<u>Plaintiffs/Respondents</u>

### AND

## BUILDING AND ALLIED TRADE UNION AND ITS TRUSTEES JAMES FOLEY, FREDERICK HOSFORD, DERMOT GRAY, JAMES LYONS AND LAURENCE O'BRIEN

<u>Defendants/Appellants</u>


<u>**JUDGMENT delivered the 24th day of July, 1996 by Keane J.**</u> [NEH DISS]


In 1982 the Plaintiffs/Respondents (whom I shall refer to as "the Corporation") acting in its capacity as road authority decided to widen Cuffe Street. To that end, they made a compulsory purchase order which was duly confirmed by the Minister for the Environment on the 2nd September 1983. One of the properties affected by the order was a building known as the Bricklayers' Hall which was owned by the Defendants/Appellants (whom I shall refer to as "the Union") who were then described as "the Ancient Guild of

Incorporated Brick and Stonelayers".  The front facade of the building was, appropriately enough, a fine example of the stonemasons' and bricklayers' craft.

At an arbitration conducted by Mr. Sean M. McDermot, the duly nominated property arbitrator, to determine the amount of compensation to be paid to the Union, its secretary, Mr. Kevin Duffy, gave evidence on oath that:

(a)    the Bricklayers' Hall was an integral part of the Union's activity,

(b)    the Union was unlikely to be in a position to rent similar premises with the same facilities, and

(c)    it was the intention of the Union to rebuild the Bricklayers' Hall and to reinstate the facade.

Two alternative bases for the assessment of the compensation to be paid to the Union were presented to the arbitrator.  The first was on the basis that the Corporation acquired the entire building, and not merely the front portion required for road widening, and sold or similarly disposed of the remainder to recoup their expenditure.  The second was on the basis that the Corporation only acquired so much of the property as was needed for road widening, thereby enabling the Union to reinstate the building, complete with facade, on the reduced site.

Prior to the arbitration the Corporation and the Union, acting through their professional advisers, sensibly agreed the sums that would be payable, depending on which basis the compensation was to be assessed. Under the first method, it was £87,857. Under the second, it was £224,414. The arbitrator, having heard the evidence, issued his award on the 27th May, 1995, and awarded the Union the latter sum, together with the costs and expenses of preparing and submitting its claim and the costs and expenses of and incidental to the reference to arbitration. By a conveyance of 30th December 1985, the portion of the site the subject of the compulsory purchase order was conveyed to the Corporation by the Union in consideration of the sum of £224,414 paid to the Union.

Following the award and prior to that conveyance, most of the Bricklayers' Hall was demolished by the Union and since then no attempt has been made to rebuild the buildings, including the facade, on the site which they retained.

The Corporation thereupon instituted the present proceedings, in which they claim:

(a)    a declaration that the Union holds the sum of £224,414 in trust for the reconstruction of the Bricklayers' Hall and the reinstatement of the front facade;

(b)    a mandatory injunction requiring the Union to apply the money in the reconstruction of the Bricklayers' Hall and the reinstatement of the facade;

(c)    payment by the Union to the Corporation of the sum of £136,557 (the difference between the two agreed sums) together with appropriate interest, as being an amount by which the Union has been allegedly unjustly enriched.

The relief sought in paragraph (c) was obviously sought as an alternative to the reliefs claimed in the preceding paragraphs to provide for the contingency that the Union might have put it out of their power to reinstate the building by disposing of the cleared site.

A defence was delivered on behalf of the Union in which it was pleaded that the statement of claim disclosed no cause of action and that the Corporation were in any event estopped by the doctrine of res judicata from making the claim. They also denied that the Union was under any duty to the Corporation to reconstruct the Bricklayers' Hall or reinstate the facade, that the sum of £220,414 was held by them on any trust for the Corporation or otherwise and that they had been unjustly enriched.

