# EXHIBIT N



## SUPREME COURT

**Denham C.J.**
**O'Donnell J.**
**McKechnie J.**
**Clarke J.**
**MacMenamin J.**
**Charleton J.**
**O'Malley J.**

**Supreme Court No: 2016/45**

**IN THE MATTER OF AN APPLICATION BY THE ACCOUNTANT OF THE COURTS OF JUSTICE PURSUANT TO THE INSURANCE ACT 1964 (AS AMENDED BY THE INSURANCE (AMENDMENT) ACT 2011)**

**BETWEEN:**

**THE LAW SOCIETY OF IRELAND**
**Claimant (By Order of the Court)/Respondent**

**AND**

**THE MOTOR INSURERS' BUREAU OF IRELAND**
**Respondent (By Order of the Court)/Appellant**

**Judgment of O'Donnell J. delivered the 25th of May 2017**

1 The legal ideal aspires to clarity, certainty and precision, but much of the business of the courts, particularly in the interpretation of contracts or statutes involves a consideration of ambiguity. Ambiguity however is not solely a feature of language. Rubin's Vase is an image used in psychology but now well known. It is an ambiguous form that can be seen either as a vase or two symmetrical faces, but not both. Similarly, Wittgenstein apparently used an ambiguous image in the nature of a line drawing which could be viewed either as a rabbit or a duck to illustrate a distinction he sought to make between "seeing that" and "seeing as". The provisions of the Motor Insurers' Bureau Agreements ("the Agreement") with respective Ministers for Transport between 1955 and 2009, are a much more humdrum example. But, as the extensive judgments in the High Court and Court of Appeal, and the detailed arguments in this Court all show, they too are ambiguous and their interpretation is to some extent also dependent on perception.

2 From the point of view of a person involved in a road traffic accident, and who seeks compensation from a driver who is under a legal obligation to have insurance against the risk of injury caused by such an accident, there is no relevant distinction between those cases undoubtedly covered by the MIBI Agreement of the uninsured or untraced driver or the drivers where cover has been repudiated, and the circumstances considered here, where the negligent driver has the benefit of an insurance policy, but the insurance company is insolvent and unable to provide the indemnity which it agreed. To the injured party, his lawyer and, perhaps, a Government minister concerned with public policy, these represent different ways in which for the victim of an accident, the reality of recovery can fall short of the promise of compulsory insurance of road vehicles. To an innocent party whose claim succeeds but who does not receive compensation, it is a matter of irrelevance precisely why an insurance policy is not available to cover the claim or all of the claim, and accordingly entirely sensible that a provision, in this case in the shape of an agreement with the motor insurers, should provide a safety net which ensured that injured claimants were not left uncompensated. From the perspective of a motor insurer, there is however a very significant difference between the industry accepting responsibility for compensation of claimants whose injuries are caused by an uninsured (or untraced) driver as a result of an accident, and on the other hand accepting liability for injuries caused by drivers who have insurance policies with a company which has become insolvent. The first is a risk which can be assessed, and indeed managed by encouraging enforcement of the law, and can be provided for by being priced into the premiums charged to customers. It will always necessarily be a fraction of the total claims exposure of a company and because it is spread across the market, it will have little competitive impact. As the evidence in this case shows however, acceptance of an obligation to make good claims which were required to be met by an insurer which has since become insolvent is of an entirely different magnitude and which could easily put at risk the solvency of the remaining insurers. The question for this Court is whether or not the Agreement is to be interpreted as covering claims to be met by an insolvent insurer. That in turn involves considering what the parties to the Agreement are to be understood to have meant when they made the operative Agreement in 2009, itself a successor to earlier agreements dating back to 1955. That task involves a consideration of the language used and the background facts, conscious also that such matters may take on a different complexion depending on the vantage point from which they are viewed.

3 This case has been the subject of detailed consideration in the High Court (Hedigan J.) ([2015] I.E.H.C. 564) and in three concurring judgments in the Court of Appeal ([2016] I.E.C.A. 60). The proceedings did not involve oral evidence, cross-examination or any dispute on the facts. However, while the facts are not in controversy, a dispute has raged over the manner in which such matters should be interpreted, and in particular the weight to be given to certain factors. I gratefully adopt therefore the account of the facts set out in the judgment of Mr. Justice Clarke. Accordingly, it will I hope be sufficient to identify the factors which I consider to be relevant and explain why on balance I have come to the conclusion that in this case the appellant's ("the MIBI") interpretation of the Agreement is correct.

**The Factors**
4 The relevant factors looked at neutrally, appear to be as follows:

    (i) The broad language of the Agreement, and in particular clause 4;

    (ii) The payment by the MIBI of certain claims in respect of the equitable insurance companies;

    (iii) The manner in which similar language in the UK agreement has been referred to in certain judgments;

    (iv) The terms of a note included in the accounts of the MIBI for 2012 and 2013;

    (v) The terms of a memorandum of Government in 1964 obtained from the National Archives;

    (vi) The provisions of s.3 of the Insurance Act 1964 (as amended) and as re-enacted as s.3(7) of the Insurance Act 2011;

    (vii) The headings of the MIBI Agreement;

    (viii) The interpretation of the Agreement attributed to the parties namely, the MIBI and the Minister;

    (ix) The terms of the Agreement providing for the operation of the Agreement in any particular case, and in particular clause 3;

    (x) The Memorandum of Association of the MIBI;

    (xi) Considerations of commercial common sense;

    (xii) The provisions and operation of the 1964 Act.

5 I think it is accepted that factors (i) – (v) broadly speaking favour the interpretation advanced by the Law Society, namely that the Agreement binds the MIBI to satisfy judgments obtained which have not been honoured in whole or in part by reason of the insolvency of an insurer. Factors (vii) to (xii) broadly speaking are in favour of the interpretation advanced by the MIBI, namely that that is, that the Agreement is limited to the satisfaction of judgments obtained in respect of uninsured and untraced drivers. Factor (vi) is relied on by both parties in support of their respective interpretations.

6 In my view however, it is not a simply question of assigning these factors to either side of the argument and explaining the weight which it is considered should be attributed to each factor and then considering on which side the balance lies. Since it is not suggested that there is any difference in understanding between the parties, the Agreement here has a single meaning, even if it is disputed. That is the meaning which both parties are taken to have agreed upon. That meaning is, however, to be determined from a consideration of the Agreement as a whole. What the Court must seek therefore is not an interpretation in which some aspects win out over others. Rather it is a case of providing an interpretation of the Agreement as a whole, which not only relies on those features supportive of the interpretation, but also most plausibly interprets the entire Agreement and in particular those provisions which appear to point to a contrary conclusion. Even if the majority of factors appeared to tend broadly to one side of the argument, that interpretation cannot be accepted if it is wholly and fundamentally irreconcilable with some essential features. To take a concrete example, the words chosen by the parties are obviously of particular significance. It may be that looked at in isolation all considerations of language, syntax and grammar strongly suggest that one interpretation is much more likely than another which is submitted. However, if the objectively more likely interpretation is plainly and unavoidably inconsistent with another provision of the contract in respect of which there is no ambiguity, then that itself is a strong indicator that another possible, if less objectively likely, interpretation of the clause was that which the parties intended and therefore agreed. Even then a court might still have to consider whether it was possible that the parties had simply managed to contradict themselves in the course of the same document. An agreement is an exercise in communication and there is a working, though by no means irrebuttable, presumption of coherence. It is important therefore to test any interpretation of a clause against the understanding of the agreement to be gleaned from what is said, and sometimes not said, elsewhere in the agreement.

7 Both parties and all the judges are in agreement that the operative principles are those set out at pages 114-115 in the decision in the judgment of Lord Hoffman in *Investors Compensation Scheme Ltd v. West Bromwich Building Society* [1998] 1 All E.R. 98, and which has been adopted with approval in the Irish courts:

    (1) Interpretation is the ascertainment of the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract.

    (2) The background was famously referred to by Lord Wilberforce as the "matrix of fact," but this phrase is, if anything, an understated description of what the background may include. Subject to the requirement that it should have been reasonably available to the parties and to the exception to be mentioned next, it includes absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man.

    (3) The law excludes from the admissible background the previous negotiations of the parties and their declarations of subjective intent. They are admissible only in an action for rectification. The law makes this distinction for reasons of practical policy and, in this respect only, legal interpretation differs from the way we would interpret utterances in ordinary life. The boundaries of this exception are in some respects unclear. But this is not the occasion on which to explore them.

    (4) The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars; the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean. The background may not merely enable the reasonable man to choose between the possible meanings of words which are ambiguous but even (as occasionally happens in ordinary life) to conclude that the

parties must, for whatever reason, have used the wrong words or syntax. . . .

> (5) The "rule" that words should be given their "natural and ordinary meaning" reflects the commonsense proposition that we do not easily accept that people have made linguistic mistakes, particularly in formal documents. On the other hand, if one would nevertheless conclude from the background that something must have gone wrong with the language, the law does not require judges to attribute to the parties an intention which they plainly could not have had. Lord Diplock made this point more vigorously when he said... :
>
>> ". . . if detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business common sense, it must be made to yield to business common sense.""

