# EXHIBIT O

THE SUPREME COURT

68 & 110/04

Murray C.J.
Hardiman J.
Fennelly J.
BETWEEN

**Dakota Packaging Ltd**

**Plaintiff/Respondent**

and

**AHP Manufacturing BV trading as Wyeth Medica Ireland**

**Defendant/Appellant**

JUDGMENT delivered on the 15th day of December, 2004 by FENNELLY J.

1. In a judgment delivered on 10th October 2003, Peart J determined that the Appellant (hereinafter "*Wyeth*") were bound to give reasonable notice to the Respondent (hereinafter "*Dakota*") of the termination of a trading relationship, whereby they had been major purchasers of packaging from the latter. He also determined that the period of notice should be twelve months and that, during the period of notice, Wyeth were obliged to continue to purchase whatever goods of that type Wyeth required during that period.

2. Wyeth's main point is that the learned trial judge purported to imply the term with regard to reasonable notice, while finding that there was no long-term purchase agreement between the parties. Dakota concedes that a term cannot be implied where there is no contract, but maintains that the learned trial judge "*in effect*" and despite some ambiguous language found that there was such a contract.

3. While the parties both in the High Court and in this Court presented extensive submissions on the law regarding implied contract terms, there was no fundamental disagreement as to the relevant principles or cases. It was agreed that there can be no implied term without a contract. Thus, the principal issue to be determined is whether the learned trial judge found that there was a contract (other than individual contracts for the sale of goods).

**The Facts**

4. Dakota is one of Ireland's major print and packaging companies. It was a public limited company until 1994. It trades from Airways Industrial Estate, Dublin 17. At the commencement of these proceedings, it employed some 160 persons. Employment had peaked at over 200 about the year 2000. The Appellant is a company registered in the Netherlands, but trades in Ireland as Wyeth Medica Ireland. It is part of a major American multi-national company which manufactures pharmaceutical products. Its Irish manufacturing base is at Newbridge, Co Kildare, where it manufactures contraceptive products. Both companies are sophisticated enterprises operating in a competitive business environment and are accustomed to the need for high standards.

5. After initial contacts in 1993, Wyeth commenced purchasing packaging from Dakota. From small beginnings of some IR£100,000 in 1993, the business increased to IR£700,000 in 1995. The greatest increase was from 1999 onwards. About that time, Dakota invested some €10 million in its manufacturing facilities in order to assist the growth of its business with Wyeth. The business increased to just short of €4 million in 1999 and reached a peak value of €8.6 million in 2000, falling slightly to €8 million in 2001 and to €6.2 million in 2002. At the time of the commencement of the proceedings, the Wyeth business represented approximately 40% of the total turnover of Dakota.

6. In late 2002 and early 2003, Wyeth expressed concern about the financial stability of Dakota. These concerns were the subject of much discussion and argument between the parties. Whether these concerns were justified or not - and it is only fair to say that Dakota maintains that they were not - does not need to be decided and it was not decided in the High Court. It appears that the real effect of these events was to cause Wyeth to take a closer look at the prices they were paying to Dakota and to conclude that the goods could be sourced more competitively elsewhere. Again, whether they were correct in this respect is not relevant. Dakota's sole contention is that, while Wyeth were entitled to terminate their trading relationship, they were required to give reasonable notice, or as it was put in evidence on behalf of Dakota, to "*agree an exit strategy*." Thus, Wyeth did not have to justify the termination or even give a reason, provided they gave proper notice.

7. Unless there was some long-term agreement between the parties for the sale and purchase of packaging, there was no contract into which Peart J was entitled to imply a term that reasonable notice had to be given of its termination. In one sense, this issue can be disposed of simply by looking at the judgment of Peart J. Dakota has not appealed his findings regarding the existence or otherwise of a contract. If, as Wyeth maintains, Peart J found there was no such contract, they are entitled to succeed on the appeal. Therefore, I will refer to the judgment of the learned trial judge as fully as is necessary to deal with this question. I will also, however, refer to the evidence which, according to Dakota, established the existence of such a contract. Principally, this evidence was given by Mr Tony Fox, who was at all material times the sales director of Dakota. In saying this, I would also remark that, as was rightly stated by Mr Paul Gardiner, Senior Counsel, for Dakota, the facts themselves were not in serious dispute.

