UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARK WARREN PEARY,

    Plaintiff,

v.

DC COMICS, INC.; DC COMICS; DC ENTERTAINMENT, INC.; WARNER BROS. DISCOVERY, INC.; and DOES 1-10,

    Defendants.

Case No. 1:25-cv-00910-JMF

**DECLARATION OF ANITA CADE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

---

I, Anita Cade, declare and state as follows:

1. I am a partner at Ashurst Australia in the firm's intellectual property and media practice. I am admitted in the states of Victoria and New South Wales, Australia. I hold a Bachelor of Arts (Hons) from Monash University and a Bachelor of Laws from La Trobe University. Over the past 26 years of practice, I have developed experience in a number of areas of intellectual property law, including copyright. My copyright work is a particular focus of my practice and includes advising clients in relation to protection and enforcement of copyright, defence of copyright claims, and in licensing and commercialising copyright. I have represented clients in copyright rate-setting proceedings in the Copyright Tribunal of Australia, and in copyright cases in the Federal Court of Australia. A copy of my curriculum vitae is attached to this Declaration as **Exhibit A**.

2. The content of this Declaration is based on my knowledge and experience as a legal practitioner in Australia. If called as a witness, I could and would competently testify to said content.

3. In preparing this Declaration, I have reviewed the following documents:
   - Plaintiff's Complaint, dated 31 January 2025
   - Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction, dated 28 February 2025

1

- The Central District of California's decision in *DC Comics v. Pacific Pictures Corp.*, 2012 WL 4936588 (C.D. Cal. 2012) ("*Superman I*")
- The Ninth Circuit Court of Appeals' decision in *DC Comics v. Pacific Pictures Corp.*, 545 F. App'x 678 (9th Cir. 2013) ("*Superman II*")
- The Last Will and Testament of Joseph Shuster, dated June 28, 1988
- The agreement between DC Comics Inc., Frank Shuster, and Jean Shuster Peavy (dated as of August 1, 1992)

4. I have been asked to provide my expert opinion on certain issues of Australian law that are implicated in Plaintiff's preliminary injunction motion. Specifically, I have been asked to opine on the following questions as a matter of Australian law:

(1) Did the 1938 Grant[1] give rise to a reversionary interest under section 239(4) of the *Copyright Act 1968* (Cth) (the **Australian 1968 Act**)?

(2) If so, did any reversionary copyright interest devolve to Ms Jean Shuster Peavy when Mr Joseph Shuster died in 1992?

(3) If so, did Ms Peavy effectively assign any reversionary interest she may have owned to DC Comics in the 1992 Agreement?

5. For the convenience of the Court, I have summarised my opinions on these questions as follows:

6. **Question (1) – No.** In my opinion, an Australian court would be reluctant to disturb or interfere with the finding of the US courts that the 1992 Agreement revoked the 1938 Grant and constituted a new assignment of the copyright in Superman to DC Comics. Thus, an Australian court would likely find that because the 1938 Grant no longer affected the ownership of the copyright after the 1992 Agreement, the 1938 Grant no longer gave rise to a reversionary interest under section 239(4) of the Australian 1968 Act, or put another way, any reversionary interest that did arise from the 1938 Grant was extinguished by the 1992 Agreement's revocation of the 1938 Grant.

7. **Question (2) – Yes.** Even if there were a reversionary interest stemming from the 1938 Grant, it would have devolved to Ms Peavy as Mr Shuster's "legal personal representative"

---

[1] For the purposes of this Declaration, I adopt the terms "1938 Grant" and "1992 Agreement" as they are defined in Plaintiff's Complaint.

2

within the ordinary meaning of the term in section 239(4). Ms Peavy was the sole executor appointed by Mr Shuster's will, and the reversionary interest therefore would have devolved on Ms Peavy in that capacity upon Mr Shuster's death.

