# EXHIBIT B

COMMONWEALTH      OF      AUSTRALIA.

———————

# REPORT

OF THE

## Committee Appointed by the Attorney-General of the Commonwealth

TO

## Consider what Alterations are Desirable

IN

## The Copyright Law of the Commonwealth.

———————

*By Authority:*
A. J. ARTHUR, Commonwealth Government Printer, Canberra.
(Printed in Australia.)

4531/63.

# REPORT

OF

# The Copyright Law Review Committee, 1959.

4531/63.—2

# CONTENTS.

| | | Paragraphs. |
|---|---|---|
| I. | Introductory . . . . . . . . . . . . . . | 1- 13 |
| II. | History of Australian Legislation . . . . . . . . . . . | 14-22 |
| III. | British Act of 1956 . . . . . . . . . . . . | 23-26 |
| IV. | Differences between 1911 Act and 1956 Act . . . . . . . | 27-28 |
| V. | Brussels Convention and Universal Copyright Convention . . . . ., | 29-52 |
| VI. | Literary, Dramatic and Musical Works . . . . . . . . . | 53-70 |
| VII. | Artistic Works . . . . ., . . . . . . | 71-78 |
| VIII. | Ownership of Copyright. . . . . . . . . . . | 79-91 |
| IX. | Infringement by Importation, Sale and Other Dealings . . . . . | 92-105 |
| X. | General Exceptions from Protection of Literary, Dramatic and Musical Works . . | 106-128 |
| XI. | Works in Libraries . . . . . . . . . . | 129-151 |
| XII. | Compulsory Licence to Manufacture Records . . . . ., . | 152-216 |
| XIII. | General Exceptions from Protection of Artistic Works . . . . . . | 217-221 |
| XIV. | Anonymous and Pseudonymous Works and Works of Joint Authorship . . | 222-225 |
| XV. | Copyright in Sound Recordings, Cinematograph Films, Broadcasts and Typographical Arrangements . . . . . . . . . | 226-227 |
| XVI. | Gramophone Records . . . . . . . . . . . | 228-264 |
| XVII. | Cinematography Films . . . . . . . . . . . | 265-278 |
| XVIII. | Sound and Television Broadcasts . . . . . . . . . . | 279-300 |
| XIX. | Typographical Arrangements . . . . . . . . . . | 301-302 |
| XX. | Infringement of Copyright in Records, Films, etc., by Importation, Sale or Other Dealings . . . . . . . . . . . . . .. | 303-304 |
| XXI | Remedies for Infringement . . . . . . .. .. ... | 305-339 |
| XXII. | Tribunal . . . . . . . . . .. .. .. | 340-378 |
| XXIII. | Extension or Restriction of Operation of Act . . .. .. .. | 379-388 |
| XXIV. | Assignment, Licences and Testamentary Dispositions .. .. .. | 389-400 |
| XXV. | The Crown . . . . . . . .. .. .. | 401-406 |
| XXVI. | Diffusion Services and Broadcasts of Recordings and Films .. .. .. | 407-413 |
| XXVII. | Use of Copyright Material for Education . . . . .. .. .. | 414-419 |
| XXVIII. | False Attribution of Authorship . . . . . .. .. .. | 420-425 |
| XXIX. | Forfeited Works . . . . . . . . .. .. .. | 426-427 |
| XXX. | Industrial Designs . . . . . . . .. .. .. | 428-437 |
| XXXI. | Definitions . . . . . . . . . .. .. .. | 438-443 |
| XXXII. | *Copyright Act* 1912-1950-- Registration and Summary Offences . . . . ., . . | 444-466 |
| | Deposit of Books . . . . . . . . . . | 467-470 |
| | Groundless Threats of Legal Proceedings: . . . . . . . | 471 |
| XXXIII. | Miscellaneous . . . . . . . . . . . . | 472-503 |
| XXXIV. | Summary of Recommendations . . . . . . . . . | 504 |

The Honorable Sir GARFIELD BARWICK. Q.C., M.P., Attorney-General of the Commonwealth.

## I. INTRODUCTORY.

This Committee was appointed on 15th September, 1958, by the then Attorney-General, Senator the Honorable Neil O'Sullivan (now the Honorable Sir Neil O'Sullivan),

> to examine the copyright law of Australia, and to advise which of the amendments recently made in the law of copyright in the United Kingdom should be incorporated *into* Australia copyright law and what other alterations or additions, if any, should be ma& to the copyright law of Australia.

2. Shortly after its appointment the Committee caused a notice to be inserted in each of the daily newspapers published in the capital cities of the Commonwealth inviting representations in writing with respect to matters within the terms of reference. Similar advertisements were inserted in those newspapers in early October, 1959, informing the public that the Committee had considered all the submissions that had been made to it and inviting persons or organizations who had not yet made representations and who wished to do so to forward them before we presented our report.

3. Representations in writing were received from the persons and organizations referred to in the First Schedule to this Report. Where it was felt that amplification was desirable, the Committee invited each of the persons and organizations making such representations to appear before it and the representations were discussed in detail with the interested party. In addition, arrangements were made for the exchange of representations between parties having conflicting interests, with the result that the Committee has had the advantage of comment on and criticism of such representations from parties holding opposing views.

4. Parties were free to be represented by counsel and in some cases they were so represented. We did not hold our hearings in public and, thereby, obtained, we think, a freer and franker discussion of the issues. Also, owing to the fact that we were not empowered to take evidence on oath or to require witnesses to submit to cross examination, we felt that there was little to be gained by public hearings.

5. The Committee has held 37 meetings and has carefully considered all aspects of copyright law in relation to Australia and has examined minutely the provisions of the Copyright Act, 1956 of the United Kingdom.

6. In approaching the task assigned to it the Committee has been greatly assisted not only by the various representations it has received, but also by the Reports of similar bodies in the United Kingdom, Canada and New Zealand. They are-

> The Report of the Copyright Committee, 1951, of the United Kingdom (Cmd. 8662) which recommended most of the alterations now contained in the Copyright Act, 1956, of the United 'Kingdom (hereinafter referred to as " the Gregory Committee ");
>
> The Report on Copyright of the Canadian Royal Commission on Patents, Copyright, Trade Marks and Industrial Designs dated 1st August, 1957; and
>
> The Report of the Copyright Committee, 1959, of New Zealand.

The last two Reports have, we understand, not yet been implemented by any alteration to the copyright law of those countries.

8

7. The law of copyright is chiefly concerned with the protection of the author of a literary, musical, dramatic or artistic work from the unauthorized reproduction of such work or its performance in public.  The need for such protection was first recognized in relation to literary works, the reproduction of which became relatively easy with the invention of printing in the fifteenth century. The early law in the United Kingdom on the subject was concerned with the prevention of the unauthorized reproduction of copies of books *(Copinger and Skone James on Copyright, 9th.* Ed., p. 3).  Later legislation extended copyright protection to engravings (1734), works of sculpture (1814) and in 1833 the performing right in dramatic works received statutory protection, to be followed in 1842 by similar protection in respect of musical works. Paintings, drawings and photographs were, for the first time, protected in 1862.

8. It will thus be seen that the subject-matter of copyright protection has expanded over the years, and by 1911 extended to literary, dramatic, musical and artistic works.

9. Further modern developments by that time led to the express recognition in the Copyright Act, 1911 of the sole right in the case of a literary, dramatic or musical work to make any record, perforated roll, cinematography film or other contrivance by means of which the work may be mechanically performed or delivered (1911 Act, section 1 (2) *(d))*. Since then the development of radio and television has opened up new fields of reproduction which have not heretofore been expressly dealt with in Australian copyright law. Problems associated with these media, as also those arising from improvements in gramophone reproduction and photography, have formed a substantial part of the matters which we have been called upon to consider.

10. Prior to 1911, copyright had also become the subject in the first instance of international treaties, to a number of which Great Britain was a party, and later of international conventions. In 1886 the International Convention for the Protection of Literary and Artistic Works (the Berne Convention) was framed whereby the contracting States were " constituted into a Union for the protection of the rights of authors over their literary and artistic works ".

11. Certain modifications were discussed at a further Conference in Paris in 1896 which resulted in the " Additional Act of Paris, 1896", and a revised Convention was signed at Berlin in 1908. Further developments in this direction have been the Conventions signed at Rome in 1928 and at Brussels in 1948. Great Britain adhered to the Berne Convention from its inception and by reason of that adherence Australia was bound by its provisions and by the subsequent Conventions which followed the first International Convention of 1886. On the 14th April, 1928, Australia became a member of the Berne Union in its own right.  It subsequently ratified the Rome Convention, but as at this date it has not ratified the Brussels Convention.

12. In addition to the Berne Union, Conventions have been made upon somewhat different principles between the United States and certain other American countries, most of which have never been members of the Berne Union. The absence of mutual relations in regard to copyright between these countries—particularly the United States of America-and the countries adhering to the Berne Union has led to efforts being made to bridge the gap. These, in 1952, resulted in the Universal Copyright Convention to which a number of countries, including Great Britain and the United States of America, have adhered. Australia has not at this date ratified the Universal Copyright Convention. (See *Copinger,* 9th Ed., p. 354,)

13. In arriving at our recommendations our task has essentially been one of balancing the interests of the copyright owner with those of copyright users and the general public. The primary end of the law on this subject is to give to the author of a creative work his just reward for the benefit he has bestowed on the community

9

and *also* to encourage the making of further creative works. On the other hand, as copyright is in the nature of a monopoly, the law should ensure, as far as possible, that the rights conferred are not abused and that study, research and education are not unduly hampered. In weighing up these factors we must, of course, have regard to our existing and possible future internatioml obligations.

## II. HISTORY OF AUSTRALIAN LEGISLATION.

14. By section 51 (xviii.) of the Constitution the Commonwealth Parliament has, subject to the Constitution, power to make laws for the peace, order and good government of the Commonwealth with respect to copyrights, patents of inventions and designs, and trade marks. Early in the history of the Commonwealth this power was exercised by the Parliament, the first Commonwealth Patents Act being passed in 1903 and a Trade Marks Act and Copyright Act being passed in 1905. These Acts, when proclaimed, operated to supersede the legislation which, prior to the foundation of the Commonwealth, had been passed in the respective Colonies in relation to those subject-matters.

15. *The Copyright Act* 1905 came into operation on 1st January, 1907. That Act was based upon the provisions of a Bill which had been introduced into the House of Lords in 1900 but had not become law. It provided a uniform law for the Commonwealth, supplementing Imperial Acts then operative therein and superseding Colonial Acts which in varying degrees had supplemented such Imperial Acts. It provided for literary, musical, dramatic and artistic copyright in works published, performed or made in Australia and enacted that the term of the copyright should be 42 years or " the author's life and seven years" whichever term should last the longer (sections 17 and 36).

16. The Berne Convention of 1886 was revised at Berlin in 1908 and following upon this a Committee was appointed in Great Britain to examine the revised Convention and to consider whether the existing law should be altered. Following its Report, the Copyright Act, 1911 was passed by the Parliament of Great Britain. That Act contained a provision (section 25) that, except for such provisions as were expressly restricted to the United Kingdom, the Act should extend throughout His Majesty's dominions, subject to a proviso in the case of self-governing Dominions that it should not extend to such a Dominion unless declared by the Legislature of that Dominion to be in force therein with or without modifications and additions.

17. In 1912, the Commonwealth Parliament passed a new Copyright Act which, by section 8, provided that the British Copyright Act of 191 l—which was set out in a Schedule to the Commonwealth Act—should, subject to any modifications in the Commonwealth Act, be in force in the Commonwealth and should be deemed to have been in force therein as from 1st July, 1912.

18. Subject to some relatively insignificant amendments made to the Commonwealth Act in 1933, 1935 and 1950, that Act, with its scheduled British Copyright Act, 1911, constitutes the law governing copyright in the Commonwealth and those of its Territories to which the Act has been extended.

19. It thus appears that Australian law governing copyright has at all times followed closely, though (at times before the establishment of the Commonwealth) somewhat belatedly, developments in Great Britain, and 'for all practical purposes it can be said that since 1912 Australian law on this subject has been the same as that of Great Britain. Indeed, it may be said that Australian copyright law has

always been substantially the same as the law operating in Great Britain. The Commonwealth Act of 1912 contains several provisions that do not appear in the Imperial Act of 1911. These are, however, of a comparatively minor nature and do not affect the operation of the provisions of the 1911 Act.

20. In relation to a matter in which the same person very frequently may seek to maintain rights in Great Britain and in other countries as well as in Australia in respect of the same work there are great advantages in being able to rely upon legal provisions in the countries where copyright is claimed which are substantially the same in their operation. Furthermore, the decisions not only of our own Courts but also those of Great Britain are a real guide in the administration and interpretation of our law, as are text-books and other publications which on such a subject as this appear in the United Kingdom more frequently than in Australia.

21. The British Copyright Act, 1911 was repealed by the Copyright Act, 1956 but, notwithstanding that repeal, the latter Act contained provisions preserving the operation of the 1911 Act insofar as it forms part of the law of any country other than the United Kingdom. In such circumstances, section 50 and paragraph 41 of the Seventh Schedule provide that the 1911 Act shall, so long as it forms part of the law of that country, be construed. and have effect as if the Act had not been repealed. The High Court, in *Copyright Owners' Reproduction Society Limited* v. *E.M.I. (Australia) Pty. Ltd. (1959)* A.L.R., 127, held that it was clear, having regard to these provisions, that the Copyright Act 1911 remains law in the Commonwealth of Australia.

22. So, there is at the moment a marked difference in the form-and in many respects the substance—of British and Australian Copyright Statutes respectively.


### III. BRITISH ACT OF 1956.

23. One of the first problems we have been called upon to solve is whether the provisions of the Copyright Act, 1956 should in substance form the basis of an Act to be passed by the Commonwealth Parliament or whether an entirely different Australian Act should be framed. We have already indicated some of the advantages which flow from the existence of a form of legislation common to both countries (para. 20),

24. On the other hand, there are features of the British Act which are open to criticism at least from the point of view of those accustomed to the form of draftsmanship which has been a feature of Commonwealth Acts since the early days of Federation. It may be useful to mention some of these—

(a) The nature of copyright as created by the 1911 Act was defined by specifying the sole rights which by virtue of the Act accrued to the owner of copyright. In the 1956 Act copyright is defined as the exclusive right to do and to authorize other persons to do certain acts which are designated as " the acts restricted by the copyright". This seems to be a somewhat cumbersome and misleading method of describing the rights which copyright bestows on its owner.  It directs the mind *to the* infringer—to the things which must not be done without the owners' consent—rather than to the owner and what is comprised in his ownership,

(b) The " acts' restricted" by copyright in works of varying descriptions are specified in a number of sections each dealing with work of a particular description. (See sections 2 (5), 3 (5), 12 (5), 13 (5), 14 (4), 15 (3).) All this involves a good deal of repetition, some of which is avoided in the Indian Act viz., the Copyright Act, 1957, which appears in

*Copinger,* 9th Ed., p. 738.    On the other hand, we can see some advantage in the form used in the 1956 Act. It enables, for example, a person who is only concerned with one particular type of work to find set out in a compendious form in a single portion of the Act the rights in which he is interested.

(c) The definitions appear in section 48.   They would, following Australian practice, be more appropriately placed in the opening sections of the Act. There is also a good deal of repetition of definitions. In some cases definitions appear in particular sections and in section 48 it is enacted that the word or phrase has the meaning assigned to it in another section of the Act. (See, e.g., in section 48 the definitions of " Artistic Work ", " Cinematography Film ", " The Corporation ", " The Authority " and " Sufficient Acknowledgement ".)

*(d)* A number of provisions which are to be found in schedules would be more appropriately included in the Act itself. We refer in particular to the 1st, 2nd and 3rd Schedules.

(e) We shall have occasion in the course of this Report to refer to a number of provisions which are not free from ambiguity and to others in which we think improvements could be made in the draftsmanship.

(f) At times there is a tendency to descend into much detail in relation to matters which might properly be governed by a statement of general principle. Section 41 (1) is an example of this.

25. Despite our misgivings about aspects of the Act such as we have indicated, we think the most desirable course for us, having regard to our terms of reference, is to accept that Act as the basis for our examination of the problems raised for our consideration, to indicate which of its provisions we would in principle accept or reject and, where necessary, to state amendments we would make to those provisions. If our recommendations are accepted by the Government, the Parliamentary Draftsman would doubtless give expression to the conclusions so enunciated by us in such manner as he deemed most appropriate.

26. We would welcome the opportunity of discussing points of draftsmanship in connexion with our recommendations with the Parliamentary Draftsman and of considering any draft bill based on our recommendations if and when it is prepared.

## IV. DIFFERENCES BETWEEN 1911 ACT AND 1956 ACT.

27. Apart from considerable differences in draftsmanship, the 1956 Act introduces a number of provisions not to be found in the 1911 Act—

(a) Under the 1911 Act the place of first publication is an essential element in determining the existence of copyright in a published work (section 1 (1) (a)). Under the 1956 Act the place of first publication may be the determining element, but there are alternative determining factors, viz., nationality, domicile and residence of the author (section 2 (2) *(a), (b)* and the definition of " qualified person " in section 1 (5) ).

(b) In section 7 of the 1956 Act special protection against liability for infringement, subject to safeguards, is extended to certain libraries in their copying of copyright material and also to the reproduction of ancient material kept in certain libraries, museums and other institutions.

12

(c) The copyright in records conferred by the 1911 Act is re-enacted in a different form (section 12) with provisions expressly including in the copyright the right of causing the recording to be heard in public and of broadcasting the record. The corresponding section (viz., section 19) of the 1911 Act did not expressly refer to these elements but the section was interpreted by Maugham, *J.* in *Gramophone Co. Ltd. v. Cawardine & Co. (1934)* 1 Ch. 450, as including such rights.

(d) Separate copyright is created in cinematography films (section 13).

(e) New copyrights are created in—

    (i) television broadcasts and sound broadcasts made by the British Broadcasting Corporation or the Independent Television Authority (section 14); and

    (ii) typographical arrangements of published editions of works (section 15).

*(f)* A Performing Right Tribunal is created to adjudicate in certain disputes between prospective copyright users and bodies such as the Performing Right Society (sections 23-30).

*(g)* The borderline between works which have copyright protection and works protected as registered designs is redefined (sections 10 and 44).

*(h)* The compulsory licensing provisions contained in the proviso to section 3 and in section 4 of the 1911 Act are not re-enacted.

*(i)* Other alterations include-

    (i) alterations to the provisions of section 16 relating to the works of joint authors. (See section 11 (2) and Third Schedule to 1956 Act);

    (ii) provisions such as section 2 (3) of the 1956 Act whereby the term of copyright protection subsequent *to the* death of the author or in the case of posthumous works, subsequent to publication, performance, sale of records or broadcasting of the work is 50 years from the first January following those events (Cf. 1911 Act, section 3); and

    (iii) alteration of the provisions relating to simultaneous publication. (See *section* 49 (2) *(d)* of the 1956 Act and cf. section 35 (3) of the 1911 Act).

28. As will be seen in paragraphs 38 and 39 and it will be necessary to adopt a number of these alterations in order to ratify the Brussels Convention and the Universal Copyright Convention. Our conclusions as to each of these matters will be found in subsequent sections of this Report.

## V.  BRUSSELS CONVENTION
### AND
## UNIVERSAL  COPYRIGHT  CONVENTION.

29. The Brussels Convention is an International Convention revising the Berne Convention of 1886 as revised at International Conferences subsequent thereto.

30. The Convention applies to literary and artistic works, as defined in Article 2, and the countries to which the Convention applies constitute a Union for the protection of the rights of authors over such works.

13

31. The purpose of the Convention is to ensure that nationals of a Union country, in respect of both published and unpublished works, and non-nationals who first publish their works in a Union country shall enjoy, not only the rights accruing from the law of the country of origin of the work, but also certain rights in other Union countries.   The country of origin of an unpublished work is the country to which the author belongs and that of a published work the country of first publication, subject to provisions as to simultaneous publication.

32. In the case of nationals of a Union country, their rights in other Union countries extend to unpublished works as well as to works first published in a Union country. The rights enjoyed include those specially granted by the Convention as well as those granted by the respective laws of the countries of the Union to their nationals.

33. These rights are not to be subject to any formality.

34. In the case of authors who are not nationals of a Union country, the rights do not extend to their unpublished works, but if they first publish their works in a Union country, they enjoy in that country the same rights as native authors and, in other Union countries, the rights granted by the Convention.

35. The term of protection granted by the Convention is, generally speaking, the life of the author and 50 years after his death.

36. The Universal Copyright Convention provides for
  the adequate and effective protection of the rights of authors and other copyright proprietors in literary, scientific and artistic works
The protection extends to the published and unpublished works of nationals of a Contracting State and to works first published in that State. In each Contracting State published works are to enjoy the same protection as that State accords to works of its nationals first published therein and unpublished works are to enjoy the same protection as that other State accords to unpublished works of its own nationals. The term of protection is not less than the life of the author and twenty-five years after his death, However, where a country determines the period of protection from the date of publication it is provided that the term should be not less than twenty-five years from publication.

37. The right of a Contracting State under its domestic law to require compliance with formalities is recognized, but, in the case of works published outside its territory by an author not a national of the Contracting State, such formalities are to be regarded as satisfied if, from the time of first publication, all authorized copies of the work bear the symbol ⓒ accompanied by the name of the copyright proprietor and the year of first publication. By virtue of the Appendix Declaration to the Universal Copyright Convention, works which have as their origin a country which has withdrawn from the Berne Union after 1st January, 1951 are not protected by the Universal Copyright Convention in the countries of the Berne Union.

38. Before Australia can ratify the Brussels Convention the following amendments to our law would be required: —

  (a) the amendment of section 35 (1.) of the 1911 Act to provide for the protection of cinematography films as such (see Article 2 (1.) of the Convention);

  (b) the repeal of part of section 3 and the whole of section 4 of the 1911 Act providing for schemes of compulsory licensing;

14

(c) the amendment of section 35 (3.) of the 1911 Act so that publication within thirty days (instead of fourteen days as at present) of the original publication shall be deemed to be simultaneous publication (see Article 4 (3.) of the Convention);

(d) the amendment of section 16 (1.) of the 1911 Act to provide that in the case of a work of joint authorship the term of protection shall be calculated from the death of the last surviving author (instead of from the death of the author who dies first as at present).   (See Article 7 bis of the Convention);

(e) the amendment of section 2 (l.) (v) and (vi) of the 1911 Act to give effect to Article 10 of the Convention which requires that quotations and excerpts shall be accompanied by an acknowledgment of the source and name of the author;

(f) the insertion of a provision to the effect of Article 7 (4. ) fixing the term of protection for anonymous and pseudonymous works at 50 years from the date of publication; and

(g) the insertion of a provision that where the term of protection of works runs from the date of the author's death or of publication, such terms shall be deemed to begin on 1st January of the year following the event (see Article 7 (6. ) of the Convention).

39. Ratification of the Universal Copyright Convention would require the following amendments to our law:—

(a) the same amendments as are set out in (a) and (c) of paragraph 38 above;

(b) the amendment of sections 1 (1.) and 29 (1.) of the 1911 Act to provide for the protection of works on the basis of nationality or citizenship of the author as well as of place of first publication (see Article II (1.) of the Convention);

(c) the insertion of a provision to provide for the protection of works of international organizations (see Protocol 2 to the Convention and

(d) the amendment of section 4 of the 1911 Act (if it is not repealed) to the effect that a compulsory licence, as provided by the section, shall not be granted until 25 years after the author's death.

40. The New Zealand Copyright Committee and the Canadian Royal Commission recommended that their countries should refrain from acceding to the Brussels Revision of the Berne Convention.

41. Some of the main reasons for these recommendations are as follows: —

(a) The term of protection for original works is required by Article 7 (2) to be the life of the author and 50 years after his death. Countries that are bound by the Brussels Revision cannot, therefore, provide for a shorter period of protection or for a term based on a number of years from first publication. Article 7 (2) also requires the repeal of provisions such as sections 3 and 4 of the 1911 Act which provide for a system of compulsory licensing after the death of the author.

(b) It is arguable that the Brussels Revision does not enable countries to provide for the authorizing of public performances without payment of a fee by, for example, charitable institutions.

(c) It is arguable that a country cannot, under the Brussels Revision, provide that it is not an infringement of copyright in any broadcast work for the person receiving the broadcast to cause it to be seen or heard in public.

The New Zealand Committee did not consider that the suggested provision in (c) was inconsistent with the Brussels Convention.

42. We recommending this Report that, generally speaking, the term of protection for literary, dramatic or artistic works should be the life of the author and 50 years after. The Commission in Canada and the Committee in New Zealand recommended that the term of protection should generally be 56 years from first publication or the life of the author whichever period is the longer.

43. The term of protection under our present law is, by and large, the life of the author and 50 years thereafter. However, under section 3 of the 1911 Act a publisher may reproduce a published work for sale without the consent of the copyright owner 25 years from the death of the author provided he pays a royalty calculated at 10 per cent. on the price of the published work. Also, under section 4, a person may apply to the Privy Council at any time after the death of an author for a compulsory licence to reproduce a published or performed work upon such conditions as the Judicial Committee might think fit.

44. We have received no submissions in favour of a retention of the above provisions qualifying the period of protection. It seems, also, that little, if any, use has been made of them in Australia. For all practical purposes, therefore, the period of protection for copyright in Australia has, since 1912, conformed to the present requirements of the Brussels Revision.

45. In recommending a shorter period of protection, the New Zealand Committee and the Canadian Commission were greatly influenced by the fact that their countries were largely users of copyright material. This is also true of Australia; however, the present term of protection does not appear to have caused any hardship to users of copyright material in Australia. Indeed, we have been urged by the organizations representing copyright users which have made submissions to us to recommend the ratification of the Brussels Revision.

46. Basing the term of protection on the life of the author has certain obvious advantages. All the works of a particular author fall into the public domain at the same time and the date of death of an author is often easier to ascertain than the date of first publication.

47. Most countries of the world provide for a term of protection based on a number of years from the death of an author and most of these provide for a period of 50 years from the death of the author. The United States is a significant exception,

48. In weighing up the interests of the community as against those of the author any period of copyright that is chosen will be a somewhat arbitrary one. In recommending the period that it did, the Canadian Royal Commission was considerably influenced by the term operating in the United States. The New Zealand Committee, in turn, considered that it should align itself with Canada in this regard.

49. We can see no particular virtue in the term recommended by the reviewing bodies in Canada and New Zealand as against our present period of protection. We feel that the onus of showing that such a substantial alteration of our present law is desirable should be on the person advocating it. No one has made a submission specifically urging us to recommend that Australia should not ratify the Brussels Revision.

16

50. As Australia is primarily a user country and is likely to remain that way for some time, it might, of course, be in our economic interests to make the term of protection as short as possible. Factors other than the balance of payments are, however, involved, such as justice to the overseas authors, the benefits of whose works Australians enjoy. We also mention that literary, dramatic, musical and artistic works of Australian origin are growing and receiving increasing recognition abroad. The United Kingdom will, we think, remain one of the main users of Australian copyright material and we are of the view that our authors should in that country be entitled to the same copyright protection as British authors. This can only be ensured by granting in Australia reciprocal benefits to British authors.

51. Our recommendations regarding charitable performances and public performances by means of the reception of a broadcast are dealt with later *in* this *report*. All our recommendations are, in our opinion, consistent with the Brussels Revision. We, therefore, recommend that Australia should accede to that Convention.

52. The benefits to be derived from accession to the Universal Copyright Convention are obvious, particularly in that it enables Australian copyright owners to receive copyright protection in the United States for published works with a minimum of formality. At present published Australian works do not receive full protection in the United States unless they are manufactured in that country. Adherance to the Universal Copyright Convention would free Australian authors from that requirement as well as other American provisions regarding registration and notice. Both the New Zealand Committee and the Canadian Royal Commission recommended that their countries accede to the Universal Copyright Convention and we recommend that Australia do the same.

## VI. LITERARY, DRAMATIC AND MUSICAL WORKS.

53. Section 2 (1) of the 1956 Act provides for the subsistence of copyright in every original literary, dramatic or musical work which is unpublished and of which the author was a qualified person at the time when the work was made, or, if the making of the work extended over a period, was a qualified person for a substantial part of that period.

54. " Qualified person" is defined in section 1 (5) as follows:—

(a) in the case of an individual, means a person who is a British subject or British protected person or a citizen of the Republic of Ireland or (not being *a* British subject or British protected person or a citizen of the Republic of Ireland) is domiciled *or* resident n the United Kingdom or in another country to which that provision extends; and

(b) in the case of a body corporate, means a body incorporated under the laws of any part of the United Kingdom or of another country to which that provision extends.

55. We recommend that provisions similar to sections 2 (1) and 1 (5) of the 1956 Act be enacted. In the case of an individual we think that " qualified person" should be defined as a person who is a British subject within *the* meaning of the *Nationality and Citizenship Act* 1948-1958 or a citizen of the Republic of Ireland or a person domiciled or resident in the Commonwealth.

56. Under the recommendations that we are making a body corporate can only be a qualified person for purposes of copyright in gramophone records, cinematography films, broadcasts and typographical arrangements. In our view, therefore, the definition of qualified person, so far as it related to a body corporate, should indicate that it is reIevant only for those purposes dealt with in Part II. of the 1956 Act.

17

57, Copyright in published works should, we think, subsist in a work (or, if copyright in the work subsisted immediately before publication, should continue to subsist) if *(a)* the work was first published in the Commonwealth or (b) the author was a qualified person at the time when the work was first published or at his death, whichever occurs earlier. This recommendation corresponds to section 2 (2) of the 1956 Act.

58. Later in this Report (para. 384), we recommend that the Governor-General be given power to extend, by proclamation, the protection of copyright to works first published in other countries and works the authors of which are nationals or residents of other countries. Similar provision exists in section 29 of the 1911 Act and is necessary to enable Australia to satisfy its international obligations.

59. *Term of Protection.* —Generally speaking, copyright in literary, dramatic and musical works exists, under the 1911 Act, for the life of the author and 50 years thereafter, subject to the provisions for compulsory licence dealt with in the sections 3 and 4 of that Act.

60. As we mentioned earlier (para. 44), we have received no submissions in favour of the retention of those compulsory licence provisions.  As those provisions are inconsistent with article 7 of the Brussels Convention, which requires the term of protection to be the life of the author and 50 years after his death, and as little, if any, use seems to have been made of them we recommend their repeal. The term of copyright in literary, dramatic and musical works should be that set out in section 2 (3) of the 1956 Act. which is as follows:—

(3) Subject to the last preceding sub-section copyright subsisting in a work by virtue of this section shall continue to subsist until the end of the period of fifty years from the end of the calendar year in which the author died, and shall then expire:

Provided that if before the death of the author none of the following acts had been done, that is to say—

(a) the publication of the work,
(b) the performance of the work in public,
(c) the offer for sale to the public of records of the work, and
(d) the broadcasting of the work,

the copyright shall continue to subsist until the end of the period of fifty years from the end of the calendar year which includes the earliest occasion on which one of those acts is done.

our present law in this regard is set out in sections 3 and 17 of the 1911 Act.

61. It will be noted that the term of protection provided for in section 2 (3) of the 1956 Act is calculated, not in relation to the date of death of the author, as in the 1911 Act, but from the end of the calendar year in which the author died. This provision is required by Article 7 (6) of the Brussels Convention and seems to us to be desirable in any event.

62. *Restricted Acts.*- Section 2 (5) of the 1956 Act provides that the following should be acts restricted by the copyright in literary, dramatic or musical works :—

*(a)* reproducing the work in any material form;

*(b)* publishing the work;

*(c)* performing the work in public;

*(d)* broadcasting the work;

*(e)* causing the work to be transmitted to subscribers to a diffusion service;

*(f)* making any adaptation of the work;

*(g)* doing, in relation to an adaptation of the work, any of the acts specified in relation to the work in (a) to (e) above.

We recommend the adoption of those provisions.

72. In conformity with section 3 (1) of the 1956 Act, '*artistic work" should be defined to mean the following:—

> *(a)* paintings, sculptures, drawings, engravings and photographs (all irrespective of artistic quality);
>
> *(b)* works of architecture, being either buildings or models for buildings;
>
> *(c)* works of artistic craftsmanship not falling within (a) and (b).

73. This definition, generally speaking, is consistent with existing law except in the case of works of architecture. Under present Australian law, for a work of architecture to be protected it must be an " architectural work of art" as defined in section 35 (1) of the 1911 Act. It seems to us, however, that Article 2 (1) of the Berne Convention requires all works of architecture to be protected. In any case, we think it undesirable that the existence of copyright in this case should require a finding that the work has an artistic character.

74. *Term of Protection.* -Section 3 (4) of the 1956 Act provides as follows :—

> (4) Subject to the last preceding sub-section, copyright subsisting in a work by virtue of this section shall continue to subsist until the end of the period of fifty years from the end of the calendar year in which the author died, and shall then expire:
> Provided that—
>> (u) in the case of an engraving, if before the death of the author the engraving had not been published, the copyright shalt continue to subsist until the end of the period of fifty years from the end of the calendar year in which it is first published;
>> (6) the copyright in a Photograph shall continue to subsist until the end of the period of fifty years from the end of the calendar year in which the photograph is first published, and shaft then expire.

We recommend the enactment of a provision to the same effect.

75. *Photographs.*— The Library Association of Australia has submitted to us that the period of protection for photographs should be 25 years from the end of the calendar year in which the photograph was first published. It was pointed out by the Association that the period of protection provided by the 1956 Act for photographs might be considerably longer than under present Australian law which prescribes **a** term of 50 years from the making of the original negative (section 21 of the 1911 Act). We are of "the opinion, however, that the term prescribed by the 1956 Act is more appropriate in view of the advances that have been made in photography since 1911. Many photographs produced in recent years have been the result of considerable artistic skill and judgment and we think that the term of protection prescribed by the 1956 Act is to be preferred as it goes further towards giving photographs a protection similar to that given to other artistic work.

76. Later in this Report, we recommend provisions relating to the use and reproduction of unpublished photographs and engravings that might be of historical interest and have been deposited in libraries and other institutions.

77. *Restricted Acts.* —The acts restricted by the copyright in an artistic work should in our opinion be those set out in section 3 (5) of the 1956 Act which are as follows:—

> *(a)* reproducing the work in any material from;
>
> *(b)* publishing the work;
>
> *(c)* including the work in a television broadcast;
>
> *(d)* causing a television programme which includes the work to be transmitted to subscribers to a diffusion service.

20

78. We recommend elsewhere that, in conformity with the 1956 Act and with present law, a work should be taken to have been published only if reproductions of the work have been issued to the public. Under our recommendations, therefore, the mere exhibition of an artistic work will not be an infringement of copyright. The inclusion of an artistic work in a television broadcast is, in our view, similar, for present purposes, to its exhibition in public and we would prefer that (c) and (d) above should not be restricted acts. It may be, however, that Article 11 bis of the Brussels Convention requires that protection be given to artistic works in this respect and, if that be so, we recommend accordingly. In this regard we direct attention to the comments of the Canadian Commission (p. 45). If it be decided that the Brussels Convention requires this protection we recommend certain limitations. We deal with these later (para. 219).

## VIII. OWNERSHIP OF COPYRIGHT.

79. We approve the basic principle set out in section 4 (1) of the 1956 Act and in our present law that, subject to certain exceptions, the author of a work should be the first owner of copyright.

80. *Work produced in the course of employment.*— Section 4 (4) of the 1956 Act provides that where, in a case not falling within sub-sections (2) and (3) of that section (which relate to work made by journalists and to commissioned work), a work is made in the course of an author's employment by another person under a contract of service or apprenticeship, the employer shall be entitled to any copyright subsisting in the work. This provision, generally speaking, conforms to our existing law and to the general principles of common law regarding things done and produced in the course of employment and we favour it.

81. *Commissioned Work.*— The Gregory Committee recommended that where a work is commissioned for valuable consideration, the person who commissioned the work should, in the absence of agreement to the contrary, be the owner of copyright in the work (para. 27 I). It was further recommended that, where the work was commissioned for a particular purpose, the author should have the right to restrain its use for any other purpose without his consent (para. 272).

82. The 1956 Act does not conform to those recommendations. Under that Act, the author, subject to agreement to the contrary, retains copyright in a commissioned work except in the case of *(a)* a photograph or an engraving or (b) a painting or drawing of a portrait. In the latter cases, copyright is in the person who commissioned the work (section 4 (3)). The 1911 Act contains a similar provision in section 5 (1.).

83. We do not approve of the provisions of the 1911 Act or the 1956 Act in this regard. The purpose for which a work is commissioned seems to us to be a vital consideration in determining who should be the owner of copyright. We see no reason why, for example, a person who commissions a photograph for the purpose of illustrating a book should be permitted to use it as a commercial advertisement without the consent of the author. As the Gregory Committee pointed out, " there is ground for supposing that when a work is commissioned for a particular purpose, that purpose may well have determined the price paid for it, and if it is used for another purpose the author may be prejudiced not only in respect of his immediate financial return but also in respect of his general reputation " (para. 272).

