# EXHIBIT H

# HIGH COURT OF AUSTRALIA

FRENCH CJ,
KIEFEL, BELL, GAGELER, KEANE, NETTLE AND GORDON JJ

---

**Matter No S99/2015**

MOUNT BRUCE MINING PTY LIMITED                    APPELLANT

AND

WRIGHT PROSPECTING PTY LIMITED & ANOR        RESPONDENTS

**Matter No S102/2015**

WRIGHT PROSPECTING PTY LIMITED                    APPELLANT

AND

MOUNT BRUCE MINING PTY LIMITED & ANOR      RESPONDENTS


*Mount Bruce Mining Pty Limited v Wright Prospecting Pty Limited*
*Wright Prospecting Pty Limited v Mount Bruce Mining Pty Limited*
[2015] HCA 37
*14 October 2015*
S99/2015 & S102/2015

### ORDER

**Matter No S99/2015**

*Appeal dismissed with costs.*

**Matter No S102/2015**

1.   *Appeal and cross-appeal allowed.*

2.   *Set aside paragraphs 1–6 of the order of the Court of Appeal of the*
     *Supreme Court of New South Wales made on 9 December 2014 and,*
     *in their place, order that the appeal to that Court be dismissed with*
     *costs.*

2.

3.      *The first respondent pay the appellant's and the second respondent's*
        *costs in this Court.*


On appeal from the Supreme Court of New South Wales


**Representation**

A J Myers QC with K A Stern SC and R J Hardcastle for the appellant in
S102/2015 and the first respondent in S99/2015 (instructed by Clayton Utz
Lawyers)

N J Young QC with M J Darke SC and M A Izzo for the appellant in
S99/2015 and the first respondent in S102/2015 (instructed by Allens)

N C Hutley SC with J C Giles for the second respondent in both matters
(instructed by Horton Rhodes)

**Intervener**

A C Archibald QC with M P Costello for Perron Iron Ore Pty Ltd,
intervening (instructed by King & Wood Mallesons)


Notice:  This copy of the Court's Reasons for Judgment is subject
to formal revision prior to publication in the Commonwealth Law
Reports.

**CATCHWORDS**

**Mount Bruce Mining Pty Limited v Wright Prospecting Pty Limited**
**Wright Prospecting Pty Limited v Mount Bruce Mining Pty Limited**

Contract – Construction of terms – Where contract concerned acquisition of rights in relation to temporary reserves and payment of royalties in respect of iron ore mined – Where royalty payable in respect of iron ore mined from "MBM area" – Whether "MBM area" refers to physical area of land or rights in relation to that land – Meaning of phrase "deriving title through or under".

Contract – Construction of terms – Recourse to background or surrounding circumstances.

High Court – Appellate jurisdiction of High Court – Precedential value of special leave reasons.

Words and phrases – "commercial purpose", "deriving title through or under", "MBM area", "surrounding circumstances", "temporary reserves".

*Mining Act* 1904 (WA), ss 48, 50, 53, 276, 277.

FRENCH CJ, NETTLE AND GORDON JJ.

Introduction

1    Wright Prospecting Pty Limited ("WPPL"), Hancock Prospecting Pty Limited ("HPPL") (together "Hanwright"), Hamersley Iron Pty Limited ("Hamersley Iron") and Mount Bruce Mining Pty Limited ("MBM") entered into an agreement dated 5 May 1970 ("the 1970 Agreement").  These appeals arise out of a dispute about the construction of a provision of the 1970 Agreement concerning the payment of royalties by MBM in relation to ore mined from areas of land the subject of the Agreement.

2    Under cl 2.2 of the 1970 Agreement, MBM acquired from Hanwright the entire rights in relation to the "MBM area", a term defined by reference to "temporary reserves" granted under the *Mining Act* 1904 (WA) ("the Mining Act").  Under cl 3.1 of the 1970 Agreement, royalties were payable to Hanwright on "[o]re won by MBM from the MBM area".  The obligation to pay royalties extended to "all persons or corporations deriving title through or under" MBM to the MBM area.

3    Hanwright commenced proceedings against Hamersley Iron and MBM in the Supreme Court of New South Wales, claiming that royalties were payable by MBM in respect of iron ore won from two areas known as "Eastern Range" and "Channar".  The trial judge upheld Hanwright's claim against MBM[1] and entered judgment for Hanwright against MBM in the amount of $130,816,256.83[2].

4    The Court of Appeal of the Supreme Court of New South Wales allowed the appeal, in part[3].  Relevantly, the Court of Appeal agreed with the trial judge that "MBM area" referred to an area of land to which rights of occupancy had been transferred to MBM (rather than to the rights themselves) and that all of Eastern Range and part of Channar, referred to as "Channar A", are in the MBM area.  However, the Court of Appeal also held that Hanwright was not entitled to royalties in respect of ore being won from Channar A because the ore was not being won or mined in that area by entities deriving title to that land "through or under" MBM.

5    There are two questions on appeal to this Court.  The first question is whether Eastern Range and Channar A are within the MBM area.  The answer to that question turns on whether the term "MBM area" as defined in the 1970

1    *Wright Prospecting Pty Ltd v Hamersley Iron Pty Ltd* [2013] NSWSC 536.

2    *Wright Prospecting Pty Ltd v Hamersley Iron Pty Ltd [No 2]* [2013] NSWSC 709.

3    *Mount Bruce Mining Pty Ltd v Wright Prospecting Pty Ltd* [2014] NSWCA 323.

*French    CJ*
*Nettle     J*
*Gordon     J*

2.

Agreement refers to an area of land to which rights of occupancy had been transferred to MBM, or whether it refers to the rights themselves. That question is raised in S99 of 2015. If the answer to the first question is yes, the second question arises: whether the ore that has been mined in those parts of the MBM area was mined by entities "deriving title through or under" MBM. That question is raised in S102 of 2015. The appeal by WPPL in that matter is supported by the cross-appeal by HPPL in the same matter.

6          It was accepted at trial, and was common ground before this Court, that if Eastern Range is within the MBM area then a royalty is payable because it is not disputed that ore is being won there by entities deriving title "through or under" MBM. The second question therefore relates only to Channar A. It is for this reason that the factual analysis at times focuses on Channar A.

7          For the reasons that follow, the "MBM area" in cll 2.2 and 3.1 of the 1970 Agreement is the physical area indicated on the map attached to the 1970 Agreement as numbered blocks 4937H to 4946H and 4963H to 4967H. Ore has been mined in the MBM area (which includes Eastern Range and Channar A) by entities deriving title through or under MBM. MBM is therefore obliged, under cl 3.1 of the 1970 Agreement, to pay Hanwright a royalty on the ore being won from the MBM area.

8          These reasons will address the relevant provisions of the Mining Act and the factual history including the sequence of private and State Agreements of which the 1970 Agreement is part. They will also refer to the relevant principles of construction and the two constructional questions raised by these appeals.

### The Mining Act – temporary reserves and mining leases

9          Section 276 of the Mining Act permitted the relevant Minister to temporarily reserve any Crown land from occupation and to authorise any person to temporarily occupy it on such terms as the Minister thought fit. The marginal note in the Mining Act referred to these reserves as "[t]emporary reserves". The authorisation of temporary occupancy of Crown land was granted in respect of areas or blocks of land identified by numbers and described as temporary reserves. Often, for ease of reference, a temporary reserve was referred to by the prefix "TR" followed by the block number. The terms and conditions of any right of occupancy that exceeded 12 months and the terms and conditions of any renewal of that right of occupancy had to be tabled in Parliament[4].

10         Relevantly, s 48 of the Mining Act authorised the Governor to grant a lease of any Crown land for purposes including mining and all purposes

---

**4**    s 277(3)-(4).

*French    CJ*
*Nettle      J*
*Gordon      J*

3.

necessary to effectively carry on mining operations for any mineral other than gold[5]. The area of land comprising the mining lease was to be "such as may be prescribed" but could not exceed 300 acres[6]. The term could not exceed 21 years from 1 January preceding the approval with a right to renew for 21 years[7]. There was no connection made in the Mining Act between the grant of a temporary reserve and the grant of a mining lease. Relevantly for present purposes, however, the grant of a mining lease over an area covered by a temporary reserve was only made following expiry or surrender of the temporary reserve[8].

11      The grants of temporary reserves and mining leases relevant to these appeals take their place within the framework of agreements made between the State and the grantees. Each agreement was approved or ratified by an Act of Parliament enacted for that purpose. The factual history, including reference to relevant State Agreements, follows.

*The 1962 Agreement and the 1963 Hamersley State Agreement*

12      During the 1950s and the 1960s, Hanwright identified bodies of iron ore in the Pilbara in Western Australia.

13      In October 1962, Hamersley Holdings Pty Ltd ("Hamersley Holdings") and Hamersley Iron were formed. Hamersley Iron and MBM are both wholly owned subsidiaries of Hamersley Holdings. Hamersley Holdings is a subsidiary of Rio Tinto Ltd ("Rio Tinto"). Hamersley Iron was the operative company for what became known, within the Rio Tinto group, as the Hamersley project.

