UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARK WARREN PEARY, individually and in his capacity as executor of the Estate of Joseph Shuster,

        Plaintiff,

vs.

DC COMICS, INC., et al.,

        Defendants.

Civil Action No. 1:25-cv-00910-JMF

**DECLARATION OF THE RT. HON. PROFESSOR SIR ROBIN JACOB, INSTRUCTED BY THE PLAINTIFF, IN RELATION TO THE MOTION FOR A PRELIMINARY INJUNCTION**

---

I, the Right Honourable Professor Sir Robin Jacob, declare and state as follows:

**A.    Qualifications and Experience**

1.    I am the Hugh Laddie Professor of Intellectual Property Law in the Faculty of Laws of University College London[1]. I am also a member of the Chambers of Daniel Alexander KC, 8 New Square, Lincoln's Inn, London, WC2A 3QP. I joined those Chambers in 1967 and practiced as a barrister from there until my appointment as a High Court Judge in 1993. In 1981, I was appointed Queen's Counsel (QC), a title which automatically changed to King's Counsel (KC) upon the death of Her Majesty Queen Elizabeth II. Following my retirement from the Court of Appeal in 2011, I re-joined chambers to conduct my professional work as an arbitrator, expert witness, mediator and like from there. I am not entitled to and do not practice as a barrister[2]. I am a member of the Privy Council, the body which acted as in effect[3] the court of last resort for all Commonwealth nations at the passage of the 1911 Copyright Act.

---

[1] The Faculty is ranked 1st for Law in The Times Good University Guide 2025.

[2] Appointment to the High Court automatically has the effect of cancelling these.

[3] Actually, the form of the decision then was advice to the King who would formally endorse it. I appeared as counsel before the PC in two cases, the Lego one mentioned below and on a trade mark appeal from Trinidad.

2. A copy of my current curriculum vitae is attached to this Declaration as **Exhibit 1.** It will be seen that I have much experience in intellectual property of all kinds. Throughout my career I have been involved in copyright work as a legal advisor, barrister, Deputy Chairman of the Copyright Tribunal, High Court Judge and Lord Justice of Appeal[4], and now, Professor, arbitrator, expert witness and mediator

3. I cannot recall all the copyright cases and work in which I have been involved. The following are some of them[5]:

   (i) In my early years as a junior barrister, I was counsel for the British Phonographic Institute and did many cases (often several a week) involving record (disk) piracy.

   (ii) I did a lot of cases concerned with copyright in design drawings for manufactured articles. These included bath racks, a baby carrier, a letter-box draught excluder, a computer chip (as early as 1975) and many other things.

   (iii) I was counsel for Tyco, a US toy company which made near perfect copies of Lego bricks. I appeared in all the Hong Kong proceedings (for an interim injunction) at first instance and appeal and in the main hearing at first instance, appeal in Hong Kong and final appeal to the Privy Council in London. Tyco prevailed and Lego then sued them in Australia where I was called to the Bar in New South Wales. Tyco prevailed there too. I was subsequently made a QC of New South Wales and the Federal Bar and am now a KC of both. I have my name on the list of members of a leading set of Chambers in Sydney called Nigel Bowen Chambers[6].

   (iv) I did a number of music copyright cases as counsel and judge. I successfully defended Vangelis who was accused of copying Chariots of Fire from the theme

---

[4] The formal title of a judge of the Court of Appeal of England and Wales.

[5] There will be others.

[6] It is purely honorary – I do not have a practicing certificate.

music of a Greek soap opera. I defended George Michael who was accused of copying a piece of music – the plaintiff gave up shortly before trial. As a judge I found in favour of Bjork who was accused of copying. In the Court of Appeal, I was a member of the Court which held that there was copyright in a modern re-creation of the work by the court composer to King Louis the Fourteenth of France and gave my own judgment on the point.

(v) Another Court of Appeal decision in which I was involved during my service was that cited by Mr Ian Mill KC at his paragraph 2. The case was *Novello v Keith Prowse*. Indeed, I gave a terse assenting judgment. While neither the case itself nor my opinion expressed below bear on the issues before this Court, given its mention by others, I reproduce my judgment as an indication of my view of the point in that case:

> I agree with the reasoning of Lloyd J. I also agree with his final comments and echo them myself. At its heart Mr Garnett's submissions amount to this: that an author who had invalidly tried to assign the reversion before June 15, 1957 could not do so thereafter, whereas an author who had never tried to do so could. That is absurd and cannot be the law. There is no need to read cl.28(3) in that way. "Without prejudice to the generality . . ." does not extend the generality. It falls within it.