The case was at hearing in the High Court for eight days. Most of the hearing, was, however, taken up by legal submissions; the facts, as already

summarised in this judgment, were not in dispute. Evidence was given on behalf of the Corporation by Mr. John Faley, a valuer, Mr. Eugene Farrelly, a quantity surveyor, Mr. Charles Clancy, an architect and Mr. Michael Reynolds, an architect and town planner. No evidence was given on behalf of the Union.

In a lengthy judgment, Budd J, concluded that the claim of the Corporation was well founded and that they were entitled to be paid the sum of £158,957 by the Union. From that judgment, the Union have now appealed to this court.

On behalf of the Union, Mr. Patrick Keane, S.C. submitted that the proceedings were an undisguised attack on the finality of the award in the arbitration proceedings. He said that the High Court had been invited, in effect, to consider the award of the property arbitrator in the light of changed circumstances and reassess the compensation which he had awarded. He further submitted that the Union were under no legal obligation to reinstate the building and there was no evidence to support the case made, implicitly if not expressly, on behalf of the Corporation that they had in some sense acted in bad faith. There was no allegation that the award of the arbitrator had been procured by fraud and, in those circumstances, the Union were entitled as a matter of law to the sums paid to them on foot of the award.

Mr. Keane further submitted that there was no evidence of any representation by the Union to the Corporation or any commitment on their

behalf that the building would be reinstated.   The agreement entered into between the professional advisers to the Corporation and to the Union as to the cost of reinstatement was no more than that; it was in no sense an undertaking on behalf of the Union that, in the event of being awarded compensation on that basis, they would carry out the work in question.   There was also no evidence, he said, to support the Corporation's contention that the Corporation paid over the amount of the award as a result of "a mistake of fact".   He said there was no evidence to support the contention that, as of December 1985 when the existing building was allegedly demolished, the Union had changed its mind. Those facts, even if proved, which, he said, they were not, only supported an inference that the Union did not propose to proceed with the reinstatement in the precise terms of the plans which formed the basis of agreement as to the amount of the compensation.

In a further elaboration of his submission that the Corporation were precluded by the doctrine of res judicata from pursuing their claim, Mr. Keane submitted that, insofar as the decision in Moses v. MacFerlan, [1760] 2 Burr. 1005 was authority for the proposition that a final judgment of a court or tribunal of competent jurisdiction could be reopened where it appeared to another court unjust and inequitable, it had been strongly criticised and should not be followed by this court.   He relied in this context on the decision of Eyre C.J. in Phillips v. Hunter, [1795] 2 Hy.Bl 402 and the statement of the law in Goff & Jones on the Law of Restitution, 4th Edition, at pp763/4.

Mr. Keane further submitted that, if the legislature had intended that monies paid on foot of an award made in accordance with the relevant statutory provisions could be recovered by the acquiring authority in circumstances such as the present, they could have so provided but had chosen not to do so.

On behalf of the Corporation, Mr. Eoghan Fitzsimons, S.C. submitted that the proceedings instituted by the Corporation were not in any sense an attempt to reopen the arbitrator's award. He said that the Corporation accepted that they were bound by the arbitrator's finding that, at the date of the hearing before him, the Union bona fide intended to reinstate the building. Nor was it suggested on their behalf that the Union were precluded from subsequently changing their mind, as they obviously had, in declining to proceed with the reinstatement. He submitted, however, that it was unconscionable for the Union to change their mind and retain the compensation which they had been awarded on the basis of reinstatement. He submitted that the doctrine of unjust enrichment had been firmly established in Irish law, at least since the decision in East Cork Foods Limited v. O'Dwyer Steel Company, [1978] IR 103, and that all the requirements for its invocation in the present case were met. The Corporation had not simply asserted that the unarguable enrichment of the Union was "unjust" in any loose or imprecise sense; they relied on the specific circumstances of the present case as rendering the enrichment unjust.