8 These principles represent a significant staging point in the development of what might be described as a modern approach to the interpretation of contracts, a development which, as the principles recognise, has not necessarily reached its terminus. The common law is treated as a coherent and consistent body of law developing incrementally by subtle changes, and only on occasion by sharp and dramatic turns. It is sometimes only after a period of time that the significance of a development is understood and it becomes apparent that the direction of the law has altered considerably. The modern approach to the interpretation of contracts is one which would probably be unrecognisable to, and might be regarded as heresy, by the Victorian judges who expounded so confidently on commercial matters. In my view, it is important to understand the full import of the changes wrought by the approach set out in *Investors Compensation Scheme Ltd. v. West Bromwich Building Society*. It is also necessary to be aware of the significance of this development for the overall approach to the interpretation of agreements, and not to simply mix and match authorities drawn from different eras and contexts, as if they were a body of coherent rules produced by a single author. For example, the "rule" that where a recital and an operative part of a deed conflict that the operative provision must prevail, is like the "rule" referred to by Lord Hoffman that words should be given their "natural and ordinary meaning", no more than an expression of common sense about the manner in which we communicate. It is not an iron rule, particularly if it may not have been present to the mind of the parties when making their agreement. To take a homely example, if in agreement it is recited that a landowner wishes to have ragworts removed from a specified field, and the operative provisions says in general language that he will pay a certain amount per 100 ragworts delivered on a given day, no one would suggest that this entitles the other party to produce an unlimited number of ragworts from any other location and demand payment. In that case of course it might be said that there is no true conflict, but rather that the recital can be read harmoniously with the operative provision as indicating the scope of the agreement. But this itself illustrates the importance of approaching the Agreement in a holistic way rather than having immediate resort to case law.

9 A contract is a form of communication intended to convey the meaning agreed upon by the parties. Words are the vehicle through which that meaning is conveyed but the meaning of a document is much more than the meaning of the words. It is what the parties would reasonably have been understood to mean from a consideration of all the available guides to the meaning of the agreement. Words are an important and very often the only necessary guide to discerning the meaning, but they are only a guide, and as recognised by Lord Hoffman, they can be ambiguous, and sometimes even, as happens in real life, it may be apparent the parties have for whatever reason used the wrong words or syntax. In those circumstances, the words must give way.

10 Since much in this case turns on the approach to be taken to the apparently clear and broad language used in clause 4.1.1, I think it useful to consider in a little more detail the implications of the approach in *Investors Compensation Scheme Ltd. v. West Bromwich Building Society*. In a paper given to German patent lawyers, "Patent construction" (2006) CIPA *Journal 727*, Lord Hoffman discussed this approach to interpretation. Patent law is traditionally seen as highly specialised and precise and technical. However he took a very homely example. He was standing at his kitchen sink doing the washing up when his wife suggested he should put on his umbrella. He hesitated only for a moment before opening a cupboard taking out an apron and putting it on. He continued at pages 727-728:

> "If one looks in the dictionary, there is no way in which the word umbrella . . . can mean apron. . . Nevertheless I understood clearly what my wife was using the word umbrella to mean. I was in the kitchen, which has a roof, and anyway it was not raining, so she clearly could not have intended the dictionary meaning of umbrella. But an umbrella keeps you from getting wet and this suggested that she was concerned that I might get my suit wet while I was washing up the dishes. For that purpose, I usually wear an apron. So I concluded that she was using the word umbrella to mean apron. The reason why she chose that word does not particularly matter. It might have been some poetic fancy but more likely it was just a slip of the tongue. The point is that despite the dictionary, she succeeded in conveying the meaning which she intended.
>
> This illustration tells us something important about language. It is a code which we use to communicate. The code has two elements: semantics, the meaning of words, and syntax . . . the order in which words are arranged. *But when we try to understand what someone is saying, the code is only part of what we rely on. Enormously important is the background, the context, the knowledge already assumed to be shared between the speaker and listener, [and] the purpose for [which] the communication is being made. What we are trying to understand is not just the meaning of the words. That in itself is inadequate. The real object, as in the case of my wife's remarks about putting on my umbrella, is to understand what the speaker intended to mean by using those words*.
>
> That was a case of someone conveying a meaning, clearly and unambiguously, although she has used the wrong word. In legal documents, including patent specifications, one does not often get people using the wrong words. Most patent specifications are very carefully drafted and you would certainly hesitate a long time before concluding that the background and context show the draftsman must have used the wrong word. However, if you do come to that conclusion, as sometimes you do, you give effect to what you think the draftsman was using the word to mean, irrespective of what the word means in a dictionary. . . . It would have been absurd if, standing in the kitchen, I had got out my umbrella. If you say that understanding your wife in ordinary conversation is different from construing patent specifications and other legal documents, I say that the only difference is that you will more readily start with the assumption that highly paid people drafting legal documents were using words in the ordinary dictionary meanings. But that is all." [Emphasis added].

11 In this case, I consider that the words used in clause 4.1.1, are certainly *capable* of bearing the meaning for which the Law Society contends. It would be idle, and indeed dishonest to pretend that the arguments and considerations which persuaded the courts below, and which are set out so eloquently in the judgment Clarke J. delivers, are not strong and plausible. Indeed if this case had not been so well prepared and argued by both sides, it is conceivable that a judgment in favour of one or other of the parties might not have attracted notice or comment. But the parties here were well matched and have fought each other to a standstill through three courts, and it is necessary to make a decision. The background, the context, the knowledge shared between the parties, and the purpose for which the agreement was being made, all lead me to the conclusion that the MIBI Agreement was not

intended to extend to cases where the defendant was insured, but his insurer has become insolvent.

12 Legal agreements are not poetry intended to have nuances and layers of meaning which reveal themselves only on repeated and perhaps contestable readings. Agreements are intended to express in a clear and functional manner what the parties have agreed upon in respect of their relationship, and the agreements often do so in a manner which gives rise to no dispute. But language, and the business of communication is complex, particularly when addressed to the future, which may throw up issues not anticipated or precisely considered at the time when an agreement was made. It is not merely therefore a question of analysing the words used, but rather it is the function of the court to try and understand from all the available information, including the words used, what it is that the parties agreed, or what it is a reasonable person would consider they had agreed. In that regard, the Court must consider not just the words used, but also the specific context, the broader context, the background law, any prior agreements, the other terms of this Agreement, other provisions drafted at the same time and forming part of the same transaction, and what might be described as the logic, commercial or otherwise, of the agreement. All of these are features which point towards the interpretation of the agreement, and in complex cases, a court must consider all of the factors, and the weight to be attributed to each. The reasonable person who is the guide to the interpretation of the agreement is expected not merely to possess linguistic skills but must also have, or acquire, a sympathetic understanding of the commercial or practical context in which the agreement was meant to operate, and perhaps even an understanding of the many ways in which even written, formal and legal communication falls short of the standard clarity and precision set by the early editions of Fowler's *Modern English Usage*.

13 What might be described as the modern approach to interpretation probably owes something to a developing understanding of communication. But it is also a valuable correction to a disposition to make what might be described as the errors to which lawyers are prone. Precision in language is highly valued among lawyers and for good reason. It is an important skill that benefits clients when being advised as to transactions, and when on occasion such transactions give rise to legal disputes and litigation. Inevitably in such disputes and particularly one as extensive and contestable as this, there is an intense focus on the language and in particular the words used. It is important to remind ourselves however, that the process is not the deconstruction of a text, but rather the interpretation of an agreement. Parties undoubtedly seek clarity of language, but they do not do so as an end in itself. The focus of the parties is an agreement, normally commercial, which they consider is to their benefit. That is the context in which the words are used, and in which they must be interpreted.

14 It is also inevitable that when there is a dispute about an issue, that there is a tendency to approach the interpretation of an agreement through that dispute. In this case, it might be said that the question for the Court is whether the MIBI Agreement covers policies issued by insurers which have become insolvent. But it is an error, which can sometimes lead to the wrong result, to approach the interpretation of the Agreement solely through this focus. It is indeed rare that disputes on contractual interpretation address issues which are central to an agreement because, often if the matter is heavily negotiated, the parties will have a clear understanding of what has been agreed, and that will be reflected in the agreement. Much more difficulty arises when the issue, as here, is one which is not specifically addressed, discussed or negotiated. Although the question can be framed as to what the parties agreed about that specific issue, the true question is perhaps subtly different. It is necessary to understand the entirety of an agreement and then to consider what that means for the specific issue now raised. It is necessary therefore to see the agreement and the background context, as the parties saw them at the time the agreement was made, rather than to approach it through the lens of the dispute which has arisen sometimes much later.

15 I make these observations at the outset, because it appears to me that above all the argument about detail, a significant difference between those who, like me, consider that the Agreement does not extend to insolvent insurer claims, and those who take the contrary view, is a difference to the importance to be attributed to the words used in clause 4.1.1 The more those words are considered on their own, the easier it is to conclude that the insolvent insurer cases come within the Agreement. The more they are seen as a guide, albeit an important one, to the Agreement as a whole, the more possible it is to conclude that the Agreement, when properly construed does not cover those cases.

**What Agreement is to be construed?**
16 One issue which has arisen in this case is what Agreement is to be construed. There are a series of MIBI Agreements expressed to be supplemental on the original agreement of 1955. In a lucid and attractive argument, counsel for the Law Society argued that the correct approach to the interpretation in the clause in the Agreement, which had remained essentially unchanged since 1955, was to consider what it meant in 1955, and then to consider what if anything in the intervening time could alter that meaning. Attractive though it is, I do not agree that this is the correct approach. The agreement which we must interpret is the operative Agreement applicable at the time when the issue arose with the accountant of the High Court. Accordingly that is the 2009 Agreement. Where there is some ambiguity about the meaning of a clause, then it is entirely possible that it might be said that one interpretation was more plausible as of say 1955. However, if over the intervening years, the Agreement has been amended and supplemented in a manner which is strongly suggestive of the other meaning, or arguably only consistent with it, then the applicable Agreement in 2009 is or ought to be interpreted in that way. To return to Rubin's vase, if in subsequent years the parties or their successors add eyes, teeth, and moustaches to the silhouettes, then the picture can only be of two faces however plausible the vase interpretation may have been initially. However, I agree that the fact that this is a developing agreement is important to its understanding in a number of different respects. The 2009 Agreement is nominally the product of the same parties as those which made the 1955 Agreement, but in reality entirely different people were involved. That in my view must be taken into account in considering the various forms of the Agreement. The development of the Agreement may also be relevant in a different respect. There is or may be a natural unwillingness to revise aspects of an agreement which have been found to work satisfactorily. At the same time, the fact that the Agreement is returned to on a number of occasions by the same parties represented by different persons, may be relevant in considering arguments relating to what has been described as business common sense. It is useful to ask, if at each renegotiation or amendment, whether the parties can be said to have intended to agree to the provision as interpreted.