**The High Court Judgment**

8. The following appear to me to be the most material passages from the judgment of Peart J. Firstly, in summarising the facts, he made the following statements:

> "A critical feature of this trading relationship as far as the present dispute is concerned is that at no time was there ever any supply agreement in writing concluded between the parties. The relationship developed over time with orders for product being received from Wyeth and being supplied on an order by order basis by Dakota, although Wyeth would from time to time give Dakota a forecast of anticipated orders so that presumably Dakota could have sufficient raw materials available when the orders were placed to fulfil the orders without delay.
>
> In relation to orders, Mr Tony Fox, Dakota's Sales Director agreed when giving evidence that each order placed represented a separate contract for the supply of the goods so ordered. The standard terms and conditions appearing on the back of each order form were in line with this, but Mr Fox went on to say that if that was to be the sole basis on which business was to be done with Wyeth, its orders could not have been fulfilled to meet their requirements, and that was why annual forecasts of volumes were made, so that the necessary quantities of raw materials (i.e. board) would be in stock at Dakota to meet the orders placed. Those stocks of board had to be bought in from board manufacturers and the lead time for that was about 10-12 weeks. He said that the business relationship with Wyeth could not have developed and matured in the way it did, if Dakota were to operate only on the basis that Wyeth had no obligations over and above what was stated on the order form, but he

*had to accept that on paper that was the extent of Wyeth's obligation in relation to goods ordered."* (page 9)

*"Mr Fox also confirmed in his evidence that in early 1997 Wyeth introduced what is described as a "Blanket Order" system of ordering, in order to cut down on paperwork given the number of orders being placed from time to time. A letter from Wyeth dated 29th January 1997 announcing the introduction of this new purchasing system stated that the normal purchasing terms and conditions would continue to apply, and then stated "that the Blanket Order should not be interpreted as a firm commitment by WMI to purchase the authorised quantity stated in the Blanket Order. You may only produce and deliver the stated call-off quantities".* (pages 9/10)

*"Mr Fox was also referred to a further development in purchasing arrangements which was introduced in January 2000. This is what has been referred to as the "two month firm window". In effect there would be a six month forecast given of anticipated orders going forward, but there would be a two month "firm window", the latter being what Dakota could actually manufacture and that Wyeth guaranteed to take and pay for. The forecast six month period was merely indicative, and Wyeth had no obligation to purchase on foot of it. In April 2000 a document was sent by Wyeth entitled "Standardized procedures for vendors" and this set out the new arrangements relating to "Firm period" and "Forecast" and other matters which would form the basis for the purchasing arrangements with all Wyeth suppliers, and not just Dakota. Under the paragraph headed "Forecast" it states:*

> *"The forecast period is for the following four months of the schedule. Vendors should use the Schedule period to forecast for base material for periods outside of the Firm Period. This period can be used by supplier to produce & hold stock but WMI is not liable for any stock outside the firm period that does not have a purchase order."*

*While Mr Fox acknowledged that this document existed, he again stated that from a practical point of view it was not possible to operate strictly in accordance with it, because of the lead time needed to buy in raw material from board manufacturers. The two month window would not give sufficient lead time."* (page 10)

9. More importantly, when he came to what he described as his "*conclusions*," the learned judge said:

> *"Nothing was ever written down, and each order constituted a contract for the delivery of the stipulated goods. Business gradually increased through 1995 to 1998 when just less than two million euro worth of business was transacted, again just on an order by order basis."* (page 29)