8. **Question (3) – Yes.** Although the relevant copyright under section 239(4) does not vest in the legal personal representative until 25 years after the author's death, the *reversionary interest* may be assigned at any point after the author's death. Here, US courts determined that the 1992 Agreement granted "*all*" rights that Ms Peavy "may have under any . . . agreement or otherwise, whether now or hereafter existing regarding any copyrights . . . in any and all work created in whole or in part by [Mr Shuster]." This determination, coupled with the plain language of the 1992 Agreement itself, would likely lead an Australian court to conclude that the broad grant of rights from Ms Peavy to DC Comics in the 1992 Agreement included any reversionary interest that may have devolved to Ms Peavy under section 239(4).

9. These opinions should not be construed as an exhaustive recitation of the barriers Plaintiff's claims face under Australian law. Given the short time provided to respond to Plaintiff's preliminary injunction motion, I have focused my opinion on the three issues above.

10. For purposes of this Declaration, I have assumed the following facts:

   a) The original 1938 "Superman" comic strips were created by Joseph Shuster as illustrator and Jerome Siegel as author of the written text.

   b) On 1 March 1938, Mr Shuster and Mr Siegel assigned the "exclusive right to the use of the [Superman] characters and story" to DC Comics Inc., DC Comics' predecessor (the **1938 Grant**).

   c) Mr Shuster died on 30 July 1992.

   d) In his will, Mr Shuster appointed his sister, Jean Peavy, as the sole beneficiary and executrix of his estate.

   e) On 17 August 1992, Ms Peavy executed an affidavit under California law identifying herself as Mr Shuster's "successor" and sole heir, and requesting that certain property "be paid, delivered or transferred" to her.

f) On 21 August 1992, Ms Peavy wrote to DC Comics identifying herself as heir to Mr Shuster's will, requesting that DC Comics pay Mr Shuster's "final debts and expenses".

g) On 2 October 1992, Ms Peavy and her brother, Frank Shuster, entered into an agreement with DC Comics granting DC Comics all rights (including future rights) regarding copyright or other property in all works created by Joseph Shuster (the **1992 Agreement**).

h) On numerous occasions over the following decade or so, Ms Peavy reaffirmed the 1992 Agreement, including in writing to DC Comics.

i) Sometime before 2003 (but long after signing the 1992 agreement), Ms Peavy signed and filed a Declination to Act as Personal Representative (of the Shuster estate) in the Los Angeles Superior Court.

j) Mark Peary was granted probate of Mr Shuster's will by the Los Angeles Superior Court on 23 July 2003, and in applying for such probate, Mr Peary signed a form acknowledging Ms Peavy as the sole beneficiary and heir under Mr Shuster's will.

k) Ms Peavy died on 20 August 2016.

## How the reversionary interest provisions of the Australian 1968 Act generally operate.

11. The relevant provisions of section 239 of the Australian 1968 Act are set out below:

> *239 Assignments and licences*
>
> *(1) Subject to this section, where copyright subsists in a work by virtue of this Act, any document that was made, or event that occurred, before the commencement of this Act, being a document or event that had any operation affecting the ownership of, or creating, transferring or terminating an interest, right or licence in respect of, copyright in the work under the [British] Copyright Act, 1911 or would have had such an operation if that Act had continued in force, has the like operation in relation to the copyright in the work under this Act.*
>
> *(2) If the operation of a document to which the last preceding subsection applies was or would have been limited to a period specified in the document, the document does not have any operation in relation to the copyright under this Act, except in so far as that period extends after the commencement of this Act.*
>
> *(3) For the purposes of the operation of a document in accordance with this section:*
>
> > *(a) expressions used in the document have the same respective meanings as they had immediately before the commencement of this Act, whether or*

> *not those expressions have different meanings for the purposes of this Act; and*
>
> *(b) subsection 197(1) does not apply.*
>
> *(4) Without prejudice to the generality of subsection (1), where the author of a work that was made before the commencement of this Act was the first owner of the copyright in the work:*
>
> > *(a) any assignment of the copyright, or any grant of an interest in the copyright, made by the author (otherwise than by will) after the commencement of the Copyright Act, 1911 and before the commencement of this Act, being an assignment or grant that has effect in relation to copyright in the work under this Act by virtue of subsection (1), does not operate to vest in the assignee or grantee any rights with respect to the copyright in the work after the expiration of 25 years after the date of the death of the author;*
> >
> > *(b) on the death of the author, the reversionary interest in the copyright expectant on the termination of that period devolves, notwithstanding any agreement to the contrary, on his or her legal personal representative as part of his or her estate; and*
> >
> > *(c) any agreement entered into by the author as to the disposition of that reversionary interest is of no force or effect;*
>
> *but nothing in this subsection shall be taken to apply to the assignment of the copyright in a collective work or a licence to publish a work or a part of a work as part of a collective work.*
>
> *(5) In the last preceding subsection, expressions that are defined by section 204 have the meanings respectively given to those expressions by that section and do not have the meanings, if any, respectively given to those expressions by Part II.*