84. Similarly, we are of the view that if, say, a literary work is commissioned for the purposes of broadcasting, the author should not, in the absence of agreement to the contrary, be permitted to authorize its broadcast by a rival broadcasting station. In those circumstances, copyright in the work, so far as it concerns broadcasting, should, we think, be vested in the broadcaster who commissioned it.

85. We recommend, therefore, that a person who commissions a work for valuable consideration should, in the absence of agreement to the contrary, be the owner of copyright in the work insofar as it relates to the purpose for which he commissioned it, provided that his purpose was communicated to the author before the work was made. In all other respects copyright should remain in the author.

86. *Publications in Newspapers and Periodicals.*— Both the 1911 Act and the 1956 Act contain special provisions regarding works published in newspapers, magazines and similar periodicals. The 1911 Act provides, in section 5 (1.) (b), that where a work is an article or other contribution to a newspaper, magazine or similar periodical, there shall, in the absence of agreement to the contrary, be deemed to be reserved to the author a right to restrain the publication of the work, otherwise than as part of a newspaper, magazine or similar periodical. Section 4 (2) of the 1956 Act is as follows:—

> (2) Where a literary, dramatic or artistic work is made by the author in the course of his employment by the proprietor of a newspaper, magazine or similar periodical under a contract of service or apprenticeship, and is so made for the purpose of publication in a newspaper, magazine or similar periodical, the said proprietor shall be entitled to the copyright in the work insofar as the copyright relates to publication of the work in any newspaper, magazine or similar periodical, or to reproduction of the work for the purpose of its being so published, but in all other respects the author shall be entitled to any copyright subsisting in the work by virtue of this Part of this Act.

87. The latter sub-section conforms more closely than the provision in the 1911 Act to the recommendation we have made regarding commissioned works and we recommend the enactment of a provision to the same effect as section 4 (2).

88. It has been submitted to us by the Australian Journalists' Association that an employee-journalist should, in the absence of agreement to the contrary, have copyright jointly with his employer in works produced in the course of his employment insofar as the copyright relates to publication in arty newspaper, magazine or similar periodical other than the first one in which it is published. The Journalists' Association asks for this increased protection on the ground that overseas sales and extensive syndication " provide a huge and profitable field for the exploitation of material out of all proportion to the wage which is the employee's sole claim, under the present law, to profit from exceptional work".

89. We doubt whether a provision of that nature would make any practical difference to the position of the journalist as a newspaper proprietor could, and doubtless would, ensure that his employee's contract of service provided to the contrary.

90. It is to be noted that if our recommendations are accepted journalists will be in a more favorable position than they are under our present law. Indeed, journalists who are employees are and, will under these recommendations continue to be, in a uniquely favorable position as compared with employees in other fields. Furthermore, it seems to us that this question is related to conditions of employment that would be more appropriately dealt with by an industrial tribunal than by the copyright law.

22

91. *Agreements Regarding Ownership of Copyright.—We* emphasize that all the recommendations we have made above, regarding the exceptions from the general rule that an author is the first owner of copyright, are subject to agreement to the contrary. A provision to similar effect is contained in section 4 (5) of the 1956 Act, We think that a. provision of that nature in an Australian Act should appear before rather than after the provisions setting out the exceptions.

## IX. INFRINGEMENT BY IMPORTATION, SALE AND OTHER DEALINGS.

92. Sub-sections (2), (3) and (4) of section 5 of the 1956 Act provide as follows : —

(2) The copyright in a literary, dramatic, musical or artistic work is infringed by any person who, without the licence of the owner of the copyright, imports an article (otherwise than for his private and domestic rise) into the United Kingdom, or into any other country to which this section extends, if to his knowledge the making of that article constituted an infringement of that copyright, or would have constituted such an *infringement if the* article had been made in the place into which it is so imported.

(3) The copyright in a literary, dramatic, musical or artistic work is infringed by any person who, in the United Kingdom, or in any other country to which this section extends, and without the licence of the *owner* of the copyright—

    *(a)* sells, lets for hire, or by way of trade offers or exposes for sale or hire any article,

    *(b)* by way of trade exhibits any article in public,

if to his knowledge the making of the article constituted an infringement of that copyright, or (in the case of an imported article) would have constituted an infringement of that copyright if the article had berm made in the place into which it was imported.

(4) The last preceding sub-section shall apply in relation to the distribution of *any* articles either—

    *(a)* for the purposes of trade, or

    *(b)* for other purposes, but to such an extent as to affect prejudicially the owner of the copyright in question,

as it applies in relation to the sale of an article.

These provisions, generally speaking, correspond to section 2 (2.) of the 1911 Act.

93. The Copyright Owners' Reproduction Society Limited has complained that the requirement of proving guilty knowledge makes it almost impossible in many cases to bring an action under these provisions.  It seems to us, however, that circumstances could arise where it would be unjust to make, say, a bookseller liable for infringement when he was unaware that the making of importation of the books concerned was done in infringement of copyright.  The average bookseller must, in most cases, rely upon the honesty of the publisher.

94. Nevertheless, we recognize the difficulty of the copyright owner in bringing an action under these provisions.  We recommend that, subject to qualifications mentioned later, provisions to the effect of sub-sections (1) to (4) of section 5 of the 1956 Act be enacted but that in sub-sections (2) and (3) the onus should be on the importer, seller or dealer to prove that he was not aware and had no reasonable grounds for suspecting that the making or importation of the work concerned was an infringement of copyright.

95. Sub-section (2) of section 5 provides that it shall be an infringement, in the circumstances set out, to import an article without the consent of the owner of the copyright where (a) " the making of the article constituted an infringement of that copyright" or (b) " the making would have constituted such an infringement if it had been made in the place into which it is imported". At first sight it might appear that "(a)" is intended to cover the case of the importation of an article the making of

23

which was an infringement of the copyright granted by the laws of another country. However, " copyright" in relation to a work is defined in section 1 (1) to mean the " exclusive right, by virtue and subject to the provisions of this Act, to do, and to authorize other persons to do, certain acts in relation to that work in the United Kingdom or in any other country to which the relevant provision of this Act extends". Provision is made, in section 31, for the extension of the provisions of the Act to places such as the Isle of Man, the Channel Islands and the colonies. It would seem, therefore, that the reference to the importation of an article " the making of which constituted an infringement of that copyright " envisages circumstances where, for example, an article is imported into the United Kingdom that was made in a colony, to which the Act extends, in infringement of copyright in that colony.

96. We later recommend (para. 382) that any new Australian copyright Act should extend to all the Territories under the authority of the Commonwealth. In other words, the law should operate over the whole area over which the Commonwealth Parliament has legislative jurisdiction,   In those circumstances, we do not consider that the concept of " importation" for the purposes of a provision such as section 5(2) should extend to the sending of articles from a Territory to the Commonwealth or *vice versa.* Such a transaction, if it is by way of commerce, might, however, constitute an infringement under the equivalent of section 5(3). We recommend, therefore, that the words " constituted an infringement of that copyright or" should be omitted from an Australian provision corresponding to section 5(2).

97. If it is decided that the sending of an article from a Territory to the Commonwealth or *vice versa* should constitute " importation " for the purposes of section 5(2) it should be made clear that the words " the making of that article constituted an infringement"  refer only to articles made in an area over which the Act operates.

98. We also recommend that the words "by the importer" be added after "made" in a provision corresponding to section 5(2).   Under the United 'Kingdom provision it might, perhaps, be argued that importation does not constitute an infringement if anyone, including the copyright owner, could, in the place of importation, have made the article free from infringement.

99. *Places of Public* Entertainment.--Sub-sections (5) and (6) of the 1956 Act provide as follows :—

(5) The copyright in a literary, dramatic or musical work is also infringed by any person who permits a place of public entertainment to be used for a performance in public of the work, where the performance  constitutes an infringement of the copyright in the work:

Provided that this sub-section shall not apply in a case where the person permitting the place to be so used—

(a) was not aware, and had no reasonable grounds for suspecting, that the performance would be an infringement of the copyright, or

(b) gave the permission gratuitously, or for a consideration which was only nominal or (if more than nominal ) did not exceed a reasonable estimate of the expenses to be incurred by him in consequence of the me of the place for the performance.

(6) In this section " place of public entertainment" includes any premises which are occupied mainly for other purposes, but are from time to time made available for hire to such persons as may desire to hire them for purposes of public entertainment.

A similar provision appears in section 2 (3.) of the 1911 Act.

100. It is claimed by the Australasian Performing Right Association Limited that copyright owners have had some difficulty in bringing actions under these provisions because of the requirement of proving " permission ".  It was held by the High Court for example, that the owner of a hall did not " permit" a performance of which

complaint was made even though he had been informed that the infringement would occur and could have prevented it by terminating the contract of letting. *(Australasian Performing Right Association Limited v. Adelaide Corporation (1928)* 40 C.L.R. 481.)

101. It has been submitted to us that a copyright owner should merely be required to prove that the hall owner had permitted a performance of literary, dramatic and musical work and that an infringement occurred during the performance. This would relieve the copyright owner of the necessity of proving that the hall owner permitted the particular infringement. The hall owner could rely nevertheless on the defences provided for in the proviso to section 5(5) of the 1956 Act.

102. We have given some consideration to whether the special liability of hall proprietors, in this respect, should not be abolished as has been recommended by the Canadian Royal Commission and the New Zealand Committee. If a hall proprietor actually authorises an infringement he is liable under the general provisions of the Act; if he does not authorize it and is merely concerned with letting the hall it might be argued that he should not be required to supervise the items played.

103. One of us is of the opinion that the hall owner's liability should be abolished, for the above reasons and, also, because that liability seems to be anomalous when it is considered that a proprietor of a building is not liable for any other tort or infringement committed by a lessee.

104. The rest of us do not recommend the abolition of the hall proprietor's liability in view of the fact that a similar provision has been part of our law for nearly half a century and no one has recommended its repeal. However, we do not think that that liability should be extended and, therefore. we recommend the enactment of a provision to the effect of section 5 (5) of the 1956 Act.

105. If it is decided to preserve the hall owner's liability we are of the view that the words " to such persons as may desire to hire them " in section 5 (6) of the 1956 Act are unnecessary and should be omitted from any corresponding Australian provision.

## X. GENERAL EXCEPTIONS FROM PROTECTION OF LITERARY, DRAMATIC AND MUSICAL WORKS.

106. We recommend the enactment of provisions to the same effect as section 6 (1), (2) and (3) of the 1956 Act, which provides as follows:—

6.—(1 ) No fair dealing with a literary, dramatic or musical work for purposes of research or private study shall constitute an infringement of the copyright in the work.

(2) No fair dealing *with* a literary, dramatic or musical work shall constitute an infringement of the copyright in the work if it is for purposes of criticism or review, whether of that work or of another work, and is accompanied by a sufficient acknowledgment.

(3) No fair dealing with a literary, dramatic or musical work shall constitute an infringement of the copyright in the work if it is for the purpose of reporting current events-

*(a)* in a newspaper, magazine or similar periodical, or

*(b)* by means of broadcasting, or in a cinematography film,

and, in a case failing within paragraph (r?) of this sub-section, is accompanied by a sufficient acknowledgment.

107. The Australasian Performing Right Association Limited and the Copyright Owners' Reproduction Society Limited have submitted that provision should be made to ensure that section 6 (3)(b) extends only to the use of works which form part of the current event. Those organizations fear that sub-section (3) as it stands would authorize the playing of background music to a news item without the consent of the

25

copyright owner.  The Australian Broadcasting Commission and the Commercial broadcasters agree that the " dubbing " of music should not be authorized by this provision but point out that the suggested alteration of the provision might prevent a television broadcaster from using, say, a map for the purposes of illustrating a particular current event.

108. Under the recommendations we make and under the 1956 Act a map is an " artistic work" and, therefore, not covered by section 6 (3).  However, we are recommending the enactment of a provision similar to section 6 (3) to deal with fair dealing in artistic works (para. 222).  We, therefore, recommend that in any Australian provision corresponding to section 6 (3) it should be clearly provided that, in cases coming within paragraph (b), " fair dealing " does not extend to the playing of musical works that do not form part of the current event being reported.

109. It should be provided, as in section 6 (4) of the 1956 Act, that copyright is not infringed by reproducing a work for the purposes of a judicial proceeding or for the purposes of a report of a judicial proceeding. We approve of the definition of " judicial proceeding " in section 48 of the 1956 Act, namely, " a proceeding, before any court, tribunal or person having by law power to hear, receive and examine evidence on oath."

110. *Recitations* -- Section 6 (5) of the 1956 Act provides as follows:—

(5) The reading or recitation in public by one person of any reasonable extract from a published literary or dramatic work, if accompanied by a sufficient acknowledgment, shall not constitute an infringement of the copyright in the work:

Provided that this sub-section shall not apply to anything done for the purposes of broadcasting.

This provision, without the proviso or the requirement of acknowledgment, is the same as our present law (section 2 (1.) (vi) of the 1911 Act).

111. We recommend the enactment of a provision substantially to the effect of section 6 (5) of the 1956 Act with the omission of the proviso.  Recitations of reasonable extracts of works in public halls have for many years been regarded as a legitimate exception to copyright protection and it seems to us that the broadcasting of such recitations is the modern successor to that form of entertainment.  It may be contended that the exclusion of the broadcasting of recitations of extracts of works from the ambit of copyright protection would be contrary to Article 11 bis of the Brussels Convention.  That Article, among other things, requires that authors be given the exclusive right to authorize " the radio-diffusion of their works or the communication thereof to the public by any means of wireless diffusion of signs, sounds or images ".

112. We are unable, for present purposes, to see any difference, in this regard, between broadcasting and public performance.  As the latter has, for years, been accepted in this connexion as a proper exception from copyright protection, we have little doubt that the same would apply to the broadcasting of recitations of reasonable extracts of works.

113. We further recommend that the requirement in section 6 (5) that the reading should be by one person should be omitted from any corresponding Australian provision.

114. *Collections for Use in Schools.* — Section 6 (6) of the 1956 Act provides as follows :—

(6) The copyright in a published literary or dramatic work is not infringed by the inclusion of a short passage therefrom in a collection intended for the use of schools, if—

(a) the collection is described in its title, and in any advertisements thereof issued by or on behalf of the publisher, as being so intended, and

26

*(b)* the work in question was not published for the use of schools, and

(c) the collection consists mainly of material in which no copyright subsists, and

(d) the inclusion of the passage is accompanied by a sufficient acknowledgement:

Provided that this sub-section shall not apply in relation to the copyright in a work if, in addition to the passage in question, two or more other excerpts from works by the author thereof (being works in which copyright subsists at the time when the collection is published) are contained in that collection, or are contained in that collection taken together with every similar collection (if any) published by the same publisher within the period of five years immediately preceding the publication of that collection.

This provision is similar, apart from some alterations, to our present law (section 2 (l.) (iv) of the 1911 Act).

115. We recommend the enactment of a provision substantially to the effect of section 6(6). We are of the view that the provision should extend to works collected for use in educational institutions (cf. Indian Act, section 51 (1) *(g))*.

116. We also recommend (as did the Canadian Royal Commission) the insertion of the words "or by the author in collaboration or jointly with one or more authors" immediately after the first parenthesis in the proviso.

117. " *Ephemeral " reproductions.* --Article 11 bis ( 1 ) of the Brussels Convention provides that an author shall have the exclusive right to authorize the broadcasting of his work. Under paragraph (3) of that article permission to broadcast is not, except where otherwise provided, to imply permission to record the work broadcast. That paragraph goes on to provide:—

It shall, however, be a matter for the legislation in the countries of the Union to determine the regulations for ephemeral recordings made by a broadcasting body by means of its own facilities and used for its own emissions. The preservation of these recordings in official archives may, on the ground of their exceptional documentary character, be authorized by such legislation.

118. In pursuance of the above provisions the United Kingdom enacted section 6 (7) of the 1956 Act which is as follows:—

(7) Where by virtue of an assignment or licence a person is authorized to broadcast a literary, dramatic, or musical work from a place in the United Kingdom, or in another country to which section two of this Act extends, but (apart from this sub-section) would not be entitled to make reproductions of it in the form of a record or of a cinematograph film, the copyright in the work is not infringed by his making such a reproduction of the work solely for the purpose of broadcasting the work:

Provided that this subsection shall not apply if—

(a) the reproduction is used for making any further reproduction therefrom, or for any other purpose except that of broadcasting in accordance with the assignment or licence, or

*(b)* the reproduction is not destroyed before the end of the period of twenty-eight days beginning with the day on which it is first used for broadcasting the work in pursuance of the assignment or licence, or such extended period (if any) as may be agreed between the person who made the reproduction and the person who (in relation to the making of reproductions of the description in question) is the owner of the copyright.

This provision followed the recommendation of the Gregory Committee whose views on the matter are to be found in paragraphs 115 to 119 of their Report.

119. The reproductions referred to in the above provision are those intended purely to facilitate the broadcasting of copyright material. For the right to make the reproduction to arise there must be an authority to broadcast and the reproduction can only be used in the exercise of that authority.

120. Reproductions of performances by artists and others are often made by broadcasters for the purposes of subsequent broadcasting. In a country such as Australia, with its different time zones and limited number of co-axial cables, we think that this practice *is* necessary and desirable.

27

121. The Copyright Owners' Reproduction Society Limited say that they have always granted permission for the making of records for this purpose, but they claim that the broadcaster should pay a suitable fee to the copyright owner for such permission.

122. We concur in the statement of the Canadian Royal Commission that "It ought not to be presumed that, having authorized a broadcast, presumably for suitable remuneration, the author wishes to place a road block in the way of a person so authorized with a view to getting another fee for its removal " (p. 57). We think that an authority to broadcast should embrace the use by the broadcaster of facilities which will enable him to make use of that authority in an effective and convenient manner.

123. The United Kingdom provision operates only where the authority to broadcast is " by virtue of an assignment or licence ". The broadcaster's authority might, however, derive from the Act itself, for example, the quotation of a work for criticism and review.   We are of the view that a provision for " ephemeral " reproductions should extend to those cases.

124. For a provision similar to section 6 (7) to be effective we think that the period during which the reproduction can be retained before destruction should be sufficient to enable the Australian Broadcasting Commission or a commercial network to use the reproduced programme from all its stations. These stations may be spread throughout Australia and (in the case of the Australian Broadcasting Commission) its Territories.   We recommend, therefore, that a broadcaster should be permitted to retain the reproduction for six months and it should be made clear that more than one ephemeral reproduction can be made in respect of any performance.

125. It has been submitted to us that provision should be made to enable a broadcaster to make an ephemeral reproduction of a record. The broadcasting stations ask for this right to enable them to reproduce completely a programme which, for example, consists partly of recorded music and partly of the announcer's comments on that music.   We do not favour the extension of the ephemeral reproduction provisions to cases of that kind.   It seems to us that such a provision could seriously prejudice the copyright owner and the record manufacturer because, in the case of music which has a short popularity or which is played infrequently, it could tend to discourage the buying of records for broadcasting purposes. The considerations of convenience (particularly in respect of the time factor) that operate in respect of live broadcasts do not apply in the case of the broadcasting of records.

126. We do not think that a statutory right to retain records made under this provision for archival purposes should be given to the broadcaster. We have no doubt that an appropriate arrangement could be made with the copyright owner for its retention upon payment of a fee. In any case, it would be difficult to define satisfactorily the conditions of the right of retention as set out in the Convention. The object of a provision such as section 6 (7) of the Act is completely opposed to that involved in the preservation of records or films indefinitely.

127. It would, we think, be consistent with the purpose of ephemeral reproductions, namely, the facilitation of a broadcast, to permit a person other than the broadcaster to make the record for the broadcaster however, such an extension of the provision would, we think, be contrary to Article 11 bis (3) of the Brussels Convention which requires the recording to be "made by the broadcasting body by means of its own facilities".   That provision does not, we think, prevent a network from making recordings for its member stations, if the authority to broadcast was given to the network, it seems to us that the network would be a " broadcasting body" for the purposes of Article 11 bis (3).

4531/63.4

28

128. Accordingly, we recommend the enactment of a provision to the effect of section 6 (7) of the 1956 Act subject to the following alterations:—

    *(a)* omit "by virtue of an assignment or licence" at the beginning of the provision;

    *(b)* substitute " the authority" for " assignment or licence " in paragraphs *(a)* and *(b)* of the proviso;

    *(c)* substitute " *six* months" *for* " twenty-eight days" in paragraph (b) of the proviso;

    *(d)* add" in accordance with his authority" at the end of the first paragraph; and

    *(e)* omit the words " in the United Kingdom, or in another country to which section two of this Act extends " and substitute either " in the Commonwealth" (if " Commonwealth" is defined to include the Territories) or " in the Commonwealth or in a Territory to which section two extends".

## XI. WORKS IN LIBRARIES.

129. The whole of section 7 of the 1956 Act dealing with speciaI exceptions in respect of librarians making copies of copyright material and the copying of old manuscripts in libraries is new. In the 1911 Act there were no specific exemptions given to librarians who derived general protection from the provisions covering fair dealing.

130. However, in the last thirty years or so, not only has the number of reference libraries grown far beyond what existed in 1911, but modem techniques of copying by photo-mechanical means have brought about an enormous increase in the demand by students and others for copies of copyright material held in libraries.

131. Librarians in this country, as well as in the United 'Kingdom, have consequently feared that in certain circumstances they might be in an assailable position when making copies for students or for other libraries.   Representations were made on this matter to the Gregory Committee by the Library Association of Great Britain. The portion of the Gregory Report dealing with this question will be found at paragraphs 43-53.

132. The Australian Library Association, in making representations to us, derived much advantage from the fact that the 1956 Act had taken cognizance of the views put by their brother librarians in England. In the course of their written and oral submissions to us, they put several points relating to section 7 which will be dealt with below. In general, the Australian Library Association welcomes the provisions as " a minimum standard of desirable reform for adoption into Australian copyright law", but considers that there should be certain extensions, based partly on what it considers inadequacies in the 1956 Act, and partly on differences in the pattern and organization of libraries in Australia and the United Kingdom.

133. The question of copying by librarians can best be considered under two headings, namely, copying for students and copying for other libraries.

*Copying for Students.*

134. Sub-sections (1) and (2) of section 7 of the 1956 Act provide as follows:—

    7.—(1 ) The copyright in an article contained in a periodical publication is not infringed by the making or supplying of a copy of the article, if the copy is made or supplied by or on behalf of the librarian of a library of a class prescribed by regulation made under this subsection by the Board of Trade, and the conditions prescribed by those regulations are complied with.

29

(2) In making any regulations for the purposes of the preceding subsection the Board of Trade shall make such provision as the Board may consider appropriate for securing—

    *(a)* that the libraries to which the regulations apply are not established or conducted for profit;

    *(b)* that the copies in question are supplied only to persons satisfying the librarian, or a person acting on his behalf, that they require them for purposes of research or private study and will not use them for any other purpose;

    *(c)* that no person is furnished under the regulations with two or more copies of the same article;

    *(d)* that no copy extends to more than one article contained in any one publication and

    *(e)* that persons to whom copies are supplied under the regulations are required to pay for them a sum not less than the cost (including a contribution to the general expenses of the library) attributable to their production,

and may impose such other requirements (if any ) as may appear to the Board to be expedient.

135. We take the same view as the Gregory Committee that, subject to certain safeguards, students should be entitled to the benefit of the modern means of copying that science has made available (para. 43).

136. The classes of library permitted to do such copying and the conditions under which the copying may take place are laid dawn in Regulations made under the 1956 Act by the Board of Trade. We would, however, recommend that the classes of library should be specified in the Act rather than in Regulations.

137. A submission was made by the Library Association that sub-section (2) (a) of section 7 which deals with the copying of periodical literature should extend to " special libraries" established in industrial concerns which are conducted for profit provided that the library is non-profit-making. It was pointed out that these libraries frequently have requests for copies of material in technical periodicals and might not, under the 1956 Act, be protected in making such copies. We are of the opinion that this is a reasonable view and recommend the enactment of a provision to the effect of section 7(2) subject to a proviso that reference libraries not themselves conducted for profit but forming part of a profit-making organization should be regarded as " libraries not established or conducted for profit " for the purposes of this section of the Act.

138. The Library Association further put to us that paragraph (d) of section 7(2) should be deleted and replaced by the following: —

that no copy extends to more than one article in any one publication or if to more than one then only to articles relating to the same subject-matter.

We also recommend the adoption of this suggestion.

139. The problem of making copies for students of work of a non-periodical character is dealt with in section 7(3) and (4). Those provisions are as follows :—

(3) The copyright in a published literary, dramatic or musical work, other than an article contained in a periodical publication, is not infringed by the making or supplying of a copy of part of the work, if the copy is made or supplied by or on behalf of the librarian of a library of a class prescribed by regulations made under this subsection by the Board of Trade, and the conditions prescribed by those regulations are complied with:

Provided that this subsection shall not apply if, at the time when the copy is made, the librarian knows the name and address of a person entitled to authorize the making of the copy, or could by reasonable inquiry ascertain the name and address of such a person.

(4) The provisions of subsection (2) of this section shall apply for the purposes of the last preceding subsection:

Provided that paragraph *(d)* of the said sub-section (2) shall not apply for those purposes, but any regulations made under the last preceding subsection shall include such provision as the Board of Trade may consider appropriate for securing that no copy to which the regulations apply extends to more than a reasonable proportion of the work in question.

30

140. The proviso to sub-section (3) was challenged by the Library Association on the grounds that the geographical isolation of Australian libraries from the main centres of book production made the proviso unduly onerous. while appreciating the librarians' point of view we are unable to see that they are in a much different position from an English librarian in regard to, say, American copyright material, nor do we think it desirable or fair to copyright owners that their works or parts of those works should be copied by mechanical means without the knowledge of the copyright owners who would, in those circumstances, be unable to ascertain how much of their works had been copied or how many copies had been made. Such a copyright owner would be unable to determine whether the copying of his work had exceeded the requirements of the provision regarding the right of copy.

141. We referred this matter to the Australian Book Publishers' Association who suggested that the best compromise might be to allow the librarian to copy a reasonable part of a non-periodical copyright work provided that notice was given within a reasonable time to the copyright owner or publisher of the amount that had been copied.

142. If this suggestion were adopted the copyright owner would be in a position to know, as far as it is possible, the extent to which his work was being used. If the amount of copying exceeded reasonable bounds he could make appropriate representations to the libraries or, in the last resort, to the Government for a change in the law. This seems to us to be a fair suggestion and we recommend its adoption. However, so that the situation can be easily rectified if it leads to abuse, we recommend that the conditions of copying of non-periodical work by libraries should be inserted in the Regulations.

143. In conformity with the recommendation we have made above (para. 137) in connexion with periodical literature, we recommend that the privilege of copying parts of non-periodical works should extend to libraries of commercial concerns provided that the library itself is not conducted for profit.

*Copying for Other Libraries.*

144. Sub-section (5) of section 7 is as follows:—

(5) The copyright in a published literary, dramatic or musical work is not infringed by the making or supplying of a copy of the work, or of part of it, by or on behalf of the librarian of a library of a class prescribed by regulations made under this subsection by the Board of Trade, if—

*(a)* the copy is supplied to the librarian of any library of a class so prescribed

*(b)* at the time when the copy is made, the librarian by or on whose behalf it is supplied does not know the name and address of any person entitled to authorize the. making of the copy, and could not by reasonable inquiry ascertain the name and address of such a person; and

(c) any other condition prescribed by the regulations are complied with:

Provided that the condition specified in paragraph *(b)* of this subsection shall not apply in the case of an article contained in a periodical publication.

145. The Library Association further submitted that paragraph *(b)* should not be included in any Australian provision corresponding to section 7 (5), so that a library of a prescribed class could copy the whole, or part, of a non-periodical work for another library of a prescribed class without reference or notice to the copyright owner. We do not recommend that this submission be adopted. In our view the same degree of urgency does not exist in the circumstances contemplated by section 7 ( 5 ) as in the case of copying for students. As the whole work could, under section 7 (5), be copied and as we have already recommended the extension of the privilege of copying to libraries of commercial establishments, it seems to us reasonable that in the case of copying for other libraries the consent of the copyright owner should be obtained where his name and address are known or can reasonably be ascertained.

31

146. The Library Association suggested that a library should be authorized to copy a book for another library if it is not available in Australia. We think that this is a most difficult test to apply, How many bookshops, for example, would a librarian have to try before it could be said that the book was not available? In any case, we consider that this is a field where there is considerable risk to the copyright owner, involving as it does the copying of the whole of his work. The mere fact that a work is " out of print " is not, in our view, sufficient justification for the copying of the work as it may prevent the building up of a demand for the work sufficient to justify commercially the bringing out of a new edition.   We, therefore, reject the Librarians' submission.

### *Copying of Unpublished Works in Libraries.*

*147.* Section 7 (6) of the 1956 Act is as follows:—

(6) Where, at a time more than fifty years from the end of the calendar year in which the author of a literary, dramatic or musical work died, and more than one hundred years after the time, or the end of the period, at or during the work was made,—

(a) copyright subsists in the work, but

(b) the work has not been published, and

(c) the manuscript or a copy of the work is kept in a library, museum or other institution where (subject to any provisions regulating the institution in question) it is open to public inspection,

the copyright in the work is not infringed by a person who reproduces the work for purposes of research or private study, or with a view to publication.

148. We recommend that, in section 7 (6), it should be made plain that a librarian is authorized to make a copy of an unpublished manuscript for a person for the purpose of research or private study or with a view to publication, the onus being on the person requesting the copy to get any further permissions that might be required.   The Library Association also suggested that the term of 100 years in section 7 (6) should be shortened to 75 years in view of the relatively short period of Australian development and increasing interest in our early history, and this we recommend.

149. We also considered the extension of this provision to cover photographs and engravings, and recommend that these works should be included. Under the 1911 Act the term of copyright of a photograph expired 50 years after its making and, therefore, a provision similar to section 7 (6) was unnecessary to authorize the copying of old unpublished photographs.   If our recommendations are put into effect, however, the term of protection of a photograph will be 50 years from first publication. There may be many photographs of historical interest that could not otherwise be copied.

150. The New Zealand Committee recommended that specific provision should be made to authorize university librarians to supply for purposes of research or private study copies of unpublished theses deposited with them (para. 102). We consider that a provision of this nature would be most desirable and recommend accordingly.

### *Conclusion.*

151. We recommend, therefore, the enactment of a provision to the effect of section 7 subject to the following alterations:—

(a) Sub-section (2) should provide that, for purposes of the Act, a library is not deemed to be established or conducted for profit merely because it is part of an enterprise which is established or conducted for profit;

(b) The cases of libraries to which sub-sections (1), (2), (3), (4) and (5) apply should be specified in the Act rather than the Regulations;

32

(c) In sub-section (2), the words " or if more than one article, only to articles relating to the same subject-matter " should be inserted before " and " in paragraph (d);

*(d)* The proviso to sub-section (3) should be deleted and there should be substituted a provision that the sub-section shall apply subject to such conditions as are prescribed. The Regulations should prescribe that, if the librarian knows the name and address of the person entitled to authorize the making of the copy or could by reasonable inquiry ascertain the name and address of such a person, the librarian shall inform that person of the amount of the work that has been copied and to whom it has been supplied;

*(e)* Where a person has a right to copy a manuscript under sub-section (6) it should be made clear that a librarian is authorized to copy it for him;

*(f)* Insert " or a photograph or engraving" after " work " wherever appearing in sub-section (6);

*(g)* Substitute " seventy-five " for " one hundred " in sub-section (6);

*(h)* University librarians should be empowered to supply, for purposes of research or private study, copies of unpublished theses deposited with them;

*(i)* Substitute " the Governor-General " for " the Board of Trade " wherever appearing

*(j)* Delete the last two *lines* of section 7 (2).


## XII. COMPULSORY LICENCE TO MANUFACTURE RECORDS.

152. Two major problems arise in relation to gramophone records, each of which has an historical background of some interest. One relates to the compulsory licence for the making of records and the other to the performing right in records. The latter will be dealt with later in this Report (paras. 232-254).

153. Article 3 of the Closing Protocol of the Berne Convention of 1886 reads as follows:—

> 3. It is understood that the manufacture and sale of instruments  serving to reproduce mechanically musical airs in which copyright subsists shall not be considered as constituting infringement of musical  copyright.

At that time there was little in the way of mechanical means for reproduction which could occasion the author of a musical work much concern.  By 1908, with the growth of the gramophone and other means of mechanical reproduction, the scene had greatly changed. In the revised Berne Convention, signed at Berlin in November of that year, paragraphs 1 and 2 of Article 13 provided—

> The authors of musical works shall have the exclusive right of authorising (1) the adaptation of those works to instruments which can reproduce them mechanically; (2) the public performance of the said works by means of these instruments.

> Reservations  and conditions relating to the application of this Article may be determined by the domestic legislation of each country in so far as it is concerned; but the effect of any such reservations and conditions will be strictly limited to the country which has put them in force.

33

Effect was given to this provision in section 1 (2. ) *(d)* of the 1911 Act. At the same time, the interests of the producers of mechanical contrivances were not overlooked. By section 19 (2.) of the 1911 Act it was provided, inter *alia*, as follows :—

> (2. ) It shall not be deemed to be an infringement of copyright in any musical work for any person to make within the parts of His Majesty's dominions to which this Act extends records, perforated rolls, or other contrivances by means of which the work may be mechanically performed, if such person proves—
>
> > (a) that such contrivances have previously been made by, or with the consent or acquiescence of, the owner of the copyright in the work; and
> >
> > (b) that he has given the prescribed notice of his intention to make the contrivances, and has paid in the prescribed manner to, or for the benefit of, the owner of the copyright in the work royalties in respect of all such contrivances sold by him, calculated at the rate hereinafter mentioned.

154. The rate of royalty was fixed at 5 per cent. on the ordinary retail selling price of the contrivance (section 19 (3.)) subject to revision by the Board of Trade after seven years. In 1928 the Board of Trade made an order increasing the rate to 6 1/4 per cent. and the order was confirmed and enacted as law by the Imperial Parliament. (See Copyright Order Confirmation (Mechanical Instruments Royalties) Act, 1928.) In *Copyright Owners' Reproduction Society Ltd. v. E.M.I. (Aust. ) Pty. Ltd., (1959)* A.L.R. 127 it was held by the High Court that the increased rate was not applicable in Australia.

155. A logical basis for section 19 (2. ) is not easy to discover. No such licence operates in relation to any other form of reproduction of copyright material and a similar compulsory licence would indeed seem strange in relation to the reproduction of books. This is, however, not a perfect analogy. The owner of the copyright in a musical work is in an analogous position to the owner of copyright in a book insofar as the reproduction of his written material is concerned. He, like the copyright owner of a book, can restrain its unauthorized publication. Similarly, he can prevent performance of the work in public, the broadcasting of the work and exercise the other rights which form the sum total of his copyright in the work. He can refuse to permit a recording of the work to be made. The only respect in which his rights differ from those of the owner of copyright in a literary work arises if and only if he permits such recording of the work as is contemplated by section 19 (2. ) of the 1911 Act. By this permission he renders the work subject to the compulsory licensing provisions under which other recordings can be made by persons who comply with those provisions.

156. The Copyright Owners Reproduction Society Limited argued that the compulsory licence system was arbitrary in that it fixes a rate of remuneration which has no relationship to any free bargaining between the parties. Although the compulsory licence does not operate until a recording is once authorized, there is no room for bargaining with a manufacturer who wishes to make the first record. A manufacturer knows that once a copyright owner authorized him to make a recording of a work, his competitors will be able to record the same work at a royalty of 5 per cent. of the retail selling price. He is. therefore, unlikely to pay a royalty higher than that fixed by the statute.

157. It was also submitted that under the compulsory licence system a composer has no power to prevent or control the production of an inferior record of his work. This danger, it is said, is particularly great in the case of cheap records. Lord Jowitt in the House of Lords debates on the Copyright Bill argued strongly against the compulsory licence system on this ground.

158. A further argument against this system is that it gives to the record maker an economic advantage which is withheld from other classes of music users and qualifies the rights of a copyright owner of music in a manner not suffered by other

copyright owners, Whatever the historical justification for this position, it is said that it is no longer defensible to-day when the record industry is firmly established and royalties for the making of records have taken the place of royalties from sheet music as a major source of the composer's income. It is pointed out that even 50 years ago the United Kingdom Copyright Committee rejected the suggestion for a compulsory licence system of this nature.

159. It is said that another disadvantage suffered by the copyright owner of music under the compulsory licence provisions is that he has no chance of deciding with whom he will deal. Even though a manufacturer has proved himself to be unreliable and unworthy the copyright owner is forced to continue to deal with him.