14      Prior to December 1962, Hanwright was granted rights of occupancy over certain temporary reserves ("the 1962 Hanwright TRs"). These reserves became the subject of an agreement on 12 December 1962 between Lang Hancock (owner of HPPL), Ernest Wright (owner of WPPL) and Hanwright (as Vendors) and Hamersley Iron (as Purchaser) ("the 1962 Agreement") whereby the Vendors sold to Hamersley Iron all their right, title and interest in and to certain temporary reserves, the land comprised therein and all rights to prospect or mine granted thereby or flowing therefrom. The 1962 Hanwright TRs are unrelated to the temporary reserves the subject of these appeals.

---

**5**    s 48(1).

**6**    s 50(1)(b).

**7**    s 53.

**8**    *Nicholas v Western Australia* [1972] WAR 168 at 171. See also *Delhi International Oil Corporation v Olive* [1973] WAR 52 at 54; Lang and Crommelin, *Australian Mining and Petroleum Laws*, (1979) at [807.5].

*French      CJ*
*Nettle      J*
*Gordon      J*

4.

15          The 1962 Agreement provided for a royalty to be payable to Hanwright if ore was won from the area of the 1962 Hanwright TRs or from additional identified areas of land over which, at that time, Hanwright did not hold any rights of occupancy.    Clause 24(iii) provided that, except where the context otherwise required:

> "The expression 'the Purchaser' shall … *include its successors and assigns and all persons or corporations deriving title through or under the Purchaser* to any areas of land in respect of which an obligation to pay any amount has arisen or may arise".  (emphasis added)

16          That clause is at the heart of the second construction question identified earlier and is considered later in these reasons.

17          Pursuant to a State Agreement approved[9] on 13 November 1963 ("the 1963 Hamersley State Agreement"), Hamersley Iron acquired significant temporary reserves over the areas covered by the 1962 Agreement.

*The 1967 Hanwright State Agreement*

18          By a further State Agreement approved[10] on 23 October 1967 ("the 1967 Hanwright State Agreement"), Hanwright was granted temporary reserves over areas which came to be numbered as blocks 4937H to 4967H (inclusive) ("the Temporary Reserves") for a period expiring on 31 December 1968, with successive renewals for a period of 12 months.  The last renewal would expire on the earliest of a number of events.  One event was the date Hanwright applied for a mining lease.  Clause 8(1) of the 1967 Hanwright State Agreement permitted Hanwright to apply for a mining lease of part or parts of the total area of the Temporary Reserves not exceeding 300 square miles for a period of 21 years. Eastern Range lies wholly within TR 4967H and Channar lies wholly within TR 4965H and TR 4966H.  Accordingly, Eastern Range and Channar lie wholly within the Temporary Reserves.

*The 1968 Agreement*

19          On 31 January 1968, Hanwright and Hamersley Iron entered into an agreement ("the 1968 Agreement").  Under the 1968 Agreement, Hamersley Iron was to form a new company, MBM, of which Hamersley Iron would hold 75 per cent and Hanwright would hold 25 per cent.  The 1968 Agreement also dealt with temporary reserves held by Hanwright, described as the "Mount Bruce Reserves", which included Eastern Range and Channar A.  Ore won by MBM

**9**     *Iron Ore (Hamersley Range) Agreement Act* 1963 (WA).

**10**    *Iron Ore (Hanwright) Agreement Act* 1967 (WA).

*French    CJ*
*Nettle      J*
*Gordon    J*

5.

from the Mount Bruce Reserves would be subject to payment by MBM to Hanwright of a royalty. Importantly, if Hamersley Iron gave Hanwright written notice, certain temporary reserves held by Hanwright (including the Mount Bruce Reserves) were to be transferred to MBM.

*The 1968 Hanwright State Amendment Agreement*

20      The 1967 Hanwright State Agreement was amended by a further State Agreement ("the 1968 Hanwright State Amendment Agreement"), approved[11] on 12 November 1968. Temporary reserves earlier issued to Hanwright were cancelled and the Temporary Reserves, which included TR 4965H, TR 4966H and TR 4967H, were issued to Hanwright.

*The 1970 Agreement and its implementation*

21      Hanwright, Hamersley Iron and MBM entered into the 1970 Agreement on 5 May 1970.

22      The preamble records that:

"1.1      Hanwright hold[s] Temporary Reserves in respect of areas indicated on the attached map (Appendix A) as the following numbered blocks:

4937H to 4967H inclusive

and that these blocks (hereinafter referred to as 'Mount Bruce Temporary Reserves') are subject to the exercise of an option by [MBM].

1.2      There exists an agreement dated 31st January, 1968 between Hanwright and Hamersley [Iron] whereby Hamersley [Iron] may exercise an option over the Temporary Reserves.

…

1.4      All references to blocks or reserves include all present and future rights of Hanwright in relation to the above blocks and reserves including any extensions of the ore bodies located therein or any adjustments of the present indicated boundaries of the above Temporary Reserves arranged with the Western Australian Government."

---

[11] *Iron Ore (Hanwright) Agreement Act Amendment Act* 1968 (WA).

*French    CJ*
*Nettle      J*
*Gordon    J*

6.

23    The 1970 Agreement recorded that Hamersley Iron relinquished its option under the 1968 Agreement[12].

24    Clause 2.2 provided that, in consideration of that relinquishment and the payment of $5 million by MBM to Hanwright, the Mount Bruce Temporary Reserves were divided between Hanwright and MBM so that in respect of:

> "temporary reserves 4947H to 4962H inclusive (hereinafter called 'Hanwright area') the entire rights thereto are restored to Hanwright and in respect to temporary reserves 4937H to 4946H inclusive and 4963H to 4967H inclusive (together hereinafter called 'MBM area'), MBM acquires the entire rights thereto."

25    As is evident, as part of that division MBM acquired from Hanwright "the entire rights" to "temporary reserves 4937H to 4946H inclusive and 4963H to 4967H inclusive", which were collectively defined as the "MBM area". Channar A is wholly within the area that was covered by TR 4965H and TR 4966H.   Eastern Range is wholly within the area that was covered by TR 4967H.

26    Royalties were addressed in cl 3.1 of the 1970 Agreement, which relevantly provided that:

> "Ore won by MBM from the MBM area will be subject to the payment to Hanwright of a base Royalty of 2.5% *on the same conditions as apply to the existing Agreement between Hanwright and Hamersley [Iron]*". (emphasis added)

27    The "existing Agreement between Hanwright and Hamersley [Iron]" was a reference to the 1962 Agreement.  It was common ground that the obligation to pay royalties extended to "all persons or corporations deriving title through or under" MBM because cl 3.1 of the 1970 Agreement incorporated, by reference, cl 24(iii) of the 1962 Agreement.

28    Under cl 3.1 of the 1970 Agreement, a royalty on ore won was therefore payable to Hanwright if two conditions were satisfied:  (1) the ore was won from the MBM area; and (2) the ore was won by MBM or by an entity captured by the extended definition in cl 24(iii), which included the successors and assigns of MBM and all persons or corporations deriving title through or under MBM to any areas of land in respect of which an obligation to pay a royalty had arisen or may arise.

---

**12**   cl 2.1.

*French    CJ*
*Nettle      J*
*Gordon    J*

7.

29        Implementation of the arrangements in the 1970 Agreement required governmental approval[13].

*The 1972 Mount Bruce State Agreement and what followed*

30        On 10 March 1972, a State Agreement was executed between the State of Western Australia and MBM ("the 1972 Mount Bruce State Agreement"). It was approved[14] by an Act of Parliament on 16 June 1972. Under the 1972 Mount Bruce State Agreement, MBM was entitled to apply for a mining lease over the MBM area to a maximum area of 300 square miles.

31        On 30 August 1972 Hanwright surrendered its rights of occupancy over the MBM area and on 18 April 1973 MBM was granted rights of occupancy over land covered by the MBM area (expressed to be retrospective to 30 August 1972).

32        On 17 October 1974, a mining lease, ML 252SA, was granted by the State of Western Australia to MBM. This was for an area of 210.91 square miles, less than the 300 square miles maximum area that had been agreed in the 1972 Mount Bruce State Agreement. Upon the grant of ML 252SA, the rights of occupancy held by MBM over what remained of TR 4965H, TR 4966H and TR 4967H (within the MBM area) expired and were cancelled.

*Eastern Range and secs 236 and 237 of ML 4SA*

33        From 17 October 1974 until 26 August 1977, there were no temporary reserves or mining leases over what remained of the former TR 4967H. It was unoccupied and unreserved land.

34        However, on 26 August 1977, MBM was granted TR 6603H, which provided rights of occupancy over an area which covered a large part (if not the whole) of what remained of the former TR 4967H.

35        Under a State Agreement approved[15] on 27 May 1982, Hamersley Iron obtained the right to apply for a mining lease over the area covered by TR 6603H, subject to MBM surrendering TR 6603H. On 19 April 1982, MBM surrendered that temporary reserve.