(vi) Finally, by way of my expertise in copyright law, I should mention that for about four years before I was appointed to the High Court, I was a Deputy-Chairman of the Copyright Tribunal created by the Patents, Designs and Copyright Act 1988 to replace the former Performing Right Tribunal but with additional jurisdiction. I presided over a 5-man tribunal to fix the rate of royalty for records (disks and tapes then) for the use of music copyright.

### B.  Materials Reviewed

In forming my opinions, I have relied upon the following materials, the truth of which, except as to matters of law, I have assumed, particularly in light of the apparent absence of disputes as to historical facts:

- The Plaintiff's Complaint dated 31 January 2025;
- The Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction dated 28 February 2025;

- The Central District of California's decision in *DC Comics v. Pacific Pictures Corp.*, 2012 WL 4936588 (C.D. Cal. 2012);

- The Ninth Circuit Court of Appeals' decision in *DC Comics v. Pacific Pictures Corp.*, 545 F. App'x 678 (9th Cir. 2013) ("*Shuster I*");

- The Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction dated 7 April 2025;

- The expert reports, of the same mentioned date, of Messrs Ian Mill, KC, Daniel Glover, Carlos Salizzo, and Ms Anita Cade.

### C. The Copyright Act 1911 and the proviso to its section 5(2)

4. Before I turn to the specifics of this case I should say something about the Act itself and the proviso in particular.

#### *(a) The Act generally*

5. Prior to this Act copyright law in the UK had grown from the first (in the world) copyright statute, known as "the Statute of Anne, 1710". It only provided for copyright in books – literary copyright. Over the next nearly 200 years, Act by Act various other types were included and the term increased from time to time. The 1911 Act repealed all the previous Acts (which had been described as "a glorious muddle") consolidating everything into one Act and increased the term of copyright to comply with latest revision of the Berne Convention (1907)[7].

6. The Act applied it to the colonies of Britain too, not just the UK. Part 1 of the Act contains its key provisions. It is headed "Part 1 Imperial Copyright". The Act applied directly to existing colonies. Provision was made for it to apply also to British possessions which were already self-governing if the legislature of the possession so declared. The details of this do not matter for present purposes – it suffices to note that in practice this Act became the law of every part of the then British Empire – indeed it is because the law in Australia was the same as that of the UK (and HK) that I was chosen as counsel to argue the Australian *Lego v Tyco* case.

---

[7] The first version of the Convention was in 1887.

7. Given this fact, it was the Imperial Act providing for essentially the same law of copyright in all parts of the then very extensive British Empire – many more than the four countries in respect of which the entity once known as Detective Comics and its successors ("DC") has provided expert evidence. I will later collectively call all such countries the "Proviso Countries". In this respect, I concur with the opinions of DC's experts that, given the more limited law concerning the proviso outside the UK itself, present and former Commonwealth courts may look to English law for guidance.

*(b) The Proviso*

8. Section 5(2) of the 1911 Act begins by providing, in short, that copyright is assignable and licensable. The detailed language does not matter. What does is the proviso (to which I subsequently refer to as the "Proviso") that reads:

> Provided that, where the author of a work is the first owner of the copyright therein, no assignment of the copyright, and no grant of any interest therein, made by him (otherwise than by will) after the passing of this Act, shall be operative to vest in the assignee or grantee any rights with respect to the copyright in the work beyond the expiration of twenty-five years from the death of the author, and the reversionary interest in the copyright expectant on the termination of that period shall, on the death of the author, notwithstanding any agreement to the contrary, devolve on his legal personal representatives as part of his estate, and any agreement entered into by him as to the disposition of such reversionary interest shall be null and void, but nothing in this proviso shall be construed as applying to the assignment of the copyright in a collective work or a licence to publish a work or part of a work as part of a collective work.

9. Subject to the point about what is meant by "legal personal representatives" I discuss later, here does not appear to be any dispute as to the meaning of the Proviso. A first author can assign his or her copyright, but not for that part of the copyright term starting 25 years after the year of his or her death and ending upon expiry of the copyright[8]. Any purported assignment of the copyright for this period made by the author in his lifetime is "null and void."

---

[8] Originally expiry was 50 years from the end of the year of the author's death. It is now 70.