Mr. Fitzsimons submitted that the circumstances in the present case which rendered the enrichment unjust were the unqualified representation at the

- 3252

arbitration that the building would be reinstated, the effective demolition, within a few months of the publication of the award, of the building, putting it out of the power of the Union to reinstate the building in accordance with the plans furnished to the Corporation and the failure of the Union to give any evidence at the hearing in the High Court as to why they had changed their minds. He submitted that, since the trial judge had given them every opportunity of adducing evidence, it was reasonable to infer that the reasons for their change of mind were such as to render their retention of the money inequitable.

Mr. Fitzsimons submitted that in these circumstances the Corporation were clearly entitled to the repayment by the Union of such an amount as would undo the unjust enrichment which had occurred. Alternatively, Mr. Fitzsimons submitted that the monies paid on foot of the award were impressed with a constructive trust, citing in support the much quoted words of Cardozo J. in Beatly v. Guggenheim Exploration Company, 225 NY 380, 386 [1919] that:

"A constructive trust is the formula through which the conscience of equity finds expression."

In considering these submissions, I should at the outset refer to the statutory provisions applicable to the payment of the sum of £220,414 to the Union.

Section 2 of the Acquisition of Land (Assessment of Compensation) Act

1919 (hereinafter "the 1919 Act") which, it was accepted, applies to this as it does to many other forms of compulsory purchase, provides (as amended) that:

"In assessing compensation, a property arbitrator shall act in accordance with the following rules...

    (2)    The value of land shall, subject as hereinafter provided, be taken to be the amount which the land if sold in the open market by a willing seller might be expected to realise: provided always that the arbitrator shall be entitled to consider all returns and assessments of capital value for taxation made or acquiesced in by the claimant...

    (5)    Where land is, and but for the compulsory acquisition would continue to be, devoted to a purpose of such a nature that there is no general demand or market for land for that purpose, the compensation may, if the property arbitrator is satisfied that reinstatement in some other place is bona fide intended, be assessed on the basis of the reasonable cost of equivalent reinstatement..."

Section 6, as amended, provides that:

"(1)  The decision of a property arbitrator upon any question of fact shall be final and binding on the parties, and the persons claiming under them respectively, but the property arbitrator may, and shall, if the High Court so directs, state at any stage of the proceedings, in the form of a special case for the opinion of the High Court, any question of law arising in the course of the proceedings, and may state his award as to the whole or part thereof in the form of a special case for the opinion of the High Court."

Section 41 of the Arbitration Act 1954 provides that:

"An award on an arbitration agreement may, by leave of the court, be enforced in the same manner as a judgment or order to the same effect and, where leave is so given, judgment may be entered in terms of the award."

Section 27 of the same Act provides that:

"Unless a contrary intention is expressed therein, every arbitration agreement shall, where such a provision is applicable to the reference, be deemed to contain a provision that the award to be

made by the arbitrator or umpire shall be final and binding on the

parties and the persons claiming under them respectively."

Both of these provisions are applicable to arbitrations under the 1919 Act except

to the extent that Part II of the 1954 Act is inconsistent therewith.

The compulsory purchase procedure under which the Corporation

acquired the land in question from the Union is different in almost every respect

from a purchase by agreement.  Although Rule (2) provides for the assessment

of compensation on the basis of the value of the land on the open market, some

of the other rules, and the manner in which they have been judicially construed,

make it clear that the assessment of compensation is more in the nature of an

award of damages for the expropriation of his property against the wishes of the

owner.   Although the acquisition is effected in the public interest, both

parliament and the courts have been at pains to ensure that the award of

compensation reflects, not merely a price that might have been agreed by a

willing vendor and purchaser, but also all the elements of loss suffered by

someone dispossessed of land against his will.

Hence, the provision in Rule (5) for the assessment of compensation on

"the reasonable cost of equivalent reinstatement" where that is appropriate.

Where the arbitrator is satisfied that the owner bona fide intends to reinstate the

building, be it a church, a museum or whatever, on some other site, the extent

of his loss will not necessarily be reflected in the open market value of the land,

since he will be unlikely to find a purchaser who will be prepared to pay him that sum if it happens to exceed the market value.