17 A related issue in this case is that I think it is necessary to distinguish carefully between evidence which predates 1964 and that which postdates it. The existence of the Insurance Act of 1964 ("the 1964 Act") and the fund it established are indeed key components in this case. While the interpretation of the MIBI Agreements is the issue debated here, the specific legal controversy is the contention that the accountant of the High Court should not make payments under the scheme of the 1964 Act. The question of the breadth or otherwise of the MIBI Agreement is not something to be considered in the abstract. The existence of the 1964 Act and the mechanism it creates is an important part of the context against which the MIBI Agreement must be construed at least thereafter. The 1964 Act on its face covers claims made in respect of Setanta insurance policies unless excluded by the terms of s.3(7) and the fact that payment can be made elsewhere. The MIBI Agreement for its part is certainly capable of covering such claims. The question therefore is the line between the two.

**The issues raised by the structure of the proceedings**
18 It is also important to keep in mind the somewhat unusual format of these proceedings. The origin of the case was the contention by the Law Society made to the accountant of the High Court that the MIBI Agreement covered claims made in respect of Setanta

Insurance and that therefore the accountant should not make a payment. The accountant raised the matter and the President of the High Court directed a trial of the issue between the Law Society and the MIBI. However, these proceedings are not plenary proceedings. No discovery has been sought or oral evidence given. The information marshalled so impressively emerges from public sources. A court must be therefore a little more cautious in drawing general conclusions from the documents provided to it than might be case where discovery has been obtained and scrutinised by the parties.

19 The structure of these proceedings is important in another respect. The proceedings themselves are not, as would almost invariably be the case, between the two parties to the Agreement or their assignees or successors. Moreover the Agreement which is sought to be construed is itself unusual in that it is an agreement between two parties which confers benefits on third parties for whom it may be said the Law Society are a reasonable proxy. It has been observed that the nature of the MIBI Agreement is perhaps best understood as an agreement that the MIBI will not raise a privity objection if sued by a claimant. But in the context of this case, that raises a particular difficulty. The MIBI's obligation is therefore not to raise a privity objection to any claim brought, which is itself within the scope of the Agreement. In this case the MIBI however takes a view as to the scope of the Agreement which does not extend to the Setanta claims. If the MIBI refused to satisfy any judgment and objected that any claimant did not have privity with it and therefore could not sue to enforce the Agreement, it would fall to the party to the Agreement, that is the Minister, to enforce it in favour of the third party. Otherwise, absent one of the recognised exceptions to the privity rule, it cannot be enforced. That is of particular relevance here, where it is contended that both parties to the Agreement consider that it does not extend to the Setanta claims or claims made in respect of insurers which have become insolvent.

20 This is connected to a further potential difficulty touched on in the judgment of Ms. Justice Finlay Geoghegan in the Court of Appeal. The origin of this case lies in the fact that there is now a disparity, not just in mechanism, but in amount between the liability of the Insurance Compensation Fund ("the insurance fund"), under the 1964 Act and the liability of the MIBI if it arises. In blunt terms, a claimant will be limited to 65% of a claim (and in any event capped at €830,000) if it falls to be dealt with under the 1964 Act regime, whereas the MIBI Agreement provides for effectively full recovery. It is indeed a useful thought experiment to consider how this question of interpretation would be approached if the situation was somewhat reversed and the insurance fund provided a full indemnity, but the MIBI Agreement did not extend to property damage. The Setanta claims undoubtedly fall *prima facie* within the scope of the Insurance Compensation Fund under the 1964 Act (as amended) since Setanta is an insolvent insurer. The structure of these proceedings is a contention made that the accountant ought not to make payment under the Act because it is contended that there is another source of payment here, namely the MIBI. However, even if the contention of the Law Society is upheld in this case that by itself does not ensure payment from the MIBI: all it does, negatively, is prevent payment from the Insurance Compensation Fund. Whether a claimant may recover from the MIBI in fact may depend in broad terms on whether the MIBI in the light of a judgment accepted that it was liable. Even then, there may be significant difficulties of procedure which may mean that even under the terms of the MIBI Agreement, strict compliance with which is a precondition to liability, there is no obligation to pay. In such circumstances, a claimant may not recover at all, or will be forced back to the fund with added delay and considerable expense. While the large and difficult issue involved in this case is whether the MIBI has a liability under the Agreement in general, these specific problems cannot be ignored in the resolution in the case.

21 Finally, there may be merit in applying a form of sense check to the legal analysis. What conclusions are to be drawn from the interpretation arrived at by the Court? As a matter of fact, how is it suggested that all the different factors occurred? Is it the case that the Court is being asked to accept that one or other party was oblivious to the meaning now contended to be agreed and that state of ignorance continued for 60 years, or is it suggested that the parties always understood that the Agreement would have certain consequences but now seek to deny that because of the scale of the potential liability? It is useful to articulate the factual theory upon which it is said that the interpretation of the contract is compatible with all the relevant evidence. That explanation should be capable of being tested against any of the factors. But it too must at least be consistent. If different explanations were provided for different aspects of the case, then that must at a minimum, raise questions as to the plausibility of the interpretation contended for. Thus, for example, it should not be possible to advance an interpretation that lays heavy emphasis on the words of a particular clause on the basis that they are the product of careful legal drafting, but discount the provisions of other parts of the agreement or suite of agreements produced at the same time. Those too must be assumed to be the product of careful drafting, and any inconsistency between them and the interpretation of the clause argued for must be addressed. Similarly it ought not to be possible to explain some aspects of the obvious difficulties in this case on the basis that the parties did not really realised the extent of the agreement they were making, but explain others, even tacitly on the basis that the parties did fully understand the scope of the agreement they were making, but now faced with liability, have both dishonestly sought to resile from that position.

22 It is now necessary to turn to the construction of the Agreement. As already indicated, I have come to the conclusion that the Agreement does not oblige the MIBI to cover claims made in respect of drivers whose insurer has become insolvent. In approaching that question it is necessary first to place the agreement in it commercial factual and legal context, keeping in mind the possibility that the Agreement may have a different appearance depending on the perspective from which it is viewed. This is not an exercise in context trumping words. Rather it is a process of interpretation of the text of an agreement seeking to reconcile so far as possible all the admissible evidence and arguments, so as to give effect to the Agreement the parties are to be understood to have made.

**Commercial background**
23 There is no dispute and less doubt that the Agreement certainly covers at least three classes of case: the untraced driver, the uninsured driver who never had a policy of insurance, and the driver whose policy has been repudiated. There may be a degree of overlap between these cases since in some at least of the cases of the untraced driver, the driver may have been uninsured. It is said by the MIBI that these represent a measurable risk which is to some extent controllable in that extra enforcement will have an impact upon the number of drivers who are uninsured, and in any event, it is possible to make an actuarial calculation of the likely cost in any given year which is itself likely to be a fraction of the overall cost of claims. Members of the MIBI are then called upon to contribute accordingly.

24 There is also no doubt, and it was not contested in evidence or indeed capable of being contested, that if the MIBI Agreement is held to cover claims made against the policy holder whose insurer has become insolvent, then that is not just a significantly different risk, but it is one which is potentially ruinous for the remaining insurers. The nature of insurance involves an assessment of risk, the period between receipt of premium and potential payment, investment return during that period, and the fixing of premiums to attract business which will be profitable. It follows that an insurer, who undervalues risk and offers reduced premiums, will attract more business. There is not only therefore an inherent risk that a company which miscalculates risk will become insolvent, but it is also likely to have acquired a very substantial segment of the market. The companies which have failed, and been the subject of payments through the insurance fund, namely the ICI, PMPA, and Quinn Insurance Ltd., all had substantial businesses and the amount of the deficiencies involved were very large indeed being €139m, €164m and €1.158bn respectively. In a substantial case, even if the MIBI made a call upon its members, it is likely that some of them would not be able to meet the call, in which case the burden would fall on the remaining insurers with a further possible domino effect. Indeed it is more likely that the MIBI as a limited company would simply be wound up. The irony would be then that on the Law Society's interpretation, Setanta claimants would then fall back upon

the insurance fund, but all other MIBI claimants would have no recourse. There is no doubt therefore that if the Agreement has the effect contended for by the Law Society, that it was an extremely foolish agreement to make on a professional level, and indeed to continue to supplement and renew on five occasions up until the most recent agreement in 2009. This is not a determinative factor since it is not unknown for commercial parties to make agreements that in retrospect are clearly unwise. Nevertheless, the commercial impact of the Agreement is a necessary part of the background since if an agreement is plainly foolish to the point of threatening the financial viability of the companies, then it is necessary to offer some plausible explanation why a prudent party (and in this case that involves all the motor insurers doing business in the State) would enter such an agreement and renew it over a period of 60 years.