> *"In 1996 as we know, Dakota had at first failed to win a tender for the Wyeth business at that time. On the 14th February 1996 a letter was received from Mr Slater indicating that the business was to be transferred to a new supplier but he also indicated that the business would be transferred over a mutually agreed period of time, and he then thanked Dakota for its support in the tendering process, whatever that meant, and also expressed appreciation for the long standing association between the two companies. In my view, taking a snapshot of the relationship between the two companies at that time, there was no obligation upon Wyeth to give any notice to Dakota, and anything contained in that letter was a voluntary gesture on the part of Wyeth. Perhaps, indeed, it suited Wyeth to transfer the business gradually to its new suppliers, rather than to have the changeover take place overnight. In any event it was expressed in the way that appears in the letter, but I cannot see how that letter can constitute anything in the way of a binding commitment that at any future time at which the relationship might be terminated the transfer of business to any new supplier would be undertaken in a timeframe to be mutually agreed between the parties. It could not amount to that, and I am satisfied that no form of estoppel can arise therefrom. If there is to be a term of reasonable notice implied into the relations between the plaintiff and the defendant, it cannot in my opinion arise by virtue of that letter."* (pages 29/30)

> *"I am satisfied that the level of the relationship as of that time was of a character similar to many a business relationship of 5 years' standing. In any walk of life, business comes and goes. It can go for any number of reasons, or for no reason other than someone's whim or a simple desire for change, and no notice may be required to be given in these circumstances, unless there is an express term to the contrary.*

> *Nevertheless the law has recognised that in some circumstances reasonable notice of termination must be given, even where there is no such term expressed in any written contract between the parties. I have been referred to a number of such cases, each of which is different in terms of the type of relationship existed between the parties, and there is certainly no case to which I have been referred which is on all fours with the present case, though there are some similarities in some of the cases. But the fact that the court will imply terms in certain circumstances is well settled, …"* (page 30)

10. Having referred to the judgment of Murphy J in *Sweeney v Duggan* [1997] 2 I.R. 531, he continued on page 29:

> *"Having referred to the said officious bystander, he went on to say that in addition to the sort of case in which the parties would say "Oh, but of course", there was a variety of cases in which a contractual term would be implied not on the basis of the presumed intention of the parties, but deriving from the nature of the contract itself, and referred to Lord Wilberforce's description of the different categories as no more than shades on a continuous spectrum. I take this to mean that the range of cases, or the variety or kinds of cases in which a term will be implied is not confined in any way, and that there is vested in the court a wide discretion as to when it shall regard it as reasonable to imply a term, such as a reasonable notice term.*

> *I say this because a feature of the present case, and an unusual feature, is that in spite of the very large volume of business transacted by Wyeth with Dakota, and of the very substantial investments both in terms of money, premises, plant and machinery, and personnel, no long-term or even medium term supply agreement was ever entered into between Dakota and Wyeth. Such an agreement would be of more benefit to Dakota than to Wyeth, but one cannot say that it would not have been of some benefit to Wyeth also, since they had a dependence on Dakota, which was recognised, albeit in a somewhat negative way, by Ms. Todd at the backend of 2002 when she embarked upon an examination of the risk to Wyeth of this dependency."* (page 32)

11. He continued at page 32:

> "The question now is whether the relationship which developed between Wyeth and Dakota during and after 1998 changed things in such a way as to bring that relationship, which was an evolving one, into that category of relations which the law has recognised as capable of having implied therein a term that it will not be terminated other than on the basis of reasonable notice being given."