12. Section 239(4) was imported into the Australian 1968 Act from the British 1911 Copyright Act[2] (**British 1911 Act**) (that is, it was "grandfathered" in respect of works created prior to 1968). As observed by the "Spicer Committee" (the Copyright Law Review Committee that advised the Commonwealth government on which provisions should be included in the Australian 1968 Act) in its 1959 report (**Exhibit B**), these provisions "[appear] to have been

---

[2] Section 5(2), Copyright Act 1911.

5

designed to protect the family of the author and ensure to them a portion of the benefit of a work which may not have received recognition until after the death of the author".[3]

13.  Plaintiff's preliminary injunction motion describes the case as a straightforward question of international copyright law. It states that under the copyright laws of Australia, amongst others, the rights that Mr Shuster assigned to the Defendants' predecessor in 1938 automatically reverted to the executor of Mr Shuster's estate in 2017.

14.  It is correct that section 239(4) of the Australian 1968 Act can automatically revert certain assignments of copyright upon the expiry of 25 years from the death of the author. However, the provision contains particular requirements and qualifications, which I observe have not been addressed by Plaintiff in either his preliminary injunction motion or his complaint. These are:

   a) There must have been an Australian copyright that subsisted by reason of the British 1911 Act (**1911 Australian copyright**). It is insufficient to point to copyright subsisting in other countries (including at the time of the original grant). The reversionary interest applies only in relation to Australian copyright.

   b) The author must be the first owner of the *Australian* copyright.

   c) The author must have made an assignment of, or other grant of an interest in relation to, the 1911 Australian copyright prior to the Australian 1968 Act commencing.

   d) That assignment or other grant must *have* affect in relation to the Australian 1968 Act copyright at the time the assignment or grant is reverted by section 239(4)(a), being the expiration of 25 years after the death of the author. It is insufficient to prove that the assignment *had* effect at some point prior to this.[4]

   e) The reversionary interest will not arise in respect of an assignment or other grant of interest of the copyright in a "collective work" (which is defined in the Australian 1968 Act), or a licence to publish a work or part of a work as part of a collective work.

---

[3] Copyright Law Review Committee, Government Printer, Canberra, 1959, paragraph 393.
[4] For example, if at any point the author and original grantee terminated the original grant (or the grantee had separately assigned the copyright back to the author) such that the original grant no longer had any effect on the copyright, section 239(4)(a) would not apply. This is this apparent not only from the text of section 239(4)(a), but from the statute's purpose.

15.     If the above threshold elements of section 239(4) are met by the plaintiff, the reversionary interest is capable of devolving on the "legal personal representative" as part of the estate upon the death of the author, notwithstanding any agreement to the contrary. "Legal personal representative" is not defined in the Australian 1968 Act (I discuss this further below).

**The 1938 Grant is not subject to reversion under section 239(4).**

16.     As noted in paragraph 14(d) above, for a copyright assignment to qualify for reversion under section 239(4), it must affect the ownership of, or an interest in, the Australian 1968 Act copyright.

17.     In *Superman II*, the United States Court of Appeals for the Ninth Circuit determined that "the 1992 Agreement, as a matter of New York law, *superseded the 1938 assignment of copyrights to DC, and therefore operated to revoke that assignment* and re-grant the Superman copyrights to DC". 545 F. App'x at 680 (emphasis added); *see also Superman I*, 2012 WL 4936588, at *5–7 (noting that the 1992 Agreement "essentially revok[ed]" the 1938 Grant and "unmistakably operates to supersede all prior grants").