160. On the other hand, the compulsory licence provisions may be said to serve the copyright owner and the general public in a number of ways. They prevent the development of a monopoly in record manufacture. The resulting competitive situation gives to the public the advantage of being able to hear a wide variety of renditions of the work. Music in this respect differs from other forms of copyright material. It can only be appreciated by being heard and the interpretation of a particular orchestra or performer may contribute much to the understanding and enjoyment of the work by the listener. A wide variety of interpretation, apart from benefiting the general public, is of advantage to the copyright owner, producing, as it does, greater sales of records and a longer period of demand for popular works. The competition existing at present provides some protection against inferior recordings as the better recordings tend to drive poor recordings off the market.

161. The principle of compulsory licensing was accepted in the United States in 1909 and although it has remained a subject of acute and frequent controversy in Congress it remains part of the law of the United States to-day. It seems clear that it was introduced into the copyright law of the United States in what was regarded as the public interest to prevent monopoly in the mechanical reproduction of copyright musical works. Whether its repeal would encourage monopoly in that field in the United States to-day is a question upon which differing views are held in that country.

162. In Great Britain, a plea for the inclusion of compulsory licence provisions was rejected by the Committee which recommended the 1911 Act but the provision was inserted in the Committee stages of the Bill in the House of Commons and passed into law. As in the United States, it was designed to prevent a monopoly being gained of the most popular works bv any particular manufacturer. (*Çopinger* 9th Edition, p. 273.) It has remained part of our law ever since.

163. Similar provisions operate in—

Canada—Copyright Act R.S. section 19; *Copinger* 9th Edition, p. 711.

*United* States—United States Code. Title 17—Copyrights, section 1 *(e); Copinger* 9th Edition, pp. 830-831.

India—Copyright Act, 1957, section 52 (1) *(j); Copinger* 9th Edition, pp. 757-8.

*South Africa—Patents,* Designs, Trade Marks and Copyright Act, 1916, section 143; Copinger 9th Edition, p, 791.

*Republic of* Ireland—Industrial and Commercial Property (Protection) Act, 1927, section 169 (2); *Copinger* 9th Edition, p. 817.

New Zealand—Copyright Act, 1913, section 25 (2); *Copinger* 9th Edition, pp. 778-9.

35

164. As far as we have been able to ascertain it appears that similar provisions do not operate in most Western European countries, but conditions for mechanical reproduction are largely governed by the terms of a Standard Contract which The Bureau International de L'Edition Mecanique (the B.I.E.M.) has negotiated with the Phonographic Industry.  A copy of the current Standard Contract has been made available to us.  It took effect on 1 January, 1956 and continues to operate until 31 December, 1959 (Article XXVI. ( 1 )). Under this contract manufacturers are given the non-exclusive right to record mechanically the works of the B.I.E.M. repertoire. In Article XII. rates of royalty are prescribed for the United States of America and Canada which conform to the statutory rates in those countries. The rates for South America and Central America are left to agreement between B.I.E.M. and the manufacturers in those countries.  There are special provisions for the British Zone (see Article VI. ) which ensure conformity with the Copyright Acts of the countries in the Zone. In all other countries to which the contract is applicable the rate is 8 per cent. of the retail selling price (or 4 per cent. per side of double sided mechanical reproductions (Article XII. (3) ).

165. It thus appears that throughout the western world manufacturers of records enjoy rights to reproduce copyright works either under compulsory licence provisions or by virtue of the terms of the B.I.E.M. Standard Contract.

166. The Gregory Committee recommended the re-enactment of the compulsory licence provisions upon the ground that they had been law for forty years and that a sufficiently strong case has not been made out for any substantial change (para. 81).

167. In the absence of some clear logical basis for such a compulsory licence system we would not recommend such a provision were it not for the history of the matter and the widespread acceptance of the principle which cannot, we think, be lightly disregarded.

168. Historically, it would seem that after a period in which the author of a musical work had no protection against mechanical reproduction he acquired such a right. By that time record manufacturing interests had grown up which depended very largely upon the freedom to reproduce which each manufacturer enjoyed. A situation in which the survival of particular manufacturers might well have been put in, jeopardy, if authors in exercising their newly acquired right confined their favours wholly or largely to a rival concern, was one which manufacturers could hardly be expected to contemplate with equanimity.  Thus, as it seems to us, this somewhat anomalous provision found its way into the 1911 Act and has now formed part of our law for nearly fifty years.

169. These are circumstances which themselves suggest that the repeal of the provisions at this stage could harm enterprises which have developed upon the basis that this was a permanent feature of our copyright law.

170. To this we would add one further consideration.  The principle has enjoyed wide application. In view of the fact that it is accepted both in England and America, local Australian manufacturers might, if the provision were repealed here, be placed at a disadvantage in competing with importations from abroad.  The only practical effect of such a repeal might be that the statutory royalty rate now prescribed (viz., 5 per cent.) would be replaced by a standard contract royalty rate, perhaps 8 per cent. as in the B.I.E.M. Standard Contract.

171. Having regard to all these circumstances we do not recommend the repeal of the compulsory licence provisions.  History perhaps more than logic plays its part in the development of ideas and in this case we think historical considerations coupled with practical realities lead to the conclusion that the law should not now be changed.

172. Under section 19 (2. ) of the 1911 Act the essential circumstance from which the right to make records and other contrivances arises is that such contrivances have previously been *made* by or with the consent or acquiescence of the owner of the copyright. The corresponding provision of the 1956 Act is section 8 ( 1 ) (a) under which the condition precedent to the exercise of the right is that records of the work have previously been *made in or imported into the United Kingdom for purposes* of *retail sale* by or with the licence of the owner of the copyright. This provision is in some respects wider and in other respects narrower in its application than the corresponding provision in the 1911 Act.  It applies where records are imported as well as where they are made but the making as well as the importation must be for purposes of retail sale and the records must be made in or imported into the United Kingdom.

173. In a corresponding section of an Australian Act, the Commonwealth would be substituted for the United Kingdom and in this respect the application of the provision would be more limited than the existing section 19 (2.). As we have indicated in another portion of this report, the 1911 Act operates in Australia as an Act of the Imperial Parliament. Section 19 (2. ) relates to the making of records and other contrivances " within the parts of His Majesty's dominions to which this Act extends".

174. In prescribing the conditions under which the making of such contrivances was not to be an infringement section 19 (2. ) requires proof "that such contrivances have previously been *made* by or with the consent or acquiescence of the owner of the copyright in the work".  It does not in as many words say that this making must be within the parts of His Majesty's dominions to which the Act extends but it would seem that section 19 (2) *(a)* should be construed in this sense.  *(See Albert v. Hoffnung and Co. Ltd., (1921* ) 22 N.S.W. S. R.75; *Gramophone Coy. Ltd. v. Leo Feist Incorporated,* 1928 V.L.R. 420; 41 C. L. R. 1; *Copinger* 9th Edition, page 280.)

175. The consent to the making of a contrivance in one part of the dominions could bring the compulsory licence provisions into operation in another part if at the time the consent were given the owner of the copyright in the relevant parts of the dominions was the same person *(Albert v. Hoffnung and Co. Ltd., supra; Gramophone Coy. Ltd. v. Leo Feist Incorporated, supra).*

176. If ownership of the copyright in the relevant parts of the dominions subsequently became divided the then owner of the copyright in the part in which the compulsory licence is to be exercised is the relevant owner for purposes of notice and payment of royalties under the section *(Albert v. Hoffnung and Co. Ltd., supra).*

177. It will thus be seen that the adoption in Australia of section 8 of the 1956 Act will make some substantial alteration to the position which exists under the 1911 Act. This will arise in part from the fact that our law will cease to be governed by the provisions of an Imperial Act and will depend solely upon an Australian law.

178. The Canadian Royal Commission recommended that the compulsory licence should operate in Canada if any owner of copyright in the work anywhere in the world authorized the making of a record in any country notwithstanding the fact that he was not at the time of such authorization the owner of the Canadian copyright (Canadian Report pp. 66-67).  The argument used to support this recommendation was that the purpose of requiring consent to an initial recording was to protect an author who did not wish to have his work recorded at all.  Consent to its initial recording could only be given by him or by a person deriving title from him and, therefore, once consent was given by such a person the need for protection against recording itself disappeared. The Association of Australian Record Manufacturers urged us to adopt this view.

*179. We* think an Australian Copyright Act should concern itself with the rights of the owner of the copyright in this country and that those rights should not be affected by the conduct of other owners of copyright in the work elsewhere.

180. As an alternative submission, the record manufacturers urged that the compulsory licence provisions should operate when the owner of the Australian copyright authorized the making of a record either in or outside Australia. In our view, a provision of this nature would place serious difficulties in the way of the copyright owner. Many musical plays, for example, have their origin in England or America and it sometimes takes considerable time for a play to be produced in Australia. A producer is, of course, anxious that, by the time the play is performed here the public will not find the music and lyrics of the songs " stale" by reason of having heard them too often. The copyright owner can only ensure against this happening if he can prevent, not only the public performance, but also the making and sale of records.

181. In our view, therefore, a person should be authorized to make a record of a work only where the copyright owner has previously consented to the making of a record in, or its importation into, Australia.

182. The Association of Australian Record Manufacturers also contended that the compulsory licence when operative should authorize the importation as well as the making of a record. Four of us do not recommend the adoption of this proposal, The compulsory licence is, as we have already indicated, a somewhat anomalous limitation upon the rights of the copyright owner and we are not disposed to widen it. To the extent to which it does operate we think it not unreasonable that those who in Australia seek to enjoy benefits conferred by Australian law should do so by manufacturing records in Australia and thus contribute to the stability and growth of that section of our manufacturing industry. One of us, however, is of the opinion that if by his own acts, namely, the authorization of the making or importation of records, a copyright owner in effect opens the gate to other record manufacturers, there is no sound reason why the copyright law should require such recording to take place in Australia. He considers that if the compulsory licence system does not extend to importation the Australian public might be denied the benefit of hearing the works sung or performed by many famous foreign singers and performers. In this regard, he finds the reasoning of the New Zealand Committee, in paragraphs 190-194 of their Report, compelling.

183. The submission of the record manufacturers referred to in the above paragraph concerned the importation of records for purposes of sale. A further problem arises (on which we have received no submissions) regarding the importation of matrices by a manufacturer for the purpose of pressing records intended for sale.

184. Under section 2 (5) of the 1956 Act it is a "restricted act" to reproduce a work m any material form. " Reproduction " in the case of a literary dramatic and musical work includes, among other things, " a reproduction in the form of a record" (section 48). " Record " is defined in section 48 to mean "any disc, tape, perforated roll or other device in which sounds are embodied so as to be capable (with or without the aid of some other instrument) of being automatically reproduced therefrom ". We understand that a matrix, from which records are pressed, is a device in which sounds are embodied and that those sounds are capable of being automatically reproduced from it, although it is not, of course, usual to "play" a matrix so as to reproduce the sound. It would seem, therefore, that the making of a matrix is a " restricted act" and that its importation would, in the circumstances set out in section 5 (2) of the 1956 Act, constitute an infringement. It appears also that a person who makes or imports a matrix made from another record without permission commits an

infringement of the copyright, if any, in the record. The first owner of copyright in the record is the original recorder and not the person who presses records from the original matrix or recording.

185. We have been told that only 4 per cent, of records sold in Australia are originally recorded here, the remainder being manufactured from matrices originally produced overseas. Unless, therefore, a person who had a right to manufacture records of a work under section 8 could also import the matrix in order to make those records the right would, in Australia, be of so little value as to be practically worthless. We, therefore, recommend that where a person has a right, subject to the conditions set out in section 8, to make records for sale he should have the right to import a record or matrix for the purpose of making those records.

186. It may be that there, are, or will be, types of matrices which would not come within the definition of " reproduction" set out in section 48 of the 1956 Act because they do not comply with the definition of "record" in that section. We recommend, therefore, that "reproduction" should be defined so as to ensure that it includes all devices from which records are pressed whether or not the sounds embodied *in the* device are " capable of being automatically reproduced therefrom".

187. Our attention was directed by the same Association to the fact that section 8 (1) (a) of the 1956 Act requires the initial making or importation to be " by or with the licence of" the copyright owner.  The corresponding words in the 1911 Act were " with the consent or acquiescence" of the copyright owner.  The Indian Act of 1957 uses the phrase "by or with the licence or consent of the copyright owner". We think that reference to licence alone may be somewhat too restrictive, possibly excluding cases in which there is at least consent by conduct. We would accordingly recommend the use of the phrase "licence or consent" as in the Indian Act.

188. It was also suggested by the Association that the words " for the purposes of retail sale" should be omitted from section 8(1) *(a)*. It  was said that records were not infrequently imported with the consent of the copyright owner for broadcasting and that the extensive use of such a record for that purpose in advance of its importation for retail sale could in the case of some musical works which enjoy popularity over a short period of time restrict the market available to the manufacturer when at a later stage he was in a position to make records under the section.

189. We are not satisfied that there is much substance in this claim and are of the view that the broadcasting of records often tends rather to improve than depress the market for records. In any event, however, we think the copyright owner should be entitled to authorize importation for broadcasting if he so desires without bringing into operation the compulsory licence provisions.

190. Paragraph (c) of section 8 ( 1 ) of the 1956 Act provides as one of the conditions of manufacture that the manufacturer intends to sell the record "by retail* and paragraph (d) provides for the payment of royalties in respect of records that are sold " by retail".  We do not see any reason why the provision should be limited to sales by retail provided the royalties are calculated on the " ordinary retail selling price" as provided for in section 8 (2).

191. We recommend the enactment of a provision to the effect of section 8 (1) of the 1956 Act with the omission of the words "by retail" from paragraphs (c) and (d) and the substitution of " the Commonwealth" for " the United Kingdom" wherever appearing.

192. *Rate of Royalty.*—Considerable discussion before us centred around the rate of royalty which should be prescribed in the compulsory licence provisions and certain incidental matters.

39

193. The manufacturers contended that the rate should remain at 5% as at present and should be calculated on the retail price of the record less sales tax and less the cost of containers. It was said that 5% on the Australian retail price returned more to the copyright owner than 61/4% the present rate in Great Britain which is calculated on a retail price which excludes purchase tax. This was due to the fact that the Australian retail price, including as it does, sales tax, is higher than the corresponding price in Great Britain. For example, it was put to us that on the sale of a twelve inch record which plays at 331/3rd revolutions per minute the royalty at present payable in Australia is 2s. 71/2d., while in the United Kingdom the royalty payable is 1s. 10 7/8d. If the Australian rate or royalty remained at 5% and sales tax was excluded from the " ordinary retail selling price" the royalty payable on the sale of the record would be 2s. 3d. (All amounts are expressed in Australian currency. )

194. On the other hand, the Copyright Owners' Reproduction Society, which made representations to us in this regard on behalf of copyright owners, maintained that the rate should be in line with that which is now recognized in the Standard Contract of B.I.E.M. to which reference has already been made, namely 8% or 4% for each side in the case of a double sided record, and that the calculation should be made on the retail price of the record without any deduction for sales tax or the cost of containers.

195. As this Committee is not empowered to take evidence on oath it was not possible for us to engage in the kind of investigation which might be necessary to determine finally this issue. In determining what is a fair percentage of the retail price that should be paid in royalties to a copyright owner we do not think it is justifiable to make a comparison of the actual sum of money that a copyright owner in Australia and Great Britain receives. Standards of prices, wages and general living conditions differ considerably in those two countries and a true comparison would require a detailed economic analysis of the amount paid in royalties in both countries in relation to factors such as the general level of incomes, profit and so forth.

196. There have undoubtedly been certain developments since 1911 which suggest that the rate should be higher than that which was then prescribed. The great changes in the value of money may be said to be irrelevant to a percentage calculation, but an important new factor is the advent of the long playing record. In place of a single sided record of one work or a double sided record of two works, as many as five or six works may now be recorded on one side of a record. Despite this the percentage remains the same although it must be conceded that the same copyright owner derives some benefit from the higher price at which such a record is sold. On the other hand, it has become possible to produce certain types of record very cheaply. The records which were the subject-matter of a decision of the House of Lords in *Chappel & Coy. Ltd. v. The Nestle Coy. Ltd., [1959]* 2 All E.R. 701 were sold by the manufacturer at a wholesale price of 4d. each. As previously indicated the rate has been 6 1/4% in Great Britain for over 30 years.

197. Having regard to the matters mentioned above, we consider that the rate should be more than 5%. We recommend that until the rate is revised after an investigation of the relevant factors it should be 6 1/4% as in the 1956 Act, subject to a provision similar to that contained in section 8 (4). The task of revising the rate could, we think, be included in the functions of the Copyright Tribunal, the creation of which we recommend in a later section of this report (pare. 355).

198. We do not think any deduction from the retail price should be made for sales tax. It is not the only tax which serves in part to determine the figure at which retail sales take place and it clearly would be impossible to disentangle all the elements with reference to which that price is determined.

199. Purchase tax in Great Britain rests on a different basis. It is a tax on the purchase imposed over and above the retail price. The distinction between the two *types* of tax is recognized in the B.IE.M. Standard Contract to which reference has already been made. Article XI. (7) of that document reads as follows :—

> Taxes imposed on the retail price shall not be included for the purpose of calculating the royalty where, according to the legal regulations in force, they must be collected over and above the retail price

200. When a record is sold in a container at a single retail price we see no justification for deducting from that price the cost of the container. It appears to us to serve the same purpose as the wrappings and containers in which many articles are sold and in relation to which it could scarcely be maintained that the retail price of the article was something less than that charged for the article and its container as sold. In the field of literary works, for example, an author's royalty is almost invariably a percentage of the retail selling price of his work. It has never been suggested that a deduction should be made from that price in estimating the royalty to make allowance for any special quality paper, binding or book jacket that the publisher may have used. In our view, the position is similar in respect of the use of record covers. The amount spent on them is purely a question for the manufacturer to determine.

201. As has already been indicated a number of works are now frequently recorded on a single record. The copyright in such works may belong to different owners. In that event the 1911 Act (section 19 (4.)) provides that the sums payable by way of royalties shall be apportioned amongst the several owners in such proportions as failing agreement may be determined by arbitration. There is also provision for the payment of not less than a halfpenny for each separate musical work (section 19 (3.)).

202. These provisions have been repeated in section 8 (4) of the 1956 Act with an increase of the minimum royalty to 3/4d. subject to revision by the Board of Trade.

203. It seems to us that the provisions for apportionment are not satisfactory, requiring as they do either agreement or voluntary arbitration. We think, that where a number of works are on a single recording and all those works are in copyright, it would be sufficient and more satisfactory to adopt an arbitrary basis of apportionment by prescribing that the royalties payable should be apportioned among the several owners by dividing the total amount of royalties by the number of copyright works on the record and paying to the copyright owner of each work the amount so ascertained. A fairer apportionment would perhaps be obtained by having regard to the playing time required for each work but the involved accounting which this would necessitate seems to render such a course impractical. With this view, both the record manufacturers and the copyright owners agree. In any event, by the method we suggest owners of copyright will over a period probably receive relatively similar treatment. A comparatively long work of one composer in one recording will doubtless be compensated for by a comparatively shorter one by that composer in another recording

204. We accordingly recommend the method of apportionment suggested above. We further recommend that the minimum royalty should be one penny.

205. A further problem in this regard arises when non-copyright and copyright works are included on the same recording. The present practice appears to be that the full royalty is claimed by and paid to the owners of the copyright works. In such a case we think the royalty which would otherwise be payable under section 8 (2) of the 1956 Act should be reduced to an amount which would represent the sum properly attributable to the copyright works under the method of apportionment we have recommended above, and that that amount should be divided among the copyright owners accordingly.

**206.** The Gregory Committee recommended that if a record included non-copyright material, the copyright owner should be entitled to the full royalty assessed in relation to the selling price of the record and not co a reduced or proportionate amount (para. 83). This recommendation was based on the view of the Committee that whether non-copyright material was included in a record was purely for the manufacturer to decide. The New Zealand Committee pointed out, however, that most of the records made in that country were made from a matrix obtained from abroad and the manufacturer could produce only pressings from that matrix containing the same selections. He has no control over the selection (para. 206). A similar situation prevails in Australia. Even in respect of records originally manufactured in Australia we take the view that the royalty should be reduced proportionately where the record contains non-copyright material. The case is even stronger in the case of pressings.

207. Regulation 44 of the Copyright Regulations provides that unless otherwise agreed royalties shall be payable by means of adhesive labels purchased from the owner of the copyright and affixed to the contrivance as provided in regulation 45.

208. With the advent of the long playing record on which a number of copyright works may be recorded, the use of adhesive stamps can be both laborious and awkward. In the case of some manufacturers other arrangements are of course made by agreement but in the absence of agreement the only alternative at present is the use of adhesive stamps.

209. We think this difficulty could be overcome by the adoption m the Regulation of a method of payment similar to that which prevails under the B.I.E.M. Standard Contract to which reference has already been made. Article XV. of that Contract provides as follows:—

> (1) The manufacturer shall deposit with the B.I.E.M., by way of permanent guarantee for the payment of royalties and for the performance of all the provisions of the present contract, a sum corresponding approximately to the amount of royalties due for one quarter's exploitation. The amount of this guarantee shall be revised every six months, to be maintained from six months to six months at three times the average monthly amount of the royalties paid during the course of the past year.

> (2) If from a six-monthly revision it would appear that the amount of the guarantee is insufficient, the Manufacturer must make it up to the full amount, within three days from the receipt by him of a notification from the B.I.E.M. by registered letter with advice of receipt.

> (3) If from a six-monthly revision it would appear that the amount of the guarantee is too high, the excess shall be placed to the credit of the Manufacturer's account in the books of the B.I.E.M.

210. We think it would be sufficient if an existing manufacturer were required to keep on deposit with the copyright owner an amount equal to the royalty on his dealings for the previous month. In the case of a new manufacturer an amount equal to the royalty on his estimated dealings for the first month of trading would seem appropriate as an initial deposit. The notice required by regulation 42 should include a statement of such estimated dealings and the royalty payable on that basis.

211. We also recommend that where the Regulations under a provision to the effect of section 8 of the 1956 Act require the giving of notice and information to the copyright owner it should be an offence to give fake information. A manufacturer should, we think, be required to insert on the label of the record a statement that it was made pursuant to the compulsory licensing provisions of the Act. A penalty should be prescribed for giving false information in this regard.

212. *Adaptations.*— The compulsory licence provisions under section 8 operate if records of the works or " of a similar adaptation of the work" have previously been made or imported. Section 8 (6) of the 1956 Act is as follows:—

> (6) For the purposes of this section an adaptation of a work shall be taken to be similar to an adaptation thereof contained in previous records if the two adaptations do not substantially differ in their treatment of the work, either in respect of style or (apart from any difference in numbers) in respect of the performers required for performing them.

213. The meaning of this provision is rather obscure. As has been pointed out in *Copinger* (9th Edition, p. 279), it is not clear whether the last requirement refers to the quality of the performers or the instruments or to both. It seems to us that different instruments rather than performers is the vital factor.   We therefore recommend the enactment of a provision to the effect of section 8 (6) substituting " instruments " for " performers ".

214. *Defaulting Manufacturers.*— It has been suggested that provision should be made for a manufacturer to lose the statutory right to manufacture records of music in copyright if he defaults in his obligations under the section or the Regulations in relation to the copyright owner of the work which he wishes to record or has infringed the copyright of any work of that owner.

215.   Breaches of the Regulations can, we think, best be dealt with by penalties as has been suggested above. As far as infringement is concerned, we are in sympathy with the suggestion but consider that there are serious difficulties in the way of enacting such a provision. It would, for example, be necessary to decide in a particular case whether, by reason of such infringement, a person should be prevented from manufacturing forever or for a particular length of time.   As to that, the seriousness of the infringement would be relevant. Because of the requirements of the Constitution, only a Court can determine whether an infringement has occurred and it would also seem to be the appropriate body to decide for how long the manufacturer who has infringed shall lose his right.

216. As a manufacturer, in the case of popular music, would need to know quickly whether he could manufacture a record and as the determination of whether he has committed an infringement might take a considerable length. of time, a provision to the effect of this submission could seriously prejudice a manufacturer even though he was entirely innocent. There is the further objection that such a provision would partake of the nature of double punishment for the same offence.

## XIII. GENERAL EXCEPTIONS FROM PROTECTION OF ARTISTIC WORKS.

217. Subsections (1) and (2) of section 9 of the 1956 Act provide for " fair dealing" with on artistic work for purposes of research or private study and criticism and review.   Subsection (7) of section 9 provides than an artistic work is not infringed by reproducing it for purposes of a judicial proceeding or for a report of a judicial proceeding. These provisions are similar to those dealt with. in relation to literary dramatic and musical works and, as in the case of those works, we recommend the adoption of the United Kingdom provisions to the same effect.

218. Subsections (3), (4), (5) and (6) of section 9 are as follows :—

> (3) The copyright in a work to which this subsection applies which is permanently situated in a public place, or in premises open to the Public, is not infringed by the making of a painting, drawing, engraving or photograph of the work, or the inclusion of the work in a cinematography film or in a television broadcast.
>
> This subsection applies to sculptures, and to such works of artistic craftsmanship m are mentioned in paragraph (c) of subsection (1) of section three of this Act.

(4) The copyright in a work of architecture is not infringed by the making of a painting, drawing, engraving or photograph of the work, or the inclusion of the work in a cinematography film or in a television broadcast.

(5) Without prejudice to the two last preceding subsections the copyright in an artistic work is *not infringed* by the inclusion of the work in a cinematography film or in a television broadcast, if its inclusion therein is only by way of background or is otherwise only incidental *to* its principal matters represented in the film or broadcast.

(6) The copyright in an artistic work is not infringed by the publication of a painting, drawing, engraving, photograph or cinematography film if by virtue of any of the *three* last preceding subsections the making of that painting, drawing, engraving, photograph or film did not constitute an infringement of the copyright.

219. Sub-sections (3) and (4) permit persons to make two dimensional copies of three dimensional works of art that are situated in a public place and works of architecture. The Director of the New South Wales Art Gallery has submitted that a provision such as section 9 (3) should not extend to sculpture and similar works that are situated in public galleries. It seems to us, however, that the trustees of such galleries have little to fear from a provision of this nature as they have complete control of the entry into the gallery and can regulate copying of works in the building. Sub-section (3) is primarily concerned with statues and such like that are situated in public parks and streets and we think that it is a reasonable provision. We recommend the enactment of provisions to the effect of sub-sections (3), (4), (5) and (6) of section 9 of the 1956 Act.

220. We further recommend the enactment of provisions to the effect of sub-sections (8) to (11) of section 9, which are as follows:—

(8) The making of an object of any description which is in three dimensions shall not be taken to infringe the copyright in an artistic work in two dimensions, if the object would not appear, to persons who are not experts in relation to objects of that description, to be a reproduction of the artistic work.

(9) The copyright in an artistic work is not infringed by the making of a subsequent artistic work by the same *author,* notwithstanding that part of the earlier work—

(a) is reproduced in the subsequent work, and

*(b) is so* reproduced by the use of a mould, cast, sketch, plan, model or study made for the purposes of the earlier work,

if in making the subsequent work the author does not repeat or imitate the main design *design* of the earlier work.

(10) Where copyright subsists in a building as a work of architecture, the copyright is not infringed by any reconstruction of that building; and where a building has been constructed in accordance with architectural drawings or plans in which copyright subsists, and has been so constructed by, or with the licence of, the owner of that copyright, any subsequent reconstruction of the building by reference to those drawings or plans shall not constitute an infringement of that copyright.

(11) The provisions of this section shall apply in relation to a television programme which is caused to be transmitted to subscribers to a diffusion service as they apply in relation to a television broadcast.

221. It is clear under our present law that, say, a statuette may be regarded as a reproduction of a sketch of a figure which forms the design of the statuette. The Gregory Committee considered that that view was a reasonable one subject to the requirement that a reproduction, to infringe, must at least be a visible copy of the work obvious to the layman. They considered that it should not be an infringement of the copyright in a drawing to erect a building based on the drawing if the result has no clearly visual resemblance to the drawing (para. 258). Sub-section (8) of section 9 of the 1956 Act was based on that recommendation. We agree with the views of the Gregory Committee in this regard and adopt them, with respect, as our own.

4531/63.—5

222. The 1956 Act does not provide for fair dealing with an artistic work for purposes of reporting a current event or for the inclusion of artistic works in an "ephemeral" reproduction. In our view, provision should be made to cover these matters. The provisions should be similar to those recommended above in relation to literary, dramatic and musical works,

## XIV. ANONYMOUS AND PSEUDONYMOUS WORKS AND WORKS OF JOINT AUTHORSHIP.

223. Section 11 of the 1956 Act states that provision regarding works published anonymously and pseudonymously are set out in the Second Schedule and that the provisions of the Third Schedule shall have effect with respect to works of joint authorship. Provisions of this nature should not, we think, be placed in schedules to an Act but should appear in the body of the Act itself. We recommend the enactment of provisions to the effect of the Second and Third Schedules to the 1956 Act.

224. In respect of works of joint authorship the chief difference between the 1956 Act and our present law is that under the 1956 Act the period of copyright is determined from the death of the last surviving author while under our present law it is determined from the death of the author who died first. The provision in the 1956 Act conforms to the requirements of Article 7 bis of the Brussels Convention.

225. The provisions of the 1956 Act relating to the duration of copyright in anonymous and pseudonymous works comply with Article 7 (4), (5) and (6) of the Brussels Convention.

## XV. COPYRIGHT IN SOUND RECORDINGS, CINEMATOGRAPHY. FILMS, BROADCASTS AND TYPOGRAPHICAL ARRANGEMENTS.

226. In subsequent chapters of our Report we recommend the creation or continuance of -copyright in subject matters that are not themselves original literary, dramatic, musical *or* artistic works. Insofar as those subject matters involve the use of original works, copyright in them is ancillary to the fundamental rights of the author of those works, that is to say, none of the rights which we recommend in this part of the Report is intended, unless otherwise expressly stated, to affect or detract from the rights which we have recommended should be enjoyed by the authors of original literary, dramatic, musical or artistic works. As an illustration, we recommend that one of the acts that should be restricted by copyright in a record is the public performance of that record. A person who wishes *to* publicly perform such a record is required to obtain the consent of the owner of copyright in the record, however, if the record records works which are in copyright he is also required to obtain the consent to their public performance of the copyright owner in those works. In the 1956 Act, copyright in original works is dealt with in Part I. and copyright in recordings, films, broadcasts and typographical arrangements is provided for in Part II. Section 16 (6) provides as follows:—

(6) Where by virtue of this Part of this Act copyright subsists in a sound recording, cinematography film, broadcast or other subject-matter, nothing in this Part of this Act shall be construed as affecting the operation of Part I. of this Act in relation to any literary, dramatic, musical or artistic work from which that subject-matter is wholly or partly derived; and copyright subsisting by virtue of this Part of this Act shall be additional to, and independent of, any copyright subsisting by virtue of Part I. of this Act:

Provided that this subsection shall have effect subject to the provisions of subsection (7) of section thirteen of this Act.

227. We recommend the enactment of a provision to the effect of section 16 (6). We shall deal later with section 13 (7) mentioned in the proviso to that provision.

## XVI.  GRAMOPHONE  RECORDS.

228. Section 19 (1. ) of the 1911 Act provides—

(1.) Copyright shall subsist in records, perforated rolls, and other contrivances by means of which sounds may be mechanically reproduced, in like manner as if such contrivances were musical works, but the term of copyright shall be fifty years from the making of the original plate from which the contrivance was directly or indirectly derived, and the person who was the owner of such original plate at the time when such plate was made shall be deemed to be the author of the work, and, where such owner is a body corporate, the body corporate shall be deemed for the purposes of this Act to reside within the parts of His Majesty's dominions to which this Act extends if it has established a place of business within such parts.

229. Section 12 (1) and (2) of the 1956 Act provides:—

(1) Copyright shall subsist, subject to the provisions of this Act, in every sound recording of which the maker was a qualified person at the time when the recording was made.

(2) Without prejudice to the preceding subsection, copyright shall subsist, subject to the provisions of this Act, in every sound recording which has been published, if the first publication of the recording took place in the United Kingdom or in another country to which this section extends.

230. By sub-section (9) of section 12, " sound recording " is defined to mean " the aggregate of the sound embodied in and capable of being reproduced by means of a record of every description ".

231. By sub-section (5) of section 12, the acts restricted by the copyright in a sound recording are—

(a) making a record embodying the recording;

(b) causing the recording to be heard in public; and

(c) broadcasting the recording.

232. There are a number of matters raised by interested parties in relation to these provisions, but the principal question arises in relation to the extent of the rights given by sub-section (5) when read with section 1 (2). No one has questioned the right of the maker of the recording to prohibit the making of another record from his recording and to prohibit the public performance, including broadcasting, of the record so made. But there has been a strenuous contest as to whether the maker of a retard should have the right to restrain the public performance or broadcasting of his record; in other words, whether paragraphs (b) and (c) of section 12 (5) of the 1956 Act should be adopted here insofar as they cover records not made in infringement of copyright. It appears that although some countries have conferred such a right, many countries, including the United States of America, have denied it. The British Copyright (International Convention) Order 1957 distinguishes between these two groups of countries in applying the Act to other countries.

233. There is no International Convention requiring Great Britain or Australia to confer upon the makers of sound recordings any of the rights referred to in section 12 (5) (a), (b) and (c) of the 1956 Act.

234. A question may arise whether the giving of copyright to the maker of a sound recording is a valid exercise of the power given by the Constitution to Parliament to make laws with respect to copyrights. It may be said that the word " copyrights " in section 51 (xviii.) of the Constitution is referring to copyrights of the kind in existence at the date of the enactment of the Constitution-see *Attorney-General for New South Wales v. Brewery Employees' Union of New South Wales, (1908) 6* C.L.R. 469 where a similar problem arose in relation to trade marks. Reference may also be made to *R. v. Brislan; ex parte Williams, (1935)* 54 C.L.R. 262, which

46

held that broadcasting fell within the words, in pl. (v.) of section 51 of the Constitution, " postal, telegraphic, telephonic and other like services".   However, the matter falls outside the province of this Committee and we assume that it is within power to confer copyright on the makers of sound recordings to the extent set out in section 12 of the 1956 Act.

235. We proceed, therefore, to consider whether we should recommend the adoption of section 12 (5) (b) and (c) of that Act.

236. The Gregory Committee gave a good deal of consideration to the problem before recommending that the rights conferred by paragraphs (b) and (c) should be adopted (paras. 78-81; 140-157; 194-200). In paragraph 140 the Report sets out the history of the matter. From this it appears that in 1909, before a Copyright Committee, record manufacturers sought, as against the owner of the general copyright in works which they had recorded, the right of public performance of their records, but did not suggest that they should have a right to prevent the public performance by others of records made by them.   After the 1911 Act was passed, it was not asserted until 1933 that they had such a right conferred upon them by section 19 (1.). In *Gramophone Co. Ltd. v. Stephen Cawardine & Co., (1934)* Ch. 450, Maugham J. held that such a right was given by the section and the decision has not since been challenged. Lowe *J.* of the Supreme Court of Victoria, had expressed the same view in *Australasian Performing Right Association Ltd. v. 3 DB Broadcasting Co. Pty. Ltd., (1929)* V.L.R. 107 at p. 113, to which Maugham J. referred.

237. Before us, representations were made to the effect that the maker of a sound recording should not have the right to control the public performance or broadcasting of such recording, but should be confined to the right to sell his recordings. The business of selling records, it was said, had in recent years very greatly expanded and was to-day very profitable. Submissions supporting the denial of the right were advanced by the Australian Broadcasting Commission and by Australian Commercial Broadcasters. Both national and commercial broadcasting and television stations use large numbers of records.

238. Before proceeding to summarise the opposing contentions we refer to several matters of some importance—

    *(a)* To concede to the maker of a sound recording the right to restrict public performance of the recording is to oblige those who perform the recording in public or who broadcast it to obtain not only a licence from the owner of copyright in the record but also from the owner of copyright in the work recorded.

    *(b)* The great majority of records sold in Australia are imported either directly or by the importation of matrices from which records are pressed in Australia. Many of these come from the United States of America, and it certainly seems anomalous that the maker of a sound recording in that country should enjoy here a performing right in his recording which he does not enjoy in his own country.

    (c) The Canadian Royal Commission reported against the allowance of the right of the maker to control public performance and broadcasting of a sound record (pp. 77-8). The New Zealand Committee recommended (para. 230) limiting the right to the control of broadcasting and public performances in cases where—

        (i) the recording is performed in a place to which a charge is made for admission;

47

(ii) the recording is performed by or upon a coin-operated machine;

(iii) the person causing the recording to be heard in public received any payment in respect of the performance; or

(iv) the owner of the record embodying the recording receives any payment in respect of the bbc performance.

(d) Mr. Justice Owen, sitting as a Royal Commision on Performing Rights in 1933, at a time when manufacturers were asserting such a right, but before it had been established by the *Cawardine Case,* said in his Report, at p. 51 (Recommendation 14)—

The law should be made clear on this Point, and, in the opinion of this Commission, the Performing right now claimed by some record manufacturers is unreasonable and, if in law it exists, this right should be abolished.