---

**13**    cl 10 of the 1970 Agreement.

**14**    *Iron Ore (Mount Bruce) Agreement Act* 1972 (WA).

**15**    *Iron Ore (Hamersley Range) Agreement Amendment Act* 1982 (WA).

*French    CJ*
*Nettle    J*
*Gordon    J*

8.

36      Accordingly, on 8 December 1982, Hamersley Iron was granted new sections of an existing mining lease, ML 4SA, which included part of the area covered by TR 6603H.   Sections 236 and 237, included in the expanded ML 4SA, are Eastern Range.   Hamersley Iron has held secs 236 and 237 of ML 4SA from grant onwards.

37      As noted earlier, the only question regarding Eastern Range for resolution in these appeals is whether Eastern Range was in the MBM area, because it was common ground at trial, on appeal and before this Court that Hamersley Iron derived title to Eastern Range through or under MBM.   Accordingly, if Eastern Range is in the MBM area, then a royalty is due to Hanwright for ore won from Eastern Range.

*Channar*

38      Channar, which was wholly within the MBM area, was not consistently treated.   Part of it (referred to as Channar B) was included in secs 18 and 19 of ML 252SA.   MBM pays royalties to Hanwright in respect of ore won from that area.   There is no dispute as to Hanwright's entitlement to royalties over Channar B.   The balance of Channar (referred to as Channar A) was not covered by ML 252SA.   MBM's rights in respect of Channar A expired.   From 17 October 1974 until 26 August 1977 (when MBM was granted TR 6603H), there were no temporary reserves or mining leases over what remained of the former TR 4965H and TR 4966H.   It was unoccupied and unreserved land.

*Hamersley Exploration and ML 4SA*

39      On 21 April 1978, Hamersley Exploration Pty Limited ("Hamex"), a subsidiary of Hamersley Holdings and part of the Hamersley group, was granted rights of occupancy over TR 6663H, which covered a large part (if not the whole) of the reduced vacant area remaining of the former TR 4966H after the grant of ML 252SA.   TR 4966H covered part of Channar A and was within the MBM area.   On 2 May 1979, Hamex was granted rights of occupancy over TR 6982H and TR 6983H, parts of which covered what had been TR 4965H and TR 4966H (and which also covered part of Channar A).   TR 6663H, TR 6982H and TR 6983H together covered the whole of Channar A.   The applications by Hamex for TR 6663H, TR 6982H and TR 6983H identified that the area was on the boundary of ML 252SA, that the proposed work was (among other things) to continue structural and stratigraphic studies on existing data, that Hamex was a wholly owned subsidiary of Hamersley Holdings and that adequate funds were available for the programme.

French    CJ
Nettle    J
Gordon    J

9.

40        By the applications for, and granting of, ML 252SA and TR 6663H,
TR 6982H and TR 6983H, the Hamersley group held (through a mining lease or
right of occupancy over a temporary reserve) the entirety of the Channar area.

41        In 1982, the 1963 Hamersley State Agreement was varied to provide that
Hamersley Iron (and its successors and permitted assigns and appointees) could
vary an existing mining lease (ML 4SA) to cover a number of new areas, subject
to relevant rights of occupancy being surrendered[16].  On 19 April 1982, Hamex
surrendered its rights of occupancy over TR 6663H, TR 6982H and TR 6983H.
On 8 December 1982, Hamersley Iron was granted new sections of ML 4SA,
including sec 238, which covered Channar A.

*Channar Joint Venture*

42        On 16 November 1987, CMIEC (Channar) Pty Ltd and Channar Mining
Pty Limited ("the Channar Joint Venturers") entered into a joint venture
agreement.  Channar Mining Pty Limited is a wholly owned subsidiary of
Hamersley Holdings and part of the Hamersley group.

43        In 1987, the Channar Joint Venturers and Hamersley Iron entered into a
State Agreement with the State of Western Australia ("the 1987 Channar State
Agreement")[17].  Clause 15 of the 1987 Channar State Agreement provided that
the State would grant the Channar Joint Venturers a mining lease over both
Channar A and Channar B on condition that Hamersley Iron surrender sec 238 of
ML 4SA (Channar A) and MBM surrender secs 18 and 19 of ML 252SA
(Channar B).  On 22 March 1988, Hamersley Iron surrendered sec 238 of
ML 4SA and MBM surrendered secs 18 and 19 of ML 252SA.

44        The trial judge made two relevant and unchallenged findings:  first, that "it
may safely be inferred that MBM's surrender of secs 18 and 19 of ML 252SA
and Hamersley Iron's surrender of sec 238 of ML 4SA … were by arrangement
between themselves and the Channar Joint Venturers" and, second, that those
surrenders were both necessary for the grant of ML 265SA[18].

45        On 8 May 1988, the Channar Joint Venturers were granted ML 265SA for
a term of 30 years over the combined areas of Channar A and Channar B.

---

16    That amendment agreement was approved by the *Iron Ore (Hamersley Range)
       Agreement Amendment Act* 1982 (WA).

17    Approved by the *Iron Ore (Channar Joint Venture) Agreement Act* 1987 (WA).

18    *Wright Prospecting Pty Ltd v Hamersley Iron Pty Ltd* [2013] NSWSC 536 at [128].

*French    CJ*
*Nettle      J*
*Gordon    J*

10.

Applicable legal principles in these appeals

46          The rights and liabilities of parties under a provision of a contract are determined objectively[19], by reference to its text, context (the entire text of the contract as well as any contract, document or statutory provision referred to in the text of the contract) and purpose[20].

47          In determining the meaning of the terms of a commercial contract, it is necessary to ask what a reasonable businessperson would have understood those terms to mean[21]. That enquiry will require consideration of the language used by the parties in the contract, the circumstances addressed by the contract and the commercial purpose or objects to be secured by the contract[22].

48          Ordinarily, this process of construction is possible by reference to the contract alone. Indeed, if an expression in a contract is unambiguous or susceptible of only one meaning, evidence of surrounding circumstances (events, circumstances and things external to the contract) cannot be adduced to contradict its plain meaning[23].

49          However, sometimes, recourse to events, circumstances and things external to the contract is necessary. It may be necessary in identifying the commercial purpose or objects of the contract where that task is facilitated by an understanding "of the genesis of the transaction, the background, the context [and] the market in which the parties are operating"[24]. It may be necessary in

---

**19**    *Electricity Generation Corporation v Woodside Energy Ltd* (2014) 251 CLR 640 at 656 [35]; [2014] HCA 7.

**20**    *Codelfa Construction Pty Ltd v State Rail Authority of New South Wales* (1982) 149 CLR 337 at 350 (citing *Reardon Smith Line Ltd v Yngvar Hansen-Tangen* [1976] 1 WLR 989 at 995-996; [1976] 3 All ER 570 at 574), 352; [1982] HCA 24. See also Sir Anthony Mason, "Opening Address", (2009) 25 *Journal of Contract Law* 1 at 3.

**21**    *Electricity Generation Corporation v Woodside Energy Ltd* (2014) 251 CLR 640 at 656 [35].

**22**    *Electricity Generation Corporation v Woodside Energy Ltd* (2014) 251 CLR 640 at 656-657 [35].

**23**    *Codelfa Construction Pty Ltd v State Rail Authority of New South Wales* (1982) 149 CLR 337 at 352. See also Sir Anthony Mason, "Opening Address", (2009) 25 *Journal of Contract Law* 1 at 3.

**24**    *Electricity Generation Corporation v Woodside Energy Ltd* (2014) 251 CLR 640 at

11.

determining the proper construction where there is a constructional choice.  The question whether events, circumstances and things external to the contract may be resorted to, in order to identify the existence of a constructional choice, does not arise in these appeals.

50          Each of the events, circumstances and things external to the contract to which recourse may be had is objective.  What may be referred to are events, circumstances and things external to the contract which are known to the parties or which assist in identifying the purpose or object of the transaction, which may include its history, background and context and the market in which the parties were operating.  What is inadmissible is evidence of the parties' statements and actions reflecting their actual intentions and expectations[25].

51          Other principles are relevant in the construction of commercial contracts.  Unless a contrary intention is indicated in the contract, a court is entitled to approach the task of giving a commercial contract an interpretation on the assumption "that the parties ... intended to produce a commercial result"[26].  Put another way, a commercial contract should be construed so as to avoid it "making commercial nonsense or working commercial inconvenience"[27].

52          These observations are not intended to state any departure from the law as set out in *Codelfa Construction Pty Ltd v State Rail Authority of New South Wales*[28] and *Electricity Generation Corporation v Woodside Energy Ltd*[29].  We agree with the observations of Kiefel and Keane JJ with respect to *Western Export Services Inc v Jireh International Pty Ltd*[30].