10. Nor is there any dispute that the Proviso was preserved by the 1956 Copyright Act which replaced the 1911 Act. It did so by paragraph 28(3) of the 7th Schedule to that Act which reads:

> Without prejudice to the generality of sub-paragraph (1) of this paragraph, the proviso set out in paragraph 6 of the Eighth Schedule to this Act (being the proviso to subsection (2) of section five of the Act of 1911) shall apply to assignments and licences having effect in relation to copyright under this Act in accordance with that sub-paragraph, as if that proviso had been re-enacted in this Act.

It was this paragraph which was the subject of the *Novello case* mentioned above.

11. To help forming this opinion I researched the history of the Proviso to try to discover what was said about its purpose. It is not possible to see from Parliamentary records any reasons for it. This is because it was not in the Bill as originally introduced to Parliament. It was introduced at the Committee stage and unfortunately in those days no record was taken of what was said in Committee. All one has are the minutes of what was decided, i.e., to include the Proviso as the Act proceeded further through Parliament.

12. I have however found what was said about the Proviso by the learned author F.E Skone James. At p. 117 of the 6th (1927) edition of "Copinger on Copyright"[9] he said this:

> The proviso to section 5, sub-section 2 was of course, inserted in the interests of an author's family, to prevent, if possible, a successful author from making improvident contracts to the detriment of his dependents.

13. He goes on to say that the Proviso is not likely to work in the case of a successful author and explains why. He did not consider the position in this case – an unsuccessful author whose work becomes immensely successful. **Exhibit 2** (attached) is the full text.

---

[9] A legal textbook on copyright now in its 18th edition. It was the only textbook on the subject until around the 1970s.

14. The important point about this history is that the Proviso was to protect the interests of the author's family.

### D. The Facts of the Present Case

15. In 1938 the original authors, Joseph Shuster and Jerome Siegel, assigned all their copyrights in Superman to Detective Comics, Inc for $130.

16. Joseph Shuster died on the 30th July 1992. He was resident in California then, at the time he made his will and indeed, for long before that.

17. He left a will dated June 28, 1988. Jean Peavy, his sister is named as sole beneficiary with provision as to who would inherit in the event she pre-deceased him.

18. As regards executors the will provided this:

> I hereby nominate and appoint my sister, Jean Adel Peavy, executrix of this my Last Will and Testament, to act without bond. In the event that my sister is for any reason unable or unwilling to act as executrix hereof, I nominate Mark Warren Peary to act as executor, also without bond.

19. This positioning in the alternative, and the effect of any declination to act, would be considered by the relevant courts to be matters of California law, in which I am not expert.

20. Joseph Shuster's assets were very valuable by then – for pursuant to the Proviso it included the Superman copyrights for the last 25 years of the then 50-year post-mortem period commencing on 1st January 1993 – the "reversionary copyrights". But it is very unlikely that Jean Peavy or Mark Peary knew about the reversionary copyrights. Apart from these the estate was worth very little. Jean Peavy was also close to destitute.

21. On 10th February 1992, just six months after Joseph Shuster's death, Jean Peavy and Frank Shuster, apparently without the advice of counsel, signed an agreement drafted by DC, "dated as of August 1st 1992" (the day after Joseph died) which in effect (I do

not need to repeat the language, most of which one can doubt either Jean Peavy or Frank Shuster understood) which purported to convey to DC any interest they may have in the Superman copyrights for a mere $25,000 a year.

22. I understand that there was litigation in California over a decade ago about the US copyrights in Superman, which I have reviewed. It was held that the 1992 agreement (which was assumed to be valid) had the (to my eyes at least) surprising effect of transferring the Joseph Shuster's US copyright interest in Superman assigned by the 1938 agreement back to Joseph Schuster's Estate and near simultaneously, re-assigning it back to DC.[10]

### E.   The Opinions of Messrs Ian Mill KC (UK), Giancarlo Salizzo (Ireland), Daniel Glover (Canada), and Ms Anita Cade (Australia)

23. I have read each of these opinions. They each make essentially the same three points which I summarise thus:

(1) The "Re-grant" point.

The notion here is that the 1992 agreement re-assignment and re-grant point means that the Proviso simply did not come into play at all – there was no longer an assignment made during the life of the author to which the Proviso could apply. It is said an English court would follow the Californian decisions

(2) The 1992 assignment by Jean Peavy was effective.