The "equivalent reinstatement" basis of compensation thus provides the machinery, in cases where it is appropriate, of compensating the owner of the property in full in circumstances where he would not be fully compensated by being awarded the open market value.  I emphasize this aspect of Rule (5), because the learned High Court judge at a number of points in his judgment appears to treat the Corporation as having acquired, in consideration of the payment of the compensation, a benefit in the form of the preservation of the facade of the building.  That approach, however, overlooks the fact that the acquisition was not being effected by the Corporation in their capacity as a planning authority and the question as to whether or not, in that capacity, they would have stipulated for the preservation of the facade was irrelevant to the amount of compensation which they were required to pay arising out of their acquisition of the land in question as a road authority.

It is accepted by the Corporation that the award in this case was final and binding on both them and the Union.  The doctrine of res judicata applicable to this, as to every final judgment or award of any competent court or tribunal, has the consequence that the parties are estopped between themselves from litigating the issues determined by the award again.  The justification of the doctrine is normally found in the maxim interest rei publicae ut sit finis litium and it is important to bear in mind that the public interest referred to reflects,

in part at least, the interest of all citizens who resort to litigation in obtaining a final and conclusive determination of their disputes. However severe the stresses of litigation may be for the parties involved - the anxiety, the delays, the costs, the public and painful nature of the process - there is at least the comfort that at some stage finality is reached. Save in those exceptional cases where his opponent can prove that the judgment was procured by fraud, the successful litigant can sleep easily in the knowledge that he need never return to court again.

That finality is, of course, secured at a cost. The defendant who discovers as soon as the case is over that the award of damages against him is grossly excessive because of facts of which he was wholly unaware and was unable to bring before the court cannot, in the absence of fraud, resist the enforcement of the judgment against him. The plaintiff who similarly finds out that his damages are far less than those which would have been awarded had the court been in possession of evidence not available at the hearing is equally precluded from disputing the finality of the judgment. The interest of the public in that finality is given precedence by the law over the injustices which inevitably sometimes result.

These principles apply with even greater force to an award under the 1919 Act. Not merely is a disappointed claimant precluded from reopening the award should he find that there was evidence which he could have brought before the arbitrator which would have resulted in a far higher level of

compensation:  he has not even the opportunity, available to those claiming damages arising out of civil wrongs as opposed to a statutory expropriation, of having the findings at first instance tested on appeal.

It is claimed, however, on behalf of the Corporation that, in the case of assessments carried out under Rule (5), that finality is significantly abridged. It is conceded, and inevitably so, that had the Union elected to give evidence which demonstrated, that, owing to circumstances unforeseen by them at the time of the arbitration, it was no longer possible for them to reinstate the building and that the costs of acquiring suitable premises elsewhere would in any event exhaust the award, no question of "unjust enrichment" would arise. They are quite right in submitting that, given the remarkable alacrity with which the Union proceeded to demolish the building, it is singularly unlikely that the Union would have been in the position to give any such evidence.  But the general principle for which they contend cannot be solely tested by reference to the facts of the present case.  A claimant who, without any element of fraud, is awarded compensation on the basis of equivalent reinstatement is either entitled to treat the litigation as at an end or he is not.  If he can be called to account for his conduct in not reinstating the building at some indeterminate stage in the future, then, however else the award in his favour may be described, it is certainly not final in any meaningful sense.  Thus, if the case made on behalf of the Corporation is well founded, a body which has given evidence in good faith to the arbitrator that it intends to reinstate the building

on another site and which subsequently discovers that, because of difficulties

arising from planning constraints, problems of title, the effect on neighbouring

properties or a myriad of other considerations, reinstatement is impossible and

which also finds that the money awarded will do no more than cover the

acquisition of another building, may legitimately be subjected to all the hazards

of a further court action at some stage in the future. It will be in vain for it to

plead res judicata: on proof by the acquiring authority that it has not in fact

reinstated the building, it will be compelled to adduce evidence as to the reasons

why it has not done so.