25 A further feature is that while at one level the argument is that if the Agreement extends to claims made against insolvent insurers, that is only a further heading of coverage that it is necessary to recognise that it represents liability of a different sort and type. The categories of untraced/uninsured/repudiated cases, have a common feature in that they relate to actions of wrongdoing committed by a driver of a car. The driver of a vehicle whose insurer who later becomes insolvent, has done nothing wrong. Furthermore, the risk being covered is entirely different: on one case it is a risk that the driver will be uninsured, will leave the scene, or will breach the terms of his or her insurance. At one level, it is understandable that if insurers get the benefit of a captive market created by the desire that injured plaintiffs should not go uncompensated, that a corollary should be that they pay compensation in such cases. After all, if the uninsured drivers had complied with their statutory obligations, or the untraced drivers had been found, then the companies may have received a premium but they would still have this liability. In the case of a policy which has been repudiated, then an insurer has at least been prepared to take the risk of that driver, and therefore it is not unreasonable that it should be obliged to compensate a plaintiff if injured, and left to pursue its dispute with its own insured. In effect the claimant is protected, and the risk that the individual defendant will not be able to pay the damages is transferred from the injured party to the MIBI, but not removed. It is less clear why in principle insurers should also take on the risk of the insolvency of another insurer. Such an insurer is necessarily a competitor, and moreover one whose activity may have reduced the profitability of the solvent insurers. In such a case, it is perhaps not unreasonable that the insolvency should be borne by the general insurance market and the State in the same way as other claims against parties whose insurer is insolvent.

26 The MIBI has also made reference to the fact that the Agreement now satisfies an important State obligation under Directive 2009/103/EC which requires the State to make provisions for "a body to guarantee that the victim will not remain without compensation where the vehicle which caused the accident is uninsured or unidentified". The CJEU in *Csonka and Others v. Magyar Állam* (C-409/11), confirmed that the Directive does not extend a compensation policy obligation to insolvent insurers. At paragraph 44, Advocate General Mengozzi identified the difference between the two classes of liability as follows:

> "Lastly, I should also like to emphasise the important difference that exists, in my view, between a vehicle in respect of which the insurance obligation as described in Article 3 of Directive 72/166 has not been satisfied and a vehicle insured with an insolvent insurer. After all, a vehicle for which the insurance obligation has not been satisfied is an uninsured vehicle. A vehicle which was insured with an insolvent insurer *has* satisfied the obligation to secure insurance against civil liability in respect of the use of vehicles. The risk cover is genuine but the compensation is delayed by the financial situation of the insurer."

27 The existence of the MIBI Agreement is linked to the provisions of s.76 of the Road Traffic Act, firstly of 1933, and subsequently s.76 of the Act of 1961, which made insurance of motor vehicles compulsory. A vehicle insured with an insolvent insurer has, as Advocate General Mengozzi observes, satisfied that obligation. As the Law Society points out, it is quite possible that in this one respect, Ireland has made a more extensive provision than was required by European law (though given the trend of the development of Irish law and even the development of coverage in respect of uninsured driving that seems unlikely). However, the analysis of the ECJ and Advocate General Mengozzi in *Csonka* is more important in my view in recognising that the liability of an insolvent insurer to victims of a road traffic accident is of a different order type and genus than the area covered by the Directive and by the agreed provisions of the MIBI of the uninsured/untraced/repudiated cases. If therefore, insurers and subsequently the MIBI agreed to extend their liability to insolvent insurers, then it is extremely unlikely that they could have done so advertently, and with an awareness of the potential liability that was being assumed. That is the commercial background which is relevant to the interpretation of the Agreement.

**The words used**
28 I think it is clear that the principal argument which persuaded the High Court and Court of Appeal that the Law Society was correct in its interpretation of the Agreement, was the apparent clear words of clause 4.1.1 of the Agreement. I will set these out with the emphasis attributed to them by the Law Society, in its submissions:

> "Subject to the provisions of clause 4.4, **if Judgment/Injuries Board Order to Pay in respect of** any liability for injury to person or death or damage to property which is required to be covered by an approved policy of insurance under s.56 of the Act is **obtained against any person or persons** in any court established under the Courts (Establishment and Constitution) Act, 1961 (No.38 of 1961) or the Injuries Board established by the PIAB Act 2003 **whether or not such person or persons be in fact covered by an approved policy of insurance and any such judgement is not satisfied in full within 28 days** from the date upon which the person or persons in whose favour such judgement is given become entitled to enforce it **then MIBI will so far as such judgement relates to injury to person or damage to property and subject to the provisions of this Agreement pay or cause to be paid** to the person or persons in whose favour such judgement was given any sum payable or remaining payable thereunder in respect of the aforesaid liability including taxed costs (or such proportion thereof as is attributable to the relevant liability) or satisfy or cause to be satisfied such judgement **whatever may be the cause of the failure of the judgement debtor.**" (Emphasis added)

29 The MIBI has sought to suggest that the claim is a clause only about timing, or a subsidiary provision. I do not agree. As the Law Society suggests in its written submissions, clause 4.1.1 imports the essential nature of the obligation under the Agreement and cannot be said to be merely a timing matter or a subsidiary provision, not least, because there is no other liability clause.

30 It is clear that the wording of this clause was a significant factor in the courts below. For example, Ms. Justice Finlay Geoghegan recognised the difficulty of reconciling the Law Society's interpretation with the other provisions of the Agreement, most notably clause 3.11 which permits for the assignment of a judgment and consequently its enforcement against the insured. However, she considered that that could not "require a construction of the liability of MIBI under the 2009 Agreement which is different to the meaning of clause 4.1.1 construed in accordance with the ordinary meaning of the words used in relevant background to the 2009 Agreement". Again, she considered that "any inconsistency between the clause 3.11 and clause 4.1.1 could not alter the construction of the 2009 Agreement as a whole in accordance with the ordinary meaning of the words used by the parties". In my

view, this approach elevates the ordinary meaning of the words to a position which is not perhaps entirely merited. It is clear from the principle set out in *Investors Compensation Scheme Ltd. v. West Bromwich Building Society*, that if the ordinary meaning of the words would lead to a conclusion contrary to the intention which emerged from the rest of the Agreement and the relevant background, then those ordinary words must give way. Indeed, as was observed in that case, a court might come to the conclusion that the drafting had simply miscarried, and that notwithstanding the clear and unambiguous words used, that the parties cannot be held to be bound by such a meaning. Nevertheless, I agree since in any agreement words are used to convey meanings and to express agreement, very considerable weight must be given to them, and that taken on their face, they are certainly broad enough to support the contention of the Law Society that claims in respect of insolvent insurers are covered by the agreements.

31 However, it is important to note that the words used here are not *specific*. They make no reference to insolvency of an insurer and are not otherwise directed towards that case. This is not a case of reading umbrella as apron or phone as post. Rather the words of the clause are *general* and it is said that the breadth of the language must encompass claims made against insolvent insurers. This is important because the question becomes not only the meaning that may be attributed to such language, but also the intended field of application of the provision, which means considering the indications as to scope to be found in the entire agreement. On its face, the reading contended for by the Law Society suggests not merely that the Agreement is broad enough to cover claims in respect of insolvent insurers, but must also include claims against solvent insurers where for any reason payment is not forthcoming within 21 days of judgment. This could occur because of delay on the part of an insurance company, industrial action in relation to that company, or in other sectors of the economy which prevent payment being made, or for other reasons. What is inescapable is that the reading of the clause proffered by the Law Society in this case would make the MIBI a blanket guarantor of all claims, at least those in respect of which compulsory insurance was necessary. Of course this is not how the Agreement has been interpreted or applied. Claims are not routinely notified to the MIBI to maintain the possibility of executing under the MIBI Agreement against that company. However for present purposes, it is this broader interpretation that must be tested against the rest of the Agreement, and the commercial and other background factors to it.

32 The MIBI rely on three factors of the Agreement which they say are plainly inconsistent with such an interpretation. First, as already observed, they say that the language is general and not specific. It does not mention insolvency at all. Given the significant nature of such potential liability it is surprising, at a minimum, that it would not be specifically stated, particularly if the Agreement must be treated as having been carefully drafted to reflect the parties' intentions. Although this point can be shortly stated, it is a powerful point nonetheless. Second, the preamble to the Agreement states:

> "text of an agreement dated the 29th January, 2009, between the Minister for Transport and the Motor Insurers' Bureau of Ireland extending, with effect from dates specified in the Agreement, the scope of the Bureau's liability with certain exceptions, for compensation for victims of road accidents involving uninsured or stolen vehicles and unidentified or untraced drivers to the full range of compulsory insurance in respect of injury to person and damage to property under the Road Traffic Act 1961".

Not only does the preamble not mention the liability for claims in respect of which the insurer has become insolvent, it plainly does not describe the Agreement in the broad terms which the Law Society's interpretation would seem to require. It does not state that the MIBI is in effect a guarantor of all judgments for all road traffic act claims in respect of which compulsory insurance is necessary which have remained unpaid for 21 days. If we approach clause 4.1.1 as a carefully drafted provision, there is no reason to assume carelessness here, and the fact that the narrow and specific terms of the preamble are inconsistent with the broad and general interpretation advanced, is a serious obstacle to the interpretation advanced by the Law Society.

33 The Law Society offers two responses to this, one broader and one narrower. First, it says that no reliance should be placed upon the preamble because of the terms of the clause 4.1.1. It relies on the authority such as the judgment of Romilly M.R. in *Young v Smith* (1865) L.R. 1 Eq. 180 for the proposition that "where the recitals on the operative part of the deal are at variance, the operative part must be officious and the recitals inofficious". In the Court of Appeal, Ryan P. agreed with this approach.

34 I cannot accept this argument. I rather question whether this Victorian certainty is applicable here at least to exclude the question *in limine*. The judgment cited expresses the common sense view that the parties will pay particular attention to the operative provisions of a contract, which are likely to be more specific than any generalisation in the preamble or recitals. Where there is a clear conflict between such general descriptive provisions and specific operative provisions, then effect will normally be given to the operative provisions applying that presumption. But the question here is whether there is such an inconsistency or rather whether the two can be read consistently which is what one would normally expect. Put more simply still, the question for the Court is perhaps why would the parties describe this Agreement in inadequate and misleadingly narrow terms, if indeed the Agreement has the broad and generous sweep for which the Law Society contends? To my mind, it is an inadequate answer to this question to merely cite Victorian authority.