12. The following step in the reasoning is crucial and merits full citation. At page 32/33, Peart J said:

> "In 1997/1998 there was a development in the evolution of the relationship between Wyeth and Dakota. New products were being launched by Wyeth and very substantial quantities were expected. I am satisfied that Wyeth wanted Dakota to supply these anticipated increased volumes if it had the capacity. This accounts for Mr Slater speaking to Dakota at the time about moving its operation to an upgraded and larger premises if it wanted to be a major player in the packaging industry. There is no doubt also that Dakota was an ambitious company anxious to expand its business, and it goes without saying that it would jump at the chance of supplying Wyeth with the sort of quantities which were being talked about. Dakota had other customers which a new premises and upgraded facility would also benefit.
>
> But I am satisfied that a very close relationship had developed between these two companies by this time, and without going so far as to say that Dakota was induced by Wyeth to invest so heavily in new premises and equipment, it was clear that if that was done the new business would come their way. It was certainly a benefit to Dakota, but it was also a benefit to Wyeth who now had a local supplier who could satisfy its requirements both as to reliability of supply and as to quality of product. Both of these factors are of critical importance to Wyeth given the business it is in. This is borne out by the evidence given by Wyeth.
>
> As we now know the new levels of business did come Dakota's way, and in fact the forecasts were exceeded. But while I am not saying this close cooperation, and encouragement by Wyeth to invest created of itself some sort of contractual relationship, it was a very significant factor in the development of the overall relationship between the parties, and a factor which I must take into account when considering the nature of the relationship between the parties. I prefer to use the phrase "nature of the relationship" between the parties, because the use of the word "contract" is confusing in this case, because, as Mr Murray was at pains to point out, there never was any contract in existence except each individual order of specific goods from time to time, and perhaps the commitment to purchase those goods specified in the "firm window" in the forecasts given by Wyeth. But to confine myself to that "contract" is to ignore essential aspects of the overall relationship, and would fail to recognise what Murphy J. was referring to in Sweeney v. Duggan when he stated that there are a variety of cases in which a contractual term will be implied on the basis not of the intention of the parties, but deriving from the nature of the contract itself. I refine this a little bit further for the purpose of this case by stating that it ought also to be derived from the nature of the relationship of the parties, as in the present case.
>
> I accept that for a term to be implied it must not just be reasonable but must also be necessary. In addition I am satisfied that a term cannot be implied simply because one party considers that in all the circumstances it would be fair to them. It must also be capable of formulation with reasonable precision. That much is clear from the English authorities and from Sweeney v. Duggan."

13. Later on the same page he continued:

> "But in relation to the development of the relationship from 1998, I have absolutely no doubt that both parties would have regarded the giving of reasonable notice as a desirable thing had it been discussed. I do not have to state why Dakota would regard it as desirable, because that is obvious. But as far as Wyeth is concerned they were also putting themselves in a position of some dependency on Dakota. This was not seen as risky at the time, but there was risk. That risk was appreciated by September 2002 as we know. In fact I find it extraordinary that the matter was not brought up for discussion by Dakota either of their own motion as it were, or on the prompting of their Bank or even their auditors. However that was the situation. Dakota either closed their minds to the possibility of peremptory termination, or worked on the assumption that everybody would be decent about things when and if that situation arose.
>
> While Wyeth have said that they would never agree to enter into any long-term supply agreement with a supplier, and do not in fact do so, that is not the same as saying that they would never agree to reasonable notice of termination. The fact that they do not have long-term supply agreements with their suppliers does not prevent this court from finding that a term of reasonable notice is capable of being implied."

14. At a later stage, he gave further consideration to the grounds on which a term may be implied. He considered that would be fair to both parties and also reasonable. He said that it was necessary to give business efficacy to the relationship after 1998. He also spoke of giving "*business efficacy to the arrangements between the parties.*"

15. I have quoted at such length because it is necessary to understand what exactly the learned trial judge decided. It is perfectly clear, in my opinion, that the learned trial judge held that there was never at any time an agreement or a contract between the parties, other than individual purchase and sale contracts. Mr Gardiner, in seeking to explain what was, from his point of view, a very stark finding that "*no long-term or even medium term supply agreement was ever entered into between Dakota and Wyeth*" sought to argue that the judge was merely referring to the absence of a written agreement. However, that is not what he said and there is nothing in the immediate context of this statement to suggest that the judge was making such a qualified statement.