18.     In Australia, the common law principle of issue estoppel would apply to prevent Plaintiff from seeking to relitigate the US courts' finding that the 1992 Agreement revoked or extinguished the effect of the 1938 Grant. Under that principle, "[a] judicial determination directly involving an issue of fact or of law disposes once and for all of the issue, so that it cannot afterwards be raised between the same parties or their privies. The estoppel covers only those matters which the prior judgment, decree or order necessarily established as the legal foundation or justification of its conclusion." *Blair v. Curran* [1939] HCA 23; 62 CLR 464, at 531-532, per Dixon J (attached as **Exhibit C**). Here, because the determination that the 1992 Agreement revoked the 1938 Grant justified the US courts' conclusion that Plaintiff's 2003 notice of termination was ineffective to terminate DC Comics' copyright in Superman under US law, Plaintiff is likely estopped from challenging that determination.

19.     Accepting the US courts' finding would in turn likely lead an Australian court to conclude that because the 1938 Grant no longer affected the ownership of the copyright after 1992, any reversionary interest that could have arisen under the statute was extinguished by the revocation of the 1938 Grant.

20.     In my view, this conclusion would itself be sufficient to dispense with any infringement claims brought on the basis of an alleged reversionary interest under the Australian 1968 Act.

### Setting aside the implications associated with the revocation of the 1938 Grant, any reversionary interest under section 239(4) would have devolved to Ms Peavy upon Mr Shuster's death.

21.     Assuming for the sake of completeness that the 1938 Grant qualified for reversion under section 239(4), upon Mr Shuster's death, "the reversionary interest in the copyright expectant" would have "devolve[d] . . . on [his] "legal personal representative as part of [his] estate."

22.     The term "legal personal representative" is not defined in the Australian 1968 Act. Moreover, my inquiries undertaken for the purposes of this Declaration did not identify any judicial consideration of section 239(4) of the Australian 1968 Act or the reversionary interest provisions within section 5(2) of the 1911 Copyright Act by any court in Australia, and I am not otherwise aware of any such judicial consideration.

23.     However, there is a relevant British case which considers the equivalent English statutory provision. In *Redwood Music Ltd. v B. Feldman & Co. Ltd* [1979] RPC 1 (*Redwood*) (attached as **Exhibit D**), the High Court of Justice suggested that "legal personal representatives" in the reversionary interest provisions of the British 1911 Act (i.e., the statute from which Australian copyright reversion rights are derived) included those named as executor by the will, regardless of whether probate had been granted.[5]

---

[5] Page 10, line 4.

8

24. An Australian court would likely find the British court's reasoning persuasive, including because, as I discuss further below, it also appears to be the case in Australia that an executor derives their title as legal personal representative from the will itself (and probate merely *proves* that title).[6]

25. As a matter of statutory interpretation, the term "legal personal representative" would be taken to have the same meaning regardless of where it is used in the Australian 1968 Act.

26. "Legal personal representative" is also used in the Australian 1968 Act in relation to moral rights (rights which were inserted by the *Copyright Amendment (Moral Rights) Act 2000* (Cth)). The relevant provisions[7] concern the enforcement of a deceased author's moral rights (and the resulting recovery of damages) by the legal personal representative of the author's estate.[8] Following the death of the author, the author's legal personal representative is entitled to exercise and enforce the author's moral rights. This means that a third party seeking consent to use a copyright work in a manner that may otherwise infringe the author's moral rights would need consent from the author's legal personal representative following the death of the author.

27. The moral rights provisions of the Australian 1968 Act do not provide any express guidance on the meaning of "legal personal representative".

28. My inquiries undertaken for the purposes of this Declaration did not identify any judicial consideration of the relevant moral rights provisions of the Australian 1968 Act by any court in Australia, and I am not otherwise aware of any such judicial consideration.

29. It likely would not have been the Australian Parliament's intention, in using "legal personal representative" in the moral rights provisions, that a third party wishing to obtain consent to use a copyright work in a manner that may infringe the moral rights, would have to

---

[6] As is the case in Britain, as discussed in *Redwood*, Page 8, line 13.

[7] ss 195AN(1), 195ANB(1) and 195AZA(6)).