239. The arguments presented by broadcasting interests against the right in question may be summarized thus—

(a) The right was not intentionally conferred, and was not supposed to exist until the *Cawardine Case.* It had not been sought by makers of recordings. Speeches by Lord Lucas of Chilworth and by Lord Jowitt *in the* House of Lords on 15 November, 1955 *(Hansard,* p. 516; pp. 546-7) are quoted by the Australian Commercial Broadcasters to support this historical account.

(b) The maker of a record makes no artistic contribution to the original; still less does a person who merely presses a record from a matrix made outside Australia. Such persons do no more than carry out an industrial process and are in no different position from the printer of a book.

(c) Australian conditions differ from those in England, as there is very little original recording done in Australia. Figures submitted to us by the Australian Commercial Broadcasters show that "of recordings released in Australia, almost 65% are manufactured from original masters made in the United States of America whilst only 20% are made from masters of English origin, 13% from Continental masters and about 4% are produced locally".

*(d)* Broadcasting does not affect adversely the sale of gramophone records, but on the contrary greatly promotes them. The prosperous state of the record industry is mainly attributable, it is said, to the broadcasting of records.

240. For the record manufacturers it was submitted—

*(a) The* production of a recording requires a great deal of technical skill, but it requires much more. The selection of a conductor, the composition of an orchestra, the selection and training of musicians, the placing of microphones, the control of sound, all play a part in the recording, so that there may well be great differences between recordings. Added to that, there is a considerable outlay of money.

(b) Since the 1911 Act there has been a great change in the uses to which recordings can be put. The introduction of electrical recording, the perfection of sound amplification and broadcasting have enabled recordings *to* be used not only in private homes but in theatres, cinemas, hotels, restaurants, cafes and dance halls as well as in broadcasting and television. In these circumstances the views advanced in 1909 have little importance.

(c) The widespread dissemination of the recording lowers its value and can cause grave damage by reducing sales.

*(d)* The value of a recording can be impaired by the way in which it is used by broadcasting stations, as, for example, if used as a stop-gap between programmed and subject to being cut off before completion. A record may also be used in connexion with a stage production for which it is unsuitable.

(e) Some artists refuse to perform for recording purposes unless the manufacturer agrees to prohibit the use of the record in unsuitable ways, such as are referred to in paragraph (d).

(f) There has been a large capital investment in the record industry in the expectation of recoupment in part by royalties from public performance. It would be unjust to limit now the source from which revenue can be derived. It would probably lead to an increase in the retail price of records if manufacturers were to be confined to such sales for revenue.

(g) The record manufacturers refer to the Recommendations of a Parliamentary Committee on Broadcasting in 1942, and quote paragraph 87 of the Committee's report. The Committee recommended that there be no change in the law whereby the maker of a record had the right to restrain the public performance of his record. Its Report stated that the maker of the record may have paid a large fee to, say, Caruso, in the expectation of recoupment by fees from public performance and it would be unjust to take away his right. It is also said, in paragraph 92—

> The Australian Broadcasting Commission no longer hold the opinion that the law should be altered to prevent record makers from claiming public performance fees, and we do not recommend any legislative action in that direction.

(h) The Gregory Report recommended (para. 184) that the right be retained.

(i) In respect of the public performance, copyright in a record is in a similar position to copyright in a broadcasting programme. The Gregory Committee recommended (para. 192), and section 14 of the 1956 Act enacts, that the owner of copyright in a broadcast should be entitled to prevent its rebroadcast by others or, in the case of a television broadcast, its performance to a paying audience. No suggestion has been made to exclude this right.

(j) There is some evidence that the right in question is receiving considerable international support. Draft international agreements have been proposed under the auspices of the International Labour organization and Unesco which deal with this right.

(k) The matters raised by Lord Jowitt and Lord Lucas of Chilworth in the House of Lords debates on the Copyright Bill were concerned only with the right to control public performance and not with the right to control broadcasting.

241. It is apparent from this statement of the contentions on each side that the question is a very difficult one and is one upon which different minds will reach different conclusions. But upon careful consideration of the material presented to us we think we should not recommend any change in the law in this respect. We are of the view that the making of a record involves a considerable amount of artistic and technical skill. As was stated by Maugham, J. in the *Cawardine Case (at* p. 455) —

> The *arrangement* of the recording instruments in the building where the record is to be made, the building itself, the timing to fit the record, the production of the artistic effects, and, perhaps above all, the persons who play the instruments, not forgetting the conductor, combine together to make an artistic record, which is very far from the mere production of a piece of music.

49

242. We do not think that the result of another person's effort and skill should be made available to wide audiences by means of broadcasting or public performance without any payment being made to that person.  Records are to a large extent the life blood of broadcasting stations, particularly commercial stations. By using records the amount of money which is saved in payment to artists and musicians is, we think, considerable.  It certainly seems unjust that these stations should profit by the artistic and technical skill of others without being required to make any payment other than the price of the record. We approve of the statement of the Gregory Committee that " there would be something at variance with ordinary ideas of justice and fair play if an entertainment promoter, for his own personal profit, were to be at liberty to make use of records for broadcast programmed without any control or payment whatsoever, nor do we believe that it would be in the interests of the general public that he should do so" (para. 185).

243. We are also impressed by the argument that there would be some injustice in destroying rights in existence after money has been invested in making records on the basis of existing law.

244. The broadcasting interests have submitted to us that they should be able to control the showing of their television broadcasts to a paying audience. We later recommend the creation of a right of that nature.  If such a right is granted we do not see how logically it can be denied to the record manufacturer.

245. We, therefore, recommend the enactment of a provision to the effect of section 1.2 (5) of the 1956 Act,

246. The questions that then arise are whether copyright should be recognized in a recording first published in another country and, if so, whether such copyright should include the right to restrain public performance.

247. As has already been observed there is no International Convention which requires countries acceding to it to give any copyright in respect of recordings. But most countries do give some rights in such a recording but these vary in extent. In our view, if we are to give copyright to makers of records first published in Australia we should at least give copyright also to makers of records first published in those countries which give corresponding rights.  This is really concerned with the application of provisions of the Act by Order under section 32 of the 1956 Act and does not directly arise under section 12 itself.

248. In England this matter has been dealt with by the Copyright (International Conventions) Order 1957 (set out in *Copinger* 9th Edition, pp. 680-683). Proviso (iii) to clause 1 of the Order is—

in the case of any country other than Australia, Canada, Denmark, the Federal Republic of Germany, India, Israel, New Zealand, Norway, Pakistan, South Africa, Spain, and Switzerland, the acts restricted by the copyright in a sound recording conferred by section 12 of the Act as applied by this Order shall not include-
(a) causing the recording to be heard in public;
(b) broadcasting the recording.

249. The result is that in respect of first publication in those countries which do not confer upon makers of sound recordings the right to restrain public performance and broadcasting of the record, no such right is given in Great Britain, but in respect of first publication in those countries which do confer such rights, similar rights are given.  In this regard, however, the provisions of section 49 (2) (d) are material. That section provides that " a publication in the United Kingdom or in any other country shall not be treated as being other than the first publication by reason only of an earlier publication elsewhere if the two publications took place within a period or not more than thirty days ".

*250.* It is possible, therefore, for an American record manufacturer to obtain a performing right in a record in the United Kingdom by " publishing" his record in, say, Canada within thirty days of its publication in the United States.

251. If it were thought desirable to confer a performing right only in respect of records made in or first published in countries that themselves grant a performing right, we would recommend that a provision to the effect of section 49 (2) (d) of the 1956 Act should not be enacted in Australia in respect of the copyright in records.   It seems to us that a provision of that nature provides an easy means of evading the principle of reciprocity.

252. However, four of us see serious practical difficulties in the way of confining the performing right to records first published in countries that themselves grant a performing right in records.   The Commercial Broadcasters have maintained for some time that section 19 of the 1911 Act does not confer a performing right on the copyright owner of a record first published in a place outside the area covered by the 1911 Act, such as the United States.   A number of years ago, therefore, they announced that they would not pay royalties in respect of the broadcasting of records that *were* made from matrices produced in the United States. As a performing right clearly existed in records first published in England, these broadcasters ceased to play any recordings that originated in that country.   Subsequently an agreement was arrived at between the Commercial Broadcasters and E.M.I. (Aust.) Ltd. under which no performing right fee was to be payable in respect of the broadcasting of records made by that company or their subsidiaries.   In return the broadcasters agreed to give each record manufacturer in rotation a programme of fifteen minutes duration per week.   This agreement is without prejudice to the legal rights of any of the parties.

253. We have little doubt that if the performing right were granted only in respect of records first published in countries that provide for such a performing right, the Commercial Broadcasters would act, as they did previously, by playing only American records.   This would have the result that either the public would be denied the benefit of the broadcasting over the commercial stations of recordings first published in, say, England or Australia or the provisions relating to the performing right would be defeated by British and Australian manufacturers being forced to permit the broadcasting of their records on the commercial stations without the payment of any royalties. For these reasons four of us consider that a performing right should be conferred in respect of all records that are in copyright in Australia without regard to whether provisions for such a performing right exist in the country of first publication.

254. One of us, however, is not satisfied that royalties should be paid on the public performance of records first published in a country which does not grant a performing right to record manufacturers.   He does not see why, for example, an American record maker should be able to exact in Australia a royalty which he is denied in his own country. It seems to him to be an unsatisfactory answer to say that broadcasters would tend to play records on which no royalty was payable rather than records on which a royalty was payable.   If they did this, the Commonwealth has ample power under the broadcasting power to prevent it. One method of preventing it might be to impose on the broadcast performance of royalty-free records an impost equal to the royalty for the benefit of the Treasury instead of for the benefit of the foreign record maker.

255. We shall now give our other recommendations regarding copyright in sound recordings.

51

256. We recommend that copyright should subsist in every sound recording of which the maker was a qualified person when the record was made and in recordings that are first published in the Commonwealth. The period of protection should be fifty years from the end of the calendar year in which the work was first published, These recommendations are similar in effect to section 12 (l), (2) and (3) of the 1956 Act.

257. Sub-section (4) of section 12 provides that the maker of a sound recording shall be the first owner of copyright, but where the making of a record is commissioned for valuable consideration the person who commissioned it shall, in the absence of agreement to the contrary, be the first owner of copyright. For the reasons given above in relation to literary, dramatic, musical and artistic work we think that a person who commissions a record should, in the absence of agreement to the contrary, possess copyright in the record to the extent of the purpose for which he commissioned it, provided that his purpose was communicated to the author before the work was made. In all other respects copyright should be in the maker.

258. There arises the question whether protection should be accorded to records pressed in Australia from matrices imported from other countries where the actual recording is made. We do not consider that any protection should be given to records so made in Australia as what is done here is merely the carrying out of an industrial process. Whether copyright subsists in the record and what is the extent of the protection will then depend on where the recording was first published. Of course, a person who publicly performs or reproduces a record made from an imported matrix might commit an infringement of the copyright, if any, possessed by the original recorder. The maker of the record should be the person who actually records the performance. If this is done in, say, the United State;, then if the Act & applied to that country by Proclamation the original recorder will have the copyright here. The Gregory Report (para. 91) expressed the same view, namely, that no protection should be given in respect of the mere pressing of a record, but that when Orders in Council were made applying provisions of the Act to different countries appropriate provision could be made, as was done by the Copyright (International Conventions) Order 1957.

259. A definition to the effect of section 12 (8) of the 1956 Act should, therefore, be enacted. That provision is as follows:—

(8) For the purposes of this Act a sound recording shall be taken to be made at the time when the first record embodying the recording is produced, and the maker of a sound recording is the person who owns that record at the time when the recording is made.

260. Earlier in this report we discussed the question of what acts should be restricted by copyright in a record. Our recommendation is that the following acts should be restricted:—

(a) making a record embodying the recording

(b) causing the recording to be heard in public; and

(c) broadcasting the recording.

261. We recommend elsewhere (para. 413) that a person who causes a record to be heard in public by means of the reception of a broadcast should not be liable for infringement of copyright in the recording.

262. If our above recommendations are put into effect, copyright in a record will exist for fifty years from first publication and we think that provision should be made to require the indication on records of the year of their first publication. Accordingly we recommend the enactment of a provision to the effect of section 12 (6)

of the 1956 Act which, in effect, provides that an action for infringement of copyright in a record shall not lie if the owner of the copyright has issued it without causing the record or the record container to bear a label or mark indicating the year in which it was *first* published or unless he has taken all reasonable steps to that end.

263. Section 12 (7) of the 1956 Act provides as follows:—

(7) Where a sound recording is caused to be heard in public—

    (a) at any premises where *persons* reside or deep, as part of the amenities provided exclusively or mainly for residents or inmates therein, or

    *(b)* as part of the activities of, or for the benefit of, a club, society or other organization which is not established or conducted for profit and whose main objects are charitable or *are* otherwise concerned with the advancement of religion, education or social welfare,

the act of causing it to be so heard shall not constitute an infringement of the copyright in the recording:

Provided that this subsection shall not apply—

    (i) in the case of such premises as are mentioned in paragraph (a) of this subsection, if a special *charge* is made for admission to the part of the premises where the recording is to be heard; or

    (ii) in the case of such an organization as is mentioned in paragraph *(b)* of this subsection, if a charge is made for admission to the place where the recording is to be heard, and any of the proceeds of the charge are applied otherwise than for the purposes of the organization.

264. We recommend enacting a provision substantially in accordance with the above sub-section; however, in line with our recommendations made above (para. 69) regarding the performance of literary, dramatic and musical works in guest houses and hotels, we think that the words " or mainly" should be deleted from paragraph *(a)* and the words " or their guests" should be added after " therein".

## XVII. CINEMATOGRAPH FILMS.

265. Article 14 (2) of the Rome Convention provided for the protection of cinematography productions "if the author has given the work an original character". If this character were absent the article required that the cinematography film should enjoy protection as a photographic work.

266. In the Brussels Convention this article has been deleted but by Article 2 of that Convention " Cinematographic works and works produced by a process analagous to cinematography " are included in the term " literary and artistic works" and are entitled to protection accordingly. However, in the case of such works, it is provided in Article 7 (3) that " the term of protection shall be governed by the law of the country where the protection is claimed but shall not exceed the term fixed in the country of origin of the work".

267. The Universal Copyright Convention requires " adequate and effective protection of the rights of authors and other copyright proprietors " in certain works, including " cinematographic works".

268. Although, having regard to the provisions of the Brussels Convention, cinematography films could be included among the general provisions governing literary and artistic works, we think it is appropriate that a particular copyright in cinematography films should be created with its own special term of protection.

269. Section 13 (3) of the 1956 Act in effect protects the film until publication and thereafter until the end of fifty years from the end of the calendar year in which it is first published. " Publication " means the sale, letting on hire or offer for sale or hire of copies of the film to the public (section 13 (10)).

53

270. The Gregory Committee recommended a period of twenty-five years after registration or first public performance (paragraph 106). The Canadian Commission recommended a period of forty years from publication as defined in the 1956 Act. The New Zealand Committee recommended that the film copyright should continue until forty years from the end of the year in which the film was first published of registered: provided that in no case should it extend beyond forty-five years from the end of the year in which the film was made (para. 270).

271. No representations have been made to us in support of a shorter period than that prescribed by the 1956 Act and we would recommend the adoption of those provisions of that Act.

272. If our above recommendations are put into effect, copyright m a film will subsist as such independently of any copyright subsisting in its component features. When copyright expires in a film we do not think that the owner of copyright in the component features such as the script, background music and so forth should be in a position to prevent the reproduction or performance of that film. We therefore recommence the enactment of a provision to the effect of section 13 (7) of the 1956 Act, which provides as follows:—

> (7) Where by virtue of this section copyright has subsisted in a cinematography film, a person who, after that copyright has expired, causes the film to be seen, or to be seen and of heard, in public does not thereby infringe any copyright subsisting by virtue of Part I of this Act in any literary, dramatic, musical or artistic work.

273. We approve the principle of sub-section (4) of section 13 that the maker of the film should be the first owner of copyright.  However, in conformity with our other recommendations we are of the opinion that where a film is commissioned for valuable consideration the person who commissioned the film should in the absence of agreement to the contrary be the owner of copyright to the extent of his purpose in commissioning the film provided that his purpose is communicated to the maker before the film is made. We think a provision of this nature is particularly desirable in the case of films as we understand that in Britain there has been considerable confusion and doubt in particular cases as to who is the " maker" of a film.

274. The acts restricted by copyright in a film should be those set out in section 13 (5) of the 1956 Act, which are as follows:—

(a) making a copy of the film;
(b) causing the film, in so far as it consists of visual images, to be seen in public, or in so far as it consists of sounds, to be heard in public;
(c) broadcasting the film;
(d) causing the film to be transmitted to subscribers to a diffusion service.

275. In the case of a film that consists wholly or mainly of photographs which, at the time they were taken, were means of communicating news, we recommend that it should not be an infringement of copyright to cause the film to be seen or heard in public after the end of fifty years from the end of the calendar year in which the principal events depicted tn the film occurred (cf. section 13 (8) of the 1956 Act).

### Licences by APRA to Cinematography Exhibitors.

276. The Cinematography Exhibitors' Association has informed us that the hiring contracts which their members have with film distributors confer on the exhibitor a right of public performance in respect of copyright in all the component parts of the film with the exception of musical works included in the sound track of the film. The exhibitor is then compelled to obtain from the Australian Performing Right Association Limited (A. P. R. A.) a licence to perform publicly the musical works included in the film.

277, The Cinematography Exhibitors consider that the situation set out above is unjust and ask that the copyright law be amended *to* provided that every contract for the hire of pictures for public exhibition shall confer on the lessee the right of public performance of the film without the payment of separate or additional fees in respect of copyright. They state that in *the* United States the requirement of a separate payment for the performing right in musical works in the sound tracks of films was held to be contrary to the provisions of the anti-trust laws of that country.

278. We do not see how a provision of the nature suggested by the Cinematography Exhibitors' Association could be of any great material help to the members of that Association. If APRA did not collect a separate fee for the performing right in music, presumably it would be added on to the hiring charge. If the Association considers that the present fees it is required to pay to APRA are inequitable it can have recourse to the Copyright Tribunal, the creation of which we recommend later in this Report. The Association did not suggest to us that the fees it is at present paying are unjust.

## XVIII.  SOUND  AND  TELEVISION  BROADCASTS.

279. Section 14 of 1956 Act creates a new copyright in sound broadcasts and television broadcasts made by the British Broadcasting Corporation and the Independent Television Authority in Great Britain.

280. The copyright in sound and television broadcasts protects the broadcaster against the making of a sound recording of the broadcast and against the re-broadcasting of the same. In the case of the television broadcast, there is in addition a performing *right* which protects the copyright owner against display of the broadcast in public to a paying audience.

281. While it seems to us indisputable that broadcasting authorities are fairly entitled to be protected against conduct of the type covered by these provisions, a question does arise as to whether such protection properly finds its place in a Copyright Act.

282. The conception of copyright which has hitherto been accepted is one which extends protection against copying and performing in public any work insofar as it is reduced to a permanent form. Copyright has not been extended to confer such protection in relation to a mere spectacle or performance which is transitory in its very nature.  Indeed, despite strong representations by a number of bodies which sought such protection, the Gregory Committee did not recommend any such extension of the law.

283. If such protection is denied in the case of a mere spectacle, how logically can justification be found for protecting as copyright the oral account of the spectacle which is broadcast or the vision of the spectacle which by means of a television broadcast is made available to viewers?

284. It is true that in many cases the broadcast will be recorded on tape or film, in which case the record or film will enjoy its own copyright protection, but the copyright here being considered is one which attaches to the broadcast itself.

285. It is significant that neither the Brussels Convention nor the Universal Copyright Convention recognizes such a right.  Indeed, it has been the task of two other international bodies to consider the practicability of international action with respect to what are described as " rights called 'neighbouring on copyrights ' ". They

55

are the Committee of Experts on the International Protection of Performers, Recorders and Broadcasters and the International Labour Office. The rights which these international bodies have considered are those of performers, manufacturers of phonographic records and similar instruments and broadcasting organizations. A perusal of the documentation prepared by the International Labour Office relating to the proposed International Convention concerning the protection of these rights indicates how closely inter-related they are.

286. Having regard to these considerations, there is something to be said against the importation of this new conception into the realms of copyright. In the Commonwealth the further problem arises that such provisions may not be justified as an exercise by the Parliament of its power over the subject-matter of copyright, although in this respect the broadcasting power would also be relevant. However, there can be no doubt that broadcasting authorities are properly entitled to protection against the pirating of their broadcasts, whether by re-broadcasting or recording, and there seems to us, at least in the case of television, to be a case for protection against the display in public to a paying audience of the programme received. The latter problem is one which seems of no practical importance now in relation to sound broadcasts, but could be of moment in the case of television.

287. In the absence of express provisions giving a copyright in broadcasts, the broadcasting authority could obtain protection by recording or filming its broadcast and rely upon the copyright thus arising in the record or film. In most cases this would doubtless be done. However, the protection should not be dependent upon this course being followed.

288. The conclusion we reach, therefore, is that provision should be made, either in the copyright law or in some other appropriate legislation, for the protection of sound and television broadcasts against the kind of pirating envisaged by section 14 of the 1956 Act.

289. If it be decided that this protection can properly be included in the copyright law we think that, in substance, the provisions of section 14 should be adopted and the following comments are made on the assumption that this course is followed.

290. We recommend that copyright should subsist in every television or sound broadcast made by the Australian Broadcasting Commission or a person licensed under the *Broadcasting and Television Act* 1942-1956. The broadcaster should be the first owner of copyright and the period of protection should expire 50 years from the end of the calendar year in which the broadcast is made (cf. section 14 (2) of the 1956 Act). We further recommend the enactment of a provision to the effect of section 14 (3) of the 1956 Act, which is as follows :—

> (3) In so far as a television broadcast or sound broadcast is a repetition (whether the first or any subsequent repetition) of a television broadcast or sound broadcast previously made as mentioned in subsection (1) of this section (whether by the Corporation or by the Authority), and is made by broadcasting, material recorded on film, records or otherwise,
>
> > (a) copyright shall not subsist therein by virtue of this section if it is made after end of the period of fifty years from the end of the calendar year in which the previous broadcast was made; and
> >
> > (b) if it is made before the end of that period, any copyright subsisting therein by virtue of this section shall expire at the end of that period.

291. We approve of the " restricted acts " listed in section 14 (4) of the 1956 Act, which are as follows:-

> (a) in the case of a television broadcast in so far as it consists of visual images, making, otherwise than for private purposes, a cinematography film of it or a copy of such a film:

(b) in the case of a sound broadcast, or of a television broadcast in so far as it consists of sounds, making, otherwise than for private purposes, a sound recording of it or a record embodying such a recording;

(c) in the case of a television broadcast, causing it, in so far as it consists of visual images, to be seen in public, or, insofar as it consists of sounds, to be heard in public, if it is seen or heard by a paying audience;

(d) in the case either of a television broadcast or of a sound broadcast, re-broadcasting it.

292, The Gregory Committee recommended the enactment of a provision to the effect of (c) above.  The. Committee was largely influenced in making that recommendation by the unwillingness of the promoters of sporting events to permit the televising of those events because of a possible diminution of audience and financial loss.  It was thought that this provision would encourage sports promoters to come to agreement more readily regarding the conditions upon which sporting events can be televised as they would be aware that the broadcasting authorities could control the degree to which programmed could be shown to a paying audience. The Committee was also of the view that it was unfair that a person should be in a position to show television programmed to a paying audience when he contributes nothing to the cost of the programmed.

293. Both the Canadian Royal Commission and the New Zealand Committee reject the recommendation of the Gregory Committee in this respect. The former body did so on the ground that television was so widespread in Canada that the fear of using it for direct profit was illusory.  The New Zealand Committee concluded that a similar position would prevail in that country when television was introduced. Television, of course, has made rapid advances in Australia and we have no doubt that it will continue to do so.  The question whether persons will show television programmed for profit is one that only time can answer. We are, however, impressed by the reasons of the Gregory Committee and we adopt them, with respect, as our own.

294. In our opinion the phrase " for the private use of the person doing the act" is preferable to " for private purposes " in (u) and (b) of section 14 (4). A film or record of a broadcast should be deemed to be used otherwise than for the private use of the person doing the act if it is done for any of the following purposes as is provided in section 14 (7):—

(a) the sale or letting for hire of any copy of the film, or, as the case may be, of any record embodying the recording;

(b) broadcasting the film or recording;

(c) causing the film or recording to be seen or heard in public.

295. It seems to us, having regard to the provisions of section 14 (6), that under the 1956 Act a person may, without committing an infringement of the broadcasting copyright, take as many photographs of a television broadcast as he wishes provided no two photographs constitute " a sequence of images". We can see no good reason for limiting the protection to this extent and recommend that the taking of a photograph of any part of a television broadcast should be a restricted act if it is done otherwise than for the private use of the person taking the photograph,

296. It should be provided, as in section 14 (5), that the restrictions imposed in relation to copyright in broadcasts shall apply whether the act in question is done by the reception of the broadcast or by making use of any record, print, negative, tape or other article on which the broadcast has been recorded.

297. The question of what is a "paying audience" for purposes of the public performance of a television broadcast is dealt with in section 14(8) which is as follows:—

(8) For the purposes of paragraph (c) of sub-section (4) of this section, a television broadcast shall be taken to be seen or heard by a paying audience if it is seen or heard by persons who either—

(a) have been admitted for payment to the place where the broadcast is to be seen or heard, or have been admitted for payment to a place of which that place forms part, or

(b) have been admitted to the place where the broadcast is to be seen or heard in circumstances where goods or services are supplied there at prices which exceed the prices usually charged at that place and are partly attributable to the facilities afforded for seeing or hearing the broadcast:

Provided that for the purposes of paragraph (a) of this sub-section no account shall be taken—

(i) of persons admitted to that place in question as residents or inmates therein, or

(ii) of persons admitted to the place as members of a club or society, where the payment is only for membership of the club or society and the provision of facilities for seeing or hearing television broadcasts is only incidental to the main purposes of the club or society.

298. Paragraph (b) of the above provision is somewhat difficult to construe. As has been pointed out in *Copinger* (9th Edition, p. 299) it would seem that, under that provision, if enhanced prices are regularly charged because of television broadcasting facilities the place is not within the section. We are of the opinion, therefore, that the words " exceed the prices usually charged at that place and" should be omitted from a corresponding Australian provision. It would then be clear that a " paying audience " included an audience admitted to a place in which prices charged for goods and services are partly attributable to the provision of television.

299. In conformity with our general recommendations regarding performances in guest houses and hotels we think that in place of paragraph (i) of the proviso to section 14 (8) it should be provided that no account shall be taken of performances at any premises where persons reside or sleep, as part of the amenities provided exclusively for residents or inmates and their guests. Subject to the above alterations, we recommend the enactment of a provision to the effect of section 14 (8).

300. We further recommend the enactment of provisions to the effect of sub-sections (9) and (1 O) which are as follows:—

(9) The copyright in a television broadcast or sound broadcast is not infringed by anything done in relation to the broadcast for the purposes of a judicial proceeding.

(10) In this Act " television broadcast" means visual images broadcast by way of television, together with any sounds broadcast for reception along with those images, and " sound broadcast " means sounds broadcast otherwise than as part of a television broadcast; and for the purposes of this Act a television broadcast or sound broadcast shall be taken to be made by the body by whom, at the time when, and from the place from which, the visual images or sounds in question, or both. as the case may be, are broadcast.

## XIX. TYPOGRAPHICAL ARRANGEMENTS.

301. The 1956 Act, in section 15, creates copyright in the typographical arrangements of published editions of literary, dramatic and musical works if the first publication took place in the United Kingdom or the publisher was a qualified person at the date of first publication. The act restricted by the copyright is the making, by any photographic means or similar process, of a reproduction of the typographical arrangement of the edition. The purpose is to prevent a particular edition being exactly copied by a competitor.

58

302. We understand that it is now possible to make reprints of published works by photographic means and that it can be done relatively cheaply owing to the absence of type-setting. We are also given to understand that even before the enactment of section 15 of the 1956 Act it was not uncommon for one publisher to pay another a sum for permission to use a typographical arrangement. In our view, therefore, a copyright in typographical arrangements should be created and provisions along the lines of section 15 should be enacted.

## XX. INFRINGEMENT OF COPYRIGHT IN RECORDS, FILMS, ETC., BY IMPORTATION, SALE OR OTHER DEALINGS.

303. Section 16 (2) to (5) of the 1956 Act deals with the infringement of copyright in records, films, broadcasts and published editions by importation, sale or other dealings. These provisions are similar to section 5 which relates to infringement of copyright in original works.

304. In accordance with our recommendations made above regarding original works (para. 94) we consider the onus should be on the importer, seller or dealer to prove that he did not know that the article concerned was made or imported in infringement of copyright. Also, the words " by the importer" should be added after " made" in section 16 (2). Otherwise we recommend the enactment of provisions to the effect of section 16 (2) to (5).

## XXI. REMEDIES FOR INFRINGEMENT.

### *Action by Owner of Copyright for Infringement.*

*305.* Section 17 (1) of the 1956 Act provides, in effect, that infringement of copyright shall be actionable at the suit of the owner who shall be entitled to all such relief by way of damages, injunction, accounts or otherwise as is available in any corresponding proceedings in respect of infringements of other proprietary rights. However, in the case of an infringer who, at the time of the infringement was not aware or had no grounds for suspecting that copyright subsisted in the work or matter concerned, section 17 (2) provides that the plaintiff shall not be entitled to damages in respect of the infringement but shall be entitled to an account of profits, whether or not any other relief is granted under that section.

*306. These* provisions are similar in substance to our present law (sections 6 (1.) and 8 of the 1911 Act) except that the right of an account of profits against an innocent infringer is new.

*307.* As the Berne Convention prevents compulsory registration of copyright, there can be no comprehensive copyright register. Therefore, we agree that an innocent infringer should not be liable for damages; however, there is no reason why he should be permitted to gain a profit from his infringement.

*308.* Section 17 *(2)* protects a person from liability for damages only where he did not know that copyright subsisted in the work and had no grounds for suspecting that it subsisted. It does not protect a person who, say, obtained a licence from a person who is not the true owner of copyright even though he honestly believed that person to be the true owner of copyright. The New Zealand Committee recommended that an infringer should not, in those circumstances be liable for damages. That Committee pointed out that a person could know that a work was in copyright and could take every step possible to ensure that he obtained a licence from the proper person and yet, through no fault of his own, and despite searching inquiry, he could

be in error. We agree with the New Zealand Committee that a person in those circumstances should not be liable for damages. We recommend, therefore, the enactment of provisions to the effect of section 17 (1) and (2) subject to substituting in sub-section (2) the words " that it was an infringement of copyright" for " that copyright subsisted in the work".

309. Section 17 (3) enables a court, in an action for infringement. to grant exemplary damages where it thinks such a remedy is appropriate having regard to the flagrancy of the infringement and any benefit accruing to the infringer. We approve of a provision to this effect. It may be particularly useful in the case of the performing right where the event has occurred and the loss is difficult to assess in precise money terms.

310. In the case of an action for infringement of copyright in respect of the construction of a building, section 17 (4) of the 1956 Act provides that no injunction or other order shall be made (a) after the construction of the building has been begun so as to prevent it from being completed or *(b)* so as to require the building, insofar as it has been constructed, to be demolished.

.311. In our view, the question whether an injunction should be granted in any particular case should be one for the courts to decide. We can imagine circumstances. for example, which would justify the demolition of a building, the construction of which has just begun. Where the justice of granting a remedy depends so much on the facts of a particular case we think it is more appropriate that the matter should be left to the courts to apply ordinary equitable principles that have been evolved over the years.

312. We approve of a provision to the effect of section 17 (5), which provides that in the Part of the Act relating to remedies for infringement " action" includes a counterclaim and references to the plaintiff and to the defendant shall be construed accordingly.

### Rights in respect of Infringing Copies.

*313.* The recommendations made above concern the remedies of the copyright owner against an infringer in respect of the act of infringement. Both the 1911 Act and the 1956 Act also grant a remedy in conversion against persons who have infringing copies in their possession.

314. Section 18 (1) of the 1956 Act provides that the owner of any copyright shall be entitled to all such rights and remedies in respect of conversion or detention by any person of any infringing copy, or of any plate used or intended to be used for making infringing copies, as he would be entitled to if he were the owner of every such copy or plate and has been the owner thereof since the time when it was made. This provision is substantially to the same effect as section 7 of the 1911 Act; however, in the 1956 Act, it is qualified by section 18 (2) which is as follows:—

(2) A plaintiff shall not be entitled by virtue of this section to any damages or to any other pecuniary remedy (except costs) if it is proved or admitted that, at the time of the conversion or detention in question,—

(a) the defendant was not aware, and had no reasonable grounds for suspecting, that copyright subsisted in the work or other subject-matter to which the action relates, or

(b) where the articles converted or detained were infringing copies, the defendant believed, and had reasonable grounds for believing, that they were not infringing copies, or

(c) where the article converted or detained was a plate used or intended to be used for making any articles, the' defendant 'believed, and had reasonable grounds for believing, that the articles so made or intended to be made were not, or (as the case may be) would not be, infringing copies.

315. The exemption of a person who has no "guilty knowledge" from liability for damages for conversion is, we think, more consistent, than our present law, with our recommendations regarding actions for infringement and wc, therefore, recommend the enactment of provisions to the effect of section 18(1) and (2).

*316.* The New Zealand Committee in recommending the adoption of section 18 of the 1956 Act also recommended the enactment of provisions, not to be found in the 1956 Act, relating to infringing copies or plates held by a person who at the time he came into possession of them was not aware and had no reasonable grounds for supposing they 'were infringing copies or plates (paras. 346 and 347 of the New Zealand Report).

317. In this respect they adopted with one qualification the proposa!s made by the Canadian Commission at p. 131 of the Report of that Commission. Those proposals are expounded in the following extract from page 85 of the Canadian Report: —

> What we propose in this connexion in regard to infringing copies is that the copyright owner should have the option of taking the infringing copies off the person's hands at cost or of leaving them in his hands, to be disposed of by him, in which latter event the person would be obliged to account to the copyright owner for the profits. So long as the copyright owner exercises neither option the person should be free to dispose of the infringing copies, accounting for the profits (earned after he receives notice they are infringing copies). This option should be exercisable by the copyright owner not only at the beginning of or in an infringement action but before or in the absence of an action. A notice of exercise of the option at any time should result in the person being liable to deliver up the infringing copies forthwith being compensated for the cost or to account for profits thereafter as the case may be.
>
> In all cases a person whether innocent or otherwise should be liable to deliver up infringing plates on notice without compensation, or for damages if he retains them.

The New Zealand Committee's qualification was that the innocent infringer should account for profits earned before as well as after he has notice that his copies are infringing copies.

318. In this case, we do not feel we can make the same recommendation as the Canadian Commission or the New Zealand Committee. The existence of infringing copies is a potential threat to the interests of the copyright owner and, while we think in the circumstances provided for in section 18 (2) of the 1956 Act the defendant should not be liable for damages, the copyright owner should have an unqualified right to claim the surrender of infringing copies or plates.

319. " Infringing copy" is defined in section 18 (3) as follows:—

> (3) In this Part of this Act " infringing COPY"-
>> (a) in relation to a literary, dramatic, musical or artistic work, or to such a published edition as is mentioned in section fifteen of this Act, means a reproduction otherwise than in the form of a cinematography film,
>> (b) in relation to a sound recording, means a record embodying that recording,
>> (c) in relation to a cinematography film, means a copy of the film, and
>> (d) in relation to a television broadcast or a sound broadcast, means a copy of a cinematography film of it or a record embodying a sound recording of it,
>
> being (in any such case) an article the making of which constituted an infringement of the copyright in the work, edition, recording, film or broadcast, or, in the case of an imported article, would have constituted an infringement of that copyright if the article had been made in the place into which it was imported; and " plate " in eludes any stereotype, stone, block, mould, matrix, transfer, negative or other appliance.

320. Paragraph *(d)* of the above provision does not seem to include a film or record made of a broadcast unless that film or record is a copy of another film or record of the broadcast. We see no reason why a film or record made direct from a live broadcast should be excluded from the definition,   We, therefore, recommend the

enactment of a provision to the effect of section 18 (3) subject to the above alteration. The words " by the importer " should be added after " the article had been made" in the latter part of the provision.

### Period of Limitation.

321. We further recommend that there should, in Australia, be a uniform period of limitation for bringing actions for infringement and conversion and that it should be six years from the date on which the infringement occurred.

### Proceedings where Copyright is subject to an Exclusive Licence.

*322.* Under the 1911 Act, the question whether an exclusive licensee can sue in his own name is doubtful (see *Copinger,* p. 136 *et seq.).* *The* Gregory Committee recommended that the position should be clarified.  Section 19 of the 1956 Act largely conforms to the Committee's recommendations.  Genera.lly speaking, section 19 ensures that an exclusive licensee shall be entitled to sue for infringement or conversion and that a defendant shall be entitled to set up any de fence which he could have raised against the copyright owner.  Provision is also made for joining the copyright owner with the exclusive licensee in certain actions. We recommend the enactment of a provision to the same effect.