---

657 [35], citing *Codelfa Construction Pty Ltd v State Rail Authority of New South Wales* (1982) 149 CLR 337 at 350, in turn citing *Reardon Smith Line Ltd v Yngvar Hansen-Tangen* [1976] 1 WLR 989 at 995-996; [1976] 3 All ER 570 at 574.

**25**   *Codelfa Construction Pty Ltd v State Rail Authority of New South Wales* (1982) 149 CLR 337 at 352; *Reardon Smith Line Ltd v Yngvar Hansen-Tangen* [1976] 1 WLR 989 at 995-996; [1976] 3 All ER 570 at 574.

**26**   *Electricity Generation Corporation v Woodside Energy Ltd* (2014) 251 CLR 640 at 657 [35], citing *Re Golden Key Ltd* [2009] EWCA Civ 636 at [28].

**27**   *Electricity Generation Corporation v Woodside Energy Ltd* (2014) 251 CLR 640 at 657 [35], citing *Zhu v Treasurer of New South Wales* (2004) 218 CLR 530 at 559 [82]; [2004] HCA 56.

**28**   (1982) 149 CLR 337.

**29**   (2014) 251 CLR 640.

*French    CJ*
*Nettle      J*
*Gordon    J*

12.

53        It is appropriate to consider each construction issue in turn.

MBM area – S99 of 2015

54        The first question is about the proper construction of the phrase "MBM area" in the 1970 Agreement.  It concerns the first condition for the payment of royalties to Hanwright pursuant to cl 3.1 of the 1970 Agreement, namely from where must the ore be won for a royalty to be payable?

55        The question is – does the phrase "MBM area" refer to an area of land fixed by the then existing boundaries of identified temporary reserves or is it a reference to Hanwright's present and future rights in relation to those temporary reserves, being the rights which MBM acquired from Hanwright?  That question may be resolved upon a consideration of the text, context and purpose of the 1970 Agreement.  It involves an application of the ordinary and unambiguous meaning of the relevant words of the definition of "MBM area".

56        The Court of Appeal construed the term "MBM area" in cl 3.1 of the 1970 Agreement to refer to an area of land identified in two ways:  by being the subject of specific temporary reserves and by being marked on a map attached to the 1970 Agreement[31].

57        MBM submitted, however, that on a careful contextual reading of cll 1.1, 1.4 and 2.2 of the 1970 Agreement, "MBM area" in cl 2.2 refers to and includes "Hanwright's present and future rights in relation to temporary reserves 4937H to 4946H and 4963H to 4967H, being the rights which MBM acquired" under cl 2.2.  MBM submitted that a royalty is only payable under cl 3.1 on ore won from the exercise of rights it obtained from Hanwright.  Hanwright submitted that a royalty is payable on ore won by MBM from the fixed area of land referred to in the 1970 Agreement.

58        MBM's construction should be rejected.  For the reasons that follow, "MBM area" refers to the area of land fixed by the then existing boundaries of temporary reserves numbered 4937H to 4946H inclusive and 4963H to 4967H inclusive.  That is the natural and ordinary understanding of the language used and is consistent with the commercial circumstances which the 1970 Agreement addressed and the purpose or object of the transaction it was intended to secure.

59        The starting point is the language used by the parties in the 1970 Agreement.

**30**    (2011) 86 ALJR 1; 282 ALR 604; [2011] HCA 45.

**31**    *Mount Bruce Mining Pty Ltd v Wright Prospecting Pty Ltd* [2014] NSWCA 323 at [42]-[46], [96]-[100].

*French    CJ*
*Nettle      J*
*Gordon     J*

13.

60          First, cl 1.1 of the 1970 Agreement records that temporary reserves known as the "Mount Bruce Temporary Reserves" were areas indicated on a map appended to the 1970 Agreement and numbered as blocks 4937H to 4967H (inclusive).  The reference to "temporary reserves" was a reference to the rights of occupancy granted pursuant to s 276 of the Mining Act in respect of Crown land reserved by the Minister under that section.   As is apparent, the phrase "Mount Bruce Temporary Reserves" was intended to refer to areas of land identified in two ways – by reference to specific areas marked on the map and by being the subject of TR 4937H to TR 4967H (inclusive).

61          By cl 2.2 of the 1970 Agreement, those Mount Bruce Temporary Reserves were divided between MBM and Hanwright.   The Mount Bruce Temporary Reserves numbered 4937H to 4946H and 4963H to 4967H inclusive were labelled the "MBM area" and MBM acquired the *entire rights* to those temporary reserves.   The remaining identified temporary reserves (identified by block numbers on the map) were labelled the "Hanwright area".  The entire rights to the Hanwright area were restored to Hanwright.  Clause 2.2 maintains the distinction between rights and the areas of land in respect of which those rights are held.

62          The MBM area was and remained defined by reference to identified temporary reserves (by block numbers) which were indicated on the map appended to the 1970 Agreement.    That construction of "MBM area" is consistent with a (if not the) principal purpose or object of the 1970 Agreement, namely to effect a division of the Mount Bruce Temporary Reserves between Hanwright and MBM.  The lines of division were drawn by reference to physical areas or blocks on a map and not by reference to any other indicia.

63          Other clauses of the 1970 Agreement support this construction and treat the MBM area as a physical area.  In cl 3.1, the obligation to pay royalties is for "[o]re won by MBM from the MBM area".  Clause 12 refers to the fact that Hamersley Iron agrees to continue to finance Hanwright "until the commencement of mining of the MBM area".

64          Similarly, other clauses of the 1970 Agreement also deal with the parties' respective obligations and rights by reference to physical areas and not any other indicia.   For example, cl 2.3 refers to the reduction of the Mount Bruce Temporary Reserves to a mining lease or leases and provides that the "*total area* of such lease or leases will be divided between MBM and Hanwright" (emphasis added) in the proportion of 75 per cent to MBM and 25 per cent to Hanwright.  It further provides that Hamersley Iron will use its best endeavours to ensure that Hanwright is granted tenure over certain "additional areas" indicated by Hanwright in the areas around Mount Bruce.  Clause 6.12 refers to accepting "ore from the Hanwright area blended with ore produced by Hamersley [Iron] from its

French    CJ
Nettle    J
Gordon    J

14.

areas" and cl 9 refers to permission being granted to a party to represent Hanwright "for sale of ore mined from the Hanwright area".

65        MBM placed considerable reliance on cl 1.4 of the 1970 Agreement.  That provision does not support its construction.  Clause 1.4 comprises two parts.  The first three lines provide that "[a]ll references to blocks or reserves include all present and future rights of Hanwright in relation to the above blocks and reserves".  The identifying indicia are the blocks and reserves divided by reference to physical areas.  What is divided between Hanwright and MBM are Hanwright's current and future rights to those physical blocks and reserves.  The need for the clause to pick up Hanwright's "future rights" arose because rights might come into existence between the date of the 1970 Agreement and the date of the division of the Temporary Reserves provided for by cl 2.2.  That Hanwright's rights in relation to the MBM area might change between those two dates was made clear by a number of clauses in the 1970 Agreement[32] including, in particular, cl 10, which provided:

> "The implementation of these arrangements and the obligations involved by them on the part of Hanwright and on the part of Hamersley [Iron] and MBM are all subject to and conditional upon the necessary Governmental approvals and implementations being effected."

66        The second part of cl 1.4 reinforces that the MBM area is defined by reference to areas of land.  It provides that "[a]ll references to blocks or reserves" include "any extensions of the ore bodies located therein or any adjustments of the present indicated boundaries of the [Mount Bruce] Temporary Reserves arranged with the Western Australian Government".  The physical ore bodies are located in areas of land.  The boundaries of the temporary reserves are defined by reference to areas of land.  That cl 1.4 extends the physical boundaries of the blocks or reserves in these two ways is unsurprising.  First, a grantee of a temporary reserve is granted rights of exclusive occupation for mineral exploration purposes for a limited time.  As a result of that mineral exploration it is possible that ore bodies identified within the temporary reserve may be identified as physically extending into areas outside the area of land comprising the temporary reserve.  Second, the boundaries of temporary reserves might be

---

[32]    See, also, cl 2.3 (which contemplated a new State Agreement to amend the 1967 Hanwright State Agreement) and cl 4 (under which Hanwright and MBM agreed to seek the Minister's consent to vary the *Iron Ore (Hanwright) Agreement Act Amendment Act* 1968 (WA) so that MBM's right to give notice under that agreement to take the place of the joint venturers would be limited to the blocks of the MBM area and MBM would take over secondary processing obligations under the *Iron Ore (Hanwright) Agreement Act* 1967 (WA) and the *Iron Ore (Hanwright) Agreement Act Amendment Act* 1968 (WA)).

*French   CJ*
*Nettle     J*
*Gordon    J*

15.

adjusted, or the rights in relation to particular areas might be cancelled and new rights created by reference to the same or different block numbers referring to the same or different areas.  That reflects the nature of temporary reserves, the nature of mineral exploration and the power to obtain a mining lease under the Mining Act.  For example, cancellation of rights and the creation of new rights in relation to the same land occurred between the making of the 1967 Hanwright State Agreement and the making of the 1970 Agreement[33].