The argument here is that Jean Peavy, as named executrix in her brother's will, had power to deal with the estate even though probate had not been (and never was) granted to her, and she declined to serve as such when the will was probated.

---

[10] I find this surprising. I do not think an English court would have so decided had the matter been a question of English law.

(3) Because the UK reversion provisions permit a legal personal representative to assign the reversionary interest at any time one only has to apply the local law (English, Irish, Canadian, Australian, as the case may be) to see that if there was a reversionary interest to assign, it was assigned.

**My Opinion**

    **A. Jean Peavy is not shown to have authority to enter the 1992 agreement.**

24. All four opinions fail for essentially the same reason. That reason is that it is not shown that Jean Peavy had authority to enter into the 1992 agreement. True she was named as executrix in the will. But the will was made in California by a long-term Californian resident domiciled in California. Whether or not a person named as executor in a Californian will has power in absence of the grant of probate to deal with estate property must be a single question – one to be answered by Californian law. This question cannot depend on the local law of assets within a particular jurisdiction. Otherwise you could, and likely would, get different results for assets in different countries, completely muddling the ownership of such property.

25. More specifically one country may have different rules for powers to deal with estate assets prior to probate than other countries. One can see how under one system a named executor may be permitted to enter into minor transactions, e.g., pay electricity bills out of estate assets, but not major transactions like this. Other systems may allow any kind of dealing. It may also depend on the size of the estate because giving all but a very minor fraction of the estate without probate could also have a major effect on any payable inheritance tax. None of the expert evidence has addressed this fundamental question.

26. I also note paragraphs 41 to 45 of the Complaint. If those paragraphs are right (again, I am no expert in Californian law, but neither do any of DC's expert witnesses claim such expertise) all three points made by DC's experts fall away because each of them depends on the 1992 agreement being valid. It was not, if Jean Peavy had no legal authority under California law to enter into it without probate being opened and her subsequent appointment as executrix.

### B. Jean Peavy was not a "legal personal representative" with the meaning of the Proviso.

27. There is another point to be made. The *Peer* case exhibited by Mr Mill as Exhibit C contains some important passages about the meaning of "legal personal representatives" in the Proviso, passages which he does not reproduce. I set these out here:

> [58] At an early stage, after reference had been made to section 5 (2) of the 1911 Act supra, it came to be seen that the proviso put a difficulty in Peer's way where it relied other than on an original agreement. In particular there was a difficulty as to its assertions that there had been assignments to it of the 1911 Act reversions, namely as to the English copyright in respect of a period beyond the expiry of 25 years after the composer's death. The 1911 Act provides, as I have referred to, that the 1911 Act reversion "shall … devolve on [the composer's] legal personal representatives as part of his estate".
>
> [59] Who are such "legal personal representatives"? The English copyright is movable property situate in England. In the ordinary course an English court does not, with respect to such property, look into whether some one or more persons, either by way of the order of some foreign court or otherwise, have become describable as "legal personal representatives" but rather expects an English grant to be made that includes the property in question. Thus one finds in *Dicey & Morris, Conflict of Laws, 13th Edition 2000*, under the general editorship of Mr Lawrence Collins, as he then was, the following at Rule 127 and thereafter:-
>
>> "Rule 127 – A grant of representation or other authority to represent a deceased person under the law of a foreign country has no operation in England.
>>
>> ……….
>> ……….
>>
>> Comment
>>
>> 26-037 The general rule is that a foreign representative of the deceased who wishes to represent him in England must obtain a grant of representation here and cannot sue in his character as a foreign personal representative. The rule, is, in short, an application of the general principle that no person will be recognised by the English courts as personal representative of the deceased unless and until he has obtained an English grant of probate or letters of administration."
>
> I omit matter immaterial here and come to the key passages:

> [71]    However, I am glad to find I have no need to hold *Redwood* to be wrong. In that case there had been persons whom, it seems, could fairly be described as having the characteristics of "legal personal representatives" within a loose but ordinary usage, namely Mr Simons' three United States executors. Given (applying English law by analogy) that their title as executors was *conferred* upon them by Mr Simons' will irrespective of whether there had been a United States or English grant to them, they could, as it seems to me, be described, without abuse of language, as personal representatives and the fact that the judgment speaks of their having made an assent suggests that that was so. But it is, in my view, too big a jump to move from regarding persons who, despite the absence of any English grant could, for the reasons I have given, be fairly describable as "legal personal representatives" to concluding that *anyone* becoming entitled to the English personal property in any capacity on the death of someone domiciled abroad can be, without more, regarded as a "legal personal representative" within the proviso. Robert Goff J. had no need to go that far and I have no reason to think that he meant to or did.
>
> [72]    <u>I confess my preferred construction of the proviso would be to limit "legal personal representatives", consistently with the observations in *Dicey*[11], to those obtaining an English grant but if that is wrong I would limit them so as to exclude the very different categories composed of heirs, next-of-kin, devisees, legatees or creditors in respect of whom no grant or order of any Court, English or foreign, has been made as to title to or as to the vesting of the deceased's personal property</u>. I do not expect, in the absence from the 1911 Act of any express provision in that behalf, that persons in such categories were intended to be included by the legislature; I find no authority that requires them to be included and the fact that it may, in the case of some foreign jurisdictions, be more difficult to separate the categories I have described than it is in this one merely strengthens the reasons for my preferred construction.

28.    This is an unequivocal <u>considered</u> opinion of Lindsay J, a widely respected judge of the Chancery Division, the Division of the High Court to which probate matters are assigned. I have underlined the key parts. Lindsay J's opinion is clear: that "legal personal representative" means someone who has obtained a *"grant or order of any Court, English or foreign . . . as to the vesting of the deceased's personal property."* That is, a formally authorized person. Jean Peavy was not such a person at the time of the 1992 agreement or ever.

29.    Mr Mill does not go so far as to say Lindsay J was wrong. He brushes this opinion aside, merely saying in his footnote 3: "Its brief observations on the position where there is a will are obiter dicta". I do not know whether US lawyers use that Latin

---

[11] Dicey is the leading UK book on Conflict of Laws.

phrase – it means an expression of the law not necessary to the decision. That may be so, and it is indeed not long. But one only has to read it to see that it is to the point and very seriously considered. In my opinion it would be followed in the English courts[12]. That would mean Jean Peavy had no power to do what the 1992 agreement purported to do – to convey the English copyright in Superman – absent a court order empowering her so to do. The power to do that has instead fallen on Mr Mark Warren Peary, who has obtained probate of the estate in California.

### C. The Re-Grant theory cannot apply to the reversionary copyrights.

30.   The suggestion is that the 1992 agreement conveyed the Superman copyrights (originally assigned to DC in 1938) from DC to Jean Peavy, who near simultaneously re-assigned them back to DC[13]. It is then said that this re-assignment, because it was made post-mortem, did not fall within the scope of the Proviso at all because that applies only to assignments whilst the author was alive.

31.   The argument is fallacious for one simple reason. The Proviso vested the reversionary interests of the copyrights in the estate the very moment Shuster died. Thus, the reversions were assets of the estate already, not DC or Ms Peavy, at the time of the 1992 agreement. So, Ms Peavy could not "revoke" them and DC could not "re-assign" them by the agreement.

32.   So, in my opinion the Re-Grant theory, whilst it may have applied to copyrights in countries not subject to the Proviso, could not apply in any Proviso Country. Any other result would additionally read the Proviso's "notwithstanding any agreement to the contrary" out of the statutes concerned.

---

[12] It is seldom that a considered expression of opinion, even if obiter dicta, is disregarded.

[13] This was the effect given by the Californian cases, which were concerned only with US copyright and US law. The US never had a provision like the Proviso.

### D.  Estoppel

33. Does what common law courts outside the US call "issue estoppel,", and which I understand US courts call "collateral estoppel" or "issue preclusion", apply? In my opinion no. It is true that any <u>precise</u> issue fairly litigated, even in a foreign court, can be the subject of an issue estoppel. But in my opinion no UK court would consider *Shuster I* preclusive on the issue of Ms Peavy's authority to act either for herself or an estate. The issues are different. Moreover, on appeal, the decision was that, for purposes of the US copyrights at issue, the fundamental issue of Jean Peavy's probate authority had been waived. That was of course in those proceedings. There was no decision on the point – no decided issue which is subject to re-litigation now. There is no potential for a conflicting result by a different tribunal, the evil the doctrine of issue estoppel aims to prevent.

34. I only add one other thought. The penultimate paragraph of the 1992 agreement strongly suggests that DC were aware that it might be open to challenge – why else would it make an express provision for payback if the agreement were ever challenged?

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. Executed on <u>20</u> April 2025.

BY: *Robin Jacob*

The Rt. Hon. Professor Sir Robin Jacob