It is necessary to emphasize again that there is nothing to suggest that

such were the circumstances in the present case, but the question as to whether

the award is in every sense final or is merely final in a qualified sense cannot

be determined solely by reference to the facts of one case. That would be a

classic instance of hard cases making bad law. It must be determined as a

matter of legal principle.

It also follows inevitably from the submissions on behalf of the

Corporation that Section 6(1) of the 1919 Act must be read as though it were

subject to a proviso that, in the event of the compensation having been assessed

by reference to Rule (5), and the equivalent reinstatement not having been

thereafter effected, the owner must refund to the acquiring authority such

proportion of the compensation as a court of competent jurisdiction deems to

be just and equitable. It is of interest to note that in the Local Government

(Planning and Development) Act 1963 (which itself, in the Fourth Schedule, introduced additional rules to those contained in the 1919 Act) a provision of such a nature was expressly enacted to deal with certain cases where an owner of property suffers loss as a result of a decision involving a refusal of planning permission or a grant of such permission subject to conditions.  Section 73 (1) provides that no person is to carry out any development to which that section applies on land in respect of which an award of compensation has been registered at any time during the succeeding fourteen years without making an appropriate repayment to the planning authority.

These consequences - the qualified application of the res judicata principle and the amendment by implication of the 1919 Act - are, it is submitted, necessitated by what is said to be the application of the concept of unjust enrichment to the facts of the present case.

It is clear that, under our law, a person can in certain circumstances be obliged to effect restitution of money or other property to another where it would be unjust for him to retain the property.  Moreover, as Henchy J. noted in East Cork Foods Limited v. O'Dwyer Steel Co, 1978] IR 103, this principle no longer rests on the fiction of an implied promise to return the property which, in the days when the forms of action still ruled English law, led to its tortuous rationalisation as being "quasi-contractual" in nature.

The modern authorities in this and other common law jurisdictions, of which Murphy v. Attorney General, [1982] IR 241 is a leading Irish example

have demonstrated that unjust enrichment exists as a distinctive legal concept, separate from both contract and tort, which in the words of Deane J. in the High Court of Australia in <u>Pavey & Matthews v. Paul</u>, [1987] 162 CLR 221:

> "Explains why the law recognises, in a variety of distinct categories of cases, an obligation on the part of the defendant to make fair and just restitution for a benefit derived at the expense of a plaintiff and which assists in the determination, by the ordinary process of legal reasoning, of the question of whether the law should, in justice, recognise the obligation in a new and developing category of case."

The authorities also demonstrate that, while there is seldom any problem in ascertaining whether two essential preconditions for the application of the doctrine have been met - i.e. an enrichment of the defendant at the expense of the plaintiff - considerably more difficulty has been experienced in determining when the enrichment should be regarded as "unjust" and whether there are any reasons why, even where it can be regarded as "unjust", restitution should nevertheless be denied to the plaintiff.

As to the first of these difficulties, the law, as it has developed, has avoided the dangers of "palm tree justice" by identifying whether the case belongs in a specific category which justifies so describing the enrichment: possible instances are money paid under duress or as a result of a

mistake of fact or law or accompanied by a total failure of consideration. Whether the retention by the Union of the entire compensation in the present case falls within such a category or not, however, it would in any event be necessary to consider whether restitution is precluded because of other factors. In the latter context, the following passage from the judgment of Henchy J. in Murphy v. Attorney General, at p.314 is of particular significance:

> "Over the centuries the law has come to recognise, in one degree or another, that factors such as prescription (negative or positive), waiver, estoppel, laches, a statute of limitation, res judicata or other matters (most of which may be grouped under the heading of public policy) may debar a person from obtaining redress in the courts for injury, pecuniary or otherwise, which would be justiciable and redressable if such considerations had not intervened."

In the present case, confronted with this difficulty the Corporation seek to rely on Moses v. MacFerlan, as authority for the proposition that, in the circumstances of this case, it would be unjust for the Union not to refund the money at least in part.