35 The second answer the Law Society proffer is that the description in the preamble itself is plainly inadequate since even on the MIBI's interpretation of the Agreement because it does not refer to cases where the insurer has repudiated liability. That is so, and this would be a reason for giving effect to the specific provisions of the Agreement which provide cover in that case. But that only highlights the fact that there are no such similar specific provisions in the Agreement dealing with the case of insolvency. Furthermore, it does not explain why the preamble does not describe the Agreement in the broad and comprehensive terms for which the Law Society must necessarily contend namely that it covers <u>all</u> claims subject to limited exceptions.

36 The third point made by the MIBI is that the Law Society's interpretation is inconsistent with the specific provisions of the Agreement. Some of the procedures and provisions under the Agreement may be difficult, if not impossible, to satisfy in the case of insolvency even though it has been held that strict compliance with the Agreement is a necessary precondition to liability of the MIBI under it. This is particularly significant since the procedures in the Agreement are important, indeed central to it. It is very much an Agreement designed to put in place procedures to be followed to obtain recovery in certain cases. Thus, for example, where insolvency occurs after the accident and commencement of proceedings, and possibly even after judgment, it will have been impossible to comply with the prior notification obligations, and it may not have been the case that the parties complied with the obligation of notice in relation to any motion for judgment. This issue arises in the most acute form however in connection with clause 3.11 which the Court of Appeal acknowledged was the most difficult provision to read compatibly with the interpretation of that the Agreement provided for liability for claims in respect of which the insurer was insolvent.

**Clause 3.11**
37 Clause 3.11 provides in simple terms that on satisfaction of a judgment, the judgment is assigned to the MIBI. The purpose of this is of course to permit the MIBI to recover against the defendant in the proceedings. This is entirely logical in those general cases which the MIBI accepts are covered by the Agreement. The risk that an uninsured defendant may not be able to meet the judgment in favour of the plaintiff is transferred from the plaintiff to the MIBI. But the Agreement does not absolve the defendant who after all

is culpable first in relation to driving, and second in failing to be insured in compliance with the statutory obligation, or leaving the scene of an accident (or both) or breaching the terms of his insurance so as to give rise to repudiation of the contract. The MIBI, having satisfied the claim of the innocent injured party is fully entitled to seek to recover from such a person if they have the means to make good the loss and clause 3.11 is a necessary step. However, in the case of an insolvent insurer, the driver is not at fault for the inability of the insurance policy to provide cover for the award fully, or perhaps at all, by reason of the insolvency of the insurer. However, if the Agreement applies to such a case, the plaintiff must have obtained judgment against that defendant, and clause 3.11 allows the MIBI to seek to recover the total amount of the judgment and costs from that person who if they have any means will then be at risk of losing their assets, including conceivably their home. It is accepted that this is an unjust outcome which the parties can hardly have intended. Thus the MIBI argue strongly that this is a reason to conclude that the parties did not intend that a broad reading be given to clause 4.1.1 and is instead consistent with the narrower reading suggested by the preamble that the Agreement was intended to cover only a limited class of cases.

38 It is important to emphasise that the focus on this aspect of the case, and the possible injustice to an insured who has an accident but finds himself or herself the subject of a claim by the MIBI, is not a question of seeking to weigh possible injustices. Obviously the person who is injured, in an accident caused in whole or in part by negligent driving is a victim not just of a legal wrong, but if the promise of compulsory insurance fails, and such a person cannot recover damages, then that person suffers a further serious injustice. Indeed the MIBI Agreement was introduced to address that problem in the case of uninsured or untraced drivers, at least. The focus on the possibility of recovery by the MIBI against the insured whose insurer has become insolvent arises however because it sheds light on the question of interpretation of the Agreement which this Court must consider. Given that one of the purposes of compulsory insurance is indeed to protect drivers from the costs of compensation which might otherwise be ruinous, it might be expected that if it was intended that there should be recovery from the MIBI rather than the insurance fund, then the parties to the Agreement would have addressed the apparent injustice of treating a person who has complied with the obligation to obtain insurance (but where insurer becomes insolvent after the accident) in the same way as a person who for example had not obtained insurance or left the scene of an accident. If we are to approach the provisions of one clause as the product of careful legal drafting, then once again the question arises: if the parties intended the Agreement to extend to such cases, why is there no reference to this situation, and why should it be assumed that the parties intended to leave an apparently unfair outcome in place? If the parties had in view the possibility of insurer insolvency why address the possible injustice to a plaintiff but not to the corresponding defendant? It would for example have been a simple thing to provide that in the case of a driver whose insurance company becomes insolvent that clause 3.11 shall not apply. One, and perhaps the most obvious answer to these queries is that the parties did not intend to address the issue of insurer insolvency at all.

39 It is instructive to consider how this problem is responded to by the Law Society, in an argument which was accepted in the Court of Appeal. Both Ryan P. and Finlay Geoghegan J. agreed that there was an inconsistency and potentially severe injustice here but that this consequence could not, as they saw it, override the clear words of clause 4.1.1 in what was described as their natural and ordinary meaning. Again, and respectfully, I disagree that this is the correct approach. This approach takes the ordinary and natural, or perhaps surface, meaning of words as a fixed and immutable point and concludes that if another provision is not compatible with it, then the incompatibility and consequent injustice must simply be accepted. But in my view, the fact that there is such an unavoidable incompatibility and obvious injustice, is a reason to consider if the so called ordinary and natural meaning should indeed be given to the words in their context. The question is what interpretation is to be given to the Agreement as a whole and in its entire context. This is all the more important where the question relates principally to the scope of the agreement. Paying attention to compatibility and apparent logical inconsistency such as this, is central to the approach which culminated in the decision of *Investors Compensation Scheme Ltd. v. West Bromwich Building Society*. Words are important as a guide and often the surest guide to the agreement made by the parties. But where other guides suggest a different approach to that suggested by the dictionary meaning of the words taken on their own and out of context, then that is a reason to reconsider the interpretation to be given to the contract.

40 Finlay Geoghegan J. offered a slightly different solution. She accepted the argument made by counsel for the Law Society that it would not necessarily follow that the insured who could not obtain indemnity under the policy, and against whom the MIBI enforced a judgment, would be left without a remedy. It was suggested, that if the MIBI sought to enforce the judgment, the insured might then be able to claim from the insurance fund and furthermore that such claim would not be precluded by the terms of s.3(7) of the 1964 Act as inserted by the 2011 Act. Again with respect, it appears to me that there is subtle but important shift of focus here. The question is not whether if the Law Society interpretation is correct, that an insured *might* be able to mount some plausible argument that a sympathetic court might accept to allow him or her to recover from the insurance fund at least to the extent of 65% of the cost of the claim. The question is whether the parties to the Agreement could ever have been thought to have intended such an unsatisfactory, cumbersome, opaque, and inevitably unjust result. Even if this interpretation of the Agreement and the Act is correct (and it is acknowledged that this is anything but clear-cut), it would mean that the victim would still obtain judgment against the insured. If the MIBI satisfied the judgment, it would then take an assignment of the judgment and could seek to execute it against the insured. The insured *may* then seek to recover against the insurance fund, but would be limited to 65% of the judgment amount. There would be inevitable delay in having it determined that such a claim could indeed be made during which time the defendant would be at risk of execution, interest would be mounting, as indeed would stress. If, in the event the defendant was unsuccessful in the argument floated by counsel for the MIBI in this case, then there would be no recovery from the insurance fund, and the defendant would face the prospect of being at the loss of further costs incurred in seeking it. If the argument is successful, recovery would still be limited to 65% (or the capped amount) at some future point, which may still leave a very substantial debt. The MIBI for its part would still be able to demand satisfaction of the full 100% of the judgment from the defendant. It is difficult to conceive of any reason why the parties to the MIBI Agreements between 1955 and 2009 could have thought that this would be a desirable situation. But if they had considered this possibility, then it is also difficult to understand why they would have provided for such a cumbersome procedure, when an easier solution would have been to allow the MIBI to recover direct from the insurance fund which could have been provided for in both the Agreement and in the legislation. But finally, if we are to believe that the parties addressed their minds to the situation and intended the outcome that the possible injustice to the insured should be palliated by permitting an indirect claim on the fund by the insured after execution of a judgment assigned by MIBI, it is difficult, if not impossible, to believe that the Agreement would not have said so.

41 It is worth recalling why this sub-issue arose in the present context. It was argued forcefully by the MIBI that the Agreement cannot be given the broad interpretation advanced by the Law Society, (and which undoubtedly accords with the ordinary meaning of the words in clause 4.1.1 taken on their own) because to do so would conflict with clause 3.11, or at least mean that the Agreement would operate in a manifestly unjust way, and that therefore the parties cannot be taken to have intended to agree to such a course unless that was their unmistakable intention. It is no answer to that argument to prefer the plain meaning words of clause 4.1.1, because the words of 3.11 are equally plain if not more so. Nor is it an answer to suggest that the injustice which would follow or would not be so great if the Agreement and Act can be interpreted in a novel way. That is of no assistance to the interpretation issue unless it suggests that the parties considered the position and intended it. That is plainly not the case here. If indirect recovery by the insured from the insurance fund was however intended, then surely that would have been made more explicit. In any event, the equivalent provisions of clause 3.11 permitting assignment of the judgment were in place since 1955, and therefore, on the Law

Society's interpretation at least, the original Agreement intended full recovery against the innocent insured, without any recourse to the insurance fund since of course that was not created until 1964.