16. Other of the passages quoted above show the learned trial judge studiously even elaborately avoiding the use of the word contract or agreement. I cannot agree with Mr Gardiner's submission that the learned trial judge held that there was a contract. He preferred quite expressly to use the phrase "*nature of the relationship*" between the parties, because, as he said, "*the use of the word "contract" is confusing" in this case.*" Even in the passage where he cited Murphy J on the question of implying terms into <u>contracts</u>, he felt it necessary to "*refine*" that dictum "*by stating that it ought also be derived from the nature of the relationship of*

*the parties…."*

17. Accordingly, I am satisfied that the learned trial judge was very careful even deliberate in his use of language. It was not, as suggested by Mr Gardiner, ambiguous. He may have been mistaken in the legal conclusion he drew, but that is a different matter.

18. Furthermore, it was quite consistent with the evidence and with the comments made by the learned trial judge on it that he should come to this conclusion. The case, as originally pleaded and presented by Dakota was that the agreement was made in October 1993, at the outset of the dealings between the parties. As we have seen, the learned trial judge rejected that contention, holding that "*each order constituted a contract for the delivery of stipulated goods*." Next, at the hearing Dakota relied on a letter written by Wyeth in 1996 in a very particular context. Dakota had been required to engage in a tendering process, if they were to continue supplying Wyeth. Initially, Dakota lost out in this process in favour of other suppliers. They were able, however, to persuade Wyeth to reverse this decision, because the competing tenders had been submitted on an incorrect basis which had distorted the process. The important point was that, in the intervening period when Dakota were going to lose the business, Wyeth wrote a letter to Dakota as follows:

> "*We refer to your recent tender submission in regard to our folding carton business in Ireland and the UK.*
>
> *Regretfully, your tender has not been successful in this instance. The "Preferred Supplier" status has been awarded to a limited number of companies for our carton business. <u>It is our intention to transfer business over a mutually agreed period of time.</u>"*

19. This letter became a major plank in the evidence of Mr Tony Fox on behalf of Dakota. He maintained that it demonstrated that Wyeth had agreed to adopt some form of mechanism of termination. Again, as already seen, Peart J rejected this contention. He could not see how the letter could "*constitute anything in the way of a binding commitment*."

20. Dakota had to depend on the evidence of Mr Fox, if it were to establish the existence of a binding agreement. Mr Fox expressly agreed that Dakota did not have a long-term supply agreement with Wyeth. Curiously, he maintained, nonetheless, that they had a "*long-term contract*." He was pressed repeatedly on this point in cross-examination. A representative answer would be the following:

> "*We did not have an agreement in written format. In the spirit of the working relationship that existed form 1993, it was our firm belief that there was an agreement between Dakota Packaging and Wyeth, and that then least that we would have expected as a result of that very close working relationship and the investment that we put in to support Wyeth in what was a very dramatic period for them, was that they would respect that and in their decision to exit, which we don't have a problem with…and in effect what we are looking for is a managed exit programme that will not damage our business.*"

21. At another point, asked whether Dakota had an agreement which required Wyeth to do business for a particular period, he said:

> "*The only agreement that we had in terms of volumes were, basically, the forecasts that we were given on an annual basis….*"

22. Mr Fox gave no evidence of anything in the nature of a negotiated agreement. In reality, Dakota asked the court to infer an agreement from the relationship between the parties, the extensive business they were doing, the investment that Dakota had made and the undoubted history of close cooperation between the parties on every aspect. It is impossible not to be impressed with the commitment of Dakota to the business and the large volume of sales they built up. It is a notable feature of the case that no complaint is made about the quality of Dakota's service to their customer. Consequently, it is not at all surprising that they were aggrieved at losing this very valuable customer so suddenly. Nonetheless, Peart J could find the existence of an agreement only if there was evidence to support it. Such written communications as existed tended to negative the existence of any long-term commitment by Wyeth. For example, in January 2000 Wyeth denied any responsibility for stock purchased outside the two month "*firm period*". For reasons already given, I am satisfied that the learned judge came to a carefully considered view that there was no agreement or contract and that this conclusion was firmly based on the evidence.