[8] In the moral rights provisions, the legal personal representative does not acquire the moral rights (as they remain inalienable), but acquires the right to enforce and recover damages in respect of the author's moral rights.

9

wait for probate or administration to be granted (in a case like this, for over 10 years) before there was someone from whom such consent could be obtained. Rather, it seems the purposes of the moral rights provisions would best be served by an interpretation that a person can acquire the status of "legal personal representative" simply by being appointed the executor in a will and without any unnecessary formality.

30. Additionally, for the following reasons, the ordinary meaning of "legal personal representative" in Australia appears to include a person who has been appointed as the executor by a will, prior to probate being granted. This ordinary meaning can be ascertained from materials extrinsic to the Australian 1968 Act.

31. The extent to which one can refer to extrinsic materials in interpreting an Australian statute is governed by the *Acts Interpretation Act 1901* (Cth) (**Exhibit E**). Section 15AA of that statute states:

> *"In interpreting a provision of an Act, the interpretation that would best achieve the purpose or object of the Act (whether or not that purpose or object is expressly stated in the Act) is to be preferred to each other interpretation."*

32. Section 15AB(1) of the *Acts Interpretation Act* provides that if any material not forming part of the statutory text is capable of assisting in the ascertainment of the meaning of a provision, consideration may be given to that material:

> a) to confirm that the meaning of the provision is the ordinary meaning conveyed by the text of the provision, taking into account its context in the statutory text and the purpose or object underlying the statute; or
>
> b) to determine the meaning of the provision when:
>
> > i. the provision is ambiguous or obscure; or
> >
> > ii. the ordinary meaning conveyed by the text of the provision taking into account its context in the statute and the purpose or object underlying the act leads to a result that is manifestly absurd or is unreasonable.

10

33. The "Encyclopaedic Australian Legal Dictionary" (**Exhibit F**) defines:[9]

   a) "legal personal representative" to mean:
   *A person who is an executor of the will or administrator of the estate (in the case of intestacy) of a deceased person, the trustee of the estate of a person under a legal disability, or a person who holds an enduring power of attorney granted by a person: for example, (CTH) Superannuation Industry (Supervision) Act 1993 s 10.*

   b) "executor" to mean (emphasis added):
   *The person **appointed by a testator** to manage, administer, direct, and dispose of property under the will. **The grant of probate affirms an executor's right to act.** Executors' duties include: to bury the deceased; to prove the will; and to administer the estate properly according to law, which involves getting in the estate as quickly as possible, paying estate debts, and distributing the balance to the beneficiaries. The executor's office is a single office, so that if more than one executor is appointed their authority is joint and several: Union Bank of Australia v Harrison (1910) 11 CLR 492.*

34.  Applying section 15AB(1)(a) of the *Acts Interpretation Act*, the above definitions confirm that the ordinary meaning of "legal personal representative" in Australia includes a person who has been appointed as the executor by a will, prior to probate being granted (probate which would *affirm* the right to act – for example, for the benefit of third parties wanting evidence that a person claiming to be the executor is entitled to deal in assets of the estate – but not itself *grant* the title).

35.  The definitions can also be relied on to confirm the meaning of "legal personal representative" is its ordinary meaning as conveyed by the text of the Australian 1968 Act, taking into account the context and purposes underlying the statute. Moreover, section 239(4) is

---

[9] Published by LexisNexis Australia.

11

not "ambiguous or obscure", and adopting the ordinary meaning of "legal personal representative" would not "lead to a result that is manifestly absurd or is unreasonable".[10]

36. Here, Mr Shuster's will named Ms Peavy as his sole heir and executor. The will further emphasized that Ms Peavy was "empowered" to:

> "...mortgage, lease, sell, exchange and convey the personal and real property of [Mr Shuster's] estate without an order of court for that purpose and without notice, approval or confirmation and in all other respects to administer and settle [Mr Shuster's] estate without intervention of court."

37. Thus, an Australian court would likely find that Ms Peavy was Mr Shuster's legal personal representative under section 239(4)(a), regardless of whether the will had been probated—and therefore, that any reversionary interest fell to her upon Mr Shuster's death.