### Presumptions in Copyright Actions.

*323.* Under section 20 (1) of the 1956 Act, if the defendant does not put in issue the subsistence or ownership of copyright in a work, copyright is presumed to exist and the plaintiff is presumed to be the owner of the copyright. This provision is to the same effect as the relevant part of section 6 (3. ) of the 1911 Act.

324. Sub-sections (2), (3) and (4) of section 20 of the 1956 Act are as follows:—

(2) Subject to the preceding subsection,  where, in the case of a literary, dramatic, musical or artistic work, a name purporting to be that of the author appeared on copies of the work as published, or, in the case of an artistic work, appeared on the work when it was made, the person whose name so appeared (if it was his true name or a name by which he was commonly known) shall, in any action brought by virtue of this Part of this Act, be presumed, unless the contrary is proved,—

(a) to be the author of the work, and

(b) to have made the work in circumstances not falling within subsection (2), subsection (3) or subsection (4) of section four of this Act.

(3) In the case of a work alleged to be a work of joint authorship, the last preceding subsection shall apply in relation to each person alleged to be one of the authors of the work, as if references in that subsection to the author were references to one of the authors.

(4) Where, in an action brought by virtue of this Part of this Act with respect to a literary, dramatic, musical or artistic work, subsection (2) of this section does not apply, but it is established—

*(a)* that the work was first published in the United Kingdom, or in another country to which section two, or, as the case may be, section three, of this Act extends, and was so published within the period of fifty years ending with the beginning of the calendar year in which the action was brought, and

*(b)* that a name purporting to be that of the publisher appeared on copies of the work as first published,

then, unless the contrary is shown, copyright shall be presumed to subsist in the work and the person whose name so appeared shalt be presumed to have been the owner of that copyright at the time of the publication.

For the purposes of this subsection a fact shall be taken to be established if it is proved or admitted, or if it is presumed in pursuance of the following provisions of this section.

325. We have received a submission that the author, in the circumstances set out in sub-section (2), should have the benefit of the presumptions given to a publisher under sub-section (4). The chief difference between the presumption in these provisions is that, under sub-section (4), copyright is presumed to exist, while no such

presumption is provided for in sub-section (2).   However, the presumption of the existence of copyright seems to have little importance in sub-section (4) because if the matters set out in paragraph *(a)* are established, copyright clearly exists if the work is " original".

326. The other presumption in sub-section (4), namely, that of ownership of copyright at the time of publication, is one which the author, in substance, has by virtue of sub-section (2), because the presumption of authorship conferred by that provision must also mean that there is a presumption that he was the first owner of copyright. We, therefore, recommend that the submissions should not be adopted and that provisions to the effect of sub-sections (1) to (4) should be enacted.

327. Sub-sections (5), (6) and (7) of section 20 of the 1956 Act are as follows:—
  (5) Where in an action brought by virtue of this Part of this Act with respect to a literary, dramatic, musical or artistic work it is proved or admitted that the author of the work is dead,—

    (a) the work shall be presumed to be art original work unless the contrary is proved,

    (b) if it is alleged by the plaintiff that a publication specified in the allegation was the first publication of the work, and that it took place in a country and on a date so specified, that publication shall be presumed, unless the contrary is proved, to have been the first publication of the work, and to have taken place in that country and on that date.

  (6) Paragraphs *(a)* and *(b)* of the last preceding subsection shall apply where a work has been published, and—

    *(a)* the publication was anonymous, or was under a name alleged by the plaintiff to have been a pseudonym, and

    *(b)* it is not shown that the work has ever been published under the true name of the author, or under *a* name by which he was commonly known, or that it is possible for a person without previous knowledge of the facts to ascertain the identity of the author by reasonable inquiry,

as those paragraphs apply in a case where it is proved that the author is dead.

  (7) In any action brought by virtue of this Part of this Act with respect to copyright in a sound recording, if records embodying that recording or part thereof have been issued to the public, and at the time when those records were so issued they bore a label or other mark comprising any one or more of the following statements, that is to say,—

    *(a)* that a person named on the label or mark was the maker of the sound recording;

    *(b)* that the recording was first published in a year specified on the label or mark;

    *(c)* that the recording was first published in a country specified on the label. or mark,

that label or mark shall be sufficient evidence of the facts so stated except in so far as the contrary is proved.

328. We recommend the enactment of legislation to the effect of the above provisions; however, in sub-section (7) we think that it should be made clear that the benefit of the presumptions is given only when the information was on the label from the time that the records were first issued.   Under the United Kingdom provisions, it may be that a manufacturer could obtain the benefits of that provision if the information was put on the label merely for the purpose of bringing that particular action.

### *Penalties and Summary Proceedings.*

*329.* Section 21 of the 1956 Act provides that various dealings which infringe copyright shall constitute an offence.   This provision is similar in effect to section 14 of the *Copyright Act* 1912-1950 of the Commonwealth and section 11 of the 1911 Act.

330. Some of us doubt the wisdom of inserting criminal provisions in a copyright Act. We realize, however, that they may be desirable in the case of an offender who is a man of little means.   Also, it might be said that infringement of copyright

somewhat resembles stealing, which is, of course, the concern of the criminal law, In addition, as the provision has been in operation for many years we are not disposed to recommend its repeal, We recommend, therefore, the enactment of provisions to the effect of sub-sections (1) to (5) of section 21 which are as follows:—

21.—(1) Any person who, at a time when copyright subsists in a work,—
    *(a)* makes for sale or hire, or
    *(b)* sells or lets for hire, or by way of trade offers or exposes for sale or hire, or
    *(c)* byway of trade exhibits in public, or
    *(d)* imports into the United Kingdom, otherwise than for his private and domestic use,
any article which he knows to be an infringing copy of the work, shall be guilty of an offence under this subsection.

(2) Any person who, at a time when copyright subsists in a work, distributes, either—
    *(a)* for purposes of trade, or
    *(b)* for other purposes, but to such an extent as to affect prejudicially the owner of the copyright,
articles which he knows to be infringing copies of the work, shall be guilty of an offence under this subsection.

(3) Any person who, at a time when copyright subsists in a work, makes or has in his possession a plate, knowing that it is to be used for making infringing copies of the work, shall be guilty of an offence under this subsection.

(4) The preceding subsections shall apply in relation to copyright subsisting in any subject-matter by virtue of Part II of this Act, as they apply in relation to copyright subsisting by virtue of Part I of this Act.

(5) Any person who causes a literary, dramatic or musical work to be performed in public, knowing that copyright subsists in the work and that the performance constitutes an infringement of the copyright, shall be guilty of an offence under this subsection.

331. The maximum penalties imposed for offences tinder sub-sections (1) and (2) should, in our opinion, be five pounds for each article to which the offence relates, or, in cases other than a first offence under the section, two months' imprisonment. A fine imposed should not exceed two hundred pounds in respect of articles comprised in the same transaction. A person found guilty of an offence under sub-sections (3) or (5) should be liable to a fine not exceeding two hundred pounds or (in a case other than first conviction under the section) to imprisonment for a term not exceeding two months.

332. Under section 14 of the *Copyright Act 1912-1950, the* maximum monetary penalties are forty shillings for every copy dealt with in contravention of the section but not exceeding fifty pounds in respect of the same transaction. For second or subsequent offences the maximum penalty is a fine as above or two months' imprisonment. We recommend an increase in the monetary penalties having regard to the altered value of money since the Act was passed.

333. We also recommend the enactment of a provision to the effect of section 21 (9) of the 1956 Act which is as follows:—

(9) The court before which a person is charged with an offence under this section may, whether he is convicted of the offence or not, order that any article in his possession which appears to the court to be an infringing copy, or to be a plate used or intended to be used for making infringing copies, shall be destroyed or delivered up to the owner of the copyright in question or otherwise dealt with as the court may think fit.

This provision is the same as section 14 (3.) of the *Copyright Act* 1912-1950 of the Commonwealth.

*Detention by the Customs.*

*334.* Section 10 of the *Copyright Act 1912-1950* of the Commonwealth makes provision for the Customs to detain the importation of copies of a work in copyright if the owner of copyright gives notice to the Comptroller-General that he is desirous

that such copies should not be imported. Provision is also made, among other things, for the Comptroller-General to be indemnified by the informant for expenses and damages incurred in respect of the detention. A similar provision was contained in section 14 of the 1911 Act.

335. Under section 22 of the 1956 Act only printed copies of published literary, dramatic and musical works are liable to detention (section 22 (1) and (2)). We do not think that customs officers should be put into the position of having to determine whether a recording or an artistic work is an infringement of copyright and we, therefore, favour limiting the Australian provision to printed copies of literary, dramatic and musical works.

336. Another difference between our present law and the 1956 Act is that, under the former provision, a copyright owner may give notice requiring the Customs to seize works which are imported for personal use only, while the 1956 Act specifically excludes from the ambit of the provision works imported for private or domestic use (section 22 (3) ). The Comptroller-General of Customs has stated that the present Australian provision, in this respect, has caused considerable embarrassment and difficulties of administration to officers of his Department and that the provision in the 1956 Act is preferable. We agree with the views expressed by the Comptroller-General.

337. We recommend the enactment of a provision to the effect that the owner of copyright in any published literary, dramatic or musical work may give notice in writing to the Comptroller-General of Customs that he is the owner of copyright in the work and that he is desirous that copies of the work should not be imported into the Commonwealth for a period, not exceeding five years, specified in the notice. The period should not extend beyond the end of the period for which the copyright subsists.

338. Where a notice has been given and not withdrawn the importation of copies of the work (otherwise than for private and domestic use) should, subject to the recommendations we make below, be prohibited imports within the meaning of the Customs Act. It should be expressly provided that the copies which are deemed to be prohibited imports are printed copies made outside the Commonwealth which, if they had been made in the Commonwealth by the importer, would be infringing copies.

339. The Governor-General she,.&l be given power to make regulations regarding, among other things, the following matters:—

*(a) the* forms of notices;

*(b)* the times at which notices must be given;

(c) the giving of information and evidence to the Comptroller-General;

(d) the payment of fees and the giving of security to the Comptroller-General in respect of any liability or expense incurred as a result of the detention and

(e) indemnifying the Comptroller-General against any such liability and expense.

We deal later with the question of the disposal of forfeited good's (para. 426).

## XXII. TRIBUNAL.

In most countries over the last thirty years a development in the field of copyright protection has been the creation of organisations to control the exercise of copyright and in particular of performing rights. Such organisations either acquire copyrights from their members or act as agents on behalf of their members to enforce copyrights; they issue licences to persons owning places of public entertainment or desirous of giving public entertainments; and they appoint inspectors to see that unauthorised performances of works controlled by them do not take place and in the last resort they enforce the rights of their

65

members by legal action. From the point of view of composers of music and owners of musical copyright the system has great advantages, in that no individual composer or copyright owner can in practice secure adequate protection for his work or deal with the very large number of persons and bodies desirous of exploiting such works. On the other hand, the system has considerable advantages from the point of view of the public and those giving entertainments, in that licences can be obtained from a single organisation, whereas, without such a system, it would be necessary to obtain individual licences from a large number of owners of copyright, and the delay and inconvenience and the risk of performing music without having obtained a licence from the person entitled to give one would greatly add to the difficulty and expense of performing music in public on any substantial scale.

But the existence of such organisations has given rise to complaints of the abuse of monopoly rights, since virtually all popular music is now controlled by such societies. Moreover the creation of additional rights such as the performing right in gramophone records, and, more recently, the creation of broadcasting and television rights, has created the possibility that there should be a number of different organisations such that a licence will be required from each for a particular public performance. *(Copinger,* 9th Edition, p. 406.)

340. The Australasian Performing Right Association Limited (known as APRA), was created in 1926 as a company limited by guarantee and having no share capital. Its members, who are all composers, song lyric writers and musical publishers, assign to the Association their right of public performance in their works. The Association licenses public performances of the works in Australia and New Zealand, collects fees for the licences and if necessary takes action to restrain infringing performances. The Association does not hold performing rights in operas, musical plays or such like (the " *grand droit")* but it does control performances of individual items forming part of those works (the *"petit  druit").*

341. Similar societies exist in other countries, such as the Performing Right Society Limited (known as P.R.S.), in the United Kingdom, and the American Society of Composers, Authors and Publishers (known as ASCAP), in the United States. APRA is affiliated with these and other organizations and holds the performing right in Australia and New Zealand of the works of members of those organizations. As a result of these arrangements, APRA claims to own the performing right to over 80'% of all copyright music performed in Australia.

342. Another organization which operates in Australia is the Copyright Owners' Reproduction Society Limited (known as C.O.R.S.). The purpose of this organization is to promote and protect the interests of owners of the right to authorize the making of records, films and other contrivances embodying musical, literary or dramatic works. The Society is, therefore, concerned purely with the " mechanical right" Unlike APRA, it does not collect royalties or issue licences on behalf of its members and does not, itself, hold arty mechanical rights.  These rights are retained by its members.

343. Although APRA has proved useful both from the point of view of the copyright owners and the music users, the amount of music it controls is so large that it might fairly be described, we think, as having monopolistic control over the performance of copyright music in Australia.  Over a period of years, concern has been expressed in many quarters, particularly in the early days of the Association, regarding actual or potential abuse of this monopolistic power.

344. In 1932 the Commonwealth Government set up a Royal Commission and appointed Mr. Justice Owen of the Supreme Court of New South Wales to inquire into and report upon several matters concerning performing rights, including the rates, methods and conditions of payment to owners of copyright for the right to perform their works in public. The Commission reported that APRA was, to all intents and purposes, a super-monopoly controlling or claiming to control most of the music which users in public must use and was able to dictate its own terms.  His Honour.

therefore, recommended that the Minister should have power to refer disputes between APRA and organizations of music users for determination and arbitration to such persons as may be prescribed.

345. The Government of the day had doubts whether an enactment providing for compulsory arbitration of disputes between APRA and other bodies would be consistent with the Berne Convention.   Protests against the Commission's recommendations were received from performing rights societies throughout the world (including APRA), and from many eminent composers. As a result, provisions for compulsory arbitration were not inserted in the Commonwealth Act; however, the *Copyright Act 1912* was amended by inserting section 13A which provides for voluntary arbitration in disputes between copyright owners and music users.   This section gives the Governor-General power to appoint an arbitrator to settle a dispute, but only if the parties so desire.

346. On introducing the Bill to enact section 13A, the then Attorney-General (now Sir John Latham) stated that whether the provision would prove effective would depend on the co-operation of the parties, particularly APRA. He added that "if the parties do not avail themselves of that opportunity, the position will have to be , reconsidered " *(Hansard,* Vol. 143, p. 5839).   As far as we are aware no use has been made of that provision.

347. The activities of APRA again came under official notice when the Parliamentary Standing Committee on Broadcasting in 1943 recommended a system of compulsory arbitration in respect of disputes between APRA and the Australian Broadcasting Commission or the Federation of Commercial Broadcasting Stations. The Committee reported as follows:—

> The need for an organisation such as APRA and the value of its services are not questioned. Nevertheless, it is in the nature of a monopoly . . ,   Such being the case, it is the duty of the State to provide means of properly safeguarding the community from possible exploitation.

*348.* The Committee had no difficulty in the way of adopting the recommendation so far as the Convention was concerned, as Article 11 bis (2) of the Rome Convention explicitly provided that member countries could limit the right of authors to authorize the communication of their works by radio.   No legislation followed the Committee's recommendation in this respect.

*349.* We have been informed by the Australian Broadcasting Commission and the Federation of Commercial Broadcasting Stations that they have no existing dispute with APRA regarding the royalties payable by them to that Association. Both the Commercial Broadcasters and the Australian Broadcasting Commission have existing agreements with APRA.   The agreement between APRA and the A.B.C. so far as sound broadcasting is concerned was a result of arbitration without resort to section 13A.

*350.* At the Brussels Conference in 1948, Article 11 was amended and it was explicitly provided that an author of a dramatic or musical work should enjoy the exclusive right of authorizing public performances of his work. When the text of this article was adopted, the United Kingdom delegation made a declaration accepting the new provision on the basis that the United Kingdom Government remained free to enact such legislation as they might consider necessary in the public interest to prevent or deal with any abuse of the monopoly rights conferred upon owners of copyright by the law of the United Kingdom.   The delegation of Australia, together with that of New Zealand, South Africa, Switzerland, Canada, the Republic of Ireland, India, the Netherlands, Pakistan and Norway, associated themselves with the British declaration.

351. Relying on the above declaration, the Gregory Committee recommended the establishment of a standing tribunal to decide certain disputes between performing rights organizations and other authorities controlling performing rights on the one hand and would-be users of the works controlled on the other hand. This recommendation was put into effect by the enactment of sections 23 to 30 of the 1956 Act.

352. It might be mentioned, here, that Canada has had for many years a Board with the function, among other things, of annually reviewing the tariffs of licensing bodies.

353. All the parties who have appeared before us and who have made submissions in relation to this matter agree that some form of compulsory arbitration is desirable. Whatever the attitude of APRA may have been in the past, it now strongly supports the establishment of a permanent tribunal.   The Record Manufacturers have also urged us to recommend the creation of a permanent tribunal.   Other bodies such as those representing broadcasting interests and cinematography exhibitors have submitted that a more informal system of compulsory arbitration be adopted.   It has been suggested to us that the English provisions creating a permanent tribunal have caused undue delay and expense and that the establishment of a permanent tribunal might discourage parties from reaching a settlement by negotiation. On the other hand, APRA and the Association of Australian Record Manufacturers point out that if a tribunal is not created, arbitration in various disputes might be conducted by different arbitrators, who could differ in the principles they applied and, therefore, arbitration determinations would not provide the same continuity in the application of principles and the development of policy and practice that one would expect from a permanent tribunal.   It is said that once principles were enunciated by a permanent tribunal those principles could be expected to form the basis of negotiation in similar cases.

*354.* It was our impression that the bodies who opposed the establishment of a tribunal of the British type were not against the idea of a permanent arbitrator as such provided that formalities, expense and delay were reduced to a minimum. In our opinion, the advantages flowing from continuity of decisions and consistency in the application of principles are sufficiently great to warrant the creation of a permanent tribunal to deal with disputes relating to performing rights. Nevertheless, we regard it as important that the difficulties which, it has been suggested, have occurred under the United Kingdom provisions should, if possible, be avoided in Australia.

355. Section 23 of the 1956 Act provides for the creation of a tribunal, to be called the Performing Right Tribunal, and to consist of a chairman appointed by the Lord Chancellor and of not less than two nor more than four members appointed by the Board of Trade.   We have been told that some of the delay in the final determination of matters by the Performing Right Tribunal has been due to the difficult in fixing times for hearing that are convenient to all members of the Tribunal.   We are of the view, therefore, that unless the parties otherwise agree, only one person should sit on an Australian Tribunal to hear any matter.   A person appointed on the Tribunal should, we think, be a duly qualified legal practitioner of some years' standing or a person who holds or has held judicial office. We realize, however, that considerable delay might be caused by conflict between the statutory duties of a person appointed under the Act and his professional commitments. We recommend, therefore, that three persons with the above qualifications should be appointed members of the tribunal but that only one of the members should, unless the parties otherwise agree, sit on the tribunal at any one time. One member should be given the title of " President", who should have authority to decide which

member will sit in any particular matter. Owing to the fact that the decisions will be decisions of the tribunal and not merely personal decisions of the person hearing the matter we think there will be a tendency for members to consult with each other and to follow each other's decisions and, in this way, the advantage of a continuity of decisions will be preserved.

356. *Jurisdiction.*— The Gregory Committee recommended that the Tribunal should only deal with cases where conditions of monopoly or quasi-monopoly may obtain, for example, disputes with P.R.S. or in respect of rights owned by a limited number of companies, such as the performing right in records and broadcasts. It was of the view that fees charged by individual authors for performance of their work or refusal by them to grant a licence either at all or except on certain conditions should not be subject to revision by the Tribunal. With that view, we agree.

357. We therefore recommend that, so far as concerns licences for performing rights, the Tribunal should have jurisdiction to determine disputes between persons or organizations requiring licences and the following bodies (hereinafter referred to as " licensing bodies ") :—

> *(a)* organizations which have as one of their main objects the negotiation or granting of licences to perform or broadcast literary, dramatic or musical works;
>
> *(b) in* the case of licences to perform or broadcast a sound recording, the owner of copyright in the recording or any person or body authorized to grant or negotiate the granting of such licences; and
>
> (c) in the case of licences to perform publicly television broadcasts to a paying audience, the owner of copyright in the broadcast or any person or body authorized to grant or negotiate the granting of such licences.

358. In respect of *(a)* above, we recommend the same limitation as appears in the proviso to section 24(3) of the 1956 Act, namely, that it shall not extend to an organization by reason that its objects include the negotiation or granting of individual licences, each relating to a single work or the works of a single author, if they do not include the negotiation or granting of general licences, each extending to the works of several authors. The purpose of this is to exclude publishers and producers whose practice is to grant individual licences in respect of particular plays or musical works.

359. *Existing Licence Schemes.*-- Section 25 of the 1956 Act deals with applications to the Tribunal to vary existing licence schemes. A "licence scheme" is defined in section 24(4) to mean, in relation to licences of any description, a scheme made by one or more licensing bodies setting out the classes of cases in which they, or persons on whose behalf they act, are willing to grant licences of that description, and the charges (if any), and terms and conditions, subject to which licences would be granted in those classes of cases.

360. Section 25 of the Act provides as follows :—

> 25.—( 1) Where, at any time while a licence scheme is in operation, a dispute arises with respect to the scheme between the licensing body operating the scheme and—
>
> > (a) an organization claiming to be representative of persons requiring licences in cases of a class to which the scheme applies, or
> >
> > (b) any person claiming that he requires a licence in a case of a class to which the scheme applies,
>
> the organization or person in question may refer the scheme to the tribunal in so far as it relates to cases of that class.

(2) The parties to a reference under this section shall be-

    *(a)* the organization or person at whose instance the reference is made;

    (b) the licensing body operating the scheme to which the reference relates; and

    (c) such other organizations or persons (if any) as apply to the tribunal to be made parties to the reference and, in accordance with the next following subsection, are made parties thereto.

(3) where an organization (whether claiming to be representative of persons requiring licences or not) or a person (whether requiring a licence or not) applies to the tribunal to be made a party to a reference, and the tribunal is satisfied that the organization or person has a substantial interest in the matter in dispute, the tribunal may, if it thinks fit, make that organization or person a party to the reference.

(4) The tribunal shall not entertain a reference under this section by an organization unless the tribunal is satisfied that the organization is reasonably representative of the class of persons which it claims to represent.

(5) Subject to the last preceding subsection, the tribunal, or any reference under this section, shall consider the matter in dispute, and, after giving to the parties to the reference an opportunity of presenting their cases respectively, shall make such order, either confirming or varying the scheme. in so far as it relates to cases of the class to which the reference relates, as the tribunal may determine to be reasonable in the circumstances.

(6) An order of the tribunal under this section may, notwithstanding anything contained in the licence scheme to which it relates, be made so as to be in force either indefinitely or for such period as the tribunal may determine.

(7) Where a licence scheme has been referred to the tribunal under this section then, notwithstanding anything contained in the scheme,—

    (a) the scheme shall remain in operation until the tribunal has made an order in pursuance of the reference, and

    (b) after such an order has been made, the scheme shall remain in operation, in so far as it relates to the class of cases in respect of which the order was made, so long as the order remains in force:

Provided that this subsection shall not apply in relation to a reference as respects any period after the reference has been withdrawn, or has been discharged by virtue of subsection (4) of this section.

361. Section 25 makes it clear that the licensing body has no power to refer to the Tribunal for its approval an existing licensing scheme or any alterations it proposes to make to an existing licensing scheme. APRA has submitted to us that a licensing body should be able to refer a proposed tariff to the Tribunal if it is unable to obtain agreement. APRA points out that under the provisions of the 1956 Act, a licensing body, in the event of a failure of negotiations, has no alternative but to impose a scheme and in all hearings before the Tribunal under section 25 a licensing body is in the embarrassing position of being the defendant.

362. One member of the Committee, while appreciating the force of APRA's objection, feels there is much wisdom in the provisions to which it objects. His views are summarized in the next two paragraphs.

363. It should be the responsibility of APRA or any other licensing body representing copyright owners to formulate the terms upon which it is in the final analysis prepared to allow others to use copyright works rather than forego the revenue to be derived from such use. If it be permitted to take to the tribunal a scheme which other parties will not accept there is a danger that the licensing body may seek in the first instance terms more favorable to itself than those it would in fact be prepared to accept. In other words, knowing that in the event of rejection by the prospective users of the terms it first submits it can go to the tribunal, the licensing body may be encouraged to seek a decision from the Tribunal on those terms rather than disclose its minimum terms.

364. The law should be such as to encourage settlement of the terms by negotiation. The purpose of the tribunal should be to protect the users against the possibility that the terms imposed by the licensing body are unreasonable. The licensing body should, however, be left in the position in which it must formulate the terms it is prepared to accept rather than lose the prospective return.

365. On the whole, however, a majority of us are in favour of allowing a licensing body to initiate proceedings before the tribunal in respect of a scheme or a proposed scheme. To deny the right of originating proceedings to licensing bodies might result in their resorting to various methods to force music users to bring the matter before the tribunal. We consider that it is preferable to permit the licensing bodies to do directly what otherwise they might do indirectly. In our view, also, it is unfair for one party in matters such as these to be denied the benefit of originating proceedings enjoyed by the other party.

366. We recommend the enactment of a provision to the effect of section 25 of the 1956 Act. The words " or a licensing body" should be added after " organization or person" appearing after paragraph (b) of section 25 (1). The tribunal should also be empowered to make interim orders.

367. Section 26 of the 1956 Act deals with the reference of a scheme to the tribunal while an order in respect of that scheme remains in force. A scheme may not be referred again to the tribunal without special leave earlier than twelve months from when the order was made, or, in the case of an order made so as to be in force "for fifteen months, or less, three months before the date of expiry of the order. The persons or bodies who may refer a scheme again to the tribunal under section 26 are (a) the licensing body operating the scheme, (b) any organization claiming to be a representative of persons requiring licences in cases of the class to which the order applies, or (c) any person claiming that he requires a licence in a case of that class.

368. We recommend the enactment of provisions to the effect of section 26.

369. *Applications to the Tribunal by an Individual.*— The provisions dealt with above concern the authority of the tribunal to confirm or vary licence schemes put into operation by organizations under which licences are to be granted in certain cases. The second function of the tribunal under the 1956 Act is to deal with applications by an individual who claims that a licensing body refuses to grant a licence in accordance with a scheme or that there is no applicable licence scheme and the licensing body refuses to grant a licence either at all or on reasonable terms. The relevant provisions are contained in section 27 of the 1956 Act and we recommend the enactment of provisions to the same effect.

370. *Effect of Orders.*— Where the tribunal has made an order confirming or varying a scheme or declaring that a person is entitled to a licence, a person who comes within the terms of the scheme, as confirmed or varied, or the order, should not be liable for infringement if he conforms to the terms and conditions and charges that are laid down, but should be in like position as if he was the holder of a licence. In this respect we approve of the provisions of section 29(1), (2) and (3) of the 1956 Act.

371. *Television and Sound Recordings.*—We also recommend the enactment of provisions to the effect of section 29(4) and (5) which are as follows:—

(4) In the exercise of its jurisdiction in respect of licences relating to television broadcasts, the tribunal shall have regard (among other matters) to any conditions imposed by the promoters of any entertainment or other event which is to be comprised in the

71

broadcasts; and, in particular, the tribunal shell not hold a refusal or failure to grant a licence to be unreasonable if it could not have been granted consistently with those conditions:

Provided that nothing in this subsection shall require the tribunal to have regard to any such conditions in so far as they purport to regulate the charges to be imposed in respect of the grant of licences, or in so far as they relate to payments to be made to the promoters of any event in consideration of the grant of facilities for broadcasting.

(5) Where, on a reference to the tribunal under this Part of this Act,—

(a) the reference relates to licences in respect of copyright in sound recordings or in television broadcasts, and

(b) the tribunal is satisfied that any of the licences in question are required for the purposes of organizations such as are mentioned in paragraph (b) of subsection (7) of section twelve of this Act, the tribunal may, if it thinks tit, exercise its powers under this Part of this Act so as to reduce, in the case of those organizations, to such extent as the tribunal thinks fit, the charges which it determines generally to be reasonable in relation to cases of the class to which the reference relates, or, if it thinks fit, so as to exempt those organizations from the payment of any such charges.

The organizations referred to in section 12 (7)(b) of the 1956 Act are " a club, society or other organization which is not established or conducted for profit and whose main objects are charitable or are otherwise concerned with the advancement of religion, education or social welfare".

*372.* The object of sub-section (4) is to enable sport and entertainment promoters to impose conditions regarding the places and the conditions under which such broadcasts may be shown. These promoters might be willing to have the event televised only on those conditions.

373. Sub-section (5) meets the case of an organization that normally carries on its activities without charge being made for admission but which at times, in order to raise funds to further its objects. makes such a charge. It might be useful for it to have a general licence to cover such occasions, but having regard to the fact that its more normal activities are not such as to call for a general licence and that its objects are of a charitable nature, it has some claim to obtain such a licence on more liberal terms.

*374. Questions of Law.*— We recommend that the tribunal should be authorized to refer at the request of a party any question of law arising in the course of proceedings before the tribunal to the Court for decision, whether before or after the tribunal has given its decision in the proceeding, provided in the latter case it is referred within such time as is prescribed by the rules of the tribunal. We further recommend the enactment of provisions to the effect of sub-sections (2) to (5) of section 30 of the 1956 Act.

375. We deal later with what courts should be invested with jurisdiction in these matters (para. 486).

376. *Jurisdiction in relation to Foreign Broadcasts.*-- Section 28 of the 1956 Act contains elaborate provisions regarding the exercise of jurisdiction by the tribunal in relation to the diffusion of foreign broadcasts.  They seem to be mainly concerned with foreign broadcasts which cater primarily for British audiences such as Radio Luxemburg. As Australian conditions are very different, in this respect, from those in the United Kingdom we do not see any need for a similar provision in Australian legislation.

377. *Name of Tribunal.*— Under section 8(3) of the 1956 Act the Board of Trade is given the function of reviewing the rate of royalty to be paid in respect of gramophone records made pursuant to the compulsory licence provisions of section 8.

Elsewhere in this Report we recommend that this function of review be given *to* the tribunal. The title " Performing Right Tribunal" used in the 1956 Act would, therefore, be inappropriate in Australia and we recommend that the tribunal be called the " Copyright Tribunal".

378. *Administration and Rules of Copyright Tribunal.-* Provisions relating to appointment, resignation and absence of members of the Copyright Tribunal, the awarding of costs and so forth should be placed in the body of the Act and not, as is the case in the 1956 Act, in a Schedule. The Governor-General should be authorized to make rules as to the procedure regarding the making of ret'erences and applications to the Tribunal, including rules to make provision for the matters set out in paragraph 6(3) of the Fourth Schedule to the 1956 Act which provides as follows:—

(3) Any such rules may include provisions—

(a) for prescribing the period within which, after the tribunal has given its decision in any proceedings, a request may be made to the tribunal to refer a question of law to the court;

(b) for requiring notice of any intended application to the court under subsection (2) of section thirty of this Act to be given to the tribunal and to the other parties to the proceedings, and for limiting the time within which any such notice is to be given;

(c) for suspending, or authorizing or requiring the tribunal to suspend, the operation of orders of the tribunal, in cases where, after giving its decision, the tribunal refers a question of law to the court;

(d) for modifying, in relation to orders of the tribunal whose operation is suspended, the operation of any provisions of Part IV of this Act as to the effect of orders made thereunder;

(e) for the publication of notices, or the taking of any other steps, for securing that persons affected by the suspension of an order of the tribunal will be informed of its suspension;

(f) for regulating or prescribing any other matters incidental to or, consequential upon any request, application, order or decision under section thirty of this Act.

## XXIII. EXTENSION OR RESTRICTION OF OPERATION OF ACT.

### *The Territories,*

379. Under section 2A of the Copyright Act 1912-1950 of the Commonwealth, that Act extends to such Territories under the authority of the Commonwealth as the Governor-General, by Proclamation, declares and the extension of the Act to any Territory is subject to such modifications and additions relating exclusively to procedure, remedies and administration as the Governor-General specifies in the Proclamation declaring the extension.

380. By Proclamation dated 13th May, 1935, the Governor-General declared that the *Copyright Act 1912-1933* should on and from 1st April, 1935, extend *to* the Territories of Papua, New Guinea and Norfolk Island. That Proclamation was repealed by a Proclamation dated 12th September, 1941, under which the *Copyright Act 1912-1935* was extended to the Territories of Papua, New Guinea and Norfolk Island on and from 1st October, 1941. It seems that the purpose of the later Proclamation was to ensure the extension to the Territories named of the amendment made to the Copyright Act in 1935 which granted a remedy in case of groundless threats of legal proceedings.

381. Since the date of that Proclamation the Commonwealth has acquired a number of Territories such as Christmas Island, Cocos Island and Heard and McDonald Islands. It would seem that the Imperial Copyright Act, 1911 remains law in Christmas

Island and Cocos Island and that the Commonwealth Act operates in Heard and McDonald Islands by virtue of section 5 of the *Heard and McDonald Islands Act* 1953-1957.

382. We recommend that any new Copyright Act of the Commonwealth shall extend to all the Territories under the authority of the Commonwealth. This recommendation could be put into effect either by defining " Commonwealth " in the Act to include the Territories or by having a provision similar to section 2A of the *Copyright Act* 1912-1950.

### *Application of the Act to Other Countries.*

*383.* Australia, as a member of the Berne Union, is required to give copyright protection to works first published in a country of the Union and to give the same protection to the unpublished works of nationals of the countries of the Union as it gives to its own nationals. The Universal Copyright Convention, in addition, requires member countries to give the same protection to the published works of nationals of any Contracting State as it accords to works of its own nationals first published in its own territory. The Universal Copyright Convention goes beyond the conceptions contained in the Berne Convention and the 1911 Act in that protection extends to all works of Convention nationals irrespective of the country of first publication. Neither of the Conventions requires protection to be given in respect of copyright in sound recordings, broadcasts or typographical arrangements; however, we think it would be desirable to enable the Governor-General to apply, in the case of other countries which grant similar reciprocal rights, the provisions of the Australian Act dealing with those rights.

384. Accordingly, we recommend the enactment of a provision, similar to section 32 of the 1956 Act, subject to alterations appropriate to Australian circumstances. The Governor-General should be empowered by Proclamation to apply in the case of any country any of the provisions of the Act specified in the Proclamation so as to secure that those provisions—

*(a)* apply in relation to literary, dramatic, musical or artistic works, sound recordings, cinematography films or typographical arrangements of editions first published in that country as they apply in relation to literary, dramatic, musical or artistic works, sound recordings, cinematography films *or* editions first published in the Commonwealth;

(b) apply in relation to persons who, at a material time, are citizens or subjects of that country as they apply in *relation to* persons who, at such. a time, are British subjects;

(c) apply in relation to persons who, at a material time, are domiciled or resident in that country as they apply in relation to persons who, at such a time, are domiciled or resident in the Commonwealth;

(d) apply in relation to bodies incorporated under the laws of that country as they apply in relation to bodies incorporated under the laws of any part of the Commonwealth;

(e) apply in relation to television broadcasts and sound broadcasts made from places in that country, by one or more organizations constituted in or under the laws of that country, as they apply in relation to television broadcasts and sound broadcasts made from places in the Commonwealth by the Australian Broadcasting Commission or a person licensed under the *Broadcasting and Television Act* 1942-1956.

385. It should be provided that the Proclamation may apply the provisions concerned subject to exceptions or modifications and apply them either generally or in relation to such classes of works as may be specified in the Proclamation.

*386.* It should be provided that the Governor-General shall not make a Proclamation applying any of the provisions of the Act in the case of another country, other than a country which is a party to a Convention relating to copyright to which Australia is a party, unless the Governor-General is satisfied that, in respect of the class of works or subject-matter to which those provisions relate, provision has been or will be made under the laws of that country whereby adequate protection will be given to owners of copyright under the Australian Act (cf. section 32 (3) of the 1956 Act).

### International Organizations.

*387.* Protocol 2 annexed to the Universal Copyright Convention provides that protection shall be given to works published for the first time by the United Nations, by Specialized Agencies in relationship therewith or by the Organization of American States. Section 33 of the 1956 Act enables Her Majesty to apply the provisions of the Act to works published by international organizations. We recommend the enactment of a provision to the same effect with alterations appropriate to Australian circumstances.

### Countries not Giving Adequate Protection to Australian Works.

*388.* We think that a provision similar to section 35 of the 1956 Act should be enacted to enable the Governor-General by Proclamation to deny or qualify copyright protection to citizens of countries that do not give adequate protection to Australian works.