67        MBM had the right to occupy and prospect over the whole of the MBM area through the division of the Mount Bruce Temporary Reserves.  MBM obtained those rights to the MBM area from Hanwright under the 1970 Agreement.  What MBM did with those rights and how it won ore from the MBM area was a matter for it.  The commercial arrangement that was struck was that MBM would pay Hanwright a royalty based on the amount of ore won by it and all persons and corporations deriving title through or under it from any part of the MBM area, which had been held by Hanwright but transferred to MBM.

68        There is nothing in the text of the 1970 Agreement or the purpose or object of the transaction it was intended to secure[34] to suggest that the parties intended that Hanwright's entitlement to a royalty was conditional upon ore being won from the exercise of rights which Hanwright held at the time of the 1970 Agreement.

69        The appeal in S99 of 2015 should be dismissed with costs.

"Through or under" – S102 of 2015

70        As has been seen, Hanwright surrendered a defined area[35] – the MBM area – in exchange for a royalty for ore won from that area[36].  The commercial opportunity which MBM, a member of the Hamersley group, obtained was not limited to the rights Hanwright held when the 1970 Agreement was executed.

71        The royalty obligation in cl 3.1 of the 1970 Agreement was that "[o]re won by MBM from the MBM area will be subject to the payment to Hanwright of a base Royalty of 2.5% *on the same conditions as apply to the existing Agreement between Hanwright and Hamersley [Iron]*" (emphasis added).  The

33   See [20] above.

34   *Electricity Generation Corporation v Woodside Energy Ltd* (2014) 251 CLR 640 at 656-657 [35].

35   cl 2.2 of the 1970 Agreement.

36   cl 3.1 of the 1970 Agreement.

*French    CJ*
*Nettle    J*
*Gordon    J*

16.

"existing Agreement between Hanwright and Hamersley [Iron]" was a reference
to the 1962 Agreement.    It was common ground that the phrase "same
conditions" extended the obligation to pay royalties to "all persons or
corporations deriving title through or under" MBM because cl 3.1 incorporated,
by reference, cl 24(iii) of the 1962 Agreement, which included the following:

> "The expression [MBM] shall … include its successors and assigns and all
> persons or corporations deriving title through or under [MBM] to any
> areas of land in respect of which an obligation to pay any amount has
> arisen or may arise".

72          Ore is now being won from Channar A pursuant to ML 265SA.
ML 265SA is a 30-year mining lease granted to the Channar Joint Venturers[37]
on 8 May 1988 with effect from 22 February 1988.    A prerequisite to the Channar
Joint Venturers obtaining ML 265SA from the State was that MBM surrender
secs 18 and 19 of ML 252SA and Hamersley Iron surrender sec 238 of ML 4SA.
Sections 18 and 19 of ML 252SA were Channar B and were held by MBM.
Section 238 of ML 4SA was Channar A and was held by Hamersley Iron.

73          This is the second construction issue.    Are the Channar Joint Venturers
"persons or corporations deriving title through or under [MBM] to [Channar A]"?

74          That question raises a constructional choice.    Is the phrase "persons or
corporations deriving title through or under" MBM limited to succession,
assignment or conveyance or is it sufficiently broad to cover a close practical or
causal connection between the rights exercised by the Channar Joint Venturers
and the rights which MBM obtained from Hanwright under the 1970 Agreement?
The Court of Appeal adopted the former, narrow construction and held that the
Channar Joint Venturers' rights in respect of Channar A could not be traced back
to any "title" of MBM to the land[38].

75          The text of the 1970 Agreement itself provides indications that the phrase
"through or under" is broader than formal succession, assignment or conveyance.

76          First, cl 3.1 of the 1970 Agreement read with cl 24(iii) of the 1962
Agreement extends the royalty obligation.    It is a royalty obligation of MBM
which was and remains tied to identified areas of land – the MBM area.    But, as
has been seen, that area of land was accepted to be likely to be subject to some
adjustment and change[39].    Second, cl 3.1 does not refer to deriving title "from"

---

37    Under s 71 of the *Mining Act* 1978 (WA).

38    *Mount Bruce Mining Pty Ltd v Wright Prospecting Pty Ltd* [2014] NSWCA 323 at
[60], [63].

*French    CJ*
*Nettle     J*
*Gordon     J*

17.

MBM but rather it refers to deriving title "through or under" MBM.  The expression "through or under" has been acknowledged to be a relatively flexible one[40].

77          The surrounding circumstances further support that wider construction. At the time the 1970 Agreement was executed, the MBM area was defined by reference to temporary reserves – reserves which the parties knew, because of s 276 of the Mining Act, were of a particular nature (temporary occupancy for mineral exploration purposes).  The obligation to pay the royalty arose when one was won from that area.  A mining lease was necessary for that purpose and necessarily attached to a smaller area of land than the temporary reserves.  In other words, the 1970 Agreement was drafted on the basis that it was unlikely that title, in a legal sense, to the temporary reserves included in the MBM area would remain static.

78          Second, it was the surrender of secs 18 and 19 of ML 252SA (held by MBM) as well as the surrender of sec 238 of ML 4SA (held by Hamersley Iron) which were preconditions to the grant of ML 265SA (held by the Channar Joint Venturers).  As the trial judge found, "it may safely be inferred that MBM's surrender of secs 18 and 19 of ML 252SA and Hamersley Iron's surrender of sec 238 of ML 4SA, both of which were necessary for the grant of ML 265SA, were by arrangement between themselves and the Channar Joint Venturers"[41]. That finding was not challenged on appeal.  That is unsurprising.  Each of MBM, Hamersley Iron and Channar Mining Pty Limited (one of the Channar Joint Venturers) is part of the Hamersley group.

79          Third, the wider construction accords with commercial reality.  The extent of an ore body is unknown and work on one area is often dependent on work undertaken on an area adjacent to or near another area the subject of current exploration.  This is demonstrated by what happened when Hamex was granted rights of occupancy over TR 6663H, TR 6982H and TR 6983H, which together covered the whole of Channar A.  As we have seen, Hamex identified that the area (Channar A) was on the boundary of secs 18 and 19 of ML 252SA (Channar B) and that the proposed work was to *continue* structural and stratigraphic studies on existing data.  Of course, Hamex was not the member of

---

**39**  See [65]-[66] above.

**40**  See, eg, albeit in the different context of legislation governing commercial arbitration, *Tanning Research Laboratories Inc v O'Brien* (1990) 169 CLR 332 at 341-342; [1990] HCA 8; *Flint Ink NZ Ltd v Huhtamaki Australia Pty Ltd* (2014) 289 FLR 30 at 45 [57], 47 [63]-[64], 50 [72].

**41**  *Wright Prospecting Pty Ltd v Hamersley Iron Pty Ltd* [2013] NSWSC 536 at [128].

*French    CJ*
*Nettle      J*
*Gordon     J*

18.

the Hamersley group that held the temporary reserves which were included in ML 252SA or expired on the grant of ML 252SA. Those temporary reserves were held by MBM as part of the MBM area. These facts are referred to not as subsequent conduct, but as facts which demonstrate the nature of mineral exploration.

80        These circumstances make clear that the wider construction is consistent with the purpose or object of cl 3.1 of the 1970 Agreement (incorporating cl 24(iii) of the 1962 Agreement) and commercial reality, namely that after the division of the Mount Bruce Temporary Reserves and the allocation of the MBM area to MBM, it was the Hamersley group that had control over by whom, where and when the MBM area was developed. The price to be paid was that when ore was won from the MBM area "through or under" MBM, a royalty was payable to Hanwright.

81        For those reasons, the Court of Appeal erred in adopting a narrow construction of the phrase "through or under". The Court of Appeal correctly identified that it was faced with a constructional choice that had to be resolved not by reference to authority but by reference to the text and context of the 1970 Agreement[42]. However, the Court took as its starting point its decision in *Sahab Holdings Pty Ltd v Registrar-General (No 2)*[43], which concerned the statutory phrase "any person claiming through or under that person" in the *Real Property Act* 1900 (NSW). It did not follow from *Sahab* that continuity of a chain of title is always invoked by the phrase any person "deriving title through or under"[44]. Having regard to the proper construction of "through or under" in the context of the 1970 Agreement, the want of unbroken chain of "title" which the Court of Appeal relied upon was not determinative. The Court's reasoning would have had more force if cl 3.1 of the 1970 Agreement (incorporating cl 24(iii) of the 1962 Agreement) had referred to deriving title "from" MBM[45]. That was not the language of the clause.

---

**42**  *Mount Bruce Mining Pty Ltd v Wright Prospecting Pty Ltd* [2014] NSWCA 323 at [55]. See also at [87], [104].

**43**  (2012) 16 BPR 30,353 at 30,360 [28].

**44**  *Mount Bruce Mining Pty Ltd v Wright Prospecting Pty Ltd* [2014] NSWCA 323 at [55]-[56]. See also at [87], [104].