The facts in that case, which is usually regarded as the starting point of the lengthy and fitful journey of English law towards a doctrine of unjust enrichment, can be briefly summarised. The plaintiff, Moses, endorsed to the

Defendant, MacFerlan, four promissory notes in order to enable MacFerlan to recover the money in his own name. However, before endorsing the notes, MacFerlan agreed that Moses should not be liable to the payment of any part of the money. Contrary to this agreement, MacFerlan sued Moses in the Court of Conscience for the sums in question and that court, holding that they could not admit any evidence of the agreement between the two, gave judgment against Moses. Moses having paid the money into court and MacFerlan having taken it out, Moses brought an action on the case in the King's Bench Division before Lord Mansfield. A verdict was found by him in favour of Moses, but subject to the opinion of the court upon the question

> "whether the money could be recovered in the present form of action, or whether it must be recovered by an action brought upon the special agreement only."

The hearing of the motion to set aside the verdict in favour of the plaintiff entered by Lord Mansfield at <u>nisi prius</u> having come before the full court, the question was resolved in favour of Moses. Lord Mansfield, who again delivered the judgment with which all the other members concurred, said that

> "this kind of equitable action, to recover back money which ought not in justice to be kept, is very beneficial and therefore much encouraged...in

one word, the gist of this kind of action is that the Defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money."

However, while that statement of the law was the genesis of the law of unjust enrichment as it ultimately became, there has been little or no support for the view of the court in that case that the "ties of natural justice and equity" justified the setting aside of the decree of a court of competent jurisdiction.

In <u>Phillips v. Hunter</u>, [1795] 2H.BL. 402, Eyre C.J. said that:

"The case of <u>Moses v. MacFerlan</u> is, I believe, the only decided case that countenances such an action, but I cannot subscribe to the authority of that case..."

Having gone on to consider the case in some detail, he summarised his view as follows:

"I believe that the judgment did not satisfy Westminster Hall at the time; I never could subscribe to it; it seemed to me to unsettle foundations."

In Goff and Jones on the <u>Law of Restitution</u> (4th Edition), the learned editor, having observed that

"this maxim (<u>interest</u> <u>rei</u> <u>publicae</u> <u>ut</u> <u>sit</u> <u>finis</u> <u>litium</u>) is as important in the

law of restitution as in any other branch of English private law"

adds:

"Lord Mansfield's decision in <u>Moses v. MacFerlan</u>, although just, was

a blatant attack upon, and a <u>de</u> <u>facto</u> reversal of, the judgment of a

competent court, and his observations have not been accepted as authority

for any exception to the principle of <u>res</u> <u>judicata</u>."

I am satisfied that <u>Moses v. MacFerlan</u> is not a satisfactory authority for

the proposition that the doctrine of <u>res</u> <u>judicata</u> can be significantly abridged by

the invocation of the concept of unjust enrichment. <u>Res</u> <u>judicata</u>, on the

contrary, as Henchy J. pointed out in <u>Murphy v. Attorney General</u>, is one of

the factors the application of which may render a seemingly unjust enrichment

irreversible. I am also satisfied that in the present case, for the reasons I have

elaborated, its successful invocation would involve the addition by judicial

decision of a significant qualification to the operation of Rule (5) in S.2 of the

1919 Act, which the legislature, as was their privilege, decided not to enact.

I think it is unnecessary to determine whether the retention by the Union

of the entire compensation constituted an unjust enrichment of them, because

I am satisfied that those two considerations - public policy as reflected in the

doctrine of <u>res</u> <u>judicata</u> and the exclusive role of the Oireachtas in legislation - are such as to render any such unjust enrichment, in the circumstances of the present case, irreversible.

I would allow the appeal, discharge the Order of the learned High Court judge and substitute therefor an Order dismissing the claim of the Corporation.

*appeal*

*Ronan Keane*

*24/7/1996*