42 The only plausible answer the Law Society can give is that it was accepted by Ryan P. namely that it does not matter because the plain words of clause 4.1.1 must prevail. But that means accepting that the parties were clumsy at best in the way in which they expressed themselves in clause 3.11. Once however, this possibility is acknowledged, then the question equally arises why should the Court not consider the possibility that clause 3.11 is accurate and intended, and that clause 4.1.1 should not be given the broad reading contended for? Why in other words not consider the possibility that it is clause 4.1.1 which is clumsy?

43 This leads to a further point of broader application. It is not merely that the broad reading of clause 4.1.1 is admittedly difficult to reconcile with both the preamble and clause 3.11, significant as though those points are. The fact is that there is no other provision of the Agreement which can be said to be consistent with, or otherwise reinforce, the Law Society's reading of clause 4.1.1 which would have it extend not just to insolvent insurers but indeed to any claim not met within 21 days of judgment. The Agreement contains fairly detailed provisions (which must be strictly complied with) which are plainly directed towards those cases which the MIBI accept are covered by the Agreement: the uninsured/untraced/repudiation cases. The insolvent insurer (or even the more general unmet judgment) cases present different issues of fact; yet no specific provision can be identified that is referable to either of these cases. As already observed some of the provisions are difficult to apply and others produce a palpably unfair result. When we recall that on any view the issues posed by the insolvent insurer present different and distinct questions of both law and policy, and furthermore that on a commercial level involve a very extensive liability, this silence is baffling if the Agreements were intended and understood to have the meaning contended for. It is difficult, if not impossible, to believe that if the MIBI or its constituent members had intended and understood that the Agreement extended to the case of insolvent insurers (or indeed more broadly again to all cases) that specific reference would be made to that, first in the preamble and then in clause 4.1.1, and that specific provisions would be included directed to such cases.

**The Memorandum of Association of the MIBI**
44 The MIBI also rely to the Memorandum of Association of the MIBI. Object 3.1 of the Memorandum provides that the principal object of the company is to "enter into agreements and make arrangements in compliance with current agreements with the Minister for Transport . . . responsible for compulsory motor vehicle insurance and connected matters for the compensation of victims of road traffic accidents ... involving either uninsured vehicles, stolen vehicles, unidentified drivers, or untraced drivers which are required to be covered by contract of insurance ...". Plainly the objects clause does not extend to providing compensation for the victim of road accidents where the driver is insured with a company which is now insolvent. Accordingly, if the Agreement is interpreted to extend to insolvent insurers, payment would be *ultra vires* the MIBI.

45 This is responded to by the Law Society with an argument accepted by Hogan J. in the Court of Appeal. It is first pointed out that the MIBI's interpretation of the Agreement itself goes somewhat further than the Memorandum in that uninsured drivers (and not simply uninsured vehicles) are admittedly covered. Hogan J. acknowledged however that there was a strong argument that the Memorandum did not extend to cover the liability which the Law Society contended was part of the Agreement. However he considered the most straight forward answer to this was that no road user injured and who sought recovery, would be "actually aware" of this lack of *vires* on the part of the MIBI, and therefore any such lack of *vires* could not be pleaded by the MIBI so as to exclude entitlements otherwise conferred by the 2009 Agreement on such third parties pursuant to s.8(1) of the Companies Act 1963, which for the purposes of the case was considered to be the applicable provision.

46 Again, this is however a subtle shifting of gears which presents an apparent response to the argument but in fact addresses a different question, which was not posed. In my view at least, the question is not whether the MIBI could raise a plea of *ultra vires*, but rather what light this admitted interpretation of the Memorandum of Association throws upon the Agreement itself. The Memorandum of Association of the company is particularly important in this case. It should be recalled, that the original Agreement of the 10th March, 1955, was between named insurers and the Minister for Local Government under which they agreed to form the company. The MIBI was therefore incorporated on the 27th July, 1955, and the Agreement entered into thereafter between the Minister for Local Government and the newly formed MIBI. The incorporation of the company was therefore a key provision in the Agreement between the Minister and the insurance companies and furthermore was entered into during the same time period, and in the same legal context, as the Agreement of the 10th March, 1955, and the subsequent Agreement of the 30th November, 1955. Its terms throw substantial light on the scope of the Agreement as understood at the time. It is significant that the Minister, who was to approve the formation of the company, raised no objection to this formulation of the objects clause. There could be no reason why the companies incorporating the MIBI would voluntarily seek a mismatch between the scope of objects clause and the scope of the Agreement which the company was incorporated to enter into. The only possible conclusion from this sequence of events is that the insurers establishing the MIBI did not advert to the possibility of the insolvency of an insurer and did not consider that it was the function of the MIBI to make payments in relation to it. This is a very powerful indicator of the scope of the Agreement as contemplated by the parties at the time. It is no answer to this to argue that if the Agreement is construed more broadly, then the MIBI would not be entitled to raise the doctrine of *ultra vires* as a defence to the claim.

**The position taken by the Minister**
47 The MIBI also rely on the position adopted by the other party to the Agreement, the Minister for Transport. The MIBI has exhibited a letter of the 10th September, 2014, to the MIBI from a principal officer in the Department, which was also copied to the relevant equivalent officer in the Department of Finance. It states as follows:

> ` "The Department has considered the contents of your letter and sought the advice of the Attorney General in this regard.
>
> It is the Department's position that there is no legal obligation, under the MIBI Agreement 2009, on the MIBI to satisfy judgements or claims made against customers of Setanta Insurance in liquidation when they have an existing approved policy of insurance at the time of the accident which has not been declared void or cancelled up to May 2014. Furthermore the Department is of the view that the Insurance Compensation Fund, established under the Insurance Act 1964 as amended, is the express statutory mechanism for providing compensation for claimants against insurers, both foreign and domestic, in liquidation. This would include any claims made by injured victims against Setanta who have not had their judgments or claims satisfied by Setanta."

48 The MIBI rely on this as reflecting the views of the other party to the Agreement and as coinciding with the view maintained by the MIBI that claims against defendants insured who have become insolvent are not captured by the Agreement. The Law Society argued, and indeed the Court of Appeal appears to have accepted, that the letter was irrelevant since it merely recorded legal advice, which moreover, in the light of the decision of the Court of Appeal, was erroneous. I do not think however that it is sufficient to treat the letter in this fashion. It is certainly clear that advice was obtained prior to its completion and it so states. Furthermore,

since it distinguishes carefully between claimants in respect of accidents which occurred prior to cancellation of the policy in May 2014, and those thereafter, it makes a careful distinction which may reflect advice. But the letter does not purport to be merely, or at all, the recording of legal advice. Rather it states the "position" of the Department. Furthermore, it is written in the context of a dispute which by then had arisen and which had been the subject of public controversy not least in circumstances where the matter had been agitated in the Oireachtas, and before Oireachtas sub-committees, at which the principal officer in the Department of Finance copied with the letter had given evidence. It is a serious matter for the Department to commit itself in this way in general, but more so when done specifically in the context of the public dispute which had arisen. The Law Society do point out that the Department did not participate in the proceedings although having been served, and that no affidavit was sworn by an official setting out the background facts. This is true, but I do not think that the Court can assume as the Law Society invited it to do so, that the letter is misleading, and that although the Department knew the Agreement covered insolvent insurers, it has nevertheless adopted a contrary "position" in the knowledge that the letter would be used in court. It would indeed be a serious thing if the position adopted in public by the Department was intentionally misleading. Such a serious conclusion could however only be arrived at after a full oral hearing and cross-examination which did not take place here and which the Law Society did not seek. I consider that the Court must therefore take the letter as proffered as a representation of the position of the Department and not merely legal advice with the qualification that it has not been the subject of testing in court as might have occurred had there been an oral hearing. However, taking it in this way, the letter offers further important support for the interpretation advanced by the MIBI. If this is accepted, even with some qualifications, then it appears that the MIBI and the Department of Transport shared a view as to the scope of the Agreement. If so, it becomes difficult to see how it can be said that the Agreement can be interpreted more broadly than the parties to the Agreement itself contend.

**The Act of 1964**

49 Both sides rely on the provisions of this legislation. Clearly, the Setanta liquidation claims come within the scope of the 1964 Act as subsequently amended, because they are claims made in respect of an insurer now insolvent. However the Law Society pointed to provisions of the Act. First, s.3(2) of the 1964 Act as inserted by s.4 of the 2011 Act, provides, rather curiously, that the High Court should order payment out of the insurance fund "only if it appears to the High Court that it is unlikely that the claim can be met otherwise than from the Fund." This indeed was the provision relied upon by the Law Society to persuade the accountant of the High Court to seek directions rather than make payments from the Insurance Fund to those with claims against a driver insured by Setanta.

50 Furthermore, s.3(4) of the 1964 Act which was re-enacted in identical terms by s.4 of the Insurance (Amendment) Act of 2011 and became section 3(7). It makes specific reference to the Motor Insurers' Bureau of Ireland and provides:

> "Where in respect of a sum due under a policy, a payment equal to the whole of the sum is made by the Motor Insurers' Bureau of Ireland, a payment shall not be made out of the Fund under this section in respect of the sum, and where, in respect of such a sum, a payment equal to part of the sum is made by that Bureau, a payment out of the Fund in respect of the sum shall not exceed the amount of the sum less the amount of the payment by that Bureau."

51 Section 3(2) of the 1964 Act (as amended) is important in this case since it is the ostensible basis upon which these proceedings are mounted. However, if payment is refused in reliance on s.3(2), that by itself does not ensure that payment will be made by any other source, and specifically the MIBI. That raises issues as to the resolution of these proceedings, and the appropriateness of them for these complex matters, but it does not add much to the question of interpretation. Section 3(2) is in general terms, and cannot itself be read as a statutory endorsement of the possibility of payment by the MIBI.