23. Having regard to this conclusion, it is not contested that the learned trial judge was not entitled to imply a term into the "*arrangements*" or "*the relationship*" between the parties. In *Sweeney v Duggan,* Murphy J noted that there were "*at least two situations where the courts will, independent of statutory requirement, imply a term which has not been expressly agreed by the parties to a <u>contract</u>*" (my emphasis). He considered, citing *The Moorcock* (1889) 14 P.D. 64, the case of terms "*inferred on the basis of the presumed intention of the parties.*" He also referred to the "*variety of cases in which a contractual term has been implied on the basis, not of the intention of the parties to the <u>contract</u> but deriving from the nature of the <u>contract</u> itself.*" (emphasis added) Here he referred to *Liverpool C.C. v Irwin* [1977] A.C. 239. Later, he stated:

> "*Whether a term is implied pursuant to the presumed intention of the parties or as a legal incident of a definable category of <u>contract</u> it must be not merely reasonable but also necessary. Clearly it cannot be implied if is inconsistent with the express wording of the contract and furthermore it may be difficult to infer a term which cannot be formulated with reasonable precision.*" (emphasis added).

24. Quite clearly, therefore, there must be a contract before a term can be implied. Peart J, having determined that there was no contract of the relevant type, was not entitled to infer or imply any term. His refinement of the dictum of Murphy J was not justified. There must be a contract.

25. Since that is sufficient to determine the appeal, it is not strictly necessary to comment further. Nonetheless, I think it desirable to state that the cases on the topic - indeed the cases which were very properly cited by the learned trial judge - do not warrant at least some of the language used in the judgment. In particular, the courts do not have "*a broad discretion*" to imply terms. It is not enough that a term to be implied is "*fair and reasonable.*" It is true that the learned judge went on to hold that the term must also be

necessary, but it is important to bear in mind that the courts will not lightly infer terms. In this case, the implication of a term that reasonable notice must be given seems, assuming there to be a contract, simple enough, but Peart J himself saw difficulties in formulating the term, when he considered the obligations of Wyeth during the notice period. How much product did they have to buy? At what price? Clearly, these were matters that would have been the subject of detailed negotiation, if the matter had arisen. That is an additional reason. It would be difficult to measure up to the "*reasonable precision*" test postulated by Murphy J.

**Other Defences**
26. Wyeth relied on two additional grounds of defence which they argued on the appeal. Firstly, they argued that reliance on the alleged agreement, being one not to be performed within one year from its making, would have been defeated by the requirement that it be evidenced by a note or memorandum in writing for the purpose of the Statute of Frauds (Ireland) 1695. There was an interesting discussion as to the status, in Irish law, of the doctrine of part performance in the cases of contracts of this type. English case law, before the requirement was abolished, appeared to hold that the doctrine applied only to contracts for the sale of land. (see *Britain v Rossiter* (1879) 11 QBD 123; *Maddison v Alderson* (1883) 8 App. Cas. 467) Palles C.B., on one view, declined to follow these cases in *Crowley v O'Sullivan* [1900] 2 I.R. 477. More recently, however, Barron J, speaking for this Court, and referring to *Maddison v Alderson,* stated in *Mackey v Wilde* (1998) 1 I.L.R.M. 449 that in "*all the earlier cases, it was assumed that the acts of part performance must necessarily relate to and affect land.*" The conclusion in the present appeal is that there was no contract, so the question of the need for writing does not arise. Accordingly, it seems better to leave that, as well as a point concerning the absence of writing to satisfy the Sale of Goods Act, for debate on another day.

27. I would allow the appeal and substitute for the judgment of the High Court an order that, there being no agreement, the appellant was not required to give the Respondent reasonable notice of termination of the trading relationship between the parties. That is the only matter before this court. Mr Gardiner says that there are outstanding matters such as a claim based on alleged misrepresentation and that they will be pursued before the High Court. That does not appear to require any order from this court, but the parties should be heard following the delivery of this judgment.