## To the extent Ms Peavy may have possessed any reversionary interest under section 239(4), she validly assigned it to DC Comics in the 1992 Agreement.

38. Under section 239(4), once the reversionary interest has devolved, there is no waiting period on the legal personal representative's ability to assign the interest.

39. The Spicer Committee recognised this in its 1959 report:

> "*the benefits given* [by the equivalent reversionary interest provisions under the 1911 Copyright Act] *are somewhat illusory. Although the reversionary interest in the copyright is unassignable during the author's lifetime,* ***it is assignable by his personal representative upon his death****. It is also liable to be sold by his representative for the payment of debts and it may even be the duty of the representative to realise the interest for the purpose of winding up the estate. If a legatee wished to sell the interest immediately after the author's death, rather than wait twenty-five years for a chance of income, the only possible purchaser*

---

[10] It would therefore be unnecessary, if not outright impermissible, to proceed to an analysis under section 15AB(1)(b) of the *Acts Interpretation Act* by looking to other materials not forming part of the statutory text of the Australian 1968 Act (such as definitions of the terms found in particular statutes) to determine the meaning of the term.

> *will usually be the author's publisher and the amount he will be prepared to pay is not likely to be large particularly in view of the fact that the value of the interest depends on the popularity of the work twenty-five years hence.*"[11]

40. That view is also consistent with the settled interpretation of section 5(2) of the British 1911 Act, on which the reversionary rights provisions in the Australian 1968 Act are based. *See Chappell & Co. Ltd. and Others v. Redwood Music Ltd. Redwood Music Ltd. v. Francis, Day & Hunter Ltd. and Another* [1981] R.P.C. 337 (noting that the British 1911 Act "made [it] impossible for the author either to assign or license, or to contract to assign or license, [the reversionary interest] in manner extending into the reversionary 25 year period, ***though his legal personal representatives (or a beneficiary after assent) can do so at any time after the author's death***") (**Exhibit G**).

41. The question, then, is whether Ms Peavy—as Mr Shuster's legal personal representative—validly assigned any reversionary interest she may have possessed to DC Comics via the 1992 Agreement.

42. As a threshold matter, an Australian court would agree that the 1992 Agreement complies with section 196(3) of the Australian 1968 Act, which requires that an assignment of copyright be in writing to be valid.

43. There is no specific language that Ms Peavy would need to use in order to assign any Australian reversionary interest to DC Comics. As to determining the scope and effect of the assignment in the 1992 Agreement, the relevant principles of contract interpretation in Australia would apply and are summarised by the Australian High Court in *Mount Bruce Mining v. Wright Prospecting* [2015] HCA 37 (**Exhibit H**). Contractual provisions are interpreted objectively, having regard to their language and the contract's purpose. Accordingly, an Australian court would look to the plain language of the 1992 Agreement in which Ms Peavy granted DC Comics "any" and "all" rights she "may have under any . . . agreement or otherwise, whether now or hereafter existing regarding any copyrights . . . in any and all work created in

---

[11] Copyright Law Review Committee, Government Printer, Canberra, 1959, at paragraph 395.

whole or in part by [Mr Shuster]." The court would very likely read that language as broad enough to include any reversionary interest, present or future. The reversionary interest is a "right" (which itself can be disposed of for compensation) that Ms Peavy would have had under statute (so "by agreement *or otherwise*"), which as of the time of the 1992 Agreement existed ("whether now or hereafter existing"), and which is "regarding" the copyright in Superman. An Australian court would also likely take into account that the US courts, applying governing New York law, previously characterized the 1992 Agreement as a "broad release" with "all-encompassing language." *Superman I*, 2012 WL 4936588, at *4–7; *Superman II*, 545 F. App'x at 680–81.

44.     Thus, to the extent that Ms Peavy ever possessed a reversionary interest in Superman copyrights under section 239(4), an Australian court would very likely conclude that she had validly assigned that interest by way of the 1992 Agreement.[12]

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. Executed on 7 April 2025.

BY: _____

Anita Cade

---

[12] Of course, any assignment in 1992 Agreement itself would not be subject to reversion under section 239(4), as the assignment was made decades after the commencement of the Australian 1968 Act and was not made by Mr Shuster (i.e., the author).