## XXIV. ASSIGNMENTS, LICENCES AND TESTAMENTARY DISPOSITIONS.

### Assignments and Licences.

389. It should be provided, as in section 36 (1) of the 1956 Act, that copyright shall be transmissible by assignment, testamentary disposition or by operation of law, as personal or moveable property. We also approve the principle in section 36 (3) that assignments should be effective only if they are in writing signed by or on behalf of the assignor.

*390.* Section 36 (2) of the 1956 Act provides as follows:—

> (2) An assignment of copyright may be limited in any of the following ways, or in any combination of two or more of those ways, that is to say,—
>
> (a) so as to apply to one or more, but not all, of the classes of acts which by virtue of this Act the owner of the copyright has the exclusive right to do (including any one or more classes of acts not separately designated in this Act as being restricted by the copyright, but failing within any of the classes of acts so designated);
>
> (b) so as to apply to any one or more, but not all, of the countries in relation to which the owner of the copyright has by virtue of this Act that exclusive right;
>
> (c) so as to apply to part, but not the whole, of the period for which the copyright is to subsist;
>
> and references in this Act to a partial assignment are references to an assignment so limited.

The provisions for assignment in the 1911 Act are set out in section 5 (2.) and (3.). We recommend the enactment of a provision to the effect of section 36 (2) of the 1956 Act.

391. Section 36 (4) of the 1956 Act is as follows:—

(4) A licence granted in respect of any copyright by the person who, in relation to the matters to which the licence relates, is the owner of the copyright shall be binding upon every successor in title to his interest in the copyright, except a purchaser in good faith for valuable consideration and without notice (actual or constructive) of the licence or a person deriving title from such a purchaser; and references in this Act, in relation to any copyright, to the doing of anything with, or (as the case may be) without, the licence of the owner of the copyright shall be construed accordingly.

392. Under the 1911 Act the position regarding exclusive licences is doubtful. Section 36 (4) of the 1956 Act enables a purchaser in good faith and without notice (and even a person who takes from him with notice) to defeat the claims of a prior licensee.   We cart see no good reason for this exception. 'Whatever the position regarding other forms of property, we think that a licence and an assignment of copyright are interests of a similar order and that the first in rime ought to prevail. The Canadian Royal Commission took a similar view (p. 115). We recommend, therefore, the enactment of a provision similar to section 36 (4) with the omission of the words " except a purchaser in good faith for valuable consideration and without notice (actual or constructive) of the licence or a person deriving title from such a purchaser".

393. Under the proviso to section 5 (2.) of the 1911 Act, an assignment of copyright made by the author, otherwise than by will, cannot have effect for a longer term than the life of the author and twenty-five years. A similar provision does not appear in the 1956 Act. The provision appears to have been designed to protect the family of the author and ensure to them a portion of the benefit of a work which may not have received recognition until after the death of the author.

394. The New Zealand Committee recommended the retention of a similar provision in the Act of that country.   (We mention, however, that under the period of protection recommended by that Committee the benefit given to an author's family by the provision will in most cases be considerably less than is the case at present. ) The Committee's reasons were as follows (para. 80) :—

We consider that the retention of the proviso to section 8 (2) [i.e. the New Zealand equivalent to section 5 (2.) of the 1911 Act] may well be of value to the successors of a deceased author, particularly in cases where after the author's death his works become popular. We have no evidence of this but we feel that the proviso can do no harm.

395. It is somewhat doubtful whether provisions of the nature of the proviso to section 5 (2) are consistent with the Brussels Convention. We do not think that that provision has been of great benefit to authors' families and would not recommend that Australia refuse to ratify the Brussels Convention in order to retain the provision. As has been pointed out in *Copinger (9th* edition, p. 134) the benefits given in this connexion are somewhat illusory. Although the reversionary interest in the copyright is unassignable during the author's lifetime, it is assignable by his personal representative upon his death. It is also liable to be sold by his representative for the payment of debts and it may even be the duty of the representative to realize the interest for the purpose of winding up the estate.   If a legatee wished to sell the interest immediately after the author's death, rather than wait twenty-five years for a chance of income, the only possible purchaser will usually be the author's publisher and the amount he will be prepared to pay is not likely to be large particularly in view of the fact that the value of the interest depends on the popularity of the work twenty-five years hence.

396. Although, as the New Zealand Committee stated, the presence of the provision can do no harm, we do not think that that is sufficient reason for retaining it, particularly as it may be inconsistent with the Brussels Convention.

73

*Prospective Ownership of Copyright.*

397. Section 37 of the 1956 Act creates a new method of assigning rights before they come into existence. This provision appears to convert what would otherwise be an equitable right into a legal right. We recommend the enactment of a provision to the effect of sub-sections (1), (2), (3) and (5) of section 37. Sub-section (4) refers to the Fifth Schedule which is concerned with the creation of a body to represent both the B.B.C. and the Independent Television Authority of the United Kingdom. A provision of that nature is not relevant to Australian circumstances.

*Testamentary Disposition of Unpublished Manuscripts.*

398. Section 17 (2) of the 1911 Act provides that the ownership of an author's manuscript after his death, where such ownership has been acquired under a testamentary disposition made by the author and the manuscript is of a work which has not been published or performed or delivered in public, shall be prima facie proof of the copyright being with the owner of the manuscript. It should be noted that the provision applies only where the manuscript is derived directly from the author.

399. Section 38 of the 1956 Act provides that where a person is entitled under a bequest to the manuscript of a literary, dramatic, musical or artistic work and the work was not published before the death of the testator, the bequest shall, unless the contrary intention is indicated, be construed as including any copyright the testator held in the work immediately before his death.

400. As *Copinger* states (9th Edition, p. 18), this section goes considerably beyond the provision in the 1911 Act in that it provides a rule of construction and not of evidence. We agree with the Gregory Committee that, generally speaking, it is the intention of a testator that his interest of copyright in a manuscript should pass with the manuscript itself and the fact that this is not expressly indicated is usually due to inadvertence. We, therefore, recommend the enactment of a provision to the effect of section 38 of the 1956 Act.


## XXV. THE CROWN.

401. The 1911 Act does not appear to bind the Crown and, therefore, the Crown is not, in Australia, liable for infringement. Section 18 of that Act provides for copyright to vest in the Crown in respect of works prepared or published by or under the direction of the Crown. The term of protection under that provision is fifty years from first publication.

402. Section 39 of the 1956 Act in effect provides that copyright in works, cinematography films or sound recordings made by or under the direction of the Crown shall, subject to agreement to the contrary, subsist in the Crown. The Crown is entitled to copyright in those circumstances even though, apart from that section, copyright would not subsist in the work. The effect of this provision is that the Crown has copyright in works and articles made under its direction or control without regard to the nationality or residence of the " author" or the place of first publication. In the case of a literary, dramatic and musical work, Crown copyright subsists until the work is published and, thereafter, until the end of fifty years from the end of the calendar year in which it is first published. Crown copyright *in* the case of artistic works, other than engravings and photographs, continues to subsist until the end of fifty years from the end of the calendar year in which the work was made and, in the case of an engraving or a photograph, copyright continues until the end of fifty years from the end of the calendar year in which it is first published.

403. We recommend the enactment of a provision similar to section 39 of the 1956 Act which should be applicable to the Crown in the right of the Commonwealth and the States.

404. The Gregory Committee recommended that the Crown should be empowered to reproduce copyright material in connexion with the equipment of the Armed Forces and possibly also for civil defence and essential communications, subject to compensation (para. 75). This recommendation has, to a large extent, been put into effect by the provisions of the Defence Contracts Act, 1958. The Solicitor-General of the Commonwealth has expressed the view that the Commonwealth and the States should be empowered to use copyright material for any purposes of the Crown, subject to the payment of just terms to be fixed, in the absence of agreement, by the Court. A majority of us agree with that view. The occasions on which the Crown may need to use copyright material are varied and many. Most of us think that it is not possible to list those matters which might be said to be more vital to the public interest than others. At the same time, the rights of the author should be protected by provisions for the payment of just compensation to be fixed in the last resort by the Court. Our recommendation in this regard is, of course, confined to the Crown in the strict legal sense of that term and is not intended to cover statutory corporations, such as the Australian Broadcasting Commission and the Australian National Airlines Commission, which are not entitled to the privileges and immunities of the Crown.

405. We note that the Commonwealth and the States have a right to use inventions, subject to the payment of compensation, under section 125 of the *Patents Act* 1952-1955. We recommend the enactment of a provision on similar lines in respect of Crown use of copyright material.

406. Two of us are of the view that the Crown's right to use copyright material without the consent of the copyright owner should be confined to use for defence purposes only. Their views may be summarized as follows :—

    (a) The Gregory Committee considered that the right in question should be exercisable only in connexion with the equipment for the armed forces and perhaps for purposes of civil defence and communications. That Committee specifically stated that the whole field of copyright was so wide that they did not consider it reasonable that the power should extend any further. No convincing reasons have been given for going further than the Gregory Committee was prepared to go. The United Kingdom Parliament did not see fit to reverse the recommendation of the Committee in this regard.

    (b) The country with which Australia has the most important copyright dealings is the United Kingdom and, if that country restricts the right of the Crown to the compulsory use of Australian copyright material for defence purposes only, it seems unreasonable that the Crown in the right of the Commonwealth or the States should be given power to obtain a compulsory licence to use the material of United Kingdom copyright owners for all purposes.

    (c) Even if provision is made for effective compensation the copyright owner might be put to great difficulty and no little expense in establishing before a court what compensation should be paid in any particular case.

    (d) This does not appear to be a matter in which the Committee's general policy of adhering to the principles contained in the 1956 Act should be departed from.

## XXVI. DIFFUSION SERVICES AND BROADCASTS OF RECORDINGS AND FILMS.

407. Under the 1956 Act, and our recommendations, broadcasting a work and performing a work in public are two separate " restricted acts ". We later recommend, in conformity with section 48 (5) of the 1956 Act, that the act of broadcasting should not itself constitute performance in public, but a work or subject-matter should be deemed to be caused to be seen or heard by the operation of a receiving set. Therefore, a person who makes an unauthorized broadcast commits an infringement by reason of broadcasting while a person who allows that broadcast to be seen or heard in public by means of his receiving set without the consent of the copyright owner commits an infringement by reason of the public performance.

408. If our previous recommendations were put into effect without qualification, a person who operated a television set in public (say, in a restaurant) would be required to obtain licences from and pay royalties to the copyright owners of *(a)* original works, (b) sound recordings and (C) films, insofar as any of them were heard by or shown to the public by means of the television set. In addition a royalty might be demanded by the television authorities if the programme were shown to a " paying audience".

409. The harshness of this position is, in the 1956 Act, mitigated by section 40 which provides as follows: —

40.—(1 ) Where a sound broadcast or television broadcast is made by the Corporation or the Authority, and a Person, by the reception of that broadcast, causes a sound recording to be heard in public, he does not thereby infringe the copyright (if any) in that recording under section twelve of this Act.

(2) Where a television broadcast or sound broadcast is made by the Corporation or the Authority, and the broadcast is an authorized broadcast, any person who, by the reception of the broadcast, causes a cinematography film to be seen or heard in public shall be in the like position, in any proceedings for infringement of the copyright (if any) in the film under section thirteen of this Act, as if he had been the holder of a licence granted by the owner of that copyright to cause the film to be seen or heard in public by the reception of the broadcast.

(3) Where a television broadcast or sound broadcast by the Corporation or the Authority, and the broadcast is an authorized broadcast, any person who, by the reception of the broadcast, causes a programme to be transmitted to subscribers to a diffusion service, being a programme comprising a literary, dramatic or musical work, or an adaptation of such a work, or an artistic work, or a cinematography film, shall be in the like position, in any proceedings for infringement of the copyright (if any) in the work or film, as if he had been the holder of a licence granted by the owner of that copyright to include the work, adaptation or film in any programme caused to be transmitted by him to subscribers to that service by the reception of the broadcast.

(4) If, in the circumstances mentioned in either of the last two preceding subsections, the person causing the cinematography film to be seen or heard, or the programme to be transmitted, as the case may be, infringed the copyright in question, by reason that the broadcast was not an authorized broadcast,—

(a) no proceedings shall be brought against that person under this Act in respect of his infringement of that copyright, but

(b) it shall be taken into account in assessing damages in any proceedings against the Corporation or the Authority,  as the case may be, in respect of that copyright in so far as that copyright was infringed by them in making the broadcast.

(5) For the purposes of this section, a broadcast shall be taken, in relation to a work or cinematography film, to be an authorized broadcast if, but only if, it is made by, or with the licence of, the owner of the copyright in the work or film.

410. The effect of this section is that a person who causes works, films or records to be seen or heard in public by means of the operation of a receiving set is liable to obtain a " performing right " licence only from the copyright owners of the

79

original literary, dramatic, musical or artistic works performed. If the broadcasts are shown to a " paying audience" the broadcasting authorities, under section 14, also have a right of control and may prevent the performance or require the payment of a royalty.

411. Copyright in films and records are treated differently. It is not an infringement of copyright in a record to cause it to be heard in public by means of the reception of a broadcast whether or not the broadcasting of that record was authorized; on the other hand the causing of a film to be seen in public by means of the reception of a television broadcast does constitute an infringement of copyright in the film if the broadcasting of it was not authorized.  However, in the latter case, no proceedings may be brought against the operator of the receiving set by the owner of copyright in the film, but it is taken into account in assessing damages against the broadcaster. This different treatment of records and films seems to be required by the Brussels Convention which provides for protection for cinematography films but not for sound recordings.

412. Sub-sections (3) and (4) of section 40 prevent any proceedings being brought against the operator of a diffusion service by the owner of copyright in a work or film. The act of diffusion does not constitute an infringement if the broadcasting} of the work or film was authorized. If the broadcasting was unauthorized no proceedings can be brought against the operator of the diffusion service but it is taken into account in assessing damages against the broadcaster.  The operator of the diffusion service is in a more favorable position than the operator of a receiving set in that proceedings cannot be brought against him by the copyright owner of the original works being broadcasts. The policy behind this would appear to be that the diffusion service is a normal extension of a broadcast and a person who authorizes the broadcasting of his work should be taken to have authorized its diffusion to those areas which, although they cannot be reached directly by the ordinary broadcasts, are served by a diffusion service.

413. We think that the provisions of section 40 are desirable and recommend the enactment of provisions to the same effect. The phrase " the Australian Broadcasting Commission or a person licensed to broadcast under the *Broadcasting and Television Act 1942-1956"* should be substituted for " the Corporation or the Authority" (wherever appearing).


## XXVII.  USE OF COPYRIGHT MATERIAL FOR EDUCATION.

414. Sub-sections (1) to (5) of section 41 of the 1956 Act provide as follows :—

(1) Where copyright subsists in a literary, dramatic, musical or artistic work, the copyright shall not be taken to be infringed by reason only that the work is reproduced, or an adaptation of the work is made or reproduced,—

    (a) in the course of instructions, whether at a school or elsewhere, where the reproduction or adaptation is made by a teacher or pupil otherwise than by the use of a duplicating process, or

    (b) as part of the questions to be answered in an examination, or in an answer to such a question.

(2) Nothing in the preceding subsection shall apply to the publication of a work or of an adaptation of a work; and, for the purposes of section five of this Act, the fact that to a person's knowledge the making of an article would have constituted an infringement of copyright but for the preceding subsection shall have the like effect as if, to his knowledge, the making of it had constituted such an infringement.

(3) For the avoidance of doubt it is hereby declared that, where a literary, dramatic or musical work—

    (a) is performed in class, or otherwise in the presence of an audience, and

    (b) is so performed in the course of the activities of a school, by a person who is a teacher in, or a pupil in attendance at, the school,

the performance shall not be taken for the purposes of this Act to be a performance in public if the audience is limited to persons who are teachers in, or pupils in attendance at, the school, or are otherwise directly connected with the activities of the school.

(4) For the purposes of the last preceding subsection a person shall not be taken to be directly connected with the activities of a school by reason only that he is a parent or guardian of a pupil in attendance at the school.

(5) The two last preceding subsections shall apply in relation to sound recordings, cinematography films and television broadcasts as they apply in relation to literary, dramatic and musical works, as if any reference to performance were a reference to the act of causing the sounds or visual images in question to be heard or seen.

415. We agree with the general principle involved in these provisions but have our doubts whether it is necessary or desirable for a Copyright Act to go into so much detail regarding what is essentially " fair dealing". On the whole, however, we think that this is a matter where considerations of uniformity ought to prevail. Also, we think that unintended significance might be attached to the omission of such a provision from an Australian Act which is otherwise based largely on the United Kingdom Act.

416. We, therefore, recommend the enactment of provisions to the effect of sub-sections (1) to (5) of the 1956 Act. We think that sub-section (6) is overcautious and unnecessary.

417. The Australian Broadcasting Commission has submitted to us that schools should be permitted, without infringing copyright, to make records of school broadcasts. The Commission points out that school time tables do not always accord with hours of broadcasting. We have been told that it is common practice for schools to make recordings of school broadcasts on tape which are played at times suitable to the classes. In England, where this practice also prevails, it has been suggested that the recordings are made in breach of copyright.

*418.* We recommend that the recording of school broadcasts of the Australian Broadcasting Commission should not constitute a breach of any copyright in the works broadcast if the recording is made by the school authorities and is not used outside the school.

419. For the purpose of these recommendations we think that the word " school" should extend to all educational institutions not conducted for profit. We *note that* the words " educational institution" are used in a provision of the Copyright Act of India similar to section 41 (section 52 (1) (i)).

## XXVIII. FALSE ATTRIBUTION OF AUTHORSHIP.

420. Article 6 bis (1) of the Brussels Convention provides that, independently of the author's copyright, and even after the transfer of that copyright, the author shall have the right, during his lifetime, to claim authorship of the work and to object to any distortion, mutilation or other alteration thereof, or any other action in relation to the said work which would be prejudicial to his honour or reputation. Paragraph (2) of that article goes on to provide that the rights granted to the author by the article shall be maintained after his death and until the expiry of the copyright insofar as the legislation of the countries in the Union permits.

421. The questions of false attribution of authorship and mutilation of works are not, strictly speaking, matters of copyright; however, legislation dealing with these matters is required by the Brussels Convention.

422. Section 43 of the 1956 Act grants a person a civil remedy *in* cases where authorship of a work is falsely attributed to him. In respect of an artistic work a civil remedy is provided in cases of wrongful alteration of the work.

423. One of us strongly disapproves of the inclusion in an Australian Copyright Act of a provision to the effect of section 43. His reasons are as follows:—

> (a) The subject has no connexion with copyright. Section 43 confers no rights on the owner of copyright as such. The provision applies to authors of works which are not the subject of copyright as well as the authors of works which are. The acts prohibited bear no relation to infringement of copyright; they do not involve the reproduction of an author's work in any way. Indeed, except in the case of alteration of an artistic work, it is the essence of the offence that the person aggrieved is not the author, whereas the law of copyright is primarily concerned with the rights of the author and his assignees.
>
> *(b)* The acts prohibited may be prevented or published in many cases by the law relating to defamation, trade libel and so forth.

424. The rest of US, while agreeing that the provisions of section 43 do not come within the strict ambit of " copyright", are of the view that they are desirable particularly in view of the provisions of Article 6 bis of the Brussels Convention. That Convention is primarily concerned with copyright and we, therefore, think that the inclusion of a provision of the nature of section 43 in a Copyright Act would not be inappropriate. We also doubt whether common law remedies would in all cases be sufficient to deal with the type of wrongs covered by section 43. The following comments are of those of us who support the enactment of a provision similar to section 43.

425. Sub-section (5) gives the author or his personal representative the right to bring an action under the section at any time before the expiration of twenty years from the death of the author. Article 6 bis of the Convention only *requires* that right to be granted for the period of the author's life. If a provision of this nature is not authorized by\ the copyright power, the Commonwealth may have to rely on the external affairs power. In those circumstances, we are of the view that an Australian provision would need to be limited to the life of the author. We would have preferred, however, that the right continue until the termination of copyright in the work if copyright subsists therein. However, in view of our doubts regarding the extent of Commonwealth power we recommend the enactment of a provision to the effect of section 43 with the alteration of sub-section (5) to provide that the right shall continue only until the death of the author.

## XXIX. FORFEITED WORKS.

426. Sub-section (3) of section 46 of the 1956 Act provides that "nothing in this Act shall affect the right of the Crown or of any person deriving title from the Crown to sell, use or otherwise deal with articles forfeited under the laws relating to customs or excise, including any article so forfeited by virtue of this Act or any enactment repealed by this Act".

427. We do not think that a similar provision should be inserted in Australian legislation. The Crown should not, in our opinion, have the power to sell forfeited works that are in copyright without the consent of the copyright owner. Rights of

82

ownership in objects being seized are quite different and separate from the ownership of any copyright therein and we do not see why the copyright owner should suffer loss because of the actions of someone else.  If the action which gave rise to the forfeiture was committed by the copyright owner, himself, we think it not unjust that the Crown should be authorized to dispose of the article as it pleases.

## XXX. INDUSTRIAL DESIGNS.

428. Section 22 of the 1911 Act provides as follows :—

22.—( 1.) This Act shall not apply to designs capable of being registered under the *Patents and Designs Act, 1907,* except designs which, though capable of being so registered, are not used or intended to be used as models or patterns to be multiplied by any industrial process.

(2.) General rules under section eighty-six of the *Patents and Designs Act, 1907* may be made for determining the conditions under which a design shall be deemed to be used for such purposes as aforesaid.

By virtue of section 9 of the *Copyright Act* 1912-1950 of the Commonwealth references to provisions of the *Patents and Designs Act,* 1907 are to be read as references to the corresponding provisions of the *Designs Act* 1906 of the Commonwealth.

*429.* The Designs Act provides for the protection of designs " applicable, in any way or by any means, to the purpose of the ornamentation, or pattern, or shape, or configuration, of an article, or to any two or more of those purposes". In order to qualify for registration a design must be " new or original". Without further provision many designs applied for would come within the scope of both the Designs Act and, as artistic works, the Copyright Act.

*430.* Protection under the Designs Act requires registration and the term of protection is considerably shorter than that for artistic works under the Copyright Act. The period of protection under the Designs Act is five years from registration with possible extensions for two further periods of five years upon payment of a fee. The protection under the Designs Act is, to some extent, broader than that given under the Copyright Act. The former Act prevents the use of a design similar to a registered design whether or not it was copied from the registered design. The Copyright Act is, for present purposes, concerned only with copying.

431. Section 22 of the 1911 Act was, therefore, inserted to provide a borderline between works protected under the Designs Act and those protected by the Copyright Act.

432. The difficulties experienced in applying section 22, particularly so far es the determination of " intention" is concerned, are set out in detail in the Gregory Report (paras. 235-238).  The Gregory Committee recommended that (a) artistic copyright should subsist in all works which are original artistic works irrespective of intention, (b) the copyright owner should be free to have the design registered under the Designs Act if he wishes to apply it industrially even though it has been previously published and, therefore, no longer "new" within the meaning of that Act, (c) after registration, the protection of the Copyright Act should cease for the designs of the article as so registered, (d) on the expiry of registration the registered design and associated designs should go into the public domain and (e) if the copyright owner applies the work as an industrial design without having registered it, the protection of the Copyright Act should cease as regards articles made to that design and associated designs but that the original work should continue to enjoy protection against copying under the Copyright Act.

*433.* The Gregory Committee's recommendations were enacted in sections 10 and 44 of the 1956 Act. The Canadian Royal Commission made similar recommendations. The New Zealand Committee, however, was of the opinion that all designs which are original artistic works, whatever their purpose or intended application, should be protected under the copyright law on the same basis. That Committee based its recommendations on the following grounds :—

> *(a)* The exploitation of a work has no effect on copyright in it and, therefore the distinction between artistic works and industrial designs is indefensible in principle.
>
> (b) The fact that industrial designs are generally ephemeral in nature is no argument in favour of the distinction as many works in copyright have an ephemeral existence.
>
> (c) The designs legislation is unsatisfactory in practice and does not give any real protection against the pirating of industrial designs.

434. Had we been authorized to make recommendations regarding the amendment of the law relating to designs it may be that, after inquiring into the matters dealt with by the New Zealand Committee, we would have come to the same conclusions as that Committee.    On this, however, we express no opinion. The New Zealand recommendation would have the effect of reducing to a very great extent the importance and application of the designs legislation.    While we are not suggesting that that may not be the correct solution, we do not feel competent to make such a recommendation without an extensive inquiry into the revision of the Designs Act which is, of course, beyond our terms of reference.

*435. The* Australian Institute of Patent Attorneys' has submitted to us that legislation in this regard on the lines of the 1956 Act should be enacted.

436. We are of the opinion that, at least until the designs legislation is reviewed, the distinction between artistic works and industrial designs should be preserved and we, therefore, recommend the enactment of provisions to the same effect as sections 10 and 44 of the 1956 Act.

*437.* We have received representations to the effect that if the relevant provisions of the 1956 Act are adopted provision should be made for the registration of a comprehensive design in respect of artistic works consisting of fanciful fictional characters such as "Mickey Mouse ".    It is pointed out that these cartoon characters can be depicted in an infinite variety of postures and costumes and in order to obtain adequate protection in respect of the application of those figures as industrial designs, a limitless number of registrations would be required. It is suggested, therefore, that provision should be made enabling a cartoon artist to receive protection under the Designs Act in respect of the use of his fictional character by means of a single comprehensive designs registration.    This is a matter which seems to fall outside our terms of reference and would be more appropriately considered by a body reviewing the designs legislation. We accordingly make no recommendation with regard to it.

## XXXI. DEFINITIONS.

*438.* In the main we approve the definitions in section 48 (1) of the 1956 Act so far as they are applicable to Australian   circumstances.    As stated earlier, we think that the definitions should appear early in the Act, in accordance with Common-wealth practice, and their repetitions elsewhere in the Act should be avoided. The majority of us, however, do not approve of the definition of " author " in relation to a photograph which is defined to mean " the person who, at the time when the

*Registration and Summary Offences.*

*445.* It is convenient to deal first with the provisions for registration contained in sections 26-39. These sections enable the owner of a copyright to obtain registrations of his right (section 28) and also, enable registration to be obtained of assignments, transmissions and licences (section 29).  Registration in every case is entirely optional.

446. Any provision for compulsory registration would, we think, clearly conflict with article 4 of the Brussels Convention which provides in paragraph 2 that the enjoyment and exercise of the rights referred to in that article " shall not be subject to any formality ".

447. Notwithstanding the voluntary character of the registration, section 33 provides that every register of copyrights (there are three registers provided for in section 27) " shall be *prima facie evidence* of the particulars entered therein ". This appears to us to be a most undesirable provision for a number of reasons.

448. The ownership of copyright may not always be a simple matter to determine and may involve a consideration of transactions extending over many years and require the determination of difficult questions of law.  All that the Registrar has before him on an application for registration is the application itself which is in the form of a declaration by the applicant. (See Copyright Regulations, Second Schedule.) In this the applicant declares when and where and by whom the work for which he seeks registration was first published in a convention country and in addition is required to declare that such date was not later that 14 days after the date of first publication elsewhere. (Under the Brussels Convention the corresponding requirement in this regard would be 30 days (Article 4 (3) ).) The Applicant is also required to declare who was the author of the work and that he, the applicant, is the owner.

449. There are no provisions for any public notifications of the application and, although in a case in which any suspicion as to the accuracy of the statements contained in the application was aroused in the mind of the Registrar or his officers, he would doubtless seek further proof, in most cases it is difficult to see how the Registrar can do much more than rely upon the statements appearing in the application. Indeed, in discussions with us the Registrar quite properly and frankly acknowledged that that was so.

450. The Registrar, under the provisions of section 36 of the Act and regulation 35, may alter or amend the register where error has been made purely through the fault of the office or on application to amend by the owner where the error has been made through accident on the part of the applicant or his agent.

451. Otherwise the register may be rectified by a Judge of a State Supreme Court on application by the Registrar or a person aggrieved (section 37).

452. Even if the provisions for the initial registration of the copyright required more effective proof of ownership, the fact that registration of assignments, transmissions and licences is of necessity voluntary greatly detracts from the value of the register as an accurate record of ownership.

453. We were informed by the Registrar that registrations of assignments were in fact few in number—on the average about five per annum. Whether this is to be accounted for by the fact that these are substantially the only assignments of registered copyright which have occurred or that a number of assignees have failed to register we are unable to determine, but we suspect that assignments, transmissions and licences

have occurred which have not been registered. The Institute of Patent Attorneys of Australia has suggested that the existing provisions for registration are of little value and should be repealed.

*454.* Apart from the fact that the register provides *prima facie* proof of ownership, there are other consequences which seem to flow from registration which seem to us undesirable once it is realized that the register can be, and probably is in some cases, an inaccurate record of actual ownership.

455. By section 16 a Justice of the Peace is given power upon application by the *registered owner* or his agent to issue a warrant or the seizure of infringing copies of a registered work and following upon this a Court of Summary Jurisdiction, on proof that they are infringing copies, may order their destruction (section 17). There was a similar section in operation in Great Britain relating to copyright in musical works under which the *owner* of a musical copyright could apply for a warrant. (See Musical (Summary Proceedings) Copyright Act, 1902, which was preserved by section 11 (4) of the 1911 Act. ) The 1902 Act was repealed by the 1956 Act (section 50 (2) and Ninth Schedule).

*456.* Similarly, in section 17 the *registered owner* of the right to perform or authorize the performance of a musical or dramatic work in the Commonwealth or his agent can by notice in writing forbid the performance in public of the work in infringement of his right and the person to whom such notice is given is required to refrain from performing accordingly or become subject to a penalty of **£10.** Under sub-section (2.) a person is forbidden under pain of a penalty of **£20** from giving any such notice without just cause; but sub-section (3.) makes it clear that proof of *registered* ownership and of reasonable grounds for believing that the person to whom the notice was given was about to perform in infringement of his right is sufficient to establish just cause. The origin of this section appears to be section 54 of the *Copyright Act 1905* of the Commonwealth, although in its form in that Act the rights were conferred on the *owner* of the copyright.

457. In section 15 a penalty is imposed for permitting any theatre or other place of entertainment to be used for certain performances without the consent of the *registered* owner of the sole right to perform a musical or dramatic work (cf. section 51, *Copyright Act 1905*).

458. It seems to us most undesirable that any of these consequences should flow in favour of a *registered* owner from the mere fact of registration, particularly when such registration may, for the reasons we have indicated, be an inaccurate record of actual ownership.

*459.* We think it would be undesirable to re-enact these sections even in proof of actual ownership rather than registered ownership of the copyright was a condition precedent to relief. These summary remedies of a penal character are inappropriate for the determination of what may be quite difficult problems of ownership and in this sphere, as is the case with patents, the rights of parties are most appropriately determined in actions for infringement. Speedy relief in the form of interim and interlocutory injunctions is available in proceedings of this character.

*460.* As far as we have been able to discover, it would seem that the particular sections, 15, 16 and 17, to which we have specifically referred have not been resorted to, at least in recent years.

*461.* Section 14 is another section making provisions for summary offences in connexion with copyright. This corresponds in substance with section 11 of the 1911 Act and has been re-enacted in section 21 of the 1956 Act. In effect, it prohibits dealings with infringing copies of a copyright work and imposes penalties for so doing. We have recommended the retention of the section with some alterations (para. 330).

462. In effect, therefore, we think Part III. of the *Copyright Act 1912-1950,* **with** the exception of section 14, should be repealed.

463. It is necessary to return to the registration provisions. For the reasons we have already indicated these provisions are not such as to provide a complete and accurate record of ownership even in relation to works which are registered.

464. There would be some advantages to be derived from a register which provided an up-to-date record of all material covered by Australian copyright law but such a record could not be obtained in the absence of compulsory registration as a condition of copyright recognition. Such requirements would not be in accord with our existing international obligations and would, in any event, require the maintenance of a register of great bulk and involve the examination of countless applications for registration. We, therefore, dismiss such a proposition as impracticable.

465. In the absence of compulsion we see no virtue in the present provisions. They involve a good deal of work for the office, much of which is concerned with the registration of periodical journals and sporting programmed, which derive little, if any, advantages from registration.

466. We recommend, therefore, that Part IV. of the *Copyright Act 1912-1950* should be repealed.

### *Deposit of Books.*

*467.* Section 40 provides that " the publisher of every book which is first published in the Commonwealth after the commencement of this section and in which copyright subsists under this Act" shall deliver at his own expense a copy of the publication to the Librarian of the Commonwealth Parliament.

468. It is not clear whether this section applies to all books upon their first publication in the Commonwealth or whether it is confined to books published in the Commonwealth that have not been previously published elsewhere. We recommend that the provision should be limited to the latter class of books. It seems to us that the main purpose of such a provision should be to build up a complete collection of Australian literature.

469. Under section 15 (7.) of the 1911 Act, which is continued in operation by section 50 of the 1956 Act, and which corresponds to section 40 of the *Copyright Act 1912-1950, the* expression "book" is defined to include among other things, a sheet of music. The definition of " book" in section 40 of the *Copyright Act* 1912-1950 is practically identical with that in the 1911 Act except that the words " sheet of music" are omitted. We can see no good reason for this omission.

470. We approve the provisions of section 41 which preserve to the States the power to make law requiring the delivery of books to specified libraries.

### *Groundless Threats of Legal Proceedings.*

*471.* Section 41A grants a civil remedy in cases of groundless threats of legal proceedings in respects of alleged infringements. This provision was inserted in 1935 and we think that it is particularly desirable in relation to copyright and industrial property. The type of provision set out in section 121 of the Patents Act, however, seems preferable to section 41A of the Copyright Act.

## XXXIII.  MISCELLANEOUS.

### Performers' Protection.

472.. In the field of performing rights problems arise in relation to performers who partake in the making of sound recordings and participate in broadcasts and it may be that they have some greater claim to the proceeds derived from sound recordings and broadcasting than they have heretofore received.

473. These are problems which have been raised in the international sphere where they have been considered by a UNESCO Committee of Experts on the International Protection of Performers, Recorders and Broadcasters and by the International Labour Organization.  The former body met at Monaco in 1957 and produced "a draft agreement on the protection of certain rights called neighboring on copyrights".  The latter organization in the same year produced a "proposed International Convention concerning the protection of performers, manufacturers of phonographic records and broadcasting organizations ".

474. We understand that moves are afoot to appoint a Committee of Experts by International Labour Organization and UNESCO and the International Bureau for the Protection of Literary and Artistic Works with a view to preparing a single draft international agreement on these matters.  It is proposed later to convene an inter-government conference to consider the draft agreement.

475. The Gregory Committee rejected claims for a new right to be given to performers, mainly on the ground that the conception of "copyright", as it has always been understood in British law, involves something which is in a recognizable " material form ".  In Australia, we have the additional problem that such a right probably does not come within the Commonwealth's power to make laws with respect to " copyrights".

476. The Dramatic and Musical Performers' Protection Act, 1958 of the United Kingdom, generally speaking, makes it an offence to make a record, film or broadcast of a performance of any dramatic or musical work without the consent in writing of the performer. This Act repealed the Dramatic and Musical Performers' Protection Act, 1925 and section 45 of the Copyright Act, 1956 which contained similar provisions.

477. Although provisions such as those contained in the Dramatic and Musical Performers' Protection Act seem to us to be desirable we do not feel able to recommend the enactment of similar provisions by the Commonwealth, owing to constitutional restrictions on Commonwealth power.  For the same reason, we make no recommendations regarding the grant to performers of a right in the nature of copyright.

### Sporting Spectacles.

478. The High Court held in Victoria Park Racing Club v. Taylor, 58 C.L.R. 479 that there was no copyright in a spectacle.  In that case, a broadcasting company was forbidden by a racing club from broadcasting a horse race.  The broadcasting company, therefore, erected a tower on the land of an adjoining owner and,' by overlooking the race course, was able to broadcast a description of the races being run. The High Court held that in so doing, no right of the racing club had been infringed and that the club had no legal remedy.

479. Section 115 of the Broadcasting and Television Act 1942-1956 was subsequently enacted. That section provides as follows:—

115. The Commission or the holder of a licence for a commercial television station shall not televise, either directly, or by means of any recording, film or other material or device or otherwise, the whole or a part of a sporting event or other entertainment held

in Australia, after the commencement of this section, in a place to which a charge is made for admission, if the images of the sporting event or other entertainment originate from the use of equipment outside that place.

480. We agree with the reasons of the Gregory Committee for rejecting the creation of a copyright in a sporting spectacle. That Committee pointed out the practical difficulties that would arise from such a copyright and also stated that such a copyright could hardly be confined to sporting spectacles. Also, in Australia there exist the same constitutional difficulties as are referred to above in relation to performers.

481. It seems to us that sports promoters have most of the protection they seek in section 115 of the Broadcasting and Television Act. We mention that the New Zealand Committee refused to recommend the creation of a copyright in sporting spectacles but recommended the enactment in that country of a provision to the effect of section 115 of our Broadcasting and Television Act.

482. Some of the anxieties of the sporting bodies will also be allayed indirectly in the case of television by the right given to broadcasting organizations to control the showing of television to a paying audience.