**45**  *Mount Bruce Mining Pty Ltd v Wright Prospecting Pty Ltd* [2014] NSWCA 323 at [67], [70]. See also at [87], [104].

*French    CJ*
*Nettle      J*
*Gordon    J*

19.

*Orders in S102 of 2015*

82          The appeal and cross-appeal in S102 of 2015 should be allowed.
Paragraphs 1-6 of the order made by the New South Wales Court of Appeal on
9 December 2014 should be set aside and in lieu thereof the appeal to that Court
should be dismissed with costs.  MBM should pay WPPL's and HPPL's costs in
this Court.

*Kiefel    J*
*Keane    J*

20.

83    KIEFEL AND KEANE JJ.   The material provisions of the agreements between the parties, the legislative background to those agreements, and the issues in dispute between the parties are stated in the reasons of French CJ, Nettle and Gordon JJ.  We gratefully adopt their Honours' summary, and proceed to state our reasons for concluding that, in both appeals, the arguments advanced on behalf of MBM should be rejected.

84        We turn first to the issue concerning the "MBM area".

The "MBM area"

85        The thrust of the case advanced by MBM under this heading was that Hanwright's entitlement to royalties in respect of iron ore won from the MBM area was confined to iron ore won by the exercise of rights under the tenements held by Hanwright at the time of the 1970 Agreement.  Hanwright's position was that the 1970 Agreement allocated to MBM the exclusive right to pursue the recovery of iron ore from the MBM area in return for the payment of royalties in respect of iron ore won from that land.

86        The primary judge (Hammerschlag J) held[46] that "the MBM area is the physical area indicated on the map attached to the 1970 Agreement as numbered blocks 4937H to 4946H and 4963H to 4967H."  His Honour held[47] that the rights conferred by Hanwright upon MBM under the 1970 Agreement "pertained to the entire expanse of land covered by TRs 4937H to 4946H and 4963H to 4967H." His Honour took[48] this to be the "commercially rational and sensible" outcome, based on an objective construction of the 1970 Agreement, incorporating cll 9 and 24(iii) of the 1962 Agreement.

87        The Court of Appeal agreed that the parties to the 1970 Agreement adopted a geographically based conception of the MBM area.  In particular, cl 1.1 refers to the "Mount Bruce Temporary Reserves" as "these blocks"[49]; and cl 1.4 provides that "[a]ll references to blocks or reserves include all present and future rights of Hanwright"[50].  It was held[51] that cl 1.4 expands the meaning of

46   *Wright Prospecting Pty Ltd v Hamersley Iron Pty Ltd* [2013] NSWSC 536 at [98].

47   *Wright Prospecting Pty Ltd v Hamersley Iron Pty Ltd* [2013] NSWSC 536 at [105].

48   *Wright Prospecting Pty Ltd v Hamersley Iron Pty Ltd* [2013] NSWSC 536 at [107]. See also at [89], [99], [102]-[104].

49   *Mount Bruce Mining Pty Ltd v Wright Prospecting Pty Ltd* [2014] NSWCA 323 at [42], [96].

50   *Mount Bruce Mining Pty Ltd v Wright Prospecting Pty Ltd* [2014] NSWCA 323 at [43].  See also at [95], [97].

21.

"blocks" but does not displace its primary signification of areas of land. In addition, cl 2.2 provides for the division of the rights conferred by the TRs to identified areas of land[52]. And, importantly, cl 3, the provision which actually creates Hanwright's entitlement to the payment of royalties on iron ore, operates by reference to the area of land from which that iron ore may be won[53]. As Macfarlan JA noted[54], "it is a more natural use of English to speak of ore 'won ... from' an area of land than of ore 'won ... from' a right".

88        MBM's principal submission challenging these conclusions was that the phrase "[o]re won ... from the MBM area" in cl 3.1 of the 1970 Agreement means "[o]re won from the exercise of the rights acquired from Hanwright in relation to temporary reserves 4937H to 4946H and 4963H to 4967H, or rights deriving therefrom", so that MBM's liability to pay royalties to Hanwright was confined to such ore. This meaning was said to be gleaned from a reading of the phrase "MBM area" in cl 2.2, with the instruction provided by cll 1.1 and 1.4. MBM submitted that the Court of Appeal erred in relying on the ordinary meaning of the word "area" given that it forms part of what was said to be a specifically defined expression.

89        MBM argued that cl 1.1, in stating that Hanwright "hold Temporary Reserves *in respect of areas* indicated on the attached map" (emphasis added by MBM), implies that the TRs are referred to as bundles of rights in respect of areas of land. MBM argued that the "point of reference" for understanding the phrase "these blocks" is not the land but the rights in respect of it. Further, cl 1.4, which provides that all references to blocks or reserves "include all present and future rights of Hanwright in relation to [them]", was said to indicate that the Court of Appeal erred in concluding that the word "blocks" in cl 1.1 refers to areas of land. It was argued that cl 1.4 ensures that all references to blocks be read as including present and future rights, and that there is no "primary signification" apart from that.

90        In argument in this Court, MBM put heavy emphasis on cl 1.4 as an "interpretative provision" of overriding significance in relation to the meaning of the words "blocks" and "reserves", so that the expression "MBM area", defined

51   *Mount Bruce Mining Pty Ltd v Wright Prospecting Pty Ltd* [2014] NSWCA 323 at [43]. See also at [44], [97].

52   *Mount Bruce Mining Pty Ltd v Wright Prospecting Pty Ltd* [2014] NSWCA 323 at [45]-[46], [100].

53   *Mount Bruce Mining Pty Ltd v Wright Prospecting Pty Ltd* [2014] NSWCA 323 at [46]-[47], [101].

54   *Mount Bruce Mining Pty Ltd v Wright Prospecting Pty Ltd* [2014] NSWCA 323 at [47].

*Kiefel    J*
*Keane    J*

22.

in cl 2.2 as "temporary reserves 4937H to 4946H inclusive and 4963H to 4967H inclusive", signifies the rights which MBM is to acquire in respect of those reserves. It was said to follow that the words in cl 2.2 "MBM acquires the entire rights thereto" mean that the rights being acquired are confined to the present and future rights described in cl 1.4 so that the phrase "MBM area" must be taken to refer exclusively to those rights.

91        MBM's emphasis on cl 1.4 as determinative of the scope of MBM's royalty obligations fails to recognise that cl 1.4 is not definitive of the "MBM area". It is expressed so as to *include* "all present and future rights" in the 1970 Agreement's references to "blocks and reserves". The words of cl 1.4 are not words of definition; they are words of extension, distinctly apt to ensure that references to "blocks and reserves" are understood to comprehend, *not only* areas of land affected by the tenements in question, *but also* all rights to explore and exploit those tenements which might be presently available to Hanwright or acquired by it in the future. And the inclusory reference in cl 1.4 to "extensions of the ore bodies located therein" is a reference to a physical phenomenon included in "blocks and reserves"; which tends to confirm that the blocks and reserves are themselves understood as physical phenomena.

92        The 1970 Agreement allocated to MBM the opportunity, exercisable over an indefinite period of time, to win iron ore from areas of land affected by the existing tenements. But the Agreement did not confine MBM's opportunity to the exercise of rights under the tenements which affected the land and provided a convenient description of it. The stance taken in this litigation by MBM fails to recognise that the 1970 Agreement was concerned with "rights" conferred by tenements granted by the State only insofar as rights were necessary to the realisation of the opportunity to explore and exploit the areas of land allocated for that purpose by the agreement between Hanwright and MBM.

93        The TRs themselves were rights of temporary occupancy; the right to extract iron ore depended on the terms to be agreed with the State[55]. The essential postulate of cl 3.1 of the 1970 Agreement was that iron ore would be extracted from the area allocated to MBM. It would have been obvious to the parties that the TRs would be replaced by other tenements, such as mining leases, if MBM's operations on the areas in question led to the recovery of iron ore, on which royalties would be payable. It follows that the details of the arrangements which might be made from time to time between MBM and the State over the course of exploring and exploiting the MBM area were of no moment to the parties to the 1970 Agreement.

94        The 1970 Agreement allocated to MBM the opportunity to pursue the exploitation of the MBM area in return for its promise of royalties upon iron ore

---

**55**    *Mining Act* 1904 (WA), ss 276, 277(3) and 277(4).

Kiefel      J
Keane      J

23.

being won from the realisation of that opportunity.  Both the opportunity and the obligation were to continue indefinitely.  The pursuit by MBM of that opportunity upon the lands allocated to it by Hanwright might be effected under various tenements granted by the State.  The circumstance that these tenements were not previously held by Hanwright could not, of itself, defeat Hanwright's entitlement to royalty payments.

"Persons … deriving title through or under" MBM

95        Hanwright's ongoing entitlement to royalties did not depend upon the exploitation of the tenements allocated by it to MBM; but by cl 24(iii) of the 1962 Agreement that entitlement did depend upon the recovery of iron ore under a title deriving "through or under" MBM.