52 Section 3(4) of the 1964 Act (as re-enacted as s.3(7) under the 2011 Act) is however a different matter. It specifically refers to the MIBI and contemplates the possibility that there may be payment. Presumably the reference to part payment by the MIBI is a reference to the limitations on recovery in respect of property damage which, although adjusted, have remained a part of the regime. Counsel for the Law Society argues with considerable force, that given its context, this is a clear endorsement of the possibility that the MIBI will have a liability in the case of insolvency, since it is only in that context that the possibility of a payment out of the insurance fund could arise. Thus, he says, this is only consistent with the MIBI being liable in such a circumstance.

53 The MIBI respond in two different ways— neither of which is fully convincing. First, it is suggested that there is some residual area where it is possible that there is a circumstance where the section may have application. Thus, in the so called "insurer concern" cases, an individual insurer has a responsibility and of course may become insolvent. However, it is not clear that in such a case it can be said that the MIBI makes a payment which is contemplated by s.3(4). Alternatively it said that s.3(4) is clearly drafted in the light of the issue which arose in respect of the insolvency of the Equitable Insurance company, to which greater reference will be made below, where the MIBI certainly made some payments. If however, this was the reason for s.3(4) it does not readily explain why it would be re-enacted as s.3(7) in 2011. Again, the MIBI suggest there is a tendency to draft by accumulation, and it is rare for provisions in legislation to be dropped. This is true but nevertheless, neither of these explanations are wholly convincing.

54 This is an important point, and one which favours the Law Society's interpretation. However, it is not a point which determines the case. The provisions of s.3(4) contemplate but do not require payment by the MIBI in such circumstances. The central feature of this case is that there was a degree of confusion and ambiguity as to the function of the MIBI in insolvency claims. Therefore the Act can be read that *if*, for whatever reason, a payment is made by the MIBI, then the insurance fund is to that extent, absolved. But a different point can also be made in this regard. The interpretation advanced by the Law Society assumes that motor claims against insolvent insurers come within the terms of the MIBI. Thus they should be excluded as a matter of principle from the insurance fund. If the Law Society's interpretation is correct, one might expect therefore that claims made in respect of road traffic accidents involving vehicles and driving which is the subject of the compulsory insurance provisions of the Road Traffic Act, would be simply excluded from the scope of the legislation in 1964, and certainly when re-enacted in 1983 and again in 2011. Two other aspects of the regime under the 1964 Act also support, at least inferentially, the position of the MIBI. First, if the interpretation of the Law Society is correct, then motor insurers, who are the subject of calls under the MIBI Agreement, should not be required to contribute through the levy to the insurance fund. Put another way, motor policies, should not be the subject of a levy for the insurance fund, or at least at the same rate, since on the Law Society's argument, the insurance fund does not deal with motor claims. If accordingly, the motor insurers considered that MIBI was to be the source of compensation of plaintiffs' claims against drivers whose insurer becomes insolvent, then it seems likely that at some stage they would have raised the issue in an attempt to reduce, if not remove, their obligation to contribute to the insurance fund.

55 Furthermore, the insurance fund has dealt with very substantial claims made in respect of insolvent insurers who provided motor insurance. The PMPA failed in 1983, ICI (later Icarom) in 1985, and more recently Quinn Insurance Ltd. went into administration. Each of these companies had substantial motor business. As of the 1st April, 2015, the principal officer in the Department of Finance stated that the amount outstanding owed by those businesses were then €139 million, €164 million and €1.158 billion, respectively. Given the

structure of the insurance fund, these monies were met by monies advanced from the public purse which are gradually recouped from the 2% levy over time. It should be said that in each of these cases, the mechanism adopted was to make use of the administration procedure which meant that the companies although insolvent, were not placed in liquidation but rather were maintained as a going concern. There was therefore no question of any limitation on the amount to be paid in respect of claims. Nevertheless the fact remains that if the Law Society's contention is correct, then the accountant and the High Court were wrong to make any payments in respect of the motor claims of those companies since such claims properly fell to the MIBI to satisfy. It is not a sufficient answer to suggest, as I understand the Law Society to do, that this is irrelevant because there was no practical difference for claimants, since the administration process meant that the claims were paid in full, albeit through the insurance fund. From the perspective of claimants that is so and provides some, although not a complete explanation, why no such claims were not made to the MIBI. But it provides no satisfactory explanation whatsoever from the perspective of the insurance fund and the Accountant whose statutory obligation it was to ensure that only claims were paid which properly fell on the insurance fund.

56 Three further matters are relied upon by the Law Society. First, the Equitable Insurance Company collapsed in 1964. The problems created by this event appear to have been the genesis for the introduction of the 1964 Act and the creation of the Insurance Compensation Fund. In the course of its creation, a memorandum to Government in April 1964, records that the Motor Insurers' Bureau "will in accordance with the terms of the agreement with the Minister for Local Government meet certain liabilities under motor policies to the extent of €140,000 leaving a balance of €210,000 approximately". It is also recorded that the Minister had requested the MIBI to accept liability for all claims under equitable motor policies whether or not they were covered by the Agreement with the Minister for Local Government but that the request was turned down. The Law Society's suggestion is that this is clear evidence that as of 1964 the MIBI Agreement was considered to cover the risk of an insurer's insolvency. Against this the MIBI point out that this occurred in a different legal context, that it is not clear that on the basis upon which any money was paid by the MIBI in respect of the Equitable Insurance Company, and finally, they point to the provisions of the MIBI's council minutes of the 26th September, 1994, which recorded that the Bureau had succeeded in recovering more than €94,000 in respect of the Equitable Insurance Company (in liquidation) "which is the amount which was discharged by the Bureau on behalf of Equitable in the past" and that this was now the end of the Bureau's involvement in the matter. The MIBI maintain therefore, that any payment made in 1964 may have been on an *ex gratia* basis, and predated the establishment of the insurance fund, and cannot therefore be considered a decisive guide to the interpretation of the Agreement after 1964, where, as already set out, it appears that large insolvencies of companies with motor policies were dealt with under the insurance fund.

57 Finally, the Law Society point to the provisions of the accounts of the MIBI which, for 2012, contain a note which sets out a contingent liability that:

> "In the event of insolvency of any of its members, the Bureau is required, under its agreement with the Minister for Transport, to pay claims, to the extent that its insolvent member is unable to do so."

Mr. Casey, the Chief Executive of the MIBI, who swore an affidavit on its behalf in these proceedings, has acknowledged that the accounts contain this provision but maintains that it is an error and that no provision was made in the accounts for any such contingent liability. The Law Society argue that a statement in the accounts adopted by the directors of the company is a solemn matter and not likely to be disregarded. That is so, but human error is not impossible. There is scope for confusion as to the liability of MIBI members to contribute *inter se* to MIBI liability in the case of the insolvency of a member of the MIBI, and the question of whether the MIBI's liability extends to insolvent insurers. In any event, given the fact that this case extends over a 60 year period, it is misguided to assume a single corporate entity with a single shared view of this matter. The fact is that during this time there would have been considerable turnover of individuals both in the Department and the MIBI and its constituent insurers. Accordingly, it cannot simply be a case of finding what some people have said at different stages and attributing that view to the body in general throughout its life. Whereas here, a provision is ambiguous, it is to be expected that some persons involved on either side over the period of 60 years will hold a different view and may express them. However, the question, if relevant is what the general view of those involved with the company or the Department was particularly at the time of, and as expressed in, the Agreements.

58 While undoubtedly this is a finely balanced case, in my view it must be resolved in favour of the interpretation advanced by the MIBI. It is clear that the major factor in the decisions of the High Court and Court of Appeal was the weight given to what was described as the ordinary and natural meaning of the words in clause 4.1.1. However, in my view when the clause is put in the context of the Agreement as a whole and set against the background of what was known between 1955 and 2009, it is possible to read those words as the MIBI suggest, as being applicable only to a limited class of claims. Once the scope of the Agreement is established, then the generality of the language used in clause 4.1.1 poses no difficulty. For the most part, the Department and the MIBI had a shared understanding of the scope of the Agreement and the broad language used, was employed in that context and subject to that limitation. The information in the Memorandum for Government in relation to Equitable Insurance is not unequivocal, and, at any event, relates to a period before the enactment of the 1964 Act.