483. Several football bodies have submitted to us that copyright should exist in the lists prepared by those bodies, of the names of players and the numbers allotted to them for purposes of identification. It is said that the sale of football publications is the means of adding to the revenue of football clubs and the prior publication of such lists by, for example, newspapers would deprive them of the major part of such revenue. We are unable to see how copyright can be conferred merely in respect of the name of a player associated with his football number. It has been held that copyright may exist in various compilations such as an alphabetical list of railway stations, a list of fox-hounds and hunting dogs and lists of stock exchange prices and football fixtures. In all these cases the question whether copyright exists depends to a large extent on the amount of labour, capital or skill expended in making the compilation. We think that the law in this regard should not be changed.

484. It seems that the football clubs may have copyright in the lists they prepare as published in the various football publications (see *Football League Ltd. v. Littlewoods Pools Ltd., (1959) 3* W.L.R. 42). Such copyright, however, does not prevent a person making his own list by attending a match. In the field of copyright there is not, in our view, any way to legislate against this. Indeed, no proposal on how this could be achieved was submitted to us. We, therefore, reject the submissions in this regard.

### The Court.

485. The Solicitor-General of the Commonwealth has suggested to us that exclusive original jurisdiction in copyright actions should be conferred on the Supreme Courts of the States. The High Court has concurrent original jurisdiction in actions for infringement of patents and trade marks, but as the Solicitor-General points out, the High Court in the latter cases is also the " Appeal Tribunal" from decisions of the Commissioner and the Registrar. The Patent and Trade Marks Law Review Committees were of the opinion that the High Court would in the circumstances be likely to become more experienced in those matters than the Judges of the Supreme Court.

486. As we are recommending that there should be no registration or examination of copyright material there is no need for a registrar or provision for appeals from him and we think, therefore, that copyright actions have no special features that justify a departure from the general policy of leaving original jurisdiction with respect

to most matters arising under Commonwealth law to the State or Territory courts. Uniformity of construction of the Act would be achieved, as in other fields of law, by use of the High Court's appellate jurisdiction. We, therefore, recommend that the Supreme Court of the States and Territories should be given exclusive original jurisdiction in matters arising under the Copyright Act.

### " Droit Moral."

487. We have received representations regarding what is called on the Continent " the moral right " of the author.  One of the matters involved in this question is the false attribution of authorship which we have dealt with earlier in this report.

488. It has been submitted to us that the law should provide that no artistic work should be altered or publicly exhibited without the consent of the artist. Our recommendations regarding false attribution of authorship go some way towards meeting the submission regarding alteration of works.

489. We do not consider that any further protection for artists should be provided for, even if the Commonwealth had the necessary constitutional power. The artist is free to protect himself by inserting terms in his contract of sale. Also, as the matters raised primarily concern the reputation of the artist, we consider that the action for defamation is more appropriate than any statutory cause of action which might be enacted in a Copyright Act.

490. In weighing up the interests of the artist and the owner of a work of art so far as public exhibition of the work is concerned, we are unable to recommend that the law should come down in favour of the artist. One of the reasons given for the conferring on an artist the right to restrain public exhibition of his work is that the work may no longer represent the present day style and quality of the artist. We think that an artist could easily ensure against his reputation suffering in this respect by putting on the work the date it was made.

### Register of Works Owned by Licensing Bodies.

491. Certain bodies have complained that APRA will not give them a list of works in which it owns the performing right and it has been suggested that APRA should be required to file a list of that nature.  Such a provision exists in Canada (section 48 (1)).

492. We agree with the conclusions of the New Zealand Copyright Committee that the difficulties alleged to have been experienced in this regard are more theoretical than real.  We have inspected the registry kept by APRA in Sydney. The records kept seem quite comprehensive and information appears to be made readily available to those requiring it. New works are added to the records daily and works coming out of copyright are duly noted.  There does not seem, therefore, to be any practical need for requiring the filing of a list (which would be out of date almost as soon as it was filed) as APRA itself maintains such a record. We have received no evidence that any body or persons other than APRA claims performing right fees in respect of the type of works which are controlled by APRA.

493. Copyright works not controlled by APRA, such as musical plays and operas, are usually controlled by a limited number of companies and we are not satisfied that there has been much difficulty in tracing the owners. Indeed, in many cases, APRA itself supplies the information as it usually possesses the performing right in individual items included in those works.

### *Maps.*

494. The Director of National Mapping has informed us that the National Mapping Council is concerned at the extent to which the maps produced by governmental agencies are being copied by private companies to produce maps which are then sold in competition with governmental maps. The Director asks whether it is legally practicable to compel private map producers to indicate on the maps the source of the material used in their production.

495. Australia's international obligations prevent the enactment of a law to make the existence of copyright in maps depend on the insertion on those maps of the information suggested by the Director. The only other means by which the end desired by the Director could be achieved would be by making it an offence not to indicate the information on a map. Such a law would not, we think, come with the constitutional power of the Commonwealth and we therefore make no recommendation in this regard.

496. Under the 1911 Act a map is included in the definition of " literary work" (section 35 (1.)). Under the 1956 Act, it is included in the definition of " drawing" (section 48) and is, therefore, an " artistic work". The Department of Lands of New South Wales has submitted that the relevant definitions in the 1956 Act are preferable. We have, in the main, recommended the adoption of the definitions in the 1956 Act (para. 438).

### *"Traditional    Works."*

497. It has been submitted to us that a collector of " traditional material" should be offered the same copyright protection as is given to a composer of original work By " traditional material" is meant work which does not exist in permanent form but is acquired by oral tradition such as the tribal music of the Australian aborigines. This material is often collected by noting it from the performances of singers and instrumentalists. It is suggested by Wattle Recordings that the law should provide that where a collector has reduced such a song to permanent form by noting or recording it, it should be an infringement for another person to publish a version of the same song unless he can show that he derived his version from the original source and not from the collector's notes or recordings.

498. It would seem that much of the protection that is sought by Wattle Recordings is already provided for under both the 1911 and the 1956 Acts. The Courts, on many occasions, have upheld the existence of copyright in selections of non-copyright material. As has been stated above (para. 483) the subsistence of copyright in the field of collections depends to a large extent on the labour, skill and capital that has been expended. The precise amount of these factors required is, of course, difficult to define precisely. It was held by the Privy Council, for example, in *Macmillan v. Cooper, (1923) 40* T.L.R. 186 that a publication consisting of a reprint of passages selected for use in schools from a work that had not enjoyed copyright protection might be entitled to copyright, if the selection of the passages required, for the purpose of effecting the object in view, accurate knowledge, sound judgment and literary skill. This test would, we think, be satisfied in respect of many of the collections of traditional music.

499. We feel that it is impossible to lay down precise standards and consider that the question of the subsistence of copyright, in this field, is better left to the courts to decide by application of accepted principles.

*Contracts between Composers and Music Publishers.*

*500.* The Australian Songwriters and Composers' Association have submitted that—

- (u) all contracts drawn up by Australian music publishers should be couched in substantially identical phraseology;
- (b) all such contracts should contain a clause setting out a date not later than which the music shall be published in printed form; and
- (c) the music publishers should not be permitted to insert a clause in those contracts to the effect that a composer shall not receive any royalties after the end of a period that is shorter than the period of copyright.

The Association claims that clauses of the nature referred to in (c) above are not infrequently found in contracts drawn up by music publishers. They further claim that on occasions publishers, required under their contract to publish a song, attempt to satisfy that obligation by merely issuing a few copies of the composition made by means of a duplicating machine. We are not in a position to know whether, and, if so, to what extent the practices of which the Association complains take place.

501. As circumstances must vary from case to case we do not think that it is possible to lay down a standard form of contract applicable to cover all dealings between song writers and musical publishers or to prescribe any particular terms of such contracts. We consider that the matters raised by the Association are better left to bargaining and discussion between that Association and the music publishers.

*Transitional Provisions.*

502. We recommend the enactment of transitional provisions to the effect of those contained in the 1956 Act appropriately altered, where necessary, to conform to our above recommendations.

*Moves to Extend Period of Copyright Protection.*

503. The General Manager of APRA has brought to our attention information regarding attempts in some European countries to adopt a uniform period of copyright protection based on the Spanish copyright legislation which provides for a term of the life of the author and eighty years thereafter. It seems strange to us that one or two Union countries should increase the term and then try and say others should fall into line for the sake of uniformity when there was uniformity until they destroyed it. *In* any case, as stated earlier we think that Australia should keep in line with Great Britain on this question.

## XXXIV. SUMMARY OF RECOMMENDATIONS.

*504.* Our principal recommendations are as follows. (References in this summary to " the 1956 Act" are references to the Copyright Act, 1956 of the United Kingdom.)

*Conventions.*

(1.) Australia should adhere to the Brussels Revision of the Berne Convention (para. 51) and the Universal Copyright Convention (para. 52).

*Literary, Dramatic and Musical Works.*

(2.) Provisions similar to section 2 of the 1956 Act should be enacted (paras. 53-65). However, it should not be a " restricted act" to perform publicly a work by means of the operation of a broadcast receiving set or gramophone record at any premises where persons reside or sleep as part of the amenities provided exclusively for residents or their guests (para. 70).

*Artistic Works.*

(3.) Provisions to the effect of section 3 of the 1956 Act should be enacted (paras. 71-78).

*Ownership of Copyright.*

(4.) provisions similar to section 4 (l), (2), (4), (5) and (6) of the 1956 Act should be enacted (paras. 78-91).

(5.) A person who commissions a work for valuable consideration should, in the absence of agreement to the contrary, be the owner of copyright in the work insofar as it relates to the purpose for which he commissioned it, provided that his purpose was communicated to the author before the work was made. In all other respects copyright should remain in the author (para. 85),

*Infringement by Importation, Sale, &c.*

(6.) In adapting section 5 of the 1956 Act it should be provided that in sub-sections (2) and (3) the onus should be on the importer, seller or dealer to prove that he was not aware and had no reasonable grounds for suspecting that the making or importation of the work was an infringement of copyright (para. 94).

(7.) The words "by the importer" should be added after " made" in a provision corresponding to section 5 (2) (para. 95).

(8. ) It should not be an infringement by " importation" to bring an infringing copy from a Territory to the Commonwealth or *vice versa* (para. 96).

(9.) provisions to the effect of section 5 (5) and (6) of the 1956 Act (dealing with the liability of owners of places of public entertainment) should be enacted subject to deleting the words "to such persons as may desire to hire them" in sub-section 6 (paras. 103-105).

*Fair Dealing with Literary, Dramatic and Musical Works.*

(10.) Provisions to the effect of section 6 (1) and (2) of the 1956 Act should be enacted (para. 106).

(11.) In adapting section 6 (3) of the 1956 Act (dealiNg with the reporting of current events) it should be made clear that in cases coming within paragraph (b), " fair dealing" does not extend to the playing of musical works that do not form part of the current event being reported (para. 108).

(12) In adapting section 6 (5) of the 1956 Act (dealing with recitations) the proviso and the requirement that the recitation should be by one person should be deleted (para. 106).

(13.) In adapting section 6 (6) of the 1956 Act (dealing with collections for use in schools) the provision should extend to works collected for use in educational institutions (paras. 111, 113).

(14. ) It should not be an infringement of copyright to make an ephemeral repro-duction of any literary dramatic or musical work for the purpose of broadcasting that work where the person who makes the reproduction is authorized by assignment, licence or by virtue of the Act to broadcast the work. A reproduction should be deemed to be ephemeral if it is destroyed after six months (para. 128).

(15.) The ephemeral reproduction provisions should not extend to the recording of records (para. 125).

(16. ) There should not be any statutory right to retain reproductions made under the ephemeral reproduction provisions for archival purposes (para. 126).

*94*

*Works in Libraries.*

*(17.)* In adapting section 7 of the 1956 Act (dealing with the supplying of copies of works by librarians) —

    (a) the provisions should be extended to include libraries of commercial concerns which are conducted for profit provided the library itself is non-profit-making (paras. 137, 143);

    (b) paragraph (d) of sub-section (2) should be altered to permit the copying of more than one article from one publication if the articles copied relate to the same subject-matter (para. 151);

    (c) the proviso to sub-section (3) should be omitted but it should be provided that after copying a part of a non-periodical work the library should give notice to the copyright owner within a reasonable time of the amount that had been copied and the person to whom the copy had been supplied (para. 151);

    (d) sub-section (6) (dealing with the copying of old unpublished manuscripts) should extend to the copying of articles and engravings. The words "seventy-five years " should be substituted for " one hundred years" (para. 151);

    (e) authority should be given to university librarians to supply, for purposes of research or private study, copies of unpublished theses deposited with them (para. 151).

*Compulsory Licence to Manufacture Records.*

(18.) The system of compulsory licensing in respect of gramophone records should" be retained and provisions along the lines of section 8 of the 1956 Act should be enacted subject to the following alterations (para. 171) :—

    (a) the words "or consent * should be added after " licence" in sub-section (1) (a) (para. 187);

    (b) the words " by retail" should be omitted from paragraphs (c) and (d) of sub-section (1) (para. 191);

    (c) the rate of royalty should be 6 1/4 per cent. of the ordinary retail selling price and no reduction should be made from that price in respect of sales tax or cost of record containers (paras. 197-200);

    (d) a copyright tribunal should have the task of revising the rate (para. 197);

    (e) the minimum royalty provided for in sub-section (4) should be one penny (para. 204);

    (f) Where several work are included on one record and they are all in copyright, the royalty should be apportioned among the copyright owners by dividing the royalty by the number of works on the record (para. 203);

    (g) where a record includes non-copyright material, the total royalty should be reduced proportionately (para. 206);

    (h) the use of adhesive stamps should be abolished and the manufacturer should be required to keep on deposit with the copyright owner an amount equal to its royalty on his dealings for the previous month and, in the case of a new manufacturer, an amount equal to the royalty on his estimated dealings for the first month (para. 210);

    (i) where the Regulations require the giving of notice and information to the copyright owner, it should be an offence to give false information (para. 211);

(j) in sub-section (6) (which defines " adaptation ") " instruments " should be substituted for" performers" (para. 213);

(k) the compulsory licence system shouId extend to the importation of a matrix or a record for the purpose of making records from it for sale (para. 185).

### *Fair Dealing with Artistic Works,*

*(19. )* Provisions to the effect of section 9 of the 1956 Act should be enacted (paras. 217-221).

(20.) Fair dealing with an artistic work for the purposes of reporting a current event should not constitute an infringement (para. 222).

(21.) Provision should be made for ephemeral reproductions of artistic works on the same basis as that in relation to literary, dramatic and musical works (para. 222).

### *Anonymous and Pseudonymous Works and Works of Joint Authorship.*

*(22.)* Provisions to the effect of the Second and Third Schedules to the 1956 Act should be enacted, but they should be placed in the body of the Act (para. 223).

### *Gramophone Records.*

(23.) The performing right in gramophone records should be retained (para. 245).

(24. ) The performing right should be conferred in respect of all records that are in copyright in Australia without regard to whether provisions for such a right exist in the country of first publication (para. 253).

(25.) Provisions to the effect of section 12 of the 1956 Act should be enacted subject to altering sub-section (7) by deleting the words " or mainly" in paragraph (a) and adding" or their guests" after" therein" (para. 264).

### *Cinematograph   Films.*

(26.) Provisions to the effect of section 13 of the 1956 Act should be enacted subject to altering sub-section (4) to provide that where a film is commissioned for valuable consideration the person who commissioned the film should, in the absence of agreement to the contrary, be the owner of copyright to the extent of his purpose in commissioning the film provided his purpose is communicated to the maker before the film is made (paras. 268-275).

### *Sound  and  Television  Broadcasts.*

(27.) Copyright should subsist in every television or sound broadcast made by the Australian Broadcasting Commission or a person licensed under the *Broadcasting and Television Act* 1942-1956 (para. 290).

(28.) Provisions along the lines of section 14 of the 1956 Act should be enacted, subject to the following alterations :—

(a) " for the private use of the person doing the act" should be substituted for " for private purposes" in sub-section (4) (a) and (b) (para. 294);

(b) the words " exceed the prices usually charged at that place and" should be deleted from sub-section (8) (b) (para. 298);

(c) paragraph (i) of the proviso to sub-section (8) should provide that no account shall be taken of performances at premises where persons reside or sleep, as part of the amenities provided exclusively for residents or inmates and their guests (para. 299).


***Copyright in Typographical Arrangements.***

(29.) Provisions to the effect of section 15 of the 1956 Act should be enacted (para. 302).

***Infringement of Copyright in Records, &c., by Importation, Sale or Similar Dealings.***

*(30.)* Provisions to the effect of section 16 of the 1956 Act should be enacted (para. 304).

***Remedies for Infringement.***

*(31.)* Provisions to the effect of sections 17, and 18 and 19 of the 1956 Act should be enacted subject to the following alterations :—

*(a)* sub-section (2) of section 17 should exempt from liability for damages for infringement persons who at the time of an infringement were not aware and had no reasonable grounds for suspecting that the act was an infringement of copyright (para. 308);

(b) the provision in sub-section (4) of section 17, that no injunction shall be made after the construction of a building has been begun, should be deleted (para 311),

(c) paragraph *(d)* of section 18(3) should define " infringing copy" to include a film or record made directly from a broadcast (para. 320).

(32.) Provisions to the effect of section 20 of the 1956 Act should be enacted subject to altering sub-section (7) to provide that the benefits of the presumptions are conferred only when the information was on the label at the time the records were first issued (para. 328).

(33.) Provisions to the effect of section 21(1) to (5) of the 1956 Act should be enacted (para. 330).

(34.) In adapting sub-sections (7) and (8) of section 21 of the 1956 Act, the maximum penalties for offences under sub-sections (1) and (2) should be five pounds for each article to which the offence relates or, in cases other than a first offence, two months imprisonment. A fine should not exceed two hundred pounds in respect of articles comprised in the same transaction. A person found guilty of an offence under sub-sections (3) to (5) should be liable to a fine not exceeding two hundred pounds or (in a case other than first conviction under the section) to imprisonment for two months (para. 331).

(35.) Provisions to the effect of section 22 of the 1956 Act should be enacted (paras. 337-339).

***Tribunal.***

(36.) There should be a tribunal to deal with disputes between bodies authorized to grant licences for the public performance of works and persons desiring licences (para. 355).

(37.) The tribunal should consist of three persons who are either legal practitioners of some years' standing or who hold or have held judicial office. One member should have the title of " President" (para. 355).

(38.) Only one member should, unless the parties otherwise agree, sit on the tribunal to hear any particular matter (para. 355).

(39.) Provisions similar to sections 24, 25, 26, 27, 29 and 30 of the 1956 Act should be enacted (paras. 356-378), but a licensing body should have the power to refer to the tribunal a proposed licensing scheme or an existing licensing scheme (para. 365).

(40. ) The tribunal should be called " the Copyright Tribunal " (para, 377).

### Extension or Restriction of Operation of Act.

(41.) The Act should extend to all Territories under the authority of the Commonwealth (para. 382).

(42.) Provisions similar to section 32 of the 1956 Act should be enacted (para. 384.)

(43.) Provisions similar to sections 33 and 35 of the 1956 Act should be enacted (paras. 387, 388).

### Assignments, Licences and Testamentary Dispositions.

(44.) In adapting section 36 of the 1956 Act, the provision in sub-section (4), enabling a purchaser in good faith and without notice to defeat the claims of a prior licensee, should be deleted (para. 392).

(45.) Section 5 (2.) of the 1911 Act should be repealed and not re-enacted in a new Copyright Act (para. 396).

(46.) Provisions to the effect of section 37 (with the exception of sub-section (4)) and section 38 of the 1956 Act should be enacted (paras. 397, 400).

### The Crown.

(47.) Provisions to the effect of section 39 of the 1956 Act should be enacted and should be applicable to the Crown in the right of the Commonwealth and the States (para. 403).

(48.) The commonwealth and the States should be empowered to use copyright material for any purposes of the Crown, subject to payment of just compensation (para. 405).

### Broadcasts of Recordings and Films.

(49.) Provisions similar to section 40 of the 1956 Act should be enacted (para. 413).

### Use of Copyright Material for Education.

(50). Provisions to the effect of sub-sections (1) to (5) of section 41 of the 1956 Act should be enacted (para. 416). In adapting that section, it should be made clear that the word "school" extends to all education institutions not conducted for profit (para. 419).

(51.) The recording by school authorities of school broadcasts of the A.B.C. should not constitute a breach of coypright in the works broadcast if the recording is not used outside the school (para. 418).

### False Attribution of Authorship.

(52.) In adapting section 43 of the 1956 Act, it should be provided that actions under that section cannot be brought after the death of the author (para. 425).

### Forfeited Works.

(53.) In adapting section 46 (3) of the 1956 Act, it should be provided that the Crown cannot sell forfeited works that are in copyright without the consent of the copyright owner unless the action which gave rise to the forfeiture was committed by the copyright owner (para. 427).

### Industrial Designs.

(54.) Provisions similar to the effect of sections 10 and 44 of the 1956 Act should be enacted (para. 436).

*Definitions.*

*(55.)* In adapting section 48 of the 1956 Act—

    (a) the definition of "author" in relation to "photograph" should be " the person who takes the photograph" (para. 428);

    (b) the definition of " wireless telegraphy" should be set out in a Copyright Act fully and not by reference to another Act (para. 439);

    (c) in sub-section (3), the latter part of that provision should read " and is operated as part of the amenities provided exclusively for residents or inmates therein or their guests" (para. 440).

(56.) Provisions to the effect of sub-sections (1) to (4) of section 49 of the 1956 Act should be enacted (para. 443).

*Copyright Act* 1912-1950.

    *(a) Registration and Summary Offences.*

*(57.)* Provision for voluntary registration and for summary offences dependent on registration set out in Parts III. and IV. of the *Copyright Act* 1912-1950 should be repealed (paras. 462, 466).

    *(b) Deposit of Books.*

(58.) It should be made clear that section 40 of the *Copyright Act 1912-1950* extends only to books that are published in the Commonwealth and have not been previously published elsewhere (para. 468).

(59.) The definition of " book" in section 40 should include " sheet of music" (para. 469).

    (c) *Groundless Threats of Legal Proceedings.*

*(60.)* There should be a civil remedy in cases of groundless threats of legal proceedings along the lines of section 121 of the Patents Act (para. 471).

*Miscellaneous.*

    *(a] Performers' Right.*

(61.) No recommendation is made regarding the grant to performers of a right in the nature of copyright (para. 477).

(62.) There should not be any right in the nature of copyright in respect of sporting spectacles (para. 480).

    *(b) The Court.*

(63.) The Supreme Court of the States and Territories should have exclusive original jurisdiction in copyright actions (para. 486).

    *(c) " Droit Moral".*

(64.) Provision should not be made to prevent a purchaser of an artistic work from exhibiting that work without the consent of the artist (para. 490).

    *(d) Filing of List of Works.*

(65.) Provision should not be made to require a licensing body to file a list of the works in which it owns copyright (paras. 492, 493),

    *(e) Maps.*

(66.) Provision should not be made to require map producers to indicate on their maps the source of the material used in their production (para. 495).

*(f) " Traditional Works".*

(67.) No special provisions should be enacted in respect of copyright in " traditional works" (para. 499).

*(g)* Contracts between ***Composers and Music Publishers.***

(68.) Legislation should not lay down a standard form of contract to cover dealings between composers and music publishers (para. 501).

---

### ACKNOWLEDGMENT.

505. It would be ungracious of us to end this report without a suitable acknowledgment of the assistance we have received from Mr. L. R. Zincs who has been the Secretary of the Committee since its inception. He has at all times displayed the keenest interest in the work of the Committee, has made himself familiar with the many problems it has faced and contributed much to ensure that our deliberations should be directed to all facets of those problems. Without his keenness, energy and efficiency it would have been impossible for us to complete this report at this time. It is in no formal sense that we each individually wish to express our profound gratitude to him.

Signed at Melbourne this twenty-second day of December, 1959.

> J. A. SPICER, Chairman.
> ARTHUR DEAN.
> G. A. FERGUSON.
> PERCY JONES.
> A. J. MOIR.

100

## FIRST SCHEDULE.

### PERSONS AND ORGANIZATIONS FROM WHOM REPRESENTATIONS HAVE BEEN RECEIVED.

Accommodation Owners' Association of Australia.
Amusement Proprietors' Association of Australia (Federal Council).
Australasian Performing Right Association Limited.
Australian Association of Advertising Agencies.
Australian Association of National Advertisers.
Australian Book Publishers' Association.
Australian Broadcasting Commission.
Australian Federation of Commercial Broadcasting Stations.
Australian Film Producers' Association.
Australian Journalists' Association (Federal Executive).
Australian National Football Council.
Australian Newspapers Council.
Australian Paper Manufacturers Limited.
Australian Songwriters and Composers Association.
Australian Unesco Committee for Visual Arts.
Baalman, Mr. J.
Blatchford, Mr. Robert.
Cinematograpb Exhibitors' Association.
Copyright Owners Reproduction Society Limited.
Crawford, Mr. J. R.
Cyril Stevens Studios Pty. Limited.
Department of Customs and Excise.
Department of Lands, New South Wales.
Department of Lands, South Australia.
Director of National Mapping.
Harding, Mr. E. L. D.
Institute of Patent Attorneys of Australia.
Institution of Engineers.
J. C. Williamson Theatres Limited.
John Fairfax and Sons Pty. Limited.
Law Council of Australia.
Library Association of Australia.
Library Board of Western Australia.
Musicians' Union of Australia.
New South Wales Rugby Football League.
Norway, Mr. Nevil Shute.
Orban, Mr. Desiderius.
Osborn, Mr. Andrew D.
Pidd, Rev. A. T.
Public Library of South Australia.
Registrar of Copyrights.
Royal Australian Institute of Architects.
Sansom, Mr. Clive.
Scott and Furphy, Messrs.
Solicitor-General of the Commonwealth.
Southern Metropolitan Planning Association.
Starke, Mr. J. G.
Taylor Instrument Companies of Australia Pty. Limited.
Victorian Chamber of Catering Industries.
Victorian Football League.
Walt Disney Mickey Mouse (A/asia) Pty. Limited.
Wattle Recordings.
World Record Club.

101

## SECOND SCHEDULE.

INTERNATIONAL CONVENTION REVISING THE BERNE CONVENTION FOR THE PRO-
TECTION OF LITERARY AND ARTISTIC WORKS, SIGNED ON 9TH SEPTEMBER, 1886,
COMPLETED AT PARIS, 4th M.4Y, 1896; REVISED AT BERLIN, 13TH NOVEMBER, 1908,
COMPLETED AT BERNE, 2oth MARCH, 1914 AND REVISED AT ROME 2nd JUNE, 1928

### Brussels 26th June 1948

Australia, Austria, Belgium, Brazil, Canada, Czechoslovakia, Denmark, Finland, France, Greece,
Hungary, Iceland, India, Ireland, Italy, Lebanon, Liechtenstein, Luxembourg, Monaco, Morocco,
New Zealand, the Netherlands, Norway, Pakistan, Poland, Portugal, Spain, Sweden, Switzerland,
Syria, Tunis, the Union of South Africa, the United Kingdom of Great Britain and Northern Ireland,
Vactican City and Yugoslavia.

Being equally animated by the desire to protect in as effective and uniform a manner as possible
the rights of authors over their literary and artistic works,

Have resolved to revise and to complete the Act signed at Berne on the 9th September 1886,[1]
completed at Paris on the 4th May 1896,[2] revised at Berlin on the 13th November 1908,[3]
completed at Berne on the 20th March 1914[4] and revised at Rome on the 2nd June 1928. [5]

Consequently, the undersigned Plenipotentiaries, having presented their full powers, recognised
as in good and due form, have agreed as follows:

### ARTICLE 1

The countries to which this Convention applies constitute a Union for the protection of the
rights of authors over their literary and artistic works.

### ARTICLE 2

(1) The term " literary and artistic works" shall include every production in the literary,
scientific and artistic domain, whatever may be the mode or form of its expression, such as
books, pamphlet~and other writings; lectures, addresses, sermons and other works of the same
nature; dramatic or dramatico-musical works, choreographic works and entertainments in dumb
show, the acting form of which is fixed in writing *or* otherwise, musical compositions with or
without words; cinematographic works and works produced by a process analogous to cinemato-
graphy; works of drawing, painting, architecture, sculpture, engraving and lithography; photographic
works and works produced by a process analogous to photography, works of applied art; illustra-
tions, geographical charts, plans, sketches and plastic works relative to geography, topography,
architecture or science.

(2) Translations, adaptations, arrangements of music and other alterations of a literary **or**
artistic work shall be protected as original works without prejudice to the rights of the author of
the original work. It shall, however, be a matter for legislation in the countries of the Union to
determine the protection to be granted to translations of official texts of a legislative, administrative
and legal nature.

(3) Collections of literary or artistic works such as encyclopedias and anthologies which by
reason of the selection and arrangements of their contents constitute intellectual creations shall be
protected as such without prejudice to the rights of the authors in respect of each of the works
forming part of such collections.

(4) The works mentioned in this Article shall enjoy protection in all countries of the Union.
This protection shall operate for the benefit of the author and his legal representatives and assignees.

(S) It shall be a matter for legislation in the countries of the Union to determine the extent
of the application of their laws to works of applied art and industrial designs and models, as well
as the conditions under which such works, designs and models shall be protected. Works protected
in the country of origin solely as designs and models shall be entitled in other countries of the
Union only to such protection as shall be accorded to designs and models in such countries.

### ARTICLE 2bis

(1) It shaII be a matter for legislation in the countries of the Union to exclude wholly or in
part from the protection afforded by the preceding Article political speeches and speeches delivered
in the course of legal proceedings.

[1] " Switzerland No. 1 (1887)," C.5167.
[2] " Treaty Series No. 14 (1897)," C. 8681.
[3] " Treaty Series No. 19 (1912)," Cd. 6324.

[4] " Treaty Series No. 11 (1914)," Cd. 7613.
[5] " Treaty *Series No.* 12 (1932)," Cmd. 4057.

102

(2) It shall also be a matter for legislation in the countries of the Union to determine the conditions under which lectures, addresses, sermons and other works of the same nature may be reproduced by the press.

(3) Nevertheless, the author alone shall have the right of making a collection of his works mentioned in the above paragraphs.

### ARTICLE 3
(omitted)

### ARTICLE 4

(1) Authors who are nationals of any of the countries of the Union shall enjoy in countries other` than the country of origin of the work, for their works, whether unpublished or first published in a country of the Union, the rights which their respective laws do now or may hereafter grant to their nationals, as well as the rights specially granted by this Convention.

(2) The enjoyment and the exercise of these rights shall not be subject to any formality; such enjoyment and such exercise shall be independent of the existence of protection in the country of origin of the work. Consequently, apart from the provisions of this Convention, the extent of protection, as well as the means of redress afforded to the author to protect his rights, shall be governed exclusively by the laws of the country where protection is claimed.

(3) The country of origin shall be considered to be, in the case of published works, the country of first publication, even in the case of works published simultaneously in several countries of the Union which grant the same term of protection; in the case of works published simultaneously in several countries of the Union which grant different terms of protection, the country of which the legislation grants the shortest term of protection.  In the case of works published simultaneously in a country outside the Union and in a country of the Union, the latter country shall be considered exclusively as the country of origin.  A work shall be considered as having been published simultaneously in several countries which has been published in two or more countries within thirty days of its first publication.

(4) For the purposes of Articles 4, 5 and 6, " published works" shall be understood to be works copies of which have been issued and made available in sufficient quantities to the public, whatever may be the means of manufacture of the copies. The presentation of a dramatic, dramatico-musical or cinematographic work, the performance of a musical work, the public recitation of a literary work, the transmission or the radio-diffusion of literary or artistic works, the exhibition of a work of art and the construction of a work of architecture shall not constitute publication.

(5) The country of origin shall be considered to be, in the case of unpublished works, the country to which the author belongs.  However, in the case of works of architecture, or of graphic and plastic works forming part of a building, the country of the Union where these works have been built or incorporated in a building shall be considered as the country of origin.

### ARTICLE 5

Authors who are nationals of one of the countries of the Union, and who first publish their works in another country of the Union, shall have in the latter country the same rights as native authors.

### ARTICLE 6

(1) Authors who are *not* nationals of one of the countries of the Union, and who first publish their works in one of those countries, shall enjoy in that country the same rights as native authors, end in the other countries of the Union the rights granted by this Convention.

(2) Nevertheless, where any country outside the Union fails to protect in an adequate manner the works of authors who are nationals of one of the countries of the Union, the latter country may restrict the protection given to the works of authors who are, at the date of the first publication thereof, nationals of the other country and are not effectively domiciled in one of the countries of the Union. If the country of first publication avails itself of this right, the other countries of the , Union shall not be required to grant to works thus subjected to special treatment a wider protection then that granted to them in the country of first publication.

(3) No restrictions introduced by virtue of the preceding paragraph shall affect the rights which err author may have acquired in respect of a work published in a country of the Union before such restrictions were put into force.

(4) The countries of the Union which restrict the grant of copyright in accordance with this Article shall give notice thereof to the Government of the Swiss Confederation by a written declaration specifying the countries in regard to which protection is restricted, and the restrictions to which rights of authors who are nationals of those countries are subjected. The Government of the Swiss Confederation shall immediately communicate this declaration to all the countries of the Union.

103

### ARTICLE 6bis

(1) Independently of the author's copyright, and even after the transfer of the said copyright, the author shall have the right, during his lifetime, to claim authorship of the work and to object to any distortion, mutilation or other alteration thereof, *or* any other action in relation to the said work which would be prejudicial to his honour or reputation.

(2) In so far as the legislation of the countries of the Union permits, the rights granted to the author in accordance with the preceding paragraph shall, after his death, be maintained, at least until the expiry of the copyright, and shall be exercisable by the persons or institutions authorised by the said legislation. The determination of the conditions under which the rights mentioned in this paragraph shall be exercised shall be governed by the legislation of the countries of the Union.

(3) The means of redress for safeguarding the rights granted by this Article shall be governed by the legislation of the country where protection is claimed.

### ARTICLE 7

(1) The term of protection granted by this Convention shall be the fife of the author and fifty years after his death.

(2) However, where one or more countries of the Union grant a term of protection in excess of that provided by paragraph (l), the term shall be governed by the law of the country where protection is claimed, but shall not exceed the term fixed in the country of origin of the work.

(3) In the case of cinematographic and photographic works, as well as works produced by a process analogous to cinematography or photography, and in the case of works of applied art, the term of protection shall be governed by the law of the country where protection is claimed, but shall not exceed the term fixed in the country of origin of the work.

(4) In the *case* of anonymous and pseudonymous works the term of protection shall be fixed at fifty years from the date of *their* publication.    However, when the pseudonym adopted by the author leaves no doubt as to his identity, the term of protection shall be that provided in paragraph (l). If the author of an anonymous or pseudonymous work discloses his identity during the above-mentioned period, the term of protection applicable shall be that provided in paragraph (l).

(5) In the case of posthumous works which do not fall within the categories of works included in paragraphs (3) and (4) the term of the protection afforded to the heirs and the legal representatives and assignees of the author shall end at the expiry of fifty years after the death of the author.

(6) The term of protection subsequent to the death of the author and the *terms* provided by paragraphs (3), (4) and (5) shall run from the date of his death or of publication, but such terms shall always be deemed to begin on the 1st January of the year following the event which gives rise to them.

### ARTICLE Ibis

In the case of a work of joint authorship the term of protection shall be calculated from the date of the death of the last surviving author.

### ARTICLE 8

Anthers of literary and artistic works protected by this Convention shall have the exclusive fight of making and of authorizing the translation of their works throughout the *term* of protection of their rights in the original works.

### ARTICLE 9

(1) Serial novels, short stories and all other works, whether literary, scientific *or* artistic, whatever their purpose, and which are published in the newspapers or periodicals of one of the countries of the Union shall not be reproduced in the other countries without the consent of the authors.

(2) Articles on current economic, political or religious topics may be reproduced by the press unless the reproduction thereof is expressly reserved; nevertheless, the source must always be clearly indicated. The legal consequences of the breach of this obligation shall be determined by the laws of the country where protection is claimed.

(3) The protection of this Convention shall not apply to news of the day nor to miscellaneous information having the character of mere items of news.

### ARTICLE 10

(1) It shall be permissible in all the countries of the Union to make short quotations from newspaper articles and periodicals, as well as to include them in press summaries.



104

(2) The right to include excerpts from literary or artistic works in educational or scientific publications, or in chrestomathies, in so far as this inclusion is justified by its purpose, shall be a matter for legislation in the countries of the Union, and for special arrangements existing or to be concluded between them.

(3) Quotations and excerpts shall be accompanied by an acknowledgment of the source and by the name of the author, if his name appears thereon.

ARTICLE 10bis

It shall be a matter for legislation in countries of the Union to determine the conditions under which recording, reproduction, and public communication of short extracts from literary and artistic works may be made for the purpose of reporting current events by means of photography or cinematography or by radio-diffusion.