96        A number of points may be made in relation to cl 24(iii) and its operation as part of the 1970 Agreement.  First, the protean quality of the phrase "through or under" must be acknowledged[56].  The nature and extent of the connections between things comprehended by a prepositional phrase of this kind depend on the context in which, and the purpose for which, the phrase is used[57].  As Brennan and Dawson JJ said in *Tanning Research Laboratories Inc v O'Brien*[58], "[t]he meaning of the phrase 'through or under a party' must be ascertained not by reference to authority but by reference to the text and context of" the provision in which the phrase appears.

97        The Court of Appeal drew support for its view of the scope of the phrase, "deriving title through or under" MBM, from *Sahab Holdings Pty Ltd v Registrar-General (No 2)*[59].  That case concerned the application of the phrase "any person claiming through or under that person" in s 12A(3) of the *Real Property Act* 1900 (NSW).  The Court of Appeal in this case placed reliance[60] on the following passage from the reasons of the court in *Sahab Holdings*[61]:

---

56    *Flint Ink NZ Ltd v Huhtamaki Australia Pty Ltd* (2014) 289 FLR 30 at 45 [57].

57    Cf *Tooheys Ltd v Commissioner of Stamp Duties (NSW)* (1961) 105 CLR 602 at 620-621; [1961] HCA 35.

58    (1990) 169 CLR 332 at 342; [1990] HCA 8.

59    (2012) 16 BPR 30,353.

60    *Mount Bruce Mining Pty Ltd v Wright Prospecting Pty Ltd* [2014] NSWCA 323 at [55].

61    (2012) 16 BPR 30,353 at 30,360 [28].

*Kiefel*        J
*Keane*        J

24.

> "… A claims 'through' B if A has acquired title or rights from B, or from someone who has acquired rights from B, and so on through howsoever many intermediary titleholders or holders of rights there might be between A and B.  One is looking at the history through which A's rights have been acquired".

98        At issue in *Sahab Holdings* was whether title to land acquired by registration of a transfer, within a system of title by registration as distinct from registration of title, could be said to be claimed through or under the previous holder of the title to the same parcel of land.  The decision in *Sahab Holdings* did not in any way purport to essay the full extent of the scope of the phrase "through or under".  Such an exercise was not necessary to resolve the issue addressed by the court; it was enough to hold that an unbroken chain of title was a sufficient connection for the purposes of the statutory provision in question[62].  And it is hardly conceivable that a different conclusion would have been reached given that the particular statutory provision in question assumed the possibility of succession to title between registered owners.

99        In the present case, the Court of Appeal framed the issue as whether "the Joint Venturers acquired title to the subject land (Channar A) *from* MBM" (emphasis added)[63].  Given the considerations of text and context which are material here, it is tolerably clear that the reference in cl 24(iii) to title derived "through or under" MBM cannot be taken to require a title acquired from MBM via an "unbroken chain of 'title' over Channar A linking the present owners … to MBM."[64]  Clause 24(iii) expressly includes in the meaning of the phrase "the Purchaser" two categories of persons.  It speaks, first, of the "successors and assigns" of MBM, and, secondly, of other persons, being "all persons" who derive "title through or under" MBM.  The second category cannot sensibly be confined to those persons who derive their title by succession or assignment from MBM:  the words creating the second category of "Purchaser" are not to be disregarded as being otiose.  As the primary judge rightly observed, the expression in question "clearly goes beyond formal succession, assignment or conveyance."[65]

---

62    *Mount Bruce Mining Pty Ltd v Wright Prospecting Pty Ltd* [2014] NSWCA 323 at [56], [60].

63    *Mount Bruce Mining Pty Ltd v Wright Prospecting Pty Ltd* [2014] NSWCA 323 at [67].

64    *Mount Bruce Mining Pty Ltd v Wright Prospecting Pty Ltd* [2014] NSWCA 323 at [63].

65    *Wright Prospecting Pty Ltd v Hamersley Iron Pty Ltd* [2013] NSWSC 536 at [125].

*Kiefel*    J
*Keane*    J

25.

100        The reference in cl 24(iii) to "areas of land" is to land affected by a current mining tenement pursuant to which iron ore is being won.  It does not invite an inquiry into whether parts of that land were, historically, included in a differently designated tenement or part thereof.   The Court of Appeal's focus upon Channar A as if it were itself an "area" of the kind referred to in cl 24(iii) was a distraction from the real issue, which led that Court to address the wrong question in proceeding to the conclusion that MBM's surrender of secs 18 and 19 of ML 252SA "did not result in the [joint venturers] acquiring Channar A from [MBM]."[66]

101        Quite apart from the point that the issue is not whether the joint venturers acquired their title *from* MBM, the Court of Appeal proceeded on the erroneous basis that the connection required by cl 24(iii) could be satisfied only if the land described as Channar A was itself specifically acquired from MBM.   The relevant "area" for present purposes is the land covered by ML 265SA, granted to the joint venturers by the State in May 1988; it is not the parcels of land previously covered by part of ML 4SA (ie the land designated as Channar A) and secs 18 and 19 of ML 252SA (ie the land designated as Channar B).

102        It is evident from the context in which cl 24(iii) appears, both in the 1962 Agreement, and in the 1970 Agreement, into which it was imported (in particular cll 1.1, 2.2 and 3.1 of the 1970 Agreement), that when cl 24(iii) speaks of "areas" it is not speaking, as MBM contended, of the precise physical location of a given body of iron ore which happens to have become the subject of a dispute between the parties.  Clause 24(iii) is speaking of the area of land affected by the tenement which identifies it and pursuant to which iron ore is being won when the question of the entitlement to royalties in respect of that ore arises.  As it happens, the parties chose, for the purposes of litigating their dispute, to speak of Channar A to refer to land previously designated as part of ML 4SA, and of Channar B to refer to land previously designated as secs 18 and 19 of ML 252SA.  But that choice could not and did not alter the effect of the 1970 Agreement; it certainly did not modify the meaning of "areas" in cl 24(iii).

103        The question is not whether "the Joint Venturers acquired title to the subject land (Channar A) from MBM"[67].   The real question is whether ML 265SA affects an area of land title to which was a title deriving "through or under" MBM.

---

**66**    *Mount Bruce Mining Pty Ltd v Wright Prospecting Pty Ltd* [2014] NSWCA 323 at [69].

**67**    *Mount Bruce Mining Pty Ltd v Wright Prospecting Pty Ltd* [2014] NSWCA 323 at [67].

*Kiefel      J*
*Keane      J*

26.

104        Given that, under an agreement to which approval was given by the *Iron Ore (Channar Joint Venture) Agreement Act* 1987 (WA), pursuant to which the State agreed to grant ML 265SA, it was a condition of the grant of ML 265SA that MBM surrender secs 18 and 19 of ML 252SA, it is correct, as a matter of ordinary language, to say that the joint venturers' title to ML 265SA was derived through or under MBM. Indeed, given that the surrender by MBM of its title to secs 18 and 19 was a condition of the grant of ML 265SA to the joint venturers by the State, it would be a distinctly odd use of language to say that the joint venturers' title to ML 265SA was not a title deriving through or under MBM.

105        Further, and as already noted, the 1970 Agreement was of indefinite duration. Its terms reflect the indifference of the parties to changes in the particular rights of exploration and exploitation that different mining tenements, as granted from time to time by the State, might confer on those actually winning ore from the land. The exigencies of exploration and mining over the long term meant that the opportunity of exploring and exploiting the areas of land conferred by the agreed allocation of areas between MBM and Hanwright would be exercisable under a variety of tenements granted by the State.

106        These observations direct attention to matters which may be taken to be known by each of the parties to the 1970 Agreement and which form part of the circumstances in which it was made. The parties may be taken to be aware that temporary reserves themselves provided only a right to occupation of lands which enabled further exploration. Mining leases and agreements with the State were necessary to undertake exploitation. They knew that tenements would be surrendered and regranted, sometimes as amalgamations of former tenements to the same or different tenement holders, while MBM pursued the opportunity afforded it by Hanwright with respect to the lands which MBM had identified as having potential for exploitation. They knew that once Hanwright had divested itself of the temporary reserves and MBM had acquired them, MBM could deal with them as it chose in the pursuit of its objectives in the MBM area. It could do so itself or in conjunction with any other entity which was then or might come to be part of the Hamersley group. It could do so with a third party.

107        A construction of the words "deriving title" in cl 24(iii) as meaning a chain of title analogous to that in systems of land registration could only be arrived at by placing undue emphasis upon those words to the exclusion of other words. In any event the possibility that such a meaning could have been intended is negated by reference to the circumstances surrounding the meaning of the 1970 Agreement and in particular the facts known to the parties. To the extent that there is any ambiguity arising from these words it is resolved in favour of the construction referred to above.

108        That regard may be had to the mutual knowledge of the parties to an agreement in the process of construing it is evident from *Codelfa Construction*

*Kiefel    J*
*Keane    J*

27.