**United Kingdom Authorities**

59 The Law Society however also place reliance on observations in certain UK authorities. I agree that particularly in an area as obscure as this, any source that shines light on the matter is welcome. Furthermore, it seems probable that both structure and content of the MIBI Agreement was closely modelled on the UK agreement. Perhaps the most relevant authority is the observation of Diplock L.J. (as he then was) in *Gurtner v. Circuit* [1968] 2 Q.B. 587 at p.598. The first two paragraphs of the judgment are particularly useful:

> "This appeal illustrates once again the legal anomalies which result from the method adopted by the Minister of Transport in 1946 to fill a gap in the protection of third parties injured by negligent driving of motor vehicles provided by the Road Traffic Acts of 1930 and 1934.
>
> Under those Acts although insurance against third party risk was made compulsory and insurers made directly liable to satisfy judgments against their assured, an injured person, although he had recovered judgment against a negligent defendant, could whistle for his money if (a) the defendant was not insured at the time of the accident or (b) his policy of insurance was avoided in the circumstances specified in section 10(3) of the Act of 1934 for non-disclosure or misrepresentation or <u>(c) his insurer too was insolvent</u>. To fill this gap the insurers transacting compulsory motor vehicle insurance business in Great Britain, acting in agreement with the Minister of Transport, formed a company, the Motor Insurers' Bureau, to assume liability to satisfy judgments of these three kinds. But instead of amending the legislation so as to impose upon the Motor Insurers' Bureau a statutory liability to the unsatisfied judgment creditor as had been done by the Road Traffic Act, 1934, in respect of the liability of insurers to satisfy judgments against defendants covered by a valid policy of insurance, the matter was dealt with by an agreement of June 17, 1946 between the Minister of Transport and the Motor Insurers' Bureau." [Emphasis added]

60 Understandably the Law Society place heavy reliance on this observation, and the circumstance in which the observation has been repeated in subsequent cases. However, it is an observation on a matter which was not the subject of the argument in the case. *Gurtner v. Circuit* is an important decision as to the circumstances in which a non-party may seek to be joined as a party to litigation. In that UK case, the MIB had sought to be joined as a defendant to contest a claim in circumstances where the defendant was to be treated as uninsured. The case did not raise the specific question as to whether the agreement extended to the insolvent insurer situation. In *Morgans v. Launchbury* [1973] A.C. 127, Lord Pearson (again *obiter*) appears to have described as "not effectively insured" persons who had "taken their policies from an insolvent insurance company". These judgments predate the introduction of the Policy Holders Protection Act of 1975 and 1977, (now replaced by the Financial Services and Markets Act 2000) which introduced a scheme of compensation in respect of insolvent insurers akin to the Insurance Act of 1964. Subsequently, the UK MIB agreement was amended to exclude cases in which a claimant had received compensation from "the Policy Holders Protection Board under the Policy Holders Protection Act 1975". Accordingly while the matter has been referred to in passing in subsequent cases, and indeed in one academic article, the matter has not been the subject of a decided case in which the issue was clearly raised. Both sides rely on these developments for their own purposes. The MIBI argue that the UK position now reflects the logic of the position contended for by them in that insolvent insurer claims are dealt with as part of the regime set up to deal with the problems created by insolvencies among insurers, rather than under the Motor Insurers' Bureau type agreement. On the other hand, the Law Society argue with some force, that this result was only achieved by specific amendments which accordingly implies that without such language, the Agreements would extend to the insolvent insurer situation. In my view, the balance of these arguments favours the Law Society. However, that only goes so far. The UK has, as it were, put features on the faces and coloured them in in relief, so that there can no longer be any argument that the picture is a vase. In Ireland we face a situation where the picture is free from that type of clear statutory and contractual adjustment. In that context, I agree that it is significant that Diplock L.J. considered in 1968 that the same language in the United Kingdom was broad enough to cover the insolvent insurer situation, but since the issue was not argued and did not arise in the case, the observation, preceding as it does the 1975 legislation, has less force than would be the case if it had been the subject of clear argument and reasoned decision.

61 *Gurtner v. Circuit* is also relevant to another aspect of the case which was touched on earlier and which relates to the manner in which these proceedings have been designed. It confirms that the legal analysis of the MIB agreement is one made between two parties conferring a benefit on third party claimants. Unless one of the exceptions to the privity rule applies, such an agreement is not enforceable at the suit of any such third party (at least without the acquiescence of the party sued) and as both Diplock L.J. and Salmon L.J. observed, the ultimate method and enforcement of the Agreement in the case of any dispute would be for the Minister to sue the MIBI for enforcement of the terms of the Agreement. This is reinforced by the fact that the 2009 version of the Agreement contains a provision in relation to which disputes are resolved finally, by the decision of the Minister. If both the Minister and the MIBI are agreed on the extent to which the Agreement covers claims, then the Minister would not sue, and could not, at least without some elaborate and relatively novel legal argument, be forced to do so.

62 It is of course to be expected, that in the circumstances of this case the Minister would accept the determination of the Court that the proceedings cover the insolvent insurer case if that was the decision of the Court. But this cannot be guaranteed, and in any event only leads to a further problem, which clearly troubled Finlay Geoghegan J. in the Court of Appeal. These proceedings do not, and any proceedings, could not force the MIBI to satisfy any individual award. Nor could proceedings provide a blanket obligation on the MIBI to satisfy awards where the insurer was insolvent. That is because compliance with the MIBI is a precondition to liability in any case, whether or not the insurer is insolvent. These proceedings seek to achieve a result indirectly and negatively, by preventing the accountant of the High Court from making payment from the insurance fund to parties otherwise entitled to claim under it, on the basis that it appears that another source of compensation is available, in this case, a possible claim against the MIBI. An order effectively restraining the accountant from payment does not compel payment by the MIBI. If the MIBI did not satisfy the judgment, then the claimant would have to revert to the insurance fund, in which case the attempt to obtain payment from the MIBI would have been a costly and pointless detour. This is clearly less than satisfactorily, but is the effect of the fact that all parties and all information are not before the Court.

63 This leads to a final consideration. It is unrealistic not to recognise that at the forefront of this case is the fact that these complex arguments are only necessary because there is a substantial difference between the available recovery under the insurance fund (limited to 65% or €830,000), and from the MIBI which recovery is close to a full indemnity against judgments obtained. It is indeed an interesting thought experiment to consider how the arguments might differ if the situation was reversed and the insurance fund offered the prospect of 100% recovery and the MIBI only a substantial fraction. However, it is not possible to be unaware of the fact that if the Agreement is interpreted as the MIBI suggests it should be, victims of road traffic accidents will face a significant limit on the amount that they can recover. The Law Society makes this point very effectively in the conclusion of its submission by arguing that a finding that liability lay with the insurance fund, and not the MIBI "would be to the benefit of insurers at the expense of victims".

64 The reality is however that the Court is not asked to determine whether a victim should be paid in full, or almost in full (from the MIBI), or in part (from the insurance fund). If that were the question, it would be easily answered. It is asked to give a determination on the interpretation of an agreement in accordance with principles applicable to every contract. Whatever interpretation is given, it will almost certainly lead to further developments, either the possible winding up of the MIBI, or the renegotiation of the Agreement on the one hand, because even the Law Society appears to accept, that the Agreement as interpreted, lacks any commercial justification or logic from the insurers point of view. On the other hand, if the claims are to be met under the insurance fund, then it is inevitable that there would be pressure for the amendment of the 1964 Act scheme. The logic of limiting payments made in respect of insolvent insurers, makes some sense in the context of claims by policy holders. It may be thought that there should be some moral hazard, as it were, for the decision to place insurance with a new insurer offering perhaps suspiciously low premiums. Otherwise there would be no incentive to obtain insurance from more cautious businesses, since any policy holder would know that there was a 100% backstop in the shape of the insurance fund. However, whatever logic there exists in this regard, the same logic cannot, it seems, apply to victims who have claims against a policy holder with such a company. A victim does not choose the party with whom he or she collides, and still less his or her insurer. It is perhaps instructive that when the ICI, the PMPA, and Quinn Insurance Ltd. all collapsed, the authorities adopted the option of administration to allow the companies to continue in business with the effect that all claims were met. If accordingly, this Court were to determine that on its true construction such claims do not fall under the MIBI and must therefore be met by the insurance fund, then there is a strong and probably unanswerable case in equity for the amendment of the scheme to permit recovery of such claims. If indeed, the position were maintained that victims are limited to 65% of the recovery, the constitutional validity of the application of any such limit to third party claimants would clearly arise and have to be addressed.

65 However, the issue for this case and which the Court must resolve, is the difficult one of the interpretation to be given to an agreement which itself is ambiguous. This is like a freeform jigsaw where it is possible to arrange the pieces in at least two different patterns, each of which has some attractive elements, but where some pieces are difficult to fit into the overall pattern. It is useful therefore to stand back and consider the overall picture, and the competing arguments as to what occurred here.

66 I do not think it is possible to arrive at a conclusion that the Agreement had a meaning that neither of the parties intended. Nor in these circumstances is it necessary to consider the possibility that the Minister for Transport believed and intended that the Agreement would cover insolvent insurers but the MIBI did not. The issue in this case appears to resolve itself therefore to a question as to what the parties collectively intended. On the Law Society's case, the parties intended to cover the case of an insolvent insurer (although perhaps not appreciating the significance of this liability), and the MIBI has now sought to resile from that position when faced with the scope of the liability. Furthermore, it is contended that the Department has facilitated this approach by taking a public stance that at least suggests it agrees with the MIBI's interpretation, and certainly does not contest it. On this approach, the language of clause 4.1.1 is deliberate and the reference in the accounts represents the true position of the MIBI (and necessarily the Department). This interpretation would however raise troubling questions, particularly since it reflects adversely on the individuals and institutions involved, in circumstances where there has not been a hearing with full discovery, oral evidence and cross-examination. Ultimately however, I consider the argument put forward by the MIBI to be a more plausible approach. On this version, the parties were in agreement as to the scope of what was to be covered by the Agreement and in its various iterations, namely the uninsured/untraced/repudiated cases. In that context they used words of general application, which when viewed, particularly out of their context, certainly are capable of much broader application. However, given the fact that liability for claims against drivers whose insurance company has become insolvent raises different issues of law, procedure and fact, and moreover involves significantly different risk and exposure, it is difficult to accept that had such an extension of liability been intended on each occasion on which the Agreement was made or renewed or amended, that detailed provisions would not have been included for the different factual and legal scenarios, and that explicit provision would be made for the interaction between satisfaction by the MIBI and recovery from the insurance fund, and indeed the possibility of recovery of portion of the amount from the liquidator of the insolvent insurer. In simple terms, it is difficult to accept that the parties intended to cover such a case, and yet did not address themselves to the commercial and legal issues involved. In those circumstances, I have come to the conclusion that the Agreement must be interpreted as applying only to the limited class of cases as asserted by the MIBI and does not extend generally either to cases where an insurer is insolvent, or indeed to all cases in which a claim has not been satisfied within 21 days. Accordingly I would allow the appeal, and set aside the declaration made in the Court of Appeal.