ARTICLE 11

(1) The authors of dramatic, dramatico-rmrsical or musical works shall enjoy the exclusive right of authorizing: i. the public presentation and public performance of their works; ii. the public distribution by any means of the presentation and performance of their works. The application of the provisions of Articles 11 bis and 13 is, however, reserved.

(2) Authors of dramatic or dramatico-musical works, during the full term of their rights over the original works, shall enjoy the same rights with respect to translations thereof.

(3) In order to enjoy the protection of this Article, authors shall not be bound, when publishing their works, to forbid the public presentation or performance thereof.

ARTICLE 11 bis

*(1)* Authors of literary and artistic works shall have the exclusive right of authorizing: i. the radio-diffusion of their works or the communication thereof to the public by any other means of wireless diffusion of signs, sounds or images; ii. any communication to the public whether over wires or not, of the radio-diffusion of the work, when this communication is made by a body other than the original one; iii the communication to the public by loudspeaker or any other similar instrument transmitting, by signs, sounds or images, the radio-diffusion of the work.

(2) It shall be a matter for legislation in the countries of the Union to determine the conditions under which the rights mentioned in the preceding paragraph may be exercised, but these conditions shall apply only in the countries where they have been prescribed. T'hey shall not in any circumstances be prejudicial to the moral right of the author, nor to his right to obtain just remuneration which, in the absence of agreement, shall be fixed by competent authority.

(3) Except where otherwise provided, permission granted *in* accordance with paragraph (1) of this Article shall not imply permission to record the radio-diffused work by means of instruments recording sounds or images. It shall, however, be a matter for legislation in the countries of the Union to determine the regulations for ephemeral recordings made by a broadcasting body by means of its own facilities and used for its own emissions. The preservation of these recordings in official archives may, on the ground of their exceptional documentary character, be authorised by such legislation.

ARTICLE 11 ter

Authors of literary works shall enjoy the exclusive right of authorizing the public recitation of their works.

ARTICLE 12

Authors of literary, scientific or artistic works shall enjoy the exclusive right of authorizing Adaptations, arrangements and other alterations of their works.

ARTICLE 13

(1) Authors of musical works shall have the exclusive right of authorizing: i. the recording of such works by instruments capable of reproducing them mechanically; ii. the public performance by means of such instruments of works thus recorded.

(2) Reservations and conditions relating to the application of the rights mentioned in the preceding paragraph may be determined by legislation in each country of the Union, in so far as it may be concerned; but all such reservations and conditions shall apply only in the countries which have prescribed them and shall not, in any circumstances,, be prejudicial to the author's right to obtain just remuneration which. in the absence of agreement. shall be fixed by competent authority.

105

(3) The provisions of paragraph (1) of this Article shall not be retroactive and consequently shall not be applicable in a country of the Union to works which, in that country, may have been lawfully adapted to mechanical instruments before the coming into force of the Convention signed at Berlin on the 13th November 1908, and, in the case of a country having acceded to the Convention since that date or acceding to it in the future, before the date of its accession.

(4) Recordings made in accordance with paragraphs (2) and (3) of this Article and imported without permission from the parties concerned into a country where they are not lawfully allowed shall be liable to seizure.

### Article 14

(1) Authors of literary, scientific or artistic works shall have the exclusive right of authorizing: i. the cinematographic adaptation and reproduction of these works, and the distribution of the works thus adapted or reproduced; ii. the public presentation and performance of the works thus adapted or reproduced.

(2) Without prejudice to the rights of the author of the work adapted or reproduced, a cinematographic work shall be protected as an original work.

(3) The adaptation under any other artistic form of cinematographic productions derived from literary, scientific or artistic works shall, without prejudice to the authorisation of their authors, remain subject to the authorisation of the author of the original work.

(4) Cinematographic adaptation of literary, scientific or artistic works shall not be subject to the reservations and conditions contained in Article 13, paragraph (2).

(5) The provisions of this Article shall apply to reproduction or production effected by any other process analogous to cinematography.

### Article 14bis

*(1) The* author, or after his death the persons or institutions authorised by national legislation, shall, in respect of original works of art and original manuscripts of writers and composers, enjoy the inalienable right to an interest in any sale of the work subsequent to the first disposal of the work by the author.

(2) The protection provided by the preceding paragraph may be claimed in a *country* of the Union only if legislation in the country to which the author belongs so permits, and to the degree permitted by the country where this protection is claimed.

(3) The procedure for collection and the amounts shall be matters for determination by national legislation.

### Article 15

(1) In order that the author of a literary or artistic work protected by this Convention shall, in the absence of proof to the contrary, be regarded as such, and consequently be entitled to institute infringement proceedings in countries of the Union, it shall be sufficient for his name to appear on the work in the usual manner. This paragraph shall be applicable even if this name is a pseudonym, where the pseudonym adopted by the author leaves no doubt as to hisidentity.

(2) In the case of anonymous and pseudonymous works, other than those referred to in the preceding paragraph, the publisher whose name appears on the work shall, in the absence of proof to the contrary, be regarded as representing the author, and in this capacity he shall be entitled to protect and enforce the author's rights. The provisions of this paragraph shall cease to apply if the author reveals his identity and establishes his claim to authorship of the work.

### Article 16

(1) Works infringing copyright may be seized by the competent authorities of any country Of the Union where the original work enjoys legal protection.

(2) In these countries the seizure may also apply to reproductions imported front a country where the work is not protected, or has ceased to be protected.

(3) The seizure shall take place in accordance with the legislation of each country.

### Article 17

The provisions of this Convention cannot in any way affect the right of the Government of each country of the Union to permit, to control, or to prohibit by legislation, the circulation, presentation, or exhibition of any work or production in regard to which the competent authority may find it necessary to exercise that right.

106

### ARTICLE 18

(1) This Convention shall apply to all works which at the moment of its coming into force have not yet fallen into the public domain in the country of origin through the expiry of the term of protection.

(2) If, however, through the expiry of the term of protection which was previously granted, a work has fallen into the public domain of the country where protection is claimed, that work shall not be protected anew.

(3) The application of this principle shall be in accordance with the provisions contained in special Conventions to that effect existing or to be concluded between countries of the Union. In the absence of such provisions, the respective countries shall determine, each in so far as it is concerned, the manner in which the said principle is to be applied.

(4) The above provisions shall apply equally in the case of new accessions to the Union, and in the event of protection being extended by the application of Article 7 or by abandonment of reservations.

### ARTICLE 19

The provisions of this Convention shall not preclude the making of *a* claim to the benefit of any wider provisions which may be afforded by legislation in a country of the Union.

### ARTICLE 20

The Governments of the countries of the Union reserve to themselves the right to enter into special Arrangements between each other, in so far as such Arrangements shall confer upon authors more extended rights than those granted by the Convention, or embody other provisions not contrary to this Convention. The provisions of existing Arrangements which satisfy these conditions shall remain applicable.

### ARTICLE 21

(1) The International Office established under the name of the " Office of the International Union for the Protection of Literary and Artistic Works" shall be maintained.

(2) That Office shall be placed under the high authority of the Government of the Swiss Confederation, which shall regulate its organisation and supervise its working.

(3) The official language of the Office shall be the French language.

### ARTICLE 22

(1) The International Office shall collect information of every kind relating to the protection of the rights of authors over their literary and artistic works. It shall co-ordinate end publish such information It shall undertake the study of questions of general interest to the Union and, by the aid of documents placed at its disposal by the different Administrations, it shall edit a periodical publication in the French language on questions which concern the purpose of the Union. The Governments of the countries of the Union reserve to themselves the power to authorise by agreement the publication by the Office of an edition in one or more other languages if, by experience, this should be shown to be necessary.

(2) The International Office shall always place itself at the disposal of members of the Union in order to provide them with any special information which they may require relating to the protection of literary and artistic works.

(3) The Director of the International Office shall make an annual report on his administration, which shall be communicated to all the members of the Union.

### ARTICLE 23

(1) The expenses of the Office of the International Union shall be shared by the countries of the Union. Until a fresh arrangement is made, they shall not exceed the amount of one hundred and twenty thousand gold francs a year.[a] This amount may be increased, if necessaxy, : by unanimous decision of the countries of the Union or of one of the Conferences provided for in Article 24.

(2) The share of the total expense to be paid by each country shall be determined by the division of the countries of the Union and those subsequently acceding to the Union into six classes, each of which shall contribute in the proportion of a certain number of units, viz.:

| | | |
|---|---|---|
| 1st class | . . . . . . . . . . . . . . | 25 units |
| 2nd " | . . . . . . . . . . . . . . | 20 " |
| 3rd " | . . . . . . . . . . . . . | 15 " |
| 4th " | . . . . . . . . . . . . | 10 " |
| 5th " | . . . . . . . . . . . . . . | 5 " |
| 6th " | . . . . . . . . . . . . . . | 3 . . .: |

[a] This monetary unit is the gold franc of 100 centimes, weighing 10/31 of a gramme and of a fineness of 0.900.

107

(3) These coefficients shall be multiplied by the number of countries of each class, and the total product thus obtained will give the number of units by which the total expense is *to* be divided. The quotient will give the amount of the unit of expense.

(4) Each country shall declare, at the time of its accession, in which of the said classes it desires to be placed, but it may subsequently declare that it wishes to be placed in another class.

(5) The Swiss Administration shall prepare the budget of the Office, supervise its expenditure, make the necessary advances, and draw up the annual account, which shall be communicated to all the other Administrations.

## ARTICLE 24

(1) This Convention may be submitted to revision for the purpose of introducing improvements intended to perfect the system of the Union.

(2) Questions of this kind, as well as those which in other respects concern the development of the Union, shelf be considered in Conferences to be held successively in the countries of the Union by delegates of the said countries. The Administration of the country where a Conference is to meet shall, with the assistance of the International Office, prepare the programme of the Conference. The Director of the Office shall attend the sessions of the Conferences, and may take part in the discussions, but without the right to *vote*.

(3) No alteration in this Convention shelf be binding on the Union except by the unanimous consent of the countries composing it.

## ARTICLE 25

(1) Countries outside the Union which make provision for the legal protection of the rights forming the object of this Convention may accede thereto upon request.

(2) Such accession shall be notified in writing to the Government of the Swiss Confederation, who shall communicate it to all the other countries of the Union.

(3) Such accession shall imply full acceptance of all the clauses and admission to all the advantages provided by this Convention, and shall take effect one month after the date of the notification made by the Government of the Swiss Confederation to the other countries of the Union, unless some later date has been indicated by the acceding country. It may, nevertheless contact an indication that the acceding country wishes to substitute, provisionally at least, for Article 8, which relates to transitions, the provisions of Article 5 of the Convention of 1886 revised at Paris in 1896, on the understanding that those provisions shall apply only *to* translations into the language or languages of that country.

## ARTICLE 26

(1) Any country of the Union may at any time in writing notify the Swiss Government that this Convention shall apply to its overseas territories, colonies, protectorates, territories under its trusteeship, or to any other territory for the international relations of which it is responsible, and the Convention shall thereupon apply to all the territories named in such notification, as from a date determined in accordance with Article 25, paragraph (3). In the absence of such notification, the Convention shall not apply to such territories.

(2) Any country of the Union may *at* any time in writing notify the Government of the Swiss Confederation that this Convention shall cease to apply to all or any of the territories which have been made the subject of a notification under the preceding paragraph, and the Convention shall cease to apply in the territories named in such notification twelve months after its receipt by the Government of the Swiss Confederation.

(3) All notifications given to the Government of the Swiss Confederation in accordance with the provisions of paragraph (1) and (2) of this Article shall be communicated by that Government to all the countries of the Union.

## ARTICLE 27

(1) This convention shall replace, in relations between the countries of the Union, the Convention of Berne of the 9th September 1886, and the subsequent revisions thereof. The Instruments previously in force shall continue to be applicable in relations with countries which do not ratify this Convention.

(2) The countries on whose behalf this Convention is signed may retain the benefit of the reservations which they have previously formulated, on condition that they make declaration to that effect at the time of the deposit of their ratifications..

(3) Countries which are at present members of the Union, but on whose behalf this Convention is not signed, may accede to it at any time, in the manner provided for in Article 25. In that event they shall enjoy the benefit of the provisions of the preceding paragraph,

108

### ARTICLE *27bis*

A dispute between two or more countries of the Union concerning the interpretation or application of this convention, not settled by negotiation, shall be brought before the International Court of Justice for determination by it unless the countries concerned agree on some other method of settlement. The country requesting that the dispute should be brought before the Court shall inform the International Office; the Office shall bring the matter to the attention of the other countries of the Union.

### ARTICLE 28

(1) This Convention shall be ratified, and the ratifications deposited at Brussels, not later than the 1st July 1951. The ratifications, with the dates thereof and all declarations which may accompany them, shall be communicated by the Belgian Government to the Government of the Swiss Confederation, which shall notify the other countries of the Union thereof.

(2) This Convention shall come into force, between the countries which have ratified it, one month after the 1st July 1951. Nevertheless, if before that date it has been ratified by at least six countries of the Union, it shall come into force between those countries one month after the notification to them by the Government of the Swiss Confederation of the deposit of the sixth ratification and, *in* the case of countries which ratify thereafter, one month after the notification of each of such ratifications.

(3) Until the 1st July 1951, countries outside the Union may join it by acceding either to the Convention signed at Rome on the 2nd June 1928, or to this Convention. On or after the 1st July 1951, they may accede only to this Convention. The countries of the Union which shall not have ratified this Convention by the 1st July 1951, may accede thereto in accordance with the procedure provided by Article 25. In this event they shall be entitled to the benefit of the provisions of Article 27, paragraph (2).

### ARTICLE 29

(1) This Convention shall remain in force for an indefinite period. Nevertheless, each country of the Union shall be entitled to denounce it at any time by means of a notification in writing addressed to the Government of the Swiss Confederation.

(2) This denunciation, which shall be communicated by the Government of the Swiss Confederation to all the other countries of the Union, shall take effect only in respect of the country making it, and twelve months after the receipt of the notification of denunciation addressed to the Government of the Swiss Confederation. The Convention shall remain in full force and effect for the other countries of the Union.

(3) The right of denunciation provided by this Article shall not be exercised by any country before the expiry of five years from the date of its ratification or accession.

### ARTICLE 30

(1) Countries which introduce into their legislation the term of protection of fifty years provided by Article 7, paragraph (1), of this Convention shall give notice thereof in writing to the Government of the Swiss Confederation, which shall immediately communicate it to all the other countries of the Union,

, (2) The same procedure shall be followed in the case of countries, abandoning the reservations made or maintained by them in accordance with Articles 25 and 27.

### ARTICLE 31

The official Acts of the Conferences shall be established in French. An equivalent text shall be established in English. In case of dispute as to the interpretation of the Acts, the French text shall always prevail. Any country or group of countries of the Union shall be entitled to have established by the International Office an authoritative text of the said Acts in the language of its choice, and by arrangement with the Office. These texts shall be published in the Acts of the Conferences, annexed to the French and English texts.

In faith whereof the respective Plenipotentiaries have signed the Convention.

Done at Brussels, the 26th day of June 1948, in a single copy, which shall be deposited in the archives of the Department of Foreign Affairs and Foreign Trade of Belgium. A copy, duly certified, shall be transmitted by the diplomatic channel to each country of the Union.

*[Here follow the signatures of the Plenipotentiaries of the States (including Australia) on behalf of which the Convention was signed.]*



109

## THIRD  SCHEDULE

### UNIVERSAL  COPYRIGHT  CONVENTION

*Geneva, September 6, 1952*

The  Contracting  States,

Moved  by  the  desire  to  assure  in  all  countries  copyright  protection  of  literary,  scientific  and  artistic  works,

Convinced  that  a  system  of  copyright  protection  appropriate  to  all  nations  of  the  world  and  expressed  in  a  universal  convention,  additional  to,  and  without  impairing  international  systems  already  in  force,  will  ensure  respect  for  the  rights  of  the  individual  and  encourage  the  development  of  literature,  the  sciences  and  the  arts,

Persuaded  that  such  a  universal  copyright  system  will  facilitate  a  wider  dissemination  of  works  of  the  human  mind  and  increase  international  understanding,

Have  agreed  es  follows:

#### ARTICLE I

Each  Contracting  State  undertakes  to  provide  for  the  adequate  and  effective  protection  of  the  rights  of  authors  and  other  copyright  proprietors  in  literary,  scientific  and  artistic  works,  including  writings,  musical,  dramatic  and  cinematographic  works,  and  paintings,  engravings  and  sculpture.

#### ARTICLE  II

1.  Published  works  of  nationals  of  any  Contracting  State  and  works  first  published  in  that  State  shall  enjoy  in  each  other  Contracting  State  the  same  protection  as  that  other  State  accords  to  works  of  its  nationals  first  published  in  its  own  territory.

2.  Unpublished  works  of  nationals  of  each  Contracting  State  shall  enjoy  in  each  other  Contracting  State  the  same  protection  as  that  other  State  accords  to  unpublished  works  of  its  own  nationals.

3.  For  the  purpose  of  this  Convention  any  Contracting  State  may,  by  domestic  legislation,  assimilate  to  its  own  nationals  any  person  domiciled  in  that  State.

#### ARTICLE 111

1.  Any  Contracting  State  which,  under  its  domestic  law,  requires  as  a  condition  of  copyright  compliance  with  formalities  such  as  deposit,  registration,  notice,  notarial  certificates,  payment  of  fees  or  manufacture  or  publication  in  that  Contracting  State,  shall  regard  these  requirements  as  satisfied  with  respect  to  all  works  protected  in  accordance  with  this  Convention  and  first  published  outside  its  territory  and  the  author  of  which  is  not  one  of  its  nationals,  if  from  the  time  of  the  first  publication  all  the  copies  of  the  work  published  with  the  authority  of  the  author  or  other  copyright  proprietor  bear  the  symbol  ©  accompanied  by  the  name  of  the  copyright  proprietor  and  the  year  of  first  publication  placed  in  such  manner  and  location  as  to  give  reasonable  notice  of  claim  of  copyright.

2.  The  provisions  of  paragraph  1  of  this  article  shall  not  preclude  any  Contracting  State  from  requiring  formalities  or  other  conditions  for  the  acquisition  and  enjoyment  of  copyright  in  respect  of  works  first  published  in  its  territory  or  works  of  its  nationals  wherever  published.

3.  The  provisions  of  paragraph  1  of  this  article  shall  not  preclude  any  Contracting  State  from  providing  that  a  person  seeking  judicial  relief  must,  in  bringing  the  action,  comply  with  procedural  requirements,  such  as  that  the  complainant  must  appear  through  domestic  counsel  or  that  the  complainant  must  deposit  with  the  court  or  an  administrative  office,  or  both,  a  copy  of  the  work  involved  in  the  litigation,  provided  that  failure  to  comply  with  such  requirements  shall  not  affect  the  validity  of  the  copyright,  nor  shall  any  such  requirement  be  imposed  upon  a  national  of  another  Contracting  State  if  such  requirement  is  not  imposed  on  nationals  of  the  State  in  which  protection  is  claimed.

4.  In  each  Contracting  State  there  shall  be  legal  means  of  protecting  without  formalities  the  unpublished  works  of  nationals  of  other  Contracting  States.

5.  If  a  Contracting  State  grants  protection  for  more  than  one  term  of  copyright  and  the  first  term  is  for  a  period  longer  than  one  of  the  minimum  periods  prescribed  in  article  IV,  such  State  shelf  not  be  required  to  comply  with  the  provisions  of  paragraph  1  of  this  article  111  in  respect  of  the  second  or  any  subsequent  term  of  copyright.

#### ARTICLE  IV

L  The  duration  of  protection  of  a  work  shall  be  governed,  in  accordance  with  the  previsions  of  article  II  and  this  article,  by  the  law  of  the  Contracting  State  in  which  protection  is  claimed.

110

2. The term of protection for works protected under this Convention shall not be less than the life of the author and 25 years after his death.

However, any Contracting State which, on the effective date of this Convention in that State, has limited this term for certain classes of works to a period computed from the first publication of the work, shall be entitled to maintain these exceptions and to extend them to other classes of works. For all these classes the term of protection shall not be less than 25 years from the date of first publication.

Any Contracting State which, upon the effective date of this Convention in that State, does not compute the term of protection upon the basis of the life of the author, shall be entitled to compute the term of protection from the date of the first publication of the work or from its registration prior to publication, as the case may be, provided the term of protection shall not be less than 25 years from the date of first publication or from its registration prior to publication, as the case may be.

If the legislation of a Contracting State grants two or more successive terms of protection, the duration of the first term shall not be less than one of the minimum periods specified above.

3. The provisions of paragraph 2 of this article shell not apply to photographic works or to works of applied art; provided, however, that the term of protection in those Contracting States which protect photographic works, or works of applied art in so far as they are protected as artistic works, shall not be less than ten years for each of said classes of works.

4. No Contracting State shall be obliged to grant protection to a work for a period longer than that fixed for the class of works to which the work in question belongs, in the case of unpublished works by the law of the Contracting State of which the author is a national, and in the case of published works by the law of the Contracting State in which the work has been first published.

For the purposes of the application of the preceding provision, if the law of any Contracting State grants two or mere successive terms of protection, the period of protection of that State shall be considered to be the aggregate of those terms. However, if a specified work is not protected by such State during the second or any subsequent term for any reason, the other Contracting States shall not be obliged to protect it during the second or any subsequent term.

5. For the *purposes* of the application of paragraph 4 of this article, the work of a national of a Contracting State, first published in a non-Contracting State, shall be treated as though first published in the Contracting State of which the author *is a* national.

6. For the purposes of the application of paragraph 4 of this article, in case of simultaneous publication in two or more Contracting States, the work shall be treated as though first published in the State which affords the shortest term; any work published in two or more Contracting States within thirty days of its first publication shall be considered as having been published simultaneously in said Contracting States.

## ARTICLE V

1. Copyright shall include the exclusive right of the author to make, publish, and authorise the making and publication of translations of works protected under this Convention.

2. However, any Contracting State may, by its domestic legislation, restrict the right of translation of writings, but only subject to the following provisions:

If, after the expiration of a period of seven years from the date of the first publication of a writing, a translation of such writing has not been published in the national language or languages, as the case may be, of the Contracting State, by the owner of the right of translation or with his authorisation, any national of such Contracting State may obtain a non-exclusive licence from the competent authority thereof to translate the work and publish the work so translated in any of the national languages in which it has not been published; provided that such national, in accordance with the procedure of the State concerned, establishes either that he has requested, and been denied, authorisation by the proprietor of the right to make and publish the translation, or that, after due diligence on his part, he was unable to find the owner of the right. A licence may also be granted on the same conditions if all previous editions of a translation in such language are out of print.

If the owner of the right of translation cannot be found, then the applicant for a licence shall send copies of his application to the publisher whose name appears on the work and, if the nationality of the owner of the right of translation is known, to the diplomatic or consular representative of the State of which such owner is a national, or to the organisation which may have been designated by the government of that State. The licence shall not be granted before the expiration of a period of two months from the date of the despatch of the copies of the application.

Due provision shall be made by domestic legislation to assure to the owner of the right of translation a compensation which is just and conforms to international standards to assure payment and transmittal of such compensation, and to assure a correct translation of the work.

111

The original title and the name of the author of the work shall be printed on all copies of the published translation. The licence shall be valid only for publication of the translation in the territory of the Contracting State where it has been applied for. Copies so published may be imported and sold in another Contracting State if one of the national languages of such other State is the same language as that into which the work has been so translated, and if the domestic law in such other State makes provision for such licences and does not prohibit such importation and sale. Where the foregoing conditions do not exist, the importation and safe, of such copies its a Contracting State shall be governed by its domestic *law* and its agreements. The licence shall not be transferred by the licensee.

The licence shall not be granted when the author has withdrawn from circulation all copies of the work.

### ARTICLE VI

"Publication", as used in this Convention, means the reproduction in tangible form and the general distribution to the public of copies of a work from which it can be read or otherwise visually perceived.

### ARTICLE VII

This Convention shall not apply to works or rights in works which, at the effective date of the Convention in a Contracting State where protection is claimed, are permanently in the Public domain in the said Contracting State.

### ARTICLE VIII

1. This Convention, which shall bear the date of September 6, 1952, shall be deposited with the Director-General of the United Nations Educational, Scientific and Cultural Organization and shall remain open for signature by all States for a period of 120 days after that data. It shall be subject to ratification or acceptance by the signatory States.

2. Any State which has not signed this Convention may accede thereto.

3. Ratification, acceptance or accession shall be effected by the deposit of an instrument to that effect with the Director-General of the United Nations Educational, Scientific and Cultural Organization.

### ARTICLE IX

1. This Convention shall come into force three months after the deposit of twelve instruments of ratification, acceptance or accession, among which there shall be those of four States which are not members of the International Union for the Protection of Literary and Artistic Works.

2. Subsequently, this Convention shall come into force in respect of each State three months after that State has deposited its instrument of ratification, acceptance or accession.

### ARTICLE X

1. Each State party to this Convention undertakes to adopt, in accordance with its Constitution, such measures as are necessary to ensure the application of this Convention.

2. It is understood, however, that at the time an instrument of ratification, acceptance or accession is deposited on behalf of any State, such State must be in a position under its domestic law to give effect to the terms of this Convention.

### ARTICLE XI

1. An Intergovernmental Committee is hereby established with the following duties:—
    (a) to study the problems concerning the application and operation of this Convention;
    (b) to make preparation for periodic revisions of this Convention;
    (c) to study any other problems concerning the international protection of copyright, its co-operation with the various interested international organizations, such as the United Nations Educational, Scientific and Cultural Organization, the International Union for the Protection of Literary and Artistic Works and the Organization of American States;
    (d) to inform the Contracting States as to its activities.

2. The Committee shall consist of the representatives of twelve Contracting States to be selected with due consideration to fair geographical representation and in conformity with the Resolution relating to this article, annexed to this Convention.

The Director-General of the United Nations Educational, Scientific and Cultural Organization, the Director of the Bureau of the International Union for the Protection *of* Literary and Artistic Works and the Secretary-General of the Organization of American States, or their representatives, may attend meetings of the Committee in an advisory capacity.

‘ .

112

### ARTICLE XII

The Intergovernmental Committee shalt convene a conference for revision of this Convention whenever it deems necessary, or at the request of at least ten Contracting States, or a majority of the Contracting States if there are less than twenty Contracting States.

### ARTICLE XIII

Any Contracting State may, at the time of deposit of its instrument of ratification, acceptance or accession, or at any time thereafter, declare by notification addressed to the Director-General of the United Nations Educational, Scientific and Cultural Organization that this Convention shall apply to all or any of the countries or territories for the international relations of which it is responsible and this Convention shall thereupon apply to the countries or territories named in such notification after the expiration of the term of three months provided for in article IX. In the absence of such notification, this Convention shall not apply to arty such country or territory.

### ARTICLE XIV

1. Any Contracting State may denounce this Convention in its own name or on behalf of all or any of the countries or territories as to which a notification has been given under article XIII. The denunciation shalt be made by notification addressed to the Director-General of the United Nations Educational, Scientific end Cultural Organization.

2. Such denunciation shall operate only in respect of the State of the country or territory on whose behalf it was made and shall not take effect until twelve months after the date of receipt of the notification.

### ARTICLE X V

A dispute between two or more Contracting States concerning the interpretation or application of this Convention, not settled by negotiation, shall, unless the States concerned agree on some ether method of settlement, be brought before the International Court of Justice for determination by it.

### ARTICLE XVI

1. This Convention shell be established in English, French and Spanish. The three texts shall be signed and shaft be equally authoritative.

2. Official texts of this Convention shell be established in German, Italian and Portuguese.

Any Contracting State or group of Contracting States shall be entitled to have established by the Director-General of the United Nations Educational Scientific and Cultural Organization other texts in the language of its choice by arrangement with the Director-General

All such texts shall be annexed to the signed texts of this Convention.

### ARTICLE XVII

1. This Convention shall not in any way affect the provisions of the Berne Convention for the Protection of Literary and Artistic Works or membership in the Union created by that Convention,

2. In application of the foregoing paragraph, a Declaration has been annexed to the present article. This Declaration is an integral Part of this Convention for the States bound by the Berne Convention'' on January 1, 1951, or which have or may become bound to it at a later date. The signature of this Convention by such States shall also constitute signature of the said Declaration, and ratification, acceptance or accession by such States shall include the Declaration as well as the Convention.

### ARTICLE XVIII

This Convention shalt not abrogate multilateral or bilateral copyright conventions or arrangements that are or may be in effect exclusively between two or more American Republics. In the event of any difference either between the provisions of such existing conventions or arrangements and the provisions of this Convention, or between the provisions of this Convention and those of any new convention or arrangement which may be formulated between two or more American Republics after this Convention comes into force, the convention or arrangement most recently formulated shall prevail between the parties thereto.  Rights in works acquired in any Contracting State under existing conventions or arrangements before the date this Convention comes into force in such State shall not be affected.

### ARTICLE XIX

This Convention shall not abrogate multilateral or bilateral conventions or arrangements in effect between two or more Contracting States. In the event of any difference between the provisions of such existing contentious or arrangements and the provisions of this Convention, the provisions of

---

[1] " Switzerland No. 1 (1887)," C. 5167.

113

this Convention shall prevail. Rights in works acquired in any Contracting State under existing conventions or arrangements before the date on which this Convention comes into force in such State shall not be affected. Nothing in this article shall affect the provisions of articles XVII and XVIII of this Convention.

### ARTICLE XX

Reservations to this Convention shall not be permitted.

### ARTICLE XXI

The Director-General of the United Nations Educational, Scientific and Cultural Organization shall send duly certified copies of this Convention to the States interested, to the Swiss Federal Council and to the Secretary-General of the United Nations for registration by him.

He shall also inform all interested States of the ratifications, acceptances and accessions which have been deposited, the date on which this Convention comes into force, the notifications under Article XIII of this Convention, and denunciations under Article XIV.

### APPENDIX DECLARATION

*relating to Article XVII*

*The* States which are members of the International Union for the Protection of Literary and *Artistic* Works, and which are signatories to the Universal Copyright Convention.

Desiring to reinforce their mutual relations on the basis of the said Union and to avoid any conflict which might result from the co-existence of the Convention of Berne and the Universal convention.

Have, by common agreement, accepted the terms of the following declaration:

    (a) Works which, according to the Berne Convention, have as their country of origin a country which has withdrawn from the Inter-national Union created by the said Convention, after January 1, 1951, shall not be protected by the Universal Copyright Convention in the countries of the Berne Union;

    (b) The Universal Copyright Convention shall not be applicable to the relationships among countries of the Berne Union in so far as it relates to the protection of works having as their country of origin, within the meaning of the Berne Convention, a country of the International Union created by the said Convention.

### RESOLUTION CONCERNING ARTICLE XI

The Intergovernmental Copyright Conference,

Having considered the problems relating to the Intergovernmental Committee provided for in Article XI of the Universal Copyright Convention,

resolves:

1. The first members of the Committee shall be representatives of the following twelve States, each of those States designating one representative and an alternate: Argentina, Brazil, France, Germany, India, Italy, Japan, Mexico, Spain, Switzerland, United Kingdom and United States of America.

2. The Committee shall be constituted as soon as the Convention comes into force in accordance with article XI of this Convention.

3. The Committee shall elect its Chairman and one Vice-Chairman. It shalt establish its rules of procedure having regard to the following principles:—

    (a) the normal duration of the term of office of the representatives shall be six years with one-third retiring every two years;

    (6) before the expiration of the term of office of say members, the Committee shall decide which States shall cease to be represented on it and which States shall be called upon to designate representative the representatives of those States which have not ratified, accepted or acceded shall be the first to retire,

    (c) the different parts of the world shall be fairly represented

and expresses the wish

that the United Nations Educational, Scientific and Cultural Organization provide its Secretariat

In faith whereof the undersigned, having deposited their respective full powers, have signed this Convention.

Done at Geneva, this sixth day of September, 1952, in a single copy.

[Here follow *the signatures of the Plenipotentiaries of the States (including Australia) on behalf of which the Convention was signed.*]

114

PROTOCOL 1 ANNEXED TO THE UNIVERSAL COPY RIGHT CONVENTION CONCERNING THE APPLICATION OF THAT CONVENTION TO THE WORKS OF STATELESS PERSONS AND REFUGEES

The States parties hereto, being also parties to the Universal Copyright Convention (hereinafter referred to as the " Convention") have accepted the following provisions:—

1. Stateless persons and refugees who have their habitual residence in a State party to this Protocol shall, for the purposes of the Convention, be assimilated to the nationals of that State.

2.—(a) This Protocol shall be signed and shall be subject to ratification or acceptance, or may be acceded to, as if the provisions of article VIII of the Convention applied hereto.

(b) This Protocol shall enter into force in respect of each State on the date of deposit of the instrument of ratification, acceptance or accession of the State concerned or on the date of entry into force of the Convention with respect to such State, whichever is the later.

In faith whereof the undersigned, being duly authorised thereto, have signed this Protocol.

Done at Geneva this sixth day of September, 1952, in the English, French and Spanish languages, the three texts being equally authoritative, in a single copy which shall be dep.muted with the Director-General of U. N. E. S.C.O. The Director-General shall send certified copies to the signatory States, to the Swiss Federal Council and to the Secretary-General of the United Nations for registration.

*[Here follow the signatures of the Plenipotentiaries of the States (including Australia) on behalf of which Protocol 1 was signed.]*

---

PROTOCOL 2 ANNEXED TO THE UNIVERSAL COPYRIGHT CONVENTION, CONCERNING THE APPLICATION OF THAT CONVENTION TO THE WORKS OF CERTAIN INTERNATIONAL ORGANIZATIONS

The State parties hereto, being also parties to the Universal Copyright Convention (hereinafter referred to as the" Convention "),

Have accepted the following provisions:

1.—(a) The protection provided for in article II (1) of the Convention shall apply to works published for the first time by the United Nations, by the Specialised Agencies in relationship therewith, or by the Organization of American States;

(b) Similarly, article II (2) of the Convention shall apply to the said organization or agencies.

2.—(a) This Protocol shall be signed and shall be subject to ratification or acceptance, or may be acceded to, as if the provisions of article VIII of the Convention applied hereto.

(b) This Protocol shall enter into force for each State on the date of deposit of the instrument of ratification, acceptance or accession of the State concerned or on the date of entry into force of the Convention with respect to such State, whichever is the later.

In faith whereof the undersigned, being duly authorised thereto, have signed this Protocol.

Done at Geneva, this sixth day of September, 1952, in the English, French and Spanish languages, the three texts being equally authoritative, in a single copy which shall be deposited with the Director-Genera-l of the Unesco.

The Director-General shall send certified copies to the signatory States, to the Swiss Federal Council, and to the Secretary-General of the United Nations for registration.

*[Here follow the signatures of the Plenipotentiaries of the States (including Australia) on behalf of which Protocol 2* **was** *signed.1*

115

### PROTOCOL 3 ANNEXED TO THE UNIVERSAL COPYRIGHT CONVENTION CONCERNING THE EFFECTIVE DATE OF INSTRUMENTS OF RATIFICATION OR ACCEPTANCE OF OR ACCESSION TO THAT CONVENTION

States parties hereto,

Recognizing that the application of the Universal Copyright Convention (hereinafter referred to as the " Convention ") to States participating in all the international copyright systems already in force will contribute greatly to the value of the Convention;

Have agreed as follows:—

1. Any State party hereto may, on depositing its instrument of ratification or acceptance of or accession to the Convention, notify the Director-General of the United Nations Educational, Scientific and Cultural Organisation (hereinafter referred to as " Director-General") that that instrument shall not take effect for the purposes of Article IX of the Convention until any other State named in such notification shall have deposited its instrument.

2. The notification referred to in paragraph 1 above shall accompany the instrument to which it relates.

3. The Director-General shall inform all States signatory or which have then acceded to the Convention of any notifications received in accordance with this Protocol.

4. This Protocol shall bear the same date and shall remain open for signature for the same period as the Convention.

5. It shall be subject to ratification or acceptance by the signatory States. Any State which has not signed this Protocol may accede thereto.

6.—(a) Ratification or acceptance or accession shall be effected by the deposit of an instrument to that effect with the Director-General.

(b) This Protocol shall enter into force on the date of deposit of not less than four instruments of ratification or acceptance or accession.  The Director-General shall inform all interested States of this date. Instruments deposited after such date shall take effect on the date of their deposit.

In faith whereof the undersigned, being duly authorised thereto, have signed this Protocol.

Done at Geneva, the sixth day of September, 1952, in the English, French and the Spanish languages, the three texts being equally authoritative, in a single copy which shall be annexed to the original copy of the Convention.  The Director-General shall send certified copies to the signatory States to the Swiss Federal council, and to the Secretary-General of United Nations for registration.

*[Here follow the signatures of the Plenipotentiaries of the States (including Australia) on behalf of which Protocol 3 was signed.]*

By Authority: A. J. ARTHUR, Commonwealth Government Printer, Canberra.