*Pty Ltd v State Rail Authority of New South Wales*[68].    Mason J, with whom Stephen and Wilson JJ agreed, accepted that there may be a need to have regard to the circumstances surrounding a commercial contract in order to construe its terms or to imply a further term.    In the passages preceding what his Honour described as the "true rule" of construction[69], his Honour identified "mutually known facts" which may assist in understanding the meaning of a descriptive term or the "genesis" or "aim" of the transaction.    His Honour had earlier referred[70] to the judgment of Lord Wilberforce in *Prenn v Simmonds*[71], where it was said that:

> "[t]he time has long passed when agreements … were isolated from the matrix of facts in which they were set and interpreted purely on internal linguistic considerations."

109        In a passage from *DTR Nominees Pty Ltd v Mona Homes Pty Ltd*[72], to which Mason J referred[73], it was said that the object of the exercise was to show that "the attribution of a strict legal meaning would 'make the transaction futile'". In *Electricity Generation Corporation v Woodside Energy Ltd*[74], French CJ, Hayne, Crennan and Kiefel JJ explained that a commercial contract should be construed by reference to the surrounding circumstances known to the parties and the commercial purpose or objects to be secured by the contract in order to avoid a result that could not have been intended.

110        The "ambiguity" which Mason J said may need to be resolved arises when the words are "susceptible of more than one meaning."[75]    His Honour did not say how such an ambiguity might be identified.    His Honour's reasons in *Codelfa* are directed to how an ambiguity might be resolved.

---

68    (1982) 149 CLR 337; [1982] HCA 24.

69    (1982) 149 CLR 337 at 351-352.

70    (1982) 149 CLR 337 at 348-349.

71    [1971] 1 WLR 1381 at 1383-1384; [1971] 3 All ER 237 at 239.

72    (1978) 138 CLR 423 at 429; [1978] HCA 12, referring to *Prenn v Simmonds* [1971] 1 WLR 1381 at 1384; [1971] 3 All ER 237 at 240.

73    (1982) 149 CLR 337 at 351.

74    (2014) 251 CLR 640 at 656-657 [35]; [2014] HCA 7.

75    *Codelfa Construction Pty Ltd v State Rail Authority of New South Wales* (1982) 149 CLR 337 at 352.

*Kiefel      J*
*Keane      J*

28.

111        In reasons for the refusal of special leave to appeal given in *Western Export Services Inc v Jireh International Pty Ltd*[76], reference was made to a requirement that it is essential to identify ambiguity in the language of the contract before the court may have regard to the surrounding circumstances and the object of the transaction. There may be differences of views about whether this requirement arises from what was said in *Codelfa*. This is not the occasion to resolve that question.

112        It should, however, be observed that statements made in the course of reasons for refusing an application for special leave create no precedent and are binding on no one. An application for special leave is merely an application to commence proceedings in the Court[77]. Until the grant of special leave there are no proceedings inter partes before the Court[78].

113        The question whether an ambiguity in the meaning of terms in a commercial contract may be identified by reference to matters external to the contract does not arise in this case and the issue identified in *Jireh* has not been the subject of submissions before this Court. To the extent that there is any possible ambiguity as to the meaning of the words "deriving title through or under", it arises from the terms of cl 24(iii) itself.

114        As between the parties to the 1970 Agreement, MBM was assured exclusive enjoyment of the opportunity to exploit an area of land allocated to it irrespective of the nature or terms of the tenement by which such activities were authorised by the State. And in return for that opportunity, Hanwright was assured of the payment of royalties upon the proceeds of that exploitation. In this context, and given this purpose, to speak of title derived "through or under" MBM was to speak of a title to win iron ore from land where MBM had deployed its own title in order to facilitate the acquisition of any title pursuant to which that exploitation might be pursued. Under the *Iron Ore (Channar Joint Venture) Agreement Act* 1987, MBM's surrender of its title to secs 18 and 19 of ML 252SA facilitated the acquisition by the joint venturers of the title to ML 265SA. The evident purpose of cl 24(iii) was to ensure that royalties would be payable to Hanwright in respect of iron ore won by *anyone* from land in the MBM area so long as the exploitation of the land was carried on under a title the derivation of which was facilitated by the deployment by MBM of any title obtained by it in the course of its pursuit of the opportunity afforded by Hanwright.

---

**76**    (2011) 86 ALJR 1 at 2 [2]; 282 ALR 604 at 605; [2011] HCA 45.

**77**    *North Ganalanja Aboriginal Corporation v Queensland* (1996) 185 CLR 595 at 643 per McHugh J; [1996] HCA 2.

**78**    *Collins v The Queen* (1975) 133 CLR 120 at 122; [1975] HCA 60.

*Kiefel     J*
*Keane     J*

29.

115    Finally, it should also be said that a title so derived would not cease to be properly so described because its derivation was also effected by other means. Clause 24(iii) does not invite an inquiry as to the sole or predominant source from which the title of the Purchaser was derived[79]; and given the evident purpose of cl 24(iii), one would not be disposed to read it to mean that MBM's facilitation of the new derivation of title must be the sole and exclusive source of that title.

116    Accordingly, the primary judge was right to conclude that the joint venturers' title to exploit the area affected by ML 265SA was title derived "through or under" MBM.

Conclusion

117    We agree with the orders proposed by French CJ, Nettle and Gordon JJ.

---

**79**    *Actors and Announcers Equity Association v Fontana Films Pty Ltd* (1982) 150 CLR 169 at 193; [1982] HCA 23.

*Bell      J*
*Gageler   J*

30.

118    BELL AND GAGELER JJ.   These appeals do not raise an important question on which intermediate courts of appeal are currently divided.   That question is whether ambiguity must be shown before a court interpreting a written contract can have regard to background circumstances.

119        Until that question is squarely raised in and determined by this Court, the question remains for other Australian courts to determine on the basis that *Codelfa Construction Pty Ltd v State Rail Authority of New South Wales*[80] remains binding authority.   That point, which of itself says nothing about the scope of the holding in *Codelfa*, was made in the joint reasons for judgment in *Royal Botanic Gardens and Domain Trust v South Sydney City Council*[81].   The point was reiterated, but taken no further, in the joint reasons for refusing special leave to appeal in *Western Export Services Inc v Jireh International Pty Ltd*[82].   It should go without saying that reasons for refusing special leave to appeal in a civil proceeding are not themselves binding authority.

120        The question whether ambiguity must be shown before a court interpreting a written contract may have regard to background circumstances does not arise for determination in these appeals because the parties agree that the terms "MBM area" in cl 2.2 and "through or under" in cl 3.1 of the 1970 Agreement are ambiguous.   The parties also agree, consistently with numerous recent statements of principle in this Court[83], that the proper interpretation of each of those terms is to be determined by reference to what reasonable businesspersons having all the background knowledge then reasonably available to the parties would have understood those terms to have meant as at 5 May 1970.

121        To the extent that there is any issue of interpretative principle which divides the parties, that issue is limited to whether the meaning of the defined term "MBM area" can be informed by the defined term itself.   The issue is not to be resolved by invocation of the strictures of logic presumptively applicable to the interpretation of a defined expression within a complex statutory scheme[84].   It

**80**    (1982) 149 CLR 337; [1982] HCA 24.

**81**    (2002) 240 CLR 45 at 63 [39]; [2002] HCA 5.

**82**    (2011) 86 ALJR 1 at 2-3 [3]-[4]; 282 ALR 604 at 605; [2011] HCA 45.

**83**    See *Electricity Generation Corporation v Woodside Energy Ltd* (2014) 251 CLR 640 at 656-657 [35] (and the cases there cited), 662 [53]; [2014] HCA 7.   See also *Maggbury Pty Ltd v Hafele Australia Pty Ltd* (2001) 210 CLR 181 at 188 [11]; [2001] HCA 70.

**84**    Cf *Wacal Developments Pty Ltd v Realty Developments Pty Ltd* (1978) 140 CLR 503 at 507; [1978] HCA 30.   See also *Commissioner for Railways (NSW) v Agalianos* (1955) 92 CLR 390 at 397; [1955] HCA 27.

*Bell        J*
*Gageler    J*

31.

is to be resolved instead by reference to the overriding criterion of how reasonable businesspersons can be taken to have understood the term. In the absence of the background circumstances indicating some reason to think otherwise, it is therefore appropriate to proceed on the assumption that the words chosen as the label for the defined term were not chosen arbitrarily but as "a distillation of ... a concept intended to be more precisely stated in the definition"[85].

122        No other issue of interpretative principle falls for determination in these appeals. Indeed, no other issue has been argued.

123        Save that we see no occasion to address the "true rule" stated by Mason J in *Codelfa*, we agree with the reasons given by Kiefel and Keane JJ for concluding that Hanwright's interpretation of each of the disputed terms is to be preferred. For those reasons, we agree with the orders proposed by French CJ, Nettle and Gordon JJ.

---

**85**    *Chartbrook Ltd v Persimmon Homes Ltd* [2009] AC 1101 at 1112-1113 [17].